F1S8SOK1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MARK I. SOKOLOW, et al.,

 4               Plaintiffs,

 5          v.                              04 CV 397 (GBD)

 6   PALESTINE LIBERATION
     ORGANIZATION, et al.,
 7
                 Defendants.
 8
     ------------------------------x
 9                                          January 28, 2015
                                            9:15 a.m.
10
     Before:
11
                      HON. GEORGE B. DANIELS,
12
                                            District Judge
13
                           APPEARANCES
14
     ARNOLD & PORTER LLP
15        Attorneys for Plaintiffs
     BY:  KENT A. YALOWITZ
16        PHILIP W. HORTON
          TAL MACHNES
17        SARA PILDIS
          CARMELA T. ROMEO
18        RACHEL WEISER

19   MILLER & CHEVALIER, CHARTERED
          Attorneys for Defendants
20   BY:  MARK J. ROCHON
          LAURA G. FERGUSON
21        BRIAN A. HILL
          MICHAEL SATIN
22        DAWN E. MURPHY-JOHNSON

23   Also present:  RACHELLE AVITAL, Hebrew interpreter
                     RINA NE'EMAN, Hebrew interpreter
24

25
```

F1S8SOK1

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning.

3           Let me put aside the issue of the deposition

4    designations.  I guess they go into three categories.  One,

5    whether they should be allowed at all; two, whether or not in

6    fairness the plaintiffs should read a portion at the same time

7    when they read their portion; and, three, whether or not it's

8    admissible on the defendants' case.

9           The first objection by the plaintiff to the

10   designation by the defendant is Jadallah, and I partially agree

11   with the plaintiff.

12          MR. YALOWITZ:  I apologize.  I am having a little

13   trouble hearing you over this machine.

14          THE COURT:  All right.  I will keep my voice up.

15          On the designation on page 27, I think the portion on

16   27 and the top of 28 in fairness should be read at the same

17   time.  It's the same inquiry about the financing.

18          The portion that is at the bottom, line 17 through the

19   next page, line 10, I don't think given the way the answer was

20   given he has any basis one way or the other to make these

21   statements.  Clearly not firsthand knowledge.

22          The question was whether or not moneys in any currency

23   transferred from the Palestinian National Authority directly or

24   indirectly to the Al Aqsa Martyrs Brigades for the time period

25   1999 to 2005.

F1S8SOK1

1          Unless you can tell me on what basis he has some

2    personal knowledge of every single transfer, whether direct or

3    indirect, that went to the Al Aqsa Brigade, I don't think he

4    has any firsthand knowledge of that.

5          MR. HILL:  If I could address that.  He does explain

6    the answer on 129.  He is saying that because by law they are

7    only allowed to transfers moneys for things that are in the

8    budget and that thing was not in the budget, therefore, there

9    were no transfers that day as a matter of law.  That is what he

10   is saying.  He does have personal knowledge of that because he

11   works in the finance ministry and manages the budget.

12         THE COURT:  I take that not in support of your

13   position but in opposition of your position.  If that's the

14   basis on which he is giving that testimony, that's further

15   evidence that it's not direct evidence of his knowledge of

16   whether or not there was money transferred, directly or

17   indirectly, to the Al Aqsa Martyrs Brigades.  Then there would

18   be some logical conclusion for him to draw, but that is clearly

19   not the fact.  He makes clear he doesn't know.  He says just

20   because it's not in the budget line, it never happened.  He is

21   not in the position to say that.

22         That's the basis on which he is saying he is basing

23   that answer and that's not a direct, nonhearsay knowledge that

24   gives him a basis to say, therefore, because it's not a line in

25   the budget he concludes that no money was ever transferred,

F1S8SOK1

1    directly or indirectly, to the Al Aqsa Martyr Brigades.

2            MR. HILL:  I think it's a lay opinion that the jury is

3    entitled to hear based on his knowledge, and I would ask the

4    court, if not requiring the plaintiffs to read it now, allow us

5    to read it in our case when we read the other portions.

6            THE COURT:  No.  I have considered it.  I don't think

7    there is a basis for a lay opinion on this fact.  It's either

8    fact or not a fact.  He has no layperson's opinion as to

9    whether or not the Al Aqsa Martyrs Brigade got the money.  If

10    someone slipped him money, then the best he can say is he did

11    it to the best of my knowledge.

12            MR. HILL:  What is he saying is if it was done, it was

13    done contrary to the law and the budget.

14            THE COURT:  No.  He said it wasn't done.  That's part

15    of the problem.  He said there is no money transferred to

16    anything other than what is in the budget.  He doesn't know

17    that.  He has no basis.  It's not even a legitimate opinion.

18            MR. HILL:  He does, your Honor, because he

19    administered the budget during the relevant time frame.

20            THE COURT:  He doesn't know what happened to the money

21    after it's transferred to the budget line or if someone else

22    decides to give the money to the Al Aqsa Martyrs Brigades.  He

23    is saying all he knows is it's not a budget line so they must

24    not have gotten the money.

25            MR. HILL:  We think it is relevant and probative and

F1S8SOK1

1  based on his personal knowledge.  I understand the court's

2  ruling.

3          THE COURT:  That part is out.

4          MR. YALOWITZ:  Do we end with the answer on 15?

5          THE COURT:  You end it at 11 on 28.

6          I think the continued Q and A about the budget matter

7  on 188, I think that that is an appropriate part of that

8  discussion that the plaintiff wants to read.  That portion

9  should be read.

10          I am not going to require the plaintiff read the 192,

11  line 21.  It's likely I will let the defendant read the rest of

12  it, if they want to read it, but the exchange about the

13  intifada, I don't think the plaintiff should be required to

14  read that.  If the defendants want that read --

15          MR. YALOWITZ:  Where are we?

16          THE COURT:  I'm on page 192.

17          MR. YALOWITZ:  Are we on Al-Sheikh?

18          THE COURT:  No, Jadallah.

19          MR. YALOWITZ:  Your Honor, I'm sorry.  I thought we

20  were on 188 through 190 for Jadallah.  Maybe I am just

21  looking -- maybe we are looking at different sheets.

22          THE COURT:  We are because I am at 192.  Are you on

23  192 to 193?

24          MR. YALOWITZ:  Not on Jadallah.  Let me look at

25  Al-Sheikh.

F1S8SOK1

1           THE COURT:  Am I correct from defendant you were

2     seeking to offer Jadallah, I have 188 through 193.

3           MR. YALOWITZ:  190, line 2.

4           THE COURT:  192, line 22.  You don't have that.

5           MR. YALOWITZ:  No, sir.

6           THE COURT:  Is that a portion that the defendant

7     designated?

8           MR. HILL:  Bear with me, your Honor.

9           THE COURT:  You just have 188 through 190.  Does that

10    mean you don't have any objection to 190 through 193?  I have

11    190 through 193.

12          MR. YALOWITZ:  What it is intended to mean is that

13    when they sent me an e-mail Friday night saying, these are in

14    fairness designations, this chart was the limit of their in

15    fairness designations.

16          THE COURT:  That's not the limit of what I have been

17    given.

18          Do you have a copy of this?

19          MR. YALOWITZ:  I have that in the back, your Honor.

20          THE COURT:  We will skip over that.

21          MR. YALOWITZ:  They put that aside and said that's not

22    part of our in fairness designations.

23          They can pop up and say no, it is, but I think the

24    record in the correspondence between us is that their in

25    fairness designation ends at 190, line 2, and I think their

F1S8SOK1

1  silence on that is an admission here.  If they have some other

2  documentation that they did send me that, I am pleased to be

3  corrected.

4              THE COURT:  What did you intend, Mr. Hill?

5              MR. HILL:  We did intend to stop for the in fairness

6  portions at 190, line 1.  We intend to offer this portion in

7  our case.

8              THE COURT:  OK.

9          Then Al-Sheikh, I looked at that a little more

10  carefully.  On Al-Sheikh, I think the plaintiffs, if you're

11  going to read page 5, I think you should read page 14.  And I

12  think you should read page 15.  I don't think the plaintiffs

13  should have to read pages 16, 17.

14              MR. YALOWITZ:  I think the problem here, your Honor,

15  is somehow what the defendants have given you is broader than

16  what their in fairness designations are.

17              THE COURT:  That might be my mistake by not reading

18  the correspondence.

19              MR. YALOWITZ:  There has been so much paper flying at

20  you.

21              THE COURT:  Do I have a copy of that letter?  Was that

22  letter sent to me?

23              MR. YALOWITZ:  Yes.

24              THE COURT:  No.  The defendants' letter that you say

25  you got narrowing the request, did I get a copy of that?

F1S8SOK1

1          MR. YALOWITZ:  It's an e-mail that somebody on Mr.

2     Rochon's team sent to me on Friday night.  Then I reproduced it

3     in my chart.

4          THE COURT:  I am still going off of the yellow and the

5     green.

6          MR. YALOWITZ:  It's overbroad.  What you have got in

7     front of you is their whole everything designations, not their

8     in fairness.

9          So I am happy to either hand you up a copy of my

10     letter, which I think with one exception we talked about

11     faithfully reproduces their request, or I can just read it out

12     to you and we can go line by line.

13          THE COURT:  If there is something at issue still, you

14     have to tell me.  Because you gave me a letter that said that

15     you objected to all the pages 72 through 74.

16          MR. YALOWITZ:  I was going to take you there, your

17     Honor.

18          With regard to Al-Sheikh, we have got one, two, three,

19     four, five.  We have got passages where we are in dispute.  We

20     have got a bunch of passages where they have made an in

21     fairness counterdesignation and I have said fine, I don't care.

22     It's not like I am fighting them on every single one.

23          THE COURT:  You had no objection to most of it.

24          MR. YALOWITZ:  Right.

25          So 72, 14, through 74, 6, we talked about.  My big

F1S8SOK1

1    problem with part of that is that Al-Sheikh doesn't have any

2    personal knowledge of some of the things he says.  And they

3    never foundationalize him.  He says all of the PA's buildings

4    were destroyed.  How could he know that?  They didn't ask him

5    did you take a census or anything like that.  If he wants to

6    say the political situation is unstable, he knows about that,

7    but all their buildings were destroyed?

8            THE COURT:  I don't know if he doesn't know about

9    that.  I don't know how many buildings we are talking about and

10   I don't know whether he got up and went to work one day and all

11   the buildings were destroyed.  I don't have any basis to say

12   that's hearsay.  The question was asked and there was no

13   objection.

14           MR. YALOWITZ:  I am sorry?

15           THE COURT:  The question was asked and there was no

16   objection on that basis.

17           MR. YALOWITZ:  This is as if the witness is sitting in

18   the courtroom.  So all objections are preserved except to form.

19           THE COURT:  But sometimes you made objections and

20   sometimes you didn't.

21           MR. YALOWITZ:  I wasn't at these depositions.

22           THE COURT:  I understand, but the lawyers sometimes

23   make objections and preserve those objections for later on.

24   That was not an objection made at the time to the answer.

25   Nobody said objection, hearsay, but go ahead and answer the

F1S8SOK1

1   question anyway.  I don't have any basis to read this to

2   conclude that this is hearsay.

3          MR. YALOWITZ:  I am not saying it's hearsay; I am

4   saying he has no personal knowledge.

5          THE COURT:  That's hearsay.

6          MR. YALOWITZ:  He could be making it up.

7          THE COURT:  But I don't know.  Why would I conclude

8   that?  I would only exclude it if I had a basis to conclude

9   that either he is making it up or somebody told him this rather

10  than this is something that he saw.  I can't take this as

11  opposed to anything else he said and assume that this is

12  supposed to be hearsay.  He says the buildings were destroyed.

13  I assume that he knows that the buildings were destroyed.

14         MR. YALOWITZ:  Let me explain my thought process and

15  we will be guided by you on this obviously, but let me take you

16  to what my thinking is as to why I think it is an inappropriate

17  counterdesignation.

18         Number one, it's not responsive to the question.  So

19  this is just something that the witness blurts out, number one.

20         Number two, because the defendants are offering it

21  affirmatively, they are offering it affirmatively, it's their

22  burden to make some establishment that he knows what he is

23  talking about.  All they have to do is say, in cross at the end

24  of the deposition, now you said some stuff, how do you know

25  that?  They chose not to do that because he is their witness,

F1S8SOK1

1    he is their employee.  They figure they can bring him to trial.

2                THE COURT:  This was the plaintiffs' examination.

3                MR. YALOWITZ:  It was not a plaintiff in this case.

4                THE COURT:  You can't use that for any purpose at this

5    point because you want this transcript in evidence.  And you

6    can't argue I should allow it in evidence but at the same time

7    I am supposed to somehow say that you didn't have an interest

8    in making an appropriate record here because you weren't the

9    party.  You are the one that wants this deposition in.  You

10    can't have it both ways.  It's either in fairness a deposition

11    that the parties can use against or for both sides or it's not.

12                MR. YALOWITZ:  Look, I don't want to get ahead of

13    myself because I do want to put something in.  We have been

14    looking at that question and we have found some cases.  I

15    believe I will be able to put something in in the next day or

16    two on that very topic.

17                My problem with this particular thing is it's not

18    responsive to the question.  I am just talking about this line.

19    It's not responsive to the question.  His testimony is he got

20    paid for six years.  Then there was this period of time when he

21    was in transition, and they asked him a question about -- the

22    question I have a problem is, they say, How long was the period

23    of time?  And he never answers that question.

24                THE COURT:  He says he didn't know.

25                MR. YALOWITZ:  Right.

F1S8SOK1

```
 1            THE COURT:  Then the question was --

 2            MR. YALOWITZ:  Then they say, well, do you mean nobody

 3    knew?  He says, no, I mean all the buildings were destroyed.

 4            THE COURT:  That plaintiffs' attorney asked him the

 5    question, Do you mean that nobody knew how long the period was

 6    that you could continue receiving a salary?  He asked him what

 7    he meant and his response was, this is what I mean.  That was

 8    directly responsive to the question.  He said there was so much

 9    confusion and violence going on, all the buildings got

10    destroyed.  That's why I can't tell you exactly when it did

11    because there was chaos when all the buildings were destroyed.

12    That's directly responsive to the question.

13            MR. YALOWITZ:  I understand the ruling.  Let's keep

14    going.

15            THE COURT:  You might convince me if they want it

16    read, maybe they can read it themselves, but that's awkward

17    given the line of questioning.

18            MR. YALOWITZ:  We will deal with the logistics.  We

19    will figure out the logistics.  Let's keep going.

20            THE COURT:  Then you said 140.

21            MR. YALOWITZ:  Hold on one second.  122, I don't have

22    a problem with their counterdesignations, but there is some

23    additional things I want to read just to put them in context.

24    I don't think there is a problem with that.

25            THE COURT:  Make sure they know what you're completely
```

F1S8SOK1

1      going to read and if there is objection, let me know.  If they

2      say, because you want to read more, they have some other

3      counterdesignations, you can let me know.  But why don't you

4      discuss that with them before you discuss that with me.  If

5      there is no problem, then you don't even have to discuss it

6      with me.

7              MR. YALOWITZ:  They will let me know if they have a

8      problem with it; otherwise, I will assume that what is in my

9      letter is OK.

10             MR. HILL:  If it's page 122, lines 12 to 23, I do not

11     object to that being read at the same time.

12             THE COURT:  Is that it?

13             MR. YALOWITZ:  The other one we have is 123, lines 7

14     through 16.  I am not hearing any objection from the defense on

15     that.

16             THE COURT:  He is still reading.

17             MR. HILL:  You should read through 19 so you can get

18     the whole answer.  Otherwise, it's fine.

19             MR. YALOWITZ:  This is the first I heard that they

20     have a problem with this.

21             THE COURT:  If you two would talk to each other a

22     little more, it wouldn't be the first that you have heard.

23             MR. YALOWITZ:  That's fine.

24             I think your Honor has already ruled on 140 and 141.

25             THE COURT:  140 and 141, their designations you do not

F1S8SOK1

1    have to read.

2              MR. YALOWITZ:  Then we are on 154, line 23, through

3    156, line 2.

4              THE COURT:  I don't have a real problem with the

5    admissibility of this testimony.  I am just not sure in

6    fairness it should be your burden to read it.  If they want it

7    in, they should read it.

8              I don't have a strong opinion about it.  Some of it

9    does relate to budget, but I think a different kind of point is

10   being made.  I think the point that is being made is making the

11   points about spending money for humanitarian aid and all that

12   kind of stuff.  Obviously, it doesn't advance your argument one

13   way or the other whether or not money is going to Al Aqsa.

14             MR. HILL:  It would affect the issue whether the money

15   was given with the knowledge that it would be used for

16   terrorism as opposed to some other purpose.

17             THE COURT:  That's what I said.  It may be something

18   that you believe is relevant to put in, but in fairness it's

19   not necessarily what he should be required to read.

20             MR. HILL:  The reason we contend it is in fairness is

21   because as the examination continues, Mr. Al-Sheikh is

22   confronted with two documents that are already in evidence here

23   and asked about who the payments are made to.  So the jury is

24   entitled we believe to hear Mr. Al-Sheikh's explanation that

25   those were humanitarian in nature as opposed to what Mr.

F1S8SOK1

1    Yalowitz intends to argue, that they were in support for

2    terrorism.

3              THE COURT:  I don't know what part you're talking

4    about because the designations I have, literally from page

5    147 -- the designations I have from pages 153 through 175 are

6    all your designations.

7              MR. HILL:  Yes, sir.

8              THE COURT:  I don't know which question you're talking

9    about.

10             MR. HILL:  Particularly, we are talking about 154,

11   line 23, through 156, line 2.

12             THE COURT:  What are you saying is being inquired

13   about there?

14             MR. HILL:  Mr. Al-Sheikh is being asked about requests

15   he would make to Yasser Arafat for payments to certain people.

16   This is on 155, line 8.  For instance, I used to present to Abu

17   Ammar humanitarian aid.  In this instance I presented to him

18   people.  Let's say, he would wire to each person $600,000.

19             THE COURT:  I didn't follow your point.  You said he

20   was being asked by the plaintiff and then you quoted me this

21   portion that you wanted read.  What is the part --

22             MR. HILL:  That it relates to?

23             THE COURT:  Yes.

24             MR. HILL:  If you look at page 202.

25             THE COURT:  It's a little awkward to say it relates to

F1S8SOK1

1    something that is 20 pages later.

2        MR. HILL:  He says, What is this document?  I

3    presented this to Yasser Arafat, financial aid for certain

4    people.  So this is the type of document on 202 that he is

5    being examined about, that he is earlier more generally being

6    examined about on pages --

7        THE COURT:  Where does it say that?  What line is a

8    line that one would say is the type of document or the type of

9    payment that he was shown?

10        MR. HILL:  Following on then, on page 203, he

11    identifies the handwriting.  Then we get to line 16.  He says,

12    What did you write in this letter?  The answer on line 18 is, I

13    requested from Abu Ammar to allocate money for three people.

14        So this is a specific example of the general practice

15    of requesting humanitarian aid.

16        THE COURT:  What difference does it make whether it's

17    humanitarian aid or not humanitarian aid for the jury to

18    understand the process that is being required here?

19        MR. HILL:  It makes a difference because the

20    plaintiffs are arguing, as I understand it, that these payments

21    to persons who are not perpetrators in this case are somehow

22    relevant to whether or not the PA or PLO was supporting

23    terrorism.  So the jury in fairness should hear the testimony

24    from Mr. Al-Sheikh that these requests for payments are in fact

25    humanitarian in nature, in contrast to what the plaintiffs want

F1S8SOK1

1    to argue is that they support terrorism.

2            THE COURT:  I understand your point.  The distinction

3    that I am not following is that why is the jury entitled to

4    hear it from the plaintiff?

5            MR. HILL:  Because in fairness they should be told

6    that the documents that they are hearing testimony about

7    starting on page 202 are characterized by the witness as

8    humanitarian requests on the earlier pages of the transcript.

9            THE COURT:  He never references that document before

10   he is shown that document.  He never says that's a humanitarian

11   payment.  Where does he say that this document corresponds to a

12   humanitarian payment?

13           MR. HILL:  He is talking about a general practice of

14   requesting humanitarian payments and later in the examination

15   he is confronted with the specific details.

16           THE COURT:  No, he is confronted with a document.  It

17   doesn't say I am showing you a document that represents

18   humanitarian payments.

19           MR. HILL:  Page 202, line 16:  I presented this Yasser

20   Arafat, financial aid for certain people.

21           THE COURT:  The question is what is this document?  He

22   doesn't say it is humanitarian aid.  He says I presented this

23   to Yasser Arafat, financial aid for certain people.

24           MR. HILL:  Yes, sir.

25           THE COURT:  The jury understands that.  I'm not quite

F1S8SOK1

1    sure what that whole line of questioning somehow clears up for

2    the jury that they don't understand given what they know about

3    this case.

4            As I say, they haven't convinced me that you're wrong,

5    that it's relevant, if you want to argue about that point and

6    you want to say that this makes that point.  But I think that's

7    for you to put forward as an explanation and for you to read

8    and it's not their responsibility to do it.  It's not their

9    position, that's for sure.

10           MR. HILL:  It's definitely not their position.  That's

11   why we thought in fairness it should be included, but I

12   understand the court's ruling.

13           MR. YALOWITZ:  So this whole thing is out, your Honor,

14   154 through 158?

15           THE COURT:  You will not be required to read it, but I

16   don't want to mislead you that it's out when it's likely to

17   come in.

18           MR. YALOWITZ:  We will get you something on that.  We

19   have looked at it a little bit, and I feel pretty good about

20   our position, but I want to give it to you in writing.

21           THE COURT:  Then I think the last objection you had, I

22   think we addressed it.

23           MR. YALOWITZ:  I think you ruled on that, that

24   translators and lawyers bickering is not evidence.

25           THE COURT:  Only those portions that I specifically

F1S8SOK1

1    indicated, like the translated portion, I think is out for all

2    purposes.  There is no reason for either side to read that.

3          I don't remember if I identified any specific others,

4    but you can let me know if I missed something.  But that pretty

5    much is going to be my general position.

6          If you want to give me something further to try to

7    preclude them from offering any deposition testimony, my view,

8    unless I see something more specific, my view is under the

9    rule, particularly the subdivision (6), using part of a

10   deposition, it says:  If a party offers in evidence only part

11   of a deposition, the adverse party may require to offer or to

12   introduce other parts that in fairness should be considered

13   with the part introduced, and any party may itself introduce

14   any other parts.

15         MR. YALOWITZ:  My focus, just so we are clear, and we

16   will get you cases because the cases address this, my focus is

17   part (a)(1).

18         THE COURT:  My focus is part (6).

19         You put in the deposition testimony.  (a)(1) deals

20   with whether or not it's going to be admissible and on what

21   basis it's going to be admissible.

22         MR. YALOWITZ:  It's three legs of the stool.  You have

23   to have all three.  Leg number one, the party was present.  I

24   don't meet that.

25         THE COURT:  Then you shouldn't use it.  You want me to

F1S8SOK1

```
 1    exclude it?  I can't let you have it in and you argue that you
 2    don't meet the requirement for it coming in.
 3            MR. YALOWITZ:  They don't meet the requirement.  I do.
 4    Because it may be used against a party.
 5            I am going to giving something in writing.  I
 6    understand that there is an open question about this and if we
 7    use the depositions, I understand there is an open question.
 8            THE COURT:  I can't quite tell from what you have
 9    given me and reading the transcript, I don't even know -- I
10    assume you are contending that this is somehow 30(b)(6)
11    witnesses, all of them, and this is somehow admissions by the
12    defendant.
13            MR. YALOWITZ:  Right.
14            THE COURT:  But I don't know who is a 30(b)(6)
15    witness.  You may tell me everybody who you designate is a
16    30(b)(6) witness in some case.  You can understand my position,
17    even if you disagree with it, that, look, no, can't do that.
18    You can't just say I have got an admissible portion of a
19    deposition, but they should be precluded, the rule precludes
20    them from offering in fairness any other portion of that
21    deposition.  That's not what the rule says.  The rule says just
22    the opposite.  It says, if you designate a portion of the
23    deposition, they can ask you to in fairness introduce other
24    portions, and they can introduce any other parts of the
25    deposition.  That's what the rule says.
```

F1S8SOK1

1            If you have a case that says they are precluded from

2    doing that, I would like to see it because I have not found

3    such case in the Second Circuit.

4            Do you have a such a case in the Second Circuit?

5            MR. YALOWITZ:  I don't know about a Second Circuit

6    case.  I have cases from other judges of this court.

7            THE COURT:  If you have something that specifically

8    says that, then let me see which one of my colleagues said that

9    and the reason they said it and see if I agree with it.

10           MR. YALOWITZ:  We have got to look at it.  I don't

11   think it's a clear-cut.  There is no answer from the Second

12   Circuit on this.  So we will just have to look at it.  I am

13   going to get you something in writing.

14           I understand the defendants' position.  I think I have

15   support for my position.  I understand if we offer these

16   depositions, that question hasn't been answered.

17           THE COURT:  Unless there is a rule, and I don't see

18   anything in the rule precluding it, my position is this.  It

19   doesn't matter on what basis you get to use part of a

20   deposition.  Once you get to use part of a deposition,

21   regardless of what basis it comes in, then (6) applies, that

22   you can use the part of the deposition for whatever reason you

23   say it's admissible.  And if you do that, they have the right

24   to demand in fairness that you not give partial answers, that

25   you give the complete answers.  And the rule says once you put

F1S8SOK1

1    the deposition in evidence, a portion that you want, they have

2    the right to offer any other admissible portion.

3         MR. YALOWITZ:  OK.  First of all, what I understand

4    the rule to do is, if you meet (1)(a), which we have to give

5    you some cases on whether they can meet (1)(a), but if you meet

6    (1)(a), then it's as if the witness is sitting there on the

7    stand.  So they still have to have personal knowledge.

8         THE COURT:  I don't say that they meet (1)(a).  You

9    meet (1)(a).  You are the one offering this deposition.  They

10   didn't raise this issue.  You have to meet (1)(a).  You have to

11   tell me you have a basis on which to say this deposition is

12   admissible.  You say you have a basis.  I understand your

13   basis.  Once you give me a basis for admitting the deposition,

14   then the rules apply as to how that deposition is going to be

15   used.  And they don't apply by saying, well, you get to pick

16   the stuff out of the deposition that you want to read, but they

17   can't counterdesignate anything they say in fairness should be

18   read and they can't offer any other portions of that deposition

19   that you have indicated to this jury that they should rely on

20   as admissible evidence.

21        MR. YALOWITZ:  I want to give you something in writing

22   on this because I think the case law says, or some of the case

23   law says -- I think they cited an Eighth Circuit case from 1982

24   or something that says what you're saying, but I think the more

25   recent case law from this district says the opposite.  I

F1S8SOK1

1    haven't looked at it.  I have got somebody looking at it.

2              THE COURT:  Just give me a cite and I will read that

3    case as soon as I have a free moment.

4              MR. ROCHON:  I have nothing on that.  I have one other

5    short thing.

6              THE COURT:  We are still short jurors.  We still have

7    three or four that we are still waiting for.

8              MR. ROCHON:  With the first three witnesses, when they

9    finished all their testimony, Mr. Yalowitz thanked them in

10   various degrees of heartfeltness, but unfortunately in the

11   presence of the jury right here.  I would like to avoid that

12   going forward.  I think the thanks to the witness departing

13   really shouldn't happen in front of the jury.  And it becomes

14   more important as we come to the plaintiffs which is going to

15   be far more emotional testimony, more intense.  I don't think

16   that should happen in the presence of the jury.

17             THE COURT:  Mr. Yalowitz, can you take this issue out

18   of this case.

19             MR. YALOWITZ:  I think you're allowed to show

20   affection to your client in front of the jury.  I understand

21   why --

22             THE COURT:  You have got a case for that?

23             MR. YALOWITZ:  I have never looked at it because I

24   have never had anybody say I don't want them to do that.

25             THE COURT:  As I say, you both can't have it both

F1S8SOK1

1   ways.  I am doing my best to try to make sure this jury decides

2   this case on the substance and on the merits and without any

3   emotionally or politically charged issues that others may bring

4   into this case.  I think if you want me to do that and protect

5   you from them doing that, then I have to apply the rules

6   straight across-the-board.

7          There is no utility for you to thank the witness in

8   front of the jury for anything.  I don't care who it is.  Let's

9   just leave that out.  Everybody leave that out.  Let the

10  witnesses come in, give their testimony, let them leave.

11  Whatever you want to say to them, comfort them or do whatever

12  else you want to do outside the presence of the jury.

13  Otherwise we run a risk.

14          MR. YALOWITZ:  Frankly, every time I do a normal thing

15  I get something an application to the court to have me not do

16  it.  When we said terror cell, we had a problem with that.  We

17  don't say the word terrorism.  We had a problem with that.

18  Don't comfort your client?  We are going to have people weeping

19  on the witness stand and I am supposed to stand there like a

20  automaton.

21          THE COURT:  You're supposed to be professional.  I

22  have had plenty of experience with emotional witnesses and if

23  it's necessary, we can take a break.  We can offer them water.

24  We can offer them a tissue.  We can do whatever you want to do.

25  But it's not your time to do anything of greater significance

F1S8SOK1

1     in front of the jury.  If you want a break to comfort your

2     witness, then you ask for a break and we will take a break and

3     then you can say or do whatever you think is appropriate to

4     compose your witness.

5          You may not like them picking at you, but you don't

6     need this in this case and it's not an appropriate place for it

7     in this case.  OK?

8          MR. YALOWITZ:  I will abide by the court's instruction

9     on this.  I have to tell you, I am very disappointed in the

10    professionalism of the defense.

11         THE COURT:  You have told me that 20 times already.  I

12    don't know what you want me to do with it.  If you want to

13    vent, I will give you another couple seconds to vent.  But it

14    doesn't affect my judgment to make sure this case is fairly

15    presented.

16         MR. YALOWITZ:  I don't want to vent.  I want there to

17    be a consequence the next time we get a politically loaded

18    question, the next time we have questions that are designed to

19    elicit sympathy for the Palestinian people.  It's not relevant

20    to this case how many people were injured.

21         THE COURT:  Mr. Yalowitz, if you think that somehow I

22    have been unfair in my rulings, I have handled the lawyers one

23    way differently than I handled their lawyers, you can point

24    that out to me and I will attempt to do a better job.  I have

25    tried to across-the-board, in fairness, treat those issues the

F1S8SOK1

1    same.  I just can't hear from you that you want to see me pick

2    on them.

3         MR. YALOWITZ:  I think you have fairly warned them.  I

4    think you have appropriately sustained objections.  I am not

5    complaining about that.  I am looking to the future, not the

6    past.

7         In the future, I don't want to hear those kinds of

8    politically loaded questions, politically loaded behavior, and

9    I think that they need to be -- they are saying, oh, we don't

10   want Yalowitz to say thank you to the witness.  Well, I don't

11   want the defendants asking inappropriate questions that you

12   have repeatedly ruled are inappropriate and that from the very

13   beginning they have said they weren't going to do.  They stood

14   up here and said it's not appropriate to bring politics into

15   this case.  And then you heard his questions.

16        THE COURT:  What else do you want me to do about it,

17   Mr. Yalowitz?

18        MR. YALOWITZ:  I think if they do it again, they

19   should be admonished in front of the jury.

20        THE COURT:  If you do it, should I do the same thing?

21        MR. YALOWITZ:  I welcome the same level of scrutiny.

22        THE COURT:  I will take the action that I deem is

23   appropriate at the time and the action that I think is

24   warranted by the extent of the egregiousness of the conduct and

25   to the extent that I don't unduly prejudice either side by

F1S8SOK1

1    inappropriately admonishing you or Mr. Rochon or Mr. Hill or

2    anybody from either side with regard to an issue.

3         MR. YALOWITZ:  Nobody could ask for anything better

4    than that.

5         THE COURT:  I intend to do that.

6         Did you have something, Mr. Rochon?

7         MR. ROCHON:  Only if the court needed me to respond to

8    anything.

9         THE COURT:  No.  If you could just quickly respond, do

10   you have any position with regard to the letter that I received

11   about Dr. Perry or Dr. Strous?

12        MR. HILL:  Dr. Perry is a treating physician who

13   treated Shaul Mandelkorn.  As your Honor knows, Shaul

14   Mandelkorn is not U.S. national and his claims have been

15   dismissed.  So our position is that we should not be hearing

16   testimony from the treating physician of Shaul Mandelkorn about

17   injuries to Shaul Mandelkorn.

18        THE COURT:  It depends.  If the injury is supposed to

19   be as a result of PTSD that Leonard Mandelkorn saw his son

20   experience, who is supposed to give me testimony that Shaul has

21   PTSD?

22        MR. HILL:  My position is whether or not Shaul as a

23   technical matter has PTSD is irrelevant to Leonard Mandelkorn's

24   damages.  Leonard Mandelkorn's damages will be based on his

25   knowledge of his son, his interactions with his son.  And

F1S8SOK1

1    Leonard Mandelkorn will be able to testify about his injuries.

2              Now, Dr. Strous has also evaluated Leonard Mandelkorn.

3    I have no objection to Dr. Strous testifying about Leonard

4    Mandelkorn's injuries.  However, I do have an objection to Dr.

5    Strous testifying about Shaul Mandelkorn's injuries, and for

6    that matter, Leonard Mandelkorn's wife Nurit's injuries.

7              So to the extent people are no longer plaintiffs, our

8    position is that doctors are not to be testifying about

9    injuries, be they mental or physical or economic, to

10   nonplaintiffs.

11             THE COURT:  In the abstract, and I don't have as much

12   detail as you, but in the abstract I don't have a problem if

13   the plaintiff believed that they have a sustainable theory that

14   the injuries suffered by Leonard Mandelkorn was as a result of

15   observing and having knowledge of the condition that his son

16   suffered as a result of the incident.  I think that is a

17   legitimate issue on which they should have the right to present

18   evidence.

19             So I don't know to what extent that they intend to go

20   into the, as you say, injury of Shaul, but I think that it

21   doesn't preclude someone explaining, an expert or treating

22   physician explaining what condition that Shaul Mandelkorn was

23   experiencing that caused the injury to Leonard.

24             Now, I don't know to what extent they want to go

25   through these.  I don't know there is much relevance beyond

F1S8SOK1

1    explaining what his condition was and what symptoms manifest

2    itself, to the extent that those are symptoms that, a condition

3    about which Leonard had knowledge and adversely affected

4    Leonard to the extent that he suffered injury that should be

5    compensated in damages.

6         So unless you can articulate something specifically

7    that he is going to say, where I can either rule that's in or

8    that's out, I think they have some leeway with regard to

9    presenting some basic information about what physical or

10   emotional condition that manifested itself, or of which Leonard

11   was aware, that they claim caused Leonard injury that they are

12   seeking to have compensated.

13        MR. HILL:  Part of this is I don't know exactly what

14   Dr. Perry is going to say, but as I understand it, Dr. Perry

15   did not treat Leonard Mandelkorn, and the plaintiffs can tell

16   me if I am wrong about that.  So I don't see how Dr. Perry, as

17   the treating physician for Shaul, will have personal knowledge

18   of the effect of Shaul's injuries on Leonard.  That's my

19   objection to Dr. Perry.

20        THE COURT:  It seems to me that it's admissible within

21   the area of being in the abstract admissible, that the doctor

22   says, look, I don't know about Leonard, and I don't know what

23   Leonard is going to say, but I can tell you that Shaul had X

24   condition and X symptoms.  Now, to the extent he says that, and

25   to the extent that Leonard testifies that I was emotionally

F1S8SOK1

1    damaged knowing that my son had this condition and seeing the

2    symptoms of how they manifest, I think the jury has some right

3    to understand what that is, particularly if they are going to

4    make some assessment beyond what Leonard just happens to say

5    that my son was depressed every day and that made me depressed.

6         Well, that doesn't tell me the extent of this

7    depression.  It doesn't tell me what caused this depression.

8    They even have a causation issue to address to show that the

9    cause of the PTSD is the terrorist act for which the defendants

10   are responsible, the knowledge of which or experience of which

11   caused Leonard's compensable injury.

12        MR. HILL:  I understand your Honor's ruling.

13        Let me raise one other issue, which is Dr. Perry also

14   apparently intends to testify about the reputation of Stuart

15   Scott Goldberg.

16        THE COURT:  I didn't follow that at all.

17        MR. HILL:  I don't think that should be admitted.

18        THE COURT:  I just don't know the relevance of that

19   issue.

20        MR. HILL:  Mr. Goldberg is also not an American

21   national and his claims and the claims of his estate were

22   dismissed by your Honor.  So, therefore, we don't think his

23   professional reputation is relevant to any issues.

24        THE COURT:  Even if he was here, what is his

25   professional reputation, you want to put that in issue?

F1S8SOK1

 1              MR. YALOWITZ:  Let me pass over the reputation.  I

 2     will just tell you what we learned from Perry.  Perry actually

 3     shared office space with Goldberg and so he saw the family in

 4     the aftermath of the murder of Goldberg.

 5              THE COURT:  Goldberg is not in this case.

 6              MR. YALOWITZ:  The whole family is.  So he can give a

 7     before and after.  It goes to what they lost.

 8              (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1sQsok2

1              (Jury not present)

2              THE COURT:  The way you characterized it is that there

3    were long-term injuries suffered by Leonard and that Peri is

4    going to talk about the professional reputation of Scott

5    Goldberg.  I am sure you are not saying that they damaged his

6    reputation, and that's what caused injury to his family.

7              MR. YALOWITZ:  No.  What I was thinking last night --

8    and I may stand corrected on this:  There are two things, one

9    of which I think may be out, and one of which I think is

10   definitely in.

11             So what I was thinking was in but may be out now that

12   your Honor has asked me about it is the lost earnings of

13   Goldberg himself, his lost earnings.

14             THE COURT:  Right.

15             MR. YALOWITZ:  Which his reputation would go to.

16             THE COURT:  But who damaged his reputation?

17             MR. YALOWITZ:  No.  No.  He had a fine reputation.  He

18   had a nice practice.  He had a lot of patients coming to him,

19   and, therefore, he had good earning potential; not that anyone

20   hurt his reputation but that he had good earning potential.

21             THE COURT:  I understand it a little better now, but I

22   am not sure why that plays a part in terms of damages of the

23   family.

24             MR. YALOWITZ:  I think you may be right about that.

25             THE COURT:  They could not sue for his lost earnings.

F1sQsok2

1            MR. YALOWITZ:  I think you're right.  I think that

2      part is wrong.

3            The other thing though is that he knew the family; he

4      saw the circumstances of the family.  It is a classical sort of

5      wrongful death.  They were a nice family.  They were close.

6      They came to the office afterward, and he could give a little

7      perspective on who he was.

8            THE COURT:  We can discuss further whether any of that

9      would be admissible, but that's not what you addressed in the

10     letter.

11            MR. YALOWITZ:  I apologize for that.

12            THE COURT:  I wasn't clear.

13            All our jurors are here.  Let's go back to cross and

14     then we will proceed.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sQsok2

1              (Jury present)

2              THE COURT:  Good morning.  Luckily, the weather wasn't

3    as bad as it was predicted, but I think it was prudent for us

4    to adjourn until today.  We are ready to proceed.  I appreciate

5    your coming in even now because I know the weather is still

6    bad.  It's treacherous out there.  Be careful as you're

7    traveling.

8              At this point we are going to continue with the

9    cross-examination by Mr. Hill and hopefully we can make up some

10   of the time.

11    ISRAEL SHRENZEL, resumed.

12   CROSS-EXAMINATION

13   BY MR. HILL:

14   Q.  Good morning, Mr. Shrenzel.

15   A.  Good morning to you.

16   Q.  I'd like to talk to you about the attack on June 19, 2002.

17   The binder for that attack mentions just one individual who was

18   involved in that attack.  Sa'id Awada, correct?

19   A.  Yes.

20   Q.  Sa'id Awada was not a PA employee as of June 19, 2002,

21   correct?

22   A.  Yes.  He was 17 years old.  Yes.

23   Q.  He did not work for the PA, correct?

24   A.  As far as I know, he didn't.

25   Q.  Let's look at what's in evidence as Plaintiff's Trial

F1sQsok2                        Shrenzel – Cross

1    Exhibit 19.  This is the martyr file for Mr. Awada, correct?

2    A.  Yes.

3    Q.  If we could look at wage 6828, at the top under personal

4    information, under the heading previous employment, it

5    indicates that Mr. Awada was a construction worker, correct?

6    A.  Yes.

7    Q.  You have testified about payments that were made to

8    prisoners and their families after the attacks, correct?

9    A.  Yes, I did.

10   Q.  You would agree that those payments to prisoners and their

11   families were not the direct cause of the perpetration of these

12   attacks, correct?

13            MR. YALOWITZ:  Objection.

14            THE COURT:  Sustained as to the form.

15   Q.  The people who committed these crimes didn't do so in order

16   to get payments for their family while they were in prison,

17   right?

18   A.  Yes they --

19            MR. YALOWITZ:  Objection.

20            THE COURT:  Overruled.  You can answer that.

21   A.  The money issue was a factor.  It was a contributing factor

22   to their motivation, but I would like to stress that their main

23   motivation was brought about by the deeds and misdeeds of the

24   defendants, and the defendants did much worse things than

25   providing salaries to the families.

F1sQsok2                        Shrenzel - Cross

1    Q.  Sir, you would agree that the payments to prisoners and

2    their families were not the primary objective for committing

3    the crime, right?

4                MR. YALOWITZ:  Objection.

5                THE COURT:  Overruled.  You can answer.

6    A.  No.  Although it's, of course, nice to know that once you

7    are in jail, you get your salary or either your family is

8    compensated and that your name is going to be attached, as you

9    mentioned on Monday, to forms that praise you, etc., etc., but

10   it was not the central factor.

11               The central motivation was the way the perpetrators of

12   the attack and the planners, all the people involved that we

13   have discussed here, what did they understand Arafat's policy

14   from the PA leadership, what did they understand, and they

15   understand that we are now launching a wide-scale terrorist

16   campaign against Israel.  We are supporting terrorism.  We are,

17   in fact, becoming a terrorist entity.  That's what they

18   understood.  And this is far worse than post factum supplying

19   material assistance which in itself, as I said, is a

20   contributing factor.

21   Q.  You would agree that payments of money to families of

22   martyrs did not motivate the suicide attackers to do the

23   attacks, right?

24               MR. YALOWITZ:  Objection.

25               THE COURT:  Overruled.  You can answer.

F1sQsok2                          Shrenzel - Cross

1    A.  Of course that was not a motivation.  The motivation what

2    Arafat preached, what Arafat decided, what Arafat condoned,

3    what orders and what atmosphere was created by the PA, an

4    atmosphere of an all-out attack against the Israel contrary to

5    the commitment, the written commitment of the PA during the

6    Oslo Accords' years.

7          So this shift of policy which was basically very

8    tragic for both people, both the Palestinians and the

9    Israelis -- this shift of policy is the main theme of the PA

10   leadership, and, as I say, the introduction of terrorism and

11   the fact that it -- that some of the security apparatuses

12   become tools for terrorism, and the main organization of the PA

13   that is identified with Fatah also became part of the terrorism

14   machine of the PA.  These are the main motivations.

15         So Palestinian operatives ask themselves, what is

16   expected from me?  Yes, in the year 2000, when it was the

17   eruption of Fatah and forward.  What is expected for me?  What

18   Arafat wants for me?  What Fatah wants for me?  What should I

19   perform as a member of the security apparatuses?  And the

20   answer was:  You should participate -- his understanding was:

21   I should take active role in the attacks against Israel.

22   That's what the main motivation.

23         OK, it's nice if I have to sacrifice my life, my

24   family will be compensated.  That's very nice, but that was not

25   the main factor.

F1sQsok2                          Shrenzel - Cross

1   Q.  This is not the first time you have testified in this case,

2   is it, sir?

3   A.  Yes, I have a deposition with Mr. Satin.  Yes.

4   Q.  You have previously testified that suicide attackers

5   certainly didn't do so in order for their families to receive

6   martyr payments, correct?

7   A.  Yes, I did, and I stick to it.  Yes.

8   Q.  In fact, you testified that that would not even be logical,

9   correct?

10  A.  Yes.

11  Q.  You also testified that you didn't have any evidence that

12  the perpetrators in these cases did their crimes in order to

13  receive prison payments, correct?

14  A.  Yes -- I think I explained my position at length, and I can

15  reiterate it.  The responsibility lies with the defendants,

16  yes, with the defendant's policy, this is the main issue:  The

17  sudden shift of death, the sudden shift of policy that resulted

18  in Israel finding itself confronted with such a widespread

19  terrorist attack.  I don't think anyone is going to detonate

20  himself just on the idea that his family is going to get money,

21  yes.  It's far more deep and profound.

22  Q.  You testified about some language that was found in certain

23  magazines, right?

24  A.  Yes, I did.

25  Q.  You don't actually know who read those magazines, right?

F1sQsok2                         Shrenzel - Cross

1    A.  On a one-to-one basis, of course I don't know who reads The

2    New York Times --

3    Q.  You don't have any evidence that any of the perpetrators of

4    the attacks in issue in this case actually read any of these

5    magazines right?

6    A.  No, I don't have a definite knowledge of that.

7    Q.  Mr. Yalowitz read some portions of those magazines to the

8    jury, correct?

9    A.  Yes, he did.

10   Q.  He did not read the entire magazine, correct?

11   A.  It was up to him to choose, and I -- as I rely on you, I

12   rely that he made it wisely, yes.

13   Q.  He didn't read even the entire articles, did he?

14   A.  OK.  Yes.

15   Q.  In some instances, he didn't even read the entire

16   sentences, did he?

17   A.  This I don't know.  I really can't tell.

18   Q.  Let's take a look at one.  Let's take a look at Plaintiff's

19   Exhibit 175, which is in evidence.  This is one of the

20   magazines that Mr. Yalowitz read from, right?

21   A.  As I said, so much was read to my ears during these days,

22   but I rely on you.  If you said it was read, I accept it.

23   Q.  Let's look at page which is page 00171 T in the middle.  If

24   you could call out that paragraph that starts with "The

25   European nations" and highlight the portion through the word

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

F1sQsok2                     Shrenzel - Cross

1    communities.

2          So this is the portion of this magazine that

3    Mr. Yalowitz read, right?

4    A.  Yes.

5    Q.  It reads: "The European nations and the U.S., who have

6    strategic interests in the region, are called upon to see the

7    necessity of urgent and immediate action to stop Israeli

8    practices against the Palestinian people.  Without this, their

9    vital interests shall be directly jeopardized, and this shall

10   redound adversely on their people's and communities."

11         Do you see that?

12   A.  Yes.

13   Q.  That's where Mr. Yalowitz stopped reading, right?

14   A.  If you say so, OK.

15   Q.  Just continue let's show the rest of the sentence.

16         The rest of the sentence says: "Since the Arab and

17   Islamist communities in these countries play a prominent role

18   pressuring these governments by turning out for impressive,

19   peaceful marches aimed at getting foreign nations to exert

20   positive and effective pressure on Israel.  These communities

21   speak the word of truth and justice in relation to our

22   Palestinian people, who continue to suffer under the most

23   extreme example of occupation in the world."

24         Mr. Yalowitz did not read that portion, did he, sir?

25   A.  OK, yes.

F1sQsok2                         Shrenzel - Cross

1    Q.  He also didn't read the next paragraph.  Let's show that
2    one, Justin.
3         This paragraph says:  "A Real War.  The Israelis
4    consider the Palestinian Intifada to be a real war and to wage
5    it, they utilize airplanes, tanks, rockets and all the lethal
6    and internationally prohibited weapons.  The Palestinian side
7    considers the Intifada to be peaceful for it uses only sacred
8    stones to wage it.  It is therefore incumbent on peace-loving
9    nations to point a finger of accusation at Barak and his
10   military establishment, because he is an aggressor who is
11   waging a real war against the Palestinian people."
12        Barak was the prime minister of Israel at the time,
13   wasn't he?
14   A.  Yes, he was.
15   Q.  The next sentence says:  "To this we say that the bloodshed
16   of martyrs shall not being in vein, for through the
17   accumulation of Palestinian bloodshed, we succeeded in forging
18   the 1988 declaration of independence and succeeded in getting a
19   real and true Palestine recorded on political and geographic
20   maps.  And through the accumulation of Palestinian bloodshed,
21   we shall announce the establishment of our independent
22   Palestinian state on all the lands that were occupied in 1967.
23        "The Palestinian people are among the people's of the
24   world most deserving of independence and their martyrs,
25   wounded, prisoners and disabled have led the way, as these

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sQsok2                    Shrenzel - Cross

1    martyrs are the sons of the Palestinian state.  Without them,

2    we shall not succeed in achieving our nationalistic goals,

3    foremost among these the establishment of an independent

4    Palestinian state with its capital in Jerusalem.  And despite

5    all this, the Palestinian people are still striving for a just

6    and comprehensive peace, and still seeking to reclaim usurped

7    rights that are so inconsistent with the spilling of blood and

8    killing of innocent children."

9            Mr. Yalowitz didn't read that section either, did he?

10   A.  Yes, but let me remind you, I find it a little bit awkward

11   that I have to relate to what Mr. Yalowitz did or didn't do.  I

12   better refer to what I did and what I said.

13           MR. HILL:  I have no further questions, your Honor.

14           THE COURT:  Mr. Yalowitz, any further questions?

15           MR. YALOWITZ:  Briefly.

16   REDIRECT EXAMINATION

17   BY MR. YALOWITZ:

18   Q.  Let me begin with Exhibit 175 that Mr. Hill was just asking

19   about.  Do you recall the date of that or should we pull it up

20   and find it?

21   A.  Yes.

22   Q.  Let's pull it up and find it.  Can you see it on the

23   screen?  Does it show the date?

24   A.  Yes, this is of November 2000.

25   Q.  Following November of 2000, as we went into 2001, 2002,

F1sQsok2                      Shrenzel - Redirect

1    2003, did you have the opportunity to examine these four

2    security apparatus magazines we were talking about?

3    A.   Yes, I did, as I said in my direct examination.

4    Q.   Could you just give your recollection of the degree to

5    which the pro-violence rhetoric -- do you recall whether the

6    rhetoric concerning violence by the Palestinian police

7    intensified, decreased?  What did it do?

8    A.   Yes, I believe we see a gradual degree of intensification

9    of the level of incitement of calling upon the apparatuses to

10   take part in activities against Israel; and more than that, in

11   creating an atmosphere.  This is the crucial issue.  There was

12   an atmosphere, either those were employees of the PA, either

13   they read it, either they were exposed to announcement by the

14   commanders that are in compliance with the messages that are

15   listed here.  So the overall atmosphere grew more and more

16   violent.

17           If you check, for example, how many times the notion

18   of blood, the notion of martyrdom is repeatedly mentioned.

19   Again, we should look at it from the point of view of the

20   potential reader or the potential employee of the PA, what he

21   understands.  He understands that he as a PA officer --

22           MR. ROCHON:  Objection, your Honor.

23           THE COURT:  Overruled.

24   A.   He understands that he as an employee of the PA or as a

25   Fatah member or both, both a Fatah member and PA employee, he

F1sQsok2                    Shrenzel - Redirect

1    shouldn't contribute to calm down the situation he shouldn't

2    condemn terrorist activity.  He shouldn't look upon other

3    employees who carry out suicide attacks as murderers, as

4    criminals.  He should probably himself contribute to that

5    wide-scale attack that I have referred to previously.

6    Q.  Do you recall seeing issues of these magazines calling on

7    people to engage in liquidation or extermination or things like

8    that?

9             MR. ROCHON:  Objection.  Leading.

10            THE COURT:  Overruled.  You can answer.

11   A.  They were.  They even reached that part, our part that

12   speaks about the Jews and descendents of monkeys and pigs; that

13   there are anti-Semitic expression.  Usually they refrain from.

14            MR. ROCHON:  Objection.

15            THE COURT:  No, overruled.  He was asked about this.

16   Q.  They refrain from directly saying please go out and kill

17   all Jews or all the Israeli citizens.  But, again, it is the

18   explicit, but no less than that, the implicit messages of these

19   magazines.  And, as I said, it is really a very -- it was, I

20   believe, a contributing factor.

21            This accompanied the instructions.  This accompanied

22   the decision of Arafat.  You see there was a political decision

23   to launch a wide-scale attack and to support it; then there was

24   the actual support; and then was the whole issue of propaganda,

25   of creating the proper atmosphere in which people, for example,

F1sQsok2                      Shrenzel - Redirect

1   a 17-year-old former constructor would go out and detonate

2   himself.  Yes?  Or a policeman as we saw, reading the Shurta,

3   either reading -- yes, as I said, I don't have specific

4   evidence that Said Ramadan read the specific portion, but he

5   was exposed to the atmosphere that is reflected here; and for

6   him it was clear, this is what my superiors expect from me.

7            MR. ROCHON:  Objection, your Honor.

8   A.  They want me to go out and --

9            THE COURT:  No.  Overruled.

10  A.  -- shoot indiscriminately in the streets of Jerusalem.  He

11  also could have understood it from the spirit of the magazine.

12  Q.  Now, Mr. Hill was asking you about a lot of the documents.

13  What I would like to do, I also would like to go back to some

14  of those documents.  The way I would like to do it is to look

15  in one of our binders.  I am going to hand out to the jury our

16  binder from the attack of March 21, 2002.  I think you may have

17  your binder handy behind you on that?

18  A.  Yes.

19            MR. YALOWITZ:  I need just one moment.

20  Q.  Mr. Hill was asking you about whether the PA accepted or

21  relied on the facts set forth in the martyr files.  Do you

22  remember that line of questioning?

23  A.  Could you please repeat it?

24  Q.  Sure.  Do you remember Mr. Hill asked you some questions

25  about the martyr files?

F1sQsok2                        Shrenzel - Redirect

1    A.  Yes.

2    Q.  The files of the martyrs?

3    A.  He mainly asked about the issue that it was a prepared form

4    and filled in, yes.

5    Q.  So I just want to look with you on tab A of the Mohammed

6    Hashaika file, the Mohammed Hashaika packet.  Do I have it

7    right, this is Hashaika's' martyr file?

8    A.  You mean Exhibit 23?

9    Q.  Exhibit 23, yes.

10   A.  Yes, this is the martyr file.  Yes.

11   Q.  I think Mr. Hill was showing you page 2 to show you it was

12   a form that was filled out by hand some of the information.

13   Turn to the second page.

14   A.  Yes, the second page is all printed.  It's in English, so

15   maybe to look at the Arabic, no?

16   Q.  Sure.  Definitely.  Let us know when you have a chance to

17   look at it.  I want to orient us on that?

18   A.  I have the same page in English and Arabic 7305.

19   Q.  Do I recall correctly that Mr. Hill wanted to point out,

20   and you agreed with him, that some of the information is filled

21   out by hand on that form?

22   A.  Yes, it is.

23   Q.  Then I think you were saying, if I remember it right, that

24   the information was then relied on and approved by some

25   employees of the PA and the PLO?

F1sQsok2                      Shrenzel - Redirect

1    A.  Yes, I said it's necessary to assume that, of course, the

2    PA cannot pay just based on a statement of a member of the

3    family.

4    Q.  Is there a place in this document where the general

5    director of this organization actually does approve?

6    A.  Yes, I also pointed to it when I was asked by Mr. Hill,

7    that after everything is reviewed, then there is -- and it's on

8    another two pages on 7307, an approval of the general director.

9    After weighing the evidence, the evidence provided to him, that

10   was his decision.

11   Q.  Then let's confirm on 7307 in the Arabic.  Does he actually

12   have that signature?

13   A.  Yes, I have it.

14   Q.  It looks like there is something, at least on the English,

15   it says audit notes?

16   A.  Audit notes.

17   Q.  Do you see where I'm looking right below "approval of the

18   general director"?

19   A.  In Arabic, it's more "comments of the inquiry" or something

20   like that.

21   Q.  So what is that?  Is that somebody checking up after the

22   director approves it?

23   A.  Maybe.  I'm not that knowledgeable about the minute details

24   of the Palestinian bureaucracy regarding this document, but

25   it's clear.  There are approval of the general director but

1   under the audit notes, there is only a signature.  Yes, so

2   maybe it's logical it seems that there is a further check of

3   this approval.

4   Q.  So based on this document, does the PLO today pay this

5   family every single month as a matter of policy?

6   A.  Yes.

7   Q.  As a policy matter, would it discourage terrorism if the PA

8   and the PLO adopted a policy of refusing to pay the families of

9   suicide terrorists?

10  A.  Yes, this would be an indication that the PA is against

11  terrorist attack.  Yes.  But this, unfortunately, was far from

12  happening.  We had all the signs of the opposite, as I tried to

13  explain.

14  Q.  Are you aware of another government anywhere in the world

15  that pays the families of suicide terrorists every single month

16  because they committed a suicide terror attack?

17          MR. ROCHON:  Objection.

18          THE COURT:  Sustained.

19  Q.  Let's look at one of the prisoner files from that case.  I

20  think we can find one, if I'm remembering right, under the

21  Nasser Shawish packet.  Shawish is the second guy in.  There is

22  a picture of him with his arms crossed, and then his prisoner

23  file looks like it's Exhibit 83 which is under tab C.  Let's

24  make sure everybody gets there.

25  A.  83.  Yes, I have that.

F1sQsok2                         Shrenzel - Redirect

1   Q.  Let's see if we can find that preprinted form which I think
2   is on 9327.  It's about 15 pages in.
3   A.  93 which?
4   Q.  9327.
5   A.  You direct me to the English or the Arabic or both?
6   Q.  Let's use both, I guess.
7   A.  So I found the English.
8   Q.  Let's start with the Arabic.  They have a couple of good
9   things on it.
10  A.  Yes, I see the Arabic as well.
11  Q.  The Arabic, kind of in the middle toward the bottom third
12  of the page has a big seal stamp on it.  Do you see that?
13  A.  Yes, this is the emblem of the PA, yes.
14  Q.  That's like the stamp of approval?
15          MR. ROCHON:  Objection, your Honor.
16          THE COURT:  Sustained.
17  Q.  Then I think Mr. Hill was pointing out that the portion of
18  the document that says that Shawish is in prison as a result of
19  his fight for his country.  That is part of the official form?
20  A.  Yes.
21  Q.  Whose words are those "as a result of his fight for his
22  country"?
23          MR. ROCHON:  Objection, your Honor.
24          THE COURT:  Overruled.
25  A.  These are the words of the ministry of prisoners, of the

F1sQsok2                      Shrenzel - Redirect

1    Palestinian ministry of prisoners.  They are those who prepared

2    the form, and, as I said, they, unfortunately, attached it or

3    linked it with names of convicted murderers.  This is the main

4    problem, as I explained.

5    Q.  I just want to ask you about an answer that you gave on

6    Monday.  I will read from the transcript.  I am on 1501 to

7    1502.

8          You said:  "The whole idea of the form is this person

9    convicted in an Israeli jail for multiple cases of murder, I

10   remind you, he is considered to be serving his prison sentence

11   because of his, as it says here in the translation, his fight

12   for his country."

13         My question is:  He is considered by whom to be

14   serving his prison sentence because of his fight for his

15   country?

16   A.  In an official form of the ministry of prisoners of the

17   Palestinian Authority, it, of course, is considered a stature

18   outside the formalities or the phrasing of this document.  That

19   is the way it's portrayed in the media.  One can say that there

20   are heaps of praise usually on most salient terrorist but

21   basically on everyone who is serving his time in an Israeli

22   prison.

23   Q.  You said heaps of praise?

24   A.  Yes.

25   Q.  I also want to go to one of those promotion records that

F1sQsok2                       Shrenzel - Redirect

1    Mr. Hill was asking you about.  I think we can see one in the

2    packet of Abdel Karim Aweis.  He is the next big tab over in

3    our binder.  You can see his picture here.  He is in 1159?

4    A.  Yes.

5    Q.  I want to look at Exhibit 103.

6    A.  Which one?

7    Q.  I think we didn't put 103 in.  I think we have to put it up

8    on the screen.  I didn't have my binders last night.  Let's go

9    ahead and put 103 up on the screen.  Do you see 103 up on the

10   screen?

11   A.  Yes.

12   Q.  Do you remember Mr. Hill was asking you questions about

13   these kinds of administrative orders?

14   A.  Yes, I do.

15   Q.  In particular, he was asking you about where it might say

16   on the document that it was pursuant to the presidential order?

17   A.  Yes.

18   Q.  Just looking at it, can you direct the jury to where it

19   indicates that this is a presidential order?

20   A.  As you can see, you can see on the left side the name of

21   the PLO is written, the Palestinian Liberation Organization,

22   then the PA, which we call here the PA, and so it's official.

23   And, again -- and that's in the beginning.  Then you have the

24   emblem.  And then after the beginning of the administrative

25   order, it's written clearly pursuant to the instructions of his

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sQsok2                         Shrenzel - Redirect

 1   excellency the president, commander in chief of the security

 2   forces.

 3   Q.   Who is the president and commander in chief of the security

 4   forces?

 5   A.   At that date 2008 it was president Mahmoud Abbas.

 6   Q.   So when the documents that we have in our binder like

 7   tab -- let's look at tab D under Aweis.  That is Exhibit 58.

 8   If we look on the bottom, it talks about presidential orders,

 9   promotions by presidential orders on the right-hand side.

10   A.   Yes, this is in exact compliance of what we have in front

11   of us here.

12   Q.   So the document matches up to the order?

13   A.   Yes, it did.

14   Q.   Great.  What does it tell us about PA policy with regard to

15   terrorists that they give promotions to people sitting in jail

16   while convicted of terrorist murders?

17            MR. ROCHON:  Objection, your Honor.

18            THE COURT:  Sustained as to the form of the question.

19   Q.   Can you tell us what policy it reflects to give promotions

20   to individuals such as Abdel Karim Aweis who have been

21   convicted of murder?

22            MR. ROCHON:  Objection, your Honor.

23            THE COURT:  No, I'm going to allow that.

24            You can answer the question.

25   A.   I think I have discussed it several times, but let me

F1sQsok2                    Shrenzel - Redirect

1    reiterate it.  It reflects a policy of praise, of appreciation,

2    of endorsing what he did.  And this is really unthinkable, yes?

3    It's like if —— let's say a convicted murderer that belongs to

4    the security forces of a certain country, it's unheard of, and

5    it's totally illogical that he gets promoted, and it's a

6    reflection, as I tried to explain on Monday and today, this is

7    a reflection of the policy of the PA.  They wanted him to do

8    it.  He did it.  They praised him for that and they continue

9    their support for him.

10   Q.  By the way, Abdel Karim Aweis, did he have a criminal

11   record before he got hired by the PA?

12         MR. ROCHON:  Objection.

13   A.  Yes, we discussed it.

14         THE COURT:  Overruled.

15   A.  He killed a person with an ax, with a knife, he was

16   convicted and sentenced to life in prison.  He was released

17   under some gestures by a consequence of the Israeli courts.

18   Q.  Now, I want to come back to Mohammed Hashaika, one of the

19   bombers in the attack.  He is the first one in our binder.

20   Let's be sure we are oriented to him.  He is 1171 in our

21   binder.  Then I want to look at his GIS file, which is tab E in

22   the binder.

23         In particular, I want to ask you about the report on

24   the second page?  Do you have that report in front of you

25   A.  Yes.  9953?

F1sQsok2                        Shrenzel - Redirect

1    Q.  9953.

2    A.  Yes, I have it.

3    Q.  Mr. Hill asked you some questions about this document or,

4    actually, I think Mr. Hill pointed out this document and -- am

5    I remembering this right?  He pointed this out, and the only

6    question he asked was whether I had asked you anything about

7    it?

8    A.  I don't exactly remember.  It was one minute or something

9    before we adjourned on Monday, but if you have the transcript,

10   I can read --

11   Q.  It's all right.  You don't remember it.  It's no problem.

12   Looking toward the bottom of this report --

13   A.  Yes.

14   Q.  -- there is a bullet item that says: "Originally, the

15   aforementioned intended to perform his operation in the

16   Netanyanya, and he was arrested in Tulkarem by the Palestinian

17   Authority.  He was transferred to Ramallah and was imprisoned

18   there."

19   A.  Yes, now I remember.  Mr. Hill asked me to confirm the fact

20   that you have skipped some of the -- some portion of this

21   bullet.

22   Q.  So let's focus on this portion.

23   A.  OK.

24   Q.  I think what Mr. Hill is interested in is he says --

25            MR. ROCHON:  Objection, your Honor.

1    THE COURT:  Sustained?  What's your question.

2  Q.  During the --

3    THE COURT:  What's your question?

4  Q.  I want to ask --

5    THE COURT:  What is your question?

6    MR. YALOWITZ:  I withdraw it.  Let me ask another

7  question.

8  Q.  Let me direct your attention to the sentence -- I will read

9  you a sentence and ask you a question about it.  The sentence

10  is: "During the invasion into Ramallah, he escaped from prison

11  and intended to perform his operation through people of the

12  Islamic jihad, but then the Al-Aqsa Martyrs Brigades have taken

13  him from them."

14    My question is, are there other documents in our

15  binder that are inconsistent with this statement?

16    MR. ROCHON:  Objection, your Honor.

17    THE COURT:  No, I will let him answer that.

18  A.  Yes, and I believe that the assertion that he escaped

19  because of these very so-called invasion or incursion, he is

20  not correct, because we have significant pieces of information

21  to the contrary.  For example, we have the verdict of Abdel

22  Karim Aweis.  He was convicted according to his own confession

23  that he is the one that released Hashaika, the suicide bomber.

24  Because Mr. Nasser Shawish is a partner in planning this

25  attack, told him that Mr. Hashaika is ready to carry out a

1    terrorist attack, and therefore released him.

2    Q.  Let's just look at that together.

3    A.  OK.

4    Q.  This is under Abdel Karim Aweis.  He is the third one in

5    our binder.  We see his picture.

6           Then if we turn to tab A, let's make sure we are

7    really solid on this.  Turn to tab A.  Are you there Exhibit

8    375?

9    A.  Yes, I'm there.

10   Q.  This document, is this a transcript of a hearing in the

11   case of Abdel Karim appeals?

12   A.  Yes.

13   Q.  If we look at the very bottom of the first page, it says:

14   "Prosecutor:  We have reached an arrangement in the case

15   whereby the defendant will plead guilty to the amended

16   indictment and the prosecution undertakes not to make use of

17   the statement by the defendant today before the Court in other

18   cases.

19          Then the defendant says on the next page, his counsel

20   says, "I confirm the statements of my colleague.  I have

21   explained the amended indictment to my client.  He understands

22   it and pleads guilty to it."

23          Then the defendant says:  "My counsel has explained

24   the amended indictment to me.  I understand and plead guilty to

25   it.  I request with regard to count 19, if explicitly or

F1sQsok2                        Shrenzel - Redirect

1    implicitly, I incriminate my brother blank, I do not admit

2    this.  I admit I sent with my brother blank and blank, but my

3    brother did not know that they were being sent to carry out the

4    attack.  I asked my brother to take them, as he is a taxi

5    driver, without him knowing of the intentions to carry out an

6    attack.

7         Based on that, if we look at the next page, we see

8    verdict, based on the guilty plea we convict the defendant of

9    the offenses that are attributed to him.  Are you with me

10   A.  Yes, sir.

11   Q.  Now let's go to that amended indictment that you were

12   speaking about.  That's on the next tab 356?

13   A.  Yes.

14   Q.  I want to go with you to page 35.  Let's open that up?

15   A.  Yes.

16   Q.  I guess we should even start on 34.  Let's just make sure

17   everybody is there before we start with it.  First of all, this

18   is the 39th count, do we see that on page 34?

19   A.  The 9, I see it, yes.

20   Q.  That's not 19th count that we were look at a moment ago

21   where we were talking about his blot?

22   A.  I'm on page 3478.

23   Q.  Great.  Then --

24   A.  Yes, 39th count.  Yes, I looked at the number.

25   Q.  If we look at item 3 on page 35?

F1sQsok2                         Shrenzel - Redirect

1    A.   Yes.

2    Q.   I will read it.  "In early March 2002, Muhammad Hashaika

3    was remanded in the Mucataa complex of the Palestinian

4    Authority in Ramallah."

5         Can you remind us was is that Mucataa complex?

6    A.   The Mucataa complex, as I explained, is a compound a main

7    compound of the Palestinian Authority where also some of the

8    security apparatus resided, especially the central intelligence

9    and its head, Tawfiq Tirawi.  And please remember that the

10   convicted person here Abdullah Karim Aweis was an officer in

11   that force.  And also the jail was probably in the Mucataa.

12   Q.   So in early March 2002, Mohammed Hashaika was remanded in

13   the Mucataa complex of the Palestinian Authority in Ramallah

14   following the request for the defendant, who is -- I think it's

15   a typo.

16   A.   In.

17   Q.   -- who is in the general intelligence of the Palestinian

18   Authority, Mohammed Hashaika was released from the said remand.

19        Could you tell me how you reconciled those two

20   documents?

21        MR. ROCHON:  Objection, your Honor.

22        THE COURT:  No, he can answer overruled.

23   A.   Yes, as I said, I do not accept the assertion of the GIS

24   file that it had anything to do with the potential or

25   hypothetic Israeli invasion.  I assume it was in the interest

F1sQsok2                      Shrenzel - Redirect

1  of the GIS to present it like this because they were so deeply

2  involved in the case.  As you remember --

3          MR. ROCHON:  Objection, your Honor.

4          THE COURT:  I'm going to sustain the objection.

5          Let what the's your follow up question?

6  Q.  Let's go back to a 138 exhibit -- I'm sorry 148 which is

7  tab E.

8  A.  In whose file?

9  Q.  Hashaika?

10  A.  Tab E of Hashaika?

11  Q.  Yes.

12  A.  148.

13  Q.  Let's look at 148, page 2.  Are you there?

14  A.  Yes.

15  Q.  What is the date of the report that Mr. Hill was asking you

16  about.

17  A.  The date entered is November of 2011.

18  Q.  November 2011?

19  A.  Yes.

20  Q.  Do you know what year this case was filed, the case we are

21  here about?

22  A.  2003.

23  Q.  So by 2011?

24  A.  '02 or '03, yes.

25  Q.  By 2011, the lawsuit that we are here about had already

1   been filed?

2   A.  Yeah.  The case was over.  Aweis was convicted according to

3   his plea, and this is later.  This was produced later.

4   Q.  In fact, this lawsuit Sokolow against PLO, do you know when

5   this lawsuit was filed?

6          MR. ROCHON:  Objection, your Honor.

7          THE COURT:  You can answer.

8   A.  No, I honestly don't remember.

9   Q.  May I refresh?

10          MR. ROCHON:  Your Honor, we will stipulate.

11          THE COURT:  No.

12          MR. ROCHON:  It's relevant.  If the Court deems it

13   relevant, we don't need this witness --

14          THE COURT:  I don't know if it's relevant.

15          MR. ROCHON:  Right.

16          THE COURT:  He says he doesn't know.

17          MR. YALOWITZ:  Sure.  So I would like to either

18   refresh him or counsel will stipulate.

19          MR. ROCHON:  If the Court deems it relevant, we'd be

20   willing to stipulate.

21          THE COURT:  I don't know if it's relevant.  I don't

22   know if you have an objection to its relevance.

23          MR. ROCHON:  I do.

24          THE COURT:  Are you trying to make some point with

25   this witness in --

F1sQsok2                        Shrenzel - Redirect

1              MR. YALOWITZ:  Yes.

2              THE COURT:  Why don't you ask him the next question?

3              MR. YALOWITZ:  I'm sorry, your Honor?

4              THE COURT:  Why don't you ask him the next question.

5    Q.  Sure.  Was this 2011 report after the Palestinian Authority

6    had already been sued in this case?

7    A.  Yes, I assume it is.

8    Q.  Thank you.  Who was in charge of the general intelligence

9    service?

10   A.  Tawfiq Tirawi.

11   Q.  By the way, have you seen any documents from the defendants

12   in which they made any evidence to capture Hashaika after his

13   departure from prison in the Mucataa?

14             MR. ROCHON:  Objection, your Honor.

15             THE COURT:  I'll overrule.  You can answer.

16             MR. ROCHON:  Including as to scope.

17             THE COURT:  You can answer that yes or no.

18   A.  No, not at all.  I wasn't warned.  He wasn't looking --

19             THE COURT:  Sir.  You answered yes or no.  That's all

20   I want.

21   A.  OK.

22   Q.  Have you seen any documents reflecting any indication that

23   they should try to capture him or get him back in some way?

24             MR. ROCHON:  Objection, your Honor.  Sustained.  Asked

25   and answered.

F1sQsok2                        Shrenzel - Redirect

1   Q.  Do you see any documents reflecting a large manhunt to try

2   and catch this --

3               THE COURT:  Mr. Yalowitz is this the same question

4   three times.  How is this a different question?  He answered.he

5   said he's never seen such a document.

6               MR. YALOWITZ:  All right.  Thank you, your Honor.

7   Q.  Have you seen any documents indicating the level of

8   security that was placed over this individual?

9               MR. ROCHON:  Objection, your Honor.

10              THE COURT:  Sustained.

11  Q.  Was this individual allowed to come and go during his

12  prison stay?

13              MR. ROCHON:  Objection.

14              THE COURT:  Sustained.

15  Q.  Let's take a look at Exhibit 1060 which is tab F in our

16  binder.

17  A.  Yes.

18  Q.  Who is the author of this document?

19  A.  Tawfiq Tirawi, the head of the general intelligence.

20  Q.  As I recall, Mr. Hill asked you about whether Tawfiq Tirawi

21  had been convicted of the March 21 attack.  Do you remember

22  that line of questions?

23  A.  Yes, I remember being questioned and I answered that --

24              MR. ROCHON:  Objection, your Honor.

25              THE COURT:  Overruled.

F1sQsok2                      Shrenzel - Redirect

1   A.  I answered that I reiterated that he was not convicted

2   because, unfortunately, in spite of being one of the most

3   wanted terror operatives by Israel, he wasn't captured by

4   Israel and was not put to justice.

5   Q.  Mr. Hill also asked you if he was convicted of the

6   January 27 of 02 attack.  Am I remembering that right?

7   A.  Yes, the same answer.

8   Q.  Based on Exhibit 1060 what was Tirawi's role in that

9   March 21 attack?

10          MR. ROCHON:  Objection, your Honor.

11          THE COURT:  I'm going to sustain as to the form of the

12  question.  If there is something in the document you want to

13  refer to, you can.

14  Q.  Sure.  Do you see where Tirawi informs Arafat of the arrest

15  and interrogation of Hashaika?

16  A.  Yes.

17  Q.  And then he says, "The matter is at Arafat's discretion?

18  A.  Yes, the matter is at your excellency's discretion, I see.

19  Q.  Based on this, what can you say Tirawi's role was in the

20  attack?

21          MR. ROCHON:  Objection, your Honor.

22          THE COURT:  Sustained as to the form of the question.

23  Q.  Sure.  Based on this document, do you have an opinion as to

24  Tirawi's involvement?

25          MR. ROCHON:  Objection, your Honor.

1          THE COURT:  Sustained.  Haven't we been over this?

2          MR. YALOWITZ:  Sure.

3          THE COURT:  Asked and answered.

4   Q.  Let me just also go to Exhibit 233, which is the January 27

5   attack.  This one we will have to put up on the screen.

6          MR. ROCHON:  Objection.  Scope.

7          THE COURT:  No, I'll overrule it.  You can answer.

8   Q.  Is this another document from the PA?

9   A.  Yes, this brings us back to the Wafa Idris case.  This is

10  the document of the preventive security that relates to the

11  involvement of the general intelligence in the issue of Wafa

12  Idris, as it says in the headline or in the comment that was

13  written there.

14  Q.  Do you recall that the defendants stipulated that the

15  handwriting at the very top was written by a PA employee?

16  A.  Yes, I even remember that his name was Nabani.  Yes, he was

17  one of the officials to whom the letter was addressed.

18  Q.  It says:  "This information proves that the general

19  intelligence are involved in the issue of Wafa Idris."

20          Did I read that right?

21  A.  Your English is beyond doubt.

22  Q.  Do you recall looking at the custodial statements of Noor,

23  the individual who was convicted in that attack?

24  A.  I remember it in general.  If you want, we can --

25  Q.  I think I have one or two questions on that.  If we need

1    the document, I'll put it up.

2    A.  OK.

3    Q.  Do you recall where Noor got the bomb that Wafa Idris used?

4    Which building he got it in?

5             MR. ROCHON:  Objection, your Honor.

6             THE COURT:  Sustained as to the form of the question.

7             MR. YALOWITZ:  Bear with me then, your Honor.  I am

8    just going to get the document and I will need just a moment.

9             MR. ROCHON:  Your Honor, may we request a side bar?

10            MR. YALOWITZ:  I'm really almost done, and I think

11   we're here really within the scope of what your Honor's ruling

12   was.

13            THE COURT:  Talk to each other and see if you can

14   resolve it.

15            MR. ROCHON:  I don't think this is one we can resolve.

16   I'll be happy to talk to him.

17            THE COURT:  Well, come up.

18            (Continued on next page)

19

20

21

22

23

24

25

F1sQsok2                    Shrenzel - Redirect

1              (At the sidebar)

2              MR. ROCHON:  Thank you, your Honor.  This goes to the

3     core issue of whether they can use the Noor statements to

4     implicate my client in this attack.  He is about to -- the

5     question was where did Noor get the bomb.

6              THE COURT:  That's why I sustained the objection, and

7     I told him already that if you have something, and you want to

8     go to that report and you want to quote something from it, then

9     you can.

10             MR. ROCHON:  Of course what it's going to say is that

11    it's going to suggest he got it from someone at the Mucataa.

12    That is to implicate my client in this because the witness --

13    it's the same issue we raised with the Court previously.  It's

14    juxtaposing to try to suggest my client provided the bomb,

15    that's exactly what the Noor statement cannot be used to do.

16             MR. YALOWITZ:  I thought we got a ruling from your

17    Honor on this that it was OK to argue from the inference that

18    he committed his crime in the Mucataa.

19             THE COURT:  I don't have any problems with you arguing

20    that the inference is whatever it is, but I want to know what

21    it is you want to ask this witness.

22             MR. YALOWITZ:  Let me just find the exact passage.

23             MR. ROCHON:  This is an area that we did not inquire

24    in at all on cross as to the letter.

25             MR. YALOWITZ:  They did.  They asked he wasn't

F1sQsok2                       Shrenzel - Redirect

1     convicted.  They completely opened the door on this.

2              MR. ROCHON:  Your Honor, if the purpose is to respond

3     to whether Mr. Tirawi could be convicted, then what he is

4     trying to do is suggest that by this statement by Noor against

5     Tirawi, and that is act exactly what you told him he couldn't

6     do.  He is using the statement of this gentleman who is

7     shifting blame to others to say the people he was shifting

8     blame to is my client.  This is exactly what he cannot do.

9              THE COURT:  I still don't know what the question is.

10    What are you going to ask this witness?

11             MR. YALOWITZ:  I'm going to show him a passage in

12    which he says, "I got the bomb in the Mucataa."

13             THE COURT:  OK.  Then what?

14             MR. YALOWITZ:  Then what's the Mucataa?

15             THE COURT:  We have been through that like five times

16    already.  You don't have to ask him that.  It's been asked and

17    answered.

18             MR. YALOWITZ:  Then I just want to show him that

19    passage.

20             THE COURT:  And ask him what?

21             MR. YALOWITZ:  And ask him is that consistent with

22    your understanding.

23             MR. ROCHON:  Of what?

24             THE COURT:  That's not even a substantive question.

25    That's argument.  So I'm not going to allow that kind of

1    question.  If you want to make whatever reasonable arguments

2    you want to make, but that is not a substantive response from

3    this witness with regard to that issue.  It will remain to be

4    seen of whether you have what appropriate instances you can to

5    argue --

6            MR. YALOWITZ:  Let me move away from this document.

7    We can argue from the document.  I will have some follow-up on

8    233, which I will focus on the text of 233.

9            THE COURT:  I don't remember which one it is.

10           MR. ROCHON:  It's the letter we didn't ask a single

11   question about on cross-examination deliberately.  That was the

12   whole point of our scope of cross.

13           MR. YALOWITZ:  It's Tirawi was convicted and talks

14   about Tirawi.  It's fair.

15           THE COURT:  Let's see what the questions are.

16           MR. YALOWITZ:  Your Honor, while we're here, I don't

17   understand why if Mr. Hill is doing the cross-examination,

18   Mr. Rochon is doing the objecting.  It seems like if we have

19   one lawyer per witness, that would be more orderly.

20           THE COURT:  You don't want them to tag-team you?

21           MR. YALOWITZ:  I don't like being tag-teamed.

22           THE COURT:  I think you're real good at this.

23           You can handle both.

24       (Continued on next page)

25

1              (In open court)

2    BY MR. YALOWITZ:

3    Q.  So, Mr. Shrenzel, have you had a chance to consider the

4    role of Tawfiq Tirawi in connection with the Wafa Idris suicide

5    bombing based on Exhibit 233?

6              MR. ROCHON:  Objection, your Honor.

7              THE COURT:  Overruled.

8              You can answer.

9    A.  Yes.  I would say the following.  This very document cannot

10   provide us with a conclusive final proof of his prior knowledge

11   of the attack.  But given our overall knowledge about --

12             MR. ROCHON:  Objection.

13             THE COURT:  He can finish.

14   A.  -- the profound involvement of Tirawi during the whole

15   period, in the series of attacks, of covering up, of providing

16   weapons, for example, the explosives used in the Hashaika

17   attack, if we take all of the Tirawi file in consideration, I

18   think it's more likely than not that he had prior knowledge and

19   involvement in that attack.  That's my professional assessment.

20             MR. ROCHON:  Objection.

21             THE COURT:  Overruled.

22             MR. YALOWITZ:  I have nothing further on redirect.

23             THE COURT:  Any further questions, Mr. Hill?

24             MR. HILL:  No, your Honor.

25             THE COURT:  Thank you, sir.

F1S8SOK3                          Shrenzel – redirect

1              You can step down.

2              THE WITNESS:  Thank you, your Honor.

3              MR. YALOWITZ:  Would it be convenient to take a recess

4      while we prepare for the next witness?

5              THE COURT:  Sure.

6              Let's take a ten-minute break.

7              Don't discuss the case, keep an open mind, and I will

8      see you in ten minutes.

9              (Jury exits courtroom)

10              MR. ROCHON:  When the court comes back, I have some

11      issues that relate to redirect, but I can raise them when you

12      come back.

13              THE COURT:  Sure.

14              (Witness excused)

15              (Recess)

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

F1S8SOK3

 1              (Jury not present)

 2              MR. ROCHON:  As to the redirect, there are at least

 3      four different areas where the witness went into either

 4      inadmissible or improper testimony, each of which we objected

 5      to.  I will reference first the areas where he discussed

 6      evidence that this court had excluded.

 7              When Mr. Yalowitz went to the magazines, and we were

 8      objecting, the witness nonetheless included some of the

 9      material from the magazines about, that contains language about

10      Jewish people and exactly the kind of inflammatory religious

11      language this court ruled cannot come in and this witness

12      specifically referenced that language in his answer.

13              THE COURT:  My recollection is he referenced that kind

14      of language on cross.

15              MR. ROCHON:  No, sir.  He referenced it during the

16      redirect.

17              THE COURT:  Go ahead.  You can finish.

18              MR. ROCHON:  If he referenced it on cross and I am

19      mistaken, it would be improper as well.

20              THE COURT:  But you asked the questions and you didn't

21      stop him.  And I know what you're going to lay out in a second.

22      You're going to lay out how it is beyond the scope of cross.

23      Quite frankly, he was asked questions and he was allowed to go

24      on in a very long narrative and give his opinions about all of

25      these areas.

F1S8SOK3

```
 1              I think the defense opened the door to all of this.
 2      If you didn't want the answer, you should have said it was
 3      nonresponsive and gone on to another question.  One question he
 4      answered for about five minutes and he went into all of his
 5      opinions into all of these areas, and not only without
 6      objection but in response to the defense's question.  That's
 7      basically my position.  So if you want to quickly put the rest
 8      of it on the record, then we can get the jury in.
 9              MR. ROCHON:  As to the specific references, I was just
10      citing the language in the magazines.  I don't think he
11      included that even in his long answers during cross.
12              THE COURT:  I will look at the transcript.
13              MR. ROCHON:  Certainly we didn't get into it during
14      the close of his redirect examination, but the witness
15      referenced that Tawfiq Tirawi allegedly supplied the explosives
16      to Mr. Hashaika in his attack.  You excluded a custodial
17      statement in which that was referenced, and that is because a
18      custodial statement was putting the blame on another.
19              THE COURT:  I have to look at the transcript because
20      my recollection is there was not an objection.
21              MR. ROCHON:  There was an objection before the answer
22      and after the answer.  And it was towards the end of the
23      redirect.
24              In addition, again over objection, he discussed as to
25      the motivations of individuals, specifically as to Abdul Karim
```

F1S8SOK3

1      Aweis, that "they wanted him to do it and he did it," and the

2      "they" in that instance was our clients.  The experts are not

3      allowed to testify about the state of the mind of an entity or

4      organization.

5             THE COURT:  Given the answers given on cross, that was

6      well within the scope.  He gave similar answers on cross.  He

7      gave more complete answers.

8             MR. ROCHON:  The fact that the witness was able to

9      sneak in improper answers --

10            THE COURT:  He can't sneak it in on cross.  You asked

11     him the questions.  That argument doesn't fly.  You didn't

12     object.  You let him go on and on.

13            MR. ROCHON:  I understand the court's position on

14     that.  I respectfully disagree.

15            THE COURT:  That is fine.  You don't preserve any

16     objection to a question that you asked and an answer that was

17     given and you didn't object to the answer, or you didn't stop

18     the witness from going on.

19            Anything else?

20            MR. ROCHON:  Yes.

21            THE COURT:  I don't want the jury to wait.

22            MR. ROCHON:  It's only one other specific reference.

23     He specifically discussed at some length what Said Ramadan

24     supposedly thought and said this is what he thought.  Said

25     Ramadan, you will recall, is one of the suicide attackers in

F1S8SOK3

1    this case.  There is no evidence as to what Said Ramadan was

2    thinking, as to his motivation in this case, and we have a

3    contemporaneous objection, and I know the court overruled it,

4    but I wanted to point out this testimony was also improper by

5    the witness.

6             THE COURT:  If there is no basis in the record for

7    that, then that's an argument you will make to this jury.  They

8    can assess his expertise and the basis for his conclusions

9    based on the evidence that's before them.  If it is consistent

10   with that, they can accept it.  If it's inconsistent, you will

11   argue that they should reject it.

12            MR. ROCHON:  Lest some day someone say I didn't ask

13   for a remedy for my objections, your Honor, I think given the

14   testimony the court can either strike the redirect or declare a

15   mistrial.  If you are not inclined to declare a mistrial, I

16   wouldn't want to fail to ask for a remedy given our objection.

17            THE COURT:  What remedy are you asking for?

18            MR. ROCHON:  To strike the redirect.

19            THE COURT:  I am not going to strike the redirect.  I

20   think it was within the scope of cross.  I think I gave you

21   significant leeway on cross.  I think you gave him significant

22   leeway in his answers.  I think the questions posed that relate

23   to that are within the scope of that cross and nothing is

24   appropriate to strike.

25            I will look at the transcript when I get the

F1S8SOK3

1    transcript.  If I believe some other remedy is appropriate, I

2    will consider it.

3             Let's get the jury.

4             (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1S8SOK3

```
 1            (Jury present)
 2            THE COURT:  Would the plaintiffs call their next
 3    witness.
 4            MR. HORTON:  Plaintiffs call Dr. Rael Strous.
 5            THE COURT:  Would you state and spell your name for
 6    the court reporter.
 7            THE WITNESS:  My name is Rael Strous.  R-A-E-L,
 8    S-T-R-O-U-S.
 9     RAEL STROUS,
10        called as a witness by the plaintiffs,
11        having been duly sworn, testified as follows:
12            THE COURT:  You can inquire.
13    DIRECT EXAMINATION
14    BY MR. HORTON:
15    Q.  Good morning, Dr. Strous.  My name is Phil Horton.
16            What is your profession, sir?
17    A.  I am a psychiatrist.
18    Q.  Are you a medical doctor?
19    A.  I am a medical doctor as well.
20    Q.  In what country or countries are you licensed to practice
21    medicine?
22    A.  Currently, I am licensed in the State of Israel since I am
23    living there right now.
24    Q.  Have you ever been licensed to practice medicine in any
25    other countries?
```

F1S8SOK3                          Strous - direct

1    A.  Yes, I have.

2    Q.  Which ones?

3    A.  South Africa, England and the United States.

4    Q.  Dr. Strous, I want to ask you some questions about your

5    education.

6           Where did you go to medical school?

7    A.  I went to medical school at the University of Witwatersrand

8    in Johannesburg, South Africa.  That's where I completed my

9    medical school training.

10   Q.  When did you graduate from medical school?

11   A.  I graduated in 1989.

12   Q.  What did you do after you graduated?

13   A.  Following graduation, I did a year of internship, which is

14   a year of rotation, through surgery and internal medicine.

15   That was in 1990.

16   Q.  Where did you do that?

17   A.  I did that also in Johannesburg, Hillbrow Hospital.

18   Q.  What did you do next?

19   A.  I then went on to do my residency in the field of

20   psychiatry in the Bronx, New York.

21   Q.  Why did you decide to become a psychiatrist?

22   A.  As a young, energetic doctor, at the completion of my

23   medical school training and during my internship I was living

24   in Apartheid, South Africa, at the time and I used to go in the

25   evenings taking two bags, one full of sandwiches and one full

F1S8SOK3                      Strous - direct

1    of medicines and go and treat the black homeless street kids.

2            And during this time, once again deciding the future

3    of my career, at the time I used to do part-time emergency

4    medicine, trauma medicine, and I was still deciding what I

5    wanted to do, and at this time I used to go in a volunteer

6    fashion on the street and treat these children, I realized

7    treating superficial sore throats and cuts and wounds and

8    sometimes suturing was less important than I thought a kind

9    word and dealing with these people on an emotional level.

10   Remember, these were children whose parents either disappeared

11   or were placed in jail under the South African Apartheid

12   government.  I felt that going into the field of psychiatry

13   would more deal with my inner feeling that I wanted to help.

14   And even superficially people sometimes appeared OK or you

15   dealt with medical issues and I felt emotional pain was

16   something much more significant and more in keeping with my

17   desires and interest in the field of medicine.

18   Q.  Now before I ask you why you decided to become a

19   psychiatrist, I think you mentioned residency.

20           Can you explain to the jury what the concept of

21   residency means for a doctor?

22   A.  Residency, once a person has completed the field of

23   medicine, residency is an extra period of usually four years in

24   the United States where one goes into and works in that field

25   and one receives advanced training and expertise in a

F1S8SOK3                         Strous - direct

1   particular field of medicine.

2           I chose psychiatry.  I went to Albert Einstein Faculty

3   of Medicine in the Bronx.  I lived in Pelham Parkway,

4   Eastchester Road, and I spent four years in rotations between

5   various hospitals:  North Central Bronx on 210th Street,

6   Montefiore Hospital on Gun Hill Road, Jacobi Hospital, and

7   Bronx State Hospital, where I was a chief resident.  I had four

8   of the best years of my life.

9   Q.  Why did you choose to go to Albert Einstein for your

10  residency?

11  A.  Albert Einstein College of Medicine at the time, it

12  appeared that the training in psychiatry was known for

13  particular excellence, combining the biological side, meaning

14  the medication side of psychiatry, as well as the

15  psychodynamic, the psychological side, the emotional side,

16  which is basically regarding talking to people and connecting

17  to people on an emotional level and helping them with

18  psychological issues, not just by medicine but also through the

19  psychotherapy side, which spoke to me.

20  Q.  Doctor, you mentioned two or three hospitals that I think

21  you said you worked at during the course of you residency.  Can

22  you remind us what each one of them was and what you were

23  doing.

24  A.  During the residency, during the rotations, they place you

25  in different hospitals depending on what rotation.  For

F1S8SOK3                          Strous - direct

1    example, Jacobi Hospital, I spent a year there in the

2    outpatient department dealing with people coming in from the

3    streets, from their homes.

4         At North Central Bronx on 210th Street, if I remember

5    correctly, they were inpatient, where we would deal with people

6    who weren't well enough to stay at home and they had to be

7    admitted, and we treated these people in the hospital for their

8    psychiatric issues.

9         Montefiore Hospital, I did inpatient once again,

10   neuropsychiatry, which is a combination of psychiatric issues

11   as well as neurological issues based on abnormalities in the

12   brain, and we would treat people on an inpatient basis.

13        The final year I was the chief resident at the Bronx

14   state hospital, and that was more serious chronologically ill

15   patients who had to be admitted sometimes for months, even

16   years.  As I mentioned, during that year as well I was a chief

17   resident responsible for coordinating the residents in the

18   whole program, of which there were approximately 18 per year.

19   I remember there were about 72 in the whole program and I was a

20   coordinator.

21   Q.  You used the phrase several times chief resident.  Can you

22   make clear what the difference is between a chief resident and

23   a resident?

24   A.  Resident is four years, but in the final year of residency,

25   the program selects an individual based on leadership, academic

F1S8SOK3                         Strous – direct

ability to coordinate the other residents during the programs
as well as to organize activities and ensure that training is
optimal for residents and that their needs are being taken care
of.

Q.    Can you recall how many other residents out of the pool of
which you were selected chief resident?

A.    There were approximately 72 because there were 18 per year.

Q.    How long did you live and work in the Bronx?

A.    I was there four years.

Q.    What did you do after your residency in the Bronx?

A.    Based on research and expertise that I developed in a
particular area during my residency, I was recruited by a
program at Harvard Medical School to do a fellowship.

        A fellowship is a two-year super-specialty training in
a particular area of psychiatry.  Fellowships are in all areas
of medicine, but my area was related obviously to psychiatry,
and then I moved over to Boston at the Commonwealth Research
Center based at the Massachusetts health program affiliated
with Harvard Medical School.  I was a Harvard, considered a
Harvard fellow, and clinical residency in
neuropsychopharmacology.

Q.    Can you tell us what neuropsychopharmacology is?

A.    Neuropsychopharmacology is the field of psychiatry which
addresses, deals with the interaction between medication and
psychiatric illnesses.

F1S8SOK3                        Strous - direct

1          So I was there dealing with people who, their first

2     episode of psychosis, where people's sense of reality became

3     challenged due to illness, and we looked at various medications

4     and how to characterize the illnesses and advance research both

5     on the medications that are best for these people as well as

6     trying to understand what is going on in their brain.  So we

7     looked at genetics, we looked at brain imaging, which is like

8     advanced X-rays, functional MRI to look at various areas of the

9     brain to see where it was normal.

10    Q.  How long was this fellowship at Harvard Medical School?

11    A.  Two years.

12    Q.  What did you do next?

13    A.  I then moved to Israel.

14    Q.  Before we get there, let me go back to the United States.

15          Are you familiar with the term board certification as

16    it's used in the United States?

17    A.  Yes, I am.

18    Q.  What does that term mean?

19    A.  Board certification is a process which ensures that people

20    who have completed advanced training have developed a

21    particular expertise in the field, and it's an organization

22    that evaluates the training program as well as the evaluation

23    methods, which is two examinations at the end.  Now, not

24    everybody completes a residency or training in a particular

25    subspecialty of medicine gets board certified.  You can be

board eligible or board certified.  But those who want to be
sure that they attained this level of expertise go through this
process and then you can claim that you're board certified in
any particular field of medicine.

Q.  Did you become board certified in the United States?

A.  I did.

Q.  In what area?

A.  In the field of psychiatry.

Q.  Is there a similar concept of board certification in
Israel, where you said you went next?

A.  Yes, there is.

Q.  Are you board certified in psychiatry in Israel?

A.  I am.  I might add, not only am I board certified in
Israel, but I am part of the process that writes the exams and
examines people to ensure that they are board certified in
Israel.

Q.  Let's go back to your employment history.  You said after
Harvard you went back to Israel.  What did you do there?

A.  Filing the necessary paperwork and bureaucracy of getting
my medical license and the equivalent of board certification in
Israel, I began to work in psychiatry at the Beer Yaakov Mental
Health Center.

Q.  Can you describe what the Beer Yaakov Center is?

A.  Beer Yaakov Mental Health Center is the largest psychiatric
hospital in Israel, with 550 beds.  It's an academic and

F1S8SOK3                        Strous - direct

1    state-run hospital, just like the Bronx psychiatric state

2    hospital where I worked in the United States.

3    Q.  When you say it is academic, what do you mean by that?

4    A.  Academic means that it's affiliated to university and

5    research is encouraged, and those who -- the senior doctors who

6    teach and publish research have the opportunity to have

7    academic advancement and academic position through the

8    university as well.

9    Q.  What was your first position at the Beer Yaakov Mental

10   Health Center?

11   A.  I was a senior psychiatrist on an inpatient ward.

12   Q.  Could you describe what your job was in that position?

13   A.  Initially my job in the hospital was to admit patients,

14   evaluate them, treat in the hospital and discharge them to

15   appropriate living conditions, whether it be their house or

16   various assisted living accommodations, as well as teach.

17   Q.  Did your position at Beer Yaakov ever change?

18   A.  Yes, it did.  Following the requirements of a three-year

19   stipulation, which one needed to head a department, almost

20   precisely after I attained the three years I was promoted to

21   the director of an inpatient unit.

22   Q.  Could you just describe what that inpatient unit was?

23   A.  The initial position I had as director of the inpatient

24   unit, I was responsible for treatment and management and care

25   of patients who were hospitalized for, in the chronic inpatient

F1S8SOK3                      Strous - direct

1    department, many ranging from a few months to a few years.

2                So inpatient wards are divided into acute inpatient

3    and chronic inpatient, and I was director of the chronic

4    inpatient department.

5    Q.   Can you explain the difference between an acute patient and

6    a chronic patient?

7    A.   Acute inpatient unit is someone who gets admitted through

8    the emergency room for some acute, sudden psychiatric problem

9    which is of current concern, related to impairment and

10   functioning outside the hospital.  Once a person is in an acute

11   inpatient department and cannot be discharged home or to any

12   other assisted living accommodation because they are still too

13   ill, they get transferred to the chronic inpatient department,

14   which I was managing.  I will add, this is all voluntary

15   inpatient, 99 percent, and it's all open units, not locked

16   units, as most of them are in the United States.

17   Q.   I believe you said you were promoted to the director of the

18   chronic inpatient unit.  Did I have that right?

19   A.   That's right.

20   Q.   Can you explain what your duties were as the director of

21   the chronic inpatient unit?

22   A.   For those ten years, until approximately year ago, as a

23   director of the chronic inpatient, my responsibility was for

24   supervising the care and management of all the patients in the

25   department as well as supervising the staff, and the staff

F1S8SOK3                          Strous - direct

1    consists of other psychiatrists, other trainees, psychologists,

2    social workers, occupational therapists and any other para,

3    what you call paramedical staff, including art therapists,

4    music therapists, etc., as well as the nursing staff of course.

5    Q.  Can give us some idea how many people were under your

6    supervision?

7    A.  During the time, as I mentioned, up until a year ago, in

8    the chronic inpatient department there were probably

9    around -- well, when you mention under my supervision in the

10   wards, because I was also director of residency training.  So I

11   had all the residents in the entire institution to manage.  So

12   I would say between 50 to 100, perhaps.

13   Q.  At any one time about how many patients are we talking

14   about?

15   A.  It could range from the low 30s to 40, 50 sometimes.

16   Q.  You mentioned that you were the director of chronic

17   inpatient unit till about a year ago.  Is that correct?

18   A.  Yes.

19   Q.  Did your job then change?

20   A.  It did.

21   Q.  Can you explain how?

22   A.  Just over a year ago I received a promotion to my current

23   position where I am now deputy director of the entire

24   institution, as well as director of ambulatory services.  I am

25   responsible for the management of all the psychiatric mental

F1S8SOK3                        Strous – direct

1  health clinics attached to the hospital for the center south of

2  Israel.  Approximately 100,000 visits a year, including 14

3  clinics.

4  Q.  Let me break that down.  When you said you became deputy

5  director of the institution, are you referring to the Beer

6  Yaakov Mental Health Center?

7  A.  That's right.

8  Q.  Can you describe what your duties are as deputy director?

9  A.  I am involved in the management decisions, but most

10  importantly supervising and ensuring the highest standards of

11  clinical excellence regarding the psychiatric management of

12  patients.

13  Q.  I believe you also said that you are now involved in

14  responsibilities for clinics outside of the Beer Yaakov Mental

15  Health Center itself.  Is that correct?

16  A.  That's correct.

17  Q.  Can you explain that?

18  A.  The Beer Yaakov hospital, just like many psychiatric

19  hospitals in the United States, have an inpatient department

20  and an outpatient department.  Many outpatient

21  departments –– many hospitals have an outpatient department

22  attached to the hospital often on the ground floor.  Beer

23  Yaakov is responsible for not only the outpatient departments

24  on the premises of the hospital, but for all the outpatient

25  clinics, from south Tel Aviv all the way down to south Israel.

F1S8SOK3                         Strous - direct

1    As I mentioned, we have a population of well over a million

2    people.  About 100,000 visits a year.

3    Q.  Doctor, have you ever taught psychiatry?

4    A.  I have.

5    Q.  Where?

6    A.  During my fellowship in Boston, in Harvard, I was involved

7    in the teaching of medical students from Harvard Medical

8    School.  Then once I moved to Israel, I became involved in the

9    teaching of medical students at Tel Aviv University.

10          I achieved an academic level, and I was also, for a

11   period just over two years, there is a medical school attached

12   to the Tel Aviv University which is for Americans.  So Tel Aviv

13   University faculty medicine has two sections.  It has a section

14   for Israeli medical students and a section for American medical

15   students.  I was the head of that program for a period of two

16   years.  It's equivalent of dean of a medical school in America.

17   The students used to call me dean, but the official position

18   was program director of the Sackler Medical School.  And I was

19   the head of that for two years.

20          Then I was directly involved in the teaching of

21   medicine in general.  But in addition to that, I have been

22   teaching over the whole period of 14 years or so medical

23   students in the field of psychiatry.

24   Q.  Can you give us some idea of particular areas of psychiatry

25   that you have taught over those 14 years?

1    A.  I have taught all areas of psychiatry.  But once again,

2    based on my particular expertise in certain areas, I have

3    focused on teaching of the areas I am considered to have

4    particular interest or expertise in, and that's involved in

5    schizophrenia, posttraumatic stress disorder and ethics.

6    Q.  Have you taught in the area of depression?

7    A.  Depression, I have taught in that for sure.  I have given

8    courses on that.  But when I have dealt with the research side,

9    I have dealt more particularly with schizophrenia, PTSD and

10   ethics.  But I have given courses on depression, anxiety,

11   personality disorders and neuropsychiatric syndromes.

12   Q.  Other than the teaching that you were doing at Tel Aviv

13   University and the Sackler Faculty, have you done any other

14   teaching?

15   A.  I have taught in various and on numerous organizations,

16   hospitals, as well as conferences where I travel, delivering

17   research papers and giving lectures in many different areas.

18   And I would not bore the court with mentioning, but I give

19   literally tens of lectures every month or two in various areas.

20   Hundreds and hundreds.

21   Q.  Are these all in Israel?

22   A.  Not only in Israel.  I lecture at conferences as well,

23   including the United States and various countries in Europe.

24   Q.  Have you been involved in committee work at Sackler?

25   A.  Sackler Medical School, I was involved in the committee on

F1S8SOK3                         Strous - direct

1    education, the committee on accepting students, selection

2    committee on curriculum development, and I am involved in

3    evaluating research submissions as well as academic

4    advancement.

5           In all medical schools there is a path of academic

6    advancement of which there are various levels, and as part of

7    my commitments to the medical school, I am involved in

8    assessing others' academic advantage, just as others have

9    assessed mine over the years.

10   Q.  Have you ever been awarded any grants to do research in the

11   field of psychiatry?

12   A.  I have.

13   Q.  Could you give us some idea of the grants you have gotten

14   and the areas in which you have done research.

15   A.  I have had 12 grants over the years, amounting to thousands

16   of dollars in various areas, including posttraumatic stress

17   disorder, schizophrenia, neurosteroids, which is a form of, a

18   brain substance which is involved in various psychiatric

19   illnesses, and in ethics.

20          Now, grants are important to do research and research

21   is important to get an academic advancement, which has given me

22   the ability to advance academically according to the path with

23   my current academic level.

24   Q.  Have you published any articles about psychiatry in

25   academic journals?

F1S8SOK3                         Strous - direct

1   A.  I have.

2   Q.  Can you just give us of an idea of about how many articles

3   you have published?

4   A.  Approximately 150.

5   Q.  Are some of these in peer-reviewed journals?

6   A.  They are all in peer-reviewed journals.

7   Q.  Can you explain what a peer-reviewed journal is?

8   A.  Peer-reviewed journal means when you submit a paper it gets

9   evaluated and assessed by several reviewers in your field to

10  ascertain and to ensure that the paper is of high academic

11  standards and meet the standard of any particular journal.

12          A lot of people write articles, for example, in the

13  newspaper on various journals that are not peer reviewed, but

14  that doesn't ensure that the substance of the article has

15  obtained any particular evaluation of peers in your field.

16  Q.  Are the peer-reviewed journals in which you published, are

17  these limited to circulation in Israel or were they circulated

18  more broadly?

19  A.  All of those are international journals.

20  Q.  Have you ever written articles about posttraumatic stress

21  disorder?

22  A.  I have.

23  Q.  Have you ever received any academic professional awards?

24  A.  I have.

25  Q.  Can you give us some idea of about how many and give us

F1S8SOK3                          Strous - direct

1    some examples.

2    A.   23, most of which are from the United States, including

3    leadership awards from the American Medical Association, best

4    research paper by the American Psychiatric Association,

5    American Biological Psychiatry Association, International

6    Neuropsychiatry Association, International Schizophrenia

7    Association.  I can go on.

8    Q.   Are you a member of any professional societies in the field

9    of psychiatry?

10   A.   I am.

11   Q.   Can you just sort of summarize those if the list is too

12   long?

13   A.   There have been several over the years.  Currently, based

14   on where I am living, the Israel Medical Association, Israel

15   Psychiatric Association, Israel Biological Psychiatry

16   Association, The World Psychiatry Association, and the

17   International Biological Psychiatry Association.

18   Q.   Doctor, during the time at the Beer Yaakov Center, have you

19   ever had occasion to evaluate patients for legal purposes?

20   A.   I have.

21   Q.   Can you explain what you have done in that area?

22   A.   As part of my responsibility for being a head of the unit

23   as well as one of the senior psychiatrists we get many cases

24   that are referred to us from the courts for evaluation to

25   ensure the person is competent to stand trial and to see where

F1S8SOK3                          Strous - direct

1    there is any grounds for not guilty by reason of insanity.

2              So these are cases that are sent to the hospital for

3    inpatient evaluation.  And now that I am in the outpatient, we

4    get also similar.  But some people need to be inpatient to be

5    evaluated and some people can be evaluated on the outpatient,

6    and I am involved in assessing that.

7              My level of assessment is on two levels.  Both

8    one-on-one evaluating people over the years.  And then also, as

9    the head of the unit or now the director of the whole services,

10   one can say that many people do need evaluations.  There are

11   fewer than actually give some -- how do you say.  We evaluate

12   those who are evaluating, give them direction, and then even

13   fewer who coordinate the entire process.  That's what my

14   position is now.  I coordinate all those that evaluate the

15   others, who give direction to all of those that are actually

16   evaluating the patients.

17   Q.  In your current position, which I believe is director of

18   outpatient ambulatory services, is that correct?

19   A.  That's correct.

20   Q.  Do you do any work relating to victims of emotional trauma?

21   A.  Yes, I do.

22   Q.  Can you describe the sort of work that you do with respect

23   to victims of emotional trauma.

24             First of all, can you explain what that phrase

25   emotional trauma means to you?

F1S8SOK3                        Strous - direct

1   A.   Emotional trauma relates to the fact that people have been

2   exposed to various events in their lives, experience

3   difficulties which become a focus of clinical interest because

4   it affects their function and then they get referred for

5   psychiatric evaluation, and once they are referred for

6   psychiatric evaluation, I both treat and supervise others

7   giving treatment for those people who are suffering due to

8   exposure to various trauma.

9   Q.   Can you give us examples of the sorts of trauma you're

10  referring to which these patients have been exposed?

11  A.   There are various forms of trauma that people get exposed

12  to.   There is trauma based on what we call normal life

13  events -- divorce, being fired from a job.   And then there is

14  trauma that people get exposed to based on an event which is

15  considered over and above in the normal course of life, normal

16  course of daily living, which is something usually in a

17  situation where a person's life has been in danger or the

18  person feels that their life has been threatened.

19  Q.   Have you treated victims of terrorism?

20  A.   I have.

21  Q.   Have you treated family members of persons who have been

22  victims of terrorism?

23  A.   I have.

24  Q.   Can you give us some idea of the extent of your experience

25  in this area?

F1S8SOK3                         Strous - direct

A.  I can answer it in two levels.  I refer people based on my

management in the clinics as well as based on the fact that I

have attained a certain academic level, which I haven't

mentioned up until now.  There are two tracks I have, both as

director of the ambulatory service but I am also a full

professor at the university.  Based on that, I also get

referred people for assistance based on their academic level.

Let me explain.

        In the United States, in the academics, there are four

levels of academic levels attached to university.  There is

instructor, assistant professor, associate professor and full

professor.  In Israel, there are five.  Instructor, lecturer,

senior lecturer, associate professor and full professor.  I am

a full professor at the medical school.  Based on that, I also

get referred people for management and assessment through

various other channels based on that level.

        So I manage people also with the hat of the director

of ambulatory services and supervise other psychiatrists and

psychologists and social workers who are treating as well as

through the track of being a full professor at the medical

school since I lecture on these fields as well.

Q.  Can you give us some idea of the scope of how many people

have been victims of terrorism you have had a chance to deal

with through any of these various tracks you have mentioned?

Too hard to give a number?

F1S8SOK3                        Strous - direct

1    A.  It's difficult to answer, but I would say tens of

2    individuals, well into over a hundred.

3    Q.  We have been talking about your work both in academia and

4    as the director of the outpatient and ambulatory services at

5    Beer Yaakov.

6            Do you have a private practice as a psychiatrist?

7    A.  I do.

8    Q.  Where is that?

9    A.  I do a few hours in the evenings and one afternoon a week

10   in Jerusalem in Beit Shemesh.

11   Q.  In your work in private practice, have you treated patients

12   for the kind of mental health conditions that you found in the

13   plaintiffs whom you have evaluated in this case?

14   A.  Yes, I have.

15           MR. HORTON:  Your Honor, I would tender Dr. Strous as

16   an expert in psychiatry in the evaluation and treatment of

17   victims of emotional trauma.

18           THE COURT:  Any objection?

19           MR. HILL:  No, your Honor.

20           THE COURT:  You can inquire on that basis.

21           He is so qualified.

22   Q.  Dr. Strous, what were you asked to do in this case?

23   A.  I was asked to evaluate several individuals who were either

24   injured in various terror attacks or whose family members were

25   injured or died in terror attacks.

F1S8SOK3                          Strous – direct

1    Q.  As you sit here today, how many evaluations do you have to

2    offer?

3    A.  My understanding is there are over 20, 24.

4    Q.  Did you interview all of these people?

5    A.  I did.

6    Q.  Were you able to interview all of them in person, meaning

7    that you were physically in the same room with them?

8    A.  No.

9    Q.  Were you in the same room with some of them?

10    A.  Yes.

11                (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1sQsok4                         Strous - Direct

1  Q.  How did you interview those plaintiffs with whom you were

2  not physically in the same room?

3  A.  According to the well-known, well-developed standard of

4  tele-psychiatry, I evaluated people over various

5  telecommunication media such as Skype based on practical

6  considerations.

7  Q.  Could you tell us what you mean by practical

8  considerations?

9  A.  Either people have not been able to meet me -- to come to

10 me in person or people who have been in different countries to

11 me.

12 Q.  Are conducting psychiatric evaluations by Skype considered

13 acceptable in your profession?

14 A.  Yes, it is.

15 Q.  Did you rely on any sources of information other than the

16 interviews of the particular plaintiffs that you've just

17 discussed the interviews in preparing your evaluation of the

18 plaintiffs?

19 A.  Yes, I have, multiple sources of converging information.

20 Q.  Could you tell us what those sources were?

21 A.  The sources include speaking to family members and looking

22 at various medical notes.

23 Q.  Did you read any deposition?

24 A.  As well as, yes, depositions as well.

25 Q.  Have you prepared any materials based on your evaluations

F1sQsok4                          Strous - Direct

1    of plaintiffs?

2    A.  I have.

3    Q.  Doctor, I've placed before you, I hope you still have it, a

4    notebook of your evaluations.  Still there?

5    A.  Yes.

6    Q.  The reporter is looking at it.  I want to make sure you

7    still have it.  If you need to refer to it, please feel free

8    are you familiar with the publication known as *Diagnostic and*

9    *Statistical Manual of Mental Disorder*?

10   A.  Yes I am.

11   Q.  Is that an acronym by that publication is known?

12   A.  Yes.

13   Q.  What is it called?

14   A.  DSM.

15   Q.  Tell us what the DSM is.

16   A.  The DSM is standardized classification of mental illness

17   used by mental health practitioners in the United States.

18   Q.  Is it followed world-wide?

19   A.  It's used world-wide, but not necessarily as an official

20   publication -- the official classification of diseases in

21   countries out of the United States, in most countries what you

22   called ICD, *International Classification Of Diseases*, which is

23   the official classification used in Israel and Europe.

24   Q.  In your work in this case, have you used in at least some

25   cases the terminology used by the DSM in making diagnoses?

F1sQsok4                          Strous - Direct

1    A.  Yes, I have.

2    Q.  In all cases?

3    A.  In most cases, but there's certain cases where the names of

4    various disorders are considered not finely defined by all and

5    the various terminologies that are used for the same disorder.

6    Q.  Dr. Strous, I now want to turn to the plaintiffs that you

7    evaluated starting with Shmuel Waldman.

8           We put a picture of Mr. Waldman up on the screen to

9    help the jury remember who is who here.  Can you briefly tell

10   us who Mr. Waldman is and what you understand what happened to

11   him?

12   A.  Mr. Waldman is a 35-year-old United States citizen who is

13   married and currently residing in New Jersey.  He has five

14   children, and he works in window treatment.

15          On the 22nd of January 2002, he was in Israel at the

16   time on his way home from work.  He was working as a manager,

17   senior manager of a retail home supply store going on his way

18   home.  He was walking in the streets of Jerusalem, and someone

19   came up behind him and sprayed him with bullets, killing a lady

20   standing next to him and being shot himself in the leg.  He had

21   two gunshot wounds to the leg.  He was rushed off to the

22   hospital.  He spent 12 days at hospitals.  Then he had 18

23   months of rehabilitation, both physical and much longer -- 18

24   months of physical rehabilitation but a much longer period of

25   psychiatric rehabilitation.

F1sQsok4                          Strous - Direct

1    Q.  Based on your evaluation of Mr. Waldman, did you diagnose

2    him with any mental disorders?

3    A.  I did.  Mr. Waldman --

4    Q.  What was your diagnosis?

5    A.  According to my best professional opinion, Mr. Waldman

6    suffers from posttraumatic stress disorder as well as

7    personality disorder NOS.

8    Q.  Let's start with posttraumatic stress disorder, which has

9    been mentioned before.  A few minutes ago you were talking

10   about the division of responsibilities, and you talked about

11   acute versus chronic patients.  Would you characterize your

12   diagnosis of PTSD for Mr. Waldman as either acute on the one

13   hand or as chronic?

14   A.  Mr. Waldman, based on the fact that he still exhibits

15   prominent symptoms of the disorder 12 years after the fact that

16   he went through the terror attack, I would diagnose him as

17   suffering from chronic posttraumatic stress disorder.

18   Q.  Can you explain to the jury what posttraumatic stress

19   disorder, or PTSD as I'll often refer to it, is?

20   A.  Posttraumatic stress disorder is a debilitating syndrome

21   where a person is exposed to a catastrophic event in which

22   their life is in danger and they feel that their life was in

23   danger, and they experience intense horror, fear; and it is

24   expressed in a very classic well-known, well-described

25   classical group of symptoms.

1              The group of symptoms is expressed by re-experiencing

2      whereby they have flashbacks that can be going on in their

3      lives and going to the store, to the supermarket, like we all

4      do, and in general day-to-day thinking suddenly they get

5      flashbacks to that catastrophic event where their life was in

6      danger; they have nightmares, they have intrusive thoughts,

7      which means suddenly they could be teaching or working and

8      suddenly they have thoughts of the event and what they went

9      through.  Also when someone mentions what they went through or

10     they get a reminder, like watching the news or reading a book

11     or seeing a movie, they experience intense emotional pain, as

12     well as physiological response, which means their body will

13     respond in a way that suddenly their blood pressure shoots up,

14     they may get headaches, they may get hyperventilation.  They

15     may get palpitations.  That's one.

16             The second is arousal.  They engage in often reckless

17     or self-destructive behavior.  They could be very aggressive.

18     They are hypervigilant.  When they walk through the streets.

19     They're constantly aware that maybe something is going to

20     happen to them.  They're constantly on the lookout.  They can

21     never relax.  It's a very disabling thing.  It sounds as if,

22     oh, what's the difference, you always have to be careful when

23     you cross the street, but these are people that are constantly

24     in fear that something is going to happen to them and it

25     affects their function.

F1sQsok4                          Strous - Direct

1           They're very sensitive to noises.  We don't realize

2      it, but we hear loud noises all the time, but these are people

3      who they may hear a car backfiring or a door slamming or

4      someone shouting, like you get a lot of in Israel, and they

5      once again experience this intense fear.

6      Q.  Are there other symptoms associated with PTSD?

7      A.  There are.  Also there are what we call negative

8      alterations in mood and thinking processes.  They constantly

9      think that they are to blame in some way.  They have a negative

10     self-image about themselves.  They feel that life is not the

11     same.  It's forever changed.  They have problems in

12     concentration.  They may feel hopeless going through what they

13     do.

14          I remind you that catastrophic life events are not

15     just a terror event.  The most common cause of PTSD is motor

16     vehicle accidents, but people go through other events like

17     rape, tsunami, earthquake, etc.  So any kind of these events,

18     even though there are differences and the extent to what some

19     people suffer from what we call these constellation group of

20     symptoms, there are many different responses where a person may

21     feel their life is in danger which get expressed in this

22     manner.

23     Q.  Please explain to us why you made the diagnosis that

24     Mr. Waldman suffers from chronic PTSD?

25     A.  When Mr. Waldman was walking through the streets of

F1sQsok4                          Strous - Direct

 1   Jerusalem going on his way home, being shot at and actually

 2   seeing someone die next to you, that's pretty scary, and

 3   Mr. Waldman felt that his life was in danger.  That set into

 4   motion this cascade of events with all those symptoms that have

 5   been expressed in the various manners over the years.

 6   Q.  Can you give us some examples of his symptoms that he

 7   suffers as a result of his PTSD?

 8   A.  Mr. Waldman clearly describes having chronic nightmares,

 9   flashbacks, especially around the time when his memory is

10   triggered, for example, anniversaries or seeing on the news

11   various reminders of any terror or destructive events.

12        Avoidance.  He tries not to talk about the events.

13   When people talk about it, even though it's very difficult not

14   to because often people who have been in terror attacks are

15   considered somewhat celebrities and people talk about it.

16        He describes he's very sensitive to loud noises and

17   he's hypervigilant in crowds.  He's always looking around him.

18   He can never relax.  That's a very profound thing.  You go

19   through life and you can never relax.  We always have people

20   around us, but he is someone that, you know, you go out and you

21   constantly feel that there's a potential that something is

22   going to happen, you can never relax.

23        He doesn't attend many family celebrations as a result

24   because when you go to family celebrations, there's always a

25   lot of people and there are crowds and you can never be

F1sQsok4                          Strous – Direct

1   comfortable because he expressed he experiences intense

2   anxiety.

3   Q.  Go ahead.

4   A.  This is expressed even in panic.  Panic is a very scary

5   thing.  It can be you go to a wedding, and everyone is happy

6   and enjoying dancing, and suddenly he gets panic because

7   there's a lot of people around because he thinks something is

8   going to happen.  It doesn't make sense, but that's the

9   disorder.

10  Q.  Can PTSD affect one's temper?

11  A.  It does.  I mentioned as part of the arousal that he feels

12  he has -- he gets aggressive and very irritable, and he has a

13  short fuse.  That's affected his relationship with his wife and

14  his children.  His children ask him, "Daddy, why do you get so

15  upset?  We don't understand you when you respond in that way."

16  That is a marked change from before the event.  That is very

17  important to ask in the field if we have to look at temporal

18  association, which means the connection in time between this

19  change in behavior and the event that caused it.  And just over

20  a year ago -- or this was before I saw him, he was

21  hospitalized.

22  Q.  I'll get to that point.

23  A.  OK.

24  Q.  Could you give us an idea of how severe Mr. Waldman's PTSD

25  is?

F1sQsok4                          Strous - Direct

1    A.  I think Mr. PTSD's is severe because it affects his

2    function in a marked way.

3    Q.  Has he ever sought psychiatric help?

4    A.  He has.  He was involved in psychiatric management right

5    after the event.  For the first month after the event where

6    one's life is in danger, we call it acute stress.  We don't

7    call it PTSD.  It has to last longer than one month.  After one

8    month, we call it PTSD.

9         Immediately after the event because Israel has had

10   experience with a lot of people in terror, the idea is if you

11   treat it straightaway and you try involving yourself

12   straightaway, you can help mitigate or stop the development

13   later on of PTSD unless it's very severe.  He was treated

14   straightaway.  Unfortunately, it continued afterwards, and he

15   was treated for a period of years by psychologists.  And then

16   because it was so dysfunctional, he was also referred for

17   psychiatric treatment and he received medication to try to help

18   his PTSD.

19   Q.  As part of your evaluation of Mr. Waldman, have you

20   reviewed any records of his treatment by other mental health

21   providers?

22   A.  I have.

23   Q.  Are you familiar with treatment notes from a doctor named

24   Judith Guedalia?

25   A.  Yes.

F1sQsok4                          Strous - Direct

1   Q.  Are you familiar with Dr. Guedalia?

2   A.  Not personally, but I know who she is, where she works, her

3   function, her position.

4   Q.  Could you tell us who she is?

5   A.  Dr. Guedalia is director of neuropsychiatry at the Shaare

6   Zedek Hospital in Jerusalem.

7   Q.  Do you know if she works until the field of PTSD?

8   A.  Yes, that's her specialty.

9   Q.  Have you reviewed her treatment notes of Mr. Waldman?

10  A.  I have.

11  Q.  How, if at all, do they square with your opinions?

12  A.  Dr. Guedalia diagnosed Mr. Waldman with PTSD and wrote that

13  he that he suffers from severe symptoms involving anxiety, how

14  he looks at himself, how he relates to his family and an

15  inability to work.  She treated him accordingly.

16  Q.  Did you also review any treatment records by doctors named

17  Israel Winkler or Moshe Kalian?

18  A.  Yes, I did.

19  Q.  By both?

20  A.  By both.

21  Q.  Do you know who they are?

22  A.  Israel Winkler is involved in rehabilitation service.  He

23  also evaluated him and he also diagnosed him as suffering from

24  PTSD.

25          Dr. Moshe Kalian is the senior district psychiatrist

F1sQsok4                          Strous - Direct

1    in Jerusalem.  He evaluated him also, and does not acknowledge,

2    on the professional level of Dr. Kalian who is very strict on

3    diagnoses and criteria, he also diagnosed him with PTSD and

4    gave him a certain level of disability accordingly.

5    Q.  A couple minutes ago doctor, I'm afraid I cut you off.  I

6    think you were going to refer to Mr. Waldman's treatment in a

7    facility in America.  Is that correct?

8    A.  In addition to his management by a psychiatrist on an

9    outpatient, he was admitted to Four Winds Hospital -- I will

10   back up a little.  At the time of the event, he was working in

11   Israel, but he moved back to the United States.  He is

12   currently living in the United States.  I believe at the end of

13   2012, his symptoms were once again triggered.  That is a very

14   common thing in PTSD; that things go around and events trigger

15   off, like someone who may have been raped, and then suddenly

16   they see a news report, and it triggers off the symptoms again.

17           So for him, his symptoms were triggered off because

18   there was a flaring of hostilities in Israel again based on

19   various things that were happening at the time in the Middle

20   East.  He became very aggressive, irritable, depressed and he

21   was admitted to the Four Winds Hospital for a period of six

22   days.

23           While there, he was diagnosed once again suffering

24   from posttraumatic stress disorder and major depressive

25   disorder, and he was treated accordingly.  And very clearly, we

F1sQsok4                                Strous – Direct

1    are talking ten years later, they diagnosed him.  These aren't

2    Israeli doctors and psychological mental health practitioners

3    in Israel.  These are people who are here who are giving

4    independent evaluation of someone ten years down the line also

5    diagnosing him as PTSD.  That for me is a very prominent

6    indication of the fact that he is still suffering ten years

7    down the line.

8    Q.  By the way, Doctor, did you understand that his PTSD has

9    affected his business at all?

10   A.  While in the attack in Israel, he stopped working at the

11   place.  He was unable to concentrate.  He was unable to

12   function.  He left that job.  He returned to the United States

13   and he never managed to find really his place.  His functional

14   ability was considered to be high, as verified by an

15   evaluation, I believe by Israel Winkler, that before the event

16   he was functioning at a very high level, very intelligent; and

17   that changed markedly after the event.

18        On his return to the United States, he never found his

19   place.  Eventually, his father, who is a successful

20   businessman, set him up in a window treatment business, and I

21   believe that it's floundering, not doing well, and he feels

22   that he is inadequate.  He is not able to focus.  He is not

23   able to function based on his mental health state over the

24   years.

25        He never attained and returned to his previous

F1sQsok4                          Strous – Direct

1    function.  He never got back to that.  He is a gentleman with

2    high expectations and high potential, and he just is not doing

3    it yet, and he just never managed to be what he says, a father

4    and a husband to his family and provide for them accordingly.

5    That is another source of frustration for him.

6    Q.  Let me take you back now to a moment.  When I asked you

7    initially what your diagnoses were, you gave me two, the first

8    of which was chronic PTSD which we have been discussing.

9         If I'm correct, the second one was personality

10   disorder N-O-S, I believe you said.  Is that correct?

11   A.  That's correct.

12   Q.  First of all, could you tell us what NOS stands for?  Is

13   that an acronym?

14   A.  It's an acronym for not otherwise specified.

15   Q.  Can you tell us what personality disorder not otherwise

16   specified is?

17   A.  Personality disorder is a very common group of symptoms --

18   common condition whereby a person over time exhibits, shows,

19   maladaptive, inflexible patterns of dealing with other people.

20   So these are people who have difficulties relating to other

21   people in their interpersonal function, in their dealings with

22   other people.  So they may be impulsive.  They may be not

23   respectful.  And there are various -- a number of ways that it

24   can be expressed.

25   Q.  Why do you say that Mr. Waldman has personality disorder

F1sQsok4                         Strous - Direct

1    NOS?

2    A.   Because I think there is something about the manner of

3    Mr. Waldman the way he comes across that he doesn't always take

4    into consideration the sensitivity of others.  He has become

5    very self-preoccupied with his physical and emotional

6    difficulties, and is not sure about his direction in life and

7    his confusion sometimes in what he wants to do.

8    Q.   Can you tell us whether or not Mr. Waldman had personality

9    disorder NOS before the terrorist attack?

10   A.   There may be some features in his personality that affected

11   his behavior and interaction with other people, but very

12   interestingly, a lot of people have issues, but they deal with

13   it.  What happens is that when a person goes through stress in

14   life, people behave in certain ways that are difficult for

15   other people around them, but one can understand based on the

16   stress that they've gone through.  So even though when we look

17   at them we say, hey, that person is not behaving in a way that

18   is conducive to appropriate behavior amongst other people, we

19   can understand that their engagement of behavior based on

20   various stress that they've gone through in life.

21        For example, someone goes through a difficult day at

22   work and they come home and they're frustrated and they may

23   kick the door or they snap at family members.  We also see it

24   when people get old and frustrated or people don't have -- or

25   someone's been fired from a job or people have relationship

F1sQsok4                          Strous - Direct

1    difficulties that comes out that they become difficult people.

2    But that doesn't mean necessarily that that would have happened

3    if they hadn't gone through those difficulties.

4              So, in answer to your question, did he have this

5    before?  It could be, but it was only expressed to the extent

6    that it was following the terror attack.  There was no

7    evidence, both from his family, both from his wife, both from

8    the psychologist who evaluated him directly at the time that

9    any of this was involved in any of his interaction, and his

10   wife says it.  His wife says very clearly, "This is not the man

11   I married.  He was not like this before."  Or at the time of

12   the marriage; it wasn't before the terror.

13   Q.  Does the personality disorder NOS have any impact on his

14   PTSD?

15   A.  No.  Well, from the perspective of what I just mentioned,

16   that the PTSD and the stress that he went through affects the

17   expression of that in terms of now that he's gone through the

18   stress, it comes out.  But personality disorder doesn't cause

19   PTSD.

20   Q.  Dr. Strous, have you reviewed the reports of mental health

21   experts hired by the defendants in this case for Mr. Waldman?

22   A.  I did.

23   Q.  Are you aware that they have diagnosed him with something

24   called narcissistic personality disorder?

25   A.  Yes.

F1sQsok4                            Strous - Direct

1    Q.   What is that?

2    A.   Narcissistic personality disorder is a pervasive -- it's a

3    strong feeling where a person believes he is -- he has

4    pervasive states of grandiosity, need for admiration, that the

5    person has a sense of entitlement, he exploits other people, he

6    is preoccupied with the feeling of unlimited success,

7    greatness, power.  He is arrogant, haughty and interacts with

8    people throughout his life or her life in that manner.  We see

9    this in all walks of life, and it significantly affects

10   people's relationships with that person.

11   Q.   Do you agree or disagree with the diagnosis that

12   defendant's experts gave of narcissistic personality disorder?

13   A.   Definitely not.  Mr. Waldman --

14   Q.   You say definitely not.  You mean you disagree?

15   A.   I disagree.  I disagree.

16   Q.   Could you tell us why?

17   A.   People narcissistic personality disorder believe that

18   they're special, believe that they need to be admired, believe

19   that they -- and exploit other people.  This is a man who in

20   2010 donated his kidney to a person he didn't know.  He just

21   thought about it at the time, and he decided I want to give

22   part of my body to someone else.  There is no way that anyone

23   with narcissistic personality would ever do that.

24           Most importantly, I would say, one of the most

25   important factors that has caused Mr. Waldman to feel

F1sQsok4                                Strous - Direct

1    frustrated and irritable is the fact that he believes he is a

2    failure in his life.  He believes he has failed his family, he

3    has failed himself, and he cannot -- he feels that the way he

4    interacts with people because of what he went through, he has

5    no control of and, therefore, he has failed people around him.

6    He feels he failed his family financially because he can't

7    support them.  He gets help from his father.  There is no way

8    who someone who is a narcissistic personality disorder feels

9    that way.  In fact, on the contrary, by definition, someone who

10   has a narcissistic disorder has these feelings of unlimited

11   success, power and he is just not there.  And you need all of

12   those symptoms.

13   Q.  Another acronym for you, Doctor.  Do you have any

14   understanding as to whether Mr. Waldman may have ADHD?

15   A.  May I define that first.  ADHD is attention deficit

16   hyperactivity disorder.  There has been some mention that

17   perhaps in the past Mr. Waldman had issues of ADHD.  I did not

18   see anything on my examination that indicated that he had ADHD,

19   but there is evidence in the literature that those who had ADHD

20   in the past are more susceptible for developing PTSD later, but

21   more importantly are more susceptible to developing severe

22   PTSD.  So that's something that doesn't cause it, but those who

23   have it are more open to developing it.

24         And PTSD, may I just as an aside, there are certain

25   things that put a person to be more predisposed to developing

F1sQsok4                        Strous - Direct

1    PTSD.  For example, females are more predisposed to get PTSD.

2    As I mentioned, people who are ADHD are more predisposed to

3    getting PTSD.  And people who are exposed to a catastrophic

4    life event which was sudden and violent.  So you get much more

5    PTSD for someone who was in a terror event compared to someone

6    who was in a PTSD in a tsunami or an earthquake.  That is quite

7    clear from the literature.

8    Q.  Why is that, Doctor?

9    A.  The suddenness, the what we call the evil intent what the

10   person perceives as evil intent, they are unable to make sense

11   of it, the fact that definitely is considered to predispose.

12        There are two ways to divide PTSD.  There are natural

13   events and there's human events.  So a person can feel their

14   life is in danger from a human event, like a motor vehicle

15   accident or terror event, or PTSD from a tsunami or earthquake

16   or an avalanche.

17        PT is much higher from someone involved in a human

18   event.  But even if you look at the human event, there is

19   intentional and non-intentional human event.  Non-intentional

20   is motor vehicle accidents.  An intentional is terror victim or

21   homicide or rape.  So PTSD rates are much higher under rape or

22   terror event, they're very similar, actually, compared to a

23   motor vehicle accident when it wasn't intentional but the

24   person's life was in danger.

25   Q.  Doctor, can you tell us whether Mr. Waldman's condition has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1sQsok4                          Strous - Direct

1    improved over the years?

2    A.   It has improved to some extent.  In some ways part of it

3    has gotten worse.  It's involved a hospitalization for the

4    management of PTSD ten years later, which he never experienced

5    after the event.  And that is actually well-described in the

6    literature.  PTSD as a result of non-intentional trauma

7    actually gets much less over time, but there have been reports

8    that PTSD related to intentional trauma:  Rape, terror event,

9    homicide, actually increases over time, over the years.

10   Q.   In your professional opinion, Doctor, what is the cause of

11   Mr. Waldman's PTSD?

12   A.   I think it's very clear based on my evaluation of

13   Mr. Waldman taking into account all the corroborating

14   information -- depositions, medical reports -- that in my best

15   professional opinion I would hazard to say in a very obvious

16   manner that his PTSD is related to the terror event experience

17   in 2002 where he was shot on the streets of Jerusalem.

18   Q.   Do you believe that his PTSD and personality disorder are

19   reasonably certain to be permanent?

20   A.   Yes.

21   Q.   Do you hold all of the opinions that you've given today

22   about Mr. Waldman today to a reasonable degree of medical

23   certainty?

24   A.   Yes.

25              THE COURT:  Can we take lunch break at this point?

F1sQsok4                          Strous — Direct

1              MR. HORTON:  Certainly, your Honor.

2              THE COURT:  Ladies and gentlemen, Don't discuss the

3    case.  Keep an open mind.  I'm going to ask you to be back in

4    the jury room by 2:05.

5              (Luncheon recess)

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1S8SOK5                              Strous – direct

1                            AFTERNOON SESSION

2                                2:05 p.m.

3              (Jury not present)

4              THE COURT:  Can we continue with this witness?

5         What do we need to address?

6              MR. HORTON:  By agreement among counsel, we have

7    placed the little cards, we have placed them on the jurors'

8    chairs, because we are going through the plaintiffs now, just

9    as an aid to help the jurors remember who is who in the case.

10   But we are agreed on this.

11             Do you need a card?

12             THE COURT:  No, I have two of them right here.

13             Let's get the jury.

14             Do you have the actual exhibit photos that you wanted

15   me to look at?

16             MR. YALOWITZ:  I think we have a courtesy copy coming

17   in a second.  We got it during the lunch break.  So bear with

18   me.  Why don't I go back and check while we are waiting.

19             Is that it?  Here it is, Judge.  I will give it to

20   your law clerk.

21             Let's get the jury.

22             (Continued on next page)

23

24

25

F1S8SOK5                          Strous – direct

1                (Jury present)

2       RAEL STROUS, resumed.

3                THE COURT:  You can continue, Mr. Horton.

4                MR. HORTON:  Thank you, your Honor.

5       BY MR. HORTON:

6       Q.  Dr. Strous, I now want to move to the Gould family.

7                Who did you evaluate from that family?

8       A.  I evaluated two people, Shayna Elliott and her mother

9       Elise.

10      Q.  Let's start with Shayna, whose full name is Shayna Gould

11      Elliott.

12               Can you tell us what you understand of what happened

13      to Ms. Elliott.

14      A.  First background.  She is a 32-year-old United States

15      citizen, married with two children, living in the area of

16      Chicago.

17               On the 22nd of January 2002, she was in Israel

18      studying post high school.  She went to Jaffa Street to pick up

19      a ticket to return to the United States, her air flight ticket.

20      While she was walking through the streets, she was shot and

21      injured very severely.  She does not remember the details of

22      the shooting too well.  It appears that she lost consciousness

23      a little bit afterwards and it affected her memory for some of

24      the precise details after she was actually shot.  But she was

25      told by the ambulance driver who picked her up what happened.

F1S8SOK5                          Strous - direct

1              He had seen her fall after being shot by the man --

2       apparently the shooter was about seven feet away from her.  She

3       was walking through the streets.  So once again, she is 20

4       years old and just going about her life and she was shot in the

5       chest, just above the breast, and rushed off to hospital.

6              The ambulance driver -- it became a famous, well-known

7       case in Israel because the ambulance driver's wife worked in

8       the operating room and she was there on arrival.  She came with

9       no pulse and they considered her dead.  But because the

10      ambulance driver had called his wife, who had worked in the

11      operating room, they moved her straight up to the operating

12      room.  She didn't even go through the emergency room.

13             She was operated on immediately.  They cut open her

14      chest, removed some ribs.  She had open heart resuscitation.

15      Open heart resuscitation means, instead of what we see when we

16      see a person pushing on the chest to get the heart going,

17      actually took her heart out with the doctor's hands and pumping

18      the actual heart itself.  Open heart resuscitation.

19             She developed -- because the lung was so damaged, they

20      removed the lung.  She was in intensive care for I believe a

21      period of five days and she remained in hospital for two weeks.

22             She does not remember anything of being in intensive

23      care.  She was unconscious in a kind of coma, and probably

24      induced coma.  After she came out of the intensive care, she

25      started remembering that period of time.

F1S8SOK5                          Strous – direct

1    Q.  In addition to interviewing Ms. Elliott herself, did you

2    speak to anybody else about her?

3    A.  I spoke to her mother.

4    Q.  What is her mother's name again?

5    A.  Her mother is Elise.

6    Q.  Based on your evaluation of Ms. Elliott, did you diagnose

7    her with any mental disorders?

8    A.  Yes.

9    Q.  What was your diagnosis?

10   A.  I diagnosed her with posttraumatic stress disorder, PTSD,

11   which we discussed before, and adjustment disorder with

12   depression.

13   Q.  Briefly on the PTSD, when we talked about Mr. Waldman I

14   think you termed it as chronic PTSD.  Is it chronic with Ms.

15   Elliott as well?

16   A.  It is.  Based on the time that I evaluated her, which was

17   early in 2013, she still had significant symptoms resulting

18   from this terror attack affecting her life, impairing many

19   aspects of her function in various ways, and therefore based on

20   that, 11 years later I call that chronic.

21   Q.  Let me ask you a terminology question.  Your second

22   diagnosis, if I got it right, was adjustment disorder with

23   depression, is that correct?

24   A.  That's correct.

25   Q.  This is a terminology questions.  Can you tell us, what is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1S8SOK5                          Strous - direct

1   adjustment disorder with depression?

2   A.   Adjustment disorder with depression is the development of

3   emotional and behavioral symptoms in response to a stress in a

4   person's life, to the extent that it becomes a marked -- causes

5   marked distress and it affects function and impairment of,

6   social and occupational function.

7   Q.   You refer to adjustment disorder with depression.  Is it

8   possible to have an adjustment disorder with some other

9   condition besides depression?

10  A.   Adjustment disorder can be manifested in many ways in

11  different people.  Most commonly depression is one way, and we

12  know what depression is, or it could be anxiety and sometimes

13  it affects conduct.  The person becomes very agitated,

14  irritable, aggressive.

15         In her situation I am calling it adjustment disorder

16  because, not relating to the event itself but the repercussions

17  of the event, how it affected her life, caused marked stresses

18  in other areas.  So PTSD is related to the terror event itself

19  and adjustment disorder is related to a marked distress and

20  related to other effects that the event had on her life.

21  Q.   Doctor, I want to ask you about the bases for each of your

22  two diagnoses, chronic PTSD and adjustment disorder with

23  depression.

24         Starting with the period in the aftermath, not just

25  the few days but the period closer to the attack.  I am going

1    to ask you to talk about both, and if you could make clear when

2    you're talking why she has PTSD and why she has adjustment

3    disorder depression.

4           So if you could start with the period relatively soon

5    after the attack.

6    A.   Shayna, following the initial treatment in the hospital,

7    she was discharged and she reports that her rehabilitation

8    period was very challenging, very difficult for her, and caused

9    a lot of issues, which is not always the usual picture.  She

10   reported that she was very weak.  Her left arm, she had to

11   start learning how to use again.  She is left-handed, and she

12   was in a lot of pain.

13          She stayed in Israel for another month.  She couldn't

14   go back to the school where she was studying because of the

15   risk of infection, so she had to move into a hotel near the

16   hospital with her mother.  And this for her was very traumatic

17   in itself.  She reported that she did not get on well with her

18   mother over this time, in close contact, and she was going

19   through various physical therapy, occupational therapy, and it

20   was very traumatic.

21          The emotional trauma in particular she reports was

22   very overwhelming.  She said she tried to survive but she

23   remained in a lot of pain.  Her mother had to do everything for

24   her.  She couldn't shower.  She couldn't wash herself.  She

25   felt she was taken down as a person and as a cripple.  She was

F1S8SOK5                          Strous - direct

1    a 20 year old.  She was a good looking young lady, saw her

2    whole life ahead of her, and she just felt that this took the

3    bottom out of her life.

4            She distinctly remembers feeling she wasn't herself.

5    Before she was very independent, lots of friends, gregarious,

6    and now she was limited to the room with her mother.  She felt

7    that no one would ever marry her because of her disfigurement,

8    and at the time she thought she couldn't function.  Remember,

9    her arm, she couldn't use her arm.  She thought look at how I

10   am.

11           She felt a lot of guilt later on because she could see

12   the tension that was developing between her parents over this

13   time.  She reported that she had a destroyed self-image.  She

14   wasn't herself.  She felt life was all over for her.  This was

15   compounded by the fact that she couldn't sleep and she had this

16   underlying anxiety which started, which she didn't have before.

17   Constantly on edge.

18           Anxiety, we think about depression, feeling down is a

19   big thing.  But sometimes anxiety, when a person is anxious,

20   constantly on edge, tense all the time, that can in some ways

21   be more disabling, and that is what she reported.  For her the

22   anxiety, constantly feeling on edge, constantly feeling tense,

23   affected her ability to function.

24           After a period of six to nine months -- she didn't

25   remember exactly when -- she felt she absolutely lost it and

F1S8SOK5                         Strous – direct

1   started seeing a psychologist, which lasted for a period of

2   years after that.

3   Q.   The symptoms you have just been describing, do they deal

4   with PTSD or adjustment disorder with depression?

5   A.   The PTSD symptoms are a little different from that.  I am

6   reporting the adjustments, the adjustment disorder to the

7   condition of being in close quarters with her mother and

8   dealing with her disabilities.

9            The PTSD symptoms started developing over this time

10   and exist to this day, as expressed by still recurring

11   nightmares.  She had started developing flashbacks, which were

12   very frequent early on and less so now.  Avoidance, where she

13   would avoid talking about -- anyone who wanted to talk to her

14   about it, she couldn't talk about it.

15           Later it came to follow her wherever she went.  She

16   became a celebrity.  Whenever she went to the restaurant,

17   you're the person who got shot, you're the person who nearly

18   died, and it became her identity.  So she would avoid trying to

19   talk about and going to places with people who may talk to her

20   about it.  She developed marked noise sensitivity.

21   Q.   Just go a little slower.

22   A.   PTSD, she met all three of those criteria for PTSD of

23   reexperiencing the flashbacks, the avoidance, and the arousal,

24   the sensitivity.

25           There were other long-term psychological issues that

F1S8SOK5                          Strous – direct

1    came out.

2    Q.  I was just about to ask you.  I had asked you before to

3    deal with the immediate period.  Can you talk about what you

4    saw with the longer term.

5    A.  The longer term it came to affect her in other ways.  She

6    felt very unattractive.  She felt no one would marry her.  This

7    became a very profound influence on her behavior.  She would go

8    in and out of relationships because she was scared that no one

9    would marry her.  So she would connect with guys who weren't

10   necessarily the most appropriate because she was scared that no

11   one would love her, no one would ever marry her.  So she wanted

12   the connection just to give her some validity.

13          Over time it became difficult to separate who she was

14   and her as a victim.  It took over her life.  Remember, she was

15   a young person still developing her personality and her

16   direction in life.  She reported that the period, a year or two

17   or three and onwards was awful for her and she dealt with this

18   and she was given treatment and psychotherapy.

19          Long-term effects over time, in answer to your

20   question, she still feels constant underlying fear.  She has

21   this feeling, and this is very common with people with PTSD,

22   this pending doom that something is going to happen.  She

23   remembers very clearly writing in her diary the night before

24   this happened that life is so good, things are going well, and

25   then, boom, the next day she gets shot.

F1S8SOK5                          Strous - direct

1              So now she has developed this perception that just

2      life is not a safe place.  Her husband -- she is married now --

3      travels and she is constantly terrified that something is going

4      to happen to her.  So she could never relax.  She is constantly

5      on this flame of anxiety.

6              You look at her and you say she looks OK.  But so do

7      people who have been raped and so do people who have gone

8      through child abuse.  That affects their life forever, and

9      that's exactly what has happened to her.  That even though she

10     is married now and she has a husband and her fear that she

11     would never get married wasn't actualized, she did get married

12     but it is still affecting her life.

13             She goes through thinking negatively, with negative

14     scenes of the event.  It affects her friendships.  She feels no

15     one can ever understand me.  So there is always that distance

16     between her and her people and her interactions.

17     Q.  Is it your understanding, Doctor, that Shayna received any

18     mental health treatment for the conditions that you have

19     described?

20     A.  Yes, she did.  She was in psychotherapy treatment by

21     psychologists for several years.

22     Q.  Have you had a chance to review any of the mental health

23     records of the people who have treated Shayna?

24     A.  Yes.

25     Q.  How did they relate to your opinions here?

F1S8SOK5                          Strous – direct

1   A.  She was treated by a psychologist and she was diagnosed

2   with PTSD trauma and having difficulty defining her direction

3   and dealing with the anxiety of what she went through.

4   Q.  A couple of minutes ago you referred to the period after

5   the attack when she had to move into a hotel and stay with her

6   mother, and I think you mentioned the relationship with her

7   mother.

8          Can you tell us more about the nature of Shayna's

9   relationship with her mother.

10  A.  Shayna is a young lady, was a strong character and here,

11  from a position of independence, she was suddenly thrown into

12  an environment of being closed up with her mother, and her

13  mother had been concerned for her child that had just been

14  shot.  Remember, her mother had never been to Israel and her

15  mother was also thrown into this stressful, sudden situation,

16  literally taken out of class, thrown off to Israel after

17  hearing her daughter was shot, flying on a plane not knowing if

18  her daughter was alive or dead, arriving, 12 days in hospital.

19  And two of them, with strong characters, had a lot of clashes

20  in their relationship and constant tension between the two of

21  them and ongoing conflict, which continues to this day.

22  Q.  Do you have any views as to whether the difficulty she has

23  had with her mother contributes to her PTSD or to the

24  adjustment disorder with depression?

25  A.  I don't believe it's related to the PTSD.  I think in my

1     best judgment it is related to the adjustment disorder because

2     that is part of her stress that she is dealing with and the

3     aftermath of what happened.

4             So in addition to the PTSD, she had this other aspect

5     of the ongoing stresses which affected -- at the time of me

6     evaluating her, she was not in contact with her mother.  They

7     had cut off interaction, and that for her was a big stress.

8             Also, because her mother blamed Shayna going through

9     what she went through with the shooting, not Shayna but the

10    event, as causing the breakup of her marriage.  So in addition

11    to the tension between Shayna and her mother, Shayna felt guilt

12    that what she went through caused the breakup of her parents'

13    marriage.

14    Q.  Doctor, to your knowledge, did Ms. Elliott suffer from any

15    mental disorders before the shooting?

16    A.  No.

17    Q.  Has she improved over the years?

18    A.  She has improved over the years.  And while the severity of

19    the PTSD is not as severe as it was early on, it still

20    continues to be a very serious condition for her affecting

21    aspects of her life.

22    Q.  In your opinion, Doctor, what is the cause of Ms. Elliott's

23    posttraumatic stress disorder and her adjustment disorder with

24    depression?

25    A.  She was shot in Jerusalem.

F1S8SOK5                        Strous – direct

1   Q.  Do you believe her chronic PTSD and adjustment disorder

2   with depression are permanent?

3   A.  Yes.

4   Q.  Do you hold all of the opinions you have given about Ms.

5   Elliott today to a reasonable degree of medical certainty?

6   A.  Yes.

7   Q.  Let's move now, Doctor, to someone we just referred to, Ms.

8   Elliott's mother, Ms. Elise Gould.

9           I asked you before if you had gotten any information

10  from Shayna or anyone else.  Did you get any information about

11  Ms. Gould from anybody else?

12  A.  From her daughter Shayna.

13  Q.  Tell us a little bit about who Ms. Gould is and what

14  happened to her in the aftermath of the attack.

15  A.  Ms. Elise Gould is a 64-year-old United States citizen,

16  divorced with two children.  She is a school teacher.

17          On the 22nd of January 2002, she remembers very

18  clearly she was in class teaching.  She was called out of class

19  to go to the principal's office.  She thought she was about to

20  be fired.  She received in the principal's office a telephone

21  call from her husband -- they were married at the time --

22  indicating that their daughter had been shot and severely

23  wounded in a terror attack in Israel.  He said they needed to

24  go urgently to Israel.

25          She went home, packed her bags, and was rushed off to

F1S8SOK5                      Strous - direct

1   the airport.  She flew to Israel.  She tried to get information

2   on the way and she remembers vividly the panic, despair,

3   bewilderment, shock of not knowing what was going on.  All she

4   knew was her daughter was in surgery.  She knew it was serious,

5   and they didn't give her any further information.  So she

6   thought her daughter was dead.

7           The immediate impact for her was shock, anxiety, worry

8   and pain, and she arrived in Israel.

9   Q.  Did you diagnose Mrs. Gould with any mental disorders?

10  A.  I did, yes.

11  Q.  And what are those?

12  A.  I diagnosed her with adjustment disorder with depression

13  and chronic PTSD.

14  Q.  With respect to the PTSD, did she have what I will call

15  full-blown PTSD like her daughter?

16  A.  Yes, she did.

17          Sorry.  The mother?

18  Q.  The mother.

19  A.  Partial PTSD.

20  Q.  OK.  I think that's the first time we have heard of partial

21  PTSD.  Can you explain to us what partial PTSD is.

22  A.  Partial PTSD is a syndrome well described in the literature

23  whereby a person either immediately or over time has the

24  symptoms of PTSD but not necessarily all the three clusters.

25  There are four clusters now.  At the time I evaluated her it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1S8SOK5                        Strous - direct

1    was still the old DSM.  It may be that the person has one or

2    two clusters and we call it partial PTSD as opposed to complete

3    PTSD.

4           That does not in any way take away from the severity

5    of the illness because the person could have severe partial

6    PTSD with just one or two of the three but suffers very

7    severely.  But it is a syndrome that is common in literature

8    and is gaining more research because either over time the

9    person has partial over time or only at the time has partial.

10   But it's well-known to the extent that it's become a focus of

11   clinical and research concern.

12   Q.  Just to clarify, partial PTSD, is that necessarily less

13   serious than, again, if you're comfortable with the phrase,

14   full-blown PTSD?

15   A.  No.

16   Q.  Now I want you to go back now and tell us what the bases

17   are for your two diagnoses of Ms. Gould, chronic partial PTSD

18   and adjustment disorder with depression, again beginning with

19   the period soon after the attack and then moving forward in

20   time after that.

21   A.  At the time she thought that her -- she knew her daughter

22   was in a very serious situation and may even be dead.  So she

23   arrived in Israel and the thought going through her mind is

24   maybe my daughter is dead or severely injured.  This brought

25   back thoughts for her, when she was a child her parents also

F1S8SOK5                          Strous - direct

1    lost a child.  She thought, just like her parents lost a child,

2    she is about to lose a child.  She thought she could be in the

3    same situation.

4             Visiting Shayna in Israel for her was very

5    overwhelming, bewildering.  This was her first time in Israel,

6    in a hospital, didn't know the language.  Her daughter was in

7    surgery.  She was so overwhelmed by this she couldn't even tell

8    her daughter that her lung was removed.  So she asked her

9    doctor to tell her.

10            She described the time as being overwhelming,

11   devastating for her.  9/11 was still fresh in her mind.  I

12   remind you that this was a few months after 9/11.  So the whole

13   psyche of many people living in America at the time was terror

14   is something very real and people were on edge in general.  So

15   this just compounded the worries for her that now her daughter

16   was caught up in something very similar.

17            She also felt a lot of guilt because it was her who

18   allowed her daughter not only to go to Israel but to stay for a

19   second year.  This was her daughter's second year in Israel.

20   As I mentioned when I spoke about Shayna, she stayed in Israel

21   when her husband went back and she looked after Shayna.  She

22   was responsible for all of Shayna's initial care while in

23   Israel and fighting with authorities in Israel.  Things aren't

24   as polite and developed in some ways as things are from my

25   experience in the United States.  The bureaucracy was a big

F1S8SOK5                              Strous - direct

1    issue and she had to fight with the bureaucracy to get the

2    medical care her daughter needed, the various therapies,

3    dealing with the hotel, etc.

4            Therefore, a lot of tension developed, as I mentioned,

5    during that time between her and Shayna.  She felt if anything

6    went wrong, Shayna would blame her when it wasn't her fault.

7    She was just trying to do her best.  There was this constant

8    stress going on.  So that was the initial time.

9    Q.  Before you move on to the longer term, I want to take you

10   back and ask you a question I should have asked you before.

11           When you talked about Mr. Waldman and Ms. Elliott

12   having PTSD, they were of course both the physical victim of

13   attacks and, as you testified, Ms. Gould was back in the United

14   States when her daughter was attacked.

15           Does one have to be present at the site of the event

16   in order to be diagnosed with PTSD?

17   A.  You're asking an interesting question because one would

18   think that by definition PTSD is, and the specific cluster of

19   symptoms, group of symptoms that comes from it, you would

20   expect it would have to be you involved, that you would have to

21   be at the site with your life in danger.  But in actual fact,

22   if it's someone who is a close family member or someone who you

23   are in close connection with whose life is being threatened,

24   you yourself can develop a classic group of symptoms that I

25   mentioned.  That's exactly what happened with her.

F1S8SOK5                        Strous - direct

1          The DSM, the bible of our classification that I

2    mentioned earlier, defines that and says PTSD is not only

3    occurring -- does not only occur with people themselves when

4    their lives are threatened, but if your significant family

5    member or close relative's life has been in danger, you too can

6    suffer from PTSD.  And that's what happened with her.

7    Q.  Thank you, Doctor.

8          Now go back to where we were.  I was about to ask you

9    about the longer term consequences and symptomatology that you

10   saw in Ms. Gould that support your two diagnoses.

11   A.  So Mrs. Gould strongly reports how the stress and exposure

12   being with Shayna's injuries affect her mood to this day.  Now

13   in her situation we are talking about the mood was very

14   prominent.  She says she started getting very emotional over

15   relatively small issues, which wasn't there before, because of

16   the stress.  She gets especially emotional at times of

17   festivals and other occasions because she lost her family.  Her

18   family fell apart after this.  She doesn't have any contact

19   with Shayna and that was a marked change from before.

20         She attributes her divorce to her husband, which

21   happened afterwards, to the fact that she wasn't available

22   emotionally for her husband, both on an emotional level but

23   also physically present because she was busy dealing with

24   Shayna's issues.  And she said she grew apart from her husband

25   on the basis of that, including the fact that he started -- it

F1S8SOK5                        Strous – direct

1    came into play there was a continuation of an extramarital

2    affair and she attributes the fact that this continued because

3    of the fact that she wasn't there for her husband.

4           She also reports that she developed various medical

5    problems which she didn't have before, acid reflux and her

6    weight went completely out of control causing her medical

7    problems such as high blood pressure and borderline diabetes.

8    So she reports because she was constantly under stress that

9    affected her medical status as well.

10          She also feels distant from her social crowd.  And

11   this is a very common thing with PTSD.  People feel alienated.

12   It is one of the criteria, that you feel distant.  You can't

13   connect.  You're not there with people and you feel that no one

14   can understand you.  You feel like your life is completely

15   changed forever.  No one can understand me so I don't want to

16   be around people.

17          She did see a therapist in order to deal with the

18   emotional state because she thought it was very traumatic and

19   turned for help because she wasn't able to deal with it on her

20   own.

21   Q.  Doctor, do you ascribe any of her problems with the fact

22   that she was a caregiver for Shayna, even putting aside the

23   differences that they had, that she had to care for this person

24   who was physically injured?

25   A.  I believe the stress of dealing with someone who is

F1S8SOK5                        Strous - direct

1   chronically ill and in an acute stage, and initial stage and

2   long-term also did contribute to a lot of her stress, and

3   that's something that is well described in the literature. that

4   people dealing and caring for people who have illness, serious

5   illness -- in this case Shayna would meet those criteria --

6   affected the person's mental status as well.

7   Q.  Is there literature in the medical and psychiatric

8   literature that involve this issue of the difficulties of a

9   caregiver?

10  A.  Yes.

11  Q.  Let me go back to Mrs. Gould and her husband.  You

12  mentioned that they became divorced sometime after the attack,

13  correct?

14  A.  That's correct.

15  Q.  Are you aware that Mr. Gould had an affair at some point?

16  A.  Yes.

17  Q.  Is that something you discussed with Mrs. Gould?

18  A.  Yes.  She told me about it.

19  Q.  Do you have an opinion on the extent of either the divorce

20  or the fact that her husband had an affair is the cause of

21  either her PTSD or her adjustment disorder with depression as

22  opposed to what happened to her daughter?

23  A.  No.  I don't think her PTSD or adjustment disorder is

24  caused by the fact that her husband had an affair.  I believe

25  that part of the adjustment disorder and dealing with the

F1S8SOK5                           Strous - direct

1    aftermath of what happened or being disconnected to Shayna and

2    divorcing and the stress of being divorced, I believe that

3    contributed to some of the symptoms of adjustment disorder but

4    didn't cause adjustment disorder.  She would have adjustment

5    disorder even if she was still together with her husband, but

6    that's an added stress that contributes to the condition.  In

7    terms of PTSD, absolutely not, it's not connected.

8    Q.  To your knowledge, did Mrs. Gould have any mental disorders

9    prior to the attack on Shayna?

10   A.  No.

11   Q.  In your opinion, what is the cause of her chronic partial

12   PTSD and adjustment disorder with depression?

13   A.  The shooting of her daughter.

14   Q.  Do you believe that her chronic partial PTSD and adjustment

15   disorder with depression are reasonably certain to be

16   permanent?

17   A.  Yes.

18   Q.  Do you hold all of the opinions that you have given about

19   Elise Gould today to a reasonable degree of medical certainty?

20   A.  Yes.

21   Q.  Doctor, let's turn to another family, the Sokolow family.

22   Can you start by telling us how many members of that family you

23   evaluated.

24   A.  There were five, the two parents and three daughters.

25   Q.  Without going into any real details about the individual

F1S8SOK5                          Strous – direct

1    members of the family, can you just tell us in general what

2    happened to the Sokolow family.

3    A.   One of the Sokolow daughters, Elana, was studying in Israel

4    for a year after high school.  It's a very common thing that

5    youth take a year off after high school before they decide what

6    to do and they go around the world or have a travel experience

7    or study experience.

8         Their older daughter Elana decided to study in Israel

9    for a year.  The family decided to visit her because the

10   12-year-old daughter was having a Bat Mitzvah, which in the

11   Jewish faith it's the age at which a young lady reaches

12   religious maturity.  So they decided to celebrate the

13   12-year-old daughter's Bat Mitzvah by traveling to Israel to

14   celebrate in Israel but as well to visit their daughter.

15        But at the time there was tension in Israel and there

16   was this intifada going on.  So they were there for ten days,

17   and they wanted to stay away from any public places or keep

18   away from any potential terror.  But on the last day their

19   daughter who was having a Bat Mitzvah wanted a certain pair of

20   shoes and they knew of a shop that was selling this particular

21   kind of shoes.  They decided, we have been here ten days, this

22   is our last day of Israel, let's go to the shop as a family and

23   go buy a pair of shoes for our daughter.

24        They go to the shop.  They buy the shoes.  They come

25   out of the shop waiting for someone to bring them something,

F1S8SOK5                          Strous - direct

1    another relative, standing on the sidewalk, boom, terror,

2    suicide bomber.

3    Q.  Were all five members of the family present at the attack?

4    A.  No.  Elana, the daughter, older of the three daughters, was

5    in her school studying and she was in class.  So she wasn't

6    there at the time.  So the two daughters, the two other

7    daughters, younger two daughters, and two parents were there

8    going shopping.

9    Q.  Let's discuss them one at a time and I want to start with

10   the father, Mark Sokolow.  Tell us briefly who Mr. Sokolow is.

11   A.  Mark Sokolow is a 56-year-old United States citizen,

12   currently residing in Woodmere, New York.  He is married with

13   three daughters and he works as an attorney.

14        He was there in Israel with his family.  He was

15   standing on the sidewalk.  He remembers hearing a loud noise,

16   thrown to the ground, seeing a lot of debris and dust going

17   around him, and he realized straight-away it was bomb

18   explosion.  Remember they had this in the back of their minds,

19   but on the last day they went into town, which they hadn't done

20   in the first ten days.  So this was something that he knew

21   straight-away was going on.

22        He remembers it being very scary for him.  He thought

23   something terrible happened to his family as well.  He was

24   alive and thinking, but his first thoughts went to his youngest

25   daughter Jamie, who is 12.  He managed to get up even though

F1S8SOK5                        Strous – direct

1    his leg was hurting.  He recalls there being absolute

2    pandemonium around him.  He remembers being thrusted into an

3    ambulance but being so panicked about what happened to his

4    family, leaving the ambulance and running out to see if he

5    could find his family.  He was caught and put back in the

6    ambulance and taken to the hospital, even though he tried to

7    find out what happened to his family.  He thought his family

8    were dead.

9           While in hospital he managed to catch sight of his

10   youngest daughter being rushed off on a hospital stretcher,

11   gurney, and he was told that his daughter had been transferred

12   to another hospital in order to deal with her eye injury, which

13   had better specialties in dealing with those specific injuries.

14   He was told, though, that his wife and daughter were still

15   alive in another hospital in the Jerusalem area.

16   Q.  Doctor, did you diagnose Mark Sokolow with any mental

17   disorders?

18   A.  I did.

19   Q.  What did you diagnose him with?

20   A.  Partial PTSD.

21   Q.  Can you explain to us the basis for that diagnosis,

22   starting with symptomatology in the period close after the

23   attack and then forward into the future.

24   A.  Mr. Sokolow distinctly remembers the period, the acute

25   period, the initial period, as being very traumatic for him,

F1S8SOK5                          Strous – direct

1    overwhelmed, dealing with the stress and pain that he had to go

2    through due to his injuries, resulting from a burst eardrum,

3    some shrapnel injury, and obviously his wife and his daughters.

4         This was compounded by the fact that here was a man

5    who liked to be in control and to take care of his family and

6    felt completely out of control.  Starting from the fact that he

7    didn't have the language.  He is in Israel where the language

8    is Hebrew, and he is an English speaker, and he felt it was

9    very difficult to take control with the language and cultural

10   barriers.  It was overwhelming for him.

11        Also, the press was all over him.  A few months before

12   he had been in 9/11 and he had escaped 9/11.  So the press

13   loved him.  He had been in two terror attacks within a matter

14   of a couple of months.

15        He remembers speaking to a social worker.  He was

16   referred to a social worker.  It appears that he was so

17   stressed that they felt he needed some help.

18        He felt a lot of guilt because it was him who decided

19   to bring his family to Israel.  I am not sure if I mentioned

20   it, but going to Israel to celebrate a daughter's Bat Mitzvah

21   was not the initial thought.  Initially the thought was they

22   were going to Disney World, Disneyland or Disney World, but

23   they went to Israel, and he felt guilt because it was his

24   decision.

25        Then he developed classic PTSD symptomatology over

F1S8SOK5                          Strous – direct

1    time.  He admits to avoidance behavior.  He avoids crowded

2    public places, buses.  He would only go to restaurants where

3    there was security outside.

4            He did, though, find it helpful to return to Israel a

5    year later to a memorial ceremony.  He became preoccupied in

6    this terror event.  One person died.  He was an individual who

7    felt while he survived, his family survived, but someone else

8    died and he developed a connection to that gentleman's family

9    and that preoccupied him.  He used to ruminate about it.  And

10   for a long period of time, including up until the present, he

11   became very sensitive to loud noises and feels edgy a great

12   deal of time.

13           It took him a long time to return to work.  However,

14   he did return to work a few weeks later, but this period of

15   time was very stressful and difficult for him.  All of them

16   needed medical workups and followups.  His wife needed further

17   surgery.  He himself required surgery on his eardrum.  So this

18   sudden change in their life of being like a normal American

19   family living in Long Island and suddenly being thrown into

20   this preoccupation of medical issues and disability and stress

21   and being overwhelmed.

22           He felt that it affected his ability to focus and

23   concentrate and affected his ability to return to full function

24   at work.  People deal with stress in different ways.  For him

25   to deal with the stress was to talk about it, and he used to

F1S8SOK5                          Strous - direct

1    talk a lot about it, including in public forums about what he
2    went through.
3    Q.  Did his difficulties affect his ability to engage in
4    community affairs?
5    A.  He thought that because he was so preoccupied with his
6    family and his own issues, he disengaged a lot from his
7    connection with the outside, including most prominently
8    community affairs.  He was a very prominent individual in his
9    community and he kind of disconnected.  He said I can't deal
10   with this.  I have got my life to deal with, my family to deal
11   with.  So that was a marked change for him.
12   Q.  Do you consider his partial PTSD to be chronic?
13   A.  Yes.
14   Q.  Now, you mentioned that Mr. Sokolow was involved in the
15   attacks on the World Trade Center on September 11, correct?
16   A.  Yes.
17   Q.  Do you understand, was he actually in one of the Twin
18   Towers?
19   A.  I believe so.
20   Q.  Have you considered whether the fact he was involved in
21   this major terrorist attack just a couple of months or so,
22   three or four months before the attack in Jerusalem, it might
23   be a contributing factor in causing the PTSD you have
24   diagnosed?
25   A.  I have thought a lot about that and I spent a great deal of

F1S8SOK5                          Strous - direct

1    time questioning him as to the period between being involved in

2    9/11 and the terror attack in Jerusalem, and I could find

3    nothing.  There were just no symptoms of PTSD, absolutely

4    nothing that came out.  So it's very clear that the PTSD

5    symptoms that he suffered from occurred only after the time of

6    the shooting in Jerusalem.

7            I thought about it a lot.  In actual fact, there is a

8    lot in the literature that deals with this.  PTSD is much less

9    prominent, if at all, in situations where a lot of people are

10   involved compared to when you're involved in a more one to one.

11           First of all, he was injured in the shooting in

12   Jerusalem.  Second of all, it was a much more personal thing.

13   It was his family that was attacked and those around him,

14   whereas the 9/11 were thousands of people and he was one of

15   many.  When you're one of a few, it's a much greater risk of

16   developing PTSD.

17           So there was absolutely no symptoms of PTSD that

18   occurred after 9/11.  It all started after the shooting.  So I

19   have to conclude from that that the PTSD that he had was

20   related to that event in Jerusalem and not 9/11.  But I only

21   came to that after thinking a lot about it and questioning him

22   about this.

23   Q.  You may have just answered my next question but let me be

24   clear.  Are you aware of any mental disorders that Mr. Sokolow

25   suffered prior to the attack on his himself and his family in

1    Jerusalem?

2    A.  No.

3    Q.  In your opinion, what is the cause of his chronic partial

4    PTSD?

5    A.  The suicide bombing in Jerusalem.

6    Q.  Do you believe that his chronic partial PTSD is likely to

7    be permanent?

8    A.  Yes.

9    Q.  Do you hold all of these opinions that you have given as to

10   Mark Sokolow to a reasonable degree of medical certainty?

11   A.  Yes.

12   Q.  Let's move to another member of the Sokolow family, the

13   daughter Elana Sokolow, whose name is now Elana Sokolow Rosman.

14        I think you have mentioned her by name already but you

15   can just remind us who Elana is.

16   A.  Elana is a 31-year-old United States citizen, currently

17   residing in New York.  She is married with I believe one child.

18   She may have more recently.  I don't know.  She is a physician

19   currently specializing in the field of internal medicine.

20   Q.  Was she with her family when the bombing occurred?

21   A.  No.  She was in class, she was in studies.

22   Q.  Have you diagnosed Dr. Rosman with any mental disorders?

23   A.  Adjustment disorder with anxiety.

24   Q.  Have you considered whether she may have partial PTSD as

25   well?

1    A.  I have.  I would say based on the updating of the DSM --

2    remember, the DSM gets updated every couple of years.  Based on

3    more recent research, the criteria changed, tweaked over time.

4    I would say today, which is after the period when I evaluated

5    her, I would say that she would also meet some of the criteria

6    for PTSD.

7    Q.  Have your views about Elana's condition changed any or is

8    this just a change of terminology because of the updating of

9    the DSM?

10   A.  Her symptoms haven't changed, but because the latest

11   updated DSM have added a very specific phrase which was hinted

12   to, alluded to in the previous DSM but wasn't as specific,

13   where they state very specifically that PTSD can also occur in

14   family members of those who were exposed to the

15   life-threatening catastrophic event themselves.  So they don't

16   necessarily have to be there themselves, but their family

17   members could have been exposed to it.

18   Q.  Could you now tell us what is the basis for your diagnoses

19   for Elana, focusing on the period soon after the attack?

20   A.  Well, after the attack she remembers being told there was

21   some kind of incident in the center of city.  She was trying to

22   get ahold of her family.  She couldn't get ahold of them.  She

23   was then visited by the school principal who told her that her

24   family had been injured and rushed off to hospital.

25            She found her mother and sister but couldn't find her

F1S8SOK5                          Strous - direct

sister and father.  She remembered feeling very panicky,

overwhelmed, stressed.  As you could imagine, she was young,

she was 18 at the time, 19, and she had to now deal with the

fact that her family were injured and potentially blown up in

an explosion and she had to find them.

        After finding them and being relieved in some way that

they were at least alive, she remembers having to deal with all

of the bureaucracy and getting the best medical care in a

country that wasn't hers and with a language that wasn't

familiar to her.  She had to negotiate all of this on her own,

with her daughter, 12 years old, who couldn't speak any Hebrew

and she had to make sure someone was with her all the time

because her daughter was separated from the rest of them.

        So she remembers this adrenaline rush and being

overwhelmed with these painful questions.  How could this

happen to my family, and then the guilt.  Why they injured?

Why not me?  Will they be OK?  They came to visit me and now

they are suffering.  That's not fair.

        She remembers feeling very down, feeling very anxious,

and that continued over time.  She developed specific anxiety

of going on buses and being in crowds, classic symptoms, and

the avoidance of such surroundings.  Then I went back to

America and she stayed in Israel.  Then once again she felt

these feelings of my family is going through all this

rehabilitation and pain and emotional issues in America and I

F1S8SOK5                              Strous – direct

1   am stuck in Israel.  I am not with them.  So she was torn.  On

2   one hand she knew the right thing was to complete studies, but

3   on the other hand, she wasn't with them.

4   Q.  Doctor, before we get any further, can you remind us, you

5   said Elana is a practicing doctor now.  How old was she when

6   she was having to go through the period of having to care for

7   her injured family at the time of the bombing?

8   A.  She was 19.

9   Q.  Thank you.

10       I think I cut you off.  You were going to talk about

11  what supports your diagnosis based on what happened after she

12  came back to America.

13  A.  She felt very down, very anxious.  She became very

14  sensitive to loud noises, which is once again classic PTSD

15  symptoms.  She reports having very sleepless nights due to

16  worrying about her family.  She would occasionally dream of the

17  event.  She felt that her social relationships, and this is

18  very common, were affected because of the distance of what she

19  had gone through between –- her friends were young and carefree

20  and now she had to deal with the yoke of her family and what

21  they went through.

22       She had to grow up very quickly.  She had no doubt

23  that her studies were affected adversely for the rest of that

24  year.  She wasn't able to concentrate and focus as she could.

25  And none of this was a problem from before.  She didn't go for

F1S8SOK5                              Strous - direct

1    any formal therapy but she used her teachers.  Her teachers,

2    role models were there and she used to talk to them a lot on a

3    one-to-one basis.  So she declined to go to therapy.

4    Q.  What symptoms of PTSD does she still have to this day?

5    A.  So long-term symptoms of PTSD, classic PTSD, were

6    hypervigilance, constantly watching around, feeling on edge,

7    heightened awareness, especially when in large crowds, and she

8    feels fearful and anxious.  As a young physician being on call,

9    you're called out in the night, and that's not uncommon, and

10   she feels that is very destructive.  She does it.  A lot of

11   people, even when they get these symptoms they go through the

12   motions, but inside it is very difficult for her.  That is very

13   problematic for her from an emotional perspective during a very

14   informative period of her life.

15            Remember, this is also a time when she had to

16   establish herself as a person and her direction and even though

17   she went into medicine and is functioning at a professional

18   level, she feels this event, and this is really profound when

19   she told me this, she said this is something she still thinks

20   about every day.  She wasn't involved in it.  She wasn't

21   injured.  But this is an event that she still thinks about

22   every day, and part of that is just associated with that she is

23   grateful her family is alive.  But it's something that

24   accompanies her all the time.

25   Q.  To your knowledge, did Elana suffer from any mental

F1S8SOK5                           Strous - direct

1  disorders prior to the attack?

2  A.  No.

3  Q.  In your opinion, what is the cause of her chronic partial

4  PTSD or adjustment disorder with depression?

5  A.  Her family being injured in a suicide bombing in Jerusalem.

6  Q.  Do you believe mental disorders are reasonably certain to

7  be permanent?

8  A.  Yes.

9  Q.  Do you hold the opinions that you have given about Elana

10  Rosman today to a reasonable degree of medical certainty?

11  A.  Yes.

12  Q.  Doctor, let's move to another member of the Sokolow family,

13  Lauren Sokolow Mandelstam.

14          Can you tell us a little bit about who Lauren

15  Mandelstam is.

16  A.  Lauren Mandelstam is a 29-year-old United States citizen,

17  currently residing in New York.  She is married with two

18  children and works as a physician's assistant in a cardiology

19  office.

20  Q.  How old was she at the time of the attack?

21  A.  She was 14.  I think she was 16, I believe.

22  Q.  Tell us, as you understand it, what happened to Lauren.

23  A.  Lauren, on the last day of the ten-day visit with her

24  family, she remembers very well going to the shoe store, coming

25  out, her parents purchasing the shoes for her sister, and then

F1S8SOK5                        Strous – direct

 1   she remembers waiting and the sound of the blast, being knocked

 2   to the ground.  She realized also immediately what had

 3   happened, which is very scary for her.

 4          She reports that the smoke around her was thick and

 5   tried to flee from the smoke.  Someone stopped her, grabbed

 6   her, put her on a stretcher, put her in an ambulance which took

 7   her straight to the hospital.  She remembers the panic of not

 8   knowing what happened to her family.  She had these scary

 9   thoughts which went through her mind.  She remembers vividly

10   thinking, will I die or will I survive?  Is my family all dead?

11   And where will I live if my family is all dead.  And she had no

12   contact with her family.

13          She reports it was hours before she found out what

14   happened to her family.  She remained in hospital for four

15   days.  She reported her injuries were second degree burns to

16   her face and her ankle, multiple shrapnel injuries throughout

17   her body, injury from bolts to her right calf, and perforated

18   left eardrum, and she couldn't hear out of that ear at the

19   time.

20          She remembers how overwhelmed and uncomfortable this

21   was for her and very, very anxious, very nervous to be in

22   Israel.  She was seen by a social worker due to her state.  She

23   was discharged a few days later and she was reported to be so

24   stressed, so anxious she couldn't stay a day later in Israel.

25   She got on the next plane back to America.

1             So her family were there in hospital still being

2     treated or her parents and her sister and she just couldn't

3     stay in Israel.  She just got on the next plane and went.  She

4     was out of there and stayed with family and friends in America.

5     Q.  Did you diagnosis Lauren with any mental disorders?

6     A.  I did.

7     Q.  With what?

8     A.  Chronic partial PTSD.

9     Q.  Now, Doctor, can you describe the basis for that diagnosis,

10    again starting with the period shortly after the attack.

11    A.  So initially she had poor sleep and nightmares.  To this

12    day she still reports nightmares, which are painful and

13    overwhelming.  She reports occasionally flashbacks to the

14    event.  They are not as frequent now as they were initially,

15    but they are still there.  They pop up from time to time as she

16    describes it, but are as painful and frightening as ever.

17    Flashbacks can be very disturbing because the person feels they

18    are in a situation again.

19            Now, I don't need to tell you what it's like to be in

20    a terror situation where you feel your life is about to end and

21    that's what a flashback is.  You flash back to the event and

22    you feel that I am about to die again, and that's very

23    disabling, that's a very painful thing.  Even though your mind

24    cognitively, your brain says that can't be, I am not about to

25    die, but that's what happens in a flashback.

F1S8SOK5                          Strous - direct

 1            She reports that she is still sensitive to loud noises

 2     and she avoids crowded places.  She avoided them initially but

 3     today she still occasionally feels that I am uncomfortable in

 4     this situation when there are a lot of people around.

 5            She didn't describe depression after the event but

 6     just more scared and anxious for a long time.  She never saw

 7     herself as an anxious person, before but she feels that was

 8     something that developed later because of the stress that she

 9     went through at the time.

10            She feels that this affected her in many ways,

11     particularly socially and with regard to her drive.  That is a

12     big thing for her because she is a young lady, and at the time

13     she obviously wasn't married, she is now, but her face was

14     scared.  Even though she had treatment for that, the lines on

15     her face -- you can't see from the picture, but the lines on

16     her face, it looked like someone had drawn pen on her, and she

17     reports being in various situations where the person says, hey,

18     you have got pen on your face.  Oh, no, here I go again.

19     Obviously not to everyone, but sometimes she has to say those

20     are actually scars from injuries I sustained in a bombing in

21     Jerusalem.

22            (Continued on next page)

23

24

25

F1sQsok6                          Strous - Direct

1    Q.  Has she gone back to Israel after the attack?

2    A.  She did.  She did go back to Israel.  As is customary for

3    many of her crowded school, as I mentioned earlier, people go

4    for a year.  In her environment, people go for a year to Israel

5    to study before they continue with their studies in the United

6    States.

7              She did go back.  She remembers how difficult it was

8    for her to go back.  In the beginning, she stayed in her room.

9    She wouldn't leave her room.  It took her a long time to

10   actually make the decision to go back to Israel, but once she

11   was there, she wouldn't leave her room.  It took her a long

12   time.  She reports that her friends almost had to like force

13   her out of the room.  In some ways, it's kind of treatment for

14   her to be like forced out and get back into the world.  And she

15   did.  She did to some extent.  But once again, it didn't take

16   away a lot of those other disabling accompanying features of

17   the PTSD.

18   Q.  Has she ever considered moving to Israel?

19   A.  She said that that is absolutely out of the question.  She

20   wouldn't do that.

21   Q.  Why is that an issue for her at all?

22   A.  Because she's married to her husband, and she feels that

23   that is something that he would be interested in, but that is

24   not something that she could ever consider based on what she

25   went through, and therefore it just not a consideration.

F1sQsok6                           Strous – Direct

1   Q.  Did you administer any psychological tests to

2   Ms. Mandelstam?

3   A.  I did.

4   Q.  What tests?

5   A.  The posttraumatic disorder scale.

6   Q.  What did the test indicate?

7   A.  It showed that she had mild version of PTSD.

8   Q.  I have to go back here for a moment.  I meant to ask you

9   the same question about her father, Mark Sokolow.  Did you

10  administer any psychological tests to him?

11  A.  I did.

12  Q.  Which test?

13  A.  Also the posttraumatic stress disorder scale.

14  Q.  What did it show?

15  A.  It also showed he had PTSD, a mild version.  Remember, this

16  is several years later, but at the time that I evaluated him he

17  had a mild version of PTSD.  I can't comment as to what level

18  of PTSD he did have earlier on several months after the event

19  itself; but at the time of my evaluation, he had mild PTSD.

20  Q.  Let's go back to Lauren again.  To your knowledge, did

21  Lauren suffer from any emotional disorders as of the time of

22  the attack?

23  A.  No.

24  Q.  In your opinion, what is the cause of Lauren's chronic

25  partial PTSD?

F1sQsok6                          Strous - Direct

1    A.   Being injured by a suicide bombing in Jerusalem.

2    Q.   Do you believe her chronic partial PTSD is reasonably

3    likely to be permanent?

4    A.   Yes.

5    Q.   Do you hold all the opinions you've given today about

6    Lauren's Sokolow Mandelstam to a reasonable degree of medical

7    certainty?

8    A.   Yes.

9    Q.   Let's move to the remaining Sokolow daughter, Jamie Sokolow

10   Fenster.  Can you tell us who Jamie is?

11   A.   Jamie Sokolow, now James Fenster, is a 25-year-old United

12   States citizen currently residing in New York.  She is married,

13   and she also works as a physician assistant.

14   Q.   Do you know how Jamie was at the time of the attack?

15   A.   She was 12.

16   Q.   Tell us, if you would please, as you understand it, what

17   happened to Jamie in the attack?

18   A.   Jamie was with her family, comes out of the store --

19   remember, the shoes were for her and the visit to Israel was

20   for her.  So this is always in the back of her mind, and I'll

21   come to that later.

22        She remembers coming out, the bomb went off.  She

23   remembers being blown away, landing on a sidewalk.  She managed

24   to get up but couldn't see clearly because it was a blur, and

25   she wasn't sure why.  She then saw her mother lying on the

F1sQsok6                         Strous - Direct

1    sidewalk, and she noted her mother to be bleeding a lot.

2              Then someone grabbed her before she could approach her

3    mother and threw her into the ambulance.  This was very scary

4    for her because people didn't know that she was American and

5    people didn't know that she couldn't speak Hebrew.  And people

6    were shouting, telling her things, and she didn't know what was

7    going on.

8              She was rushed off to a hospital and she remembers

9    being very traumatized, being confused, overwhelmed, in general

10   shock and anxiety.  She didn't know what happened to her

11   family.  She saw that she was bleeding, but she didn't know how

12   injured she was.  She also said, "Will I live or die?"  A

13   12-year-old girl thinking you're about to die is a scary thing.

14   Would she ever get back to America or to the states with her

15   sisters.  She felt very alone.  Everyone was mumbling language

16   around her.  She didn't understand what was going on.

17             Eventually, her older sister found her.  Because she

18   had significant injuries to her eye, she was taken off to

19   another hospital, to Hadassah Hospital, which was considered to

20   have a better expertise at dealing with serious eye injuries.

21             She reported that her injuries were mainly to her eye

22   with a torn iris, that is the color part of the eye, and

23   developing cataract later.  She had multiple shrapnel injuries

24   all over her body.  She required plastic surgery.  She said it

25   was very traumatic for her on the first night when the doctors

F1sQsok6                          Strous - Direct

1  removed glass from her eye.  I believe that during the surgery

2  removing glass from an eye it is done under a local but she is

3  awake.  So here is a 12-year-old, her eye being -- having

4  surgery on it, it was very scary for her.  When she saw her

5  face for the first time after a few days when they removed the

6  bandages, she just burst into tears.  Her face was very

7  disfigured, and she felt very depressed and overwhelmed, and

8  she thought she would be scarred very badly for the rest of her

9  life, and it would affect her whole life potential.  For a

10 12-year-old, this is overwhelming for her.

11 Q.  Did you diagnose Jamie with any mental disorders?

12 A.  I did.

13 Q.  What was it?

14 A.  Chronic partial PTSD.

15 Q.  Could you now explain to us the basis for that diagnosis,

16 again, first focusing on the period in the immediate aftermath

17 of the attack?

18 A.  The initial period for Jamie was characterized by poor

19 sleep, flashbacks, especially when triggered by loud noises.

20 She told me if someone would slam a door or she'd hear a truck,

21 as I mentioned the classical backfiring, any loud noise, she

22 would get flashback to what happened.  She reports that she

23 still sensitive to loud noises, but she didn't report any

24 nightmares.  That was something she didn't have.  That was

25 initially.

F1sQsok6                          Strous - Direct

1    Q.  Anything else in the period immediately after the attack?

2    A.  After that she reported that as a result of her injury, she

3    became very sensitive to light and has trouble reading close.

4    That started pretty much initially and has continued.  It

5    affects her function at times even when it's required.  Even

6    though she has managed to study, she feels she hasn't been able

7    to actualize her potential.  So even though she's working, she

8    distinctly reports that she wasn't able to achieve what she

9    believes is her potential that she could have.

10          She became very bothered by the scars.  She also

11   reports after the plastic surgery she also has black lines, and

12   people ask her about the paint on her face.  She is still

13   sensitive to loud noises.

14          Another very important thing that Jamie reported to me

15   was that she felt distanced from other girls her age.  She had

16   to grow up very quickly.  Going through all the medical

17   problems and dealing with the emotional trauma, she grew up

18   very quickly and because she was in some ways, or at least

19   initially, feel more mature compared to her friends, she got

20   stuck in that and distanced herself from her friends, and it

21   affected her social life a lot.  Because of these issues, she

22   saw a social worker initially, but even long-term she was

23   referred to a school psychologist because of the difficulty she

24   was experiencing as a result of this.

25          I mentioned that they went to Israel because of her,

F1sQsok6                        Strous - Direct

1   and she felt a lot of guilt; not only guilt that they went to

2   Israel, but guilt that they went to the shoe shop because she

3   wanted a certain type of shoe.  The family were very careful of

4   not going to public places, but it was the last day, and her

5   father reported she wanted the shoes, let's go get it for her,

6   and that bothered her for a long time.  Even though her family

7   tried to rationalize with her not to feel the guilt, she felt

8   it, and for a young girl that wasn't easy.

9   Q.  Doctor, you mentioned that she got some therapy.  Have you

10  had a chance to review any of the records of her mental health

11  treatment?

12  A.  I just referred to the medical notes in the hospital where

13  she was referred to the mental health professionals in a

14  hospital initially at the time in Israel.  Long-term when she

15  came back to the United States, she was seen by the school

16  psychologist as per her reports, but I don't have any medical

17  notes on that.

18  Q.  Do the records that you reviewed from her stay in Israel

19  affect your diagnosis at all?

20  A.  Sorry?

21  Q.  I think you indicated you did see some records from when

22  she was hospitalized in Israel before she came back to see the

23  school psychologist?

24  A.  Yes.

25  Q.  How do those records square with your notes?

F1sQsok6                           Strous - Direct

1    A.  Well, she was referred for her.  Now, I don't know if she

2    was referred particularly because she was overwhelmed and not

3    coping or they referred everyone for help.  That I don't know,

4    but she was definitely referred for help.  So it appeared to me

5    that there was something going on at the time requiring

6    psychological involvement.  But, once again, I don't have any

7    details of the content of that interaction.

8    Q.  Did you administer any psychological tests to Jamie?

9    A.  I did.

10   Q.  What tests?

11   A.  The posttraumatic disorder scale.

12   Q.  What did the test indicate for Jamie?

13   A.  It showed she also had PTSD.

14   Q.  Doctor, to your knowledge, did Jamie suffer from any mental

15   disorders prior to the shooting?

16   A.  No.

17   Q.  In your opinion, what is the cause of her chronic partial

18   PTSD?

19   A.  Being injured in the bombing in Jerusalem.

20   Q.  Do you believe that her chronic partial PTSD is reasonably

21   certain to be permanent?

22   A.  I do.

23   Q.  Do you hold your opinions that you've given today about

24   Jamie Fenster to a reasonable degree of medical certainty?

25   A.  Yes.

F1sQsok6                            Strous - Direct

1    Q.   Let's move to the final member of Sokolow family, Rena
2    Sokolow.  Could you tell us who she is?
3    A.   Mrs. Rena Sokolow is a 57-year-old United States citizen
4    currently residing in New York.  She is married with three
5    daughters and works as a pension administrator.
6    Q.   Tell us as you understand it what happened to Mrs. Sokolow?
7    A.   She was with her family.  They go to buy shoes for her
8    daughter on the last day of their visit to Israel.  A bomb goes
9    off.  She vividly remembers being dispersed from her family.
10   She remembers being thrown to the ground, lying on the ground,
11   experiencing pain in her leg.  She also vividly remembers
12   seeing lying next to her, the severed head of the suicide
13   bomber who once was a woman, and that is very scary for her,
14   lying and seeing a head next to you.  She didn't know whose
15   head this was.  She reports this being very distressing and
16   then looking around for her family.
17        She then reports seeing her 12-year-old daughter
18   standing above her and looking down at her.  She didn't know
19   where her other daughter and her husband were.  She was
20   experiencing excruciating pain, as she described it to me, in
21   her leg.  She remembers a woman next to her grabbing a scarf
22   and tying it around her leg to stop the bleeding.  She was then
23   rushed and placed in an ambulance, rushed off to the hospital
24   and she remembers tremendous pain.  It is not clear to me
25   whether the pain was just in her leg or other parts of her

F1sQsok6                          Strous - Direct

body, but she reports being in overwhelming pain.  She had this
fear that she was about to lose her leg.  She still did not
know where her husband was and her other daughter.

        She remembers lying in pain in the hospital, being
evaluated, and then finally after finding out her family was
alive, so she was relieved from that perspective, but she was
very concerned about her 12-year-old daughter's eye because she
had been told her daughter had been injured in her eye with a
very serious injury.  She thought her daughter was about to be
blinded in that eye and was brought to another hospital.

        She reports that she herself suffered an open multiple
fracture, which means that the leg was fractured and the bone
was sticking out and then sent to surgery for this broken leg.
She had bad shrapnel wounds to both legs.

Q.  Did you diagnose Rena Sokolow with any mental disorders?

A.  I did.

Q.  With what?

A.  I diagnosed her with partial PTSD and chronic anxiety
disorder.

Q.  What happened in the aftermath of the attack to support
your diagnoses?

A.  So Mrs. Sokolow received initial treatments in Israel,
orthopedic therapy, and then she went back to America after, I
believe, ten days for further treatment.  She received all the
surgery and physical therapy.  No weight bearing for five

F1sQsok6                      Strous - Direct

1    months.

2          But from a psychological perspective, she remained

3    very anxious, very overwhelmed initially.  Then she reports to

4    me that her treatment was a doctor of a friend, and that gave

5    her the treatment she needed to calm her.  She was -- she

6    reported that she was very overwhelmed by the physical changes.

7    Her mobility was affected.

8          She was a lady who was very active and gregarious, and

9    I would say about to use the word vivacious.  She was a very

10   larger-than-life kind of character.  Now she was kind of

11   bed-bound.  She developed anxiety.  Even though the intensity

12   of initial anxiety abated; that is, it become less, she

13   reported a high level of anxiety for many years following the

14   event which affected her function in various ways.  She felt

15   anxious in crowded places, stores.  Going over bridges and

16   tunnels are very difficult for her to this day, but she has no

17   choice.  She does it, but she feels very anxious.  You can't

18   typically avoid in New York City -- I don't live here now, but

19   I did for four years, and I remember, you can't really get

20   around without going through bridges and tunnels.  It's part of

21   life here.  Coming from South Africa, I hadn't experienced that

22   there, but I experienced a lot of it here.  For someone who

23   doesn't pay attention, you don't realize how many bridges and

24   tunnels there are.  Me coming from South Africa, I did because

25   I didn't have any of those there, but here we have a lot.  Now,

F1sQsok6                          Strous - Direct

1    I can understand when she says bridges and tunnels are very

2    difficult for her.

3              In public places whenever anyone has a jacket on, you

4    know, we don't realize it, but someone who's gone through

5    trauma is very sensitive to that because every time you see

6    someone with a jacket you're thinking, hey, maybe that's a

7    bomber.  It's irrational, but people with PTSD go through that,

8    and it affects their function.

9              She has been back to Israel but, she refuses to get on

10   a bus.  She didn't really want to go back, but her husband was

11   very keen on going back after one year to the anniversary event

12   because he felt connected to the person who died.  He didn't

13   know the person, but he wanted to connect to that family.  So

14   she went along with him.  It was difficult, but she did it.

15             So long-term repercussions were, in particular,

16   anxiety.  She describes depression.  In terms of the PTSD, she

17   reports flashbacks initially, which don't occur at present.

18   She reports avoidance.  For her the main feature of PTSD which

19   continues to this day is avoidance.  She is very sensitive to

20   loud noises.

21             Much of the traumatic memories regarding the head of

22   the suicide bomber who she sees next to her, and the thought of

23   that was so traumatic it is with her to this day.  She tries to

24   tell herself -- she tries all kinds of things, it's very

25   interesting.  She tries to not have those thoughts.  She says

F1sQsok6                         Strous - Direct

 1   maybe it was a mannequin, but she knows it is a fruitless

 2   exercise, and she clearly -- because people say to her,

 3   "Pretend it was a mannequin," She says, "But it wasn't."  She

 4   remembers it clearly being a woman's head.

 5          Long-term effects involve concentration and memory.

 6   She felt she never went back to the function she had before;

 7   that her concentration and memory were just -- she would look

 8   at words and she would not absorb what she used to in the past.

 9          In crowds, she reports that she is constantly looking

10   over her shoulder, and this is a big difference from before.

11   Q.  Did you administer any psychological tests to Rena Sokolow?

12   A.  I did.

13   Q.  Which test and what did it indicate?

14   A.  I administered the posttraumatic stress scale and the

15   Hamilton scale for anxiety.

16   Q.  What do they show?

17   A.  Both show presence of posttraumatic stress disorder and

18   anxiety.

19   Q.  To your knowledge, Doctor, did Rena Sokolow suffer from any

20   mental disorders prior to the bombing?

21   A.  No.

22   Q.  In your opinion, what is the cause of her chronic partial

23   PTSD?

24   A.  Being involved in a bombing in Jerusalem 2002.

25   Q.  Do you believe that her chronic partial PTSD is reasonably

F1sQsok6                         Strous - Direct

1    certain to be permanent?

2    A.  Yes.

3    Q.  Do you hold your opinions about her to a reasonable degree

4    of medical certainty?

5    A.  Yes.

6    Q.  Doctor, I believe you testified now that four members of

7    the Sokolow family, all except Elana suffer currently from

8    chronic partial PTSD.  Do you have an opinion as to whether any

9    of them suffer from what I will refer to again as full-blown,

10   not partial, PTSD in the past?

11   A.  I believe that from what though told me they were -- it was

12   full-blown PTSD at the time.  When I say at the time, one month

13   afterward because you need one month before you can call it

14   PTSD.  But I didn't examine them at the time, so I use my best

15   professional judgment to say under any certainty whether --

16   without examining a person at the time, I cannot state for sure

17   there was full-blown PTSD, but that doesn't take anything away

18   from the severity of even if they experienced partial PTSD.

19              MR. HORTON:  Your Honor, that's the end of the Sokolow

20   family.  Would this be a convenient time to take a break?

21              THE COURT:  Yes.

22              Ladies and gentlemen, take ten minute broke.  Don't

23   discuss the case.  Keep an open mind.  I'll see you in ten

24   minutes.

25              (Recess)

1                THE COURT:  Let's get the jury in.

2                (Jury present)

3                THE COURT:  You can continue, Mr. Horton.

4                MR. HORTON:  Thank you, your Honor.

5     BY MR. HORTON:

6     Q.  Dr. Strous, I now want to move to another plaintiff Leonard

7     Mandelkorn.  Can you tell us who Mr. Mandelkorn is?

8     A.  Mr. Mandelkorn is a 60-year-old United States citizen, dual

9     United States/Israeli citizen currently residing in Israel.  He

10    emigrated to Israel 1967.  He is married and employed as a

11    teacher in a local learning institution in Israel.

12    Q.  Was Leonard Mandelkorn the subject of a terrorist attack on

13    him personally?

14    A.  No.

15    Q.  Was the member of his family the member of such an attack?

16    A.  Yes.

17    Q.  Who?

18    A.  He had a son.  He had a son Shaul who was injured in a

19    terror attack in Jerusalem on the 19th of February 2002.

20    Q.  Can you just briefly explain what happened to Shaul in that

21    attack?

22    A.  Shaul was a 17-year-old young male who was getting off a

23    bus in Jerusalem in the neighborhood of French Hill.  He was

24    completing his schooling.  He does not so remember seeing a

25    suicide bomber, but a bomb went off and he was injured.  He

F1sQsok6                           Strous - Direct

found himself lying on the ground.  He remembers the quiet

after the explosion and that all went all gray around him and

blurry.  He was rushed off to a hospital.

        He reported to me that the experience was very

frightening and he began praying to deal with it.

        Leonard remembers, you know, very clearly at the time

that he heard that there was a terror attack.  He didn't know

his son was involved, but he tried to get information, and he

couldn't find out where his son was because he thought his son

was in the north but he couldn't contact his son.  He began to

panic.  Then I report that Mr. Mandelkorn reports that he heard

someone from the place where he lives was killed, so he thought

it was his son.  Then he got into a car, rushed off to the

hospital in Jerusalem and then he found out that his son was

not killed but was severely injured in this explosion, in the

suicide bombing.

        He was informed that his son was suffering from

multiple severe injuries but, however, he would live.  He

remembers feeling overwhelmed.  He had emotional pain and

panic.  He Began to pray also, the father.  That was both the

father and son's way of dealing with it was immediately to pray

because that was the only thing that would calm him himself.

Q.  Did you perform a psychiatric evaluation of Leonard

Mandelkorn?

A.  I did.

F1sQsok6                          Strous - Direct

1   Q.  Based on that evaluation, did you diagnose him with any

2   mental disorders?

3   A.  I did.

4   Q.  What was your diagnosis or diagnoses?

5   A.  Dysthymic disorder of a chronic nature, as well adjustment

6   disorder with depressed mood and anxiety.

7   Q.  Let me take those one at a time.  The first you mentioned

8   was dysthymic disorder.  I think that's the first time we've

9   heard it today.  Can you tell us what dysthymic disorder?

10  A.  Dysthymic disorder is -- it's depression for most days,

11  then not over a period of two years, where a person feels low

12  mood and it affects their sleep where they could have more

13  sleep or less sleep.  It affects their appetite.  They could

14  have increased appetite or lower appetite.  The can cause low

15  self-esteem, low energy level, and it can cause hopelessness

16  and affects concentration and thereby affecting the function

17  through all of those symptoms.

18  Q.  You used the phrase dysthymic disorder.  Is it also

19  sometimes referred to as dysthymia?

20  A.  Dysthymia and dysthymic disorder are used interchangeably.

21  It's like saying depression or depressive disorder.

22  Q.  You also mention the adjustment disorder with depressed

23  mood and anxiety.  I think you referred to at least one earlier

24  plaintiff as having adjustment disorder with depression.  This

25  time you used the phrase depressed mood and anxiety to modify

F1sQsok6                        Strous - Direct

1    adjustment disorder.  It may seem obvious, but could you

2    explain what adjustment disorder with depressed mood and

3    anxiety is?

4    A.  I remind you that adjustment disorder is development of

5    emotional and behavioral symptoms in response to a identifiable

6    stressor, but not one where the person's life was threatened.

7    In some cases that can be expressed or manifested by a

8    depression.  In some cases it can be manifested by anxiety.  In

9    Mr. Mandelkorn's situation, he had both.  He had both depressed

10   mood as well as anxiety.

11   Q.  Did you also perform psychiatric evaluation of Leonard's

12   son Shaul?

13   A.  I did.

14   Q.  Did you diagnose him with any mental disorders caused by

15   the terrorist attack on him?

16   A.  I did.  I diagnosed his son with partial PTSD, anxiety

17   disorder, and chronic dysthymia, dysthymic disorder of a

18   chronic nature.

19   Q.  Let's go back to the father now, Leonard, who we see on the

20   screen.  Could you explain to us again starting with the period

21   in the aftermath of the attack on his son the basis for your

22   diagnoses of chronic dysthymia disorder and adjustment disorder

23   with depressed mood and anxiety?

24   A.  Mr. Mandelkorn felt very overwhelmed at the time.  His son

25   was severely injured.  His son was in the hospital, and he felt

F1sQsok6                          Strous - Direct

1    that his son –– he didn't initially know his son was going to

2    survive, even though the doctors tried to reassure him.

3         May I indicate that he had lost a son earlier, several

4    years earlier at the age of 11.  His son was the age of 11.

5    This was about five or six years earlier, and he was scared he

6    was about to lose another son.  His son had died five years

7    earlier died from some kind of heart phenomenon.  So he thought

8    now he's about –– some heart problem on a sudden basis.  And

9    now he felt else's about to lose another son so that conjured

10   up a lot of overwhelming anxiety.

11        Most importantly for Mr. Mandelkorn, the stress of

12   dealing with the son in the hospital was very difficult for

13   him.  He spent a lot of time with his son helping him.  His son

14   had partial blindness in his left eye.  He had bladder

15   dysfunction, a skin infection, and he was the designated family

16   member to be with him and to help him go through all of this.

17        He became excessively preoccupied with his son's hell.

18   The problems of his son's eyesight became the main focus of his

19   stress and tension.  He was concerned that his son not only had

20   lost vision in his left eye, because he lost some of the vision

21   based on shrapnel, but his other eye also needed surgery.  So

22   now he was concerned that his son was going to go blind in both

23   eyes.  That it didn't come to be.  At the time he only had

24   partial blindness in the one eye, but not in the right.  This

25   was also compounded by anxiety that his son was not coping

F1sQsok6                          Strous - Direct

1    himself with all the medical procedures.

2            Now, his son and the family in general are

3    ultra-orthodox in religious circles.  For his son, it was very

4    difficult for his son to have close contact with women in the

5    hospital ward.  His son required surgery on his stomach, called

6    exploratory laparotomy to see if there were any injuries.  So

7    his son developed bladder dysfunction, urinary retention, so

8    you're required to catheterize, which is a pipe that goes into

9    the bladder, and woman nurses were doing that, and this was

10   very traumatic for his son.  Here, he had to be there with the

11   son in hospital and helping his son go through all these

12   medical procedures, which was very difficult for him.  And he

13   says that, you know, in addition to the stress of the medical

14   worries, he had to deal with the worry of his son having

15   trouble as a young man being in close contact with woman, which

16   was very difficult for a religious young gentleman at the time.

17           He reported that his overall function, I'm talking

18   about Mr. Mandelkorn now, was grossly affected.  He wasn't able

19   to teach.  He spent most of his time with his son traveling up

20   and down.  Also, they lived in a village which was in the rural

21   areas over the Green Line, and for them it was travel on very

22   dangerous roads.  So that compounded his anxiety.  He said that

23   his inability to concentrate affected his social and

24   occupational function.  He had low mood.  He was feeling down,

25   intense anxiety which just manifested in all aspects of his

F1sQsok6                          Strous - Direct

1   life, with constant underlying tension.  He said that he was

2   unable to enjoy experiences, both then and continued for a long

3   time afterwards.  Experiences which in the past had brought him

4   joy, he couldn't enjoy or achieve any kind of satisfaction.  He

5   felt this heaviness, this burden of just constantly not free,

6   this constant thing that he had to deal with the son and his

7   medical problems.  He felt his cognitive ability had declined

8   and overall less mental strength.  That is very classic with

9   dysthymia that people feel low energy, and it affects their

10  whole functioning, concentration, self-esteem, etc.

11       Overall he reports for him the biggest thing was

12  feeling overwhelmed, much of which he says continues to this

13  day, and scarred by the ongoing stress and worries of his son's

14  medical health.

15  Q.  I just want to get a term straight, Doctor.  You used the

16  term, I believe in referring to the Mandelkorn family,

17  ultra-orthodox.  Could you tell us what you mean by that?

18  A.  Ultra-orthodox is a form of Jewish -- it's a direction in,

19  I would say very intense applicability of Jewish law to daily

20  behavior.  So whereas many would keep to Jewish tradition and

21  Jewish laws, there is a community of ultra-orthodox who dress

22  in a particular way and show very strong affiliation with

23  Jewish law to the extent that it develops and takes over many

24  aspects of their lives in a very strict enforcement of its law.

25  Q.  Thank you.  You were speaking earlier, I'd asked you about

F1sQsok6                          Strous - Direct

1    the period shortly after the attack.  Were there any events

2    medical events in Shaul's life that appeared that occurred

3    after that initial attack which had a further impact upon his

4    father, Leonard?

5    A.   In addition to having to accompany his son for physical

6    therapy, for the surgery on his eye and for the shrapnel wounds

7    and taking responsibility for being with him all the time and

8    helping him negotiate and navigate the medical system, once

9    again with woman being around, and his son being extra

10   sensitive to contact with woman, later on what happened was

11   that with the son developing strong PTSD symptoms regarding

12   being hypervigilant, being constantly on edge with people

13   around, his son developed anxiety, on a low level, based on the

14   event he experienced.

15           But then what happened, that after a period of time,

16   his son was visiting -- was in some kind of educational

17   experience on a weekend and there was a robbery where he was,

18   and the son developed an intense anxiety attack, which at the

19   time they thought was a heart attack.  He developed

20   palpitations, feeling that he was going to die, extreme

21   agitation.  He was rushed to the hospital thinking he had a

22   heart attack.  It came back after all the tests that it was

23   anxiety or panic attack.  His father, Mr. Mandelkorn was

24   concerned now that not only was his son injured in his eyesight

25   and his direction in life particularly, but now another son of

F1sQsok6                        Strous - Direct

his was going to have a heart attack.  This son at all didn't

have a heart attack.  It was pure intense anxiety, but for him

that became a constant concern for him.

        But I would say the biggest issue for Mr. Mandelkorn,

if anything, which constantly affects him to this today was the

fact that his son until this suicide bomber was a high flier.

His son Shaul was his father's blue-eyed boy.  He was the one

who was destined for greatness, or that is how he saw him.

        He was extremely intelligent.   He was the leader of

his class.  He was destined for, the way he described it, as

greatness in whatever field.  And they saw him as a leader in

this community, that his son Shaul is going to go on to become

a senior leader because based on his leadership and high

intelligence.  He felt after this, Mr. Mandelkorn describes

very clearly, his son lost it all.  He became a shell of his

former self and never achieved the potential that they felt

that he was capable of.

Q.  Doctor, a couple minutes ago you were talking about some of

Shaul's difficulties dealing with women in the hospital.  Did

he have a broader issue with women particularly looking at

women outside of the hospital context?

A.  You know, you bring up an interesting issue.  People when

they go through an experience, a difficult experience in life

in order to cope with them, I look for different ways of making

sense of it.

F1sQsok6                          Strous - Direct

1              I will give you an example:  This week is

2    international Holocaust Day, and the psychiatrist who went

3    through the Holocaust, Victor Frankel, who went through

4    Auschwitz himself said it's not what people go through that

5    help people get through but finding meaning in something.  So

6    if a person can find meaning in a difficult experience that

7    helps them survive and cope.

8              So what Shaul Mandelkorn did was that he was injured

9    severely in this eye and lost sight.  So to try and cope with

10   it and to try and find meaning what he experienced, he felt for

11   him what he needed to do -- remember, he was living in the

12   ultra-orthodox world where he was, he felt if he found some

13   meaning in his eye, that would help him cope and deal with it

14   and ward off any potential damage to his other eye or

15   blindness.

16             So in the ultra-orthodox world, men are warned to take

17   extra special care in eyesight in terms of looking at woman,

18   gazing at woman.  So he felt if he paid extra care to that area

19   of not looking at woman, and being excited by a woman, which is

20   a well-known, well-described aspect of ultra-orthodoxy in

21   Judaism, that would ward off or prevent any further problems

22   with this eye.  But, most importantly, the fact that he was

23   injured in his eye was a message for him that he needed to take

24   more care in that area.  For him, that was a way of finding

25   meaning in his injury, and he became focused on this issue.

1              He consulted various rabbinical figures in order to

2       validate his feeling that he needed to focus on that, and he

3       took that to a very -- but made it a focus of his life, to the

4       extent that it would affect him going out to various occasions,

5       family events, because he would say he would go to a wedding

6       and maybe there would be a woman dressed inappropriately.  For

7       sure he wouldn't go to the beach because ultra-orthodox don't

8       go to the beach anyway, at least not to the extent we know it.

9       They would go to the beach, but there are separate beaches.

10      There's also separate seating on the buses.

11             You know, there are people in this world

12      ultra-orthodox, and not everyone and not in every wedding, but

13      even at weddings there is separate seating.  So if there

14      wouldn't be that, he wouldn't go.  It affected his life to a

15      big extent.  That became a focus of concern for Mr. Mandelkorn

16      additionally suffering because not only his son was suffering

17      physically, but now his son's function was suffering because he

18      took meaning in the fact that, oh, my eye is injured, I need to

19      focus on improving myself especially in that area.

20             (Continued on next page)

21

22

23

24

25

F1S8SOK7                          Strous - direct

1    Q.  Dr. Strous, have you read the report of the defendants'

2    mental health experts about Shaul Mandelkorn?

3    A.  Yes.

4    Q.  Have you read the sections of it that discuss the issue of

5    Shaul's difficulties with respect to the issue of looking at

6    women?

7    A.  Yes.

8    Q.  Are you aware that they say that the problem with Shaul is

9    that he suffers from something called obsessive compulsive

10   disorder and that is the reason he can't look at women?

11   A.  Yes.  I found this very interesting.

12   Q.  Could you start by telling the jury what obsessive

13   compulsive disorder is?

14   A.  Obsessive compulsive disorder is a debilitating syndrome

15   where a person has excessive thoughts and recurring thoughts,

16   or rituals and behaviors, in a particular area, which they

17   recognize to be irrational and no matter how hard they try,

18   they cannot stop thinking about those issues that they thought,

19   or they cannot stop doing those rituals even though they try.

20   So they could have obsessive thoughts about cleanliness; they

21   could have obsessive thoughts about washing their hands; they

22   could have compulsions, checking doors when they leave the

23   house.  Now, they realize that it is irrational and they try

24   very hard to stop it, but they can't.

25   Q.  In your opinion, did Shaul Mandelkorn suffer from obsessive

F1S8SOK7                          Strous – direct

1    compulsive disorder?

2    A.  No, he doesn't.

3    Q.  Why not?

4    A.  I found the fact that he was diagnosed with obsessive

5    compulsive disorder in the evaluation so interesting that I use

6    it frequently in my teaching of medical students and psychiatry

7    residents.  This is a classic example of a failure to recognize

8    and appreciate cultural difficulties, which one has to be

9    sensitive to before one makes a diagnosis.

10          So, for example, many times people will say

11   individuals have psychotic disorders when in fact they have

12   obsessive compulsive disorders because a person is not

13   sensitive to a person's culture.

14          So, too, someone may say someone has obsessive

15   compulsive disorder when they don't understand that this is

16   something that is very clearly identifiable with the person's

17   religion and culture.

18          So you can't diagnose people with various disorders

19   unless you understand what their culture is.

20          The classic studies on this have been done in the

21   differences between severe mental disorders between the United

22   States and England, with regard to severe illnesses, difference

23   between how psychiatrists have diagnosed white people and black

24   people.  I will give that as example which is of relevance to

25   American culture.  If a doctor doesn't understand the culture

F1S8SOK7                        Strous - direct

1    and ethic issues or sensitive to where the person is coming

2    from, a person can misdiagnose people.

3            So here is an example where people have misdiagnosed

4    someone with OCD when he doesn't have OCD.  For OCD, you would

5    have to recognize that the thought is irrational.

6    Mr. Mandelkorn does not believe the thought is irrational.

7    They have to try to get rid of the thought and not be able to.

8    And Mr. Mandelkorn doesn't try to get rid of the thought

9    because he believes it's a very real religious response to his

10   injury.  So in no way does this meet the criteria for obsessive

11   compulsive disorder.

12   Q.  If not obsessive compulsive disorder, to what do you

13   ascribe Shaul Mandelkorn's, if you will, intensity about not

14   looking at women?

15   A.  Mr. Mandelkorn, as I mentioned, suffers from partial PTSD

16   and anxiety disorder, and this issue of what happened to his

17   eye is not related even those disorders.  It's related to the

18   fact that he is someone who experienced a devastating attack

19   where he felt -- where he was injured, and he is trying to find

20   some meaning in it.  And based on his religious world that he

21   lives in, the meaning that he finds to cope with it is saying,

22   OK, I am injured in my eye, I need to take particular attention

23   to my eyesight.  It obviously happened to me for a reason, and

24   therefore I need to pay particular attention to my day-to-day

25   life in this aspect of my religious observance.

F1S8SOK7                      Strous - direct

1    Q.  I think you may have alluded to this earlier, Doctor, but

2    just to be clear, what do you view is the impact of Shaul's

3    issue of looking at women and the intensity of it on his father

4    Leonard?

5    A.  His father recognizes that his son's particular attention

6    to his eyesight and gazing at women has affected his function

7    now, because at times he won't go out with the family just in

8    case he might see an indecently dressed lady.  So he recognizes

9    that this is a very intense focus on an aspect of very

10   acceptable religious activity, but it's affecting his son's

11   function.  He understands where it's coming from, but he is

12   concerned.  He is concerned that this is affecting his son in

13   his behavior, and therefore it's concerning to him.

14   Q.  Doctor, in your opinion, what is the cause of Leonard

15   Mandelkorn's chronic dysthymia and adjustment disorder with

16   depressed mood and anxiety?

17   A.  It is quite clear, based on my best professional opinion of

18   the diagnosis that I mentioned early on, that there is a clear

19   temporal association, there is a clear connection in time to

20   Mr. Mandelkorn experiencing all those symptoms related to his

21   son being injured, and, therefore, it's clear to me that his

22   son being injured in the terror bombing is a cause of

23   Mr. Mandelkorn Sr.'s symptoms.

24   Q.  Let me ask you about some other things that might be

25   affecting Mr. Mandelkorn.

1              You mentioned that some years prior he had another son

2    die from a heart ailment.  Do you see that as a cause of the

3    mental disorders that you diagnosed in Mr. Mandelkorn Sr.,

4    Leonard?

5    A.  No.

6    Q.  Why not?

7    A.  Because there was no expression of all of these features

8    that I have mentioned, in terms of constant anxiety, feeling

9    low mood, affecting concentration, a function in teaching, none

10   of those things became a dominant feature of his life after the

11   loss of his son.

12   Q.  To your understanding, does Leonard Mandelkorn suffer from

13   any health issues?

14   A.  He has a heart problem called cardiomyopathy, which is

15   enlarged heart.

16   Q.  Have you considered whether his heart issues might be a

17   causative factor in the two disorders that you have diagnosed?

18   A.  I did.

19   Q.  What is your view in that regard?

20   A.  I don't believe that his cardiomyopathy is causing any of

21   these features that he is going through.

22   Q.  Why is that?

23   A.  Because enlarged heart does not cause depression and

24   anxiety and all those mood features that I mentioned.

25   Q.  Do you know if Mr. Mandelkorn is in the position of having

F1S8SOK7                        Strous - direct

1    to care for other family members who need heightened degrees of

2    care?

3    A.   Yes.

4    Q.   What is your understanding in that regard?

5    A.   He has his parents and his in-laws living with him, and he

6    has to care for them.  He also has a sister who has some kind

7    of intellectual disability and is living at an institution, and

8    he takes care of her as well; he is involved in the care for

9    her.

10   Q.   Have you considered whether Mr. Mandelkorn's role in having

11   to care for and think about either the parents or in-laws that

12   you mentioned, or the sister in the institution, plays a role

13   in causing the emotional disorders that you have diagnosed?

14   A.   I don't believe that the manner and extent to which he is

15   affected by Shaul Mandelkorn's issues in any way compares to

16   the stress of dealing with those other family members, to the

17   extent that what he is going through now is clearly related to

18   what his son went through, that is what preoccupies him all the

19   time.  Many of us have to deal with family members and elderly

20   parents, but those don't cause the anxiety and the dysfunction

21   and change in behavior that was clearly associated with the

22   son's injury.

23   Q.   Similar question, Doctor.  Do you have any understanding as

24   to whether Leonard Mandelkorn has any stress in his life

25   related to the status of his job as a teacher?

F1S8SOK7                          Strous - direct

A.  His job as a teacher is pretty -- his function has

decreased, but it is pretty stable.  I don't think he has any

chance of losing his job based on his function.  He teaches in

an institution.  The extent of his teaching, his

responsibilities have changed somewhat over the years, but he

doesn't feel that is threatening -- that's not a threat to him;

he doesn't feel that that's a cause of his stress.

Q.  Do you believe that Leonard Mandelkorn's chronic dysthymia

and his adjustment disorder with depression are reasonably

certain to be permanent?

A.  Yes.

Q.  Do you hold all the opinions that you have given today

about Leonard Mandelkorn to a reasonable degree of medical

certainty?

A.  Yes.

Q.  Dr. Strous, I have been asking you questions about

plaintiffs who were wounded in terrorist attacks and whose

family members suffered damage.

        You referred to this earlier, but I just wanted to be

clear.  Do you have any opinion as to whether the emotional

impact on these people would likely have been the same if the

physical injury suffered by those had been the result of

something other than a violent terrorist attack, such as a

workplace accident or a car accident?

A.  It is quite clear from the research of PTSD, or any

F1S8SOK7                         Strous – direct

1    traumatic event, that when the event is intentional and sudden

2    and violent, there is a much greater chance of there being a

3    development of PTSD.

4            In terms of percentage wise, just to give an example,

5    in the United States there are studies, and around the world,

6    that have said that PTSD is in the range of 6 to 18 or 6 to 20

7    percent.  In the United States, there has been a major study

8    called the National Co-morbidity Survey which put the rate of

9    PTSD at 6 to 18 percent in the United States.

10           However, if the incident is the result of intentional

11   trauma, for example, rape or homicide or terror, the rate of

12   PTSD dramatically escalates.  12-1/2 to 70 percent some studies

13   have shown.  The rates of PTSD after rape are 80 percent.  And

14   I have no doubt that in the higher range, from what we have

15   seen here, in any terror event, if someone dies, the rates of

16   PTSD are much higher when it's involved in an intentional

17   manner.

18   Q.  Doctor, I now want to turn to the families of the people

19   who were killed in the bombing in the cafeteria of the Hebrew

20   University.

21           I am going to start with the family of Benjamin

22   Blutstein.  Could you tell us how many members of Ben

23   Blutstein's family you evaluated?

24   A.  Three.

25   Q.  Who?

F1S8SOK7                         Strous - direct

1    A.   I evaluated the mother, Katherine breaker; the father,

2    Richard Blutstein; and the sister, Rivka Blutstein.

3    Q.   Before I ask you about any of these three people, can you

4    tell us what you understand about who Ben Blutstein was and

5    what happened to him?

6    A.   Ben Blutstein was a young gentleman.  I believe he was 20

7    at the time, in his early 20s.  He was in Israel studying for a

8    period of time.  He was studying both religious education, but

9    also in the social area, and he was at Hebrew University in the

10   cafeteria on the 31st of July 2002.  He was about to return the

11   next day to the United States, and there was an explosion in

12   the cafeteria, the Frank Sinatra cafeteria, at Hebrew

13   University, and he died.

14   Q.   Let's now move to the members of his family, starting with

15   his mother, Katherine Baker.  Can you tell us who she is?

16   A.   Katherine Baker is a 63-year-old female, United States

17   citizen.  She lives in Harrisburg.  She is married with one

18   child.  She is a practicing professor --

19   Q.   To be clear, when you say "with one child," is that in

20   addition to Ben?

21   A.   That's in addition to Ben.  She is a practicing professor

22   of microbiology and biochemistry.

23        On July 31, 2002, she remembers waking up early at

24   7:00 in the morning, listening to the news, and hearing that

25   there was an explosion in Jerusalem at Hebrew University.  She

F1S8SOK7                        Strous - direct

1    was immediately concerned for her son Ben's welfare and tried

2    to contact him.  He didn't reply.  She started flipping news

3    channels to get more information.  She called friends in Israel

4    to try and get information.  No one replied.  Later in the

5    afternoon she was contacted by someone from the State

6    Department who officially informed her that her son had died in

7    the explosion in the cafeteria.

8            After receiving a call, she tells me, her life

9    completely changed, from being multicolored and

10   multi-dimensional to being gray.  Those with her words, gray

11   and lifeless.

12   Q.  Did you diagnose Dr. Baker with any mental disorders?

13   A.  I did.

14   Q.  What did you diagnose her with?

15   A.  Pathological bereavement and adjustment disorder with

16   depression.

17   Q.  Now, for an earlier plaintiff that you had diagnosed with

18   adjustment disorder with depression, you said that due to a

19   change in the terminology in the DSM you were changing the

20   terminology to chronic partial PTSD.  Are you doing that with

21   respect to Dr. Baker?

22   A.  There is one factor of the PTSD that still is an issue for

23   her, and therefore with the latest update in terminology, I

24   could say we would call it partial PTSD, that is true.

25   Q.  Again, is there any change in your views of Dr. Baker or is

F1S8SOK7                          Strous - direct

1    this just a terminology issue, if you will, in your profession?

2    A.  It's terminology.

3    Q.  I believe the first diagnosis you mentioned for Dr. Baker

4    was pathological bereavement, is that correct?

5    A.  That's true.

6    Q.  I think this the first time we have heard the term

7    pathological bereavement.  Can you tell us what that is?

8    A.  On the death of anyone that's close to someone people go

9    through bereavement, but there is a distinct syndrome of

10   pathological bereavement, which goes by a number of different

11   names.  It is also called complicated grief, prolonged grief

12   disorder, and in the latest year, persistent complex

13   bereavement disorder, which is a syndrome or a group of

14   symptoms characterized by the person's inability to deal with

15   that loss and move on with their life.

16           So, in my experience, intense longing, sadness,

17   yearning for the dead person, that causes anger, bitterness at

18   times.  The person may feel empty, it's unbearable for them to

19   go through this.  They feel they can't trust people or affects

20   the caring for others around them.  They may become pervasively

21   preoccupied with the memory and try to preserve that memory in

22   many different ways, by visiting the grave a lot, keeping the

23   room the same way for years and years.  It affects sometimes

24   their connection with other people; they avoid connection with

25   other people.  But it very clearly affects all aspects of their

1    lives.  They feel confused.  There is a shock and disbelief

2    that doesn't resolve over a period of time, which is what is

3    normally acceptable and expected after the loss of a person who

4    is close to somebody.

5    Q.  Could you tell us what supports your two diagnoses of Dr.

6    Baker, both pathological bereavement and either chronic partial

7    PTSD or adjustment disorder, again, beginning with the period

8    shortly after the death of her son?

9    A.  So Mrs. Baker, after hearing her son had died, as she

10   mentioned, her life turned gray and lifeless.  The next day she

11   was supposed to meet her son at the airport.  Instead her son

12   came back in a box.  And she said she completely shut down for

13   one week, did not function at all.  She doesn't remember much

14   of this week, which is indescribably painful, agonizing.

15          She reports that her mood for a significant period of

16   time after this week was none.  She experienced devastation.

17   She said the bottom fell out of her life.  She said that she

18   was very close to her son, her son was a very wonderful

19   individual in her mind and he was very much a family person.

20   He was especially close, as she describes, to his little

21   sister, and that the loss was incomprehensible for her.

22          She reported that her sleep -- talking about

23   Mrs. Baker now -- was very much affected due to nightmares.  In

24   addition, her appetite was very much affected and for two

25   months she hardly ate, with a loss of weight, and her mood was

F1S8SOK7                        Strous - direct

1   low all the time.  Then over time things only expanded in many

2   ways.

3   Q.  Could you now tell us a little bit more about the

4   longer-term consequences of her son's death and how those

5   support your two diagnoses?

6   A.  She reported that over time everything she did was tinged

7   with sadness over the loss of her son.  She reports that her

8   mood is low all of the time.  She reports feeling full of

9   anger, hopelessness, meaningless.  Her anger was directed both

10  to the terrorists that she described as well as God.  She would

11  be angry at situations that in the past would not cause her to

12  be angry.

13          To this day she reports that she wakes up two to three

14  times a week due to nightmares.  She reports that her work is

15  very much affected as well.  She just received tenure as a

16  professor, but she virtually stopped all research and

17  publications for almost four to five years.  So she had

18  intensely productive and it all stopped.

19          Her social life was also dramatically affected.  She

20  would rarely see other people in a social setting.  She became

21  very withdrawn, especially in the first year.  It has improved

22  to some extent.  I asked her why would you not want to be with

23  people?  She said, why should she inflict her sadness on other

24  people?  She basically kept to herself.

25          She became tearful in situations that often were

F1S8SOK7                    Strous - direct

1    inappropriate.  At the time that I met her, she had described

2    for me how in the synagogue she had read from the scroll for

3    one of the festivals and she became tearful and crying, because

4    even though it should be a happy experience for her, she said,

5    you know, her son Ben should have been there for her.

6          She struggles to be happy in situations where you

7    would be happy, for example, her daughter's wedding.  She was

8    overwhelmed with feelings of sadness at her daughter's wedding,

9    because how could it be that my daughter is being married now

10   and Ben is not here.  Ben was missing.

11         Before every sabbath, and now we are talking about I

12   saw her almost 11 years, almost 11 years after the event, she

13   visits the cemetery every single week, at least once a week,

14   and she spends at least 30 minutes at the cemetery once a week

15   visiting her son.

16         The event also placed a distance between her and her

17   husband, and she thought her relationship was never the same

18   with her and her husband because of the feelings that she had

19   inside her, which are very intense and she couldn't connect

20   even with her husband.

21   Q.  Let me ask you a little bit more about the diagnosis

22   pathological bereavement.  Is this a DSM diagnosis?

23   A.  Pathological bereavement is a diagnosis which is in the

24   DSM-V under the name of persistent complex bereavement

25   disorder, and it is at the back of the DSM in a section which

F1S8SOK7                        Strous – direct

is dedicated to syndromes which require more research before

they enter the first part of the DSM.

          Now, interestingly, it's become such a prominent issue

and discussion, this issue of pathological bereavement, it is

in the latest medical journal going by the name the New England

Journal of Medicine, which is the top medical journal in the

world based on its impact factor, in this month, January 2015,

as a feature article on this disorder, and there they call it

complicated grief.  And they mention in the article that this

disorder, which I am calling pathological bereavement, which is

how we refer to it in Israel, goes by a number of different

names around the world.  In the DSM, as I mentioned, persistent

complex bereavement disorder.  Katherine Shear in this New

England Journal of Medicine article calls it complicated grief

disorder, and she refers to the fact that in Europe, in the

ICD, which is another classification of diseases, it's called

prolonged grief disorder.  So we have the same disorder going

by different names.  It has several other names, by the way,

but those are the four most important names.

          So it's a disorder that is very well recognized, as

characterized by the inability of people to move on and dealing

with bereavement, and is exhibited in a very specific,

well-described manner.

Q.  Doctor, can the condition for which you're using the term

pathological bereavement, can that occur based on the death of

F1S8SOK7                          Strous – direct

1    any person that's close to the subject of a family member, a

2    dear friend, something like that?  What sort of death can kick

3    off this disorder?

4    A.  Any kind of death can cause complicated grief or

5    pathological bereavement.  In fact, the figures are 2 to 3

6    percent of individuals who, when someone dies, can exhibit

7    these features.  However, if the loss of the individual is

8    sudden and violent, such as homicide or a terror attack, the

9    rate of this complicated grief shoots up to in the area of 25

10   to 70 percent.  Those are the situations we are dealing with

11   here because of the suddenness and the violence and the

12   aggressive nature, and especially if it's a child or some other

13   close family member.

14   Q.  Is there any particular kind of family member for whom it's

15   recognized that this condition is particularly likely to occur?

16   A.  A child.

17   Q.  Does it make a difference if the child is grown or still

18   immature?

19   A.  No.  And may I add sometimes when the child is older, in

20   some ways the syndrome is complicated by the fact that there

21   are various physical ailments that are associated with this,

22   that people who have complicated grief develop substance abuse,

23   they may become suicidal, they develop immune disorders,

24   physical disorders, they often have cardiovascular, which is

25   heart problems, and there is a high rate of cancer with people

F1S8SOK7                         Strous - direct

1   who have complicated grief.

2   Q.   Doctor, are you aware as to whether or not Dr. Baker has

3   any significant physical health problems?

4   A.   Yes, she does.

5   Q.   What do you understand are her physical problems?

6   A.   She developed -- before the event she had a stroke.  This

7   is several years before this event.  It affected her physical

8   functioning, but it's something that over time she overcame and

9   continued to function at a pretty high level in her profession

10  and in her family.

11  Q.   Any other physical problems that you're aware of?

12  A.   I believe she had hypertension, high blood pressure, and

13  then she used to smoke a lot, and that was an issue that caused

14  her problems and she received treatment for that.

15  Q.   Do you have an opinion as to the role, if any, played by

16  her stroke or any other problems, hypertension, as to whether

17  or not they are causes of the emotional disorders that you have

18  diagnosed Dr. Baker with?

19  A.   No, I don't.  She was never treated for any of these

20  symptoms that I mentioned before.

21  Q.   Do you have an understanding as to whether she ever

22  obtained any mental health treatment as a result of her son's

23  death?

24  A.   She did.  She was treated by a psychologist.

25  Q.   Have you had a chance to review the treatment records of

F1S8SOK7                          Strous – direct

1   that psychologist?

2   A.  Yes.

3   Q.  How did they impact on your opinions?

4   A.  She was treated for depression and for what they described

5   as difficulties dealing with the loss of her son after that

6   period.

7   Q.  Has she improved any over the years?

8   A.  She has improved.  There are exacerbations especially

9   around the times of anniversaries or special occasions, such as

10  when her daughter got married, but she has returned to some

11  function.  She reported to me very clearly that her students

12  know to keep away from her around the time of the anniversary

13  of her son's death, because she withdraws, becomes moody, and

14  her function is affected around that time, so keep away from

15  Professor Baker.

16  Q.  Doctor, what is your professional opinion as to the cause

17  of Dr. Baker's pathological bereavement and chronic partial

18  PTSD?

19  A.  The loss of her son.

20  Q.  Do you believe that those conditions are reasonably certain

21  to be permanent?

22  A.  Yes.

23  Q.  Do you hold your opinions about Dr. Baker to a reasonable

24  degree of medical certainty?

25  A.  Yes.

F1S8SOK7                          Strous - direct

1   Q.  Let's turn to another member of Ben Blutstein's family, his

2   father Richard.

3        Doctor, could you tell us about Richard Blutstein?

4   A.  Mr. Blutstein is a 65-year-old United States citizen,

5   married with one surviving child.  He is a practicing

6   pediatrician.  He remembers clearly on the day of the

7   suicide -- of the bomb.  It wasn't a suicide bombing; this was

8   a bombing in the cafeteria.  He was watching CNN in the morning

9   when it was reported that there was an explosion in Hebrew

10  University.  He immediately called his son Ben on the cell

11  phone and was transferred to his answering machine.  When he

12  arrived at work at 9:00 in the morning, he called some people

13  he knew in Israel and also received messages.  Then he called

14  the institution where he was learning in Jerusalem, but

15  couldn't get any further information.  He spent the day seeing

16  patients, and then in the afternoon he was contacted by a

17  member of his community indicating that Ben had died in the

18  explosion.

19  Q.  What do you understand about the nature of Dr. Blutstein's

20  relationship with his son Ben while Ben was alive?

21  A.  He reports that he was very close with his son and they

22  spoke very often on the phone.  He reported that the loss left

23  a major vacuum in his life.  He found himself dealing with

24  intense pain in the initial period.  I remind you that he was

25  supposed to meet his son the next day coming back from Israel,

1    and he met his son and accompanied him to his funeral.

2    Q.  Just to clarify, Doctor, to go back to Dr. Baker, the

3    mother for a moment, what did you understand about the nature

4    and quality of her relationship with Ben before Ben died?

5    A.  They were both very close with their son.  They had a

6    different relationship with the son, but they both

7    reported -- remember, he was their only son.  They had a son

8    and a daughter.  And for Mr. Blutstein, his son was -- that's

9    an extension of himself, and it left a massive void for him and

10   something that he has never been able to, for obvious reasons,

11   replace.

12   Q.  Based on your evaluation of Dr. Blutstein, did you diagnose

13   him with any mental disorders?

14   A.  Pathological bereavement and adjustment disorder.

15   Q.  Again, is the adjustment disorder one that you might today

16   call chronic partial PTSD because of a terminology change?

17   A.  There are features, but I would keep them as adjustment

18   disorder, because for Mr. Blutstein the issue is not so much

19   the post-traumatic stress, but the difficulties in adjusting to

20   the repercussions of what happened, in terms of especially his

21   relationship with his wife, and for that it caused him a lot of

22   distress.

23   Q.  Could you now tell us what happened in the soon aftermath

24   of Ben's death that underlies your diagnoses of pathological

25   bereavement and adjustment disorder for Dr. Blutstein?

F1S8SOK7                          Strous - direct

1    A.  Initially he reported a major issue with his sleep.  He was

2    constantly preoccupied and ruminating of the death of his son.

3    Then over time things changed.  He reports that he feels a low

4    level of sadness.  When I say low level, it's always there, but

5    it's significant.  He deeply misses Ben and just very, very sad

6    that he will never meet him again and never be with him again.

7    He reports that he is not depressed, just deeply sad.  It's

8    always with him.  To this day he gives his son a blessing on a

9    Friday night.  When he sits down at the table for the

10   traditional Friday night meal with his family, he blesses his

11   son.

12        He reported that he didn't enjoy his daughter's

13   wedding as much as he should have, and for him it was

14   bittersweet.  The wedding for him is a reminder that he will

15   never be at Ben's wedding, and this was something that

16   preoccupied his thoughts at his daughter's wedding, and that he

17   will never see Ben's children.

18        He reported that for him he used to be very active in

19   the community, and various activities associated with it, but

20   following the loss of his son he withdrew completely.  For

21   example, he used to be a ritual -- he was a ritual circumciser.

22   That was his job in the community; he used to do the

23   circumcisions, and he stopped that.  He also stopped working as

24   an attending pediatrician.  He used to work in a hospital and

25   he thought he just -- he couldn't deal with being in his

1    practice in the office as well as in the hospital, so he

2    stopped working in the hospital.  Over time he also put on a

3    lot of weight, he stopped caring for himself, and his diabetes

4    got out of control as a result.

5         He also says his social life was affected, even though

6    in his opinion he said it wasn't affected as much as his wife's

7    social life.  He said his wife completely disconnected and

8    withdrew from the world and people.  He did to some extent, but

9    not as much as his wife.  He stopped all professional contacts

10   outside of work, which affected him as well.  He just didn't

11   feel comfortable being around people so he had the minimum

12   possible required connection with people.  The rest he would

13   stay to himself.  And, in general, and this is a very common

14   thing with people with pathological bereavement, they stop

15   enjoying things as much as they did.

16        Interestingly, this is similar to what his wife said,

17   that things just became gray.  Life changes for people who have

18   pathological bereavement.  The experience is just not the same.

19   And the reports, and this is related to adjustment disorder,

20   that his relationship with his wife was significantly affected

21   because his wife withdrew from contact, and even including him,

22   in order to deal with the loss.

23   Q.  To your knowledge, Doctor, did Dr. Blutstein suffer from

24   any mental disorders prior to the killing of his son?

25   A.  No.

F1S8SOK7                          Strous - direct

1    Q.  Has he improved over the years?

2    A.  While there was been some improvement, there is still many

3    features that continue to be very seriously affected in his

4    life.  So there are features that continue to be very

5    dysfunctional to this day.

6    Q.  Are you aware, Doctor, that Dr. Blutstein has in the year

7    since his son's death taken up activities such as learning how

8    to fly a plane, how to sail, and ride a motorcycle?

9    A.  I am aware of it, and I found it interesting.  It's

10   difficult to make sense of some of it because it is very much

11   out of character of what he did before.  It's difficult to

12   really say with any professional certainty exactly what is

13   underlying that.  Some would say that maybe this is reckless

14   behavior for someone at his age to start doing some of the

15   things, but I think that maybe one of the reasons is he is

16   trying to find some kind of outlets to deal with his

17   frustration, to deal with his pain, and in a way -- also,

18   remember, his relationship with his wife, I wouldn't say he is

19   estranged, it's too strong, but there is a disconnect.

20   Therefore, he is finding something to occupy that void in his

21   life, both in the social sense because he feels a difficulty

22   being around people, his wife has distanced herself from him,

23   and he is finding an outlet, and that's what he is doing.

24   Q.  Doctor, in your opinion, what is the cause of

25   Dr. Blutstein's pathological bereavement and adjustment

F1S8SOK7                      Strous - direct

1   disorder?

2   A.  The loss of his son and the explosion in Hebrew University.

3   Q.  Do you believe that his pathological bereavement and

4   adjustment disorder are likely to be permanent?

5   A.  Yes.

6   Q.  Do you hold all of the opinions you have given today about

7   Richard Blutstein to a reasonable degree of medical certainty?

8   A.  Yes.

9   Q.  I have one more member of the Blutstein family.  This is

10  the daughter Rebecca, who I understand goes by Rivka.  Could

11  you tell us who Rivka is?

12  A.  Rivka Blutstein is a 26-year-old United States citizen,

13  living in New York.  She is married, recently married at the

14  time that I evaluated her, and she is currently a -- she was at

15  the time a first year medical student in New York.

16  Q.  Do you know how old she was when her brother was killed?

17  A.  She was 13.

18  Q.  What do you understand about the nature of Rivka's

19  relationship with her brother?

20  A.  Rivka describes the connection with her brother, her only

21  other sibling, as being remarkable.  They were very close.  Her

22  parents she described as being two professionals, very involved

23  in their work, and therefore she felt like her older brother,

24  her big brother, was her role model in her life.  He was in a

25  way the one that was at home when she came home, and they spent

F1S8SOK7                          Strous - direct

1   a lot of time together, and in some ways brought her up in many

2   aspects of her life.  And she was absolutely devastated by the

3   loss of her brother.  She saw her brother as the stability for

4   her and then he was suddenly just gone.  Even though there was

5   an age difference, she felt particularly close with him.

6           She was 13, and she described the fact that up until

7   that nothing ever bad happened in her life.  She had the

8   perfect life, living in middle class America and everything

9   going great, and then suddenly her brother was dead and it

10  didn't make sense to her.  She didn't understand the day it was

11  told to her.  She kept on saying to herself, Ben is dead, Ben

12  is dead.  She remembers very clearly that was her initial

13  response.

14          She told me that when her brother was in Israel, she

15  went to visit him just to maintain a connection, and therefore

16  the loss just changed her life.

17          She reports that her life from then on was

18  dramatically changed.  She said that her parents were

19  devastated and were dealing with their own pain and somewhat

20  disconnected from her at the time.  She realized they tried

21  very hard to help her deal with it, but her parents were very,

22  very pained.  She said the news media were all over the family.

23  This is Harrisburg, Harrisburg people don't get blown up in

24  bombs, and this became a celebrity case and was big news in the

25  area.

1              She recalls after the initial shock and bewilderment

2      she was very sad.  She didn't know how to talk about it.  She

3      was 13.  She was a little girl.  How do I deal with the fact

4      that my family is being irreversibly traumatized?  Her social

5      life was affected.  This was a 13 year old going into her

6      teens, developing herself in very important years of her life.

7      She didn't know how to talk openly.  She became withdrawn.  She

8      had these thoughts all the time of her brother being blown up

9      and the indignity of that.  Her brother was a larger-than-life

10     character, and the indignity of him being blown up, and she

11     pictured him in little pieces around the cafeteria, and that

12     was very difficult of her.

13     Q.  Based on your evaluation of Rivka, did you diagnose her

14     with any mental disorders?

15     A.  I did.

16     Q.  What were they?

17     A.  Pathological bereavement.

18     Q.  I am sorry if I cut you off.  Were there any other bases

19     for your diagnoses than the ones you have just gone through?

20     A.  No.  Pathological bereavement.

21     Q.  Do you know if Rivka has had any mental health treatment?

22     A.  She did.  She was treated for five years as a result of

23     what she went through.  Part of that was related to the fact

24     that she didn't know how to talk about what she went through.

25     She was having some symptoms, which based on the DSM-V, I would

1   not call PTSD, in terms of occasional nightmares and not

2   wanting to go back to those places, even though she has

3   returned on one occasion.  But her life was very much affected

4   in terms of social interaction.  And she would be in class, and

5   the teacher would read a story, and she would burst into tears

6   because it would touch something.  She would go to see a movie,

7   she remembers going to see the movie Finding Nemo, and burst

8   into crying watching the scene where the father sees the dead

9   son.  She said it is very difficult to describe to others and

10  the psychotherapy helps her talk about it.

11      She said that her social life was dramatically

12  affected.  She used to go to situations and people would ask

13  her how many siblings she had, and she would have to talk about

14  it, and then she would feel burdened by other people's issues.

15  I am not sure if you're aware of it, but We live in a society

16  where often when you tell people the problems you have, people

17  say, you know what happened to me.  In some ways people are not

18  connecting with her on her own level, but, rather, burdening

19  her with other people's problems, and she felt that was also

20  very difficult for her.

21      She describes the fact that the memory and her

22  connection with Ben intrudes on her life in many ways, and she

23  says the memory of Ben causes her also to be very sad, and the

24  fact that he was not at her wedding.  She said at the time she

25  was turning 25, she was very anxious when she turned 25 because

F1S8SOK7                          Strous - direct

1   Ben was 25 at the time, at the time that he died.  Therefore,

2   Ben is 25.  Now I am going to be older than Ben, my big

3   brother, how could that be.

4          This is expressed in other areas of her life.  For

5   example, when she calls someone and they don't answer, this

6   causes a flashback to the time that her parents tried to call

7   him, and she gets anxious even though she knows it's

8   irrational.

9   Q.  You mentioned, Doctor, some PTSD symptomatology for Rivka.

10  Does she merit a diagnosis of partial PTSD?

11  A.  She reports occasionally nightmares, which includes Ben and

12  the fact that he doesn't want to return to the family.  As I

13  mentioned, with the updating of the DSM-V, with that symptom of

14  nightmares, I guess one could call it partial PTSD in that one

15  area, but I don't believe any of the other areas.

16  Q.  What do you believe is the cause of Rivka's pathological

17  bereavement?

18  A.  The loss of her brother in the explosion at Hebrew

19  University.

20  Q.  Do you believe her pathological bereavement is reasonably

21  certain to be permanent?

22  A.  Yes.

23  Q.  Do you hold all of the medical opinions you have given us

24  today about Rivka Blutstein to a reasonable degree of medical

25  certainty?

F1S8SOK7                              Strous - direct

1    A.  Yes.

2                MR. HORTON:  We are hard upon 5:00 and I have finished

3    with this family.  Should we stop now?

4                THE COURT:  Yes.

5                Ladies and gentlemen, we will take a break at this

6    time.  Don't discuss the case.  Keep an open mind.  I will see

7    you at 9:45, and we will see if we can keep moving along and

8    make up for time.  Have a great evening.

9                (Jury exits courtroom)

10               THE COURT:  I have some letters.  The other side on

11   both letters haven't yet had an opportunity to respond.  I have

12   looked at the letters.  If you want to respond overnight, we

13   will address them first thing in the morning.

14               The first thing is it's unclear to me whether

15   Weinstein is still going to testify or not.

16               MR. HORTON:  As far as we are concerned, there is no

17   reason he shouldn't testify.  He is an expert.  He is going to

18   testify as to the lost wages of two of the plaintiffs who live

19   in Israel.  I really haven't a chance to look at their letter,

20   but they indicated that plaintiff at her deposition, she didn't

21   think she was going for lost wages.  Well, she is.  There has

22   been an expert report on her.  There has been a deposition.  It

23   should be a nonissue.

24               THE COURT:  We will talk about that in the morning.

25               Also, the plaintiffs have raised the issue about the

F1S8SOK7

1    Goldberg family.  We haven't heard that testimony yet from this

2    witness.  I think that's the last incident to talk about.  The

3    defendants should let me know right away in the morning whether

4    or not you anticipate that you're going to raise the issue that

5    they say they want to address in this case with regard to, I

6    guess, the relationship of the family.

7              MR. HORTON:  Are you referring to the Dr. Perry issue?

8              THE COURT:  No.  I am referring to the music video.

9              MR. HORTON:  OK.

10              THE COURT:  Or recording.

11              MR. ROCHON:  We will be ready to address all of that

12    first thing in the morning.

13              MR. YALOWITZ:  It's an audio.

14              MR. HORTON:  Just to be clear, it's not just the

15    Goldberg family.  We have the Coulter family, we have Larry

16    Carter, we have the Goldbergs, and we have Nevenka Gritz yet to

17    cover with this witness.

18              THE COURT:  I understand we haven't addressed the

19    Goldbergs yet.

20              MR. HORTON:  We are half done.

21              THE COURT:  I wanted to ask, I didn't have a date.

22    Did you have a date for this audio?  I couldn't find a date.

23              MR. YALOWITZ:  We can figure it out because the

24    youngest was a baby.  So it has to be after his birth.  He was

25    an infant at the time of the murder.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F1S8SOK7

1    THE COURT:  Just be prepared with that information

2    tomorrow.

3    MR. YALOWITZ:  We can narrow it down at least to

4    within a year.

5    THE COURT:  We will see if this is even necessary.

6    My quick reaction is, the way you cropped Plaintiffs'

7    Exhibit 1133, I have less of a problem with it than I did, and

8    you know obviously what the problem I had with it.

9    1150 I still have a problem with.  I am still not sure

10    who is depicted in 1150.

11    MR. YALOWITZ:  It's the plaintiffs.

12    THE COURT:  The person standing and the person lying?

13    MR. YALOWITZ:  The person standing is the dad.  That's

14    Alan Bauer.

15    THE COURT:  On the phone?

16    MR. YALOWITZ:  He's on the phone.  Then the little boy

17    is Yehonathon Bauer; he is the seven year old.

18    THE COURT:  I still have some issues with the graphic

19    nature of the photo, but my recollection is I also precluded it

20    based on the untimeliness of its production.  That hasn't

21    changed.

22    So, as I said, with the other picture that you have

23    cropped, I have less of a problem with and I am willing to

24    consider having that be admitted.  This other photo, you have

25    to overcome both of those issues in order for me to change my

F1S8SOK7

1   ruling.

2        MR. YALOWITZ:  We will rely on your Honor's discretion

3   in that regard.

4        THE COURT:  If there is anything else I need, just let

5   me know, and we will get together at 9:15 and resolve those

6   quickly and see if we can get started early with the jury.

7        MR. ROCHON:  Thank you, your Honor.

8        MR. HORTON:  Thank you, your Honor.

9        (Adjourned to January 29, 2015, at 9:15 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

ISRAEL SHRENZEL

Cross By Mr. Hill . . . . . . . . . . . . .1559

Redirect By Mr. Yalowitz . . . . . . . . . .1567

RAEL STROUS

Direct By Mr. Horton . . . . . . . . . . . .1601