F1tQsok1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARK I. SOKOLOW, et al.,

4                  Plaintiffs,

5            v.                          04 CV 397 (GBD)
                                         Trial
6   PALESTINE LIBERATION
    ORGANIZATION, et al.,
7
                   Defendants.
8
    ------------------------------x
9                                        New York, N.Y.
                                         January 29, 2015
10                                       9:15 a.m.

11  Before:

12                   HON. GEORGE B. DANIELS,

13                                       District Judge
                                         and a Jury
14                        APPEARANCES

15  ARNOLD & PORTER LLP
         Attorneys for Plaintiffs
16  BY:  KENT A. YALOWITZ
         PHILIP W. HORTON
17       TAL MACHNES
         SARA PILDIS
18       CARMELA T. ROMEO
         RACHEL WEISER
19
    MILLER & CHEVALIER, CHARTERED
20       Attorneys for Defendants
    BY:  MARK J. ROCHON
21       LAURA G. FERGUSON
         BRIAN A. HILL
22       MICHAEL SATIN
         DAWN E. MURPHY-JOHNSON
23

24  Also present:  RACHELLE AVITAL, Hebrew interpreter
                   RINA NE'EMAN, Hebrew interpreter
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

F1tQsok1

 1            (In open court; jury not present)

 2            THE COURT:  Let me first address, Mr. Yalowitz, is

 3    there any purpose of this audiotape if the defendants do not

 4    intend to raise the issue that you argued that this was in

 5    response.

 6            MR. YALOWITZ:  Yes.  The audiotape is very, very

 7    important to this family.  It is pretty standard in a wrongful

 8    death case to be able to put into evidence about the

 9    circumstances of the family for the death of decedent.

10            THE COURT:  What do you say this puts at issue and

11    proves?  This is a different argument than you made before

12    because they pulled the rug out from under you with regard to

13    your other argument.

14            MR. YALOWITZ:  I want to come to that argument, but I

15    first want to just explain that one of the things you are

16    allowed to put in in a wrongful death case is what are the

17    circumstances of the family.  That is classic wrongful death

18    material.  I'm sure your Honor had a chance to listen to that

19    audiotape and read the transcript.  It is incredibly meaningful

20    to these people to be able to tell their story to the jury.

21            THE COURT:  I understand that.  That is not a basis on

22    which I can rule; that it is terribly meaningful to them.  I

23    have to rule on an evidentiary basis.

24            MR. YALOWITZ:  The evidentiary basis is the classical

25    standard wrongful death circumstances of the family,

F1tQsok1

1    circumstances of the decedent.  That is the standard.

2                 THE COURT:  What do you say this tape proves?

3                 MR. YALOWITZ:  It proves that they were a very close

4    family.  It illustrates they were a very close family in a

5    tangible way that doesn't come alive just from the testimony

6    itself.

7                 THE COURT:  But it comes alive in every other case

8    where the witnesses get on the stand and they testify.  In this

9    case the other side is not even disputing it.

10                MR. YALOWITZ:  Let me come to that problem too because

11   what they say is they don't intend to dispute it.

12                THE COURT:  That's the way you guys talk to me.

13                MR. YALOWITZ:  I hope I don't talk to you that way.

14                THE COURT:  You had specifically used those words.  I

15   am not making this up.  You said to me I don't intend to do

16   this.

17                MR. YALOWITZ:  That's what they said.

18                THE COURT:  Both sides have said this on this issue.

19                MR. YALOWITZ:  I don't know.  I think if I promise you

20   something, I deliver it, and I haven't -- I really don't want

21   to get into a who struck John, but my problem is I have to put

22   on my case now, and the criticism of this family and the

23   picking at this family by the defendant's experts was all over

24   the depositions, it was all over the expert reports.  There is

25   no way I can control what they do in their case.

F1tQsok1

1          THE COURT:  I can control it though.  They're not

2     going to do it.  They said they're not going to do it, and I'm

3     not going to let them do it.  That's the end of that issue as

4     far as I'm concerned.

5          MR. YALOWITZ:  I just don't believe them, Judge.

6          THE COURT:  Well, I believe everything you guys tell

7     me.  They say they're not going to do it and regardless of

8     whether I believe it, I'm going to stop them from doing it.

9     They're not going to put in any such evidence.  So you have to

10    give me an argument -- if they don't raise this issue, you've

11    got to give me the argument.  You can't give me the argument,

12    "I don't believe them, Judge, so I want to put it in."  I can't

13    rule on that basis.

14         MR. YALOWITZ:  Well, as I said, I think that in any

15    wrongful death case things like photographs of the family and

16    videotapes, which I'm not bringing of the family, or audiotapes

17    of the family, it just illustrates in a way that raw testimony

18    can't what it is that the family was like before.

19         I don't really see any undue prejudice here.  It's not

20    like we're playing hours of family videos or something.  It's a

21    three-minute tape, an audiotape just to illustrate some of the

22    testimony.  I just really don't see the prejudice to the

23    defendants.  Frankly, you know, you've kept out a lot of

24    evidence on grounds of prejudice having to do with religion and

25    things like that.  I understand that has been your ruling.

F1tQsok1

1    Here, I just really don't see any prejudice, and I do think

2    it's relevant to the circumstances of the family, which is a

3    the standard in the wrongful death context.  We looked at this

4    on summary judgment.  The defendants wanted those wrongful

5    death claims dismissed for lack of evidence and --

6            THE COURT:  Why does this one family need this and

7    five other families don't?  You're in an awkward position.

8    You're trying to tell me how critical it is, and you've got it

9    only for one family out of all the families that are plaintiffs

10   in this case.  The other plaintiffs don't have this.  And they

11   have a strong, if not stronger, case from your perspective to

12   present to the jury based on your testimony.  What makes it so

13   unique about this family that they need an audiotape that is

14   obviously the subject matter of which doesn't have anything to

15   do with the issues.

16           MR. YALOWITZ:  Every family is unique.  Every loss is

17   unique.

18           THE COURT:  What's unique about this family that they

19   need an audiotape as opposed to all the other families you

20   represent?  That's what I'm asking.

21           MR. YALOWITZ:  I guess all I can say is that this

22   family came to me and said, "I want to be able to share this

23   with the jury.  It will help the jury understand my life and

24   what I lost."

25           THE COURT:  OK.  Then I understand that.

F1tQsok1

1          MR. YALOWITZ:  The others didn't come to me and say

2     that.

3          THE COURT:  I understand that.  From your perspective,

4     that's compelling, and I think it is appropriate for you to

5     make that argument on their behalf if they want you to do that

6     and they feel strongly about doing that.

7          MR. YALOWITZ:  If I thought there was some prejudice,

8     I would tell them, "No, we really can't do that."

9          THE COURT:  That is not, as I say -- I would not fault

10    you for making an application that your client wants you to

11    make.  The reality is that that is not any consideration in

12    terms of its admissibility for me to consider, because they

13    strongly want the jury to hear it.  There are a lot of things

14    that families and plaintiffs and defendants strongly want the

15    jury to hear, but that can't compel me to admit it.

16          As they say, the greatest value of this videotape is

17    to engender sympathy.  That's the greatest value, and that's

18    not appropriate to this jury to consider this case that way.

19          Now if they want to talk about how close they are,

20    they want to talk about some instances that demonstrate that,

21    about their loss, the jury is entitled to that information.

22          MR. YALOWITZ:  I don't mean any disrespect on this,

23    but I don't understand what the prejudice is.  It's obviously

24    relevant to the circumstances of the family.

25          THE COURT:  It has no probative value with regard to

F1tQsok1

 1    the issues that this jury has to decide.

 2                MR. YALOWITZ:  I think that --

 3                THE COURT:  At best, it unduly is prejudicial, it is

 4    cumulative, it is unnecessary, it is a danger that the jury,

 5    even if you didn't intend it for that purpose, would misuse it

 6    for that purpose, and this is a case that everybody else has to

 7    provide their case based on their testimony about the

 8    circumstances, the injuries they suffered and under oath

 9    explaining it to the jury without audios, videos or any other

10    aid to give the jury some snapshot of a few minutes of their

11    life at sometime that had nothing to do with this case.

12                As I say, your argument today is different than your

13    argument yesterday.  You don't have your argument that you made

14    yesterday.  Quite frankly, I think the argument you made

15    yesterday is a stronger argument than the argument you made

16    today.  If it wasn't a stronger argument, this is the argument

17    you would have been making yesterday rather than the argument

18    that you're putting it in simply because they're going to raise

19    the issue.  They said they're not going to raise this issue.

20    They're not going to challenge them on that.

21                If I am going to prevent them from doing so, if for

22    some reason it slips in, then I'm going to let you grab the

23    audiotape and I am going to let you play it before this jury.

24    But based on your argument yesterday that sort of walked into a

25    different argument today once they said that that is clearly

F1tQsok1

1    unnecessary because that issue is not in this case.  There is

2    no reason to just put this in, one, because your client really

3    wants the jury to hear it.  And I understand that.  And, two,

4    that somehow it is going to give some sort of picture that this

5    family, as opposed to any of the other families, somehow this

6    demonstrates that they have a closer relationship than the

7    other families or that they have a closer relationship than

8    they can demonstrate by the other evidence in this case through

9    their testimony.

10             MR. YALOWITZ:  This is the only family where the

11   father was killed.

12             THE COURT:  I understand.

13             MR. YALOWITZ:  He was the father of seven children,

14   and some of them were very, very young at the time.

15             THE COURT:  I understand.

16             MR. YALOWITZ:  So I think this family is uniquely

17   situated.  I'm very, very --

18             THE COURT:  My anticipation --

19             MR. YALOWITZ:  Let me just say, I am not going to

20   fight it.  I'm incredibly disappointed.  Do we need to

21   foundationalize it or can we have a stipulation that it's

22   authentic?

23             MR. ROCHON:  Stipulate that it's authentic.

24             MR. YALOWITZ:  Then we'll then we'll cross their

25   experts with it.

F1tQsok1

1          THE COURT:  How are you going to cross --

2          MR. YALOWITZ:  If they open the door.

3          THE COURT:  If they open the door, we will discuss it

4    before anybody uses this audiotape or anybody asks any

5    questions.

6          MR. YALOWITZ:  Then they're going to re-argue your

7    ruling.  All right let's move on.

8          THE COURT:  I'm not sure why you don't understand.

9    This is a straightforward ruling, Mr. Yalowitz.  Just because

10   you want it and didn't get it, it doesn't require a tantrum.

11   It requires you accepting my ruling, and let's move on.

12         MR. YALOWITZ:  I am not tantrumming.  I'm moving on.

13   I'm really am.

14         THE COURT:  I'm not particularly interested in how

15   disappointed you are.  I expect you to be disappointed when you

16   lose.  I expect you to be excited when you win.  I don't need

17   that, OK?  Let's just move on.  I've given it serious

18   consideration.

19         MR. YALOWITZ:  Do I understand the ruling right that

20   if the defendants open the door about the closeness of the

21   family or the reasons why they're injured -- they are saying

22   the injuries are caused by decisions -- their experts testified

23   in their depositions that the plaintiffs suggested and the

24   expert reports suggested that a cause or the cause of the

25   plaintiffs injuries were decisions made after the death of the

F1tQsok1

1    father, after the murder of Scott Goldberg.  I just want to be

2    clear that your ruling is premised on a representation that the

3    defendants are not going to make any of those arguments in

4    their case.  If they do, then I will be permitted to rebut it

5    by showing that audiotape.  Am I understanding correctly?

6         THE COURT:  I'm not going to deal with a hypothetical.

7    My ruling is this:  That you argued that the purpose of this

8    tape is to overcome -- the purpose of this tape is to

9    demonstrate the closeness of the family.  If they raise any

10   issue that indicates that they believe that that was not the

11   case, I will consider whether they've opened the door to that.

12   But no I'm not going to guarantee you'll get this in.  I can

13   pretty much guarantee you that I don't expect this to be in

14   this case period, so I wouldn't plan on it.  All right?

15        With regard to Mr. Weinstein, your economics expert --

16   Mr. Hill?

17        MR. HILL:  Your Honor, there is really methodological

18   problems which is why we raised it for you.  He is offering

19   opinions on two of the plaintiffs, Mrs. Goldberg and Mr. Gritz.

20   With Mr. Gritz, the methodological problem is he does not take

21   a deduction for taxes.

22        THE COURT:  That doesn't disqualify him as an expert.

23   That may make him a bad expert.  My gatekeeping function

24   doesn't say he can no longer forever in his life be qualified

25   as an expert because he forgot to put in facts.

F1tQsok1

1          MR. ROCHON:  It's not a matter of qualifications.

2     It's a matter of methodology for the opinion he wants to offer.

3     He wants to offer an opinion that the reasonable value of the

4     damages to Mr. Gritz's estate are, I think, $965,000.  That

5     opinion is based on a methodology that does not deduct for

6     taxes Mr. Gritz would have paid during his lifetime.

7          THE COURT:  I assume by the time he gets off the

8     stand, that will be a fact.

9          MR. ROCHON:  This is the point --

10         THE COURT:  You don't have any problems with any of

11    the calculations that he has made other than he didn't deduct

12    taxes.  When he says either on direct or he says on cross,

13    yeah, the only thing I didn't do is deduct taxes, and when you

14    deduct taxes from that, sure, you don't get to keep all of the

15    money that you would have earned.  What's wrong with the

16    methodology, except he forgot.

17         MR. HILL:  That's what Daubert is there for.  It's to

18    keep the jury from getting an opinion that is not based on

19    appropriate methodology.  There is no legitimate debate within

20    the field that you can't get as damages taxes you would have

21    paid over your lifetime.

22         THE COURT:  I assume he is not going to disagree with

23    that.

24         MR. HILL:  I don't know what he's going to do because,

25    frankly, he's not qualified to do it.  Setting aside the issue

F1tQsok1

1    of qualifications, my point is that the jury should not hear an

2    opinion that is based on a methodology that everyone in the

3    field, except this gentleman, apparently, agrees is

4    inappropriate, and you as the gatekeeper should not allow the

5    jury to be given a number in the guise of an opinion that does

6    not meet the acceptable methodology.  That's what you need to

7    do under 702.

8              THE COURT:  Mr. Horton.

9              MR. HORTON:  In fact, Mr. Weinstein will testify that

10   this is not just a mistake.  He has a reason for doing this.

11   It has to do with Israelii tax laws.  He is either dealing with

12   people who died in Israel or living in Israel.  He actually has

13   a basis for what he is saying.  Mr. Hill is free to argue that

14   his basis is wrong, but this is not just, oops, I missed up on

15   the standard methodology.  He has a reason.  He will explain

16   it.

17             MR. HILL:  This decedent is not resident in Israel.

18   This decedent would be getting money from this court in the

19   United States of America.  So, the same rule for the

20   methodology about deducting taxes from decedent's estate has to

21   apply for Mr. Gritz as it does for the other decedents, and the

22   other experts plaintiff has proffered has made the deduction

23   for taxes.  I don't see a basis for Israeli law to somehow

24   trump the methodology that is required here.

25             What the jury is going to get, they will get

F1tQsok1

1    calculations for three decedents that deduct for taxes and one

2    that does not.  And your Honor has to decide whether that's

3    appropriate methodology.  We don't believe it is, and we would

4    ask you not to allow the opinion, at least in this form.

5        THE COURT:  I don't agree with you that he is either

6    unqualified or his methodology is so flawed that he should be

7    precluded from testifying.  The only thing, it's not a problem

8    with the methodology.  Either it is a math problem or it is a

9    fact problem, and you have to factor in the taxes.

10        Now, whether he should have factored in the taxes and

11    didn't factor in the taxes, it is an issue, not of methodology;

12    it's an issue of whether or not in utilizing the methodology --

13    no one disagrees about the methodology.  You've not

14    demonstrated that the methodology he used is any different than

15    the methodology anyone else has used.

16        The methodology is that you calculate the income and

17    for U.S. residents you deduct the taxes.  I didn't hear

18    anything about his methodology that disagrees with that.  If

19    his methodology is that he thinks this is not a U.S. citizen,

20    and there is no taxes in Israel, I assume your expert wouldn't

21    disagree with that.  It's a factual question as to whether or

22    not he was given the appropriate facts as to whether or not

23    this was an Israeli citizen who would recover in Israel or

24    whether or not this is a U.S. citizen who will recover in the

25    U.S.  Given those set of facts, if all the experts agree on the

F1tQsok1

1    same set of facts, the methodology is not an issue.

2              MR. HILL:  Your Honor, this may be an issue of law.

3    As I understand it, Mr. Gritz is not an Israeli citizen.  I

4    will stand corrected if plaintiffs correct me.  He is an

5    American citizen.  It is on that basis he has proceeded with

6    his ATA claim.  It's my position that as a matter of law he

7    should not be allowed to recover without a deduction for

8    American taxes.

9              THE COURT:  If it's a matter of law, then it's not an

10   issue of methodology.  If it's a matter of law, then you will

11   convince me that I will instruct the jury that that is the law.

12   When they get to damages, they will calculate damages based on

13   what the law is; not on a numbers cruncher.  I hate to be

14   disrespectful to economists, but basically in this courtroom

15   that's basically what they are.  They are not here to tell us

16   what the law is.  They're hear to crunch the numbers and tell

17   us what those numbers would be.

18              This expert seems to have at least the expertise and

19   at least a reasonable methodology that he utilized in this case

20   to come up with his numbers.  That doesn't mean they're right.

21   And clearly if you argue that it's a question of law, that it's

22   irrelevant with regard to his testimony, the question is

23   whether or not -- it's question of both fact and law.  One,

24   somebody going to have to establish whether this person is a

25   U.S. citizen or non-U.S. citizen.  And two --

F1tQsok1

1          MR. HILL:  I don't think there is a dispute about his

2     nationality.  The plaintiffs can tell me if I'm wrong.

3          THE COURT:  You just answered the question that you

4     weren't sure about it.

5          MR. HILL:  No, I'm not.  Everything in the record

6     indicates Mr. Gritz is an American, not an Israeli.

7          THE COURT:  Fine.  If that's the fact in this case,

8     then the law would be clear.  My guess is both your expert and

9     their expert is going to say the law would be clear, that if he

10    is a U.S. citizen and living in the U.S., then, yes, I should

11    deduct the taxes; but if he is an Israeli citizen in Israel, I

12    assume both of your experts are going to say you don't deduct

13    the taxes.

14         MR. HILL:  I don't think the methodology is governed

15    by the location of the decedent, your Honor.  It's governed by

16    the law of this court.

17         THE COURT:  No, it's governed by what process he uses

18    and what set of facts he's given, and whether or not given a

19    certain set of facts he used the proper methodology.  If he was

20    given a fact that this person is a non-U.S. citizen, it is not

21    an issue of methodology.  It may be a wrong assumption that

22    they've given him to make his numbers, but you don't say that

23    he added some gift to his cousin as an income, and that was his

24    methodology because he thinks that that is what's included in

25    income.  This is not a methodology issue.  I understand your

F1tQsok1

1    position.

2          MR. HILL:  May I address the methodology issue with

3    respect to the Mrs. Goldberg calculation which is of a

4    different type?

5          THE COURT:  Do you have something different to say

6    than what you put in the letter?

7          MR. HILL:  Taxes are one issue, but the other issue is

8    twofold:  One, this analysis assumes that Mrs. Goldberg was

9    working.  She was, in fact, not working.

10          THE COURT:  Again, that's a fact.

11          MR. HILL:  So it's not relevant.  That's fact number

12    one.

13          I think even more importantly it does not deduct for

14    the mitigation that she could have earned had she worked.  That

15    is, again, clearly required by the acceptable methodology.

16    When you're dealing with someone who is injured -- take me as a

17    hypothetical.  If I was injured, the calculation would be what

18    I would have earned had I not been injured less what I could

19    earn post injury.

20          The second half of that is missing from Ms. Goldberg.

21          THE COURT:  Is there any evidence that she had an

22    opportunity to mitigate and didn't mitigate?

23          MR. HILL:  Well, she is not physically injured so it's

24    a requirement that there be a deduction for what she could have

25    earned.

F1tQsok1

1          THE COURT:  Is there any evidence that, as you say, he

2     should have deducted it.  If there is some evidence in this

3     case that she was able to work and could have mitigated and did

4     not seek work, then that's a factual issue.  I am not going to

5     debate that with the experts.  Whatever the experts -- even

6     your expert -- when on whatever assumption you told him to

7     make.  If you told him to make the assumption that she's

8     capable of working and they factored that in, then that's the

9     appropriate methodology.  If they told him that she wasn't

10     working and she's never worked and she shouldn't have to work

11     now, and don't factor that in, then he takes those facts as

12     given.

13          MR. HILL:  The problem, your Honor, is that this

14     witness has assumed that she would have worked but for the

15     death of the husband, when she in fact was not working.  That's

16     a counterfactual assumption.  But then has not deducted what

17     she could earn after her husband's death.  That's a

18     methodological problem.

19          THE COURT:  I disagree.  That is grist for

20     cross-examination.

21          MR. HORTON:  Just to clarify, your Honor, our expert

22     is going on the assumption because of Mrs. Goldberg's emotional

23     injuries after her husband's death, she would not be able to

24     work.  Mr. Hill is free to dispute that.  That's the

25     methodology.

F1tQsok1

1          THE COURT:  I don't think that that goes to my

2    gate-keeping function.  As they say, these guys are economists.

3    This is not an unusual circumstance.  There are plenty of cases

4    where -- most cases where the economists come up with different

5    numbers.  It doesn't make it an issue of methodology.  This is

6    not an issue of methodology.

7          From what I see, they've established this person's

8    qualifications, and they established the reasonable methodology

9    of how he came up with his numbers, then that's appropriate.

10   To the extent you say his numbers are off, that's an issue for

11   the jury, and they can decide how that affects their judgment

12   if they are going to calculate damages and utilize the experts'

13   opinions in doing so.

14         With regard to the photographs -- let me just make

15   sure I have the numbers right.

16         Mr. Yalowitz, the photograph that you cropped, 1133,

17   what are you saying this photograph represents as cropped?

18         MR. YALOWITZ:  This is the scene of the Bauer attack

19   in the moments after the bomber blew himself up.  We have

20   omitted the two decedents who were at the bottom of the photo.

21         THE COURT:  Mr. Hill and Mr. Rochon, is there some

22   specific objection you have to that photograph as it now

23   exists?

24         MR. ROCHON:  We just stand on the prior arguments.

25   Nothing additional, your Honor.  We do recognize the cropping

F1tQsok1

1    has taken care of the most inflammatory part of it.

2             THE COURT:  Then I will allow that photograph in

3    evidence.

4             MR. YALOWITZ:  Thank you, your Honor.  Is that a

5    stipulation?  We don't have to foundationalize it with

6    Mr. Bauer?

7             MR. ROCHON:  It does not need to be foundationalized.

8             MR. YALOWITZ:  I'm sorry, what's the number?

9             THE COURT:  That's 1133.

10            MR. YALOWITZ:  So 1133 as modified is admitted in

11   evidence, your Honor?

12            THE COURT:  It will be admitted.

13            MR. YALOWITZ:  It will be when we offer it.

14            MR. ROCHON:  And it doesn't need to be

15   foundationalized.  We won't object.

16            THE COURT:  Now, 1150.

17            MR. YALOWITZ:  May I speak to 1150?

18            THE COURT:  You know what my objections are to that.

19   What do you say that this represents?

20            MR. YALOWITZ:  So this is a photo -- let me tell you

21   what it is and let me tell you when we got it, and then I'll

22   just talk about it a little bit.

23            This is a photo that was taken of Alan Bauer and

24   Yehonathon Bauer in the immediate moments after they were

25   injured in the attack.

F1tQsok1

1          THE COURT:  Who is who?

2          MR. YALOWITZ:  Alan Bauer is the dad.  He's talking on

3    the phone.  Yoni Bauer is the little boy.  He's lying on the

4    ground.  Alan in preparing for his testimony found this photo.

5    He didn't have it.  I didn't have it.  The day that he found

6    it -- it was taken by a professional photographer, so it was

7    out on some website.  The date that we found it, we provided it

8    to the defendants.

9          THE COURT:  Which was when?

10          MR. YALOWITZ:  The day that they sent it -- the day

11    that they sent a version of it to your Honor.  I think it was

12    maybe the 12th or 13th of January, something like that, but

13    literally that day.

14          THE COURT:  The day we started jury selection?

15          MR. YALOWITZ:  I believe so.

16          THE COURT:  The day we started the trial.

17          MR. YALOWITZ:  It could be.  Whatever the date of

18    their letter is, is the date that I got it, disclosed it to

19    them, and then without discussing it with me, they printed a

20    version of it that I think looks kind of different than what my

21    version was.  Theirs seemed really red and kind of

22    inflammatory.  Maybe that was inadvertent.  I didn't discuss

23    with them why theirs was so red and angry-looking.  Anyway, I

24    know there was a lot going on that day.  I remember your Honor

25    made a pretty quick decision that based on the timing ahead --

F1tQsok1

1    it's not a criticism of you.

2             THE COURT:  That's what I tell you, you give me 30

3    seconds to make a decision, it's 30 seconds worth of thought.

4             MR. YALOWITZ:  Look, I am not criticizing you, but my

5    memory is they sent something.  They didn't really tell you

6    what it was.  It looked very scary and bloody and red.

7             THE COURT:  Well, it is scary and bloody and red.

8             MR. YALOWITZ:  Even mine, but I think theirs looked

9    worse.  They didn't tell you what it was and --

10             THE COURT:  Quite frankly, I don't know why you say

11   theirs looked worse.  I don't have theirs in front of me.

12   Yours, clearly, whatever red there was, the only red I was

13   concerned about is the blood, and yours clearly shows where the

14   blood is.

15             MR. YALOWITZ:  Yes.

16             THE COURT:  So I don't think theirs is more scary than

17   yours.  It's the blood and it's the scene that I have a concern

18   with.

19             MR. YALOWITZ:  Let me just say, you and I did not

20   discuss who these people were.  Your Honor, I think, made a

21   decision based on the image and based on the timing, and that's

22   the ruling and I understand that.  We had so much going on, I

23   didn't feel it was appropriate to trouble you at that time; but

24   since that time, we have had other things come into the case

25   that were exchanged after the trial began.  So I thought that

F1tQsok1

1  perhaps the Court would take a look at it on the merits after

2  having a chance to understand who these individuals are, which

3  was just information we didn't have.

4          THE COURT:  What is the impact you have from this

5  photograph other than the blood?

6          MR. YALOWITZ:  I'm color-blind.  I don't really see

7  the red, so --

8          THE COURT:  The jury is not color blind.

9          MR. YALOWITZ:  I know that, but you're asking me about

10  the blood, and I don't really see --

11         THE COURT:  One of your colleagues who is not

12  color-blind look at it and explain it to you because the blood

13  is pretty stark.

14         MR. YALOWITZ:  Part of the damages in this case is

15  being hit in a terror attack.  That photograph illustrates the

16  fact of being hit in a terror attack:  The look on the dad's

17  face, talking on the phone, the kid lying on the ground.  That

18  is the moment.  That is the moment, and this is a case about

19  that moment.  It's not some random person.

20         THE COURT:  Well, Mr. Yalowitz --

21         MR. YALOWITZ:  I think the relevance is obvious.  I

22  understand that the image is disturbing, I understand that, but

23  we have spoken about this.  I will just say it very briefly,

24  the fact that a defendant engages in horrible acts is not a

25  basis to keep something from the jury.  I don't have to

F1tQsok1

1    sanitize my case.

2              THE COURT:  No, you don't, but I don't have to make

3    the assumption that you make.  I don't make an assumption as to

4    who committed this act.  That's for the jury to determine.  So

5    that is not even a way to argue this case.  You're absolutely

6    right; if you prove your case, then that's one thing.  If you

7    don't prove your case, that's another thing.  I take no

8    position as to that.

9              MR. YALOWITZ:  May I make one suggestion for the

10   Court's consideration of this photograph?

11             THE COURT:  Yes.

12             MR. YALOWITZ:  We could offer it in black and white.

13             THE COURT:  I don't know what it looks like in black

14   and white.  Wait, I do know what it looks like in black and

15   white.

16             MR. YALOWITZ:  We could print it.  That might cure the

17   concerns that you're expressing, which I respect and --

18             THE COURT:  No, it does not.  I saw this photo in

19   black and white.  I had it in black and white.  That is the

20   color.  I looked at it in every version that you articulated.

21   Part of my problem too is that even with regard to the

22   timing -- look, Mr. Yalowitz, you intended to try this case

23   without this photo, OK?  So it's kind of difficult for you to

24   say that this is sort of critical to your case.  You didn't

25   have this photo.  You never intended to offer this photo.  You

F1tQsok1

1    by happenstance had your client give you the photo the day we

2    started the trial.  The day before that you intended to win

3    your case without it.  So the compelling argument that you need

4    this photo now is not as strong as it might have been had you

5    found the smoking gun.  This is not that.

6           So my position is the same.  For those three reasons:

7    One, because you were going to try the case without this and

8    you intended to prove your case without this.

9           Two, the untimeliness of its production -- and at a

10   time it was offered to you that you and the other side were

11   specifically arguing to me that I should start to be tougher on

12   the other side producing things at the last minute and not

13   having produced stuff during discovery or even after the

14   discovery closed in a reasonable time.  This, unfortunately,

15   was one of those examples regardless of when your client

16   discovered it.  If it was out there and you thought it was

17   important evidence, then it should have been located then, and

18   it should have been given to the other side.

19          More importantly, on top of that, I find that it is

20   much more prejudicial, unduly prejudicial than probative.  This

21   photograph is consistent and not inconsistent with all my other

22   rulings with regard to the photographs.

23          Look, I have already had testimony yesterday about a

24   victim having to look at the severed head of a terrorist

25   bomber.  You got that.  It's in.  But for you to put in a

F1tQsok1

1   picture of the severed head, no, I think that's a little bit of

2   overkill on this issue.

3           So to the extent that the witness wants to testify

4   about what he did, what the scene looked like, where he was,

5   any vivid memories that he has of it which affects his injury,

6   whether it be emotional, mental, physical, you can do so; but

7   this is literally just a motion for me to reconsider the ruling

8   I have already made.  At this point, I see no basis to change

9   my ruling given that the photo raises exactly the same issues

10  that I ruled were out for before, and nothing has changed since

11  that time.

12          MR. YALOWITZ:  I appreciate that you took a second

13  look at it.  I know that you made a more informed decision this

14  time, and I appreciate it.

15          THE COURT:  OK.  How are we doing?  I think we were

16  short a few jurors.  Is there anything else we need to address

17  before we continue with this witness?

18          MR. ROCHON:  Not on behalf of this witness.

19          MR. YALOWITZ:  There is one other thing.

20          THE COURT:  Yes.

21          MR. YALOWITZ:  Which is in the opening we used these

22  family photographs and particularly the family trees.  I am

23  wondering if we can get those admitted in evidence by

24  stipulation or is that something that the defendants feel need

25  to have foundational testimony?

F1tQsok1

1          THE COURT:  That is a question you should have

2     directed that way instead of this way.  I am not an interpreter

3     or translator for lawyers.  Why don't you discuss it and see if

4     the two of you can work it out, and if you can deal with it.

5     If you can't, let me know.  I would rather you guys talk to

6     each other rather than talk to me.

7          MR. YALOWITZ:  Yes, sir.

8          THE COURT:  We are still waiting for one.  Anything

9     else we can address now?

10          MR. ROCHON:  Not on our part.  May I step out briefly

11     in light of the fact the we are waiting for the juror?

12          THE COURT:  Mr. Horton, let me ask how long will you

13     be on direct.

14          MR. HILL:  Yes.  We are a little bit over halfway

15     through the outline, so we still have a little ways to go.

16          THE COURT:  How long do you think it might take you?

17          MR. HORTON:  I'm hoping we might be done by lunch, but

18     I don't want to promise it.  It obviously depends on when the

19     jury comes in.  We're already past 10:00.

20          THE COURT:  I am going to assume they are going to be

21     here in the next two to three minutes.

22          MR. ROCHON:  I will tell the Court and counsel for

23     purposes of planning, we expect an extremely short cross.

24          MR. HORTON:  Thank you.

25          (Pause)

F1tQsok1

1          MR. YALOWITZ:  Your Honor, while we're waiting for the

2     jury there is one other item I want to put on your radar

3     screen.

4          THE COURT:  Yes.

5          MR. YALOWITZ:  At least one and maybe two of the

6     plaintiffs have expressed to me concern about publicity around

7     some of their injuries.  One of the plaintiffs has really a

8     ghastly scar.  Another one had very severe emotional problems

9     that we're going to need to talk about and there may be times

10    when I ask the Court to excuse the public on items that would

11    involve very sensitive personal matters like that.  So I just

12    wanted to alert you to that.  We had raised that early on in

13    the case.

14         THE COURT:  Mr. Rochon.

15         MR. ROCHON:  On any issue like that, your Honor, we

16    are going to defer to the Court as long as obviously counsel

17    and our client representatives are present, and if it relates

18    to anyone in the audience as long as either everyone is excused

19    or no one is excused, we won't take a position.

20         THE COURT:  My position in the abstract is usually

21    that I have never done that.  The public has a right.  This is

22    a public trial.  This isn't a star chamber.  The public has a

23    right.  I know the public has an interest in this trial, and I

24    know that there has been press at this trial.  I don't think I

25    have a basis to exclude the public from hearing the testimony

F1tQsok1

1      of this trial based on that argument alone.

2              To the extent that you believe that there is something

3      that a witness does not want to testify to in open court under

4      oath, then I suggest that witness not testify to it.  But I am

5      very hesitant -- and not only would it be an exception to my

6      rule, it would be an act that I have never taken to exclude the

7      public from a civil trial because of something a witness wants

8      to say under oath that they want the jury to consider to make a

9      determination as to liability.

10             So we can discuss it further, and I'll consider it,

11     and you can give me to the extent, even if you'd like in

12     writing, what issues may arise, but my inclination is not to

13     exclude anyone from the public or the press from any portion of

14     this trial.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F1T8SOK2

1              MR. ROCHON:  There may be a way to work with counsel

2     to come up with a way to work through this.  Whoever on the

3     plaintiffs' team is in charge of this issue, maybe at a break

4     we can talk about if there is a way to mitigate the issues for

5     the witnesses.

6              THE COURT:  Why don't you come up with a way to do

7     that and propose jointly to me.  As I say, depending on what

8     you come up with, if it's directly in conflict with the basic

9     proposition that this is a public courthouse, public courtroom,

10    a public trial, and that there would have to be extraordinary

11    circumstance for me to exclude the public from testimony of a

12    witness that's given in open court.

13             Why don't you discuss it.  I think our last juror is

14    here.  We will discuss this later.

15             MR. YALOWITZ:  I will just say that this is an issue,

16    if you were to grant my application, it would have to be

17    consistent with certain Second Circuit standards.  So what we

18    are going to do is, we will hear what the defendants have to

19    say and if we think it will be productive, we will make a

20    written application to your Honor that would allow you to

21    consider the kinds of findings that would be required to meet

22    the Second Circuit standard and then you will have complete

23    information and you can make a judgment at that time.

24             I do think it would require certain findings on the

25    record and we will give you the information that will allow you

F1T8SOK2

1    to consider whether those findings are appropriate.

2            THE COURT:  I assume at this point, my assumption is

3    that at least this witness, if not additional witnesses, has

4    already testified with regard to the issues, whether physical

5    or mental, that the witness themselves would testify to.

6            MR. YALOWITZ:  I think it really goes to some of the

7    specifics, but I don't disagree with what your Honor is saying.

8            THE COURT:  Let's get the jury because they are all

9    here and I want to try to keep them on time.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1T8SOK2

 1          (Jury present)

 2     RAEL STROUS, resumed.

 3          THE COURT:  Good morning.

 4          We are ready to proceed.  We were just waiting on you.

 5     I want to emphasize that we are a team.  We can't start until

 6     everybody arrives.  If you are going to be significantly late,

 7     please let us know.  I am trying to make the lawyers come in

 8     here early so we can deal with issues before you arrive so we

 9     can start on time.

10          At this point, we are ready to proceed, and I think we

11     can still make up the time.  So let's continue with the

12     cross-examination.

13          Mr. Horton.

14          MR. HORTON:  Thank you, your Honor.

15     CROSS-EXAMINATION (Cont'd)

16     BY MR. HORTON:

17     Q.  Good morning, Doctor.

18     A.  Good morning.

19     Q.  Before we go on with the next family, can you tell if it's

20     possible for a person who has been diagnosed with the sort of

21     mental health disorders that you discussed yesterday to suffer

22     from such a disorder but to believe they are in fact not

23     mentally ill?

24     A.  That is actually often the case and that's part of the

25     difficulty sometimes in my profession, to help individuals get

1    the treatment that they require and in actual fact to stay in

2    treatment.

3             There is a well-known joke about psychiatrists.  How

4    many psychiatrists does it take to change a lightbulb?  It's

5    only one, but the lightbulb has to want to change.  And it's

6    the same thing with patients.  Sometimes it's not the patient

7    individual that comes for help, but the family will bring them

8    or other individuals.  But it's very difficult sometimes to get

9    individuals to recognize that they have problems, as opposed to

10   in general medicine if you see a cut or a person has a sore

11   throat, they are more likely to go to the physician for help.

12   Whereas with psychiatric disorders, it's not uncommon that

13   people don't recognize that they have a problem and don't go

14   for help.

15   Q.  Let's now move to the next family involved in the Hebrew

16   University bombing, the Coulter family, the family of Janice

17   Coulter.

18            First, can you tell us, according to your

19   understanding, who is Janice Coulter?

20   A.  Janice Coulter was a 37-year-old United States citizen, who

21   lived, I believe she was based in Boston, and she was assistant

22   director for the Rothberg International student program, of

23   which many students were studying at Hebrew University.  So her

24   job was, she was based in the United States and she would

25   assist students in the organization and selection of courses

F1T8SOK2                     Strous - cross

1    and in the technical details of studying at Hebrew University,

2    American students, and very occasionally she would have to go

3    to Israel.

4            On the occasion of the bombing, during which she was

5    killed, the director wasn't able to accompany students so she

6    was asked to replace him or her and to accompany a group of

7    students who were commencing their studies in Jerusalem.  So

8    she went over for two days, that's it, and she was supposed to

9    return within a short time.

10           She was in the cafeteria talking to some of the

11   students.  I believe she may have been drinking coffee at the

12   time, and there was bag full of shrapnel and a bomb which

13   exploded and killed her as well as several other individuals.

14   Q.  How old was Janice Coulter when she was killed?

15   A.  She was 37.

16   Q.  How many members of her family did you perform psychiatric

17   evaluations for?

18   A.  Two.

19   Q.  Who?

20   A.  Janice's father Robert, Bob, and her sister, Diane Miller.

21   Q.  I want to start with Robert Coulter, Sr.  If it's OK with

22   you, Doctor, I am going to refer to him as senior simply

23   because there is a Robert Jr. as well.

24           Could you tell us who Robert Coulter, Sr. is?

25   A.  Robert Coulter is a 78-year-old United States citizen,

F1T8SOK2                           Strous - cross

1    currently residing in Massachusetts.  He is retired.  He worked

2    previously as a supervisor in an engineering corporation, I

3    believe related to some nuclear plants' activities, in the

4    past.

5    Q.  What do you understand about the nature of his

6    relationship -- did you perform a psychiatric evaluation of

7    Mr. Coulter, Sr.?

8    A.  I did.

9    Q.  What do you understand about the nature of his relationship

10   with his daughter Janice?

11   A.  Mr. Coulter, in a very profound, sensitive way described

12   that his relationship with his daughter was extremely close.

13   He reports that she was always like daddy's girl.  He

14   remembered very clearly the interactions over the years going

15   from her childhood up until the present when I saw him and the

16   memories.  For him it was absolutely devastating to lose his

17   daughter.

18        He described that he almost had an extra-sensory

19   connection with her.  The day that she died -- she was in

20   Israel, as I mentioned, accompanying these students -- on the

21   morning of that fateful day he was watching TV and he heard on

22   the TV that there was an explosion at Hebrew University and he

23   remembers saying to himself, oh, my God, my daughter Janice is

24   in Israel.  I hope she's OK.  Then he remembers watching Fox

25   News and seeing them taking out the body bags of people that

F1T8SOK2                          Strous – cross

1    were killed, and he saw from the side of one of the body bags

2    blond hair hanging out.  And he said, oh, my God, that's

3    Janice.

4            He called his family member's daughter and said, oh,

5    my God, Janice has been killed.  Everyone said, no, it cannot

6    be.  He said, Janice is there.  Later in the day someone from

7    the United States Consulate called and confirmed.  But even

8    before it was confirmed he felt that he knew.  He just went

9    absolutely crazy.  He started crying like a baby.  He went

10   absolutely, in his words, bananas.

11           They confirmed that it was his daughter based on the

12   fact that she had a bracelet saying she was allergic to

13   beestings.

14   Q.  Doctor, based on your evaluation of Mr. Coulter, Sr., did

15   you diagnose him as having any mental disorders?

16   A.  I did.

17   Q.  What was your diagnosis?

18   A.  Pathological bereavement and alcohol abuse disorder.

19   Q.  Did you also diagnose him with dysthymia?

20   A.  Dysthymia is another diagnosis that came in.

21   Q.  We heard a lot of psychiatric terms yesterday.  Could you

22   just remind the jury what dysthymia is.

23   A.  Dysthymia is depression that a person experiences most of

24   the day, for most days over a period of two years, which

25   affects their function in many different ways relating to

1  sleep, appetite, increased sleep or decreased sleep, increased

2  appetite or lowered appetite, low self-esteem, low energy,

3  concentration and hopelessness.

4  Q.  Doctor, you were starting to tell us about how the death

5  affected Mr. Coulter, Sr.  Can you tell us what else you can

6  tell us about the facts that underlie your diagnoses that you

7  have just mentioned?

8  A.  Mr. Coulter said that after the death of his daughter, he

9  clearly never enjoyed life again as he did before, and all

10  activities that he used to do just were never the same.  He

11  reported that his daughter was the most sensitive, loving,

12  caring individual, successful, the sweetest person you would

13  ever meet and he felt the loss of her was absolutely

14  devastating for him.

15          He reported for weeks afterwards, as a result of the

16  pain and devastation, he had struggled to sleep and the only

17  thing that would help him was alcohol.  He had used alcohol in

18  the past to relax, but it never became an issue, an absolute

19  requirement to sleep.

20          After the alcohol increased, the sleep became so bad,

21  even with the alcohol, that he went to a doctor and he was

22  given sleeping medication.  And for a long time after that he

23  reported that he was very depressed and it affected his

24  function.

25          He had dreams about her.  The dreams, though, were

F1T8SOK2                          Strous - cross

1    positive dreams.  But he still had those dreams.  They

2    continued for a long time.  He remembered -- a lot of his

3    memories would be flashbacks to the fact that when he came home

4    from work his daughter Janice, at a young age and even going

5    into teens, would run up and give him hugs and daddy is home

6    and not let go of him.  For him those memories, that took away

7    my daughter Janice but never took away my memories.  And these

8    are recurring memories that never go away but still cause him

9    ongoing pain because of the memories that come back.

10            He reports that when these memories come back, and

11   they are very painful, the only thing that would help him was

12   alcohol, and he would drink, which became a problem over the

13   years.

14            He reported that the loss did not affect his social

15   life very much, because he was a social person, and that helped

16   him to some extent.  But the pain is very inner and it was very

17   difficult for him sometimes to talk to people about it.

18            He reported that even though he was retired at the

19   time, it was very difficult for him to go back to his other

20   activities that he would be involved in.  He had some hobbies.

21   He would do work around the house.  And it was very difficult

22   for him to return to those kind of activities.

23            He reports, though, he has frequent flashbacks still

24   to the day that I was examining him of those body bags.  For

25   him the body bag with the blond hair hanging out on the side is

F1T8SOK2                          Strous - cross

1     an indelible memory that he feels he could never get rid of.

2            He reports that a lot of this anger was anger at God

3     and why did God do this to him.  At present, at least at the

4     time I examined him, he informed me that the memories are as

5     painful as ever.

6            The way he deals with this, as I mentioned before, is

7     not just with alcohol but also becoming very quiet and

8     withdrawing.  For him that was the way he dealt with it.  He

9     became very closed up to himself and he feels that his whole

10    personality structure was affected as a result.

11           He described his inner feelings as being very sad.

12    Not just depressed, but very sad.  And that's a very common

13    thing with complicated grief, as well described in the

14    literature.  Some people develop depression, but some people

15    become very, very sad and that sadness just envelops their

16    whole life and affects all their current activity.

17           He knows the pain will never go away.  Life is gray

18    for him forever.  Interestingly enough, this is a very common

19    way it's described with people who have had a sudden loss of

20    individuals in their family with whom they are close with that

21    life just becomes gray.  We heard that as well yesterday, if I

22    may remind you, with Ben Blutstein's mother, gray.

23    Q.  Is that Katherine Baker you're referring to?

24    A.  Katherine Baker.

25    Q.  To your knowledge, did Mr. Coulter, Sr. suffer from any

F1T8SOK2                    Strous - cross

1   mental disorders before the death of his daughter?

2   A.  Not to my mind.

3   Q.  In your opinion, what is the cause of his pathological

4   bereavement and dysthymia?

5   A.  The loss of his daughter in the bombing at Hebrew

6   University at the Frank Sinatra cafeteria.

7   Q.  Do you have an understanding whether Mr. Coulter, Sr. has

8   some other deaths of people who were close to him in, say, the

9   three years or so before the death of his daughter?

10  A.  Yes.

11  Q.  Who is it you understand that he also lost?

12  A.  He lost his daughter in 2002.  Three years prior to that he

13  lost a wife and a year later, two years prior, he lost, his

14  son-in-law died.  And then a month before his daughter died,

15  his brother died from cancer.

16       His wife died from a long illness.  His son-in-law,

17  with whom he was close, died from liver disease, and his

18  brother also died from some chronic illness.

19  Q.  Did you discuss with Mr. Coulter, Sr. his reactions to the

20  death of these three other members of his family?

21  A.  I did.

22  Q.  What is your opinion as to whether his pathological

23  bereavement and dysthymia may be related to these three other

24  deaths as opposed to the death of his daughter?

25  A.  That is very interesting.  Because he had so many losses in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1T8SOK2                          Strous – cross

1   his life in the years previous, you would expect that some of

2   what he described after the death of Janice would also be

3   associated with the loss of those other individuals.  In actual

4   fact, that wasn't the case.

5       He reported that he dealt with those other losses in a

6   very normal path of dealing with bereavement.  Everybody goes

7   through loss sometimes in life and for him he thought that the

8   nature of the bereavement was very different from the other

9   cases, both in terms of intensity and in character and nature.

10      I asked him why that should be.  And there is

11  something about the suddenness, the injustice of it, and the

12  gruesome nature of being exploded in a bomb when you're at the

13  prime of your life.  For him that was absolutely devastating.

14      As I mentioned yesterday, that is very well described

15  in the literature, that people go through bereavement in

16  different manners.  There is something about the sudden,

17  tragic, very violent loss of a child in such circumstances that

18  precipitate this cascade of events and people enter into this

19  complicated grief, pathological bereavement pattern.

20  Q.  You mentioned Mr. Coulter, Sr. has had issues with alcohol,

21  correct?

22  A.  That's true.

23  Q.  Can you describe in a little more detail what you

24  understand about those issues.

25  A.  Mr. Coulter described that before the loss of Janice he

F1T8SOK2                          Strous - cross

1   used to drink socially.  Remember that he used to travel a lot

2   as part of his work and people used to drink.  It was social.

3   That is what people did at night.

4            But after the loss of Janice, he reported very clearly

5   that in order to deal with the pain of the loss of her he

6   started drinking much more.  And this is very well described

7   also and very well-known to my profession, that people often

8   use substances to self-medicate themselves.  Now, substances

9   could be hard drugs like, as we know, cocaine, heroin, LSD,

10  crack, etc., but the more common one, and people don't often

11  recognize that it's severe and sometimes more severe than those

12  other substance uses, and that's alcohol.

13           That's exactly what happened, in my opinion, with Mr.

14  Coulter.  After the loss of Janice, in order to treat his

15  underlying pain, vacuum loss, he turned to alcohol and it

16  became more and more of an issue.  And many people who drink

17  alcohol don't recognize it is such an issue until it becomes a

18  problem where they start getting medical problems, etc.

19           So over the years he became more and more involved in

20  the use of alcohol to deal with his inner pain and it became a

21  major problem requiring -- he became alcohol dependent and

22  required treatment, medical treatment.  He was admitted to an

23  institution for alcohol detox and alcohol treatment.  And it

24  was described very, very clearly in the notes that I examined

25  that the use of this alcohol was related to these loss issues

F1T8SOK2                          Strous - cross

1    that he had experienced with the loss of his daughter.

2    Q.  Is his use or abuse of alcohol in any sense a cause of his

3    pathological bereavement?

4    A.  No.

5    Q.  How about his dysthymia, the chronic depression?

6    A.  I believe that based on the evidence that I got from

7    examining him and the notes that I read, as well as my clinical

8    experience, it appears to me that in this case the dysthymia is

9    what caused the alcohol use rather than the alcohol use causing

10   dysthymia.

11          A lot of people who have alcohol use can also get

12   depressed based on the fact that their functioning is going

13   down, but I think that is not the case here.  The case here is

14   that in order to treat his underlying pain and sadness, he

15   turned to increasingly abnormal amounts of alcohol to dull that

16   pain.  So I believe that the dysthymia caused the alcohol

17   dependence and the alcohol dependence later on requiring

18   admission.  Several years later, by the way.

19   Q.  In your opinion is Mr. Coulter, Sr.'s pathological

20   bereavement and dysthymia, are they reasonably certain to be

21   permanent?

22   A.  I believe so.

23   Q.  Do you hold all of the opinions you have given today about

24   Mr. Coulter, Sr. to a reasonable degree of medical certainty?

25   A.  Yes, I do.

F1T8SOK2                         Strous - cross

1    Q.  Let's move to another member of the Coulter family, Diane

2    Miller.

3            Can you start by just telling us who Diane Miller is.

4    A.  Diane Miller is a 45-year-old female United States citizen,

5    currently residing in Lakeville, Massachusetts.  She is married

6    with two children and she works in sales and marketing for a

7    food company.

8    Q.  What do you understand about the nature and character of

9    her relationship with her sister Janice?

10   A.  Diane reports that she was extremely close to Janice.

11   Janice was her best friend.  They were very close.  She thought

12   that Janice was her strength in life and that whenever she went

13   through difficulties in life, including the loss of her

14   husband, Janice was always there to be there for her.  Janice

15   was her strength, and whenever she had difficulties she would

16   turn to Janice.  Janice was always there.  Janice would always

17   drop everything and be there for her.

18           It was devastating for her to lose Janice.  She said

19   to me, how could this be?  How did my sister and how did me and

20   my family get involved in such a thing?  We are not Jewish.  We

21   are a very normal American family.  How did we get involved

22   losing someone so central to our family in some Middle Eastern

23   conflict which has absolutely nothing to do our family just by

24   chance?  And for her that just compounded the pain, the fact

25   that her daughter -- her sister died in such a sudden,

F1T8SOK2                           Strous - cross

1    unexpected manner.

2    Q.  A few moments ago when you were talking about her father,

3    Mr. Coulter, Sr., you mentioned the fact that his son-in-law

4    had died.  Is the son-in-law Ms. Miller's husband, her first

5    husband?

6    A.  Yes.

7    Q.  Based on your evaluation of Ms. Miller, did you diagnose

8    here with any mental disorders?

9    A.  Pathological bereavement.

10   Q.  Could you now take us through what happened with Ms. Miller

11   in the aftermath of the attack that supports your diagnosis of

12   pathological bereavement.

13   A.  She too had seen on television that there was some

14   explosion in Hebrew University in the cafeteria on CNN.  She

15   tried to call her sister, with no response.  She started

16   panicking.  Various other people she tried to contact also had

17   not heard from Janice.

18       I remind you that Janice had only been accompanying

19   students for a few days to Israel and was not even supposed to

20   be there.  She was just a fill-in for the director who was ill

21   at the time.  Around 5 p.m. later on this day she was contacted

22   by someone from the State Department indicating that her sister

23   had died.

24       She feels and is constantly aware of the fact that

25   fate had dealt her a bad deal.  She reports and has this vivid

F1T8SOK2                        Strous – cross

vision of Janice sitting at the cafeteria and, as she describes

to me, that Janice was sitting talking to people and then

suddenly she was hit by a bolt in her neck, hitting the jugular

vein, and suddenly she just went white and collapsed and died

almost, she believes, instantaneously with a blank look on her

face, the way people described it to her.

         She described the news of Janice's death as absolutely

horrific and devastating for her since they were very close.

She reports that she was clearly depressed and could not sleep

or eat for a few weeks after this.  She took a few weeks off

from work because she wasn't functioning.  Even when she

returned to work, she had difficulty focusing, and it was very

difficult for her.

         She had significant sleep problems but she denied any

nightmares.  But she did have flashbacks over the years,

particularly around birthday anniversary, especially to the

vision, her father had the vision of, the flashbacks with the

body bags with the blond hair.  She had the flashbacks of her

sister being hit by a bolt and just a blank look and

collapsing.

         She reported that emotionally it was her who had to

deal with dealing with Janice's apartment and clearing it out.

Remember, Janice wasn't married.  So Janice lived alone and

someone had to go into the apartment and deal with everything

that had accumulated over the years.  Janice was 37.  She had a

1  life.  She wasn't married but she had a life, and it was Diane

2  who had to deal with the aftermath of what she said was a

3  tragic death.  She remained in disbelief throughout this

4  process.  How could this happen to my sister?  How could this

5  happen to us?

6          She had gone through grief counseling with her

7  therapist previously when her husband died.  So she didn't go

8  for help.  She thought she had the skills and the tools to deal

9  with it, but she reported very clearly to me that even with the

10  tools that she had gained from the therapist that she had

11  assistance from previously after her husband died, it still

12  didn't take away the pain.  There was something about the

13  suddenness and the tragic loss of her sister in such

14  circumstances that even with all the skills and coping

15  mechanisms she had, it just didn't take away the sadness.

16          She relied also on friends for support.  That is very

17  important.  In fact, one of her friends at the time who helped

18  her go through this later became her second husband.

19          She reports another way that affected her was socially

20  because every time she would meet people she would have to go

21  through the pain of reliving what she went through, because

22  people would ask her about her life, and she thought she

23  couldn't disconnect who she was from the fact that she was

24  someone who lost a sister through a terror bombing.

25          She also reported this affected her children and was

F1T8SOK2                        Strous – cross

1    very difficult for her to bring up her children with the

2    knowledge that her children would never know Janice, and she

3    felt that's just very unfair because Janice was so special.

4    And that particular issue has become a big focus for her and

5    for that she says time does not make it any easier.

6          She says she gets particularly sad when she sees

7    families because she says how could that be that now our family

8    is destroyed, is torn apart by the fact that such a prominent,

9    central member of our family is just not there anymore.

10          Finally, for her, she reported very clearly that her

11   profession, even though she is still working, was put on a

12   backtrack.  Because she had concentration issues and because

13   her drive was affected, which lasted for a long time.  She felt

14   career advancement was just not where it could have been

15   because she needed such a long time to heal, which has still

16   not been finalized for her.

17   Q.  To your knowledge, did Ms. Miller have any mental disorders

18   prior to the death of her sister?

19   A.  No.

20   Q.  A few minutes ago we were talking about Mr. Coulter, Sr.

21   and we talked about the tragedies in her life.  Obviously the

22   same family.  Ms. Miller's first husband died, her mother died

23   and I guess her uncle died, the father's brother.

24          Did you discuss with Ms. Miller the effect of those

25   losses on her?

F1T8SOK2                        Strous - cross

1    A.  I did.  As I mentioned, she went through grief counseling

2    on the loss particularly of her husband.  Her husband died in

3    circumstances that wasn't sudden and related to a medical

4    condition, but she felt the intense yearning and longing and

5    anger and bitterness just was not there with the loss of her

6    husband compared to the loss of her sister.

7         Remember also, she has moved on with her life in terms

8    of she remarried.  So she has a family, which she is able to

9    restart again in terms of a partner, but she can never replace

10   her sister, which was for her best friend.  She is gone.  And

11   that emptiness is what she described as unbearable.

12        These are the classic symptoms described for

13   pathological bereavement or complicated grief, as I mentioned

14   in the article published in the New England Journal.  There is

15   something innate in the difference of the bereavement process

16   for someone who dies in a sudden, violent, an aggressive manner

17   that puts into place this process of pathological bereavement,

18   which is very different to normal bereavement.  And we have

19   seen this here.  It's just the classic example.

20        I don't do much of this kind of work, but when I see

21   these people I would in some ways love to present them to my

22   students because are straight from the book in terms of some of

23   these disorders that I am describing today.

24   Q.  You talked about the loss of Ms. Miller's first husband.

25   As I mentioned, she apparently also lost an uncle and mother.

F1T8SOK2                          Strous - cross

1   Do you have an opinion as to which those other losses are the

2   cause of her pathological bereavement as opposed to the death

3   of her sister?

4   A.  I don't believe that they are associated.  I believe she

5   went through normal bereavement.  She wasn't insensitive to the

6   loss.  But these features that I am describing today were not

7   described in the previous losses that she had.

8   Q.  Do you believe that Ms. Miller's pathological bereavement

9   is reasonably likely to be permanent?

10  A.  Yes.

11  Q.  Do you hold all of the opinions you have given about her

12  today to a reasonable degree of medical certainty?

13  A.  Yes.

14  Q.  Doctor, let's move to another family.  Specifically, the

15  family of Diane Carter.

16         Can you tell us who Diane Carter was.

17  A.  Diane Carter was a 37-year-old United States citizen, who

18  had been living in Israel for a few years.  She had moved there

19  to be with her boyfriend, with whom she subsequently broke up.

20  She stayed in Jerusalem and was working in the archives of

21  Hebrew University.

22  Q.  She was the same age, 37, as Ms. Coulter was?

23  A.  I believe she was 36.  I may stand to be corrected, but I

24  believe that she was 36 and Janice was 37.

25  Q.  So they are roughly the same age?

F1T8SOK2                        Strous - cross

1   A.  Yes.

2   Q.  Did you evaluate anyone from Ms. Carter's family?

3   A.  I did.

4   Q.  Who did you evaluate?

5   A.  Her father, Larry Carter.

6   Q.  Could you tell us who Larry Carter is.

7   A.  Larry Carter is a 76-year-old United States citizen,

8   currently residing in Greensboro, North Carolina.  He is

9   married with two children and currently retired.  He worked in

10  veterinary medicine.

11  Q.  When you say two children, does that include the daughter

12  that died in Hebrew University?

13  A.  Yes.

14  Q.  One survivor then?

15  A.  Yes.  It's not uncommon, may I add, for people who have

16  lost people in such a manner to still report that that

17  individual still is a child.  So he will tell me he has two

18  children but one of them died in such tragic circumstances.

19  Q.  Based on your evaluation of Mr. Carter, did you diagnose

20  him with any mental disorders?

21  A.  I did.  Pathological bereavement and chronic dysthymia

22  disorder.

23  Q.  Can you now tell us what happened to Mr. Carter,

24  particularly beginning with the time period after the attack,

25  that supports your two diagnoses, pathological bereavement and

F1T8SOK2                        Strous - cross

1    chronic dysthymia?

2    A.  He reports that on the 31st of July, 2002, his daughter,

3    who was working at Hebrew University, was killed in this

4    bombing.  He only found out about this a day later.  He

5    received a call from a reporter in Raleigh, North Carolina, who

6    wanted some information.  That's how he was told.

7           Diane's mother then called him -- they were divorced

8    at the time -- and told him that Diane had been killed in an

9    explosion in this Frank Sinatra cafeteria.

10          He reports that he was absolutely devastated initially

11   and thought there must be some mistake.  It's not uncommon for

12   some people when they hear of a loss to be in denial, and that

13   characterized his initial response.  And this is also very

14   commonly described in the literature with the theory of Kübler

15   loss.  People go through different stages of loss.  Often the

16   first stage is denial and then people get into anger,

17   bargaining, depression, etc.

18          But for him it was characterized by denial.  He called

19   a friend, a newspaper reporter, who advised him to call the

20   Israeli embassy and the State Department.  And only finally on

21   August, the 2nd he was contacted from someone in the State

22   Department in Israel confirming that his daughter officially

23   had died in the explosion.

24          His words precisely were, the news was devastating

25   beyond words.  He said there is no way to describe the pain and

F1T8SOK2                         Strous - cross

damage that the news did to him.  He reports that he had lost

in the past his parents, sister and two brothers, but nothing

comes anything close to the loss of a child.  He describes

honestly that he would not wish this on his worst enemy.

        With initial disbelief and pain, over time he has come

to accept that this is obviously -- he came to accept that this

is the truth.  And he reports emphatically, even though with a

period of time since the blast and the loss, he still thinks

about her every day.

        What is interesting here is that he wasn't in contact

with his daughter for several years before that.  When she

moved to Israel with this boyfriend, she converted and then

moved to Israel and they had no contact.  But even with the

fact that they had no contact, he reports he always had the

hope that they were going to be in contact again.  But for him

this grief still is not in any way affected by the fact that

they weren't in contact.

Q.  Just to clarify that, Doctor, as you understand it, was it

his daughter who didn't want to have contact with him or did he

not want to have contact with her?

A.  His daughter did not want to have contact with him.

Q.  I am sorry if I interrupted you.  Did you have more to say

about Dr. Carter?

A.  Just based on what I said, he feels the fact that they

didn't have any ongoing contact did not mitigate or diminish

F1T8SOK2                        Strous - cross

his pain on the loss of his daughter, and he always had this

hope that they would be in contact again.

He reported that in the long term his mood also was

very much affected.  He tried not to let the loss affect his

work.  He very much believed -- he is a hale and hearty

southerner, where everybody is grin and bear it and real men

don't cry and let's try to get through it.  But here is a man

who when you sit with him the grief is still very profound so

many years later that he will cry like a little baby.

He reports, as I mentioned, the loss is always on his

mind, never much below the surface, in his words, and he says

it can just surface at any time in a more intense manner when

it's triggered by something.  And we all go through things in

life without realizing that there are certain events, we can

hear something on the news or see something on the street and

trigger the memory and he would once again feel like it was

happening the same day.  And that's not uncommon with

complicated grief or pathological bereavement.

Q.  You mentioned, Doctor, that Mr. Carter was divorced from

Diane's mother.  Is that correct?

A.  Yes.

Q.  In your view, does the divorce factor at all into his

pathological bereavement or chronic dysthymia?

A.  No.  None of these symptoms or features are focused around

the fact that he is divorced from his wife.  The content of

F1T8SOK2                       Strous - cross

1    anything of what he reported is all around the loss of his

2    daughter and not in any way related to the divorce.

3    Q.  Do you know if he is remarried?

4    A.  I believe so, yes.

5    Q.  To your knowledge, did Dr. Carter, Mr. Carter -- he is a

6    doctor -- did he suffer from any mental disorders before the

7    killing of his daughter?

8    A.  No.

9    Q.  What do you believe is the cause of his pathological

10   bereavement and chronic dysthymia?

11   A.  The loss of his daughter in the bombing in Hebrew

12   University.

13   Q.  Do you hold all of the opinions you have given today about

14   Mr. Carter to a reasonable degree of medical certainty?

15   A.  Yes, I do.

16   Q.  Let's move to another family and another attack.

17           I now want to talk about the family of Stuart

18   Goldberg.

19           Before we talk about the people that you evaluated,

20   can you tell us who Mr. Goldberg was.  What happened to him?

21   A.  Stuart Scott Goldberg was a 37-year-old psychotherapist

22   living in Israel, working in Jerusalem.  He had a psychotherapy

23   practice and worked a lot with at-risk teens.  He was married

24   to his wife for 17 years and had seven children.

25           Mr. Goldberg I did not know personally, but he was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1T8SOK2                    Strous - cross

1    well-known in the field of psychology in Israel, in the

2    orthodox, ultra-Orthodox and Orthodox world.  He used to

3    lecture frequently at conferences.  He was very much a

4    larger-than-life character.  He was a big chap.  I personally

5    had never met him or spoken with him and I don't believe I have

6    ever seen him in person either, even though he may have been at

7    some of the conferences I attended, but I knew of him by name

8    because he was a prominent worker in those fields and lecturer

9    and a very powerful individual and considered to be very

10   dedicated to his profession, especially since he was working

11   with at-risk teens in the streets of Jerusalem and was

12   considered very dedicated to his field.

13   Q.  What happened to him?

14   A.  On the 29th of January 2004 -- I just realized is the 11th

15   year anniversary of that.  Is that true?

16   Q.  I think that's true.

17   A.  11 years ago to the day he left home in the morning,

18   traveling on the bus to his psychotherapy practice, and a

19   suicide bomber -- apparently he was reading a book.  He had

20   just spoken to his wife on the phone, and it was reported by

21   someone who survived that he was reading a book and the suicide

22   bomber sitting near him on the bus stood up and blew himself up

23   and he was killed.

24   Q.  Did you evaluate any members of Mr. Goldberg's family?

25   A.  I did.

F1T8SOK2                          Strous - cross

1    Q.   How many?

2    A.   I evaluated his wife Karen and seven of his children.

3    Q.   Could you give us some idea of the age range of the

4    Goldberg children as of the date 11 years ago that their father

5    was killed?

6    A.   The ages were ranging from 16, 14, 12, 10, 7, 4, and one

7    just under one year.  I believe 10 months old.

8    Q.   In evaluating the individual members of the Goldberg

9    family, did you rely on information provided by family members

10   about other family members or just what the person told them

11   about themselves?

12   A.   I evaluated each one of the family, all eight of them on

13   their own, as well as getting corroborating information and

14   from the mother about each of the children, and each of the

15   children also gave me information about each of the others in

16   the course of the conversation.  They all contributed to

17   multiple sources of converging information which helped me

18   understand the picture of this family.  There was also

19   information from therapists who were involved in managing

20   treating this family.

21   Q.   Were the stories that you heard from various family members

22   generally consistent with each other?

23   A.   Absolutely.  They were a very close-knit family and

24   therefore the information was just, fitted in very clearly, one

25   with each other.

F1T8SOK2                        Strous – cross

1   Q.  In evaluating the members of Mr. Goldberg's family, did you

2   take into account their religion and culture and its impact on

3   their family life?

4   A.  Yes.

5   Q.  Can you give us a background of the religion of the

6   Goldberg family and the culture in which they lived.

7   A.  The Goldberg family were an ultra-Orthodox family.  As I

8   mentioned yesterday, it's a subgroup of the Jewish culture in

9   religion where there is a very strict applicability of the law

10  to every aspect of their life.  They live in their own

11  communities.  They dress in a particular way.  They have their

12  own schools.  Many of the religious practices are very strict,

13  which affects every aspect of their life.  Men and women are

14  very much separate in all aspects of their dealing and schools

15  are separate.  They often have buses that have separate

16  seating.  And the communities are separated from other people.

17          It's very important to understand these cultural

18  differences, which seem very strange at the source from their

19  perspective.  They don't have television.  They may have phones

20  but a kosher phone.  A kosher phone means it doesn't have text,

21  it won't have Internet, because they don't want to be exposed

22  to the outside aspects of the world which may affect what you

23  see and what you get exposed to.  It's not unlike in a way the

24  Amish population, as many people know in the United States,

25  that they live separately, they have their own customs, they

F1T8SOK2                          Strous - cross

1    dress separately, and they have certain practices that seem

2    very strange -- no electricity, no television, no nails in

3    their houses, I believe.

4          So the ultra-Orthodox have different cultural

5    practices which may seem very unusual, but to them it's very

6    much in keeping with very strict observance of Jewish law.

7    Q.  In your practice in Israel, do you treat ultra-Orthodox

8    patients?

9    A.  Yes.  Besides the work that I do in the hospital's

10   outpatient department, I run a specialized clinic for the

11   ultra-Orthodox within the context of my work in the hospital

12   where patients come from all over Israel, and the

13   ultra-Orthodox community particularly to my clinic, which is

14   dedicated to the treatment of ultra-Orthodox and there are very

15   specific differences which can take me a long time to go into

16   but I won't.

17         I also have a private practice which is in the

18   evenings, which is almost exclusively well over 90, 95 percent

19   dedicated to treatments of ultra-Orthodox.  My time is limited

20   so I dedicate myself only to treat this population, even though

21   that's not the world that I personally am part of.

22   Q.  Doctor, can you describe for us the role that the father

23   plays in most ultra-Orthodox families?

24   A.  There is a very specific designated role for the father

25   which takes on a number of different elements.  The father is

F1T8SOK2                    Strous - cross

the one that makes most of the educational decisions for the

children.  The father is the one, when he has daughters, that

goes out and finds the husband and interviews.  It sounds like

matchmaking, but they actually go and check it out very well.

But it's always the father that does it.  Jewish Orthodox males

have to go to daily prayers three times a day, and it's always

the father that takes the son.  When the son studies, it's the

father who studies with the son, not the mother.  And there are

many, many other examples in this manner.  And it's often the

mother who stays at home and looks after the children while the

husband goes out to work.

         In some situations it can be the opposite, that the

father is the one who goes and studies in a religious

institution and it's the mother that goes out and works.  So

both of those are options.

Q.  Based on your interactions with the various members of the

Goldberg family, how would you say that Mr. Goldberg compared

to this description you have just given in general about the

roles of Orthodox fathers?

A.  I think based on the information that I have that this was

a classic ultra-Orthodox family and the roles were pretty much

classic in this situation.

         He was the one individual who would make a lot of the

family decisions and be with the sons and go out and do what

they needed to do and the mother had a very traditional, mother

F1T8SOK2                        Strous - cross

1    Karen had a very traditional motherly role, being at home with

2    the children, always being at home when they came home from

3    school, etc.

4    Q.  Let's now talk about the individual members of the Goldberg

5    family, and I would like to start with the mother, Karen

6    Goldberg.  You were just talking about her.

7          Can you tell us a bit more about Karen Goldberg.

8    A.  Karen Goldberg is a 52-year-old United States citizen,

9    currently residing in Israel in a village by the name of Betar.

10   She is unemployed.  She was born in New York and she emigrated

11   to Israel in 1993.

12         As I mentioned, she was married to Stuart Scott for 17

13   years and she describes the fact that they had an absolute

14   perfect family.  They did everything together as a family.

15   They would sing a lot together.  They would clean the house

16   together.  They would spend a lot of time day to day as a

17   family, as a group.  And she described the fact that their

18   family was just a remarkable unit that everyone knew about.

19         People used to come -- she described they were known

20   very well as singers and often people would come and listen to

21   them outside or come inside and hear them singing because they

22   had a very unique practice of singing a lot together.  That

23   would describe them very well.

24   Q.  Just to skip forward for a moment, Doctor, how did the

25   descriptions of the Goldberg children, those who could remember

F1T8SOK2                        Strous - cross

1  their father about family life when their father was alive,

2  compare with the description that you just gave about Mrs.

3  Goldberg?

4  A.  When I met with the children, they told me the same thing.

5  They remembered, the older children -- the younger ones were 1,

6  4 and 7 and don't remember that as well.  But the 7-year-old

7  remembers the singing.  They remembered that they did

8  everything together.  That was the thing that kept on coming up

9  again and again.  They were such a close-knit family and they

10 would do things that normal families wouldn't do together.  How

11 often do you hear of a family cleaning the house together on

12 Friday and having fun and enjoying it.  That's what they

13 described.  For example, that was something for me which was

14 very striking, very unusual in a family.

15         I always ask myself, the way that they described the

16 loss of such a strong individual, what is better, to have a

17 very close-knit family and a very powerful family experience,

18 but remember when someone does it, the risk is if the person

19 suddenly disappears, the whole unit falls apart and the gap

20 between what was before and what is now is so vast and so

21 great, is it better not to be such a present father and have

22 such a close family.  It's an interesting question.

23         But that's something that kept coming up again and

24 again of the special nature of this family, which describes the

25 indescribably effective nature of this family after the loss of

F1T8SOK2                         Strous – cross

1   this powerful individual.

2   Q.  Based on your evaluation of Mrs. Goldberg, the mother, did

3   you diagnose her with any mental disorders?

4   A.  I did.

5   Q.  What was your diagnosis?

6   A.  Pathological bereavement and adjustment disorder with

7   depressed mood.

8   Q.  Can you now explain what the bases was for those two

9   diagnoses, again beginning with the period of the aftermath of

10  Mr. Goldberg and then going forward.

11  A.  The first day when she tried to get ahold of her husband,

12  couldn't get through to him, eventually people started coming

13  to the house and she realized something was not right.  She was

14  taken off to the forensic center called Abu Kabir.  She wasn't

15  able to identify her husband.  It was too painful.  So two

16  friends went and identified her husband.

17        She remembers coming home and feeling the need and

18  responsibility to tell her children, which she did.  There were

19  social workers involved in the beginning, recognizing the

20  absolute gravity and extent of her change in life with dealing

21  with seven kids of such varying ages on her own, and therefore

22  help was there right from the beginning.

23        She remained in total shock initially for the whole

24  period of time.  She reported her whole world suddenly fell

25  apart.  Since they had such an excellent marriage and he was

F1T8SOK2                    Strous - cross

1    such a wonderful person, the loss for her was absolutely

2    devastating and incalculable.

3         She reported that the loss of him in their life

4    required a complete change in lifestyle.  She suddenly had to

5    take care of all of the household, all of the financial

6    details, financial issues, which her husband used to do before,

7    which is also something classically that the father does in the

8    ultra-Orthodox community.  She had to take responsibility for

9    all the educational decisions and deal with her children's

10   issues of losing their father.

11        Her life was destroyed.  Her children's life, the way

12   she described it, was destroyed.  And both of them became a

13   cascade, like a circular thing.  She was destroyed, her

14   children were destroyed, and the fact that her children were

15   destroyed even destroyed her even more.  So that became totally

16   overwhelming for her and she struggled to make sense of this

17   while at the same time she knew she had to function and cope,

18   and she felt that she did a good job of it.

19        She had help.  She was responsible enough to cooperate

20   fully with all the help that she could find, and that included

21   social workers and psychologists helping the family, the

22   children deal with their issues and helping her cope with the

23   children's issues.

24        Initially she met with the social worker to deal with

25   the children and how to best approach each of their

F1T8SOK2                          Strous - cross

1    developmental stages of dealing with the loss.  She was meeting

2    two hours a week and then decreased it to one hour a week.  She

3    also met a psychologist, Dr. Joel Comet, to help her deal with

4    her loss and with all the subsequent issues going around.

5    Q.  I know we are getting a bit ahead of ourselves, Doctor, but

6    did you also evaluate all of the Goldberg children as having

7    emotional disorders?

8    A.  I did.

9    Q.  Can you tell us whether the difficulties that the children

10   suffered in turn had an impact on Mrs. Goldberg's mental state?

11   A.  Yes.

12   Q.  Please explain that.

13   A.  Each of them went through their own issues, and she felt

14   responsible to deal with each of her children where they were

15   at.  Because all of us deal with loss in different ways, even

16   though there are some characteristic patterns, she had to deal

17   with each child on their own individually as well as a group.

18   So on the one hand she was dealing with her own loss of her

19   husband, who she was so close to.  She had to deal with her

20   children's issues.  As I mentioned, it further caused her pain

21   to see her seven children suffering to the extent that they

22   did.

23          She reported that due to that she had to

24   hyperfunction, and she did everything she could.  She was busy

25   the whole day dealing with issues of the children's schools,

F1T8SOK2                         Strous – cross

1   dealing with the children's own therapists, dealing with trying

2   to run the house, shopping, and the finances.  Remember that

3   her husband was the wage earner here and she wasn't working at

4   the time.  But she couldn't go back to work or work at all

5   because she had to deal with all these children and the issues.

6   So the whole family orientation also was lost, and that was

7   also part of her difficulties.

8          The difficulties here was also the family unit became

9   very disorganized from the perspective that some of the

10  children became very aggressive, which is not an uncommon way

11  of dealing with loss of a parent at a young age.  She required

12  a lot of outside help to deal with these children with

13  psychological intervention.  Most of them were not so

14  cooperative with that and that was a further difficulty for

15  her.

16  Q.  Can you tell us how she was doing today or as of the time

17  that you met with her that underlies your diagnosis?

18  A.  Long term the stress took its toll.  She thought she had

19  never had any time for herself.  She could never see or plan

20  anything in advance because she was constantly dealing with the

21  children's issues.  She felt that she had to remain an

22  excellent mother, which she thought she did over all the years

23  and to do everything necessary for her children to the best of

24  her ability under the circumstances, the difficult

25  circumstances.

1           She feels over time, when the children started calming

2    down, she had to deal with her issues, which she never had time

3    to really do before, and that's dealing with her own chronic

4    emotional pain.  That's not uncommon, that she focused very

5    much in the early years on her children and as they started

6    moving on she had to deal with her issues.  She stopped

7    enjoying things from a very early stage after the loss of her

8    husband, including cooking, cleaning, things just weren't the

9    same anymore.

10           Socially was also difficult, despite social support

11   being there, because everything became around the children and

12   felt very socially isolated and alone.  She felt no one could

13   possibly understand what it was like to be a very happily

14   married woman and then suddenly losing your husband, with whom

15   you're very close to, and having to deal with seven children on

16   your own.

17           She reported her mood as being depressed at the time I

18   saw her.  On a scale of one out of ten, she felt that she lost

19   her zest for life and she feels low and struggles to function

20   with her mood.  She had been recommended to take medication

21   with her mood, but she was reluctant to do so but she continued

22   psychotherapy.

23           She feels at times that life is just not worth the

24   pain and the suffering that she has endured, but what keeps her

25   going is the children and responsibility.  That's a very common

F1T8SOK2                        Strous - cross

1    thing, that we know that depression has a doubled incidence in

2    women compared to men, but suicide is much higher in men.  So

3    why should women if they are more depressed have much less

4    suicide even though they might feel at times life is not worth

5    living, and that's exactly what she said.

6            What keeps her going are her children and

7    responsibility for the children.  Even though women go through

8    intense depression at times, often what keeps them going is the

9    requirement inherently and need to deal with the children.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1tQsok3                         Strous – Direct

1   Q.   Doctor, have you reviewed the report of the defendant's

2   mental health professionals about Mrs. Goldberg?

3   A.   Yes.

4   Q.   Are you aware they diagnosed her with a condition called

5   dependent personality disorder?

6   A.   Yes.

7   Q.   First of all, can you tell us what dependent personality

8   disorder is?

9   A.   Dependent personality disorder is a pervasive pattern of

10  when a person deals with life through submissive and clinging

11  behavior and a constant fear of being alone.  They develop

12  dependency on other people.  They aren't able to take any

13  responsibility for anything in their life.  They can't make any

14  decisions.  They are unable to initiate anything in their life.

15  They feel a constant need to be nurtured by others and can't

16  take responsibility for day-to-day aspects of their lives.

17          These are usually females that get involved in abusive

18  relationships but are scared to get out because they are scared

19  of being alone because they may feel "I will be left alone and

20  no one will be there to care for me," so they often stay in

21  abusive relationships.

22          There was absolutely nothing from my examination of

23  Mrs. Goldberg that indicated that she suffers or exhibits any

24  features of dependent personality disorder.  It's just simply

25  not the case.

F1tQsok3                          Strous - Direct

1    Q.  To your knowledge, did Mrs. Goldberg suffer from any mental

2    disorders prior to the death of her husband?

3    A.  No, she describes very clearly being a very happy,

4    well-adjusted individual with never any psychiatric or

5    psychological issues.

6    Q.  In your professional opinion, what is the cause of her

7    pathological bereavement and dysthymia?

8    A.  It's based on the fact that Mrs. Goldberg experienced a

9    devastating loss of her husband with whom she was very close,

10   and everything that she demonstrates in terms of all the

11   features are very consistent with pathological bereavement due

12   to the loss of her husband in the suicide bomb.

13   Q.  Do you believe that her pathological bereavement and

14   adjustment disorder are reasonably certain to be permanent?

15   A.  Yes.

16   Q.  Do you hold the opinions you've given about Mrs. Goldberg

17   today to a reasonable degree of medical certainty?

18   A.  Yes.

19           MR. HORTON:  Your Honor, we've been going for awhile I

20   wonder if it would be a convenient time to take a break before

21   I start the Goldberg children.

22           THE COURT:  Sure.  Ladies and gentlemen, we will take

23   a ten minute break.  Don't discuss the case.  Keep an open

24   mind.  I'll see you in ten minutes.

25           (Recess)

F1tQsok3                         Strous – Direct

1          THE COURT:  Are we ready to proceed?

2          MR. YALOWITZ:  Yes, your Honor.  While we were on

3  break Dr. Peri who is our next witness arrived.  At the break

4  Mr. Rochon confirmed he does not object to Dr. Peri sitting in

5  the audience while he waits for his turn at the witness stand.

6          THE COURT:  Sure.  Let's get the jury in, please.

7          MR. ROCHON:  Your Honor, before the jury comes in, I

8  understood Dr. Peri is a treating physician, but he is also

9  here as to the damages suffered by the Goldberg family from

10  some personal knowledge.  If I am correct about that, if he is

11  both a fact witness and expert witness, it might make sense for

12  him to sit outside.  I don't know.  I apologize to

13  Mr. Yalowitz.  I did represent I had no problem with it, but I

14  misunderstood the nature of his testimony.

15          MR. YALOWITZ:  That's fine.  We'll ask him to step

16  out.

17          THE COURT:  Do you want him out?

18          MR. ROCHON:  I think so because the testimony will

19  overlap on a factual basis.

20          MR. YALOWITZ:  Bear with me, your Honor.  I am just

21  going to explain the situation to Dr. Peri.

22          (Continued on next page)

23

24

25

F1tQsok3                              Strous - Direct

1          (Jury present)

2          THE COURT:  You can continue.

3          MR. HORTON:  Thank you, your Honor.

4   BY MR. HORTON:

5   Q.  Dr. Strous, I'd like now to turn to the seven Goldberg

6   children.  We are going to take them from oldest to youngest.

7   We will start with Chana Goldberg.  Can you tell us who she is?

8   A.  Chana Goldberg is a 27-year-old United States and Israeli

9   citizen currently residing in Israel.  She is married with two

10  children.

11  Q.  How old was she when her father was killed?

12  A.  She was 16.

13  Q.  Based on your evaluation of Chana, did you diagnose her

14  with any mental disorders?

15  A.  I did.

16  Q.  What was your diagnosis?

17  A.  Pathological bereavement and chronic dysthymic disorder.

18  Q.  How did Chana describe her relationship with her father?

19  A.  She described her relationship with her father as being

20  very close.  She was the oldest of the siblings and therefore

21  she said that for her father, she was the first one and,

22  therefore, it was something very special in their connection

23  that they had.  She remembers very clearly that from the day

24  that her father died, her life was changed forever.  It was

25  never, ever the same.

F1tQsok3                    Strous - Direct

1   Q.  What was your diagnosis of Chana?

2   A.  Pathological bereavement and chronic dysthymic disorder.

3   Q.  Would you now take us through the bases for those two

4   diagnoses, again, beginning with the period in the aftermath of

5   her father's death?

6   A.  When she returned home on the day that her father died, she

7   reported that that was the first day ever -- that's the way she

8   understood it or she remembers -- that her mother was not home

9   when she came home.  And that was the beginning of a very

10  difficult period for her.  She said life in general became

11  completely unpredictable and unexpected.

12          For a long time after her father died in the

13  explosion, and continuing to this day, is the way she told me,

14  she did not sleep properly.  This affected her daily function.

15          She reported she used to be the top student in her

16  class; and in the end due to the stress and emotional trauma

17  she went through, she never even achieved her high school

18  diploma.

19          She reported that her mother was often out of the

20  house dealing with issues of her siblings and, therefore, it

21  was her responsibility at home to take control as the oldest

22  sibling.  She found the task very challenging and difficult,

23  and in the end was not able to cope.  So after a period of time

24  she just withdrew.  It was the only other way she could deal

25  with it.  Without a father, she felt that often, in addition to

F1tQsok3                        Strous - Direct

1    her mother, it was her that had to discipline the children

2    because her mother couldn't be in every place all at once.

3    With seven very active boisterous children, she had to help out

4    her mother with her disciplining.  For example, refusal of some

5    of the children to go to bed.  It was part of her

6    responsibility to help her mother get the children to bed.

7            After one year, she reported she went into a severe

8    depression and then was not able to function as expressed by

9    her inability to eat properly and appropriately and even to

10   pray.  She had been in ongoing psychotherapy for that reason.

11   those were the initial issues.

12   Q.  As time went on, what did you see?

13   A.  As time went on, she developed what she described as

14   continuing low mood and she had developed issues with her

15   eating and struggling with her weight.

16           She also started struggling with chronic anxiety,

17   long-term anxiety which affected much of her behavior.  For

18   example, if she called someone and they don't answer, which is

19   often, she gets very anxious like something's happened, and she

20   responds in a very exaggerated, extreme way.  She feels that

21   life is unpredictable and never feels calm.

22           Also, it had strong effects on her social interaction.

23   Even though she may have lots of friends, she says, on a

24   superficial basis, she feels her friends treat her differently

25   and are scared to be natural around her; therefore, she feels

F1tQsok3                        Strous - Direct

1    very alone.  She feels no one can understand her.  She also

2    felt no one could understand her at school, the teachers, etc,

3    what she went through because the pain was very internal and

4    she couldn't describe what it was like for other people.

5            She also reports chronic long-term body symptoms

6    related to the stress and anxiety such as headaches.  She feels

7    constantly on edge, edgy, and that she has been dealt a bad

8    deal in life.

9            She reports also nightmares intermittently over the

10   years, and she feels her whole career path was dramatically

11   affected.  She said from an early age, she wanted to be a

12   psychologist, and she knows that it's not possible now.  She

13   didn't even achieve her high school diploma based on her

14   necessity of helping around the house and dealing with her own

15   feelings of the pain of losing her father.

16   Q.  Were you able to obtain any information from Chana's

17   mother, Karen Goldberg, to support your diagnoses of Chana?

18   A.  Yes.  Her mother reports that she was initially very

19   together to help and to be around and to deal with a lot of the

20   issues when she wasn't around herself currently dealing outside

21   the house with the family issues.  But then after a time, as

22   Chana said, she just lost it and she just withdrew and wasn't

23   able to function.

24           I also reviewed some of the notes from a social worker

25   who had seen her that said Chana became very obsessive and

F1tQsok3                          Strous - Direct

1    perfectionist about issues.  What obviously appeared to happen

2    is that over time being too perfectionist just took its toll

3    and she became overwhelmed and just completely stopped

4    functioning.  It became too much of a burden on her to be

5    perfect and to do everything perfectly which she felt she

6    needed to do for her family, and she lost it.

7    Q.  Is Chana married?

8    A.  She is.

9    Q.  Is this her first marriage?

10   A.  This is her second marriage.  That is another important

11   aspect of how her life was affected.  Her first marriage, she

12   reports, had been completely inappropriate.  She was very

13   scared that she wouldn't ever get married because she comes

14   from a tainted family, a family without a father and a family

15   who had been so damaged by the loss of such a prominent member

16   in such a well-known fashion; in the bombing.

17         So what happens, as I mentioned before in an

18   ultra-orthodox world, the father selects and examines,

19   supervises a whole process of match-making and finding a good

20   husband.  In an ultra-orthodox world when people get married,

21   they don't date in the way that we understand dating.  They

22   meet once or twice or three times sometimes, maximum four or

23   five depending on the particular -- sometimes even just once,

24   as I mentioned, and then they get married.  But it's the father

25   that decides that, and the father that does most of this

F1tQsok3                        Strous - Direct

1    process.

2           So here she didn't have a father.  She was scared that

3    she would never get married, so she was matched with someone

4    who wasn't appropriate and no one checked out whether this was

5    the right one for her, but she went with it because she was

6    scared about who would marry her, and it came out to be an

7    extremely abusive marriage.  The husband was abusive to her

8    physically and sexually.  And there was even a question about

9    they had a child and what the father was doing to the child.

10   Eventually after a long period of time, much longer than it

11   should have been, she divorced him.  She was very scared to get

12   divorced initially because she said this is an already

13   traumatized family, and here to bring in the stigma of divorce

14   in an ultra-orthodox family is a very big deal.  Divorce is not

15   something that is very common as it is in a non-ultra-orthodox

16   world.

17          When she was abused by her first husband, she used to

18   cry a lot and be very frustrated by the fact that she is stuck

19   in this marriage.  Her husband used to blame her crying and

20   complaining on the fact that she had lost her father in this

21   terror bombing, and, therefore, she felt she lost on every

22   account.  Eventually she did get a divorce and she later

23   remarried

24   Q.  In your opinion, doctor --

25   A.  I just wanted to mention that the case with her first

1  husband was so abusive that my understanding -- and I'm not

2  sure where things stand -- but it actually became the focus of

3  legal intervention with police.  So it was a very real abusive

4  relationship.

5  Q.  In your opinion, Doctor, did this abusive first marriage

6  have any impact on her pathological bereavement?

7  A.  I would believe that the symptoms that she reports of the

8  bereavement with the intense yearning, loss, unbearable pain

9  which much of it is still there so many years after the event

10  is not at all focused and related to the abusive marriage.  She

11  does have pain.  She does have very difficult memories from the

12  abusive marriage, but that is not the focus of her loss and

13  yearning for her father.  And that low mood was there before.

14  It contributed to her getting involved very quickly in the

15  relationship which wasn't appropriate for her, but her feelings

16  that I described today are related very clearly temporally in

17  terms of connection and time with the loss of her father and

18  not of an abusive marriage.

19  Q.  How about your second diagnosis of chronic dysthymia, can

20  you explain to us what you think the cause is of that as

21  between the death of Chana's father and this abusive marriage?

22  A.  Since the loss of her father, beginning not straightaway

23  because in the beginning she hyperfunctioned.  She functioned

24  over and above.  And she didn't at least after actually express

25  the depression she was feeling inside until she collapsed

F1tQsok3                          Strous - Direct

1    several months after the loss of her father.  She had this low

2    level of depression, lost in all over these eleven years.  I

3    remind you today is the anniversary, and that is clearly

4    related to the loss of her father.

5        I cannot exclude the fact that going through a

6    difficult marriage was a contributor to some of the lonely

7    mood.  We all go through difficult experience in life and

8    everything contributes to how we feel at any particular time.

9    But it clearly began long before that.

10       I remind you also that she is remarried, and in terms

11   of her marital life and family life, she has done some amends

12   in that era and she does have a family.  So we are not talking

13   about someone who is depressed because she's divorced and

14   living alone and having to care for a child on her own.  She is

15   happily married, and she describes her current marriage as

16   being very happy.

17   Q.  Are you aware that the defendants mental health experts

18   diagnosed Chana has having PTSD as a result of her first

19   marriage?

20   A.  Yes.

21   Q.  Did you question Chana to determine whether you thought she

22   might have PTSD from her first marriage?

23   A.  Yes.

24   Q.  What did you conclude?

25   A.  I didn't find those features.  I didn't hear that she was

F1tQsok3                          Strous – Direct

having nightmares about the abuse in that marriage.  I didn't
hear flashbacks.  I didn't hear avoidance.  She remarried
pretty soon after that, which people with PTSD from previous
marriages often wait a long, long time before they get into any
relationships again.  So that avoidance is very clear.

          When I spoke to her about it, I didn't see the
emotion.  When I spoke to her about her father, the emotion
gushed.  When I spoke to her about the relationship with the
ex-husband, there was frustration, there was some anger towards
him, but I didn't hear the classic depressive negative
self-imagery that is classically associated with PTSD after
some experience.

          She feels though that based on what she went through,
she missed out on a lot of her adolescence and adulthood and
feels a lot of responsibility still towards her family even
though years have passed since this happened.

Q.  To your knowledge, did Chana suffer from any mental
disorders prior to the murder of her father?

A.  No.

Q.  I think you have already dealt with this somewhat, but just
to make sure we've covered all the bases, in your professional
opinion, what is the cause of Chana's pathological bereavement
and chronic dysthymia?

A.  The loss of her father in suicide bombing in Jerusalem.

Q.  Do you believe that her pathological bereavement and

F1tQsok3                          Strous - Direct

1    chronic dysthymia are reasonably certain to be permanent?

2    A.  Yes.

3    Q.  Do you hold the opinion you've given about Chana Goldberg

4    today with a reasonable degree of medical certainty?

5    A.  Yes.

6    Q.  Let's move to the next oldest Goldberg child, Esther

7    Goldberg.  Can you tell you also who Esther is?

8    A.  Esther is a 25-year-old dual United States and Israeli

9    citizen, currently residing in Israel.  She is married with one

10   child, and works as a substitute child care provider in a

11   kindergarten.

12   Q.  How old was Esther when her father was killed?

13   A.  She was 14.

14   Q.  Based on your evaluation of Esther, have you diagnosed her

15   with any mental disorders?

16   A.  I have.

17   Q.  What?

18   A.  Pathological bereavement and adjustment disorder with

19   disturbances of mood and behavior.

20   Q.  Doctor, we talked about adjustment disorders at various

21   times before.  It may be self-explanatory.  Can you tell us

22   what you mean by adjustment disorder and disturbances of mood

23   and behavior.  And maybe just a little refresh on what

24   adjustment disorder is.

25   A.  Adjustment disorder is the development of emotional and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1tQsok3                         Strous – Direct

behavioral symptoms in response to a clearly identifiable

stressor, and the response of an individual is over and above

what is expected and it causes marked impairment in the

person's life in function.

Q.  Could you now going back to Esther.  How did she describe

her relationship were many her father?

A.  She, as other siblings did, indicated that her relationship

with her father was very close, and they were a very close

family.  She remembered vividly singing together and doing some

of the other things that I mention together as a family unit

that is what sort of characterized them, and that is what's a

very clear loss for her; not just her father but the loss of

her family experience.

     She recalls very clearly the day her father died.  She

remembers feeling confused and not understanding why there were

so many people in the house, and no one would say anything

until the mother came home.  She said that her life turned

completely upside down after that.  They were a dream family

before and the loss of that was very profound for her.  No one

was motivated to do anything.  They just were all shocked to

the inner core, and everything -- she said that for her life

lost its beauty.

     She is a very charismatic dynamic individual, and she

felt for her things just were never the same, for her

particularly.  She also reported that her mother always used to

F1tQsok3                         Strous – Direct

1    be at home when she came home, but her mother, due to dealing

2    with the stresses and meetings at school and therapists and

3    teachers for her siblings, was often not home when she came

4    home from school.  Therefore, she reports very clearly that in

5    some ways she felt she lost both parents.

6            The role that her mother was there for her before was

7    just not the same.  The connection that she had with her mother

8    changed very much because her mother had to deal with

9    everything.  So her mother was not the person who would be at

10   home to welcome her every day because her mother was dealing

11   with all these other things.  So not only did she lose her

12   father and family togetherness, but she lost a lot of what her

13   mother used to be for all of them before.  She said that she

14   tried to block out a lot of her pain, and she knows that

15   obviously was not necessarily the best thing.

16           Since that event of losing her father, she constantly

17   felt edgy for a long period of time, and much of that continues

18   today as well.  There are effects on aspects of her behavior.

19   She feels her concentration was never the same.  These are

20   classic things one knows from the literature affects people

21   with pathological bereavement.  Her mood still gets down from

22   time to time despite the time since the event, and she feels

23   it's related to that.

24           A lot of her function has returned and in some ways

25   she is better over the years, but she still continues to suffer

F1tQsok3                        Strous - Direct

in a very significant manner.  She feels that even though she

is married now, she has her own family, she feels she still has

to dedicate a lot of her time to contribute to her nuclear

family at the expense of her own family and own home and

husband.

        May I add that an important part for her social

interactions and relationship in the ultra-orthodox world is

very prominent, and she felt she lost all of that because she

had to be at home helping her mother with her siblings and the

mother has to help with homework with all seven as well.

        What happens in the household because there are so

many children —— this is unrelated to the fact often where both

parents are around or not, but the older children help with the

younger ones.  She felt in this situation it became absolutely

excessive because her mother was dealing with so many other

aspects of dealing with the family, that the older siblings had

to take care of many of the younger children.  What would

happen then, she would get burnt out and crashed.  This was

particularly evidenced when her older sister got married and

left the home and she was left as the next oldest to deal with

a lot of these issues.

Q.  Did Esther's mother, Karen Goldberg, provide any

information that supports your diagnoses of Esther?

A.  Yes, she did.  Karen, her mother, said that after the loss

of her father, Esther became very moody, and this was

F1tQsok3                          Strous - Direct

1    accompanied by obsessive tendencies.  She became very obsessive

2    about everything in terms of needing order in her life.  When

3    things were not perfectly in order -- it is not common in a

4    chaotic household with seven children dealing with the tragedy

5    in the early days, Chana would respond with tantrums and

6    physical fights.  There were times she would refuse to go to

7    school as well.  She refused therapy initially to deal with her

8    pain.

9    Q.  If I can interrupt, Doctor.  I think you just referred to

10   Chana, Doctor.  Were you referring to Esther?

11   A.  I'm sorry.  Esther.  I'm talking about Esther now.

12          There were times when Esther refused to go to school.

13   What Karen would do, she would meet with a therapist to get

14   help on how to work with Esther on her own because Esther would

15   refuse to go for therapy as a teenager, developing independency

16   and character personality.  She was very feisty.  So she would

17   refuse -- Esther would refuse to go to therapy, so Karen would

18   have to consult therapists on how to deal with Esther's issues.

19   Q.  To your knowledge, did Esther suffer from any mental

20   disorders prior to the killing of her father?

21   A.  No.

22   Q.  In your opinion, what was the cause of Esther's

23   pathological bereavement and adjustment disorder with

24   disturbances of mood and behavior?

25   A.  Yes.  The loss of her father in the terror bombing in

F1tQsok3                          Strous – Direct

1   Jerusalem.

2   Q.  Do you believe those conditions are reasonably certain to

3   be permanent?

4   A.  Yes.

5   Q.  Do you hold your opinions that you've given today about

6   Esther Goldberg to a reasonable degree of medical certainty?

7   A.  Yes.

8   Q.  Let's move to the next Goldberg child in order of age.

9           This time we will go to Yitzhak.  Can you tell us

10  about who Yitzhak is.

11  A.  Yitzhak is a 23-year-old dual United States and Israeli

12  citizen currently residing in Israel.  He is single and

13  currently a student.

14  Q.  How old was Yitzhak when his father was murdered?

15  A.  He was 12-years-old at the time.  He recalls very well the

16  day that it happened.  He was told by his principal to come sit

17  near the front of the class.  He went home and then found his

18  house full of people and didn't understand what was going on.

19  Later his mother arrived and told him and his siblings that

20  their father had died.  He reports very clearly that in

21  retrospect, if he would have known the pain that he would have

22  gone through over the years, he would have left the house

23  immediately and killed himself.

24          He reports that the loss of his father was a major

25  shock for him and a lot changed for the worse in every possible

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1tQsok3                       Strous – Direct

manner.  He also reports that he had a very close and happy

family.  He felt, particularly as the oldest son, that he was

the most affected.  He felt overwhelmed, confused, not able to

function at school.  He was considered to be a very good

student, but he essentially left school in the seventh grade

after being a very promising student.

He reports that his function from being a very calm,

cooperative, engaging child became very angry, depressed and

aggressive; not surprising for someone going through

pathological bereavement and well-described in children.  He

would frequently get into trouble with anyone he had contact

with.  He denied the use of drugs or alcohol ever.  He reported

that his schooling was markedly affected.  And, therefore, now

it's very difficult for him to catch up and do anything with

his life.

I understand he is moving on and studying more

recently, but he felt he missed out on his entire adolescence

clearly due to the struggles he had in the aftermath of losing

his father.  He said that his mother was very instrumental in

helping him cope and dedicated to him deal with his pain, but

he felt that ultimately no one could help him with his pain

because it was so intense.  As he describes it: "Nothing and no

one can bring my father back."

He reports he had very clear periods of being

depressed, but that he used to deal with it by acting out.

F1tQsok3                         Strous - Direct

1    People deal with being depressed in many different ways.  We

2    heard Esther become obsessive and perfectionistic.  He dealt

3    with his pain by acting out.  He said he didn't want to live,

4    even though he never tried to kill himself.  He dealt with his

5    low mood by rebelling and eating.  Those were the two things:

6    rebelling and eating.  He gained a lot of weight, and it was

7    only recently he was working very hard to control his weight

8    and reduce with a very intense exercise schedule.

9            In addition, he reports that he had difficulty

10   connecting and disconnecting with people and his relationship

11   with his family became very strained.  This was something that

12   was not there before.  He started questioning religion.  I

13   remind you that he was the oldest child in an ultra-orthodox

14   family.

15   Q.  Oldest son, Doctor?

16   A.  Sorry?

17   Q.  Oldest son; not child.

18   A.  He was the oldest son.

19   Q.  You said the oldest child.

20   A.  Sorry.  He was the oldest son in an ultra-orthodox family.

21   His father was gone.  In some ways, he was supposed to be the

22   role model for the younger sons because there was no father,

23   but he started questioning the religion because he was so, in a

24   way, disillusioned as he described it with life because this

25   was -- and without a father figure, he had no one to ground him

F1tQsok3                          Strous – Direct

1    in what he did.  This continued with ongoing confusion with his

2    direction in life, even though he feels he is trying to work on

3    this with some improvement.

4    Q.  Did his mother provide any information that supports your

5    diagnoses of Yitzhak?

6    A.  Yes.

7    Q.  Before we get there, I'm not sure we actually got to his

8    diagnoses.  What were your diagnoses of Yitzhak?

9    A.  Pathological bereavement and adjustment disorder with

10   disturbance of mood and behavior.

11   Q.  Is that the same diagnosis as for Esther?

12   A.  Yes.

13   Q.  Thank you.

14        I'm sorry, go ahead.

15   A.  Just to continue with how his life has been affected, he

16   misses his father very intensely despite the time that has

17   elapsed.  He said that he was the one who used to spend -- he

18   has vivid memories of going daily with his father to pray and

19   that void with his father gone and he feels -- even though he

20   did see a therapist initially nothing can deal with his pain

21   and, therefore, he refused to continue.  He felt it was

22   pointless what's the point of going to talk with someone; no

23   one is going to bring his father back.  He became very

24   disillusioned.  He developed other physical symptoms at the

25   time with migraines but that does not happen at the time but

F1tQsok3                         Strous - Direct

1    that continued for a significant period of time.

2    Q.  I would ask you, Doctor -- I think before I interrupted

3    you.  If his mother provided any information to support your

4    diagnoses?

5    A.  Yes.  His mother reports that she remembers at the time

6    that after he was told that his father had died by her that he

7    wanted to kill himself and become very aggressive and did not

8    want to live.  This was a marked change in behavior from

9    before.  He became overall out of control.  He remained at home

10   for six months after the bombing.  He just was unable to attend

11   school.

12        She reported that he was lost in life without a

13   father.  He went from being a very serious and studious young

14   man who used to read a book a day to never reading a book again

15   in his teenage years since the loss of his father.

16        She went through things I discussed already that this

17   was you know you have to understand the community from where he

18   came where the father did everything with their sons, and he

19   was at a particularly impressionable age that the loss of his

20   father made some change in -- left such a void in his life.

21   Q.  To your knowledge, did Yitzhak suffer from any emotional

22   disorders prior to the death of his father?

23   A.  No.  All the acting out behavior when he used to say, "I do

24   not have a father.  Don't tell me what to do," that was a

25   marked change from what was before.  None of that was expressed

F1tQsok3                          Strous - Direct

1   before, as his mother told me.

2   Q.  Although I think it's clear enough in your professional

3   opinion, doctor, what was the loss of pathological bereavement

4   and his adjustment disorder with disturbances in mood and

5   behavior.

6   A.  Yes.  The loss of his father in a terror bombing.

7   Q.  Do you believe his mental disorders are reasonably certain

8   to be permanent?

9   A.  Yes.

10  Q.  Do you hold the opinions you've given about Yitzhak to a

11  reasonable degree of medical certainty?

12  A.  Yes.

13  Q.  Doctor, let's move to the next Goldberg child, Shoshana.

14  Could you tell us who Shoshana is?

15  A.  Shoshana Goldberg is a 21-year-old dual United States and

16  Israeli citizen currently residing in Israel.  She is single

17  and currently studying occupational therapy at a college in

18  Bnei Brak in the center of Israel.

19  Q.  How old was Shoshana when her father was killed?

20  A.  She was 12.  She remembers vividly the day when she was

21  told.

22  Q.  Let me back up for a second.  Did you diagnose Shoshana

23  with any mental disorders?

24  A.  Yes, I did.

25  Q.  What were those?

F1tQsok3                        Strous - Direct

1    A.  Pathological bereavement and chronic dysthymic disorder.

2    Q.  Thank you, Doctor.

3         If you could explain the bases for your diagnoses?

4    A.  After her father was killed, she reported her life changed

5    forever.

6         She also reported that she was very close with her

7    father, which is something that just came through in all of the

8    evaluations I did with the children.

9         She reported that she was very sad and down for a long

10   time.  She did not know how to deal with it and ended up having

11   a lot of behavioral problems, including temper tantrums.  She

12   even used to run away from home.  She reported that she could

13   not go to school.  It was very difficult for her even though

14   she was forced to go because she had no focus, and everyone

15   around her would be speaking about her father.  That was very

16   difficult for her.

17        Over time she also came to help with a lot of

18   responsibilities around the house including cooking, cleaning,

19   etc.  She felt she could never -- she always had the

20   responsibility to help her mother out at home because there was

21   so much going on.  Therefore, she wouldn't attend parties and

22   other social engagements with her friends because she didn't

23   want to let her family down.  She therefore didn't have the

24   time to vest in relationships which is so important for a

25   teenage girl.

1              She reports that she still very much misses her father

2      very deeply.  He was very loving, and she described she had a

3      particular special relationship with her father who always told

4      her, she remembers vividly, she told me her father used to sit

5      with her and say how much he cares about her and always with a

6      smile.  She has this vivid memory.  Some people have flashbacks

7      of negative experience -- of negative images of terror attack.

8      For her, she had flashbacks of her father sitting with her

9      giving her a smile saying how much he cared, but in some ways

10     that caused, as she reported, her just as much pain as she

11     would have a negative image because seeing her father saying

12     how much he cared about her with a smile caused a lot of pain

13     because she recognized that is a loss that will never come

14     back.  The fact that he just disappeared suddenly one day was

15     very devastating.

16             Over time she developed a lot of other issues such as

17     poor sleep significant weight gain, despite that she reports in

18     having low appetite and poor social life.  She said developed

19     this thing that she always had to help other people and never

20     caring about or having time for herself with any hobbies.  She

21     couldn't trust.  This is an interesting thing which is very

22     marked with her, which is also well-described in complicated

23     grief.  People who lose someone stop trusting people.  She

24     found it very difficult entering into therapy, for example.

25     Thoughts would often be:  What if the therapy ends?  I'm going

F1tQsok3                          Strous - Direct

1      to trust somebody, and if it ends, I can't go through another

2      loss, and therefore was scared to start.

3              She found it hard entering into relationships.  She

4      was also very scared of marrying because she recognized what

5      happened to her older sister getting into a marriage without

6      her father checking it out properly and now she's scared to get

7      married because who is going to check out the guy and knowing

8      her and knowing the guy well.  So she's scared to get married.

9              She feels depressed and she has lost positivity in her

10     life in many aspects, even though she enjoys her studies, what

11     she is studying now, she feels she enjoys things less than her

12     peers, and that affects her concentration because she is

13     constantly thinking what is my family need today, even ten

14     years town the line or nine years after the time.

15             She reports -- this is interesting -- she travels over

16     two hours each way to her studies every day.  That's close to

17     four hours travel every day.  She does it.  She says while most

18     of the people who would travel two hours would stay in the

19     dorms, she can't do that because she needs to be at home and

20     she doesn't want to further break up the nucleus of the family,

21     not only to be around to help but, most importantly, the fact

22     that the oldest two sisters have gotten married, and she

23     doesn't want the family to unnecessarily further be broken

24     apart.  That doesn't make sense, but that is something that is

25     very important for her.

F1tQsok3                          Strous – Direct

1              Then, finally, she reports that she longs for a role

2    model like her father was for her.  Despite the fact she has

3    her mother and her mother gives her that kind of role model,

4    the role model of what her father was for her is not there, and

5    she feels that's affected her self-esteem.  She does see a

6    psychologist now for dealing with this low mood and feelings of

7    loss.

8    Q.  I want to go back for a moment to Shoshana's age at the

9    death of her father.  If I heard you correctly, you told us

10   that her brother Yitzhak was 12, and I heard you say Shoshana

11   was 12.

12   A.  She was ten.

13   Q.  Thank you.  I wanted to clarify.

14   A.  I apologize.

15   Q.  I may have misheard.

16              To your knowledge, Doctor, did Shoshana suffer from

17   any mental disorders before the death of her father?

18   A.  No.

19   Q.  In your opinion, what is the cause of her pathological

20   bereavement and chronic dysthymia?

21   A.  The death of her father in the suicide bombing in

22   Jerusalem.

23   Q.  Do you believe that those two conditions are likely to be

24   permanent?

25   A.  Yes.

F1tQsok3                         Strous - Direct

1    Q.  Do you hold your opinions that you've given today about

2    Shoshana Goldberg to a reasonable degree of medical certainty?

3    A.  Yes.

4    Q.  Let's move to the next member of the Goldberg family, a boy

5    Eliezer.  Doctor, can you tell us who Eliezer is?

6    A.  Eliezer Goldberg is a 17-year-old dual United States and

7    Israeli citizen currently residing in Israel.  He is currently

8    studying at a local high school in eleventh grade.

9    Q.  How old was Eliezer when his father died?

10   A.  He was seven.

11   Q.  Does he remember his father?

12   A.  He does.

13   Q.  Does he remember his death?

14   A.  He does remember.  He struggled to talk about it.  He said

15   it caused him a lot of pain to talk about it and he tries to

16   block out thoughts.  Therefore, the precise details of what

17   went around it were difficult to ascertain, but he reported it

18   was there, he remembers it, and it was very difficult to talk

19   about.

20   Q.  Did you diagnose Eliezer with any mental disorders?

21   A.  I did.

22   Q.  Which ones?

23   A.  Pathological bereavement and adjustment disorder with

24   disturbance of mood and behavior.

25   Q.  Again, that's the same diagnosis you gave for the last two

F1tQsok3                          Strous – Direct

1    Goldberg children, Shoshana and Yitzhak?

2    A.   Yes.

3    Q.   Could you now tell you also what the basis is for those two

4    diagnoses?

5    A.   He does not know what life would be like with his father

6    had his father been around, but he knows it would be very

7    different because he looks at other friends of his going to

8    synagogue, going to school, studying with their father, doing

9    things with their father and he doesn't do that.  He's on his

10   own.

11        The way he describes it is he doesn't have anyone in

12   his perception to share his life with.  He sees how happy

13   others are and this makes him sad, and even to some extent

14   jealous because he does not have the same experience.  He looks

15   around at his friends and says they are just much more happy

16   than he is.  He states being without a father is very difficult

17   in religious community setting since everything is separate.

18        He admits to the fact that to this day he has a lot of

19   anxiety which affects his function and sleep.  Even though he

20   was 17, at least at the time when I examined him, he still has

21   difficulty falling asleep at night, and he feels that's related

22   to the loss of his father, in terms of the fact it was not

23   something he had before and he developed it afterwards very

24   close to the loss of his father.

25        His anxiety is expressed in fear of strangers,

1    particularly those he feels are potential terrorists.  He is

2    also anxious and scared about death and he often thinks about

3    what it would be like dying, he thinks because his father died

4    and, therefore, he is preoccupied with the concept of death.

5    He admits to avoiding anything that reminds him of his father

6    dying.

7            It is very difficult for him to go on buses.  For a

8    long time, he refused to go on buses, which is very difficult.

9    In the ultra-orthodox world, it is relatively rare that people

10   have cars, and they travel on a lot of public transport.  Not

11   to be able to go on buses made a big difference in their

12   mobility.

13           He reports he often is on edge while other people are

14   relaxed.  Therefore, he is also very sensitive to loud noises

15   more than other people.  That's how he sees it.  He says being

16   without a father and losing his father has affected everything

17   he is, and has no idea what it would be like with his father.

18   He thinks he would be more happier and definitely more

19   religious.  He is confused about what he wants from his life,

20   and he hopes when he gets older, things will be OK.

21   Q.  Was there anything in Eliezer's appearance when you

22   evaluated him that informed your diagnosis?

23   A.  Yes, it was very striking that he was withdrawn, childlike,

24   very fragile, immature and I would even say distant.  He was

25   someone that I got the impression had never really developed a

F1tQsok3                          Strous - Direct

1   personality and ability to connect with other people.  He had

2   low self-esteem, almost a kind of inadequate disposition.

3   Q.  Did his mother, Mrs. Goldberg, provide any information that

4   support your diagnoses?

5   A.  Yes.  She reported that -- did I mention he was seven?  I

6   believe he was eight at the time of his death and that he took

7   the death of his father very hard.  He started bedwetting, and

8   was very aggressive.  That was something that she reported and

9   that there was a developmental regression, which means

10  someone -- he was toilet-trained obviously, and then he started

11  bedwetting.  Due to the emotional difficulties, he had a lot of

12  academic difficulties.  He developed separation anxiety which

13  means it was very difficult for him to go to school, and the

14  mother, Karen, believed that that affected his ability to learn

15  because he was constantly anxious, insecure and low

16  self-esteem.  She reported all of this was something new after

17  the death of his father, and it was a marked change from what

18  it was before.

19  Q.  To your knowledge, did Eliezer suffer from any mental

20  disorders before the killing of his father?

21  A.  No.

22  Q.  In your professional opinion, what is the cause of his

23  pathological bereavement and adjustment disorder with

24  disturbances of mood and behavior?

25  A.  The loss of his father.

F1tQsok3                         Strous – Direct

1   Q.  Do you believe that those two conditions are reasonably

2   certain to be permanent?

3   A.  While it's impossible to know exactly the long-term

4   trajectory of an adolescent, there are many features of what

5   I'm seeing here in such critical developing years of a young

6   man that I would expect a lot of his features to be for

7   definitely for a period of time.  It is difficult to know for

8   sure when at the age of 16 we're going to see some of these

9   features, but there is enough evidence to say what I'm seeing

10  in that young child is going to be there for a very long period

11  of time.

12  Q.  Doctor, do you give all the opinions that you've given

13  today about Eliezer Goldberg to a reasonable degree of medical

14  certainty?

15  A.  Yes.

16  Q.  Let's move to the next Goldberg child, another boy named

17  Yaakov.  Can you tell us who Yaakov is?

18  A.  Yes.Yaakov is a 13-year-old dual United States American and

19  Israeli citizen currently residing in Israel.  At the time of

20  the evaluation, he was studying at eighth grade at a local

21  school.

22  Q.  How old was he when his father was skilled?

23  A.  He was four-years-old.

24  Q.  Based on your evaluation of Yaakov, did you diagnose him

25  with any mental disorders?

F1tQsok3                          Strous - Direct

1    A.  I did.

2    Q.  What disorders?

3    A.  Pathological bereavement and adjustment disorder with

4    disturbance of low mood and behavior.

5    Q.  Was that the same diagnoses as the previous three?

6    A.  Yes.

7    Q.  Does Yaakov remember his father?

8    A.  He reports that the loss of his father is very difficult

9    for him even though he doesn't remember.

10   Q.  Let's just start with remembering.  Does he have a memory

11   of his father?

12   A.  He has a vague memory but not a good one at all.

13   Q.  Does he have any memories of his father's death?

14   A.  No.

15   Q.  Now, you told you also that one of your diagnosis for

16   Yaakov is pathological bereavement.  Could you explain for us

17   how a small child who was so young when his father died and has

18   only a faint memory could suffer pathological bereavement from

19   the death of someone they scarcely remember.

20   A.  It's an interesting phenomena, but it is often in children,

21   even though they don't have a memory of a parent, they

22   definitely see around what life could have been if they would

23   have had a father.  This is particularly profound in the

24   ultra-orthodox world where the father takes such a prominent

25   role and is such a prominent involvement in the son's

F1tQsok3                              Strous – Direct

1    day-to-day activities.  So for him, the pathological

2    bereavement is around the fact that he doesn't have his father

3    to do all those things that he sees his friends have fathers to

4    do it.  Therefore, he feels that void and that loss, not

5    necessarily because of what was, but what could have been and

6    what it could like now as he goes through various life stages.

7    Q.  Would else could you tell you also what supports your two

8    diagnoses for Yaakov?

9    A.  He reports that the fact that he doesn't have a father

10   causes him a lot of problems.  He reports, his understanding is

11   because of the fact he doesn't have a father, he hates school

12   and he does not have many friends.  He feels very different

13   from others.  That is something very acute and very clear.

14          Part of the issue and why he misses his father so much

15   is because he hears from other people what a good man his

16   father was.  Therefore, when he hears would could have been,

17   that for him also causes part of the pain.  He looks at his

18   friends, and he sees that his life is much worse for him than

19   it is for them.  As an example, he sees they can go to places

20   with their father whereas he cannot.  He goes to various

21   activities and functions, and he's alone, and also friends are

22   with their fathers.  And that causes pain every time.

23          He is never able to go to synagogue services with his

24   father, which is what is done in the community three times a

25   day.  When he thinks about his father, he feels very sad and

F1tQsok3                          Strous – Direct

1  very angry.  Those are the two things that come out very

2  clearly, very sad and very angry.

3          As a result of his problems the way he describes it,

4  he does not enjoy things.  He gets very sad and depressed at

5  times, and he said sometimes he does not even want to live.  I

6  remind you I'm talking about a 13-year-old at the time that I

7  examined him.  He said that life is very hard on him.  He sees

8  a psychologist who helps him.

9          He admits he gets anxious as well at times, especially

10 when there Arabs are around, which is not uncommon in the area

11 where he lives, and that makes him feel especially unsafe.

12 Q.  Let me ask you the same question I asked you about the last

13 child.  Was there anything about Yaakov's appearance during

14 your meeting with him that would support your diagnoses?

15 A.  He also appeared very anxious and apprehensive and all of

16 this unease in talking about his father.  You could see the

17 marked change.  You know, when you talk to a child you don't go

18 straight for the issue you are there for.  You develop a

19 rapport, first of all.  Once the rapport was developed, I could

20 see the marked change in his demeanor and the way he spoke and

21 his emotions when he started talking about his father.  So even

22 though eleven years old now 0while at the time he was nine,

23 nine and a half -- you could see a major change that was still

24 affecting him just talking about his father.  You would think

25 he got used to it, but it is something that is still very acute

F1tQsok3                              Strous - Direct

1    and present.

2    Q.  You mentioned emotions that you saw when he spoke of his

3    father.  What sort of emotions are you referring to?

4    A.  He looked down.  When you talked about his father, he would

5    cry.  13-year-old boys, you know, often hold back, and he was

6    just gushing.  He was a child.  He was still profoundly

7    affected emotionally by the loss of his father that he doesn't

8    even remember.  That is sort of remarkable in a way, the extent

9    to which he is still affected by something so many years later

10   crying in the manner that he does.

11   Q.  Were you able to learn anything from Mrs. Goldberg to

12   support your diagnoses of Yaakov?

13   A.  Yes.  She reported that what was most striking about him,

14   even at the age of four, he went into a state of shock and

15   didn't understand what was going on with all the influx of

16   people.  And when he found out, his mother said he started

17   going into -- he went into this mantra like "An Arab killed my

18   father.  Who will be my father?  An Arab killed my father.  Who

19   will be my father?  An Arab killed my father.  Who will be my

20   father."  He kept saying it over and over.

21         While his English used to be good, they spoke English

22   at home, she reports he lost the use of English language.  He

23   would only speak Hebrew, even though in the later year, more

24   recently he started speaking English again.

25         She reported that even though she was so involved in

1    dealing with her other children, she put him in a @krrish, an

2    afternoon krrish.  That's a major change.  He used to be at

3    home.  And based upon her responsibilities of dealing with the

4    other children, she thought it was in his best interest to be

5    in a krrish for a few hours in the afternoon.  She feels that

6    was also a major change for him and she feels also may have

7    contributed to his insecurity even though she did that on the

8    advice of mental health professionals and social workers, which

9    was considered in his best interest.

10          Over time, due to these changes, she reported he used

11   to get very sad and very aggressive and also developed a

12   separation anxiety, and would refuse to go to school and would

13   refuse to stay alone for even short periods of time.  Someone

14   always had to be with him.  He was so insecure with the change,

15   and he became a major worrier.  He is now in therapy, and she

16   feels that even though it is many years since the loss of his

17   father, she feels that he needs the therapy just as much as the

18   other kids needed it early on.

19   Q.  To your knowledge, did Yaakov suffer from any mental

20   disorders before the murder of his father?

21   A.  No.

22   Q.  In your professional opinion, what is the cause of his

23   pathological bereavent and adjustment disorder with

24   disturbances of mood and behavior?

25   A.  The loss of his father in terror bombing.

F1tQsok3                          Strous - Direct

1  Q.  We talked earlier about how it was difficult to predict the

2  length of disorders with someone so young.  Can you tell us

3  your views as to what you see is the long-term outlook for

4  these conditions for Yaakov?

5  A.  I think based on the findings that I have and aspects of

6  his personality development that one can see at such an early

7  stage, I would expect that a lot of these self-esteem,

8  confidence and anxiety issues will continue for a very long

9  period of time.  He will continue to have difficulties -- based

10  on my clinical experience for someone exhibiting such signs at

11  an early age, that he will have these difficulties for a very

12  long period of time.

13  Q.  Doctor, do you hold the opinions you've expressed today

14  about Yaakov Goldberg to a reasonable degree of medical

15  certainty?

16  A.  Yes.

17  Q.  Let's talk about the youngest Goldberg child, a boy named

18  Tzvie.  Can you tell us who Tzvie is?

19  A.  Tzvie is a ten-year-old dual United States and Israeli

20  citizen currently residing in Israel.  At the time of his

21  evaluation he was in fifth grade in a local school in the area

22  where he lives.

23  Q.  How old was he when his father was killed?

24  A.  He was one-year-old at the time of his father's death.

25  Q.  I take it, he has no memory of the events surrounding his

F1tQsok3                          Strous - Direct

1    father's death.

2    A.   No memory.

3    Q.   Did you diagnose Tzvie with any mental disorders?

4    A.   Dysthymic disorders and anxiety disorder both NOS, not

5    otherwise specified.

6    Q.   What was Tzvie like when you met him?

7    A.   Tzvie was very closed, appeared very anxious, partially

8    cooperative, casually dressed and appropriately but appeared

9    very immature and difficult to have interaction with other

10   people.  He seemed distant.

11   Q.   Did you meet alone, just you one-on-one with Tzvie?

12   A.   I met with him one-on-one alone own; but first of all, to

13   develop a rapport, I met with him with his mother.

14   Q.   Was Tzvie able to tell you much of anything that supports

15   your diagnoses?

16   A.   He does not remember his father, for obvious reasons being

17   so young.  He didn't give me much of a history of what it was

18   like for him growing up without a father.  Most of my

19   information, I got was received from his siblings and his

20   mother.  His mother very strongly and clearly described to me

21   that at the time, she thought, oh, you know, Tzvie is so young,

22   and the loss of his father is not going to be such a big deal

23   for him because he doesn't remember, he is not going to

24   remember, and he is not going to have any relationship with his

25   father.  But she was told by a social worker at the time, that,

F1tQsok3                           Strous - Direct

1    if anything, she is going to have the most problems with Tzvie.

2    She feels that maybe long-term that is an unfortunate prophesy

3    which may actually come true.

4    Q.  What have you learned as to how that prophesy is bearing

5    out so far?

6    A.  She reported that it took a long time compared -- in

7    contrast to the other children, he started speaking at the age

8    of three.  She reports that he had a lot of difficulties at

9    school and because of what he went through and what they went

10   through as a family, he fell through the cracks because the

11   teachers didn't want to bother her and pressure Tzvie with any

12   responsibilities -- with any pressure of studying.  Therefore,

13   she reported that Tzvie only started to learn to read

14   adequately in fourth grade and that caused a lot of academic

15   problems.  She reports that Tzvie often says he feels like a

16   failure and feels stupid.  He started taking Ritalin, she

17   reported, to try to help him with some of also learning

18   difficulties, but she felt it didn't help.  She feels, Karen,

19   the mother, feels Tzvie is very smart and creative, but he is

20   not able to actualize or develop his abilities due to academic

21   difficulties and that he has a low frustration threshold.

22        She also says from time to time Tzvie says he want to

23   die due to having a hard time at school and with friends.  He

24   sees a therapist because of these frequent frustration

25   outbursts.  Karen says at times he says regarding his father,

F1tQsok3                          Strous - Direct

"How do I know my father loved me if he left me?"  This is a

child's understanding of a father he would say, "My father is

not around because he doesn't love me."

Q.   In your professional opinion, Doctor, what is the cause of

these dysthymic disorder and anxiety disorder?

A.   The loss of his father in a terror bombing.

Q.   I take it there is no reason to believe he had any

emotional disorders prior to his father's death at age one.

A.   No.

Q.   Again, I understand it is difficult at his tender age, but

what can you tell us in your view as to the outlook for Tzvie's

emotional state in the future?

A.   Based on the considerable difficulties we have already seen

academically and emotionally requiring help with a therapist

and the history his mother has given me in terms of his current

behavior, I would expect these issues would continue for a long

period of time.

          Once again, it's difficult to predict exactly in a

child going into adolescence and adulthood exactly what is

going to be long term down the line, but it appears to me based

on what we've seen already that he is still going to have

significant difficulties in his life in the future.

Q.   Do you hold the opinions you've given us today about Tzvie

Goldberg to a reasonable degree of medical certainty?

A.   Yes, I do.

F1tQsok3                        Strous - Direct

1  Q.  Doctor, before we move on, I want to ask you with regard to

2  the Strous family.  Excuse me.  You're the Strous family.

3        Do you have an understanding as to whether the

4  Goldberg family has relatives in the United States and Canada?

5  A.  I believe they do, yes.

6  Q.  Have you read the report of the defendant's mental health

7  experts, which includes Mrs. Goldberg should have taken the

8  family, left Israel and moved either to the United States or to

9  Canada?

10  A.  Yes.

11  Q.  Do you agree or disagree with that advice?

12  A.  No, I think it is clearly out of place and indicates a lack

13  of understanding with the community and environment and the

14  cultural background where the family lived.  The ultra-orthodox

15  world is known very well as being very supportive and helpful

16  with families that require from them in any number of and

17  variety of manner.  To uproot children who have gone through

18  such a significant trauma in their life, losing a father in

19  such a tragic and violent manner, to uproot them and move them

20  to another part of the world would be very difficult for them,

21  in terms of language, culture and environment.

22        I think everything in terms of the support that they

23  developed over the years, it was very clear that they were

24  getting the best possible under very difficult circumstances.

25  For her to move to the United States, she go back into the

F1tQsok3                        Strous - Direct

1    exact similar kind of world, and it would be no difference in

2    terms of the fact that there was no father around.  So I do not

3    believe that it would have added in with any way being back

4    until the United States; but, if anything, it would have

5    contributed to further stress for these seven children.

6           I believe that on a professional level, she did the

7    right thing for staying, and I believe that that is the advice

8    she also got from professionals at the time not to leave.

9    Q.  Doctor, that completes the Goldberg family.  We just have

10   one more to talk about.

11          We are going to go back now to the bombing of Hebrew

12   University.  We spoke about some of its victims.  I want to

13   talk about Nevenka Gritz, who is the mother of David Gritz.

14   Before we get to the mother, tell us your understanding of who

15   David Gritz was?

16   A.  David Gritz was a high-flying, 24-year-old dual French

17   United States citizen, studying on a bursary scholarship in the

18   Hebrew University.  He had completed his studies at McGill

19   University in Canada and was studying in Israel for a year, as

20   I mentioned, on a scholarship.  He was killed in a bomb

21   explosion in the cafeteria in the Frank Sinatra cafeteria on

22   the Hebrew University campus pulls.

23   Q.  How old was David when he was killed?

24   A.  24.

25   Q.  Did you evaluate his mother, Nevenka Gritz?

F1tQsok3                          Strous - Direct

1    A.  Yes. David was the only child -- only son of Nevenka Gritz.

2    Nevenka is a 78-year-old French and Croation and United States

3    citizen currently residing in France.

4    Q.  How many times did you speak to Mrs. Gritz?

5    A.  I spoke to her on several occasions.  I evaluated her twice

6    in detail.

7    Q.  Can you explain to the jury why you had two evaluation

8    sessions with her?

9    A.  I will come to explain later, but Nevenka Gritz was

10   extremely depressed and waiting to die.  She was not

11   cooperative on initial interview.  The initial interview was

12   done by telephone.

13   Q.  To be clear, when you say telephone, do you mean Skype or

14   old-fashioned telephone?

15   A.  Old-fashioned telephone.  She did not want to go through

16   Skype.  She agreed to talk to me on the telephone despite the

17   length on the telephone.  As a professional, I cannot evaluate

18   a person in their entirety and give it what the evaluation

19   deserves, a psychiatric evaluation, without seeing the person.

20   As a result, I traveled to France to meet with her for several

21   hours where she lived in her apartment.

22   Q.  Can you now tell us a little bit more about who Mrs. Gritz

23   is, and what's her background?

24   A.  Mrs. Gritz, as I mentioned is 78, a widow with no children

25   and is unemployed.  She is probably 79 now.  She lives in

F1tQsok3                          Strous - Direct

1    France.  On the 31st of July 2002, her only son David of was

2    killed in a terror bombing, as I mentioned.  She reported that

3    as of the loss of her son, her life is completely changed

4    forever.  She says it is impossible to describe the nightmare

5    that her life has become ever since.  Every day since without

6    any improvement, she reports she has to fight to continue to

7    live.  The shock of hearing that someone was killed so suddenly

8    and so unfairly destroyed her life.  She reported that several

9    months after that her husband also died, and she believes --

10   she attributes the death of her husband similarly to the pain

11   of losing their only child, only son.

12   Q.  Is she living alone now?

13   A.  She lives alone.  She reports that even though it was

14   several years before, and eleven years at the time of the

15   evaluation, she feels as if it happened only yesterday.  She

16   thinks of killing herself, but that this is not in her ethic,

17   even though she feels she has no reason to live and is just

18   waiting to die.

19          She recalls she often used to think about killing

20   herself, but she could not do it.  She says what is there to

21   live for?  She says, "My son, my joy, my beauty in life is

22   gone."  The only thing that's kept her going is she believes

23   that when someone dies, that there is something left of them in

24   this world, and she feels that she cannot abandon that.  Even

25   though she feels she has to fight with herself every single day

F1tQsok3                          Strous - Direct

to live, she says that losing a child, especially an only

child, is the worst possible nightmare for any parent

especially when it happened so cruel and suddenly in such an

unfair manner when someone was in the prime of his life.

She report that he was like the blue-eyed boy of all

his friends of the school.  He was, as I mentioned, a high

flier, extremely good-looking, highly intelligent and was

destined for greatness in his life.  He excelled at absolutely

everything he did.  I don't need to tell you, she does this

with tears, she said that he was such a special person; not

only in his talents, but he was very special, very warm, and

this is made especially acute when she sees David's friends

around and she thinks would could have been.

(Continued on next page)

1              She feels, though, that David is with her all the time

2    and that the memories, that even though he is gone, no one can

3    ever take that away from her, but that doesn't make the pain

4    any better.

5              She dreams about him a lot.  She tries to communicate

6    with David and ask him to stay with her, but she knows this is

7    not possible, and this engenders helplessness, she just feels

8    more and more helpless, the loss of her only child.

9              She says that she struggles day to day dealing with

10   things that other people do.  She has to push herself to get

11   out.  She knows that she needs to function, and therefore she

12   tries to do things that she feels others have told her or she

13   believes may help her, like getting out doing shopping.  She

14   tries to do collages, which she feels helps her, but she says

15   that everything she does is tinged with the memory of David and

16   just profoundly affects every aspect of her life.

17             She says that she saw a psychologist before David died

18   for personal growth, and that has helped her to some extent in

19   dealing with this, but she says that nothing can ever ever

20   prepare a person or help a person cope with such a loss in such

21   a profoundly devastating manner.

22   Q.  What was your diagnosis for Mrs. Gritz?

23   A.  Pathological bereavement and major depressive disorder.

24   Q.  I think, Doctor, this is the first time you have given the

25   diagnosis of major depressive disorder.  Can you explain to the

F1T8SOK4                          Strous – direct

1    jury what that is?

2    A.  Major depressive disorder, in contrast to dysthymic

3    disorder, is a severe disorder characterized by depression and

4    loss of interest in life and in aspects of things that people

5    would have previously received enjoyment.  It affects sleep and

6    appetite often in profound ways, to the extent that a person

7    loses at least five percent of their weight and has problems

8    falling asleep, and sometimes in atypical depression they have

9    even more sleep.  It affects their behavior in all aspects, low

10   self-esteem, guilt, rumination, suicidality, and low energy.

11   It affects their function, obviously, as I mentioned, in a very

12   profound manner.  And she has very clear signs and symptoms of

13   depression.

14   Q.  You mentioned that her husband, David's father, died not

15   all that long after David died.  Can you try to give us some

16   understanding of the extent to which David's death, on the one

17   hand, or the father's death, on the other hand, are the cause

18   of her pathological bereavement and major depressive disorder?

19   A.  Mrs. Gritz, obviously I spent some time trying to tease it

20   out, but she described very clearly that after the death of

21   David she was completely devastated.  From that day on she

22   reported that she hoped her life would not be a long one and

23   that it would soon be finished.  This is even when her husband

24   was around.  Obviously, when her husband died it was difficult

25   for her, but nothing compared to the loss of her son.

F1T8SOK4                          Strous - direct

1              That is not an uncommon feature in complicated grief.

2     Whenever someone dies there is bereavement and people feel

3     pain, but people generally don't exhibit the pain and

4     bereavement in the manner and fashion that Mrs. Gritz did on

5     the loss of a spouse.  And this is related to the effect of her

6     son, which goes against the natural order, as she said, that

7     usually children bury their parents, parents don't bury their

8     children, and the fact that he died in such a sudden, violent,

9     and what she described as unfair manner.

10    Q.  To your understanding, did Mrs. Gritz suffer from any

11    mental disorders prior to the killing of her son?

12    A.  No.  She went into, based on this depression after the loss

13    of her son, over the time she was referred for help and she

14    received medication, an antidepressant; she was receiving

15    antidepressant medication.  But this was not something that she

16    was receiving at all before.

17    Q.  Do you believe that her pathological bereavement and major

18    depressive disorder at this point are going to be permanent?

19    A.  Yes.  She describes it to me herself.  She says that she

20    knows that the pain and depression will accompany her, as I

21    quote, to the end of her days and her life forever will be

22    difficult.  Wherever she goes there are memories of him, and

23    she cannot get that out of her mind.  She just wants -- and

24    this is a quote word for word -- to be left alone and to die in

25    the near future.

F1T8SOK4                          Strous – direct

1    Q.   Doctor, do you hold your opinions that you have expressed

2    today about Mrs. Gritz to a reasonably degree of medical

3    certainty?

4    A.   Yes.

5    Q.   Over the course of yesterday afternoon and this morning up

6    to now we have been putting up on the screen pictures of the

7    various people that you evaluated.  Do you recognize all of the

8    pictures as the people that you in fact evaluated?

9    A.   Yes.

10            MR. HORTON:  Your Honor, at this time, I would like to

11   move into evidence the pictures of all of the people that Dr.

12   Strous has evaluated.  They have been previously marked as

13   Plaintiffs' Exhibits 1198 through 1221.  I believe counsel has

14   no objection.

15            MR. ROCHON:  That's true.  No objection.

16            THE COURT:  They will be admitted into evidence.

17            (Plaintiffs' Exhibits 1198 through 1221 received in

18   evidence)

19            MR. HORTON:  In addition, there was some reference to

20   the family tree pictures which were shown, and I don't think

21   there is any objection to their admission either.

22            MR. ROCHON:  That's correct.

23            THE COURT:  Does that have an exhibit number?

24            MR. HORTON:  Yes.  That's 1236 through 1245.

25            MR. ROCHON:  No objection.

F1T8SOK4                          Strous – direct

1                  THE COURT:  They will be admitted into evidence.

2                  (Plaintiffs' Exhibits 1236 through 1245 received in

3        evidence)

4                  MR. HORTON:  I don't have any further questions for

5        Dr. Strous, but my colleague, Mr. Yalowitz, I believe does.

6        Would this be a convenient time to take a lunch break?

7                  THE COURT:  Let's take a lunch break.

8                  Don't discuss the keep, keep an open mind, ladies and

9        gentlemen, and we will continue at 2:10.

10                  (Jury exits courtroom)

11                  MR. HORTON:  Your Honor, we may or may not be done.

12                  THE COURT:  Let me know at 2:10.  We will either

13        continue with direct or go straight to cross.

14                  MR. ROCHON:  What time?

15                  THE COURT:  2:10.

16                  MR. ROCHON:  Thank you.

17                  (Luncheon recess)

18

19

20

21

22

23

24

25

F1T8SOK4                          Strous – direct

1                          AFTERNOON SESSION

2                              2:10 p.m.

3          (Jury not present)

4          THE COURT:  Do you have anything further on direct

5    examination?

6          MR. HORTON:  Just a couple of questions, your Honor.

7          THE COURT:  Can we go ahead and start.

8          MR. ROCHON:  We are ready.

9          THE COURT:  Let's bring in the jury.  They are here.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1T8SOK4                          Strous – direct

1              (Jury present)

2     RAEL STROUS, resumed.

3              THE COURT:  Mr. Horton.

4              MR. HORTON:  Thank you, your Honor.

5     BY MR. HORTON:

6     Q.  Dr. Strous, I have asked you several times about your

7     familiarity with the reports filed by the mental health experts

8     of defendants.  Have you reviewed those reports and seen that

9     they have relied on a psychological test referred to as the

10    MMPI-2?

11    A.  Yes.

12    Q.  Could you tell us what the MMPI-2 test is.

13    A.  The MMPI test is -- MMPI stands for Minnesota Multiphasic

14    Personality Inventory.  It's a test made up of several hundreds

15    of questions with answers of yes or no or true or false, which

16    was originally developed in 1943 by Hathaway and later updated

17    in 1989 to the MMPI-2.

18             It's a test used predominantly by psychologists, used

19    to assist in the evaluation of the person's personality.  It

20    does not define diagnosis, definitely not according to the

21    DSM-III.

22    Q.  Doctor, were you finished?

23    A.  Yes.

24    Q.  Doctor, having reviewed the reports of the defendants'

25    mental health experts and their discussions of the MMPI-2 test,

F1T8SOK4                          Strous - direct

1    which -- first of all, you did not administer the MMPI-2 test

2    as part of your evaluations, did you?

3    A.   No, I did not, and I will explain to you why.  The MMPI is

4    known not to be dependably accurate in the assessment of

5    diagnosis for the purposes of which are required.  There are a

6    number of reasons for that, several of which relate to the fact

7    that there are certain populations that the MMPI is notoriously

8    inaccurate with.

9             May I give you two examples?

10            Spending many of my informative clinical years in

11   Apartheid, South Africa, and now living in a multicultural

12   society in Israel, I have become very sensitive to issues of

13   racial prejudice and cultural inferences and backgrounds, and

14   the MMPI is very well-known to give scores much higher in

15   certain populations, such as women and blacks, because it's not

16   sensitive to various cultural and racial sensitivities.

17   Therefore, to say that women and blacks have worse mental

18   illness in certain areas based on the findings of the MMPI is

19   simply incorrect.

20            So while it still remains very much in use by many

21   psychologists, in terms of evaluation for the purpose of which

22   I was required to analyze individuals for these evaluations, I

23   did not believe it was necessary.  And most importantly, and

24   this is the most important thing, and this is what you teach,

25   when you evaluate somebody for any condition, you have to use a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1T8SOK4                          Strous - direct

1    test which is specific for that condition.  What does that

2    mean?  So if I am evaluating someone for depression, I don't

3    use a generalized test which tests all aspects of personality.

4    I want to use a test that evaluates depression.

5            So in the case here, it was important for me to

6    evaluate anxiety, depression.  And most importantly for PTSD, I

7    used a scale that is specific for PTSD and not the generalized

8    MMPI, which just looks at, generally analyzes personality.

9            I would expect that this was used in this case by the

10   professional, by the experts for the defense, looking

11   predominantly at one aspect of the MMPI, and that is the lie

12   factor, malingering factor.  I guess in cases of forensics,

13   when it's very important to exclude aspects of malingering and

14   people might be fooling the examiner, the MMPI is considered to

15   contribute significantly to that, and for that reason I

16   believe, I would predict that was the reason that MMPI was

17   used.  But in the evaluation of a psychiatric evaluation, there

18   are many, many other ways one can detect such things.  One does

19   not need the MMPI, especially since the MMPI is considered, as

20   I mentioned before, not to be dependably accurate in such

21   situations.

22   Q.  Based on your interactions with the plaintiffs that you

23   evaluated, do you have any reason to believe that any of them

24   were malingering?

25   A.  No, I didn't.

F1T8SOK4                        Strous - direct

1    MR. HORTON:  Thank you.  That's all I have.

2    MR. ROCHON:  We have no questions for the witness.

3    THE COURT:  Thank you, sir.  You can step down.

4    (Witness excused)

5    THE COURT:  Would the plaintiff call its next witness.

6    MR. MACHNES:  Plaintiffs call Dr. Tuvia Peri.

7  TUVIA PERI,

8      called as a witness by the plaintiffs,

9      having been duly sworn, testified as follows:

10    THE COURT:  Could you state your name and spell your

11  name for the court reporter, please.

12    THE WITNESS:  My name is Tuvia Peri.  T-U-V-I-A,

13  P-E-R-I.

14    THE COURT:  You can inquire.

15  DIRECT EXAMINATION

16  BY MR. MACHNES:

17  Q.  Good afternoon, Dr. Peri.

18      Could you begin by telling the jury where you're from.

19  A.  I am from Israel, from Efrat, Israel, near Jerusalem.

20    THE COURT:  Sir, would you keep your voice up?

21    THE WITNESS:  OK.

22  Q.  What do you do for a living?

23  A.  As for now I am a licensed clinician in psychology and a

24  licensed supervisor in clinical psychology, and I am a

25  professor of psychology at Bar Ilan University in Israel.

F1T8SOK4                          Peri - direct

1   Q.   What did you do before becoming a psychologist?

2   A.   Before becoming a psychologist?  Before I was a student at

3   the university.  Before I was a student in Yeshiva.  I was in

4   high school.  I was in the Army for years.

5   Q.   At some point did you enter the Reserves of the Army?

6   A.   Yes, for many years.  Almost 30 years.

7   Q.   What was your job in the Air Force Reserves?

8   A.   I had begun my service as a combat officer in the Armed

9   Forces, and later on when I became a psychologist, I did my

10  reserve service in the Air Force in some kind of a survivor

11  training.  Quite a difficult experience.

12  Q.   Could you tell the jury a little bit more about that

13  survivor training.

14  A.   Basically we would do twice a year an exercise of about two

15  weeks that was a simulation of being in captivity.  It's quite

16  an aggressive experience.  Very interesting psychologically,

17  but it was not easy.  And I did it for about a month every year

18  for 13 years.

19  Q.   Just tell us a little bit about your training after you

20  left the Army and became a psychologist.

21  A.   I studied all my studies at the Hebrew University in

22  Jerusalem and then I started to work as a resident at Hadassah

23  Medical Center in Jerusalem.  I worked there for about more

24  than 25 years.  Part of it was clinical training and part of it

25  was research.  I am what I would define as a clinician

F1T8SOK4                          Peri - direct

1   researcher.  I did also clinical work and clinical training and
2   I also did a lot of research, for about ten years mainly
3   research in PTSD.
4   Q.  Could you tell us a little bit more about the focus of your
5   PTSD research at Hadassah?
6   A.  It was again combined.  I have done psychophysiological
7   research, brain imaging research of PTSD.  And also in
8   clinical, developing treatment methods, trying to design early
9   interventions to avoid the development of chronic PTSD cases.
10  That was our main goal.
11  Q.  What are you doing now?
12  A.  Since about five and a half years I went back to the
13  academy.  So I am professor of psychology at the university and
14  part of my job I am running community clinic.  It's service for
15  people from the community and also it's a training clinic where
16  our graduate and postgraduate students are training.
17          So I am running this clinic, which we have about 300
18  patients a year, something like that, and I am also running a
19  study of PTSD as part of our clinic.  And I have a small
20  private practice for all these years as additional income, and
21  also I love to do the treatment myself, not only supervising
22  and not only studying.  So I am doing also about 12 hours a
23  week, or something like that, I am treating myself, I am
24  treating patients, seeing patients.
25  Q.  What is your position at Bar Ilan PTSD clinic?

F1T8SOK4                         Peri - direct

1    A.   What is my position there?  I am head of the clinic.  In my

2    research I am running the study of -- we are actually

3    studying -- I also have brain imaging study, but my main

4    involvement in research with PTSD is a treatment study.  I am

5    running a treatment study of a treatment matter that I

6    developed called narrative reconstruction.  So we study a trial

7    that compares this treatment to a waiting list, efficiency

8    experiment.

9    Q.   Can you tell us the extent of your experience treating

10   trauma victims in your clinic or research or in your private

11   practice?

12   A.   That was my main research study and also a serious part of

13   my clinical work during I think more than 25 years.  During the

14   years at Hadassah, I started I think with PTSD in 1990 or

15   something like that.  I remember it was before the first Gulf

16   War.  Then during the 2000 years, at the time of the terror

17   attacks in Jerusalem it was, I have seen patients from the

18   emergency room and patients from the Yom Kippur War, 1973 war.

19   So I have seen PTSD patients just from after the trauma to 40,

20   50 years after the war.  So I have quite an extensive

21   experience with PTSD patients.

22   Q.   Do you know an individual named Leonard Mandelkorn?

23   A.   Yes.

24   Q.   How did you come to know him originally?

25   A.   I may have seen him before, but when we came really to know

F1T8SOK4                      Peri - direct

```
 1   each other more, I was teaching psychology courses for, in the

 2   Teachers College.

 3          This is his picture, yes.

 4          I was teaching psychology courses, introductory

 5   courses and more advanced courses in Teachers College and he

 6   studied in this program.  There were rabbis attending this

 7   program in order to get a degree in education or something.  So

 8   he took one of my courses and another one I think he attended,

 9   two of my courses.  Then we knew each other.

10          After his son was injured in a terror attack, he

11   started consulting me, telling me, look, my son has gone

12   through this kind of explosion.  Usually I tried to reassure

13   him, look it's normal, this is an early response after trauma

14   and things like that, and he would ask me, approach me in the

15   corridor after a lecture and ask me about it.  That was our

16   first interaction.

17   Q.  Did he reach out to you at some point in 2004 about

18   treating his son?

19          THE COURT:  You have to keep your voice up.

20   Q.  Did Mr. Mandelkorn reach out to you at some point in 2004

21   about treating his son Shaul?

22   A.  Yes.  At the beginning he just came with questions and then

23   one day he asked me, he is ready to accept treatment, will you

24   be ready to see him?  That's where I saw him.

25   Q.  How many times did you see Shaul as a patient?
```

1   A.  I think it was between 10 to 12 meetings.  I'm not sure if

2   it was only ten.  Maybe he didn't attend all meetings.  Between

3   10 and 12 meetings.  It was a short intervention.

4   Q.  How long after the bombing did you treat Shaul?

5   A.  I think his bombing was in 2002 and he started treatment

6   about two years after the bombing.

7   Q.  Based on what you learned in treatment sessions with Shaul,

8   how did he function as a member of his community before the

9   terror attack?

10  A.  As I could understand, he was in a very good condition

11  before that.  He studied in an elite yeshiva high school, very

12  good one.  He was quite successful in his studies.  He had good

13  grades.  He was also a counselor or moderator in a youth

14  movement, which was also kind of a leading position with his

15  age group.

16          It seemed that he also in the family was kind of in a

17  position to his father, because although his father was a

18  rabbi, he was a little bit more right wing, he was more

19  conservative, and he always pushed to be more religious than

20  his parents were.

21          He came from the right background.  His father was a

22  rabbi, his mother was an educator.  Both high school educators.

23  So he was a very successful young man and he was accepted to

24  Yeshiva on the track to be a rabbi or to be an educator.  It

25  was quite clear that he is going to some kind of leading

F1T8SOK4                        Peri - direct

position in terms of religion or religious studies.  It was

quite clear, and he was on the right track.  Everything was OK

from what I could understand.

Q.  Could you explain what you mean by a Yeshiva to the jury.

A.  Yeshiva is kind of academy of Jewish studies where you sit

all day studying the Jewish books, Jewish scriptures

intellectually.  It's quite intensive, high-level intellectual

work and it's the Jewish tradition to actually to take it as

your life goal to sit and study, to learn and later on to

educate and to be a leader in the community based on what you

have learned.

         So such a Yeshiva is quite intensive.  You have to sit

in the morning from about 8:30 in the morning till 11:00 at

night every day with a short break at noon to study.  So it's

quite demanding intellectually and emotionally.  You have to

endure that.

         That was his dream, actually, because he was in the

Yeshiva high school where half a day you study secular studies.

When you go to an academy like that, you are devoted to what

you believe is the most important thing to do.  For him, he was

very much eager to go back.  The explosion occurred just at the

end of his high school studies.

Q.  During your treatment of Shaul, did you observe any affect

that the terror attack had on him?

A.  Sure.

F1T8SOK4                          Peri - direct

1    Q.  Just explain that a little bit.

2    A.  I diagnosed him as a clear-cut PTSD.  That was, basically

3    he was a PTSD case.  But there was also something that is not

4    exactly a diagnosis.  He was a different personality.  He was

5    kind of fearful, anxious, shallow emotionally and numb, very

6    defensive.  He was not the same ambitious, energetic, lively

7    person that they described he was before, or he himself

8    described himself as being before.

9    Q.  Did he describe reexperiencing the terror attack?

10   A.  Sure.  That was the main thing that brought him for

11   therapy, that he had severe events of reexperiencing where he

12   would go into serious panic attacks, hiding himself, being very

13   anxious.  It was quite severe and it happened on events where

14   there was noises of shootings.  There was a rumor that somehow

15   terrorists entered their village or something like that.  But

16   what was worse, it happened almost every time he went to sleep.

17   This time of falling asleep or being in a twilight zone was

18   very frightening for him and it was a reminder for his state

19   after the explosion.

20          So going to sleep was quite a terrifying event for

21   him.  It was difficult for him.  And he would reexperience many

22   times his trauma.

23   Q.  Did Shaul report having any of these symptoms of

24   anxiousness or the reexperiencing or the fearfulness, did he

25   report having any of them prior to the terror attack?

F1T8SOK4                         Peri - direct

1    A.  He said he had worries.  He was a little bit anxious

2    before, especially the fact that he lost his brother and it was

3    years before.  One of his brothers died from a heart failure,

4    that he had a previous medical problem.  So he describes a

5    little bit anxious but nothing similar to this intense

6    reexperiencing events that brought him to the treatment.

7    Q.  You mentioned that his brother died of a heart attack.

8    When did that happen?

9    A.  I understood that his brother was born with some kind of

10   heart failure and he was treated and followed through the years

11   and then just before his Bar Mitzvah, he was 13, one Saturday

12   night he just passed away just on the spot.

13   Q.  What role do you believe, if any, that Shaul's brother's

14   death played in the symptoms that he was reporting when he came

15   for treatment to you?

16   A.  I think it has a part.  Usually what we know from our

17   studies is that most of PTSD patients develop PTSD after they

18   have experienced some prior trauma during their lives.  But you

19   have to remember, the prevalence of trauma in life for normal

20   people is very high.  It's about 80, 90 percent have had some

21   kind of a trauma in their past.  Usually they overcome it.  And

22   Shaul also overcame this one and he was quite successful in his

23   life before.

24          I suppose that the fact that he was wounded and his

25   life was in danger and he was so anxious after the trauma in

F1T8SOK4                    Peri - direct

1    some way he relived or caused the reliving of the possibility

2    of losing your life just on the spot and instantly because it

3    was in his memory in some way.  But I suppose if he would go

4    into another severe trauma, it was just a memory and he would

5    continue his life, a painful memory, but he wouldn't suffer

6    such a severe disorder.

7    Q.  So in your professional opinion what was the cause of

8    Shaul's PTSD?

9    A.  It's difficult to go into understanding.  The main cause

10   was the terror attack he was involved in, because he was in an

11   event where there was a sudden explosion.  I think eight or ten

12   people were dead around him.  Dozens were wounded.  He was

13   bleeding, seriously wounded, gradually losing his

14   consciousness, hearing other people ending their living around

15   him.  And then he ended up in the ICU for, I don't know how

16   many days again with pain, with worries, with worries that he

17   will lose his vision.

18            So he endured a very, very serious trauma.  This is

19   the kind of event that you would find in PTSD.  It's the first

20   criteria that you have to endure an event that endangers your

21   life.  That's what it is.

22   Q.  Did Shaul return to his studies at the same level he was at

23   prior to the bombing?

24   A.  He wanted very much.  In a way he was kind of a -- you have

25   these patients coming and complaining more than they suffer.

F1T8SOK4                           Peri - direct

He was the kind of patient that denied suffering.  He was

actually suggested treatment before he had seen me, but he

didn't want to take it.

       He came to me after there was some kind of his

reexperiencing events and then he was ready for treatment.  But

again, he wanted very much to go back to his previous life, to

go back to the Yeshiva.  So he actually went back to the

Yeshiva but then he encountered problems.  He had concentration

problems.  He couldn't sit for so many hours.  He had vision

problems.  He couldn't read, because you have to sit and read

books, and he had difficulties.

       Mainly the emotional problem, just -- he did it, but

it was not in the same intensity, with the same vigor that he

had before.

Q.  You mentioned that Shaul was the type of patient who denied

suffering.

A.  Right.

Q.  Having treated and worked with PTSD patients during your

career, is that something that you observed in others?  That

denied suffering?

A.  You see this kind of patient.  They are not the majority.

Most PTSD patients are complaining even more than you would

expect.  It is always kind of suspect that they complain of

more intense symptoms than they really suffer.  That's one of

the problems with PTSD patients, that people don't believe

F1T8SOK4                          Peri - direct

1     them.

2          But he was the kind -- even though he was seriously

3     wounded, even though his vision was impaired, even though he

4     suffered from very clear intrusive symptoms and avoidance and

5     whatever and had hyperarousal, he would say, no, I'm OK.  That

6     was his attitude.  It was also a way of avoiding -- I thought

7     he needed a longer treatment, longer intervention, but he

8     wouldn't go for that.  He had this attitude, OK, you helped me,

9     I am helped, I can continue my life.

10    Q.  What was your impression as his psychologist about whether

11    he was OK or not?

12    A.  Whether he was?

13    Q.  Whether he was OK after the bombing.

14    A.  He was not OK.  That was very clear.  I hoped that he will

15    improve.  I have to say that I haven't seen him for ten years

16    since I treated him, and I just read the papers of the trial

17    recently.  It was quite a sad experience for me to learn that

18    he actually -- he is quite chronic.  He never went back to who

19    he was before.

20          At the end of our intervention, I hoped that my short

21    intervention, which is basically a kind of first aid, will be

22    enough and he will just go back to his motivation and

23    everything will be OK.  But even when we finished our

24    intervention, he still suffered from the same symptoms that I

25    wrote at that time.  It seemed he was never back to the same

F1T8SOK4                          Peri - direct

1    person that he was before.

2    Q.  During the course of your treatment of Shaul, did you learn

3    that Shaul avoids eye contact with women?

4    A.  He mentioned that, yes.

5    Q.  In your professional opinion, what was the source of that

6    conduct?

7    A.  First of all, I didn't see it as such a big problem because

8    it was common in his class and in these kind of boys,

9    adolescents in his class that are very religious, trying to be

10   more serious in their religious life, it was quite common to

11   deal with this question of trying to avoid watching a woman and

12   being not very successful in that as a young man.  So it was

13   not very strange.

14        It took a more central part in our meetings because of

15   this meeting of this cabalistic rabbi.  They went to a

16   cabalistic rabbi to get some reassurance.  It's kind of

17   mystification.  A rabbi that deals with mystics.  They went to

18   this rabbi that his father knew because they was very much

19   worried before one of his operations in his eyes.  They were

20   afraid of bad consequences of this surgery.

21   Q.  The surgery was to correct injuries --

22   A.  The surgery was, there was shrapnel or something that was

23   still -- it's easier for me like that.  There was a shrapnel

24   that was left in his eye and he had to undergo this surgery to

25   take it out.  But there was the danger that it will cause more

1    harm to his vision.  So they were kind of tense before this

2    operation and they went to this rabbi to get reassurance or a

3    blessing before the surgery.

4         What happened, this rabbi shouted at him that he was

5    hit in his eyes because he didn't keep his eyes clean enough

6    and he should repair his ways and keep his eyes clean.  So that

7    intensified everything around this issue.  So he felt guilty.

8    He felt that he is not successful enough in keeping his eyes

9    clean enough.  So it exacerbated his situation I think.

10   Q.  Do you believe that the conduct was related to Shaul's PTSD

11   or unrelated?

12   A.  That the conduct?

13   Q.  Yes.

14   A.  As I said, I think he believed that it's important not to

15   look at women.  It was important for him.  He was worried about

16   this issue.  For sure he experienced that if you do the right

17   thing, if you keep your eyes not watching women, then you are

18   more protected, you are less in danger and you are blessed.

19   Once you don't do that, then your life is in danger, your

20   vision is in danger.  It added on to this general anxious

21   situation as a PTSD patient.

22        So it was kind of a mix.  I don't believe you can

23   really separate it.

24   Q.  Do you think that Shaul's conduct of avoiding eye contact

25   with women was a symptom of an obsessive compulsive disorder?

F1T8SOK4                         Peri - direct

1    A.  I doubt it.  I doubt it very much.

2          PTSD and OCD symptoms actually have some similarity.

3    There is some similarity in the symptoms because both of them

4    are disorders of recurrent thoughts.  It's true for PTSD that

5    you recurrently think about your traumatic memory and for PTSD

6    thinking about what you are worried about.  And people say that

7    there may be an underlying mechanism, a biological mechanism

8    that is similar to these disorders.  So it's quite difficult to

9    tell whether it's a PTSD or whether it's an OCD.

10          Even if there is some level of OCD there, I am sure

11   that it was very much intensified and exacerbated after the

12   trauma because of his general anxiousness in his situation and

13   his worries, and now if he is not pure enough with his eyes,

14   then his life is in danger, his health is in danger, he is not

15   blessed anymore.  So it was kind of -- I doubt whether you can

16   separate it and say that he had OCD and not the PTSD or he had

17   two disorders.  If I had to diagnose it, I would put everything

18   under PTSD and question the OCD.

19   Q.  In treating Shaul, did you ever administer to him the MMPI

20   exam?

21   A.  No.  It's not a test that we use in Israel so much.  It's

22   not exactly the test for diagnosing PTSD.  This is not

23   something you do to diagnose PTSD.  There are other tools,

24   other reliable psychometric tools to diagnose PTSD.  You don't

25   use MMPI to diagnose PTSD.

F1T8SOK4                        Peri - direct

1          Recently there are some articles about maybe using

2    MMPI to identify people who are faking PTSD.  But as a

3    diagnostic tool it's not a very good tool.  Also there are some

4    scales that are developed during the years, special scales to

5    diagnose PTSD through the MMPI, but usually it only has some

6    statistical value.  The PTSD patient would be higher in certain

7    scale of the MMPI.  But it is not a tool to diagnose PTSD.  I

8    would never use it.  It is a personality questionnaire.  It's

9    not a questionnaire to diagnose PTSD.  You would use the

10   Mississippi scale.  There are a few very commonly used tools to

11   diagnose PTSD.  But it's not the MMPI for sure.

12   Q.  How did Shaul's PTSD affect his father Leonard?

13   A.  He was not my patient.  So I know it more from discussions

14   before treatment, during treatment, after treatment when we

15   met.  He was very much worried.  He was very much worried about

16   his son.  He was happy that he is alive because he was almost

17   dead in the event.  He was very happy that he was alive.  Later

18   on he was worried about his emotional and cognitive abilities

19   and his career.  So it was kind of an issue that he was very

20   much worried about and he was happy that I was helpful for him.

21          What I learned recently, that actually they now

22   realize that he is alive and more or less healthy, limited, but

23   he is not the person that they dreamt of.  He is not in the

24   career or the person that they had hoped for for his life.

25   Q.  Have you had an opportunity to review the reports of the

F1T8SOK4                    Peri - direct

1    defendants' mental health experts on the members of the

2    Mandelkorn family?

3    A.   I read it, yes.

4    Q.   What were your impressions of their interviews?

5    A.   They did a good job in terms of reporting in details, in a

6    very detailed manner, their interviews with Shaul, with his

7    father, with his mother.  So there is a lot of information in

8    their interview and they reported it very well.

9         It's somewhat odd or strange that they arranged the

10   information in a way dealing with just the OCD and ignoring

11   parts that are inside their report.  If you read the report,

12   you will find all the symptoms of PTSD.  Just in their

13   description of the report you will see that they report about

14   his sleeping problems, his fear of losing his soul when he

15   falls asleep, the same that he felt at the time of the

16   explosion.  They report avoiding places with many people.  They

17   report him suspecting every person that goes with a backpack or

18   something that maybe it's a suicide bomber.  They report that

19   he is telling about rage outburst on his children, which is a

20   very common symptom in PTSD patients.  They report his mother

21   praying about him not being a rabbi as she hoped for.

22        So everything is there, but in a way -- they put all

23   the information very clear, but they arranged it in such a way

24   dealing only with the OCD, not taking into account anything

25   contrary or the beliefs of his class.

F1T8SOK4                    Peri - direct

1           So their analysis is strange.  The report is quite

2    good and the information is there in a very detailed manner,

3    but their analysis, the way they interpreted the data seems to

4    be quite odd.

5    Q.  I want to now ask you just a few questions about another

6    individual relevant to this case.

7           Did you know an individual named Yechezkel or Scott

8    Goldberg?

9    A.  Yes.  That's a painful memory.  We shared actually an

10   office before his death.  We rented together an apartment in

11   Jerusalem where he worked in one room and I used the other

12   room.  So we shared our clinic for, I think, a year, a year and

13   a half, or maybe two years.  I don't remember exactly.  But for

14   a while we shared an office.

15   Q.  Is this a photograph of Scott Goldberg up on the screen?

16   A.  Yes.  I haven't seen this photo in four years.  Yes.

17           MR. MACHNES:  We have marked this Exhibit as 1246 and

18   we move its admission, your Honor.

19           MR. ROCHON:  No objection.

20           THE COURT:  It will be admitted in evidence.

21           (Plaintiffs' Exhibit 1246 received in evidence)

22   A.  I have to say it's quite moving to see this because I

23   haven't seen his picture for many years.

24   Q.  Can you just tell us how you first met Scott Goldberg.

25   A.  I actually dealt with this apartment because it was owned

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    by a friend of mine.  He was a psychiatrist that started

2    working at this apartment.  He actually grew up in this

3    apartment.  When he left Jerusalem, I was left with this

4    apartment to this day and I am dealing with renting it out.

5            So I published that there was a room for rent and

6    Yechezkel came.  He loved it very much.  It's kind of an old

7    stone house, Jerusalem stone house with the atmosphere.  I

8    remember the word that he used.  My clientele will love this

9    place.  That was his term.  So I just recalled it this morning.

10   I never heard this word clientele.  This is the first time I

11   heard this kind of word.  And he loved the place.  On the spot

12   he wanted it.  He didn't negotiate the price.  He just wanted

13   it very much.  And he actually did.  He furnished the room,

14   arranged it as he liked, and started working.

15   Q.  Who were his clientele?

16   A.  Mainly, as much as I could understand, he worked with

17   youth, with troubled youth, especially Haredi, ultra-Orthodox

18   group.  There were young people who couldn't find places in the

19   Yeshiva.  Some of them would go into drugs or other problems on

20   the streets of Jerusalem, and he was kind of special

21   personality.  He made this kind of connection to them.  He was

22   quite successful in that.  Not every professional knows how to

23   do that.  So he found this niche.  It seems that he was quite

24   successful and quite happy with that.

25   Q.  What was he like as a person?

F1T8SOK4                     Peri - direct

1   A.  He was quite warm, intelligent, friendly, very nice, very

2   nice looking, nice behaving.  He was a good partner.

3   Q.  How did you find out that he had been killed, I think it's

4   11 years ago today?

5   A.  It was a sad day because that was a Thursday and the

6   explosion took place about 8:30 or 9:00 in the morning.  This

7   was, as I said before, I worked in my private practice only one

8   day, one and a half days.  The rest of my time was in the

9   hospital.  So I used to be at the hospital at that time.  And

10  we heard there was an explosion and many people were dead.  Our

11  usual custom in those days was we didn't run straight to the

12  emergency room.  We waited for two or three hours until the

13  medical situation was stabilized and then we started dealing

14  with the mental problems.

15          After about 12:00, at noon, I got a phone call,

16  because I had another psychologist that used to use my room

17  during the days that I was not in the office.  So he called me

18  and said, look, I am worried about Yechezkel.  Patients are

19  knocking on the door, coming in, and he is not here.  He is not

20  answering the phone.  I don't know what is happening.  Should I

21  call his wife.  I said, We can't do that.  We can't call his

22  wife.

23          So we waited.  After a few hours he called me again,

24  look, patients are coming.  I think his wife called him or

25  something and he said he was on the bus.  He just talked to his

F1T8SOK4                    Peri - direct

1    wife minutes before the explosion.  In the evening his body was

2    identified that he was on this bus.  It was quite sad.

3    Q.  Did you observe the Goldberg family continuing to visit his

4    office after Scott had been killed?

5    A.  I heard about it.  I didn't know because with psychologists

6    you work inside your room.  You don't know exactly what is

7    happening.  You don't meet each other.  You arrange your

8    schedule in such a way that nobody will meet each other in the

9    corridor.

10         But they kept paying the rent for more than a year.

11   And many times we suggested maybe it's about time to give up

12   because it's quite a high rent.  It's in a good area of

13   Jerusalem.  It's quite a high rent.  But his wife said she

14   can't do that, and she continued to pay the rent for more than

15   a year.  She couldn't take out the furniture.  She couldn't

16   take out his stuff.  Everything was left as it was during his

17   last day.

18         The only thing I had to do was to break in the room

19   because he had a canary bird inside the room and it was locked

20   in the room.  So I had to invite somebody to break in to take

21   out this bird, to give her some water and bring the family his

22   bird.  But otherwise the room stayed the way it was the day he

23   left it.  It was quite a painful time.

24             MR. MACHNES:  No further questions on direct.

25             THE COURT:  Any cross-examination?

F1T8SOK4                    Peri - direct

1            MR. ROCHON:  No.  Thank you, sir.

2            THE COURT:  Thank you, sir.  You can step down.

3            (Witness excused)

4            THE COURT:  Would plaintiffs call their next witness.

5            MR. HORTON:  Plaintiffs call Dr. Alan Friedman.

6     ALAN FRIEDMAN,

7         called as a witness by the plaintiffs,

8         having affirmed to tell the truth, testified as follows:

9            THE COURT:  Could you state and spell your first and

10    last name for the court reporter.

11           THE WITNESS:  Alan Friedman.  A-L-A-N,

12    F-R-I-E-D-M-A-N.

13           MR. HORTON:  Bear with me for a moment.  We are doing

14    some notebook shuffling.

15           THE COURT:  Sure.

16           MR. HORTON:  If I may approach for a moment.  I just

17    wanted to give Dr. Friedman a copy of his expert reports.

18           THE COURT:  Yes.

19    DIRECT EXAMINATION

20    BY MR. HORTON:

21    Q.  Good afternoon, Doctor.  Would you please state your full

22    name.

23    A.  Alan Friedman.

24    Q.  What is your profession?

25    A.  I am a physician.

F1T8SOK4                          Friedman - direct

1  Q.  Do you specialize in any particular areas of medicine?

2  A.  Yes, I do.

3  Q.  Could you tell us what it is.

4  A.  Physical medicine and rehabilitation.

5  Q.  Could you describe to the jury what the field of physical

6  medicine and rehabilitation is all about?

7  A.  Sure.  Physical medicine and rehabilitation is a diverse

8  field, basically made up of what we call physical medicine and

9  a separate field that could be its own specialty called

10 rehabilitation.

11        Rehabilitation covers traumatic brain injury, spinal

12 cord injury, strokes, any debilitating injury that you would

13 just naturally think somebody would need rehabilitation from.

14 It also includes rehabilitation from surgery, from, for

15 example, knee replacements, hip replacements.

16        The physical medicine end of things tends to be more

17 what people think of as sports medicine -- neck pain, back

18 pain, people who might have a pinched nerve in their neck.

19 Carpal tunnel syndrome is something we deal with a lot,

20 tingling in the hands, numbness, those kinds of things.

21        The truth is these really are the two polar opposites

22 of the spectrum.  We have very debilitated patients in

23 rehabilitation and we have a very young population in sports

24 medicine and physical medicine, but the common denominator is

25 function.  The rehab doctor physiatrist, as the specialty is

F1T8SOK4                    Friedman - direct

1  known as, we are experts and we deal with the functions.  So

2  that's how these two fields are sort of combined into one.

3  Q.  As a doctor of physical medicine and rehabilitation, do you

4  have expertise in nerve injuries?

5  A.  Yes, I do.

6  Q.  Can you explain that?

7  A.  I touched upon one of them briefly.  Carpal tunnel syndrome

8  is a nerve injury wherein the median nerve is compressed at the

9  wrist.  People describe usually tingling in the thumb, index

10  and middle finger, but they could just as easily describe it as

11  pain.  A lot of time it presents with pain rather than tingling

12  that can also present with weakness.  Other nerve injuries, as

13  I mentioned, pinched nerves in the neck, in the back.  These

14  are more what we call peripheral nerve injuries.  Nerve

15  injuries in the shoulder.

16          Obviously somebody who has a stroke or spinal cord

17  injury or brain injury, those are also nerve injuries.  Those

18  are what we would call more as a central nerve injury.

19          The easy way to sort of think about the field is I

20  tell people we do everything that an orthopedist does other

21  than surgery and we do everything that a neurologist does other

22  than perhaps epilepsy.  That sort of encompasses the physical

23  medicine part of things.

24          Specifically, I do a lot of nerve testing.  It's

25  called an EMG test, electromyography, which encompasses really

F1T8SOK4                           Friedman – direct

1    two parts of the test, which is the electromyography wherein --

2    that's actually the second part of the test.  We take a needle

3    and insert it into different muscles to determine whether there

4    is nerve damage to those muscles, or perhaps there is a primary

5    muscle disease or injury.

6             The other half of the test, which is really performed

7    first, is with electrical shocks along the path of the nerve.

8    It's a nasty test.  Basically nerves work by electricity.  So

9    we redo that.  We do a shock to where the nerve should be and

10   measure it at the muscle that the nerve goes to and record

11   different responses from that.

12   Q.  Doctor, where are you licensed to practice medicine?

13   A.  I am licensed in Israel, I am licensed in New Jersey, New

14   York and Ohio.

15   Q.  Are you currently practicing in all four jurisdictions?

16   A.  No.  I do not practice in Ohio yet.

17   Q.  How about the other three?

18   A.  The other three, yes.

19   Q.  Let me ask you some questions about your education and

20   background.

21             Where did you go to college?

22   A.  I went to Yeshiva University here in Manhattan.

23   Q.  Where did you go to medical school?

24   A.  Across the river, and I went to Albert Einstein College of

25   Medicine in the Bronx.

F1T8SOK4                        Friedman - direct

1   Q.  When did you graduate from medical school?

2   A.  Ancient history.  1993.

3   Q.  Did you do a residency after you graduated from medical

4   school?

5   A.  I did two residencies after medical school.  The first one

6   was a three-year residency, complete residency in internal

7   medicine and the second residency, obviously, was in physical

8   medicine and rehabilitation.

9   Q.  Let me ask you about the first residency.

10         First of all, what is internal medicine?

11  A.  Internal medicine is what most people would think of as

12  their family doctor, their internist, their regular doctor.

13  This is the person you would go to who deals with high blood

14  pressure, diabetes, the full gamut of medical problems.

15  Q.  Which residency came first, internal medicine or physical

16  and rehabilitative medicine?

17  A.  Internal medicine came first.

18  Q.  Where was your internal medicine residency?

19  A.  I did that at North Shore University Hospital in Manhasset,

20  New York.

21  Q.  When was that?

22  A.  1993 to 1996.

23  Q.  Then your second residency, did that start up in 1996 when

24  the first one ended?

25  A.  Residencies always start July 1 and June 30.  So the one

F1T8SOK4                        Friedman - direct

1    ended on June 30, 1996 and the next one started on July 1,

2    1996.

3    Q.  Not much of a break.

4    A.  No.

5    Q.  Where was your residency for physical rehabilitative

6    medicine?

7    A.  That was officially at University of Medicine and Dentistry

8    in New Jersey, which is now called Rutgers, and that was the

9    official university program.  A bulk of that was performed at

10   the Kessler Institute for Rehabilitation in New Jersey, and

11   this is one of the top rehab residencies in the country.

12   Q.  Can you describe the sort of medical work you did during

13   your residency, the second residency, physical and

14   rehabilitative medicine?

15   A.  Every rehab resident has to rotate through various

16   departments for various periods of time and then there's

17   certain periods of elective time.  So we all do a rotation in

18   spinal cord injury and that may be acute and inpatient.

19         Acute, it's more of a consult service at University

20   Hospital in Newark and there you see a lot of people coming in

21   than the immediate spinal cord injury care.

22         At Kessler Institute, that would be a facility where

23   the patient, once stabilized, would be transferred there and

24   the rehab, or the beginning of the rehab process of spinal

25   injury patients.  We also rotate through traumatic brain injury

F1T8SOK4                          Friedman - direct

1    rotations and everybody has to know a good deal about what is

2    called TBI, or traumatic brain injury.  There is a stroke

3    rotation.  There is pediatric rehabilitation that we deal with.

4    Then the spattering of different outpatient rotations which

5    cover a lot of the physical medicine side of things and

6    orthopedic rehabilitation.

7              Interestingly, in Israel it's actually split between

8    neurologic and orthopedic rehabilitation.  There is sometimes

9    two separate departments that deal with those separately, but

10   in this country everybody does both in all of them.  And

11   obviously throughout the residency depends where one's interest

12   lies as to whether we would do more outpatient, more inpatient,

13   more spinal cord, just like any other residency.

14   Q.  How long did your residency in physical and rehabilitative

15   medicine last?

16   A.  Both my residencies were three years.

17   Q.  What did you do after the second residency concluded?

18   A.  I went to work.

19   Q.  Where?

20   A.  I worked in a private practice in Englewood, New Jersey.

21   Q.  How long were you there?

22   A.  I was there from July 1 until the next March.

23   Q.  What was the nature of your work there?

24   A.  That was an outpatient private practice.  A good portion of

25   what I did was working in nursing homes, doing nursing home

F1T8SOK4                          Friedman – direct

evaluations, which included many people postoperative, hip

replacements, knee replacements.  Not just that, if somebody

had a fracture and needed time before they can go home and

needed help rehabilitating, so we would see a lot of those.  A

lot of strokes.

        What I did not mention, I sort of glanced upon it, a

lot of times an elderly patient gets, let's say, atrial

fibrillation or pneumonia and they end up in the hospital for a

week and by that time they are unable to go home.  They are too

weak.  So they need a period of rehabilitation.  So that's a

lot of what we see in the nursing home, a subacute

rehabilitation populous.

        I also did outpatient evaluations, EMG testings, a

little bit of a lot of different things.

Q.  Was your practice at the center focused on physical and

rehabilitation medicine?

A.  Yes.

Q.  Was that the focus of this particular clinic overall?

A.  Yes.  It's a physiatry practice.

Q.  What did you do after you left this practice?

A.  I went into private practice on my own.

Q.  Can you describe that practice for us.

A.  So it's pretty much the same things.  Just now I had to

worry about a lot of other things that were not getting handed

to me, like where to work, where to go.  But I continued to

F1T8SOK4                          Friedman - direct

 1    work in the one hospital where I had been before and doing

 2    inpatient consults, outpatient consults, any injury testing,

 3    and I continued to work -- when I say nursing home, it's really

 4    subacute rehabilitation.  Let me just explain.

 5              I think you guys are going to learn a lot about

 6    medicine in the next couple of days.

 7              So acute rehabilitation is what we would refer to as

 8    something like Kessler Institute for Rehabilitation where the

 9    whole facility is geared towards rehabilitation.  Patients come

10    in in a much more sick status and acute injuries.  Subacute

11    rehabilitation is a lot of nursing homes will dedicate one of

12    their wings to their rehab population and whereas most of the

13    patients are clients in a nursing home on long-term care and

14    long-term visitors, subacute rehabilitation is typically

15    patients who would come in with the things that I described,

16    for like one to two weeks.

17              For example, somebody after a hip replacement might

18    need ten days of some rehabilitation.  They would go to

19    subacute more likely than acute care.

20    Q.  Did you start your private practice in the U.S. in the year

21    2000?

22    A.  No.  I began in 1999.

23    Q.  The private practice after you left Kessler.

24    A.  Yes.

25    Q.  Does that private practice continue today?

F1T8SOK4                          Friedman - direct

1   A.  Yes.

2   Q.  It has lasted for 15 years and counting?

3   A.  Yes.

4   Q.  Can you tell us geographically where your U.S.-based

5   practice is?

6   A.  It's very difficult.  I am sliced into many pieces.

7          I still work in Paterson, New Jersey.  That was where

8   I had actually initially started.  Even when I was with the

9   group with Englewood, I was spending time in Paterson and

10  continued there on my own.  I am there one or two days a month

11  in Paterson, New Jersey.  I have a small practice in Brooklyn,

12  completely outpatient practice.  Now I have covered Manhattan,

13  the Bronx, Brooklyn and Queens.  I haven't yet hit Staten

14  Island.

15         And a good portion of what I do is upstate New York.

16  So I do evaluations in Syracuse, Rochester and Buffalo, New

17  York.

18  Q.  Can you give us an idea on average about how many days a

19  month you are engaged in your U.S.-based practice?

20  A.  Approximately ten days a month.

21  Q.  Do you also practice physical and rehabilitative medicine

22  in Israel?

23  A.  Yes.

24  Q.  When and where did you first start practicing that?

25  A.  When I moved to Israel, which was in 2000, for the next

F1T8SOK4                         Friedman - direct

1    eight years I worked at Hadassah University Hospital.

2    Q.   What is Hadassah University Hospital?

3    A.   Hadassah Hospital is the largest hospital in Jerusalem.

4    It's split into two campuses -- the Ein Kerem campus and the

5    Mt. Scopus campus.  It's part of Hebrew University and which

6    gives it its university status.  Obviously it's a free-function

7    hospital.  The rehabilitation department is based in the Mt.

8    Scopus campus.

9    Q.   Can you describe the nature of the work you did during your

10   years at the Hadassah University Hospital?

11   A.   So the bulk of what I did in Hadassah was EMG testing.

12   Q.   Again, that's a sort of nerve testing?

13   A.   Electrical nerve test that I described.  That's the bulk of

14   what I did there.

15            Initially I had to do a period of retraining when I

16   moved there to ensure that I was up to the Israeli standards.

17   So while doing the retraining time, I was working on the wards

18   on inpatient rehabilitation as opposed to my training here

19   where there was a separate spinal cord injury, separate brain

20   injury unit, separate stroke unit.  In Hadassah, all traumas

21   were in the same unit.  So we saw a lot of different things.

22   We saw trauma, we saw brain injury.  We saw some spinal cord

23   injury and a lot of general rehabilitation.

24   Q.   Did you eventually move on from Hadassah to another

25   position in Israel?

F1T8SOK4                    Friedman - direct

1   A.  Yes.

2   Q.  Can you tell us about that?

3   A.  I am currently the head of rehabilitation medicine at

4   Laniado Hospital in Netanya, Israel.

5   Q.  Can you tell us briefly what sort of facility that is?

6   A.  That best could be described in U.S. terms as a community

7   hospital.  In America, at least once upon a time, there was

8   basically a hospital in every town or a little cluster of towns

9   and villages.  Due to the financial changes in medicine, it's

10  less so but still very common.

11          In Israel, there are almost no community hospitals.

12  All the hospitals tend to be large what we call tertiary care

13  centers.  So it's funny because New Yorkers really only get

14  exposure mostly to the tertiary care centers.  We have Mt.

15  Sinai, we have Cornell, NYU, Bellevue.  These are all large

16  hospitals affiliated with university programs and when there

17  are cases that are less clear in the periphery hospitals, they

18  would be referred here.

19          In Israel they tend to be mostly, if only, tertiary

20  care hospitals.  Laniado Hospital is a smaller, what I would

21  refer to as a community-type hospital in Netanya, but it is the

22  only hospital there.

23  Q.  What kind of work do you do at Laniado Hospital?

24  A.  General rehabilitation.  I do inpatient consults.  I do

25  outpatient consults in my clinic.  And I do a lot of EMG

F1T8SOK4                        Friedman - direct

1    testing.

2    Q.  Do you evaluate individual patients?

3    A.  Yes.

4    Q.  How does that work compare to the sort of work you did in

5    this case, the evaluation work?

6    A.  It's exactly the same kind of populous of the patients that

7    I examined in this case.

8    Q.  In Israel are you involved in training medical students?

9    A.  Yes, I am.

10   Q.  Can you briefly tell us what you do in that area.

11   A.  Sure.  I train students from the Technion University, which

12   is based in Haifa, and I train both the internal medicine

13   students and the geriatric students.  The geriatric students

14   because there's a lot of overlap between geriatrics and

15   rehabilitation, as one might realize.  So when the head of

16   geriatrics asks me to spend time with the students, talk to

17   them about the interface and teach them more about the

18   rehabilitation side of what they would see with geriatric

19   patients as opposed to the medicine side, what drugs to give

20   them, what kind of ailments ail all the patients.  But the bulk

21   of my time with medical students was with the internal medicine

22   students, and with them my role is basically to teach them how

23   to do a good solid physical examination.

24   Q.  Are you board certified in the United States?

25   A.  Yes, I am.

F1T8SOK4                    Friedman - direct

1   Q.  In what area?

2   A.  In physical medicine and rehabilitation.

3   Q.  Is there some sort of equivalent, either board

4   certifications or licensures in Israel?

5   A.  Yes, there is.  They don't have board certification, but

6   they have what is called in the English translation would be an

7   expert license.

8   Q.  Do you hold such a license in Israel?

9   A.  Yes.

10  Q.  In what area?

11  A.  In physical medicine and rehabilitation.

12          Allow me to -- it's a big mouthful.  Physical medicine

13  and rehabilitation, it's usually either abbreviated PM&R or I

14  usually just refer to myself as a rehab doctor.  So from here

15  on in if I say rehab doctor or physiatrist, those are the same

16  terms.

17          (Continued on next page)

18

19

20

21

22

23

24

25

F1tQsok5                          Friedman - Direct

1  Q.  Doctor, have you ever evaluated and treated victims of

2  terrorism?

3  A.  Yes, I have.

4  Q.  Can you give us some idea of your level of experience in

5  that area?

6  A.  So when I was at Hadassah, it was the height of the second

7  Intifada it was about 2001, 2002, 2003, so when I was there, we

8  were seeing a lot of trauma victims, both patients who had been

9  in terrorist attacks and also personnel who had boarded those

10 or, you know, been involved in, you know, soldiers or policemen

11 who had also been involved in those attacks.

12       It was interesting because, unfortunately in Israel,

13 everybody is used to lots of terror attacks.  You never get

14 used to it, but it's listed on the radio after such an attack

15 that there were X amount of people who were killed; there are X

16 amount of severely injured patients; there are X amount of

17 moderately injured patients and some amount of lightly injured

18 patients.

19       Obviously, we prefer the lightly to be the higher

20 tally, but as a rehab doctor, I know that the ones who are

21 listed as moderate are the ones that I am going to end up

22 seeing.  The severely injured patients are the ones who end up

23 receiving a lot of detailed surgery, ICU care, and those are

24 the ones that hopefully they survive, you know, that they're

25 going to get the care.

1              The people who are lightly injured, a lot of times, it

2      may be a fracture or something that is even treated and

3      released.

4              But the moderate category is the one I always feel bad

5      for because these are the people who have severe injuries, but

6      they don't quite make it to critical, thank God, and but they

7      end up with a lot of surgeries and a lot of problems and a lot

8      of nerve injuries.  They often have the longest and most

9      prolonged rehab course

10     Q.  Can you give us some idea how many terror or trauma victims

11     you've treated during the period of the Intifada?

12     A.  So at least a hundred.  I don't -- in and out of Hadassah

13     and clinic, I don't have an exact amount.

14     Q.  Have you ever been retained as an expert witness to use

15     your shorthand phrase, as a rehab doctor for litigation in the

16     United States?

17     A.  Yes, I have.

18     Q.  Have you been retained in such a facet in terrorism cases?

19     A.  Yes, I have.

20     Q.  How many?

21     A.  I had testified in three or four, and I've given expert

22     opinions via affidavit in another four, I believe.

23              MR. HORTON:  Your Honor, I would tender the witness as

24     an expert in physical and rehabilitative medicine and internal

25     medicine.

F1tQsok5                        Friedman - Direct

1                    MR. ROCHON:  No objection, your Honor.

2                    THE COURT:  You can inquire on that basis, Mr. Horton.

3                    MR. HORTON:  Thank you.

4     Q.  Dr. Friedman, what were you asked to do in this case?

5     A.  I was asked to examine claimants and render a report and an

6     opinion as to their injuries.

7     Q.  What did you do in order to evaluate these claimants and to

8     render your reports?

9     A.  I examined them -- first, I took their history.  I examined

10    them and reviewed the medical records.

11    Q.  What kind of examination did you perform?

12    A.  The same examination that I do with pretty much every

13    patient that comes through my clinic.  I refer to it as a full

14    neuromuscular examination which entails head to toe, checking

15    the nerves, checking the reflexes, sensation, strength of all

16    the muscle groups, how they work, the reflexes, how they look,

17    how they function, coordination, and neurology exam.

18    Q.  You mentioned review of medical records.  Did you review

19    medical records of the plaintiffs as well?

20    A.  I did.

21    Q.  Were they mostly in English or in Hebrew?

22    A.  Mixed.  Depends on the claimants.  Some of them were in

23    English.  Some of them were in Hebrew.

24    Q.  What's your capacity to read Hebrew?

25    A.  I'm fluent in Hebrew.

F1tQsok5                          Friedman - Direct

1    Q.   Thank you.  During what period of time did you perform

2    these evaluations?

3    A.   Pardon me?

4    Q.   When did you perform these evaluations?

5    A.   I examined these people in February 2013.

6    Q.   So this was a number of years after the attacks?

7    A.   That was a number of years, at least nine to ten.

8    Q.   Did you review the plaintiffs' medical records before or

9    after you examined them physically?

10   A.   Most of them I reviewed after I examined them.  I think

11   there were one or two people that I reviewed at least to get a

12   feel for what had happened to them before I examined them.

13   Q.   Is there a reason why you generally reviewed the medical

14   records after the examination?

15   A.   I'm somewhat old school.  I don't like being biased by the

16   medical records before I see a patient, so I take the history

17   and give an examination, and then I know that my examination is

18   based on what they told me and complained about rather than

19   what I am zeroing in on based on the medical records.

20           It's funny because people actually complain to me

21   about that when they see me in the office.  "Doc, don't you

22   want to see the x-ray or the MRI report?"  And I say, "Yeah,

23   yeah, at the end."

24   Q.   Did you actually prepare written evaluations of the people

25   you evaluated?

1    A.  I did.

2    Q.  I've placed a copy of your evaluations in front of you in

3    case you need to refer to it.

4    A.  Thank you.

5    Q.  Let's start to talk about some of the individuals.  I would

6    like to start with a young man named Yehonathon Bauer.  He

7    generally goes by the name Yoni.  Do you remember Yoni's

8    picture as a person you evaluated?

9    A.  Yes.

10   Q.  Tell us what you understand about who Yoni is and what

11   happened to him.

12   A.  So I may flip back and forth between Yehonathon and Yoni.

13   I wrote it as Yehonathon, which is in Hebrew for Jonathan.

14           I saw him in February, 2013 when he was 17.  But on

15   March 22, 2002, when he was injured, he was seven-years-old.

16   He was walking down the street with his father.  I believe

17   actually he was going to work with his father, and behind them

18   there was an explosion.  He doesn't remember it.  So the

19   details of exactly what happened initially I obtained from his

20   father.

21           He was lying facedown on the sidewalk, and his father

22   said that he dragged him away from the scene, the immediate

23   scene of where he was injured and got him to an ambulance.  He

24   was taken by ambulance to Hadassah Hospital, and in the

25   ambulance he would sort of fluctuate between flailing and

F1tQsok5                          Friedman - Direct

1    yelling out and being relatively unresponsive, but he was

2    moving all four limbs which was important, as later he wasn't

3    able to.

4             He was taken to Hadassah Hospital.  He was taken to

5    the ICU where his intracerebral pressure was monitored.  They

6    realized he had a brain injury, and they placed a drain in the

7    head to be able to monitor for brain swelling.  Now, he had had

8    a screw, a Phillips screw had gone through the back of his head

9    and fractured both occipital bones, which is the bone on the

10   back lower part of one's skull, and the one screw had gone all

11   the way through and lodged in the frontal cranium.

12            So he was taken to the ICU and put into an induced

13   coma for three days.  They woke him up on -- but then he

14   apparently tried to pull out either the respirator that he was

15   on or some other tubes, and they put him back into the induced

16   coma for another day.

17   Q.  What is the purpose of an induced coma under these

18   circumstances, Doctor?

19   A.  So the concern is that the brain is going to swell and

20   cause permanent brain damage.  Also, what we see a lot of times

21   with traumatic brain injury patients is tremendous agitation

22   and moving around, and that can cause more damage.  So they

23   place patients in an induced coma for a number of reasons.  One

24   is just to calm them down.  By calming them down, it controls

25   the blood pressure.  By controlling blood pressure, it doesn't

F1tQsok5                        Friedman - Direct

1    necessarily exacerbate it, but they're able to control the
2    intracranial pressure a little better.
3            Also, and I don't know if this was the treatment
4    regimen at the time in 2002, but now cooling patients,
5    basically lowering their body temperature is standard procedure
6    for head injuries.  They found that that leads to a much better
7    outcome down the road.  So you can imagine that if somebody
8    wanted to cool your temperature down a number of degrees, it
9    would not be comfortable.  So for all the other reasons, that
10   is another reason why you would put somebody in an induced coma
11   so that you can cool the whole body.  But basically it's to
12   lower the risk of worse damage and also so that you can observe
13   and control the medical situation going on.
14   Q.  What was Yoni's condition when they eventually brought him
15   out of the medically induced coma?
16   A.  On the fourth day, they woke him up, and a number of things
17   were noted.  Specifically, he was noted to be blind.  He
18   couldn't see with either eye, and he was also paralyzed on the
19   left side of his body.
20   Q.  What eventually happened to his eyesight?
21   A.  So that did come back.  Approximately one month later his
22   eyesight returned spontaneously without any specific
23   intervention being required.
24   Q.  How about the paralysis?
25   A.  So the paralysis to some extent still exists.

F1tQsok5                         Friedman - Direct

1  Q.  We'll talk about that in detail, but he's not completely
2  paralyzed, I gather?
3  A.  No, not at all.  But it -- much slower recovery of the
4  paralysis.  He was in the ICU for three and a half weeks
5  initially, and then he was transferred to a pediatric
6  rehabilitation hospital which would be along the lines of what
7  I described as an acute care hospital earlier, but focusing on
8  pediatric cases and children.
9  Q.  What was his treatment at the rehab facility?
10  A.  So, he was there for three months as an inpatient and then
11  an additional three months daily as an outpatient.  There he
12  received physical therapy, which I may refer to as PT down the
13  line, occupational therapy and hydrotherapy.  Hydrotherapy is
14  very much part of what you might receive in physical therapy
15  but it's done in a pool.
16  Q.  I think you told us earlier that the screw had entered the
17  back of his head and gone most of the way through his brain to
18  the front?
19  A.  Correct.
20  Q.  Is it still there?
21  A.  No, it was removed a few months later by a Dr. Constantini
22  in April in Ichilov Hospital in Tel Aviv.
23  Q.  Earlier when I was asking you about the sorts of things
24  that a rehab doctor does, as you mentioned your training in
25  traumatic brain injuries, I think it's probably obvious but was

F1tQsok5                         Friedman - Direct

1    Yoni's injury a traumatic brain injury of the type discussed

2    earlier?

3    A.  Yes.

4    Q.  I now want to ask you about your physical examination of

5    Yehonathon.  Can you tell us what you found with him starting

6    with the condition of his left arm.

7    A.  The most striking part of his right -- of his right arm.

8    Q.  I believe it's the left, but I'll be governed by you.

9    A.  I don't remember what your question was.  Can you repeat

10   the question?  I thought you said right arm.

11   Q.  Does he have a problem with one of his arms, Doctor?

12   A.  Yes, he does.

13   Q.  Do you recall which arm?

14   A.  The left arm.

15   Q.  Can you explain?

16   A.  I thought you said right arm, I apologize.

17        The left arm is spastic.  Spasticity is formally

18   described as a velocity dependent tightness, for lack of a

19   better term, which means that the faster you move it, the worst

20   it is in general.  Most people in the general populous would be

21   familiar with spasticity, for example, in a child who has

22   cerebral palsy or somebody after they have a stroke.  It makes

23   it very difficult to move the limb.  Sometimes it's due to

24   weakness and sometimes it's just due to spasticity, too much

25   flow from the brain.  His left arm specifically at the shoulder

F1tQsok5                          Friedman - Direct

1   the wrist and the hand are spastic.

2   Q.  Is this something that a non-doctor can see and can tell

3   when something's different with Yoni?

4   A.  This is clearly apparent to everybody.

5   Q.  Can you just describe to the jury what his left arm looks

6   like.

7   A.  His left arm is pulled in tight to the body, and his wrist

8   is sort of flexed or bent and his fingers are bent.  So the

9   picture essentially looks something like that but tight.  It

10  looks like he is making that muscle as opposed to it just being

11  that way because the muscles that oppose it are weak.

12  Q.  Does he have any problems with flexing his shoulder on that

13  side?

14  A.  Yes, he does.

15  Q.  Can you explain that?

16  A.  Shoulder flexion is the motion of moving the arm straight

17  up in space.  So the arm is tight against him and he can't

18  himself raise the arm up.

19  Q.  How about his left wrist, does he have any issues with his

20  left wrist?

21  A.  So I did mention he is spastic wrist flexion, which means

22  the wrist is bent.

23  Q.  Does he have difficulty extending his wrist?

24  A.  Because of that he cannot on his own extend the wrist.

25  Q.  What about the condition of his left hand, how would you

F1tQsok5                          Friedman - Direct

1   describe the condition of that hand?

2   A.  So, his fingers also are tight.  They're flexed, and he is

3   unable to oppose the thumb to all of the fingers.  He has

4   decreased fine motor manipulation with that hand.

5   Q.  Does he have any issues with the muscles in his hand?

6   A.  Yes.  There's atrophy of muscles in his hand.

7   Q.  Do his issues with his hand affect his ability to use the

8   hand?

9   A.  Yes, it does.

10  Q.  Did you test that?

11  A.  I did.

12  Q.  How did you test it?

13  A.  What I typically do -- and, again, patients think I'm weird

14  for doing it -- I have everybody pick up a pin from the table I

15  actually use a paper clip so they don't prick themselves, but

16  it's the same small consistency and people need a fair amount

17  of fine motor coordination to be able to not only do this but

18  to pick it up.

19          It's much easier -- you see a lot of patients try to

20  slide it off the table and then grab it or push down on the

21  soft part of an exam bed and pick it up.  But to actually pick

22  it up off the surface, it requires a lot of dexterity, and he

23  was unable to do so with the left hand.  He was able to do so

24  with the right hand.

25  Q.  Do you have any views as to what the condition or how the

F1tQsok5                          Friedman - Direct

1   condition of his left arm and hand might limit his ability to

2   function in the world?

3   A.  So, initially he was unable to even close buttons with the

4   left hand because it's weak.  There is weakness in that arm and

5   it would make it difficult for him -- it's tight.  Let me

6   describe a little bit further about the spasticity because this

7   is something that is an important differentiation between

8   spasticity and what might be a contracture when somebody has

9   complete weakness and the wrist or the joint gets stuck.

10       Almost by definition, spasticity you are able to

11  break -- the examiner can, but the patient can't.  So what's

12  caused this -- it's termed a slow, sustained stretch and by, as

13  I mentioned it's velocity dependent, so when you put a slow

14  pressure against that spasticity, so I was able to fully extend

15  his wrist by performing a slow sustained stretch.  I was able

16  to unflex and uncurl his fingers by doing that, and I was

17  actually able to raise his arm up, again, using a slow

18  sustained stretch, although that is somewhat painful.  But he

19  is unable to do so.  So he can't use his left arm to help him

20  hold or carry objects or to pick up any objects.  Functionally

21  he has very little use of that arm and hand.

22  Q.  I now want to ask you about whether Yoni has had any impact

23  with respect to sensation or numbness, I'll say.  Is that

24  something that you tested for?

25  A.  Yes.

F1tQsok5                           Friedman - Direct

1   Q.  First, could you tell us, do you test for decreased

2   sensation or absence of sensation?  What do you test for?

3   A.  So I do a very detailed test.  There is a difference,

4   there's two kinds basically.  It gets a little will more

5   complicated, but basically there's two types of sensation:

6   Light touch where the examiner will say do you feel this and

7   pin prick sensation where again I use a paper clip and I poke

8   and ask them if they feel that.

9           Now pin prick examination is a little more exact than

10  light touch sensation, as you might expect and we grade it as

11  follows.  It's graded on a scale of two, but that's more for

12  spinal cord injury gradings.  Basically, what we do is if you

13  feel it is sharp and usually I compare -- if there is a

14  question, I compare it to another area that's unaffected,

15  usually the face unless it's a stroke patient, but you might

16  use the unaffected side but you use a control and you say:  "Is

17  this as sharp as that?"  If they say yes, then that's intact.

18  Now, if they feel it's sharp but just not as sharp as the other

19  place, then it's decreased.  If they say, "I only feel

20  pressure, I feel it but it's not sharp at all," so even if they

21  feel it, that's absent pinprick sensation.  With light touch,

22  it's yes or no.  Either they feel it or they don't feel it.  If

23  they don't feel it, it's absent.  If they do feel it, it's

24  there.

25  Q.  What did you find in terms of either absent sensation or

1   decreased sensation in Yoni's left arm, hand, and wrist?

2   A.  So his whole left upper arm, which anatomically we refer to

3   the shoulders to the elbows as the arm, from the elbow to the

4   wrist as the forearm, and the wrist is the hand.  So his hand

5   forearm and arm are decreased compared to the right upper limb.

6           Within the left hand itself, the first digit and up to

7   the inside part, so these two fingers, the thumb and the index

8   finger, were decreased.  And he has the least sensation is on

9   the inside part of his left elbow.

10  Q.  Let me ask you now about Yoni's legs and feet.

11          THE COURT:  Can we take a break, Mr. Horton?

12          MR. HORTON:  That's fine, your Honor.  I have about a

13  page and half to go on this patient.

14          THE COURT:  How long do you think it will take?

15          MR. HORTON:  Probably another ten 15 minutes.

16          THE COURT:  Let's take a break now don't discuss the

17  case.  Keep an open mind.  Be back in ten minutes.

18          (Recess)

19          (Continued on next page)

20

21

22

23

24

25

F1tQsok5                        Friedman - Direct

1            (Jury not present)

2            MR. YALOWITZ:  Before you get the jury, your Honor, I

3   just want to talk about scheduling for one moment.

4            THE COURT:  Yes, sir.

5            MR. YALOWITZ:  So it is possible that tomorrow

6   afternoon we will be without a witness.

7            THE COURT:  OK.

8            MR. YALOWITZ:  We have several witnesses ready to go.

9   I think they will take us through early afternoon.  Then we are

10  going to be done with our expert case and we have clients.

11  Some of the plaintiffs are traveling from out of town; they

12  will be here next week.  We have some local families, but the

13  local families are all Shabbat observers, and we won't be able

14  to get everybody done by -- we would have to stop them by

15  2:00 p.m. tomorrow.

16           THE COURT:  Did your Washington friends put you up to

17  this?

18           MR. ROCHON:  They do my bidding, your Honor.

19           MR. YALOWITZ:  Just because they want to leave, I'm

20  trying really hard to get somebody here.  So it's possible that

21  we are going to have to conclude.  Then I think we are going to

22  be -- if we are able to proceed efficiently with our witnesses,

23  I think we will be able to complete our case, if not Friday,

24  the 6th, then Monday, the 9th.  So we are going to start

25  needing to hear from the defendants about those depositions

F1tQsok5                        Friedman - Direct

 1    that were ordered as well as their order of witnesses their

 2    exhibits.

 3            THE COURT:  I'm sure the jury will be happy to hear

 4    it.

 5            MR. YALOWITZ:  If we succeed on that, we are likely to

 6    be ahead of where I thought we would be by a few days even

 7    notwithstanding the snowstorm.

 8            THE COURT:  Why don't we do this then:  If we can do

 9    all of your witnesses that you think would take half a day or

10    into the afternoon tomorrow, whenever we finish that, we'll

11    adjourn.  And then you don't have to bring any victims in till

12    starting Monday and see if you can do them next week.

13            So I would anticipate that either we will adjourn for

14    day at lunchtime or well have a little shorter lunch and then

15    we will finish up and adjourn by 3:00 or so bought one thing I

16    don't want to do is have witnesses here tomorrow who don't get

17    to get on the stand.

18            MR. YALOWITZ:  Right.  We have Dr. Friedman and we

19    have the two economists, or the economists and -- I really do

20    think that will take us through, if not lunch, a little after

21    lunch.

22            THE COURT:  Approximately how many witnesses do you

23    think you will call after tomorrow?

24            MR. YALOWITZ:  Lost track.  It's a lot.

25            THE COURT:  Like 20, 30?

F1tQsok5                          Friedman - Direct

1              MR. YALOWITZ:  Yes.

2              THE COURT:  Most of them you think you could get in in

3       a week?

4              MR. YALOWITZ:  Yes.  I don't want people on the stand

5       telling about Aunt Minnie from Sioux City.  I want them to get

6       in, tell who they are, talk about their, you know, and get out.

7              THE COURT:  OK.

8              MR. YALOWITZ:  And based on the representation from

9       defendants, I don't think they're going to have cross of these

10      people.  They might have some.  I'm not saying they promised

11      me.  And even if they did, I wouldn't hold them to it.

12             THE COURT:  The schedule might be this:  That you

13      might finish by Friday or early the next week we are still

14      planning to take off Thursday, Friday and Monday then, right?

15      Because the Court is closed on Thursday and Monday.  So that

16      means we would pick up and finish up whatever defense case

17      might be at the 17th, the week of the 17th, or if it's more

18      than a week, we will spill into the week after that.  There is

19      a good possibility that we could be talking about summations,

20      the third week after President's Day or the last week of

21      February.

22             MR. YALOWITZ:  Right.  Even if I have a rebuttal case,

23      based on some of the questions, I might have a rebuttal case.

24      I haven't reached a conclusion on that.  Obviously we have the

25      issue of Marcus and there was some questions that led me to

F1tQsok5                          Friedman - Direct

1    think there might be a rebuttal case, but I have to see what

2    they will do.

3            One thing I think would be very, very useful for you

4    and for me is to hear from the defendants actually who they now

5    plan to call, so I think maybe Tuesday we ought to get a call

6    list from them.

7            THE COURT:  I will need some guidance tomorrow, as a

8    matter of fact.

9            MR. YALOWITZ:  I'm sorry?

10           THE COURT:  I would like some guidance from them

11   tomorrow what you've indicated and what they anticipated how

12   many number of witnesses.  I am not personally interested in

13   the details of who is coming, but I bet you are interested in

14   that.

15           MR. YALOWITZ:  You bet I am.

16           THE COURT:  So if they could give us as much

17   information as possible so we could move forward in a efficient

18   matter.

19           MR. HORTON:  One other matter, Dr. Friedman identified

20   the picture of Yehonathon Bauer.  We'd like to move it into

21   evidence.

22           MR. ROCHON:  Without objection.

23           THE COURT:  It will be admitted into evidence without

24   objection.

25           MR. ROCHON:  At one point you said there might come a

F1tQsok5                        Friedman - Direct

1    day we might not sit on a Friday.  Tomorrow is not that day, I

2    recognize.  I'm wondering about the 6th if we're ahead of

3    schedule or something and maybe that doesn't work because of

4    the plaintiffs.

5           MR. YALOWITZ:  It would be serious problems for

6    reasons I am not privy to explain.

7           THE COURT:  Let's hope we can adjourn early on the 6th

8    also.  But, like I said, I can commit at this point -- I

9    committed to the jury that we won't sit the next Thursday

10   Friday or Monday.  So I don't want too much of the gap since we

11   had a weather gap and the holiday gap coming.

12          MR. YALOWITZ:  I understand completely.

13          THE COURT:  Let's get the jury and move forward.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F1tQsok5                          Friedman - Direct

 1              (Jury present)

 2              THE COURT:  You can continue, Mr. Horton.

 3              MR. HORTON:  Thank you, your Honor.

 4    BY MR. HORTON:

 5    Q.  Dr. Friedman, could you now tell us about your examination

 6    of Yehonathon and what did you find?

 7    A.  He has muscle atrophy in the feet, both feet and

 8    circulation where the muscles are tight and shaking to some

 9    extent.  Checking on the reflexes, there is clonus, which means

10    that his reflexes were what we call brisk, indicating a

11    neurologic injury and the ankle tends to flap and continue that

12    way when you tap with the reflex hammer.  There is also some

13    decreased sensation in the left thigh.

14    Q.  Are there any issues with the way he walks?

15    A.  Yes.

16    Q.  Could you describe that, please.

17    A.  He walks -- again, he's injured mostly on the paralyzed

18    side which is the left side.  The right foot, however, is

19    turned outwards.  So he tends to walk on the side of the right

20    foot.  And on the left foot he has what we call a hip hike,

21    which basically every three or four steps he tends to bend over

22    basically to the right side to raise the left hip upwards.

23    Usually what that signifies is weakness in the ankle, and

24    patients are doing that so they don't trip or fall.  So his

25    gait is striking.  The foot is twisted on the right foot and

F1tQsok5                           Friedman – Direct

1    the left foot every once in awhile he raises up the hip, and he

2    doesn't really move the ankle at all on the left side.  So it's

3    minimal.  The ankle doesn't come up or down, which is why he

4    needs to sort of raise up the whole leg to be able to clear.

5    Q.  Would it be accurate to say he limps in lay terms?

6    A.  It's an impressive limp, yes.

7    Q.  Obvious to anyone who sees it?

8    A.  Obvious to anybody who sees it.

9    Q.  Did you measure the length of his legs?

10   A.  I did.

11   Q.  Is there a difference?

12   A.  There is a difference, a two centimeter difference, almost

13   an inch with the left leg being shorter.

14   Q.  Do you believe that's accounted for by his brain injuries?

15   A.  I do.

16   Q.  Why?

17   A.  Because that was the side that was paralyzed when he was a

18   young boy, and it most likely didn't develop normally.  He

19   wasn't using it normally.  The leg, the bones weren't taking

20   impact and being stimulated to grow properly.

21   Q.  All the conditions you described for Yehonathon so far you

22   believe are caused by the injury to his brain?

23   A.  Yes.

24   Q.  Do you hold that opinion a reasonable degree of medical

25   certainty?

F1tQsok5                          Friedman - Direct

1    A.  Yes, I do.

2    Q.  Based on your examination of Yoni, are there any other

3    functional limitations that you would think he is going to be

4    suffering from?

5    A.  Well, I mentioned the issue of not being able to use the

6    left arm functionally.  He obviously has the walking issue.  So

7    put together not being able to use the left leg and not being

8    able to use the left arm pretty much at all, so he is not going

9    to be able to find a job where he needs to stand or walk a lot

10   or any heavy lifting or fine motor coordination with two hands.

11   Q.  Are his injuries going to limit his ability to engage in

12   sports or recreation?

13   A.  Yes.

14   Q.  Can you give us some idea of the extent of that.

15   A.  Again, he can't run.  He can barely walk.  He can't use the

16   left arm.  Basketball is out.  Baseball is out.  Pretty much

17   any sport I can think of except for maybe racquetball is out.

18   Recreation, he doesn't walk or run very well at all.  So that

19   limits pretty much all recreation as far as I can even right

20   off the bat think of it.

21   Q.  Do Yoni's injuries predispose him to any other injuries in

22   the future or medical problems, I should say?

23   A.  Yes.

24   Q.  Could you explain it?

25   A.  So the walking problems not only in and of themselves

F1tQsok5                         Friedman - Direct

1    affect his walking, but when people walk abnormally, they

2    develop what we call biomechanical changes.  If your foot is

3    not landing properly, it changes the angle at the knee.  There

4    are numerous articles to support this.  We know that people

5    with osteoarthritis of the knee, run-of-the-mill arthritis that

6    people get.  So the vector and the physics of how the angles

7    change on the knee joint is extremely well documented in

8    numerous studies.  It changes.  That puts different forces on

9    the joints.  And the hip joint is connected to the knee joint

10   connected to the ankle joint and all of these things go into

11   place.  So people who don't walk normally or have leg length

12   differences, so that over time causes pain or arthritis, and

13   that can lead over to back pain and changes in the other leg.

14           Especially now, he's putting more weight and emphasis

15   on his right leg.  So it's great he's 17, but when he's 37,

16   what's going to be with his back and his other leg?  So that

17   definitely plays into -- is a problem down the road.

18   Q.  You talked earlier about some of his loss or decrease in

19   sensation.  Does that predispose him to any potential medical

20   problems?

21   A.  So the loss of sensation doesn't necessarily predispose him

22   to medical problems.  However, if he develops a medical problem

23   that affects his sensation -- the most common in today's

24   society would be diabetes, so if he were to develop diabetes,

25   like probably ten percent of the population will develop, so

1    he's already starting with half a deck.  So if he were to

2    develop something that would cause him to lose sensation down

3    the road, he is much more at risk than somebody starting with

4    normal sensation developing that.

5    Q.   What can be the consequences of this sort of loss of

6    sensation?

7    A.   Well, diabetics who we all hear stories, and obviously as a

8    doctor I see it, you know, patients who had diabetes who

9    develop ulcers, they're at risk for amputations, for the

10   chronic vascular problems that go along with that, the medical

11   problems that develop, you know, infection.  So he is not at

12   risk -- what he has now is not going to cause that, but should

13   something come along that causes him to have that risk or would

14   cause those problems, then he is much more at risk for the

15   worst and most severe complications that we fear.

16          The first question I hear when somebody says diabetes

17   or you have a neuropathy which is a nerve problem that

18   develops, that's the first question I hear from people:  Am I

19   going to have to have an amputation?  How bad is that?  So this

20   will not cause it, but if there is something that will cause

21   it, he is at risk.

22   Q.   Let's move to another plaintiff Shmuel Waldman.  Can you

23   tell us who Mr. Waldman is and what you understand what

24   happened to him?

25   A.   Mr. Shmuel Waldman was 22-years-old at the time of his

F1tQsok5                          Friedman - Direct

 1   injury in 2002.  January 22, 2002 he was waiting to board a

 2   bus.  A terrorist shot him twice in the back of the right leg.

 3   Both bullets exited from the front of the leg.  He was able to

 4   get on to the bus and fell down in the bus.  The bus driver

 5   drove him very quickly to a hospital that is within a couple

 6   blocks and from there that's Bikur Holim Hospital, and from

 7   there he was transferred to Shaare Zedek hospital.

 8   Q.  Can you describe for us the nature of the injuries and the

 9   details that he suffered and what the doctors did about it him?

10   A.  He was diagnosed when he got to Shaare Zedek Hospital,

11   perhaps even at Bikur Holim, with a comminuted right tibial

12   fracture.  Tibia is the long bone that connects the knee to the

13   ankle, and a comminuted fracture is a fracture that is -- it's

14   not a clean fracture.  Usually it's in a couple of, places

15   maybe a little piece chipped off of the bone.  It's a more

16   serious fracture.  The same day he was taken to the operating

17   room and they did surgery what's called open reduction internal

18   fixation.  They put a plate with screws to fix the fracture.

19   Q.  Were there any other procedures that they performed on him?

20   A.  Yes.  He had a fasciotomy which is the swelling in the leg

21   puts it at risk to different compartments in the leg, so if

22   there is an injury and the tissue swells, so there is nowhere

23   for the tissue to go, that puts it at risk for necrosis,

24   gangrene.  What they do a lot of times they'll slice it open.

25   It's called a fasciotomy because the fascia is the lining of

1  the muscles, and this gives just space for the muscles to

2  extend.  So he had a fasciotomy in the right leg where the

3  bullet wounds were in addition to the surgery that he had done.

4  And a week later they took a skin graft from his thigh.  They

5  took the skin from his right thigh and grafted it over the site

6  where the fasciotomy was in the leg.

7  Q.  Did he have any further surgeries down the road you ascribe

8  to the wounds he suffered that day?

9  A.  He had three additional surgeries down the road.

10 Q.  Could you explain what those are?

11 A.  Yes.  In October 2010, so eight years after the injury, he

12 was found to have an ulcer which is a breakdown of the skin, I

13 mentioned briefly with the diabetic issues, but it's a

14 breakdown of skin.  He had loss of sensation underneath his

15 right foot.  So he had surgery to treat that.  He had a series

16 of three surgeries.  He had surgery in June 2011.  He had

17 another surgery in September 2011.  And then he had a third

18 surgery which is not necessarily related to those two, but it

19 related to him developing hammertoes and scar tissue so he had

20 a third surgery in December 2011.  So between June and

21 December 2011 which was nine years after his initial injury he

22 had three surgeries:  Boom, boom, boom.

23 Q.  Did he require any physical therapy in connection with

24 these later surgeries?

25 A.  Yes.

F1tQsok5                          Friedman - Direct

1    Q.  About how much?

2    A.  He received nine months, from June 2011 until March 2012,

3    he received physical therapy.

4    Q.  Doctor, I now want to talk to you about your physical

5    examination of Mr. Waldman.  First of all, did you find any

6    loss of sensation in the injured leg?

7    A.  Yes.

8    Q.  What did you find?

9    A.  He has absent, he has no sensation in the inside part of

10   the right leg.  He has decreased sensation in the front of the

11   right leg where the skin graft is all the way down to the foot.

12   Then he has absent sensation in the sole of the right foot, the

13   right sole.

14   Q.  Did he have any problem with the toes on his right foot?

15   A.  As far as sensation?

16   Q.  I'm sorry, no, any other issues moving on from sensation

17   with respect to the toes.

18   A.  He has decreased strength in the big toe.  He can raise it

19   up just a little bit.  Other than the big toe, he is unable to

20   raise the other toes on the right foot at all.  There is a

21   weakness called dorsiflexion which is raising up the ankle, and

22   there is some mild weakness we call it pushing down on the gas

23   pedal, so pushing down on the ankle with the right foot.

24   Q.  As a practical matter, do these problems with the ankle,

25   what practical impact does that have on him?

F1tQsok5                          Friedman - Direct

1    A.  On him?

2    Q.  Yes.

3    A.  He reports, because he's driving for one, he can't move his

4    ankle up and down.  So he states that he has to literally pick

5    up his foot move it to the side and then push down between the

6    two pedals, whereas everybody else basically plants their heel

7    and rotates the foot, he states he has to pick up the foot and

8    move the foot across every time.

9    Q.  Did you test his walking and sense of balance?

10   A.  Yes.

11   Q.  What did you find?

12   A.  He has a basically normal walking, but it looks like the

13   one leg is a little bit -- when I see him, it looks like the

14   one leg is shorter than the other.  Also it's getting somewhat

15   technical with how he walks, but as we plant the heel and we

16   bring it down slowly to flexion and then the last thing that

17   touches the ground is the big toe.  That's not only the last

18   thing, but to touch the ground when you're landing, but that's

19   almost used as the pivot when we start raising the foot off the

20   ground.  So he comes down later on the foot.

21   Q.  Are his legs the same length?

22   A.  His legs are, I believe, not the same length.

23   Q.  And do you relate that to his injuries?

24   A.  Yes.  The right leg is shorter than the left, and, yes,

25   that's common after fraction and surgeries.

F1tQsok5                         Friedman - Direct

1    Q.  Have you formed an opinion as to whether the conditions we

2    just described for Mr. Waldman were caused by the wounds that

3    he suffered or perhaps by the surgeries that he had thereafter?

4    A.  So, he has abnormal walking, decreased sensation and some

5    weakness which go along with -- there's also scars on his legs,

6    so a lot of this matches up to where the scars are, and these

7    are fitting with the fact that he had been initially shot, also

8    had the fasciotomy, the skin graft which, loss of sensation

9    reports are associated with that and then the subsequent

10   surgeries.

11   Q.  Did Mr. Waldman report any functional difficulties he has

12   as a result of this injuries?

13   A.  One thing he mentioned he had been working selling window

14   dressings, drapes and blinds.  Because of the numbness in the

15   sole, his foot kept slipping off the ladder.  He wasn't able to

16   climb or stay up on the ladder because he didn't have the

17   sensation of where he was so that was one of the functional

18   things he reported.

19   Q.  Did he report any pain to you at this point?

20   A.  Yes.

21   Q.  What did he report?

22   A.  So, he had pain from one of the screws that was in the leg

23   and the plate.  Actually, shortly after the surgery itself, he

24   initially had another procedure to take out the bottom screw

25   because it was causing pain.  The top screw is still in there.

1    He states that that causes a lot of pain in the leg.  He also

2    reports low back pain.

3    Q.  In your opinion, Doctor, are the pains he reported

4    consistent with the injuries that he suffered?

5    A.  Yes.

6    Q.  Did ever report any problems related to the loss of

7    sensation in his feet?

8    A.  I mentioned the issue he had reported with the ladder.

9    Q.  Yes.

10   A.  He also reported to me a situation where he was –– he was

11   diagnosed with cellulitis according to the medical records.  He

12   states that at the time he was diagnosed apparently he had had

13   a nail go through the bottom of his shoe into his foot.  It had

14   been there for a number of days causing the swelling and

15   subsequent infection, and he was not aware that the screw had

16   been there.

17           (Continued on next page)

18

19

20

21

22

23

24

25

F1T8SOK6                    Friedman - direct

1    Q.  What is cellulitis?

2    A.  Cellulitis is an infection of the skin.

3    Q.  Can that be serious if not treated?

4    A.  It can be very serious if not treated.  We hear sometimes

5    of flesh-eating bacteria, that is an extreme form of

6    cellulitis, but it is a similar bacteria that can cause it.

7    Q.  Let me ask you the same question I asked you earlier about

8    Yehonathon.  Did the loss of sensation that you found for

9    Mr. Waldman presuppose him to any medical problems or increase

10   his risk of or medical problems?

11   A.  I will give the same answer.  The loss of sensation itself

12   does not necessarily cause, will not necessarily cause him

13   problems.  Blood vessels and nerves travel together.  There is

14   something called vasa nervorum, blood vessels that go to the

15   nerves, and the blood vessels themselves are controlled by the

16   nerves.  That's why it causes the blood vessels to dilate when

17   we need more blood in an area or to constrict.  It's under

18   neurologic control.  So the two play together.

19          Again, what he has now is not going to cause nerve

20   problems down the road, or blood problems or vascular problems

21   down the road, but as I said before with Mr. Bauer, should he

22   develop something, he would be much more at risk.  And he

23   actually has already demonstrated -- he told me the story about

24   the nail in the foot.  I didn't see it in the hospital records

25   that there was a nail there, but he has already shown that he

F1T8SOK6                    Friedman - direct

1    is at risk for problems based on decreased sensation in his

2    sole.

3    Q.  Do you have a view as to whether the problems you described

4    are likely to be permanent?

5    A.  Yes.

6    Q.  Do you hold the opinions you have expressed about

7    Mr. Waldman to a reasonable degree of medical certainty?

8    A.  I do, with the one caveat that his back pain is

9    multifactorial.  So I do believe it is largely related to his

10   gait problems and the other issues with the leg, but it is also

11   impacted by the other issues.

12   Q.  Thank you.

13            Let's move to another plaintiff, Shayna Gould Elliott.

14            Doctor, can you tell us who Shayna Gould Elliott is

15   and what happened to her?

16   A.  Shayna Gould, married name Elliott, was injured in the same

17   attack that we just discussed with Mr. Waldman.  She was 19

18   years old at the time and she was shot through the back.  Dr.

19   Strous went through more of the details, but briefly, she

20   was -- the ambulance driver recognized that she was in life

21   danger.  They called to the hospital where his wife worked in

22   the operating room.  They took her there immediately.  She had

23   no pulse.  She was declared dead on arrival.  The

24   cardiothoracic surgeon who was called to attend to her

25   performed what is called cardiac massage.

F1T8SOK6                          Friedman - direct

1          The only time I have ever seen a depiction of this is

2    in the movie Indiana Jones and the Temple of Doom.  If anybody

3    remembers that movie, there is a magic man and he sticks his

4    hand through the skin, but basically he grabs the heart and

5    pumps it.

6          They open the chest, somebody grabs the heart and

7    pumps it.  Because there was blood compressing the pericardial

8    sac, which is the lining of the heart, the heart isn't able to

9    expand and pump on its own.  So while they were trying to drain

10   the blood -- again, she was dead on arrival -- so the surgeon

11   himself took the heart and pumped it for her until such time as

12   they were able to once again get a pulse.

13   Q.  Did she have any other internal organ damage?

14   A.  She did.

15   Q.  Can you describe that, please?

16   A.  The bullet said she had destruction of the seventh and

17   eighth ribs on the left.  We have twelve ribs.  And she had

18   injury to the left lung.  They took out the entire left lung

19   and the lining of the lung.  So they opened up the chest and

20   they took out her left lung as part of the surgery.

21   Q.  Did she have any other injuries besides the gunshot wound

22   that took out her ribs and her lung?

23   A.  She had shrapnel wounds, one to the right big toe, one to

24   the left thigh, and to both feet.

25   Q.  Have you reviewed any records of Shayna's follow-up care

F1T8SOK6                         Friedman - direct

1    after she returned to the United States?

2    A.  Yes.

3    Q.  Could you just briefly describe the care she has had?

4    A.  Pardon me?

5    Q.  Could you describe the sort of follow-up care she has had

6    to have here?

7    A.  So after she returned to the United States, she has seen

8    many doctors.  She has been followed for her pulmonary

9    function, the lung function.  She has been seeing a

10   psychologist for PTSD.  She has had surgery -- in March 2004,

11   she had surgery to take the shrapnel out of her chest and out

12   of both feet.  They also at the time shaved down the ribs.  She

13   had plastic surgery to treat a scar, and also, she had breast

14   implants, breast augmentation surgery.  There are multiple

15   medical visits for chest pain, back pain, abdominal pain.

16   There were medical records -- as soon as a month after the

17   injury, she went to her doctor and was complaining of left arm

18   and shoulder pain.

19   Q.  The breast surgery mentioned, was that related to her

20   injuries?

21   A.  Yes.

22   Q.  It wasn't just elected cosmetic surgery?

23   A.  Correct.  She reports that the left breast -- again, she

24   was 19, a developmental age.  So she reported that the left

25   breast never grew to the same size, that there was some

F1T8SOK6                         Friedman - direct

1  asymmetry, so she underwent surgery on both of them to have

2  them made equal.

3  Q.  Did you conduct a physical examination of Shayna?

4  A.  No.

5  Q.  Did you examine her in some manner?

6  A.  Yes.

7  Q.  Can you explain what you did?

8  A.  Shayna lives in Chicago and her husband travels a lot, and

9  she had a newborn at the time I wished to examine her.  So she

10  did not come to New York.  We did the examination via Skype.

11  Q.  Is that an accepted way in your profession to do such an

12  examination?

13  A.  It is.  In fact, a lot of the major medical centers

14  nowadays do telemedicine.  It's a growing field.

15  Q.  Was Shayna by herself at the other end of the Skype?

16  A.  No.  There was a neurology resident who performed the

17  examination under my direction for me.

18  Q.  Did you do anything with that resident to ensure that the

19  examination was performed correctly?

20  A.  I instructed her exactly what to do.  The resident never

21  gave me an opinion as to what she was testing, with the one

22  exception of strength.  Meaning I would tell her what to

23  examine, for example, sensation, poke her with a pin here, and

24  then I would ask the questions and get the answer.  The only

25  thing that really was with strength testing, where it's graded

F1T8SOK6                        Friedman - direct

1    out of five, so you want to know if it's full strength, there's

2    some weakness to resistance.  Certain levels I can see on my

3    own.  Can a patient raise the arm, move the joint through the

4    full range against gravity, that gives you to a three out of

5    five.

6           So they were sort of doing fine with what exactly is

7    the level of the strength.  So for that I basically relied upon

8    the resident to say that there was some resistance.  I could

9    obviously see if she would fully resist or gave way, but that

10   would be the one limitation.  And anything else that I felt

11   would be deemed to be subjective, such as feeling for shrapnel

12   or trying to palpate anything, we didn't do.

13   Q.  I am now going to ask you about the results of your

14   examination, the telemedicine examination that you described,

15   beginning with the description of any scars on Shayna's torso.

16   What did you find?

17   A.  Before even the scars, just looking at her, her left

18   shoulder is elevated a little bit.  So you can see that some

19   things are not equal there.

20          She has scars -- I will just go through where I found

21   them -- on the big toe on the right.  There's scars on the

22   middle of the right ankle.  There's scars over the lateral

23   left -- basically, this part of the left foot.  She has scars

24   over her chest from where they purportedly had chest tubes for

25   the surgery.  There is a small scar over the left breast that

F1T8SOK6                    Friedman - direct

1    was related to the bullet itself.  Her largest scar is 34

2    centimeters, so it's about 16, 17 inches.  It starts in the

3    back, just to the side of her spine, and goes down and around

4    to the front of the left chest.

5    Q.  As you understand it, what caused that scar?

6    A.  I believe that was the surgical scar.

7    Q.  Did Shayna report any pain or discomfort associated with

8    the scars or otherwise in her torso?

9    A.  In her torso she reports that she has numbness.  The torso

10   is the chest.  She has numbness on the left side of the chest

11   from just about her breast to the lower rib cage area, both in

12   the front and in the back.

13   Q.  How about pain in her chest, did she report that?

14   A.  She reports that she has burned herself.  She has pain over

15   the left chest.

16   Q.  You might want to take a look at page 6 of your report.

17   A.  I am.  She reports two kinds of pain.  What we have said

18   until now is pain, and then there is a different kind of pain

19   reported as neuropathic.  She doesn't call it neuropathic.  We

20   call it neuropathic, which basically means it's nerve pain.

21        Usually, let's say, you bang your head so you have

22   sort of an ache or a throb.  That's one kind of pain.  But then

23   there is what patients describe as nerve pain.  Doctor, it

24   burns, it's cold, I can't touch it, it's too sensitive.  That

25   is what we refer to as neuropathic pain.  You don't need to

1    touch it.  It hurts on its own.  These are like the pains that

2    are most difficult for us to treat and also the most

3    distressing to patients.

4            So she has this 14-inch, 15-inch scar, and she reports

5    shooting and sharp pains along the whole scar itself.

6    Q.  To what do you attribute this pain, Doctor?

7    A.  Neuropathic, we often see it after there is a scar, the

8    nerves sometimes don't heal normally; they are a little bit

9    hypersensitive.  But it follows her surgical scar.  So I

10   attribute it to that.

11   Q.  Just to be clear, is the cause of the pain, as you

12   understand it, the surgery she had to undergo because of the

13   wound she suffered?

14   A.  Yes.

15   Q.  What about the loss of sensation, in your opinion what

16   causes the loss of sensation?

17   A.  Again, she reports loss of sensation in the front and the

18   back.  Any time you cut skin you're cutting nerves that go to

19   the skin.  So it's more normal than not that after somebody has

20   surgery they will have numbness in that area.

21           In the chest, the sensory nerves come off from where

22   the ribs are.  So she had deep surgery and the loss of

23   sensation in the chest is more likely than not from that

24   surgery itself, if not just from the scar.

25   Q.  Did Shayna report any pain in her left arm?

F1T8SOK6                          Friedman - direct

1    A.   Yes.

2    Q.   Could you describe that, please?

3    A.   She reports pain that shoots from the left shoulder all the

4    way down to the hand.  She told me that because of that, for

5    many months she would keep her arm basically attached to her

6    body, because any time she would move it or use it it would

7    give her this pain.  And also when she is hot, she still gets

8    this pain.  She describes this as an ache and a throb, and some

9    parts of the arm it's described as sharp.  She says that cold

10   actually makes it better.  And, as I said, heat makes it worse.

11   Q.   Briefly, Doctor, before I go on with the pain in the left

12   arm that you just been describing, do you have an opinion to a

13   reasonable degree of medical certainty as to the other pain and

14   the numbness that you described before for Shayna as to the

15   cause of that?

16   A.   Yes.

17   Q.   What is that?

18   A.   Her injury and/or the surgery that she underwent because of

19   the injury.

20   Q.   Now let's move back to the pain in the left arm that you

21   just described.

22          Did she say whether this pain has affected her ability

23   to function?

24   A.   She is lefty.  She had to learn to write with her right

25   hand because she couldn't use her left arm at all.  It was too

F1T8SOK6                         Friedman - direct

1   painful.  So she told me that she basically learned to write

2   with her other hand.  But because of that she still can't write

3   for long periods of time, and the hand cramps up, and her

4   writing gets sloppy.  In general, it's the pain and the fact

5   that this is her dominant arm so it affects whatever she can do

6   with it.

7   Q.  Have you considered, Doctor, whether the bullet that Shayna

8   took to the chest could create the pain that she reported in

9   her left arm?

10  A.  Yes, I have.

11  Q.  She was not shot in the left arm, as far as you know, is

12  that correct?

13  A.  Correct.

14  Q.  What are your views as to whether her injuries could have

15  caused the pain in her left arm?

16  A.   Initially, this was somewhat confusing to me because, as

17  you said, she was not shot in the left arm.  I went to a

18  conference and I heard a lecture on shoulder pain and arm pain

19  and its relationship to the whole, what we call the scapula,

20  which is shoulder blade, and that whole area.  And I went back

21  to her record.  First, she reported pain in the shoulder within

22  a month after she returned to the States.  So temporally it was

23  there right after her injury.

24  Q.  Just to be clear, the word "temporally," what does that

25  refer to?

F1T8SOK6                          Friedman - direct

1    A.   Time wise.  She states that she was fine.  She was shot.

2    She had the surgery.  Immediately thereafter she started having

3    pain in the left shoulder and in the arm.

4          It sort of dawned on me that the surgery that was

5    done, they used the latissimus dorsi muscle flap to close the

6    surgical scar and to close up the chest cavity.  Anybody who

7    works out in the gym, not me, knows the latissimus dorsi as the

8    lats.  This is a large muscle that extends all the way from the

9    spine, but underneath the shoulder blade, all the way around

10   the back, and then it hooks in -- it's easier for me to show

11   you this way.  It comes around from your back and hooks around

12   into your arm.  What we call the origin is along the spine and

13   the ribs in the back, and it inserts into the bicipital groove

14   in the arm here.

15         So this muscle was cut and tightened most likely when

16   they did the surgery, and to some extent shortened.  Plus, she

17   had destruction of the seventh and eighth ribs, which are

18   basically the mooring ribs of this large muscle.  The shoulder

19   blade go down to the fifth rib, and this muscle starts

20   basically at the sixth to the twelfth vertebrae in the middle

21   part of the spine and the lower ribs.

22         So although initially I was unable to describe it, on

23   further thought, we have the large muscle that was cut, that

24   basically inserts itself right into the shoulder and affects

25   the shoulder.  The job of the latissimus dorsi muscle is to

F1T8SOK6                          Friedman - direct

1   internally rotate the shoulder itself so it moves into the

2   joint.  It moves the shoulder backwards and it pulls it closer

3   to the arm, to the body.  So the whole large job of the

4   latissimus dorsi is to hold the back and the ribs and the

5   shoulder area into place, as well as a direct effect on the

6   shoulder itself.

7   Q.  So do you believe, Doctor, that the use of this muscle to

8   close up in the surgery, is that the cause of the pain in her

9   left arm?

10  A.  I believe so.

11  Q.  Do you believe that to a reasonable degree of medical

12  certainty?

13  A.  I do.

14  Q.  Thank you.

15          By the way, did she have any loss of sensation in the

16  left arm as well as this pain that she reported?

17  A.  She has loss of sensation in the inside part of the forearm

18  and in the back part of the forearm.

19  Q.  To what do you attribute that?

20  A.  It's difficult to say.  The nerves that supply that come

21  off the brachial plexus, which is the grouping of nerves that

22  supply all the muscles and sensation in the arm.  So the nerve

23  that goes to the latissimus dorsi muscle comes off the plexus

24  in very close proximity to these other nerves that cause

25  sensation.  But I can't specifically say that the one is

F1T8SOK6                         Friedman - direct

1   related to the other.

2   Q.  Did Shayna report any problems with her feet?

3   A.  She does.

4   Q.  What does she report?

5   A.  OK.  She has pain, hypersensitivity, and what we call

6   allodynia in the left foot.  Again, she doesn't say I have

7   allodynia.  What she tells me is it burns, it's extremely

8   hypersensitive, I can't even put a sock on my foot because it

9   hurts so much.  And this is typical of patients who have

10  allodynia.  They always describe, I can't sleep with a sheet on

11  top of me because that bothers me too much.  She goes as far as

12  to say -- don't forget, she lives in Chicago -- that she

13  doesn't wear a sock on that foot in the winter in Chicago

14  because it hurts her too much.

15  Q.  Are you able to state what the cause of the allodynia and

16  other problems in the feet are?

17  A.  Allodynia is a symptom.  It's not something that we can

18  typically do and say, well, this is why it's caused.  Sometimes

19  it follows a nerve injury at which point we can test with the

20  nerve test that I do.  Sometimes it's related to a different

21  disease process, termed complex regional pain syndrome, in

22  which sometimes in that situation there is another test you can

23  do to find out.  But in many cases it's there.  We don't have a

24  good description for it.  And it drives patients nuts.  It's

25  very distressing for them.

F1T8SOK6                        Friedman - direct

1    Q.  Are you able to say what is causing this for Shayna?

2    A.  She has a scar in that exact distribution where she reports

3    the pain.  She did have surgery to remove -- again, we are in

4    the left foot and she had surgery to remove shrapnel from that

5    foot, and there is a scar in that same distribution.  So I

6    don't think there is an injury to the nerve per se, but it

7    could just be as simple as the scar itself or the fact that

8    there was some trauma in cutting the skin that caused it.  This

9    is not a pain that's always definable or to find a source for.

10   Sometimes it just happens.

11   Q.  Doctor, let's move on to Shayna's lung, or rather the

12   absence of a lung.  Did she report any symptoms that you would

13   associate with the loss of the lung?

14   A.  Yes.

15   Q.  What?

16   A.  I'm not sure it's associated per se with a lack of a lung

17   or a loss of a lung.  She happened to have lost a lung.  She

18   reports chest tightness and asthma symptoms, especially when

19   it's cold.

20   Q.  Does she have any difficulty with exercise?

21   A.  She has shortness of breath when she exercises.

22   Q.  Considering what happened to her lung, does that surprise

23   you?

24   A.  Yes and no.  There are patients out there with one lung who

25   do well.  But, on the other hand, she had a lung out.  And she

F1T8SOK6                        Friedman - direct

1    had not just the lung out, she had trauma to the whole chest

2    cavity.  So it's not surprising for her to tell me that she has

3    pulmonary symptoms.

4    Q.  Did you review any medical tests of Shayna's pulmonary

5    function?

6    A.  Yes.

7    Q.  What did you review?

8    A.  She has had pulmonary function tests.

9    Q.  What is a pulmonary test?

10   A.  It's a test where they have you blow into a tube and suck

11   into a tube, depending on what specifically they are testing at

12   the time, and it gives a picture as to how the lung or lungs

13   are acting as a unit with airflow.

14   Q.  What did the test show for Shayna?

15   A.  She has restrictive airway disease.

16   Q.  What does that mean?

17   A.  It means, easily said, the airflow is not normal.

18   Q.  Let's talk about what the future may hold for Shayna.  Is

19   she at any heightened risk for medical problems as a result of

20   the loss of her lung?

21   A.  She is because, again, she is starting with half a deck.

22   There is nothing in her day-to-day or the history that I

23   obtained to say, oh, my goodness, this woman is going to

24   develop X, Y and Z problems.  However, let's say that down the

25   road she develops a cancer in the right lung that normally you

F1T8SOK6                        Friedman - direct

1    would take out the lung because you can function well with one

2    lung; she does decently function, and there are people, as I

3    said, who function quite well with one lung.  But what would

4    happen now if you need to take out her one lung?  She would

5    need a lung transplant.  That's a much more serious situation.

6    Lung transplants (a) are iffy propositions, and (b) it's very

7    difficult to find a good lung donor.  My understanding is that

8    the waiting list for a lung transplant is exceedingly long.  So

9    if she were to need surgery on the right lung, or let's say she

10   developed an infection that would require that out, not even

11   cancer, part of the lung or the whole lung itself, she would be

12   in trouble.

13   Q.  I have asked you this question about a couple of the other

14   plaintiffs.  Is she at risk for medical problems because of the

15   loss of sensation?

16   A.  So my answer is along the same lines, that yes, because she

17   is starting with a less than full deck.

18   Q.  Just to make sure we have wrapped this up, I understand

19   there are some issues with respect to causation of the

20   difficulties she reported with her feet.  Other than that, do

21   you believe the problems she has reported and that you have

22   found are a result of her wounds and of the surgery she had

23   because of the wounds?

24   A.  With the exception of the foot, yes.

25   Q.  Do you hold those views to a reasonable degree of medical

F1T8SOK6                    Friedman - direct

1    certainty?

2    A.  Yes, I do.

3    Q.  Do you believe her injuries are likely to be permanent?

4    A.  Yes.

5           MR. HORTON:  Your Honor, it's about 10 of 5.  Would

6    you like to break now?

7           THE COURT:  Why don't we do that?

8           Ladies and gentlemen, this is what we are going to do.

9    Tomorrow we are going to adjourn somewhere between 1 and 3:00.

10   So you can plan on going home early.

11          We have a full week next week.  I want to have a full

12   week.  I am working with the lawyers so we get all the

13   witnesses here and try to do a number of witnesses next week.

14   I don't want to be too optimistic, but I want to say that I

15   think if we proceed the way I hope we will next week, we will

16   get ahead of schedule.  We may be on schedule to finish the

17   witnesses before the end of February and not have to spill into

18   March.  But I want to see how we go.

19          Now, remember, the week after next the court is closed

20   on Thursday the 12th and Monday the 16th for Presidents' Day.

21   So I am going to give you Thursday, Friday and Monday off.  So

22   we will go a full week next week.  We will go Monday the 9th,

23   Tuesday the 10th, Wednesday the 11th, and then we will come

24   back on Tuesday the 17th after Presidents' Day, and we will

25   continue those two weeks.  And if we stay ahead of schedule, as

F1T8SOK6                         Friedman - direct

1    I hope we will get ahead of schedule next week, hopefully we

2    will finish the witnesses before the end of February.

3            So that's the best that I can tell you at this point.

4    Don't discuss the case.  Keep an open mind.  We will see you

5    tomorrow.  Depending on how many witnesses we have and whether

6    we finish them, if we finish them before lunch, we will go home

7    then.  If we don't finish them before lunch, if we can still

8    finish by 3:00, I want to keep you here so we can stay ahead of

9    schedule.

10           So have a good evening and I will see you tomorrow

11   morning.

12           (Jury exits courtroom)

13           THE COURT:  Scheduling wise, we will talk about it

14   tomorrow and see where we are with everyone.  I am going to

15   assume at this point that there is a possibility that we can

16   finish the plaintiffs' witnesses by the end of next week or by

17   the beginning of the week after.  So that means if there is a

18   defense case, depending on how many witnesses there are, we can

19   finish those witnesses, if there are just a couple of days, two

20   or three days worth of witnesses and we finish early, we might

21   even be able to finish those witnesses before the 12th, but we

22   will plan on seeing if we can finish the witnesses at the

23   latest by before the end of the Presidents' Day week.

24           If that's the case, then I would anticipate that we

25   could go to summations the Monday or somewhere before or after

F1T8SOK6

1   the last Monday in February.  I think the briefest schedule

2   would probably be the plaintiffs finishing with their witnesses

3   next week, the defense having no witnesses or the witnesses can

4   be done within that three days of the week after that, and we

5   may be in a position to start summations on the 17th right

6   after Presidents' Day.

7           We will see where we are tomorrow.  I will get a

8   better feel from you as to what you might anticipate, and then

9   we will start next week specifically trying to firm up exactly

10  how many witnesses we think we have and how long they might

11  take, and figure out a convenient schedule that works out for

12  you and the jury so that you and they can be prepared once the

13  witnesses are finished to have summations, jury charge, and

14  deliberations.

15          Also, I am going to factor in some time wanting to

16  hear motions and to have a charging conference.  I am confident

17  that given where we think we are that what I have told the jury

18  is not too optimistic and we won't slip behind.

19          Is there anything else we need to address today?

20          MR. YALOWITZ:  One thing.  I have two things.  One big

21  and one nearly trivial.

22          The big one is we have sort of gone back and forth

23  before trial about the verdict sheet.  We have recommended a

24  general verdict.  We still think a general verdict is the way

25  to go.  The defendants had said they were going to propose a

F1T8SOK6

```
 1   draft verdict; they elected not to do that.  I know your Honor
 2   was thinking about working one up as a draft.
 3           THE COURT:  I am working on one as we speak.  I have a
 4   draft, and I am continuing to work on it, trying to figure out
 5   exactly where we are going to be and how the issues are going
 6   to be.  And then I want to discuss with you, particularly when
 7   the plaintiffs rest, exactly what your position is as to what
 8   claims you think are appropriate, and then we can discuss
 9   further what you propose to be in the verdict form.  Then
10   hopefully I will be in a position to share with you something
11   that I am confident about in terms of at least my approach.
12           MR. YALOWITZ:  In that regard, I have been looking at
13   a couple of things.  It's always harder to see what is not
14   there than what is there.  I looked at your Honor's proposed
15   substantive jury instructions, which you were gracious enough
16   to give us even before we opened, which was very helpful to me.
17   There are a couple of things that I want to give you a
18   supplemental requested charge on.
19           THE COURT:  Sure.
20           MR. YALOWITZ:  Alter ego, we gave you a charge on
21   that, and I just want to review the evidence that supports it.
22   Ratification, which I know we gave you a charge on.  But, quite
23   frankly, I wasn't that happy with the charge and I want to give
24   you what I think is a very simple one, and again, the legal and
25   factual support for it.
```

F1T8SOK6

1     THE COURT:  Sure.

2     MR. YALOWITZ:  Material support under 2339(b), I think

3  your Honor has something, but I just want to refocus on that

4  personnel issue.

5     There may have been one other.  Oh, yeah.  A charge

6  along the lines of Judge Sand's *Monell* charge.  Not that it's

7  required, but that it's permitted.  Remember, *Monell* is a

8  higher standard than classical respondeat superior.  In *Monell*,

9  you have to show a policy or practice and then you meet

10  respondeat superior.  Here, in a lot of ways policy and

11  practice is more obvious than were they wearing their uniforms

12  or whatever.  So I am not arguing that I have to prove *Monell*,

13  but I want you to take a look at as a sort of within respondeat

14  superior.

15     THE COURT:  That's fine.  My recollection is that

16  originally you had argued against a *Monell*.

17     MR. YALOWITZ:  I did, but then I did give you the -- I

18  think I gave you something along those lines.  It's a little

19  subtle because I'm not saying we have to meet *Monell*.  I am

20  saying if we do it, it's good enough.

21     THE COURT:  OK.  What is usually helpful to me is if

22  sometime before the end of next week you could get to me as

23  early as possible two things.  One, given what I have given you

24  is a very, very rough draft, a subject matter that you think is

25  not in there that you think should be in there, and if you want

F1T8SOK6

1  to give me the word for word on it that's fine.  Usually I like

2  to focus on if there is particular area that you want

3  instructed on that has not been instructed on so I can focus on

4  that, either pulling out a standard charge on that or taking a

5  charge from you.  Otherwise I am more interested in the wording

6  of the substantive charge, if you think that a specific word is

7  appropriate with regard to the substantive charges, so I can

8  review whatever you submit to me.

9        In terms of the general charges, I am not wedded to

10  all of the language.  Those are mostly standard Sand charges or

11  some modified.  They aren't controversial and they are not

12  substantive.  They are more procedural.  So if you have some

13  language changes or suggestions, or want to add something or

14  drop something because it's superfluous, we can discuss that

15  when we have a charging conference, so you can give me

16  something early.

17        More so with the substantive charge, obviously, I want

18  to make sure that I am focusing in on what you want to focus

19  the jury on as the theory of the case.  Under the statute,

20  there are a bunch of ways to approach the statute, depending on

21  how the proof is evaluated at the end.  So concentrate on that

22  and if you think a *Monell* or some other charge is appropriate,

23  give me that.

24        Given that I am more educated about the nature of the

25  proof, I am not really totally comfortable on the language that

F1T8SOK6

1   I gave you.  I am not sure all of its appropriate or some other

2   things should be added or some things probably should be

3   changed.  So I am going to start working on that over the

4   weekend.  We will have plenty of time.  We will start talking

5   about it early and hopefully we will have plenty of time for

6   you to propose to me and for us to go through it.

7           What I usually ultimately do is finally I usually give

8   you what I think is close to what the final instruction is and

9   give you enough time so you can go through it.  One, I am going

10  to ask you if there is some subject matter I have left out or

11  something I have put in there that you don't need that is not

12  appropriate for this case.  Two, I will basically say, do you

13  have any changes you want to recommend to the first five pages,

14  first ten pages, and then just go word for word seeing what you

15  recommend.  And then if there is some real legal arguments to

16  be made about the substantive instructions, if you can give me

17  some support for what your position is for why a certain

18  instruction is appropriate to give or a certain instruction is

19  inappropriate to give, we will look at that and we will discuss

20  that, so we will have it all finalized at least a day or more

21  before you sum up.

22          MR. YALOWITZ:  That's very helpful.

23          I just want to commend Mr. Rochon.  I really liked the

24  way he thanked the last witness.  I thought it was very

25  professional, very appropriate.  I am planning to follow that

F1T8SOK6

1    lead.

2            THE COURT:  You following his lead would surprise me.

3            MR. YALOWITZ:  On that particular issue, I thought he

4    did a very good job.

5            THE COURT:  Have a good night and I will see you in

6    the morning and we will see how early we can end tomorrow.

7            MR. YALOWITZ:  One thing.  With our witnesses coming

8    from out of town, our clients coming from out of town, I may

9    want to push it really to 5, or even if we are almost done with

10   somebody, even past 5.

11           THE COURT:  I will give you a great deal of

12   flexibility, as long as you have them here and they are ready

13   to go, if someone shows up and we have to even interrupt the

14   witness, and there is no objection, or we have to go past 5 to

15   finish up a witness.

16           MR. YALOWITZ:  I appreciate that.

17           THE COURT:  I will see you tomorrow.

18           (Adjourned to January 30, 2015, at 9:15 a.m.)

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                         Page

 3   RAEL STROUS

 4   Cross By Mr. Horton  . . . . . 1768

 5   TUVIA PERI

 6   Direct By Mr. Machnes  . . . . 1860

 7   ALAN FRIEDMAN

 8   Direct By Mr. Horton . . . . . 1881

 9                    PLAINTIFF EXHIBITS

10   Exhibit No.                         Received

11    1198 through 1221   . . . . . . . . . . . .1854

12    1236 through 1245   . . . . . . . . . . . .1855

13    1246    . . . . . . . . . . . . . . . .1877

14

15

16

17

18

19

20

21

22

23

24

25
```