F1uQsok1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARK I. SOKOLOW, et al.,

4                 Plaintiffs,

5            v.                          04 CV 397 (GBD)
                                         Trial
6   PALESTINE LIBERATION
    ORGANIZATION, et al.,
7
                  Defendants.
8
    ------------------------------x
9                                        New York, N.Y.
                                         January 30, 2015
10                                       9:30 a.m.

11  Before:

12                    HON. GEORGE B. DANIELS,

13                                       District Judge
                                          and a Jury
14                       APPEARANCES

15  ARNOLD & PORTER LLP
         Attorneys for Plaintiffs
16  BY:  KENT A. YALOWITZ
         PHILIP W. HORTON
17       TAL MACHNES
         SARA PILDIS
18       CARMELA T. ROMEO
         RACHEL WEISER
19
    MILLER & CHEVALIER, CHARTERED
20       Attorneys for Defendants
    BY:  MARK J. ROCHON
21       LAURA G. FERGUSON
         BRIAN A. HILL
22       MICHAEL SATIN
         DAWN E. MURPHY-JOHNSON
23

24  Also present:  RACHELLE AVITAL, Hebrew interpreter
                   RINA NE'EMAN, Hebrew interpreter
25

F1uQsok1

1          (In open court; jury not present)

2          THE COURT:  I just wanted to address right away so I

3    can give defense an opportunity to respond, but I wanted to

4    pull out the depositions designations if I can find them in my

5    stack.  Can you just remind me to which letter it was attached?

6          MR. YALOWITZ:  I think it was Saturday, the 24th of

7    January, your Honor.  Quite frankly, I don't think I have a

8    copy of it with me in the courtroom.

9          THE COURT:  I know I have a copy.

10          MR. YALOWITZ:  I do have the depositions themselves; I

11    just don't have the letter.

12          THE COURT:  I think I have two copies, one that I

13    highlighted myself.

14          You are going to have to point me to which one I

15    should be looking at.  I have two.  I have the one attached to

16    plaintiff's January 24 letter, although I took it apart, but I

17    have several exhibits that I think were attached to --

18          MR. YALOWITZ:  Even an earlier one maybe.

19          THE COURT:  Right.

20          MR. YALOWITZ:  Judge, I'm just not sure where you want

21    to go with this this morning.  There are two buckets.

22          THE COURT:  Yes.

23          MR. YALOWITZ:  The first bucket is what you'd call

24    like the true counterdesignations.

25          THE COURT:  Right.

F1uQsok1

1          MR. YALOWITZ:  I thought we were done with that.

2     That's why I didn't bring the letter back.

3          THE COURT:  I thought we were done with that too.

4          MR. YALOWITZ:  The bigger bucket are things that they

5     want to do on their direct case.  Quite frankly, that is the

6     letter I put in yesterday saying -- I sort of have two

7     positions on that.  The first is I don't think any of it comes

8     in under the rule, which I really want to make sure I walk you

9     through my reasoning of the rule.  You may not agree with me at

10    the end.

11         THE COURT:  I think I understand your position, but I

12    still don't see any support for that position that somehow the

13    language is superfluous.

14         MR. YALOWITZ:  I don't think it's superfluous at all.

15    I think it fits exactly into (a)(1)(C).

16         THE COURT:  We can come back to that.  Let me lay out

17    for you what my approach is to this, first of all.  My approach

18    is, you have certain designations.  Your argument with regard

19    to why you say the depositions are admissible or portions of

20    the deposition are admissible is affected by the fact that -- I

21    don't think the argument that there were different parties is a

22    significant argument to make given the fact that you want to

23    use it and given the fact that you want to use it even in

24    instances where they weren't 30(b)(6) witnesses.

25         MR. YALOWITZ:  I put those in different buckets.  I

F1uQsok1

```
 1   think there is a difference between 30(b)(6) and the guy who

 2   was not a 30(b)(6) witness.

 3           THE COURT:  I agree with that, but you didn't make a

 4   difference.  You want them all.

 5           MR. YALOWITZ:  I may offer them all.  I haven't

 6   offered any of them yet.

 7           THE COURT:  Also, it's a little different because,

 8   quite frankly, the issues were exactly the same and the

 9   attorneys were the same attorneys who represented the

10   plaintiffs here.

11           MR. YALOWITZ:  I could speak to that, if I may.

12           THE COURT:  You can speak to that, but that is the

13   fact as I know it.

14           MR. YALOWITZ:  Look, I'm newer to the cases than these

15   depositions.

16           THE COURT:  Right.

17           MR. YALOWITZ:  The defendants I think had the same

18   lawyers in that case.

19           THE COURT:  And the plaintiffs in this case had the

20   same lawyers there.  Mr. Tolchin was the lawyer, wasn't he?

21           MR. YALOWITZ:  Sapirstein was Tolchin, Shatsky was

22   Tolchin.  Kleiman is a different set of lawyers.  Sapirstein

23   was Tolchin, and I don't see who this -- so three of the

24   depositions had the --

25           THE COURT:  Same lawyers who had the same interest to
```

F1uQsok1

1    ask the exact same questions that you want to use now which is

2    reflected by the fact you want to use the questions that they

3    asked.

4              MR. YALOWITZ:  Let's assume that Tolchin --

5              THE COURT:  Before we get to that, before you respond

6    it to it, let me lay out what I want to do.  That is my first

7    issue.  That is not as compelling an argument as if it was

8    offered under a different rule and there truly was not the same

9    issue and not the same lawyers.  It's not about whether the

10   parties are in the room.  It's about whether the lawyers who

11   were asking the question have the same interest to ask the same

12   questions and get the same information.  That is more of the

13   case in this instance than the other situation where another

14   lawyer with different clients suing somebody for a different

15   case or a similar case is now going to try to meet the rule.

16   That is my first issue.

17             The second issue, I think I understand your argument

18   but even if I were to accept your argument, I think that it

19   doesn't exclude most of the stuff that they've designated.

20   Most of the stuff that they've designated falls into one of two

21   categories:  There either are things under the rule that, in

22   fairness, you should be required to read or there are things

23   under the rule that, in fairness, are still related to the

24   matters that you are putting before the jury and, in fairness,

25   they should have the right to read them.

F1uQsok1

```
 1              I'll give you one example.  With regard to budgeting
 2    items and with regard to the process of the flow of money.  You
 3    want to put in some limited testimony about that, about how
 4    that works.  There is certain testimony, in fairness, that I
 5    think questions and answers, in fairness, should be given at
 6    the same time; but, in fairness, the more complete answers
 7    about how the budget works I think is related to what you are
 8    offering in the witnesses' testimony and, in fairness, is the
 9    fullness of the witnesses' testimony.  My position is that it
10    should be read.  Now, whether or not I'm going to put that
11    responsibility on you, it's clearly relevant to the same
12    inquiry and still part of the same inquiry and, in fairness, is
13    the complete answer that the witness -- the complete set of
14    answers on that subject matter the witness had given.
15              Now, I could be convinced maybe that that is not the
16    case; that somehow the rule precludes that.  What I am more
17    sensitive to is your argument that there are certain areas that
18    they want to read that you say are inadmissible and would be
19    inadmissible even if the witness was here on the stand because
20    those you've identified for me.  With regard to the other
21    testimony, you haven't identified anything.  You just want
22    carte blanche that they can't designate anything that you can't
23    read.  I can't give you that.  So the only thing you identify
24    for me -- and I can go back and look at each question and
25    answer again if I have time -- but the only things that you
```

F1uQsok1

1    have identified to me that you had a substantive objection to,

2    rather than a procedural objection to, are the items that you

3    pretty much delineated on page 4 of your letter.

4            Quite frankly, for most of those I agree with you.  I

5    don't think they have the right to read those.  I don't think

6    that they are related to the subject matter of what you are

7    trying to put before the jury.  I don't think they fall into

8    the category of being, in fairness, parts that have to be read

9    when you read your other parts, particularly your parts about

10   budget and the flow of money, for the most part; not totally,

11   but I characterize it that way.

12           And I don't think, in fairness, even if I say you

13   should have to read that I don't think, in fairness, when they

14   get up and read it, it has pretty much anything to do with what

15   you read either.  I think there are other things from that

16   witness that are helpful to them that they want in the record.

17   I don't think that is a basis for them to do that unless it's

18   consistent with the rule and unless I would make a

19   determination that if the witness were here in court, it would

20   be relevant, admissible evidence.

21           That is why I am going to see where you want to take

22   your fight.  It is likely that you can convince me as you point

23   to specific things that you say, no, Judge, that is not proper.

24   That is not admissible.  That is not relevant.  That is not

25   within the subject matter of what I discussed as being read

F1uQsok1

1    from this witness.  You might be able to convince me on Q and A

2    on certain subjects that they don't belong in this case; they

3    would be inadmissible otherwise.  And if you ask him about A,

4    they can't just throw in Z from the witness because they happen

5    to say, "Oh, that looks nice.  I'd like the jury to hear that

6    one," and it has nothing to do with it.  So that is my approach

7    to it.  The burden is pretty much on you to convince me that

8    there is some other stuff here that, in fairness, shouldn't be

9    read.

10            For example, I don't agree with you that the -- I take

11    it as a substantive and procedural issue.  I don't agree with

12    you that the testimony by the witness that the buildings were

13    destroyed is not related to the questions and answers that you

14    want to elicit about how he was paid and how the budget was

15    done.  That response was given in response to a question about,

16    OK, how does this work?  When did you start?  When did you

17    stop?  How were the payments made?  Where are the records?  And

18    the guy says, "Look, I can only give you a limited amount of

19    information about that because the building was blown up."  It

20    seems to me that that is a relevant response.  Now you have

21    another objection to it.  It seems to me that is a relevant

22    response, and I think he gave it in response to the questions

23    about that.  So I think that he has the right to say, no, I

24    can't tell you when I got off one payroll and when I got off

25    the other payroll because there was no fine line drawn because

F1uQsok1

1    we were in the middle of this conflict, and during this period

2    of time, the buildings got destroyed.  So, just like any

3    business, if the building burns down, it's going to be more

4    difficult for you to do your business.  So I accept that.

5            Now, your part about that somehow that's hearsay, I

6    have no basis -- I think we had this conversation.  I have no

7    basis to conclude this is hearsay.  If I told you my house

8    burned down, you can't say, "Well, you have to prove that

9    that's not hearsay."  I'm telling you my house burned down.  I

10   know it burned down.  You can't exclude my testimony just

11   because you say I haven't independently demonstrated it's not

12   hearsay.  There is no basis on which you can conclude it's

13   hearsay.  If the guy goes to work every day and he said, "Well,

14   I couldn't go to work because the buildings were destroyed," I

15   can't accept that I'm supposed to assume that he doesn't know

16   that.

17           MR. YALOWITZ:  Let me put that particular exchange

18   aside for a minute.  I don't want to get wrapped around the

19   axle on that exchange.  I understand what you are saying.  I

20   read the testimony a little differently.  Let me put that aside

21   for a minute.

22           Here is how I want to proceed with the depositions:

23   First of all, past performance is no guarantee of future

24   results, so I am going to try to convince you that I am right

25   on the procedural issue.  I understand you've thought it

F1uQsok1

1    through but I at least want to show you what my thinking is so

2    you will at least understand it.  I think you are almost there,

3    but at least you will understand my argument.  That is the

4    first thing I want to do.

5         The second thing I want to do is, if you don't accept

6    my procedural argument about Rule 32, I want to understand

7    where we are procedurally in terms of offering these

8    depositions.  I have no problem with my guy who, by the way,

9    we've had to substitute because of a scheduling problem.  I was

10   going to have a partner of mine named Irv Nathan read the

11   answers, but he is unavailable so @Marcus Asner is going to

12   read them.  I think you may remember Marcus from the Southern

13   District.

14        THE COURT:  Yes.

15        MR. YALOWITZ:  I have no problem with Asner reading

16   that first bucket of true counterdesignations.  But I don't

17   want to spend four hours on my case dealing with their kind of

18   secondary counterdesignations.

19        THE COURT:  I thought we already put that aside.  I

20   thought I had gone through that list, and there were a limited

21   number of things you objected to, and I thought we resolved

22   those.  I didn't think you had any issues with it.

23        MR. YALOWITZ:  I am not going to re-argue the

24   buildings thing.  I get where you are on that.

25        I just want to make sure that I have the decision that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1uQsok1

1   I have to make, which is whichever depositions we read on

2   Monday, if I don't persuade you on Rule 32 generally, we then

3   have opened the door, in essence, to the use of those

4   depositions in the defendant's case to the extent the witness

5   was sitting in the chair.

6           THE COURT:  I haven't gotten there yet because I'm not

7   sure we have to.  My position at this point is that if you

8   elicit testimony from a witness on a particular subject matter,

9   then they have the right to read questions and answers from the

10  witness that are also related to that subject matter.  That is

11  the first principle, and that is consistent with your rule.

12          MR. YALOWITZ:  Is that in their case or in my case?

13          THE COURT:  It doesn't matter.

14          MR. YALOWITZ:  It matters to me.

15          THE COURT:  I know it matters to you, but the only

16  part that I said -- we already know what you're supposed to

17  read.

18          MR. YALOWITZ:  Right.

19          THE COURT:  So I didn't think we were debating about

20  that any more.  I thought we were only debating about what they

21  get to read, I'm not forcing you to read anything else.

22          MR. YALOWITZ:  I agree with that.

23          THE COURT:  I told you what you should read.

24          MR. YALOWITZ:  I agree with that.  I'm concerned about

25  the timing issue too though.

F1uQsok1

1         THE COURT:  Why?

2         MR. YALOWITZ:  Because I've got 30 people coming in

3    from out of town.

4         THE COURT:  OK.

5         MR. YALOWITZ:  Maybe it's not 30; maybe it's 20.

6    Whatever it is, it's a lot of people, and if we wind up chewing

7    a lot of time in my case --

8         THE COURT:  Well, we shouldn't because we know exactly

9    what you're going to read now, don't we?

10         MR. YALOWITZ:  So whatever we do with those

11    depositions, as long as it comes in the defendant's case, I

12    want to be sure I have a clear understanding.

13         THE COURT:  If it comes in the defendant's case and it

14    is related on the subject matter you read on your case even if

15    it is something that I thought in fairness should have been

16    read at the same time, I think even applying your rule, they

17    would have the right to read that question and answer.

18         If you asked the person, "What is your salary?"  And

19    the person says, "$10,000."  And you ask the person, "How many

20    weeks do you work a year?"  And he says, "50."  And you say

21    that's enough.  I don't see where you have an objection if they

22    say, "Well, Judge, there is a question three pages later where

23    they say, "Didn't you take three weeks vacation during that

24    year and you only worked 47 weeks?"  You would not have a

25    legitimate argument based on your rule or the rule as I am

F1uQsok1

```
 1    interpreting it to say they can't read that.  That's all I'm
 2    saying.
 3              MR. YALOWITZ:  I think I get that.  I don't think I
 4    disagree with that at all.
 5              THE COURT:  So we will put aside those issues.  The
 6    issues are, you said what you wanted to read.  You get to read
 7    what you want to read.  I think we have designated very limited
 8    portions that we say, in fairness, the jury should have that at
 9    the same time and you're going to read that too.
10              MR. YALOWITZ:  Right.
11              THE COURT:  Then with regard to the same subject
12    matter, if they think in fairness that the jury should have the
13    complete answers and the total picture and the total responses
14    by that witness about that subject matter, I think even
15    consistent with your more restrictive view of the rule, they
16    have the right to do that, OK?
17              MR. YALOWITZ:  OK.
18              THE COURT:  So what you have to convince me of is one
19    of two things:  That it falls outside that category or, two --
20              MR. YALOWITZ:  Which a lot of it does.
21              THE COURT:  Or, two, that it would be inadmissible if
22    the witness had been here to testify.
23              MR. YALOWITZ:  Right.  Which other of it does.  OK.  I
24    get that.
25              THE COURT:  Now, the first area you have not
```

F1uQsok1

1   specified.  You haven't specified which area you say is outside

2   the subject matter.  So I don't know how to rule on that.  To

3   the extent that you say certain things are inadmissible, you've

4   identified some things that you say are inadmissible.

5           MR. YALOWITZ:  Right.

6           THE COURT:  I can address those; and then they can

7   convince me otherwise.  On page 4, the testimony about

8   non-violent expression of rejection of the occupation, I think

9   that's inadmissible.

10          MR. YALOWITZ:  Right.

11          THE COURT:  I don't see any reason why that should be

12  in this case.  I'm not sure why I would even let the witness

13  testify to that if the witness was here.

14          The testimony about difference between Jewish

15  communities and Israeli settlements.  I think that is totally

16  irrelevant to the issues in this case.  If the witness was

17  here, I probably wouldn't let the witness testify to that

18  either.

19          MR. YALOWITZ:  Right.

20          THE COURT:  And we all know why.  That is an area that

21  I say is out of bounds in this case.

22          MR. YALOWITZ:  Right.

23          THE COURT:  Now, whether or not there was -- I don't

24  have the complete question here, I just have the phrases that

25  you cited:  Whether or not the person has a view that there was

F1uQsok1

1    virtually complete disintegration of a PA security agency and

2    the structure was completely destroyed in the course of the

3    Intifada by the Israeli army.  I don't know what the basis for

4    that is, and I don't know in what context that statement is

5    made.  You might convince me that he has no basis to make such

6    a sweeping claim.  It's a little more than simply saying, "I

7    couldn't go to work because the building was destroyed."  So I

8    may agree with you that I don't see why that would be

9    admissible.

10         And you quoted some language in the next paragraph

11   "The Israeli side is withdrawing its commitment to the

12   agreement."  What do I care?  What does the jury care?  Nothing

13   to do with whether or not they were involved in terrorist acts

14   here.  It is pure politics.  It is out, OK?

15         And the fact that someone said it was a total mess

16   caused by the Israeli Defense Forces, who cares what they

17   think?  It's out.  This is not rocket science.  That's not

18   admissible unless you can give me some more complete Q and A.

19   Give me some rationale to convince me that that is a basis on

20   which this jury should make a decision as to whether or not

21   they were involved in the six terrorist acts at issue here.

22         If you have any more that you can identify for me, I

23   can rule on them.  If those are the things that you think are

24   significantly prejudicial or inadmissible portions, I mean, I

25   can understand that; but I don't think you have given me a

F1uQsok1

1        record where I can say wholesale that, no, they can't read

2        other parts because you say the rule lets you read whatever you

3        want to read and they don't get to read anything.

4                MR. YALOWITZ:  So I think we are actually -- you and I

5        on this particular issue and this reading of the rule are quite

6        close.  There may be some nuance of difference, but I think

7        given what I am hearing, I don't think it is a material

8        difference.

9                What I would like to do is, I am going to take the

10       weekend, and I am going to really drill down on these

11       transcripts and based on your guidance, I am going to make a

12       judgment of two things:  Number one, do I want to offer the

13       transcript at all.  And, number two, if I do, what are the

14       parts that I think are either out of bounds or inadequately

15       foundationalized.  Having gotten your guidance, I think I feel

16       comfortable making that judgment.  On Monday if there are

17       transcripts I want to read, and I think there probably are, we

18       will read them with the understanding that that is going to be

19       the ground rule.

20               THE COURT:  As I say, I may not be accurately stating

21       what went on at the deposition, but for most of the deposition,

22       these are both your questions and answers and their questions

23       and answers are questions and answers that were asked by the

24       plaintiffs' attorneys on the same subject matter.  And that

25       plaintiff's attorney is the same plaintiff's attorney that

F1uQsok1

1    represented the parties in this litigation.  Quite frankly, I

2    may be inaccurate, but I am going to venture to say for at

3    least some of them, if not all of them, at the same time.

4           MR. YALOWITZ:  Does that matter?  Because I'm not sure

5    that matters.

6           THE COURT:  Well, it matters if you are arguing some

7    prejudice because you didn't have an interest in asking the

8    relevant question when the issues were the same, the defendant

9    was the same, the lawyer was the same, and the only difference

10   is the names of plaintiffs are different.  It is not a

11   different -- because also, remember, in this case it's a little

12   more difficult for you to make that argument in reality

13   because, quite frankly, there are six different sets of

14   plaintiffs here, and they still have the same interest, and

15   your argument was they should all be in the same case because

16   they do have the same interest.

17          So it is kind of hard for you to argue that somehow

18   you have some legitimate argument to make that the lawyer who

19   represented these six plaintiffs based on their joint

20   victimization by terrorist attacks are somehow related to each

21   other, but he has no interest to ask the same legitimate

22   question that -- I mean, there is really no difference

23   between--

24          MR. YALOWITZ:  I am not debating on that.  The reason

25   I ask is because there is one where it wasn't Tolchin.  It's

F1uQsok1

1    somebody who is not represented by anybody associated with me,

2    and I am not sure it makes a difference.  I am just saying if

3    you think that is a decisive factor, that is something I want

4    to understand.  I think it's a factor.  I'm not saying it's not

5    a factor.

6              THE COURT:  For me it can't be a decisive factor

7    simply in the abstract on a technicality.  If you tell me that

8    Tolchin asked six questions in this area, and you tell me the

9    other lawyer who wasn't Tolchin asked the exact same question

10   in that area, what do I care whether it's a different lawyer?

11   That doesn't make any difference.  The difference is what does

12   it mean to the case?  Is it unfair to allow them to put in

13   stuff even though you are only taking a limited portion of it.

14   On the other hand, is it unfair or fair to exclude them from

15   putting in other Q and A on the certain subject matter that

16   would have otherwise been admissible because you say well

17   technically it's not the same lawyer.

18             MR. YALOWITZ:  I understand.  That is sort of what I

19   thought your thinking was.  I just wanted to make sure.

20             THE COURT:  Let me see what they want to say.

21             MR. YALOWITZ:  I think there is another topic.

22             THE COURT:  One of the jurors is missing.  Do you want

23   to respond?  I know you haven't had an opportunity to respond.

24             MR. ROCHON:  We benefited from the colloquy and,

25   therefore, that will inform our submission.  I would rather not

F1uQsok1

1    use your time to say things that we will say in our papers as

2    well.

3                I did owe you another thing, your Honor.  You wanted a

4    report on where we were from the defense case.

5                THE COURT:  Yes, I was going to ask you later in the

6    day, but if you are prepared to give it, do you anticipate that

7    you may call witnesses.  If so, approximately how many and how

8    long would that take?

9                MR. ROCHON:  I can give you some answers now.  I am

10   going to have more complete answers over the weekend.

11               I have to say the plaintiff's case looks like it's

12   going to take three and a half weeks instead of what we

13   thought, so we're juggling, and we will manage to juggle.

14               Last night -- as you know, it's a Friday/Saturday

15   weekend over there, so when I got to my hotel, it was after

16   midnight over there.  I am going to have calls over the

17   weekend.

18               There will be a defense case.  It will be

19   substantially smaller than the first list of witnesses we sent

20   the plaintiffs, and we will send them an amended will/may-call

21   list on Sunday or Monday.  I will have a pretty good estimate

22   for you on Monday.  It will take, I think, essentially more

23   than three days, less than six is my best estimate.  It is

24   going to get more precise by Monday.  That is the best I can do

25   right now.

F1uQsok1

1            THE COURT:  Approximately how many witnesses are you

2    contemplating right now?

3            MR. ROCHON:  Between six and eight.  I hope you don't

4    hold me to that.  I will have much better information for you

5    on Monday.  There are a lot of complications here.  The people

6    I expected to bring for depositions I was going to bring on the

7    16th, expecting they would testify on the week of the 23rd.  I

8    now need to look at getting them here on the 9th to testify the

9    week of the 16th.  They're all from overseas as well.  That is

10   a rough estimate.  On Monday, I will have something a lot more

11   definite.

12           THE COURT:  We will talk about it on Monday.

13           MR. YALOWITZ:  Before we move off the witness list, I

14   want to just say one thing, which is, on January 5, which was

15   like seven days before the trial began, we gave the defendants

16   a will-call list and a may-call list, and we've stuck by that.

17   I really would like to use the time available this weekend to

18   start thinking about their -- so if they have witnesses that

19   they know they are going to call, I would like to hear that

20   today.

21           I understand that they have some they are not clear

22   on, but if they could give me who they know they are going to

23   call now and then amend it on Sunday after they have had a

24   chance to counsel with their client, that would be -- Sunday by

25   noon, which is well after the end of the workday in Ramallah, I

F1uQsok1

1    think that would be kind of equality of treatment.

2              MR. ROCHON:  Here is where we are.  On January 5, I

3    gave them our list as well.  On Monday, a week before we begin

4    our case, the same schedule they gave us, I will hand him that

5    list.  Right now I will tell you, I'm evaluating everything,

6    and I'm evaluating with my client.  I don't want to proffer I

7    will call someone for sure because, frankly, the case came in a

8    little bit differently than we expected.  I didn't know they

9    were going to close and not put on -- they had other may-call

10   witnesses.  They're not going to call them.  I appreciate

11   knowing that.  Monday morning and maybe on Sunday I will give

12   Mr. Yalowitz exactly what he just asked for.

13             THE COURT:  Mr. Yalowitz, you said you had one other

14   quick issue?

15             MR. YALOWITZ:  That was the issue.  That was the

16   issue.

17             THE COURT:  That was the issue?

18             MR. YALOWITZ:  So we are going to have the will-call

19   list Monday morning 9:00 a.m.?

20             MR. ROCHON:  I will have a will-call.  There will be

21   some may-call, and it will be substantially narrower than what

22   they got on the 5th of January.

23             MR. YALOWITZ:  Monday morning 9:00 a.m.

24             Thank you, your Honor.

25             THE COURT:  Mr. Rochon.

F1uQsok1

1          MR. ROCHON:  Due to another crisis that I need to

2     attend to -- I am not asking any leave of the Court other than

3     -- I am going to absent myself after Dr. Friedman.

4          Mr. Hill.  No offense to the economist.

5          THE COURT:  Sure.

6          MR. ROCHON:  Thank you.  I've discussed that with my

7     client.

8          THE COURT:  Mr. Yalowitz, who do you intend to put on

9     today?

10          MR. YALOWITZ:  When Dr. Friedman is finished,

11     Mr. Horton is going to question Soudry and Weinstein.  They are

12     both lost wages calculations.  He is conserving his voice

13     because he is not feeling well.  So if he crashes, then

14     Ms. Romeo may do the questioning.

15          THE COURT:  She's back up.

16          MR. YALOWITZ:  Anyway, we are hoping that it will be

17     done.

18          MS. ROMEO:  It will be done today.

19          THE COURT:  You think we will be done by lunchtime or

20     we have to take lunch and come back after?

21          MS. ROMEO:  I think middle of the afternoon.

22          We also have one small housekeeping matter.  We spoke

23     with defense counsel and we wanted to move for admission of

24     additional photographs that were not covered by our admission

25     yesterday.  Those exhibits numbers are 1223 to 1225, 1231, 1247

F1uQsok1

1    through 1259, so plaintiff offers those in evidence.

2              MR. ROCHON:  Those are all photos of individuals.

3    There is no objection.  We will need copies of some of those.

4    We'll work that out with plaintiffs.

5              THE COURT:  Those will be admitted.

6              (Plaintiff's Exhibits 1223-1225, 1231, 1247 through

7    1259 received in evidence)

8              THE COURT:  Let me see if our last juror is here.

9    Still missing one?  Same one?  No?  A different one?

10             Let me take you back to the deposition designations.

11   What is attached to the January 24 letter is the way this

12   version of what the designations are going to be from both

13   sides?

14             MR. YALOWITZ:  Let me consult, your Honor.

15             THE COURT:  Sure.

16             (Pause)

17             MR. YALOWITZ:  It should be.

18             THE COURT:  I think I have their designation first and

19   then you told me after we discussed it that you had gotten

20   this, and this is different.

21             MR. YALOWITZ:  So the answer is, we are not really

22   sure.

23             THE COURT:  OK.

24             MR. YALOWITZ:  I think what we should do is if you

25   want to look at it over the weekend, we will send you and the

F1uQsok1

1    defendants a courtesy copy of what we think are the green

2    designations and then my blue that are kind of in that second

3    bucket.

4              THE COURT:  All I need from you really --

5              MR. YALOWITZ:  If you don't want to look at it over

6    the weekend, we will give it to you next week.

7              THE COURT:  Wanting to is not the question.  The

8    bottom line is I just need for you to tell me substantively

9    what Q and A you object to coming into this case at all and

10   tell me what the reason is.  You know that I am not

11   particularly impressed by your technical procedural reasons,

12   but if you have some real substantive objection or

13   admissibility objection, then point me to those sections so I

14   can read them.  I will see whether it is related to the

15   portions you want.  I will see whether or not it appears to be

16   admissible evidence.

17             I have already pretty much given you at least my

18   impression.  I will let Mr. Rochon or Mr. Hill convince me

19   otherwise, but I have given you my impression of the portions

20   that you cited to me in your letter.  So if you have any other

21   portions like that, you'd better tell me what they are because

22   otherwise my default position is going to be I'm going to let

23   them read the rest if your only objection is technically you

24   think that they shouldn't be allowed to read even though you

25   get to read.

F1uQsok1

1              MR. YALOWITZ:  Here is what I am going to do:  I am

2      going to -- in deference to Super Bowl Sunday, what I am going

3      to do is -- we have gotten a lot of rulings in the case since

4      we did those designations and objections.  I now understand

5      exactly where you are -- obviously, subject to finality, but I

6      understand where I think you are on how you read that rule.  It

7      is very helpful to me to understand that.

8              I am going to go through these transcripts this

9      weekend with those things in mind.  It won't be Saturday or it

10     won't be Sunday -- but it will be relatively promptly, maybe

11     Sunday night, Monday morning, something like that.  I will get

12     you any transcript I decide I'm not going to read from.  I will

13     tell you that so you don't have to look at it at all.  Any

14     transcript I decide I am going to read from, I am going to give

15     you the same kind of chart I did before with no objection or I

16     object because it's unrelated or --

17             THE COURT:  I just need to know what the objection is.

18             MR. YALOWITZ:  Unrelated, not foundationalized,

19     whatever it is.

20             THE COURT:  I think that I need to see something of

21     substance.  As I said, I'm more guided by the Rules of Evidence

22     rather than the Rules of Civil Procedure on this issue.

23             MR. YALOWITZ:  I understand.  I think that will save

24     you some work, and it will be more targeted and more focused

25     because I also do want to think about not only can I object but

F1uQsok1

1   do I need to.

2           THE COURT:  Then I will wait to hear from Mr. Hill

3   either before or after that before I make a final ruling.

4           MR. HILL:  I think efficiently it should be after.

5   Just so your Honor has it in the record, the highlights

6   attached to the January 21 letter -- I can give you another

7   copy.

8           THE COURT:  I think that is what I have.  I am being

9   told that's different than what's attached to his January 24.

10          MR. HILL:  The January 24 is different.  So the

11  complete set of what we wish to offer with respect to these

12  five depositions is attached to the January 21 letter.  I'm

13  happy to give you another copy if you'd like.

14          THE COURT:  Why don't you give me that because I don't

15  know why this is different then.  I thought this is what you

16  gave them about what you wanted --

17          MR. HILL:  It happened in stages, your Honor.  I can

18  relate it all if you'd like.

19          MR. YALOWITZ:  So if you actually don't want to watch

20  the Super Bowl, and you would actually like to do something

21  less interesting, you can read that.

22          THE COURT:  I'll read it before I see you Monday.

23  Let's wind this up.  The jurors are here.  I want to bring them

24  out.

25          MR. YALOWITZ:  So you are going to read that or

F1uQsok1

1   because I have to go back and look at what it is if you are

2   going to read it.

3           THE COURT:  I'm going to keep you guessing.  I will

4   read it at some point.  Let's get the jurors in and see if we

5   can finish this witness.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1uQsok1

```
 1              (Jury present)

 2       ALAN FRIEDMAN, resumed.

 3   DIRECT EXAMINATION CONTINUED

 4   BY MR. HORTON:

 5              THE COURT:  Ladies and gentlemen, what I would like to

 6   do, I'd like to see if we can get through two or three

 7   witnesses today.  We got a little bit of a late start.  I think

 8   we are more likely to adjourn closer to 3:00.  We will have a

 9   little shorter lunch and adjourn closer to 3:00 than closer to

10   lunchtime.  Let's see how we proceed.  If we can adjourn by

11   lunchtime, we will but it is more likely some time

12   mid-afternoon than lunchtime.

13              Why don't you continue, Mr. Horton.

14              MR. HORTON:  Thank you, your Honor.

15   Q.  Good morning, Dr. Friedman.

16   A.  Good morning.

17   Q.  We are now going to move to the Sokolow family starting

18   with Rena Sokolow.

19              THE COURT:  Mr. Horton I know you're having a little

20   difficulty so lean that up to you.

21              MR. HORTON:  Let me know, your Honor, I am doing my

22   best here.

23   Q.  Doctor, could you tell us briefly who Rena Sokolow is and

24   what happened to her?

25   A.  Yes.  In the interest of brevity, rather than going through
```

1    this with each member.  Once again, the Sokolow family, there

2    were four of them visiting Israel.  They were standing outside

3    a shoe store on January 27, 2002, which is two days ago plus 13

4    years, when a suicide bomber detonated her explosive device.

5    Rena Sokolow recalls falling down and lying in a pool of blood

6    with her right leg protruding out of the skin.  She was taken

7    by ambulance to Shaare Zedek Hospital and was noted to have a

8    fracture of the right tibia.  It was a segmental type fracture,

9    which basically means the bone -- the break was its own

10   separate piece.  That same day she underwent surgery by putting

11   in a plate and screws to correct that.

12   Q.  In addition to the break in her leg that you mentioned, did

13   she have any other wounds?

14   A.  Yes.  She was noted to have open wounds, open cuts in both

15   the right and left legs and also had shrapnel wounds in both

16   legs.  She was also diagnosed with a perforated right ear drum.

17          (Continued on next page)

18

19

20

21

22

23

24

25

F1U8SOK2                        Friedman - direct

1   Q.  Could you describe the treatment she was given during the

2   time of the attack for those various wounds?

3   A.  As I mentioned, she had surgery on the right leg with the

4   plate and screws put in on the same day of the injury.  She

5   remained in the hospital for ten days, was treated with

6   antibiotics because she was having recurrent fevers.  They felt

7   that her blood count was very low and wanted to give her a

8   blood transfusion, but she was concerned about the safety of

9   the blood and refused the transfusions.

10  Q.  Did she ever have the shrapnel removed?

11  A.  Yes.  Upon return to the United States, she had two

12  surgeries.  She had one in June and one in July, both of them

13  in 2003, to take out shrapnel from the left knee and from the

14  left ankle.  I believe there may be a typo in the report.  It

15  says knee twice.  But one was the ankle and one was the knee.

16  Q.  Have you reviewed the records of Ms. Sokolow's follow-up

17  care with respect to the healing and therapy on her leg?

18  A.  Yes.

19  Q.  Can you explain what the course of her recovery was?

20  A.  So she was seen almost immediately in Long Island in the

21  South Nassau Wound Care Center by Dr. Alan Friedman, not me.

22  She was treated by an orthopedist with a cam walker and then a

23  walker.  A cam walker is a Velcro boot.  It's a fiberglass boot

24  with Velcro closures and rubber sole, and a regular walker is

25  something that you carry with your hands to help you walk.  She

F1U8SOK2                    Friedman - direct

1    was not allowed to put any weight upon the right leg initially

2    until it was felt to have healed, and the injury was in

3    January.

4          Finally, in June of that same year, she was able to

5    now resume weight bearing on the right leg.  She also received

6    a significant period of physical therapy for at least one year.

7    Q.  Did you conduct a physical examination of Ms. Sokolow to

8    determine how she was doing as of now, or as of the time of

9    your evaluation?

10   A.  Yes, I did.

11   Q.  Could you tell us what you found in that evaluation,

12   starting with any issues of loss or decrease of sensation?

13   A.  I examined her in February of 2013.  I noticed that she had

14   decreased sensation and absence of sensation in different parts

15   of the legs.  Both legs were affected.  There is decreased

16   sensation on the outside of the left leg and absence of

17   sensation in the inside of the left leg.  In the right leg,

18   basically she has got no sensation in both sides of the leg.

19   And then on the top part of the foot she has, from the middle

20   foot to the toes, she does have sensation but it's decreased.

21   Q.  Has she suffered any impairment of function with respect to

22   her legs?

23   A.  So she reports no problems walking, but she does have pain

24   and she has tingling and numbness in the feet.  She states that

25   she also has tightness in the right calf and ankle and this has

F1U8SOK2                              Friedman - direct

 1  sort of -- it's worse in the morning, worse on cold days, and

 2  because of that she has difficulty skiing or jumping.

 3  Q.  Does she have any restrictions on the range of motion with

 4  her right leg or ankle?

 5  A.  Yes.

 6  Q.  Could you explain those, please.

 7  A.  So she has a 50 percent decrease in the ability to raise

 8  the right ankle up.

 9  Q.  Does she still have any scaring?

10  A.  She has scars in both legs.  In the right leg she has got

11  scattered scars pretty much all over.  There is, what I wrote

12  in my report, described it looks like a divot, a star-shaped

13  almost indentation right above to the outside part of the knee,

14  right over the bone, that people feel the round part on the

15  outside of the knee.  That's the fibula head.

16          On the left leg there is 11-and-a-half centimeters,

17  which is about 4 inches, 5 inches, scar on the outside part of

18  the leg.  She also has scars from which she had surgery, and

19  that's over both sides, the inside and outside of the left leg.

20  Q.  Doctor, I think you have referred so far to loss of

21  sensation or numbness, to pain, to tingling, to tightness and

22  to the scaring.

23          Do you have a professional opinion as to the cause of

24  all these items that you have explained?

25  A.  Yes.  Basically she states that the sensation has been

1  affected since the time of the injury.  She has scars in those

2  areas from where she had surgery to remove shrapnel and the

3  surgery on the leg.  And I believe those are related to her

4  injuries from the bombing.

5  Q.  Do you think that those injuries are likely to be

6  permanent?

7  A.  Yes.  I saw her in 2013.  The injury was in 2002 and they

8  were still present, and I had no reason to believe they were

9  resolved at this point.

10  Q.  Let me ask you also if you examined Ms. Sokolow's, the toes

11  on her right foot?

12  A.  I did.

13  Q.  Did you find any issues or loss of function there?

14  A.  She has weakness of the raising the big toe.

15  Q.  Are you able to say what causes that?

16  A.  Yes.

17  Q.  What in your opinion is the cause of her inability to raise

18  her right toe?

19  A.  She reported to me that she had been told that the tendon

20  that raises the big toe had been lacerated or cut and they were

21  unable to fix that.

22  Q.  Doctor, do any of the conditions that you have described

23  with respect to Rena Sokolow put her at risk for future medical

24  issues beyond those that she has now?

25  A.  Yes.  When she walks, her foot comes down slightly fast at

F1U8SOK2                         Friedman - direct

1    the end, but she has the weakness of toe that I mentioned

2    yesterday.  It's the last thing that comes down and almost the

3    last thing that leaves the ground.

4              She doesn't have any walking problems now per se, and

5    she reports no problems.  She does have decreased sensation

6    and, as we mentioned yesterday -- again, it's the same issue --

7    that decrease sensation.  Should there be a problem further

8    down the road, once again, she is starting with less than a

9    full sensation and therefore she is already starting a little

10   bit closer to being, having a more permanent problem in

11   general.  As we said yesterday, although her gait is not so

12   affected at this point, any change in gait could predispose

13   down the road to arthritis.

14   Q.  Do you hold the opinions that you have given about

15   Ms. Sokolow this morning to a reasonable degree of medical

16   certainty?

17   A.  Yes, I do.

18   Q.  Let's move to her husband, Mark Sokolow.

19   A.  OK.

20   Q.  I think you have pretty well described what happened to all

21   the Sokolow family that morning in terms of the event.  So can

22   you move straight to the description based on your review of

23   the records of Mr. Sokolow's injuries.

24   A.  Mr. Sokolow was taken to the hospital, which is basically

25   right around the corner from the scene.  In the emergency room

F1U8SOK2                      Friedman - direct

1    he was treated for a cut on the face and scrapes on the face,

2    neck, his right arm, left leg.  They actually stitched, sutured

3    the cut on his right cheek.  He had no burns but a lot of

4    bruising, and his right eardrum was perforated.  He was given

5    antibiotics intravenously and kept in the hospital for 24 hours

6    and then released.

7             Actually, it's interesting based on the Sokolow

8    family, perforated eardrums, you can tell how they were

9    standing in relation to each other at the time of the blast.

10   Q.  What do you mean by that, Doctor?

11   A.  Well, two of them had right eardrum perforations and

12   another one had a left eardrum perforation and a blast injury

13   is, to put it as basic as possible, is a full rushing of air

14   and pressure, and that's what perforates the eardrum.  So it's

15   much less likely that the perforations were on the side away

16   from the blast.

17            So his and his wife's right eardrums were perforated

18   and the daughter's left eardrum was perforated which leaves me

19   to assume that they were standing facing each other at the

20   time.

21   Q.  Did Mr. Sokolow require treatment to deal with his burst

22   eardrum?

23   A.  Yes, he did.

24   Q.  What did he require?

25   A.  When he returned to the United States he underwent surgery

F1U8SOK2                        Friedman - direct

1    to repair the eardrum.

2    Q.  Let me ask you about your examination of Mr. Sokolow.  Did

3    you find any evidence of shrapnel still in his body?

4    A.  In my physical examination I was able to palpate or to feel

5    shrapnel in his right thigh.

6    Q.  Does that cause him any difficulties?

7    A.  He reports that whole area of the thigh is hypersensitive.

8    Q.  Just to be clear, what do you mean by hypersensitive?

9    A.  So, very sensitive.  If you touch it, it's uncomfortable.

10   Not to the extent of what I described yesterday as allodynia,

11   that people can't bear it when you touch it, but sometimes

12   anything that would rub against it would really be very

13   uncomfortable, a lot of discomfort.  But they do have the

14   sensation there.  It's just uncomfortable and it does affect

15   what they would wear or what they would put in the area.

16   Q.  Doctor, are you familiar with the term tinnitus?

17   A.  Yes, I am.

18   Q.  Can you tell us what tinnitus is?

19   A.  Tinnitus is a sensation of buzzing or ringing in the ears.

20   Q.  How did doctors test for tinnitus?

21   A.  We don't.  It's a symptom.

22   Q.  How do you determine if the patient has it?

23   A.  The patient says, doc, I have ringing in my ears or buzzing

24   in my ears.  There is no way to test it objectively.

25   Q.  Does Mr. Sokolow have tinnitus?

F1U8SOK2                    Friedman - direct

1    A.  So he did not initially until he had the eardrum repaired,

2    and since the surgery in March of 2002 he states that he has

3    constant tinnitus.

4    Q.  That's ten years later?

5    A.  Yes.

6    Q.  Doctor, in your opinion are the tinnitus and the

7    hypersensitivity in Mr. Sokolow's leg likely to be permanent?

8    A.  Yes.

9    Q.  Do you hold the opinions that you have given about

10   Mr. Sokolow at this point to a reasonable degree of medical

11   certainty?

12   A.  Yes, I do.

13   Q.  Let's turn to one of the Sokolow daughters, Lauren Sokolow

14   Mandelstam.

15          Can you remind us about how old Ms. Sokolow was at the

16   time of the attack.

17   A.  Lauren was 16 years old at the time of the attack.

18   Q.  Based on your review of her medical records, could you

19   please tell the jury what her injuries were.

20   A.  So Lauren ran across the street and was treated at the

21   scene, but then she was taken by ambulance to Shaare Zedek

22   Hospital.  She was treated for shrapnel injuries in both legs

23   as well as burns to her face and to her hair and she is the one

24   who was diagnosed with the left eardrum perforation.

25          She also had a bolt shrapnel wound to her right leg,

F1U8SOK2                        Friedman - direct

1   which she describes as a shrapnel hole, and that was sutured.

2   She was discharged on the 30th of January, which is a few days

3   after the bombing, and got out of dodge.  Even though her

4   family was still there returned immediately to the United

5   States.

6   Q.  Did she require follow-up treatment for her injuries?

7   A.  Yes, she did.

8   Q.  Can you explain what that treatment was.

9   A.  On March 11, 2002, she had the left eardrum repaired.

10  That's actually the same day that her father had his surgery

11  for the same procedure.  She was also seen by Dr. Martin

12  Kessler, a plastic surgeon, for evaluation of the burn on the

13  face and the shrapnel wounds, and she underwent an excision --

14  they took out a very large scar on her cheek in May of 2002.

15  And plastic surgery for that.

16  Q.  Let me now ask you about your physical exam of her.  Did

17  you find any evidence of shrapnel remaining?

18  A.  I will read it from the report.

19          There is a hard, solid object palpable in the back of

20  the left thigh near the knee.  She actually reports pain when

21  she bends the left knee and states this embedded shrapnel is

22  still causing her pain every time she bends that knee.  It was,

23  on my examination, about the size of a ball bearing.

24  Q.  When you say palpable, that means you can literally feel it

25  with your fingers?

F1U8SOK2                          Friedman - direct

1    A.  Correct.

2    Q.  Does Lauren suffer from any loss of sensation?

3    A.  Yes.  She reports numbness in the right calf and in the

4    right leg and on examination there is decreased both pinprick

5    and light touch sensation in a one-and-a-half inch area over

6    the back of the right leg.

7    Q.  In your opinion, what is the cause of the loss of

8    sensation -- I have left one question out.

9         Did you detect any scaring in your examination of

10   Lauren?

11   A.  She has a scar over the back of the right leg.  She has an

12   arc-shaped scar over the outside bottom part of the left eye.

13   Those are the scars that I saw.

14   Q.  Thank you, Doctor.

15        Let me go back to the question that I had started.

16        You have mentioned some numbness, pain and scaring.

17   In your professional opinion, what is the cause of those?

18   A.  The bombing in January of 2002.

19   Q.  Do you think that the loss of sensation and the pain are

20   likely to be permanent?

21   A.  Yes, I do.

22   Q.  Do you hold all of your opinions you have expressed about

23   Lauren Sokolow to a reasonable degree of medical certainty?

24   A.  Yes, I do.

25        I just want to add something.  She was completely deaf

F1U8SOK2                          Friedman - direct

1    in the left ear before they fixed the eardrum.  Now she says

2    that the hearing is normal.  But she said she couldn't hear

3    anything in that ear for two months basically.

4    Q.  Let's move to one final person, Doctor.  Shaul Mandelkorn.

5    The jury has already heard something.

6              Can you tell us briefly who Shaul Mandelkorn is and

7    what happened to him?

8    A.  Shaul Mandelkorn was at the time, on June 19, 2002, a

9    17-year-old student.  He was standing at a bus stop when there

10   was an explosion.  He told me that he doesn't remember much of

11   it at all.  All he really remembers is it being very quiet and

12   black, and that's pretty much all he can recall of the event.

13             He was evacuated by ambulance to Shaare Zedek Hospital

14   and he was actually kept there for five to six weeks.  He was

15   diagnosed with a fracture of the eye socket on the left orbit.

16   Actually, I am getting a little bit ahead of myself.

17             Initially they took him to the operating room because

18   they found that he had bleeding in the left lung.  Not in the

19   lung, in the cavity around the lung, and they drained that.  As

20   is common in a trauma where they will see shrapnel in the

21   abdomen, they opened him up to do exploratory surgery to make

22   sure none of the internal organs had been lacerated and that

23   there was internal bleeding.  So he had those two surgeries on

24   the same day of the injury.

25             Also, on the same day of the bombing, they found that

F1U8SOK2                          Friedman - direct

1    he had an open wound on the right elbow, and that had exposed a

2    nerve, the ulnar nerve that comes across the elbow, and also

3    there was a laceration of the artery that basically supplies

4    the rest of the arm.  He needed a graft.  They took a vein out

5    of his leg to repair that artery, and they closed it up.  The

6    nerve itself did not need any surgical procedure to be done.

7    Q.  I think when you started, Doctor, you started to refer to

8    the injury to Shaul's eyes.  Can you go back to his eyes?

9    A.  I shall.  I mentioned that the left eye socket or orbit

10   bone was fractured and there was also bleeding from shrapnel in

11   the eye socket and in the eye.  The shrapnel was removed from

12   the left eye and they repaired the lower eyelid surgically.

13        The right eye, there was shrapnel in the cornea.  Now,

14   corneal tears are extremely painful.  So he had shrapnel in the

15   right cornea, which subsequently we will get to that.  He had

16   surgery on that.

17        He also had a fracture of the left ankle and he needed

18   surgical repair of that.  This is all done immediately

19   following the bombing.  And he had a crush and avulsion injury

20   of the thigh on the right side.

21   Q.  Could you explain what a crush and avulsion injury is?

22   A.  Avulsion means that the muscle or tendon is torn, usually

23   from its source.  So hanging off.

24        A crush injury is similar to what we described

25   yesterday when we were talking about a fasciotomy.  You might

1    do a fasciotomy to treat a crush injury.

2            For example, if a building falls down and there is a

3    brick or beam lying across somebody's leg, it literally crushes

4    the muscle and it causes the muscle to begin to die because

5    there is no oxygen getting to the muscle.  So those injuries

6    are treated immediately.

7            He did not require -- he had a myomectomy and/or a

8    fasciotomy.  Exactly what was performed was unclear to me.  But

9    basically it was the same.  They had to cut, clear the area

10   away of dead muscle, dead skin, so that the remaining muscle

11   could survive.  There was a loss of -- the muscle itself was

12   taken out from the right thigh.

13   Q.  Thank you, Doctor.

14           Did he require any skin grafts?

15   A.  Let me just finish the initial injuries.

16   Q.  I'm sorry.  I thought you were done.  You can finish the

17   initial injuries.

18   A.  Both eardrums were perforated, and also they had to remove

19   multiple shrapnel from different places in the body.

20           Now to the skin grafts.

21   Q.  Thank you, sir.

22   A.  He had skin grafts to the right hand, the left thigh, the

23   right index finger.  Those initially.  Unfortunately, the graft

24   to the right thigh didn't take, which is not uncommon.  He told

25   me that he needed a second procedure, another graft, to the

F1U8SOK2                         Friedman - direct

1    right thigh and, for reasons that are unclear, it was done

2    without anesthesia.  So that was extremely painful to him.  He

3    told me at the time he was in extreme pain.

4           That second graft also failed.  So he needed a third

5    graft, skin graft, to the right thigh, and that was done

6    perhaps even a full year later.  And that one was successful.

7    By then it was done for a chronic ulcer with a foreign body,

8    which this was done later on but it implies there was still

9    shrapnel or something in there.  Foreign body could just be a

10   suture from the other skin graft.

11   Q.  Did he ever require any further procedures with respect to

12   his eyes?

13   A.  Yes.  As I said before, he had shrapnel to the right cornea

14   and he developed a cataract in the right eye and he

15   subsequently had surgery to remove the cataract from the right

16   eye.

17   Q.  Doctor, let me now ask you about your physical examination.

18          Did I miss something?

19   A.  I missed something.  He was diagnosed with left macular

20   edema of the left eye.  Macular edema is basically when there

21   is swelling of the middle part of the retina.  The macular

22   basically gives us our center field of vision.

23          So we see this often in elderly patients but not in

24   anybody of his age without something like a trauma causing

25   this.  It's difficult to treat.  I'm not an ophthalmologist.

F1U8SOK2                          Friedman - direct

1    So he would be able to see all the way around, but not in the

2    middle, which is really most of where we see for the most part.

3    But he was diagnosed with that on the left side.  So the

4    cataract was on the right side and the macular edema was on the

5    left side.

6    Q.  Is his vision impaired in both eyes, Doctor?

7    A.  He still has a problem with the left eye.  On the right eye

8    decreased.  In the left he still has the loss of the center

9    vision and on the right eye he tells me his vision is just

10   decreased.

11   Q.  Let's go forward to your examination of Shaul.

12   A.  OK.

13   Q.  You mentioned a number of wounds that he suffered on the

14   day of the bombing.  Can you see any scaring today from those

15   wounds?

16   A.  He has got lots of scars.  He has a large scar -- remember,

17   he had surgery.  So he has a scar from the bottom solar plexus

18   all the way down past the belly button in the midline.  He has

19   a lot of small scars in both sides of his abdomen, in the left

20   shoulder, left arm and the neck.  He has a zigzag scar, which

21   suggests that was from surgery, in the right arm.  A large scar

22   from the armpit all the way down towards the elbow.  That one

23   is 16 centimeters long and 2 centimeters wide.  So it's almost

24   an inch wide and about 7 inches long.  That's the one that goes

25   straight down on the inside of the arm there.

F1U8SOK2                    Friedman - direct

1           He has scars on the left thigh, under the left eye, on

2     the left knee, on the right leg, and the right ankle.

3     Q.  Doctor, what did you see when you inspected Shaul's right

4     thigh?

5     A.  So there is a large area that has an indentation basically

6     where he is missing muscle.  There is also the skin graft

7     sites, that I didn't mention yet, over the right elbow arm,

8     finger and the right thigh.  So not only does he have missing

9     muscle, but he has a skin graft site, which I measured is 19

10    centimeters by 8 centimeters, which, briefly, 2 to 3 inches in

11    one direction and about 9 inches in the other direction.

12          So that's a large portion of his thigh that he has a

13    skin graft site on.  He also has two skin graft sites on the

14    left thigh.  Those are probably the donor sites.

15    Q.  You mentioned the loss of muscle on the right thigh.  Is

16    this something that's easy to see from looking at as long as

17    the place is uncovered?

18    A.  Yes.  It was apparent to me easily.

19    Q.  Does Shaul still have any shrapnel in his body?

20    A.  There was shrapnel that I was able to feel in the left

21    thigh.

22    Q.  Does he suffer from any loss of sensation?

23    A.  On my examination, he had slightly decreased sensation in

24    the inside of the right ankle and it's hypersensitive in the

25    right arm.

F1U8SOK2                    Friedman - direct

1   Q.  I just asked you about -- I'm sorry.  I first asked you

2   about loss of sensation and I was going to ask you about

3   hypersensation, sort of the opposite end of the scale.

4   A.  Again, there is loss of sensation in the ankle area and

5   there is hyper or increased sensation, just as we just

6   mentioned with Mr. Sokolow, in the right arm and all the way

7   down the arm, the forearm.

8   Q.  Did Mr. Mandelkorn indicate whether the injuries he

9   suffered had affected his function in any way?

10  A.  He told me he has difficulty reading, and he is able to

11  drive but he has limitations.  He also has floaters in his

12  eyes, little black spots that sometimes just float across your

13  vision.  He also states that he can't run for any long period

14  of time.

15  Q.  Based on your examination of him, did the problems that he

16  reported surprise you at all?

17  A.  No.

18  Q.  Can you tell us what your professional opinion is as to the

19  cause of the scaring, the loss of sensation, the increased

20  sensation, the lost muscle mass, and the limitations that he

21  reported?

22  A.  The bombing in which he was injured in 2002.

23  Q.  In your opinion are the limitations that you found and that

24  he reported likely permanent?

25  A.  Yes.

F1U8SOK2                      Friedman - direct

1   Q.  Do you hold your opinions that you have expressed today

2   about Mr. Mandelkorn to a reasonable degree of medical

3   certainty?

4   A.  Yes.

5   Q.  Doctor, unless you can provide a cure for the common cold,

6   that's all I have.

7            THE COURT:  Cross-examination.

8            MR. ROCHON:  No questions.

9            MR. YALOWITZ:  Before we call the next witness, may I

10  just consult Mr. Horton about his cold?

11           We don't need to excuse anybody, but I need just a

12  moment or two away from everybody.

13           MR. ROCHON:  As they do that, if I may be excused.

14           THE COURT:  Yes, sir.

15           MR. ROCHON:  Thank you very much.

16           (Witness excused)

17           MR. YALOWITZ:  We are good to go.

18           THE COURT:  Are you prepared to call your next

19  witness?

20           MR. HORTON:  The plaintiffs call Michael Soudry, your

21  Honor.

22   MICHAEL SOUDRY,

23       called as a witness by the plaintiffs,

24       having been duly sworn, testified as follows:

25           THE COURT:  Would you state your name and spell your

F1U8SOK2                     Friedman - direct

1    name for the court reporter.

2              THE WITNESS:  My name is Michael Soudry.  S-O-U-D-R-Y.

3    DIRECT EXAMINATION

4    BY MR. HORTON:

5    Q.  Mr. Soudry, what is your profession?

6    A.  I am a forensic economist.

7    Q.  Can you explain to the jury what a forensic economist is.

8    A.  Yes.  I am asked to calculate economic losses for

9    litigation matters in cases such as personal injuries, wrongful

10   death, employment termination, business damages.  In all those

11   type of cases I am asked to calculate if it's lost earnings, if

12   it's projecting medical care costs, or if it's business

13   damages, I will project the lost profits to the business as

14   related to an event that caused damages to the business.

15             Usually I prepare reports.  I will explain the

16   methodology that I am applying and the findings and if it's

17   necessary, I come to court and testify and explain the

18   methodology and my findings.  I do this for plaintiffs and

19   defendants.

20   Q.  Where are you from originally, Mr. Soudry?  Some might say

21   you have an accent and some might not.

22   A.  I was born in Israel.

23   Q.  Where do you live now?

24   A.  I live in New Jersey.

25   Q.  How long have you been there?

F1U8SOK2                      Soudry – direct

1   A.  I came to the United States in 1993 and in New Jersey '95.

2   I was living in Manhattan for two years before.

3   Q.  Where did you go to college?

4   A.  I study at Hebrew University.  I have a BA in economics.  I

5   graduate in 1993.  And I have master degree in business

6   administration with a major in finance, graduated from Hebrew

7   University in 1993.

8   Q.  What did you do after you finished your MBA?

9   A.  I was working for the Israeli Bureau of Statistics or

10  Central Bureau of Statistics in Israel as an economist for two

11  years.  In 1993, I moved to the United States and I start

12  working for the Israel Economic Commission in Manhattan.  I was

13  there for two years as an economist.  I did mostly research.

14  And since 1995, I am employed by a company by the name of

15  Eco-Stat, LLC, which we are part of an accounting company,

16  Friedman, LLP, working as a forensic economist for about close

17  to 19 years now.

18  Q.  Mr. Soudry, how much of the work that you do as a forensic

19  economist involve the calculation of lost wages and lost

20  earnings?

21  A.  Most of my entire work is lost wages and lost calculations.

22  I would say about 95 percent of my work.

23  Q.  On average can you tell us about how many cases you handle

24  a year?

25  A.  Between 150 to 200 matters a year.

F1U8SOK2                        Soudry - direct

1  Q.  Have you testified as an expert witness in this area

2  before?

3  A.  Yes, I did.

4  Q.  Can you give us some time over the course of the average

5  times about how many times you would testify on lost wages?

6  A.  I testify about 15 times in court.  Most of my testimony is

7  in New York and New Jersey, and about another 20 times in

8  depositions.

9          MR. HORTON:  I would tender Mr. Soudry as an expert in

10  the calculation of economic damages for persons with lost

11  income.

12          THE COURT:  Any objection?

13          MR. HILL:  No, your Honor.

14          THE COURT:  You can inquire on that basis.

15  Q.  What were you asked to do in this case?

16  A.  I was asked to calculate the economic impact for the three

17  individuals that I prepared the report for.

18  Q.  Is this work similar to the sort of work you generally do

19  as a forensic economist?

20  A.  Yes.  One of them is an injury case and two others are

21  death cases.  It's the same type of cases, similar incidents,

22  but all the rest is the same from a perspective of the

23  calculation.

24  Q.  You mentioned there were two death cases.  Which plaintiffs

25  are you referring to?

F1U8SOK2                              Soudry - direct

```
1    A.  The two death cases is Janice Coulter and Diane Carter.
2    Q.  Who was the third plaintiff, the one that's not a death
3    case?
4    A.  Shayna Elliott is the injury.
5    Q.  Can you quickly tell the jury what sort of sources of
6    information you relied on performing your work in this case?
7    A.  I reviewed the deposition transcript of the family member
8    in the death cases and for Ms. Elliott I reviewed her
9    deposition testimony.  I also reviewed pay stubs in one of
10   those cases.  I spoke with the family member and I spoke with
11   Ms. Elliott.
12   Q.  Let's talk about how one goes about calculating economic
13   damages for lost earnings.
14        Before we actually talk about any of the individuals,
15   can you give us a very brief overview of how one calculates
16   lost wages.
17   A.  Yes.  Essentially what you have to do is to try to estimate
18   or establish what would have been the earnings of the
19   individual, the annual earnings.  Then we project it over the
20   work life of each individual.  We make several deduction, and
21   we make adjustment for present value, which I will explain
22   later what it means.  Then we are left with the economic loss
23   or lost earnings.
24   Q.  Can you explain to the jury what the concept of present
25   value is, how you make such an adjustment?
```

F1U8SOK2                        Soudry - direct

1    A.  Yes.  The present value come into play in this matter

2    because we are going to project into the future.  So the

3    concept of present value is the ability of money to earn

4    interest over time.

5           The best way is to give you an example what that mean,

6    ability of money to earn income.  If I have to give you $100

7    now, it's worth for me $100.  I have to just put $100 and give

8    it to you.  But if I have to give you $100 five years from now,

9    how much it's worth for me now?  Is it the same?  Is it less or

10   more?  It's actually less, and why less?  Because I can put

11   let's say just $90 now, put it in an earning interest vehicle,

12   savings or treasury that will earn interest and in five years

13   it will be $100.  So if I owe you $100 in five years from now,

14   I need to keep now maybe 90, 95, depends on how much interest

15   the money could earn over that time period.

16          So when I will project losses into the future, I will

17   reduce them to present value because we need the value right

18   now.

19   Q.  OK, Doctor.  Let's turn to your calculations for Shayna

20   Gould Elliott, the person who survived.

21   A.  Yes.

22   Q.  I think the jury probably understands.  Can you give us two

23   sentences on who Ms. Elliott is.

24   A.  Yes.  Ms. Elliott was born on July 20, 1998.  She got

25   injured on January 22, 2002.  She was 19 and a half, 19.5 to be

F1U8SOK2                         Soudry - direct

1    exact at the time of her injury.  She was studying for one year

2    program in Jerusalem at the time of her injury, and she had a

3    bad injury.  You heard all that testimony so I will not repeat

4    it.  But that's basically it.

5              She now lives in Chicago.  She is married.  She has

6    kids.  She was able to graduate after a delay, and we will

7    discuss that, from college.

8    Q.  That's where I was going to turn next, Doctor.

9              Leaving aside for treatment for medical issues, we

10   don't need to cover that, can you tell us what Ms. Elliott did

11   after she returned to Chicago following --

12   A.  She started college as an interior designer.  That was her

13   major.  She started in 2003.  But because of her recovery and

14   injury that she had, she didn't finish it.  It was delayed by

15   two, three years.  She had to take two, three years in between.

16   And she only graduate in 2009.

17   Q.  What was her degree in?

18   A.  Interior design.

19             She was unable to find employment once she graduated,

20   and she attributed it to mostly because at the time she

21   graduated the economy was poor after the recession in 2008, the

22   labor market was very, very depressed, and she couldn't find a

23   job, and that's basically the background.

24   Q.  Mr. Soudry, I want to ask you to give us an extremely quick

25   overview just what the components are of the damages you found

F1U8SOK2                        Soudry - direct

1    for Ms. Elliott and then we will go back and talk about how you

2    calculated them.

3    A.   For Ms. Elliott, we have two components of her damages.

4    Let me just find it.

5    Q.   Are you looking in your binder?  I think it may be at the

6    bottom of Table 4.

7    A.   Tab 4?  OK.  I have it here too.  I will just read it from

8    here.

9            So the total economic loss for Ms. Elliott is

10   $660,995.

11   Q.   Is that divided into parts in any way?

12   A.   Yes.  There are two component of her economic losses.  Her

13   lost earnings, which is basically what I project her lost

14   earning to be, $308,225.

15           The second economic loss for her, because of her

16   injury she is limited in her ability to function at home, and

17   as an economist I could measure those in economic terms, and we

18   will get into it later, but the value of loss of household

19   services for her is $352,770.  That comes to a total of

20   $660,995.

21   Q.   Thank you, Mr. Soudry.

22           Let's go back and talk about each of those two

23   components, starting with the first one listed as item one up

24   on the screen, the lost earnings of about $308,000.

25   A.   Yes.

F1U8SOK2                          Soudry - direct

1    Q.  In calculating this, did you make any assumptions as to

2    what kind of work Ms. Elliott would have done if she had not

3    been injured in the attack?

4    A.  Yes.  I projected earnings based on her occupation, which

5    is interior designer.  As I mentioned, she was unable to enter

6    the labor force.  She got married, she had kids, and then she

7    just didn't enter the labor force.

8            So I project that but for her injury, and that's the

9    analysis, but for her injury, that's how you have to think

10   about it, she would have entered the labor force, graduated in

11   2006 and enter the labor force in 2006 and earned $34,220 per

12   year.

13   Q.  Why did you pick 2006?

14   A.  If she would finish college on time, that would be the time

15   that she would have finished.

16   Q.  Did you assume that she would work as an interior designer

17   throughout her career?

18   A.  No.  I assumed that she will start at $34,220 per year.

19   Q.  I am not asking about numbers yet.  I am asking about what

20   kind of work she would do.

21   A.  Yes.  Something in interior design or something similar to

22   that.

23   Q.  Mr. Soudry, I want to show you a chart from your work,

24   which is entitled The Value of Ms. Shayna Elliott's Lost

25   Earnings, Table 1.

F1U8SOK2                        Soudry - direct

1              Did you prepare this chart, Mr. Soudry?

2    A.  Yes.

3    Q.  Could you please take a look at the column on the left-hand

4    side which lists years and tell us why these years are listed.

5    A.  So this table is basically showing you a year-by-year

6    analysis.  So I am starting in 2006, the year that she would

7    have been expected to enter the labor force but for her injury.

8    And 2006 is a split year, and I am going from 2006 through

9    2009, and this is the past losses.

10             From 2010 essentially through 2015 -- this is six

11   years -- I am assuming that she would be out of the labor force

12   regardless of her injury.  So basically what you're seeing here

13   is a table, had Ms. Elliott was not injured.  That's what we

14   could expect her earning would have been over her work life.

15             So she would have about six years that she would be

16   out of the labor force, from 2010 through 2015.  She was

17   raising her kids, she has kids, young children, and she would

18   have stayed at home.  So I calculate no earnings during this

19   time period for her.

20             She would have returned to the labor force in 2016.

21   Q.  Can you explain to us how you came up with the figures for

22   what you assumed Ms. Elliott would earn as an interior

23   designer, starting with the first period, 2006 through 2009,

24   before you assumed she would leave the labor force and start a

25   family.

F1U8SOK2                         Soudry - direct

1    A.  Yes.  I looked at the U.S. labor statistics earnings for

2    interior designer and based on that I assumed she would have

3    earned in the first, actually, three and a half years, she

4    would have earned the 25 percentile as a starting salary.

5            After graduating from college, and I am applying the

6    average earnings for interior designer at the 25 percentile,

7    meaning there is 25 percent below you that earns and 25 percent

8    that earns more than you.  So kind of on the lower side for

9    those years.  It's based on $34,220 per year.

10           For the future years when she would have returned and

11   have more experience already, I am projecting her earnings

12   based on $58,612 per year, again, interior designer, based on

13   the 50 percentile this time.  So 50 percentile means 50 percent

14   of the population in this occupation earns less than you and 50

15   percent earn more than you.  And I keep her at the 50

16   percentile throughout her work life expectancy.

17   Q.  Why did you assume she would never get, if you will, above

18   the middle of the pack in terms of her earnings?

19   A.  I wanted to be conservative in my analysis because I am

20   making projections into the future.  So I wanted to stay

21   conservative and assume that she would be at the middle in the

22   future.

23   Q.  Did you assume she would make $58,000 every year for the

24   rest of her career since her assumed return to work in 2016?

25   A.  No.  As you could see in the wages column, under the wages

F1U8SOK2                    Soudry - direct

1    column, I am increasing those earnings.  And when I project

2    earnings into the future, we have to take into account wage

3    inflation.  What is wage inflation?  It's increasing wages over

4    time.

5            In general, inflation is increase of prices from one

6    period to another period.  But looking historically we see that

7    wages increase.  If we look at the last ten years, wages

8    increased on average, including the recession and the weak

9    labor market, we have about 2.3 percent per year.  If we look

10   at 20 years, it's about 2.8 percent per year.

11           I am projecting basically from 2016 going forward that

12   her earning will increase about 2.5 percent on average per

13   year, going forward.

14   Q.  Mr. Soudry, how long did you assume Ms. Elliott would work,

15   how many years in the future?

16   A.  I assumed her work life is 34 years.

17   Q.  Why did you make that assumption?

18   A.  That's a statistical work life expectancy.  That's based on

19   statistical table and that shows us how many years she would

20   work.

21   Q.  We have been looking at the column labeled Wages.  Is that

22   correct?

23   A.  Yes.

24           So the first we have is years, then age, and then the

25   wages that I projected.  Correct.

F1U8SOK2                          Soudry - direct

1  Q.  The next column, it is an abbreviation, but it appears to

2  say Unemployment Effects.

3          Can you tell us what that is all about.

4  A.  It's a reduction for ability of unemployment.  There is no

5  100 percent certainty.  So for every year I am deducting

6  unemployment effect.

7  Q.  Just to take the year 2016, the first year after she comes

8  back to work, can you show us what sort of deduction you made

9  for this?

10  A.  Yes.  I projected in the year 2016, at the time Ms. Elliott

11  will be 34 years of age, I projected her wages to be $58,612

12  and I'm deducting $2,286 for unemployment effect.

13  Q.  Mr. Soudry, the next column is labeled Taxes.

14          Can you explain to the jury what that is all about.

15  A.  Yes.  Income taxes.  She would have paid income taxes on

16  her earnings and I am deducting income taxes at 17.6 percent in

17  the year 2016.  So it's 9,913 that I am deducting from her

18  earnings.

19  Q.  Does that include federal and state?

20  A.  Correct.

21  Q.  Which state did you select?

22  A.  Illinois.

23  Q.  I think we have already seen the figure.

24          Let's go to the next column, which is labeled Job

25  Maintenance.

1    A.  Going to work costs money.  If it's transportation, if it's

2    food that you eat outside of home, and professional association

3    that you belong to.  Those costs I had to deduct also from her

4    gross earnings.  I am deducting 4.5 percent of her earnings for

5    job-related expenses.  And it comes to in the year 2006,

6    $2,535.

7    Q.  In your experience, Mr. Soudry, do all forensic economists

8    that calculate lost wages make a deduction for job maintenance

9    expenses?

10   A.  In injury cases, no.  Some do, some not.  I tend to be more

11   conservative in my analysis so I deduct.

12   Q.  The next two columns are labeled Annual Income and Present

13   Value.

14          The next column is labeled Annual Income.  Can you

15   tell us what that represents.

16   A.  Yes.  So annual income is essentially summarizing all of

17   those factors that I highlight in yellow and it's basically,

18   and I will go over it quickly, the wages are $58,612, minus

19   $2,286, minus $9,913 income taxes, deducting job-related

20   expenses of $2,535.  Then I am arriving at a loss of annual

21   income, $43,878.

22   Q.  The next column is labeled Present Value.  You discussed

23   present value before.

24   A.  Correct.

25   Q.  Can you explain it here?

F1U8SOK2                        Soudry - direct

1    A.  So you can see here, from a future value in 2016 of 43,878,

2    the present value of that is $40,568.  And I am using a 4

3    percent discount rate, the interest rate to calculate that

4    reduction, which the present value is the column I am going to

5    summarize as her earnings.

6    Q.  Now the last column is labeled Cumulative PV.

7          I take it PV stands for present value?

8    A.  Correct.

9    Q.  Can you explain what this column represents.

10   A.  It's basically each year with the previous year.

11         So we can see, for example, through 2009, actually,

12   her earnings, had she was not injured, what we could expect her

13   earnings would be up to now.  It's $98,367.  So it adds all the

14   past together.

15   Q.  Is that for the period, the 98,000 actually -- if you could

16   just mark the 98,000 number.  What period of time does that

17   number represent?

18   A.  That's from 2006 through the present, to now.

19   Q.  Do you have a number for the time she returns to the work

20   force in 2016 through the end of her career?

21   A.  Yes.  From now to the end of her career, it's $1,007,584.

22   And all those years is essentially 34 years, as I mentioned

23   before.  It's 34 years.

24   Q.  What is the present value of her earnings after all these

25   deductions for her working life?

1    A.  We have to add the past of 98,367, plus the future,

2    1,007,584, and we will get total earnings, $1,105,951.

3    Q.  Is that the amount you believe the jury should award Ms.

4    Elliott for her lost earnings?

5    A.  No.

6    Q.  Can you tell us what the next step in your analysis was?

7    A.  The next step is essentially to look and say what she earn

8    so far since her injury to now and what we could expect her to

9    earn in the future and deduct that amount from this sum of

10   money.

11   Q.  So, Mr. Soudry, I am going to put up on the screen another

12   one of your tables.  Table 3.

13          This is a chart entitled The Value of Ms. Elliott's

14   Recoverable Lost Earnings.

15          Did you prepare this table?

16   A.  Yes, I did.

17   Q.  Could you explain to the jury what it is and how it deals

18   with the mitigation issue you just mentioned?

19   A.  Yes.  So what we see in this table, again, it's divided to

20   pretrial period and post-trial period.  And we have the years,

21   the age of Ms. Elliott, and we have the pre-injury earnings.

22   That's exactly the table of the present value that I explain

23   and showed you before.

24          Then I have a column, it's titled Mitigation Earnings.

25   That's what she earned up to now and what she will earn in the

F1U8SOK2                        Soudry - direct

1    future, and the differential between them will give us the

2    loss.

3    Q.  Let's start with the period -- this is divided into two

4    periods just like your first table.  Is that correct?

5    A.  Yes.  Correct.

6    Q.  Let's start with the first period which is labeled Pretrial

7    Losses from 2004 to 2009.

8            Can you explain to the jury how you came up with

9    mitigation earnings that you list there?

10   A.  Yes.  So the pre-injury earning is what she would have

11   earned had she was not injured.  That's exactly the same number

12   that I just showed to you in the present value.  In 2006 she

13   will enter the labor force, she would have, and she would have

14   earned $13,339 and so forth through 2009.

15           What happened is when she took a break from her

16   college, she went to live in New York for about two years and

17   she was working here and she earned $12,729 in 2004, $20,011 in

18   2005, and $15,234 in 2006.  So those amount of money she earned

19   and I am deducting that from her loss.

20   Q.  Now you have nothing listed for the years 2007 through

21   2009.  Why is that?

22   A.  Because but for her injury she would have been in college.

23   That's the projections.  And therefore all that is a loss for

24   her.  After 2006 she didn't work and so there is zero.  She has

25   no income.

F1U8SOK2                     Soudry - direct

1   Q.  Let's talk now about the money that you believe she will

2   actually make notwithstanding her injuries in the future,

3   beginning in 2016.

4        I take it these are not records of actual earnings

5   since it's not 2016?

6   A.  Correct.

7        So I projected that she will enter the labor force in

8   2016.  She is able to sustain, based on when I talked to her,

9   and she said she could manage part-time job.  She would like to

10  do interior designer but she doesn't know if she is able to

11  carry all of the equipment and the thing that she has to do.

12       So what I did is I projected her earnings based on the

13  25 percentile for her occupation, which in 2016 comes to yearly

14  about $41,945.  It's actually $40,568, as you could see on the

15  table.

16  Q.  That's what you projected that she would have earned absent

17  the injury?

18  A.  Yes.  This is in present value.

19       What we see here, had she was not injured.  But next

20  to it was 30,182.  That is already reduced to present value.

21  So it's 41,945.  In present value we are arriving at $30,187.

22  Q.  So what do you have for her actual loss for the year 2016?

23  A.  Only for that year is $10,381.

24  Q.  Now if we look we will see that the numbers change over

25  time in the future.  Can you explain why that is?

F1U8SOK2                      Soudry - direct

1    A.  Yes.  This table is only present value.  As I mentioned to

2    you, present value, the number will go down as you go farther

3    from now.  So if I have to give you $100 ten years from now, I

4    only have to keep $80.

5           That's the same reason the number goes down in the

6    future because this table shows you the present value, and in

7    both columns, the pre-injury and mitigation earnings, are all

8    those deductions we spoke about, are taken into effect.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1uQsok3                         Soudry - Direct

1   Q.  Mr. Soudry, can you now tell us what you believe her total

2   loss after subtracting the amount she actually earned would be

3   for the period in the past for 2009?

4   A.  Yes, the loss is 50,394, loss up to now.  $50,394.

5   Q.  Let's go to the second period the period that begins in

6   2016 and runs through to the end of her career.  What do you

7   project of her losses after deducting the presumed mitigation

8   earnings for that period?

9   A.  That would be additional of $257,831.

10  Q.  What is the total?

11  A.  The total for Ms. Elliot's loss earnings is $308,225.

12  Q.  Ms. Romeo, can I ask you briefly to go back to the chart

13  that we had up first that showed that summarizes the components

14  of Shayna's damages.  Did you see the 308,000 figure there?

15  A.  Correct.

16  Q.  Let's move to the second component, Mr. Soudry, the value

17  of lost household services.  Could you explain to the jury what

18  that is all about?

19  A.  Yes.  So, the second component of her economic damage

20  besides the lost earnings in some cases is the loss of your

21  ability to provide chores around the house; if it's cleaning,

22  cooking, laundry, all those elements, that have economic loss.

23  And the way economists measure those economic losses is

24  basically to look at the replacement cost of those services.

25         If you could buy those services in the market, they

F1uQsok3                        Soudry - Direct

1   have value, meaning they have economic value.  So if you ask me

2   to go and purchase those services to have somebody to come in

3   the house because you're unable to do it, the cooking,

4   cleaning, shopping and so forth, then they have economic value.

5   Ms. Elliot has that loss too as a component.

6   Q.  Has she actually had to pay for assistance up till now?

7   A.  Yes, she does.

8   Q.  Did you find out from her how much?

9   A.  Yes.  She pays for five hours a day somebody to come and

10  assist her on the daily chores around the house that she needs.

11  Q.  How much help did you assume she would need in the future

12  going down through the years?

13  A.  I assumed that the number of hours are 22 hours per week up

14  to the time that the chart when I prepared my report, a second

15  chart would be six years of age at 32 hours per week and then I

16  reduced it to 14 hours of assistance.

17  Q.  Why the reduction when her child reaches the age of six?

18  A.  Because there is less needs for assistance and care that

19  she will have to give.  When I did it, I spoke with her on the

20  phone, and she gave me the information of what she needs now.

21  I also looked at the Bureau of Labor Statistics.  It shows us

22  that a female employed provides on average, depending on the

23  age of your kids in the household, between 17, 18 hours per

24  week to 32 hours per week.  So taking that into account, I

25  projected the damages.

1    Q.  Before you showed us that you assumed she would be in the

2    labor force until age 64, so you calculated earnings up until

3    that age.  How long did you calculate out damages for lost

4    household services?

5    A.  To about age 75.

6    Q.  Why did you go to age 75 instead of stopping at her assumed

7    retirement at age 64?

8    A.  Household services you keep providing theoretically until

9    the end of your life.  So for Ms. Elliot, her statistical life

10   expectancy based on U.S. Government statistical life tables is

11   to age 81.8.  I stopped the calculation at 75, assuming that

12   when you get older, it's not that you stop providing household

13   services, but you tend to do less.  So just to be conservative,

14   we ended it at 75.

15   Q.  What rate of pay did you assume Ms. Elliot would have to

16   pay?

17   A.  The $12 that she is paying now.

18   Q.  Let me show you another chart from your report labeled

19   table four which is entitled The Present Value of Ms. Elliot's

20   Lost Household Services.  Did you prepare this chart?

21   A.  Yes.

22   Q.  Can you explain to the jury how it works.

23   A.  Basically, the same way we explained to you the lost

24   earnings.  There are two parts:  The pretrial losses and the

25   post trial losses.  This time there is no gap in the years.  It

F1uQsok3                          Soudry - Direct

1    goes all the way to 2014, and when I prepared this report, I

2    assumed a trial date of December 1, 2014.  And there is the

3    year of Ms. Elliot, the age and the value of lost household

4    services.

5          So based on 22 hours per week, so the calculation is

6    22 hours times 52 weeks per year times $12 and we get $13,728

7    if you see up there.  I am starting it at the year 2010.  She

8    got married in 2009, so I started it in 2010.  I keep the value

9    the same through 2013, and then I am increasing that by

10   2.5 percent for wage inflation that I explained before.

11         As you can see when we get into the year 2018, the

12   value dropped because I'm calculating it thereafter at 14 hours

13   per week instead of 22 hours per week.

14   Q.  The next column, Mr. Soudry, is labeled disability

15   probability.  Can you tell the jury what that is all about?

16   A.  Yes.  I reduced 2.35 percent for the period that she would

17   be sick.  Regular people get cold, flu, they cannot do the same

18   household services, so the few days a year that you are sick

19   and you are not providing that, so regardless of her injury,

20   she could have been sick and not been able to provide the

21   household services every day, every day, so I am deducting

22   2.35 percent period.

23   Q.  I think we can skip to the final column labeled Cumulative

24   Present Value so we can total all of this up.  Can you explain

25   to us how this will give us the total value that you calculated

F1uQsok3                        Soudry - Direct

1    for the value of Ms. Elliot's lost household services?

2    A.   It's adding up year by year, so the total loss up to now

3    $65,910.

4    Q.   What about the following period after the trial?

5    A.   So we have to add $286,086 and we get a total loss of value

6    household services of $352,770.

7    Q.   If we can go to our summary chart, do you see that number

8    in the summary chart?

9    A.   Yes.  So we have the value plus household services, as I

10   mentioned, $352,770.

11   Q.   Mr. Soudry, in your view as a forensic economist, are these

12   damages of $660,995 based on a reasonable degree of economic

13   probability?

14   A.   Correct.

15          MR. HORTON:  Your Honor, it's now 11:25.  We are at

16   the end of Ms. Elliot.  Would this be a convenient time to take

17   a break?

18          THE COURT:  We'll take a ten minute break.  Don't

19   discuss the case.  Keep an open mind.  We'll bring you back in

20   ten minutes.

21          (Continued on next page)

22

23

24

25

F1uQsok3                         Soudry – Direct

1              (Jury not present)

2              MR. HORTON:  Your Honor, I have to say we have two

3    plaintiffs left to go, but they should continue much more

4    quickly since we've already laid the ground work.

5              THE COURT:  Good.  We'll continue in ten minutes.

6              (Recess)

7              MR. HORTON:  Your Honor, before the jury comes back,

8    counsel has conferred briefly on the next witness,

9    Mr. Weinstein.  I understand Mr. Hill, there is something he

10   wants to put on the record.

11             THE COURT:  Yes.

12             MR. HILL:  As you know, we filed an objection to both

13   his qualifications and his opinions.  For purposes of

14   preserving the record, when your Honor asks if I have objection

15   to the qualifications and I say "yes, as previously stated,"

16   that would be sufficient, I hope.  I didn't want to interrupt

17   Mr. Horton's examination.

18             THE COURT:  You don't have to say "previously stated."

19   When I ask you if you have an objection, you say "yes."

20             MR. HILL:  And that's good enough.  Thank you, your

21   Honor.

22             THE COURT:  Let's get the jury.

23

24             (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1            (Jury present)

2            THE COURT:  You can continue, Mr. Horton.

3            MR. HORTON:  Thank you, your Honor.

4    BY MR. HORTON:

5    Q.  Mr. Soudry, I now want to move to your calculations for the

6    economic damages for the two plaintiffs you mentioned who were

7    killed.  I'm going to start with Janis Coulter.  Briefly remind

8    the jury who Janis Coulter was.

9    A.  Yes, Janis Coulter.  She was born on August 5, 1965.  She

10   died on July 31, 2002 in Jerusalem.  She was actually living

11   and working in New York in Manhattan, and she was in Israel for

12   part of her job visiting Israel.  She was visiting Hebrew

13   University.  She was working here for the American Friends of

14   Hebrew University as assistant director of foreign students.

15   As I mentioned, she was almost 37.  It was like six days before

16   her birthday she died.

17   Q.  Mr. Soudry, what country do you believe Ms. Coulter would

18   have continued to work had she not died?

19   A.  Here in the United States.

20   Q.  I want to start by asking what you believe she would have

21   earned in the U.S., and to do that, I want to show you a chart

22   for your report entitle The Present Value of the Loss to the

23   Estate of Ms. Janis Coulter.  Did you prepare this chart,

24   Mr. Soudry?

25   A.  Yes, I did.

F1uQsok3                         Soudry - Direct

1   Q.  Could you take us through and explain how you calculated

2   the amount of the wages that Ms. Coulter would have made

3   through the end of her career.

4   A.  Yes.  The wages that I calculated is based on what she

5   earned here.  I had a pay stub.  She earned $48,500 in 2002.

6   That was her annual earnings in New York where she worked.  So

7   I projected the earnings from 2002 -- 2002, as you could see

8   $20,370, it's a partial year because she died during that year.

9   So this is just a portion of the year from the time she died to

10  the end of the year.  And thereafter I'm applying the actual

11  wage growth rate in the U.S. economy and I'm projecting her

12  earnings.

13  Q.  You mentioned Ms. Coulter was about 36 or 37 when she died.

14  Did you assume that she would ever get promoted to a better

15  paying job during the course of her career?

16  A.  No.  I assumed she would stay basically the same level of

17  salary and receive on average, as I mentioned, going forward a

18  2.5 percent wage growth rate.  But she would not get any merit

19  increases like getting promoted, becoming the director with a

20  much higher salary.  I just kept it the same that she was.  I

21  just wanted to be conservative.

22  Q.  Does that reflect any value judgment on your part on the

23  unlikelihood of Ms. Coulter ever being promoted?

24  A.  It is not my judgment.  She probably would have, but I just

25  wanted to be conservative.

F1uQsok3                         Soudry - Direct

1    Q.  Could you show us the chart where the figures are for

2    Ms. Coulter's lost income.

3    A.  Could you repeat that?

4    Q.  Could you show us on the chart where the figures are for

5    the lost wages of Ms. Coulter.

6    A.  So the lost wages are in that first column there, type

7    number one wages, and then I project the earnings for each

8    year.  If you look at 2003, a full year, she would have been 38

9    years of age at the time, and I estimated her earnings to be

10   $50,004.

11   Q.  How long did you assume that Ms. Coulter would continue to

12   work?

13   A.  I assumed that Ms. Coulter would be active in the labor

14   force for 25.4 years.  That would bring her to age 62.4.

15   Q.  Ms. Machnes, could you scroll down the chart a moment to

16   show that to the jury.  Ms. Romeo, excuse me.

17   A.  You can see it is going all the way to the year 2027.

18            MR. HORTON:  Sorry.  My cold is affecting my memory.

19   Q.  Mr. Soudry, can you tell us what you assumed as total wages

20   for Ms. Coulter through age 62 prior to making any deductions?

21   A.  Her annual earnings?

22   Q.  No, are they totaled here or just -- they're not totaled?

23   A.  They're not totaled because we need to make several

24   deductions and then I'm totaling.

25   Q.  Sorry.  Let's scroll back up to the top and talk about

F1uQsok3                    Soudry - Direct

1    deductions.

2    A.  Yes.

3    Q.  This should look familiar at least for a while.  Can you

4    explain to the jury what the next two columns are and the way

5    it affects the taxes?

6    A.  Yes, it's essentially the same analysis as for Ms. Elliot.

7    Here for Ms. Coulter I have the wages.  Then I'm deducting

8    unemployment effects the same way I did for Ms. Elliot.  Then

9    I'm reducing income taxes which is New York City taxes, federal

10   taxes, state taxes and payroll taxes.  I'm deducting income

11   taxes of 29 percent of her earnings.  The only differential

12   here is the column personal consumption with Ms. Elliot because

13   she is still alive, I only deducted job related expenses.  But

14   Ms. Coulter, she died, so we deducting personal consumption,

15   the portion of the income that she would have consumed on

16   herself which is more broad than just job maintenance expenses.

17   I'm deducting for Ms. Coulter 62.15 percent of her earnings for

18   the portion of the past, meaning from 2002 through 2014.  And

19   in the future I'm deducting 60.8 percent of her earnings for

20   personal consumption.

21   Q.  Could you tell us where you got these figures for the

22   deductions for her assumed personal consumption over the course

23   of her life?

24   A.  Yes, those came from a table that was produced by the

25   Justice Department, the U.S. Justice Department for the 9/11

F1uQsok3                              Soudry - Direct

1    victims compensation fund when they calculated the damages, and

2    that's applied for in the future victims so they gave those

3    percentages of personal consumption to apply, and I'm using

4    those.

5    Q.  Let's pick a year to use just as an example.  Maybe we will

6    go to year 2003 which is the first full year here.

7    A.  So in 2003, as I mentioned, Ms. Coulter would have been 38

8    years of age.  Her earnings are estimated to be $50,004 minus

9    unemployment effects of $3,200, deducting taxes, income taxes

10   $13,526, deducting further personal consumption of $29,088, and

11   we arriving at a loss of $4,189.

12   Q.  We have seen this heading before.  Can you explain what the

13   cumulative present value is on this chart?

14   A.  The cumulative is just adding each year with a previous

15   year.  As you can see, the present value of past losses is the

16   same as the annual.  There is no change.  This is usually --

17   actually, in the past -- if I owed you money in the past, I

18   have to give you interest.  So you have to increase it with

19   interest, not reduce it.  But that is the code we do.  So I

20   have annual and cumulative and adding it together.

21   Q.  What are her total damages after that deduction of personal

22   consumption from the period start of the trial -- from her

23   death up to the start of trial?

24   A.  $58,852.

25   Q.  Could you show us where the chart shows her damages would

F1uQsok3                        Soudry - Direct

1    be for the time after the trial up through the end of her life?

2    A.  $73,285 the future losses in present value.

3    Q.  So Mr. Soudry, can you tell us what you would calculate is

4    the total economic losses for the estate of Janis Coulter?

5    A.  Yes.  $132,137.

6    Q.  Are your findings regarding Ms. Coulter based on a

7    reasonable degree of economic probability?

8    A.  Yes.

9    Q.  Let's turn to the final plaintiff for whom you did an

10   evaluation, Diane Carter?

11   A.  Yes.

12   Q.  Start by reminding us who Diane Carter was.

13   A.  Diane Carter was, she was born in the U.S.  She moved to

14   Israel, and she was working at Hebrew University in an

15   administration position there.  She was born on November 5,

16   1964.  She died in Jerusalem in July 31, 2002.  She was 37.7

17   years old at the time she died.

18   Q.  What is your understanding as to what her job was in Israel

19   at the time of her death?

20   A.  She was in an administration job at Hebrew University.

21   Q.  Did you assume that she would continue in that kind of job

22   thereafter had she not died?

23   A.  Yes, I assumed she would continued to reside in Israel, she

24   would continue to work in some similar, not everybody in the

25   status of same job for entire life but, something similar to

F1uQsok3                       Soudry - Direct

1    what she did at the time she died.

2    Q.  I asked you earlier when we were talking about Ms. Coulter

3    if you assumed she would ever get some sort of promotion or do

4    a higher paying job, and you said no.  Do you did you do the

5    same thing with Ms. Carter?

6    A.  Yes, correct.

7    Q.  How long did you assume she would have worked?

8    A.  I projected her earnings to age 64.

9    Q.  Did you have any record of what Ms. Carter actually earned

10   over in Israel at Hebrew University?

11   A.  I did.  I was not provided with any records or pay stubs or

12   something like this of her earnings.  It was not available.

13   Q.  So you didn't have any records of her actual earnings.  How

14   did you decide how much you assumed she would have earned had

15   she continued to work?

16   A.  What I did, I looked at the education industry in Israel, I

17   looked at the Central Bureau of Statistics data where I used to

18   work.  I looked at what's the average monthly earnings in that

19   industry for people that are in the educational industry in

20   Israel.  So I found the earnings in the Israel currency, and I

21   conferred them to dollars, and then I arrived at annual dollars

22   value.

23   Q.  Let me show you the chart that you prepared for Ms. Carter.

24   We will put it up on the screen.  Then I will ask you to

25   confirm this is the chart you prepared to reflect your

F1uQsok3                          Soudry - Direct

1  calculation for Ms. Carter.  Is this the chart you prepared to

2  reflect your calculation for Ms. Carter?

3  A.  Yes.

4  Q.  Is it really any different except that the numbers changed;

5  the analysis is the same for Ms. Coulter who also died?

6  A.  It's the same methodology.

7  Q.  Could you just very briefly then walk us through it?

8  A.  Yes.  So, again, 2002 is a partial year so we go to 2003 at

9  the time she would have been 39 years of age and projected her

10  earnings in U.S. dollars to be $17,852.  I'm deducting

11  unemployment, as you could see.  I'm deducting taxes, based on

12  Israel taxes.  I'm deducting personal consumption based on the

13  9/11 tables regarding the annual loss and then cumulative loss.

14  Q.  Mr. Soudry, do you know if the state of Israel would tax

15  any recovery by the estate of Diane Carter in this lawsuit

16  because she lived in Israel for so long?

17  A.  I don't know.

18  Q.  Let me ask you to assume that they would tax such an award.

19  If that were true, would you still have made a deduction for

20  taxes in your calculations?

21  A.  No, not if they tax.

22  Q.  Why not?

23  A.  Because otherwise you will double taxation.  One time I'm

24  reducing it and then it would be reduced further.  So it would

25  be twice reduced.  For example, here I'm reducing because the

1    award will not be, so it will be twice if I would.

2    Q.  You made the same large deduction of personal consumption

3    here as you did for Ms. Coulter?

4    A.  Yes.

5    Q.  What did you use as a basis for determining what number to

6    use for personal consumption for Ms. Coulter or, excuse me, for

7    Ms. Carter?

8    A.  For Ms. Carter, I am reducing it by 74.6 percent for the

9    past portion of the calculation, and the future 72.55 percent.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1U8SOK4                          Soudry - direct

1   Q.  Where do those percentages come from?

2   A.  It comes from the table that was prepared by the Justice

3   Department, the U.S. Justice Department for the 9/11 victim

4   compensation fund.

5   Q.  OK, Mr. Soudry, let's sum up what the bottom line is for

6   Ms. Carter.  Can you start by telling us what her losses after

7   all the deductions, including for personal consumption, are for

8   the period following her death up to the date of trial?

9   A.  The total loss up to now is $20,032.

10  Q.  What about for the period following trial up through the

11  presumed end of Ms. Carter's career in Israel?

12  A.  $28,513.

13  Q.  Could you tell us, therefore, what your findings are for

14  the total loss of economic damages for the estate of Diane

15  Carter?

16  A.  $48,545.

17  Q.  Are your findings regarding economic damages for the estate

18  of Diane Carter based on a reasonable degree of economic

19  probability?

20  A.  Correct.

21          MR. HORTON:  Your Honor, I have no further questions

22  of Mr. Soudry.

23          THE COURT:  Any cross-examination?

24          MR. HILL:  No, your Honor.

25          THE COURT:  Thank you, sir.  You can step down.

F1U8SOK4                          Soudry - direct

 1            (Witness excused)

 2            THE COURT:  Would plaintiff call its next witness?

 3            MR. HORTON:  Your Honor, before we do that, I just

 4   wanting to move into evidence the charts that have been up on

 5   the screen.  Ms. Elliott's charts have been marked as

 6   Plaintiffs' Exhibit 1228, Ms. Coulter is 1229, Ms. Carter is

 7   1230.  I have conferred with counsel.  I believe they have no

 8   objection.

 9            MR. HILL:  No objection.

10            THE COURT:  They will be admitted in evidence.

11            (Plaintiffs' Exhibits 1228, 1229 and 1230 received in

12   evidence)

13            MR. HORTON:  I am just going to do some notebook

14   shuffling, but the plaintiffs call Dov Weinstein.

15    DOV WEINSTEIN,

16        called as a witness by the plaintiffs,

17        having been duly sworn, testified through Hebrew

18        interpretation as follows:

19            MR. HORTON:  Your Honor, Mr. Weinstein will testify in

20   Hebrew.

21            THE COURT:  You can inquire.

22   DIRECT EXAMINATION

23   BY MR. HORTON:

24   Q.  Could you state your full name, please?

25   A.  Dov Weinstein.

F1U8SOK4                    Weinstein – direct

1    Q.  Mr. Weinstein, what is your profession?

2    A.  I am an accountant.

3    Q.  In what country do you live?

4    A.  In Israel.

5    Q.  How long have you lived there?

6    A.  I was born there 60 years ago.

7    Q.  What is your native language?

8    A.  Hebrew.

9    Q.  Do you speak English at all?

10   A.  Yes, I do.

11   Q.  Which language are you more comfortable in, Hebrew or

12   English?

13   A.  In Hebrew.

14   Q.  Let me ask you about your background.  What did you do

15   after you graduated from high school?

16   A.  I went into the army.

17   Q.  How long were you in the army?

18   A.  Three years.

19   Q.  Did you go to school after you left the army?

20   A.  Yes.  I studied accounting.

21   Q.  Where did you study?

22   A.  In Jerusalem.

23   Q.  Did you get a degree in accounting?

24   A.  Yes.  I completed my studies as an accountant.

25   Q.  In Israel, are there tests that one must take to be

F1U8SOK4                        Weinstein – direct

1   qualified as a certified public accountant, if that is a term

2   that has meaning in Israel?

3   A.  Yes.

4   Q.  How many such tests must one take to become a certified

5   public accountant in Israel?

6   A.  The total is 17.

7   Q.  Did you take all 17?

8   A.  Yes.

9   Q.  Did you pass them?

10  A.  Yes.

11  Q.  Are you in fact a certified public accountant in Israel?

12  A.  Yes, I am.

13  Q.  What was your first accounting job?

14  A.  I worked in a firm called PwC today.  Then it was called

15  Kesselman & Kesselman.  Today it's known as PwC.

16  Q.  How long were you with the firm formerly known as Kesselman

17  & Kesselman?

18  A.  About ten years.

19  Q.  What did you do after you left that firm?

20  A.  I opened my own firm.

21  Q.  What is the name of your firm?

22  A.  Dov Weinstein & Associates, accountants.

23  Q.  When did you open the firm?

24  A.  In 1989 or 8.

25  Q.  Are you still working at that firm?

1    A.  Yes, I run it.

2    Q.  Can you give us a description of what it's like today, how

3    many accountants work there and that sort of thing?

4    A.   It is a firm that has two branches, one is in Tel Aviv and

5    one is in Jerusalem.  It employs 36 people.  It has a license

6    from the PCAOB to represent Israeli firms in the United States,

7    as well as American firms under the SEC.  We are members of an

8    international organization known as TIAG, and we are its

9    representatives in Israel.  I am a member of an organization

10   known as STEP.  It is an organization that deals with running

11   trusteeships and assets.  The firm has the ISO standard, both

12   the European and American standards.

13   Q.  Mr. Weinstein, are you familiar with the way that

14   accountants calculate lost economic damages for lost wages in

15   personal injury or wrongful death cases?

16   A.  Yes, I am.

17   Q.  Have you performed research in that area?

18   A.  Yes.

19   Q.  Has your staff performed research in that area?

20   A.  Both I and both of my teams did.

21   Q.  Have you ever been retained as an expert to calculate

22   economic damages based on lost earnings in litigation in the

23   United States in which the plaintiff was a victim of terrorism?

24   A.   Yes, there were three such cases.

25   Q.  Have you ever been retained as an expert to calculate

F1U8SOK4                        Weinstein - direct

1   economic damages based on lost wages in Israel?

2   A.  Yes, but not many.  The well-known cases in the U.S. -- the

3   cases in the United States were the cases Benke, Waxman and

4   Goldman.  Goldman is known as Ben Raphael.

5            MR. HORTON:  I would tender Mr. Weinstein as an expert

6   in the calculation of economic damages for persons claiming

7   lost wages.

8            THE COURT:  Any objection?

9            MR. HILL:  Yes.

10           THE COURT:  He is qualified on that basis.

11           You can inquire on that basis.

12           MR. HORTON:  Thank you, your Honor.

13  Q.  Mr. Weinstein, what were you asked to do in this case?

14  A.  I was asked to investigate two cases.  Mr. Gritz, who was

15  killed in a terror attack, on the campus of the Hebrew

16  University, in Jerusalem, when he was 24 years old and was just

17  about to complete his Ph.D. in political science and

18  philosophy.

19  Q.  What was the second case in which you were asked to

20  calculate damages?

21  A.  The second case was that of Mrs. Goldberg, whose husband

22  was killed when she was 42 years old, his name was Shaul

23  Goldberg, also in a terror attack.

24  Q.  In calculating damages for these two individuals, an

25  individual and an estate, as of what date did you calculate the

F1U8SOK4                         Weinstein – direct

1   value of the economic losses?

2   A.  The first date was set at the time that I was approached in

3   July 2013.  And after that I was asked to update the

4   calculations to December 2014.

5   Q.  Let's move first to your calculations for Mrs. Goldberg.

6          First of all, was Mrs. Goldberg employed at the time

7   of her husband's killing?

8   A.  No.

9   Q.  What assumptions have you made as to whether she would

10  actually be able to work following the death of her husband?

11  A.  She was a professional in computers.

12  Q.  I want to back up, Mr. Weinstein.  I want to ask first,

13  have you assumed whether she will actually be able to work or

14  not going forward as a result of what she has been through?

15  A.  No.

16  Q.  Thank you.

17         Now let's go back to what you assume she would have

18  done but for the killing of her husband.

19         I want to start by showing you a chart from your

20  report labeled, Karen Goldberg, Total Economic Loss.

21         Mr. Weinstein, what I am going to do is have you

22  quickly summarize this chart, and then we will go back into

23  some of the details of what is in it.  So this is just a

24  summary.

25         If you look under the heading that says "revised

F1U8SOK4                        Weinstein - direct

1    December 1, 2014," you will see the letters NIS.  What does NIS

2    refer to?

3    A.  It stands for new Israeli shekels.  That's the Israeli

4    currency.

5    Q.  Did you perform your initial calculations for Ms. Goldberg

6    in shekels rather than dollars?

7    A.  Yes.

8    Q.  Let's look at the components of the damages that you have.

9         First, on the left-hand side there is a line labeled,

10   Total Salary Loss, Current Prices.

11        Can you tell us what that refers to, sir?

12   A.  The total income that she would have received if she had

13   worked one year after the event up to her planned age of

14   retirement.  The sum is in Israeli shekels and it is calculated

15   according to the current value of the money, the present value

16   or NPV, based on December 2014.  The historical sums were not

17   changed but were recorded according to their historical value

18   without change.

19   Q.  So does the phrase "current prices," is that a reference to

20   present value?

21   A.  Yes.  With the exception of the item that I mentioned that

22   was not updated to that date but left at its historical value.

23   Q.  Let's move to the second item on the left-hand side which

24   says total severance pay.  I will leave out the current prices

25   since we know what that means.  What does total severance pay

F1U8SOK4                    Weinstein - direct

1    refer to?

2    A.   Severance pay is severance pay.

3    Q.   What is severance pay in Israel?  Can you describe what

4    that is?

5    A.   The law says in Israel that when a person leaves a job, or

6    retires from a job, when he reaches retirement age, or if he is

7    dismissed, he is entitled, among other entitlements, to one

8    monthly salary per year from the date when he started working

9    in that place of work up to the day when he leaves or is

10   dismissed.

11   Q.   Is severance pay in addition to any pension rights that an

12   employee has?

13   A.   Yes.  Sometimes it is added to the pension, but it is

14   calculated separately.

15   Q.   That takes us to the next line which says total pension

16   loss.  Could you tell us what that is all about?

17   A.   Since 2008, there has been a requirement to allocate for

18   employees in Israel part of their salary for pension funds.

19   The employer is also required to contribute a higher sum.  This

20   is the sum that is accumulated over the years, which she would

21   receive after retiring, all this in current terms, in current

22   prices, that is, of December 2014.

23   Q.   Mr. Weinstein, next to each of the three lines we have been

24   talking about there is a number right under NIS.  Are those the

25   amounts that you calculated for each category?

F1U8SOK4                          Weinstein - direct

1    A.  Yes.

2    Q.  What did you calculate as the total for Ms. Goldberg's

3    losses in shekels?

4    A.  The total is 2,949,628 shekels.

5    Q.  Have you converted that number of shekels for the

6    equivalent value in U.S. dollars?

7    A.  Yes.  According to the value at the time we did the

8    calculation, which was in December 2014, December 1, 2014.

9    Q.  Let's go back now and look in a little more detail at each

10   of the three categories that make up her damages.  And we will

11   start with the first, her total salary loss, 2.3 million

12   shekels.

13           I think I may have cut you off a little bit earlier

14   when you started to explain how you assumed what Mrs.

15   Goldberg's earnings would have been.  Can you now explain to

16   the jury what job you assume Mrs. Goldberg would have had in

17   the future had her husband not been killed?

18   A.  Mrs. Goldberg was an academic who had completed her

19   university studies in computers and psychology.  These are

20   professions that are very much in demand in Israel, and there

21   are always more jobs that can be filled in these particular

22   areas.  We are talking about especially the areas of software

23   and high tech and so on.  Many of the professionals who work in

24   this field work from home, especially when women who have

25   children are involved.

F1U8SOK4                          Weinstein - direct

1   Q.  I think you told us that your understanding was Mrs.

2   Goldberg was not yet working in the computer field at the time

3   of her husband's death.

4   A.  Yes.  At the time of the terror attack when her husband was

5   killed, Mrs. Goldberg was caring for seven children.

6   Q.  When do you assume that she would have begun to work in the

7   computer field?

8   A.  We spoke to her and she told us that she had planned to go

9   back to work one year later after the date of when the terror

10  attack occurred.

11  Q.  Looking at your chart, what year was the attack?

12  A.  2004 January.

13  Q.  So what year did you assume she would actually begin to

14  work in the computer field?

15  A.  In 2005, one year later.

16  Q.  How did you determine the salary that you assumed Mrs.

17  Goldberg would have made once she went back to work?

18  A.  The truth is that we exercised a great deal of conservatism

19  in our estimates.  So instead of taking the specific field and

20  the specific income, we just took an average of the average

21  wage in the Israeli economy.

22  Q.  Do you have a view as to whether the average wages in the

23  computer industry, Mrs. Goldberg's field, would have been lower

24  or higher than the average wage from the economy that you used?

25  A.  It could be even three times higher than the figure we

F1U8SOK4                        Weinstein – direct

1   used.

2   Q.  Then why did you use such a low figure?

3   A.  Because we didn't have a history for her.  So in this case,

4   we preferred to err on the side of a conservative estimate, a

5   very conservative estimate.

6   Q.  How long did you assume Mrs. Goldberg would work?

7   A.  According to the law in Israel, a woman like Mrs. Goldberg

8   could retire at age 64.  She could also retire later on, but a

9   mother of seven children, the assumption was that she would

10  want to retire earlier in order to spend time with her

11  grandchildren.

12  Q.  Mr. Weinstein, let me show you a chart from your expert

13  report labeled, Karen Goldberg Salary Calculations in NIS

14  Currency.  This is schedule 2.

15          Did you prepare this chart, Mr. Weinstein?

16  A.  Yes, we prepared it.

17  Q.  When you say "we," just to be clear, who are you referring

18  to?

19  A.  My team along with three other CPAs from my firm.

20  Q.  The first column on the left-hand side of the chart seems

21  clear enough.  It's years.

22          Could you explain to us the meaning of the second

23  column, which is labeled, Projected Future Wages?

24  A.  Yes.  We took the salary that was the average salary for

25  the Israeli economy.  We see that in December 2014, it's 9,550,

F1U8SOK4                        Weinstein - direct

1    and we computed it back according to the values that existed

2    previously.  We took it forward at the rate of the increase of

3    the average wage in the Israeli economy.

4    Q.  What was that rate?

5    A.  4.2 percent per annum.  In the United States it's 3

6    percent.

7    Q.  Do you have an understanding, Mr. Weinstein, as to whether

8    wages in the computer industry were growing at 4.2 percent per

9    year?

10   A.  Over the past ten years it's risen at a rate of almost 15

11   percent.

12   Q.  Why did you assume such a low rate of increase for Mrs.

13   Goldberg?

14   A.  A CPA is obligated to act in a conservative manner, and

15   that's the way we proceeded.

16   Q.  Let's go to the next column on your chart, which is

17   labeled -- by the way, these numbers are all in shekels, is

18   that correct?

19   A.  That's correct.  It's the new Israeli shekels.

20   Q.  Could you explain to us what the column labeled, Less

21   Projected Future Contributions is all about?

22   A.  That's the law that I mentioned in 2008 that requires that

23   a deduction be made from the employee's salary for the purpose

24   of that employee's future pension.

25   Q.  I see that your chart shows no contributions deducted for

F1U8SOK4                        Weinstein - direct

1    the years 2005, 6 and 7.  Why is that?

2    A.  That's because the law was enacted in 2008.

3    Q.  What did you calculate for the total contributions that

4    Mrs. Goldberg would have been required to make over the course

5    of her career?

6    A.  Her relative contribution for purposes of her pension, in

7    terms of a salary deduction, was 119,895 shekels.

8    Q.  What did you do with that number in your calculations?

9    A.  We deducted it from her gross wages.

10   Q.  Mr. Weinstein, did you subtract anything from Mrs.

11   Goldberg's wages to reflect any income taxes that she might

12   have paid on her earnings in Israel?

13   A.  I don't really understand your question.

14   Q.  Did you deduct anything for taxes?

15   A.  No.

16   Q.  Could you explain why you did not make any such deductions?

17   A.  Yes.  The case law in Israel and in the United Kingdom, and

18   in Israel we base ourselves on British law, all of the court

19   rulings cancel the possibility of deducting taxes because there

20   is separation between the compensated amount of money and the

21   money that has to be calculated for the compensating party.

22          The second phenomenon is with respect to the amounts

23   that she would receive, there would be taxes.  But in any

24   event, the income for her, with seven children, would be tax

25   free in any event had it been over all of the years.

F1U8SOK4                    Weinstein – direct

1    Q.  Let's go back to your chart now, Mr. Weinstein.

2              Can you tell us what the column labeled, Total

3    Projected Future Income represents?

4    A.  This is the income that she would have in hand after paying

5    for her pension.

6    Q.  The next two columns are labeled, Factor to December 1,

7    2014, and, Total Loss Value at December 1, 2014.

8              Could you tell us what those columns are all about?

9    A.  The amounts of money that are paid a few years later are

10   worth much less than they are currently worth.  So that is the

11   calculation of the current value.

12   Q.  What is the final current value as of December 1, 2014 of

13   the assumed lost earnings for Mrs. Goldberg over the course of

14   her career?

15   A.  It's 2,305,264 new Israeli shekels.

16   Q.  Let's go back to the summary chart, if we could.

17             Do you see that number reflected on your summary

18   chart?

19   A.  Yes.  It's the first line that depicts the amount of money,

20   the line that's currently highlighted in yellow.

21   Q.  Now, going to the second line, severance pay you already

22   described to us before.

23             What did you calculate for the severance pay that you

24   believe Mrs. Goldberg would have received when she retired?

25   A.  Yes.  It's the last salary that she should have received

F1U8SOK4                          Weinstein – direct

1   multiplied by the number of years she worked.

2   Q.  Now let's move to the next line, total pension.  What did

3   you calculate for total pension?

4   A.  There is a chart for that, but generally speaking, we took

5   the amount of money that had been deducted from her salary over

6   the course of the years, we added the amount of money that her

7   employer was supposed to set aside for that purpose, and we

8   added what the National Insurance Institute in Israel pays for

9   every employee when they retire.

10  Q.  What is the National Insurance Institute of Israel?

11  A.  Here it's called something different.  Here it's not called

12  National Insurance; it's called Social Security.

13  Q.  You mentioned a chart, Mr. Weinstein.  Let's go to the

14  chart, which I believe is labeled table 3.

15          Mr. Weinstein, could you just quickly walk the jury

16  through this chart and explain how you calculated the value of

17  Mrs. Goldberg's total pension losses?

18  A.  The first component is the year, and according to the

19  Central Bureau of Statistics, a woman of her status and her

20  situation, lives on average 83.9 years, in other words, she

21  should live up to the year 2041.  In December 2026, she should

22  have retired at the age of 64.

23          The next column, the second from the left, takes into

24  account her contributions from her salary towards pension,

25  along with the part that the employer contributes each month to

F1U8SOK4                          Weinstein - direct

1    her fund, and all this in current prices of 2014.  And that is

2    why the later sums appear lower.

3              In the third column from the left, these are the

4    amounts paid by the National Insurance, the equivalent of the

5    Social Security, to a person who reaches pension or old age.

6    We didn't touch this sum because it is automatically updated by

7    the National Insurance Institute.

8              The last column is the sum total of the previous

9    columns.

10   Q.  What did you calculate at the end of this for the total

11   value of Mrs. Goldberg's lost pension payments?

12   A.  The total amount of her pension in current prices -- when I

13   say today I am referring to December of 2014 -- are 404,206

14   shekels.

15   Q.  Finally, let's go back to the summary chart one last time.

16   Does that number appear on the summary chart?

17   A.  Yes.  It appears in the third line.

18   Q.  Just as a final reminder, Mr. Weinstein, what are Mrs.

19   Goldberg's total economic losses after you have converted them

20   from shekels to U.S. dollars?

21   A.  The total in shekels is 2,949,628.  The exchange rate of

22   the dollar at that time was 3.914.  And the total amount in

23   dollars is 753,610.

24   Q.  Mr. Weinstein, are your calculations regarding Mrs.

25   Goldberg's economic loss based on a reasonable degree of

F1U8SOK4                         Weinstein - direct

1  economic probability?

2  A.  Yes, and conservative.

3          MR. HORTON:  I have one more person to go.  I think we

4  can probably finish that by 1 if we push on, but I will be

5  guided by you.

6          THE COURT:  Let's push on.

7  Q.  Mr. Weinstein, I now want to ask you about the other

8  person, your other calculation of economic damages for the

9  estate of David Gritz.

10         Can you just tell the jury who David Gritz was?

11  A.  David Gritz was an American and French citizen.  He was

12  born to a woman who was originally Croatian but later received

13  French citizenship.  His father was also an American citizen,

14  essentially an American citizen.  She married relatively late

15  at 36, and she had David when she was 42 years old.

16  Q.  Go ahead, Mr. Weinstein.

17  A.  David grew up in a home in which many different languages

18  were spoken -- French, English, German, and Croatian.  And as I

19  learned, he also knew Spanish, and he studied Hebrew in Israel

20  for a year and reached quite a high level.

21  Q.  What was he doing at the time of his death?

22  A.  At the time of his death, he was about to complete a

23  special year of study at the Hebrew University for outstanding

24  Jewish students from all around the world while he was

25  completing his Ph.D. studies at a university in France, and all

F1U8SOK4                          Weinstein - direct

1    that remained for him was to complete his dissertation on the

2    Tower of Babel, the politics of the Tower of Babel.

3    Q.  How old was he when he died?

4    A.  24.

5    Q.  As you understand it, what were his career plans?

6    A.  Based on our discussions with his mother, he was about to

7    complete his Ph.D. in political science and philosophy.  His

8    plan was to move to the United States and to be involved in the

9    academic profession.

10   Q.  Do you know what level he planned to seek employment in the

11   academic profession?  By that I mean at the college level, high

12   school level?

13   A.  The assumption was that he was going to teach in the

14   university.  Based on our discussions with his mother, we

15   learned that he was planning to return to Israel later in his

16   life, in his 50s.

17   Q.  Did you make projections for his earnings, therefore, in

18   both the United States and then in a later period in his life

19   back in Israel?

20   A.  Yes.

21   Q.  Let's start by talking about what you believe he would have

22   earned in the United States.

23          I would like to show you a chart from your expert

24   report entitled "David Gritz salary calculation in U.S.

25   dollars."

1          Just to clarify, Mr. Weinstein, when we were looking

2     at Mrs. Goldberg a few minutes ago, you performed the

3     calculations for her in shekels.  Did you perform the

4     calculations for Mr. Gritz in dollars rather than shekels?

5     A.  Here I did the calculation in dollars.  For the part in

6     Israel, I did the calculation in shekels, but immediately

7     converted it to dollars.

8     Q.  Let's do a quick summary and then we will go back into a

9     few more details.

10          First, on the first line it says "total salary loss."

11    What did you calculate as Mr. Gritz's total salary loss?

12    A.  This, and there is an attached table that specifies it more

13    in detail, this is the expected projected salary loss over the

14    course of his life, in the United States and in Israel, with

15    the deduction of all the various things that could be

16    deducted -- the self-consumption of an unmarried person,

17    pension contributions.  And there is even another component,

18    something which I added because I was asked to even though I

19    don't agree with it, but it is something that is done here in

20    the United States, and that is a deduction for the component of

21    unemployment.

22    Q.  Would this be reflected on table 2, Mr. Weinstein?

23    A.  I will just add that for a person in his field, it doesn't

24    seem realistic to include the component of unemployment, a

25    person with so many languages and skills, at the age of 24

F1U8SOK4                    Weinstein – direct

1   already he was about to finish his Ph.D.

2   Q.  Let's go to schedule 2 and talk in a little bit more detail

3   about how you calculated his total salary loss.

4           Starting at the top the column, is this something you

5   and your staff prepared, Mr. Weinstein?

6   A.  Yes.

7   Q.  The column on the left-hand side says USA.  Do you see what

8   I am referring to?

9   A.  Yes.

10  Q.  Does this reflect his earnings during the period you

11  assumed he would have worked in the United States?

12  A.  Yes.

13  Q.  Looking at the section of schedule 2 that has been blown up

14  here, the fourth column that says "projected future wages"

15  suggested assumed income of $47,901 for Mr. Gritz in the year

16  2003, is that correct?

17  A.  Yes.

18  Q.  How did you come up with the number $47,901 as the assumed

19  pay for Mr. Gritz in Hebrew University?

20  A.  We chose from a number of different sources and chose the

21  one that appeared to us to be the most reliable, how much an

22  assistant professor should be making, which is a relatively

23  junior position in the university.

24  Q.  Did you assume that Mr. Gritz would ever be promoted from

25  assistant professor, perhaps to full professor, during the

F1U8SOK4                          Weinstein - direct

1    course of his teaching time in America?

2    A.  Yes, we did.  And we decided to choose, as we did in many

3    different areas in regard to this individual, to leave it on

4    the relatively low average level in order to err on the side of

5    conservatism.

6         The basis for the salary was the year 2012, when the

7    average salary for this type of position was $62,500 a year,

8    and later we updated it according to 2014 when the average

9    salary in that area was $81,987.

10   Q.  Did you assume that Mr. Gritz's salary would grow with

11   inflation over time?

12   A.  Yes.  We raised the salary 3 percent according to the

13   average annual rise in the United States.

14        MR. HORTON:  Ms. Romeo, if you can back up a little

15   bit now.  I want to scroll further down the chart.

16   Q.  I know it's a bit hard to read, but if you look down about

17   three quarters of the way down the chart, you will see that the

18   "source of income" indication in the first column changes from

19   USA to Israel.  Do you see that, Mr. Weinstein?

20   A.  Yes, I do.

21   Q.  Mr. Weinstein, does this tell us what age you assume

22   Mr. Gritz would have moved back to Israel and begun to work

23   there?

24   A.  According to the mother, 55 or 56.  Ultimately we decided

25   on the age 57 because that is an age when many people come,

F1U8SOK4                       Weinstein - direct

1    after their children have grown up, which he of course did not

2    have a chance to have.

3    Q.  What kind of work did you assume Mr. Gritz would do in

4    Israel as opposed to America?

5    A.  We remained conservative, and so we kept him in the same

6    position.

7    Q.  Is that an assistant professor position in Israel?

8    A.  Yes.

9    Q.  Were you able to find data suggesting how much an assistant

10   professor in Israel would make?

11   A.  Yes.  We used the figures from the Central Bureau of

12   Statistics and the tables from the Central Bank of Israel.

13   Q.  Did you assume those numbers would have grown with time up

14   to the year 2035 when he moved back to Israel?

15   A.  Yes.  One important point, there is a sharp drop in his

16   income from the moment he comes to live in Israel.

17   Q.  Why is that?

18   A.  Because according to the Central Bureau of Statistics, the

19   average salary for an assistant professor is lower in Israel

20   than in the United States.

21         MR. HORTON:  Ms. Romeo, can we go back to see the

22   entire chart now for a moment.

23   Q.  Before we were looking at the projected future wages

24   column.

25         The next column says "less unemployment effects."  I

1    think you mentioned that column and your displeasure with it

2    before.  Can you explain what this is all about?

3    A.  We took the figures, as we were asked to by the attorneys,

4    because that's what the situation is in the United States, and

5    we deducted 4 percent for unemployment effects in the United

6    States.  In Israel, it's rare to find a situation of

7    unemployment in this type of area of employment and with this

8    type of qualifications.

9    Q.  Let's look back to your chart.  The next column says "less

10   projected future contributions."  I think you explained that

11   before for Mrs. Goldberg, but can you briefly explain it again?

12   A.  I didn't explain it about the United States.

13   Q.  OK.  Let's do that.

14   A.  Here, too, there is a requirement by law to deduct for

15   Social Security payments.  And in Israel, it is indeed based on

16   pension contributions according to the law passed in 2008.

17   Q.  So did you deduct for contributions during the time that

18   you assumed he would be in the United States and also for the

19   time you believed he would be in Israel?

20   A.  Yes.

21          MR. HORTON:  Ms. Romeo, if you can show us the bottom

22   of the chart, maybe we can get some numbers here.

23   Q.  The first figure, a little over 4-1/2 million dollars, what

24   does that represent?

25   A.  This represents the total salary that David Gritz was

1   supposed to have received, both in Israel and in the United

2   States, under the assumption that he would have remained at the

3   level of an assistant professor, and unmarried in the same

4   circumstances as when he died, because that is the material

5   that we had at hand.

6   Q.  The next number is in parentheses 118,000 and some odd

7   dollars.  Just tell us again what that is and what you did with

8   it.

9   A.  This is the assessment of the unemployment effects.

10  Q.  What about the next number in parentheses, 287,000 and some

11  odd dollars?

12  A.  This is the amount that the employee contributes towards

13  his pension so that he will have something to live on when he

14  retires.  That's only his part.

15  Q.  Then the final number that we can see here, about $4.1

16  million, what does that represent?

17  A.  This reflects the total minus the two deductions that we

18  just mentioned.  One is not actually a deduction, one is a

19  calculation.

20  Q.  Has this number been reduced to reflect present value yet?

21  A.  No, not yet.

22          MR. HORTON:  Ms. Romeo, can you go back to the whole

23  chart?

24  Q.  I know it's hard to read, Mr. Weinstein, but does this

25  chart also reflect a present value calculation of that $4.1

F1U8SOK4                    Weinstein - direct

1   million figure that we were just looking at?

2   A.  The table, the column, the total of which is 2,643,000

3   plus --

4            THE INTERPRETER:  It doesn't appear here says the

5   witness.

6            MR. HORTON:  Can you scroll down a little further?

7            Just leave it on the whole chart, and we will do the

8   best we can here.

9   Q.  If you look at the column that's labeled, Total Loss Value

10  December 1, 2014, can you tell us what that is?

11  A.  This column represents the current prices of the income

12  that David Gritz should have received under the circumstances

13  as we described them, based on the value of December 2014, when

14  the history, the value was not updated from 2003 to 2014.

15  Q.  What is the total value of his lost earnings reduced to a

16  present discounted value as of December 1, 2014?

17  A.  $2,643,124.

18  Q.  Did you make any further deductions to this number, Mr.

19  Weinstein?

20  A.  Yes.

21  Q.  Can you explain what you did?

22  A.  I deducted personal consumption at the maximum sum, which

23  is the sum attributed to an unmarried person.  It's based on

24  two methods.  One is the American basis, which was determined

25  in September of 2011, which is 61.7 percent for an unmarried

F1U8SOK4                        Weinstein - direct

1    person.  And the second part, the part in Israel, the deduction

2    there is for 70 percent, which was determined in a series of

3    court rulings, the most famous of which being Pinsk v. The

4    Harel Insurance Company.

5    Q.  Mr. Weinstein, once you have made the personal consumption

6    deductions for both the U.S. and Israel, what figure did you

7    come up with for Mr. Gritz's total lost earnings after the

8    deduction for personal consumption?

9    A.  965,531.

10        MR. HORTON:  Ms. Romeo, can we go back again to the

11   summary chart?

12   Q.  Do you see that number reflected on the summary chart for

13   Mr. Gritz?

14   A.  Yes.  It is in the first line that says "total salary loss,

15   current prices," as it is highlighted on the screen.

16   Q.  Then the second line says "total severance pay, current

17   prices."  Is this the same sort of severance pay that you

18   testified about with respect to Mrs. Goldberg?

19   A.  Yes, but only for the period that he would be in Israel.

20   Q.  Then let's go to the third line, total pension loss,

21   $56,000.  Could you explain that to us?

22   A.  These are the sums that he was expected to receive from the

23   day that he retired and would receive pension in Israel, that

24   is the age of 67, until the anticipated or expected day when

25   according to the Central Bureau of Statistics a person like him

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    would die, which is the age of 80.7, a little bit over the age

2    of 80, a little bit lower for women.

3    Q.  Mr. Weinstein, what did you total up for the total economic

4    losses for the estate of David Gritz in U.S. dollars?

5    A.  Do you mean the total or the total for pension?

6    Q.  First of all, what was the total for pension?

7    A.  The total for pension is $56,013.

8    Q.  Then adding all three components -- total salary loss,

9    total severance pay, and total pension loss -- what is the

10   total economic losses for the estate of David Gritz?

11   A.  The total sum in dollars is $1,073,081, in terms of

12   December 2014.

13   Q.  Mr. Weinstein, are your findings that this is the right sum

14   for the economic losses of Mr. Gritz's estate based on a

15   reasonable degree of economic probability?

16   A.  Yes, as the possible minimum.

17          MR. HORTON:  Your Honor, I have no further questions.

18          THE COURT:  Do you have questions for this witness?

19          MR. HILL:  No questions.

20          THE COURT:  Ladies and gentlemen, I kept you a little

21   late because I am going to send you home right now.  Don't

22   discuss the case.  Keep an open mind.  I think we are ahead of

23   schedule.  I am hopeful that we are going to finish before the

24   end of February with the witnesses.  If we stay on schedule as

25   I anticipate for next week, I think we can save some time.

F1U8SOK4                    Weinstein – direct

1          Don't discuss the case.  Keep an open mind.  I will

2    see you next Monday at 9:45.  Have a good weekend.

3              (Jury exits courtroom)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F1U8SOK4

1          MR. HORTON:  I would like to move the admission of the

2     charts for Mrs. Goldberg, which has been collectively marked as

3     Plaintiffs' Exhibit 1226, and for Mr. Gritz, which has been

4     collectively marked as Plaintiffs' Exhibit 1227.

5          THE COURT:  Do you object to that?

6          MR. HILL:  I do object, your Honor.

7          THE COURT:  They will be admitted in evidence over

8     objection.

9          (Plaintiffs' Exhibits 1226 and 1227 received in

10    evidence)

11         THE COURT:  I will see you Monday morning.  I have

12    some other cases waiting.

13         MR. YALOWITZ:  What time would you like us here, your

14    Honor?

15         THE COURT:  What do we have to resolve on Monday

16    before the jury starts?

17         MR. YALOWITZ:  Monday morning we are likely to play

18    and read at least some of those depositions, but I think what

19    we are going to do on Monday morning is set so I don't think

20    there is going to be any open issues with that.  And then we

21    are going to go right into the plaintiffs.

22         Unless Mr. Hill tells you otherwise, I don't

23    anticipate -- first of all, I am not offering a lot of exhibits

24    with these witnesses, some personal items and things like that,

25    personal items, photographs, shrapnel removed from the bodies

F1U8SOK4

1   of some of the plaintiffs.  I don't anticipate letters over the

2   weekend from the defendants, but I could be wrong about that.

3          THE COURT:  Let's plan on 9:15.  Whatever issues there

4   are to resolve we will meet and try to resolve them as early as

5   possible.  Otherwise, if the jury gets here on time at 9:45, we

6   will start right at 9:45.

7          Have a good weekend.

8          MR. YALOWITZ:  Mr. Hill can say right now if he is

9   planning to send letters in over the weekend that we don't know

10  about.

11         Are you, Brian?

12         THE COURT:  Mr. Yalowitz, I wouldn't rely on anything

13  in that regard.  So don't waste my time because I have other

14  cases to bring in.  If you want to talk to Mr. Hill, you can

15  speak to him.

16         (Adjourned to February 2, 2015, at 9:15 a.m.)

17

18

19

20

21

22

23

24

25

F1U8SOK4

PLAINTIFF EXHIBITS

Exhibit No.                                      Received

 1223-1225, 1231, 1247 through 1259  . . . . .1972

 1228, 1229 and 1230   . . . . . . . . . . .2031

 1226 and 1227   . . . . . . . . . . . . . .2059

INDEX OF EXAMINATION

Examination of:                                   Page

ALAN FRIEDMAN

Direct By Mr. Horton . . . . . 1977

MICHAEL SOUDRY

Direct By Mr. Horton . . . . . 1997

DOV WEINSTEIN

Direct By Mr. Horton . . . . . 2031