F268SOK1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARK I. SOKOLOW, et al.,

                Plaintiffs,

           v.                           04 CV 397 (GBD)

PALESTINE LIBERATION
ORGANIZATION, et al.,

                Defendants.

------------------------------x
                                        New York, N.Y.
                                        February 6, 2015
                                        10:00 a.m.

Before:
                    HON. GEORGE B. DANIELS,

                                        District Judge

                        APPEARANCES

ARNOLD & PORTER LLP
      Attorneys for Plaintiffs
BY:   KENT A. YALOWITZ
      PHILIP W. HORTON
      TAL MACHNES
      SARA PILDIS
      CARMELA T. ROMEO
      RACHEL WEISER

MILLER & CHEVALIER, CHARTERED
      Attorneys for Defendants
BY:   MARK J. ROCHON
      LAURA G. FERGUSON
      BRIAN A. HILL
      MICHAEL SATIN
      DAWN E. MURPHY-JOHNSON

Also present:  RINA NE'EMAN, Hebrew interpreter

F268SOK1

1         (Trial resumed; jury not present)

2         THE COURT:  Good morning.

3         Mr. Yalowitz, did you resolve the issues that we were

4    starting to discuss about the things that you wanted to

5    unredact?

6         MR. YALOWITZ:  I think we are close.  There has been a

7    discussion even as your Honor was walking in, and I don't think

8    we have finally resolved it, but I am guardedly optimistic.  I

9    am guardedly optimistic that by the lunch hour we will either

10   have an agreement or have a very limited dispute for the court.

11        MS. ROMEO:  It may be one issue we have to discuss

12   after our discussions, your Honor.

13        THE COURT:  Surely.

14        I received the letter from the defense about the

15   Mukataa and Palestinian Authority.  Did you want to just

16   respond to that or did you want to submit something in writing?

17        MR. YALOWITZ:  I don't think I need anything further

18   in writing.  I think we have been over this document quite a

19   bit.  I think that, although I am not happy with where the

20   court struck the balance, I understand the defendant is not

21   happy with where the court struck the balance, at least as I

22   understand it, the document, as the court struck the balance,

23   is in evidence.  As long as I'm not trying to link person A as

24   an employee of the Palestinian Authority, I can use that

25   document for the jury to draw whatever inferences they might

F268SOK1

1    draw from it.

2              I am not going to talk about person A.  I am not going

3    to say there is a redacted person who was an employee of the

4    Palestinian Authority.  Quite frankly, I think the document is

5    an important document for the jury to have.  Unless your Honor

6    has questions or thoughts or concerns about revisiting where

7    you struck the balance, I think I am prepared to live with it.

8              THE COURT:  No.  My position has not changed.  These

9    are not new arguments.  I have considered all of these

10   arguments.  I think it is encompassed in his own

11   self-inculpatory statements, the manner in which he conducted

12   it.  The argument, to say it is somehow collateral that they

13   met at the Mukataa and somehow that's outside his

14   self-inculpatory statement, that would be like saying in the

15   '50s when the mafia met upstate, we have to redact that they

16   met upstate at somebody else's house because it's part of the

17   inculpatory house.  That's where the incriminating activity

18   took place.

19             So I think this statement is well within that.  I

20   think also that it is not a statement that directly accuses or

21   incriminates either defendant or any of their agents or any

22   employees acting within the scope of their employ.  The fact

23   that they met with somebody who works at the Mukataa, quite

24   frankly, doesn't tell me one way or the other, one, what the

25   nature of that employment or relationship is at the Mukataa and

F268SOK1

1    doesn't say whether or not that person acted in this regard on

2    behalf of the PLO or the PA as its agent, and it doesn't tell

3    us that this person was acting within the scope of their employ

4    in furtherance of the PA's business when they met.  That's a

5    determination for the jury to make from their review of all the

6    evidence in the case.

7         As I have already indicated, although I can redact in

8    such a way as to protect the defendants from what might be an

9    unreliable hearsay accusation, which does not fall under a

10   hearsay exception as self-inculpatory, I cannot protect the

11   defendant from whatever reasonable inferences the jury wants to

12   draw from all of the evidence in this case.

13        I think, even as the defendants characterize it, they

14   are concerned about what it might suggest.  I can't protect

15   them from what it might suggest.  I can only protect them from

16   the nonhearsay factual allegation against them, which is not a

17   statement made under oath either in this courtroom or in a

18   deposition where the parties were examined.

19        That's been my approach with regard to all of these

20   redactions and that's still my determination at this point with

21   regard to that issue.

22        MR. YALOWITZ:  Thank you, your Honor.

23        I just want to make sure where you are on this.  I

24   agree that based on the evidence that has come in an argument

25   that person A or an unidentified person was acting within the

F268SOK1

1    scope of his employment would not be a reasonable inference to

2    draw from this document based on the rulings of the court.  But

3    there is evidence that Wafa Idris was an informant for the PA

4    and that she was recruited in the Mukataa.  And I think that is

5    reasonable to tell the jury about.

6            THE COURT:  It's reasonable to tell the jury about if

7    that's in fact what the evidence before this jury indicates.

8    If that is what the evidence before the jury indicates, then

9    you can reference it.  If it is a genuine factual dispute based

10   on the evidence, then the parties can argue about whether or

11   not that is a genuine factual dispute.  This case, as I will

12   instruct the jury, their determination will be based on a

13   review of both direct and circumstantial evidence.

14           If there is direct evidence of that in the record,

15   then you can reference it.  If there is not direct evidence in

16   that but there is a reasonable basis to infer that, based on

17   the circumstantial evidence, I think that you have appropriate

18   leeway to make such arguments as long as it doesn't go beyond

19   the bounds of what is in fact before the jury and as long as

20   it's not based on your knowledge or your reference to items and

21   reliance on items that are redacted.

22           That's the best guidance I can give you.  If you step

23   over that line, then I will quickly step in.  But I think

24   that's the way I have approached it and that's the way I think

25   that it's appropriate for the parties to argue with regard to

F268SOK1

1    the facts that are before this jury and the disputed facts that

2    are before this jury.

3         MR. YALOWITZ:  OK.  That's actually very helpful to

4    me.  I appreciate it, your Honor.

5         THE COURT:  I think what I am going to do is, we have

6    a couple of minutes because we are waiting on three jurors.  I

7    may give you a draft, which is significantly different, but it

8    is significant in some important respects, a draft of both the

9    final jury instructions, in the condition they are in now which

10   isn't final but close to it, and a verdict form.

11        What we need to discuss is, I need some guidance with

12   regard to what the plaintiffs' actual theories are that they

13   want to present to the jury and the defendant's position as to

14   whether those theories are appropriate.

15        I have sort of approached it several ways.  Sometimes

16   it's more important to go to the verdict form first than go to

17   the instructions because that's where we want to end up.

18        I have proposed questions with regard to each

19   incident, and I put in a number of questions, many of which I

20   believe are not repetitive and they are not a separate

21   determination that the jury needs to make, many of which I have

22   not made a determination whether they even apply to that

23   particular incident, and many of which I am not even sure that

24   specific theory is the theory that the plaintiff is proceeding

25   with regard to that incident or that the defendants don't have

F268SOK1

1    an argument to be made that that's an inappropriate instruction

2    or theory for the jury to consider.

3           I plan on giving it to you today so you can have it

4    over the weekend.

5           I have broken down the verdict form into two parts.

6    The first part deals with liability.  Right now, as I have it

7    formulated now, the first 11 pages of this verdict form deal

8    with liability.  The heading is Liability and Roman numeral 1

9    is January 22, 2002, Jaffa Road shooting.  And then it has

10   several questions under it.  Right now it has seven questions.

11   I am not sure that we need all seven questions or all seven

12   questions are appropriate.

13          Page 3 is Roman numeral 2, the January 27, 2002, Jaffa

14   Road bombing.  That has two pages of questions which we will

15   discuss.

16          Then we go to number 3, the March 21, 2002, King

17   George Street bombing, with two pages of questions.

18          June 19, French Hill bombing, with two pages of

19   questions.

20          July 31, 2002 bombing, Hebrew University bombing, all

21   having at the top the heading Liability.

22          Then the January 29 bus number 19 bombing.

23          Then I have a blank page in between liability and

24   damages.  On that page, it's not totally blank but it states

25   the following:  If you find at least one defendant is liable as

F268SOK1

1    to any plaintiff, please proceed to answer the related

2    questions regarding damages beginning on page 16.  If you do

3    not find that at least one defendant is liable to any

4    plaintiff, you should proceed no further.

5              Then the next page, the heading is Damages, and it

6    follows the same format.

7              Roman numeral 1, January 22, 2002, Jaffa Road

8    shooting.

9              Then it's broken down individually, by individual

10   plaintiff.

11             What should be a little bit easier for the jury is on

12   each separate bombing I have as a heading just those plaintiffs

13   who were involved in that bombing or shooting.

14             So the question is a basic question.  If they get to

15   damages, we should decide whether it should be more specific or

16   greater questions or fewer questions.  For example, I am going

17   to give you the first question:

18             What amount of damages, if any, do you award as

19   compensation for plaintiff Elise Gould's injuries that you

20   determine were caused by the January 22, 2002 terrorist attack?

21   That's it.

22             The question with regard to the Jaffa Road shooting,

23   it's asked seven times because there are seven plaintiffs.

24             The next one says Damages.  Roman numeral 2, January

25   27 bombing, Jaffa Road bombing.  What, if any, amount of

F268SOK1

1    damages do you award for compensation for plaintiff Elana

2    Sokolow's injuries that you determine were caused by the

3    January 27, 2002 terrorist attack?

4            It follows the same pattern as to each and it goes

5    right through each one of them.

6            I think at this point Roman numeral 4 is June 19,

7    2002, French Hill bombing.  That is entitled Leonard Mandelkorn

8    and Palestinian Authority and Palestinian Liberation

9    Organization, and it's only on that page because he is the only

10   plaintiff left.

11           What amount of damages do you award for plaintiff

12   Leonard Mandelkorn's injuries that you determine were caused by

13   the June 19, 2002 terrorist attack?

14           Then I have a dollar sign and a line and whatever they

15   determine based on what your arguments are, if they get to that

16   point, they will fill in there.

17           They will answer all of the relevant questions and I

18   will explain that to them and then the foreperson will sign it

19   and date it and that will be the verdict.

20           Now, going back to liability, just so you will know

21   what you're looking at and what my thoughts are, you will see

22   in terms of the questions, there are several questions that

23   could be asked and answered.

24           The jurors are here so I am going to take two more

25   minutes so you will have an idea.

F268SOK1

1          I have tried to come up with these kinds of questions

2     and we can discuss what is necessary and what is appropriate.

3          Question number 1 is basically the scope of employment

4     of the PA.

5          Question number 2 is basically a PA agent question.

6          Question number 3 is basically a PLO agent question.

7          Question number 4 is a harboring question, if that's

8     appropriate for any of this.  I am not quite sure yet.  We need

9     to discuss whether or not that is going to be appropriate as a

10    separate question.

11         Another question is providing material support for a

12    terrorist attack.

13         Another question, possible question, is providing

14    material support to a terrorist organization.

15         A possible question is on providing the funds.

16         My view is all of these questions are not necessary or

17    appropriate.  Quite frankly, depending on what the parties want

18    to argue about -- I will give you an example of the way I

19    phrased the first three questions, which are pretty much the

20    same for all incidents.

21         Did the plaintiffs prove by a preponderance of the

22    evidence that defendant PA is liable for the January 22, 2002

23    terrorist attack because it was committed by a PA employee,

24    acting within the scope of his employment, and in furtherance

25    of the interests of the defendant PA?

F268SOK1

1          That's the way I have asked that question.  And check

2     either yes or no.

3          The second question would be:  Did plaintiffs prove by

4     a preponderance of the evidence that the defendant PA is liable

5     for the January 22, 2002 terrorist attack because the attack

6     was committed or assisted by an agent of defendant PA?

7          Question number 3:  Did plaintiff prove by a

8     preponderance of the evidence that the defendant PLO is liable

9     for the January 22, 2002 terrorist attack because the attack

10     was committed or assisted by an agent of defendant PLO?

11          My first thought was that was all really that was

12     necessary.  Whether or not there is that general question or

13     whether or not there is a material support question, I don't

14     think it makes a difference.  I think that the proof with

15     regard to either one of those, they are not going to find one

16     without the other.

17          I will give you the next few questions just the way

18     they are phrased and then we can talk about whether any of

19     these are appropriate with regard to any or all of these

20     incidents or some of these incidents.

21          The harboring question, if that becomes necessary as

22     to any one of these incidents, basically reads:  Did plaintiffs

23     prove by a preponderance of the evidence that defendant PA is

24     liable for the January 22 terrorist attack because it harbored

25     or concealed a person who it knew or had reasonable grounds to

F268SOK1

1    believe committed or was about to commit the terrorist attack?

2                The same question for the PLO.

3                With regard to providing material support, if we want

4    to go that way instead of the more general question, or you can

5    argue if you think both are appropriate, it basically says:

6    Did plaintiffs prove by a preponderance of the evidence that

7    defendant PA is liable for the January 22, 2002 terrorist

8    attack because it knowingly provided material support or

9    resources that were used in preparation for or in carrying out

10   the terrorist attack?

11               The same question would be asked with regard to the

12   PLO.

13               I will just give you an example of the providing

14   support to a terrorist organization.  Obviously, with regard to

15   Al Aqsa Brigade, that only applies to some of the later

16   incidents.

17               MR. YALOWITZ:  July 31, your Honor.

18               THE COURT:  I am just looking for Hamas.

19               MR. YALOWITZ:  July 31.

20               THE COURT:  All right.  The question is basically

21   this:  Did plaintiffs prove by a preponderance of the evidence

22   that defendant PLO provided material support or resources to

23   Hamas after its designation as a foreign terrorist organization

24   that were used in preparation for and in carrying out the

25   terrorist attack?

F268SOK1

1              Then the Al Aqsa Brigade question would be a similar

2     question:  Did plaintiffs prove by preponderance of the

3     evidence that the defendant PA or PLO, depending on each

4     separate question, is liable for the June 19, 2002 terrorist

5     attack because it knowingly provided material support or

6     resources to the Al Aqsa Martyrs Brigades after its designation

7     as a foreign terrorist organization and that were used in

8     preparation for or carrying out the terrorist attack?

9              That's how I have approached it.  Those are the

10    general choices that we have with regard to theories as I see

11    it and choices of words.  Because the last question, if it's

12    even necessary, because I think it's subsumed in the others,

13    but the funds, or I would have to think about what incidents we

14    would have about any direct provision of funds on any

15    particular attack, but the question would be:  Did plaintiffs

16    prove by a preponderance of the evidence that defendant PLO is

17    liable for the July 31, 2002 terrorist attack because it

18    knowingly provided funds that were used to carry out the

19    terrorist attack?

20             That basically has been my approach and I am trying to

21    put it in a way that clearly articulates the standards for them

22    to apply that is basic enough for them to approach that.  I

23    think it's much more than what we need.  I think it's even much

24    more than is supported by all of the evidence.  And it's a

25    27-page verdict form as I have it now.

F268SOK1

1          I will let you look at that and make a determination.

2     We can talk about it next week as you look through that.

3          MR. YALOWITZ:  I think that will be helpful to see.  I

4     can tell you have been working on this for a while.  I have

5     given you some thoughts, particularly about alter ego,

6     particularly about ratification.  You probably haven't had a

7     chance to read it.

8          THE COURT:  I did.  I have read what you have

9     submitted to me.  I am not prepared to discuss it because I

10    haven't read all of the underlying cases that you cited for

11    that proposition.

12         MR. YALOWITZ:  All I was going to say, I think that's

13    an item that you need to reflect on, the defendants may want to

14    be heard on it, and I just wanted to put a marker that that's a

15    thing that needs to be discussed.

16         THE COURT:  My view had been, when I first started

17    working and continuously worked on the jury instructions, my

18    view with respect to my approach with the verdict form is I was

19    trying to write the verdict form in a way that those nuances or

20    issues with regard to jury instructions wouldn't change the

21    verdict form.  I don't think they change the questions as they

22    are asked.

23         Quite frankly, I can tell you I am not particularly at

24    this point persuaded that your instructions are appropriate,

25    but we will discuss it further.  And I want to read the cases,

F268SOK1

1    and I have read some of the cases when we first started when

2    these issues were raised, but I want to go back to all of the

3    cases that you're relying upon and then we can discuss that.

4              Your instructions with regard to --

5              MR. YALOWITZ:  Policy and practice.

6              THE COURT:  Not the policy and practice.  I am not

7    particularly impressed with that one either, to tell you the

8    truth.

9              Look, you're either going to prove they were employees

10   working on behalf of the PA or you're going to prove that they

11   were agents of the PA or the PLO.  I'm not sure that any other

12   theory relieves you of what your responsibilities are with

13   regard to demonstrating that.

14             MR. YALOWITZ:  I think policy and practice is one of

15   those discretionary items.  Obviously, I can argue that in

16   closing.

17             THE COURT:  I am sure you can argue that in closing.

18   You can argue that they are liable if they are employees acting

19   within the scope of their employ in the interests of the PA.

20             MR. YALOWITZ:  Right.

21             THE COURT:  That's what you have to sustain.  A policy

22   and practice does not relieve you of that burden.

23             MR. YALOWITZ:  I agree with that.

24             THE COURT:  And it does not in and of itself -- I

25   think the wording as you have it implies in and of itself

F268SOK1

1    creates some liability on behalf of defendant, and it does not.

2    Your burden is to prove that they are employees acting within

3    the scope of their employ in the interests of the PA, and your

4    burden is to prove that an agent, those people who are not

5    employees of the PA, with regard to the PLO, that an agent of

6    the PA and PLO were involved in either helping to perpetrate

7    these terrorist attacks or to provide material support for

8    these terrorist attacks.

9            I don't think there is a different or separate or

10   easier way to prove that other than the evidence that they are

11   in fact people who made conscious decisions to be involved in

12   perpetrating or assisting in the perpetration of these acts.

13   So I will look further at your instructions.

14           You had some minor suggestions about damages, the

15   amount of damages.  I don't have a real problem with your

16   proposed damages instruction on a specific dollar amount and I

17   don't have in principle a problem with your increased

18   susceptibility to injury.  Let me look.  I want to compare the

19   Sand instruction to the PJI instructions and see what I am more

20   comfortable with.  The eggshell skull rule.  There may have

21   some arguments against that, but I don't see a real controversy

22   about that.

23           MR. YALOWITZ:  I don't think we found one in Sand.

24           THE COURT:  I have Sand right here.

25           MR. YALOWITZ:  We may just have missed it.

F268SOK1

1           THE COURT:  I think you may be right.  I don't think

2     there is a Sand one.  So I may just go with the PJI.  The PJI

3     is here too.  I have been doing ten things at one time.

4           That's basically where we are.  I want to wind up so

5     we can get the jury in.

6           MR. YALOWITZ:  Just to put that marker down, as you

7     know, my instinct on the verdict form has been less is more.  I

8     especially felt that when we had a lot of other claims in the

9     case.  The risk of a too-detailed verdict form will cause

10    confusion.  I think the way you have done it sounds pretty

11    simple to me.  I want to look it, reflect on it, and think

12    about it.

13          THE COURT:  I want to look through it.  I think I

14    might make one or two minor typo changes.  My intent is to give

15    you a copy of that and give you a copy of the jury instructions

16    before we adjourn for the day so you can look over it this

17    weekend and we can start talking about it next week.

18          MR. YALOWITZ:  I think the big question is on

19    ratification, is that a separate theory of liability, is it

20    kind of subsumed within the scope of employment or agency.

21    There has been some litigation on that.  You have got to look

22    at the cases.  We have looked at the cases.  I am sure the

23    defendants will want to be heard on that.

24          THE COURT:  I can tell you I have two problems.  One

25    is the theory in general and whether that's applicable, whether

F268SOK1

1    that's really as you have stated it is the law; two, whether

2    the facts in this case support any such application; and,

3    three, I am not convinced that your instruction, which is

4    really my bottom-line ruling always, the instruction as you

5    proposed it is an appropriate legal instruction to give to the

6    case.

7         For example, you say failure to disavow their

8    employees or other agents actually constitute ratification.  I

9    am not sure that's true legally.  Just because I didn't say

10   anything about it doesn't constitute ratification.  I don't

11   think that's a legally correct principle.  Or failure to take

12   adequate steps to investigate is ratification.  In and of

13   itself that's not ratification.  Even if I were to accept your

14   theory, I have some problems about whether or not the

15   instruction itself that you propose is an accurate instruction

16   even of that theory, if that theory does in fact exist and can

17   exist in this circumstance.

18        Basically, what you're arguing here is if somebody

19   says, Judge, I know you didn't like Mr. X.  If my law clerk

20   said, I know you didn't like Mr. X.  I want you to know that

21   Mr. X died last week.  I was the one that poisoned him.  Now

22   you say, if I just don't do anything about it that means you

23   can sue me for him being poisoned because that means I ratified

24   simply because I know about it, or I didn't investigate it

25   further, or I didn't disavow it.  That's not the law.

F268SOK1

1              MR. YALOWITZ:  So it's funny.  Proposing jury

2       instructions in some ways can be harder than tailoring them.  I

3       can give you the law.  The restatement is pretty black letter.

4       We can all look at it, and there is no doubt that section of

5       the restatement exists and people can understand it.

6              My job is to find something that somebody else has

7       done that's kind of been koshered up, if you will.  You may

8       have some concerns about some of the nuances, the defendants

9       may have some concerns about either the whole thing or some of

10      the nuances.  But if I start nuancing it, then that in a way

11      diminishes what I am doing.

12             I am not saying that Judge Cogan did the perfect

13      instruction.  I am not saying that judge in California did a

14      perfect instruction.  I am saying here are some examples of how

15      it's been done and here is the evidence that I have that fits

16      into that legal concept.

17             So I am not saying I need every single nuance.  On the

18      other hand, I think -- you're right.  If you read in the

19      newspaper a cop got shot and you don't disavow it, that doesn't

20      make you liable.

21             THE COURT:  Again, even if my law clerk confesses to

22      me she shot the cop, that doesn't make me liable.  The cop's

23      family can't sue me.  I understand your ratification theory in

24      the abstract and I understand it because it really arises out

25      of a contractual situation.  That's where that principle comes

F268SOK1

1        from.

2                    MR. YALOWITZ:  Yes.

3                    THE COURT:  I am not going to hold you to a terrorist

4        case, but I want to see where you say that can be applied in an

5        intentional tort situation.

6                    MR. YALOWITZ:  I think there is an example in the

7        restatement, which we brought, about an employee unauthorized

8        to lie about a competitor.  And then the employer says, good

9        job.  The reporters of the restatement says that's

10       ratification.

11                   I think there is an argument to be made about setting

12       up a system in which every single citizen of your country gets

13       put on the payroll if they get convicted of a terrorist crime.

14       I think that fits better in the material support category.

15       That's where it was in the *Arab Bank* case.  I don't think we

16       need ratification for every single person who did something bad

17       and got convicted in this case.

18                   THE COURT:  I'm not even sure which incident -- we

19       have to go through each incident.  I am not sure which

20       incidents you say were ratified and which weren't ratified.

21       The evidence proves they were involved from the beginning or

22       you say that there is some evidence that indicates that they

23       had nothing to do with it and they subsequently ratified it and

24       that's why they are liable for that particular injury to that

25       particular plaintiff in that particular terrorist attack.

F268SOK1

1              MR. YALOWITZ:  I think we need to go through it.  I

2        think again what Judge Cogan did in *Chaudhry* is instructive.

3        Because there the defendant was involved but the defendant both

4        denied that he was involved and denied that he ratified.  The

5        judge said in that circumstance, which was very similar to what

6        we have here, you can go to the jury on those alternate

7        theories.

8              THE COURT:  I will look at it more carefully, Judge

9        Cogan's, and I also have the benefit of knowing him very well.

10       Even before this case started I picked up the phone and spoke

11       to him and asked him what he did and what worked in terms of

12       trying his case and what didn't work.  So I can always figure

13       out what he was thinking.  That's not very difficult.

14             MR. YALOWITZ:  I am sure everybody in this case got

15       the benefit of what happened in that case from their

16       counterparts.

17             THE COURT:  Mr. Rochon, did you want to add something

18       at this point?

19             MR. ROCHON:  On the ratification, and we will continue

20       to enjoy the discussions on that.  But this is something

21       probably I feel about the same way Mr. Yalowitz probably feels

22       about me arguing about the Mukataa again and again.

23             As we had the conversation at the time of the summary

24       judgment motion, with the same cases and same arguments, that

25       was rejected.  Of course, our position is that the instruction

F268SOK1

1    not be given, and that's been the position for a while here.

2                On the damages, specific dollar amount, I assume we

3    are only referencing economic damages, that there is not a

4    specific dollar amount that will be requested as to noneconomic

5    damages.

6                THE COURT:  I haven't thought about it.  In prior

7    cases, depending on the type of case and what law was being

8    applied, sometimes it's appropriate to do so.  Sometimes it's

9    inappropriate to do so.  If you want to convince me it's

10   inappropriate to do so in this case, I am willing to consider

11   that.

12               MR. ROCHON:  We will engage on that.

13               THE COURT:  I don't really know of any cases in this

14   context that address that issue.  This isn't a slip and fall in

15   state court.  Some of those principles may or may not apply.

16   It's not even a tort case in which it is a state law case but

17   only here on diversity jurisdiction.  I have to look at it more

18   carefully.

19               As I say, in principle, unless you convince me that

20   they should be precluded in asking for a particular amount, I

21   don't have any problems in giving the jury some focus.  If they

22   do that, you probably don't have any objection to telling the

23   jury, whatever they ask for, that's not important.  What you

24   think is appropriate is what is important.

25               MR. ROCHON:  If you permit them to use a specific

F268SOK1

1    dollar damage for economic damages, we'd want that and of

2    course that instruction.

3            THE COURT:  Why don't you try to see if you can find

4    research that is compelling to you and will be compelling to

5    me.

6            MR. ROCHON:  On the rest of the issues we can wait to

7    look at the instructions and the verdict form.

8            THE COURT:  We have four witnesses and you think they

9    will take about an hour apiece, or less?

10           MR. YALOWITZ:  That's been the goal.  None of these

11   witnesses I think needs to be more than an hour.  Possible

12   exception, Mrs. Gritz, because she has got to cover both her

13   husband and herself.  Even that I don't think the jury benefits

14   from a lengthy examination.  So we are going to try to move

15   through it efficiently with all four.

16           THE COURT:  Should I be comfortable telling the jury

17   that you will probably rest today?

18           MR. YALOWITZ:  The only open issue that I can think of

19   that I need to nail down is this issue of what exactly we are

20   going to give with regard to the Abdullah Barghouti indictment.

21   That's a technical issue.

22           THE COURT:  What I want to say to the jury,

23   particularly because we took a little bit of time here, and I

24   think it was important to save time in the long run, but I want

25   to be able to say that I believe we may finish all of the

F268SOK1

1    plaintiffs' witnesses today.

2              MR. YALOWITZ:  Without question that's going to

3    happen.

4              THE COURT:  Mr. Rochon, would it be appropriate for me

5    to say that the defendants' witnesses will testify next week,

6    beginning on Monday, or is there a possibility that you won't

7    call any witnesses and it will be inappropriate for me to say

8    that?

9              MR. ROCHON:  I appreciate you asking.  We will be

10   calling witnesses.  So if you would say that the defense case

11   will begin next week.  It may be completed next week.  I think

12   it might carry over.

13             THE COURT:  At this point, how many witnesses are you

14   anticipating realistically?

15             MR. ROCHON:  Between seven and nine.

16             THE COURT:  If I had nine witnesses, all I have to do

17   is three a day to get them done on average.  If I had seven

18   witnesses, I don't even have to do that.

19             MR. ROCHON:  A couple of them will be kind of long.

20   Not Shrenzel-esque, but longer than a few minutes.  So we will

21   see.

22             MR. YALOWITZ:  Sometime today I do want to discuss

23   some of the defendants' witnesses.  Some of the witnesses I

24   don't have a problem with.  Some of the witnesses I think need

25   to be -- I just want to make sure everybody understands the

F268SOK1

1  court's prior rulings, including the defendants.

2            MR. ROCHON:  We understand the court's prior rulings.

3  We have for a long time.

4            THE COURT:  I think I have pretty much made it clear

5  what the scope of the witness's testimony should or should not

6  be in this case.  I hope that is real clear.  I assume I'm not

7  going to have to cut any witness short.

8            MR. YALOWITZ:  I am concerned that five of the seven,

9  as I read the expert reports, as I understand who they are and

10 what their person knowledge is for the ones who are not

11 experts, my concern is that five of the seven appear to be

12 either completely inappropriate or lacking expertise on the

13 subject matters that remain in the case.  We just need to have

14 a conversation about it.

15           THE COURT:  We will.  Obviously my best guidance to

16 you at this point is my rulings on the deposition designations.

17 Because obviously that reflects my view of the appropriate

18 scope and the relevance of certain kinds of testimony.  So that

19 should be your best guide as to what I would be prepared to

20 rely from a live witness.

21           MR. ROCHON:  I have already indicated there is at

22 least one I wanted to raise with the court in advance.  While I

23 think it falls within your rulings, I am aware that you might

24 not and that Mr. Yalowitz might not.  There is one that I think

25 we should discuss in advance.  I think I will end up discussing

F268SOK1

1    more than one in advance because that's how litigation works.

2              MR. YALOWITZ:  This afternoon?

3              THE COURT:  It depends how much time we have this

4    afternoon.  If we end early enough so that the jury can go

5    home, we can have some basic discussion and I can get the D.C.

6    people on the train, then we will do it.

7              MR. YALOWITZ:  I am prepared to discuss all of them,

8    consistent with the court's schedule.

9              THE COURT:  Let's get the jury and see how quickly we

10   can move.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F268SOK1

1          (Jury present)

2          THE COURT:  I want to thank you for being prompt this

3     morning.  We took a little extra time because I wanted to

4     discuss and make sure we have the logistics of where we were

5     and how long it's going to take us.  I think it was a

6     worthwhile discussion.

7          I think that there is a good possibility that the

8     plaintiff will finish calling all of its witnesses today.  If

9     that is the case, we will begin with the defense witnesses, if

10    defense calls witnesses, on Monday.

11         So that's our schedule.  As I say, I think we have

12    several days left of testimony, maybe four, five days worth of

13    testimony.  So what I am planning on, given where we are, if we

14    can finish the plaintiffs' witnesses today and begin the

15    defendants' witnesses on Monday -- remember, we will sit

16    Monday, Tuesday, Wednesday.  Then I will give you Thursday,

17    Friday and Monday off, and then we will continue on Tuesday,

18    the 17th.

19         I am going to have further discussions with the

20    parties to see if I can confidently say to you I am hopeful

21    that we can finish the witnesses.  After we finish the

22    witnesses, we will have closing arguments by the lawyers, I

23    will instruct you on the law, and you will begin your

24    deliberations.

25         That's the outline of where we are.  We are ahead of

F268SOK1

1  schedule, and I think we are moving along efficiently and the

2  parties have been very cooperative in getting the witnesses

3  here.

4         With that said, we will just proceed for as long as it

5  takes to finish the witnesses today.  I think it will happen

6  before the end of the day and we can adjourn a little early

7  because I think we may have about four or five witnesses at

8  most today.

9         Mr. Yalowitz, could you call the plaintiffs' next

10  witness?

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F26TSOK2                          R. Blutstein – direct

```
 1              MR. YALOWITZ:  Yes, your Honor, the plaintiffs call
 2    Richard Blutstein.
 3              With the Court's permission I would like to hand out
 4    our little reference cards.
 5              THE COURT:  Yes.
 6     RICHARD BLUTSTEIN,
 7         called as a witness by the Plaintiffs,
 8         having been duly sworn, testified as follows:
 9    DIRECT EXAMINATION
10    BY MR. YALOWITZ:
11    Q.  Good morning, Richard.
12              Richard, could you tell us where you grew up.
13    A.  I was born in Chicago but I mostly grew up Corning, New
14    York.
15    Q.  Are you a citizen of the United States of America?
16    A.  I am.
17    Q.  And was your son Ben a citizen of the United States?
18    A.  Yes.
19    Q.  Where did you go to college?
20    A.  Dickinson College in Carlisle, Pennsylvania.
21    Q.  And what did you do after college?
22    A.  I went to medical school.
23    Q.  Where did you go to medical school?
24    A.  Jefferson in Philadelphia.
25    Q.  Are you a practicing doctor today?
```

F26TSOK2                          R. Blutstein – direct

1   A.  Yes, I'm a pediatrician in Harrisburg, Pennsylvania.

2   Q.  When did you move to Harrisburg?

3   A.  1981.

4   Q.  Are you married?

5   A.  Yes.

6   Q.  What does your wife do?

7   A.  She's a professor of microbiology at Penn State,

8   Harrisburg.

9   Q.  How long have you lived in Harrisburg?

10  A.  1981 until now, so.

11  Q.  25 years?

12  A.  34 years.

13  Q.  Did you raise your family there in Harrisburg?

14  A.  Yes.

15  Q.  So tell us about your -- the ages of your two children,

16  when were they born?

17  A.  So Ben was born in 1977.  At that time I was pediatric

18  resident in Wilmington, Delaware, so he was born in Wilmington

19  Medical Center.  Then we moved to Charlottesville where I did a

20  post-doc and Kathy did a post-doc, and then we moved to

21  Harrisburg, and I got a job there at the hospital, and

22  Katherine had various jobs, but then she had Rivkah in 1988.

23  Q.  So what's the -- what was the age difference between Ben

24  and Rivkah?

25  A.  Eleven years.

F26TSOK2                        R. Blutstein - direct

1    Q.  Now are you still practicing today?

2    A.  Yes.

3    Q.  How many days a week do you see patients?

4    A.  Five or six, depending.

5    Q.  And are you in practice by yourself?

6    A.  I have a nurse practitioner.

7    Q.  So why don't you tell us a little bit about Ben in his high

8    school years.

9    A.  Well, Ben -- well, during his -- sort of just before his

10   high school years we were sort of undergoing sort of a

11   religious transition becoming more and more observant Jewishly,

12   and for a long time Ben went along with that.  But then Ben got

13   involved with some drugs, actually, and became less interested

14   in sort of traditional observant Judaism.

15   Q.  Was that hard on your family that Ben was involved with

16   drugs?

17   A.  Well, yes and no.  I mean we didn't really know that he

18   was.  We just knew that he was -- that he had gone from a sweet

19   kid to a not-so-sweet kid.

20   Q.  And did Ben go to college?

21   A.  Yes, he went to Brandeis and got in trouble in Brandeis and

22   went to Dickinson.

23   Q.  He went to Dickinson where you went?

24   A.  Yes, Katherine and I both graduated from Dickinson.  That

25   is where we found out about the drugs, because they found drugs

F26TSOK2                              R. Blutstein - direct

1   in his room, and he was actually suspended from Dickinson for a

2   semester, but then he graduated.

3   Q.  When Ben was suspended from Dickinson, where did he go?

4   A.  Well, he lived with us in our house, but he did like a drug

5   rehab program.

6   Q.  How would you describe his situation having left two

7   schools and living at home?

8   A.  Well, I think actually things improved a lot after he was

9   suspended from Dickinson.  Then he became -- he worked at

10  various jobs.  He worked in a bagel bakery, he worked in my

11  office for about six months as a medical assistant, and he also

12  got a job -- after he finished rehab he actually got a job at

13  the place he had rehabbed at as some sort of assistant.

14  Q.  What was that place called?

15  A.  White Deer Run.

16  Q.  How long did he stay there as a patient?

17  A.  Well, he was never inpatient there, it was strictly

18  outpatient.  I don't remember the exact time that he was in

19  rehab counseling.

20  Q.  Did you see a change in him as he went through rehab

21  counseling?

22  A.  Oh, yeah.  He basically developed a sense of purpose with

23  his life.  He decided he wanted to become a drug rehab

24  counselor himself.

25  Q.  What else changed about Ben as he recovered from his --

F26TSOK2                          R. Blutstein - direct

1    A.  As he became sort of more involved with our family he also

2    became more religiously observant himself.  And then ultimately

3    he decided that he wanted to go to Israel and study at Pardes

4    for a year.

5    Q.  Just tell us what Pardes is.

6    A.  It's a like a yeshiva but it's not a classic yeshiva.  In a

7    classic yeshiva it's all men, where as this was sort of a co-ed

8    place designed -- established by an American designed for

9    Americans who graduated from college to come and spend a year

10   studying in an Orthodox but co-ed environment.

11   Q.  When did Ben go there, what year?

12   A.  I'm thinking 2000, 2000, 2001.

13   Q.  And how long it -- how long was the program that he signed

14   up for?

15   A.  So initially it was a one-year program.

16   Q.  And how did he like it?

17   A.  Well, I'm guessing he liked it because he signed up for

18   another year.  He actually signed up for a program to become a

19   Jewish educator.

20   Q.  When Ben was living in Israel, did he stay in touch with

21   you?

22   A.  Sure, we talked.  Typically Sundays was our telephone days.

23   We had a set time on Sunday that we would either call him or he

24   would call us.

25   Q.  So I'm sorry, I just wanted to ask you that question.  You

F26TSOK2                              R. Blutstein - direct

1   were telling us about the three-year program that he was

2   signing up for.

3   A.  Right, so he signed up ultimately for a three-year program

4   to become a Jewish educator.

5   Q.  What did he tell you about that program?

6   A.  He seemed excited.  At the end of the program part of the

7   deal was he had to have -- you were obligated to come back

8   North America and teach for three years in a Jewish day school

9   in North America.

10  Q.  When Ben was not in school, what were some other things he

11  liked to do?

12  A.  So when Ben was in high school, he got into being a DJ, and

13  his run was -- we have a ranch house, and we converted the

14  attic of the ranch house into his bedroom, and he put some

15  turntables up there and got probably a thousand records and he

16  would practice for hours doing his little scratch thing.  Then

17  he got a few jobs in Harrisburg, and then when he went to

18  Jerusalem he was actually sort of study during the day and at

19  night he got jobs at various bars in Jerusalem and even some in

20  Tel Aviv.

21  Q.  How would you describe Ben as a person in terms of his --

22  just describe Ben as a person as you remember.

23  A.  He was very charismatic.  People liked him.  And basically

24  his interests were -- by the time he got to Jerusalem he was

25  very of involved in his studies and also in DJ'ing.  And that

1    drove people nuts because he would wear a kippah and tzitzit,

2    which had like ritual fringes, and everybody in Jerusalem

3    recognized his tzitzit and kippah as being religious stuff, but

4    he also had various piercings, like earrings and other

5    piercings.  So the religious people were like you can't do

6    that, and the people who were not religious were like why are

7    you wearing a kippah.

8    Q.  Did Ben have friends from different communities?

9    A.  Sure.  So some of the bars -- one of Ben's main venues for

10   DJ'ing was a place called D-1, which was an Arab-owned bar in

11   Jerusalem, and we actually went there at one point.  And he

12   also was involved in both Alcoholics Anonymous and Narcotics

13   Anonymous in Jerusalem.

14   Q.  Was he a member of those organizations?

15   A.  To the extent that they have members.  They're anonymous.

16   I'm not exactly sure how the organization works, but it's

17   somehow -- their key word is anonymous, so I don't know how the

18   organization actually happens, but they get together.

19   Q.  As you understood it, did Ben go to those meetings?

20   A.  Right, and to the extent that they have leaders in those

21   meetings he became somewhat of a leader at those places,

22   organizing things.

23   Q.  And was Ben political?

24   A.  No.  So like he got a gig once in Tel Aviv -- and this is

25   the time when Rivkah and I were there -- and this was a

F26TSOK2                        R. Blutstein – direct

1    Thursday night.  And in Israel, Thursday night is like the big

2    night.  It's kind of like Friday night here, because a lot of

3    places are closed.  Fridays are either a half day or no

4    workday, they work Sunday through Thursday, and sometimes

5    Friday afternoon.  So Thursday night was a big going out night.

6            And they had something called the Rave against the

7    Occupation, which is like a protest against the Israeli

8    occupation of the West Bank, in Tel Aviv, right across from the

9    Israeli military headquarters.  So Ben a lot of times DJ'ed for

10   a rapper, a particular rapper who had been invited to perform

11   at this Rave Against the Occupation, and he invited Ben to come

12   and DJ for him while he rapped.  So Ben did that, and he came

13   along, and that Thursday night there were probably about 3 or

14   4,000 people and he was DJ'ing for the Rave Against the

15   Occupation.

16           And then Friday we went and visited some friends of

17   ours who live in Mitzpe Yericho, which is a settlement in the

18   West Bank.  And we weren't going there because of its being a

19   settlement, we were going there because they were friends from

20   Harrisburg.  So that was what Ben was about, his music and his

21   friends.  So the irony of his being at the Rave Against the

22   Occupation on Thursday and Friday going spending Shabbat on the

23   West Bank.

24   Q.  So I want to take you to the summer of 2002.  Where was Ben

25   at that point?  Was he back in Harrisburg?

F26TSOK2                         R. Blutstein - direct

 1    A.  So again his studies -- the semester ended I think in May,
 2    so he came back to Harrisburg in May, and he was in Harrisburg
 3    until I think the last day of June, because I think he was
 4    going to go for a summer session at Hebrew University.  As part
 5    of his program he had to have Hebrew language training, and he
 6    took a course at the Hebrew University in Hebrew language.  So
 7    he was home for about six weeks between May and the end of
 8    June.
 9    Q.  How were those six weeks for your relationship with Ben?
10    A.  It was really good.  Actually part of what Ben had done, he
11    learned a lot of like tunes, traditional Jewish things that are
12    sung on Shabbat, and these were tunes that we didn't know.  And
13    he actually got the Shabbat like prayer book out and made us a
14    tape.  And he started -- basically he sang a new tune for each
15    of those songs with the idea that we would learn them, and
16    ultimately we did learn them.
17    Q.  So when did Ben go back to Jerusalem?
18    A.  Probably like the very end of June.
19    Q.  What was his purpose in going back?
20    A.  So he was going to take the Ulpa course, Hebrew language
21    course, at the Hebrew University.
22    Q.  Did he take that course?
23    A.  Right.  And then the day of the bombing was actually the
24    day of the final exam.
25    Q.  So before we go there, I just want to ask you, when Ben was

F26TSOK2                        R. Blutstein - direct

1   back in Jerusalem in July of 2002, did you continue those

2   Sunday telephone calls?

3   A.  Oh, sure, yes.

4   Q.  How were his spirits in those calls?

5   A.  He was good, like he was actually at each -- the last day

6   of class, like the day before the bombing, they have like a

7   little -- they have a party, and he was actually invited to be

8   the MC, and people would get up and do skits and sing songs in

9   Hebrew, and he is like the guy who is organizing it all.

10  Q.  Did you speak to him the last Sunday before he was supposed

11  to come home?

12  A.  Yes.

13  Q.  How were his spirits then?

14  A.  They were good, because I was supposed to pick him up on

15  Thursday, he was coming in on Thursday evening, and we talked

16  about when and where I was going to pick him up.

17  Q.  So what day was he supposed to fly home?

18  A.  Thursday.  The bombing was on Wednesday.

19  Q.  Was he meant to leave that Wednesday night and fly home

20  overnight?

21  A.  I think, yeah.  I'm not exactly sure what time he was

22  supposed to -- I don't know the exact time of his flight, but

23  he had his ticket with him, actually.

24  Q.  Had you planned to take Thursday off in order to pick him

25  up from the airport?

F26TSOK2                      R. Blutstein – direct

1    A.   Exactly.  So I already prebooked Thursday as not being in

2    the office.

3    Q.   And is that easy for you to do?  Do you have like a lot of

4    flexibility in your schedule?

5    A.   Well, as long as people have -- several months out you have

6    flexibility, but once we get closer to the time and I have a

7    full schedule of patients, it's not easy to just dump patients.

8    Q.   So what was Ben supposed to do on his last day in Jerusalem

9    before he came home to Harrisburg?

10   A.   I don't know what specific plans he might have had,

11   actually.

12   Q.   Was he at that Hebrew University to take a test or

13   something like that?

14   A.   Right, so at that moment he was waiting to take his final

15   exam in the course.

16   Q.   And so I want to take you now to that Wednesday.  How did

17   the day start for you?

18   A.   My normal routine is I get up and I watch -- I have

19   breakfast in front of TV watching CNN.

20   Q.   Did you start your day in the ordinary way?

21   A.   Yes.

22   Q.   Tell us what you saw on television.

23   A.   I saw the CNN breaking news was bombing at the Hebrew

24   University.  And so I immediately called Ben's cell phone, but

25   it went straight to voice mail.

F26TSOK2                         R. Blutstein - direct

1    Q.  What were you thinking at that point?

2    A.  Well, I didn't really think about the possibility that he

3    might be dead, I was sort of thinking that he was injured.

4    Q.  Was he attending Hebrew University or was he there just for

5    that test?

6    A.  Right, so his major course of study was at Pardes, but one

7    of the requirements for the Pardes program is that he become

8    fluent in Hebrew.  So they had to -- I think in Israel there's

9    like standardized levels of Hebrew proficiency, and six being

10   the highest.  He had to get up to level six in order to be part

11   of that program at that he was in, so Hebrew University had

12   these courses, and he was taking the fourth level there.  If he

13   passed that he could get onto -- the next time he could have

14   gone on to the fifth level.

15   Q.  So you saw that there was a bombing, and you tried his cell

16   phone and it went to the voice mail.  What happened after that

17   in your day?

18   A.  I tried a couple more times on his cell phone and I went to

19   work.  Of course even before that I called Katherine in to see,

20   to watch the TV with me, and then we told Rivkah about it.  But

21   we weren't super concerned at that point.  We were worried, but

22   not -- I wasn't thinking the worst.

23   Q.  How old was Rivkah?

24   A.  She must have been 14, maybe 13.

25   Q.  And so you went to work, and what's the next news that you

F26TSOK2                          R. Blutstein - direct

1   heard?

2   A.  So as soon as I got to work I called -- I made two phone

3   calls to Israel.  I called two friends in Israel, one actually

4   was the guy that we visited in Mitzpe Yericho who had lived in

5   Harrisburg and moved there, and another guy who had actually

6   been our rabbi in Harrisburg who also moved to Jerusalem.  I

7   called those numbers and it went to voice mail, and I told them

8   that there had been a bombing at the university and Ben was

9   supposed to be there at that time and place, could they check

10  up on it.  And one of them was Chanan Morrison.  So anyway,

11  ultimately -- I didn't realize at the time, but ultimately

12  Chanan did make contact and was asked to go to the forensic

13  lab.  I don't know where it is, but somewhere in Israel is like

14  a central lab where they identify --

15  Q.  Like a medical examiner's office?

16  A.  Exactly.

17  Q.  So your friend went to that medical examiner?

18          THE COURT:  Sorry, let me slow you down.  You're

19  talking over each other and making it difficult for the court

20  reporter.

21          MR. YALOWITZ:  Thank you, we'll both slow down.

22          THE COURT:  You just did it again.  One at a time.

23  A.  So Chanan went to the forensic lab and identified Ben's

24  body.

25  Q.  And then how did you get the news, Richard?

F26TSOK2                         R. Blutstein - direct

1    A.  So during all this period of time I was seeing patients in

2    my office, and then Chanan's wife, I think, called somebody,

3    called her friend in Harrisburg, who told other people, and

4    ultimately Marian Fransten, who is one of our Harrisburg

5    friends and neighbors, came to the house and talked to

6    Katherine.  And I think at that point Marian knew but she

7    didn't actually tell Katherine, because apparently the official

8    word was to come through the U.S. Embassy.

9    Q.  So what happened when you got home?

10   A.  Well, before I got home I got a call, so apparently the

11   U.S. Embassy did call the house around 4 o'clock in the

12   afternoon, and Marian was there with Katherine when Katherine

13   got the news, and Katherine was too upset set to call me, so

14   Marian called me.  And then I was -- I still had another two

15   patients to see in the office, but I saw them because they were

16   there, and I drove home.

17   Q.  Just describe your status that afternoon after you got the

18   news.

19   A.  Well, at that moment I had a flashback to my dad who died

20   when I was twelve, and it was like sort of the thoughts of him

21   were reverberating in my head at that particular moment, but

22   sort of the finality of it, and sort of on autopilot, seeing

23   the patients, driving home.

24              And then when I got home, my house was actually

25   already filled with people, like cleaning out, doing the

F26TSOK2                          R. Blutstein - direct

1    dishes.  So I think Marian organized the community to sort of

2    be on call, so as soon as we heard the news they came in and

3    started helping out.

4    Q.  When did Ben come home that week?

5    A.  So his body was flown back to JFK on Thursday, and actually

6    Bert Morrison, who is the husband of Marian Fransten, arranged

7    for like a police escort all the way from the airport to

8    Harrisburg, three different states, New York, New Jersey,

9    Pennsylvania, and then we arranged for the funeral to be on

10   Friday afternoon.  We had the funeral.

11   Q.  Richard, how has Ben's death affected you?

12   A.  Two things.  One is in terms of my professional life I sort

13   of withdrew, because I always wasn't like a leader in local

14   medical community, but I was a regular attendant of meetings

15   and that sort of thing.  At that point I stopped going to any

16   sort of meetings or medical social functions.

17           On the other hand, because it was Friday afternoon, a

18   lot of people from Pardis actually came to the funeral, but

19   because it was Friday afternoon and they were all Shabbat

20   observant, which means they don't travel on the Sabbath, which

21   starts on Friday evening and go goes to Saturday evening, they

22   were sort of stuck in Harrisburg for Shabbat, and they kind of

23   hung out at our house and they made plans to come back at some

24   future point to have like sort of a celebration of his life.

25   And that did happen in February of 2003.

F26TSOK2                          R. Blutstein - direct

1   Q.  Tell us about that event.

2   A.  Well, that was kind of an amazing thing, because there's

3   like a large meeting room at the Jewish community center in

4   Harrisburg, a meeting room, presentation room, it probably

5   holds several hundred people.  And we had like a Friday night

6   dinner.  All of the synagogues in town arranged to have their

7   own prayers in different rooms at the JCC, and then they all

8   came together for this Friday evening meal.  Rabbi Landies, who

9   is the head of Pardes, spoke there.  And it was sort of an

10  amazing event, and all five synagogues in Harrisburg were doing

11  something together.

12  Q.  Richard, how would you describe your emotional reaction to

13  the loss of Ben?

14  A.  Well, like I said, I sort of in many ways withdrew, and

15  even at the synagogue I sort of -- I didn't stop going to

16  synagogue, but I went less often for a while, especially at the

17  high holidays.  I basically didn't go to high holidays at all

18  for about ten years.  I think that was because the high

19  holidays has huge numbers of people and I didn't want to be

20  around that many people.

21  Q.  Are you comfortable around people these days?

22  A.  A lot more so than then, yes.

23  Q.  What made you uncomfortable in the years following Ben's

24  death?

25  A.  About being around people?  I don't know if I could name a

1   cause, I just didn't want to be around people.  It made me feel

2   worse to be around a lot of people.

3   Q.  What was your mood like following Ben's murder?

4   A.  Well, one thing, a couple of years before that I had been

5   diagnosed with diabetes, and I started gaining weight, I wasn't

6   taking my diabetes medicine as much, just generally just trying

7   to be in familiar places with the family.

8   Q.  Did you have trouble sleeping?

9   A.  For me sleep was not an issue.  Katherine, yes, Katherine

10  had a serious problem with sleeping, but sleeping was not

11  really an issue for me.

12  Q.  Do you feel that the murder of your son impacted your

13  marriage?

14  A.  Yes.  Katherine has always been sort of a volatile person

15  with periods of sweetness and periods of unsweetness, but it

16  got much worse after that.  In terms of her being angry, she

17  was angry.  She basically she stopped going to the synagogue

18  altogether because she was angry, just angry, angry at God,

19  angry at everybody.

20  Q.  I think you may have touched on this, but just describe the

21  way your professional interactions changed before and after the

22  murder of your son.

23  A.  Another thing now -- so at that time I was a mohel, that is

24  to say I was a ritual circumciser, because one of Jewish

25  rituals is on the 8th day, Jewish babies are circumcised, and I

F26TSOK2                        R. Blutstein - direct

1    became the Jewish ritual circumciser I think in 1993.  And

2    basically that came to a grinding halt for at least a year.

3    Basically for a year nobody asked me to do that.  And after a

4    year, I got -- I started doing some, but not that many.

5    Basically I was the only person in Harrisburg to do that.  So

6    people were coming in from Philadelphia because they were

7    afraid to call me, I guess.

8    Q.  Richard, could you describe for the jury the pain that you

9    have based on the murder of your son.

10   A.  Just sort of this hole there knowing that not only am I not

11   talking to him, I'm also not talking to his wife or his kids,

12   which he never had.  At that time he had a girlfriend, and the

13   girlfriend came and spoke at his funeral.  And it seems pretty

14   clear from what she said at the funeral that their intent was

15   ultimately to get married, and a couple of years -- about three

16   or four years after Ben died she did get married and had some

17   kids.  And I think about her and her kids, and they could have

18   been my grandchildren.

19   Q.  Richard, I want to turn to how the murder has affected

20   Katherine.

21   A.  I think of the three of us, Rivkah, Katherine and me, I

22   think it affected her the most.

23   Q.  I think earlier you mentioned that she was angry.

24   A.  Yes.

25   Q.  Talk about that a little bit.

F26TSOK2                        R. Blutstein - direct

1   A.  Sometimes she is just fine.  A lot of times she is fine,

2   but there are many times where little things will set her off,

3   and just gets angry.

4   Q.  Was she that way to the same extent before Ben's murder?

5   A.  No, no, she always had -- I mean she always had that

6   potential, but it was sort of few and far between as opposed to

7   a regular thing after.  I think she has improved recently, but

8   it's still -- even coming here, yesterday she said she wasn't

9   coming.  She was just angry, angry that this was happening.

10  And ultimately we talked to her and she decided to come today.

11  Q.  Are there other symptoms that she has?  Is she sad, happy?

12  A.  She does have a problem sleeping.  It's not uncommon for

13  her to wake up with a nightmare.  I sometimes hear her talking,

14  or sometimes she just sits up, shouts something and sits up in

15  the bed and she's having nightmares about this sort of thing.

16  Q.  And what about her mood?

17  A.  So Katherine -- when you lose a kid or any loved one, even

18  though you go through a period of intense sadness, most of the

19  time you learn how to laugh again.  But Katherine really

20  didn't.  And like she'll -- so Ben's grave is a few miles from

21  our house, and I make a point of going there once a year, but

22  Katherine goes there at least once a week, and sometimes more

23  often than once a week.  Sometimes she would go and sit there

24  for an hour in the car, like sort of not getting out of the

25  car, she has a hard time walking, but watching the grave

F26TSOK2                      R. Blutstein – direct

1    marker, and she says she's talking to Ben.

2    Q.  I would like you to try to summarize for the jury some of

3    the impacts that Ben's murder has had on Katherine.  I think

4    you touched on some of them.

5    A.  So part of what Katherine does in her job as a professor at

6    Penn State is to do research.  It's a big part of what --

7    they're judged in their job on three categories, teaching,

8    service and research.  And basically she stopped doing research

9    altogether, which is a big thing for her because she really

10   prided herself on being an excellent researcher.

11          And I mentioned she essentially stopped going to shul,

12   the synagogue, except basically for -- because every year, even

13   after that first year, we still have a program in Ben's memory

14   once a year, and she would go to those, but otherwise she

15   didn't have to go or do any socializing.  People would come to

16   the house and talk to her, but she didn't go out much, she

17   would stay in the house.

18   Q.  What about her enjoyment of life?

19   A.  So basically she's still in mourning.  Much the way I was

20   in mourning the first year, she is still there.

21   Q.  Are there times when she feels hopeless?

22   A.  Yeah.  If there's two ways to see something, the half full,

23   half empty, she's half empty.

24   Q.  What would you say the impact has been on her with regard

25   to your marriage?

F26TSOK2                          R. Blutstein - direct

1    A.  Well, in terms of weight gain, she gained a lot more weight

2    than I did.  I was finally able to lose some weight, but she

3    really didn't.  As a consequence, she's -- she has very limited

4    mobility.  She can walk some, but like today, to get from -- to

5    get around New York we had a wheelchair for her.

6    Q.  Richard, I'm going to put a summary on the board of some of

7    the things we talked about, and I want you to look at it and

8    tell the jury if you think it's accurate.

9    A.  Yeah, that looks good.

10   Q.  And I also want to show you a slide that we made about you

11   and just ask you if that summarizes the description that you

12   had that you gave us about yourself.  I noticed we have

13   difficulty sleeping, which you said you don't have, so we'll

14   need to fix that.

15          Is there anything else in that summary that -- is

16   everything else in that summary accurate?

17   A.  Except for the sleeping part, everything else looks

18   accurate.

19   Q.  And I also want to ask you a little bit about Rivkah, your

20   daughter.  Are you able to summarize for the jury some of the

21   impacts on her?

22   A.  Right.  So she is very smart.  Katherine and I both have

23   advanced degrees, but I think she's smarter than either one of

24   us, but she sort of analyzes everything.  And like a bunch of

25   times she's written essays for schools for various things, and

F26TSOK2                          R. Blutstein - direct

1    inevitably the essays she chooses to write about Ben, various

2    aspects of her life with Ben.  And actually one of the things

3    she wrote was -- when she was about 15 was that one of the

4    things that concerned her was at some point that Ben wasn't

5    getting any older, she was, and at some point she would be

6    older than him.  And he was 25 when he died, and she's 26, and

7    her 25th birthday was kind of -- that added a tinge of emotion

8    to that.

9    Q.  Was she close to Ben as a child?

10   A.  Oh, yes.  So Ben was like her third parent because of that

11   eleven-year difference.  He was a teenager, she was a little

12   kid, and basically she idolized him.  Katherine is fond of

13   telling the story like he would come home from college and with

14   some laundry, and Rivkah -- when we would ask Rivkah to take

15   the laundry to the laundry room we would get no, I can't do it

16   now, but when Ben came home, Rivkah, laundry, she was there to

17   serve him.  They were very close.  We actually ended up -- one

18   of our beds got destroyed because they would play essentially

19   football on our bed, and basically the legs collapsed from all

20   the jumping on it.

21   Q.  How did family life change for Rivkah after Ben's murder?

22   A.  Well, she became very self conscious amongst her friends,

23   not amongst her close friends, but amongst people that she knew

24   that weren't her close friends, because she was concerned about

25   being the dead boy's sister.  That was an issue for her.

F26TSOK2                    R. Blutstein - direct

1    Q.  How would you summarize her mood following Ben's death?

2    A.  She was quiet.  She kind of -- I mean she was with us, and

3    she didn't run away or anything, but she became very withdrawn

4    into herself.  I think all three of us did, really.

5    Q.  Did she focus on the details of the explosion, Richard?

6    A.  Yes, exactly.  That was part of her analysis was thinking

7    about that over and over, the actual event.

8    Q.  And Richard, did you spend a lot of time trying to learn

9    about the event?

10   A.  A fair amount.  So two things, one is that Katherine and I

11   actually made a video, I think it was October, a couple of

12   months after the murder of Ben's life.  We got a particular

13   bunch of photos when Ben was living, and I got a bunch of

14   photos at the carnage of Hebrew University.  And I remember one

15   of the photos, there was a bloody chair, it was not a little

16   blood, it was like globs of blood.  And I don't know if it was

17   the chair, but it might well have been the chair that Ben was

18   sitting on.  And then I have always been sort of a news junkie,

19   but I became -- like I would scour the internet for everything

20   that I could find about not only Ben's murder but also just the

21   situation between -- the Israeli situation.

22   Q.  I want to make sure we don't really talk about politics,

23   but if you could just come back to summarizing Rivkah's -- what

24   the effects were on Rivkah for us, that would be helpful.

25   A.  So when we would have these events in Ben's memory, Rivkah

F26TSOK2                     R. Blutstein - direct

1    would come to them reluctantly.  She was not a totally willing

2    participant in them.  She just wanted to sort of not do that

3    kind of stuff.  She didn't want to speak in public about it or

4    much even privately about it.  But at one point Katherine went

5    to -- did a sabbatical, and she spent it in a research in

6    Israel, and Rivkah and I became very close during the six

7    months that Katherine was in Israel.  Then we went and visited

8    her, Rivkah and I went and visited her in Israel where she was

9    living.  At that point it was several years later, and I would

10   say Rivkah seemed a little better at that point being

11   comfortable being back in Israel.

12   Q.  Does Rivkah have nightmares?

13   A.  I don't know.  I haven't actually asked her.

14   Q.  Can you tell us, Richard, how you feel about the fact that

15   this was a terror attack instead of an accident?

16   A.  Well, accidents happen, whereas people who go out and

17   intend to kill other people, that's an evil thing, and I feel

18   like I have been touched by evil.

19        MR. YALOWITZ:  Thank you, Richard, I don't have

20   anything further on direct.

21        MR. ROCHON:  No questions, your Honor.

22        THE COURT:  Thank you, sir, you can step down.

23        Mr. Yalowitz.

24        MR. YALOWITZ:  Your Honor, our next witness will be

25   Rivkah Blutstein.

F26TSOK2                        R. Blutstein – direct

1              Ms. Pildis will be conducting the examination.

2      RIVKAH BLUTSTEIN,

3          called as a witness by the Plaintiffs,

4          having been duly sworn, testified as follows:

5      DIRECT EXAMINATION

6      BY MS. PILDIS:

7      Q.  Good morning, Rivkah.

8      A.  Hi.

9      Q.  Where are you from?

10     A.  I'm from Harrisburg, Pennsylvania.

11     Q.  Where do you live now?

12     A.  I live in the Upper East Side of Manhattan.

13     Q.  Are you in school?

14     A.  Yes, I'm in medical school at Cornell.

15     Q.  Is that here in New York City?

16     A.  Yeah, that's 69th and York.  It's on the Upper East Side.

17     I live in student housing right across the street.

18     Q.  Are you a citizen of the United States of America?

19     A.  Yes, I am.

20     Q.  What was your childhood like growing up in Harrisburg?

21     A.  So my dad was a pediatrician.  My mom was a professor.  And

22     I had an older brother, Ben, who was eleven years older than

23     me, and he kind of took care of me a lot.  I went to a Jewish

24     school like three blocks away from my house, so since fourth

25     grade I was able to walk to school.  A lot of friends lived in

F26TSOK2                    Blutstein - direct

1   my neighborhood.  It was pretty nice growing up.

2   Q.  I'm going to show you a picture, but I need to take a

3   moment to cover the screen.

4            MR. ROCHON:  We're not going to object to the photo.

5            THE COURT:  Do you have an exhibit number?

6            MS. PILDIS:  It's Exhibit 1232.

7            THE COURT:  It will be admitted into evidence.

8            MS. PILDIS:  Thank you.

9            (Plaintiff's Exhibit 1232 received in evidence)

10  Q.  Have you seen that picture before?

11  A.  I have.

12  Q.  Can you tell us who is in the picture?

13  A.  So on the right is my dad, and next to him is my mom, and

14  then that's me, very young, and all the way on the left is my

15  brother Ben.

16  Q.  How old do you think you were in that picture?

17  A.  Maybe like five, I think, or six, because I'm going based

18  on how I look and how much facial hair my brother has, so maybe

19  he's 18 or so.

20  Q.  Can you tell us more about what your relationship with your

21  brother was like at that point in your life?

22  A.  So it was amazing.  Because Ben was eleven years older than

23  me, he was a lot like a parent to me, but like a cool and fun

24  parent.  So he like enforced rules and he made me wash my hands

25  and wear shoes when I went outside, but he also played with me.

F26TSOK2                          Blutstein - direct

He picked me up from school every day and made me a snack and I
think helped me with my homework, but mostly like showed me
what being a person was about.  I know that sounds a little
weird, but he bought my first CD, and I was so the excited
because my 17-year-old brother drove me to a CD store and I
went and got to pick out whatever I want.  And he just -- he
really made me feel safe and really took care of me.  But we
had a lot of fun together also.  He wasn't just like a
caretaker, it was like he really cared about me in a really
wonderful way.

Q.  Did he have a nickname for you?

A.  Yeah, so he called me Rivs, because my name is Rivkah, and
he always did.

Q.  As you got older, did your relationship change?

A.  Yes.  So at some point he went to college.  When he was 18
he went to college, and so he moved out of the house, so I
didn't see him as much.  So I got a phone in my room so I could
talk to him on the phone, and that was very exciting.  And then
we talked on the phone at least once a week, and that was
really good, because we just made jokes on the phone.  Because
what do you talk to a second grader about on the phone?  I
didn't really know what to say and he didn't know what to say,
but we just made jokes on the phone.

        He moved back home for a while, and he lived in our
house or near us in Harrisburg, so we got to see each other

1    more, but then he moved to Israel to go to school there.  And

2    so again, we talked on the phone a lot.  But like we still

3    talked a lot and made a lot of jokes, but I guess we never

4    really talked so much about very serious things, because like I

5    was eleven or twelve.  So we somewhat talked about serious

6    things, but I was only developing into a person at that time,

7    so --

8    Q.  Did you visit him in Israel?

9    A.  I did, with my father.

10   Q.  What was that like?

11   A.  It was really cool.  Like I said, I just idolized him and

12   everything he did I thought was so cool.  He showed us his

13   apartment and it was amazing, and he took me to a restaurant

14   and it was amazing.  He introduced us to his friends and they

15   were all so like cool and interesting.

16        It's hard for me to -- I feel like I keep saying the

17   word "cool," but it's because I was twelve and that's kind of

18   how I interpreted everything when I was twelve.  I was amazed

19   at how smart and how grown up and how cool everyone was.  And

20   Ben was so proud to show me around, he wanted his friends to

21   see me, and that was amazing that he wanted them to know me and

22   he was also interested in me and that the coolest person

23   thought that I was interesting and I was special.

24   Q.  In your eyes, who was the coolest person in the world?

25   A.  Ben was the coolest person in the world.

F26TSOK2                        Blutstein – direct

1   Q.  Do you remember being told that Ben was dead?

2   A.  Yes.

3   Q.  Who told you that?

4   A.  My mom was on the phone, I think with the State Department.

5   So someone told her over the phone that Ben was dead, and so

6   she looked at me and said Ben is dead.  And I remember crying

7   immediately, but only because I knew I should cry, because like

8   it just didn't make sense that he was dead.  It was just a

9   nonsensical thing that she said to me, it couldn't be real.  I

10  couldn't understand it.  And I couldn't even miss him because I

11  normally talked to him once a week, and it hadn't even been a

12  full week that I talked to him, so it was normal for me not to

13  talk to him again.  So maybe on Sunday when I should talk to

14  him I would start missing him.  And I felt like I didn't know

15  what to do, but I knew that I should cry, so I cried.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

F268SOK3                        R. Blutstein – direct

1    BY MS. PILDIS:

2    Q.  I would like to show you another photograph.  This one is

3    Exhibit 1141.

4            Have you seen that picture before?

5    A.  I have.

6    Q.  Can you tell me where you are and who is in the picture?

7    A.  So this picture is outside of the synagogue where Ben's

8    funeral was.  On the right is me, then my mom and my dad, and

9    my dad's sister Laura.  We are leaving the synagogue to go to

10   the cemetery where Ben is going to be buried.

11   Q.  Do you remember what you were thinking in that picture?

12   A.  I was just repeating the words "Ben is dead" over in my

13   head, trying to make it a real thing, trying to understand what

14   that meant.  I don't know because until that time we had been

15   in this weird limbo where Ben's body was still in Israel and

16   his body was traveling back to America, and I didn't really

17   know much about that.  But then at the funeral we saw this box

18   that had Ben in it supposedly.  I was just looking at the box

19   and thinking, what does it mean, what is this, how is this

20   possible?  This is a nightmare, but this is real.  Just being

21   really confused about how it could possibly be real that I was

22   at my brother's funeral.

23   Q.  When did it start to feel more real to you?

24   A.  I mean, it started right then, I think, really seeing the

25   box it started to feel more real because there was proof that

F268SOK3                          R. Blutstein - direct

he was dead.  But also I was 13 years old when Ben died, so a
little part of my held out hope, maybe he wasn't really dead.
Maybe it was a mistake.  Maybe it wasn't true.  Like I still
hope that, you know.  As an adult I don't think that's true,
but the 13-year-old part of myself still hopes that I'm wrong
and this didn't happen.  I don't know.  As the years have gone
by and I have grown up and become more mature and I understand
things better, he is dead.

Q.  Rivkah, how does Ben's death impact you now?

A.  Well, right now I am testifying.  So that's one thing.  I'm
not at school.  I miss my brother.  It's been 11 years since I
have talked to him.  I have changed a lot since then and he has
never gotten to know adult me.  I have never gotten to know
adult him.  I miss him in my life.  I wish I had a sibling.
And I just feel so different from so many of my other friends
and other people that I know because the worst thing that I
could possibly imagine happened to me.  For most people they
never experienced that.  They have never had a nightmare be
reality.  So I feel like I am more afraid of the world because
I know that anything terrible you can imagine can happen, and
probably will.  Something awful will happen to you.  Something
awful will happen to me.  Another awful thing will happen to me
because why shouldn't it.  It already did.

        So I am more afraid when crossing the street against
the light and I always buckle my seatbelt because I might get

F268SOK3                          R. Blutstein – direct

1    hit by a car, I might get into a car accident, and all these

2    awful things I think of could happen.  I know that I am not

3    special and all of the dangers of the world are really real,

4    and I think a lot of people when I was kid didn't know that,

5    thought they were invincible.  Since I was 13 I knew I was not

6    invincible.

7    Q.  Can you describe every day things, like going to the

8    movies, are different for you?

9    A.  So that's another time when I feel really different from

10   other people, going to the movies in particular.  I remember

11   not too long after Ben died, maybe a year or two, I went to see

12   Finding Nemo with my parents.  Finding Nemo is like a fun and

13   happy story, but in the beginning of the movie you see this

14   fish couple and all of their children are murdered in front of

15   them by a barracuda.  A barracuda comes and eats 500 of their

16   children and kills the wife and family.  All that is left is

17   the dad and this one egg.

18          And it was just background to the story, but when I

19   watched that, I just get stuck thinking how terrible that is

20   for that fish Marlin and how did he go on and how can he do

21   anything, how can he raise his one child that is left, how can

22   he do those things, because of that horrible thing we just saw

23   happen to them, and no one else gets stuck on that because

24   that's not the main part of the movie.  But that's the part of

25   the movie that I feel closest to, is watching his family being

F268SOK3                          R. Blutstein - direct

1    murdered.  It's really hard to go to the movie with your

2    friends and start balling when you see the setup of a Disney

3    movie.

4              I remember specifically seeing Finding Nemo and it

5    really hit me.  Towards the end there was a scene where Nemo

6    needs to pretend to be dead in order to be released from a

7    dentist's office and as it happens to be his dad comes to

8    rescue him at the moment when he is pretending to be dead.  His

9    dad sees him dead.  And my dad started crying when this dad,

10   this fish who has lost everything in his life, sees his last

11   son, who he travelled across the ocean, for dead.  He has

12   nothing left.  He is completely broken, and my dad started

13   crying and I understood why.  Because I get it.  My dad and I

14   both get it.  Because something really terrible happened to us.

15   And a lot of other people don't get it because to them it's a

16   cute Disney movie and they don't really connect to that one

17   moment of horror when Marlin sees Nemo dead.

18   Q.  Rivkah, how has your family life been different since your

19   brother has been murdered?

20   A.  My mom just got so sad and didn't want to see people,

21   didn't want to interact with people.  She really withdrew.  We

22   all feel a big hole in our family.  We all know it's there and

23   we talk about it.  But there is only so much we can say to one

24   another about the fact that we have a dead brother and a dead

25   son.

F268SOK3                          R. Blutstein - direct

1              I don't know.  It's hard to explain what it's like to

2      live with a broken family, a family that knows it's broken and

3      knows there is a piece missing, but that we still have to do

4      things.

5              I was very concerned when I was a kid that my parents

6      wouldn't be happy at my wedding because they would only be sad

7      that they were not able to go to Ben's wedding.  So when I

8      actually got married, they were so happy when I got married and

9      they were so terribly sad that they didn't get to go to Ben's

10     wedding and Ben didn't go to mine.  It's not like an either or.

11     It's always happy and sad.  It's always joyful and scared.  We

12     never really get to just have a fun moment because any good

13     thing that happens, it's always, but Ben isn't here and we wish

14     he could have been.

15     Q.  You mentioned your wedding.  Rivkah, where did you get

16     married?

17     A.  I got married at the synagogue that my family goes to,

18     which is the same place where Ben's funeral was.  So the

19     picture of us leaving the funeral, I have very similar pictures

20     of my wedding with me and my husband leaving the synagogue

21     after we got married.

22             It was really good to get married in the place where

23     my brother's funeral was because it felt like one of the only

24     places where I could be understood, where everyone in the room

25     would understand the empty piece of my family that was there.

F268SOK3                        R. Blutstein – direct

1    If my dead brother can't be there, at least we can all know he
2    is not there together.
3            So in planning for the wedding I really liked the idea
4    of getting married in that place and being able to bring him
5    and his memory and his spirit into the event.
6    Q.  Rivkah, I would like to ask you to summarize your injuries
7    that you have experienced because of the murder of your
8    brother.  You have touched on some of them already.  How else
9    would you characterize your injuries?
10   A.  So I miss my brother.  I lost my brother who I love, who I
11   want to talk to.  I miss him.  I missed the opportunity to see
12   him grow up.  He died when he was 25 and I'm 26 now.  I am
13   older than my older brother.  I missed the opportunity of
14   seeing him at 27 and 28.  I missed the opportunity for him to
15   see me at 25 and for him to maybe see my high school boyfriend
16   and tell me that that guy wasn't as great as I thought he was,
17   or for him to tell me he was awesome.  Whatever he was going to
18   say.  I don't know.
19   Q.  I think you have already touched on everything else.  I am
20   going to put up a slide and ask you if it's an accurate
21   summary, and if it's not, please correct it.
22   A.  Yeah, it is.  It is very correct.
23           MS. PILDIS:  At this time, we would like to move the
24   summary slides into evidence.
25           THE COURT:  It will be admitted in evidence.

F268SOK3                          R. Blutstein - direct

1    Q.  How often do you think about Ben?

2    A.  It's hard to say because I might just think of a thing that

3    happened in my childhood and it's very non-traumatic, and that

4    happens on a regular basis.  When I was 5 I used to eat a lot

5    of donuts.  My brother got those donuts for me.  But then every

6    once in a while, I'm really traumatically thinking about that.

7    Maybe that happens once a month when I'm watching a movie, like

8    I already explained, and I will see something that just reminds

9    me of how awful the world is and how awful things could be and

10   how I lost him forever and how really sad that is.  I think

11   about it in a lot of different ways a lot of different times.

12   Q.  Rivkah, how is this different because it was a terror

13   attack?

14   A.  Somebody wanted to kill him.  That seems very important to

15   me.  There were people who planned to kill my brother.  They

16   didn't know his name and didn't plan to kill him.  They planned

17   to kill somebody and he was that somebody because he was there.

18   And just knowing that, knowing that there is this person out

19   there, people out there who worked so hard to kill my brother,

20   that's different than an accident.  There is a person that did

21   it.

22        Just for my belief in justice and that there is

23   justice in the world and there is brightness and goodness and

24   that we can do good and right things in the world, it seems

25   very important to me that a person who intended to kill my

F268SOK3                        R. Blutstein – direct

 1   brother and then killed my brother come to some sort of

 2   punishment because of that.

 3           MS. PILDIS:  I have no further questions at this time.

 4           MR. ROCHON:  I have no questions.

 5           THE COURT:  Thank you, ma'am.  You can step down.

 6           (Witness excused)

 7           THE COURT:  Ladies and gentlemen of the jury, let's

 8   take a short break.  We will take a ten-minute break.

 9           Don't discuss the case.  Keep an open mind.  We will

10   take a ten-minute break and continue.

11           (Jury exits courtroom)

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

F268SOK3                         R. Blutstein – direct

1              MR. ROCHON:  Ten minutes, your Honor?

2              THE COURT:  Yes.

3              (Recess)

4              THE COURT:  If the witness is wheelchair bound, we can

5       put her in an appropriate place.  If she is not totally

6       wheelchair bound --

7              MS. PILDIS:  She can't, your Honor.

8              Your Honor, will that microphone on the side work for

9       her?

10             THE COURT:  How long would you anticipate her

11      testimony to be?

12             MR. YALOWITZ:  Half an hour.

13             THE COURT:  Would you like some water?

14             THE WITNESS:  That would be nice, your Honor.

15             THE COURT:  Are we all set up and ready to proceed?

16             Let's bring in the jury.

17             (Continued on next page)

18

19

20

21

22

23

24

25

F268SOK3                          R. Blutstein – direct

1              (Jury present)

2              THE COURT:  Mr. Yalowitz, would you identify your next

3     witness?

4              MR. YALOWITZ:  Yes, your Honor.  Plaintiffs call

5     Katherine Baker.

6              THE COURT:  Can everybody see, Ms. Baker?

7              All right.

8      KATHERINE BAKER,

9          called as a witness by the plaintiffs,

10          having so affirmed to tell the truth,

11          testified as follows:

12              THE COURT:  You can inquire.

13    DIRECT EXAMINATION

14    BY MR. YALOWITZ:

15    Q.  Katherine, where did you grow up?

16    A.  I grew up in Chevy Chase, Maryland, outside of Washington,

17    D.C.

18    Q.  Did you go to college?

19    A.  Yes.  I went to Dickinson College.

20    Q.  What year did you graduate from Dickinson College?

21    A.  I graduated in 1973.

22    Q.  Did you go to graduate school after that?

23    A.  I got a Ph.D. from the University of Delaware in 1980.

24    Q.  What was your Ph.D. in?

25    A.  Microbiology and ecology.

F268SOK3                      Baker - direct

1   Q.  What is that, microbiology?

2   A.  I study anything that is smaller than the head of a pin,

3   primarily those things that cause diseases, bacteria and

4   viruses.

5   Q.  Have you kept up with that?

6   A.  Yes.  I am a professor at Penn State University.

7   Q.  Is that in Harrisburg?

8   A.  Yes.

9   Q.  We have heard about your family and we met Rivkah.

10        I just want you to share your thoughts about Ben as a

11  child and a teenager.

12  A.  Ben was an extremely bright child, which in some ways was a

13  real blessing and in some ways I think caused him some

14  difficulties.  He always tried to find where the limit was to

15  everything.  He was always searching for answers, and he spent

16  a long time deciding who he was and what he wanted to do and

17  trying to bring what to me what several different worlds

18  together.

19        When Ben died, he was studying at the Pardes Institute

20  of Jewish Studies at Hebrew University.  So he wanted to be a

21  Jewish educator.  He was studying very traditional Jewish text.

22  And then in the evening he was hip hop DJ at a bar in downtown

23  Jerusalem.  And he was probably the only person in Jerusalem

24  who had an earring and at the same time made it to services

25  every morning.  So he felt it was really nice to have a foot in

F268SOK3                          Baker - direct

1    both worlds.

2    Q.  Describe the period when Ben moved back home with you after

3    he was asked to leave Dickinson?

4    A.  It was a period for Ben in which he really, I think,

5    reassessed his life.  It was very, very difficult for him.  He

6    became committed to the -- the Jewish word is *Shuvah*, to look

7    at what you have done and what you have done that has caused

8    you problems and to repent in, probably the way best described

9    is that if you had the opportunity to make the same mistake

10   again you wouldn't do it.

11          And Ben took that period of time to really reflect and

12   learn where his weaknesses had been, what his problems would

13   be, and one of the last things that he mentioned to me was that

14   he really wanted to teach all those kids who were at risk

15   because he probably made the same mistakes that they have made

16   and he could give them some direction and they wouldn't have to

17   repeat his mistakes.

18   Q.  How were his spirits?  Just give us a picture of Ben's

19   spirits in the days and weeks after he moved back home after

20   being asked to leave school for the second time.

21   A.  He was very stressed and very depressed.  He was very

22   angry, because I think he took a lot of the anger at himself

23   and turned it out.  That was initially.  He was at home for

24   about six to eight months all told before he finally went to

25   Pardes.  I think it was only that period of time.  It might

F268SOK3                        Baker - direct

1   have been a whole year.  And it was amazing to watch him become

2   involved with NA and gradually pull himself back together and

3   turn into a good person.

4   Q.  What was NA?

5   A.  Narcotics Anonymous.

6   Q.  How often did Ben go to NA?

7   A.  Well, when he was living at home he went two or three times

8   a week.  I'm not sure how often he went when he was in

9   Jerusalem.  He had the key.  He was one of two people who had

10  the key for the meeting room.  So he was at least there fairly

11  often.

12  Q.  I meant to ask you and it slipped my mind.  Are you a

13  citizen of the United States of America?

14  A.  Yes.

15  Q.  Just to come back to Ben in Israel, just compare and

16  contrast his spirits as he went through that first year in

17  Israel versus the months right after he had come back home to

18  live with you.

19  A.  It was like two different people.  He was happy.  He was

20  directed.  Two weeks before Ben died he turned 25, and I called

21  him.  And probably the thing that summarizes the change in him

22  was he said to me in that conversation, he said, You know, mom,

23  I finally know what I need to do with my life, what I want to

24  do with my life, and I am happier than I have ever been.  So it

25  was just a complete, absolute turnaround.

F268SOK3                          Baker - direct

1  Q.  How did that make you feel as a parent?

2  A.  When he said it, I was overjoyed and it's something that

3  stays with me, will always stay with me, and some days it's the

4  only thing that gives me the will to get up and face another

5  day.

6  Q.  Could you just give the jury a picture from your

7  perspective of Ben's personality?

8  A.  Very bright, very demanding, had a very difficult time when

9  he felt he didn't understand things, and therefore pushed his

10  hardest to understand things, and also incredibly tolerant.

11  Q.  When you say tolerant, just expand on that a little bit.

12  Tolerant of people, tolerant of what?

13  A.  Tolerant of people, tolerant of particularly differences.

14  There are two things that come to my mind.  When Ben was at

15  Dickinson, one of his closest friends was an Egyptian student

16  and Ben was with a group of people and they made an ethnic slur

17  against this particular student.  And Ben was the one who went

18  with the student to the student board to file a complaint.

19  Because his feeling was, if you make an ethnic slur against one

20  person, you will do it against any person, and you can't

21  tolerate those kinds of things.

22         The other thing goes to when he was in Jerusalem.

23  Most of the hip hop DJs are very nonreligious people.  One of

24  his friends from Israel told us this after Ben died.  There is

25  a thing called the *lulav* and *etrog*.  They are religious symbols

F268SOK3                      Baker - direct

1    for the Jewish holiday of Sukkot.  And Ken came to visit Ben at
2    his room to talk about a gig they were going to do and put some
3    records on top of the *lulav* and *etrog*.  And Ben just quietly
4    picked them up and said, it's OK that you have the records and
5    it's OK what we do, but this is something that to me is sacred,
6    and so you don't put things on top of it.
7                And Ken said, as somebody who wasn't religious, that
8    for the first time he realized -- he had always grown up as a
9    nonreligious person thinking, well, religious people can be
10   bigoted, and he also realized that nonreligious people can be
11   just as intolerant, and that Ben was willing to say, I will
12   accept what you do, then you have to accept what I do.
13   Q.  Katherine, you described a conversation that you had with
14   Ben around his birthday I think you said.
15   A.  Yes.
16   Q.  What time of year was that?
17   A.  Ben turned 25 on July 15.
18   Q.  So I want to take you to July 31.  How did that day start
19   for you?
20   A.  My husband and I were in the habit of every morning when we
21   got up watching a little bit of the news.  We are CNN junkies.
22   And he had gone in first to turn on the news.  I was still
23   finishing dressing.  I was going to go to work.  And he call
24   called me in and said that there had been a bombing at Hebrew
25   University.

F268SOK3                          Baker - direct

1          We called Ben's cell phone and it went straight

2     through to voice mail, and he started calling everyone that we

3     knew in Israel and no one knew where Ben was.  And we started

4     flipping the channels on the television between all the news

5     stations.  And then my husband had to go to work.

6     Q.  Did you stay at home?

7     A.  I stayed at home.  I stayed at home and my husband had to

8     go to work, and I just flipped through the news channels.

9     About 9:00 a friend stopped by.  I didn't know at that

10    point -- she already knew what had happened and she knew what

11    had happened to Ben.  The community decided it would organize

12    things and take care of all of the arrangements before we knew

13    what had happened and have everything in place to try and

14    support us.

15          Then she left and about -- this is from 7 a.m. until

16    about 4 p.m.  Then about 4 p.m. the State Department called and

17    told me that Ben was dead.

18    Q.  Katherine, did you see something on the news that made you

19    think of Ben?

20    A.  Yeah.  After a while they kept showing the same footage,

21    and one of the things they showed was this large pair of

22    Chucks.  They are basketball sneakers.  And these were in pink.

23    Ben had a pair of pink Chucks.  Ben also had size 10 and a half

24    feet.  So you would not expect those to be little girl Chucks.

25    He had bought those when his sister was born and he had gotten

F268SOK3                         Baker - direct

1    a little pair of Chucks for her and a big pair of Chucks in

2    pink for himself.  And I saw what looked like this pair of

3    Chucks just every once in a while flashing, this blood-stained

4    pair of Chucks.  So it seemed to me that those had to be Ben's.

5    Q.  What did you think when you saw those?

6    A.  I think I did what any parent can do.  I told myself that

7    he had been sitting at the table and taking his shoes off and

8    his shoes had been left behind when he fled and was fine.  I

9    told myself any of a number of stories because in the back of

10   my mind I knew that it meant he had either been injured or was

11   dead.

12   Q.  Katherine, tell us about that call from the State

13   Department.

14   A.  There is not a whole lot I can tell you.  The State

15   Department called.  A secretary from the State Department

16   called and I think said, I'm very sorry to tell you, but your

17   son was killed in a bombing at Hebrew University.  I think I

18   was on the phone with her for another five or ten minutes.  I

19   have very little recollection after that moment of what she

20   said.

21        I do know that the major thing that I do recall

22   thinking was that I now had to go tell my daughter that the

23   person that she considered to be the coolest person in the

24   world, the most important person in the world, was not going to

25   come home the next day and was never going to come home again.

1              Pretty much, I don't have good, clear memories of most

2     of the rest of that day or probably a week after.  I think I

3     was just in -- I think I was just on autopilot.  I don't really

4     recall things that happened.  My husband will tell me people

5     who came to visit and I have no recollection of speaking to

6     them or seeing them or anything.

7     Q.  Do you remember your emotional state in those days?

8     A.  I remember feeling empty and drained.  I remember feeling

9     as if the whole world had just gone from having color to being

10    black and white, gray.  That's what I remember.

11    Q.  Katherine, what was the funeral like?

12    A.  It was big.  I mean the funeral was hard and a blank and a

13    blur.  There are only a couple of things that stand out.  I met

14    Ben's girlfriend at the funeral.  They were thinking -- she was

15    going to come home a couple of days after Ben got home and she

16    was going to come for a visit because they were serious enough

17    that Ben was going to introduce me to his girlfriend.  It's a

18    very strange thing to meet your son's girlfriend when she is

19    getting ready to deliver the eulogy for your son.

20    Q.  Was there another visitor from Israel that day?

21    A.  Yeah.  It wasn't that day.  There is a week after the

22    funeral called shiva in Judaism where you stay home and people

23    come and pay condolence calls, and this may be the only visit

24    that I really have a clear, clear recollection of.

25              A woman came in.  I had no idea who she was.  She came

F268SOK3                    Baker – direct

1    over and sat down next to me and she said, I'm from Benjamin's

2    NA group in Jerusalem.  And we took up a collection so one of

3    us could come and I got to be the one.  And I want to tell you

4    something about your son.  A little while ago I was going

5    through a rough time, is what this woman said, and I was

6    leaving a meeting and I was going to go out and I was going to

7    go back to using drugs, and I probably would have OD'd that

8    night.  But Ben came running after me and he walked me to a

9    coffee house and we sat there all night and we talked and the

10   only reason why I am still alive to be here to tell you how

11   horrible it is that your son is gone is because of what he did

12   that night.

13   Q.  Katherine, what is your Friday routine?

14   A.  At the beginning of the sabbath you light candles and in

15   our household we always say a blessing over the children.

16   There are two traditional blessings which are said, one for a

17   son and one for a daughter.  We always did that.  And we still

18   always do that, with one other small thing.

19        I have arranged my work schedule now so that I always

20   leave work by noon on Friday so that I can spend time at the

21   cemetery giving Ben his blessing and talking to him about my

22   week, and then I go home and my husband and I make the sabbath

23   and light the candles and then the two of us recite the

24   blessing for Ben every sabbath.

25   Q.  Katherine, could you just describe for the jury some of the

F268SOK3                    Baker - direct

1   effects that Ben's murder has had on your life?

2   A.  I think some of the easiest things to do are -- it's like

3   two separate lives.  Things were normal and happy and with all

4   the stresses that everyone normally has before Ben died, and

5   then they went to just always being gray.  There is always a

6   feeling of sadness in everything that I do because Ben is not

7   there.  There are ways that I feel distant from the rest of the

8   world because when people have happy things happen to them,

9   some part of me always said, yeah, that's wonderful, and I'm

10  really glad that they get to hold their grandchild and I'm

11  never going to see Ben's children, or they get to do this and

12  I'm never going to see this for my son, and there's so many

13  things that I would want.

14        Even a couple of years ago when my daughter got

15  married and I was there, and there was this just big hole in

16  the wedding because Ben was supposed to be there.  He was

17  supposed to be dancing with his sister.  He was supposed to be

18  congratulating her.  And it's all of those things that are

19  there all the time.

20        There are a lot of little things.  I have a nightmare.

21  At some level I think people would call it nightmares.  I think

22  I lack the creativity to come up with anything that really

23  shows a lot of variety.  But a couple of times a week when I go

24  to sleep, I wake up and what I remember that I have been

25  dreaming about is I am someplace with my family, usually

F268SOK3                              Baker - direct

1    someplace that has something to do with relaxing or eating or

2    having coffee or something like that, and something terrible

3    happens and I can't get to my children and I can't do anything

4    to help them.  And that wakes me up.

5    Q.  Katherine, are there days when you have trouble getting out

6    of bed?

7    A.  It's probably better to say are there days when I don't

8    have trouble getting out of bed.  Yeah.  It's hard to get up

9    every day.  It's hard to go to work.  It's hard to think

10   of -- it's hard not to just give up.  I don't give up because

11   my husband needs me and my daughter needs me and I don't give

12   up because if I give up, then Ben is really gone.

13   Q.  Katherine, do you have health problems that have developed

14   within the last few years?

15   A.  I do, but I don't know how much of those are just

16   exacerbation of underlying health problems.  I do know that I

17   have -- I'm much more stressed.  I have longer periods of being

18   sad and probably depressed.  I think some of the problems that

19   I have in terms of my arthritis and my ability to walk have to

20   do with just the fact that for a long period of time after Ben

21   died I didn't want to do things.  I didn't want to exercise.

22   It was all of that.  But I don't know that there is a direct

23   cause-and-effect relationship here.

24   Q.  Katherine, you mentioned Rivkah's wedding.  Could you just

25   tell us about that day a little bit.

F268SOK3                         Baker - direct

1    A.  It was a very traditional Jewish wedding.  There are seven

2    cups of wine in a Jewish wedding and you invite people up to

3    say a blessing.  And there is some formulaic blessings that are

4    said.  And for the sixth cup of wine, the rabbi stopped the

5    ceremony and said that this cup of wine was the cup of wine

6    that Ben would have said the blessing for and so we were doing

7    this blessing for Ben and for all of the people in our families

8    who couldn't be there.

9          The whole congregation -- and Harrisburg is a very

10   small town.  So we lost our son and Harrisburg lost a member of

11   this little tiny community that they had.  So there were a huge

12   number of people at the wedding and they all just stood up and

13   did the blessing for Ben because he couldn't be there.  It's

14   very different when you're in a tiny community to lose someone

15   in terms of the impact, not only on your family but on the

16   whole community.

17   Q.  What would you describe was your emotional feeling at

18   Rivkah's wedding, Katherine?

19   A.  What is it at any point when there is something happy

20   happening?  I was overjoyed that Rivkah was there and then

21   there was that great big hole that Ben wasn't the DJ for the

22   wedding, for the reception, that Ben wasn't there.  So there

23   was a lot of happiness and a lot of crying.  But that's the way

24   everything is for us now.

25         MR. YALOWITZ:  I don't have any further questions,

F268SOK3                         Baker - direct

1   Katherine, on direct.

2            Thank you.

3            MR. ROCHON:  No questions.

4            THE COURT:  Thank you, ma'am.

5            (Witness excused)

6            THE COURT:  Did you want to take the lunch break?  How

7   long do you anticipate the next witness?

8            MR. YALOWITZ:  I think the witness will be more than

9   half an hour, less than an hour.  I think it might be best to

10  take the break.

11           THE COURT:  I am going to give you --

12           JUROR:  We can stay.

13           THE COURT:  Do you think we can finish the witness by

14  1:30?

15           MR. YALOWITZ:  Why don't we see how we do.  I think if

16  the jury wants to stay and press ahead, I am happy to do that.

17           THE JURY:  We all agree.

18           THE COURT:  Let's see if we can finish this witness up

19  in the next half hour, 45 minutes.

20           MR. YALOWITZ:  Our next witness and our last witness

21  of our affirmative case is Nevenka Gritz.

22           We have a standby translator.

23           English is not Mrs. Gritz's native language, but if

24  she needs help, we can get her a word here or there.

25

F268SOK3                          Baker - direct

1      NEVENKA GRITZ,

2           called as a witness by the plaintiffs,

3           having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. YALOWITZ:

6    Q.  Nevenka, just pull your chair up to the microphone so the

7    jury can hear you as you speak.

8           MR. YALOWITZ:  Marlene, you don't need to speak unless

9    Nevenka asks you to.

10          THE INTERPRETER:  OK, sir.

11   Q.  Now, Nevenka, where were you born?

12   A.  I'm born in Bosnia, ex-Yugoslavia, in a small city Livno.

13          THE COURT:  Move your chair closer.

14          Can you answer that question again?

15   Q.  Where were you born, Nevenka?

16   A.  I am born in Livno.  It's a small city in Bosnia, in

17   ex-Yugoslavia.

18   Q.  Where did you grow up?

19   A.  I grow up and I finish my college there and after that I go

20   to Zagreb University.

21   Q.  To Zagreb?

22   A.  It's in Croatia.

23   Q.  Now, what did you study in university in Croatia?

24   A.  I studied history of art, art history.

25   Q.  Did you love art?

F268SOK3                          Gritz - direct

1    A.  Yeah.  I had art in my life.

2    Q.  What did you do when you finished with university in

3    Croatia?

4    A.  Pardon?

5    Q.  What did you do when you finished university in Croatia?

6    A.  After I finished the university, I came in Paris, but I

7    took maybe two years to have my passport and to have the

8    possibility to come.  At that time it was difficult for the

9    people to go out of the country.

10   Q.  So you left Yugoslavia and you went to Paris, France?

11   A.  Yes.

12   Q.  What were you doing in Paris when you first moved there?

13   A.  When I came, I was in Alliance Francaise because I liked to

14   learn French, and I find the work like free au pair.  I don't

15   know how you say in English.  Free au pair.  Every work that I

16   find at that time, I took it and it was good.  And I learned

17   French in the same time, visiting museum and everything.

18   Q.  How old were you when you moved to Paris?

19   A.  How old?  I was 26.

20   Q.  What year was it?

21   A.  I don't know.  '57, '56.  I am very, very bad in the time

22   and the years.

23   Q.  When did you meet your husband Norman?

24   A.  Norman is American and he born in Chicago and his parents

25   are from Poland, but he is fifth generation in the states.

F268SOK3                          Gritz - direct

1    Q.  Where did you meet him?

2    A.  I met him in Paris, in friend's house.

3    Q.  How old were you when you met him?  How old were you when

4    you and Norman met?

5    A.  How old we are?  We was around 32, 33 years old, something

6    like that.

7    Q.  You said Norman was from Chicago.  Was he an American

8    citizen?

9    A.  Yes.

10   Q.  What was he doing in Paris?

11   A.  Norman in Paris, he was working for the French big school,

12   the Grande Ecole.  He was professor, and he could choose and

13   propose the different subject for his students.

14   Q.  When you and Norman first met, was he a student or was he a

15   professor?

16   A.  He was already finished his study.

17   Q.  What was he like as a young person, Norman?

18   A.  How he was?

19   Q.  Yes.

20   A.  He was just very communicative, very nice person, very

21   open, very interesting.  For me, it was really chance to meet

22   this man.

23   Q.  Where did you live?

24   A.  We live, in the beginning we didn't live together.  We live

25   together three years after we met and we live in the 5th

F268SOK3                        Gritz - direct

1   arrondissement in Paris.

2   Q.  Just describe that neighborhood for people who haven't been

3   there.  What is it like?

4   A.  Pardon?

5   Q.  What is the neighborhood like?  What is that neighborhood

6   like?

7   A.  It's the Quartier Latin.  It's near the Luxembourg garden.

8   It's near the Sorbonne.  It's very, very nice neighborhood.

9   Even now when Paris change, it's still like village.

10  Q.  How old was Norman compared to you?

11  A.  Norman and I, we have the same age.  Both of us we born in

12  '56.  I don't remember first time he came in Europe.  He came

13  to Europe even before he finish his study.

14  Q.  How old were you when you had David?

15  A.  I was 40 and a half.

16  Q.  Did David get American citizenship?

17  A.  Norman declared in American Embassy and that day he has

18  American passport, and he has French passport when he was I

19  think 16 or 17.

20  Q.  Did you spend time in the United States as a young family?

21  A.  We spent the time in Norman's family and we spent half time

22  with Norman's family and half time with friends.

23  Q.  Where did you go when you were visiting Norman's family?

24  A.  In Los Angeles, because his father died.  His sister took

25  the mother in Los Angeles.  But we always stop in Chicago

F268SOK3                    Gritz - direct

1    because Norman has a few very, very dear people that he always

2    want to see in Chicago, and we had friends there.

3    Q.  Did you spend time on the east coast as well?  Did you

4    spend time in the east as well?

5    A.  Where?

6    Q.  In the east.

7    A.  Yeah.  We spend the time in New York and in Massachusetts

8    because there we had the friends.  When David was three years

9    old we bought a small house in the woods in Massachusetts

10   because we had the friends there.  We went almost every summer

11   there for four or six weeks.

12   Q.  What language did Norman and David speak?

13   A.  English.  Completely from the beginning.  I spoke with him

14   Croatian.  In the beginning he wants that I speak Croatian, but

15   after he didn't want me to speak Croatian because any mother in

16   the school don't speak Croatian and he want me to speak French,

17   and I accepted that.

18   Q.  How old was David when he asked you to speak French?

19   A.  Three years old.  When he was 7 he came back and he ask me

20   to speak Croatian, but it was always the same things.

21   Q.  Did David like to travel?

22   A.  Yeah.

23   Q.  Where did you take him as a young child besides the United

24   States?

25   A.  I didn't hear.

F268SOK3                       Gritz - direct

1   Q.  Did you take him to Croatia?

2   A.  Yeah, we take him to Croatia.  We was in Italy.  We had

3   friends there.  In Germany and in Croatia.  Every second year

4   because it was one year in Croatia and one year in the states.

5   For the different vacation we was in Italy or in Germany or in

6   Poland.

7   Q.  What was your life like when David was a very young child?

8   A.  Pardon?

9   Q.  When David was a very young child, when he was very young,

10  what was your relationship with him?

11  A.  I didn't hear.  When David was small, what was my

12  relationship with him?

13  Q.  Yes.

14  A.  It was very, very good relation.  I was happy to have him.

15  I learned so many things from him, I can say for myself, but

16  Norman was very, very nice with him too.  It was beautiful

17  time.

18  Q.  When David was a young child, did he take music lessons?

19  A.  David begin to take the music lessons, he was three and a

20  half.

21  Q.  How did it come about that he began to take music lessons?

22  A.  He ask, and I really don't know.  We heard the music at

23  home, but we never speak to him that he had to learn something.

24  I don't know how he find.  And he ask to put in the school for

25  the violin, and he begin to play the violin, with Suzuki method

F268SOK3                    Gritz - direct

1    in the school in the 5th arrondissement.  And he finish

2    the -- after the Suzuki, he was in the music school in the 5th

3    arrondissement to the end.  He finished the violin there.

4    Q.  Whose idea was it for David to study the violin?

5    A.  Who push him?

6    Q.  Who came up with the idea for him to study the violin?

7    A.  I really don't know.  I remember he was in Los Angeles.  He

8    was just on the road.  He said I would like to learn the

9    violin.  He ask maybe for six or five or six months before I

10   decide to give him to the school.

11   Q.  How old was he when he started asking to learn the violin?

12   A.  How old?  He was around three years.  He was very, very

13   young.  I don't know from where he had this idea.

14   Q.  Was David good at school?

15   A.  He was good.  He was a normal child.

16   Q.  Did he learn to read and write before he began school?

17   A.  He begin because he learned how to write and how to read

18   before he begin the real school.  But he was in the preschool.

19   In the preschool he begin to learn how to read and how to

20   write.

21   Q.  I want to ask you a little bit more about David and music.

22   Did David learn any other instruments besides the violin?

23   A.  I think that he was maybe, I don't remember, 16 or 17.  He

24   took the lesson to learn the piano for two years.  After that

25   he played just by himself, and he played the classic guitar

1    because I had the classic guitar.  And after that he played the

2    electric guitar with his friends.

3    Q.  Was he playing electric guitar in a rock band?

4    A.  Yeah.

5    Q.  Where were they?

6    A.  They beginning at parties.  They played for a few years.  I

7    don't remember.  When he finish his baccalaureate in Paris, he

8    went one year in Montreal and there they had the group and they

9    played in the cafe in Montreal.

10   Q.  Did his band play their own music or did they play music

11   that other people wrote?

12   A.  I think that most of the -- they write the music because

13   everybody -- it's not David just, but everybody do that.  They

14   write the words and the music.

15   Q.  Did David like to travel as a young adult?

16   A.  Yeah.  When he was young he travelled very often with us,

17   and he begin to travel by himself.  I think that he was maybe

18   16.  I don't remember really.  But he travel.  He travel in

19   France, in England, and he was in Germany for the language,

20   because he learned German, and in Spain for the language too

21   because somebody from Germany came and stayed with us and from

22   Spain somebody came and stayed with us and David goes there.

23   Q.  Did you say David learned German?

24   A.  David learned German, yes.

25   Q.  Did you say he learned Spanish also?

F268SOK3                    Gritz - direct

1    A.  He learned Spanish also, Spanish and Greek and Latin.  He

2    learned Hebrew.  Not in the school.  It was private school.  He

3    learned Russian, because Russian is very, very near of

4    Croatian, and he just has to learn how to write Russian.

5    Q.  When you were growing up, what religion were you?

6    A.  I am Catholic.

7    Q.  When Norman was growing up, what was his religion?

8    A.  Norman was Jew.

9    Q.  Did you have religion in your home when you were raising

10   David as a young child?

11   A.  Not really.  We spoke about the religion.  David read the

12   things and he was interested, but in the beginning he didn't

13   choose any religion.  Even if he -- I propose him if he wants

14   to learn something he can go to the church, because church was

15   only two minutes from the house, and he said that he doesn't

16   want.  But I think in the school, the children in the school,

17   he heard about the Hebrew school and this is his idea.  It

18   wasn't Norman that tell him you have to go.  And he goes to

19   Hebrew school.  He was 18 years old and he was there two years

20   and he learned how to write, how to read.

21          The first year I think that he was the best student

22   because nobody push him.  But second year he stated that it was

23   less interesting for him, but it was always the same thing.  It

24   was the prayers.  But he wants to learn Hebrew speaking, he

25   wants to learn how to speak Hebrew.

F268SOK3                        Gritz - direct

1   Q.  Before he went to learn Hebrew, did you and Norman discuss

2   that?

3   A.  If we discuss?

4   Q.  Did you discuss --

5   A.  Norman didn't want to take him in the school because he

6   said you have very many things to do.  You have the music, you

7   have some sport.  I don't know what now you're going to learn

8   Hebrew.  I tell to Norman, if he ask you, I don't know how many

9   times, if he want, he is going to learn.  If he want to stop,

10  he is going to stop.  And it's OK.

11  Q.  Was that typical of David that he sort of decided what he

12  wanted to do?

13  A.  We both agreed with him that he can choose the things.  But

14  if it's possible that he can do.

15  Q.  When David finished with his high school years, did he go

16  to university?

17  A.  Yeah.  When he finished his baccalaureate he was two

18  years -- in France you have two years.  He wasn't already at

19  the university.  He make two years the preparatory school.  I

20  don't think that there is the correspondent in the state.  The

21  French system is completely different.

22        After that he was at the university because he study

23  philosophy, but in the same time he was in the political

24  science at the same time.

25  Q.  When he went to university, where did he choose to go?

F268SOK3                    Gritz - direct

1    Where did he go to university?

2    A.   It was the part of the Sorbonne, in Paris.

3    Q.   Before that, did he go to McGill?

4    A.   Before that he was one year in McGill.  When he came back

5    from the McGill, he make two years the preparatory school and

6    university and political science.

7    Q.   Did you and Norman take David to drop him off at McGill?

8    A.   Did we?

9    Q.   Did you take him and drop him off?

10   A.   Yes.  It was in the end of the summer.  It was in

11   Massachusetts.  We took him to Montreal.

12   Q.   I would like to show you a picture of David with you and

13   another picture of David with Norman.  I am just going to bring

14   it up and show it to you.

15            MR. YALOWITZ:  May I approach, your Honor?

16            THE COURT:  Yes.

17   A.   This is just before we leave David in Montreal and it was

18   really difficult.  It was the first time that we make the

19   separation with him.

20            MR. YALOWITZ:  Plaintiffs offer Plaintiffs' 1235 in

21   evidence.

22            MR. ROCHON:  No objection.

23            THE COURT:  It will be admitted.

24            (Plaintiffs' Exhibit 1235 received in evidence)

25   Q.   Is this the day that you dropped David off for the first

F268SOK3                      Gritz - direct

1    time?

2    A.   Yeah.  It was first time.  And we came back in

3    Massachusetts and he stayed in Montreal.

4    Q.   Is that you on the right?

5    A.   Yes.

6    Q.   In the picture on the left?

7    A.   Norman and David.

8    Q.   When David came back from Montreal, what was he studying at

9    the Sorbonne?

10   A.   He study philosophy and political science.  At Sorbonne it

11   was philosophy, but political science it's a different school.

12   It's a different school.

13   Q.   Did he finish that course of study?

14   A.   Yeah.

15   Q.   What did he decide to do next after that?

16   A.   After he finished the political science, he had to go for

17   six months -- every student has to go somewhere else.  I don't

18   know what the word for that.  He had the possibility to go to

19   Israel, and he had the books and he could stay for one year and

20   making the same time the six months for the science, political

21   science, and the same time he was thinking to begin to make his

22   Ph.D. there because he was thinking to work on the politics of

23   Babel.

24              (Continued on next page)

25

F26TSOK4                        Gritz - direct

1    BY MR. YALOWITZ:

2    Q.  Babel?

3    A.  Babel.

4    Q.  Could you describe the relationship between David and

5    Norman?

6    A.  They were good friends.  They were really good friends, and

7    they liked to go to together to the cinema, to cafe, they often

8    went to the cafe.  Even when they were small they would go to

9    the cafe.  And they -- very often David would propose to Norman

10   would you like to come to me, you can work on your things and I

11   work on my things so we can sit in the cafe, and they do that.

12   They had really very good -- they was really friends.

13   Q.  And did they invite you to go with them or did they want to

14   just go by themselves sometimes?

15   A.  No, no.  Sometimes I went with them, but sometimes they

16   didn't want me, they didn't want me.  But sometimes I went,

17   they went to the cinema sometimes, and I remember that I came

18   just by myself and I find them after the film.

19   Q.  You were starting to tell us about David's opportunity to

20   study at the Hartman Institute.

21   A.  David came in Jerusalem on the 15 of July and returned on

22   31, so he spent just two weeks in Jerusalem.  But he met the

23   people there, but he met very many people in two weeks, I don't

24   know how many people he met.

25   Q.  Was that typical of David that he was connected to people

F26TSOK4                         Gritz - direct

1   in that way?

2   A.   Yeah, he had very, very many friends, I don't know

3   everybody.

4   Q.   Did David tell you what he wanted to study in Israel?

5   A.   David was interested in Jewish philosophy and for Jewish

6   thinking, and I think that he was interested in the religion,

7   even the difference and the things between the religion,

8   because I really don't know everything.  But I think that they

9   had very often like confidence about the different religion,

10  and he was interested for all these things.  I don't know, I

11  think that David was right there with the idea that he's going

12  to make something like peace or something.

13  Q.   Was David interested in learning any other languages when

14  he was in Israel?

15  A.   He was -- I know that he was thinking after Hebrew, because

16  he spoke Hebrew enough when he came there, and he was thinking

17  to study Arab, too.

18  Q.   Arabic?

19  A.   Arabic, yeah.

20  Q.   How did you feel about David traveling to Israel?

21  A.   I wasn't very happy that he decide to go.  Norman didn't

22  say anything, and sometimes I was unhappy with Norman, I say

23  maybe you can speak with him.  And Norman said he was always a

24  free man and he had decide.  And I said he can decide but it's

25  not really a good time for him to go to Israel and Jerusalem,

F26TSOK4                          Gritz - direct

1    they will be always there, he had the time to go there.  And

2    David was very unhappy that I wasn't really happy that he

3    decide to go.

4    Q.  Did you and David speak about that issue?

5    A.  Yeah, very, very often.  In the end I tell him David, I

6    give you -- go, you will learn very many things.  You are going

7    to have a beautiful year.  But it wasn't like that.

8    Q.  Where were you on July 31st, 2002?

9    A.  Norman -- David leave Paris on the 15th of July and we take

10   him to the airport, but Norman and I, we came and stayed on 26,

11   I remember in general, I don't remember but we came to New York

12   on 26 July, and we always stayed a few days in New York before

13   we got to Massachusetts in our little house.

14   Q.  Where were you staying in New York?

15   A.  We stayed with the friends.  We stayed for the years, very,

16   very long time, even with David and one of David's friends who

17   came for a few years, we always stayed with them at that time.

18   Q.  Where did they live?

19   A.  They lived First Avenue and 20th Street, Cooper Town.

20   Q.  Peter Cooper Village?

21   A.  Yeah.

22   Q.  How did the day begin for you and Norman on the 31st of

23   July?

24   A.  I remember it was -- we were thinking that day we were

25   thinking go to Massachusetts, leave for Massachusetts, and my

F26TSOK4                         Gritz - direct

1  friend Susan, she was in the kitchen, it was around 8 o'clock

2  in the morning in the States, and she came and she -- I was in

3  the room to prepare the things to go, and Norman was in the

4  bathroom, and she said I just saw on the television, she has a

5  small television, that there was p'tzatza at the Hebrew

6  University.

7            MR. YALOWITZ:  Could you help with the word p'tzatza?

8  A.  I don't know how I say -- the bombing, the bombing in the

9  Hebrew University.

10 Q.  And what did you say when Susan told you there was a

11 bombing at the university?

12 A.  I had -- like my knee suddenly caught and down, and I was

13 already thinking David didn't phone, because the day before in

14 Jerusalem there is one bombing somewhere else, and the David

15 phoned us in the morning around 8:30 and he said don't worry,

16 I'm fine.

17            But this morning we didn't have the phone call from

18 David, and I was just -- I was in the bathroom, I say to

19 Norman, please come out, David didn't phone, and there is the

20 bombing at the Hebrew University.  And Norman say he don't have

21 to go to the Hebrew University.  And I said Norman, he had --

22 because he had to pass the test for the degree that he had to

23 complete.

24 Q.  David was there in order to take a test to see how good he

25 was in Hebrew?

F26TSOK4                    Gritz - direct

1   A.   Yeah, and Norman didn't want -- he didn't want -- he said

2   no, no, no.  I say Norman, he was there, and we don't have the

3   telephone call from him, I don't know, something wrong.  I

4   don't know what is wrong.  But Norman didn't want to hear

5   anything.

6        And after that we didn't have a very, very many people

7   to call in Israel, just we had two telephone numbers of the

8   woman who rent him the room.  And we tried to phone her, but it

9   was just machine, and we tried to phone another telephone call.

10  And we didn't have anybody, and David didn't have the telephone

11  that day because he didn't have the time to buy the cell

12  telephone and we couldn't phone him.  We phoned in the room

13  when he was leaving, wasn't there.  And I was just -- I don't

14  know, it was something.

15  Q.   What else did you --

16  A.   We was waiting about 15 minutes and I said Norman, we have

17  to phone in the French Embassy or French Consulate and/or

18  Israeli Consulate.  And we phoned them, and they said yes, yes,

19  we know that there is the bombing but we don't have the news

20  about David.  We are going to call you in half hour.  And it

21  was like this all the time.  They didn't -- they know already

22  that David was victim, but they didn't want to say.

23       And after that we know that they don't have the right

24  to tell us, because police have the right to tell us, and

25  police was looking for us in Paris because they find telephone

F26TSOK4                     Gritz - direct

1   number in Paris in David's things.  But in Paris we heard from

2   friends from India that -- they stayed in our apartment, and

3   the friends from India, they didn't -- the police didn't want

4   to tell them anything, but it was all the time needed the

5   telephone thinking that maybe David is -- maybe he just has

6   something, that he's going to call.  But there is no call from

7   David.

8          And Susan, our friend, she tried to call the hospital

9   in Jerusalem to know if David is somewhere in the hospital.

10  But it was always negative, and it was only in the afternoon

11  around I remember 5 o'clock the police called us in New York,

12  because my friends from India, they had our number in New York,

13  and they called us in New York, and they tell us that David was

14  victim.

15  Q.  Who took that call?

16  A.  I don't remember, maybe Norman.  I think maybe Norman.  And

17  we both were there, Richard, Norman and I, and I remember the

18  first thing that I said, they killed David, but David is not

19  dead.  And I think that for me it's just -- I think that I am

20  always in this thinking and this situation.

21  Q.  And what time was it in New York when you finally got the

22  news?

23  A.  It was around 4:30, 5 o'clock in New York time.

24  Q.  What did you do?

25  A.  After that I don't know, I think that I couldn't really --

F26TSOK4                        Gritz - direct

1    I remember that I couldn't take anything -- I didn't eat

2    anything for more than ten days, anything, just drink, the

3    water and tea.  But the people from French and Israeli

4    Consulate, they phone us very, very often, and they asked what

5    you are going to do.  Would you like to go to Israel or would

6    you like to go to Paris?

7              And Norman asked me:  What do you think?  And I said:

8    Norman, what are we going to do in Israel?  We are going back

9    to Paris.  And I think that we leave -- I don't remember, but I

10   think maybe in the same evening we leave for Paris.  It was

11   about Monday, Tuesday, but it was the Wednesday and I think

12   that we -- I think that we leave, or maybe tomorrow, I don't

13   remember.

14   Q.  When you got to Paris, did you buy a newspaper?

15   A.  No, I took a newspaper in the plane, and there was the

16   picture of cafeteria, and I saw David, and I say to Norman,

17   this is David.  And Norman say no, it's not David.  I say okay.

18   Q.  Was it a picture of some of the victims of the bombing?

19   A.  Just the picture of David, and there was like police, I

20   don't know, the people around, but David was -- I saw just half

21   of his face and his leg, and it was David.  And when we came to

22   Paris, one Italian friend, she had a picture in Italian

23   newspaper and it was the bigger picture.  But it was David.  I

24   don't know -- I know, but I think I didn't understand anything,

25   even today, and think that today David is always somewhere.

F26TSOK4                    Gritz - direct

1   Q.  Nevenka, did David's remains come home to Paris?

2   A.  Did David what?

3   Q.  Did David come home to Paris?

4   A.  Yeah.

5   Q.  Tell us about that day.

6   A.  This is something that I can tell you very clearly because

7   I think that it's something that -- I really can't go back.  A

8   few people came with David and wanted to bring his violin and

9   bring his computer, and there is this box, and it didn't have

10  anything of value or anything, and tomorrow it will be funeral

11  tomorrow morning.

12  Q.  Where did you meet the body?

13  A.  Montpernasse Cemetery.  It's not far from my house.

14  Q.  Did you go to the airport to collect David's body and his

15  belongings?

16  A.  Yeah, I tell you this is something that I really can't

17  understand how I could do that, but I think that -- I don't

18  know, it's something just one friend of ours with us with his

19  car and Norman and I, and we was behind this car who took

20  David's body in the funeral home and tomorrow morning it was

21  the funeral at the cemetery Montparnasse.

22  Q.  How many people were at the funeral, Nevenka?

23  A.  I don't really -- somebody made like cassette, I never saw

24  the cassette.  I think that there is many people, especially

25  very many of David's friends, and even our friends.  And we

F26TSOK4                              Gritz – direct

1   have friends that they came from the different country and they

2   stopped vacation and they came.  There was very many people,

3   but I really didn't see.  I never saw the cassette.

4   Q.  How long did Norman live after David's death?

5   A.  Three years.

6   Q.  And then Norman died?

7   A.  Norman died in 2005 and David died in 2002.

8   Q.  Was David your only child?

9   A.  Yeah.

10  Q.  How did Norman take David's death?  How was it for Norman?

11  A.  I think that Norman has heart problem, but I think that he

12  died from half his heart problem and half because of David's

13  death.  Because I think that Norman spent all the three years

14  that he had to live to arrange David's things, that he writes

15  very many things, but he writes sometimes like article about

16  the music, about the painting, and he make one social work in

17  the neighborhood in Paris, but he made that for the school.  It

18  was like the interview with the different people, because there

19  is very many Jewish and Arabs who lives in that neighborhood,

20  and David spent one week there and he met very, very many

21  people, and he write maybe ten pages about this.  And at that

22  time Norman and I, we was in the room and he didn't want to

23  come with us, he said that I have to go.

24  Q.  I want come back to something that you said and make sure

25  that we get it clearly.  So I want to ask you again about

F26TSOK4                        Gritz - direct

1    David's notebooks and what Norman did with them.  And maybe you

2    can tell Marlene and she can tell us.  You can tell her in

3    French and she'll tell us.

4    A.  I think that Norman -- David's work for the philosophy,

5    Norman write maybe ten pages about David, and in this ten pages

6    that he write, he took very, many things from David's book, but

7    in David's notebook he write the things that he was doing, what

8    he was reading, what he was thinking about something that he

9    saw.  But Norman took the things that he was thinking that this

10   is going to be interesting and he write this ten pages about

11   David.

12   Q.  Nevenka, how many notebooks did David fill up and leave

13   behind?

14   A.  I think 15.

15   Q.  Did he write in those notebooks in his handwriting, in his

16   own handwriting?

17   A.  Yeah, it's all David's writing, yeah.

18   Q.  Was David's handwriting easy to read?

19   A.  I can't hear you very well.

20   Q.  Was his handwriting easy to read?

21   A.  No, this is the reason that I really -- I try to read and I

22   really couldn't, but Norman take really the time and patience

23   to read.  It was very difficult to read.

24   Q.  Did Norman go through all 15 of those notebooks?

25   A.  Yeah, Norman read everything.

F26TSOK4                         Gritz - direct

1   Q.  And did he do something with the notebooks?  I think that's

2   what you were explaining before.

3   A.  Yeah, David's work that he write, his philosophy, it was

4   published, and Norman's text is published in this book, too.

5   Q.  So I just want to show you -- I'm going to show you a

6   document that we marked for identification as 1137.

7            MR. YALOWITZ:  And bear with me, your Honor, because I

8   thought I would have the lunch hour to make sure I was

9   organized, and I may have an extra copy.

10           MR. ROCHON:  While Mr. Yalowitz does that, or after he

11  does that, may we approach the bench briefly?

12           THE COURT:  Okay.

13  A.  Yeah, this is --

14           THE COURT:  Just a minute.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F26TSOK4                     Gritz - direct

1          (At sidebar)

2          MR. ROCHON:  Judge, these are ones -- you haven't

3    ruled on these yet.

4          THE COURT:  I didn't know if it was still an issue.

5          MR. ROCHON:  Well, I don't know which ones he's going

6    to use.  This is the notebook of the son, which is -- I don't

7    know, I --

8          THE COURT:  No, this isn't the notebook of the son.

9          MR. ROCHON:  We have got -- I gave Mr. Yalowitz my

10   copy.

11         THE COURT:  This is the thing that was read about the

12   father.

13         MR. YALOWITZ:  Correct.

14         MR. ROCHON:  We are objecting.  We need a ruling from

15   the Court.

16         THE COURT:  Is there any -- give me some idea of

17   what's in there that you don't want the jury to see.

18         MR. ROCHON:  I just think it creates unfair prejudice

19   because it's obviously the father's writings and the son's

20   writings, and I just don't think that -- this woman could talk

21   about her own grief and loss and her husband's grief and loss,

22   but I don't think this is a way to demonstrate --

23         THE COURT:  Is there something in substance that you

24   think falls into category?

25         MR. ROCHON:  Nothing on the attack itself that I have

1   seen, unless I'm mistaken.

2              THE COURT:  What do you want to do?

3              MR. YALOWITZ:  I want her to explain what it is and to

4   have her or me read a couple of very brief passages and move on

5   to the next things.  I think that part of Norman's grief --

6   part of the way that Norman dealt with his grief was by going

7   over David's life and writing about it and expressing himself.

8              THE COURT:  Do you want to offer this in evidence or

9   just want portions in?

10             MR. YALOWITZ:  I want to offer it in evidence.

11             THE COURT:  How much more do you have to do?

12             MR. YALOWITZ:  I think we're 20 minutes.

13             THE COURT:  Can we cut it down to ten minutes?  I mean

14  you're going a little slow with this witness.

15             MR. YALOWITZ:  I know, it's hard to get it out of her.

16             THE COURT:  It's not her, it's you.  I'm not blaming

17  it on her.  You're being repetitive.  Whatever she says you say

18  let me go back and ask you again.  That's a problem.

19             MR. YALOWITZ:  I'm not going to fight you on this.

20             THE COURT:  This is your jury.  They are sitting here.

21  You want them to sit here for another 20 minutes?  That's fine.

22             MR. YALOWITZ:  Not really.  Let me do it as fast as I

23  can move, and if he has a problem with it I think he should

24  object and you make a ruling.

25             THE COURT:  I'm going overrule the objection.  Let's

F26TSOK4                           Gritz - direct

1    put it in.

2              MR. YALOWITZ:  Thanks.  Great.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F26TSOK4                          Gritz - direct

1                    (In open court)

2     BY MR. YALOWITZ:

3     Q.  Do you have the paper I handed you?  Do you have it in

4     front of you?

5            I think you described it as something that Norman

6     wrote, is that right?

7     A.  Yeah, all his article Norman wrote, there is many, many

8     things from David's notebook.

9            MR. YALOWITZ:  Your Honor, plaintiff's offer

10    Exhibit 1137 in evidence.

11           MR. ROCHON:  Objection.

12           THE COURT:  It will be admitted into evidence.

13           (Plaintiff's Exhibit 1137 received in evidence)

14    Q.  I would like you to look at the front page of this journal,

15    and I just want you to focus on --

16           MR. YALOWITZ:  Maybe, actually, Ms. Romeo, why don't

17    you put it on the screen, the very front page.

18    Q.  And I want you to focus on the two quotations from David's

19    journal that are on the very front page.  So it's just -- do

20    you see those, Nevenka?

21    A.  I have to take my glasses because these glasses are to see

22    far.

23           I see this is his -- this was the last summer that

24    David spend with us in Massachusetts, and he was writing his

25    memoir about the philosophy, French philosopher, but in his --

F26TSOK4                      Gritz - direct

1    Norman find the things in 2001 that he write, I don't know how.

2    Q.  These were passages?

3    A.  Yeah, but it's in English.  David write this one year, it's

4    something like he was thinking that something was going to be

5    happening to him, I don't know.

6    Q.  Are these passages that Norman selected to --

7    A.  Yeah, Norman was a very, Norman was --

8            MR. YALOWITZ:  Your Honor, I would like to read one

9    passage.

10            THE COURT:  She's trying it finish her answer.

11            MR. YALOWITZ:  I apologize.

12    A.  Norman was very realistic man, but two things that he find,

13    he was just very, very impressed, because it's like something

14    like premonition that something is going to happen to David,

15    that like he knows.

16            MR. YALOWITZ:  May I read, your Honor?

17            THE COURT:  Yes.

18    Q.  Click, a nudge inside the head and you disappear.  Youth,

19    eternal, oh, my time on this earth.

20    A.  Yeah, it's something -- yeah, there is very many things

21    like that about David, but I don't want really to go through

22    them this day.

23            MR. YALOWITZ:  I have one more passage from Norman's

24    writing that I will like to read, your Honor.

25            THE COURT:  Yes.

1    Q.  In human terms, David had an extraordinary influence on

2    others, even those he barely knew.  His intelligence, his

3    qualities, and his charm were striking.  But he also has shown

4    from the inside, sensitive, attentive, patient and generous.

5    He showed an emotional intelligence and an enthusiasm that

6    could not help but move people.  From the depths of his heart

7    he was concerned with the lives of others, and he was always

8    there to help them and encourage them in acts and in words.

9             Nevenka, is this something that Norman wrote about

10   David after David died?

11   A.  Yeah.

12   Q.  Would you say that after David's death Norman lost his

13   taste for life?

14   A.  I don't know.  I think that we just lost very many things

15   about everything, but we lost a very, very many things about

16   life, and I always -- I remember that I said to friends and

17   to -- because David's professors came very often, and I tell

18   them now David just leave me a free way to die, I'm not afraid

19   of dying.

20   Q.  Nevenka, do you suffer from depression?

21   A.  Sometimes, yeah.  But I take something because I don't want

22   to be down.  Sometimes if I sunk, I'm going down, I take

23   something.  And I am always busy, and this is my best therapy.

24   I am always busy.  I have my studio, I make the collage, I

25   always work on that and I always work for everyday life.  And I

F26TSOK4                      Gritz - direct

1    still have friends, David's friends, Norman's colleagues, my

2    friends.  And I go to cinema if I am just down, I am going to

3    the cinema to see films, and I spend a good time.

4    Q.  Nevenka, are there times that you think of suicide?

5    A.  Yeah, I was thinking that it can be very -- something if I

6    lose my head or something, if I am -- maybe I can go to

7    Switzerland because there you can die with the music.

8    Q.  Nevenka, I want to put on the screen some slides that we

9    looked at last night.  Do you remember we looked at those?  Is

10   this an accurate summary of the things that we talked about?

11   A.  Yeah, it is okay.

12   Q.  And let's just look at the one from Norman.  Is that an

13   accurate summary of the things that we spoke about?

14   A.  Mm-hmm.  Yeah, it's okay.

15              MR. YALOWITZ:  Your Honor, plaintiffs offer in

16   evidence the summary that we just showed Ms. Gritz, 1275.

17              MR. ROCHON:  No objection.

18              THE COURT:  It will be admitted.

19              (Plaintiff's Exhibit 1275 received in evidence)

20   Q.  Nevenka, before David was murdered, had you ever been to

21   Israel?

22   A.  No, but I wasn't -- I really didn't know very many things

23   about Israel.  Norman was two times when he was student and

24   later he was there just for ten days, one week or something.

25   Q.  How many times have you been to Israel since David's

F26TSOK4                    Gritz - direct

1    murder?

2    A.  Very often.  I don't know how many times, but very often.

3    And sometimes I just need to go there because David was there,

4    but it's very difficult to not -- but I need sometimes to go,

5    but I have -- I make an agreement with musical academy in

6    Jerusalem, and I would like to leave them my small apartment in

7    the Paris because I don't have anybody, in David's name, and

8    that they can, when I have died, they can sell the apartment

9    and they give the money to the very good students to continue

10   to learn the instrument and for three instruments, for piano,

11   cello and violin.

12           THE COURT:  Thank you, Nevenka.

13           Your Honor, I don't have any further questions.

14           THE COURT:  Mr. Rochon.

15           MR. ROCHON:  No questions, your Honor.

16           THE COURT:  Thank you, ma'am, you can step down.

17           Thank you, ladies and gentlemen, for your indulgence.

18   I will send you home for the whole weekend.  I will see you

19   Monday morning at 9:45.  I'm hopeful that we will stay on

20   schedule and maybe cut off a day or two if we can so we can get

21   the case to you as early as possible in the next couple of

22   weeks.  Have a good weekend, I will see you Monday.

23           (Continued on next page)

24

25

F26TSOK4

```
 1              (Jury not present)

 2              THE COURT:  Why don't we do this, Mr. Yalowitz, why

 3    don't you see if there's anything else that you need clean up

 4    or offer in evidence, or anything between now and Monday

 5    morning.  Monday morning you can tell me that you rest.

 6              You can make a decision, Mr. Rochon, in terms of what

 7    you want to do in terms of motions.  If you want to preserve

 8    them, that's fine, if you want to articulate them for the

 9    record, that's fine, if you want some time for argument Monday

10    or you want to submit something, that's fine.  You can make

11    that judgment after the plaintiff formally rests Monday

12    morning.

13              MR. ROCHON:  Thank you.

14              THE COURT:  Let's see how efficiently we can proceed.

15    We have three days next week, so let's see.  I mean my most

16    optimistic scenario would be to try to finish the defense

17    witnesses next week and have Tuesday ready to go for

18    summations, but I know that is not being represented to me to

19    be a reasonable thought.  But we'll see how we go, and then

20    we'll keep preparing.

21              What I am going to do is hand you now a copy of the

22    verdict form as I described it so you can start looking at

23    that.  I think I will have my law clerk email you -- I think we

24    have the copies being made of the jury instructions, so you can

25    have those, so you can start looking at those over the weekend
```

F26TSOK4

1    and next week, and we'll talk about it further and have several

2    conferences and final charging conference before we go to

3    summation.

4              MR. YALOWITZ:  So one thing that I would like to

5    reserve some time for I think Monday morning, Mr. Rochon has

6    identified for us a number of exhibits, and frankly, I think a

7    number of witnesses who I suspect he feels duty bound to offer,

8    but understands that, based on Court's prior rulings, probably

9    are not going to come in.  I may be mistaken about that, I

10   can't read his mind.

11             But what I would like to do is reserve some time

12   Monday morning, we'll get you the exhibits that we think are

13   inconsistent with your rulings, we'll identify the witnesses

14   that we think are inconsistent with the rulings, we'll learn a

15   little bit more tomorrow night when we take those depositions,

16   and I hope what we can do is come in Monday morning, having

17   given you some information about what we think shouldn't come

18   in in this case.  And I know it's putting a lot on you, but I

19   think we'll be able to look at --

20             THE COURT:  I'm used to it by now.

21             MR. YALOWITZ:  I think you'll be able to look at the

22   documents, and Mr. Rochon can articulate why he thinks they

23   need to come in.  And I don't think it will be all that

24   controversial, but I think it would be prudent do to it before

25   we start with the witnesses.

F26TSOK4

1              MR. ROCHON:  I agree.  I don't agree with him saying

2     he's reading my mind, but what he said about the witnesses are

3     fine, the procedures are fine.  He wants to discuss these

4     things the same as I did with his witnesses.

5              THE COURT:  We'll meet at 9:15 and have the jurors

6     come in at 9:45 and have a half hour before we start to address

7     those issues.  And let's try to address those as efficiently as

8     we can so we can move forward efficiently with the witnesses.

9              MR. YALOWITZ:  That's great.  For the record, I know

10    what Mr. Rochon is going to do before he knows what he's going

11    to do.

12             THE COURT:  Have a good weekend.

13             MR. ROCHON:  You, too, your Honor.

14             (Adjourned to February 9, 2015, at 9:15 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    RICHARD BLUTSTEIN

4    Direct By Mr. Yalowitz . . . . . . . . . . .2698

5    RIVKAH BLUTSTEIN

6    Direct By Ms. Pildis . . . . . . . . . . . .2722

7    KATHERINE BAKER

8    Direct By Mr. Yalowitz . . . . . . . . . . .2736

9    NEVENKA GRITZ

10   Direct By Mr. Yalowitz . . . . . . . . . . .2750

11                   PLAINTIFF EXHIBITS

12   Exhibit No.                          Received

13    1232    . . . . . . . . . . . . . . . . . .2723

14    1235    . . . . . . . . . . . . . . . . . .2760

15    1137    . . . . . . . . . . . . . . . . . .2776

16    1275    . . . . . . . . . . . . . . . . . .2779

17

18

19

20

21

22

23

24

25
```