F298SOK1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
3    MARK I. SOKOLOW, et al.,
4                    Plaintiffs,
5             v.                          04 CV 397 (GBD)
6    PALESTINE LIBERATION
     ORGANIZATION, et al.,
7
                    Defendants.
8
     ------------------------------x
9                                        New York, N.Y.
                                         February 9, 2015
10                                       9:15 a.m.
11   Before:
                    HON. GEORGE B. DANIELS,
12
                                         District Judge
13
                             APPEARANCES
14
     ARNOLD & PORTER LLP
15        Attorneys for Plaintiffs
     BY:  KENT A. YALOWITZ
16        PHILIP W. HORTON
          TAL MACHNES
17        SARA PILDIS
          CARMELA T. ROMEO
18        RACHEL WEISER
          LUCY S. McMILLAN
19
     MILLER & CHEVALIER, CHARTERED
20        Attorneys for Defendants
     BY:  MARK J. ROCHON
21        LAURA G. FERGUSON
          BRIAN A. HILL
22        MICHAEL SATIN
          DAWN E. MURPHY-JOHNSON
23
     Also present:  BACHIR AL-OKLA, Arabic interpreter
24                  RULA QAWAS, Arabic interpreter
25
```

F298SOK1

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  Good morning.

 3              Mr. Yalowitz, what I anticipate doing is simply

 4    turning to you and asking you if there is anything further on

 5    behalf of the plaintiff, any further testimony or evidence you

 6    want to offer, you can do so; otherwise, you can just tell me

 7    you rest at this time.

 8              MR. YALOWITZ:  We did, per your suggestion, take a

 9    little time over the weekend to review.  I do have one exhibit

10    that I want to add to one of the binders that is in evidence.

11    We have notified the defendants.  It's Exhibit 157.

12              157 is a General Intelligence document concerning an

13    individual named Nasser Shawish.  He was convicted for his role

14    in the March 21 bombing of the Bauer family, and so I just want

15    to offer 157 in evidence.

16              THE COURT:  Mr. Hill.

17              MR. HILL:  We had previous objections to this

18    document.  In addition, I am not sure what its particular

19    relevance is.  My third concern is there is the name of an

20    alleged victim of a sexual assault which has not been redacted.

21              THE COURT:  Is this a document we have discussed

22    previously?

23              MR. HILL:  It's a type of document.  It was not used

24    with any of the previous witnesses or previously offered.

25              THE COURT:  Was it submitted or the subject of
```

F298SOK1

1     discussion?

2               MR. YALOWITZ:  This was in the 177.  It was in the 177

3     documents that we went around and about last year.  I don't

4     know if you have read this one, but it will certainly appear

5     familiar to you.

6               THE COURT:  Was there any testimony about this one?

7               MR. YALOWITZ:  No, sir.

8               THE COURT:  Mr. Hill, did you have any specific

9     objection to this document that's different or specific to this

10    document as opposed to the other?

11              MR. HILL:  Other than the name of the alleged victim.

12              THE COURT:  Where is that?

13              MR. HILL:  I think it's on the last page, your Honor.

14    That person is not a party.  Obviously I don't think their name

15    should be in the record.

16              THE COURT:  This is Exhibit 157.

17              MR. YALOWITZ:  May I consult with Mr. Hill for a

18    moment?

19              THE COURT:  Yes.  Could you just tell me what line I

20    am looking at.

21              MR. YALOWITZ:  That was really my question too.  Where

22    are we looking that is of concern to the defendants?

23              MR. HILL:  I was looking at the wrong page.  It's on

24    the page, the bottom is marked 9991T.

25              There is also a reference to an attempted seduction of

F298SOK1

1    a family member.

2              THE COURT:  Did you want both lines out or one line?

3              MR. HILL:  I'm not sure what the relevance of any of

4    this alleged sexual misconduct is to the case.  So maybe the

5    whole section should come out.  I don't know what portion the

6    plaintiffs think is relevant because they didn't use it with

7    the witness.

8              THE COURT:  I think we do know the portions that are

9    relevant because when I look back at my review of the 177

10   document, I do have an indication that this was in the category

11   of in documents rather than out documents and the portions that

12   they indicated that they thought were relevant and the portions

13   that you had objected to, I reviewed those portions.

14             MR. YALOWITZ:  May I make a suggestion here?

15             THE COURT:  Sure.

16             MR. YALOWITZ:  My suggestion is that the defendants

17   identify right now what part of page 4 they would like

18   redacted.  I don't think I am going to have a problem solving

19   that.  I don't really care what the name of this individual was

20   and I don't plan to use this business about drugs and sex.

21   That's not what this case is about.

22             MR. HILL:  Why don't we just take the whole page out

23   and then we don't have to waste any more time.

24             MR. YALOWITZ:  We can't take the whole page out.

25             THE COURT:  As I say, I understand the grounds for

F298SOK1

1   your objection.  I am trying to figure out whether this is

2   consistent or inconsistent with the arguments that the parties

3   have made about being of good morals.

4           Is there some such statement here one way or the other

5   that furthers that argument one way or the other?

6           MR. HILL:  I didn't see it, your Honor.

7           MR. YALOWITZ:  I didn't see good in terms of morals on

8   this one, or bad in terms of morals.

9           THE COURT:  Obviously those statements don't go to the

10  argument that he is good in terms of morals.  I understand your

11  grounds.  Careful what you ask for.  You may get it.  You want

12  it out.  You don't want any reference to these assessments.

13          MR. HILL:  I am right now highlighting the names.

14  Maybe that will solve it.

15          MR. YALOWITZ:  I don't have a problem taking out the

16  names.

17          THE COURT:  Is there some reason that this portion has

18  relevance?

19          MR. YALOWITZ:  In 2001, the aforementioned carried an

20  M-16, an MP-5 and a Kalashnikov and worked for the Islamic

21  Jihad.

22          THE COURT:  Mr. Hill, I will give you the flexibility.

23  I think one line is relevant but I defer to you as to how you

24  want this redacted.

25          MR. HILL:  If the plaintiffs are OK redacting the

F298SOK1

1    names of the people allegedly involved in the crimes other than

2    the person that is the subject, I think that will solve the

3    problem.

4              THE COURT:  That will be the name of the wife?

5              MR. HILL:  Yes.

6              THE COURT:  And the name of the wife's friend?

7              MR. HILL:  Right.

8              THE COURT:  Let me make sure I have that.  That would

9    be the name after wife on the third line of the text?  And the

10   fourth line after "was" after the redaction.

11             What did you want to do with the wife of his brother?

12             MR. HILL:  I think that should come out too.  If the

13   plaintiffs don't think that's relevant, there is no reason to

14   have those people's privacy invaded.

15             THE COURT:  Take out the two names, the brother's name

16   and the wife of the brother.

17             MR. HILL:  Yes, sir.

18             MR. YALOWITZ:  I am fine with that.  I see it.  In

19   1998, the aforementioned tried to harass the wife of his

20   brother, and we will just redact those two names.  That's fine.

21             Anything else?

22             MR. HILL:  The name of an alleged victim in the next

23   paragraph.

24             THE COURT:  After Nablus, his name is.

25             MR. YALOWITZ:  That's fine.  We will take out that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F298SOK1

1    name.

2                    Anything else?

3                    MR. HILL:  Then the last line, there's two names and

4    those should come out.

5                    THE COURT:  The next-to-last line.  His wife line,

6    before they were married and he had sex with his wife's friend

7    and then redact that.

8                    MR. YALOWITZ:  That's fine.

9                    THE COURT:  Is that otherwise consistent with the

10   discussion we had with the 177 document?  I think this document

11   falls in the same category as the others.

12                   MR. HILL:  Just so the record is clear, there are

13   actually two 9991Ts.  So if you page back to the page prior to

14   where you were, there is some additional misconduct there.

15   Those names should come out as well.

16                   THE COURT:  Where are you, what paragraph?

17                   MR. HILL:  The page 9991T.  It's actually on two pages

18   of the English version.  We were talking about the second part.

19                   THE COURT:  So what names in there?

20                   MR. HILL:  At the top, in the sixth line down:  There

21   are rumors according to which the aforementioned raped a young

22   woman whose cousin is.  The cousin's name should come out.

23                   The next paragraph refers to sex with the wife of the

24   brother.  Those names should come out.

25                   THE COURT:  Those are the same names that we took out.

F298SOK1

1          MR. HILL:  Then there is the paragraph that starts:

2     The third leaflet.  So that person's name should come out.

3     Then that name is in the next paragraph.

4          THE COURT:  Is Akbar a place?

5          MR. HILL:  Akbar is a place.

6          The next paragraph that starts with "the

7     aforementioned," there is the name there that should be

8     redacted.

9          THE COURT:  "Placed pressure on?"

10          MR. HILL:  Yes.

11          Skip down two paragraphs and the one that starts with

12     "the aforementioned and his father" and the last sentence also

13     mentions again the name of the brother's wife.

14          THE COURT:  Take out the name in between brother and

15     wife and take out the name after wife.

16          MR. HILL:  Thank you, your Honor.

17          THE COURT:  Mr. Yalowitz, that's fine with you?

18          MR. YALOWITZ:  That's all fine with the plaintiffs.

19          MR. HILL:  Subject to our other objections as well as

20     the fact that it wasn't used with the witness.

21          MR. YALOWITZ:  Not yet.

22          THE COURT:  We will put that aside.

23          I will admit 157.

24          (Plaintiffs' Exhibit 157 received in evidence)

25          MR. YALOWITZ:  That's it for the plaintiffs.  We rest.

F298SOK1

1              THE COURT:  Let me turn to the defense.

2              Mr. Hill, what do we anticipate for today?

3              MR. HILL:  There are some issues with the plaintiffs'

4    other redactions with other documents that we finally received

5    last night at about 9:00.

6              There are two categories.  One is an issue that we

7    spoke about Thursday in the context of the Abdullah Barghouti

8    indictment and it is references to organizations that the

9    plaintiffs claim are affiliated with the defendants.

10             As you may remember, there was a reference to

11   something called the Izz ad-Din al-Qassam Brigades and you

12   asked Mr. Yalowitz if he was intending that was associated with

13   the defendants.  He said he was not.

14             THE COURT:  I thought my question was whether that was

15   the same as the Al Aqsa Brigade.

16             MR. HILL:  It's a different organization.

17             So the question is, in light of the plaintiffs' effort

18   to argue that the Al Aqsa Martyrs Brigade or Fatah are alter

19   egos of the defendants, if that argument is going to be

20   permitted or that instruction is going to be given, then it

21   seems to us references to Fatah or the Al Aqsa Martyrs Brigade

22   should be redacted on the same principle that references to the

23   Palestinian Authority are currently redacted.  That's one

24   issue.

25             The other issue is this.  Some of the redactions that

F298SOK1

1    we are working through are obviously not correct for whatever

2    reason.  For example, there is an unredacted custodial

3    statement that references the alleged escape of Abdullah

4    Barghouti.  We assume that is an oversight and that that could

5    be corrected.  But we are still working our way through them.

6    As a matter of clarity, we are going to need to come to

7    agreement and address the court on those two issues.

8              THE COURT:  Well, the first issue, I think the

9    conclusion and deductions the jury would have to make based on

10   the evidence is within their purview.  I don't think I can

11   accept your argument if they are simply going to argue, and you

12   haven't convinced me to give such an instruction, but if they

13   are simply going to argue that they are an alter ego, that

14   somehow, whoever they argue that they are alter ego of, comes

15   out.  Because if they establish they are alter ego, they will

16   have to figure out are they going to attribute that to the

17   defendant.

18             I don't think I can accept that argument.  The

19   argument is irrelevant to whether or not they want to argue

20   they are the same or work hand in hand, different entities but

21   coordinated.  I don't think it really matters in this case

22   unless they convince me that there is some legal principle that

23   applies on the facts of this case that would warrant my

24   instructing the jury that somehow determining alter ego is

25   going to determine liability in this case.  And I am not yet

F298SOK1

1     convinced of that.

2                The fact that they reference other entities and the

3     fact that they want to try to argue to the jury or convince the

4     jury that whatever those other entities did there is enough of

5     a connection between the defendants and those other entities

6     that they should conclude that the defendants were involved, I

7     don't see that as compelling, a different analysis with regard

8     to the redactions.

9                It's not a direct accusation against either defendant.

10    And obviously this whole case is about whether or not there are

11    proper inferences or there is circumstantial evidence or other

12    evidence that in combination would compel the jury to make

13    certain conclusions.  And I think my analysis is still the same

14    as it was with regard to all the kinds of items that you say,

15    if the jury is convinced of Y, then X should be redacted.

16                I am not going off of any ifs.  I think that's really

17    sort of what is guiding me on that.  You have got to take out

18    the ifs.  It is an accusation against the defendant or it is

19    not an accusation.  If the plaintiff convinces them that there

20    is a relationship between the defendant and this other entity,

21    then I don't think that falls within the nature of the

22    preclusion and redactions.

23                MR. HILL:  What I suggest we do is we confer with the

24    plaintiffs and see if we can agree on them.  If there are

25    issues, recognizing that the plaintiffs are closing right now,

F298SOK1

1    we will bring them to your Honor's attention.

2              MR. YALOWITZ:  I guess I would say we are closing

3    subject to this redaction issue.  I'm sorry, your Honor.  We

4    are closing subject to this redaction issue.  What I would

5    really like to do on the redactions -- we have had such

6    logistical problems with it -- I would like the defendants to

7    actually propose to me actual redactions that they think I am

8    missing rather than these soft conversations about you didn't

9    do it the way I like it.

10              THE COURT:  At this point, as I say, at this late date

11    in the proceedings, I expect that to happen.  If they don't

12    identify for you specifically what redactions that they think

13    should be made and were inadvertently not made, then I am not

14    going to discuss it any further.

15              MR. HILL:  We will do that, your Honor.

16              MR. YALOWITZ:  Ms. Romeo was prepared to argue the

17    redaction issue.  I think you stole her thunder.

18              THE COURT:  She's been very persuasive.

19              MR. YALOWITZ:  I think you said everything she was

20    going to say.

21              THE COURT:  What do we plan for today?

22              MR. ROCHON:  Your Honor, I was looking for my

23    translator.

24              THE COURT:  I can't hear you.

25              MR. ROCHON:  The first witness will be Majed Faraj,

F298SOK1

1    followed by Dr. Ashrawi.  They are longer witnesses and so that

2    might conclude the witnesses for today I would expect.  If we

3    need, though, we have additional witnesses available.

4          I had mentioned last week I have potential issues with

5    visas with some witnesses.  I think we have worked through

6    that.  So an issue we won't need to get into is those people's

7    visas are coming a little late.  I think the current witnesses

8    will take us through Wednesday and those witnesses with

9    additional visas will come on the 17th.  The defense case I am

10   quite sure will conclude on the 17th.  That's my current

11   estimation.  Not beyond that.

12         As to the defense case, the plaintiffs did send

13   exhibits they wish to use on cross-examination of the witnesses

14   and of those, six were excluded by the court previously.  I

15   don't know that if they weren't admissible before they become

16   admissible just because it's a defense witness on the stand.

17         THE COURT:  The answer to that is it depends.  It

18   depends whether or not the questioning with the exhibit is

19   within the scope of the direct examination and opens the door

20   to that exhibit and there is an otherwise legal basis to

21   exclude the exhibit.

22         MR. ROCHON:  The court's rulings on many of these was

23   based not on foundational objections.  These went to whether or

24   not they would be proper evidence for the jury.  Certainly one

25   can always potentially open the door to something, but I can't

F298SOK1

1    envision any of these having the door open.  Before the

2    plaintiffs would use any exhibit that was previously excluded

3    by the court, we think they should raise that with the court

4    before they seek to use it.

5            THE COURT:  I think that's reasonable.

6            Can you identify for me at least the exhibit numbers?

7            MR. ROCHON:  219, 228, 235.  Those three were excluded

8    on January 16.

9            305.  That was excluded on January 23.

10           727 and 928.  Those were excluded on January 16.

11           THE COURT:  Can you just give me basically in a word

12   or two what you say each one of these are?

13           MR. ROCHON:  No.  That's an honest answer.

14           THE COURT:  That's a candid and straightforward

15   answer.

16           MR. ROCHON:  By the time they wish to use them I will

17   be much more informed.

18           THE COURT:  Is there something we need to address

19   before we start with these two witnesses?

20           MR. YALOWITZ:  No, I don't think so.  I will tell you

21   that we also got a lengthy list of exhibits from the

22   defendants, many of which I think were clearly excluded not on

23   a banana-by-banana basis, but bunch-by-bunch basis.

24           MR. ROCHON:  If I could help out Mr. Yalowitz, none of

25   those are going to be used with the first witness Majed Faraj.

F298SOK1

1    I think our witness list may have been trimmed down and some of

2    them will not be offered.  As to the first witness, we won't be

3    using those.

4              MR. YALOWITZ:  I ask for the same courtesy.  I think

5    that Mr. Rochon is smart enough to know the parameters of what

6    the court is allowing in the parties' affirmative cases.  If we

7    have exhibits offered that cross that line, we are going to

8    need to discuss them.

9              THE COURT:  I assume at this point that with regard to

10   this first witness, that, one we need not discuss whether this

11   witness is going to testify; we need not discuss what this

12   witness will testify to; we need not discuss what exhibits are

13   going to be offered on direct examination of these witnesses.

14             Do we need to discuss any of the exhibits that you

15   might want to offer with regard to cross-examination?

16             MR. YALOWITZ:  Well, I need to see what the direct is.

17             THE COURT:  Are any of these exhibits that he

18   indicated exhibits that you want to use on cross-examination of

19   this witness?

20             MR. YALOWITZ:  They might.

21             THE COURT:  Tell me which ones they are.

22             MR. YALOWITZ:  I need to see what his direct is.  He

23   is sitting in the courtroom.

24             THE COURT:  I understand that.  My only question is,

25   are these ones that you anticipated, if appropriate, would come

F298SOK1

 1   in through this witness or did you anticipate, no, these will

 2   be used on cross-examination of later witnesses?

 3              MR. YALOWITZ:  A number of them are statements by his

 4   superior officers.

 5              THE COURT:  Can you identify those exhibits for me so

 6   I can be prepared?

 7              MR. YALOWITZ:  Off the top of my head I can't.

 8              THE COURT:  Off the top of any of the heads of your

 9   colleagues?

10              You gave them a list of exhibits.  I assume you know

11   which ones you want to use on cross of this witness.

12              MR. YALOWITZ:  I thought there were some that were not

13   germane to this witness.  Why don't you assume that all of the

14   ones that Mr. Rochon listed are going to be potentially used on

15   cross.

16              THE COURT:  These are exhibits that are where?  Where

17   do I find these exhibits?

18              MR. YALOWITZ:  Many of them are videos.  So they would

19   be on the video disks that we have provided.

20              THE COURT:  Have I seen all of these exhibits?

21              MR. YALOWITZ:  Every one that he described you have

22   seen.

23              THE COURT:  Which ones are videos?

24              MR. YALOWITZ:  Do you know, Ms. Machnes?

25              I am informed that the ones that Mr. Rochon listed are

F298SOK1

1    videos.

2         THE COURT:  All of these are videos and all of these

3    are videos that you submitted to me that I reviewed and we

4    discussed and I ruled that they were not going to be

5    admitted --

6         MR. YALOWITZ:  Correct.

7         THE COURT:  -- on the plaintiffs' case.

8         MR. YALOWITZ:  Correct.

9         THE COURT:  I know you gave me a letter with that

10   video that laid out what was in the videos.  Do you remember

11   what the date of that letter is?

12        MR. YALOWITZ:  We would have to either look it up or

13   get you another copy of the disk.

14        THE COURT:  I think we have a copy of the disk.  I

15   want to figure out what you described them as.

16        MR. YALOWITZ:  I will give you the general category of

17   what they are.

18        THE COURT:  Most of them I remember as either being

19   rallies or funerals or statements, news statements.

20        MR. YALOWITZ:  These are statements of senior PA

21   officials.  These will be statements of people from the PA

22   describing facts.  If they are inconsistent with the witness's

23   testimony, I may use them to refresh or impeach.  They are

24   people he knows or reported to during the relevant time frame.

25        So we are not talking about like people firing guns in

F298SOK1

1    the air or stuff like that.  We are talking about senior PA

2    officials making statements that are either self-inculpatory or

3    are admissions about the work that they did during the time

4    frame that this witness is supposed to testify about.

5         THE COURT:  Clearly I won't be able to rule until I

6    specifically remember which ones they were and until after the

7    direct is finished.

8         MR. YALOWITZ:  We have to see what his direct is.

9    These are all statements in Arabic.  So in the first instance,

10   we can try to refresh his recollection.  We don't have to show

11   it to the jury to refresh his recollection.  He can look at a

12   video and say, yeah, that reminds me, you're right, or no, I

13   disagree with it, and then we will face the issue of

14   impeachment obviously.

15        Two other things with this witness, which are just

16   sort of color, but color that I care about.  One is that this

17   witness has testified previously that he lost his father during

18   the Al Aqsa Intifada and his testimony is that he lost his

19   father due to some kind of action by the Israeli military.  I

20   don't think that's relevant to this case.  To bring that in

21   front of this jury would clearly be a play on sympathy and I

22   don't think it's germane.

23        THE COURT:  You don't intend to cross-examine him on

24   that issue with regard to motive?

25        MR. YALOWITZ:  No.  He is a senior employee of the PA.

F298SOK1

```
1    I assume he is here in his professional capacity, and I have

2    every reason to believe he will testify as a professional and

3    not as -- I have never met him, but I have read his testimony.

4    He strikes me as someone who has got a point of view.

5         MR. ROCHON:  He won't be referencing the death of his

6    father on direct examination and unless the door is open to it,

7    we wouldn't seek to use it on redirect.

8         MR. YALOWITZ:  I respect his grief.  I don't think

9    it's relevant.

10         The second thing is, in recent years he received some

11   kind of a commendation or medal from the branch of the United

12   States government for some work he did involving bringing some

13   Al-Qaeda terrorists to justice.  It's so recent, and he is a

14   fact witness, I don't think it's germane to the events that

15   this jury needs to be thinking about and hearing about.

16         MR. ROCHON:  On that I disagree.  I think that's

17   relevant background for the witness.  He is a senior

18   intelligence officer of my client.  This is relevant as

19   background.  It's just as relevant as some of the plaintiffs'

20   witnesses, some of whom have hobbies, some played chess, one

21   translated the Koran.  So the plaintiffs have taken a fairly

22   broad view of what is appropriate background for a witness.

23   This at least relates to his actual work and therefore is far

24   more relevant background for this witness.

25         I will tell you it's not a big deal and the witness
```

F298SOK1

1    will not, just so you and the court know, he will not claim

2    that this was really for him personally in that sense.  He

3    actually describes it more to the overall role of the

4    functioning of his agency.

5         MR. YALOWITZ:  Then it's even further afield.  The

6    agency, what the agency did in 2012 or 2013 has nothing to do

7    with what it did in 2000 and 2004.

8         THE COURT:  I was sort of with you, Mr. Rochon, until

9    you made that last statement.

10        MR. ROCHON:  He is modest.

11        His description of what the witness would say, he

12   makes it sound like somehow this guy was out capturing people.

13   It is not that.

14        THE COURT:  The reality is, I think the argument is

15   stronger if that was the case, not weaker.  If the plaintiff

16   had gotten on the stand and part of the plaintiff's background

17   is that they wanted to testify they got a purple heart from the

18   war, that would be admissible.  The jury gets to assess what

19   this person's background is and those things attributed to that

20   witness which goes to the witness's credibility and the jury's

21   assessment of the witness's testimony.

22        Quite frankly, if he is going to testify about acts

23   distinguished or not that are attributable to him that you

24   think is relevant for the jury to assess his character and

25   truthfulness, then I think you're entitled to do that.  If your

F298SOK1

1    position is a little different, then, no, this has nothing to

2    do with him and has to with his agency.  I couldn't care less

3    what awards his agency won.  I am not quite sure why it would

4    be relevant.

5            MR. ROCHON:  The witness, as the head of the agency,

6    who is entrusted with that kind of information, is important.

7    The fact of the award is really of no moment to us.  And,

8    frankly, the witness is going to need to be careful not to

9    reveal any information.  So actually we are not going to be

10   trying to blow up what he did there.

11           THE COURT:  What is it that you want him to say?

12           MR. ROCHON:  I expect he will talk about his meetings

13   with U.S. officials.

14           THE COURT:  With regard to this one issue.

15           MR. ROCHON:  I don't expect to get anything there.

16   The particular thing that arguably he was complimented for we

17   wish hadn't been put in the letter.

18           THE COURT:  Are you going to ask him about that?

19           MR. ROCHON:  No.  We wish it hadn't been put in the

20   letter.  Frankly, it exposes the witness to problems.

21           THE COURT:  You don't intend to ask him about that

22   award that he or his agency got from the U.S. government on

23   your direct examination.

24           MR. ROCHON:  I will not ask him about an award that

25   they got from the United States government.  He wouldn't want

F298SOK1

1  to talk about it anyway.

2          MR. YALOWITZ:  I am pleased to hear that.

3          Frankly, I think his recent meetings with U.S.

4  officials, I don't really get what that has to do -- this guy

5  is a fact witness who was in charge of the Bethlehem regions

6  preventative security during the Al Aqsa Intifada.

7          One thing I am very concerned about is they are trying

8  to use him as if he were like a 30(b)(6) witness or something.

9  When he testified on deposition, he gave very lengthy speeches

10  and he was -- look, he has a point of view and he was very

11  expressive about his point of view.  He is very critical of

12  some of the actions of the Israeli government.  Those things

13  you have already ruled are beyond the scope of this trial.

14          I am going to try to be very vigilant and not let the

15  witness wander off into those areas.  The witness will testify

16  in Arabic.  It would help me if I could have an Arabic speaker

17  who is not a lawyer sit with me at the table.

18          THE COURT:  That's fine.

19          MR. YALOWITZ:  We will do that.  If we hear something

20  that concerns us, even before it's translated, we may object

21  and then we will deal with it.

22          MR. ROCHON:  We will play it by ear.

23          THE COURT:  You can do that, but I have seen

24  cross-examination in different settings, and I have never been

25  convinced, where you have translator in the box with questions

F298SOK1

1    asked, translated in the box, it's translated back out of the

2    box.  If you have an objection to the question, you should make

3    the objection to the question.  If the witness has given an

4    answer, my attitude is pretty much you don't get to cut the

5    interpreter off because the witness has already given the

6    answer.

7              MR. YALOWITZ:  OK.  I understand.

8              THE COURT:  Unless you think it's something so

9    outrageous that warrants not letting the jury know what it is

10   that the witness has said.

11             MR. ROCHON:  I don't anticipate issues like that with

12   this witness.  He is a very disciplined person.  The questions

13   at the deposition were of course more open-ended, as

14   depositions are.

15             THE COURT:  At this point I don't have a basis to

16   conclude that there is a particular issue that I should exclude

17   at this point.

18             MR. YALOWITZ:  I think we need to take it question by

19   question and answer by answer.  I go by the rule that I heard

20   from a trial judge, it's never too early to object.

21             THE COURT:  I agree with that.

22             MR. ROCHON:  Or too often.

23             I think we are set.

24             THE COURT:  We are still waiting for two jurors.

25             MR. ROCHON:  One of our translators is here.

F298SOK1

1          THE COURT:  We are missing one juror.

2          MR. ROCHON:  Can I briefly check on the translator.

3     We have two and they are going to rotate.

4          MR. YALOWITZ:  I was just going to say, over the

5     weekend I had chance to look over the draft jury instructions

6     and draft verdict sheet and overall I think there are a couple

7     of things I want to talk about, but I am ready to talk about it

8     whenever you are.

9          THE COURT:  We will start talking about it today.  We

10    will do it on a daily basis and I can keep refining it.  We

11    will start doing that today.

12         MR. ROCHON:  Your Honor, I only have one other issue

13    to discuss.  As we referenced last week, there will be a Rule

14    50 motion.

15         THE COURT:  How did you want to handle it?

16         MR. ROCHON:  Here is how I would like to handle it.

17    We will be filing in writing, once the plaintiffs close, and

18    that will be submitted I think later this morning.  The focus

19    of that is going to be -- and what I anticipate doing is filing

20    again at the end of the case.

21         The first motion we will be filing today will be

22    focusing on the three material support issues and then as to

23    the three incidents that we think have the biggest problems for

24    the plaintiffs.  We think some of the defense testimony will go

25    to scope of employment and then that will be incorporated in

F298SOK1

```
 1    the final motion which will cover all claims by the plaintiffs.
 2            We would like to argue the one we filed that goes more
 3    directly to the three incidents.  By that I mean the
 4    Mandelkorn, Sokolow and Hebrew University incidents.  The court
 5    may entertain argument on that when the court wishes and we
 6    would be prepared to entertain that when you wish.  But I think
 7    it would be helpful to file it in writing and give you and Mr.
 8    Yalowitz a chance to read it and then to argue it ideally
 9    sometime this week, if the court permits.  But we do plan on
10    filing at the end of the case that would cover the entire
11    trial.
12            THE COURT:  We will find an appropriate time to do
13    that.  We will wait for your filing.  If you want it done
14    before next week, then you will have to give me a filing
15    earlier enough so Mr. Yalowitz can respond in writing or if he
16    just wants to respond orally, he can do that.  I can either do
17    it sometime before the end of the week and/or after the defense
18    rests, both sides have rested, before we go into summations.
19            MR. ROCHON:  Thank you for that.
20            A lot of these people are out of country so we are
21    hoping to get them on today and get them flying back to their
22    official duties.
23            MR. YALOWITZ:  Your Honor, if I could ask the defense
24    indulgence to let us know their order of witnesses after Dr.
25    Ashrawi.  They have given us seven witnesses that they plan to
```

F298SOK1

1   call this week, but the order keeps changing due to people's

2   travel schedules.

3        MR. ROCHON:  Happy to do that.

4        It will be Majed Faraj, Dr. Ashrawi.  Then I

5   anticipate Michael Sfard very briefly, and then Shawqi Issa.

6   Those are the first four.

7        MR. YALOWITZ:  With regard to Sfard, we do have a

8   letter in because his report was obviously very focused on

9   international law issues and things that are really not

10  relevant to the case.

11       THE COURT:  Do you have a recent letter or are you

12  referring back?

13       MR. YALOWITZ:  Maybe last week.

14       MR. ROCHON:  There was one last week from them on

15  Sfard.

16       MR. YALOWITZ:  They are both really very gracious

17  people.  I like both of them personally.  They are

18  international human rights lawyers, and Sfard talks about the

19  Israeli military court system and identifies things that he

20  wished were better in the Israeli court system.

21       MR. ROCHON:  I won't be talking about that unless Mr.

22  Yalowitz asks him about it.  He will not be talking about his

23  views about the military court systems on direct examination.

24       MR. YALOWITZ:  That's all he gave in his expert

25  report.  If they have got some new thing they want him to talk

F298SOK1

1    about, I haven't heard what it is in writing.  I have gotten

2    some hints from Mr. Rochon, and he promised me I would get

3    something in writing, but that hasn't happened.

4        We did submit a letter.  The defendants did not

5    respond to it.  I think before Sfard goes on the stand, your

6    Honor needs to see what they plan to offer him for and make a

7    judgment as to whether it's within the scope of his report,

8    obviously fairly construed.  If his report touches on the

9    thing, I think you have been very clear that it has to be

10   touched on in the report.  I am not saying that he has to have

11   cited chapter and verse exactly every exhibit and like that,

12   but if he was talking about baseball and now he wants to give

13   expert testimony about football, that's not in his report.  He

14   can't do that.

15       THE COURT:  This is what I would like to do.

16       Mr. Rochon, you should either discuss with Mr.

17   Yalowitz the nature and the subject matter of the testimony

18   and/or make some proffer before me as to what you anticipate

19   this witness is going to testify to, and I would like to do

20   that the day before he is anticipated to testify.

21       MR. ROCHON:  I think we will be able to provide a

22   written summary for Mr. Yalowitz maybe during the lunch period

23   and then we will see if he still wants to argue about it.

24       MR. YALOWITZ:  Just so we are clear, I do think it

25   needs to be in writing.  We have had some --

F298SOK1

1          MR. ROCHON:  I will read it aloud on the record.

2          MR. YALOWITZ:  We have had some trouble communicating

3     with each other and I think writing would be best.

4          THE COURT:  He will submit something to you in

5     writing.

6          MR. YALOWITZ:  I am pleased to hear that.  That may be

7     helpful.

8          THE COURT:  We are still trying to locate jurors.

9          MR. ROCHON:  May I step to talk to the translators?

10          THE COURT:  Yes.

11          MR. ROCHON:  On the translator, we are ready as soon

12     as you are.

13          THE COURT:  As soon as we get that last juror.

14          I think our last juror has arrived.

15          MR. ROCHON:  Can I get the witness and the translator

16     up?

17          THE COURT:  Let them stay in the audience now.

18          I am going to turn to the plaintiffs first.

19          Let's get the jury.

20          (Continued on next page)

21

22

23

24

25

F298SOK1

1          (Jury present)

2          THE COURT:  Ladies and gentlemen, this is where we

3     are.  As I indicated to you, we are going to take three days

4     this week and then we are going to adjourn.  We are going to

5     take off Thursday, Friday and Monday and come back on Tuesday.

6          At this point my best estimate is we will finish the

7     witnesses sometime next week.  So I will give you further

8     instructions as we get closer.  I am hopeful we can finish the

9     witnesses next week.

10          With that, Mr. Yalowitz, do you have anything further

11     on behalf of the plaintiffs?

12          MR. YALOWITZ:  No, your Honor.

13          There are certain documents that the defendants have

14     indicated they need to come back to us on.  That's a technical

15     issue.  We discussed it earlier.  Other than that, the

16     plaintiffs are prepared to rest their case and hand it over to

17     the defense.

18          THE COURT:  Now that the plaintiffs have rested, Mr.

19     Rochon, do you wish to call any witnesses on behalf of the

20     defendant?

21          MR. ROCHON:  Yes.

22          Thank you, your Honor.

23          We will begin by calling General Majed Faraj.

24          He will be testifying with a translator.

25

F298SOK1

1      MAJED FARAJ,

2           called as a witness by the defendants,

3           having been duly sworn, testified through Arabic

4           interpreter as follows:

5    DIRECT EXAMINATION

6    BY MR. ROCHON:

7    Q.  Sir, would you please tell us your name.

8    A.  Majed Ali Mohammad Faraj.

9    Q.  Are you employed, sir?

10   A.  Yes.

11   Q.  Where do you work?

12   A.  My employer is the president of the Palestinian Authority,

13   Mahmoud Abbas, and I work for him.

14           I work for Mahmoud Abbas, who is the head of the

15   Palestinian state, and I work for him.

16   Q.  Do you have in your job, is there a rank that you have

17   that's like a military sort of rank?

18   A.  Yes, I do.

19   Q.  What is that rank?

20   A.  Major general.

21           MR. ROCHON:  For the translator's benefit, to your

22   left is a real-time translation.  So if you ever need to follow

23   what I am saying, you can see it on that screen.

24   Q.  General Faraj, do you know some English?  Do you understand

25   some English?

F298SOK1                          Faraj - direct

1    A.  Very little.

2    Q.  Therefore, is it easier for you to testify in Arabic?

3    A.  Certainly.

4    Q.  You described your employment.  Do you work for a specific

5    agency within the Palestinian Authority?

6    A.  Yes.

7    Q.  Which one?

8    A.  The military, general military intelligence of Palestine.

9    Q.  Is that sometimes referred to as the GIS?

10   A.  Correction.  It is the General Intelligence Department.

11   Q.  Is that sometimes referred to as the GIS?

12   A.  Yes.

13   Q.  What is your current position at the GIS?

14   A.  The head.

15   Q.  Are you familiar with an entity in the United States called

16   the CIA?

17   A.  Yes.

18   Q.  In terms of its responsibilities and duties for Palestine,

19   how does the GIS compare to the responsibilities of the CIA in

20   the United States?

21          MR. YALOWITZ:  Objection.  Lack of personal knowledge.

22          THE COURT:  Overruled.  You can cross-examine.

23   Q.  You can answer the question.

24   A.  It is within the general responsibilities, although the

25   responsibilities are different in size.

F298SOK1                          Faraj – direct

1    Q.  In connection with your duties at the GIS, do you have

2    occasion to ever meet with U.S. officials?

3    A.  Yes.

4    Q.  Can you please tell us some of the U.S. officials with whom

5    you have met in connection with your duties at the GIS?

6             MR. YALOWITZ:  Objection.  Relevance.

7             MR. ROCHON:  It shows, first of all, the familiarity,

8    which was objected to.

9             THE COURT:  Come up to the sidebar.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F298SOK1                      Faraj - direct

1              (At the sidebar)

2              MR. ROCHON:  It's all background.

3              THE COURT:  Background for what?

4              MR. ROCHON:  He meets regularly with high-level U.S.

5    officials.

6              THE COURT:  What difference does it make who the

7    high-level officials are that he meets with?

8              MR. ROCHON:  This witness comes before the jury

9    speaking in a foreign language.  They don't know who he is.  I

10   want to establish that he is in fact who he says he is, he does

11   have these meetings.

12             THE COURT:  How does it make him more or less credible

13   as a witness if it doesn't go to the substance of his testimony

14   of who he meets with in the United States?

15             MR. ROCHON:  This witness is eventually going to

16   testify about his own efforts on behalf of the PA during the

17   Second Intifada to fight terror, and his work was with U.S.

18   officials as well, and he did his work well and he is now at

19   the highest rank within the agency that has that

20   responsibility.

21             In connection with that he is entrusted with

22   information by both Israelis and the United States of America

23   in order to do that and to establish his bona fides as a

24   witness and the fact that he knows what he is talking about

25   when it comes to fighting terror.

F298SOK1                        Faraj - direct

1          THE COURT:  What relevant U.S. officials are you going
2     to elicit that he met with during the Second Intifada?
3          MR. ROCHON:  After the Second Intifada, he met with
4     U.S. officials, and even after the Second Intifada.
5          THE COURT:  What do you expect him to say?
6          MR. ROCHON:  I expect him to say John Brennan, David
7     Petraeus, the head of the CIA, President Obama, John Kerry,
8     Condoleezza Rice, General Dayton.
9          THE COURT:  To establish what?
10         MR. ROCHON:  To establish that this man in fact is who
11    he says he is.  He is going to describe his efforts during the
12    Second Intifada in terms of combating terror.  It is what he
13    did.
14         THE COURT:  You keep taking it back to the Second
15    Intifada.  All those people are not people he met with during
16    the Second Intifada.
17         MR. ROCHON:  It is background.  The plaintiffs put on
18    background for witnesses that extended to who they played chess
19    with.
20         THE COURT:  Maybe some of that was relevant and some
21    of it wasn't.
22         MR. ROCHON:  Whether they translated the Koran.
23         THE COURT:  You just want to show he has a bunch of
24    high-level U.S. friends?
25         MR. ROCHON:  I want to show that these high-level U.S.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F298SOK1                        Faraj - direct

1    friends -- the relevance of this, it goes to his work.  These

2    aren't U.S. friends.  These aren't social meetings.

3              THE COURT:  So he says I have met President Obama.

4    Where do you go from there?

5              MR. ROCHON:  I am more interested in his meetings with

6    heads of the CIA.

7              THE COURT:  Did he meet with heads of the CIA during

8    the Second Intifada?

9              MR. ROCHON:  Subsequent to it.

10             THE COURT:  Who are you saying that he met with during

11   the Second Intifada that is going to be of substance?

12             MR. ROCHON:  All sorts of people during the Second

13   Intifada.  They are at the CIA rank.

14             THE COURT:  You want to say he met with heads of the

15   CIA and these other individuals to demonstrate what again?

16             MR. ROCHON:  It demonstrates who this witness is

17   before the jury.

18             THE COURT:  We know who he is.

19             MR. ROCHON:  You have got to give some background for

20   a witness in order for the jury to see who he really is.

21             THE COURT:  Why is this relevant background?

22             MR. ROCHON:  It's relevant background because it shows

23   his involvement in fighting terror.  That's what he does.

24             THE COURT:  You didn't ask him who do you meet with in

25   fighting terror.  You asked him who are the high-level U.S.

F298SOK1                        Faraj - direct

1     people that you are buddies with.

2              MR. ROCHON:  I will rephrase it.

3              THE COURT:  Let's get the parameters.

4              Mr. Yalowitz.

5              MR. YALOWITZ:  I have a problem talking about what he

6     did and what his work has been after the Second Intifada.  I

7     will tell you why, and this really goes to the relevance of

8     some of the cross-examination exhibits that we talked about

9     this morning.

10             We have a lot of high-level PA people who made

11    self-inculpatory statements saying we did it during the Al Aqsa

12    Intifada.  On the defendants' objection that was kept out

13    because it was not close enough in time to be relevant, or I

14    should say the relevance was outweighed by potential prejudice

15    because of the distance in time.

16             So now we have the defendants' case and the very first

17    thing they want to do is they want to say, tell us about all

18    the great stuff that you have done recently.  I just don't

19    think it is relevant, and if it is relevant, then it opens the

20    door to cross on the admissions and inculpatory statements that

21    were kept out at the defendants' request because they were

22    distant in time.

23             THE COURT:  Is he going to testify about his actives

24    during the Second Intifada?

25             MR. ROCHON:  Yes.

F298SOK1                        Faraj - direct

1              THE COURT:  Was he in the same capacity at that time?

2              MR. ROCHON:  He wasn't.

3              MR. YALOWITZ:  He was in a different agency.

4              THE COURT:  What was his role during the Second

5    Intifada?

6              MR. ROCHON:  He had two roles.  He had the middle

7    region of the Second Intifada.  He was involved in arresting

8    terrorists, coordinating with the Israelis and the Americans

9    and was actively engaged.

10             Here is what I would ask the court if I could do.  I

11   will go back to the Second Intifada and I will go back to that

12   time frame and then maybe we can evaluate this.

13             MR. YALOWITZ:  I don't have a problem with him saying

14   who he is and what he did during the relevant years.  I know

15   who he is and what he did during the relevant years.  I expect

16   him to testify truthfully about that.  I have no problem with

17   Mr. Rochon bringing that out.  My problem is after the fact.

18             MR. ROCHON:  I do think I should be able to get --

19             THE COURT:  What do you want to ask him?

20             Do you want to withdraw this question and rephrase it

21   or go to something else?

22             MR. ROCHON:  I will ask another question.

23             THE COURT:  What is going to be the general nature of

24   your question?

25             MR. ROCHON:  I will go to 2002.

F298SOK1                      Faraj - direct

1            THE COURT:  OK.

2            (Continued on next page)

F298SOK1                      Faraj - direct

1              (In open court; jury present)

2     BY MR. ROCHON:

3     Q.  General Faraj, I'll come back --

4              INTERPRETER:  Correction, your Honor, if I may, as

5     interpreter.

6              The difference between GIS and CIA, it is in terms of

7     volume of duties and not difference volume and scope.

8     Q.  Thank you.

9              General Faraj, I'll come back to your work in security

10    and intelligence, but first I want to find out a little bit of

11    background about you personally.  Can you tell us how old you

12    are?

13    A.  Yes.  Go ahead, please.

14    Q.  How old are you?  How old are you?  Where do you live --

15    A.  Fifty-two years.

16             MR. ROCHON:  I'm sorry.  I did not become fluent in

17    Arabic over the weekend, so make I should find out what he

18    said.

19    A.  Fifty-two years.

20    Q.  Where were you born?

21    A.  I was born in the -- in Dheisheh camp, refugee camp.

22    Q.  Where is that -- I'll try to pronounce this correctly.

23    Where is the Dheisheh refugee camp?

24    A.  In the district of Bethlehem.

25    Q.  And is that -- where do you live now?

f29esok2                          Faraj - direct

1     A.  A live in Ramallah in the West Bank.

2     Q.  And the refugee camp, is that where you grew up?

3     A.  Yes.

4     Q.  And is that where you went to school?

5     A.  Yes.

6     Q.  And where, in fact, did you go to school?  What was the

7     high school that you went to?

8     A.  In the camp I went just to primary school and secondary

9     school.

10    Q.  Did you eventually in your life also go to university?

11    A.  Yes.

12    Q.  What university did you attend?

13    A.  The Open University of Jerusalem.

14    Q.  Did you graduate from the Open University of Jerusalem?

15    A.  Yes.

16    Q.  And with what degree did you graduate from the Open

17    University of Jerusalem?

18    A.  It is -- I mean, university, university degree in

19    management.

20    Q.  And when did you graduate from university?

21    A.  Almost in 2000.

22    Q.  And are you married?

23    A.  Yes.

24    Q.  And do you have any children?

25    A.  Yes.  I have six children; four girls and two boys.

f29esok2                          Faraj – direct

1    Q.  You're currently, as you indicated, the head of the GIS.

2    For how long have you worked in security or intelligence or

3    police work?

4    A.  Since 1994.

5    Q.  And what was your first position in such work?

6    A.  At the beginning I worked for the Preventive Security.

7    Q.  And for how long did you work for the Preventive Security?

8    A.  Thirteen years.

9    Q.  And so when was it that you left Preventive Security?

10   A.  In 2007.

11   Q.  And so you worked for Preventive Security during the period

12   of time that is referred to as the Second Intifada?

13   A.  Yes.

14   Q.  And after you left Preventive Security, what job did you

15   take?

16   A.  I was head of the military intelligence service from 2007

17   until 2009.

18   Q.  And after you stopped being the head of the military

19   intelligence in 2009, is that when you went to the GIS?

20   A.  Yes.  True.

21   Q.  So if I understand correctly, you've worked for the

22   Preventive Security, PSS, military intelligence and the GIS,

23   correct?

24   A.  Yes.

25   Q.  Could you please give the ladies and gentlemen of the jury

f29esok2                         Faraj - direct

1    an understanding of the basic responsibilities of those three

2    entities.

3            MR. YALOWITZ:  Object to the form, your Honor.

4            THE COURT:  Just a minute.  I think we're having some

5    technical difficulties.

6            MR. ROCHON:  I think we can proceed, if it's okay with

7    you, your Honor.

8            THE COURT:  Sure.  I'd like to.  Why don't you restate

9    the question.

10           MR. ROCHON:  Sure.  I'll re-ask it.

11   BY MR. ROCHON:

12   Q.  During this trial we've heard about the GIS and the PSS and

13   military intelligence.  Could you please tell us the

14   responsibilities of each of them.

15           MR. YALOWITZ:  Object to the form.

16           THE COURT:  Overruled.  He can answer.

17   A.  In the Preventive Security, most of the responsibilities

18   and tasks were internal.  And also, there are some duties

19   regarding combating extremism, terrorism, etc., but always

20   within the Palestinian territory.  The military intelligence

21   work has to do with military people, with those who work there.

22   It has nothing to do at all with civilians.  And also, it aims

23   at protecting the military intelligence structure and to find

24   any violation to prevent any violation of any rules.

25           As for the general intelligence, well, it works in

f29esok2                          Faraj - direct

1    combating extremism and violence.  It works within the

2    Palestinian territory and outside the Palestinian territory.

3    Q.  Thank you.  So if I understand correctly, the GIS has

4    contact with entities or agencies outside of the Palestinian

5    territory, as well as within the Palestinian territory; is that

6    right?

7    A.  Yes, sir.

8    Q.  And during the period of the Second Intifada, then your

9    work was with the PSS, as you said?

10        MR. YALOWITZ:  Object to the leading, your Honor.

11   A.  Yes --

12        MR. YALOWITZ:  I object to the leading.

13        THE COURT:  I'll allow him to answer that question,

14   but you can be a little less leading.

15   Q.  I didn't hear the answer, sir.

16   A.  Yes.  I was in the Preventive Security.

17   Q.  And what duties did you have at the PSS during the period

18   of 2000 until 2004?

19   A.  The main task of the Preventive Security services between

20   2000 and 2004 was to work in order to establish, again,

21   stability and security, and to combat violence and terrorism,

22   and trying to establish and create an appropriate political

23   environment.

24        MR. ROCHON:  Would either the witness or the

25   translator like a bottle of water?

f29esok2                         Faraj - direct

1              If I may, your Honor.

2              THE COURT:  Yes.

3              MR. ROCHON:  Thank you.

4    Q.  If you could please tell me, what was your actual title in

5    the year 2000 in connection with your work at the PSS?

6    A.  I work -- I don't know Arabic in English.  It's call ra'ed.

7    And then a higher rank than ra'ed, and then colonel, then

8    higher rank than colonel.  And in the year 2000 I was holding a

9    title moqaddam.

10   Q.  That title, the word you just said, what's the level just

11   below that?

12   A.  The one above that is colonel.

13   Q.  Thank you.  Did you have a regional responsibility in the

14   year 2000?

15   A.  I was the director of Preventive Security until the

16   beginning of 2000.  Then after that I moved and became the

17   director of the Preventive Security in Hebron.

18   Q.  And as of --

19   A.  In Hebron district.

20   Q.  And as of 2004 what was your -- what were your

21   responsibilities in the PSS?

22   A.  After I left Hebron I became the director of Preventive

23   Security in Ramallah.  Then I went to -- to Jericho, sorry --

24   Jericho, Ramallah and the suburbs of Jerusalem.  And this is

25   from 2003 until 2004.

f29esok2                           Faraj - direct

1   Q.  Now, you said you began with the PSS in 1994.  When was the

2   PSS actually created?

3   A.  Preventive Security was established in 1994 after the Oslo

4   Accords were signed.

5   Q.  And in connection with your work at the PSS, did you ever

6   receive training?

7   A.  Yes.  We received training at the beginning for our work.

8   Q.  Did you ever receive training from any outside countries?

9   A.  Yes.

10  Q.  From which countries did you personally receive training or

11  did the men of your command receive training?

12  A.  I was trained in the USA, in France, UK and Egypt.

13  Q.  And what was the nature of the training that you received

14  in the US, in France, the UK and Egypt?

15  A.  At the beginning the training was inside the Palestinian

16  territory.  It was not in the USA or in France or UK or Egypt.

17  And basically it was training about security operations.

18          Correction.  Yes, no training in the USA, in France

19  and the UK.  It was inside the Palestinian territory, the

20  training.  But, yes, in 1994, I went to Egypt for training.

21  Q.  Was any of the training that was conducted inside the

22  Palestinian territories provided by US, French or UK military

23  or police?

24          MR. YALOWITZ:  Object to the leading.

25          THE COURT:  Overruled.

f29esok2                    Faraj - direct

1    Q.  You may answer the question.

2              INTERPRETER:  Could you please repeat the question.

3    Q.  Sure.  Was any of the training that was conducted inside

4    the Palestinian territory provided by the US, UK or French

5    military or intelligence?

6    A.  Basically the training was how we can establish and build a

7    security structure.  Then the training was how to become

8    security officers, how to get information, how to collect

9    information, then how to determine the objectives, the threats

10   facing our country.

11   Q.  I asked my question poorly, so let me rephrase it.  The

12   trainers that you had, were any of them from outside the

13   Palestinian services?

14   A.  Yes, indeed.  These three countries, USA, France and UK,

15   they sent trainers to train the Palestinian officers.

16   Q.  The work of the PSS military intelligence and GIS, has any

17   of that work that you have conducted in your career been

18   directed by the PLO?

19   A.  As a matter of fact, it was done for the Palestinian

20   National Authority, but these agreements were reached in --

21   within the accords that were signed with the Palestinian

22   Liberation Organization, but the main responsibility, the main

23   responsibility for the -- for these training, for these

24   actions, for my work was with the Palestinian national

25   authorities.

f29esok2                        Faraj - direct

1    Q.  And was any of your work with the PSS military intelligence

2    or GIS directed by Fatah, the political party?

3    A.  As a matter of fact, these services, the PSS, GIS and

4    general intelligence, they work for -- I mean, to ensure the

5    security, to order and stability.  They have nothing to do with

6    political factions.  These are structures separate.  They have

7    nothing to do with political factions.

8    Q.  Other than the role of the PLO in signing the Oslo Accords,

9    does the PLO otherwise direct or supervise or manage the

10   security or intelligence services that we're talking about?

11   A.  The PLO is a political structure, but Palestinian National

12   Authority is the legal one.  It is the one that runs things in

13   terms of law in Palestinian territory.

14   Q.  Where does the Palestinian Authority have authority to

15   operate geographically?

16   A.  In accordance with the Oslo Accords, the Palestinian

17   National Authority, they work in the West Bank and in the Gaza

18   strip.

19   Q.  Pursuant to those accords does the Palestinian Authority

20   have any offices elsewhere than the West Bank or Gaza?

21   A.  Its role and authority is limited to West Bank and Gaza

22   Strip only.

23   Q.  And just I want to be perfectly clear, because its role and

24   authority is limited to those places, does it have any offices,

25   the Palestine authority, anyplace other than those two places?

f29esok2                        Faraj - direct

1   A.  Certainly, no.

2   Q.  I should let the translator know that if you need to switch

3   with your colleague at any point, that's up to you two.  We

4   don't tell you when to do it.  It's your call.

5          Sir, I'd like to ask you, in 2003 how many employees

6   were there in the overall security and military and

7   intelligence forces of the Palestinian Authority?

8          MR. YALOWITZ:  Objection.  Lack of personal knowledge.

9          THE COURT:  No.  Overruled.  But on that basis, are

10  you talking about in a particular agency?  You gave three

11  agencies.  Which one are you talking about?

12         MR. ROCHON:  I'll ask a better question, your Honor.

13  Q.  Looking at all of the security, intelligence and police

14  forces in the West Bank and Gaza of the PA, how many total

15  personnel were there in 2003?

16         MR. YALOWITZ:  I have the same objection, your Honor.

17         THE COURT:  Overruled.  He can answer.

18  A.  In 2003 the number was between 38,000 to 40,000.

19  Q.  And do you know how many total employees there were in the

20  Palestinian Authority in that time period?  And that's 2003.

21  A.  Almost 100,000.

22  Q.  I'd like to turn your attention specifically to the period

23  of 2000 to 2004.  That was the period that is associated with

24  being called the Second Intifada, is that right?

25         MR. YALOWITZ:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

f29esok2                         Faraj - direct

1    A.  Correct.

2               MR. YALOWITZ:  Leading the witness, your Honor.

3               THE COURT:  Overruled on this preliminary.

4    Q.  Can you please tell us what your specific role and duties

5    were in that period regarding terror activities.

6    A.  I can speak in general.  I cannot go in details due to the

7    confidentiality of the matter.  Actually, during those years we

8    have two main tasks.  The first one was how to combat terrorism

9    and violence and to control it.  And the second was to try to

10   create a stable situation sort of in order to bring back the

11   political negotiations.

12   Q.  I'm going to give this translator water and she'll know

13   it's hers because there's no label on this one.  The other

14   translator can have his back.

15              Sir, if you could tell me, please, who did you report

16   to directly in the period -- if it's more than one person, tell

17   us -- between 2000 and 2004?

18   A.  I used to report to the chief or head of the PSS, Jibril

19   Rajjoub.

20   Q.  And was that for the whole period of 2000 to 2004?

21   A.  From the period between 2000 until July 2002 I was

22   reporting to Jibril Rajjoub, and after that until -- from that

23   period until July 2003, I was reporting to Zuhair Manasrah, who

24   became the chief of the PSS.  And after that until 2003 -- from

25   2003 to 2004 was Ziad Habreeh.

f29esok2                    Faraj - direct

1   Q.  Did you ever meet with Yasser Arafat during that period?

2   A.  Yes.

3   Q.  In the course of your meetings with Yasser Arafat during

4   that period did you ever discuss issues of terror?

5   A.  Yes.

6   Q.  During that period of 2000 to 2004 how frequently were you

7   in meetings or discussions with colleagues regarding issues

8   related to terror?

9   A.  At least more than ten times.

10  Q.  Ten times in the course of what period?

11  A.  Our meetings were held according to -- when the

12  circumstances allowed.  So it was -- mainly we held those

13  meetings between 2001 to 2002 and from late 2003 until the mid

14  of 2004.  That was due to the difficulties of transportation

15  and movement between --

16          MR. YALOWITZ:  Objection.

17  A.  -- between -- for the --

18          MR. YALOWITZ:  Objection.  I have an objection.

19          THE COURT:  Let him finish the answer.

20  A.  From Ramallah -- between the areas and Ramallah.

21          THE COURT:  I'll let that answer stand.

22  Q.  Sir, during the period of 2000 to 2004 did the PSS ever

23  coordinate its efforts in regard to combating terror with

24  Israel?

25  A.  Yes.

f29esok2                         Faraj - direct

1   Q.  Did the PSS ever coordinate those efforts with individuals

2   from the United States?

3   A.  Yes.

4   Q.  Did you have communications with individuals in the

5   securities apparatuses of Israel and the United States during

6   that period?

7   A.  Yes.

8         THE COURT:  Mr. Rochon, you're going away from the

9   mic.  Could you just point it more in your direction?

10        MR. ROCHON:  I'm sorry.

11  Q.  How frequently did you meet with representatives of the

12  United States or Israel during that time period on issues

13  related to combating terror?

14  A.  Hundreds of times.

15  Q.  And in those hundreds of times that you met with them, can

16  you give us a general sense of the nature of those

17  communications or meetings?

18  A.  In general, I can.  In general I would say most of these

19  meetings were on how to control and stop and prevent and combat

20  terrorism and extremism and how to go back to negotiations.

21  And of course in such meetings the main thing we do is exchange

22  information.

23  Q.  In terms of the exchange of information -- again, please

24  speak at a general level -- could you give us a sense of what

25  kind of information you or people acting at your direction

f29esok2                    Faraj - direct

1   shared with the US or Israel?

2   A.  In general we used to give them information that -- we used

3   to give them information that used to help in preventing either

4   violence or terrorism.  Or they used to give us information

5   related to people suspicious of -- that may be suspicious of

6   carrying out some extremist or terrorist acts.

7   Q.  I'd like to ask you, sir, during the period of the -- that

8   we're talking about, 2000 to 2004, did you personally have

9   involvement in efforts to stop specific terror activities?

10  A.  Yes.

11  Q.  Was there danger involved in those activities?

12  A.  Certainly.

13  Q.  Can you please give the jury a sense of what kinds of

14  activities you or the men under your command engaged in that

15  were specific efforts to stop terrorist activities that

16  involved potential danger to you or the men under your command.

17  A.  In late 2001 we tried to arrest a group of people who were

18  affiliated with Hamas.  They were in Hebron.  During that time

19  they clashed.  There was an armed clash.  One person was

20  injured.  He was an officer.  And another one was martyred.

21  Q.  When you say "injured," what do you mean?

22  A.  A bullet shot -- it was shot on his leg.

23  Q.  And when you say that another was martyred, just for the

24  benefit of the jury, what do you mean specifically?

25  A.  He was killed.

f29esok2                    Faraj - direct

1   Q.  And the two individuals you're talking about, the one that

2   was shot in the leg and the one that was killed, were they

3   members of the security services or Hamas in this specific

4   incident?

5   A.  Both persons were officers in the PSS.

6   Q.  Sir, how often during the period that we're talking about,

7   2000 to 2004, were PSS officers shot, either killed or wounded,

8   by militants that they were trying to arrest?

9   A.  At that time there was a lot of attacks against the PSS and

10  other security apparatuses.  And many officers and many

11  employees at these apparatuses were attacked.  And actually,

12  some of them were -- their families were threatened and -- or

13  their houses were burned down.  That happened all over the

14  governorates of West Bank, including some centers or

15  headquarters that were -- went under attacks of either bombs or

16  other kind of attacks.

17            MR. YALOWITZ:  Your Honor, I object to the long

18  narrative answer.  I think if we could have a more focused

19  question, we would appreciate it.

20            THE COURT:  I'm going to let that answer stand.

21            What's your next question?

22  Q.  And I want to be specific here.  I'd like you to make sure

23  that as you answer this question, you focus on actions done by

24  Palestinian militant groups.

25            That last answer you gave, was that a description of

f29esok2                    Faraj - direct

1    activities they engaged in?  Please just say yes or no.

2              INTERPRETER:  Would you please repeat that?  I'm

3    sorry.  Sir, would you please repeat that.

4    Q.  I just want to be --

5              THE COURT:  I think it's on the screen there.

6              MR. ROCHON:  I'll re-ask it.

7    Q.  I just want to be very clear, General Faraj, that last

8    answer you gave, I want to focus specifically on actions

9    engaged in by Palestinian militants or militant groups.  Was

10   that what the last answer related to?

11   A.  Yeah, it was.

12   Q.  And what kind of groups were engaged in those actions

13   against the Palestinian security forces?

14             MR. YALOWITZ:  Object to the overbreadth, your Honor.

15   Object to the overbreadth.

16             MR. ROCHON:  I'll rephrase it, if it makes it easier.

17             THE COURT:  I'm going to sustain the objection.

18   Rather than what kind --

19   Q.  Were there specific factions that engaged in those

20   activities?

21             MR. YALOWITZ:  It's the same objection, your Honor.

22             THE COURT:  Overruled.

23   A.  There were factions and individuals or individuals who

24   actually formed groups.

25   Q.  What was, sir -- I'm trying to against a sense from you

f29esok2                         Faraj - direct

1    what the conditions were like on the ground in the West Bank

2    during this period?

3            MR. ROCHON:  That's not a -- I'm just orienting the

4    witness and not asking a specific question.

5            THE COURT:  Why don't you give him the question,

6    because if you give her too many words, she's got to translate

7    it all.

8            MR. ROCHON:  Thank you, your Honor.

9    Q.  Sir, what was the overall security situation in the West

10   Bank at that time?

11           MR. YALOWITZ:  Objection.

12           THE COURT:  Sustained as to the broad --

13   Q.  Don't answer.

14           Sir, can you give us, please, an estimate of how many

15   Palestinian security or police personnel were injured or shot

16   by Palestinian militants or individuals during the period of

17   2000 to 2004?

18           MR. YALOWITZ:  Objection.  Overbroad.

19           THE COURT:  Overruled.

20           MR. YALOWITZ:  Lack of personal knowledge.

21           THE COURT:  Overruled.

22   BY MR. ROCHON:

23   Q.  You may answer.

24   A.  Those who were injured, their numbers exceed the hundreds.

25   However, the killing cases where kind of less, or a few.

f29esok2                         Faraj - direct

1    Q.   Thank you.

2              MR. ROCHON:  Your Honor, at some point if the Court is

3    going to take a morning break --

4              THE COURT:  You want to do it now?

5              MR. ROCHON:  That might be helpful.

6              THE COURT:  Ladies and gentlemen, don't discuss the

7    case.  We've been over it.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

f29esok2                        Faraj - direct

1            (In open court; jury not present)

2            MR. ROCHON:  Your Honor, the next area of inquires is

3    one that I think is entirely proper but I want to raise because

4    Mr. Yalowitz may disagree with me.

5            I've confined the questions so far to the impact on

6    the security apparatus of Palestinian activates militants.  The

7    next phase of the direct examination would go to the impact on

8    the securities service's ability to function because of the

9    actions of Israelis, frankly.  I can do that without any

10   pejorative information.  This is already in exhibits that

11   plaintiffs have put --

12           THE COURT:  What is it that you're trying to elicit

13   from this witness?

14           MR. ROCHON:  There was substantial destruction to the

15   security infrastructure as a result of incursions by the

16   Israelis into the West Bank, both physically and through fire,

17   beginning very early in this period that this witness has

18   actual knowledge of and was aware of.  That impact on the

19   security infrastructure is discussed by the United States in

20   one of the PLOCCA reports that's already in evidence, and, in

21   fact, I've already used in cross-examination, that discusses

22   this fact and the deterioration of the ability of the PA to

23   engage in security activity.

24           THE COURT:  And what are the things that you say that

25   you want to elicit that have that effect?

f29esok2                         Faraj - direct

1          MR. ROCHON:  Destruction of all the police buildings

2   and security buildings such that they had no place to go to

3   work, and if they did go to work, they could get killed.

4          THE COURT:  Well, I'm not sure I understand the latter

5   part; if they went to work, they would get killed.

6          MR. ROCHON:  Because there were rocket attacks on

7   police stations by the Israeli army and rocket attacks to

8   destroy prisons.  There was several Palestinian police officers

9   and prisoners were killed in a rocket attack on a prison during

10  this period.  And this is not -- this is known facts.  You can

11  talk about relevance, but it's covered in materials already in

12  evidence.

13         THE COURT:  Which exhibit is it covered in?

14         MR. ROCHON:  I believe it's 635.  Exactly, 635, page

15  six.

16         THE COURT:  Which paragraph?

17         MR. ROCHON:  Paragraphs are going to be a little bit

18  of a problem for me.  I can have it pulled up for me here, your

19  Honor.

20         MR. YALOWITZ:  It doesn't say all the buildings were

21  destroyed.  It doesn't say there was a rocket attack on a

22  prison.  You know, this is exactly the kind of shenanigans that

23  we've talked about ad nauseam.

24         MR. ROCHON:  If it was shenanigans -- all that

25  stuff --

f29esok2                        Faraj - direct

1          THE COURT:  You can debate that over your break, but

2     why don't you give me some relevant evidence so I can make a

3     determination.

4          MR. ROCHON:  In addition the ongoing violence in

5     Israel's retaliation against PA security --

6          THE COURT:  I'm sorry.  Where are you reading from?

7          MR. ROCHON:  It's on the screen, your Honor.

8          THE COURT:  Where are you reading from?

9          MR. ROCHON:  Middle paragraph, security.  It's

10    highlighted in yellow.  And it describes the profoundly

11    negative effect on the ability to PLO and remaining security

12    forces to carry out their security responsibilities.

13         Now, I didn't put that into evidence.  I actually

14    objected to it and didn't win.  The plaintiffs put that into

15    evidence.  And this witness' testimony only fleshes that out.

16         THE COURT:  Well, let me give you this guidance at

17    this point.  And I think it's consistent with at least one or

18    more rulings that I've already made.

19         To the extent that evidence has been put before this

20    jury or you want to put evidence before this jury that the

21    security forces could not effectively operate because buildings

22    had been destroyed or because there was rocket fire that

23    prevented people from coming to work, I believe that that

24    testimony is relevant.  I believe it is admissible.

25         I believe no more than that is relevant or admissible.

f29esok2                    Faraj - direct

1    Their argument is they were coordinated activities that were

2    going on that they could have or should have or should not have

3    taken certain actions.  To the extent that your defense is that

4    they were in no condition to be able to effectively take those

5    actions, I think that the fact that -- if it is a fact, the

6    fact that there is no building to work in and there are no

7    records and there's lack of communication because of the

8    violence that was taking place, I think that is relevant.

9            Now, whether or not -- I don't think that -- again, I

10   can protect the plaintiffs from the jury understanding or

11   knowing that some of this was as a result of rocket attacks or

12   other activity by the Israeli military.  That's out there, and

13   I think that that fact is what it is.  Beyond that, I'm not

14   sure where you want to go with it.

15           MR. ROCHON:  That only just goes to what you said.  In

16   fact, I've instructed the witnesses to do their best to

17   describe impact on Palestinian functioning as opposed to

18   focusing on who did it.  And I kind of see the line that the

19   Court has asked us to draw in this regard to try to do that.

20           Now, sometimes it's harder than others, but these

21   witnesses I think really do get that.  We have worked very hard

22   to make sure they get it; that fundamentally the issue in this

23   trial is not what Israel did or did not do, but, rather, what

24   the state of the Palestinian's political and security

25   infrastructure was at the time in terms of its ability to

f29esok2                    Faraj - direct

1    function.  And I think these witnesses get it.  I only raise it

2    because I knew --

3                THE COURT:  I understand.  I think it's appropriate to

4    raise.

5                MR. ROCHON:  I think we're exactly where you want to

6    be -- I don't need to reinstruct the witness, let me tell you

7    that.

8                THE COURT:  Mr. Yalowitz?

9                MR. YALOWITZ:  So I just have three concerns, and I'll

10   just tell them to you.

11               The first is we saw early in this trial Mr. Hill

12   crossing the line, going way overboard.  I think you correctly

13   upheld the objections about trying to bring Israel -- drag the

14   state of Israel policies into the case, putting the State of

15   Israel on trial.  I think the Court correctly has admonished

16   the defense, and I'm alert to the fact that they've crossed the

17   line once already.  So I'm on heightened alert because of that

18   violation of the Court's prior orders, number one.

19               Number two, I'm quite concerned that what this witness

20   is doing is speaking in very vague generalities.  You know,

21   during the relevant years, he was a midlevel security official.

22   And he can talk about, as if Mr. Rochon asked him, what did he

23   do?  What did the men under his command do?  But when he starts

24   going into, you know, what did the security forces do, how did

25   the security forces function, he has no basis to know that.

f29esok2                    Faraj - direct

1    He's sitting in Bethlehem doing his work.  He doesn't know

2    what's going on in the Mukataa.  He doesn't know what's going

3    on in some other agency.  He's not in charge of Tawfiq Tirawi

4    or any of these other guys.  So I have no problem with him

5    talking about, was his building destroyed, was his paycheck

6    interrupted; that seems perfectly legitimate.  He knows, and he

7    can talk about it.  He's a fact witness.

8            But when he starts talking about all the buildings

9    were destroyed, I mean, it's like saying all the buildings in

10   New Jersey were destroyed.  How does anybody know that?

11           THE COURT:  Well, plenty people would know that.  You

12   can't say that nobody would ever be in a building who could

13   testify to that.  All they have to do is go to Jersey.

14           So the reality is, with regard to your second point, I

15   don't accept that point.  I understand your objections in that

16   regard, but that's subject to cross-examination.  If you think

17   that he's testifying to things that he doesn't have any basis

18   on which to testify, I don't have a basis to conclude that at

19   this point.  If he says the buildings were destroyed, I don't

20   know -- you want me to assume that he doesn't know the

21   buildings were destroyed.  I don't assume that.  I assume he

22   does know the buildings have been destroyed.

23           MR. YALOWITZ:  I think they need to give a foundation,

24   but I understand your views.

25           THE COURT:  If you think that he is testifying to

f29esok2                        Faraj - direct

1    something that he has no basis to know, then you can

2    cross-examine him on that and demonstrate that that's beyond

3    his knowledge.  But so far there's nothing that he has said

4    that naturally I would assume he doesn't know.

5            MR. YALOWITZ:  Okay, fine.  I understand.

6            The third thing -- and this is really surprising to

7    me, and it concerned me -- you know, Mr. Rochon, I have a very

8    high respect for him.  His skill set as a lawyer is very high.

9    I'm really surprised that he's leading this witness as tightly

10   as he is.  This is direct examination.  And, frankly, I just

11   think that --

12           THE COURT:  That's an unrelated issue.  Look, this is

13   my position:  With regard to preliminary matters that are not

14   generally in dispute, I give a certain amount of leeway,

15   particularly with regard to a witness who is obviously

16   testifying through an interpreter and the communication doesn't

17   always seem to be as clean as it might otherwise be.

18           If there's something that you believe, as we used to

19   say when we were kids, that he's put words into the witness'

20   mouth, then that's what I'm listening for.  So I don't want him

21   to say it the way he wants to hear it.  I want the witness to

22   say it the way the witness would characterize it.

23           So I understand the nature of your objection.  I agree

24   with you that Mr. Rochon has probably been more leading than he

25   needs to be.

1            Mr. Rochon, I would just ask that --

2            MR. ROCHON:  I'm doing it partly because they object

3    to general things, because he might say stuff they don't like.

4    I'm being whipsawed, because if I ask a general question, he

5    jumps up and says, we don't know what he's going to say now.

6            THE COURT:  Well, as I said, I can't help you with

7    being whipsawed.  You've got to pick one and reject the other.

8    That's the only thing I can do for you.

9            MR. ROCHON:  I'll open it up.

10           THE COURT:  If their main objection is that you're

11   leading, then be less leading and let the witness answer the

12   question.

13           But, again, he's right in one sense, Mr. Yalowitz.

14   You can't on the one hand object -- I shouldn't say it because

15   there are -- on the one hand, he's either being leading or the

16   other hand, you're objecting that the witness is giving you a

17   narrative answer.

18           The better way to do that is to, Mr. Rochon, focus his

19   questions, to make them -- to put less information in the

20   question and to put fewer words in the question and ask for a

21   limited amount of information within each question.

22           MR. ROCHON:  I'm happy to do that.  I think

23   Mr. Yalowitz should choose the other course, because I'm not

24   saying this witness is going to break any rules, but, you know,

25   it's hard when they're walking a line, they're going to obey

f29esok2                          Faraj - direct

1      the Court's rulings.  I'm trying to keep this focussed so that

2      we stay within the parameters.  And if he wants more open-ended

3      questions, I know how to do that, too.

4                  MR. YALOWITZ:  I don't want open-ended questions.  I

5      want focused questions that are not leading.

6                  THE COURT:  You guys are talking to each other, not to

7      my reporter or me.

8                  So the bottom line is, look, I don't have to give you

9      guys a lesson in examination.  You know what the rules are.

10     Follow the rules.

11                 Now, back to the issue again that we first addressed,

12     that's the nature of my approach to this, that, Mr. Yalowitz,

13     you can't argue that they had an ability to do all these things

14     that you say they should have done to try to prevent terrorism,

15     when they say that they had a structure that was of violence

16     and it was difficult for them to do that.

17                 Now, that is not a commentary on the political

18     situation or whether that Israel rightly or wrongly, you know,

19     destroyed a building.  If you have some information you want to

20     elicit to demonstrate that, you know, there was some good

21     reason for a certain attack, then I'll consider whether that's

22     an issue.  But I don't think that we need to go that far.

23                 But as I said, the information is out there.  There's

24     no reason for this jury -- for me to try to protect from this

25     jury the fact that there was a general violent conflict going

f29esok2                          Faraj - direct

1    on, and at least efforts by Israeli government to combat

2    terrorism and, in those efforts, those efforts also resulted in

3    military actions taken by the Israeli government, and some of

4    those military actions, as all military actions, have

5    collateral damage.  Okay?  And that's basically it.  To the

6    extent, no more, no less, that I think is relevant on that

7    point.

8          MR. YALOWITZ:  So, look, let me just say, I understand

9    the ruling, and I really don't want to reargue it.  I think

10   you've drawn a line that neither side is happy with, which you

11   see there's a theme that has developed in that regard.

12         The one thing is this is no longer a negligence case.

13   This is an intentional tort case.  And I think it's a

14   recklessness case.  If there is a specific act of recklessness

15   or intentional conduct that the defendants have evidence to

16   explain away, that's one thing.  But to say to this jury, you

17   know, the whole place was in chaos and, therefore, we had no

18   control over anything and not have anybody with specific

19   personal knowledge of why a particular individual was let out

20   on the street --

21         THE COURT:  Then he can't testify with regard to why a

22   particular individual was let out.

23         MR. YALOWITZ:  I just want to be very clear that I

24   understand you're giving the defendants some leeway here, but

25   we have to be very clear that there is a limit and that they're

1    not to argue from sort of general chaos to a specific example,

2    when there are people with specific knowledge that they have

3    chosen not to bring to this Court.

4            THE COURT:  Well, the only thing factually that was at

5    issue, and even an issue previously at other points in this

6    trial, was whether or not the headquarters of the PA were in

7    such condition as made it difficult for them to manage their

8    responsibilities.  That's the issue.  That's all an issue that

9    the jury is going to -- on this record so far is going to be

10   concerned about.  How parties want to argue about that and

11   argue about whether or not that's a good excuse or not a good

12   excuse for what they did or didn't do, I think that's still

13   within the jurors' purview.  And I think on this record so far

14   it is sufficient.  And I will very carefully observe the nature

15   of the questions and the number of questions on this issue to

16   make sure it doesn't cross over a line that I've drawn.

17           MR. ROCHON:  Okay.  When would you like us back?

18           THE COURT:  Take five minutes.

19           (Recess)

20

21

22

23

24

25

F298SOK3                    Faraj - direct

1              MR. YALOWITZ:  After we broke one thing was brought to

2      my attention which is of concern to me.  I am facing forward at

3      the front of the courtroom so my team and I are unaware of it,

4      but I am informed that there is some signaling going on, head

5      shaking and other things, by some of the perhaps nonlawyers on

6      the defense team.  I just ask that that kind of body language

7      not take place in the courtroom.  I don't think it's

8      appropriate at any time, but particularly when there is a

9      witness on the stand.

10             THE COURT:  I will simply say for all of the parties

11     and the lawyers that they should restrain their body language.

12             MR. YALOWITZ:  Right.  Thank you.

13             MR. ROCHON:  None of those people are in the courtroom

14     right now.

15             MR. YALOWITZ:  Maybe Mr. Rochon can counsel with his

16     client on that topic.  They are also behind him I think.  He

17     may not be aware of it either.

18             THE COURT:  Let's continue.

19             MR. ROCHON:  As we do so, this witness has also been

20     arrested and has served time in Israeli prisons and I was going

21     to ask him if that happened and for what.

22             THE COURT:  What do you anticipate his answer to be?

23             MR. ROCHON:  That he was several years in prisons in

24     different time periods for a variety of activities, protest

25     activities, being a member of Fatah, raising Palestinian flags.

F298SOK3                         Faraj – direct

1    It goes both to his personal experience and it also goes to one

2    of the security events that can be prosecuted in the military

3    courts.

4              THE COURT:  Mr. Yalowitz.

5              MR. YALOWITZ:  I don't think his prison record is

6    relevant.  I was not planning on asking him about it, and I

7    think having him extemporize about what he was in prison for in

8    the 1970s or 80s, whenever he was in prison, really is totally

9    irrelevant to the time period in question.

10             THE COURT:  I am going to exclude it.

11             Can we get the witness?

12             MR. ROCHON:  Just one thing, if I may.

13             Now would be a good time to remind everyone in the

14   audience that it's not helpful to shake their head even if they

15   think the translation is slightly off.  I can usually sense if

16   that's an issue and clear it up with the question.  I just want

17   the people in the audience not to react to that or anything

18   else.

19             THE COURT:  Thank you.

20             Let's get the jury.

21             (Continued on next page)

22

23

24

25

F298SOK3                         Faraj - direct

 1              (Jury present)

 2       MAJED FARAJ, resumed.

 3              MR. ROCHON:  May I proceed, your Honor?

 4              THE COURT:  Yes, sir.

 5              MR. ROCHON:  Thank you.

 6       BY MR. ROCHON:

 7       Q.  Sir, I would like to ask you about the capacity of the

 8       security infrastructure during the Second Intifada.

 9              What was the ability of the security infrastructure to

10       do its job during the Second Intifada?

11              MR. YALOWITZ:  Objection.  Overbroad.

12              THE COURT:  Sustained.

13       Q.  Sir, could you give us a sense of whether there were any

14       limitations or challenges faced by the security infrastructure

15       during the period of 2000 to 2004?

16              MR. YALOWITZ:  Same objection.

17              THE COURT:  Overruled.

18              You can answer.

19       A.  When?  What period?

20       Q.  2000 to 2004.

21       A.  The conditions from 2000 until 2004 changed a lot.  First

22       of all, at the level of the headquarters, they were destroyed.

23       In the areas we were working there was difficulty to reach from

24       one part to another.  There was difficulty in the movement of

25       officers.  And there was difficulty in undertaking our tasks

F298SOK3                    Faraj - direct

1    and duties.

2    Q.  You described the difficulty in movement.  I want to turn

3    to that for a second.

4          The jury has heard about an area A, area B and area C.

5    What authority did the security or police or intelligence

6    apparatus have to operate at all in area C?

7    A.  No authority whatsoever for Palestinian authorities over

8    the area C, whether military or civilian.

9    Q.  Why was that?

10   A.  This is part of the agreements that were signed after the

11   Oslo Accords between Israel and the PLO.

12   Q.  What ability did the Palestinian intelligence or security

13   police apparatus have in area B?

14   A.  Area B was under the Palestinian civilian authority, and

15   some police centers were allowed to be also in area B.  As for

16   security matters, the authority was in the hand of Israel.

17   Q.  As to area A, what was the circumstance under the Oslo

18   Accord?

19   A.  Full civilian and military authority was under the control

20   of the Palestinian Authority.

21         MR. ROCHON:  Justin, if you could bring up Exhibit 75,

22   please.

23         This is already in evidence, your Honor, and it should

24   be on the screen before the witness.

25   Q.  General Faraj, could you please have a look at Defense

F298SOK3                          Faraj - direct

1   Exhibit 75 and familiarize yourself with it?

2   A.  Yes, sir.

3   Q.  Do you recognize that?

4   A.  This is the map of the West Bank.

5   Q.  I see that there is three different colors within the map,

6   some of it green, some of it light brown I guess, and some of

7   it -- I don't know what color that is -- burnt orange.  Do you

8   see that?

9   A.  Yes.

10  Q.  Can you tell us what corresponds, if at all, to those three

11  different colors, what they represent?

12  A.  This is in accordance with the division of areas into A, B

13  and C.  The largest part is C area, the light brown is area B,

14  and the orange one is area A.

15  Q.  In terms of the authority of the security apparatus or law

16  enforcement apparatus, did it have any authority to investigate

17  or act in Jerusalem?

18  A.  If you're talking about Jerusalem within the wall, the

19  Palestinian Authority has no authority whatsoever over that

20  area in terms of civilian, military, whatever, anything at all.

21  But some of the villages around Jerusalem fall within area B,

22  and hence, the same thing applies to them as they apply to area

23  B in other areas.

24  Q.  That same thing that applies to them is that there's

25  civilian authority but not security authority in area B?

F298SOK3                        Faraj - direct

1    A.  Yes.  But some areas in area B, there are offices for

2    civilian police.

3    Q.  Now, what I would like to ask you about is how the

4    situation under the Oslo Accords in area A and B was affected

5    during the Second Intifada period?

6              MR. YALOWITZ:  Objection.  Overbroad.

7              THE COURT:  What is your question?

8              MR. ROCHON:  I will rephrase it.  I can never remember

9    exactly how I asked it.

10             THE COURT:  I am not sure if it was even a question.

11   Q.  If I could, sir, was there any impact on the ability of the

12   Palestinian Authority to exercise its security or enforcement

13   authority in area A during the period of the Second Intifada?

14   A.  Yes.  By the end of 2001, yes.

15   Q.  Tell us what that was.

16   A.  Yes.  As a matter of fact, during that period, the Israel

17   could enter area A.

18             MR. YALOWITZ:  Objection.

19             THE COURT:  Overruled.

20   A.  And this area was divided into different areas.  And there

21   was some kind of cutting of -- there were obstacles that were

22   established that made movement difficult.

23             MR. ROCHON:  If the translators want to switch, that

24   would be very helpful.

25   A.  Almost at the end of 2002 up till now there is nothing

1    called area A.  Therefore, the areas A, B and C are not the

2    same as they used to be according to the Oslo Accords and other

3    agreements following to that.

4              MR. YALOWITZ:  Objection.

5              THE COURT:  I will let it stand.  Let's move on.

6    Q.  I want to simply ask about any impact in area A during the

7    period of 2000 and 2004.

8              What impacts were there during that period on the

9    ability of the security apparatus to do its job during this

10   period of time?

11             MR. YALOWITZ:  Objection.

12             THE COURT:  Wasn't this asked and answered already?

13             MR. ROCHON:  I did not think so, but I will obviously

14   defer to the Court.

15             THE COURT:  I thought you asked him specifically that,

16   what impact did it have on their ability, and he gave an

17   answer.

18   Q.  Were there police stations in area A during 2000 and 2004?

19   A.  Not the same all police stations.  However, they were

20   renewed and replaced with some offices that kind of do almost

21   the same work.  However, their movements were connected to the

22   areas, to some areas in area A, and that was in coordination

23   with the Israelis.

24   Q.  My question is, first of all, were there police stations in

25   area A?

F298SOK3                          Faraj - direct

1   A.  Yes.  For sure there was before that.

2   Q.  During the period of 2000 to 2004, what were the conditions

3   of those police stations?

4            MR. YALOWITZ:  Objection.  Overbroad.

5            THE COURT:  Just a second.  I am going to sustain.

6   Q.  Where did you operate physically in 2000 to 2004?

7   A.  Until September 2002, I was holding operations in Hebron,

8   and after that I moved to Ramallah.

9   Q.  The place where you worked in Hebron, what was its

10  condition when you left and went to Ramallah?

11           MR. YALOWITZ:  Objection.

12           THE COURT:  Overruled.

13           MR. YALOWITZ:  Relevance, your Honor.

14           THE COURT:  Overruled.  When I say overruled, that

15  means he can answer.

16           MR. YALOWITZ:  I'm sorry.

17  A.  We used to work in a building that contained all the

18  security apparatuses and that building was destroyed in April

19  2002.

20  Q.  When you say destroyed, by what?

21           MR. YALOWITZ:  Objection.

22           THE COURT:  Overruled.

23  A.  This building was very big.  Actually, it was the biggest

24  building in the West Bank and it was destroyed by implanting a

25  huge amount of bombs.

F298SOK3                          Faraj - direct

1    Q.  Are you aware of any other police type buildings in other

2    cities that were affected during this period?

3    A.  Yes.

4    Q.  Please tell us specifically as to any other similar

5    buildings of which you were aware that had such damage.

6    A.   In Bethlehem, the buildings there were destroyed by

7    shelling from F-16.  A number of centers in Ramallah were

8    shelled and destroyed.  The same thing happened in other

9    governorates, like Jenin, Nablus and Tulkarm.

10   Q.  Were there prisons or jails in area A prior to the Second

11   Intifada?

12   A.  Yes.

13   Q.  Were the conditions of those jails or prisons the same

14   during the Second Intifada as they were beforehand?

15              MR. YALOWITZ:  Objection.

16              THE COURT:  Overruled.

17   A.  Definitely, no.

18   Q.  Could you please tell us what happened to the jails or

19   prisons?

20              MR. YALOWITZ:  Objection.  Overbroad.

21              THE COURT:  Overruled.

22   A.  Part of these jails or prisons were within the general

23   buildings, security buildings, and they were destroyed at the

24   same time of destruction of the centers.

25   Q.  You mentioned earlier that there was some destruction in

F298SOK3                        Faraj - direct

1  Nablus and Hebron and the other cities.  Can you give us

2  specific examples of what happened to jails or prisons during

3  this period city to city?

4  A.  For example, in Nablus, there was a well-known prison

5  called Jnaid.  This prison was shelled and the result of that

6  was four officers were killed and two of the prisoners also

7  were killed.

8  Q.  As to any other cities, can you give us specific examples

9  from your actual knowledge?

10 A.  Similar incidents of destruction of prisons did not happen,

11 but there was destruction of other buildings.

12 Q.  Once you reported to your new position in Ramallah, can you

13 please tell us what month and year that was again?

14 A.  I was in that position in the beginning of 2003, and I used

15 to work in Ramallah and rented a new office.  At the time there

16 was nothing but remnants of headquarters because the central

17 headquarters that was in Beitunia actually was exposed to

18 destruction and shelling.

19 Q.  During the period of time we are talking about, where did

20 PSS employees go to work if their buildings had been destroyed?

21 A.  As of 2002 until the middle of 2003, most of the employees

22 were not able to go to work, physically to go to work, simply

23 because there was a lack of movement and the inability for them

24 to reach there.

25 Q.  When you say lack of movement, I would like you to explain

F298SOK3                          Faraj - direct

1    precisely what you mean.  What was the lack of movement?

2    A.  For example, to go from Bethlehem to Ramallah, in the

3    normal circumstances you will need 30, 35 minutes to get there.

4              Under the circumstances I am talking about, and that

5    became new, if you actually were able to get there, you will

6    need more than 24 hours.

7    Q.  Why was that?

8              MR. YALOWITZ:  Objection.

9              THE COURT:  Overruled.

10   A.  That's because of the existence of the Israeli army and the

11   crossings and the separation of these areas.

12   Q.  So if one lived in Bethlehem but one's job was in Ramallah,

13   how would you get to work in that time period?

14   A.  At that time we used to consider the situation.  However,

15   they sometimes used or were able to make it, and I was one of

16   them.  We used to walk across the mountains to get to work.

17   Q.  Are you familiar with something called Operation Defensive

18   Shield?

19   A.  Are we talking about --

20             MR. ROCHON:  May I withdraw and ask another question?

21             THE COURT:  Sure.

22   Q.  The question is, are you familiar with something called

23   Operation Defensive Shield?

24   A.  Are they a different name that we call in Arabic the

25   protective wall?  It's a different name.

F298SOK3                          Faraj - direct

1   Q.  Thank you.  In March of 2002, was there an operation that

2   occurred in the West Bank?

3   A.  Yes.

4   Q.  What did you call that?

5   A.  We and Israelis call it, actually, Operation Defense

6   Shield.

7   Q.  Did that operation make it easier or harder for you to do

8   your work as a PSS officer?

9   A.  This operation ended the work of the Palestinian National

10  Authority and its civilian branches and defensive branches, and

11  all the areas became under the Israeli military authority, and

12  most of the areas were under a curfew.

13  Q.  Sir, in the period of time we are talking about, 2000 to

14  2004, when you were able to exercise your duties, can you give

15  further description of what you personally were doing to resist

16  the militants?

17  A.  First of all, arresting them; second, coordination with

18  Israelis; third, coordinating with the friend countries, like

19  United States of America.

20  Q.  Did anyone from the Palestinian Authority among your

21  supervisors ever restrict you from carrying out your duties?

22  A.  No.

23  Q.  You said that you met with Yasser Arafat.  Were any of

24  those meetings in this period?

25  A.  Yes.

F298SOK3                      Faraj - direct

1    Q.  Were you ever restricted by him or directed by him not to

2    carry out your duties?

3    A.  No.

4    Q.  Did it ever come a time in the course of your duties, or

5    the men under your command, that you arrested people who

6    identified with the political party Fatah?

7    A.  Yes.

8    Q.  Are you yourself a member of Fatah?

9    A.  Yes.

10   Q.  Did you ever restrict the law enforcement or anti-terror

11   work because of what party or faction someone belonged to?

12   A.  I used to enforce the law away from the political factions.

13   Q.  We talked about some of the challenges faced by the

14   security apparatus in this period.  Were there any foreign

15   imposed challenges on your ability?

16   A.  There was some targeting.  Therefore, there were some

17   countries that were assisting some individuals in the West Bank

18   and the Gaza Strip, because these countries, they have some

19   position against the political situation.

20   Q.  When you say these countries, could you be more specific?

21   A.  I'm not sure if I can speak with some extensiveness to

22   explain.

23   Q.  My question to you, if you're able to explain, is, when you

24   say some countries were against the political process, could

25   you please explain which countries and what you mean by the

F298SOK3                        Faraj - direct

1    political process?

2    A.    When I talk about the political process, we are talking

3    about the agreement that started between the PLO and Israel.

4    And this agreement was a bilateral agreement between the PLO

5    and Israel that meant to reach a political solution to end the

6    occupation for the Palestinians, for the territories that were

7    occupied in the year 1967.  And there were some political

8    factions against this agreement, and there were some regional

9    parties that also were against this agreement.  These countries

10    and factions met together and were able to use the Second

11    Intifada in order to make sure that the whole political process

12    is a failure -- Hamas, Jihad Islamic and the popular front, and

13    the outsiders were Hezbollah and Iran.  All these parties were

14    working against the Palestinian Authority, and they were

15    targeting to make sure that this political process is a

16    complete failure.

17    Q.    Did what you just described affect your security services'

18    ability to fight terror in that period?

19    A.    This was part of the threats.  I mean that the threats were

20    bigger than what we think, the circle of the threats were huge.

21    Q.    Sir, can you please give us specific examples of steps that

22    you or men under your command took during that period related

23    to efforts to thwart attacks, stop attacks?

24    A.    Many people were arrested.  There were a lot of arrests at

25    that time.  On the scale of the West Bank, hundreds of people

F298SOK3                         Faraj - direct

1    were arrested.  And at that time I was working in Hebron, or at

2    the time I was working in Hebron, there were a hundred

3    prisoners arrested, their weapons were confiscated, and

4    sometimes some bombs were confiscated as well.

5    Q.  Have you ever heard of something called the Zinni list?

6    A.  Yes.  General Zinni.

7    Q.  Yes.  Did you ever meet General Zinni?

8    A.  Yes.

9    Q.  When did you meet General Zinni?

10   A.  I met him in Ramallah.

11   Q.  In what year?

12   A.  I think 2001.

13   Q.  General Zinni, just for the ladies and gentlemen of the

14   jury who may not know who he is, where is he from?

15   A.  General Zinni is an American general who was sent by the

16   United States in order to help to control the situation, the

17   security situation or circumstances.

18   Q.  In addition to General Zinni, can you give us an idea of

19   what other American security, military or intelligence people

20   you met with during the period 2000 to 2004?

21   A.  At that time I met with Mr. George Tenet.  On a different

22   meeting I met with Secretary Colin Powell.

23   Q.  Others?

24   A.  At that period of time I met with those people.  However,

25   in 2004 I met with some other people in the United States.

F298SOK3                         Faraj - direct

1              MR. YALOWITZ:  Objection.

2              THE COURT:  Overruled.

3              MR. YALOWITZ:  Can we have another question or is he

4      going to continue?

5              THE COURT:  I don't think he is finished answering the

6      first question.

7      A.   As I mentioned before, we were in contact with many other

8      foreign countries.  In addition to the United States, we were

9      in contact with the French, the British and the Germans and

10     many others during that period.

11     Q.   You had begun an answer where you said you met with someone

12     in 2004.  Who was that?

13     A.   In 2004, I met with officials from the CIA.

14     Q.   You mentioned the name George Tenet earlier.  For the

15     ladies and gentlemen of the jury, can you just remind them who

16     George Tenet was in that time period?

17     A.   At that time when I met him, he was in the position or the

18     post of the head of the CIA.

19     Q.   These meetings you had with the individual Zinni and Tenet

20     and Colin Powell in this time period, what was your

21     relationship with those men?

22     A.   Excellent, especially I am talking about the agents in

23     general.

24     Q.   Sir, following those meetings, did the United States cut

25     off relationships between you and senior intelligence or

F298SOK3                        Faraj - direct

1    military officials?

2    A.  We still have until this moment relationships with these

3    institutions.

4    Q.  When you say we have, does that include you personally?

5    A.  Of course.

6    Q.  I am not going to go into all of them, but what I would

7    like to ask you is when was your most recent meeting with

8    senior intelligence or military personnel in the United States?

9           MR. YALOWITZ:  Objection.

10          THE COURT:  Sustained.

11   Q.  I had asked you previously about the Zinni list.

12   A.  Yes.

13   Q.  What was it?

14   A.  It included a group of names for people in the West Bank

15   and Gaza Strip, and the Palestinian Authority was asked to

16   arrest them.

17   Q.  What did you do in response to receiving the Zinni list?

18   A.  Some names were from the governor of Hebron.  They were

19   arrested since they were mentioned on the Zinni list.

20   Q.  Did you decline to arrest anybody on that Zinni list

21   because you didn't want to or for any other reason?

22   A.  I arrested whoever I was able to arrest.

23   Q.  Have you ever heard the term Al Aqsa Martyrs Brigade?

24   A.  Of course.

25   Q.  What was that?

F298SOK3                    Faraj - direct

1    A.   It's a group of individuals.  It's not a political faction

2    and it's not an entity or organization.  They don't have a

3    specific reference.  They are individuals.

4    Q.   Those individuals that you just described, was there any

5    particular activity associated with them under that name?

6    A.   Yes.

7    Q.   Can you give a sense of whether or not you were ever

8    involved in arresting anyone who was supposedly affiliated with

9    that group?

10   A.   Yes.  I arrested some of the individuals, and they are not

11   an organization.

12   Q.   When you say they are not an organization, explain please

13   what you mean by they are not an organization.

14   A.   They don't have a political agenda.  They don't have a

15   structural organization like any other party.  They don't have

16   any economic or social agendas.  And they do not have one

17   leadership.  Therefore, one might find a small group of

18   them -- so one may find in one area different groups of people

19   that each one of them claim they are affiliated to this Al Aqsa

20   Martyrs Brigades.

21   Q.   You have already mentioned Hamas.  Can you describe what

22   the relationship was between the PA security and police

23   infrastructure in Hamas during this period?

24              MR. YALOWITZ:  Objection.  Overbroad, your Honor.

25              THE COURT:  Overruled.

F298SOK3                    Faraj – direct

1   A.   First of all, Hamas has a different political agenda than

2   the PLO has.   Hamas was against any political solution from the

3   beginning and it worked hard to make sure that Oslo Accords

4   become a failure.   Therefore, our relationship with them was

5   more in crisis and we clashed with them.   And, as of 1994, we

6   start arresting members of Hamas, and we were trying all the

7   time to prevent any destructive activity that Hamas may hold.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F29esok4                          Faraj - direct

1   BY MR. ROCHON:

2   Q.  The last attack in this case occurred in 2004.  Can you

3   please tell us what happened as between Hamas and the PA and

4   PLO as of 2007.

5           MR. YALOWITZ:  Objection.

6           THE COURT:  Can we take a break and we'll discuss it?

7           MR. ROCHON:  That sound like a good idea.

8           THE COURT:  Let's take a lunch break.

9           Don't discuss the case.  Keep an open mind.  I'll see

10  you at 2:05, and we'll continue then.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F29esok4                         Faraj - direct

1            (In open court; jury not present)

2            THE COURT:  Mr. Rochon, you're asking about 2004, then

3    you jump to 2007.

4            MR. ROCHON:  2007 was a violent overthrow of by Hamas

5    as against the PA, PLO.  And I think that that oppositional

6    nature between Hamas and our client is quite relevant,

7    particularly in the case where their theory, apparently, on the

8    Hebrew university is that PA and PLO were acting apparently

9    within the scope of employment to assist them.  And so

10   obviously relationship with them is very relevant.  And the

11   fact that it continued to deteriorate to that point in 2007,

12   which is not that long after these incidents, is quite

13   relevant.

14           THE COURT:  Well, as you say, you see a gap there.

15   You're asking him about what happened in 2001 to 2004, and you

16   asked him about Hamas, and then you jumped to wanting him to

17   say that in 2007.

18           MR. ROCHON:  Brief indulgence.  When are we returning?

19           THE COURT:  2:05.

20           MR. ROCHON:  2:05.  Thank you, your Honor.

21           THE COURT:  So you wanted him to jump to an overthrow

22   by Hamas in 2007?

23           MR. ROCHON:  Well, I could, if Mr. Yalowitz or the

24   Court prefers, say, did the relationships continue in that

25   course in subsequent years, and eventually then go to -- and

F29esok4                          Faraj - direct

1   did it eventually reach such a breach there was a violent

2   overthrow?  In 2007 Hamas is throwing Palestinian authority

3   officials from buildings alive in a takeover of the Gaza Strip.

4         My client -- let me finish.  My client is on trial

5   here on a theory of acting in concert with Hamas in connection

6   with one of the incidents.  And apparently the theory is going

7   to be it was within the scope of employment of one of our

8   employees to do so, because if it wasn't, we should get a

9   directed verdict.

10        THE COURT:  Well, yes, but it's the time period that's

11  obviously the first issue.  And then beyond that, I'm trying to

12  figure out where else are you going with this, other than to

13  say that in 2007, that there was a violent overthrow by Hamas?

14        MR. ROCHON:  I want to get to that, how sharp the

15  divide is between the entity that our client is claiming my

16  client acted in concert with and the truth.

17        THE COURT:  So what are the facts that he's going to

18  say that can demonstrate that?

19        MR. ROCHON:  I didn't hear the Court.  I'm sorry.

20        THE COURT:  What are the facts that he's going to

21  testify to that are supposed to demonstrate that?  What is he

22  going to say?  Give me everything you want him to say.

23        MR. ROCHON:  I want him to say, was there a violent

24  overthrow of the PA by Hamas on the Gaza Strip in 2007?

25        THE COURT:  And when you say "a violent overthrow,"

F29esok4                           Faraj - direct

1    what do you mean?

2             MR. ROCHON:  Killing Palestinian authority.

3             THE COURT:  Killing doesn't have anything to do with

4    an overthrow.  You said an overthrow.  What does that mean?

5             MR. ROCHON:  It means they literally ejected the

6    Fatah, the PLO, the structure there.  It rejected it and killed

7    members of -- one of my clients' members.  PLO were being

8    assassinated.

9             THE COURT:  You want to ask him about assassinations

10   of members of the PLO?

11            MR. ROCHON:  I did not think I needed to go that far.

12            THE COURT:  I'm just trying to understand the limits

13   or the extent of what you want to be said.

14            MR. ROCHON:  I want to establish that that breach was

15   strong, and it continued, and it led to --

16            THE COURT:  I understand what you want to do.  I'm

17   just trying to figure out how you're going to get there.  You

18   asked him a question:  What happened in 2007?  If he says there

19   was a violent overthrow of the government structure by Hamas

20   and Hamas took over, then do we go over to a different subject

21   matter, or have you got some other information you want him to

22   testify to?

23            MR. ROCHON:  I'd be done with that.

24            THE COURT:  That's the first answer.

25            And when he says overthrow, they're now -- Hamas was

F29esok4                    Faraj - direct

1    now the government or there was no government?

2                MR. ROCHON:  In the Gaza Strip, Hamas is the

3    government.

4                THE COURT:  Okay.  And in what way do you claim that

5    Hamas was the government?  What functions did they have?

6                MR. ROCHON:  They did a poor job of it, but ostensibly

7    ran the government.  This part is not -- I think everyone

8    agrees they took over the governing structure.

9                THE COURT:  I understand that.  But when you say

10   "overthrow," I'm just trying to figure out what you're

11   trying --

12               MR. ROCHON:  They took over the institutions, ejected

13   members of the PLO from Fatah, killed the ones they could.  And

14   the others tried to flee, if they could, for the most part.

15   That's what the Gaza Strip --

16               THE COURT:  Until when?  Remind me of the history.

17               MR. ROCHON:  Until today.  Until now.

18               THE COURT:  It's not today.  I thought today the PA

19   was the governing authority in West Bank.

20               MR. ROCHON:  There's talk about reconciliation as

21   between the administration, but they haven't formed a

22   reconciliation government.

23               THE COURT:  Is it your position that the PA does not

24   have representatives and is not the international

25   representative of --

F29esok4                        Faraj - direct

1              MR. ROCHON:  In the Gaza Strip.  I'm talking about the

2       Gaza Strip.  The West Bank --

3              THE COURT:  Oh, you're just talking about the Gaza

4       Strip.

5              MR. ROCHON:  Yes.

6              THE COURT:  That's what I wanted to know because --

7       all right.  You're saying that they overthrew the government in

8       the Gaza Strip?

9              MR. ROCHON:  Yes.

10             THE COURT:  You're not saying they overthrew the

11      government?

12             MR. ROCHON:  No, they just --

13             THE COURT:  And you're not saying that that's what

14      happened in the West Bank?

15             MR. ROCHON:  No.

16             THE COURT:  Okay.  So just give me one more time how

17      he's going to answer your question.

18             MR. ROCHON:  I expect --

19             THE COURT:  Give it to me as if you are him.  What is

20      the answer to my question?

21             MR. ROCHON:  That the relations between the PA, the

22      PLO and Hamas reached the point in 2007 that Hamas took over

23      governance in the Gaza Strip and ejected the PLO and tried to

24      eject and/or kill members of Fatah and the PLO, and then

25      usurped the governing powers to itself.

F29esok4                         Faraj - direct

1            THE COURT:  All right.  Mr. Yalowitz?

2            MR. ROCHON:  I don't know if he'll use the word usurp,

3    but --

4            THE COURT:  Okay.

5            MR. YALOWITZ:  First of all, I mean, I think what

6    Mr. Rochon is saying is basically accurate as a matter of fact.

7    My problem with it is it's outside the time period of this

8    case.  We already offered those Intifada diaries to show unity

9    and coordination between Hamas and Fatah during the actual

10   period in the case.  Those were kept out --

11           THE COURT:  But Fatah is not the defendant in this

12   case.

13           MR. YALOWITZ:  I understand, but there's certainly

14   evidence from which a jury could infer that Fatah and the PA

15   and the PLO have the same political agenda.

16           THE COURT:  Okay.  But there's also evidence that they

17   don't have the same political agenda.

18           MR. YALOWITZ:  I understand that.  I'm not rearguing

19   the ruling.  I'm saying --

20           THE COURT:  I haven't ruled yet.  What are you trying

21   to get me to do?

22           MR. YALOWITZ:  Well, I'm saying if -- I think he's

23   opened the door to evidence about coordination between Hamas

24   and the PA and Fatah during the relevant period.

25           THE COURT:  I don't disagree with that, because I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F29esok4                        Faraj - direct

1    don't even think that's the issue we're talking about.  The

2    issue I'm addressing right now is you objected to the question,

3    what happened between Hamas and the -- was it the Fatah or PA?

4    What was your question?

5            MR. ROCHON:  They were -- the PA.

6            THE COURT:  The PA.  What happened between Hamas and

7    the PA in 2007?

8            MR. YALOWITZ:  Right.

9            THE COURT:  Now, that was what you objected to.

10   That's what I'm trying to rule on.

11           MR. YALOWITZ:  My problem is it's beyond the time

12   frame, and it's attempting to gain sympathy for the defendant

13   instead of relevant evidence.

14           THE COURT:  You don't think that it's relevant for him

15   to say that we had a bad relationship, which we had for a long

16   time, that ultimately culminated in their taking over or

17   overthrowing us in the Gaza Strip in 2007?

18           MR. YALOWITZ:  My view is that the relevance is very

19   remote by the time you get to 2007.  It's a different

20   leadership.  Arafat is dead.  Remember, we saw Arafat kissing

21   the head of Hamas when he was alive.  Now Arafat dies.  There's

22   new leadership, and they have bad relationship.  And they wind

23   up --

24           THE COURT:  Remind me when Yasser Arafat died.

25           MR. YALOWITZ:  November of '04.  November 2004.  So,

F29esok4                         Faraj - direct

1    look, my view is whatever probative value it may have is very

2    remote.  And it seems to me that the prejudicial value of

3    trying to get people to feel sorry for the defendants because

4    they can't keep control of their own territory outweighs that

5    remote probative value.

6             THE COURT:  Well, no.  I'm going to agree that there's

7    some limited testimony, and limited to the extent that they

8    have asked the question.  If you had had evidence that in 2007

9    from which you wanted to argue that the relationship between

10   the PA and the PLO and Hamas was such that they were

11   coordinating, good friends, and you wanted to argue that it

12   culminated in a unification or celebration or party or whatever

13   you want in 2007, I'm sure you would be arguing just the

14   opposite; that if there was such evidence that there was a good

15   relationship that culminated in joint celebration, you would be

16   arguing that that would be at least some relevance that

17   outweighs the prejudicial value of being three years later.

18            MR. YALOWITZ:  Well, I'll say this:  They did have a

19   big party in 2014.  And they announced the unity government and

20   Abbas's hand in hand.

21            THE COURT:  He may open the door to that.  I don't

22   know.  I don't know whether or not -- I'm not here to try to

23   analyze what the political situation is or isn't at any given

24   point in time.  I'm just trying to figure out whether or not

25   there is evidence from which this jury could conclude -- and I

F29esok4                         Faraj - direct

1    assume that from the evidence that you've presented -- not

2    assumed; I think it's fairly clear from the evidence that you

3    presented -- that you don't contend that they had a bad

4    relationship right up to 2007.  You contend that they had a

5    good relationship, and at some point after 2004, that

6    relationship deteriorated.

7            Now, whether or not the activities in the Gaza Strip

8    in 2007 is consistent with that or inconsistent with that, I

9    think that's a determination for the jury to make.

10           MR. YALOWITZ:  Sure.

11           THE COURT:  If it makes sense that these people who --

12   I mean, as they say, logic would play a part in assessing

13   whether or not their relationship that you say they had in

14   2004, that it makes sense that they -- the nature of the

15   relationship they had in 2007 and whether or not there was some

16   significant intervening fact, whether it's Arafat's death or

17   some other intervening fact that would make good friends turn

18   into strong enemies.  So I think that limited question is

19   relevant.  I think it's appropriate for a direct response and

20   not a narrative answer.  And not here.  Unless Mr. Rochon wants

21   to pursue that questioning any further, I think that that is

22   relevant evidence for the jury to consider.

23           MR. ROCHON:  In terms of timing, I think there's about

24   30 or 45 minutes of direct left.  I think this will be the

25   longest of the defense witnesses, except perhaps Mr. Robinson,

F29esok4                          Faraj - direct

1    but certainly longer than the next witness, in terms of

2    Mr. Yalowitz's planning, or the Court's.

3             THE COURT:  All right.  Then let's take a break and

4    I'll see you at 2:05.  I have two criminal cases.

5             MR. ROCHON:  Thank you.

6             (Luncheon adjournment)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F29esok4                          Faraj - direct

                              AFTERNOON SESSION

1                                 2:12 p.m.

2          THE COURT:  Are we ready to continue?

3          MR. ROCHON:  Yes.

4          THE COURT:  Bring the witness back.  So let's get the

5   jury.

6          (In open court; jury present)

7          THE COURT:  You can continue, Mr. Rochon.

8          MR. ROCHON:  Thank you.

9   BY MR. ROCHON:

10  Q.  General Faraj, when we broke, we were talking about

11  relationships with Hamas in 2004.  Can you please tell us

12  whether the relations between the PA, PLO and Hamas changed

13  between 2004 and 2007.

14  A.  During the -- these three years, the relationship with --

15  between the Palestinian authority, PLO and Hamas went through

16  three phases.  However, among these three phases, there was a

17  conflict between the PA and Hamas.  In 2004 President Yasser

18  Arafat was -- died or martyred.  And, of course, Hamas had

19  during that time considered that as good opportunity to take

20  over the authority of the Palestinian Authority.  Therefore, it

21  escalated its activities against the PA, and they are convinced

22  that all the security centers were destructed in Gaza and --

23  and the PA -- under the PA.  And the second phase was during

24  the elections of 2006, then in 2007, Hamas took control of Gaza

F29esok4                           Faraj - direct

1    Strip using armed weapons.

2    Q.  Have you ever heard of someone named Abdullah Barghouti?

3    A.  Yes.

4    Q.  During the period of 2000 to 2004, did you ever become

5    aware of Mr. Barghouti?

6    A.  What I know about Abdullah Barghouti, that he was detained

7    at the PSS, then he got arrested by the Israelis.  And he until

8    this moment is still detained in the Israeli prisons.

9    Q.  Was there ever a period of time in which you or the men

10   under your command were looking for Abdullah Barghouti?

11   A.  I think that was in the late of 2001, or maybe the

12   beginning of 2000.  There was a decision issued by the PSS to

13   search for that person wanted at that time and with all the

14   information.  And his picture, a photo, picture, was released.

15   As a director of Hebron governor at that time, I received that

16   decision with all the information with it.

17   Q.  Did you make any efforts, or the men under your command

18   make any efforts to look for him?

19   A.  We were trying to find information and studied what we had

20   in the files.  And we also studied the relations, if any, on

21   how to reach out to him.  However, we did not find Abdullah

22   Barghouti in Hebron governor.

23   Q.  Do you know if he was eventually arrested by the PA?

24   A.  I know that he was a detainee at the PSS.

25   Q.  And at which PSS office was he a detainee?

F29esok4                        Faraj - direct

1    A.   In Ramallah, in the main office in Ramallah, in an area

2    called Petunia.

3    Q.   Because we mentioned Ramallah and Petunia together, just

4    explain to the jury, how close is Petunia to Ramallah?

5    A.   About five minutes.

6    Q.   After he was detained in the offices of the PSS, was there

7    ever a time that you began to look for him again?

8    A.   Yes.

9    Q.   What was that based on, looking for him again after he had

10   already been detained by the PSS?

11   A.   According to a decision we had received by the headquarters

12   that there was a prisoner who escaped the prison, and everyone

13   should be on the look for this person to arrest him.

14   Q.   And to your knowledge was he then eventually after that

15   picked up?

16   A.   I know that he was detained by the Israelis.

17   Q.   I'd like to talk with you next about the Palestinian --

18            MR. YALOWITZ:  Your Honor, may I approach about the

19   last dates, please.

20            (Continued on next page)

21

22

23

24

25

F29esok4                          Faraj - direct

1              (At side bar)

2              MR. YALOWITZ:  Your Honor, Mr. Rochon just

3    purposefully elicited hearsay testimony that this man escaped.

4    The witness obviously has no personal knowledge of that.  This

5    was scripted and rehearsed.  We have had ad nauseam fights

6    about documentation from Abdullah Barghouti's own mouth saying,

7    I was released.  And I think we need to strike the testimony,

8    which is hearsay.  And I think he's opened the door to those

9    documents.

10             THE COURT:  Well, I can't do both.  So you've got to

11   give me a choice.

12             MR. ROCHON:  I'm not --

13             MR. YALOWITZ:  I think, if I have my choice, I'll take

14   the documents unredacted.

15             MR. ROCHON:  I don't think the documents unredacted

16   become admissible, because this witness testifies that they

17   looked for the man after he had already been detained.  I don't

18   think, by the way, that that proves that he escaped.  That just

19   proves that he received a report to that effect, which police

20   officers act on all the time.

21             THE COURT:  I'm not going to strike the testimony,

22   because it's a little late to object on that one.  But I'm

23   going to give further consideration as to whether they've

24   opened the door to the document.  They've clearly put in

25   evidence that he had escaped.  And it's clearly an indication

F29esok4                         Faraj - direct

1    in that statement that he said, no, I didn't escape.

2              So I may allow you to unredact that portion of the

3    document.  But let's finish with this witness so we can discuss

4    this.

5              MR. YALOWITZ:  Thank you, your Honor.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F29esok4                        Faraj - direct

1              (In open court; jury present)

2    BY MR. ROCHON:

3    Q.   Sir, during the trial we've heard some testimony about

4    promotions of prisoners, and I'd like to ask you some questions

5    about that.

6              Are you aware of the general policies at the

7    Palestinian Authority regarding payments related to prisoners

8    and promotions to prisoners who are employed in the security

9    services?

10   A.   Yes.

11   Q.   First of all, are the promotions of individuals in the

12   security forces based on -- what are those promotions based on?

13   A.   There is a system under which the PA works it.  It is in

14   relation with a social or civic services.  And there's another

15   code for the security forces.  These are the two systems that

16   are applicable on oral and police work and under the PA.

17   Q.   Did such payments and promotions begin during the Second

18   Intifada?

19   A.   These systems started as of 1994.  However, in coordination

20   with some countries -- to be more specific, we're talking about

21   the countries we called donor states -- that assessed

22   Palestinian Authority to develop its institutions.  Some

23   adjustments and modification happened or occurred for some

24   codes.

25   Q.   And when you said the reference to the donor states and

F29esok4                          Faraj - direct

1    their role, could you provide us a little more detail on that.

2    A.  As of the beginning of the establishment of the Palestinian

3    Authority in 1994, and as this -- that the Palestinian state

4    become watching member under the occupation, there are some

5    Europeans, Asian countries in addition to the United States,

6    like Norway, Sweden, British -- Britain, France, Germany and

7    many other European countries, or other countries like Japan

8    and the United States of America that is considered to be the

9    largest assistant to provide or to assist the building of the

10   institutions of Palestinian Authority.  These countries provide

11   experts in many areas who help to build the PA in the best

12   manner and help also to write on or enact the most appropriate

13   codes and help to provide the best services for citizens.

14   These countries helped us all along the past years, and they

15   still do.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

F298SOK5                        Faraj- direct

1    BY MR. ROCHON:

2    Q.  How did they relate to, these activities, to the practice

3    of payments to prisoners or the practices of promotions to

4    those who were in prison?

5    A.  As for the prisoners, we have two types of prisoners.  We

6    have the prisoners that were held in prison before the Oslo

7    Accords.  And we have the prisoners who were released after

8    signing the Oslo Accords.  And there are some people who are

9    still in prison, in the Israeli prisons.

10          As of the establishment of the Palestinian Authority

11   in 1994, an institution was established to handle and take care

12   of the prisoners, whether inside or outside the prisons, and

13   that was by the donor countries or donor states.  And the

14   reason of establishing such an institution was to rehabilitate

15   them and in order to contribute and change them and change the

16   culture, and also to engage them in an active manner within the

17   society.

18          Of course there is a system -- the promotion system

19   within the military and security institutions is applicable for

20   those who are in the prisons because it's related to the time,

21   not to the performance, and there was a discussion with many

22   friend countries in which we made use of their expertise in

23   this field, especially of those countries like United States,

24   Britain and France, and how to deal with those people who

25   commit violence and terrorism and how to separate them from

F298SOK5                        Faraj- direct

 1   their surroundings and how to create a better climate for not

 2   this to occur again or their surroundings.

 3            And we made use of these experiences and expertise.

 4   Maybe the best experience we used was the experience of the

 5   United States in Iraq.

 6            MR. YALOWITZ:  Objection, your Honor.

 7            THE COURT:  I'm sorry.  I lost where your question is.

 8   Is this responsive to your question?

 9            MR. ROCHON:  I believe it is because it goes to the

10   purpose of the prisoner payments.

11            THE COURT:  What was your question?

12            MR. ROCHON:  I can ask another.

13            THE COURT:  If you have got a complete answer on the

14   last one, you can ask another.

15   Q.  Can you explain how these payments relate to the Security

16   Forces' role in the West Bank and Gaza?

17   A.  It is the same system that is applicable.  There is a code

18   that deals with -- related to years, meaning that the person,

19   whenever that person completes a year, he will reach a certain

20   promotion and salary.

21   Q.  Let me interrupt you.  I may have asked my question poorly.

22            My question is, how do these payments relate to your

23   job in terms of providing -- how do they relate to the role of

24   the PSS and GIS in terms of their activities in preventing more

25   terror?

F298SOK5                         Faraj- direct

1            MR. YALOWITZ:  I didn't want to interrupt the

2    translator, but I do have a problem with this line.  Maybe we

3    can discuss it.

4            THE COURT:  I want to get an answer to this question.

5    A.  First of all, these payments and promotions are under laws

6    and they have nothing to do with this apparatus or that.

7    Therefore, there is a complete coordination and a joint

8    operation chamber to combat terrorism and violence, or any

9    destructive activities in general, and all the employees in

10    these situations are working under the system of the PA in

11    which they apply these laws on them, which is now known as the

12    Palestinian state.

13    Q.  My question is, how do the payments to prisoners or the

14    promotions relate to the effort to fight terrorism?

15            MR. YALOWITZ:  Objection.

16            THE COURT:  I am going to sustain the objection.  You

17    have asked a few times.  He doesn't have a clue of what you're

18    asking him.  So why don't you rephrase the question.

19    Q.  You mentioned the experience of the United States, France

20    and the UK in Iraq.

21            MR. YALOWITZ:  Objection.

22            MR. ROCHON:  May we approach on this?

23            THE COURT:  Yes.

24            (Continued on next page)

25

F298SOK5                        Faraj- direct

1                (At the sidebar)

2                THE COURT:  What is your objection?

3                MR. YALOWITZ:  I know he is trying to get something.

4    I have no idea what it is.

5                THE COURT:  That's not a basis for an objection.

6                MR. YALOWITZ:  To start bringing in the United States

7    in Iraq.

8                THE COURT:  What do you object to?  That's not what he

9    said five minutes ago.  You have been objecting to this five

10   times.  Where do you think he is going that you are objecting

11   to?

12               MR. YALOWITZ:  What he is trying to do is say that

13   they pay terrorists who are convicted and sitting in jail

14   because that's what the United States wants them to do.  I

15   think that's inappropriate.

16               THE COURT:  I would be surprised if that's his answer.

17               MR. ROCHON:  His answer would be that the experience

18   of co-opting terrorists through payments and support is a way

19   to bring loyalty to the state building as opposed to having

20   them go out and resist.

21               THE COURT:  Obviously, that's the answer you're trying

22   to elicit.  That's not the answer he is giving you.  You have

23   asked this three times.  Why don't you rephrase it?

24               MR. ROCHON:  I know what he would say.  That's what

25   the United States, France and Britain did in Iraq.

F298SOK5                          Faraj- direct

1          THE COURT:  What does it have to do with why PA did

2    it?

3          MR. ROCHON:  It's for the same reason.  He thought it

4    would be instructive to give that explanation.

5          THE COURT:  Who cares why they did it?  He has got one

6    of two reasons and only one of them is admissible.  If this is

7    the way they independently decided to combat terrorism, then he

8    can say so.  But if they are doing it simply because the U.S.

9    did it in Iraq, it is not admissible.  Get rid of U.S. and

10   Iraq.  If you want to ask him why did they pay terrorists, go

11   right ahead and ask it.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

F298SOK5                        Faraj- direct

 1              (In open court)

 2   BY MR. ROCHON:

 3   Q.  What is the hoped for result for making such payments from

 4   a security standpoint?

 5              THE INTERPRETER:  Would you please repeat that?

 6   Q.  What is the hoped for result from a security standpoint for

 7   making such payments?

 8   A.  First of all, we pay these salaries for some humanitarian

 9   reasons because this salary may go to that person's family or

10   wife, and if that person is not married it might go to his

11   father or mother.  Also, we do not want to create more

12   sympathizers from the surroundings of this person with him or

13   with the actions.  And also to give some hope for that

14   prisoner, to show him that if he changed his path, he will have

15   a future.

16              Those who were detained during the past years, there

17   were hundreds of thousands.  Those of them who went back to

18   prison or went back to the past path where they committed

19   violence or unlawful activities, they were very, very limited

20   numbers.  Therefore, we are looking for the results, and we do

21   not pay that salary as a reward, and we give it actually for

22   the mission.

23              If you ask me about my personal experience --

24   Q.  Just a second.  I want to make sure from the personal

25   experience that we don't get into an area that --

F298SOK5                         Faraj- direct

1          MR. ROCHON:  If the court doesn't mind me interrupting

2     the witness.

3          THE COURT:  OK.

4     Q.  From your experience, I do want to ask you about your

5     personal experience from a security standpoint of what would

6     happen if such support was not provided.

7     A.  I think it will create a larger number of those who do not

8     have hope and they might tend to go for activities that we

9     don't want them to go after.

10    Q.  Just to be clear, what kind of activities you don't want

11    them to go back to?

12    A.  A lot of activities.  Terrorism, crime, drugs, killing,

13    theft, prostitution, a lot of diseases that those who do not

14    have the means for living may go after.

15    Q.  Sir, I want to ask you, have you ever heard of someone

16    named Tawfiq Tirawi?

17    A.  Yes.

18    Q.  Do you know what positions in the security establishments

19    Tawfiq Tirawi held from 2000 to 2004?

20    A.  He was the head of the West Bank and he was the deputy of

21    the GIS, the second deputy of the GIS.

22    Q.  When you said he was the head of the West Bank, the head of

23    what of the West Bank?

24    A.  The head of GIS in the West Bank.

25    Q.  In addition to knowing who he is back then, do you know him

F298SOK5                      Faraj- direct

1   today?

2   A.  Yes.

3   Q.  Between 2003 and today, have you ever been in any meetings

4   with Tawfiq Tirawi?

5   A.  Several times.

6   Q.  Have you ever been in any meetings with Tawfiq Tirawi and

7   Israeli security or intelligence officials between 2003 and

8   today?

9           MR. YALOWITZ:  Object to the over-breadth.

10          THE COURT:  Overruled.

11  A.  Yes.

12  Q.  How many times between 2003 and today have you been in

13  meetings that included Tawfiq Tirawi and members of the Israeli

14  security or intelligence apparatus?

15  A.  A number of times.

16  Q.  Just because I am a lawyer, when someone says a number that

17  could be a lot of things.  Give us a more precise number.

18  A.  About five times.

19  Q.  At any of those meetings that included yourself, Tawfiq

20  Tirawi and the Israeli security personnel between 2003 and

21  today, did they try to arrest him?

22  A.  Of course not.

23  Q.  What kind of issues were being discussed in the meetings

24  that you were at that included yourself, Tawfiq Tirawi and the

25  Israeli security personnel?

F298SOK5                           Faraj- direct

1    A.   Usually the discussion is about two major points:  How to

2    create stability and how to combat violence or terrorism.

3    Q.   In those meetings did you or Mr. Tirawi share information

4    with the Israeli security personnel?

5    A.   We have coordination with the Israelis.

6    Q.   I am not going to ask you what specific information but I

7    am going to ask you again, did you and Mr. Tirawi or Mr. Tirawi

8    share security information with the Israeli personnel in those

9    meetings?

10   A.   Yes.

11   Q.   In those meetings, without getting into the specifics of

12   what they shared, did the Israeli security personnel share

13   information with you and Mr. Tirawi?

14   A.   Yes.

15   Q.   Are you aware whether or not Mr. Tirawi ever travelled from

16   the West Bank to anywhere else from the period 2003 until

17   today?

18   A.   Yes.

19   Q.   Can you tell us to what places you are personally aware of

20   him traveling from the West Bank to other places in this

21   period?

22   A.   Talking about the past two months, I know that he went to

23   Norway and Sweden and Morocco, Egypt, Jordan, and he went back

24   to the West Bank.

25   Q.   When a Palestinian from the West Bank travels to those

F298SOK5                        Faraj- direct

1  places, is there any security that he or she must go through?

2  A.  The Palestinian state does not have any control over any

3  crossings or borders.  Therefore, from the West Bank you can

4  travel from three crossings, two of them are rail or land and

5  one is by air.  All three of them are under the complete

6  control of Israelis.

7  Q.  Is that true when you're leaving as well as when you're

8  coming back?

9  A.  Yes.

10 Q.  You mentioned travel of Mr. Tirawi.  I think you said, I

11 want to put the time period right.  The list of countries was

12 in the last what period?

13 A.  I said that was in the past two months he went to Sweden,

14 Norway, Morocco, Egypt, Jordan, and from Jordan he went back to

15 West Bank.

16 Q.  And even before the last two months and the other time

17 period between 2003 and this year, are you aware of any other

18 times when Mr. Tirawi would have been outside the West Bank,

19 whether in Israel, Jerusalem or elsewhere?

20 A.  He used to go to Gaza through Gaza Strip through Israel.

21 Of course that was before 2007, before the Hamas coup.

22 Q.  The jury may not understand how this works.  In the West

23 Bank and you're Palestinian or you wish to go or want to go to

24 the Gaza Strip, can you travel that without going through

25 Israeli security?

F298SOK5                         Faraj- direct

1    A.  Of course not.

2    Q.  Sir, I would like to ask you personally about your views of

3    the suicide attacks, and particularly during the period of 2000

4    to 2004.  What was your view of such attacks?

5    A.  My view from the suicide attacks before these days and

6    after is the same.  These are acts of terrorism.  It's true

7    that it kills people and also it kills peace and kills the

8    future.  That's why we are fighting it and we will continue to

9    do so in Palestine and we will be part of the regional and

10   international corporation to fight terrorism.

11   Q.  Were those your views in 2000 to 2004 as well?

12   A.  It was before 2000, before 2000 -- after 2000 to after 2004

13   until now the same.

14   Q.  Thank you, sir.

15          MR. ROCHON:  I have no further questions.

16          THE COURT:  Let's take a short break before we go on

17   to cross-examination.

18          Ladies and gentlemen, don't discuss the case.  Keep an

19   open mind.

20          (Jury exits courtroom)

21          (Continued on next page)

22

23

24

25

F298SOK5                          Faraj- direct

1          THE COURT:  Before we go on to cross, let's address

2     the issue of the redaction.  You said you wanted it unredacted.

3     Are you talking about Exhibit 427?

4          MR. YALOWITZ:  427, most definitely.  And, also, I

5     haven't had a chance to check because I have been listening to

6     the testimony, but I believe that the release is mentioned in

7     Count 51 of the Ahmed Barghouti -- I believe that Ahmed

8     Barghouti, both in his custodial statement and in Count 51 of

9     his indictment to which he pled guilty, also acknowledges that

10     Abdullah Barghouti was released.

11          THE COURT:  Ahmed Barghouti.

12          MR. YALOWITZ:  Yes.  Count 51.  I think that's 357.

13          Then also 1147 is his custodial statement.  I think we

14     can find unredacted copies of it if it would be useful to the

15     court.

16          THE COURT:  I have 427, the unredacted copy.  I don't

17     have in front of me the redacted copy.  Is that in one of the

18     binders?

19          MR. YALOWITZ:  We didn't put it in the binders because

20     it was the subject of debate.

21          THE COURT:  Do you have a copy of the redacted one?

22          MR. YALOWITZ:  We can put that up for your Honor if it

23     will be helpful.

24          THE COURT:  You said 358.

25          MR. YALOWITZ:  357, Count 51.

F298SOK5                         Faraj- direct

1              THE COURT:  Let me just work backwards.  I don't see

2    anything that's redacted in that regard on Exhibit 357.

3              MR. YALOWITZ:  I agree.  I am looking at it too.

4              THE COURT:  So let's put that aside.

5              You said there were two others.

6              MR. YALOWITZ:  427.

7              THE COURT:  427, I have the unredacted copy.  I just

8    don't have a redacted copy.  You said another document besides

9    427.

10             MR. YALOWITZ:  1147, your Honor.

11             THE COURT:  Where would that be?

12             MR. YALOWITZ:  I don't think we offered it because of

13   the court's earlier rulings.

14             THE COURT:  If it's not in evidence, then the

15   redaction is not at issue.

16             MR. YALOWITZ:  We can just use it unredacted.  I don't

17   want to do that without previewing it with the court.

18             THE COURT:  I don't think I excluded the document for

19   that reason.

20             MR. YALOWITZ:  I agree.

21             THE COURT:  So then the document is excluded.  So you

22   can't use it for any purpose.

23             MR. YALOWITZ:  It wasn't offered so it wasn't

24   excluded.

25             THE COURT:  OK.  What is it?

F298SOK5                        Faraj- direct

 1              MR. YALOWITZ:  It's a custodial statement of Ahmed

 2    Barghouti.

 3              THE COURT:  I didn't rule on that?

 4              MR. YALOWITZ:  Correct.  We didn't offer it because we

 5    were only going to use it for the proposition that the

 6    preventive security released Abdullah Barghouti based on the

 7    statement of Ahmed Barghouti.  Since the court had excluded

 8    Abdullah Barghouti's, we were just following the ruling.

 9              THE COURT:  What do you want to do?

10              MR. YALOWITZ:  What I want to do is use -- is the

11    witness in the room?

12              MR. ROCHON:  I am happy to exclude him.  He'd rather

13    smoke.

14              MR. YALOWITZ:  What I want to do, and I frankly didn't

15    think I would hear this from this witness, what I want to do is

16    look at 427 and 1147 and I need a minute to get organized.

17              THE COURT:  That's what I am trying to do now so I can

18    make a ruling so you can go into your cross.  You said you can

19    put it on the screen?

20              MR. YALOWITZ:  We might be able to put it on the

21    screen.

22              THE COURT:  I have the unredacted 427 in front of me.

23              MR. YALOWITZ:  If you have the unredacted 427, look at

24    statement number 1, sheet 12.

25              THE COURT:  I have that right in front of me.  I am

F298SOK5                        Faraj- direct

 1   trying to figure out what words were redacted.  I just don't

 2   have that.

 3            MR. YALOWITZ:  We should be able to put that on the

 4   screen.

 5            THE COURT:  That's what I am looking for so I can

 6   compare what it.

 7            All right.  What lines or portions of lines do you

 8   want to unredact?

 9            MR. YALOWITZ:  4 through 9.

10            THE COURT:  And that is this part that I have

11   highlighted right here?

12            MR. YALOWITZ:  I am sure it is.

13            This guy worked for Jabril Rajoub.

14            THE COURT:  What do we have about Jabril Rajoub

15   already in evidence?

16            MR. YALOWITZ:  The deposition of Mosaab Yousef, who

17   was the guy at that arrest, he said that at the time of the

18   arrest Jabril Rajoub and Marwan Barghouti and his father, who

19   was the head of Hamas, made a deal that they would arrest him

20   and then release him.  So that's all in evidence.

21            Now, this closes the circle.

22            THE COURT:  Is it identified as those individuals in

23   that document?  I don't remember.  Are those individuals

24   identified by name?

25            MR. YALOWITZ:  In 427, yes.

F298SOK5                          Faraj– direct

1             THE COURT:  In the other document.

2             MR. YALOWITZ:  In the deposition, yes.

3             THE COURT:  Whose deposition was that?

4             MR. YALOWITZ:  It was Mosaab Yousef.  He was the guy

5    who was the son of the Hamas leader.

6             THE COURT:  You say he basically testified to what you

7    say is part of 8 and 9 or 9 and 10?

8             MR. YALOWITZ:  In the testimony he said they were

9    going to arrest Abdullah Barghouti and there was a lot of

10   shooting --

11            THE COURT:  I remember that.

12            MR. YALOWITZ:  -- and they went off and made a deal

13   and the deal was between Marwan Barghouti, Jabril Rajoub and

14   the head of Hamas, and the deal was they would arrest him and

15   then release him.

16            THE COURT:  I understand that.  That's not what is

17   written here.

18            MR. YALOWITZ:  That's why I want to use this as well.

19            THE COURT:  That's not what is written here.  So what

20   is it that's here that you say is already in evidence?

21            MR. YALOWITZ:  What is there is not in evidence.

22   That's why I want it unredacted.

23            THE COURT:  We don't have anywhere else out of his

24   testimony or anywhere else that Jabril Rajoub delivered

25   Barghouti and Bilal to Marwan.

F298SOK5                         Faraj- direct

1           MR. YALOWITZ:  Correct.

2           THE COURT:  And that they stayed in Marwan's house.

3    Wasn't that part his indictment?

4           MR. YALOWITZ:  No.

5           THE COURT:  About three weeks.  Then Marwan

6    Barghouti's home is in Ramallah.

7           Is there any other reference anywhere else to getting

8    out of prison?

9           MR. YALOWITZ:  The only other place, like I said, the

10   only other place I can think of off the top of my head is 1147,

11   which has not been offered, which we can also put up on the

12   screen and show you.

13          THE COURT:  Let me see 1147 because you didn't offer

14   it.  I don't know why it's now independently admissible.

15          What do you say is the relevant portion?

16          MR. YALOWITZ:  This is the custodial statement of

17   Ahmed Barghouti.

18          THE COURT:  So he says what where?

19          MR. YALOWITZ:  So that statement is consistent with

20   his indictment to which he pled guilty.  It just fleshes out

21   the detail particularly talking about Jabril and Marwan.

22          THE COURT:  Remind me of what Jabril's job was.

23          MR. YALOWITZ:  Jabril was the head of preventative

24   security in the West Bank.  So he was superior to the witness

25   in that department that he was in, where they were supposedly

F298SOK5                         Faraj- direct

1    looking for Abdullah Barghouti because he escaped.  He is the

2    boss, either directly or indirectly he is the boss of the

3    witness.

4              MR. ROCHON:  I don't think there is anything that

5    opens the door to either of these.  Of course there is several

6    layers of hearsay.

7              THE COURT:  What wasn't the layer of hearsay about

8    what he testified to.  I assume he wasn't there when the guy

9    escaped.

10             MR. ROCHON:  Actually, if I hadn't been interrupted, I

11   was going to say --

12             THE COURT:  It's a little late for you to concede that

13   rather than make an objection.  You elicited it and that was

14   the answer to your question.  He said that he escaped.

15             MR. ROCHON:  No, he did not say he escaped.

16             THE COURT:  Maybe I was in a different room.  What do

17   you think he said?

18             MR. ROCHON:  He said he received a report that he had

19   escaped and based on that he looked for him.  He never said

20   that he escaped.

21             THE COURT:  I don't have a recollection that he said I

22   received a report that he escaped.  I don't remember that being

23   the testimony.  I will check it.

24             MR. ROCHON:  Please do.  I know that's his testimony.

25             THE COURT:  I'm not sure that makes a difference.

F298SOK5                       Faraj- direct

1    It's still hearsay.  You put it in the evidence for the jury to

2    believe he escaped.

3              MR. ROCHON:  They looked for the guy once.  They found

4    him.  They arrested him.  He got out.  They looked for him.

5              THE COURT:  No.  He escaped.  They wouldn't be looking

6    for him if they let him out.

7              MR. ROCHON:  He received a report that he escaped.  He

8    did not say that.

9              THE COURT:  That's not critical.  The bottom line

10   is --

11             MR. ROCHON:  If I can finish the argument.

12             Nothing in that would change the rulings as to what

13   would be proper hearsay testimony or -- not testimony, hearsay

14   reports in police statements by others.  If we look at what the

15   plaintiffs have highlighted here, he says this is this guy

16   Ahmed Barghouti talking about Jabril Rajoub calling Marwan

17   Barghouti and a conversation between those two people.  Layers

18   upon layers of fingerpointing and hearsay.

19             The court's rationale for excluding this was not it

20   was being excluded because there was no evidence of an escape.

21   The court's rationale for redacting these statements and why

22   this one doesn't come close to getting in is because this is

23   someone's custodial interrogation in which they are talking

24   about conduct of others and pointing the finger at others.

25             The rationale for keeping that out is the same right

F298SOK5                         Faraj- direct

1   now as it was an hour and a half ago.

2               THE COURT:  My recollection, Mr. Rochon -- and you can

3   correct me if I am wrong -- that you gave me the impression

4   that you were not going to try to put before this jury the

5   disputed fact of whether he was released or escaped.

6               MR. ROCHON:  No.  We have actually announced to the

7   other side and Mr. Yalowitz has complained that we had raised

8   that he escaped late in the game and he said why did we find

9   out this guy escaped so late.

10              THE COURT:  What evidence do you have that he escaped?

11              MR. ROCHON:  Your Honor, I actually am of the view

12  that the evidence that has come in is not in for the truth.

13              THE COURT:  You want me to unring the jury's bell on

14  that one?

15              MR. ROCHON:  I don't think I can argue it because it's

16  only a report upon which he acted.

17              THE COURT:  Then what was the relevance of it?

18              MR. ROCHON:  They are claiming we didn't do what we

19  could to get this guy.  They are claiming he was released.

20              THE COURT:  Right, and you want to make it clear that

21  he wasn't released, that he escaped.

22              MR. ROCHON:  No.  This man's actions that they are

23  trying to create liability on my client on occurred nine months

24  after he got out, however he got out.

25              THE COURT:  That's a different question.  You can

F298SOK5                          Faraj- direct

1    debate that as much as you want to debate it.

2              MR. ROCHON:  The point that we want to establish is

3    that they were looking for him to arrest him, which is

4    inconsistent with letting him out.  They were looking for him

5    one time and they got him.

6              THE COURT:  If you wanted to do that, then that's what

7    he would have said.  He wouldn't have said he escaped.

8              MR. ROCHON:  I actually think this is a mountain out

9    of a molehill.

10             THE COURT:  Then you shouldn't worry about.  Let him

11   ask his questions and put in his own unredacted document.  You

12   made the mountain, not them.

13             MR. ROCHON:  My point is I don't think this witness's

14   testimony establishes escape.  He objects.

15             THE COURT:  The guy said in the report that he

16   escaped.  What do you think the jury is supposed to take from

17   that.  That's not even a reasonable argument for you to make

18   that the jury is not supposed to think he -- he got out how?

19   What is the only evidence before this jury as to how he got

20   out?

21             MR. ROCHON:  There is evidence that he was transferred

22   from 1147, is it?

23             THE COURT:  No.  There is testimony that he escaped.

24             MR. ROCHON:  357, Count 51 says transferred.

25             Mr. Shrenzel claimed he was released.  I could finish

F298SOK5                          Faraj- direct

1   my direct now and say, sir, you referenced Mr. Barghouti.  I

2   want to ask you, do you have personal knowledge of how he got

3   out of jail.

4              THE COURT:  It doesn't matter.  It's too late for

5   that.

6              MR. ROCHON:  It is not, your Honor, because I could

7   ask him --

8              THE COURT:  You shouldn't have asked him in the first

9   place.  You can't undo it now.  You asked him what he acted

10  upon and he responded.  And I can only assume you expected that

11  answer, that he escaped.

12             MR. ROCHON:  The next question, if he doesn't

13  object --

14             THE COURT:  You never asked the next question.

15             MR. ROCHON:  I didn't get to ask the next question.

16             THE COURT:  Your next question is going to undo that

17  how?

18             MR. ROCHON:  By saying, sir, did you have any personal

19  knowledge of how he got out?  No.

20             THE COURT:  I understand your point.

21             MR. ROCHON:  It wasn't in his area.

22             THE COURT:  But that would not have cured the question

23  and answer.

24             MR. ROCHON:  I understand the court disagrees with me.

25  This doesn't become unhearsay by that.

F298SOK5                    Faraj- direct

1           THE COURT:  This is what I think is appropriate.

2    First of all, I think the plaintiffs have a right to ask this

3    witness, to question this witness about his statement that he

4    escaped.  How he knows it, what he thinks he knows, where he

5    got that from, if he has got any personal knowledge of that, or

6    what personal knowledge he has of the circumstances under which

7    he got out of prison.

8           I think they also have the right to ask the witness

9    about whether or not he is aware that Barghouti gave a

10   statement when he was in custody and in that statement he said

11   he was released.  He has the right to ask him that at this

12   point.  Because if he says he got a report that he escaped, he

13   has got the right to ask him did you get a report that he was

14   released, and did you ever see Mr. Barghouti's statement that

15   he was released, not escaped?

16          He has the right to ask him that and he has the right,

17   as far as I am concerned, unless something else happens, they

18   have the right to put this report in front of him, ask him if

19   he has ever seen this, was he aware of this, when he testified

20   that he escaped whether he was aware that he made that

21   statement.  I think they have the right to unredact that part

22   of the statement that they are going to utilize on

23   cross-examination to ask this witness on what basis he says

24   that he escaped and whether or not, whatever report he got,

25   whether or not he did or did not get the report that he had

F298SOK5                          Faraj- direct

1    been released.  Because that's what this report says.

2            So I don't know what report you're referencing.  But

3    if he got this report, that's not the statement that he would

4    have given.  And we are aware of no report that

5    indicates -- which report do you believe he was referencing

6    when he said he escaped?

7            MR. ROCHON:  A report from the Palestinian.

8            THE COURT:  What report?  Any document that we have in

9    evidence here?

10           MR. ROCHON:  No, sir.

11           THE COURT:  You're not referencing a written report.

12           MR. ROCHON:  The witness is referencing a written

13   report.

14           THE COURT:  You're not aware of any written report

15   that exists that this witness is talking about.

16           MR. ROCHON:  I am fully competent there was such a

17   report.

18           THE COURT:  I am asking you.  Don't be fully

19   competent.  Show it to me.

20           MR. ROCHON:  It's not in evidence.

21           THE COURT:  Do you have it not in evidence?

22           MR. ROCHON:  No.

23           THE COURT:  You're not aware of any written report

24   that he got that said this person escaped?  That's a

25   straightforward question.  The answer is yes or no.

1        MR. ROCHON:  I am aware.

2        THE COURT:  Where is the written report that you're

3   aware of that says that he escaped.

4        MR. ROCHON:  I am aware of it because the witness says

5   he saw it.  That's evidence.

6        THE COURT:  Mr. Rochon, you are just being evasive.

7        MR. ROCHON:  You're asking me if I have a piece of

8   paper?  No.

9        THE COURT:  That's all I am asking.  There is no such

10  written report that you're aware of that exists that is a

11  report that he referenced.

12       MR. ROCHON:  That exists today, no.

13       THE COURT:  That ever existed as far as you know.

14       MR. ROCHON:  I firmly believe --

15       THE COURT:  No.  You have never seen such a document.

16       MR. ROCHON:  That's true.

17       THE COURT:  The only indication that you have that

18  such a document exists is because this witness said so.  Quite

19  frankly, are you saying this witness said he had a written

20  document?

21       MR. ROCHON:  Yes.  I know that's what he would say.

22       THE COURT:  We can discuss further if you want to

23  convince me that this whole statement shouldn't be unredacted,

24  but clearly at least 4 through 7, and I have to think in the

25  context of 8 and 9, but clearly with regard to 4 through 7 I

F298SOK5                              Faraj- direct

think the plaintiffs have the right to ask him on what basis he

says that this person escaped, what report he received and

whether he ever verified any such thing, what he says the

circumstances of that escape was, and whether or not he was

aware of the GIS report that says, or the interrogation, not

the GIS report.

MR. ROCHON:  The interrogation is way after the facts.

THE COURT:  If he is aware of it any time before

today.  So whether he is aware that when he was in custody he

said he didn't escape, he said that he was released.  And this

witness can say whether he knows that or not.  If he says,

yeah, I know he said that, then maybe we don't need the

unredacted.  But if he says, no, I'm not aware of it, then I

want him to show him the document unredacted, read that to him

and ask him whether or not he is aware of that statement.  He

can answer whatever way he wants to answer.  And then that

statement in that report comes in now unredacted because you

clearly opened the door to a dispute as to whether or not they

had information.  I don't care whether it's true or not.

Whether or not there is information that was provided to them

that is inconsistent with any current belief under oath that

this guy escaped.  That's my position.

MR. ROCHON:  If the court would please look at the

transcript on this.  Because the witness did not claim a

current view as to whether he escaped or not.

F298SOK5                      Faraj- direct

1          THE COURT:  It doesn't matter.  Even he said it the

2     way you said it, my view is not any different.  If you didn't

3     want this to be an issue, you shouldn't have raised it.

4          As a matter of fact, I think your argument is weaker

5     if he says he saw a report because this is simply a report and

6     it's just as much hearsay as the report that you want to

7     reference that doesn't even exist.

8          MR. ROCHON:  This is not a report.  This is just a

9     custodial statement of some guy pointing the finger.

10          THE COURT:  It's a report of a custodial statement,

11     right?

12          MR. ROCHON:  It's in theory what some guy said to the

13     police.

14          THE COURT:  That's what a police report is.

15          MR. ROCHON:  It's not a finding.

16          THE COURT:  That's what a police report is.  If you

17     walk down the street and say show me the police report of where

18     my client gave the statement, they will give you something like

19     this.

20          MR. ROCHON:  There was actually an indictment on this

21     issue.  All it says is that the individual was transferred.

22     That's what it says.

23          THE COURT:  Mr. Rochon, you can't convince me because,

24     quite frankly, I think I was very fair and bent over backwards

25     so that no prejudice would come to you or your clients by

F298SOK5                    Faraj- direct

1    raising this issue unnecessarily in an appropriate manner.  You

2    stepped over those bounds, not Mr. Yalowitz.  He did not raise

3    this issue.  You raised this issue.

4            This was the answer that he gave.  You're stuck with

5    it.  And in fairness you cannot have the only evidence in this

6    case now is evidence that he saw a report that told him that

7    this guy escaped, when we have the actual report that's in

8    evidence that says the guy said just the opposite.  OK.  I

9    can't give you any more on that issue.

10           Mr. Yalowitz, as long as you stay consistent within

11   those bounds, I am not sure whether or not -- as I say, you can

12   let me know whether or not 8 and 9 -- I am going to leave out 8

13   or 9 unless you can convince me because that's not with regard

14   to whether or not he escaped or whether or not he was released.

15           MR. YALOWITZ:  Let's play it as you have said.  I

16   think it's fair for me to ask the question, Jabril Rajoub was

17   your boss.  Are you aware that Jabril Rajoub was the one who

18   released him and see what he says.

19           THE COURT:  I think you can ask him that.

20           No.  I don't want you to ask him are you aware that he

21   released him?  Because that implies that you have information

22   that is not before this jury.  That's assuming a fact not in

23   evidence, as they say.  You can ask him, did Jabril Rajoub

24   release him, do you have any information whether Jabril Rajoub

25   released him, or however you want to phrase it, and let's see

F298SOK5                        Faraj- direct

1    where it goes from there.

2              I don't want to spend a lot of time on this issue

3    because I agree with Mr. Rochon, I don't think this is going to

4    be the determinative issue.  I agree with you in fairness, you

5    shouldn't be stuck with a record that has been made by the

6    defense without confronting the witness with the contrary

7    statements or evidence that's inconsistent with what he

8    testified to before this jury.

9              MR. YALOWITZ:  The other one that I need to raise with

10   you --

11             MR. ROCHON:  Before we leave this one, I don't want to

12   close this up without saying something additionally.  I don't

13   want to have him feel trapped.  If the witness is asked about

14   this, I believe what the witness will say is there was

15   criticism for the failure to keep this guy in custody.  Not a

16   belief that he was released, but that somebody screwed up.  He

17   was aware it was looked into.  In other words, that's what he

18   would say.  I don't want Mr. Yalowitz to ask him questions and

19   then make it worse.

20             MR. YALOWITZ:  If that's his testimony, then we have

21   got to show him Jabril Rajoub.

22             MR. ROCHON:  That's not his testimony yet because I

23   didn't ask him that.

24             THE COURT:  I didn't open this can of worms.  I am

25   only trying to deal with this.  I don't know what this guy is

F298SOK5                        Faraj- direct

 1   going to say.  You know what this guy is going to say.

 2          He can ask him.  If he wants to respond that way, he

 3   can respond whatever way is appropriate for him to respond

 4   within his knowledge.  I think that this has opened the door.

 5   I think you have the right to ask him about what he knows and

 6   how he knows it, and if you want to specifically ask him about

 7   certain facts, you can ask him whether certain facts are true

 8   or not true.

 9          Then we can figure out exactly beyond, depending on

10   what he says, how much of an unredaction there would be.  But I

11   don't intend to spend a lot of time on this issue before this

12   witness.  Let's get it done, put it out there, and then you can

13   argue it.

14          MR. YALOWITZ:  The other one, your Honor, over my

15   objection Mr. Rochon elicited testimony about what a great guy

16   Tawfiq Tirawi is.

17          MR. ROCHON:  I did not.

18          THE COURT:  What do you say the witness said that

19   should have been kept out?

20          Questions are not evidence.  Answers are.

21          MR. YALOWITZ:  What the witness said was starting in

22   2003 and to the present day Tawfiq Tirawi has moved about

23   freely, has cooperated with the Israeli authorities, has

24   exchanged intelligence.

25          THE COURT:  Is there something about that you disagree

F298SOK5                      Faraj- direct

1    with?

2              MR. YALOWITZ:  I think the inference he wants the jury

3    to draw is Tawfiq Tirawi is innocent.

4              THE COURT:  The inference he wants them to draw is

5    that they thought he was so guilty they could have arrested him

6    any time between now and the time you say they found out he was

7    a co-conspirator in a terror attack.

8              MR. YALOWITZ:  Right.  The only thing I want to do is

9    because my view was 2003 to the present is way outside the

10   time.

11             THE COURT:  That's not true.  If I knew you murdered

12   Jimmy Hoffa, it doesn't mean I can't arrest you now.

13             MR. YALOWITZ:  The thing I want to do, there was a

14   video of Tirawi talking about blood, murder -- not murder,

15   blood and sacrifice.

16             THE COURT:  I have seen it.

17             MR. YALOWITZ:  I know you remember it.  It was from

18   2009 and we talked about it.  The ruling at that time was its

19   probative value was outweighed by potential prejudice, as I

20   recall it.  And my view is since the witness is in essence

21   vouching for Tirawi we are entitled to impeach him with that

22   video so that the jury can decide.

23             THE COURT: How does that video impeach --

24             MR. YALOWITZ:  I have got to ask the questions.  But

25   the questions are, did Tirawi give a speech in which he

F298SOK5                          Faraj- direct

1    encouraged people --

2              THE COURT:  How does that impeach his testimony?  If

3    anything, it makes his testimony even stronger.  If that was

4    further evidence he was a terrorist, then they had twice as

5    many reasons to arrest him.

6              MR. YALOWITZ:  That's an argument for Mr. Rochon to

7    make.

8              THE COURT:  We are not going down that route.  Let's

9    stick to what the real issues are in this case.

10             I have agreed with you on the escape or release issue.

11   Let's deal with that and go on to the more substantive issues

12   that this witness has to testify about.

13             We will take two minutes and we will get the jury

14   back.

15             (Recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

F298SOK5                          Faraj- direct

1              (In open court; jury not present)

2              MR. YALOWITZ:  I'm ready to start.  I don't think

3    we're going to finish this afternoon, but let's start and see

4    how far we can get.  We're having trouble because apparently

5    the electricity blew in our little room, so there's some things

6    we can't print.  But I don't think I'm going to finish him this

7    afternoon.  I don't think I'm going to go much beyond the start

8    tomorrow morning.  So let's see what we can get done now and

9    get the jury back.

10             THE COURT:  Let's get the jury.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

f29esok6

1          (In open court; jury present)

2          THE COURT:  Mr. Yalowitz, cross-examination?

3    CROSS EXAMINATION

4    BY MR. YALOWITZ:

5    Q.  Mr. Faraj, do I have it right that the PLO established the

6    PA?

7    A.  Yes, sir.

8    Q.  And is it correct that you cannot really talk about a

9    separation between the Palestinian Authority and the Fatah?

10   A.  Yes.  There is separation between PLO and Fatah.

11   Q.  I thought that your testimony was that you cannot really

12   talk about a separation between the Palestinian Authority and

13   Fatah.  Didn't you give that testimony under oath in the past?

14   A.  PLO includes all Palestinian factions, and Fatah is one of

15   those Palestinian factions.  In addition to factions, there are

16   independent personalities who do not belong to any faction and

17   there are members of PLO.

18   Q.  Let me try it again.  Maybe it was the way I asked the

19   question.  You testified in the past that you cannot really

20   talk about a separation between the Palestinian Authority and

21   Fatah; isn't that a fact?

22   A.  I didn't say there is no difference.  I say there is a

23   difference between PLO and Fatah.

24   Q.  Mr. Faraj, you gave a deposition under oath on August 8,

25   2010, in Jerusalem, Israel.  Do you remember that?

1   A.  Yes, I did.  It was in Jerusalem.  It was not about the

2   relation between PLO and Fatah.  It was between Fatah and the

3   Palestinian Authority.

4   Q.  And in your deposition -- first of all, you gave your

5   deposition under oath, right?

6   A.  Yes.

7   Q.  And you swore to tell the truth, right?

8   A.  Certainly.

9   Q.  And to the best of your ability, you did tell the truth,

10  right?

11  A.  Yes, sir.

12  Q.  And in that deposition you testified, and I quote --

13          MR. ROCHON:  Page and line?

14          MR. YALOWITZ:  Page 148, line 25.

15  Q.  So you cannot really talk about a separation between the

16  Palestinian Authority and the Fatah.

17          Do you remember giving that testimony?

18          MR. ROCHON:  I need the page and line, Judge.

19          THE COURT:  Just a second.  Let him finish his answer.

20  A.  I don't remember exactly what I said that time, but I can

21  testify now and I could tell you exactly.

22  Q.  Why don't I read the question and answer that you gave back

23  in 2010, and then I can ask you if it's still your testimony

24  today.

25  A.  Yes, sir.

f29esok6                    Faraj - cross

1    Q.  I'm reading from a deposition you gave August 8, 2010, page

2    148, line 18.

3    "Q   What Palestinian Authority oversight was there over

4    Fatah's activities in the time period leading up to March 24,

5    2002?

6    "A   Usually, most often, there was a relation between the

7    ruling party and the Palestinian Authority.  Maybe you would

8    find members of Fatah central committee.  Members of Fatah

9    revolutionary council would be like ministers or holding other

10   posts.  So you cannot really talk about a separation between

11   the Palestinian Authority and the Fatah."

12            Do you recall giving that --

13            MR. ROCHON:  Your Honor, I'd ask counsel finish the

14   answer.

15            MR. YALOWITZ:  Your Honor, I've been handed a note

16   that there may be a translation problem.

17            THE COURT:  Well, I think we have a screen working.

18   So he can read right off the screen.  If you want to hand it to

19   him -- I don't know how much English he understands.  If you

20   want to show him the transcript, it might make it easier.

21            MR. YALOWITZ:  May I approach?

22            THE COURT:  Yes.

23   Q.  Sir, are you able to read enough English to read the

24   question and answer?

25            INTERPRETER:  Yes, sir.

f29esok6                        Faraj - cross

 1                MR. YALOWITZ:  I was speaking to the --

 2                INTERPRETER:  Sorry.

 3                (Inaudible discussion between counsel and interpreter)

 4                MR. ROCHON:  Your Honor, we just have to have this

 5      taken down.  I can't hear.

 6                MR. YALOWITZ:  Let me ask the question.

 7      BY MR. YALOWITZ:

 8      Q.  Were you able to read what the deposition said, Mr. Faraj?

 9      A.  No.

10      Q.  And did your translator translate it for you so you were

11      able to understand it in Arabic?

12      A.  I answered the question.  I do not know at this date.  I

13      gave an answer.  I do not know if this is a question or another

14      question.

15      Q.  Well, based on what your translator read to you, are you

16      changing the testimony that you gave in 2010, or is your 2010

17      testimony accurate?

18                MR. ROCHON:  Your Honor, I'm objecting.  I'd like to

19      ask to approach the bench.

20                THE COURT:  No.  You can cross-examine.  If you think

21      he hasn't read the whole thing, you can read as much of it as

22      you want.

23      Q.  Go ahead.

24      A.  What I said, and what still I said now, PLO signed Oslo

25      Accords with Israel.  In terms of these accords, the

f29esok6                    Faraj - cross

1    Palestinian Authority was established.  Palestinian Authority

2    is composed of Palestinian factions and of independent

3    personalities.  So you can find personalities from Palestinian

4    factions in the Palestinian Authority, whether from Fatah

5    organization or other organization.  But the Palestinian

6    Authority exercises its legal status and not the faction

7    status.  This doesn't mean that Palestinian Authority is Fatah

8    or that Fatah is the PLO.  The Palestinian Authority works for

9    the Palestinian people in the West Bank and in the Gaza Strip.

10   It was open for all those who want to establish this authority

11   and to work for the people.

12           In 1996 there were legislative elections that took

13   place.  And Fatah was one of those who participated in the

14   legislative elections.  And it gained many seats in the

15   parliament.  Of the Palestinian --

16           MR. YALOWITZ:  Your Honor, I -- well, I withdraw.

17   Q.  Mr. Faraj, let me try it again.  I want to ask you a yes or

18   no question, okay?  I want to ask you a yes or no question.

19           Do you agree with the statement that you yourself made

20   in 2010, that you cannot really talk about a separation between

21   the Palestinian Authority and the Fatah, yes or no?

22   A.  What I said, and what I repeat now, is what I have just

23   mentioned to you.  If there is a mistake in the translation of

24   any word whatsoever, as you have tried now, you have asked the

25   translator or the interpreter to change some words.  This is

f29esok6                    Faraj - cross

 1    what I said.  Fatah is part of the Palestinian Authority and

 2    other faction -- Palestinian factions are also included.  But

 3    the Palestinian Authority is illegal, has illegal status and

 4    not factional status.

 5            MR. YALOWITZ:  Your Honor, could the Court please

 6    instruct the witness to answer the question yes or no, or if he

 7    can't answer it yes or no, just to say, I can't answer it yes

 8    or no.

 9            THE COURT:  No.  You can inquire of the witness.  If

10    you don't get a responsive answer, you can ask it again.

11    Q.  Let's try it again, Mr. Faraj.  And I want you to answer

12    yes or no, if you can.  And if you can't, just say I can't

13    answer yes or no.  Do you understand what I'm asking?

14            So let me ask the question:  Yes or no, do you agree

15    with the statement you made in 2010, and I quote, so you cannot

16    really talk about a separation between the Palestinian

17    Authority and the Fatah, yes or no?  I agree or I disagree?

18    A.  No.

19    Q.  You disagree with the statement you gave under oath in your

20    deposition in 2010?

21            MR. ROCHON:  Objection, your Honor.

22            THE COURT:  Overruled.

23    A.  What I said in 2010 is exactly what I have just mentioned.

24    If this is what you are talking about, yes, I agree.  If there

25    is a different meaning of some words, then I give you the

f29esok6                          Faraj – cross

1    explanation that I have just made.

2    Q.  Now, I want to ask you, I think you agree with me that no

3    matter what your political beliefs, killing innocent civilians

4    is morally unacceptable, right?

5    A.  Yes.

6    Q.  And shooting people with an M16 rifle on a pedestrian mall

7    is morally unacceptable, right?

8    A.  Yes.

9    Q.  And making homemade bombs and sending people on suicide

10   missions to kill civilians is morally unacceptable, right?

11   A.  Yes, sir.

12   Q.  Now, you spoke in your direct testimony about the

13   prevention of terror activities, right?

14   A.  Yes, sir.

15   Q.  And you agree with me that it is inconsistent with the

16   prevention of terror activities to cover up involvement in

17   those activities, right?

18   A.  Yes.

19   Q.  You agree with me that it is inconsistent with the

20   prevention of terror activities to defend those activities,

21   right?

22   A.  Yes.

23   Q.  You agree with me that it is inconsistent with the

24   prevention of terror activities to fail to dismiss your own

25   employee if you have knowledge that the employee is engaging in

f29esok6                          Faraj - cross

1    those activities, right?

2    A.  Yes.

3    Q.  You agree with me that it is inconsistent with the

4    prevention of terror if you learn about the misconduct of an

5    employee involving terror to fail to remedy that misconduct,

6    right?

7              MR. ROCHON:  Objection.

8              THE COURT:  Overruled.  You can answer.

9    A.  Yes.

10   Q.  You agree with me that it is inconsistent with the

11   prevention of terror activities to make statements of approval

12   about terror activities, right?

13   A.  To incite people to kill, to commit crimes by any party is

14   totally unacceptable.

15   Q.  You agree with me that it is inconsistent with the

16   prevention of terror activities to provide money to terrorists,

17   right?

18   A.  Yes, sir.

19   Q.  You agree with me that it is inconsistent with the

20   prevention of terror activities to provide terrorists with safe

21   houses, right?

22   A.  Yes.

23   Q.  You agree with me that it is inconsistent with the

24   prevention of terror activities to release a bomb maker from

25   jail, right?

1    A.  Yes.

2    Q.  You agree with me that it is inconsistent with the

3    prevention of terror activities to harbor people who you know

4    or have reason to believe have engaged or may engage in terror

5    activities, right?

6    A.  Yes.

7    Q.  Now, I want to ask you about some of the security forces

8    that existed between 2000 and 2004.  Are you with me?

9    A.  Yes.

10   Q.  There was a civil police force, right?

11   A.  Yes.

12   Q.  You never worked in that civil police force, did you?

13   A.  No.

14   Q.  There was a marine police force, right?

15   A.  Yes.

16   Q.  You didn't work in that police force between 2000 and 2004,

17   right?

18   A.  Yes, sir.

19   Q.  There was a General Intelligence Service between 2000 and

20   2004, right?

21   A.  Yes.

22   Q.  You didn't work in that service either, did you?

23   A.  No, I didn't work for that service.

24   Q.  You didn't join the General Intelligence Service until

25   2009, right?

f29esok6                        Faraj - cross

1   A.  Yes.

2   Q.  And that was five years after the death of Yasser Arafat,

3   right?

4   A.  Yes.

5   Q.  Now, I want to show you what we've marked in evidence as

6   Exhibit 1121.  Should we put it on the screen?

7           I think for the benefit of the witness, I'm going to

8   have to read, your Honor, because I don't think he can read the

9   English language.

10          THE COURT:  Go ahead.

11  Q.  So I'm going to read you the name of an individual and

12  their branch of service.  And then I'm going to ask you a

13  question.

14          Abdel Karim Aweis, intelligence.  Mr. Karim Aweis was

15  not in the Preventive Security Service, right?

16  A.  I don't know.

17  Q.  You don't know whether Abdel Karim Aweis was in the

18  preventative security?

19  A.  I don't.

20  Q.  How about Nasser Aweis?  He's the next one on the list,

21  Nasser Aweis intelligence/national security.  Do you know who

22  Nasser Aweis is?

23  A.  As a name, yes, I know.

24  Q.  He was never in Preventive Security, was he?

25  A.  Sorry?  Pardon?

f29esok6                         Faraj - cross

1   Q.  He was never in the Preventive Security Service with you,

2   right?

3   A.  Yes, he -- no.

4   Q.  The answer is he was never in Preventive Security, correct?

5   A.  He was never, yes.  He was never in Preventive Security.

6   Q.  The next one on the list is Ahmed Barghouti, police.

7        Ahmed Barghouti was never in Preventive Security, was

8   he?

9   A.  No, he was not.

10  Q.  Do you know who Ahmed Barghouti is?

11  A.  As a name, just a name.

12  Q.  The next one on the list is Marwan Barghouti, legislative

13  council.

14        Marwan Barghouti was never in Preventive Security, was

15  he?

16  A.  No, he was not.

17  Q.  The next one is Hilmi Hamash, police.  Do you know who

18  Mr. Hamash is?

19  A.  Yes, I know.

20  Q.  You know him?

21        MR. YALOWITZ:  He said yes in Arabic but I picked it

22  up.

23  A.  Yes.

24  Q.  Was he in Preventive Security with you, Hilmi Hamash?

25  A.  No, he was not.

f29esok6                          Faraj - cross

1   Q.  Mohammed Hashaika, police.

2           Hashaika was not in Preventive Security with you, was

3   he?

4   A.  Hashaika, no, he was not.

5           MR. ROCHON:  Your Honor, I just object to the form.

6   When he says "with you," if counsel could just be clear as to

7   what he's -- could I have the Court's indulgence?

8           THE COURT:  Yes.  I assume he meant at the same time.

9           MR. ROCHON:  It was a translation issue.  I addressed

10  it.

11  Q.  Mohammed Hashaika was never in the Preventive Security,

12  correct?

13  A.  No, he was not with me.

14  Q.  Well, the question is, he was never in the Preventive

15  Security at all ever, right?

16  A.  What I know that he -- he was not working for a Preventive

17  Security.

18  Q.  Now, Ali Ja'ara, he's the next one on the list.  Do you see

19  him, Ali Ja'ara, police?  He was never in Preventive Security,

20  was he?

21  A.  No, he was not.

22  Q.  Majid Al-Masri, police.  Al-Masri was never in Preventive

23  Security, was he?

24  A.  No, he was not  -- I don't know.  Sorry.  I don't know him.

25  Q.  Abdel Rahman Maqdad, national security.  Do you know him?

f29esok6                         Faraj - cross

1   A.  No, I don't know.

2   Q.  As far as you're aware, he was never in Preventive

3   Security, was he?

4   A.  I don't know him.

5   Q.  Mohammed Mousleh, bodyguard and driver in the legislative

6   council.  Do you see his name?

7   A.  I don't know him.

8   Q.  He was not in the Preventive Security, right?

9   A.  I don't know him.  I've never heard of him.

10  Q.  Said Ramadan.  Have you ever heard of him?

11  A.  I don't know him.

12  Q.  You've never heard of him?

13  A.  No.

14  Q.  How about Ahmed Salah, have you ever heard of him?

15  A.  Yes, I know him.

16  Q.  He was in the intelligence group, right?

17  A.  I know him because he's from Bethlehem, not because he

18  works for the intelligence.  If it is the same name, Ahmed or

19  Halid.

20  Q.  I believe his name is Ahmed Salah.  Ahmed Salah.  Is that

21  the same guy you're thinking of?

22  A.  No, I don't know.

23  Q.  You don't know this Ahmed Salah, who's in the intelligence

24  branch?

25  A.  No, I don't know him.

1   Q.   None of these men were ever in your group in the preventive

2   security from 2000 to 2004, right?

3   A.   What I know about only some of them, yes, I can tell you.

4   But that's it.

5   Q.   Now, between 2000 and 2004 how many security officials were

6   there in the Preventive Security system in all of the

7   Palestinian Authority?

8   A.   Is it in the West Bank or in West Bank and Gaza Strip as

9   well?

10  Q.   So in West Bank and Gaza altogether, Preventive Security

11  Service, 2000 to 2004, how many?

12  A.   Around 5,500.

13  Q.   And of those 5,500, how many worked under your command at

14  any one time during the period 2000 to 2004?

15  A.   The West Bank was separated from Gaza Strip.  Therefore,

16  those security officers in the West Bank were about 2,500.  In

17  Hebron I had around 900 security officers working for me.  And

18  in Ramallah, Jericho, and the suburbs of Jerusalem, there were

19  about 600 security officers.

20  Q.   So did you report directly to the head of security in the

21  West Bank during those years, the head of Preventive Security

22  in the West Bank in those years?

23  A.   Yes, I was.

24  Q.   And that person was named Jibril Rajjoub, right?

25  A.   Until July 2002, yes, it was Jibril Rajjoub who was the --

f29esok6                         Faraj - cross

1    to whom I reported.

2    Q.   And during the same period, 2000 to 2002, the head of

3    Preventive Security in Gaza was who?

4    A.   Mohammad Dahlan.

5    Q.   Mohammad Dahlan.  And did Jibril Rajjoub report directly to

6    Yasser Arafat?

7    A.   Yes.

8    Q.   And Mohammad Dahlan reported directly to Yasser Arafat,

9    right?

10   A.   Yes.

11   Q.   In fact, all of the security force heads reported directly

12   to Yasser Arafat, right?

13   A.   The security officers reported directly to their -- direct

14   head of or chief, but the head of Preventive Security was

15   directly reporting to Yasser Arafat, because Yasser Arafat was

16   the president at the same time the Minister of Interior.  And

17   Preventive Security is part of internal security which belongs

18   then to the Ministry of Interior.

19   Q.   Let me make sure I have it straight.  Yasser Arafat was the

20   chairman of the PLO, right?

21   A.   Yes.

22   Q.   And he was the president of the Palestinian Authority,

23   right?

24   A.   Yes, elected.

25   Q.   And he was the commander of Fatah, right?

1   A.   Yes.

2   Q.   And he was the Prime Minister, right?

3   A.   Yes.

4   Q.   And he was the Minister of Interior, right?

5   A.   Yes.

6   Q.   Now, you said you went to meetings with Mr. Arafat, right?

7   A.   Yes.

8   Q.   Were you ever in a meeting with him alone, one on one?

9   A.   In two meetings, yes, we were alone, but in most meetings

10  there were other, other participants.

11  Q.   And did Mr. Arafat ever ask you if it was okay for him to

12  approve payments to particular individuals that he was thinking

13  about paying?

14  A.   No.

15  Q.   Did Mr. Arafat ever ask you if it was okay for him to

16  release prisoners that he was thinking of releasing?

17           MR. ROCHON:   Objection, your Honor.

18           THE COURT:   Overruled.

19  A.   No.

20  Q.   Now, the heads of all of those agencies we've talked about

21  were all working for Yasser Arafat, right?

22  A.   They were working for the political system, not for Yasser

23  Arafat, because there was also a military council, and there

24  was a person in charge in the West Bank.  He is the head of

25  general security.  And there was another person in charge in

f29esok6                         Faraj - cross

1    Gaza in the same position.

2    Q.  Didn't you say in your deposition that all of the heads of

3    security were working for Yasser Arafat, and that he calls the

4    shots?

5    A.  I say the same thing.  Yasser Arafat was the head of the

6    Palestinian people.  According to our military law, Yasser

7    Arafat was the head of the Palestinian people, as a matter of

8    fact, or like any other president, he is the high commander of

9    the Palestinian people.  This is what is stipulated in our law.

10   Q.  Let me read you an answer that you gave in your deposition.

11   And I just want to ask you, yes or no, are you sticking with

12   that answer.  Are you ready?

13   A.  Yes.

14   Q.  I'm reading from page 28, line 3, of that same August 8

15   deposition.  This is your testimony:  So under normal

16   circumstances the relationship of all the security apparatuses

17   or agencies is with the head of national security in the West

18   Bank and Gaza Strip alike, but due to the exceptional

19   circumstances, they were held by Yasser Arafat.  He was calling

20   the shots.

21          Did you give that testimony under oath in 2010?

22   A.  I said, and I say again, that president -- that Yasser

23   Arafat as a president of the Palestinian people, he is the high

24   commander of the security forces.

25   Q.  He was calling the shots, right?

f29esok6                        Faraj - cross

1   A.  He is the high commander, the first responsible person.

2   Q.  And it was he who made the decisions and called the shots,

3   right?

4   A.  Yes.  He takes these decisions, but in consultation with

5   the security authorities.

6   Q.  The ultimate decisions, although he would consult with the

7   security people who worked for him, Arafat made the decisions,

8   right?

9   A.  Like any other president in the world.  The security

10  apparatus might take decisions or subject their reports, and it

11  is the president who takes the decision, the final decision.

12  Q.  Now, I want to ask you a little bit more about Jibril

13  Rajjoub.  Was Jibril Rajjoub, after he was in charge of the

14  Preventive Security in the West Bank, did Jibril Rajjoub become

15  a national security adviser to Yasser Arafat?

16  A.  Yes.  Yes, he was the national security adviser.

17  Q.  And he held that job both in his -- under the PLO and the

18  PA, right?

19  A.  No.  Only PA.  Only Palestinian Authority.

20  Q.  Did Jibril Rajjoub ever give you his business card?

21  A.  No.

22  Q.  Would -- let me ask you this:  Are you aware that Jibril

23  Rajjoub's national security adviser business card lists his job

24  as being under both the PLO and the Palestinian Authority?

25          MR. ROCHON:  Objection to form.

f29esok6                    Faraj - cross

1              THE COURT:  Overruled.

2    A.   What I know personally, that there is no national adviser,

3    security adviser for PLO.  There's a national security adviser

4    for the Palestinian Authority.  What Jibril Rajjoub calls

5    himself or doesn't call himself, it's none of my business.

6    Q.   Let's show you Exhibit 1127 in evidence.  Do you see that

7    on the screen, Mr. Faraj?

8    A.   Yes.

9    Q.   And that's Jibril Rajjoub's business card, right?

10   A.   It needs explanation.

11   Q.   Can you answer yes or no?  Is it his business card or is it

12   not his business card?

13   A.   I don't know whether that's his business card.  Yes, but

14   even this card, it says PLO.  And this PLO sign, it's all -- it

15   exists in all its official documents of the Palestinian

16   Authority.  So it is included in Jibril's business card as it

17   is in all official documents, but I don't know, frankly, if

18   this is really his business card or not.

19   Q.   Assuming that it's his business card, I think what you're

20   saying is in official documents of the PA, they also say that

21   they're from the PLO.  Do I have that right?

22              MR. ROCHON:  Objection.

23              THE COURT:  Overruled.

24   A.   In official documents, yes.

25   Q.   Thank you.

1              Now, when you worked for Jibril Rajjoub, did he give

2     you directives and orders?

3     A.   Yes.

4     Q.   Did you ever disobey his orders?

5     A.   No, I never.

6     Q.   Did you find Jibril Rajjoub to be an honest reporter of the

7     facts to you?

8              MR. ROCHON:  Objection.

9              THE COURT:  Sustained.

10    Q.   Did Jibril Rajjoub -- when is the last time you spoke with

11    Jibril Rajjoub?

12    A.   In the past or at present?

13    Q.   When is the last time in the past that you spoke with him?

14    A.   Two weeks ago.

15    Q.   And do you have a personal relationship with him or just a

16    professional relationship with him?

17    A.   Now it is personal.

18    Q.   And are you personally close to him?  Is he a friend of

19    yours?

20    A.   Good -- we have good relation.

21    Q.   And do you find him to be a person of honesty and

22    integrity?

23             MR. ROCHON:  Objection.

24             THE COURT:  Sustained.

25    Q.   Is he still in the PA or the PLO today?

1    A.   In the Palestinian National Authority, he doesn't have --

2    he doesn't hold any post.

3    Q.   Is he still in Fatah?

4    A.   Yes.

5    Q.   And you yourself are also still in Fatah, right?

6    A.   Yes.

7    Q.   Now, let me ask you a little bit about Mohammad Dahlan.

8    He's also in Fatah, right?

9    A.   He was, and he was deceased.

10   Q.   Dahlan was the founder and head of Preventive Security in

11   Gaza from 1994 to 2001, right?

12           MR. ROCHON:  Objection, your Honor.

13           THE COURT:  Overruled.  He can answer it, if he knows.

14   A.   Yes.  He was the head of the Preventive Security.

15   Q.   And after that in 2003, he was a Minister of Internal

16   Security, right?

17   A.   Yes -- sorry, not true.

18           (Continued on next page)

19

20

21

22

23

24

25

F298SOK7                          Faraj - cross

1   Q.  I am incorrect about that?

2   A.  No.

3   Q.  Today Muhammad Dahlan is a member of the PA Legislative

4   Council, right?

5   A.  Yes.

6   Q.  When is the last time you spoke with Muhammad Dahlan?

7   A.  More than three years ago.

8   Q.  Do you have a personal relationship with him, the way you

9   do with Rajoub?

10          MR. ROCHON:  Objection.

11          THE COURT:  Overruled.

12  A.  No.

13  Q.  Do you find him to be an honest reporter of the facts?

14          MR. ROCHON:  Objection, your Honor.

15          THE COURT:  Sustained.

16  Q.  Now, I want to ask you about Tawfiq Tirawi.

17          Tirawi was your predecessor at the General

18  Intelligence Service, right?

19  A.  No.  There was another one.

20  Q.  There was somebody between Tirawi and you?

21  A.  Yes, there was another person.

22  Q.  Today Tirawi is in charge of the Palestinian Authority's

23  military academy, right?

24          MR. ROCHON:  Objection.

25          THE COURT:  Overruled.

F298SOK7                          Faraj - cross

1    A.   This academy is no longer there.  Now it has become a

2    university.  It's called Independence University.

3    Q.   And Tirawi still runs it?

4    A.   He is not the head of the university.  He is the head of

5    the council of trustees.

6    Q.   When is the last time you spoke with Tirawi?

7    A.   Three, four days before I came here.

8    Q.   Are you aware that Tirawi gave a declaration to the court

9    in this case at the request of the PA and the PLO?

10            MR. ROCHON:  Objection, your Honor.

11            THE COURT:  Is that in evidence?

12            MR. ROCHON:  No.

13            MR. YALOWITZ:  Not yet.

14            THE COURT:  Then I am going to sustain the form of the

15   question.

16   Q.   Do you know whether Tirawi gave a declaration to this court

17   at the request of the PA and the PLO?

18            MR. ROCHON:  Objection.

19            THE COURT:  Overruled.

20   A.   No, I don't know.

21   Q.   Maybe I can help you out.  Why don't I show it?

22            MR. YALOWITZ:  May I approach?

23            THE COURT:  You can't help him out if he doesn't know.

24            MR. YALOWITZ:  All right.  Fair enough.

25   Q.   Do you know of any reason why Tirawi would be unable to

F298SOK7                        Faraj - cross

1   come to court and testify?

2              MR. ROCHON:  Objection, your Honor.

3              THE COURT:  Sustained.

4   Q.  Is Tirawi a member of Fatah?

5   A.  Yes.

6   Q.  Are you familiar with an individual named Adnan Dameri?

7              MR. ROCHON:  Objection, your Honor.

8              THE COURT:  Overruled.

9   A.  Dameri or Tameri?

10  Q.  Who is the spokesman for the Palestinian security apparatus

11  today?

12  A.  Adnan al-Dameri, not Tameri.  In Arabic it makes a

13  difference.

14  Q.  I believe you.

15             When is the last time you spoke with Adnan?

16  A.  A week ago.

17  Q.  He is still the official spokesman for the Palestinian

18  security apparatus?

19  A.  Until the moment I came here, yes, he was.

20  Q.  Is he a member of Fatah?

21  A.  Yes.

22  Q.  Now, what about Marwan Barghouti, do you know Marwan

23  Barghouti?

24  A.  Yes.

25  Q.  How do you know Marwan Barghouti?

F298SOK7                         Faraj - cross

1  A.  I know him, a normal person.

2  Q.  He is a normal person?

3  A.  Yes, normal individual, yes.  He was away from post and

4  prestige.  He was a normal person.

5  Q.  He was in charge of Fatah in the West Bank during 2000 to

6  2002, right?

7  A.  No.

8  Q.  What was his role in Fatah during 2000 to 2002?

9  A.  One of the leaders in the Fatah movement.

10 Q.  He was one of the two secretary generals of Fatah in the

11 West Bank during that period?

12 A.  There is only one secretary general of the movement, not

13 two, who is the head of the movement, Yasser Arafat.  And there

14 was the central committee and there was the revolutionary

15 council.  And Marwan Barghouti was a member of the

16 revolutionary council, and also responsible for the central

17 committee.  And then above him is the head of the Fatah

18 movement.  He was the third in grade in the movement among the

19 leadership.

20 Q.  He was the number-three guy in Fatah?

21 A.  There was a third structure of Fatah.  Yes, he was the head

22 of the third structure of Fatah.  The first grade or the first

23 level is the head of the movement.  Then the central committee

24 of the movement, and also this is a very high leadership

25 position.  Then comes the revolutionary council.  Marwan was a

F298SOK7                         Faraj - cross

1    member of the revolutionary council together with about 120

2    other members.

3    Q.   I think earlier you said he had become famous or

4    prestigious or something like that.  Am I remembering that

5    right?

6    A.   I didn't say that.

7    Q.   Am I wrong about that?

8    A.   For Marwan Barghouti, I did say that he likes to show off,

9    or he wants to show off.

10   Q.   Marwan Barghouti became the symbol of the Al Aqsa Martyr

11   Brigades, right?

12            MR. ROCHON:  Objection.

13            THE COURT:  Overruled.

14            He can answer.

15   A.   No, he was not a symbol.

16   Q.   Today you're the head of the General Intelligence Service,

17   is that right?

18   A.   Yes.

19   Q.   The General Intelligence Service creates reports about

20   different people, right?

21   A.   Certainly.

22   Q.   Have you read the report of the General Intelligence

23   Service on Marwan Barghouti?

24   A.   These are leadership personalities.  This person is in

25   prison.  What report would we write on him?

F298SOK7                         Faraj - cross

1    Q.  I guess my question is a really simple one.  Have you read

2    any GIS reports about Marwan Barghouti?  Yes or no?

3    A.  Myself, no.

4    Q.  You said Marwan Barghouti today is in prison, is that

5    right?

6    A.  Yes.

7    Q.  He is in prison because he was convicted for engaging in

8    terrorist activity, right?

9    A.  This is what Israel claims.

10   Q.  You don't deny that he was convicted, do you?

11   A.  I know that he was convicted, but I know also he sent

12   letters to the media that he is not responsible for the actions

13   he claim to be responsible for.

14   Q.  Did Jabril Rajoub ever say to your knowledge that it was

15   Marwan al-Barghouti who founded the Al Aqsa Brigades according

16   to a decision by Yasser Arafat?

17           MR. ROCHON:  Objection.

18           THE COURT:  Overruled.

19   A.  No.

20   Q.  Jabril Rajoub never said that?

21           MR. ROCHON:  Objection, your Honor.

22           THE COURT:  He can answer.

23   A.  As for me, no.

24           MR. YALOWITZ:  Plaintiffs would like to offer Exhibit

25   928 in evidence.  Perhaps we should speak to the court at

F298SOK7                          Faraj – cross

1    sidebar about it.

2              THE COURT:  Do you have an objection?

3              MR. ROCHON:  Yes, sir.

4              THE COURT:  Come up.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              (At the sidebar)

2              THE COURT:  What do you want to offer?

3              MR. YALOWITZ:  Should I read it aloud?

4              THE COURT:  Just tell me what it is.

5              MR. YALOWITZ:  It's an Al Jazeera television interview

6      in which Rajoub is quoted as saying, "Practically speaking, you

7      were the ones who fought and kept up the resistance.  We never

8      removed the resistance from our agenda, and we never will.  As

9      you know, it was Marwan al-Barghouti who founded the Al Aqsa

10     Brigades according to a decision by Yasser Arafat.  Marwan was

11     its chief of staff."  It goes on from there.

12             MR. ROCHON:  This is a statement by a guy who is not

13     this witness about another guy who is also not here.  A

14     statement by Jabril Rajoub was given at a time when he was not

15     a PA employee.  So this is just a statement of some guy who

16     used to work for my client.  Therefore, I don't think he should

17     be asked about it in the first place, but my objection to that

18     was overruled.  Mr. Rajoub mulling around saying things since

19     he left the government has no place in this trial.

20             THE COURT:  On what legal basis is this admissible?

21             MR. YALOWITZ:  This is a statement --

22             THE COURT:  You want a moment to think about that?

23             MR. YALOWITZ:  I need a moment.  You have embarrassed

24     me.

25             THE COURT:  I know why you want it.  You have got to

F298SOK7                          Faraj - cross

1    have a ground and a reason.

2              MR. YALOWITZ:  This is a self-inculpatory statement.

3    He is talking about "we."  He said "we never removed

4    resistance."

5              THE COURT:  Who is he self-inculpating?

6              MR. YALOWITZ:  Himself and his co-conspirators, like

7    Barghouti.

8              MR. ROCHON:  It's not very close, but it was a nice

9    try.

10             First of all, the witness on the stand can say he is

11   engaged in resistance right now and it wouldn't be an

12   incriminatory statement because resistance is OK.

13             MR. YALOWITZ:  "We never had a dispute with Hamas or

14   anyone else regarding the principle of resistance.  In all of

15   our agreements with the brothers in Hamas and the other

16   factions, we always insisted resistance is our legitimate

17   right."

18             THE COURT:  I understand why you want it, but I am

19   still groping for a legal basis under the rules of evidence.

20             MR. YALOWITZ:  I think it's self-inculpatory.

21             MR. ROCHON:  A lot of these other statements are of

22   the same category.  I don't know if there is going to be more

23   on this, but I think we are probably done on this one.

24             THE COURT:  If you don't have a good faith basis to

25   believe that this witness is going to give you a yes answer,

F298SOK7                    Faraj - cross

1    then you shouldn't ask this witness the question.

2              MR. YALOWITZ:  He said he is friends with Rajoub.

3              Let me ask the other questions in a neutral way.  Did

4    he say X?  Did Rajoub say Al Aqsa Martyr Brigades is part of

5    Fatah?  Did Rajoub call Al Aqsa Brigades the noblest

6    phenomenon?  If he says no, then I will move on.

7              MR. ROCHON:  We object.

8              THE COURT:  You have got a basic rank hearsay

9    objection here.

10             MR. YALOWITZ:  It's a question.  If he admits it --

11             THE COURT:  It's not the question.  It's evidence.

12   It's an answer.  If he doesn't give you an answer of yes, then

13   the question is useless.

14             MR. ROCHON:  Even if he does give an answer yes, it's

15   hearsay.

16             THE COURT:  There is no way in which you have a right

17   to put that in front of this jury.  That's what it comes down

18   to.

19             (Continued on next page)

20

21

22

23

24

25

F298SOK7                          Faraj – cross

1                     (In open court)

2       BY MR. YALOWITZ:

3       Q.  So, Mr. Faraj, in September of 2014, was Adnan al-Dameri

4       the official spokesman for the Palestinian Security Forces?

5       A.  We are talking about GIS or PSS, the preventive security or

6       the general intelligence?

7       Q.  Well, I actually wasn't talking about either one.

8                     What was Adnan al-Dameri's job in September 2014?

9       A.  He was the spokesperson of the security institution, and he

10      was the head of the political directive.

11      Q.  Was he authorized to make public statements on behalf of

12      the PA?

13                    MR. ROCHON:  Objection, your Honor.

14                    THE COURT:  Sustained.  He is not in a position to

15      say.

16      Q.  Do you know whether he was the official spokesman for the

17      PA security forces?

18                    MR. ROCHON:  Objection.

19                    THE COURT:  Overruled.

20      A.  Yes.  He is the spokesperson of the Palestinian security.

21      Q.  Did you see an interview that he gave to Al Quds al

22      Arabi --

23                    MR. ROCHON:  Objection, your Honor.

24                    THE COURT:  Sustained.

25      Q.  -- in September 2014?

F298SOK7                        Faraj - cross

1                THE COURT:  Sustained.

2                Let's adjourn for the day.

3                Ladies and gentlemen, don't discuss the case, keep an

4    open mind.  See you 9:45 tomorrow.  We will start as soon as

5    you arrive.

6                (Jury exits courtroom)

7                THE COURT:  You can step down, sir.

8                Mr. Yalowitz, there is a rationale behind every one of

9    my rulings.  I don't just toss them around.  I think you know

10   what the rationale was.  You can't simply just ask this witness

11   about whether or not he read stuff that is published someplace

12   else for the simple purpose of trying to get what that person

13   said in his statement in the publication before the jury.

14               MR. YALOWITZ:  I understand that.  This is an

15   admission by the official spokesperson of the PA.  Let me just

16   read you what he said.  I think it goes directly to what the

17   witness's testimony is.

18               MR. ROCHON:  Can counsel indicate from where he is

19   reading?  It's a newspaper I understand.

20               MR. YALOWITZ:  He says, "Frankly speaking, when it was

21   requested of the Palestinian Security Forces, in an official

22   decree in the year 2000, during the Al Aqsa Intifada, they

23   fought valiantly with their limited means and hundreds of them

24   have been martyred, wounded or in prison.  700 of these

25   officers and soldiers still remain inside the Israeli

F298SOK7

1    occupation prisons.  Therefore, the security forces are subject

2    to political decision-making."

3             THE COURT:  I'm not even sure what that is supposed to

4    mean.  What is the relevance of that statement?  It proves

5    what?

6             MR. YALOWITZ:  That proves that the security forces

7    who committed acts of terror were subject to political

8    decision-making and they weren't rogue employees.

9             THE COURT:  That's what that says?

10            First of all, it didn't say anything about terror.  So

11   what portion of that are you saying stands for that

12   proposition?

13            MR. YALOWITZ:  The fact that they have got 700

14   officers and soldiers in Israel in prison.

15            THE COURT:  That's a fact.

16            MR. YALOWITZ:  That's a fact.

17            THE COURT:  So there are 700 people who were officers

18   who were in an Israeli jail.

19            MR. YALOWITZ:  The fact that, according to this

20   spokesman, that fact proves -- he says, "Therefore, the

21   security forces are subject to political decision-making," and

22   he is linking that 700 to the Al Aqsa Intifada.

23            THE COURT:  Where does it say anything about Al Aqsa

24   Intifada?

25            MR. YALOWITZ:  In the previous sentence.  He says,

F298SOK7

1    "Frankly speaking, when it was requested of the Palestinian

2    Security Forces, in an official decree in the year 2000, during

3    the Al Aqsa Intifada, they fought valiantly with their limited

4    means and hundreds of them have been martyred, wounded or in

5    prison."

6              THE COURT:  This is a newspaper article?

7              MR. YALOWITZ:  Quoting this official spokesman.

8              THE COURT:  How do we know it's being accurately

9    quoted?  Isn't that the purpose of the hearsay rule?  That the

10   statement by this reporter about what this other person said

11   may not be accurate.  So, therefore, you need to bring that

12   person in as a witness if they are going to testify that he

13   made such a statement that you want to offer for its truth.

14             MR. YALOWITZ:  The original comment was made by this

15   spokesman on a Facebook post.  I may have a copy of that in the

16   original Arabic.

17             THE COURT:  How can you prove that he posted it?

18             MR. YALOWITZ:  I think it's under his name.  We don't

19   have him here.

20             THE COURT:  I am not saying anything that surprises

21   you.  You can't slip all of this stuff in that you want to

22   quote from third parties who are not witnesses in this case so

23   the jury can assume what they say or said in 2013, 2014 is an

24   accurate and truthful rendition of what was going on back in

25   2001, 2002 and 2004, particularly when it's being reported by

F298SOK7

1    various layers of hearsay.

2              MR. YALOWITZ:  I don't want to argue with you.

3              THE COURT:  You can argue with me.  It's fine.  You

4    won't win it, but you can argue with me.

5              MR. YALOWITZ:  That's why I don't want to argue.

6              THE COURT:  You argue.  I rule.  That's fine.  You can

7    argue.

8              MR. YALOWITZ:  That's the division of labor here.

9              THE COURT:  It doesn't disturb me.  You are

10   experienced enough to know you can't do that.  You have got to

11   give me something else.  Particularly with this witness who

12   doesn't have a clue about any of this stuff.  He hasn't said he

13   is aware of any of the statements that you are trying to put in

14   through him.

15             From now on, I am not going to allow you to shoot in

16   the dark to try to see which witness you can get to say, yeah,

17   I read something that you want to put in and so you can hit the

18   jackpot and determine that you can get it in through that

19   witness.  You have no good faith basis to believe that this

20   witness has any testimony to give with regard to that

21   statement.  None whatsoever.

22             MR. YALOWITZ:  I am going to disagree with you.

23             THE COURT:  What do you think he is going to say?

24             MR. YALOWITZ:  I think that this was a significant

25   enough statement proximate in time to his testimony by the

F298SOK7

1   official spokesman for his security forces that he would have

2   been aware of it.

3          THE COURT:  You haven't demonstrated that yet.  And it

4   has turned out to be just the opposite with every single

5   statement you have attempted to introduce in that way through

6   this witness.  He says he never heard it.  Why should he have

7   heard it, just because you say it's out there?

8          MR. YALOWITZ:  I shouldn't have taken the bait of

9   arguing it with you.  When you say I didn't have a good faith

10  basis --

11         THE COURT:  You don't have a deposition that you took

12  of this witness where he acknowledged he heard this.  You don't

13  have a statement by this witness saying he heard anything about

14  this.  It's just a shot in the dark.  You're just hoping that

15  he said, yeah, I heard it.  I am not going to let you keep

16  reading stuff before the jury and doing it that way.  The same

17  thing I said to them.  And I can't unring the bell with the

18  jury.  You want to put it before the jury.  No, you can't.

19         The reality is if you want to have him read something

20  or you want something read to him privately out of the hearing

21  of the jury and ask him whether he is aware of any of that, and

22  you have at least some good faith basis to think he might say

23  yes, then put it in front of him and privately ask him to read

24  it, or have it translated to him, and you can say, without

25  telling us what is in it, have you ever heard that before, and

F298SOK7

1       he'll say no.

2                MR. YALOWITZ:  Let me try it that way.

3                THE COURT:  But only do that on something that you

4       have some basis in fact to believe that there is some

5       affirmative evidence that he really does know something about

6       it.  I am not going to let you just keep putting it in front of

7       him just because it's in a newspaper article or public

8       statement so you can hope he will say, yeah, that's something I

9       heard.  If you want to take some opportunity to do that on

10      something that you think is real important and you think is

11      admissible and you have a reason to think he is going to say

12      yes, then I will give you some leeway.  But if you want to just

13      do that with everything you want to slip in, somebody else's

14      statement about these events who is not testifying here, I am

15      going to start to shut this down.

16               MR. YALOWITZ:  Let me look at it tonight.  We will

17      either be real focused or we will move on entirely.  I hear

18      what you're saying.  We will either be very focused and do it

19      in the way you have suggested or we will just move on.

20               MR. ROCHON:  I think I learned once to quit when I am

21      ahead.  I have nothing to add.

22               THE COURT:  Let's pick up tomorrow morning at 9:45.

23      If you have got some other issues you want to bring to my

24      attention, let's do it.

25               MR. ROCHON:  Did you mean 9:15 for us?

F298SOK7

1        THE COURT:  I guess 9:15 if I anticipate there will be

2    something.

3        MR. YALOWITZ:  I think not the next witness, but the

4    witness after is Sfard, and if I could get a proffer from the

5    defense as to what they think he is going to testify about, I

6    will reflect on it overnight, and if we have something to argue

7    about, we can do that.

8        MR. ROCHON:  I read him the proffer at lunch.  I will

9    give it to him again.

10       MR. YALOWITZ:  I want it on the record.

11       MR. ROCHON:  Here is he what he is going.  He is going

12   to testify about what security offenses are under Israeli law,

13   under Israeli military law.  He is going to talk about how

14   prisoners are classified as security prisoners.  He will talk

15   about the percentage of cases brought in the military court

16   during the relevant time period, which were for murder or

17   attempted murder.  That's it.  It's like 20 minutes of

18   testimony and it's directly responsive to plaintiffs' case.

19       This is a guy who studied that whole system, compiled

20   the statistics on these things, produced a written report on

21   it.  None of it is about the quality of justice.  None of it is

22   about due process.  None of it is about how the system even

23   works really.  It's just some really basic stuff that's been

24   testified about by other witnesses.

25       MR. YALOWITZ:  Quite frankly, I don't have a problem

F298SOK7

1   with the first one.  I don't understand what the second one

2   means.

3               THE COURT:  What is the second one?

4               MR. ROCHON:  He would say that the Israeli prison

5   service first determines who is classified as a security

6   prisoner.  And that's relevant to who gets the payments.

7               THE COURT:  Again, don't tell me what the subject

8   matter is, or don't tell me what your questions are.  What is

9   he going to say?

10              MR. ROCHON:  That the Israeli prison service

11  classifies prisoners as security prisoners or not.

12              THE COURT:  Is he going to say how?

13              MR. ROCHON:  Yes.

14              THE COURT:  Tell me that.

15              THE COURT:  I will let Mr. Satin do it.

16              MR. SATIN:  He will talk about the law and an order

17  that was made that says these are the offenses that qualified

18  someone to be a security prisoner.

19              THE COURT:  What are the relevant offenses to this

20  case?

21              MR. ROCHON:  The relevance to this case -- and I

22  apologize for the tag team -- is that the plaintiffs have

23  obviously emphasized payments to prisoners, and we want to

24  establish those payments are made across a wide array, not just

25  to people who are convicted of acts of terror.

F298SOK7

1          THE COURT:  I am not sure what that has to do with how

2     the PA decides to give them a payment.  It seems to me that the

3     level and different classifications by the Israeli government

4     are totally irrelevant and play absolutely no part in the

5     Palestinian Authority determining whether or not they are going

6     to make a payment.

7          MR. ROCHON:  It's a binary world.  You're either a

8     security prisoner or you're not.

9          THE COURT:  And if you're a security prisoner, even if

10    that just means you stole a loaf of bread, you get a payment.

11    So what difference does it make how they are classified?  What

12    difference does it make?

13         MR. ROCHON:  Because the PA actually does take that

14    information and uses it to determine who receives such payment.

15         THE COURT:  The PA takes the information that the

16    person is classified as a security prisoner regardless of why

17    they are classified as such, right?

18         MR. ROCHON:  Yes.

19         THE COURT:  And makes payments.

20         MR. ROCHON:  Yes.

21         THE COURT:  So what difference does it make between

22    person A who is classified one way and person B who is

23    classified a second way when it doesn't make a bit of

24    difference about whether or not the PA is going to pay them?

25         MR. ROCHON:  It's important to this case that the

F298SOK7

1    determination is made by the Israeli prisons, not by the PA.

2              THE COURT:  But it's not.  The determination to make

3    the payments is made by the Palestinian Authority because the

4    Palestinian Authority said we will make payments to anybody who

5    the Israeli government classifies as a security prisoner.

6              MR. ROCHON:  If somebody will stipulate to that --

7              THE COURT:  Am I saying something that is incorrect?

8              MR. ROCHON:  You're saying something that is correct,

9    but it's not yet quite in evidence.

10             THE COURT:  Well, I don't know where I picked it up.

11   I didn't pick it up anywhere else but this courtroom.

12             MR. ROCHON:  We can write up a stipulation to that

13   effect.

14             THE COURT:  I assume you may have some other utility

15   for it, but I don't see how it advances your argument that

16   somehow that affects the judgment about whether they are going

17   to get a payment.  It has nothing to do with whether they are

18   going to get a payment.  If Israel changed their

19   classifications and added five more subject matters under being

20   a security prisoner, they would get payments like everybody

21   else, right?

22             MR. ROCHON:  Yes.

23             THE COURT:  So what difference does it make?  Why do

24   we need testimony about the 20 categories of who security

25   prisoners are for that purpose?  You may want it for some other

F298SOK7

1    purpose, but not that purpose.

2          MR. ROCHON:  First of all, the testimony will be about

3    as long as this argument.  The point is just that it's a wide

4    array of offenses that the PA is accepting this for.  And that

5    helps us, we believe, because the plaintiffs through their

6    expert has made a big deal on a chart over here that we pay 17

7    million shekels a month for security prisoners, and the

8    impression we are concerned the jury might have is that that 17

9    million shekels a month is going to people who bombed, killed,

10   did terrible terrorist acts, and we want to show that it's for

11   a wide array including some things that are very much not

12   serious.

13         THE COURT:  What is that list?

14         MR. ROCHON:  That's what Mr. Sfard can help with.

15         MR. SATIN:  Do you want me to tell the court the types

16   of offenses that are on there?

17         THE COURT:  I want you to tell me how many, and

18   depending how large a list that is, I want to know how much of

19   it we are going to sit hear and listen to.

20         MR. SATIN:  Just to be clear, we weren't going to

21   elicit every single offense because it is quite long.

22         THE COURT:  So what are you going to elicit?

23         MR. SATIN:  Categories.  It will be such things as

24   throwing objects, disturbance of the peace, disturbing a police

25   officer on business, destruction of property.  Offenses that

F298SOK7

1    clearly are not the type of terrorist activity that this jury

2    has heard about.

3            THE COURT:  So you want to show that not everybody who

4    is there is in prison because he is a terrorist.

5            MR. ROCHON:  Not everybody who gets this money is a

6    terrorist.

7            THE COURT:  Not everybody who is getting this money is

8    somebody who is a terrorist.

9            MR. YALOWITZ:  I don't have this matrix memorized, but

10   I don't think you start getting serious money until you have

11   been in prison for a long time.  The longer you're in, the more

12   you get.

13           There's two things that I have a problem with.  One is

14   they are trying to run away from their decisions, which is it's

15   not Israel's decision who they pay, it's their decision who

16   they pay.  And if they want to pay a terrorist, they pay a

17   terrorist.  And if they don't want to pay a terrorist, they

18   know how to write a law -- they are intelligent people -- that

19   says we are not going to pay a terrorist.  So to have somebody

20   go say a whole bunch of stuff about, well, it's Israel who

21   decides, I think it's not relevant, and I think what they are

22   trying to do is run away from their own law.

23           The other thing is this last business about how many

24   people are in -- since 1967 how many people have ever been

25   arrested or something --

F298SOK7

 1              MR. ROCHON:  We are not going to ask him that.  What I

 2      said was that, in the relevant time period, how many of those

 3      people were charged with murder or assault?

 4              THE COURT:  What is he going to say?

 5              MR. SATIN:  He would say that between 2002 and 2006,

 6      of the number of people who are charged in the military court,

 7      1 percent were charged with murder and another 4 percent

 8      attempted murder.

 9              THE COURT:  Why doesn't that cut both ways?

10              MR. ROCHON:  If it cuts at least one way, we would

11      like to put it in.

12              The process was really important when they had a

13      witness on the stand going through our law and talking about

14      how it worked.  When we want to put in some additional evidence

15      about the process, all of a sudden we are running away.

16              THE COURT:  I am just going on what you say.  If all

17      you intend to do is that, I am inclined to say go at it, and

18      you guys can argue about that and argue that most of the people

19      who are in prison aren't in prison -- what did you say 1

20      percent and 4 percent?

21              MR. SATIN:  Yes.

22              THE COURT:  You are going say 95 percent who are

23      security prisoners are not convicted of murder or attempted

24      murder.  And they can argue, then that doesn't make it very

25      difficult for you to cut out that 5 percent and not pay them,

F298SOK7

1   pay all the other rock throwers.  You guys can argue what you

2   want.  Unless Mr. Yalowitz has a more substantive objection to

3   that minimal testimony, I will allow that.

4          MR. YALOWITZ:  I don't have a problem with the

5   testimony as it's been described.

6          MR. ROCHON:  All right.

7          THE COURT:  Then I will see you in the morning.  9:15

8   and we will deal with all the other issues.

9          (Adjourned to February 10, 2015, at 9:15 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F298SOK7

                            PLAINTIFF EXHIBITS

Exhibit No.                                        Received

  157    . . . . . . . . . . . . . . . . . .2792


                           INDEX OF EXAMINATION

Examination of:                                    Page

MAJED FARAJ

Direct By Mr. Rochon . . . . . . . . . . . .2814

Cross By Mr. Yalowitz  . . . . . . . . . . .2922