F2ATSOK1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MARK I. SOKOLOW, et al.,

4                   Plaintiffs,

5              v.                        04 CV 397 (GBD)

6    PALESTINE LIBERATION
     ORGANIZATION, et al.,
7
                   Defendants.
8
     ------------------------------x
9                                        New York, N.Y.
                                         February 10, 2015
10                                       9:15 a.m.

11   Before:
                    HON. GEORGE B. DANIELS,
12
                                         District Judge
13
                         APPEARANCES
14
     ARNOLD & PORTER LLP
15        Attorneys for Plaintiffs
     BY:  KENT A. YALOWITZ
16        PHILIP W. HORTON
          TAL MACHNES
17        SARA PILDIS
          CARMELA T. ROMEO
18        RACHEL WEISER
          LUCY S. McMILLAN
19
     MILLER & CHEVALIER, CHARTERED
20        Attorneys for Defendants
     BY:  MARK J. ROCHON
21        LAURA G. FERGUSON
          BRIAN A. HILL
22        MICHAEL SATIN
          DAWN E. MURPHY-JOHNSON
23
     Also present:  BACHIR AL-OKLA, Arabic interpreter
24                  ZAHA BUSTAMI, Arabic interpreter

25

F2ATSOK1

| 1 | (Jury not present) |
| 2 | THE COURT:  Good morning, let me -- I want to do one |
| 3 | thing first and then we can discuss it further.  Is the witness |
| 4 | here? |

1          (Jury not present)

2          THE COURT:  Good morning, let me -- I want to do one

3    thing first and then we can discuss it further.  Is the witness

4    here?

5          MR. ROCHON:  The witness is not here, but he's on the

6    8th floor.

7          THE COURT:  I want him here because what I want to do

8    is in regard to the letter I received, and you can respond to

9    that.

10          I want to look at the video -- and I think I remember

11    them, but I want to look at the video and I want the witness to

12    see it out of the presence of the jury, and then we can figure

13    out whether or not the witness should be questioned about it.

14          So if I decide that you should be able to question the

15    witness, and we'll see if you can lay a proper foundation for

16    their admissibility.  And if they're otherwise admissible, you

17    can do that and I can rule they're in or rule that they're out,

18    or at least figure out whether or not there's going to be

19    questioning regarding to the witness regarding these statements

20    or the videos themselves will come in.

21          MR. YALOWITZ:  We appreciate that.  That's exactly how

22    we were hoping to proceed.

23          In that regard, we also last night were looking at

24    Tawfiq Tirawi's personal web site, and I also, outside of the

25    presence of the jury, would like to show that the witness.

F2ATSOK1

1          THE COURT:  What is the substance?

2          MR. YALOWITZ:  The substance of it is he was the most

3     wanted by Israel during the Al Aqsa intifada.  He stayed in the

4     Mukataa for several years under the protection of Arafat.  And

5     so the inference is -- I think the fair inference from the

6     testimony -- I have never spoken to Tirawi, unlike the witness,

7     but the inference I'm drawing from the testimony and the facts

8     as I understand them is that Tirawi seems to have gotten some

9     kind of political pardon in 2003 from the State of Israel.

10          THE COURT:  So I guess they don't want him.  He's not

11     wanted by the State of Israel.

12          MR. YALOWITZ:  He was wanted before 2003.

13          THE COURT:  But forgiven.

14          MR. YALOWITZ:  As of 2003 he seems to have been

15     pardoned.

16          THE COURT:  So what is that evidence of?

17          MR. YALOWITZ:  That's evidence that rebuts the

18     defendants' suggestion that he never did anything wrong.

19          THE COURT:  Why does that rebut that if they pardoned

20     him?  Do we know why they pardoned him?  Did they pardon him

21     because he was innocent or because they didn't have proof or

22     did they pardon him because there was some exchange of

23     prisoners or some or reason for the pardon?

24          MR. YALOWITZ:  My guess is, like so many things in the

25     Middle East, it depends who you ask.

F2ATSOK1

 1            THE COURT:  And you're asking Tirawi not anybody else.

 2            MR. YALOWITZ:  I'm prepared to ask Faraj was he

 3    pardoned.

 4            MR. ROCHON:  Not Tirawi.

 5            THE COURT:  You said it was his web site, so you want

 6    to use --

 7            MR. YALOWITZ:  He didn't say he was pardoned.

 8            THE COURT:  But you're trying to say that he put on

 9    his web site --

10            MR. YALOWITZ:  That he was wanted.

11            THE COURT:  So that's his statement that he was

12    wanted, that's not anybody else's statement that he was wanted.

13            MR. YALOWITZ:  There is evidence already in the record

14    that he was wanted, so --

15            THE COURT:  You want to put in further evidence he was

16    wanted without putting in evidence that he was pardoned?

17            MR. YALOWITZ:  I'm willing to ask the question:  Is it

18    your belief that he was pardoned?

19            THE COURT:  If there is evidence that he was wanted

20    and then pardoned --

21            MR. YALOWITZ:  I don't have that evidence.

22            THE COURT:  But I'm not sure what is the reasonable

23    inference or what is the utility of his own web site that says

24    he was wanted?  To imply that because he was wanted he must

25    have been guilty?

F2ATSOK1

```
 1              MR. YALOWITZ:  To imply that because he was wanted he

 2   may have been guilty.  That's an issue for the jury to decide.

 3              THE COURT:  Did you hear that?

 4              MR. ROCHON:  I missed it.

 5              THE COURT:  Because I didn't see you react to it.  You

 6   can say it again.

 7              MR. YALOWITZ:  Sure, the fact that he was wanted --

 8              MR. ROCHON:  Should the translator begin yet or not?

 9              THE COURT:  No.  In fact, let me have the court report

10   read what you said about my last question and your last answer.

11              (Record read)

12              THE COURT:  You think it's a stronger argument that he

13   may have been guilty for that purpose rather than being

14   evidence that he was in fact guilty?

15              MR. YALOWITZ:  The fact that he was wanted makes it

16   more likely than not that he was guilty.

17              THE COURT:  But not if he was pardoned.  It makes it

18   more likely than not that he wasn't guilty.

19              MR. ROCHON:  There's a real topsyturvy element that is

20   happening, because the trial is now turning into playing what

21   other people may or may not have said and trying to present it

22   to witnesses.  And what those other people said outside of

23   court, if not for the truth, doesn't matter at all, and if for

24   the truth is not admissible that way.  And even if they said

25   it, it still doesn't prove the things that Mr. Yalowitz wants.
```

F2ATSOK1

1     That's one part of the topsyturvy things here.

2              But the other thing is Shrenzel, when faced with the

3     evidence that this guy was never charged in any of these

4     incidents, said that's because we wouldn't get him.  And it was

5     pretty dramatic.  He said because he was not in the hands of

6     Israeli authority, that's the only reason -- were he captured

7     by the Israelis, as we really liked to do, he would have been

8     indicted.  That's what Shrenzel says.  Now we're hearing no, he

9     was pardoned in 2003, before even the last incident in this

10    case occurred.

11             And so Shrenzel's testimony is inconsistent with the

12    argument that is now being used to get in what Tirawi put on

13    his web site, which is Brian Williams said that he stared down

14    a rocket grenade launcher, and he said that on TV, too, and it

15    wasn't true.  Just because Tawfiq Tirawi puts on his web site

16    that he was the greatest guy ever in the second intifada is

17    about as reliable a piece of evidence as me going to the guy

18    who shines my shoes out there and saying:  What do you think

19    about the trial?

20             This is not how you try cases, which is presenting

21    what people say on web sites and saying to the witnesses:  Hey,

22    what do you think of that?  They never sought to depose Tawfiq

23    Tirawi, even though they argued to you he's part of our client.

24    We don't agree he's part of our clients.  They never sought a

25    deposition to say to him:  So, Tawfiq Tirawi, were you

F2ATSOK1

1    involved?  Did you do this?  Did you want it?

2          All of this, Judge, I think is getting away from how

3    we do trials in the United States, which is witnesses come to

4    court and they get cross-examined on what that said and what

5    they know and not present out-of-court statements by others for

6    them to just opine on.

7          So we suggest that we really don't need to hear about

8    Tawfiq Tirawi's Facebook postings which were like printed

9    yesterday.

10          THE COURT:  Do you have a copy for me to look at?

11          MR. ROCHON:  We have an extra.

12          No offense to Brian Williams, I'm sure there's an

13    explanation for that.

14          THE COURT:  Where --

15          MR. YALOWITZ:  We're on page 2 of 3 at the bottom

16    left, it says Al Aqsa intifada.

17          THE COURT:  Page 2 of 3 on the bottom.

18          MR. YALOWITZ:  When the Al Aqsa intifada erupted,

19    Tawfiq Al Tirawi had a declared view that didn't go along with

20    the Israeli occupation desire.  Therefore, accusations were

21    pointed to him and he was wanted once again.  He was under

22    siege in the Al Mukataa with the former leader Yasser Arafat

23    for more than three years.  During the last siege imposed on

24    the late president Arafat, Al Tirawi became the most wanted

25    Palestinian.  That's all I want to ask him about.

F2ATSOK1

1          THE COURT:  That's not an accurate picture of what

2     ultimately happened.  He was never sought and he -- when you

3     say he was pardoned, I'm not even sure what that means.  What

4     do you mean he was pardoned?

5          MR. YALOWITZ:  What I have been told is that he was

6     wanted, and that as part of a political deal the Palestinian

7     side and the Israeli side reached an agreement that he would

8     not be prosecuted.  At this point, that's not in the record.  I

9     don't know if this witness knows about it.  I'm telling you

10    that's my understanding of what happened.  I don't know what

11    year it happened.  I'm guessing from what Mr. Rochon's

12    questions were that it was 2003.

13          So the truth, as I understand it, is he was wanted, he

14    was in the Mukataa, he was pardoned, he's not wanted today.

15    And I think that given all of the back and forth about was he

16    wanted, was he arrested, was he charged, I think it's fair to

17    put that factually neutral story.

18          THE COURT:  What do you claim he was wanted for?

19          MR. YALOWITZ:  For terrorist activity.

20          THE COURT:  Which terrorist activity?

21          MR. YALOWITZ:  I don't know.

22          THE COURT:  That's a problem, too.  Are you saying he

23    was wanted for one of the terrorist activities involved in this

24    case?

25          MR. YALOWITZ:  I don't -- I'm not saying he wasn't,

F2ATSOK1

1    I'm not saying he was.  I'm saying I don't know.

2              THE COURT:  You're saying you have no evidence that he

3    was wanted in relationship to any of the terrorist attacks at

4    issue in this case.

5              MR. YALOWITZ:  I don't have any knowledge on that at

6    all.

7              THE COURT:  All right.  So you don't know why he was

8    wanted and you don't know why or how he was pardoned.

9              MR. YALOWITZ:  That is true.

10             THE COURT:  And you want is the jury to conclude that

11   the Israelis thought he was a bad person?  What is the --

12   you've got to give me something more than they wanted him.

13             MR. YALOWITZ:  I think the whole Tirawi was he wanted,

14   where was he wanted, I think it's become a bit of a side show.

15             THE COURT:  I do, too, and I'm not sure I understand

16   what you claim he was wanted for.

17             MR. YALOWITZ:  Because I don't know what he was wanted

18   for.

19             THE COURT:  Then I guess it's not very much use to the

20   jury then.

21             MR. YALOWITZ:  Oh, right.  Tirawi was implicated in

22   the March 21 bombing by one of the convicted individuals,

23   Nassar Shawish.

24             THE COURT:  In a statement to Israeli --

25             MR. YALOWITZ:  In a statement to Israeli officials.

F2ATSOK1

1          So I am deducing that that was something that they

2     would have wanted him for.  I have never talked to anybody or

3     seen any documents saying:  Wanted, the FBI most wanted list,

4     Tawfiq Tirawi, in connection with such and such.

5          THE COURT:  Is there any public information that they

6     wanted him?

7          MR. YALOWITZ:  Yeah, it's in the record.  There's one

8     of the -- I think it's the captured document reports said

9     he's -- I want to be careful about "wanted," but he's certainly

10    implicated in those captured documents.

11         THE COURT:  When was the Zinni list?

12         MR. YALOWITZ:  December of '01.

13         THE COURT:  And he wasn't on the Zinni list.

14         MR. YALOWITZ:  Not that I know of.  We don't have a

15    complete copy of the Zinni list, but I don't have any basis to

16    say he was.

17         THE COURT:  So you want the jury to draw the

18    conclusion that he was a terrorist because the Israeli

19    government -- he says the Israeli government wanted -- he was

20    one of the top wanted people for a limited period of time

21    before he was pardoned, as you say.

22         MR. YALOWITZ:  I want the jury to -- let me put it

23    this way, I would -- if I had my druthers, I would want the

24    jury to look at the evidence in this case directly implicating

25    Tirawi, and that would be that.

F2ATSOK1

1           On cross the defendant said well, he was never

2     charged.  And so we now have a side show about that cross

3     questioning, why was he never charged.  The defendants want to

4     argue --

5           THE COURT:  We know why he was never charged, because

6     the Israeli government made a decision that they did no longer

7     wanted him and would no longer pursue criminal charges against

8     him for any reason.

9           MR. YALOWITZ:  For whatever reason.

10          THE COURT:  For any reason.  It doesn't matter what

11    reason it is.  That's the reason why he was never charged,

12    because the Israeli government made a decision not to charge

13    him.  They didn't need to pardon him.  There are a lot of

14    people sitting in prisons who would have loved a pardon but the

15    Israeli government would not give it either on its own or in

16    exchange for something else.

17          So it is an Israeli government decision whether or not

18    they wanted to charge him, arrest him, or seek his indictment,

19    or accuse him of any particular crime.  The jury nor I have any

20    indication of what crime that the Israeli government believes

21    that he committed.

22          I don't know what to do with that.  I can't just sort

23    of say well, I don't know if he was wanted as a material

24    witness, I don't know why he was wanted.  It doesn't say that

25    he was accused of X attack and he's wanted for that attack.

F2ATSOK1

1    Matter of fact, I don't think you have any evidence from the

2    Israeli government explaining their view of what it is that

3    they thought he was guilty of.

4        MR. YALOWITZ:  I want to check that, but I'm sitting

5    here today, I don't disagree with anything you said.

6        THE COURT:  All right.

7        MR. ROCHON:  We also have Tirawi might have some

8    fairly -- no offense to Mr. Tirawi -- grandiose views of

9    himself.  And for instance, assuming that he was pardoned in

10   2003, his claim on his Facebook page that he was under siege in

11   the Al Mukataa for more than three years would suggest that he

12   decided to stay there after he had been pardoned for a while,

13   because the siege began, at the soonest, in 2002.  So I guess

14   for a couple of years he stayed there.

15           This is so many layers of unreliable information piled

16   on unreliable information, all sparked -- because the

17   plaintiff's witness, when presented with a simple fact he was

18   not charged, decided to claim that the only reason was because

19   they could never get him.  And Judge, if what Mr. Yalowitz is

20   saying today is true, then what he said the other day was at

21   best wrong, if not false.

22       MR. YALOWITZ:  I think Mr. Rochon is mischaracterizing

23   the testimony.

24       THE COURT:  The jury can make their own determination

25   to exactly how the evidence was presented, but I, on the basis

F2ATSOK1

1    of -- the bare basis on which you said that this evidence would

2    support the kind of inference that you want it to support, I

3    don't see that this is a legitimate piece of evidence for the

4    jury to make that inference.

5          MR. YALOWITZ:  I understand the Court's ruling, let's

6    move on to other things.

7          THE COURT:  Would you show the two videotapes that you

8    want to ask this witness about?

9          MR. YALOWITZ:  Hold on.  Before we do that, I have a

10    problem with one of the translators who just stood up.

11          THE COURT:  What's your problem?

12          MR. YALOWITZ:  My problem is this -- ma'am, I

13    apologize, I don't remember your name.

14          THE INTERPRETER:  Zaha Bustami.

15          MR. YALOWITZ:  Ms. Bustami any not on the list of

16    translators given to us.  We were given a list of four

17    translators.  We worked diligently to with the defendants to

18    try to vet the translators.  They worked with them, they

19    brought them.  This lady was not on -- we didn't hear about her

20    until last night.  They decided to make a last-minute

21    substitution.

22          I'm very concerned about her as a translator because

23    she appeared as a check translator in the Arab Bank trial and

24    there was a problem, and the problem was a political problem.

25    The problem is this lady -- I respect her political views,

F2ATSOK1

1    she's very active in the political issues between the Israelis

2    and the Palestinians, she has come out very strongly on the

3    Palestinian side, and that leaked into her work as a

4    translator.

5        And the example that I heard from the plaintiffs'

6    counsel -- I spoke to him this morning -- from the Arab Bank

7    trial was that she translated the term amaliya istishhadiya,

8    which is an Arabic word even I know from the case, which is a

9    suicide bomber, she translated that as deceased person.  And

10   that is denuding the word of all of its specificity in a way

11   that I find very troubling.  And to bring somebody new in the

12   middle of cross-examination, who has a history that I'm

13   concerned about, and have her substitute in for the cross when

14   she wasn't there for the direct is a very serious concern to

15   me.  And I asked the defendants to use only the four that we

16   have already had notice of, and for whatever reason they're

17   refusing.  And so to have this woman start to translate, it's a

18   real problem for me.

19       THE COURT:  Before I hear from Mr. Rochon, let me give

20   my reaction and two possible scenarios.  Obviously one is that

21   if she translates something inaccurately, I have allowed you to

22   have your own translator at the table, and he can notify and

23   you can notify me and we can address it.

24       But I might even give you more than that.  If you wish

25   to utilize simply the other translator for your

F2ATSOK1

cross-examination, I don't particularly have a problem with

that.  I don't want to wear out the one translator, and if she

needs a break, we can take a break.  But I'm not really

inclined to tell Mr. Rochon which one he has to use when he's

on his examination, but if you would prefer on your

cross-examination to utilize the other translator who was here

yesterday, I don't have a real problem with that, but I'll hear

from Mr. Rochon.

MR. ROCHON:  Let me give the Court a background.

There were four names -- Mr. Yalowitz asked the Court that we

give four names.  The woman sitting down is one of the four.

The gentleman yesterday did a terrible job, by all accounts.  I

think plaintiffs noticed some of the problems.  We noticed some

of the problems.  We couldn't bring him back.  We tried to see

if the other two weren't available.  They weren't available.

The translator sitting down needs some back up, so we

wanted to have some back up.  The issue Mr. Yalowitz refers

to -- I wasn't at the Arab Bank case, I haven't talked to that

lawyer, but since the translators understand both English and

Arabic, ideally, she of course heard Mr. Yalowitz and

understands that in this trial amaliya istishhadiya is

translated as suicide bomb her or suicide attack, doesn't

necessarily mean bomber.  So I think that's fine.  I don't

think we can use the person that the Court is referring to as

the plaintiff's translator --

F2ATSOK1

1           THE COURT:  No, that's not what I was suggesting.

2           MR. ROCHON:  -- for his cross.

3           THE COURT:  I was suggesting that he could utilize

4    your other translator who was here yesterday if he's more

5    comfortable with that on cross.  That's all I'm suggesting.

6           MR. ROCHON:  That's fine.  She may need a break at

7    times.

8           THE COURT:  That's right.  I don't want to wear her

9    out.  If she tells me, we can give her a break, but you can use

10   utilize either one of the translators on your redirect if you

11   have redirect, and I will give Mr. Yalowitz whatever translator

12   he's most comfortable with, and he has his own translator at

13   the table, so if there's a problem, we agreed yesterday to let

14   him have someone who can tell us there's a problem.  And I

15   appreciate the fact that it was a little awkward yesterday with

16   the other interpreter, and that the change that is being made

17   here with regard to translators is to improve the situation.

18          MR. ROCHON:  I am fine with the Court's approach using

19   Ms. Okla as our translator during the primary part of

20   Mr. Yalowitz's cross, as long as he understands that perhaps

21   after 30 minutes or so she would need a break, and he can

22   decide if he wishes to have them switch or take a short recess.

23          THE COURT:  Mr. Yalowitz?

24          MR. YALOWITZ:  I think that's a good approach.  Let's

25   start that way, and I think that if we wind up using the second

F2ATSOK1

1    translator, whose name I've already forgotten, I'm really

2    sorry, maybe Mr. Spitzen can sit side by side, and if there's a

3    problem, they can discuss it and see if they can come to an

4    agreement.

5         THE COURT:  I think it's easier if Mr. Spitzen sits by

6    you and tells you if there's a problem.

7         MR. YALOWITZ:  I object to the translation and ask for

8    a side bar.

9         THE COURT:  You can ask for a side bar if you think

10   it's a serious question; not if it's a question of semantics,

11   if it's a question of meanings.

12        MR. ROCHON:  The other thing we can do, of course, is

13   when the one translator is not working she can work as a check

14   translator as well that we can inquire of.

15        THE COURT:  As matter of fact, I observed that to

16   already be the case.  She helped yesterday the gentleman who

17   was having some issues, and she could do that today.  I do not

18   anticipate the issues Mr. Yalowitz is talking about, but I

19   agree we have not provided the name of translator in advance,

20   and we respect the position.

21        MR. YALOWITZ:  Let's proceed that way and we'll see

22   how it goes.

23        THE COURT:  Would you play the Exhibit 217 and 218 so

24   we can all look at it, including --

25        MR. ROCHON:  If I may now, using the translator,

F2ATSOK1

1    please look at this is video.

2              THE COURT:  Is this in English or Arabic?

3              MR. YALOWITZ:  It's in Arabic and there are English

4    subtitles.

5              THE COURT:  Good.  I'm pretty sure he have seen them

6    both.

7              (Video recording played)

8              THE COURT:  So play the second one.

9              (Video recording played)

10             THE COURT:  He can be excused now.

11             MR. ROCHON:  Our witness room only has one chair, but

12   he'll be nearby.

13             THE COURT:  Mr. Yalowitz, you say that Exhibit 217 was

14   a clip from 2001?

15             MR. YALOWITZ:  That's our information, correct.

16             THE COURT:  And do you know approximately when?

17             MR. YALOWITZ:  I do not.

18             MR. ROCHON:  There has to be a mistake on that.

19             THE COURT:  That doesn't make a lot of sense to me.

20   What month is the intifada supposed to have --

21             MR. YALOWITZ:  September of 2000.

22             MR. ROCHON:  October.

23             MR. YALOWITZ:  September 28.

24             THE COURT:  Of 2000?

25             MR. YALOWITZ:  Right.

F2ATSOK1

```
 1              THE COURT:  You think he's saying in 2001 that a year
 2     before October, September of 2000 that they were under
 3     protection of --
 4              MS. MACHNES:  The reason we think this clip is from
 5     2001 is because we had somebody look at the whole clip, and
 6     there's a part of it where Dahlan's title flashes on the
 7     screen, and his position -- having that title ended in
 8     November 2001, so we think it's at some point before he left
 9     that position.
10              THE COURT:  And when -- do you have any information
11     about what -- when this tape was created, when you obtained it?
12              MS. MACHNES:  We obtained it -- I'm not entirely sure,
13     I don't know, but it's from Abu Dhabi TV.  It's possible we got
14     it from web site or obtained it from the station that aired it.
15     I'm not entirely sure.
16              MR. ROCHON:  In the letter it says it's from YouTube.
17              MR. YALOWITZ:  Let me add on that that Eviatar was
18     prepared to testified testify about this, and he checked every
19     one of these videos.  And for example, where it was listed on a
20     particular television station, he called up Al Jazeera and
21     asked them did this air, is this yours.  So now he's not here
22     presently, but we could either get him on the phone in the
23     courthouse, get him on the phone to say what he did.  Or if
24     there's some foundational issue I'm sure that Eviatar can
25     address it, because he was prepared to testify about these two
```

F2ATSOK1

1    videos, and I saw with my own eyes how much work he did to get

2    ready to make sure that he had a view that they were what they

3    purported to be.

4            THE COURT:  There are two issues.  Obviously there's

5    one issue -- there are always two issues, but in this

6    particular case, the specific two issues are:  One, the

7    admissibility for the purpose that you want to offer it.

8    Frankly, I don't have a serious problem with that.  If a

9    statement is made by the head -- he claimed that he was at the

10   time head of the security force?

11           MR. YALOWITZ:  In Gaza.  He was one of two.  Rajoub

12   was the one for the West Bank, he was for the one for Gaza.  As

13   I understand the structure, the witness was in the West Bank,

14   his boss was Rajoub, Rajoub's counterpart in Gaza was Dahlan.

15   So he's next to Rajoub, above the witness, but not a

16   reporting --

17           THE COURT:  But in Gaza.

18           MR. YALOWITZ:  In Gaza.

19           THE COURT:  But obviously the other question is to lay

20   some foundation for this video, has this witness has seen it.

21   If he has seen it before, or even if he hasn't seen it before,

22   if he recognizes the person and says I know who that is and

23   that's a video of X making comments on Abu Dhabi TV, like any

24   other photograph, you don't have to be the one to have taken

25   the photograph, you don't have to have seen the photo before,

F2ATSOK1

1    if you recognize the photo and what it is, you may be able to

2    identify it.

3            But to do so, he might have to have more information

4    than what we have, because I don't know if you can establish

5    that this was made -- this was a statement during the course of

6    his employ on behalf of the PA.  If it is, then that might be

7    admissible if it's an admissible purpose.  If you cannot

8    establish that, then I think that's a foundational problem.

9            I think, as I say, with regard to -- I find some

10    relevant cross-examination with regard to the testimony about

11    the relationship with Hamas, particularly in light of over

12    plaintiff's objection that they can demonstrate that Hamas took

13    over in the Gaza in 2007.

14            So I don't have a real problem about whether or not

15    there's a purpose for this, the only question I have is whether

16    or not you can sufficiently lay the foundation that this is a

17    statement that he is making in the scope of his employ as being

18    employed at the time by the PA, that is a statement that can be

19    attributed as an admission of the PA.

20            MR. ROCHON:  I'm following the Court's reasoning and

21    we have real concerns about the accuracy of the purported date

22    and position.  I think what they're saying is some media

23    person, I don't know if it's -- as broadcast it would not have

24    included English subtitles, so somebody has put those subtitles

25    on.  If earlier in the video either that third person or even a

F2ATSOK1

1    TV station put a title on there, I don't know if it would

2    describe his current title, a former title, his title at the

3    time.

4              THE COURT:  I don't remember seeing that.  What was

5    the title that was on?

6              MR. ROCHON:  It's not in that part.

7              THE COURT:  I don't remember seeing it.  You're not

8    talking about video itself?

9              MR. ROCHON:  No, they're claiming earlier, I think

10   that there was some reference to a title.  I think that's what

11   counsel -- I will let counsel speak to --

12             THE COURT:  That's not what?

13             MS. MACHNES:  It's not in the translation, it came up

14   in the broadcast.  It's a longer broadcast, and so the point

15   there's a bar that comes up in the broadcast saying who is this

16   person that is speaking, and that bar that comes up says what

17   his title is.

18             MR. ROCHON:  The reason I have some skepticism is this

19   guy is a politician.  And you can assume the witness is going

20   to recognize the face.  The guy is well known.

21             THE COURT:  We need a little more than that.

22             MR. ROCHON:  A lot more than that.  I think everyone

23   can agree they run for office, and one of the issues, of

24   course, when these guys are running for office is who resisted

25   more, lawful resistence in our view, sometimes construed by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2ATSOK1

1    plaintiffs as unlawful, but it's a political issue.  In my

2    clients' elections, every time there's an election, who resists

3    the occupation more than the other guys.  And people make, like

4    Tirawi and others, grandiose claims.

5         In one of our cases a politician said:  I lied when I

6    said those things.  I was running for office.  That's what we

7    do.  That's the most honest answer I think I ever heard, that a

8    politician admitting he made it up.  I don't if Tirawi would

9    say to about this, whether he said it, and whether he said it

10   in his political capacity or his job, because he was both.  He

11   had a job, and sometimes he was elected or trying to get

12   elected.

13        So there's questions here as to whether he's speaking

14   at a time when he was an employee, in his capacity as an

15   employee.  There's a concern to the date of statement, because

16   the plaintiffs are only inferring it from what somebody put as

17   his title.  So there's a lot of unreliability to try to use it

18   as a statement of our client.  So we certainly don't think that

19   it should be presented to the jury.  We don't have the whole

20   clip, by the way.

21        THE COURT:  You have never seen the whole clip?

22        MR. ROCHON:  No.

23        MR. YALOWITZ:  Wait, I'm not sure.

24        They have never seen the whole clip?

25        Look, let me do this, before the jury comes back, let

F2ATSOK1

1    me consult with Mr. Spitzen.  Spitzen had the Eviatar job

2    before Eviatar did.  He's a fluent Arabic speaker.  He knows

3    the milieux very well.  Let me see if he has a basis to

4    foundationalize this document, and if he does, whether it's

5    consistent with our information.  If he doesn't, we'll candidly

6    tell you that.

7              THE COURT:  And I have a different --

8              MR. YALOWITZ:  Different view of the second one.

9              THE COURT:  The second one was October 21, 2012.

10             MR. YALOWITZ:  We don't need to discuss the second

11   one.  I understand your views.

12             THE COURT:  Understand why I have concerns about the

13   timing.

14             MR. YALOWITZ:  So let's do that.  I just have -- we'll

15   consult with him, and we'll see if we have a basis to

16   foundationalize it.

17             And then I just have two other things that I want to

18   raise.  The first is I really, really want to reach closure on

19   this redactions business, and I think I need the Court to

20   impose a deadline on the defendants for getting me their

21   redactions.  Whatever they think is reasonable, is going to be

22   fine with me, I just can't get a commitment out of them on the

23   deadline.

24             MR. ROCHON:  I didn't hear the first part.

25             THE COURT:  You need it within a reasonable period of

F2ATSOK1

1    time, so I'm going to ask you when that's going to be.

2              MR. ROCHON:  The guy who will do the work -- certainly

3    this week.

4              THE COURT:  This week either means today or tomorrow.

5              MR. ROCHON:  For these purposes, I don't know if it

6    meant Court time.

7              THE COURT:  It does mean Court time.

8              MR. ROCHON:  Not today, tomorrow.

9              MR. YALOWITZ:  I didn't hear.

10             THE COURT:  He said not today, tomorrow.

11             MR. YALOWITZ:  Tomorrow.

12             THE COURT:  I want this:  If you have further

13   redactions that you believe should be made, I want those

14   presented to Mr. Yalowitz before lunch time tomorrow.

15             MR. YALOWITZ:  Thank you, your Honor.

16             My only other agenda before the jury is here --

17             THE COURT:  They're here.

18             MR. YALOWITZ:  Then if I could have two minutes to

19   consult with Spitzen about this.

20             THE COURT:  Sure.

21             MR. YALOWITZ:  And at some point today I want to give

22   you my reactions to the jury charge, which I do have some

23   thoughts about it.  I think --

24             THE COURT:  We'll discuss them.

25             MR. ROCHON:  Your Honor, I have to say we're very

F2ATSOK1

1    interested in trying to get some of our witnesses back.

2                THE COURT:  So let's move.

3                MR. ROCHON:  And then we have had the testimonial

4    witness out of the room while we were talking about the

5    videotape, but I understand the plaintiffs are now concerning

6    using Mr. Spitzen as a back-up.

7                MR. YALOWITZ:  Not as a fact witness, not in front of

8    the jury, this is a question of admissibility.  That's for the

9    judge to decide.

10               MR. ROCHON:  Just talk to Mr. Spitzen.  I understand.

11               MR. YALOWITZ:  Could I be excused for a moment?

12               THE COURT:  Yes, do it quickly, and let's get the jury

13   in.

14               (Pause)

15               MR. YALOWITZ:  Thank you for that pause.  What we will

16   do is find out if he has a basis to identify it by date.  And I

17   will just be candid, I was very clear with him, he has to

18   really have a basis for it.

19               THE COURT:  He who?

20               MR. YALOWITZ:  Mr. Spitzen.  So he will look at the

21   video and speak to Eviatar.

22               THE COURT:  This witness may or may not have seen this

23   before, may or may not tell you approximately when it was and

24   when he saw it.  And he may know what it is, but he may not.

25   So let him see it.  We'll let him see it outside the presence

F2ATSOK1

1    of the jury, so if you want to explore that without putting it

2    before the jury with this witness, we'll see if he has the

3    basis to lay the foundation, otherwise else you could make

4    whatever decision you want to make about how to attempt it put

5    it in.

6            MR. YALOWITZ:  That's fine.  We're ready to proceed

7    then.

8            MR. ROCHON:  And I think we're all in agreement it

9    won't be shown until we have a further discussion not in front

10   of the jury.

11           THE COURT:  Right, it will not be shown or the detail

12   of the statement will not be quoted before this jury.

13           MR. ROCHON:  Thank you.

14           THE COURT:  So let's get the jury.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F2ATSOK1

1              (Jury present)

2              THE COURT:  Good morning, ladies and gentlemen.

3              You can continue.

4     MAJED FARAJ,

5          having been previously sworn, testified as follows:

6     CROSS-EXAMINATION

7     BY MR. YALOWITZ:

8     Q.  Mr. Faraj, good morning.

9     A.  Good morning.

10    Q.  Yesterday during your direct examination you testified that

11    you heard that Abdullah Barghouti escaped from prison out of

12    the custody of the preventive security.  Do you remember giving

13    that testimony?

14    A.  Do you want me to repeat it?

15    Q.  No, I don't want you to repeat it, I want to ask if that

16    was your testimony.

17    A.  Yes.

18    Q.  And that testimony was not true, was it?

19    A.  My testimony was correct.

20    Q.  Isn't it a fact that your testimony was incorrect in that

21    particular?

22    A.  My testimony was correct.

23    Q.  Mr. Faraj, during 2001, Jabril Rajoub was your direct

24    supervisor, is that right?

25    A.  Yes.

F2ATSOK1                    Faraj - cross

1   Q.  Are you aware that Jabril Rajoub arrested Abdullah

2   Barghouti?

3   A.  I know that Abdullah Barghouti was arrested by the PSS.

4   Q.  First of all, that was August 9, 2001, right?

5   A.  I remember it was late 2001.  Of course it's very easy to

6   get that date if we want.  It's something simple to have.

7   Q.  Abdullah Barghouti was arrested on the day that he blew up

8   the Sbarro restaurant, August 9, 2001, is that a fact?

9           MR. ROCHON:  Objection.

10          THE COURT:  Overruled.

11  A.  I think that Abdullah is one of the suspects in this

12  incident.

13  Q.  You were not at his arrest personally, right?

14  A.  No, I was not.

15  Q.  You were not there, correct?

16          THE INTERPRETER:  In Arabic, because it's vice versa,

17  he was not.

18  Q.  Let me try -- I want to make sure we're a hundred percent

19  clear.  Were you at the arrest of Abdullah Barghouti

20  personally?

21  A.  No.

22  Q.  Jabril Rajoub was there, isn't that true?

23  A.  I don't know.

24  Q.  And Marwan Barghouti was there, isn't that true?

25  A.  I don't know.

F2ATSOK1                      Faraj - cross

1    Q.  And Mosaab Yousef was there, isn't that right?

2    A.  I don't know.

3    Q.  You know who Mosaab Yousef was?

4    A.  I read about him, yes.

5    Q.  And Mosaab Yousef testified in this case that Jabril Rajoub

6    and Marwan Barghouti --

7              MR. ROCHON:  Objection.

8              THE COURT:  Sustained to form.

9    Q.  Have you had the opportunity to watch the deposition

10   testimony of Mosaab Yousef about the arrest of Abdullah

11   Barghouti?

12   A.  No.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

F2A8SOK2                         Faraj - cross

1          MR. YALOWITZ:  Your Honor, at this time plaintiffs

2     will play the clip of Mosaab Yousef testifying about the arrest

3     of Abdullah Barghouti.

4          MR. ROCHON:  Your Honor, we would object.

5          THE COURT:  It's in evidence.

6          MR. ROCHON:  It is definitely in evidence.

7          THE COURT:  He can play it for the witness and ask the

8     witness questions about it.

9          (Videotape played)

10          MR. ROCHON:  Can we stop it?

11          THE COURT:  Yes.

12          Can we have the translator translate what is said on

13     the tape.

14          How much of this did you want to play?

15          MR. YALOWITZ:  We don't know the exact time stamp.  I

16     am prepared to replay it or start from here.  I am not going to

17     ask him when he was born or such.

18          THE COURT:  I want to make sure he understands what is

19     being said if you're going to question him about.

20          MR. YALOWITZ:  I am not going to question him about

21     what has already been played, but I am happy to replay it if

22     the defense wants me to.

23          The witness needs to hear it in Arabic.

24          THE COURT:  Why don't you look and see what portion

25     you want to play and then that portion we will have translated

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2A8SOK2                    Faraj - cross

1  for the witness, the portion that you want to question the

2  witness about.

3          MR. YALOWITZ:  The problem is we need to hear it.

4          THE COURT:  Go ahead and hear it.  Play it.

5          (Videotape played)

6          THE COURT:  You have a hard copy of the transcript.

7  If you could hand that to the interpreter so the interpreter

8  can read it right off the transcript as it's being played.

9          Do you have that?

10         MR. YALOWITZ:  Bear with us, your Honor.  We have it

11 and we just need to get it.

12         Everybody is trying to find it so we can give a copy.

13         MR. ROCHON:  We have one that has some handwriting on

14 it, but I don't think that will matter.

15         THE COURT:  Just show the portions where you want to

16 start.

17         How many questions and answers do you want to play?

18         MR. YALOWITZ:  It's prior about a minute, a minute and

19 a half, something like that.

20         THE COURT:  Is it about ten questions and answers?

21         MR. YALOWITZ:  Something like that.

22         THE COURT:  So why don't you put it up on the video.

23         MR. ROCHON:  It's actually just two questions.  As it

24 turns out, one has a long answer.

25         If I can instruct the interpreter.

F2A8SOK2                      Faraj - cross

1              THE COURT:  Yes.

2              MR. ROCHON:  You will be starting right here.

3              THE COURT:  Let's get to that portion.

4              (Videotape played)

5              THE COURT:  Mr. Yalowitz.

6    BY MR. YALOWITZ:

7    Q.  Mr. Faraj, have you had a chance to hear the translation of

8    that testimony?

9    A.  From the interpreter, yes.

10   Q.  Now, you know all of those players who were described in

11   that testimony, don't you?

12   A.  Yes.  An exception for Abdullah Barghouti who I know of his

13   name.

14   Q.  You know him to the be Hamas bomb maker that they were

15   arresting, right?

16   A.  I know that he was accused of that.

17   Q.  Then you know Mosaab Yousef to be the son of -- what is his

18   father's name?

19   A.  This guy's name is Mosaab Hasan Yousef and this person,

20   actually he works with Israeli Shabak.

21   Q.  Who is his father?

22   A.  Hasan Yousef.

23   Q.  And Hasan Yousef was the head of Hamas in the West Bank,

24   right?

25   A.  He is one of the leaders of Hamas but not the first leader.

F2A8SOK2                        Faraj - cross

1    Q.  Fair enough.  His father was a Hamas leader in the West

2    Bank, right?

3    A.  He is considered to be one of the political leaders of

4    Hamas in the West Bank.

5    Q.  And Marwan Barghouti, we have talked about him, he was

6    active in the Al Aqsa Martyr Brigades, right?

7    A.  Marwan Barghouti is an activist with Fatah, not Al Aqsa

8    Martyrs Brigades.

9    Q.  It's the same Marwan Barghouti we have been talking about

10   yesterday, right?

11   A.  If he holds the same name, so we are talking about the same

12   person.  Because in video clip I did not see anyone talking

13   except for Mosaab.  I did not see Hasan, I did not see Marwan,

14   I did not see anybody else.

15   Q.  But Mosaab was also talking about Jabril Rajoub, right?

16   A.  Yes.  Mosaab mentioned Jabril Rajoub.

17   Q.  And he testified under oath in this case that Jabril Rajoub

18   made a deal that the preventive security would release Abdullah

19   Barghouti after his arrest.  You saw that, right?

20              MR. ROCHON:  Objection.

21              THE COURT:  Overruled.  He can answer.

22              MR. ROCHON:  He didn't quote it precisely.

23              THE COURT:  He can answer.

24   A.  According to the interpretation I heard, I think there was

25   contradiction in Mosaab's saying.  He was talking about a force

F2A8SOK2                    Faraj - cross

1    of the PSS headed by the leader or the head of this apparent

2    apparatus and he is talking about gunfires, and he was talking

3    about only two people of Hamas members.  Therefore, this force,

4    I think normally that this force is not in the position to make

5    deals.

6           The other point is the one who is speaking is Mosaab.

7    I don't want to insult him personally.  However, I think Mosaab

8    is not in the position to testify on issues of this scale.  The

9    third point that Hasan Yousef was arrested by Israelis --

10          MR. YALOWITZ:  Objection.

11          THE COURT:  What is your question?

12          MR. YALOWITZ:  Let me ask the next question.

13          MR. ROCHON:  The witness wasn't finished with his

14   answer.

15          THE COURT:  I will sustain the objection.  It was not

16   responsive.

17          What is your question?

18   Q.  Sir, isn't it a fact that Mosaab Yousef was at the arrest

19   personally and testified that Marwan Barghouti had a kind of

20   deal with Jabril Rajoub on the side?

21          MR. ROCHON:  I was going to object and ask to approach

22   the bench on this line of questioning.

23          THE COURT:  Come up.

24          (Continued on next page)

25

F2A8SOK2                        Faraj - cross

1              (At the sidebar)

2              MR. ROCHON:  He is asking the witness to comment on

3       the testimony of another.  It is not proper in the first

4       instance, which is why I was objecting.

5              THE COURT:  He didn't ask him to comment on his

6       testimony.  He asked him is that what he said.  He can ask him

7       if that's what he said and then he can ask him if he has any

8       information that is consistent or inconsistent.

9              MR. ROCHON:  When he was giving that answer

10      previously, Mr. Yalowitz interrupted and you sustained it.

11             THE COURT:  I sustained it at that point because he

12      had already answered the question.  He was going on to say

13      something else.

14             If you want him to say something else on redirect, you

15      can have him say something else.  He only asked him, is that

16      what he said?  And I let him give as much of an answer as went

17      forward before you objected.

18             MR. ROCHON:  Just repeating the testimony for the

19      witnesses and asking people whether they said that or not will

20      (A) make the trial endless and (B) is not relevant.  We have

21      the testimony.  He is obviously seeking to have this witness --

22      in fact, the previous question asked this witness to comment on

23      the testimony, and he had gone through two reasons why he

24      doubted it and he was getting to his third.

25             THE COURT:  If you want to ask him if he has a third,

                      SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

F2A8SOK2                    Faraj - cross

1    you can ask him that.

2            MR. ROCHON:  But interrupting the witness in the

3    middle of answering the question --

4            THE COURT:  He was giving a long narrative and that is

5    not the question.  I let him give as much of it until he said

6    that wasn't responsive to his question and we moved on.

7            Now, if you want to bring out more, then you make

8    yourself a note and bring out more.

9            Mr. Yalowitz, it is not particularly useful,

10   particular through the interpreter, asking him is that what was

11   on the tape because we all know that is what is on the tape.

12           MR. YALOWITZ:  I am trying to move on.

13           THE COURT:  I suggest you skip your introductory

14   question and go right to it and ask him if that's true, if he

15   has any information that's consistent with the information he

16   got, whether that's inconsistent with the information he got,

17   whether he got different information.  Go right to the heart of

18   it.

19           (Continued on next page)

20

21

22

23

24

25

F2A8SOK2                    Faraj - cross

1              (In open court)

2    BY MR. YALOWITZ:

3    Q.  Mr. Faraj, do you have any information inconsistent with

4    the fact that Jabril Rajoub said that PSS would release

5    Abdullah Barghouti after his arrest?

6    A.  I do not think that Jabril Rajoub had done something like

7    that, and if he wanted to do something like that, the deal, he

8    will not go with force to make that arrest, according to what

9    Mosaab said that Jabril Rajoub went along with force.

10   Q.  Isn't it a fact that the Preventive Security Service

11   actually did release Abdullah Barghouti from prison?

12   A.  What I know is Abdullah Barghouti escaped the prison.

13   Q.  How do you know that?

14   A.  Yesterday I spoke --

15              MR. YALOWITZ:  Objection.

16              THE COURT:  Overruled.  You asked him how did he know.

17   He can answer.

18              THE INTERPRETER:  I ask the witness to repeat.

19   A.  I mentioned yesterday that we have received a letter when I

20   was on top of my work in Hebron with a name of the person of

21   his four names and a picture and some other details about a

22   person who escaped prison, and that he was a dangerous person

23   and it is important to try to find him and arrest him.  And we

24   searched for him in Hebron.  However, we did not find him.

25   Q.  You never saw him escape, right?

F2A8SOK2                        Faraj - cross

1   A.  I have never seen him personally, whether it was when he

2   was arrested or when he was in detention or when he escaped or

3   after he escaped.

4   Q.  Isn't it a fact that Abdullah Barghouti himself said that

5   he was released from prison by the Preventive Security Service?

6          MR. ROCHON:  Objection.

7          THE COURT:  Overruled.

8   A.  Whether he said it or not, that's not what we have.  We

9   know that we looked for him and we did not find him, and if he

10  mentioned something different, that's something totally up to

11  him.

12  Q.  That's something what?

13  A.  Totally up to him.

14  Q.  So let me show you, or I will put it up, Plaintiffs'

15  Exhibit 427, page 12, sheet number 2.  This is the statement of

16  Abdullah Barghouti.  We see his name up at the very top.  First

17  name Abdullah, last name Barghouti.

18          Do you see that?

19  A.  Where the interpreter pointed out, yes, I see.

20  Q.  And this is the statement that Abdullah Barghouti made to

21  the Israeli police after his arrest, isn't that right?

22  A.  This is what you say.  For what he said, what he said not,

23  I don't know.  This document was not issued by us.  I don't

24  know the source of it.

25  Q.  Let me direct you to line 4.

F2A8SOK2                    Faraj - cross

1              "Question:  What did they do with you after the

2      interrogation?

3              "Answer:  We were detained in the preventive security

4      prison in Ramallah from that day until the day on which Abu Ali

5      Mustafa was eliminated.  After his elimination they released us

6      from the prison."

7              Did you hear that from the translator?

8      A.  From the interpreter, yes.

9      Q.  Now, that statement by Abdullah Barghouti itself is

10     completely inconsistent with your testimony, isn't that right?

11     A.  I am responsible for my testimony and I don't know the

12     source of this document.  Therefore, Abdullah may have said

13     this or not.  However, for me this is not precise.

14     Q.  So you don't have any personal direct knowledge of what

15     happened with Abdullah Barghouti's departure from the prison in

16     Bitunia, right?

17     A.  I know that Abdullah Barghouti was arrested.  I know that

18     he is a dangerous suspect.  That's why Jabril Rajoub himself,

19     who was the head of that apparatus, went to arrest him himself,

20     and according to what Mosaab said, as you showed me in the

21     video.  Therefore, he escaped prison afterwards.  This is what

22     I know about Abdullah.

23     Q.  Jabril Rajoub himself handed Abdullah Barghouti over to

24     Marwan Barghouti, isn't that true?

25              MR. ROCHON:  Objection.

 1              THE COURT:  Overruled.

 2              He can answer.

 3   A.  I don't know.  According to what I know, it's inaccurate to

 4   say that Jabril Rajoub will release such a dangerous prisoner

 5   in this manner.  Jabril Rajoub actually is accused by Hamas to

 6   hand some of the suspects.  Therefore, Jabril Rajoub is the

 7   suspect doing what you mentioned.  Therefore, Jabril Rajoub by

 8   no means can release that person in the manner you mentioned.

 9   Q.  Now, you're aware that after his release Abdullah Barghouti

10   was taken to a safe house by Ahmed Barghouti, right?

11              MR. ROCHON:  Objection, your Honor.

12              THE COURT:  I am going to sustain to the form of the

13   question.

14   Q.  Isn't it a fact that Ahmed Barghouti took Abdullah

15   Barghouti to a safe house after he was released from prison?

16   A.  I don't know about that.  But once again, Abdullah

17   Barghouti escaped the prison and he was not released.

18   Q.  Now, you know who Ahmed Barghouti is, right?

19   A.  I know him generally.  I don't have much information about

20   him.

21   Q.  He was Marwan Barghouti's bodyguard, right?

22   A.  I did not know that Marwan has bodyguards.

23   Q.  He was Marwan Barghouti's right-hand man and driver, right?

24   A.  I did not know that he was his right hand or his driver.  I

25   don't know.

F2A8SOK2                    Faraj - cross

1   Q.  You know that Ahmed Barghouti is in jail for having been

2   convicted of acts of terrorism, right?

3   A.  If it is the person I know of, yes.

4   Q.  Let's take a look at what -- you know that Ahmed Barghouti

5   pled guilty to committing acts of terror, right?

6   A.  I don't have Palestinian documents to prove that.

7   Q.  Now, have you looked at Ahmed Barghouti's General

8   Intelligence file?

9   A.  Ahmed Barghouti as a name is on the files of the Israeli

10  prison.  We don't have the Palestinian documents for what he is

11  accused of and what he is convicted of.  We have some

12  information that is documented according to the Israeli

13  information, not the Palestinian information.

14  Q.  Are you the head of the Palestinian Authority's General

15  Intelligence Service?

16  A.  Yes.

17  Q.  Are you aware that the Palestinian Authority General

18  Intelligence Service has issued reports about Ahmed Barghouti?

19  A.  There might be some reports that is related to Ahmed or any

20  other prisoner and his location and the charges and his

21  sentence if he is convict.

22          MR. YALOWITZ:  Your Honor, may I approach the witness

23  with a copy in Arabic of Plaintiffs' Exhibit 142, please?

24          THE COURT:  Yes.

25  Q.  This is your intelligence report about Ahmed Barghouti,

F2A8SOK2                    Faraj – cross

1    isn't that right?  Mr. Faraj?

2    A.  This is not a report on Ahmed Barghouti.  We call it a

3    personal file which indicates his personal identification,

4    which contains name and other details and it has some

5    information in order to be kept in his file.  So mainly it's an

6    identification document for that person.

7    Q.  This report --

8                THE COURT:  Just a second.  You can't talk at the same

9    time.

10   A.  And it shows all his personal information and it shows that

11   he is convict, and the other side of the page it shows some of

12   that personal characteristics and it mentions that he was with

13   Marwan and that he was arrested.  This is more of a card, a

14   personal card to identify the person and not to identify his

15   operations.

16   Q.  This is your document from the General Intelligence

17   Service?  Yes or no.

18   A.  That is a stamp, but there is no signature of anybody in

19   charge.  The official document should be in a different way and

20   should be sealed with an official seal and signed.

21               MR. ROCHON:  We will stipulate.  The witness may not

22   see it, but we are prepared to stipulate if counsel wants.

23               MR. YALOWITZ:  I was going to ask him.

24               THE COURT:  Go ahead.

25               MR. YALOWITZ:  A stipulation is fine.

F2A8SOK2                        Faraj - cross

```
 1    Q.  Are you denying --

 2            MR. ROCHON:  If we are going to have a stipulation,

 3    the witness needs to understand so we don't continue to waste

 4    time.

 5            We would stipulate that in fact that is from the GIS

 6    files.

 7            THE COURT:  Why don't you translate that last

 8    statement for the witness.

 9            MR. ROCHON:  We will stipulate that this document is

10    from the GIS file, even though it's a single page, but for the

11    witness's benefit we will stipulate to that.

12            MR. YALOWITZ:  Your Honor, I need to ask a question.

13            THE COURT:  Go ahead.

14    Q.  Are you denying that this is a GIS document from the files

15    of the GIS?

16    A.  I do not deny the emblem or the heading.  We have such a

17    template.  But what I said is this specific paper is not

18    officially sealed.  Therefore, it may be in our files and it is

19    an identification card and anybody may or can do a paper like

20    that and fill it out the way they want.

21    Q.  So yes or no, are you denying that this paper in front of

22    you is an authentic copy of a paper from the files of the GIS

23    as your counsel has just represented to this court?

24            MR. ROCHON:  Objection.  I'm not the counsel for this

25    witness.
```

F2A8SOK2                        Faraj - cross

```
 1              Judge, this is becoming --

 2              THE COURT:  Have a seat.

 3              Rephrase your question.

 4   Q.  Sir, are you denying that this paper in front of you is an

 5   authentic copy of a card from the files of the General

 6   Intelligence Service of which you are in charge?  Yes or no?

 7   A.  Specifically this paper?

 8   Q.  Specifically this paper.

 9              Are you denying it's authenticity?  Yes or no?

10   A.  I neither deny nor confirm because of the layout of the

11   page is our layout.  And the personal information, this is the

12   same that we use on our files.  However, it's not sealed or

13   stamped by us officially so we cannot use it.  And for me

14   personally as the head of the GIS, I would at least deal with

15   officially sealed papers or documents.

16   Q.  Do you see where it says on Exhibit 142 that Ahmed

17   Barghouti was Marwan Barghouti's bodyguard?

18   A.  Yes.

19   Q.  That's correct information, isn't it?

20   A.  I don't know.

21   Q.  You don't know.  All right.

22              Let's go to Ahmed Barghouti's statement to the Israeli

23   police --

24              MR. ROCHON:  Objection to form.

25   Q.  I am just looking for the date.
```

F2A8SOK2                         Faraj - cross

1           -- on March 10, 2003.

2           THE COURT:  Both sides, cut out a lot of the

3    introduction.  Go straight to the question because it's easier

4    for the interpreter to interpret straight, direct questions.

5           MR. YALOWITZ:  Yes, sir.

6    Q.  Are you aware -- let me rephrase.

7           Isn't it a fact that Ahmed Barghouti gave a statement

8    to the Israeli police on April 21, 2002?

9    A.  Is that question for me?

10   Q.  Isn't that true?

11   A.  I don't know.

12   Q.  On April 21, 2002, Ahmed Barghouti was an employee of the

13   Palestinian Authority, isn't that correct?

14   A.  I don't know.

15   Q.  In fact, Ahmed Barghouti is still an employee of the

16   Palestinian Authority today, isn't that right?

17   A.  I read that in the list you handed me yesterday that Ahmed

18   Barghouti is an employee at the Palestinian Authority.

19   Q.  Isn't it a fact that Ahmed Barghouti told the police that

20   on the day which Abdullah Barghouti was released from the

21   preventive security prison in Bitunia --

22          THE INTERPRETER:  If we can kind of make it -- because

23   I am losing the names.  Ahmed Barghouti?

24          MR. YALOWITZ:  Should we give --

25          THE COURT:  The monitor went out.

F2A8SOK2                    Faraj - cross

1              Did you want a break?

2              THE INTERPRETER:  That would be great.

3              Ladies and gentlemen, let's take a ten-minute break.

4              (Jury exits courtroom)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          MR. ROCHON:  This form of cross-examination we

3     continue to maintain is improper.

4          THE COURT:  Which form?

5          MR. ROCHON:  The form of presenting to a witness

6     simply what somebody else supposedly said on a given day.  We

7     have no reason to believe the witness would know about it.  As

8     he just said, he has no idea what Ahmed Barghouti told the

9     Israeli police.

10         THE COURT:  You can ask him if he has information, if

11    that's true or not true.

12         MR. ROCHON:  He can ask him if he has information.

13    But as far as saying do you know whether or not this person

14    said this, or what do you think of this person saying that, is

15    not proper.

16         THE COURT:  I don't remember a question asked, what do

17    you think of this person saying that.  I don't remember that

18    question at all.

19         Your first question, he is allowed to ask the witness.

20    He is allowed to ask the witness if the witness is aware that

21    another person made a particular statement.  There is not

22    anything objectionable about that question.  He is either aware

23    or not.  Then he can ask him whether he has information that is

24    consistent or inconsistent with that, given the fact that he is

25    aware that somebody else made that statement.  That's perfectly

F2A8SOK2                        Faraj - cross

1    appropriate.

2            Now, it can be done a little bit more efficiently, but

3    it is not an objectionable question.

4            MR. ROCHON:  Here is why I am saying it is.  The

5    witness just said he doesn't know what Ahmed Barghouti said.

6            THE COURT:  Right.

7            MR. ROCHON:  The next question from Mr. Yalowitz was

8    presenting him the statement to the Israeli police.  Once the

9    witness says he doesn't know what someone has said, then to

10   present an out-of-court statement from another person --

11           THE COURT:  It wasn't an out-of-court statement from

12   another person.  My understanding it was a document that had

13   been admitted into evidence.

14           MR. ROCHON:  But the document in evidence is an

15   out-of-court statement.

16           THE COURT:  It doesn't matter whether it's an

17   out-of-court statement.  He has the evidence before this jury.

18   He asked if he has ever heard it.  He says no.  He has got the

19   right to ask him if he has information that is consistent with

20   the other information that is already before this jury.

21           If he wants to say no, I don't care who said it, I

22   never heard it before but I know it's not true, he can say

23   that.  I understand the nature of the awkwardness.  As I say,

24   it can be done a little bit more efficiently but that is not a

25   legal basis to object to the question.

F2A8SOK2                    Faraj - cross

1          Mr. Yalowitz, just a second.

2          MR. YALOWITZ:  I thought we were done.

3          MR. ROCHON:  This statement is not in evidence.

4          THE COURT:  Which statement are you referring to?

5          MR. ROCHON:  The one he asked the witness about.  1147

6    is not in evidence.

7          THE COURT:  I don't remember what he asked the witness

8    that came off that statement.

9          MR. ROCHON:  He asked him, are you aware of this

10   statement that he gave to the police, and he is referring to

11   1147.

12         THE COURT:  I didn't know that.  That part you didn't

13   object to.

14         MR. ROCHON:  That's why I am doing it now.

15         THE COURT:  You can't do it now.  You have to do it at

16   the time he asks the question and before he gives the answer.

17         MR. ROCHON:  He hadn't gotten to the content yet.  My

18   objection was on the floor when we took the break.  I am

19   objecting to the use of this out-of-court statement not in

20   evidence.

21         THE COURT:  So you're objecting to some future use

22   because you're not objecting to something in the past.  You

23   didn't timely make an objection.  What are you trying to

24   preclude him from doing in the future?

25         MR. ROCHON:  Asking this witness about an out-of-court

F2A8SOK2                         Faraj - cross

1   statement that is not in evidence.

2              THE COURT:  I don't have any problems with that if

3   that out-of-court statement is not in any document that's in

4   evidence.  He can't quote from that document.  He can ask this

5   witness about any fact that he has a good faith basis to ask

6   him about as to whether or not this witness knows of that fact

7   or doesn't know of that fact and whether or not at some point,

8   given the nature of the issues here, whether or not he became

9   aware of that fact.  If he did, he did.  If he didn't, he

10  didn't.  I agree.

11             If your objection is that he is attempting to put in

12  statements by witnesses, out-of-court statements by witnesses

13  in reports that are not in evidence before this jury, then I

14  agree with you, he cannot do that and should not be allowed to

15  do that.

16             This is the first that I am hearing about that given

17  what objections you have made in the past.  But if your

18  position is that he should not be able to quote from a document

19  that is not in evidence simply to ask this witness whether he

20  heard that somebody else made that statement, I agree with you

21  and Mr. Yalowitz should not proceed in that manner.

22             MR. ROCHON:  The other thing that is related, similar

23  but different is asking a witness about other testimony is

24  different than asking about out-of-court statements.  With

25  Mosaab Yousef he is just really saying what do you think of the

F2A8SOK2                    Faraj - cross

 1    testimony this guy gave.  I realize it's a deposition, but

 2    asking the witness to comment on testimony of another is not a

 3    proper means of examination.

 4            THE COURT:  As I said, the only proper means of

 5    examination is asking a witness about a fact that is presented

 6    before this jury and asking this witness is that fact true or

 7    is that fact false.

 8            MR. ROCHON:  I agree.

 9            THE COURT:  And he can do that.  And there are better

10    ways to do that.  And I agree with you that in most instances

11    there is a more efficient way to do it than Mr. Yalowitz has

12    been doing.  But it is not a basis for an objection to the

13    question.

14            I will encourage Mr. Yalowitz to do that in a more

15    efficient way, but if you feel that he is asking a question

16    which will elicit an inadmissible answer, then I will hear the

17    objection at the time.  The nature of your objections now are

18    not that he is asking a question that he doesn't have the right

19    to inquire about.  He does have the right to inquire about

20    that, and because you don't like the way he asked the question

21    doesn't make it a grounds for an objection.

22            As I said, Mr. Yalowitz, for the purpose of

23    efficiency, I am going to ask you to make sure your questions,

24    as I already indicated for a lot of reasons, are shorter,

25    simpler, less compound, directly to the point about whether or

F2A8SOK2                        Faraj - cross

1    not you want this witness to either verify a fact or deny a

2    fact.  And it would be better if you ask it in a way that he is

3    not verifying or disagreeing with someone else's statement

4    either made in this court, made in documents in this court, or

5    made outside of court.

6              MR. ROCHON:  I have one more thing to say on this

7    point.

8              I agree he can ask him, isn't it a fact he escaped,

9    isn't there in fact a deal to let him out.  The facts are

10   clearly open game.  The witness says whatever he says.  But

11   then to say to him, what about somebody else says something

12   different?  That's what I am saying is improper.

13             THE COURT:  The reason it's not improper in this case

14   is because it's not just an issue of whether or not it is true.

15   It is an issue of whether or not the PA and the PA's agents and

16   employees were aware of these facts, or even aware that these

17   accusations were made.  It is relevant to the knowledge and

18   intent that is central to this case.

19             So he can ask him whether or not he has heard any of

20   this.  He can ask him when he heard it.  He can ask him was it

21   in the mix of information that he utilized in terms of the

22   decision-making in this case.  It has a greater relevance

23   rather than just whether it is true or it is false.  So that's

24   why I have given him that leeway.

25             I don't care whether or not he knows whether it's true

F2A8SOK2                    Faraj – cross

1    or false.  I care whether or not he had that information.  For

2    example, if he had contrary information from any source that

3    the person had been released rather than escaped, then he has

4    the right to ask him that, regardless of whether or not his

5    person view is he escaped and he rejected all the other

6    information he had that he was released.

7            So I think that is fair game.  I think the subject

8    matter is fair game.  And I think the nature of the way the

9    questions were asked are not inadmissible or not legally

10   objectionable.  But as I said, there is a more efficient way to

11   do it.

12           If there is a point that you have to make when there

13   is a question asked that the question is truly objectionable

14   because the question, the way it's asked, is eliciting

15   inadmissible testimony, then I will hear it.  I am not here to

16   grade the lawyers about how well they ask questions.

17           At some point I will sustain such an objection if I

18   think it is a waste of the jury's time or such an inefficient

19   way to do it or the nature of the questions are misleading the

20   jury.  He stated a question, which I sustained the objection,

21   although he asked the question all over again which you did not

22   object to it then.  When he loaded the question with, what did

23   you do after he escaped.  Well, the guy just said he didn't

24   escape.  So it is not a proper way to phrase the question to

25   say, what did you do after he escaped?

F2A8SOK2                    Faraj - cross

1           So I understand the nature of your objections.  I have

2      been doing this a long time.

3           MR. ROCHON:  I can't object each time.

4           THE COURT:  Yes, you can.

5           MR. ROCHON:  I know you're not stopping me.

6           THE COURT:  You better object every time you think it

7      is important to object.  Every time you think he may be doing

8      damage to your case, that's when I know you will object.

9           MR. ROCHON:  The witness obviously has a view of

10     whether he escaped or not.  So how many times are we going to

11     put that in there.

12          THE COURT:  Mr. Yalowitz, you can have the last word.

13          MR. YALOWITZ:  I want to have the next word on the

14     next topic.  I think we have beat this topic to death.

15          THE COURT:  OK.

16          MR. YALOWITZ:  I asked the witness, isn't a fact that

17     Jabril Rajoub released him?  The witness first said the right

18     thing, which is I don't know.  And I thought he was going to

19     stop.  But he didn't stop.  He then gave a long speech about

20     how Jabril Rajoub would never do that.

21          Well, we have a report which is redacted right now,

22     that's from Abdullah Barghouti saying Jabril Rajoub is the one

23     who released me.

24          THE COURT:  That doesn't make it true.

25          MR. YALOWITZ:  It doesn't make it true, but it's the

F2A8SOK2                      Faraj - cross

1    same concept, which is, I think I should be allowed to confront

2    him with that statement and see if that shakes his testimony.

3           THE COURT:  Not at all.  You can ask him, has he ever

4    seen any report or any document at all or anything that ever

5    indicated that he was released.  You can ask him whether he is

6    aware of any such document.  And he will either say, yeah, I

7    saw something, or, no, I have never seen anything that gives me

8    a reason to believe he was released.  And if he says, yeah, I

9    saw something but I rejected it, then you can ask him what he

10   saw and inquire why he rejected it.

11          You can't throw in front of the jury an out-of-court

12   statement, even though he is going to deny he has ever heard it

13   or knows anything about it.  That doesn't make it admissible if

14   it was inadmissible to begin with.

15          So if you think it's appropriate to inquire further on

16   this area, you can inquire further.  You can ask him, tell us

17   how he escaped.  You can ask him whatever you want to about

18   that.  I have given you great leeway.  But you can't keep

19   shoving statements of other people that were inadmissible as

20   substantive evidence to make it substantive evidence just

21   because he says something different.

22          I have given you the statement that I thought was the

23   reasonable statement that you had a right to question him about

24   and that was the statement by the Barghouti when he said, I was

25   released.  Quite frankly, from your questions now, I don't know

F2A8SOK2                    Faraj - cross

1    if he had ever heard that statement.  From the conversation we

2    had yesterday from Mr. Rochon, Mr. Rochon implied that he had

3    heard that statement previously at some point because he was

4    telling you, he was warning you what he was going to say about

5    it if you had asked him about it.

6              MR. ROCHON:  The warning was if -- Mr. Yalowitz hasn't

7    gone into it, but there was an inquiry made with the

8    Palestinian Authority as to how he escaped, not whether he was

9    released.  I have no reason --

10             THE COURT:  I don't know what that investigation was

11   and I don't know what they examined.  I don't know if they

12   examined people's statements and I don't know whether they had

13   some information that he was released and their investigation

14   concluded that that was not true, that he really escaped.  I

15   don't even know what basis he is saying he escaped, whether

16   someone left the door open.  Quite frankly, I am not even sure

17   whether or not there is any inconsistency from the arguments

18   that he escaped or he was released.  He may have escaped and

19   had been released.  I don't know if he crawled out a window or

20   some guard left the door wide open for him.  I don't know how

21   he got out.

22             So if you guys think that's worth spending more time

23   on it, spend more time on it.  But I think I have tried to give

24   you what I thought were the reasonable parameters with this

25   witness to inquire, if you want to get some more detail, about

F2A8SOK2                         Faraj - cross

1    what is the basis that this witness concluded that he escaped

2    and whether or not he had any information that he considered,

3    anybody ever said to him in any report or any statement, you

4    know what, I heard that the guy was released.

5            If you have more questions, I think they are perfectly

6    appropriate, and he can tell what he investigated and why he

7    said he escaped and he can give you chapter and verse about

8    what the conclusion was, exactly how he escaped.  You know,

9    somebody flew in with a helicopter and picked him up.  I don't

10   know how he escaped nor does this jury.  You can decide where

11   you want to go.  I don't want to waste a lot of time with the

12   jury.

13           Let's get more direct with these questions.

14           You want to use the one interpreter.  So don't wear

15   her out.  I have given you that leeway.

16           Let's get directly to the point here.

17           I know what Mr. Rochon's concern is.  His concern is

18   you don't have any legitimate questions of this witness about

19   what his true knowledge is; you just want to utilize this

20   witness to shove other out-of-court statements that you

21   couldn't otherwise get in.  That is his concern.  I understand

22   that.  I have done this myself.  I know how lawyers try cases.

23           (Continued on next page)

24

25

F2ATSOK3

1              MR. ROCHON:  You didn't do that.

2              THE COURT:  No, I tried cases myself.  I would never

3    do that.

4              MR. YALOWITZ:  Let the record reflect the laughter in

5    the courtroom.

6              THE COURT:  So take a break and let's get this moving,

7    because I want to keep us moving for the jury and the

8    witnesses.

9              (Recess taken)

10              MR. YALOWITZ:  Your Honor, Mr. Spitzen has watched the

11   whole video, and we would like to offer it in evidence on the

12   basis that it was, based on the face of the video, the title of

13   Dahlan was a title that he held prior to November of 2001, and

14   so it's a statement by an employee about the course of his

15   employment.

16              THE COURT:  Have you shown that entire video to the

17   defense?

18              MR. YALOWITZ:  I accept their representation that we

19   have not.

20              THE COURT:  That's the first thing.

21              MR. YALOWITZ:  We can do that.

22              THE COURT:  And then I assume that unless the defense

23   is going to not object to the video being offered into

24   evidence, I assume that you either are going to attempt to lay

25   that foundation with this witness and ask this witness if he

F2ATSOK3

1    recognizes the tape, and he says yeah, that is what it is, or

2    if not, then you're going to have to wait to call a witness or

3    you get somebody else who they're calling who can lay that

4    basis.

5              MR. YALOWITZ:  Let's ask him the questions on the

6    assumption that it's not in evidence, because I have never seen

7    a document offered that the defendants have failed to object to

8    in this case.

9              MR. ROCHON:  And assume we are objecting, that is safe

10   to say.

11             MR. YALOWITZ:  And we'll ask him the questions and if

12   he lays a foundation we'll offer it.

13             THE COURT:  My suggestion is that you simply start out

14   with we played a video for you before we started.  Have you

15   ever seen that videotape before?

16             MR. ROCHON:  Before we start with the jury?

17             THE COURT:  Yeah.

18             MR. ROCHON:  The witness is coming in now.

19             THE COURT:  And if you want to ask him -- even if you

20   want to ask him -- ask him whether he recognizes the person in

21   the video, he can say he does or doesn't, and you can attempt

22   to lay part of your foundation now.  Let him identify who it

23   is, and if he has seen it before, he can tell what you it was,

24   and he can give you a general time frame.  If he says I know

25   this guy but I have no idea, I never seen this video before,

F2ATSOK3

1    and I don't know -- this is the first time I saw it and I can't

2    tell you anything about it, then you have to try it with

3    somebody else.

4            MR. YALOWITZ:  Okay.  Should we do that right now

5    before the jury comes in?

6            THE COURT:  No.

7            MR. YALOWITZ:  Do it in front of the jury?

8            THE COURT:  Yes, ask that basic question.

9            MR. ROCHON:  Are we going to play the video?

10           THE COURT:  No.  He has already seen it.  I was

11   thinking ahead.

12           MR. ROCHON:  Yes.  He may not know which one he's

13   talking about, he saw two.

14           THE COURT:  If he wants to put it up on the screen,

15   the beginning of it, you can do that.

16           MR. YALOWITZ:  I'll queue it up and put the box top

17   on.

18           THE COURT:  If he says he's never seen it before, the

19   most he can get out of it for you, he can get part of the

20   foundation.

21           (Continued on next page)

22

23

24

25

F2ATSOK3                    Faraj - cross

1          (Jury present)

2          THE COURT:  You can continue.

3          MR. YALOWITZ:  Thank you, your Honor.

4    BY MR. YALOWITZ:

5    Q.  Mr. Faraj, I want to ask you very specifically about

6    your -- what you saw with your own eyes.

7          You didn't see how Abdullah Barghouti got out of jail,

8    right?

9    A.  No, I did not see that.  The way he escaped, no, I did not

10   see it.

11   Q.  You have no idea how he got out of jail based on what you

12   personally saw, right?

13   A.  No, I don't have any idea.

14   Q.  Let's continue on.  I've covered the screen.

15          THE COURT:  Ask the question.  Go right to the

16   question.

17   Q.  Bear with me, I will put something on your screen.  Would

18   you direct your attention to the screen, Mr. Faraj?

19          Do you see the videotape, the beginning of the

20   videotape in front of you?

21   A.  Yes.

22   Q.  We showed that you videotape this morning, right?

23   A.  I saw the picture.

24   Q.  Do you remember this morning before the jury came in we

25   showed you the videotape?

F2ATSOK3                    Faraj - cross

1  A.  Now I can see the video but the video is not playing.

2  Q.  You recognize the fellow in the videotape, right?

3  A.  Yes.

4  Q.  That's Muhammad Dahlan, right?

5  A.  Yes.

6  Q.  That's the guy who was in charge of preventive security in

7  the West Bank during 2001, right?

8          MR. ROCHON:  Objection.

9          THE COURT:  Overruled.

10 Q.  Sorry.  Let me rephrase the question.

11         That's the guy who was in charge of preventative

12 security in Gaza during 2001, right?

13 A.  He had different positions in the Palestinian security.

14 Amongst many of those positions he was the head of PSS in 2001.

15 From 2001 until 2007 he was in different positions related to

16 the security.

17 Q.  Now before this morning when I showed it to you, had you

18 ever seen the videotape that's on your screen?

19 A.  I don't remember.

20 Q.  So when you gave your testimony yesterday, you didn't have

21 in mind the videotape that I showed you this morning, right?

22         THE INTERPRETER:  I need to advise the witness to say

23 meaningful sentences for me to be able to translate them,

24 otherwise, I will be making up things.

25 A.  I don't know.

F2ATSOK3                        Faraj - cross

1   Q.  You don't know whether, when you gave your testimony

2   yesterday, you had in mind the videotape that I showed you this

3   morning?

4           MR. ROCHON:  Objection.

5           THE COURT:  Overruled.

6   A.  No, I do not know.

7   Q.  Now are you familiar with something called the Intifada

8   Diaries?

9   A.  Is it a book or is it an article or report?

10  Q.  Can you answer the question as I asked it?

11  A.  There are plenty of things that were written about the

12  intifada.  Are we first talking here about the first intifada

13  or the second intifada?  I don't know what you mean by your

14  question.  There were many books or articles or reports written

15  about the intifada, so what would you indicate in your

16  question?

17  Q.  General Faraj, do you really not know whether you're here

18  to testify about the first intifada or the second intifada?

19          MR. ROCHON:  Objection.

20          THE COURT:  Sustained.

21          MR. YALOWITZ:  Your Honor, plaintiffs offer -- well,

22  let me show the witness what has been marked for identification

23  as Exhibit 192A.

24          May I approach, your Honor?

25          THE COURT:  Yes.

1              MR. ROCHON:  Objection, your Honor.

2              THE COURT:  He can show it to the witness.  I don't

3      know what basis you object to showing it to the witness.

4              MR. ROCHON:  It has been discussed with the Court

5      previously.  That's my basis.

6              THE COURT:  I don't know what he's going to ask him.

7      Let's wait and see where we're going.

8      BY MR. YALOWITZ:

9      Q.  Mr. Faraj, do you know what that is?

10     A.  It's a statement.

11     Q.  And who is it signed on behalf of at the bottom?

12     A.  As written here it's a group of Palestinian factions.  If

13     you want me, I can name all of them.

14     Q.  Can you confirm that Fatah is one of the factions that

15     signed this document?

16             MR. ROCHON:  Objection.

17             THE COURT:  Sustained.

18     Q.  What is the title of document?

19             MR. ROCHON:  Objection, your Honor.

20             THE COURT:  Sustained.

21     Q.  Have you seen this document before?

22             MR. ROCHON:  Objection.

23             THE COURT:  Overruled.  You can answer that question.

24     A.  I have to read it.

25     Q.  Take a moment.

F2ATSOK3                          Faraj - cross

1    A.  Because it's not a document, it's a statement.

2            MR. ROCHON:  Your Honor, while the witness is reading,

3    may we have a minute at the bench?

4            THE COURT:  Come up.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2ATSOK3                    Faraj - cross

1              (At side bar)

2              MR. ROCHON:  Several reasons.  Your Honor previously

3     excluded this.  Counsel refers to it as being signed.  It's not

4     signed, it's just a typewritten piece of paper that has at the

5     end of it the names of some groups.  Your excluding it wasn't

6     based on foundation, it was based on contents.  Having the

7     witness read it will not make it less objectionable.

8              Counsel knows it's been excluded, and he suggested

9     showing documents already excluded by court order.  We should

10    talk about them before he starts moving them around the

11    courtroom.  That's why I objected.  If he shows somebody

12    something that you excluded as evidence, we ought to know about

13    it before we put it in front of the jury before saying it

14    again.

15             MR. YALOWITZ:  I thought we talked about this

16    yesterday.  This is a document showing that Hamas and Fatah

17    were coordinating their activities during second intifada.  My

18    recollection is this was excluded under 403 because its

19    probative value was outweighed by the potential prejudice.  And

20    the witness opened the door to it by saying that Hamas and

21    Fatah could never get along, and in fact there was a violent

22    overthrow.

23             THE COURT:  I don't know -- two things, one, we can

24    get further with the document or beyond the document by the

25    simple question of whether or not he's ever seen this before

F2ATSOK3                    Faraj - cross

1    and knows what it is.  It seems to me that he's been implying

2    that he hasn't seen it before and he doesn't know what it is,

3    so therefore you have to pull it back away from the witness and

4    you don't go into its contents.

5              Now I don't know whether the questions you have are

6    prompted by what's written in the document, but if you do, you

7    should let me know what those questions are.  And those

8    questions are not going to be based on reading from the

9    document, particularly from a document that he's never seen.

10             So what is it that you think is of substance that you

11   want to ask him about his previous testimony on direct?

12             MR. YALOWITZ:  That there was a coordinating committee

13   called the National Islamic Forces, that they included

14   representatives from Fatah and representatives from Hamas, and

15   that they issued joint statements during the course of the

16   intifada, and some of those statements were direct calls for

17   violent activities.  That's where I'm going with this, which is

18   inconsistent with his testimony.

19             MR. ROCHON:  I don't think, first of all --

20             MR. YALOWITZ:  He may not know anything about these

21   statements.

22             MR. ROCHON:  I don't have any reason to believe he

23   does, but I also know referring to some statements -- there's

24   nothing handwritten on there, there is nothing signed on there.

25   As counsel knows, it's a typewritten piece of paper from

F2ATSOK3                          Faraj - cross

1    somewhere that you have previously excluded.  It's dated, if

2    can you believe the date, September 30.

3              THE COURT:  What year?

4              MR. ROCHON:  Of 2000.

5              MR. YALOWITZ:  It has a PA stamp on it stamped

6    Palestinian National Authority, central information.

7              THE COURT:  This is the way you're going to proceed:

8    If you're going to figure out if this witness has ever seen the

9    document and knows the content of the document, you can ask him

10   whether he has ever seen this before.  If he says no, that's

11   the end of the document.

12             If he says yes, maybe there is something in the

13   document that he can testify about.  If you want to ask him

14   independently whether or not there has been any joint

15   statements he's aware of that have been issued by Fatah and

16   whoever else you want to say, Hamas, then you can ask him that.

17   But if he says no, he's not aware of it, then that's the end of

18   it.

19             And I don't expect you to ask questions -- this is the

20   very basic rule that I'm going to follow, I don't expect you to

21   ask questions that assumes facts not in evidence.  All right?

22             MR. YALOWITZ:  Got you.

23             THE COURT:  Do we understand, everybody?

24             MR. ROCHON:  Yes.

25             THE COURT:  You understand what that means?

F2ATSOK3                        Faraj - cross

1             MR. YALOWITZ:  Yes.

2             THE COURT:  That's the problem, and if you start to do

3    that or continue to do that, I'm going to cut the questioning

4    off.

5             MR. YALOWITZ:  Okay.

6             THE COURT:  So if you want to ask him if he knows

7    anything about this document or seen it before, let's do it, if

8    you want to ask him about statements, take it step by step.

9             MR. YALOWITZ:  Step by step.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2ATSOK3                    Faraj - cross

1              (In open court)

2    BY MR. YALOWITZ:

3    Q.  Mr. Faraj, while we were with the judge --

4              THE COURT:  Mr. Yalowitz.

5    Q.  -- did you have the opportunity to read the document?

6    A.  Yes.

7    Q.  Have you ever seen it before?

8    A.  I may have seen it.  I may have not.  We're talking about a

9    document that was issued 15 years ago.

10   Q.  Are you aware of statements by something called the

11   National and Islamic Forces?

12             MR. ROCHON:  Objection.

13             THE COURT:  I'm going to sustain as to the form of the

14   question.

15   Q.  Are there -- was there an entity or a committee called

16   National and Islamic Forces during the Al Aqsa intifada?

17   A.  Yes.

18   Q.  Did they issue statements?

19   A.  Yes.

20   Q.  Did you see statements issued by the National and Islamic

21   Forces?

22   A.  I read some of their statements and I heard some of their

23   announcement at that time.

24   Q.  Was the National and Islamic Forces composed of factions

25   that included Fatah?

F2ATSOK3                    Faraj - cross

1   A.  Yes.

2   Q.  Was Marwan Barghouti the Fatah representative to the

3   National and Islamic Forces?

4   A.  He was there, but he was not the only representative of

5   Fatah.  Sakher Habash was the representative -- he was the

6   member of the central committee and president of -- an official

7   representative of Fatah.

8   Q.  Do you yourself have any role in the National and Islamic

9   Forces?

10  A.  For me, no.

11  Q.  Was Hamas also a faction that participated in the National

12  and Islamic forces?

13  A.  At that time, and as a response to the incident happened at

14  that time, which was the visit of Sharon to the Al Aqsa Mosque.

15          MR. YALOWITZ:  Objection.

16          THE COURT:  Overruled.  You can answer.

17          You asked.

18          MR. YALOWITZ:  He's giving a non-responsive answer,

19  but okay, go ahead.

20          THE COURT:  No, that's directly responsive to your

21  question.  You can finish.

22  A.  And as a result of that visit, tens of Palestinians were

23  killed.

24          MR. YALOWITZ:  Objection.

25  A.  According to what is mentioned in this statement.

F2ATSOK3                    Faraj – cross

1              THE COURT:  Sustained.  Don't talk about what is in

2    that statement.

3              Do you have any further questions on this issue?

4    Q.  During the 2001 period, did you read statements issued by

5    the National and Islamic Forces?

6              MR. ROCHON:  Objection.

7              THE COURT:  Overruled.

8    A.  There was a commission that is still there, it is a

9    political entity or commission.  However, the events in the mid

10   2001 and also late 2001, it was beyond its means, because at

11   that time most of the actions became military.

12   Q.  I'm sorry, let me try the question again and just see if

13   you can answer it yes or no.

14             During 2001 did you read statements issued by the

15   National and Islamic Forces?  Yes or no.

16   A.  I cannot say yes, I cannot say no.  I'm under oath.  We're

17   talking about 14 years ago.  I may have read something, I may

18   have not.

19   Q.  You just don't remember sitting here today, is that the

20   story?

21             MR. ROCHON:  Objection, your Honor.

22             THE COURT:  Overruled.

23   A.  I remember exactly the events that started in 2000 and

24   events after that.  However, small things like reading a

25   statement or hearing an announcement, I cannot tell if I read

F2ATSOK3                    Faraj - cross

 1    it or heard it or not.  Due to the circumstances that we were

 2    living under at the time were much bigger as security officers

 3    to focus on reading a statement or hearing an announcement,

 4    that with all due respect to anybody who made an announcement,

 5    that's not in defense of anybody who made announcement or

 6    statement.

 7    Q.  Did Fatah and Hamas issue joint statements?

 8              MR. ROCHON:  Objection.

 9              THE COURT:  Overruled.

10              MR. ROCHON:  Time frame.

11              THE COURT:  No, you can question.

12              MR. ROCHON:  Thank you.

13    A.  About the massacre that happened in Al Aqsa Mosque, Fatah

14    and Hamas actually issued a statement on that incident of the

15    massacre happened in Al Aqsa Mosque.  And it was not only Fatah

16    and Hamas, all the political forces, Palestinian political

17    forces and many Israeli parties and many international

18    countries or many countries due to the timing of that event

19    that occurred during the negotiations.

20    Q.  Do you recall who Abu Ali Mustafa was?

21    A.  Yes.

22    Q.  Who was he?

23    A.  He was one of the leadership of popular front who returned

24    after the efforts to the Palestinian territory because he was

25    living abroad.  And after the resignation of George Habash from

1   the PFLP, Abu Ali Mustafa became the head of the PFLP, and he

2   used to live in Ramallah.

3   Q.  Did you, in the preventive security services, have concerns

4   about the activities of Abu Ali Mustafa?

5   A.  Abu Ali, as secretary general, I don't have concerns about

6   him.  And he has -- there was some activities for the popular

7   front or PFLP, and that we were concerned about, and that was

8   before the year 2000 and before the break out of the second

9   intifada we detained or arrested many of them before that date,

10  before 2002, before 2000.

11  Q.  Was Abu Ali Mustafa killed by the Israeli government?

12          MR. ROCHON:  Objection, your Honor.

13          THE COURT:  Overruled.  He can answer.

14  A.  What I know, that a rocket was shelled on Abu Ali's office

15  in Ramallah and he was killed.

16  Q.  Do you recall the date of that event?

17  A.  No.

18          MR. YALOWITZ:  Your Honor, may I approach?

19          THE COURT:  Yes.

20  Q.  I'm handing the witness what has been marked Exhibit 914

21  for identification, and the Arabic is at the end.  Would you

22  please look at Exhibit 914 for identification.

23          Does that refresh your recollection as to the date

24  that Abu Ali Mustafa was killed?

25          MR. ROCHON:  Objection, your Honor.

F2ATSOK3                      Faraj - cross

1            THE COURT:  Overruled, you can answer.

2   A.  No.

3   Q.  Have you ever seen Exhibit 914 before?

4   A.  The same previous answer.  We're talking about a document

5   that was issued almost 14 years ago.  I may have read it, I may

6   have not.  I can remember that Abu Ali Musafa was killed and

7   that he was the general of security of PFLP.  However, if a

8   statement was issued or not or if I read the statement or not,

9   I don't remember that.

10  Q.  When you gave your testimony yesterday about the

11  relationship between Hamas and Fatah, did you have Exhibit 914

12  in mind?

13            MR. ROCHON:  Objection, form, your Honor.

14            THE COURT:  I'll let him answer.

15  A.  Of course not.

16  Q.  Do you recall who Sheik Ahmed Yassin was?

17  A.  Yes.

18  Q.  Who was he?

19  A.  He was one of the people working at the Muslim Brotherhood

20  who was trying in the '80s to establish an organization that

21  work against PLO and Fatah.  In the middle '80s there was some

22  clashes between Fatah and Muslim Brotherhood in Gaza, and he

23  was the head of the Islamic Congregation in Gaza.  At the

24  beginning of the first intifada, the Muslim Brotherhood

25  announced that they formed Hamas movement.  He was sort of like

F2ATSOK3                          Faraj - cross

1    a spiritual father for this movement.  He was detained in

2    Israel prisons, and they exchanged him for the assassination

3    attempt that happened in Jordan.  So that was sort of a deal to

4    release him and return the collaborators of the Israeli Mossad,

5    the Israeli Mossad agents to go back from Jordan and not to be

6    arrested.

7              MR. YALOWITZ:  Objection.

8              MR. ROCHON:  The question was who was --

9              MR. YALOWITZ:  All the sudden we're hearing about the

10   Mossad.

11             THE COURT:  If you want more specific answers you need

12   to ask more specific questions.  Go on to another question.

13   Q.  Let me try another question.

14             THE COURT:  What's your next question?

15   Q.  Sheik Ahmed Yassin was a founder of Hamas, right?

16   A.  He was one of the founders of the Muslim Brotherhood and

17   Hamas movement.

18   Q.  And I want to show you a photograph of Yasser Arafat with

19   Sheik Ahmed Yassim.  Is that Sheik Ahmed Yassin sitting being

20   kissed by Yasser Arafat?

21   A.  Yes.

22   Q.  And can you tell what Mr. Arafat is presenting there?  Can

23   you see that plaque?

24   A.  There's a shield or armor that says Palestinian National

25   Authority, but I cannot see the writing underneath that.

F2ATSOK3                         Faraj – cross

1   Q.  It's a presentation from the Palestinian Authority to Sheik

2   Ahmed Yassin, right?

3   A.  That was after he was released from the Israeli prison in

4   the exchange that happened with Jordan.

5   Q.  And the kiss is a sign of respect and admiration, right?

6   A.  It might be sort of to show respect, or it might be the

7   goodbye kiss as Sheik Ahmed Yassin was paralyzed and sick and

8   he was about to die.

9   Q.  So yesterday -- do you recall that yesterday you testified

10  about a clash between Hamas and the PA in 2007?

11  A.  I talked about the coup that happened in 2007 by Hamas.

12  Q.  In 2014 Hamas and the PLO announced a unity government,

13  isn't that right?

14  A.  There is no unity government, there's only a circumscribed

15  government that announced its commitment to the political

16  agenda by Abu Mazen and they announce it on the media.  And it

17  aimed mainly to reach to the elections.  And therefore, the

18  existing government is government for the Palestinian people,

19  and it is committed to their political agenda of President Abu

20  Mazen and the Palestinian State, and it doesn't have -- doesn't

21  contain any member of Hamas, and the international community

22  and Israel deal with this government.

23  Q.  Isn't it a fact that Abu Mazen appeared hand in hand

24  smiling for photographs with Ismail Haniyeh?

25          MR. ROCHON:  Objection, your Honor.

F2ATSOK3                       Faraj – cross

1          THE COURT:  Overruled, he can answer.

2    Q.  Yes or no.

3    A.  He may have in 2006, and he may have seen Ismail Haniyeh

4    outside Gaza after 2007, and he may have smiled and he may have

5    not.

6    Q.  Let me show you what we marked for identification as

7    Plaintiff's 1279.  Do you see that?

8    A.  Yes.

9    Q.  Can you please identify the two individuals in that

10   photograph?

11   A.  President Mohmoud Abbas and Ismail Haniyeh.

12          MR. YALOWITZ:  Plaintiff's offer 1279 in evidence.

13          THE COURT:  Any objection?

14          MR. ROCHON:  No, your Honor.

15          THE COURT:  It will be admitted into evidence.

16          (Plaintiff's Exhibit 1279 received in evidence)

17   Q.  Who is the man on the left?

18   A.  To the left is Ismail Haniyeh.

19   Q.  Who is the men with the glasses holding his hand up

20   clasping hands?

21   A.  President Abu Mazen.

22   Q.  And then Ismail Haniyeh is on our right, isn't that

23   correct?

24   A.  Yes, Ismail Haniyeh is to our right, yes.

25   Q.  And he's the leader of Hamas, right?

F2ATSOK3                         Faraj - cross

1   A.  One of the leaders of Hamas.

2   Q.  I want to ask you some questions about Al Aqsa Brigades.

3   Are you aware that the United States government designated the

4   Al Aqsa Brigades as a foreign terrorist organization in 2002?

5   A.  Yes.

6   Q.  I want to ask you about people who self identify as members

7   of the Al Aqsa Brigades.  Do you have information --

8           MR. ROCHON:  Objection, form, your Honor.

9           THE COURT:  I didn't hear the question.

10  Q.  Do you have information in the GIS files about individuals

11  who are members of the Al Aqsa Brigades?  Yes or no.

12  A.  We have many files of members of the Al Aqsa Brigades.

13  Q.  Are you aware that Nasser Aweis is a member of the Al Aqsa

14  Brigades?

15  A.  Yes.

16  Q.  Are you aware that Faras Ghanem is a member of the Al Aqsa

17  Brigades?

18  A.  No, I heard of the first name, however, not the second

19  name.

20  Q.  Have you ever heard of Muhammad Sami Abdullah?

21  A.  Maybe I know his last name, his surname, but I cannot

22  recognize his name.

23  Q.  Let me show you one of your GIS files and let's see if that

24  will help you remember him.

25          MR. ROCHON:  Your Honor, objection to the commentary.

F2ATSOK3                     Faraj - cross

1     If we could just --

2               THE COURT:  Slow down, Mr. Yalowitz.  I encourage to

3     you go straight to the questions.

4               MR. YALOWITZ:  May I approach the witness, your Honor?

5               THE COURT:  Yes.

6               MR. YALOWITZ:  I'm showing the witness what is in

7     evidence as Exhibit 136.

8               MR. ROCHON:  Your Honor, that's a single page.

9     Exhibit 136 has more than that.  This happened before.  Let's

10    show all the pages and we won't have the issue that we had the

11    last time.

12              MR. YALOWITZ:  There's only one Arabic page.  The

13    witness can't read English.  I'm happy to show him whatever the

14    Court thinks is appropriate.

15              THE COURT:  I have no view on that.  If they want him

16    to show more, they can show him, as long as the record reflects

17    you're showing him one page of the document.

18              MR. YALOWITZ:  He has a two-page document.

19              THE COURT:  He has two pages a document.

20              MR. YALOWITZ:  Correct.

21              THE COURT:  Not a two-page document.

22              MR. YALOWITZ:  He has a complete copy in Arabic of

23    Exhibit 136.

24              THE COURT:  That's the entire document.

25              MR. YALOWITZ:  That's what he has.

1              THE COURT:  That's the entire document.

2              MR. YALOWITZ:  Correct.

3              THE COURT:  All right.

4              MR. YALOWITZ:  Let's show the jury the English.

5     BY MR. YALOWITZ:

6     Q.  Mr. Faraj, this is the general intelligence file of

7     Mohammed Sami Ibrahim Abdullah, right?

8     A.  I will give you the same answer that I gave you this

9     morning for a similar document of a different name.  I cannot

10    deny or confirm the name, and I know that I'm not required to

11    know the names of all the Palestinian people.  This paper is

12    not authorized by the GIS.  Anybody can make a copy or a

13    template like that, that doesn't mean I deny it or I confirm

14    it.  Maybe if you ask me to give you similar paper I can give

15    it to you but with a seal and it will be officially

16    authenticated.

17             MR. ROCHON:  Your Honor, I'm offering the same

18    agreement if counsel --

19             MR. YALOWITZ:  Let me ask my question.

20             THE COURT:  Let him ask his question.

21             MR. ROCHON:  All right.

22    Q.  Can you assume for purposes of my questions that it's

23    authentic and it is what it appears to be?  Could you make that

24    assumption?

25    A.  No, I can't.

F2A8SOK4                    Faraj - cross

1              MR. ROCHON:  I can offer the stipulation if he wants.

2              THE COURT:  He doesn't want it.  So you might as well

3    sit back down.

4    BY MR. YALOWITZ:

5    Q.  Will you look with me at the second page of the document.

6    Just turn it over and look at the back page.  Do you see there

7    is a report in a box in the middle of the page?

8    A.  Yes.

9    Q.  The third bullet says, "The aforementioned has participated

10   in murders with (illegible) Shehadeh and (three illegible

11   names) all of them members of the Al Aqsa Martyrs Brigades."

12              Do you see that?

13   A.  I see the third bullet.  I can see some of the words.

14   However, not all the words are clear or legible.  This paper is

15   not that clear.  I cannot read it.

16   Q.  Do you see that the subject of the report, Mohammed Sami

17   Ibrahim Abdullah, participated in Al Aqsa Martyrs Brigades

18   activities, do you see that from the report?

19   A.  I can see the word Al Aqsa Martyrs Brigades and the fourth

20   line.  However, not all of the third line; the names mentioned

21   therein are not clear.

22   Q.  Can you tell from reading the document that the subject

23   participated in murders with members of the Al Aqsa Martyr

24   Brigades?

25   A.  All of them are members of Al Aqsa Martyrs Brigades.  This

F2A8SOK4                        Faraj - cross

1    is in the fourth line.

2    Q.  Now, have you heard of Mohamed Mousleh?

3    A.  No.

4    Q.  Have you heard of Nasser Shawish?

5    A.  As a name, yes.

6    Q.  Are you aware that Nasser Shawish has as his political

7    affiliation Fatah/Al Aqsa Martyrs Brigades?

8    A.  Yes.  He says that he is from Al Aqsa Martyrs Brigades.

9    Q.  Do you know who Mohamed Hashaika was?

10   A.  No.

11   Q.  Do you know who Sa'id Awada was?

12   A.  No.

13   Q.  How about Ali Ja'ara, have you ever heard of him?

14   A.  Yes.

15   Q.  Who is he?

16        MR. YALOWITZ:  Let me rephrase.

17   Q.  He was a suicide terrorist, isn't that right?

18   A.  As far as I remember, yes.

19   Q.  He was a member of the Palestinian police force, right?

20   A.  Maybe he works at the Palestinian police, but that doesn't

21   mean that he actually works as a Palestinian police.

22   Q.  Do you know who Said Ramadan was?

23   A.  No.

24   Q.  So I want to ask you a little bit more about Nasser Aweis.

25   Do you recall that name?

F2A8SOK4                      Faraj – cross

1   A.  I remember the name, yes.

2   Q.  Do you recall that Nasser Aweis was on the Zinni list?

3   A.  I don't remember.

4   Q.  You just don't remember either way?

5   A.  I don't remember either way, yes or no.

6   Q.  Are you aware that Nasser Aweis was employed by the General

7   Intelligence Service?

8   A.  No.

9   Q.  Are you aware that he was transferred to the National

10  Security Service?

11  A.  No.

12  Q.  Are you aware that Nasser Aweis was convicted on 14 counts

13  of murder for terrorist activities?

14  A.  According to the Israeli documents, yes, that Nasser Aweis

15  is a suspect of killing Israelis.

16  Q.  In fact, he is in jail, right?

17  A.  Yes.

18  Q.  While in jail, he continues to receive his Palestinian

19  Authority salary, right?

20  A.  I think we talked about the salaries yesterday, and we

21  looked at the salaries from a different point of view, and we

22  gave our explanation on that matter.

23          Therefore, it's impossible that we gave Nasser Aweis a

24  salary because he did an action against the Israeli.

25  Therefore, we did the salaries --

F2A8SOK4                    Faraj - cross

1          THE INTERPRETER:  I have to ask the witness to repeat

2     that, and I may ask you to break after.

3          MR. YALOWITZ:  Let him just finish.

4          (Pause)

5     A.  As for the salaries, we worked on that on the basis of the

6     countries who helped us and who have experience on that

7     subject.  We also were in the Israeli prisons and the Israeli

8     government used to give assistance to our families --

9          MR. YALOWITZ:  Objection, your Honor.  It's not

10    responsive.

11         THE COURT:  Finish that answer.

12    A.  -- through the social affairs.

13         THE COURT:  Did you have another question and then we

14    will take a break?

15         MR. YALOWITZ:  I think we should let the translator

16    take a break.

17         THE COURT:  Did you want to take the lunch break or

18    just take five minutes?

19         MR. YALOWITZ:  I am happy either way.  Whatever your

20    Honor wants.

21         THE COURT:  Ladies and gentlemen, we will take the

22    lunch break.  I am going to ask you to be back in the jury room

23    at 1:55 so we can start promptly then.

24         (Jury exits courtroom)

25         MR. ROCHON:  If we could get a sense of how much

F2A8SOK4                        Faraj - cross

1    longer?

2              THE COURT:  Mr. Yalowitz, how much longer?

3              MR. YALOWITZ:  I really don't think I have more than

4    half an hour.  I am going to try to cut it down over the lunch

5    break.  The witness has given much lengthier answers than I

6    expected.

7              THE COURT:  You just gave me a much lengthier answer.

8    A half hour is good.

9              (Luncheon recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2A8SOK4                          Faraj – cross

1                              AFTERNOON SESSION

2                                  2:00 p.m.

3              (Jury not present)

4              MR. ROCHON:  Should I get the witness?

5              THE COURT:  Yes, please.

6              Is there anything we need to address before we

7    continue?

8              MR. ROCHON:  I do know the other translator, I think,

9    will be back as well.

10             THE COURT:  We shouldn't wait?

11             MR. ROCHON:  I don't think we should wait.

12             MR. YALOWITZ:  We are ready for the jury so long as

13   you are.

14             THE COURT:  Let's bring the jury in.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2     MAJED FARAJ, resumed.

3          THE COURT:  You can continue, Mr. Yalowitz.

4          MR. YALOWITZ:  Thank you, your Honor.

5     BY MR. YALOWITZ:

6     Q.  Mr. Faraj, yesterday you gave some testimony about the Oslo

7     Accords.  Do you remember that?

8     A.  Yes, I did talk about Oslo Accords between the PLO and

9     Israel.

10    Q.  That's a bilateral agreement that was binding on the PLO

11    and the PA, right?

12    A.  A political agreement, yes.

13    Q.  Mr. Rochon asked you about efforts of the PA to comply with

14    its commitments in the Oslo Accords, right?

15         MR. ROCHON:  Objection.

16         THE COURT:  Overruled.

17    A.  He asked me about some parts of the Accords.

18    Q.  I want to ask you about one other part, which is part of

19    the security annex.  Are you familiar with the security annex?

20    A.  I completely know all of the security agreement between us

21    and Israel.

22    Q.  I would like to direct your attention to Exhibit 552, annex

23    1, paragraph 4(e).  I am going to put it on the screen, or Ms.

24    Machnes is going to put it on the screen.

25         I will read it.

F2A8SOK4                         Faraj – cross

1             "In accordance with Palestinian law, the employment of

2      policemen who have been convicted of serious crimes, or have

3      been found to be actively involved in terrorist activities

4      subsequent to their recruitment, will be immediately

5      terminated, and their weapons and police identification

6      documentation will be confiscated."

7             The PA has not terminated many individuals convicted

8      of terrorist activity, isn't that true?

9      A.   The Palestinian Authority and its employees and who

10     committed violations under the Palestinian documents and

11     evidence, as I have read in some of the documents you presented

12     to me, to arrest an officer of the PSS, that happened in

13     Kakilia.  Many of those were arrested and their entries were

14     canceled and some procedures were taken against them.

15            This point that you just mentioned, talking about a

16     certain part, because it talks in general, most of those who

17     work in the Palestinian Authority and office establishment are

18     people who were previously detained in the Israeli prisons, and

19     most of those who are coordinating with Israel work on these

20     various bodies or apparatus, and they are the ones who are

21     combating terrorism, and they are the ones who are working on

22     the civility, and they are who gave the opportunity again to

23     the negotiation on the peace process between the Israelis and

24     the Palestinians.  And I am amongst those who were in the

25     Israeli prison, and I spent a few years in the Israeli prisons,

F2A8SOK4                    Faraj - cross

1  despite that I have been working in the security apparatus as

2  of 1994.

3  Q.  Let me ask you this.  Abdel Karim Aweis was convicted of

4  serious crimes and has been found to be actively involved in

5  terrorist activities subsequent to his recruitment into the

6  Palestinian police, correct?

7  A.  This was according to evidence given by Israel that

8  mentioned the arrest was in the Israeli prisons, not

9  Palestinian prisons.

10 Q.  He has not been terminated, right?

11 A.  He does not practice any work because he is in prison.

12 Q.  He is still on the payroll and he is still getting

13 promotions, right?

14 A.  As for the payroll, there is something that needs to be

15 clarified.

16 Q.  I just want to ask you yes or no.  He is still on the

17 payroll, yes or no?

18 A.  I respect your wish.  However, this kind of response needs

19 a clarification so that everybody knows why do we pay salaries.

20 Q.  Can you answer the question yes or no?  Is he still on the

21 payroll today?

22 A.  He is still on the payroll for reasons related to the

23 vision of the Palestinian Authority.

24 Q.  He has not been terminated as required by the Oslo Accords,

25 right?  Yes or no?

F2A8SOK4                        Faraj - cross

1    A.  It's easier to answer with yes or no, and I think we are in

2    accord, and I think the whole picture should be clear.  I was

3    in the Israeli prisons --

4              MR. YALOWITZ:  Objection, your Honor.

5              THE COURT:  I will stop the answer at that point.

6              Do you have another question?

7              MR. YALOWITZ:  I really didn't.  I just wanted to get

8    a yes or no to the question of whether Abdel Karim Aweis has

9    been terminated.

10             THE COURT:  It doesn't appear you're going to get one.

11             MR. YALOWITZ:  I agree.

12             I don't have anything further.

13             MR. ROCHON:  Thank you, your Honor.

14   REDIRECT EXAMINATION

15   BY MR. ROCHON:

16   Q.  Sir, just a few questions.

17             I would like to start with that deposition that was

18   shown to you yesterday of your deposition from August 2010.

19             MR. ROCHON:  In particular, turn to page 148, would

20   you, Justin, of that deposition.

21             If you could highlight the bottom.

22   Q.  I would like to give you, sir, an opportunity with the

23   translator, so I will read slowly, to hear the questions and

24   the answers that included what Mr. Yalowitz said yesterday.

25             If I could, the questioning in that area began on line

F2A8SOK4                    Faraj - redirect

1    7.

2    "Q.  To what extent did the Palestinian Authority and Fatah

3    coordinate on security activities in the time period leading up

4    to March 24, 2002?

5    "A.  The same thing.  Fatah is the ruling party.  In this

6    capacity, people from Fatah are ministers, for example.  People

7    from Fatah are security officials or in various posts in the

8    Palestinian Authority."

9    "Q.  Did the Palestinian Authority assign to Fatah any

10   particular security responsibilities?

11   "A.  No.

12   "Q.  What Palestinian Authority oversight was there over

13   Fatah's activities in the time period leading up to March 24,

14   2002?

15   "A.  Usually, most often, there was a relation between the

16   ruling party and the Palestinian Authority.  Maybe you would

17   find members of Fatah central committee, members of Fatah

18   Revolutionary Council would be like ministers or holding other

19   posts.  So you cannot really talk about a separation between

20   the Palestinian Authority and the Fatah.  But at no time there

21   was for Fatah a security service for apparatus.  The security

22   services were part of the Palestinian Authority.  And the same

23   applies to other ministers.  They were part of the Palestinian

24   Authority."

25            In terms of the relationship between Fatah and the PA,

1    if we can move to line 11 on that same page of 149.

2              MR. ROCHON:  Begin with line 7, if you would, Justin.

3    "Q.  What oversight of Fatah was done, if any, by the

4    Palestinian Authority security services?

5    "A.  The term 'oversight' is really big, general here.

6    "Q.  Monitoring and policing.

7    "A.  Fatah, in terms of security and in terms of information,

8    was followed up -- was monitored like any other political

9    organization in the Palestinian territories."

10             Sir, have you been able to follow from the translator

11   what I just read in English?

12   A.  Yes.

13   Q.  Was that your complete testimony on the relationship

14   between the PA and Fatah at your deposition?

15             MR. YALOWITZ:  We need to speak to the Court for just

16   one second.

17             THE COURT:  Before he finishes answering this

18   question?

19             MR. YALOWITZ:  Yes.

20             (Continued on next page)

21

22

23

24

25

F2A8SOK4                          Faraj – redirect

1              (At the sidebar)

2              MR. YALOWITZ:  I am sorry, your Honor.  I was reading

3      along with the testimony.  I didn't see this other interpreter

4      come in.  She has got to keep her voice up so we can monitor

5      her.  That was the understanding.

6              MR. ROCHON:  I will just say keep your voice up.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)

 2              MR. ROCHON:  I actually forgot if I had a question

 3    that I had asked or there was an objection or not.

 4              THE COURT:  Could you just pull the microphone closer

 5    to you?  I think we fixed the mike.  Tap that and see if it's

 6    working.  So speak into the microphone.

 7              THE INTERPRETER:  Is this far enough?

 8              THE COURT:  That's good.

 9              MR. ROCHON:  I will ask it again.  I think I know what

10    it was.

11    BY MR. ROCHON:

12    Q.  Was that your testimony as to the relationship between the

13    PA and Fatah at your deposition?

14    A.  This is my understanding of the relationship between Fatah

15    and the Palestinian Authority and to which I alluded yesterday.

16    Q.  At the end of your examination just now, when this

17    gentleman was asking you questions, you were asked about

18    payments to Nasser Aweis, I think it was.

19              MR. YALOWITZ:  We need your help.

20              THE COURT:  Keep your voice up in both languages for

21    us.

22              THE INTERPRETER:  OK.  I can do that.

23    Q.  Let me ask you, sir, why is it that the Palestinian

24    Authority pays prisoners even after they have been convicted?

25    A.  This is a very broad and complicated subject.
```

F2A8SOK4                        Faraj - redirect

1    Q.  Let me stop you and ask you a more focused question then.

2            Is there any reason related to security as to why the

3    PA pays prisoners?

4    A.  Yes.

5    Q.  What is that reason?

6    A.  The most important reason relates to the individual,

7    himself or herself, and their family.

8            First of all, we do not want this individual to have a

9    vulnerability that would lead to their continuing in terrorism

10   or violent activities.

11           The second aspect is that this person may be married

12   and has a family; therefore, the salary goes to the family.

13           Thirdly, part of the salary may actually go to the

14   parents if the individual is not married.

15           Fourth, the needs of that individual might be

16   exploited by certain extremist organizations.

17           Our experience in this field has been very, very

18   successful.  It might have failed in certain very limited

19   incidents, but if we are talking about the thousands of people

20   who went to prison, or if we actually go to the period from the

21   beginning of the occupation in 1967 to date, more than 800,000

22   Palestinians have gone into prison.

23           MR. YALOWITZ:  Objection.

24           THE COURT:  Overruled.

25   A.  Before 1994 --

F2A8SOK4                    Faraj - redirect

1           MR. YALOWITZ:  Your Honor.

2           THE COURT:  I am going to sustain the objection at

3     this point.  That's beyond the scope of your question.

4           What is your question?

5           MR. ROCHON:  The question was why --

6           THE COURT:  Ask another question or go on to something

7     more specific.

8     Q.  The practice of the PA paying prisoners' salaries and

9     promotions of prisoners began when?

10    A.  The Palestinian Authority was established in 1994.

11    Q.  Did the Palestinian Authority begin payment of prisoners at

12    that point when it was created?

13    A.  Yes.

14    Q.  Prior to 1994, if a Palestinian was in prison, did that

15    mean he did not get paid?

16    A.  There were four entities that assisted with financial

17    payments.  The PLO, the Palestine Liberation Organization; the

18    International Committee for the Red Cross used to pay and cover

19    the needs of the prisoner inside the prison; and Israel,

20    through the Ministry of Social Affairs, used to pay the

21    families, the needy families; and the United Nations relief and

22    work agencies used to pay families through social assistance

23    programs.  In either case, the payment did not go to the

24    prisoner himself; the primary beneficiary of the salary was the

25    family of the prisoner.

1          MR. ROCHON:  If we could go to Exhibit 551, please,

2     Justin, the videotape of that individual that we played earlier

3     to the witness.

4          Do you have that clip?

5          If we don't have the clip, I would ask if the

6     plaintiffs could cue up the clip that they played for the

7     witness.

8          MR. YALOWITZ:  I am not sure I understand.

9          MR. ROCHON:  551 is the videotape of Mosaab Hassan

10    Yousef that was played for the witness.

11         MR. YALOWITZ:  May I just consult with counsel for a

12    minute?

13         THE COURT:  Yes.

14         MR. ROCHON:  The same portion that was played

15    previously.

16         MR. YALOWITZ:  We will work on that.

17         MR. ROCHON:  I thank plaintiffs for doing that.

18         While they do that, I want to ask the witness a couple

19    of questions to set that up.

20    BY MR. ROCHON:

21    Q.  I am going to ask that he play again for you again and

22    listen to the translator as she translates it.

23         THE COURT:  Did you want to do it with the transcript

24    too?

25         MR. ROCHON:  The same way we did it earlier.

F2A8SOK4                    Faraj - redirect

1             It may have stayed up there.  That may be it sitting
2    in front of the witness.
3             May I approach, your Honor?
4             THE COURT:  Yes.
5             MR. ROCHON:  It is in fact here.
6             THE COURT:  You just want to play the same thing all
7    over again?
8             MR. ROCHON:  In fact, just for convenience sake, I
9    don't think I need to play it.  If I can read aloud the same
10   portion that was played, if that may be done.
11            THE COURT:  Sure.
12            Why don't you move back --
13            MR. ROCHON:  I will need another copy for me.
14            THE COURT:  -- so the jury can hear you and you won't
15   have your back to them.
16            MR. ROCHON:  I gave the witness my copy.  I am trying
17   to pull it up.
18            THE COURT:  Come on back up.  Keep your voice up.
19            MR. ROCHON:  They tell me I keep my voice too loud,
20   your Honor.
21            "Have you met Abdullah Barghouti?"
22            THE INTERPRETER:  He answered no.
23            MR. ROCHON:  Just wait.  She will read it.
24            "Have you met Abdullah Barghouti?
25            "While I never met him in person like in a meeting,

1   but I was at the location where he was arrested.

2              "Where was that?

3              "It happened that that was just -- the building next

4   to our residence in Ramallah.  We heard the -- some fire,

5   gunfire, and in a couple of minutes we received a phone call

6   and it was Marwan Barghouti telling my father to meet with him

7   outside because Jabril Rajoub, the PA, were trying to arrest

8   two Hamas people.

9              "Now, we didn't know who are the two Hamas people, and

10  it happened that it was Abdullah Barghouti and Bilar Barghouti

11  and that was their second arrest."

12             I stop there, your Honor.

13  BY MR. ROCHON:

14  Q.  Let me ask you, this references the second arrest of these

15  two people, is that right?  Is that what it says?

16  A.  According to what I heard just now, yes.

17  Q.  However, can you please tell us if you know who arrested

18  Abdullah Barghouti the second time?

19  A.  Preventive Security Services, PSS.

20  Q.  When was his first arrest?

21  A.  I don't know.

22  Q.  Do you know if he had been arrested a time before whatever

23  this person saw?

24  A.  No.

25  Q.  When this person said this was the second arrest of them,

F2A8SOK4                         Faraj - redirect

1    do you have any idea whether he was right or wrong?

2    A.  For me, the question of Mosaab Yousef is a whole different

3    matter.

4             MR. YALOWITZ:  Objection.

5    A.  Second --

6             THE COURT:  Let him finish.

7    A.  Secondly, based on this paper that we have just

8    reviewed --

9             THE COURT:  Just a second.  Let's focus the question.

10            What is your question, Mr. Rochon?

11            MR. ROCHON:  Whether or not, based on what he

12   knows --

13            THE COURT:  Ask him.

14   Q.  Based on what you know, do you know what this witness was

15   talking about when he referenced a second arrest?

16   A.  No.

17            MR. ROCHON:  If I could have, Justin, 1128.

18   Q.  I have put 1128 up on the screen.  That's the photograph of

19   Yasser Arafat and this individual Sheikh Yassin, is that right?

20   A.  Yes.

21   Q.  What was the physical condition of Sheikh Yassin at that

22   time?

23   A.  It is very well-known that Sheikh Ahmed Yassin was

24   paraplegic and essentially incapable of speech, paralyzed.

25   Q.  What was the condition of his vision?

F2A8SOK4                         Faraj - redirect

1    A.  What I also knew from talk about Ahmed Yassin is that he

2    was also incapable essentially of seeing.

3    Q.  So on the day that Yasser Arafat is kissing the paralyzed,

4    incapable of seeing Sheikh Yassin, do you know what day that

5    was?

6    A.  I don't know.

7    Q.  Do you know what the circumstance was?

8    A.  Possibly, possibly this was after his release from Israeli

9    prisons after the deal that was struck with Jordan.

10   Q.  But if I understand you correctly, you don't know for sure?

11   A.  For sure, no.

12   Q.  OK.

13            MR. ROCHON:  I would like to see, if I could, Justin,

14   1279.

15   Q.  Sir, you were asked about this photograph that includes

16   someone you called Abu Mazen.

17            Just for the jury's benefit, remind them what is Abu

18   Mazen's other name?

19   A.  Abu Mazen is Mahmoud Abbas, President of the State of

20   Palestine.

21   Q.  That's the person with the glasses?

22   A.  Yes.

23   Q.  Do you know what the occasion was for the taking of this

24   photograph?

25   A.  No.

F2A8SOK4                    Faraj - redirect

1   Q.  The other person is Ismail Haniyeh?

2   A.  Yes.  Ismail Haniyeh.

3   Q.  You were asked questions about the current governance

4   between the PA and Hamas.  And you said there was a technocrat

5   government?

6   A.  Yes.

7   Q.  What does that mean for the jurors who might not know what

8   a technocrat government is in your terminology?

9   A.  This expression is meant to refer to an apolitical or

10  nonpolitical government, cabinet, one that does not belong to

11  particular political parties.  It consists of independent

12  figures from within Palestinian society, professionals.  This

13  cabinet government is formed and it is committed to the

14  political program, meaning, in other words, the peace program,

15  the two state solution program, which would be between Israel

16  and Palestine.

17           The conditions of the quartet that are for any

18  Palestinian government, it must recognize the conditions of the

19  quartet in order for them to deal with it.  This government now

20  is committed to those demands of the quartet and it carries out

21  and implements the political program.  Therefore, Israel

22  first --

23           MR. YALOWITZ:  Objection.

24           THE COURT:  Overruled.

25  A.  -- and all states in the world indeed have relations with

F2A8SOK4                          Faraj - redirect

1    this government.  There are joint meetings held between Israeli

2    ministers and Palestinian ministers from this government.  This

3    is the government of which I was asked and about which I

4    answered.

5              MR. ROCHON:  If we could go to Exhibit 427, please,

6    Justin, the redacted versions.

7              He may not have the one that was used on direct

8    examination.  Therefore, once again, I would ask if plaintiffs

9    have the version that was used on direct examination with the

10   witness of 427?

11             Thank you.

12             Justin, if you would scroll forward, please, to the

13   last half of that document, to the portion that is not in

14   English and is handwritten, please.

15             MR. YALOWITZ:  May I suggest --

16             MR. ROCHON:  There we go.

17   Q.  So I just want to ask you, sir, this is the same exhibit

18   that you were shown on direct examination, a handwritten

19   portion.  Do you recognize what language that handwritten

20   portion is in?

21   A.  It's in Hebrew, the language of Israel.

22   Q.  Did you know when you first looked at it that the document

23   you were looking at was a translation of a Hebrew language

24   document into English?

25   A.  No, I didn't.

F2A8SOK4                    Faraj - redirect

1   Q.  Do you know what languages Abdullah Barghouti speaks?

2   A.  No.

3   Q.  Do you have any reason to believe that Abdullah Barghouti

4   was interviewed in Hebrew when he was arrested?

5   A.  No.

6   Q.  Were you presented on cross-examination with whatever it

7   was that Abdullah Barghouti said in fact to his interrogators?

8   A.  No, I did not hear him.  There were merely some points that

9   were offered by the lawyer.

10          MR. ROCHON:  If we could quickly go to the last one,

11  actually, 1127, Justin.

12          You might want to blow that up a little bit if you're

13  able to.

14  Q.  Do you remember looking at this on direct examination?

15  A.  Yes.

16  Q.  Leaving aside whether this is the real business card of

17  Jabril Rajoub or not, is it unusual to see a document that

18  includes both the name of the Palestinian Authority and the PLO

19  on the same document?

20  A.  The usual situation was that official documents carried the

21  names of both, the Palestinian National Authority and the

22  Palestine Liberation Organization.  After 2012, only the name

23  of the State of Palestine would appear because the agreement

24  was, or the Accords were Accords between the PLO and the State

25  of Israel, and political negotiations continue between the PLO

F2A8SOK4                    Faraj - redirect

1    and Israel.

2    Q.  Just because a document has both the name of the PLO and

3    the name of the PNA on it, does that mean they are the same

4    thing?

5    A.  No, because the PLO is different from the PA.

6    Q.  Sir, you were shown a couple of pages from GIS files on

7    cross-examination.

8            How many thousands of pages of documents are in the

9    GIS file?

10   A.  Thank God, we have lots and lots.

11   Q.  How many different people, roughly, would the GIS have

12   files on?

13   A.  Well, the nature of the work is different here.  There are

14   people who are resident in the West Bank, others who reside in

15   the Gaza Strip, and others who reside in the many states all

16   over the world.  So this is all based on the nature of the work

17   that we carry out.

18   Q.  As an intelligence agency, the Palestinian equivalent of

19   the CIA, you said on direct examination, is it unusual to have

20   files on all sorts of people, good and bad?

21   A.  The nature of the circumstances under which we live, and

22   the nature of the work we do, and especially over the last four

23   or five years, leads us to have many files within our records.

24   You might have files on people who are quite respectable and

25   you might find files about people who could be suspects or

F2A8SOK4                    Faraj – redirect

1    accused.

2    Q.  You were asked I think on cross-examination about someone

3    named Ali Ja'ara.  Do you remember being asked about Ali

4    Ja'ara?

5    A.  Yes.

6    Q.  You said he may have been employed by the police, but that

7    does not mean that he works for the police.  Could you please

8    explain?

9    A.  What I meant is that there might be employees working in

10   the ranks of the police force or some other apparatus who have

11   committed certain mistakes, which we would not support and

12   which we oppose, but this does not mean at all that it was the

13   police force that committed that error or the intelligence

14   services that committed that error or any such apparatus.

15           If certain individuals in the U.S. Army committed

16   errors, that does not mean that the U.S. Army in its entirety

17   committed errors.  And if one individual, if one officer in the

18   Israeli army committed a mistake, it does not mean that the

19   entire Israeli army has committed the mistake.  We are no

20   exception to that.  We, the Palestinians, are just like all

21   other nations.  Certainly some individuals might commit

22   mistakes, and I repeat, we are strongly opposed to those, but

23   our general policy would not support or encourage these

24   mistakes, and would not side with them.

25           MR. YALOWITZ:  Objection.

F2A8SOK4                    Faraj - redirect

1          THE COURT:  Overruled.

2   A.  That is what I meant.

3          MR. ROCHON:  I have no further questions.

4          THE COURT:  Any further questions?

5          MR. YALOWITZ:  Just a few.

6   RECROSS-EXAMINATION

7   BY MR. YALOWITZ:

8   Q.  Mr. Faraj, isn't it a fact that an employee prisoner is

9   able to designate himself as the beneficiary of the payment,

10  salary payments that he gets as a result of staying in the

11  employment of the Palestinian Authority police forces?

12  A.  Could you repeat the interpretation, please?

13         THE INTERPRETER:  I will do so.

14  A.  I don't understand the question.

15  Q.  Let me try it again.

16         You're aware that -- I will break it down for you.

17         You're aware that employees of the Palestinian

18  Authority are in prison for committing terrorist offenses,

19  right?

20  A.  According to Israeli trials and not Palestinian trials.

21  Q.  You're aware that the Palestinian Authority pays those

22  people a salary, right?

23  A.  Their salaries continue to be given, yes.

24  Q.  And you testified just now, in response to your counsel's

25  question, that this was money that was going to the family,

F2A8SOK4                     Faraj - recross

1    right?

2              MR. ROCHON:  Objection to the form, your Honor.

3              THE COURT:  Overruled.

4              You can answer.

5    A.   What I said was that the beneficiary of this money, and one

6    of the reasons that lead us to continue paying these salaries,

7    is that if the individual is married and has a family and this

8    payment will help the family and the wife.  Or if the person is

9    not married, then the money would go to the parents.  And the

10   third point that I raised is that such payments would make the

11   individual immune, would strengthen that individual against

12   extremist organizations and the attraction.

13   Q.   Are you aware, sir, that the prisoner has the power to

14   designate himself as the beneficiary?  Yes or no?  Are you

15   aware of that fact?

16   A.   Yes.  The salary owner can designate the beneficiary.  But

17   if you look actually at the salaries and how they are

18   designated, then you will see how much of that is being paid.

19   Q.   Let's take a look at one of them.  We will go to Exhibit

20   96, the file of Majed al-Masri.

21              Let's look at the second page together.

22              MR. YALOWITZ:  I will read, your Honor.

23              THE COURT:  Do you have the Arabic for him to look at?

24              MR. YALOWITZ:  May I approach, your Honor?

25              I will need this back.

F2A8SOK4                         Faraj - recross

1    Q.  "Beneficiary's account number.  Bank of Palestine, Ltd.

2    Name:  Majed al-Masri."  Then there is an account number and

3    the branch.  Do you see that?

4    A.  Yes.

5    Q.  He is the beneficiary, not his wife, right?

6    A.  Based on what is written in the paper here, no.  There is

7    written in Arabic at the top of the page Umm Hassan is the

8    beneficiary, based on this paper.

9              MR. YALOWITZ:  May I approach?

10             THE COURT:  Yes.

11   Q.  Let's look at the fifth page together.

12             MR. YALOWITZ:  May I approach?

13             THE COURT:  Yes.

14             MR. YALOWITZ:  Will you help him find what is on the

15   screen so he can follow along in Arabic?

16             THE INTERPRETER:  May I add to the answer that the

17   witness gave when he read what is written, Umm Hassan in Arabic

18   is mother of Hassan is the beneficiary.

19   A.  I do not know who she is.  I only read what is written.

20   The name of the beneficiary, Umm Hassan, the mother of Hassan.

21             (Continued on next page)

22

23

24

25

F2aQsok5                          Faraj - cross

1   Q.  Let's look together at item 4 and see who the beneficiary

2   is.  The translator will help you find item 4, beneficiary

3   information.  Let me know when you've found it.

4            THE INTERPRETER:  Which item?  What is the number,

5   please?

6   Q.  It's paragraph four.  It says beneficiary information.

7   Then it says beneficiary name:  Majed Ismail Al-Masri.

8   Relationship:  The detainee himself.  Let me know when you've

9   found that.  Page 9489.  May I approach?  I'll find it.

10           THE INTERPRETER:  89?  I don't have 89.

11           MR. YALOWITZ:  I'll find it.  No problem.

12   Q.  Do you see item 4?

13   A.  Yes.

14   Q.  The beneficiary is the detainee himself, right?

15   A.  No.

16   Q.  It doesn't say that in Arabic?

17   A.  In Arabic the page that you showed me earlier, and this

18   page here on the second line, name of the agent or proxy and

19   between brackets, the beneficiary, it's not legible at all.  So

20   please take a look.  If anybody can read what is written here,

21   I don't know.  In Arabic, nothing at all is legible.  Look at

22   it.

23   Q.  Let's move on.  All right.

24           Mr. Rochon asked you some questions about a Hebrew

25   language document.  Do you remember that?

F2aQsok5                      Faraj - cross

1   A.  Yes.  Yes.  I was asked about a document that appeared on

2   the computer and was written in Hebrew.

3   Q.  You have people in the GIS who know how to read Hebrew,

4   right?

5   A.  Yes.

6   Q.  You yourself are able to speak and read Hebrew, right?

7   A.  I speak it a little.  I read it a little.

8   Q.  Now, I just want to ask you one more line of questions,

9   which is about Ali Ja'ara.  Do you remember you were asked some

10  questions about Ali Ja'ara?

11  A.  Yes.

12  Q.  Ali Ja'ara was from Bethlehem like you, right?

13  A.  No.

14  Q.  Ali Ja'ara was a Palestinian police officer in the

15  Bethlehem region, right?

16  A.  It's possible that he worked in the Bethlehem area, yes.  I

17  wouldn't know that.

18  Q.  After he blew himself up on the number 19 bus, he was

19  reinstated as a police officer, right?

20  A.  You mean after he was exploded or blew himself up, he was

21  taken back to the police?

22  Q.  Right.  Do you know that?

23  A.  No.

24  Q.  Was Ali Ja'ara given a lavish state funeral?

25          MR. ROCHON:  Objection.  Your Honor.

F2aQsok5                          Faraj - cross

1           THE COURT:  I'm going to sustain the objection unless
2   you have some basis for the question.
3   Q.  Did you attend the funeral of Ali Ja'ara?
4           MR. ROCHON:  Objection, your Honor.
5           THE COURT:  You can answer that yes or no.
6   A.  No.
7           MR. YALOWITZ:  I have nothing further.
8           THE COURT:  Any questions?
9           MR. ROCHON:  No, your Honor.
10          THE COURT:  Thank you, sir.  You can step down.
11          (Witness excused)
12          THE COURT:  Do you want to begin with your next
13  witness?  We'll take a break in about 10 or 15 minutes.
14          MR. HILL:  Our next witness is Hanan Ashrawi.
15   HANAN ASHRAWI,
16      called as a witness by the Defendant,
17      having been duly sworn, testified as follows:
18  DIRECT EXAMINATION
19  BY MR. HILL:
20  Q.  Good afternoon, ladies and gentlemen.
21          Good afternoon, Dr. Ashrawi.  Would you please
22  introduce yourself to the members of the jury.
23  A.  My name is Hanan Ashrawi.
24  Q.  Do you work?
25  A.  I'm a member of the PLO executive committee, the Palestine

F2aQsok5                    Ashrawi – Direct

1   Liberation Organization executive committee.

2   Q.  What is the executive committee of the PLO?

3   A.  It is the highest political body in Palestine.  It is like

4   the cabinet of the Palestine Liberation Organization, which is

5   the representative body of all Palistinians everywhere.

6   Q.  Before we talk about your work, I want to talk about your

7   background.

8   A.  Yes.

9   Q.  Where are you from?

10  A.  I'm from Ramallah on the West Bank, and my family has been

11  there for centuries.

12  Q.  Did you grow up in Ramallah?

13  A.  Yes, I did.

14  Q.  Did you go to school there?

15  A.  Yes, I did.

16  Q.  Where did you attend school growing up in Ramallah?

17  A.  Friends School, which is an American Quaker school in

18  Ramallah.

19  Q.  Where did you learn your English?

20  A.  I learned at home.  Our parents raised us to be bilingual,

21  but I went to American schools all my life.

22  Q.  After your time at the Friends School in Ramallah, where

23  did you go to college?

24  A.  I went to the American University of Beirut, which is also

25  an American Presbyterian university, started in the 19th

F2aQsok5                          Ashrawi – Direct

```
 1    Century.
 2    Q.  How long did you study at the University of Beirut?
 3    A.  I did my bachelor's and my master's, so I stayed six years.
 4    Q.  What did you get your bachelor's degree in?
 5    A.  English literature.
 6    Q.  How about your master's?
 7    A.  English literature, Renaissance literature and textual
 8    criticism.
 9    Q.  After you did your master's degree at the American
10    University of Beirut, did you do any further graduate work?
11    A.  Yes, I went to the University of Virginia in
12    Charlottesville, Virginia, and I got my Ph.D. from there.
13    Q.  Are you still a Cavaliers fan?
14    A.  Pardon?
15    Q.  Are you still a Cavaliers fan?
16    A.  Yes.
17            THE COURT:  You both have to keep your voice up.
18    Shout at each other.
19    Q.  What did you get your Ph.D. in from the University of
20    Virginia?
21    A.  My main areas were medieval literature.  Then I did
22    comparative literature.
23    Q.  After you completed your Ph.D., did you get a job?
24    A.  Yes.  I went back home.
25    Q.  Where did you work?
```

F2aQsok5                          Ashrawi - Direct

1    A.   I worked at Bir Zeit University in the West Bank which is

2    just north of Ramallah.

3    Q.   What did you teach at Bir Zeit University?

4    A.   I established the department of English, and I taught

5    English, different courses, and then later I became dean of the

6    faculty of arts.

7    Q.   Did you establish any organizations while you were working

8    as a professor and dean at Bir Zeit University?

9    A.   Yes, I did.

10   Q.   Which ones?

11   A.   At the university there were several, but the ones I like

12   are the legal aid committee and the human rights documentation

13   project, and, of course, the union of workers.

14   Q.   What was the legal aid committee?

15   A.   It was a committee to defend our students who were

16   arrested.

17   Q.   What was the human rights documentation project?

18   A.   It was also to document violence and to work with the

19   lawyers and to keep track of what's been happening with

20   closures of the university and other things.

21   Q.   What did you do as a member of the union there?

22   A.   Well, actually, I gave the administration a hard time until

23   I became an administrator; but we defended the rights of

24   faculty and staff.

25   Q.   How long did you work at Bir Zeit University?

F2aQsok5                          Ashrawi - Direct

1    A.  I went from 1973 till 1990.  '91 I took leave of absence.

2    Q.  At some point did you become involved in the

3    Israeli-Palistinian peace process?

4    A.  Yes, I did.

5    Q.  When was that, approximately?

6    A.  The direct involvement was in 1991 when Secretary of State

7    then James Baker wanted to explore the possibilities of

8    launching a peace process, so I and two others were asked to

9    negotiate or discuss the launching of the peace processes with

10   secretary James Baker.

11   Q.  Without going into a lot of detail -- we will come to that

12   later -- what role did you play in the Israeli-Palistinian

13   peace process?

14   A.  I became a member of the leadership committee and the

15   official spokesperson for the delegation, and I was in charge

16   of negotiating with the Americans.

17   Q.  Did you ever hold a position with the Palestinian

18   Authority?

19   A.  Yes, I did.

20   Q.  When was that?

21   A.  1996 to 1998.

22   Q.  What position did you hold?

23   A.  I was minister of higher education and research.

24   Q.  Were you ever elected to office in the Palestinian

25   Authority?

F2aQsok5                          Ashrawi - Direct

1    A.  Yes, I was.

2    Q.  What office were you elected to?

3    A.  In 1996 -- yes, I was elected to the Palestinian

4    Legislative Council, which is our parliament for the

5    Palestinian Authority.  And I was re-elected in 2006.

6    Q.  After you left Bir Zeit, were you involved in founding any

7    other organizations?

8    A.  Yes.  I was involved in founding the civil society

9    organization and NGO.

10   Q.  For the benefit of the jury, can you explain what you mean

11   when you say civil society or NGO?

12   A.  These are non-governmental organizations which are

13   voluntarily constructed in order to help people in general.  My

14   main concern was human rights, good governance and

15   anti-corruption.

16   Q.  How many of these non-governmental organizations did you

17   establish, Dr. Ashrawi?

18   A.  The first one was the independent commission for citizens

19   rights, which later became the independent commission for human

20   rights.  It is like a watchdog authority, an ombudsman, so to

21   speak.  And it become official and it became a state

22   institution.

23   Q.  You said you were an ombudsman.  Can you explain to the

24   members of the jury what an ombudsman is?

25   A.  It's an advocate for presenting grievances, especially

F2aQsok5                    Ashrawi – Direct

1  grievances against the government, against any official body.

2  And the ombudsman can be in defense of anything, women,

3  children, violations of law, and so on.

4  Q.  Did you establish any other non-governmental organizations

5  other than the independent commission that you referenced?

6  A.  Yes.  After I left the cabinet, I established in 1998 the

7  Palestinian Initiative for the Promotion of Global Dialogue and

8  Democracy.

9  Q.  What does that organization do?

10  A.  That's an organization concerned with good governance, with

11  establishing, of course, rule of law but also with empowering

12  women and youth and training them for leadership, but also we

13  engage globally in terms of presenting the Palistinian

14  initiative.

15  Q.  Did you found any other NGO?

16  A.  Yes.  The Coalition for Accountability and Integrity (AMAN)

17  which is a coalition of several non-government institutions and

18  individuals that have been committed to fighting corruption.

19  It's an anti-corruption organization.  And it worked to

20  establish an integrated system of accountability in Palestine.

21  Sorry.

22  Q.  Were you finished?

23  A.  It later became the Palestinian Branch of Amnesty –– of

24  Transparency International.

25  Q.  Any other non-governmental organizations that you founded

F2aQsok5                        Ashrawi - Direct

1    during your time in Palestine?

2    A.  These three, but I volunteered for many.

3    Q.  Now, you mentioned a couple of times these different

4    non-governmental organizations were involved in addressing

5    problems with the government.  Which government were you

6    involved in addressing problems with?

7    A.  Well, when we established -- the Palestinian Authority was

8    established in 1993 and started working in '94, that was the

9    primary objective of ensuring that nation building and state

10   building would proceed according to the proper bases of

11   transparency, accountability and respect for human rights.

12   Q.  Now, when you talk about trying to get the government to

13   respect transparency, accountability and human rights, which

14   government were you trying to get to respect those things?

15   A.  The PA, the Palestinian Authority, which was in charge of

16   administering rights and building institutions.

17   Q.  Now, you mentioned that you're currently on the executive

18   committee of the PLO.  Do you hold any other positions in any

19   other PLO bodies?

20   A.  Yes.  The legislative representative bodies.

21   Q.  Can you explain what the legislative body that you're

22   referring to is?

23   A.  Because the PLO is such a large representative body, it is

24   made up of several organizations.  The executive level is the

25   PLO Executive Authority, but then you have the Palestine

F2aQsok5                          Ashrawi – Direct

1    National Council, which is like our parliament in exile -- it

2    used to be in exile.  Now it represents Palistinians

3    everywhere.  It has all the different political factions and

4    parties.  It has unions and representative bodies, student

5    unions, women's unions and professional unions and so on.  And

6    it delivers services to Palistinians in exile in refugee camps

7    as well as first it was under occupation and is now in

8    Palestine.  And the PNC, the Palistinian National Council also

9    established an intermediary department which is called the

10   central council in order to be the intermediary between the

11   national council and the executive committee.  I know it's

12   complicated but our life is complicated.

13   Q.  That's OK.  Are you saying there are actually two different

14   Palestinian legislatures:  One affiliated with the PA and one

15   affiliated with the PLO?

16   A.  Yes.  The PLO is the older, larger institution.

17   Q.  What's the PLO legislature called?

18   A.  The Palestine National Council.  It's a representative for

19   all Palistinians everywhere.

20   Q.  So the people that belong to that, are they only from

21   Palestinian territories or are they from places outside of

22   Palestine as well?

23   A.  No.  The members of the PLO National Council are from all

24   over the world.  Palistinians who were either expelled or left

25   in 1948, as well as Palistinians in refugee camps, as well as,

F2aQsok5                              Ashrawi - Direct

1    you know, all Palistinians everywhere.  But because under

2    occupation we weren't allowed to belong to PLO institutions.

3    The Palistinians under occupation in the West Bank including

4    Jerusalem and Gaza --

5                MR. YALOWITZ:  Objection.

6                THE COURT:  I'm going to sustain the objection at this

7    point.

8    Q.  Let me ask another question.

9                So the Palestinian legislature that's associated with

10   the Palestinian Authority, what's the name of that one?

11   A.  That's the Palestinian Legislative Council.  It is a much

12   smaller body.

13   Q.  Is that the one you were elected to --

14   A.  Yes.

15   Q.  -- in 1996?

16   A.  And 2006, yes.

17   Q.  Are the members of the Palestinian Legislative Council only

18   Palistinians who live in the Palestinian territories?

19   A.  Yes.  It was established in accordance with the agreement,

20   the declaration of principles, and as such the council, the

21   legislative council was made up of Palistinians who were

22   directly elected only in the West Bank and Jerusalem and Gaza

23   but not from outside, and the numbers were smaller.  We started

24   out 88 and then we become 132.

25   Q.  We're going to take a break in a minute.  I want to ask you

F2aQsok5                         Ashrawi - Direct

 1   a couple of questions about your personal life.  Are you

 2   married?

 3   A.  Yes I am.

 4   Q.  When did you get married?

 5   A.  Sorry?  When?  I got married on August 8, 1975 at St.

 6   George's Cathedral in Jerusalem.

 7   Q.  Where is your husband from?

 8   A.  My husband is from Jerusalem and Nazareth.

 9   Q.  Is your husband a politician?

10   A.  No.

11   Q.  What does he do?

12   A.  Well, he's a retired UN member, staff member, but he's an

13   artist, a musician and photographer.

14   Q.  Do you have any children?

15   A.  I have two daughters.

16   Q.  Do you have any grandchildren?

17   A.  Yeah.  I have three grandchildren.

18   Q.  What do your daughters do?

19   A.  Pardon?

20   Q.  What do your daughters do?

21   A.  What do my daughters --

22   Q.  Do for a living.

23   A.  Do for a living.

24         One has just -- the older one got her B.A. at Earlham

25   College in the states and her Master's in Vienna.  She got

F2aQsok5                          Ashrawi – Direct

1    diplomacy in international affairs and then finally she studied

2    psychotherapy, psychoanalysis at the Sigmund Freud University

3    Vienna.

4           My younger one finished George Mason, and she got her

5    B.A. in government and prelaw and decided not to go into law;

6    did graduate work in education; and now is interested in going

7    into medical school.

8    Q.  Where do you live?

9    A.  I live in Ramallah and I have also residence in Jerusalem.

10          MR. HILL:  Your Honor, this is a good place to take a

11   break.

12          THE COURT:  Let's take a ten minute break, ladies and

13   gentlemen.  Don't discuss the case.  Keep an open mind.  I'll

14   see you in ten minutes.

15          (Jury recessed)

16          THE COURT:  We'll take a ten minute break.

17                         (Recess)

18          (Continued on next page)

19

20

21

22

23

24

25

F2aQsok5                         Ashrawi - Direct

 1              (Jury not present)

 2              MR. YALOWITZ:  Your Honor, I think the witness needs

 3    to be excused.

 4              THE COURT:  I will ask you to step out if you want to

 5    argue about something.

 6              MR. YALOWITZ:  That would be great.

 7              THE COURT:  Would you just take the witness into the

 8    witness room?

 9              MR. ROCHON:  I'll take care of it.  Mr. Hill has it.

10    Come out with me, Doctor.  We'll be in the hallway.

11              MR. YALOWITZ:  Your Honor, I have a serious problem

12    with what's going on with this witness.  First of all, she

13    has --

14              THE COURT:  She didn't say anything yet.

15              MR. YALOWITZ:  Right.  Well, let me tell you what, we

16    took her deposition Saturday night.  She doesn't have any

17    direct knowledge.  She was not in the PLO or the PA during the

18    al-aqsa Intifada.  She is a well-known, very prominent

19    political activist.  She said that she was going to be

20    testifying about the PLO, the relationship between the PLO and

21    the PA and Fatah, which she wasn't in any of those

22    organizations during the relevant years, about the history of

23    the PLO and its development.  We went over that.  That is not

24    relevant in this case.  It's evolution of major landmarks,

25    political decision-making, negotiated settlement and so on.

F2aQsok5                          Ashrawi – Direct

 1    None of that is relevant in the case.

 2              Then about developments within the peace process,

 3    again, it doesn't go to the issues in this case.  Her role in

 4    the peace process, I'm sure, is very interesting, but not

 5    germane to the jury; and then about the situation in 2002 and

 6    2004, what happened then, the tragic conditions that we

 7    underwent.  That's the proffer we got from these defendants.

 8              THE COURT:  But you deposed her.

 9              MR. YALOWITZ:  We did.

10              THE COURT:  I don't have to worry about the proffer.

11              MR. YALOWITZ:  And then what we saw here was Mr. Hill

12    just asking her --

13              THE COURT:  You jumped over something.  You didn't

14    make this argument either before the deposition or after the

15    deposition.  So I am trying to understand how this is coming up

16    now that the witness has been on the stand for ten minutes.

17              MR. YALOWITZ:  Well, I wanted to give him some leeway,

18    rather than pick a fight and they understand the Court's

19    rulings.  So let's see if she has something of relevance to

20    say.

21              THE COURT:  You know what she has to say.  You deposed

22    her yesterday or the day before.

23              MR. YALOWITZ:  Right.

24              THE COURT:  So you know exactly what she has to say.

25    It's not a guess.

F2aQsok5                          Ashrawi - Direct

1                    MR. YALOWITZ:  Bear with me here.

2                    What we got was background, leading questions on

3       background, which that's another problem, but we don't have to

4       talk about that.

5                    THE COURT:  It's not a big issue.

6                    MR. YALOWITZ:  I didn't object.  And then we got her

7       slipping in -- her whole tone changed, she went from being

8       animated and talking to the jury about her life.  Her whole

9       tone changed and she started slipping in under Mr. Hill's

10      questioning -- you know, he's already crossed the line,

11      slipping in "we weren't even allowed to belong to the PLO under

12      the Israeli occupation."  Clearly over the line.  Clearly

13      inappropriate.  Your Honor correctly sustained the objection.

14      I don't know how many times these defendants have to be told

15      they can't play those kinds of games.

16                   THE COURT:  Mr. Yalowitz, I understand your reaction

17      to the witness, but, quite frankly, all I recollect is you

18      objected one time and I sustained the objection.  I am not sure

19      in substance what you are saying about why this witness

20      shouldn't be allowed to testify now that we've already sworn

21      her in and she's given us ten minutes on her background.

22                   MR. YALOWITZ:  If they have something of actual

23      relevance to give this jury --

24                   THE COURT:  I can't deal with if's.  You have to tell

25      me.  If you have some objection at this point, you have to tell

F2aQsok5                          Ashrawi - Direct

me specifically what it is.  If you want me to take her off the

stand and send her home, you have to give me a good reason why.

If you want me to limit her testify testimony, you have to give

me some basis, since you deposed this witness, that you think

she is going to say something that you believe is going to be

improper and you want me to know that, so I can make sure that

they don't go into that area.  But this general reaction that

you're not comfortable with her there is not much I can do

about it.

          MR. YALOWITZ:  OK.  Well, look, I understood that she

was going to give very limited testimony about the relationship

between the PA and the PLO and Fatah.  That's issue in this

case.

          THE COURT:  OK.

          MR. YALOWITZ:  I don't have a problem with her giving

limited, focused testimony on that topic.

          THE COURT:  Do I have any basis to believe that that

is not what she is going to testify about?

          MR. YALOWITZ:  Well, she said in her deposition she

was planning to talk about a lot of things that are way beyond

the scope, like the situation on the ground that we -- and the

tragic circumstances that we went through.  Obviously, that

would be inappropriate rate.  I expect that the defendants

understand that.  I expect that Mr. Rochon has informed his

witness not to talk about things that are outside of the

F2aQsok5                        Ashrawi - Direct

1    bounds, and yet we saw her on background slipping political

2    statements in, and that's got to stop.

3            THE COURT:  I will hear from them.

4            MR. ROCHON:  I'll be very short.

5            THE COURT:  Let me just tell you where I am so we can

6    move past this.  I will listen and sustain as appropriate any

7    objections that you have to any improper questions or any

8    improper answers.  If I get a feeling that the defendants have

9    brought her here for an improper purpose and are systematically

10   attempting to elicit information that we all understood, even

11   if we didn't agree, that that wasn't going to take place, I am

12   going to thank the witness, we're going to pack her up and

13   we're going to send her home.  OK?

14           MR. YALOWITZ:  Thank you.

15           THE COURT:  That's the only thing I can say to you

16   about that if she gets to that point.  If she crosses the line

17   once or twice because she volunteers something, I will deal

18   with it on a per question or per answer basis and tell the jury

19   to disregard it if I think it's improper or stop it so it

20   doesn't go any further.

21           If I get the impression that Mr. Hill is genuinely

22   intentionally attempting to avoid any of the rulings that we've

23   previously discussed and points that I've made clear about the

24   extent and limits of the testimony here, then I am going to

25   take action to end this examination and send her on her way.

F2aQsok5                        Ashrawi – Direct

1              That's the only thing that I can give you at this

2      point based on the general nature of your concern about whether

3      or not she is going to testify to something improper,

4      particularly in light of the fact that you've already deposed

5      her.  And we didn't argue about this yesterday.  You didn't

6      tell me stop her from coming because you deposed her, and she

7      has absolutely nothing legitimate to say.  You waited till she

8      got on the stand, I swore her in, she started testifying, and

9      now during the break you decided well, now I don't want her

10     around.

11             MR. YALOWITZ:  I don't have a problem with the limited

12     focused subject of the relationship between the PLO, the PA

13     and, Fatah.  To the extent she has some personal knowledge on

14     those things, I don't have a problem with that.  But what we

15     have already started seeing that was of grave concern, I wanted

16     to object immediately and I wanted to highlight it for you so

17     you can act accordingly.

18             THE COURT:  The only thing I can say is unlike the

19     lawyers, I cannot discern a pattern from one question, one

20     objection and my sustaining that one objection.

21             I have no basis for me personally to be concerned that

22     somehow we've crossed the line here.  I don't know what your

23     specific concerns are that you think she is going to volunteer

24     a specific piece of information that you believe they know

25     should not be in this case.  If that happens, and it's clear to

F2aQsok5                          Ashrawi - Direct

1   me that she or they are attempting to do that -- I say this and

2   it's not a threat, it's just the way I deal with it, and it's

3   the way I'm going to deal with it.

4           Is there anything you want to say, Mr. Hill?

5           MR. ROCHON:  I want to say as long as he never thinks

6   that our failure to challenge characterizations is an agreement

7   with them, then I think I can sit down and we ought to proceed

8   with this witness' testimony.

9           THE COURT:  That's my position.

10          MR. YALOWITZ:  Let me just say --

11          THE COURT:  Mr. Yalowitz, do we need to discuss this

12  any further?  I don't want to waste the jury's time.

13          MR. YALOWITZ:  We don't need to discuss anything

14  further yet.

15          THE COURT:  Bring in the witness.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

F2aQsok5                        Ashrawi - Direct

1              (Jury present)

2              THE COURT:  Mr. Hill, you can continue.

3              MR. HILL:  Thank you, your Honor.

4    Q.  Dr. Ashrawi, let's talk to you about the PLO or the

5    Palestine Liberation Organization, its full name.  When was the

6    PLO formed?

7    A.  In 1964 in Jerusalem.

8    Q.  When the PLO was originally formed in 1964, what was its

9    main goal?

10   A.  The liberation of Palestine.

11   Q.  When the PLO was originally formed in 1964, what was its

12   general attitude toward the state of Israel?

13              MR. YALOWITZ:  Objection.

14              THE COURT:  I'm going to sustain the objection.

15   Q.  Did the PLO's position change as time went on?

16              MR. YALOWITZ:  Objection.

17              THE COURT:  Sustained.

18   Q.  Did there come a time when the PLO agreed to negotiate a

19   peaceful settlement to the Israel Palestinian conflict?

20              MR. YALOWITZ:  Objection.

21              THE COURT:  Overruled.

22   A.  Yes.

23   Q.  When was that time?

24   A.  The decision was taken by the Palestine National Council in

25   the meeting of 1988.

F2aQsok5                    Ashrawi - Direct

1    Q.  At that meeting in 1988, did the PLO make any decisions

2    about whether to accept the state of Israeli?

3    A.  Yes, they did.

4    Q.  What was that decision?

5    A.  They accepted the principle of partition of Palestine based

6    on one resolution 181, which divided Palestine into two states,

7    and then they accepted 242, U.N. Resolutions 242, 338 which

8    referred to the 67 boundaries that are were occupied by --

9              MR. YALOWITZ:  Objection.

10             THE COURT:  Overruled.  I'll let that stand.  Let's

11   move forward.

12             MR. ROCHON:  Yes, your Honor.

13   Q.  In 1988, did the PLO take a position about whether to use

14   violence as a means of establishing a Palestinian state?

15   A.  No, the PLO committed itself to a negotiated peaceful

16   political settlement.

17   Q.  After 1988, were there in fact negotiations between

18   Israelis and Palistinians about a peaceful resolution to the

19   Israeli-Palestinian conflict?

20   A.  Yes, talks started in --

21             MR. YALOWITZ:  Objection.

22             THE COURT:  Overruled.  You can answer.

23   A.  Thank you.  The talks started in 1991 under the sponsorship

24   of the Americans.

25   Q.  Did you play a role in these peace talks that began in

F2aQsok5                         Ashrawi – Direct

1     1991.

2     A.  Yes, I did.

3     Q.  What was your role?

4     A.  I negotiated with the Americans, with the Secretary of

5     State James Baker then, and with the President George Bush --

6     George Herbert Walker Bush on launching the peace talks, and

7     then I helped set up the structure for the negotiating

8     delegation, and then I become a member of the leadership

9     committee and official spokesperson for the delegation.

10    Q.  Now, the talks that you're referring to, did they occur in

11    certain cities around the world?

12    A.  Yes.  They started in Madrid.  The opening talks were in

13    Madrid.  And then we moved to Washington and they are know as

14    the Washington Talks.

15    Q.  During what period of time were these talks going on

16    between Palistinians and Israelis first in Madrid and then

17    later in Washington D.C.?

18    A.  I'm sorry?

19    Q.  During what time were the Madrid and Washington talks?

20    A.  1991 to 1993, September 1993.

21    Q.  While these talks were going on in Madrid and Washington

22    D.C., were there, in fact, secret negotiations between the

23    state of Israel and the PLO?

24    A.  Yes.

25              MR. YALOWITZ:  Objection.

1           THE COURT:  Sustained.

2  Q.  Did you become aware of any additional negotiations that

3  were occurring during this time?

4           MR. YALOWITZ:  Same objection.

5           THE COURT:  Sustained.

6  Q.  Was there eventually a peace agreement between Israel and

7  the PLO?

8  A.  Yes, there was an interim agreement; not a peace agreement,

9  not a peace treaty.  There was a series of agreements.

10  Q.  What was the first agreement that was signed?

11  A.  It was called the Declaration of Principles.  It was signed

12  on the White House lawn in 1993, September 13, 1993, known as

13  the Oslo Agreement.

14  Q.  Why is it known as the Oslo Agreement?

15           THE WITNESS:  May I answer?

16           THE COURT:  Yes.

17  A.  Because the talks that took place that led to agreement

18  took place in Oslo away from the main talks that were taking

19  place in Washington.  So they were the back channel talks.

20           MR. HILL:  Your Honor, may I approach?

21           THE COURT:  Yes.

22  Q.  Dr. Ashrawi, I've handed you a document marked for

23  identification as Defendant's Exhibit 17.

24  A.  Yes.

25  Q.  Do you recognize what this document is?

F2aQsok5                          Ashrawi - Direct

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  Its it's entitled the exchange of letters between Prime

4    Minister Rabin and Chairman Arafat.  These were the letters

5    that were exchanged by Yasser Arafat the chairman of the PLO

6    executive committee then and Yitzhak Rabin, the prime minister

7    of Israel then.

8              MR. HILL:  Your Honor, I offer in evidence Defendant's

9    Exhibit 17.

10              THE COURT:  Any objection?

11              MR. YALOWITZ:  No.

12              THE COURT:  They will be admitted into evidence.

13              (Defendant's Exhibit 17 received in evidence)

14              MR. HILL:  Justin, if we could put the first page up

15    and if you could enlarge the text on that letter which is dated

16    September 9, 1993.

17    Q.  Dr. Ashrawi, this is addressed to Yitzhak Rabin Prime

18    Minister of Israel.  Do you see that?

19    A.  Yes.

20    Q.  Did you ever meet Prime Minister Rabin?

21    A.  Yes.  Several times.

22    Q.  And the letter is from Yasser Arafat, Chairman of the

23    Palestine Liberation Organization.  Did you ever meet Yasser

24    Arafat?

25    A.  Many times.

F2aQsok5                        Ashrawi – Direct

1    Q.  Ma'am, would you read the first three paragraphs of the

2    letter from Yasser Arafat to the Israeli Prime Minister Yitzhak

3    Rabin?

4    A.  Mr. Prime Minister:  The signing of the Declaration of

5    Principles marks a new era in the history of the Middle East.

6    In firm conviction thereof, I would like to confirm the

7    following PLO commitments:  The PLO recognizes the right of the

8    state of Israel to exist in peace and security.  The PLO

9    accepts United Nations Security Council Resolutions 242 and

10   338."

11   Q.  Ma'am, earlier you mentioned those U.N. resolution 242 and

12   338.  For the benefit of the jury, can you explain what U.N.

13   Resolution 242 and 338 called for?

14              MR. YALOWITZ:  Objection.

15              THE COURT:  Overruled.

16   A.  These resolutions are adopted by the security council one,

17   and after the 67, more 242.  And 338 in 1973 after the '73 war.

18   242 calls for --

19              MR. YALOWITZ:  Objection.

20              THE COURT:  Overruled.  Keep your voice up.

21   A.  I'm sorry, your Honor.  Yes.  U.N. Security Council 242

22   calls for the withdrawal of Israel from the territories -- from

23   territories occupied in 1967 and for the rights of all states

24   to live in peaceful and recognized borders.

25              338 calls also for the implementation of 242, the

F2aQsok5                    Ashrawi - Direct

1    withdrawal of Israel from the occupied territories and calls

2    for a negotiated settlement to the conflict.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2ATSOK5                    Ashrawi – direct

1    BY MR. HILL:

2    Q.  Now you mentioned that these were resolutions of the united

3    Nations Security Council.  Again, for the benefit of the jury,

4    could you explain what that body is?

5            MR. YALOWITZ:  Objection.

6            THE COURT:  Sustained.

7    Q.  If you could read the fourth -- the fifth paragraph in the

8    letter, would you do so, ma'am.

9    A.  The PLO considers that the signing of the Declaration of

10   Principles constitutes a historic event, inaugurating a new

11   epoch of peaceful co-existence free from violence and all other

12   acts which endanger peace and stability.  Accordingly, the PLO

13   renounces the use of terrorism and other acts of violence and

14   will assume responsibility for all the PLO elements and

15   personnel in order to ensure compliance, prevent violations,

16   and discipline violators.

17   Q.  Thank you.  If you could turn over to the next page, and

18   just the third letter on the page there, the one at the bottom,

19   doctor, would you read the letter that was sent by Prime

20   Minister Yitzhak Rabin to Yasser Arafat.

21   A.  Mr. Chairman, in response to your letter of September 9,

22   1993, I wish to confirm to you that, in light of the PLO

23   commitments included in your letter, the government of Israel

24   has decided to recognize the PLO as the representative of the

25   Palestinian people and commence negotiations with the PLO

F2ATSOK5                          Ashrawi – direct

1     within the Middle East peace process.

2     Q.  Thank you, ma'am.

3             MR. HILL:  Your Honor, may I approach?

4             THE COURT:  Yes.

5     Q.  Dr. Ashrawi, I handed you what we marked as Defendant's

6     Exhibit Number 18.  Do you recognize this document?

7             MR. YALOWITZ:  Objection.

8             THE COURT:  She can answer that question.

9     A.  Yes, this is the official UN document that registers the

10    Declaration of Principles, I think.  Hold on.

11            Yes, this is the agreement arrived at in the 1993.

12    Q.  Is this the documents that is referenced in the exchange of

13    letters that we just read between Yasser Arafat and Prime

14    Minister Rabin?

15    A.  Yes.

16            MR. YALOWITZ:  I offer in evidence Defendant's Exhibit

17    18.

18            THE COURT:  Any objection?

19            MR. YALOWITZ:  Yes.

20            THE COURT:  I sustain the objection.  There's no need

21    for this.

22    Q.  Let me show you what is in evidence as Defendant's Exhibit

23    Number 71.

24            Were you present on the occasion of the taking of this

25    photograph?

F2ATSOK5                         Ashrawi – direct

1    A.  Yes, I was.

2    Q.  Where this was photograph taken?

3    A.  This was taken on the White House lawn when the Declaration

4    of Principles was signed with President Bill Clinton presiding,

5    and of course Prime Minister Yitzhak Rabin and Yasser Arafat,

6    the chairman of the PLO Executive Committee.

7    Q.  Did Prime Minister Rabin and Yasser Arafat receive an award

8    as a result of the Declaration of Principles?

9              MR. YALOWITZ:  Objection.

10             THE COURT:  Overruled.  Don't we have this in

11   evidence?

12             MR. YALOWITZ:  We do, your Honor.

13   A.  Yes, they did.  They received the Nobel Peace Prize along

14   with Prime Minister -- sorry, Prime Minister at that time

15   Shimon Perez.

16   Q.  Let me show you Defense Exhibit 74.  Who are the people in

17   this picture?

18   A.  To the left is Chairman Yasser Arafat, chairman of the PLO,

19   in the center is Shimon Peres, who was the foreign minister

20   then of Israel, and to the right is Prime Minister Yitzhak

21   Rabin, who was the prime minister.

22   Q.  Let me ask you if subsequent to the Declaration of

23   Principles that was signed on the White House lawn in 1993

24   there were further agreements between Israel and the PLO.

25   A.  Yes, there were.

F2ATSOK5                        Ashrawi - direct

 1   Q.  And let me show you a document already in evidence, I will

 2   give you a paper copy as well.  This is plaintiff's trial

 3   Exhibit Number 532.

 4           Dr. Ashrawi, I handed what you in evidences

 5   Plaintiff's Exhibit 532.  This is a copy of something called

 6   the Israeli Palestinian Interim Agreement.  Are you familiar

 7   with this document?

 8   A.  Yes, I am.

 9   Q.  Is this another document that was -- another agreement

10   entered into by the PLO and the state of the Israel?

11   A.  Yes, it is.

12   Q.  And who on behalf of the PLO entered into this agreement?

13   A.  Yasser Arafat, Chairman of the PLO.

14   Q.  And who on behalf the State of Israel entered into this

15   agreement?

16   A.  In 1995 it was Prime Minister Rabin.

17           THE COURT:  You have to keep your voice up.

18           THE WITNESS:  Yes.

19   Q.  After the interim agreement was signed in 1995, we have

20   already heard testimony that something called the Palestinian

21   Authority was created, is that right?

22   A.  Yes, that's right.

23   Q.  What was going to be the role of the PLO after the

24   Palestinian Authority was created as a result of the Oslo

25   Accords?

F2ATSOK5                        Ashrawi – direct

1    A.  Well, the Palestinian Authority was established as per the

2    agreement in order to run the lives the Palestinian people, to

3    deliver services, build institutions for the interim period

4    that was supposed to end in 1999 with the establishment of the

5    Palestinian state.  So it was an interim arrangement for an

6    administrative body, an executive body and administrative body,

7    and it wasn't empowered to make any political decisions or sign

8    any agreements.

9    Q.  After the PA was established for the interim period by the

10   Oslo Accords, what was the role of the PLO?

11   A.  The PLO --

12            MR. YALOWITZ:  Object to the leading.

13            THE COURT:  Overruled.

14   A.  The PLO remained the representative body for all

15   Palestinian people everywhere.  It remained the address for

16   political decision making, for policy decisions, for diplomatic

17   representation throughout the world, and for signing

18   agreements, as well as for negotiations was the primary tasks

19   of the PLO.

20   Q.  During the period 2002 to 2004, where did the PLO maintain

21   its headquarters?

22   A.  They had more than one.  The PLO was in Amman, Jordan, and

23   in Ramallah and in Gaza, three headquarters.

24   Q.  Did the PLO, during that time period, maintain any offices

25   in the United States of America?

F2ATSOK5                          Ashrawi - direct

1    A.  Yes.

2    Q.  Where were those offices located in the period 2002 to

3    2004?

4    A.  In New York there was the PLO Missions Office, the

5    delegation to the UN, and in Washington the mission to the U.S.

6    Q.  Were there any other PLO offices in the United States

7    during that period?

8            MR. YALOWITZ:  Objection.

9            THE COURT:  Overruled.  You can answer.

10   A.  Not that I know of.

11   Q.  Did the Palestinian Authority have any offices in the

12   United States during that time?

13           MR. YALOWITZ:  Objection.

14           THE COURT:  Overruled.  You can answer.

15   A.  No, they didn't.

16   Q.  Now you mentioned that the Oslo Accords established -- they

17   were an interim agreement and they were going to be for an

18   interim period.  Why were they an interim agreement?  What was

19   contemplated to follow?

20           THE COURT:  Sustained.

21   Q.  What was supposed to happen after the Oslo Accords were

22   signed?

23           MR. YALOWITZ:  Objection.

24           THE COURT:  Sustained.

25   Q.  Let me show you what is in evidence as Defendant's Exhibit

F2ATSOK5                        Ashrawi - direct

1    72.  Do you recognize the men in this photo?

2    A.  Yes.

3    Q.  Who are they?

4    A.  To the left is Ehud Barak, who was then Prime Minister of

5    Israel, and in the middle is President Clinton, President of

6    the U.S., and to the right is Yasser Arafat who was President

7    by that time of the PLO.

8    Q.  And where was this photograph taken?

9    A.  This was one of the Camp David photographs in 2000.

10   Q.  What was happening at Camp David in 2000?

11   A.  There were talks.

12   Q.  What were they talking about?

13            MR. YALOWITZ:  Objection.

14            THE COURT:  Overruled, you can answer.

15   A.  They were talking about continuing the negotiations and

16   achieving a solution based on the two-state solution that

17   President Bill Clinton had articulated, and were hoping these

18   would conclude the permanent status issue talks that were

19   postponed.

20   Q.  Did those talks at Camp David in fact result in a permanent

21   status agreement?

22   A.  No.

23   Q.  Is there a permanent status agreement today?

24   A.  No.

25   Q.  Do you know Yasser Arafat?

F2ATSOK5                          Ashrawi – direct

1    A.  Yes.

2    Q.  Over the course of your career, how many times do you think

3    you met with Yasser Arafat?

4    A.  Hundreds of times, at least.

5    Q.  Did you meet with Yasser Arafat during the period 2002 to

6    2004?

7    A.  Yes, repeatedly.

8    Q.  Can you estimate for the members of the jury approximately

9    how many times you met with or spoke with Yasser Arafat during

10   the period 2002 to 2004?

11   A.  Few hundred times.

12   Q.  During those communications with Yasser Arafat during the

13   period 2002 to 2004, did you discuss efforts to stop terrorism?

14   A.  Yes, we did.

15   Q.  During those communications with Yasser Arafat in the

16   period 2002 go 2004, did discuss efforts to restart peace talks

17   with Israel?

18   A.  Yes, we did, repeatedly.

19   Q.  During the period 2000 to 2004, did you have meetings with

20   American officials?

21   A.  Yes, I did.

22   Q.  On approximately how many occasions do you believe you met

23   with American officials during the period about of 2000 to

24   2004?

25   A.  Scores, but not hundreds.

1   Q.   Which American officials were you meeting with during this

2   period?

3   A.   Primarily it was then National Security Adviser Condoleezza

4   Rice, and I met also with Dick Cheney, Vice President Cheney, I

5   met with then Secretary of State Colin Powell, and when

6   Condoleezza Rice moved to the State Department, we continued

7   our meetings as she became Secretary of State.

8   Q.   During these meetings you were having with American

9   officials in the period 2000 to 2004, did you have suggestions

10  about stopping terrorism?

11  A.   Yes.

12  Q.   Did you have discussions about resuming peace talks with

13  the Israelis?

14  A.   Yes, I did.

15  Q.   Ma'am, you mentioned that you live today in Ramallah, is

16  that correct?

17  A.   That's right.

18  Q.   Where is your house located?

19  A.   Across the street from the Mukataa or the president's

20  headquarters, which used to be known as the Tegart building.

21  Q.   Did you live in that home during the period 2002 to 2004?

22  A.   Yes.

23  Q.   While you were living in Ramallah in the period 2002 to

24  2004, did you have occasion to observe any destruction to PA

25  facilities?

F2ATSOK5                          Ashrawi - direct

1              MR. YALOWITZ:  Objection.

2              THE COURT:  Overruled.

3    A.  Yes, I did, firsthand.

4    Q.  Could you describe for the members of the jury what you saw

5    in terms of destruction of PA facilities in Ramallah in the

6    period 2002 to 2004?

7              MR. YALOWITZ:  Objection.

8              THE COURT:  I'm going to sustain this to the form of

9    the question and I will allow you some leeway to ask some

10   leading questions, but not as broad questions and open ended.

11   Q.  Did you have occasion to observe police stations in

12   Ramallah that had been damaged or destroyed in the period 2000

13   to 2004?

14             MR. YALOWITZ:  Objection.

15             THE COURT:  Is your objection beyond just the leading

16   nature?

17             MR. YALOWITZ:  No, I accept the leading this time

18   because of the Court's instruction.

19             THE COURT:  Then I'm going to overrule your objection.

20   Q.  During the period 2000 to 2004, did you have occasion to

21   observe damage or destruction to Palestinian police stations in

22   Ramallah?

23   A.  Yes, I did.

24   Q.  Could you describe for the members of the jury, without

25   going into how it happened, what you saw had happened to those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2ATSOK5                         Ashrawi – direct

1    facilities?

2              MR. YALOWITZ:  Objection.

3              THE COURT:  Overruled, you can answer.

4              THE WITNESS:  Your Honor, I saw --

5              THE COURT:  You can answer.

6              THE WITNESS:  Because I saw what happened.

7              THE COURT:  Well, just tell us what damage you

8    observed.

9    A.  Well, the police station was totally destroyed.  It was

10   two, three blocks away from my home, but across the street from

11   my home there was --

12             THE COURT:  Is that responsive to your question?

13   Q.  Let me pose another question.  Across the street from your

14   home you mentioned was the Mukataa, right?

15   A.  Yes.

16   Q.  And that was a facility where, among other things,

17   President Arafat worked, right?

18   A.  Yes, lived and worked there.

19   Q.  Can you describe the destruction that you saw of the

20   Mukataa during the period 2002 to 2004 that was across from

21   your home?

22   A.  Yes, I saw it being shelled, it was bombed by --

23             MR. YALOWITZ:  Objection.

24             THE COURT:  No, I'm going to sustain the objection.

25   Tell us what the nature of the damage was.

A.  Yes, two, three main buildings were destroyed, and then

later on -- this was late March.  Then the outer wall was

totally destroyed.  And then in June the rest of the building,

including the president's office, was blown up, and my house --

all the stones and the debris and so on came to my house and my

windows and doors and things were also blown out because of

the -- I can't say what, because of the destruction and debris

of the Mukataa across the street.

Q.  Ma'am, did you witness destruction or damage to any other

Palestinian security forces facilities in or around Ramallah in

the period 2002 to 2004?

A.  I saw the preventive security headquarters destroyed almost

completely.

Q.  Can you describe what it looked like after you saw it when

it had been damaged or destroyed?

A.  Rubble.  And I saw the training, the police training

headquarters and the prison, of course, which was in Mukataa

was gone, totally destroyed.

            THE COURT:  You have to keep your voice up.

            MR. YALOWITZ:  Objection.  Objection.

            THE COURT:  Sorry, I don't know what you objected to.

            MR. YALOWITZ:  I objected to the last answer, and we

need to talk.

            THE COURT:  All right.  Come up.

            (Continued on next page)

F2ATSOK5                         Ashrawi - direct

1              THE COURT:  I didn't pick up the last thing she said.

2              MR. YALOWITZ:  She said the prison, the Mukataa, was

3      completely destroyed.

4              THE COURT:  I heard that part.  That's the part you

5      objected to?

6              MR. YALOWITZ:  That's my problem.

7              THE COURT:  What's your problem with that?

8              MR. YALOWITZ:  My problem with that is how is it she

9      knows.

10             THE COURT:  Because she said she lived across street

11     and saw it completely destroyed.  I don't understand the nature

12     of the objection.  You don't think that she really saw what she

13     said she saw?

14             MR. YALOWITZ:  I don't think that she saw what she

15     said she saw.

16             THE COURT:  That's grist for cross-examination.

17     That's not inadmissible because you don't believe her.

18             MR. YALOWITZ:  I think this witness -- I will cross

19     her.

20             THE COURT:  She's across the street.

21             MR. YALOWITZ:  She has no basis.

22             THE COURT:  If somebody blew up the house across the

23     street, you won't know it?

24             MR. YALOWITZ:  I would know it.

25             THE COURT:  Let's not fight about what is really not

F2ATSOK5                          Ashrawi – direct

1    an issue here.  It's no big secret about how these buildings

2    got destroyed.  Everyone knows this at this point in this

3    trial.  I'm trying to give you some protection without having

4    it repeated ten times, but come on, she can say the buildings

5    were there or not there.

6              MR. ROCHON:  This is in the U.S. reports that are in

7    evidence as to who did it.

8              THE COURT:  Mr. Rochon, that's not necessary.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2ATSOK5                        Ashrawi – direct

1                    (In open court)

2                    THE COURT:  Mr. Hill.

3                    MR. HILL:  Thank you, your Honor.

4       BY MR. HILL:

5       Q.  During the period 2002 to 2004, did you observe any

6       difficulties Palestinian security forces had moving in and

7       around Ramallah?

8       A.  Just the security forces?

9       Q.  Yes, ma'am.

10      A.  Yes.

11      Q.  Can you describe what you observed in terms of difficulty

12      of PA forces moving in and around Ramallah?

13      A.  Well, around my area there were no streets, there were

14      tanks and there was nothing, so it was very difficult for

15      anybody to move.  And then there were no security forces around

16      actually at that time.  So in addition to the divisions and the

17      checkpoints within the city itself, there was no possibility of

18      moving.  And then there was curfews, there were constant

19      curfews.  We couldn't leave the house.

20                   MR. YALOWITZ:  Objection.

21                   THE COURT:  Overruled.  I will let that stand.

22                   Next question, Mr. Hill.

23      Q.  During the period 2000 to 2004, did you do anything to try

24      and prevent or stop further terrorism?

25      A.  Yes, I did.

F2ATSOK5                          Ashrawi – direct

1    Q.  Could you describe for the members of the jury what steps

2    you took to try and prevent future terrorism during the period

3    2000 to 2004?

4    A.  Well, as soon as we could move around we had several

5    meetings, public meetings, town meetings.  I also gave many

6    statements, interviews.  And I think we issued statements also

7    to try to appeal to everybody to stop the violence.  And I

8    also -- this is internally, but I also had talks outside.

9             MS. MACHNES:  Your Honor, may I approach?

10            THE COURT:  Yes.

11   Q.  I handed you for identification a document which we marked

12   as Defendant's Exhibit 41.  Do you recognize this document?

13   A.  Yes, I do.

14   Q.  What is it?

15   A.  Pardon?

16   Q.  What is it?

17            MR. YALOWITZ:  Objection.

18            THE COURT:  Could I see a copy of the document?

19            Come up for a second.

20            (Continued on next page)

21

22

23

24

25

F2ATSOK5                          Ashrawi - direct

 1              (At side bar)

 2              THE COURT:  Let me just make one thing real clear so

 3    there's no surprises.  If you start putting in these kinds of

 4    public statements, you are going to open the door to a number

 5    of public statements that I excluded from this case that the

 6    plaintiffs asked to put out.  So let me make that real clear to

 7    everyone.

 8              You have an objection to this?

 9              MR. YALOWITZ:  Yes, I do.

10              THE COURT:  You are going to offer this document?

11              MR. ROCHON:  Judge, here's where we are.  Partly is

12    this is -- I will talk to Mr. Hill whether we offer it in light

13    of the Court's comments in one second, but we gave the list of

14    exhibits that we would use to the plaintiffs, and as we

15    proceeded with their witnesses we let them know which ones we

16    would objection to before cross-examination.  If they have

17    objections to the exhibits that we gave them last week, we

18    shouldn't hear about it in the middle of an examination.

19              MR. YALOWITZ:  Then I will have nothing to say if he

20    will pull that stunt.

21              Here's what he said --

22              THE COURT:  I don't want to hear that.

23              MR. ROCHON:  We're not going to offer the document.

24              THE COURT:  Are you going to offer similar documents?

25              MR. ROCHON:  No.

F2ATSOK5                          Ashrawi – direct

1           THE COURT:  Do you want them to offer them now?  You

2      objected.

3           MR. YALOWITZ:  I object.

4           THE COURT:  I sustained your objection.  They withdraw

5      the document.  Let's go.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2ATSOK5                          Ashrawi – direct

1          (In open court)

2              MR. HILL:  Your Honor, may I approach the witness?

3              THE COURT:  Yes, sir.

4    BY MR. HILL:

5    Q.  When you were involved in efforts to prevent terrorism

6    during the 2000 to 2004 time frame, why did you do that?

7    A.  For several reasons.  The first is, of course, moral,

8    because we believe that all kinds of violence -- I personally

9    believe is morally abhorrent and unacceptable and cruel.  But

10   we also knew -- I knew and lots of my friends knew that this

11   was counterproductive, that it really damaged our cause and

12   didn't serve the cause of the PLO, nor the cause of freedom and

13   justice.  So we tried to prevent violence from all sides.

14             MR. HILL:  Thank you.

15             Nothing further on direct, your Honor.

16             THE COURT:  Mr. Yalowitz.

17   CROSS-EXAMINATION

18   BY MR. YALOWITZ:

19   Q.  Dr. Ashrawi, you agree with me that no matter what your

20   political beliefs, killing innocent civilians is morally

21   unacceptable, right?

22   A.  Yes.

23   Q.  You agree with me that it doesn't matter what your

24   political beliefs, shooting a young person with an M-16 rifle

25   in a pedestrian mall is morally unacceptable, right?

F2ATSOK5                    Ashrawi — cross

1    A.  Yes.

2    Q.  You agree with me that it doesn't matter what your

3    political beliefs are, making homemade bombs and sending

4    suicide terrorists on suicide missions is morally unacceptable,

5    right?

6             MR. HILL:  Objection.

7             THE COURT:  Overruled.

8    A.  Yes.

9    Q.  You have spent your life working to prevent terror, right?

10   A.  Yes.

11   Q.  And you agree --

12   A.  Among other things.

13   Q.  And you agree with me that it is not helpful to the

14   prevention of terror to harbor terrorists who you know or have

15   reason to believe are about to commit terrorist acts, right?

16            MR. HILL:  Objection.

17            THE COURT:  Overruled.

18   A.  Yes.

19   Q.  And you agree with me that it is not helpful to the

20   prevention of terror to pay money to terrorists who you know or

21   have reason to know are committing terrorist acts, right?

22   A.  Right.

23   Q.  And you agree with me that it is not helpful to the

24   prevention of terror to provide weapons or training to people

25   who you know or have reason to believe are going to commit

F2ATSOK5                          Ashrawi — cross

1    terrorist acts, right?

2    A.  Yes.  May I ask a question?

3    Q.  You'll have to wait until your counsel comes, and then he

4    might be able to help you.

5           You agree with me that it is not helpful to the

6    prevention of terror to provide a safe house to a bomb maker,

7    right?

8    A.  Yes.

9           MR. HILL:  Objection, your Honor, could we approach?

10           THE COURT:  Come up.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2ATSOK5                         Ashrawi – cross

1          (At side bar)

2          MR. HILL:  The objection is scope.  This is not

3   anything that I asked.

4          THE COURT:  She said she was completely against

5   terrorism and working for peace.  That seems to open the door

6   whether or not any of this is relevant about the nature of the

7   questions that he asked.

8          MR. HILL:  It's the same cross that we got with last

9   witness.

10          THE COURT:  It may if your question to everybody is

11   are you for or against terrorism.

12          Let's move on.  These answers aren't a big surprise.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2ATSOK5                           Ashrawi - cross

1              (In open court)

2    BY MR. YALOWITZ:

3    Q.  You agree with me it is not helpful to the prevention of

4    terror to cover up the activities of terrorists, right?

5    A.  Yes.

6    Q.  And you agree with me that it is not helpful to the

7    prevention of terror to glorify and reward people who

8    perpetrate terrorist activities, right?

9    A.  Yes.

10   Q.  Now when you knew Yasser Arafat, he was chairman of the

11   PLO, right?

12   A.  Yes.

13   Q.  And he was president of the PA, right?

14   A.  Yes.

15   Q.  And he was the head of Fatah, right?

16   A.  Yes.

17   Q.  And Arafat appointed you as a minister of higher education

18   and research in 1996, right?

19   A.  Yes.

20   Q.  Now you yourself are not a member of Fatah, are you?

21   A.  No.

22   Q.  And so as minister of higher education and research, did

23   you supervise employees who carried weapons?

24   A.  No.

25   Q.  Now you resigned two years later in 1998, right?

F2ATSOK5                        Ashrawi – cross

1    A.  Yes.

2    Q.  And did you that because?

3    A.  Sorry, I didn't resign, I didn't accept my reappointment.

4    Q.  Arafat announced that you were going to be reappointed,

5    isn't that right?

6    A.  Yes.

7    Q.  And you publicly rejected the reappointment, right?

8    A.  Yes.

9    Q.  You have to speak.

10   A.  Yes, I said.

11   Q.  And you did that because Arafat had failed to carry out

12   reforms on human rights issues and fundamental freedoms, isn't

13   that right?

14   A.  Partly, yes.

15   Q.  And now you are a member of the PA's legislature, right?

16   A.  Yes.

17   Q.  You have been a member of the PA's legislature since 1996,

18   right?

19   A.  Right.

20   Q.  And that's called the PLC, is that right?

21   A.  That's right.

22   Q.  That's the acronym we would use in English?

23   A.  Yes, legislative counsel.

24   Q.  Now there's also something called the PNC, right?

25   A.  Yes.

F2ATSOK5                          Ashrawi – cross

1    Q.  That's the Palestinian National Council?

2    A.  Yes.

3    Q.  And that's part of the PLO, right?

4    A.  That's right.

5    Q.  And when you become a member of the PLC, you automatically

6    become a member of the PNC, is that right?

7    A.  That was with the first PLC, yes.

8    Q.  Now there are -- are you familiar with an institution

9    within the PLO called the Martyrs Foundation?

10   A.  In Amman?

11   Q.  I don't know physically where it is, Doctor, but it's a

12   foundation for the benefit of martyrs and injured persons.  Are

13   you familiar with that organization?

14   A.  The name is familiar, but I'm not familiar with the

15   organization itself.

16   Q.  Do you know whether it's in the PA or the PLO today?

17   A.  PLO, I think.

18   Q.  And it used to be in the PA, right?

19   A.  Before the martyrs and families of martyrs organization was

20   with the PLO.  It moved temporarily to the PA and then was

21   restored to the PLO.

22   Q.  How long was it in the PA before it went back to the PLO?

23   A.  I don't know.

24   Q.  It was years, right, several years?

25   A.  I don't know when it moved to the PA.

 1    Q.  Are you familiar with a ministry for prisoners and

 2    ex-prisoners?

 3    A.  Yes.

 4    Q.  And that used to be part of the PA, right?

 5    A.  Yes.

 6    Q.  And recently it got moved into the PLO, right?

 7            MR. HILL:  Objection, your Honor, scope.

 8            THE COURT:  Overruled.

 9    A.  It also used to be PLO and then it became PA and back to

10    the PLO, yes.

11    Q.  So here's my question, Doctor, how is it decided to -- how

12    is it decided when these institutions are going to be moved

13    back and forth?

14            MR. HILL:  Objection.

15            THE COURT:  She can answer if she knows.

16    A.  Because of the different nature of the jobs of the tasks

17    and responsibilities of the two institutions.

18    Q.  I mean like is there a procedure for moving an institution

19    between the PA and the PLO?

20    A.  It's a presidential decision, I think.

21    Q.  And so that was a decision taken by Abu Mazen recently for

22    the prisoners?

23    A.  President Mahmoud Abbas, yes, and it was presented to the

24    PLO executive.

25    Q.  Now you went to the United States during the 2000 to 2004

F2ATSOK5                          Ashrawi – cross

1    period, is that right?

2    A.  That's right.

3    Q.  And you were sent there by Chairman Arafat, right?

4    A.  Yes, right.

5    Q.  And you were there on behalf of Chairman Arafat, right?

6    A.  Right.

7    Q.  And you mentioned some of the people you met with.  You

8    also met with somebody named Elliot Abrams, right?

9    A.  Yes, he was in the NSC.

10   Q.  He was special assistant to the president, right?

11   A.  I don't know what his official post was, but I met him a

12   couple of times with Condoleezza Rice, and then he came with

13   the delegation to Palestinian.

14   Q.  Well, you invited him to your home, didn't you?

15   A.  No, he asked to come, and when somebody wants to come and

16   visit, you don't say no.

17   Q.  So Mr. Abrams came to your home?

18   A.  Yes, he did.  With a delegation, not by himself.

19   Q.  Did you discuss the U.S. policy toward the PA and the PLO

20   with the Americans you mentioned?

21   A.  Yes.

22   Q.  And you discussed U.S. policy toward the PA and the PLO

23   with Mr. Abrams as well, right?

24   A.  In one meeting possibly, yes, but when he came it was a

25   different topic.

F2ATSOK5                      Ashrawi - cross

1   Q.  Did Elliot Abrams publish a book about his time working for

2   the president?

3            MR. ROCHON:  Objection, your Honor.

4            THE COURT:  Sustained.

5   Q.  Did you become familiar with U.S. policy toward the PA and

6   the PLO during the 2002 time frame?

7   A.  I'm sorry, I don't understand exactly.

8   Q.  You were coming to the United States in 2002, right?

9   A.  Yes.

10  Q.  And you met with very senior U.S. officials, right?

11  A.  Yes.

12  Q.  And you met with them because you wanted to discuss the

13  U.S. policy toward Israel and the PA and the PLO, right?

14  A.  Yeah, not just that, there were specific issues we were

15  discussing.

16  Q.  Did you discuss U.S. policy toward the PA and the PLO in

17  Israel?

18  A.  Not in broad terms of the abstract, on specific issues.

19  Q.  Did you report your discussions on those specific issues --

20  without getting into them, did you report back to Chairman

21  Arafat about your discussions?

22  A.  Yes, I did.

23  Q.  Now I want to try to be very specific about some of the

24  timing of some of the things you spoke about on direct

25  examination.  I think you mentioned that there were times when

F2ATSOK5                      Ashrawi – cross

1    there was destruction of government buildings in Ramallah,

2    right?

3    A.  Yes.

4    Q.  And that was in late March of 2002, is that right?

5    A.  Late March and in April and in June and in between there.

6    It wasn't just one time.

7    Q.  The period -- the period that you're describing lasted from

8    late March until June of 2002, do I have that right?

9    A.  And beyond.

10   Q.  And did it -- was that the situation in January of 2004?

11   A.  I don't remember.  I don't know.

12   Q.  Now do you recall that in late March 2002 the United States

13   designated the Al Aqsa Brigades as a foreign terrorist

14   organization?

15            MR. ROCHON:  Scope, your Honor.

16            THE COURT:  Overruled.

17   A.  I don't know.

18   Q.  Did you follow U.S. policy toward the Palestinian

19   Liberation Organization and the PA as part of your work for

20   Chairman Arafat?

21   A.  Yes.

22   Q.  And do you recall whether in June of 2004 the President of

23   the United States gave a speech about --

24            MR. ROCHON:  Objection, your Honor.

25            THE COURT:  Sustained.

F2ATSOK5                          Ashrawi – cross

1   Q.  Do you recall the President of the United States --

2           MR. ROCHON:  Same objection, your Honor.

3           THE COURT:  Sustained.  We don't care what the

4   President of the United States does.

5   Q.  Did the United States policy toward the PA and the PLO

6   change in June of 2004?

7           MR. ROCHON:  Objection, your Honor.

8           THE COURT:  Sustained.

9   Q.  Is Hamas in the PA?

10  A.  No.

11  Q.  Is Hamas in the PLO?

12  A.  No.

13  Q.  Now --

14  A.  That needs clarification.  I don't want to say something

15  wrong.

16  Q.  Go ahead.

17  A.  In 2006 we had elections.  Hamas land under the title of

18  the block for reform and change, and it was elected to the PLC

19  and since the PLC is the legislative body of the PA, Hamas

20  became part of the PA.

21  Q.  That was in 2006?

22  A.  Yes.

23  Q.  Did you ever spend time in the prison in the Mukataa?

24  A.  Yes.  Before the PLO came or during or after?  I'm sorry,

25  specific time?

F2ATSOK5                        Ashrawi – cross

1   Q.  I was trying to get a handle on if you knew where it was.

2   A.  The prison of Mukataa?  Yes, I was held there and my father

3   was held there.  I know it well.

4   Q.  You mentioned that you saw that the prison was damaged in

5   2002, is that right?

6   A.  Yes, of course.

7   Q.  And that was after late March of 2002, is that right?

8   A.  Yes.

9           MR. YALOWITZ:  I don't have anything further.

10          THE COURT:  Do you have any further questions?

11          MR. HILL:  No questions, your Honor.

12          THE COURT:  Thank you, Doctor, you can step down.

13  Thank you.

14          THE WITNESS:  Thank you very much.

15          THE COURT:  Do you want to begin with the next

16  witness?

17          MR. ROCHON:  Our preference would be to not begin with

18  the next witness now, your Honor.

19          THE COURT:  Are we still on schedule?

20          MR. ROCHON:  We actually ahead of schedule.

21          THE COURT:  Good.  I'm sure that's what the jury wants

22  to hear.

23          So you want to go ahead and take your break for the

24  day?

25          MR. ROCHON:  That would be great.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2ATSOK5

1          THE COURT:  Ladies and gentlemen, we're going to

2    adjourn for the day.  Don't discuss the case.  Keep an open

3    mind.  Tomorrow is the only other day that we will sit this

4    week, then Monday, Tuesday.  I'm hopeful by, at the latest -- I

5    said Monday, but I'm hopeful the latest Wednesday or Thursday

6    next week we might be able to finish the case.

7          Don't discuss the case.  Keep an open mind and I will

8    see you tomorrow morning at 9:45.

9          (Jury not present)

10          MR. ROCHON:  Just to amplify, I think we're ahead of

11    schedule.  I think our testimony will conclude on Tuesday.

12          THE COURT:  And how many more witnesses do you

13    anticipate?

14          MR. ROCHON:  I think we'll get through three witnesses

15    tomorrow, relatively brief, and then we could maybe start a

16    fourth.  But I think probably those three and then one -- a

17    couple on Tuesday, but I think we'll be done Tuesday maybe

18    carrying over to the middle of Wednesday.

19          THE COURT:  So at this point you anticipate about five

20    more witnesses?

21          MR. ROCHON:  At most.

22          MR. YALOWITZ:  So I have a couple of agenda items.

23    First of all, two of the defendant's witnesses that they have

24    identified I have a problem with their testimony.

25          One of them -- frankly I'm quite disappointed that I

F2ATSOK5

1     feel this way because I really like him personally, but Raja

2     Shehadeh is an expert witness who talked about the

3     international law of occupation and the settlements and things

4     like that.  And he really is a very nice person, but I don't

5     think he has anything of relevance for this jury.

6              And the other one is Lori Allen.

7              MR. ROCHON:  I think we're going to be withdrawing

8     Ms. Allen.

9              MR. YALOWITZ:  So I will also commend her as a nice

10    person.

11             THE COURT:  The record will so reflect.

12             Shehadeh I looked at because you had an issue with

13    Shehadeh and Sfard, so I read that.  Can you just give me some

14    proffer consistent with the Shehadeh's expert report about what

15    part of that expert report you are going to ask him to testify

16    about?

17             MR. HILL:  Yes, your Honor.  As you know from reading

18    it, Mr. Shehadeh is an expert in the Olso Accord, so he will

19    talk about how they created the PA, what authority it was

20    given, what authority it was not given.  He will also talk

21    about the issue of authorities over Jerusalem.  He will talk

22    about the issue that the plaintiffs have injected into the case

23    about whether the PA has complied with the terms of the interim

24    agreement.  That was an issue both with Mr. Eviatar --

25             THE COURT:  Why is that an issue?

F2ATSOK5

1           MR. HILL:  Mr. Eviatar testified about it and General

2   Faraj was cross-examined about it.

3           THE COURT:  Why is it an issue?

4           MR. HILL:  We objected to it.  We thought the Court

5   thought it was an issue.

6           THE COURT:  I didn't think it was an issue, but what

7   difference does it make?

8           MR. HILL:  Now that it has been injected --

9           THE COURT:  Injected to what consequence?  I don't

10  know how it makes a difference one way or the other.

11          MR. HILL:  They suggested that the Palestinian

12  Authority failed to live up to its security agreement.

13          THE COURT:  Because they said they promised they were

14  going -- to use generically, a fight or oppose terrorism and

15  take certain acts against terrorists, and they did not.  So

16  what is this witness going to say in that regard?

17          MR. HILL:  Limitations put on the ability to comply

18  with that.

19          THE COURT:  Comply with what?

20          MR. HILL:  The Olso Accord and the annex that

21  Mr. Yalowitz used with the next witness.

22          THE COURT:  Give me a specific example, because my

23  understanding and my recollection of the testimony is, for

24  example, they said that they didn't take certain acts to arrest

25  certain people.  Well, I assume this witness is not going to

F2ATSOK5

1  say they didn't have any ability to arrest certain people,

2  so --

3          MR. HILL:  He will explain how, under the terms of the

4  accords and the way the authorities given the Palestinian

5  Authority were limited by the accords and the powers that were

6  reserved to the IDF in the West Bank prevented the PA from

7  doing the things that the plaintiffs are now --

8          THE COURT:  Like what?  What couldn't they do?

9          MR. HILL:  They couldn't travel outside of Area A to

10  arrest people without permission of the Israelis.  They

11  couldn't travel between one Area A and another Area A.

12          THE COURT:  So you said -- you hooked on something at

13  the end of that.  You said without permission of the Israelis.

14  Well, is there any evidence that the Israelis denied them such

15  permission?

16          MR. HILL:  Yes, sir.  And Mr. Shehadeh will also

17  testify about during the period in issue when he also lived in

18  Ramallah, what he observed personally about restrictions on

19  movement and destruction of PA facilities.  So similar to the

20  testimony that you allowed from Dr. Ashrawi, but he's observing

21  different things because he's a different person.

22          THE COURT:  I don't understand what he is going to say

23  that he saw.

24          MR. HILL:  He saw in September of 2000 the Ramallah

25  Police Station destroyed.

F2ATSOK5

1           THE COURT:  He's going to repeat what we just heard?

2     Is he going to say anything different?

3           MR. ROCHON:  Time frame.

4           THE COURT:  When?

5           MR. HILL:  September of 2000.

6           THE COURT:  September of 2000?

7           MR. ROCHON:  Yes.

8           THE COURT:  Why is that relevant?

9           MR. HILL:  There was no police station in Ramallah

10    after September of 2000, so it made harder to apprehend

11    terrorists in the absence of a police station.

12          THE COURT:  That is contrary to the testimony we just

13    heard.  I thought we heard the police was destroyed.

14          MR. ROCHON:  It was, in September of 2000.

15          THE COURT:  No, she said it was March of 2002 going to

16    June of 2002.

17          MR. ROCHON:  She was talking about the Mukataa, two

18    different things.

19          THE COURT:  No, she never made such a distinction.  I

20    don't know that I remember it.  She said she was there during

21    that period of time and all these buildings were destroyed

22    during that period of time.  And are you saying there's no

23    police station since 2001, is that what he's going to say?

24          MR. HILL:  Since the fall of 2000.

25          THE COURT:  Since the fall of 2000 the police had

F2ATSOK5

1    nowhere to go?

2                MR. HILL:  The Ramallah Police Headquarters was

3    destroyed in 2000.

4                THE COURT:  And that prevented them from doing what in

5    2000?

6                MR. HILL:  Stopping some of the attacks that occurred

7    in 2002.

8                THE COURT:  And why is that?

9                MR. HILL:  Because they didn't have a police station

10   to work from.

11               THE COURT:  But they did work.

12               MR. HILL:  Well, he will testify about that.

13               THE COURT:  And they had a prison, and assume they

14   still were on duty.  I'm just trying to understand the

15   relevance of this other than to show their actions were somehow

16   restricted.

17               MR. HILL:  He lived there at the time, and he will

18   explain how, toward the beginning of the second intifada, the

19   Palestinian police were functioning.

20               THE COURT:  What is he going to say about how they

21   were functioning?

22               MR. HILL:  He lived there.  He will say at the

23   beginning they were doing their policing and that declined over

24   this period.

25               THE COURT:  Is he a police person?

F2ATSOK5

1           MR. HILL:  No, he's a lawyer who lives in Ramallah and

2    saw this with his own eyes.

3           THE COURT:  Is this his observations out of his

4    window?  What basis does he have to give us what is going on in

5    the police department?

6           MR. HILL:  He lived in Ramallah.

7           THE COURT:  So his personal observations of where he

8    saw police and didn't see police?

9           MR. HILL:  Yes, among other things, as well as his

10   expert testimony about the legal structure that the PA was

11   operating under at the time and the legal constraints.

12          THE COURT:  That's what I'm trying to understand.

13   What is the legal constraint other than you said that if they

14   wanted to arrest a terrorist they needed the cooperation of

15   Israel.

16          MR. HILL:  Right.  Because Israel, under the terms of

17   the Oslo Accords, retained overall security authority, not only

18   for Areas B and C, but for Area A as well.  And as time went

19   on, the Israelis effectively constrained Area A by limiting the

20   ability of the Palestinian Authority outside the area.

21          THE COURT:  What was it that was put in issue here

22   that you say that they were prevented from doing?

23          MR. HILL:  As I understand the plaintiffs' claim is

24   that the PA is liable for harboring people because it failed to

25   apprehend them.  If that claim is not going to proceed, then I

F2ATSOK5

1    will not to need to put on evidence.

2            THE COURT:  That claim -- as far as I'm concerned, we

3    can debate that now.  As far as I'm concerned, that's not a

4    claim.  That's not how you harbor a terrorist.  That's not

5    definition of harboring a terrorist because you didn't go find

6    them in Brazil.  That's not harboring a terrorist.  Harboring a

7    terrorist is what we think about, that you either did something

8    to either protect them from apprehension or to protect them

9    from detention.

10            MR. YALOWITZ:  I think your Honor is right.  It's in

11    the statute.  It has to be a physical act.

12            THE COURT:  So are you going to argue that somehow

13    because they didn't find somebody and arrest them, that in and

14    of itself qualifies as harboring a terrorist?  If so, who are

15    you going to make the claim about?

16            MR. YALOWITZ:  I don't think the statute lets me make

17    that argument.  If it did --

18            THE COURT:  That's why I want to talk these issues

19    out.

20            MR. HILL:  If we're not going to hear in closing that

21    the PA is liable because it failed to arrest Nasser Aweis or

22    Abdel Karim Aweis, who were allegedly on the Zinni list, that's

23    fine.  I thought that was plaintiffs' position.

24            THE COURT:  I assume that their position is this, and

25    they can -- Mr. Yalowitz can correct me if I'm wrong.  I assume

F2ATSOK5

1    their position is that that does not legally qualify under the

2    statute as harboring a terrorist.  But what they did and didn't

3    do may be relevant evidence as to whether or not it's

4    consistent with or inconsistent with, furthers or doesn't

5    further, other activity that they point to that would make the

6    jury believe that what they were doing was intending to harbor

7    a terrorist.

8             MR. YALOWITZ:  I don't think it goes to harboring.

9             THE COURT:  Frankly, I'm not sure at this point -- and

10   maybe we should start talking about that.  I'm not sure who

11   specifically are all the people that the plaintiff is going to

12   contend were harbored.  So I guess that's the first thing that

13   we have to theorize, because the only person that comes to

14   mind -- I'm not going to say there's no argument for somebody

15   else, but the only person who comes to mind is Abdullah

16   Barghouti who they say they gave him a place to live.  They let

17   him out of jail, gave him a place live, and then released him

18   so he could make another bomb and blow something else up.

19   That's the only person, on the top of my mind, that I think if

20   there's an argument about harboring, there's an argument that

21   is either one to convince me it should or shouldn't go to the

22   jury or one to convince the jury that qualifies under these

23   circumstances as harboring.

24             Is there somebody else that you think was harbored

25   here, Mr. Yalowitz?

F2ATSOK5

1           MR. YALOWITZ:  Yeah, the others that I'm sort of

2    thinking about are Mohammed Hashaika and Nasser Shawish.

3           THE COURT:  You said you're thinking about it.  That's

4    a little less committal than I thought you would be at this

5    late date.  Who have you proved were harboring?

6           MR. YALOWITZ:  I think they meet the statutory

7    definition.  They're in jail, they were let out of jail.

8    That's a physical act that helps them on their way to commit a

9    terrorist act.

10           THE COURT:  Say that again?  Who?

11           MR. YALOWITZ:  The March 21 bombing, Muhammad Hashaika

12    and Nasser Shawish.

13           THE COURT:  Just on that, so the only -- let's just

14    narrow it and we'll talk about it.  We'll take a few minutes

15    now and continue this conversation.  But you believe you

16    have -- you believe that you want -- you probably are going to

17    want to argue to the jury that you proved -- am I correct you

18    want to argue to the jury that there's enough proof for them to

19    conclude that Abdullah Barghouti was harbored?

20           MR. YALOWITZ:  Yes.

21           THE COURT:  And that's as to which event?

22           MR. YALOWITZ:  July 31, '02.

23           THE COURT:  The Hebrew University bomb, the one that

24    occurred several months after he was released.

25           MR. YALOWITZ:  Correct.

3149

F2ATSOK5

1          THE COURT:  And who else did you say?

2          MR. YALOWITZ:  The March 21, '02 Bauer attack, which

3     I'm sure you'll recall the document in evidence where Tirawi

4     informed Arafat we caught some guys, one of them is a suicide,

5     wants to commit a suicide operation, Muhammad Hashaika, and

6     then he was with another guy named Nasser Shawish, and those

7     guys five weeks later were out on the street and Hashaika blew

8     himself up behind Alan and Yoni Bauer.

9          THE COURT:  What about the other guy?

10          MR. YALOWITZ:  Nasser Shawish is convicted and in jail

11     for committing that crime.  He didn't blow himself up.

12          THE COURT:  So both of them were complicit in that

13     crime.

14          MR. YALOWITZ:  Right.

15          THE COURT:  You're saying they were held by the --

16     they were released out of prison by the --

17          MR. YALOWITZ:  By the PA.

18          THE COURT:  -- by the PA before they committed this

19     offense?

20          MR. YALOWITZ:  Correct.

21          MR. ROCHON:  Judge, that will be a new definition of

22     harboring, because when you harbor someone you're supposed to

23     hold them.  There's no case in the world that I think we'll

24     find that says having something not your custody is harboring

25     them.  However they criticize that, whatever they have to say

F2ATSOK5

1    about that, it's not going to be harboring.

2             MR. YALOWITZ:  Let me look at the statute.

3             THE COURT:  Well, again, that's why I made the

4    questions out the way I did in the verdict form, because that

5    may be -- I know you have a different theory of liability

6    particularly with regard to some of these or all of the

7    incidents.  Again, I'm trying to figure out what is subsumed

8    into what and what is the proper argument.  Now if you want to

9    say -- I guess you also have a theory that that is providing

10   material support in the form of personnel.  I remember you

11   argued that.

12            MR. YALOWITZ:  I don't want to go to personnel on --

13   well, let me say this.  With regard to Abdullah Barghouti, it's

14   very clearly personnel, and 2339(b) has a very clean and

15   specific definition of personnel.  Quite frankly, there's been

16   some litigation over the definition of personnel in 2339(a).  I

17   don't think that providing Hashaika and Shawish comes anywhere

18   close to the line of where there's a problem, but I know you

19   will want to look at that before we went and did that

20   definition.

21            THE COURT:  I can tell you what -- and I think I

22   alluded to it before, how I first approached it and the steps I

23   approached.  My very first question seemed to encompass just

24   about any other theory that you got.  It says that these were

25   PA.  That's not necessarily technically true of all, but it

F2ATSOK5

1    basically says anybody who you can establish was a PA employee

2    who, when they acted, they were acting within a scope of their

3    employ and in the interest of the PA, that that is enough to

4    establish -- with the causation, enough to establish the PA's

5    liability.  So if that's the way you are going with the PA, if

6    you establish that, you don't need anything else.

7         With regard to the -- but you also have, if you want,

8    or not want, you also have an agency theory that whether or not

9    it's established that the PA employees acted within the scope

10   of their employ and in the PA's interest committed these acts,

11   your more general theory is both the PA and the PLO were

12   directly involved in the commission of these terrorist acts

13   because they had people who at their direction, behest,

14   request, however you want to argue it, that agents on their

15   behalf, from the evidence one could see that -- as one would

16   say, you could see the PA's or the PLO's hand involved in the

17   perpetration of these acts.  That's a different theory.

18        Now whether or not that is a more convenient theory

19   for the parties to argue about and for the jury to understand

20   other than a very similar theory of the PA and the PLO provided

21   material support to intentionally commit these terrorist acts.

22   Not much difference between those two theories.

23        Then there's a theory, if it's appropriate, but only

24   on a couple of -- they say one, you may say two or three, with

25   regard to providing -- well, they said two, they recognized

F2ATSOK5

1    two.  We have at least one theory that they provided material

2    support to a designated terrorist organization, that's an

3    alternative theory, but I'm not sure if you prove one or the

4    other, you pretty much have to prove that.  If you prove that,

5    you are pretty much going to have to prove the others.

6          So they provide material support to a designated

7    terrorist organization, Hamas with regard to one, Hebrew

8    University bombing, and/or they provide material support to Al

9    Aqsa Brigades after they were designated.  But I have to look

10   more carefully.  I think you said that there's two.  I think

11   their argument in the most recent letter said there was one.  I

12   have to look at the timing and if we ever analyze that.

13         And then I think the only other possible theory on any

14   case is that -- I'm not even sure that, other than the

15   harboring on the limited ones that you say, obviously there's

16   also a -- under the statute there's a provided funds, but I'm

17   not sure that you have a separate theory.

18         MR. YALOWITZ:  I said I don't think so, we're not

19   going to.  We'll go on a separate theory.

20         THE COURT:  So that one I can eliminate out of the

21   jury instructions and eliminate that as a further issue to be

22   dealt with.

23         MR. YALOWITZ:  Because it's subsumed within the

24   material support.

25         THE COURT:  So you will both have to decide for

F2ATSOK5

1    yourselves and try to convince me whether you should have one,

2    two, three, all different theories, or how you want to cleanly

3    present the case to the jury with the issues that you want them

4    to consider.  And pretty much what should drive that decision

5    is what is the theory or theories that best corresponds with

6    the disputed issues in this case, and what you are asking the

7    jury to simply determine.

8           As I say, this is not -- like I say in criminal cases,

9    there is only two crimes, who done it and what happened.  This

10   a who done it, this is not a what happened.  Everyone knows --

11   the victims can tell us exactly what happened to them, and

12   their relatives, the terrible things that occurred.  The

13   question is not what happened, the question is who did it.

14   Whatever theory you want to proceed on should be consistent

15   with the jury's focus on determining whether there is

16   sufficient evidence in this case to indicate that the PA and/or

17   the PLO were directly involved in perpetrating or assisting in

18   the perpetration of these terrorist acts.

19          So in saying that, I'll hear Mr. Rochon, but then I

20   want to quickly go back to that Shehadeh.

21          MR. ROCHON:  Let me ask the Court if we could do this.

22   I will try to tighten it up and see if I could give something

23   that satisfies the Court and Mr. Yalowitz in morning, and we're

24   prepared if we can't call them to move on.  And that would be

25   my preference.  We heard the Court's primary reaction and we'll

F2ATSOK5

1    respond.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2AQSOK7

1          THE COURT:  Quite frankly, I don't think this jury

2     needs a whole lot more testimony about the Oslo Accords for

3     what it's worth.

4          MR. ROCHON:  I was going for zero.  If I had my way,

5     we'd be done by now.

6          MR. YALOWITZ:  Can we hold him to that?

7          THE COURT:  I think the jury has pretty much gotten

8     the point that you are trying to make that there wasn't a

9     building standing that anybody was working on.  Whether that's

10    true or not, I don't know.  But I know that that's pretty much

11    the image the jury has now of that.  And trying to minimize any

12    prejudice as to why that happened, but I think they know pretty

13    much know why it happened too.  The people didn't go to work

14    that day and blow up their own building.  The jury is pretty

15    smart.  They can figure that one out.

16          Are you going to call Safad still?

17          MR. ROCHON:  Yes, on the very narrow proffer we made

18    yesterday.

19          THE COURT:  I am not even sure what that was.  What

20    was the proffer?

21          MR. ROCHON:  It was as to the definition of security

22    offenses, the number of -- it's Mr. Satin's witness, but I

23    think 20 minutes of direct tops?

24          MR. SATIN:  I haven't done very much lately, so I'm

25    likely to go on for three hours, but I'm pretty sure that it is

F2AQSOK7

1    only going to last --

2            MR. YALOWITZ:  I'll help you out.

3            THE COURT:  I'll meet with my court reporter after we

4    take a break and you can continue.

5            MR. SATIN:  No objection.

6            MR. YALOWITZ:  So if I could come back to the jury

7    verdict form.

8            THE COURT:  Yes.

9            MR. YALOWITZ:  There was one thing I just wanted to

10   kind of get your thinking on.  If you look at the first one --

11   by the way, I should say that I think what you've got on this

12   jury verdict form is more than what we need in terms of

13   theories.  I think one of the things I have to do is come back

14   to you and tell you which ones to take out.  I think you've

15   got -- I didn't see any that I said, oh, wait, there's

16   something missing I want to add.  So just in terms of the

17   overall structure, I don't have a problem with it.

18            If you look at the first two questions, I just have a

19   question

20            THE COURT:  Sure.

21            MR. YALOWITZ:  The first one is:  Did plaintiffs prove

22   by a preponderance of the evidence that defendant PA is liable

23   for the January 22, 2002 terror attack because the attack was

24   committed by a PA employee acting within the scope of his

25   employment and in furtherance of the interest of defendant PA.

F2AQSOK7

```
 1              I am just worried about the words "was committed by"
 2     as being -- the jury might think that means they've got to
 3     focus on the shooter.
 4              THE COURT:  I understand your concern.  Obviously,
 5     that is not what was meant by that.
 6              MR. YALOWITZ:  I just want to think about that a
 7     little more.
 8              THE COURT:  OK.
 9              MR. YALOWITZ:  One thought that occurred to me -- and
10     it really comes out of something in the instructions that I
11     also want to talk to you about -- is when I went back and
12     looked at the statute, if we look at 2331.(1)(a), it doesn't
13     talk about committing the crime, it talks about activities that
14     involve violent acts or acts dangerous to human life.
15              So I am thinking about, for example, the release of
16     Abdullah Barghouti.  That is not a violent crime, but it's an
17     act dangerous to human life, right?  If you give a child a
18     loaded gun, you've not committed a violent crime.  What you've
19     done is you've been involved in activities that are dangerous
20     to human life.
21              THE COURT:  The problem is that in and of itself
22     doesn't create the liability.
23              MR. YALOWITZ:  Yes.  Look, obviously there's other
24     elements that you have to get to -- causation and intent, I
25     understand that.  I am looking for a way to --
```

F2AQSOK7

1          THE COURT:  Even beyond the causation.  Even if there

2     wasn't a causation issue, there is no offense under the statute

3     that would simply deal with criminally or civilly releasing

4     some guy from prison.  That doesn't violate statute.

5          MR. YALOWITZ:  We need to talk about it.  I think if

6     you look at providing personnel, it has to do more than simply

7     release, I completely agree with that.

8          THE COURT:  You've got to be complicit in the crime.

9          MR. YALOWITZ:  Absolutely, or in a conspiracy, for

10    example.

11         THE COURT:  Right.  It has to be knowing and

12    intentional.  That is the instruction that I give -- knowing

13    and intentional.

14         MR. YALOWITZ:  I also want to talk to you about that.

15         THE COURT:  Knowing and intentional with regard to

16    what one would expect to be a terrorist act that would be

17    committed as a result.

18         MR. YALOWITZ:  I think we are on the same page,

19    although I just want to put down a marker on recklessness

20    because if you look at Judge Posner in the *Boim* case out of the

21    Seventh Circuit, if you look at Judge Weinstein in the *Gill*

22    case, they both talk about recklessness.

23         Then the other thing that I want to go back and look

24    at, because I haven't looked at it in a couple of months, the

25    circuit just came out with a case in what was called *NatWest*.

F2AQSOK7

1    I can't remember who the plaintiff was.  They said something

2    about intent too.  I just don't have it firmly in mind, Judge.

3    They made a comment that I think is very good for me, but,

4    quite frankly, I don't know that it eliminates -- I don't think

5    it should be taken too far.

6         THE COURT:  At this point, I can tell you that many of

7    these issues -- or all of them I considered even if I don't

8    remember why I resolved it the way I did.  This language was

9    chosen specifically because I thought about these issues.

10        But I'm not sure I would agree with you with regard to

11   recklessness.  I think that particularly on these set of facts,

12   I think the benefit and the most that you get with regard to

13   knowing is the conscious avoidance charge.  I think that on

14   these facts I'm not sure, and I think that that is in the

15   abstract appropriate, but it may or may not be generous in this

16   instance.  I can confidently say if the jury finds liability on

17   one or more or all of these incidents, it will be the exception

18   rather than the rule if they've made any determination other

19   than they made a conscious decision to participate and bring

20   about these terrorist acts.  I just think neither one of you

21   are in a position to argue that somehow they should have known

22   better.  That is not the nature of this proof.

23        MR. YALOWITZ:  This is not a negligence case.

24        THE COURT:  That's what I say.  It's not even a

25   recklessness case.  They knew that they were doing this because

F2AQSOK7

```
 1    they were supporting terrorism and they expected a terrorist

 2    act to result and to be accomplished with the benefit of their

 3    participation, or they did not.

 4            Now, as I say, even the conscious avoidance charge I

 5    struggled with as to whether or not I can pick up any scenario

 6    on any of these incidents where this jury could reasonably find

 7    that they really did know but they avoided knowing.  You have

 8    to explain which one of those that that would really be and

 9    convince me that they are a set of facts that the jury can

10    determine.  The PLO and the PA, they either participated with

11    knowledge and intent to commit terrorist acts or they did not.

12            I don't see much of a different theory on the basis of

13    the evidence that we have here.  It is not like they recklessly

14    left a bomb in somebody's yard and they knew he was a

15    terrorist.  You know, if you have some weird theory, I could

16    think of a recklessness theory there, but on these facts if the

17    jury were to accept the facts and inferences that you want them

18    to draw from direct and circumstantial evidence, not only do I

19    not think there would be a reasonable conclusion of

20    recklessness, I don't even think there is a reasonable theory

21    that I can articulate that they somehow consciously avoided

22    knowing the true facts.

23            MR. YALOWITZ:  Let me think about it on the

24    recklessness issue.  I may just stand on my request.  If I

25    stand on my request, I'm not withdrawing it.  I understand your
```

F2AQSOK7

1    views.

2            THE COURT:  If you can convince me and show me some

3    case law and show me some -- you need not to just give me cases

4    with some law on the abstract; you need to give me that law and

5    how it was applied in a similar situation that we have here on

6    these facts.  I am not sure that I can image realistically what

7    set of facts the jury has that they could find recklessness.

8            MR. YALOWITZ:  Like I said, I want to think about that

9    issue.  Whether or not I want to come back to you and take

10   another swing at, you know, you're kind of giving me an

11   opportunity to take it to bat.

12           THE COURT:  Sure.

13           MR. YALOWITZ:  I may stand on what I've got or I may

14   come back and say these facts in particular I think warrant a

15   recklessness charge.  The cases are pretty clear.  I'm not

16   worried about the cases.  I take more seriously what you're

17   saying.  I remember the cases.  I take more seriously what

18   you're saying:  Do you need it and is it appropriate given the

19   facts we've got in evidence.  I'm not withdrawing the

20   recklessness request.  I want to think about whether we need to

21   have another conversation about it.

22           THE COURT:  You might convince me to throw in the

23   reckless charge.  I haven't given it that much thought, given

24   the nature of the proof that you argued to me prior to trial

25   and the nature of the theory that you're arguing to the jury.

F2AQSOK7

1    I don't think that you are really going to candidly stand up

2    before the jury and say:  Ladies and gentlemen, I think the

3    evidence indicates that they were reckless.  I doubt that that

4    is going to come out of your mouth.

5              MR. YALOWITZ:  It depends on what the instructions

6    are.

7              THE COURT:  It shouldn't depend on what the

8    instructions are because all my instructions will be fairly

9    neutral.  And if that's what the jury believes you're trying to

10   convince them of, I think they'll react a little differently

11   because that's not the way the case was presented.

12             Mr. Rochon, do you have something.

13             MR. ROCHON:  No.  Just standing out of respect.

14             MR. YALOWITZ:  There is one thing I just want to put

15   in -- I have to look at it, but there was a -- bear with me.

16   This was the only other one I thought was sort of -- I

17   shouldn't say that.  There was a couple that I thought were --

18             THE COURT:  We'll talk about it over the next few

19   days.

20             MR. ROCHON:  If Mr. Yalowitz isn't ready to address it

21   tonight, I'd be happy to address it tomorrow.

22             THE COURT:  You're talking about the jury instructions

23   or the verdict form?

24             MR. YALOWITZ:  No, the instructions.

25             THE COURT:  OK.  We can go through it page by page

F2AQSOK7

1    starting tomorrow.

2              MR. YALOWITZ:  That would be good.  One thing that I

3    want you to think about that I have been thinking about, you

4    took the sort of standard Judge Sand instruction of "you can

5    request the exhibits."

6              THE COURT:  Yes.

7              MR. YALOWITZ:  Given the nature of the evidence, there

8    are certainly some exhibits that I think the jury really needs,

9    like these binders.  I don't have a problem giving them all the

10   exhibits, but I don't want them to have to come, you know,

11   mother, may I see the exhibits?

12             MR. ROCHON:  You know what I'm going to say.

13             THE COURT:  You're going to disagree.

14             MR. ROCHON:  Yes, but very eloquently.  The bottom

15   line:  You can't give some.  You shouldn't give them all unless

16   they ask for them.

17             THE COURT:  It depends.  I can tell you this:  My

18   preference is always to send the jury in, give them that

19   instruction so they can stay focused so I know they're not just

20   sitting there thinking they have to read the binder for the

21   next three days and have no idea why they're looking at it.

22             If they want something you pointed out to them that

23   they should look at, they should request it at least.  I know

24   they're focused on it when they request it.  It's not my job to

25   tell them what exhibits they think they should discuss and some

F2AQSOK7

1    they shouldn't.  Sometimes jurors go in without exhibits and

2    come back in 15 minutes and say they've got a verdict.

3    Sometimes they go in and by the time they're finished, they've

4    asked for every single exhibit by many different notes.  At

5    least I know they made a conscious decision about what they

6    thought would be useful to their discussion.

7         If you want to agree on the process, I will go along

8    probably with whatever you agree to.  Otherwise, you are going

9    to have to convince me, because, quite frankly, given the

10   nature of the binders and the exhibits -- you can just look at

11   the stack of boxes you've got against the wall in this case.  I

12   don't think it is necessarily helpful to burden the jury with

13   that volume of exhibits, if that is not what they're going to

14   look at.

15        MR. YALOWITZ:  That's 12 copies.  I don't want to give

16   them 12 copies.  I hear you.  And I can address that.

17        THE COURT:  I don't need them to sit in there and read

18   the Oslo Accords.  I need them to start talking about what the

19   evidence really demonstrates and focus on what you directed

20   their attention to.

21        It is going to be a limited number of exhibits, not

22   telling them that I think you've got to look at every possible

23   exhibit.  Try to think about it and you might convince me to do

24   something different.  That's usually the standard way I

25   proceed.  In certain cases where we have minimal exhibits, I

F2AQSOK7

1  agree with the parties and send it in and not be bothered or a

2  dozen exhibits or so.  What are we up to?

3           MR. YALOWITZ:  We have less than 1,200.

4           MR. ROCHON:  And some of them are multipage.

5           MR. YALOWITZ:  But more than a handful, no doubt.

6           THE COURT:  We will talk about it some more tomorrow.

7           MR. YALOWITZ:  We ask for you to instruct the jury in

8  your usual way on this issue.  Unless something comes to mind,

9  I am comfortable with standing on that request.

10           THE COURT:  If you want me to be more specific about

11  certain things or reference the binders, I will reference that.

12           MR. YALOWITZ:  I can do that.

13           THE COURT:  You can see the way I write my

14  instructions.  I don't marshal the evidence.  I don't comment

15  upon the evidence.  They are basic, general instructions.  I

16  let you utilize that in any way you want to.  I try to be

17  helpful before we start by giving you some rough draft in which

18  reference is made to some of the instructions that I intend to

19  give at the end.  So this is my guidance to you.  Take what you

20  can utilize in terms of what I intend to instruct the jury.

21           MR. ROCHON:  What time tomorrow?

22           THE COURT:  We have something to discuss before 9:45?

23           MR. ROCHON:  I think if we are here at 9:30, we'd be

24  able to cover it.

25           THE COURT:  That's good.  Let's do 9:30.

F2AQSOK7

1            MR. YALOWITZ:  That's fine.

2            THE COURT:  I will start looking at it in light of our

3    discussion.

4            (Trial continued February 11, 2015 at 9:30 a.m.)

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    MAJED FARAJ

 4    Cross By Mr. Yalowitz . . . . . . . . . . .2996

 5    Redirect By Mr. Rochon . . . . . . . . . . .3060

 6    Recross By Mr. Yalowitz . . . . . . . . . .3077

 7    HANAN ASHRAWI

 8     Direct By Mr. Hill . . . . . . . . . . . .3082

 9    Cross By Mr. Yalowitz . . . . . . . . . . .3126

10                       PLAINTIFF EXHIBITS

11    Exhibit No.                             Received

12     1279    . . . . . . . . . . . . . . . . .3047

13                       DEFENDANT EXHIBITS

14    Exhibit No.                             Received

15     17    . . . . . . . . . . . . . . . . . .3105

16

17

18

19

20

21

22

23

24

25
```