```
F2B8SOK1
```

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MARK I. SOKOLOW, et al.,

 4                  Plaintiffs,

 5            v.                              04 CV 397 (GBD)

 6   PALESTINE LIBERATION
     ORGANIZATION, et al.,
 7
                    Defendants.
 8
     ------------------------------x
 9                                           New York, N.Y.
                                             February 11, 2015
10                                           9:45 a.m.

11   Before:
                     HON. GEORGE B. DANIELS,
12
                                             District Judge
13
                             APPEARANCES
14
     ARNOLD & PORTER LLP
15        Attorneys for Plaintiffs
     BY:  KENT A. YALOWITZ
16        PHILIP W. HORTON
          TAL MACHNES
17        SARA PILDIS
          CARMELA T. ROMEO
18        RACHEL WEISER
          LUCY S. McMILLAN
19
     MILLER & CHEVALIER, CHARTERED
20        Attorneys for Defendants
     BY:  MARK J. ROCHON
21        LAURA G. FERGUSON
          BRIAN A. HILL
22        MICHAEL SATIN
          DAWN E. MURPHY-JOHNSON
23

24

25

F2B8SOK1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          MR. YALOWITZ:  Your Honor, unless you want to start, I

4    have a long list.

5          THE COURT:  OK.  Let's address what needs to be

6    addressed before we continue with the witnesses.

7          MR. YALOWITZ:  What we have had on witnesses in the

8    last two days has been a circus.  We have had witnesses who

9    have no direct knowledge of anything that happened in the case.

10   We had a lady here yesterday who came and said, I was the

11   public face for peace.

12         THE COURT:  I'm not sure whether this is an

13   application or a speech.  What is your application?

14         MR. YALOWITZ:  I want no more testimony about all the

15   buildings were destroyed unless it is linked to a specific

16   attack in this case, number one.

17         Number two, I want to make sure that Michael Sfard,

18   who is scheduled to testify next, doesn't start talking about

19   how there are two systems of justice, one for the Palestinians

20   and one for the Israelis, which is what I think the defendants

21   are planning to try to sneak in.

22         Number three, I want no more fact witnesses who say I

23   hate terror and I was trying to fight terror unless they are

24   percipient witnesses who have nonhearsay evidence about the

25   actually facts evidence in this case.

F2B8SOK1

```
 1              Number four, I want Marcus to testify because we need
 2    to rebut the misimpression that this jury is left with from
 3    these two witnesses that there is only one public face of the
 4    PA and it's against terror.
 5              THE COURT:  The last two things you said are
 6    inconsistent.  If there is more than one public face, then you
 7    can't complain that more than one public face is talking about
 8    their commitment against terror.  This person who just
 9    testified is a high-level PLO official and legislator.
10              Now, I assume Mr. Marcus would say that she would be
11    the public face of the PLO.  So those two positions are
12    inconsistent.
13              MR. YALOWITZ:  What I am saying is my hands were quite
14    closely cuffed in my affirmative case.
15              THE COURT:  In doing what?
16              MR. YALOWITZ:  In presenting the negative public face
17    of the PA and the PLO, the incitement of terror, the
18    encouragement of terror, public statements encouraging terror.
19    I understood the court's ruling.  I did my best to abide by it.
20              THE COURT:  I never restricted you with regard to any
21    questions you asked any of the witnesses in that regard.
22              MR. YALOWITZ:  The issue was putting on documents --
23              THE COURT:  I ruled on individual documents and
24    individual pieces of evidence that you said that you wanted to
25    offer in support of that position.
```

F2B8SOK1

| 1 | MR. YALOWITZ:  Right.  I think I hewed to those |

1          MR. YALOWITZ:  Right.  I think I hewed to those

2     rulings as closely as I could.

3          So my problem is I think they have opened the door to

4     rebuttable testimony.

5          THE COURT:  Tell me what Marcus is going to say that

6     is supposed to be directly rebutting someone's testimony?  Who

7     is he going to rebut and what is he going to say?

8          MR. YALOWITZ:  He is going to rebut Ashrawi and Faraj,

9     and I understand they are going to call Issa, and Issa is a

10    bird of the same feather.  He is an ex-human rights lawyer who

11    has recently joined the PA.

12         So Marcus is going to say, that's all well and good

13    that they have people who say those things, but look at the

14    other things they say.  For example, there are times when

15    Arafat has gone on television and whipped up the crowd to

16    encourage violence and terrorism.

17         THE COURT:  I have examined what you consider to be

18    examples of that, and part of my decision is I reject that

19    premise.  You can't say that someone is saying I am against

20    terror, that the converse of that is someone, as you want to

21    characterize, whipped up a crowd emotionally with the

22    implication that he is saying I am for terror.  You don't have

23    that.  You didn't offer that on the other side.  I even

24    restricted them in the same manner I restricted you.

25         If you want to say that somebody who came in here who

F2B8SOK1

 1    is a PA official and that person has either one or two

 2    positions, I am for terror or I am against terror, obviously

 3    that's relevant.  The witness comes in and says, I am a PA

 4    official, I am a person who can state the position of the PA

 5    either currently or indicate what the position of the PA has

 6    been on terror and the position that we have stated is that we

 7    are against terror.

 8          Now, if you have some evidence, testimony or document,

 9    that says that I am for terror, then I would like to see it.

10    Because the inferences that you want to draw, because some

11    individual is at a funeral or some individual says we are

12    brothers in the struggle, that does not translate into what you

13    want to characterize it as as a statement of, I am for terror,

14    I want everybody to go out and commit terrorist acts, I commit

15    terrorist acts.

16          If you have that kind of thing, then fine.  Show it to

17    me and I will let you counter that.  But my position has been

18    consistent, that you can't just simply say because at some

19    emotional event or some interview when the person is asked

20    about something in general, they say something that you say

21    aligns them with terrorism, because you and I both know that 99

22    percent of those circumstances, if not 100 percent of those

23    circumstances, if that individual was directly asked, are you a

24    terrorist and are you for terror and are you telling people to

25    go out and commit terrorist acts, they would say no.  We know

F2B8SOK1

1    that it's part of your argument.  If you have something like

2    that, but I have never seen anything like that.

3           MR. YALOWITZ:  Let me give you two examples of things

4    that I think are really close to the bone on this issue that we

5    have.

6           We have videos and newspaper articles on PA-owned

7    media.  So this is their own media that they own and control.

8           THE COURT:  We went through that and I gave you some

9    of those.

10          MR. YALOWITZ:  You did.  And we have glorifications of

11   particular perpetrators in this case.  Now, some of them are

12   after the time, I understand that and I understand that was

13   your view and I get that.  I am smart enough to understand that

14   was your view.

15          Now we have people who come, like this guy Issa, who

16   didn't even join the PA until 2014, and they are having him be

17   the public face saying we are against terror.  We have

18   testimony about how they had trouble with Hamas in 2007.  So

19   what they have done is they have opened up the time frame very

20   significantly.

21          I don't think anybody can argue legitimately that it's

22   irrelevant that the PA on PA TV honored Abdullah Barghouti, or

23   that the PA on PA TV honored Nasser Shawish, or that the

24   minister of detainees and ex-detainees, whose name was Issa

25   Karaka, went and paid solidarity visits to the family of

F2B8SOK1

1    Abdullah Barghouti.

2              THE COURT:  The last thing that you said, yes, a

3    reasonable person can disagree, that because you go and visit

4    who is otherwise an innocent collateral person with regard to

5    their relative who committed an act, simply because you go

6    visit that person and console that person, no, you can't make

7    that argument.  That is an illegitimate argument.

8              If my mother blew up a building and is thrown in jail

9    or killed in the process, because someone comes to me and says,

10   I'm sorry your mother died, the only reasonable inference is

11   not that the person is coming because that person is a

12   supporter of the terrorist act.

13             MR. YALOWITZ:  I agree with that, that the mere fact

14   of paying a visit.  Obviously you have to look at, what did

15   they say?  Did they publish the visit on their official media?

16   Did they say things that were glorifying the actions of the

17   person?

18             THE COURT:  You didn't give me anything in conjunction

19   with those visits by this person in which this person said, I

20   went there because I want you to know I am a terrorist and I

21   not only support what this terrorist did, but we helped him

22   commit this offense.  Because that's part of your problem too.

23   You want to make this case about terrorism.  This case is not

24   about terrorism.  This case is not about who supports

25   terrorism, who is in favor of terrorism.  It is about who

F2B8SOK1

1    committed specific terrorist acts that are in issue in this

2    case.  That's part of the balance that I am trying to deal

3    with.

4            You can't simply say that it advances your argument by

5    saying, OK, they like this guy who was a terrorist.  So that

6    translates into that they are in favor of terrorism, and that

7    further translates into they were in furtherance of the

8    terrorist act he committed, and that further translates they

9    are complicit in the terrorist act they committed.

10           MR. YALOWITZ:  What you're saying is where I started

11   out this morning.  I said, let's have percipient witnesses.

12   Let's stop with the high-level lady who doesn't know anything

13   about any of the facts or a high-level guy that joined in 2014

14   who doesn't know anything about the facts, or the general who

15   got medals for fighting terror.

16           OK.  They have presented that evidence.  It's not

17   relevant.  It's not probative on the core issues of the case.

18           THE COURT:  I understand your reaction to these

19   witnesses.  I don't understand what specific testimony, what

20   questions and answers that you believe were in this case that

21   you say were improper.  As a matter of fact, I gave you

22   significant leeway, over their objection, to go through with

23   this last witness every single relevant question that you

24   thought was appropriate with regard to whether or not this

25   witness agreed with you that it would not be appropriate to

F2B8SOK1

1    support terrorists and their terrorist acts.  You went through

2    that in painstaking detail.  I allowed you to do that.

3        It's appropriate for the jury to assess that, to see

4    whether or not this person is going to try to say something

5    that is unreasonable, say something that is simply a hidden

6    bias, say something that is defied by logic.

7        MR. YALOWITZ:  And now what I want to do is show that

8    in fact, in addition to the actions, which we have their

9    actions already in evidence, the jury can reach those

10   conclusions, but in addition to their actions, I want to show

11   that their words, for example, putting a video up saying Wafa

12   Idris is great, or putting a video up saying Nasser Shawish is

13   great, that they have other words that are inconsistent with

14   the testimony of these witnesses that they have brought.  I

15   think that's a fair rebuttal to the way that they chose to put

16   on their case.

17       THE COURT:  I say this finally and then you can tell

18   me specifically what it is you want me to reconsider, which

19   video or which statement.  But I specifically, in painstaking

20   detail, went through every one of those statements.  In

21   fairness to you, with all due respect to your argument, the way

22   you're arguing this is your characterization of these

23   statements.  It's not the words that are in these statements.

24       So if you want to compel me, you need to tell me, this

25   witness, who you need to determine, Judge, is a spokesperson or

F2B8SOK1

1    acting on behalf of the PA, made this particular statement that

2    I am quoting to you.  I want to put that statement before the

3    jury because that statement, word for word, is what I say is

4    their commitment, it is reflective of the PA or PLO's

5    commitment to terrorist activity, and furthers my argument that

6    they were involved in the terrorist activities that were

7    committed in this case.

8            Show me, give me the line that you say is the proof of

9    that.  As I said to you, if they say, we are against terrorism

10   and you have some statement where they said we are for

11   terrorism, then show it to me and show me that that is someone

12   who made a statement officially or in their capacity as a

13   spokesperson for the PA or PLO and I will allow you to put that

14   in.  But I have looked at every one of these and none of them

15   say that.  It is an inference you want to draw and I think it

16   is an unreasonable inference.

17           MR. YALOWITZ:  Let me just ask your views about the

18   two that I have in mind.

19           THE COURT:  OK.

20           MR. YALOWITZ:  Because that will inform my thinking.

21           I will give you three things that I have in my mind.

22           The first is a video that went up on PA TV immediately

23   after the Wafa Idris suicide bomb.  So we are in the time frame

24   of the case.  I know you remember because we had a lot of

25   questions about it.  What is it?  It's a music video, a

F2B8SOK1

1    performance.

2              THE COURT:  Right.  I definitely remember that.

3    That's the one I said is this MTV?  I don't know what it is.

4              MR. YALOWITZ:  I am not the guy to put it in context

5    because it's not my expertise.  Marcus is the guy to put it in

6    context because Marcus studies the PA media.

7              THE COURT:  And he knows when this was produced, why

8    it was produced, what it was produced for?

9              MR. YALOWITZ:  I am sure he does.

10             THE COURT:  What is his answer to those questions?

11             MR. YALOWITZ:  I am sure I can get that information.

12             THE COURT:  I can't advance that argument for you

13   unless I have that information.  You say that he can, but I am

14   not sure he knows exactly under what circumstances this

15   performance was given.

16             Part of my problem -- and I don't mean to keep

17   interrupting you.  I am going to try to focus you.  If you're

18   trying to convince me -- part of my problem is that with regard

19   to your overall they control the media, it's sort of like

20   saying to me, well, I watched this TV show on the BBC and so

21   therefore I want to use that as an official statement by the

22   British government.  I can't do that.  You have got to give me

23   something more than that.  TV is news, entertainment.  It is

24   fluff.  It is commercials.  Everything on TV is not an official

25   statement by the government.

F2B8SOK1

 1              MR. YALOWITZ:  What you're doing, and it's not

 2     unreasonable because you never lived in the West Bank, but what

 3     you're doing --

 4              THE COURT:  You haven't either.  I don't know.

 5              MR. YALOWITZ:  I have never lived there either, but I

 6     have learned something about it.

 7              THE COURT:  I have learned a little, not as much as

 8     you.

 9              MR. YALOWITZ:  I would like you to learn a little more

10     during the trial from Marcus.

11              What Marcus will teach is there are lots of TV

12     stations.  There are TV stations that are independent.  There

13     is Al Jazeera.  There is a TV station called PATV, which is

14     owned and controlled by the government and which only puts on

15     things that the PA approves.  That is his testimony.  It is not

16     just his opinion; he has got an evidentiary basis for it.

17              THE COURT:  That's true of many public television

18     stations.

19              MR. YALOWITZ:  So that when PATV puts on a music video

20     glorifying a suicide bomber, I'm not sure it matters who wrote

21     the song, who performed it.  I think what matters is PATV is

22     sending a message of approval of her actions.

23              THE COURT:  Why?  You haven't demonstrated to me he is

24     in a position to say that.  Simply because it is on TV.  You

25     say they put it on TV.  I don't know if they put it on TV or

F2B8SOK1

1    they allowed it to be placed on TV.  That's a distinction.  I

2    don't know if it was their decision, you know what, let's

3    glorify a terrorist, or somebody came to them and said, we have

4    a concert, we want to put it on, can we put it on and we have

5    got this famous performer, who everybody likes, who has a bunch

6    of songs, and we want to put it on.  And they say, OK, fine,

7    put it on.  People like to watch that kind of stuff.

8            I don't even have any evidence that anybody in the PA

9    was even aware of what the content of this song was going to be

10   about.  It's such speculation for me to say that.  And that's

11   only your first hurdle.  Because it's not an official statement

12   of a government official.  It's a song.  It is entertainment.

13           You know, Yasser Arafat didn't go to the UN to sing

14   speeches.  That's not the way it works in the real world.  I

15   can't accept that some woman, that we don't even know who she

16   is, decided she wrote a song or she sang somebody else's song

17   that glorified somebody that they considered to be somebody to

18   be glorified, and then I am supposed to assume that that's an

19   official statement by the Palestinian Authority or the PLO.

20           MR. YALOWITZ:  I hear what you're saying.  I really

21   do.  I am not sure I am doing a good job of communicating my

22   views, which are when you take a video and you play it

23   repeatedly on your TV station, that sends a message.  That

24   reflects your state of mind.

25           THE COURT:  How many times do you say this video was

F2B8SOK1

1    played?

2              MR. YALOWITZ:  I have to look it up, but dozens.

3              THE COURT:  Who decided to play this video?

4              MR. YALOWITZ:  The evidence that Marcus will bring is

5    that this station is tightly controlled and nothing goes on it

6    unless the PA officials approve it.

7              THE COURT:  That's true of almost every station.

8              MR. YALOWITZ:  If NY1 put broadcasts dozens of times

9    saying some guy who went into Times Square and blew himself up

10   is great, that would say something about what the City of New

11   York thinks about terrorism.  That would be communicative.

12             THE COURT:  I am listening to what you're saying and

13   I'm not sure, in the abstract, that's a particularly compelling

14   argument.  You say it like it's compelling, but do you really

15   believe that?  You really believe that if NBC allows Saturday

16   Night Live to broadcast for 30 years that you can put that as

17   evidence of what NBC's position is on any particular political

18   subject that they decide to ridicule?

19             MR. YALOWITZ:  That's totally different.

20             THE COURT:  Why is that totally different?  You

21   haven't given me the evidence why it is totally different.

22   What is the evidence?

23             MR. YALOWITZ:  Because it is a private company, for

24   profit, protected by the First Amendment.  I can't think of a

25   more different circumstance.

F2B8SOK1

1          THE COURT:  What evidence do you have that a

2    government official made a decision to put this on as an

3    indication that the government is itself making a statement

4    about glorifying this particular individual?

5          MR. YALOWITZ:  Because they don't put anything on that

6    station, the evidence is, both documentary and testimonial from

7    Marcus, that they don't put anything on that station unless

8    it's approved by the editorial board of PATV, which is

9    appointed, paid, controlled and dominated by the political

10   officials of the PA.

11         THE COURT:  But because they allowed it on TV --

12         MR. YALOWITZ:  And played it repeatedly.

13         THE COURT:  But because they allowed it on TV is not a

14   reasonable conclusion that -- one, I don't even know what

15   government official you claim even saw this, or even reviewed

16   this.  You want some nebulous sort of government guy must have

17   looked at this.

18         Tell me who in the government approved this for the

19   TV.

20         MR. YALOWITZ:  I don't have the guy's name memorized.

21         THE COURT:  Do you have somebody?

22         MR. YALOWITZ:  Let me finish the sentence.

23         We know who it is and we have documents from their own

24   mouth saying, we are going to make reforms to make the PATV

25   independent.

F2B8SOK1

1          THE COURT:  That has nothing to do with the clip that

2     you want to put on.  Who do you say in the government made a

3     conscious decision that reflects that the government said, we

4     are putting this on because this is our government view?

5          MR. YALOWITZ:  I don't have the guy's name memorized.

6          THE COURT:  You have the guy?

7          MR. YALOWITZ:  We have a guy.

8          THE COURT:  And you say this is a government official

9     who specifically approved this and under circumstances in which

10    it is reasonable for the jury to conclude that he was, on

11    behalf of the government, saying this is the government's

12    official position?

13         MR. YALOWITZ:  OK.  Let me break that down because I

14    am not going to come with evidence saying the guy sat in his

15    office and watched the video and put a stamp on it saying

16    approved.

17         THE COURT:  I assume you're not going to come in with

18    any evidence close to that.

19         MR. YALOWITZ:  But I am going to come with evidence

20    that says, the practice and pattern of this TV station is that

21    it's all approved, they don't have a First Amendment, they

22    don't have a separation between publisher and editor, and so

23    everything they put on reflects a decision by them to allow it

24    on.

25         THE COURT:  OK.  That doesn't advance your argument.

F2B8SOK1

1    Simply because they make a decision to allow it on is not

2    evidence that it is their own statement that they are

3    announcing today we are for terror.  That's not what you can

4    offer it for.

5             MR. YALOWITZ:  Let me give you a little bit broader

6    perspective.  This video is one example of so many in which the

7    PA turned Wafa Idris into a national hero.  And I think the

8    jury is entitled to hear that.  It is very, very specific to

9    our case.  They name summer camps after the woman, they name

10   town squares after the woman.

11            THE COURT:  "They" who?

12            MR. YALOWITZ:  The PA.

13            THE COURT:  I don't have any recollection that you

14   offered any such evidence, from my review, in order to put this

15   before the jury.

16            MR. YALOWITZ:  I don't think I offered documents, but

17   that's the testimony of Marcus.

18            THE COURT:  His testimony has got to be based on

19   something.  What did he look at?  Can we look at what he looked

20   at?

21            MR. YALOWITZ:  Of course we can.

22            THE COURT:  See, I am saying to you, on the record

23   that you have given me you don't even have the answers to most

24   of the questions that I think are relevant to give you a ruling

25   in your favor.

F2B8SOK1

 1              You say Mr. Marcus has it hidden in his back pocket.

 2      I have given you a full opportunity to tell me on what basis

 3      you say that this evidence is an official statement by the PA.

 4      If it is not an official statement by the PA, then it is not

 5      admissible for the purpose in which you want to offer it.

 6              MR. YALOWITZ:  I have got to move off it.  I really do

 7      understand your views.  I appreciate the guidance.  I have got

 8      other problems with these defendants today.  That's why I am

 9      moving on.

10              Last night we got --

11              THE COURT:  You got the two other witnesses.  I have

12      the letter.

13              What are we doing with these witnesses?  Let me find

14      out why they put you in this position and why I shouldn't

15      preclude the witnesses.

16              MR. ROCHON:  Can I tell you what I anticipate the

17      schedule is for the day?

18              THE COURT:  Yes.

19              MR. ROCHON:  Those witnesses will testify next week.

20      In terms of how you manage the jury's time --

21              THE COURT:  They just all arrived.

22              MR. ROCHON:  We have three witnesses lined up and

23      ready to go.  I know Mr. Yalowitz has some other arguments to

24      make.  I don't know if they relate to the witnesses that will

25      testify this morning.  I think both sides would very much

F2B8SOK1

1    appreciate time working through the jury instructions today

2    because we are going to have our five-day break.

3         THE COURT:  How soon do you think you will be finished

4    with your three witnesses?

5         MR. ROCHON:  Just after lunch.  I was anticipating

6    that perhaps the court could consider getting through the

7    witnesses, letting the jury go, and working with us on the

8    instructions.  I at least would benefit because we are going to

9    close next week.

10        THE COURT:  Yes.

11        MR. ROCHON:  As to these two witnesses that he

12   complains of, the record on that is we had indicated we would

13   not be calling them in light of the court's rulings because at

14   that point the document that they are relevant to is not in

15   evidence.

16        MR. YALOWITZ:  That's false, and I have to address

17   that.

18        THE COURT:  Mr. Yalowitz, I will always give you your

19   turn.  Relax.  Just relax.  Your jumping up in the middle of

20   his statement is not more persuasive than your giving me your

21   objection after.

22        Mr. Rochon, what are you calling these guys for and

23   what are they going to say?

24        MR. ROCHON:  They are the drafter and one of the

25   people whose handwriting is on that memorandum that concerned

F2B8SOK1

1    Wafa Idris that was used on one of the experts for the

2    plaintiffs' examination.

3            THE COURT:  What memorandum?

4            MR. ROCHON:  It's the one that says at the top in

5    handwriting, this shows that the GIS was involved in the Wafa

6    Idris issue.

7            THE COURT:  You have the person who wrote that?

8            MR. ROCHON:  Yes.  That's one of the two people.  The

9    other is one of the individuals whose handwriting is on the

10   side.

11           These witnesses became particularly relevant after

12   Shrenzel testified in some length about the document and gave

13   views of it.  On February 2, therefore, when we gave a list of

14   our witnesses to plaintiffs, we included these two witnesses as

15   may-call witnesses.  I have that e-mail and I can tender it to

16   the court.

17           THE COURT:  I take your word for it.

18           MR. YALOWITZ:  I don't.  I haven't seen it.  I'm not

19   sure what Mr. Rochon is talking about.

20           MR. ROCHON:  We gave it to counsel this morning.  I

21   will give it to counsel again.  We of course gave it to him on

22   February 2 as well.

23           This is responsive to that testimony.

24           THE COURT:  Did you indicate to them at that time what

25   the subject matter of their testimony would be?

F2B8SOK1

1          MR. ROCHON:  No, we didn't.  Of course, it was a may

2     call.  But their names had been referenced in court either that

3     day or the day before.  They are the names on the stipulation

4     we did.  Remember we did a stipulation as to whose names were

5     on that memorandum.

6          THE COURT:  Everybody knew that these were the two

7     people whose names were on the memorandum.

8          MR. ROCHON:  Right.  And we provided them in discovery

9     in response to an interrogatory as to whose names were on the

10    memorandum.  The witness testified about it.  We stipulated to

11    those names.  On February 2 we gave those names to the

12    plaintiffs as two people we may call.

13         THE COURT:  What are these two witnesses going to say?

14         MR. ROCHON:  The woman who drafted it would explain

15    the basis for the information she had.

16         THE COURT:  What is she going to say?

17         MR. ROCHON:  She would testify that she lived in the

18    camp where -- I don't think she would say this, actually.

19         THE COURT:  Tell me what she is going to say.  That's

20    my question.  That's all my question is.

21         MR. ROCHON:  I am being too lawyerly today.

22         She would say that she received that information

23    that's in the memorandum from someone in the camp, from hearsay

24    in the camp.  There were rumors about it.  She told her boss

25    and her boss told her, put it in a memo, and she put it in a

F2B8SOK1

1    memo.  She is a low-level administrative employee, not a

2    decision-maker.  She said, hey, I heard this, and her boss said

3    put it in a memo and she did.

4              The other guy is one of the signatures who received

5    it.  He would say, I got this and I didn't think it was very

6    important.

7              THE COURT:  I assume he is going to say a little more

8    than that because that's not what he said on the memo.

9              MR. ROCHON:  He didn't write the memo.

10             THE COURT:  He wrote something on the memo.

11             MR. ROCHON:  The one at the top that says "this

12   shows," that is not this person.

13             THE COURT:  Who is the second person?

14             MR. ROCHON:  Tmaize.

15             THE COURT:  Why are you calling him if he didn't write

16   anything on the memo?

17             MR. ROCHON:  He did write something on the memo, just

18   not that part on the top.

19             THE COURT:  What is his purpose?

20             MR. ROCHON:  Because he is the supervisor of all of

21   these people.  He would explain that he looked at this memo and

22   did not attach much importance to it and understood that it was

23   only referencing that Tirawi had some concerns about the family

24   of the woman who had blown herself up.

25             THE COURT:  He did what with it?

F2B8SOK1

1          MR. ROCHON:  Nothing because he thought it was big

2     nonissue.  Within days, IDF apparently seized the memo and here

3     we are ten years later trying a case where it pops up as

4     evidence.

5          THE COURT:  Which witness is that?

6          MR. ROCHON:  Tmaize.

7          THE COURT:  Tmaize?

8          MR. ROCHON:  That's the boss of these people.

9          THE COURT:  Mr. Yalowitz.

10          MR. YALOWITZ:  First of all, this is trial by ambush.

11     Judge, we were together for a pretrial conference on December

12     16 and Mr. Hill was told by the court, unless you believe that

13     the memo was a fake, it's coming in evidence.  I remember that

14     as clear as a bell.  I am sure you do too.

15          The next thing we heard from the defendants was the

16     day we offered it in evidence, was going to offer it in

17     evidence, which was January 23, Hill strutted up to the sidebar

18     and said, there is no foundation for this document.  And you

19     remember I had to deal with the interrogatory and figure it

20     out, and they stood there silently and we had to wait for

21     another day to put it on.

22          Then we figured it out and we came into the courtroom

23     ready to introduce the interrogatory.  And in order to avoid

24     that event, the defendants stipulated that it was authentic and

25     here is who was on it, so they didn't have to put the

F2B8SOK1

1      interrogatory in.  They had the interrogatory.  They knew that

2      the document was coming in since December.

3              The other thing that happened in December was you

4      said, I want to know who your witnesses are and what they are

5      going to testify about.  So there weren't any new special

6      rulings that happened after December.  And they wrote a letter

7      on December 23rd, which said, we are withdrawing these

8      witnesses.

9              THE COURT:  And they said they wrote a letter on

10     February 5 saying they decided to put on this witness.  You

11     didn't put that in your letter.

12             MR. YALOWITZ:  Because they slipped it in.

13             THE COURT:  They didn't slip it in.  You either got it

14     or didn't get it.

15             MR. YALOWITZ:  Let me hand up what they gave because

16     it's pretty deceptive to me.

17             THE COURT:  You did not know that they made a

18     statement on this date that they intended to possibly call this

19     witness?

20             MR. YALOWITZ:  If this was their way of trying to tell

21     me that they were changing their views about whether to call

22     these witnesses, it is a hide-the-ball e-mail.  It is a very

23     hide-the-ball e-mail.

24             THE COURT:  Let me see where they are listed.

25             MR. YALOWITZ:  Somewhere down at the bottom.

F2B8SOK1

```
1          And I certainly didn't take seriously -- I didn't even
2   know that they had put him back on their list.  And they
3   certainly never gave me -- remember, the ruling was on December
4   23rd, tell me and you what the witnesses are actually going to
5   testify about.  And that was to remedy the defendants'
6   violation of Rule 26(a) because they never gave me those
7   disclosures during discovery.
8          So now here I am, at the end of trial, and all of a
9   sudden it's popped up.  One business day from today we are
10  adding some new witnesses.  That's really trial by ambush.
11  That is really trial by ambush.
12          THE COURT:  Let me make sure I understand the whole
13  scenario.  They put these two witnesses on the witness list
14  prior to December 23rd.  They withdrew them off the witness
15  list on December 23rd.
16          MR. YALOWITZ:  Correct.
17          THE COURT:  They put them back on the may-call list on
18  February 2nd.  I am not sure what you say that you concluded
19  from the fact that they were taken off the actual witness list
20  in December and then placed on the may-call list.
21          MR. YALOWITZ:  I didn't know they were placed on the
22  may-call list.
23          THE COURT:  I can't excuse that.  Unless you tell me
24  you didn't get the e-mail, you can't say you didn't know.
25          MR. YALOWITZ:  They gave me the e-mail.  I believe
```

F2B8SOK1

1   them.

2               THE COURT:  You had it, and your team of lawyers had

3   this e-mail.  I assume that you're not using the excuse that

4   you didn't just bother to read it, right?  That's not what

5   you're arguing, right?  You can't argue they didn't give you

6   this.

7               MR. YALOWITZ:  No, I am not arguing they didn't give

8   it to me.

9               Here is my problem.  On December 30th, we got a

10  substitution of these two witnesses, Ashrawi and Issa.  It was

11  a big deal.  And we have been very diligent in preparing for

12  the witnesses that they disclosed on December 23rd and December

13  30th.  We have investigated their background.  We have pulled

14  their military court records.  We have pulled their police

15  records.  We know what their activities are.  We know if they

16  have been arrested.  We know if they have been in jail.  We are

17  prepared to cross-examine them.

18              THE COURT:  You're arguing that you're not prepared to

19  cross-examine the people who are on the may-call list.  I

20  assume that's not true.

21              MR. YALOWITZ:  It is true.

22              THE COURT:  Why would you ignore the people on the

23  may-call list because then if they called them, you would be

24  unprepared.

25              MR. YALOWITZ:  Because the defendants deceived me.

F2B8SOK1

1          THE COURT:  Tell me how they deceived you.  They said

2   we may call this person.  You thought that meant we are not

3   going to call this person?

4          MR. YALOWITZ:  Mark Rochon said to me, we are shifting

5   around because I think we are going to add Shehadeh to our

6   will-call list.  And I can't see it to know whether Shehadeh is

7   now on their will-call list.

8          THE COURT:  On February 2, Shehadeh was the first name

9   on the may-call list.

10          MR. YALOWITZ:  So what they did was they kind of did a

11   little head fake.  They said we are going to send you something

12   and it's going to be about Shehadeh.  I will admit, I did not

13   take the January 5th list and put it side by side with the

14   February 2 list to see if they had slipped in somebody else.  I

15   didn't do that.  In hindsight, I wish I had.

16          THE COURT:  It didn't matter whether they slipped in

17   somebody else.  What you're arguing is no one did they put on

18   the may-call list on February 2 should be allowed to testify.

19          MR. YALOWITZ:  I am not saying that at all.  I am

20   saying when they withdrew their witnesses, when they withdrew

21   their witnesses in a letter to this court on December 23rd,

22   that was a meaningful act.

23          THE COURT:  I know.  If they put them back on the

24   may-call list, that had to be a meaningful act too, didn't it?

25          Are you saying that if they withdrew them in December,

F2B8SOK1

1    even though they put them back on the may-call list, that

2    deceived you into thinking that they definitely made a decision

3    that they were not going to call these witnesses?

4              MR. YALOWITZ:  When I got the letter in December, I

5    was led to believe by defendants in December that anybody who

6    was not on the will-call list was not going to be called.

7              THE COURT:  Even if they were on the may-call list?

8              MR. YALOWITZ:  They said, we have got -- let me be

9    very clear what they did in December.

10             THE COURT:  I am more concerned about the February

11   list and I am more concerned about whether or not you're saying

12   that it's unfair for them to call anybody who is on the

13   may-call list that you were given on February 2.

14             MR. YALOWITZ:  I think it is.  I will explain why.

15             THE COURT:  You thought because they are on the

16   may-call list, that means they are not going to call this

17   witness.

18             MR. YALOWITZ:  No.  No.  When I got the letter on

19   December 23 and they said, defendants no longer intend to call

20   nine of the witnesses, and one of those witnesses was Sabri

21   Tmaize, and another one of those nine witnesses was Amneeh

22   Reehan, I put tools down on researching those individuals and I

23   didn't have any disclosure like this letter of, this person is

24   going to testify about this subject and that person is going to

25   testify about that subject.

F2B8SOK1

1          So I am sitting here in February trying to put my case

2     on and I get this e-mail that comes in and they don't say to

3     me, we are reinstating these individuals.

4          THE COURT:  They said we are putting this on the

5     may-call list.

6          MR. YALOWITZ:  They don't say we are reinstating these

7     people expressly and they don't say they are going to testify

8     about the following subjects.

9          I don't know where they are on that list, but they are

10    somewhere hidden down at the bottom.

11         THE COURT:  When you say hidden, there is a list and

12    they are one of the names on it.

13         MR. YALOWITZ:  I really don't think that counsel

14    should be expected, every time they get an e-mail from their

15    adversary, to go back and compare it to everything that has

16    gone on in the past and see, oh, my gosh, they have tried to

17    slip something in.

18         THE COURT:  You expect that of me.  You expect me to

19    read all these things every morning and try to figure out what

20    happened two months ago.

21         The bottom line is, you have got to give me a better

22    argument that if they said that the person is on the may-call

23    list on February 2, what was your reasonable expectation about

24    whether or not they would be allowed to call anyone on that

25    may-call list that you got on February 2?

F2BTSOK2

1           MR. YALOWITZ:  Well, I certainly think, your Honor,

2      that if they were going to ask the Court for relief from their

3      representation that they were withdrawing those witnesses --

4           THE COURT:  But they didn't make any representation to

5      me.

6           MR. YALOWITZ:  Yes, they did, sir.

7           THE COURT:  Which letter?

8           MR. YALOWITZ:  This is docket 677.

9           THE COURT:  Is it written to me?

10          MR. YALOWITZ:  Yes.

11          THE COURT:  What letter are you talking about?

12          MR. ROCHON:  Is that the December 23rd letter,

13     counsel?

14          Mr. Yalowitz nodded his head.  Thank you.

15          THE COURT:  Let me ask you this question.  Is there

16     any other witness on the may call list who they withdrew?

17          MR. YALOWITZ:  I don't know.  The first is that the

18     defendants brought to my attention that they sent -- I believe

19     them, that they sent me this email on February 2.

20          THE COURT:  Are you calling anybody else on this may

21     call list?

22          MR. ROCHON:  Well, the may call list we have Shehadeh

23     on there, as you see.  Of the others, I do not believe so.

24     Excuse me, Khaled Abu Al-Yaman.

25          THE COURT:  Yamen you intend to call?

F2BTSOK2

1          MR. ROCHON:  Yes, but he wasn't referenced in the

2     letter.

3          MR. YALOWITZ:  He was referenced as somebody on their

4     list on December 23.

5          THE COURT:  Is there anyone else on this list that you

6     say that you no longer intended to call that you put back on

7     the may call list?

8          MR. ROCHON:  The four names at the bottom, Sabri

9     Tmaize, Ghaleb Al-Nobani, Amneh Rehan, Hilel Abdel Haq are four

10    names that all relate to that same memorandum.

11          Judge, just because we had talked about an email but

12    it's not in the record, the email from February 2nd went to

13    seven Arnold & Porter lawyers as well as affiliate counsel,

14    including four sitting at counsel table this morning.  So this

15    wasn't a send it to Yalowitz he's too busy to read everything

16    sort of email, this was sent to the whole squad on

17    February 2nd.

18          The other thing I would say is well before the close

19    of discovery in this case, in response to an interrogatory, we

20    provided these names, and you know that.  The plaintiffs never

21    sought to depose any of these people.

22          As of December 23rd, I guess the argument would be

23    they had done no preparation related to those people and were

24    going to begin their preparation for dealing with those

25    witnesses I guess after December 23rd, and then now getting the

F2BTSOK2

1    names of these people I guess six days before they would

2    testify that they would not be ready to cross-examine them, I

3    actually think that counsel on both sides have dealt with

4    vastly more difficult circumstances in the course of a trial

5    than preparing to cross-examine witness in that time frame.

6          Moreover, the situation as to these witnesses of

7    course changed with the witness of the plaintiff's expert.  I

8    think these are witnesses who, if we never mentioned them as

9    potential witnesses in light of their testimony, we could have

10   added them for the first time ever on February 2nd because

11   their relevance developed in the plaintiff's case.

12         I wasn't planning on calling any of those people until

13   the evidence developed the way it did.  And I have to be

14   honest, assuming that the Court -- or I shouldn't say assuming,

15   if the Court allows us to call them, I'm still not a hundred

16   percent sure I will.  I will get them here -- I'm working to

17   get them here, there's always visa issues, I'm working to get

18   them here, and I will make -- I apologize for this -- like any

19   lawyer, a game-time decision.  That's what I have to do.

20   Because these are witnesses who will be testifying in a very

21   difficult circumstance for them personally, and I'm going to

22   have to make an assessment when I get them to New York:  Am I

23   comfortable putting their testimony in on a host of issues that

24   have to do with cultural issues, that have to do with how the

25   case has come in, that has to do with eyeballing them more.

F2BTSOK2

 1    The people that met with them are my colleagues.  I have not

 2    met with them personally before.  So I will be making a

 3    game-time decision.

 4              But I think that the notion that we did what we were

 5    asked to do on February 2nd, to give the list -- and although

 6    it seems a long list of may calls, most of the names -- the

 7    first seven after Shehadeh, the next seven names are damages

 8    folks that we had to keep as may call but everybody knew we

 9    might not call, given the way we managed the damages portion of

10    the case.  The seven names after Shehadeh are all defense

11    experts only as to damages that anyone knew that we might not

12    call because I had to leave on the list but we don't know what

13    might happen.

14              THE COURT:  Let me see the document one more time.

15              MR. ROCHON:  The email?

16              THE COURT:  No, the exhibit.

17              MR. ROCHON:  233.

18              THE COURT:  I don't have it in front of me.  You can

19    put it on on the screen or give me a hard copy.

20              MR. YALOWITZ:  I think that the contrast when they

21    wanted to substitute new witnesses of Ashrawi and Issa and they

22    wrote your Honor a letter and offered to do depositions and

23    they acted immediately is a huge contrast compared to this kind

24    of behavior where they slip it in and they don't say what

25    they're going to testify about, and they do it at 8:00 o'clock

F2BTSOK2

in the morning while a witness is coming on the stand.  I just
think that -- I honestly believe this was intended to deceive
me, and I feel very deceived.

THE COURT:  Where is the signatures and --

MR. ROCHON:  This is the English translation.

THE COURT:  Show me where you say each person --

MR. ROCHON:  This would be the woman Amna.  She had
this maiden name, married name deal, but this is her, and
Tmaize's.

THE COURT:  And he wrote what?

MR. ROCHON:  It says, handwriting, brother, illegible,
but it's important confirm this with her brother and inform me
as soon as possible, and there's a signature, which is Tmaize's
signature.

THE COURT:  And that whole statement --

MR. ROCHON:  Is scribbled in hand.

THE COURT:  His hand?

MR. ROCHON:  Right.  If you go to the second, right
and left, this is the on the left side, here on the Arabic
version would be his scrawl, and the woman who signs it and
prepared the letter is here.

THE COURT:  And he directed her to to what?

MR. ROCHON:  Actually I don't think that he would say
that he directed her to to anything.

THE COURT:  He wrote something on there for whom?

F2BTSOK2

1          MR. ROCHON:  It would probably be for one of his

2    subordinates.  She is an extremely junior person.

3          THE COURT:  What did he do with it?

4          MR. ROCHON:  What he did with it was nothing.  He

5    thought it was a non-issue.

6          THE COURT:  He did something with it.  He wrote a

7    message to someone and gave it to someone, unless you tell me

8    he wrote it and threw it in a desk drawer.

9          MR. ROCHON:  He wrote this, and we believe it was

10   seized within a day or two.

11         THE COURT:  So his testimony would be he never

12   transferred it to anyone?

13         MR. ROCHON:  After he signed it, no, it literally got

14   taken.

15         THE COURT:  What's the date of this document?

16         MR. YALOWITZ:  That's false, your Honor.

17         THE COURT:  Wait a minute.  Let me get the dates, then

18   you can tell me what is false.

19         MR. YALOWITZ:  I know the dates because Operation --

20         THE COURT:  Mr. Yalowitz, relax, have a seat.  Okay?

21   Relax.  Have a seat.  You're not persuasive this way.  You're

22   persuasive when you're calm and articulate in your position.

23         MR. YALOWITZ:  That's rare.

24         THE COURT:  I would like to make it more.

25         This document was drafted by her on what date?

F2BTSOK2

1              MR. ROCHON:  The date in the upper left-hand corner,

2     February 14.

3              THE COURT:  February 14.

4              MR. ROCHON:  That's our understanding.

5              THE COURT:  And she gave to him when?

6              MR. ROCHON:  I think she gave it to the guy at the top

7     first, at the very, very top, that is a translation of

8     handwriting as well.

9              THE COURT:  That's the third person's handwriting.

10    The person she gave the document to.

11             MR. ROCHON:  Yeah, someone she had contact with.

12             THE COURT:  What happened to the document when he got

13    it?

14             MR. ROCHON:  He sends it to the guy on the bottom, you

15    slide down, there's handwriting at the bottom as well, to the

16    brother, head of directorate, that's how he sends it to the guy

17    on the right.

18             THE COURT:  Whose handwriting is at the bottom?

19             MR. ROCHON:  Abdel Haq.

20             THE COURT:  That's the person she sent it to?

21             MR. ROCHON:  No, she prepared this -- it's addressed

22    to the people, brother head of national security, head of

23    political security, those are the two individuals -- the

24    handwriting on the bottom and the handwriting at the top.

25             THE COURT:  You confused me.

F2BTSOK2

1          MR. ROCHON:  I confused myself, your Honor.

2          THE COURT:  This was addressed to whom?

3          MR. ROCHON:  She didn't put the names.

4          THE COURT:  Who do you say this is supposed to be

5    addressed to?

6          MR. ROCHON:  Two names, the head of national security,

7    the head of political security, and their names are Abdel Haq

8    and Nobani.

9          THE COURT:  But not this person.

10         MR. ROCHON:  The guy on the right I think is their

11   boss.

12         THE COURT:  So it's not addressed to him.

13         MR. ROCHON:  No.

14         THE COURT:  And his testimony would be he got this

15   when?

16         MR. ROCHON:  We believe on or around the 22nd.

17         THE COURT:  When do you claim it was seized?

18         MR. ROCHON:  Shortly thereafter.

19         THE COURT:  What does that mean?

20         MR. ROCHON:  Within days.  I understand Mr. Yalowitz

21   thinks that Operation Defensive Shield didn't happen until the

22   end of March, and he's right, but that wasn't the first time

23   the Israelis took documents from the Palestinian Authority.

24         THE COURT:  What is the basis for your belief this was

25   seized within days?

F2BTSOK2

1          MR. ROCHON:  That's what Tmaize would say.

2          THE COURT:  Mr. Yalowitz.

3          MR. YALOWITZ:  This document is on a web site saying

4   it was seized in Operation Defensive Shield, which didn't start

5   until March 29.  And also, this is written on a computer.  This

6   is not a handwritten note where there is only one copy.  This

7   was written in 2002.  The photocopy machine had been invented

8   and the computer had been invented.

9          THE COURT:  I'm missing your point.

10          MR. YALOWITZ:  The idea that they didn't have another

11   copy of this because a copy was seized, I just -- and the

12   inference that they want the jury to draw is that they didn't

13   think it was important and then they didn't follow up because

14   the Israelis took the document away from us.  That's a joke

15   because the document is on a computer and the information is in

16   their heads.  They all still work there.

17          So the reason they didn't follow up is what whatever

18   they didn't follow up on.  But the fundamental issue is all of

19   this was fully known to the defendants years ago and they

20   didn't list these people.  They didn't disclose these people's

21   testimony during discovery.

22          THE COURT:  But they did disclose to you that she was

23   the author of this document.

24          MR. YALOWITZ:  No, they didn't.  They didn't disclose

25   that.

F2BTSOK2

```
 1                THE COURT:  They told me they did.
 2                MR. YALOWITZ:  No, they didn't.  They answered an
 3       interrogatory in which it was asked who are the people who
 4       signed this letter, and they gave four names.  That's what they
 5       disclosed.
 6                THE COURT:  Am I incorrect -- I thought may
 7       recollection was even during this trial there was some
 8       statement either out of the witnesses -- out of the jury's
 9       presence or before the jury that this person was the same
10       person as this person.
11                MR. YALOWITZ:  Right.
12                THE COURT:  Didn't we have some --
13                MR. YALOWITZ:  We did, the defendants offered that
14       because they didn't want the interrogatory answer coming in
15       evidence.
16                THE COURT:  So we put it before the jury that the
17       person here is the person Rehan.
18                MR. YALOWITZ:  Correct.
19                MR. YALOWITZ:  And the defendants -- the Court gave
20       the defendants the opportunity to remedy their discovery
21       violation by giving a list of who they intended to call and
22       what they were going to say, and that at least gave me the
23       opportunity to understand who they were intending to call and
24       what they were going to say.  And then on December -- and you
25       have that letter, I handed it up to the Court.
```

F2BTSOK2

           And then on December 30, when they were changing their

1

2    mind and they wanted to add people to the list that they had

3    represented to the Court were going to be witnesses in the

4    trial, they wrote another letter to you and they said we need

5    to make a change.

6           Now they didn't do that.  Now here we are a day before

7    they want to put these witnesses on and they have never asked

8    you for any relief until this moment.  They have never made any

9    representation of what these people are going to testify about,

10   and I just think at some point trial by ambush has to stop.

11          THE COURT:  Well, I am assuming that when this person

12   was put on the list the only thing you could have concluded was

13   that her testimony had to do with this letter.

14          MR. YALOWITZ:  Look --

15          THE COURT:  Right?  You knew that.

16          MR. YALOWITZ:  I have been very transparent about this

17   February 2 email.

18          THE COURT:  But even before February 2, when this

19   person was identified, if this person was possibly a witness,

20   you knew that most likely this witness would testify to how

21   this letter was prepared.

22          MR. YALOWITZ:  The lady.

23          THE COURT:  Right.

24          MR. YALOWITZ:  I understand that.

25          THE COURT:  And I assume whatever preparation you did

F2BTSOK2

1    you were fully prepared to address that if that was going to

2    come up.

3        MR. YALOWITZ:  So a lot of the defendants' witnesses

4    have criminal records, and you know we have done a lot of work

5    to get ready for the witnesses based on the representations

6    that we got in December.

7        So this lady, I don't know if she has a criminal

8    record, I know she's from a family that is Fatah activists or

9    whatever they are, but the defendants -- it seems to me that I

10    was purposely put at a disadvantage by these defendants, and

11    they know it.  I don't hear Mr. Rochon saying I asked the Court

12    for relief, I told you we were changing our mind.  What they

13    did was hid the ball from me, and I have never done that to

14    them.  I have never done that to them.

15        THE COURT:  I don't have sufficient information to

16    make that determination.

17        MR. YALOWITZ:  Let me say this, if you're going to let

18    these witnesses testify, I think we need a deposition like we

19    got with Issa and Ashrawi.

20        THE COURT:  I can't do that.  If you wanted a

21    deposition you could have taken the deposition during discovery

22    or when they were first put on the list if you thought that was

23    necessary.

24        My position is this, and I will give you this leeway,

25    I think that it is appropriate -- I think independently it is

F2BTSOK2

1    appropriate rebuttal testimony to bring in the person who wrote

2    this letter.  I think that's appropriate.  I think that would

3    have been appropriate even if the witness wasn't on the list

4    once you put the document in.

5         But the amount of ambush and surprise is not as great

6    as you say, because it's clear that you knew who this witness

7    was, you clearly knew who wrote this letter, it is clear this

8    person was possibly -- under any circumstance might possibly be

9    a witness, and it's clear this would be the subject matter of

10   her testimony.

11        I can't say that you did not have an opportunity to be

12   prepared to cross-examine her because somehow now it's being

13   disclosed to you at the last minute that this person is the

14   person who had the letter and could come in and say why she

15   wrote the letter and what information she got, and that you

16   didn't have that information in enough time that if you wanted

17   to prepare for the cross-examination of the witness you would

18   have prepared.  Quite frankly, I'm not even sure you

19   articulated what you would have done further now other than you

20   said you want to know if she has a criminal record.

21        But it seems to me that you know everything you're

22   going to know other than you wanted to pose questions to her to

23   see how she would answer them and you got some effective

24   question to answer in a deposition.  It seems to me that you

25   know everything that you need to know about this witness on the

F2BTSOK2

1    limited testimony that she is going to offer to cross-examine

2    this witness.

3          You put in this document.  You put in this document to

4    reflect -- and you want to argue from this document that it

5    reflects that they had knowledge previously of this person's

6    involvement in this.  This is the witness that wrote the

7    letter.  You knew it was the witness who wrote the letter.  If

8    you had any concern that the letter did or did not represent

9    what you want to argue it to represent, you had a full

10   opportunity to depose this witness or determine whether or not

11   you thought this witness was going to give contrary testimony.

12         Whether in saying that you are not -- I can't figure

13   that out, and I'm not going to play detective to do so, but it

14   seems to me that you were aware that this was the author of

15   this document, you were aware this person might possibly be a

16   witness, and even if you hadn't been aware, having put in the

17   document and asking for an inference which she can rebut, it

18   would have been proper for them to call her in rebuttal of the

19   purpose for which you put this in and the argument that you

20   intend to make with regard to this document.  And so I'm going

21   to allow her to testify.

22         Now with regard to Tmaize, I'm not particularly

23   completely compelled to allow Tmaize to testify.  I will only

24   allow Tmaize to testify if you want to cross-examine him and

25   they want to put him on after you know I'm going to allow him,

F2BTSOK2

```
 1    given the fact that you know I'm going to let her testify.

 2            I don't see any -- what she meant when she wrote the

 3    letter seems to be the most important thing.  If they want to

 4    call him and say he did nothing with it, and you would like him

 5    to do that so you can cross-examine him and say and demonstrate

 6    to the jury that that testimony is incredible, that they had a

 7    full opportunity to do this, they had this on the computers,

 8    they could have done something with it, they could have

 9    investigated it if they wanted to, you can withdraw your

10    objection to him and he could come in here.  But if you still

11    have an objection to calling both of these witnesses, I think I

12    am going to sustain to calling the second witness.

13            MR. YALOWITZ:  I'm standing on the objection with

14    regard to Tmaize.  If we reflect on it and we change our views,

15    we'll certainly let the defendants know so that they can get

16    him here.

17            MR. ROCHON:  He's going to be traveling.  Getting him

18    here is complicated.  We're working with the State Department

19    to get visas for these people.

20            MR. YALOWITZ:  If they wanted make to make an earlier

21    decision, then they knew where to find me.

22            THE COURT:  If you think that there's any possibility

23    that if they withdraw their objection that you will call him,

24    then you better put him on the plane and get him here.

25            MR. ROCHON:  Understood.
```

F2BTSOK2

1              THE COURT:  If they make a decision —— even if they

2       turn to you and say to you after they cross-examine Rehan, you

3       know what, I would love to have this guy on the stand, if you

4       got him in the room, put him on if you want him.  If you want

5       to put him on, then you can put him on.

6              MR. YALOWITZ:  Thank you.  We understand the ruling

7       and the reasons for it.

8              I'm anxious to get the jury in, as I'm sure you are.

9       I still don't know who the witnesses are for today.  The

10      defendants are shifting around so much.

11             THE COURT:  Give me the three witnesses and the order

12      that you're going to call them.

13             MR. ROCHON:  It's been the same for a while.  It's

14      going to be Sfard, Issa, and Shehadeh, understanding that we

15      still have argument on Shehadeh.

16             MR. YALOWITZ:  We have a problem with Shehadeh.

17             THE COURT:  We can do the first two.  Can we

18      efficiently move through the first two and then talk about

19      Shehadeh?

20             MR. YALOWITZ:  Are the defendants withdrawing

21      Robinson?

22             MR. ROCHON:  We're not withdrawing him.  I'm not sure

23      that we will reach him, and he's a pretty long witness, and I

24      wanted to discuss it.

25             MR. YALOWITZ:  I think we should forge ahead with the

F2BTSOK2

1    testimony.

2            THE COURT:  Who is Robinson?

3            MR. YALOWITZ:  He's one of their experts.

4            THE COURT:  On what issue?  You have an objection to

5    Robinson?

6            MR. YALOWITZ:  No.

7            THE COURT:  Okay.

8            MR. YALOWITZ:  I will have objections to some of the

9    things he says, some of them I might even raise in response to

10    questions or answers.

11            THE COURT:  All right.

12            MR. YALOWITZ:  But I understand why they're calling

13    him.

14            THE COURT:  Then let's move forward.

15            MR. ROCHON:  Judge, on the other issue, I hesitate to

16    talk, but there's been reference to all these witnesses have

17    criminal records.  I want to be very clear, because someday

18    somebody might look at this, the only record that any of these

19    people have is for security type of offenses.

20            THE COURT:  Have those been disclosed?

21            MR. ROCHON:  No, because they won't let us put them

22    in.

23            THE COURT:  I didn't ask you whether you would put

24    them in.  Did you disclose whether those individuals have such

25    criminal records?

F2BTSOK2

1          MR. ROCHON:  I haven't even made that a focus.

2          THE COURT:  Have they requested that information?

3          MR. ROCHON:  No.

4          MR. YALOWITZ:  I'm requesting it now with regard to

5     the two late disclosed witness.  If the defendants have it, I

6     think they should be required to turn it over.

7          MR. ROCHON:  All we can do is ask people.  The Israeli

8     government doesn't provide us with access.

9          THE COURT:  That's fine.  Speak to your witnesses and

10    make a representation to Mr. Yalowitz to what extent they have

11    been arrested and served time.  It is something that I think

12    you have the obligation to do because in fact that was what you

13    wanted to bring out with several witnesses.

14         MR. ROCHON:  Just one.

15         THE COURT:  I think one witness made reference to it

16    even though I said you shouldn't bring it out.  So if they have

17    been arrested, convicted and imprisoned, you should let them

18    know.  Whether they have been detained, that's a different

19    question, but if they have a conviction, I don't know care what

20    kind of conviction it is, a conviction under any jurisdiction,

21    you should find out.

22         MR. YALOWITZ:  Your Honor, we request that for all the

23    defendants' witnesses they claim to bring.

24         MR. ROCHON:  I'm unaware in a civil case of such a

25    discovery request being made at this point, but I will do what

F2BTSOK2

1    I can to comply with the request.

2            I think the only witness that may be mentioned

3    conviction -- but I may be wrong, because my memory is

4    terrible, was yesterday Ms. Ashrawi, because that's when

5    Mr. Yalowitz asked did she knew where the jail was.

6            THE COURT:  No, I think the last witness said he had

7    been detained.

8            MR. ROCHON:  I'm sure your recollection is better than

9    mine, but Mrs. Ashrawi's reference, in any event, was certainly

10   not to Israel.

11           THE COURT:  I want to to get the witness.  If they're

12   an hour or less, maybe we can get them all done.

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

F2BTSOK2

1              (Jury present)

2              THE COURT:  Welcome.  I am hopeful we can be on

3    schedule so we could finish.  I needed to deal with some issues

4    rather than delaying us.  So we're prepared to move forward.  I

5    will try to get two or three witnesses done today and we'll

6    adjourn, and I'm still confident that we will finish witnesses

7    sometime next week.

8              You can call defense's next witness.

9              MR. ROCHON:  Thank you.  Defendant calls Michael

10   Sfard.

11    MICHAEL SFARD,

12        called as a witness by the Defendants,

13        having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MR. SATIN:

16   Q.  Mr. Sfard, please state your name.

17   A.  Michael Sfard.

18   Q.  Mr. Sfard, where are you from?

19   A.  From Israel.

20   Q.  What city did you grow up in?

21   A.  In Jerusalem.

22   Q.  Where do you live now?

23   A.  I live in Tel Aviv.

24   Q.  What country are you a citizen of?

25   A.  I'm a citizen of the State of Israel.

F2BTSOK2                    Sfard – direct

1    Q.  Do you work?

2    A.  I do.

3    Q.  What do you do?

4    A.  I am a lawyer.

5    Q.  It's fair to say that one thing the lawyers from both sides

6    can agree on in this case that is that we won't hold that

7    against you.

8    A.  I hope so.

9    Q.  Are you licensed to practice law?

10   A.  I am.

11   Q.  And how long have you been licensed to practice law?

12   A.  Since 1999.

13   Q.  Where did you study law?

14   A.  I studied law at the law faculty of Hebrew University in

15   Jerusalem.

16   Q.  Is that the same university that was the subject of a

17   bombing in 2002?

18   A.  That is the same university.

19   Q.  Were you a student there at the time?

20   A.  No, I graduated in 1998.

21   Q.  After graduation, did you do an internship?

22   A.  I have.

23   Q.  Where was that?

24   A.  I interned with a known Israeli attorney, human rights

25   attorney, Avigdor Feldman.

F2BTSOK2                        Sfard – direct

1    Q.   What type of work did you do during your internship?

2    A.   Feldman's office focused on criminal litigation and human

3    rights litigation, and these were the main two areas of law

4    that I practiced.

5    Q.   Did the criminal litigation involve representing

6    individuals in the Israeli military court system?

7    A.   It did.

8    Q.   And what year was your internship?

9    A.   1998 through 1999.

10   Q.   Did you also stay on with Mr. Feldman after your internship

11   ended?

12   A.   Yes, I have.

13   Q.   How long?

14   A.   I stayed for another year as an associate attorney in his

15   office, then I left for one year for studies and returned for

16   another -- until 2004 again as an associate.

17   Q.   And you said you left for studies.  What studies did you do

18   at that point?

19   A.   Post-graduate studies at the University College London in

20   law.

21   Q.   Did you graduate?

22   A.   I have.

23   Q.   With what degree?

24   A.   Masters in law.

25   Q.   What did you study at that university?

F2BTSOK2                        Sfard - direct

1   A.   I studied international human rights law.  That was my

2   major.

3   Q.   And after you graduated from the University College London,

4   you returned to Israel?

5   A.   Yes.

6   Q.   Did you say already that you started to work again with

7   Mr. Feldman?

8   A.   That's right.

9   Q.   How long did you work with Mr. Feldman at that point?

10  A.   Up until 2004.

11  Q.   And what type of work were you doing at that time period?

12  A.   Again human rights work and criminal defense litigation.

13  Q.   Did that criminal defense litigation -- was that in the

14  Israeli civilian court or Israeli military court?

15  A.   It was in both.

16  Q.   So did you actually yourself with Mr. Feldman represent

17  individuals in the Israeli military court system?

18  A.   Yes, I have.

19  Q.   Was that a trial level or the appellate level?

20  A.   In both.

21  Q.   What were the years all together in which you practiced law

22  in the Israeli military court system?

23  A.   Well, I practiced law at the Israeli military court system

24  since I was an intern in 1998, and then up to probably 2006.

25  Q.   At some point did you leave the office with Mr. Feldman and

F2BTSOK2                          Sfard - direct

1    start your own law practice?

2    A.  Yes.

3    Q.  Do you still have that practice?

4    A.  I do.

5    Q.  How many lawyers are in your firm?

6    A.  Five lawyers and two interns in my firm.

7    Q.  And besides your representation of individuals in the

8    Israeli military court system, are you familiar with that

9    system from other ways?

10   A.  Yes, I am.

11   Q.  Were you involved in a study about the Israeli military

12   court system?

13            MR. YALOWITZ:  Objection, your Honor, I need to be

14   heard.

15            THE COURT:  He could answer that question.

16            MR. YALOWITZ:  Yeah.

17   A.  I was.

18            THE COURT:  Go ahead.  Let me see where he's going.

19            MR. SATIN:  I would like to repeat the question

20   because the objection came in the middle of asking it.

21            THE COURT:  No, go to the next question.

22   Q.  Who conducted the study about the Israeli military court

23   system?

24            MR. YALOWITZ:  Objection.

25            THE COURT:  Sustained.

F2BTSOK2                          Sfard - direct

1   Q.  What was the time period that the study of the Israeli

2   military court system focused on?

3            MR. YALOWITZ:  Objection.

4            THE COURT:  Sustained.

5   Q.  So based on your own legal practice and your work with the

6   study, are you familiar with the Israeli military court system?

7            MR. YALOWITZ:  Objection.

8            THE COURT:  Overruled, you can answer.

9   A.  I am.

10  Q.  Are you familiar with the law in the Israeli military Court

11  system?

12  A.  I am.

13  Q.  Do you know which types of crimes are prosecuted in the

14  Israeli military court system?

15  A.  I do.

16  Q.  Do you know how Israel classifies prisoners as security

17  prisoners?

18           MR. YALOWITZ:  Objection.

19           THE COURT:  Overruled.  You can answer that.

20  A.  I do.

21  Q.  And before we get to that specific testimony, I want to ask

22  you a couple more questions about your background.  Have you

23  received any awards for your work?

24  A.  I have.

25  Q.  What awards?

F2BTSOK2                         Sfard - direct

1    A.  I received the Emil Grunzweig Award.

2    Q.  What is that?

3    A.  That is an award given annually by the Association for

4    Civil Rights in Israel to individuals or to groups for their

5    contribution to the advancement of human rights in Israel.

6    Q.  How many people get that award?

7    A.  Usually one, sometimes two.

8    Q.  Have you also received any fellowships?

9    A.  Well, actually I received a fellowship a few months ago,

10   yes.

11   Q.  What was that for?

12   A.  Fellowship with the Open Society Foundation.

13   Q.  What is the Open Society Foundation?

14   A.  It's a big non-government organization with branches all

15   over the world, and they have headquarters here in New York

16   City, and operates to promote democracy, human rights, and the

17   rule of law.

18   Q.  As part of that fellowship, will you be relocated from

19   Israel for a period of time?

20   A.  Yeah, I will be relocating with my family to New York City

21   this summer for a year.

22   Q.  Do you know where you're going to live?

23   A.  Hopefully in a neighborhood that has good public schools

24   and low rents, if possible.

25   Q.  Good luck with the rents.

F2BTSOK2                          Sfard - direct

1              Mr. Sfard, are you familiar with the term "security

2    offenses?"

3    A.  I am.

4    Q.  And under the current Israeli military law, what are

5    security offenses?

6    A.  Well, the military penal code applicable to the West Bank

7    has a definition of security offenses, and that is every

8    offense that is listed in the table that is attached to that

9    military order.

10   Q.  How many different offenses are listed on that table?

11   A.  There are 51 different offenses in that table.

12   Q.  Does that list include violent and non-violent offenses?

13   A.  Yes, it does.

14   Q.  Could you please provide the jury with some examples of

15   those non-violent offenses that are on that list of security

16   offenses?

17   A.  For example, it includes --

18              MR. YALOWITZ:  Objection.

19              THE COURT:  I'm going to sustain the objection unless

20   you're going to offer that list into evidence.

21              MR. SATIN:  I certainly could.

22              THE COURT:  Do you intend to offer the list?

23              MR. SATIN:  There was testimony about it.

24              THE COURT:  I don't know where he was reading from.

25   Do you intend to offer the list or not?

F2BTSOK2                         Sfard - direct

1                MR. SATIN:  If that's the --

2                THE COURT:  I'm asking you.  I'm not trying to

3     restrict you.  Are you going to offer the list?

4                MR. SATIN:  Sure.

5                THE COURT:  Do you object to the list?

6                MR. YALOWITZ:  I don't know, I have never seen it

7     before.

8                THE COURT:  Is that what he's looking at now that he's

9     getting ready to read from?

10               MR. SATIN:  Yes, your Honor.

11               THE COURT:  Could you show it to plaintiff's counsel

12    so we can move forward?  I want to keep us efficiently moving.

13               THE WITNESS:  It's in Hebrew.  This is the list, table

14    three.

15               THE COURT:  Do you have a list in English?

16               MR. SATIN:  I do not, your Honor.  I wasn't originally

17    seeking to introduce the list.  We're calling him as an expert

18    to testify --

19               THE COURT:  I understand why you're calling him.  I

20    don't want to waste time.  You don't have the complete list

21    that he just referred to?

22               MR. SATIN:  We have the complete list, not in English.

23               THE COURT:  English is what I'm interested in.  You

24    don't have a list in English that the jury or Mr. Yalowitz can

25    see?

F2BTSOK2                          Sfard - direct

1              MR. SATIN:  No.

2              MR. ROCHON:  Your Honor, may I make a suggestion?

3     Maybe we could have the witness testify not the list but from

4     his recollection.

5              THE COURT:  That's fine or, Mr. Yalowitz, if you want

6     to get the completes list, if he has th ecomplete list in front

7     of him, I will allow him to read the entire list.

8              MR. YALOWITZ:  Let's continue on the basis that the

9     witness won't have the list and --

10             THE COURT:  He can have the list.  I don't know if

11    he's got to the memorize it.

12             MR. YALOWITZ:  As you wish.

13             THE COURT:  Unless you have some specific articulable

14    objection let's move forward efficiently.  If they want to ask

15    that limited question, they can, and ask the broader question.

16    BY MR. SATIN:

17    Q.  Based on your recollection, what are some the offenses on

18    that list?

19    A.  On that list there are offenses such as organizing

20    unpermitted demonstrations, organizing unpermitted marches,

21    membership in an unauthorized association, and, of course,

22    there are violent offenses as well on the list.

23    Q.  Is breaking curfew on that list?

24    A.  Breaking curfew is on that list, also violating order of

25    closed military zone is on the list.

F2BTSOK2                         Sfard - direct

1   Q.  Would you agree that security offenses under military law

2   are not just violent crimes like attempted murder or murder?

3   A.  Yes, I do.

4   Q.  Mr. Sfard, when you were involved in the study of the

5   Israeli military court system, did it contain statistics about

6   what types crimes people were charged with in the Israeli

7   military court system?

8             MR. YALOWITZ:  Objection.

9             THE COURT:  Come up.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At side bar)

2          THE COURT:  You got me spinning my wheels here.  I

3     thought I made clear and you had clear in your minds what the

4     parameters would be with regard to this witness's testimony.  I

5     don't want to spend more time on this.

6          MR. ROCHON:  We're not violating.

7          THE COURT:  What's your objection?

8          MR. YALOWITZ:  My objection is that they said they

9     were going to talk about what are the security crimes.  They

10    did that.  What percentage.

11         MR. ROCHON:  That's what we're doing next.

12         THE COURT:  That's what he asked him and you objected.

13         MR. YALOWITZ:  Because he's talking about his study.

14         MR. ROCHON:  That's the foundation for the testimony.

15    Let me tell you something.  This witness is a lawyer.  He's

16    been clearly instructed.  He's not going to get into any

17    prohibited areas, this guy.

18         THE COURT:  What is he going to say?  Because he

19    doesn't have more than five minutes worth of testimony, as far

20    as I'm concerned.

21         MR. SATIN:  He's going to say that based on those

22    statistics he obtained, there are one percent for murder and

23    four percent for attempted murder.

24         THE COURT:  Where else do you go?

25         MR. SATIN:  How does Israeli law determine who is a

F2BTSOK2                          Sfard – direct

1    security prisoner.

2             THE COURT:  What is the answer to that?

3             MR. SATIN:  He's going say there's three grounds based

4    on the law.

5             THE COURT:  What are the grounds?

6             MR. SATIN:  Committed security offense, any offense

7    with a nationalistic motivation, or the third round is

8    providing service to a terror organization.

9             MR. YALOWITZ:  I don't have a problem that.

10            THE COURT:  Anything else?

11            MR. SATIN:  No, that's it.

12            THE COURT:  You can cross-examine him and let's send

13   him on his way and let's get the next guy in here.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F2BTSOK2                         Sfard - direct

1   BY MR. SATIN:

2   Q.  Mr. Sfard, during that study, did you obtain statistics

3   about which types of crimes people were charged with?

4   A.  We have.

5   Q.  Did you determine what percentage of those crimes were for

6   either murder or attempted murder?

7   A.  The figures we obtained have shown between the years 2004

8   to 2006 one percent of all defendants that have been charged in

9   military court system were charged with murder and four percent

10  were charged with attempted murder.

11  Q.  Those statistics, the one percent for murder and four

12  percent for attempted murder, do they only involve attacks on

13  Israeli civilians?

14  A.  No, not necessarily.

15  Q.  What else is there?

16  A.  Attacks on Israeli soldiers, Israeli policeman, security

17  forces as well.

18  Q.  Are there statistics specifically about attacks on

19  civilians?

20  A.  We do not obtain those statistics.  I don't think there is.

21  Q.  So would the number for just civilians be lower or

22  higher --

23          MR. YALOWITZ:  Objection.

24          THE COURT:  Sustained.

25  Q.  Now I want to ask you briefly about how Israel classifies

F2BTSOK2                        Sfard – direct

1    prisoners.  Does Israel classify certain prisoners as security

2    prisoners?

3    A.  It does.

4    Q.  Is there a law or ordinance about that?

5    A.  Well, there is an order issued by the Israeli prison

6    service commissioner which classifies prisoners into category

7    of security prisoner.

8    Q.  Does that order say how prisoners are specifically to be

9    classified in that way?

10   A.  Yes, it does.

11   Q.  How many different grounds are there by which someone can

12   be classified as a security prisoner?

13   A.  Well, there are three main grounds.

14   Q.  What's the first one?

15   A.  The first one is prisoners who were charged or convicted

16   for an offense that by its nature and circumstances is an

17   offense against the security of the state.

18   Q.  Does that category, the first round, include membership in

19   an illegal or unlawful association?

20   A.  It does.

21   Q.  What is the second ground?

22   A.  The second ground is a person who was convicted or charged

23   with any offense that was committed with nationalistic

24   motivation.

25   Q.  Does it matter what the offense is?

F2BTSOK2                        Sfard - direct

1   A.  No, it doesn't.

2   Q.  And what does it mean for an offense to be done with a

3   nationalistic motivation?

4   A.  Well, it means with a political aim.

5   Q.  And who decides whether the crime is done with a political

6   aim?

7          MR. YALOWITZ:  Objection.

8          THE COURT:  Overruled.  You can answer.

9   A.  The prison authorities.

10  Q.  To be clear, the prison authorities of what state?

11         MR. YALOWITZ:  Objection.

12         THE COURT:  Overruled, you can answer.

13  A.  The State of Israel.

14  Q.  What is the third ground?

15  A.  Well, the third ground are prisoners who have been

16  convicted or charged with an offense which had or might have

17  assisted in unlawful association or an individual to cause harm

18  to state security, and those acts have been committed either

19  with knowledge that such damage to security will happen or with

20  indifference to that result.

21  Q.  So out of that third category, does the prisoner have to

22  have the specific intent to harm the State of Israel?

23  A.  No, it's enough that he's indifferent to the result.

24  Q.  Now of those three grounds that you just spoke of, to be

25  classified as a security prisoner, does it have to be shown

F2BTSOK2                      Sfard – direct

1    that all three grounds were met or just one?

2    A.  It's enough that one ground is met.

3    Q.  What is the ground that include the most offenses?

4    A.  Well, the ground that deals with nationalistic motivation,

5    because that can include any offense.

6    Q.  And does the Palestinian Authority have anything to do with

7    the decision by the Israeli prison service about who gets

8    classified as a security prisoner?

9    A.  Of course not.

10          MR. SATIN:  Nothing further, your Honor.

11          THE COURT:  Mr. Yalowitz.

12   CROSS-EXAMINATION

13   BY MR. YALOWITZ:

14   Q.  Mr. Sfard, nice to see you again.

15   A.  Nice to see you, too, Mr. Yalowitz.

16   Q.  I look forward to seeing you this summer as well.

17   A.  This summer?

18   Q.  We were together in Jerusalem and we spoke about this case,

19   right?

20   A.  That was more than last summer, I think.

21   Q.  Now I want to ask you about some of the things that

22   Mr. Sfar spoke to you about.

23   A.  Mr. Satin.

24   Q.  Mr. Satin spoke to you about.

25          He said that -- he asked you about being convicted for

F2BTSOK2                    Sfard - cross

1    participating in demonstrations.  Do you remember that?

2    A.  Well, I mentioned organizing unpermitted demonstrations.

3    Q.  Based on your experience, what would the typical sentence

4    be for somebody who is convicted of that crime?

5    A.  I don't think there is a typical sentence because every

6    case and every defendant has its own characteristics, but the

7    offense has a prescribed maximum penalty of ten years.

8    Q.  And based on your work, I think you know that almost every

9    case in the system you're talking about is pled, right?

10   There's a plea bargain?

11             MR. SATIN:  Objection, beyond the scope.

12             THE COURT:  Overruled.  You can answer.

13   A.  Many of them are.

14   Q.  It's more than 95 percent, right?

15   A.  These are the estimations, yes.

16   Q.  And so do you have any experience representing clients who

17   reach plea bargains for offenses like organizing demonstrations

18   or breaking curfew?

19   A.  I have experience in plea bargaining in the military courts

20   but not over that offense.

21   Q.  And do you have any information at all about the typical

22   length of sentence for the kinds of non-violence offenses

23   you're talking about?

24   A.  Sorry, but again, every trial is a different trial, every

25   defendant is different, and then the penalty depends on the

F2BTSOK2                        Sfard - cross

1    circumstances, whether the defendant has prior offenses, I

2    think, of that sort.  So I don't think there is a fixed length

3    of sentence.

4    Q.  Are you aware of anyone -- can you think of a single

5    example of anyone who actually got ten years for breaking

6    curfew?

7    A.  No.

8    Q.  Can you think of anyone who got ten years for organizing a

9    demonstration?

10   A.  No.

11   Q.  Can you think of anyone who got five years for breaking

12   curfew?

13   A.  No, I don't know of any specific case.

14   Q.  Anyone who got five years for organizing a demonstration?

15   A.  No, I don't know.

16   Q.  Do you know anyone who got three years for breaking curfew?

17   A.  I really don't know because I am not familiar with any

18   specific case of breaking a curfew.  I have not represented

19   anyone on that offense.

20   Q.  Can you think anyone who got three years for organizing a

21   demonstration?

22   A.  No, I can't.

23   Q.  Now you also mentioned membership in unlawful

24   organizations.

25   A.  Right.

F2BTSOK2                          Sfard - cross

1   Q.  Al Aqsa Brigades, that's an unlawful organization, right?

2   A.  Yes, it is.

3   Q.  Membership in Al Aqsa Brigades is a pretty serious offense,

4   isn't it?

5   A.  It is an offense that has the penalty of up to ten years

6   according to the military law and order.

7   Q.  But being a member of Al Aqsa Brigades is a pretty bad

8   thing, right?

9              MR. SATIN:  Objection, your Honor.

10             THE COURT:  Overruled.

11  A.  In what sense?  Yes, definitely it's an offense.

12  Q.  You and I agreed when we were together in Jerusalem that

13  the crimes committed by Al Aqsa Brigades and Hamas and

14  organizations like them were crimes against humanity, is that

15  correct?

16             MR. SATIN:  Hearsay.

17             THE COURT:  Overruled.

18  A.  You asked me if I think it was war crimes, and I answered

19  that these are crimes against humanity, absolutely.

20  Q.  And now I want to ask you about murder and attempted

21  murder.  What's the maximum penalty for murder and attempted

22  murder?

23  A.  Well, for murder is death penalty, but death penalty has

24  not been used in Israel.  And for attempted murder is 20 years,

25  if I'm not mistaken.  I can check that.

F2BTSOK2                          Sfard - cross

```
1    Q.  And I think you and I spoke about a number of the
2    perpetrators in these cases, and a significant number of them
3    were actually convicted of murder.  Do you remember that?
4    A.  Yes.
5    Q.  And so those are people who are serving at least one and in
6    many cases multiple life sentences, right?
7    A.  That's right.
8    Q.  And so you said that there's only one percent of the people
9    in jail for security offenses who -- or one percent of the
10   indictments that were for murders, am I remembering that right?
11   A.  During a certain time period, yes.
12   Q.  If somebody wanted to separate out murder from lesser
13   crimes, that would be pretty easy for them to do, right?
14              MR. ROCHON:  Objection, your Honor.
15              THE COURT:  Sustained to the form of the question.
16   Q.  How easy do you think it would be to separate out -- to
17   identify the murderers as opposed to the non-violent criminals,
18   based on their indictments?
19              MR. SATIN:  Objection to who is the one doing this,
20   your Honor.
21              THE COURT:  I'm going to sustain it again as to form.
22   I don't think that's even much of a different question than you
23   asked before.
24              MR. ROCHON:  I changed the form.
25              THE COURT:  Not much.  What are you trying to ask?
```

F2BTSOK2                          Sfard – cross

1   Q.  Would you have the ability, based your knowledge, to

2   distinguish between those indicted for murder and those

3   indicted for non-violent crimes?

4           MR. SATIN:  Same objection.

5           THE COURT:  I'm going to sustain it.  Get right to the

6   heart of it.

7   Q.  Isn't it a fact that only one percent of those indicted are

8   indicted for murder?

9   A.  At a certain time period which we have the figures for,

10  yes.

11  Q.  And so isn't it a fact that it would be very easy to

12  identify those murderers and decide how to treat them if one

13  wanted to treat them differently?

14          MR. ROCHON:  Objection to form.

15          THE COURT:  Overruled.  Answer the question.

16  A.  If you had the database of prisoners and the offenses they

17  were charged or convicted with, you could assemble a list,

18  yeah.

19  Q.  And based on such a list, you could treat the murderers

20  differently from people who had non-violent offenses, right?

21  A.  Well, if you have a list, you can do whatever you want with

22  the list, yeah.

23          MR. YALOWITZ:  Thank you, nothing further.

24          THE COURT:  Any further questions?

25          MR. ROCHON:  Your Honor, there is a couple, but I

F2BTSOK2

1    think in light of the Court's rulings that I prefer to approach

2    the bench before we get to them.

3                THE COURT:  If it's something that I said is not in,

4    it's still not in.

5                MR. ROCHON:  I know that.

6                THE COURT:  If it's something I said was in, you can

7    ask.  Is there something magical about being here that gives

8    you guidance on?

9                MR. ROCHON:  Yes, I always find it magical.  It would

10   be helpful.

11               THE COURT:  Ladies and gentlemen, thank you for your

12   patience.  I will keep this moving along today.  I get tough

13   with the lawyers.

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F2BTSOK2

1           (At sidebar)

2           MR. ROCHON:  I want to -- they keep us from mentioning

3    any of the individual cases,  they keep us from mentioning why

4    everyone pleads guilty.

5           THE COURT:  What do you want to do?

6           MR. ROCHON:  Why do 95 percent of the people plead

7    guilty?

8           THE COURT:  Well, we assume 95 percent of the people

9    plead guilty because they believe that it's to their advantage,

10   as opposed to not pleading guilty.  Is there another reason why

11   95 percent of the people plead guilty?

12          MR. ROCHON:  There actually is.

13          THE COURT:  What reason?

14          MR. ROCHON:  We think there's no due process in the

15   system.  People faced with that are forced to plead guilty

16   because they have no other option.  Mr. Yalowitz knew that and

17   he walked right into it and tried to take advantage of it.

18          THE COURT:  Mr. Rochon, I want you to take a guess as

19   to what my position is on this subject.  Take a real good

20   guess.

21          MR. ROCHON:  I know your position, but I need you to

22   give me the ruling because --

23          THE COURT:  The ruling is he has not opened the door

24   to that.

25          (Continued on next page)

F2BTSOK2

 1                  (In open court)

 2                  MR. SATIN:  We have no questions.

 3                  THE COURT:  Thank you, sir, you can step down.  You

 4     can get the next witness.

 5                  MR. HILL:  Your Honor, the defendants call Mr. Shawqi

 6     Issa.

 7      SHAWQI ISSA,

 8           called as a witness by the Defendants,

 9           having been duly sworn, testified as follows:

10     DIRECT EXAMINATION

11     BY MR. HILL:

12     Q.  Good morning.

13     A.  Good morning.

14     Q.  Would you please introduce yourself to the ladies and

15     gentlemen of the jury?

16     A.  My name is Shawqi Issa.

17     Q.  Mr. Issa, do you have a job today?

18     A.  I am minister of agriculture and social affairs at the

19     Palestinian government.

20     Q.  Have you ever held any other positions within the

21     Palestinian government?

22     A.  Yes, I was the minister of detainees and ex-detainees.

23     Q.  Sir, let's talk a little about your background.  Where did

24     you get your education?

25     A.  Well, first I went to university in Moscow where I studied

F2BTSOK2                         Issa – direct

1    international law.  After that I went to Holland to the Hague

2    where I studied human rights international law.  Then I studied

3    at Uppsala University in Sweden environment and protection law,

4    and then I spent a year at Harvard here in the States visiting

5    the school of human rights program at law school.

6    Q.  Now prior to becoming part of the Palestinian government,

7    what did you do for a living?

8    A.  I was a human rights lawyer.

9    Q.  And where did you practice human rights law?

10   A.  In the West Bank in Palestine.

11   Q.  Now we heard some testimony about something called a

12   technocratic government.  Are you part of that technocratic

13   government?

14   A.  Yes.  This is what they call us now, because this last

15   government, it was a government under two or three conditions.

16   One of them that none of the ministers are members of any

17   political party, and that this government must support and

18   implement the program of the quartet.

19   Q.  What is the program of the quartet?

20            MR. YALOWITZ:  Objection.

21            THE COURT:  Overruled, he can answer.

22   A.  The quartet is a committee, the United States, the United

23   Nations, the European Union and Russia.  And this committee of

24   the four oversees and controls the peace negotiations and peace

25   process between Palestinians and Israelis and they put together

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2BTSOK2                        Issa – direct

```
 1    what is called a road map, it's a political program how to go

 2    ahead with --

 3              MR. YALOWITZ:  Objection.

 4    A.  -- peace process.

 5              THE COURT:  No, he can finish his answer.

 6    A.  And one of the conditions was that this government, its

 7    job, let's say, is to work together with the quartet to support

 8    this program of peace negotiations.

 9    Q.  Before we talk about the substance of your testimony, I

10    want to ask you a little bit about your personal life.  Are you

11    married?

12    A.  Yes, I am.

13    Q.  How long have you been married?

14    A.  Well, since 1996.

15    Q.  Do you have any children?

16    A.  18 years.

17              I have two daughters.

18    Q.  How old are your girls?

19    A.  14 and 10.

20    Q.  Now Minister, you mentioned that in the past you had been

21    the minister of detainees affairs and ex-detainees affairs, is

22    that correct?

23    A.  Yes, correct.

24    Q.  For what period of time did you hold that position?

25    A.  For about three, four months last year.
```

F2BTSOK2                        Issa – direct

1   Q.  Prior to holding that position, did you have familiarity

2   with the Palestinian ministry of detainees affairs and

3   ex-detainees affairs?

4   A.  Yes, during my work as a human rights lawyer, all these

5   years in Palestine, I was in contact with all the ministers and

6   the organs who deals with issues related to the society members

7   who I used to protect from violations of human rights.  So I

8   know what is the ministry doing.

9   Q.  As a result of your work as a human rights lawyer in

10  Palestine, did you become familiar with the laws and

11  regulations and work of the ministry of detainees affairs?

12  A.  Yes.

13          MR. HILL:  Your Honor, may I approach?

14          THE COURT:  Yes.

15  Q.  Minister, I handed you what is in evidence as plaintiff's

16  trial Exhibit 512, a copy of the law that pertains to security

17  detainees.  Are you familiar with this law and its related

18  regulations?

19  A.  Yes, I am.

20  Q.  How does the Palestinian Authority go about determining

21  whether a prisoner is a security detainee for the purpose of

22  this law?

23  A.  Actually it's not the Palestinians who decide, it's the

24  Israelis.

25  Q.  Can you explain what you mean?

F2BTSOK2                        Issa - direct

1    A.  All these detainees are held in Israeli jails, so some of

2    whom -- some of them are criminals and some are what they call

3    security detainees.  So the ministry of detainees in Palestine

4    deals with the second category, the security prisoners, and

5    they get the information from the Israelis who is security

6    detainee according to the records of the Israeli military

7    courts.

8    Q.  So does the Palestinian Authority do anything to determine

9    whether someone is a security detainee for purposes of this law

10   other than receive that information from the State of Israel?

11   A.  Well, the ministry of detainees, in order to work with any

12   case, any prisoner or his family, they must present to the

13   ministry Israeli recommends that he is a security criminal.

14   Q.  You mentioned that there are two categories of prisoners in

15   Israeli prisons, there is what is called the security prisoners

16   and what we'll call the criminal prisoners, right?

17   A.  Right.

18   Q.  Are the criminal prisoners -- are the families of criminal

19   prisoners eligible for any benefits under Palestinian law?

20   A.  Yes, of course.

21   Q.  How would the family of a criminal prisoner go about

22   obtaining benefits under Palestinian law?

23   A.  Well, first, the ones who are inside the Israeli jails,

24   they all get what we call cantina, which is $100 a month for

25   each prisoner.  This goes to criminals and security prisoners.

1    And the ministry bills that to the Israelis, they get a monthly

2    payment from the Israeli officials, how many prisoners they

3    have and how much the ministry must pay.  So this goes to both,

4    criminals and security.  And the other thing is the families,

5    the families of the criminals get benefits from the social

6    affairs ministry.

7    Q.  And I think you said this earlier, but you serve as well as

8    the minister of social affairs, right?

9    A.  Yes, I am now the minister of social affairs.

10   Q.  So if the family of a regular criminal, as opposed to a

11   security detainee, wants to receive benefits from the minister

12   of social affairs, could you explain in general how they go

13   about doing that?

14   A.  Well, the ministry of social affairs, as in any other

15   country, takes care of the families who are on special needs or

16   under poverty line or have emergency or special condition that

17   the ministry must prove aid to them.  So as part of this, the

18   families of the prisoners, when they don't have their income,

19   the ministry of social affairs must provide them with aid.  And

20   there are many programs there, there is the cash payment

21   monthly, and there is the food vouchers, and there is a program

22   to give some of these families, if they are able, a loan to

23   start small business, services of social affairs ministry

24   provide to these people.

25   Q.  Now you mentioned that the ministry of detainees affairs

F2BTSOK2                        Issa - direct

1   makes payments for what you said was a cantina to the Israeli

2   prison system, right?

3   A.  Yes.

4   Q.  And what is that money that is given to the Israeli prison

5   system for the cantina used for by the prisoners?

6   A.  To buy things from the store inside the jail, like some

7   food, some -- whatever that's enough for them to buy, dessert

8   sometimes.  And this used to be before the peace agreement,

9   before the establishment of the Palestinian Authority, the

10  Israelis took care of this, and even right across for a time,

11  but I might say the Palestinian government is forced to pay

12  this money.

13  Q.  And is the amount of money that is paid for the cantina the

14  same for regular criminal prisoners and security prisoners?

15  A.  Yes, for everyone, it's the same thing.

16  Q.  Minister, could you explain -- I know there's two different

17  systems for security prisoners and criminal prisoners in terms

18  of benefits to their families, right?

19  A.  Yes.

20  Q.  Could you explain roughly how those benefit levels compare?

21  That is, does the prisoner of -- a security detainee get a

22  different type -- I don't think a different type, a different

23  amount of benefit -- let me start the question again.

24          MR. YALOWITZ:  Objection.

25          THE COURT:  Why don't -- let's take it step by step.

F2B8SOK3                        Issa - direct

1    Q.   You mentioned that there are two different systems.  Right?

2    One for security prisoners and one for regular criminal

3    prisoners, in terms of the benefits their families can get,

4    right?

5           MR. YALOWITZ:  Objection.

6           THE COURT:  Overruled.

7    A.   Yes.

8    Q.   Can you compare, roughly, the levels of benefits those two

9    different groups of prisoner families receive?

10          MR. YALOWITZ:  Objection.

11          THE COURT:  I am going to sustain as to form.

12          Rather than ask him to compare, ask him about one and

13   then ask him about the other.

14   Q.   We have heard testimony about the levels of payments that

15   are made to the families of security prisoners already.

16          Can you explain how those levels of payments compared

17   to the benefits available to the families of regular prisoners?

18          MR. YALOWITZ:  Objection.

19          THE COURT:  Why don't you ask him about regular

20   prisoners and then ask him about security prisoners.

21   Q.   You mentioned that the regular prisoners could receive cash

22   payments, they could receive food vouchers, they could in some

23   instances receive --

24          THE COURT:  Question?

25   Q.   How does that level of benefits compare to what is paid to

F2B8SOK3                          Issa - direct

1   security prisoners?

2                THE COURT:  Sustained.

3                How much do they get?

4                Come on, guys.

5                THE WITNESS:  OK.  Shall I answer?

6                THE COURT:  Yes, please.

7   A.   The security -- let me say, first, before the establishment

8   of the Ministry of Detainees, everyone was taken care of by the

9   Social Affairs Ministry.  Even before the Palestinian

10  government, the Israelis did that.  The Social Affairs

11  Department during Israeli government in Palestine, they did

12  take care of these prisoners.

13               When the Palestinian government established the

14  special ministry to deal with the security prisoners, they paid

15  to these families according to different elements -- the

16  members of the family, how many kids, whatever, how many years

17  the prisoner spent in the prison, and if the family has income,

18  other income, this also affect what the ministry gives them.

19  Q.   Why are there two different systems for security prisoners

20  and regular criminals in terms of benefits that get paid to

21  their families?

22               MR. YALOWITZ:  Objection.

23               THE COURT:  Overruled.

24  A.   Well, the reason for establishing a special ministry for

25  the security prisoners is actually a political reason.  These

F2B8SOK3                          Issa - direct

1    are so many.  Since Israeli occupied, since 1967 until

2    recently, more than 850,000 --

3              MR. YALOWITZ:  Objection.

4              THE COURT:  I am going to sustain the objection.

5    Let's go on to something else.

6    Q.  Can you explain the current rationale for the two systems?

7    A.  OK.  In short, the Palestinian government felt that in

8    order to get more support from the people of Palestine to the

9    peace process and to its peaceful program, and not leaving

10   these wide range of families as a target for radical groups,

11   they have to give them a value because they have a lot of

12   influence in the society.  In West Bank, we have only 3 million

13   Palestinians.  So when you compare the numbers, you will find

14   each house has a prisoner.

15             MR. YALOWITZ:  Objection.

16             THE COURT:  Sustained.

17             Let's go on.  Do you have anything else for him?

18   Q.  Is there a security reason for having a different system

19   for security detainees as opposed to regular criminals?

20             MR. YALOWITZ:  Objection.

21             THE COURT:  Sustained.

22   Q.  What does the Palestinian Authority hope will happen as a

23   result of a different system for security detainees?

24             MR. YALOWITZ:  Objection.

25             THE COURT:  Sustained.

F2B8SOK3                          Issa – direct

1           MR. HILL:  I will tender the witness.

2           THE COURT:  Mr. Yalowitz, do you have some questions

3    for this witness?

4           MR. YALOWITZ:  Bear with me one second.  I may not.

5           No questions.

6           THE COURT:  Thank you, sir.  You can step down.

7           (Witness excused)

8           MR. ROCHON:  We would like a short break before the

9    next witness consistent with our earlier discussions.

10           THE COURT:  Let's take a break, ladies and gentlemen.

11           Don't discuss the case.  Keep an open mind.  I will

12    see you in ten minutes.

13           (Jury exits courtroom)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F2B8SOK3

1              (Jury not present)

2              THE COURT:  What are we doing next?

3              MR. ROCHON:  The next witness would be Mr. Shehadeh,

4    and we haven't finished our discussion.  I have asked him to

5    step out briefly while we do that.

6              THE COURT:  What do you want him to say?

7              MR. ROCHON:  On this last witness, I know you moved

8    Mr. Hill along expeditiously, but I think the court should have

9    allowed the questions, and I would like to briefly explain why.

10             THE COURT:  Yes.

11             MR. ROCHON:  The plaintiffs have made much of prison

12   payments in this case.  Frankly, our position overall is they

13   have made too much and they don't bear on the specific

14   incidents in this case.  But nonetheless, they got in that

15   testimony over objection and their witnesses said that these

16   reflect the policies in supporting terror.

17             The defendants have a completely different view as to

18   why they are made and that in fact they assist in fighting

19   terror because otherwise other elements in the society will

20   take the prisoner issue and use it to undermine the government,

21   including Hamas, Hezbollah, and others, who will throw money at

22   those families and try to -- essentially, it's a war of the

23   minds there, and that's actually going on right now.

24             THE COURT:  Don't we already have that testimony?

25             MR. ROCHON:  We have some of it.

F2B8SOK3

1          THE COURT:  We have all of it.  Nothing that you said

2    is not before this jury.

3          MR. ROCHON:  I understand.  This is coming from the

4    man who ran the Ministry, as well as the Social Affairs

5    Ministry, and so he is in a different position than simply a

6    security person.

7          THE COURT:  What is he going to say differently?

8          The bottom line is, I sustained it for several

9    reasons.  One, it's cumulative.  Two, I tried to move you along

10   to ask some appropriate questions in the right form.  I think

11   the way the questions were posed was inappropriate.  I think

12   the answers the way they were given, particularly his reference

13   to politics, I think is an inappropriate answer.  I don't think

14   he is in a position to even testify to the politics of making

15   payments, and the politics of making payments are irrelevant.

16         If he had been directly asked and he had simply

17   responded that we make these payments -- as a matter of fact,

18   he did respond.  I didn't strike any of his testimony.  He

19   responded the same thing that was said the day before.  We make

20   these payments because if we don't make the payments, we are

21   afraid they are going to align themselves with terrorists and

22   that's why we make the payments.

23         Do you think you have got something else to add or

24   some other basis to add it that wasn't asked, you can tell me

25   and I can consider it.  I think we have been through all of

F2B8SOK3

1    this.  I think the political tinge of this repeated testimony

2    is inappropriate and I think it is cumulative.  I am not even

3    sure that you have demonstrated a basis that this witness is in

4    any position to opine on the politics of the PA.

5            MR. ROCHON:  I think he is in a pretty good position

6    to opine on the politics.  First of all, he is an appointed

7    political official who has touched both relevant agencies and

8    has run both of the agencies.  And, whether we like it or not,

9    the prisoner payments is a political issue, and for us to be

10   confined -- in my client's society, this is one of the most

11   significant political issues.

12           THE COURT:  Fine.  If you want to argue that, you have

13   this record to argue that.  You put that information in and

14   this witness doesn't have anything further to add in that

15   regard.  As I said, for all those other reasons, the way it was

16   asked and the way it was answered, I think it went beyond the

17   bounds of what we are discussing.  I am running out of patience

18   to try to limit the lawyers and have lawyers simply go in

19   directions where I told the lawyers we weren't going, and I am

20   going to put a stop to it.

21           MR. ROCHON:  I didn't think that prisoner payments was

22   one of those areas, Judge.

23           THE COURT:  Just about everything is one of those

24   areas because we have talked about everything and I have given

25   you real clear rulings about where I felt you ought to go.  And

F2B8SOK3

1    there is no surprise as to what I think is admissible on that

2    issue as opposed to 99 percent of the issues that we have

3    repeatedly gone on, including the one we addressed at sidebar,

4    which is real clear, that now you thought you had an

5    opportunity to slip in something that I made clear was not

6    going to come in in this case.

7              MR. ROCHON:  I didn't slip in.  That's why I went to

8    the bench.  It's the opposite of slipping it in.  I thought you

9    had ruled that way, but I need a ruling sometimes.

10             THE COURT:  I gave you a ruling ten times on that

11   issue.

12             MR. ROCHON:  But if I think something has opened the

13   door -- I think for him to talk about the plea system and why

14   everyone pleads guilty, I realize I lost that.  I am moving on.

15   But on this issue, this witness would have said, for

16   instance --

17             THE COURT:  I heard what he said.

18             MR. ROCHON:  -- if he had been allowed to continue on

19   the political issues, for instance, the plaintiffs have made

20   much of the increase in payments that were made in 2011.

21             THE COURT:  It's irrelevant.

22             MR. ROCHON:  You let it in.

23             THE COURT:  Excuse me.  You objected to that

24   testimony?

25             MR. ROCHON:  We did.

F2B8SOK3

1              THE COURT:  To what testimony?

2              MR. ROCHON:  To the fact that they used a document

3    that had two laws on it, one of them old and one new, and they

4    were using a document that included the new law as well as the

5    old law, which included the increases.

6              THE COURT:  What does it have to do with the politics?

7              MR. ROCHON:  That is what I am trying to explain.

8         The reason for that was that after the Gilad Shalit

9    release by Israel, which was negotiated with Hamas, and Hamas

10   got all of these prisoners out, it was undermining the

11   Palestinian government and allowing Hamas to win the hearts and

12   minds of the populous over this prisoner issue.

13             THE COURT:  You think this witness is in a position to

14   testify to that from his personal knowledge?

15             MR. ROCHON:  Exactly.

16             THE COURT:  Well, I don't.  I am glad you have given

17   me that further showing because that's a further reason why I

18   would have rejected it, to have him opine on the politics and

19   the influence of Hamas.

20             He wasn't here as an expert witness on Hamas or the

21   politics of the relationship between Hamas and the PA.  It's

22   time to focus this trial and go back to what the real issue is.

23   That is not the issue in this case.

24             MR. ROCHON:  We didn't want prisoner payments.  We

25   objected completely to prisoner payments.

F2B8SOK3

1          THE COURT:  Then you can continue to ignore it because

2     you know it has nothing to do, and you can tell the jury it has

3     nothing to do with what their burden is or what they have to

4     prove in this case.  I am sure you can clearly articulate that

5     to the jury.

6          MR. ROCHON:  It's difficult because it's come in.  The

7     plaintiffs, the first day of their first expert was all about

8     prisoner payments.  Half of these boxes are full of prisoner

9     payment records.  They went through what Abdullah Barghouti

10    gets paid this year and last year, even though it has got no

11    relevance.  We objected to that.

12         Now for it to be said that it's not relevant is

13    unfair.  I didn't make it relevant.  Mr. Yalowitz made it

14    relevant.

15         THE COURT:  The only relevance of prisoner payments is

16    whether or not there is a good reason for making it, a bad

17    reason for making it, they could have made a different choice

18    and why they didn't make a different choice, and that evidence

19    is before this jury.

20         Now, to try to tinge it with, oh, we think politically

21    it's better if we do this, and to say that five times through

22    five different witnesses, particularly in the context of the

23    overall politics with Hamas, we are beyond that point.  I don't

24    want to hear any more witnesses on that issue and let's move on

25    and get to what is really the issue before this jury.

F2B8SOK3

1          Is there anything else we need to address because I

2     want you to get your third witness on, and if we finish that

3     witness quickly, be ready to put on your fourth witness.

4          MR. YALOWITZ:  So I think the next witness ought to be

5     Robinson.  And the reason I think it ought to be Robinson is

6     because I think Mr. Rochon is bluffing with Shehadeh.

7          THE COURT:  He is not bluffing because in five minutes

8     I am going to tell him to call his next witness.

9          MR. YALOWITZ:  Let's bring him on then.

10          THE COURT:  Is that who you're calling next?

11          MR. ROCHON:  Shehadeh.

12          THE COURT:  Do we need to discuss him any further?

13          MR. ROCHON:  Not on our account.

14          THE COURT:  Mr. Yalowitz, is there something we can

15     discuss so you don't need to keep popping up?

16          MR. YALOWITZ:  This is the guy they said he is going

17     to say he looked out his window and saw that all the buildings

18     were destroyed.

19          THE COURT:  He can say that.

20          MR. YALOWITZ:  He is being called as an expert

21     witness.

22          THE COURT:  That's not expert testimony.

23          MR. YALOWITZ:  Right.  So it's inappropriate, number

24     one.

25          Number two, he is going to talk about the Oslo

F2B8SOK3

 1    Accords, and we have heard enough testimony about the Oslo

 2    Accords.

 3              THE COURT:  Is there something relevant that he is

 4    going to testify to with regard to the Oslo Accords?

 5              MR. HILL:  I only want him to say two things that are

 6    not yet in evidence.

 7              THE COURT:  What is that?

 8              MR. HILL:  They are that as a result of the Oslo

 9    Accords, Israel continued to carry the responsibility for

10    defending against external threats, as well as the

11    responsibility for overall security of Israelis for the purpose

12    of safeguarding their internal security and public order.

13              THE COURT:  Who cares?  What difference does it make?

14    That is what I am trying to understand.  Give me the relevance.

15              MR. HILL:  It's relevant to respond to the evidence

16    that the PA should have prevented the attacks by arresting

17    people.  So the jury needs to know that overall responsibility

18    for that after the Oslo Accords was not the PA's job, that was

19    the Israelis' job.

20              THE COURT:  I assume he is in a position on the other

21    hand to also say that there are similar obligations placed on

22    the PA and the PLO in that regard.

23              MR. HILL:  That's in the record.  I want to tell the

24    jury that the overall responsibility remained with the

25    Israelis.

F2B8SOK3

1              I also want to tell the jury that the Israelis

2    retained exclusive jurisdiction over any crimes that occurred

3    outside of the Palestinian territories or any crimes against

4    Israelis.

5              THE COURT:  Say that again.

6              MR. HILL:  Israelis, under the terms of the accord,

7    retained exclusive jurisdiction over any crimes that occurred

8    outside of the territories -- in other words, in Jerusalem,

9    which is where all these attacks took place -- or that involved

10   Israelis, which all of these attacks did.

11             MR. YALOWITZ:  It's not relevant.  It's confusing.

12             THE COURT:  Why does that make a difference in terms

13   of, one, what the Palestinian Authority or PLO obligations

14   were, or why is that relevant one way or the other as to

15   whether or not they were involved in these six terrorist

16   attacks?

17             MR. HILL:  It involves the question of whether the PA

18   personnel, who allegedly perpetrated these attacks, were doing

19   so within the scope of their employment.

20             THE COURT:  How does that make a difference whether

21   it's within the scope of their employment?

22             MR. HILL:  Because the terms under which the PA was

23   created prohibited PA forces from operating in those areas and

24   from investigating those attacks.

25             THE COURT:  Maybe you're trying to find something that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2B8SOK3

 1    I don't even think is in this case.  Who cares?  Nobody is

 2    saying that they are responsible for these terrorist acts

 3    because they didn't arrest terrorists.  The theory here, and

 4    the facts and the evidence the jury has to consider, is whether

 5    there is any basis to conclude that they were knowing and

 6    intentionally participating in these terrorist attacks.  That's

 7    been my position.  That continues to be my position.  I don't

 8    know what theory you think that your client is responsible

 9    other than that.

10         MR. HILL:  If the plaintiffs are not going to be

11    allowed, for example, to argue that because Nasser Aweis and

12    Abdel Karim Aweis were on the Zinni list and they weren't

13    apprehended, that that somehow is evidence of our liability,

14    that's fine.

15         THE COURT:  It may somehow be evidence of their state

16    of mind.

17         MR. HILL:  In that case I would like the jury to

18    hear --

19         THE COURT:  They could have arrested them.  Right?

20         MR. HILL:  I would like the jury to hear --

21         THE COURT:  What this guy has got to say doesn't

22    change that.  They still could have arrested him.  They were

23    asked specifically to arrest him.  How does that change it?

24         MR. HILL:  The point is for the crimes that occurred

25    outside of the territory or occurred to Israelis, the PA

F2B8SOK3

1    actually had no jurisdiction to operate for those crimes.

2    That's the point I want the witness to make.

3         THE COURT:  That is an unfair and false impression.

4    They did have some authority.  They had the authority that was

5    given to them to investigate, arrest, detain those individuals

6    who were present in the Palestinian territories that they

7    believed were committing terrorist acts.

8         MR. HILL:  I understand.

9         THE COURT:  Isn't that the only issue?

10        MR. HILL:  That's the issue.

11        THE COURT:  Nobody is arguing they had to run into

12   Jerusalem and arrest people.  Do you think somebody has made

13   that argument?

14        MR. HILL:  I think it will take three minutes to get

15   the witness to explain that the PA had no ability to operate --

16        THE COURT:  That's not true.  They had a security

17   responsibility.

18        MR. HILL:  Within area A.

19        THE COURT:  Right.  And there is no dispute in this

20   case as to whether or not they had authority to arrest people

21   in Jerusalem.

22        MR. HILL:  Very well.

23        THE COURT:  I don't know what else you want the jury

24   to get from that.  If that's all you want to call him for,

25   that's not an issue.

F2B8SOK3

1          MR. HILL:  The other area I want to call him about, as

2     the time passed, since he lived in Ramallah, from his personal

3     knowledge, how the ability of the PA police was limited by

4     subsequent incursions by --

5          THE COURT:  What relationship did he have to the

6     police that puts him in a position to do so?  Just a lay

7     observer?

8          MR. HILL:  He was not in the police at the time, but

9     he is aware that on March 11th the Israeli army came to

10    Ramallah and stayed for three days, until March 14.

11         THE COURT:  I am not going to allow that.

12         MR. HILL:  I want him to testify to that.  If I can

13    just make my proffer.

14         THE COURT:  You can make your proffer, but I am not

15    going to allow it.

16         MR. HILL:  There was evidence in the case in the form

17    of Plaintiffs' Exhibit 148 that Mohammed Hashaika escaped from

18    the Mukataa when the Israeli army invaded Ramallah.  That is in

19    evidence.  It's important for us, to establish the credibility

20    of that statement, that we demonstrate that the Israeli army in

21    fact came to Ramallah before the date of the bombing in which

22    the Bauers were injured, which was March 21.  So I want this

23    witness, who has personal knowledge of that incursion, to say I

24    was in Ramallah on those dates and I know that the army came on

25    the 11th and they stayed until the 14th.  I want to do that to

F2B8SOK3

1   buttress the document which Mr. Yalowitz challenged the

2   reliability of.

3          THE COURT:  What document?

4          MR. HILL:  Plaintiffs' Trial Exhibit 148, the GIS file

5   that indicates that Hashaika escaped when the Israeli army

6   invaded Ramallah.  And I want Mr. Shehadeh to establish the

7   date of that invasion so the jury can tie them together to show

8   that in fact there was an incursion into Ramallah shortly

9   before the Bauer bombing so they can see the credibility of the

10  assertion that they escaped during the invasion.

11         THE COURT:  That is totally inappropriate for the

12  purpose of which you say you want to offer it.  It is

13  inadmissible, and I am not going to let you slip in -- and

14  that's still my word -- slip in the fact that, and I must say

15  for at least a second time, the fact that the Israeli military

16  were all over the streets with their tanks and took over the

17  Palestinian territory so nobody could do any effective act.

18         If you have someone who investigated these individuals

19  in the police department who will come in here and say, I was

20  looking for this guy, I could not find this guy because I was

21  tripping over tanks, then you bring that person in here and you

22  let that person say that.  We are not going to do what you're

23  attempting to do, and I know what you're attempting to do.

24         MR. HILL:  For the record, let me finish the proffer.

25         He would testify that the Ramallah police station was

F2B8SOK3

1    destroyed in October 2000.  He would testify that the PSS

2    headquarters was destroyed in early April 2002.  He would

3    testify that as of the dates of the June 19, 2002 bombing and

4    the July 31, 2002 bombing, the Israeli army was still present

5    in Ramallah and preventing the PA police --

6                THE COURT:  No reference to the Israeli army.  I

7    cannot be any clearer than that.  No reference to the Israeli

8    army.

9                Do we have an understanding about that?

10               MR. HILL:  It's already in the--

11               THE COURT:  Do we have an understanding about that?

12               MR. HILL:  I hear, your Honor.  There is a document

13   that plaintiffs put in evidence that talks about what happened

14   when the army invaded Ramallah.  That's in evidence.  All I

15   want to do is have the witness, who was in Ramallah, explain

16   the dates on which the Israeli army was there.

17               THE COURT:  No reference to the Israeli army.

18               MR. HILL:  I understand the court's ruling.

19               MR. ROCHON:  The other parts, without referring to the

20   other parts, the dates that the destruction occurred, without

21   reference to the Israeli army, is important.  Because the last

22   witness who testified about this did not give those earlier

23   dates.  Mr. Shehadeh knows the earlier dates.

24               THE COURT:  If this witness wants to say the police

25   station was destroyed on such and such a date, and the

F2B8SOK3

1    headquarters was destroyed on another date, you can have him

2    testify to those limited facts.

3            MR. HILL:  Could he testify to the fact that a curfew

4    was imposed on those dates?

5            THE COURT:  No.

6            MR. ROCHON:  We will need to instruct the witness.

7            THE COURT:  You can or you can send him home.  We are

8    not doing this.

9            Just for illustration, you have absolutely no basis in

10   this record to argue that the police department could not and

11   did not do something that they were obligated to do because of

12   a curfew.  You have no such basis in this record to say that.

13           Now, if you have got somebody who is the head of the

14   police department and says my guys were getting ready to arrest

15   Mr. X and 10:00 came and they told us, no, everybody has got to

16   go home, you bring that witness in.  That's relevant testimony

17   for the jury to logically conclude that they couldn't do their

18   law enforcement responsibility because there was a curfew.

19           Think about what you're saying to me.  You want to say

20   that because there was a curfew that all of the police

21   departments had to run into their houses and couldn't come back

22   out, and if they were getting ready to arrest somebody and that

23   is somebody who is relevant to this case, that they didn't

24   arrest because of the curfew.  If you have somebody who wants

25   to say that, that they didn't arrest Mr. Barghouti or somebody

F2B8SOK3

1    else because they were getting ready to arrest him and then the

2    curfew was imposed and they were made to get off the street

3    rather than go down the street to arrest him first, then you

4    bring that person in.

5         But you and I both know there is no such testimony.

6    No one can testify to that.  And you cannot imply that and try

7    to argue that simply because there was a curfew that somehow

8    the police department was dysfunctioned.  There is no evidence

9    that way, and this guy just simply saying, oh, I had to go home

10   at 10:00 because the Israelis imposed a curfew does not do it.

11             MR. ROCHON:  Yes, sir.

12             THE COURT:  So you better figure out how much or how

13   little is worth putting this guy on for, and that's very

14   little.  If you want to call him, fine, you can call him.  But

15   those are the parameters.  Again, it's not a real big secret

16   that this is my position.

17             MR. ROCHON:  Here is what I want to do.  Our case is

18   obviously speeding up because we have had legal discussions.

19        We had anticipated that we would play our deposition

20   designations on Tuesday, but I think given how things have

21   moved I would prefer to do it this afternoon.

22             MR. YALOWITZ:  This is the first I am hearing.

23             THE COURT:  Mr. Yalowitz, quiet.

24        Tell me what you want to do.

25             MR. ROCHON:  Use our deposition designations.  You

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2B8SOK3

1    have already ruled on them.  It's just a question of reading in

2    the portions in which --

3              THE COURT:  You want to do that this afternoon.

4              MR. YALOWITZ:  I want --

5              THE COURT:  Mr. Yalowitz, wait, if you want me to hear

6    from you.  I am not going to tell you to wait again.  I am

7    going to just tell you I am not going to hear from you at all.

8              Mr. Rochon, you have another witness.

9              MR. ROCHON:  Right.

10             THE COURT:  You can call one or two more witnesses.

11             MR. ROCHON:  I would like to call Shehadeh.

12             THE COURT:  You had two more witnesses.

13             MR. ROCHON:  Yes.

14             THE COURT:  I would like to put them on.

15             MR. ROCHON:  Our goal is to have our expert at the

16   end.  And I may not get my goal, but I do want to do it after

17   the deposition designations.

18             THE COURT:  If he is here to testify, I assume he is

19   going to testify today.

20             MR. ROCHON:  I want to do my deposition designations

21   first.

22             THE COURT:  How long do you think that will take?

23             MR. ROCHON:  About 40 minutes.

24             THE COURT:  You can do your deposition designations,

25   then you call that witness, and then we can adjourn for the

F2B8SOK3

1    day.

2           MR. ROCHON:  That is fine.

3           On the deposition designations, there is one issue we

4    did want to raise with the court.  Remember you wrote

5    handwritten what was in and what was out on our designations.

6    You wrote it on what had been proffered by the plaintiffs and

7    then your clerk provided us a copy of the rulings.

8           On one of them, as to Fayyad, at page 61 and 62 --

9           THE COURT:  I don't have the document I gave you.

10   Something I said was out you want in?

11          MR. ROCHON:  No.

12          THE COURT:  Something I said was in you want out?

13          MR. ROCHON:  No.  The plaintiffs, because they had

14   prepared it in their notes, had included that this particular

15   testimony opens the door to rebuttal testimony by Marcus.  I

16   don't think the court ruled on that.

17          THE COURT:  I haven't.

18          MR. ROCHON:  I wanted to discuss that before we played

19   it.

20          THE COURT:  What is the statement?

21          MR. HILL:  We can play it.  It's very short.

22          THE COURT:  You can just read it.

23          MR. ROCHON:  It's at page 61 and 62 of the Fayyad

24   deposition.

25          THE COURT:  Tell me what it's about.

F2B8SOK3

1              MR. HILL:  It's about what Intifada means.

2              THE COURT:  Go ahead.

3              MR. HILL:  The witness says that no one organized the

4     Intifada and he condemned violence.

5              THE COURT:  Who condemned it?

6              MR. HILL:  At the time, he was the prime minister.

7              MR. ROCHON:  Fayyad.

8              MR. YALOWITZ:  This is a combination.

9              THE COURT:  OK.  That's basically the subject matter.

10             MR. HILL:  Another one is that the witness said he

11    condemned suicide terrorism.

12             MR. ROCHON:  Then he condemned violence.

13             The plaintiffs have said that opens the door to

14    Marcus.  I don't want to open doors if I can help it.

15             THE COURT:  Mr. Yalowitz.

16             MR. YALOWITZ:  This is what we talked about yesterday

17    about Ashrawi.  If they want to come with public statements by

18    senior PA or PLO officials saying, I was against violence, here

19    is my statement of what I said at the time, they can't have it

20    both ways.

21             THE COURT:  This isn't a public statement; this is an

22    examination.

23             MR. YALOWITZ:  Quite frankly, I was trying to listen

24    to what he was saying.  They represented to me this morning

25    that they were not going to offer depositions today.  So it's

F2B8SOK3

 1    the first I am hearing about since I was told.  Since I walked

 2    in the courtroom, they have been on again off again.  I haven't

 3    had a chance to go back and look at what they are doing.  Once

 4    again I am being ambushed.

 5            THE COURT:  You're not being ambushed.  All you have

 6    to do is make sure they are reading the portions that I wrote

 7    on that piece of paper.  You don't get to cross-examine the

 8    deposition.

 9            MR. YALOWITZ:  I agree.  Our view is when we had time

10    to go through it carefully and look at it, my reaction, and I

11    went through these myself, my reaction was that opens the door.

12            Now, they understand that's my reaction.

13            THE COURT:  I am not convinced that that is the case.

14            MR. YALOWITZ:  They can make an informed decision and

15    we will discuss it if they offer it.

16            THE COURT:  I don't mean this the way Mr. Rochon took

17    it, but I know you would like to slip in Mr. Marcus.

18            MR. YALOWITZ:  I don't want to slip him in at all.

19            THE COURT:  I don't mean you're trying to do something

20    behind my back.  I just mean you want to try to get it through

21    the backdoor when you can't get it in the front door.

22            So you want Marcus on.  You would love to have the

23    jury hear Mr. Marcus and his opinions about whether or not

24    these guys are terrorists.  We have discussed him.  He was not

25    relevant then.  He was not admissible then.  He is not

F2B8SOK3

1    admissible now.  These things don't make him admissible.

2              If you want to cross-examine any witness, and I let

3    you cross-examine the other witness about their in-court

4    statement about whether they were for or against terrorism, I

5    assume that if there is some cross-examination about this

6    witness which is inconsistent with that in his deposition, you

7    could read that portion if you want.

8              This witness has already been deposed.  He is not here

9    live.  What he said under oath at that point in time is what he

10   said.  You offered his testimony, portions of his testimony.

11   They have right to offer other portions of his testimony.  You

12   can't change the testimony.

13             MR. YALOWITZ:  I understand the court's ruling on the

14   depositions.  We went over that.  I will say my recollection is

15   on Marcus, we had discussions.  You didn't make a ruling

16   because I said, if I want to bring him I will apply to bring

17   him.

18             THE COURT:  You may be right.  I will take your word

19   for it.

20             MR. YALOWITZ:  You have never ruled that he has got

21   inadmissible testimony.  You certainly expressed views and we

22   have had discussions, and I am not saying I don't have an idea

23   of where your head is at, but there has not been a ruling that

24   he is inadmissible.  I think if the defendants want to take

25   that risk they can make a reasoned judgment.

F2B8SOK3

1          THE COURT:  I see no reason why Mr. Marcus should

2     testify.  If you convince me otherwise before they rest or

3     after they rest, I will hear you.  But if that's the only

4     rebuttal witness you have, and he would be a rebuttal witness,

5     then I don't anticipate we are going to have a rebuttal case.

6          MR. YALOWITZ:  I understand where you are with Marcus.

7     Let's move through the depositions and get to the next witness.

8          THE COURT:  I know where we are at this point.  The

9     lawyers start to get a little antsy toward the end of the trial

10    because obviously this is it.  So stay focused.  Let's start

11    thinking about the jury.  You have to start thinking about how

12    you're going to argue to the jury.  This case is in.  I

13    guarantee there is not a whole lot new that the jury is going

14    to learn from now until next week.

15         MR. YALOWITZ:  We are ready to go.

16         THE COURT:  My sense of the jury, they are ready to

17    hear from you.  They don't want to hear a whole bunch of

18    repetitive stuff or sit there while you come up to the sidebar

19    and argue about the form of a question.

20         Let's take five minutes.  Let's prepare to do this

21    witness.  Let's prepare to do the deposition testimony.  Let's

22    prepare to do the witness after that so we can limit as much of

23    the time today and we can talk about jury instructions and we

24    can limit as much time as we need to use on Tuesday.

25         MR. ROCHON:  I don't think we will finish the expert

F2B8SOK3

1    today, but I do want a lot some time --

2              THE COURT:  I am hopeful that we might.

3              (Recess)

4              MR. ROCHON:  I was still instructing the witness.

5              THE COURT:  You need a couple of more minutes.

6              (Pause)

7              THE COURT:  Let's get the jury.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2B8SOK3

 1          (Jury present)

 2          THE COURT:  Mr. Rochon, would you call the defense's

 3   next witness.

 4          MR. ROCHON:  We call what will be a relatively brief

 5   witness, Raja Shehadeh.

 6    RAJA SHEHADEH,

 7        called as a witness by the defendants,

 8        having been duly sworn, testified as follows:

 9   DIRECT EXAMINATION

10   BY MR. ROCHON:

11   Q.  Sir, would you please tell us your name.

12   A.  My name is Raja Shehadeh.

13   Q.  Mr. Shehadeh, where do you live?

14   A.  I live in Ramallah.

15   Q.  We have heard a lot about that.  Ramallah is in the West

16   Bank?

17   A.  Yes.

18   Q.  How long have you lived there?

19   A.  I have lived there all my life.

20   Q.  I hate to do this to you, but how old are you?

21   A.  I am 63.

22   Q.  What is your job?

23   A.  I am a lawyer and a writer.

24   Q.  Just if we could get a real brief background from you,

25   please.  Where did you go to law school?

F2B8SOK3                          Shehadeh - direct

1    A.  I studied law in London.

2    Q.  At what school?

3    A.  At the College of Law, and I did examinations and became a

4    barrister of law.

5    Q.  After you became a lawyer, have you practiced law?

6    A.  I have been practicing law since 1979.

7    Q.  I take it since you have been living in Ramallah that's

8    where you practice law?

9    A.  This is where I practice law, in Ramallah.

10   Q.  You said you are also a writer?

11   A.  I am a writer.

12   Q.  We are not going to get into all of your books.  How many

13   have you written?

14   A.  I have published 14.

15   Q.  I guess for a writer the question is not how many you have

16   written but how many you have published.

17   A.  Sometimes you write and it's not published.

18   Q.  When was your most recent book published?

19   A.  Tomorrow is the publication date of my most recent book.

20   It's called Language of War, Language of Peace:  Palestine,

21   Israel and the Search for Justice.

22   Q.  When was your first book written?

23   A.  1982.  It was called The Third Way.

24   Q.  Are you married?

25   A.  I am married.  I have a wife.

F2B8SOK3                        Shehadeh – direct

1   Q.  Do you have extended family that also lives in Ramallah?

2   A.  My brother lives in Ramallah and my mother and father lived

3   in Ramallah.

4   Q.  I am going to take you back, if I could, to the period of

5   2000 to 2004.  I have actually brought you all this way just to

6   ask you a couple of questions.

7   A.  So be it.

8   Q.  Did you know where the Ramallah police station was located

9   in the beginning of the year 2000?

10  A.  I went to school at the American Quaker School and the

11  Ramallah police station is right next to the school I studied

12  at.  It's an old building.

13  Q.  Can you tell us, sir, the Ramallah police station, what its

14  condition was in October of 2000?

15  A.  On October 12, it was destroyed and its condition became

16  that it was leveled, completely leveled.

17  Q.  Was any part of the structure remaining standing and

18  operable after October 12, 2000?

19  A.  After it was leveled, there is nothing left.

20  Q.  My second question:  Are you aware of the location in the

21  beginning of 2002 of the PSS headquarters?

22  A.  Yes, I am.

23  Q.  Where was the PSS headquarters located at the beginning of

24  2002?

25  A.  It was located in a suburb of Ramallah, which is adjacent

F2B8SOK3                        Shehadeh – direct

1    to Ramallah, which is called Beitunia.

2    Q.  You said that was a suburb.  How close is Beitunia to, say,

3    downtown Ramallah?

4    A.  A few minutes drive.

5    Q.  You said that the headquarters of the PSS was there at the

6    beginning of 2002?

7    A.  That's right.

8    Q.  Can you tell me, please, and tell the jurors more

9    importantly, what the condition was of the PSS headquarters in

10   April of 2002?

11   A.  It was heavily destroyed on April 2.

12   Q.  When you say heavily destroyed, can you describe its

13   appearance after that?

14   A.  Toppled.  The building was toppled.  The roof was

15   collapsed.

16   Q.  Was there any other damage that you saw?

17   A.  Extensive damage.

18   Q.  Thank you for coming here, sir.

19          MR. ROCHON:  I have no further questions.

20          THE COURT:  Mr. Yalowitz, any questions?

21          MR. YALOWITZ:  No questions.

22          THE COURT:  Thank you, sir.  You can step down.

23          (Witness excused)

24          MR. ROCHON:  Next we have some deposition designations

25   that we are going to present to the jury, if we can.

F2B8SOK3                          "Abu Libdeh"

 1          THE COURT:  Are we doing this by video or doing it by

 2   reading?

 3          MR. ROCHON:  Some of each.  One from column A and one

 4   from column B.  Two videos, one to read.  I will let Mr. Hill

 5   decide which order he wants to present it.

 6          MR. HILL:  Why don't we start with the reading of the

 7   deposition of Hassan Abu Libdeh.

 8          THE COURT:  Tell us how you want to conduct it.

 9          MR. ROCHON:  We have a colleague who will be the

10   reader.

11          MR. HILL:  Could we put the picture of Mr. Abu Libdeh

12   up on screen so the jury can be reminded?

13          THE COURT:  And your name is?

14          THE WITNESS:  Andrew Wise.

15          THE COURT:  Mr. Hill.

16          MR. HILL:  This is portions of the deposition that

17   were read during the plaintiffs' case, additional portions that

18   were read during the plaintiffs' case.

19          THE COURT:  All of these depositions are depositions,

20   portions of which the jury has already heard?

21          MR. HILL:  No, sir.  These are portions which the jury

22   has not heard.

23          THE COURT:  I misstated it.  All of these depositions

24   are depositions that the jury have heard some testimony from.

25          MR. HILL:  In the plaintiffs' case, yes.

F2B8SOK3                           "Abu Libdeh"

1          THE COURT:  These are not new people.  These are the

2     same people but additional designations.

3          MR. HILL:  Yes, your Honor.

4          MR. YALOWITZ:  Can we just get a representation from

5     the defendants of what they are going to read so that we can

6     follow along.

7          THE COURT:  I assume you're going to read exactly what

8     we all discussed previously.

9          MR. HILL:  Yes, your Honor.

10          THE COURT:  Anything more or anything less?

11          MR. HILL:  Not with respect to this one.  Less with

12     respect to the others.

13          THE COURT:  Why don't you read this one.  I think they

14     know about this one and then you can let them know how you are

15     going to read the others.

16          MR. HILL:  Let's begin on page 7 of the transcript.

17     "Q.  When did you first begin to work for the Palestinian

18     National Authority?

19     "A.  I started working for the Palestinian National Authority

20     in the first day the Palestinian Authority was declared in the

21     year 1993."

22          THE COURT:  Could you put the mic a little closer to

23     you.

24     "Q.  Where were you born?

25     "A.  I was born in the village of Arabba in the second sector

F2B8SOK3                          "Abu Libdeh"

1   of Jenin.

2   "Q.   Where did you grow up and do your elementary and high

3   school schooling?

4   "A.   I went to elementary school in the village of Arabba and

5   then I went to go to school in Jordan, in Amman, and then I

6   went back to the city of Jenin to high school.   And then I went

7   from Jenin to Ramallah to study in the University of Birzeit."

8              MR. HILL:   Page 9.

9   "Q.   Did you receive your degree from that university?

10  "A.   My first degree, yes.

11  "Q.   What was your first degree?   A bachelor's?

12  "A.   I got a first degree in math.

13  "Q.   Did you continue schooling directly or did you go to work

14  before returning to school?

15  "A.   I worked for a year in the University of Birzeit, and then

16  I travelled to the United States and I received a second degree

17  from the University of Stanford.   And then I went back for two

18  years to the University of Birzeit and went back to the United

19  States and completed a doctorate in the University of Cornell

20  in the year '88.

21  "Q.   So you have a master's degree from Stanford University in

22  California, and a doctorate from Cornell University in New

23  York, is that right?

24  "A.   Yes."

25             MR. HILL:   Page 10.

F2B8SOK3                              "Abu Libdeh"

1    "Q.  You have also served as a research assistant and lecturer

2    at Cornell University, isn't that correct?

3    "A.  Yes."

4              MR. HILL:  Page 24.

5    "Q.  In that context, and without belaboring the point, tell

6    the court, please, generally the history as you understand it

7    of the establishment of the Palestine Liberation Organization

8    and how it, as you observed it, came to be the negotiator in

9    the establishment of the Palestinian National Authority?

10   "A.  The Palestinian Liberation Organization was created by

11   Arab League in 1964 to represent the Palestinian people, and

12   the Arab League in 1974 voted unanimously that the PLO is the

13   sole, legitimate representative of the Palestinian people.

14              "In view of this voting, the Palestine Liberation

15   Organization represented to the best of its ability the

16   interest of the Palestinian people, and when the negotiation

17   started we were chosen, myself and other delegates, to

18   negotiate on behalf of the PLO the organization being the sole,

19   legitimate representative of the Palestinian people.

20   "Q.  Were you, from a history point of view, historical

21   perspective, were you at any time prior to 1983 active in any

22   capacity with the Palestine Liberation Organization prior to

23   the time that you came on to the negotiating committee that

24   resulted in the establishment of the Palestinian National

25   Authority?

F2B8SOK3                         "Abu Libdeh"

1    "A.  The PLO does not have a register of, quote, members,

2    especially at that time those who resided in the West Bank or

3    in Gaza.  But we all Palestinians recognize that the PLO is the

4    sole, legitimate representative of the Palestinian people and

5    being one of them, I was one of those represented by the PLO.

6    "Q.  Did you hold any position at any time with the PLO prior

7    to the time that you came on to the negotiating committee that

8    led to the establishment of the Palestinian National Authority?

9    "A.  No."

10            MR. HILL:  Page 27.

11   "Q.  At any time have you ever been affiliated with any

12   particular political party or political movement within

13   Palestinian society?

14   "A.  Yes.  As a member of Fatah organization and many NGOs.

15   "Q.  In what year did you first become affiliated with Fatah?

16   "A.  1973 as a member."

17            (Continued on next page)

18

19

20

21

22

23

24

25

F2BTSOK4                          "Abu Libdeh"

1   "Q.  And have you continued your membership in Fatah

2   continuously from that time until now?

3   "A.  Yes."

4         MR. HILL:  Page 30.

5   "Q.  Please tell the Court whether or not prior to

6   September 13, 1993 the Palestinian National Authority existed

7   as entity or an organization?

8   "A.  It did not exist."

9         MR. HILL:  Page 31.

10  "Q.  And what is it that occurred, sir, to cause and permit the

11  creation of the entity known as the Palestinian National

12  Authority?

13  "A.  The successful negotiations between the Palestine

14  Liberation Organization and Israel led to the signing of the

15  Declaration of Principles, and then later on to the signing of

16  the Oslo agreements, and this is the basic regulatory

17  foundation for the Palestinian National Authority.

18  "Q.  Would you describe the legal entity of the Palestine

19  National Authority as being an organization, a non-governmental

20  organization, a corporation, or what, if you know?  And

21  understand your expertise is not in legal matters, but I would

22  like to know what is your view since you're here as the

23  designated representative of the Palestine National Authority.

24  "A.  The PNA is a legal structure which was born as a result of

25  the successful negotiations between the PLO and Israel, and it

F2BTSOK4                          "Abu Libdeh"

1    is governed by its basic law and the various subsidiary

2    sectoral laws and the binding principles of the negotiated

3    agreements.  The reference for its work, its functions, is the

4    Oslo agreements and the various laws that have been put

5    together and approved by the Palestine Legislative Council,

6    which is how this entity works."

7                 MR. HILL:  Page 33.

8    "Q.  Please, Dr. Abu Libdeh, explain to the Court the role of

9    the Palestine Liberation Organization in the Palestinian

10   National Authority after the establishment of the Palestinian

11   National Authority on September 13, 1993.

12   "A.  There is no direct role the PLO plays in the functions of

13   the PNA.  The PNA is an organ created as a result of

14   negotiations, bound by the agreements with Israel, and the laws

15   that have been established since then, and bound also by the

16   political program of the PLO being the sole legitimate remember

17   active of the Palestinian people entering into agreements with

18   Israel.  All of the agreements signed with Israel were signed

19   by the PLO on behalf of the Palestinian people, including those

20   agreements creating the Palestinian National Authority."

21                 MR. HILL:  Page 35.

22   "Q.  So we understand then that the Palestinian National

23   Authority, otherwise referred to as the PNA or PA, did not

24   exist prior to the signing of the documents on the White House

25   lawn on September 13, 1993, is that correct?

F2BTSOK4                         "Abu Libdeh"

1    "A.   Correct.

2    "Q.   And when you use the term Oslo Accords, to what were you

3    referring, please, sir?

4    "A.   In general, Oslo Accords refers to all documents signed

5    between the PLO and Israel, and specifically Oslo I, which was

6    signed in 1994, and Oslo II, which was signed in 1995.

7    Q.   Is there a difference, sir, if you would please explain to

8    the Court, between what was signed on the White House lawn on

9    September 13, 1993 and what you now referenced as the Oslo

10   Accords and Oslo I and II?

11   A.   The first one, the DOP, the Declaration of Principles, is

12   the framework agreement between Israel and the PLO.   Oslo I was

13   phase one of the detailed arrangements reflecting the agreement

14   in 1993, and Oslo II is further details of this agreement.   The

15   first one was referring to, and in the phase one of Oslo I was

16   referring to arrangements for Gaza and Jericho, and Oslo II was

17   referring to the whole of the West Bank and Gaza."

18             MR. HILL:   Page 42.

19   "Q.   Although the Declaration of Principles of September 13,

20   1993 created the Palestinian National Authority, do I

21   understand from your testimony that in order for it as a entity

22   to be able to grow so it could function on behalf of the

23   Palestinian people, various institutions and infrastructures

24   had to be created?

25   "A.   Correct.

F2BTSOK4                           "Abu Libdeh"

1    "Q.  Now explain to the Court how long the process of

2    establishing institutions and infrastructures for the

3    Palestinian National Authority went on during that time period,

4    because, of course, common history reflects that Prime Minister

5    Dr. Salam Fayyad speaks even today about infrastructure and

6    institutions.  So explain to the Court, please, the growth and

7    development of the infrastructure and institutions from

8    September 1993 forward, if you would, please, sir.

9    "A.  The signing of the Declaration of Principles opened the

10   way for completing the institutional arrangements, to fund

11   those institutions that will lead to the development of the

12   services that were not attempted by the occupation, and to

13   strengthen those that will be transferred to the Palestinian

14   Authority upon the signing of the Oslo I and Oslo II.  So the

15   process, first of all, there is nothing in history that says

16   from the day one to day X this thing is created, this is a

17   process, but the bulk of the process probably took through

18   1996."

19            MR. HILL:  Page 45.

20   "Q.  Dr. Abu Libdeh, did the Palestinian National Authority as

21   an entity sign the Oslo I agreements in 1994?

22   "A.  No.

23   "Q.  Which parties signed that agreement?

24   "A.  That agreement was between the PLO and Israel.  This was

25   signed by the PLO and Israel."

F2BTSOK4                        "Abu Libdeh"

1          MR. HILL:  Page 50.

2     "Q.  In relation to the civil administration transfer of

3     authority from the State of Israel to the Palestinian National

4     Authority over the West Bank in Oslo II, please tell the Court

5     whether or not geographic lines or definitions were established

6     as it relates to the areas geographically that were transferred

7     for civil administration from the State of Israel to the

8     Palestinian National Authority.

9     "A.  In Oslo II the West Bank was divided into three zones.

10    One was called Zone A, where the Palestinian Authority was

11    assigned full authority functions and responsibilities,

12    including issues relating to security matters, the public order

13    in particular, and those areas where the city centers of the

14    West Bank.  This is one zone.

15         The second zone was designated as Area B, which refers

16    to most of the remaining populated areas, and in these areas,

17    designated as B, the Palestinian Authority was assigned the

18    functions and responsibilities in the civil spheres, that is to

19    say, to serve the people in civil matters with an overriding

20    security responsibility of Israel for Israel.

21         And the remaining areas of the West Bank were

22    characterized as Area C where the Palestinian Authority had no

23    responsibilities or authorities."

24         MR. HILL:  Page 82.

25    "Q.  And was there a legislative body in existence for the

F2BTSOK4                        "Abu Libdeh"

1   Palestinian National Authority for the time period 2000 to

2   2005?

3   "A.  Yes.

4   "Q.  What was the name of that legislative body?

5   "A.  The Palestinian Legislative Council."

6           THE COURT:  Page 87.

7   "Q.  So stepping back for a moment to the time period until the

8   death of the late Yasser Arafat, tell the Court, if you would,

9   who had elected Yasser Arafat as the president of the

10  Palestinian Liberation Organization after its creation?

11  "A.  Yasser Arafat ran for office on January 20, 1996, and he

12  won the elections to the office of the president of the

13  Palestinian Authority in 1996.

14  "Q.  And at the time that Yasser Arafat ran and became

15  president of the Palestinian Authority in 1996, was he then

16  serving as the president or the head of the Palestine

17  Liberation Organization?

18  "A.  Yes.

19  "Q.  Did he continue in that position?

20  "A.  Yes.

21  "Q.  Was he also the head of Fatah?

22  "A.  Yes.

23  "Q.  And did he continue in that position?

24  "A.  But these three different organizations each had its own

25  governance charter modalities of electing to office.  These are

F2BTSOK4                          "Abu Libdeh"

1    two, three different entities.  So yes, he happened to be in

2    each of those, but he assumed the office in each of those as a

3    result of a process that is limited to each of those.

4    "Q.  All right.

5    "A.  Independent of that."

6          MR. HILL:  Page 100.

7    "Q.  Let me ask you whether or not during the time period 1999

8    until the death of the late Yasser Arafat in 2004, he

9    maintained a separate office or headquarters for his

10   responsibilities as the head or chairman of Fatah as

11   distinguished from his responsibilities as the president of the

12   Palestinian National Authority.

13   "A.  Fatah is run by a body called the Central Committee, and

14   this central committee is composed of 18 members, has its own

15   headquarters, and Chairman Arafat is the chair of that.  So the

16   headquarters of Fatah is the place where the Central Committee

17   has its own headquarters.

18   "Q.  And at the Central Committee headquarters of Fatah for the

19   time period 1999 through November 2004 when Yasser Arafat

20   passed away, did the Central Committee of Fatah have an actual

21   address, offices, and buildings for the Central Committee of

22   Fatah?

23   "A.  Yes."

24          MR. HILL:  Page 105.

25   "Q.  For the same time period, from 2000 through 2004, please

F2BTSOK4                        "Abu Libdeh"

1    tell the Court whether or not any separate offices were

2    maintained -- and by "offices," I'm referring to physical

3    headquarters -- for the Palestinian Liberation Organization.

4    "A.  Yes.

5    "Q.  Did they have a separate office in Ramallah?

6    "A.  They had two offices, one in Gaza and one in Ramallah.

7    "Q.  And were they in separate buildings from the offices of

8    Fatah?

9    "A.  Yes.

10   "Q.  Were they in separate buildings from the offices of the

11   Palestine Liberation Organization?

12   "A.  Yes."

13            MR. HILL:  Page 108.

14   "Q.  In your capacity as the designated representative of the

15   Palestinian National Authority, please explain how, during the

16   time period between 2000 through 2004, Yasser Arafat, as the

17   president of the Palestinian National Authority, functioned in

18   his position simultaneously as the president of the Palestinian

19   National Authority and the chairman of the Central Committee of

20   Fatah and the chairman of the Executive Committee of the PLO.

21   A.  These are three separate institutions.  Each has its

22   governing body, the Central Committee for Fatah, the government

23   in terms of its ministries and so on, and the Executive

24   Committee of the PLO.  He is -- he was the chairman of this

25   Executive Committee because he chairs the Central Committee of

F2BTSOK4                              "Abu Libdeh"

1    Fatah, which is a member of the PLO, who happened to be the

2    largest member of the political parties.  And based on this

3    being the largest member of the political parties, they had the

4    right to nominate the chairman of the Executive Committee of

5    the PLO, and they nominated the chairman of Central Committee

6    of Fatah.

7            As far as the Palestinian National Authority is

8    concerned, Fatah, who is a member of the PLO, run for

9    elections, and they nominated him for office, and he managed to

10   get the necessary votes to become the chairman of the

11   Palestinian Authority.

12           So basically these three separate institutions, each

13   with its independent governance, had only one thing in common,

14   the chairman, but each has its own governance, policies, work,

15   schedule, and all the objectives, whatever it is, but this is

16   the way he became the one."

17           MR. HILL:  Page 111.

18   "Q.  Dr. Abu Libdeh, is as the designated representative the

19   Palestine Liberation Organization, can you please describe to

20   us, to the extent of your knowledge and observations, the

21   manner in which Yasser Arafat functioned during the course of

22   his business tenure as the common chairman of the Palestinian

23   Liberation Organization, chairman of Fatah, and president

24   simultaneously of the Palestinian National Authority.

25   "A.  Based on my own experience, Yasser Arafat wasn't

F2BTSOK4                        "Abu Libdeh"

1    functioning as a CEO of each of them, he was functioning as

2    something like the chairman of the board.  So he wasn't really

3    doing the business of managing the micro level functions of

4    each of these independent entities, but rather than having a

5    more remotely style of management, which could be characterized

6    as the closest you can get to the concept of having -- being

7    the chairman of the board, which is the case, and that the

8    executive functions are carried out independently within each

9    of the organizations.

10   "Q.  From the time period 2000 through 2004, can you please

11   describe, as the designated representative of the Palestinian

12   National Authority, the manner in which the PA, the PLO, and

13   Fatah conducted the business of the Palestinian National

14   Authority for the time period 2000 through 2004?

15   "A.  The business of the PNA was conducted of the PNA.  Fatah

16   has no direct management or administrative relationship with

17   the PNA.  Fatah is a political organization, a member of the

18   PLO, part of the platform of the PLO who has its policies and

19   strategic objectives, and whose chairman, being the president

20   of the PNA, elected president of the PNA, is making sure that

21   the PNA is in line politically with the policies and the --"

22              MR. HILL:  Page 113.

23   "A.  So there was never and still there is no administrative

24   relationship horizontally or vertically between Fatah and the

25   PNA.  The only relations or only link with Fatah and the PNA is

F2BTSOK4                          "Abu Libdeh"

1   the Fatah, being a member of the PLO, supports the government

2   of the PNA as long as this government is implementing the

3   policies, the strategic policies of the PLO.

4          That is to say, today, if Fatah is not happy with the

5   government, they do not -- or at the time they do not ask the

6   government or request the government or instruct the government

7   because there is no relationship.  The PNA is accountable --

8   the executive order, the executive branch of the PNA is

9   accountable to the head of government who is accountable to the

10  Legislative Council, which is part of the PNA."

11         MR. HILL:  Page 117.

12  "Q.  The designated representative of the Palestinian National

13  Authority, would you agree with the statement that the PA was

14  made accountable to the Executive Committee -- to the PLO

15  Executive Committee?

16  "A.  The PA?

17  "Q.  Yes.

18  "A.  The PLO Executive Committee, being the sole or the

19  executive committee of the PLO, the sole legitimate

20  representative of the Palestinian people, who entered into

21  interim contractual agreements with Israel, has found the PA in

22  accordance with the agreements.  And in regard, the PLO has the

23  full authority to dismantle the PNA or to instruct the PNA, in

24  terms of alignment with the political program objectives and

25  policies of the PLO, but no executive authority of the PLO over

F2BTSOK4                        "Abu Libdeh"

 1    the PNA."

 2                MR. HILL:  Page 119.

 3    "Q.  So can you please explain, for the time period of 1999

 4    through 2005, whether the Palestinian National Authority was

 5    responsible for the negotiations with the State of Israel, or

 6    whether those responsibilities were in the authority of the

 7    Palestinian Liberation Organization.

 8    "A.  Please define the word 'negotiations.'

 9    "Q.  Communications and discussions about issues relating to

10    governance and other functions within the area of the West Bank

11    and Gaza.

12    "A.  On issues relating to the exercise of the functions and

13    responsibilities of the PNA, in accordance with the Oslo

14    agreements, all communications with the Israeli side is done by

15    the PA.  Other communications relating to the final status and

16    the fates of the Palestinian territory and the fate of the

17    future relations with Israel, that is the function of the PLO."

18                MR. HILL:  Page 152.

19    "Q.  Dr. Abu Libdeh, please tell the Court what was or is the

20    'Second Intifada' and the meaning of the words 'Second

21    Intifada.'

22    "A.  The word "intifada" has no English translation.  If you

23    look at Webster's or whatever, it comes as is.  It is

24    universally accepted as one word in all languages.  It

25    describes the popular actions of the Palestinian public against

F2BTSOK4                          "Abu Libdeh"

1    the continuation of the occupation, and now it is used to refer

2    to any actions of protests or objection to something if it is

3    of popular nature."

4              MR. HILL:  Page 181.

5    "Q.  As you recall, Dr. Abu Libdeh, for the year of 2002, was

6    there any particular ministry of the Palestinian National

7    Authority government with which Marwan Barghouti was

8    affiliated?

9    "A.  No.

10   "Q.  To the best of your knowledge, sir, did Marwan Barghouti

11   in the year 2002 perform any functions for the Palestinian

12   National Authority except in his capacity as a member of the

13   Palestinian Legislative Council?  And I ask you this as the

14   designated representative of the Palestinian National

15   Authority.

16   "A.  No.

17   "Q.  And as the designated representative of the PA, you're

18   telling the Court that Marwan Barghouti had no other

19   responsibilities on behalf the Palestinian National Authority

20   in March of 2002 except as a member of the Palestinian

21   Legislative Council?

22   "A.  To the best of my recollection."

23              MR. HILL:  Page 185.

24   "Q.  Tell the Court whether or not, as the designee of the

25   Palestinian Authority, Marwan Barghouti is continuing even to

F2BTSOK4                    "Abu Libdeh"

1    the current time as a member of the Palestinian Legislative

2    Council?

3    "A.   Yes."

4            MR. HILL:   Page 200.

5    "Q.   For the time period 2000 through 2005, to what extent did

6    the Palestinian National Authority coordinate its activities

7    with the PLO in relation to issues of civil administration,

8    finance, foreign affairs, and to the extent you can answer it,

9    security?

10   "A.   The PLO has no business in dealing with the day-to-day

11   affairs of the Palestinian population of West Bank and Gaza.

12   The PLO represents the whole of the Palestinian people

13   everywhere.   The civil affairs of the population of the West

14   Bank and Gaza is managed by the PA on the basis of the mandate

15   given by the Oslo Agreements, and the program that the cabinet

16   and the vote of confidence on that basis.   And this is also

17   true for finance, with one exception.   In the finance matters,

18   and in the context of the reforms that were approved by the

19   Legislative Council in 2002, it was internationally agreed that

20   the single treasury account is established, and that the direct

21   authority of the finance ministry where the budget is executed

22   out of that ministry.   The foreign affairs is not a portfolio

23   which is part of the mandate of the PA.   The foreign affairs is

24   a function of the PLO.   And the security, the internal

25   security, is under the direct mandate of the PA."

F2BTSOK4                          "Abu Libdeh"

1                MR. HILL:  Page 228.

2    "Q.  Why, as part of the Olso Agreements, was the Palestinian

3    National Authority required to be accountable to what you have

4    described as the policies of the Palestinian Liberation

5    Organization?  What was the concern that led to that?

6    "A.  Because the PLO was committed to two-state solution and to

7    the program which was approved in the year 1988, which is a

8    program based on reaching a solution through negotiations.  The

9    PA, which is a subsidiary which was created by these

10   agreements, cannot really invent policies that are contrary to

11   the spirit and contractual arrangements between the PLO and

12   Israel.  Therefore, the PNA cannot, out of the blue, come out

13   and let's say withdraw recognition of Israel or announce

14   policies that are contrary to the policies and political

15   program of the PLO, which is based on the work toward the

16   two-state solution through negotiations.

17   "Q.  I think you mentioned earlier also that many of the

18   members of the Palestinian National Authority were elected, is

19   that correct?

20   "A.  Yes.

21   "Q.  The legislative counsel was elected?

22   "A.  They were elected directly by the people.

23   "Q.  There were presidential elections?

24   "A.  Through the presidential and legislative elections.  We

25   had one in 1996 where the president was elected and legislative

F2BTSOK4                          "Abu Libdeh"

1  council, and we had another one in 2005 where the president was

2  elected after the death of Yasser Arafat, and then in 2006 we

3  had legislative elections.

4  "Q.  And under Oslo, what would happen if a political party ran

5  for election on a party that was counter to the principles of

6  Oslo?

7  "A.  They cannot."

8              MS. MACHNES:  Your Honor, that concludes the reading

9  the deposition of Hasan Abu Libder.

10             THE COURT:  Could we do one more and go to one

11  o'clock?

12             MR. ROCHON:  The next one is a video, and I think we

13  have it queued up.

14             MR. HILL:  At this time we'll show the video

15  deposition of Hussein Al-Sheikh.  The jury previously had

16  portioned of his testimony read to them, but this is the actual

17  video.

18             (Video recording played)

19             MR. ROCHON:  That's it, Judge.

20             THE COURT:  Okay.  I kept you over.  I was trying to

21  move this along.  Let's take lunch.

22             Ladies and gentlemen, don't discuss the case.  Keep an

23  open mind.  I ask you to be back at 2:15 and we'll get started

24  a little early.  I'll see you at 2:15.

25             (Luncheon recess taken)

F2B8SOK5

1                        AFTERNOON SESSION

2                           2:20 p.m.

3              (Jury not present)

4              THE COURT:  Are we ready to continue?

5              MR. YALOWITZ:  Yes, sir.

6              MR. ROCHON:  Here is what I would like to do.  I would

7     like to give you an idea of what I think our itinerary is going

8     to be or ought to be.

9              We have about 12 minutes of video.  Then what I was

10    going to do this weekend was to make the decision as to whether

11    or not I had evidence from Mr. Robinson that was not going to

12    violate the Court's directives.  Glenn Robinson is our expert.

13             Here is where I am.  As I understand the Court's

14    rulings, I think all that I want from him I think might fall

15    afoul of your rulings, and that will cause me to not call him.

16             THE COURT:  In all these weeks I have accomplished

17    something.

18             MR. ROCHON:  As I like to say, I don't know how to

19    play electric guitar and the only way I can earn a living is by

20    being a lawyer.

21             I am going to make a decision today.  I am not asking

22    you to have us wait to Tuesday to make that decision, but I

23    would like to put on the record what I would like him to

24    testify to, not to irritate the court --

25             THE COURT:  Despite what it seems like, I don't get

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F2B8SOK5

1    irritated, and everyday is a new day.

2                MR. ROCHON:  I have witnessed that's the Court's view.

3    I have no quarrel with that.

4                So that's where we are.

5                What I am going to ask the Court for, the witnesses

6    from Palestine, we have been working their visa issues

7    throughout.  We are going to finish a little early.  I am going

8    to ask the Court to give us the indulgence to call them on

9    Tuesday because they are not here.  That has been a complicated

10   issue.  So I would ask for that leeway.  We have redactions to

11   talk about, maybe, although that's not my expertise, it's Ms.

12   Machnes and Mr. Satin.  We have instructions to talk about.

13               MR. YALOWITZ:  He is wasting time.

14               MR. ROCHON:  For the jury's sake, what I would be

15   asking the Court to do is play the video.  If I am wrong and I

16   persuade you that I can call Robinson, we would have to put him

17   on today.  I don't want to play a game where I make these

18   arguments and then change my mind later.  I can imagine my

19   colleague in front of me would be quite upset at that.

20               MR. YALOWITZ:  What makes you say that?

21               MR. ROCHON:  So that's where we are.

22               THE COURT:  Let me just throw in another fact here.

23               I am in a situation that I have made a commitment with

24   the former mayor to speak at his class on Monday afternoon at

25   4:00 at Columbia.

F2B8SOK5

```
 1              MR. ROCHON:  Monday or Tuesday?

 2              THE COURT:  Tuesday at 4:00.  I am trying to make a

 3    decision whether at this late date I can cancel that or whether

 4    or not we can still finish up what we need to do by about 3 or

 5    so, and I can go ahead and meet that commitment.  I would

 6    prefer that.

 7              MR. YALOWITZ:  Let me make a suggestion.  If they are

 8    going to call Robinson, I think we have got to start him today,

 9    and maybe we can finish him today.  I have a few questions for

10    him.  I met him.  Maybe I will call him as a witness if they

11    don't want him.  I understand why they may not want him.  It's

12    not because of the rulings because of his opinions.

13              Let's get him done or as far as we can today.  Mr.

14    Rochon and his team know that the redaction issue is not to

15    deal with Ms. Machnes on it because she doesn't know it.  Ms.

16    Romeo knows it.  She has been in the office and they can call

17    her any time they want.  That is like a stalling thing.  We are

18    not going to deal with that here in the courtroom, unless they

19    are ready to go on that, which it doesn't seem like they are.

20              I would like to get the jury back in the room --

21              THE COURT:  I don't hear you disagreeing on any point

22    at this point.  I thought that is what he just said.

23              What I anticipate, and I just need to know if there is

24    something that I am not anticipating, we are going to finish up

25    the deposition.  We are going to figure out today whether
```

F2B8SOK5

1    Robinson is going to testify.  If he is going to testify, he is

2    going to testify today.  If he is not, we are sending him home.

3    Then I anticipate that from, what I remember or know, that we

4    only anticipate possibly the two witnesses with regard to the

5    document or some others.

6             MR. ROCHON:  Four.  They just complained about two.

7             THE COURT:  We anticipate four more witnesses?

8             MR. ROCHON:  I bet you we don't end up putting on four

9    more witnesses next week.  You know as well as I do how these

10   things go.

11            THE COURT:  I know how they can go, how they should

12   go, and I know how sometimes they don't go.  I need to know

13   realistically from you how many hours of testimony do you

14   realistically think at this point.  And I understand and I

15   don't want to say that you're playing coy with Mr. Yalowitz,

16   but it's a little late in the day for you not to have a pretty

17   good idea of how you're going to wind up this case.  Nothing is

18   going to change except if you change it.

19            MR. ROCHON:  The only thing that is going to change is

20   if I change my mind.  I agree.  I told you that these people, I

21   am getting them over here to eyeball and see if I am

22   comfortable with the testimony if I need it.  And until I

23   eyeball a person and see how they are going to play, I don't

24   decide.  In my experience in life, and where I think this case

25   is, I think my case will certainly rest on Monday, even with

F2B8SOK5

1    your obligation.

2             THE COURT:  How many hours of testimony do you think

3    that realistically we would have to have anticipate to end

4    Tuesday?

5             MR. ROCHON:  Three or four.

6             THE COURT:  Three or four if you called all four

7    witnesses.

8             MR. ROCHON:  These are really narrow issues.  We are

9    not going to find out what the dog's name is or anything like

10   that.  It's pretty targeted stuff.

11            THE COURT:  At this point we have already talked

12   about --

13            MR. ROCHON:  The two people on the letter.

14            THE COURT:  Then that's what we are going to do.

15            How much more do you say of depositions?

16            MR. ROCHON:  14 minutes.

17            THE COURT:  Do you want to talk about Robinson now?

18            MR. ROCHON:  Yes.

19            THE COURT:  Let's get rid of Robinson.

20            MR. ROCHON:  There are things that he would say that

21   go to general incitement, the things you have kept out on both

22   sides.  We obviously disagree with some of the rulings, but I

23   am not trying to reargue anything.

24            THE COURT:  You want to both convince me to open up

25   the case so you can put in all of your incitement and they can

F2B8SOK5

1    put in all of their incitement?

2              MR. ROCHON:  No.  We want to keep it to the torts.

3              For instance, he has an opinion that some of these

4    most violent incidents occurred in reaction to two

5    assassinations by the Israelis at a time of a cease-fire.  But

6    he has no specific knowledge of any of the incidents in that

7    sense.  He is not a fact witness.  So he has that testimony.

8              THE COURT:  He may have a very legitimate opinion

9    about that, but that doesn't make it any more or less likely

10   that the PA and the PLO responded in the same manner that you

11   say individuals may have responded in light of that.  So it

12   doesn't advance the issues in this case.

13             If it made the ordinary guy on the street upset and

14   angry, it probably made the president of the PLO and the PA

15   just as angry and upset.  So that is not a basis for the jury

16   to determine who is responsible for the terrorist act.  That's

17   my reaction to that.

18             MR. ROCHON:  He would also testify that Arafat had

19   lost control of the street because they were so angry at the

20   failure to deliver a state and at the consequences of the

21   Israeli activities in the region and that therefore he had lost

22   commanding control.

23             THE COURT:  I thought we have a little bit of that

24   already in this case.

25             MR. ROCHON:  When I get near it, I notice the court

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2B8SOK5

1    doesn't like me to get too near it.  The relevant thing for him

2    is to focus on the Israeli actions, which I know you have tried

3    to keep out.

4         THE COURT:  As I say, the reason why he lost control,

5    again, doesn't advance one way or the other whether or not the

6    PA or the PLO was involved in the terrorist attack.  He may

7    have lost control because he had a physical disease, or he may

8    have lost control because of what you say the Israeli

9    government did.  But it doesn't advance the jury's assessment

10   of whether or not he, or people on his behest, or people who

11   took over control when he lost control, are still acting on

12   behalf of the PA or the PLO, if they were in fact involved in

13   the terrorist acts.

14        We have run out of a lot of hard facts.  So let me

15   give you the, oh, well, if he, quote, in general lost control,

16   that somehow is the argument of why he couldn't have done it,

17   it doesn't work that way.  You have given us the hard evidence

18   and now you guys are on the cloudy stuff here.

19        MR. ROCHON:  In short, we realize that we are not

20   trying a failure to prevent case.  We think some of the

21   plaintiffs' testimony, but certainly the testimony that he

22   would have to offer responds to this question of whether the PA

23   should have done more or whether the PA encouraged these

24   things; not these specific things, but just general sorts of

25   failure-to-prevent-type things.  And that's what the court has

F2B8SOK5

1    made pretty clear we are not trying.

2            Then, finally, you did not allow me to ask so I would

3    never call Mr. Robinson to testify about whether the IDF's

4    incursion and the reports of what they found were influenced by

5    propaganda or political influence.  I cross-examined or tried

6    to cross-examine Mr. Eviatar about that and you stopped me.

7            THE COURT:  Again, I don't know why that makes it more

8    or less likely that the PA committed these terrorist acts.

9    It's more prejudicial than probative.

10           MR. ROCHON:  Because I have been listening to you, we

11   think if he were to testify, that he would run afoul of your

12   rulings in these areas, and to the degree that he has other

13   limited testimony to give --

14           THE COURT:  It's not worth it.

15           MR. ROCHON:  And it would be hard to give that without

16   referring to those other things, and I think there would be

17   slippage and problems, and we would get into a place where you

18   have asked us not to get.

19           So unless I have persuaded you in this limited way

20   that those are appropriate topics for his testimony, I am going

21   to choose to not call him.

22           THE COURT:  Do you want to say something, Mr.

23   Yalowitz?

24           MR. YALOWITZ:  Look --

25           THE COURT:  You could have said no.

F2B8SOK5

1    MR. YALOWITZ:  Whether to call Mr. Robinson is up to

2  you and them.  I am ready to call him.  If they want to call

3  him, let's get him in here and get going.

4    MR. ROCHON:  I want to call him for those things.  If

5  he doesn't object, you're going to let me do it, I assume.  I

6  hope.

7    THE COURT:  If Mr. Yalowitz tells me to either

8  preclude his testimony because all of his testimony is

9  inadmissible, or let him testify and just preclude some of his

10  testimony, or just let you put him on up there and see how it

11  flies --

12    MR. ROCHON:  What I don't want to have is where I have

13  told him what I want from him, and then we start picking it

14  apart in front of the jury, irritating you and them.  That's

15  why I am doing it this way.

16    THE COURT:  I try to see it from their perspective.

17    Mr. Yalowitz, what do you want me to do with Mr.

18  Robinson?

19    MR. YALOWITZ:  I don't have a problem if they don't

20  call him.

21    THE COURT:  I didn't ask you that.

22    Do you have a problem if they do call him?  Do you

23  want me to preclude him from testifying?

24    MR. YALOWITZ:  Fine.

25    THE COURT:  Is that a yes?

F2B8SOK5

1          MR. YALOWITZ:  Yes.  Fine.

2          THE COURT:  If he is to give testimony in those areas

3    that we just discussed, and that is the purpose for calling

4    him, no, he should not be called for those purposes and should

5    not be put on the stand to respond in that manner, regardless

6    of which questions he is responding to.  So if you have

7    something else in a more limited fashion that avoids any of

8    that discussion, then you should call him for that limited

9    purpose and make sure that that limited purpose is an

10   admissible one.

11         MR. ROCHON:  The other areas have been well covered.

12   Would you like more on Oslo?

13         THE COURT:  I think the jury, we have all learned a

14   whole lot in the last few weeks.  I think they are more

15   educated on this than most people walking the street.

16         Quite frankly, right now, also in fairness to both you

17   and Mr. Yalowitz, I went painstakingly through this deposition

18   and a lot of the stuff that you are still trying to call

19   witnesses to repeat is even being repeated in this deposition

20   transcript.  We are beating a dead horse.  It's time that the

21   jury gets this.

22         MR. ROCHON:  I think the Fayyad one covers different

23   areas.  It's at least shorter.  And the court can tell the jury

24   that you denied my motion that they have popcorn while they

25   watch the video.

F2B8SOK5

1                THE COURT:  I reserve decision on that.

2                MR. YALOWITZ:  It's a joint motion.

3                So Robinson is out.

4                THE COURT:  We are not going to have Robinson.

5                Does that mean the only thing we are going to do is

6       finish the deposition testimony and then we are going to

7       adjourn?

8                MR. ROCHON:  Yes.  The only other witnesses that might

9       be called in the defense case would be the four that we

10      referenced.  There are no other witnesses.

11               THE COURT:  At this point, as they say, going to the

12      likely and unlikely list, as Mr. Yalowitz received it, it is

13      likely that we are going to hear from the woman who wrote the

14      memo?

15               MR. ROCHON:  Right.

16               THE COURT:  And it's not as likely that we are going

17      to hear from the last two.

18               MR. ROCHON:  Right.

19               THE COURT:  And I have already indicated that if you

20      put on the woman who wrote the memo, unless you give me a

21      specific proffer that compels me at some point, or Mr. Yalowitz

22      withdraws his objection to the person who basically at this

23      point just received the memo and, as you said, didn't consider

24      it to be important enough to do anything with, this whole

25      debate about whether or not it was seized or not seized, it's

F2B8SOK5

1    irrelevant since he already made up his mind he wasn't going to

2    do anything with it.  So I don't see why that is a relevant

3    debate here, because when he got it he said there is nothing

4    for me to do, and he put it aside and then it was seized.

5          My guess is we will have one, two or three witnesses,

6    which I would think we can either finish before lunch or by

7    3:00, and then I can keep my schedule and we can still have

8    some time this afternoon, the beginning of Tuesday and before I

9    have to leave to finalize the process, the jury instructions

10   and the verdict form, and what the issues are going to be and

11   how they are going to be presented to this jury.

12         I will ask you at some point to give me an estimate of

13   approximately how long you think you might be on summation.  As

14   I always say, I usually do not find it necessary to put time

15   limits on the lawyers, but if you give me an estimate and begin

16   to go way beyond that, I will usually inquire about whether or

17   not you're almost done.

18         I have a basic philosophy that by the time I ask you

19   to sit down, you would have lost the jury long before that.  I

20   am serious about that.  As long as you're making your points

21   and not being repetitive and making extraneous irrelevant

22   arguments, I will let you do it.  So I can start planning

23   basically how I can handle the jury in that process and what

24   they can expect.

25         I anticipate as early as Wednesday morning we are

F2B8SOK5

1    going to be going into summations.

2              MR. ROCHON:  Right.

3              MR. YALOWITZ:  Based on where we are in the case right

4    now, there are a couple of things that I am thinking about

5    doing on rebuttal.  If I do them, it would be very short.  I

6    would be addressing this business about Tirawi in a few

7    sentences, just to talk about the issue of when was he wanted

8    and when was he stopped being wanted and why.

9              THE COURT:  Through what kind of a witness?

10             MR. YALOWITZ:  Shrenzel.

11             THE COURT:  One of your expert witnesses.

12             MR. YALOWITZ:  Right.  And foundationalizing a couple

13    of documents that we talked about during the defendants' case

14    that sort of became relevant.  I am really thinking it's a half

15    an hour, something like that.  I sort of wanted to get a sense

16    of your views about that.

17             THE COURT:  We will talk about that and if you're

18    going to do that, be prepared to do that on Tuesday and we can

19    talk about whether or not it makes sense for you to be prepared

20    to do that or you can make a decision as to whether or not you

21    want to do that.

22             Anything else?

23             MR. ROCHON:  We should bring the jury in and make them

24    happy.

25             THE COURT:  Let's bring them in and they will be

F2B8SOK5

1    pleasantly surprised when we finish this and it's over.

2          (Jury present)

3          THE COURT:  Mr. Rochon.

4          MR. ROCHON:  Yes, your Honor.  Good news and bad news.

5    We have one more video to play.  That's the bad news.  And the

6    good news is I think we will be done.

7          JUROR:  One more video and done?  I'm sorry.

8          THE COURT:  When I say we are working out here to save

9    you time, I really mean it.  We are moving efficiently.  We

10   will talk about how we will plan for next week.

11         MR. ROCHON:  The video is cued up and it's of Salam

12   Fayyad who was seen previously in another video in the

13   plaintiff's case and this is another portion of that same

14   deposition.

15         And Mr. Yalowitz agreed that we both move the court to

16   provide popcorn during videos.

17         MR. YALOWITZ:  That's a joint motion.

18         THE COURT:  You promised me you wouldn't embarrass me

19   by saying that.

20         Motion denied.

21         (Videotape played)

22         MR. ROCHON:  That's the end of it.

23         THE COURT:  Ladies and gentlemen, you have two

24   choices.  You can sit around and wait for popcorn or you can

25   adjourn.

F2B8SOK5

 1            So this is what we are going to do.  Let me explain to
 2   you where we are and what I think we are going to be doing next
 3   week.  As I said, we are going to adjourn today.  We are not
 4   going to pick up until Tuesday after the holiday.  We are
 5   coming to the end of the testimony next week.  Obviously you
 6   have given significant time and attention to this case.

 7            Next week you move into what is the second phase and
 8   very important phase for you, the summations, and I will
 9   instruct you on the law and give you the case to begin your
10   deliberations next week.

11            So what I would like you to do is take the next few
12   days, get some rest, recharge your batteries.  Be ready to
13   continue next week.  I am hopeful and fairly confident that we
14   will finish the witnesses on Tuesday or Wednesday.  If we
15   finish the witnesses on Tuesday or Wednesday, we will have the
16   summations or closing arguments of the lawyers on Wednesday or
17   Thursday.  Then, after the closing arguments of the lawyers, I
18   will instruct you on the law and I will send you in to begin
19   your deliberations.

20            So that's what the schedule is.  I am hopeful that you
21   will be in deliberating on this case before the end of the week
22   next week, even though it's only a four-day week.  So that's
23   what we are planning on and working with the lawyers so we can
24   efficiently get to that point in the next few days and next
25   week.

F2B8SOK5

1      As I say, go home, get some rest, be ready to

2  continue.  That's what we are going to do next week.

3      Once we start deliberations, I am going to start

4  ordering you lunch.  So whatever period of time you deliberate

5  we will just send your lunches in and you can eat while you

6  deliberate or suspend deliberations and eat your lunch.  But we

7  will take care of you and I will explain the process to you

8  once the case is given to you for your deliberations.

9      With that said, have a good weekend.  I will see you

10 on Tuesday.

11     I am going to ask you to be here at 9:30 on Tuesday in

12 case we have more witnesses than I thought to wind the case up

13 so that we can start on time and get those witnesses done and

14 be ready to go ahead and proceed as quickly as possible to give

15 you the case.

16     Don't discuss the case.  Keep an open mind.  I will

17 see you on Tuesday.

18     Have a good night.

19     (Jury exits courtroom)

20     THE COURT:  I want to take some time just for a few

21 minutes and then we can gear everything up in terms of what we

22 need to address in terms of the verdict form, the jury

23 instructions and the claims as they will be presented to the

24 jury.

25     First, I know, Mr. Yalowitz, you haven't had an

F2B8SOK5

1    opportunity to respond to the letter I received from the

2    defense with regard to proposed jury instructions that I

3    received from Mr. Rochon this morning.

4              Let me just tell you my reactions to it and then you

5    can further argue, either side, with regard to my initial

6    reaction.

7              With regard to the witness prep, I have no problems

8    taking that out.  I don't know if Mr. Yalowitz has a strong

9    opinion or if he wants to think about it further.  It was iffy

10   when I put it in in the first place whether or not we really

11   needed it.  So unless there is a strong view one way or the

12   other, or there is a strong view to keep it in, I will take it

13   out.

14             MR. YALOWITZ:  I will accept the defendants'

15   suggestion that there is no evidence that their witnesses have

16   been prepared.

17             THE COURT:  OK.

18             MR. YALOWITZ:  Let me think about it.

19             THE COURT:  My inclination is just take it out.  I

20   don't think there is an issue for you to decide.

21             The second one, with regard to the photographs, I have

22   no problem with just indicating they are photographs of

23   individuals and scenes.  I am prepared to do that.

24             On the burden of proof, for the most part I agree that

25   the instruction that they asked, it's consistent with what the

F2B8SOK5

1    situation is.  Obviously the burden hasn't shifted to the

2    defendant for any reason.  The defendant has no burden with

3    regard to any of the issues.

4           Some of the language that I am choosing is a little

5    different than theirs but not much.  For example, in number 3

6    at the beginning, page 29, where they want to substitute each

7    plaintiff, I have no problem with that.  I put each individual

8    plaintiff has the burden of proving every element of his or her

9    claim by a preponderance of the evidence.  I am not wedded to

10   that language.

11          Then on page 30, where it says, the fifth line down,

12   you must decide that issue against, I will add on, the

13   plaintiff on the issue you are considering is what I have,

14   rather than the party having this burden of proof.

15          Five more lines down:  On the other hand, instead of

16   the party with this burden of proof, the plaintiffs need prove

17   no more than a preponderance so long as you find that the

18   scales tip, however slightly, in favor of the plaintiff.  And

19   what the plaintiff claims is more likely true than not true,

20   then that element would have been proved by a preponderance of

21   the evidence.  I think that's consistent with what they were

22   asking for.  That's my view of it.

23          I will give Mr. Yalowitz an opportunity, if he has a

24   different view, to be heard further on that before I make the

25   final decision.

F2B8SOK5

1          With regard to the damages, I don't have any problem

2     making an order change, which would basically be, one, what is

3     on -- I will work a little backwards.

4          MR. YALOWITZ:  I was hoping you put damages as the

5     very first thing.

6          THE COURT:  I am sure you would.

7          The multiple claims and multiple defendants, I am

8     going to move that up in front of damages.  I may move it up

9     even further.  I am trying to figure out where that should go.

10    I think I threw it in there as an afterthought.  So it will be

11    clearly ahead of damages but may even be ahead of the

12    substantive instructions, but let me just think about that.

13         Also, I am going to move forward the causation element

14    on 59 and 60.  I understand what their position is.  And move

15    back the damages instructions until after the causation

16    instruction.  I think that is consistent with how they have

17    reacted to that.

18         I want to give Mr. Yalowitz an opportunity to give me

19    some guidance as to what he thinks about the next issue.  I

20    have to pull out what I think is an appropriate -- well, no,

21    let me stop.  I am not there yet.

22         With regard to proximate cause, I am prepared to make

23    a minor change at this point, and I don't know whether or not

24    Mr. Yalowitz will have an objection to that or that would

25    satisfy the defense given their request.  Not fully what the

F2B8SOK5

1     defendants have asked for.

2            If you look at page 54, at the end of the first full

3     paragraph, that last line says:  If you decide that a plaintiff

4     is entitled to recover, only if you decide that the plaintiff

5     is entitled to recover, will you consider, I am going to say

6     his or her measure of damages.

7            But with regard to the next paragraph, addressing the

8     issue with regard to proximate cause, consistent with the way

9     the other language that I give, what I think is appropriate at

10    this time, and you can convince me something more or less

11    should be done, but I think that paragraph should read:  If you

12    find that plaintiff is entitled to recover from defendant PA

13    and/or defendant PLO, you must render a verdict in a sum of

14    money that will justly and fairly compensate that plaintiff for

15    all injuries and disabilities he or she sustained from the

16    terrorist attack.

17           That's the language that I think is appropriate.  As

18    far as I am concerned, once they find liability, any damages

19    that were sustained from the terrorist attack I believe is

20    appropriate for the jury would be a basis for the jury to

21    attribute to whatever defendant, one or both that they find.

22           MR. YALOWITZ:  I want to look at it.  But my initial

23    reaction is that sounds consistent with my understanding of the

24    law and the evidence.  I just want to see it in black and

25    white.

F2B8SOK5

1          THE COURT:  I think I might just fax it to you before

2      the week is out with the changes, and we can still change it

3      back if we have to.

4          On the next page, more directly to the defendants'

5      suggestion, where it says on the seconde line:  If you find

6      that defendant PA and/or defendant PLO is liable, this is the

7      way I want to change those next two sentences.

8          If you find that defendant PA and/or defendant PLO is

9      liable to a plaintiff, then you must award that plaintiff a sum

10     of money that will justly and fairly compensate him or her for

11     any injury proximately caused by either defendant's conduct.

12         Most of that I think I lifted almost word for word

13     from what the defense suggested, but I think that's an

14     appropriate way to say it.  They suggested I take out two

15     paragraphs below that the word furthermore.  I don't have any

16     problems with that.

17         I am still thinking about and trying to think of it in

18     the context about the intervening cause instruction.  I don't

19     have a strong feeling that it doesn't apply to someone for the

20     jury to evaluate that.  I forget what you pointed to in the

21     facts.

22         There may be an analysis, for example, with regard to

23     Chana Goldberg, about whether or not there is an intervening

24     cause.  I won't reference it any further than that.  I am just

25     trying to think about, and I don't have all the different

F2B8SOK5

1    parties available, but in the first instance you should decide

2    whether or not you have a legitimate argument to argue that the

3    jury should not be instructed with regard to intervening cause.

4    As I say, I haven't thought it completely out, but I have been

5    trying to remember what things might qualify.

6              MR. YALOWITZ:  I think it's a real hard argument for

7    them to make in the circumstances of this case.  It may go, if

8    they want to argue that some of the injuries wouldn't have

9    happened but for the second blow, I understand they want to

10   make that argument, but to suggest that there were no damages

11   because of an intervening cause, I don't see how they make that

12   argument.

13             THE COURT:  I am now evaluating that myself.  I

14   haven't had an opportunity to really -- I am going to look at

15   some instructions.

16             MR. YALOWITZ:  I haven't either.  I am just reacting.

17             THE COURT:  I agree that there is sufficient evidence,

18   and particularly if I change the instructions in the manner as

19   suggested with regard to proximate cause and those issues.  I

20   am not sure that doesn't address that and whether the other

21   things really do qualify as some intervening cause.

22             MR. YALOWITZ:  I understand the concept they are

23   trying to get at.  I just don't think that captures it.  I

24   think what we are trying to say is, don't give her extra, not

25   don't give her anything.

F2B8SOK5

1          THE COURT:  Even in more fairness to you, I think what

2     their argument is -- and even more straightforward than that,

3     it's really not intervening cause -- is that any injuries that

4     she suffered from those circumstances were not caused by the

5     act itself.

6          Now, you can argue that it was because -- as I say,

7     it's not an appropriate characterization.  There is sort of a

8     domino effect.

9          MR. YALOWITZ:  That was her testimony and they chose

10    to not cross her and present anything in rebuttal to that.

11    That was certainly her testimony.

12         THE COURT:  Let's put it this way.  I think they do

13    have the right to argue, if they wish to argue that, or have

14    the jury consider whether or not all of the things that she

15    suffered are as a result of the terrorist attack or those

16    injuries were proximately caused by the terrorist attack.

17         I think they have the right to evaluate that and it is

18    for them to determine whether or not they believe that that is

19    the case or that's not the case.  And my instructions to them,

20    either in a causation instruction or a separate intervening

21    cause instruction, would be appropriate for them to make that

22    evaluation.

23         Now, whether it really qualifies as an intervening

24    cause and whether there is something else with some other

25    defendants that they want to articulate, that's the other thing

F2B8SOK5

1    too.  I have got 25 plaintiffs and this is the only one that

2    comes to mind that there is an arguable argument about.  Think

3    about that more and look at that further.

4            With regard to the mitigation of damages, quite

5    frankly, my recollection goes back to where it started.  The

6    case started out that way and never ended up that way.  I think

7    we had evidence with regard to one plaintiff having to do with

8    economic or earnings loss.

9            Unless the defense argues that it applies to somebody

10   other than -- I don't know if it's related family members too,

11   that it's related to.  But I don't even remember what would be

12   the argument if that particular person didn't mitigate.

13           It's not going to be the major issue in this case, but

14   if you can articulate for me as we talk about it further, maybe

15   on Tuesday, what is this addressed to and what is the evidence

16   that you want the jury to evaluate under this instruction, then

17   I can have a clearer idea of whether or not it would be

18   appropriate and necessary in this case.

19           With regard to treble damages, my view, and I will go

20   back and look at some of the cases and cases cited by the

21   defendant and I will hear from the plaintiff, my view when I

22   first looked at this before we started and during the trial is

23   that I am not of the view that any consideration or instruction

24   or evaluation or notification to the jury on treble damages is

25   appropriate in this case.

F2B8SOK5

1          I think the case law is fairly consistent that it

2     should play no role in their assessment of what the actual

3     damages suffered are.  That's their role.  And the statute is

4     written in a way that has convinced me that their sole role

5     with regard to damages, if they get that far, is to determine

6     what it is that they believe are the damages that have been

7     suffered by each plaintiff.  And their sole role is to give us

8     what the value of those damages are.  And the statute indicates

9     that after they determine those damages, those damages are to

10    be trebled.

11         In my view, the only reason I would tell them that is

12    because it's supposed to play some role in their determination

13    of this case.  I think that would be inappropriate.  It should

14    play no role in their determination of liability or actual

15    damages, and they have no role to play with regard to treble

16    damages.

17         So unless you can convince me that there is some basis

18    in law, and even here you only describe it as within my

19    discretion.  Unless you say that there is something that says

20    that I am compelled to do so, which I am not aware of, even if

21    I could do that, there is nothing on these facts or unique

22    about their assessment and what we are asking them to do that

23    would give me any reason to raise this issue with them and

24    discuss this issue with them.

25         They have no role to play with regard to treble

F2B8SOK5

1    damages and awareness of that should not affect in any way

2    their determination of what the actual damages are that have

3    been suffered by plaintiffs, to the extent they reach damages.

4         Nominal damages, again, I have to sort of think it out

5    with the facts.  The only thing I can think of, and I am not

6    even sure that's an appropriate analysis, is -- I forget what

7    the plaintiff's name was.  Obviously, the only one that comes

8    to mind is Mr. Carter, who testified that he hadn't had any

9    contact with his daughter for ten years before that.  I have to

10   look at what he really said his damages were and how it came

11   out and hear from Mr. Yalowitz on that.

12        I am not really persuaded that nominal damages is an

13   appropriate instruction in this case.  Either there are damages

14   or aren't damages and either they have a value or they don't

15   have a value.  If they have a one dollar value, that's their

16   value.  If they have a thousand dollar value, that's their

17   value.  And that's for the jury to determine.

18        Damages in the real world are not nominal.  They are

19   what you have suffered as a proximate cause of the actions or

20   individuals found to be liable.

21        MR. YALOWITZ:  I agree with that.  A nominal damages

22   instruction can be very dangerous.  I remember when we looked

23   at this back in the summer -- I haven't had a chance to go back

24   and look, but I think in our objections to the defendants'

25   proposed nominal damage instruction we had some law that

F2B8SOK5

1    suggested it's very dangerous and usually inappropriate.  I can

2    see in like a voting rights case where you're really bringing

3    it to make a social change.

4         THE COURT:  Or if the primary relief is some kind of

5    injunctive relief.  Here it's just putting a value on what the

6    injury was.  If that value is high, they give it the high low.

7    If that value is low, they give it the low value.  If that

8    value is zero, they give it a zero.  I have been in those cases

9    where jurors come back with zero dollars even though they find

10   liability because they believe plaintiffs have suffered no

11   damages.  I would have to be convinced that that's necessary or

12   required in this case.

13        But on those issues that's sort of my thinking at this

14   point in time.  We can discuss it further and I want to look at

15   some of the cases and convince myself that I am going in the

16   right direction.

17        What I want to address quickly is the question, and I

18   haven't come to a view yet, the question of a specific request

19   for a damage amount on noneconomic issues.  I know that's an

20   important issue for the parties.  I will give you an

21   opportunity to argue it further.  Let me tell you what I am

22   feeling at this point.

23        I haven't yet found any case law that says I have to

24   do it or I have to not do it.  I found no case law yet that

25   says there is error for me to allow it.  My inclination is sort

F2B8SOK5

1    of this way, and we can talk about it further.

2              In fairness, I am probably inclined to allow Mr.

3    Yalowitz to ask for an actual number if he wishes to do that.

4    Not so much inclined for him to argue about, one, to indicate

5    that's his opinion to be the appropriate number or a fair

6    number or make an argument particularly about that.  If he

7    wants to suggest a number and have the jury consider that

8    number, I think that may or may not be of some use for the

9    jury.

10             As I say, in fairness, I would want to present it in

11   that form and I would probably want to discuss and have a clear

12   idea, and have the defendants have a clear idea, before we

13   start the summations of what that number is going to be,

14   because I think it's unfair that the defendant has to sum up

15   first.  Unless you guys come up with a different agreement as

16   to that.  I will do it any way you want to do it.  Obviously

17   plaintiff gets the last word because they have the burden of

18   proof.  But I have been in some cases where the parties have

19   agreed that instead of defendant going first and plaintiff

20   going last that the plaintiff might go first, defendant goes

21   second and the plaintiff can have a rebuttal in criminal cases.

22             Assuming that we are going to have the defendant sum

23   up first and then the plaintiff sum up, I am probably more

24   inclined to allow you to put a number out there, or numbers out

25   there, if, as I say, it is not heavily laden with your personal

F2B8SOK5

1    assessment of what is reasonable, some strong argument about

2    whether that is fair and reasonable.  I may be able to be

3    convinced that you should have some more leeway, but it's

4    really up to the jury to determine what number they are going

5    to get.  But I think it may be worth for them knowing what

6    number you're going to be requesting.  Because in their mind

7    they may be thinking if they get to damages, they may be

8    thinking less or in their mind they may be thinking more.

9              If you give them some baseline, then they can figure

10   out whether or not that's consistent with that baseline or

11   whether they want to use that for any guide as to what the

12   plaintiffs want.  That's really all it comes down to.

13             I would look at it as an argument not of what the

14   lawyers think is reasonable, because that's for their

15   determination, but a request by the plaintiffs as to what they

16   want.

17             In fairness, I think whether or not the defendants

18   want to even address damages in their summations rather than

19   simply concentrate on liability, basically has been the way the

20   case has been proceeding, I think they have the right to know

21   when they sit down what you're going to be asking for so if

22   they want to say something with regard to that, in fairness

23   they should, rather than groping in the dark about what might

24   come afterwards and what amount of damages is going to be

25   sought from the jury.

F2B8SOK5

1      If liability is determined, they can make an

2   assessment of whether or not that's something they should

3   address or something that they shouldn't address, and let the

4   jury make their own determination consistent with my jury

5   instructions.

6      That's sort of my inclination.  I can probably be

7   convinced one way or the other to go in another direction.  I

8   would be open to further instructions to the jury on that issue

9   if I decided to go that way or the plaintiff thought of a more

10  specific instruction, different, stronger, or weaker than I

11  have given with regard to that issue.  As I had proposed, I

12  would consider that.

13      At this point, my inclination is not really to

14  restrict the plaintiffs in that manner.  But we can talk about

15  that further.

16      I guess I really need -- maybe it's appropriate if we

17  can do it now.  Mr. Yalowitz, I sort of need some guidance from

18  you of in what way you want to present the issues to the jury.

19      MR. YALOWITZ:  In terms of the verdict sheet?

20      THE COURT:  Yes.

21      MR. YALOWITZ:  I like the verdict sheet.  I had that

22  one question for you about just clarifying some of the wording.

23      THE COURT:  As a matter of fact, you did point

24  something out that I think I left out in error because it was

25  supposed to be consistent.

F2B8SOK5

1              What you pointed out in the first question, that the

2     attack was committed by a PA employee, it should have read, and

3     I have insert it the same way the second question reads, the

4     attack was committed or assisted by an employee.  That's what

5     it says in the second and third.

6              MR. YALOWITZ:  I see.

7              THE COURT:  Committed or assisted.  All three of them

8     are supposed to read that way.  You did point that out to me.

9     I appreciate that.

10             The issue is, is there a way to condense this and

11    focus the jury on.  I thought about maybe just combining those

12    into a material support question rather than sort of a more

13    general question.  Maybe something along the lines of:  If

14    plaintiffs prove that defendant was liable because a PA

15    employee, acting within the scope of his employment and in

16    furtherance of the interests of defendant PA, knowingly

17    provided material support and resources.  I am not sure.

18             There are some cases where I think the evidence is

19    such that you will argue that in some of the cases the

20    terrorists themselves were PA employees, but in some cases it

21    really is not the actual perpetrator, terrorist, suicide bomber

22    or shooter, but they are someone who provided material support

23    to a person who was the shooter.

24             I didn't know how you wanted to argue that in terms of

25    liability.  Do you really want to argue or have the jury try to

F2B8SOK5

1    figure out whether or not the PA is liable because an employee

2    committed and assisted, the PA may be liable because an agent

3    committed or assisted, the PA is liable because an employee or

4    agent provided material support?  What do you want to do with

5    the providing support to a terrorist organization?  And then we

6    talked about the harboring.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2BTSOK6

1          MR. YALOWITZ:  Let me tell you where my thinking is

2     right now.  There are definitely some questions that just have

3     to come out, because the case just didn't develop that way.  In

4     fact, one of the cases that -- the June 19 bombing we wound up

5     not having evidence on an employee at all, and that's a little

6     glitch that we have to fix up in the -- you may have already

7     caught it.

8          THE COURT:  I had to take these out, but there are a

9     number of ones that I flagged in terms that I didn't think we

10    would ultimately get.

11         MR. YALOWITZ:  Also I think at one point in the charge

12    there's six attacks in which an employee participated, and it's

13    really only five, but okay, so that's kind a level on that we

14    all understand.

15         My inclination, although I haven't reached a firm

16    landing point, is to leave it with the array of questions.  I

17    understand the idea of -- and where I started out in this case,

18    as you know, was basically guilty or not guilty, but then

19    having looked at the way you did it, I kind of liked it, but I

20    honestly want to reflect on it a little bit.

21         THE COURT:  That's fine.

22         MR. YALOWITZ:  We're not preparing to cross-examine

23    six witnesses.

24         THE COURT:  I think that it was somewhat awkward for

25    me, because when I go back to the complaint, the complaint

F2BTSOK6

1    really doesn't give me that kind of guidance because it doesn't

2    break down any of those in the way that I had broken it down.

3    It doesn't even say what section.

4              MR. YALOWITZ:  You're not complaining to the drafter.

5              THE COURT:  That's why I said you understand what I'm

6    saying.  That's what you are confronted with and that's what I

7    was confronted with in sort of in general talks about being

8    responsible for terrorist acts and sort of includes all the

9    different theories but doesn't differentiate.

10             MR. YALOWITZ:  And there's something to be said for

11   giving them a real simple -- I haven't ruled it out, I just

12   kind of want to reflect on it.

13             THE COURT:  Why don't you think about that.

14             MR. YALOWITZ:  We could draft one that would work.

15             THE COURT:  Also remember, look at it again with the

16   eye that -- from both sides with the eye that some of the

17   questions -- there is some inconsistency with some of the

18   questions.  Some of the questions asked about whether the PA or

19   the PLO is liable because the PA or the PLO did certain things,

20   but other questions asked whether the PA and the PLO are liable

21   because their employees or their agents did certain things.

22             And I'm a little uncomfortable with the inconsistency,

23   although I think it's not an inaccurate way to say it.  But

24   when I say:  Is defendant PA liable for X terrorist attack

25   because it knowingly provide material support and resources,

F2BTSOK6

1    well, what am I saying to the jury?  That it provided material

2    support and resources as opposed to its employee or its agent

3    providing material support?  Or, as I say, with the first three

4    questions, pretty much the first three questions are the only

5    three questions right now, as I have worded, that address the

6    distinction between the PA, the PLO, PA employee, PA agent, PLO

7    agent.  So I think it's little complicated, I don't think it is

8    particularly helpful for either side to have to trip over all

9    of those kinds of questions.

10           MR. YALOWITZ:  One data point that I think is very

11   important in my thought process is whether the defendants have

12   an objection to the way you prepared the verdict form.

13           THE COURT:  I was going to -- at this point,

14   Mr. Rochon, do you have a suggestion about how to approach

15   this?

16           MR. ROCHON:  We certainly have some issues with parts

17   that I think Ms. Ferguson may be more educated on me.

18           THE COURT:  Ms. Ferguson.

19           MS. FERGUSON:  Your Honor, defendants believe it's

20   important to keep the vicarious liability theory separate from

21   the material support theory.  So asking the jury whether a PA

22   employee planned or perpetrated the attack versus asking about

23   material support, because I think if you talk about assistance

24   in the context of the vicarious liability theory, it starts to

25   get very confusing about what is enough for assistance.  And I

F2BTSOK6

1    just think, as a matter of clarity, there's different elements,

2    whether if you're talking about the employee carrying out the

3    act of international terrorism versus the PA and PLO

4    institutionally carrying out an act of terrorism by violating a

5    material support statute.  So if we start blending those

6    together, I think it would get very confusing.

7              THE COURT:  Although I don't really know on these

8    facts there is any distinction between assisting and providing

9    material support.

10             MS. FERGUSON:  Well, the law in the Second Circuit is

11   that there is no aiding and abetting liability under the ATA.

12   If it's not the case that the defendant directly planned,

13   perpetrated the attack, then there has to be some showing that

14   some other predicate criminal act was violated, and the

15   plaintiffs have identified particular material support

16   statutes.  So the assistance has to fall within the

17   requirements of that particular material support statute.

18             THE COURT:  But reality is that if you're referring to

19   the predicate crimes, there's no dispute what the predicate

20   crimes are here, it's murder and attempted murder.  It's just

21   not an issue to be even wasting the jury's time about whether

22   there are predicate crimes.

23             MS. FERGUSON:  So are the three -- I would say three,

24   not five, the three cases, Bauer, the Goldberg, the

25   Gould/Waldman, where there's evidence of employees carrying out

F2BTSOK6

1    or being convicted of murder or attempted murder.  And the

2    argument is that the PA is vicariously liable because those

3    employees, the plaintiffs would argue, acted within the scope

4    their employment.  So that's one thing that the jury will have

5    to decide.

6            THE COURT:  I keep getting confused.  I thought all

7    employees that you're referring to were in fact the

8    perpetrators of the attack.

9            MS. FERGUSON:  No.  For example, in the Gould/Waldman

10   shooting, a number of employees were convicted of planning the

11   attack or recruiting the suicide bomber.

12           THE COURT:  So your broader definition is not just

13   that they were the attacker.

14           MS. FERGUSON:  They were convicted of some active role

15   in planning, perpetrating.  They don't have to have been the

16   shooter, they don't have to have been the suicide bomber, but

17   if they were convicted of some role in the attack.  And that's

18   what the convictions the plaintiffs went through for Goldberg,

19   Gould/Waldman and Bauer.

20           THE COURT:  That's helpful, because my view -- that's

21   not the way I was looking at it.  I was making the distinction

22   between those people who were the attackers, and if you weren't

23   the actual attacker, you were someone who either assisted or

24   you were someone who provided material support to the attacker,

25   that's the way I viewed the evidence.  But you're looking at

F2BTSOK6

1    it --

2              MS. FERGUSON:  I think a way that is less confusing

3    for the jury and I think the proper way to look at it is if

4    there's evidence that a PA employee planned the attack, that

5    also in theory if they could establish the employment and

6    causation and all the other things, that could give rise to

7    respondeat superior liability.  So I think those the respondeat

8    superior cases with an employee has been convicted of not just

9    actually perpetrating but planning.  That's three cases.  But

10   the other three, there's no evidence of that, and it's only a

11   material support case.

12             THE COURT:  But I looked at it a little differently.

13   Any employee who is involved in any way falls under the

14   respondeat superior theory.

15             MS. FERGUSON:  They had to have committed an act of

16   international terrorism.

17             THE COURT:  No, the PA has to have committed an act.

18             MS. FERGUSON:  They were part of a conspiracy, and we

19   don't have a conspiracy.

20             THE COURT:  No, there's no conspiracy argument.  It's

21   not a conspiracy.  It's an employee argument which is more

22   similar to an agency argument.  If I am involved in helping

23   someone commit an act of international terrorism, and I do so

24   as employee, and I do so in furtherance of the interests of my

25   employer, I'm responsible, the employer is responsible.

F2BTSOK6

          1              MS. FERGUSON:  This is a really key point.

          2              THE COURT:  I don't understand your distinction.

          3              MS. FERGUSON:  The defendant has to be have committed

          4    an act of international terrorism.  If the argument is that the

          5    PA, as the defendant, committed an act of international

          6    terrorism because of the act of international terrorism that

          7    the employee perpetrated, the plaintiffs have to establish that

          8    the PA employee violated a particular criminal statute that

          9    satisfies the predicate criminal act requirement.

         10              THE COURT:  Murder.

         11              MR. YALOWITZ:  Like murder.

         12              MS. FERGUSON:  But assisting isn't murder.

         13              THE COURT:  Assisting a murder is murder.  Helping

         14    somebody to commit a murder is a murder.

         15              MR. YALOWITZ:  It's a crime in every state in the

         16    Union.

         17              THE COURT:  I don't concentrate on the predicate

         18    having anything to do with down the road.  The predicate crime

         19    is in fact the act that killed the person.  And if you helped

         20    that person, assisted that person, gave support to that person

         21    to commit that predicate act, you are responsible for that.

         22    You don't have to separately murder someone.

         23              MS. FERGUSON:  I think that's directly inconsistent

         24    with the Second Circuit law of aiding and abetting liability

         25    under the ATA.  You cannot say the defendant had committed an

F2BTSOK6

1    agent of international terrorism because an employee has aided

2    and abetted.

3        THE COURT:  That would gut the entire statute.  The

4    statute -- the act that resulted in the death of the innocent

5    person has to be an act of international terrorism.  There's no

6    debate that the acts done by the terrorists that resulted in

7    the deaths and injuries of these individuals was an act of

8    international terrorism.  So the question is -- you're sort of

9    saying -- well, I'm not even sure how you get past material

10   support, but --

11       MS. FERGUSON:  That's a separate act of the

12   international terrorism.  But what I'm concerned about is the

13   "assist" language is very loosey goosey.  I don't know that the

14   jury will know what it means to assist.  I think it has to be

15   tied to a particular predicate criminal act.

16       THE COURT:  I think I understand what you're saying,

17   because if that's your view, and I'm not sure -- and

18   Mr. Yalowitz can think of it in terms of what his current view

19   is.  If you think that the jury should be asked whether or not

20   the PA -- whether or not PA employees committed an act of

21   terror or whether -- and I guess we want to talk about PA and

22   we'll put the PLO aside, because I don't think that you have

23   the same argument.

24       But if you're saying it's appropriate to ask the jury

25   whether or not in a situation where the evidence indicates the

F2BTSOK6

1    person who perpetrated the crime was a PA employee, I don't

2    have any problems with that.  But on the other hand, what they

3    still are entitled to -- and whether you put aside or take out

4    the word "assist" all together under the word "employee" -- but

5    they still are entitled to ask the question of whether a PA

6    employee on behalf of the PA provided material support to a

7    terrorist.  They still are entitled to do that, because they

8    would still be responsible for -- let's forget the words

9    "assist," "aiding and abetting" or "conspiracy," they would

10   still be responsible for helping the terrorists commit the act

11   by providing the material support for that terrorist.  And we

12   give all the different definitions to material support.

13          If they established the PA's employee, acting within a

14   scope of his employment, gave a bomb -- that's not the example

15   here, but gave a bomb to a suicide bomber so they could go blow

16   up someone on the street, that would be enough to ask the jury

17   whether or not the PA is responsible under respondeat superior

18   argument for providing material support to the terrorist,

19   because their employee did so within the scope of their employ

20   and on their behalf.

21          So I understand -- what we're talking about, all of us

22   are talking about is sort of the semantics of how we want to do

23   this.  The theories are still there.  They're either

24   responsible themselves for any terrorist act that the employee

25   himself committed, if they can prove that it was within the act

F2BTSOK6

 1    of his employ, or they're responsible for any material support

 2    that the employee provides within the scope of employment.

 3              Whether he assists or whether or not you think that --

 4    we haven't talked about whether you think there is a separate

 5    agency theory with regard to the PA or whether that is just a

 6    theory with regard to the PLO, I don't know what your view is

 7    on that, but I'm not quite sure what theory you say the PA gets

 8    to avoid by any of this language.  They cannot avoid having a

 9    jury consider whether or not a terrorist attacker was a PA

10    employee when he perpetrated -- he or she perpetrated the

11    terrorist attack if that's the evidence they find.  And they

12    have the right to determine whether or not a PA employee

13    provided material support.

14              MS. FERGUSON:  My main issue is with that "assist"

15    language.

16              THE COURT:  So if it's simply committed, as I had the

17    question phrased the first time, and the second question is

18    provided material support, is that consistent with your

19    thinking?

20              MS. FERGUSON:  Yes.

21              THE COURT:  And what about the agency separate

22    committed through its agent.

23              MS. FERGUSON:  So with respect to agency, your Honor,

24    first as to the PLO in your November opinion on our motion for

25    summary judgment, you granted that with respect to vicarious

F2BTSOK6

1    liability theories against the PLO.

2            THE COURT:  Right, and I had no question as to the

3    vicarious liability question.

4            MS. FERGUSON:  We view agency --

5            THE COURT:  No, agency is not a theory of vicarious

6    liability.  Vicarious liability is simply an employee within

7    the scope of the employment.  That's what we were always

8    addressing.  That's what I intended to address.  That doesn't

9    address agency, that's different issue.

10            MS. FERGUSON:  With respect --

11            THE COURT:  And every entity acts through an

12    individual, so they must be an agency.

13            MS. FERGUSON:  With respect to the PLO, I guess our

14    threshold argument will be that there is no evidence that's

15    been presented to the jury that any PLO agent is acting with

16    express, inherent or --

17            THE COURT:  That's a different question.  I haven't

18    debated -- I mean I haven't listened to the arguments of the

19    parties and whether or not the evidence is sufficient or not

20    sufficient to go to the jury.  Right now I'm trying to figure

21    out, if it does go to the jury, what is the manner in which it

22    should go to the jury and whether or not this is a legally

23    improper way to ask a question or there's a better way to ask

24    the question.

25            MS. FERGUSON:  It's our position that there is no

F2BTSOK6

1    liability under the ATA and agency theories.  We haven't

2    identified any decisions that would allow that.  And, of

3    course, we have also taken the position as the foreign

4    government we shouldn't be subjected to respondeat superior.

5         THE COURT:  I agree with you on that.

6         MS. FERGUSON:  Is there an agency instruction?  We

7    believe it's important that it be clear that the principal must

8    have consented to the agent's performance of a particular act.

9         THE COURT:  Well, I'm not sure that --

10        MS. FERGUSON:  That is not quite in there.

11        THE COURT:  I'm not sure that is inconsistent with the

12   instruction I gave on agency.  You have to concede that if an

13   official in the PLO directed, asked some individual, whether

14   they were a PLO member or a PA official or a PA employee, if

15   they asked an individual I would like you to go and deliver

16   this bomb to X, because X is going to blow up the bomb at this

17   location and kill innocent people, if that occurred, you can't

18   argue that there's no theory of agency.  It's clear that

19   someone on behalf of the PLO would have taken acts to provide

20   material support.

21        That's the only -- I mean that's semantics we're

22   talking about.  If you don't want to use the word "agency," you

23   can give me a better word, but you can't get out of liability

24   because you say the statute didn't provide liability for the

25   PLO if Yasser Arafat in fact directed his next door neighbor to

F2BTSOK6

 1    deliver a bomb to someone that he wanted to help blow up a

 2    location.  You know that that would make the PLO liable if he's

 3    doing so on behalf of the PLO.  The PLO doesn't have legs and

 4    arms, the PLO is not a human being, a human being has to be an

 5    agent for the PLO.

 6            MS. FERGUSON:  I think we will be submitting a letter

 7    on this.  I think instruction we propose --

 8            THE COURT:  Mr. Yalowitz, let her finish.

 9            MR. YALOWITZ:  Before we move to the next topic --

10            THE COURT:  You cut her in mid sentence, Mr. Yalowitz.

11    Be polite.

12            MS. FERGUSON:  We propose two tweaks to the agent

13    instruction.  One is to make sure that the authorization has to

14    be for that particular act, and we'll provide citation for

15    that.  And then also in the last paragraph on page 38 of the

16    draft it says if you find that the agent acted with express

17    apparent or inherent authority to bind the PA or PLO, you may

18    find the PA or PLO were responsible.  We would add that the

19    agent acted within express or with express or apparent

20    authority and within the scope.  I think that sort of got --

21            THE COURT:  I'm sorry, what is the part that you were

22    adding?

23            MS. FERGUSON:  They were acting within the scope of

24    that authority.  You included that element earlier when you

25    described the rule.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2BTSOK6

1          THE COURT:  So why do I need to say it again?

2          MS. FERGUSON:  When you summarize at the end it looks

3     like it's enough if they had some sort of authority.

4          THE COURT:  I will look at it and see if it makes a

5     difference legally in terms of the way --

6          MS. FERGUSON:  More fundamentally I think it's

7     confusing to introduce to the jury the notion of agency when no

8     one falls into that category that is not an employee.

9          THE COURT:  How would you describe it?

10         MS. FERGUSON:  I think the respondeat superior

11    instruction covers everyone.

12         THE COURT:  No, it does is not.  The respondeat

13    superior is only a theory of employment.  The respondeat

14    superior theory is not a theory of direct liability.

15         MS. FERGUSON:  So who are these non-employees?

16         THE COURT:  The people that you asked to do the

17    terrorist act and participate in it.  If I asked you to go out

18    across the street and rob the bank and bring me some money, you

19    are my agent.

20         MS. FERGUSON:  There's no evidence of any principal

21    asking an agent to do that.  There's no evidence of that.

22         THE COURT:  Well, there are plenty of people who are

23    involved who are members of the PLO who are not employee of the

24    PA who there's evidence that they were involved.

25         MS. FERGUSON:  Who?  I honestly don't know who we're

F2BTSOK6

1    talking about.

2          THE COURT:  Abdullah Barghouti.

3          MS. FERGUSON:  Abdullah Barghouti was part of Hamas,

4    he was definitely not part of the PLO.

5          THE COURT:  I know, but if he's acting at the

6    direction of someone from the PA, he's acting as an agent of

7    the PA.

8          MS. FERGUSON:  There's no evidence of that whatsoever.

9          THE COURT:  I apologize because I am trying to -- you

10   asked me to pick one and I thought maybe I would pick that one,

11   maybe hit the jackpot.

12         MS. FERGUSON:  I said pick one.

13         THE COURT:  But the reality is you can't say -- look,

14   as long as they have the bare minimum evidence that somebody

15   from the PA communicated with somebody -- somebody from the PLO

16   communicated with somebody else either in or outside the PLO or

17   the PA, and that communication was to further and advance the

18   terrorist attack, and the assistance that they provided helped

19   that terrorist attack take place, they are responsible for that

20   terrorist attack.

21         They can't give the guy a gun and a bomb -- and I

22   don't care what employment they have, somebody from the PLO or

23   a responsible person from the PLO can't ask some other person

24   to deliver a bomb or a gun so a terrorist attacker can do a

25   terrorist act and then you say oh, well, that's not providing

F2BTSOK6

1    material support.

2             MS. FERGUSON:  Your Honor, there's an absence of

3    evidence about the PLO directing --

4             THE COURT:  That's a different question.  That's not a

5    question of the form of the jury verdict form.  If you want to

6    argue that and I will consider that, and if you want to

7    convince me before the case gets to the jury, or you want to

8    convince me after we get a verdict, if the jury decides not to

9    find liability or to find liability that is not supported by

10   the evidence, that's a different question.

11            Right now I'm trying to concentrate on how do I

12   give -- how do I ask the jury to consider this if I determine

13   there's sufficient evidence for them to make this decision.

14   And the decision that they have to make is did somebody from

15   the PLO help or do something to provide material support to the

16   terrorist who committed the terrorist act.  That's the

17   question.  That's a complicated question.  Whether you want to

18   characterize it as agency or characterize it as something else,

19   it doesn't really matter much to me, but I thought that was the

20   basis of how the parties were arguing this and making the

21   distinction between the PA being liable for its employees'

22   actions and the PLO only being liable if they took some

23   affirmative act that indicated that they were directing or

24   assisting or asking someone to in fact do a terrorist act that

25   took place.

F2BTSOK6

1        Now how you want to characterize that is a question.

2    I'm open to that.  But you can't simply say well, there's no

3    liability under the ATA because they're not an employee and the

4    only theory is respondeat superior.  That's not the only

5    theory.  If none of these people were employees, there would be

6    no respondeat superior theory.

7        MR. YALOWITZ:  So your Honor, if I could, I am happy

8    to let Ms. Ferguson continue on this discussion, I was just

9    wondering if it might be consistent with the Court's comfort to

10   take a short break.

11       MR. ROCHON:  We are going to be submitting in writing

12   these issues, so --

13       THE COURT:  I'm trying to get it up for you.  You know

14   where my concerns are.  As I say, that's not what I -- I don't

15   want to, at this point, debate whether there is sufficient

16   evidence.  That's what I'm saying.  I want to figure out if

17   there is sufficient evidence, how am I supposed to give this to

18   the jury.  And I don't -- I may be misinterpreting what you're

19   saying, but if you're saying that there is no legal theory to

20   submit anything but a respondeat superior question to the jury

21   on the PLO, I can't accept that.

22       MS. FERGUSON:  To make sure I will be useful, do you

23   want to focus on the form right now?

24       THE COURT:  Yeah.

25       MS. FERGUSON:  Because I have comments on the charge

F2BTSOK6

1     as well.

2                THE COURT:  We could discuss the charge further, but I

3     assume 90 percent of what you have with regard to the charge

4     you gave me in the letter.

5                MS. FERGUSON:  There is a few other items.

6                THE COURT:  We only got ten percent.

7                Why don't you come back after a short break.

8                MR. YALOWITZ:  I'm sorry for interrupting.

9                THE COURT:  When you got to go, you got to go.

10               (Recess taken)

11               MR. YALOWITZ:  Just a couple of things before we

12    continue.  I'm informed that there was an error in the playing

13    of the deposition of Al-Sheikh.  We don't consider it a

14    material error.  The defendants pointed it out and told us what

15    it was.  And so it was some additional testimony that neither

16    side has designated, and it was a couple of questions to which

17    it seemed like the witness didn't know the answer.

18               THE COURT:  You mean it was played?

19               MR. YALOWITZ:  It was played and it shouldn't have

20    been played.  I don't have a problem with it.

21               Then the other thing is we were trying to work out

22    some arrangements on the timing of our witness disclosures.  I

23    have proposed to Mr. Rochon that he let me know as soon as he

24    can what of the three or four witnesses he's thinking about,

25    which ones he's actually going to call, and I can let him know

F2BTSOK6

```
 1    24 hours later who my rebuttal witnesses are, if any, and I am
 2    hoping he will accept that proposal before we leave, or if he
 3    doesn't accept the proposal you'll help us reach an arrangement
 4    that is reasonable.
 5            THE COURT:  I probably won't.
 6            MR. ROCHON:  I would like to know who their rebuttal
 7    witnesses are going to be, and I think if they're based on
 8    things that are already in evidence then there would be no
 9    reason not to follow the usual rule.
10            THE COURT:  You guys make me give my standard line.
11    I'm not an interpreter or translator for lawyers.  You
12    shouldn't have to ask me what you want to ask them.  Ask him.
13            MR. ROCHON:  We have.
14            THE COURT:  And he should give you an answer.
15            MR. ROCHON:  He wants --
16            THE COURT:  You shouldn't have to tell me you asked
17    him.
18            MR. ROCHON:  So far we haven't worked out.
19            THE COURT:  What we have is a failure to communicate.
20            MR. ROCHON:  Do I get to be Paul Newman?
21            THE COURT:  What would you like me to do?
22            MR. ROCHON:  I would like you to tell Mr. Yalowitz
23    that he should let us know by, say, Sunday if he has rebuttal
24    witnesses, who they are, if they are based on something in
25    evidence now.
```

F2BTSOK6

1              THE COURT:  When are you going to tell him who your

2      witnesses are?

3              MR. ROCHON:  We told them who they may be.

4              THE COURT:  When are you going to tell them who the

5      actual witnesses are?

6              MR. ROCHON:  If we cut them, we'll let them know.  I'm

7      not going to eyeball them until Sunday, so that's why.  If I

8      was eyeballing them right now, I would tell him right now.  I

9      want to literally eyeball these people.  You don't want to hear

10     about the tactics and why, but there's reasons for it.

11             THE COURT:  All I think is that -- all Mr. Yalowitz is

12     asking for, as you anticipate, the witnesses show up and they

13     make you as happy as you want to be, who are you going to call?

14     Are you going to call them all --

15             MR. ROCHON:  Yes.

16             THE COURT:  -- if they come in and say exactly what

17     you want them to say?

18             MR. ROCHON:  I will call three, because you told me I

19     couldn't call one.

20             THE COURT:  So you would call those three.

21             MR. ROCHON:  Yes, and no more.

22             THE COURT:  And you have given them the substance of

23     their testimony?

24             MR. ROCHON:  We have the two witnesses, and we the

25     proffered as to the woman, and you excluded the other fellow,

F2BTSOK6

1   so the answer is yes.

2            THE COURT:  What is the length of their testimony?

3            MR. ROCHON:  Length of direct testimony would be 30

4    minutes apiece, at most.  And I could be pretty efficient.  I

5    got Shehadeh on and off.

6            THE COURT:  I thought this would be 30 minutes.

7            MR. ROCHON:  It could be less.

8            THE COURT:  I'm sure it will be.

9            MR. ROCHON:  No more than.

10           THE COURT:  Is there anything else that you need to

11   know, Mr. Yalowitz, to be able to devastatingly cross-examine

12   these witnesses?

13           MR. YALOWITZ:  I thought my cross was pretty

14   effective.

15           THE COURT:  So I think that if you want some more

16   information --

17           MR. YALOWITZ:  The other thing is the criminal

18   records.

19           MR. ROCHON:  I'm making that effort, and they're all

20   ancient, but I'm getting them anyway.  But my request goes to

21   his rebuttal witnesses.

22           THE COURT:  When are you going to be able to tell them

23   that you have rebuttal to the witnesses we've already heard?

24           MR. YALOWITZ:  I'm fairly confident I do have

25   rebuttal, and I'm trying it figure out who that witness is

F2BTSOK6

1    going to be.

2              MR. ROCHON:  That was a very lawyerly answer.

3              MR. YALOWITZ:  No, it's a true answer.

4              THE COURT:  Who do you think that witness might be?

5              MR. YALOWITZ:  I think it will either be Shrenzel or

6    Eviatar or Spitzen.  I think those are the three possible

7    witnesses.

8              THE COURT:  One of them you heard from.

9              MR. YALOWITZ:  Spitzen we heard in his capacity as a

10   Arabic speaker.

11             MR. ROCHON:  Spitzen has never been on a witness list.

12             THE COURT:  Why don't you --

13             MR. ROCHON:  We'll see what we have to say once we

14   know what he's trying to say rather than have him argue it now.

15             THE COURT:  Could you let him know by Sunday?

16             MR. YALOWITZ:  I will let him know 24 hours after I

17   hear from him.

18             THE COURT:  Can you let him know by Sunday?

19             MR. YALOWITZ:  If he can let me know by Saturday.

20             MR. ROCHON:  Judge --

21             THE COURT:  I'm done, guys.  You know, I'm done.  You

22   live with each other.  That's how you do it.

23             MR. YALOWITZ:  We have had a very significant failure

24   to communicate.  There's been a real breakdown of trust.

25             THE COURT:  It's really not my job to do this.

F2BTSOK6

1          MR. ROCHON:  But Judge, we should get a proffer of

2     whatever rebuttal they want.

3          THE COURT:  A lot of things should happen in this

4     case.

5          MR. ROCHON:  You should force them to give a proffer

6     of rebuttal before Tuesday.

7          THE COURT:  Whatever date you give them, I will give

8     you.

9          MR. ROCHON:  I will give him my information of whether

10    I call these people before Tuesday, of course.

11         THE COURT:  Then he should give you before Tuesday.

12         MR. ROCHON:  That's what I'm asking for, at the same

13    time.

14         THE COURT:  You tell him when you're going to give him

15    the information and you let him know what ahead of time when

16    you give him the information he should be prepared at that same

17    time to give you his information.

18         MR. ROCHON:  Thank you.

19         THE COURT:  Can you live with that, Mr. Yalowitz?  So

20    if you want to work out an earlier date rather than a later

21    date to prepare yourselves, then do so.

22         MR. YALOWITZ:  We'll deal with it as -- we'll play it

23    as you have laid it out.

24         THE COURT:  Good.

25         MR. YALOWITZ:  It will be fine.

F2BTSOK6

1              THE COURT:  So.

2              MR. YALOWITZ:  We sent him an email like four weeks in

3      the middle night that has all this information.

4              THE COURT:  I'm sure you did.  I would be shocked to

5      hear anything other than that from you.

6              MR. YALOWITZ:  So on the real stuff, I have like four

7      agenda items on the jury instructions.

8              THE COURT:  Go ahead.

9              MR. YALOWITZ:  Agenda item number one is the first

10     element of the substantive count.  I want to make sure I

11     understand what it's intended to do.

12             THE COURT:  Where are you?

13             MR. YALOWITZ:  I'm really on page 39.  And what I'm

14     thinking you're driving at here is you are foreshadowing

15     element number one, which is knowingly.  And my concern is that

16     it's got -- it sort of builds in a thing that might be

17     misconstrued, particularly in closing, which is knowingly

18     committed a violent act intended to cause death or serious

19     bodily injury.

20             And I think a lawyer reads this and says well, the

21     defendant, through its employees or agents, knowingly did that,

22     and that kind of -- I understand where you could get that, but

23     I think for the jury what you may have been driving at was the

24     defendant through its employees or agents acting knowingly,

25     because that's then what the jury instruction says, or

F2BTSOK6

knowingly committed an act of international terrorism or

something like that.

          I don't have a problem with -- let me put it this way,

I don't have a problem that we haven't discussed about

knowingly, but I just worry about the committed a violent act

intended to cause death or serious bodily injury.

          THE COURT:  That's what we were just -- Ms. Ferguson

and I were just talking about that, partially what we were

talking about, but that's the predicate act, and that's the

predicate act that must be established.  And frankly, there's

no reasonable view of the evidence that that act has not been

established, clearly an act to cause death or serious bodily

injury, that it was committed, but they must find the defendant

is the one that committed it.

          MR. YALOWITZ:  So frankly, in the context of the

overall instructions, I don't think this is a problem, I'm

worried about seeing it blown up on the screen saying you have

got to find that the PA committed an act, and I'm more worried

about how it might be used in closing.  And I agree with you

that the predicate act -- there's not really a genuine dispute

about the predicate act, it's all about the link, and so I just

worry about --

          THE COURT:  If you have better language, suggest it to

me and I will review it.  I don't think the jury is going it to

fine tune this like the lawyers do, they just want to know what

F2BTSOK6

1    they're supposed to figure out.  And most of this, except for

2    some individual elements, most of the jury can figure out for

3    themselves what they have to decide.  They already know what

4    they have to decide.

5              MR. YALOWITZ:  I think so.  I will get you some

6    language on that.

7              THE COURT:  If you have something else to propose.

8              MR. YALOWITZ:  And I think that just if you want to

9    talk about -- I think we already talked about recklessness, I'm

10   going to think about whether there's anything I want to add to

11   that discussion.

12             THE COURT:  You think this is a reckless case?

13             MR. YALOWITZ:  I want to think about whether there's

14   anything I want to add or I may want to stand on the discussion

15   we had.  If I do think there's anything I want to add, I will

16   get it to you.

17             On alter ego, if you want to discuss it, I can.

18             THE COURT:  We could discuss it briefly.  I'm still

19   struggling with, one, where you get the theory, where you get

20   that as a theory of liability.  Are you trying to lift this

21   from a pierce the corporate veil analysis or is there some

22   theory of liability that you think is associated with these

23   claims?

24             MR. YALOWITZ:  So I think that there's pretty strong

25   evidence that there's a lot of leakage between the PA and the

F2BTSOK6

1    PLO and Fatah.  I mean I think that obviously supports an

2    agency theory.  I don't have any problem with that.  I think it

3    does support an alter ego theory, but I want to think about

4    whether we really need to have that.

5              THE COURT:  Which alter ego theory are we using?  Out

6    of a corporate alter ego theory?

7              MR. YALOWITZ:  Yeah.

8              THE COURT:  Or piercing the corporate veil?

9              MR. YALOWITZ:  Right.

10             THE COURT:  Because frankly that's not even a theory

11   of liability.  If you were really talking about a genuine alter

12   ego situation, you would only be suing the PA in which you got

13   a judgment against the PA asking me to enforce that judgment

14   against the PLO, I wouldn't be giving that to a jury, that's a

15   legal argument.  That's not a factual determination for them to

16   make.  You would have to demonstrate that the judgment you get

17   against one should be applied against the other, considering

18   all the elements that one is supposed to apply for alter ego.

19             That's why I keep asking you where do you get this

20   theory of liability to the jury of alter ego that somehow

21   they're supposed to make that determination and say I enter a

22   judgment against one, and since I'm going to enter a judgment

23   against one we think the other one is the same thing so we're

24   going to make that judgment applicable to other.  That's not a

25   jury determination.

F2BTSOK6

1          MR. YALOWITZ:  I want to look at it in that light

2     then, Judge, because what I want to look at I hadn't really

3     thought about it in the way that you're saying is that it's

4     really a legal issue, not a fact issue.  So let me just take

5     another look at that.  And again, if there is something I think

6     we need to raise with you on it, I will do that.

7          THE COURT:  I understand your general theory, and I

8     have no problems with your taking the opportunity to argue that

9     the relationship is so close that it is appropriate for them to

10     conclude that when a person has taking acts on behalf of one

11     it's logical to conclude they were taking acts on behalf of the

12     other.

13          Particularly when you're talking about Yasser Arafat,

14     I'm not sure that he would have disagreed with you if he made a

15     decision on one day that wasn't a decision on both the PA and

16     the PLO in his individual capacities in each entity.  But just

17     to sort of say well, he made a decision on behalf of the PA one

18     day and then that is so closely associated that that means that

19     anything he would decide on behalf of the PA the PLO is liable

20     for.  If the PA -- the mail truck ran over somebody in the

21     street, somehow you could sue the PLO on some theory that

22     they're the same as the PA and get a judgment for the accident.

23          MR. YALOWITZ:  Frankly I think what you're saying is

24     that is just not a jury issue.

25          THE COURT:  That's my point, one of my issues.

F2BTSOK6

1          MR. YALOWITZ:  Let me look at that and think about it

2     in that context.

3          And then the other thing I think I have given you some

4     thoughts on ratification, if you want to discuss it.

5          THE COURT:  I just don't see it on these facts, and

6     I'm real cautious about being the first judge to say that under

7     the ATA that the theory of liability is that if someone commits

8     a terrorist act and you later approve of it that therefore the

9     party is responsible for the terrorist act.

10          And frankly, I'm not even sure -- again, the weakness

11     of that argument is also in the facts, not just the legal

12     theory, because it's the inference that you want drawn.  There

13     is no evidence that anyone in the PA or the PLO after the fact

14     said I am taking responsibility for this particular terrorist

15     act.  There's just no such adoption of that.  The things about

16     oh, this one is a martyr or this one let's write a song about

17     or this one let's say that they're a hero --

18          MR. YALOWITZ:  Let's keep him on the payroll and give

19     him promotions and give him a job and say he fought for his

20     country.

21          THE COURT:  That was never done in the context of the

22     terrorist act.  There's no evidence here that anyone said okay,

23     this guy is a terrorist, and somebody else said okay, yeah, so

24     let's give him some money.  That's not it.  There's no such

25     evidence that any of those acts, those decisions were made in

F2BTSOK6

1    contemplation of any individual terrorist act that was

2    committed.  There's not that evidence.

3          MR. YALOWITZ:  This may be -- look, this may be one

4    where we aren't going to reach agreement on.

5          THE COURT:  I'm trying to tell you where I am.  If you

6    have something else that you think is persuasive in terms of

7    case law that you want to show me, I'm perfectly willing to

8    review that.  But as I keep thinking about it and reviewing it,

9    it is real -- it would be dangerous ground for me to say that

10   plaintiffs can recover on this kind of theory given what in

11   most of these cases is such a politically complicated scenario

12   of -- I can understand if you say that a certain country or

13   entity is behind a terrorist act, whether it's 9/11 or

14   something else, but it's a whole different thing to say well,

15   after it happened they said well, we're real glad it happened

16   and we sent the terrorist family a bunch of flowers to say hey,

17   we didn't do it but we thought of it and we probably would

18   have.  Those kinds of theories, I don't see those theories

19   being advanced in any of these cases.

20          (Continued on next page)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2B8SOK7

1          MR. YALOWITZ:  Look, I think you're doing a great job

2     of laying out the defendants' kind of best argument.  I

3     understand it.  I want to give you what you need to come to

4     ground on that issue.  I think the most informative case we

5     have is the one we talked about from Judge Cogan.  Admittedly,

6     that was a little different.  That's a different statute.

7     That's not this statute.

8          THE COURT:  If you want to give me your permission, I

9     will pick up the phone and call Judge Cogan and ask him what he

10    was thinking.

11         MR. YALOWITZ:  I encourage it.  I don't think you need

12    the parties' permission.

13         THE COURT:  I don't want to make the decision based on

14    something that I did that we didn't discuss.  I just don't feel

15    comfortable making the call and have you argue from the cases,

16    and then I simply say, well, I spoke to Judge Cogan and that's

17    not what he meant.

18         MR. YALOWITZ:  I know how these things are.  You have

19    given respectful consideration obviously, but you're going to

20    make your own decision based on the statute and case and the

21    facts which you have been living through.  I don't have a

22    problem with you talking with Judge Cogan.  I sort of assumed

23    you have.

24         THE COURT:  I talked to him before we started the

25    trial, particularly with regard to jury selection and with

F2B8SOK7

1    regard to some of the issues in this case.

2           MR. YALOWITZ:  I assume that if that happens, he is

3    not going to sit on a panel, but he would recuse himself.

4           THE COURT:  I don't anticipate that would be a

5    problem.  I just don't like to factor in things outside of what

6    you have submitted to me.

7           MR. YALOWITZ:  I would encourage it.  I don't know

8    where you're going to come to ground.  I think we have given

9    you really a case that does fit ratification, with regard to

10   the employees and agents, very tightly.  I understand the

11   concern you have about you don't have a preexisting

12   relationship.  It's really a theory that comes out of contract

13   law.  I get that.

14          THE COURT:  I'm not even sure that's the case that you

15   presented.  I am not sure that's really your argument.  Is your

16   argument that they didn't know anything about this before it

17   happened and they just adopted it after it happened?  I would

18   be shocked if you told me that's what your theory of this case

19   is.

20          So what you're asking me to give is not even the

21   theory of the case, not even the evidence you presented.  You

22   will stand here and say to me and the jury, no, we have

23   presented sufficient evidence to indicate that they were

24   complicit in this from the beginning, if not from the beginning

25   at least until the time it took place, and then you want to

F2B8SOK7

1  give me a ratification theory to give to the jury.

2          MR. YALOWITZ:  Obviously, as you said, the evidence is

3  circumstantial evidence of complicity.  There is no doubt about

4  that.  And that's the theory we are going to the jury on if you

5  don't give us that ratification charge.

6          We will think about it.  I think it's a legitimate

7  alternate charge given the defense posture, and that's what

8  wound up happening in the Chaudry case.  It wasn't really a

9  plaintiff driven charge; it was really a defense driven charge.

10         THE COURT:  The problem with the cases that you gave

11 me is that I think most of the arguments you're making are not

12 in the case law itself.  It may be in the underlying jury

13 instructions and some references to it, but there is no case

14 law that says that.  I have read those cases and those aren't

15 the issues in those published opinions.

16         MR. YALOWITZ:  Certainly that's true in the circuit.

17 I went back and looked at what the circuit said.  It was an

18 issue in the briefing and the circuit said, look, we don't have

19 a problem with it.  That's different.

20         THE COURT:  I was looking for guidance there.  That's

21 why I struggled with it because I didn't find the guidance in

22 those cases that you cited.

23         MR. YALOWITZ:  That is different than saying, this was

24 the charge read in such and such a case which the circuit

25 approved.

F2B8SOK7

1           THE COURT:  We will look at that.

2           Mr. Rochon.

3           MR. ROCHON:  I am just hoping that some day we finish

4    with this ratification.  We have spent a lot of time on it.  It

5    didn't make it past summary judgment.  Sooner or later Mr.

6    Yalowitz has to accept where we are.

7           THE COURT:  That will be the last day on his way out

8    the door.

9           MR. YALOWITZ:  Let me say, I am here for you on this.

10   If you have come to ground and you have reached a ruling and

11   you reject my position, I will move on.  If it's an open issue,

12   I am available to help you reach the decision.  So I am not

13   trying to reargue anything.

14          THE COURT:  I understand that.

15          Is there any other issues that you wanted to address

16   now?

17          MR. YALOWITZ:  I have been carrying my Redweld with my

18   notes back and forth every day, and I don't know if it's in the

19   witness room or what.  I think what we can do is over the

20   weekend we may have a few nits and nats.  I do want to give you

21   the language on that first element just to see if there is

22   something.

23          THE COURT:  Send me a proposal.

24          MR. YALOWITZ:  I understand your intent is to capture

25   the knowing --

F2B8SOK7

1          THE COURT:  I am not wedded to that language.

2          There were some other issues you had raised.  You

3    wanted me to do something with policy and practice.

4          MR. YALOWITZ:  I thought you had ruled on that.

5          THE COURT:  I thought I did too.

6          You requested a missing witness charge.  I wasn't

7    quite sure what the basis for that was.

8          MR. YALOWITZ:  Let me look at that.  Obviously, I can

9    argue, you know, where is Waldo.  The obvious guy is Tirawi.

10   He is a globetrotting -- we heard evidence from the defendants

11   that he trots around the globe.  He was on a jet two weeks ago

12   and he didn't come to the court.  I don't think I have a basis

13   for a witness charge on him because I don't think he is a

14   current employee.

15         THE COURT:  That's what I was going to say.  It's a

16   two-edged sword.  The standard instruction is the witness is

17   available to both sides.  Even in this case, even if he is

18   outside the jurisdiction, there is no evidence in this case

19   that they have greater access to him than you have.  You or

20   your team has been over there, and if he was available to be

21   deposed and we had depositions that the jury has, if you

22   thought he had something relevant to support your case to say,

23   you would have pursued that.

24         MR. YALOWITZ:  By "you," you mean you or your

25   predecessor.  But I live with the shoes I am wearing.  I

F2B8SOK7

1    understand that.

2            THE COURT:  I will allow you to characterize it any

3    way you want.

4            MR. ROCHON:  I don't think those shoes ought to be

5    filled by anyone arguing a failure to present any witness

6    unless they clear it in advance with the court.  If there is

7    not a basis for the instruction, there is not a basis for the

8    argument.

9            MR. YALOWITZ:  That's not true.  That's completely not

10   true.

11           THE COURT:  There are rules and there are exceptions

12   to the rule.  But I can tell you, if you make that argument,

13   what we may end up with is my granting their request for an

14   instruction that witnesses are available to both sides and that

15   you have made this argument, but you have given no basis for

16   them to conclude that somehow they have greater access to this

17   witness than you, and if you thought he had something to say

18   that would be helpful to you, they should assume that you would

19   have brought him.

20           If you think you're going to go in that direction, you

21   might want to make sure that I know about it beforehand

22   because, quite frankly, I am not sure what you're trying to

23   imply that he would have said had he been here.  I am not sure,

24   based on these facts, the jury has any reason to believe that

25   he would come here and be a useful witness for their

F2B8SOK7

1    consideration.  And if he was here, you would probably be

2    making that argument, that he was a useless witness for their

3    consideration.

4              MR. YALOWITZ:  It would depend on what he said.

5              THE COURT:  As I said, you can assume that he probably

6    would say something that you weren't going to argue that that

7    was something that you had hoped you would bring him in here to

8    say.  There is no evidence that he had anything to say that

9    would be helpful to you.

10              MR. YALOWITZ:  If he would tell the truth there is.

11              THE COURT:  That's a really important point.  That's

12    why we swear them in.  That's why we exclude hearsay statements

13    out of court.

14              If you have got further suggestions on the verdict

15    form, my request from both sides at this point is draft me a

16    question and send it to me, and send it to me before the end of

17    business tomorrow.  I want to see what it is you're asking me

18    for.  I am not going to debate these in the abstract anymore.

19    If you have got a suggestion of how to ask the question, you

20    give it to me and I will consider it.  And I have given you my

21    best attempt to try to see how this is going to go.  So make up

22    your mind how you want to address these issues if they go to

23    the jury.

24              Now, I don't know what the defense wants to do in

25    terms of -- did you intend to reserve further motions or did

F2B8SOK7

1    you intend to make further motions?

2          MR. ROCHON:  We would like to argue the Rule 50 at a

3    time convenient to the court.  It would be best done before the

4    close of all evidence.

5          THE COURT:  OK.

6          MR. YALOWITZ:  Did your Honor want a written response?

7          THE COURT:  Only if you thought that's the best way

8    you want to respond.  If you want to respond orally, you can do

9    that.  I will hear them.

10          My view of it at this point is that if you have to

11    work real hard to convince me, then I am going to at least

12    reserve decision until after we get a verdict, and then I can

13    look fully at the transcript and fully evaluate that.  But if

14    there is something that is fairly obvious that we can talk

15    about that's clear to me that there is just no way at this

16    point a jury could find on that basis.

17          At this point, are you doing anything with harboring?

18          MR. YALOWITZ:  The two that we talked about.

19          THE COURT:  You're still going to request those

20    questions.

21          MR. YALOWITZ:  Yes.

22          There is law, like in the foreign sovereign immunity

23    cases, where Al Qaeda goes to Sudan and the country of Sudan

24    lets Al Qaeda have a base, and they say that's harboring

25    terrorists.  You can make that argument here but, quite

F2B8SOK7

1    frankly, it's not something I feel we really need to go to the

2    jury.

3              THE COURT:  I'm not sure I would understand that

4    argument here.

5              MR. YALOWITZ:  It's good that we don't have to discuss

6    it then.

7              THE COURT:  It's a basic principle.  If they gave safe

8    haven to someone that they knew who had committed a terrorist

9    act and was wanted for that, or they were seeking to find out

10   who it was, or they gave safe haven to someone in preparation

11   for a terrorist act, then that's harboring a terrorist.  It's

12   not rocket science.

13             I will look at it as to the ones you want it for, and

14   I think that if you want the jury to make a specific

15   determination separately as to one or two of these events and

16   you can convince me that there is sufficient evidence, when I

17   hear the motions we can discuss that further.

18             Give me as much as you can over the next couple of

19   days.  The building is closed tomorrow but --

20             MR. YALOWITZ:  ECF is still open.

21             THE COURT:  I have learned that 24 hours a day in this

22   trial.

23             MR. YALOWITZ:  We have learned it too.

24             THE COURT:  I would like to go back to the old ways,

25   where you mail it to me.

F2B8SOK7

1          I am going to try to, at least by Friday, to sort of

2     have a good idea of what you want and have a good idea of what

3     my position is so we can have further discussion Tuesday

4     morning, and then further discussion before I have to leave on

5     Tuesday, and then just finalize everything up on Wednesday

6     morning if we can have summations on Wednesday.  I will wait

7     till Tuesday to ask you about how long your summations will be

8     so we can plan the jurors' time.

9          If you have any specific recommendation about jury

10    instructions or the verdict form, give it to me as quickly as

11    possible.  We are at the point where we are not going to just

12    discuss it.  You have got to give me specific language that you

13    want, or tell me specific language that you want out or give me

14    a specific instruction, and if that's an appropriate

15    instruction on the law, then I will consider it and consider

16    putting it in.  If it's not an appropriate alternative

17    instruction, unless you convince me that I should come up with

18    a third alternative, I am going to pretty much stick with what

19    I have got.

20          MR. YALOWITZ:  I don't want to impose on you or your

21    clerk too much, but I know you have been working on these and

22    have made some adjustments.  If it's possible to get them

23    electronically, even in PDF form.

24          THE COURT:  If you give me substantially all of what

25    you recommend by tomorrow end of the day or early evening, I

F2B8SOK7

1    will try to be in here Friday to get it all done so that we can

2    electronically send it back to you in what you convince me or

3    not convince me the form that it should be so we can discuss it

4    first thing Tuesday morning or you can respond to it even

5    further over the long weekend.

6          MR. YALOWITZ:  Like I said, the only one that I think

7    here being open is ratification.  I know you're going to look

8    further at that.

9          THE COURT:  I will look further at that.  If you think

10   there is something else I haven't considered, you can ask me to

11   consider it, send it to me.  As I say, if I haven't already

12   said so, and I think I have, I'm leaning toward that it is not

13   an appropriate theory based upon the facts and the proof and

14   the evidence that's been presented in this case.

15         MR. YALOWITZ:  I am shocked to hear that.

16         THE COURT:  As I say, this is a pretty straightforward

17   dispute.  You say they did it.  They say they didn't.

18         MR. YALOWITZ:  That's great.  I think we will stand on

19   where we are, unless you have more questions.

20         THE COURT:  I will try to get it to you on that

21   schedule because I think it's time for you to spend most of

22   your time in preparing closing arguments and discussing this

23   with the jury rather than to try to argue it to me.  I want to

24   give you the full opportunity to be prepared for summations,

25   wind up this case with your last few witnesses, and then we can

F2B8SOK7

1    move forward efficiently on Tuesday and Wednesday.

2            If we can get this case to this jury by Thursday, we

3    can give them Thursday, Friday to deliberate, and if they have

4    to come back Monday to deliberate, we will give them that too.

5    In terms of the schedule, it has worked out well.  I think the

6    jury really did need this long weekend.  I think it's to your

7    advantage that the jury will have several days to rest before

8    they have to start to think about this case because I think it

9    is very demanding on the jury and on all of us.

10           I will see you on Tuesday.  I will wait to hear from

11   you tomorrow if you have something for me to look at.  And I

12   will try to prepare so we can get you something before Friday

13   night and I will send it to you.

14           Have a good weekend everybody.

15           MR. YALOWITZ:  Thank you, Judge.

16           THE COURT:  You're welcome.

17           (Adjourned to February 17, 2015, at 9:15 a.m.)

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                                Page

3    MICHAEL SFARD

4    Direct By Mr. Satin  . . . . . . . . . . . .3216

5    Cross By Mr. Yalowitz  . . . . . . . . . .3232

6    SHAWQI ISSA

7    Direct By Mr. Hill . . . . . . . . . . . .3240

8    RAJA SHEHADEH

9    Direct By Mr. Rochon . . . . . . . . . . .3274

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25