F2H8SOK1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MARK I. SOKOLOW, et al.,

 4              Plaintiffs,

 5        v.                              04 CV 397 (GBD)

 6   PALESTINE LIBERATION
     ORGANIZATION, et al.,
 7
                Defendants.
 8
     ------------------------------x
 9                                       New York, N.Y.
                                         February 17, 2015
10                                       10:00 a.m.

11   Before:
                    HON. GEORGE B. DANIELS,
12
                                         District Judge
13
                            APPEARANCES
14
     ARNOLD & PORTER LLP
15        Attorneys for Plaintiffs
     BY:  KENT A. YALOWITZ
16        PHILIP W. HORTON
          TAL MACHNES
17        SARA PILDIS
          CARMELA T. ROMEO
18        RACHEL WEISER
          LUCY S. McMILLAN
19
     MILLER & CHEVALIER, CHARTERED
20        Attorneys for Defendants
     BY:  MARK J. ROCHON
21        LAURA G. FERGUSON
          BRIAN A. HILL
22        MICHAEL SATIN
          DAWN E. MURPHY-JOHNSON
23

24

25
```

F2H8SOK1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          As you have already been notified, one of our jurors

4    was stuck in Connecticut and called this morning at about 8,

5    8:30 and said, she I believe, could not get down here today.

6    So I notified as quickly as possible all of the other jurors we

7    will adjourn until tomorrow.

8          Let's use the time productively though.  I have read

9    all the letters.  Let me first address the issue of what we

10   have planned for tomorrow.

11         Mr. Rochon, let me start with you.  Who do you intend

12   to call at this point?  How long is it going to take, and

13   basically what is going to be the subject of that testimony?

14         MR. ROCHON:  I expect to call two or three -- I am

15   going to make the decision on the third actually during the

16   examinations because there are two witnesses that relate to

17   potentially the Wafa Idris bombing.

18         The first witness will being Amneh Reehan, the woman

19   that wrote that letter.  The second witness will be General Abu

20   Yaman, who is one of the witnesses disclosed all along, and he

21   was a GIS officer who was responsible for directing the arrest

22   of Hashaika and eventually assisting in the transfer of

23   Hashaika from where he was arrested to Ramallah.  He will not

24   be testifying that he saw the man escape or that the man

25   escaped.  He is of the view that he did escape, but he can't

F2H8SOK1

1     testify to that from actual knowledge.

2              THE COURT:  So what is he going testify to?

3              MR. ROCHON:  The first part of that, that the PA

4     directed his arrest, wanted his arrest, and there was never a

5     direction that he be released.  And that goes as to the PA's

6     position as to this person Hashaika.

7              THE COURT:  Remind me -- go ahead.

8              MR. ROCHON:  The plaintiffs claim that Abdel Karim

9     Aweis got him from the jail, along with Nasser Shawish, the two

10    of them, and they have been arrested together in a town called

11    Tulkarm.  And from my client's standpoint, we wanted to

12    establish that he was in fact arrested, that the PA wanted him

13    in custody.  He has an official position.  That is this guy's

14    job.

15             THE COURT:  So he arrested this individual?

16             MR. ROCHON:  He directed the arrest of this

17    individual.  He was a more senior person.  He also helped to

18    coordinate the transfer, and the transfer of this individual

19    person from Tulkarm to Ramallah was done in coordination with

20    the United States.

21             THE COURT:  Was he on the Zinni list?

22             MR. ROCHON:  No, not that I know of.

23             Put it this way, no one says he was.

24             THE COURT:  He wasn't on the list that we saw.

25             So I am just trying to make sure I understand the

F2H8SOK1

1    limits and the scope of his testimony.

2              So he is going to say that he directed that he be

3    arrested.  And he is going to say he did that why?

4              MR. ROCHON:  Because they received information that he

5    was going to be engaged in an attack.  That information, I

6    believe, was provided by the Israelis to the Palestinians.

7              THE COURT:  He was arrested when?

8              MR. ROCHON:  February 10 or 11.

9              THE COURT:  Of?

10             MR. ROCHON:  2002.

11             THE COURT:  So he was arrested.  Remind me, which

12   incident?

13             MR. ROCHON:  The incident in which he did commit a

14   suicide attack was March 21.

15             THE COURT:  So he is going to say that the Israelis

16   told him to arrest him.  He gave the order to arrest that

17   individual.  That individual was arrested in about February of

18   2002.

19             MR. ROCHON:  Yes.

20             THE COURT:  What else does he have to say?

21             MR. ROCHON:  Then the decision was made that he should

22   be held in Ramallah instead of in Tulkarm because it was more

23   secure.  They coordinated the transfer of him from Tulkarm to

24   Ramallah.

25             THE COURT:  When?

F2H8SOK1

1          MR. ROCHON:  That would have been February --

2          THE COURT:  Still in February.

3          MR. ROCHON:  Yes.

4          THE COURT:  Days after his initial arrest.

5          MR. ROCHON:  Not long after his initial arrest.

6          THE COURT:  Do you know the date of his arrest?

7          MR. ROCHON:  The 10th is the arrest.

8          THE COURT:  He was transferred on what date?

9          MR. ROCHON:  Shortly thereafter.

10         THE COURT:  Within that week?  Three or four days or

11    three or four weeks?

12         MR. ROCHON:  Closer to three or four days.  The

13    witness doesn't have a specific date to give us, but not three

14    or four weeks.

15         THE COURT:  So the person arrested was suspected of

16    being a terrorist bomber, intending to carry out a terrorist

17    attack.  He was arrested in February and then he was

18    transferred to Ramallah.

19         What else does he have to say?

20         MR. ROCHON:  He assisted and coordinated, because they

21    needed Americans to assist, so he was transferred in an armed

22    convoy.  It was actually a convoy with the United States in the

23    front and rear car, Palestinians in the middle.  The reason is

24    because they were going through areas in which no Palestinian

25    security officials could have a weapon and they wanted the

F2H8SOK1

1      transfer --

2              THE COURT:  He was transferred to the Mukataa?

3              MR. ROCHON:  Yes, and placed into a cell there in the

4      military intelligence section.

5              THE COURT:  What else does he have to say after that?

6              MR. ROCHON:  That's the gist of his testimony as to

7      Hashaika.

8              THE COURT:  Does he have any knowledge about how

9      Hashaika got out of prison weeks before the terrorist attack?

10             MR. ROCHON:  He is not able to say that he got out

11     weeks before.  In fact, your Honor, I don't believe that's the

12     case.  He can't specify when he got out.

13             THE COURT:  He definitely got before March 21.

14             MR. ROCHON:  Exactly.

15             THE COURT:  He got out weeks before.

16             MR. ROCHON:  I don't know if it was weeks or days.

17             He is not going to offer testimony as to when he got

18     out.

19             THE COURT:  He has no testimony to offer as to when or

20     how he got out?

21             MR. ROCHON:  He has nothing that I would consider to

22     be admissible testimony that I could present as to how he got

23     out.  He has a view, but the rules evidence would not allow it.

24             THE COURT:  His view is as good as yours.

25             MR. ROCHON:  Probably a little better than mine, but

F2H8SOK1

1    not good enough.

2          THE COURT:  Not admissible evidence.  He has no

3    firsthand knowledge of how this guy walked out of prison or

4    escaped.  Ran, walked, crawled, however he got out of prison.

5          MR. ROCHON:  I can't offer him for that.

6          That's about 13 minutes of testimony.

7          THE COURT:  Do you have any problems with any of that,

8    Mr. Yalowitz?

9          MR. YALOWITZ:  Yes, I do.

10         THE COURT:  What is your problem?

11         MR. YALOWITZ:  Number one, I don't know what it means

12   to say he directed or coordinated.  If the guy --

13         THE COURT:  He gave the order.

14         MR. YALOWITZ:  That's what you said.  I didn't hear

15   Rochon say that.

16         THE COURT:  If he is not going to say that, then he is

17   not going to testify.

18         MR. ROCHON:  I believe I said he directed the arrest.

19         MR. YALOWITZ:  I don't know what that means.

20         THE COURT:  I assume he gave the order.

21         MR. ROCHON:  Yes.

22         MR. YALOWITZ:  Is that what that means?

23         THE COURT:  He just said yes.

24         MR. YALOWITZ:  He kind of mumbled it.  I didn't hear

25   it.

F2H8SOK1

1          THE COURT:  Yes is the answer.

2          MR. YALOWITZ:  All right.  That's the first thing.

3          The second thing is, this business about they couldn't

4     go through certain areas because Palestinians weren't allowed

5     to have guns.  That's clearly outside the bounds.  It's not

6     relevant.

7          THE COURT:  I agree with you.  I am going to keep that

8     out.

9          MR. YALOWITZ:  This is the problem I have with these

10    defendants and their witnesses.

11         THE COURT:  Tell me substantively what your problem

12    is.

13         MR. YALOWITZ:  I said it and you have said you're

14    going to keep it out.  I believe you.  I don't believe them.

15         THE COURT:  Anything else?

16         MR. YALOWITZ:  Yes.

17         THE COURT:  If he wants to say that they arrested him

18    with the assistance of the U.S. government and they had a

19    convoy that went and took him to Ramallah, I have no problem

20    with that.

21         MR. YALOWITZ:  I don't have a problem with that.

22         I am very, very concerned that we are going to have a

23    witness who tries to slip in hearsay.

24         THE COURT:  He will not.  I am directing he not.  It's

25    not going to happen.

F2H8SOK1

1          Mr. Rochon, you are going to instruct him that he is

2     not supposed to make any comment with regard to his opinion

3     about how this guy got out of prison.

4          Is that the issue you're worried about?

5          MR. YALOWITZ:  That is one issue I am worried about.

6     The other is I heard Rochon say there was never an order to

7     release Hashaika.  How can that guy possibly know that?

8          THE COURT:  He can say he never gave an order to

9     release Hashaika.  I don't know if that's what he is going to

10    testify to.  You're right, he can't testify that an order was

11    never given.  If they want to elicit that, he can say he never

12    gave an order to release.

13         Quite frankly, as I think it out, if he has no idea

14    how he got out, I don't know why it's relevant that he didn't

15    give an order to release him.

16         MR. YALOWITZ:  I agree with that.

17         THE COURT:  Mr. Rochon, did you intend to offer that

18    testimony?

19         MR. ROCHON:  Yes.  I feel like plaintiffs are doing a

20    heck of job of stripping away everything that we might put in.

21         Now, this witness directed his arrest.  He did not

22    give an order he be released.  He is a senior person in

23    Ramallah.  He is unaware of any order to direct his release.

24         THE COURT:  The fact that he unaware of it is

25    irrelevant.  You're not aware of it.  I'm not aware of it.  We

F2H8SOK1

1    don't know how he got out.  It doesn't make it more or less

2    likely that he got out based on someone else's assistance or

3    direction.

4           MR. ROCHON:  As a senior person in that particular

5    region, his lack of awareness of that is relevant.

6           It's one thing to say, does it prove conclusively no

7    order was given?  No.  But is it relevant that he is unaware of

8    any such order?  Of course it is relevant.

9           THE COURT:  It's only relevant that he never gave such

10   an order.  If he never gave such an order, maybe it's relevant.

11   I don't know why it's relevant at all since you're not calling

12   him for any circumstantial or direct evidence as to how he was

13   released.

14          If you're trying to imply that he must have escaped

15   because this person didn't give the order to release him, I

16   don't think that's admissible.

17          MR. ROCHON:  As long as the plaintiffs aren't going to

18   argue it was within Abdullah Karim Aweis's scope of

19   authority --

20          MR. YALOWITZ:  Of course it was.

21          MR. ROCHON:  Let me finish, Mr. Yalowitz.

22          As long as they are not going to argue that, then I

23   don't need to put in what my witness understood to be the

24   authority.

25          THE COURT:  I didn't understand that.

F2H8SOK1

1          MR. ROCHON:  They are going to claim Abdel Karim Aweis

2    got him out.

3          THE COURT:  Your witness doesn't know whether or not

4    Aweis got him out, right?

5          MR. ROCHON:  Right.

6          THE COURT:  That's the end of that discussion.  He

7    doesn't know whether that's true or not.

8          MR. ROCHON:  Judge, here is the argument.

9          You and Mr. Yalowitz are focusing on whether this guy

10   is going to say he escaped.  This testimony is relevant as to

11   whether or not, if Mr. Aweis did that, whether it was within

12   his scope of authority as an employee of the PA.  And in that

13   vein, it's important that I should be able to establish what

14   this individual's mental state was as to whether any such

15   release was authorized.

16         THE COURT:  How would he know that?

17         MR. ROCHON:  Because he is one step down in the GIS,

18   and GIS --

19         THE COURT:  He doesn't know whether his boss gave the

20   order.  He doesn't know whether Arafat gave the order.  He

21   doesn't know whether someone below him, above someone else gave

22   the order.  All he can say is he didn't give the order.

23         MR. ROCHON:  It is relevant as to whether or not an

24   order was given, whether or not this man ever was aware of such

25   an order.

F2H8SOK1

1          THE COURT:  Why?  Who cares if he is aware of the

2     order.  He either knows or he didn't know.

3          MR. ROCHON:  Because in the course of his duties, if

4     there had been such an order, it's the kind of thing he should

5     have been told about.

6          THE COURT:  Unless they didn't want him to know.

7          MR. ROCHON:  The question of whether or not it is

8     conclusive proof is different than whether it's relevant to

9     show an issue in dispute, which is whether or not Abdel Karim

10    Aweis acted within his authority if in fact he got him out as

11    they claim.

12         THE COURT:  The fact is, when he comes here to tell us

13    what he is unaware of is not a proper subject of his testimony.

14    He can tell us what he is aware of.  He is not the only person.

15    No one is arguing that it was his act that constituted the

16    scope of employment.

17              Unless he or someone else has some direct evidence to

18    give as to how this person got out of prison, the fact that he

19    doesn't have a clue about how he got out of prison, first of

20    all, that's a little inconsistent that he would have known if

21    somebody had given the order.  If he had gotten out anyway, he

22    should have known how he got out.  He should have some

23    information.

24         MR. ROCHON:  He has a clue.

25         THE COURT:  What basis does he have?  Did someone

F2H8SOK1

1    inform him how this guy got out?

2            MR. ROCHON:  No.  You said he doesn't have a clue.  He

3    actually has a clue.

4            THE COURT:  A clue means he knows.  He doesn't know,

5    right?

6            MR. ROCHON:  He has no admissible evidence.

7            THE COURT:  He doesn't know.

8            MR. ROCHON:  As you and I would use the word know, he

9    does not know.

10           THE COURT:  As he would use the word know, he would

11   say, I don't know.

12           MR. ROCHON:  Based on custom and practice, he would

13   have a view.  I am not going to seek to elicit it.

14           THE COURT:  If he is asked, do you know how this

15   person got out of prison, he would answer, no, I do not.

16           MR. ROCHON:  If you phrased the question to say, do

17   you know of your own person knowledge --

18           THE COURT:  I didn't say that.  If I ask him, do you

19   know how this person got out of prison, he would say I do not.

20           MR. ROCHON:  That would be the best answer you could

21   give.  Most human beings in that position, given what he knows,

22   he actually believes he escaped.

23           THE COURT:  How does he believe he got out?  What does

24   he believe happened that constituted his release from prison?

25           MR. ROCHON:  They received warnings from -- I am not

F2H8SOK1

1  seeking to elicit this.  But every time you ask me what he in

2  fact believes, Mr. Yalowitz thinks I am trying to get that into

3  evidence.

4            THE COURT:  It's not coming into evidence.  You're

5  saying it's relevant somehow to his state of mind and you keep

6  saying he has a clue and I want to know what that clue is.

7            What does he think happened?

8            MR. ROCHON:  He believes that when the Israelis called

9  to warn that there was going to a bombing of the Mukataa, the

10  men who were guarding the military intelligence prison, like

11  others in Mukataa, vacated it.

12            THE COURT:  Did they unlock all the doors so the

13  prisoners can get out?

14            MR. ROCHON:  Therefore, the security was such that

15  they could get out.

16            THE COURT:  What does that mean?  Just because the

17  guards left the prison -- I could be a guard at Rikers Island.

18  If I decide that somebody says there is a bomb threat and I run

19  out and I decide I'm not going to stick around, all the

20  prisoners don't get to walk out.  Someone has to release them

21  too.

22            MR. ROCHON:  In other prisons when they were blown up,

23  prisoners and officers died and --

24            THE COURT:  I am asking you, how does he think -- not

25  how the guards got out -- how does he think the prisoners got

F2H8SOK1

1    out?

2            MR. ROCHON:  He thinks at that point the security was

3    such that prisoners could get out.

4            THE COURT:  How?

5            MR. ROCHON:  Your view of the prison and mine --

6            THE COURT:  I am just asking you.

7            I am just asking you, tell me physically how he

8    believed the prisoners got out of prison.  He thinks everybody

9    got out?

10            MR. ROCHON:  Yeah, I think everybody did get out.

11            THE COURT:  How does he think that was effectuated?

12            MR. ROCHON:  Either when the bombing happened that

13    destroyed the prison or before.

14            THE COURT:  Or before?

15            MR. ROCHON:  Yes.

16            THE COURT:  How would it have happened before?

17            MR. ROCHON:  A guard may have unlocked doors so

18    prisoners wouldn't have got killed.  That wouldn't be a

19    release.

20            THE COURT:  That would be a release.  I am just

21    saying, I don't understand your argument.  That is a release.

22    If you want to argue they released him for another reason,

23    that's different.  That is a release.  If they open the door

24    and say, you know it's dangerous here, we don't think you

25    should stick around, go home, that's a release.  Right?

F2H8SOK1

1              MR. ROCHON:  I am not arguing to get that into

2     evidence.  The only reason we are talking about this is I

3     mentioned that he does in fact have what he considers to be a

4     clue as to how they got out.  I am not going to be putting that

5     into evidence.

6              What I am arguing for is that the witness who directed

7     the arrest should be allowed to say that he is unaware of any

8     order that they be released.

9              THE COURT:  What you just gave me of how he thought

10    they got out is inconsistent with that position, that he was

11    unaware of any order to release them.  You just said the way he

12    thinks they got out is because the place was going to be

13    bombed.  The people gave an order that all the guards should

14    leave and somehow before the prison was bombed somebody let

15    them out.

16             MR. ROCHON:  I am only trying to put in some of the

17    evidence.  I can tell you what the guy thinks happened.

18             The Israelis first hit on Mukataa was at a specific

19    place, a fuel plant.  When they hit that fuel plant there was

20    some damage to the prison as well.  He believes that is when

21    people got out.

22             THE COURT:  He believes they blew the wall open and

23    they just walked out.

24             MR. ROCHON:  I am not trying to get this into

25    evidence.

F2H8SOK1

1          THE COURT:  You are trying to get it in.  If you want

2    to abandon your proffer of his opinion or his knowledge about

3    whether somebody else gave the order, then we don't have to

4    have that discussion.  I am giving you an opportunity to

5    convince me that he has some basis on which to say that it's

6    more likely than not that nobody gave an order to release this

7    guy days or weeks before he committed a suicide bomb.

8          MR. ROCHON:  The only way a member of a law

9    enforcement organization can say he is unaware of an order is

10   to bring in every person --

11         THE COURT:  I never said that.  You don't have to

12   argue that.  I am trying to figure out what the basis is for

13   his knowledge and how is it relevant and how does it make it

14   more likely than not that he didn't give the order and he

15   wasn't there when somebody else gave the order.

16         MR. ROCHON:  He didn't give such an order.  He is the

17   number two man in this organization.  He believes that his boss

18   did not give an order.

19         THE COURT:  Why does he believe that?

20         MR. ROCHON:  Because his boss is the one who told him

21   to make sure these guys get arrested.

22         THE COURT:  So?

23         MR. ROCHON:  That is evidence that his boss wished for

24   them to be arrested.  That's inconsistent with that he wished

25   for them to be released.

F2H8SOK1

1          THE COURT:  No.  Clearly people have been arrested and

2  released according to the plaintiffs.  They say that's the MO.

3          MR. ROCHON:  They say that, but I don't have to accept

4  it.

5          THE COURT:  No, you don't.  You have to give me some

6  facts that dispute that.

7          What is the fact that he is going to testify to that

8  disputes that?  He has no more basis than you to even know

9  whether or not somebody else gave the order.

10         MR. ROCHON:  I would say to the court that your

11  questions to me I think are better for Mr. Yalowitz's cross

12  than as a basis to exclude from the evidence altogether this

13  witness's statement that he is unaware of any order directing

14  this person be released, given that he knows he didn't, and he

15  was the number two guy there, and he was in daily communication

16  with the number one guy, and the number one guy, who is Tawfiq

17  Tirawi.  Plaintiffs have said things about him, but we don't

18  have to accept them.

19         Tawfiq Tirawi is the one who told him to make sure

20  these people were arrested, that directed him to contact

21  Tulkarm and ensure their arrest.  Therefore, it would be

22  inconsistent with wanting the person out, to have arrested

23  them, and then move them to a more --

24         THE COURT:  Mr. Rochon, the problem I have -- and I

25  think this is your burden, not theirs -- the problem that I

F2H8SOK1

1   have with all of your arguments that you have made with regard

2   to whether he was released, or whether or not any of these

3   people were released, or whether they escaped, is you are in

4   the best position to call someone and tell us how these people

5   got out of prison.  You have decided not to do so, not to take

6   on that burden.  So I am asking you all of these questions, and

7   these aren't magical questions.  They are not trick questions.

8         I am asking you, look, your people, they controlled

9   the prison.  All you have to do is give me a proffer about what

10  you say is the true fact about how they got out of prison.  You

11  have declined to do so.  But you want to imply that there is

12  some basis to conclude that they got out innocently.  I can't

13  let you just hide behind the fact that you don't want to tell

14  us how they got out of prison because you know.  Your people

15  know.  They know one way or the other.  Just tell me how they

16  got out.  You keep dancing around this issue.

17        MR. ROCHON:  I can't find the guards who were in the

18  prison.

19        THE COURT:  You can tell me what the official position

20  is, chapter and verse, about how these people got out of jail.

21  You do not have that.  Your people have not told you that, or

22  if they have told you that, it is something you have decided to

23  decline to tell me.

24        I don't know how these people got out of prison.  Your

25  people know how these people got out of prison.  This is the

F2H8SOK1

1    guy you say is number two in the GIS and he doesn't know how

2    they got out of prison?

3              MR. ROCHON:  Judge, because he wasn't at the prison

4    when they got out.  The only evidence you are letting me put in

5    is an --

6              THE COURT:  I am letting you put in any person that

7    was at the prison when they were released, any person that was

8    there the day before, any person that can give me some facts

9    back up your theory of these people must have escaped.  That's

10   the only thing that you have proffered.

11             You have a theory that they must have escaped.  You

12   have no witness who is willing to come into this courthouse who

13   is an employee of the defendant who will say they escaped on

14   Tuesday because the building was bombed.  I was there on

15   Monday.  They were locked up.  I showed up on Wednesday and the

16   building fell down and the walls collapsed and everybody was

17   missing.  You have proffered no substantive evidence about how

18   they got out, which is a basis for me to conclude that, one,

19   either you don't want me to tell, which I don't conclude, or

20   your people are incapable of telling me.  So if they are

21   incapable of telling me, I am not going to let them come in

22   here and imply that they know something that they don't.

23             You have brought nobody in this case at all during

24   this trial to say how any individual who was locked up by the

25   PA or the PLO got out of jail.  Not a single fact.  Not a

F2H8SOK1

1    single witness who could testify as to either, direct or

2    hearsay evidence, as to how it is they got out.

3              What am I supposed to do with that?  I am supposed to

4    let you have people just keep saying we didn't release them, we

5    don't think anybody else released them, we think they must have

6    escaped?

7              MR. ROCHON:  If you let me put in hearsay evidence, I

8    would have had it.

9              THE COURT:  You're not entitled to hearsay evidence.

10   You have direct evidence.  You could have asked that.  As a

11   matter of fact, I asked you what the hearsay evidence is and

12   you have not to this day told me how any particular person got

13   out of prison even based on hearsay.

14             MR. ROCHON:  You have asked me --

15             THE COURT:  I asked you how did they get out.

16             MR. ROCHON:  I have a view of how they got out.

17             THE COURT:  I don't want your view.  I want a fact.  I

18   want somebody to say, you know what, even if it's hearsay, this

19   person can say, I am most concerned about this.  I showed up

20   the next day and I said, where are all the prisoners?  That's

21   what I would expect.  And then somebody would have said to him,

22   I'm sorry, general or colonel or whatever his title is, I'm

23   sorry, those people escaped yesterday.

24             You're saying he is so concerned about arresting him

25   and transporting him to a more secure facility.  The day after

F2H8SOK1

1    they are all missing, he doesn't have a clue how they got out.

2    Doesn't have a report from anybody, written or oral, as to the

3    details of how these people left the prison.  There is no

4    person that you have alluded to that had direct or

5    circumstantial evidence and can tell us how these people left

6    the prison.

7            So he can come and he can testify about how he made

8    the arrest and how he delivered these people to the prison and

9    the last thing he saw was that they were locked up in the

10   prison.  If he wants to testify, and I am not even sure why he

11   should go there, but if he wants to testify that he didn't

12   personally give an order to release them, he can testify to

13   that.  He cannot testify about his knowledge or lack of

14   knowledge about whether or not anyone else gave an order to

15   release him.

16           That's my ruling.

17           MR. ROCHON:  I understand the court's ruling.  The

18   court's questions and comments as to whether there is a factual

19   basis for our belief that they escaped --

20           THE COURT:  I asked you what is the factual basis.

21           MR. ROCHON:  We have talked to many people who have

22   given us reports that they escaped.

23           THE COURT:  How did they escape?  That's a very simple

24   question.

25           MR. ROCHON:  What we have been told by others is the

F2H8SOK1

1  jail was destroyed and that's how these guys got out.  I don't

2  have the witness to present on that.

3           THE COURT:  They didn't get out all on the same day.

4           MR. ROCHON:  These two did.

5           THE COURT:  You have made the same argument.

6           MR. ROCHON:  Barghouti wasn't in the same prison.

7           THE COURT:  That's the point.  His prison wasn't

8  destroyed.  So that's not the argument for how he got out.

9           You have got nobody who said, I heard that this is

10  exactly -- what is the fact about what you heard, hearsay or

11  otherwise, about how Barghouti got out?

12           MR. ROCHON:  We have heard the same thing, that there

13  was a destruction of the jail.

14           THE COURT:  That means what?  That means the jail was

15  bombed and the walls were destroyed and so they just walked out

16  of the prison.  That is what your belief is.

17           MR. ROCHON:  That's our understanding.  I don't have

18  an eyewitness on it, your Honor.

19           THE COURT:  You don't have any report, even a hearsay

20  report, to anybody?

21           Mr. Rochon.

22           MR. ROCHON:  On Hashaika we do have a report.  It's in

23  evidence.

24           THE COURT:  Not as to the details of how he got out of

25  the prison.

F2H8SOK1

1          MR. ROCHON:  As to the fact of the escape.

2          THE COURT:  Think about it.  You're telling me how

3    important it is to make sure these people were in a secure

4    facility.  These people are just missing the next day.  You're

5    saying there is no investigation, there is no written report,

6    there is no I spoke to this guard and this guard said.  There

7    is absolutely nothing that indicates how it is that they

8    escaped except this one reference.  I can't even say that.

9    There is absolutely no written or oral statement by anyone or

10   received by anyone as to how they got out other than they must

11   have escaped.

12         MR. ROCHON:  As to Barghouti, I proffered to you that

13   there was an investigation.

14         THE COURT:  How was it determined that Barghouti got

15   out?

16         MR. ROCHON:  That he had escaped.

17         THE COURT:  How?

18         MR. ROCHON:  I wasn't allowed to put it in.

19         THE COURT:  Tell me.  I am asking you to tell me that.

20         MR. ROCHON:  Destruction of the facility.

21         THE COURT:  How does that facilitate his release?

22         MR. ROCHON:  It wasn't secure anymore.

23         THE COURT:  What does that mean?  The lock was broken?

24   The walls fell down?  Did all the other prisoners escape at the

25   same time?  What does that mean?

F2H8SOK1

1          MR. ROCHON:  Judge, what it means is this.  During

2     that period of time, as you have heard, jails were being

3     bombed, prisons were being bombed.

4          THE COURT:  You don't have to go back through that.

5     That doesn't tell me the details of how this individual left

6     the prison or how any individual left the prison.  You want to

7     give me a general, oh, well, anybody that you figured out that

8     we arrested and was in prison is no longer in prison, it's

9     because they escaped when the building was blown up.  That's

10    all you have given me.

11         MR. ROCHON:  As to these two individuals, which are

12    the only ones in question in this case --

13         THE COURT:  Are these the only two individuals that

14    escaped when the building was bombed?

15         MR. ROCHON:  We haven't conducted a factual

16    investigation as to others.

17         THE COURT:  You didn't ask anybody that?

18         MR. ROCHON:  It hasn't been our focus.  It is 13 years

19    ago.

20         THE COURT:  So?

21         MR. ROCHON:  It will a little hard to find --

22         THE COURT:  So are all of these facts you're trying to

23    give the jury 13 years ago.

24         MR. ROCHON:  I am just saying when the court suggests

25    that the absence of a witness to corroborate what others

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2H8SOK1

1   understand to be the case --

2          THE COURT:  It's not an absence of corroboration; it

3   is an absence of any explanation about how they escaped during

4   bombings of the prisons.

5          MR. ROCHON:  Somehow I have ended up telling you that

6   I am not trying to put on a witness to say that he escaped.

7          THE COURT:  You said you want him to say he is not

8   aware of anyone giving an order to release him so that the jury

9   can imply and infer that he must have escaped.  It has no other

10  relevance, does it?

11         MR. ROCHON:  It goes as to whether or not if Abdel

12  Karim Aweis, who was subordinate to this individual, got him

13  out, it was not with authority.  They want to argue it was

14  within the scope of his authority when he got him out.  They

15  want to argue that.  It is relevant to his scope of authority,

16  the fact that this individual is unaware of any such order.

17  That doesn't infer escape or not escape.  But it does go to

18  scope of authority.  To prohibit us from putting that on allows

19  the plaintiff to argue that was within the scope of authority

20  and limits us --

21         THE COURT:  This guy cannot say that an order was not

22  given by this person and he cannot say that that order wasn't

23  within the scope of his authority.

24         MR. ROCHON:  I am not going to say --

25         THE COURT:  He can't say that.

F2H8SOK1

1          MR. ROCHON:  But he can say, but you won't let me.

2          THE COURT:  Every witness you want to call can say, I

3    am unaware of any order releasing this guy from prison.  You

4    had the head of GIS here.

5          MR. ROCHON:  Yes.  He wasn't head of GIS at the time.

6          THE COURT:  He wasn't head of GIS either.

7          MR. ROCHON:  He was the person who coordinated the

8    arrest of the individual, the placement of where he was

9    located.

10          THE COURT:  Did he head up any investigation as to how

11    this person got out of prison?

12          MR. ROCHON:  No, sir.

13          THE COURT:  OK.  That issue is set aside.  He can't

14    testify that he is unaware that somebody else gave the order.

15          You have another issue on that witness?

16          MR. YALOWITZ:  Yes, I do.  I have a big issue about

17    closing with all of this.  Mr. Rochon just stood here and he

18    looked you in the eye and lied to you.

19          MR. ROCHON:  You know, Judge --

20          THE COURT:  That blows past me, Mr. Rochon.  You know

21    that.

22          MR. YALOWITZ:  He put on a witness Faraj who said

23    there was only one jail that was destroyed.  That was the sworn

24    testimony of his witness, Faraj.  He put on a witness Ashrawi

25    who said that the Mukataa prison was bombed at the end of March

F2H8SOK1

1    or later 2002.  So that's not when Hashaika got out of jail.

2    Hashaika was already dead by then.  Then he put on a witness

3    Shehadeh, who said the preventive security, which is where

4    Abdullah Barghouti was held, that building was bombed in April

5    of 2002, and Abdullah Barghouti was released in August of 2001.

6             So if he is willing to look you in the eye -- I will

7    be more polite -- and bullshit you, then what is he going to do

8    with the jury talking about all of the prisons were destroyed?

9             THE COURT:  Mr. Yalowitz, I am going to put a stop to

10   this.  Don't use that kind of language to describe anything

11   that's going on in this case.  Have a seat.

12            Mr. Rochon, your third witness, let's assume your

13   third witness is going to testify, what is this third witness

14   going to testify to?

15            MR. ROCHON:  He is the one who filled out the Wafa

16   Idris martyr file.  He is actually the person who filled out

17   the file.  He doesn't know if somebody filled it out.

18            THE COURT:  He is going to testify to what?

19            MR. ROCHON:  As to the basis for the language in the

20   file.  In the file there is language that the plaintiffs have

21   alluded to that characterizes the operation and he would

22   explain why he wrote that.

23            THE COURT:  What is he going to explain?

24            MR. ROCHON:  That's how it was referred to in the

25   public media and that was his source of the information.

F2H8SOK1

1          THE COURT:  What facts are you focused on?

2          MR. ROCHON:  Wafa Idris.

3          THE COURT:  What was the issue?

4          MR. ROCHON:  In the recommendation portion of the

5   file, plaintiffs have focused on a statement that -- I will get

6   the exact language -- that she died in a heroic martyrdom

7   operation.  That's in his handwriting.  I would like to ask him

8   where did you get that information.

9          THE COURT:  What is he going to say?  That wasn't his

10  conclusion?

11         MR. ROCHON:  That was how it was referred to in the

12  media.

13         THE COURT:  He wrote that based on the reference in

14  the media.

15         MR. ROCHON:  He would explain, when you have a

16  situation like that, they have no evidence of what happened

17  other than the family coming in, because they don't have a

18  body, they don't have a death certificate.  All they have is

19  really what the family says or public information and that's

20  why he wrote that letter.

21         THE COURT:  At most, we will have two to three

22  witnesses by the defense tomorrow.

23         MR. ROCHON:  Yes.  Total testimony I think an hour, 15

24  minutes, unless the cross is very long, which hopefully, given

25  how tailored I have tried to make my direct, should not be an

F2H8SOK1

1    opportunity to get into the entire case and say, what do you

2    think about this, that and the other thing?  Because I think

3    what is sauce for the goose should be sauce for the gander.

4            THE COURT:  It usually is in this courtroom.  Neither

5    one of you has been happy with any of my rulings.

6            Mr. Yalowitz, after the defense rests, first of all,

7    you want to offer Exhibit 1281?  Is that the primary purpose of

8    this rebuttal?

9            MR. YALOWITZ:  No, that's not the primary rebuttal.

10           Remind me, 1281 is?

11           THE COURT:  1987 designation.

12           MR. YALOWITZ:  That's definitely not the primary

13   purpose.

14           THE COURT:  Are you intending to attempt to offer that

15   in evidence?

16           MR. YALOWITZ:  We are considering offering that in

17   evidence.

18           THE COURT:  You can forget that.

19           MR. YALOWITZ:  Fine.

20           THE COURT:  There is already testimony in this case

21   that during the relevant time period the PLO was not considered

22   to be a terrorist organization designated by the United States

23   or the Secretary of State.  That's the relevant time period.

24   1987 is a whole different ball game.

25           MR. YALOWITZ:  Let's move on.

F2H8SOK1

1          THE COURT:  I am not so sure what you want to call the

2     rebuttal witness to say.  What is he rebutting?

3          MR. YALOWITZ:  For example, we heard testimony that

4     Tirawi is a free man today, and there is an implication that

5     Shrenzel was incomplete in his description of what was going on

6     with Tirawi during cross.  I want to clean that up.

7          THE COURT:  What do you say it was implied that

8     Shrenzel did or didn't?

9          MR. YALOWITZ:  Shrenzel said Tirawi was not indicted

10     or tried or convicted because the Israeli authorities did not

11     catch him.

12          THE COURT:  Right.

13          MR. YALOWITZ:  The implication from the Faraj

14     testimony was he was easy to catch.  There was no problem.  And

15     therefore Shrenzel must have been lying.  That's the

16     implication.

17          THE COURT:  He doesn't have to be lying.  He just

18     doesn't have to be correct.

19          MR. YALOWITZ:  Or he wasn't correct.

20          So Shrenzel can explain that answer.  He is going to

21     say that Tirawi was in the Mukataa under the protection of

22     Arafat.  And then there was a change in policy toward Tirawi.

23          THE COURT:  By whom?

24          MR. YALOWITZ:  By the Israeli authorities.

25          THE COURT:  If anything, that's what contradicts him,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2H8SOK1

1     not the other testimony.  He didn't say that he wasn't arrested

2     because there was a change in policy by the Israelis.  He said

3     he wasn't arrested because they couldn't find him.

4               MR. YALOWITZ:  He said they didn't catch him.

5               THE COURT:  Let me take your words.  They didn't

6     arrest him because -- they didn't catch him.  I think you would

7     agree that the reasonable import of his testimony was that he

8     was not arrested because they couldn't find him and they

9     couldn't arrest him.  That's what he said.

10              MR. YALOWITZ:  They knew exactly where he was.

11              THE COURT:  But he had an opportunity to say that

12    ultimately the real reason he wasn't arrested was because the

13    Israelis made a decision not to arrest him.

14              MR. YALOWITZ:  Right.

15              THE COURT:  But he never said that.

16              MR. YALOWITZ:  He can say that now.

17              THE COURT:  Shouldn't he have said that while he was a

18    witness on direct, redirect or cross?  How does that rebut

19    something that happened on the defense case?

20              MR. YALOWITZ:  Because the defense says he is a free

21    man today.

22              THE COURT:  Isn't that true?

23              MR. YALOWITZ:  I think it is true.

24              THE COURT:  And he is a free man because the Israelis

25    don't want him.

F2H8SOK1

1              MR. YALOWITZ:  I think that's true.

2              THE COURT:  But he is not a free man because they

3     can't find him or they can't arrest him.

4              MR. YALOWITZ:  Right.

5              I think he should be allowed to give a moment of

6     testimony --

7              THE COURT:  What is he going to say about why he

8     didn't testify to that as the reason this person was not

9     arrested?

10              MR. YALOWITZ:  Because I didn't ask him.

11              THE COURT:  He was asked.  He was asked, why didn't

12     they arrest him and he said that they couldn't find him.

13              MR. YALOWITZ:  I don't think he said that.

14              THE COURT:  That's what he meant.

15              MR. YALOWITZ:  I don't think that's what he meant.

16              THE COURT:  What did he mean?

17              MR. YALOWITZ:  I believe what he meant was they chose

18     not to capture him.

19              THE COURT:  That's not what he said.  Do you have his

20     transcript page you can reference me to?

21              MR. YALOWITZ:  We can look it up.  We looked at it

22     over the weekend.

23              THE COURT:  That's clearly not my recollection.

24              MR. YALOWITZ:  He said capture.

25              THE COURT:  He clearly gave the jury the impression

F2H8SOK1

1    that they were unable, not unwilling, but unable to arrest him.

2              MR. YALOWITZ:  Let's look at it.

3              THE COURT:  Does anybody have that page?

4              MR. HILL:  1588.

5              MR. ROCHON:  That is one of the references.  Also

6    1514, he said:  Because he was not in the hands of the Israeli

7    authorities, that's the only reason.  Were he captured by the

8    Israelis, as we really like to do, he would have been indicted.

9              Later he said that he was one of the most wanted

10   terror operatives by Israel.  He was not captured by Israel and

11   was not put to justice.

12             THE COURT:  The first part is what I remember.  What

13   was the first part again?

14             MR. ROCHON:  1514, your Honor.

15             THE COURT:  Let me just take a look.  I don't have a

16   strong opinion.

17             MR. YALOWITZ:  What happened was Mr. Rochon takes what

18   he says and kind of shifts it a little bit and leaves you, and

19   perhaps the jury, with a misimpression.

20             THE COURT:  If it was a misimpression, it was given by

21   Shrenzel, inadvertently or deliberately, because he did not say

22   that they decided they no longer wanted him for any crime.

23   That would have been the natural answer to that question,

24   wouldn't it?

25             MR. YALOWITZ:  There are two fact points that I think

F2H8SOK1

 1    should be cleared up based on the testimony of Faraj and the

 2    questions of Faraj about could have been captured.

 3            Point number one, the Israeli authorities did not

 4    capture Tirawi because they didn't want to break into the

 5    Mukataa or Arafat was protecting Tirawi, number one.

 6            Number two --

 7            THE COURT:  Where does he get that from?

 8            MR. YALOWITZ:  That I can't tell you what his basis

 9    for it is off the top of my head.

10            THE COURT:  That's a fact.  That's not an opinion.

11            MR. YALOWITZ:  That's a fact.

12            THE COURT:  I assume he wasn't there personally.

13    Where does he get that fact from?

14            MR. YALOWITZ:  I have to ask him.

15            THE COURT:  You better ask him because he is not going

16    to testify because that's what he wants to say.

17            What is the second?

18            MR. YALOWITZ:  Fact number two is that the Israeli

19    government had a change in policy and decided no longer to

20    pursue Tirawi.

21            THE COURT:  OK.  He is going to say the reason why he

22    is not today in prison, the reason why he was never indicted

23    ultimately is because they decided not to indict.

24            MR. YALOWITZ:  Correct.

25            THE COURT:  But that's not the answer he gave.

F2H8SOK1

1          MR. YALOWITZ:  I think it's consistent with the answer

2     he gave, which is they didn't catch him.

3          THE COURT:  No.  Mr. Yalowitz, you're giving me lawyer

4     speak now.  This is common sense.

5          The guy was asked, you asked the guy correctly, what

6     happened to this guy?  And somebody asked him more than once,

7     why didn't they ever arrest this guy?  And he said because they

8     couldn't capture him.  That's all he said.

9          MR. YALOWITZ:  He didn't say they couldn't capture

10    him.

11         He said they didn't capture him.  Unfortunately,

12    that's an ambiguous answer.

13         THE COURT:  The direct, truthful answer would have

14    been that because they ultimately decided they didn't want him.

15    He never volunteered that.  He never cleared that up.

16         Look, I don't need to debate this point with you.

17    Quite frankly, if you want to call him for that purpose and

18    subject him to further cross-examination on that issue, I guess

19    they would welcome that.

20         Is there anything else other than trying to clear up

21    the misconception that you say that they have created on their

22    case that somehow he was not arrested because the Israelis

23    didn't want him?

24         MR. YALOWITZ:  Yes.  There are a couple of other

25    things.

F2H8SOK1

1          THE COURT:  What else?

2          MR. YALOWITZ:  The relationship between the defendants

3     and Hamas, which Faraj testified about that it was a terrible,

4     hateful relationship.

5          THE COURT:  What is he going to say that he didn't

6     already say?

7          MR. YALOWITZ:  He is going to say that this guy

8     Yassin, the guy with the picture being kissed, wasn't a

9     spiritual leader, wasn't about to die, which is the impression

10    that the defendants left, that he was actually an important

11    Hamas guy.

12         THE COURT:  We know he was an important Hamas guy.

13    How does he know he wasn't about to die?

14         MR. YALOWITZ:  Because he didn't die in 2004.

15         THE COURT:  When was this kiss supposedly?

16         MR. YALOWITZ:  Before he died.

17         THE COURT:  How much longer before?

18         MR. YALOWITZ:  I can't say.

19         THE COURT:  I don't want to waste a lot of the jurors'

20    time.  He is going to rebut their statement that he was going

21    to die.

22         MR. YALOWITZ:  He is going to rebut the impression

23    left with the jury that there was a hostile relationship

24    between Hamas and the PA.

25         THE COURT:  He is going to rebut that by saying what?

F2H8SOK1

1          MR. YALOWITZ:  Number one, he is going to comment on

2     it briefly.

3          THE COURT:  What is he going to say?

4          MR. YALOWITZ:  He is going to say that they had a

5     cooperative relationship during the Intifada.

6          THE COURT:  Which means what?

7          MR. YALOWITZ:  Which means they did operations

8     together.

9          THE COURT:  What does that mean?

10         MR. YALOWITZ:  They planned suicide operations and

11    conducted suicide operations together.

12         THE COURT:  What is he basing that on, that they

13    planned suicide operations together?

14         MR. YALOWITZ:  He has done the research of looking up

15    many suicide operations.

16         THE COURT:  Is that in his expert report?

17         MR. YALOWITZ:  I don't believe it is, no.

18         THE COURT:  On what basis does he have the right to

19    give that expert opinion at this point in this trial?

20         MR. YALOWITZ:  I think it's fair ground for rebuttal.

21         THE COURT:  Why?

22         MR. YALOWITZ:  Because the defendants, unexpectedly in

23    my view, said that they have a hostile relationship.

24         THE COURT:  What did you expect them to say?

25         MR. YALOWITZ:  I expected them to focus on the 2000 to

F2H8SOK1

1   2004 period and not start in with 2007 and later periods

2   which --

3                THE COURT:  You want him to rebut the relationship in

4   2007?

5                MR. YALOWITZ:  I want him to come back to 2004.

6                THE COURT:  Hasn't he already said that?

7                MR. YALOWITZ:  Eviatar said it.

8                THE COURT:  Somebody said it.

9                MR. YALOWITZ:  The other thing I want him for, and

10  really it's just a moment or two, I want him to foundationalize

11  that video of Muhammad Dahlan saying we protected Hamas.  We

12  talked about that video.  I want him to set the foundation for

13  him.

14               THE COURT:  Why is that video now admissible?

15               MR. YALOWITZ:  The video is of Dahlan.  This is

16  Exhibit 217, which we looked at.  This is Dahlan during a

17  period when he is an employee of the defendants.

18               THE COURT:  What period of time is that?

19               MR. YALOWITZ:  Like 2001.

20               THE COURT:  And he said what?

21               MR. YALOWITZ:  He said we protected Hamas.  That

22  rebuts the testimony of Faraj that they didn't cooperate with

23  Hamas.

24               THE COURT:  Didn't cooperate with Hamas on what?

25               My understanding was, and the reason I excluded the

F2H8SOK1

1    video, is because the video was not commenting on what you want

2    to use it for.  The video was saying, look, we are the order in

3    the West Bank and our responsibility is to protect all of the

4    citizens of the West Bank and certain individuals who

5    are -- there are two types of individuals.  There are certain

6    individuals who Israelis tell us to arrest, and we do the

7    arrests, or as you say, we don't do the arrests.  We arrest

8    them and let them go.  But there are certain other individuals

9    that the Israelis have targeted for assassination.  It is our

10   responsibility to protect everyone in the West Bank from

11   assassination.

12           That is not part of the deal.  So yes, we have the

13   responsibility to protect the lives of the people in Hamas,

14   just as we have the responsibility to protect the lives of

15   other Palestinians.  And if the Israeli government wants to

16   arrest these people, then they should arrest these people.  But

17   they can't blow up their houses with them and their families in

18   it because we have a responsibility to protect all of the

19   Palestinians.  That was my reading of the statement out of

20   context.

21           You still want to use that to imply that they were

22   saying that they were planning terrorist attacks together?

23           MR. YALOWITZ:  I must be -- maybe I am misremembering

24   this one, your Honor.

25           THE COURT:  Maybe I am misremembering it.  I thought

F2H8SOK1

1    it was a video.

2              MR. YALOWITZ:  This is one we showed the witness

3    outside the presence of the jury because we thought it was

4    inconsistent with his testimony which was that they were trying

5    to arrest people from Hamas.  His testimony was our job was to

6    arrest all the Hamas guys.  Then this wasn't his direct boss

7    but it was the guy in Gaza who had the parallel title.  I

8    thought we showed it to him on the theory that if he had seen

9    it, it would come in because it was inconsistent with his

10   testimony.

11             THE COURT:  Do we have it?  Can we take a quick look

12   at it.  If it's the one I remember, it may have been the one

13   you played for him.  I know you played three.

14             MR. YALOWITZ:  I think there was Tirawi Facebook page,

15   which we said we weren't going to use.  Then there were two

16   videos, one of which was from a much later time period, and he

17   didn't remember it and I think we concluded that that's just

18   not going to come in.  And then I thought this one, the issue

19   was just foundationalizing its date.

20             Let's see if we can put it up on the screen.

21             THE COURT:  While we are doing that, anything else he

22   is supposed to rebut?

23             MR. YALOWITZ:  The other thing is, we have the police

24   statement by Ahmed Barghouti.  Remember, Ahmed Barghouti is the

25   Barghouti who took the engineer Abdullah Barghouti from the

F2H8SOK1

1    prison to the safe house.  And Ahmed, in his custodial

2    statement, which I didn't offer in my direct case, made some

3    comments about the release of -- said, on the day Abdullah was

4    released, I got a call and went over to the prison and took him

5    to the safe house.

6            THE COURT:  How does that rebut?

7            MR. YALOWITZ:  It's a third guy talking about the

8    release issue.

9            THE COURT:  What are you rebutting?

10           MR. YALOWITZ:  The hearsay testimony that he escaped.

11   Remember, Faraj slipped in this hearsay testimony, oh, I heard

12   he escaped.  We then unredacted the Abdullah Barghouti

13   statement in which he said I was released.  This is the guy

14   that went and got him from the prison and he also says, he uses

15   the word released in his statement.

16           I didn't offer it in direct because we had talked

17   about the issue of the release and I had understood your views

18   on that.  So I want to offer this document in evidence.  I just

19   want to foundationalize it and put it in and say, here is

20   another document saying he was released, another report.

21           THE COURT:  My ruling was a little more limited than

22   that.  My ruling was that you had the right, once that witness

23   said that he had escaped, to put Abdullah Barghouti's statement

24   before the witness to ask the witness was he aware of the

25   statement that he made that he was released.  That was for

F2H8SOK1

1    impeachment purposes.  That was not for substantive evidence

2    purposes.

3            So at that point I thought it was appropriate for you

4    to cross-examine him with regard to that issue.  But now you

5    simply want to offer extrinsic evidence through this statement

6    that was otherwise inadmissible through this witness, that was

7    inadmissible prior to that witness's testimony, and its

8    admissibility status hasn't changed.  I don't know if I would

9    have granted the application if you said you wanted to ask him

10   and cross-examine him or try to impeach him with that

11   statement.

12           MR. YALOWITZ:  Let me do this with that document

13   because I don't think you have seen it.

14           THE COURT:  It was attached to your letter, wasn't it?

15           MR. YALOWITZ:  1147B?  I'm not sure.

16           THE COURT:  Maybe it was attached to their letter.

17           MR. YALOWITZ:  So you have it, 1147B.  Take a look at

18   it.

19           If your ruling is you're not going to let it in --

20           THE COURT:  You want to let it in now as substantive

21   evidence of the fact that he was released.

22           MR. YALOWITZ:  Right.

23           THE COURT:  Because Ahmed said it during his, was it

24   his interrogation?

25           MR. YALOWITZ:  Correct.

F2H8SOK1

1          THE COURT:  That doesn't change its hearsay nature.

2          MR. YALOWITZ:  I don't want debate.  You know your

3     views on the hearsay issue.  I think you know my view on the

4     hearsay issue too.

5          My view is it's part of his overall statement.  You

6     have to look at it and draw that line.  And if you have looked

7     at it and drawn the line, then I don't want to debate it with

8     you.  I didn't think you had seen it.

9          THE COURT:  I had seen it even before that.

10         MR. YALOWITZ:  If you have ruled it's out, that's

11    fine.  We will move on.  I didn't understand.

12         THE COURT:  We discussed it specifically before.

13         MR. YALOWITZ:  I know we have discussed it.

14         THE COURT:  I know I have read it.

15         MR. YALOWITZ:  You understand where I am with that.

16    You have got it.  It's there.  It says what it says.

17         THE COURT:  That portion of it, as I say, I don't

18    think I am going to let you backdoor it, as they say, by trying

19    to get it in now as substantive evidence when it doesn't

20    qualify as substantive evidence.

21         MR. YALOWITZ:  I understand your ruling on it.

22         THE COURT:  It was within my discretion.  I think I

23    gave you the appropriate leeway with regard to cross-examining

24    that witness about the basis for his saying this person was

25    released, particularly since he didn't have any personal

F2H8SOK1

1    firsthand knowledge.

2            So I gave you that other document, let you ask him

3    about it, and it's out there as something that is not

4    consistent with his general impression that somehow this guy

5    escaped.

6            MR. YALOWITZ:  OK.  I understand your ruling on that.

7    That's fine.

8            If I had understood it before, we wouldn't have gone

9    through and around it.

10            THE COURT:  Anything else that he is going to testify

11    to before I hear from Mr. Rochon?

12            MR. YALOWITZ:  A couple of other things.

13            There are a couple of dates I want him to nail down,

14    just very short, that have kind of become relevant based on the

15    defendants' case.

16            Number one, that this Operation Defensive Shield began

17    on March 29, 2002.  That's just a very basic fact.

18            Number two, that Abu Ali Mustafa was eliminated on

19    August 27.  It has become relevant because we have unredacted

20    that.

21            THE COURT:  We don't have that in evidence?

22            MR. YALOWITZ:  Neither of those are in.

23            THE COURT:  All right.

24            MR. YALOWITZ:  There is one prisoner file where there

25    was a translation issue.

F2H8SOK1

1           Faraj, when he was shown the prisoner file of Majed
2    al-Masri, said it looks like his mother is getting the money.
3           THE COURT:  Is he going to say something different?
4           (Continued on next page)

F2HTSOK2

1     MR. YALOWITZ:  No, no, he read it and he's going to

2 show the jury exactly -- he's going to explain what that -- or

3 pick word is that Faraj was claiming to translate, and he's

4 going to link -- he's going to show to a fair-thee-well in a

5 minute and a half that Faraj is -- that Al-Masri is the one

6 getting the money, not his mother, not his wife.

7     THE COURT:  It doesn't say mother?

8     MR. YALOWITZ:  It doesn't say mother.

9     THE COURT:  Why is that an expert opinion rather than

10 a translation opinion?

11     MR. YALOWITZ:  It's a translation.  He knows how to

12 translate.

13     THE COURT:  But we have the translator who translated

14 it and you had a guy sitting at the table who was agreeing or

15 not agreeing with the translation.  So where is there some

16 evidence that is not what it means?

17     MR. YALOWITZ:  So I can't put -- I can't -- it's their

18 case, I can't bring a guy who is a translator and say wait a

19 minute, this means such and such.

20     THE COURT:  You can at the table because the guy was

21 sitting right next to you.  You're saying that that was not --

22 you want Shrenzel, who is not an expert in interpretation, to

23 testify to that when nobody -- your expert never said that was

24 an incorrect statement on the piece of paper?

25     MR. YALOWITZ:  Wait a minute, we have got -- I want to

F2HTSOK2

1    make sure we're talking about apples and apples.  So the issue

2    was not the words coming out of Faraj's mouth, those I didn't

3    have a problem with the way they were translating.

4                THE COURT:  But you said mother of the defendant.

5                MR. YALOWITZ:  Right.  And that was not correct, and I

6    don't have any way of putting somebody on while he's testifying

7    to say he's misreading the word.  All I can do is --

8                THE COURT:  You did.  Well, I guess if it's not -- I

9    mean I thought he gave us two portions on that document that

10   referenced the mother.

11               MR. YALOWITZ:  Well, that's why we need to clean it

12   up, because it didn't reference the mother, and it's pretty

13   obvious that it doesn't, and it's not going to take long to

14   clean that up, and it goes to the guy's credibility.

15               THE COURT:  What is it supposed to say?

16               MR. YALOWITZ:  What it says is -- it says the

17   detainee's or the prisoner's bank account -- it doesn't say the

18   prisoner's mother, it says the prisoner's bank account, and

19   then --

20               THE COURT:  I think he said what was handwritten said

21   the prisoner's mother, the mother of the prisoner.

22               MR. YALOWITZ:  And that's incorrect, that's an

23   incorrect reading of those words.  That's not what those words

24   say.  They don't say the mother of the prisoner, they say the

25   bank account of the prisoner.  And Faraj wouldn't admit it

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F2HTSOK2

1    because he said the copy was illegible, and it really will not

2    take long to clean this up.

3           THE COURT:  Anything else?

4           MR. YALOWITZ:  Yeah, two other things.  One is in

5    response to the Ashrawi testimony -- and I don't know if you

6    will let me do it, but Ashrawi came and said I'm for peace and

7    I was there for Arafat in the 2002 period in Washington.  What

8    she didn't say is that as a result of Arafat's conduct, the

9    President of the United States -- because I started to ask her

10   this question and you sustained the objection -- the President

11   of the United States decided that he would no longer deal with

12   Arafat because, in the views of the United States government,

13   Arafat was compromised by terror.  And the President made that

14   announcement in a speech on June 24.

15          THE COURT:  Made an announcement that Arafat has been

16   compromised by terror?

17          MR. YALOWITZ:  Yes, he said I call on the Palestinian

18   people to elect new leadership uncompromised by terror.  So I

19   would like to offer that to rebut the Ashrawi testimony.

20          THE COURT:  The fact that he says I want new

21   leadership uncompromised by terror, why does that necessarily

22   mean that the old leadership was compromised by terror?

23          MR. YALOWITZ:  Because that was the conclusion the

24   White House reached in 2002.

25          THE COURT:  I'm not going to allow that.

F2HTSOK2

1              MR. YALOWITZ:  Okay, fine.  You understand what I'm

2      offering it for.

3              THE COURT:  No, I don't.  I mean unless it's for

4      improper purpose, then I understand it, but for a proper

5      purpose, no, I don't understand it.  You want him to testify

6      that he heard that the President of the United States accused

7      Arafat of being a terrorist?  That's basically what you said to

8      me.

9              MR. YALOWITZ:  That the President reached that

10     conclusion based on the evidence available to him.

11             THE COURT:  And you think that's admissible for some

12     purpose in this trial that makes it more or less likely that

13     they were involved in the terrorist attacks?

14             MR. YALOWITZ:  I think -- I didn't offer it in my case

15     in chief.  I did not offer it in my case in chief.  I did not

16     expect that what we would have is bland generalizations from

17     some minister without portfolio saying we were all for peace.

18             THE COURT:  Why is that a surprise to you?  It wasn't

19     a surprise to me or anybody else in this room that there they

20     were going come in here and say we are not terrorists, we

21     didn't participate in terrorist acts, and we were negotiating

22     peace and that was our intent.  That was no big surprise to

23     you.  I'm sure you didn't expect them to say the opposite.

24             MR. YALOWITZ:  I expected them -- I don't know what I

25     expected them to do.

F2HTSOK2

1              THE COURT:  That's what I expected them to do.

2              MR. YALOWITZ:  I didn't expect Ashrawi, until she came

3    in the last minute and gave these bland generalizations --

4    that's fine, she gave these bland generalizations, which I

5    don't think are appropriate at all, on whether these six

6    attacks were perpetrated by a PA employee acting within the

7    scope of employment.

8              But now it's out there, and I think it's fair rebuttal

9    to say well, when you went to the President -- when you went to

10   the United States to give your bland generalizations, they

11   didn't believe you, and they didn't believe you because they

12   saw the evidence of what they were actually doing rather than

13   the pretty words that you were coming to offer.

14             THE COURT:  That's pretty loaded, that they saw the

15   evidence of what you were actually doing.  You have absolutely

16   no one, Shrenzel or anybody, that can testify to that.

17             MR. YALOWITZ:  Shrenzel is an expert.  I have hearsay

18   evidence.

19             THE COURT:  Expert doesn't get you to say anything

20   that you want to say.

21             MR. YALOWITZ:  You understand my theory of it.

22             THE COURT:  He can't testify to it.

23             MR. YALOWITZ:  That's fine.  The final thing is we had

24   a lot of testimony in the defense case from Hussein Al-Sheikh,

25   who came on video and said, among other things, you know, I was

F2HTSOK2

1    imprisoned for being in the PLO, and they had this guy on for a

2    long time.  And Al-Sheikh, on the day that Arafat died, issued

3    a video statement, it was on video, saying basically force is

4    the right path, force is the way to end the occupation, and I

5    think that that is -- again, I didn't --

6             THE COURT:  Meaning what?  You want to say that means

7    that he says do terrorist bombings and shootings?

8             MR. YALOWITZ:  What I want to say is when he -- when

9    he gave his testimony saying we're all for peace, that was in

10   2010, that's inconsistent with what he said back in 2004.

11            THE COURT:  But why is that rebuttal?  Why isn't that

12   the subject cross-examination if you thought there was a

13   appropriate cross-examination?

14            MR. YALOWITZ:  I can't cross-examine a deposition.

15            THE COURT:  You mean the deposition.  Well, you could

16   have at the time when he said it, the witness, that you could

17   have.

18            MR. YALOWITZ:  Whatever, somebody else could have.

19            THE COURT:  Not you personally.

20            MR. YALOWITZ:  I understand you mean the royal "you."

21            THE COURT:  Stepping in the shoes of the person.

22            MR. YALOWITZ:  In fact, I think it was the subject of

23   his deposition, and we could play that portion of his

24   deposition in which he is shown the video, we'll show the

25   video, and then we'll say okay, that -- let's show the video

F2HTSOK2

1    that -- he's shown a video, he's asked is that you, he says

2    yeah, that's me, I said that.

3        THE COURT:  But other than impeachment, is there any

4    other substantive purpose for that extrinsic evidence?

5        MR. YALOWITZ:  It goes to the question -- it's fair --

6    if you say impeachment, cross-examination --

7        THE COURT:  It makes a difference.

8        MR. YALOWITZ:  It's a fair basis.

9        THE COURT:  For impeachment only.

10        MR. YALOWITZ:  To question his statements or the

11    impression that the defendants want to leave that everything

12    that Hussein Al-Sheikh was about was humanitarian assistance.

13    And you remember we went back and forth.

14        THE COURT:  To further what argument, that he should

15    not be believed, or further some argument about terror?

16        MR. YALOWITZ:  To go to the argument about terror.

17    It's both, but I think --

18        THE COURT:  How does it go to whether it makes it more

19    likely than not that the PA or the PLO was involved in these

20    terrorist acts because he said in an announcement that I think

21    we're going to have to resort to an armed struggle?

22        MR. YALOWITZ:  Because he's the guy who is requesting

23    and -- we're requesting Arafat's approval to pay money to

24    terrorists.  So he write these letters saying, you know, please

25    give $2,000 to each of these three warrior brothers, and then

F2HTSOK2

1    the defendants come and say no, they weren't warriors, they

2    were just strugglers, and so there's a debate about what was

3    his knowledge and intent when he asked for money for people

4    designated as terrorists.

5              THE COURT:  And you want to put in what evidence?

6              MR. YALOWITZ:  It's just a video Al-Sheikh saying

7    Arafat stood for armed struggle.

8              THE COURT:  Have I seen this?

9              MR. YALOWITZ:  I don't think we've offered it before.

10             THE COURT:  Can I see it?

11             MR. YALOWITZ:  Yeah.  We happen to have it ready.

12             THE COURT:  Very good.  This was not the subject of

13   his examination at deposition?

14             MR. YALOWITZ:  It was.  He was asked is that you, and

15   he confirmed it was.

16             THE COURT:  There were no substantive questions about

17   his motives or what he meant.

18             MR. YALOWITZ:  I don't think so.

19             (Video recording played)

20             THE COURT:  You believe he's talking about terrorist

21   acts when he makes that statement publicly?

22             MR. YALOWITZ:  I do believe that, yes.

23             THE COURT:  He's not talking about a terrorist act,

24   he's not talk about a suicide bombing, he's not announcing in

25   this interview that he's asking people to do suicide bombings

F2HTSOK2

1    and shootings.  I assume that's not your argument.

2              MR. YALOWITZ:  No, this is the day after Arafat died.

3    He's reflecting on the legacy of Arafat.

4              THE COURT:  But the fact that he made the statement

5    after Arafat died, how is that substantive evidence that makes

6    it more likely than not that the PA was involved, or the PLO?

7              MR. YALOWITZ:  It goes to knowledge.  It goes to

8    knowledge.

9              THE COURT:  Whose knowledge?

10             MR. YALOWITZ:  The knowledge of Arafat and --

11             THE COURT:  Arafat is dead.

12             MR. YALOWITZ:  Right.  So the knowledge of Arafat and

13   Al-Sheikh, it goes particularly to his knowledge and the

14   relationship between them in that one of my arguments is that

15   the PA and the PLO, through Arafat, Al-Sheikh and others,

16   provided material support to Al Aqsa Brigades in the form of

17   money.  That is a very simple argument.  The jury needs to

18   connect the dots between an Al Aqsa attack and Arafat knowingly

19   provided material support to Al Aqsa, and among the issues is

20   knowledge, and so --

21             THE COURT:  Knowledge of what?

22             MR. YALOWITZ:  Knowledge knowing material support, did

23   they know that they were giving money to people who were

24   engaged in terrorist activities in, admittedly, the period

25   before --

F2HTSOK2

```
 1              THE COURT:  How does this reflect that?

 2              MR. YALOWITZ:  So when the defendants offer testimony

 3    from a witness who was implicated in giving money to terrorists

 4    and they say see, he was just offering humanitarian aid, then

 5    they're saying he didn't know these people were terrorists.  So

 6    when he makes a statement on television on the death of Arafat

 7    saying armed struggle is the best way to get rid of the

 8    occupation, then that supports the inference that when he was

 9    giving money to terrorists he understood that they were

10    terrorists.

11              THE COURT:  I understand your argument, but I'm not

12    going to allow it.  So that application is denied.

13              Is that pretty much it for Shrenzel?

14              MR. YALOWITZ:  Yeah, there are two, right, two

15    perpetrate -- two photos I want to offer with him that

16    apparently we didn't put in a photograph of Marwan Barghouti.

17              THE COURT:  I thought we did.

18              MR. YALOWITZ:  I thought we did, too.

19              THE COURT:  Didn't we show a photo of Marwan Barghouti

20    to the jury?

21              MR. YALOWITZ:  I thought we had, but I didn't find any

22    record that has been admitted in evidence.  I don't think it's

23    going to be controversial.  Then I also want a photo just to

24    help the jury of the father of Mosaab Yousef so the jury can

25    visualize the people.
```

F2HTSOK2

1          THE COURT:  The one talking about at the location

2     where they were doing the arrests?

3          MR. YALOWITZ:  Right.

4          THE COURT:  Let me hear what portion Mr. Rochon

5     objects to.

6          You have one more?

7          MR. YALOWITZ:  I think that's it.  You want to see

8     217?

9          THE COURT:  What did you want to do with it?

10          MR. YALOWITZ:  Let's look at 217.

11          THE COURT:  My recollection is a little vague.

12          (Video recording played).

13          THE COURT:  That's it?

14          MR. YALOWITZ:  That's it.

15          THE COURT:  So you want this to stand for the

16     proposition that they were doing what with Hamas when they said

17     they were under the protection in the Gaza strip at that time

18     under the protective forces, security forces?

19          MR. YALOWITZ:  That that rebuts the testimony of Faraj

20     that they were trying to arrest Hamas operatives.

21          THE COURT:  But they did arrest Hamas operatives.

22          MR. YALOWITZ:  Well, they arrested -- we know of one

23     that they arrested and released.

24          THE COURT:  But it doesn't rebut that they were trying

25     to arrest Hamas operatives, but they weren't -- you conceded

F2HTSOK2

1   that they were arresting Hamas operatives.

2              MR. YALOWITZ:  It tends to support my theory of the

3   case and rebut the defendants' theory of the case.  The

4   defendants' theory of the case is that they never had a good

5   relationship with Hamas, they never had any cooperation with

6   Hamas, they were always trying to arrest Hamas operatives.  And

7   my theory of the case is they had an on-again off-again

8   relationship with Hamas, and there were times -- and the

9   intifada was one of them where they cooperated with Hamas and

10  protected Hamas operatives.

11             THE COURT:  And what protection do you say he's

12  referring to, since I don't have anybody who is authenticating

13  this statement?

14             MR. YALOWITZ:  I think that the inference -- the fair

15  inference, and he says I'm giving the example of Gaza, because

16  I don't want to go into what was going on in the West Bank, but

17  I think the fair inference is both in Gaza and in the West Bank

18  there were time when the preventive security force was

19  protecting Hamas operatives.

20             THE COURT:  In what way?

21             MR. YALOWITZ:  By keeping them out of the hands of the

22  Israeli authorities.

23             THE COURT:  You mean by harboring a Hamas person that

24  the Israeli government indicated that they were attempting to

25  arrest?

F2HTSOK2

1              MR. YALOWITZ:  That would be one example, which is the

2      example in our case.

3              THE COURT:  What is the evidence of that in this case,

4      or that you say supports --

5              MR. YALOWITZ:  In this case we know -- the jury

6      doesn't know, but we know that Jabril Rajoub, who was this

7      guy's counterpart, took a Hamas bomb maker and gave him to

8      Marwan Barghouti and he put him in a safe house.  We know that.

9              THE COURT:  And you think that's what is he

10     referencing in this statement?

11             MR. YALOWITZ:  I think that's among the things that

12     he's referencing.

13             THE COURT:  What gives you -- what makes you think

14     that rather than want to think that?

15             MR. YALOWITZ:  Because that's the evidence we have in

16     this case of protecting a Hamas operative.

17             THE COURT:  I understand.  I still think that that's

18     inadmissible.  I think it's taken out of context.  It's clear

19     that's not what he is trying to say publicly.  If he was, that

20     would even be inconsistent with your theory that they're saying

21     one thing and doing something else.

22             That's the whole problem with allowing public

23     statements, they're inconsistent with your position that

24     they're saying they're for peace but they are really behind

25     terrorist attacks.  Well, these are not statements saying we're

F2HTSOK2

1    behind terrorist attacks, nor do you contend that they ever

2    made any public statement that if they were anything they were

3    mouthing public statements that they were in peace negotiations

4    and they were trying to live up to the Oslo Accords, but it's

5    that surreptitiously they were doing something different.  This

6    isn't the surreptitious part, this is the public part.

7            MR. YALOWITZ:  I may have misremembered your ruling on

8    this, or you may -- on reflection, it doesn't matter.

9            THE COURT:  That's my position.

10           MR. YALOWITZ:  I understand your ruling, that's fine.

11           Let's just move forward, that's fine.

12           THE COURT:  Mr. Rochon, given the parts that I say

13   that I don't think that we should get back into, what else do

14   you specifically object to him testifying?

15           MR. ROCHON:  I won't address anything in which you

16   already ruled or have a firm opinion that it's out.  I want to

17   make sure that I cover everything, because I don't think

18   there's any improper rebuttal on what's been said at all, but a

19   couple are closer than other, I will admit.

20           On Tirawi, I don't know if the Court ruled that

21   Shrenzel can rebut Shrenzel, not the defense case, but however

22   one characterizes it, we do object to that.  The testimony, in

23   reality, we heard a lot of things about this, last week

24   plaintiff's counsel was arguing that Tirawi had been pardoned

25   in 2003, now we are hearing -- but it's less specific as to the

F2HTSOK2

1    date, what he said, and there are several answers here about

2    when Shrenzel was testifying, he said Israel was not able to

3    capture him.

4            THE COURT:  That was my recollection.

5            MR. ROCHON:  That is not a statement that is -- that's

6    not consistent with how --

7            MR. YALOWITZ:  Sorry, Mr. Rochon, who said that?

8            MR. ROCHON:  Mr. Shrenzel, page 1514 of the transcript

9    of this trial.

10           THE COURT:  Go ahead.

11           MR. ROCHON:  And he went on to clearly give the

12   impression that anyone would have been left with that the only

13   reason this guy wasn't charged is because they couldn't capture

14   him.

15           In fact, were he captured by the Israelis, as we would

16   really like to do, he would have been indicted.  The impression

17   was clear, the testimony in the defense case is not being

18   rebutted here.  In fact, what they're doing is offering

19   Shrenzel the opportunity to I guess correct what he said.

20   That's not rebuttal.  The time for him to have corrected what

21   he said was while he was on the stand under oath the first

22   time, not to come in now and say something different.

23           THE COURT:  Well, he didn't have to clear it up if you

24   weren't going to dispute it.

25           MR. ROCHON:  I kind of had to dispute it.

F2HTSOK2

1          THE COURT:  He would have let it rest if you hadn't

2     come in and said that's not what happened.  I guess he figured

3     he wouldn't have to bother.

4          MR. ROCHON:  He might not have had to bother, but I

5     don't think the plaintiffs get to do a do over with their

6     witness because they put on testimony that is inconsistent with

7     what he said on direct.  He's not going to come in and say it

8     again, he's going to say the part about the reason that he

9     wasn't charged is because we couldn't capture him, no, the

10    reason is because we pardoned him or released him or changed

11    our view.  That's not proper rebuttal, so he should not be

12    allowed to testify.

13         THE COURT:  I understand your position -- and I think

14    this is a close one, but I think I go in their direction on

15    this one, mainly because I think the jury at this point -- if

16    they want to change the issue with regard to Shrenzel's

17    testimony from he didn't know what he was talking about to he

18    deliberately misled you, then I'm sure that you have the

19    sufficient skills to make that point in front of the jury if he

20    wants to get up now and give testimony that is different than

21    what he gave before.  And I have specific instructions in my

22    jury instructions with regard to witnesses that give testimony

23    in one regard and give different testimony on a different

24    occasion.

25         Frankly, in my view, that testimony, if he says that

F2HTSOK2

1    in the way that Mr. Yalowitz is now proffering, it would be

2    inconsistent with the testimony that he gave when he first got

3    on the stand.  And I think the jury should have the full

4    opportunity, given the fact that you put in evidence that

5    disputes what he said, for them to assess whether they think he

6    was mistaken or he was deliberately misleading.  I think that

7    if he wants to call him for that purpose then he has to face

8    further cross-examination and be confronted with the statements

9    that he made and the fact that he never said that, and now he's

10   here to say it now only because it was demonstrated that what

11   he said was not true.

12        MR. ROCHON:  I understand the Court's ruling.  I think

13   we do need a really specific proffer if the plaintiffs are

14   going to try to get into why or how, A, he knows this new

15   information and what levels of hearsay are behind it, or that

16   he will offer, because --

17        THE COURT:  It depends on what you think he's going to

18   say.  I don't think he has -- I think he's simply going to say

19   that he agrees with you, that they didn't -- that they made an

20   ultimate decision that they didn't want to arrest him.  I don't

21   think anybody disputes that.  The question is not whether he's

22   going to say that, if that's what they're going to call him

23   for, the question is why didn't he say that when he first was

24   on the stand and had a full opportunity to do so.

25        MR. ROCHON:  I agree.  My concern is I don't want to

F2HTSOK2

1    have testimony that we haven't got a specific proffer on.  If

2    Mr. Yalowitz is going to try to ask him why did Israel decide

3    not to arrest him, I don't think that this witness should get

4    into hearsay that will again repeat out-of-court information

5    implicating Mr. Tirawi in the guise of explaining Israel's

6    decision not to charge him.  So I would like to ask the Court

7    if you could have Mr. Yalowitz give a proffer as detailed as

8    the one I was giving on my --

9            THE COURT:  What is he going to say?

10           MR. YALOWITZ:  They had a policy change.  He's not

11   going to talk about -- I don't want him talk about -- I will

12   instruct him not to talk about the evidence implicating Tirawi.

13   I don't -- I think that's done.  Whatever is in on that is in.

14           THE COURT:  But is he going to say anything other than

15   the change of policy was that they decided to say never mind,

16   we don't -- we decided we don't want the guy?  Is there some

17   policy?

18           MR. YALOWITZ:  I think that's enough.

19           THE COURT:  Is there some other policy that you are

20   going to elicit?

21           MR. YALOWITZ:  No, I wasn't planning to.

22           THE COURT:  Okay.  He's going to say that they had a

23   change of mind, they no longer wanted him, and he's going to

24   say that ultimately after they did not find him, if that's what

25   he meant to say, or they could not find him, when they did find

F2HTSOK2

```
 1    him, they decided that they didn't want him anyway, and that
 2    was their change in policy by the time they found him.
 3              MR. ROCHON:  I don't know if that's what the proffer
 4    is.
 5              THE COURT:  That's what I just heard.
 6              MR. ROCHON:  I don't know about this thing when they
 7    found him.
 8              THE COURT:  Not when they found him.
 9              MR. ROCHON:  I heard this 2003 date the other day from
10    Mr. Yalowitz.
11              MR. YALOWITZ:  That's not correct, 2003 -- look, the
12    policy change was 2005, the 2003 I was relying -- frankly, I
13    heard that testimony from Faraj, it was interesting testimony
14    to me and I needed to investigate it.  But Faraj on
15    Mr. Rochon's questioning made it sound like 2003 was the key
16    date.  So I was going off of what Mr. Rochon's questions were.
17    In fact, as I understand the facts, it's not 2003.
18              THE COURT:  Well, you know what, the reality is I'm
19    not particularly interested in limiting his testimony at all.
20    I'm pretty much interested in what his explanation is for why
21    he told the jury that he wasn't arrested because they couldn't
22    find him, and now he's saying that oh, that's not true, they
23    really just decided that they didn't want him, and if I gave
24    you the impression that the only reason why he's not indicted
25    and in an Israeli jail is because someone protected him from
```

F2HTSOK2

1    the Israelis and they weren't able to do that, I'm sorry,

2    that's not the impression I meant to give you.  If he wants to

3    say that, that's fine.

4            MR. ROCHON:  I want to make sure there's no other

5    hearsay that comes in from this guy about Tirawi or the

6    decision making, because I think this is now more fact

7    testimony than expert testimony.

8            THE COURT:  No, I mean, as I say, I don't expect him

9    to give us any new facts than he already testified to and that

10   you already put in evidence on your case.  He's going to say

11   yes, that there did come a time that they decided they didn't

12   want him, and I'm sure if you want to cross-examine him

13   further, and that's your decision, he will be in a position to

14   have to say yes, there was a significant period of time,

15   probably right up until today, that, if they wanted him, they

16   could have taken some efforts to get him, and they decided they

17   no longer wanted him.  There was a change in their position,

18   and that is really the reason why he's not in prison today, not

19   because they can't find him, because he's real easy to find.

20           MR. ROCHON:  I understand the Court's ruling on that

21   one.

22           THE COURT:  The jury can assess, when they hear my

23   instructions on expert witnesses, and they can evaluate him.

24           MR. YALOWITZ:  Several other areas.  He said to Majid

25   Al-Masri, that's the guy whose prisoner of payment record was

F2HTSOK2

1    shown to Faraj, and now the plaintiffs want to say that Faraj

2    was wrong about how he read it.  That ostensibly impeaches

3    Faraj, but they didn't do the critical step necessary before

4    impeachment, which is confront him with the claim that he was

5    translating improperly, even though they had a guy sitting

6    there or special request to sit at counsel table and never said

7    to Faraj:  Isn't that wrong?  Please explain.

8              That is what a witness is entitled to before they are

9    impeached with this inconsistent evidence, and they did not

10   that.  They said this is a credibility cross.  It's unfair to

11   the witness to do that, especially when we went through all the

12   machinations to make sure they were in the position to know

13   what was being said.  In fact, it's their document.  They

14   didn't have to rely on what the translator was saying, they had

15   the document in front of them since the beginning of the case.

16             THE COURT:  Was that portion of the document ever

17   translated on the document?

18             MR. YALOWITZ:  Yes.

19             MR. ROCHON:  The document was translated, but not the

20   handwritten portion that he was referring to.

21             THE COURT:  The handwritten portion was not

22   translated?

23             MR. YALOWITZ:  No, it is, it is translated.

24             THE COURT:  What does it say?

25             MR. YALOWITZ:  It says the account of the prisoner.

F2HTSOK2

1          THE COURT:  That's how it's translated?

2          MR. YALOWITZ:  Right.

3          MR. ROCHON:  If we could, please, your Honor, if one

4    looks at their exhibit, the English version has a square with

5    writing inside of it, nothing on top.  The Arabic version that

6    the witness looked at has writing on top of that square, which

7    is what the witness was referring Mr. Yalowitz to.

8          THE COURT:  But that writing was never translated in

9    the English version.

10          MR. ROCHON:  In English version.

11          THE COURT:  In the English version it wasn't

12    translated?

13          MR. ROCHON:  Of the exhibit.

14          THE COURT:  On the exhibit itself.

15          MR. ROCHON:  Right.  And go to page 9484.

16          THE COURT:  Is there a reason why that wasn't

17    translated?

18          MR. YALOWITZ:  It was translated, he's just not

19    reading it right.  May I hand it up?

20          MR. ROCHON:  Let me make sure I'm talking about the

21    same page.

22          MR. YALOWITZ:  Page 9484, it says beneficiary's

23    account number, and in brackets, handwritten.

24          Let's try get our facts right here.

25          MR. ROCHON:  So, Judge --

F2HTSOK2

1          THE COURT:  You're saying the handwritten part says

2     Bank of Palestine LTD.  What are you saying is the handwritten?

3          MR. ROCHON:  Judge, if you look at that document and

4     then advance forward, please, see the one on the right, that is

5     the Arabic version, you see the handwriting?

6          THE COURT:  Yes, at the top.

7          MR. YALOWITZ:  It's not translated is what I said.

8     Maybe I did get my facts right.  Sometimes even a blind

9     squirrel finds a nut.

10          THE COURT:  So --

11          MR. ROCHON:  Handwriting on the bottom.

12          THE COURT:  But the handwriting on the top is what

13     he's referring to?

14          MR. ROCHON:  That's what the witness was referring to

15     to Mr. Yalowitz.

16          THE COURT:  And that's not translated into English on

17     document?

18          MR. ROCHON:  That's what it appears to me.

19          MR. YALOWITZ:  He's mistaken about that.

20          THE COURT:  Where is it translated into English?

21          MR. YALOWITZ:  It says beneficiary's account number,

22     bracket, handwritten.

23          THE COURT:  Right, it says handwritten.  So when you

24     say handwritten, what is it supposed to say?  What does it say?

25          MR. YALOWITZ:  The handwriting says beneficiary's

F2HTSOK2

1   account number.

2           THE COURT:  That's what you say that the handwritten

3   notation says?

4           MR. YALOWITZ:  Right.

5           MR. ROCHON:  And the witness says that it says

6   something about beneficiary's mother.

7           THE COURT:  Right.

8           MR. YALOWITZ:  This writing about Bank of Palestine,

9   that's Bank of Palestine.

10          THE COURT:  But what are you saying that the witness

11  will say that the top says?

12          MR. YALOWITZ:  He will say it says beneficiary's

13  account number.

14          THE COURT:  Wasn't there also another notation where

15  he says that said something about the mother?

16          MR. ROCHON:  There's a separate page in the same

17  exhibit where he referenced the mother as well.

18          MR. YALOWITZ:  And that wasn't true either.

19          THE COURT:  What is that supposed to say,

20  Mr. Yalowitz?  Do we have that page?

21          MR. YALOWITZ:  With respect to the other page, which

22  is the fifth page of the document, it says beneficiary named

23  Majid Al-Masri, relationship, the detainee himself, and

24  Al-Masri -- I mean Faraj said well, that I can't read because

25  it's illegible.  So he didn't -- he wasn't willing to admit --

F2HTSOK2

<table>
<tr><td>1</td><td>THE COURT:  Is that translated?</td></tr>
<tr><td>2</td><td>MR. YALOWITZ:  Yeah.</td></tr>
<tr><td>3</td><td>THE COURT:  And is it in English?</td></tr>
<tr><td>4</td><td>MR. YALOWITZ:  In English it says relationship, the</td></tr>
<tr><td>5</td><td>detainee himself.  It's under item four, beneficiary name and</td></tr>
<tr><td>6</td><td>relationship.</td></tr>
<tr><td>7</td><td>THE COURT:  But he didn't -- there's no dispute as to</td></tr>
<tr><td>8</td><td>the translation here.</td></tr>
<tr><td>9</td><td>MR. YALOWITZ:  Well, apparently there is.</td></tr>
<tr><td>10</td><td>THE COURT:  No, is there?</td></tr>
<tr><td>11</td><td>MR. YALOWITZ:  As between the lawyers?</td></tr>
<tr><td>12</td><td>THE COURT:  No, what do you say that he said was on</td></tr>
<tr><td>13</td><td>the page?</td></tr>
<tr><td>14</td><td>MR. YALOWITZ:  He said he couldn't read it.</td></tr>
<tr><td>15</td><td>THE COURT:  He said he couldn't read it, but he didn't</td></tr>
<tr><td>16</td><td>say it says something different than what you translated.</td></tr>
<tr><td>17</td><td>MR. ROCHON:  Judge, on the other document, which is</td></tr>
<tr><td>18</td><td>still on the screen, there's also -- I'm not sure you can see</td></tr>
<tr><td>19</td><td>it through the screen in the courtroom, there's also some</td></tr>
<tr><td>20</td><td>handwriting on the bottom of the document.</td></tr>
<tr><td>21</td><td>THE COURT:  Is that at issue?</td></tr>
<tr><td>22</td><td>MR. ROCHON:  Well, what the witness was referring to</td></tr>
<tr><td>23</td><td>when he said it was Umm Hasan, Mr. Yalowitz was at the stand</td></tr>
<tr><td>24</td><td>with him so -- it wasn't on the screen for the witness to point</td></tr>
<tr><td>25</td><td>to where exactly he was reading this.</td></tr>
</table>

F2HTSOK2

1          My point is that --

2          THE COURT:  So are you arguing he was reading from the

3     bottom?

4          MR. ROCHON:  I'm arguing that he said it said Umm

5     Hasan, and most importantly, they didn't confront him with that

6     is not what it says, what you were reading is not what it says,

7     they didn't confront him with that.

8          THE COURT:  They did confront him, he said is that

9     what it says, and he said yes.

10          MR. ROCHON:  He said doesn't it say detainee, his

11     handwriting says Umm.

12          THE COURT:  So they did confront him.

13          MR. ROCHON:  But what they didn't confront him with

14     was the idea was he misreading, and the witness is entitled to

15     that.

16          THE COURT:  They did confront him, they said doesn't

17     it say something different than what you had translated.  They

18     said doesn't it say beneficiary, that's the very first

19     question, and he said no.

20          MR. ROCHON:  Mr. Yalowitz never questioned whether he

21     was reading the words correctly.  In fact, he backed off the

22     examination.

23          THE COURT:  Well, bottom line is that's what the

24     document says, so I don't know how you could back away from

25     what the document says.  You are the one who wants to rely on

F2HTSOK2

1    the fact that the document now says something different than

2    what the translation says.

3            MR. ROCHON:  I never asked him about the document, I

4    wasn't going into this.

5            THE COURT:  But your document doesn't say what he says

6    it said.

7            MR. ROCHON:  I don't know why the Court says that.

8            THE COURT:  Because it says beneficiary, your

9    translation, you don't have a translation that says what he

10   said.

11           MR. ROCHON:  He was pointing at some handwriting on

12   the document.

13           THE COURT:  And your responsibility, and I'm sure you

14   thoroughly did so, was to make sure that everything that was

15   translated in English was an accurate translation on the

16   document.  Otherwise, they slipped in "terrorist," right?  I'm

17   sure you made sure that that did not happen.  So it was your

18   responsibility, if you thought this was -- matter of fact, this

19   is what impeaches him, it doesn't say what he says it says.

20   The translation doesn't say that.

21           MR. ROCHON:  If that's what impeaches him then we

22   don't need a witness.  The witness is going to be focusing not

23   on that English translation but on the other one.  So this

24   isn't a question of what the English version says, it's a

25   question on what the witness says on the Arabic version.

F2HTSOK2

```
 1              THE COURT:  I will disagree with you.  He can use this
 2    witness as well as a probably a number of witnesses to
 3    demonstrate that in Arabic it doesn't say what he says it says.
 4    And he can also emphasize to the jury that the English
 5    translation doesn't say what he says it says, if that's going
 6    to make any difference whatsoever in the jury's determination
 7    in this case.
 8              MR. ROCHON:  Understanding that, I would suggest to
 9    the Court there is other handwriting on this document that is
10    clearly not the translated under anything.
11              THE COURT:  Then you are stuck with it, aren't you?
12    You should have translated it if you wanted it translated.  If
13    you want somebody now who wants to translate it, you can bring
14    them in.
15              MR. ROCHON:  I don't think it's a big issue.
16              THE COURT:  I don't either.
17              MR. ROCHON:  But I don't want my witness impeached on
18    a credibility point when he wasn't fairly confronted.
19              THE COURT:  But he was confronted.  He was shown the
20    document.  He was asked is this what it says, and said no.  He
21    gave his own view of what it says.  What is he supposed to do
22    after that, say:  Are you sure?  How is he supposed to confront
23    him?  He showed him the document, and Mr. Yalowitz demonstrated
24    his shock when the guy said it says mother, because Yalowitz
25    said to him wait a minute, where does it say that, and the
```

F2HTSOK2

1    document before the jury didn't say that.

2              MR. ROCHON:  Mr. Yalowitz actually did not say where

3    does it say that.  If he said that, then the witness would have

4    pointed somewhere and we would have proper impeachment.

5              THE COURT:  I'm not sure -- he was definitely asked,

6    because he pointed out where it was that said mother of the

7    person, and he pointed to it, and he showed Mr. Yalowitz where

8    it said it.

9              MR. ROCHON:  That's where I disagree with the Court.

10   Mr. Yalowitz stayed right here going back and forth with his

11   colleagues and did not go to the witness and say show me where

12   it says that.

13             THE COURT:  Well, you can look at the transcript, but

14   it was clear that the guy knew what he was being asked, he was

15   saying that it said something different than what we know --

16   everyone in this room knows what he said is not in the

17   translation.  It is not in the translation.

18             So if you thought that there was some

19   misunderstanding, you could have asked him.  It is not on the

20   translation.  That alone they could use to impeach him, because

21   there's no translation of any document -- and both sides knew

22   that this document was translated, there's no translation of

23   any document that says what he says it said.

24             MR. ROCHON:  If Mr. Yalowitz wanted to use the English

25   language to impeach him, I wasn't objecting, that's in

F2HTSOK2

1    evidence, but we object to another witness coming in to impeach

2    him when he wasn't adequately confronted.

3             THE COURT:  Well, he was confronted sufficiently, so

4    I'm going to -- since, one, he was asked on cross-examination,

5    not on direct examination, number two, he was directly pointed

6    to that -- and I have to look at the transcript, you can look

7    at the transcript, and three, the portion that everybody else

8    in this room thought said beneficiary account in handwriting,

9    he's now saying says something different, and he was clearly

10   confronted with it.  He doesn't have to be accused of being a

11   liar, he just has to show him document and that's what he

12   confronts him with it.  There's no secret of what he was being

13   asked about.

14            So that they could ask him or anybody else who

15   understands that language.  And if you have an interpreter who

16   wants to come in and say that's an accurate interpretation --

17   because you're not even saying that, you can't fault them for

18   the guy sitting next to them.  Fine, you have plenty of people

19   who speak Arabic, let them show you where it says that.

20            MR. ROCHON:  I understand the Court's ruling.

21            The other things that were proffered, I want to cover

22   them, but the plaintiffs said they want to introduce a

23   photograph of Marwan Barghouti.  There is one of him in

24   already.

25            THE COURT:  I thought there was.

F2HTSOK2

1          MR. ROCHON:  You allowed it in over objection of him

2     at a funeral procession or something, so they could do a still

3     from that.

4          THE COURT:  It was a video?

5          MR. ROCHON:  Yes.

6          THE COURT:  I don't remember which video.  Which one

7     is that?

8          MR. ROCHON:  The one of him making statements and we

9     didn't win.

10         THE COURT:  That was offered on the case in chief?

11         MR. ROCHON:  Yes.

12         THE COURT:  I remember in general now.

13         MR. ROCHON:  Then also there's a photograph of Yasser

14    Arafat holding a photograph of him, so that's in evidence.  And

15    then the one they want to introduce is one of him in manacles.

16    We don't need a photograph of Marwan Barghouti in manacles.  If

17    they have a non-pejorative photograph of him not in manacles,

18    I'm not going to object.  I don't think that's rebuttal, but --

19         THE COURT:  If that's the photo they want, and we

20    already have photos in, I won't let it in.

21         MR. YALOWITZ:  We'll see if we can find one that is

22    agreeable to both sides.

23         THE COURT:  The one already in evidence is the one

24    agreeable to both sides.

25         MR. YALOWITZ:  Let me look and see, because there is a

F2HTSOK2

```
 1   video, it's a very degraded quality, we just want the jury to
 2   be able to see the guy's face.
 3            MR. ROCHON:  If we find a non-pejorative one, I won't
 4   make a big deal about that.
 5            As far as the photograph of this fellow Mosab Hassan
 6   Yousef's father, that rebuts nothing.  And that is such a side
 7   issue, the father of this guy, that putting in the rebuttal I
 8   think should not be allowed.  Unlike Marwan Barghouti, it's
 9   part of this trial, whether we like it or not, you ruled his
10   conviction comes in, there's been conversation about him.  This
11   guy's father --
12            THE COURT:  There's been conversation about him, too.
13            MR. ROCHON:  Very little.  He's said to be a Hamas
14   person, and putting in his photo to prove what?
15            THE COURT:  He was the person that did the
16   negotiations supposedly to -- isn't it, about how he's going to
17   be arrested?
18            MR. ROCHON:  It rebuts nothing.
19            THE COURT:  I thought there was some testimony about
20   that on cross.
21            MR. ROCHON:  There was some testimony about --
22            THE COURT:  And you read in the deposition portion.
23            MR. ROCHON:  I read in the deposition, but it rebuts
24   nothing what the father looks like.
25            THE COURT:  It's not that big a deal for me.  I don't
```

F2HTSOK2

1    think it makes any difference.

2            MR. ROCHON:  When something is not a big deal -- I

3    didn't object to something that is not a big deal, if they want

4    Marwan Barghouti --

5            THE COURT:  This one you want to keep out.

6            MR. ROCHON:  Yes, because it's a distraction from the

7    issues in this case.

8            THE COURT:  Fine.  Unless Mr. Yalowitz has some strong

9    argument to make as why it is compelling to get this photo in

10   front of the jury, I am not going to let him do it at this time

11   if you object.

12           MR. YALOWITZ:  Let me just say really what I want to

13   do is no secret.  This deposition testimony is useful to my

14   case.  I just want to have photographs of the players so that

15   the jury can understand who the different people are.

16           THE COURT:  I understand what you want to do, and I

17   don't think there's anything illegitimate about it except that

18   he's right, this is an afterthought now, and it's not proper

19   rebuttal.  It's not.  So if he objects to it, I will give him

20   technically that foul and you get a free foul shot.

21           MR. YALOWITZ:  Fine.  I can do it with a shadow, I can

22   illustrate it without a photo.

23           THE COURT:  Maybe you can trade him off something

24   else.

25           MR. YALOWITZ:  Since we're so close to each other.

F2HTSOK2

1          MR. ROCHON:  They said they wanted to move in the date

2     of the beginning of Operation Defensive Shield.  There was

3     testimony that it was late March, but if he wants to get

4     specifically March 29, I don't think there's been testimony of

5     March 29 yet.  If somebody says Operation Defense Shield starts

6     March 29, I don't think it rebuts anything, but frankly it

7     doesn't matter.

8          THE COURT:  If you want to stipulate to those dates,

9     you can do so and save us all time.

10          MR. ROCHON:  If he doesn't testify otherwise, I will

11     stipulate to when ODS started.

12          Abu Ali's Mustafa's date of assassination I think is

13     in evidence.

14          MR. YALOWITZ:  I don't recall that.

15          MR. ROCHON:  I don't think that it rebuts anything in

16     the case.

17          THE COURT:  If you could find where it's in the record

18     and it's clear, show Mr. Yalowitz and maybe we don't need to go

19     through it again.

20          MR. ROCHON:  Then finally, your Honor, I think that

21     covered everything that you haven't already excluded, except he

22     said something about wanting to put on Shrenzel on the hostile

23     friendly relationship with Hamas, and you asked is that

24     anywhere in his report, and the answer is no, Shrenzel did not

25     include in his report that.  And I don't think it's proper

F2HTSOK2

```
 1    rebuttal given the proffer that we have here to have Shrenzel
 2    come in here and start re-opining on that.  The evidence on
 3    this -- in the plaintiff's case in chief there was evidence on
 4    this.  Having Shrenzel come in and give opinions on this that
 5    weren't in his report and weren't disclosed as rebuttal
 6    evidence is improper rebuttal.
 7              THE COURT:  I didn't know -- other than the video,
 8    what is he going to say in substance?
 9              MR. YALOWITZ:  He will say that --
10              THE COURT:  Quote him word for word.
11              MR. YALOWITZ:  Yes, it was a very good relationship
12    during this time period and --
13              THE COURT:  I thought he already said that.
14              MR. YALOWITZ:  Eviatar said that, Eviatar said --
15              THE COURT:  That was the subject that the Eviatar
16    expert used, that was not the subject of Shrenzel's expertise.
17              MR. YALOWITZ:  It is a subject of his expertise.  He
18    added this Hamas lexicon.  We didn't offer him on that topic.
19              THE COURT:  Did he opine about that in his report?
20              MR. YALOWITZ:  He did not.
21              THE COURT:  We won't go back there.  If Eviatar is --
22              MR. YALOWITZ:  Frankly it's like a really small thing,
23    this Sheik Yassin.  I was going to do the Dahlan video, which
24    you said was out.  It's very short, and I'm trying to not have
25    two guys and a Hebrew translator.
```

F2HTSOK2

1          THE COURT:  I'm not sure I would even let it in as

2     rebuttal from the other guy, because the other guy is the one

3     qualified to testify about it.  I think to the extent that he

4     testified about the relationship of Hamas, and to the extent

5     they put on testimony in response to that, for him to get back

6     up there and repeat the same things is not rebuttal.

7          MR. YALOWITZ:  20-second time out on this.  I want you

8     to be sure, because I think we're down to a very small thing,

9     and --

10          THE COURT:  I agree, but it still may be important.

11          MR. YALOWITZ:  It may be important, but it's not going

12     to be a lot of time.  And the issue is this --

13          THE COURT:  Time is not the essence.

14          MR. YALOWITZ:  The issue is this, if your ruling is I

15     don't want him to talk about Sheik Yassin because I don't want

16     anybody to talk about Sheik Yassin.  Okay, if that's your

17     ruling, then we'll move on.  If your ruling is I want Eviatar

18     to talk about it instead of Shrenzel, I need to understand that

19     so I can deal with that.

20          THE COURT:  You want to impeach this other witness

21     because he said that the circumstances of this photo was that

22     the guy was old, released from prison, blind and on his death's

23     door.  Now I mean so you want to bring in some expert to say --

24     some expert on the Middle East to say it's my opinion that this

25     guy wasn't ready to die, you got a doctor who could say that?

F2HTSOK2

1    This guy doesn't say that.  Come on, give me a break.  This guy

2    is not qualified to say that.

3                MR. YALOWITZ:  It's not his health.

4                THE COURT:  It is his health.

5                MR. YALOWITZ:  The health of political leaders is

6    important to people, and the testimony is not his blood

7    pressure was low that kind of stuff, the testimony is he was at

8    the height of his powers, and so when --

9                THE COURT:  He wasn't at the height of his physical

10   powers because the jury could see from the photograph the guy

11   is sitting in a wheelchair looking dazed.

12               MR. YALOWITZ:  Okay, that's opinion, but the testimony

13   is when Yasser Arafat gives the guy a kiss --

14               THE COURT:  That was the kiss of death?  Is that the

15   question?  Come on, let's focus here.

16               MR. YALOWITZ:  What I want to understand is this is

17   something that I want to address.  If you say don't address

18   that, we'll move on.

19               THE COURT:  I will explore as deep as I can what you

20   say the relevance is and this guy is not qualified, nor is it

21   appropriate rebuttal for him to come in and say no, this guy

22   wasn't dying, so Yasser Arafat must be kissing him because he

23   loves him.  That's not what this case is about, and think it's

24   waste of time.  It's an issue that is not appropriate for

25   rebuttal, given the nature of the testimony.  And I don't know

F2HTSOK2

1   if he could in fact dispute any statement that this witness

2   made.  He may want to dispute the implication, but I don't

3   think he's here to dispute, one, whether the guy had just been

4   released from prison, two, whether the guy was in a wheelchair,

5   three, whether the guy was in bad health, four, whether the guy

6   was half blind, five, whether the guy had a significant

7   physical condition which --

8           MR. YALOWITZ:  It's not his physical condition.  I

9   want you to tell me where you are on it.

10          THE COURT:  Where I am --

11          MR. YALOWITZ:  It's not his physical condition, it's

12  his political condition.

13          THE COURT:  What he will say about that?

14          MR. YALOWITZ:  That he was still a strong, important

15  leader for Hamas.

16          THE COURT:  We assume that's true since Yasser Arafat

17  is kissing him on the cheek.

18          MR. YALOWITZ:  That's a natural inference.

19          THE COURT:  That's what you want to argue from that,

20  despite what his health was, he didn't kiss everyone who was on

21  death's door.  I mean he picked this guy and posed pictures

22  with him, I assume it's supposed to show that there's some

23  reconciliation if not greater affection between these two

24  individuals.  You can argue whatever you want, but this expert

25  can't tell me whether they're buddy buddy or not because he

F2HTSOK2

1    kissed him on the cheek.

2          MR. YALOWITZ:  All I need you to say is -- when you

3    say this expert, you mean Eviatar or Shrenzel?  Because I don't

4    want to screw around and bring Eviatar.

5          THE COURT:  I mean Eviatar or Shrenzel.

6          MR. YALOWITZ:  That's all I wanted to understand.

7          THE COURT:  Focus what you want from this guy, get him

8    in, get him off.  You have to find out if he's available

9    tomorrow.

10          MR. YALOWITZ:  We'll figure it out.

11          THE COURT:  So when they rest, he's ready to go.

12          MR. ROCHON:  And it's Tirawi we talked about, the form

13    we talked about, and then we'll either work out these dates or

14    he'll say the two dates.

15          THE COURT:  Right.  Is there any chance we can shut

16    this down by lunchtime tomorrow?

17          MR. YALOWITZ:  Marwan.

18          MR. ROCHON:  And a photo of Marwan, but Judge, we've

19    got photos of Marwan.  Oh, if you get a new photo.

20          THE COURT:  Right.

21          MR. ROCHON:  I didn't see the witness on that.  We'll

22    stipulate.  I know what the guy looks like, I don't need him to

23    foundationalize photos of Marwan Barghouti.

24          MR. YALOWITZ:  I want us to pause and note that we may

25    actually offer an exhibit in evidence that the defendants don't

F2HTSOK2

 1   object to.

 2           MR. ROCHON:  That happened many times.

 3           MR. YALOWITZ:  Before we move off witnesses, Judge,

 4   there's one other thing, which is they're talking about

 5   bringing at least one witness who has a criminal record, Khaled

 6   Abu Al-Yaman.  They have given me --

 7           THE COURT:  Is he one of the three?

 8           MR. YALOWITZ:  Yes.  They have given me some

 9   information about his criminal history.  Depending on what he

10   says, I may ask him some questions about his criminal history,

11   and I want to make sure if they have an application about that,

12   they deal with it.

13           THE COURT:  Do you know something that they don't?

14           MR. YALOWITZ:  I don't know what they know about his

15   criminal history.

16           THE COURT:  You know something more than what they

17   have given you?

18           MR. YALOWITZ:  I believe I do.

19           THE COURT:  And you have a good faith basis to pose a

20   question to this witness with regard to his credibility?

21           MR. YALOWITZ:  Indeed I do.  I should say I might.  It

22   depends on what he says.

23           THE COURT:  I'm not sure why it would depend on what

24   he says.

25           MR. YALOWITZ:  Because when I say what were you

F2HTSOK2

1    convicted of, if he doesn't say what I know, then I will

2    confront him about it.

3            MR. ROCHON:  So we don't have it.  The plaintiffs

4    disclosed no convictions to us.  We disclosed what we're aware

5    of.

6            THE COURT:  And you don't want to give them a heads up

7    on this one?

8            MR. YALOWITZ:  I don't.

9            MR. ROCHON:  Well, Judge --

10           THE COURT:  This is the way we're going to proceed:

11   You bring your witness.  If you decide that you're going to

12   want to ask him that question, then you ask for a side bar or

13   we do it out of the presence of the jury.  I will hear what it

14   is that you think you want to ask him, and if you're not

15   willing to disclose it to them now, I will make a determination

16   at that point whether you should have the opportunity to ask

17   the witness the question and see if he admits it or denies it,

18   depending on what you -- how you say that conviction may go to

19   his credibility.

20           MR. ROCHON:  Judge, two things.  First of all, it's

21   discoverable if they have such a thing.  Second, we're entitled

22   to take the sting out of prior convictions.

23           THE COURT:  It's not discoverable if he asked you for

24   his prior convictions and you didn't tell him.  It's not

25   discovery.  If you didn't represent -- if he did not represent

F2HTSOK2

1    to you that he had an additional conviction and they think that

2    they have good faith basis to ask that, you don't have the

3    right to have them warn you that they're going to catch your

4    guy in a lie when he gets on the stand.

5         So you better warn your guy that they think that they

6    have something more than you what you disclosed to them, so if

7    he forgot something, he better think long and hard and let you

8    know, because it could come up, if he's asked about his prior

9    convictions, and the only stuff that he gives up is the stuff

10   that you give me, and they're going to have to show me what the

11   good faith basis is for them to ask that question and whether

12   or not he does have a conviction.

13        (Continued on next page)

F2H8SOK3

1          MR. ROCHON:  Here is my conundrum.  With other

2     witnesses the plaintiffs have objected to us bringing in their

3     prior convictions by the Israelis.

4          THE COURT:  And you may object to this.

5          MR. ROCHON:  If they are going to use convictions, I

6     want to ask him on direct about his convictions.  Previously

7     they have objected.

8          THE COURT:  You can ask him about his convictions on

9     direct if you want.

10          MR. ROCHON:  In the past they objected to that.  They

11     are all Israeli convictions.  In the past they have objected

12     because it was injecting an issue that you didn't like.

13          THE COURT:  What is the conviction you have disclosed

14     to them?

15          MR. ROCHON:  We sent an e-mail to them last night.

16          THE COURT:  Was he convicted of throwing rocks at a

17     tank or convicted of participating in some violent act?

18          MR. ROCHON:  It's not a violent one.

19          THE COURT:  Does it go to his credibility?

20          MR. ROCHON:  Not in my view.  It's protest activity or

21     illegal organization or something like that.

22          THE COURT:  He was convicted of something?

23          MR. ROCHON:  Throwing stones, organizing protests.

24          THE COURT:  I had it right, convicted of throwing

25     stones.

F2H8SOK3

1          So you want to bring out the fact that he was

2    convicted of throwing stones?

3          MR. ROCHON:  Previously the plaintiffs, if I was going

4    to do that before -- we are all topsy-turvy now.  Before they

5    said I can't do that because that shows the Israelis lock up

6    guys for a long period of time for dumb stuff.  Now, they are

7    saying they want to use something.  All I am saying is if they

8    are going to use a conviction, I want to bring this thing out.

9          THE COURT:  You want them to bring out the fact that

10   he was convicted of throwing stones?

11         MR. YALOWITZ:  I don't have a problem with him

12   testifying truthfully about what he was convicted of.

13         THE COURT:  On his direct examination.

14         MR. YALOWITZ:  I don't have a problem with it, as long

15   as it's truthful.

16         THE COURT:  You will have to make a judgment.

17         MR. ROCHON:  Then, of course, they will proffer that

18   it's in the last ten years.

19         MR. YALOWITZ:  It's not in the last ten years.

20         THE COURT:  I don't know what they are going to

21   proffer.  They haven't told me what it is.

22         MR. ROCHON:  I take we are impeaching for credibility

23   with a prior conviction.

24         THE COURT:  I don't know if we are even going to get

25   do this.

F2H8SOK3

1          MR. ROCHON:  I am just saying they can't even ask him

2     if it doesn't meet the requirements for prior convictions.

3          THE COURT:  If you want to put that in there, Mr.

4     Rochon, that's fine and dandy, but it's not until he comes up

5     to me and says, I want to ask him X.  And I am going to say,

6     what was he convicted of and when was he convicted?  And what

7     do you want to ask him and tell me how it goes to his

8     credibility.  If they convince me, and it's particularly

9     something that he has not disclosed on his direct examination,

10     or even disclosed to you because you have not disclosed it to

11     the other side, then I will make a judgment at that point in

12     time.  But otherwise it's much ado about doing.

13          MR. ROCHON:  OK.

14          THE COURT:  I just want to address some issues now so

15     we can get them out of the way and then we can adjourn for the

16     day and we can talk again tomorrow.

17          I am just looking at the letters that I got.  I don't

18     think there are really any more evidentiary issues.

19          MR. YALOWITZ:  May I just raise one thing before we

20     move off this?

21          THE COURT:  Yes.

22          MR. YALOWITZ:  Because it's going to get late in

23     Israel and I just want someone to notify Shrenzel to be ready.

24          What time do we hope to get going in the morning?  Do

25     we maybe want to start a little early?

F2H8SOK3

|   |   |
|---|---|
| 1 | THE COURT:  I expect that we should be starting as |
| 2 | early as 10 with the witnesses, and I expect you should be |
| 3 | prepared for your having to put on your rebuttal case as early |
| 4 | as noon. |
| 5 | MR. YALOWITZ:  I was hoping we might even do it |
| 6 | earlier than that.  We will try to have him ready by 10 because |
| 7 | the defendants may decide, based on their gut feeling, that |
| 8 | they don't want to put these witnesses on. |
| 9 | THE COURT:  You may decide you don't want to put on a |
| 10 | rebuttal. |
| 11 | MR. YALOWITZ:  So let's try to do it between 10 and |
| 12 | 12:30. |
| 13 | THE COURT:  You have a better feel than I do of what |
| 14 | the direct and cross is going to be. |
| 15 | There are some arguments with regard to summations. |
| 16 | We can discuss that tomorrow. |
| 17 | Let me just address a couple of things.  I will give |
| 18 | you some guidance. |
| 19 | You can argue to me whether or not the evidence is |
| 20 | sufficient if you want to be heard further tomorrow when you |
| 21 | rest and we send the jury home, but I don't have in the |
| 22 | abstract a position that they can't attempt to argue that |
| 23 | Abdullah Barghouti was provided to Hamas.  If he was the guy in |
| 24 | jail, in their custody, and if they think a reasonable |
| 25 | inference can be drawn by the jury, based on the facts of this |

case, that he was released so he could make future bombs and

bombing attacks, and after his release he subsequently was

involved in such activity on behalf of Hamas and Hamas needed a

bomb maker, and he could demonstrate that he was the

perpetrator -- there is not much issue about that with regard

to the Hebrew University bombing -- I think they have the right

to argue that they provided what was an essential material

support, which was the guy who could make a bomb.  Since they

did have him in their custody and control, they did not have to

release him to Hamas.  If the jury finds they released him to

Hamas so Hamas can use him as a bomb maker, that's a factual

dispute that the lawyers can argue to the jury based on the

evidence.

        I am not sure I understand the argument with regard

to, quote, terrorism premium or something that amounts to

punitive damages.  To the extent I recollect the testimony, the

plaintiff can argue that the plaintiffs suffered and they

suffered injury that should be compensated, and they suffered

greater injury because it was a terrorist attack than they may

have suffered, as they testified, if there had been some other

attack.  If the jury gets to that point and they logically feel

that these people suffered greater because it was a terrorist

attack than they would have suffered had it been some other

accident or intentional murder, then I think it's within the

realm of the argument to what extent the jury should assume

F2H8SOK3

1    from the facts that their injury is compensable in damages in a

2    greater amount than if it had been an accident or they had been

3    a victim of some random crime.

4              MR. ROCHON:  I understand the court's ruling and the

5    evidence on it.  The argument though may seem like a subtle

6    distinction, but it's one that we think is important.  The

7    plaintiffs may not argue that the jury should award more to,

8    quote, teach the defendants a lesson or send a message.

9              THE COURT:  I agree.

10             MR. ROCHON:  Those kinds of things that you normally

11   see in punitive cases.

12             THE COURT:  To the extent he says it's related to

13   their assessment of the witnesses and how they testified and

14   what damages they said they suffered, they did put in evidence

15   in this case that it was significantly more hurtful that it was

16   a terrorist attack that these individuals or their relatives

17   died or were injured by than it would have been a car accident.

18             MR. ROCHON:  I understand.  Ours is a more limited

19   point.

20             THE COURT:  I think that's the way I would limit it.

21             Let me go to the redactions and get rid of those.  The

22   salah one and salah two should be redacted.

23             The senior official in the Yemenite Army should be

24   redacted.

25             The deputy commander of the Palestinian Navy should be

F2H8SOK3

1       redacted.

2                The chairman of the authority, Arafat, should be

3       redacted.

4                This was all consistent with other redactions that

5       have been made.

6                I don't have a recollection about the Israeli military

7       court record of Nasser Shawish.  What was the dispute about

8       that?

9                MR. SATIN:  The issue with this one is there was a

10      trial in this case, and then midway through the trial the

11      defendant started making statements, incriminating statements.

12      Based on those in-court statements, he was then convicted.

13      That was the basis of the conviction.  And as a result, the

14      plaintiffs were allowed to admit into evidence the indictment

15      for which he was charged and ultimately convicted of.

16                THE COURT:  Why are we discussing this issue again

17      now?  Didn't I already rule?

18                MR. SATIN:  I don't know if this issue had been

19      discussed before.  Now we have got these proposed redactions

20      from the plaintiffs and it did not include redactions of the

21      trial testimony and that trial testimony did not form the basis

22      of the conviction.

23                THE COURT:  You are just objecting to it because you

24      say it's irrelevant; it's not consistent with the nature of the

25      redactions you were making before with regard to redacting

F2H8SOK3

1    names and references to individuals who have been accused by

2    third parties.

3          MR. SATIN:  As far as I know, this is the only

4    situation we have encountered where there is actual trial

5    testimony about that issue as opposed to either a verdict from

6    the court or just a guilty plea and the indictment that

7    attached to that guilty plea.

8          THE COURT:  I think I looked at the references and I

9    am not sure -- I understand, I think, your grounds for

10   objection.  I just don't understand why you're objecting.  What

11   is it that you think you don't want the jury to hear?

12         MR. SATIN:  The questions and answers of witnesses

13   during that trial.

14         THE COURT:  What question and answer?  What is the

15   prejudicial question and answer?

16         MR. SATIN:  Part of the concern is it's not clear who

17   the declarant is, but there is testimony --

18         THE COURT:  I thought these were statements by the

19   defendant.  No?

20         MR. SATIN:  The part that we are seeking to redact is

21   not the statement of the defendant, but the statement of

22   witnesses who testified during the trial.  But ultimately the

23   conviction of the defendant wasn't based on that testimony.  It

24   was based on statements the defendant made mid-trial.  In other

25   words, he decided -- and I think he was unrepresented in the

F2H8SOK3

1    case -- he decided to start blurting things out in the middle

2    of the trial.  Based on those things he said in the middle of

3    the trial, the court convicted him, and the indictment as a

4    result of that was admitted in evidence.

5              THE COURT:  Which exhibit are you referencing?

6              MR. SATIN:  382G.

7              THE COURT:  382G is an examination of witnesses.

8              MR. SATIN:  Correct.

9              THE COURT:  What is it that you wanted to redact?

10             MR. SATIN:  The direct examination and

11   cross-examination.

12             THE COURT:  Of who?  These are all witnesses who are

13   not the defendant.

14             MR. SATIN:  Correct.

15             Beginning on the third page, which at the bottom it

16   says 76, you see where it says "defendant," and this is where

17   the defendant starts making statements, and then again on the

18   next page.

19             THE COURT:  76?

20             MR. SATIN:  Correct.

21             THE COURT:  Is this the defendant's statement?  Just

22   the bottom is the defendant's statement.

23             MR. SATIN:  We don't believe, according to the court's

24   rulings, that it would be proper to redact what the defendant

25   said.  That's why we are not seeking that redaction.  We are

F2H8SOK3

1     seeking only the redaction of witnesses who testified during

2     that trial which did not form the basis of the conviction.

3              THE COURT:  So that's defense witness number 3 and

4     defense witness number 4?

5              MR. SATIN:  Correct.

6              THE COURT:  That's not part of testimony, 78.

7              MR. SATIN:  78 is what the defendant said.

8              THE COURT:  So you're talking about?

9              MR. SATIN:  All the testimony on 74, all the testimony

10    on 75.  The testimony on 76 until the last three lines, which

11    is when the defendant is speaking.  Then the testimony on page

12    77 up until the last four lines where it says defendant.

13             THE COURT:  I understand what you're saying.

14             This was a trial, not a plea.

15             MR. SATIN:  It was a trial that became a plea.

16    Because of the statements he made during the trial, it became

17    effectively a plea.

18             THE COURT:  Did he plead guilty?  Did he say, I am

19    guilty of this charge?

20             MR. SATIN:  Yes.

21             MR. YALOWITZ:  No.

22             MR. SATIN:  Depends what you mean he pled guilty.

23             THE COURT:  Its common sense meaning.

24             MR. SATIN:  If you look at page 77 --

25             THE COURT:  Did he enter formally a plea of guilty,

F2H8SOK3

1     yes or no?  Or did he just admit the facts that constituted his

2     guilt?

3               MR. SATIN:  He made all kinds of admissions, and then

4     prosecutor asked the court to convict him based on those

5     admissions.

6               THE COURT:  So that's not a plea of guilty.

7               MS. ROMEO:  If you look at page 80 it says, we convict

8     the defendant of the crime.

9               THE COURT:  It's not a plea of guilty; it is a jury

10    judgment.  Just like parties would come before me and say,

11    judge, we want to preserve our right to object to the

12    suppression rules.  So we will stipulate that you can convict

13    my client on this record so we can preserve our right.  Because

14    if we plead guilty we don't preserve that right, but if you

15    convict us by a bench trial, we preserve that right.  If I go

16    along with that, I look at the record, I convict him based on

17    the stipulated facts.  In this case, he was convicted by the

18    court.

19              MR. SATIN:  The trial didn't finish.

20              THE COURT:  He didn't enter a plea of guilty.  He was

21    found guilty, right?

22              MR. SATIN:  Based on what he said during the trial.

23              THE COURT:  He was found guilty by the court.

24              MR. SATIN:  Yes.

25              THE COURT:  He did not plead guilty.

F2H8SOK3

1          MR. SATIN:  That is correct.

2          THE COURT:  He did not relieve the court of its

3    independent obligation to find that the facts established his

4    guilt.

5          MR. SATIN:  Correct, based on what he said.

6          THE COURT:  That's why they had the witnesses.

7          MR. SATIN:  The witnesses preceded what he said.

8          THE COURT:  OK.  Is there some reason why the

9    witnesses' testimony is admissible?

10          MS. ROMEO:  Well, your Honor, if you look at page 77,

11    for example, witness number 4 actually talks about knowledge in

12    connection with the attack involving Mohamed Hashaika.

13          THE COURT:  He says he doesn't have a clue who Mohamed

14    Hashaika is.

15          MS. ROMEO:  If you look at page 77 for witness number

16    4.  The first two do say, I only know what I know from the

17    television.  But if you look at 77, he says, I took Mohamed

18    Hashaika to the checkpoint.  Blank took Hashaika to the

19    checkpoint, introduced him to me, etc.

20          THE COURT:  So what is the hearsay exception?

21          MS. ROMEO:  In these documents we have only been

22    redacting the names of --

23          THE COURT:  What is the hearsay exception that makes

24    this admissible for the truth?

25          MS. ROMEO:  This is a judgment of conviction.

F2H8SOK3

1              THE COURT:  The transcript isn't a judgment.

2              MS. ROMEO:  A self-inculpatory statement.

3              This is what we have been dealing with all along.  We

4     have got statements in these documents, self-inculpatory

5     statements, where we have been redacting --

6              THE COURT:  What is the statement you need?

7              MS. ROMEO:  We would like to keep in defense witness

8     number 4.

9              THE COURT:  Why?  Because he is saying what?

10             MS. ROMEO:  It's Abdel Karim Aweis.

11             THE COURT:  Why is that important?

12             MS. ROMEO:  He is discussing his involvement, which is

13    corroborated by his conviction.

14             THE COURT:  What does it have to do with the

15    defendant's involvement?

16             MS. ROMEO:  They are saying that he met Hashaika at

17    the checkpoint.

18             THE COURT:  What is he saying about the defendant?

19             Who is the defendant in this case.

20             MS. ROMEO:  This Nasser Shawish.

21             THE COURT:  He is not saying anything about Shawish.

22    Does he reference Shawish?

23             MS. ROMEO:  Give me one moment, your Honor.

24             It's a mistake in the redaction.  If you look under

25    witness 4, the question that says, What was my connection with

F2H8SOK3

1    the terrorist attack carried out by Hashaika?  The name is

2    blacked out but the answer is Nasser.  He is saying Nasser

3    Shawish took Hashaika to the checkpoint.

4            THE COURT:  Does Shawish say that?

5            MS. ROMEO:  Yes.  So it's all corroborated.

6            THE COURT:  Why do you need this witness?

7            MS. ROMEO:  This document has been in evidence for

8    weeks.  We discussed this document with defendants, and what

9    was redacted in accordance with those discussions was on page

10   8.  So they are just going back and forth on this.

11           THE COURT:  I don't think we ever discussed the

12   statement by other witnesses during the trial.

13           MS. ROMEO:  On that point, if I may just raise it, my

14   recollection is that back in December, when we first started

15   talking about these redactions, Mr. Satin made an argument

16   concerning Shawish's documents.  I could go back and check.

17   This is probably the second or third time this issue has come

18   up.

19           THE COURT:  Did you address it and did I address it?

20           MS. ROMEO:  Yes.  And I can look back.

21           THE COURT:  What did I say?

22           MS. ROMEO:  I believe it was in December, that these

23   statements did not have to come out.

24           THE COURT:  I don't have a recollection of discussing

25   statements that were in the reports that were witness

F2H8SOK3

1    statements that were not statements of the defendant who pled

2    guilty or was convicted.

3              MS. ROMEO:  I think it was a more general discussion.

4              THE COURT:  Quite frankly, this is the first time that

5    I have a recollection of ever even knowing that what was

6    included in there was independent testimony of third party

7    witnesses.

8              MS. ROMEO:  We definitely talked about the facts that

9    there were counts in which Shawish was convicted and not

10   convicted.  The defendants did make an argument that statements

11   didn't support the conviction should come out, which is exactly

12   what Mr. Satin is saying right now, because he was convicted on

13   the basis of his indictment.

14             THE COURT:  I agreed with that.

15             MS. ROMEO:  Our position is that that statement should

16   stay in.

17             THE COURT:  As I say, I have given you all of the

18   redacted statements of the witnesses who pled guilty and were

19   convicted.  I think you should take out the statements by

20   others who, quite frankly, I don't even have a clue as to who

21   these people are.

22             MS. ROMEO:  Does that include --

23             MR. YALOWITZ:  Wait a minute.  We have gone on and on

24   and on about these redactions.

25             THE COURT:  It's going to stop today.  I don't want to

F2H8SOK3

1    hear any more about redactions.  This is it.  Take out the

2    defense witnesses' testimony.

3                MS. ROMEO:  Is that including Abdel Karim Aweis?

4                THE COURT:  No.  If it's a statement by the defendant,

5    you can leave it in.

6                MS. ROMEO:  I understand that.  But defense witness

7    number 4, who is Abdel Karim Aweis, discusses Nasser Shawish,

8    who is independently convicted and is corroborated.

9                THE COURT:  And you have his conviction somewhere

10   else.

11               MS. ROMEO:  It's in evidence.

12               THE COURT:  You have the same stuff someplace else,

13   the same statement by him, right?

14               MS. ROMEO:  I would have to double-check the

15   conviction, but I believe that's the case.

16               THE COURT:  We don't need it here as testimony.

17               MS. ROMEO:  If there is something we need, we will

18   come back to you.

19               THE COURT:  Take out the things that are referenced to

20   defense witnesses.

21               I think we already talked about Ahmed's statement.

22               MR. YALOWITZ:  I just want to be really clear because

23   we have had more salami tactics with these redactions than I

24   have seen in just about anything else in this case.  That's it

25   on redactions?

F2H8SOK3

```
 1              THE COURT:  That's it.

 2              MR. YALOWITZ:  Done, finished, no more redactions.

 3              THE COURT:  That's it.

 4              MR. YALOWITZ:  Can we make sure the defendants

 5   understand that?

 6              THE COURT:  They speak English.

 7              MR. YALOWITZ:  I would just like them to say we

 8   understand the ruling.

 9              THE COURT:  I don't care whether they understand it or

10   not.  That's it.  Unless they tell me at this moment there is

11   something else you guys didn't resolve.  I am not going to hear

12   any more about redactions, unless you guys agree that you made

13   some inadvertent error and you agree to do something.

14              I am still working on the jury instructions.  Let me

15   just go to two things because I can use some guidance between

16   now and tomorrow.

17              I am not sure I understand the legal basis for your

18   objection, Mr. Yalowitz, with regard to respondeat superior,

19   and, quite frankly, I remember you saying you don't want it in

20   furtherance of their interest or activities, but I remember we

21   had a specific discussion and you asked me to take out the

22   reference to business, commercial or noncommercial.  So you

23   can't have it both ways.

24              It's clear that the law requires that they act in

25   furtherance of the employer's business activities, commercial
```

F2H8SOK3

1    or noncommercial.  In this case, it's not business activities.

2    It's really their interest or the activities that are in

3    furtherance of the PA's business, particularly to the extent

4    that you say that it is within the scope of their business, or

5    their interest as I call it, to do terrorist acts.

6         I am willing to consider, which I don't think is

7    necessarily helpful to you, but I am willing to consider

8    putting back in business or putting in activities or putting in

9    interest.  But you cannot convince me, without the employer

10   acting in furtherance of one of those, that you could establish

11   liability.

12        In light of your suggestion, I have rewritten the

13   respondeat superior section, and I have basically went straight

14   back to the PJI -- not your version of it, not my version of

15   it -- and I have taken some case law at the end that I think is

16   appropriate.

17        Now, again, I think it's clear for this jury if I talk

18   in furtherance of the PA's interest or in furtherance of the

19   PA's activities rather than their business, but we can discuss

20   that further.  But I think it's important for me to add some

21   language that I think lets the jury know the distinction

22   between respondeat superior and any other direct liability.

23   And I think it's the last paragraph that I have taken out of

24   the case law, which basically says that it is not sufficient

25   that the employee was engaged in the employer's service at the

F2H8SOK3

1     time of the incident giving rise to the action.  The test is

2     whether the employee's act was in furtherance of the employer's

3     business and was incident to the performance of duties

4     entrusted to the employee.  Where the employee's act was

5     committed solely for personal end rather than in furtherance of

6     or incident to the employer's business, the employer will not

7     be held liable.

8             I think that's the distinction to be drawn between any

9     direct liability.  I don't care how to characterize it to the

10    jury.  I think it is legally accurate to characterize it that

11    they have to act in the employer's interest, whether that be

12    business interest or other interest.  In this case, I think

13    it's a little awkward to basically say that the PA --

14    regardless of what you claim is their activity -- that the PA

15    is, quote, in the business of terrorism.  There is no such

16    business.  There is only those people who are involved in those

17    kinds of activities or those people who have those kinds of

18    interests.

19            It seems to me that this is a very narrow -- as a

20    matter of fact, defense lodged an objection to respondeat

21    superior.  So I think it's a very narrow, legally appropriate

22    theory, if that's the way you want to go.  But it only applies

23    to those instances where the terrorist bomber or shooter was

24    acting in the scope of the employer.

25            You can look at this and you can tell me whether you

F2H8SOK3

1    want me to go back to the way I phrased it, or phrase it in one

2    of the other ways, but you're not going to avoid "in

3    furtherance" language.  You are going to have to live with some

4    "in furtherance" language.  Otherwise you do not have such a

5    separate theory.

6         MR. YALOWITZ:  I want to read it carefully.  I don't

7    want to just answer on the fly.

8         THE COURT:  I took it almost word for word out of the

9    PJI.

10         MR. YALOWITZ:  I read the cases.  I know what cases

11   you're talking about.  There are a number of cases that deal

12   with this personal motives thing.  I know those cases.  I

13   haven't looked at them in detail, but I know the concept.  I

14   understand what you are trying to capture with that.

15         Let me just ask you one thing -- two things that I

16   think will inform my views -- maybe three things on this topic.

17         The first thing is, if we were to stick with the

18   respondeat superior language that's in your draft of Friday,

19   but we were to change the word interest to activities, is that

20   something that you're sort of thinking about or do you want to

21   add this language anyway?  The word interest I get a little

22   hung up on.

23         THE COURT:  I understand that.  I don't think in this

24   case there is really a substantive distinction between that.  I

25   would have to think about it more.  I might be able to be

F2H8SOK3

1    convinced, as I say, one of those three words -- business or

2    activities or interest.

3           MR. YALOWITZ:  I don't have a problem with activities.

4           THE COURT:  I think technically it really is supposed

5    to apply to a situation where they are acting in furtherance of

6    the employer's business, interest or activities.  I think

7    that's really technically what it is supposed to be.

8           You asked me to take out commercial or noncommercial

9    business activities.  If you want me to stick back to that, I

10   will think about it.  But it seems to me the essence of what I

11   need to get to the jury is that these employees were engaged in

12   this activity because they believed it was in the interest of

13   their employer to do so.  I don't see anything sophisticated

14   about that.  You may not prefer that word because it may seem

15   like it is a somewhat easier test than the others words, but I

16   don't think it is.

17          MR. YALOWITZ:  My problem with the word is it just

18   pops out.  It's not anywhere else.

19          THE COURT:  It's supposed to pop out because that's

20   the critical part.  That's the only part you're really fighting

21   about.  That's why I am trying to make it pop out.  The jury

22   decides that issue and they go back home.  They don't need to

23   find whether or not it's an employer or employee, or whether or

24   not the employee was employed at the time.  None of those

25   things the jury should spend an iota of consideration on.

F2H8SOK3

1          MR. YALOWITZ:  I am not explaining my problem.  If you

2     use the word activities, I don't have a problem, and I will

3     tell you why.  Because you have got a very good, detailed

4     instruction on what is the scope of employment.  That's the

5     ultimate question for the jury, were they acting within the

6     scope of their employment?  And you go through, it has to be

7     within the scope of their authority, it has to be in

8     furtherance of the employer's business, the employer's business

9     is its regularly conducted activities.  That's just a standard

10    PJI charge.  I don't have a problem with any of that.

11         Then there is this kind of old language that lingers

12    in some of the cases from a long time ago, and sometimes it

13    carries through, in furtherance of the interest.  And I think

14    that's shorthand for this solely personal motives thing.

15         I am not convinced that the evidence really supports

16    it.  You see that in a sexual harassment case, for example,

17    where the defendant comes and says, look, how is it possible

18    that sexual harassment is in furtherance of my business?  I

19    make widgets.  And they say, that's purely personal motive.

20         THE COURT:  But that's true in this case.  That's the

21    same argument.  They are not in the business of terrorism.

22    They are in the business of governing the West Bank.  So that's

23    not what they were set up for.  They make widgets.  They make

24    security and governance for the Palestinian territory.  That's

25    what they are in the business of.  They are not supposed to be

F2H8SOK3

1       in the business of terrorism.

2                   MR. YALOWITZ:  They are not supposed to be, but they

3       are.

4                   THE COURT:  That's not their business activity.  So

5       the analogy you just gave me is spot on.  It is not the

6       standard, oh, well, I'm the UPS driver and I run somebody over

7       while I was delivering a package.  That's respondeat superior.

8                   MR. YALOWITZ:  Well, if the UPS driver did it on

9       purpose and they gave him a promotion and a raise --

10                  THE COURT:  That's a good point.  This is not a

11      negligence case.  OK?  This is a deliberate, intentional

12      tortious act.  It's not about the UPS driver.  You're right, it

13      would be a different analysis if the UPS driver ran over people

14      on purpose.  Then I wouldn't be saying, well, if the jury

15      decides that was in furtherance of UPS's business, of course

16      it's not in furtherance of their business.  They are not in the

17      business of deliberately running over people with a UPS truck.

18      But if they gave a nod and a wink to the driver and said, the

19      FedEx president is crossing the street tomorrow, we wouldn't be

20      unhappy if something happened to him, and then he ran him over

21      with a UPS truck, then you would say, well, that was clearly in

22      furtherance of their interest because they wanted this to

23      happen.

24                  That's what I am trying to struggle with here in terms

25      of being fair to both sides and laying that out for the jury

F2H8SOK3

1    and give you an opportunity to argue whatever you want to

2    argue.  But you have not convinced me that it is a legally

3    inappropriate instruction to say that they have to act in

4    furtherance of the interest because that's even some of the

5    language that's used in the cases.  I don't think I made that

6    language up.

7           MR. YALOWITZ:  You didn't make that language up.

8           Number one, my problem is I have got Judge Friendly

9    and Judge Calabresi, who -- Judge Friendly and Judge Calabresi,

10    they are not writing about the law of Guam just because they

11    think it is important to give guidance on the law of Guam.  In

12    fact, those two cases are in the restatement as the correct

13    standard of law.  And I am sure that when this case goes to the

14    Second Circuit, and it will, those cases are going to be the

15    first things they look at.

16           THE COURT:  Well, not necessarily, because there is

17    another case that should be the first case they look at.  There

18    is a more recent case, and I forget which case I looked at --

19    they even cited it in their letter -- that lays out exactly

20    what I said.  The Second Circuit says exactly what said.

21           MR. YALOWITZ:  I guarantee you I know what case Judge

22    Calabresi is going to be looking at if he is on the panel.

23           THE COURT:  As I say, it takes two of them to reverse

24    one of me.

25           MR. YALOWITZ:  I am sure you read those cases.  I am

F2H8SOK3

1    sure you understand my issue of in furtherance of. I don't

2    have a problem with -- the way you have rewritten it, first, I

3    want to think about it, and I may give you some refinements.

4            THE COURT: This is my model and you can give me

5    suggestions.

6            MR. YALOWITZ: Particularly to avoid confusion. But

7    when I look at that last paragraph, especially just the way you

8    have written it, I don't think it's inconsistent with the cases

9    that I have seen, at least looking at it on first blush. So I

10   don't have a problem with it on first reaction.

11           I do have a concern about that "in furtherance of"

12   language being in the verdict sheet because I think all of this

13   goes to scope of employment.

14           THE COURT: The problem I have is that that's the only

15   thing that's in dispute. If I know for sure that the jury

16   determined that in your favor, I know that they have resolved

17   the only genuine factual dispute in this case.

18           MR. YALOWITZ: I am not sure I understand your

19   thinking on this then. If we went with the new version that we

20   just started looking at right now --

21           THE COURT: We would have to decide whether or not I

22   leave in the word "business," or change that word to

23   "interest," or change that word to "activities," or if there is

24   some version of business, interest or activities. My

25   preference is interest. Then I will use that as a model if you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2H8SOK3

1    have some other specific issues with regard to this

2    instruction.  But I have literally lifted this out of the PJI

3    instruction almost word for word that you cited to me in

4    support of your modified PJI instruction.  So I decided to go

5    back to the newer version of it and add the case law and the

6    language that I know has been approved.

7                MR. YALOWITZ:  We may be down to really short strokes.

8    Of the three words, I think the one that fits the facts of this

9    case and is fairest to both sides is activities.  If we changed

10   in furtherance of interest to in furtherance of activities in

11   the verdict sheet, and we change business activities in the

12   instructions, or regularly conducted activities -- I think

13   regularly conducted activities is more consistent with the

14   pattern instructions -- I think I may not have a problem with

15   it.  I want to reflect on it and look at it, but I may not have

16   a problem with that.  And I don't know if you have a problem

17   with it.  You have to reflect on it too.

18                THE COURT:  In the abstract I don't have a serious

19   problem with it.  I am just trying to make sure that I can

20   focus the jury's attention on what they really need to spend

21   their time on.  I have given it a lot of thought before I put

22   it in there.  I didn't just willy-nilly put it in there.  I

23   think that that best addresses the arguments that both sides

24   want to argue about.

25                MR. YALOWITZ:  I think the language that you came up

F2H8SOK3

1  with this morning or over the weekend better captures the

2  concept that we are talking about.  I think this paragraph,

3  subject to it may need some refinement, I think that is a

4  better instruction than what we had before.

5           THE COURT:  One of the reasons why I stayed away from

6  their business, other than what I have just said, is because

7  you specifically asked me to take out the reference to

8  commercial and noncommercial.  That was sort of important

9  because what this case is about, you're right, if it's about

10  business at all, it's about noncommercial business.  It is not

11  about commercial business.  So rather than make them think this

12  has something to do with a real business, that's not what we

13  are trying to tell them in this case.  As you say, this is more

14  like the exception that you gave about sexual harassment than

15  it is about a standard negligence respondeat superior theory.

16           MR. YALOWITZ:  Everybody has understood that.  My

17  opening was business as usual, standard operating procedure.

18           THE COURT:  I am not wedded to it because I think both

19  sides can clearly articulate what you say the determinative

20  facts are supposed to be, and argue consistent with what you

21  want the jury to determine, and unless you somehow misstate the

22  law, I think you're probably going to make it clearer than I

23  exactly what it is you two are fighting about.

24           MR. YALOWITZ:  That's the problem.  Ultimately the

25  instructions are from you.

F2H8SOK3

 1          THE COURT:  But ultimately the facts are from you.  So

 2     that's what is at issue here.  I don't think the instructions

 3     are particularly complex.  If I had to rewrite these

 4     instructions, I would probably write them in five or six pages.

 5          Generally, what is at issue here, they have to figure

 6     out whether or not this is what the PA wanted to happen.

 7     That's basically all it comes down to.  There is no more or

 8     less complicated way to analyze it.  You tell them what the

 9     facts are that they are supposed to evaluate in terms of

10     whether or not this is really what they wanted to happen, and

11     they did something to make it happen, or their employees did it

12     because they made clear to their employees they wanted it to

13     happen.

14          Mr. Rochon, did you have something?

15          MR. ROCHON:  I share the view that I want to think

16     about it a little bit further as well.  I think the word

17     activities I might end up concluding is too vague when applying

18     to government to give the guidance we need.  I would like to

19     think about that a little bit further.  As to government, it's

20     hard to come up with the perfect word.  I recognize that.  We

21     know that it's not a commercial business.  The jury knows that

22     as well.  So if you use the word business, they are not going

23     to think we are talking about the PA is selling things.  So I

24     want to think about it a little more.

25          THE COURT:  The only other thing I could use some

F2H8SOK3

1    guidance on now, the verdict form, as we talked about it and

2    you convinced me on certain issues, I became of the view that

3    this case is really about either they did this directly under

4    the theory of respondeat superior of the PA or that they

5    provided material support.  That's why I backed away from it.

6    It was getting too complicated, and I backed away from, well,

7    did they themselves commit this offense?

8           Quite frankly, the facts before the jury for the jury

9    to resolve, they need to resolve whether or not the PA is

10   responsible because the employees were employees at the time

11   and did it in furtherance of their business, interests or

12   activities.  To the extent that they don't find that, they just

13   need to determine whether or not they provided material support

14   to anybody else or anybody who was committing this offense.

15          I guess one can argue that there is someplace that

16   technically they can decide that it wasn't respondeat superior

17   but somehow those people who were bombers or shooters were

18   still acting as individuals or agents of the PA and/or the PLO.

19   But if they provided material support to any one of these,

20   that's a violation of the act, and whether the jury wants to

21   try to figure out whether we are asking them something

22   significantly different, in terms of asking them whether there

23   is a direct participation, I'm not even sure respondeat

24   superior is particularly useful to them as a theory.  Because

25   if they find that they provided material support for one or all

F2H8SOK3

1    of these acts, that's it, game over.  They don't have to decide

2    anything else.  They could decide on a different theory.  They

3    could decide material support to Al Aqsa and Hamas.  As I say,

4    I have put some of those things in.  We have already taken out

5    funds.  And they could find that they harbored somebody.  But

6    it seems to me once they decide the material support question,

7    they are going straight to damages.

8         So I think those are the two critical questions,

9    whether they provided material support by providing personnel,

10   providing their own employees, by assisting others.  It doesn't

11   really matter beyond that whether or not they harbored

12   somebody.  Obviously, if they provided material support, I

13   don't see how they can't determine they provided material

14   support for one of these terrorist acts and not determine that

15   they provided material support to Hamas or Al Aqsa Brigade once

16   they were designated a terrorist organization to commit those

17   terrorist acts.  They still have to determine independently

18   whether or not there is sufficient evidence that those entities

19   were the perpetrators.

20        I guess I can throw back in my questions initially

21   about whether or not they were responsible for the terrorist

22   acts because their agents committed the offense.

23        MR. YALOWITZ:  That's the only one that I wanted to

24   kick around a little bit.  What you said makes a lot of sense

25   to me.  The issue with agents, quite frankly, is some -- I

F2H8SOK3

 1    mean, employee is an agent so that's one thing.  But some of

 2    the people were not agents and some of the entities were not

 3    agents.  So there is evidence in the record --

 4            THE COURT:  I don't know how you can say that, when

 5    you say some of the people are not agents.

 6            MR. YALOWITZ:  Were agents.  Maybe I misspoke.

 7            So, for example, there is evidence from which a jury

 8    can conclude that Wafa Idris was an agent of the PA.  There is

 9    evidence from which a jury can conclude that Al Aqsa Martyr

10    Brigades was an agent of the PLO.  So that's kind of a useful

11    way to talk about it to the jury.

12            THE COURT:  It depends on where you want them to

13    concentrate their time.  Because you're going to have a much

14    simpler discussion with regard to material support.  You don't

15    even have to talk about how deeply involved they were.  The

16    only question for the jury is did they provide material

17    support, as I define that for them.  And if they provided

18    material support, they are in the soup.  That's it.  They

19    cannot do that.  If they provided material support, they are

20    responsible for these acts, if they did so.  And if you find

21    that they provided material support, then that's the end of the

22    discuss.  Then all you have to decide is how much you're going

23    to provide in damages, when you find damages, if the incident

24    that you say that they provided material support for caused

25    those damages.

F2H8SOK3

1            It doesn't matter whether they provided 100 percent of

2    the support or they provided 1 percent of the support.  If they

3    provided material support, then they are responsible for these

4    attacks.  And if you find that they did not provide material

5    support, that these people were off doing this on their own,

6    and they did nothing to knowingly assist -- I shouldn't use the

7    word assist -- but knowingly further the accomplishment of

8    these terrorist acts, then that's the end of the discussion and

9    you go home.

10            You just have to figure out how you want to spend your

11    time because these are the arguments that the two of you are

12    going to have to make.  Probably more so for the plaintiff than

13    the defendant.  If you want to spend your time making an

14    argument and explaining to the jury why they have to decide

15    whether there was respondeat superior, whether there was

16    material support, whether they independently committed the

17    offense, and whether they harbored or supported Hamas --

18            MR. YALOWITZ:  We plaintiffs, we like lots of options.

19            THE COURT:  Options are good.

20            MR. YALOWITZ:  At some point you have to give up

21    optionality.

22            THE COURT:  The jurors sat through weeks and weeks of

23    testimony.  It's your job to make it simple for them if you

24    want a verdict in your favor.  They try to make us think when

25    we get to law school to take something simple and make it

F2H8SOK3

1    complicated.  It's just the opposite, particularly as a trial

2    lawyer.  It's your time to make this simple for them and say,

3    look, we are not fighting about 85 percent of the facts here.

4    We know who the players are.  We know who the bombers are.  We

5    know who is in charge, who is supposed to be in charge.  If the

6    PA or the PLO decided that they wanted this to take place, they

7    provided material support so it can take place.

8              MR. YALOWITZ:  I want to think about it and finalize

9    my views.

10              THE COURT:  I can very quickly put them back in.  But

11   as you can see, this verdict form as of now is 21 pages.  I

12   think it was like 45 pages when I threw in a direct liability

13   question as to the PA and then another separate liability

14   question as to the PLO with regard to every single incident.

15              MR. YALOWITZ:  I think we are down to a narrow set of

16   questions here.  Let reflect on it.

17              The only thing on the verdict form that I see right

18   now that I really know I want a change on is that word

19   interests.  Like I said, I don't have a problem with

20   activities, especially given that last paragraph in the new

21   instructions.

22              THE COURT:  I think you suggested that I change the

23   order back.

24              MR. YALOWITZ:  I want to think about that more.

25              THE COURT:  It depends on whether we throw back in an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2H8SOK3

1    independent question of liability as to each defendant.  The

2    reason I did this is because, if they decide the material

3    support question, then the others get to be a lot easier.  Not

4    necessarily determinative on every single thing.  They can

5    still find that they provided material support, but they didn't

6    harbor.

7             MR. YALOWITZ:  Why don't we leave it in the order that

8    you have got it, unless I come back and say, no, no, I really

9    want you to change it.

10            THE COURT:  Also, I think it's more consistent with

11   the separate determinations that have to be made by the jury

12   with regard to the PA and the PLO.  I have technically put it

13   in the order in which it is in the caption.  As a matter of

14   fact, on the last one I had reversed the caption.  But I put it

15   in the order that's in the caption so they should decide

16   whether the PLO provided material support, and then they should

17   decide whether the PA provided material support, and then they

18   should decide whether an employee of the PA in fact carried out

19   the act, and then there is the PA and the PLO questions with

20   regard to harboring, and there is the PA and the PLO

21   questioning with regard to providing material support to a

22   foreign terrorist organization.

23            Quite frankly, the easiest determination –– not the

24   easiest, but the consistent determination will be pretty much,

25   if they find material support with regard to the PA or the PLO,

F2H8SOK3

1    they are clearly likely to find that they provided material

2    support to the foreign terrorist organization.

3              MR. YALOWITZ:  The only other thing I wanted to

4    cover --

5              MR. ROCHON:  If we are going to leave this one, I can

6    wait until the end if that is easier for Mr. Yalowitz.

7              MR. YALOWITZ:  It would be easier if you waited.

8              The other thing I wanted to cover, the other thing I

9    put in my letter is that sort of intro to the antiterrorism act

10   where we talk about -- I don't remember the exact wording, but

11   the violent attacks.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

F2HTSOK4

1              THE COURT:  I don't have a strong position on that.  I

2      might go your way on that one.  I want to think about it a

3      little bit.  It's just a question of clarity, as far as I'm

4      concerned.  I just want to be consistent.  You want me to say

5      act of international terrorism?

6              MR. YALOWITZ:  Yeah.

7              THE COURT:  I don't have a problem with that.  I don't

8      know why the defendants would have a problem with that.

9              MR. YALOWITZ:  I just don't want there to be something

10     that is misused in closing, that's my concern.

11             THE COURT:  As I said, I don't have a strong opinion

12     about that, and I'm probably willing to give you that.  And

13     there was something else that you suggested changing.  I made

14     the change that you asked me to separate the knowing from the

15     first element.  You asked me to separate that, and I did.

16             And I'm probably going to move up -- I did make a

17     change over the weekend, I will move up the respondeat superior

18     and the agency language even further.  I'm not totally

19     comfortable where it is, but I know it should be closer to the

20     elements, and I think I have it after the injury sort of

21     transition section into damages.  And I don't think it should

22     be in between those two, I'm talking about moving page 51, the

23     instruction on 51 and through 57 to before 49, where 49 starts

24     talking about injury, more related to liability than injury,

25     and I would move it up at least in front of that, if not

F2HTSOK4

1    further than that.

2              MR. YALOWITZ:  I think Sand puts it even earlier, but

3    it's so discretionary.

4              THE COURT:  The problem is I don't want to separate --

5    I'm trying to struggle with separating the different -- the

6    harboring and the material support and providing material

7    support to a terrorist organization.  I wanted to keep all of

8    those in a group.  So I couldn't find a convenient place to

9    stick this in between that, maybe I could stick it in between

10   before I get to the harboring and the other sections, if I will

11   just deal right after I get the basic elements or put it right

12   back where it originally was right up front.  But up front, I

13   didn't think it was as useful until I knew what the elements

14   were.

15             MR. YALOWITZ:  I think it's a classical problem, and I

16   think that's why they solved it by putting it up front, because

17   they don't want it to break up the elements.  But I think

18   they'll get the picture wherever you put it.

19             THE COURT:  I will take the suggestion and talk about

20   it more tomorrow.

21             Mr. Rochon?

22             MR. ROCHON:  I anticipate from your conversation that

23   you're likely to send around a new draft here fairly soon.  Am

24   I right or wrong?

25             THE COURT:  Yeah, I might not be able to get it to you

F2HTSOK4

1    before the morning, but I still have this other afternoon

2    commitment.  And I don't know if I'm going to be where I want

3    to be, but by tomorrow morning, before you rest you will

4    definitely have it, and hopefully by the time we start in the

5    morning.

6              MR. ROCHON:  The part where -- the colloquy about the

7    verdict form is helpful.

8              And on the agency issue, when I look at the evidence,

9    it's hard to envision any scenario in which the jury would be

10   saying no on material support and yet reach --

11             THE COURT:  Right.

12             MR. ROCHON:  So it has the capacity to confuse.  I

13   don't know the Court's tentative views.

14             THE COURT:  My tentative view is I took it out.  I

15   took it out because I thought as long as they decided material

16   support, that's a more direct analysis for them, and that's --

17   who cares whether they had -- whether they independently did it

18   on their own.  It doesn't matter.  If they provided material

19   support then they're responsible.

20             And so my view was to take out and to simplify it.

21   I'm not sure that I am of the view that the plaintiff is

22   entitled to it if they really wanted to do that, but I didn't

23   see the advantage to either the plaintiff or the defendant to

24   do that particularly.

25             I also have in mind -- I know a little bit about

F2HTSOK4

1    jurors and how they use the verdict forms and how it guides

2    them in terms of what they focus on.  And that was one of the

3    reasons why I put the order this way, because I wanted to focus

4    their attention and look and figure out if they provided

5    material support.  Because if they did, then that will guide a

6    quicker discussion with regard to that.  If they started out

7    with the employer liability, I think that's a too limited an

8    analysis for them to spend the first hours or days discussing

9    with regard to whether or not they're confident that support

10    was provided.

11         We can debate about the semantics of whether aiding

12    and abetting.  Obviously providing material support is a

13    different analysis than simply being the person who sent out

14    their minions to blow themselves up or shoot people, and I put

15    it that way to focus the jury.

16         I need, Mr. Yalowitz -- I guess both sides, make sure

17    I have all the plaintiffs correct and all the plaintiffs are

18    still in the case.  That was my best analysis, judgment.  Both

19    sides should look at that if I have left anybody out or didn't

20    put anybody in.

21         MR. YALOWITZ:  We'll double-check.  I didn't --

22    nothing jumped out at me that somebody was missing or that

23    someone should have been dismissed out on the summary judgment

24    wasn't.  I don't mean legally, I mean logistically, I'm not

25    conceding that summary judgment.

F2HTSOK4

```
 1              THE COURT:  I understand.
 2              Mr. Rochon, you should let me know if you want
 3     really -- if you have what would be basically an obvious
 4     argument to make that I should eliminate some theory out of
 5     this case that goes to the jury.  Otherwise, my inclination at
 6     this point is to let the jury handle this first and then
 7     determine whether or not -- unless I think there's some
 8     significant prejudice to you given the case, I want to see what
 9     they have to say about these claims first, unless there's some
10     clear legally insufficient claim that I should take away from
11     that.  Then I can reevaluate, if they don't rule in your favor
12     on that issue, whether it's supported by the evidence.
13              Because part of the problem in a trial like this, you
14     should have an opportunity and I should have an opportunity to
15     go back to the transcript and make sure that we, as you say,
16     what we think is there is really there and/or and make a
17     determination.  So I am willing to hear you tomorrow.  What I
18     would anticipate is that we send the jury home early tomorrow
19     and have final discussions and sum up on Thursday.
20              MR. YALOWITZ:  The only problem I have with that --
21     and look, this is really up to you, the problem I have with
22     that is this we have several plaintiffs in anticipation of
23     Wednesday summations are on their way back to New York and
24     would like to hear the summations on Wednesday.  If we can get
25     to them, I understand we've got -- we may not be able to.
```

F2HTSOK4

1          If we go until Thursday it's a problem getting these

2   particular individuals back to Israel on Thursday night because

3   by the time they fly and land it's too late for them to get

4   home to observe the Sabbath.  So that means we have to keep

5   them in New York several days.

6          Look, at the end of -- we may not be able to get to

7   summations on Wednesday.  If we can't, we're in your hands on

8   that, but it would be very helpful to these -- it's four of

9   them, it's not everybody, it's four of them.

10          THE COURT:  Well, that begs the question.  Let me ask

11   at this point, at this time, Mr. Rochon, approximately how long

12   do you anticipate your summation?

13          MR. ROCHON:  I would say 90 minutes.

14          THE COURT:  Mr. Yalowitz?

15          MR. YALOWITZ:  Seven hours.  But I'm going to cut it

16   down between now and then.

17          THE COURT:  Can you give me a more specific estimate?

18          MR. YALOWITZ:  Look, I think I'm likely to go two

19   hours.  I think that's likely.  I'm over that right now, and I

20   know I need to cut it down, but that's kind of where I'm

21   thinking.

22          THE COURT:  Mr. Rochon, did you want -- if possible,

23   did you want to start tomorrow afternoon?

24          MR. ROCHON:  Here's what I was thinking, I think we

25   have some things to address, including some things on the Rule

F2HTSOK4

1     50 we would like to talk to you about tomorrow, and getting the

2     instructions and knowing them is helpful to have that the day

3     before.

4              THE COURT:  Well, you pretty much got in essence.

5              MR. ROCHON:  This agency stuff, and I heard you on the

6     verdict form, but on the instructions I understand the Court --

7     I don't understand the Court is also taking out the

8     instructions or would instruct agency but not have it on the

9     verdict form.

10              THE COURT:  I think it's appropriate to instruct on

11     agency with regard to material support.

12              MR. ROCHON:  We want to discuss that with you, of

13     course.

14              THE COURT:  We can discuss that further, but the

15     problem I have with that argument is that specifically the

16     instruction I give the jury is that this kind of entity can

17     only act through its agents.  It can only act through other

18     entities or human beings, but more likely human beings.

19              And so the PA is not a person.  It doesn't have legs

20     and arms, it can't physically do anything.  People have to do

21     it as its agents.  That's the only context in which I think

22     agency is particularly relevant in this case is that an entity

23     can only act through its agents.

24              So I think they need to know -- and for the benefit of

25     both sides, they need to know if you need to find a person who

F2HTSOK4

1     is of high responsibility so that they, just like any corporate

2     circumstance, they are considered a managerial person or can be

3     an employee that you're directing.

4          But the real responsibility for most of this in terms

5     of providing material support would be to the extent that a

6     high-level individual is not themselves giving directions, or

7     as they say Arafat is not directly giving money or support or

8     whatever other resources to do a terrorist act, that to the

9     extent that he gave that responsibility to others, they are the

10    agents of the PA and the PLO.  And if they demonstrate that

11    they were acting with that given authority, just similar but a

12    little different, a lot different than respondeat superior, if

13    they are given that authority and they act at the behest,

14    direction, command or encouragement of a responsible PA or PLO

15    official, they go out and to those acts as their agents, and

16    the PLO or PA can't say well, Arafat didn't strap a bomb to

17    himself, or Arafat didn't drive unlawful interests to cross the

18    border, or an employee of the PA didn't do that, as long as

19    they establish that somebody, that you got to do that on your

20    behalf because that's what you wanted to happen, then they are

21    your agent for the acts that they do to accomplish that.

22          MR. ROCHON:  So I think on that one it will be helpful

23    to continue to discuss, because obviously employees are sort of

24    easy to figure out.  And the question is -- and what I think

25    the defense ought to be entitled to here, if we don't prevail

F2HTSOK4

1    on not giving the instruction, is to give a clear understanding

2    of who the plaintiffs contend are agents on these facts.

3    Because we're going to have argument -- I'm going first, and I

4    do need to know their theories before I argue.

5            So I would like to discuss the -- because our view on

6    these facts, it's really hard to see the agency argument as

7    separated from the direct support to one of AMB or whatever or

8    the respondeat superior argument, and we want clarity on what

9    this instruction would allow the plaintiffs to argue,

10   particularly since I won't be arguing after Mr. Yalowitz but

11   before.  But in any event, I want to know this.

12           THE COURT:  I think your first guidance, unless

13   Mr. Yalowitz wants to give you greater guidance, is anybody

14   that the evidence indicates that was either instructed or

15   directed or requested to commit this terrorist act or to do

16   something which would be necessary to facilitate this terrorist

17   act.

18           This person -- to the extent the jury should find this

19   person was given that direction by a high level responsible PA

20   person, or they could infer that that was who they got those

21   directions from, that person, in acting to facilitate that

22   terrorist act, could constitute an agent of the PLO.  I can't

23   tell you as to each one of these six ones who the one to ten

24   people that they claim fit that category, but --

25           MR. ROCHON:  It's such a vague sort of instruction how

F2HTSOK4

1    in this case one would sort of parse out how one would argue

2    where you don't have the traditional agency relationships.

3              THE COURT:  I don't think this is an unusual -- I

4    think it is a traditional agency relationship.  I think

5    agents -- I don't think -- you seem to want to make something

6    more sophisticated than it is.  If I asked to you go to

7    McDonald's and get me a Big Mac, you're my agent.  There's

8    nothing sophisticated about that.  This has nothing to do with

9    the PA structure.

10             MR. ROCHON:  I'm responsible for your cholesterol.

11             THE COURT:  But I didn't see -- in reading through

12   your suggestion, I didn't see any real argument that the law

13   that I stated on agency is incorrect.

14             MR. ROCHON:  The question is whether the facts justify

15   giving the instruction is much more than whether, as stated, it

16   would be right.  The question would be on these facts whether

17   all of that law would be appropriate.

18             THE COURT:  But you didn't identify for me which ones

19   would not be appropriate.

20             MR. ROCHON:  I'm still a little vague.  It may seem

21   obvious for everyone else.  I know the plaintiffs referenced

22   Wafa Idris would be deemed an agent of the PA or PLO.  I'm not

23   sure the facts would support being an agent of the PLO or even

24   the PA because their evidence is that she got the bomb at the

25   Mukataa.  So the question is can that instruction -- that if

F2HTSOK4

1    that theory isn't applicable in that incident, I want to know,

2    because I got to know what I'm fighting.  I can't shadow box in

3    the dark.

4            THE COURT:  Let's put it this way.  Mr. Yalowitz is a

5    nice guy, but frankly, I don't have a lot of confidence that he

6    will be nice enough to tell you exactly what he will argue.

7    But you know what the record shows.  The record shows that

8    there's a possible argument or there isn't a possible argument.

9    It shows who the people are who the jury can determine were

10   involved and who weren't the people involved.  It shows that

11   they had some connection with the PA or the PLO or they didn't

12   have connection with the PA or the PLO.  If he wants to be more

13   specific for you, fine, then he should do so, but --

14           MR. ROCHON:  Maybe we should assume for just this

15   conversation that he decides not to be more specific.

16           THE COURT:  That was my basic premise.

17           MR. ROCHON:  That was the choice he made.

18           THE COURT:  What do you want me to force him to do,

19   tell you exactly everybody he's going to say is an agent?

20           MR. ROCHON:  Well, I think --

21           THE COURT:  I'm not sure you're entitled to this.

22           MR. ROCHON:  I think we are entitled to know who they

23   argue who is going to be an agent of our clients.

24           THE COURT:  They're going to argue whatever they think

25   the facts support.

F2HTSOK4

1          MR. ROCHON:  Yeah, but I mean presumably they won't

2     argue people that facts don't support would be their position.

3          THE COURT:  If they do, I'm sure you will --

4          MR. ROCHON:  This all started as to when we ought to

5     close.  That's how we get on this track.  And I think it would

6     be beneficial to have some argument on the Rule 50 tomorrow to

7     get clarity on this.  I do think it would be beneficial to work

8     through the witnesses, work through the instructions, work

9     throughout verdict form, have those arguments and close the

10    next day, even if somebody does need to stay here or beyond

11    10:00 p.m.  There's a 10 o'clock flight to Tel Aviv out of New

12    York.  I've been on it more times than I would like to admit

13    over the course of the last seven years, 50 or 60 times.

14         MR. YALOWITZ:  They can't take a flight like that.

15    The problem is --

16         THE COURT:  You're not being heard by me or the court

17    reporter.  The reality is -- I don't want to spend the time

18    because I don't need to debate that.  The reality is I

19    structured it as best I can.  I am not going to force

20    Mr. Rochon -- if you want to sum up first, maybe I will

21    consider it.

22         MR. YALOWITZ:  Open and close and then a final --

23         THE COURT:  Short rebuttal.  If you want to consider

24    that, I will consider doing that.  But I'm not going to put the

25    burden on Mr. Rochon so he has to scramble to accommodate your

F2HTSOK4

1    plaintiffs that he has to close tomorrow.  Now if he wants to

2    do that, he can.  If you want to do that, you can.

3            But otherwise, I can't control the weather, I

4    expect -- look, I was in a situation where I was calling jurors

5    between 8:30 and 9 o'clock who were on their way, somebody

6    already arrived here, to tell them they should stay home.  I

7    will do the best I can.  If you want to talk to Mr. Rochon to

8    see if you can work that out, or if you want to open first and

9    Mr. Rochon can open after you and I will give you short

10   rebuttal, you can consider that.  But I don't think I'm in a

11   position to force him to open for your convenience.

12           MR. YALOWITZ:  I understand that.  Look, I had one

13   other thing I want to raise with the Court, but I was hoping we

14   might take a short break.

15           THE COURT:  Well, I want to wind up.

16           MR. YALOWITZ:  So let me quickly say the final thing

17   on my mind, which is reflecting on that final paragraph on

18   respondeat superior, there are New York cases that say -- I

19   don't think there's any dispute this is the law -- where an

20   employee is traveling on company business and personal

21   business, that doesn't alleviate the company of liability.  We

22   may want to just add something like that for clarity.  I don't

23   have language in mind.

24           THE COURT:  Think about it.  If you have some language

25   that you suggest -- I thought about this in a lot of different

F2HTSOK4

1    ways, I can't think of anything particularly applicable here

2    that the jury needs legal instructions on, but you want to

3    fashion something, propose something to me, be prepared with it

4    tonight or tomorrow morning, and we'll discuss it.  I want to

5    make sure that we could be ready to begin summations as early

6    as Thursday.

7         MR. YALOWITZ:  Or possibly tomorrow.  I might come in

8    in the morning and say look, let's get to it, let's get the

9    jury going.  And the defendants may not agree, they may want to

10   go first because they want primacy.

11        THE COURT:  You can work that out tonight or this

12   afternoon.  Talk about it and see if that is really that

13   important to your clients.

14        MR. YALOWITZ:  We'll try to figure that out, but I'm

15   sure whatever we want they will agree with anyway.

16        THE COURT:  Okay.  So let me go back and do some work

17   before I leave this afternoon and do some more tonight, and

18   then we'll be ready to wind up the witnesses tomorrow and

19   address all the issues again and be ready to go tomorrow

20   afternoon or Wednesday -- I mean Thursday morning.

21        If you are correct about your summations, I anticipate

22   an hour or two from the defense and two to three hours from the

23   plaintiff.  Did I get that wrong?  Then we might be in a

24   position to hopefully -- at that rate we'll be in a position to

25   charge the jury and send them in to start their deliberations

F2HTSOK4

1    on the same day.

2            Go to work, and I will see you tomorrow morning.

3    Let's start at 9:15 so we can make sure we're all set to go.

4            MR. YALOWITZ:  For planning purposes, if the

5    defendants have decided that they're definitely calling or not

6    calling any of the witnesses, then that would be useful

7    information.

8            THE COURT:  Hopefully they can provide that

9    information as quickly as they're able to determine.

10           MR. ROCHON:  Thank you, your Honor.

11           (Adjourned to February 18, 2015 at 9:15 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25