F2ITSOK1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

MARK I. SOKOLOW, et al.,

                    Plaintiffs,

            v.                          04 CV 397 (GBD)

PALESTINE LIBERATION
ORGANIZATION, et al.,

                    Defendants.

------------------------------x

                                        New York, N.Y.
                                        February 18, 2015
                                        9:30 a.m.

Before:
                  HON. GEORGE B. DANIELS,

                                        District Judge

                           APPEARANCES

ARNOLD & PORTER LLP
      Attorneys for Plaintiffs
BY:   KENT A. YALOWITZ
      PHILIP W. HORTON
      TAL MACHNES
      SARA PILDIS
      CARMELA T. ROMEO
      RACHEL WEISER
      LUCY S. McMILLAN

MILLER & CHEVALIER, CHARTERED
      Attorneys for Defendants
BY:   MARK J. ROCHON
      LAURA G. FERGUSON
      BRIAN A. HILL
      MICHAEL SATIN
      DAWN E. MURPHY-JOHNSON

Also present:  ZAHA BUSTAMI, Arabic interpreter

F2ITSOK1

1          (Jury not present)

2          THE COURT:  Good morning.  I think about half our

3     jurors are here.  I reviewed the submissions that I got.

4     Before I talk with them about that, let's talk about scheduling

5     and see where we are.

6          MR. ROCHON:  I informed the plaintiffs that we will

7     not be calling General Al-Yaman based on our discussions

8     yesterday.  I will be calling -- plan on calling Amnah Reehan,

9     and told the plaintiffs it is unlikely that I will call

10     Suleiman al-Deek, but I make that decision after.

11          THE COURT:  So you will be prepared to rest this

12     morning.

13          MR. ROCHON:  Yes.

14          THE COURT:  And the one witness that you referred to,

15     your direct examination is about 20 minutes?

16          MR. ROCHON:  I think that's right.  But there is an

17     issue that arose as to her.  And I think this morning around

18     9:20, in other words, after we got here, the plaintiffs sent me

19     a video, I think, that they played for me now a portion of a

20     video that is apparently the witness Amnah Reehan, and I'm not

21     sure the purpose of which they use wish to use the video.

22          THE COURT:  I assume on cross-examination --

23          MR. ROCHON:  I assume they don't want me to use it on

24     direct, I agree.

25          MR. YALOWITZ:  Actually we do, but I don't think he

F2ITSOK1

1    will.

2         MR. ROCHON:  It's a late disclosed document if ever

3    there were.

4         THE COURT:  Not necessarily if it's simply they never

5    intended to offer it in their case in chief, nor did they

6    intend to offer it at all.  They intended to utilize it to

7    cross-examine your witness.  I'm not sure they had an

8    obligation to tell you every exhibit prior to your witness

9    testifying on direct examination everything that they were

10   going use to try to impeach the witness.

11        MR. ROCHON:  I do know that I was directed to provide

12   the documents that I would use to cross-examine their

13   witnesses, and when we failed to do so timely, we were

14   criticized for it.

15        THE COURT:  Well, if you want me to apply that rule

16   across the board, that's different, but I don't think there's a

17   legal requirement, that they violated a rule of evidence

18   because they didn't show you.  You're saying you are somehow

19   prejudiced because they surprised you with this?  I don't even

20   know what it is.

21        MR. ROCHON:  We ask that we play it for the Court.

22        THE COURT:  Could you summarize it for?

23        MR. ROCHON:  I have seen it for the first time a few

24   minutes ago, and I'm not in a really good position to describe

25   what it says given that.

F2ITSOK1

1              THE COURT:  What is it?

2              MR. ROCHON:  It appears to be an interview of her at

3      some funeral or wedding or something.

4              THE COURT:  And you don't know whose funeral or

5      wedding?

6              MR. ROCHON:  The video doesn't explain it, and it's

7      been a surprise to me.  So if the plaintiffs wish to use it, I

8      think we should find out first if there's an improper purpose.

9              THE COURT:  What jumps out as being relevant?

10             MR. ROCHON:  Nothing jumps out as being relevant, but

11     it does jump out as potentially problematic, although, again,

12     the plaintiffs know what they will do better than I.  There's

13     reference to combatants on it.  There's a name on it that is

14     not Wafa Idiris, so it's not related, as far as I know, to any

15     of these attacks.  So it seems to be a television interview of

16     her, maybe a snippet of an interview.  I asked if they would

17     provide the entire video, and they declined to do so as of yet.

18     So I don't know the context of what is going on there.  It does

19     appear to be Ms. Reehan on camera.

20             THE COURT:  Do you know the time frame?

21             MR. ROCHON:  I have no idea.

22             THE COURT:  Let me find out from Mr. Yalowitz what he

23     intends do it with it, and I will take a quick look.

24             MR. ROCHON:  It's about a minute long or less.

25             MR. YALOWITZ:  It all depends on what she says in

F2ITSOK1

 1  response to my questions.  I have questions for her.  She made

 2  statements.  Mr. Rochon confirmed it's her.  I think the

 3  questions go to her bias, they go to her perspective on why

 4  she's coming here to testify.  I think they're perfectly

 5  legitimate questions.  We can take it question by question.  I

 6  don't really want to give him all my trial notebook strategy

 7  with this witness.

 8         THE COURT:  I understand.  Can you -- you have shown

 9  it to him, could you give me an idea of what it is?

10         MR. YALOWITZ:  I can read you the translation.

11         THE COURT:  It's easier for me, because then I can

12  focus on what you think is relevant.  Just describe it to me

13  first.  What do you say it is?

14         MR. YALOWITZ:  It's an interview of Amnah, this lady,

15  and she's speaking about a funeral, and she says it was a

16  wedding, and not a funeral.

17         THE COURT:  Okay.

18         MR. YALOWITZ:  It was a great funeral, and they

19  conducted a military eulogy for the first time.  They conducted

20  a military eulogy for Amir on the 3rd and 40th day of his

21  martyrdom.  Armed and masked combatants came because he was a

22  commander.  And it was the nicest eulogy ever.  His funeral was

23  the best wedding for him.

24         THE COURT:  Okay.  And who is this person whose

25  funeral it is?

F2ITSOK1

1          MR. YALOWITZ:  It's her brother.

2          THE COURT:  It's her brother?

3          MR. YALOWITZ:  Yep.

4          THE COURT:  And can you give me some other idea of

5     what happened -- who he was, what he did, and what happened to

6     him?

7          MR. YALOWITZ:  I don't know what he did, but he died

8     as a martyr in the conflict.

9          THE COURT:  What does that mean?  He got run over by a

10     tank or he blew himself up?

11          MR. YALOWITZ:  I don't think he blew himself up.  He's

12     not a suicide attacker.

13          THE COURT:  So what are you trying to imply?

14          MR. YALOWITZ:  How he was killed, why he was killed, I

15     don't know.

16          THE COURT:  What is the relevant impeachment?

17          MR. YALOWITZ:  This is a person who thinks that --

18          THE COURT:  Her brother is a martyr.

19          MR. YALOWITZ:  This is a person who describes death, a

20     funeral as a wedding.  This is a person who glorifies death.

21     This is a person who is proud to be associated with a violent

22     death of a family member.

23          THE COURT:  You didn't tell me how he died.

24          MR. YALOWITZ:  He was killed in some kind of military

25     encounter.

F2ITSOK1

1          THE COURT:  How do you know that?

2          MR. YALOWITZ:  It's -- well --

3          THE COURT:  You imply that from what she said?

4          MR. YALOWITZ:  This is a movie that's like 20 or 30

5     minutes, a television show, and other parts of the show talk

6     about the brother and his --

7          THE COURT:  Give me some more information about the

8     brother.  What does it talk about?

9          MR. YALOWITZ:  That's what I know.

10          THE COURT:  I mean the bare stuff that you gave me

11     would not convince me that this has significant probative value

12     that she's at the funeral of her brother, calls him a martyr,

13     and says that this is more akin to a wedding rather than a

14     funeral.  I don't know if she's referring to her religious

15     beliefs or referring to her political beliefs.  And I don't

16     know if she's motivated by her relationship with this

17     individual or motivated by some act of terror that you say is

18     reflected by what he did or by what she is discussing.

19          So what's the context?  How does this bring us closer

20     to terror, or is that not the purpose?

21          MR. YALOWITZ:  No, the purpose is to illustrate that

22     whether it was military activity against civilians, military

23     activity against soldiers, I don't know, I don't care, I'm not

24     saying that the brother was a terrorist, I don't know,

25     although --

F2ITSOK1

1          THE COURT:  So why is it bad for her to say that her

2     brother is a martyr if he died as opposed to people say --

3          MR. YALOWITZ:  Because it suggests that somebody who

4     works at the preventive security service isn't really all that

5     against militant activity.

6          THE COURT:  You can't say that unless you tell me that

7     he was involved in militant activity.  Was he involved in

8     militant activity?

9          MR. YALOWITZ:  I believe she'll say he was, because I

10    think he was.

11         THE COURT:  What is it that you think he did?

12         MR. YALOWITZ:  I think that he was in Al Aqsa

13    Brigades.

14         THE COURT:  What's your basis for that belief?

15         MR. YALOWITZ:  The statements in the movie and other

16    research.

17         THE COURT:  Does it say he's in Al Aqsa Brigades?

18         MR. YALOWITZ:  It doesn't say Al Aqsa Brigades.

19         THE COURT:  Does it say that he's an employee of the

20    Fatah or a member of Hamas?

21         MR. YALOWITZ:  I think she'll say he was a member of

22    Fatah.

23         THE COURT:  But that's not the import of this.  You

24    want to imply that he is involved in acts of terror?

25         MR. YALOWITZ:  I think that's a reasonable inference

F2ITSOK1

1    from the fact that masked men show up at his funeral and give

2    him an eulogy.

3              THE COURT:  Who are these masked men?

4              MR. YALOWITZ:  He was a commander of some kind, and

5    they are people honoring him for his military activities.

6              THE COURT:  Do you have any basis to believe that the

7    Israeli government considered him to be a terrorist or criminal

8    or wanted individual?

9              MR. YALOWITZ:  I believe that, but I can't put my

10   finger on where I got that, but I have a little report that I

11   could look at.

12             THE COURT:  The problem --

13             MR. YALOWITZ:  And I do believe that, I'm not making

14   it up, but I can't give you chapter and verse.

15             THE COURT:  I just want to know whether there's a good

16   faith basis for that belief.

17             Look, if a relative of mine passed away and I went --

18   my brother died and I went to his funeral and I said well, this

19   is a celebration of his life rather than a mourning of his

20   death, you wouldn't say that that must mean that I was

21   glorifying all the bad things that he did in life.

22             MR. YALOWITZ:  I agree with that, but look, it

23   could -- I mean if you just to carry your hypothetical, if your

24   brother died and a bunch of gang members came to his funeral

25   with hoods on their heads and you said that was a great

F2ITSOK1

         funeral, I was really happy that I was there, it might raise

         some questions about your perspective on gang violence that

         people might want to know.

                    THE COURT:  It depends.

                    MR. YALOWITZ:  If they were judging your credibility.

                    THE COURT:  That's a very good example, because I

         would say in my particular circumstances, no, because my

         brother was a captain in the Department of Corrections and

         worked at Rikers Island for most of his career before he

         retied.  So if a bunch of gang members showed up and showed

         respect for him, I would assume maybe he helped them turn their

         life around or did some good for them or treated them well

         while they were in the jail.  I wouldn't say that means that my

         brother is a gang member.

                    MR. YALOWITZ:  That's a credible explanation that you

         could give on cross-examination if you were a witness, and the

         jury would believe you.  They would be like well, he had a good

         explanation for that.

                    THE COURT:  So the implication that you want is from

         the fact that the masked individuals showed up at the funeral.

                    MR. YALOWITZ:  And that she thought it was great.  So

         she might have a credible explanation for it.

                    THE COURT:  Okay.

                    MR. YALOWITZ:  That's up to her.

                    THE COURT:  When do you say this funeral took place?

F2ITSOK1

1        MR. YALOWITZ:  I have to look, I think in the pre '04

2   period, but I have to look that up.  It doesn't really matter

3   to her credibility.

4        THE COURT:  What is the proper impeachment of her?

5        MR. YALOWITZ:  I'm going to ask her does she have

6   siblings, are any of them married, I might ask her questions

7   about what happened to her brother.

8        THE COURT:  Okay.

9        MR. YALOWITZ:  And did you go to his funeral, what did

10  you think of it?  Didn't you say that there were masked men

11  there and they gave him a military eulogy?  Did you compare it

12  to a wedding?  Why did you do that?

13       THE COURT:  And you say that doesn't go to the

14  substantive issues in this case, that goes to her credibility.

15       MR. YALOWITZ:  Goes to her potential bias, it goes to

16  the bone fides of -- remember, she's in the preventive

17  security.

18       THE COURT:  Remind me, I'm sorry, I get them confused,

19  what is she being called for?

20       MR. YALOWITZ:  She's going to say that she wrote that

21  Exhibit 233, and that she heard it from --

22       There's another thing.  I want to finish this

23  conversation with you, but there is another thing about her

24  testimony that we need to talk about while we're waiting for

25  the jury, but that's the tenor of it.

F2ITSOK1

1        And if she answers -- if I asked you about -- go back

2   to hypothetical, if I asked you about your brother's funeral

3   and you said everything that you had given in some interview,

4   we don't need to play the video of you because you answered

5   truthfully.  But if you run away from it, I might have to

6   refresh you or impeach you.

7        THE COURT:  Then I will go to the next issue.  I think

8   we have about ten jurors.

9        Mr. Rochon, your objection at this point is the

10  playing of the video, is that basically it?

11       MR. ROCHON:  I think questions about this woman's

12  brother are pretty far afield, given what she's being called to

13  testify to.  To start asking every witness or a witness about

14  the death of their siblings and try to connect it in some

15  relevant way to this trial and her feelings about the death of

16  their siblings seems to be about as tangential as one can get

17  in terms of examination.

18       As far as the proffers that have been made, I ask to

19  see the whole video, because there seems to be some references

20  to other parts of it that counsel thinks informs us, and they

21  declined to show it to me.

22       MR. YALOWITZ:  It's publically available, and it's

23  their client who is on it.  I would have thought they would

24  have known all about it.

25       THE COURT:  That would not be my assumption that you

F2ITSOK1

1      intended to use this on February 18 at 11 o'clock, 2015.  I'm

2      sure they had no reason to believe that you intended to use

3      this, and they had no other reason to want to look -- find her

4      brother's funeral and review the whole tape.

5              MR. YALOWITZ:  I said I would do research on her

6      because, remember, she was a new witness.  I didn't have --

7      last week I didn't expect she was even going to show up.

8              THE COURT:  But your research goes in a different

9      direction than their research.

10              MR. YALOWITZ:  Then they're not as thorough as I

11     thought they were.  They seem very thorough to me.

12              THE COURT:  They have a different perspective.

13              MR. YALOWITZ:  That's for sure.

14              THE COURT:  Well, look --

15              MR. YALOWITZ:  The truth is we have to see how she is

16     as a witness.

17              THE COURT:  I'm not sure that -- let's put it this

18     way, at this point I'm not inclined to have this video played

19     before the jury.  I think that you should have an opportunity

20     to ask questions that go to her bias.  And I'm not sure, based

21     on, as you say, what she says, whether or not some question

22     related to her brother or brother's funeral would be a fruitful

23     area to go to and appropriate area to go to at this point,

24     depending on what she says.

25              Look, the jury is very intelligent.  The jury is going

F2ITSOK1

1    to conclude that just about every witness who testified in this

2    case has a bias.  This is such an emotionally and politically

3    charged circumstance that if someone came in here and told me

4    they were totally objective and had no bias when they came on

5    the witness stand, I think any jury would be suspect of any

6    witness who came and said that kind of statement.  That doesn't

7    mean they're bad people.  They have a point of view or

8    perspective, and they usually are either aligned with the

9    defendants' interests or aligned with the plaintiffs'

10   interests.  So I don't think it's going to take much to

11   establish a bias.

12         The question is not -- as I instruct the jury, the

13   question is not whether they have a bias, the question is

14   whether or not they let that bias influence their testimony and

15   whether it affects their ability to tell the truth and give an

16   accurate account of the things they testify about.  But I think

17   you have the right to question a witness about things that will

18   generally reflect upon the witness's bias, if that's what you

19   feel that you want to go to, to impeach the witness.

20         So I will wait and see.  Before you go to the next

21   level and ask specific questions about this funeral, I would

22   expect there will be other questions first that have nothing to

23   do with the funeral, and you will make a judgment of whether or

24   not that's a sufficient basis for you to impeach the witness to

25   the extent that you wish to impeach the witness.

F2ITSOK1

1        If that is not sufficient, then you need to tell me,

2   out of the presence of the jury, that you want to go in another

3   direction, including or solely asking about this funeral and

4   the circumstances of the funeral and the circumstances of the

5   witness's death and what it is supposed to reflect on things

6   she may or may not have said or thought.  And then a separate

7   decision will have to be made as to whether or not any

8   reference to a video or a portion of the video is appropriate,

9   and we will have to have a subsequent discussion about that

10  before that happens.

11       So if I were you, I would say it's very likely that

12  you are going to get to ask questions independent of this video

13  in which you say go to her bias, it is very unlikely we're

14  going to play this video.  And whether or not you should make a

15  judgment and direct your questions, my suggestion would be

16  direct your questions with regard to bias in such a way that

17  you could establish what you want to establish short of showing

18  this video or asking about this video, because that may be it.

19       MR. YALOWITZ:  That sounds right to me.

20       THE COURT:  If you have done that, and you still think

21  it's appropriate --

22       MR. YALOWITZ:  We can discuss it.

23       THE COURT:  -- we can discuss it further.

24       MR. YALOWITZ:  Okay.

25       THE COURT:  You said you had another issue.

F2ITSOK1

1          MR. YALOWITZ:  One other issue.  This has come up a

2     little bit and I have left it alone, but part of the proffer

3     was that this lady lives in a camp, that's what Mr. Rochon has

4     confirmed, that's what she's going to say she lives in, a

5     refugee camp.

6          THE COURT:  Haven't we had that kind of testimony?

7          MR. YALOWITZ:  We have, and I really -- it was sort

8     of -- it was another one of those things slipped in, and quite

9     frankly, these are not refugee camps with tents and army trucks

10    bringing water around and latrines.

11         THE COURT:  I understand.

12         MR. YALOWITZ:  So either we can find a neutral term

13    for it that doesn't make the jury think that these people are

14    living in tents, or we can have a witness like Mr. Spitzen, who

15    has been in all these places, come and explain what they

16    actually look like as part of the rebuttal case.

17         Frankly, I am not trying to micromanage the way he

18    puts on his witnesses.  If he wants to elicit that testimony, I

19    think it's inappropriate, but he's done it, and I don't think

20    we are going to unring that bell.  But quite frankly, if he

21    does it again at this late time, at this late stage toward the

22    end of the trial, I think it will need to be corrected, so the

23    defendants are on notice about that.

24         THE COURT:  Mr. Rochon, is there any legitimate

25    purpose for referencing a refugee camp?

F2ITSOK1

1           MR. ROCHON:  If the person is asked where they live, I

2     don't think we should start telling them to not say where they

3     live accurately.

4           THE COURT:  Saying where they live is not necessarily:

5     I live in a refugee camp.  If you asked me where I live, I

6     don't necessarily -- it depends on what you -- given the

7     witness with the indication that you want to elicit, if you

8     want to know where she lives, she can give you her address, she

9     can tell you what street she lives on, she can tell what you

10    town she lives in.  Is there some reason why refugee camp is

11    necessary?

12          MR. ROCHON:  I don't really care if she says refugee

13    camp.  I think this is micromanaging my witnesses.  But if the

14    Court would like me to instruct the witness not to use the --

15    she does live in a camp, that's what she lives in.

16          THE COURT:  Do we care?

17          MR. ROCHON:  I could ask her where she lives.

18          THE COURT:  Do we care that she lives in a camp?

19          MR. ROCHON:  We care -- every single witness in this

20    trial has been asked where they live.

21          THE COURT:  Not every single witness says I live in a

22    refugee camp.

23          MR. ROCHON:  I said I could instruct her and not say

24    refugee.  Camp is the name of where she lives.

25          THE COURT:  Why do we need that?

F2ITSOK1

1           MR. ROCHON:  I'm not saying whether we need it or not.

2           THE COURT:  So take it out.

3           MR. ROCHON:  When I ask her where she lives, what

4     would Mr. Yalowitz want me to say?

5           THE COURT:  I want her to say anything she wants to

6     say other than refugee camp.

7           MR. ROCHON:  She's not going to say refugee.

8           THE COURT:  I don't want her to say refugee or camp.

9     She could say she lives in Ramallah.

10          MR. ROCHON:  She doesn't live in Ramallah.

11          THE COURT:  What town?

12          MR. ROCHON:  It's a camp.

13          THE COURT:  She could say she lives in the West Bank.

14          MR. ROCHON:  This micromanaging my case.

15          THE COURT:  That's fine, Mr. Rochon.  Unless you give

16    me a legitimate reason, other than an improper inference, why

17    you think you want this in, let's take it out.

18          MR. ROCHON:  I have no idea what improper inference

19    we're worried about if someone says they live in a camp.

20          THE COURT:  I don't think that I have to explain that

21    to you, but I suggest if you don't think it's significant one

22    way or the other, take it out.  Because the jury may misuse it

23    to think somehow that refugee camp means that the Israeli

24    government is displacing everybody, destroying all their homes,

25    they have no place to live, and they're sitting in some camp

F2ITSOK1

1   someplace trying to figure out if they could ever go back to

2   their homes.  If you can't figure that out, I can spell that

3   out for you.  That's all I'm saying.  I know what Mr. Yalowitz

4   is saying.  It's not rocket science.  I don't know that they

5   will make that inference, but unless you give me a legitimate

6   reason why you want her to mouth "refugee" or mouth "camp,"

7   tell her not to say it.

8           MR. ROCHON:  I will do that if that's what you want me

9   to instruct her.

10          THE COURT:  I want you to instruct her that she should

11  not make any reference to the fact that she lives in a refugee

12  camp or any kind of camp.  If you ask her where she lives, you

13  should tell her, as you would prep a witness, you tell her what

14  you expect her to say, what you are really asking her.  If

15  you're asking her whether she lives in Jerusalem or lives in

16  the West Bank or lives in the Gaza, she can give that answer.

17  If you're asking some other relevant question, then you can

18  tell her what answer you want her to give.  You have to tell me

19  what you want her to say.  What do you want her to say?

20          MR. ROCHON:  Now I'm going to work with her to --

21          THE COURT:  This is not that sophisticated.  Tell me

22  what you want her to say.

23          MR. ROCHON:  I anticipated her saying that she

24  discussed issues with people in her camp and it's the basis for

25  her letter, because her testimony concerns conversations that

F2ITSOK1

1    occurred in the place she lives.

2            But I will take care of it, and I will find a way, but

3    it will take me a couple of minutes because it takes some

4    explaining.  If a person is discussing what happened in a

5    place, then to tell them not to name the place in the way that

6    she has named it her entire life, people --

7            THE COURT:  Mr. Rochon, you're giving me lawyer

8    arguments now.

9            MR. ROCHON:  No, I'm not.

10           THE COURT:  It's not that sophisticated.  You tell her

11   that look, I'm going to ask you what prompted you to do this,

12   and you are going to say I spoke to some people, and as a

13   result of information that I got from people where I live, they

14   told me X or they gave me -- I don't know what they told her is

15   going to be admissible, but I spoke to these people, and as a

16   result of speaking to these people I thought I was given this

17   information.  That's it.  It's not that the sophisticated.

18           MR. ROCHON:  I hear the Court.

19           THE COURT:  No, I'm giving you a suggestion.  I'm not

20   telling you -- you could figure out any way you want to do it.

21   All I said to you is she's not going to make a reference to

22   refugee camp.  If you think that gives you such a hurdle that

23   it's not worth calling her, then tell her to go home.

24           MR. ROCHON:  It's not that it's such a hurdle.

25           THE COURT:  Then why are we wasting time on this?

F2ITSOK1

1           MR. ROCHON:  We're wasting time on this because

2     Mr. Yalowitz is trying to micromanage my case.

3           THE COURT:  You haven't told me why it's relevant.

4     You said to me it doesn't matter to you.  Now you tell me about

5     the task you have to do as I put it to you.  Do it.  It's very

6     simple.  Somebody could have done it while we were talking.

7     Say:  Don't say "refugee camp."

8           MR. ROCHON:  I certainly expect no one to be talking

9     to her based on our conversation until I direct the witness.

10          The "refugee," I don't think was an issue.  I don't

11    think she would use the word "refugee" in any event, and I'm

12    going to follow your instruction.

13          THE COURT:  Is this impossible for you to do?

14          MR. ROCHON:  Judge --

15          THE COURT:  If it's not, just do it.  I don't want to

16    hear how hard it is, just do it so we can stop wasting time on

17    this.

18          MR. ROCHON:  Judge, it's easy for me to tell her not

19    to say the word "camp."

20          THE COURT:  No, you speak to her and make sure she

21    makes no reference to refugee camp or any kind of camp that

22    she's in or anybody else is in.  That's it.  It's not that

23    hard.

24          MR. ROCHON:  I understand.  My part is easy, and I

25    will work with the witness.

F2ITSOK1

1              THE COURT:  Let's not waste any more time on it.

2              MR. ROCHON:  Your Honor, then if the word "camp" slips

3       out of her mind.

4              THE COURT:  If the word "camp" slips out of her mind,

5       I will blame you and tell her to go home.  So you tell her the

6       word "camp" should not slip out of her mouth.  Just do it,

7       Mr. Rochon.

8              MR. ROCHON:  Judge, this is unfair.

9              THE COURT:  How is this prejudicing you, Mr. Rochon?

10             No, I don't want to hear it.  Are you going to do it

11      or not do it?

12             MR. ROCHON:  I will do it.

13             THE COURT:  Then let's go on.  Let's move on.  You

14      want to waste any more of the jury's time on this?

15             MR. ROCHON:  I didn't start it, he did.

16             THE COURT:  You can finish it, though.  He gave me the

17      problem, you can give me the solution.  Solve the problem.  You

18      said it doesn't matter, so take it out.

19             MR. ROCHON:  I want to make sure Mr. Yalowitz is done.

20             THE COURT:  I don't care if Mr. Yalowitz is done.

21      We're moving on.  As far as I'm concerned, he's done.

22             MR. ROCHON:  Shall I step out?

23             THE COURT:  If you want to do it now, step out.

24             MR. ROCHON:  I assume that's what we're going to do.

25             THE COURT:  Is this your next witness?  Then step out

F2ITSOK1

1    and do it, and when you come back we can continue if the jury

2    is not here.

3              (Mr. Rochon exited courtroom)

4              MR. YALOWITZ:  So your Honor, I don't think it changes

5    our discussion at all --

6              THE COURT:  Wait until Mr. Rochon returns, unless

7    Mr. Hill wants to continue.

8              MR. HILL:  Let's wait for Mr. Rochon.

9              (Mr. Rochon entered courtroom)

10             THE COURT:  The jurors are here, too.

11             MR. YALOWITZ:  It will take me ten seconds.

12             MR. ROCHON:  Would you like the witness on the witness

13   stand?

14             THE COURT:  No.  Would you like the witness excluded?

15             MR. YALOWITZ:  Yeah, that would be great.

16             THE COURT:  He had one more thing that he would like

17   to say.  She could step outside and we'll be with her in 30

18   seconds.

19             Yes, you had something else.

20             MR. YALOWITZ:  While we were talking I was informed

21   that the brother died in 2004 during a shoot out between Israel

22   defense soldiers and Fatah militants.  So that's how he died.

23             MR. ROCHON:  Judge, I think this makes --

24             MR. YALOWITZ:  I don't think it changes anything that

25   we talked about.

F2ITSOK1

1          THE COURT:  It doesn't change what she can testify

2    about, although it makes me less inclined to let the video in.

3          MR. ROCHON:  I know I'm inclined not to let the video

4    in, but I don't think this witness should be asked the

5    circumstances of her brother's death.

6          THE COURT:  She's not going to be asked anything about

7    her brother, her brother's death and the funeral, unless we

8    discuss it further and the record of cross-examination and

9    direct examination makes it compellingly appropriate for those

10   sort of questions.

11         MR. YALOWITZ:  And I understand that.

12         MR. ROCHON:  Thanks.

13         THE COURT:  So the jury is here.  So one other last

14   question before we start.  What are you going to do after that,

15   Mr. Yalowitz, if this is the only witness?

16         MR. YALOWITZ:  I assume I'm going to cross-examine

17   al-Deek, because he keeps telling me he's unlikely to call him.

18         THE COURT:  What are you doing with your witnesses?

19         MR. YALOWITZ:  Then we'll have Shrenzel and put him on

20   the video, and he will do the three things we talked about,

21   give us two dates.  He is going to give us the -- he will

22   explain the translation of that document, and that's my

23   rebuttal -- and I got to move in this exhibit of Marwan

24   Barghouti, and that's my rebuttal case.  Those are the few

25   threads left of my rebuttal.

F2ITSOK1

1        THE COURT:  What we will do is we'll do this witness,

2   then we'll take a short break so you can set up the video, and

3   then we'll bring the jurors back out and we'll let them see the

4   rebuttal and then we'll be done.

5        MR. YALOWITZ:  I think he has a second witness, this

6   al-Deek.

7        MR. ROCHON:  I have been saying all along he's highly

8   unlikely to be called.

9        (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2I8SOK2

1          THE COURT:  I heard what you said.

2          MR. YALOWITZ:  That's why I assume he is going to call

3     him because he keeps saying he is not going to call him.

4          THE COURT:  Let's get the jury.

5          MR. ROCHON:  Before we bring in the jury, I again want

6     to instruct the witness through the interpreter, once she is up

7     here, about this issue.  So I will bring the witness in.

8          THE COURT:  You don't have to put her in the box to do

9     that.

10          Where is your interpreter?  Take your interpreter out

11     to speak to the witness privately.

12          One last thing.  Can I assume at this point that we

13     are going to start with summations tomorrow morning unless you

14     guys have worked something else out?

15          MR. ROCHON:  That's what I understand.

16          MR. YALOWITZ:  There has been no agreement to alter

17     the ground rules that your Honor has set.

18          THE COURT:  Then let's get the jury in and do the

19     witness.

20          (Continued on next page)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2I8SOK2

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.

3          Hopefully the weather will cooperate with us for the

4     rest of the week.

5          I want to let you know that it is my intention to

6     finish the witnesses today.  Hopefully before the end of the

7     day.  Then I can work with the lawyers and be prepared for

8     their summations, their closing arguments, which I will

9     schedule for tomorrow morning.  And hopefully as soon as the

10    closing arguments are done of the lawyers I will instruct you

11    on the law and send you in to begin your deliberations.

12         That's our schedule.  We are ahead of schedule.  We

13    can move forward efficiently.

14         Mr. Rochon, do you wish to call your next witness.

15         MR. ROCHON:  Thank you, your Honor.

16         Good morning.

17         I will call Ms. Amnah Reehan to the stand.  She will

18    be testifying through an interpreter.  So I will ask the

19    interpreter to come forward as well.

20         I anticipate, most likely, this will be the only

21    witness for the defense today.

22     AMNAH REEHAN,

23         called as a witness by the defense,

24         having been duly sworn testified through Arabic

25         interpreter as follows:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2I8SOK2

1    DIRECT EXAMINATION

2    BY MR. ROCHON:

3    Q.  Ma'am, could you please tell us for the record your name.

4    A.  Amnah Reehan.

5    Q.  Ma'am, where do you live?

6    A.  Amari.

7    Q.  Could you please tell us how close or far away is Amari

8    from the town of Ramallah?

9    A.  It's very close.

10   Q.  Is that in the West Bank?

11   A.  Yes.

12   Q.  How long have you lived in the West Bank, ma'am?

13   A.  Ever since I was born.

14   Q.  That causes me to unfortunately ask you, how old are you?

15   A.  44 years old.

16   Q.  Are you married?

17   A.  Yes, I am.

18   Q.  Is Reehan your married name or maiden name?

19   A.  It's my married name.

20   Q.  What was your maiden name?

21   A.  Aidiya.

22   Q.  Now, ma'am, do you have children?

23   A.  Yes.

24   Q.  How many children do you have?

25   A.  I have four.

F2I8SOK2                         Reehan - direct

1    Q.  Do they live with you?

2    A.  Yes.

3    Q.  Where did you go to school?

4    A.  In Amari.

5    Q.  Is that where you went to high school?

6    A.  High school was in Ramallah and pre-high school was in

7    Amari.

8    Q.  Thank you.

9            After you finished high school, did there ever come a

10   time that you also attended college?

11   A.  Yes.

12   Q.  Was that before or after you started working?

13   A.  After I started working.

14   Q.  Where was it that you started working before you went to

15   college?

16   A.  In Preventive Security.

17   Q.  Is Preventive Security located where?

18   A.  In Ramallah.

19   Q.  When did you start at Preventive Security?

20   A.  1997.

21   Q.  When you started at Preventive Security in 1997, what was

22   your position?

23   A.  When I started working there, I was working in a department

24   that had to do with communications.

25   Q.  By 2002, February of 2002, what was your position at

1    Preventive Security?

2    A.  I was working in a department called Political Security.

3    Q.  Within the department called Political Security, what was

4    your position?

5    A.  I was a secretary.

6    Q.  Now, you mentioned that you went to college after you began

7    at Preventive Security.

8           Did you graduate college?

9    A.  Yes, I did.

10   Q.  You said you started at Preventive Security in 1997.  When

11   did you complete college?

12   A.  2006.

13   Q.  What college did you go to?

14   A.  Jerusalem Open University.

15   Q.  What did you graduate in?  What was your area of study?

16   A.  BA in accounting.

17          MR. ROCHON:  Justin, can you put up 233 for me,

18   please?

19          Your Honor, may I approach the witness with a hard

20   copy of Plaintiffs' Exhibit 233?

21          THE COURT:  Yes.

22   Q.  Let me hand you this document, ma'am.  We are also going to

23   put a portion of it on the screen.

24          If you would be so kind as to go to the last page of

25   the document.

1            Do you recognize that?

2   A.  Yes.

3   Q.  Who wrote it?

4   A.  I did.

5            MR. ROCHON:  For the record, your Honor, on the screen

6   is an Arabic version of the letter.  I will put an English one

7   up in a second, but I wanted to inquire about the Arabic.

8            THE COURT:  Can you refer to it by exhibit number?

9            MR. ROCHON:  Throughout the references will be 233.

10           Can I approach the large screen?

11           THE COURT:  Yes, sir.

12           Do you need a laser pointer?

13           MR. ROCHON:  Sure.

14           If I could have an old-fashioned one.

15  Q.  Ma'am, for the jurors who haven't seen Arabic typewritten

16  documents, I would like to ask you something about how this was

17  prepared.

18           The portion that I am pointing to, through here and

19  through whatever this is, was that prepared in handwriting or

20  typewriting?

21  A.  It's printed, typewritten, not handwritten.

22  Q.  Ma'am, at the bottom of the letter, and I don't know if the

23  witness can see this because of the screen, and I don't want to

24  move this screen if that's going to affect things, but may I

25  move this screen?

1              THE COURT:  I'm not sure you can.

2              MR. YALOWITZ:  Please don't let Mr. Rochon move the

3      screen.

4              THE COURT:  Why don't you just point it out to her on

5      the page and then you can go back to the screen and point it

6      out to the jury.

7      Q.  Pointing here to the bottom where the two words appear, one

8      on top of each other, can you tell me what that says?

9      A.  For your information with respect.

10     Q.  Is there a place on the document where your name appears?

11     A.  Yes.

12     Q.  I would like you to point me to where on the document your

13     name appears.

14             So I can describe it with words, is that the

15     typewritten portion that appears at the bottom left?

16     A.  Yes.

17     Q.  What exactly does this typewritten portion at the bottom

18     left say, ma'am?

19     A.  It's my name, Amnah Aidiya, and where I work, which is

20     Political Security.

21     Q.  I take it, therefore, you used your maiden name when you

22     put that on the letter?

23     A.  Yes.

24     Q.  We also see on this letter some handwriting that's on the

25     left side at the bottom and the top.

F2I8SOK2                          Reehan - direct

1                    Do you see that?

2    A.  Yes, I see that.

3    Q.  Beginning with the handwriting at the top, do you recognize

4    that handwriting?

5    A.  Do you want me to read it?

6    Q.  First I just asked if you recognize it.

7    A.  Yes.

8    Q.  Whose handwriting is that?

9    A.  The manager, the person who used to be my manager.

10   Q.  What is that person's name?

11   A.  Ghaleb Nobani.

12   Q.  Do you know that person's last name?

13   A.  Nobani.

14   Q.  Do you recognize the handwriting at the bottom of the page?

15   A.  Yes, I recognize it.

16   Q.  Whose handwriting is that?

17   A.  Halil Abdel Haq.

18   Q.  Do you recognize the handwriting on the left side of the

19   document?

20   A.  Yes.

21   Q.  Now, ma'am, I am going to ask you to keep the Arabic

22   version in front of you.

23            MR. ROCHON:  But I am going to ask Justin if you would

24   please put the English version up for the ladies and gentlemen

25   of the jury who may not read Arabic.

1   Q.  Ma'am, I would like to discuss with you the content of the

2   document.

3          There is a date on the document and in the English

4   version it's on the left side.  What is the date of the

5   document?

6   A.  February 14, 2002.

7   Q.  Is that the day you prepared this?

8   A.  Yes.

9   Q.  The letter discusses an issue regarding someone named Wafa

10  Idris.  Is that correct?

11  A.  Wafa Idris, yes.

12  Q.  If we could read the letter out loud with you, ma'am, the

13  body of it.

14          The content of this letter, was that something that

15  you --

16          MR. ROCHON:  That's a bad question so I am going to

17  start that one over, your Honor.

18  Q.  What is the subject that is in the letter, listed as the

19  subject of the letter?

20  A.  Special information about the martyr Wafa Idris.

21  Q.  Would it be fair to also translate that as private

22  information regarding the issue of *shahida* Wafa Idris?

23  A.  Yes, that is correct.

24  Q.  I didn't hear the answer.

25  A.  Yes, that is correct.  It is private or specific

1   information about her.

2   Q.  In the body of the document it discusses someone named

3   Tawfiq Tirawi and someone named Khalil Idris, correct?

4   A.  Yes.

5   Q.  Prior to writing this report, had you discussed its content

6   with Tawfiq Tirawi?

7   A.  No.

8   Q.  Prior to writing this report, had you discussed its content

9   with Khalil Idris?

10  A.  No.

11  Q.  The report discusses supposed calls, correct?

12          MR. YALOWITZ:  Object to the leading.

13          THE COURT:  I am going to sustain to the form of the

14  question.

15  Q.  The report discusses calls, correct?

16  A.  Yes.

17  Q.  Did you hear yourself any calls?

18  A.  No.

19  Q.  Ma'am, let me ask you, where did you live in 2002?  Was

20  that in Amari or somewhere else?

21  A.  In Amari.

22  Q.  And ma'am, did you know Wafa Idris?

23  A.  Yes, I did.

24  Q.  Before she died, where did she live?

25  A.  She lived in Amari.  She was my next-door neighbor.

1    Q.  When did you learn that Wafa Idris had committed a suicide
2    attack?
3    A.  On the day of that incident, of that attack.
4    Q.  Ma'am, when did you learn the information that's in this
5    report?
6    A.  On the day when news came out that Wafa had carried out
7    that operation.
8    Q.  The report, however, is dated 17 or 18 days later, correct?
9    A.  Yes.
10   Q.  Why did you prepare this on February 14?
11   A.  Because I was carrying out an ordinary conversation with my
12   manager at work and I mentioned this and he said this is
13   important information, it's good to put it down in writing.
14   Q.  Based on that instruction from him, is that when you put it
15   down in writing?
16   A.  Yes.
17   Q.  Ma'am, if you had not spoken to Khalil Idris or Tawfiq
18   Tirawi about these calls, what was the basis for the
19   information that you put in this document?
20   A.  It was a kind of gossip that I heard or just casual
21   conversation that I heard and I mentioned it, and upon his
22   instruction I wrote it down.  Because my work in the security
23   office requires that any information we receive should be
24   documented and written down.
25   Q.  I would like you to read to yourself the entire body of the

F2I8SOK2                     Reehan - direct

1    document for us, please.

2    A.  Yes, I have.

3    Q.  Now, ma'am, there is something at the bottom of the letter

4    that says:  The family indicated that during her last day Wafa

5    did not show any signs that she was not coming back.  She said

6    she was traveling to Nablus and might be late.

7               Do you see that in the Arabic version?

8    A.  Yes, I see it.

9    Q.  What is the basis for that sentence, as in where did you

10   learn that?

11   A.  When this event took place, everybody usually would

12   go -- these are our traditions.  That's the way we do things.

13   If there is a major incident -- a death, a wedding, anything in

14   the house of somebody -- we would always go visit that family.

15   So we went there.  And the people were asking her mother.  What

16   I heard is that this is what her mother said.

17              MR. YALOWITZ:  Objection.

18              THE COURT:  Overruled.

19   Q.  Did you hear it from the mother or did you hear it from

20   others than the mother?

21              MR. YALOWITZ:  Objection.

22              THE COURT:  Sustained as to the form of the question.

23              She said she heard it from the mother.  So rephrase

24   the question.

25   Q.  Ma'am, when did you hear this from the mother?

F2I8SOK2                    Reehan - direct

1    A.  On the day of the event.  There were also many interviews

2    carried out with the mother through the media and she kept

3    repeating that.

4    Q.  Now, as to the portion of the document that is above that

5    part, that begins with "at the night" and ends in "in this

6    way," what was the basis for that part of your report?

7    A.  I don't understand.

8         Could you repeat the question, please?

9    Q.  Sure.

10        The part of the report that begins "at the night" and

11   ends with "in this way," what was the basis for that part of

12   your report?

13   A.  People in the street were talking about that, and various

14   people said so and I heard that, that Tirawi called Halil and

15   so on and so forth.

16   Q.  Was this something you heard from the mother of Wafa Idris?

17   A.  No.

18             MR. ROCHON:  No further questions.

19             THE COURT:  Mr. Yalowitz.

20             MR. YALOWITZ:  Very brief, your Honor.

21   CROSS-EXAMINATION

22   BY MR. YALOWITZ:

23   Q.  Ms. Reehan, I just want to make sure I have this right.

24        The letter was addressed to two people, the head of

25   National Security and the head of Political Security, is that

F2I8SOK2                          Reehan - cross

1    right?

2    A.  Yes.

3    Q.  Do I have it right that the head of Political Security was

4    Mr. Nobani?

5    A.  Yes.

6    Q.  And then the head of National Security was Mr. Abdel Haq?

7    A.  Yes.  Hilal Abdel Haq.

8    Q.  And the handwriting at the very top, that was written by

9    Mr. Nobani?

10   A.  Yes.

11   Q.  Did you say that you worked directly for Mr. Nobani?

12   A.  Yes.

13   Q.  Who was Mr. Nobani's boss?

14   A.  It would be the head of National Security, which in this

15   case is Hilal.  And the overall manager of the directorate or

16   the director of the directorate is Sabri.

17   Q.  So Hilal, is that Mr. Abdel Haq?

18   A.  Yes.

19   Q.  So Mr. Nobani works for Mr. Abdel Haq.  Do I have that

20   right?

21   A.  Yes.

22   Q.  And then Mr. Abdel Haq's boss is Mr. Tmaize.  Is that how

23   you say his name?

24   A.  Tmaize, Sabri Tmaize.

25   Q.  Who was Mr. Tmaize's boss?

1    A.  It would be the overall head or chair of the apparatus, the

2    entire agency.

3    Q.  Was that Jabril Rajoub?

4    A.  I am not entirely sure I remember if at this time it was

5    Jabril Rajoub or Ziyad Habbal-Rih.

6    Q.  What was the name of the person who held that position

7    after Mr. Rajoub?

8    A.  Ziyad Habbal-Rih.

9    Q.  Then above Jabril Rajoub, who was Jabril Rajoub's boss?

10   A.  That would be Abu Mazen, head of the Palestinian Authority.

11   Q.  Well, back in 2002, who was Jabril Rajoub's boss?

12   A.  I don't know at that date.  It might have been Yasser

13   Arafat, Abu Ammar.

14   Q.  Abu Ammar is Yasser Arafat?

15   A.  Yes.

16   Q.  As far as you know, was there anybody above Yasser Arafat?

17   A.  No.

18   Q.  As far as you know, can remember, was there anybody between

19   Mr. Rajoub and Yasser Arafat?

20   A.  I don't know.

21            MR. YALOWITZ:  I don't have any further questions.

22            THE COURT:  Anything further?

23            MR. ROCHON:  No, sir.

24            THE COURT:  Thank you, ma'am.

25            You can step down.

F2I8SOK2                          Reehan - cross

1              (Witness excused)

2              MR. ROCHON:  The defense of the PA and the PLO rests.

3              THE COURT:  Ladies and gentlemen, we are going to take

4     a short break because I think we may have one rebuttal witness

5     that you have heard from before that I am going to let the

6     plaintiffs call by video, because I think he is back in Israel

7     and he is not here.  Let me see if we can set that up and we

8     can do that, and we will probably be finished with the

9     witnesses before lunch.  That may or may not be the last

10    witness.  If we finish, I will send you home and I will work

11    with the lawyers so we can be ready to proceed first thing in

12    the morning.

13             Don't discuss the case.  Keep an open mind.  I will

14    bring you back in maybe 15 minutes to see if we are set.

15             (Jury exits courtroom)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

F2I8SOK2                         Reehan - cross

1                (Jury not present)

2                THE COURT:  Mr. Yalowitz, you intend to call this

3      witness?

4                MR. YALOWITZ:  Yes.  We have Mr. Shrenzel that we will

5      link up by video, if all goes well, and also plaintiffs move

6      Exhibit 1161.  I don't need to do it in front of the jury.  I

7      don't think the defendants have an objection to it.

8                THE COURT:  Just for the record, 1161 would be what?

9                MR. YALOWITZ:  It's a photograph of an individual

10     named Marwan Barghouti.

11               MR. ROCHON:  No objection.

12               THE COURT:  It will be admitted in evidence.

13               (Plaintiffs' Exhibit 1161 received in evidence)

14               MR. YALOWITZ:  Is the court keeping copies?

15               THE COURT:  No.  As a matter of fact, let me address

16     that right now quickly.

17               I want the parties to keep track of your own exhibits.

18     Have them ready to go if we get a note for an exhibit.  As long

19     as both sides agree that that's the exhibit they are

20     requesting, we are going to send it right in without having

21     anybody reconvene.  If they want testimony or have any other

22     questions, we will bring them out.  But make sure you handle

23     your own exhibits.

24               I know I have been getting letters about filing

25     exhibits and that sort of thing.  My position is at this point

1    you keep track of all of your exhibits.  If you want to make an

2    application after the trial ends to make certain documents,

3    whether they are letters, exhibits or other items, as part of

4    the record, particularly if you want to make it part of the

5    record on appeal, just give me that application and we can

6    address it at that point.

7             MR. YALOWITZ:  I don't know if that letter came from

8    us.

9             THE COURT:  It's not a letter.  I have a notice of

10   filing by defendant proffering Defendants' Trial Exhibits 29

11   and 70 for the record.

12            MR. YALOWITZ:  They are just filing their proffer,

13   that's fine.

14            THE COURT:  I just wanted to let you know how I am

15   handling it.

16            MR. ROCHON:  On the exhibits, I thought it might be a

17   good idea tomorrow when we are done if a couple of members of

18   our team and Mr. Yalowitz's team sit down with the exhibits and

19   make sure everything is order so when the jury asks --

20            THE COURT:  That would be helpful.

21            MR. ROCHON:  -- then your clerk is in a position to

22   know these have all been vetted and can send them back.

23            THE COURT:  I would like to know you agree with all of

24   the exhibits that are in evidence.  Put that list together,

25   have those exhibits ready and handy.  If the jury wants Exhibit

F2I8SOK2                          Reehan – cross

1     233, we can pull it out and send it right in.  So try to do

2     that.

3                Go ahead and see if you can set this up in the next

4     ten minutes.  If you can, as soon as you know we are ready to

5     go, we will bring the jury back out and do this.

6                You anticipate your direct examination will be?

7                MR. YALOWITZ:  Four, five hours.

8                THE COURT:  I will change hours into minutes.

9                MR. YALOWITZ:  I wish it could be that quick.  It

10    could be that quick.  We will see.  Based on what is left, I

11    think 15 minutes.

12               THE COURT:  I suspect we will be sending the jury home

13    by noon.

14               MR. ROCHON:  I agree.

15               MR. YALOWITZ:  I think so.

16               THE COURT:  Let's take a short break and see if we can

17    set this up and try to do this efficiently.

18               (Recess)

19               (Continued on next page)

20

21

22

23

24

25

F2ITSOK3

1          (Jury not present)

2          THE COURT:  This is what we're going to do, just

3     before you examine, Mr. Yalowitz, I will have my law clerk get

4     on the camera and remind the witness he's still under oath.

5          MR. YALOWITZ:  And if we could have the camera zoom so

6     he could see my face.

7          THE COURT:  We'll do it there.  I'll have you walk

8     over and stand in front.  You tell me if you're set up the way

9     you want to be set up.

10          MR. YALOWITZ:  I think we are.  Give me one second.

11          Mr. Shrenzel, can you hear us?

12          MR. SHRENZEL:  Yes, sir.

13          THE COURT:  All right.

14          MR. ROCHON:  Your Honor, I want to make sure we're

15     clear on the four areas, two dates --

16          THE COURT:  Mr. Rochon, I don't want to go through

17     this again.  I don't want to waste the jury's time.  We

18     discussed this.  We went through it.  If you have something

19     different to say, let's say it, then let's go.

20          MR. YALOWITZ:  I have one thing that I want to raise

21     with the Court, which is I want to ask him one question about

22     Exhibit 233, which is that exhibit that Ms. Reehan just

23     testified about, which is -- the question is was that a

24     document captured by the IDF.

25          THE COURT:  Didn't we already have that testimony?

F2ITSOK3

1              MR. ROCHON:  Yes.

2              MR. YALOWITZ:  Well, then they shouldn't have a

3     problem.

4              MR. ROCHON:  If he wants to ask that, you already have

5     it, but if that's the one question, fine.

6              THE COURT:  Then let's get the jury and get this done

7     so I can send them away and we can start talking.

8              MR. YALOWITZ:  We could oathatize him.

9              THE COURT:  This is my preference.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Mr. Yalowitz, call your rebuttal witness.

3           MR. YALOWITZ:  Your Honor, plaintiffs recall Israel

4    Shrenzel.

5     ISRAEL SHRENZEL,

6        called as a witness by the Plaintiffs,

7        having been previously sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. YALOWITZ:

10          DEPUTY CLERK:  Mr. Shrenzel, I want to remind you that

11   you are under oath.

12          THE WITNESS:  Yes, I'm aware of that.

13          THE COURT:  You can continue.

14   BY MR. YALOWITZ:

15   Q.  Welcome back, Mr. Shrenzel, we're happy to see you again.

16   A.  Happy as well, in spirit if not physically.

17   Q.  I just really have a few questions.  This should be pretty

18   brief.  First, I am going to put an exhibit on the screen so

19   the jury can see it.  It's Exhibit 427 in evidence.  It will

20   serve as a reference point.  Bear with me one second.

21          MR. YALOWITZ:  May I read, your Honor?

22          THE COURT:  Yes, you may want to stay there if he is

23   going to see you.

24   Q.  I'm reading from Exhibit 427.  This is question:  What did

25   they do with you after the interrogation?

1              Answer:  We were detained in the preventive security

2     prison in Ramallah from that day until the day on which Abu Ali

3     Mustafa was eliminated.  After his elimination they released us

4     from the prison.

5              My question, Mr. Shrenzel, is do you know the date on

6     which Abu Ali Mustafa was eliminated?

7     A.  Yes, I do.

8     Q.  What is that date?

9     A.  It was August 27, 2001.

10    Q.  Now we heard some testimony in the defense case about

11    something called Operation Defensive Shield.  Are you familiar

12    with that operation?

13    A.  Of course.

14    Q.  And do you know what date that operation started?

15    A.  Yes, that operation started on 29th of March, 2002.

16    Q.  We also heard some testimony during the defense case about

17    Exhibit 233.  Do you know which exhibit that is or do you

18    recall?

19    A.  The letter?

20              MR. YALOWITZ:  May I read the subject, your Honor?

21    Q.  Subject, private information regarding the issue of female

22    martyr Wafa Idris.  Do you recall that letter?

23    A.  Yes, I recall that document, and I have testified about it.

24    Q.  Where did you first acquire a copy of that document?

25              Or let me ask a different question, was that document

1   captured during Operation Defensive Shield by the IDF?

2   A.  Yes, it was.

3   Q.  Now I also want to ask you about a document that we heard

4   some testimony about, which is Exhibit 95 -- excuse me, 96.  Do

5   you have a copy of Exhibit 96 with you?

6   A.  Yes, I do.

7   Q.  What is Exhibit 96?  Just remind us.

8   A.  This exhibit is an application form of a prisoner in order

9   to determine his status and to whom his location goes to.

10  Q.  I just would like you to turn to -- there's a page that has

11  a bank card in Arabic, and in English it says beneficiary's

12  account number, Bank of Palestine Limited.

13  A.  Yes, I have it in front of me, this page.  And really this

14  is the card, the bank card, it said in the heading this is the

15  Bank of Palestine, then the name of the beneficiary, Majid

16  Masri, then the number of the account, and then the branch,

17  it's in Nablus, a major city in the West Bank.  And about that

18  card, in Arabic handwritten out it says -- I translated into

19  English the number of the account of the beneficiary.

20  Q.  Now could you go to the main body of the -- well, let me

21  ask you, does it say mother of the beneficiary?

22  A.  No, no, without parents, no mother involved here.  Only in

23  Arabic I read already, I can say in Arabic as well if it's

24  deemed necessary, but in English it's the number of the account

25  of the beneficiary.  Let me say it in Arabic as well.  (Witness

F2ITSOK3                         Shrenzel - direct

1   speaking Arabic)

2   Q.  Is there any way that --

3           MR. ROCHON:  Objection.

4   Q.  Let me ask a little different question.  Did you have any

5   trouble reading that handwriting?

6   A.  No, basically this is quite easy to decipher.

7   Q.  And was there even a moment of confusion that you had about

8   whether it says mother of the beneficiary?

9           MR. ROCHON:  Objection.

10          THE COURT:  Overruled, you can answer.

11  A.  No, because I see three letters, and the word "mother"

12  indeed ends with the same letter as the word "number," but

13  still you can see clearly three letters here.  And also the

14  context, of course, that it says clearly that this is the

15  number of the account, and this corresponds with what we have

16  in the card.  So this is both logically and easy to read as

17  well.

18  Q.  I want to take you to the front of the document.  I think

19  it's the second page.

20  A.  Which page?

21  Q.  Just go back to the English translation of the beneficiary

22  account number, that bank card that we were just looking at,

23  and let me know when you're done.

24  A.  What page in English, please?

25  Q.  It's the second page of the document.  So just stay on the

1   page 9484 in English.

2   A.  Yes, I am there.

3   Q.  And we're looking at here on it the screen in New York

4   where it says beneficiary's account number, is that correctly

5   translated?

6   A.  Yes, that's the way I translated it.

7   Q.  Now I want to turn with you to the fifth page in the

8   document, which is page 9489.

9   A.  Yes, I'm there.

10  Q.  And what is the information for marital status of Majid

11  Al-Masri?  It's under item three, social status information at

12  the very top.

13  A.  Yes.

14  Q.  Is he married, according to this document?

15  A.  Yes, he is married.  There is the mention of his wife, the

16  name of the wife.

17  Q.  And now looking down at column four, beneficiary

18  information, who is the beneficiary name in item four, is it

19  the wife?

20  A.  No, it's not the wife, it's Majid Masri himself.

21  Q.  It's not the mother?

22  A.  No mother, no wife, just him, Majid Masri.

23  Q.  I want to ask you one other thing, I want you to make a

24  note in your mind of the beneficiary's ID number, 904460862.

25  Do you see that?

1    A.  Yes, I do.

2    Q.  Now let's just see if we can find that in the Arabic side,

3    let's look on page 9487.

4    A.  Yes, I see, this is his ID, and basically of course the

5    same number.

6    Q.  Just bear with us one second, we have to get to page 9487

7    in the Arabic.

8              MR. YALOWITZ:  May I read, your Honor?

9              THE COURT:  Yes.

10   Q.  904460862.  Do those numbers match, Mr. Shrenzel?

11   A.  They do.

12             MR. YALOWITZ:  Okay.  Thank you.  I don't have any

13   further questions for Mr. Shrenzel on direct.

14             THE COURT:  Any further questions, Mr. Rochon?

15             MR. ROCHON:  Yes, a couple.

16   CROSS-EXAMINATION

17   BY MR. ROCHON:

18   Q.  Mr. Shrenzel, you have no idea whether or not this fellow

19   Massey's wife or mother also had access to that account, do

20   you?

21   A.  No, I didn't check this.

22   Q.  And do you think that Mr. Masri was getting out of Israeli

23   prisons and going to the Bank of Palestine to get money?

24   A.  I assume you know the answer as well, no.

25             MR. ROCHON:  Thanks.

F2ITSOK3

1           THE COURT:  Anything further, Mr. Yalowitz?

2           MR. YALOWITZ:  No.

3           THE COURT:  Thank you, Mr. Shrenzel.

4           THE WITNESS:  Thank you.

5           THE COURT:  Anyone further on behalf of the

6    plaintiffs?

7           MR. YALOWITZ:  No, sir.

8           THE COURT:  Anything further on behalf of the defense?

9           MR. ROCHON:  No, sir.

10           THE COURT:  Ladies and gentlemen, both sides rested

11    their case.  What we will do is I will work with the lawyers

12    the rest of the day so we can move forward efficiently

13    tomorrow.  Tomorrow we'll start with the summations, closing

14    arguments of the lawyers, and after we do that and I give you

15    instructions on the law, then I will send you in to begin your

16    deliberations.

17           Hopefully we can accomplish all of that within that

18    one day, and you could at least begin your deliberations

19    sometime tomorrow afternoon.  But probably the earliest would

20    be late tomorrow afternoon, given what we need to accomplish

21    tomorrow.

22           So I will send you home so I can work with the

23    lawyers.  Don't discuss the case.  Keep an open mind.  I will

24    ask you to be here at 9:30.  I'm going to try to see if we can

25    start at 9:45 with the summations so we can have enough time to

F2ITSOK3

1    get everything done.  The latest I want to start is 10 o'clock.

2    So really try to make an effort to be here at 9:30 so we start

3    early, but in any event, I really do want to start before

4    10 o'clock so we can get in everything that we need to get in

5    so you can begin your deliberations on this case tomorrow.

6         So I will see you tomorrow morning.  Have a good

7    evening.  Don't discuss the case.  Keep an open mind until I

8    finally give the case to you.

9         (Jury not present)

10        THE COURT:  We need to do a few things.  One, the

11   defendant wants to be heard on specific motions.  We need do

12   that, and also we need to address our final charging conference

13   and address the issues with regard to the jury instructions and

14   verdict form.

15        What I would like to do is probably do this, use about

16   a half hour now, and then adjourn about 12:30 maybe come back

17   at 2 o'clock.  Also that gives me some time to do other

18   research that I want to do, given the letters that I have

19   gotten and think about changes to the language.

20        We could use this time as you will.  Let me just say a

21   couple of things.  With regard to the -- I have all the

22   letters.  With regard to the request about the jury verdict

23   form, I'm looking for some appropriate language.  The defense

24   asked that I put in the verdict form some reference to senior

25   official.  I'm looking for some appropriate language that would

1    more broadly and appropriately reference what kind of person

2    must be the responsible person with regard to either a

3    respondeat superior theory or agency theory.  I'm not quite

4    sure that it matters with regard to either one.  But I will

5    look at that over lunch further, and I haven't got something

6    that -- I don't have something that I'm comfortable with yet.

7         I don't have any problem giving some definition in the

8    jury instruction, but my verdict form is not a jury

9    instruction.  So I don't think it is appropriate for the

10   verdict form.  I think it complicates the verdict form.  But I

11   am inclined to give some appropriate instruction to the jury.

12        Frankly, a verdict form is just as sufficient to say

13   is the defendant liable or the defendant not liable.  So the

14   verdict form is not the appropriate place where I should

15   instruct the jury what kind of person that it must be

16   demonstrated who is either in the position of the employer and

17   represents the employer or in a position to act on behalf of

18   the PA or the PLO in making a decision to give directions or

19   participate on behalf of the PA or the PLO with someone who is

20   an agent or employee.

21        MR. YALOWITZ:  One thing that you might think about,

22   Judge, on this issue, we looked at this question a little bit

23   back in the summer when we were looking at jury instructions.

24   I don't know exactly what you have in mind.  I think you're

25   searching for something that might provide useful guidance.

F2ITSOK3

1    And one thing you might want to look at, and I will try to get

2    you the cite at the lunch break, we may have cited it in our

3    request to charge, but there are a couple of cases that come

4    out of the antitrust context, and think there was one that

5    Judge Palmieri called *United States v. Fox*, something like

6    that.  And it was a violation of a consent decree and there was

7    an agent who violated the decree and the government prosecuted

8    both her and Fox for violating the decree, and I think he made

9    some findings and then the circuit made some comments about

10   when an agent binds a principal.

11        And then they cited an antitrust case.  I haven't

12   looked at this for a while so it's a little hazy in my mind,

13   but they cited an antitrust case that had a jury instruction

14   that I think I gave you in my request to charge.  So you may

15   have to -- well, we both may have to kind of triangulate to

16   find that case, but it was a case that Judge Palmieri decided,

17   because I know because he was my judge, then it went up to

18   circuit and they talked about it.

19        THE COURT:  Obviously the thing that I'm concerned

20   about is in a standard corporate situation it's a lot easier to

21   define manager, employee, and someone who has that role.  I

22   think this is certainly unique circumstances to find the

23   appropriate way -- I'm not sure that senior official is the

24   appropriate -- I know the intent of that, but I'm not sure that

25   that's the appropriate language.  But if both sides agree

F2ITSOK3

1     that's the language they want me to use --

2              MR. YALOWITZ:  We can go back to the Monell standard,

3     you know, I mean if what they're saying --

4              THE COURT:  I'm looking for a definition or phrase.

5              MR. YALOWITZ:  This comes back to the 1983 cases, if

6     you think about it, a government context, what they say is you

7     have regular scope of employment, that's not enough for a

8     government because of what Congress decided in 1865 or

9     whatever, so we're going to impose this higher standard which

10    you have to prove either a policy making official, which like

11    would be Yasser Arafat, or you have to prove a policy, custom

12    or practice, and that then locks in the government.

13             Now I really don't think that Monell is required, but

14    I have always said that Monell kind of -- that fits these

15    facts, and if you gave them an instruction to track something

16    Judge Sand did in his 1983, but says "may," and this is a way

17    in which they could be bound, I don't have a problem with that,

18    I requested it.

19             THE COURT:  I will look and see if there's a specific

20    definition or phrase or instruction with regard to will -- and

21    this is more of a capacity issue, not really a substantive

22    issue beyond that, how do I describe a person who really has

23    the responsible capacity to be able to say that that person can

24    bind the PA or the PLO.  I think the two of you are talking a

25    little past each other because I think you're concentrating on

F2ITSOK3

1    the respondeat superior situation and I think they're

2    addressing it more broadly in terms of general agency.

3             MR. YALOWITZ:  I think it goes to both.

4             THE COURT:  I do too.  I'm trying to find a phrase

5    that would be applicable for both.  I mean, as they say, if we

6    are trying to say Microsoft did something, who are the people

7    besides Bill Gates who we say is the person acting on behalf of

8    Microsoft, how do we describe that person and how do we define

9    that person's role and responsibilities and authority.  So

10   that's what I'm looking for over the lunch break, and I will

11   look for some more guidance from you to see if I can come up

12   with something.

13            MR. YALOWITZ:  Just so you know where my head is at, I

14   think the City of Newark is a much better analogy than

15   Microsoft.  If we are looking at the City of Newark, who can

16   bind the City of Newark?  It's not just Cory Booker.

17            THE COURT:  The problem I have is I have two

18   defendants.  That may be applicable to the PA, but I'm not sure

19   that's applicable to the PLO, because the PLO is not like a

20   city of Newark.  So if you want an agency -- if you want to say

21   that the PLO is responsible because a responsible person of the

22   PLO -- if we're talking about somebody other than Yasser

23   Arafat, you have to sort of give me how low in the echelon of

24   the PLO can one go before you say no, that person doesn't act

25   on behalf of the PLO.  And that's not even necessarily the only

1    analysis because you have to say even if that person didn't

2    act, doesn't have that capacity to act, by his role generally

3    was he given that capacity by somebody else who does have that

4    role.  And that's the nature of agency, agency can be several

5    layers of agency.

6          MR. YALOWITZ:  Or an agency can be an entity, that's

7    true, too, so Fatah can be an agent of the PLO.  And it's a

8    little more --

9          THE COURT:  But that I don't have to define as much,

10   because the real problem -- because even when you say Fatah is

11   an agent of the PLO, then I still have to get the jury to

12   figure out who is acting on behalf of Fatah.  There has to be a

13   human being involved.  Somebody has to describe who is the

14   human being that is taking the actions that binds the inanimate

15   entity and give me an appropriate word or phrase to describe

16   that person's authority and responsibility.  So that's what I'm

17   struggling with.  So I will come back to that, but that's what

18   I'm looking for some guidance for in the case law and from you.

19         I'm not really thrilled about your business activities

20   or interests.  I'm not sure what those three words are supposed

21   to independently denote.  So we could have a further discussion

22   about that after lunch and really look at it, but you don't say

23   business activities, you say business activities and interests,

24   so I'm having a little problem getting my mind around those

25   concepts.

F2ITSOK3

1          MR. YALOWITZ:  We're both struggling with this piece

2     of it.  Frankly, I was happy with activities, but we're trying

3     to -- if we want to be more inclusive or more expansive, I

4     don't have a problem with that.

5          THE COURT:  As I say, I'm not wedded to it, but I was

6     happy with interests.  That's what I wrote and I thought that

7     was appropriate, and I think that the parties could argue that.

8     But if it seems to imply something that you think the jury

9     might misunderstand, I'm willing to give them further

10     instruction in that regard so they don't imply something else

11     from that.  But I just -- my preference, not any more than

12     personal preference, was I thought, after going through all

13     this in my mind and discussions, that appropriately describes

14     it.  But let me look at it more in the next hour and a half.

15          MR. YALOWITZ:  And I think if you have some further

16     cautionary language at the end about the cases talk about

17     traveling on mixed motive, it's not just in respondeat

18     superior, we see it in the civil rights cases, too, mixed

19     motive.

20          THE COURT:  I am looking at some modification in other

21     regards either consistent with what you suggested or something

22     else that I think might be addressed with record to the

23     employment instruction.  I'm not totally comfortable with

24     everything that you asked me to do, but some of it I think I

25     can address for you to make it clear for the jury and take out

F2ITSOK3

1    or change some of the language.  But I want to take some more

2    time to review that.

3            What is your view at this point, Mr. Yalowitz, in

4    terms of what you want the jury to decide?  You want something

5    beyond -- are you talking about the material support, you want

6    something beyond that?

7            MR. YALOWITZ:  I like where you landed with the three

8    questions on the first three attacks and then --

9            THE COURT:  So you want me to go back to just a

10   question that talks about independent liability for their acts

11   and question if it's independent -- a determination that is

12   independent of providing material support?

13           MR. YALOWITZ:  I'm not sure that I understand the

14   question.

15           THE COURT:  Sorry, you want me to go back and throw in

16   if they have a question that I asked about?

17           MR. YALOWITZ:  No, your February 13 draft, I want to

18   go with that, the only thing is on the scope of employment, I

19   did want that.

20           THE COURT:  That's the one that -- the first question

21   is --

22           MR. YALOWITZ:  Did plaintiffs prove by a preponderance

23   of the evidence that the PLO is liable for the January 22

24   attack because the PLO knowingly provided material support or

25   resources that were used in preparation for and carrying out

F2ITSOK3

1     the attack.  I'm good with that.

2                THE COURT:  You want me to stick with that?

3                MR. YALOWITZ:  I want you to stick with that.

4                THE COURT:  You may want to modify it, too, but the

5     only other determination that I have for them to make in

6     dealing with the first January 22nd Jaffa Road shooting is

7     whether or not there was an employee of the PA acting within

8     the scope.  Are you satisfied with those three questions --

9                MR. YALOWITZ:  I'm satisfied.

10                THE COURT:  -- sufficient to answer the questions that

11     you want the jury to answer?

12                MR. YALOWITZ:  Indeed they are.

13                THE COURT:  Did you have a different position on that

14     issue?

15                MR. YALOWITZ:  I want to make sure we lock in the

16     final language, but the concept of --

17                THE COURT:  But you don't want me to go back to the

18     original one that I gave you independently whether or not an

19     agent on behalf --

20                MR. YALOWITZ:  No, you were a couple of steps ahead of

21     me, but I caught up with you here.

22                THE COURT:  I have been thinking about this since the

23     beginning.  You have been thinking about trying the case.

24                MR. YALOWITZ:  You have been thinking about trying the

25     case, too.

F2ITSOK3

1          THE COURT:  I only have to give you a fair trial.

2          MS. FERGUSON:  Your Honor, on the January 22, 2002

3     questions, as an example is questions one and two don't

4     sufficiently guide the jury in conjunction with the current

5     jury charge about who acts for the PA and PLO.  So I think you

6     mentioned you would be working on --

7          THE COURT:  I'm not sure I understand your point.

8          MS. FERGUSON:  As the verdict form is currently

9     drafted, the jury doesn't necessarily know what it means for

10    defendant PLO to be liable.

11         THE COURT:  They do know because I just instructed

12    them five minutes before that.

13         MS. FERGUSON:  So we wanted to insert making it clear

14    it's a senior official.

15         THE COURT:  No, I understand that.

16         MS. FERGUSON:  So long as -- if your Honor is not

17    going to do that, so long as the instructions about who can act

18    on behalf of the PLO and PA are very clear so it's clear these

19    questions are going to entity level liability.

20         THE COURT:  That's what I first said.  I'm not adverse

21    to giving you some senior official kind of instruction if not

22    that specific instruction itself that there has to be a senior

23    official of the PA before you could find that that person is

24    acting either as a employer or principal.

25         Remember we're talking about two different things,

F2ITSOK3

1    we're talking about employer/employee liability and talking

2    about principal/agent liability.  It may be a fine distinction

3    to draw in this case, but that is the distinction that I think

4    the jury need to understand that's the different question.

5          MS. FERGUSON:  So question three, I go to the employer

6    and employee issue --

7          THE COURT:  The question should only --

8          MS. FERGUSON:  -- what was originally set up in the

9    case was respondeat superior versus direct liability, and I

10   view these questions one and two as going to direct liability.

11         THE COURT:  Yes.

12         MS. FERGUSON:  Organizational institutional level.

13         THE COURT:  Yes.

14         MS. FERGUSON:  We want to make sure that the jury

15   charge make clear that one and two go to that entity level

16   direct liability.

17         THE COURT:  Okay.  As I say, I'm hesitant to play a

18   lot with, as they say, stuff the turkey, play a lot with the

19   verdict form and try to stick in every element that I'm

20   instructing them with.  So I would like to keep it as simple as

21   I possibly can.  But I understand your concern and I think I

22   want to address that in making sure that I give them the full,

23   complete, and accurate jury instruction that is supposed to

24   underlie this determination.

25         So that is what I'm going to go back and try to figure

1  out, particularly with regard to both the respondeat superior

2  instruction and the agency instruction.  What I need to make

3  sure the jury knows is that, look, the person that they find

4  who the plaintiffs are claiming that is taking these acts as

5  the PA, with regard to the third question, that person has got

6  to qualify as the PA, as the employer, as the PA.  With regard

7  to the person that they argue or persons they say or argue are

8  acting on behalf of the PA and the PLO beyond the employment

9  respondeat superior has to be a person who has that capacity to

10 qualify as someone who is acting on behalf of the PA and the

11 PLO and they have that authority and that responsibility.

12         MS. FERGUSON:  And there's two layers to that, as you

13 mentioned.  So first you have to find that there is an agency

14 relationship.  For example, we heard that Wafa Idris they may

15 argue is an agent of the PA.  First the jury has to find there

16 is an agency relationship, and in addition they need to find

17 that the principal -- that the individual, the human being

18 acting as a principal has that power.

19         THE COURT:  Right, I agree with you.

20         MS. FERGUSON:  And then that the agent knows he's

21 acting on behalf of the principal, consented to do so, and is

22 acting within the scope of the agency.

23         THE COURT:  That could be circumstantial evidence or

24 an inference to be drawn that in the layers of people that they

25 say were involved, that at the top end is somebody who is a

F2ITSOK3

1    responsible senior official, and at the bottom end we couldn't

2    care less who that person is, that person is the agent and/or

3    the employee.  Now it doesn't matter how many different people

4    are in between those two as long as you have the directions

5    coming or the material support decision coming from the top and

6    filtering down to the bottom.

7          MS. FERGUSON:  I think maybe we'll get to this when we

8    discuss Rule 50, but I think it's important to be concrete.

9    For example, with the Wafa Idris example, the only evidence is

10   some reference to a supervisor.  We have no idea who that is,

11   so the jury cannot make a determination to whether or not that

12   person acted on behalf of the PA and could be a principal,

13   whether an agency relationship was formed.  There's simply no

14   elements for an agency relationship.

15         THE COURT:  I think that's a perfectly reasonable

16   argument to go to the jury.  Whether it's an argument that

17   compels me not to have the jury consider it at all is a

18   different issue.  That's not a legal instruction, that's an

19   argument.  You could make that argument.  So either make that

20   argument to convince me that there's no evidence that I should

21   even let a jury consider on this issue, or it is an argument

22   that you make to the jury to convince them that, given the

23   instructions that I have given them, that the proof in this

24   case doesn't meet that qualification.

25         MS. FERGUSON:  This case, even as the plaintiffs have

F2ITSOK3

1   framed it in opposing summary judgment, has always been about

2   whether an employee carried out the attack within the scope of

3   their employment or whether the PA and PLO had some direct

4   liability because at the institutional officer level they

5   provided material support.  Now they have injected this very

6   sort of confusing agency theory when it's not even clear what

7   non-employee agencies we're talking about carried out attacks,

8   and it creates a lot of risk.

9           THE COURT:  Not really, because I think you guys are

10   complicating it too much.  The agency theory is as simple as

11   this, that if the PA and the PLO are the principals, they

12   cannot act unless some agent acts on their behalf.  That's

13   just, as they say, IBM can't act except through its agents.

14   That's the basis of that principle.

15           MS. FERGUSON:  It can act at the officer level, the

16   director level --

17           THE COURT:  Right, so I need to define for the jury

18   how much authority a person has to have in order to be a

19   participant in the providing of material support.

20           Now if you want me to say the person -- that there has

21   to be evidence that some senior official of the PA or the PLO

22   were involved in the decision-making process to provide

23   material support, I understand that.

24           MS. FERGUSON:  Yes, because it has to be shown that

25   the defendants, the PA and the PLO, engaged in wrongful conduct

F2ITSOK3

1    that constituted an act of international terrorism because the

2    defendants will get hit with trebled damages.

3          THE COURT:  I don't disagree with the principle.  You

4    want me to complicate it rather than simplify it.  I don't want

5    to complicate it a whole lot further.  All I need is to find

6    the right phrase to describe the kind of person who is in that

7    position and find the right instruction to define that

8    position.

9          Because quite frankly, the problem I have with what

10   you want me to say is that I don't think the person necessarily

11   has to be an official.  You say it's got to be a senior

12   official.  Well, I don't know what official means.  They don't

13   have to necessarily have a title.  They have to have capacity.

14         So the fact that -- I haven't thought it out, but I

15   don't -- I haven't thought out exactly who speaks and binds the

16   PLO and whether or not there's somebody in this case who, even

17   if they don't have an official -- if they're not an official of

18   the PA or PLO, they don't have that capacity or weren't given

19   that capacity by some official.

20         So I understand your point.  I don't disagree with

21   you, but I need to address it.  As I say, if both sides are

22   satisfied with senior official, I will put it out there and you

23   can argue to the jury what the limits or the extent of that is

24   supposed to mean.

25         MR. YALOWITZ:  Here's my suggestion on this one.  My

F2ITSOK3

1   suggestion is managerial agent, and I'll tell you why I like

2   it.  I like it because the Second Circuit likes it.

3           THE COURT:  But they like it in the context of a

4   corporation, that's the problem, a company.  This is not a

5   company.

6           MR. YALOWITZ:  I understand that, and that's something

7   that we need to think about.  I'm not pushing it, but anyway --

8           THE COURT:  That's not an unreasonable suggestion.  I

9   struggled with that, some managerial position, but I'm not

10  quite sure that fits in this kind of case.

11          MR. YALOWITZ:  Look, we both need to reflect on it

12  further, I understand that.  I'm trying to think creatively

13  here beyond what we have done before.  Frankly, I think that

14  managerial agent is a simple enough concept that it can apply

15  to a government entity or --

16          THE COURT:  But you give me another problem.  I don't

17  want to use the word "agent," because I'm trying to make a

18  distinction between the agent and the principal, so I don't

19  want to say managerial agent, I want to say manager, agent.

20          MR. YALOWITZ:  Here's -- let me read you what they

21  approved in -- the case is called *United States v. Coppers*, and

22  I understand it's a different -- I understand it's a little

23  different fact scenario, but anyway, the cite is 652 F.2d 290.

24  And they said an entity can be held liable for the acts of its

25  managerial agents that are done on behalf of and to the benefit

F2ITSOK3

1    of the entity and directly related to the performance of the

2    duties the employee had authority to perform.

3              THE COURT:  But that's a definition of agent, that's

4    not a definition of principal.

5              MR. YALOWITZ:  Then they go on and say by a managerial

6    agent, I mean an officer of the entity or an agent of the

7    entity having duties of such responsibility that his conduct

8    may fairly be assumed to represent the entity.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2I8SOK4

1        THE COURT:  I like that last language.

2        Can you give me a copy of that?  I am going to play

3   with that.  I like the last part of that.  I may combine that

4   with what they suggested.

5        MR. YALOWITZ:  It's got my notes on the back of it.

6   Anyway, it's *United States v. Coppers Co.*, 652 F.2d 290, at

7   298.  It was my proposal number 14 from August 8.

8        THE COURT:  That's helpful.

9        MR. ROCHON:  We will look at that over lunch and some

10  other things.

11       I want to say one thing.  There is one thing I wanted

12  to get to before lunch.  Your tentative view has been to allow

13  Mr. Yalowitz to argue for specific numbers.

14       THE COURT:  That's my note right in front of me.  I

15  will tell you exactly what I intend to do.

16       Mr. Yalowitz, you should be prepared, if you want to

17  do that, when we come back after lunch, to tell us exactly what

18  you're going to ask for, tell us exactly what you're going to

19  ask in general, if you are going to ask for an aggregate, and

20  tell us specifically as to what you're going to ask for with

21  regard to the individual plaintiffs' recovery.

22       If you cannot provide that this afternoon before we

23  adjourn, then you're not going to argue it.  You should give it

24  to them in fairness.  So I am giving you some leeway to do

25  that.  Given the order in which they are going to order, they

F2I8SOK4

1    should know that this afternoon.

2              MR. YALOWITZ:  All right.  That's fine.  No problem.

3              THE COURT:  Let me just look at this over lunch.  We

4    will reconvene at 2:00 and we will address the rest of these

5    issues.

6              MR. YALOWITZ:  If you could give us a sense of your

7    timing on the verdict sheet.  I like to use the verdict sheet

8    as part of my demonstratives.

9              THE COURT:  I hope we are going to know word for word

10   before we adjourn this afternoon exactly what it's going to

11   say.  It might not be any different than what we have.

12             MR. ROCHON:  Thank you, your Honor.

13             MR. YALOWITZ:  Wherever you are on that, I just want a

14   copy of it so I can take it with me and build it into my slide

15   show.

16             THE COURT:  All right.

17             (Luncheon recess)

18

19

20

21

22

23

24

25

F2I8SOK4

                        AFTERNOON SESSION

                            2:00 p.m.

1

2

3          (Jury not present)

4          THE COURT:  I think I have come to what I am confident

5    is the appropriate instruction combining both the suggestion by

6    the defense, Ms. Ferguson, and Mr. Yalowitz.

7          And, quite frankly, Mr. Yalowitz, your reference to

8    that case I think was particularly helpful.

9          MR. YALOWITZ:  That's high praise.  Thank you.

10         THE COURT:  I am going to give you the language that I

11   think is appropriate having looked at the language of that case

12   and trying to incorporate the request of the defense.

13         As a matter of fact, why don't I read it to you.  I

14   think this is the appropriate instruction to give in that

15   regard for the parties to argue as to the evidence.

16         In order to prove that a defendant is liable for a

17   particular claim, plaintiffs must demonstrate the involvement

18   of a senior official, or other person having duties of such

19   responsibility, that his or her conduct may fairly be assumed

20   to represent the PLO or PA.

21         I think that should do it.  You can digest it a little

22   bit and tell me now or later if there is something I have

23   missed or that doesn't address your concerns, but I think, as I

24   said, the language in the case that Mr. Yalowitz presented me,

25   I think this is probably the best way to tell the jury what

F2I8SOK4

1        they have to determine on that issue.

2                Does that make sense to you, Mr. Yalowitz?

3                MR. YALOWITZ:  I think especially in light of the

4        overall instructions which is Judge Sand's long blessed

5        standard instruction, the New York pattern jury instruction,

6        which I think it sounds like you are hewing very closely to, I

7        think in the overall context of the jury instructions I don't

8        have a problem with it.

9                THE COURT:  As far as I am concerned, this is the

10       instruction that applies to both theories of liability.  If you

11       don't have this, you can't get out of the box on either one of

12       those theories.  Unless you demonstrate that either the person

13       there is a senior official or other person having those

14       responsibilities who would thus qualify as the employer or who

15       would thus qualify as the principal who is directing the agent.

16               Ms. Ferguson, do you have a reaction?

17               MR. FERGUSON:  I had a question as to where this would

18       go in the jury charge.

19               THE COURT:  I haven't gotten that far.  Do you have a

20       suggestion?  I am willing to hear it.

21               MR. FERGUSON:  This ties back to the form.  I do think

22       that questions 1 and 2, on the January 22, 2002 shooting, go to

23       this notion of direct liability where the PA or PLO will only

24       be liable for the acts of a senior official.

25               THE COURT:  As I say, it doesn't matter.  On either

F2I8SOK4

1    theory this is the appropriate rule.

2            MR. FERGUSON:  So I think there should be a discussion

3    that tells the jury when you're deciding whether the PA or PLO

4    is directly liable, you need to find that there was a senior

5    official.

6            THE COURT:  No.  I said if they are going to find them

7    liable on any claim.  I think this applies to every single

8    claim that's on this verdict form.  If they can't find this,

9    they should not find liability against your client.  This is an

10   instruction I am going to give to them generally.  So I don't

11   want to associate it with any particular claim.

12           MR. FERGUSON:  All right.

13           THE COURT:  Not respondeat superior alone, not

14   harboring alone, not providing material support to a terrorist

15   organization.  Every single claim that I have in this verdict

16   form requires this.  That's my intention.

17           MR. FERGUSON:  Our only other issue would be with the

18   word assumed.

19           THE COURT:  I took that right out of the case.  If you

20   suggest a better word, I would consider that.

21           MR. FERGUSON:  Maybe determined.

22           THE COURT:  I just took it right out.

23           MR. FERGUSON:  Determined.  Assumed is not really

24   clear who is making that assumption or how reasonable that

25   assumption can be.  So, having duties of such responsibility,

F2I8SOK4

1    that his or her conduct may fairly be determined to represent?

2         THE COURT:  I think a better word is considered.

3         MR. FERGUSON:  We like it better than assumed.

4         THE COURT:  That's not a surprising reaction.  I am

5    not wedded to the word.  I just took it straight out of the

6    case.

7         MR. YALOWITZ:  I don't have a problem with considered.

8    Look, my preference is assumed because I am kind of

9    old-fashioned.  I like to stick with the things that I know the

10   Circuit has approved.  So my vote would be for assumed because

11   then we know it's something that's got that seal of approval.

12        You won't get a complaint from me to change it to

13   considered.

14        THE COURT:  In order to determine a defendant is

15   liable for a particular claim, I was going to say any claim,

16   but I figured maybe you would prefer it this way.

17        MR. ROCHON:  Any is fine.

18        THE COURT:  You want to do any instead?

19        MR. ROCHON:  Yes.

20        THE COURT:  Mr. Yalowitz.

21        MR. YALOWITZ:  I leave it to you.  I like the way you

22   wrote it, but I don't have a problem if you want to change it.

23        THE COURT:  This is what it would read.

24        In order to prove that a defendant is liable for any

25   claim, plaintiff must demonstrate the involvement of a senior

F2I8SOK4

1    official, or other person having duties of such responsibility,

2    that his or her conduct may fairly be considered to represent

3    the PLO or PA.

4            MR. ROCHON:  Two things.  I am agreeing to concept.  I

5    think it should say must demonstrate the involvement as to that

6    claim or as to a claim.

7            THE COURT:  I played with that.

8            MR. ROCHON:  Involvement in what?

9            MR. YALOWITZ:  I would rather stop tinkering with it.

10           THE COURT:  I thought about that and I thought it

11   didn't particularly help to do that.

12           Let me hear Mr. Rochon out.

13           MR. ROCHON:  In order to prove that a defendant is

14   liable for, it says any claim, plaintiffs must demonstrate the

15   involvement as to that claim of a senior official or other

16   person.  He can't be liable just because there is other

17   involvement; it has to be involvement in the claim.  It can't

18   just be involvement generally.  Because then the danger is they

19   will think Arafat is a bad guy, that's involved.  The

20   involvement has to tie to a claim.

21           THE COURT:  I am not wedded to it, but I am not sure

22   that's technically accurate.  It's really the involvement as to

23   that terrorist attack.  Because there are several different

24   claims with regard to certain attacks.

25           MR. ROCHON:  It would have to refer to the attack.

F2I8SOK4

1          MR. YALOWITZ:  I really don't like it.  I want to

2     stick with what we have got.  Really, what we are doing here is

3     we are trying to give -- the defendants are trying to find some

4     toehold to make mischief in their closing.

5          THE COURT:  I would never assume that.

6          MR. YALOWITZ:  It's not assumption; it's an inference

7     based on circumstantial evidence and prior conduct.

8          I would like to stick with the way you have drafted

9     it.  I would like to stick with what the Second Circuit has

10    approved.  We have already got other instructions, over the

11    defendants' objection, saying -- remember, these guys wanted to

12    septificate the case.

13         THE COURT:  What was that big word?

14         MR. YALOWITZ:  Bifurcating the seven.

15         Septification.  I learned that from Mr. Shrenzel.

16         THE COURT:  I don't think English is his native

17    language.

18         Let me just look at it one more time and either think

19    about it some more, suggest something different, or take one or

20    the other.

21         I don't prefer what is suggested by the defense.  As a

22    matter of fact, it makes me think to even address that I should

23    just go back to a particular claim, because that was my intent.

24    Any particular claim, it's clear to the jury I am saying, if I

25    say particular claim, they have to show that they are involved

F2I8SOK4

1    in that particular claim.

2              MR. ROCHON:  Right.

3              THE COURT:  I think I should just go back that.

4              MR. ROCHON:  If the court goes back to that, should it

5    say as to a particular attack instead of claim?

6              THE COURT:  I can consider that, but I don't think

7    that's particularly helpful to you if you want a separate

8    determination as to the different claims.

9              MR. ROCHON:  By claim you're referring to the

10   different victims?

11             THE COURT:  I am referring to the different questions.

12   There are different theories of liability.  Maybe claim is not

13   the right word.

14             MR. ROCHON:  You could say liable under a particular

15   theory.

16             THE COURT:  I don't have any strong feelings about

17   changing the word claim to attack, but I was trying to

18   emphasize it's a separate determination made not just with

19   regard to the particular attack, but it's a separate

20   determination with regard to the particular claim that we are

21   asking them to consider.

22             Remember, this is going to go either before, in

23   between or after the instruction with regard to respondeat

24   superior and providing material direct support.  Those are the

25   claims.  These are theories of recovery.

F2I8SOK4

1            MR. ROCHON:  I thought theory was closer than claim.

2     But theory is a word that is sometimes lawyer-like.

3            THE COURT:  Plaintiffs don't like the word theory.

4     They say this is not theory, this is fact.

5            Let me think about it a little bit.  We will come back

6     to it and then I will see if I can come up with something else.

7            At this point the way I have it, that I am most

8     comfortable with it, is In order to prove that a defendant is

9     liable for a particular claim, plaintiffs must demonstrate the

10    involvement of a senior official or other person, having duties

11    of such responsibility, that his or her conduct may fairly be

12    considered to represent the PLO or PA.

13           I think that's an accurate statement of the legal

14    principle we are trying to discuss and whether or not we should

15    be more precise or articulate it in a different manner.  I

16    always think of my jury instructions in conjunction with your

17    summations.  I don't think there is going to be any mystery

18    with regard to what this means to the extent that the parties

19    are going to argue about it.  I assume the parties will be

20    arguing about it.

21           MR. ROCHON:  If this is placed in a way that it's

22    clear it applies to both, agency and respondeat superior,

23    that's really the thrust of this.

24           THE COURT:  I just ran out of time.  Let me just take

25    a look at the instruction now as I have it before we talk about

F2I8SOK4

1    changing the other language.

2            MR. YALOWITZ:  What I did in my initial request, I put

3    it in between agents and employees.  I am sure I had a good

4    reason for that at the time because I thought about my

5    proposals very carefully.  I can't remember why I put it the

6    way I did.

7            I think I put it because I was talking about

8    managerial agents and then went down sort of agent, managerial

9    agent, employee.

10           THE COURT:  I think it should go behind it.

11           MR. YALOWITZ:  Right before damages?

12           THE COURT:  Maybe right before injury.

13           MR. YALOWITZ:  You moved injury down further.

14           One thing you might want to do is if you're putting it

15   after the employee section, you might want some kind of a lead

16   in to make it clear.  I don't know what the right wording would

17   be, but something like whether, with regard to an agent or with

18   regard to an employee, in order to prove the defendant is

19   liable.  I don't know if that is exactly the right concept.

20           THE COURT:  I think it's appropriate right after, and

21   my paging is different than you had yesterday.  But my

22   harboring a terrorist instruction is now on page 48.  I don't

23   remember if that was where it was before.

24           Right now I have the direct liability under agency as

25   49 and right after that respondeat superior as 51 through 55.

F2I8SOK4

Then I have injury.

I don't think it's appropriate for me to put it between respondeat superior or injury because then it sounds like it only applies to respondeat superior.

So I think the best place to put it is to put it before I start explaining to them the different theory of agency and respondeat superior.  So to put it right after I give them the harboring instruction.  Because that means I have given them all of the substantive instructions and then I would say, Plaintiffs separately allege the defendants violated the ATA by harboring or concealing a person who they knew had reasonable grounds to believe committed or was about to commit an act of international terrorism that injured a plaintiff in this case.  To harbor or to conceal means to do any physical act that provides assistance, including food, shelter or other assistance, to aid another in avoiding detection or apprehension.

In order to prove that a defendant is liable for a particular claim, the plaintiff must demonstrate the involvement of a senior official or other person, having duties of such responsibility, that his or her conduct may fairly be considered to represent the PLO or PA.

MR. ROCHON:  I like the placement.

THE COURT:  Then go into the agency.

MR. ROCHON:  It needs a prefatory statement of

F2I8SOK4

1      whatever you think is right to say as to each of these,

2      respondeat superior, agency, harboring, then to say this.

3      Because that is really the thrust of this.  If you don't say

4      that, they might think it just relates to harboring.  It's not

5      for us so much of where you say it, but where to place it.

6                  MR. YALOWITZ:  We really need to say, if we are going

7      to be separating that part, I think we need to say the

8      involvement of a senior official, employee acting within the

9      scope of employment, or other person having such duties and

10     responsibilities, so that there is no mistake.

11                 THE COURT:  I am not sure where you're referring.

12                 MR. YALOWITZ:  Here is the proposal that I have.  In

13     order to prove that a defendant is liable for a particular

14     claim, plaintiffs must demonstrate the involvement of a senior

15     official, employee acting within the scope of employment, or

16     other person, and then go on from there.

17                 THE COURT:  I don't think that that's right, unless

18     they agree with that.

19                 MR. ROCHON:  No.

20                 THE COURT:  That's why I wanted to avoid all of that.

21     I don't care what capacity they are saying they were involved.

22     They have got to prove this.

23                 MR. YALOWITZ:  I want to be very clear about this.  If

24     the jury believes me that Said Ramadan pulled the trigger

25     within the scope of his employment, I win.

F2I8SOK4

1          So I don't want there to be any confusion that there

2     is some other additional requirement that I also have to prove

3     that a senior official was involved with his pulling the

4     trigger in some way other than that the jury can reasonably

5     infer from all the facts and circumstances that he was acting

6     within the scope of his employment.

7          I think everybody understands that's the law.  But if

8     the defendants are trying to argue from this addition that

9     that's no longer the instruction, then we just need to clear

10    that up.

11         MR. ROCHON:  They will get the respondeat superior

12    instruction.

13         MR. YALOWITZ:  That's not responsive to my point.

14         THE COURT:  This is sort of a unique case, but I am

15    not sure I agree with you.  I think that that's true even with

16    respondeat superior.  Respondeat superior defines it in a

17    different way, but it's still a person that you would find that

18    had such responsibilities that the conduct could fairly be

19    considered to represent the PLO or the PA.  That is what

20    respondeat superior means.  I don't even give them the

21    respondeat superior instruction until after --

22         MR. YALOWITZ:  That is just captured by the other

23    person.

24         THE COURT:  Remember, I would give that instruction

25    and then I would say -- and we can talk about the language

F2I8SOK4

1    again -- then I would give the instruction on agents and say,

2    With regard to both the PA and the PLO, plaintiffs contend that

3    each is directly liable for the acts of its agents who

4    committed terrorist acts or provided material support on the PA

5    and PLO's behalf.

6            Then, after I give them the full instruction about how

7    an agent acts on behalf of the principal, then we go to

8    respondeat superior.

9            As to the PA, plaintiffs also contend the PA is liable

10   as an employer for the acts of its employees that were

11   committed within the scope of their employment.  Employer is

12   responsible for the act of its employee if the act is within

13   the scope of his or her employment.

14           MR. YALOWITZ:  I don't have a problem with this then.

15   If there is some problem in closing that I can't clear up and

16   we need some kind of curative instruction, we will raise it.  I

17   think we understand the legal principles.

18           THE COURT:  The bigger danger is always it sounds like

19   we are making it better, but then in the middle of the argument

20   you realize that it has a implication that you really hadn't

21   thought about and now you try to clean it up.  I am fairly

22   confident about this language under any circumstances, under

23   any theory.  To the extent there are some nuances that are

24   determinative of this case, I think the parties have a full

25   opportunity to argue that and to know that my instructions are

1    going to be consistent with that argument.

2            I will think about it some more if you want to address

3    that further.  The only thing that I think I will proffer as a

4    change with regard to this language is to address the defense's

5    point that Mr. Rochon raised.  I might simply say before we

6    start, When considering all claims under the ATA, in order to

7    prove that a defendant is liable for a particular claim,

8    plaintiffs must demonstrate the involvement of a senior

9    official, or other person having duties of such responsibility,

10   that his or her conduct may fairly be considered to represent

11   the PLO or PA.  Because I have just given them all of the

12   different claims under the ATA.  I have given them the

13   harboring claim.  I have given them the material support claim.

14   I have given them the providing material support to a foreign

15   terrorist organization claim.  They are all claims under the

16   ATA.  Every single one of those claims this is what they have

17   to determine.

18           That's my thinking.  I will play with it.  I will

19   think about it one more time.  If you have any more

20   suggestions, if you want to give it to me in writing tonight or

21   later if it pops into your head.

22           I meant to ask you, and I don't know if you're still

23   pressing.  At some point, Mr. Yalowitz, you said there was a

24   second harboring claim which I didn't identify.

25           MR. YALOWITZ:  I was thinking about Hashaika, which is

F2I8SOK4

1  the March 21 attack.

2          THE COURT:  You think that's appropriate for a

3  harboring claim?  How do you say they are harboring?

4          MR. YALOWITZ:  He was a suicide terrorist wanted by

5  the Israeli authorities.  The PA arrested him and kept him in

6  the Mukataa for a while and then released him.  A jury could

7  consider that harboring.  I think there is a lot of other

8  evidence as well, but they basically turned the Mukataa into a

9  safe house for the guy.

10          THE COURT:  I don't remember the evidence on that.  I

11 remember your theory about Barghouti and that's why I have the

12 harboring in there.  I am not even sure it's worth throwing a

13 harboring in there given the nature of this case.

14          MR. YALOWITZ:  Barghouti is a little different because

15 of the safe house.

16          THE COURT:  Are you pressing that, or not?  You didn't

17 say anything about it.

18          MR. YALOWITZ:  Frankly, I didn't think I needed it and

19 I didn't want to tug it on your sleeve about it.

20          THE COURT:  You want to keep the harboring in for

21 Barghouti?

22          MR. YALOWITZ:  I think it's helpful.

23          THE COURT:  I will hear from them.  I think their

24 position is it's not appropriate on the evidence.

25          How do you intend to articulate how they harbored?

F2I8SOK4

1          MR. YALOWITZ:  That they made a deal to arrest him

2     with the understanding that they would release him, that they

3     kept him for three weeks and then they turned him over to

4     somebody who kept him in a safe house.

5          THE COURT:  I am not persuaded that simply because

6     they arrested him and released him that's a harboring.

7          MR. YALOWITZ:  That's why I didn't really push it.  I

8     think a reasonable jury could infer it, but I think there are a

9     lot more direct ways to go with that claim.

10         THE COURT:  If your argument to the jury is that the

11    evidence supports that they had him, they released him,

12    everybody knew he was a bomber and it's reasonable to infer

13    that the Israeli government would have liked to have found him,

14    the fact that they hid him in the safe house would constitute a

15    harboring, I can at least in the abstract understand that

16    theory if you intended to argue that.  But my position is

17    still, and I will defer to you on this, is it worth your while

18    having the jury concentrate on that given what the case is

19    about.

20         MR. YALOWITZ:  I think this attack is a little

21    different because it is a Hamas attack.  That's another reason,

22    quite frankly, why with Hashaika I was less worried about it

23    because that's an Al Aqsa attack and the defendants'

24    fingerprints are all over the Al Aqsa attacks.

25         THE COURT:  I will hear the argument, to the extent

F2I8SOK4

1    they want to make it in the motions.  Unless they have an

2    argument convincing me to knock it out substantively, I can

3    understand at least an articulable theory, and if you think

4    it's worth keeping it in, for those reasons or other reasons, I

5    will defer to that.

6              MR. YALOWITZ:  I might reflect on it just a little

7    bit.  That's where I am right now.

8              MR. ROCHON:  At the danger that he might reflect on

9    it, I am opposed to it.

10             The mischief of the harboring charge is indicated in

11   these other comments about the notion that locking someone else

12   up is harboring them.  That would be a misuse of the theory.

13             THE COURT:  I don't think that would be a valid theory

14   and I think he conceded that by the fact that he is not

15   pressing the other theory.  I think harboring means exactly

16   what I am going to tell the jury.  You had the guy and you

17   protected him from apprehension.

18             MR. ROCHON:  You're familiar with our other arguments

19   as to harboring as to Abdullah, we previously objected as to

20   him.

21             THE COURT:  For different reasons.

22             Harboring means, it says, to harbor or conceal.  To

23   includes providing shelter, to aid another in avoiding

24   detection or apprehension.  They gave him a safe house.  That's

25   what a safe house is for.  That's the definition of a safe

1   house.  So they can be safe from apprehension and detection.

2           MR. FERGUSON:  Safe house is a form of material

3   support.  To the extent they want to rely on the safe house

4   theory, they have that in 2939(a) or (b).

5           THE COURT:  I don't disagree with you.  As I say,

6   that's my choice and your choice and that's their choice.  They

7   can have ten different theories as long as the jury can find on

8   that basis they are entitled to have them and have the jury

9   consider it.  I think it's cleaner the other way, to take it

10  out.  I agree with you.  If they get past material support,

11  they will be ready to go home for the most part.  They are

12  going to say we are done and come out.

13          I can't imagine a situation where they can find that

14  no defendant provided material support but they find that they

15  are liable for harboring and liable for respondeat superior

16  liability.  Unless there is some weird theory I can't think of

17  where that is possible, but I can't imagine on these facts that

18  would be possible.  They are either going to say they provided

19  material support or they didn't.

20          MR. YALOWITZ:  The question on the table, Judge, is

21  whether we have that as a question in the verdict sheet.

22          THE COURT:  That's all it comes down to, whether you

23  have it as a separate determination for them to make.  If it's

24  not a separate determination, I can still give the instruction.

25  I don't have to give the instruction.  If you wanted to argue

F2I8SOK4

1      that they provided material support because they also harbored

2      him, and therefore you can consider that, just like you said

3      you wanted to argue they provided material support because they

4      provided personnel.  Whatever theories of material support, you

5      can argue.  Harboring is a way of providing material support.

6      The issue is whether or not that's a separate claim that they

7      have to consider.

8              MR. YALOWITZ:  A separate question that they have to

9      answer in the verdict sheet.  That's really what we are talking

10     about.

11             THE COURT:  That's all we are talking about.

12             MR. YALOWITZ:  I do want to reflect on that.

13             THE COURT:  Why don't you think about it.  If you want

14     it as a separate question, I will give it to you.  If you don't

15     want it, then I think it's going to be a cleaner case.

16             Quite frankly, without the harboring, we have material

17     support, we have material support to a foreign terrorist

18     organization and we have respondeat superior.  That pretty much

19     covers it all.

20             MR. YALOWITZ:  I know that.  This comes back to the

21     conversation we were having before about do you want to go with

22     a lot of questions or fewer questions.  I may catch up to you.

23             THE COURT:  Your initial proposed verdict form was

24     even more basic than that.  You went right to the heart of it.

25     Are they liable or are they not.  That's pretty much what they

1    are really going to decide.  You can think about that.

2              MR. YALOWITZ:  I will.

3              THE COURT:  I am very careful even about the order and

4    the wording because I know what is important about the verdict

5    form.  It's not just what they are told that they have to

6    answer, but it gives them some guide as to how they are going

7    to proceed in deliberations.  I am always conscious of that.

8    Sometimes they start backwards.  They start with the last

9    count.  You think they are finished but they have just started.

10             For the most part I think they are going to read the

11   first three questions and they are going to say that's the

12   heart of it.  Pretty much how we are going to answer these

13   first two questions.  Given the arguments of the lawyers, it is

14   really going to determine whether we are going on to damages or

15   we are going to come out and go home.  I am very conscious of

16   the order and wording and the claims.

17             Remember, everything you ask them to do they spend

18   time on.  You have to figure out how you want them to spend

19   their time in the jury room while they are deliberating.  They

20   may decide to spend the first day talking about harboring.  If

21   that's what you want them to do, that's fine.  If you want them

22   to just start thinking about material support, which I think is

23   what this case is really about, I think you need to just

24   evaluate whether or not this is exactly how you want them to

25   proceed.

F2I8SOK4

1          MR. YALOWITZ:  Before we leave today, hopefully we

2     will take a short break and come back and talk about that

3     issue.

4          THE COURT:  Ms. Ferguson, did you want to say

5     something?

6          MR. FERGUSON:  On the agency charge, we submitted a

7     letter where we requested some clarifications to make clear to

8     the jury the elements of forming an agency relationship.

9          THE COURT:  Which one of the letters?

10         MR. FERGUSON:  Docket number 813, your Honor.

11         THE COURT:  813?

12         MR. FERGUSON:  I have an extra copy.

13         THE COURT:  I know I have it.

14         Just remind me and I will catch up.

15         MR. FERGUSON:  The draft that your Honor circulated on

16    February 13 describes when an agent has authority to act, but

17    it doesn't describe when a principal/agent relationship has

18    been created and the elements of that.  We proposed language to

19    explain that.

20         Then in addition, to emphasize the element of control

21    the principal must have control over the agent, and also the

22    requirement that the agent have consented to act on the

23    principal's behalf.  And also the requirement that the

24    principal have delegated that authority as to the particular

25    act in question.

F2I8SOK4

1          THE COURT:  I am not sure I did see this letter.  I

2     have a copy now.  I don't think I saw this letter.

3          MR. FERGUSON:  This is an important issue for us

4     because it is the breadth of the agency instruction.

5          THE COURT:  I am at a disadvantage because I didn't

6     get a chance to read this letter.

7          What do you want me to do?

8          MR. FERGUSON:  If you turn to page 4 of the letter,

9     you will see the red lines that start toward the bottom.  That

10    describes when the agency relationship arises, that the

11    principal must manifest itself to another person, the agent.

12    That the agent shall act on principal's behalf and subject to

13    the principal's control.  And also the agent must manifest

14    consent to so act.

15         THE COURT:  I am not sure what you're saying is

16    missing.

17         MR. FERGUSON:  What is missing from the draft is it

18    jumps right into discussing when someone who is characterized

19    as an agent is acting with authority and it is missing the

20    element that the agent has to sort of consent to act on behalf

21    of the principal, that the principal has to control the agent.

22    The principal, and this is very important in the facts of this

23    case, that the principal only has the ability to create an

24    agency relationship and delegate authority if the principal

25    himself has that authority.

F2I8SOK4

1          That would be the second paragraph, the first full

2     paragraph on page 5.

3          THE COURT:  I am not sure what you're addressing is

4     different from what we addressed with the last instruction.  It

5     seems like a basic principle.  The jury doesn't need a legal

6     definition.  I just told them that they have to find there was

7     involvement of someone who was an official.

8          MR. FERGUSON:  There needs to be an agreement between

9     the principal and agent, that the agent is going to act on

10    principal's behalf.

11         THE COURT:  It says that.  It says:  In order to find

12    that the act of an agent is binding on the entity, you must

13    find that the agent had authority to act in the manner in which

14    he or she is alleged to have acted.

15         MR. FERGUSON:  It needs to be more explicit.

16         THE COURT:  About what?

17         MR. FERGUSON:  That the principal intended the agent

18    to act on his behalf and the agent has consented, it is in fact

19    acting on the principal's behalf, that the principal is

20    controlling the agent.

21         THE COURT:  You probably won't convince me to put that

22    language in there.  I think that's confusing and technically

23    not the law.  They don't have to control the agent.  I don't

24    know what you mean by that.

25         MR. FERGUSON:  With respect to the act at issue.

1          THE COURT:  They just have to give them authority to

2     act.  They don't have to control them.  They can just say go

3     out and kill somebody.  They don't have to tell them how to do

4     it.  They don't have to control what they do.  They are still

5     their agent if they are asked to do that and they say, OK, I

6     will do it for you.  I am not sure what you mean by control.

7          Unless you can articulate something that I am missing,

8     that I don't think is an appropriate instruction or requirement

9     that the jury has to find some control by the principal.

10          MR. FERGUSON:  This comes from the Johnson case,

11    Second Circuit 2013, that we cite on page 2 of the letter.

12    This is the last paragraph on page 2.  The three elements

13    necessary to an agency relationship are (1) a manifestation by

14    the principal that the agent will act for him; (2) acceptance

15    by the agent of the undertaking, and (3) an understanding

16    between the parties that the principal will be in control of

17    the undertaking.

18          THE COURT:  OK.  You gave me all of those legal

19    concepts, and I simply say, express authority is created by the

20    direct, oral, or written giving of that authority by the entity

21    to its agent.  For example, express authority to perform

22    certain duties may be a specific direction or part of the

23    employee's written or verbal contract.

24          MR. FERGUSON:  I don't think we have any scenarios

25    where we have express authority being given to a non-employed

F2I8SOK4

1    agent.  I am more worried about the more nebulous concept of

2    apparent authority or inherent authority.

3          THE COURT:  Apparent authority, on the other hand, is

4    the authority which a principal, by reason of its acts and

5    conduct, leads a third person reasonably to believe that its

6    agent possesses.  Apparent authority can be created by

7    appointing a person to a position, such as manager or other

8    position which carries generally recognized duties.  In other

9    words, apparent authority may be based on a holding out to the

10   world that the agent, in this particular position by the

11   entity, to third parties who deal with this agent.  Knowing of

12   its position, the agent has apparent authority to do all those

13   things ordinarily done by someone in that position, regardless

14   of any unknown limitations which are imposed on the particular

15   agent.

16          You don't disagree with any of that language, do you?

17          MR. FERGUSON:  I think the draft is focusing on the

18   sort of second part of the inquiry.  Once an agency

19   relationship is created, what forms can that take?  What is

20   missing is an instruction to the jury on what is necessary to

21   form an agency relationship.

22          So, for example, just because someone may view someone

23   as having the appearance of acting on behalf of the PA doesn't

24   mean that person in fact consented to act on behalf of the PA.

25   It doesn't mean the PA intended for them to act on behalf of

F2I8SOK4

1    the PA.  It doesn't mean the PA employee alleged to be the

2    principal had in fact the authority to create that agency

3    relationship.

4            THE COURT:  It does mean all of those things.  In

5    light of the instruction we just agreed upon, if the person

6    either expressly or gives someone else express or apparent

7    authority to act on their behalf.

8            MR. FERGUSON:  But a low-level employee couldn't

9    necessarily do that.

10           THE COURT:  Do what?

11           MR. FERGUSON:  A low-level employee cannot then become

12   the principal.

13           THE COURT:  That's correct.  He is the agent.

14           This is not describing the principal.  This is

15   describing the agent.  We just described the principal the way

16   you asked me to describe the principal.

17           MR. FERGUSON:  So the instruction we would seek that

18   would go to this point is the instruction that an individual --

19   this is on page 5, the first full paragraph.  An individual has

20   the capacity to act as a principal in a relationship of agency

21   if he delegates to the agent authority which he himself

22   possesses.  In other words, an individual acting on behalf of

23   the principal may not create an agent who has greater power

24   than the individual himself possesses.

25           I think we have to get very concrete about this.

F2I8SOK4

1    THE COURT:  Because you're making this much more

2    complicated.

3    MR. FERGUSON:  Our position is there shouldn't be an

4    agency instruction.  There shouldn't be agency liability.

5    Because Mr. Yalowitz intends to argue that people like Wafa

6    Idris acted as an agent of the PA when carrying out the suicide

7    bombing attack, the allegation is that the principal apparently

8    was some supervisor at the Mukataa.  The jury needs to be

9    instructed that they have to find that there actually was an

10   agency relationship between the supervisor at the Mukataa, that

11   Wafa Idris knew and consented to act on behalf of the PA and

12   that the supervisor at the Mukataa had the authority to act as

13   a principal in hiring someone to carry out a suicide bombing.

14   THE COURT:  The first part of what you said I don't

15   think I agree with.  Idris didn't have to know anything.  If an

16   official of the PA asked her to do a bombing, even if she never

17   knew that this person was an official of the PA, the PA could

18   still be held responsible.  It doesn't matter what she knows.

19   It matters what their conduct was.

20       So you will understand and when you want to argue it,

21   I am giving a much broader definition to agent than you say

22   that the plaintiffs are arguing with those particular

23   individuals.  As far as I am concerned, Yasser Arafat is an

24   agent of the PA and the PLO.  He is not the PA, the PLO.  He is

25   an agent of the PA and the PLO by any definition.  He is not

the PA.  Nor is anyone below him or who has authority there who

one can say he is the PA.  He is the person who has the

authority that's been given to him and he represents the PA.

He is the PA's agent.  The PA acts through him.

That's why I say I have a ladder here.  The top of the ladder

is the highest person on the rung.  That human being is an

agent under any theory.  That human being is not the PA.  And

everybody below that human being, who is being asked to take

acts by someone higher than them, they are an agent.  That's my

concept of agency here.  You guys are sort of concentrating on,

well, what about the Wafa Idris?

MR. FERGUSON:  Then who is the principal?

THE COURT:  The principal is the PA or the PLO.  As I

say, if they prove that Yasser Arafat gave directions to do a

suicide bomb, then Yasser Arafat is the agent of the PA and was

acting on their behalf because of his official capacity.  As

you say because of your language, he is a senior official.

That's all he is.  Under your definition he is a senior

official of the PA.  He is not the PA.

I mean that's the concept.  So when you think about

how you want to argue about this, if you want to argue in a

more limited concept, but that's not the concept I am giving to

the jury.  Industries can't act on their own.  They are

inanimate objects.  They have to act through agents.  Every

human being that does something that binds the PA or the PLO,

F2I8SOK4

in any contract, in any negotiations, in Oslo Accords, that

human being is simply the agent of the PA, representing the

PA's interests, in furtherance of the PA's or PLO's interests.

MR. FERGUSON:  In order to establish that the agent is

acting on behalf of the PA or PLO, what do the plaintiffs have

to establish?

THE COURT:  They have to establish that the PA or the

PLO gave him such duties and responsibilities that his conduct

may fairly be considered to represent the PA and the PLO.  And

how do they do that?  They can do that by an election.

The President of the United States is not the United

States.  He has been given those powers and responsibilities.

He is just an agent of the United States.  He goes and writes a

treaty with Russia, it's not because he is the United States.

It's because he is the agent of the United States and he has

the authority that's been authorized to him in his official

capacity as a senior official of the United States government,

whether it's him or the Secretary of State or whoever else was

exercising it.  That's my concept of it.

Understanding that that's the kind of definition I am

giving them, I think your argument should be consistent with

those definitions.

So I don't think it warrants any real distinction to

be made for the jury between principal and agent.  There are

only two principals involved in this case -- the PA and the

F2I8SOK4

1    PLO -- and everybody else is an agent as far as I am concerned.

2                (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. FERGUSON:  That's a helpful clarification.  The

2     cases direct the liability, which seems to require some level

3     of officer level involvement.

4          THE COURT:  That's the thrust of these instructions.

5     Now whether or not you're an agent on the high end of the rung

6     or an agent on the lower end of the rung, if there's a chain

7     there they have to show there's no break in the chain.

8          MS. FERGUSON:  But the authority still needs to come

9     from the PA.

10         THE COURT:  From the PA to somebody who is exercising

11    that authority.  And they may pass that authority down to

12    someone else.  As they say, they're not claiming Yasser Arafat

13    blew up a bomb, they're claiming the PA gave Yasser Arafat the

14    authority to make those decisions and Yasser Arafat made a

15    decision and told X, and X told Y and Y got somebody to do it,

16    everybody is an agent of the PA or the PLO if that could be

17    established.

18         So in that regard, I'm not sure -- I think I can only

19    confuse the jury by trying to tell them that they're supposed

20    to think of somebody else as a principal other than the

21    defendants in this case.  The defendants in this case are the

22    only principals in this case.  So my resistance to that part of

23    the language would be that.

24         But I don't really think that -- I mean I'm willing, I

25    am just not sure -- most of your added language has to do with

F2ITSOK5

1    defining the principal's role.  And who did you think the

2    principal was?

3            MS. FERGUSON:  I guess our fundamental concern is we

4    worked really hard to refine the set of respondeat superior

5    instructions so it would be really clear, and the PA would be

6    liable for the acts of low level employees.  We disagree with

7    that as a theory, but accepting your Honor's rulings, we

8    refined those instructions.

9            THE COURT:  I don't think that we disagree on the

10   legal principle.  They're only responsible for the acts that

11   they offer and the authority that they gave to someone else and

12   the direction that they gave to someone else.

13           MS. FERGUSON:  I guess the concern is that the jury

14   may not get to the third question on the verdict form, the

15   respondeat superior question, which asks them to find it was

16   within the scope of employment.  If they view agency very

17   broadly, they may think someone that sounded like an agent of

18   the PA did it, therefore the PA must be liable.  So that

19   creates an expansive liability that would be much broader than

20   respondeat superior.

21           THE COURT:  I don't think that's going to be an issue

22   for the jury, given what I anticipate the arguments are going

23   to be and given the instructions here.  But the problem that

24   you have is that you want to keep emphasizing that look, we

25   have two defendants here.  And I have done that consistently in

F2ITSOK5

1    my charge, that they should make a separate determination.

2              The separate determination that they have to make as

3    to the PLO has nothing to do with respondeat superior.  It's

4    totally an agency theory.  Somebody on behalf of the PLO the

5    plaintiffs claim decided to get other individuals to commit a

6    bombing or a shooting.  That's the theory.

7              It's not a respondent superior theory.  You argued

8    strenuously that they're not the employer, nor have I accepted

9    their argument that the PLO is an employer.  And they tried to

10   argue that they're one and the same, and whatever you want to

11   argue in that regard.  But if I threw out the respondeat

12   superior instruction, this would be the only instruction I

13   would be giving.

14             MS. FERGUSON:  But there's no evidence of PLO

15   involvement.

16             THE COURT:  But that's of a different question.

17   That's a different question of the sufficiency of the jury

18   instruction if the jury is going to consider whether there is

19   such evidence.

20             MS. FERGUSON:  But that issue is sort of driving the

21   jury instruction in the form and creating confusion about

22   agency.

23             THE COURT:  It can't drive the jury instruction.  For

24   the purpose of these jury instructions, the only argument that

25   you could make to me is that you assume that it is a jury

F2ITSOK5

1    question for them to resolve this issue.  If it is a jury

2    question and it's going to the jury, then the only question is

3    what is the appropriate instruction to give them?

4          I can't give them an instruction that would be a valid

5    instruction based on the fact that they shouldn't be

6    considering this at all.  That's not the purpose of the jury

7    instruction.  That's your motion.  That's your separate

8    argument.  But with regard to the jury instructions, you have

9    to proceed on this assumption:  You have lost that argument.

10   That's the only assumption you can proceed on.  You lost that

11   argument that it shouldn't go to the jury and it's not a jury

12   determination.

13         So having lost that argument, what is the -- if you

14   want the jury to decide this, what is the appropriate

15   instruction I am supposed to give them to decide this?  I'm not

16   supposed to say I'm giving you this instruction but, by the

17   way, they really don't have any evidence to support this.

18   That's not the way I'm supposed to give it.

19         I'm supposed to say look, you have to decide whether

20   the evidence supports this.  You have to decide whether or not

21   someone on behalf of the PA decided to involve themselves with

22   these attacks and determine whether there is evidence whether

23   or not that person, given their either senior official capacity

24   or other responsibilities, that one could consider them to be

25   representing the PA on these issues.

F2ITSOK5

1          If you decide that, then the only question -- there

2     are really only two questions really for this jury, one is

3     whether or not there is involvement of a, as you say, senior

4     official or other such responsible person, and two, whether or

5     not there is a connection between that person and the person

6     who committed the terrorist act.  Once they decide that,

7     they're not -- I don't think that you're disputing anything

8     else in this case.

9          MS. FERGUSON:  But at one point you said, and correct

10    me if I'm wrong, that the other -- that the language other

11    person having duties of such responsibility that his or her

12    conduct may fairly be considered, it could be any employee.

13         THE COURT:  No, it's got to be an employee whose

14    conduct may fairly be considered to represent the PLO or the

15    PA.

16         If I represent the PLO -- as I say, put it back in the

17    U.S. context, that evaluation would be an appropriate

18    evaluation about the President of the United States and/or the

19    Secretary of State either because of their official position or

20    it could be they're a senior official in government, so that is

21    an appropriate theory of responsibility.  Or if the President

22    decided to tap you tomorrow to be the envoy to the Middle East

23    to negotiate peace, you would be considered to be somebody with

24    such responsibility that your conduct would be fairly

25    considered to represent the interests of the United States.

F2ITSOK5

1      That's all it means.

2                  MS. FERGUSON:  We're not talking about a low level

3      employee.  The mere fact that someone has an employee status.

4                  THE COURT:  No, not at all.  So I don't want you to

5      think that I'm giving that instruction, because I don't want

6      you to argue it that way.  Because you're right, absolutely

7      not.  It's not what this is supposed to mean.  And I have taken

8      this -- as I said to Mr. Yalowitz, I thought the case in its

9      analysis in the context, it was a different context, but I

10     think that's what it is.

11                 If this person fairly represents then they're the

12     representative of the PA.  As a representative of the PA, they

13     have this authority it's within the scope of this authority to

14     make these decisions and ask people to take actions and ask

15     people to do good things and bad things.  And they claim that

16     they asked people to do bad things, and they did that because

17     the PA or the PLO gave them that authority to ask on behalf of

18     the PA and the PLO.

19                 So that is the only -- that's the concept of that.  I

20     don't want to make this more complicated than it really should

21     be for this jury.  I think this jury really pretty much

22     understands that even without the instruction.

23                 I will look at it further, but other than sort of

24     making some word changes and maybe I think read through

25     carefully your proposal and see if there's a particular line

F2ITSOK5

1    that makes sense to add, but I don't think the instruction I

2    will give is an inappropriate instruction, although I think

3    it's incomplete with regard to the issues the jury has to

4    decide.

5             MR. YALOWITZ:  Could I say I would really like to move

6    away from this and get done with our day because it's getting

7    late.  I don't really need to be heard on it other than to say

8    I really would like to stick with Judge Sand's instruction.

9             I didn't read the cases that she cited this her

10   letter.  It came in very late last night.  But she's not

11   representing that she has some case that says Judge Sand's

12   instruction is wrong or incomplete or you got to give some

13   other instruction because Judge Sand didn't get it right.  And

14   I understand you're going to look at the language and think

15   about it, but unless she's got a case that says this is a good

16   instruction to give and we affirm the instruction that they

17   gave or this was a bad instruction to give and we reversed it,

18   I think we need to stick with Judge Sand.  That's all I need to

19   say.

20            THE COURT:  I think in concept I don't disagree with

21   that.  Focus me, and I will hear you with regard to the motions

22   and maybe I will grant them, but let me -- what haven't we

23   addressed with regard to the jury instruction?

24            MR. YALOWITZ:  I think you were going to give us some

25   language on some of the edits or additions we were thinking

F2ITSOK5

1      about with regard to respondeat superior.

2              THE COURT:  Give me a little more guidance about not

3      what you want but why you want it.  That's what I'm struggling

4      with.

5              MR. YALOWITZ:  There are two things that bother me.

6      The first is if we use the word "interests" only at the very

7      end and not build it in as kind of part of the whole definition

8      that they're hearing it sounds like a new concept.  I don't

9      think it really is a new concept.

10             THE COURT:  Where do you want me to integrate

11     "interests?"

12             MR. YALOWITZ:  So like at the very beginning, if the

13     act is in furtherance of the -- an employer is responsible for

14     the act of its employee if the act is in furtherance of the

15     employer's blank.

16             So if you say "business," that's fine.  I didn't love

17     it because of what we talked about.  If you say "regularly

18     conducted activities," that's fine.  If you say "interests"

19     there and then build it in throughout, I don't have as much of

20     a problem with it.  It's not the word it's that it kind of came

21     out of context at the end.

22             THE COURT:  If you are comfortable with settling

23     consistently throughout on the word "interests," I don't have

24     any problem putting that word in there consistently throughout

25     and taking out all other references.  Where we left it and

F2ITSOK5

1    where your letter started out is if you wanted me to say

2    "business activities" and "interests."

3              MR. YALOWITZ:  I was trying to let a thousand flowers

4    bloom, but I'm okay with "interests" throughout.

5              THE COURT:  Then that's where I started.  I would like

6    to stay there.

7              MR. ROCHON:  I think we have a real problem with

8    "interests," your Honor.

9              THE COURT:  You're only supposed to have a problem

10   with the things they want.  You can't keep switching.  They

11   wanted something yesterday and you were against it, now he

12   doesn't want it.  I thought I won him over, now you have the

13   opposite.

14             MR. ROCHON:  Sorry, Judge, but interests of a

15   government is going to be too broad a concept, because we start

16   talking about what the government might do.

17             THE COURT:  You used the word "government," I have not

18   used the word "government" at all in this case.

19             MR. ROCHON:  Political party or government.

20             THE COURT:  I don't think that is anything that is

21   applicable to an evaluation of this case.  This is not about

22   the actions of a government that somehow makes it somehow

23   unique because this is a country.  This is not what that is

24   about.

25             MR. ROCHON:  We're in agreement that it's not about

F2ITSOK5

1    that, but the jury knows when you say whatever you're going to

2    say, if you are going to refer to -- he wants you to say PA or

3    PLO, but if you say an employer, that's going to be -- you're

4    going to use that instead of naming the defendant, then the

5    PA -- everyone knows when you say employer you can only be

6    talking about --

7                THE COURT:  And you're going to tell them that.

8                MR. ROCHON:  Right.  Therefore, when you talk about an

9    employer's interests in the context of a case where in fact the

10   defendant is a government, the jury -- what are the interests

11   of a government?  It can get too broad.  So regularly conducted

12   business -- a government has many interests.

13               THE COURT:  No, the only interests that we're talking

14   about is whether somebody has an interest in blowing up

15   somebody or shooting someone.  That's the only interest

16   involved in this case.  How is the jury going to be somehow

17   confused, that they had some other interest in common?

18               MR. ROCHON:  Here's the problem, to get right to the

19   nub, the PA, as we heard, one of its interests -- I'm not going

20   to argue about this, just the jury knows, was against the

21   occupation.  These people who did this, committed these

22   reprehensible acts, may have thought that that assisted that

23   effort.  And the jury should not conclude that because the PA

24   simply had an interest in ending the occupation, anything that

25   someone did that they thought related to that, that we should

F2ITSOK5

1   be held liable.

2          THE COURT:  No, you're absolutely wrong on that.

3   You're absolutely wrong legally on that, all the other elements

4   address that.  The question is did they have an interest.  Was

5   it in the PA's interest for them to do a bombing?

6          And I couldn't care what interest that was, as long as

7   all the other elements are met.  It could be, as long as

8   they're acting within the scope of their employ, as long as

9   this was something reasonably foreseeable to them, as long as

10  these elements that we talked about, I can't care less what the

11  interest was.

12         It doesn't even matter if they said that the only

13  reason I did it was because I thought it was make my boss

14  happy.  It doesn't matter what the interest is, it matters

15  whether they're acting -- they did the act and they did it

16  within the scope of the employ and all the other elements are

17  met.  It doesn't matter what the interest was.  I don't know

18  where you argue that from.

19         MR. ROCHON:  Where I am with that thought is the word

20  is so broad to be given mischievous meaning.

21         THE COURT:  I don't understand the mischievous

22  meaning.  If the employer did -- in any context, if the

23  employer did something and they're within the scope of their

24  employ and within the authority it was given to them, and it

25  was reasonably foreseeable they might take this action, and

F2ITSOK5

1   they said the only reason I did it was because I wanted to make

2   my boss happy, what do I care what the interest is?

3          As long as they have -- as long as what motivated them

4   was the employer's interest.  It doesn't have to be of interest

5   to bomb something, it has to be an interest that they're

6   responsible for -- not because of direct liability, they're

7   responsible for it because of their acting within the scope of

8   their employ.

9          I don't understand -- I just don't follow your logic

10  that interest means something -- it's got to be defined, it's

11  got to be limited in some way.  It doesn't have to be limited

12  in any way.  I don't care what kind of interest it was.  If it

13  was in their interest to do the bombing and all the other

14  elements of respondeat superior apply, then they're

15  responsible.  Is there something that you disagree about that

16  statement?

17         MR. ROCHON:  I don't see any scenario in which this

18  would be in the PA interests.

19         THE COURT:  If the PA wanted people to get killed, it

20  would be in their interest.  That's the whole point.  That's

21  the whole argument.

22         MR. ROCHON:  If I could, your Honor, the language

23  that -- we're modifying the language when we start coming up

24  with "interest," and I think that that is not --

25         THE COURT:  We're not modifying the language.  The

F2ITSOK5

1   language was in there all along and you didn't complain about

2   it until they complained about it and today when they backed

3   away from it.  You argued in your letter that things have been

4   this way for weeks and weeks and now they're complaining about

5   it.  The same thing applies to you.  It's been in here weeks

6   and weeks, and on the last day when you didn't complain about

7   it before.

8            MR. ROCHON:  I think yesterday I was complaining that

9   "interests" not be there.

10           THE COURT:  That went past me because I don't remember

11   it.  You suggested what instead?

12           MR. ROCHON:  Yesterday we talked about "business" or

13   "activities."

14           THE COURT:  You suggested what yesterday?

15           MR. ROCHON:  "Activities."

16           THE COURT:  You suggested "activities?"

17           MR. ROCHON:  I said I preferred it to "interests."

18           THE COURT:  You want "activities?"

19           Mr. Yalowitz, you want "activities?"

20           MR. YALOWITZ:  He wants "activities," I want

21   "interests."

22           THE COURT:  You want "activities?"

23           MR. ROCHON:  What I would like is 'regularly conducted

24   business."

25           THE COURT:  But this isn't regularly conducted

F2ITSOK5

1    business.  It doesn't matter whether it's regularly conducted

2    business.  It doesn't have to be regularly conducted business.

3    It could be irregularly conducted business.  It doesn't have to

4    be business.

5               MR. ROCHON:  Or "business."

6               THE COURT:  It doesn't have to be business, right?

7               MR. ROCHON:  Well, I am going with what I think to be

8    a more standard term for a respondeat superior instruction than

9    what is being proposed.

10              THE COURT:  If this was a standard employer I would

11   agree with you, but, as you indicated, this is not what we're

12   dealing with here.  The interests can be broader.  This is not

13   a commercial venture.

14              MR. ROCHON:  But that's agreed, it's not a commercial

15   venture, but I still suggest to the Court that using the

16   standard language -- the parties can argue --

17              THE COURT:  So you think it is not a correct statement

18   of the law to say "interest?"

19              MR. ROCHON:  I do not think it's a correct statement

20   of the law, and I think it would be subject to mischievous use

21   in the facts of this case.

22              THE COURT:  Tell me how again, because I haven't

23   understood how you say --

24              MR. ROCHON:  I think "interests" is such a broad word

25   that could include things that one wants to happen even if it's

F2ITSOK5

1    not what you do.

2              THE COURT:  That's true, and that makes you liable,

3    doesn't it?

4              MR. ROCHON:  I don't think so.

5              THE COURT:  How does that not make you liable?

6              MR. ROCHON:  I think, your Honor, that interests can

7    be such a broad and amorphous word that it would be subject to

8    misuse here.

9              THE COURT:  I will give you one more shot it.  I will

10   go through the instruction.  It says:  As to the PA, plaintiffs

11   also contend that the PA is liable as an employer for the acts

12   of the its employees that were committed within the scope of

13   their employment.  An employer is responsible for the acts of

14   its employee if the act is within the scope of his or her

15   employment.

16             An act is within the scope of employment if it is in

17   furtherance of the employer's usual activities and is within

18   the scope of the employee's authority.  An employer's usual

19   activities are those it regularly conducts.  An act is within

20   the scope of an employee's authority if it is performed while

21   the employee is engaged generally in the performance of his or

22   her assigned duties, or if the act is reasonably necessary or

23   incidental to the employment.  The employer need not have

24   authorized the specific act in question.

25             Among the factors you may consider in deciding whether

F2ITSOK5

a PA employee was acting in furtherance of the PA's activities
and within the scope of his or her authority are the connection
between the time, place and occasion for the act, the history
of the relationship between the PA and the employee spelled out
in actual practice, whether the act is one commonly done by
such an employee, the extent of the departure from normal
methods of performance, and whether the specific act was one
that the PA could reasonably have anticipated.

If you find an employee of the PA intentionally caused
injury to a plaintiff while acting within the scope of his or
her authority and in furtherance of the PA's activities, then
the PA is legally responsible for the employee's conduct.  Even
if you had find that the PA specifically instructed its
employees not to perform the shooting and bombings that are
issue in this case, if you find those acts were done in
furtherance of the PA's activities and were reasonably
foreseeable by the PA, you may find those acts were within the
scope of the employee's authority.

The PA would be liable as an employer for the acts of
its employees if the act was performed within the scope of his
employment and in furtherance of the interests of the PA.

That's what it says.  You didn't say anything about
that part.  You think I should change that there?

MR. ROCHON:  I think "usual activities," which is the
first word you used, is what you should use throughout.

F2ITSOK5

| | |
|---|---|
| 1 | THE COURT:  All right.  Unless -- I am willing to use |
| 2 | consistently the word "activities," take out the word |
| 3 | "interests," take out the word "business." |
| 4 | MR. ROCHON:  Thank you. |
| 5 | THE COURT:  Would that -- |
| 6 | MR. ROCHON:  Thank you for your patience. |
| 7 | THE COURT:  Is that consistent with what you want? |
| 8 | MR. ROCHON:  Thank you.  I realize we have taken |
| 9 | different positions. |
| 10 | THE COURT:  You won this one. |
| 11 | MR. ROCHON:  I appreciate the Court's patience. |
| 12 | THE COURT:  Don't tell me tomorrow -- |
| 13 | MR. ROCHON:  If I do that, they will tackle me. |
| 14 | THE COURT:  Is "usual activities" good enough for what |
| 15 | you want to argue? |
| 16 | MR. YALOWITZ:  That's fine.  I want it more so maybe |
| 17 | he'll come back to "interests." |
| 18 | THE COURT:  Don't ask for more.  I want to get you out |
| 19 | of here so you can prepare for tomorrow. |
| 20 | MR. YALOWITZ:  What do we do with this sole motivation |
| 21 | and the mixed motive?  Did we take all that out or are we |
| 22 | adding stuff about that?  My vote is just to leave it with the |
| 23 | pattern, but if you're going to add stuff, I want to hear what |
| 24 | you're adding and make sure it's consistent. |
| 25 | THE COURT:  Did you still want something?  Who wanted |

F2ITSOK5

something in there?

MR. YALOWITZ:  They wanted to argue that a guy who is avenging his brother's death or something, and my understanding is they have got that argument to make, I don't think that there's any evidence of anybody who was solely motivated by personal reasons, but that may be an argument that you're going to let them make.  And if it is, I just want to make sure that we're clear that the instruction is sole motivation, and that if it's a mixed motivation, then respondeat superior --

THE COURT:  Unless someone can articulate to me what is the circumstance in this case that we're referring to, I don't see why I should interject that in the case.  I don't know of any evidence that is consistent with someone having a separate independent motive to blow people up.  I don't know how -- or shoot people, that isn't the general political motive that people who do those acts have and people who don't do those acts have.

MR. ROCHON:  In the files that the plaintiffs have introduced there's reference to motivation of some of the attackers.

THE COURT:  Give me an example what would be their sole motivation.

MR. ROCHON:  Not sole, reference to personal animosity or retaliation for specific killings.

THE COURT:  I know, but that's not an inconsistent --

F2ITSOK5

1          MR. ROCHON:  Could I ask a question?  You read

2     something, I just didn't -- you gave us the instruction and

3     what you just read, I'm not sure I have the current version of

4     what you just read, or maybe it's just --

5          THE COURT:  Sorry, you're right, I read the old

6     version.  You have that.

7          MR. ROCHON:  So it may be helpful, so we're all on the

8     same page, to know precisely where you are.

9          THE COURT:  I should have read the new version.  I'm

10    sorry, I should have read the new version.  So I will change

11    all the references to "business" to "activities."  Sorry, I

12    apologize.  And so you want -- is there something else that you

13    wanted, Mr. Rochon, with regard to that issue?

14         MR. ROCHON:  The one that you read yesterday and gave

15    yesterday, we had nothing else to say.

16         THE COURT:  What about this sole motivation?

17         MR. ROCHON:  It's in there now.

18         THE COURT:  I see.

19         MR. ROCHON:  So that's why I'm getting confused.

20         THE COURT:  Well, I thought they -- my recollection is

21    I think Mr. Yalowitz was referring to some language stronger

22    than this talking about some other motivation, but this

23    language is sufficient.

24         MR. YALOWITZ:  So that's where I have a problem.  My

25    vote -- this is the language that came up from the cases.

F2ITSOK5

1          THE COURT:  Right, right.

2          MR. YALOWITZ:  So my vote is to take that out, because

3     I don't think there's evidence that supports going to the jury

4     with that theory.  I don't see any evidence in this case of

5     anybody who the defendants could legitimately argue and a jury

6     could probably conclude was solely motivated by personal

7     non-employment motivation.

8          THE COURT:  Well, I can't agree with that, because

9     that doesn't convince me I should still leave this in because

10     that is ultimately what the jury is going to decide.  They're

11     literally going to decide whether or not these people acted on

12     their own for their own personal reasons or they acted on

13     behalf of the PA and/or the PLO because that's what they

14     thought they wanted them to do.

15          So that is the ultimate question.  We know they acted

16     for some reason.  If you find them liable, they acted for the

17     reason that the PA and the PLO had directed or requested them

18     to do this or gave them the impression they wanted do this.  If

19     they find they're not liable, it's because they acted for their

20     own personal interests.

21          MR. YALOWITZ:  So what did you want do with that

22     paragraph?

23          THE COURT:  Nothing but leave it the way it was,

24     because that says where the employee's act was committed solely

25     for personal ends, rather than in furtherance or incident to

F2ITSOK5

1   the employer's activities, the employer will not be held

2   liable.

3           MR. YALOWITZ:  So what I was suggesting there is that

4   we add a sentence to just balance it off, to say, if,

5   however --

6           THE COURT:  Frankly, I just did the opposite.  I added

7   that sentence to balance it off the other way because I didn't

8   have anything in here to say they should find them not liable.

9   The other language was that they should find them liable.  That

10  last paragraph is why I threw it in there because every single

11  paragraph before that says if you find this, you should find

12  them liable.  And I certainly put this in -- I said that's not

13  balanced, I should put in some statement if you don't find

14  this, you should not find them liable.  So I looked at it in

15  that context.

16          MR. YALOWITZ:  My issue is -- I'm not trying to

17  micromanage the balancing, maybe I shouldn't have started

18  there, my issue is I want -- the law I think is really clear

19  that if you have got a mixed motive, if you've got a mixed

20  motive like I wanted to avenge the death of my brother and I

21  wanted to please my boss, then the company loses or the

22  defendant loses in this case.

23          THE COURT:  I don't disagree with you.

24          MR. YALOWITZ:  I think that language that you read is

25  consistent with what I'm saying.

F2ITSOK5

1           THE COURT:  The only thing I said is where the

2    employee's act was committed solely for personal ends.

3           MR. YALOWITZ:  If you say it like that, if you say it

4    like that.

5           THE COURT:  Rather than in furtherance -- I will take

6    out "incident," rather in furtherance of the employer's

7    activities.  That's the way I'm going to say.

8           MR. YALOWITZ:  We need to pump the volume on "solely."

9           THE COURT:  I am getting real good at reading jury

10   instructions.  I'm not so boring.  Will not be held liable, and

11   the paragraph that ends before, before I added that paragraph,

12   that says if you find it was to done in furtherance of the

13   employer's business, that's going to be now "activities," and

14   was reasonably foreseeable by the employer, you may find that

15   it was within the scope of the employee's authority.

16          MR. ROCHON:  And we could pick words that we want you

17   to emphasize.  I like "not sufficient."

18          THE COURT:  I could highlight liable or not liable.

19          So I will work on that and clean that up.  Is there

20   something else I should be working on?

21          MR. YALOWITZ:  No, no, no, we got to make sure that

22   the verdict sheet is --

23          THE COURT:  I don't see any reason to change the

24   verdict sheet now that we had the discussion.  Is there

25   something to change?

F2ITSOK5

1          MR. YALOWITZ:  No.

2          THE COURT:  I was just going to change it to take out

3    the word "interests" and put in the word "activities."  That's

4    the only change that I was going to make on the verdict form.

5          MR. YALOWITZ:  I think I would vote -- look, you have

6    to be the ultimate judge of it.  I would vote for scope of

7    employment and not add -- because in furtherance of activities

8    is part of the scope of employment test, so that's my only

9    problem with it.

10         THE COURT:  He wants to take out the "in furtherance"

11   language.

12         MR. YALOWITZ:  If they're acting within the scope of

13   employment.

14         THE COURT:  I think, in fairness, I think the jury has

15   to know that those are the real two critical elements.  They

16   can't have one without the other.  And I think in fairness the

17   balance gives the parties an opportunity to argue.  I think

18   after both sides have argued this, the jury is going to look at

19   this question and know exactly what they are being asked and

20   what you pointed them to to decide those two questions.

21         MR. YALOWITZ:  At least one of the two of us has

22   confidence in my ability to make that argument.

23         MR. ROCHON:  I was going to see how Mr. Yalowitz

24   filled out his bracket.

25         THE COURT:  You want to take a short break?

F2ITSOK5

1              MR. YALOWITZ:  Yeah, one other thing.

2              THE COURT:  Let's take a short break and deal with

3    your damages, then we'll deal with whatever motion they want to

4    articulate to the extent they want to articulate it at this

5    point in time.

6              MR. YALOWITZ:  Do you need me for the motion or can

7    they argue that for the record?

8              THE COURT:  I always need you.

9              MR. YALOWITZ:  One other agenda item, we can't seem to

10   reach an agreement on when to go over the exhibits.  I would

11   like somebody from my group and somebody from Mr. Rochon's

12   group today to stay in the courtroom after we're finished and

13   look at all the exhibits and make sure we don't have a

14   disagreement, so that if the jury wants the exhibits two

15   minutes after we're done with your instructions we can give

16   them to them.

17             THE COURT:  Mr. Rochon.

18             MR. ROCHON:  We talked about just doing it in court,

19   but instead they offered us to take them back and we'll do it

20   that way.

21             THE COURT:  Are you going to give them something to

22   take back?

23             MR. ROCHON:  We don't have that many exhibits.  We

24   don't have very many exhibits.  We can get them our exhibits.

25             THE COURT:  That's all I need to know.  You can tell

F2ITSOK5

1    them today every single defense exhibit that you have in

2    evidence?

3              MR. ROCHON:  Oh, sure.

4              THE COURT:  They will do that, and then you just tell

5    them every single exhibit that you have in evidence, and if

6    they have a problem with it, they better tell you.

7              MR. YALOWITZ:  I just need them to have a deadline.

8              THE COURT:  To do what?

9              MR. YALOWITZ:  To tell me if they have a problem with

10   any of my exhibits.

11             MR. ROCHON:  They're in evidence.

12             THE COURT:  When are you going to give it to them?

13             MR. YALOWITZ:  It's right here in the courtroom.

14             MS. ROMEO:  Just to interject, the issue is we have

15   binders of documents changing redactions, so they want to

16   actually page through and check through these exhibits.

17             THE COURT:  They can do that from now until next

18   month, as far as I'm concerned.  I don't care about that.  If

19   you have your exhibits --

20             MS. ROMEO:  We have them right here.

21             THE COURT:  -- and you know the numbers and what is in

22   evidence, frankly we know it.  You are supposed to be saving me

23   time so we don't have to go back and do it.

24             Mr. Yalowitz, pull together all your exhibits.  If you

25   want to write down on a piece of paper, you tell them these are

1     the exhibits and numbers that we have in evidence.  You hand it

2     to them, and they will do what they will with them.

3              If I don't hear any objection -- it doesn't matter if

4     I hear an objection.  We'll know whether or not it's in

5     evidence or not.  And I assume that 99.9 percent of what you

6     tell them is in evidence, they're not going to be able to

7     dispute.  So you just make sure you know what exhibits you

8     have, and you ought to give them that list.  If they don't want

9     to look at it --

10             MR. YALOWITZ:  That's their problem.

11             THE COURT:  As far as I'm concerned, I'm going to

12    ask --

13             MR. YALOWITZ:  My issue is we have --

14             THE COURT:  Let's focus.

15             MR. YALOWITZ:  -- I don't want the jury sitting around

16    waiting while the defendants patshke around with -- it's a

17    better word than another word -- patshke around with we don't

18    like this redaction.

19             THE COURT:  I'm done dealing with that.  I'm done with

20    those issues.  Matter of fact, I am done with exhibits,

21    unless -- if you say something is in evidence, unless I have

22    some reason to dispute it, it's going back in the jury room.

23    If they don't want to check it beforehand, then they don't have

24    to do that.

25             MR. YALOWITZ:  Consistent with your ruling --

F2ITSOK5

|   |   |
|---|---|
| 1 | THE COURT:  Other than you being prepared to discuss |
| 2 | damages and you being prepared to argue whatever motion you |
| 3 | want to argue, is there something else we need to address |
| 4 | before we go today? |
| 5 | MR. ROCHON:  We asked for the mitigation instruction |
| 6 | and intervening cause, and you had not finished that, and -- |
| 7 | THE COURT:  Let me take five minutes with that. |
| 8 | MR. YALOWITZ:  I thought those were rejected. |
| 9 | THE COURT:  I wasn't convinced. |
| 10 | MR. YALOWITZ:  I know we talked about them. |
| 11 | THE COURT:  What evidence in this case do you claim |
| 12 | that somebody didn't mitigate their damages? |
| 13 | MR. ROCHON:  I think the economic damages to Karen |
| 14 | Goldberg were not mitigated. |
| 15 | THE COURT:  What is evidence is there that they |
| 16 | weren't mitigated, that she had an opportunity to mitigate and |
| 17 | didn't? |
| 18 | MR. HILL:  The claim is she would have got a job and |
| 19 | didn't because her husband died.  And we challenged the |
| 20 | admissibility of that testimony because a party is required do |
| 21 | their best to try and get a job, and there was no evidence that |
| 22 | she did in fact try to get a job, so therefore there's a lack |
| 23 | of mitigation.  And we challenged the calculation because it |
| 24 | did not include reduction for what she could have reasonably |
| 25 | mitigated. |

F2ITSOK5

1          MR. YALOWITZ:  This went in without objection.

2          MR. HILL:  It was objected to.

3          MR. YALOWITZ:  It went in without objection to the

4     jury.

5          THE COURT:  Let's put it this way, I don't know how it

6     went in front of the jury, and I don't remember the specific

7     objection or discussion that we might have had with it, but I

8     don't have a recollection of the evidence or the issue that she

9     did not mitigate her damages.  And I'm not sure what why that

10    is a particular issue in this case.  Maybe you ought to wait,

11    let's revisit that after they tell you how much they're going

12    to be asking for.

13         MR. ROCHON:  Fine.  On intervening cause, it was easy

14    to remember because it was the testimony about the intentional

15    tort of another.  And I realize plaintiffs have a theory as to

16    why it wouldn't be an intervening cause, but I don't think as a

17    legal matter one could decide it's not an intervening cause,

18    the intentional tort of another.  Their theory is it wouldn't

19    be because Mr. Goldberg was not there to assist in the

20    selection of a husband.

21         THE COURT:  Why isn't that just a strict causation?

22         MR. ROCHON:  Well, it was obviously moving testimony,

23    you recall we --

24         THE COURT:  Right.

25         MR. ROCHON:  It sort of affected some of the jurors.

F2ITSOK5

1          THE COURT:  I can't change that.

2          MR. ROCHON:  I don't think you can either, but I think

3     it makes it more important for the jury to understand the

4     concept of intervening cause as -- in other words, those

5     terrible acts, in our view, the damages from them should not be

6     assigned to our client.

7          THE COURT:  The damages from what?

8          MR. ROCHON:  Again, protecting confidentiality.

9          THE COURT:  I don't want to go into great detail,

10    but --

11         MR. ROCHON:  The damages from the intentional tort of

12    the other.

13         THE COURT:  But --

14         MR. ROCHON:  To the witness, I'm not talking about the

15    jury, the witness.

16         THE COURT:  But I'm trying to figure out why that is

17    technically an intervening cause rather than either a lack of

18    causation for those damages or that injury, or simply that it

19    was exacerbated by that situation rather than -- see, the

20    problem that I have is that I don't see the concept of well, if

21    it hadn't been for this intervening cause she wouldn't have

22    these damages.  This is slightly different argument.

23         MR. ROCHON:  Usually we think about intervening cause

24    on liability, and that's not what this goes to, I recognize.

25    But intervening cause can be relevant to damages.  So if some

F2ITSOK5

1    portion of a person's overall non-economic damages would be

2    attributed -- or the factual basis were attributed to an

3    intervening cause, but not all of them on this theory, because

4    I recognize the plaintiffs' theory is that substantial damages

5    occurred before that and independent of that, but clearly that

6    act should not be -- in our view, should not be attributed to

7    the PA.

8            THE COURT:  But you have to establish that the damages

9    that she suffered post those events were all damages coming

10   from those events.  That's what intervenes.  It can't be that

11   oh, she has -- it was exacerbated or she suffered additional

12   because of this.  Intervening cause cuts off the damages.  It's

13   difficult for me to imagine -- as you say, I'm not sure the

14   cases you gave me were applicable on a damages assessment, I

15   thought they were applicable on a liability assessment.

16           MR. ROCHON:  That's where most of the intervening

17   cause is.

18           THE COURT:  Was there any intervening cause case that

19   you cited to me that would cut off damages after liability is

20   determined?

21           MR. ROCHON:  Judge, the answer is no.  But can I

22   explain?

23           THE COURT:  Yes.

24           MR. ROCHON:  I tried to answer first.

25           THE COURT:  I like that.  I rarely get that from

F2ITSOK5

1    lawyers.

2            MR. ROCHON:  Here's what I think would be the most

3    honest way for me to describe it.  That act contributed

4    additional damages but did not cut off the flow of damages from

5    the original tort if there were to be a liability found.

6    That's the only common sense way to look at it.  It's not like

7    that thing came in and caused you to lose all the other

8    damages.

9            THE COURT:  But that wouldn't be an intervening cause

10   by definition, would it?  Intervening cause is different.  I'm

11   giving an eggshell skull instruction.

12           MR. ROCHON:  We like that.

13           THE COURT:  I'm supposed to give that.  You don't have

14   to like it, but that's the law.

15           And also there's another instruction that I am given

16   them that it doesn't matter what percentage of the damages were

17   caused by the intervening act, by this other act or this act.

18   For liability purpose you have to decide whether it caused

19   injury.  And then the injury that you decide was caused, you

20   have to evaluate that.

21           Now if you want to argue that there's no evidence that

22   most of those injuries were caused by this, by the terrorist

23   act, then you could argue that.  That's a causation issue.  But

24   I don't think on this evidence that you could say well,

25   something intervened and caused her damages where otherwise she

F2ITSOK5

1    would not have suffered any damages because --

2              MR. ROCHON:  I don't think I could argue that.  I

3    agree.  But I do think that an instruction as to this that

4    says, in essence, if you find that there's an intervening cause

5    of an intentional act of another to cause some damages to a

6    plaintiff, you should not attribute those damages to the

7    defendants.

8              THE COURT:  But I have an instruction that says you

9    should only attribute damages to the injuries that were caused

10   by this event.

11             MR. ROCHON:  This is harder to figure out.  I think a

12   special instruction on this, without naming --

13             THE COURT:  If you could find me such an instruction

14   in a damages situation that solely addresses the issue of

15   damages, I will give it more serious consideration.  But I'm

16   not aware of any case where that's the appropriate instruction

17   particularly.  Frankly, it's inconsistent with what the law is

18   otherwise that it doesn't matter in terms of liability, as long

19   as some damages were demonstrated, that you compensate that

20   victim for the damages that arose as a result of those

21   injuries.

22             MR. ROCHON:  Judge, I understand.  Let's see if

23   Mr. Yalowitz can talk you into my position.

24             MR. YALOWITZ:  I want to say one thing, which is I

25   would really like to wrap things up today, so on --

F2ITSOK5

```
1              THE COURT:  You want to sum up today?

2              MR. YALOWITZ:  I did want to sum up today, but we're

3    not doing that.

4              Look, on this mitigation business, this is a head fake

5    by Mr. Rochon -- I mean not mitigation, intervening cause.

6    What he wants to do is get an instruction on intervening cause

7    and then use it to argue that all these crimes by the employees

8    were the intervening cause.  That's his game here.

9              THE COURT:  Well, he may surprise you and not address

10   damages at all.

11             MR. YALOWITZ:  He's not going to address damages at

12   all.  He doesn't want this instruction for damages because he

13   hasn't touched damages.  And maybe he'll change course, he's

14   been known to do that, but I don't think he will address

15   damages.  But if he does, he doesn't need an intervening cause

16   instruction, he can argue it.  What he is really trying to do

17   is use this fact -- and he even said don't name the person,

18   then what he's going to do is he's going to say that -- he's

19   going to argue to the jury that all of the convictions are

20   evidence of intervening cause.

21             THE COURT:  The convictions of what?

22             MR. YALOWITZ:  Of all of his employees, his client's

23   employees.

24             THE COURT:  I don't think that he will argue that.

25             MR. YALOWITZ:  He better not, because --
```

F2ITSOK5

1          THE COURT:  The bottom line is I know what he wants to

2     do, and it's not illegitimate, it's a strategy.  And the

3     strategy is that I know the defendants are going for broke on

4     liability, because it doesn't much matter about the damages

5     once they lose on liability.  It's going to be a big judgment

6     or a bigger judgment.  It's not going to -- they're fighting

7     over their liability.

8          Now if he wants to argue -- to the extent that he

9     wants to argue it, or the extent that he wants to say something

10    in advance of your request for damages, I think he's entitled

11    to do so.

12         MR. YALOWITZ:  I agree with that.  I don't think he's

13    entitled to some intervening cause instruction that he then

14    misuses.

15         THE COURT:  The mitigation and intervening cause I

16    will think about it a little more.  Part of the reason I'm not

17    convinced is because Mr. Yalowitz is right, most of this

18    evidence went in not even without objection, went in without

19    question.  There wasn't even one question.  For the most part

20    there wasn't any question as to whether these were legitimate

21    damages.  There was nothing implied by questioning these

22    witnesses about this.

23         And I agree, I don't think it -- my guess is that I

24    would be shocked if there's a liability determination, there's

25    a damages determination, and that some mitigation of damages

F2ITSOK5

1    issue would reduce that liability by five percent.  I would be

2    shocked.  Because most of the liability -- most of the damages

3    here are not lost wages.  There's only one person that even

4    gave evidence on wages.  To now interject that into the case

5    and think it means something more.

6              This is the one situation, if I even decided to do it,

7    I would only do it with regard to that one witness and

8    articulate that one plaintiff, because it doesn't apply to any

9    other plaintiff, and I'm not sure that is what the defense

10   wants me to do.  But if you want to encourage me to do that, I

11   might consider that.  But there's clearly no evidence about

12   lack of mitigation with regard to anybody else, and there's

13   clearly no evidence with regard to intervening cause, as it has

14   been argued to me, other than that one plaintiff.

15             So if you want me to direct the jury's attention to

16   that one plaintiff and say that the defense position is that

17   intervening cause caused her damages and you should decide

18   that, I will consider that, but I'm not sure that's what you

19   want from me.  I know you want it sprinkled out there.

20             MR. ROCHON:  On that I might want to ask, as to that

21   specific, because I thought it was such an obviously affecting

22   part of the trial.

23             THE COURT:  As I say, if you can give me -- I will

24   reconsider it if you fax me tonight some case law that does

25   that.

F2ITSOK5

1          MR. ROCHON:  I understand the Court's position.

2          THE COURT:  I'm not sure that that's appropriate.  I

3   think you could still argue that much of the damage she talked

4   about were because of other things in her life, and they

5   understood the powerful testimony she gave about what occurred

6   in her life.

7          And you can make the reasonable argument that look, we

8   appreciate that her father wasn't around to help her pick her

9   husband, but people pick spouses every day, and those are the

10  life decisions they have to make.  And to say she was damaged

11  because he wasn't around, I thought it was a little bit of a

12  stretch, but it wasn't much of an issue.  But that's sort of

13  like saying well, her dad was killed and therefore she wrecked

14  her car because he didn't teach her how to drive a car, that is

15  not proximate cause.  That's a proximate cause argument, that's

16  not an intervening cause argument.

17         MR. ROCHON:  Understood.  Thank you.

18         MS. WEISER:  Your Honor, with regard to that argument,

19  I just want to add, if you going to reconsider that issue, the

20  defendants would also have had to provided you with some kind

21  of expert testimony on that.  This is a complicated issue, and

22  intervening cause would require some way to parse this out.

23  They didn't cross the plaintiff, they didn't cross our

24  psychiatric expert, they didn't present you with any kind of

25  psychiatric expert testimony.  So how would the jury even make

F2ITSOK5

1    any determination?  It would all be conjecture.  So he could

2    argue there's no causation, but he certainly can't argue that

3    somehow we could parse this out without providing the jury with

4    information on that.

5             THE COURT:  Well, I think I only partially agree with

6    that.  I don't think that they needed an expert.  Quite

7    frankly, I don't have a recollection your expert said that's

8    what caused her damage, that was the cause of her problems, her

9    marital issues.  I don't think any expert said that.  I'm not

10   sure -- and even if that were, I don't think that's the only

11   way to prove it.  That's a way to prove it or disprove it, but

12   that's not only way.

13            MS. WEISER:  The real reason I was standing up,

14   actually, because you already made my point, I actually have a

15   scheduling question for you.  We have plaintiffs who flew in

16   from Israel to be here for closing arguments, and everything,

17   as you know, got pushed off.  They need to leave.  We have done

18   everything we can to move flights, and they need to leave by

19   tomorrow afternoon.  Is there a way that we could message the

20   jurors to come in by nine tomorrow so we could try to start --

21            THE COURT:  No, it's too late for that.  I told them

22   9:30.  If we're ready to go at 9:30, we'll go at 9:30, but I

23   say the only thing that could help you at this point is have

24   Mr. Yalowitz shave a half hour off closing argument.

25            MR. YALOWITZ:  Another half an hour.

F2ITSOK5

1            MS. WEISER:  We ask that we start as early as possible

2    and push through as quickly as possible.

3            THE COURT:  As soon as they get here, we'll go.

4            So let's take a short break and take 20 minutes, and I

5    will hear you on motions so we'll go back and finalize this and

6    try and get it to you tonight.

7            (Recess taken)

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2I8SOK6

1          THE COURT:  Before I hear the motion, let me just

2     address two more issues that I forgot to address.

3          One, I want to make clear that I am not -- it wasn't

4     raised in court, but it was raised in the papers.  I do not

5     find a requirement that to violate the ATA you must know that

6     U.S. citizens were to be injured.  I find that nowhere in the

7     statute.  The statute doesn't say that.  It doesn't give that

8     as an element.  It doesn't give that as a part of the knowing

9     or intentional or any other circumstance.  I can't find the

10    language, but my recollection of the language was it just

11    requires that the injury suffered was suffered by U.S.

12    citizens.

13         So I am not giving any instruction nor requirement

14    that the jury must find that they knew it was U.S. citizens or

15    the target was U.S. citizens.  I think that would gut the

16    statute to put a burden on the plaintiffs to try to prove in

17    any circumstance that the U.S. citizens who were injured or

18    killed, that it was done intentionally to kill U.S. citizens.

19    I don't find that to be the crime.

20         The only thing I am going to say about summations is

21    that I am not inclined to be as restrictive as the defendants

22    have asked me about summations, particularly with regard to the

23    redactions.

24         At this point, I think it is appropriate for Mr.

25    Yalowitz to argue that, based on the admitted evidence in this

case, they can draw certain conclusions.  He cannot say that

they can draw a conclusion about what the redactions were.

That's the best guidance that I can give you.  When the jury

considers all of the evidence, they can decide whether or not

it is a reasonable inference.

They said they went to the Mukataa.  I think it's

probably appropriate for him to argue that if they went to the

Mukataa, it's a reasonable conclusion, or was not a reasonable

conclusion, that they were meeting with somebody who either had

an office or had some other dealings at the Mukataa, and it was

reasonable to conclude that that's most likely a person who is

an employee.

Now, he cannot imply that the redactions themselves

redacted certain individuals.  I had thought about giving an

instruction on redactions, and I really never came to a final

decision on that.  Think about that overnight and give me, if

you think that I should, give me something you can propose that

I give with regard to redactions.

MR. YALOWITZ:  I have an idea on redactions.  You

should say that the defendants have requested that extensive

redactions were made in this case.  You should draw no

conclusions about that.

THE COURT:  I think I need something a little more

balanced than that.  I don't want any argument about what the

jury should conclude as to what the redactions must say or must

F2I8SOK6

1   include.  I don't want any reference with regard to that.  If

2   it is redacted it is redacted.  I'm not even sure that it is

3   even proper to tell the jury that these are redactions that the

4   parties did here as opposed to redactions on the documents when

5   they got them.  It's irrelevant to the jury's determination how

6   those redactions were made, and it simply means to them that

7   that evidence is not available to them, and it's not available

8   at this trial.

9           MR. YALOWITZ:  That's all fine.  We are not planning

10  to argue that you should draw a conclusion based on the fact of

11  redaction or something like that.

12          THE COURT:  My guess is that they are going to believe

13  whatever you say with regard to that is going to be over the

14  line.

15          MR. YALOWITZ:  I wasn't planning to address the fact

16  of redactions at all, quite frankly.

17          THE COURT:  As I say, I want to make clear, you can't

18  even argue that they should conclude that the document says X.

19          MR. YALOWITZ:  I guess I need a little guidance on

20  that.

21          THE COURT:  I am giving you very specific guidance.

22  You cannot argue that they should conclude the redaction says

23  X.  You can argue about what one can argue from the facts that

24  they do have about what might be the circumstance, whatever is

25  a reasonable argument.  But you cannot even act like you know

F2I8SOK6

1   what is in the redaction, and you cannot say that they should

2   conclude that this reference that was crossed out is to Yasser

3   Arafat.

4          MR. YALOWITZ:  That is the concrete example I wanted

5   to ask you about.  I want to be guided by you on this, and I

6   will follow the guidance, but I want to be very clear.  That's

7   the exact example I wanted to go to.

8          So Fuad Shubaki admits, and it's in his conviction,

9   that he received an order from blank.  Then there is testimony

10  that the only guy above him in the hierarchy was Yasser Arafat.

11  So isn't it reasonable circumstantial evidence, or do you want

12  me to not to say it, that when he says I received an order from

13  blank, the jury can fill in the blanks with whoever is above

14  him in the hierarchy.

15         THE COURT:  I do not think it's proper for you to

16  argue that.  It may be proper for you to argue half of what you

17  said, in going in a different direction, but you can't

18  reference what is not on the document.  You can say, look, he

19  said he got directions from somebody.  The testimony that you

20  heard is that there is only one person higher than him.  So I

21  think on the evidence that you have before you, it would be

22  reasonable for you to conclude that this came from somebody who

23  was higher than him, and the transcript said the only person

24  higher than me is Yasser Arafat.

25         MR. YALOWITZ:  I am good with that.

F2I8SOK6

1         THE COURT:  That's probably my best guidance.  You

2    need to proceed as if you don't know what is in the redaction.

3    You can argue whatever you want about what one could conclude

4    from the redacted evidence which is before the jury.  But I

5    want nothing about saying that you can conclude that this is

6    what the document says, or you can conclude that I know what it

7    says and you don't know what it says.

8         MR. YALOWITZ:  I am not going to do that.

9         THE COURT:  But I am giving you the worst case

10   scenario and the best case scenario so that you know that you

11   can only argue from the document what you would have argued had

12   these documents showed up on your desk in that form.

13        MR. YALOWITZ:  That's a fine way to proceed.

14        Just to come back to the Shubaki thing, I think I got

15   it.  Shubaki had only one person above him and the evidence is

16   that he got orders to do stuff.  That's fine.

17        THE COURT:  And I know in certain instances you have

18   what would be logical, reasonable conclusions to draw from

19   statements made by one person and then in combination with

20   statements made by a different person.

21        MR. YALOWITZ:  Circumstantial evidence.

22        THE COURT:  All of this is circumstantial evidence.

23   None of this is direct evidence.  Your argument about Yasser

24   Arafat is only circumstantial evidence based on the evidence

25   before this jury.

F2I8SOK6

1      So that's a good way to think about it.  It is nothing

2   more than circumstantial evidence that you can argue with

3   regard to the logical conclusions that one can draw by looking

4   at these documents in the form that they are in and without

5   knowing what things have been redacted.

6      MR. YALOWITZ:  I think that's a fair way to proceed.

7   I know that the defendants had made some noise about this and,

8   quite frankly, I think that this was a petard that they hoisted

9   themselves up on.

10      THE COURT:  It's clear to me that if I had said you

11   could argue it the other way, you would be doing it.

12      MR. YALOWITZ:  I think you protected them more than

13   they deserve.

14      THE COURT:  I think I protected you both more than you

15   deserve, but that's the kind of guy I am.

16      MR. YALOWITZ:  Don't assume from my silence that I

17   agree with that.

18      I plan to follow your guidance on this.  That's

19   useful.  Quite frankly, I don't think you need an instruction

20   on redaction.

21      THE COURT:  If this issue comes up inappropriately --

22   and I am trying to also minimize the opportunity they have to

23   interrupt you and object to what you say -- if this comes up in

24   a way that you think I ought to address it, I think both sides

25   should be prepared to give me something that you suggest that I

F2I8SOK6

1    should do to cure it, and I will consider it.  Otherwise, I

2    will just take a quick look and see if I have something or I

3    can find something on redactions.

4              MR. YALOWITZ:  It may be something that comes out of

5    *Bruton*, which is where this really comes from.

6              THE COURT:  I may or may not have given such an

7    instruction in the past that the parties have agreed upon.

8              Mr. Rochon, what do you want to deal with, damages

9    first or your motion?

10             MR. ROCHON:  I would like to hear Mr. Yalowitz on

11   damages first.

12             THE COURT:  Mr. Yalowitz, what are you going to ask

13   for?

14             MR. YALOWITZ:  Can we hear what is in the case before

15   we go to damages?

16             THE COURT:  No.

17             MR. YALOWITZ:  Ms. Machnes is going to lead our

18   discussion on this, your Honor.

19             THE COURT:  Can we do it fairly quickly?

20             MS. MACHNES:  I will do my best.

21             We are planning to ask for a specific number for each

22   plaintiff.  All of the numbers are based on actual judgments

23   from terror cases of plaintiffs that are similarly situated.

24             THE COURT:  Why don't you do this.  I think the

25   easiest thing for you to do is to take the verdict form and

F2I8SOK6

1  take the damages questions on the verdict form and just go down

2  each one of those questions and tell them how much money you're

3  going to ask for so they can write it down on their form.

4          MS. MACHNES:  I have a list in front of me, which

5  might not be exactly the same order as the verdict form, but I

6  will just read it into the record.

7          THE COURT:  Why don't you go ahead.  You are going to

8  identify by plaintiff and amount?

9          MS. MACHNES:  Yes.

10          MR. ROCHON:  You will have to go a little slower then.

11          THE COURT:  Is it easier to just give that to them in

12  writing?

13          MS. MACHNES:  I don't have an updated list.

14          THE COURT:  What does it all total up to?

15          MS. MACHNES:  I don't have the exact total either

16  because we have made edits.  It's around 350 million, is what

17  it totals up to.

18          THE COURT:  Give them the specifics so they can be

19  prepared.

20          MS. MACHNES:  Sure.

21          For Alan Bauer, we will be requesting 11.5 million.

22          For Binyamin Bauer, we will be requesting 2.5 million.

23          For Daniel Bauer, 2.5 million.

24          Yoni Bauer, 19.5 million.

25          Yehuda Bauer, 2.5 million.

F2I8SOK6

1        For Katherine Baker, we will be requesting 15 million.

2        For the estate of Benjamin Blutstein, we will not be

3   asking for a specific amount.

4        For Rivkah Blutstein, we will be requesting 7.5

5   million.

6        For Richard Blutstein, 15 million.

7        For Larry Carter, we will requesting 15 million.

8        For the estate of Diane Carter, we will not be

9   requesting for a specific amount.

10        For Shaun Carter, we will be requesting 7.5 million.

11        For Dianne Coulter Miller, 7.5 million.

12        For Robert Coulter, Jr., 7.5 million.

13        For Robert Coulter, Sr., 15 million.

14        For the estate of Janis Coulter, we will not ask for a

15   specific amount.

16        For Zvi Goldberg, we will ask for 12 million.

17        Chana Goldberg, 12 million.

18        Eliezer Goldberg, 12 million.

19        Esther Goldberg, 12 million.

20        Karen Goldberg, 15.8 million.

21        Shoshana Goldberg, 12 million.

22        Yaakov Goldberg, 12 million.

23        Yitzhak Goldberg, 12 million.

24        For Elise Gould, we will be requesting 2.5 million.

25        For Ronald Gould, 2.5 million.

F2I8SOK6

1              For Shayna Gould, 15.7 million.

2              Jessica Gould, 2 million.

3              For Nevenka Gritz, we will be requesting 15 million.

4              For the estate of Norman Gritz, 15 million.

5              For the estate of David Gritz, we will not ask for a

6       specific amount.

7              For Leonard Mandelkorn, we will request 2.5 million.

8              Elana Sokolow, 4 million.

9              Jamie Sokolow, 11.5 million.

10             Lauren Sokolow, 10.5 million.

11             Mark Sokolow, 11 million.

12             Rena Sokolow, 14 million.

13             For Henna Waldman, 6 million.

14             For Morris Waldman, 2.5 million.

15             For Shmuel Waldman, 12 million.

16             MR. ROCHON:  I was writing as fast as I could, but on

17      the Waldmans I couldn't keep up.

18             MS. MACHNES:  I will repeat those.

19             For Henna Waldman, 6 million.

20             Morris Waldman, 2.5 million.

21             Shmuel Waldman, 12 million.

22             THE COURT:  Is that the whole list?

23             MS. MACHNES:  That is the whole list.

24             THE COURT:  Mr. Rochon, did you want to be heard on

25      motions?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F2I8SOK6

1          MR. ROCHON:  On the motions it's going to be Ms.

2     Ferguson on the Rule 50.

3          On these, you have already heard us as to why we think

4     the plaintiffs should not be able to give a number.  The cases

5     they have argued suggests it's within your discretion.  I would

6     suggest the amounts being sought here are so outsized that the

7     Court should reconsider its position and not allow numbers to

8     be given and let this jury use their own judgment.

9          I think your position on that should be particularly

10    informed by the fact that we did offer an expert on noneconomic

11    damages, and the expert wasn't allowed and when arguing against

12    it, the plaintiffs suggested that that would invade the

13    province of the jury.  I think whether it comes from Mr.

14    Yalowitz's mouth or an expert or whomever, jurors should decide

15    these noneconomic damages and not be pushed, especially by such

16    large claims here.  Therefore, we would once again renew our

17    objection to the plaintiffs giving specific numbers.

18         THE COURT:  One thing I have to disagree in the way

19    you characterize it.  The ruling with regard to your expert was

20    a different ruling.  That was a ruling about whether or not it

21    was within the expert's expertise.

22         As a matter of fact, my recollection was, and I could

23    be corrected if I am wrong, my recollection was it really

24    wasn't -- to the extent there was expert testimony, it was just

25    a lawyer's review of verdicts that were given in other cases

F2I8SOK6

1    that weren't terrorist cases, and they wanted to offer evidence

2    that somehow that should be a guide from an expert that those

3    are appropriate amounts in this kind of case.  That's a

4    different circumstance.  I think my recollection is I addressed

5    that specifically, and that was the nature of the proffer of

6    that expert's testimony.

7          MR. ROCHON:  Part of the proffer was as to his review

8    of the damages amounts in the 9/11 cases.

9          THE COURT:  I take back that it wasn't terrorist

10   cases.  I think just that kind of comparison, my view is it was

11   not within the province of an expert, and that kind of

12   comparison is not a valid expert opinion about the

13   reasonableness and appropriateness of certain kinds of damages

14   for individual plaintiffs in different cases.

15         My position with Mr. Yalowitz is that he can request

16   an amount.  That's consistent with the case law.  That's all I

17   am going to allow him to do.  He can argue that they should

18   provide a reasonable amount.  He cannot argue that in his

19   opinion this is the reasonable amount, or in his opinion this

20   somehow is consistent with the evidence.  I don't want any

21   argument about the amount of damages.  He can argue that they

22   should provide a reasonable amount, and he can argue that they

23   have to determine, consistent with my instructions, whatever

24   the reasonable amount is.  And he can tell them what he is

25   requesting.  That's it.

F2I8SOK6

1        As I say, consistent with the case law, I thought it

2    was appropriate and fair, but not necessary, to require him to

3    tell you so you have a full opportunity if you think you want

4    to give the jury guidance with regard to whether or not certain

5    things were caused by the acts, certain injuries weren't caused

6    by them, certain things should be compensated, certain things

7    shouldn't be compensated.

8        Even if you want to argue, as I say, with regard to

9    causation, as to what you characterize as an intervening cause,

10   or even with regard to whether or not that's an appropriate

11   calculation of economic damages, based on the record that they

12   have before them, about whether or not she had an opportunity

13   to work and make that money.  I will still give some

14   consideration on that, whether or not mitigation is

15   appropriate.  But my recollection -- Mr. Yalowitz, you or

16   someone from your team can give me this for the record -- with

17   regard to the one who had loss of wages, the loss of wages you

18   calculated, the evidence was what?

19        MR. YALOWITZ:  800,000, I think.

20        THE COURT:  What is the amount you're requesting for

21   this person?

22        MR. YALOWITZ:  15.8.

23        THE COURT:  That's not surprising.

24        So that's why I said before I would be shocked if the

25   mitigation question was of great significance.

1           MR. YALOWITZ:  First of all, it's the defendants'

2      burden to prove that there was a failure to mitigate.  They

3      asked for and received a modification of the instruction that

4      plaintiffs have the burden on everything.  So if they are now

5      going to go back and ask for mitigation, it would needlessly

6      complexify the whole burden of proof issue, number one.

7           Number two, this is another one where I think, quite

8      frankly, what they are trying to do is slip in something

9      ostensibly for one purpose and use it for another.  I don't

10     think they really are trying to say Shifra Goldberg's lost

11     wages should be 500,000 instead of 800,000.  I think they want

12     to say, Oh, gosh, these Americans went to Israel and put

13     themselves in harm's way and make that kind of an argument.

14          MR. ROCHON:  I am fine if there is an instruction that

15     only refers to her.

16          THE COURT:  I think I did also look at who has the

17     burden on that, and I think Mr. Yalowitz is right, it would be

18     defendants' burden.  Quite frankly, I don't see any evidence in

19     this case for the jury to conclude that she could have, should

20     have, and didn't work, and therefore there is a basis to

21     conclude that.  I am not going to preclude you from arguing

22     that if you think there is a reasonable basis to argue that

23     from the evidence in this case.

24          Quite frankly, I wouldn't even reconsider this unless

25     you were to affirmatively make a representation that you

F2I8SOK6

1    intended to reference that in your summation.  If you don't

2    intend to reference that in your summation, I think it's

3    totally inappropriate for me to give an instruction on that and

4    say that you somehow put an issue that she hasn't mitigated,

5    when you haven't said one single word about that to the jury.

6    You didn't ask one single question to demonstrate that in this

7    case and you don't intend to specifically reference that.

8           If you want to add that to your argument, I will give

9    that further consideration, but I can't just throw out an

10   instruction on this when there has been no evidence presented,

11   no argument made to the jury, no questions posed with regard to

12   raising this issue, and you just want it to be hanging out

13   there by getting it as an additional argument from the court

14   that you don't want to individually make based on the evidence.

15          Why don't I go to Ms. Ferguson.

16          Ms. Ferguson, give me the most obvious one that you

17   think that I should deal with now rather than let the jury do

18   my job for me.

19          MR. FERGUSON:  I will start with the Sokolow attack.

20          Just for the record, we did move under 50(a) at the

21   close of plaintiffs' case, docket number 795.  This evening we

22   will be moving again, at the close of the evidence, so you will

23   get papers at the end of the day.

24          THE COURT:  I will consider those motions timely made.

25          MR. FERGUSON:  I will focus on a few of the attacks

F2I8SOK6

1    where we believe that the lack of evidence is particularly

2    clear.

3            Sokolow, the January 27, 2002 bombing.  The suicide

4    bomber, Wafa Idris, was not a PA employee.  Munzar Noor, who is

5    alleged to have participated in planning the attack, was not a

6    PA employee.  Both were employed by Red Crescent, which is not

7    a PA organization.

8            Your Honor has previously concluded that there is no

9    PLO respondeat superior claims in the case.

10           So no respondeat superior liability for Sokolow.

11   There is no employees who were involved in carrying out the

12   attack.

13           THE COURT:  I have two problems that you can address

14   directly, as I have considered this.

15           I am not saying I am denying your motion at this

16   point.  I am probably still reserving decision on it.  Because

17   for most of this, one, I think it's appropriate to send it to

18   the jury and let them evaluate these issues first; and, two,

19   most of these arguments I need to go specifically to the

20   transcripts in this long trial and see what the lack of or what

21   evidence there is to support these arguments and give you an

22   opportunity to make those arguments more completely in writing.

23           But with Wafa Idris, we have the references in the

24   documents to the person at the Mukataa.  And we also have the

25   document we dealt with today from this witness.  I can't say

F2I8SOK6

1     that there is a total lack of evidence in that regard.  In the

2     evaluation, the total evaluation, those pieces of evidence may

3     or may not be sufficient to sustain their burden.  But clearly

4     a piece of evidence, regardless of how strong it is, usually

5     points in one direction or the other, and usually it will point

6     in the direction of liability or point in the direction of

7     nonliability.

8          In this case, the fact that they met with somebody at

9     the Mukataa, I think we all concede does not point in the

10    direction of nonliability, it points in the direction of

11    liability.  It may be insufficient, that's your argument, but

12    it clearly doesn't point in the other direction.

13         Also, this document that you disagree that it

14    represents some prior knowledge or involvement of the PA or PA

15    officials with regard to the knowledge they had about Wafa

16    Idris, if it can be argued that that's what it represents, the

17    fact that they said that they knew something before they wanted

18    something to be public points in the direction of liability

19    rather than in the direction of nonliability.

20         So I think that those two pieces of evidence are the

21    things -- I can't confidently say that those are the only

22    things that they are going to argue that's in this case that

23    might be circumstantial evidence, if not direct evidence of PA

24    or PLO involvement, but it seems to me at this point it is in

25    evidence and it's not appropriate for me to weigh the evidence;

F2I8SOK6

 1    it's appropriate for the jury to weigh the evidence.

 2            MR. FERGUSON:  If I could just briefly address those

 3    two items of evidence.

 4            First, the reference in the Munzar Noor custodial

 5    statement that there was a meeting at the Mukataa.  This is

 6    what I referenced earlier where, without knowing who that

 7    person is, the jury cannot possibly assess whether that

 8    unidentified employee, even assuming they weren't an employee,

 9    at the Mukataa was acting within the scope of his employment in

10    connection with this meeting, or that he acted as a principal

11    and therefore Wafa Idris was an agent.

12            So there may be a piece of evidence, but it is not

13    sufficient to establish the elements the jury needs to find for

14    respondeat superior liability or agency liability, because we

15    know nothing about who that person is and there is no other

16    evidence that would allow a jury to conclude that that person

17    was acting within the scope of his employment or within

18    authority of the PA or PLO.

19            THE COURT:  That may be, as I say, a factual dispute,

20    a factual argument.  It's logical and reasonable for the jury

21    to conclude, and it's logical and reasonable for the jury to

22    reject the argument that, look, if they went to the Mukataa,

23    and under the circumstances under which they went to deal with,

24    it is more likely they were talking to some PA employee rather

25    than somebody who is detained in the jail.

F2I8SOK6

1          MR. FERGUSON:  But that doesn't create liability on

2     the PA.

3          THE COURT:  I agree.  That in itself doesn't create

4     liability.  What creates liability is whether or not, based on

5     all of the evidence in this case, a reasonable jury can

6     conclude that they were talking to someone who was acting

7     within the scope of their employer.

8          Now, they could also utilize other evidence if they

9     find evidence from other attacks would indicate that this was

10    consistent with or inconsistent with activities of the PA or

11    complicity with the PA.

12         I understand your argument and, quite frankly, I am

13    not saying that your argument cannot prevail but it does not

14    compel me to say, without a much more thorough evaluation of

15    the record here, and, quite frankly, in discussing this

16    internally too, it really makes a difference to me what the

17    parties are going to argue.  I am not even sure how you're

18    arguing this case.  I don't know exactly what you're going to

19    say.  I know in general, but you're going to reference

20    evidence, you're going to help me recollect, and you're going

21    to put, both for me and for the jury, all this in some context.

22    I still have problems keeping the names straight.

23         As I say, quite frankly, it is also a concern of mine,

24    given the extensiveness of this litigation, if I am going to

25    make that judgment, I'd rather personally be in a position to

F2I8SOK6

1   make that judgment after the jury has rendered their verdict

2   than to make that judgment and then be told that I have made

3   the wrong judgment and then we have to come back and try this

4   case over.  I am not going to pretend that that is not a real

5   concern to me given the history of this litigation.

6           As I say, I am not going to deny this motion at this

7   point in time, but those things are the reasons that make me

8   hesitate to grant that motion on that basis.

9           MR. FERGUSON:  So, your Honor, in light of that, I

10  won't walk through our arguments as to the other attacks, and I

11  will rely on our papers.

12          I would like to focus just before we leave on the PLO,

13  because this has been a recurring theme of ours that there is

14  an absence of evidence of any PLO involvement.  Your Honor

15  already found there was no involvement of any PLO employee

16  involvement.  As you said, these organizations only act through

17  employees.  It's not clear what agents they are talking about.

18          THE COURT:  They are clearly accusing Yasser Arafat.

19  There is no question about that.  There are other high-level

20  GIS and other employees who, as we run through the definition,

21  may or may not fit the definition of a senior official of the

22  PA.

23          Now, whether or not there is substantial evidence of

24  their involvement or evidence of their involvement in these

25  acts, obviously -- and I have given them reasons why I have

F2I8SOK6

1    rejected their ratification theory that they say they wish to

2    have the jury conclude, but it seems to me that you're right,

3    it is a different analysis, and maybe even a more difficult

4    task for them, because of the structure of the PLO, to try to

5    figure out who is -- I can't even tell you who I can name as a

6    senior official of the PLO.  Quite frankly, I would be

7    interested to hear their summation as to whether they are

8    groping in the dark or whether or not they really have some

9    things in mind that I just haven't kept up with or just don't

10   remember.

11              MR. FERGUSON:  But the PLO should not be put in a

12   position of having it go to a verdict when there is no evidence

13   as to the PLO.  The only PLO official I am aware they have

14   identified is Yasser Arafat, and there is no evidence that he

15   directed any of these attacks.

16              THE COURT:  There is some evidence that Yasser Arafat

17   approved moneys.

18              MR. FERGUSON:  None of them connected to these

19   attacks.

20              THE COURT:  Again, I don't want to try to argue the

21   specifics of this for them because I don't have the specifics.

22   Vaguely I can say there is at least some evidence that they say

23   the jury should consider with regard to Yasser Arafat either

24   authorizing transfers of funds or requesting or ordering

25   transfers of funds either from the PA budget to the PLO, from

F2I8SOK6

1    the PLO to Fatah, from Fatah to the Al Aqsa Martyr Brigades.

2    That's their theory.  Now, whether or not that is borne out by

3    the testimony, the actual testimony.

4         Also, what makes it more difficult for me right now to

5    evaluate is there were experts who testified, and I can't

6    totally reject the opinions of the experts.  It's an evaluation

7    for the jury to make.  Quite frankly, a jury can conclude,

8    simply on the opinion of an expert, if that evidence came

9    before them and that opinion came before them, that they find

10   that it is more likely than not that that's the case because

11   they think the expert has a reasonable basis for that opinion

12   and they accept that opinion.

13        So I think your concentration has been primarily on

14   the independent evidence, but, as I say, I have to factor in

15   also the expert testimony and say whether or not that's a

16   reasonable basis, depending on -- again, I would have to go

17   back and see exactly what expert said what.  I know what their

18   general testimony was.

19        I do not feel comfortable that I can resolve this, as

20   they say, off the cuff from the bench, and as I say, it is not

21   fair -- let's put it this way.  I don't think in weighing what

22   you say is the fairness of having the PLO stick around till

23   verdict, I don't find it as compelling an argument to kick them

24   out of the case at this stage of the proceeding, nor in

25   comparison to, as I say again, the possibility that I may have

F2I8SOK6

1    to drag them back in here and try this case all over again, if

2    upon review that I dismiss this case the Second Circuit says,

3    you know what, we don't know what the jury would have done with

4    it, but we think there is enough that it should have gone to

5    the jury, we are going to reverse you, send it back, and have

6    you try it again.  I don't think that would be fair to the

7    plaintiffs or the PLO or the PA.

8           I am sure you're not anticipating that happening and

9    hoping that it doesn't, but I'd say, on the basis of the expert

10   testimony -- and, unfortunately, your argument really is a

11   separate argument as to each separate attack, which I can only

12   say it's really not reasonable for me to think that I can off

13   the top of my head separate all of them and make that kind of

14   evaluation without, as I say, hearing the summations, seeing

15   how the lawyers are focusing their arguments, what arguments

16   they are really trying to put before the jury, remind me of

17   what they are putting in, in the context of all of the

18   arguments on both sides, and then to painstakingly review this

19   transcript of almost two months of trial to see whether or not

20   there is a minimal amount of evidence that should have gone to

21   the jury or whether there is a basis for me to conclude that no

22   reasonable jury could have found liability on these facts, and

23   to get the benefit of further submissions from the parties to

24   direct my evaluations.

25          I clearly understand your argument, and I am not going

F2I8SOK6

1      to deny it at this point, but I am going to reserve decision.

2                    MR. ROCHON:  I have one question.  Do you send the

3      instructions back with them?

4                    THE COURT:  I do not.

5                    MR. ROCHON:  You bring them in to reinstruct?

6                    THE COURT:  I bring them in to reinstruct.

7                    My basic rule is this.  That's the way I do it unless

8      the parties agree that they want me to do it a different way.

9      I usually go along on almost any issue.  If the parties say

10     they agree that I should do it a certain way, then I am likely

11     to go along with that, unless I can explain to them or convince

12     the parties that's probably not the preferable way to do it.

13                   With regard to jury instructions, I usually tell them

14     if they want any instruction read back, they should give us a

15     note and tell us what they want read back.  I will usually

16     either repeat the same jury instruction, or we will fashion a

17     response to their question on the law, or I will find something

18     that's related to the jury instruction I have already given

19     that addresses the issues that they have raised, or the

20     question that they have raised that they have some concerns

21     about the instruction.

22                   Only if you tell me you agree you want me to send it

23     in will I do so.  If I do that, I usually do it one or two

24     ways.  I will simply sanitize the written instructions that I

25     gave you and take out all the headings.  Sometimes the easier

F2I8SOK6

1     way is to just get the transcript from the court reporter,

2     because that's what I actually gave, and then just send in the

3     transcript.  I have done that in the past too, but that's the

4     exception rather than the rule.  The rule is that I bring them

5     out.

6          MR. ROCHON:  Thank you.  I said I had one question,

7     but now I have got two more.

8          How close do you keep counsel during deliberations,

9     and when do you think we will get the final version of your

10    jury instructions?

11         THE COURT:  Sometime tonight you will get the final

12    version of my jury instructions.

13         What you need to do is to give us information about

14    how to get in contact with you when we have a note, and not be

15    more than 10 or 15 minutes away.

16         MR. ROCHON:  Thank you.

17         THE COURT:  Otherwise you don't have to sit in the

18    courtroom.

19         MR. ROCHON:  Thank you.

20         THE COURT:  My suggestion is have somebody in the

21    courtroom in case they just ask for exhibits so that you can

22    agree that's the exhibit they are looking for and it's in

23    evidence.  And as long as I am told that you agree, I will tell

24    my law clerk to hand it to the marshal and have the marshal

25    hand it to the jury.

F2I8SOK6

1          MR. ROCHON:  Thank you.

2          THE COURT:  Otherwise we will reconvene for any other

3    kinds of questions.

4          MR. YALOWITZ:  Thank you, your Honor.

5          THE COURT:  Good luck.  I know you have plenty of work

6    to do.  So do I.  I will see you all tomorrow morning at 9:15.

7          MR. YALOWITZ:  We will look for an e-mail tonight from

8    chambers?

9          THE COURT:  Yes.

10          MR. YALOWITZ:  Appreciate it so much.

11          (Adjourned to February 19, 2015, at 9:15 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION
2    Examination of:                            Page
3    AMNAH REEHAN
4    Direct By Mr. Rochon . . . . . . . . . . . .3539
5    Cross By Mr. Yalowitz  . . . . . . . . . . .3549
6    ISRAEL SHRENZEL
7    Direct By Mr. Yalowitz . . . . . . . . . . .3558
8    Cross By Mr. Rochon  . . . . . . . . . . . .3563
9                        PLAINTIFF EXHIBITS
10   Exhibit No.                              Received
11    1161     . . . . . . . . . . . . . . . . . .3553
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300