F2J8SOK1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MARK I. SOKOLOW, et al.,

4                   Plaintiffs,

5           v.                              04 CV 397 (GBD)

6    PALESTINE LIBERATION
     ORGANIZATION, et al.,
7
                   Defendants.
8
     ------------------------------x
9                                           New York, N.Y.
                                            February 19, 2015
10                                          9:30 a.m.

11   Before:
                   HON. GEORGE B. DANIELS,
12
                                            District Judge
13
                              APPEARANCES
14
     ARNOLD & PORTER LLP
15        Attorneys for Plaintiffs
     BY:  KENT A. YALOWITZ
16        PHILIP W. HORTON
          TAL MACHNES
17        SARA PILDIS
          CARMELA T. ROMEO
18        RACHEL WEISER
          LUCY S. McMILLAN
19
     MILLER & CHEVALIER, CHARTERED
20        Attorneys for Defendants
     BY:  MARK J. ROCHON
21        LAURA G. FERGUSON
          BRIAN A. HILL
22        MICHAEL SATIN
          DAWN E. MURPHY-JOHNSON
23

24

25

F2J8SOK1

 1              (Trial resumed; jury not present)

 2              THE COURT:  Good morning.

 3              Most of our jurors are here so we can start as soon as

 4       they are arrive.

 5              I understand there were some questions about the

 6       podium.  You can move it as close to the middle of the jurors

 7       as far as it can stretch if it's convenient.

 8              MR. ROCHON:  We have worked that out.

 9              MR. YALOWITZ:  We have figured out something that I

10       think will work for the three of us.  It is amazing.  It

11       finally happened.

12              THE COURT:  I gave you what I consider at this point,

13       unless there are further suggestions, what I consider to be the

14       final of the verdict form.  You see I have made some minor

15       changes consistent with what we have discussed, but otherwise I

16       assume that's the way we are going to go with the verdict form.

17              Mr. Rochon.

18              MR. ROCHON:  Agreed.

19              THE COURT:  Mr. Yalowitz.

20              MR. YALOWITZ:  What we got from Ms. Clerk last night

21       is fine with us.  There was a letter that came in from the

22       defendants, I think after that but maybe before, asking for

23       some additional language.

24              MR. ROCHON:  The language didn't go to the verdict

25       form.

F2J8SOK1

1          MR. YALOWITZ:  The verdict form we are done with.

2     Neither side is happy with it.

3          THE COURT:  Then it must be good.

4          Also, with regard to the jury charge, that's pretty

5     much it.  I have got one letter with regard to one item.

6     Before I address that, is there anything else, Mr. Yalowitz,

7     with regard to the charge?

8          MR. YALOWITZ:  I would like to go back to several

9     things, but I think that we shouldn't.

10         THE COURT:  Anything new?

11         MR. ROCHON:  Same here.  Nothing that hasn't already

12    been raised.

13         THE COURT:  Let me address this one sentence.

14         What is your position, Mr. Yalowitz?

15         MR. YALOWITZ:  I think it is redundant and confusing.

16         THE COURT:  Mr. Rochon.

17         MR. ROCHON:  It's hard to see it as redundant because

18    we don't otherwise say what the activities are.  It can't be

19    redundant.

20         THE COURT:  I don't feel strongly one way or the other

21    and I can be convinced by one side or the other on this one.  I

22    deliberately took it out because my view of both the law in the

23    abstract and the particular facts put before this jury that are

24    relevant to that determination, I don't believe that it is

25    required that it be regularly conducted activity.  One could be

F2J8SOK1

responsible for respondeat superior even for something that
isn't regularly conducted.

       If I gave a person an assignment, even if it was an
unusual assignment, in considering the factors that I lay out
for the jury to consider, they can still evaluate whether or
not -- if I sent my law clerk out to the bank for me, even
though I don't regularly do that, it is not an automatic
determination, and we lay out the factors to be considered
which are beginning on page 54 at the bottom.

       I say:  Among the factors you may consider in deciding
whether an employee was acting within the furtherance of the
PA's activities and within the scope of his authority, you may
include the connection between the time, place and occasion for
the act, the history of the relationship between the PA and its
employee as spelled out in actual practice, and then I say,
whether the act is commonly done by such an employee, the
extent of the departure from normal methods of performance, and
whether the specific act was one that the PA could reasonably
have anticipated.  If you find that the employee caused the
injury to the plaintiff while acting within the scope of his
authority in furtherance of the PA's activity, then the PA is
legally responsible for the employee's conduct.

       So it seems to me the more appropriate analysis by the
jury is to consider certain factors and one of the factors to
consider is whether the act is commonly done by the employee,

F2J8SOK1

1    and another fact to consider is the extent of the departure

2    from normal methods of performance and whether the specific act

3    was one that the PA could have reasonably anticipated.

4           I am not sure if I just throw in a line this simply

5    says employees's usual activities that they regularly conduct.

6    I am not sure what I am telling them legally.

7           MR. ROCHON:  I think all of the things you said are

8    there for Mr. Yalowitz to argue.

9           THE COURT:  They are there for you to argue also.

10           MR. ROCHON:  I agree.  However, the sentence that

11   you're talking about is one that I think is a standard part of

12   that normal instruction on respondeat superior.  Therefore, it

13   does give some guidance as to how at least in the first

14   instance a juror should look at activities.

15           There is clearly not only this instruction but in the

16   agency instruction, the scenario in which you're describing is

17   available to Mr. Yalowitz to argue.  However, we don't have

18   anything in here now that describes activities.  It's all as to

19   scope.

20           THE COURT:  This doesn't describe activities either.

21           MR. ROCHON:  It gives a sense of what that means is

22   the regularly conducted activities.

23           THE COURT:  It doesn't have to be a regularly

24   conducted activity.  It is a factor to consider.

25           You think legally it has to be a regularly conducted

F2J8SOK1

1   activity?  Is that what you're trying to get me to give to the

2   jury, that it has to be a regularly conducted activity?

3             MR. ROCHON:  I think you have to define the word as it

4   is in the instruction.

5             THE COURT:  Define which word?

6             MR. ROCHON:  Activities.

7             THE COURT:  That's not a definition of activities.

8             MR. ROCHON:  Those that it regularly conducts.

9             THE COURT:  That's a definition of usual activities.

10  That's not a definition of activities.  It doesn't define

11  unusual activities.  It doesn't define activities that are

12  either characterized as usual or unusual.

13            MR. ROCHON:  Judge, our position would be that, first

14  of all, deviating from the standard instruction we would

15  suggest to the court is not appropriate here especially when we

16  are dealing with a situation such as this where it's an entity,

17  we all agree it's a governmental entity we are talking about,

18  and we should give some guidance, and this gives some guidance.

19            THE COURT:  What is the guidance you're trying to give

20  to the jury?  What is it that you want to argue from this

21  sentence?  What do you want them to conclude from this

22  sentence, that it has to be a regularly conducted activity for

23  there to be liability on respondeat superior?

24            MR. ROCHON:  I think what will happen is, in the

25  absence of some specific situation like you describe, where

F2J8SOK1

```
 1    there is a specific directive that it would go outside the
 2    normal activities --
 3              THE COURT:  I assume every one of these acts one could
 4    consider outside their normal activities.  They don't every
 5    day, even if they were found to be liable, they don't every day
 6    send someone out to commit a terrorist act.
 7              MR. ROCHON:  This is why the instruction is helpful
 8    for the jury to know they have to look for specific evidence.
 9              THE COURT:  They need to do what?
10              MR. ROCHON:  Specific evidence as to whether this is
11    within the scope.
12              THE COURT:  The specific evidence I give them is that
13    they should consider whether or not it's the usual --
14              MR. ROCHON:  Which is why my language isn't
15    prejudicial to the plaintiffs and it is part of the standard
16    instruction and especially in a case where you are also, over
17    our objection, giving agency, to the degree the acts were
18    specifically authorized, which is what the court is
19    hypothesizing, Mr. Yalowitz has plenty to argue.
20              THE COURT:  Mr. Yalowitz, let me hear from you and
21    then I will make a determination.
22              MR. YALOWITZ:  He already got activities instead of
23    interests.  Now he is trying to slice the salami even further,
24    which I guess that is effective lawyering if he gets it.  But
25    it's not part of the standard instruction to say what he is
```

F2J8SOK1

 1    asking to say.

 2              I remember this because we proposed an edit to get

 3    away from the business issue.  This was a definition of

 4    business.  So once you take out the word business, you don't

 5    need a definition of business.  So it's either redundant

 6    because it's going back to activities or it's confusing or it's

 7    both.  I just think you have thought through these instructions

 8    very carefully, the parties have argued and argued and argued

 9    over them, you have given everybody lots of leeway to make

10    their arguments.  I think it's time to lock it in and move

11    forward.

12              That's my view unless you have any questions.

13              THE COURT:  Let me just consider something first.

14              Mr. Rochon, I am trying to understand whether or not

15    you mean to try to describe the employer's usual activities or

16    the employee's usual activities.

17              MR. ROCHON:  Employer's.  That's where the sentence

18    comes from in the standard instruction.  My purpose is to

19    describe employer's.

20              THE COURT:  I just don't remember the standard

21    instruction, what was the sentence before this in the standard

22    instruction?

23              MR. ROCHON:  In the standard instruction, your

24    sentence before includes both conducted activities and

25    furtherance in one sentence, and the standard instruction first

F2J8SOK1

1    has a sentence about business or activities and then has this.

2            THE COURT:  Which standard instruction?

3            MR. ROCHON:  I didn't bring --

4            THE COURT:  Which standard instruction?  Are you

5    talking about the PJI instruction or the Sand instruction?

6            MR. YALOWITZ:  It's from the pattern jury.  It's from

7    New York Pattern Jury.  It's 2:235.

8            MR. ROCHON:  I know where it was in your February 13

9    draft.

10           THE COURT:  I need to know in what context the

11   standard instruction gave this sentence.

12           MR. ROCHON:  I understand, your Honor.

13           THE COURT:  2:235?  Just a second.

14           MR. YALOWITZ:  I am happy to read it to you.  I don't

15   have the book with me.

16           THE COURT:  I do have the book in front of me and I

17   have it tabbed.

18           2:235.  Mr. Rochon, it's not in that instruction.  I'm

19   not sure.

20           MR. ROCHON:  I am going from memory.  It may be in

21   Sand.  But I know it was in the standard instruction.

22           THE COURT:  The instruction that I have is pretty much

23   what 235 is.  It is not in 235.  I can show you it.

24           MR. ROCHON:  I know when you put it in your proposed

25   instruction that I understood it to be from the standard, from

F2J8SOK1

1    Sand, because you had had it in your February 13 draft.  Then

2    when we redid it, I noticed it was out.

3             THE COURT:  I may have taken it from one of the

4    proposed instructions that you gave me, and I may have taken it

5    out after I looked at the standard instruction and considered

6    it in context.

7             You need to tell me where it comes from so I can make

8    some determination, because it doesn't come from the

9    instruction on employer/employee scope of employment.  I can

10   show it to you if you want.  If you think there is another

11   instruction I should be looking at.

12            What did you propose?  Did you propose this?

13            MR. ROCHON:  I am not going to go with my memory

14   because I had been thinking about something else all night.  So

15   I if I am wrong, I will be called to task for it.

16            MR. YALOWITZ:  Sand doesn't have it.

17            THE COURT:  I don't think Sand would have it.

18            Do you know where that language comes from, Mr.

19   Yalowitz?

20            MR. YALOWITZ:  I think they kind of mixed and matched.

21   When you're using business, which is what the pattern jury

22   instruction does, you need to give the jury some guidance about

23   what is business.

24            THE COURT:  Which was the pattern jury instruction on

25   business that you used?

F2J8SOK1

1           MR. YALOWITZ:  I don't have the book, but my request

2      was an act was within the scope of employment in furtherance of

3      the employer's business.

4           THE COURT:  Do you know where you got that from?

5           MR. YALOWITZ:  2:235.

6           THE COURT:  You modified it.  That's not what 2:235

7      says.

8           MR. YALOWITZ:  Do you want me to take a look at the

9      book?

10           THE COURT:  Sure.  Our jurors aren't here yet.  We

11      will start as soon as they come.

12           235 is consistent with what I have here.  It's almost

13      word for word what I have here.

14           MR. ROCHON:  May I ask the court a question.  You're

15      going to instruct them after lunch?

16           THE COURT:  I will instruct as soon as all of the

17      summations are done.

18           MR. ROCHON:  We may also address this after the

19      closings.

20           THE COURT:  We might be able to.  I am only using this

21      time because the jurors aren't here yet.  We will stop as soon

22      as the jurors are here.

23           MR. ROCHON:  I won't use that sentence in my closing.

24           THE COURT:  I didn't give it a great deal of thought,

25      but when I thought about it I took it out.  I don't remember

F2J8SOK1

```
 1    where it came from to get it in there in the first place.
 2            MR. YALOWITZ:  I don't know either.  2:237 talks about
 3    employer's business.
 4            THE COURT:  Right.
 5            MR. YALOWITZ:  Maybe I made it up.
 6            THE COURT:  Is it in 2:237?
 7            MR. YALOWITZ:  No.
 8            THE COURT:  I just don't know that that language is
 9    from a standard jury instruction.  It may be language you
10    incorporated from a case.  Again, I just don't have a
11    recollection.  Obviously I thought about it because I crossed
12    it out and I took it out.
13            MR. ROCHON:  Right.  At one point it was in there.  I
14    am going to do this.  I will know better before you instruct
15    and I won't use that in my closing.  So it would only be in
16    your instructions if I persuade you to use it.
17            THE COURT:  I'm not even sure what you would say even
18    if I gave it to you now.  I don't think you can legitimately
19    say it can't be respondeat superior unless they find that it
20    was the usual activity that's regularly conducted by the
21    employer.  I don't think you can legally say that.  That's not
22    true.  That's not what this language says.
23            MR. ROCHON:  That's why there is arguments.  I agree
24    there are arguments available to Mr. Yalowitz both under
25    respondeat superior and agency along those lines.
```

F2J8SOK1

```
1          THE COURT:  If you want this language, you have got to
2    give it to me in the context.  You have got to tell me what I
3    am trying to instruct the jury on.  And either I am telling
4    them that this is important or not important.  Either I am
5    telling them it's one of the factors they should consider, so I
6    should put it in the factors portion, or I am saying this is
7    something that is required before they can find respondeat
8    superior.
9          The latter I don't think is a correct statement of the
10   law, and that's not even what this says and that's not what you
11   requested that I say.  To just throw this sentence in, I am not
12   sure what direction that takes the jury.  I will look around
13   even while you're summing up and see from earlier drafts where
14   this language came from, but it's not the standard language in
15   this instruction that I have utilized.
16         I think we are like two or three jurors away.  So
17   hopefully any minute -- many times the marshals bring them up
18   in a group and we will be ready to go.
19         MR. YALOWITZ:  I don't remember the defendants asking
20   for a respondeat superior.
21         THE COURT:  I don't remember that either.  I remember
22   when I first got the instructions, I know that I had gotten
23   instructions from you and objections from them.  I may have
24   gotten a later instruction from them, but I don't have it at
25   hand.
```

F2J8SOK1

1          So it's more likely what I did is I looked at your

2     requested instruction and then I went back to the standard

3     instruction and I think I made it closer to the standard

4     instruction than what you asked for.

5          I have your proposed instruction number 15.  As a

6     matter of fact, in this discussion it is in your requested

7     instruction.  That's where it comes from.

8          MR. YALOWITZ:  Right.  It may come from --

9          THE COURT:  It says, employer's business is regularly

10    conducted business.

11         MR. YALOWITZ:  Ms. Romeo reminds me, we may have

12    gotten this from 803(6) or something.

13         THE COURT:  Well, you cite *Bushey* and pattern

14    instruction 235.  It's not in 235.  So you must have pulled it

15    out of *Bushey*.

16         I didn't read the whole sentence.  An employer's

17    business is its regularly conducted activities, whether

18    commercial or noncommercial.  That may be why it came out

19    because you asked me to take out the commercial and

20    noncommercial.  That may have been the time that I took this

21    out.  As I say, I don't see this as part of any standard

22    instruction.

23         MR. YALOWITZ:  I agree with that.

24         MR. ROCHON:  Once again, we have what is called

25    reversible error.

F2J8SOK1

1          THE COURT:  You are only against what the other is

2     for.

3          MR. ROCHON:  I thought it was a brilliant suggestion.

4          THE COURT:  You criticized the suggestion.

5          MR. YALOWITZ:  He may have thought at some point it

6     was brilliant, but in his objections he thought it should come

7     out.

8          THE COURT:  I will look at *Bushey* while you're summing

9     up and if I think it's worth a further discussion I will.  I

10     think just throwing the sentence in now out of context, I don't

11     think that's particularly useful to the jury.

12          If you want to argue those factors, as I say, this is

13     not the normal method and not commonly done by the employee,

14     and make those arguments, even if you want to say it's not

15     regularly conducted business, you can argue that, but I don't

16     know that the jury needs a legal instruction.  I am not going

17     to tell them that that's required.

18          We are about ready to go.  We still have one or two

19     jurors missing.  We are all set up for the streaming.  I will

20     indicate in front of the jury that we have the cameras for an

21     overflow room.  Someone asked about that.  If you're going to

22     ask about it, then they will have concern about that.  I will

23     just let them know that's all it is.  It's not a recording of

24     the proceedings and they are not on camera.  It's just

25     streaming the summations to another courtroom, overflow

F2J8SOK1

 1    courtroom.

 2              We will start as soon as they walk in.

 3              MS. WEISER:  We have one small housekeeping issue.  I

 4    raised this with Mr. Rochon, but he wasn't receptive or you

 5    came in.

 6              THE COURT:  I assume I came in.

 7              MR. ROCHON:  You did.

 8              THE COURT:  What would you like?

 9              MS. WEISER:  We wanted to ask that a few of the

10    plaintiffs be permitted to sit up front.

11              THE COURT:  I already resolved that and said yes about

12    an hour ago.

13              Is it not being done?

14              MS. WEISER:  We will effectuate that now that we know.

15              THE COURT:  There are two open seats right there.  I

16    didn't know how crowded it was going to be.  If you want to

17    utilize those seats, you may.

18              MS. WEISER:  Thank you, your Honor.

19              THE COURT:  We are almost full but not full yet.  I

20    know some people were told that summations would start at 10:00

21    so I think some people will still be trickling in.

22              (Pause)

23              MR. YALOWITZ:  Your Honor, do we have a minute before

24    we get started?

25              THE COURT:  Yes.  We are waiting for one juror.

F2J8SOK1

1          MR. YALOWITZ:  I will just be back in one minute.

2          THE COURT:  OK.

3          MR. ROCHON:  What time do you let them go?

4          THE COURT:  I have ordered lunch for 12:30.  I am

5   probably going to shorten their lunch.  So I am probably going

6   to give them 45, 50 minutes for lunch so we can continue.

7          MR. YALOWITZ:  So if I am on, you want me to just find

8   a breaking point?

9          THE COURT:  Yes.  If you start on or before 12:00,

10  sure.  Then sometime between, my law clerk will hand me a note

11  as soon as their lunch arrives and maybe we can hand it to one

12  of your colleagues and they can hand it to you and you can find

13  a convenient place to stop.

14         MR. YALOWITZ:  There will be natural breaking points.

15         MR. ROCHON:  Normally I don't like to have lunch

16  between counsel's closing, but if we have got to, we have got

17  to.

18         THE COURT:  We are talking about almost day-long

19  summations.  So there is nothing we can do about that.  We are

20  talking about four, five hours of summations.

21         MR. ROCHON:  I thought he said he was going to two

22  hours.

23         MR. YALOWITZ:  I thought I said I would be seven

24  hours.

25         MR. ROCHON:  I remember two.

F2J8SOK1

1           We will see how it goes.

2           My question, actually, was at the end of the day what

3      time do you usually let jurors go?

4           THE COURT:  This is what I do.  If I can give them the

5      jury instructions and send them in to deliberate, say no later

6      than 4:30 or so, I will say to them they can deliberate as long

7      as they like beyond 5:00.  But if at any time at 5:00 or later

8      they wish to adjourn for the day and come back and continue

9      tomorrow, they can just send us a note saying they are ready to

10     adjourn and we will adjourn.

11          MR. ROCHON:  If there is not a verdict today, as we go

12     forward, how do we know every day that they are done so we know

13     they are free?

14          THE COURT:  You will be back in court before I

15     discharge them.

16          MR. ROCHON:  You will excuse them every day in court?

17          THE COURT:  Yes.

18          If I say that to them and it starts to become 6:30,

19     7:00 and I haven't heard from them, I may bring them back out

20     and say it's late.  If they think they are on the verge of a

21     verdict and they want to continue, I will usually say given the

22     hour, it's late for the jury.

23          MR. YALOWITZ:  7:00 is a half day for us lawyers.

24          THE COURT:  You won't have anything to do tonight.

25          Are we good?

F2J8SOK1

1            Ladies and gentlemen, we are ready to go.  We are

2   going to get the jury and we will begin with summations.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2J8SOK1

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen, please

3    be seated.

4          Ladies and gentlemen, we are prepared to move forward

5    with the summations, closing arguments of the lawyers.  Let me

6    just make a couple of comments before we do that.

7          You will notice there is just a camera here in the

8    corner.  The rules are that courtroom proceedings are not to be

9    recorded or filmed.  So that's not what is happening.  What is

10   happening is we have an overflow room for other interested

11   public who might want to watch the summations in another

12   courtroom and this is just streaming to that other courtroom.

13   That's the purpose of this camera.  It's focused on the

14   lawyers, it's not focused on you or me.  So that is the purpose

15   of that.

16         Ladies and gentlemen, before we begin the summations,

17   let me just remind you of two things.  One, what the lawyers

18   say is not evidence.  Two, it is your recollection of the

19   testimony that controls.

20         So with those two reminders, we will start with the

21   closing arguments for the defendants by Mr. Rochon.

22         Mr. Rochon.

23         MR. ROCHON:  Thank you.

24         So much sadness.  So much unbelievable sadness and

25   death and injuries over an extended period of time.

1          So many unnecessary losses.  So many lives that were

2     affected and hurt.

3          On the screen are Plaintiffs' Exhibits 496, 634 and

4     635 from the United States of America that documents some of

5     the sadness and injuries that were occurring at that time.  Out

6     of all of that sadness, all of those injuries, all those

7     deaths, all those souls extinguished, we take six incidents and

8     we bring them to you for you to decide.  Not all of those

9     deaths, not all of those injuries, not all of that sadness.

10    Six incidents.

11         The reason I focus on that as I begin is because we

12    are not here to decide the Second Intifada.  We are not here to

13    decide who was right or wrong in all those deaths and injuries.

14    We are not here to decide any of that.  And even if we were, we

15    don't even have the tools to do it.  Judge Daniels has worked

16    hard to try to keep this case focused on the these actual

17    incidents that we are here to try, the actual incidents, not

18    all the sadness, not all the death, not the conflicts, not the

19    occupation, not all that political stuff.

20         Sure, we heard about some of that because it surrounds

21    the incidents, but the core issues in this trial are not those

22    things.  And I start that way because if we focus on the

23    incidents instead of some general focus on Palestine this or

24    policies here, if we focus on what evidence has been offered on

25    the incidents themselves, there is only one set of verdicts you

1    can return, and that is that the PA and the PLO are not liable.

2            I start here as well because so much of this trial

3    focused on things other than specific evidence of those

4    incidents.

5            So in my closing argument I want to talk to you about

6    what the evidence was that came in and how it did not relate to

7    your actual task.  Then I want to talk to you about the

8    evidence that does relate to these incidents.  Because the

9    danger, ladies and gentlemen, the danger -- if there is one

10   thing I am worried about as I stand here, if there is one thing

11   I am worried about is someone is going to judge my client

12   because of who they are and not for what they didn't do.

13           I am afraid that because so many broad statements have

14   been made, so many policies have been discussed, so much

15   evidence that has nothing to do with these incidents have been

16   brought before you, that a judgment could be rendered if you

17   did do your job on something other than the evidence as to

18   these six incidents.

19           As I told you at the beginning of the trial, my name

20   is Mark Rochon.  I am honored to be before you.  I am honored

21   to represent the Palestinian people, the Palestinian

22   government, and the PLO in these cases.  And as I stand before

23   you on their behalf, I want to work with you so that at the end

24   of your service, you can return the hard verdict, but the right

25   verdict.

1         Because if there is one thing in this case that cries

2    out, every one of us it cries out to, if something can be done

3    to stop the loss that these people suffered, we would do it.

4    If something could be done to take away the pain that these

5    people suffered, we would do it.  If you could simply make it

6    go away, I know each and every one of you would make it go

7    away.  But you don't have that power.

8         One thing I really don't want to happen is for the bad

9    guys, the killers, the people who did this, to get away while

10   the Palestinian Authority or the PLO pay for something they did

11   not do and what you know caused them harm.

12        The Palestinian Authority and the PLO did not benefit

13   from these tragedies.  The Palestinian Authority and the PLO,

14   as they were in 2002, still today, you heard from the

15   witnesses, the issues continue, things haven't changed, there

16   is no state.  These incidents are by the extremists, the bad

17   guys who keep the good things from happening, and a verdict

18   against the Palestinian Authority or the PLO would only damage

19   the government and the PLO who do not deserve it.

20        So as I talk with you a little bit, let me just say

21   first thing, did you ever think you would know so much about

22   the Oslo Accords as you learned in this case?  And I am sure

23   you heard far more about them than you would like to hear.

24   There was a lot of this evidence that came in.  You might have

25   been saying to yourself, why am I hearing about this?  And I

F2J8SOK1                    Summation - Mr. Rochon

1    understand that.  Because we are lawyers, we sometimes think

2    things are important and put them into evidence.  I am

3    including me, and definitely including the other side as well.

4    We think they are important.  But then now we come to closing

5    and we talk about, OK, what is the evidence that actually

6    matters in this case?  What is the evidence that goes to these

7    six incidents?

8           Well, I think it is important for you to know a little

9    bit about our clients at the beginning of the trial and

10   throughout the trial.  So the PLO and PA, you heard evidence

11   about them and who they are.  So let's talk about it.

12          So this was we will call it a fledgling government.  A

13   government that was just getting started.  This wasn't the

14   United States 226 years after the Declaration of Independence.

15   This was the Palestinian Authority in 2001, '2, '3, '4, less

16   than a decade after it was invented and at a time when, you

17   know from the evidence, there were tremendous impediments to

18   governments.

19          Now, if we can go to the first slide, Justin.

20          I am not as well coordinated on these slides, but I

21   will get through it.

22          One of the things I want to talk to you about, this

23   government of the Palestinian Authority, there was some

24   testimony about its size.

25          I asked General Faraj:  How many total personnel in

F2J8SOK1                     Summation - Mr. Rochon

1    the Security Forces were there in 2003?

2            Answer:  38,000 to 40,000 different security

3    personnel, including everybody -- police, security,

4    intelligence, Gaza, West Bank.  The whole thing.

5            Then how many total employees?

6            100,000 in 2003.

7            Think about that.  If you look at this case from one

8    side of the telescope, you look at this case and you say, wow,

9    look at these incidents, there were a lot of PA employees

10   involved in these incidents.  They might be liable.  Then you

11   get around the other end of the telescope and you say, holy

12   cow, that is less than one-tenth of one percent of the PA

13   employees were involved in this incident.  In any government,

14   in any society, sometimes people who do terrible things happen

15   to be government employees.  Sometimes people who do terrible

16   things happen to work for the security services.  Does that

17   mean every single time someone from the security service does

18   something the security service is liable?

19           So what end of the telescope do you look at things

20   from?  That's why we put that in front of you.  So that you can

21   understand that in reality of this case, and your common sense

22   told you this even if I hadn't brought the General over here,

23   that this is a ridiculously small number of employees who were

24   involved in these incidents.

25           And that matters.  So you cannot infer simply from the

 1   fact that it was an employee that there is liability.  Even if
 2   you were tempted to do that, Judge Daniels is going to instruct
 3   you on the law as to when you can hold an organization liable
 4   for what its employees do.  And I will get to those
 5   instructions later.  But for right now the point is that there
 6   were a lot of employees and we are here talking about the acts
 7   of a very small number that were not within the course of their
 8   employment, but were things they did for their own reasons.
 9           And you know that there was a lot of disruption in
10   that area.  I am just going to give you some of the disruption
11   that was there.  You heard about something, first of all,
12   called Operation Defensive Shield.  That was the witness on
13   videotape, Shrenzel.  Shrenzel said that started March 29,
14   2002.  Another witness said it was near the end of March 2002.
15   So we'll take that.
16           Was that the first incident where there was some kind
17   of damage of the PA's security structure?  No.
18           Take this guy Munzar Noor.  He is the guy who was
19   convicted for being involved in the Wafa Idris bombing that
20   hurt the Sokolow family.  So this guy Munzar Noor, when he had
21   his statement that he gave, it says:  Three days after the
22   attack, on January 30, 2002, blank came to arrest me.  He goes
23   on to say:  After 40 days, Israeli aircraft bombed the Mukataa
24   in Ramallah and I was released.
25           So 40 days after January 30, I am no mathematician,

1   but I think we are talking about March 9 or 10 of 2002.

2          There was the testimony -- I think we have it here --

3   of Raja Shehadeh.  And Raja Shehadeh testified about

4   when -- you remember, he was the Palestinian author, the short

5   guy, who came here and testified last week I think.  And he

6   said -- and I apologize for calling him a short guy if he is

7   here.  He said the Ramallah police station, what the condition

8   was in October of 2000.  October 12, 2000, it was destroyed and

9   its condition was it became completely leveled.

10         Was any part of the structure remaining standing and

11  operable after October 12, 2000?

12         After it was leveled there was nothing left.

13         Then the PSS headquarters in 2002, where he said, you

14  can see, on April 2, 2002, it was heavily destroyed.

15         If you can go to 496.  I think it's the next one.

16         You don't have to take the word of Noor or Shehadeh

17  for the destruction.  Because the United States government, in

18  a PLOCCA report, said:  During the incursions, the PA security

19  forces in the West Bank were severely damaged both in manpower

20  and equipment.  The headquarters of the PA's principal security

21  office in the West Bank was destroyed by the IDF.

22         By the way, it's hard to remember all of these

23  exhibits in evidence, but you remember the guy Eviatar, one of

24  their experts kind of early in the case, one of these IDF

25  intelligence officers, I actually showed him that and he said

1   he disagreed with that.

2          We will talk about bias a little bit.  When you have a

3   trial, when we bring the Palestinian Authority over here, the

4   PLO over here for trial and we have them tried for these six

5   incidents, I want to stop right here.  How did that trial work?

6   If you could step back and imagine.  The Palestinian Authority

7   and the PLO have not had the greatest relationship with the

8   Israeli Defense Forces over the last couple of decades.  I

9   think we can all agree.

10          MR. YALOWITZ:  Objection.

11          THE COURT:  Overruled.

12          MR. YALOWITZ:  Not in evidence.

13          THE COURT:  Overruled.

14          You can respond.

15          MR. ROCHON:  You know from the evidence in this case,

16   in case there was any doubt, the IDF, according to the United

17   States, destroyed the headquarters.  So there is no question

18   that there was some bias of an Israeli defense intelligence

19   person as against the PA and the PLO.

20          I guess there would be bias, maybe if there was a

21   Palestinian security person coming in to testify as to Israel,

22   they would say he was biased.  But Mr. Faraj didn't come in to

23   testify against Israel.  He came in to talk to you about what

24   happened in the West Bank during a certain period of time.  He

25   didn't ask you to conclude misconduct by Israelis.  That's not

F2J8SOK1                    Summation - Mr. Rochon

1   what we are here to do.

2          But you bring the Palestinian Authority and PLO over

3   for this trial and when you put on evidence against them, the

4   only people you can put on to show their liability, the only

5   people who put up their right hand, swear to tell the truth,

6   and come in to say something against them are IDF intelligence

7   officers who served there during the time.

8          Ladies and gentlemen, step back and think if in your

9   own life, your own interests were going to be decided based on

10  the sworn testimony of supposed experts who are in that same

11  posture towards you as these two witnesses, Shrenzel and

12  Eviatar, were as against my client.  Objective, uninterested,

13  or biased?

14         I will mention this right here.  He even said,

15  Eviatar, that the United States report on the damage was wrong.

16  So who are you going to believe?  The IDF intelligence agent

17  who comes in to try to create liability for my client or the

18  United States of America's report on the same issue?  That's a

19  demonstration of bias.

20         Let me go to the next slide.

21         The first one talked about the damage done.  I showed

22  this to Eviatar as well.  And he said:  The United States of

23  America, in this PLOCCA report, following the March and April

24  IDF operations in the West Bank, the PA security force's

25  ability to resume regular security cooperation is significantly

diminished.  Many PA security facilities and much of their

equipment and weaponry have been destroyed or confiscated.

It was a fledgling government working under the most

difficult circumstances imaginable.  Not just like the

differences with Israel and this occupation, but you heard from

General Faraj, you also have these other crazies trying to

undermine the government:  Hamas, Hezbollah, outside

influences.  Just imagine trying to have a government that

tries to keep the situation under control in those

circumstances.

This trial asks a lot of you.  It asks you to take

your common sense that you're born and live with, but then to

apply it to something I bet was foreign to you when this trial

started.  You had those questionnaires and some of you knew a

little about this, some of you didn't know about the overall

issues, but this case does require you, in being fair, to think

about the government there, and to think about the forces

there, and to think about the fact that, whether you like it or

not, some security officers, some people, some individuals will

do cursed things to others, terrible things, and unspeakable

things.

And then you're going to hold the government liable

for what those individuals did.  I don't think you will.  I

think you will be asked to, but I don't think you will because

it's not the right thing.

1          Now, as the trial proceeded, the plaintiffs in their

2    opening and their witnesses put on a whole lot of evidence

3    about stuff that did not relate to any of these incidents.  I

4    will give you some examples.

5          Prisoner payments.  You now are all ready to be

6    full-time experts on Palestinian policies regarding prisoner

7    payments.  So they put on witnesses.  They made arguments.

8    They went through them.  They had a big chart up here.  17

9    million shekels a month for prisoner payments.

10         Palestinian Authority, I told you in the opening they

11   pay prisoners.  I told you in the opening they have martyrs

12   payments.  I told you in the opening those were our documents

13   that showed those things.  If I were to ask you right now, and

14   I am not so don't answer out loud -- I am not allowed to ask

15   you questions -- but if I were to ask you right now, do you

16   think that's a good set of policies?  Maybe most of you say no.

17   Maybe one or two of you say yes.  Maybe some of you will say I

18   don't know enough yet.  And none of those answers matter

19   because none of those payments caused these incidents to

20   happen.

21         You heard those payments were made before the Second

22   Intifada.  They continue today.  They have been made in times

23   of not a lot of violence, in times of a lot of violence, and in

24   times again of not a lot of violence.  They don't cause these

25   things.  There is no evidence that anyone did anything to get a

1    prisoner payment.

2           Think about that for a second.  Right now, if I were

3    to offer you the wonderful opportunity to sit in an Israeli

4    prison in order to receive $1500 a month, who is going for

5    that?  Nobody.  Those payments, those policies -- General Faraj

6    explained them to you -- you may agree with it, you may not

7    agree with it.  When you boil it down, there is not only no

8    evidence saying one did it to get them, but payments were all

9    made after the fact, and by logic they could not have caused

10   the act.

11          To the degree that the plaintiffs relied on the fact

12   that the numbers were big at some point and became larger, I

13   would have to ask them, did everybody in 2002 know that some

14   day the Palestinian Authority was going to increase the amount

15   of money that would be paid to prisoners in 2011 so it was a

16   good time to get in on the growing business of being a

17   Palestinian prisoner so some day you can get a little bit more

18   money?  Why did we spend so much time on how much people were

19   getting paid in 2011 or '12 or '13?  What did it have to do

20   with this case?  It has to do with them trying to make the

21   Palestinian Authority look bad.

22          What about martyrs' payments?  It's foreign to us

23   something called paying martyrs.

24          (Continued on next page)

25

F2JTSOK2                        Summation - Mr. Rochon

1            MR. ROCHON:  There is zero evidence.  And common sense

2    tells you nobody killed themself so their family could get 600

3    shekels a month.  Nobody.

4            But you don't have to take my word for it.  Their

5    expert, Israel Shrenzel:

6            Sir, you would agree that the payments to prisoners

7    and their families were not the primary objective for

8    committing the crime, right?

9            No.  Then he goes on.

10            Although it's nice to know once you are in jail you

11    get your salary, et cetera, you would agree that payments of

12    money to families of martyrs did not motivate the suicide

13    attackers to do attacks.

14            Of course that was not a motivation.

15            Next page.  He agreed again that he previously

16    testified that suicide attackers didn't do so in order for

17    their families to receive payments.

18            Yes, and I stick to it.

19            You said that that would will not be logical, correct?

20            Yes.

21            You also testified that you didn't have any evidence

22    that the perpetrators in these cases did their crimes in order

23    to receive prison payments, correct?

24            Yes.

25            So common sense and their expert tells you that's not

1   why these things happen.  So it's interesting.  You guys know a

2   whole lot about prisoner payments and martyr payments, but do

3   you have any evidence that they caused these incidents to

4   occur?  No.

5           And as far as the prisoner payments that the martyrs'

6   payments and other payments made, you know there was a

7   background where there were tremendous financial consequences

8   that were going on in the society as a result of this conflict.

9           Next slide.

10          So in this time period -- and this is again from a

11  United States report, Exhibit 635, that during these incursions

12  that we talked about earlier when the Israeli defense forces

13  stayed in most Palestinian cities for months at a time, that

14  they demolished the homes of families of suicide bombers and

15  wanted men.

16          Next slide.

17          You know from the documents put in by the plaintiffs

18  that Ali Jara, the suicide attacker in the last incident, the

19  house of his father was blown up.  Hilmi Halmash, who is one of

20  the other perpetrators, the army demolished his house.  Abdel

21  Mouseih, another one of the perpetrators, his house in the

22  particular refugee camp was demolished.  It was a terrible

23  time.  It was a terrible time.  That's why if you were forced

24  to try decide who's right and who's wrong, you would have a

25  heck of a time doing anything.  We haven't given you the tools to

1    figure out is this policy right or is this policy right.  Are

2    home demolishments of people's homes who were not involved

3    right?  Are prisoner payments right?

4              MR. YALOWITZ:  Objection.

5              THE COURT:  Overruled.

6              MR. ROCHON:  That's not why we're here.

7              The verdict form will not say to you, ladies and

8    gentlemen, if you were the prime minister of the Palestinian

9    Authority, would you have martyr payments?  Would you have

10   prisoner payments?  It's not going to be on the verdict form.

11             The verdict form will ask you to decide whether the

12   evidence relates to these incidents, and that evidence

13   conclusively does not.

14             What about promotions that they talked about?  They

15   spent a lot of time talking about people getting promoted.  And

16   when the guy was on the stand he says the president approved

17   this promotion specifically, as if President Arafat or Abbas

18   personally said:  That guy, I'm going to promote him, that

19   specific one guy, I'm going to give him a promotion.

20             Then Mr. Hill stood up and showed the witness that the

21   promotions were on a form that had hundreds of people being

22   promoted at the same time.  And the notion that it was done

23   specifically by the president was simply because all promotions

24   are done by the president because that's how militaries work.

25   So there was nothing specific as to these people, it was an

1   effort to exaggerate the testimony.

2           Promotions after the events occurred cannot cause the

3   event to have occurred.  There's this thing I learned about in

4   college, it's called the time space continuum, which sounds

5   fancy, but I believe -- I didn't do that well in physics, I

6   think it means basically if something happens after something

7   else, it cannot have caused it.  So the promotion after the

8   event cannot have caused the event to have occurred.  It's just

9   a way for the plaintiffs to try to make the Palestinian

10  Authority look bad and take your eye away from the ball of

11  these incidents.

12          I will say when I was a young lawyer they didn't let

13  us have water in the courtrooms.  Things were really formal.

14  And now that I'm at the age that I need to go to the restroom

15  every 30 minutes no matter what, I can have all the water I

16  want.  I have never been so well hydrated in my life as in this

17  trial.

18          So what I want to talk about with you as well, that

19  other general stuff that the plaintiffs put into evidence and

20  that don't relate to these incidents, such things as they put

21  in -- they like these police periodicals.  Do you remember

22  those periodicals that they put into evidence, some police

23  magazine or something?

24          And they liked those, and I'm sure they scoured them.

25  I'm sure they looked at all that had ever been written, I am

1   sure they looked and looked.  And one word about one of these

2   incidents in one of those magazines?  Ladies and gentlemen, no.

3   Take them back there.  Read what they put in.  One word about

4   any of these incidents?  No.

5          Or they put in these Israeli Defense Forces, the same

6   guys who were the experts, the Israeli Defense Forces, when

7   they did these incursions, they seized documents, said there

8   were hundreds of thousands of document they seized.  And they

9   come in here and put in these reports.  And I know it's hard to

10  parse through this stuff, but in those reports, those IDF

11  reports that say all these bad things about my client,s out of

12  cherry picked document that they found was there any word about

13  any of these incidents?  No.

14         So here's the reality, it's like the police, thinking

15  that something bad is going on, decided to execute a search

16  warrant at the biggest drug house in the world, the entire West

17  Bank, and they come in with tanks and police and they seize

18  documents, laptops, they seize all these hundreds of thousands

19  of documents.  They say we're going to charge these guys with

20  these six incidents based on the evidence we found.  And they

21  stand before the jury and they say but none of the evidence we

22  found talks about those incidents, because not one word in

23  those files discusses the Hebrew University bombing, the

24  Sokolow incident, Ali Jara's bombing, the Hashaika bombing, the

25  Ramadan shooting, the incident where they say some guy Awada on

1    June 19 did something.  Not one word about those incidents or

2    showing any support for them.

3            And on the police magazines, they put in something --

4    I don't think I have it on the screen, but they put in a

5    magazine that is pretrial Exhibit 175, and Mr. Yalowitz had the

6    witness read from it or he read from it.  And they read this

7    portion of it, and they said -- it sounded bad, they liked it,

8    the magazine -- this was the best they kind of come up with,

9    out of all the magazines, the European nation -- I'm quoting

10   from pretrial Exhibit 175.  The European nations and the U.S.,

11   who have strategic interests in the region, are called upon to

12   see the necessity of urgent and immediate action to stop

13   Israeli practices against the Palestinian people.  Without

14   this, their vital interests should be directly jeopardized and

15   this shall redound adversely on their peoples and communities.

16           I guess they thought it sounded threatening or

17   something.  That's what they decided focus on.  That has

18   nothing to do with these issues.  But Mr. Yalowitz, he forgot

19   to read the next paragraph.  Oh.  Since the Arab and Islamic

20   communities in those countries play a prominent role pressuring

21   these governments by turning out for impressive -- what kind of

22   marches -- peaceful marches aimed at getting foreign nations to

23   exert positive and effective pressure on Israel.  These

24   communities speak the word of truth and justice in relation to

25   our Palestinian people who continue to suffer under the most

1     extreme example of occupation in the world.

2              Wow.  Those police magazines really do help you decide

3     this case, don't they?  All they show is that there was

4     rhetoric, and I'm sure there was rhetoric on both sides.

5     Rhetoric is not evidence.  Just like the words of counsel

6     aren't evidence, although I hate to admit it, rhetoric of

7     politicians is not evidence either.  And so these police

8     magazines are just a distraction because there's language in

9     there that they think makes my client looks bad even though it

10    doesn't go to these incidents.

11             So they also liked to talk about Marwan Barghouti a

12    lot.  Shubaki.  These doing convictions are so long, I don't

13    even know, 50, 60, 120, I don't know how many pages long.  So

14    they like to talk about Shubaki and they like to talk about

15    Marwan Barghouti.  They like to say bad things about them.

16             And then you go, and if you were to take the time and

17    read their convictions that the plaintiffs put into evidence

18    and you were to try to look for these incidents, in the Shubaki

19    verdict you would find zilch.  Nothing.  The man was convicted

20    of things, but not these incidents.  You go to the Marwan

21    Barghouti one, and if you parse through it, and it's hard, but

22    if you take the time, you will learn that Marwan Barghouti was

23    not convicted for any of these incidents.

24             But let me tell you something they did not highlight,

25    Marwan Barghouti was actually charged with one of these

1   incidents, the January 22nd incident, and not found guilty.

2          So to the degree that the Marwan Barghouti conviction

3   or the Fuad Shubaki conviction tells you anything, what it

4   tells you is that Marwan Barghouti was charged with one of

5   these incidents and not convicted of it, and not even charged

6   with any of the others.  Shubaki was not even charged with any

7   of these incidents.  Why did they want to talk about them?

8   They're supposedly senior people.

9          So who is Marwan Barghouti?  He's a congressman.  Now

10  I'm not from around here, you probably figured that out, I'm

11  from Washington.  I read the papers.  And I don't mean this in

12  any kind of offensive way, but sometimes congressmen around

13  here do some pretty crazy things.  Sometimes congressmen are on

14  TV doing things that one would not approve of.  Every time a

15  congressman does something, he or she is not implicating the

16  national government of the United States of America.

17         So Marwan Barghouti's a politician in the Palestinian

18  Legislative Council.  He got a PA paycheck the same way that

19  representative took stupid pictures on my Snapchat I wish a

20  hadn't taken, or representative beat up somebody, or

21  representative solicited a prostitute the way guys in Congress

22  sometimes do.  They all got U.S. government paychecks.

23         Your representative in Congress gets a green paycheck

24  just like other people in the government.  That does not mean

25  when they say something that they're saying it for the United

1    States of America and the United States of America can be held

2    liable for it.  That does not mean when they do something that

3    the United States of America did it.

4           Marwan Barghouti is a politician who apparently likes

5    to mouth off.  No offense to Mr. Barghouti, but that's what

6    politicians do.  And he made statements, and when he spoke, he

7    spoke for himself, he did not speak for the PA, he did not

8    speak for the PLO.  He's a politician.

9           And they want to say well, he was the leader of Fatah.

10   Well, if this case was called Sokolow versus Fatah, then

11   whoever was the lawyer for Fatah could talk about that.  But

12   Fatah is not here.  They want to say but he was the spiritual

13   leader of the Al Aqsa Brigades and led them, and all these

14   cases are Al Aqsa Brigades.  So why don't we see what the

15   Israeli verdict as to the Al Aqsa Brigades in the Marwan

16   Barghouti case had to say.

17          If I could get 451.

18          So in that verdict, paragraph 169, you will see that

19   contrary to the theory of the plaintiffs here, which is they

20   got this notion that it's the PLO creates the PA and the PLO is

21   Fatah and Fatah ran the Al Aqsa Brigades and Marwan Barghouti

22   was their leader, so anything that anyone ever claimed for the

23   Al Aqsa Brigades my client should pay for.  I guess that's

24   their theory, and it is punishment for something someone else

25   did.

1          So what did the Israeli court system say about the Al

2    Aqsa Brigades?  Did they say it was this well-organized

3    coordinated led entity?  And this is in Marwan Barghouti's case

4    where the Israelis are trying them:  From the overall body of

5    evidence it becomes apparent that the Al Aqsa Brigades were not

6    an organized body under one leader, but rather a collection of

7    field cells with each one having its own commander.

8          That is pretty important stuff, because that's the

9    Israeli court system.

10          And there was a guy who sat in that seat, raised his

11    right hand and swore to you that the Al Aqsa Brigades was not

12    that, and that the Al Aqsa Brigades was responsible for each of

13    these incidents.  That guy's name was Shrenzel.  And he tried

14    to tie all of the incidents except the Hebrew University

15    incident to the Al Aqsa Brigades as if it was a single unit

16    taking responsibility for these things.  Is that what that

17    says?

18          Who are you going to believe, a paid expert who has

19    animosity against the very people against whom he's testifying,

20    or common sense given this verdict that they say you should

21    rely on?

22          So ladies and gentlemen, they had a lot of generic

23    evidence, payments, IDF stuff that doesn't talk about these

24    incidents, Marwan Barghouti and Fuad Shubaki that doesn't talk

25    about these incidents.  So why don't we do this, for the first

1    time in a long time why don't we talk about what the supposed

2    evidence is as to these six incidents and see if it stand up to

3    the test.  The test that falls on the plaintiffs.

4         As we do that, if we could go to the next slide,

5    multiple claims, multiple defendants, please.  The great thing

6    about this technology for someone who has organizational

7    challenges like myself, Justin can keep me in line.

8         So this is one of the jury instructions that Judge

9    Daniels will read to you.  It's pretty basic.  Each defendant

10   is entitled to your separate consideration.  The question of

11   whether liability has been proven is personal to each defendant

12   and must be decided by you as to each defendant individually on

13   each claim.

14        That makes sense, right?  That's not rocket science.

15   But I mention it to you now, and I want you to think about the

16   PLO and the PA.  Two defendants, two trials.  Double duty for

17   you.

18        The evidence as to the PLO in this case, first of all,

19   they have got this respondeat superior stuff, and that is the

20   law that applies to holding an employer liable for what an

21   employee does.  In this case, that instruction does not apply

22   to the PLO because there are no employees of the PLO who are

23   alleged to have done these.  The theory the plaintiffs have

24   can't even be responsible for employees.

25        So what did the PLO do?  I know it's -- people hear

1    the word "PLO," and you heard that before and think well that's

2    good or bad, but let's stand back and ask you think about this

3    evidence.  Ask yourself, what did the PLO supposedly do?  Well,

4    they say Yasser Arafat is the head of the PLO.  They put that

5    into evidence.

6          And what else did they put in evidence that somebody

7    senior from the PLO was doing here?  You think about it for a

8    minute.  They talk a lot about all these guys in the PA

9    security forces.  That's the PA.  They talk a lot about the

10   policies.  That's the PA.  So really, where is the PLO

11   evidence?  I think they just want you to treat these two

12   defendants alike.  I think, ladies and gentlemen, that that is

13   not the kind of jurors you are, that you don't judge

14   collectively, you judge individually.  That's why you're here.

15   And think, as we go through these incidents, think, as he's

16   talking for however long he talks, about what is the evidence

17   that is specific as to the PLO in this case.

18         And then we get to the incidents themselves.  And

19   actually maybe before we do that, let's talk about one more

20   thing.  Expert witnesses, let's talk about them for a second,

21   because their liability case, that's Kaufman, Shrenzel and

22   Eviatar.  Kaufman is the guy who moved in the convictions

23   through him.  Eviatar and Shrenzel are the two guys who tried

24   to deliver to you the liability of the PA and the PLO by saying

25   things.

1          And the judge is going to instruct you on expert

2     witnesses.  And one of the instructions will be that in

3     weighing the expert's testimony -- at the bottom of the first

4     paragraph -- you may consider the expert's qualifications, his

5     or her opinions, his or her reasons for testifying, as well as

6     all of the other considerations that ordinarily apply when you

7     are deciding whether or not to believe a witness's testimony.

8          And it's that last part as well as all the other

9     considerations that ordinarily apply that is really important.

10    Because the credibility matters, the credibility of witnesses

11    matters, experts and others.  So that will be the instruction

12    that the judge will give you on expert witnesses.

13         So when it says that you can consider all the other

14    factors, maybe we should look at part of the credibility

15    instruction.  So this is an excerpt from an instruction that

16    the judge will give you on credibility.  And the first part of

17    this says if a witness is shown knowingly to have testified

18    falsely concerning any material matter, you have a right to

19    mistrust such witness testimony in other particulars, and you

20    may reject all of the testimony of that witness or give it such

21    credibility as you may think it deserves.

22         Remember Shrenzel?  Shrenzel had this testimony about

23    how Tawfiq Tirawi was the most wanted man, and if they could

24    have gotten their hands on him, they would have locked him up.

25    Because we said to him:  Tawfiq Tirawi wasn't convicted of

1    anything, was he?  And he had this non-responsive answer.  He

2    didn't just say that's right, he wasn't convicted of anything,

3    he started talking about that he was the most wanted man and we

4    weren't able to get him, but if we could have, we would have.

5           Then you heard from Faraj, said the guy was traveling

6    around freely, meeting with the Israelis on security

7    coordination, discussing issues, traveling abroad, going to

8    Israeli checkpoints, no restrictions on travel.  Shrenzel did

9    not tell you the truth.  Shrenzel exaggerated or intentionally

10   misspoke when he talked about that.  And you can consider that

11   in evaluating all his other evidence.

12          So when they put him on yesterday by video, Shrenzel

13   is up there, he didn't clear that up for you yesterday.  He

14   didn't explain how it was that he falsely claimed to you that

15   Tawfiq Tirawi was the most wanted terrorist or something,

16   Tawfiq Tirawi couldn't be caught.  It wasn't true is what the

17   evidence shows, ladies and gentlemen, and you can consider that

18   in evaluating his testimony.

19          And you also know it wasn't true because the way he

20   answered his questions, because just above that portion -- and

21   I forgot to put it on a slide, but just above, you do not have

22   to accept the testimony of any witness -- excuse me, on the

23   credibility instruction, in addition, you're going to be asked

24   in terms of evaluating the testimony how does the witness --

25   the things you can consider:  Was the witness candid, frank and

1    forthright, or did the witness seem as if he or she was hiding

2    something, being evasive in some way.  Then the judge will say:

3    How did the witness the witness testified on direct examination

4    compare with the way the witness testified on

5    cross-examination?

6         So take Eviatar and Shrenzel.  When they're on direct

7    examination, they respond to every question just the way the

8    person wants it to be responded to, directly, succinctly.  And

9    when they're on cross-examination they're asked a simple

10   question like Tawfiq Tirawi wasn't convicted of these

11   incidents, was he, and they make speeches to try to get things

12   in, to be non-responsive, to change the way they testify, to

13   play games.  When I questioned Eviatar, I could asked him what

14   day it was, and he would have testified that the Palestinian

15   Authority was responsible for everything that ever happened.

16         MR. YALOWITZ:  Objection, not in evidence.

17         THE COURT:  Overruled.

18         MR. ROCHON:  The fact is you know from the way they

19   answered their questions, when I'm standing here talking to

20   that guy, and he's on the witness stand and I asked him a

21   simple question, did he respond the way he did to him, or does

22   he try to make a speech?

23         When Mr. Hill asked Shrenzel questions, did he respond

24   to Mr. Hill the same way he did with Mr. Yalowitz, or did he

25   try to make a speech?  Did he have an interest in the outcome

1    of the case?  You know he did by the way he answered the

2    questions and the fact that he did not tell the truth.

3            When we get to the instructions on liability, the

4    judge -- if we go to the one that begins, "In order to prove,"

5    at the beginning.  When the judge is going to give you some

6    instructions on respondeat superior and agency, he is going

7    to -- Judge Daniels is going to read:  In order to prove that a

8    defendant is liable for a particular claim under the ATA,

9    plaintiffs must demonstrate the involvement of a senior

10   official or other person having duties of such responsibility

11   that his or her conduct may fairly be considered to represent

12   the PLO or PA.

13           I just want to be clear, when I say Judge Daniels is

14   going to read this, it's not like -- this is the kind of thing

15   that lawyers discuss with the Court before closing.  So it's

16   not like a predicting something we don't know about or

17   guessing, it's the kind of thing that we work out with the

18   Court in advance.

19           This is an instruction that is very important.  It

20   applies to all of their theories.  All of their theories.

21   Unless they show you to a preponderance of the evidence that

22   involvement of a senior official or other person having duties

23   of such responsibility that his or her conduct may fairly be

24   considered to represent one of my clients, your verdict is not

25   liable, not liable, not liable, not liable, not liable, not

1    liable, six times.

2              And they don't have that evidence.  Because when you

3    look at the people they say did these things, you're going to

4    know that under respondeat superior theory, which applies only

5    to the PA, that they were not acting as part of their duties

6    within the scope of their employment.

7              And when it comes to anything as to the PLO, you're

8    not going to have anything that shows any of those people

9    involved in these six incidents, and certainly not someone who

10   is a senior official or a person with duties of such

11   responsibility, as this instruction says.  This instruction

12   applies to and will be at the beginning of the instructions on

13   respondeat superior and agency.  It applies to all of their

14   theories.  So when you look at the evidence, you need to be

15   aware of that.

16             And in that regard, let's talk about what the United

17   States of America has said about that.

18             Plaintiffs Exhibit 634.  There is no conclusive

19   evidence that the senior leaderships of the PA or PLO were

20   involved in planning or approving specific acts of violence.

21             Done and dusted.

22             It's only the United States of America.  Eviatar would

23   say believe the IDF instead.  But you can't do that.  There is

24   no conclusive evidence that the senior leaderships of the PA or

25   PLO were involved in planning or approving specific acts of

1    violence.

2              We are here to decide whether or not senior leadership

3    of the PA or PLO or other persons having duties of such

4    responsibility did those things.  So I would suggest to you

5    that no matter what Colonel Eviatar thinks, that the position

6    and investigation and report of the PLOCCA, the United States

7    of America, matters a little bit on that issue, whether Colonel

8    Eviatar likes it or not.

9              I would like to move now -- I will come back to the

10   actual instruction on respondeat superior, but I would like to

11   now discuss with you the evidence that actually came in as to

12   the specific events.

13             So first we'll talk about the incident on

14   January 22nd, 2002 involving Said Ramadan.

15             First of all, as to this incident and the people

16   convicted in it, there are no individuals who match that

17   definition of senior leadership or senior official, as Judge

18   Daniels will instruct you.

19             There is no evidence of any PA equipment being used,

20   of any PA gun being used.  He used a gun, no evidence of it

21   being a PA gun.

22             In fact, the evidence is that Said Ramadan had a

23   personal motive to avenge the death, a friend of his had been

24   killed.  And that's in pretrial Exhibit 362 on page 5:265.

25   Ahmed Barghouti paid for things for him.  And in pretrial

 1  Exhibit 357, page 5:189, it said he paid with his own money,

 2  bought him sneakers or food or something.

 3         There is no evidence that it occurred in a place where

 4  the PA security officials operate because they weren't allowed

 5  to operate in Jerusalem.

 6         There is no evidence that it involved a time of day

 7  when any PA person, low level who was convicted of that, was

 8  even on duty.

 9         There is no evidence that it was directed by anybody

10  from the PA.

11         What they have is a low-level conviction in Israeli

12  court and no evidence that it's within the scope of employment.

13  You might as well take someone who is off duty on their job and

14  does something terrible and say let's hold the employer liable.

15         And the thing they want to latch on to the most is

16  that he was promoted. Said Ramadan had a posthumous promotion.

17  They want to talk about that. And the question you have to ask

18  yourself: Was he promoted because he died, because of how he

19  died, and does it matter? Because is there any evidence Said

20  Ramadan was even thinking about that on the day that he

21  committed this horrific act.

22         In fact, is there any evidence in this case at all as

23  to any of the incidents, any of the people who did them were

24  doing them at the direction or behest of the Palestinian

25  Authority? They want you to infer that from the absence of

1   evidence.  And that's not how it works.

2           I want to move next to the incident on January 27,

3   2002.  We often refer to this as the Wafa Idris incident.  This

4   one I want to take a couple minutes on, because it's very

5   interesting how the evidence was presented to you.  And I use

6   that word loosely, because the way the evidence was presented

7   to you might have given a false impression.

8           So Wafa Idris.  Wafa Idris was not a PA employee.  The

9   guy who was convicted -- she worked for the Red Crescent, which

10  is like the Red Cross over there.  The guy who was convicted is

11  this guy Munzar Noor.  He worked for the Red Crescent, not the

12  PA.  So far, zero for PA.  They have no evidence that you could

13  rely on to say that a PA person was involved whatsoever, let

14  alone a PLO person.  There is no PLO at all.

15          So they put in this statement of this guy Noor, and

16  they're going to talk to you about it, and they're going to say

17  that Idris went to the Mukataa and that's where she got the

18  bomb.  And they want you to decide if she went to the Mukataa

19  and got the bomb there, it must have been a PA person that gave

20  it to her.

21          Let me ask you this, she was there.  She wasn't a PA

22  person.  There's no evidence that only PA people would be

23  there.  So you cannot infer guilt simply because that's where

24  she got the bomb without any evidence that shows you as to from

25  whom or for what or for what purpose or what was said.

1            But there's more.  They put in the conviction of

2     Munzar Noor but not, I suggest to you, the most important part.

3     So if we could go to that conviction, which is 322, and on the

4     third page, I want it really take my time here.

5            This is what the court said when they convicted Munzar

6     Noor.  And what they said was:  At the same time, before we

7     detail the supporting elements found in the defendant's

8     statements and weave them together with the extrinsic evidence

9     supporting the facts in the indictment, it is worth noting that

10    the defendant's admissions in this case gradually came to

11    confirm the accusation.  That is, as the interrogation

12    continued, his statements became more compete and detailed.

13    This may be seen to be a natural development of the

14    interrogation with the subject initially not being willing to

15    admit to all of the suspicions, but as the interrogation

16    develops he reveals many more elements of the truth.  Hence we

17    found it appropriate to reject the defense counsel's request in

18    his summation to specifically adopt the first statement and not

19    the later ones.

20           Wow.  I wonder what his later statement said.  His

21    later statement, 465.  This is, as you will see in your binder,

22    if you take your binder on the incident involving Ms. Idris and

23    you look at his statements, you see two statements in there.

24    And the second and later dated one is 465.

25           What does it say?  Does it say Mukataa?  In the home

1    of blank we sat down.  Later, after she returned to blank's

2    house, later on I was with her at blank's house.  The day

3    before the attack the three of us, blank and Wafa Idris and I

4    met in blank's house.

5         Oh.  That's just the days before the attack.  What

6    about on the day of the attack Wafa Idris was late in arriving

7    and taking the explosive device from.  Wafa Idris should have

8    been at place.  There is a word that is missing there, isn't

9    there?  The word is called Mukataa.

10        The statement that the court found reliable is not the

11   statement that the plaintiffs rely on to ask you to find the PA

12   and the PLO liable for something they did not do.  This

13   despicable act of Wafa Idris and Munzar Noor was not the act of

14   the PA or the PLO.  And the only evidence that they offer to

15   you to say it is is a statement this guy supposedly gave where

16   he referenced supposedly the Mukataa, and from that they ask

17   you to hold the PA and the PLO liable.  If that holds the PA

18   and PLO liable, we didn't need a trial, you could find him

19   liable for every bad thing that ever happened.

20        That, ladies and gentlemen, is their evidence.

21        The only other thing they offer you is they said well,

22   it was an Al Aqsa Martyrs Brigades incident.  Says who?

23   Shrenzel.  Based on what?  Shrenzel said so.  No, I mean what

24   evidence?  No evidence.  It's called Shrenzel said so.  This

25   isn't a Shrenzel said so trial.  We have trials based on

1    evidence not Shrenzel said so.  He offered nothing to say it

2    was Al Aqsa Martyrs Brigades, but frankly that doesn't matter

3    because I don't represent the Al Aqsa Martyrs Brigades.  And my

4    client is not responsible -- neither of my clients are

5    responsible for the Al Aqsa Martyrs Brigade or Brigades or

6    loosely organized cells or whatever they are did or did not do.

7    That's their Sokolow Idris evidence.  And you know what, it's

8    nowhere near enough to hold the PA or PLO liable for this.

9            If you move next to the March 21st, 2002 incident, in

10   which Hashaika was the suicide attacker, you see the same

11   failures of evidence as are similar in the first incident we

12   spoke about.

13           The evidence on this -- we can go to the first of the

14   slides here.  So when you look at the indictment of Mohammed

15   Hashaika -- actually this is from Abdel Karim Aweis.  The

16   defendant and blank convinced Mohammed Hashaika not to believe

17   the Palestinian Authority intelligence officer out of fear that

18   he would hand him over to Israel.

19           Again, you got to stop and think about what that

20   means.  You have this guy Abdel Karim Aweis, who was a PA

21   employee, and he was convicted of this, terrible human being,

22   and he's the one who is working with Hashaika.  And according

23   to the indictment -- this isn't Abdel Karim Aweis, this is the

24   indictment of the guy, the charges of which he was convicted.

25   It says that he and blank convinced him not to believe the

1    Palestinian Authority intelligence officer out of fear he would

2    hand him over to Israel.

3         What does that tell you?  It tells you that the

4    Palestinian intelligence officer they thought would turn him

5    over to Israel.  They want to hold us liable even though the

6    theory of the court against the guy who did it was that he had

7    to hide it from the Palestinian Authority intelligence officer

8    or else he would have turned him over.  That is crazy town,

9    ladies and gentlemen.  To say that we should be held liable

10   even though the evidence against Abdel Karim Aweis was that he

11   was hiding it from the PA intelligence officer.

12        That is a perfect example of how someone can be an

13   employee but not be acting within the scope of their

14   employment.  That's their evidence.

15        You can go to the next slide, please.

16        Moreover, as you already know, this guy Hashaika was

17   originally arrested by PA.  So the guy is under arrest,

18   transferred to Ramallah, imprisoned there, and it says during

19   the invasion into Ramallah he escaped from prison and intended

20   to perform his operations, and people responded to that because

21   Al Aqsa Brigades have taken him from them.  That's his escape.

22   The plaintiffs like to point out that that document has a date

23   on it.  Big deal.  The date is after the event.  They want to

24   suggest there is stuff they made that up and put it in there.

25        You know, ladies and gentlemen, if the Palestinian

1   Authority was making up stuff to put in these GIS files, they

2   would look a lot different.  Right?  I mean they love these GIS

3   files, the plaintiffs.  Every single time there is something

4   bad in there that says said that they did something heroic or

5   some other terrible thing, they think that's the God's truth

6   and you should believe it, and everything in them is true,

7   unless, of course, there is something they don't like, in which

8   case they say it's made up.

9           So I guess the idea is that the Palestinian Authority

10  was going through the files to make stuff up and forgot to take

11  out the bad stuff, including the bad stuff that is in this very

12  file that the plaintiffs also like.  They can't have it both

13  ways.  The evidence of Hashaika escaping is just as good as the

14  other evidence from these GIS files.

15          The next slide, please.

16          Again, the aforementioned escaped during the invasion

17  into Ramallah and intended to perform an operation on behalf of

18  Islamic jihad but Al Aqsa Brigades had taken him.

19          On the incident -- you can go to the final one, or the

20  next one, there's one more there, which would be I think

21  Exhibit 1060.  So the plaintiffs want to rely on this a lot,

22  and this one is 1060, and they want it say that this suggests

23  that Mohammed Hashaika -- this one of that documents of his

24  arrest -- that he was in the Palestinian Islamic jihad.  And

25  they try to make a lot out of the fact that it's to the

F2JTSOK2                    Summation - Mr. Rochon

president, and it's from this guy Tawfiq Tirawi, and because
the letter is closed with the matter is at your Excellency's
discretion, they want to argue that means that they
intentionally let him out.  I know it seems crazy that they
want to argue that by the way someone closes out a letter to
the president, but that is what they want to argue.  They want
to argue that because the letter closes to say the matter is at
your Excellency's discretion, from that fact you should
conclude that they let him out as opposed to the evidence that
shows he escaped.  That's not a basis to conclude that.  That's
how you would close a letter to a boss, at least in the formal
setting like this, to the president.  That's their evidence.

          Even, however, if their theory that Abdel Karim Aweis
got him out, and that's their theory, were true, and even if
you assume that Abdel Karim Aweis got to prison and grabbed
this guy and got him out, you already know from the other
evidence I showed you that Abdel Karim Aweis was acting without
authority, not with authority.  He's just an employee.  He's
not a high-level employee.  He doesn't meet that standard.

          This case turns on Abdel Karim Aweis, who is not of
sufficient authority that you should attribute his actions to
the PA, and certainly not that he was acting within the scope
of his employment in the PA.  And there is in fact evidence in
the plaintiff's own case that he was hiding his activities from
the Palestinian intelligence.

1          So that is their case, in essence, as to Hashaika.

2          Now I would like to turn to the incident from June 19,

3     2002.  This is the incident involving the Mandelkorn incident.

4          And so I thought I would look at their binder,

5     actually, before I get to that.  My colleagues, who are smarter

6     than me, handed me a note and told me what I forgot to do.

7          Could we go to 233, please, and thank you.

8          So this is the memo about Tirawi, and this goes back

9     to the Idris incident, and I forgot to put this up here.  We

10    had the lady testify to that yesterday, Amhah Reehan, the woman

11    who wrote this.  And the testimony on this is as follows,

12    Shrenzel even admitted that this did not show prior knowledge

13    of Tirawi.  Shrenzel himself, the guy who always reads the

14    worst into things.  I could quote you the specific place where

15    he said it.

16         Here's the memo, and in it she says at the night in

17    which it was revealed that the person who carried out the

18    attack was Wafa Idris.  And before anyone claimed

19    responsibility for the attack, Tawfiq Tirawi supposedly did

20    this stuff.

21         Here's where we are on this:  Number one, what was the

22    basis for what is in there?  Gossip.  That's what she said.

23    She wrote it.  Did they ask her any questions on that?  No.

24    Not one question.  Not one challenge to what she said.  She

25    said it was based on gossip.  And that is the unrebutted sole

1    testimony as to the basis for the information in this document.

2    And Mr. Yalowitz chose not to ask her one question about it.

3    And gossip is not evidence, even when it's written down.

4           And in any event, what it says is that before anyone

5    claimed responsibility for the attack, actually does not say

6    before anyone knew that Wafa Idris did it, those are two

7    different things.  The woman said that there was a big

8    gathering in her community where people were talking about it,

9    and this was the gossip out there.  So obviously they knew in

10   her community.  The only thing that this supposedly said is

11   before anyone claimed responsibility for it, that this guy had

12   called the family.  So it does not prove prior knowledge.  And

13   when cross-examined on this by Mr. Hill, this very document

14   cannot provide us with a conclusive final proof of his final

15   knowledge of the attack.  That's Shrenzel.

16          He went on say terrible stuff about Tawfiq Tirawi.

17   This guy was willing to say anything about Tawfiq Tirawi under

18   the sun.  This guy accused Tawfiq Tirawi of stuff although it

19   proved to be false and was demonstrated to be false, and even

20   he said that it did not provide final proof of his prior

21   knowledge of the attack.

22          So if Shrenzel is not willing to go that far, I dare

23   say you ought not be willing to go that far.  But he did not

24   know what you learned from the woman who wrote it.  She took

25   the stand, she took the oath, she told you the circumstances of

F2JTSOK2                    Summation - Mr. Rochon

1    it, unrebutted gossip.  That's the memo about which they made

2    so much.

3           So I was turning, before I went back to that which I

4    forgotten, to the June 19 incident.  They have a binder for

5    each incident, so the June 19 binder, this is for French Hill,

6    Jerusalem.  So you go through this binder, there's no

7    convictions of anybody.

8           In fact, you go through this binder and you look real

9    hard for the date June 19, you won't find it.  There are

10   convictions in here, I'm sorry.  To be fair, there's

11   convictions of like Shubaki and Barghouti that have nothing to

12   do with the June 19 incident, they just threw it in there.  So

13   go through the binder and look at the table of contents and

14   come across it, and got all the IDF reports, you know, these

15   guys like they don't mention the incident, they really like

16   putting the IDF reports in here.  They have got the verdict in

17   the Fuad Shubaki case, got nothing to do with this case, threw

18   in documents about giving money, $600 to three guys, nothing to

19   do with June 19, another document about $800, nothing to do

20   with June 19.  They have got one of these PLOCCA reports.  They

21   threw in the Barghouti conviction, nothing to do with June 19.

22   They went with the Majid Masri conviction, nothing to do with

23   June 19.  They went with, just to be complete, the Nasser Aweis

24   conviction.  The guy is not convicted of this.

25          So where do you find anything about June 19 in this

F2JTSOK2                         Summation - Mr. Rochon

1    binder?  Well, in the martyr file for the guy Awada, who they

2    say did it, you don't find the date June 19.

3              If we could go to that, please.

4              He was martyred on June 18 while executing the

5    Jerusalem Martyrdom Operation.  That's not the day of the

6    incident, that's the day before.  They don't say where this

7    happened.  This one happened on French Hill.  I think there's

8    another slide there.  The next one.

9              So what is in this binder at page 6 of Exhibit 496 is

10   one of those PLOCCA reports.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. ROCHON:  What it says is just after the end of the

2     reporting period, on June 18 and 19, two suicide bombers killed

3     26 Israelis.  And Arafat condemned these.

4          So from that report you know there was an incident on

5     the 18th and an incident on the 19th.  They brought liability

6     against my client for an incident that happened on the 19th and

7     their evidence of it happening shows a martyr file for a guy

8     who says blew himself up on the 18th, not even the day of the

9     Mandelkorn incident.  And that guy wasn't a PA employee.

10          So you have a tragedy, a Palestinian who blew himself

11    up, according to his martyr file, on June 18th in Jerusalem,

12    you have a report from the United States that says something

13    happened on the 18th and 19th, and the only evidence that this

14    guy Awada has anything to do with this case -- Shrenzel said he

15    was sure that the date was wrong in the martyr's file -- is

16    because Shrenzel said so.

17          MR. YALOWITZ:  Objection.

18          THE COURT:  Overruled.

19          MR. ROCHON:  The plaintiffs can't even on that

20    incident establish for sure that the person who they say blew

21    himself up is the right person.  But even if he is, even if

22    this guy Awada, his file is wrong, and in fact he is the person

23    who did this attack on the 19th, what your evidence is that

24    someone who did not work for the Palestinian Authority

25    committed a suicide attack, and Al Aqsa Martyrs Brigade took

1   credit for it, according to the file.  And Shrenzel, of course.

2          That is it.  If you're going to say the PA or PLO is

3   liable for that one, then we didn't need a trial.  We could

4   have just lined up everything that ever happened in this period

5   and say the PA and PLO is liable.  Because you need evidence,

6   not just say-so, and not just Shrenzel.

7          Then you go to the Hebrew University incident.  Maybe

8   the most despicable of all, although you hate to choose because

9   they are all despicable.

10          And before we get there, I want to talk to you a

11   little bit about damages because I told you in opening that

12   during a large part of the trial I wouldn't be jumping up and

13   asking questions, and I actually lived up to it.  Lawyers don't

14   often do that.  So for two weeks we had testimony from

15   psychologists, psychiatrists, doctors, economists, and the

16   victims and their families in these cases.  And in the course

17   of those two weeks I asked one question.

18          And why did I do that?  Of course, I could have asked

19   questions to try to suggest if damages were even overstated or

20   if some witnesses were less credible than others, or some

21   witnesses seemed to be more exaggerated than others.  I didn't

22   do that because I didn't need to.  Because, first of all, you

23   have common sense and you were evaluating that testimony and

24   you could distinguish among them.  And there were parts of that

25   testimony where there wasn't a dry eye in the house, including

F2J8SOK3                    Summation - Mr. Rochon

1   the guy sitting in this chair.  Anybody who has got a mother,

2   father, sister, brother, a child, anyone who wasn't affected by

3   the testimony has lost their heart.  And I haven't lost mine,

4   and I know you haven't lost yours.

5        The Palestinian Authority and PLO condemned those

6   actions, and on their behalf I can tell you that that pain is

7   real.  I am never going to pretend it's not.

8        Now, you want to do something for them.  You are human

9   beings.  You want to do something for them.  If you didn't, I

10  want to do something for them.  But it can't be done by finding

11  a wrong country or political organization liable.  It just

12  can't be done.

13        So the best I can do on behalf of my client was to not

14  ask questions, to make clear that we don't stand for this, that

15  we don't tolerate this, and that it is wrong.

16        Obviously, from our standpoint there should not be

17  liability in this case, and I think that's what the evidence

18  requires.  But if any of you disagree with me, I am just going

19  to rely on your judgment to not overstate, to evaluate

20  critically, to do that.

21        I am not abdicating my responsibility.  I am not

22  trying to abdicate my responsibility on that issue.  I am

23  saying to you, though, the PA and PLO condemn these for their

24  horrific nature, and I am going to ask you to return the right

25  verdict that it's not liable.  And if any of you think

 1    otherwise, I will regret that, but I ask you to use your best

 2    judgment.

 3              I want to talk about the Hebrew University.

 4              I guess there is one other thing on this.  I guess

 5    plaintiffs' counsel can make arguments on that as well.  I

 6    would be shocked if he didn't.  And there is an instruction the

 7    judge is going to give you on sympathy here.

 8              Do you mind pulling that up, Justin?

 9              But in a case like this, we actually have an

10    instruction because it's so human.  The judge will read you an

11    instruction that tries to help give you some guidance on that,

12    but consistent with your own common sense.  It's pretty short.

13    I can read it.

14              So, under your oath as jurors, you are not to be

15    swayed by sympathy.  You are to be guided solely by the

16    evidence in this case.  And the crucial, hard-core question

17    that you must ask yourselves as you sift through the evidence

18    is:  Have the plaintiffs proven their case by a preponderance

19    of the evidence?

20              The reason that's there is to remind you, as you think

21    about the sympathy, that the crucial, hard-core question you

22    must ask yourselves is what you have to deal with here.  It is

23    for you alone to decide whether the plaintiffs have proven

24    their case solely on the evidence and subject to the law.

25              Then this last part is important:  It must be clear to

1  you that once you let fear or prejudice or bias, or what is

2  most important here is sympathy, interfere with your thinking,

3  there is a risk that you will not arrive at a true and just

4  verdict.

5          We asked you to do hard work here.  We asked you to

6  listen to the evidence, to want to hear that painful evidence,

7  and still to do right by the evidence, and that's what that

8  instruction is all about.

9          So with that, I would like to turn, if I could, to the

10  Hebrew University incident.

11          So the Hebrew University incident, as I said, is the

12  most despicable events you can imagine.  This is a bomb in a

13  cafeteria, not a suicide attack, and all of the evidence in the

14  case is that it was done by Hamas.  There is no dispute on

15  that, that Abdullah Barghouti was in Hamas.  And Hamas is not,

16  to put it mildly, the PA or the PLO.  Hamas is not even one of

17  the political parties in the PLO.  And you heard the

18  testimony -- you probably know from your own background -- that

19  Hamas and my clients are at odds.  And that was also the

20  testimony of General Faraj.

21          The plaintiffs' evidence on this is, again, you have

22  to look at it with critical eyes.  So what did do they have?

23  They want to say that Abdullah Barghouti was picked up, and

24  there was some deal for him to get out, and that he was allowed

25  out and that he did this.  And after he got out, that somebody

1   who worked for the PA let him stay in her apartment for a few

2   days.  They will call it giving him shelter or something like

3   that, but the evidence is let him stay in an apartment for a

4   few days.  That's their evidence.

5        What is the basis for their claim?  Well, they say

6   Mosaab Hassan Yousef, that guy on the video, was there and saw

7   that this guy, they were trying to arrest him and they were

8   shooting and they had to make a deal to get him arrested.  So

9   they have the arrest of Abdullah Barghouti.

10       Now, the arrest of Abdullah Barghouti is a sign that

11  the PA was trying to get him arrested even in the face of

12  gunfire.  So having endured being shot at to get him under

13  arrest, the plaintiffs' theory is that they are going to let

14  him out.

15       There is also evidence from General Faraj that he

16  received a report of his escape.  So there is conflicting

17  evidence.

18       The plaintiffs put in evidence from Abdullah

19  Barghouti, ironically, that he was released on August 27, 2001,

20  in one of his custodial statements.  Actually, what he said he

21  was released the day some guy got killed, but yesterday

22  Shrenzel said he was killed August 27, 2001.

23       So on August 27, 2001, this guy was released.  The

24  incident in question happened July 31, 2002, almost a year

25  later.

1          Now, in that period, this individual, the evidence

2   shows that you have, that hasn't been highlighted, was on the

3   run, using false identities, and escaping arrest by the

4   Israelis.  I am going to show you some of that evidence to show

5   you how hard it was to apprehend this guy or keep him in.  The

6   evidence will show you, their evidence, that the period of time

7   in which he was supposedly given shelter was at the end of

8   2001.

9          So the theory is, I guess, he gets out August 27,

10  2001, and at some point late 2001 this guy Ahmed Barghouti

11  let's him stay in a place.

12          Now, where is the evidence of a PA person at a

13  sufficient level to get him out?

14          They want to rely on Mosaab Hassan Yousef, the video

15  of this guy, who says that he is apparently sitting somewhere

16  and by coincidence here is this whole thing.  Supposedly here

17  is Jabril Rajoub talking, in a perfect spot, he overhears this,

18  and he reports it.  And you heard from Majed Faraj that this

19  guy was some Israeli spy, Mosaab Hassan Yousef.  But he is also

20  said to be the son of a Hamas leader.  So I don't know which he

21  was.  Maybe he was both.

22          But his testimony or his deposition, I guess, is to

23  try to take or put some of the blame on the PA for something

24  clearly that Hamas did, this bombing.  The guy whose place he

25  stayed, Ahmed Barghouti, is some low-level guy who was a

 1    driver.  Who was he a driver for?  According to them, Marwan

 2    Barghouti.  Marwan Barghouti shows up again.  Remember, Marwan

 3    Barghouti is not a PA person.  He is just a politician.  So he

 4    is his driver.  He puts him up for a few days.  That's their

 5    case.

 6            I would like to show you some of the various documents

 7    that reflect some of the problems in the plaintiffs' case as to

 8    the Hebrew University incident.

 9            Justin, I bet you have those lined up if I know you.

10            First of all, on Hebrew University survivors, they

11    have got six people who were convicted.  Five of them were not

12    PA people.  The only PA person convicted in connection with the

13    Hebrew University incident is Ahmed Barghouti, this low-level

14    driver.  And a driver cannot create the liability they are

15    trying to give us.

16            So this is the one where he says he got out, August

17    27, 2001.  But just for a second, just realize, their source

18    for him being released as opposed to escape, Abdullah

19    Barghouti.  That guy's word is good.  You want to know some

20    facts about this case, go to Abdullah Barghouti, because he is

21    one good, solid, trustworthy, raise your right hand, you can

22    believe anything he says guy, as opposed to General Faraj, who

23    has not been convicted of killing 75 people, who is not a

24    member of Hamas, who has not destroyed families, and who has

25    come to court and has testified in front of you.  But, no,

1    believe Abdullah Barghouti because he is such a good guy.

2              Next one, please.

3              Then this is regarding his transfer and it's on his

4    release.  This is from Ahmed Barghouti.  What it says:  In late

5    2001, or thereafter, or thereabouts, that he gave shelter.

6              Then if you go to the next slide.

7              At the time set forth, which is late 2001, transferred

8    Abdullah Barghouti.

9              So, first of all, this allegation would be incorrect

10   with the notion that he got out on August 27 because that's not

11   late 2001.  It's not even fall yet.  Then he provided lodging

12   to him in the above-mentioned apartment for several days.

13             So this is either he got out August 27, like Abdullah

14   says, or late 2001, like Ahmed says, you don't know.  And these

15   statements that are brought before you are just, what happens,

16   as you know, these guys are interviewed.  You see on the back

17   Hebrew-language interviews and then translated into English of

18   interviews that you have no reason to believe were conducted in

19   Hebrew in the first place.  And by guys who are currently under

20   interrogation for the terrible things they have done.  The

21   quality of these statements as evidence is sometimes hard to

22   rely on as opposed to an actual witness on the stand telling

23   you about the report he received about the arrest.

24             But Ahmed says this and put him up for a few days.

25             So more Abdullah.  You can either believe him or not.

F2J8SOK3                      Summation - Mr. Rochon

1  In my view, on behalf of the defendants, you should not believe

2  one word Abdullah Barghouti has ever said in his live long

3  life, including the statements the plaintiffs want to rely on.

4  What in the world are we doing when these quadruple layers of

5  foreign-language interviews of some of the worst people in the

6  world are being brought in, presented to you in writing,

7  supposedly to establish my client's liability.  Their evidence

8  of this guy's supposed release comes from principally the bad

9  guys.

10          But if you're going to look at Abdullah Barghouti's

11  statement, he says:  That was in the period in which he trained

12  me in the preparation of explosive and explosive devices after

13  I left the Preventive Security prison.  So that would be

14  Abdullah suggesting that his main training on explosives

15  happened after he got out, not before.

16          They like to say, as they did in opening and probably

17  will in closing, that letting him out was to let out Hamas's

18  big bomb maker.  If you believe Abdullah, he got a significant

19  amount of his training after he got out, not before.  I am not

20  saying you should believe this guy.  But if you're going to

21  believe some of his stuff, you can't pick and choose just the

22  parts they like.

23          Here is his indictment.  Now this guy Abdullah

24  Barghouti, you need to know what kind of slippery guy he is

25  because they want you to rely on his word.  They want you to

1    find my client liable based on what Abdullah Barghouti said.

2    That is crazy when you think about it.  A Hamas guy who killed

3    all those people.  Hamas is antithetical to my client.  But he

4    had a forged identity card bearing the name of blank when he

5    was examined by Israeli Defense Forces soldiers in Ramallah or

6    thereabouts with an intent to deceive them.  That's one of the

7    things he got convicted of.

8           IDF had an observation post on the rooftop of the

9    house in which he lived.

10          They checked my identity card, and I gave them the

11   identity card in the name of Ashraf Allabad with my photograph.

12          So in this case, they want to hold us liable for the

13   guy having three days in an apartment with Ahmed Barghouti.

14   Meanwhile, he is fooling IDF people who are on the roof of his

15   house.

16          More about his identity card.

17          I told you I was wanted by Israel since the day of the

18   attack with the beer can, so I needed a forged identity card.

19          This guy is running amuck, fooling people, lying to

20   people.  You can't rely on him.  But if you do, you have got to

21   believe it all, I guess, because this is their main witness for

22   my client's liability, Abdullah Barghouti.

23          There were two instances where I was stopped for

24   checking by Israeli Defense Forces soldiers.  I showed them the

25   identity card and they let me go.

1            If those had been Palestinian Authority police

2      officers that he said that about, what do you think he would

3      say?  The Palestinian police authority had him and they let him

4      go.  Hold the Palestinian Authority liable because they had him

5      and they let him go.  But it wasn't the Palestinian Authority

6      that had him so we don't care about that.

7            Move on, please.

8            Then how did he do it?  The explosives were purchased

9      by the defendant himself, that's Barghouti, and by his fellow

10     members of the Hamas organization.  The above-mentioned

11     explosives were purchased by using Hamas money.

12           So the equipment he used to kill those people, Hamas.

13     The money, Hamas.  Trained, according to him.  There is not a

14     suggestion that he was trained by the PA.

15           Out running around with his fake ID fooling IDF

16     soldiers.  But he is not going to fool you.  You cannot hold

17     the PA and PLO liable for what Abdullah Barghouti did because

18     of what Abdullah Barghouti said.

19           See if there is another one, Justin.

20           THE COURT:  Did you want to take a break, Mr. Rochon?

21           MR. ROCHON:  That will be fine.  I think I do have a

22     little bit more.

23           THE COURT:  Ladies and gentlemen, don't discuss the

24     case.  Keep an open mind until I finally give the case to you.

25           I am going to bring you back in promptly at noon.

1          (Jury exits courtroom)

2          THE COURT:  Let's take a ten-minute break.

3          (Recess)

4          MR. YALOWITZ:  I have a brief application.

5          First of all, Mr. Rochon asked the jurors to think in

6    their own lives what would happen if somebody came and gave

7    testimony that was biased.  That's a violation of the golden

8    rule.  I want him to either be sat down for violating that rule

9    or I want the leeway to make the same kinds of arguments to

10   this jury.

11         THE COURT:  I am not sure what kind of argument you

12   want to make.

13         MR. YALOWITZ:  If I say to this jury, think in your

14   own lives how you would feel, what would you do if this, I

15   think I am entitled to do that based on Mr. Rochon opening the

16   door.

17         THE COURT:  You objected several times.  I don't

18   remember you objecting to that.

19         MR. YALOWITZ:  I don't think I objected at that

20   moment.

21         THE COURT:  No, you didn't.

22         MR. YALOWITZ:  The second problem I have is when he

23   was talking about the police magazines, he said these were the

24   best they could come up with.  You and I know that he kept out

25   really, really powerful and direct incitement of violence under

1   403.  And for him to say to the jury and leave the jury with

2   the misimpression that I scoured these magazines and this was

3   all there was is incorrect.

4          THE COURT:  That's not the way I heard him say it nor

5   the way I interpreted it.  I may have even interpreted it

6   incorrectly, but I interpreted it that you went through those

7   magazines and none of those magazines provided any evidence

8   with regard to these particular six incidents.  That's what I

9   remember.

10         MR. YALOWITZ:  He said that and I didn't have a

11  problem with that.

12         Then he went on to read from 175 and talk about the

13  substance of 175.  Then he said this is the best they can come

14  up with.  And that I have a problem with.

15         THE COURT:  I don't remember a specific objection to

16  that.

17         MR. YALOWITZ:  I did object to that.

18         THE COURT:  To that particular statement?

19         MR. YALOWITZ:  I did.

20         THE COURT:  What do you want to do?

21         MR. YALOWITZ:  I don't know how we cure it at this

22  point.  Maybe we let in one example that's worse, like 201

23  which we have talked about quite a bit.

24         THE COURT:  I am going to deny that application

25  because you're using two different definitions of worse.  He is

 1   talking about whether or not it is strong or weak evidence of

 2   their participation in these events.  You're talking about does

 3   it show some more inflammatory statement.  I think those are

 4   two separate issues.  I don't think he was commenting on that

 5   issue.

 6              MR. YALOWITZ:  I understand that.

 7              THE COURT:  If you have other evidence in this case

 8   that you believe is stronger evidence than that in the sense

 9   that it points more directly to the PA's or PLO's involvement

10   in the terrorist acts at issue, then you can reference it in

11   summation.  But that was not the way that I understood the

12   nature of the argument.

13              MR. YALOWITZ:  I understand your ruling.

14              The third one, and this one I feel really strongly

15   about.  He spent a long time trying to sow confusion about June

16   18 and 19 and one was a Hamas and one was an Al Aqsa Brigade

17   attack.  I am sure you remember I wanted not to give to the

18   jury to take back, but I wanted to read to the jury that chart

19   in order to clear up which date was June 18 and which date was

20   June 19.

21              The defendants successfully kept that out.  In my view

22   I think that was error.  It might have been harmless error at

23   the time, but now that he has in closing suggested that the

24   June 18 attack is the attack which was the Al Aqsa attack and

25   the June 19 was the Hamas attack, we need to clear that up

F2J8SOK3                   Summation - Mr. Rochon

 1    other than simply by the testimony which we have.  Because the

 2    testimony is based on a very reliable source which we were not

 3    allowed to put in evidence.

 4            THE COURT:  Well, that's not my recollection of how

 5    that occurred.  I don't have any recollection of my precluding

 6    you from attempting to clear up that issue if you thought that

 7    issue needed clarification.

 8            My specific recollection of that issue, and I may be

 9    confusing it with another, is you simply wanted to offer a

10    document into evidence in which no foundation had been laid to

11    offer that evidence.  And then you said, oh, I don't want to

12    offer it in evidence, I just want to show it to the jury.  My

13    position was consistent with the rule, that, no, you can't just

14    show stuff to the jury.  Things that get before the jury are

15    things that are in evidence.

16            As a matter of fact, I have to back up as I am talking

17    because I am remembering now.  You specifically said you did

18    not want to offer it into evidence.  My recollection is you

19    just wanted to show it to the jury.

20            Now, if you want to go back to the transcript and find

21    that specifically and cite me to it.  But, clearly, I have no

22    recollection, and I am sure that I did not say anything or rule

23    in any way that would have precluded you from offering either

24    testimony or admit into evidence any exhibits with regard to

25    that issue.  I do not have any recollection, if that's what

1    you're saying, that somehow I limited your questioning on that

2    issue or I would not allow you to offer an admissible exhibit.

3            MR. YALOWITZ:  I am not sure it's going to change your

4    views, but let me tell you what my recollection is.  I don't

5    have the transcript handy, but I have a clear recollection

6    about it because we had a discussion about it.

7            I wanted to offer the information in that chart under

8    803(18), and under 803(18) it does not go back to the jury, it

9    does not go on the screen.  It is read to the jury.  So that

10   was my proffer.  Not to send it back but to read it to the

11   jury.  I know we had a discussion about that.

12           THE COURT:  You wanted to do that under which rule?

13           MR. YALOWITZ:  803(18).

14           THE COURT:  As what?

15           MR. YALOWITZ:  As facts -- I forget the exact

16   phrasing.

17           MR. ROCHON:  Learned treatise.

18           MR. YALOWITZ:  Learned treatise.  Periodicals, reports

19   or learned treatise on which an expert reasonably relies.

20           THE COURT:  But that doesn't relieve you of the

21   obligation to lay that foundation.  And you did not lay that

22   foundation.  And I did not preclude you from doing so.

23           You didn't say you wanted to offer it at all.  I will

24   look at the rule and you can cite to the transcript.  But the

25   bottom line is, I don't think his argument has opened the door

 1    to any further evidence, and I don't know what else you want me

 2    to do other than you addressing that issue.

 3              I can only assume, given the fact that that issue

 4    arose, that both sides did what they thought was appropriate to

 5    make clear about the dates.  I don't think I restricted you in

 6    any manner with regard to any testimony with regard to the

 7    date, whether or not this was or wasn't the same incident.  If

 8    you want me to, I can look at the exhibit and look at the

 9    transcript, but I am not sure that you proposed any remedy that

10    I would have considered to give you at this point in time,

11    other than you responding in whatever manner you think is

12    appropriate to his argument about what this evidence really

13    does show.

14              MR. YALOWITZ:  Let me be very clear.  I understand the

15    rule and I don't want to debate it.  We can look at the

16    transcript.  We can both look at the transcript at lunch.  I

17    understand the ruling.  I don't want to debate it.

18              The cure that I am proposing, and it may be that you

19    don't want to do it and we can just move on, the cure I am

20    proposing is for me to be allowed to reference and read from

21    that chart in closing.  You can consider that and you may

22    conclude it's not a necessary remedy or appropriate remedy, but

23    you may think about --

24              THE COURT:  I have to look back at the rule because

25    I'm not even sure you cited the rule appropriately.  I don't

1    think the rule is that you can show things to the jury under

2    that rule even though they are not in evidence.  I think it is

3    a rule of admissibility of evidence and if you want to

4    establish it, you have to follow the procedures and offer it in

5    evidence and admit it in evidence before it can be shown to the

6    jury.

7         I asked you whether you wanted to admit it in evidence

8    and you said no, is my recollection.  You said, all I want to

9    do is read it, I don't want them to see the whole document.

10   Well, you can't do that.

11        MR. YALOWITZ:  You and I are remembering the

12   conversation the same.  So we don't have a disagreement about

13   the facts.  You have to read the rule, reflect on my request.

14   If you deny my request, we will move on.

15        THE COURT:  I can only give it further consideration

16   if you can cite me the transcript so I can look at the

17   transcript.

18        MR. YALOWITZ:  We will give you a copy of the chart

19   and we will find a page of the transcript.

20        THE COURT:  Mr. Rochon, how much more time do you

21   think you have?

22        MR. ROCHON:  My estimates of time have been shown to

23   be sorely inadequate, as you predicted they would be.  Having

24   said that, I think 20, 25 minutes tops.  Before lunch.

25        THE COURT:  Hopefully, by the time you finish I will

1      get a note that the lunch has arrived and we can send them in

2      and have lunch before we start with the plaintiffs' summation.

3              Let's get the jury.

4              MR. YALOWITZ:  If it will help Mr. Rochon finish

5      faster, given the hour, I am not going to try to slip in and

6      start.  If he only goes another ten minutes, that's fine.

7              THE COURT:  I don't want to waste their time.  Let's

8      just see when lunch arrives.

9              Let's get the jury, please.

10             (Jury present)

11             THE COURT:  Mr. Rochon.

12             MR. ROCHON:  Thank you, your Honor.

13             Ladies and gentlemen, good afternoon.  Just to

14     alleviate any concerns, I am going to be finishing before

15     lunch, and that means it's going to be about 20, 25 minutes

16     maybe.

17             You probably have not wasted as much time as I have

18     watching ESPN.  There is a show, a guy named Tony Kornheiser

19     and a guy named Michael Wilbon on Pardon the Interruption and

20     after they finish the show, at the end there is always a guy

21     who comes out to explain all of the mistakes they have made.

22             My colleague, I won't say which one, down at the end

23     has pointed out that I might have said in the Hebrew University

24     incident whether or not a PA person was convicted, and, in

25     fact, no PA person was convicted there.  Ahmed Barghouti, his

1    conviction was only for allegedly sheltering Abdullah

2    Barghouti.  So if I said that there was a PA person convicted

3    on that one, I was wrong.  It wasn't the person at the end.  It

4    was that guy right there.

5           So, ladies and gentlemen, the next incident and last

6    of the six is the Goldberg incident on January 29, 2004.  I am

7    sure you remember the incident and the testimony very well.

8           As to that, ladies and gentlemen, it's also the case

9    that the person who did this was someone named Ali Ja'ara.  And

10   as is the case with all of these incidents, there is either no

11   evidence of why the individuals did it or there is evidence of

12   motivations other than anything to do with the PA.

13          So, Justin, if you would go to the next slide.

14          In this one, the conviction of Hilmi Hamash, it says:

15   They heard that blank was looking for a person who was prepared

16   to commit suicide and introduced him to Ali Ja'ara from whom he

17   heard was having a bad life and was interested in carrying out

18   a suicide attack.  So this guy had a bad life.  In the files

19   you will see as to Wafa Idris problems in her personal life.

20   And in the Hashaika file you will hear there is retaliation for

21   something that happened.

22          The important point is that there is no evidence of

23   the motivations you need to further the PA's activities.  There

24   is no evidence of this being something they did for those kinds

25   of reasons.  What they did, they did for their own reasons.

1    Despicable, selfish, but not the PA's.

2            Furthermore, on the Goldberg incident, as to -- this

3    is the last one.  It tells you again something we saw in one of

4    the other convictions.  If you can go to the next slide.

5            This is the conviction of Hilmi Hamash.  It says that

6    as to this guy Hamash, who knew prior to the commission of the

7    attack of the intent to execute it, that he also covered up for

8    the suicide terrorist at their joint workplace at the

9    Palestinian Authority.

10           As to this guy Ja'ara, the evidence is in fact that

11   Ja'ara had lost his job beforehand and so he was not a member

12   of the PA as of the date of the attack.

13           The point that I am trying to make to you is what does

14   the conviction of Hamash reflect?

15           If you go to the next slide.

16           It says:  He not only did not sever himself from the

17   conspiracy, but could also have prevented the outcome of the

18   attack if he had reported the reason for the absence of Ali

19   Ja'ara from the morning parade to his commanders in the

20   Palestinian Authority.

21           Again, when you see this, you have to stop and think

22   for a second as to what do they mean.  This is telling you that

23   in the eyes of the court that convicted Hilmi Hamash, he was

24   convicted because they knew if he had reported this to his

25   superiors at the Palestinian Authority, the act would not have

1    happened.  It is very hard to conclude that the Palestinian

2    Authority is legally responsible for something that they would

3    have stopped if they had been made known of it.

4           The conviction of the Israeli court of this individual

5    shows that in the eyes of that military tribunal his commanders

6    in the Palestinian Authority would have stopped the attack if

7    Hamash had brought it to their attention.  That is evidence

8    that is far more direct of what the PA's activities were, of

9    whether or not these things were within the scope of employment

10   and whether you can hold the PA liable.

11          It's similar to the other evidence I talked about

12   earlier in my closing argument that shows the same thing.

13          So, ladies and gentlemen, as to these six attacks, the

14   evidence I think, as I have discussed it with you, does not tie

15   the PA to them or the PLO to them.

16          I would like to discuss a couple of things with you

17   because I know Mr. Yalowitz after lunch is going to have the

18   opportunity to speak to you and I don't get to speak to you

19   again.  The way this works, I go, he goes, the judge goes and

20   then you go.

21          I think I ended my opening statement by pointing out

22   that it's your voice, not mine or Mr. Yalowitz's, that matters

23   in the end.  Your voice that eventually speaks as to what is

24   going to happen here.

25          As Mr. Yalowitz speaks, because I don't get to speak

1   again, I would like you to ask you to consider some things

2   because I know that there are things that they like in the

3   documents they want to talk about to try to undermine the

4   position of the PA.  That's his job.

5         For instance, they want to point to statements in GIS

6   files that say someone was of good morals.  The statements and

7   forms about promotions and so on.  They want to take the

8   bureaucratic forms and try to use them to suggest, as you think

9   about it, bad things about the PA, but when you analyze it

10  carefully, that don't go to the attacks at issue.  Because what

11  is said about these people in the file don't show why they did

12  what they did or how they did what they did.

13        the evidence as to why these people write these things

14  in their files as to their status, it's clear that these

15  individuals, who are incarcerated and they are being evaluated

16  by the intelligence service, they are evaluating them from the

17  standpoint of an intelligence service.  And as to a

18  intelligence service, it makes sense that they would look at

19  whether or not they could be subject to influence by a third

20  party.

21        MR. YALOWITZ:  Objection.  Not in evidence.

22        THE COURT:  Overruled.  I already indicated to the

23  jury what the lawyers say is not evidence.

24        MR. ROCHON:  As to the statements written by

25  bureaucrats in files, in connection with some large

1    bureaucratic operation to pay benefits that are established

2    policy of the PA and PLO, a statement made by some individual

3    as to the conduct or their actions cannot after the fact create

4    liability on the PA for what they did.

5            The issue in this trial should not be that kind of

6    generic statements in files.  It should be, is there evidence

7    that ties the PA or the PLO to these specific attacks?  As he

8    argues and as he says bad things about my clients, I would ask

9    you to ask yourself how did that relate to this incident, that

10   incident, that incident.  Because that is what we are here to

11   do, ladies and gentlemen.

12           The court has prepared for you a verdict form and I

13   would just like to put up for a second.  If you can start with

14   the first count.

15           So the court has a verdict form and on the screen you

16   see the January 22, 2002 shooting.  And as to each of the

17   incidents the plaintiffs will offer you their view as to the

18   evidence.  They may offer their view as to whatever damages

19   they claim.  But the court is going to give you the theories

20   that are available for each of the incidents.

21           As to this first one, the January 22nd, the one

22   involving Said Ramadan, the first question is whether the PLO

23   knowingly provided material support or resources.  As I have

24   discussed with you, the evidence of the PLO doing so is nil.

25           Then they will ask if the PA is liable for the same,

1  and the same analysis.

2           As for the responsibility of any of their employees,

3  remember the first instruction, the short one I read to you

4  that applies to the scope of employment as well as material

5  support that requires it to involve the actions of an official

6  at a higher level.

7           Then the second incident is the January 27, 2002 Jaffa

8  Road incident.  Again, ladies and gentlemen, it's the same

9  three questions.  I won't repeat each of them for you.  But

10  it's the same three questions.

11           When it comes to the third question about scope of

12  employment, where they try to rely on the act of a PA employee,

13  note you can only find liability if that person was acting

14  within the scope of his employment and in furtherance of the

15  activities of the PA.  And you know from this evidence that

16  these individuals, employees may they be, did not do so.

17           If you go to the third incident, the King George

18  Street bombing, again, this is the one that we talked about

19  involving Hashaika.  Again, it's the same three questions and

20  it's the same three answers.

21           Then when we get to the June 19 incident, that's the

22  French Hill one, the Mandelkorn incident.  You will see that

23  you're asked an additional question because there is an issue

24  in this case that involves -- this is after the Al Aqsa Martyrs

25  Brigades had been designated as an FTO by the United States.

1    So the questions are slightly different, but the answers are

2    the same.  Because the evidence in that one, over all of them

3    maybe, shows not only no involvement here, it is absolutely

4    unclear of any -- they are simply a non-PA person who did it.

5    And if he did it -- maybe they have the date wrong and they

6    can't even say when it happened.

7                MR. YALOWITZ:  Objection.

8                THE COURT:  Overruled.

9                MR. ROCHON:  Then if you go to Hebrew University

10   bombing, you can get more questions.  On the Hebrew University,

11   that's the first page.

12               If you go to the next page, Justin.

13               You will see on that one you have seven questions.

14   The fact that you have seven questions does not mean there is

15   more evidence.  It's just a matter of where the law requires

16   more answers to questions.  But if you look at them -- go to

17   the prior page -- as to the first question:  Did the PLO

18   provide material support?  That's the Hamas incident where

19   there is no evidence of the PLO providing anything.

20               Is the PA liable for providing material support?  The

21   only theory they have is, I guess, Ahmed Barghouti letting him

22   stay in an apartment for a few days, or their theory will be

23   that they let him out, even though the evidence is conflicting

24   on that and their main source for it is Abdullah Barghouti.  In

25   any event, whoever let him out certainly was not acting within

1    the scope of their employment or the authority of the PA.

2             Number three talks about whether an employee of the

3    PA, acting within the scope of their employment in furtherance,

4    provided material support or resources in reparation.  Now they

5    are focusing on an employee of the PA.  No PA employee

6    convicted in that incident.  The only possible connection that

7    Barghouti got convicted for letting this guy stay in the

8    apartment for three days, almost seven or eight months before

9    the incident occurred.

10            Then if you go to the next page, this gets more

11   complicated because you have these Hamas issues.  So the

12   question is, because Hamas was a foreign terrorist

13   organization, whether either the PLO or the PA provided

14   assistance to Hamas.  So that's what those are.

15            But as to each of these, the question, did they give

16   something to Hamas?  No.  It has to relate to the attack.  In

17   each of these, ladies and gentlemen, the evidence must tie to

18   an attack, not just having something to do with Hamas.

19            Then the last two the plaintiffs have:  Did someone

20   from the PLO harbor or conceal a person who the PLO knew or had

21   reasonable grounds to believe.  Well, there is zero.  I guess

22   this relates to, in theory, the apartment this guy stayed in,

23   but there is no PLO hold there, or letting him out, there is no

24   PLO hold there.

25            Then the same question as to the PA supposedly,

1    harboring or concealing a person that the PA knew or had

2    reasonable grounds to believe committed or was about to commit

3    this attack.  Notice that each of these questions, each of the

4    questions formulated by the court in the verdict form has the

5    words at the end "this attack."

6         You go through your verdict form when you go back to

7    deliberate and you will see every single question ends with the

8    words "this attack."  That's because we are not here to make

9    general decisions about did the PA do something good or bad.

10   It's just like I said in the beginning of my closing, it is

11   about these six incidents.

12         Justin, just for clarity, if we go to the last one.

13         That again, ladies and gentlemen, this one has a total

14   of five questions.  It follows sort of the same pattern except

15   there are no Hamas issues here.  I won't go through each one of

16   them with you except to say that the analysis on each of these

17   is that the evidence must relate to the particular attack, and

18   there is a shortfall there.

19         So that's why I ask you when you hear plaintiffs'

20   counsel talk in his closing, make sure he is not trying to

21   convince you based on some general bad feeling about my client,

22   a dislike for its policies.  It's got to relate to these

23   attacks individually.

24         Finally, ladies and gentlemen, as far as the law,

25   there is an instruction on respondeat superior that the judge

1   will give you.

2           So this is the instruction that goes to when you can

3   hold an entity liable for what its employees do.  Because your

4   common sense tells you that you can't just say because someone

5   was employed somewhere that the company they work for is liable

6   for everything they do.

7           So what this tells you is that an employer is

8   responsible for the acts of the employee if it's in furtherance

9   of the activities of the employer, and is within the scope of

10  the employee's authority.

11          The instruction goes on to say about the factors that

12  you can consider.  That's towards the bottom.  The judge will

13  give you guidance as to when you can determine an employee is

14  acting within the furtherance of the PA activities and within

15  the scope of his authority.  Understand, this has nothing to do

16  with the PLO.  This is an instruction only as to the PA.

17          Here is what you can consider.  You may include, the

18  connection between the time place and occasion for the act.  So

19  none of these employees were engaged in any of these alleged

20  acts.  There is no evidence while they were working, in the

21  place where they worked.  It wasn't part of their duties.  The

22  activities occurred outside where the PA even operated.  And

23  there is no evidence of using anything from the PA to do it.

24  These are just employees on their own doing things.

25          You talk about the history and relationship between

F2J8SOK3                    Summation - Mr. Rochon

1   the PA and its employees spelled out in actual practice.  And

2   there, while the plaintiffs want to talk generally about the PA

3   and say bad things about the PA, as to these acts and these

4   employees is where the evidence falls short.  So they don't

5   talk about that often.

6           The extent from normal methods of performance and

7   whether the specific act was one that the PA could reasonably

8   have anticipated.  And here you have evidence these people were

9   hiding this from the PA.  And clearly not within the scope of

10  their PA activities.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. ROCHON:  So if you find that employee caused

2     injury while acting within the scope of his authority and in

3     furtherance of the PA's activities, then the PA is legally

4     responsible.

5          Now the instruction does say that -- Mr. Yalowitz will

6     undoubtedly talk about this language -- even though you find

7     that the PA as the employer specifically instructed the

8     employee not to perform the bombings or shootings that are at

9     issue, if you find it was done in furtherance of the employer's

10    activities and was reasonably foreseeable, you may find it was

11    within the scope of the authority.

12         But then the instruction concludes on the next page,

13    it is not sufficient that the employee was simply engaged in

14    the employer's service at the time of the incident giving rise

15    to the action.  And I have been telling you that since we first

16    met six weeks ago.  The test is whether the employee's act was

17    in furtherance of the activities and was incident to the

18    performance of duties entrusted to the employee.  These acts

19    were not incident to the performance of duties entrusted to the

20    employees.

21         Ladies and gentlemen, the instruction on whether you

22    can hold an entity liable for what its employees do will give

23    you clear guidance that the PA cannot be held liable for what

24    the employees did on their own.

25         So ladies and gentlemen, thank you so much.  You have

1    been a wonderful jury to be in front of.  I know at times you

2    may feel we used a lot of time and maybe we it could have been

3    done more briefly.  I like to the blame the other side for

4    that, I know they want to blame me.  It doesn't matter.  I know

5    that you will carry out your duties in the highest possible

6    manner, and I know that when you speak at the end of all your

7    deliberations that you will follow the judge's instructions,

8    you will consider evidence, and you will do something that is

9    hard.  Because the temptation is to help the people is there,

10   but the evidence doesn't support holding the PA or PLO

11   responsible for what the bad guys did, and holding them

12   responsible when the evidence doesn't support it would be the

13   wrong thing.

14            I ask, as you think about your verdict, to think about

15   how you will feel about it --

16            MR. YALOWITZ:  Objection.

17            MR. ROCHON:  -- in ten years looking back at this

18   case.

19            THE COURT:  Overruled.

20            MR. ROCHON:  Once the dust clears, once the evidence

21   is closed, once you think about it, think about how you would

22   feel about it if, on this evidence, the PA or the PLO was held

23   liable for things that the evidence shows they should not be

24   held responsible for what others did.

25            When you think about that and you think about the

1   evidence in this case, it is such a challenge that I am glad we

2   took such time to choose you, and I'm glad you took such time

3   to serve here.  And I thank you in advance for your service,

4   your verdict, and the voice with which you will speak at the

5   end of this case that the PA and PLO are not liable for what

6   happened here.  Thank you so much.

7                THE COURT:  Ladies and gentlemen, this is what we're

8   going to do, I ordered your lunch for 12:30, so I'm hopeful

9   it's here or close to arrival.  So we'll take a break.  I will

10  give you a shorter lunch break and have you eat in the jury

11  room so we can come back quickly and continue with the

12  summation, the summation for the plaintiffs.

13               What I'm going to say -- I will plan on bringing you

14  out at 1:20.  So hopefully your lunch is here.  If your lunch

15  is little delayed I may give you a little more time to eat

16  lunch, but hopefully within that time we could be prepared to

17  continue and get the other summation in, and I will instruct

18  you on the law and maybe have an opportunity to have you begin

19  your deliberations sometime this afternoon.

20               So don't discuss the case, keep an open mind until I

21  finally give the case to you.  I will see you at 1:20.

22               (Jury not present)

23               THE COURT:  Are we prepared to have lunch?  Have a

24  quick lunch and we'll start back up at 1:20 with your

25  summations.

F2JTSOK4

1          MR. YALOWITZ:  That's great, your Honor.  Just for

2     your convenience, if you're still reflecting on that

3     conversation we had, we're looking for the page of the

4     transcript, but I will give you the chart.  And what I was

5     talking about is entries 59 and 60, and you can look at them

6     and reflect on it, and we have had -- we don't need to discuss

7     it any further unless you have questions.

8          THE COURT:  If you find the transcript page, why don't

9     you call chambers and just give us that over lunch, and I will

10    take a quick look at that time.

11         MR. YALOWITZ:  And I know you know the rule.

12         (Luncheon recess taken)

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

F2JTSOK4

<pre>
 1                      AFTERNOON SESSION

 2                         (1:20 p.m.)

 3          (Jury not present)

 4          THE COURT:  Mr. Yalowitz, are you ready for your

 5    summation?

 6          MR. YALOWITZ:  Yes, sir, I hope to be.

 7          THE COURT:  Then let's get the jury.

 8          MR. YALOWITZ:  Did you want to address the issue

 9    further?

10          THE COURT:  No, at this point you can respond based on

11    the evidence.  But I still have it.  I'm looking at it.  I want

12    to go back to the transcript to orient myself, but don't think

13    my position is different.

14          MR. YALOWITZ:  I wanted to make sure you were aware of

15    it.

16          THE COURT:  Thank you.

17          MR. YALOWITZ:  Your Honor, may I provide copies of the

18    index cards to leave them on the seats for the jury before they

19    come in?

20          MR. ROCHON:  If he wants to leave it on the seats, I

21    have no problem with that.

22          MR. YALOWITZ:  I think that he doesn't want me handing

23    things to the jury during closing.

24          THE COURT:  Just give it to my clerk.

25          MR. ROCHON:  Judge, I can see counsel is going to use
</pre>

1   some slides, and obviously he can present his closing as he

2   sees fit.  I only used evidence, not any slides.

3           THE COURT:  I assume that's what they will use, too.

4           MR. YALOWITZ:  No, I have some commentary, but it's

5   very light.  It's not anything I wouldn't be saying,

6   commenting.

7           MR. ROCHON:  I haven't seen them.  If I need to

8   object, I will, but it's not like I have seen them before, if I

9   do object.

10          THE COURT:  Hopefully it won't be anything of issue.

11          MR. YALOWITZ:  I don't have anything planned that I

12   expect to draw an objection.

13          THE COURT:  That's always useful.

14          Then let's get the jury in.  How long do you estimate

15   at this point, Mr. Yalowitz?

16          MR. YALOWITZ:  Two to three hours.  And if you would

17   like a break -- well, I think we should break.

18          THE COURT:  If you want a break tell me.  About an

19   hour, hour and a half.

20          MR. YALOWITZ:  Okay.

21          (Jury present)

22          THE COURT:  Mr. Yalowitz.

23          MR. YALOWITZ:  Thank you, your Honor.

24          Ladies and gentlemen, thank you.  Thank you for your

25   service in this case.  There are four things that our country

1    can ask us to do.  Ask to us pay our taxes.  We have do that.

2    Our country asks us to vote.  We don't have to do that, but we

3    should do that.  Our country can ask us to serve in the

4    military.  We have no choice about that, and there are those

5    who serve with honor.  And our country can ask us to serve on a

6    jury, and that is what our country asked of you.  And ladies

7    and gentlemen, you have served exemplary service on this jury.

8    I think that may be the only thing that the plaintiffs and the

9    defendants will agree on in these closings, but I will tell you

10   on behalf of my families who came here seeking justice, we

11   thank you.

12        This case is about ten American families who were

13   going about their ordinary lives until one day when everything

14   changed.  Shmuel Waldman and Shayna Gould were teenage kids, 19

15   and 20 years old, waiting on a bus.  Shmuel and his wife Henna

16   are here in the courtroom.  Shayna and her sister Jessica are

17   here in the courtroom.

18        The Sokolow family were buying a pair of shoes for

19   their twelve year old.  Mark and Rena are here today.

20        Alan Bauer was walking home from work holding the hand

21   of his seven year old child.  Alan has come back from Jerusalem

22   to be here today.

23        Rabbi Mandelkorn was waiting at home for his boy to

24   return from a school trip by bus when he got the call that

25   nothing would ever be the same in his life.  The rabbi is here

F2JTSOK4                    Summation - Mr. Yalowitz

1    today.

2         Diane Carter, Janice Coulter, Ben Blutstein, David

3    Gritz, they were having lunch in a university cafeteria.  Their

4    lives were ended that day because they choose to eat lunch.

5    Diane Coulter Miller is here today to stand up for her sister,

6    and Larry Carter is here to stand up for his daughter.

7         And Scotty Goldberg was riding a bus to work.  At 20

8    minutes to nine he was on the phone with his wife, and eight

9    minutes later he was dead.  His wife and his daughter Esther,

10   Karen and Esther are here today to stand up for their husband

11   and their father.

12        We have been together all these weeks in this

13   courtroom because the plaintiffs are citizens of the United

14   States of America.  Judge Daniels will instruct you on the law,

15   and here is some of what he is going to tell you about the

16   Anti-Terrorism Act.  The Anti-Terrorism Act provides a remedy

17   for U.S. citizens who suffered injury by reason of an act of

18   international terrorism.

19        In other words, the Anti-Terrorism Act allows citizens

20   of the United States who have been injured by terrorism

21   anywhere in the world to come to court in the United States and

22   hold the perpetrators accountable in a court of law.  In fact,

23   later today Judge Daniels will tell you that in order for it to

24   be international terrorism, it has to take place outside or

25   primarily outside the jurisdiction of the United States.

1          This was a law that was passed by the United States

2     Congress and signed by President Bill Clinton for the purpose

3     of fighting terror by protecting our fellow American citizens

4     wherever they go in the world.  Wherever a citizen of the

5     United States travels, this law travels with us.  And it does

6     another important thing, it hits those who send terrorists

7     where it hurts them most, in the wallet.  Money is oxygen for

8     terrorism.  Take away their money by making them pay their fair

9     share of what they did.

10          Now for you to award these families the damages that

11     you believe they deserve, I need to walk you through the

12     liability case and the verdict sheet that Judge Daniels is

13     going to give you later today.  Filling out this verdict sheet

14     correctly is important, because it will give you the power to

15     award the damages that these families deserve.

16          Now you heard the defendants talking about no

17     conclusive evidence.  The defendants' lawyer even put a slide

18     from the U.S. State Department saying there was no conclusive

19     evidence of PA and PLO senior official involvement in 2002.

20          Well, first of all, we're going to see evidence that

21     developed that did find those senior officials liable.  It's in

22     the binders, and you're going to be able to look at that.  But

23     second of all, the defendants' lawyer misstated the burden of

24     proof.  These families don't have to come here and give you

25     conclusive evidence, what they have to do is give you a

1   preponderance of the evidence, which is like a scale of

2   justice.  If the scale tips even a little bit in favor of the

3   plaintiffs then I have carried my burden.  And remember, we

4   brought you a lot of evidence here, and I will take you through

5   it.  It's not a conclusive evidence standard.

6           MR. ROCHON:  Objection, your Honor.

7           THE COURT:  Overruled.

8           MR. YALOWITZ:  Now I also want to talk to you a little

9   bit about the different ways that you can find the PA and the

10  PLO liable.  There are two ways that we can go here.  The first

11  is material support, and the second is scope of employment.

12  We're going to talk about both of those.

13          And you heard the lawyer for the defendants refer to

14  the introductory language that Judge Daniels is going to talk

15  about, which is that in order to prove that a defendant is

16  liable for a particular claim under the ATA, the plaintiffs

17  must demonstrate the involvement of a senior official or other

18  person having duties of such responsibility that his or her

19  conduct may fairly be considered to represent the PLO or the

20  PA.

21          That's not complicated.  It may sound kind of

22  lawyer-like, but think about who fairly represents any entity.

23  If you're a beat cop walking the street, you fairly represent

24  the NYPD.  If you're a customer service rep and somebody calls

25  you at your place of work and asks you how to do something or

1    how to solve a problem for them, you fairly represent your

2    employer.  You don't have to be a senior top official to fairly

3    be considered to represent the entity.

4           Now material support is a really broad term.  Material

5    support means property -- any property or other service.  It

6    includes money, it includes personnel, it includes safe houses,

7    it includes explosives, it includes lodging and weapons and

8    lethal substances and transportation and training and other

9    things.  And we're going to go through the evidence today of

10   material support.

11          We're also going to talk about two different kinds of

12   material support.  One is for the particular terror act, like

13   Ahmed Barghouti taking the bomb maker to safe house.  And the

14   other is a more general type of support, creating a policy in

15   which you give money to people, providing money to a terror

16   organization.  And Judge Daniels is going to instruct you on

17   this topic, too.  He's going to say you need not find that a

18   person for whose conduct a defendant is liable intended that a

19   specific crime or terror attack be carried out.  Giving

20   material support to a known terror organization is not legal.

21   It's not okay.  You can't do that.

22          Now we have been talking about policies pretty much

23   the whole time.  When you have a policy in which you say to

24   your employees if you commit a terrorist act we will fire you,

25   that says something about who you are and what you believe in.

1    And if you say -- if you have a policy in which you say to your

2    employees if you commit a terrorist act we're going to keep you

3    on the payroll, even if you're in jail, and we're going to take

4    care of your family and we're going to give you promotions, and

5    when we write our records about it we're going to say as a

6    matter of course you're doing this as a result of your fight

7    for your country and you're good in terms of security and

8    morals, that says something else about what you want your

9    employees to do.  And if you have that well-established policy

10   and they do it, you're providing material support to them, just

11   like if you hire somebody to do a job and they don't do it

12   until after -- then they do it and then you pay them after, you

13   have provided material support to them.  You have paid them for

14   the job even if you pay them after.

15          When you have a policy, well known and well

16   established, in which you say even if you're not an employee,

17   if you go to jail because you committed a terrorist act and

18   killed or injured civilians, we'll put you on the payroll, that

19   says something about who you are and what you believe in.  And

20   it's proving support to people even if it's after the fact,

21   even if you pay them after the fact.  If it's a well-known

22   policy and then they do it and then you pay them, you provided

23   support.

24          The same with these martyr payments.  If you have a

25   well-established policy, we're going to take care of your

1   family, and then they do it and you take care of the family,

2   you are providing material support.  And it doesn't matter if

3   you're a hundred percent of the motive or one percent of the

4   motive, you just can't do that.

5           Now I also want to give you a little bit of overview

6   of the road map of where we're going to go not only on material

7   support but on scope of employment.  That's a legal word, but

8   it's also going to be easy once we go through the factors that

9   Judge Daniels is going to give you.

10          The question is were these employees who did it --

11  there's no dispute about that fact, they did it -- were these

12  employees acting in a way their employer should be held

13  responsible for?  By virtue of their job, was it a person

14  having the kind of responsibilities that their conduct could be

15  reasonably anticipated in light of the facts and circumstances?

16  Were they acting in furtherance of the PA's activities?

17          Now I want you to think about something from our lives

18  that might be applicable.  If you have an NYPD cop and he goes

19  over to New Jersey and he kills somebody and the NYPD fires

20  him, that's what you would expect.  But if you have an NYPD cop

21  who goes over to New Jersey and kills somebody and the NYPD

22  says good job, you're good in terms of security and morals, you

23  were doing that as a result of your fight for New York and

24  we're going to keep you on the payroll and give you promotions

25  while you're in jail, that says something else about that.  And

1    when you have not one guy, not ten guys, not 50 guys, but when

2    you have hundreds of guys who do that, then you begin to see a

3    pattern, and the pattern is this is the regularly conducted

4    activities of the PA.

5            Now I want to start with these employment policies,

6    because the very biggest kind of material support you can give

7    to terrorism is money and personnel.  And these guys gave both

8    in the form of all of those Al Aqsa Martyrs Brigades security

9    officers.  And we saw over and over again in the PA's own

10   payroll records and in the PA's own promotion records, that

11   they were paying and promoting people that they knew that they

12   knew had committed terror acts?

13           MR. ROCHON:  Objection, your Honor.

14           THE COURT:  Overruled.

15           MR. YALOWITZ:  And in 2013 they even passed a law

16   saying that policy is going to be locked in as a matter of law.

17   The state shall continue to pay the salary of an imprisoned

18   employee.  That's how common it was.  It's so common that their

19   employees go to prison that they have to pass a law to reassure

20   the employees that it's okay.  And it's not just their

21   employees, it's also the PA prisoner log.

22           Now in any government what the law says reflects the

23   government's values.  As I said, we have been together since

24   January 7 because our country has passed a law protecting

25   Americans from acts of international terrorism.

1           And the PA has laws, too.  And we spent a long time

2    looking at that prisoners' log.  This is the one that defines

3    prisoner as anyone who participates in that struggle against

4    the occupation.  This is the law that has that matrix of

5    payments that says come on, we'll put you on the payroll when

6    you commit a crime, and the longer you're in jail the more

7    money we will pay you.  And you don't have to do anything, you

8    have to perform no service at all once you have committed your

9    terrorist act.

10          Now the PA brought a guy in, Faraj, or Issa, to claim

11   they're just following Israel's lists, that they have no

12   control over who they pay.  But you and I know that's not true.

13   Even Michael Sfard came in and said to you it would be really

14   easy to separate out the one percent of murderers or the five

15   percent of murder and attempted murder.  It wouldn't be hard to

16   do.  If you don't want to pay murderers, you don't have to, and

17   you can't sit there in a court of law and say oh, I'm helpless,

18   sorry, I can't pay.

19          Now this prisoner law and this prisoner institute

20   started in the PA and then it moved to the PLO.  Today that

21   prisoner institute is in the PLO, and today the PLO is making

22   those payments.

23          Now the martyr foundation also has a policy.  They pay

24   terrorist families every single month because these people blew

25   themselves up and killed civilians.  And again, it may be that

1    they want to provide payments to other people who are injured,

2    but you don't have to pay terrorists if you don't want to.  And

3    what we saw in this case, we had five terrorists who killed

4    themselves, and all five got paid because they died committing

5    a terrorist act.  And the payments are not tied to need, and

6    there's nothing that requires them to pay suicide terrorists.

7    And if you set up a program in which you say if you commit a

8    terrorist act we will pay your family, that is providing

9    material support, and you can't do that.

10           Now you'll notice that your verdict sheet has separate

11   questions for the PA and the PLO.  The PA and the PLO want you

12   to believe that they're separate in this court.  But what is

13   does the evidence show about separation?  First of all, look at

14   the payroll records and the military records.  We saw that they

15   had both headings over and over and over and over and over

16   again.  Their own records don't make a distinction between the

17   PA and the PLO.  Even Jabril Rajoub has on his business card

18   that he's the security adviser under both organizations.

19           So when you think about who is providing that material

20   support by keeping terrorists on the payroll and giving them

21   promotions, it's both.  When you think about the martyr

22   institute, that's an institute that was in the PLO, they moved

23   it back to the PA, they moved it back to the PLO, the prisoners

24   gets moved back and forth.  We asked Hanan Ashrawi about that.

25   She came and testified, she was a very nice lady who was all in

F2JTSOK4                    Summation – Mr. Yalowitz

1    favor of peace, and said how do you move these ministries back

2    and forth?  She said well, it's a presidential decision.  So

3    that's how easy it is for them to move it back and forth.

4         And speaking of presidential decisions, let's not

5    forget who was the president of the PLO -- sorry, the chairman

6    of the PLO, the president of the PA, the minister of the

7    interior, the head of security, the chairman of Fatah, this was

8    Yasser Arafat. He had all of those responsibilities.  And an

9    entity can't act on its own.  An entity can only act through

10   its agents and employees.  That's the only two ways that an

11   entity can act.  So when the PLO does something, the only

12   people who can answer for it are people like Yasser Arafat or

13   people under his command or agency.

14        Now agency isn't a complicated concept.  If I ask you

15   to -- if I tell you to go to my kitchen, take money out of my

16   cookie jar and buy me a Big Mac, you're my agent.  If I tell

17   you go take this bomb, go across the street and blow it up,

18   you're my agent if you go do that.

19        So when Arafat told people to go give money to this

20   terrorist or give money to that terrorist --

21             MR. ROCHON:  Objection.

22             THE COURT:  Overruled.

23             MR. YALOWITZ:  -- they're his agents.  They're acting

24   under his supervision.

25        Now there's really no doubt from the evidence you saw

1   that Arafat controlled the money.  That was the testimony of

2   Hussein Al-Sheikh.  As president and prime minister of the

3   Palestinian Authority between 2000 and 2004, did Yasser Arafat

4   have any authority over expenditures of the Palestinian

5   Authority?

6           Answer:  Of course, he was the president.

7           Salam Fayyad even said that the PLO didn't have its

8   own independent money.  He said after the PA came into being,

9   the PLO ceased to have its own independent sources of funding

10  largely.  Funding for its own operations did come from the PA.

11          Now that is pretty simple.  Those policies, those

12  policies are enough for you to check yes on those boxes about

13  material support.  Anytime that there's a terrorist who is kept

14  on the payroll, that's material support, and you can check yes.

15  Anytime there's a terrorist who is brought on the payroll,

16  that's a material support, and you can check yes.

17          MR. ROCHON:  Objection, your Honor.

18          THE COURT:  Overruled.  I will give the jury

19  instructions on the law.

20          MR. YALOWITZ:  Anytime that there's martyr payments,

21  you can check yes.  You don't have to find that those payments

22  preceded the attack.  Anybody ever paid a bill after they got

23  the services or after they got the goods?

24          Now there's also another kind of material support

25  here, which is material support of a known terror organization.

F2JTSOK4                    Summation - Mr. Yalowitz

1     And the evidence on this is undisputed.  There's no dispute

2     that it was common knowledge in the West Bank and in the Gaza

3     strip in 2001 and 2002 and forward that Al Aqsa Martyrs

4     Brigades was committing terrorist acts.  There's no dispute

5     that it was common knowledge in that place and in that time

6     that Hamas was committing terrorist attacks.  And there's a

7     mountain of evidence that the PLO and the PA supported those

8     terrorist organizations.  And the dots are pretty easy to

9     connect here, and they all run through Yasser Arafat.

10              Ask yourselves three questions about the five Al Aqsa

11     attacks:  First was it an Al Aqsa attack?  None of that is

12     disputed.  Every single one of these attacks was an Al Aqsa

13     attack.

14              Second, Al Aqsa Martyrs Brigades is the armed wing of

15     Fatah.  We heard evidence on that from the plaintiffs, and the

16     defendants stood mute.

17              Number three, Arafat and his subordinates -- sorry,

18     Arafat and his agents knowingly gave material support and

19     resources to Fatah/AAMB operatives.  A mountain of evidence on

20     that.

21              Let's take a look.  First of all, how do we know that

22     these were Al Aqsa Martyrs Brigades attacks?  We all remember

23     the testimony of Shrenzel, and we went through the evidence,

24     and then we went through his conclusions.  And other than the

25     Hamas attack, he was very clear that these were Al Aqsa Martyrs

F2JTSOK4                    Summation - Mr. Yalowitz

 1   Brigades attacks.

 2          Now in closing, the defendants' lawyers have

 3   challenged some of the evidence on one of those attacks, and I

 4   would like to read you what happened during the trial of this.

 5          This is from the testimony of Israel Shrenzel.

 6   "Q.  Looking at the second bullet, it says he was murdered on

 7   June 18 while executing the Jerusalem martyrdom operation.  Do

 8   you see that?

 9   "A.  I do."

10          And remember, the file shows it was an Al Aqsa attack.

11   And I said:

12   "Q.  Have you had the opportunity to evaluate whether the

13   attack took place on June 18 or June 19?

14   "A.  The attack that we are dealing with took place on the 19th

15   of June.  Unfortunately this reflects how successive the

16   attacks were.

17          "Mr. Rochon:  Objection.

18          "The Court:  Sustained.  What is your question?

19   "Q.  Have you satisfied yourself that the attack of Said Awada

20   took place on June 19?

21   "A.  Absolutely.

22   "Q.  And are you satisfied that the attack was an Al Aqsa

23   attack?

24          "Mr. Rochon:  Objection.

25          "The Court:  Overrule.  You can cross-examine.

1    "A.  Absolutely."

2            Now there was no cross-examination on that topic.

3    There was no cross-examination at all because -- well, I don't

4    know why they didn't cross-examine.  They chose not to, and now

5    they have to live with that consequence.

6            Now how do we know that Al Aqsa Martyrs Brigades is

7    the armed wing of Fatah?  It's really simple.  Their own web

8    site says it.  This is a PLO web site, although it's got that

9    PA logo, but it's a PLO web site from the U.K. in Arabic.  We

10   translated it for you.

11           Al Aqsa Martyrs Brigades, this is the military wing of

12   the Fatah movement.  It started its activities at the beginning

13   of the Second Palestinian Intifada.  It carried out a number of

14   quality military operations and offered many martyrs.

15           This is the defendant's own words.  It's not mine.

16   Did they bring their employees who wrote this to try to explain

17   it away?  They did not.

18           MR. ROCHON:  Objection, your Honor.

19           THE COURT:  Overruled.

20           MR. YALOWITZ:  This is their own web site.  Look they

21   document from Said Ramadan.  On page one, the intelligence

22   service said this was a Fatah operation, and on page two they

23   said he carried out a martyrdom operation on behalf of the Al

24   Aqsa Martyrs Brigades.  That's their own document.  They had

25   the head of the intelligence service on the witness stand, he

1    didn't say a word to try to rebut this.  Not one word.

2            And it's not just Said Ramadan.  Look at all these

3    files I'll show you, Nasser Aweis, Ahmed Salah, Nasser Shawish,

4    Faras Ghanem, Himli Hamash, Ahmed Barghouti, Mohammed Abdullah,

5    Marwan Barghouti, Muhammad Muslah, over and over and over again

6    their own documents link up Fatah and Al Aqsa Martyrs Brigades.

7    Even the U.S. government in an unclassified State Department

8    report says that Al Aqsa Martyrs Brigades members came from

9    Fatah.

10           Now number three, Arafat and his agents knowingly gave

11   material support and resources to Fatah and AAMB operatives.

12   How do we know this?  That's that binder of evidence that the

13   defendants' lawyer was making fun of for the June 19 attack.

14   It's a whole binder of evidence showing knowing support,

15   material support and resources.  And you listen to Judge

16   Daniels' instructions on material support and resources,

17   because he's going to tell you what the law is on this.  You

18   need not find that a person for whose conduct a defendant is

19   liable intended that a specific crime or terror attack be

20   carried out.  Listen to Judge Daniels, not to the defense

21   counsel.

22           Let's start with those IDF reports on captured

23   documents.  Those documents provide evidence of the role of

24   Arafat and PA apparatuses.  Large sums of money are transferred

25   on a monthly basis in order to finance terrorist

F2JTSOK4                    Summation - Mr. Yalowitz

1    infrastructure.  And remember, Arafat didn't strap bombs on

2    himself or his top guys, he worked through agents.

3            And we saw that in the captured documents, too.

4    Arafat does not hold direct contacts with the heads of the

5    terror cells.  Instead he uses intermediaries.  And the

6    captured documents identified people, Marwan Barghouti, Hussein

7    Al-Sheikh, Fuad Shubaki.

8            Counsel for the defense told you a little bit about

9    Marwan Barghouti's conviction.  There are two important things

10   about this conviction that I want you to focus on.  The first

11   is Marwan Barghouti was convicted in May of 2004.  After that

12   no conclusive evidence report came out.

13           The second is what he was convicted for, and I will

14   read to you from paragraph 140.  The terror attacks that are

15   the subject of this indictment and many others were executed by

16   the field operatives of the Fatah, members of the Tanzim, and

17   by cells that were organized within the framework that is

18   called the Al Aqsa Martyrs Brigades.  The defendant was the

19   leader of Fatah in the West Bank and commander of the Tanzim

20   and the Al Aqsa Martyrs Brigades, as he admitted during the

21   course of his interrogation and as proven by much additional

22   evidence.  The defendant's roles in the leadership of the

23   terrorist organizations were also described at length above.

24   Paragraph 140.  If you have some doubt about who Marwan

25   Barghouti was or what he did, go to paragraph 140.

1            And what about Shubaki?  He was convicted, too.  He

2    was convicted of paying the Al Aqsa Martyrs Brigades with PA

3    money.  You can read that in his conviction.  And he was

4    convicted of getting weapons for the Al Aqsa Martyrs Brigades

5    under orders.  And we heard the testimony, unrebutted, who had

6    the authority to issue orders to Fuad Shubaki.  He only had one

7    supervisor, Yasser Arafat.  Those dots are not hard to connect.

8            I also want to show you had Nasser Aweis' conviction,

9    which is in that binder.  This was Nasser Aweis' testimony on

10   which he was convicted.  On whose behalf -- Nasser Aweis was a

11   PA employee.  In fact, he still is.  He's been promoted twice.

12   He's been skipped in ranks because they're so proud of him.

13   "Q.  On whose behalf did you carry out the terrorist attacks

14   which you noted above?

15   "A.  On behalf of Al Aqsa Martyrs Brigades, which belongs to

16   the Fatah.

17   "Q.  Who is in charge of the Fatah?

18   "A.  Yasser Arafat is in charge, and he is the chairman of the

19   Fatah movement.

20   "Q.  Who used to provide the money for the perpetration of the

21   terror attacks against Israeli targets?

22   "A.  People in the Tanzim Fatah in the West Bank and in Lebanon

23   used to provide me with money."

24           Nasser Aweis, convicted January 22, 2002 attack in

25   which he sent a suicide terrorist to shoot at the heart of

F2JTSOK4                    Summation - Mr. Yalowitz

1    Shayna Gould and to shoot at the heart of Shmuel Waldman.  He's

2    the line that connects Yasser Arafat and these defendants to

3    this attack and two attacks like this by providing material

4    support in the form of money.

5           You saw a lot of raw documents in the trial, too,

6    showing actual payment transfers.  Document after document,

7    actual records showing actual transfers of money to Fatah,

8    showing actual approval signed by Yasser Arafat himself saying

9    use PA money to pay these people.  And you heard Al-Sheikh

10   himself testify, sworn testimony, Fatah and the PLO are the

11   same because the Fatah and the PLO budget are with Arafat.

12          Now there is another small piece of this material

13   support puzzle, and that is the question of whether Arafat

14   acted knowingly and whether his agents on his behalf acted

15   knowingly.  That's pretty easy here.  Judge Daniels is going

16   give you an instruction on when somebody acts knowingly, but

17   you already know it.  A person acts knowingly if he acts

18   intentionally and voluntarily, and not because of ignorance,

19   mistake, accident, or carelessness.  Whether the defendants

20   acted knowingly may be proven by their conduct and by all the

21   facts and circumstances of this case.

22          This is not an accident case.  Arafat didn't

23   accidentally approve money to terrorists.  Nassar Aweis didn't

24   accidently get money from Fatah to go out on terrorist

25   activities.  Everyone understood what the Al Aqsa Martyrs

1   Brigades was doing.  Even the U.S. government, our government,

2   saw that, U.S. State Department.  Documents show direct

3   payments from the PA to Fatah party activists, some of whom

4   were also affiliated with the Al Aqsa Martyrs Brigades who have

5   been involved in violence.  The payments were likely made with

6   the knowledge that the intended recipients had been involved in

7   violence and terrorism.  That's knowing support of the Al Aqsa

8   Martyrs Brigades by Arafat and his agents.  That's all there is

9   to material support.

10          Let's talk about the other way you might hold the PA

11   liable.  Judge Daniels is going to instruct you this part

12   applies to the PA, not to the PLO.

13          It's that third question on your verdict sheets.  Were

14   the employees who pulled the trigger, were the employees who

15   videotaped the suicide terrorists, were the employees who gave

16   them money, were the employees who sent them on their way, were

17   those employees acting within the scope of their employment?

18          Now let's put this in perspective.  If you have an

19   NYPD guy who wants to avenge the death of his brother and he

20   goes out and commits a terrorist act, what the NYPD does with

21   that guy tells you whether he's within the scope of his

22   employment.  Do they fire him and prosecute him and put him in

23   jail like they should?  You can't pin his crime on the NYPD if

24   that's what he does.  But if you've got hundreds of NYPD cops

25   going across to New Jersey killing people in New Jersey --

 1              MR. ROCHON:  Objection.

 2              THE COURT:  Overruled.

 3              MR. YALOWITZ:  If you have hundreds of NYPD cops and

 4    they stay on the payroll and they get promotions, and the NYPD

 5    writes in their files they're good in terms of security and

 6    morals, and they keep paying them while they're sitting in jail

 7    in New Jersey, and the NYPD writes he's in New Jersey as a

 8    result -- he's in jail as a result of his fight for New York,

 9    then maybe you conclude he is acting within the scope of

10    employment.  What other conclusion can you reach?

11              Now Judge Daniels is going to give you the factors

12    that will guide you in this decision.  There are four of them.

13    The connection between the time, place and occasion, the

14    history of the relationship between the PA and the employee as

15    spelled out in actual practice, that's an important one.

16              (Continued on next page)

1            MR. YALOWITZ:  Whether the act is commonly done and

2     the extent of the departure from the normal methods of

3     performance.

4            Factor 4:  Whether the specific act was one that the

5     PA could reasonably have anticipated?

6                  Those are factors that you can look at.

7            You don't have to meet all of them.  They are things

8     that will guide you in your deliberations on scope of

9     employment.  And I think when you go through the evidence, you

10    are going to see this is a pretty easy one too.  Because,

11    obviously, the biggest employee that they have, the big dog at

12    the PA, was a man named Yasser Arafat.

13                  Yasser Arafat was in charge.  And Yasser Arafat was

14    responsible for all of the material support that we just talked

15    about.

16                  Now, let's talk a little bit about the time and the

17    place and the occasion.

18                  The time was 2002 to 2004.  And the place was

19    Jerusalem.  And if you look in that Marwan Barghouti verdict,

20    you will see incitement, a million martyrs are marching to

21    Jerusalem, and you can connect those dots.  You can connect

22    those dots.  A million martyrs are on their way to Jerusalem

23    and then PA employees go send suicide terrorists, or themselves

24    go to Jerusalem and become suicide terrorists.  That's a

25    connection between the time, place and occasion.

F2J8SOK5                    Summation - Mr. Yalowitz

1          That's what Israel Shrenzel talked about.  He said:

2     "The motivation was what Arafat preached, what Arafat decided,

3     what Arafat condoned, what orders and what atmosphere was

4     created by the PA, an atmosphere of all-out attack against

5     Israel."

6          Now, I want to talk a little bit about Shrenzel

7     because I think that he has been unfairly maligned here.

8     Shrenzel came and he was a very balanced witness.  There were

9     things that he said that the defendants liked, and you saw a

10    lot of that in the defendants' closing just now.  There were

11    things that he said that they didn't like and they didn't

12    cross-examine him on.

13         They asked him:  You never worked for the PA?  And he

14    said:  Well, I hope some day there is peace and I will be able

15    to.

16         This is a man who translated the Koran because he

17    wants to bring the two peoples closer together.  And I think

18    when you go back and look at his testimony and look at was he

19    an open and frank witness, I don't think you will have any

20    doubt about that.

21         Now, you can judge Shrenzel's testimony on this point

22    from the other evidence in the case as well.  When the head of

23    an organization takes photo opportunities to appear in photos

24    with bazookas or machine guns or holding up posters of

25    terrorists, when he makes media appearances like that, what

F2J8SOK5                    Summation – Mr. Yalowitz

1    message does that send to his employees?

2            Some of us have worked in large organizations, and we

3    see what the messaging from the top means and how important it

4    is.  And this is a society in which there were thousands of

5    police officers, 38,000 police officers in a population less

6    than 3 million.  That's about how many NYPD officers we have,

7    and we are a lot bigger than that.

8            Now, was Arafat in control?  Ask Arafat.

9            (Videotape played)

10           MR. YALOWITZ:  Total control.

11           Let's look at the history of the relationship.  That's

12   one of the most disturbing aspects of this case.

13           Employees get paid and promoted even after they are

14   convicted.  How many times did we see in those binders good in

15   terms of security and morals?  How many times did we see in

16   those binders, he is in prison as a result of his fight for his

17   country?

18           Where are the orders on the other side?  Where are the

19   orders saying don't do this?  Where are the documents

20   investigating an employee for killing people?  Where are the

21   documents punishing an employee for killing people?  Where are

22   the documents firing an employee for killing people, or telling

23   an employee it's bad to kill people, or saying don't release

24   bomb makers from prison, or, holy cow, a terrorist has escaped,

25   let's go try and catch him?

1          We don't have anything like that in this case because

2     the evidence doesn't exist.  That's not how they did it.  They

3     didn't roll that way.

4          Now, we did hear from the defendants that some people

5     had some personal motives.  But listen to Judge Daniels'

6     instruction on that one too, because personal motives only

7     matter if there is no employer motive at all.

8          Judge Daniels is going to say:  "The test is whether

9     the employee's act was in furtherance of the employer's

10    activities and was incident to the performance of duties

11    entrusted to the employee.  Where the employee's act was

12    committed solely for personal ends rather than in furtherance

13    of the employer's activities, the employer will not be held

14    liable."

15         So when a guy goes and makes a supposed revenge

16    killing, and then they promote him and keep him on the payroll

17    and tell him he is good in security and morals and say he is in

18    there as a result of the fight for his country, that's a mixed

19    motive at best.  That's not solely for personal motives.

20         Let's look at the third factor, whether the act is one

21    commonly done.

22         The unrebutted testimony here is that there were

23    hundreds of employees who did this.  And it makes sense if you

24    think about how many attacks there were.  Attack after attack

25    after attack.  We saw that in the convictions, dozens and

1    dozens of attacks.  And that's only of the people who were

2    convicted in this case.  Hundreds, many hundreds from among the

3    Palestinian security apparatuses.

4            Now, defendants try to suggest that their employees

5    were in jail for breaking curfew or organizing demonstrations.

6    But these are people who have been in jail for more than ten

7    years.  And you heard from Michael Sfard, that legal expert

8    from Jerusalem, who testified that you don't get that kind of

9    time for breaking curfew.  You get that kind of time for

10   murder.  And he has only got five lawyers in his shop.  He

11   doesn't have 100,000 employees.  And he said he could

12   distinguish between the 5 percent who are in for murder or

13   attempted murder and the rest of them.  It wouldn't be that

14   hard if you had the list.  And you heard Issa say that he had

15   the list.

16           Let's go to factor number 4.

17           Well, let me just say one more thing, which is that it

18   was so common for employees to be in jail that they actually

19   passed a law about it saying, when you go in jail, we are going

20   to keep you on the payroll.

21           Now, let's talk about that fourth factor, whether the

22   specific act was one that the PA could have reasonably

23   anticipated.

24           How do you know what somebody wants you to do?  How do

25   you know what somebody expects other than the words that they

F2J8SOK5                    Summation - Mr. Yalowitz

1    say and the conduct that they engage in?  And we all remember

2    the words that they said to their police employees in their

3    police magazines.

4           Their own magazines, their own magazines spoke about

5    blood and martyrdom.  Their own magazines told people to go be

6    violent.  People with guns, people's whose job it was to carry

7    a gun.

8           Here again Shrenzel:  "Palestinian operatives ask

9    themselves, what is expected from me?"  In his accent.  What

10   Arafat wants from me?  What Fatah wants for me?  What should I

11   perform as a member of the security apparatuses?

12          And the answer is, you should participate.  His

13   understanding was I should take an active role in the attacks

14   against Israel.

15          Look at what some of these magazines said.  They said:

16   "We cannot but bow reverentially and respectfully to our heroic

17   martyrs who have watered the soil of our beloved nation with

18   their pure blood in order to prove to the whole world that our

19   Palestinian land is our right, and that blood is a small price

20   to pay on the path to liberating and defending it.  This has

21   fashioned a marvelous picture embroidered with the blood of our

22   martyrs and the wounds of our heroes."

23          This is what you write to the police who carry guns?

24   Wait, there is more.

25          Our Palestinian people are persevering in the glorious

F2J8SOK5                    Summation - Mr. Yalowitz

Intifada, the blessed Al Aqsa Intifada for a third consecutive

month, offering up legions of martyrs, and making the costliest

and most precious sacrifice in the cause of realizing their

legitimate aspirations of ending the Israeli occupation of our

land and holy places."

That's what you write to your security employees?

What do you expect they will do if you write things like that?

There is more.

"They are becoming martyrs as a sacrifice for the

Palestinian dream, and in compliance with the call of Al Aqsa.

For this reason, we today wage war in an advancing position; we

wage war with the occupation, continuing in our Intifada."

What can you reasonably foresee when you write those

kinds of things in a police magazine?

And we saw the Fatah also, their circulars.

"Oh, combatants, our martyrs are nobler than all of

us.  They have made the dream a reality.  Keep a firm grip on

the trigger.  They will not enjoy security, peace and

stability.  Let your blows intensify and let the Intifada

continue."

You write something like that to your armed

operatives?  Can you really be surprised when they send

terrorists to kill civilians?

Now, the defendants' lawyer pooh-poohed these

magazines and said, that's all they can come up with.  But I

F2J8SOK5                    Summation - Mr. Yalowitz

1    have got to tell you, the evidence in this case is there were

2    other magazines that were even worse.  And Shrenzel read them

3    and he told you about them.

4              First of all, he said:  "The overall atmosphere grew

5    more and more violent."

6              MR. ROCHON:  Objection, your Honor.

7              THE COURT:  Overruled.

8              MR. YALOWITZ:  "If you check, for example, how many

9    times the notion of blood, the notion of martyrdom is

10   repeatedly mentioned."

11             He went on and he was asked:  "Do you recall seeing

12   issues of these magazines calling on people to engage in

13   liquidation or extermination or things like that?"

14             These are the defendants' own magazines.  Liquidation

15   and extermination.

16             And he says:  "They were.  They were.  You see, there

17   was a political decision to launch a wide-scale attack and to

18   support it.  And then there was the whole issue of propaganda,

19   of creating the proper atmosphere in which, for example, a

20   17-year-old former contractor would go out and detonate

21   himself.  Or a policeman, as we saw, reading the Shurta, and

22   for him it was clear, This is what my superiors expect from me.

23   They want me to go out and shoot indiscriminately in the

24   streets of Jerusalem."

25             When you incite people, when you pay them and when you

1    promote them for a certain kind of conduct, what can you

2    reasonably expect?

3           Your Honor, would it be a convenient time to give the

4    jury a break before we move into the next topic?

5           THE COURT:  Ladies and gentlemen, let's take a

6    ten-minute break.

7           Keep an open mind.

8           I will see you in ten minutes.

9           (Jury exits courtroom)

10          MR. ROCHON:  It may not come as a surprise, but we

11   have a few concerns as to some things that Mr. Yalowitz said.

12          I will let Ms. Ferguson handle the first couple.

13          MR. FERGUSON:  Your Honor, first, Mr. Yalowitz is

14   making alter ego arguments.  He is asking the jury to impose

15   liability on the PLO because it has the same leader and there

16   is some financial connection.  He is not making an agency

17   argument.  He is making an alter ego argument.  The court has

18   not provided an alter ego instruction.  That's very

19   problematic.

20          He is also making an alter ego argument as to Fatah

21   and Al Aqsa Martyrs Brigade.  The evidence there, I think it

22   was from a State Department report that Arafat had made a

23   payment to Fatah.  And he said that shows there is material

24   support to Al Aqsa.  He is collapsing these entities and

25   treating them as an alter ego and there is no alter ego

1    instruction.  That is going to be highly prejudicial.

2             Second, he is making an argument which the court

3    rejected.  He told the jury that paying a salary to your

4    employee constitutes material support.

5             THE COURT:  Say that again.

6             MR. FERGUSON:  Paying salaries to employees is form of

7    material support, and if the PA employees were used for Al Aqsa

8    operations, that's the PA providing material support.

9             In your Honor's November order on a motion for summary

10   judgment, you considered that argument and rejected it and

11   said, no, that is not a form of material support, and he just

12   argued to the jury that it is.

13            We are going to need an instruction on material

14   support that clarifies that paying salaries or just the mere

15   fact that a person is an employee does not constitute material

16   support.

17            He also told the jury that prisoner payments is

18   material support, when material support has to be provided

19   knowing it's going to be used in the preparation or carrying

20   out of an attack.  So, basically, he is making ratification

21   arguments you rejected and dressing them up as material support

22   when it cannot be reconciled within your language of the

23   statute.

24            In addition, when we had the discussion yesterday

25   about who can be a defendant, we agreed on a senior official or

F2J8SOK5                    Summation - Mr. Yalowitz

  1    other persons having duties of such responsibility that his or

  2    her conduct may fairly be considered to represent the PLO or

  3    PA.

  4            My concern is that Mr. Yalowitz has argued that any

  5    low-level employee would fit that description.  You said, no,

  6    that's not what you intended.  He just argued to the jury any

  7    beat cop would meet that description.  He is saying any member

  8    of the security forces would meet that description because they

  9    are in uniform.  And that was exactly the argument we were

 10    concerned about.

 11            MR. ROCHON:  There also has been multiple references

 12    to hundreds of PA officers locked up for killings.  He said it

 13    directly, and then he said it by analogy when he talked about

 14    police officers from New York, hundreds of them going to New

 15    Jersey and killing people.

 16            There is no evidence in this case of hundreds of PA

 17    officers killing people.  There is evidence of PA officers

 18    locked up.  There is no evidence of hundreds of PA officers

 19    killing people.  And he has said it more than once.  He said it

 20    as part of his liability theory.  Therefore, the misstatement

 21    of the evidence is prejudicial to us on the exact issue of

 22    liability.  It's a misstatement of evidence that goes right to

 23    the theory of liability.

 24            THE COURT:  As I always do, I have already instructed

 25    the jury two things, and I do that specifically for these

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F2J8SOK5                    Summation - Mr. Yalowitz

1    reasons.  One, what the lawyers say is not evidence.  It is

2    their recollection of the testimony that controls.

3              I have already indicated to the jury during the

4    summation that I will instruct them on the law.  I think my

5    instructions are appropriate.  I think to the extent that the

6    lawyers have made arguments that are inconsistent with those

7    instructions, as my instructions emphasize, it is my

8    instructions they must follow.

9              So to the extent that the lawyers either misstate the

10   facts or misstate the law, I have appropriate instructions in

11   my final instructions that I can give the jury appropriate

12   guidance as to how they should review this case, how they

13   should decide this case, and what standards they should use.

14             If at some point I feel that either side has gone over

15   the line, and I don't believe that either side has at this

16   point, I am prepared to consider a further objection and/or

17   either restrict Mr. Yalowitz in his argument or to instruct the

18   jury more specifically with regard to that argument, or to tell

19   them to totally disregard that argument.

20             So let's take a ten-minute break.

21             (Recess)

22             THE COURT:  Mr. Yalowitz, are you ready to continue?

23             MR. YALOWITZ:  I think I have got one colleague we

24   should wait for so she doesn't disrespect the jury, your Honor.

25             I apologize.

 1              THE COURT:  It's all right.

 2              MS. WEISER:  Before we bring the jury back in, is

 3     there a way to adjust the heat in this room down a bit?  Some

 4     of the clients are feeling ill.

 5              THE COURT:  We will try to get the heat down.

 6              Let's get the jury in.

 7              (Jury present)

 8              THE COURT:  I am trying to get them to turn the heat

 9     down.

10              Mr. Yalowitz, you can continue.

11              MR. YALOWITZ:  We have got the legal framework and the

12     way the evidence fits into that legal framework, and now comes

13     the easy part which is fitting that evidence and that framework

14     into the six attacks.

15              Let's begin with January 22, 2002, 4:20 p.m. on Jaffa

16     Road.  Shayna Gould and Shmuel Waldman are waiting on a bus.

17              Look how many PA employees are involved in this terror

18     cell.  One, two, three, four, five, six PA employees planned

19     and perpetrated this attack.

20              Let's look at the shooter himself, the man who aimed

21     at the heart of my clients.  This is what he did to prepare

22     himself.

23              (Videotape played)

24              MR. YALOWITZ:  That's a PA police officer with an M-16

25     rifle in front of an Al Aqsa Martyr Brigade banner with an Al

F2J8SOK5                     Summation - Mr. Yalowitz

1   Aqsa Martyr Brigade headband.

2          "Look at what he did.  He took out his M-16 rifle and

3   he raised it up, and I was his target.  He screamed out Allahu

4   Akbar.  When he did that, I knew what it meant.  The whole

5   world was frozen.  He started spraying the bullets.  He didn't

6   care who was there."

7          Henna Waldman.  "The person that shot my husband, that

8   was not an accident.  He was the first two bullets, and he was

9   aiming for his heart."

10          Let's start with material support.  These are the

11   questions you are going to see on the verdict sheet that Judge

12   Daniels is going to give you.

13          You now know how easy it is.  Those policies, the fact

14   that this was an Al Aqsa Martyr Brigade attack.  Shrenzel was

15   asked those questions at the very end of his direct testimony.

16   The defendants didn't cross-examine him on that.  They didn't

17   rebut him on that.

18          I wrote it on the board in front of you.  They never

19   came back to it.  The fact that the PA and the PLO were

20   Arafat's person piggy bank for financing the Al Aqsa Martyr

21   Brigades is all you need for those first two questions, plus

22   the material support that the PA and the PLO provided in the

23   form of policies that supported not only terror in general, but

24   these very individuals.

25          By the time you get back to that room, and you will

F2J8SOK5                    Summation - Mr. Yalowitz

1  understand the way the evidence fits into the instructions that

2  Judge Daniels is going to give you, it is going to be very easy

3  to check yes on those two boxes and move forward to your next

4  task.

5          Let's go to question 3.

6          Let's go back to those four factors that we talked

7  about on the scope of employment.

8          The connection between the time and place.  We already

9  talked about that one.

10         Was it commonly done?  We already talked about that

11  one.

12         Reasonably expected, reasonably anticipated.  We

13  talked about that one.

14         Let's talk about some specifics, some very, very

15  specific documents about the history of the relationship

16  between the PA and the six employees who perpetrated this

17  crime, as spelled out in actual practice, and let's start with

18  the shooter.

19         This is the payroll record of Said Ramadan from the

20  year 2002.  It's in your binder.  What do you notice about it

21  that's strange?  This is a man who died committing his crimes

22  in January of 2002 and they kept him on the payroll in

23  February, in March and April and May and on through December,

24  they kept him on the payroll.

25         What did they say about him in their documents, their

1    official government documents?  They said, he was martyred

2    while performing his national duty in a Fatah operation.  And

3    they promoted him and the said he is good in terms of security

4    and morals.

5            What does that say about their expectations of his

6    conduct?  What does that say about whether he was acting in

7    furtherance of their activities and in the scope of his

8    employment?

9            And it's not just him.  Look at Ahmed Barghouti.  12

10   counts of murder.  He is still on the payroll.  He has been

11   promoted twice.  Once pursuant to the direction of the

12   president.  And I'm not saying the president sits there and

13   picks out individuals himself.  I'm saying, why does the

14   president of their entity promote people who do this?  Can they

15   not tell who is a terrorist?  Is it so common in their

16   organization they don't even know who the terrorists are?

17           Look at their intelligence files.  It says what he

18   did.  He is on 15 life sentences.  It's right there in their

19   intelligence files.  By the way, he is good in terms of

20   security and morals.  Their words, not mine.

21           Look at Nasser Aweis.  He is the one whose testimony

22   we read earlier about how he got financing from Fatah's Tanzim,

23   from Arafat.  He was on the list of most wanted terrorists.

24   Convicted of 14 counts of murder.  In prison as a result of the

25   fight for his country.  Still on the payroll, still been

1  promoted.  He is good in terms of security and morals too if

2  you ask these defendants.  Good in terms of security and

3  morals.

4          Here is Mohamed Mousleh.  He was a very active AAMB

5  operative.  Those are not my word, it's their words.  Very

6  active.  Eight counts of murder.  His security and moral

7  status, according to them, is good.

8          Here is Majed al-Masri.  He is a ten-time murderer

9  according to them because he was fighting for his country.  He

10 has been promoted twice.

11          That's the relationship between this employer and

12 these terrorists as spelled out in actual practice.  But here

13 is something really profound in Majed al-Masri's file.  Majed

14 al-Masri was a troubled employee, and he was disciplined for

15 firing off his Kalashnikov rifle in front of Fatah

16 headquarters.  And he was warned.  He was given a final warning

17 because he endangered Fatah people.  And his final warning was,

18 if he ever violates instructions again he is going to be fired.

19          Well, guess what?  He has been convicted of murder,

20 and he has not been fired.  So you tell me, where are the

21 instructions telling these people not to commit murder against

22 civilians?  That's the scope of employment.  That's the

23 relationship in actual practice.  It's not very hard to check

24 box 3 yes.

25          Let's go to January 27, 2002, Jaffa Road.  12:30 p.m.

1    Mark and Rena just bought shoes for their 12 year old.

2              Now, this is a case of circumstantial evidence.  I

3    don't have a conviction in this one.  The judge is going to

4    give you instructions about circumstantial evidence and he is

5    going to teach you it's pretty simple.  If you're in a room

6    with the shades drawn and a bunch of people walk in and they

7    are dripping wet and they are carrying umbrellas and water is

8    streaming off the umbrellas, you don't have any direct evidence

9    that it's raining outside, but your common sense tells you,

10   given the circumstances, it's raining outside.

11             So let's look at the circumstantial evidence.  One

12   other thing he is going to tell you about, which is what is an

13   agent?  He is going to tell you an individual person need not

14   be an employee of the entity in order to be an agent.  You

15   could be a secret agent.  Or you could have a very simple

16   agency relationship.  If I give you money and tell you to go to

17   McDonald's and buy me a Big Mac, you're my agent.  It's not

18   that complicated.  If I give you a bomb and tell you to go

19   across the street and blow yourself up, you're my agent.  It

20   all depends on what you're trying to accomplish.

21             Now, Wafa Idris spent some time in the Mukataa.  And I

22   want to be very clear who worked in the Mukataa.  Shrenzel told

23   us he wasn't the only one.  It's the compound, that very huge

24   compound in Ramallah where Arafat resided, other heads of the

25   security apparatuses, various other organs of the PA.  It's the

F2J8SOK5                    Summation - Mr. Yalowitz

1   government headquarters.

2          So as you go through this evidence, think about who

3   has an office in the Mukataa.  You can connect those dots.

4          Now, here is what Noor said in his custodial

5   statements.  He said:  "In June of 2001, I got to know Wafa

6   Idris.  After about two weeks she told me that I would meet her

7   supervisor at the Palestinian Authority and I agreed."

8          The defense counsel tried to make some hay about

9   inconsistency between the two custodial statements.  And you're

10  going to see both of them.  They are in your binders.  I gave

11  you both of them.  465 and 467.  And there is no inconsistency

12  between those for our purposes.

13         In August 2001, I went with her to the Mukataa for a

14  meeting, and we arrived there at the place of blank.  Age about

15  40, working for the blank.

16         Well, who works in the Mukataa?  You and I know that.

17         What else did Noor have to say?  In the eighth month

18  of 2001, Wafa Idris recruited me as a source for blank and

19  introduced me to blank.  Each time I had information I would

20  forward that information to blank.  His real name is blank,

21  aged about 40, and he is tall, mustached, fat and fair

22  complexioned.

23         There is no inconsistency between those two documents

24  about what Noor was doing or who he was doing it for.  You can

25  connect those dots.

1          Now let's look at what he said about how the bomb got

2    delivered to Wafa.

3          On Thursday, January 24, 2001, it was three days

4    before Wafa carried out her suicide attack.  I called blank at

5    his office and asked to meet him and we met in the afternoon at

6    the Mukataa.  I called blank and told him that Wafa was

7    prepared to carry out an attack and blank asked for us to come

8    to his office in the Mukataa on Friday, January 25, 2002, and

9    we came to the office, Wafa and I.

10         We came to the office.  Who has an office in the

11   Mukataa?

12         Next day.  On Saturday, January 26, at 4:00 p.m., Wafa

13   called me and told me that she had come to Ramallah.  I came

14   and took her in my vehicle and she travelled to blank's office

15   in the Mukataa.

16         Who has an office in the Mukataa?

17         Blank asked me to bring a bag behind the door of his

18   office.  I took the bag in my hand.  Blank told me to be

19   careful when I bring the bag and not to open it and to put it

20   next to Wafa on the floor.

21         This is in his office in the Mukataa.

22         Blank told Wafa to pick up the bag and see what it

23   weighed, and she said it was not very heavy.  Wafa asked how to

24   activate the explosive device, and blank said he would explain

25   it to her on the following day.  We went out, Wafa and I, from

1    the Mukataa and I went home.

2            Now, you can connect these dots as well as I can.

3    Wafa has a preexisting relationship with her supervisor at the

4    PA.  What kind of an agency recruits people to provide

5    information the way they recruited Noor?  What kind of an

6    agency wants to gather information and has people with offices

7    in the Mukataa?  You can connect those dots.

8            Now, counsel for the defendant pointed out that some

9    things happened in the home of an individual as well, but there

10   is nothing inconsistent about that.  Take a look at that

11   document.  That document talks about convincing Wafa,

12   convincing her to become the suicide bomber.

13           And Noor said:  We sat in blank's home, Wafa and I and

14   blank and discussed her becoming a suicide terrorist.

15           OK.  That's before she goes to the office in the

16   Mukataa.  There is nothing inconsistent.  I urge you to read

17   those documents and read that conviction because you won't have

18   any trouble connecting these dots at all.

19           And that's not the only circumstantial evidence we

20   have in this case.  Let's look at Exhibit 233.  We saw

21   testimony about it yesterday.  This is about our old friend

22   Tawfiq Tirawi, head of the intelligence service in 2002.

23           "We saw the lady who got the intelligence and reported

24   it.  She wrote that it was important.  And the intelligence she

25   got wasn't that he did it.  The intelligence that she got was

 1    that he was covering it up.  Tirawi was part of a cover-up.  He

 2    requested that the family would not announce that Wafa was the

 3    one who carried the attack and he came up with a story.  Say

 4    she got married and moved to Jordan.  And this lady who lived

 5    next door to Wafa Idris said that was casual conversation and

 6    people on the street knew about it.  "

 7              Casual conversation.  And she thought it was important

 8    and she wrote it in a memo and it went to her boss and her

 9    boss's boss and her boss's boss.  And that's all they have on

10    this.  They didn't investigate it --

11              MR. ROCHON:  Objection.

12              THE COURT:  Overruled.

13              MR. YALOWITZ:  They didn't bring you any evidence that

14    they investigated it.  They didn't bring you any evidence of

15    anybody who wrote a report saying what happened.  They swept

16    this under the carpet, ladies and gentlemen, you and I know it,

17    asking the family to hide the truth.

18              But at least one PA employee thought it was even more

19    telling than just a cover-up.

20              MR. ROCHON:  Objection.

21              THE COURT:  Overruled.

22              MR. YALOWITZ:  Look at what the boss of the lady who

23    testified yesterday wrote.  This was her boss.  He wrote:  "Be

24    informed.  This information proves that the General

25    Intelligence are involved in the issue of Wafa Idris."

1          Proves that the General Intelligence are involved in

2     the issue of Wafa Idris.

3          Where was he to explain what he did to investigate

4     that?  Where is his report?

5          And remember, Tirawi is not just involved in this

6     incident.  Tirawi is involved in a lot of bad conduct.  He is

7     implicated in a lot of bad conduct.  And counsel for the

8     defendant makes the claim that he is a free man and makes you

9     think he never did anything wrong.  But he is a globetrotter

10    today, based on the testimony of Faraj, who we will talk about

11    his testimony.  If he is so free, where is he?

12          MR. ROCHON:  Objection, your Honor.

13          THE COURT:  Overruled.

14          MR. YALOWITZ:  What was the result of this bomb

15    delivered to Wafa Idris from somebody's office in the Mukataa?

16          That's the result.

17          Jamie Sokolow, 12 years old.  "Right away I knew what

18    had happened.  I knew a bomb went off.  And I kept saying to

19    myself, no, I'm 12 years old and I'm from New York and I'm

20    going to stay alive."

21          Rena Sokolow.  "The next thing I know I looked over to

22    my right and I saw a severed head of a woman about 3 feet away

23    from me.  And I looked and there was this a little girl looking

24    down at me and I wasn't sure if it was Jamie.  Her face was all

25    disfigured and bleeding."

F2J8SOK5                    Summation - Mr. Yalowitz

1            Now let's go to the verdict sheet.

2            Questions 1 and 2, material support.

3            Remember those policies.  I can't even keep straight

4    when it's the PA and when it's the PLO that's paying those

5    prisoners or paying those martyrs.  They keep moving it back

6    and forth pursuant to presidential order.  I can't even keep

7    straight whether it's the PA or the PLO giving those terrorist

8    employees their promotions.  They keep putting both of those

9    things on their documents.

10            And remember your dots.  It's an Al Aqsa attack.

11    There is no dispute about that.  Al Aqsa is the armed wing of

12    Fatah.  We didn't hear any contrary evidence on that.

13            Arafat and his agents knowingly gave material support.

14    You have a whole binder of evidence on that from June 19.

15            We saw the policies here in action.  The Martyrs

16    Institute paying Idris's family and glorifying her because she

17    blew herself up.

18            The PA and now the PLO putting Noor on the payroll

19    because he participated in a murder, an attempted murder.

20            It's not that hard.  When you get to that verdict

21    sheet for those first two questions, you're going to check yes.

22            When we go to the third question, we go to scope of

23    employment.

24            Here you can connect the dots.  When it's common

25    practice to engage in terrorism, when you don't investigate it,

when you cover it up, when people are keeping bombs in their

office and giving them to terrorists and explaining how to use

them, when you glorify terrorists, it's not that hard to

connect the dots that one of these people was providing

material support in the scope of their employment.

As a matter of fact, you can go straight to the top on

this one too.  Yasser Arafat provided Al Aqsa support in the

scope of his employment. He did whatever he wanted.  He was

the top dog.

When you think about as circumstantial evidence and

you connect the dots, this is an easy one to check yes.

Let's go to March 21.  4:20 p.m.  Alan and Yoni

walking home, holding hands, hoods up against the cold.  But

that's not where the story begins.  The story begins with

Tirawi and Arafat.

This is that memo, 1060, from Tirawi to Arafat,

informing them that they had arrested Hashaika and Shawish.

"The person who wanted to perpetrate a suicide

operation, of whom I told your Honor yesterday, was arrested

today in Tulkarm.  Mohammed Hashaika and Nasser Shawish.  The

matter is at your Excellency's discretion."

Now, we saw Abdel Karim Aweis in this case, and he is

the one who arranged the release.  This was his admission,

which the defendants didn't show you in their closing.

"In early March 2002, Muhammad Hashaika was remanded

1    in the Mukataa complex.  Following the request of the

2    defendant, who is in the General Intelligence of the

3    Palestinian Authority, Mohammed Hashaika was released from the

4    said remand."

5              Now, the defendants had a document that said that the

6    guy escaped.  And take a look at that document.  I put it in

7    your binders because I wanted you to see all the evidence.

8    That document was written in 2012.  And that's the only

9    evidence we have suggesting an escape.

10             Think about it.  A suicide terrorist is in custody and

11   he escapes and there is no news reports, there is no APB, not a

12   single document saying he escaped.  There is not a single

13   witness who comes from the police department or the

14   intelligence department to this court to say, yeah, I tried to

15   catch him; yeah, he got out and here's why.  That's not

16   believable.  This is a court of law.  If these people had

17   evidence of this guy escaping, they should have brought it to

18   you and they chose not to do that.

19             MR. ROCHON:  Objection, your Honor.

20             THE COURT:  Overruled.

21             MR. YALOWITZ:  It wasn't just Aweis either.  Tirawi

22   gave weapons for this attack.

23             Here is Shrenzel again.

24             "Given our overall knowledge about the profound

25   involvement of Tirawi during the whole period, in the series of

F2J8SOK5                    Summation - Mr. Yalowitz

1    attacks, of covering up, of providing weapons, for example, the

2    explosives used in the Hashaika attack, if we take all of the

3    Tirawi file into consideration, I think it's more likely than

4    not that he had prior knowledge and involvement in that

5    attack."

6            That's the Idris attack, but he is talking here about

7    the Hashaika weapons.  That was Shrenzel's dispassionate,

8    professional assessment.

9            They did more than that.  They trained the driver too.

10   Look at what she had to say about it.

11               (Videotape played)

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          MR. YALOWITZ:  Of course there's training.  That's

 2    material support.  Training.  Releasing suicide terrorists.

 3    Five weeks later, five weeks after his arrest Hashaika blew

 4    himself up.  That's the result, a seven-year-old child, seven-

 5    year-old child with a screw in his head.

 6          Revital Bauer.  Somebody wanted to kill my family.

 7    Somebody wanted to kill a seven-year-old child.  Alan saw the

 8    terrorist and the terrorist certainly saw Yehonathon.  He saw a

 9    seven-year-old child and he saw that he was going to kill or

10    injure a little boy, a seven-year-old child.  It's not just the

11    release, it's not just the training of the driver.

12          There was another thing that Aweis did.  When you get

13    to -- when you think about material support for Hashaika and

14    his attack, it's pretty easy.  This is another Al Aqsa attack.

15    Look at the support for the employees, look at the support for

16    the non-employees.  Look at the number of people who were

17    involved, all of whom got money from the PA after they did this

18    in accordance with policies that were pre-existing.  This was

19    another undisputed Al Aqsa attack.  Defendants didn't

20    cross-examine Shrenzel on this or offer any evidence that it

21    was not an Al Aqsa attack.  And how do we know that the PA and

22    the PLO provided material support to Al Aqsa?  That binder of

23    evidence.  It's pretty easy to check yes on questions one and

24    two.

25          And when we talk about question three, that scope of

1   employment question, it's not just Yasser Arafat.  We start

2   with Arafat, he's at the top of the ladder, but remember, none

3   of these people were working solely for their own personal

4   motives.  We know that.  What makes a person a rogue employee

5   is not what evil they have in their heart, it's how the

6   employer treats them as a consequence of their acts, what an

7   employer says to them before and after they conduct the crime,

8   what an employer does before and after they conduct the crime.

9          This guy, Aweis, he didn't just release Hashaika, he

10  guided him to detonate his charge and cause the deaths of as

11  many Israeli civilians as possible.  The defendant clarified to

12  Hashaika that if he would be arrested he would have to detonate

13  his charge on the spot, and that the main thing will be that he

14  would kill at least one, but would nonetheless kill.

15         Now when we think about scope of employment, remember,

16  you already have the three factors, time, place and occasion.

17  Was it common?  What are their reasonable expectations from

18  their messaging to their employees?

19         And let's look at the history of the relationship with

20  Aweis in actual practice.  When they hired Aweis, he was

21  already a convicted axe murderer.  That's who you hire as a

22  police officer, a convicted axe murderer?  He's on the list of

23  the most wanted terrorists.  He gets convicted of five counts

24  of murder, and what do you do with him?  You pay him and you

25  promote him.

1          And they didn't just pay him and promote him while he

2     was in prison, they paid and promoted him while he was on that

3     Zinni list of most wanted terrorists.  January, February,

4     March, April of 2002, he is on a list of most wanted

5     terrorists, and the defendants are paying him his usual salary.

6     How do you get your salary?  You go to the bank and pick it up

7     by wire, you come into the office, you get a check.  In actual

8     practice the relationship with this murderer was that they were

9     expecting this was going to be his regularly conducted

10    activity.  When you get to question three, check yes for

11    Arafat, check yes for Aweis, check yes for Tirawi.

12         Let's go to June 19, 7:10 p.m.  French Hill Junction.

13    Seven killed.  Remember Rabbi Mandelkorn's testimony.  My son

14    was the first one to leave the bus.  He wanted to get home

15    fast.  He got out of the bus with his guitar.  My son comes out

16    this like, he's running down to here, and boom.  He was the

17    only boy on the bus who was wounded because the bus had moved

18    up.

19         We saw the pictures of that bombing in French Hill,

20    and we saw the weapon collected.  Ordinary household item

21    turned into an instrument of death and evil.

22         Now this attack is a little different because no

23    employee of the PA was brought to justice.  But we know that

24    this was an Al Aqsa attack, and it came after our government

25    had designated the Al Aqsa Martyrs Brigades as a terrorist

F2JTSOK6                        Summation - Mr. Yalowitz

1    organization.  And why did our government do that?  Our

2    government made a determination that the Al Aqsa Martyrs

3    Brigades has committed or poses a serious risk of committing

4    acts of terrorism that threaten the security of U.S. nationals

5    or the national security, foreign policy, or economy of the

6    United States.

7            Let's look at the evidence, undisputed, uncrossed.

8            Did the Al Aqsa Martyrs Brigades claim credit for the

9    June 19 attack?

10           Yes, they did.

11           What is your opinion as to whether Al Aqsa Martyrs

12   Brigades was responsible for the June 19 attack?

13           Yes, they were.

14           Now you heard counsel for the defense try to make hay

15   on the typo in the binder saying that it was a June 18 attack.

16   And there is a typo in that binder, and Shrenzel was asked

17   about it.  And he said -- he looked at it and he assessed it,

18   and he was convinced that it was the June 19 bombing, not the

19   June 18.  There's a report from the government that says that

20   June 18 and 19 both have suicide attacks.  One was Hamas, and

21   Al Aqsa was the other.

22           And when you look at that binder, you'll see that the

23   Awada attack was Al Aqsa.  So there is that typo, and Shrenzel

24   looked at it, and he satisfied himself, he looked at the kinds

25   of evidence that experts are allowed to look at.  He didn't

1   have any doubts.  And when counsel for the defense objected to

2   that testimony, Judge Daniels told him he could cross-examine

3   if he wanted to, and he chose not to.  Now we see why.  He was

4   planning to lay in wait until now and try to confuse you.

5              MR. ROCHON:  Objection, your Honor.

6              THE COURT:  Sustained.  This case is not about the

7   lawyers.

8              MR. YALOWITZ:  Now how do we know that Al Aqsa was

9   continuing to get financing after it got designated?  Shrenzel

10  investigated that.  And he came to you and he explained it.

11  "Q.  As of June 2002, was the financing continuing?

12  "A.  Yes.  We have strong evidence, as a matter of fact, that

13  Arafat himself provided financial aid to AAMB squads just a few

14  days after the attack that we are discussing, namely a few days

15  after June 19."

16             Just like hiring somebody to do a job, they go, they

17  do the job and then you pay them.  Arafat paid the Al Aqsa

18  Martyrs Brigades in June of 2002.

19             And it's not -- that's not the only payment.  We have

20  direct payments to the family of Awada, including a payment

21  from the president of the PA.  This is in Awada's martyr file.

22  6,000 shekels.  A gift from his Excellency, the president, to

23  the family of martyr and hero Said Awada to his mother for the

24  appreciation him blowing himself up at the age of 17.

25             What 17-year-old wakes up one day and says I think I

1   will blow myself up and kill people?  Do you think they come up

2   with that on their own?

3          There are four questions here, they're all about

4   material support.  Two of them relate to just regular material

5   support, and two of them relate specifically to that question

6   of giving material support to the AAMB.  And those second two

7   are easy to answer based on Mr. Shrenzel's unrebutted,

8   unchallenged testimony about that June payment.

9          Let go to Hebrew University.  This one was a Hamas

10  operation.  The operative was Abdullah Barghouti.  Abdullah

11  Barghouti was a one-man terror industry.  The defendants

12  admitted that they had been told by the United States and/or

13  Israel to arrest or detain him before July 31, 2002.

14         And you heard testimony, unchallenged testimony, about

15  that revolving door policy from Eviatar.  If the PA would

16  receive requests from Israel to arrest people who were involved

17  in acts of terror, it would send them in through one door, and

18  after a very short period of time, it would send them out the

19  other door.  In effect, the revolving door enabled those wanted

20  men to continue to perpetrate the very same acts of terror.

21         We even saw it in one of the documents the defendants

22  put up today in which Noor was in custody for 40 days and then

23  he was released.  He said I was released.  Who releases

24  murderers like that?

25         As for Barghouti, even the President of the United

1    States asked that this man be arrested because of his role in

2    the Sbarro pizza bombing.  August 9, the Palestinian Authority,

3    Chairman Arafat must condemn this horrific terrorist act, act

4    now to arrest and bring to justice those responsible.

5          So what happened?  There was a kind of deal to arrest

6    Abdullah Barghouti.  And here were the players, Jabril Rajoub,

7    who was Faraj's boss, Faraj was the guy who came and testified.

8    Marwan Barghouti, head of the Al Aqsa Martyrs Brigades, and

9    Hassan Yousef, the father of Mosaab Yousef who gave that video

10   testimony.  And the deal was described on tape by Mosaab

11   Yousef.  Here's what he said.

12          (Video recording played)

13          MR. YALOWITZ:  Three weeks later Abdullah Barghouti is

14   in fact released by the preventive security, Jabril Rajoub's

15   outfit.  We were detained in the preventive security prison

16   from that day until the day on which Abu Ali Mustafa was

17   eliminated.  We heard yesterday that was August 27, three weeks

18   later.  After his elimination, they released us from the

19   prison.

20          Now counsel for the defense wants you to think that

21   Abdullah Barghouti and Mosaab Yousef weren't telling the truth.

22   He wants you to think that Abdullah Barghouti escaped.  Well,

23   if a bomb maker -- a known bomb maker escapes, and this is a

24   guy that the President of the United States said needed to be

25   brought to justice, a known bomb maker escapes and there's no

1   reports on it?  There's like some oral report, oh, I heard he

2   escaped?  Come on.  Think about when the Boston Marathon bomber

3   was on the loose --

4               MR. ROCHON:  Objection.

5               THE COURT:  Sustained.

6               MR. YALOWITZ:  -- the whole city was locked down.

7               THE COURT:  Don't use that example.

8               MR. YALOWITZ:  Think about what you would expect if a

9   guy really escaped.  You would at least have some document on

10  which to base your claim that he escaped.

11              MR. ROCHON:  Objection, your Honor.

12              THE COURT:  Overruled.

13              MR. YALOWITZ:  You would have some person who saw him

14  escape.  You would have some person who said I showed up at

15  jail and he was escaping, we tried it catch him.  Not some guy

16  who was in another town and said I heard he escaped.  This is a

17  court of law, you bring real evidence if you have something to

18  prove.

19              Now after his release, Ahmed Barghouti and another guy

20  transferred Abdullah Barghouti to a safe house, from the prison

21  to an apartment.  And Abdullah Barghouti was convicted of

22  providing material support to Hamas for that.  Because when you

23  take a guy to a safe house, that's material support.  That's

24  harboring a terrorist.  It's not that complicated.

25              And who was this other person?  You can connect those

1    dots.  Ahmed Barghouti was not some lowly driver, as was

2    suggested earlier today, Ahmed Barghouti was the right-hand man

3    and bodyguard of Marwan Barghouti, head of Al Aqsa Martyrs

4    Brigades.  That's in your binders.  You remember Faraj was

5    questioned about Ahmed Barghouti on cross.  He was shown a GIS

6    document explaining exactly who Ahmed Barghouti was.  He

7    couldn't even admit that it was his own document from his own

8    intelligence agency even in the face of the defendants'

9    stipulation.

10           What happened next?  There was a killing spree.

11   Triple bombing in Jerusalem, Saturday night, December 1st, a

12   bombing March 9, a bombing May 7, a bombing June 30, a bombing

13   July 21, finally Hebrew University, July 31, bomb, bomb, bomb,

14   bomb, bomb.  What do you expect is going to happen when you

15   take a bomb maker and let him out of prison and put him in a

16   safe house?

17           And look at what the results were.  That's a

18   cafeteria.  That's people who were eating in the cafeteria.

19           Larry Carter.  In the newspaper, five Americans dead,

20   four are named.  Diane is not named.  And then it dawned on me,

21   she was so badly mutilated they had to use her fingerprints to

22   identify her.

23           Richard Blutstein.  I remember one of the photos.

24   There was a bloody chair, and it wasn't a little blood, it was

25   like globs of blood.  And I don't know if it was the chair, but

1    it might well have been the chair that Ben was sitting on.

2              Now this verdict sheet has a lot of questions.

3    Because the defendants harbored a terrorist, provided material

4    support for terrorism, provided material support to Hamas.

5    There are six different questions on pure material support, and

6    the answer to all of them is yes.

7              And then there's the scope of employment question for

8    the PA.  And you've got -- again you've got Yasser Arafat, and

9    again you've got Ahmed Barghouti bringing the guy to a safe

10   house with another person.  You can ask yourselves is that

11   scope of employment?  Is that regularly conducted activities?

12   Is that in furtherance of the activities of the PA?

13             Now I just want to give you one more comment about

14   Hebrew University.  Defendants are claiming that they can't be

15   liable because by the time of the bombing, time had passed

16   between the release of the bomber, and he was hard to catch.

17   But that's not what cause is.  Cause is pretty simple.  We have

18   to show that the unlawful conduct played a substantial part in

19   bringing about or causing the injuries, and that the injuries

20   were either a direct result of the unlawful activity or at

21   least a predictable consequence.

22             Well, that's pretty easy to satisfy here.  If you

23   don't let him out of jail, if you don't give him a safe house,

24   he can't elude detection.  He's in jail, he's not making bombs,

25   he's not killing people.  And if you do let him out, it's

1    predictable he's going to kill people.  That passage of time is

2    no bar to liability here.

3          Let's go to January 29.  By this point you get the

4    picture.  Look at all these PA employees involved.  This is

5    another Al Aqsa Martyrs Brigades attack.  Even the suicide

6    bomber was a PA cop.  He was fired for a couple of weeks, but

7    they put him back on the force because he blew himself up.

8    It's those policies, it's that approval.

9          And look at what happened.

10         (Video recording played)

11         MR. YALOWITZ:  Karen Goldberg had to go to the

12   coroner's office.  Her husband's two very good friends were

13   there and they said they would identify the body.  They told

14   her it was better that she didn't go in.

15         Chana and Karen went to pick up his things.  They

16   found a watch.  It had blood on it.  They found his knapsack.

17   His books.  Everything had the smell of burnt flesh and blood.

18         What did the defendants say about the man who did

19   this?  What did they say he was doing?  They said he worked as

20   a first sergeant in the police until he was martyred, and they

21   said he was performing his national duty.

22         What did they say and do about the other employees?

23         Ahmed Salah, convicted of 19 counts of murder.  He's

24   been promoted twice.  They don't have any security or moral

25   comments about him.

1          Hilmi Hamash, he's in prison for military activities

2     on behalf of the Fatah movement.  No security or moral comments

3     about him.  They think he's good.

4          Abdel Maqdad, nine of the 19 counts of murder.  The

5     defendants think he's a man of good morals.  A man of good

6     morals?  It's pretty easy to check box three yes for the

7     January 29 attack that killed Scotty Goldberg.

8          Not to mention boxes one and two, Al Aqsa attack.  All

9     those support of Al Aqsa Martyrs Brigades.  All that money, all

10    those people.  This is an easy one to check yes on.

11         I want to talk about weighing the evidence and the

12    standard of proof.  Judge Daniels is going to instruct you what

13    it means for there to be a preponderance of evidence, and I

14    want to come back to it.  It's those scales of justice.  Do

15    they tip?  Do they tip?

16         Plaintiffs in this case brought you convictions.  We

17    brought you confessions.  We brought you intelligence

18    documents.  We brought you government reports from our

19    government.  We brought you government reports from the Israeli

20    government who had people on the ground on the scene.  We

21    brought you raw documents.  We brought you three dozen

22    witnesses who testified from personal knowledge or from decades

23    of expertise.  You have these binders, you can ask for them.

24    You have summaries of the plaintiff families to help you

25    remember who they were.  You can ask for them.  You have

1   videos.  You can ask for them.  You have the defendants' own

2   words.

3           You remember the defendants' evidence?  Me neither.

4   Me neither.  I had to go back and look.  They offered four

5   photographs, a map, and a letter from 1993.

6           Where are the reports saying don't do this?  Where are

7   the reports saying what happened?  Where are the witnesses who

8   served with these people?  Where are the supervisors who said

9   don't do this, this was wrong?  Where is anybody with any

10  direct personal knowledge of what happened from the defendants'

11  side of the table?  They didn't offer it.

12          The only person from any security force that they

13  offered with any -- well, they did bring the lady who wrote the

14  report on 233, we talked about her.  Other than her, the only

15  other person they brought was Faraj, who couldn't give a

16  straight answer.  Faraj, who contradicted his own deposition

17  testimony and wouldn't admit it.  Faraj, who wouldn't admit

18  that his own documents from his own agency were what the

19  defendants admitted them to be.  Faraj, who wouldn't even admit

20  that Abdullah Barghouti was a killer.  Faraj, who even misread

21  the Arabic in a document because he didn't want to admit that

22  one of these prisoners was putting money in his own bank

23  account instead of in his wife's bank account.  Shrenzel

24  cleared that up yesterday.

25          The defendants didn't come to this court of law with

1    evidence, they came with excuses.

2              MR. ROCHON:  Objection, your Honor.

3              THE COURT:  Overruled.

4              MR. YALOWITZ:  Excuse number one, we're paying

5    prisoners to prevent radicalization.  They're paying people who

6    were multiple murderers, who are members of Hamas and other

7    designated terror organizations like Al Aqsa Martyrs Brigades

8    because they don't want them to become radicals?  How much more

9    radical do you have to get to be outside the bounds for these

10   defendants?

11             Excuse number two, we pay prisoners social welfare.

12   Well, social welfare is need based.  These payments aren't need

13   based.  These payments are based on how much time you're

14   serving.  That's not welfare.

15             Excuse number three, these people were rogue

16   employees.  That's what we heard most of this morning.  People

17   may have their own motives, that's always true.  The question

18   is how you deal with people who do bad things.  Do you fire

19   them or do you keep them on the payroll and promote them and

20   give them thousands of dollars in reward money?  Is there a

21   civilized government in the world that pays people who

22   intentionally hurt innocent civilians?

23             Here's what Shrenzel says:  Can you tell us what

24   policy it reflects to give promotions to individuals, such as

25   Abdel Karim Aweis, who have been convicted of murder?

1    It reflects a policy of praise, of appreciation, of

2    endorsing what he did.  And this is really unthinkable, yes?

3    It's like if let's a convicted murderer that belongs to the

4    security portions of a certain country, it's unheard of, and

5    it's totally illogical that he gets promoted.  And it's a

6    reflection of the policy of the PA.  They wanted him to do it.

7    He did it.  They praised him for that and they continued their

8    support for him.

9    Excuse number four, we couldn't conduct operations

10   because it was too violent.  Well, look at those payroll

11   records.  They never missed a payment.  2001, 2002, however

12   much conflict they claim there was, it wasn't too much to keep

13   paying their terrorist employees.

14   Look at the dates on the Wafa Idris murder file,

15   February 14, 2002.  They didn't have any trouble staffing the

16   martyr office in February 2002.  They didn't have any trouble

17   arresting Hashaika or arresting Abdullah Barghouti.

18   Let's look at what our government said about what

19   happened here.  During the reporting period, the Al Aqsa

20   Martyrs Brigades increasingly used suicide bombs to enormously

21   destructive effect.  On March 26 the Secretary of State

22   designated Al Aqsa Martyrs Brigades as a foreign terrorist

23   organization.  Although the PA made some rhetorical calls to

24   suppress attacks from this group, these efforts were neither

25   serious nor sustained.

1          That's what our government thought was going on.

2          Excuse number five, we're for peaceful demonstrations.

3     Yeah, they talked a good game of peace when they brought

4     witnesses here.  But actions speak louder than words.  And what

5     are their actions?  We saw the results of those actions when we

6     heard from my families.

7          They say they're against terror, but what do they do?

8     How much are they paying terrorists even today?  Today they're

9     paying terrorists $4.25 million every single month.  Every

10    month.  That's $50 million a year.  And that's just the

11    prisoner payments.  That's just the non-employees who they have

12    joined on the payroll.  That doesn't count the guys who were

13    already on the payroll, that's a different budget.  Actions

14    speak louder than words.

15         Think about who they glorified and paid.  Let's take

16    the example of Abdullah Barghouti.  We heard his description of

17    what he did, how he made those bombs, taking screws, glueing

18    them into a bag, mixing up a batch of homemade explosives, Umm

19    Al Abed, mother of Satan they call it.  Mother of Satan.

20    That's what he mixed up.  Put it in a shampoo bottle.  That's

21    how they made these bombs.

22         You want to see real evil, ladies and gentlemen, ask

23    for Exhibit 1140 and dump it out on the table.  These screws

24    were taken out of the bodies and clothing of Alan Bauer and

25    Yoni Bauer.

1          These people took household items and turned them into

2     weapons of death.  When you go back to that jury room, talk

3     about what kind -- what that kind of bomb costs.  How much does

4     it cost to buy a bag of screws and mix up a batch of homemade

5     explosives?  And then think about what it costs us.  You saw

6     that with your own eyes what it costs us.

7          What did those screws do to Yoni Bauer?  What did it

8     to to Scotty Goldberg?  His friends told his wife not to look.

9     His kids saw him come home that night in a body bag in pieces.

10         What did it do to Diane Carter?  The FBI told her dad

11    she had to be identified by her fingerprints.

12         What about the families?  Look at how sad those

13    families are, those beautiful families who came here to tell

14    you their stories.

15         Terror, my friends, has cost us far too much.  Terror

16    needs to cost these defendants more than the price of a bag of

17    screws and a shampoo bottle filled with moment made explosives.

18         Now both lawyers have been talking a lot about Judge

19    Daniels instructions which he will soon give you.  And it's

20    important that you be sure when you're deciding whether the PA

21    and the PLO should be held liable for their conduct, and when

22    you're deciding the amount of damages to impose on them, it's

23    very important to decide this case strictly according to the

24    law.  It's especially important because this case is really all

25    about law.

F2JTSOK6                        Summation - Mr. Yalowitz

1          Terrorism is the opposite of law.  Terrorism is the

2     worst form of lawlessness.  And there can be no better response

3     to terrorists than to say we will not be like you.  We will

4     hold you accountable under the law.  That is why the United

5     States Congress passed the Anti-Terrorism Act.

6          Deciding this case in accordance with law is what

7     these families want, because they are not like the PA and the

8     PLO.  Their agents didn't take to the streets with bullets and

9     bombs when their loved ones were killed or injured.  These

10    families put their trust in law.  They put their trust in their

11    lawyers to tell their story.  They put their trust in Judge

12    Daniels to give them a fair trial.  They put their trust in the

13    United States legal system which produces peaceful justice.

14    And they have put their trust in you.  All we can ask is that

15    you follow Judge Daniels' instructions, and that, I'm

16    confident, will lead to the justice that these families

17    deserve.

18         Now what is justice?  Can you bring a father back?

19    Can you bring a child back?  Can you give Shayna her lung back?

20    Can you take away Yoni's brain damage?  Can you give Shmuel

21    Waldman back his life?  What kind of justice can you give?

22         The law says that when we are injured we are entitled

23    to be made whole.  That is what the United States Congress has

24    demanded.  How can you make these families whole?  Judge

25    Daniels will tell you that you have the power and the duty to

F2JTSOK6                        Summation - Mr. Yalowitz

1      award damages for the injuries caused by these defendants'

2      misconduct.  That is the only kind of justice available in this

3      courtroom.

4              Now there's no amount of money that a wife or a father

5      or a child or a brother or a sister would accept if offered in

6      exchange for the life of a loved one or the health of a loved

7      one or the happiness of a loved one.  But if the only thing

8      that you can give them is money, money has to stand in for

9      compensation for unspeakable loss.  And I know you will not let

10     these families receive only part of what they lost.

11             How do you figure those amounts?  What is fair in the

12     context of this case?  Scotty Goldberg's kids talked about his

13     smile, that million dollar smile.  They talked about his

14     embrace, they talked about how important he was even to picking

15     a spouse in their community.  You can't give them back Chana

16     day.  You can't give them back Shifa day.  You can't give them

17     back that walk around town looking for that sandwich, looking

18     for that kid who left his sandwich at home.

19             But don't leave anything out to compensate them for

20     those losses.  The law supports and requires damages for

21     physical injury, for pain and suffering, for mental anguish,

22     for expenses, for loss of love and companionship, for past and

23     future lost earnings, for shock, for all injuries and

24     disabilities sustained from the terrorist attack.

25             Now I would like to offer you a framework for thinking

1    about damages in this case, because you have a lot of people

2    that you're going to need to think about.  And that binder with

3    the families and the summaries is going to be very helpful to

4    you in keeping track of who is who.  The amount of money that

5    you award as damages is your decision.  All I can do is give

6    you my recommendation.  What you decide might be higher or

7    lower than what I recommend.

8         The way I would like you to think about these damages

9    is I would like you to think about compensating the parent for

10   the loss of a child at $15 million.  You may choose a higher

11   number, you may choose a lower number, that's entirely up to

12   you.

13        I would like you to think about compensating a spouse

14   who lost the love and companionship at $15 million.

15        I would like you to think about a child who lost that

16   parental guidance at $12 million.

17        And I would like you to think about the loss of a

18   sibling at seven and a half million dollars.

19        Now we also have plaintiffs whose loved ones survived.

20   And a parent or child whose loved one survived a shooting or

21   bombing, I would like you to give $2.5 million.

22        We have a spouse, Henna Waldman, whose life was

23   forever altered by terror.  I would like you to give her $6

24   million.

25        And we have a lot of siblings, I think the $2 million

F2JTSOK6                    Summation - Mr. Yalowitz

1    level is the right number for those siblings.

2            As we talk about the families, keep those figures in

3    mind.  Think about Yoni Bauer, who was seven years old.  Yoni

4    took a screw to the head, convulsions, paralysis, blindness,

5    emergency rooms, ICUs, therapy, brain surgery, more brain

6    surgery, learned to talk again, learned to walk again.  And

7    where did he get back to?  You saw Yoni with your own eyes.

8    You heard him talk with your own ears.  Yoni is 20 years old.

9    Yoni has another 60 years of expected life.  How is Yoni going

10   to earn a living?  How is Yoni going to find a mate in life?

11   How is Yoni going to lead a family?  Yoni was a double

12   survivor.  It wasn't just him that day, his father was blown

13   up, too.  Think about what that does to a little boy.  Think

14   about the insecurity.  Think about the permanent change and the

15   loss of innocence at seven years old that happens when your

16   parent can't protect you from a suicide bomber.  The amount you

17   award to Yoni is up to you.  But when you combine his physical

18   injuries and his emotional injuries, his losses of all kinds,

19   including the fact that his father was with him, I recommend

20   that you award $19.5 million.

21           Alan was with Yoni that day.  Look at what Alan lives

22   with.

23           (Continued on next page)

24

25

F2J8SOK7                     Summation - Mr. Yalowitz

1          The physical pain that he went through with skin

2     grafts and surgeries.  And as we said on the first day, you and

3     I know sometimes the worst scars are the ones we carry inside.

4     A father who took his son home by the hand on a path that led

5     to a suicide bomber.  Think about the guilt that he carries.

6     Alan sat on the witness stand and he said Yoni is a good boy,

7     and he hopes some day Yoni will be able to get a driver's

8     license.  That is Alan's dream for Yoni.

9          When you combine Alan's injuries, I recommend that you

10    award Alan $11.5 million.

11         Now, what about Yoni's siblings, Alan's children?  In

12    a way, they are double survivors too.  Their whole lives were

13    turned upside down.  They have lost that security too.  Terror

14    has cost them too.  The amount you award them is up to you.  I

15    recommend $2.5 million for Binyamin.  I recommend $2.5 million

16    for Daniel.  I recommend $2.5 million for Yehuda.

17         Let's talk about Shayna.  Shayna was shot in the chest

18    by a PA police officer with an M-16 rifle.  Shayna was dead on

19    arrival at the hospital. She lost ribs.  She lost a lung.  You

20    heard about the severe pain that she went through.  You heard

21    about her long hospital day.  Five pounds of scar tissue

22    removed from her body in reconstructive surgery.  She was in so

23    much pain the doctors couldn't believe how much medication she

24    had to take.  Her memory has been affected.  For Shayna, who

25    was 20 years old, it's never going to be over.  You saw that

F2J8SOK7                    Summation - Mr. Yalowitz

1   with your own eyes when Shayna sat and testified.  We brought

2   you $700,000 of lost earnings in the economist's testimony.  I

3   recommend you award Shayna $15.7 million as fair compensation

4   for her losses.

5          What about Shayna's family?  What about her sister who

6   raced to her bedside to tell her, I didn't come this far to

7   watch you die.  She gave up her life too that day.  All those

8   years of caring for her sister.  Her own husband couldn't share

9   her bed because she was caring for Shayna.  That's how bad

10  Shayna was in shape.  Flying across the world, not knowing what

11  her situation was going to be, being told you might not get

12  back the same girl, nursing her through that terrible recovery,

13  living with terror every single day for the rest of your life.

14  I recommend that you award Jessica $2 million.  And I recommend

15  that you award Ron and Elise $2.5 million as fair compensation

16  for the heinous injuries that the defendants imposed on them.

17         Let's go to Shmuel.  Shmuel was shot that same day.

18  He was on his way home to meet his beautiful wife.  She was

19  waiting for him with a romantic dinner.  He heard that scream,

20  Allahu Akbar.  He prepared himself for death, but death didn't

21  come.  Leg surgeries, needles, shots, therapy, darkness.  That

22  man lives in darkness because of what these people did to him.

23  He lost his business.  He is not the parent he wants to be.  He

24  is not the husband he wants to be.  I recommend that you award

25  Shmuel Waldman $12 million.

F2J8SOK7                      Summation - Mr. Yalowitz

1          What about Henna?  You heard the testimony that Henna

2    had prepared that beautiful dinner.  Two weeks later they came

3    home to a plate of mashed potatoes in the shape of a heart

4    moldy because she had not left that hospital.  She was a wife

5    until January 22, 2002, and then she became a nurse.  She took

6    care of that man through thick and thin.  Who among us would

7    trade places with Henna for any amount of money?  I recommend

8    that you award her $6 million.

9          And what about Shmuel's dad, Morris?  Morris was

10   driving his father to the hospital when he got the news.  He

11   has carried that son.  He financed a business that failed.  He

12   paid the medical bills for him to try to get the treatment he

13   needed in that darkest moment.  What kind of a parent wouldn't

14   do those things?  Who among us would trade places with him for

15   any amount of money?  I recommend that you award Morris $2-1/2

16   million.

17         Let's talk about our Sokolow family.  That family that

18   survived 9/11 and said, We will not let terror intimidate us.

19   We will stand up to terror.  And then they got blown apart by a

20   suicide bomber sent from the Mukataa, from the Mukataa.

21         Rena saw the head of the suicide terrorist.  And then

22   the fear, the uncertainty, not knowing where the family was.

23   The family was literally blown apart, and in surgery,

24   conscious, with the saws, and not knowing is she going to lose

25   her leg.  And then coming home and the physical therapy and the

F2J8SOK7                      Summation - Mr. Yalowitz

 1    pain and the breakdown.  She got to the point she couldn't go

 2    on.  Rena was not just a survivor that day.  She was the mother

 3    of a survivor.  She was the wife of a survivor.  I recommend

 4    that you award Rena $14 million.

 5          Let's talk about Jamie.  Jamie was 12 years old.  Her

 6    face was filled with shrapnel.  She had to have shrapnel

 7    removed from her eye and she didn't have a parent there to be

 8    with her.  Today Jamie is a young woman in her 20s, and she has

 9    already had cataract surgery.  What does that do to a 12 year

10    old?  I recommend that you award Jamie $11.5 million.

11          Let's talk about Mark.  Mark went from being the

12    parent, provider, protector, to being a victim in that moment.

13    He was so frantic, he left the ambulance trying to find his

14    family.  He can't concentrate.  He withdrew.  His ears got

15    blown out.  It's always with him.  Not a day goes by that he

16    doesn't think of Wafa Idris and what she did to his family with

17    that bomb that she got in the Mukataa.  I recommend that you

18    award Mark $11 million.

19          Let's talk about Lauren, 15 years old.  Terrified.

20    Her sister said when she saw her, she looked like she had been

21    electrocuted.  She was so scared, she went home immediately.

22    As soon as she could get out of that hospital she went home.

23    Shrapnel, fear, PTSD.  I recommend that you award Lauren

24    Sokolow $10.5 million.

25          Let's talk about Elana.  Elana was the one they were

 1    going to visit.  Elana was the one studying abroad for a year.

 2    Elana was the one who wasn't there.  What does she carry every

 3    single day, every single day, because of what these people did

 4    to her family?

 5         MR. ROCHON:  Your Honor, I would ask counsel to

 6    address the jury instead of my clients.

 7         MR. YALOWITZ:  I am speaking to the jury, your Honor.

 8    I think they understand that.

 9         THE COURT:  Mr. Yalowitz, stop pointing and saying

10    "these people."

11         MR. YALOWITZ:  I recommend that you award Elana $4

12    million.

13         Let's talk about Rabbi Mandelkorn.  What that man has

14    gone through, what his dreams were for his son.  His son was a

15    leader.  He was a star.  Great things were expected of that boy

16    until he walked into a suicide terrorist.  40 days in the

17    hospital, scars, surgeries, pain, screaming.  And as bad as his

18    physical injuries were, the emotional injuries were worse.

19    Horrific PTSD.  You heard Dr. Peri come and talk about how bad

20    it was and how his concerned father was the one who reached out

21    to try to get that boy help.  How his father had to take him in

22    the ambulance because his panic attacks were so bad.  His

23    father has a broken heart.  I recommend that you award Rabbi

24    Mandelkorn $2.5 million.

25         Let's talk about the Blutstein family.  Ben Blutstein

F2J8SOK7                    Summation - Mr. Yalowitz

1   turned his life around.  Ben had trouble with drugs.  He joined

2   NA.  And he finally found what he wanted to do.  He wanted to

3   help people.  He was on his way home.  He just had to stop off

4   and take a test when his life was cut short.  And you heard his

5   mother talk about that girl from NA who came that day and told

6   her that Ben had saved her life.

7          That's what they took away.  They took away somebody

8   who was going to save lives.  They took away somebody who was

9   going to turn people around.  What kind of a loss is that for a

10  parent?  Who can ever recover from such a loss?  I recommend

11  that you award Ben's parents $15 million each.  And I recommend

12  you award Ben's sister $7-1/2 million.

13         Now, Ben's estate is also a plaintiff, and there is a

14  line for you to fill out something for the estate too based on

15  the evidence, and I am leaving that up to you.  I trust you to

16  make the right decision on that based on the evidence before

17  you.

18         Let's talk about David Gritz, whose parents found out

19  from the morning news, who spent the day searching, fearing the

20  worst, until their worst fears came to pass.  They were in New

21  York.  Their only child.

22         You heard about Nevenka.  She is ready to die.  She is

23  alone in the world.  She says she has nothing to live for

24  anymore.  And you heard about Norman who passed three years

25  after David.  Norman, who spent three years poring over David's

F2J8SOK7                    Summation - Mr. Yalowitz

1   journals.  Norman, who spent three years writing about David,

2   thinking about David.  All the life sucked out of him.  Before

3   David died, Nevenka had never been to Jerusalem, but now she

4   goes there.  What do you think she is searching for?

5          I recommend that you award Nevenka $15 million.  I

6   recommend that you award Nevenka as successor to Norman $15

7   million.  And I leave it to you for an award for David's

8   estate.

9          Let's talk about Janis Coulter.  Janis lived in

10  Brooklyn.  She went to Jerusalem for a three-day business trip.

11  Apple of her father's eye.  Best friend of her sister who came

12  here today to stand up for Janis, best friend.  Her dad got so

13  sick with grief he turned to alcohol to numb the pain.  We all

14  saw his pain together.  It's 13 years and that man has not

15  recovered, and no parent can recover from a loss like that.  I

16  recommend that you award Mr. Coulter $15 million.  And I

17  recommend that you award Janis's siblings 7-1/2 million.

18  Nothing worse has ever happened to this family.

19         Let's talk about Larry Carter.  Larry, who came here

20  to tell us his story.  Larry gave powerful testimony, a

21  powerful testament to his love for his daughter.  So much pain.

22  Larry said that his hope died that day.  What do you do for a

23  parent who has that much grief?  I recommend that you award

24  Larry $15 million.

25         Larry talked about Diane's sister, Shaun.   Shaun's

F2J8SOK7                    Summation - Mr. Yalowitz

1    grief was complete shock and denial.  I recommend that you

2    award Shaun $7-1/2 million.

3            Now we talk about the Goldberg family.  That big,

4    beautiful singing family, torn apart by terror.  Such a

5    beautiful family.  Such a close-knit family.  He was the glue.

6    Everything was fun, everything was a joy, everything was

7    beautiful, until 8:48 a.m., Thursday, January 29.  A widow and

8    seven children.  They told their stories so much more

9    powerfully than I can tell their stories.

10           For Karen it was second by second.  It wasn't day to

11   day.  It wasn't minute to minute.  It was second to second.  So

12   many kids with so many problems.  We brought you an economist

13   who told you about Karen's lost wages too.  For Karen, I

14   recommend that you award her $15.8 million.

15           Let's talk about Chana.  Oh, Chana.  Chana is the

16   oldest.  She was the right-hand man.  She was the one who went

17   to the police station with her mom to gather their father's

18   things.  Until the day came when they had to close down the

19   office and it broke her, it just broke her.  And you heard this

20   family explain about their community, which is different from

21   ours, about the importance of a father in that community.

22           Now, there is no community where a father is

23   unimportant.  There is no community where a father is

24   unimportant.  But where the boys and girls are separated, where

25   the father has roles that the mother can't step into, that

F2J8SOK7                      Summation - Mr. Yalowitz

1    exacerbates the loss, and that exacerbated the loss for Chana,

2    as we all saw.  For Chana, I recommend that you award her $12

3    million.

4           Let's talk about Esther, who came here today to stand

5    up for her father.  When Chana broke down, Esther took over as

6    her mom's right-hand man.  You heard Esther's stories.  You

7    heard Esther, so eloquent, so powerful, so much loss.  Esther

8    said it much better than I could.  Everything was a wreck.  I

9    recommend that you award Esther $12 million.

10          Let's talk about Yitzhak.  Yitzhak was 12 years old.

11   He was at an age in his community that was still very tender,

12   and what was thrust upon him was more than he could bear.  He

13   was expected to be a parent at 12 years old, and it broke him.

14   And he left the community.  He went from a boy who went every

15   day with his father to that synagogue to a boy who never goes,

16   never goes.  Yitzhak has it so bad he couldn't barely speak

17   when he came to talk to us.  I recommend you award Yitzhak $12

18   million.

19          Let's talk about Shoshana.  Shoshana was 10 years old.

20   Oh, Shoshana.  She used to go to the other families' houses and

21   stand by the side while the father gave a blessing to the

22   children.  She was so sad she couldn't stay in the house.  She

23   used to run away, ten years old.  She couldn't stay.  Today

24   Shoshana rides the bus two hours each way because she doesn't

25   want to be away from her family in case something happens.  I

F2J8SOK7                        Summation - Mr. Yalowitz

1    recommend that you award Shoshana $12 million.

2              Let's talk about Eliezer.  Eliezer was broken.

3    Eliezer was depressed, even to this day.  I recommend that you

4    award Eliezer $12 million.

5              Let's talk about Yaakov.  Yaakov was four years old

6    when his father was murdered, four years old.  And he went into

7    a trance, and that was what he said, that was all he could say.

8    You heard his mother talking about how needy Yaakov and Eliezer

9    and Zvi are even today.  They are so needy of their family

10   because of what happened to them.  I recommend that you award

11   Yaakov $12 million.

12             Let's talk about Zvi.  Zvi was a baby.  He couldn't

13   even talk.  And when he heard the sound on tape of his father's

14   voice, he would bang his head on the floor.  And when he began

15   to speak late, his first words were about his father.  He

16   asked, Who killed my father?  And today that child speaks of

17   death more frequently than he speaks of life.  I recommend that

18   you award Zvi $12 million.

19             I have said a lot.  I have tried to tell the stories

20   of these families as best I can.  The truth is their words and

21   their images are the most powerful testimony and the most

22   powerful testament.

23             I want to leave you with their words, ladies and

24   gentlemen.  This is terror.

25             (Videotape played)

F2J8SOK7

1            MR. YALOWITZ:  Thank you.

2            THE COURT:  Ladies and gentlemen, it's late so we are

3    going to adjourn for the day.  It's been a long day.

4            What I am going to do is ask you to be here tomorrow

5    morning at 9:30.  As soon as you arrive, I am going to give you

6    instructions on the law.  My instructions should take about 45,

7    50 minutes, and then I am going to send you right in to begin

8    your deliberations.  We will take your lunch orders when you

9    first arrive, and I will try to get you in as quickly as

10   possible.

11           I will see you at 9:30.  Get a good night's rest and I

12   will see you tomorrow morning.  Don't discuss the case.  Keep

13   an open mind until I finally instruct you on the law and you

14   begin your deliberations.

15           (Jury exits courtroom)

16           THE COURT:  I will see everyone tomorrow morning at

17   9:30.

18           (Adjourned to February 20, 2015, at 9:30 a.m.)

19

20

21

22

23

24

25