# Exhibit A

Gordon Klein, J.D., C.P.A.
UCLA Anderson School
24724 Calle Conjeo
Calabasas, CA 91302
gordon.klein@anderson.ucla.edu

March 16, 2015

Gassan A. Baloul, Partner
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC 20037

Dear Mr. Baloul,

Attached, please find my report.

Sincerely,

Gordon Klein

**Expert Report of Gordon Klein**
**March 16, 2015**

## I.      Executive Summary

1.      I have been asked by counsel for Defendants to review and critique the calculation of prejudgment interest prepared by Mr. Michael Soudry, Plaintiffs' expert, in connection with the verdict.  Mr. Soudry has calculated total damages of $1,150,117,004, which is comprised of verdict damages of $218,500,000, accrued prejudgment interest of $164,872,335, and the additional sum of $766,744,669 from trebling the verdict and prejudgment interest sums.

2.      Mr. Soudry's calculation of prejudgment interest suffers from both methodological and conceptual errors.  Although Plaintiffs' counsel certified to this Court that Mr. Soudry's methodology conforms to the district court's methodology in *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570, 2012 WL 4711407, at *3 (S.D.N.Y. Oct. 3, 2012) (Daniels, J.), in fact, Mr. Soudry's analysis does not follow *In re Terrorist Attacks on Sept. 11, 2001*.  Mr. Soudry's failure to conform to the methodology approved in *In re Terrorist Attacks on Sept. 11, 2001* overstated the Plaintiffs' damages by $331,775,354.

For example, Mr. Soudry applied prejudgment interest to the entire jury verdict, even though the court in *In re Terrorist Attacks on Sept. 11, 2001* only stated that "Plaintiffs should be awarded prejudgment interest . . . on their damages of solatium and pain and suffering damages . . . ,"[1] and did not award that interest on other compensatory damages elements.  In addition, Mr. Soudry has inflated his damages calculation by applying a multiplier to both the principal amount of compensatory damages *and* to prejudgment interest, even though the court in *In re Terrorist Attacks on Sept. 11, 2001* never authorized the magnification of prejudgment interest through the use of a multiplier.

_____

[1] *Id.*

After correcting for just these methodological deficiencies, Mr. Soudry's calculation implies total damages of $818,341,647.

3.      Furthermore, Mr. Soudry has applied prejudgment interest to the principal amount of the verdict damages in a manner that violates well-established accounting and economic principles. Specifically, Mr. Soudry has applied prejudgment interest to the economic verdict damages as if those damages had been measured in 2002-2004 dollars, even though Mr. Soudry himself, along with Plaintiffs' other financial expert Mr. Weinstein, testified at trial that he measured these damages as of December 2014, immediately before trial.  Moreover, Mr. Soudry has applied prejudgment interest to non-economic verdict damages based on the unsubstantiated assumption that the jury measured these verdict damages as of the 2002-2004 time frame of the incidents. Numerous facts in the trial record support the opposite conclusion that the jury expressed its damages award in present-day dollars as of December 2014.  Because overwhelming evidence suggests that verdict damages already are stated in present-day, date-of-trial dollars, Mr. Soudry's proposed restatement of date-of-incident values to present-day December 2014 values through the application of prejudgment interest is unnecessary, unjustified, and economically irrational.  After correcting this methodological error, and eliminating prejudgment interest from Mr. Soudry's calculated damages, the resulting damages award is $655,500,000.

4.      Additionally, even if one assumes that the triers of fact measured verdict damages in 2002-2004 nominal dollars, the application of prejudgment interest to sums that have already been augmented by trebling overcompensates Plaintiffs, yielding a double recovery for the same element of damages.

5.      Lastly, if the Court does choose to apply prejudgment interest, Mr. Soudry's use of the prime rate to augment damages instead of the risk-free rate is economically inappropriate and

appears to be higher than, and inconsistent with, the interest rate applied by fellow Plaintiffs' damages expert Mr. Weinstein.  Replacing the prime rate with the same risk-free benchmark rate applied by Mr. Weinstein would promote consistency and lower the amount of prejudgment interest reflected in the final judgment compared to Mr. Soudry's calculation.

## II.    Qualifications

6.      I currently am a faculty member at UCLA's Anderson School of Management, where I have taught fifteen different courses in the undergraduate program and MBA Program in financial and management accounting, entrepreneurship, financial statement analysis, enterprise valuation, profit forecasting, business plan development, closely held business management, venture capital, employee compensation, financing transactions, valuation, and general business law since 1981.

7.      I was a faculty member from 1987 to 2000 at UCLA's Law School, where I taught courses in accounting, damages calculation, taxation, and financial analysis in the legal process, including the economic analysis of present value, prejudgment interest, and postjudgment interest calculations. I taught similar courses as an Adjunct Professor in the LLM in Taxation Program at Loyola Law School in Los Angeles, California during fall 2001 and 2002.

8.      I am a member of the California Bar (inactive), admitted in 1979, and a Certified Public Accountant ("CPA"), registered in the state of Illinois in 1976. I have conducted executive education seminars in financial and tax aspects of business management to, among others, partners at PricewaterhouseCoopers, members of the German Bundestadt governing body, and the Finance Committee of the People's Republic of China. I have trained in excess of 8,000 CPA candidates to become CPAs in the state of California, and I have conducted training seminars for

3

all of the Big 4 CPA firms. I authored course materials utilized by UCLA law and MBA students in various courses in accounting, taxation, business law, and entrepreneurship.

9.     I have authored several books on managerial accounting, cost accounting, introductory accounting, managerial finance, and ethical responsibilities in the accounting profession. I earned a B.B.A. from the University of Michigan Business School in 1976, graduating Phi Beta Kappa, and I earned a J.D. from the University of Michigan Law School in 1979.  My full curriculum vitae is presented in Appendix A-1.

10.     I have served as an arbitrator, through the auspices of the American Arbitration Association, in numerous cases, have served as a Superior Court referee, and have served as an expert witness in a number of cases, including cases in Federal District Court, U.S. Tax Court, the Delaware Court of Chancery, and various California Superior Courts. These matters related to, among other subjects, commercial lending, the securitization of mortgage-backed securities, the economic determinants of interest rates, interest rate arbitrage, intangible asset valuation, securities valuation, executory contracts, derivatives valuation, analysis of business models, cash flow projections, economic consideration, damages, and unjust enrichment.  A list of cases in which I have given testimony in the last five years is attached as Appendix A-2.

11.     In addition, I have substantial professional experience as a derivatives trader and consultant in analyzing the business models, financial performance, and valuation of publicly traded and privately held companies, as well as advising closely held businesses and entrepreneurs.

### III.   Background

12.   On February 23, 2015, a duly empanelled jury returned a special verdict following trial in favor of Plaintiffs.[2]   Total damages in the amount of $218,500,000 were awarded.[3]   Plaintiffs asked for and received in this matter three categories of compensatory damages: the economic loss of future earnings and other prospective harms, and non-economic losses due to pain and suffering, and solatium (collectively, "Verdict Damages").[4]

13.   Mr. Soudry has calculated prejudgment interest in connection with the verdict and estimated total damages of $1,150,117,004 as follows:[5]

| | | |
|---|---|---|
| i. | Compensatory (i.e., Verdict Damages): | $218,500,000 |
| ii. | Accrued (i.e., Prejudgment) Interest: | $164,872,335 |
| iii. | Sum of Verdict and Prejudgment Interest: | $383,372,335 |
| iv. | Treble Damages (equal to 2 x iii):[6] | $766,744,669 |
| v. | Total Damages (equal to iii + iv): | $1,150,117,004[7] |

14.   Counsel for Plaintiffs asserts that Mr. Soudry's determination is in accord with the method approved in *In re Terrorist Attacks on Sept. 11, 2001*, No, 03-MDL-1570, 2012 WL

---

[2] Jury Verdict Form at 1-8, *Sokolow v. The Palestine Liberation Org.*, 04 Civ. 00397 (February 25, 2015).

[3] *Id.* at 9-21.

[4] Feb. 19, 2015 Tr. at 3843:22 through 3844:24 (emphasis added).  Plaintiffs' Counsel stated in closing arguments that "The law says that when we are injured we are entitled to be made whole.  That is what the United States Congress has demanded.  How can you make these families whole . . . don't leave anything out to compensate them for those losses.  The law supports and requires damages for physical injury, for pain and suffering, for mental anguish, for expenses, for loss of love and companionship, for past and future lost earnings, for shock, for all injuries and disabilities sustained from the terrorist attack." *Id.*

[5] Letter from Michael Soudry, Eco-Stat LLC, to Philip W. Horton, Esq., Arnold & Porter LLP, 1,3 (March 5, 2015) ("Soudry Report").

[6] Mr. Soudry multiples the total verdict and prejudgment interest by two, and adds it back to the total verdict and prejudgment interest, thus trebling the total verdict and prejudgment interest.

[7] *See* Exhibit 1 for my full replication of Mr. Soudry's calculations. In addition, he contends that additional prejudgment interest shall be awarded at the rate of 3.25% from the date of his report (March 5, 2015) until the date of judgment.  *See* Soudry Report at 1.

4711407, at *3 (S.D.N.Y. Oct. 3, 2012).[8]  In the *In re Terrorist Attacks on Sept. 11, 2001* case, the total damages award was comprised of consequential damages and punitive damages. Consequential damages equaled $1,362,277,884, which reflected the sum of $394,277,884 of economic damages, $94,000,000 of pain and suffering damages, and $874,000,000 of solatium damages.[9]  Punitive damages of $4,686,235,921 were awarded equal to 3.44 times the principal amount of the consequential damages.[10]

## IV.    Assignment

15.    I have been asked by counsel for Defendants to review and opine on Mr. Soudry's calculations. In addition, I have been asked to present alternative calculations that reflect the conclusions that I have reached concerning the resulting amount to be awarded to the Plaintiffs under such calculations.

16.    I discuss the bases for my conclusions below.  I am being compensated at my customary rate of $850 per hour for my work on this engagement.  I have been assisted in the preparation of this report by Compass Lexecon personnel.  Compass Lexecon is being compensated at the customary hourly rates for the personnel working on this engagement.  Neither my compensation nor Compass Lexecon's compensation is contingent on the Court's determination of the magnitude of prejudgment interest to be awarded.  The documents I have relied upon in the preparation of this report are listed in Appendix B.

---

[8] Letter from Kent A. Yalowitz, Arnold & Porter, to Hon. George B. Daniels (March 5, 2012).

[9] 2012 WL 4711407 (S.D.N.Y.) at 3 ("This Court adopts the Report and Recommendation in its entirety. Judgment should be entered against the Sovereign Defendants for (1) economic damages totaling $394,277,884 as broken down in Appendix 1 of this Opinion; (2) damages for pain and suffering of $2,000,000 per decedent totaling $94,000,000; (3) punitive damages totaling $4,686,235,921; and (4) damages for solatium totaling $874,000,000.").

[10] $1,362,277,884 times 3.44 equals $4,868,235,921.

V.     **Divergence in Mr. Soudry's Calculations from the Method Approved in *In re Terrorist Attacks on Sept. 11, 2001***

   A.     The Methodology Utilized by Mr. Soudry

17.     In *Sokolow,* the jury's verdict awarded three categories of compensatory damages: the economic loss of future earnings and other prospective harms; non-economic losses due to solatium; and non-economic damages due to pain and suffering (collectively, "Total Verdict Amount"). Thus, the three elements of economic and non-economic damages that collectively comprise the Total Verdict Amount can be summarized as follows:

Total Verdict Amount = Lost Future Earnings + Solatium +Pain and Suffering

18.     In turn, in determining total damages, Mr. Soudry has augmented the Total Verdict Amount by applying two steps. As his first step, Mr. Soudry has converted the Total Verdict Amount by applying a Prejudgment Interest Factor.[11] In doing so, Mr. Soudry has assumed that all three components of the Verdict Amount should be augmented by prejudgment interest. Additionally, Mr. Soudry has incorrectly assumed that the jury expressed the Verdict Amount in dollars measured as of the incident period of 2002-2004 ("The Incident Date") instead of present-day dollars, and, therefore, he opted to convert the Verdict Amount into an economically equivalent sum as of  December 2014 ("The Verdict Date."). I will refer to this sum, as measured on December 2014, as the Interest-Adjusted Verdict Value. This first step can be expressed succinctly as follows:

Interest-Adjusted Verdict Value = Verdict Amount x Prejudgment Interest Factor

19.     As his second step, Mr. Soudry further magnified the Interest-Adjusted Verdict Value by multiplying it by a trebling factor of 3.0. I will refer to this trebling factor as the "Multiplier."

---

[11] Mr. Soudry's Prejudgment Interest Factor uses the "average annual prime rate from the date of the incident to the time of [his] written report" (*i.e.*, March 5, 2015). Soudry Report at 1.

20.     In summary, Mr. Soudry has converted all three components of the Verdict Amount into his total damages measure by multiplying the Verdict Amount by a prejudgment interest factor and then *re-multiplying* it by a 3.0 magnification factor. Thus, Mr. Soudry's framework for determining total damages can be expressed according to the following formula: [12]

Total Damages = Verdict Amount x Prejudgment Interest Factor x 3.0 Multiplier

B.     The Methodology Applied in *In Re Terrorist Attacks on September 11, 2001*

21.     In the *In re Terrorist Attacks on Sept. 11, 2001* case, the Court awarded "damages in the amount of $6,048,513,805, plus prejudgment interest," and stated that "prejudgment interest is appropriate on Plaintiff's damages for solatium and pain and suffering."[13] The Court then quantified the amount of such prejudgment interest, stating:[14] "Thus, Plaintiffs should be awarded prejudgment interest at the rate of 4.96% per annum on their damages of solatium and pain and suffering damages, which total $968,000,000 . . . ."

22.     Thus, in accordance with the *In re Terrorist Attacks on Sept. 11, 2001* case, the Interest-Adjusted Verdict Value should be determined by applying prejudgment interest *only* to the Solatium and Pain and Suffering components of the Verdict Amounts, but *not* to the Economic Damages component. In equation form, this can be expressed as follows:

Interest-Adjusted Verdict Value =

(Non-Economic Verdict Amount x Prejudgment Interest Factor) + Economic Verdict Amount

23.     Also, in the *In re Terrorist Attacks on Sept. 11, 2001* case, the Court stated that a multiplier in the form of punitive damages should be applied to total compensatory damages,

---

[12] Soudry Report at 3-4, and ¶13 *supra*.

[13] 2012 WL 4711407, at *1, *3.

[14] 2012 WL 4711407, at *3.

including economic damages as well as non-economic solatium and pain and suffering.  The court determined that this amount of punitive damages equaled $4,686,235,921.  Simple arithmetic confirms that this multiplier was to be applied only to the *principal amounts* of such compensatory damages, and was not to be applied to interest on such principal amounts.[15] Consequently, under the methodology used in the *In re Terrorist Attacks on Sept. 11, 2001* case, total damages can be summarized as:

Total Damages =      Economic Verdict Amount +

(Non-Economic Verdict Amount x Prejudgment Interest Factor) +

(Total Verdict Amount x Multiplier)

C.      The Key Differences Between the Methodology Employed by Mr. Soudry and the Methodology Mandated in *In re Terrorist Attacks on Sept. 11, 2001*

24.      Notwithstanding the certification by Plaintiff's counsel that "Mr. Soudry followed the method approved of by the court in *In re Terrorist Attacks on Sept. 11, 2001*," Mr. Soudry departed from that approved method in two distinct ways.

25.      First, Mr. Soudry applied prejudgment interest to *all* damages, both economic and non-economic, even though the court stated that "prejudgment interest is appropriate on Plaintiff's damages for solatium and pain and suffering" and reiterated this mandate a second time in numerical form, stating that plaintiffs shall be "awarded prejudgment interest at the rate of 4.96% per annum on their damages of solatium and pain and suffering damages, which total $968,000,000 . . . ."[16]

---

[15] 2012 WL 4711407 (S.D.N.Y.) at *3.  Total compensatory damages equals economic damages of $394,277,884 + pain and suffering damages of $94,000,000 + solatium damages of $874,000,000, or $1,362,277,884. Applying a multiplier of 3.44 to these compensatory damages yields the punitive damages of $4,686,235,921.

[16] *Id.*

26.     Second, although the method approved in *In re Terrorist Attacks on Sept. 11, 2001* applied a multiplier only to the *principal amounts* of compensatory damages, Mr. Soudry chose to apply the multiplier to *both* principal amounts of compensatory damages *and* to *interest on such principal amounts*. In short, Mr. Soudry first multiplied verdict damages times a prejudgment interest factor and then he *re-magnified* this sum by applying a trebling multiplier. By engaging in this illogical departure from the Court's approved methodology, Mr. Soudry effectively applied the multiplier to roughly 13 years of interest, thereby excessively increasing the Plaintiffs' claimed damages entitlement by $331,775,354.

27.      After correcting both of Mr. Soudry's errors in applying the methodology approved of in the *In re Terrorist Attacks on Sept. 11, 2001* case, the revised total damages amount should be $818,341,647.  *See* Exhibit 2.

## VI.     Conceptual Errors Made by Mr. Soudry Overstate Plaintiffs' Economic Damages

A.  Prejudgment Interest Should Not Be Awarded for the Period of Time Between the 2002-2004 Dates of Incidence and the December 2014 Pretrial Date

i.   The Economic Justification for Customarily Imposing Prejudgment Interest

28.     Prejudgment interest is intended to compensate a plaintiff for the time delay between the damages measurement date[17] and the date of judgment. Accordingly, if the verdict in *Sokolow* had been awarded in U.S. dollars measured as of, say, the incidence dates in 2002-2004, it would be economically reasonable to apply prejudgment interest to compensate Plaintiffs for their deferred receipt of funds, commencing from the period 2002-2004 until the present.  Conversely, if the jury in this case expressed its verdict in the value of the dollar as of the December 2014

---

[17] The damages measurement date usually is the date on which an injury occurred or the date on which a legal action was filed.

pretrial date, not as of the incidence dates, it correspondingly would be inappropriate to impose prejudgment interest for any period commencing prior to December 2014.

ii.   The Lack of Justification for Imposing Prejudgment Interest in this Matter

29.   It is clear from the evidentiary record in *Sokolow* that both of Plaintiffs' damages experts computed the principal amount of economic damages as of December 2014, not as of the 2002-2004 incidence dates.[18]   Even a cursory review of these expert witnesses' trial exhibits and testimony reveals that they valued post-2014 future damages by discounting them back to December 2014, and not to the various dates of incidence from 2002-2004.[19]

30.   Because both Mr. Soudry and Mr. Weinstein clearly expressed at trial that they had measured economic damages as of December 2014, it is incorrect as an economic matter for Mr. Soudry to posit that prejudgment interest should begin to accrue as of 2002. Under Mr. Soudry's calculations, the Plaintiffs would unjustifiably be compensated for an unrealized payment delay of approximately thirteen years that, per the analysis of the Plaintiffs' own experts, they never sustained.

---

[18] The expert reports submitted by Mr. Soudry and Mr. Weinstein in 2013 explicitly state that they were estimating damages as of valuation dates in 2013—*i.e.*, in current dollars, not in 2002-2004 dollars. *See, e.g.,* testimony by Mr. Weinstein, Jan. 30, 2015 Tr. at 2037:14-16 ("The sum is in Israeli shekels and it is calculated according to the current value of the money, the present value or NPV, based on December 2014…"); Jan. 30, 2015 Tr. at 2055:15-17 ("What is the total value of his lost earnings reduced to a present discounted value as of December 1, 2014?  A: $2,643,124."); Weinstein Dep. Ex. 331, at 6 ("All values are calculated to their expected NPV (Net present value) as of mid-2013 (July 1, 2013) as it is assumed that the Court's judgment will be determined by then."); *see also* Defs. Dep. Ex. 228 at 2 ("[E]conomic loss is adjusted to present value, based on U.S. dollar amounts in the year 2013.").

[19] I understand that Mr. Soudry and Mr. Weinstein presented a calculation of economic loss for five Plaintiffs (Pls Tr. Exs. 1226-1230).  The total economic loss per these calculation for these five Plaintiffs equaled $2,668,366, or approximately 1.22% of the $218,500,000 in total damages awarded by the jury (who I understand did not categorize the damages awarded by the different potential components such as economic, pain and suffering and solatium).  The economic losses prior to December 2014 in these same calculations equaled $662,378, or approximately 0.3% of the total damages awarded by the jury.  As explained herein, this court found in *In re Terrorist Attacks on September 11, 2001* that prejudgment interest should be applied to non-economic damages; however, if ruled otherwise prejudgment interest may be applicable to the relatively small $662,378 pre-2014 economic losses.

31.     A simple mathematical example helps explain this error in Mr. Soudry's calculation. Suppose, for the sake of simplicity, that an incident occurred thirteen years ago in March 2002 and that the damage caused to the hypothetical plaintiff is expected to result in a one-time economic loss of $103 in March 2016 (*i.e.*, one year from now and fourteen years after the incident).  Also assume, for the sake of this illustration, that the appropriate interest rate for calculating both the present value of the economic loss and prejudgment interest is 3 percent. There are two generally accepted ways to estimate the economic damage award, both of which yield the same result:

- Method I:  First, the present value of the economic loss can be determined as of the date of incident.  Based on a compound interest rate of 3% for fourteen years (from March 2016 back to March 2002), this $103 would be diminished by $34.9 of interest, yielding a $68.1 value as of the March 2002 date of incidence.  Second, prejudgment interest can then be applied to restate the date-of-incident value forward to the date of verdict. Because the period between the March 2002 incidence date and the March 2015 verdict date is thirteen years, the $68.1 date-of-incidence value would be augmented by $31.9 of prejudgment interest, resulting in a present-day total damages amount of $68.1 + $31.9 prejudgment interest, or $100.

- Method II:  The present value of the $103 projected economic loss as of March 2016 can be directly calculated as of the March 2015 verdict date.  This damages amount equals $100 because, after applying a 3 percent interest rate, $103 discounted backward for one year naturally equals $100.

32.     It would be illogical to apply prejudgment interest to the $100 sum determined under Method II because this $100 damages award is already expressed as of March 2015.  Yet, that is

12

exactly what Mr. Soudry does in his calculation.  Mr. Soudry estimates economic damages as of the December 1, 2014 pretrial date, and then he incorrectly also adds approximately thirteen years of prejudgment interest from the date of incident to the date of his report (March 5, 2015). The example above can be used to illustrate the impact of Mr. Soudry's error.   Using the numbers above, Mr. Soudry's calculation would incorrectly yield damages of $146.9, not $100.0, because Mr. Soudry would add roughly thirteen years of economically unjustifiable interest of 3 percent compounded annually for the period from the incidence dates to March 2015. In short, using the numbers in the example above, Mr. Soudry calculation overstates damages by almost 47 percent, even though no such amounts are economically justified.[20]

33.      As discussed above, the Plaintiffs' financial experts clearly expressed their calculations of economic damages as of December 2014. Furthermore, one can reasonably infer that the amounts awarded by the jury for non-economic damages also were expressed in current dollars as of December 2014, rather than in dollars based on the nominal value of the dollar in 2002-2004.  I have seen no evidence in Mr. Soudry's report or in the trial record that supports Mr. Soudry's critical assumption that the jury intended to, or actually did, express the amounts awarded in 2002-2004 dollars.   In fact, numerous facts refute the assumption underlying Mr. Soudry's report that the jury awarded damages in 2002-2004 dollars and support the conclusion that the jury awarded damages in current dollars:

- Both of Plaintiffs' financial experts, Mr. Soudry and Mr. Weinstein presented their determinations of economic damages in schedules that expressly stated their damage measurements "as of December 1, 2014."   Because I understand that Plaintiffs' counsel and their economic experts made no distinction between their

---

[20] Mr. Soudry actually applied prejudgment interest at an average rate of about 4.5%, compounded annually, so the actual impact of his methodology is, in actuality, greater than the impact illustrated in my stylized example.  *See* Soudry Report at 3-4.

measurements of economic damages and non-economic damages, it is highly unlikely that the jurors disregarded multiple references to damages measurements posited as of December 1, 2014 and, on their own initiative, decided instead to express damages in nominal dollars of 2002-2004. I also understand that no information was ever presented at trial concerning the rate of inflation or differences in the purchasing power of the dollar between 2014 and the 2002-2004 time frame.

- In accounting and allied financial professions, a declarant has a duty to place facts in context and not obscure important distinctions that otherwise might mislead the party to whom financial information is being communicated.  Accordingly, it is inappropriate for a financial professional such as Mr. Soudry to have expressly measured and communicated economic damages to the jury in dollars as of December 2014 and to now contend that he can infer the jury's intent to have expressed non-economic damages in nominal dollars of a time period in the distant past. As discussed above, Plaintiffs' counsel, in closing arguments asked the jury that Plaintiffs be "made whole" and asked the jury to not "leave anything out to compensate them for those losses."[21]

- Even a cursory review of the economic damages schedules presented at trial by Plaintiffs' financial experts reveals that both Mr. Soudry and Mr. Weinstein carefully adjusted and differentiated each set of Plaintiffs' future losses by hundredths of a percent to ensure that each such periodic loss was meticulously discounted to its present value as of December 2014.

---

[21] Feb. 19, 2015 Tr. at 3843:22 through 3844:24 (emphasis added).

- Furthermore, Mr. Soudry's current submission of estimated damages meticulously notes miniscule increments in the average interest rate applicable to each Plaintiff and applies interest rates that differ by fractional thousandths of a percent to each set of Plaintiffs. However, I understand that neither Mr. Soudry nor Mr. Weinstein attempted at trial to differentiate between the purchasing power (*i.e.*, the value) of the dollar in 2002-2004 and purchasing power as of December 2014, even though inflation substantially eroded the dollar's purchasing power during that time span.

- It is a basic tenet of economics that, due to inflation, the value of a dollar received at an earlier date has more value than a dollar received at a later date.  Similarly, because a dollar earned in the 2002-2004 time frame is worth more than a dollar earned at the end of 2014, a jury deliberating in 2014 would have to be given detailed information about these differences in the dollar's value to have knowingly expressed its verdict in 2002-2004 dollars.  However, the jury in this matter could not have made such an informed decision because I understand that no such data was presented at trial.

- The value of the dollar similarly would have varied during the two-year time span from 2002 to 2004. If Plaintiffs' financial experts had expected the jury to determine damages as of distinct incidence dates that varied over this two-year period, rather than determine damages uniformly in current dollars, one would have expected Plaintiffs' experts to scale their suggested damages award to adjust for differences in the dollar's purchasing power at these various incidence dates. However, it is my understanding that they did not do so.

15

- In contrast, I have seen no evidence to suggest that the jury was aware of the relative value of the dollar in 2002-2004 compared to its current value or that amounts awarded by the jury were expressed in nominal dollars valued in 2002-2004 purchasing power.

- Furthermore, if the jury had intended their awards to reflect damages as of the various dates of incidence, rather than uniformly in current dollars, one might expect to observe a discernable pattern among the various Plaintiffs' awards that reveals the jury's particularization of damages based on date of incidence and corresponding differences in the dollar's purchasing power. No such pattern is observable. For instance, Plaintiffs associated with the earliest incident date of January 22, 2002 each were awarded damages amounts rounded in even millions of dollars and, concomitantly, Plaintiffs associated with the most recent incident date of January 29, 2004 likewise were awarded damages rounded in millions of dollars.

- I understand that five of the Plaintiffs offered specific expert testimony on economic damages but that the Plaintiffs otherwise left it to the jury to award the amount of economic and non-economic damages. For instance, the Plaintiffs requested a damage award for Shayna Gould Elliott of $15.7 million. The jury awarded Ms. Elliott $20 million. This and other awards suggest that the jury awarded damages in current dollars, not 2002-2004 dollars.

- I understand that damage awards such as these are based on a "*Heiser* scale" derived from a D.C. federal court case of the same name, and that damages awarded in accord with the *Heiser* scale are intended to provide full compensation

since the date of the attack, and expressly do not warrant prejudgment interest in addition to such damages as it would result in double recovery.[22]

34.     It is well-established in the economic literature that interest rates are set in the marketplace to compensate a lender for the inflation-related diminution in the purchasing power of the nominal dollars returned to them at the maturity date of a loan. For instance, if a lender grants a $100, one-year loan when expected inflation is 3%, one would expect the lender to insist upon earning at least 3% in interest to compensate for the fact that the nominal $100 repaid at the end of the loan term will have a purchasing power of only about $97 in base-year dollars. Thus, before prejudgment interest can be awarded, it is essential that the principal amount of a verdict was expressed in dollars that have sustained a loss of purchasing power (i.e., value) over time. Without clear proof that the jury intended to award damages in pre-inflation dollars with a purchasing power as of 2002-2004, rather than as of December 2014, it would be economically unjustifiable for Plaintiffs to be granted prejudgment interest for any time period prior to December 2014.

35.     If one properly eliminated prejudgment interest from the dates of incidence to the date of the jury's verdict, Mr. Soudry's estimate of damages would be reduced to $655,500,000.  *See* Exhibit 3.

> B.      Granting Prejudgment Interest and Trebling Results in Plaintiffs Reaping a Double Recovery

36.     As discussed above, a grant of prejudgment interest for the period prior to the pretrial date is economically unjustified because Plaintiffs' experts expressed their economic damages measurement as of the December 2014 pretrial date and, consistent with Plaintiffs' experts'

---

[22] *See* e.g., *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 42-43 (D.D.C. 2012).

evidence and testimony, the jury expressed its verdict as of December 2014. Nonetheless, if one assumes, or the court concludes, that Plaintiffs are entitled to some form of compensation for the time differential between the dates of incidence and present, the trebling of the base award damages adequately compensates them for that time delay.

37.    Simple arithmetic readily illustrates this point. After applying the statutory trebling factor, the principal amount of damages increased by an additional 200% to equal a tripled value. For example, trebling $100 yields a $200 increase in damages, resulting in total damages of $300. In comparison, Mr. Soudry contends that prejudgment interest should be applied at various rates in the range of 3 to 4%, rounded, which would imply interest-adjusted damages of $146.9 to $166.5 (at 3-4% compounded annually for thirteen years). If I round these prejudgment rates upward to 5% simple interest for sake of analysis (which would imply total damages of $165 after thirteen years), it becomes clear that the statutory trebling factor more than makes Plaintiffs whole for their maximum thirteen year or so delay from the date of incidence in receiving monetary sums. Indeed, the statutory trebling mechanism magnifies damages to such a substantial degree that it would more than adequately compensate Plaintiffs for their delay even if the applicable prejudgment rate was several times higher or if Plaintiffs had been forced to wait two additional decades longer that the prevailing interest rates and intervening period of delay in fact are.

As such, if Plaintiffs are granted prejudgment interest in addition to trebling, the court will overcompensate them.

## VII.    Mr. Soudry's Inconsistent Use of Interest Rates

38.    Even if one assumes, or the Court concludes, that prejudgment interest should be applied to one or more categories of compensatory damages, the approach utilized by the Plaintiffs'

financial experts still is economically irrational because the interest rate applied by Mr. Soudry in projecting prejudgment damages *going forward* is different than the interest rate that the Plaintiffs' experts themselves presented at trial in *discounting backward* their determinations of future economic damages.  This practice of using one interest rate benchmark on a forward-looking basis to maximize a party's damages recovery and then inconsistently using a different rate benchmark on a backward-looking discounting basis to again maximize a party's damages recovery is referred to as "cherry-picking."

More specifically, in calculating damages at trial, Mr. Weinstein explicitly determined the present value of various Plaintiffs' future lost income using a risk-free rate—specifically, the interest rate on U.S. Government 30-year Treasury Bonds.[23]  By applying such a low discount rate, Mr. Weinstein maximized his clients' calculated damages.

39.     In contrast, Mr. Soudry selected an interest rate benchmark that typically is higher than Mr. Weinstein's risk-free discount rate benchmark—the prime rate—to measure accrued prejudgment interest.[24]

40.     By using a low risk-free rate to estimate the present-value of future losses while using a higher prime based interest rate to calculate prejudgment interest, Plaintiffs' financial experts have inappropriately skewed their calculated damages upward.  Mr. Weinstein applied risk-free discount rates as low as 2.6% in reducing future damages to their earlier economic-equivalent

---

[23] For example, for plaintiff Karen Goldberg, Mr. Weinstein expressly states that he is applying a discount rate of 2.6%.  Pls Ex. 1226 at Schedule 2.  Also, in the calculation of David Gritz's economic loss, Mr. Weinstein uses a rate of 2.98% (titled "US 30 Year Treasury Rate) to discount projected future income (*i.e.*, after December 2014). Pls. Ex. 1227, at Schedule 2.

[24] The prime rate is "a 'reference or base rate' banks use to set the price or interest rate on many of their commercial loans and some of their consumer loan products."  *See* http://www.frbsf.org/education/publications/doctor-econ/2005/june/prime-interest-rate.  Last accessed on March 13, 2015. The prime rate generally is higher than the federal funds rate which is "the interest rate at which depository institutions trade federal funds (balances held at Federal Reserve Banks) with each other overnight."  *See* http://research.stlouisfed.org/fred2/series/FEDFUNDS/. Last accessed on March 13, 2015.

amounts, but Mr. Soudry is applying prime rates averaging over 4.5% in growing damages from the date of injury forward. Because Plaintiffs' experts typically discounted future lost earnings backward in time over more than a decade and Mr. Soudry has assumed that prejudgment interest should be applied for a period exceeding more than a decade, the differential application of the prime rate versus a risk-free rate materially distorts the estimated damages recovery that Mr. Soudry asserts Plaintiffs are entitled to receive.

41.     To illustrate, assume that a person will receive $102.60 one year from now. Further, assume that Mr. Weinstein applied a discount rate of 2.6% to express this future sum in today's dollars (as he did at trial in measuring lost future earnings at December 1, 2014) and that Mr. Soudry now is contending that prejudgment interest should grow at a forward-looking rate of over 4.5% on average (as he does in his report for periods subsequent to December 1, 2014.) Applying a discount rate of 2.6% to a $102.60 sum that will be received one year from now, Mr. Weinstein's calculated present value as of today is $100. However, by applying a prejudgment interest rate of, say, 4.5%, Mr. Soudry will restate this same value one year from now to equal $104.50, even though we know in actuality that it is exactly $102.60 on that date.

**VIII.   Selecting an Appropriate Interest Rate if Prejudgment Interest Is Awarded**

42.     An interest rate, such as the prime rate, principally compensates a lender for expected inflation, investment risk, and a reasonable profit.  Consequently, if the jurors did not fashion their awards to take into account inflation-related differences in the dollar's purchasing power between the 2002-2004 period and the present, it would be inappropriate to award Plaintiffs compensation for inflation over this time span in the form of prejudgment interest.

43.     Nonetheless, if the Court decides to award prejudgment interest, it would be inappropriate to apply a prejudgment rate that exceeds the risk-free benchmark rate applied by

Plaintiffs' expert, Mr. Weinstein. Unlike a bank lending at the prime rate, the Plaintiffs in this matter do not bear investment risks. Moreover, unlike banks, which incur significant overhead and transactional costs in procuring and consummating loan transactions, Plaintiffs incur no such costs and should accordingly not be compensated for costs or profit margin.

In short, if the court decides that Plaintiffs are entitled to prejudgment compensation, the interest rate to be applied should not exceed a risk-free rate similar to the 2.6% interest rate applied and communicated to the jury at trial by Mr. Weinstein.[25] To do otherwise would create an asymmetrical result without economic justification, in which Plaintiffs' prospective damages were discounted backward at a low benchmark rate, but the Plaintiffs' awarded damages would be inflated forward using a higher benchmark, the prime rate.

44.     For the purposes of illustration, I present an alternative version of Mr. Soudry's calculation using risk-free rates.  As demonstrated in Exhibits 4-5, prejudgment interest amounts, and thus total damages, would be lower than the amounts presented as elements of Mr. Soudry's calculations.   If one corrects Mr. Soudry's calculation of prejudgment interest to exclude economic damages, to not apply trebling to prejudgment interest, and to use the average interest rate on 10-year U.S. Treasury bond[26] from the incident date to March 5, 2015 (the date of Mr.

---

[25] *See* e.g., example 5 Franklin M. Fisher & R. Craig Romaine, *Janis Joplin's Yearbook & the Theory of Damages*, Journal of Accounting, Auditing & Finance, Winter/Spring 1990, at 148. ("Accordingly, we retain the position that prejudgment interest should be awarded at the risk-free rate.")

[26] The average interest rate of a 10-year Treasury bond from January 2002 to March 2014 is 3.535%.  Mr. Weinstein uses the interest rate on a 30-year U.S. Treasury bond in his calculation of the present value of economic losses (Pls Tr. Ex. 1227) because he is projecting economic losses through 2045 (approximately 30 years from the date of his calculation).  I use the interest rates on 10-year and 1-year Treasury instruments to better match the shorter duration over which the prejudgment interest would be calculated in this instance.  I note that in an earlier report, Mr. Soudry appears to have used the yield of a 10-year Treasury Note (which had a 2% interest rate as of the date of his report). *See* Defs. Dep. Ex. 222, at 5.  Mr. Weinstein in an earlier report used the interest rate based on the "average United States 30-year treasury bonds and the 10-year Israel government bond rate." *See* Weinstein Dep. Ex. 321, at 7.

Soudry's Report), Mr. Soudry's damages estimate diminishes to \$771,087,543.  Alternatively, using the interest rate on 1-year U.S. Treasury bills[27] reduces his estimate to \$703,542,450.[28]

---

[27] The average interest rate of a 1-year Treasury bill from January 2002 to March 2014 is 1.630%.

[28] These exhibits use Mr. Soudry's methodology other than to substitute the average interest on U.S. Treasury instruments instead of the average prime rate used by Mr. Soudry.

**Exhibit 1**
**Total Damages as Calculated by Mr. Soudry**

| | Compensatory Damages | Prejudgment Interest | Damages to be Trebled | Total Damages |
|---|---|---|---|---|
| | [a] | [b] | [c]=[a]+[b] | [c] x 3 |
| Mark I. Sokolow | 5,000,000 | 4,004,719 | 9,004,719 | 27,014,156 |
| Rena M. Sokolow | 7,500,000 | 6,007,078 | 13,507,078 | 40,521,235 |
| Jamie A. Sokolow | 6,500,000 | 5,206,134 | 11,706,134 | 35,118,403 |
| Lauren M. Sokolow | 5,000,000 | 4,004,719 | 9,004,719 | 27,014,156 |
| Elena R. Sokolow | 2,500,000 | 2,002,359 | 4,502,359 | 13,507,078 |
| Shayna Eileen Gould | 20,000,000 | 16,041,030 | 36,041,030 | 108,123,090 |
| Ronald Allan Gould | 3,000,000 | 2,406,154 | 5,406,154 | 16,218,463 |
| Elise Janet Gould | 3,000,000 | 2,406,154 | 5,406,154 | 16,218,463 |
| Jessica Rine | 3,000,000 | 2,406,154 | 5,406,154 | 16,218,463 |
| Shmuel Waldman | 7,500,000 | 6,015,386 | 13,515,386 | 40,546,159 |
| Henna Novack Waldman | 2,500,000 | 2,005,129 | 4,505,129 | 13,515,386 |
| Morris Waldman | 2,500,000 | 2,005,129 | 4,505,129 | 13,515,386 |
| Dr. Alan J. Bauer | 7,000,000 | 5,518,780 | 12,518,780 | 37,556,339 |
| Yehonathon Bauer | 25,000,000 | 19,709,927 | 44,709,927 | 134,129,782 |
| Binyamin Bauer | 1,000,000 | 788,397 | 1,788,397 | 5,365,191 |
| Daniel Bauer | 1,000,000 | 788,397 | 1,788,397 | 5,365,191 |
| Yehuda Bauer | 1,000,000 | 788,397 | 1,788,397 | 5,365,191 |
| Rabbi Leonard Mandelkorn | 10,000,000 | 7,682,386 | 17,682,386 | 53,047,159 |
| Robert L. Coulter, Sr. | 7,500,000 | 5,692,221 | 13,192,221 | 39,576,664 |
| Estate of Janis Ruth Coulter | 2,500,000 | 1,897,407 | 4,397,407 | 13,192,221 |
| Dianne Coulter Miller | 3,000,000 | 2,276,889 | 5,276,889 | 15,830,666 |
| Robert L. Coulter, Jr. | 3,000,000 | 2,276,889 | 5,276,889 | 15,830,666 |
| Dr. Larry Carter | 6,500,000 | 4,933,258 | 11,433,258 | 34,299,775 |
| Estate of Diane Carter | 1,000,000 | 758,963 | 1,758,963 | 5,276,889 |
| Shaun Choffel | 1,500,000 | 1,138,444 | 2,638,444 | 7,915,333 |
| Dr. Richard Blutstein | 6,000,000 | 4,553,777 | 10,553,777 | 31,661,331 |
| Estate of Benjamin Blutstein | 2,500,000 | 1,897,407 | 4,397,407 | 13,192,221 |
| Dr. Katherine Baker | 6,000,000 | 4,553,777 | 10,553,777 | 31,661,331 |
| Rebekah Blutstein | 4,000,000 | 3,035,851 | 7,035,851 | 21,107,554 |
| Nevenka Gritz | 10,000,000 | 7,589,628 | 17,589,628 | 52,768,885 |
| Estate of David Gritz | 2,500,000 | 1,897,407 | 4,397,407 | 13,192,221 |
| Nevenka Gritz (as successor to Norman Gritz) | 2,500,000 | 1,897,407 | 4,397,407 | 13,192,221 |
| Karen Goldberg | 13,000,000 | 8,487,777 | 21,487,777 | 64,463,330 |
| Chana Bracha Goldberg | 8,000,000 | 5,223,247 | 13,223,247 | 39,669,742 |
| Esther Zahava Goldberg | 8,000,000 | 5,223,247 | 13,223,247 | 39,669,742 |
| Yitzhak Shalom Goldberg | 6,000,000 | 3,917,435 | 9,917,435 | 29,752,306 |
| Shoshana Malka Goldberg | 4,000,000 | 2,611,624 | 6,611,624 | 19,834,871 |
| Eliezer Simcha Goldberg | 4,000,000 | 2,611,624 | 6,611,624 | 19,834,871 |
| Yaakov Moshe Goldberg | 2,000,000 | 1,305,812 | 3,305,812 | 9,917,435 |
| Tzvi Yehoshua Goldberg | 2,000,000 | 1,305,812 | 3,305,812 | 9,917,435 |
| **Total** | **218,500,000** | **164,872,332** | **383,372,332** | **1,150,117,001** |

Source: Soudry Report.
Note: Figures may differ from those reported by Mr. Soudry due to rounding errors.

**Exhibit 2**
**Correcting Mr. Soudry's Calculation:**
**Prejudgment Interest is Only Applied to Non-Economic Damages and Not Trebled**

| | Compensatory Damages | Non-Economic Damages | Prejudgment Interest | Damages to be Trebled | Total Damages |
|---|---|---|---|---|---|
| | [a] | [b] | [c] | [d]=[a] | [d] x 3 + [c] |
| Mark I. Sokolow | 5,000,000 | 5,000,000 | 4,002,663 | 5,000,000 | 19,002,663 |
| Rena M. Sokolow | 7,500,000 | 7,500,000 | 6,003,994 | 7,500,000 | 28,503,994 |
| Jamie A. Sokolow | 6,500,000 | 6,500,000 | 5,203,462 | 6,500,000 | 24,703,462 |
| Lauren M. Sokolow | 5,000,000 | 5,000,000 | 4,002,663 | 5,000,000 | 19,002,663 |
| Elena R. Sokolow | 2,500,000 | 2,500,000 | 2,001,331 | 2,500,000 | 9,501,331 |
| Shayna Eileen Gould | 20,000,000 | 19,339,005 | 15,502,908 | 20,000,000 | 75,502,908 |
| Ronald Allan Gould | 3,000,000 | 3,000,000 | 2,404,918 | 3,000,000 | 11,404,918 |
| Elise Janet Gould | 3,000,000 | 3,000,000 | 2,404,918 | 3,000,000 | 11,404,918 |
| Jessica Rine | 3,000,000 | 3,000,000 | 2,404,918 | 3,000,000 | 11,404,918 |
| Shmuel Waldman | 7,500,000 | 7,500,000 | 6,012,295 | 7,500,000 | 28,512,295 |
| Henna Novack Waldman | 2,500,000 | 2,500,000 | 2,004,098 | 2,500,000 | 9,504,098 |
| Morris Waldman | 2,500,000 | 2,500,000 | 2,004,098 | 2,500,000 | 9,504,098 |
| Dr. Alan J. Bauer | 7,000,000 | 7,000,000 | 5,518,795 | 7,000,000 | 26,518,795 |
| Yehonathon Bauer | 25,000,000 | 25,000,000 | 19,709,983 | 25,000,000 | 94,709,983 |
| Binyamin Bauer | 1,000,000 | 1,000,000 | 788,399 | 1,000,000 | 3,788,399 |
| Daniel Bauer | 1,000,000 | 1,000,000 | 788,399 | 1,000,000 | 3,788,399 |
| Yehuda Bauer | 1,000,000 | 1,000,000 | 788,399 | 1,000,000 | 3,788,399 |
| Rabbi Leonard Mandelkorn | 10,000,000 | 10,000,000 | 7,680,903 | 10,000,000 | 37,680,903 |
| Robert L. Coulter, Sr. | 7,500,000 | 7,500,000 | 5,690,888 | 7,500,000 | 28,190,888 |
| Estate of Janis Ruth Coulter | 2,500,000 | 2,367,863 | 1,796,699 | 2,500,000 | 9,296,699 |
| Dianne Coulter Miller | 3,000,000 | 3,000,000 | 2,276,355 | 3,000,000 | 11,276,355 |
| Robert L. Coulter, Jr. | 3,000,000 | 3,000,000 | 2,276,355 | 3,000,000 | 11,276,355 |
| Dr. Larry Carter | 6,500,000 | 6,500,000 | 4,932,103 | 6,500,000 | 24,432,103 |
| Estate of Diane Carter | 1,000,000 | 951,455 | 721,950 | 1,000,000 | 3,721,950 |
| Shaun Choffel | 1,500,000 | 1,500,000 | 1,138,178 | 1,500,000 | 5,638,178 |
| Dr. Richard Blutstein | 6,000,000 | 6,000,000 | 4,552,710 | 6,000,000 | 22,552,710 |
| Estate of Benjamin Blutstein | 2,500,000 | 2,500,000 | 1,896,963 | 2,500,000 | 9,396,963 |
| Dr. Katherine Baker | 6,000,000 | 6,000,000 | 4,552,710 | 6,000,000 | 22,552,710 |
| Rebekah Blutstein | 4,000,000 | 4,000,000 | 3,035,140 | 4,000,000 | 15,035,140 |
| Nevenka Gritz | 10,000,000 | 10,000,000 | 7,587,850 | 10,000,000 | 37,587,850 |
| Estate of David Gritz | 2,500,000 | 1,426,919 | 1,082,725 | 2,500,000 | 8,582,725 |
| Nevenka Gritz (as successor to Norman Gritz) | 2,500,000 | 2,500,000 | 1,896,963 | 2,500,000 | 9,396,963 |
| Karen Goldberg | 13,000,000 | 12,246,390 | 7,991,072 | 13,000,000 | 46,991,072 |
| Chana Bracha Goldberg | 8,000,000 | 8,000,000 | 5,220,198 | 8,000,000 | 29,220,198 |
| Esther Zahava Goldberg | 8,000,000 | 8,000,000 | 5,220,198 | 8,000,000 | 29,220,198 |
| Yitzhak Shalom Goldberg | 6,000,000 | 6,000,000 | 3,915,148 | 6,000,000 | 21,915,148 |
| Shoshana Malka Goldberg | 4,000,000 | 4,000,000 | 2,610,099 | 4,000,000 | 14,610,099 |
| Eliezer Simcha Goldberg | 4,000,000 | 4,000,000 | 2,610,099 | 4,000,000 | 14,610,099 |
| Yaakov Moshe Goldberg | 2,000,000 | 2,000,000 | 1,305,049 | 2,000,000 | 7,305,049 |
| Tzvi Yehoshua Goldberg | 2,000,000 | 2,000,000 | 1,305,049 | 2,000,000 | 7,305,049 |
| **Total** | **218,500,000** | **215,831,632** | **162,841,647** | **218,500,000** | **818,341,647** |
| *Reduction from Soudry's Calculation* | *0.00%* | *n/a* | *-1.23%* | *-43.01%* | *-28.85%* |

Notes:
[a] See Soudry Report.
[b] Compensatory damages less economic damages presented in Plaintiffs' trial exhibits 1226-1230.
[c] Prejudgment interest from date of incident through March 5, 2015 using the average annual prime rate per Soudry Report.

## Exhibit 3
## Correcting Mr. Soudry's Calculation:
## Assuming No Prejudgment Interest

| | Compensatory Damages | Total Damages |
|---|---|---|
| | [a] | [a] x 3 |
| Mark I. Sokolow | 5,000,000 | 15,000,000 |
| Rena M. Sokolow | 7,500,000 | 22,500,000 |
| Jamie A. Sokolow | 6,500,000 | 19,500,000 |
| Lauren M. Sokolow | 5,000,000 | 15,000,000 |
| Elena R. Sokolow | 2,500,000 | 7,500,000 |
| Shayna Eileen Gould | 20,000,000 | 60,000,000 |
| Ronald Allan Gould | 3,000,000 | 9,000,000 |
| Elise Janet Gould | 3,000,000 | 9,000,000 |
| Jessica Rine | 3,000,000 | 9,000,000 |
| Shmuel Waldman | 7,500,000 | 22,500,000 |
| Henna Novack Waldman | 2,500,000 | 7,500,000 |
| Morris Waldman | 2,500,000 | 7,500,000 |
| Dr. Alan J. Bauer | 7,000,000 | 21,000,000 |
| Yehonathon Bauer | 25,000,000 | 75,000,000 |
| Binyamin Bauer | 1,000,000 | 3,000,000 |
| Daniel Bauer | 1,000,000 | 3,000,000 |
| Yehuda Bauer | 1,000,000 | 3,000,000 |
| Rabbi Leonard Mandelkorn | 10,000,000 | 30,000,000 |
| Robert L. Coulter, Sr. | 7,500,000 | 22,500,000 |
| Estate of Janis Ruth Coulter | 2,500,000 | 7,500,000 |
| Dianne Coulter Miller | 3,000,000 | 9,000,000 |
| Robert L. Coulter, Jr. | 3,000,000 | 9,000,000 |
| Dr. Larry Carter | 6,500,000 | 19,500,000 |
| Estate of Diane Carter | 1,000,000 | 3,000,000 |
| Shaun Choffel | 1,500,000 | 4,500,000 |
| Dr. Richard Blutstein | 6,000,000 | 18,000,000 |
| Estate of Benjamin Blutstein | 2,500,000 | 7,500,000 |
| Dr. Katherine Baker | 6,000,000 | 18,000,000 |
| Rebekah Blutstein | 4,000,000 | 12,000,000 |
| Nevenka Gritz | 10,000,000 | 30,000,000 |
| Estate of David Gritz | 2,500,000 | 7,500,000 |
| Nevenka Gritz (as successor to Norman Gritz) | 2,500,000 | 7,500,000 |
| Karen Goldberg | 13,000,000 | 39,000,000 |
| Chana Bracha Goldberg | 8,000,000 | 24,000,000 |
| Esther Zahava Goldberg | 8,000,000 | 24,000,000 |
| Yitzhak Shalom Goldberg | 6,000,000 | 18,000,000 |
| Shoshana Malka Goldberg | 4,000,000 | 12,000,000 |
| Eliezer Simcha Goldberg | 4,000,000 | 12,000,000 |
| Yaakov Moshe Goldberg | 2,000,000 | 6,000,000 |
| Tzvi Yehoshua Goldberg | 2,000,000 | 6,000,000 |
| **Total** | **218,500,000** | **655,500,000** |
| *Reduction from Soudry's Calculation* | *0.00%* | *-43.01%* |

Source: Soudry Report.

**Exhibit 4**
**Correcting Mr. Soudry's Calculation:**
**Prejudgment Interest is Only Applied to Non-Economic Damages; is Not Trebled;**
**and Uses the Average Annual Yield on 10-Year U.S. Treasury Bonds**

| | Compensatory Damages | Non-Economic Damages | Prejudgment Interest | Damages to be Trebled | Total Damages |
|---|---|---|---|---|---|
| | [a] | [b] | [c] | [d]=[a] | [d] x 3 + [c] |
| Mark I. Sokolow | 5,000,000 | 5,000,000 | 2,882,359 | 5,000,000 | 17,882,359 |
| Rena M. Sokolow | 7,500,000 | 7,500,000 | 4,323,539 | 7,500,000 | 26,823,539 |
| Jamie A. Sokolow | 6,500,000 | 6,500,000 | 3,747,067 | 6,500,000 | 23,247,067 |
| Lauren M. Sokolow | 5,000,000 | 5,000,000 | 2,882,359 | 5,000,000 | 17,882,359 |
| Elena R. Sokolow | 2,500,000 | 2,500,000 | 1,441,180 | 2,500,000 | 8,941,180 |
| Shayna Eileen Gould | 20,000,000 | 19,339,005 | 11,162,896 | 20,000,000 | 71,162,896 |
| Ronald Allan Gould | 3,000,000 | 3,000,000 | 1,731,665 | 3,000,000 | 10,731,665 |
| Elise Janet Gould | 3,000,000 | 3,000,000 | 1,731,665 | 3,000,000 | 10,731,665 |
| Jessica Rine | 3,000,000 | 3,000,000 | 1,731,665 | 3,000,000 | 10,731,665 |
| Shmuel Waldman | 7,500,000 | 7,500,000 | 4,329,164 | 7,500,000 | 26,829,164 |
| Henna Novack Waldman | 2,500,000 | 2,500,000 | 1,443,055 | 2,500,000 | 8,943,055 |
| Morris Waldman | 2,500,000 | 2,500,000 | 1,443,055 | 2,500,000 | 8,943,055 |
| Dr. Alan J. Bauer | 7,000,000 | 7,000,000 | 3,954,474 | 7,000,000 | 24,954,474 |
| Yehonathon Bauer | 25,000,000 | 25,000,000 | 14,123,120 | 25,000,000 | 89,123,120 |
| Binyamin Bauer | 1,000,000 | 1,000,000 | 564,925 | 1,000,000 | 3,564,925 |
| Daniel Bauer | 1,000,000 | 1,000,000 | 564,925 | 1,000,000 | 3,564,925 |
| Yehuda Bauer | 1,000,000 | 1,000,000 | 564,925 | 1,000,000 | 3,564,925 |
| Rabbi Leonard Mandelkorn | 10,000,000 | 10,000,000 | 5,453,148 | 10,000,000 | 35,453,148 |
| Robert L. Coulter, Sr. | 7,500,000 | 7,500,000 | 4,030,949 | 7,500,000 | 26,530,949 |
| Estate of Janis Ruth Coulter | 2,500,000 | 2,367,863 | 1,272,631 | 2,500,000 | 8,772,631 |
| Dianne Coulter Miller | 3,000,000 | 3,000,000 | 1,612,380 | 3,000,000 | 10,612,380 |
| Robert L. Coulter, Jr. | 3,000,000 | 3,000,000 | 1,612,380 | 3,000,000 | 10,612,380 |
| Dr. Larry Carter | 6,500,000 | 6,500,000 | 3,493,489 | 6,500,000 | 22,993,489 |
| Estate of Diane Carter | 1,000,000 | 951,455 | 511,369 | 1,000,000 | 3,511,369 |
| Shaun Choffel | 1,500,000 | 1,500,000 | 806,190 | 1,500,000 | 5,306,190 |
| Dr. Richard Blutstein | 6,000,000 | 6,000,000 | 3,224,759 | 6,000,000 | 21,224,759 |
| Estate of Benjamin Blutstein | 2,500,000 | 2,500,000 | 1,343,650 | 2,500,000 | 8,843,650 |
| Dr. Katherine Baker | 6,000,000 | 6,000,000 | 3,224,759 | 6,000,000 | 21,224,759 |
| Rebekah Blutstein | 4,000,000 | 4,000,000 | 2,149,839 | 4,000,000 | 14,149,839 |
| Nevenka Gritz | 10,000,000 | 10,000,000 | 5,374,598 | 10,000,000 | 35,374,598 |
| Estate of David Gritz | 2,500,000 | 1,426,919 | 766,912 | 2,500,000 | 8,266,912 |
| Nevenka Gritz (as successor to Norman Gritz) | 2,500,000 | 2,500,000 | 1,343,650 | 2,500,000 | 8,843,650 |
| Karen Goldberg | 13,000,000 | 12,246,390 | 5,493,380 | 13,000,000 | 44,493,380 |
| Chana Bracha Goldberg | 8,000,000 | 8,000,000 | 3,588,571 | 8,000,000 | 27,588,571 |
| Esther Zahava Goldberg | 8,000,000 | 8,000,000 | 3,588,571 | 8,000,000 | 27,588,571 |
| Yitzhak Shalom Goldberg | 6,000,000 | 6,000,000 | 2,691,428 | 6,000,000 | 20,691,428 |
| Shoshana Malka Goldberg | 4,000,000 | 4,000,000 | 1,794,285 | 4,000,000 | 13,794,285 |
| Eliezer Simcha Goldberg | 4,000,000 | 4,000,000 | 1,794,285 | 4,000,000 | 13,794,285 |
| Yaakov Moshe Goldberg | 2,000,000 | 2,000,000 | 897,143 | 2,000,000 | 6,897,143 |
| Tzvi Yehoshua Goldberg | 2,000,000 | 2,000,000 | 897,143 | 2,000,000 | 6,897,143 |
| **Total** | **218,500,000** | **215,831,632** | **115,587,543** | **218,500,000** | **771,087,543** |
| *Reduction from Soudry's Calculation* | *0.00%* | *n/a* | *-29.89%* | *-43.01%* | *-32.96%* |

Notes:

[a] See Soudry Report.

[b] Compensatory damages less economic damages presented in Plaintiffs' trial exhibits 1226-1230.

[c] Prejudgment interest from date of incident through March 5, 2015 using the average annual 10-year treasury bond rate.

**Exhibit 5**
**Correcting Mr. Soudry's Calculation:**
**Prejudgment Interest is Only Applied to Non-Economic Damages; is Not Trebled;**
**and Uses the Average Annual Yield on 1-Year U.S. Treasury Bills**

| | Compensatory Damages | Non-Economic Damages | Prejudgment Interest | Damages to be Trebled | Total Damages |
|---|---|---|---|---|---|
| | [a] | [b] | [c] | [d]=[a] | [d] x 3 + [c] |
| Mark I. Sokolow | 5,000,000 | 5,000,000 | 1,179,635 | 5,000,000 | 16,179,635 |
| Rena M. Sokolow | 7,500,000 | 7,500,000 | 1,769,453 | 7,500,000 | 24,269,453 |
| Jamie A. Sokolow | 6,500,000 | 6,500,000 | 1,533,526 | 6,500,000 | 21,033,526 |
| Lauren M. Sokolow | 5,000,000 | 5,000,000 | 1,179,635 | 5,000,000 | 16,179,635 |
| Elena R. Sokolow | 2,500,000 | 2,500,000 | 589,818 | 2,500,000 | 8,089,818 |
| Shayna Eileen Gould | 20,000,000 | 19,339,005 | 4,567,886 | 20,000,000 | 64,567,886 |
| Ronald Allan Gould | 3,000,000 | 3,000,000 | 708,602 | 3,000,000 | 9,708,602 |
| Elise Janet Gould | 3,000,000 | 3,000,000 | 708,602 | 3,000,000 | 9,708,602 |
| Jessica Rine | 3,000,000 | 3,000,000 | 708,602 | 3,000,000 | 9,708,602 |
| Shmuel Waldman | 7,500,000 | 7,500,000 | 1,771,505 | 7,500,000 | 24,271,505 |
| Henna Novack Waldman | 2,500,000 | 2,500,000 | 590,502 | 2,500,000 | 8,090,502 |
| Morris Waldman | 2,500,000 | 2,500,000 | 590,502 | 2,500,000 | 8,090,502 |
| Dr. Alan J. Bauer | 7,000,000 | 7,000,000 | 1,623,247 | 7,000,000 | 22,623,247 |
| Yehonathon Bauer | 25,000,000 | 25,000,000 | 5,797,312 | 25,000,000 | 80,797,312 |
| Binyamin Bauer | 1,000,000 | 1,000,000 | 231,892 | 1,000,000 | 3,231,892 |
| Daniel Bauer | 1,000,000 | 1,000,000 | 231,892 | 1,000,000 | 3,231,892 |
| Yehuda Bauer | 1,000,000 | 1,000,000 | 231,892 | 1,000,000 | 3,231,892 |
| Rabbi Leonard Mandelkorn | 10,000,000 | 10,000,000 | 2,244,787 | 10,000,000 | 32,244,787 |
| Robert L. Coulter, Sr. | 7,500,000 | 7,500,000 | 1,662,340 | 7,500,000 | 24,162,340 |
| Estate of Janis Ruth Coulter | 2,500,000 | 2,367,863 | 524,826 | 2,500,000 | 8,024,826 |
| Dianne Coulter Miller | 3,000,000 | 3,000,000 | 664,936 | 3,000,000 | 9,664,936 |
| Robert L. Coulter, Jr. | 3,000,000 | 3,000,000 | 664,936 | 3,000,000 | 9,664,936 |
| Dr. Larry Carter | 6,500,000 | 6,500,000 | 1,440,695 | 6,500,000 | 20,940,695 |
| Estate of Diane Carter | 1,000,000 | 951,455 | 210,886 | 1,000,000 | 3,210,886 |
| Shaun Choffel | 1,500,000 | 1,500,000 | 332,468 | 1,500,000 | 4,832,468 |
| Dr. Richard Blutstein | 6,000,000 | 6,000,000 | 1,329,872 | 6,000,000 | 19,329,872 |
| Estate of Benjamin Blutstein | 2,500,000 | 2,500,000 | 554,113 | 2,500,000 | 8,054,113 |
| Dr. Katherine Baker | 6,000,000 | 6,000,000 | 1,329,872 | 6,000,000 | 19,329,872 |
| Rebekah Blutstein | 4,000,000 | 4,000,000 | 886,581 | 4,000,000 | 12,886,581 |
| Nevenka Gritz | 10,000,000 | 10,000,000 | 2,216,453 | 10,000,000 | 32,216,453 |
| Estate of David Gritz | 2,500,000 | 1,426,919 | 316,270 | 2,500,000 | 7,816,270 |
| Nevenka Gritz (as successor to Norman Gritz) | 2,500,000 | 2,500,000 | 554,113 | 2,500,000 | 8,054,113 |
| Karen Goldberg | 13,000,000 | 12,246,390 | 2,408,370 | 13,000,000 | 41,408,370 |
| Chana Bracha Goldberg | 8,000,000 | 8,000,000 | 1,573,277 | 8,000,000 | 25,573,277 |
| Esther Zahava Goldberg | 8,000,000 | 8,000,000 | 1,573,277 | 8,000,000 | 25,573,277 |
| Yitzhak Shalom Goldberg | 6,000,000 | 6,000,000 | 1,179,958 | 6,000,000 | 19,179,958 |
| Shoshana Malka Goldberg | 4,000,000 | 4,000,000 | 786,638 | 4,000,000 | 12,786,638 |
| Eliezer Simcha Goldberg | 4,000,000 | 4,000,000 | 786,638 | 4,000,000 | 12,786,638 |
| Yaakov Moshe Goldberg | 2,000,000 | 2,000,000 | 393,319 | 2,000,000 | 6,393,319 |
| Tzvi Yehoshua Goldberg | 2,000,000 | 2,000,000 | 393,319 | 2,000,000 | 6,393,319 |
| **Total** | **218,500,000** | **215,831,632** | **48,042,450** | **218,500,000** | **703,542,450** |
| *Reduction from Soudry's Calculation* | *0.00%* | *n/a* | *-70.86%* | *-43.01%* | *-38.83%* |

Notes:
[a] See Soudry Report.
[b] Compensatory damages less economic damages presented in Plaintiffs' trial exhibits 1226-1230.
[c] Prejudgment interest from date of incident through March 5, 2015 using the average annual 1-year treasury bill rate.

# GORDON L. KLEIN

UCLA Anderson School                          Primary: (818) 687 5567
Los Angeles, CA 90095                         gklein@anderson.ucla.edu

## SUMMARY

Gordon Klein has been a faculty member at UCLA's Law School and Anderson School of Management, court-appointed referee, arbitrator, State Bar consultant, and television commentator. Mr. Klein has testified in several highly publicized matters, including a set of mortgage-backed securities cases that the *Financial Times* heralded as "this century's biggest case against Wall Street." He has extensive experience teaching and testifying in the areas of accounting, finance, damages, intellectual property, enterprise governance, professional responsibilities, valuation, and entrepreneurship. He also has testified about international accounting principles in effect in Abu Dhabi, Guatemala, Hong Kong, Korea, Singapore, and Mexico.

## PROFESSIONAL DESIGNATIONS

- Certified Public Accountant  (registered in Illinois)

- Attorney  (non-practicing, California)

## EDUCATION

University of Michigan Law School  (J.D., 1979)

University of Michigan Business School  (B.B.A, 1976)

## HONORS

- Phi Beta Kappa
- Beta Alpha Psi
- Burroughs Corporation Scholar
- Branstrom Scholar
- Regents-Alumni Scholar

## EMPLOYMENT

**University of Michigan Ross School of Business**                    (1977-1979)
Part-time faculty member. Taught introductory accounting.

**UCLA, Anderson School of Management**                    (1981 - present)
Have taught 15 different courses in accounting, business law, tax planning, financial
statement analysis. Topics include compensation planning, cost accounting, quantitative
aspects of marketing, financial derivatives, LLC and partnership dissolution, investments,
valuation, new venture initiation, contracts, profit forecasting, and entrepreneurship.

**UCLA School of Law**                    (1987 – 2000)
Taught Law and Financial Analysis and Accounting for Lawyers. Courses emphasize
how financial and statistical data should be analyzed and presented. Topics include
damage calculations, profit forecasting, valuation, and bankruptcy.

**Loyola Law School**                    (2001 - 2002)
Adjunct Professor, LL.M. in Taxation Program. Tax Planning and Accounting for
Lawyers. Taught courses focused on structuring corporate, partnership, and LLC
transactions, financial statement analysis, and professional and fiduciary duties.

**Court Referee/Expert Witness/Arbitrator**                    (1986-present)
Appointed to serve as an LA Superior Court referee and Orange County Superior Court
referee.

Have served as an arbitrator in over 150 commercial cases, involving contract, securities,
and partnership disputes.  Member of the Accounting, Commercial Arbitration, and IRS
Tax Shelter Dispute Panels of the American Arbitration Association.

**Public Speaker/Media Commentator**                    (1986-present)
Conducted seminars for numerous organizations, including the California Society of
CPAs, Deloitte, the Finance Ministry of the People's Republic of China, members of the
German Bundestadt (Parliament), Head Start Advanced Management Conference, JP
Morgan, KPMG, Merrill Lynch, and PriceWaterhouseCoopers.

Expert on the CPA exam. Has trained over 8,000 California financial professionals to
pass the CPA exam.

Nationally recognized investment and accounting expert who frequently has appeared on
CNBC and CNN Radio. Has also has appeared in the Wall Street Journal, New York
Times, Forbes, Fortune, Business Week, Los Angeles Times, People, Bloomberg News,
and on CNN, NPR, MTV, and ABC Nightly News.

**Corporate Officer/Director**                                    (Various)
Co-founder, director, or CFO of various closely-held enterprises, including BackupNet International, a data backup software licensor; eTeamz, and Westin Communications, a financial publishing company.

**Investment and Banking Consultant**                       (2004 –present)
Expert consultant to investment banks, hedge funds, and other pooled investment organizations. Advisor to Clarium Capital (Peter Thiel), Goldman Sachs Asset Management, Goldman Sachs Investment Partners, JP Morgan, McKinsey and Co., Monarch Capital, Morgan Stanley, Stark Capital, Serengeti Capital, and Trust Company of the West

**California State Bar Enforcement Division**              (2001)
Forensic investigator. Evaluated whether suspended attorneys had complied with the financial and ethical requirements to merit reinstatement.

**Attorney**                                                     (1979-1980)
Tax attorney. Ervin, Cohen, and Jessup, Beverly Hills, CA. Currently non-practicing status.

## TEXTBOOKS AND PROFESSIONAL PUBLICATIONS

- <u>Ethics in Accounting: A Decision-Making Approach</u>, John Wiley and Sons, (forthcoming in 2015)
- Business Law
- Statistics for Business and Economics
- Cost Accounting
- Introductory Accounting
- Introductory Economics
- Managerial Finance
- Managerial Accounting
- Contributing Editor, The Knowledge Exchange's Encyclopedia of Business
- Technical consultant, <u>Advanced Accounting</u>, First Edition, 2010, Hamlen, et al, Cambridge Business Publishers

**UNIVERSITY COURSES TAUGHT / EXPERTISE**

**Accounting for Lawyers**

The record-keeping process, auditor's liability, asset valuation, financial ratios, liability determination, discount rate determination, contract interpretation of financial covenants and accounting, usury and interest rate analysis, cash flow analysis, and accrual determinations of income and expense.

**Advanced Accounting**

Merger and acquisition techniques, earn-outs, contingent price adjustments, and goodwill determination. Consolidated reporting, professional responsibilities, fiduciary reporting, foreign currency transactions, international accounting principles, bankruptcy and insolvency reporting, partnership accounting, intangibles valuation, derivatives and risk management, and governmental accounting.

**Business Plan Development**

The venture capital process, structuring the marketing, sales, and business strategy of an emerging or expanding business enterprise. Forecasting and profit planning.

**Cost Accounting**

Sales and operational budgeting, profit forecasting, cost behaviors and allocations, breakeven analysis, net present value analysis, evaluating division and executive performance.

**Intermediate Accounting I**

Revenue recognition, accounting estimates, intangibles valuation including goodwill, contingent liabilities, realization and matching principles, royalty income, accounting theory, asset swaps, depreciation, time value of money, research and development, patents, and trademarks.

**Intermediate Accounting II**

Bonds and other financing instruments, convertible securities, stock options, equity, Statement of Cash Flows, operating and capital leases, common accounting fraud techniques, real estate financing techniques, pensions, international accounting, professional ethics, and deferred taxes.

**Law and Financial Analysis**

Time value of money, capital accounts, partnership accounting, discounted cash flows, valuation, ratios, community property, funds tracing, forensic accounting, cost of capital, leverage, debt instruments, equity instruments, derivatives.

**Law for Entrepreneurs**

Contract liability and remedies, enterprise organization, agency, secured financing, bankruptcy, debt collection, the Uniform Commercial Code, unfair competition, price discrimination, antitrust, and the rights and duties of partners, officers, directors and shareholders.

**Managerial Accounting**

Core principles of accounting. Required of all MBA candidates.

**Small Business Management**

Quantitative analysis with imperfect information, market analysis, statistical analysis of data, Internet and e-commerce opportunities, workers' compensation, independent contractors, intellectual property, business strategy, franchises, goodwill valuation and determination, OSHA, personnel issues, labor relations, wrongful termination, employment contracts, and the regulatory environment.

**Structuring Entrepreneurial Deals**

Valuation and organization of closely-held enterprises, bootstrap financing, ownership and profit allocation, nontraditional valuation techniques, valuing unproven technologies,

valuing intellectual property, the cost of capital, capital structure decisions, estate planning, retirement planning, securities laws, insider trading, and Section 1244 stock.

## Tax Principles and Policy

Individual tax planning, tax return preparation, the alternative minimum tax, tax aspects of real estate investing and financing, timing asset acquisitions and dispositions, like-kind exchanges, capital gains versus ordinary income characterizations, professional duties of tax preparers, retirement planning, tax aspects of employment and independent contractor relationships, and deferred compensation.

## Taxation and Management Decisions

The formation and liquidation of enterprises, dividend distributions, stock redemptions, acquisition techniques, entrepreneurial deal structuring and related judicial doctrines, and analyzing partnership, S corporation, and LLC agreements.

## GORDON KLEIN PREVIOUS TESTIMONY

Within the past four years, I have served as a testifying expert in the following matters:

Federal Housing Finance Agency, as Conservator for Federal National Mortgage Association and the Federal Home Loan Mortgage Association v. Goldman, Sachs, et al, U.S. District Court, Southern District of New York, 11 CIV. 6198 (DLC)

Federal Housing Finance Agency, as Conservator for Federal National Mortgage Association and the Federal Home Loan Mortgage Association v. HSBC North America, et al, U.S. District Court, Southern District of New York, 11 CIV. 6189 (DLC)

Federal Housing Finance Agency, as Conservator for Federal National Mortgage Association and the Federal Home Loan Mortgage Association v. Ally Financial, et al, U.S. District Court, Southern District of New York, 11 CIV. 7010 (DLC)

Federal Housing Finance Agency, as Conservator for Federal National Mortgage Association and the Federal Home Loan Mortgage Association v. Nomura Holding Inc., et al, U.S. District Court, Southern District of New York, 11 CIV. 6201 (DLC)

Benowitz, et al v. Highwinds Capital, Inc., et al. Superior Court, Orange County, 30-2012-00556409

Hecny Brokerage Services, Inc., et al v. Sopko, Callado, OEC Logistics, Inc., Superior Court, Alameda County, AG10506488

Prime Media, LLC v. Acer America Corp. U.S. District Court, Northern District of California, (2012CV05020)

Sumner Redstone v. Commissioner of Internal Revenue. U.S. Tax Court (Docket No. 8097-13)

In Re: Cathode Ray Tube (CRT) Antitrust Litigation, retained by Munger, Tolles & Olson, on behalf of LG Electronics  (MDL No. 1917)

Hersch and Company v. Mattel, Inc.  Superior Court, Los Angeles (BC 399474)

Cole v. T-Mobile, Asurion Corp., et al. US District Court, Central District of California, (CV 06-6649-PSG (JTLx))

Leon v. Leon. Superior Court, Los Angeles County, (BC376704)

Cooper, Trustee v. Credit Suisse, et al. US Bankruptcy Court, Santa Ana, Adv. (#8-07-01140-TA)

<u>Kayne et al. v. Ho et al.</u> US District Court, Central District of California, (09-CV-6816 JAK (CWx))

<u>Deutsche Bank AG v. Deloitte and Touche, LLP.</u> Florida Circuit Court, (11-43773-CA40)

<u>Ocala Funding, LLC v. Deloitte  and Touche, LLP.</u> Florida Circuit Court, (11-30957-CA40)

<u>Novack v. Rubin, et al.</u> Massachusetts Superior Court, (SUCV2011-2086-BLS2)

<u>First American Title v. Phillips.</u> Orange County Superior Court, (30-2010-00430183)

<u>James G. Speirs, et al. v. BlueFire Ethanol Fuels, Inc.</u> Orange County Superior Court, (30-2011-00508691)

<u>Signature Financial Group et al. v. Mayer Hoffman McCann.</u> Orange County Superior Court, (30-2011- 00463492-CU-FR-CXC)

<u>United States v. Liew.</u> US District Court, Northern District of California, (11-CR-00573 JSW (NC))

<u>O'Donovan, et al. v. Cashcall, Inc.</u> US District Court, Northern District of California, (CV 08-3174 MEJ)

**Appendix B**

**List of Materials Relied Upon**

**Documents**

Baker v. Socialist People's Libyan Arab Jamahirya, March 30, 2011 Filed. Civil Action No. 03-cv-749 (JMF); Civil Action No. 08-CV-505 (JMF)

Barnard v. Theobald, United States Court of Appeals for the Ninth Circuit, February 15, 2013, Argued and Submitted, San Francisco, California; July 1, 2013, Filed. No. 11-1662, No. 11-16655

Bingham v. Zolt, United States District Court for the Southern District of New York, January 4, 1993, Decided; January 5, 1993, Filed. 86 Civ. 9477 (KC)

Chubb & Son Inc. v. Kelleher, United States District Court for the Eastern District of New York, October 22, 2010, Decided. October 22, 2010, Filed. 92 CV 4484 (TLM) (RML); 95 CV 0951 (CBA) (RML)

Elise Gould, et al. v. The Palestine Liberation Organization, et. al; Jury Verdict Form: 04 Civ. 00397 (GBD)

Estates of Ungar v. Palestinian Auth. United States District Court for the District of Rhode Island, January 27, 2004, Decided. C.A. No. 00-105L

Fortino v. Quasar Co. United States Court of Appeals for the Seventh Circuit, October 15, 1991, Argued; December 3, 1991, Decided.  No. 91-1123, 91-1197, 91-1564

Group III Capitol, Inc. v. Parasol Group, Ltd. United States District Court for the Southern District of New York, April 22, 2003, Decided; April 23, 2003, Filed. 00 Civ. 6860 (SHS)

Havlish v. bin Laden (In re Terrorist Attacks on Sept. 11, 2001) United States District Court for the Southern District of New York, July 30, 2012, Decided; July 30, 2012, Filed. 03 MDL 1570 (GBD) (FM)

Havlish v. Laden, United States District Court for the Southern District of New York, October 3, 2012, Decided; October 3, 2012, Filed. 03 MDL 1570 (GBD)(FM); 03 Civ. 9848 (GBD) (FM).

Hughes Tool Co. v. TWA, Supreme Court of the United States, October 10, 1972, Argued; January 10, 1973, Decided. No. 71-827

Estate of Michael Heiser, et al., Plaintiffs, v. Islamic Republic of Iran, et. al., Defendants.  Estate of Millard D. Campbell, et al., Plaintiffs, v. Islamic Republic of Iran, et al., Defendants. 00-CV-2329 (RCL) Consolidated With01-CV-2104 (RCL) United States District Court for the District of Columbia. 659 F. Supp. 2d 20; 2009

Middle East Engineering & Dev. Co. v. Arkwright-Boston Mfrs. Mut. Ins. Co., United States District Court for the Southern District of New York, December 21, 1987, Decided; December 22, 1987, Filed. No. 86 Civ. 834 (MGC)

Murphy v. City of Elko, United States District Court for the District of Nevada, October 6, 1997, Decided; October 6, 1997, Filed. CV-N-95-395-ECR

Nu-Life Constr. Corp. v. Board of Educ., United States District Court for the Eastern District of New York, March 16, 1992, Decided.  CV-86-0807 (ADS)

Panix Prods. V. Lewis, United States District Court for the Southern District of New York, July 15, 2003, Decided; July 15, 2003, Filed. 01 Civ. 2709 (HB)

Price v. Marshall Erdman & Assoc., United States Court of Appeals for the Seventh Circuit, February 12, 1992, Argued; July 8, 1992, Decided.  Nos. 91-2303, 91-2373, 91-3727

Securitron Magnalock Corp. v. Schnabolk, United States Court of Appeals for the Second Circuit, May 4, 1995, Argued; September 7, 1995, Decided.  Docket No. 94-9194

Securitron Magnalock Corp. v. Schnabolk, United States District Court for the Southern Distrcit of New York, October 18, 1994, Decided; October 19, 1994, Filed. 89 Civ. 6731 (AGS) (NRB)

Silivanch v. Celebrity Cruises, Inc. United States District Court for the Southern District of New York, August 23, 2000, Decided; August 23, 2000, Filed. 95 Civ. 0374 (BSJ) (JCF)

Trans World Airlines, Inc. Hughes, United States Court of Appeals for the Second Circuit, September 1, 1071, Decided.  Nos. 34902, 35114

Wultz v. Islamic Republic of Iran, United States District Court for the District of Columbia, May 14, 2012, Decided. 08-cv-1460 (RCL)

Amir Reza Oveissi, v. Islamic Republic of Iran, et al., 03-cv-1197 (RCL) United States District Court for the District of Columbia. 768 F. Supp. 2d 16

Mark I. Sokolow, et al. v. The Palestine Liberation Organization, et al.; Jury Verdict Form; 04 Civ. 00397 (GBD). January 30, 2015

Mark I. Sokolow, et al. v. The Palestine Liberation Organization, et al.; Jury Verdict Form; 04 Civ. 00397 (GBD). February 18, 2015

Mark I. Sokolow, et al. v. The Palestine Liberation Organization, et al.; Jury Verdict Form; 04 Civ. 00397 (GBD). February 19, 2015

Letter from Michael Soudry of Eco-Stat LLC to Philip W. Horton Esq. of Arnold & Porter LLP dated March 5, 2015 ("Soudry Report")

Deposition of Michael Soundry, September 26, 2013

Deposition of Dov Weinstein, October 16, 2013

Sheryl Wultzm et al., v. Islamic Republic of Iran, et al., 08-cv-1460 (RCL) United States District Court for the District of Columbia, 864 F. Supp. 2d 24, (D.D.C. 2012)

Letter from Kent A. Yalowitz of Arnold & Porter to Hon. George B. Daniels dated March 5, 2012

2012 WL 4711407 (S.D.N.Y.)

Businessland Rents, Inc. v. Brothers, United States District Court for the Northern District of Illinois, Eastern Division, November 13, 1991; November 14, 1991, Docketed. No. 91 C 0144.

Maxwell v. Angel-Etts of Cal., United States District Court for the Central District of California, July 9, 2001, Decided; July 9, 2001, Filed; July 11, 2011, Entered. Case No. CV 99-10516 DT (AJWx)

Pentech Int'l v. Hayduchok, United States District Court for the Southern District of New York, July 30, 1996, Decided; August 2, 1996, Filed. 87 CIV 7233 (KTD)

Prince of Peace Enters v. Top Quality Food Mkt., LLC, United States District Court of the Southern District of New York, January 30, 2015, Decided; February 3, 2015, Filed. 07 Civ, 349 (LAP)

**Exhibits**

Plaintiff's Trial Exhibits 1226-1230

Defendant's Deposition Exhibits 220-224, 225-228, 231

Dov. Weinstein's Exhibits 321, 325, 328-331, 335

**Webpages**

http://www.frbsf.org/education/publications/doctor-econ/2005/june/prime-interest-rate

http://research.stlouisfed.org/fred2/series/FEDFUNDS/

**Academic Literature**

Franklin M. Fisher and R. Craig Romaine; *Janis Joplin's Yearbook and the Theory of Damages; Journal of Accounting, Auditing & Finance*; Winter/Spring 1990.