UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK I. SOKOLOW, et al., | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| | ) |
| | ) No. 1:04-cv-0397 (GBD) (RLE) |
| PALESTINE LIBERATION ORGANIZATION, | ) |
| et al., | ) |
| Defendants. | ) |
| | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF THE PALESTINIAN AUTHORITY'S AND PALESTINE LIBERATION ORGANIZATION'S RENEWED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, AND, IN THE ALTERNATIVE, MOTION FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL UNDER RULE 50(b) AND RULE 59**

Dated:  May 1, 2015

Gassan A. Baloul (Bar No. 4324919)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza
23rd Floor
New York, NY 10112
Telephone: (212) 872-9800
Facsimile: (212) 872-9815
gassan.baloul@squirepb.com

John A. Burlingame (*admitted pro hac vice*)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC  20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
john.burlingame@squirepb.com

*Attorneys for Defendants Palestinian Authority
and Palestine Liberation Organization*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

I. THIS COURT LACKS JURISDICTION OVER THE PA AND PLO ..................2

    A. Three Recent District Court Decisions Illustrate Why this Court Lacks Personal Jurisdiction ...................................................................3

    B. Additional Facts Adduced at Trial Prove the PA and PLO are "At Home" Only in Palestine .................................................................7

II. NEW SEPARATE TRIALS ARE REQUIRED BY A SERIES OF SUBSTANTIAL ERRORS THAT CREATED UNFAIR PREJUDICE TO THE PA AND PLO ...................................................................................... 10

    A. The Court Allowed Plaintiffs to Present Improper Expert Testimony ........ 11

        1. Courts Emphasize *Daubert's* Important Gatekeeping Function ....... 11

        2. Plaintiffs' Experts Improperly Testified on the Ultimate Issues ..................................................................................... 12

        3. Plaintiffs Used Their Experts To Present Inadmissible Evidence As Expert Opinions ..................................................... 14

        4. This Court Improperly Allowed Plaintiffs' Experts To Claim That The Social and Political Policies of The PA and PLO Constituted Material Support ..................................................... 15

        5. Another Court Has Rejected Precisely This Type of "Expert" Testimony by Mr. Eviatar ....................................................... 18

    B. Other Evidentiary Errors Unfairly Contaminated the Trial ......................... 19

        1. This Court Erroneously Admitted Highly Prejudicial Evidence that Had Little to Do With the PA and PLO ................... 19

        2. This Court Allowed Hours of Misleading Testimony about the Palestinian Social Contract, but Limited The PA's and PLO's Ability to Respond .................................................. 21

        3. Plaintiffs Exploited the Unfair Playing Field During Closing Arguments, Resulting in Further Unfair Prejudice ....................... 24

    C. The PA and PLO Suffered Significant Unfair Prejudice as a Result of the Inclusion of Evidence of Six Distinct and Separate Attacks, Each With its Own Discrete Set of Plaintiffs, Perpetrators, and Alleged Material Support ............................................................................ 25

    D. The Court's Jury Instructions Did Not Cure the Unfair Prejudice and Confusion from Plaintiffs' Improper Closing Arguments ........................ 28

1. Plaintiffs Misled the Jury by Arguing the PA and PLO were Responsible for the Conduct of their Low-Level Employees and for Palestinian Political Organizations ........................................... 29

2. This Court's Jury Instruction on Agency Caused Prejudicial Confusion ............................................................................................... 31

3. This Court's Instruction on Agency was Materially Erroneous ....... 33

E. The Court Erred in Allowing Plaintiffs' Counsel to Provide Points of Reference for Damages Awards ........................................................ 34

F. Acting as an Independent Trier of Fact, the Court Should Decide that the Jury's Damages Award is Excessive and Unsupported ................... 35

III. THIS COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW BECAUSE THE ATA DOES NOT ALLOW FOR *RESPONDEAT SUPERIOR* LIABILITY AND PLAINTIFFS FAILED TO MEET THEIR BURDEN AT TRIAL ............................................................................. 37

A. The ATA Does Not Allow for *Respondeat Superior* Liability ............................ 38

1. Because The ATA Does Not Provide For Secondary Liability, This Court Should Not Infer Congress Intended To Allow Liability Under Respondeat Superior ...................................... 38

2. The ATA's Treble Damages Provision Prevents Application of Vicarious Liability ................................................................... 40

3. The Jury Should Not Have Been Instructed on Respondeat Superior ................................................................................... 41

B. Judgment as a Matter of Law is Appropriate Because There was Insufficient Admissible Evidence Connecting Each Individual Attack to the PA or PLO ................................................................................ 42

1. January 22, 2002 attack ......................................................... 43

2. January 27, 2002 attack ......................................................... 44

3. March 21, 2002 attack ........................................................... 45

4. June 19, 2002 attack .............................................................. 46

5. July 31, 2002 attack ............................................................... 47

6. January 29, 2004 attack ......................................................... 48

CONCLUSION .............................................................................................. 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3rd Eye Surveillance, LLC v. City of Irving,*
  No. 6:14-CV-535-JDL, 2015 U.S. Dist. LEXIS 6263 (E.D. Tex. Jan. 16, 2015) .............................. 6

*A. I. Trade Fin. v. Petra Bank,*
  989 F.2d 76 (2d Cir. 1993) ............................................................................................................... 8

*In re Air Crash near Nantucket Island,*
  462 F. Supp. 2d 360 (E.D.N.Y. 2006) ........................................................................................ Ex. A

*Anderson v. Branen,*
  17 F.3d 552 (2d Cir. 1994) .................................................................................................. 28, 31, 33

*Bailey v. N. Trust Co.,*
  196 F.R.D. 513 (N.D. Ill. 2000) .................................................................................................... 26

*Barrett v. United States,*
  651 F. Supp. 614 (S.D.N.Y. 1986) ................................................................................................. 9

*Bielunas v. F/V Misty Dawn, Inc.,*
  621 F.3d 72 (1st Cir. 2010) ........................................................................................................... 35

*Boim v. Holy Land Found. for Relief & Dev.,*
  549 F.3d 685 (7th Cir. 2008) (*en banc*) .............................................................................. 39, 40, 41

*Boim v. Quranic Literacy Inst.,*
  291 F.3d 1000 (7th Cir. 2002) ................................................................................................. 36, 37

*Brewer v. Islamic Rep. of Iran,*
  664 F. Supp. 2d 43 (D.D.C. 2009) ............................................................................................ Ex. B

*Caldecott v. Long Island Lighting Co.,*
  417 F.2d 994 (2d Cir.1969) ....................................................................................................... Ex. B

*Cameron v. City of N.Y.,*
  598 F.3d 50 (2d Cir. 2010) ...................................................................................................... 28, 37

*Capitol Records, Inc. v. MP3tunes, LLC,*
  821 F. Supp. 2d 627 (S.D.N.Y. 2011) ......................................................................................... 42

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1994) ................................................................................................................ 39, 40

*Coleman v. Quaker Oats Co.,*
  232 F.3d 1271 (9th Cir. 2000) ..................................................................................................... 25

*Consorti v. Armstrong World Indus.*,
   72 F.3d 1003 (2d Cir. 1995) ........................................................................................ 34, 37

*Crown Cork & Seal Co. v. Credit Suisse First Boston Corp.*,
   288 F.R.D. 335 (S.D.N.Y. 2013) .......................................................................................25

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014) ...............................................................................................*passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ..................................................................................................*passim*

*Davis v. Browning-Ferris Indus., Inc.*,
   898 F.2d 836 (1st Cir. 1990) ............................................................................................35

*Deskovic v. City of Peekskill*,
   673 F. Supp. 2d 154 (S.D.N.Y. 2009) ..............................................................................25

*Dixon v. Aragona*,
   87-cv-1347, 1992 U.S. Dist. LEXIS 6735 (N.D.N.Y May 9, 1992) ...........................Ex. A

*Duch v. Jakubek*,
   588 F.3d 757 (2d Cir. 2009) ...................................................................................... 29, 41

*EEOC v. Arabian Am. Oil Co.*,
   499 U.S. 244 (1991) .........................................................................................................39

*Estates of Ungar v. Palestinian Auth.*,
   304 F. Supp. 2d 232 (D.R.I. 2004) ............................................................................ 40, 41

*Estate of Esther Klieman v. Palestinian Auth.*,
   No. 04-1175, 2015 U.S. Dist. LEXIS 25167 (D.D.C. Mar. 3, 2015) ....................3, 4, 5, 7

*Foley Bros., Inc. v. Filardo*,
   336 U.S. 281 (1949) .........................................................................................................39

*Gasperini v. Ctr. for Humanities, Inc.*,
   518 U.S. 415 (1996) .........................................................................................................35

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) .........................................................................................................12

*Gill v. Arab Bank, PLC*,
   893 F. Supp. 2d 542 (E.D.N.Y. 2012) .............................................................................41

*Gilmore v. Palestinian Interim Self-Government Auth.*,
   No. 1-853, 2014 U.S. Dist. LEXIS 102093 (D.D.C. July 28, 2014) .......................... 18, 19

*Goldstein v. United States,*
   9 F. Supp. 2d 175 (E.D.N.Y. 1998) .............................................................Ex. A

*Gordon v. N.Y.C. Bd. of Educ.,*
   232 F.3d 111 (2d Cir. 2000) ....................................................................... 28, 34

*Grayson v. K Mart Corp.,*
   849 F. Supp. 785 (N.D. Ga. 1994) ..................................................................26

*Gruber v. Prudential-Bache Sec., Inc.,*
   679 F. Supp. 165 (D. Conn. 1987) ..................................................................41

*Gucci Am., Inc. v. Bank of China,*
   768 F.3d 122 (2d Cir. 2014) ..............................................................................2

*Haskell v. Kaman Corp.,*
   743 F.2d 113 (2d Cir. 1984) ............................................................................27

*Estate of Heiser v. Islamic Republic of Iran,*
   466 F. Supp. 2d 229 (D.D.C. 2006) ............................................................ 36, 37

*Hemi Grp., LLC v. City of N.Y.,*
   559 U.S. 1 (2010) ............................................................................................42

*Henderson v. AT&T Corp.,*
   918 F. Supp. 1059 (S.D. Tex. 1996) ...............................................................26

*Hunter Douglas, Inc. v. Comfortex Corp.,*
   44 F. Supp. 2d 145 (N.D.N.Y. 1999) .............................................................25

*Jean-Laurent v. Hennessey,*
   840 F. Supp. 2d 529 (E.D.N.Y. 2011) ............................................................34

*In re Joint E. & S. Dist. Asbestos Litig.,*
   52 F.3d 1124 (2d Cir. 1995) ............................................................................38

*Kolstad v. ADA,*
   527 U.S. 526 (1999).................................................................................... 40, 41

*Krishanti v. Rajaratnam,*
   No. 09-cv-05395, 2014 U.S. Dist. LEXIS 58314 (D.N.J. Apr. 28, 2014) ...........6

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999).........................................................................................12

*Lightfoot v. Union Carbide Corp.,*
   110 F.3d 898 (2d Cir. 1997) ............................................................................34

*Linde v. Arab Bank, PLC,*
  No. 04-cv-2799, 2015 U.S. Dist. LEXIS 45903 (E.D.N.Y. Apr. 8, 2015) ........................... 26, 41, 48

*Livnat v. Palestinian Auth.,*
  No. 14-668, 2015 U.S. Dist. LEXIS 16522 (D.D.C. Feb. 11, 2015) ..................................... 3, 5, 6, 7

*LNC Invs., Inc. v. First Fidelity Bank, N.A. N.J.,*
  173 F.3d 454 (2d Cir. 1999) ................................................................................................... 28

*Lore v. City of Syracuse,*
  670 F.3d 127 (2d Cir. 2012) ................................................................................................... 35

*Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.,*
  388 F. Supp. 2d 292 (S.D.N.Y. 2005) .................................................................................... 33

*Malek v. Federal Ins. Co.,*
  994 F.2d 49 (2d Cir. 1993) ..................................................................................................... 11

*Marine Midland Bank, N.A. v. Miller,*
  664 F.2d 899 (2d Cir. 1981) ................................................................................................ 8, 9

*Marvel Worldwide, Inc. v. Kirby,*
  777 F. Supp. 2d 720 (S.D.N.Y. 2011),
  *aff'd in pertinent part,* 726 F.3d 119 (2d Cir. 2013) ............................................................ 12

*Mayline Enters. v. Milea Truck Sales Corp.,*
  641 F. Supp. 2d 304 (S.D.N.Y. 2009) .................................................................................... 41

*Mazyck v. Long Island R.R.,*
  896 F. Supp. 1330 (E.D.N.Y. 1995) ................................................................................... Ex. B

*McCulloch v. Sociedad Nacional de Marineros de Honduras,*
  372 U.S. 10 (1963) .................................................................................................................. 39

*Meloff v. N.Y. Life Ins. Co.,*
  240 F.3d 138 (2d Cir. 2001) ................................................................................................... 10

*Microsoft Corp. v. AT&T Corp.,*
  550 U.S. 437 (2007) ................................................................................................................ 39

*Mileski v. Long Island R.R.,*
  499 F.2d 1169, 1172 (2d Cir. 1974)),
  *vacated on other grounds,* 518 U.S. 1031 (1996) ............................................................ 34, 35

*Moorhouse v. Boeing Co.,*
  501 F. Supp. 390 (E.D. Pa. 1980) .......................................................................................... 27

*Morrison v. Nat'l Australia Bank Ltd.,*
  561 U.S. 247 (2010) ................................................................................................................ 39

*Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.,*
   476 F. Supp. 2d 414 (S.D.N.Y. 2007) ................................................................................. 33

*Nairn v. National R. Passenger Corp.,*
   837 F.2d 565 (2d Cir. Conn. 1988) ................................................................................ Ex. B

*Nimely v. City of N.Y.,*
   414 F.3d 381 (2d Cir. 2005) ............................................................................. 11, 12, 14

*Norfleet v. Isthmian Lines, Inc.,*
   355 F.2d 349 (2d Cir. 1966) ............................................................................................ 33

*Pappas v. Middle Earth Condo. Ass'n,*
   963 F.2d 534 (2d Cir. 1992) ............................................................................................ 31

*Estate of Parsons v. Palestinian Auth.,*
   651 F. 3d 118 (D.C. Cir. 2011) ....................................................................................... 41

*Perkins v. Benguet Consol. Mining Co.,*
   342 U.S. 437 (1952) .......................................................................................................... 5

*Peterson v. Islamic Republic of Iran,*
   515 F. Supp. 2d 25 (D.D.C. 2007) ................................................................................ Ex. B

*Philipps v. City of N.Y.,*
   871 F. Supp. 2d 200 (E.D.N.Y. 2012) ............................................................................. 34

*Rau v. Roberts,*
   640 F.3d 324 (8th Cir. 2011) .......................................................................................... 42

*Real v. Bunn-O-Matic Corp.,*
   195 F.R.D. 618 (N.D. Ill. 2000) ...................................................................................... 25

*In re Rezulin Prods. Liab. Litig.,*
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................................. 12

*Riley-Jackson v. Casino Queen, Inc.,*
   No. 07-cv-0631, 2010 U.S. Dist. LEXIS 117815 (S.D. Ill. Nov. 5, 2010) ...................... 25

*Rodriguez v. Señor Frog's De La Isla, Inc.,*
   642 F.3d 28 (1st Cir. 2011) ............................................................................................. 35

*Roth v. El Al Israel Airlines, Ltd.,*
   709 F. Supp. 487 (S.D.N.Y. 1989) .................................................................................... 8

*Rothstein v. UBS AG,*
   772 F. Supp. 2d 511 (S.D.N.Y. 2011)
   *aff'd,* 708 F.3d 82 (2d Cir. 2013) .................................................................................. 42

*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013) ................................................................................27, 38, 39, 40

*Safra v. Palestinian Auth.,*
    No. 14-669, 2015 U.S. Dist. LEXIS 16492 (D.D.C. Feb. 11, 2015) ....................................... 3, 5, 6, 7

*SEC v. Tourre,*
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) ..............................................................................13

*Shu-Tao Lin v. McDonnell Douglas Corp.,*
    742 F.2d 45 (2d Cir. 1984) ................................................................................. 35, Ex. A

*In re Shulman Transport Enters., Inc.,*
    744 F.2d 293 (2d Cir. 1984) ...............................................................................33

*In re Terrorist Attacks on September 11, 2001 I,*
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)...........................................................................42

*In re Terrorist Attacks on September 11, 2001 II,*
    714 F.3d 118 (2d Cir. 2013) ................................................................................38

*Texas Indus., Inc. v. Radcliff Materials, Inc.,*
    451 U.S. 630 (1981)........................................................................................41

*Thompson v. Sanderson Farms, Inc.,*
    No. 3:04-cv-837, 2006 U.S. Dist. LEXIS 62745 (S.D. Miss. Sept. 1, 2006) ...................................26

*Toumazou v. Turkish Republic of N. Cyprus,*
    No. 09-cv-1967, 2014 U.S. Dist. LEXIS 143535 (D.D.C. Oct. 9, 2014) ........................................6

*United States v. Al-Moayad,*
    545 F.3d 139 (2d Cir. 2008) ...............................................................................19

*United States v. Mejia,*
    545 F.3d 179 (2d Cir. 2008) ...............................................................................12

*United States v. Porter,*
    90 F.3d 64 (2d Cir. 1996) .................................................................................41

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) ................................................................................28

*Vermont Plastics v. Brine, Inc.,*
    79 F.3d 272 (2d Cir. 1996) ................................................................................38

*Visual Sci., Inc. v. Integrated Comm'ns, Inc.,*
    660 F.2d 56 (2d Cir. 1981) ...............................................................................8, 9

*Waldorf v. Shuta*,
   896 F.2d 723 (3d Cir. 1990) ............................................................................35

*Weinstein v. Islamic Republic of Iran*,
   184 F. Supp. 2d 13 (D.D.C. 2002) ...........................................................Ex. A

*Wray v. Johnson*,
   202 F.3d 515 (2d Cir. 2000) .................................................................. 10, 24

*Wultz v. Islamic Republic of Iran*,
   755 F. Supp. 2d 1 (D.D.C. 2010) ..................................................................39

**Statutes**

15 U.S.C. § 78t(f) ............................................................................................39

18 U.S.C. § 2333 ...........................................................................38, 39, 40, 43

18 U.S.C. § 2339 ............................................................................................32

28 U.S.C. § 1605A ..........................................................................................40

Anti-Terrorism Act ("ATA") .......................................................................*passim*

Civil Rights Act of 1991, Pub. L. No. 102-166, § 109, 105 Stat. 1071, 1077 ........39

Foreign Sovereign Immunities Act ("FISA")..........................................36, 37, 40

Racketeer Influenced and Corrupt Organizations Act ("RICO") ....................... 41, 42

**Other Authorities**

3 Am. Jur. 2d Agency § 68................................................................................33

Fed. R. Civ. P. 12(b)(2)....................................................................................... 4

Fed. R. Civ. P. 42(b) ........................................................................................25

Fed. R. Civ. P. 50(a)........................................................................................2, 3

Fed. R. Civ. P. 59 ...................................................................................... 10, 41

Fed. R. Evid. 403 ..................................................................................... 11, 18

Fed. R. Evid. 702 ..................................................................................... 11, 18

Restatement (Second) of Agency § 1(1) cmt. b, § 14..........................................34

Restatement (Second) Torts § 46(2).................................................................36

Restatement (Second) of Torts, § 909, cmt. b ........................................................................... 40

Restatement (Third) of Agency § 2.04 ..................................................................................... 42

**INTRODUCTION**

Because it is now clear that the Court lacks personal jurisdiction over the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO"), the Court should enter judgment dismissing the case.  Although the Court has considered this issue several times, including in the wake of *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), the Court voiced its willingness to re-evaluate its determination if other district courts with similar PA/PLO litigation found no jurisdiction, which "would be a significant change in the law.  Then [the PA and PLO] might have a real opportunity at that point to renew your application [on the general jurisdiction argument]."  Apr. 11, 2014 Tr. at 63:8-13 (Doc. 478).  That has now happened, as two federal judges presiding over three separate cases have reached determinations that expressly disagree with this Court's decision that personal jurisdiction exists over the PA and PLO.  Moreover, the evidence at trial overwhelmingly established that the PA and PLO are "at home" only in Palestine.  The PA and PLO raised this issue before trial in an effort to spare all participants an avoidable commitment of judicial resources.  But the fact those resources were nonetheless committed is no reason to validate a verdict that cannot be supported by the essential prerequisite of personal jurisdiction over the PA and the PLO.  The new intervening authority, coupled with the facts adduced at trial, confirm that Plaintiffs failed to meet their burden of establishing personal jurisdiction over the PA and PLO.

Even if this Court does not follow the holdings of the three recent jurisdictional decisions, the jury's verdict cannot stand.  The jury improperly was allowed to receive rhetorically-charged hearsay and lay opinion evidence on the ultimate issues of vicarious liability and material support.  The rules of evidence and *Daubert* alone should have precluded the admission of this lay opinion masquerading as expert testimony.  Worse, the PA and the PLO were not allowed to respond in kind with comparable ultimate issue evidence, like United Nations and U.S. government reports that exonerated them.  Both the domination of the jury's deliberations by ultimate issue lay opinion

based on hearsay, and the evidentiary inequality between Plaintiffs and the PA and PLO on these issues, mandate a new trial if the Court determines to exercise jurisdiction. Indeed, another federal judge excluded one of this trial's "experts" (Alon Eviatar) in another case involving the PA because *Daubert* prevents purported experts from invading the jury's province and introducing otherwise inadmissible evidence.

Further, a new trial should be ordered based on the failure to sever the trials and materially harmful evidentiary and jury instruction errors. The PA and PLO were subjected to the admission of evidence with little to no probative value to the specific attacks at issue that improperly colored the jury's perception, while at the same time the PA and PLO were constrained from introducing evidence that would explain and contextualize that evidence. The effect of these errors was magnified by a consolidated trial asking the jury to properly assess individually distinct foreign attacks, plaintiffs, perpetrators, forms of alleged material support, and damages. Viewed either individually or in the aggregate, these errors mandate a new trial.

Finally, consistent with the statutory design of the Anti-Terrorism Act ("ATA"), judgment as a matter of law should be entered in favor of the PA and PLO on the issues of *respondeat superior* and material support. Congress did not provide for vicarious liability in the statute, and the Court's holding to the contrary cannot be squared with controlling Second Circuit authority. Judgment as a matter of law also is warranted after careful consideration of Plaintiffs' evidence – Plaintiffs simply did not provide sufficient admissible evidence to support a jury verdict on their claims.

## **ARGUMENT**

## I.   **THIS COURT LACKS JURISDICTION OVER THE PA AND PLO**

After *Daimler* and the Second Circuit's later decision in *Gucci Am., Inc. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014), the Court denied the PA's and PLO's arguments on general jurisdiction in a December 1, 2014 opinion (Doc. 657), deferred ruling on the Rule 50(a) motion made during trial

(Doc. 795 at 22-23; Feb. 18, 2015 Tr. at 3671:6-8, 3674:25-3675:1), and has yet to rule on the Rule 50(a) motion made at the close of evidence (Doc. 819 at 23-25).  *See also* Docs. 45, 66, 67, 421, 457, 497 & 604.  Given the Court's familiarity with the pre-trial jurisdictional record, the PA and PLO will focus on what has happened since the start of trial:  (i) three recent district court decisions dismissing ATA claims against the PA (and the PLO in the only case it was named) for lack of personal jurisdiction; and (ii) additional jurisdictional facts adduced at trial.   These new developments confirm Plaintiffs did not meet their burden of establishing personal jurisdiction over the PA and PLO.

### A.    Three Recent District Court Decisions Illustrate Why this Court Lacks Personal Jurisdiction

As noted in the PA's and PLO's Rule 50(a) motion (filed February 18, 2015; Doc. 819 at 23-25) and Objection to Plaintiffs' Revised Proposed Final Judgment (filed March 16, 2015; Doc. 888 at 3, n.1), since February 11, 2015, in three cases virtually identical to this one involving the assertion of ATA claims, the two district court judges presiding over those cases have held they lacked jurisdiction over the PA.  *Safra v. Palestinian Auth.*, No. 14-669, 2015 U.S. Dist. LEXIS 16492, at *47 (D.D.C. Feb. 11, 2015); *Livnat v. Palestinian Auth.*, No. 14-668, 2015 U.S. Dist. LEXIS 16522, at *47-48 (D.D.C. Feb. 11, 2015); *Estate of Esther Klieman v. Palestinian Auth.*, No. 04-1175, 2015 U.S. Dist. LEXIS 25167, at *30 (D.D.C. Mar. 3, 2015).

Most recently, Judge Friedman, who in 2006 had determined, like this Court, that general personal jurisdiction existed over the PA and PLO in view of their continuous and systematic contacts with the District of Columbia, held that, under *Daimler*, the court could no longer exercise general jurisdiction over the PA and PLO because their contacts "do not suffice to render the PA and PLO 'essentially at home' in the United States."  *Klieman*, 2015 U.S. Dist. LEXIS 25167, at *10, *17.  The *Klieman* plaintiffs, like Plaintiffs here, sued the PA and PLO under the ATA and other tort theories arising out of attacks that occurred outside of the United States.  Judge Friedman denied a

motion for reconsideration in 2008, stating that the contacts the PA and PLO allegedly had with the United States "were sufficient for the Court to exercise personal jurisdiction." *Id.* at *7-8. The PA and PLO sought reconsideration in the wake of *Daimler*, and Judge Friedman agreed that *Daimler* constituted an "intervening change in the law." *Id.* at *9-11.

Importantly, Judge Friedman considered the same evidence previously presented in this case: "maintaining a PLO office in Washington, D.C.; conducting fundraising activities and other public speaking engagements; hiring a lobbying firm to develop a public relations campaign; entering into commercial contracts in the United States; and maintaining bank accounts in New York." *Klieman*, 2015 U.S. Dist. LEXIS 25167, at *16.[1] He determined that the PA and PLO are based in Palestine and that their American activities "represent a tiny fraction of their overall activity." *Id.* at *17.

Exactly as this Court previously held, Judge Friedman found no specific jurisdiction because of the lack of any meaningful relationship between the attacks and the actions of the PA and PLO in the United States. *Id.* at *20-27. But Judge Friedman specifically disagreed with this Court's application of *Daimler* in its December 1, 2014 decision (Doc. 657) because "[i]t is not defendants' burden to demonstrate a 'home' outside the United State[s], but the plaintiffs' burden to present a *prima facie* case that defendants are 'at home' in the United States." *Id.* at *19-20. Accordingly, Judge Friedman determined general jurisdiction did not exist over the PA or the PLO:

> In light of the intervening change in law, the Court concludes that it cannot exercise general jurisdiction over the PA and the PLO because their contacts with the United States are not so continuous or systematic as to render them 'essentially at home' in this forum. The Court also finds that it cannot exercise specific jurisdiction over the defendants because the suit does not arise out of or relate to defendants' contacts with the United States. The PA and the PLO therefore will be dismissed from this case pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

*Id.* at *29-30.

---

[1] The existing jurisdictional record includes Docs. 67-2, 67-3, 67-4, 67-5, 67-6, 67-7, 497-1 at ¶ 1-66, & 497-72.

Judge Friedman's determination that, under *Daimler*, the PA and the PLO are not "at home" in the United States for purposes of general jurisdiction echoed Judge Kollar-Kotelly's February 11, 2015 decisions in *Safra* and *Livnat* in which the court likewise dismissed ATA claims against the PA for lack of personal jurisdiction.

The *Safra* court rejected plaintiffs' general jurisdiction claim, holding that "the single ascertainable place where a government such as the Palestinian Authority should be amenable to suit for all purposes is the place where it governs." *Safra*, 2015 U.S. Dist. LEXIS 16492, at *27. The court further determined that the services and activities performed by the PA in the United States establish it is *not* at home here:

> [M]any of the services allegedly provided on behalf of the Palestinian Authority suggest that the Palestinian Authority is *not* at home. Consular services in particular are generally offered by a government when it is not at home; services like community outreach and cultural events are also consistent with the nature of a government—or an affiliate of some sort—operating abroad, rather than the operations of a government 'at home.'

*Id.* at *29 (emphasis in original). Like Judge Friedman in *Klieman*, Judge Kollar-Kotelly gave careful consideration to this Court's December 1, 2014 decision and "respectfully disagree[d]" because:

> It is Plaintiffs' burden to present a *prima facie* case for jurisdiction at this stage of the litigation process; in doing so they must overcome the common sense presumption that a non-sovereign government is at home in the place they govern. None of the contacts with the United States on which the Plaintiffs rely, even if attributable to the Palestinian Authority, do so. Accordingly, the Court concludes that it does not have general jurisdiction over the Palestinian Authority.

*Safra*, 2015 U.S. Dist. LEXIS 16492, at *30; *Livnat*, 2015 U.S. Dist. LEXIS 16522, at *31.

*Safra* and *Livnat* also noted that the PA was a government, not a corporation with an exceptional case for general jurisdiction, citing to *Daimler's* discussion of *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447-48 (1952). *Safra*, 2015 U.S. Dist. LEXIS 16492, at *25-26; *Livnat*, 2015 U.S. Dist. LEXIS 16522, at *26. The diplomatic, consular, and political activities of the PA and PLO in the United States are the same "business" conducted in Washington, D.C. and the United

Nations *by virtually every government in the world*.  These undertakings are unexceptional and cannot –

consistent with *Daimler* – force every foreign government to litigate in this country's courts.

Judge Kollar-Kotelly, like this Court and Judge Friedman, found no specific personal

jurisdiction in light of "insufficient links between the specific acts underlying this action and the

United States. . . ." *Safra*, 2015 U.S. Dist. LEXIS 16492, at *33-34.  As she observed:

> [Plaintiffs'] claim that by attacking a group of Jewish worshippers in the West
> Bank—without any actual knowledge or even a reason to believe that those victims
> were connected to the United States—the Palestinian Authority was attempting to
> influence U.S. government policy towards Israel…does not allow the Court to
> conclude that 'defendant's conduct connects [it] to the forum in a meaningful way'

*Id.* at *35; *Livnat*, 2015 U.S. Dist. LEXIS 16522, at *36 (citation omitted).  Nor did the plaintiffs

suggest that "other alleged enabling actions of the Palestinian Authority . . . happened anywhere but

the West Bank." *Safra*, 2015 U.S. Dist. LEXIS 16492, at *36-37; *Livnat*, 2015 U.S. Dist. LEXIS

16522, at *37.  Even applying the lower *prima facie* standard for jurisdiction, Judge Kollar-Kotelly saw

no basis for jurisdictional discovery and dismissed the complaint for lack of personal jurisdiction.

*Safra*, 2015 U.S. Dist. LEXIS 16492, at *47-48; *Livnat*, 2015 U.S. Dist. LEXIS 16522, at *47-48.

Other courts also now recognize the *Daimler* "at home" standard applies to all government

and non-government entities—not just corporations. *Toumazou v. Turkish Republic of N. Cyprus*, No.

09-cv-1967, 2014 U.S. Dist. LEXIS 143535, at *11 (D.D.C. Oct. 9, 2014) (the defendant "is 'at

home' in northern Cyprus, as its name suggests, not in the District of Columbia"); *Krishanti v.

Rajaratnam*, No. 09-cv-05395, 2014 U.S. Dist. LEXIS 58314, at *6, *15-21 (D.N.J. Apr. 28, 2014)

(dismissing claims against a "Sri Lankan based non-governmental organization" under *Daimler* for

lack of personal jurisdiction); *3rd Eye Surveillance, LLC v. City of Irving*, No. 6:14-CV-535-JDL, 2015

U.S. Dist. LEXIS 6263, at *5 (E.D. Tex. Jan. 16, 2015) (City of Irving was not at home based only

on commercial contacts in district and attendance of meetings in district).

This Court previously voiced concern about the lack of precedent for the PA's and PLO's position and the prospect of being the first court to find no general jurisdiction over the PA and PLO in the new post-*Daimler* landscape:

> THE COURT:         But, quite frankly, as I say, I have no case where it hasn't been applied to the PLO.  I don't have any case.  You want me to be the first judge to apply the rule to the PLO in this circumstance, even though, now you may say it just happened, but the PLO has other litigation going on.  And I'm sure you're making the argument in other places.
>
> MS. FERGUSON:      We're actually in the process of concluding the briefing, and I expect there are going to be a number of dismissals under *Daimler* in a variety of lawsuits.
>
> THE COURT:         ***That would be a significant change in the law. Then you might have a real opportunity at that point to renew your application.***

Apr. 11, 2014 Tr. at 63:1-13, (emphasis added).  *Klieman*, *Livnat*, and *Safra* represent exactly the type of significant change in law this Court envisioned.  Consistent with these recent decisions on the same jurisdictional facts, this Court should dismiss this action for lack of personal jurisdiction rather than stand alone as the only court determining that the PA and PLO are "at home" in the United States under *Daimler*.

## B.   Additional Facts Adduced at Trial Prove the PA and PLO are "At Home" Only in Palestine

Just as in *Klieman*, *Safra* and *Livnat*, the proper application of *Daimler* here requires dismissal of this action even under a *prima facie* standard.  But because this case has now proceeded through trial, this Court must apply a preponderance of the evidence standard in determining whether Plaintiffs satisfied their burden of establishing personal jurisdiction.

In its previous decisions denying motions to dismiss for lack of personal jurisdiction, this Court did not convene an evidentiary hearing, drew all inferences in Plaintiffs' favor, and (improperly) required the PA and PLO to demonstrate a "home" outside the United States.  Doc. 87 & 657; Apr. 11, 2014 Tr. at 57:8-59:22, 71:14-21 (Doc. 478).  As the Second Circuit explained, if a

court "chooses not to conduct a full-blown evidentiary hearing" on the issue of personal jurisdiction, "the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981); *see Roth v. El Al Israel Airlines, Ltd.*, 709 F. Supp. 487, 489-90 (S.D.N.Y. 1989) (distinguishing between the "prima facie" burden of personal jurisdiction at summary judgment, with all inferences favoring plaintiffs, with the heavier burden at trial).

But the burden changes at trial, where "the plaintiff must establish jurisdiction by a preponderance of the evidence." *Marine Midland Bank*, 664 F.2d at 899, 904. A prior *prima facie* showing of jurisdiction does not end the inquiry; "[e]ventually personal jurisdiction must be established by a preponderance of the evidence, either at an evidentiary hearing or at trial." *A. I. Trade Fin. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993); *Visual Sci., Inc. v. Integrated Commc'ns, Inc.*, 660 F.2d 56, 58 (2d Cir. 1981) (by the time of trial, "the plaintiff must then prove the facts supporting jurisdiction by a preponderance of the evidence").

The additional evidence adduced at trial in this case demonstrates Plaintiffs failed to prove the PA and PLO are "at home" in the United States. Plaintiffs' own witnesses testified that the "center of government" for the PA is the Mukataa, a "very huge" compound in Ramallah "where Arafat resided" and containing "other heads of the security apparatuses, and various other organs of the Palestinian Authority." Jan. 22, 2015 Tr. at 1158:16-17, 1173:6-15; Jan. 23, 2015 Tr. at 1308:20-1309:2, 1323:12-17 (Shrenzel); Jan. 14, 2015 Tr. at 260:2-5 (Kaufman) (the Mukataa is the PA's headquarters where Arafat lived and worked). Mr. Eviatar explained: "Ramallah represents the place where all the Palestinian governmental ministries and entities and agencies reside." Jan. 15, 2015 Tr. at 412:23-24, 413:20-414:2. Plaintiffs' witnesses provided ample testimony consistent with the PA and PLO being at home only in Palestine. Jan. 21, 2015 Tr. at 934:8-12 (PA is "the government in

the West Bank"); *Id.* at 972:1-15; DTE 75 (PA controls Area A in the West Bank); Feb. 2, 2015 Tr.

at 2078:22-2079:4 (discussing main office of the PA and PLO at the Mukataa).

Other evidence demonstrating the PA and PLO are "at home" only in Palestine includes

that the PA's heads of security and intelligence live and work in Palestine (Jan. 16, 2015 Tr. at

615:21-616:3, 649:19-650:16 (Eviatar); Feb. 9, 2015 Tr. at 2935:1-19 (Faraj); and that the PA had

38,000 to 40,000 security employees in Palestine, the only place where the PA has offices (Feb. 9,

2015 Tr. at 2831:14-2833:1 (Faraj)).  Plaintiffs' lead counsel himself summarized the compelling case

for a determination that the PA and PLO are "at home" in Palestine:

> And I want to be very clear who worked in the Mukataa.  Shrenzel told us he wasn't
> the only one.  It's the compound, that very huge compound in Ramallah where
> Arafat resided, other heads of the security apparatuses, various other organs of the
> PA.  ***It's the government headquarters***.

Feb. 19, 2015 Tr. at 3816:21-3817:1 (emphasis added).

The Southern District of New York has dismissed on jurisdictional grounds a case following

trial.  In *Barrett v. United States*, 651 F. Supp. 614, 615 (S.D.N.Y. 1986), the Court denied a pre-trial

motion to dismiss for lack of personal jurisdiction, determining that the plaintiff had made a *prima*

*facie* showing of personal jurisdiction over Defendant Creasy.  Post-trial, the Court reviewed all of

the trial evidence related to personal jurisdiction and noted, "it is fair to require that plaintiff now

show the existence of personal jurisdiction over Creasy by a preponderance of the evidence."  *Id.* at

615 (citing *Marine Midland Bank*, 664 F.2d at 904 and *Visual Scis., Inc.* 660 F.2d at 56).  In light of the

evidence adduced, the Court found the plaintiff could not satisfy the burden, and it dismissed Mr.

Creasy from the action for lack of personal jurisdiction.  *Id.*

Here, the additional facts adduced at trial establish the PA and PLO are "at home" only in

Palestine.  Neither the PA nor PLO maintains its headquarters in the United States, nor are there

any other indicia of jurisdiction that can be squared with *Daimler*.  Plaintiffs failed to meet their

burden of proving by a preponderance of evidence that the PA and PLO are "at home" in the United States, and this Court should dismiss for lack of personal jurisdiction.

## II.  NEW SEPARATE TRIALS ARE REQUIRED BY A SERIES OF SUBSTANTIAL ERRORS THAT CREATED UNFAIR PREJUDICE TO THE PA AND PLO

A series of prejudicial errors combined to deny the PA and PLO a fair trial.  As detailed below, these include: (1) Plaintiffs' experts improperly testified on ultimate issues and other opinions, such as intent and state of mind, that they were not qualified to give, that were not based on reliable methodologies, and that, while of no assistance to jury, were unfairly prejudicial;[2] (2) Plaintiffs injected inadmissible evidence into the trial, such as reports by the Israeli Defense Force ("IDF"), evidence regarding prisoner and martyr payments, and other politically-charged evidence while the Court unduly limited the ability of the PA and PLO to place such evidence in proper context;[3] (3) the Court declined to sever the trials of the six separate attacks, creating confusion for the jury and unfair spillover consequences for the PA and PLO; (4) certain of the Court's jury instructions lessened Plaintiffs' burdens of proof and unfairly prejudiced the PA and PLO; (5) and an excessive damage verdict caused by these and other errors.

In deciding the Rule 59 motion, this Court should "examine the evidence through its own eyes." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 147 (2d Cir. 2001).  Wrongly admitted evidence requires a new trial where, for example, the evidence was "plainly critical to the jury's decision," was "material to the establishment of the critical fact," and "was emphasized in arguments to the jury." *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000) (citations omitted).  The improperly admitted testimony and evidence meets all of these criteria.  Considered individually, and collectively, these errors go to the heart of the jury's findings against the PA and PLO.  *See, e.g.*, Doc. 821 (detailing

---

[2] *See* Docs. 499, 500, 555, 684, 717, 745, 752, 758, 760, 766, 781.

[3] Jan. 21, 2015 Tr. at 925:9-22, 927:25-928:5; Feb. 11, 2015 Tr. at 3249:4-5, 3252:7-3253:4, 3255:16-23, 3256:15-25.

errors in Plaintiffs' closing arguments). Because it is impossible to "say, with fair assurance . . . that the judgment was not substantially swayed" by these errors (*Malek v. Federal Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993)), this Court should vacate the jury verdict and grant the PA and PLO new and separate trials on each attack, or at least a new trial.

### A.     The Court Allowed Plaintiffs to Present Improper Expert Testimony

This Court erred by allowing multiple witnesses to testify under the banner of "experts" on key questions of intent and ultimate liability issues. No methodology that could pass muster under *Daubert* supported this testimony, which proved to be merely a vehicle for Plaintiffs to introduce inadmissible evidence and brandish unwarranted conclusions before the jury. This Court should grant the PA and PLO a new trial because of this improper and unfairly prejudicial expert testimony.

### 1.     Courts Emphasize *Daubert's* Important Gatekeeping Function

Testimony from an expert witness is only admissible if the witness "is qualified as an expert by knowledge, skill, experience, training, or education" and (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) the "testimony is based on sufficient facts or data;" (3) the "testimony is the product of reliable principles and methods;" and (4) the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). In other words, the district court performs a "gatekeeping" function to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The Second Circuit, moreover, has noted "the uniquely important role that Rule 403 has to play in district court's scrutiny of expert testimony" given the weight a jury may accord to such evidence. *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005) ("In addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and 'may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'").

The district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). An expert strays beyond the bounds of proper expert testimony when he or she merely summarizes factual matters that require no specialized knowledge. *United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008). Moreover, an expert may not "simply transmit [ ] hearsay to the jury." *Id.* at 197 (citation omitted). An expert may apply "'his extensive experience and a reliable methodology' to the inadmissible materials," but "'repeating hearsay evidence without applying any expertise whatsoever,'" is nothing but an attempt "'to circumvent the rules prohibiting hearsay.'" *Id.* Nor may an expert express opinions regarding the state of mind, intent, or motive of a party or others. *See Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 729-30 (S.D.N.Y. 2011), *aff'd in pertinent part*, 726 F.3d 119 (2d Cir. 2013); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."). Over defense objections, Plaintiffs' experts ignored and violated each of these requirements.

### 2.    Plaintiffs' Experts Improperly Testified on the Ultimate Issues

An expert invades the jury's province as the trier of fact when he conveys lay opinions on the ultimate issues. *Nimely,* 414 F.3d at 397 ("We have consistently held, in that respect, that expert testimony that usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, by definition does not aid the jury in

making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's.") (citation and quotation marks omitted); *SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) ("Even with a cautionary instruction to the jury, expert testimony that all 'economically material' information was disclosed may suggest to the jury that their job is done, that they have been told the answer to an ultimate question."). The Court previously warned it would not allow this type of testimony. *See, e.g.,* Dec. 16, 2014 Tr. at 201:17-202:7 (Plaintiffs' Counsel: "So you just don't want him to opine on the ultimate conclusion? The Court: That's the first thing I don't want."); *see also* Dec. 16, 2014 Tr. at 192:11-193:7; 195:2-14; 198:12-200:17; 202:20-207:12; 213:5-11.

But that is exactly the type of testimony that Plaintiffs featured, as their designated experts Mr. Eviatar and Mr. Shrenzel both posited that the PA and PLO were ultimately responsible for the attacks committed by Fatah, Hamas, and the AAMB regardless of the facts of a specific attack. *See, e.g.,* Jan. 20, 2015 Tr. at 728:17-731:18; 737:10-21; 745:16-746:25; 767:9-24; 839:22-842:12; Jan. 22, 2015 Tr. at 1162:25-1164:3; 1205:2-1206:22; Jan. 23, 2015 Tr. at 1379:5-1381:11; Jan. 26, 2015 Tr. at 1428:6-18. Testimony in this vein pervaded the record. For example, Mr. Shrenzel testified that Tawfiq Tirawi—the PA's head of General Intelligence—had prior knowledge of the January 22 attack, notwithstanding a lack of any connection between him and that attack:

> Q. So, Mr. Shrenzel, have you had a chance to consider the role of Tawfiq Tirawi in connection with the Wafa Idris suicide bombing based on Exhibit 233? . . .
>
> A. Yes, I would say the following. This very document cannot provide us with a conclusive final proof of his prior knowledge of the attack. But given our overall knowledge about - - . . .
>
> A. - - the profound involvement of Tirawi during the whole period, in the series of attacks, of covering up, of providing weapons, for example, the explosives used in the Hashaika attack, if we take all the Tirawi file in consideration, I think it's more likely than not that he had prior knowledge and involvement in that attack. That's my professional assessment.

- 13 -

Jan. 28, 2015 Tr. at 1594:3-19 (objections and overruling of objections omitted). The Court also improperly allowed Mr. Shrenzel to testify that "an official of the PA considers such an attack against civilians in the center of Jerusalem as a performance of a national duty." Jan. 22, 2015 Tr. at 1101:16-22. These opinions represent nothing but speculation on the ultimate issue cloaked under the imprimatur of "expertise." They are not the product of reliable methodologies or analyses. And by "'tell[ing] the jury what result to reach,'" *Nimely*, 414 F.3d at 397, the prejudice to the PA and PLO is difficult to overstate.

### 3.  Plaintiffs Used Their Experts To Present Inadmissible Evidence As Expert Opinions

Despite objections, this Court allowed Plaintiffs to present inadmissible evidence under the guise of expert testimony that does not survive basic *Daubert* scrutiny. Much of this improper testimony involved Plaintiffs' experts positing they knew the state of mind and intentions of the attackers and the PA and PLO. This Court allowed Mr. Shrenzel to opine on the ultimate issue that one of the attackers believed the PA wanted him to "shoot indiscriminately in the streets of Jerusalem." Jan. 28, 2015 Tr. at 1570:3-11; Doc. 781 at 4-5. Similarly, Mr. Eviatar speculated how unidentified individual terrorists viewed Marwan Barghouti, a member of the Palestinian Legislative Council and leader within Fatah, but who is not an employee of the PA:

> Marwan Barghouti had a very significant role in causing the activities of terror during the Al Aqsa intifada. He served as a central axis in operating terrorist cells that belonged to Fatah and to the Al Aqsa Martyrs Brigades, the military wing of Fatah. He would supply arms, money, and other resources, including in his role as someone who was an authority for them, so that they would carry out terrorist attacks. Central terrorist operatives in Fatah and its military wing viewed Marwan Barghouti as more than an authority; they viewed him as the link between them and Yasser Arafat.

Jan. 20, 2015 Tr. at 731:9-18. Plaintiffs also used their experts as a delivery device to inject otherwise-inadmissible documents into the record. *Id.* at 737:4-744:24. And Mr. Eviatar conjured

up "expert" opinions regarding the reliability of various Israeli documents.  Jan. 16, 2015 Tr. at 621:4-19; Jan. 20, 2015 Tr. at 805:6-24.

The expert opinions often served as vehicles for Plaintiffs to smuggle in evidence the Court had deemed inadmissible.  For example, the Court erroneously permitted Mr. Shrenzel to testify Mr. Tirawi supplied explosives to an attacker (Mr. Hashaika)—even though this testimony derived from a custodial statement placing the blame on another person, and therefore was not admissible, as this Court had previously found.  Jan. 28, 2015 at 1597:3-1600:2.  It similarly allowed Mr. Shrenzel to testify that perpetrators of the attacks continued performing services for the PA by trying to support terrorism activities from prison.  Jan. 22, 2015 Tr. at 1132:4-11.  The opinions of Mr. Shrenzel and Mr. Eviatar summarized facts that were not in evidence, some of which were clearly inadmissible, and presented opinions unmoored to any discernable methodology.  *See, e.g.,* Jan. 20, 2015 Tr. at 729:1-731:19;  737:10-21;  745:16-746:25;  767:9-24;  839:22-842:12;  Jan. 22, 2015 Tr. at 1162:11-1164:3; 1205:5-1206:22.

### 4.     This Court Improperly Allowed Plaintiffs' Experts To Claim That The Social and Political Policies of The PA and PLO Constituted Material Support

Plaintiffs' experts maintained that the PA's social and political policies were intended to instigate terrorist attacks on Israel.  Mr. Eviatar offered his expert "opinion" that the prisoner and martyr payments are not "social welfare payments" (Jan. 16, 2015 Tr. at 571:1-8), but are "economic incentives [that] prod and assist the prisoner to go ahead and carry out . . . terror attacks and terror incidents of this type" (*id.* at 592:8-11, 603:14-21).  Going even further, Mr. Shrenzel opined that the real policy of the PA is to endorse terrorist attacks (Jan. 28, 2015 Tr. at 1577:19-1578:9), and he purported to peer into the mind of the PA to explain what the PA really meant to say in its documents (Jan. 22, 2015 Tr. at  1101:11-22; Jan. 26, 2015 Tr. at 1450:16-25), that the PA was not worried that the U.S. was going to designate the AAMB as a foreign terrorist organization (Jan. 22,

- 15 -

2015 Tr. at 1205:5-1206:22), and that the PA promoted the perpetrators of the attacks as "a token of appreciation" for what they did.  *Id.* at 1109:20-1110:4.

No reasonable (or identifiable) methodology supported any of these conclusions, nor was either expert qualified to opine on what or what is not "social welfare."  Despite the impropriety of such opinions, Plaintiffs filled scores of record pages with opinions by their experts to the effect that the PA's social welfare system shows intent to support terrorism.  *See, e.g.,* Jan. 16, 2015 Tr. at 579:16-581:2, 588:3-589:25, 591:1-592:11, 602:10-603:24 (Eviatar); Jan. 20, 2015 Tr. at 841:1-842:12 (Eviatar); Jan. 22, 2015 Tr. at 1089:17-22, 1106:24-1107:24, 1117:6-1118:5, 1125:5-13, 1130:9-13, 1137:8-21, 1161:10-24, 1184:2-15, 1194:8-1195:3 (Shrenzel); Jan. 26, 2015 Tr. at 1424:1-25, 1430:2-23, 1436:7-18, 1443:1-18, 1448:21-1449:18 (Shrenzel).  If there were any doubt about Plaintiffs' designs, Plaintiffs dispelled it during closing argument:  "[I]f you set up a program in which you say if you commit a terrorist act we will pay your family, that is providing material support, and you can't do that." Feb. 19, 2015 Tr. at 3787:7-9.  *See also id.* at 3789:20-22 ("Anytime that there's martyr payments, you can check yes [as to material support].  You don't have to find that those payments preceded the attack.")

This Court had previously held that post-attack social service payments do not constitute sufficient evidence of PA or PLO liability.  Doc. 646 at 11 n.11 (post-attack "ratification" is "not sufficient to demonstrate that Defendants were somehow responsible for the attacks."); Feb. 11, 2015 Tr. at 3359:18-3360:2 ("There's no evidence here that anyone said okay, this guy is a terrorist, and somebody else said okay, yeah, so let's give him some money.  That's not it.  There's no such evidence that any of those acts, those decisions were made in contemplation of any individual terrorist act that was committed.  There's not that evidence.")  Plaintiffs' so-called "expert" testimony about post-attack prisoner and martyr payments was improper and extraordinarily prejudicial;;.

- 16 -

The Palestinian social welfare safety net was not the only object of Plaintiffs' experts' soothsaying. Plaintiffs equally depicted other PA social support as causes of terrorism. Arrogating to himself the type of power that the U.S. government has to designate state sponsors of terrorism, Mr. Eviatar testified the PA would arrest terrorists, but "would send them in through one door, and after a very short period of time it would send them out the other door." Jan. 20, 2015 Tr. at 762:4-19. Over objections, he opined on the ultimate issue that this "revolving door enabled those wanted men to continue to perpetrate the very same acts of terror." *Id.*

These lay opinions on ultimate issues may have reached their outer limit with the incendiary testimony that the PA was wielding mass media to brainwash Palestinians into committing terrorism. This included testimony that the PA and PLO referred to Jews as "descendants of monkeys and pigs" and that implicit in their publications and actions was a call upon Palestinians to go out and kill all Jews and Israeli citizens. Jan. 28, 2015 Tr. at 1569:6-1570:11 (Shrenzel). Plaintiffs went so far as to have their experts opine that the PA uses Soviet-style brainwashing of Palestinians "to control their minds and thoughts and lead them in a specific way that is desired by the central leadership." Jan. 22, 2015 Tr. at 1208:2-14 (Shrenzel). The only ostensible basis for this conclusion was generalized "expert" testimony – bereft of any facts – that the PA and PLO have a policy of supervising the press and that they do not have a free press. *Id.* at 1216:1-6. That is a far cry from Orwellian mind control. Even though this Court previously had ruled that inflammatory rhetoric had no probative value and would be unduly prejudicial, Dec. 16, 2014 Tr. at 95:11-96:10,[4] it allowed this testimony over defense objections.

Time after time, this Court allowed Plaintiffs to introduce improper expert testimony that the PA's policies and procedures were enabling terrorism. Plaintiffs' experts interpreted evidence

---

[4] *See also* Doc. 781 at 1-3; Jan. 6, 2015 Tr. at 90:10-12.

within the province of the jury, purported to say what others thought and knew, and consistently espoused irrelevant, unsupported, and inflammatory attacks on the PA and PLO.  Even if this testimony were not unduly prejudicial under Rule 403, none of it could pass muster under *Daubert* because it was based on speculation and was not the product of reliable principles and methods as required by Rule 702.  This improper expert testimony was so pervasive and prejudicial as to require a new trial.

### 5.  Another Court Has Rejected Precisely This Type of "Expert" Testimony by Mr. Eviatar

In *Gilmore v. Palestinian Interim Self-Government Auth.*, No. 1-853, 2014 U.S. Dist. LEXIS 102093 (D.D.C. July 28, 2014), another federal judge (Hon. Gladys Kessler) granted summary judgment to the PA on similar ATA claims after sifting through the evidence proffered by the plaintiffs.  Importantly, the court rejected the testimony of Mr. Eviatar because he could not survive *Daubert* scrutiny.  *Id.* at *56-57.

Mr. Eviatar sought to testify (as here) that his analysis of various documents and evidence established "more likely than not" that a certain individual perpetrated a shooting.  *Id.* at *49.  Judge Kessler agreed this was nothing more than "'reviewing and weighing the evidence' in precisely the same manner as would an ordinary trier of fact."  *Id.* at *50.  The court also could discern no "particular methodology" used to support his opinion.  *Id.*  In fact, Mr. Eviatar's methodology (to the extent he had one) was nothing more than the "commonsense and general deductive principles that any non-expert finder of fact would rely on."  *Id.* at *51.  The same criticisms apply with equal, if not greater force here, as described more fully above.

Judge Kessler, moreover, faulted Mr. Eviatar's testimony because it "is based entirely on hearsay evidence that the Court has already ruled inadmissible."  *Id.* at *52.  Again, Mr. Eviatar lent no "expertise" to this analysis:  "[H]is analysis consists entirely of deductions and observations that flow directly from the content of the hearsay statements and would be self-evident to a lay person."

*Id.* at *53-54.  Judge Kessler thus refused to allow the plaintiffs in that case to smuggle inadmissible evidence in through the vehicle of expert testimony.

The reasoning behind Judge Kessler's exclusion of Mr. Eviatar's testimony demonstrates that the testimony of Mr. Eviatar and Mr. Shrenzel in this case simply cannot be squared with the requirements of *Daubert*.

### B.      Other Evidentiary Errors Unfairly Contaminated the Trial

Beyond the improper expert testimony, a new trial is required because this Court consistently allowed Plaintiffs to present evidence of minimal relevance but substantial unfair prejudice.  Some of this evidence was simply inflammatory with almost no relevance to the liability question.  Plaintiffs were allowed to attack the political and social policies of the PA and PLO while the Court limited the PA's and PLO's ability to explain the context surrounding those policies, especially when the policies responded to Israeli misdeeds.  The evidentiary imbalance between the evidence Plaintiffs were allowed to introduce and argue, coupled with the constraints imposed on PA and PLO rebuttal, permeated all facets of the trial.  Plaintiffs exploited this imbalance throughout, and they echoed these themes in closing arguments, where Plaintiffs insisted that the PA's policies sufficed to prove the PA and PLO materially supported the attacks in this case.

### 1.      This Court Erroneously Admitted Highly Prejudicial Evidence that Had Little to Do With the PA and PLO

Among the examples of inflammatory evidence with little to no probative value, this Court improperly allowed the jury to view highly inflammatory circulars, television clips, photographs, and "police magazines" with only tenuous connections to the PA and PLO.  *See, e.g.,* Jan. 21, 2015 Tr. at 994:2-995:23; Jan. 22, 2015 Tr. at 1206:23-1213:25 (magazine excerpts); Jan. 26, 2015 Tr. at 1472:11-1476:25 (circular); PTE 1128 (photograph).  Such exhibits cast little light on whether the PA and PLO provided material support for the attacks at issue, but were unduly prejudicial in a trial where the victims testified.  *See United States v. Al-Moayad*, 545 F.3d 139, 160 (2d Cir. 2008) ("[G]iven the

highly charged and emotional nature of the testimony and its minimal evidentiary value, the [trial] court's decision was arbitrary").

The Court further allowed into evidence, over defense objections, custodial statements and indictments that were the subject of guilty pleas or convictions – even indictments containing allegations that had nothing to do with any of the attacks at issue but that were highly inflammatory in nature and language. Doc 497 at 38-40; Doc. 554 at 7-8; Doc. 654; Doc. 660; Doc. 669. The indictments included charges of murders, other violence, and weapons charges. In overruling defense objections, the Court observed, "I do not find that in the abstract, it is somehow unduly prejudicial if there is evidence that a reasonable jury could conclude that the people that the defendants were dealing with and compensating were known to be involved in the acts of violence." Jan. 6, 2015 Tr. at 55:9-58:15. Even under the notion that this inflammatory evidence bore some relevance to knowledge, the indictments *post-date* the attacks for which they were introduced. In other words, these Israeli Military Court records could not establish knowledge of the PA and PLO *prior to* the specific attacks. Plaintiffs, of course, used these unrelated convictions to unfairly prejudice the PA and PLO. *See, e.g.*, Jan. 14, 2015 Tr. at 300:21-301:3 ("Q: By the way, Mr. Kaufman, do you recall how many counts of murder Abdullah Barghouti pled guilty to? A:….This guy was a professional murderer. Yes. He admitted [to] 66 counts of murder. That would be 66 people").

Abdullah Barghouti's indictment, which contained 109 counts, is a glaring example. PTE 452. The vast majority of counts did not pertain to the July 31, 2002 attack at Hebrew University, the only attack Plaintiffs associate him with, and the indictment itself is dated nearly a year later, May 29, 2003. *Id.* Similarly only a few counts of Ahmed Barghouti's September 29, 2002 Amended Indictment pertained to attacks at issue, but the Court nonetheless allowed the admission of all 53 counts from the Amended Indictment, an error repeated with all of the indictments. *See* PTE 357.

- 20 -

The mountain of crimes and mayhem put before the jury unrelated to the attacks at issue unfairly prejudiced the PA and PLO, particularly in light of its minimal probative value. Plaintiffs suffused the entire trial with this type of prejudicial evidence, attempting to paint the Palestinian government as liable based on evidence that had nothing to do with the attacks.

> **2.** **This Court Allowed Hours of Misleading Testimony about the Palestinian Social Contract, but Limited The PA's and PLO's Ability to Respond**

As shown above, Plaintiffs spent hours attacking the social and political policies of the PA, including its social welfare program, claiming that they constituted direct support for terrorism. Because such evidence would certainly be misconstrued by any American jury, allowing it at all was unduly prejudicial. *See* Doc. 701. But the Court compounded this error by limiting the PA's and PLO's ability to respond, often out of a desire to avoid politicization of the trial or overt criticism of Israel. Yet *Plaintiffs* seized this very opportunity – they politicized the trial by focusing their presentation of evidence and closing argument on those social and political policies, rather than on evidence regarding the attacks. By limiting the defense's ability to explain the political and social context of certain policies, including Israeli policies and actions, this Court created an unfair playing field on which the PA and PLO could not provide a full and fair defense.

The Court repeatedly denied the PA and PLO the ability to provide important explanations regarding the evidence presented by Plaintiffs. It refused to allow Mr. Robinson's testimony that many of the attacks "occurred in reaction to two assassinations by the Israelis at a time of a cease-fire," excluding the testimony on the improper premise that perhaps that was the PA's own motivation—without even hearing what Mr. Robinson would say on that issue. Feb. 11, 2015 Tr. at 3304:2-17. He also would have testified the PA lost control over the average Palestinian during the time of the attacks because of the failure to have a Palestinian state and the actions of Israel. *Id.* at 3304:18-22. The Court deemed this irrelevant even though the testimony tended to show that the

attacks happened because the PA did *not* have control, not because it had control over the attacks. *Id.* at 3305:4-18. While the Court did not preclude all testimony on these subjects, it unfairly hamstrung the defense by refusing to allow them to develop those critical topics.

Similarly, the Court allowed Plaintiffs to introduce hours of testimony about rhetoric against Israel (*see, e.g.,* Jan. 23, 2015 Tr. at 1282:4-1290:7 (Shrenzel)) but refused to allow the PA to explain its position on resisting the occupation and why that was not the same as providing material support for terrorism. Jan. 21, 2015 Tr. at 924:4-21 (proffering testimony about "what the occupation actually was"). The jury needed to understand the Palestinian perspective on the Israeli occupation to understand the PA's actions. And while Plaintiffs dwelt on prisoner payments at length, the Court refused to allow the PA and PLO to present important testimony from witnesses like Raja Shehadeh, who ran the Social Affairs Ministry and could explain how the prisoner payments actually reduce terrorism. Feb. 11, 2015 Tr. at 3251:3-3256:25. The Court suggested that the PA and PLO could make their arguments at closing (*id.* at 3256:1-5), which is no substitute for placing evidence before the jury.

The unfairness from this Court's rulings extended even to background about the PA's formation. It admitted Plaintiffs' extended discussion about the Oslo Accords (Jan. 15, 2015 Tr. at 416:25-425:8 (discussion about Oslo Accords)) over the PA's and PLO's objection (*id.* at 426:6-432:2 ), including testimony that the PA breached the Oslo Accords by creating an "atmosphere of an all-out attack" (Jan. 28, 2015 Tr. at 1562:1-6). But the Court then refused to allow testimony offered by the PA about the limits of the PA's jurisdiction under the Oslo Accords. Feb. 11, 2015 Tr. at 3258:23-3261:25 (proffer regarding PA's jurisdiction). It then improperly excluded (as irrelevant) the testimony of Mr. Shehadeh regarding the PA's legal rights and physical ability to arrest people. Feb. 10, 2015 Tr. at 3140:11-3146:9; *see also* Feb. 11, 2015 Tr. at 3263:16-3264:17 (regarding prisoner escapees during Israeli incursion). The Court also excluded General Abu Al-Yaman's testimony

- 22 -

about other Israeli limitations on the PA's ability to arrest terrorists, and the release of Mr. Hashaika (Feb. 17, 2015 Tr. at 3375:14-3380:4), as well as testimony from Minister Shawqi Issa about the reasons and methods of the PA's prisoner programs (Feb. 11, 2015 Tr. at 3248:24-3249:25), despite allowing testimony from Plaintiffs on those very issues.  Plaintiffs' experts were allowed to claim that the PA controls everything in Palestine, but this Court prevented the PA and PLO from painting a full picture of the limits of the PA's influence.

Likewise, this Court admitted IDF reports claiming PA responsibility for the attacks and concluding that the PA controls Fatah and Hamas.  Jan. 12, 2015 Tr. at 143:2-145:15 (the IDF's conclusions on responsibility are admissible); PTE 626, 631, 826, 829, & 830.  Yet this Court then excluded U.S. State Department and U.N. reports that impeached and explained the IDF reports and the IDF's purposes for such reports.  Jan. 21, 2015 Tr. at 921:22-928:5 (excluding Exhibits 29 and 70 proffered by defense); *see* Doc. 816.  Mr. Eviatar was allowed, over objection, to opine that "government reports" from Israel were "[c]ompletely accurate and credible."  Jan. 16, 2015 Tr. at 621:19.  But when the PA and PLO sought to introduce the political context of the IDF's reports as a tool for Israel's public relations campaign, the Court abruptly cut off those questions.  Jan. 21, 2015 Tr. at 945:1-951:11.  The Court also refused to let Mr. Robinson explain why the IDF reports were political tools of Israel, and not just ordinary course government reports, because the Court found the testimony more prejudicial than probative.  Feb. 11, 2015 Tr. at 3306:2-3308:6.  This left the jurors with little idea about the incentives the IDF had to blame attacks on the PA and PLO. Once again, the Court denied the PA and PLO the ability to inform the jurors about the political context necessary to fairly judge the evidence.

In sum, this Court erred by limiting the PA's and PLO's ability to explain the political and social context of the universal jail-time promotions, martyr payments, and the anti-Israel literature. Whether an attacker's family should be made to suffer further, and where the line is for encouraging

resistance against a devastating occupation, are serious questions for the PA and PLO.  Full context

for those political decisions would have enabled the jury to understand the PA and PLO's beliefs for

why their social programs were reasonable given the situation—and are humanitarian support for

the Palestinian people rather than material support for terrorists.  It was prejudicial and reversible

error to allow Plaintiffs to introduce and argue expert opinions on issues reserved for the jury and

then to deny the PA and PLO the ability to put on a defense, including by placing the social and

political questions in context.

> **3.      Plaintiffs Exploited the Unfair Playing Field During Closing Arguments, Resulting in Further Unfair Prejudice**

The prejudice resulting from this Court's rulings was on vivid display during closing

arguments.  Plaintiffs emphasized each of the subjects on which this Court allowed improper expert

testimony (while at the same time denying the defense fair rebuttal).  Plaintiffs argued the PA and

PLO could control the actions of every minor employee (Feb. 19, 2015 Tr. at 3781:21-3782:3,

3788:14-24, 3816:11-3817:1), that keeping prisoners on the payroll conclusively established material

support for terrorism (*id.* at 3783:1-3784:4, 3784:20-3785:9, 3789:11-23, 3803:17-20, 3813:14-

3815:24), that the martyr payments were enough to support a verdict (*id.* at 3783:1-3784:4, 3786:1-

3787:9, 3789:11-23), that the IDF reports prove PA responsibility (*id.* at 3793:22-25), that the PA

should have investigated the attacks (*id.* at 3801:18-19, 3820:7-17), that the Palestinian media proves

the PA wanted its employees to become martyrs (*id.* at 3804:1-3807:2, 3822:24-3823:5), that Mr.

Tirawi knew about and supported the attacks (*id.* at 3821:1-11, 3824:21-3825:5), and that the PA

intentionally released prisoners to commit attacks (*id.* at 3827:9-14, 3831:14-3834:16).  *See also* Doc.

821.  The Second Circuit holds that improper evidence "emphasized in arguments to the jury" can

have a substantial and injurious effect on the jury's decision.  *Wray*, 202 F.3d at 526.  Plaintiffs'

closing arguments are a textbook example of that.  This Court should therefore grant a new trial.

**C.     The PA and PLO Suffered Significant Unfair Prejudice as a Result of the Inclusion of Evidence of Six Distinct and Separate Attacks, Each With its Own Discrete Set of Plaintiffs, Perpetrators, and Alleged Material Support**

This Court's decision to try all of the attacks in one trial created substantial spillover prejudice as each terrorist attack merged into one another.[5] Even if some minimal amount of evidence about other attacks might have been admissible in individual trials, presenting *all* of the evidence about every attack in a single trial created substantial and irreparably unfair prejudice. Fed. R. Civ. P. 42(b) provides that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues." Bifurcation or separating trials "requires the presence of *only one of these conditions*." *Crown Cork & Seal Co. v. Credit Suisse First Boston Corp.*, 288 F.R.D. 335, 337 (S.D.N.Y. 2013) (citation omitted; emphasis added). Among these, "[p]rejudice is the Court's most important consideration in deciding whether to order separate trials under Rule 42(b)." *Hunter Douglas, Inc. v. Comfortex Corp.*, 44 F. Supp. 2d 145, 154 (N.D.N.Y. 1999) (quotation omitted).

Courts must exercise vigilance about the risk of jury confusion where multiple plaintiffs bring claims based on separate factual events. *See Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 171 (S.D.N.Y. 2009); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296-97 (9th Cir. 2000) (affirming severance based on the prejudice from having numerous plaintiffs testify at trial and jury confusion from being required to examine ten separate factual situations); *Riley-Jackson v. Casino Queen, Inc.*, No. 07-cv-0631, 2010 U.S. Dist. LEXIS 117815, at *26 (S.D. Ill. Nov. 5, 2010) (citing *Real v. Bunn-O-Matic Corp.*, 195 F.R.D. 618, 621 (N.D. Ill. 2000)) ("Prejudice may arise from . . . jury confusion where multiple plaintiffs bring similar claims"). As a result, courts routinely order separate trials where numerous plaintiffs bring similar claims against a few defendants, recognizing that a joint trial

---

[5] *See* Docs. 561, 580, and Nov. 20, 2014 Tr. at 3:9-4:1.

would "[present] the jury with the 'hopeless task of trying to discern who did and said what to whom and for what reason.'" *Bailey v. N. Trust Co.*, 196 F.R.D. 513, 518 (N.D. Ill. 2000) (citation omitted); *see e.g., Thompson v. Sanderson Farms, Inc.*, No. 3:04-cv-837, 2006 U.S. Dist. LEXIS 62745, at *15-16 (S.D. Miss. Sept. 1, 2006) (finding separate trials were essential where 74 plaintiffs filed employment discrimination claims against the same defendant in part because "the jury may become so overwhelmed trying to recall the independent testimony given by each plaintiff . . . that they may simply consider the evidence *in toto* when deliberating on each respective claim"); *Henderson v. AT&T Corp.*, 918 F. Supp. 1059, 1063 (S.D. Tex. 1996) (severance was warranted where joint trial would involve "a great danger that the jury will find [defendant] liable based on the sheer number of witnesses testifying about its purported wrongdoing"); *Grayson v. K Mart Corp.*, 849 F. Supp. 785, 791 (N.D. Ga. 1994).[6]

Here, the jury had to sift through evidence of six distinct attacks, each with its own discrete set of Plaintiffs.  All together, these attacks involved 40 plaintiffs and 44 alleged perpetrators, many of whom had similar names (and none of whom testified at trial), including six Mohammeds (Mousleh, Abdullah, Hashaika, Arman, Odeh, and Ma'ali), four Barghoutis (Ahmed, Abdullah, Marwan, and Bilal), three Ahmeds (Barghouti, Salah, and Sa'ad), two Nassers (Aweis and Shawish), four Alis or Aweises (Ja'ara, Halil, Nasser, and Abdel Karim), and an Abdel, Abut, Abu, and Abdul (Karim Aweis, Ali Tarifi, Ali Mustafa, and Rahman Maqdad).  Plaintiffs' counsel, and even the Court

---

[6] The recent decision in *Linde v. Arab Bank, PLC*, No. 04-cv-2799, 2015 U.S. Dist. LEXIS 45903 (E.D.N.Y. Apr. 8, 2015) reaffirming that court's decision to group 24 attacks for purposes of a liability trial is readily distinguishable.  First, the defendant failed timely to object to the trial structure and had even earlier proposed a trial structure similar to the one used at trial. *Id.* at *187.  Second, the "course of conduct" involved one form of material support (funding) to a single entity: Hamas.  *Id.* at *192.  Here, both the PA and PLO were alleged to have provided different forms of material support for each attack, and to different entities like the AAMB, Fatah, and Hamas.  Third, there were no individualized damages claims in *Linde*, whereas here most all the plaintiffs (as well as numerous experts) testified as to the individualized claims.

itself, acknowledged the difficulty of keeping the names straight.  Jan. 15, 2015 Tr. at 394:17-395:6 (Mr. Yalowitz); Feb. 18, 2015 Tr. at 3670:22 (the Court).

Each of the attackers had different ties to different organizations, such as the AAMB, Fatah, or Hamas.  And Plaintiffs struggled to link each attack to the PA and PLO through myriad intermediaries of varying complexity, creating a sprawling record involving 35 fact witnesses, nine expert witnesses, and over 360 exhibits (many of which were translated from Arabic or Hebrew). *See generally* Jan. 13, 2015 Tr. at 95:13 - Feb. 6, 2015 Tr. at 2780:16; Feb. 18, 2015 Tr. at 3558:3-3564:4.  The jury could not help but be confused by this dizzying array of similar names, diverse attacks, and speculative links through a multitude of people and organizations.

The cumulative effect of the evidence unfairly prejudiced the PA and PLO, as the gruesome nature of the attacks was magnified by the heart-rending stories of the victims.  Plaintiffs' attempts to connect each attack to the PA and PLO got lost in the haze of confusion, but that is what they wanted.  Presenting the evidence jumbled together led to an inevitable result – the jury found the PA and PLO responsible for every attack by Hamas, Fatah, or the AAMB just by virtue of the PA *existing* as the government of Occupied Palestine.

The Court's jury instructions could not remedy this prejudice.  In similar situations involving numerous fact and expert witnesses, courts have cautioned that "even the strongest jury instructions could not have dulled the impact of a parade of witnesses, each recounting his contention that defendant" had committed the wrongful act.  *See Moorhouse v. Boeing Co.*, 501 F. Supp. 390, 393 n.4 (E.D. Pa. 1980).  Importantly, in *Haskell v. Kaman Corp.*, 743 F.2d 113, 122 (2d Cir. 1984), the Second Circuit reversed and remanded for new trial where the district court erred in allowing six former officers of the defendant to detail their own terminations in a trial on age discrimination.  Such is the case here.  The trial appeared to the jury as a conspiracy trial, even though the ATA does not provide for civil conspiracy liability.  *See Rothstein v. UBS AG*, 708 F.3d 82, 97-98 (2d Cir. 2013).

**D.    The Court's Jury Instructions Did Not Cure the Unfair Prejudice and Confusion from Plaintiffs' Improper Closing Arguments**

Disregarding the law and this Court's warnings, Plaintiffs intentionally led the jury astray in closing arguments about the evidence necessary to find the PA and PLO liable for the attacks, emphasizing the PA and PLO should be liable for any terrorist act committed by any employee or operative of the PA, PLO, Fatah, Hamas, or the AAMB.  This Court erroneously overruled defense objections to those arguments, and then refused to add a curative instruction to attempt to mitigate the damage.  Doc. 821; *see also Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000); *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994).   The resulting jury confusion, and unfair prejudice to the PA and PLO, requires a new trial.

The Second Circuit has explained that "[w]here jury instructions create an erroneous impression regarding the standard of liability, it is not harmless error because it goes directly to the plaintiff's claim, and a new trial is warranted."  *LNC Invs., Inc. v. First Fidelity Bank, N.A. N.J.*, 173 F.3d 454, 463 (2d Cir. 1999) (citation omitted).   A new trial is required where, as here, jury instructions do not "adequately inform the jury on the law."  *Cameron v. City of N.Y.*, 598 F.3d 50, 68 (2d Cir. 2010).  The PA and PLO properly objected to the testimony and arguments and requested curative instructions.  *United States v. Yousef*, 327 F.3d 56, 130 (2d Cir. 2003) (defendant must show that he requested a correct instruction).

The ability of the PA and PLO to defend against liability was compromised in at least three ways.  First, Plaintiffs misled the jury into believing the PA and PLO were liable for all acts of their employees, and that Hamas, Fatah, and the AAMB were the alter egos of the PA and PLO.  Second, this Court failed to provide correct instructions to the jury on agency and vicarious liability that might have mitigated this prejudice.  Third, this Court erred in allowing Plaintiffs to proceed on theories of agency, alter ego, and vicarious liability in the first place.

- 28 -

1.      **Plaintiffs Misled the Jury by Arguing the PA and PLO were Responsible for the Conduct of their Low-Level Employees and for Palestinian Political Organizations**

Plaintiffs disregarded directions from the Court that the PA and PLO could not be liable for the individual actions of low-level employees, after the Court clarified that liability would require Plaintiffs to prove the involvement of a senior official or other person having duties of such senior responsibility, the equivalent "in the U.S. context" of "the President of the United States and/or the Secretary of State."  Feb. 18, 2015 Tr. at 3591:7-15, 3618:13-3619:22.  The Court explained that agency theories of liability were "*absolutely not*" applicable to low level employees.  *Id.* at 3619:2-10 (emphasis added):

> MS. FERGUSON:  We're not talking about a low level employee.  The mere fact that someone has an employee status.
>
> THE COURT:  *No, not at all.  So I don't want you to think that I'm giving that instruction, because I don't want you to argue it that way.  Because you're right, absolutely not.  It's not what this is supposed to mean.*

Feb. 18, 2015 Tr. at 3619:2-10 (emphasis added).  This ruling comported both with this Court's prior refusal to give an alter ego jury instruction (Feb. 11, 2015 Tr. at 3356:17-3358:25), and with Second Circuit precedent.  *See Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir. 2009) (agency liability only applies where "the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company").

Disregarding these warnings, Plaintiffs began their closing argument by explaining that as long as an employee interacts with the public, the PA and PLO are liable for his actions:

> [I]n order to prove that a defendant is liable for a particular claim under the ATA, the plaintiffs must demonstrate the involvement of a senior official or other person having duties of such responsibility that his or her conduct may fairly be considered to represent the PLO or the PA.
>
> That's not complicated.  It may sound kind of lawyer-like, think about who fairly represents any entity.  If you're a beat cop walking the street, you fairly represent the NYPD.  *If you're a customer service rep and somebody calls you at your place of work and asks you how to do something or how to solve a problem for them, you fairly represent your employer.*

> You don't have to be a senior top official to fairly be considered to represent the entity.

Feb. 19, 2015 Tr. at 3781:15-3782:3 (emphasis added).   Unsupported by the record, Plaintiffs

suggested that the PA and PLO had *hundreds* of low-level employees who had murdered Israelis:

> But if you have an NYPD cop who goes over to New Jersey and kills somebody and the NYPD says good job, you're good in terms of security and morals, you were doing that as a result of your fight for New York and we're going to keep you on the payroll and give you promotions while you're in jail, that says something else about that.   And when you have not one guy, not ten guys, not 50 guys, but when you have hundreds of guys who do that, then you begin to see a pattern, and the pattern is this is the regularly conducted activities of the PA.

Feb. 19, 2015 Tr. at 3784:20-3785:4.  Plaintiffs then posited an incorrect statement of the law to the

jury:  "Anytime that there's a terrorist who is kept on the payroll, that's material support, and you

can check yes.  Anytime there's a terrorist who is brought on the payroll, that's a material support,

and you can check yes."  *Id.* at 3789:13-16.  This argument flatly contravened this Court's rulings on

this subject.

Plaintiffs also insisted that the PA and PLO bore responsibility for *anything* done by Fatah or

the AAMB.  Feb. 19, 2015 Tr. at 3796:10-11 ("Fatah and the PLO are the same because the Fatah

and the PLO budget are with Arafat."), 3797:2-5 ("Documents show direct payments from the PA

to Fatah party activists, some of whom were also affiliated with the Al Aqsa Martyrs Brigades who

have been involved in violence.").  Plaintiffs thus told the jury that liability was assured once the

attacks were traced to Fatah: "The fact that the PA and the PLO were Arafat's personal piggy bank

for financing the Al Aqsa Martyr Brigades is all you need for those first two questions."  *Id.* at

3812:19-24.

The PA and PLO objected to these arguments, but to no avail.  Feb. 19, 2015 Tr. at 3781:6-

7, 3785:13-14, 3788:21-22, 3789:17-18, 3792:18-19, 3798:1-2, & 3806:6-7.   Defense counsel

explained that Plaintiffs were advancing improper "alter ego arguments" and "asking the jury to

impose liability on the PLO because it has the same leader and there is some financial connection . .

- 30 -

. He is collapsing these entities and treating them as an alter ego and there is no alter ego instruction. That is going to be highly prejudicial." *Id.* at 3807:13-3808:1.  But this Court refused to give any curative instruction or to otherwise respond to Plaintiffs' improper argument.  *Id.* at 3809:24-3810:19.  *See Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540-41 (2d Cir. 1992) (new trial warranted where defendant's counsel appealed to regional bias in his closing, the trial court overruled plaintiff's objection, and no curative instruction was given).

Despite the complexity of the record, the impropriety of this argument is readily apparent. As this Court is aware, Fatah and Hamas are the two major, but diametrically opposed political parties in Palestine—far more at odds than Democrats and Republicans in the United States. Individuals affiliated with each party may hold various governmental positions, including at the highest levels.  But that does not mean the PA (any more than the U.S. government in the case of Democrats and Republicans) stands responsible for the actions of the parties, even though the government is largely – if not exclusively – comprised by those parties.  Similarly, just because Yasser Arafat simultaneously served as head of Fatah and the PA does not render the PA responsible for all of Fatah's activities.

The Court's failure to take any steps to mitigate the prejudice caused by Plaintiffs' improper closing arguments warrants a new trial.

## 2.     This Court's Jury Instruction on Agency Caused Prejudicial Confusion

The Court's jury instructions did not cure the prejudice caused by Plaintiffs' arguments, and did not "adequately inform the jury on the law," *Anderson*, 17 F.3d at 556, of agency and *respondeat superior* theories of liability.  Those failures to properly instruct and to give curative instructions, such as those proposed by the defense, meant the jury received an altogether erroneous impression of the law on liability.

Before Plaintiffs' closing argument, this Court explained outside the presence of the jury that

the following instruction would apply to Plaintiffs' agency and *respondeat superior* theories of liability:

> In order to prove that a defendant is liable for a particular claim, plaintiffs must
> demonstrate the involvement of a senior official, or other person having duties of
> such [senior official] responsibility, that his or her conduct may fairly be assumed to
> represent the PLO or PA."

Feb. 18, 2015 Tr. at 3584:16-20; 3585:9-15.  The Court stressed the importance and broad

applicability of this instruction:

> I think this applies to every single claim that's on this verdict form.  If they can't find
> this, they should not find liability against your client.  This is an instruction I am
> going to give to them generally.  So I don't want to associate it with any particular
> claim . . .[n]ot respondeat superior alone, not harboring alone, not providing material
> support to a terrorist organization.  Every single claim that I have in this verdict
> form requires this.  That's my intention.

*Id.* at 3586:7-16.  However, the instruction was ultimately buried in the middle of jury instructions,

immediately following the definition of 18 U.S.C. § 2339 (HARBORING A TERRORIST), without

any introductory statement explaining how, and to what claims, it should be applied.  Feb. 20, 2015

Tr. at 3896:23-3897:11.

Concerned about the minimization of that point, the defense objected, explaining that at

least some kind of explanatory statement was necessary to avoid jury confusion:

> It needs a prefatory statement of whatever you think is right to say as to each of
> these, respondeat superior, agency, harboring, then to say this.  Because that is really
> the thrust of this.  If you don't say that, they might think it just relates to
> harboring.  It's not for us so much of where you say it, but where to place it.

Feb. 18, 2015 Tr. at 3593:25-3594:5.  The PA and PLO also requested the following curative

instruction, which echoed the Court's prior rulings:  "*In determining whether a person having duties of such*

*responsibility that his or her conduct may fairly be considered to represent the PA, it is not sufficient that the person is*

*employed by the PA police or security forces.*"  Doc. 821 at 2 (emphasis in original).  Nevertheless, the

Court declined to give any instruction or explanation that would have eliminated the ambiguity (that

Plaintiffs later exploited in argument).

This was a critical error, as it left the jury with the confusing instructions on agency and *respondeat superior*, which included sweeping concepts such as "apparent authority" and "inherent authority," without any clarification that the jury could find liability only if the agent was a senior official or other person having senior official duties.   Feb. 20, 2015 Tr. at 3897:12-3899:17.   The jury could not escape confusion when trying to decipher the instructions in conjunction with Plaintiffs' closing arguments, in which Plaintiffs' counsel argued in contravention of this Court's intent.   Plaintiffs could not tie one individual attack, directly or indirectly, to a senior official of sufficient stature to represent the PLO or PA.  *See Anderson*, 17 F.3d at 556 (the "jury charge must show no tendency to confuse or mislead jury as to applicable principles of law") (citing *Norfleet v. Isthmian Lines, Inc.*, 355 F.2d 349, 362-63 (2d Cir. 1966)).   But without proper guidance, these instructions paved the way for the jury to find liability based on the actions of low-level employees.

### 3.    This Court's Instruction on Agency was Materially Erroneous

The errors pertaining to the agency instruction were further exacerbated because the Court's instruction (Feb. 20, 2015 Tr. at 3897:12-3899:17) failed to explain that the PA and PLO must have authorized the actions of, and had control over, the alleged agents.  *See* Doc. 592 at 19-21; Doc. 803; Doc. 813.  It is well-established that "[t]he principal's power to control the agent is an essential element of an agency relationship."  *Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 422-23 (S.D.N.Y. 2007).  "'[T]he source of the authority is always the principal, never the agent.'"  *Id.* (citing 3 Am. Jur. 2d Agency § 68); *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 301 (S.D.N.Y. 2005) (noting that control over the agent is an essential characteristic of an agency relationship).  Without the PA's or PLO's control over their actions regarding the attacks, perpetrators not be considered agents of the PA.  *In re Shulman Transport Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984) ("An essential characteristic of an agency relationship is

that the agent acts subject to the principal's direction and control." (citing Restatement (Second) of Agency § 1(1) cmt. b, § 14)).

To this end, the PA and PLO asked the Court to add the following language regarding control to the jury instructions:  "You must also find that the PA[/PLO] had the power to control the agent, and that the purpose of the agency relationship was to empower the agent to take actions on behalf of and for the benefit of the PA[/PLO]—not the agent."  Doc. 803 at 4-5.  Because control is a fundamental requirement for an agency relationship, the Court's failure to provide an instruction on control renders the agency instruction erroneous.  *Gordon*, 232 F.3d at 116 ("If an instruction improperly directs the jury on whether the plaintiff has satisfied her burden of proof, it is not harmless error because it goes directly to the plaintiff's claim, and a new trial is warranted.") (citation and quotation marks omitted).

### E.     The Court Erred in Allowing Plaintiffs' Counsel to Provide Points of Reference for Damages Awards

The Court should also grant a new trial because Plaintiffs' counsel suggested specific dollar amounts for non-economic damages during closing argument.  Although the Second Circuit has declined to adopt a *per se* rule barring this practice, *see Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 912 (2d Cir. 1997), it has nevertheless emphasized "that specifying target amounts for the jury to award is disfavored" because they "anchor the jurors' expectations of a fair award at a place set by counsel, rather than by the evidence."  *Consorti v. Armstrong World Indus.*, 72 F.3d 1003, 1016 (2d Cir. 1995) (citing *Mileski v. Long Island R.R.*, 499 F.2d 1169, 1172 (2d Cir. 1974)), *vacated on other grounds*, 518 U.S. 1031 (1996).  Taking that cue, courts within the Second Circuit have prohibited plaintiffs from requesting specific amounts for non-economic injuries.  *See e.g., Philipps v. City of N.Y.*, 871 F. Supp. 2d 200, 208 (E.D.N.Y. 2012); *Jean-Laurent v. Hennessey*, 840 F. Supp. 2d 529, 558 (E.D.N.Y. 2011).

- 34 -

Other circuits likewise recognize that counsel should not be permitted to state an amount they think should be awarded for pain and suffering. *See e.g., Rodriguez v. Señor Frog's De La Isla, Inc.*, 642 F.3d 28, 37 (1st Cir. 2011); *Bielunas v. F/V Misty Dawn, Inc.*, 621 F.3d 72, 79 (1st Cir. 2010) ("we held in an unpublished opinion that *Davis* precludes counsel from requesting a pain-and-suffering dollar amount in closing" (citing *Davis v. Browning-Ferris Indus., Inc.*, 898 F.2d 836, 837-38 (1st Cir. 1990)); *Waldorf v. Shuta*, 896 F.2d 723, 744 (3d Cir. 1990) ("[P]laintiff's counsel may [not] request a specific dollar amount for pain and suffering in his closing remarks.").

The prejudice here is self-evident: the jury adopted amounts largely tracking Plaintiffs' suggestions and made their determination "[w]ithout benefit of any counter-figures from other sources." *Mileski*, 499 F.2d at 1172.

### F.   Acting as an Independent Trier of Fact, the Court Should Decide that the Jury's Damages Award is Excessive and Unsupported

"It is well established that the trial judge enjoys 'discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence,' and that '[t]his discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur).'" *Lore v. City of Syracuse*, 670 F.3d 127, 176-177 (2d Cir. 2012) (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996)). In certain cases "in which prejudicial error has infected the jury's entire consideration of plaintiff's pecuniary loss," remittitur to a certain amount may be inappropriate and the Court should, instead, disregard the jury's verdict entirely and grant a new trial. *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49-50 (2d Cir. 1984).

The Court should find the jury's $218,500,000 damages award (before trebling) excessive and unsupported by the evidence. These damages do not reflect the injuries sustained as a result of the PA and PLO's purported violations of the ATA. Assuming the jury adopted Plaintiffs' testimony

regarding the requested $2,668,368 in cumulative economic damages,[7] over $215 million of the jury's verdict consists of non-economic damages (before trebling).

Damages under the ATA must be consistent with "general common law tort principles," as the legislative history and statute itself require. *See Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1010 (7th Cir. 2002) (discussing the legislative history that references "remedies of American tort law" and "the substantive law of the American tort law system"); Doc. 497 at 40-43; Doc. 803 at 7.  Under this framework, non-economic damages for emotional distress should not be permitted unless the plaintiff is "a member of such person's immediate family *who is present at the time*, whether or not such distress results in bodily harm, or . . . any other person *who is present* at the time, if such distress results in bodily harm."  Restatement (Second) Torts § 46(2) (emphasis added).  The physical injury and presence requirements are imposed to limit the scope of recovery, particularly where an incident may result in the distress of many individuals.  *Id.*, cmt. b.  Although this Court has previously noted other "Courts that have considered this issue [who] universally allow ATA claims based on the emotional distress that U.S. nationals experience as a result of the death or injury of their family members" (Doc 646 at n.8), such view contravenes general tort principles.  Indeed, Plaintiffs improperly suggested amounts based on the damages framework established in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006).  Feb. 19, 2015 Tr. at 3844:25-3845:21; *see also* Feb. 18, 2015 Tr. at 3658:21-23.  That fact alone demonstrates the jury's award was based on assumptions having nothing to do with evidence of any plaintiff's specific injuries.  While the PA and PLO do not concede that the *Heiser* framework should govern here,[8] even assuming that

---

[7] Jan. 30, 2015 Tr. at 2003:9-20 (Shayna Gould Elliott), at 2025:21-2026:5 (Janis Ruth Coulter), at 2030:5-16 (Diane Carter), at 2046:10-23 (Karen Goldberg), at 2057:3-12 (David Gritz).

[8] *Heiser* is based on damages awarded in Foreign Sovereign Immunities Act ("FSIA"), not ATA, cases and because of the inherent differences between the two statutes (including the automatic trebling of damages in the ATA, not present in the FSIA), the Court should not automatically utilize the framework here.  Rather, the Court should employ damages

it does, the majority of damages exceeds that threshold, as illustrated by the chart annexed as Exhibit A.

Because the *Heiser* framework does not apply to individual victims, those damages awards should be assessed separately.  Even were the Court to draw comparisons to damages for victims in FSIA cases (which it should not do), the damages awarded by the jury remain excessive.  The chart annexed as Exhibit B highlights the excessiveness of those awards.

Whether viewed under general common law principles or the *Heiser* framework, the verdict is excessive by a multitude of millions of dollars.  "When courts fail to exercise the responsibility to curb excessive verdicts, the effects are uncertainty and an upward spiral.  One excessive verdict, permitted to stand, becomes precedent for another still larger one.  Unbridled, spiraling, excessive judgments predictably impose huge costs on society."  *Consorti*, 72 F.3d at 1010.  Moreover, because the Court failed to separate the trial by attack, *any* award beyond the boundaries yields spillover consequences and warrants new separate trials.  Trebling the base damages will only exponentially compound the jury's excessive award.

## III.   THIS COURT SHOULD GRANT JUDGMENT AS A MATTER OF LAW BECAUSE THE ATA DOES NOT ALLOW FOR *RESPONDEAT SUPERIOR* LIABILITY AND PLAINTIFFS FAILED TO MEET THEIR BURDEN AT TRIAL

This Court should grant judgment as a matter of law based on Second Circuit authority precluding *respondeat superior* liability under the ATA, as well as established principles that punitive damages, such as treble damages, do not apply in the vicarious liability context.  But regardless of the applicability of *respondeat superior* liability under the ATA, Plaintiffs failed to meet their burden of proving a "legally sufficient evidentiary basis" to support liability for each individual attack.  *Cameron*,

---

schemes that comport with "general common law tort principles," as the statute itself requires.  *See Boim*, 291 F.3d at 1010.

598 F.3d at 59-60.  This Court evaluates sufficiency of the evidence by "'drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of [the non-movant].'"  *Vermont Plastics v. Brine, Inc.*, 79 F.3d 272, 277-78 (2d Cir. 1996) (citing *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1131 (2d Cir. 1995).  Judgment as a matter of law is appropriate if "'a reasonable jury could only have found for the defendants.'"  *Id.* (finding insufficient evidence of misrepresentations).  Other than improper expert speculation, there was no evidence the PA or PLO knowingly gave material support to any of the attacks at issue in this case, or that their employees did so within the scope of their employment.  Instead, Plaintiffs provided a whirlwind of vague connections between the PA and Fatah, Hamas, and the AAMB, including that some of the PA's employees had overlapping membership with those organizations.  None of that evidence proved any connection between a single attack and the PA or PLO.  This Court should accordingly enter judgment for the PA and PLO.

## A.     The ATA Does Not Allow for *Respondeat Superior* Liability

Instructing the jury on *respondeat superior* liability constituted error for two independent reasons.  First, the Second Circuit already has foreclosed aiding and abetting theories under the ATA because the statute does not expressly provide for secondary liability, particularly when measured against the Supreme Court's mandate that extraterritorial statutes be strictly construed.  Second, for similar reasons, application of vicarious liability runs afoul of the Supreme Court's longstanding doctrine that punitive awards, such as treble damages under the ATA, are improper for vicarious liability offenses.

### 1.     Because The ATA Does Not Provide For Secondary Liability, This Court Should Not Infer Congress Intended To Allow Liability Under Respondeat Superior

The Second Circuit recently held that statutory silence precludes a claim for secondary liability under Section 2333 of the ATA.  *See Rothstein*, 708 F.3d at 97-98; *see also In re Terrorist Attacks*

*on September 11, 2001 II*, 714 F.3d 118, 123-25 (2d Cir. 2013).  In *Rothstein*, the Second Circuit relied

on *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), *superseded in

part by statute*, 15 U.S.C. § 78t(f), to hold the ATA does not permit civil claims for aiding and abetting

liability because Section 2333 is "silent as to the permissibility of aiding and abetting" and because

Congress provided for aiding and abetting liability elsewhere in the ATA.  *Rothstein*, 708 F.3d at 97-

98.  The Court doubted Congress could "have intended § 2333 to authorize civil liability for aiding

and abetting through its silence." *Id.* at 98.

Further militating against an inference of secondary liability is the statute's extraterritorial

reach.  Where a statute applies extraterritorially, "statutory silence on the subject of secondary

liability means there is none." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 689 (7th Cir.

2008) (*en banc*).  The Seventh Circuit held that "[t]o read secondary liability into section 2333(a) . . .

would enlarge the federal courts' extraterritorial jurisdiction." *Id.* at 689-90.  This holding merely

implements the Supreme Court's directive that "when a statute provides for some extraterritorial

application, the presumption against extraterritoriality operates to limit that provision to its terms."

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010) (citing *Microsoft Corp. v. AT&T Corp.*,

550 U.S. 437, 442, 455-56 (2007)).  Statutes proscribing conduct beyond the United States must be

strictly construed when deciding "unexpressed congressional intent." *Foley Bros., Inc. v. Filardo*, 336

U.S. 281, 285 (1949); *see EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (the presumption

against extraterritoriality "serves to protect against unintended clashes between our laws and those

of other nations which could result in international discord.") (citing *McCulloch v. Sociedad Nacional de

Marineros de Honduras*, 372 U.S. 10, 20-22 (1963)) *superseded by statute on other grounds*, Civil Rights Act

of 1991, Pub. L. No. 102-166, § 109, 105 Stat. 1071, 1077.

In reaching a contrary result under the ATA, this Court previously invoked *Wultz v. Islamic

Republic of Iran*, 755 F. Supp. 2d 1, 55 (D.D.C. 2010), which held that aiding and abetting liability

exists under Section 2333 of the ATA.  Doc. 646 at 9.  But that decision stands in direct conflict with the Second Circuit's subsequent decision in *Rothstein*, which rejected that argument in light of statutory silence.  Of course, Section 2333B regarding "material support" also contains no language regarding agency or secondary liability—it requires a direct action of material support to a foreign terrorist organization.

*Rothstein's* interpretation of the ATA is bolstered when juxtaposed with the FSIA, which allows suits based on the acts of "an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605A; s*ee Cent. Bank, N.A.,* 511 U.S. at 165 ("statutory silence cannot be interpreted as tantamount to an explicit congressional intent" to impose aiding and abetting liability under federal securities statutes).  Congress could have included *respondeat superior* liability in the ATA, as it did in FSIA, and this Court should give deference to the Congressional choice not to do so.  This Court should accordingly follow the Second Circuit's decision in *Rothstein* and hold that *respondeat superior* liability is unavailable under Section 2333 of the ATA.

### 2.    The ATA's Treble Damages Provision Prevents Application of Vicarious Liability

In addition to Congressional silence, the treble damages provisions under the ATA are incompatible with vicarious liability.  The Supreme Court has explained that "agency principles limit vicarious liability for punitive awards."  *Kolstad v. ADA*, 527 U.S. 526, 541 (1999).  This limitation derives from the common-sense notion that it is "'improper'" to award punitive damages against someone that is "'liable only vicariously.'"  *Id.* at 528 (citing the Restatement (Second) of Torts, § 909, cmt. b).  The trebled damages under the ATA qualify as punitive.  *Estates of Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 237-40 (D.R.I. 2004) (finding the "treble damages provision of 18 U.S.C. § 2333 overwhelmingly punitive"); *see also Boim v. Holy Land Found. For Relief & Dev.*, 549 F.3d at 692-93 ("'The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful

conduct.'") (citing *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639, (1981)); *Mayline Enters. v. Milea Truck Sales Corp.*, 641 F. Supp. 2d 304, 309 (S.D.N.Y. 2009) ("treble damages serve[ ] the same function as punitive damages").[9]

As explained in *Kolstad*, 527 U.S. at 542-43, vicarious liability only applies to a principal if the principal expressly authorizes the agent's conduct or if the wrongful act was committed by a high-level employee "acting in the scope of employment."  *See Duch*, 588 F.3d at 763 (finding liability where "the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company") (citation omitted); *Gruber v. Prudential-Bache Sec., Inc.*, 679 F. Supp. 165, 181 (D. Conn. 1987) (requiring acts by high-level employees in RICO case).  As detailed above, the Court's instructions on this point were confusing and misleading, and it was not clear to the jury that it had to find the PA authorized the attacks or a senior-level PA employee had to be involved in the attacks.  Without such a finding, vicarious liability will not support a punitive award of treble damages and judgment as a matter of law should have been entered.

### 3.    The Jury Should Not Have Been Instructed on Respondeat Superior

For the reasons described above, the Court erred in instructing the jury on *respondeat superior*. Therefore, if the Court declines to enter judgment as a matter of law, at a minimum it should order new, separate trials under Rule 59.

---

[9] In *Linde*, Judge Cogan, as this Court did previously, relied on *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 558 (E.D.N.Y. 2012), for the proposition that the ATA incorporates general tort principles, including *respondeat superior*.  2015 U.S. Dist. LEXIS 45903, at *152.  Judge Cogan also relied on Judge Brown's concurrence in *Estate of Parsons v. Palestinian Auth.*, 651 F. 3d 118, 148 (D.C. Cir. 2011) (Brown, J., dissenting in part and concurring in part), which interprets the ATA to permit *respondeat superior* recovery notwithstanding its treble damages provision.  *Id.*  But neither *Gill* nor Judge Brown's concurrence is binding precedence.  *United States v. Porter*, 90 F.3d 64, 67 (2d Cir. 1996) (noting that a concurring opinion is not binding on the Second Circuit).  Indeed, Judge Brown's concurrence was not adopted by the panel majority and, along with *Gill*, stands against the clear weight of legal authority.  *Estates of Ungar*, 304 F. Supp. 2d at 237-40; *Mayline Enters.*, 641 F. Supp. 2d at 309; *Boim v. Holy Land Found. For Relief & Dev.*, 549 F.3d at 692-93.  The remainder of the *respondeat superior* discussion in *Linde* is largely inapplicable because the PA's and PLO's arguments do not rest on any analogy between the ATA and the civil RICO statute, nor did they request the alternative jury charge that Judge Cogan rejected.  *Id.* at 152-156.

**B.**     **Judgment as a Matter of Law is Appropriate Because There was Insufficient Admissible Evidence Connecting Each Individual Attack to the PA or PLO**

While Plaintiffs focused on evidence about the PA's and PLO's general support for the political fight against Israel, they failed to introduce sufficient admissible evidence of their involvement in the specific attacks at issue.   This meant that scienter and causation, two requirements for a finding of ATA liability, were wholly lacking.   Scienter under the ATA requires evidence that "the defendant knew about the terrorists' illegal activities, the defendant desired to help those activities succeed, and the defendant engaged in some act of helping those activities."   *In re Terrorist Attacks on September 11, 2001 I*, 349 F. Supp. 2d 765, 828 (S.D.N.Y. 2005) (citation omitted).   Similarly, the ATA requires specific proof of proximate cause.   *Rothstein v. UBS AG*, 772 F. Supp. 2d 511, 513 (S.D.N.Y. 2011) ("'by reason of' language in ATA is synonymous with "proximate cause narrowly defined") *aff'd*, 708 F.3d 82 (2d Cir. 2013); *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (proximate cause under RICO statute – which contains language similar to the ATA – requires "'some direct relation between the injury asserted and the injurious conduct alleged'").   Other than improper expert speculation, there was insufficient evidence that the PA or PLO knowingly gave material support to terrorism, and that their actions proximately caused any of the damages at issue in this case.

Plaintiffs also failed to introduce sufficient admissible evidence that any "wrongful conduct was performed in the course of employment," which is required for a verdict based on *respondeat superior.   Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 649 (S.D.N.Y. 2011); *see also* Restatement (Third) of Agency § 2.04 ("An employer is subject to liability for torts committed while acting within the scope of their employment"); *see Rau v. Roberts*, 640 F.3d 324, 328 (8th Cir. 2011) (dismissing *respondeat superior* claim because the police officer acted "outside his jurisdiction as an officer").   At summary judgment, this Court held that Plaintiffs still needed to show that any illegal acts by individual PA employees took place within the scope of his employment to make the PA

itself liable.  Doc. 646 at 10.  During trial, this Court deferred decision on the insufficiency argument "as to each separate attack," desiring to hear each parties' summation as well as "further submissions from the parties to direct my evaluations."  Feb. 18, 2015 Tr. at 3674:10-24.

As shown below, Plaintiffs provided no evidence at trial that any PA or PLO employee performed official duties or received assistance from the PA or PLO to carry out their acts.[10]  The evidence showed each attack was carried out by Fatah, Hamas, or the AAMB —and that no specific connection existed between the individual attacks and the PA.  Some indirect connection to PA employees may be inevitable because the PA is the largest employer in Palestine, with over a hundred thousand employees.  But *respondeat superior* requires evidence that the attacks were committed not just by employees, but "in the course of employment."  Evidence that the PA or PLO failed to stop attacks or confine terrorists cannot support a verdict under the ATA.

This Court should therefore grant judgment as a matter of law to the PA and PLO based on the specific facts regarding each attack presented at trial:[11]

### 1.       January 22, 2002 attack.

Plaintiffs' evidence showed the January 22 attack was orchestrated and perpetrated by members of the AAMB, including senior members of the AAMB.  *See e.g.*, Jan. 22, 2015 Tr. at 1163:6-20; Jan. 26, 2015 Tr. at 1469:8-13.  The shooter happened to be employed by the PA's Maritime Police.  *See* PTE 62.  But Plaintiffs adduced no evidence he or the other perpetrators acted within the scope of their employment and in furtherance of the PA's business when the shooter embarked upon his shooting spree in an area over which the PA had no control.  Indeed, Plaintiffs' evidence established that the shooter carried out the attack "on behalf of the Al-Aqsa Martyr's

---

[10] *See also* Docs. 497 (Summary Judgment Motion), 682 (Renewed Summary Judgment Motion), 795 & 819 (Motions for Judgment as a Matter of Law).

[11] It bears noting that this Court earlier held Plaintiffs may not proceed with a claim under Section 2339A on the grounds the PA or PLO provided the AAMB with personnel.  Doc. 646 at 17-18.

Brigade in retaliation for the istishhad [death of a martyr] of Raed al-Karmi." PTE 153 at 2; Jan. 22, 2015 Tr. at 1104:2-7 (Shrenzel). The evidence showed that a PA employee (and also fellow AAMB member), Nasser Aweis, gave the shooter the gun and ammunition used to carry out his attack. PTE 362 at 56. But this is insufficient for a reasonable jury to conclude that Mr. Aweis did so within his employment.

The evidence also showed that Ahmed Barghouti bought food and clothes for the shooter (PTE 357 at 72-73), and that after the attack he received $1,000 from an unidentified person which he distributed to other unidentified individuals for their participation in the attack (*id.* at 40). Once again, this evidence does not show that neither Ahmed Barghouti acted within the scope of his employment, nor does it suffice to prove proximate cause. As with each of the attacks, post-attack payments to prisoners or families of perpetrators under the PA's social welfare program are insufficient to establish either direct or vicarious liability.

### 2.    January 27, 2002 attack.

Plaintiffs featured two core pieces of evidence of PA involvement associated with the January 27 attack. First, an unidentified person in the Mukataa gave the suicide bomber a bomb. *See* PTE 467. But this fails to demonstrate interaction with a PA employee acting within the scope of his employment (or to demonstrate material support). This is especially true since the evidence showed that other organizations, such as Fatah, occupied the Mukataa. Feb. 2, 2015 Tr. at 2078:6-10. The Court itself agreed that even were it reasonable for the jury to conclude it is more likely that the bomber met with a PA employee, "[t]hat in itself doesn't create liability. What creates liability is whether or not, based on all of the evidence in this case, a reasonable jury can conclude that they were talking to someone who was acting within the scope of their employ[ment]." Feb. 18, 2015 Tr. at 3670:3-7. Significantly, neither the bomber nor the other perpetrator was a PA employee. Jan.

- 44 -

23, 2015 Tr. at 1305:20-22.  And the evidence is insufficient to infer that the person in the Mukataa was acting within his employment even on the assumption that he worked for the PA.[12]

The second piece of evidence involved PTE 233, a memorandum allegedly reflecting that Mr. Tirawi had prior knowledge of the suicide bomber's identity.  Even assuming this memorandum of Mr. Tirawi's "knowledge" was admissible, that information does not make it more likely than not that Mr. Tirawi assisted with the bombing.  Indeed, the substance of Mr. Tirawi's job, like that of any intelligence chief in Palestine, would be to learn what Hamas, Fatah, and the AAMB were planning.  Prior knowledge, or lack of action to prevent a bombing, is not sufficient to show material support for the bombing.  Heads of intelligence organizations the world over doubtless learn of potential attacks that they cannot, or will not, take action to prevent.

### 3.     March 21, 2002 attack.

Plaintiffs did not show any PA/PLO involvement in the attack.  Mohamed Hashaika, the suicide bomber, was not an employee when he perpetrated the attack, having been "discharged from the salary roster of the Police Department/Northern Provinces as of February 1, 2002, for being unfit to be a police officer."  PTE 14.  Mr. Hashaika's employment records confirmed the point, establishing that he was not receiving any payments from the PA on the date of the attack.  PTE 9; *see also* Jan. 26, 2015 Tr. at 1516:11-15.

No PA employee provided funding, personnel or a safe house with the knowledge or intention it would be used in planning for or carrying out the March 21 bombing.  Plaintiffs introduced evidence that PA employee Abdel Karim Aweis made "an explosive device for carrying out the planned suicide attack" (PTE 356 at 37) and that Mr. Aweis joined the leadership of the AAMB in the Ramallah area.  Jan. 22, 2015 Tr. at 1191:16-1192:8 (Shrenzel).  However, this

---

[12] The evidence also included PTE 465 and 467, police reports of the interrogation of Noor, one of the perpetrators, which were inadmissible custodial interrogation reports. *See, e.g.*, Doc. 654.

evidence merely establishes that Mr. Aweis' involvement in the attack was driven by personal motives and the AAMB – not that the attack related to his PA connections.   Plaintiffs also introduced evidence that Mr. Aweis received payments as a prisoner (PTE 2), but this is hardly meaningful evidence because all security prisoners receive monthly payments, regardless of employment status.   The evidence that the PA police arrested two of the perpetrators and later released them from prison (without further detail) is similarly insufficient to show scienter, proximate cause, or vicarious liability.   In short, there is insufficient evidence any of the perpetrators acted within the scope of their employment, in furtherance of PA interests, or that the PA materially supported the March 21 attack.

#### 4.      June 19, 2002 attack.[13]

Plaintiffs relied on two main pieces of evidence to attempt to show the PA and PLO provided material support for this attack.   They first had Mr. Shrenzel testify that Mr. Sa'id Awada (and no other individual) perpetrated the June 19 bombing.   *See* Jan. 23, 2015 Tr. at 1363:17-19 (Shrenzel) ("Q. There is a name of a perpetrator Sa'id Awada.   Do you see that in the index? A. Sa'id Awada."), 1364:12-14 ("Q. Could you just turn to Exhibit 19 and explain what it is? A. Exhibit 19 is the martyr file of Sa'id Awada, the suicide bomber in this attack.").   No basis is provided for Mr. Shrenzel's statement that Mr. Awada was the actual perpetrator, other than his *ipse dixit*, barren of any methodology.   In fact, Plaintiffs' documentary evidence contradicts this testimony, showing that Mr. Awada committed a separate attack on *June 18, 2002*, not June 19, 2002, and only indicating "Jerusalem" as the location of Mr. Awada's death.   *See* PTE 19 (listing Sa'id Awada's date of death as June 8, 2002 or June 18, 2002).   Nevertheless, Mr. Shrenzel simply opined that he had satisfied

---

[13] This Court previously ruled the Mandelkorn plaintiffs have no *respondeat superior* claim.  Doc. 646 at 13.

himself that Mr. Awada's attack took place on June 19 (Jan. 23, 2015 Tr. at 1382:13-15) without an explanation for how he reached that conclusion.

Next, Mr. Shrenzel testified that the AAMB committed the June 19 attack. *See Id.* at 1382:16-20 ("Q: And are you satisfied that the attack was an Al Aqsa attack? A: Absolutely.") (objection omitted). The foundation for Mr. Shrenzel's testimony ostensibly was documents purporting to show payments by the PA to the AAMB on April 5 and September 19, 2001 (PTE 962 & 963) *nearly a year before* the June 19, 2002 attack and even prior to the AAMB's designation as a Foreign Terrorist Organization on March 27, 2002. No evidence connected those payments to the June 19 attack, nor did Plaintiffs provide any indication what the money was used for.

The other evidence marshalled by Plaintiffs is even less relevant. This includes Israeli court verdicts that do not discuss the June 19 bombing. PTE 362, 384, 451, 889. It also includes a letter from Palestinian General Intelligence detailing the status of "Fatah Armed Men" in Tulkarm Governate. PTE 831. Like the verdicts, this letter contains no discussion of the June 19 attack or the AAMB's involvement, and certainly says nothing about any PA assistance with the attack. *Id.* The fact that the PA's intelligence service investigated various armed groups in Palestine should come as no surprise—that was part of their job. But that is not evidence that the PA or PLO provided material support for those attacks.

### 5. July 31, 2002 attack.

No evidence exists that any of the individuals convicted for planning and perpetrating the July 31 attack – or with providing the explosive device – was a PA employee. The best the Plaintiffs could offer was evidence that Ahmed Barghouti, an officer in the PA security services who was an assistant and driver for Marwan Barghouti, a member of the Palestinian Legislative Council and a leader within Fatah in the West Bank (Jan. 20, 2015 Tr. at 809:1-4 (Eviatar)), provided lodging in an apartment for "several days" to Abdullah Barghouti and gave him a pistol when he left. (PTE 357 at

73).  Providing shelter in late 2001 for "several days" hardly establishes *respondeat superior* liability for an attack that happened over seven months later.  It is far more likely that those actions were unrelated to the bombing, or were performed based on family ties, rather than done at the behest of the PA.  This is especially so considering the evidence showed all of the perpetrators were members of the Silwan cell of Hamas, and no evidence connected them to the PA or the PLO.  Jan. 20, 2015 Tr. at 845:3-9 (Eviatar).[14]

> **6.      January 29, 2004 attack.**

The AAMB claimed responsibility for this attack.  Jan. 26, 2015 Tr. at 1428:6-18 (Shrenzel); *see also* PTE 132 ("A group belonging to the al-Aqsa Martyrs' Brigades claimed responsibility for the attack").  Because AAMB is separate from and cannot be conflated with the PA or the PLO, they cannot be held liable for such third party acts.  *See, e.g., Linde,* 2015 U.S. Dist. LEXIS 45903, at *136-37 (affirming that AAMB, and not Hamas, was responsible for the same January 29 attack and granting judgment as a matter of law on this particular attack).

No other evidence ties either the PA or the PLO to the January 29 attack.  Notably, the suicide bomber was not a PA employee at the time of attack, having previously lost his job as a police officer.  PTE 88.  Even if he were, there is insufficient evidence that the suicide bomber, or any other person associated with the attack, carried out the bombing within the scope of any PA employment or in furtherance of the PA's interests.

Nor did Plaintiffs demonstrate scienter, proximate cause, or any other element.  Unless the PA and PLO are to be responsible for every attack carried out in Palestine, they cannot be responsible for the January 29 attack.  Lockstep promotions (*See* PTE 48, 114 & 116), payments to a

---

[14] The PA and PLO continue to maintain that the admission of Mr. Yousef's deposition testimony, which involved a supposed deal that Abdullah Barghouti would be released from prison, was error.  Doc. 680, 699, & 727.

prisoner (PTE 7 & 10) and references in GIS files to security or moral status (PTE 129-131) are at best flimsy pieces of evidence, and are insufficient to sustain any damages award for this attack.

*    *    *    *

Even considering all of this evidence together, which never should have been done in a consolidated trial, there is an entirely insufficient link between the PA or PLO and any of the individual attacks.  The evidence only shows that some PA employees are members of Fatah, Hamas, or the AAMB, and that the PA receives some intelligence on the workings of those organizations.  It does not show that a single employee acted within the scope of his employment in any of the attacks, or that the PA participated with Fatah, Hamas, or the AAMB to plot any attacks.  Plaintiffs pile inference upon inference, but cannot connect the PA or PLO with any of the attacks.  This Court should therefore grant judgment as a matter of law on each individual attack.

## CONCLUSION

This Court should enter judgment for the PA and the PLO given the lack of personal jurisdiction over them, which would render any adverse judgment infirm.  Alternatively, if the Court opts to exercise jurisdiction, then it should grant new, separate trials if it does not enter judgment as a matter of law in favor of the PA and the PLO.

Dated:  May 1, 2015                    Respectfully Submitted,


                                       /s/ Gassan A. Baloul
                                       Gassan A. Baloul (Bar No. 4324919)
                                       SQUIRE PATTON BOGGS (US) LLP
                                       30 Rockefeller Plaza
                                       23rd Floor
                                       New York, NY  10112
                                       Telephone: (212) 872-9800
                                       Facsimile: (212) 872-9815
                                       gassan.baloul@squirepb.com

                                       John A. Burlingame *(admitted pro hac vice)*
                                       SQUIRE PATTON BOGGS (US) LLP
                                       2550 M Street, NW
                                       Washington, DC 20037
                                       Telephone: (202) 457-6000
                                       Facsimile: (202) 457-6315
                                       john.burlingame@squirepb.com

                                       *Attorneys for Defendants Palestinian Authority*
                                       *and Palestine Liberation Organization*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2015, a true and correct copy of the foregoing was filed with the Clerk via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

/s/ Gassan A. Baloul
Gassan A. Baloul (Bar No. 4324919)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza
23rd Floor
New York, NY  10112
Telephone: (212) 872-9800
Facsimile: (212) 872-9815
gassan.baloul@squirepb.com