**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK I. SOKOLOW, et al., ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| PALESTINE LIBERATION ) | No. 1:04-cv-0397 (GBD) (RLE) |
| ORGANIZATION, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO STAY EXECUTION OF THE JUDGMENT AND**
**TO WAIVE THE BOND REQUIREMENT**

Dated:  May 4, 2015

Gassan A. Baloul (Bar No. 4324919)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza, 23rd Floor
New York, NY 10112
Telephone: (212) 872-9800
Facsimile: (212) 872 9815
gassan.baloul@squirepb.com

John A. Burlingame (*admitted pro hac vice*)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC  20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
john.burlingame@squirepb.com

*Attorneys for Defendants Palestinian Authority*
*and Palestine Liberation Organization*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

ARGUMENT ..............................................................................................................................3

I.    FEDERAL RULE 62(B) AND 62(D) ...............................................................................3

    A.    The Stay Factors The Court Must Consider ....................................................3

    B.    Success on the Merits ......................................................................................4

    C.    The Irreparable Harm to Defendants ...............................................................6

    D.    Plaintiffs Face Minimal Harm, If Any, From a Stay ..................................... 10

    E.    The Public Interest ........................................................................................ 12

    F.    The Court Should Solicit the Views of the U.S. Government ..................................... 13

II.   THE PA AND PLO SEEK A WAIVER OF THE BOND DUE TO FINANCIAL
    HARDSHIP ...................................................................................................................... 14

    A.    The Court Has Broad Discretion to Waive the Bond For Financial Hardship. ....... 15

    B.    The PA and PLO Have Few Assets, Little Income and Overwhelming Debt
        and Deficits ................................................................................................... 16

    C.    Defendants Seek Protection for the Foreign Aid and Other Critical Assets of
        the PA/PLO Government. .............................................................................. 22

CONCLUSION .......................................................................................................................... 24

## INTRODUCTION

The Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") respectfully seek a stay of execution of the judgment without a bond pursuant to Federal Rule of Civil Procedure 62 for two primary reasons. First, the PA and PLO satisfy the traditional four-factor stay test. Their Rule 50(b) and Rule 59 post-trial motions present a substantial likelihood of success on the merits, particularly regarding this Court's lack of personal jurisdiction over the PA or PLO because they are not "at home" in the United States. Three D.C. federal district courts have now dismissed cases on nearly identical facts against the PA and PLO for lack of personal jurisdiction, and in doing so, explicitly disagreed with this Court. Those dismissals, and the split in authority they create, alone are legally sufficient to meet the likelihood of success requirement for a stay. The PA and PLO satisfy the remaining factors of the stay test because immediate enforcement of a judgment would inflict substantial and irreparable harm upon Defendants and third-parties, including the citizens governed by the PA, and will jeopardize regional security and stability. Plaintiffs face minimal harm, if any, from a stay.

Second, this motion demonstrates that neither the PA nor the PLO has the financial resources or access to credit to obtain sufficient security to secure the automatic stay. Testimony from the PA Minister of Finance and documents from the International Monetary Fund and the World Bank reveal a government in deep economic distress. The PA has few assets or sources of revenue (the PLO has none, other than the funds it receives from the PA), and has long operated with enormous budget deficits, a significant public debt burden, large overdrafts in its bank accounts, and accumulated arrears in payments owed to public employees and private sector vendors.

The PA's enduring liquidity crisis intensified in December 2014, when Israel froze the remittance of customs clearance revenues due to the PA, which comprise 70% of the PA's revenues.

As a result, the PA's public debt swelled to nearly $5 billion and its 2015 deficit to more than $1 billion, while the PA's emergency budgeting forced the reduction and elimination of critical government programs, and further compelled the PA to stop paying its private sector vendors and public employees. Although Israel agreed to release those clearance revenues on April 17, as Defendants' evidence illustrates, those clearance revenues do not come close to covering the PA's debt and deficits or solving its liquidity crisis.

This perfect financial storm has so weakened the PA's credit rating that the PA cannot secure additional lines of credit to cover a bond to secure a judgment in this case. Even if the PA could borrow to obtain a bond or other security, doing so would only harm the Palestinian people. Plagued by severe and pervasive poverty, over 20% of the Palestinian population lives below the poverty line, subsisting on one dollar a day or less. *See* Exh. A (Bishara Decl.), ¶ 58[1].   The government already has been forced to curtail or eliminate many of its public and social service programs, and the PA's more than 155,000 employees will just now begin receiving full wages after being paid just a fraction of their salaries since late 2014.

The PA and the PLO accordingly request that the Court exercise its broad discretion to stay the execution of judgment and, further, that it waive the bond requirement. Defendants seek this stay both under Rule 62(b) pending disposition of the Rule 50(b) and Rule 59 motions, and under Rule 62(d) pending appeal. Without a stay, the ability of the PA and the PLO to financially support the Palestinian people and to play their vital role in regional security and stability will be irreparably harmed. The public interest favors enabling the PA to continue to use its scant resources to perform those critical functions.

To the extent the Court has any doubt, the PA and PLO respectfully request that the Court solicit the views of the United States regarding the impact of the denial of a stay on U.S. interests

---

[1] Per ECF filing requirements, Exhibit A, the Declaration of PA Minister of Finance Shukry Bishara, is filed as a separate docket entry in support of this Motion.

and policy and on any related issue on which the United States considers it prudent to submit its views. The United States has significant foreign policy interests in ensuring regional stability, promoting the Palestinian/Israeli peace process, and in preventing efforts to seize aid to the PA provided by the international donor community, which has largely funded the operations of the PA government and the development of the West Bank and Gaza to create economic growth.

## ARGUMENT

**I.    Federal Rule 62(b) and 62(d).[2]**

### A.    The Stay Factors The Court Must Consider.

In determining whether to grant a stay under Rules 62(b) and 62(d),[3] this Court applies the traditional test for injunctive relief, namely "(1) a likelihood of success on appeal; (2) irreparable injury if the stay is denied; (3) a lack of substantial injury to other parties if the stay is granted; and (4) that the granting of a stay will serve the public interest." *Jensen v. Farrell Lines, Inc.*, No. 79 Civ. 1372, 1979 U.S. Dist. LEXIS 8196, at *5 (S.D.N.Y. Dec. 4, 1979) (Sweet, J.) (citations omitted); *accord Frankel v. ICD Holdings S.A.*, 168 F.R.D. 19, 21 (S.D.N.Y. 1996) (Kaplan, J.).

"While stated in these terms, the test contemplates that a movant may be granted relief even if it demonstrates something less than a likelihood of success on the merits of its appeal."  *Wells Fargo Bank, N.A. v. ESM Fund I, LP*, 10 Civ. 7332, 2012 U.S. Dist. LEXIS 102940, at *10-11 (S.D.N.Y. Apr. 3, 2012) (Dolinger, J.). Accordingly, in the Second Circuit, "a likelihood of success on appeal" only means that the PA and PLO must show "a substantial possibility, although less than a likelihood, of success" of prevailing on appeal. *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir.

---

[2] While Rule 62 anticipates a filing after entry of judgment, the PA and PLO file their Rule 62 motion now out of an abundance of caution in light of the Court's ordering pre-entry of judgment briefing of the Rule 50 and Rule 59 motions.

[3] The Rule 62(d) analysis differs only in that "the party posting the bond is entitled to a stay as of right; the court has no discretion to deny the stay itself, but only to fix the amount of (or to waive) the bond." *Frommert v. Conkright*, 639 F. Supp. 2d 305, 308 (W.D.N.Y. 2009) (collecting cases).

1993) (citation omitted).

Courts apply these factors "somewhat like a sliding scale," where "the necessary level or degree of possibility of success will vary according to the court's assessment of the other stay factors." *Centauri Shipping Ltd. v. Western Bulk Carriers KS*, 528 F. Supp. 2d 186, 189 (S.D.N.Y. 2007) (Sullivan, J.) (citations omitted) (citing cases, including *Thapa v. Gonzales,* 460 F.3d 323, 334 (2d Cir. 2006)). "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other." *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002) (citation omitted). Thus, if the district court determines that there are "'serious questions' going to the merits of its appeal as well as irreparable harm, the stay may be granted if the balance of hardships 'tips decidedly' in favor of the moving party." *Wells Fargo Bank, N.A.*, 2012 U.S. Dist. LEXIS 102940, at *10-11.

### B.    Success on the Merits.

Although this Court has previously rejected the personal jurisdiction arguments of the PA and PLO, at its April 11, 2014 hearing, it announced its willingness to reconsider if other district courts reached different conclusions. *See* Apr. 11, 2014 Tr. (Doc. 478) at 30, 63:11-13 (stating that such dismissals "would be a significant change in the law. Then [Defendants] might have a real opportunity at that point to renew your application [on the general jurisdiction argument]."). In early 2015, three D.C. district courts did just that. *See Safra v. Palestinian Auth*., No. 14-669, 2015 U.S. Dist. LEXIS 16492, at *47 (D.D.C. Feb. 11, 2015); *Livnat v. Palestinian Auth*., No. 14-668, 2015 U.S. Dist. LEXIS 16522, at *29-30 (D.D.C. Feb. 11, 2015); *Estate of Esther Klieman v. Palestinian Authority*, No. 04-1175, 2015 U.S. Dist. LEXIS 25167, at *30 (D.D.C. Mar. 3, 2015).

The trio of recent district court decisions finding no personal jurisdiction over the PA and the PLO more than suffice to establish a likelihood of success on appeal. District courts "may properly stay their own orders when they have ruled on an admittedly difficult legal question and

when the equities of the case suggest that the status quo be maintained." *Cayuga Indian Nation of N.Y.*
*v. Pataki*, 188 F. Supp. 2d 223, 253 (N.D.N.Y 2002) (citations omitted). *Cayuga Indian Nation*
explained that "because of the difficulties of the issues . . . presented, it would be foolhardy to
predict that there is no likelihood of success on appeal." *Id.* at 253.

The PA and PLO elaborate upon these decisions in their Rule 50(b)/59 motions, and
incorporate that motion by reference. Without recapitulating that discussion, each of the D.C.
decisions explicitly disagreed with this Court's *Daimler* "at home" analysis.   *Safra* and *Livnat*
dismissed the plaintiffs' ATA claims against the PA for lack of personal jurisdiction because "the
single ascertainable place where a government such as the Palestinian Authority should be amenable
to suit for all purposes is the place where it governs," that is, in Palestine. *Safra*, 2015 U.S. Dist.
LEXIS 16492, at *27; *Livnat*, 2015 U.S. Dist. LEXIS 16522, at *31 ("It is Plaintiffs' burden to
present a *prima facie* case for jurisdiction at this stage of the litigation process; in doing so they must
overcome the common sense presumption that a non-sovereign government is at home in the place
they govern.").

Although *Klieman* (like *Sokolow*) had previously ruled that it had general personal jurisdiction
over the PA and PLO under the "continuous and systematic contacts" test, *Klieman* ultimately
dismissed the case on reconsideration because *Daimler* constituted an "intervening change in the
law." *Estate of Esther Klieman*, 2015 U.S. Dist. LEXIS 25167, at *11. The *Klieman* court concluded
that it could no longer exercise general jurisdiction over the PA and PLO "because their contacts
with the United States are not so continuous or systematic as to render them 'essentially at home' in
this forum." *Id.* at *30. As in *Safra* and *Livnat*, *Klieman* disagreed with this Court, because "[i]t is not
defendants' burden to demonstrate a 'home' outside the United States, but the plaintiffs' burden to
present a *prima facie* case that defendants are 'at home' in the United States." *Id.* at *19-20.

This split of authority on the same question for the same defendants on nearly identical facts

demonstrates that "reasonable jurists can disagree on the question of jurisdiction and, therefore, that there is some likelihood of success on the merits." *Aslam v. Chertoff*, No. 1:07cv331, 2008 U.S. Dist. LEXIS 8376, at *3-4 (E.D. Va. Feb. 4, 2008) (describing "difference of opinion" on subject matter jurisdiction issue among federal district courts); *see also In re Kenny G. Enters. LLC*, 8:14-cv-00246, 2014 U.S. Dist. LEXIS 63318, at *5-6 (C.D. Cal. May 7, 2014) (holding that split of authority equated to a "strong showing" of likelihood to succeed); *Ave Maria Found. v. Sebelius*, 991 F. Supp. 2d 957, 963 (D. Mich. 2014) (holding that a split of authority means that "neither side is guaranteed victory" thereby showing a likelihood of success); *In re Diclemente*, No. 12-1266, 2012 U.S. Dist. LEXIS 152139, at *8 (D.N.J. Oct. 22, 2012) (holding that likelihood of success on appeal can be shown through novel legal issues or noticeable split of authorities). For these reasons, and the other arguments in Defendants' Rule 50(b)/59 motions, the PA and PLO have a significant likelihood of success on appeal.

## C.     The Irreparable Harm to Defendants.

Immediate enforcement of any judgment will inflict irreparable harm on the PA and PLO, jeopardizing an already fragile economy. Secretary of State John Kerry warned in late February 2015 that the PA's precarious financial situation raised the specter of its "collapse, threatening the broader economy and security conditions in the West Bank."[4] The harm is not confined to the PA, but extends to innocent third parties, namely the nearly 4.6 million people living in the West Bank and Gaza, and others elsewhere in the region. *See Cayuga Indian Nation*, 188 F. Supp. 2d at 252-53 (holding that "without a stay there is a very real possibility that other parties interested in this litigation will be substantially harmed"); *River Oaks Marine v. Town of Grand Island*, No. 89-cv-1016S, 1992 U.S. Dist. LEXIS 20407, at *3 (W.D.N.Y. Dec. 10, 1992) ("Many innocent third parties may

---

[4]   Exh. B (Reed, J., "Palestinians Squeezed After Israel Withholds Tax," *Financial Times*, http://www.ft.com/cms/s/0/20797ecc-bdae-11e4-8cf3-00144feab7de.html#axzz3SyHhEdFq (last visited April 25, 2015)).

suffer if execution is allowed to proceed.").

Plaintiffs' attorneys have stated publicly that, as they have done in other cases against the PA and PLO,[5] they will seek to attach and seize the PA's foreign aid moving through the U.S. banking system and customs-clearance revenues that are vital to fund its government services. Enforcement would thus jeopardize funding for public safety and the judicial system; health care; public schools and education; the payment of more than 155,000 government employee salaries and related pension funds; and, public transportation.[6] *See* Exh. A (Bishara Decl.), ¶¶ 22-23; Exh. A-1 (PA Jan. 2015 Operations, at 5-6 (Expenditure by PA Organizations)). Without the foreign aid and the clearance revenues that are the lifelines for its economy, the PA anticipates that it will fail "to meet its bare minimum obligations to the Palestinian people," which "could cause a social and security upheaval." Exh. A (Bishara Decl.), ¶ 73.

In fact, apart from those clearance revenues, the PA is "almost entirely dependent on foreign aid to meet its budget and development obligations." Exh. A (Bishara Decl.), ¶ 66. The United States, Palestine's second largest single source of financial aid since 2007, has contributed $1.302 billion. *See id.* ¶ 67 (Exh. A-23 PA Ministry of Finance Summary of Main Donors Contribution). In 2014, foreign aid accounted for 30% of the PA's total expenditures. *See* Exh. A (Bishara Decl.), ¶ 66 (Exh. A-6, PA 2014 Fiscal Developments, at 5)*; see also id.* ¶ 13 (pie chart).

The foreign aid not earmarked for specific projects[7] funds salaries and pension obligations

---

[5] *See Palestine Monetary Auth. v. Strachman*, *Estate of Yaron Ungar v. The Palestinian Auth.*, 62 A.D.3d 213 (N.Y. App. Div. 1st Dep't 2009); *see also Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993 (2d Cir. 2014) (electronic fund transfers blocked in U.S. banks).

[6] Plaintiffs' counsel, Mr. Yalowitz, announced during an April 22 panel discussion at New York University Law School that Plaintiffs intend to execute the judgment by seizing the PA's clearance revenues, among other PA funding.

[7] Most foreign aid, "approximately 60% in 2014, is allocated by the donor countries to specific purposes, such as pre-selected and approved development projects, wage bill support, and social welfare payments." Exh. A (Bishara Decl.), ¶ 69. For example, U.S. foreign aid is allocated primarily to finance fuel imports from Israeli refineries and to pay hospital bill arrears. *See id.* Restricted foreign aid payments "cannot be diverted or used for any other purpose, including use as collateral for a bond in U.S. litigation." *Id.* ¶ 70. "[C]ertain donors transfer the foreign aid money directly to the

for PA government employees, social services (including for public safety, healthcare, education, public housing and transportation), and the service on existing debt and arrears. *See id.* ¶ 71. "The PA cannot divert these unrestricted donor funds to secure a bond without causing the international donor community to reduce aid to the PA or, at a minimum, to increase restrictions on the use of the funding—further reducing the amount of unrestricted aid that can be directed to the areas of greatest need." *Id.*

Immediate enforcement thus poses the real risk of choking off international aid, particularly at a time when donors are already reducing their support. Foreign aid has dwindled the past three years, and is expected to continue to decline in 2015 by another 22%, as compared to 2014. *See id.* ¶ 68 (Exh. A-6, PA 2014 Fiscal Developments, at 4; Exh. A-11, PA April 8, 2015 Presentation, at 4. ).

When Israel froze the PA's customs-clearance revenues in December 2014, the International Monetary Fund ("IMF") cautioned that "[t]he suspension in January-March 2015 by Israel of clearance revenue, which accounts for two-thirds of overall revenue and is roughly equivalent to the PA's wage bill, caused severe fiscal strains and adversely affected the broader economy." Exh. A (Bishara Decl.), ¶ 29 (Exh. A-4, IMF April 8, 2015 Letter, at 2). Without those clearance revenues, the PA was compelled to make drastic cuts to its funding for government operations. *See id.* ¶ 30 (Exh. A-10, PA Jan. 2015 Presentation, at 42; Exh. A-11, PA April 8, 2015 Presentation, at 28-30). For example, in January 2015, the PA slashed wages and salaries for PA employees by almost two-thirds, from $154.58 million to $53.89 million; cut transfers of social assistance benefits, social security and related government assistance payments from $64 million to $51.90 million; eliminated the government's share of contributions to the State pension fund by $14.61 million; and, withheld payments to the private sector for goods and services received from vendors, paying $16.28 million

---

beneficiary or the vendor, while others will not disburse funds until they approve the ultimate recipient of the donor aid. The majority of foreign donors audit the disbursements of the funds to ensure compliance with those restrictions." *Id.*

of $28.02 million owed.  Exh. A (Bishara Decl.), ¶ 30 (citing multiple financial reports). Whether

Israel or Plaintiffs seize these funds, the impact on the Palestinian people will be the same.

If Plaintiffs are allowed to seize these clearance revenues, further, regional security and safety

will be threatened, as predicted by Secretary Kerry. PA Minister of Finance Shukry Bishara likewise

confirms that the "vast majority" of the tax revenues that Plaintiffs intend to seize go to pay

"government employee wages and salaries, of which the greatest number of employees are security

and public safety personnel." *Id.* ¶ 23. In an interview with the *Washington Post* on March 27, 2015,

the PA chief of police commented that the absence of these clearance revenues:

> **was beginning to undermine security in the West Bank**. In an interview this
> week, the chief of the Palestinian police said the freezing of funds meant he no
> longer had gasoline for patrol cars. He also said he was worried that morale and
> discipline among his 9,000 officers could begin to fray.
>
> "Am I terrified? Yes," said Maj. Gen. Hazim Attallah, the police chief. "**There is no
> police force in the world whose officers, no matter how dedicated, will come
> to work and be willing to risk their lives for half-salaries**."[8]

New York federal courts refuse to allow successful plaintiffs to immediately execute

judgments entered against public entities in far better economic condition than the PA, particularly

when third parties are likely to suffer the greatest impact. In *Morgan Guaranty Trust Co. v. Republic of*

*Palau*, for example, various banks sued the Republic of Palau after it defaulted on a loan to fund

infrastructure projects.  702 F. Supp. 60, 61 (S.D.N.Y. 1988) (Sweet, J.). After the banks obtained a

$48 million judgment, Palau moved to stay execution on a reduced bond pending disposition of its

post-trial motions and appeal.  *See id.* at 61-62. This Court granted the stay and reduced the bond

requirement because the case involved difficult issues that meant a likelihood of success on appeal,

whereas requiring the full bond or permitting the "immediate enforcement of a $45 million

---

[8]  Exh. C (Booth, W., "Israel Backs Down and Returns Frozen Funds to Palestinians," *The Washington Post*,
http://www.washingtonpost.com/world/israel-backs-down-and-returns-funds-to-palestinians/2015/03/27/c57b46d4-
617b-4cfd-9b41-d85fce0737ac_story.html (last visited April 25, 2015) (emphasis added)).

judgment would impact Palau severely," because Palau had few assets and little liquidity ($31 million in revenue compared to $28.5 million in annual expenditures). *Id.* at 66. The public interest of Palau and its citizens thus trumped the financial interests of the banks. *See id.* at 65-66; *see also Henry v. First Nat'l Bank of Clarksdale*, 424 F. Supp. 633, 638-39 (N.D. Miss. 1976), *aff'd*, 595 F.2d 291 (5th Cir. 1979) (finding irreparable harm where NAACP would "have to curtail practically all of its usual functions during the pendency of the appeal . . . current projects will have to be terminated and new projects cannot be commenced").

Similarly, in *River Oaks Marine*, 1992 U.S. Dist. LEXIS 20407, at *2-5, the district court granted a stay of execution based on an affidavit submitted by the town supervisor that "town employees would not be paid, and that water, lighting, sewage, and highway services would be disrupted" if the court allowed immediate execution. *Id.* at *2. The court likewise emphasized that "innocent third parties may suffer if execution is allowed to proceed." *Id.* at *3.

For these reasons, and the reasons discussed at greater length in Part II below, the PA and PLO face irreparable harm without a stay.

### D.    Plaintiffs Face Minimal Harm, If Any, From a Stay.

Plaintiffs will not be prejudiced by a stay under either Rule 62(b) or Rule 62(d), even without a bond. The purpose of a bond is to secure the plaintiff "against the possibility of the judgment debtor's insolvency." *Frommert*, 639 F. Supp. 2d at 313 (citation omitted). Plaintiffs have the right to be "as well off during the appeal as it would be if it could execute at once, but no better off." *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 786 F.2d 794, 800 (7th Cir. 1986) (Easterbrook, J., concurring). Therefore, a plaintiff's interest in collecting on the judgment will not be affected where a defendant's financial position is so bad that "the bond would put the defendant's other creditors in undue jeopardy." *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 17 (1st Cir. 2002) (citation omitted).

As an initial matter, the Rule 62(b) stay will be a short one, only in effect pending the Court's

resolution of the post-trial motions. While the Rule 62(d) stay would remain in effect throughout any appeal, the PA's economic crisis is such that Plaintiffs will not be harmed by a stay during any appeal.[9] *See Morgan Guaranty Trust Co.*, 702 F. Supp. at 65-66 (finding no prejudice to plaintiffs because their "ability to recover any ultimate judgment from" Palau would not "be any greater now than in the future").

Plaintiffs' interest in *immediate* payment is necessarily secondary to the secured interests of the PA's banks and vendors. *See CIMC Raffles Offshore (Sing.) PTE. LTD. v. Schahin Holdings S.A.*, No. 13-cv-0052, 2013 U.S. Dist. LEXIS 114953, at *6-7 (S.D.N.Y. Aug. 6, 2013) (noting that unsecured judgment creditors come last after secured creditors have been paid). In *Olympia Equipment Leasing Co.*, 786 F.2d at 799, Judge Easterbrook explained that a judgment creditor should not be able to execute prior to appeal where execution risks making the debtor insolvent, especially because "[u]nsecured creditors usually fare poorly in bankruptcies." Plaintiffs may not leapfrog other creditors, and exacerbate a financial crisis that could reverberate well beyond Palestine.

Further, the Second Circuit will not allow the bond requirement to deprive a litigant of its right to appeal. "It is self-evident that an appeal would be futile if, by the time the appellate court considered his case, the appeal had by application of a bonding law been robbed of any effectiveness." *Texaco, Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1154 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 1 (1987). The court ruled that *Texaco* was entitled to post a bond for significantly less than the judgment, because requiring a full bond "would lead to irreversible destruction of the debtor before its appeal could be heard and decided on the merits, thus robbing its right of appeal of any meaning and effect." *Id.* at 1156-57. The PA is in this very same position, as evidenced by the

---

[9] Indeed, Plaintiffs' immediate execution on PA assets would require "enormous time and expense" with a "questionable likelihood of success." *Knox v. Palestinian Liberation Org.*, No. 03-cv-4466, 2009 U.S. Dist. LEXIS 52610, at *34-35 (S.D.N.Y. Mar. 26, 2009). Collection is "a daunting task" in light of "the various judgments now existing against Defendants . . . combined with Defendants' penury." *Id.* at 30. That task should not begin, if at all, until the appellate proceedings have run their course.

extensive testimony and financial reports described in Part II below.

In sum, a stay will not decrease Plaintiffs' prospects of recovery. By contrast, immediate execution will only harm the Palestinian people and their creditors, and likely yield little or no financial benefit to Plaintiffs that they could not obtain after an appeal.

### E.     The Public Interest.

The public interest strongly favors a stay. Courts universally consider that maintaining public services, including police officers and utilities, is a paramount public interest.  *See Ambac Assur. Corp. v. Adelanto Pub. Util. Auth.*, No. 09-cv-5087, 2014 U.S. Dist. LEXIS 87697, at *8-9 (S.D.N.Y. June 26, 2014) (Keenan, J.) (recognizing that the public interest would be harmed "if posting the bond would cause the Authority to be unable to perform its services" as a municipality); *River Oaks Marine*, 1992 U.S. Dist. LEXIS 20407, at *4  ("Furthermore, immediate execution could work substantial hardship on the Town's residents and visitors. This would certainly not be in the public interest."); *see also NAACP v. Town of E. Haven*, 70 F.3d 219, 223 (2d Cir. 1995) ("It cannot be gainsaid that the hiring of police officers and firefighters is in the public interest.").

Beyond protecting the Palestinian people, a stay substantially benefits (1) the local region, which faces security risks if the PA is unable to maintain order in the midst of the current military conflict; (2) the United States, whose foreign policy goals include ensuring regional security and supporting the Israel/Palestinian peace process; and, (3) the international foreign donor community, which has been funding the operations of the PA government and the development of the West Bank and Gaza to create economic growth. *See* Exh. A (Bishara Decl.), ¶¶ 69, 71; *infra* Part I.F (requesting this Court solicit the views of the United States as to its foreign policy).

There is no similar public interest in favor of allowing Plaintiffs to immediately begin enforcement.  In fact, when a large judgment against a financially strapped governmental body is on appeal, courts routinely rule that the needs of the citizens for basic services outweigh the desires of

the plaintiffs for immediate payment. *See Knox*, 2009 U.S. Dist. LEXIS 52610, at *33-34 ("Ordering Defendants to promptly post a bond of that magnitude . . . could disrupt the provision of essential services to millions of citizens. Their needs are at least as compelling as the rights of non-judgment creditors, whose interests courts may balance against a plaintiff's right to security."); *Morgan Guaranty Trust Co.*, 702 F. Supp. at 66 ("[T]he public interest of Palau predominates over the financial interest of the Banks, even granted the size of the judgment entered."); *see also In re City of Detroit*, 498 B.R. 776, 793 (Bankr. E.D. Mich. 2013) (holding that the public interest favors maintaining "the City's ability to provide basic services to its residents and to remediate a host of unsafe living conditions").

### F.      The Court Should Solicit the Views of the U.S. Government.

To the extent that the Court has any doubt about the wisdom of a stay, the PA and PLO respectfully request that this Court solicit the views of the United States, as expressed by the Department of Justice and/or the Department of State, regarding the impact of immediate enforcement of any judgment on the interests and policy of the United States and any related issue on which the United States considers it prudent to submit its views. *See* 28 U.S.C. § 517. Secretary Kerry has recently expressed concerns about the PA's continued viability if its economic condition worsens:

> If the Palestinian Authority ceases or were to cease, security cooperation – or even decide to disband as a result of their economic predicament, and that could happen in the near future if they don't receive additional revenues – then we would be faced with yet another crisis that could also greatly impact the security of both Palestinians and Israelis. And that would have the potential of serious ripple effects elsewhere in the region.[10]

Plaintiffs' immediate execution on the judgment will create just this type of economic and political crisis. *See* Anne-Marie Slaughter & David L. Bosco, *Fighting Terror with Civil Litigation: The Wrong Approach*, Vol. XIII, No. 4, BULLETIN OF THE ATLANTIC COUNCIL OF THE UNITED STATES

---

[10]   Secretary   of   State   John   Kerry   Remarks   at   Press   Availability,   available   at http://translations.state.gov/st/english/texttrans/2015/02/20150222313730.html#axzz3UxB1agIC (last visited March 20, 2015).

(May 2002), at 2 ("The intrusion of U.S. civil litigation into foreign policy complicates intergovernmental diplomatic efforts."). The United States should accordingly have an opportunity to inform the Court of its views on the foreign policy issues, including whether permitting Plaintiffs to execute immediately on the judgment will harm U.S. initiatives to aid the Palestinian people or jeopardize security in the region.

Federal courts regularly seek the United States' views related to the impact of litigation events on U.S. foreign relations, including in similar cases involving the PA and PLO. *See Samantar v. Yousuf*, 560 U.S. 305, 309 (2010) ("The District Court stayed the proceedings to give the State Department an opportunity to provide a statement of interest regarding petitioner's claim of sovereign immunity."); *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 259, 297 (2d Cir. 2007) (seeking views of U.S. because the litigation "risks potentially serious adverse consequences for significant [US] interests [promoting economic growth in South Africa]"); *Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 358 (D.C. Cir. 2007) (seeking the views of the State Department in light of concerns that plaintiffs' claims would interfere with U.S. foreign policy); *Knox v. PLO*, 248 F.R.D. 420, 430-31 (S.D.N.Y. 2008); *see also Gilmore v. Palestinian Interim Self-Gov't Authority*, 675 F. Supp. 2d 104, 112 n.7 (D.D.C. 2009). Consistent with this authority, this Court should solicit the government's views.

## II.     The PA and PLO Seek a Waiver of the Bond Due to Financial Hardship.

The *Sokolow* jury awarded Plaintiffs base damages of $218.5 million, which are automatically trebled under the ATA to $655.5 million. Plaintiffs also seek trebled prejudgment interest of $494,617,005 (which the PA and PLO have opposed), requesting a total judgment of $1,150,117,004. [11]   In this District, the required amount of the bond is conventionally 111% of the

---

[11] Defendants have objected that prejudgment interest is unavailable under the ATA and on speculative future damages; and, even if prejudgment interest can be awarded, the jury's award has already compensated Plaintiffs' for prejudgment interest, Plaintiffs' calculations are economically and methodologically improper, and prejudgment interest should not be trebled. *See* Dkt. #888.

judgment, or $1,276,629,874 in this case if the Court were to enter the amount requested by Plaintiffs. The PA has insufficient assets to post a bond of even a fraction of that amount, as illustrated by extensive financial reporting, testimony and analyses by the PA government, independent authorities like the IMF and World Bank, and respected media sources.

## A.   The Court Has Broad Discretion to Waive the Bond For Financial Hardship.

This Court has broad discretion to waive the security in connection with a stay of execution of the judgment. *See Texaco*, 784 F.2d at 1133 ("The court may order partially secured or unsecured stays if they do not unduly endanger the judgment creditor's interest in ultimate recovery.") (internal quotation marks omitted); *Knox*, 2009 U.S. Dist. LEXIS 52610, at *30. Federal courts routinely waive or reduce the bond if requiring the entire bond or other security could economically cripple the judgment debtor. Where the judgment debtor sits in a precarious economic condition, as here, that security "may well be significantly less valuable than the amount of the damages award." *Alexander v. Chesapeake, Potomac & Tidewater Books, Inc.*, 190 F.R.D. 190, 193 (E.D. Va. 1999); *see Miami Int'l Realty Co. v. Paynter*, 807 F.2d 871, 874 (10th Cir. 1986) (affirming order of no security for stay, aside from the proceeds from a small malpractice insurance policy, where defendant was "financially unable to post a full bond and [ ] execution on the judgment would place him in insolvency"); *Olympia Equip. Leasing Co.*, 786 F.2d at 800 (Easterbrook, J. concurring) ("When the judgment debtor lacks the assets or credit necessary to pay at once and in full, this means that the judge should give the creditor less than complete security."); *Morgan Guaranty Trust Co.*, 702 F. Supp. at 65-66 (granting stay and reduced bond because full bond or the "immediate enforcement of a $45 million judgment would impact Palau severely"); *Trans World Airlines v. Hughes*, 314 F. Supp. 94, 98 (S.D.N.Y. 1970) (modifying bond requirement in light of party's inability to post a bond exceeding $161 million).

The PA and PLO meet the same conditions for a bond waiver as in these other cases. In

fact, another court in this district previously determined that the PA and PLO were in sufficient "financial peril" that:

> **Ordering Defendants to promptly post a bond of that magnitude** would do more than just jeopardize their ability to dispute the merits of this action. **It could disrupt the provision of essential services to millions of citizens.**

*Knox*, 2009 U.S. Dist. LEXIS 52610, at *33-34 ($192,740,660.13 judgment) (emphasis added); *see also id.* at *31("[T]he Court concludes that it would be extremely difficult, if not impossible, for Defendants to post the full amount of the Default Judgment, certainly in one installment and, most likely, even over a reasonable period of time."). That decision, of course, came years ago, before the recent recession further crippled the Palestinian economy.

### B.      The PA and PLO Have Few Assets, Little Income and Overwhelming Debt and Deficits.

The PA's fiscal condition is grim, consistent with historical trends, because the PA has a limited stream of revenues, entrenched deficits, and high levels of debt and accumulated arrears and, apart from those revenues, is almost entirely dependent on foreign charitable aid. *See* Exh. A (Bishara Decl.), ¶¶ 10, 66. The PA does not have any commercial business interests or accounts receivable, but rather earns its income from: (i) clearance revenues (indirect taxes on imported goods) "resulting from the commercial transactions between Palestine and Israel";[12] (ii) domestic tax revenues, including from income tax, value-added tax, customs, property tax, and other excise revenues; and, (iii) domestic non-tax revenues, including fees and licenses collected by various PA government ministries." *Id.*, ¶¶ 11, 17, n.7; *see id.* (Exh. A-4, IMF April 8, 2015 Letter; Exh. A-3, PA 2014 Operations).

The political and geographic context helps explain Palestine's entrenched poverty,

---

[12] *See* Exh. A-4, West Bank and Gaza – IMF Assessment Letter for the Norwegian Authorities dated April 8, 2015 ("IMF April 8, 2015 Letter") at 1, *avail. at* http://www.norway.org.ps/PageFiles/759270/Assessment%20Letter%20for%20Norwegian%20authorities.pdf (last visited April 9, 2015).

unemployment and poor economic outlook. *See* Exh. A (Bishara Decl.), ¶¶ 60, 63-64. Israel controls and restricts all major Palestinian border crossings and the free movement of people and goods, which disrupts labor and trade flows, industrial capacity and basic commerce internally and with neighboring countries. *See id.* ¶ 60. The Palestinians consequently must import most of their goods either from the Israeli market or through Israeli ports, which, in addition to Israel's control of clearance revenues, gives Israel enormous influence over the Palestinian economy. *See id.* Military conflict between the two countries since 2012 has thwarted economic growth, and in early 2014, the West Bank and Gaza entered the current recession. *See id.* ¶¶ 61-64 (Exh. A-17, IMF Sep. 12, 2014 Report, at 5; Exh. A-21, World Bank, "Economic Monitoring Report to the Ad Hoc Liaison Committee," Sept. 22, 2014, at 9).

Customs clearance revenues—which Plaintiffs plan to seize to satisfy any judgment—account for approximately 70% of the PA's expected revenues each month. *See* Exh. A (Bishara Decl.), ¶ 13. Israel collects these taxes and customs duties on the PA's behalf, and is obligated to refund those revenues monthly to the PA, roughly half of which the PA must then transfer to the Palestinian private sector businesses. *See id.*, ¶ 12. Between December 2014 and April 17, 2015, Israel froze its distribution of those funds—approximately $100 million per month. *See id.* ¶ 27.

Further, the PA has minimal state holdings from which it receives dividends; for 2014, dividends totaled just $11.09 million. *See id.* ¶ 14 (Exh. A-3, PA 2014 Operations at 4 (Revenues by Source)). The PA does not own any real estate, buildings, plants or equipment other than property located in Gaza, the West Bank and certain overseas embassies, all of which are used for government operations. *See* Exh. A (Bishara Decl.), ¶ 15. It does not sell or lease those land holdings, buildings or other assets in order to generate cash, and indeed cannot do so without impairing its ability to perform its governance duties. *See id.*, ¶ 16.

For its part, the PLO receives its only funding from the PA under a budget ratified by the

17

PA Cabinet and Legislative Council. *See* Exh. A (Bishara Decl.), ¶ 18. The PA transfers that funding

to the Palestinian National Fund, the PLO's treasury, which in turn disburses the funds "to the PLO

for its operating expenses, including salaries for PLO officials and diplomatic corps." *Id.* The PLO

does not own any businesses that generate revenue, and owns no commercial real estate or

buildings, plants or equipment, other than overseas missions and diplomatic offices used by PLO

employees in the course of performing their diplomatic functions. *See* Exh. A (Bishara Decl.), ¶¶ 20-

21. The PLO does not have any assets available to use for a bond:

> The PLO accounts for the budgeted and allocated funds that are disbursed to it by
> the PA in keeping with the same PA zero-balance accounting policies that apply to
> PA Ministries and agencies with "line" functions. This means that, at the end of each
> month, the accounts of the PLO, like the accounts of PA line Ministries and
> agencies, have a zero balance in advance of the disbursement of the next month's
> transfer of budgeted and allocated funds.

*Id.* ¶ 19.

With these limited resources, and in addition to funding the PLO, the PA is obligated to

fund conventional government services for the West Bank and Gaza. *See* Exh. A (Bishara Decl.), ¶

22 (Exh. A-1, PA Jan. 2015 Operations at 5-6 (Expenditure by PA Organizations)). The PA's

recurrent expenditures are primarily wages and salaries, social contributions, goods and services for

PA operations, contributions to social security, pensions and other social assistance programs,

interest and debt service on existing debt, and public safety and security. *See* Exh. A (Bishara Decl.),

¶ 23.  PA financial records demonstrate that "the vast majority of these expenditures is for

government employee wages and salaries, of which the greatest number of employees are security

and public safety personnel." *Id.*  (Exh. A-6, PA 2014 Fiscal Developments at 4-5; Exh. A-3, PA

2014 Operations at 7-8 (Expenditure by PA Organizations)).

The PA's minimal income cannot cover its expenses and debt obligations, resulting in a total

budget deficit of $1.698 billion in 2012; $1.57 billion in 2013; and, $1.59 billion in 2014. *See* Exh. A

(Bishara Decl.), ¶ 25 (Exh. A-9, PA 2012 Fiscal Developments, at 5; Exh. A-8, PA 2013 Fiscal

Developments, at 9; Exh. A-6, PA 2014 Fiscal Developments, at 17.). "The PA's chronic budget deficit is due, further, to the PA's inability to collect taxes, invest in, or develop roughly 63% of the area assigned the PA under the Oslo Accords (specifically, "Area C") as a result of the lack of progress in the peace process." Exh. A (Bishara Decl.), ¶ 25.

By April 2015, the Palestinian economy was in a markedly worse condition, as a result of Israel's December 2014 freeze of clearance revenues—the latest in a series of PA financial problems. *See* Exh. A (Bishara Decl.), ¶ 27. An April 8 IMF report concluded that the Israeli freeze of clearance revenues created a "dramatic negative effect" on the Palestinian economy: "The suspension in January-March 2015 by Israel of clearance revenue, which accounts for two-thirds of overall revenue and is roughly equivalent to the PA's wage bill, caused severe fiscal strains and adversely affected the broader economy." *See* Exh. A (Bishara Decl.), ¶ 29; Exh. 4, IMF April 8, 2015 Letter, at 2.

To manage this revenue crisis, the PA implemented emergency cash rationing and drastic cuts to government operations.[13] For example, in January 2015, the PA cut wages and salaries by 65%; social assistance benefits, social security and related government assistance payments by 19%; eliminated 100% of the government's share of contributions to the State pension fund; withheld 42% of payments to the private sector owed for goods and services received from vendors ("arrears"); and, withheld 14% of interest payments due on existing debt. *See* Exh. A (Bishara Decl.), ¶ 30.  Even with these cuts, however, the PA still incurred deficits of $70.74 million in January, $111.05 million in February, and $110.17 million in March. *See* Exh. A (Bishara Decl.), ¶ 32 (Exh. A-2, PA Feb. 2015 Operations, at 2 (Revenues, Expenditures and Financing Sources (Cash Basis)).

Likewise, between December 2014 and March 2015, the PA's total public debt continued to

---

[13] *See* Exh. A-10, PA Jan. 2015 Presentation at 42; Exh. 11, PA April 8, 2015 Presentation at 28-30.

swell, from $2.217 billion to $2.376 billion.[14] *See id.* ¶ 44 (Exh. A-1, PA Jan. 2015 Operations, at 9 (Public Debt); Exh. A-18, PA Commetments Report). The PA has obtained domestic and foreign loans, and credit facilities from multilateral institutions and foreign governments, which are earmarked to pay existing and past accrued PA operational costs, such as employee wages. As of March 24, 2015, the PA carried credit facilities and loans from local commercial banks totaling almost $700 million. *See* Exh. A (Bishara Decl.), ¶ 47. The available balances in the PA's depository accounts at these banks are at or near zero on a month-to-month basis, and the PA had overdrawn those accounts by more than $400 million as of March 31, 2015.[15] *See id.* ¶¶ 48-49. The banks immediately apply any deposited funds against the overdraft balance, which continues to increase as the PA pays its expenses from those accounts. *See id.* ¶ 50.

The PA's public debt and monthly deficits do not include the PA's accumulating arrears payment obligations—that is, the amounts the PA owes because it has reduced wages and withheld payments for goods and services, minor capital, development, interest payments, and tax refunds to the public and private sector. *See* Exh. A (Bishara Decl.), ¶ 51 (Exh. A-6, PA 2014 Fiscal Developments at 4, 17). An economic coping strategy born of necessity, arrears have long posed problems for the PA. While the PA made repayment of arrears a strategic budget priority for 2015, Israel's freeze of the clearance revenues rendered that impossible, eliminating 2015 revenue earmarked to pay the $778.71 million in arrears left over from 2014. *See id.*, ¶¶ 53-54 (Exh. A-11, PA April 8, 2015 Presentation, at 21). As a result, as of March 31, 2015, the PA owed total arrears to the private and public sector of $1.15 billion. *See* Exh. A (Bishara Decl.), ¶ 55 (Exh. A-6, PA 2014 Fiscal Developments, at 4; Exh. A-2, PA Feb. 2015 Operations, at 3 (Consolidated Statement on Fiscal

---

[14] *See* Exh. A-18, PA Commetments Report, March 24, 2015; Exh. A-2, PA Feb. 2015 Operations at 11 (showing public debt in February 2015 of $2.252 billion).

[15] The Petroleum Authority, which is under the control of the PA's Ministry of Finance, maintains separate bank accounts, but these also are deeply overdrawn. For example, the Petroleum Authority's account at National Bank is overdrawn by -$25,760,497 and at the Bank of Palestine by -$20,907,551. *See* Exh. A (Bishara Decl.), ¶ 49.

Operations and Arrears)).  In January 2015, the IMF issued a warning that "[s]trong efforts by the PA can only go so far to contain the crisis for a few months. The situation could become untenable, with a growing risk of social unrest and strikes that could lead to political instability. These serious risks could be mitigated if Israel quickly resumed transfers of clearance revenue and donors front loaded their aid."[16] And in April, the IMF reported that the cuts "will likely lead to some reduction in private consumption for the year as a whole, and confidence effects related to the fiscal crisis will limit private investment."  Exh. A-4, IMF April 8, 2015 Letter, at 2.

At this juncture, even with Israel's release of the past-due clearance revenues, the PA still is unable to repay its accumulated arrears.  The Israeli freeze of the PA's clearance revenues simply exacerbated a fiscal emergency, because the PA's income "does not come close to alleviating the PA's chronic liquidity crisis or to eliminating the PA's deficit or debt." Exh. A (Bishara Decl.), ¶ 40. Even with those revenues, for example, the PA would have realized deficits of $75.17 million in January 2015, $187.92 million in February 2015, and $138.55 million in March 2015.[17]  See id.

Similarly, even before Israel froze the PA's clearance revenues, the PA could not fully service its public debt.[18] See id., ¶ 43 (Exh. A-3, PA 2014 Operations at 10 (Public Debt)). In fact, even if the PA receives all of its clearance revenues this year, the PA's 2015 deficit will still exceed its 2014 deficit, particularly now that approximately 45% of the PA's 2015 expected foreign aid has been reallocated to or earmarked for reconstruction in Gaza after the 2014 war.  See id., ¶ 41 (Exh. A-4, IMF April 8, 2015 Letter, at 2; Exh. A-11, PA April 8, 2015 Presentation at 4, 29 (detailing expected 22% decline in foreign aid in 2015)).

---

[16] See Exh. A-14, IMF Statement at the End of an IMF Mission to the West Bank and Gaza dated January 25, 2015 ("IMF Jan. 25, 2015 Statement"), at 2, avail. at http://www.imf.org/external/np/sec/pr/2015/pr1524.htm (last visited March 1, 2015).

[17] See Exh. A-25, PA Mar. 2015 Operations, at 1 (Revenues, Expenditures and Financing Sources (Commitment Basis)).

[18] In June 2014, the PA carried $1.577 billion in debt to banks and multilateral institutions. "That amount did not include an additional $407 million for bank overdrafts—which indicates that, even in 2014, the available credit at lending institutions was insufficient to meet the PA's borrowing needs." See id. ¶ 43.

On April 17, after a four-month freeze, Israel agreed to transfer $462.50 million in partial clearance revenues to the PA. The PA used these funds to pay "PA employees and to pay PA obligations that accrued both during and prior to the freeze." Exh. A (Bishara Decl.), ¶ 38.

In light of these economic realities, the PA's credit rating is poor and its access to credit is minimal, such that the PA is unable to increase its debt or to secure additional lines of credit to cover a Rule 62 bond in this case.  *See id.* ¶ 56. The sureties willing to discuss a bond insist that Defendants first pay a substantial non-refundable fee simply to engage in initial negotiations, and further, explain that they would require security equal to 100% of the judgment amount, plus additional fees and costs. The PA cannot meet those terms, nor could it service the debt on such a bond. Other sureties refuse even to consider issuing a bond because of their self-described aversion to political risk—meaning both reputational risk to them and the risk of repayment by a foreign government. *See id.* ¶ 57.

### C.    Defendants Seek Protection for the Foreign Aid and Other Critical Assets of the PA/PLO Government.

Absent a stay, Plaintiffs intend to execute on any judgment against U.S.-based assets of the PA, PLO, and the Palestinian Monetary Authority ("PMA"), the Palestinian central bank, by freezing or seizing cash remittances through U.S.-based banks to or from the PA, PLO, and PMA, and by freezing, seizing, or enjoining the transfer of other U.S.-based assets of the PA, PLO and PMA. *See supra* n.6. Because the PA is cash-starved and operating at substantial financial deficits, any impairment of such transfers or assets would be as destructive as actual collection of those assets.

If the Court denies a stay, therefore, the PA and PLO respectfully urge this Court to impose two conditions on Plaintiffs' collection efforts. First, this Court should require Plaintiffs to enter any recovered assets into the Court's registry to avoid the dissipation of assets during the appeal. *See* Fed. R. Civ. P. 67 and S.D.N.Y. Local Civil Rule 67.1. Recovering those assets after a successful appeal would be difficult and expensive, if not impossible.

Second, the PA and PLO seek a partial stay prohibiting execution against five types of critical government assets: (i) foreign aid payments that the U.S. government and other donors intend to benefit the Palestinian people;[19] (ii) funds held by the World Bank under trust arrangements with foreign aid donors; (iii) PLO payments to diplomatic missions and overseas refugees; (iv) reserves and remittances in U.S. bank accounts by the PMA; and, (v) foreign exchange remittances of the PA and PLO through U.S. bank accounts.[20]

Much of this funding comprises foreign donor aid, which the PA has a moral and legal obligation to use to support its people in light of their extreme poverty and soaring unemployment rates—particularly now that the government has been forced to curtail or eliminate many of its public and social welfare programs. *See* Exh. A (Bishara Decl.), ¶ 58.

Defendants seek protection for transfers of PMA funds through U.S. banks in accord with Congressional intent to exempt the assets of independent central banks from judgment creditors. Under the Foreign Sovereign Immunities Act (which, like the ATA, enables terrorism victims to sue), Congress immunizes from attachment and execution "the property . . . of a foreign central bank or monetary authority held for its own account." 28 U.S.C. § 1611(b); *see also id.* § 1605A. The Second Circuit recognizes that U.S. assets of foreign central banks are protected because judgment

---

[19] Defendants focus in this Motion on the exclusion of assets contained in and transferred through U.S. banks, because Plaintiffs have declared their intent to execute on those assets, *see supra* n.6. Plaintiffs have not domesticated any judgment outside the U.S., thereby making a motion to protect extra-jurisdictional assets premature. In that event, however, Defendants will approach the Court for protection of the clearance revenues that comprise the majority of Defendants' income.

[20] As in their other cases, Plaintiffs' counsel have publicly announced their plans to issue restraining notices to freeze, and seek the turnover of, U.S. dollar wire transfers to or from the PA and PLO, which are cleared through U.S. banks. *See supra* n.6. In this scenario, donor wire transfers to the PA could be frozen indefinitely while the federal courts resolve the legal questions about the frozen funds. While the PA and PLO can <u>challenge</u> any such freeze of any wire transfers <u>to</u> them on the basis that the PA/PLO do not have a property interest in wire transfers that are "midstream," an intermediary bank that has been served with a restraining notice is permitted to freeze, without liability, any such wire transfer until the competing claims of Plaintiffs and the PA/PLO are resolved. *See Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993 (2d Cir. 2014); *Palestine Monetary Auth. v. Strachman* and *Estate of Yaron Ungar v. The Palestinian Auth.*, 62 A.D.3d 213 (N.Y. App. Div. 1st Dep't 2009). It is far more likely than not that the banks will freeze the transfers, therefore.

"execution against the reserves of foreign states could cause significant foreign relations problems." *EM Ltd. v. Republic of Arg.*, 473 F.3d 463, 473 (2d Cir. 2007). Furthermore, the PMA is legally distinct from the PA and PLO and not a party to this case, and should therefore be treated as such. *See First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 626-28 (1983) ("[G]overnment instrumentalities established as juridical entities distinct and independent from the sovereign should normally be treated as such.").

## **CONCLUSION**

This Court should stay execution of the judgment without requiring a bond under Rule 62(b) until this Court decides Defendants' post-trial motions, and then (if necessary) stay execution of the judgment under Rule 62(d) pending appeal to the Second Circuit. If it denies a stay, the Court should place restrictions on any permitted collection efforts by Plaintiffs to exclude certain categories of funds and, further, require Plaintiffs to enter any recovered assets into the Court's registry to avoid the dissipation of assets during the appeal.

Dated:  May 4, 2015

/s/ Gassan A. Baloul
Gassan A. Baloul (Bar No. 4324919)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza, 23rd Floor
New York, NY 10112
Telephone: (212) 872-9800
Facsimile: (212) 872 9815
gassan.baloul@squirepb.com

John A. Burlingame *(admitted pro hac vice)*
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC  20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
john.burlingame@squirepb.com

*Attorneys for Defendants Palestinian Authority*
*and Palestine Liberation Organization*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2015, a true and correct copy of the foregoing was filed with the Clerk via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

/s/ Gassan A. Baloul
Gassan A. Baloul (Bar No. 4324919)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza
23rd Floor
New York, NY 10112
Telephone: (212) 872-9800
Facsimile: (212) 872-9815
gassan.baloul@squirepb.com