**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in late 2001 – early 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, in late 2001 or thereabouts, in Ramallah or thereabouts, when he was with Marwan Barghouti, the head of the "Tanzim" of the Fatah, met Nasser Mohamed Yusef Naji (Abu-Hamid) the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah. Nasser Abu-Hamid told Marwan Barghouti of his intentions to purchase a mortar and mortar bombs for the purpose of carrying out mortar fire at Israeli settlements with the intent of causing the death of Israeli civilians. Nasser Abu-Hamid asked Marwan Barghouti for financial aid for purchasing the mortar and mortar bombs. Marwan Barghouti refused to provide him the financial aid and referred Nasser Abu-Hamid to the Defendant. The Defendant explained to Nasser Abu-Hamid that there was no need to pay a lot of money for a mortar and mortar bombs, as the Defendant already possessed a makeshift mortar and mortar bombs.

In early 2002, the Defendant referred Nasser Abu-Hamid and the latter's colleague – a senior military operative in the "Al Aqsa Martyrs Brigades" – Muhannad Abu Halawa, to the home of Ali Barghouti in order for them to receive the above mentioned mortar and mortar bombs there.

Nasser Abu-Hamid, Muhannad Abu Halawa and Abed Basat received the above mentioned makeshift mortar and 5 mortar bombs.

Nasser Abu-Hamid, with his above mentioned colleagues, fired using the above mentioned makeshift mortar a mortar bomb at the settlement of Psagot with the intent of causing the death of residents of the above mentioned settlement and IDF soldiers who were in the above mentioned settlement. The above mentioned mortar bomb did not hit the settlement of Psagot and exploded near it.

After carrying out the said attack, Nasser Abu-Hamid, reported what had happened to the Defendant. The Defendant took Nasser Abu-Hamid, to Marwan Barghouti in order to report the mortar bomb firing attack that had been performed for the first time in the Area to Marwan Barghouti too.

[Stamp] P 5: 186 [continued]

**Twenty fourth count:** (Detailed Incident 39/02 Binyamin)

Prosecution Case 444/02 Amended

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on January 15, 2002 or thereabouts, caused the intentional death of another person, as follows:

1. On January 14, 2002, Raed Karmi, who was a senior military operative in the "Tanzim" of the Fatah Organization, which is an illegal organization, was killed. Following the death of the above mentioned Raed Karmi, the head of the "Tanzim" of the Fatah in the area, Marwan Barghouti pitched a mourning tent in Albira.

2. The above mentioned Defendant, on January 15, 2002, in the above mentioned mourning tent, met Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha"), Mohamed Sami Ibrahim Abdullah, Fares Sadak Mohammed Ghanem (alias "al Hittawi"), Tarek Malhi A-Nuf and Zidan Mahareb Al Badawi.

3. The Defendant informed his above mentioned colleagues that Marwan Barghouti, the head of the "Tanzim" of the Fatah in the Area, asked for them to carry out an attack immediately to avenge the death of the above mentioned Raed Karmi and cause the death of Israeli civilians.

4. For the purpose of carrying out the said attack, the Defendant provided his above mentioned colleagues an MP-5 submachine gun, a "16" pistol and a Mazda vehicle bearing Israeli license plates.

5. The above mentioned colleagues of the Defendant, in the above mentioned mourning tent, decided that in view of the demand of the Defendant, they would carry out an attack that very evening at the Hagivonim gas station, located on Highway 443, near the entrance to Givat Ze'ev, with the intent of causing the death of Israeli civilians.

6. In the evening hours of that day, January 15, 2002, Mohamed Abdullah left the above mentioned mourning tent with Fares Ghanem. Mohamed Abdullah and Fares Ghanem traveled in an Isuzu pickup vehicle belonging to Fares Ghanem to the above mentioned gas station with the intent of carrying out the planned shooting attack there. Mohamed

[Stamp] P 5: 187

Mousleh, armed with a "14" pistol, Zidan Mahareb, armed with the above mentioned "16" pistol, and Tarek A-Nuf, armed with the above mentioned MP-5 submachine gun,

Prosecution Case 444/02 Amended

drove behind the above mentioned Isuzu vehicle. The three traveled in a Mazda vehicle, which they had received for this purpose from the Defendant.

7. The above mentioned colleagues of the Defendant reached an earth mound that blocked the exit from the villages Bir Nabala and Aljib to Highway 443, about 100 meters from the Hagivonim gas station. The above mentioned colleagues of the Defendant parked their vehicles, the Isuzu and Mazda, facing the village Bir Nabala so that they could escape from the site immediately after carrying out the planned attack.

8. Mohamed Mousleh, armed with a "14" pistol, Zidan, armed with a 16 pistol, and Tarek A-Nuf, armed with an MP-5, alighted form the vehicles and walked to the above mentioned gas station with the aim of carrying out the planned shooting attack and causing the death of Israeli civilians there.

9. Mohamed Abdullah and Fares Ghanem stayed in the above mentioned vehicles in order to make sure that no IDF patrol or other people would come to the site. Mohamed Abdullah sat in the driver's seat of the Mazda vehicle so that he could immediately evacuate his three colleagues who had departed to carry out the planned attack immediately after executing the attack.

10. Mohamed Mousleh and Tarek A-Nuf stood at the entrance to the above mentioned gas station.

11. After a few minutes, at about 7:45 p.m., Mohamed Mousleh and Tarek A-Nuf noticed a white Fiat Uno vehicle, license No. 6424905, entering the above mentioned gas station, which was driven by the late Yoela Chen, and Rachel Eini was sitting next to her.

12. Mohamed Mousleh and Tarek A-Nuf approached the above mentioned Fiat vehicle with the aim of carrying out a shooting attack against it and causing the death of the vehicle occupants. The occupants of the Fiat vehicle noticed the pistol that Mohamed Mousleh was holding and started to shout and sound the horn. Mohamed Mousleh put the pistol into his trousers and told the vehicle occupants not to fear.

[Stamp] P 5: 187 [continued]

Prosecution Case 444/02 Amended

13. At this stage, Tarek A-Nuf opened fire with burst from the MP-5 submachine gun, which the Defendant provided, at the occupants of the Fiat vehicle with the intent of causing their death. Then, Mohamed Mousleh took out his pistol to and started to shoot at the vehicle occupants with the intent of causing their death.

14. Mohamed Mousleh and Tarek A-Nuf fired at very close range a large number of rounds at the late Yoela Chen, and at Rachel Eini, who were in the above mentioned Fiat vehicle.

15. Approximately 28 bullets, which were fired by Mohamed Mousleh and Tarek A-Nuf, hit the front windshield of the vehicle, a number of bullets hit the side of the vehicle and the driver's door window.

16. During the commission of the described shooting attack, Zidan, who was standing a short distance behind Mohamed Mousleh and Tarek A-Nuf, served as a lookout and spotter.

17. Fares Ghanem, immediately after hearing the gunfire, drove from the site with his Isuzu vehicle in order to inform his colleagues whether there were checkpoints on the way to Ramallah.

[Stamp] P 5: 187 [continued]

Prosecution Case 444/02 Amended

18. Mohamed Mousleh, Tarek A-Nuf and Zidan, after having carried out the shooting attack as set forth above, ran back to the Mazda vehicle in which Mohamed Abdullah was waiting. After the three got into the vehicle, Mohamed Abdullah drove them to Ramallah.

19. In Ramallah, Mohamed Mousleh, Tarek A-Nuf, Mohamed Abdullah and Zidan met Fares Ghanem.

20. Thereafter, Mohamed Mousleh met the Defendant in Ramallah, returned the MP-5 submachine gun and the Mazda vehicle to him and reported the attack that he had carried out as described above.

21. By his acts described above, the Defendant caused the intentional death of **the late Yoela Chen**, who died at the scene as a result of gunshot wounds from bullets that were fired by Mohamed Mousleh and Tarek A-Nuf.

**Twenty fifth count: (detailed incident 39/02 Binyamin)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on January 15, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the above mentioned time, in the described in the previous count of the indictment, by his acts set forth in the previous count of the indictment, attempted to cause the intentional death of Rachel Eini, who was traveling in a white Fiat Uno vehicle, license No. 6424905, described in the previous count of the indictment. One of the bullets that were fired by Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha") and Tarek Malhi A-Nuf using the weapons that had been delivered to them by the Defendant for the purpose of carrying out the shooting attack, as described in the previous count of the indictment, hit Rachel Eini in the head and two other bullets hit her left shoulder, injuring her moderately.

**Twenty sixth count: (Detailed Incident 502/02 Zion)**

[Stamp] P 5: 188

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, caused the intentional death of another person, as follows:

1. The above mentioned Defendant, in January 2002, the Defendant decided that he wanted to execute a suicide attack inside the territory of the State of Israel in order to cause the death of as many Israeli civilians as possible.

2. The above mentioned Defendant telephoned Nasser Mahmoud Aweis, a senior operative of the "Tanzim" of the Fatah, which is an illegal organization, in Nablus. The Defendant asked Nasser Aweis to send him a person who would be prepared to carry out a suicide attack. The Defendant told Nasser Aweis that he himself would see to bringing the suicide terrorist into Jerusalem in order to carry out a suicide attack there.

3. A few days later, on January 22, 2002, in Ramallah, the Defendant met Sa'id Ramadan, a resident of Kfar Tal in the Nablus district, who informed the Defendant that he had been sent by Nasser Aweis for the purpose of carrying out a suicide attack.

4. The Defendant called Mohamed Abed Rahman Salam Mousleh (alias "Abu Satha") and asked the latter to come to him.

5. Mohamed Mousleh met the Defendant and the above mentioned Sa'id Ramadan that day in Ramallah. The Defendant introduced the two to each other. The Defendant and Mohamed Masalah took Sa'id Ramadan to a barber shop to have his hair cut before carrying out the planned suicide attack.

6. Thereafter, the Defendant and Mohamed Masalah called Fares Sadak Mohammed Ghanem (alias "Hittawi") and asked the latter to transport a suicide terrorist from Ramallah to Jerusalem in order for the suicide terrorist to carry out a suicide attack in Jerusalem and cause the death of as many Israeli civilians as possible.

7. Fares Ghanem came to Ramallah with Mohamed Sami Ibrahim Abdullah, after the latter agreed to participate in driving the suicide terrorist from Ramallah to Jerusalem. Fares Ghanem came to the meeting in his Isuzu pickup vehicle with Israeli license plates.

[Stamp] P 5: 188 [continued]

Prosecution Case 444/02 Amended

35

8.     According to the instruction of the Defendant, Fares Ghanem and Mohamed Abdullah traveled in the above mentioned Isuzu vehicle from Ramallah to Jerusalem in order to find a way that had no police or IDF checkpoints, with the aim of driving the suicide terrorist who would carry out the planned attack in Jerusalem later using the same route.

[Stamp] P 5: 188 [continued]

Prosecution Case 444/02 Amended

9. Mohamed Abdullah and Fares Ghanem traveled from Ramallah via Rafat and arrived at the Atarot Industrial Zone, where the two returned to the Jerusalem – Ramallah main road and traveled left to the junction leading to the Rama Camp, where they turned right and traveled to Adam Junction. At Adam Junction the two turned right and traveled to Hizma Junction, where they turned right and entered Anta. Through Anta, they arrived at the French Hill Junction, where the two turned right and returned to Ramallah. Mohamed Abdullah and Fares Ghanem saw that on the way that they were traveling the suicide terrorist could be driven to Jerusalem without being stopped at police or IDF checkpoints.

10. At the same time, in Ramallah, the Defendant and Mohamed Mousleh took the above mentioned Sa'id Ramadan to pray and also bought for the above mentioned Sa'id Ramadan food, new clothes and shoes. The Defendant paid with his own money for these purchases in the amount of NIS 1,200.

11. Mohamed Mousleh, at the instruction of the Defendant, brought an M-16 assault rifle and 3 magazines for the said assault rifle, filled with cartridges two of which were connected with a magazine coupler ("jungle clip").

12. According to the plan of the Defendant and his above mentioned colleagues, Sa'id Ramadan should have arrived in Jerusalem and shoot there at Israeli civilians with the intent of causing their death until he himself would be killed by the Israeli security forces.

13. Thereafter, on the same day, the Defendant, Mohamed Mousleh and Sa'id Ramadan met Mohamed Abdullah and Fares Ghanem in the area of the City Inn Hotel in Albira. The Defendant introduced Sa'id Ramadan to Mohamed Abdullah and to Fares Ghanem.

14. The Defendant explained to Mohamed Abdullah and to Fares Ghanem that the above mentioned Sa'id Ramadan was the suicide terrorist that they had to drive to Jerusalem in order for him to carry out a suicide attack by shooting at Israeli civilians with the aim of causing the death of as many Israeli civilians as possible.

15. Mohamed Abdullah and Fares Ghanem hid the above mentioned M-16 assault rifle and magazines in the above mentioned Isuzu vehicle.

[Stamp] P 5: 189

Prosecution Case 444/02 Amended

16. The Defendant and Mohamed Mousleh wished Sa'id Ramadan luck and the three traveled to Jerusalem. The Defendant told Mohamed Abdullah and Fares Ghanem that they would have to take Sa'id Ramadan to carry out the suicide attack in any place in Jerusalem of their choosing.

17. Fares Ghanem drove the Isuzu vehicle, Sa'id Ramadan sat in the seat next to the driver's seat and Mohamed Abdullah sat in the rear seat.

18. Mohamed Abdullah and Fares Ghanem transported Sa'id Ramadan to Jerusalem on a route that they had inspected earlier that day as described above.

19. In Jerusalem, Mohamed Abdullah and Fares Ghanem traveled to Sheikh Jarah St. There they took out the M-16 assault rifle and magazines that were hidden inside the vehicle and handed them over to Sa'id Ramadan. Mohamed Abdullah moved to the seat next to the driver's seat while Sa'id Ramadan moved to the back seat, holding the M-16 assault rifle and the magazines in his hands.

20. Mohamed Abdullah and Fares Ghanem drove Sa'id Ramadan to Hanevi'im Street.

21. During the journey, Sa'id Ramadan complained to Mohamed Abdullah and Fares Ghanem that his new shoes, which the Defendant had purchased for him for the attack, were too small and pinched him. Mohammed Abdullah took of his "Reebok" shoes and handed them over to Sa'id Ramadan saying "go up to heaven with "Reebok" shoes".

22. Upon reaching the junction of Strauss and Hanevi'im Streets, Mohammed Abdullah and Fares Ghanem stopped the Isuzu vehicle.

23. Mohammed Abdullah and Fares Ghanem told Sa'id Ramadan to walk down to Jaffa Street and start to shoot at a place where he would see many people.

24. After Sa'id Ramadan got out of the vehicle with the M-16 assault rifle and the ammunition, Muhammad Abdullah and Fares Ghanem drove away from the site in the Isuzu vehicle, departed through the Musrara neighborhood to Highway No. 1 and from there drove by way of the main road to Ramallah.

25. Sa'id Ramadan, a few minutes after having got out of the vehicle of Mohamed Abdullah and Fares Ghanem, arrived at Jaffa Street.

[Stamp] P 5: 189 [continued]

Prosecution Case 444/02 Amended

38

26. At about 4:20 p.m., while standing opposite Building No. 47 on Jaffa Street or thereabouts, Sa'id Ramadan loaded the M-16 assault rifle that he was carrying, shouted "Allahu Akbar" and discharged automatic gunfire indiscriminately at the people who were on Jaffa Street, at the bus stop at the site, aboard the "Egged" bus No. 27 that was at this stop at the time and at the people who were within the stores nearby with the aim of causing the death of as many people as possible. Sa'id Ramadan, while continuing to fire, fled from the site towards the parking lot in Harav Kook Street. There, Sa'id Ramadan changed magazines and continued to shoot at civilians with the aim of causing their death. Sa'id Ramadan fired through the M-16 assault rifle that he carried more than 38 cartridges. Sa'id Ramadan continued to shoot at civilians until he was killed by civilians and policemen who arrived at the site.

[Stamp] P 5: 189 [continued]

Prosecution Case 444/02 Amended

27. By his acts described above, the above mentioned Defendant caused the intentional death of **the late Ora (Svetlana) Sandlar**, who died as a result of gunshot wounds caused by the bullets that were fired by Sa'id Ramadan.

28. After the Defendant learned about the execution of the above mentioned attack, the Defendant approached Ali Faraj Barghouti and received from the latter the amount of 1,000 U.S. dollars for executing the said attack. The Defendant gave Mohamed Mousleh, Mohamed Abdullah and Fares Ghanem 100 U.S. dollars each for their participation in the execution of this attack.

**Twenty seventh count: (Detailed Incident 502/02 Zion)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, at the place set forth in the previous count of the indictment, by his actions described in the previous count of the indictment, caused the intentional death of **the late Sarah Hamburger**, who died of gunshot wounds from the bullets that were fired by Sa'id Ramadan, who was dispatched to carry out the above shooting attack by the Defendant.

**Twenty eighth count: (Detailed Incident 502/02 Zion)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

[Stamp] P 5: 190

Prosecution Case 444/02 Amended

The above mentioned Defendant, at the time set forth, at the place set forth in the twenty sixth count of the indictment, by his actions described in the twenty sixth count of the indictment, attempted to cause the intentional death of as many civilians as possible who at the time were on and near Jaffa Street. As a result of the gunfire at the site that was fired by Sa'id Ramadan, who was dispatched to carry out the above shooting attack by the Defendant, **more than 45 civilians were injured**.

**Twenty ninth count: (Detailed Incident 502/02 Zion)**

**Nature of the offense**: Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The aforesaid Defendant, at the above mentioned time, at the place set forth in the twenty sixth count of the indictment, through his actions described in the twenty sixth count of the indictment, maliciously and unlawfully damaged a large amount of property, including stores on Jaffa Street, an "Egged" bus stop, an "Egged" company bus, No. 27, and many vehicles, which were damaged by the gunfire that was discharged at the site by Sa'id Ramadan, who was dispatched to carry out the said attack by the Defendant.

[Stamp] P 5: 190 [continued]

Prosecution Case 444/02 Amended

41

**Thirtieth count:**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Section 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in late January – early February, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1. The above mentioned Defendant, at the above mentioned time, in Ramallah or thereabouts, met Zafir Abed Jawad Abed Rahman Rimawi.

2. Zafir Rimawi informed the Defendant that his cousin, Mujahed Khader Rimawi, was prepared to carry out a suicide attack.

3. At the request of the Defendant, Zafir Rimawi arranged a meeting between the Defendant and the above mentioned Mujahed Rimawi.

4. After the above mentioned meeting, the Defendant consented to the suggestion of Zafir Rimawi to send Mujahed Rimawi to carry out a suicide attack in Jerusalem in order for Mujahed Rimawi to cause the death of as many Israeli civilians as possible.

5. The plan was for Mujahed Rimawi to carry out a suicide attack using a rifle, i.e. he would shoot at Israeli civilians in Jerusalem with the intent of causing the death of as many Israeli civilians and possible and would continue to fire until he would be killed by the Israeli security forces.

6. The Defendant took an M-16 assault rifle and a number of magazines for the above mentioned assault rifle filled with cartridges from Nasser (Halum) Mohamed Yusef Naji (Abu-Hamid) for the purpose of carrying out the planned suicide attack.

7. The Defendant contacted Mohamed Sami Ibrahim Abdullah, Fares Sadak Mohammed Ghanem (alias "al Hittawi") and Tarek Malhi A-Nuf. At the request of the Defendant, the above mentioned three individuals arrived in Ramallah and met the Defendant there.

[Stamp] P 5: 191

Prosecution Case 444/02 Amended

8.  The Defendant informed his above mentioned colleagues that he was asking them to bring another terrorist into Jerusalem, who would carry out a suicide attack in Jerusalem, such as the attack described in the twenty-sixth count of the indictment, with the aim of causing the death of as many civilians as possible. The above mentioned colleagues of the Defendant consented to participate in the driving of this suicide terrorist to Jerusalem.

9.  The Defendant provided Mohamed Abdullah and Fares Ghanem with a gray Subaru vehicle, which belonged to the family of the Defendant. Mohamed Abdullah returned with the Subaru vehicle to his home in Bir Nabala, while Fares Ghanem traveled with his Isuzu pickup vehicle to his home in Kfar Aqab.

10. On the following day, The Defendant called Mohamed Abdullah and Fares Ghanem and instructed them to come to the gas station located in downtown Ramallah, pick up the suicide terrorist from there and drive him to Jerusalem in order for him to carry out the suicide attack there with the aim of causing the death of as many civilians as possible.

11. Mohamed Abdullah traveled in the Subaru vehicle until the Kalandia checkpoint, where he parked the vehicle and boarded the Isuzu vehicle of Fares Ghanem, who arrived at the site. From there, the two continued to the said meeting place.

12. In Ramallah, at the above mentioned gas station, Mohamed Abdullah and Fares Ghanem met the Defendant, who introduced them to Mujahed Rimawi, who was the suicide terrorist. The Defendant handed the above mentioned M-16 assault rifle and the above mentioned three magazines filled with cartridges for M-16 assault rifles over to Mujahed Rimawi.

13. Mohamed Abdullah and Fares Ghanem hid the M-16 assault rifle and the magazines inside the Isuzu vehicle.

14. Mohamed Abdullah and Fares Ghanem traveled together with the suicide terrorist to Jerusalem with the aim of the latter carrying out a shooting attack there and causing the death of as many civilians as possible.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended

15. Mohamed Abdullah, Fares Ghanem and Mujahed Rimawi arrived at the Kalandia Checkpoint and bypassed it. Thereafter, Mohamed Abdullah switched to the Subaru vehicle, which he had left at the site earlier and drove to A-Ram Junction. Mohamed Abdullah passed the A-Ram checkpoint in the Subaru vehicle and waited at the site for Fares Ghanem and Mujahed Rimawi, who had bypassed the A-Ram checkpoint on foot.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended