Thereafter, Fares Ghanem returned, boarded the Isuzu vehicle, in which the weapon was hidden, and passed the A-Ram checkpoint while driving alone in the Isuzu vehicle with the weapon.

16. Mohamed Abdullah drove the suicide terrorist up to a mosque in Shuafat. Fares Ghanem also arrived at this site in the Isuzu vehicle with the weapon and the ammunition.

17. There, the suicide terrorist, Mujahed Rimawi, asked to enter the mosque and to pray prior to carrying out the suicide attack. Mohamed Abdullah and Fares Ghanem agreed to this request.

18. While Mujahed Rimawi was praying at the above mentioned mosque, Mohamed Abdullah and Fares Ghanem traveled in the above mentioned Subaru vehicle to Givat Shaul in Jerusalem with the aim of checking whether there were IDF or police checkpoints on the way. The two decided to drive the suicide terrorist to Givat Shaul with the aim of carrying out the planned shooting attack there, because there were many civilians at this site.

19. When Mohamed Abdullah and Fares Ghanem returned to the mosque in Shuafat in order to pick up Mujahed Rimawi and drive him to Givat Shaul with the aim of him carrying out the planned shooting attack there, the two did not find the suicide terrorist in the mosque.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended

20. Mohamed Abdullah and Fares Ghanem called the Defendant and reported to him that the suicide terrorist had fled from them. The Defendant instructed Mohamed Abdullah and Fares Ghanem to return to Ramallah.

21. Mohamed Abdullah and Fares Ghanem returned to Ramallah, met the Defendant there and handed over to him the above mentioned Subaru vehicle, the above mentioned M-16 assault rifle and the above mentioned magazines. The Defendant returned the above mentioned M-16 assault rifle to Nasser (Halum) Mohamed Yusef Naji (Abu-Hamid).

22. The Defendant informed Zafir Rimawi that his cousin had fled when he was on his way to carrying out a shooting attack in Jerusalem.

**Thirty first count:**

**Nature of the offense**: Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense**: The above mentioned Defendant, in the Area, in February 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met Mohamed Naifa, alia "Abu Rabia" and Abed Karim Rateb Yunes Aweis. The two above mentioned individuals informed the Defendant that they had a suicide terrorist and requested the help of the Defendant. The Defendant consented to help send the suicide terrorist into the State of Israel in order for him to carry out a suicide attack and cause the death of as many Israeli civilians as possible.

The Defendant reached the apartment in Ramallah in which were "Abu Rabia", Abed Karim Aweis and a person who wanted to carry out a suicide attack. The Defendant talked to Muhannad Bader Mahmoud Al-Shaar (hereinafter: the Suicide Terrorist) and felt that the latter had serious intentions.

[Stamp] P 5: 192

Prosecution Case 444/02 Amended

The above mentioned Suicide Terrorist informed the Defendant that his father was also a "martyr" because he had been killed by IDF soldiers.

The Defendant transferred to Abu Rabi an M-16 assault rifles and 4 magazines filled with cartridges in order for him to deliver them to the above mentioned Suicide Terrorist for the purpose of carrying out the planned suicide attack.

On the following day, the Defendant returned to the above mentioned apartment with a video camera. Abed Karim filmed using the above mentioned video camera the above mentioned Suicide Terrorist, while he was reading out a leaflet, in preparation for his departure for carrying out the suicide attack inside the State of Israel. The Defendant and his above mentioned colleagues trained the above mentioned Suicide Terrorist in the use and firing of the M-16 assault rifle. Thereafter, the Defendant transferred the above mentioned Suicide Terrorist to the apartment of the Defendant in downtown Ramallah. The Defendant let the above mentioned Suicide Terrorist sleep in his home in order for him to depart from there on the following day to carry out the planned suicide attack.

When on the following morning the Defendant and Abed Karim Aweis came to the above mentioned apartment of the Defendant, the two discovered that the suicide terrorist had disappeared. In view of the disappearance of the above mentioned suicide terrorist, the above mentioned plan for executing the suicide attack was not put into action.

**Thirty second count**:

**Nature of the offense**: Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense**: The above mentioned Defendant, in the Area, in February 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

[Stamp] P 5: 192 [continued]

Prosecution Case 444/02 Amended

The above mentioned Defendant, at the time set forth, talked by telephone with Nasser Mahmoud Aweis, the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah in the Nablus area. Nasser Aweis informed the Defendant that he was sending to him two suicide terrorists. It was agreed between the Defendant and Nasser Aweis that the Defendant would have delivered weapons and hand grenades to the above mentioned suicide terrorists and have them brought to the western part of Jerusalem in order for them to carry out the suicide attack in which they would fire at Israeli civilians, with the intent of causing

[Stamp] P 5: 192 [continued]

Prosecution Case 444/02 Amended

the death of as many Israeli civilians as possible and continue to shoot until they would be killed by the Israeli security forces.

According to the instruction of the above mentioned Nasser Aweis, on February 17, 2002, Ahmed Abu Khader, a senior operative of the "Al Aqsa Martyrs Brigades", sent from Nablus to Ramallah, to the Defendant, Saadi Jihad Mohamed-Ali Makboul, Alaa Mohamed Ali Hassan (Abed Aziz) (alias "Aswad"), who were accompanied by Ula Juma Mustafa. The two were already armed with two hand grenades.

Saadi Makboul and Alaa Hassan were supposed to carry out the suicide attack as the Defendant and Nasser Aweis had planned.

Within the preparation for the above mentioned suicide attack, in the home of Mahmoud Abu Khader, the brother of the above mentioned Ahmed Abu Khader, in the Balata Refugee Camp, Ahmed Abu Khader, using a video camera, filmed Saadi Makboul and Alaa Hassan holding M-16 assault rifles. The two also read before the video camera a leaflet of the "Al Aqsa Martyrs Brigades". Ahmed Abu Khader provided Alaa Hassan and to Saadi Makboul training in the use of weapons in preparation for carrying out the planned attack.

On February 17, 2002, Saadi Makboul and Alaa Hassan departed from Nablus to Ramallah along with Ula Mohamed Juma Mustafa and Aiman Alaa Salah Bader. Ahmed Abu Khader explained to the four that they must travel to Ramallah in the taxi of Aiman Bader. Ahmad Abu Khader explained that Ula Mustafa would be responsible for Alaa Hassan and Saadi Makboul to meet "Al Aqsa Martyrs Brigades" operatives in Ramallah, who would supply them weapons and driver them to Jerusalem according to this planning.

The above mentioned four individuals were not able to come to Ramallah and meet the Defendant for the purpose of executing the planned suicide attack. The four were arrested at an IDF checkpoint, near the village Douma in the Ramallah region. The two hand grenades that were in the above mentioned taxi were detonated at the site by an explosive ordnance disposal technician.

**Thirty third count:**

**Nature of the offense:** Conspiring to cause intentional death, an offense under Section 22 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 57828-1968 and Section

[Stamp] P 5: 193

Prosecution Case 444/02 Amended

49

51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in mid-February 2002 or thereabouts, conspired with another person to cause the intentional death of another person, as follows:

The above mentioned Defendant, on February 15, 2002 or thereabouts, in Ramallah or thereabouts, met Mohamed Sami Ibrahim Abdullah, Hussam Akel Rajb Shahada and Fares Sadak Mohammed Ghanem (alias "Al Hittawi").

During the above mentioned meeting, the Defendant asked his above mentioned colleague to bring into Jerusalem a suicide terrorist, who would carry out a suicide attack with the aim of causing the death of as many people as possible. The above mentioned colleagues of the Defendant agreed to the said proposal. The Defendant promised to pay his above mentioned colleagues 300 U.S. dollars in exchange for the transport of the suicide terrorist to Jerusalem. The Defendant informed his above mentioned colleagues that he would bring to them the suicide terrorist in another day or two or so.

The Defendant also gave his above mentioned colleagues a Subaru vehicle bearing Israeli license plates, in order for his above mentioned colleagues to drive the suicide terrorist in it to Jerusalem.

Mohamed Abdullah, Fares Ghanem and Hussam Shahada planned to bring the suicide terrorist into Jerusalem in an Isuzu pickup vehicle belonging to Fares Ghanem. The above mentioned colleagues of the Defendant planned to transport the suicide terrorist to one of the places in Jerusalem that had many people in it for the suicide terrorist to carry out the planned suicide attack there. Mohamed Abdullah, Fares Ghanem and Hussam Shahada also conducted a tour of Jerusalem and chose the places that in their opinion were suitable for carrying out a shooting attack against Israeli civilians. Among other places, the above mentioned colleagues of the Defendant chose the "Ramada" hotel, the tunnels of the Begin Highway and the French Hill Junction.

The above mentioned plan of the Defendant and his above mentioned colleagues did not go ahead because about two days after the above mentioned meeting, on February 17, 2002, Hussam Shahada was arrested by the Israeli security forces, and after a day, on February 18, 2002, Fares Ghanem was arrested by the Israeli security forces.

[Stamp] P 5: 193 [continued]

Prosecution Case 444/02 Amended

According to the instruction of the Defendant, after the arrest of Fares Ghanem [and] Hussan Shahada, Mohamed Abdullah, met Mohamed Zadek Mohamed Ghanem, the brother of the above mentioned Fares Ghanem, and Tarek Malhi A-Nuf, on February 19, 2002 or thereabouts, in Ramallah,. During the said meeting, Mohamed Abdullah and Mohamed Ghanem agreed to the suggestion of Tarek A-Nuf to drive a suicide terrorist into Jerusalem in order for him to carry out a suicide attack there with the aim of causing the death of as many people as possible.

This plan did not go ahead either because Mohamed Abdullah himself was arrested on the following day, February 20, 2002, by the Israeli security forces.

[Stamp] P 5: 193 [continued]

Prosecution Case 444/02 Amended

**Thirty fourth count**: **(Detailed Incident 483/02 Shafat)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on February 25, 2002 or thereabouts, caused the intentional death of another person, as follows:

1. The above mentioned Defendant, in mid-February 2002, in Ramallah or thereabouts, the Defendant decided to send a suicide terrorist to Jerusalem in order to carry out a shooting attack against Israeli targets with the aim of causing the death of as many civilians as possible. The Defendant planned for the suicide terrorist to shoot at Israeli civilians until he would be killed by the Israeli security forces.

2. The Defendant made telephone contact with Nasser Mahmoud Aweis, a senior military operative in the "Tanzim" of the Fatah, an illegal organization, in Nablus. The Defendant asked Nasser Aweis to send a suicide terrorist to him in Ramallah for the purpose of carrying out the planned suicide attack.

3. After a few days, Rami Mohamed Mahmoud Nur contacted the Defendant and informed him that he had been sent by Nasser Aweis for the purpose of carrying out the planned suicide attack and that he was in Ramallah.

4. According to the instruction of the Defendant, Tarek Malhi A-Nuf met Rami Nur. Tarek A-Nuf brought Rami Nur to the Defendant.

5. The Defendant talked to Rami Nur and thereafter took Rami Nur to a barber shop in order for the latter to have his hair cut in preparation for executing the planned suicide attack.

6. The Defendant purchased clothes for Rami Nur, for which he paid NIS 1,000 out of his own funds.

7. Thereafter, the Defendant led Rami Nur to an apartment in Ramallah, in which the Defendant, Tarek A-Nuf and Zidan Ramadan lived (hereinafter: "the Apartment").

[Stamp] P 5: 194

Prosecution Case 444/02 Amended

8. On February 23, 2002, Sharif Mohamed Yusef Naji (Abu-Hamid) also came to the apartment, bringing an M-16 assault rifle which he had received from the Defendant for executing the planned attack. Sharif Naji (Abu-Hamid) also brought magazines for the above mentioned M-16 assault rifle from the home of his brother, Nasser Naji (Abu-Hamid).

9. In the evening hours on that day, Sharif Naji (Abu-Hamid) and Zidan Ramadan provided Rami Nur with information about the place at which Rami Nur was assigned to carry out the planned attack. The Defendant and his colleagues explained to Rami Nur that he had to carry out the planned attack in the Neve Ya'akov neighborhood in Jerusalem, at a place about which Sharif Naji and Zidan Ramadan had gathered information earlier.

10. The Defendant, along with others, filmed Rami Nur with a video camera in the framework of the preparations for the execution the planned attack.

11. At the request of Sharif Naji (Abu-Hamid), his brother, Nasser (Halum) Naji (Abu-Hamid), contacted Kamil Ghanem and asked the latter to drive Rami Nur to Jerusalem.

12. On February 25, 2002, in the evening, Rami Nur departed from Ramallah towards Jerusalem in the vehicle of Kamil Ghanem, in which the above mentioned M-16 assault rifle, the magazines and a hand grenade, which Rami Nur Nasser (Halum) Naji (Abu-Hamid) had delivered, were hidden.

13. Rami Nur arrived at the main road in the Neve Ya'akov neighborhood in Jerusalem.

14. Rami Nur got out of the above mentioned vehicle at the site specified above, armed with the above mentioned M-16 assault rifle, magazines and a hand grenade. Rami Nur approached the bus stop of the number 25 "Egged" bus line, which was at the site, and discharged automatic gunfire from the above mentioned M-16 assault rifle at vehicles that passed by and at Israeli civilians who were at the site with the aim of causing the death of as many people as possible. A police car arrived at the site and Rami Nur discharged automatic gunfire at two policemen of the Israel Police who were in the above mentioned police car with the aim of causing their deaths. The rounds that were fired by Rami Nur hit the two above mentioned policemen, who rushed towards Rami Nur and shot at him. As a result of the gunshot wounds from the rounds that were fired by Rami Nur, the late policewoman Galit Arviv was wounded and fell to the ground. Rami Nur

[Stamp] P 5: 194 [continued]

Prosecution Case 444/02 Amended

approached the late policewoman Galit Arviv and fired an additional burst at her from close range. As a result of the gunshot wounds from the bullets that were fired by Rami Nur, the late policewoman Galit Aviv died a few hours later.

15. After Rami Nur ran out of ammunition, he threw the hand grenade that he was carrying at an IDF jeep that had arrived at the site with the intent of causing the death of IDF soldiers. Only after Rami Nur was wounded and was out of ammunition were the policemen and civilians who were at the site able to overpower him.

16. By his acts described above, the above mentioned Defendant caused the intentional death of the late policewoman **Galit Arviv**.

[Stamp] P 5: 194 [continued]

Prosecution Case 444/02 Amended

54

**Thirty fifth count**: (Detailed Incident 483/02 Shafat)

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, whether within the Area or outside of it, on February 25, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, by his acts described in the previous count of the indictment, attempted to cause the intentional death of as many Israeli civilians as possible. As a result of the gunshot wounds from the bullets that were fired by Rami Mahmoud Nur, who was dispatched to carry out the said attack by the Defendant, eight Israeli civilians and policemen were wounded.

**Thirty sixth count**: (Detailed Incident 483/02 Shafat)

**Nature of the offense**: Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty fourth count of the indictment, by his acts described in the thirty fourth count of the indictment, maliciously and unlawfully caused damage to the bus stop of "Egged" line 25 in Neve Ya'akov, proximate to homes and vehicles that were at the above mentioned site, which were damaged by the gunfire that was discharged by Rami Mohamed Mahmoud Nur.

**Thirty seventh count**: (Detailed Incident 4258/02 Yarkon)

**Nature of the offense**: Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

[Stamp] P 5: 195

Prosecution Case 444/02 Amended

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

1. The above mentioned Defendant, in early March 2002, in Ramallah or thereabouts, made telephone contact with Nasser Mahmoud Aweis, a senior military operative of the "Tanzim" of the Fatah, which is an illegal organization, in Nablus.

2. Nasser Aweis informed the Defendant that he was sending him another suicide terrorist in order for the Defendant to dispatch him into the State of Israel in order to commit a shooting attack. The plan was for the suicide terrorist to shoot at Israeli civilians with the intent of causing the death of as many civilians as possible and continuing to fire until being killed by the gunfire of the Israeli security forces.

3. On March 4, 2002, the Defendant contacted Ibrahim Hasouna, a policeman in the Naval Police of the Palestinian Authority, who stated that he had come to Ramallah at the instruction of Nasser Aweis and that he was the suicide terrorist for the purpose of carrying out the planned shooting attack. According to the instruction of the Defendant, Tarek Malhi A-Nuf met Ibrahim Hasouna in Ramallah.

4. On that day, in Ramallah, Tarek A-Nuf met Sharif Mohamed Yusef Naji (Abu-Hamid). During the said meeting, Tarek A-Nuf introduced Ibrahim Hasouna to Sharif Naji (Abu-Hamid).

5. Tarek A-Nuf informed Sharif Abu-Hamid that the Defendant had brought the above mentioned Ibrahim Hasouna from Nablus in order for him to carry out a suicide attack with the intent of causing the death of as many Israeli civilians as possible.

6. According to the instruction of the Defendant, Tarek A-Nuf took Ibrahim Hasouna to a barber shop in order for him to have his hair cut in preparation for carrying out the planned suicide attack. In addition, Tarek A-Nuf and Sharif Naji (Abu-Hamid) purchased new clothes for Ibrahim Hasouna. Tarek A-Nuf paid for these clothes NIS 1,000, which he had received from the Defendant for this purpose.

7. Thereafter, according to the instruction of the Defendant, Tarek A-Nuf led Ibrahim Hasouna to an apartment in downtown Ramallah, in which Tarek A-Nuf, Zidan Ramadan and the Defendant lived (hereinafter: "the Apartment").

[Stamp] P 5: 195 [continued]

Prosecution Case 444/02 Amended

8.     The Defendant arrived at the Apartment and filmed Ibrahim Hasouna with a video camera in preparation for carrying out the planned suicide attack.

[Stamp] P 5: 195 [continued]

Prosecution Case 444/02 Amended

57

9. The Defendant instructed Tarek A-Nuf to drive Ibrahim Hasouna into the State of Israel in order for the latter to carry out the planned suicide attack there. The Defendant instructed Tarek A-Nuf to bring a weapon to Ibrahim Hasouna for the purpose of carrying out the planned attack.

10. The above mentioned colleagues of the Defendant started to look for a person who would bring Ibrahim Hasouna into the State of Israel in order for the latter to carry out the planned suicide attack there and to cause the death of as many Israeli civilians as possible.

11. Sharif Naji (Abu-Hamid) contacted Murad Nazmi Rizak Ajluni, the holder of an Israeli identity card living in Jerusalem, and asked the latter to come to Ramallah urgently.

12. Sharif Naji (Abu-Hamid) met the above mentioned Murad Ajluni in a café in Ramallah and asked him to drive a suicide terrorist into the State of Israel. Murad Ajluni agreed to this suggestion, but asked for Sharif Naji (Abu-Hamid) to make sure to supply a vehicle that was not stolen with Israeli license plates for this purpose.

13. Sharif Naji (Abu-Hamid), Zian Ramadan and Murad Ajluni met Mohamed Mohamed Yusef Naji (Abu-Hamid), who was with Mazen Mahmoud Omar Alkadi, in Ramallah. Mazen Alkadi drove a Ford Transit vehicle with Israeli license plates, license plate No. 7014515 (hereinafter: the Vehicle). The above mentioned persons asked Mazen Alkadi for the vehicle and the licenses of the vehicle for the purpose of driving a suicide terrorist into the territory of the State of Israel in order for the suicide terrorist to carry out a suicide attack there. Mazen Alkadi handed the vehicle over to Sharif Naji (Abu-Hamid) and Zidan Ramadan, but he asked that he himself be the one to drive it.

14. At this stage, Tarek A-Nuf and Ibrahim Hasouna went to the apartment. There, Ibrahim Hasouna showered and put on the new clothes, which had been purchased for him according to the instruction of the Defendant as set forth above.

15. At about 8:00 p.m., Sharif Naji (Abu-Hamid), Zidan Ramadan and Mazen Alkadi, who traveled in the vehicle, met Tarek A-Nuf and Ibrahim Hasouna in the Clock Square in Ramallah. Tarek A-Nuf and Ibrahim Hasouna, who were armed with an M-16 assault rifle, six magazines filled with cartridges and two hand grenades, got into the vehicle. Nasser (Halum) Mohamed Yusef Naji (Abu-Hamid) also arrived at the site, and handed over to Ibrahim Hasouna a commando knife of approximately 25 cm length.

[Stamp] P 5: 196

Prosecution Case 444/02 Amended

Nasser Abu-Hamid told Ibrahim Hasouna to stab Israeli civilians in order to cause their death after running out of ammunition.

16. All of the above mentioned persons traveled in the vehicle to Refidin Square in Ramallah, because there were not many passersby there.

17. In the above mentioned Refidin Square, Nasser (Halum) Naji (Abu-Hamid), Tarek A-Nuf and Ibrahim Hasouna field stripped the above mentioned M-16 assault rifle and put it into the side door of the vehicle.

18. Sharif Naji (Abu-Hamid), Tarek A-Nuf and Zidan Ramadan kissed Ibrahim Hasouna and wished him success.

19. Murad Ajluni informed his friends that he was working in Tel Aviv and therefore knew a place in Tel Aviv at which the planned suicide attack could be carried out.

20. It was decided that after Murad Ajluni and Mazen Alkadi would drop off Ibrahim Hasouna in Tel Aviv in a crowded place, Ibrahim Hasouna would wait a few minutes in order for his above mentioned colleagues to have time to escape from the site in the vehicle and would thereafter discharge automatic gunfire from the above mentioned M-16 assault rifle at Israeli civilians who would be at the site, with the aim of causing the death of as many Israeli civilians as possible and would continue to fire until being killed by gunfire from the Israeli security forces that would arrive at the site.

21. Ibrahim Hasouna got into the vehicle, which Mazen Alkadi was driving, with Murad Ajluni sitting beside him, and the three traveled towards Tel Aviv in order to carry out the planned suicide attack there.

22. During the journey of Murad Ajluni, Mazen Alkadi and Ibrahim Hasouna to Tel Aviv, Sharif Naji (Abu-Hamid) talked to them by cellular telephone.

23. On that night, after Mazen Alkadi, Murad Ajluni and Ibrahim Hasouna had arrived in Tel Aviv, near Ma'ariv Bridge on Petach Tikva Road, Murad Ajluni showed Ibrahim Hasouna a crowded place and instructed him to carry out the planned attack there.

24. Ibrahim Hasouna took out the above mentioned M-16 assault rifle, magazines and hand grenades, which had been concealed in the door of the vehicle as set forth above.

[Stamp] P 5: 196 [continued]

Prosecution Case 444/02 Amended

25. At about 2:15 a.m., on March 5, 2002 or thereabouts, Mazen Alkadi and Murad Ajluni let Ibrahim Hasouna, who was armed with the above mentioned M-16 assault rifle, hand grenades and commando knife, out of the vehicle near the "Seafood Market" restaurant located on Petach Tikva Road in Tel Aviv (hereinafter: the Restaurant) in order for him to carry out the planned attack.

26. Murad Ajluni and Mazen Alkadi drove away from the site towards Jerusalem in the vehicle.

27. Ibrahim Hasouna approached the "Seafood Market" restaurant and discharged automatic gunfire from the M-16 assault rifle at the occupants of the restaurant and passersby in Petach Tikva Road with the intent of causing their death.

28. Thereafter, Ibrahim Hasouna threw the two above mentioned hand grenades at the restaurant with the intent of causing the death of the occupants of the restaurant and passersby, but the two hand grenades did not detonate.

[Stamp] P 5: 196 [continued]

Prosecution Case 444/02 Amended