29. After the M-16 assault rifle, which Ibrahim Hasouna carried, ceased firing due to a stoppage, Ibrahim Hasouna took out the above mentioned commando knife and started to stab Israeli civilians who were at the site with the intent of causing their death.

30. The late policeman Master Sergeant Salim Birkat arrived at the said site. The late Master Sergeant Salim Birkat rushed at Ibrahim Hasouna and overpowered him. The late Master Sergeant Salim Birkat had the chance to inform his commanders of having overpowered the terrorist.

31. At this stage, Ibrahim Hasouna stabbed the late Master Sergeant Salim Birkat in the neck using the above mentioned commando knife with the intent of causing his death. As a result of this stab wound, the late Master Sergeant Salim Birkat died at the site.

32. By his acts described above the above mentioned Defendant caused the intentional death of **the late Master Sergeant Salim Birkat.**

33. After Sharif Naji (Abu-Hamid) learned from the television broadcasts that the planned attack had been carried out as set forth above, he contacted the Defendant and updated the latter of the execution of the said attack.

34. Immediately thereafter, the Defendant informed Marwan Barghouti, the head of the "Tanzim" of the Fatah in the Area, and Nasser Mohamed Yusef Naji (Abu-Hamid), the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah, of the attack that had been carried out. In addition, the Defendant contacted the Reuters news agency and announced the attack that had been carried out as set forth above.

**Thirty eighth count: (Detailed Incident 4258/02 Yarkon)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

[Stamp] P 5: 197

Prosecution Case 444/02 Amended

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh of the indictment, by his actions described in the thirty seventh count of the indictment, caused the intentional death of **the late Yosef Habi**, who was stabbed by Ibrahim Hasouna in the thorax and other parts of his body and died as a result.

**Thirty ninth count: (Detailed Incident 4258/02 Yarkon)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh count of the indictment, by his actions described in the thirty seventh count of the indictment, caused the intentional death of **the late Eliyahu Dahan**, who was stabbed by Ibrahim Hasouna in the thorax, abdomen and back and died as a result.

**Fortieth count: (Detailed Incident 4258/02 Yarkon)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh count of the indictment, by his actions described in the thirty seventh count of the indictment, attempted to cause the intentional death of as many civilians as possible. As a result of the gunshots that were discharged by Ibrahim Hasouna dozens of Israeli civilians were wounded.

[Stamp] P 5: 197 [continued]

Prosecution Case 444/02 Amended

**Forty first count**: (Detailed Incident 4258/02 Yarkon)

**Nature of the offense**: Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh count of the indictment, by his actions described in the thirty seventh count of the indictment, maliciously and unlawfully caused extensive damage to the "Seafood Market" Restaurant, the "Mifgash HaSteak" Restaurant, and to the nearby buildings and the vehicles that were in the area, which were damaged by the gunshots that were discharged by Ibrahim Hasouna.

**Forty second count**: (Detailed Incident 568/02 Shafat)

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, whether within the Area or outside of it, on March 8, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1. The above mentioned Defendant, at the time set forth, talked by telephone with Nasser Mahmoud Aweis, a military operative in the "Tanzim" of the Fatah, which is an illegal organization, in Nablus.

2. Nasser Aweis asked the Defendant to meet Louis Mohamed Ahmed Ouda, who had been released a short time earlier from the prison of the Preventive Security of the Palestinian Authority.

3. The Defendant met Louis Ouda in Ramallah. During the talk between the two, Louis Ouda told the Defendant that he had a suicide terrorist and that he needed an explosive belt in order for the suicide terrorist to be able to use it to carry out a suicide attack inside

[Stamp] P 5: 198

Prosecution Case 444/02 Amended

    the territory of the State of Israel and thus cause the death of as many Israeli civilians as possible. The Defendant consented to provide Louis Ouda with the requested explosive belt for the purpose of carrying out the planned suicide attack. In addition, the Defendant consented to the request of Louis Ouda to organize a sleeping place in Ramallah for the suicide terrorist.

4. Earlier, the above mentioned Louis Ouda talked to the above mentioned Nasser Aweis. The above mentioned Nasser Aweis announced that he had found a person who was prepared to carry out a suicide attack in Jerusalem, who was Mahmoud Salah, a resident of Samaria. Nasser Aweis asked Louis Ouda to transfer Mahmoud Salah to Jerusalem in order to carry out a shooting attack with the intent of causing the death of Israeli civilians. Louis Ouda agreed to this. Louis Ouda met Mahmoud Sa'id Abed Rahim Salah. Mahmoud Salah told Louis Ouda that he intended to carry out a suicide attack, after his fiancée, Darin, had also carried out a suicide attack.

5. Louis Ouda called Khaled Shwiki Habib Halabi, a resident of Beit Hanina, an operative in the "Popular Front for the Liberation of Palestine" organization, and informed him that he intended to carry out an attack in Jerusalem, by dispatching a suicide terrorist that he had. Louis Ouda asked Khaled Halabi to find people who would bring the suicide terrorist into Jerusalem. Khaled Halabi agreed to do what he was asked to do.

6. Khaled Halabi called his colleague Ghannadi Isa Ouda, a resident of Beit Hanina, an operative in the "Popular Front for the Liberation of Palestine" organization, and he met him on March 6, 2002 in Ramallah. Louis Ouda came to this meeting and met Khaled Halabi and Ghannadi Ouda near the "Arabesque" Café. Louis Ouda and Khaled Halabi suggested to Ghannadi Ouda to bring a suicide terrorist from Ramallah to Jerusalem for the purpose of carrying out an attack. Louis Ouda instructed Ghannadi Ouda to transport the suicide terrorist to the [neighborhood of] French Hill in Jerusalem, on routes bypassing checkpoints, in order for him to carry out an attack there and cause by doing so the death of Israeli civilians. Louis Ouda and Khaled Halabi suggested to Ghannadi Ouda alternatives to the attack execution site: a supermarket near the gas station in the Ramat Eshkol neighborhood, the "Domino's Pizza" restaurant in the [neighborhood of] French Hill or one of the bus stops at the French Hill Junction.

[Stamp] P 5: 198 [continued]

Prosecution Case 444/02 Amended

7. For the purpose of receiving the explosive belt for the suicide terrorist, the Defendant had Louis Ouda meet Khaled Shawish, an operative in Force 17 of the Palestinian Authority, who promised to transfer to Louis Ouda and to the suicide terrorist an explosive belt that he had and to make it available to Louis Ouda, a Force 17 operative of the Palestinian Authority by the name of Mazid, who would attach the suicide belt to the suicide terrorist.

8. The Defendant brought the suicide terrorist to the apartment in downtown Ramallah, which the Defendant had rented (hereinafter: "the Apartment").

[Stamp] P 5: 198 [continued]

Prosecution Case 444/02 Amended

9. On March 8, 2002, Ghannadi Ouda came to Ramallah at the behest of Khaled Halabi. In Ramallah, Louis Ouda, who had come to the meeting by vehicle, and Khaled Halabi, waited for Ghannadi Ouda. Louis Ouda and Khaled Halabi informed Ghannadi Ouda that he had to lead the suicide terrorist to the bus stop in the direction heading toward the Dead Sea, at the French Hill Junction in Jerusalem. Louis Ouda and Khaled Halabi made sure that Ghannadi Ouda was familiar with the bypass routes to the site, and Ghannadi Ouda told them that he intended to drive the suicide terrorist by bypassing the Kalandia checkpoint through the Quarry Road, and to continue from there to drive the terrorist to the site for carrying out the attack via Beit Hanina and Shuafat, while bypassing the Dahyat Al-Brid checkpoint.

10. Thereafter, Louis Ouda traveled to the Apartment, where he met the Defendant and Mazid, who had brought an explosive belt with him. Mazid installed the explosive belt on Mahmoud Mousleh and explained to Mahmoud Salah how to activate the explosive belt. In addition, Mahmoud Salah shaved off his beard.

11. Thereafter, the Defendant and his above mentioned colleagues hailed a taxi, and the suicide terrorist, Mahmoud Salah, wearing the explosive belt, got into the taxi on his way to carrying out a suicide attack in Jerusalem with the intent of causing the death of Israeli civilians. Khaled Halabi accompanied Mahmoud Salah to the point of meeting with Ghannadi Ouda.

12. Ghannadi Ouda and the suicide terrorist, Mahmoud Salah, continued to travel in the taxi and got out of the taxi on a dirt track near the quarries in Kalandia. From there, Ghannadi Ouda led the suicide terrorist on foot on their way to executing the planned attack.

13. In the Nuseiba quarters in Beit Hanina in Jerusalem, Ghannadi Ouda and Mahmoud Salah were arrested, at about 4:00 p.m., by Border Guard policemen. When Mahmoud Salah tried to activate the explosive belt that he was wearing, he was shot dead by one of the members of the security forces.

**Forty third count: (Detailed Incident 783/02 Binyamin)**

[Stamp] P 5: 199

Prosecution Case 444/02 Amended

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, on March 17, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1. On March 5, 2002, a senior military operative of the "Al Aqsa Martyrs Brigades" (the military arm of the "Tanzim" of the Fatah) – Muhannad Abu Halawa, was killed in Ramallah.

2. About ten days later, Majd Mahmoud Ahmad Ziada decided to avenge the death of Muhannad Abu Halawa by carrying out a lethal attack.

3. Louis Yusef Mansi and Rafat Salah agreed to join Majd Ziada to carry out the above mentioned revenge attack.

4. Louis Mansi contacted the Defendant, and received his approval to carry out the planned attack.

5. Following the approval that was given by the Defendant, Majd Ziada and Louis Mansi arrived at the home of the Defendant.

6. The Defendant delivered to the two a "Beretta" type rifle and a Kalashnikov assault rifle with magazines for carrying out the planned attack.

7. On the following day, on March 17, 2002, Majd Ziada traveled with Louis Mansi and Rafat Salah, in his "Mazda" type vehicle to the Beit El-Psagot Road, while Majd Ziada was driving the vehicle, Louis Mansi held the "Beretta" type rifle, and Rafat Salah was holding the Kalashnikov assault rifle.

8. The above mentioned persons arrived at the planned attack site at about 6:30 a.m. Louis Mansi and Rafat Salah got out of the vehicle, while Majd Ziada stayed to wait for them in the vehicle for extracting them at the end of the execution of the attack.

[Stamp] P 5: 199 [continued]

Prosecution Case 444/02 Amended

9. About a quarter of an hour later, a white Volkswagen Passat vehicle, license No. 7741115, which was being driven by Samir Karash, arrived at the site.

10. Louis Mansi and Rafat Salah fired bursts at the driver of the vehicle from the weapons, which the Defendant had provided to them for that purpose, with the intent of causing the death of the above mentioned driver of the Volkswagen vehicle.

11. As a result of the gunfire, Samir Karash was injured in his shoulder, sustaining a fracture to his proximal left humerus with crushing and metal fragments along the trajectory of the bullet, and was in need of hospitalization and surgery. In addition, three of the rounds that were discharged by Louis Mansi and Rafat Salah hit the said vehicle and caused it damage.

12. After completing the execution of the attack, Louis Mansi and Rafat Salah returned to the vehicle of Majd Ziada and the three fled from the attack site to Ramallah.

13. Thereafter, Louis Mansi called the Defendant and reported the successful execution of the attack to him.

[Stamp] P 5: 199 [continued]

Prosecution Case 444/02 Amended

**Forty fourth count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in early 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met Nizar Shahin, the bodyguard of Jibril Rajoub, the Head of the Preventive Security of the Palestinian Authority in the Area. Nizar Shahin informed the Defendant that he wanted to carry out a shooting attack against IDF soldiers who were at the Surda checkpoint and to cause their death. The Defendant provided Nizar Shahin with two pistols, a short barreled M-16 assault rifle with telescopic sights and a box of cartridges for the purpose of carrying out the said attack.

A short time later, a shooting attack was carried out at the Surda checkpoint during the course of which an IDF soldier was killed. The Defendant hastened to contact Nizar Shahin, but the latter said that he was not the one who had carried out the said attack. Thereafter, Nizar Shahin returned the weapons to the Defendant, which he had delivered to him earlier for the purpose of carrying out the said attack.

**Forty fifth count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in March 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea

[Stamp] P 5: 200

Prosecution Case 444/02 Amended

lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, conversed by telephone with Mahmoud Altiti, a senior operative in the "Al Aqsa Martyrs Brigades", the military arm of the "Tanzim" of the Fatah, which is an illegal organization.

Mahmoud Altiti told the Defendant that he had a suicide terrorist who was prepared to carry out a suicide attack inside the State of Israel. The Defendant consented to dispatching the suicide terrorist into the territory of the State of Israel in order for him to cause the death of as many Israeli civilians as possible.

On the following day, a person called Faiz from Nablus came to the Defendant. Faiz informed the Defendant that he had been sent by Mahmoud Altiti for the purpose of carrying out a suicide attack inside of Israel.

The Defendant talked to Faiz and discovered that Faiz was a poor marksman. Following this, the Defendant contacted Mahmoud Altiti again. The Defendant told Mahmoud Altiti that Faiz could carry out the suicide attack using an explosive belt that he would wear on his body. Mahmoud Altiti agreed to the suggestion of the Defendant and promised to have an explosive belt sent to the Defendant for the purpose of carrying out a planned suicide attack.

According to the instruction of the Defendant, Tarek Malhi A-Nuf purchased new clothes for Faiz and thereafter accompanied Faiz to an apartment in down tom Ramallah, in which Tarek A-Nuf, Zidan Ramadan and the Defendant lived (hereinafter: the Apartment).

The planned attack did not take place in view of the fact that the explosive devices were not sent to the Defendant and because Faiz was arrested by the Israeli security forces.

After the arrest of Faiz, the Defendant talked to the above mentioned Nasser Aweis about what had happened. Nasser Aweis promised to the Defendant to send him additional suicide terrorists in order for the Defendant to dispatch them into the territory of the State of Israel for the purpose of carrying out suicide attacks. Nasser Aweis did not have time to send additional suicide terrorist to the Defendant, because both the Defendant and Nasser Aweis were arrested by IDF forces during Operation "Defensive Shield".

[Stamp] P 5: 200 [continued]

Prosecution Case 444/02 Amended

**Forty sixth count:**

**Nature of the offense:** Attempt to manufacture an explosive object, an offense pursuant to Section 53(A) (3) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in mid-March 2002 or thereabouts, manufactured a firearm, ammunition[,] a bomb, a hand grenade, an explosive or incendiary object, without holding a permit certificate which was issued to him by or on behalf of a military commander, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah, met Louis Mohamed Mohamed Ouda, who asked the Defendant for money for military activity. In response to this, the Defendant transferred to Louis Ouda the amount of NIS 8,000, which Ali Faraj Barghouti received.

Louis Ouda, with Sharif Mohamed Yusef Naji (Abu-Hamid) purchased with the above mentioned money various chemicals.

Abed Karim Rateb Younes Aweis manufactured a large explosive device using the above mentioned chemicals.

**Forty seventh count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in March 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, delivered to Abed Karim Rateb Younes Aweis, the Head of the "Al Aqsa Martyrs' Brigades" – the military arm of the "Tanzim" of the Fatah in the Jenin area, who was then staying in Ramallah, a "14" pistol, without a permit signed by or on behalf of the commander of the Area.

[Stamp] P 5: 201

Prosecution Case 444/02 Amended

**Forty eighth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in March 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, purchased from Nasser (Halum) Mohamed Yusef Naji (Abu-Hamid) a long-barreled M-16 assault rifle for 4,000 Jordanian dinars, without a permit signed by or on behalf of the commander of the Area.

**Forty ninth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in the first half of 2001 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met Ashraf Khader Ali Jaber (Yasini) and received from the latter 1,500 cartridges for M-16 assault rifles. The Defendant paid the above mentioned Ashraf Jaber NIS 3,000 for the above mentioned cartridges. The Defendant carried out that which has been attributed to him in this count of the indictment at the instruction of Marwan Barghouti, the head of the "Tanzim" of the Fatah in the Area.

[Stamp] P 5: 201 [continued]

Prosecution Case 444/02 Amended

**Fiftieth count:**

**Nature of the offense**: Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, in May 2001 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, at the request of Ashraf Khader Ali Jaber, delivered to the latter a Kalashnikov assault rifle with a magazine and 28 cartridges. The Defendant carried out that which has been attributed to him in this count of the indictment after having received approval to do so from Marwan Barghouti, the head of the "Tanzim" of the Fatah in the Area.

Ashraf Jaber participated in a procession in Ramallah while holding the above mentioned Kalashnikov assault rifle in the air. Thereafter, Ashraf Jaber, at the instruction of the Defendant, transferred the above mentioned Kalashnikov assault rifle to Ziad Abu Ain.

**Fifty first count:**

**Nature of the offense**: Giving shelter, an offense pursuant to Section 57 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense**: The above mentioned Defendant, in the Area, in late 2001 or thereabouts, assisted or gave shelter to an unspecific person who had committed an offense against the security legislation or had been or was involved in any activity which was intended to harm the public welfare, the welfare of the Israel Defense Forces troops and soldiers and the maintenance of public order or concerning whom there are reasonable grounds to suspect that he did so, whether by giving information, shelter, food, beverages, money, clothing, weapons, ammunition, supplies, animal fodder, means of transport, petroleum or fuel of any type and kind whatsoever, or in any other way, as follows:

The above mentioned Defendant, at the time set forth, with Marwan Barghouti, transferred Bilal Yaakub Ahmed Barghouti and Abdullah Barghouti from the prison of the Preventive Security of

[Stamp] P 5: 202

Prosecution Case 444/02 Amended

the Palestinian Authority in Bitunia to an apartment, which the Defendant had rented in downtown Ramallah.

The above mentioned Bilal Barghouti and Abdullah Barghouti are senior operatives of the Hamas Organization, which is an illegal organization, and are responsible for carrying out a number of attacks against Israeli civilians, including the bombing attack at the "Sbarro" Restaurant in Jerusalem on August 9, 2001. The Defendant and Marwan Barghouti provided lodging to Bilal Barghouti and Abdullah Barghouti in the above mentioned apartment for several days.

Before Bilal Barghouti and Abdullah left the above mentioned apartment of the Defendant, the Defendant provided each of them a "14" pistol.

**Fifty second count**:

**Nature of the offense**: Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense**: The above Defendant, in the Area, in late 2001 – early 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, talked by telephone with Nasser Mahmoud Aweis, a senior military operative in the "Tanzim" of the Fatah, which is an illegal organization, in Nablus. Nasser Aweis told the Defendant that he needed 1,000 cartridges for M-16 assault rifles. The Defendant promised to bring to Nasser Aweis the requested cartridges. After a few days, a person came on behalf of Nasser Aweis to the Defendant. The Defendant delivered to the later 1,000 cartridges for M-16 assault rifles in order for him to transfer them to Nablus, to Nasser Aweis. In exchange for the above mentioned 1,000 cartridges, Nasser Aweis transferred to the bank account of the Defendant the amount of NIS 3,000.

[Stamp] P 5: 202 [continued]

Prosecution Case 444/02 Amended