PLAINTIFF'S
EXHIBIT
3 S?

| Israel | Defense | | Forces |
|---|---|---|---|
| Before the Military Court | | Court Case: | 3459/02 |
| In Beit El | | Prosecution case: | 444/02 |
| Before a panel | | Detailed incident case: | 1282/02 Binyamin |

Israel
Before the Military Court
In Beit El
Before a panel

Defense                                             Forces

Court Case:  3459/02
Prosecution case:  444/02
Detailed incident case:  1282/02 Binyamin
1283/02 Binyamin
1284/02 Binyamin
1285/02 Binyamin
234/01 Jerusalem Special
   Duties Department
457/01 Binyamin
2159/01 Binyamin
7915/01 Zion
481/01 Zion
8379/01 Zion
39/02 Binyamin
502/02 Zion
483/02 Shafat
4258/02 Yarkon
568/02 Shafat
783/02 Binyamin

[Stamp]  This indictment was received _____
on date: October 1, 2002
and entered into the log in case _____
by the court [Signature]

**In the trial between the military prosecutor – The Prosecutor**

- v. -

Ahmed Taleb Moustafa Barghouti (alias: "Al Faransi")
Identity No. 994466860, born on March 15, 1976, a resident of Albira – Ramallah
detained since April 15, 2002

**- The Defendant -**

**Amended Indictment**

**The above mentioned Defendant is accused hereby of committing the following offenses:**

**First count:**

**Nature of the offense:** Membership in an illegal organization, an offense pursuant to Regulations 84 (1) (A) and 85 (1) (A) of the Defense Regulations (Time of Emergency), 1945.

[Stamp] P 5: 175

Prosecution Case 444/02 Amended

1

**Details of the offense**: The above mentioned Defendant, in the Area, from late 2000 until the day of his arrest, was a member or acted as a member of an illegal organization, as follows:

The above mentioned Defendant, from early 2006 until the day of his arrest, acted as the driver and bodyguard of ███████████

The above mentioned Defendant, from early 2001 until the day of his arrest, operated within the framework of the "Tanzim" of the Fatah, which is an illegal organization, and conducted military activity against Israeli targets.

During the course of his military activity, the Defendant regularly received financial assistance from operatives of the "Tanzim" of the Fatah. The Defendant received through his bank account an amount of approximately NIS 7,000 from ████████████████ from the Nablus area, and an amount of approximately NIS 10,000 from ███████ in the Ramallah area.

[Stamp] P 5: 175 [continued]

Prosecution Case 444/02 Amended

2

During his military activity, the Defendant was in constant contact with the military arm of the "Tanzim" of the Fatah in Nablus – ███ in the Tul-Karm Area – ███ " in the Jenin area – ' 'n the Bethlehem and Hebron area ' in the Area – ███ (█████), and with ███

Within the framework of his above mentioned military activity, the Defendant distributed in Ramallah leaflets on taking the responsibility for attacks that were carried out in Israel and in the Area by operatives of the "Tanzim" of the Fatah.

**Second count:** Holding an office in an illegal organization, an offense under Regulations 84(1) (A) and 85(1) (B) of the Defense Regulations (Time of Emergency), 1945.

**Details of the offense:** The above mentioned Defendant, in the Area, from 2001 until the day of his arrest, managed or helped in the management of an illegal organization, or held any office or position in or under the authority of an illegal organization, as follows:

The above mentioned Defendant, during the period set forth, was one of the persons responsible for the "Al Aqsa Martyrs Brigades" Organization (Kataib Shuhada al-Aqsa) in the Ramallah area – the military arm of the "Tanzim" of the Fatah, which is an illegal organization. "The Al Aqsa Martyrs Brigades" were responsible for the commission of a large number of attacks against IDF soldiers and Israeli civilians both in the Area and within the territory of the State of Israel, in which a large number of Israeli civilians and IDF soldiers were killed.

Among other things, the Defendant served as the contact person between the other regional coordinators of the "Al Aqsa Martyrs Brigades" and



**Third count:**

**Nature of the offense:** Execution of a service for an illegal organization, an offense pursuant to Regulations 84(1) (A) and 85(1) (C) of the Defense Regulations (Time of Emergency), 1945.

[Stamp] P 5: 176

Prosecution Case 444/02 Amended

**Details of the offense:** The above mentioned Defendant, in the Area, during the period set forth in the first count of the indictment or thereabouts, performed some work or executed some service for an illegal organization, as follows:

The above mentioned Defendant, during the period set forth, in Ramallah or thereabouts, on a large number of different opportunities, distributed money to military operatives of the "Tanzim" of the Fatah. The Defendant frequently received money from the operative of the "Tanzim" of the Fatah ▇▇▇▇▇▇▇ and distributed it to many people who carried out attacks against IDF soldiers and Israeli civilians. On each opportunity, the Defendant provided to each of the operatives various amounts of money, from 100 to 300 U.S. dollars. In addition, the Defendant regularly transferred larger amounts to military operatives in the "Tanzim" of the Fatah through bank transfers.

Among other things, the Defendant transferred to ▇▇▇▇▇▇▇▇▇▇ in Tul-Karm, who is deputy of ▇▇▇▇▇▇▇ in Tul-Karm, which is the military arm of the "Tanzim" of the Fatah, the amount of NIS 3,000.

In addition, the Defendant transferred to ▇▇▇▇▇▇▇▇▇▇ (▇▇▇▇▇▇, who is the ▇▇▇▇▇ amounts from NIS 1,000 to 2,000 on approximately 6-7 different occasions, for the purpose of purchasing cartridges.

In addition to money, the Defendant regularly provided military operatives of the "Tanzim" of the Fatah cellular telephone handsets for the purpose of their military activity.

[Stamp] P 5: 176 [continued]

Prosecution Case 444/02 Amended



### Fourth count:

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in 1998 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in the Amari Refugee Camp or thereabouts, purchased from ▮▮▮▮▮▮▮ an MP-5 submachine gun for 4,000 Jordanian dinars and a short barreled M-16 assault rifle with telescopic sights in exchange for 5,000 Jordanian dinars, without a permit signed by or on behalf of the commander of the Area. The above mentioned Defendant, during the years 2001-2002, regularly delivered the above mentioned MP-5 submachine gun to various persons for them to use it to carry out shooting attacks against Israeli civilians, as will be described further in the indictment.

### Fifth count:

**Nature of the offense:** Possession of a firearm, an offense pursuant to Section 53(A) (1) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, during the period set forth in the first count of the indictment, possessed a firearm, ammunition, bomb, hand grenade or explosive or incendiary device, a tool or object or thing that is planned to cause or is capable of causing death or severe injury, without a permit certificate granted by or for a military commander, as follows:

The above mentioned Defendant, during the period set forth, in Ramallah or thereabouts, kept in his possession an MP-5 submachine gun, a pistol and a short barreled M-16 assault rifle with telescopic sights, without a permit certificate granted by or for a military commander.

### Sixth count:

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

[Stamp] P 5: 177



Prosecution Case 444/02 Amended

5

**Details of the offense:** The above mentioned Defendant, in the Area, in late 2000 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, at the time set forth, [Translator's note: as written] in Ramallah or thereabouts. delivered to ████████████████ (████████ — ████, a Kalashnikov assault rifle and 50 cartridges for a Kalashnikov assault rifle, without a permit signed by or on behalf of the commander of the Area. ████████████delivered the above mentioned Kalashnikov assault rifle and the above mentioned cartridges to ████████████ ████████reported to ████████████that he had carried out a shooting attack using the above mentioned Kalashnikov assault rifle in which the late Kahane couple were killed, and carried out a shooting attack in which an Israeli civilian was killed, using the above mentioned cartridges.

**Seventh count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, from late 2000 until the day of his arrest or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, during the period set forth, in Ramallah or thereabouts. on many different occasions. delivered to ████████████ (████████, large amounts of money totaling some tens of thousands of shekels and tens of thousands of U.S. dollars for the purpose of purchasing arms and cartridges for carrying out shooting attacks against IDF soldiers and Israeli civilians. The Defendant also regularly kept at home cartridges that had been purchased with this money and deliver them to ████████████and the latter's colleagues as necessary, without a permit signed by or on behalf of the commander of the Area.

[Stamp] P 5: 177 [continued]

Prosecution Case 444/02 Amended

**Eighth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, from late 2001 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth. in Ramallah or thereabouts. delivered to ▆▆▆▆▆▆▆▆▆▆▆▆   ▆▆▆▆▆ 100 cartridges for an M-16 assault rifle, without a permit signed by or on behalf of the commander of the Area.

**Ninth count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in early 2001 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, purchased a stolen white Mazda vehicle, a recent model. The above mentioned Defendant delivered the above mentioned vehicle to ▆▆▆▆▆▆▆▆▆▆ who departed in the above mentioned vehicle to execute attacks against Israeli civilians and IDF soldiers in the Area.

**Tenth count: (Detailed Incident 234/01 Jerusalem Special Duties Department)**

[Stamp] P 5: 178



**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 25, 2001 or thereabouts, caused the intentional death of another person, as follows:

1. The above mentioned Defendant, at the time set forth, met in Ramallah ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ (alias ▮▮▮▮▮▮) and ▮▮▮▮▮▮▮▮▮▮▮

2. ▮▮▮▮▮▮and ▮▮▮▮▮▮▮▮▮ asked the Defendant for a vehicle for the purpose of carrying out a shooting attack against Jews. The Defendant provided ▮▮▮▮▮ and ▮▮▮▮▮▮▮ a stolen silver Volkswagen Bora vehicle, bearing Israeli license plates, in order for his above mentioned colleagues to carry out a shooting attack from this vehicle with the intent of causing the death of Israeli civilians.

3. ▮▮▮▮▮▮▮▮▮ drove the Volkswagen vehicle while ▮▮▮▮▮ sat next to him armed with a "16" pistol.

4. ▮▮▮▮▮▮and ▮▮▮▮▮▮▮ traveled in the Volkswagen vehicle in the Atarot area in order to search for an Israeli vehicle with the aim of carrying out a shooting attack against it and causing the death of the vehicle occupants.

5. At about 6:15 p.m., in the Atarot Industrial Zone, ▮▮▮▮▮ and ▮▮▮▮▮▮▮ noticed a GMC Safari vehicle, license No. 7901306 (hereinafter: "the Vehicle"), which the late Elazar Akiva Fashkos drove.

6. ▮▮▮▮▮and ▮▮▮▮▮▮▮ started to drive after the Vehicle. The Defendant and ▮▮▮▮▮▮▮▮ followed the Vehicle from the Atarot Industrial Zone to A-Ram Junction and back.

7. When the vehicle returned to the Atarot Industrial Zone and drove on the main road, ▮▮▮ ▮▮▮and ▮▮▮▮▮▮▮ drove the Volkswagen vehicle near the Vehicle.

[Stamp] P 5: 178 [continued]

Prosecution Case 444/02 Amended

8.   At this stage, ███████ opened the window and fired with the above mentioned "16" pistol approximately 7 rounds at the Vehicle with the intent of causing the death of the driver of the Vehicle. A number of bullets that were fired by ███████ hit the Vehicle, one of which hit the late Elazar Akiva Fashkos, who was driving the vehicle in the neck and another hit him in the chest.

9.   Once ███████ and ████████████ saw that the vehicle had stopped, the two escaped in the Volkswagen vehicle to Ramallah.

[Stamp] P 5: 178 [continued]

Prosecution Case 444/02 Amended

10. In Ramallah, ███████ and ███████████ returned the Volkswagen vehicle to the Defendant and reported to him on the attack that they had carried out.

11. A day later, the Defendant delivered to ███████ approximately 300 U.S. dollars for carrying out the above mentioned attack. The Defendant received the above mentioned money from ███████.

12. By his acts described above, the above mentioned Defendant caused the intentional death of the late Elazar Akiva Fashkos, who died as a result of the impact of the bullets that were fired by ███████ as described above.

**Eleventh count: (Detailed Incident 457/01 Binyamin)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on February 25, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

1. The above mentioned Defendant, at the time set forth, met in Ramallah ███████ ███████, ██████████████████████ ("███████") and ███████ (███).

2. The Defendant and his above mentioned colleagues discussed the situation in the Area. The Defendant and his above mentioned colleagues contended that there was no activity against Israeli targets. The Defendant asked his above mentioned colleagues what could be done to improve the situation. The above mentioned colleagues of the Defendant asked the Defendant to provide them a vehicle and weapons and they would carry out an attack against Israeli civilians with the aim of causing their death.

3. The Defendant consented to the above mentioned proposal. The Defendant delivered to his above mentioned friends his vehicle, a gray Volkswagen Bora, 2001 model, bearing Israeli license plates, and an MP-5 submachine gun with a magazine and cartridges.

4. ███████████████████ (alias: ███████) and ███████ (███) traveled in the vehicle of the Defendant, armed with the above mentioned MP-5

[Stamp] P 5: 179

Prosecution Case 444/02 Amended

10



submachine gun, which they had received from the Defendant. The above mentioned colleagues of the Defendant reached the Atara Bridge area.

5.    At about 1:15 p.m., the above mentioned colleagues of the Defendant noticed a GMC Vandura vehicle, license No. 3082518, which Yosef Cohen was driving, this vehicle departing from the settlement Ateret and turning towards the Atara Bridge.

6.    The above mentioned colleagues of the Defendant decided to carry out a shooting attack against the above mentioned GMC vehicle with the intent of causing the death of its occupants.

7.    The above mentioned colleagues of the Defendant decided to wait until the Citroen vehicle that was driving in front of them would overtake the GMC vehicle and then [they themselves would] overtake the GMC vehicle and carry out the planned shooting attack against it.

8.    In the above mentioned Citroen vehicle, ████████████████ (████), ████████ (████) and ████████████████ (████), were traveling, armed with 2 Kalashnikov assault rifles and an M-16 assault rifle. The above mentioned occupants of the Citroen vehicle opened fire using the weapons above at the above mentioned GMC vehicle with the intent of causing the death of its occupants. 29 bullets that were fired by these persons hit the above mentioned GMC vehicle. Three bullets hit the head and neck of Yosef Cohen, who was driving the above mentioned GMC vehicle. As a result of the impact of these bullets and the impact of fragments throughout his body, Yosef Cohen was severely injured.

9.    After the above mentioned colleagues of the Defendant noticed that the GMC vehicle was hit, that it had swerved off the road and the driver of the vehicle was injured as a result of the shooting attack that was carried out from the Citroen vehicle that was driving before them, the colleagues of the Defendant escaped back to Ramallah.

10.    In Ramallah, the above mentioned colleagues of the Defendant returned the above mentioned Volkswagen vehicle and the above mentioned MP-5 submachine gun back to the Defendant. ████████████ ████████ (████) and ████ (alias: "████████") reported to the Defendant that they had carried out a shooting attack using the above mentioned vehicle and weapons and that a Jewish driver had been wounded as a result.

[Stamp] P 5: 179 [continued]



Prosecution Case 444/02 Amended

11

**Twelfth count:**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in June 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

█████████████████████████ together with █████████████████████ ████, ████████ and ████████████, at the time set forth, decided to carry out a shooting attack against the settlement of Psagot with the aim of causing the death of Israeli civilians.

The above mentioned persons approached the office of ████████████████ ████████████. The above mentioned persons met ████████ and asked the latter for weapons for carrying out a shooting attack against Israeli civilians in the settlement of Psagot. ████████ was happy to hear this plan to carry out a shooting attack at the settlement of Psagot and promised to supply weapons for carrying out the planned shooting attack.

After about a week, ████████ and his above mentioned colleagues approached the office of ████████████ in Ramallah again. ████████ was not in his office at that time and the Defendant was the one who talked with. ████████ and his above mentioned colleagues. The Defendant promised to talk to ████████ concerning the request of his above mentioned colleagues to receive weapons for the purpose of carrying out a shooting attack against the settlement of Psagot.

After about three days, ████████ and his above mentioned colleagues approached the office of ████████ in Ramallah again. These persons again asked ████████████ for weapons for carrying out a shooting attack against the settlement of Psagot. ████████ called ████████████ It was agreed that ████████████ would meet the above mentioned persons in Manara Square in Ramallah and would to deliver them weapons there for the purpose of carrying out the planned shooting attack.

[Stamp] P 5: 180

Prosecution Case 444/02 Amended



███████████ and his above mentioned colleagues met on that day, in Manara Square in Ramallah, ███████████████ During the said meeting, ███████████████ promised to transfer weapons to them for the purpose of carrying out the planned shooting attack.

That night, the Defendant arrived at the home of ██████████ in Al-Bira and delivered to ████████ an MP-5 submachine gun and cartridges for the purpose of carrying out a shooting attack against Israeli civilians.

After about an hour, ███████████ departed from his home along with ████████████████ in the vehicle of ████████████, while in possession of the above mentioned MP-5 submachine gun. ██████████ and ███████████ arrived at a site near the settlement of Psagot. There the two got out of the vehicle. ███████████████ fired all of the cartridges that the Defendant had delivered with the above mentioned MP-5 submachine gun at the settlement of Psagot with the aim of causing the death of the residents of the settlement of Psagot and of IDF soldiers who were in the settlement of Psagot.

Immediately after the shooting, ███████████ and ██████████████ returned in their above mentioned vehicle to Ramallah.

## Thirteenth count:

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on June 26, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, in June 2001 or thereabouts, in Ramallah, in the circumstances described in the previous count of the indictment, delivered to ███████████████ an MP-5 submachine gun for the purpose of carrying out shooting attacks against Israeli civilians and IDF soldiers.

███████████████, at the time set forth, with ████████████████████ and ████ departed from Ramallah towards the road leading from Pisgat Ze'ev to the [neighborhood of French Hill] in Jerusalem, in order to carry out a shooting attack there and cause the intentional death of Israeli civilians. ██████████ and his above mentioned colleagues departed as set forth armed with an

[Stamp] P 5: 180 [continued]

Prosecution Case 444/02 Amended



13

MP-5 rifle [Translator's note: as written], which had been delivered to them for this purpose by the Defendant as set forth above, and with a "9" pistol. ███████████ and his colleagues departed to execute the said attack while possessing a drawing of the [neighborhood of] French Hill, which had been made out by ████████████████ where they had planned to carry out the shooting attack.

████████████ and his above mentioned colleagues departed to execute the said attack in arrangement with █████████████ and also asked the latter to inform ████████ ████████ the head of the "Tanzim" of the Fatah, whether any of the perpetrators of the attack would be killed during the execution of the said shooting attack. ████████ and his colleagues were unable to reach the place at which they had planned to carry out the shooting attack due to the large presence of IDF forces in the Hizma area.

[Stamp] P 5: 180 [continued]



**Fourteenth count:** (Detailed Incident 2159/01 Binyamin)

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on August 25, 2001 or thereabouts, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, in August 2001, in Ramallah or thereabouts, met ██████████████ (alias ████████). ███████████████ (alias: ████████) informed the Defendant that ██████████████ ███████████████ asked to ███████████████████████████████ The Defendant permitted ███████████ to joint in the said activity.

2.  ██████████████ met the above mentioned "Tanzim" operatives, who were ██████████ ███████████████████████ (alias ████████) and ██████ The above mentioned three persons told ███████████████ The three asked ███████████████

3.  On August 25, 2001, ██████████████ and ██████████ approached ██████████ and asked ██████

4.  On that day, ██████████████ approached the Defendant ██████████████ asked the Defendant for ██████s. A short time later, on that day, the Defendant delivered to ███████████ ██████████████ an MP-5 submachine gun with a magazine filled with cartridges, in order for ██████████████ and his above mentioned colleagues to use it to carry out a shooting attack and cause the death of Israeli civilians.

[Stamp] P 5: 181



Prosecution Case 444/02 Amended

15

5.  In the evening hours, on the same day, in Ramallah or thereabouts, ████████
    delivered the above mentioned MP-5 submachine gun and ammunition to ████████
    and ████████████ who arrived in an Isuzu pickup vehicle belonging to ████ in order
    for ████ and ████ to use the above mentioned weapon to carry out a shooting attack
    and cause the death of Israeli civilians.

6.  Immediately after receiving the weapon, ████████    ████████    ████
    ████████ and ████████ departed from Ramallah towards Highway 443 with the
    aim of carrying out the planned shooting attack there. The above mentioned persons
    traveled in two vehicles – one was an Isuzu pickup belonging to ████████ and the
    other was a stolen Subaru vehicle that ████████ had brought for the purpose of carrying
    out the planned attack.

7.  Upon reaching Highway 443, ████████ continued to travel alone in the Isuzu
    vehicle, about a kilometer before the Subaru vehicle in which ████████ and ████
    ████ were traveling, in order to inform his above mentioned colleagues of IDF and
    police checkpoints on the way.

8.  All of these individuals traveled on Highway 443 towards Tel Aviv, ████ driving the
    Subaru vehicle, while ████████ armed with a Kalashnikov assault rifle, sat next
    to him, while ████████ armed with an MP-5 submachine gun, which the
    Defendant had delivered to him, sat in the rear seat.

9.  On that day, August 25, 2001, at about 10:30 p.m., next to the Dor Energy gas station, the
    occupants of the above mentioned Subaru vehicle noticed a Volkswagen Passat vehicle,
    License No. 6902818, in which the late Yaniv and Sharon Ben Sharon with their children
    and the late Doron Yosef Savari were traveling.

10. ████████ who was driving the Subaru vehicle, overtook the above mentioned
    Volkswagen vehicle and drove parallel to it. At this stage, ████████ ad ████
    ████ discharged automatic gunfire using the MP-5 submachine gun, which the
    Defendant had provided, and the Kalashnikov assault rifle, at the above mentioned
    Volkswagen vehicle with the aim of causing the death of its occupants.

11. A large number of bullets that were fired by ████████ and ████████ hit
    the Volkswagen vehicle and its occupants.

[Stamp] P 5: 181 [continued]

Prosecution Case 444/02 Amended



12. After the occupants of the Subaru vehicle noticed that the Volkswagen vehicle was zigzagging, they sped up and escaped to the village Beit Likia. There, █████ waited for them. █████ █████████ and █████████ boarded █████'s Isuzu vehicle and traveled to the village Beit Sira, where they hid the weapons near █████'s house. Thereafter, █████████ █████████ █████ and █████ returned to Ramallah in █████████'s vehicle.

13. Immediately after they returned to Ramallah, █████████ met in Ein Um Sharait █████████ who reported to █████ the attack that had been carried out with the weapon that had been delivered for this purpose by the Defendant.

14. A few days later, █████████ brought the above mentioned MP-5 submachine gun from Beit Sira and returned it to █████ █████████ transferred the above mentioned weapon to the Defendant and reported to the latter the shooting attack that had been carried out with this weapon.

15. The Defendant transferred to the perpetrators of the attack a sum of 500 U.S. dollars for executing this attack. The above mentioned Defendant received this money from █████████

[Stamp] P 5: 181 [continued]



Prosecution Case 444/02 Amended

17

16.  The above mentioned Defendant, by his acts described above, caused the intentional death of the late Yaniv Ben Shalom, who died of gunshot wounds to his head and back, from bullets that were fired from the MP-5 submachine gun described above, and from a Kalashnikov assault rifle by ▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓

**Fifteenth count: (Detailed Incident 2159/01 Binyamin)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on August 25, 2001 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, on the date set forth, at the place set forth in the fourteenth count of the indictment, by his acts described in the fourteenth count of the indictment, caused the intentional death of the late Sharon Ben Shalom, who died of gunshot wounds to her head and back, from bullets that were fired from an MP-5 submachine gun, which the Defendant delivered as described in the fourteenth count of the indictment, and from a Kalashnikov assault rifle.

**Sixteenth count: (Detailed Incident 2159/01 Binyamin)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on August 25, 2001 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, on the date set forth, at the place set forth in the fourteenth count of the indictment, by his acts described in the fourteenth count of the indictment, caused the intentional death of the late Doron Yosef Savari, who died of gunshot wounds, from bullets that were fired from an MP-5 submachine gun, which the Defendant delivered as described in the fourteenth count of the indictment, and from a Kalashnikov assault rifle.

[Stamp] P 5: 182

Prosecution Case 444/02 Amended

18



**Seventeenth count: (Detailed Incident 2159/01 Binyamin)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on August 25, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, on the date set forth, at the place set forth in the fourteenth count of the indictment, by his acts described in the fourteenth count of the indictment, attempted to cause the intentional death of the occupants of the Volkswagen Passat vehicle stated in the fourteenth count of the indictment. As a result of the gunfire set forth in the fourteenth count of the indictment from an MP-5 submachine gun, which the Defendant delivered as described in the fourteenth count of the indictment, and from a Kalashnikov assault rifle, the daughter of the late Ben Shalom couple was slightly injured by fragments in her leg.

[Stamp] P 5: 182 [continued]



Prosecution Case 444/02 Amended

19

**Eighteenth count:**

· **Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in September 2001 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

████████████████ (█████████) ─█                              ─ the military arm of the "Tanzim" of the Fatah in the Area, █████████████ and ████████ ████████ approached the above mentioned Defendant, at the time set forth, in Ramallah or thereabouts. The above mentioned persons told the Defendant that they had manufactured a mortar and had also purchased a mortar bomb for NIS 1,500. The above mentioned persons asked the Defendant to give them money, which they had paid for the above mentioned mortar bomb. The above mentioned persons said that they intended to fire the above mentioned mortar bomb towards the settlement of Psagot.

The Defendant asserted to these persons that if they would be able to fire the above mentioned mortar bomb at the settlement of Psagot, he would pay them the money for the bomb.

Later, that night, the above mentioned persons returned to the Defendant and informed him that they had fired the above mentioned mortar bomb towards the settlement of Psagot. The above mentioned persons informed the Defendant that they did not know exactly where the mortar bomb that they had fired impacted. In view of that which has been set forth above, the Defendant refused to pay the above mentioned persons money for the above mentioned mortar bomb.

Later, the Defendant reported the firing of the mortar bomb at the settlement of Psagot by the above mentioned persons to ████████████ ·

**Nineteenth count: (Detailed Incident 7915/01 Zion)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security

[Stamp] P 5: 183

Prosecution Case 444/02 Amended

20



Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on September 15, 2001 or thereabouts, caused the intentional death of another person, as follows:

1.  ▮▮▮▮▮▮▮▮▮▮▮▮ (alias ▮▮▮▮▮▮▮, approached the above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, and stated that ▮▮▮▮▮▮▮ (alias ▮▮▮▮▮▮ had approached him with another person and asked to receive an MP-5 submachine gun in order to use it to carry out a shooting attack with the aim of causing the death of Israeli civilians. ▮▮▮▮▮▮▮ asked the Defendant to deliver the MP-5 submachine gun to him, after he had already delivered it to ▮▮▮▮▮▮ previously for carrying out shooting attacks.

2.  The Defendant consented to provide the requested weapon for the purpose of carrying out the planned shooting attack.

3.  The Defendant referred ▮▮▮▮▮▮▮ to ▮▮▮▮▮▮▮ for receiving the above mentioned MP-5 submachine gun. ▮▮▮▮▮▮▮ contacted ▮▮▮▮▮▮ and received from the latter the MP-5 submachine gun of the Defendant. In addition, the Defendant provided ▮▮▮▮▮▮▮ a "14" pistol for carrying out the planned shooting attack.

4.  Later that day, ▮▮▮▮▮▮▮ delivered the above mentioned MP-5 submachine gun to ▮▮▮▮▮▮ with the aim of the latter using it to carry out a shooting attack and cause the death of Israeli civilians.

5.  Later that day, ▮▮▮▮▮▮▮▮ met ▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ (alias "▮▮▮▮▮▮"), ▮▮▮▮▮▮▮ arrived to this meeting armed with an MP-5 submachine gun and a "14" pistol, which the Defendant had supplied to him as set forth above for the purpose of carrying out a shooting attack.

6.  At about 10:00 p.m., on September 15, 2001, the above mentioned Defendants traveled from Ramallah to Jerusalem in ▮▮▮▮▮▮ 's Isuzu pickup vehicle.

[Stamp] P 5: 183 [continued]



Prosecution Case 444/02 Amended

21

7.　████████████ drove the above mentioned Isuzu vehicle and traveled with ████████ ████████ and his colleagues in order to show them a place where they would carry out the planned shooting attack and in order to show his colleagues how to escape after carrying out the attack set forth. ████████████ transported his colleagues to Highway No. 9, connecting the Ramot neighborhood to the [neighborhood of] French Hill neighborhood in Jerusalem. ████████████ showed his colleagues where to carry out

[Stamp] P 5: 183 [continued]

Prosecution Case 444/02 Amended

22

the planned attack and how to escape thereafter. At the end of the said visit, the above
mentioned gang returned to Ramallah.

8.    At about 10:30 p.m. that day, ▮▮▮▮▮▮▮▮ along with ▮▮▮▮▮▮▮▮ and
      ▮▮▮▮▮▮▮▮ traveled in a stolen gray vehicle with Israeli license plates, which
      ▮▮▮ had supplied to them for carrying out the planned attack (hereinafter: the Vehicle).
      ▮▮▮▮▮▮▮▮ drove in front of them, in the above mentioned Isuzu vehicle, in order to
      inform his colleagues by cellular telephone of police and IDF checkpoints.

9.    ▮▮▮▮▮▮▮▮ drove the above mentioned Vehicle, next to him sat ▮▮▮▮▮
      ▮▮▮▮ who was armed with a "14" pistol, which the Defendant had also supplied.

10.   The above mentioned gang stopped on Highway No. 9 near a junction leading to the
      Ramat Shlomo neighborhood and waited for a single Israeli vehicle to arrive at the site
      with the aim of carrying out a shooting attack against it and causing the death of the
      occupants of the vehicle.

11.   After a few minutes, at about 11:10 p.m., a white Renault express vehicle, license No.
      2273706 (hereinafter: the Renault), arrived at the site from the direction of the Ramat
      Shlomo nationhood and turned to Highway No. 9 towards the Ramot neighborhood.

12.   ▮▮▮▮▮▮▮▮ started to drive after the Renault and overtook it.

13.   When the Vehicle was driving parallel to the Renault, ▮▮▮▮▮▮ and ▮▮▮▮
      ▮▮▮▮ opened fire using an MP-5 submachine gun and "14" pistol, which the
      Defendant had supplied to them, against the occupants of the Renault with the aim of
      causing their death.

14.   A number of bullets that were fired by ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ hit the
      Renault and the two occupants of the Renault – the late Moshe Weiss and Meir
      Weisshaus. Thereafter, ▮▮▮▮▮▮▮▮ continued to travel towards the neighborhood
      of Ramot and near a site at which a new bridge was being built, turned right to a dirt track
      leading to Bir Nabala.

[Stamp] P 5: 184

Prosecution Case 444/02 Amended

15.   Before entering Bir Nabala, ███████████ and his colleagues, who were with him in the Vehicle, met ███████ who was waiting for them at the site in the Isuzu vehicle. From them, they all continued to travel together to Bir Nabala and thereafter escaped to Ramallah.

16.   By his acts described above, the Defendant caused the intentional death of the late Meir Weisshaus, who died in hospital later that day as a result of gunshot wounds from bullets that were fired by the colleagues of the Defendant using the MP-5 submachine gun and the "14" pistol, which the Defendant had supplied.

**Twentieth count: (Detailed Incident 7915/01 Zion)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on September 15, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, at about 11:10 p.m., at the place described in the previous count of the indictment, by his acts set forth in the previous count of the indictment, attempted to cause the intentional death of Moshe Weiss, who was driving a white Renault Express vehicle, license No. 2273706, described in the previous count of the indictment. One of the bullets that were fired by the colleagues of the Defendant, as described in the previous count of the indictment, hit the head of Moshe Weiss and severely injured him.

**Twenty first count: (Detailed Incident 7915/01 Zion)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on October 3, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

[Stamp] P 5: 184 [continued]

1.    The above mentioned Defendant, in early October 2001, in Ramallah or thereabouts, ███████████████ (alias ███████). ███████████ asked

Prosecution Case 444/02 Amended

24

the Defendant for an MP-5 submachine gun, ammunition for the above mentioned MP-5 submachine gun and a vehicle for the purpose of carrying out a shooting attack against Israeli civilians in Jerusalem with the intent of causing their death.

2. ███████████████ (alias ████████) informed the Defendant that he was planning to carry out the planned attack along with ███████████ ████████ ██████████ and █████████████████ (alias ███ ██████).

[Stamp] P 5: 184 [continued]



Prosecution Case 444/02 Amended

25

3.  Initially, the Defendant told ███████████ to carry out the planned attack from the vehicle of ███████ But ███████████ contended that he needed two vehicles, with the spotters traveling in the first vehicle and the shooters traveling in the second. In view of this, the Defendant delivered to ███████████ a stolen Mazda 323 vehicle bearing Israeli license plates, which he had purchased for that purpose from ███████ for NIS 5,000.

4.  For the purpose of carrying out the planned shooting attack, the Defendant delivered to ███████████ an MP-5 submachine gun and ammunition for this MP-5 submachine gun.

5.  On October 3, 2001, ███████████ departed from Ramallah towards Jerusalem with the aim of carrying out the planned shooting attack, in possession of the above mentioned MP-5 submachine gun and traveling in the above mentioned Mazda vehicle, which ███████████ was driving.

6.  ███████████ and ███████████ traveled in an Isuzu pickup vehicle belonging to ███████████ before the Mazda vehicle in which ███████ was traveling, with the aim of informing him of police and IDF checkpoints on the way.

7.  The above mentioned colleagues of the Defendant arrived at New Beit Hanina in Jerusalem. There, ███████████ parked the Mazda vehicle and with his other colleagues hid the above mentioned MP-5 submachine gun in the vehicle.

8.  ███████████ and ███████████ boarded the Isuzu vehicle and from there continued in the Isuzu vehicle with ███████ and ███████████ towards the Begin Road.

9.  The above mentioned colleagues of the Defendant reached the Begin road. From there, ███████████ showed his other colleagues where to carry out the planned shooting attack and how to escape after carrying out the shooting attack. The above mentioned colleagues of the Defendant decided to carry out the planned shooting attack in the first tunnel of the Begin Road from the direction of Ramot, in order for the gunshots to go unheard. Thereafter, all of these persons were to return to Beit Hanina, to the place at which the above mentioned Mazda Vehicle was left.

[Stamp] P 5: 185

Prosecution Case 444/02 Amended

10. ████████████ boarded the Mazda vehicle armed with the above mentioned MP-5 submachine gun, while ████████████ drove the said Mazda vehicle. ████████ ████████ and ████████████ drove the Mazda vehicle to the Begin road with the aim of carrying out the planned shooting attack there and causing the death of Israeli civilians.

11. ████████████ and ████████████ traveled on the road back and forth several times looking for a single Israeli vehicle with the aim of carrying out the planned shooting attack against it with the aim of causing the death of the occupants of the vehicle.

12. At about 11:35 p.m., while driving northward, in the last tunnel in their direction of travel, ████████████ and ████████████ noticed a Honda Accord vehicle, License No. 1103217, traveling on the Begin road northward. The occupants of the Honda vehicle were Tonie Amiel, Pini Maimon and Pazit Maimon.

13. ████████████ overtook the above mentioned Honda Vehicle. While ████████ was driving parallel to the above mentioned Honda vehicle, ████████ fired a single round from the MP-5 submachine gun, which the Defendant had supplied, at the occupants of the Honda vehicle, with the intent of causing their deaths. The bullet that was fired by ████████████ did not hit the above mentioned Honda vehicle.

14. After carrying out the said shooting attack, ████████████ and ████████████ continued their journey towards Highway No. 9 connecting the Ramot neighborhood to the [neighborhood of] French Hill neighborhood.

**Twenty second count: (Detailed Incident 8379/01 Zion)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on October 3, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

[Stamp] P 5: 185 [continued]



Prosecution Case 444/02 Amended

1.  After ███████████████████████ (alias ███████████) and ████████████
    ████████████ carried out the shooting attack as described in the previous count of the
    indictment, the two continued to travel in the Mazda vehicle, which the Defendant had
    supplied to them as described in the previous count of the indictment, towards Highway
    No. 9, connecting the Ramot neighborhood to the [neighborhood of] French Hill
    neighborhood, with the aim of reaching Beit Hanina from there and then continuing to
    Ramallah.

2.  During this journey, ██████████████ at the request of ███████████████ checked
    the function of the MP-5 submachine gun, which the Defendant had delivered, and also
    fired several rounds into the air.

3.  During the journey on the above mentioned Highway No. 9, at about 11:45 p.m.,
    ████████████ and ████████████████ noticed a Skoda vehicle, license No.
    6567709, which was traveling on Highway No. 9 towards the [neighborhood of] French
    Hill. Malka Cohen and Pinchas Cohen were traveling in this Skoda vehicle.

4.  ████████████████████ who as set forth was driving the Mazda vehicle, overtook the Skoda
    vehicle.

[Stamp] P 5: 185 [continued]

5.  While ██████████████ was driving parallel to the above mentioned Skoda vehicle, ██████████████ fired the MP-5 submachine gun, which the Defendant had supplied to them for the purpose of carrying out a shooting attack as described in the previous count of the indictment, discharging a few shots at the above mentioned Skoda vehicle with the aim of causing the death of the occupants of the Skoda vehicle.

6.  A number of bullets that were fired by ██████████████ hit the Skoda vehicle. Two bullets that were fired by ██████████████ hit Pinchas Cohen and another bullet hit Malka Cohen.

7.  Pinchas Cohen was moderately injured by gunshot wounds from two bullets in his abdomen, while Malka Cohen, who was 28 weeks pregnant, was moderately injured by a gunshot wound from a bullet to her head.

8.  After carrying out the said shooting attack, ██████████████ and ██████ continued to drive towards the [neighborhood of] French Hill and from there they reached New Beit Hanina. There, ██████████████ and ██████ parked the above mentioned Mazda vehicle and contacted by telephone ██████ and ██████ ██████████ (alias ██████████ ), who arrived at the site in the Isuzu vehicle belonging to ██████ in order to pick up ██████████████ and ██████████████ according to the planning set forth in the previous count of indictment.

9.  ██████████████ and ██████████████ concealed the above mentioned MP-5 submachine gun in the Isuzu vehicle and boarded the Isuzu vehicle.

10. These four persons tried to return from Jerusalem to Ramallah, but were unable to do so because of IDF and police checkpoints. The above mentioned colleagues of the Defendant stayed to sleep overnight in the home of ██████████ a friend of ██████████████ in New Beit Hanina in Jerusalem.

11. On the following day, October 4, 2001, ██████████████ and ██████████████ returned to Ramallah in the vehicle of.

12. After returning to Ramallah, ██████████████ reported to the Defendant the attacks that he had carried out using the Mazda vehicle and the MP-5 submachine gun that he had received from the Defendant.

[Stamp] P 5: 186

**Twenty third count:**

Prosecution Case 444/02 Amended

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in late 2001 – early 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, in late 2001 or thereabouts, in Ramallah or thereabouts, when he was with ███████ ███ , met ███, the military arm of the "Tanzim" of the Fatah. ██████████

██ , asked ████████ refused to provide him the financial aid and referred ██████████ to the Defendant. The Defendant explained to ███████████ that there was no need to pay a lot of money for a mortar and mortar bombs, as the Defendant already possessed a makeshift mortar and mortar bombs.

In early 2002, the Defendant referred ████████ and the latter's colleague – ██████████ to the home of ████████ in order for them to receive the above mentioned mortar and mortar bombs there. ██████████ and ████████ received the above mentioned makeshift mortar and 5 mortar bombs.

██████████ with his above mentioned colleagues, fired using the above mentioned makeshift mortar a mortar bomb at the settlement of Psagot with the intent of causing the death of residents of the above mentioned settlement and IDF soldiers who were in the above mentioned settlement. The above mentioned mortar bomb did not hit the settlement of Psagot and exploded near it.

After carrying out the said attack, ████████ reported what had happened to the Defendant. The Defendant took ████████ to ████████ in order to report the mortar bomb firing attack that had been performed for the first time in the Area to ████████ too.

[Stamp] P 5: 186 [continued]

**Twenty fourth count: (Detailed Incident 39/02 Binyamin)**

Prosecution Case 444/02 Amended



**Nature of the offense**: Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, on January 15, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.  On January 14, 2002, Raed Karmi, who was a senior military operative in the "Tanzim" of the Fatah Organization, which is an illegal organization, was killed. Following the death of the above mentioned Raed Karmi, the head of the "Tanzim" of the Fatah in the area, ▮▮▮▮▮▮▮▮ pitched a mourning tent in Albira.

2.  The above mentioned Defendant, on January 15, 2002, in the above mentioned mourning tent, met ▮▮▮▮▮▮▮▮ (alias ▮▮▮▮ ), ▮▮▮▮▮▮▮▮▮▮▮▮ , ▮▮▮▮▮ (alias ▮▮▮▮ ), ▮▮▮▮▮▮▮ ▮▮ and ▮

3.  The Defendant informed his above mentioned colleagues that ▮▮▮▮▮▮▮▮▮ the ▮▮▮▮▮▮▮▮▮▮ in the Area, asked for them to carry out an attack immediately to avenge the death of the above mentioned Raed Karmi and cause the death of Israeli civilians.

4.  For the purpose of carrying out the said attack, the Defendant provided his above mentioned colleagues an MP-5 submachine gun, a "16" pistol and a Mazda vehicle bearing Israeli license plates.

5.  The above mentioned colleagues of the Defendant, in the above mentioned mourning tent, decided that in view of the demand of the Defendant, they would carry out an attack that very evening at the Hagivonim gas station, located on Highway 443, near the entrance to Givat Ze'ev, with the intent of causing the death of Israeli civilians.

6.  In the evening hours of that day, January 15, 2002, ▮▮▮▮▮▮▮▮▮ left the above mentioned mourning tent with ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ and ▮▮▮▮▮ traveled in an Isuzu pickup vehicle belonging to ▮▮▮▮▮▮ to the above mentioned gas station with the intent of carrying out the planned shooting attack there. ▮▮▮▮▮▮

[Stamp] P 5: 187

▮▮▮▮ armed with a "14" pistol, ▮▮▮▮▮▮▮ , armed with the above mentioned "16" pistol, and ▮▮▮▮▮▮ armed with the above mentioned MP-5 submachine gun,



Prosecution Case 444/02 Amended

drove behind the above mentioned Isuzu vehicle. The three traveled in a Mazda vehicle, which they had received for this purpose from the Defendant.

7.   The above mentioned colleagues of the Defendant reached an earth mound that blocked the exit from the villages Bir Nabala and Aljib to Highway 443, about 100 meters from the Hagivonim gas station. The above mentioned colleagues of the Defendant parked their vehicles, the Isuzu and Mazda, facing the village Bir Nabala so that they could escape from the site immediately after carrying out the planned attack.

8.   ████████████ armed with a "14" pistol, ████ armed with a 16 pistol, and ████ ████████ armed with an MP-5, alighted form the vehicles and walked to the above mentioned gas station with the aim of carrying out the planned shooting attack and causing the death of Israeli civilians there.

9.   ████████████ and ████████████ stayed in the above mentioned vehicles in order to make sure that no IDF patrol or other people would come to the site. ████████████ ████████ sat in the driver's seat of the Mazda vehicle so that he could immediately evacuate his three colleagues who had departed to carry out the planned attack immediately after executing the attack.

10.  ████████████ and ████████████ stood at the entrance to the above mentioned gas station.

11.  After a few minutes, at about 7:45 p.m., ████████████ and ████████████ noticed a white Fiat Uno vehicle, license No. 6424905, entering the above mentioned gas station, which was driven by the late Yoela Chen, and Rachel Eini was sitting next to her.

12.  ████████████ and ████████████ approached the above mentioned Fiat vehicle with the aim of carrying out a shooting attack against it and causing the death of the vehicle occupants. The occupants of the Fiat vehicle noticed the pistol that ████████████ was holding and started to shout and sound the horn. ████████████ put the pistol into his trousers and t

[Stamp] P 5: 187 [continued]

13.    At this stage, ███████████ opened fire with burst from the MP-5 submachine gun, which the Defendant provided, at the occupants of the Fiat vehicle with the intent of causing their death. Then, ███████████ took out his pistol to and started to shoot at the vehicle occupants with the intent of causing their death.

14.    ███████████ and ███████████ fired at very close range a large number of rounds at the late Yoela Chen, and at Rachel Bini, who were in the above mentioned Fiat vehicle.

15.    Approximately 28 bullets, which were fired by ███████████ and ███████████ hit the front windshield of the vehicle, a number of bullets hit the side of the vehicle and the driver's door window.

16.    During the commission of the described shooting attack, █████ who was standing a short distance behind ███████████ and ███████████ served as a lookout and spotter.

17.    ███████████ immediately after hearing the gunfire, drove from the site with his Isuzu vehicle in order to inform his colleagues whether there were checkpoints on the way to Ramallah.

[Stamp] P 5: 187 [continued]

Prosecution Case 444/02 Amended

33

18. ██████████ ██████████ and ███ after having carried out the shooting attack as set forth above, ran back to the Mazda vehicle in which ██████████ was waiting. After the three got into the vehicle, ██████████████ drove them to Ramallah.

19. In Ramallah, ██████████ ██████████ ██████████ and ███ met ████████
██████████

20. Thereafter, ██████████████ met the Defendant in Ramallah, returned the MP-5 submachine gun and the Mazda vehicle to him and reported the attack that he had carried out as described above.

21. By his acts described above, the Defendant caused the intentional death of **the late Yoela Chen**, who died at the scene as a result of gunshot wounds from bullets that were fired by Mohamed Mousleh and Tarek A-Nuf.

**Twenty fifth count:** (detailed incident 39/02 Binyamin)

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on January 15, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the above mentioned time, in the described in the previous count of the indictment, by his acts set forth in the previous count of the indictment, attempted to cause the intentional death of Rachel Eini, who was traveling in a white Fiat Uno vehicle, license No. 6424905, described in the previous count of the indictment. One of the bullets that were fired by ██████████████████ (alias ██████████) and ██████████████ using the weapons that had been delivered to them by the Defendant for the purpose of carrying out the shooting attack, as described in the previous count of the indictment, hit Rachel Eini in the head and two other bullets hit her left shoulder, injuring her moderately.

**Twenty sixth count:** (Detailed Incident 502/02 Zion)

[Stamp] P 5: 188

Prosecution Case 444/02 Amended


**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, in January 2002, the Defendant decided that he wanted to execute a suicide attack inside the territory of the State of Israel in order to cause the death of as many Israeli civilians as possible.

2.  The above mentioned Defendant telephoned ███████████████ which is an illegal organization, in Nablus. The Defendant asked ███████████ to send him a person who would be prepared to carry out a suicide attack. The Defendant told ███████████ that he himself would see to bringing the suicide terrorist into Jerusalem in order to carry out a suicide attack there.

3.  A few days later, on January 22, 2002, in Ramallah, the Defendant met Sa'id Ramadan, a resident of Kfar Tal in the Nablus district, who ███████████

4.  The Defendant called ███████████████████ (alias ██████████) and asked the latter to come to him.

5.  ███████████ met the Defendant and the above mentioned Sa'id Ramadan that day in Ramallah. The Defendant introduced the two to each other. The Defendant and ███████████ took Sa'id Ramadan to a barber shop to have his hair cut before carrying out the planned suicide attack.

6.  Thereafter, the Defendant and ███████████ called ███████████ ███████ (alias ███████) and asked the latter to

7.  ███████████ came to Ramallah with ███████████████, after the latter agreed to participate in driving the suicide terrorist from Ramallah to Jerusalem. ███████ came to the meeting in his Isuzu pickup vehicle with Israeli license plates.

[Stamp] P 5: 188 [continued]

Prosecution Case 444/02 Amended

8.    According to the instruction of the Defendant,  and ████████ traveled in the above mentioned Isuzu vehicle from Ramallah to Jerusalem in order to find a way that had no police or IDF checkpoints, with the aim of driving the suicide terrorist who would carry out the planned attack in Jerusalem later using the same route.

[Stamp] P 5: 188 [continued]

Prosecution Case 444/02 Amended

9.  ████████████ and ████████ traveled from Ramallah via Rafat and arrived at the Atarot Industrial Zone, where the two returned to the Jerusalem – Ramallah main road and traveled left to the junction leading to the Rama Camp, where they turned right and traveled to Adam Junction. At Adam Junction the two turned right and traveled to Hizma Junction, where they turned right and entered Anta. Through Anta, they arrived at the French Hill Junction, where the two turned right and returned to Ramallah. ████████ ████████ and ████████████ saw that on the way that they were traveling the suicide terrorist could be driven to Jerusalem without being stopped at police or IDF checkpoints.

10. At the same time, in Ramallah, the Defendant and ████████████ took the above mentioned Sa'id Ramadan to pray and also bought for the above mentioned Sa'id Ramadan food, new clothes and shoes. The Defendant paid with his own money for these purchases in the amount of NIS 1,200.

11. ████████████, at the instruction of the Defendant, brought an M-16 assault rifle and 3 magazines for the said assault rifle, filled with cartridges two of which were connected with a magazine coupler ("jungle clip").

12. According to the plan of the Defendant and his above mentioned colleagues, Sa'id Ramadan should have arrived in Jerusalem and shoot there at Israeli civilians with the intent of causing their death until he himself would be killed by the Israeli security forces.

13. Thereafter, on the same day, the Defendant, ████████████ and Sa'id Ramadan met ████████████ and ████████████ in the area of the City Inn Hotel in Albira. The Defendant introduced Sa'id Ramadan to ████████████ and to ████████

14. The Defendant explained to ████████████ and to ████████ that the above mentioned Sa'id Ramadan was the suicide terrorist that they had to drive to Jerusalem in order for him to carry out a suicide attack by shooting at Israeli civilians with the aim of causing the death of as many Israeli civilians as possible.

15. ████████████ and ████████████ hid the above mentioned M-16 assault rifle and magazines in the above mentioned Isuzu vehicle.

[Stamp] P 5: 189

Prosecution Case 444/02 Amended



16. The Defendant and ███████████ wished Sa'id Ramadan luck and the three traveled to Jerusalem. The Defendant told ███████████ and ███████ that they would have to take Sa'id Ramadan to carry out the suicide attack in any place in Jerusalem of their choosing.

17. ███████████ drove the Isuzu vehicle, Sa'id Ramadan sat in the seat next to the driver's seat and ███████████ sat in the rear seat.

18. ███████████ and ███████████ transported Sa'id Ramadan to Jerusalem on a route that they had inspected earlier that day as described above.

19. In Jerusalem, ███████████ and ███████ traveled to Sheikh Jarah St. There they took out the M-16 assault rifle and magazines that were hidden inside the vehicle and handed them over to Sa'id Ramadan. ███████████ moved to the seat next to the driver's seat while Sa'id Ramadan moved to the back seat, holding the M-16 assault rifle and the magazines in his hands.

20. ███████████ and ███████████ drove Sa'id Ramadan to Hanevi'im Street.

21. During the journey, Sa'id Ramadan complained to ███████████ and ███████ ███████ that ___ which the Defendant had purchased for him for the attack, a. ███████████ took of his "Reebok" shoes and handed them over to Sa'id Ramadan saying "go up to heaven with "Reebok" shoes".

22. Upon reaching the junction of Strauss and Hanevi'im Streets, ███████████ and ███████████ stopped the Isuzu vehicle.

23. ███████████ and ███████ told Sa'id Ramadan to

24. After Sa'id Ramadan got out of the vehicle with the M-16 assault rifle and the ammunition, ███████████ and ███████ drove away from the site in the Isuzu vehicle, departed through the Musrara neighborhood to Highway No. 1 and from there drove by way of the main road to Ramallah.

25. Sa'id Ramadan, a few minutes after having got out of the vehicle of ███████ and ███████████ arrived at Jaffa Street.

[Stamp] P 5: 189 [continued]

Prosecution Case 444/02 Amended

26.    At about 4:20 p.m., while standing opposite Building No. 47 on Jaffa Street or thereabouts, Sa'id Ramadan loaded the M-16 assault rifle that he was carrying, shouted "Allahu Akbar" and discharged automatic gunfire indiscriminately at the people who were on Jaffa Street, at the bus stop at the site, aboard the "Egged" bus No. 27 that was at this stop at the time and at the people who were within the stores nearby with the aim of causing the death of as many people as possible. Sa'id Ramadan, while continuing to fire, fled from the site towards the parking lot in Harav Kook Street. There, Sa'id Ramadan changed magazines and continued to shoot at civilians with the aim of causing their death. Sa'id Ramadan fired through the M-16 assault rifle that he carried more than 38 cartridges. Sa'id Ramadan continued to shoot at civilians until he was killed by civilians and policemen who arrived at the site.

[Stamp] P 5: 189 [continued]

27. By his acts described above, the above mentioned Defendant caused the intentional death of the late Ora (Svetlana) Sandlar, who died as a result of gunshot wounds caused by the bullets that were fired by Sa'id Ramadan.

28. After the Defendant learned about the execution of the above mentioned attack, the Defendant approached ███████████████ and received from the latter the amount of 1,000 U.S. dollars for executing the said attack. The Defendant gave ██████████ ███████████ and ████████████ 100 U.S. dollars each for their participation in the execution of this attack.

**Twenty seventh count: (Detailed Incident 502/02 Zion)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, at the place set forth in the previous count of the indictment, by his actions described in the previous count of the indictment, caused the intentional death of the late Sarah Hamburger, who died of gunshot wounds from the bullets that were fired by Sa'id Ramadan, who was dispatched to carry out the above shooting attack by the Defendant.

**Twenty eighth count: (Detailed Incident 502/02 Zion)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

[Stamp] P 5: 190

Prosecution Case 444/02 Amended



The above mentioned Defendant, at the time set forth, at the place set forth in the twenty sixth count of the indictment, by his actions described in the twenty sixth count of the indictment, attempted to cause the intentional death of as many civilians as possible who at the time were on and near Jaffa Street. As a result of the gunfire at the site that was fired by Sa'id Ramadan, who was dispatched to carry out the above shooting attack by the Defendant, more than 45 civilians were injured.

Twenty ninth count: (Detailed Incident 502/02 Zion)

Nature of the offense: Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

Details of the offense: The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The aforesaid Defendant, at the above mentioned time, at the place set forth in the twenty sixth count of the indictment, through his actions described in the twenty sixth count of the indictment, maliciously and unlawfully damaged a large amount of property, including stores on Jaffa Street, an "Egged" bus stop, an "Egged" company bus, No. 27, and many vehicles, which were damaged by the gunfire that was discharged at the site by Sa'id Ramadan, who was dispatched to carry out the said attack by the Defendant.

[Stamp] P 5: 190 [continued]



Prosecution Case 444/02 Amended

**Thirtieth count:**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Section 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in late January – early February, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1.    The above mentioned Defendant, at the above mentioned time, in Ramallah or thereabouts, met ██████████████████████████

2.    ████████████ informed the Defendant that his cousin, ██████████████████ was prepared to carry out a suicide attack.

3.    At the request of the Defendant, ████████████ arranged a meeting between the Defendant and the above mentioned ██████████████

4.    After the above mentioned meeting, the Defendant consented to the suggestion of ████ ████████ to send ██████████████ to carry out a suicide attack in Jerusalem in order for ██████████████ to cause the death of as many Israeli civilians as possible.

5.    The plan was for ██████████████ to carry out a suicide attack using a rifle, i.e. he would shoot at Israeli civilians in Jerusalem with the intent of causing the death of as many Israeli civilians and possible and would continue to fire until he would be killed by the Israeli security forces.

6.    The Defendant took an M-16 assault rifle and a number of magazines for the above mentioned assault rifle filled with cartridges from ██████████████████████ ██████████████ for the purpose of carrying out the planned suicide attack.

7.    The Defendant contacted ██████████████████    ██████████████████████ ██████████ (alias ██████████) and ██████████████████. At the request of the Defendant, the above mentioned three individuals arrived in Ramallah and met the Defendant there.

[Stamp] P 5: 191

Prosecution Case 444/02 Amended



8.  The Defendant informed his above mentioned colleagues that he was asking them to bring another terrorist into Jerusalem, who would carry out a suicide attack in Jerusalem, such as the attack described in the twenty-sixth count of the indictment, with the aim of causing the death of as many civilians as possible. The above mentioned colleagues of the Defendant consented to participate in the driving of this suicide terrorist to Jerusalem.

9.  The Defendant provided ███████████ and ███████████ with a gray Subaru vehicle, which belonged to the family of the Defendant. ███████████ returned with the Subaru vehicle to his home in Bir Nabala, while ███████████ traveled with his Isuzu pickup vehicle to his home in Kfar Aqab.

10. On the following day, The Defendant called ███████████ and ███████████ and instructed them to come to the gas station located in downtown Ramallah, pick up the suicide terrorist from there and drive him to Jerusalem in order for him to carry out the suicide attack there with the aim of causing the death of as many civilians as possible.

11. ███████████ traveled in the Subaru vehicle until the Kalandia checkpoint, where he parked the vehicle and boarded the Isuzu vehicle of ███████████ who arrived at the site. From there, the two continued to the said meeting place.

12. In Ramallah, at the above mentioned gas station, ███████████ and ███ met the Defendant, who introduced them to ███████████ who was the suicide terrorist. The Defendant handed the above mentioned M-16 assault rifle and the above mentioned three magazines filled with cartridges for M-16 assault rifles over to ███████████ ███████████

13. ███████████ and ███████████ hid the M-16 assault rifle and the magazines inside the Isuzu vehicle.

14. ███████████ and ███████████ traveled together with the suicide terrorist to Jerusalem with the aim of the latter carrying out a shooting attack there and causing the death of as many civilians as possible.

[Stamp] P 5: 191 [continued]



Prosecution Case 444/02 Amended

43



15.  ██████████ ██████████ and ██████████ arrived at the Kalandia
Checkpoint and bypassed it. Thereafter, ██████████ switched to the Subaru
vehicle, which he had left at the site earlier and drove to A-Ram Junction. ██████████
██████████ passed the A-Ram checkpoint in the Subaru vehicle and waited at the site for
██████████ and ██████████, who had bypassed the A-Ram checkpoint on foot.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended



Thereafter, ███████████ returned, boarded the Isuzu vehicle, in which the weapon was hidden, and passed the A-Ram checkpoint while driving alone in the Isuzu vehicle with the weapon.

16. ███████████████ drove the suicide terrorist up to a mosque in Shuafat. ██████████ also arrived at this site in the Isuzu vehicle with the weapon and the ammunition.

17. There, the suicide terrorist, ████████████ asked to enter the mosque and to pray prior to carrying out the suicide attack. ██████████ and ██████████ agreed to this request.

18. While ████████████ was praying at the above mentioned mosque, ██████████ ████████ and █████████ traveled in the above mentioned Subaru vehicle to Givat Shaul in Jerusalem with the aim of checking whether there were IDF or police checkpoints on the way. The two decided to drive the suicide terrorist to Givat Shaul with the aim of carrying out the planned shooting attack there, because there were many civilians at this site.

19. When ████████████ and ██████████████ returned to the mosque in Shuafat in order to pick up ████████████ and drive him to Givat Shaul with the aim of him carrying out the planned shooting attack there, the two did not find the suicide terrorist in the mosque.



[Stamp] P 5: 191 [continued]



Prosecution Case 444/02 Amended

45

20. ███████████ and ██████████ called the Defendant and reported to him that the suicide terrorist had fled from them. The Defendant instructed ████████████ and ██████████ to return to Ramallah.

21. ███████████ and ██████████ returned to Ramallah, met the Defendant there and handed over to him the above mentioned Subaru vehicle, the above mentioned M-16 assault rifle and the above mentioned magazines. The Defendant returned the above mentioned M-16 assault rifle to ████████ (████████) ████████████ (████████.

22. The Defendant informed ██████████ that his cousin had fled when he was on his way to carrying out a shooting attack in Jerusalem.

**Thirty first count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in February 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met ████████████ ████ alia ██████████ and ████████████████ The two above mentioned individuals informed the Defendant that they had a suicide terrorist and requested the help of the Defendant. The Defendant consented to help send the suicide terrorist into the State of Israel in order for him to carry out a suicide attack and cause the death of as many Israeli civilians as possible.

The Defendant reached the apartment in Ramallah in which were ████████████ ████████ ██████ and a person who wanted to carry out a suicide attack. The Defendant talked to ████████████ ████████████████ (hereinafter: the Suicide Terrorist) and felt that the latter had serious intentions.

[Stamp] P 5: 192

Prosecution Case 444/02 Amended

46

The above mentioned Suicide Terrorist informed the Defendant that

The Defendant transferred to ▮▮▮▮ an M-16 assault rifles and 4 magazines filled with cartridges in order for him to deliver them to the above mentioned Suicide Terrorist for the purpose of carrying out the planned suicide attack.

On the following day, the Defendant returned to the above mentioned apartment with a video camera. ▮▮▮▮▮ filmed using the above mentioned video camera the above mentioned Suicide Terrorist, while he was reading out a leaflet, in preparation for his departure for carrying out the suicide attack inside the State of Israel. The Defendant and his above mentioned colleagues trained the above mentioned Suicide Terrorist in the use and firing of the M-16 assault rifle. Thereafter, the Defendant transferred the above mentioned Suicide Terrorist to the apartment of the Defendant in downtown Ramallah. The Defendant let the above mentioned Suicide Terrorist sleep in his home in order for him to depart from there on the following day to carry out the planned suicide attack.

When on the following morning the Defendant and ▮▮▮▮▮▮▮ came to the above mentioned apartment of the Defendant, the two discovered that the suicide terrorist had disappeared. In view of the disappearance of the above mentioned suicide terrorist, the above mentioned plan for executing the suicide attack was not put into action.

**Thirty second count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in February 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

[Stamp] P 5: 192 [continued]



Prosecution Case 444/02 Amended

47

The above mentioned Defendant, at the time set forth, talked by telephone with ██████ ██████ the military arm of the "Tanzim" of the Fatah in the Nablus area. ██████ informed the Defendant that he was sending to him two suicide terrorists. It was agreed between the Defendant and ██████ that the Defendant would have delivered weapons and hand grenades to the above mentioned suicide terrorists and have them brought to the western part of Jerusalem in order for them to carry out the suicide attack in which they would fire at Israeli civilians, with the intent of causing

[Stamp] P 5: 192 [continued]

Prosecution Case 444/02 Amended

the death of as many Israeli civilians as possible and continue to shoot until they would be killed by the Israeli security forces.

According to the instruction of the above mentioned ███████████ on February 17, 2002, ███████████ ", sent from Nablus to Ramallah, to the Defendant, ███████████ (███████ (alias "███████), who were accompanied by ███████████ The two were already armed with two hand grenades.

███████████ and ███████████ were supposed to carry out the suicide attack as the Defendant and ███████ had planned.

Within the preparation for the above mentioned suicide attack, in the home of ███████ ███████ the brother of the above mentioned ███████████, in the Balata Refugee Camp, ███████████ using a video camera, filmed ███████████ and ███████████ holding M-16 assault rifles. The two also read before the video camera a leaflet of the "Al Aqsa Martyrs Brigades". ███████████ provided ███████████ and to ███████████ training in the use of weapons in preparation for carrying out the planned attack.

On February 17, 2002, ███████████ and ███████████ departed from Nablus to Ramallah along with ███████████ and ███████████ ███████████ explained to the four that ███████████ explained that ███████████ ███████████ and ███████████ anu

The above mentioned four individuals were not able to come to Ramallah and meet the Defendant for the purpose of executing the planned suicide attack. The four were arrested at an IDF checkpoint, near the village Douma in the Ramallah region. The two hand grenades that were in the above mentioned taxi were detonated at the site by an explosive ordnance disposal technician.

### Thirty third count:

**Nature of the offense:** Conspiring to cause intentional death, an offense under Section 22 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 57828-1968 and Section

[Stamp] P 5: 193



Prosecution Case 444/02 Amended

51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in mid-February 2002 or thereabouts, conspired with another person to cause the intentional death of another person, as follows:

The above mentioned Defendant, on February 15, 2002 or thereabouts, in Ramallah or thereabouts, met ███████████ ███████████ and █ ███████████ (alias "███████").

During the above mentioned meeting, the Defendant asked his above mentioned colleague to bring into Jerusalem a suicide terrorist, who would carry out a suicide attack with the aim of causing the death of as many people as possible. The above mentioned colleagues of the Defendant agreed to the said proposal. The Defendant promised to pay his above mentioned colleagues 300 U.S. dollars in exchange for the transport of the suicide terrorist to Jerusalem. The Defendant informed his above mentioned colleagues that he would bring to them the suicide terrorist in another day or two or so.

The Defendant also gave his above mentioned colleagues a Subaru vehicle bearing Israeli license plates, in order for his above mentioned colleagues to drive the suicide terrorist in it to Jerusalem.

███████████, ███████████ and █ ███████████ planned to bring the suicide terrorist into Jerusalem in an Isuzu pickup vehicle belonging to ███████████. The above mentioned colleagues of the Defendant planned to transport the suicide terrorist to one of the places in Jerusalem that had many people in it for the suicide terrorist to carry out the planned suicide attack there. ███████████ and ███████████ also conducted a tour of Jerusalem and chose the places that in their opinion Among other places, the above mentioned colleagues of the Defendant chose the

The above mentioned plan of the Defendant and his above mentioned colleagues did not go ahead because about two days after the above mentioned meeting, on February 17, 2002, ███████████ was arrested by the Israeli security forces, and after a day, on February 18, 2002, ███████████ was arrested by the Israeli security forces.

[Stamp] P 5: 193 [continued]

Prosecution Case 444/02 Amended

50

According to the instruction of the Defendant, after the arrest of ██████████ [and] ██████████, ████████████ met ██████████████████, the brother of the above mentioned ██████████ and ████████████, on February 19, 2002 or thereabouts, in Ramallah,. During the said meeting, ████████████ and ██████████████ agreed to the suggestion of ████████████

This plan did not go ahead either because ██████████████ himself was arrested on the following day, February 20, 2002, by the Israeli security forces.

[Stamp] P 5: 193 [continued]

Prosecution Case 444/02 Amended

**Thirty fourth count:** (Detailed Incident 483/02 Shafat)

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on February 25, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, in mid-February 2002, in Ramallah or thereabouts, the Defendant decided to send a suicide terrorist to Jerusalem in order to carry out a shooting attack against Israeli targets with the aim of causing the death of as many civilians as possible. The Defendant planned for the suicide terrorist to shoot at Israeli civilians until he would be killed by the Israeli security forces.

2.  The Defendant made telephone contact with █████████████ op █████ , an illegal organization, in Nablus. The Defendant asked █████████ to send a suicide terrorist to him in Ramallah for the purpose of carrying out the planned suicide attack.

3.  After a few days, ███████████████ contacted the Defendant and informed him that ; █████████████

4.  According to the instruction of the Defendant, ███████████ met █████████ █████ brought █████████ to the Defendant.

5.  The Defendant talked to ████████ and thereafter took ██████ to a barber shop in order for the latter to have his hair cut in preparation for executing the planned suicide attack.

6.  The Defendant purchased clothes for ██████████ for which he paid NIS 1,000 out of his own funds.

7.  Thereafter, the Defendant led █████████ to an apartment in Ramallah, in which the Defendant, █████████ and █████████ lived (hereinafter: "the Apartment").

[Stamp] P 5: 194

Prosecution Case 444/02 Amended

52

8.  On February 23, 2002, ███████████████ (███████) also came to the apartment, bringing an M-16 assault rifle which he had received from the Defendant for executing the planned attack. ██████████ (████████ also brought magazines for the above mentioned M-16 assault rifle from the home of his brother, ████████ (███ █████).

9.  In the evening hours on that day, ████████ (████████) and ████████ provided ████████ with information about the place at which ████████ was assigned to carry out the planned attack. The Defendant and his colleagues explained to ████████ that he had to carry out the planned attack in the Neve Ya'akov neighborhood in Jerusalem, at a place about which ████████ and ████████ had gathered information earlier.

10. The Defendant, along with others, filmed ████████ with a video camera in the framework of the preparations for the execution the planned attack.

11. At the request of ████████ (████████, his brother, ████████ (██████)███ (████ ███████, contacted ████████ and asked the latter to drive ████████ to Jerusalem.

12. On February 25, 2002, in the evening, ████████ departed from Ramallah towards Jerusalem in the vehicle of ████████, in which the above mentioned M-16 assault rifle, the magazines and a hand grenade, which ████████ (██████) ██ (███ ███) had delivered, were hidden.

13. ████████ arrived at the main road in the Neve Ya'akov neighborhood in Jerusalem.

14. ████████ got out of the above mentioned vehicle at the site specified above, armed with the above mentioned M-16 assault rifle, magazines and a hand grenade. ████████ approached the bus stop of the number 25 "Egged" bus line, which was at the site, and discharged automatic gunfire from the above mentioned M-16 assault rifle at vehicles that passed by and at Israeli civilians who were at the site with the aim of causing the death of as many people as possible. A police car arrived at the site and ████████ discharged automatic gunfire at two policemen of the Israel Police who were in the above mentioned police car with the aim of causing their deaths. The rounds that were fired by ████████ hit the two above mentioned policemen, who rushed towards ████████ and shot at him. As a result of the gunshot wounds from the rounds that were fired by ███ the late policewoman Galit Arviv was wounded and fell to the ground. ████████

[Stamp] P 5: 194 [continued]


Prosecution Case 444/02 Amended

approached the late policewoman Galit Arviv and fired an additional burst at her from close range. As a result of the gunshot wounds from the bullets that were fired by ███ ███ the late policewoman Galit Aviv died a few hours later.

15.     After ████████ ran out of ammunition, he threw the hand grenade that he was carrying at an IDF jeep that had arrived at the site with the intent of causing the death of IDF soldiers. Only after ████████ was wounded and was out of ammunition were the policemen and civilians who were at the site able to overpower him.

16.     By his acts described above, the above mentioned Defendant caused the intentional death of the late policewoman **Galit Arviv.**

[Stamp] P 5: 194 [continued]

Prosecution Case 444/02 Amended



**Thirty fifth count:** (Detailed Incident 483/02 Shafat)

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on February 25, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, by his acts described in the previous count of the indictment, attempted to cause the intentional death of as many Israeli civilians as possible. As a result of the gunshot wounds from the bullets that were fired by ▮▮▮▮▮▮▮▮ ▮▮▮who was dispatched to carry out the said attack by the Defendant, eight Israeli civilians and policemen were wounded.

**Thirty sixth count:** (Detailed Incident 483/02 Shafat)

**Nature of the offense:** Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty fourth count of the indictment, by his acts described in the thirty fourth count of the indictment, maliciously and unlawfully caused damage to the bus stop of "Egged" line 25 in Neve Ya'akov, proximate to homes and vehicles that were at the above mentioned site, which were damaged by the gunfire that was discharged by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Thirty seventh count:** (Detailed Incident 4258/02 Yarkon)

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

[Stamp] P 5: 195



Prosecution Case 444/02 Amended

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.  The above mentioned Defendant, in early March 2002, in Ramallah or thereabouts, made telephone contact with ███████████████ h is an illegal organization, in Nablus.

2.  ████████ informed the Defendant that ████████ ██████████████████████████████ ck. The plan was for the suicide terrorist to shoot at Israeli civilians with the intent of causing the death of as many civilians as possible and continuing to fire until being killed by the gunfire of the Israeli security forces.

3.  On March 4, 2002, the Defendant contacted ███████████ a policeman in the Naval Police of the Palestinian Authority, who stated that ████ ██████ ██████████████████████. According to the instruction of the Defendant, ███████ met ████████ in Ramallah.

4.  On that day, in Ramallah, ████████ met ████████ (████████). During the said meeting, ████████ introduced ████████ to ████████ (A████ ████████

5.  ████████ informed ████████ ████████ ████████ que attack

6.  According to the instruction of the Defendant, ████████ took ████████ to a barber shop in order for him to have his hair cut in preparation for carrying out the planned suicide attack. In addition, ████████ and (████████ purchased new clothes for ████████ paid for these clothes NIS 1,000, which he had received from the Defendant for this purpose.

7.  Thereafter, according to the instruction of the Defendant, ████████ led ████ ████████ to an apartment in downtown Ramallah, in which ████████ ████████ and the Defendant lived (hereinafter: "the Apartment").

[Stamp] P 5: 195 [continued]

Prosecution Case 444/02 Amended



8.  The Defendant arrived at the Apartment and filmed ███████████ with a video camera in preparation for carrying out the planned suicide attack.

[Stamp] P 5: 195 [continued]



Prosecution Case 444/02 Amended

9. The Defendant instructed ███████████ to drive ███████████ into the State of Israel in order for the latter to carry out the planned suicide attack there. The Defendant instructed██████████to bring a weapon to ███████████████for the purpose of carrying out the planned attack.

10. The above mentioned colleagues of the Defendant started to look for a person who would bring ███████████ into the State of Israel in order for the latter to carry out the planned suicide attack there and to cause the death of as many Israeli civilians as possible.

11. ███████████ (██████████) contacted ██████████████, the holder of an Israeli identity card living in Jerusalem, and asked the latter to :

12. ███████████ (██████████) met the above mentioned ██████████ in a café in Ramallah and asked him to (██████████████████████████████agreed to this suggestion, but asked for ████████ (█████████ t

13. ███████ (██████████), who was with██████ met ███████████ (██████████), who was with ████████████████████ in Ramallah. ███████████ drove a Ford Transit vehicle with Israeli license plates, license plate No. 7014515 (hereinafter: the Vehicle). The above mentioned persons asked ████████████ for the vehicle and the licenses of the vehicle for the purpose of driving a suicide terrorist into the territory of the State of Israel in order for the suicide terrorist to carry out a suicide attack there. ██████████ handed the vehicle over to ███████████ (████ and ███████████but he asked that he himself be the one to drive it.

14. At this stage, ███████████ and███████████ went to the apartment. There ██████████ ███████████howered and put on the new clothes, which had been purchased for him according to the instruction of the Defendant as set forth above.

15. At about 8:00 p.m., ██████████████ an████████████ who traveled in the vehicle, met ██████████ and █████████ in the Clock Square in Ramallah. ███████████and ████████████, who were armed with an M-16 assault rifle, six magazines filled with cartridges and two hand grenades, got into the vehicle. ████████████████████████████ also arrived at the site, and handed over to ██████████ a commando knife of approximately 25 cm length.

[Stamp] P 5: 196

Prosecution Case 444/02 Amended

███████████ told ███████████ to stab Israeli civilians in order to cause their death after running out of ammunition.

16. All of the above mentioned persons traveled in the vehicle to Refidin Square in Ramallah, because there were not many passersby there.

17. In the above mentioned Refidin Square, ██████████████████ █████████ and ██████████ field stripped the above mentioned M-16 assault rifle and put it into the side door of the vehicle.

18. █████████████████ ████ and ██████████ kissed ███████████ and wished him success.

19. ██████████ informed his friends that.

20. It was decided that after █████████ and ████████████ would drop off ██████████ ████████ ve time

21. ██████████ got into the vehicle, which ███████████ was driving, with █████████ sitting beside him, and the three traveled towards Tel Aviv in order to carry out the planned suicide attack there.

22. During the journey of ████████ ███████████ and ███████████ to Tel Aviv, █████████████████ talked to them by cellular telephone.

23. On that night, after ██████████ ███████████ and ███████████ had arrived in Tel Aviv, near Ma'ariv Bridge on Petach Tikva Road, ██████████ showed ██████████ a crowded place and instructed him to carry out the planned attack there.

24. ██████████████ took out the above mentioned M-16 assault rifle, magazines and hand grenades, which had been concealed in the door of the vehicle as set forth above.

[Stamp] P 5: 196 [continued]

Prosecution Case 444/02 Amended

25. At about 2:15 a.m., on March 5, 2002 or thereabouts, ███████ and ██████ let ████████ who was armed with the above mentioned M-16 assault rifle, hand grenades and commando knife, out of the vehicle near the "Seafood Market" restaurant located on Petach Tikva Road in Tel Aviv (hereinafter: the Restaurant) in order for him to carry out the planned attack.

26. ████████ and ████████ drove away from the site towards Jerusalem in the vehicle.

27. ████████ approached the "Seafood Market" restaurant and discharged automatic gunfire from the M-16 assault rifle at the occupants of the restaurant and passersby in Petach Tikva Road with the intent of causing their death.

28. Thereafter, ████████ threw the two above mentioned hand grenades at the restaurant with the intent of causing the death of the occupants of the restaurant and passersby, but the two hand grenades did not detonate.

[Stamp] P 5: 196 [continued]

Prosecution Case 444/02 Amended

29. After the M-16 assault rifle, which ▓▓▓▓▓ carried, ceased firing due to a stoppage, ▓▓▓▓▓ took out the above mentioned commando knife and started to stab Israeli civilians who were at the site with the intent of causing their death.

30. The late policeman Master Sergeant Salim Birkat arrived at the said site. The late Master Sergeant Salim Birkat rushed at ▓▓▓▓▓ and overpowered him. The late Master Sergeant Salim Birkat had the chance to inform his commanders of having overpowered the terrorist.

31. At this stage, ▓▓▓▓▓ stabbed the late Master Sergeant Salim Birkat in the neck using the above mentioned commando knife with the intent of causing his death. As a result of this stab wound, the late Master Sergeant Salim Birkat died at the site.

32. By his acts described above the above mentioned Defendant caused the intentional death of the **late Master Sergeant Salim Birkat.**

33. ▓▓▓▓▓ learned from the television broadcasts that the planned attack had been carried out as set forth above, he contacted the Defendant and updated the latter of the execution of the said attack.

34. Immediately thereafter, the Defendant informed ▓▓▓▓▓ in the Area, and ▓▓▓▓▓ es", the military arm of the "Tanzim" of the Fatah, of the attack that had been carried out. In addition, the Defendant contacted the Reuters news agency and announced the attack that had been carried out as set forth above.

**Thirty eighth count: (Detailed Incident 4258/02 Yarkon)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

[Stamp] P 5: 197



Prosecution Case 444/02 Amended

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh of the indictment, by his actions described in the thirty seventh count of the indictment, caused the intentional death of **the late Yosef Habi**, who was stabbed by ███████████ in the thorax and other parts of his body and died as a result.

### Thirty ninth count: (Detailed Incident 4258/02 Yarkon)

**Nature of the offense**: Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh count of the indictment, by his actions described in the thirty seventh count of the indictment, caused the intentional death of **the late Eliyahu Dahan**, who was stabbed by ███████████ in the thorax, abdomen and back and died as a result.

### Fortieth count: (Detailed Incident 4258/02 Yarkon)

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh count of the indictment, by his actions described in the thirty seventh count of the indictment, attempted to cause the intentional death of as many civilians as possible. As a result of the gunshots that were discharged by ███████████ dozens of Israeli civilians were wounded.

[Stamp] P 5: 197 [continued]

Prosecution Case 444/02 Amended



**Forty first count: (Detailed Incident 4258/02 Yarkon)**

**Nature of the offense:** Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh count of the indictment, by his actions described in the thirty seventh count of the indictment, maliciously and unlawfully caused extensive damage to the "Seafood Market" Restaurant, the "Mifgash HaSteak" Restaurant, and to the nearby buildings and the vehicles that were in the area, which were damaged by the gunshots that were discharged by ███████████

**Forty second count: (Detailed Incident 568/02 Shafat)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 8, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1.   The above mentioned Defendant, at the time set forth, talked by telephone with ███████ ███████████ h, which is an illegal organization, in Nablus.

2.   ███████████ asked the Defendant to meet ███████████████ who had been released a short time earlier from the prison of the Preventive Security of the Palestinian Authority.

3.   The Defendant met ███████████ in Ramallah. During the talk between the two, ███████ ███████ told the Defendant that :

[Stamp] P 5: 198



Prosecution Case 444/02 Amended



The Defendant consented to provide ▮▮▮▮ with the requested explosive belt for the purpose of carrying out the planned suicide attack. In addition, the Defendant consented to the request of ▮▮▮▮ to organize a sleeping place in Ramallah for the suicide terrorist.

4.  Earlier, the above mentioned ▮▮▮▮ talked to the above mentioned ▮▮▮▮ The above mentioned ▮▮▮▮ announced that ▮

    ▮ asked ▮ to transfer ▮▮▮

    ▮ agreed to this. ▮▮▮ met

    ▮▮▮ told ▮ that he

5.  ▮▮▮ called ▮▮▮, a resident of Beit Hanina,

    ▮ organization, and informed him that he intended to ▮ asked ▮ to ▮
    had ▮▮▮ agreed to ▮.

6.  ▮▮▮ called his colleague ▮▮▮ a resident of Beit Hanina, an ▮ and he met him on March 6, 2002 in Ramallah. ▮ came to this meeting and met ▮ and ▮ near the "Arabesque" Café. ▮ and suggested to ▮▮▮

    ▮ instructed ▮ to ▮

    ▮ and ▮ suggested to ▮▮▮

    tion.

Prosecution Case 444/02 Amended

7. For the purpose of receiving the explosive belt for the suicide terrorist, the Defendant had ███████ meet ██████████ who promised to transfer to ████████ ████

8. The Defendant brought the suicide terrorist to the apartment in downtown Ramallah, which the Defendant had rented (hereinafter: "the Apartment").

[Stamp] P 5: 198 [continued]

Prosecution Case 444/02 Amended

65

9.  On March 8, 2002, ███████████ came to Ramallah at the behest of ███████████ In Ramallah, ███████████ who had come to the meeting by vehicle, and waited for ███████ ███████ and ███████████ informed ███████ that ███████████████████████ ██████████ made ███████████ was familiar with the bypass routes to the site, and ███████████ ███████ told them that ████ lia

███████ t.

10. Thereafter, ███████████ traveled to the Apartment, where he met the Defendant and ███████ who had brought an explosive belt with him. ███████ installed the explosive belt on ███████████████████ and explained to ███████████████ In addition, ███████████ shaved off his beard.

11. Thereafter, the Defendant and his above mentioned colleagues hailed a taxi, and the suicide terrorist, ███████████ wearing the explosive belt, got into the taxi on his way to carrying out a suicide attack in Jerusalem with the intent of causing the death of Israeli civilians. ███████████ accompanied ███████████ to the point of meeting with

12. ███████████ and the suicide terrorist, ███████████ continued to travel in the taxi and got out of the taxi on a dirt track near the quarries in Kalandia. From there, ███████ ███████ led the suicide terrorist on foot on their way to executing the planned attack.

13. In the Nuseiba quarters in Beit Hanina in Jerusalem, ███████████ and ███████████ were arrested, at about 4:00 p.m., by Border Guard policemen. When ███████████ tried to activate the explosive belt that he was wearing, he was shot dead by one of the members of the security forces.

<u>Forty third count</u>: (Detailed Incident 783/02 Binyamin)

[Stamp] P 5: 199

Prosecution Case 444/02 Amended

66



**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, on March 17, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1.  On March 5, 2002, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ s" (the military arm of the "Tanzim" of the Fatah) — ▇▇▇▇▇▇▇▇▇▇, was killed in Ramallah.

2.  About ten days later, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ decided to avenge the death of ▇▇▇▇▇▇▇▇ by carrying out a lethal attack.

3.  ▇▇▇▇▇▇▇▇ and ▇▇▇▇▇▇ agreed to join ▇▇▇▇▇▇ to carry out the above mentioned revenge attack.

4.  ▇▇▇▇▇▇ contacted the Defendant, and received his approval to carry out the planned attack.

5.  Following the approval that was given by the Defendant, ▇▇▇▇▇▇ and ▇▇▇▇▇▇ arrived at the home of the Defendant.

6.  The Defendant delivered to the two a "Beretta" type rifle and a Kalashnikov assault rifle with magazines for carrying out the planned attack.

7.  On the following day, on March 17, 2002, ▇▇▇▇▇▇ traveled with ▇▇▇▇▇▇ and ▇▇▇▇▇▇ in his "Mazda" type vehicle to the Beit El-Psagot Road, while ▇▇▇▇▇▇ was driving the vehicle, ▇▇▇▇▇▇ held the "Beretta" type rifle, and ▇▇▇▇▇▇ was holding the Kalashnikov assault rifle.

8.  The above mentioned persons arrived at the planned attack site at about 6:30 a.m. ▇▇▇▇▇▇ and ▇▇▇▇▇▇ got out of the vehicle, while ▇▇▇▇▇▇ stayed to wait for them in the vehicle for extracting them at the end of the execution of the attack.

[Stamp] P 5: 199 [continued]



Prosecution Case 444/02 Amended

9. About a quarter of an hour later, a white Volkswagen Passat vehicle, license No. 7741115, which was being driven by Samir Karash, arrived at the site.

10. ▮▮▮▮▮ and ▮▮▮▮▮ fired bursts at the driver of the vehicle from the weapons, which the Defendant had provided to them for that purpose, with the intent of causing the death of the above mentioned driver of the Volkswagen vehicle.

11. As a result of the gunfire, Samir Karash was injured in his shoulder, sustaining a fracture to his proximal left humerus with crushing and metal fragments along the trajectory of the bullet, and was in need of hospitalization and surgery. In addition, three of the rounds that were discharged by ▮▮▮▮▮ and ▮▮▮▮▮ hit the said vehicle and caused it damage.

12. After completing the execution of the attack, ▮▮▮▮▮ and ▮▮▮▮▮ returned to the vehicle of ▮▮▮▮▮ and the three fled from the attack site to Ramallah.

13. Thereafter, ▮▮▮▮▮ called the Defendant and reported the successful execution of the attack to him.

[Stamp] P 5: 199 [continued]

Prosecution Case 444/02 Amended



**Forty fourth count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in early 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met ████ ████

████████ informed the Defendant that he wanted to carry out a shooting attack against IDF soldiers who were at the Surda checkpoint and to cause their death. The Defendant provided ████████ with two pistols, a short barreled M-16 assault rifle with telescopic sights and a box of cartridges for the purpose of carrying out the said attack.

A short time later, a shooting attack was carried out at the Surda checkpoint during the course of which an IDF soldier was killed. The Defendant hastened to contact ████████ but the latter said that he was not the one who had carried out the said attack. Thereafter, ████████ returned the weapons to the Defendant, which he had delivered to him earlier for the purpose of carrying out the said attack.

**Forty fifth count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in March 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea

[Stamp] P 5: 200



Prosecution Case 444/02 Amended

lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, conversed by telephone with ████ ██ the military arm of the "Tanzim" of the Fatah, which is an illegal organization.

████████ old the Defendant that he had a suicide terrorist who was prepared to carry out a suicide attack inside the State of Israel. The Defendant consented to dispatching the suicide terrorist into the territory of the State of Israel in order for him to cause the death of as many Israeli civilians as possible.

On the following day, a person called ████ from Nablus came to the Defendant. ███ informed the Defendant that

The Defendant talked to ████ and discovered that ████ was a poor marksman. Following this, the Defendant contacted ████ again. The Defendant told ████████ that ███ could carry out the suicide attack using an explosive belt that he would wear on his body. ████████ ████ agreed to the suggestion of the Defendant and promised to

According to the instruction of the Defendant, ████████████ purchased new clothes for ████ and thereafter accompanied ███ to an apartment in down tom Ramallah, in which ████████ ████ ████████ and the Defendant lived (hereinafter: the Apartment).

The planned attack did not take place in view of the fact that the explosive devices were not sent to the Defendant and because ████ was arrested by the Israeli security forces.

After the arrest of ████ the Defendant talked to the above mentioned ████████ about what had happened. ████████ promised to the Defendant to in order for the Defendant to dispatch them into the territory of the State of Israel for the purpose of carrying out suicide attacks. ████████ did not have time to send additional suicide terrorist to the Defendant, because both the Defendant and ████████ were arrested by IDF forces during Operation "Defensive Shield".

[Stamp] P 5: 200 [continued]

Prosecution Case 444/02 Amended



**Forty sixth count:**

**Nature of the offense:** Attempt to manufacture an explosive object, an offense pursuant to Section 53(A) (3) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in mid-March 2002 or thereabouts, manufactured a firearm, ammunition[,] a bomb, a hand grenade, an explosive or incendiary object, without holding a permit certificate which was issued to him by or on behalf of a military commander, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah, met ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ who asked the Defendant for money for military activity. In response to this, the Defendant transferred to ▮▮▮▮▮▮ the amount of NIS 8,000, which ▮ received.

▮▮▮▮▮▮ with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ purchased with the above mentioned money various chemicals.

▮▮▮▮▮▮▮▮▮▮ manufactured a large explosive device using the above mentioned chemicals.

**Forty seventh count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in March 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, delivered to ▮▮▮▮▮▮▮▮▮▮▮ ?" – the military arm of the "Tanzim" of the Fatah in the Jenin area, who was then staying in Ramallah, a "14" pistol, without a permit signed by or on behalf of the commander of the Area.

[Stamp] P 5: 201



Prosecution Case 444/02 Amended

**Forty eighth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in March 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, purchased from ████████████████████████████ a long-barreled M-16 assault rifle for 4,000 Jordanian dinars, without a permit signed by or on behalf of the commander of the Area.

**Forty ninth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in the first half of 2001 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met ████████ ████████████████ and received from the latter 1,500 cartridges for M-16 assault rifles. The Defendant paid the above mentioned ████████ NIS 3,000 for the above mentioned cartridges. The Defendant carried out that which has been attributed to him in this count of the indictment at the instruction of ████████████ Area.

[Stamp] P 5: 201 [continued]

Prosecution Case 444/02 Amended



**Fiftieth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in May 2001 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, at the request of ███████████████ delivered to the latter a Kalashnikov assault rifle with a magazine and 28 cartridges. The Defendant carried out that which has been attributed to him in this count of the indictment after having received approval to do so from ██████████████ in the Area.

███████████████ participated in a procession in Ramallah while holding the above mentioned Kalashnikov assault rifle in the air. Thereafter, ████████ at the instruction of the Defendant, transferred the above mentioned Kalashnikov assault rifle to ████████

**Fifty first count:**

**Nature of the offense:** Giving shelter, an offense pursuant to Section 57 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in late 2001 or thereabouts, assisted or gave shelter to an unspecific person who had committed an offense against the security legislation or had been or was involved in any activity which was intended to harm the public welfare, the welfare of the Israel Defense Forces troops and soldiers and the maintenance of public order or concerning whom there are reasonable grounds to suspect that he did so, whether by giving information, shelter, food, beverages, money, clothing, weapons, ammunition, supplies, animal fodder, means of transport, petroleum or fuel of any type and kind whatsoever, or in any other way, as follows:

The above mentioned Defendant, at the time set forth, with ████████████████ transferred ████ ████████████████ and Abdullah Barghouti from the prison of the Preventive Security of

[Stamp] P 5: 202



Prosecution Case 444/02 Amended

73

the Palestinian Authority in Bitunia to an apartment, which the Defendant had rented in downtown Ramallah.

The above mentioned ██████████ and Abdullah Barghouti are senior operatives of the Hamas Organization, which is an illegal organization, and are responsible for carrying out a number of attacks against Israeli civilians, including the bombing attack at the "Sbarro" Restaurant in Jerusalem on August 9, 2001. The Defendant and ██████████ provided lodging to ██████████ and Abdullah Barghouti in the above mentioned apartment for several days.

Before ██████████ and Abdullah left the above mentioned apartment of the Defendant, the Defendant provided each of them a "14" pistol.

**Fifty second count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in late 2001 – early 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, talked by telephone with ██████████ which is an illegal organization, in Nablus. ██████████ told the Defendant that he needed 1,000 cartridges for M-16 assault rifles. The Defendant promised to bring to ██████████ the requested cartridges. After a few days, a person came on behalf of ██████████ to the Defendant. The Defendant delivered to the later 1,000 cartridges for M-16 assault rifles in order for him to transfer them to Nablus, to ██████████ In exchange for the above mentioned 1,000 cartridges, ██████████ transferred to the bank account of the Defendant the amount of NIS 3,000.

[Stamp] P 5: 202 [continued]

Prosecution Case 444/02 Amended

74



**Fifty third count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in January 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

At the time set forth, in Ramallah or thereabouts, ▮▮▮▮▮▮▮▮▮▮approached the above mentioned Defendant. ▮▮▮▮▮▮▮asked the Defendant for three pistols in order to deliver them to ▮▮▮▮▮▮▮▮▮▮▮▮the military arm of the "Tanzim" of the Fatah, ▮▮▮▮▮▮▮▮▮▮▮▮▮for the purpose of carrying out a shooting attack at the Surda checkpoint of the IDF.

The Defendant agreed to the request of ▮▮▮▮▮▮▮and provided the latter with 3 pistols: a 9 mm Belgian pistol, a 9 mm Star pistol and a pistol of a type that is not known to the prosecution, and a box of cartridges for these pistols, containing 50 cartridges for a 9 mm caliber pistol.

On that day, at the headquarters of the Preventive Security of the Palestinian Authority in Bitunia or thereabouts, ▮▮▮▮▮▮▮transferred the above mentioned three pistols and cartridges to ▮ ▮▮▮▮▮▮▮▮

The planned attack was not carried out using these pistols, because on the night before the time at which the above mentioned attack was supposed to be carried out, another shooting attack was carried out at the Surda checkpoint.

After about three days, in Ramallah or thereabouts, ▮▮▮▮▮▮▮returned the above mentioned pistols with the above mentioned box of cartridges to the Defendant.

The Defendant carried out that which has been attributed to him in this count of the indictment without a permit signed by or on behalf of the commander of the Area.

**Witnesses for the prosecution:**

[Stamp] P 5: 203



Prosecution Case 444/02 Amended



1. ███████████████ Badge No. █████ Judea Investigations Office [taker of the statement of the Defendant on April 14, 2002 and on May 3, 2002, and submitter of the handwriting of the Defendant in Arabic + identity line-up report, photographs + photograph table]

2. ███████████████ Badge No. █████ Judea Investigations Office. [taker of the statements of the Defendant on April 21, 2002 and May 13, 2002 and submitter of the two handwriting specimens of the Defendant in Arabic]

3. ████████, Badge No. █████ Aman Lakhish Questioning. [taker of the statement of the Defendant on September 5, 2002].

4. ███████████████ Identity No. ███████ (detained).

5. ██████████████ Identity No. ███████ (detained) (Prosecution Case 243/02).

6. ████████████████████ Identity No. ███████ (detained) (Prosecution Case 242/02).

7. ██████████████ Identity No. █████ (detained) (Prosecution Case 241/02).

8. ██████████████ Identity No. ███████ (detained) (Prosecution Case 265/02).

9. ██████████████ Identity No. ███████ (detained)

10. ████████████████ Identity No. ███████ (detained)

11. ██████████████████ Identity No. ███████ (detained) (Prosecution Case 339/02).

12. ████████████████ Identity No. ███████ (detained) (Prosecution Case 355/02).

13. ██████████████ Identity No. ██████ (detained) (Prosecution Case 311/02)

[Stamp] P 5: 203 [continued]

Prosecution Case 444/02 Amended



14. ███████████████████████ Identity No. ████████ (detained)
(Prosecution Case 345/02)

15. ████████████████ Identity No. ████████ (detained) (Prosecution Case
356/02).

16. ████████████████ Identity No. ████████ (detained) (Prosecution Case
318/02).

17. ████████████ Identity No. ████████ (detained)

18. ████████████ Identity No. ████████ (detained)

19. ████████████ Identity No. ████████ (detained) (Prosecution Case
353/02)

20. ████████████ Identity No. ████████ (detained) (Prosecution Case
221/02)

21. ████████████ Identity No. ████████ (detained) (Prosecution Case
212/02)

22. ████████████, Identity No. ████████ (detained).

23. ████████████████ Identity No. ████████ (detained) (Prosecution
Case 639/01)

24. ███████████████████████ Identity No. ████████ (detained)
(Prosecution Case 174/02).

25. ████████████████ Identity No. ████████ (detained) (Prosecution
Case 173/02).

26. ███████████████████████ Identity No. ████████ (detained)
(Prosecution Case 322/02)

27. ████████████, Identity No. ████████ (detained) (Prosecution case
775/02).

[Stamp] P 5: 203 [continued]



Prosecution Case 444/02 Amended

77

**Detailed Incident 234/01 Jerusalem Special Duties Department.**

28. ████████ Serial No ████████ ael Defense Forces. (details in the prosecution) [statement]

29. ████████ Identity No. ████████ (details in the prosecution) [statement]

30. ████████ dentity No. ████████ details in the prosecution) [statement]

31. ████████ Badge No. ████████ Forensic Identification – Zion Station. [submitter of seizure and marking report]

32. ████████ Badge No ████████ e Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of vehicle inspection report]

33. ████████ Badge No ████████ nvestigations – Zion Station. [submitter of exhibit cover form]

34. ████████ Badge No. ████████ he Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination] (will be summoned upon explicit demand of the defense only)

35. ████████ Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion from Forensic Identification Case ████████ vill be summoned upon explicit demand of the defense only)

36. ████████ M.D., License No ████████ statement – pronouncement of the death of the late Elazar Akiva Fashkos]

37. ████████ M.D., License No. ████████ Clalit Healthcare Service – Jerusalem. [statement + submitter of death notice]

---

**Detailed Incident 457/01**

[Stamp] P 5: 204

Prosecution Case 444/02 Amended



38. ████████████████ Serial No. ████████ inyamin Station. [submitter of action report]

39. ██ Badge No. ████████ Binyamin Station. [submitter of memorandum – GMC vehicle + drawing of incident scene + seizure and marking report + exhibit cover form]

40. ████████████████ Badge No. ████████ Yehuda Forensic Identification. [submitter of photograph tables + memorandum].

41. ████████████████ Badge No. ██████ the Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of photograph tables + vehicle inspection report]

42. Yosef Cohen, Identity No. 069397198. (details in the prosecution) [wounded in the shooting attack]

43. ████████████████ Identity No ████████ details in the prosecution) [arrived first at the scene of the attack]

44. ████████████ M.D., License No ██████ Hadassah Hospital – Mount Scopus, Jerusalem. [submitter of physician certificate – interim summary] (will be summoned upon explicit demand of the defense only)

_____

**Detailed Incident 2159/01 Binyamin**

45. ████████████████ Badge No ████████ nyamin Station. [submitter of action report]

46. ████████████████ Badge No ██████ Binyamin Station. [submitter of photograph tables + seizure and marking report].

47. ████████████████ adge N ██████ the Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of initial incident scene visit report – seizure of cartridge cases and bullet fragments]

48. ████████████████ Badge No ██████ Binyamin Station. [submitter of memorandum – exhibit chain + exhibit cover form + crime scene visit report]

<div align="right">[Stamp] P 5: 204 [continued]</div>



Prosecution Case 444/02 Amended

49.  ███████████████████████ Badge No. ██████████ the Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination] (will be summoned upon explicit demand of the defense only)

50.  ████████████████████████ Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion from Forensic Identification Case ███████████] (will be summoned upon explicit demand of the defense only)

51.  █████████████; M.D., License No ██████████ Magen David Adom ambulance service – Lod station. [submitter of medical reports from scene + death notice + statement]

52.  ██████████████ Identity No ███████████, Israel Defense Forces. [statement]

53.  ████████████████ M.D., the National Institution of Forensic Medicine. [submitter of two expert opinions] (will be summoned upon explicit demand of the defense only)

54.  ███████████ Identity No.██████████████ details in the prosecution) [identification of victims]

**Detailed Incident 7915/01**

55.  ████████████████████ Badge No. ██████████ Zion Station. [submitter of action report]

56.  ██████████████████ Badge No ██████████ Forensic Identification – Zion Station. [submitter of initial scene visit report + photograph tables]

57.  ███████████████████████ Zion Station. [finder of cartridge cases at the incident scene – chain of evidence]

58.  ██████████████████████ Badge No. ██████████ the Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of vehicle inspection report – seizure of bullet fragments]

[Stamp] P 5: 204 [continued]

Prosecution Case 444/02 Amended

59. ███████████ Badge No. ██████ Zion Station Special Duties Department. [submitter of exhibit cover form]

60. █████████████ Badge No. ██████ Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt exhibits for examination] (will be summoned upon explicit demand of the defense only)

[Stamp] P 5: 204 [continued]

Prosecution Case 444/02 Amended

61.  ██████████████████ Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion from Forensic Identification Case BI/07 – 4239/01] (will be summoned upon explicit demand of the defense only)

62.  ██████████████ License No. ██████. Hadassah Ein Kerem Hospital, Jerusalem. [submitter of discharge certificate of Moshe Weiss] (will be summoned upon explicit demand of the defense only)

63.  ██████████████████ Hadassah Ein Kerem Hospital, Jerusalem. [submitter of death certificate of the late Meir Weisshaus] (will be summoned upon explicit demand of the defense only)

64.  Moshe Weiss, Identity No. 024001505. (details in the prosecution) (severely injured in the attack)

65.  ████████████ Identity No ██████████ details in the prosecution) (eyewitness)

---

**Detailed Incident 481/01 Zion**

66.  Tonie Amiel, Identity No. 032441040. (details in the prosecution) (driver of the Honda vehicle)

67.  Pini Maimon, Identity No. 025759762. (details in the prosecution) (passenger in the Honda vehicle)

68.  Pazit Maimon, Identity No. 040128084. (details in the prosecution) (passenger in the Honda vehicle)

---

**Detailed Incident 8379/01 Zion**

69.  ████████████████, Badge No █████████ orensic Identification – Zion Station. [submitter of initial scene visit report + seizure and marking report]

[Stamp] P 5: 205

Prosecution Case 444/02 Amended

70. ████████████ Identity No. ██████ Special Duties Department – Zion Station. [submitter of exhibit cover report]

71. ████████████ Badge No. ██████ the Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of vehicle inspection report – seizure of bullet fragments]

72. ████████████ Badge No ██████ Special Duties Department – Zion Station. [submitter of exhibit cover report]

73. ████████ Identity No ████████ Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination] (will be summoned upon explicit demand of the defense only)

74. ████████████ Badge No ██████ Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination]. (will be summoned upon explicit demand of the defense only)

75. ████████████ Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion from Forensic Identification Case BI/07 – 4723/01] (will be summoned upon explicit demand of the defense only)

76. ████████ Zion Station. [finding of cartridge cases in the field – evidence chain]

77. Malka Cohen, Identity No. 038791386. (details in the prosecution) (injured in the attack)

78. Pinchas Cohen, Identity No. 038348256. (details in the prosecution) (injured in the attack)

79. ████████ Identity No ████████ details in the prosecution) (eyewitness – cared for casualties)

80. ████████ M.D., License No. ████████ Hadassah Ein Kerem Hospital, Jerusalem. [submitter of discharge certificate of Pinchas Cohen] (will be summoned upon explicit demand of the defense only)

[Stamp] P 5: 205 [continued]

Prosecution Case 444/02 Amended





81.   ███████████        License No. ████ Hadassah Ein Kerem Hospital, Jerusalem.
      [submitter of discharge certificate of Malka Cohen] (will be summoned upon explicit
      demand of the defense only)

——————————

**Detailed Incident 39/02 Binyamin**

82.   ███████████        Badge No ███████rol Unit – Binyamin Station. [submitter
      of action report]

83.   ███████████        Badge No. ██████inyamin Station. [submitter of
      investigation memorandum / seizure and marking]

84.   ███████████        Badge No.██████Yehuda Forensic Identification.
      [submitter of photograph tables + collected cartridge cases from the incident scene]

85.   ███████████        Badge No. █████the Mobile Laboratory, Forensic
      Identification, National Headquarters – Jerusalem. [submitter of photograph tables +
      vehicle inspection report]

86.   ███████████        Badge No. ██████Binyamin Station. [submitter of
      exhibit cover report]

87.   ███████████        Badge No.█████Exhibits Office – Forensic Identification,
      National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt
      exhibits for examination] (will be summoned upon explicit demand of the defense only)

88.   ███████████        License No. █████Israel Defense Forces (details in the
      prosecution) [statement – pronouncement of the death of the late Yoela Chen + care for
      the casualty]

89.   ███████ M.D., License No. █████Hadassah Ein Kerem Hospital, Jerusalem.
      [submitter of physician certificate – illness summary of Rachel Eini] (will be summoned
      upon explicit demand of the defense only)

90.   Rachel Eini, Identity No. 075966614. (details in the prosecution) (injured in the attack)

[Stamp] P 5: 205 [continued]

Prosecution Case 444/02 Amended



91.  ████████ Identity No. ██████ (details in the prosecution) [statement + sketch] (eyewitness)

9.2  ████████████ Identity N ████████ details in the prosecution) (identification of the victim)

---

**Detailed Incident 502/02 Zion**

93.  ████████████████ Badge No.██████ecial Duties Department — Zion Station [submitter of memorandum, seizure and marking report]

94.  ████████████████ Special Duties Department — Zion Station [submitter of seizure and marking report]

95.  ████████████ Special Duties Department — Zion Station [submitter of memorandum, seizure and marking report + photographs]

[Stamp] P 5: 205 [continued]



Prosecution Case 444/02 Amended

96. ███████████████ Badge No. ██████ Special Duties Department – Zion Station [submitter of action report – finding of magazine coupler]

97. ██████████████ Badge No ████████ questioning – Zion Station [submitter of seizure and marking report]

98. ████████████ Identity No. ██████████ details in the prosecution) (eyewitness – pursued the terrorist)

99. ██████████ Badge No ██████████ Jerusalem Border Guard. (eyewitness – pursued and shot at the terrorist)

100. ██████████ Badge No ██████████ Patrol Unit 2 – Zion Station. (eyewitness – shot at the terrorist)

101. ████████ Identity No ██████████ Jerusalem Subdistrict Unit. (eyewitness – pursued and shot at the terrorist)

102. ██████████████ Badge No ██████████ Motorcycle Special Patrol Unit – Shalem Station. (eyewitness – pursued the terrorist, disarmed the terrorist after the terrorist was killed)

103. ████████████████ Identity N ██████████ (details in the prosecution). (eyewitness – a security guard who was at the site – opened fire and shot the terrorist)

104 ██████████ Badge No. ██████████ Detectives – Jerusalem Central Unit. (eyewitness – pursued and shot at the terrorist)

105. █████████ Badge No. ██████████ etectives – Jerusalem Central Unit. (eyewitness – shot at the terrorist)

106. ███████████ Identity No ██████████ (details in the prosecution) (eyewitness – driver of "Egged" bus who was at the site of the attack)

107. █████████ Identity No ██████████ details in the prosecution) (eyewitness)

108. ██████████████ ████ Identity No. ██████████ details in the prosecution) (eyewitness)

109. ███████████ Identity No. ██████████ (details in the prosecution) (eyewitness)

[Stamp] P 5: 206

Prosecution Case 444/02 Amended



110. ████████████ Identity No ████████████ (details in the prosecution) (eyewitness)

111. ████████████ Identity N ████████████ etails in the prosecution) (eyewitness)

112. ████████████ dentity No. ████████████ details in the prosecution) (eyewitness)

113. ████████████ Identity No. ████████████ tails in the prosecution) (eyewitness)

114. ████████████ Identity No. ████████████ details in the prosecution) (eyewitness – saw the terrorist arriving at the attack site on foot)

115. ████████████ Identity No. ████████████ (details in the prosecution) (identification of the body of the late Ora (Svetlana) Sandlar)

116. ████████████ M.D., License ████████ Hadassah Ein Kerem Hospital, Jerusalem. (submitter of death notice of the late Ora (Svetlana) Sandlar) (will be summoned upon explicit demand of the defense only)

117. ████████████ M.D., Hadassah Ein Kerem Hospital, Jerusalem. (submitter of death notice of the late Sarah Hamburger) (will be summoned upon explicit demand of the defense only)

<u>An additional list of witnesses concerning the casualties in the attack on Jaffa Street on January 22, 2002 and medical certificates related to their injury will be delivered during the trial</u>

**Detailed Incident 483/02 Shafat**

118. ████████████████ Special Duties Department, Jerusalem Central Unit. [submitter of seizure and marking report]

119. ████████████ Badge No. ████████ pecial Duties Department, Jerusalem Central Unit. [submitter of photograph table + two exhibit cover forms]

120. ████████████ adge No. ████████ orensic Identification – Zion Station. [submitter of seizure and marking report + crime scene visit report + transfer of exhibits to Forensic Identification – National Headquarters]

[Stamp] P 5: 206 [continued]

121. ████████ Patrol Unit 4, Zion Station. [submitter of seizure and marking report]

Prosecution Case 444/02 Amended

122.  ███████████████, Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion] (will be summoned upon explicit demand of the defense only)

123.  ███████████ Hadassah Mt. Scopus Hospital, Jerusalem. [submitter of death certificate] (will be summoned upon explicit demand of the defense only)

124.  ██████████ Badge No. ██████████ (details in the prosecution) [overpowered the terrorist, wounded in the attack]

125.  █████████ Identity No. ██████████ details in the prosecution) [overpowered the terrorist]

126.  ████████████ Identity ██████████ details in the prosecution) [overpowered the terrorist]

127.  ████████████ Identity No ██████████ details in the prosecution) [eyewitness]

128.  ██████████ Identity No ██████████ details in the prosecution) [eyewitness]

129.  Stas Krisensky, Identity No. 304389240. (details in the prosecution) [wounded in the attack]

130.  Lior Skizada, Identity No. 032087587. (details in the prosecution) [wounded in the attack]

131.  Keren Kadmi, Identity No. 032777716. (details in the prosecution) [wounded in the attack]

132.  Adam Garfield, Identity No. 011935426. (details in the prosecution) [wounded in the attack]

133.  Eli Ochana, Identity No. 033404773. (details in the prosecution) [wounded in the attack]

134.  Amichai Dahan, Identity No. 039243944. (details in the prosecution) [wounded in the attack]

[Stamp] P 5: 206 [continued]

Prosecution Case 444/02 Amended



135. Tamara Lifschitz Fisch, Identity No. 306706318. (details in the prosecution) [wounded in the attack]

---

**Detailed Incident 4258/02**

136. ████████ Identity No. ████████ volunteer in Yarkon Patrol Unit (details in the prosecution) [two statements, was with the late Salim Birkat]

137. ████████ Yarkon Identification, Israel Police.

138. ████████ Yarkon Investigations Branch Officer.

139. ████████ Yarkon Special Investigations Team.

140. ████████ Identity No ████████ (details in the prosecution) [eyewitness – was inside the restaurant]

141. ████████, Identity No ████████ details in the prosecution) [security guard at the restaurant, injured in the attack]

142. ████████ Identity No. 304615230. (details in the prosecution) [security guard at the restaurant]

143. ████████ Identity No ████████ (details in the prosecution) [eyewitness]

144. ████████ Identity No ████████ (details in the prosecution) [eyewitness]

145. ████████ entity No ████████ details in the prosecution) [eyewitness]

146. Shlomo David, Identity No. 00022280. (details in the prosecution) [severely injured in the attack by stab wound]

147. ████████ Identity No. ████████ (details in the prosecution) [eyewitness, injured in the attack]

148. ████████ Identity No ████████ details in the prosecution) [eyewitness, injured in the attack]

[Stamp] P 5: 207



Prosecution Case 444/02 Amended

89

149. ████████████ Identity No █████████ etails in the prosecution) [eyewitness, injured in the attack]

150. ████████████ Identity No. ████████ (details in the prosecution) [eyewitness, injured in the attack]

151. ████████████ Identity No. ████████ etails in the prosecution) [eyewitness, saw the vehicle in which the terrorist arrived]

152. ████████████ Identity N █████████ (details in the prosecution) [eyewitness]

153. ████████████ Identity No █████████ etails in the prosecution) [eyewitness, injured in the attack]

154. ████████████ Identity No █████████ (details in the prosecution) [eyewitness – statement + drawing of the incident scene]

155. ████████████ Identity No. ████████ etails in the prosecution) [eyewitness]

156. ████████████ Identity No. ████████ etails in the prosecution) [eyewitness]

157. ████████████ Identity No. 061247623. (details in the prosecution) [eyewitness]

158. ████████████ Identity No █████████ (details in the prosecution) [eyewitness]

159. ████████████ Identity No █████████ (details in the prosecution) [eyewitness]

160. ████████████ Identity No. ████████ (details in the prosecution) [eyewitness]

161. ████████████ Identity No. ████████ (details in the prosecution) [eyewitness – two statements – saw the terrorist stabbing people]

162. ████████ Identity No. ████████ (details in the prosecution) [identification of the body of the late Yosef Habi]

163. Noam Asafi, Identity No. 031877665. (details in the prosecution) [injured in the attack]

164. Yossi Azuz, Identity No. 029416740. (details in the prosecution) [severely injured in the attack]

[Stamp] P 5: 207 [continued]

Prosecution Case 444/02 Amended



165.  Michael Gruber, Identity No. 043401140. (details in the prosecution) [injured in the attack]

166.  ███████████ the National Institution of Forensic Medicine, Tel Aviv. [submitter of expert opinion] (will be summoned upon explicit demand of the defense only)

167.  Hospital records – institutional record

<u>An additional list of witnesses concerning the casualties and victims in the attack at the "Seafood Market" Restaurant in Tel Aviv on March 5, 2002 will be delivered during the trial</u>

---

**Detailed Incident 568/02 Shafat**

168.  ███████████ Badge No. ███████ Border Guard. (details in the prosecution) [statement and submitter of action report]

169.  █████████ Badge No. ███████ Border Guard [details in the prosecution].

170.  █████████ Badge No. ██████ Border Guard [details in the prosecution].

171.  █████████ Badge No. ███████ Identification – Zion Station [submitter of 2 seizure and marking reports + exhibits from exhibit entry card No. 294/02].

172.  ██████████████ Badge No. ██████ Zion Station – Bomb Disposal [submitter of action report]

173.  ████████████████ Badge No. ██████ Forensic Identification – Bomb Disposal Laboratory, National Headquarters, Jerusalem. [submitter of expert opinion and exhibit cover reports] (will be summoned upon explicit demand of the defense only)

174.  █████████████████ Badge No. ██████ the Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination] (will be summoned upon explicit demand of the defense only)

[Stamp] P 5: 207 [continued]



Prosecution Case 444/02 Amended

91

175.  ███████████ the National Institution of Forensic Medicine, Tel Aviv. [submitter of expert opinion] (will be summoned upon explicit demand of the defense only)

─────────────────

**Detailed Incident 783/02 Binyamin**

176.  ██████████████████ Badge No. █████ Binyamin Station. [submitter of action report]

[Stamp] P 5: 207 [continued]

Prosecution Case 444/02 Amended



177. ███████████████ Badge No. █████ Yehuda Forensic Identification. [submitter of crime scene visit report + photograph tables]

178. ████████████, Badge No. 57556, Binyamin Station. [submitter of exhibit cover form + memorandum + exhibits from card No. 106/02]

179. Samir Karash, Identity No. 080062771 (details in the prosecution) [wounded in the shooting attack]

180. ██████ M.D., License No. █████ Hadassah Ein Kerem Hospital, Jerusalem. [submitter of medical report] (will be summoned upon explicit demand of the defense only)

181. Query for finding and projection of vehicle and owner details [institutional record].


[Signature]
Michael Kotlik, Captain
Military Prosecutor



Date: September 29, 2002

Reference: 444-02 amended


[Stamp] P 5: 208

Prosecution Case 444/02 Amended

93

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

                              Plaintiffs,

            vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                              Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.      The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P5: 175-208.

2.      I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.      To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P5: 175-208.

                                                                Rina Ne'eman

ss.: New Jersey

On the [28] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014.

Notary Public

HNUT J MIHRETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
I.D.# 2392704



| צבא | | הגנה | | לישראל |
|---|---|---|---|---|
| בגי״ת | המשפטן | | תיק ביה״מ : | 3459/02 |
| בבית | הצבאי | | תיק תביעה : | 444/02 |
| בפני | אל | | תיק פ.א. : | 1282/02 בנימין |
| | הורב | | | 1283/02 בנימין |
| | | | | 1284/02 בנימין |
| | | | | 1285/02 בנימין |
| | | | | 234/01 מותימ ר-ם |
| | | | | 457/01 בנימין |
| | | | | 2159/01 בנימין |
| | | | | 7915/01 ציון |
| | | | | 481/01 ציון |
| | | | | 8379/01 ציון |
| | | | | 39/02 בנימין |
| | | | | 502/02 ציון |
| | | | | 483/02 שפט |
| | | | | 4258/02 ירקון |
| | | | | 568/02 שפט |
| | | | | 783/02 בנימין |

**במשפט: שבין התובע הצבאי – הנאשם**

**- נגד -**

אחמד טאלב מוצטפא ברגותי (מכונה "אל פראנסי")
ת.ז. 994466860, יליד 15.03.76, תושב: אלבירה ר.רמאללה
עצור: מיום 15.04.02

**- הנאשם -**

# כתב-אישום מתוקן

**הנאשם הנ״ל מואשם בזאת בביצוע העבירות הבאות:**

**פרט ראשון:**

**מהות העבירה:** חברות בהתאחדות בלתי מותרת, עבירה לפי תקנות 84(1)(א) ו-85(1)(א) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנ״ל, באיזור, החל מסוף שנת 2000 ועד ליום מעצרו, היה חבר או פעל כחבר בהתאחדות בלתי מותרת, דהיינו:
הנאשם הנ״ל, החל משנת 1996 ועד ליום מעצרו עבד כמנהג וכשומר ראש של ███████ שהוא ראש "התנזים" של הפתי״ח.
הנאשם הנ״ל, החל מתחילת שנת 2001 ועד ליום מעצרו פעל במסגרת "התנזים" של הפתי״ח, שהוא ההתאחדות בלתי מותרת, פעילות צבאית נגד המטרות הישראליות.
במהלך פעילותו הנ״ל הנאשם קיבל באמצעות חשבון הבנק שלו סכום של כ-7,000 ש״ח. הנאשם פעיל צבאי בכיר מאיזור שכם, גם סכום של כ-10,000 ש״ח מ███████, פעיל בכיר באיזור ברמאללה.

1

ת.ת. 444/02 מתוקן

במהלך פעילותו הצבאית הנאשם היה בקשר מתמיד עם ראש "גדודי חללי אלאקצא", הזרוע
הצבאית של "התנוזים" של הפתיאיח בשכם - ███████, ראש "גדודי חללי אלאקצא"
באיזור טול-כרם - ███████, ראש "גדודי חללי אלאקצא" באיזור ג'נין - ███████,
ראש "גדודי חללי אלאקצא" באיזור בית-לחם (חברון) - ███████, ראש "גדודי חללי
אלאקצא" באיזור - ███████, וכן עם ראש "התנוזים" של הפתיאיח -
███████.

במסגרת פעילותו הצבאית הנ"ל, הנאשם חפץ ברפאללה כרוזים בדבר לקיחת האחריות לפיגועים
שבוצעו בישראל ובאיזור על-ידי פעילי "התנוזים" של הפתיאיח.

## פרט שני:

**מהות העבירה:** נשיאות משרה בהתאחדות בלתי מותרת, עבירה לפי תקנות 84(1)(א),(ב) ו-85(1)(א),(ב)
לתקנות הגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, החל מתחילת שנת 2001 ועד ליום מעצרו, נישא או עזר
להנהלת והתנהלות בלתי מותרת, או החזיק בכל משרה או עמדה בהתאחדות בלתי מותרת או
תרם מראות, דהיינו:
הנאשם הנ"ל, בכולל התקופה האמורה, היה אחד האחראיים על ארגון "גדודי חללי אלאקצא"
ולמעשה שהתהאיב באיזור רמאללה - הזרוע הצבאית של "התנוזים" של הפתיאיח,
שהוא התאחדות בלתי מותרת. "גדודי חללי אלאקצא" הינו אחראיים לביצוע מספר רב של
פיגועים נגד חיילי צה"ל ואזרחים ישראליים הן בתחום הן בגדול שטחה של מדינת ישראל, אשר
בהן נהרגו מספר רב של אזרחים ישראליים וחיילי צה"ל.
בין היתר, הנאשם שימש כאיש קשר בין שאר האחראיים ב"גדודי חללי אלאקצא" לבין
ראש "התנוזים" של הפתיאיח - ███████.

## פרט שלישי:

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנות 84(1)(א),(ב) ו-85(1)(א),(ב)
לתקנות הגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במהלך התקופה האמורה בפרט האישום הראשון או
בסמוך לכך, עשה עבודה או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת,
דהיינו:
הנאשם הנ"ל, בכולל התקופות האמורה, ברמאללה או בסמוך לכך, במספר רב של הזדמנויות
שונות, חילק כספים לפעילים ובשליח של "התנוזים" של פתיאיח. הנאשם נהג לקבל כספים מפעיל
"התנוזים" של הפתיאיח ███████ לחולק אותם לאנשים רבים אשר ביצעו פיגועים נגד חיילי
צה"ל ואזרחים ישראליים. בכל הזדמנות הנאשם מסר לכל אחד מהפעילים סכומר כסף שנענו בין
100 ל-300 דולר ארה"ב. בנוסף לכך, הנאשם נהג להעביר סכומם גדולים יותר לפעילים צבאיים
בינתגוזים של הפתיאיח באמצעות העברות בנקאות.
בין היתר, הנאשם העביר לבכיר ב"התנוזים" של הפתיאיח בטול-כרם, שהוא
סגנו של ███████ - ראש "גדודי חללי אלאקצא" בטול-כרם, שהוא הזרוע הצבאית של
"התנוזים" של מעצרו, סכום של 3,000 ש"ח.
כמו כן, הנאשם העביר ל ███████, שהוא ראש "גדודי חללי אלאקצא",
סכומים בין 1,000 ל-2,000 ש"ח בכ-6-7 הזדמנויות שונות וזאת לצורך רכישת בדורים.
בנוסף לכסומים, הנאשם נהג לספק לפעילים צבאיים של "התנוזים" של מעצרו מכשירי טלפון
סלולריים לצורכי פעילותם הצבאית.

2

**פרט רביעי:**

**מהות העבירה:** סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי (יהודה והשומרון) (מס' 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בשנת 1998 או בסמוך לכך, סחר או עסק בצורה אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו: הנאשם הנ"ל, במועד האמור, במהלך הפגישות אמעיר או בסמוך לכך, רכש מכ"ר ▇▇▇▇▇ תמ"ק 5-MP תמורת 4,000 דינר ירדני וכן כ"ר רוסי"י M-16 מקוצר עם כוונת טלסקופית תמורת 5,500 דינר ירדני, ונאות לבצע הוטל 2001 ~ 2002, גם לפיגועים שונים. על מנת שיבוצעו באמצעותו פיגועי ירי נגד אזרחים ישראלים וזאת כפי שתומא בהמשך כתב-האישום.

**פרט חמישי:**

**מהות העבירה:** החזקת כלי-ירייה ללא היתר, עבירה לפי סעיף 53(א)(1) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במהלך התקופה האמורה בפרט האישום הראשון, החזיק ברשותו כלי-ירייה, תחמושת, מצות, רימון-יד או חפץ מפץ או מבעיר, כלי חצ או דבר המתוכנן או מסוגל לגרום מוות או חבלה חמורה, ללא בעלותם, ללא תעודה ויתר שהעתוקה על-ידי מפקד צבאי או מטעמו, דהיינו: הנאשם הנ"ל, במהלך התקופה האמורה, ברשומלתו או בסמוך לכך, החזיק ברשותו תמ"ק 5-MP, אקדח וכן רוסי"י M-16 מקוצר עם כוונת טלסקופית, וזאת ללא תעודת היתר שהעתוקה על-ידי מפקד צבאי או מטעמו.

**פרט שישי:**

**מהות העבירה:** סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי (יהודה והשומרון) (מס' 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בשנת שנת 2000 או בסמוך לכך, סחר או עסק בצורה אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו: הנאשם הנ"ל, במועד האמור, במועד האמור, ברמאללה או בסמוך לכך, מסר לידי ▇▇▇▇▇ - ראש הזרוע הצבאית של "התנונים" של הפניית, רוסי"י קלצ'ינקוב 50-1 כדורים כרמטי"י קלצ'ינקוב, וזאת ללא היתר חתום על-ידי מפקד האיזור או מטעמו. מסר את רוסי"י קלצ'ינקוב של חבורת הנ"ל לידי ▇▇▇▇▇, פעיל בכנף 17 של הרשות הפלסטינית. דיון ל▇▇▇ כי במצע באמצעות רוסי"ר קלצ'ינקוב הנ"ל פיגועי ירי שבן בקרתן בני הוג מכ"ל פיגוע חנ"ל פגועי ירי שבו תוכב אזרח ישראלי.

**פרט שביעי:**

**מהות העבירה:** סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי (יהודה והשומרון) (מס' 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, תחל מסוף שנת 2000 ועד ליום מעצרו או בסמוך לכך, סחר או עסק בצורה אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו: הנאשם הנ"ל, במועד האמור, במהלך התקופה האמורה, ברמאללה או בסמוך לכך, במספר רב של הזדמנויות שונות, מסר לידי ▇▇▇▇▇ - ראש הזרוע הצבאית של "התנונים" של הפניית, סכומי כסף גדולים של עשרות אלפי שקלים ועשרות אלפי דולרים של ארה"ב, בצורך רכישת כלי נשקלדורים להמעין פיגועי ירי נגד חיילי צה"ל ואזרחים ישראלים. הנאשם אף גם נקשאת אצל בבית הכוורים שערכשו במבה הנ"ל היתר, וזאת ללא היתר מפקד האיזור או מטעמו.

ת.ג: 444/02 מ'טק"ן

**פרט שמיני:**

**מהות העבירה:** סחר בצידוד מלחמתי, עבור לפי סעיף 2 לצו בדבר איסור סחר בצידד מלחמתי
(יהודה והשומרון) (מס' 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף שנת 2001 או בסמוך לכך, סחר או עסק בצורה
אחרת בצידוד מלחמתי, ללא היתר רתום על-ידי מפקד האיזור או מטעמו, דהיינו:
הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, מסר ל████████
████████, ראש יחידיד הכלי אלסקצא, ████ הזרוע הצבאית של "התנועה" ████ של המתית, 100 כדורים
לרובי M-16, וזאת ללא היתר חתום על-ידי מפקד האיזור או מטעמו.

**פרט תשיעי:**

**מהות העבירה:** פגיעה בביטחון האיזור, עבירה לפי סעיף 53(א)(4) לצו בדבר הוראות בטחון
(יהודה והשומרון) (מס' 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בתחילת שנת 2001 או בסמוך לכך, עשה מעשה או מחדל
שיש בהם פגיעה, היזק, הפרעה או סכנה לביטחון האיזור או לביטחון סדרות צה"ל וחיילי או
לפעולתם, שימושם או ביטחונם של כל אחד מאלה: אניה, אוירון, גמל, רצף, מזח, מעגן, שדה
תעופה, מסילת ברזל, עזיב מים, דרך, דרך-עפר, גשר, כלי רכב, כלי משא או כל אמצעי אחר של
חובלה ציבורית, או תקשורת צבורית, או כל מפעל, מחסן, או ציוד תשמישם או מסוגל לשמוש
ליצורים, לספקתם, החסנתם, העברתם, מסירתם או הצאתם של מים, דלק, גז או חשמל או כל
רכוש של מדינת ישראל או של צה"ל, דהיינו:
הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, ████ רכב מחום לכן גנב, מדוב חדיש,
הנאשם הנ"ל מסר את הרכב הנ"ל לידי ████████████ אשר יצא ברכב האמור לבצע
פגועים נגד אזרחים ישראליים וחיילי צה"ל באיזור.

**פרט עשירי:** (פ.א. 234/01 מח"מ י-ם)

**מהות העבירה:** גרימת מות בכונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה
והשומרון) (מס' 378), תש"ל-1970. וסעיף 14(א) לצו בדבר כללים לאחריות לעבירה (יהודה
והשומרון) (מס' 225), תשכ"ט-1968.

**פרטי העבירה:** הנאשם הנ"ל, בתוך באיזור ובין מחוצה לו, ביום 25:01.01 או במועד הסמוך לכך,
גרם במותו למותו של אחר, דהיינו:

1. הנאשם הנ"ל, במועד האמור, נמצא ברמאללה עם ████████ (מכונה
████) וגם ████████
2. בקשו מהנאשם רכב לצורך ביצוע פיגוע נגד נגד יהודים. הנאשם
מסר לידי ████████ רכב פולקסווגן גורדה גנב בצבע כסף, נשא לוחיות רשוי
ישראליות, וזאת על מנת שהתבצע הנ"ל לבצע מרכב זה פיגוע ירי בכוונה לגרום למותם של
אזרחים ישראליים.
3. ████████ נהג ברכב הפולקסווגן ואילו ████████ ישב לידו כשהוא חמוש באקדה 16.
4. ████████ נסע ברכב הפולקסווגן לאיזור עטרות על מנת לחפש לחפש רכב ישראלי
במסרת לבצע לעבר מנ"ו ירי ולגרום למותם של נוסעי הרכב.
5. סמוך לשעה 15:15, באיזור הנעשיה עטרות, ████████ הבחינו ברכב GMC
ספאר, מ.ר. 7901306, דמלזין, הרכב אשר בו נהג אלתר עקבא פעקוס זייל.
6. ████████ יחלו לנסוע אחרי הרכב. הנאשם ████ עקבו אחרי הרכב
מאיזור חהנעשיה עטרות עד צומת אריאום ובחזרה.
7. כאשר הרכב חזר לאיזור הנעשיה עטרות ונסע בכביש הראשי, ████ נסע
ברכב הפולקסווגן בסמוך לרכב.
8. בשלב זה, ████████ פתח אש והתחיל וירה באקדה 16 הנ"ל כ-7 כדורים לעבר הרכב בכוונה
לגרום למותם של נהג הרכב. מספר קליעים, אשר גזרו על-ידי ████ פגעו ברכב. כאשר
קליע אחד פגע בצוארו ואחד בחזהו של אלתר עקבא פעקוס זייל שמנ ברכב.
9. משהבחבנוhat ████████ כי הרכב נעצר, השניים נמלטו ברכב הפולקסווגן
לרמאללה.

4

P 5: 178

10. ברמאללה, ████████████████ החזירו את רכב הפולקסווגן לנאשם כדיווחו לו על הפיגוע שביצעו.

11. לאחר יום, הנאשם מסר ל-████████ כ-300 דולר ארה"ב עבור ביצוע הפיגוע הנ"ל. את הכסף האמור הנאשם קיבל מידי אבו עלי פרג'י ברגותי.

12. במעשים המתוארים לעיל, הנאשם הנ"ל גרם בכוונה למותם של אלעזר. עקיבא. משקלס ז"ל, אשר נפטר כתוצאה מפגיעות הקליעים שנורו על-ידי ████████ כפי שתואר.

## ‌אישום אחד-עשר: (ת.א. 457/01, בנימין)

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשל"ו-1970 (סעיפים 14(א) ו-19) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 25.02.01 או בסמוך לכך, ניסה לגרום בכוונה למותו של אחר, וזיאני:

1. הנאשם הנ"ל, במועד האמור, נפגש ברמאללה עם ████████████████████

2. הנאשם וחבריו הנ"ל דנו במצב באיזור. הנאשם וחבריו הנ"ל טענו כי אין מעלות לצאת לפעולות נגד מטרות הישראליות. הנאשם שאל את חברו הנ"ל מה ניתן לעשות. על מנת לשפר את המצב, חבריו הנ"ל של הנאשם בקשו כי הנאשם ████ ונפק למ████ רכב ███████ ושהם יבצעו פיגוע נגד האזרחים הישראליים בכוונה לגרום למותם.

3. הנאשם הסכים להצעת הנ"ל. הנאשם מסר לידי חברו הנ"ל את ████ מסוג פולקסווגן ברה, צבע אפור, מדגם שנת 2001, נושא לוחיות רישוי ישראליות, יחד תמגים MP-5 עם מחסנית וכדורים.

4. ████████ נטעו ברכבו של הנאשם, אשר באמו אותו קיבל מהנאשם. חברו הנ"ל של הנאשם ████████████

5. בסמוך לשעה 15:13, חברו הנ"ל של הנאשם הבחינו ברכב GMC ואנדרח, מ.ר. 3082518, אשר ██.██.██, יוסף בכון, בשהרכב האמור יצא מישטח עצורת ונעת למיון נשר עטארה.

6. חברו הנ"ל של הנאשם תהלטיטו לבצע פיגוע ירי לעבר רכב ה-GMC הנ"ל בכוונה לגרום למותם של נוסעים בו.

7. חברו הנ"ל של הנאשם החליטו להמתין עד שרכב הסיטרואן שעמע לפניהם יעקוף את רכב ה-GMC ואז לעקוף את רכב ה-GMC ולבצע לעבר את הכורב את פיגוע הירי המתוכנן.

8. ברכב הסיטרואן הנ"ל נסעו ████████████████ התמשים ב-2 ידוסי"ר קלצ'יקוב, ורושיר M-16. נוסעי רכב הסיטרואן הנ"ל פתחו באש לבבלי הנ"ל לעבר רכב ה-GMC הנ"ל בכוונה לגרום למותם של הנוסעים בו. 29 קליעים שנורו על-ידי האנשים הנ"ל פגעו ברכב ה-GMC הנ"ל. 3 קליעים פגעו בראשו ובצוואראו של יוסף בכון, אשר נהג ברכב ה-GMC הנ"ל, כתוצאה מפגיעות הקליעים הנ"ל וכן מפגיעות הרסיסים בכל חלקי גופו, יוסף נפצע באורח קשה.

9. לאחר שחבריו הנ"ל של הנאשם הבחינו כי כתוצאה מפגיעו הירי שנזגצ מרכב הסיטרואן שנסע לפניהם, רכב ה-GMC נפגע, ירד מתכביש ונהג הרכב נפצע, חבריו הנ"ל של הנאשם נמלטו בחזרה לרמאללה.

10. ברמאללה, חברו הנ"ל של הנאשם החזירו לנאשם את רכב הפולקסווגן הנ"ל ואת תמגיק MP-5 הנ"ל. ████████████████████████████ יהודו לנאשם כי ביצוע פיגוע ירי באמצעות הרכב וכלי הנשק הנ"ל וכי כתוצאה ממך נפצע נהג יקודי.

**פרט שנים-עשר:**

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש יוני 2001 או בסמוך לכך, ניסה לגרום במזיד במוותו
של ואחר, דהיינו: ████████████████████████ ביחד עם ████████
████████████████████ במטרה לפגוע █████ לעבור היישוב פסגות במטרה
לגרום למותם של אזרחים ישראלים.
████████████████████ ראש "התנועים" של המתנין. האנשים, הנ"ל
נפגשו עם ████████ גילגל אל משרדו של ████████ ובנשקו מהאחרון לקבל כלי נשק לצורך ביצוע פיגוע ירי נגד אזרחים
ישראלים ביישוב פסגות. ████████ שמות לשמש את התכנית הנ"ל לבצע פיגוע ירי לעבר
היישוב פסגות ומבקשים לקבל כלי נשק לצורך ביצוע פיגוע, הירי המתוכנן.
█████████████ לצורך בשבוע ימים. ████████ והחבריו הנ"ל ניגשו שוב למשרדו של
████████ לא דקק באותו לאת ████████ והנאשם היה זה זה ששותת עם
הנ"ל. הנאשם ████████ לצורך לצבר מרואן בנרות בנוגע לבקשות וחבריו הנ"ל לקבל כלי נשק לצורך
ביצוע פיגוע ירי לעבר היישוב פסגות.
לאחר כשלושה ימים, ████████ והבריו הנ"ל ניגשו שוב אל משרדו של
ברמאללה. האנשים הנ"ל ביקשו שוב ל████████ לקבל כלי נשק לצורך ביצוע פיגוע ירי לעבר
היישוב פסגות. ████████ המקושר אל ████████, פעל צבא בכיר בינתנים של
הפתוח, טוב כי ימונו את האנשים הנ"ל בכיר מרואן ברמאללה יא יםסר
████████ לם כלי נשק לצורך ביצוע פיגוע ירי המתוכנן.
████████ והנ"ל נפשו עד באותו חיים. בכיר מאהר ברמאללה עם
████████ במהלך הפגישה המאומה ████████ והכינים להשביר לידיהם כלי נשק לצורך ביצוע פיגוע
הירי המתוכנן.
בלילה של אותו הים, הנאשם הגיע לביתו של ████████ באלבירה ומסר לידי
טמקל MP-5 וכדורים ████████ ביצוע פיגוע ירי נגד אזרחים ישראלים.
לאחר כשעה, ████████ יצא טמונו ביחד עם ████████ כשהם
מחזיקים בתמיק MP-5 הנ"ל. ████████ הגיעו למקום תמצא בסמוך לישוב
פסגות. שם השניים ירדו מהרכב, ████████ ירה את כל הכדורים שמסך הנאשם בתמיק
MP-5 הנ"ל לעבר היישוב פסגות מתוך כוונה לגרום למותם של תושבי היישוב פסגות ושל חיילי
צה"ל שהיו ביישוב פסגות.
מד לאחר האר הירי, ████████ חזר ברכבם הנ"ל לרמאללה.

**פרט שלושה-עשר:**

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 26.06.01 או במועד, הסמוך לכך, ניסה לגרום בכוונה
למותו של ואחר, דהיינו:
הנאשם הנ"ל, בחודש יוני 2001 או בסמוך לכך, ברמאללה, בהתאם להתמארות בפרט האישום
הקודם, מסר לידי ████████ ותמיק MP-5 לצורך ביצוע פיגוע ירי נגד אזרחים
ישראלים והחילי מ████████. ████████ יצא
████████ במטרה האמור, ביחד עם ████████
מרמאללה כיוון הכביש הומוביל ממסך זאב לבנתי הצרפתי שבירושלים, על מנת לבצע שם
פיגוע ירי וגרום בכוונת למותם של אזרחים ישראלים. ████████ והנ"ל יצאו לאמור כשהמר
כשהם חמושים ברזמן MP-5, אשר נמסר להם למעות זו על-ידי הנאשם האמור לעיל, ובהתאם 9.
שם תכנון לבצע את פיגוע הירי, אשר נערך על-ידי
████████████████ פיגוע פעולים ובאמר בשדרות של הגבוה הצרפתית
שם תכנון לבצע את פיגוע הירי, אשר נערך על-ידי ████████ ואף ביקשו
████████ והבריו הנ"ל יצאו לביצוע הפיגוע ונאמר בתיאום עם
████████ ראש "התנועים" של המתנין, אם מי ממבצעי הפיגוע נ████████
במהלך ביצוע פיגוע הירי המתוכנן. ████████ והבריו לא הצליחו להגיע למקום שבו תכנון לבצע
את פיגוע הירי עקב מחמנת גדולה של כוחות צה"ל באיזור היתאמ.

פרט. ארבעה-עשר (ת.פ.א 2159/01 בימ"ן)

מהות העבירה: גרימת מוות במזיד, עבירה לפי סעיף 51(א) לצו בדבר הוראות בטחון (יהודה
והשומרון) (מס' 378), התשל"1970- וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה
והשומרון), התשכ"ח-1968.

פרטי העבירה: הנאשם הנ"ל, באיזור, ביום 25.08.01 או בסמוך לאחר לכך, גרם במזיד למותו
של אשר, דוליר:

1. הנאשם הנ"ל, בחודש אוגוסט 2001 ███████████ או בסמוך לכך, נפגש עם ███████
████████ (ממונה) ███████ מסר לנאשם כי הכיר מספר
פעולי התאגגנותי של הפת"ח, אשר מבצעים פיגועי ירי נגד אזרחים ושראלים.
ביקש לקבל את אישורו של הנאשם להצטרף לחוליה הנ"ל ולבצע פיגועים נגד אזרחים
ושראלים בכוונה לגרום למותם. הנאשם אישר ל ████████████ להצטרף לפעילות האמורה.

2. ████████████ השלושה הנ"ל אמרו ל ████████ נפגש עם פעילי "התנזים" הנ"ל, שהם
████████ (ממונה) ו ████████
כי בכוונתם לבצע פיגוע ירי במסתרה לגרום למותם של אזרחים ישראלים. השלושה
ביקשו מ ███████████ שסָפֵק להם כלי נשק לצורך ביצוע פיגועי הירי המתוכנן.

3. ביום 25.08.01, פנו אל ██████ לקבל עוד כלי נשק לצורך ביצוע פיגוע חירי המתוכנן.

4. ███████ באותו היום, מאוחר מצלה פנה אל הנאשם. ביקש מהנאשם לקבל כלי נשק
לצורך ביצוע פיגוע ירי נגד אזרחים ישראלים. לאחר זמן קצר, עוד באותו היום, הנאשם מסר
ל ████ תמ"ק MP-5 עם מחסנית ממולאת בכדורים ואות על מנת
וחברו הנ"ל יבצעו באמצעות פיגוע ירי לגרום למותם של אזרחים ישראלים.

5. בעלות הערב, באותו היום, ברמאללה או בסמוך לכך, ███ מסר את תמ"ק MP-5
התחתמשות הנ"ל ל ████████████ אשר הגיע ברכב אסקורט טנדר של
ואת על מנת ████ יבצעו באמצעות חמשת פיגוע ירי וגרמו למותם של
אזרחים ישראלים.

6. מיד לאחר קבלת הנשק, ██████████ יצאו מרמאללה לכוון כביש 443 במסתרד לצבע שם את פיגוע הירי המתוכנן. האמצעים הנ"ל
נסעו בשני ████ כלי רכב - לאחת, אימכוני טנדר של ████ ונחשני רכב סובארו גוב שבהיגו
לצורך ביצוע הפיגוע המתוכנן.

7. בהגיעם לכביש 443, ████████ המשער נסעו לבדו ברכב האאסהון, בקילומטר לפני רכב
הסובארו הנ"ל ברכב פולקסוון פאסאט, על מנת להודיע לחברו חנ"ל על מחסומי
צה"ל והמשטרה בדרך.

8. כל האנשים הנ"ל נסעו בכביש 443 לכוון תל-אביב, באשר ████ נהג ברכב הסובארו, לידו ישב
████ חתמשי ברושיימר קלצ'ניקוב, ובמושב האחורי ישב ████████, החמוש ███████
ג'ירק MP-5, ████ אשר אותו סיפק הנאשם.

9. באותו היום, 25.08.01, סמוך לשעה 30.22, ליד תחנת דלקג "דור אנרגיה", נבחחו נוסעי רכב
הסובארו הנ"ל ברכב פולקסוון פאסאט, מ.ר 6902818, אשר בו נסעו בני חזוג בני ████ ושניהן בן
שלום חן'ל עם שני ילדיהם גדירון יוסף סוזיר ז"ל.

10. ████████████████ שנהג ברכב הסובארו, עקף את רכב הפולקסוון הנ"ל נסע במקביל אליו. בשלב
זה, ████████████ פתחו באש אוטומטית בתמ"ק MP-5, אשר אותו סיפק
הנאשם, וברושיימר קלצ'ניקוב, לעבר רכב הפולקסוון הנ"ל במסתרה לגרום למותם של נוסעיו.

11. מספר רב של תקליעים שנורו על-לידי ████ פגעו ברכב הפולקסוון
ובנוסעיו.

12. לאחר שהוסעי רכב הסובארו הנ"ל הבחינו כי רכב הפולקסוון נסע בצ'גזג, הם האיטי את המהירות
ונמלטו לכבר בית ליקיא. שם המתינו להם ████████ שם הם חסתירְן את כלי
הנשק במסתר לביתו של ████████████ עלו לרכב האפסחו של ████████ לאחר מכן,
חזרו לרמאללה ברכבו של ████████.

13. מיד לאחר חזרתם לרמאללה, ████████ נפגש בעין שראיית עם ████████ אשר
דיוַח ████████ על הפיגוע שבוצע באמצעות הנשק שנמסר למטרה זו על-לידי הנאשם.

14. לאחר מספר מספר ימים, ████████████ הביא את תמ"ק MP-5, הנ"ל מבית סירא התחזירו ל
████ העביר את כלי המשק הנ"ל לידי הנאשם ודיווח לאחזון על פיגוע הירי
שבוצע בכלי ודמשק הנ"ל.

15. הנאשם העביר למבצעי הפיגוע הנ"ל סכום של 500 דולר ארה"ב עבור ביצוע הפיגוע הנ"ל. את
הכסף הנ"ל הנאשם קיבל ████████████.

7

ח.ת 02/444 מתוקן

16. הנאשם הנ"ל, במעשיו המתוארים לעיל, גרם בכוונה למותו של גליב בן שלום ז"ל, אשר נפטר כתוצאה מפגיעות קליעים בראשו ובגבו, אשר נורו מתמ"ק MP-5 המתואר לעיל, ומרוס"ר קלצ'ניקוב על-ידי הייתם חמדאן וחוסאם שחאדה.

__פרט חמישה-עשר:__ (פ.א. 2159/01 בנימין)

__מהות העבירה:__ גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון), תשכ"ח-1968.

__פרטי העבירה:__ הנאשם הנ"ל, באיזור, ביום 25.08.01 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום הארבעה-עשר, במעשיו המתוארים בפרט האישום הארבעה-עשר, גרם בכוונה למותה של שרון בן שלום ז"ל, אשר נפטרה כתוצאה מפגיעות קליעים בראשה ובגבה, אשר נורו מתמ"ק MP-5, אשר אותו סיפק הנאשם כמתואר בפרט האישום הארבעה-עשר, וברוס"ר קלצ'ניקוב.

__פרט שישה-עשר:__ (פ.א. 2159/01 בנימין)

__מהות העבירה:__ גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון), תשכ"ח-1968.

__פרטי העבירה:__ הנאשם הנ"ל, באיזור, ביום 25.08.01 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום הארבעה-עשר, במעשיו המתוארים בפרט האישום הארבעה-עשר, גרם בכוונה למותו של דורון יוסף סוויד ז"ל, אשר נפטר כתוצאה מפגיעות הקליעים, אשר נורו מתמ"ק MP-5, אשר אותו סיפק הנאשם כמתואר בפרט האישום הארבעה-עשר, ומרוס"ר קלצ'ניקוב.

__פרט שבעה-עשר:__ (פ.א. 2159/01 בנימין)

__מהות העבירה:__ ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

__פרטי העבירה:__ הנאשם הנ"ל, באיזור, ביום 25.08.01 או במועד הסמוך לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו:
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום הארבעה-עשר, במעשיו המתוארים בפרט האישום הארבעה-עשר, ניסה לגרום בכוונה למותם של נוסעי רכב פולקסווגן פאסאט, האמור בפרט האישום הארבעה-עשר. כתוצאה מהירי שבוצע כאמור בפרט האישום הארבעה-עשר מתמ"ק MP-5, אשר אותו סיפק הנאשם כמתואר בפרט האישום הארבעה-עשר, ומרוס"ר קלצ'ניקוב, נפצעת באורח קל מרסיסים ברגלה בתם של בני הזוג בן שלום ז"ל.

**פרט שמונה-עשר:**

**מהות העבירה:** פגיעה בביטחון האיזור, עבירה לפי סעיף 53(א)(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש ספטמבר 2001 או בסמוך לכך, עשה מעשה או מחדל שיש בהם פגיעה, חיבל, הפריעו או סכנה לביטחון האיזור או לביטחון כוחות צה"ל ולחייליו או לפעולתם, שימושם או ביטחונם של כל אחד מאלה, אלה, אוירון, נמל, רציף, מזח, מעגן, שדה תעופה, מסילת ברזל, גיזם-מים, דרך, דרך-עפר, גשר, פלי רכב, פלי משא או כל אמצעי אחר של הובלת ציבורית, או תקשורת ציבורית, או כל מפעל, מוסד, או ציוד המשמש או מסוגל לשמש לייצורם, חפקותם, החסנתם, העברתם, מסירתם או הפצתם של מים, דלק, גז או חשמל או כל רכוש של מדינת ישראל או של צה"ל, דהיינו:

אל הנאשם הנ"ל, במועד האמור ברמאללה או בסמוך לכך, פנה ▬▬▬▬▬▬▬▬▬▬▬▬▬ הידוע (להלן ▬▬▬▬▬) – חודיע לנפשם של "הנעשים" של הפעיית באיזור,
– ראש "יחזדי" הלל אסאל"נשאו" – חודיע הנבשאת של הפעיית באיזור, ▬▬▬ הנאשם ▬▬▬▬ כי הם יצרו מרגמה וגם רכשו מצבת מרגמה תמורת 1,500 ש"ח. האנשים הנ"ל ביקשו מהנאשם לתת להם כסף, אשר אותו שילמו תמורת מצבת המרגמה הנ"ל. האנשים הנ"ל אמרו כי בכוונתם לירות את פצצת המרגמה הנ"ל לעבר הישוב פסגות.

הנאשם טען בפני האנשים הנ"ל כי אם הם יצליחו לירות את מצבת המרגמה הנ"ל על הישוב פסגות, הוא ישלם להם את הכסף עבור הפצצה.
מאוחר יותר, באותה תלילה, האנשים הנ"ל חזרו אל הנאשם והודיעו לו כי הם אכן ירו את פצצת המרגמה הנ"ל לעבר הישוב פסגות. מאחר והם ▬▬▬▬▬ פסגות. ▬▬▬▬▬▬▬▬ אפם. הפגוע נפלה מצבת המרגמה ▬▬▬▬▬ או אחר. האנשים הנ"ל ▬▬▬▬ הנ"ל כסף עבור פצצת המרגמה הנ"ל.
מאוחר יותר, האנשים ביצעו ירית אודות ירי פצצת המרגמה לעבר הישוב פסגות על-ידי האנשים הנ"ל
– ראש "הרגמים" של הפטירית.

**פרט תשעה-עשר:** (ת.א. 7915/01 ציון)

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970) וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין בעצמו ובין מתוצה לו, ביום 15.09.01 או במצוע הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:

1.  אל הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, פנה ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (להמכונה "▬ (המכונה "▬▬▬"), אשר מסר כי פנה אליך ▬▬▬▬▬▬▬▬▬▬▬▬ (אשר ▬▬▬▬) ביחד עם אדם נוסף (בקשתו לקבל תמ"ק MP-5 על מנת לבצע באמצעותו פיגוע ירי במרכז גדולים למותם של אזרחים ישראליים. בקשם כי הנאשם ימסור לו את תמ"ק MP-5, אשר אותו בקש למסור ▬▬▬▬▬ לפני כן לצורך ביצוע פיגועי-ירי.
2.  הנאשם הסכים לספק את כלי הנשק המבוקש לצורך ביצוע פיגועי-הירי המתוכנן.
3.  הנאשם הפנה את ▬▬▬▬▬ לצורך קבלת תמ"ק MP-5 הנ"ל. ▬▬▬▬▬ פנה אל ▬▬▬▬▬ לקיבל מאחרון תמ"ק MP-5 של הנאשם, כמו כן, הנאשם מסר לידי ▬▬▬▬▬ אחדה 14 לצורך ביצוע פיגוע הירי המתוכנן.
4.  מאוחר יותר באותו היום, ▬▬▬▬ את תמ"ק MP-5 הנ"ל ▬▬▬▬▬▬ במטרה שהאחרון יבצע באמצעותו פיגוע ירי ויגרום למותם של אזרחים ישראליים.
5.  יותר מאוחר באותו היום, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ נפגע ברמאללה עם ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (המכונה "▬▬▬") אונם סיפק הנאשם כאמור לעיל לצורך ביצוע פיגועי-ירי.
6.  בסביבות השעה 22:00, ביום 15.09.01, האנשים הנ"ל נסעו מרמאללה לירושלים ברכב איסוזו טנדר של ▬▬▬▬▬
7.  נהג ברכב ואיסוזו הנ"ל ונסע ביחד עם ▬▬▬▬▬▬▬▬▬▬ והביריע על מנת לתראות לחם מקום שבו יבצעו את פיגוע הירי המתוכנן וכן על מנת להתראות לחברו איך ▬▬▬▬▬▬ הגיע לפתישיה חוזל כשהוא חמוש בתמ"ק MP-5 ואקדח 14, אשר ▬▬▬▬▬▬▬▬▬▬▬ הגיע אל חבריו לכביש מסי 9 המחובר בין שכונות רמות לבין שכונת הגבעה הצרפתית בירושלים. ▬▬▬▬▬ הוראה לחבריו איפה לבצע את

הפיגוע המתוכנן ואיך להיפלט לאחר מכן. בסיום הסיור האמור, החזרתו הנ"ל חזרה לרמאללה.

8. בסביבות השעה 22:30, באותו היום, ████████ ביחד עם ████████ נסע ברכב גנוב בגבול הבנוב ████████ עם לוחות רישוי ישראליות, אשר אותו סיפק להם ████████ לצורך ביצוע הפיגוע המתוכנן (להלן: הרכב), לפניהם נסע ████████ ברכב האיסוזו הנ"ל וזאת על מנת להדריינ באמצעות טלפון סלולרי לחבריו על מחוומני משטרה וצה"ל.

9. ████████ נתן ברכב הנ"ל, לידו שכב ████████, החמוש בתמ"ק MP-5, אשר אותו ████████ סיפק הנאשם, ובמושב האחורי ישב היונם ████████, החמוש באקדח 14, אשר גם אותו סיפק הנאשם.

10. החבורה הנ"ל עצרה בכביש מס' 9 בסמוך לצומת המוביל לשכונת רמת שלמה וחימתניים לרכב ישראלי בדרך שיגרע למקום בכוונה לבצע פיגוע ירי ולגרום למותם של נוסעי הרכב.

11. לאחר מספר דקות, בסמוך לשעה 23:10, הגיע למקום רכב דו אוקספרם רכב ████████, מ.ר. 2273706, (להלן: הרכב) אשר נהג מכולון שכונות רמת שלמה ומנה לכבוש שכונות רמות.

12. ████████ החל לנסוע אחרי הרכב הנ"ל ועקף אותו.

13. כשהרכב נסע במקביל לרכב, ████████ פתחו באש בתמ"ק MP-5 ואקדח ████████, אשר אותם סיפק הנאשם, לעבר נוסעי הרכב במטרה לגרום למותם.

14. מטער קליעים שורו על-ידי ████████ פגעו בגב ובשני נוסעי הרכב - משה וויט ואשר ████████ ז"ל. לאחר מכן, ████████ המשיך לנוסע לכוון שכונת רמות ובסמוך למקום שבו בונים גשר חדש מנה ████████ לירד עפר המבורלה לבני נבאללה.

15. לפני הכניסה לבני נבאללה, ████████ והבריו שתיו עמו ברכב נפגשו עם ████████ שהמתינו להם במקום ברכב האיסוזו, משם כולם בירד המשיכו בנסיעה לבני נבאללה ולאחר מכן נעלמו לרמאללה.

16. כמשנית המתוארים לעיל, הנאשם גרם בכוונה למותו של מאיר "רייאפיר ז"ל, אשר נפטר בבית החולים מאוחר יותר, באותו היום. כתוצאה מהיריות הקליעים שורו על-ידי חברו הנאשם בתמ"ק MP-5 ובאקדח 14, אשר אותם סיפק הנאשם.

**פרט עשירים:** (פ.א. 7915/01 ציון)

**מהות העבירה:** נסיון לגרימת מוות, בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין בעצמו ובין מחוזפו לו, ביום 15.09.01, או במועד הקרוב לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו:

הנאשם הנ"ל, במועד ובמקום בסמוך לשעה 23:10, במקום המתואר בפרט האישום הקודם, במעשיו האמורים בפרט האישום הקודם, ניסה לגרום בכוונה למותו של משה וייט, אשר נהג בירכב דו אוקספרם לבן, מ.ר 2273706, המתואר בפרט האישום הקודם, פגע בראשו של משה וייט ופצע אותו באורח קשה.

**פרט עשירים אחד:** (פ.א. 481/01 ציון)

**מהות העבירה:** נסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר החלאות ביטחון (יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין בעצמו ובין מחוזפו לו, ביום 03.10.01, או במועד הסמוך לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו:

1. הנאשם הנ"ל, בראשית חודש אוקטובר 2001, ברמאללה או בסמוך לכך, נפגש עם ████████ (מכונה ████████) ביקש מהנאשם לקבל תמ"ק MP-5. ████████ תחמושת לתמ"ק MP-5 הנ"ל וכן רכב לצורך לבצע פיגוע ירי נגד אזרחים ישראליים בירושלים בכוונה לגרום למותם.

2. ████████ (מכונה ████████) מסר לנאשם כי הוא מתכנן לבצע את הפיגוע המתוכנן ביחד עם ████████ (המכונה ████████).

ת.פ. 444/02 מתוקן

P 5: 184

3. ‏וַתְּחִלָּה הַנֹּאשם אמר ל‏█████ לבצע את הפיגוע המתוכנן במרכז של █████. אך
‏█████ טען כי יש צורך בשני כלי רכב, כאשר ברכב אחד יישׂעו המתרועעים החֵורים ייׂשע
‏ברכב השירי, לאוֹר האמור, האשם מסר ל‏█████ רכב מדֶגֶם 323 ג'יפ, ד.מ.סא, ואחִ"ת
‏רישוֹז שׁרֳאלֶעוֹנ, אשר אותו רכַש לצורֶך כך בסֵך‏████████ תמורת 5,000 שׁ"ח.

4. ‏לצורֶך ביצוע פיגוע הירֵי במוٰתכנֶן, הנאשׁם מסר ל‏█████ ‏מכֶמֵיק-MP-5 ‏ותַתמֶשֶׁל לתמֵיק
‏MP-5 ‏הנָּ"ל.

5. ‏ביֹום 03.10.01, █████ יצֻאֶ ‏מַרָמֶאֶלֶּה לכֻיוٰן בטמֵרֶה לבצע שם את פיגֻוע הירֵי
‏המֹתוּכֶנֶן כשׁהֶוּא מּחֲוָּק בתמֵיק-5-MP ‏ה‏נָּ"ל ונֹוסֵע ברכֶב-המֵידָה הנָּ"ל, אשֶׁר ב.א.גֻוֹהֵג.

6. ‏נֳסַע ברכַב אלֹסֹוٰן טﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ █████ לפֵי רכַב המּﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞשׁ
‏נֳסַע █████ וֻזֻאֶ בֱּמׁﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ וﬞﬞﬞ מַחֲנַה

7. ‏חֲבְֵרֻיוٰ הֲנָּ"ל שׁל הַנֹּאֹשׁם הֻגֵּעֻ לׁבֵית חֲנֻוֹת הַחֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ שׁבֵירﬞﬞﬞﬞﬞﬞ, שׁם █████
‏אֶת הֲרֻכֶב הֲמֻﬞﬞﬞﬞﬞﬞ גֻּﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ עֻﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ שׁאֲﬞﬞﬞﬞ הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ בּﬞﬞﬞﬞ הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ תﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ-MP-5 ‏הֲנָּ"ל.

8. ‏עֻﬞﬞﬞﬞﬞﬞ לֻרֻכֶב הֲﬞﬞﬞﬞﬞﬞﬞﬞ וﬞﬞﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞ בּﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ █████ בֱּﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ עֻם
‏בﬞﬞﬞﬞﬞﬞﬞﬞ בּﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ בֱֻֻֻﬞﬞﬞﬞ.

9. ‏חֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הֲנָּ"ל שׁל הַנֹּאֹשׁם הֻגֵּעﬞﬞﬞ לֱֻﬞﬞﬞﬞﬞﬞ בֱֻֻﬞﬞﬞﬞ, שׁם, █████ חֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ אֱﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ לבצע
‏אֶת פֵּﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ וﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞﬞﬞ. בֱֻֻﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ פֵּﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ, חﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ שׁל הַﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ
‏הֱֻﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ פֵּﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ שׁל כֱֻֻﬞﬞﬞﬞﬞﬞ רﬞﬞﬞﬞﬞﬞ וﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ עֻל
‏מֻﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ אֶת קﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ. לֱֻﬞﬞﬞﬞﬞﬞ מֻﬞﬞﬞﬞﬞﬞ, כֱֻ הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הֲנָּ"ל חﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ מﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ, לﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ שׁם
‏הֻﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ רֻכֶב הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הֲנָּ"ל.

10. ‏עֻﬞﬞﬞﬞﬞﬞ לֻרֻכֶב הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ כֱֻֻﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ חֲﬞﬞﬞﬞﬞﬞﬞﬞ בּﬞﬞﬞﬞﬞﬞ-5-MP ‏הֲנָּ"ל, וֻאֵﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ █████ נﬞﬞﬞﬞﬞﬞ
‏בֱֻרﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ וﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞﬞﬞ שׁל אﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ יﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ.
‏לﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ שׁם אﬞﬞﬞﬞﬞﬞ פֵּﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ וﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞﬞﬞ שׁל אﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ יﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ.

11. ‏יﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ בֱֻﬞﬞ בﬞﬞﬞﬞﬞﬞﬞﬞ לֻﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ אֶת פֵּﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הֲﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞﬞﬞ שׁל נﬞﬞﬞﬞﬞﬞﬞﬞ
‏חﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ.

12. ‏בﬞﬞﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ 23:35, ‏כֱﬞﬞﬞﬞﬞﬞ נﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ צﬞﬞﬞﬞﬞﬞﬞﬞ, בﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞ נﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ, █████
‏הﬞﬞﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞ חﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ אﬞﬞﬞﬞﬞﬞ, מﬞﬞﬞﬞ 1103217, ‏הﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞﬞﬞ
‏צﬞﬞﬞﬞﬞﬞ. בﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ, נﬞﬞﬞﬞﬞﬞﬞﬞ קﬞﬞﬞﬞﬞﬞﬞﬞ עﬞﬞﬞﬞﬞﬞﬞﬞ, פﬞﬞﬞﬞﬞﬞ מﬞﬞﬞﬞﬞﬞﬞﬞ וﬞﬞﬞﬞﬞﬞﬞﬞ מﬞﬞﬞﬞﬞﬞﬞﬞ.

13. ‏█████ עﬞﬞﬞﬞﬞﬞﬞﬞ אֶת רﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞ. בﬞﬞﬞﬞﬞﬞ זﬞﬞﬞﬞﬞﬞ █████ נﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞ
‏הﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ, █████ יﬞﬞﬞﬞﬞﬞ כﬞﬞﬞﬞﬞﬞ אﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ-MP-5, ‏אשר אﬞﬞﬞﬞﬞﬞ סﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞ, לﬞﬞﬞﬞﬞﬞ
‏נﬞﬞﬞﬞﬞﬞ רﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞ, בﬞﬞﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞ. תﬞﬞﬞﬞﬞﬞﬞﬞ שﬞﬞﬞﬞﬞﬞﬞﬞ עﬞﬞﬞﬞﬞﬞ █████ לﬞ פﬞﬞﬞ בﬞﬞﬞﬞﬞﬞ
‏הﬞﬞﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞ.

14. ‏לﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞ פﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞ, █████ הﬞﬞﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞ
‏כﬞﬞﬞﬞﬞﬞ מﬞﬞﬞ 9 הﬞﬞﬞﬞﬞﬞﬞﬞ בﬞﬞﬞ שﬞﬞﬞﬞﬞﬞ רﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞ תﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞ.

---

**פְרָט עֲשֵׂרִים הַשֵּׁנִי:** ‏(מ.א. 8379/01 ‏ציﬞﬞ)

**מﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞ:** ‏נﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞ מﬞﬞﬞ בﬞﬞﬞﬞﬞﬞ, עﬞﬞﬞﬞ לﬞﬞﬞ סﬞﬞﬞﬞ 51(א) ‏לﬞﬞ וﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞﬞ
‏(יﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ) ‏מﬞﬞﬞ 378), ‏תﬞﬞﬞﬞ-1970 ‏וﬞﬞﬞﬞﬞﬞ 14(א) ‏וﬞ-1-4 ‏לﬞﬞ וﬞﬞﬞ בﬞﬞﬞﬞ כﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞ
‏(יﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ) ‏מﬞﬞﬞ 225), ‏תﬞﬞﬞﬞﬞﬞﬞﬞ-1968.

**פֵּרָטֵי הָעֲבֵירָה:** ‏הﬞﬞﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞ, בﬞﬞﬞ אﬞﬞﬞﬞﬞﬞ גﬞﬞﬞ מﬞﬞﬞﬞﬞﬞﬞﬞ לﬞ, בﬞﬞﬞ 03.10.01, ‏בﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞﬞﬞ לﬞﬞﬞ,
‏נﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞ מﬞﬞﬞ לﬞﬞﬞﬞﬞﬞ שﬞﬞ אﬞﬞﬞﬞ, דﬞﬞﬞﬞﬞﬞ:

1. ‏לﬞﬞﬞﬞ שﬞ █████ ‏(מﬞﬞﬞﬞﬞﬞﬞﬞ █████ "יﬞﬞ) ‏וﬞ‏█████
‏בﬞﬞﬞ אﬞﬞ פﬞﬞﬞﬞﬞﬞ הﬞﬞﬞ כﬞﬞ שﬞﬞﬞﬞﬞﬞ בﬞﬞﬞ הﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞ, הﬞﬞﬞﬞﬞﬞﬞﬞ. הﬞﬞﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞ
‏הﬞﬞﬞﬞﬞﬞﬞﬞ, אﬞﬞ אﬞﬞﬞﬞ סﬞﬞﬞ הﬞﬞﬞﬞﬞﬞ כﬞﬞ שﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞ, לﬞﬞﬞﬞﬞﬞ כﬞﬞﬞﬞ מﬞﬞﬞ 9,
‏הﬞﬞﬞﬞﬞﬞ בﬞﬞﬞ שﬞﬞﬞﬞﬞﬞ רﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞ מﬞﬞ מﬞﬞﬞ לﬞﬞﬞ הﬞﬞﬞﬞ וﬞﬞﬞﬞﬞﬞﬞﬞ
‏לﬞﬞﬞﬞﬞﬞﬞﬞ.

2. ‏בﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞ, █████ עﬞ-פﬞ בﬞﬞﬞﬞﬞﬞ שﬞ █████ בﬞﬞﬞ אﬞﬞ תﬞﬞﬞﬞﬞﬞ שﬞ
‏תﬞﬞﬞﬞ MP-5, ‏אﬞﬞﬞ אﬞﬞﬞﬞ מﬞﬞﬞ הﬞﬞﬞﬞﬞﬞ, וﬞﬞﬞ נﬞﬞﬞ מﬞﬞﬞﬞ כﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞ.

3. ‏בﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞ בﬞﬞﬞﬞﬞﬞ מﬞﬞﬞ 9 הﬞﬞﬞﬞ בﬞﬞﬞﬞﬞ לﬞﬞﬞﬞﬞﬞ 23:45, █████
‏הﬞﬞﬞﬞ בﬞﬞﬞ סﬞﬞﬞﬞﬞﬞ, מﬞﬞﬞ 6567709, ‏אﬞﬞﬞ נﬞﬞﬞ בﬞﬞﬞﬞﬞ מﬞﬞﬞ 9 לﬞﬞﬞﬞﬞﬞ תﬞﬞﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞﬞﬞ. בﬞﬞﬞﬞ
‏הﬞﬞﬞﬞﬞﬞ הﬞﬞﬞﬞ נﬞﬞﬞ מﬞﬞﬞﬞ כﬞﬞﬞ וﬞﬞﬞﬞ כﬞﬞ.

4. ‏█████ אﬞﬞﬞ, כﬞﬞﬞﬞ, מﬞﬞ בﬞﬞﬞﬞ הﬞﬞﬞﬞﬞﬞ, עﬞﬞﬞ אﬞﬞ רﬞﬞ הﬞﬞﬞﬞﬞﬞ.

P 5: 185

5. בעת ש██████ נסע במקביל לרכב הסקורה הנ"ל, מחמד מצלח ירה בתמ"ק MP-5, אשר אותו סיפק לה תאשם לצורך ביצוע פיגוע הירי כפי שתואר בפרט האישום הקודם, מספר יריות לעבר רכב הסקורה הנ"ל, בכוונה לגרום למותם של נוסעי רכב הסקורה.

6. מספר קליעים שנורו על-ידי ████████ פגעו ברכב הסקורה. שני קליעים שנורו על-ידי ████████ פגעו בגופה של ████████ קלע/ם נוסף פגע בכלוב כ██.

7. פנחס כהן נפצע באורח בינוני מפגיעת שני קליעים בבטנו, איילו מלכה כהן, שהיתה בשבע ה-28 להריונה, נפצעה באורח בינוני מפגיעת קלע בראשה.

8. לאחר ביצוע פיגוע הירי רישר תאשם ████████ המשיכו בנסיעה לכיוון ████ וניבעה הצרפתית ומשם נגלא לבית חינא תודישה. שם, ██████ החתגו את רכב המ██ה הנ"ל ועברו רישר כלפונו עם ██████████, אשר הגיע למקום ברכב האישום של ████████ ██████), ו████ תכנגו ו██מור בפרט האישום הקודם.

9. ████████ הסתתרו את תמ"ק MP-5 הנ"ל ברכב האישום ועלו לרכב האישום.

10. כל ארבעת אנשים הנ"ל נסעו לחזור מירושלים לרמאללה, אך לא הצליחו לעשות, כך בגלל מחסומי צה"ל והמשטרה. חברית הנ"ל של ████████ משארך לכן אצל ██████ חברו ████████ של ██████, בבית חינא תודישה ברמאללה.

11. יום למחרת, 10.01.04, חזר ברכבו של ████████ לרמאללה.

12. לאחר חזרתו לרמאללה, ████████ דיווח חזרתו אודות הפינועים שבוצעו בעזרת רכב המ██ה והתמ"ק MP-5, אשר אותם סיפק מתאשם.

<u>פרט עשירים ושלושה:</u>

<u>מהות העבירה:</u> ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970, וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

<u>פרטי העבירה:</u> התאשם הנ"ל, באיזור, בסוף שנת 2001 - ותחילת שנת 2002 או בסמוך לכך, ניסה לגרום בכוונה למותם של אדי ████████, כדלהלן:

התאשם הנ"ל, בסוף שנת 2001 או בסמוך לכך, ברמאללה או בסמוך לכך, בעל שיחה עם ████████ - ████ יגודרי ████████ "להתוסיא" של הת███. ונפגע הנ"ל, - ראש ████████ חללי אלאקצא - ████ חוזיו האצבואת של ████████ של הפתיח, ████ סוקר כ██████ על כוונותיו לרכוש מרכמה ואצמות מרומה לצורך ביצוע ידי מרומת לעבר הישובים הישראליים בכוונה לגרום למותם של אזרחים ישראלים. ████ בקש מ██ ████████ לקבל סיוע כספי לצורך רכישת המרכמה ופצצות מרומה.

הכסף המבוקש וחמנו את █████. תאשם הסכ██ר ██ ████████ <u>כי אין</u> בל צורך לשלם חודרה כסף עבור מ██אות הפצצות מרומה, שחר ברשותו של האש██ם כבר יש מרומה מאולתרת ופצצות מרומה.

בתחילת שנת 2002, התאשם הפנה את ████████ ████ הבצא חברת של האחמרן - מפ██ל צבאי בכיר בייצורי חללי אלאקצא█ ████ ████ ביתו של ████████ על מנת שיקבל ממ██ את המרומה ואת פצצות המרומה הנ"ל.

אכן קיבל/ו אנ██ המרומה המרומה המאולתרת הנ"ל וכן 5 פצצות מרומה.

ל██בר הישבו חברי/ו חב"ל, ידח ב██מצעות המרומה המאולתרת הנ"ל פצצות מרומה לעבר היישוב פסגות בכוונה לגרום למותם של ████ תושבי ה████ב הישראל של חללי צה"ל שחיו ביישוב הנ"ל. פצצה/ת המרומה הנ"ל לא נפצ██ ביישוב ו████ והתפוצצה בממ██ך אליו.

לאחר ביצוע הפינוע הנ"ל, ████████ דיווח לאש██ על מ██ שקרה. התאשם לקח את ████ אל ████ על מ██ט שידווח גם ██ אודות פינוע ידי פצצות מרומה שבוצעו לראשונה באיזור.

ת.ת. 444/02 מתוקן

P 5: 186

**פרט עשרים וארבעה: (פ.א. 39/02 בנימין)**

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה
והשומרון) (מס' 378), תש"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירות (יהודה
והשומרון), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 15.01.02 או במועד הסמוך לכך, גרם בכוונה למותו
של אחד, דהיינו:

1. ביום 14.01.02 ערב ████ אשר היה פעיל צבאי בבכיר ב████ ארגון הפתיח,
   שהוא התאחדות בלתי מותרת. בעקבות מותו של █████ הנ"ל, ראש ה"תנגוים" של
   הפתיח באיזור - ████, פתח אותו אבלים באלבירה.

2. הנאשם הנ"ל, ביום 15.01.02, באוהל האבלים הנ"ל, נפגש עם ████████ (המכונה
   █████), █████████ (המכונה
   █████████).

3. הנאשם מסר לחבריו הנ"ל כי ████ ראש ה"תנגוים" באיזור, ביקש כי
   הם יבצעו באומן מיידי פיגוע נקמה על מותו של █████ ויגרמו למותם של אזרחים
   ישראלים.

4. לצורך ביצוע הפיגוע האמור, הנאשם מסר לחבריו הנ"ל תמונה 5-MP, אקדח 16, וכן רכב
   מדגם, הנושא לוחיות רישוי ישראליות.

5. חבריו הנ"ל של הנאשם, באוהל האבלים הנ"ל, החליטו כי, לאור דרישתו של הנאשם, יבצעו
   עוד באומן והערב פיגוע בתוכו ██████ הנמצאת בכביש 443 בסמוך לכביסת לגבעת
   זאב ותעד בכוונה לגרום למותם של אזרחים ישראלים.

6. בשעות הערב באותו חיום, 15.01.02, ████████, יצא מאוהל האבלים חניל ביחד עם
   █████████ נסע ברכב, איסוזו טנדר של פראו עשאט לתחנת
   הדלק הנ"ל במטרה לבצע שם את פיגוע היירי המתוכנן. אחריו רכב האיסוזו הנ"ל נסע
   ████, החמוש באקדח 14, ████, החמוש באקדח 16 הנ"ל, ████, החמוש
   בתמונה 5-MP הנ"ל, כשהנ"ל נסע ברכב מדינה, אשר אותו קיבלו לצורך כך מהנאשם.

7. חברי חניל הנ"ל של הנאשם הגיעו עד ערבות עפר התחממות את ████████ מכבריהם בור נבאללה
   ואבליאב, לבכיש 443 במרחק של כ-100 מטר מהתחנת הדלק הנגבלעים. חברי הנ"ל של הנאשם
   החנו את כלי הרכב שלהם, איסוזו ומזדה, עם הפנים לכיוון הכפר בור נבאללה על מנת שיוכלו
   להתמלט מהמקום מיד לאחר ביצוע הפיגוע המתוכנן.

8. █████, החמוש באקדח 14, זילאו, ████, החמוש באקדח 16, ו████, 5-3-MP,
   ירדו מכלי הרכב והלכו לתחנת הדלק הנ"ל במטרה לבצע שם את פיגוע היירי המתוכנן ולגרום
   למותם של אזרחים ישראלים.

9. נשארו בכלי הרכב ████ הנ"ל על מנת לשמור שלא יצ█ל ל█כון סיור
   של צ████ או אנשים אחרים. ████ ישב בכסא הנהג ברכב המזדה על מנת שיוכל
   להתמלט באומן מיידי את שלושת חבריו לבצע את הפיגוע המתוכנן מיידי לאחר ביצוע
   הפיגוע.

10. ████████ נעמדו בכניסה לתחנת הדלק הנ"ל.

11. לאחר מספר דקות, בסמוך לשעה 19:45, ████████ (החבריו ברכב פאט אונו
    לבן, מס' 6424905), שנכנס לתחנת הדלק הנ"ל ואשר בו נתנו יואיל חן ז"ל וזליה ישבה רשל
    לראות עיני.

12. ████ יגשו אל רכב הפאט הנ"ל בנ█ בצמתים לבצע לעבר הנוסע ירו ולגרום
    למותם של נוסעות הרכב. מוסעת רכב הפאט או הבחינו בקהדה שהם התכוונו ████ והחלו
    לצעוק ולצער. ████ בכניס את האקדח למכסכסו ואמרו למוסעה הרכב שלא לפחד.

13. בשלב זה, ████ פתח באש אוטומטים ביממ 5-MP, אשר אותו סיפק הנאשם, לעבר
    נוסעות רכב הפאט בכוונה לגרום למותם, או גם ████ שבו הוצא את אקדחו והחל
    לירות לעבר נוסעות הרכב בכוונה למותן.

14. ████ ירו מטוחים קצר מאוד מספר רב של כדורים לעבר יואלת חן ז"ל
    לעבר רשל נ█רח עיני שהיו ברכב הפאט הנ"ל.

15. כ-28 קליעים, שנורו על-ידי ████, פגעו בשמשות הקדמית של הרכב,
    מספר קליעים פגעו בגד הרכב ובשמשות חלון דלת הנהג.

16. במהלך ביצוע פיגוע היירי המתואר, ████, אשר עמד במרחק קצר מאחורי
    █████, שימש כשומר ומתרא█.

17. מיד לאחר שישמע את קולות היירי, נסע מהתוקם ברכב האיסוזו שלו על מנת
    להריע לחבריו אם יש מתחמומים בדרך לרנאללה.



13

ת.ב. 444/02 מתוקן

P 5: 187

18. ‏█████, לאחר שביצע את פיגוע חירף כאמור לעיל, חזר בריצה אל
‏רכב המזדה שבו המתין ████████ ████: לאחר שהשלישה הנ"ל עלו על רכב,
‏הסיע אותם לרמאללה.
19. ‏ברמאללה ████████ נפגשו עם ████
20. ‏לאחר מכן, ████ נפטש ברמאללקה עם הנאשם, החזיר לו את תמייק MP-5 ואת רכב
‏המזדה, ותוך דיווח על הצלחתו שביצע כמתואר לעיל.
21. ‏במעשיו המתוארים לעיל, הנאשם גרם בכוונה למותם של ████ הי"ד, אשר נפטרו במקום
‏כתוצאה מפגיעות הקליעים שמרו על-ידי ████████ ████████

## פרט עשרים וחמישה: (ת.ק. 39/02 בנימין)

**מהות העבירה:** נסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון
‏(יהודה והשומרון) (מס' 378), תשל"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה
‏(יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 15.01.02 או במועד הסמוך לכך, מסר לגורם בכוונה
‏למותם של אחר, דהיינו:
‏הנאשם הנ"ל, במועד האמור, במקום המתואר בפרט האישום הקודם, במעשיו האמורים בפרט
‏האישום הקודם, נסה לגרום בכוונה למותם של רשל ████ עיני, אשר נסעה ברכב פיאט אונו לכן,
‏מ.ר. 6424905, ██████, המתואר בפרט האישום הקודם. אחד הקליעים שמרו על-ידי ████████
‏(מכונה ████ ) בכלי נשק שנמסרו להם על-ידי הנאשם
‏לכן צריך בציעו פיגוע חירף, כפי שתואר בפרט האישום הקודם, פגע בראשה של רשל ████ עינו, וגם
‏קליעים נוספים פגעו בכתפה השמאלי ופצעו אותה בחורה בינוני.

## פרט עשרים וחמישה (שישה): (ת.ק. 502/02 צינון)

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה
‏והשומרון) (מס' 378), תשל"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה
‏והשומרון), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 22.01.02 או במועד הסמוך לכך,
‏גרם בכוונה למותם של אחר, דהיינו:
1. ‏הנאשם הנ"ל, בחדיש ינואר 2002, ████ החלים, כד בדיוולו כחבר להנצוע לפעיל פיגוע התאבדות
‏בתוך שטחחה של מדינת ישראל על מנת לגרום למותם של אזרחים שראלנלים רבים ככל
‏האפשר.
2. ‏הנאשם הנ"ל פנה באמצעות שליחם אל ████████████ פעל ברכר בישלנים" של המתינ"ל,
‏שהוא התאחדות בלון מורתב, ובקש. הנאשם בקש מ ████ לשלוח אליו אדם חמוט
‏לבצע פיגוע התאבדות. מצאנו-מבד █ █ ████ הוא עצמו ידאג לתכניס את המחבל
‏חמתאבד לירושלים על מנת שיבצע שם פיגוע התאבדות.
3. ‏לאחר מספר ימים, ביום 21.01.02, ברמאללה, הנאשם נפגש עם סעיד רמדאן, שהוא כמו' תל
‏בלטח שכם, והוא חודיעו להנאשם כי נשלח על-ידי ████ לצור בציעו פיגוע התאבדות.
4. ‏הנאשם התכונן אל ████████████ (מכונה ████ ) וביקש מהאחרון
‏לתיגש אליו.
5. ‏████ נפגש עם הנאשם עם סעיד רמדאן הנ"ל באותו היום ברמאללה. הנאשם ערך
‏ הכירות בין השניים. הנאשם ████ לקחת את סעיד רמדאן למטמרה על מנת שיתפר
‏למני בצוע פיגוע התאבדות המתוכנן.
6. ‏לאחר מכן, הנאשם ████, התקשר אל ████████ (מכונה ████ )
‏וביקש ממ מאחרון שטטיש מחבל מרמאללקה לירושלים על מנת שהמחבל המתאבד יבצע
‏בירושלים פיגוע התאבדות וגרום למותם של אזרחים ישראלנים רבים ככל האפשר.
7. ‏████ הגיע לרמאללה בידוד עם ████████ המחבל המתאבד מרמאללה לירושלים.
‏הסכים להשתתף בהסתת המחבל המתאבד מרמאללה לירושלים. ████ הגיע לפנישה
‏ברכבו אוטומטר ונוד'ו עם לוויות רשיון ישראליות.
8. ‏לפי הוראתו של הנאשם, ████ נסע ברכב המיוחר הנ"ל מרמאללקה
‏לירושלים על מנת למצוא דרך שעדין בן מחסומי משטרה וצחיל ואת במסירה להסיע יותר
‏מאחר באותה הדרך את המחבל המתאבד שיבצע את הפיגוע המתוכנן בירושלים.

14

‏ת.ת. 444/02 משטקן

P 5: 188



9. נסעו מרמאללה דרך ראפאת והגיעו לאזור התעשיה עטרות, שם השניים חזרו לכביש הראשי ירושלים-דאבאללה ונסעו שמאלה עד לצומת המוביל למחתה רמה, שם הם פנו ימינה ונסעו עד לצומת אדם השניים פנו ימינה ונסעו עד לצומת חיפה, שם הם פנו ימינה ונכנסו לעטרות. דרך עטרות, הם הגיעו לצומת הכבנים הצרפתית, שם השניים פנו ימינה וחזרו לרמאללה. ראו כי בדרך שבה נסעו ניתן לזהוב את המתכבל המתכבב לירושלים מבלי להיעצר במחסוימי משטרה וצהיל.

10. באותו הזמן, ברמאללה, האשם ו_____ לקחו את סעיד רמדאן המ"יל להתפלל ואף קנו עבור סעיד רמדאן המ"יל אוכל, בגדים ונעלים חדשים. האנשים עולים בסכם של עבור הקנינות הנ"ל סכום של 1,200 ש"ח.

11. _____ על כל הוראותיו של האשם, הביא רוסי"ר M-16 ו-3 מחסניות לרסי"ר הנ"ל מלוות בכדורים, כאשר שתי מחסניות היו מחוברות בצולבות.

12. לפי חתכונו של האנשים ותברין הנ"ל, היה זה על סעיד רמדאן להגיע לירושלים ולירות שם באזרחים ישראלים בכוונה לרצח למותם עד שהוא עצמו יתרה מאש כוחות הביטחון הישראלים.

13. לאחר מכן, באותו היום, האשם, _____ נפגשו עם באיזור המטון יסתיר אין" באלבוכה. האנשם הכיר ל_____ את סעיד רמדאו.

14. האנשם הסביר ל_____ כי סעיד רמדאו הח"יל הוא המתבל המתאבד, אשר אותו הוא צריכה לקחוב לירושלים עד מצד שבכגע שם פיגוע התאבדות כשירוח לעבר אזרחים ישראלים במטרה לרצח למותם של אזרחים רבים ככל הניתן.

15. _____ הסתירו את רוסי"ר M-16 והמחסניות ח"ניל ברכב האיסוזו הנ"יל.

16. האנשם ו_____ איחלו לסעיד רמדאו הצלחה והשלושה נסעו לירושלים. האנשם אמר _____ כי עליהם לקחת את סעיד רמדאו לבצע את פיגוע התאבדות בלב"מקום בירושלים שהם יחליו.

17. נהג ברכב האיסוזו, סעד רמדאו ישב בכסא שלד כסא הנוהג _____ התישיבו"במרכבב האחורי.

18. _____ הסיעו את סעד רמדאו לירושלים בדרך, אשר אותה בדקו מוקדם עותר באותם היום כפי שתוארו לעיל.

19. בירושלים, _____ נסעו לרחוב שיחי גירואל. שם הם הוציאו את רובי"ר M-16 והמחסניות שהיו מוחתרים בתוך חרבב ומסרו אותם לידי סעד רמדאו. _____ עבר לשבוב בכסאא שלד כסא נהג ואילו סעדד רמדאו עבר למושב האחורי, כשהוא מחזיק בידו את רובי"ר M-16 ואת המחסניות.

20. _____ הסיעו את סעד רמדאו לרחוב הנביאים.

21. במהלך הנסיעה, סעד רמדאו התלונן בפני _____ כי הנעלים החדשות, אשר אותם קנה לו האנשם עבור הפיגוע, קטנות ולוחצות לו. _____ הורלין את בכלין ירושקלו" ומסר אותו לסעיד רמדאו ואמ"ר יתעלה לגו יגן אם בללי "ירבקלו".

22. בהגיעם לצומת הרחובות שטראוס והנביאים, _____ עצרו את רכב האיסוזו.

23. _____ אמרו לסעיד רמדאו לרדת בגוג" לרחוב יפו ולחתחיל לירות במקום שירצה, ככל הרבה אששים.

24. לאחר שסעד רמדאו ירד מהרכב עם רוסי"ר M-16 והמחסניות, _____ נסעו מהמקום ברכב האיסוזו, יצאו דרך שכונת מוטרה לכביש מספר 1, ומשם נסעו דרך הכביש הראשי לרמאללה.

25. סעיד רמדאו, מספר דקות לאחר שירד מהרכב של _____ הגיע לרחוב יפו.

26. בסביבות השעה 16:20, כשהוא עמד מול בית מסי 47 ברחוב יפו או בסמוך לכך, סעיד רמדאו טעו את רוסי"ר M-16 שב" חחזיק, צעק "אללה הוא אכבר" ופתח בירי אוטומטי לכל עבר, לעבר האנשים שהיו ברחוב יפו, בתחת האוטובוסים הנמצאים במקום, בתוך אוטובוס "אגד" קו 27 שהיה באותת עת בתחנה הנ"יל וכן לעבר האנשים שהיו בתוך החנויות הסמוכות בכוונה לרצח למותם של אנשים רבים ככל הניתן. סעיד רמדאו, כשהוא ממשיך לירות, נמלט ממהמקום לעבר חחניון הנמצא ברחוב הרב קוק, שם סעיד רמדאו החליף מחסניות והמשיך לירות עבר האזרחים בכוונה לגרום למותם. סעיד רמדאו ירה בדרסי"ר M-16, שלו הרזיק, מעל 38 כדורים. סעד רמדאו המשיך לירות לעבר האזרחים עד שנהרג על-ידי האזרחים והשוטרים שהגיעו למקום.

חב"ת 444/02 מתוקן

P 5: 189

27. במעשיו המתוארים לעיל, הנאשם חבר גרם במודע למותה של אורית ██████ (סבטלנה) טנזילר ז"ל,
אשר נפטרה מהתאה מפציעות הקליעים שנורו על-ידי סעיד רמדאן.
28. לאחר שנודע לנאשם על ביצוע הפיגוע הנ"ל, הנאשם נתן אל ██████ ██████ וקיבל מהאחרון
סכום של 1,000 דולר ארה"ב, עבור ביצוע הפיגוע הנ"ל. הנאשם נתן כ ██████
100 דולר ארה"ב לכל אחד עבור השתתפותם בהוצאה לפועל של
הפיגוע הנ"ל.

✓ **פרט עשרים ושבעה:** (ת.פ.א. 502/02 ציון)

**מהות העבירה:** גרימת מותה במודע, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה
והשומרון) (מס' 378), תשל"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירות (יהודה
והשומרון), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בכן באיזור, ובכן מחוצה לו, בזום 22.01.02 או במועד הסמוך לכך,
גרם במודע למותו של אחר, דהיינו:
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום הקודם, במעשיו המתוארים בפרט
האישום הקודם, גרם במודע למותה של אורית ██████ ז"ל, אשר נשלה לביצוע הפיגוע האמור על-ידי הנאשם.
הקליעים שנורו על-ידי סעיד רמדאן, אשר נשלה לביצוע הפיגוע האמור על-ידי הנאשם.

✓ **פרט עשרים ושמונה:** (ת) 502/02 ציון)

**מהות העבירה:** ניסיון לגרימת מותם במודע, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס' 378), תשל"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, בזום 22.01.02 או במועד הסמוך לכך,
ניסה לגרום בכוונה למותם של אחר, דהיינו:
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום העשרים ושישה, במעשיו המתוארים
בפרט האישום העשרים ושישה, ניסה לגרום בכוונה למותם של אזרחים רבים כרכל הנ... אשר היו
באזולה ... ... ובקרבתה. מתאשם מחירי שבצעע במקום על-ידי סעיד רמדאן, אשר נשלה
לביצוע הפיגוע האמור על-ידי הנאשם, נפצעו מעל 45 אזרחים.

✓ **פרט עשרים ותשעה:** (ת.פ.א. 502/02 ציון)

**מהות העבירה:** חזוק בזדון לרכוש, עבירה לפי סעיף 53 לצו בדבר הוראות ביטחון (יהודה
והשומרון) (מס' 378), תשל"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה
והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, בזום 22.01.02 או במועד הסמוך לכך,
הרס רכוש או פגע בו במזיד ושלא כדין, דהיינו:
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום העשרים ושישה, במעשיו המתוארים
בפרט האישום העשרים ושישה, פגע במזיד ושלא כדין ברכוש כלין כהכלל חניית ברחוב יפו, תחנת
אוטובוס "אגד", אוטובוס "אגד" קו 27 וכן כלי רכב רבים, אשר נפגע כתוצאה מהירי שבצעע
במקום על-ידי סעיד רמדאן, אשר נשלה לביצוע הפיגוע האמור על-ידי הנאשם.

P 5: 190