

PLAINTIFF'S
EXHIBIT
357

| Israel | Defense | | Forces |
|---|---|---|---|
| Before the Military Court | | Court Case: | 3459/02 |
| In Beit El | | Prosecution case: | 444/02 |
| Before a panel | | Detailed incident case: | 1282/02 Binyamin |
| | | | 1283/02 Binyamin |
| | | | 1284/02 Binyamin |
| | | | 1285/02 Binyamin |
| | | | 234/01 Jerusalem Special Duties Department |
| | | | 457/01 Binyamin |
| | | | 2159/01 Binyamin |
| | | | 7915/01 Zion |
| | | | 481/01 Zion |
| | | | 8379/01 Zion |
| | | | 39/02 Binyamin |
| | | | 502/02 Zion |
| | | | 483/02 Shafat |
| | | | 4258/02 Yarkon |
| | | | 568/02 Shafat |
| | | | 783/02 Binyamin |

[Stamp]  This indictment was received _____
on date: October 1, 2002
and entered into the log in case _____
by the court [Signature]

### In the trial between the military prosecutor – The Prosecutor

### - v. -

Ahmed Taleb Moustafa Barghouti (alias: "Al Faransi")
Identity No. 994466860, born on March 15, 1976, a resident of Albira – Ramallah
detained since April 15, 2002

### - The Defendant -

### Amended Indictment

### The above mentioned Defendant is accused hereby of committing the following offenses:

### First count:

**Nature of the offense:** Membership in an illegal organization, an offense pursuant to Regulations 84 (1) (A) and 85 (1) (A) of the Defense Regulations (Time of Emergency), 1945.

[Stamp] P 5: 175

Prosecution Case 444/02 Amended

**Details of the offense:** The above mentioned Defendant, in the Area, from late 2000 until the day of his arrest, was a member or acted as a member of an illegal organization, as follows:

The above mentioned Defendant, from early 2006 until the day of his arrest, acted as the driver and bodyguard of ▉▉▉▉▉▉▉▉ who is the head of the "Tanzim" of the Fatah.

The above mentioned Defendant, from early 2001 until the day of his arrest, operated within the framework of the "Tanzim" of the Fatah, which is an illegal organization, and conducted military activity against Israeli targets.

During the course of his military activity, the Defendant regularly received financial assistance from operatives of the "Tanzim" of the Fatah. The Defendant received through his bank account an amount of approximately NIS 7,000 from ▉▉▉▉▉▉▉▉▉▉ a senior military operative from the Nablus area, and an amount of approximately NIS 10,000 from ▉▉▉ ▉▉▉▉ a senior operative in the Ramallah area.

[Stamp] P 5: 175 [continued]

Prosecution Case 444/02 Amended

2

During his military activity, the Defendant was in constant contact with the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah in Nablus – ███ ████████████ the Head of the "Al Aqsa Martyrs' Brigades" in the Tul-Karm Area – ███ ████████ the Head of the "Al Aqsa Martyrs' Brigades" in the Jenin area – Abed Karim Rateb Younes Aweis, the Head of the "Al Aqsa Martyrs' Brigades" in the Bethlehem and Hebron area – ████████ the Head of the "Al Aqsa Martyrs' Brigades" in the Area – █████████ ████████ (████████), and with the Head of the "Tanzim" of the Fatah – ████████████

Within the framework of his above mentioned military activity, the Defendant distributed in Ramallah leaflets on taking the responsibility for attacks that were carried out in Israel and in the Area by operatives of the "Tanzim" of the Fatah.

**Second count:** Holding an office in an illegal organization, an offense under Regulations 84(1) (A) and 85(1) (B) of the Defense Regulations (Time of Emergency), 1945.

**Details of the offense:** The above mentioned Defendant, in the Area, from 2001 until the day of his arrest, managed or helped in the management of an illegal organization, or held any office or position in or under the authority of an illegal organization, as follows:

The above mentioned Defendant, during the period set forth, was one of the persons responsible for the "Al Aqsa Martyrs Brigades" Organization (Kataib Shuhada al-Aqsa) in the Ramallah area – the military arm of the "Tanzim" of the Fatah, which is an illegal organization. "The Al Aqsa Martyrs Brigades" were responsible for the commission of a large number of attacks against IDF soldiers and Israeli civilians both in the Area and within the territory of the State of Israel, in which a large number of Israeli civilians and IDF soldiers were killed.

Among other things, the Defendant served as the contact person between the other regional coordinators of the "Al Aqsa Martyrs Brigades" and the head of the "Tanzim" of the Fatah – ████████████

**Third count:**

**Nature of the offense:** Execution of a service for an illegal organization, an offense pursuant to Regulations 84(1) (A) and 85(1) (C) of the Defense Regulations (Time of Emergency), 1945.

[Stamp] P 5: 176

Prosecution Case 444/02 Amended

3

**Details of the offense:** The above mentioned Defendant, in the Area, during the period set forth in the first count of the indictment or thereabouts, performed some work or executed some service for an illegal organization, as follows:

The above mentioned Defendant, during the period set forth, in Ramallah or thereabouts, on a large number of different opportunities, distributed money to military operatives of the "Tanzim" of the Fatah. The Defendant frequently received money from the operative of the "Tanzim" of the Fatah ███████████ and distributed it to many people who carried out attacks against IDF soldiers and Israeli civilians. On each opportunity, the Defendant provided to each of the operatives various amounts of money, from 100 to 300 U.S. dollars. In addition, the Defendant regularly transferred larger amounts to military operatives in the "Tanzim" of the Fatah through bank transfers.

Among other things, the Defendant transferred to ███████████ a senior military operative in the "Tanzim" of the Fatah in Tul-Karm, who is deputy of ████████ – the Head of the "Al Aqsa Martyrs Brigades" in Tul-Karm, which is the military arm of the "Tanzim" of the Fatah, the amount of NIS 3,000.

In addition, the Defendant transferred to ███████████████ (██████████, who is the Head of the "Al Aqsa Martyrs Brigades" amounts from NIS 1,000 to 2,000 on approximately 6-7 different occasions, for the purpose of purchasing cartridges.

In addition to money, the Defendant regularly provided military operatives of the "Tanzim" of the Fatah cellular telephone handsets for the purpose of their military activity.

[Stamp] P 5: 176 [continued]

Prosecution Case 444/02 Amended

**Fourth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in 1998 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in the Amari Refugee Camp or thereabouts, purchased from ████████ an MP-5 submachine gun for 4,000 Jordanian dinars and a short barreled M-16 assault rifle with telescopic sights in exchange for 5,000 Jordanian dinars, without a permit signed by or on behalf of the commander of the Area. The above mentioned Defendant, during the years 2001-2002, regularly delivered the above mentioned MP-5 submachine gun to various persons for them to use it to carry out shooting attacks against Israeli civilians, as will be described further in the indictment.

**Fifth count:**

**Nature of the offense:** Possession of a firearm, an offense pursuant to Section 53(A) (1) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, during the period set forth in the first count of the indictment, possessed a firearm, ammunition, bomb, hand grenade or explosive or incendiary device, a tool or object or thing that is planned to cause or is capable of causing death or severe injury, without a permit certificate granted by or for a military commander, as follows:

The above mentioned Defendant, during the period set forth, in Ramallah or thereabouts, kept in his possession an MP-5 submachine gun, a pistol and a short barreled M-16 assault rifle with telescopic sights, without a permit certificate granted by or for a military commander.

**Sixth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

[Stamp] P 5: 177

Prosecution Case 444/02 Amended

**Details of the offense:** The above mentioned Defendant, in the Area, in late 2000 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, at the time set forth, [Translator's note: as written] in Ramallah or thereabouts, delivered to ███████████████ (███████) – the head of the military arm of the "Tanzim" of the Fatah, a Kalashnikov assault rifle and 50 cartridges for a Kalashnikov assault rifle, without a permit signed by or on behalf of the commander of the Area. ████████████ delivered the above mentioned Kalashnikov assault rifle and the above mentioned cartridges to ████████████ an operative in Force 17 of the Palestinian Authority. ████████████ reported to ████████████ that he had carried out a shooting attack using the above mentioned Kalashnikov assault rifle in which the late Kahane couple were killed, and carried out a shooting attack in which an Israeli civilian was killed, using the above mentioned cartridges.

### Seventh count:

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, from late 2000 until the day of his arrest or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, during the period set forth, in Ramallah or thereabouts, on many different occasions, delivered to ████████████ (██ ████ – the head of the military of the "Tanzim" of the Fatah, large amounts of money totaling some tens of thousands of shekels and tens of thousands of U.S. dollars for the purpose of purchasing arms and cartridges for carrying out shooting attacks against IDF soldiers and Israeli civilians. The Defendant also regularly kept at home cartridges that had been purchased with this money and deliver them to ████████████ and the latter's colleagues as necessary, without a permit signed by or on behalf of the commander of the Area.

[Stamp] P 5: 177 [continued]

Prosecution Case 444/02 Amended

**Eighth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, from late 2001 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, delivered to ▮▮▮▮▮▮▮▮▮▮▮▮ (▮▮▮▮▮▮), the head of the "Al Aqsa Martyrs Brigades", the military arm of the "Tanzim" of the Fatah, 100 cartridges for an M-16 assault rifle, without a permit signed by or on behalf of the commander of the Area.

**Ninth count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in early 2001 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, purchased a stolen white Mazda vehicle, a recent model. The above mentioned Defendant delivered the above mentioned vehicle to ▮▮▮▮▮▮▮▮▮▮▮ who departed in the above mentioned vehicle to execute attacks against Israeli civilians and IDF soldiers in the Area.

**Tenth count: (Detailed Incident 234/01 Jerusalem Special Duties Department)**

[Stamp] P 5: 178

Prosecution Case 444/02 Amended

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 25, 2001 or thereabouts, caused the intentional death of another person, as follows:



1.  The above mentioned Defendant, at the time set forth, met in Ramallah ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (alias ▮▮▮▮▮ ) and ▮▮▮▮▮▮▮▮▮▮▮

2.  ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮ asked the Defendant for a vehicle for the purpose of carrying out a shooting attack against Jews. The Defendant provided ▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ a stolen silver Volkswagen Bora vehicle, bearing Israeli license plates, in order for his above mentioned colleagues to carry out a shooting attack from this vehicle with the intent of causing the death of Israeli civilians.

3.  ▮▮▮▮▮▮▮ drove the Volkswagen vehicle while ▮▮▮▮▮ sat next to him armed with a "16" pistol.

4.  ▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮ traveled in the Volkswagen vehicle in the Atarot area in order to search for an Israeli vehicle with the aim of carrying out a shooting attack against it and causing the death of the vehicle occupants.

5.  At about 6:15 p.m., in the Atarot Industrial Zone, ▮▮▮▮▮ and ▮▮▮▮▮▮ noticed a GMC Safari vehicle, license No. 7901306 (hereinafter: "the Vehicle"), which the late Elazar Akiva Fashkos drove.

6.  ▮▮▮▮▮ and ▮▮▮▮▮▮▮ started to drive after the Vehicle. The Defendant and ▮▮▮▮▮▮▮▮ followed the Vehicle from the Atarot Industrial Zone to A-Ram Junction and back.

7.  When the vehicle returned to the Atarot Industrial Zone and drove on the main road, ▮▮▮ ▮▮▮▮ and ▮▮▮▮▮▮▮ drove the Volkswagen vehicle near the Vehicle.

[Stamp] P 5: 178 [continued]

Prosecution Case 444/02 Amended

8.  At this stage, ███████ opened the window and fired with the above mentioned "16" pistol approximately 7 rounds at the Vehicle with the intent of causing the death of the driver of the Vehicle. A number of bullets that were fired by ███████ hit the Vehicle, one of which hit the late Elazar Akiva Fashkos, who was driving the vehicle in the neck and another hit him in the chest.

9.  Once ███████ and ███████████ saw that the vehicle had stopped, the two escaped in the Volkswagen vehicle to Ramallah.

[Stamp] P 5: 178 [continued]

Prosecution Case 444/02 Amended

9

10.  In Ramallah, ████████ and ██████████████ returned the Volkswagen vehicle to the Defendant and reported to him on the attack that they had carried out.

11.  A day later, the Defendant delivered to ████████ approximately 300 U.S. dollars for carrying out the above mentioned attack. The Defendant received the above mentioned money from ██████████████

12.  By his acts described above, the above mentioned Defendant caused the intentional death of **the late Elazar Akiva Fashkos**, who died as a result of the impact of the bullets that were fired by Jad Maala as described above.

**Eleventh count: (Detailed Incident 457/01 Binyamin)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on February 25, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

1.  The above mentioned Defendant, at the time set forth, met in Ramallah ██████████ ██████, ████████████████████████ ("████████") and ████████████ (█ ██ ).

2.  The Defendant and his above mentioned colleagues discussed the situation in the Area. The Defendant and his above mentioned colleagues contended that there was no activity against Israeli targets. The Defendant asked his above mentioned colleagues what could be done to improve the situation. The above mentioned colleagues of the Defendant asked the Defendant to provide them a vehicle and weapons and they would carry out an attack against Israeli civilians with the aim of causing their death.

3.  The Defendant consented to the above mentioned proposal. The Defendant delivered to his above mentioned friends his vehicle, a gray Volkswagen Bora, 2001 model, bearing Israeli license plates, and an MP-5 submachine gun with a magazine and cartridges.

4.  ██████████████, ████████████ (alias: ████████) and ████████ (█ ███ ) traveled in the vehicle of the Defendant, armed with the above mentioned MP-5

[Stamp] P 5: 179

Prosecution Case 444/02 Amended

submachine gun, which they had received from the Defendant. The above mentioned colleagues of the Defendant reached the Atara Bridge area.

5.   At about 1:15 p.m., the above mentioned colleagues of the Defendant noticed a GMC Vandura vehicle, license No. 3082518, which Yosef Cohen was driving, this vehicle departing from the settlement Ateret and turning towards the Atara Bridge.

6.   The above mentioned colleagues of the Defendant decided to carry out a shooting attack against the above mentioned GMC vehicle with the intent of causing the death of its occupants.

7.   The above mentioned colleagues of the Defendant decided to wait until the Citroen vehicle that was driving in front of them would overtake the GMC vehicle and then [they themselves would] overtake the GMC vehicle and carry out the planned shooting attack against it.

8.   In the above mentioned Citroen vehicle, ████████████████████ (█████), ████████████ (█████) and ████ (█████), were traveling, armed with 2 Kalashnikov assault rifles and an M-16 assault rifle. The above mentioned occupants of the Citroen vehicle opened fire using the weapons above at the above mentioned GMC vehicle with the intent of causing the death of its occupants. 29 bullets that were fired by these persons hit the above mentioned GMC vehicle. Three bullets hit the head and neck of Yosef Cohen, who was driving the above mentioned GMC vehicle. As a result of the impact of these bullets and the impact of fragments throughout his body, Yosef Cohen was severely injured.

9.   After the above mentioned colleagues of the Defendant noticed that the GMC vehicle was hit, that it had swerved off the road and the driver of the vehicle was injured as a result of the shooting attack that was carried out from the Citroen vehicle that was driving before them, the colleagues of the Defendant escaped back to Ramallah.

10.  In Ramallah, the above mentioned colleagues of the Defendant returned the above mentioned Volkswagen vehicle and the above mentioned MP-5 submachine gun back to the Defendant. ████████████████ ████████ (████ and ████████████ (alias: "████████") reported to the Defendant that they had carried out a shooting attack using the above mentioned vehicle and weapons and that a Jewish driver had been wounded as a result.

[Stamp] P 5: 179 [continued]

Prosecution Case 444/02 Amended

11

**Twelfth count:**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in June 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:



███████████ together with ████████████████, ████ ██, ██████ and ████████████, at the time set forth, decided to carry out a shooting attack against the settlement of Psagot with the aim of causing the death of Israeli civilians.

The above mentioned persons approached the office of ████████████ the head of the "Tanzim" of the Fatah. The above mentioned persons met ████████████ and asked the latter for weapons for carrying out a shooting attack against Israeli civilians in the settlement of Psagot. ████████████ was happy to hear this plan to carry out a shooting attack at the settlement of Psagot and promised to supply weapons for carrying out the planned shooting attack.

After about a week, ████████████ and his above mentioned colleagues approached the office of ████████████ in Ramallah again. ████████████ was not in his office at that time and the Defendant was the one who talked with. ████████████ and his above mentioned colleagues. The Defendant promised to talk to ████████████ concerning the request of his above mentioned colleagues to receive weapons for the purpose of carrying out a shooting attack against the settlement of Psagot.

After about three days, ████████████ and his above mentioned colleagues approached the office of ████████████ in Ramallah again. These persons again asked ████████████ for weapons for carrying out a shooting attack against the settlement of Psagot. ████████████ called ████████████ a senior military operative in the "Tanzim" of the Fatah. It was agreed that ████████████ would meet the above mentioned persons in Manara Square in Ramallah and would to deliver them weapons there for the purpose of carrying out the planned shooting attack.

[Stamp] P 5: 180

Prosecution Case 444/02 Amended

██████████ and his above mentioned colleagues met on that day, in Manara Square in Ramallah, ████████████████ During the said meeting, ████████████████ promised to transfer weapons to them for the purpose of carrying out the planned shooting attack.

That night, the Defendant arrived at the home of ████████ in Al-Bira and delivered to ██████████ an MP-5 submachine gun and cartridges for the purpose of carrying out a shooting attack against Israeli civilians.

After about an hour, ████████ departed from his home along with ████████████ in the vehicle of ████████, while in possession of the above mentioned MP-5 submachine gun. ████████████ and ████████████ arrived at a site near the settlement of Psagot. There the two got out of the vehicle. ████████████ fired all of the cartridges that the Defendant had delivered with the above mentioned MP-5 submachine gun at the settlement of Psagot with the aim of causing the death of the residents of the settlement of Psagot and of IDF soldiers who were in the settlement of Psagot.

Immediately after the shooting, ████████ and ████████████ returned in their above mentioned vehicle to Ramallah.

**Thirteenth count:**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on June 26, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, in June 2001 or thereabouts, in Ramallah, in the circumstances described in the previous count of the indictment, delivered to ████████████████ an MP-5 submachine gun for the purpose of carrying out shooting attacks against Israeli civilians and IDF soldiers.

████████, at the time set forth, with ████████████████ and ████████ departed from Ramallah towards the road leading from Pisgat Ze'ev to the [neighborhood of French Hill] in Jerusalem, in order to carry out a shooting attack there and cause the intentional death of Israeli civilians. ████████████ and his above mentioned colleagues departed as set forth armed with an

[Stamp] P 5: 180 [continued]

Prosecution Case 444/02 Amended

13

MP-5 rifle [Translator's note: as written], which had been delivered to them for this purpose by the Defendant as set forth above, and with a "9" pistol. ███████████ and his colleagues departed to execute the said attack while possessing a drawing of the [neighborhood of] French Hill, which had been made out by ███████████████ where they had planned to carry out the shooting attack.

███████████████ and his above mentioned colleagues departed to execute the said attack in arrangement with █████████████████████ and also asked the latter to inform ████████████ ██████████ the head of the "Tanzim" of the Fatah, whether any of the perpetrators of the attack would be killed during the execution of the said shooting attack. ███████████ and his colleagues were unable to reach the place at which they had planned to carry out the shooting attack due to the large presence of IDF forces in the Hizma area.

[Stamp] P 5: 180 [continued]

Prosecution Case 444/02 Amended

**Fourteenth count: (Detailed Incident 2159/01 Binyamin)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on August 25, 2001 or thereabouts, caused the intentional death of another person, as follows:

1.    The above mentioned Defendant, in August 2001, in Ramallah or thereabouts, met ▇▇▇▇▇▇▇ (alias ▇▇▇▇). ▇▇▇▇▇▇ (alias: ▇▇▇▇▇▇) informed the Defendant that he had met a number of operatives of the "Tanzim" of the Fatah, who carried out shooting attacks against Israeli civilians. ▇▇▇▇▇▇▇ asked to receive the approval of the Defendant to join this cell and carry out attacks against Israeli civilians with the intent of causing their death. The Defendant permitted ▇▇▇▇▇▇ to joint in the said activity.

2.    ▇▇▇▇▇▇ met the above mentioned "Tanzim" operatives, who were ▇▇▇▇ ▇▇▇▇▇▇▇ (alias ▇▇) and Tarek ▇▇▇▇ The above mentioned three persons told ▇▇▇▇▇ that they intended to carry out a shooting attack with the aim of causing the death of Israeli civilians. The three asked ▇▇▇▇▇ to provide them weapons for carrying out the planned shooting attack.

3.    On August 25, 2001, ▇▇▇▇▇ ▇▇▇▇▇ and ▇▇▇▇ approached ▇▇▇▇▇ and asked for more weapons that day for the purpose of carrying out the shooting attack.

4.    On that day, ▇▇▇▇▇ approached the Defendant. ▇▇▇▇▇ asked the Defendant for weapons for the purpose of carrying out a shooting attack against Israeli civilians. A short time later, on that day, the Defendant delivered to ▇▇▇ ▇▇▇ an MP-5 submachine gun with a magazine filled with cartridges, in order for ▇▇▇▇ and his above mentioned colleagues to use it to carry out a shooting attack and cause the death of Israeli civilians.

[Stamp] P 5: 181

Prosecution Case 444/02 Amended

15

5. In the evening hours, on the same day, in Ramallah or thereabouts, ████████ delivered the above mentioned MP-5 submachine gun and ammunition to ████████ and ████████ who arrived in an Isuzu pickup vehicle belonging to ████ in order for ████ and ████ to use the above mentioned weapon to carry out a shooting attack and cause the death of Israeli civilians.

6. Immediately after receiving the weapon, ████████ ████████, ████████ ████████ and ████ departed from Ramallah towards Highway 443 with the aim of carrying out the planned shooting attack there. The above mentioned persons traveled in two vehicles — one was an Isuzu pickup belonging to ████████ and the other was a stolen Subaru vehicle that ████████ had brought for the purpose of carrying out the planned attack.

7. Upon reaching Highway 443, ████████ continued to travel alone in the Isuzu vehicle, about a kilometer before the Subaru vehicle in which ████ ████ and ████ were traveling, in order to inform his above mentioned colleagues of IDF and police checkpoints on the way.

8. All of these individuals traveled on Highway 443 towards Tel Aviv, Ali driving the Subaru vehicle, while ████████ armed with a Kalashnikov assault rifle, sat next to him, while ████████ armed with an MP-5 submachine gun, which the Defendant had delivered to him, sat in the rear seat.

9. On that day, August 25, 2001, at about 10:30 p.m., next to the Dor Energy gas station, the occupants of the above mentioned Subaru vehicle noticed a Volkswagen Passat vehicle, License No. 6902818, in which the late Yaniv and Sharon Ben Sharon with their children and the late Doron Yosef Savari were traveling.

10. ████████ who was driving the Subaru vehicle, overtook the above mentioned Volkswagen vehicle and drove parallel to it. At this stage, ████████ ad ████ ████████ discharged automatic gunfire using the MP-5 submachine gun, which the Defendant had provided, and the Kalashnikov assault rifle, at the above mentioned Volkswagen vehicle with the aim of causing the death of its occupants.

11. A large number of bullets that were fired by ████████ and ████████ hit the Volkswagen vehicle and its occupants.

[Stamp] P 5: 181 [continued]

Prosecution Case 444/02 Amended

16

12. After the occupants of the Subaru vehicle noticed that the Volkswagen vehicle was zigzagging, they sped up and escaped to the village Beit Likia. There, ███████ waited for them. ███████ ████████████ and ███████ boarded █ ███████ 's Isuzu vehicle and traveled to the village Beit Sira, where they hid the weapons near ███████ 's house. Thereafter, ██████████████ ██████████ ███████ ███████ and ███████ returned to Ramallah in ██████████ 's vehicle.

13. Immediately after they returned to Ramallah, █████████████ met in Ein Um Sharait ██████████ who reported to ██████████ he attack that had been carried out with the weapon that had been delivered for this purpose by the Defendant.

14. A few days later, ██████████ brought the above mentioned MP-5 submachine gun from Beit Sira and returned it to ██████████ ██████████ transferred the above mentioned weapon to the Defendant and reported to the latter the shooting attack that had been carried out with this weapon.

15. The Defendant transferred to the perpetrators of the attack a sum of 500 U.S. dollars for executing this attack. The above mentioned Defendant received this money from Ali ██████████

[Stamp] P 5: 181 [continued]

Prosecution Case 444/02 Amended

17

16.    The above mentioned Defendant, by his acts described above, caused the intentional death of **the late Yaniv Ben Shalom**, who died of gunshot wounds to his head and back, from bullets that were fired from the MP-5 submachine gun described above, and from a Kalashnikov assault rifle by ████████ and ████████

### Fifteenth count: (Detailed Incident 2159/01 Binyamin)

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on August 25, 2001 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, on the date set forth, at the place set forth in the fourteenth count of the indictment, by his acts described in the fourteenth count of the indictment, caused the intentional death of **the late Sharon Ben Shalom,** who died of gunshot wounds to her head and back, from bullets that were fired from an MP-5 submachine gun, which the Defendant delivered as described in the fourteenth count of the indictment, and from a Kalashnikov assault rifle.

### Sixteenth count: (Detailed Incident 2159/01 Binyamin)

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on August 25, 2001 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, on the date set forth, at the place set forth in the fourteenth count of the indictment, by his acts described in the fourteenth count of the indictment, caused the intentional death of **the late Doron Yosef Savari**, who died of gunshot wounds, from bullets that were fired from an MP-5 submachine gun, which the Defendant delivered as described in the fourteenth count of the indictment, and from a Kalashnikov assault rifle.

[Stamp] P 5: 182

Prosecution Case 444/02 Amended

**Seventeenth count: (Detailed Incident 2159/01 Binyamin)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on August 25, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, on the date set forth, at the place set forth in the fourteenth count of the indictment, by his acts described in the fourteenth count of the indictment, attempted to cause the intentional death of the occupants of the Volkswagen Passat vehicle stated in the fourteenth count of the indictment. As a result of the gunfire set forth in the fourteenth count of the indictment from an MP-5 submachine gun, which the Defendant delivered as described in the fourteenth count of the indictment, and from a Kalashnikov assault rifle, the daughter of the late Ben Shalom couple was slightly injured by fragments in her leg.

[Stamp] P 5: 182 [continued]

Prosecution Case 444/02 Amended

**Eighteenth count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in September 2001 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

██████████████████ (███████) – the Head of the "Al Aqsa Martyrs' Brigades" – the military arm of the "Tanzim" of the Fatah in the Area, ████████████████ and ████████ ██████████ approached the above mentioned Defendant, at the time set forth, in Ramallah or thereabouts. The above mentioned persons told the Defendant that they had manufactured a mortar and had also purchased a mortar bomb for NIS 1,500. The above mentioned persons asked the Defendant to give them money, which they had paid for the above mentioned mortar bomb. The above mentioned persons said that they intended to fire the above mentioned mortar bomb towards the settlement of Psagot.

The Defendant asserted to these persons that if they would be able to fire the above mentioned mortar bomb at the settlement of Psagot, he would pay them the money for the bomb.

Later, that night, the above mentioned persons returned to the Defendant and informed him that they had fired the above mentioned mortar bomb towards the settlement of Psagot. The above mentioned persons informed the Defendant that they did not know exactly where the mortar bomb that they had fired impacted. In view of that which has been set forth above, the Defendant refused to pay the above mentioned persons money for the above mentioned mortar bomb.

Later, the Defendant reported the firing of the mortar bomb at the settlement of Psagot by the above mentioned persons to ████████████████ the Head of the "Tanzim" of the Fatah.

**Nineteenth count: (Detailed Incident 7915/01 Zion)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security

[Stamp] P 5: 183

Prosecution Case 444/02 Amended

20

Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on September 15, 2001 or thereabouts, caused the intentional death of another person, as follows:

1.  ████████████████ (alias ████████ , approached the above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, and stated that ████████████████ (alias ████████ had approached him with another person and asked to receive an MP-5 submachine gun in order to use it to carry out a shooting attack with the aim of causing the death of Israeli civilians. ████████ asked the Defendant to deliver the MP-5 submachine gun to him, after he had already delivered it to ████████ previously for carrying out shooting attacks.

2.  The Defendant consented to provide the requested weapon for the purpose of carrying out the planned shooting attack.

3.  The Defendant referred ████████████ to ████████ for receiving the above mentioned MP-5 submachine gun. ████████ contacted ████ and received from the latter the MP-5 submachine gun of the Defendant. In addition, the Defendant provided ████████████ a "14" pistol for carrying out the planned shooting attack.

4.  Later that day, ████████████ delivered the above mentioned MP-5 submachine gun to ████████ with the aim of the latter using it to carry out a shooting attack and cause the death of Israeli civilians.

5.  Later that day, ████████████████ met ████████████ ██ ████████ (alias "████████"), ████████████ and ██ ████████████ arrived to this meeting armed with an MP-5 submachine gun and a "14" pistol, which the Defendant had supplied to him as set forth above for the purpose of carrying out a shooting attack.

6.  At about 10:00 p.m., on September 15, 2001, the above mentioned Defendants traveled from Ramallah to Jerusalem in ████████ 's Isuzu pickup vehicle.

[Stamp] P 5: 183 [continued]

Prosecution Case 444/02 Amended

7.      █████████ drove the above mentioned Isuzu vehicle and traveled with ████████ and his colleagues in order to show them a place where they would carry out the planned shooting attack and in order to show his colleagues how to escape after carrying out the attack set forth. █████████ transported his colleagues to Highway No. 9, connecting the Ramot neighborhood to the [neighborhood of] French Hill neighborhood in Jerusalem. █████████ showed his colleagues where to carry out

[Stamp] P 5: 183 [continued]

Prosecution Case 444/02 Amended

22

the planned attack and how to escape thereafter. At the end of the said visit, the above mentioned gang returned to Ramallah.

8.  At about 10:30 p.m. that day, ███████████ along with ███████████ and ███████████ traveled in a stolen gray vehicle with Israeli license plates, which ██ had supplied to them for carrying out the planned attack (hereinafter: the Vehicle). ███████████ drove in front of them, in the above mentioned Isuzu vehicle, in order to inform his colleagues by cellular telephone of police and IDF checkpoints.

9.  ███████████ drove the above mentioned Vehicle, next to him sat ███████████ who was armed with a "14" pistol, which the Defendant had also supplied.

10. The above mentioned gang stopped on Highway No. 9 near a junction leading to the Ramat Shlomo neighborhood and waited for a single Israeli vehicle to arrive at the site with the aim of carrying out a shooting attack against it and causing the death of the occupants of the vehicle.

11. After a few minutes, at about 11:10 p.m., a white Renault express vehicle, license No. 2273706 (hereinafter: the Renault), arrived at the site from the direction of the Ramat Shlomo nationhood and turned to Highway No. 9 towards the Ramot neighborhood.

12. ███████████ started to drive after the Renault and overtook it.

13. When the Vehicle was driving parallel to the Renault, ███████████ and ███████████ opened fire using an MP-5 submachine gun and "14" pistol, which the Defendant had supplied to them, against the occupants of the Renault with the aim of causing their death.

14. A number of bullets that were fired by ███████████ and ███████████ hit the Renault and the two occupants of the Renault – the late Moshe Weiss and Meir Weisshaus. Thereafter, ███████████ continued to travel towards the neighborhood of Ramot and near a site at which a new bridge was being built, turned right to a dirt track leading to Bir Nabala.

[Stamp] P 5: 184

Prosecution Case 444/02 Amended

23

15. Before entering Bir Nabala, ██████████ and his colleagues, who were with him in the Vehicle, met ████████ who was waiting for them at the site in the Isuzu vehicle. From them, they all continued to travel together to Bir Nabala and thereafter escaped to Ramallah.

16. By his acts described above, the Defendant caused the intentional death of **the late Meir Weisshaus**, who died in hospital later that day as a result of gunshot wounds from bullets that were fired by the colleagues of the Defendant using the MP-5 submachine gun and the "14" pistol, which the Defendant had supplied.

**Twentieth count: (Detailed Incident 7915/01 Zion)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on September 15, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, at about 11:10 p.m., at the place described in the previous count of the indictment, by his acts set forth in the previous count of the indictment, attempted to cause the intentional death of Moshe Weiss, who was driving a white Renault Express vehicle, license No. 2273706, described in the previous count of the indictment. One of the bullets that were fired by the colleagues of the Defendant, as described in the previous count of the indictment, hit the head of Moshe Weiss and severely injured him.

**Twenty first count: (Detailed Incident 7915/01 Zion)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on October 3, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

[Stamp] P 5: 184 [continued]

1. The above mentioned Defendant, in early October 2001, in Ramallah or thereabouts, ██████████████████ (alias ████████). ████████ asked

Prosecution Case 444/02 Amended

24

the Defendant for an MP-5 submachine gun, ammunition for the above mentioned MP-5 submachine gun and a vehicle for the purpose of carrying out a shooting attack against Israeli civilians in Jerusalem with the intent of causing their death.

2. ██████████████████████ (alias ██████████) informed the Defendant that he was planning to carry out the planned attack along with ██████████████ ████████, ████████ ██████████████ and ██████████████████████ (alias ████ ████████).

[Stamp] P 5: 184 [continued]

Prosecution Case 444/02 Amended

3.  Initially, the Defendant told ▮▮▮▮▮▮▮▮▮ to carry out the planned attack from the vehicle of ▮▮▮▮▮▮▮ But ▮▮▮▮▮▮▮▮▮ contended that he needed two vehicles, with the spotters traveling in the first vehicle and the shooters traveling in the second. In view of this, the Defendant delivered to ▮▮▮▮▮▮▮▮▮ a stolen Mazda 323 vehicle bearing Israeli license plates, which he had purchased for that purpose from ▮▮▮▮▮ for NIS 5,000.

4.  For the purpose of carrying out the planned shooting attack, the Defendant delivered to ▮▮▮▮▮▮▮▮ an MP-5 submachine gun and ammunition for this MP-5 submachine gun.

5.  On October 3, 2001, ▮▮▮▮▮▮▮▮▮ departed from Ramallah towards Jerusalem with the aim of carrying out the planned shooting attack, in possession of the above mentioned MP-5 submachine gun and traveling in the above mentioned Mazda vehicle, which ▮▮▮▮▮▮▮▮ was driving.

6.  ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ traveled in an Isuzu pickup vehicle belonging to ▮▮▮▮▮▮▮ before the Mazda vehicle in which ▮▮▮▮▮▮▮ was traveling, with the aim of informing him of police and IDF checkpoints on the way.

7.  The above mentioned colleagues of the Defendant arrived at New Beit Hanina in Jerusalem. There, ▮▮▮▮▮▮▮ parked the Mazda vehicle and with his other colleagues hid the above mentioned MP-5 submachine gun in the vehicle.

8.  ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ boarded the Isuzu vehicle and from there continued in the Isuzu vehicle with ▮▮▮▮▮ and ▮▮▮▮▮▮▮ towards the Begin Road.

9.  The above mentioned colleagues of the Defendant reached the Begin road. From there, ▮▮▮▮▮▮▮ showed his other colleagues where to carry out the planned shooting attack and how to escape after carrying out the shooting attack. The above mentioned colleagues of the Defendant decided to carry out the planned shooting attack in the first tunnel of the Begin Road from the direction of Ramot, in order for the gunshots to go unheard. Thereafter, all of these persons were to return to Beit Hanina, to the place at which the above mentioned Mazda Vehicle was left.

[Stamp] P 5: 185

Prosecution Case 444/02 Amended

10. ███████████ boarded the Mazda vehicle armed with the above mentioned MP-5 submachine gun, while ███████████ drove the said Mazda vehicle. ███████ ██ and ███████████ drove the Mazda vehicle to the Begin road with the aim of carrying out the planned shooting attack there and causing the death of Israeli civilians.

11. ███████████ and ███████████ traveled on the road back and forth several times looking for a single Israeli vehicle with the aim of carrying out the planned shooting attack against it with the aim of causing the death of the occupants of the vehicle.

12. At about 11:35 p.m., while driving northward, in the last tunnel in their direction of travel, ███████████ and ███████████ noticed a Honda Accord vehicle, License No. 1103217, traveling on the Begin road northward. The occupants of the Honda vehicle were Tonie Amiel, Pini Maimon and Pazit Maimon.

13. ███████████ overtook the above mentioned Honda Vehicle. While ███████ was driving parallel to the above mentioned Honda vehicle, ███████████ fired a single round from the MP-5 submachine gun, which the Defendant had supplied, at the occupants of the Honda vehicle, with the intent of causing their deaths. The bullet that was fired by ███████████ did not hit the above mentioned Honda vehicle.

14. After carrying out the said shooting attack, ███████████ and ███████████ continued their journey towards Highway No. 9 connecting the Ramot neighborhood to the [neighborhood of] French Hill neighborhood.

**Twenty second count: (Detailed Incident 8379/01 Zion)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on October 3, 2001 or thereabouts, attempted to cause the intentional death of another person, as follows:

[Stamp] P 5: 185 [continued]

Prosecution Case 444/02 Amended

1.  After ████████████████████████ (alias ████████) and ████████
    ████████████ carried out the shooting attack as described in the previous count of the
    indictment, the two continued to travel in the Mazda vehicle, which the Defendant had
    supplied to them as described in the previous count of the indictment, towards Highway
    No. 9, connecting the Ramot neighborhood to the [neighborhood of] French Hill
    neighborhood, with the aim of reaching Beit Hanina from there and then continuing to
    Ramallah.

2.  During this journey, ████████████ at the request of ████████████ checked
    the function of the MP-5 submachine gun, which the Defendant had delivered, and also
    fired several rounds into the air.

3.  During the journey on the above mentioned Highway No. 9, at about 11:45 p.m.,
    ████████████ and ████████████ noticed a Skoda vehicle, license No.
    6567709, which was traveling on Highway No. 9 towards the [neighborhood of] French
    Hill. Malka Cohen and Pinchas Cohen were traveling in this Skoda vehicle.

4.  ████████████ who as set forth was driving the Mazda vehicle, overtook the Skoda
    vehicle.

[Stamp] P 5: 185 [continued]

Prosecution Case 444/02 Amended

28

5.    While ██████████████ was driving parallel to the above mentioned Skoda vehicle, ██████████████ fired the MP-5 submachine gun, which the Defendant had supplied to them for the purpose of carrying out a shooting attack as described in the previous count of the indictment, discharging a few shots at the above mentioned Skoda vehicle with the aim of causing the death of the occupants of the Skoda vehicle.

6.    A number of bullets that were fired by ██████████████ hit the Skoda vehicle. Two bullets that were fired by ██████████████ hit Pinchas Cohen and another bullet hit Malka Cohen.

7.    Pinchas Cohen was moderately injured by gunshot wounds from two bullets in his abdomen, while Malka Cohen, who was 28 weeks pregnant, was moderately injured by a gunshot wound from a bullet to her head.

8.    After carrying out the said shooting attack, ██████████████ and ██████████████ continued to drive towards the [neighborhood of] French Hill and from there they reached New Beit Hanina. There, ██████████████ and ██████████████ parked the above mentioned Mazda vehicle and contacted by telephone ██████████████ and ██████ (alias ██████████ , who arrived at the site in the Isuzu vehicle belonging to Fares Ghanem in order to pick up ██████████████ and ██████████████ according to the planning set forth in the previous count of indictment.

9.    ██████████████ and ██████████████ concealed the above mentioned MP-5 submachine gun in the Isuzu vehicle and boarded the Isuzu vehicle.

10.    These four persons tried to return from Jerusalem to Ramallah, but were unable to do so because of IDF and police checkpoints. The above mentioned colleagues of the Defendant stayed to sleep overnight in the home of ██████████████ , a friend of ██████████████ in New Beit Hanina in Jerusalem.

11.    On the following day, October 4, 2001, ██████████████ and ██████████████ returned to Ramallah in the vehicle of Fares Ghanem.

12.    After returning to Ramallah, ██████████████ reported to the Defendant the attacks that he had carried out using the Mazda vehicle and the MP-5 submachine gun that he had received from the Defendant.

[Stamp] P 5: 186

**Twenty third count:**

Prosecution Case 444/02 Amended

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, in late 2001 – early 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, in late 2001 or thereabouts, in Ramallah or thereabouts, when he was with ▮▮▮▮▮▮▮▮▮ the head of the "Tanzim" of the Fatah, met ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ (▮▮▮▮▮▮ the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah. ▮▮▮▮▮▮▮▮▮ told ▮▮▮▮▮▮▮▮ of his intentions to purchase a mortar and mortar bombs for the purpose of carrying out mortar fire at Israeli settlements with the intent of causing the death of Israeli civilians. ▮▮▮▮▮▮▮▮ asked ▮▮▮▮▮▮▮▮ for financial aid for purchasing the mortar and mortar bombs. ▮▮▮▮▮▮▮▮ refused to provide him the financial aid and referred ▮▮▮▮▮▮▮ to the Defendant. The Defendant explained to ▮▮▮▮▮▮▮ that there was no need to pay a lot of money for a mortar and mortar bombs, as the Defendant already possessed a makeshift mortar and mortar bombs.

In early 2002, the Defendant referred ▮▮▮▮▮▮▮ and the latter's colleague – a senior military operative in the "Al Aqsa Martyrs Brigades" – ▮▮▮▮▮▮▮▮ to the home of ▮▮▮▮▮ in order for them to receive the above mentioned mortar and mortar bombs there.

▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮ received the above mentioned makeshift mortar and 5 mortar bombs.

▮▮▮▮▮▮▮ with his above mentioned colleagues, fired using the above mentioned makeshift mortar a mortar bomb at the settlement of Psagot with the intent of causing the death of residents of the above mentioned settlement and IDF soldiers who were in the above mentioned settlement. The above mentioned mortar bomb did not hit the settlement of Psagot and exploded near it.

After carrying out the said attack, ▮▮▮▮▮▮▮ reported what had happened to the Defendant. The Defendant took ▮▮▮▮▮▮▮ to ▮▮▮▮▮▮▮ in order to report the mortar bomb firing attack that had been performed for the first time in the Area to ▮▮▮▮▮ too.

[Stamp] P 5: 186 [continued]

**Twenty fourth count**: (Detailed Incident 39/02 Binyamin)

Prosecution Case 444/02 Amended

**Nature of the offense**: Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, on January 15, 2002 or thereabouts, caused the intentional death of another person, as follows:

1.  On January 14, 2002, Raed Karmi, who was a senior military operative in the "Tanzim" of the Fatah Organization, which is an illegal organization, was killed. Following the death of the above mentioned Raed Karmi, the head of the "Tanzim" of the Fatah in the area, ███████████ pitched a mourning tent in Albira.

2.  The above mentioned Defendant, on January 15, 2002, in the above mentioned mourning tent, met ████████████████████ (alias ████████), ██████████████ ████████, ████████████████ (alias ████████), ██████████ ██ and ██████████████████.

3.  The Defendant informed his above mentioned colleagues that ██████████ the head of the "Tanzim" of the Fatah in the Area, asked for them to carry out an attack immediately to avenge the death of the above mentioned Raed Karmi and cause the death of Israeli civilians.

4.  For the purpose of carrying out the said attack, the Defendant provided his above mentioned colleagues an MP-5 submachine gun, a "16" pistol and a Mazda vehicle bearing Israeli license plates.

5.  The above mentioned colleagues of the Defendant, in the above mentioned mourning tent, decided that in view of the demand of the Defendant, they would carry out an attack that very evening at the Hagivonim gas station, located on Highway 443, near the entrance to Givat Ze'ev, with the intent of causing the death of Israeli civilians.

6.  In the evening hours of that day, January 15, 2002, ██████████ left the above mentioned mourning tent with ██████████ ████████████ and ██████████ traveled in an Isuzu pickup vehicle belonging to ██████████ to the above mentioned gas station with the intent of carrying out the planned shooting attack there. ██████████

[Stamp] P 5: 187

██████ armed with a "14" pistol, ██████████, armed with the above mentioned "16" pistol, and ██████████ armed with the above mentioned MP-5 submachine gun,

Prosecution Case 444/02 Amended

drove behind the above mentioned Isuzu vehicle. The three traveled in a Mazda vehicle, which they had received for this purpose from the Defendant.

7.  The above mentioned colleagues of the Defendant reached an earth mound that blocked the exit from the villages Bir Nabala and Aljib to Highway 443, about 100 meters from the Hagivonim gas station. The above mentioned colleagues of the Defendant parked their vehicles, the Isuzu and Mazda, facing the village Bir Nabala so that they could escape from the site immediately after carrying out the planned attack.

8.  ▮▮▮▮▮▮ armed with a "14" pistol, ▮▮▮▮ armed with a 16 pistol, and ▮▮▮▮▮ armed with an MP-5, alighted form the vehicles and walked to the above mentioned gas station with the aim of carrying out the planned shooting attack and causing the death of Israeli civilians there.

9.  ▮▮▮▮▮▮ and ▮▮▮▮▮▮ stayed in the above mentioned vehicles in order to make sure that no IDF patrol or other people would come to the site. ▮▮▮▮▮▮ ▮▮▮▮ sat in the driver's seat of the Mazda vehicle so that he could immediately evacuate his three colleagues who had departed to carry out the planned attack immediately after executing the attack.

10. ▮▮▮▮▮▮ and ▮▮▮▮▮▮ stood at the entrance to the above mentioned gas station.

11. After a few minutes, at about 7:45 p.m., ▮▮▮▮▮▮ and ▮▮▮▮▮ noticed a white Fiat Uno vehicle, license No. 6424905, entering the above mentioned gas station, which was driven by the late Yoela Chen, and Rachel Eini was sitting next to her.

12. ▮▮▮▮▮▮ and ▮▮▮▮▮▮ approached the above mentioned Fiat vehicle with the aim of carrying out a shooting attack against it and causing the death of the vehicle occupants. The occupants of the Fiat vehicle noticed the pistol that ▮▮▮▮▮▮ was holding and started to shout and sound the horn. ▮▮▮▮▮▮ put the pistol into his trousers and told the vehicle occupants not to fear.

[Stamp] P 5: 187 [continued]

Prosecution Case 444/02 Amended

13. At this stage, ███████ opened fire with burst from the MP-5 submachine gun, which the Defendant provided, at the occupants of the Fiat vehicle with the intent of causing their death. Then, ████████ took out his pistol to and started to shoot at the vehicle occupants with the intent of causing their death.

14. ███████ and ██████ fired at very close range a large number of rounds at the late Yoela Chen, and at Rachel Eini, who were in the above mentioned Fiat vehicle.

15. Approximately 28 bullets, which were fired by ████████ and ████████ hit the front windshield of the vehicle, a number of bullets hit the side of the vehicle and the driver's door window.

16. During the commission of the described shooting attack, █████ who was standing a short distance behind ████████ nd ███████ served as a lookout and spotter.

17. ████████ immediately after hearing the gunfire, drove from the site with his Isuzu vehicle in order to inform his colleagues whether there were checkpoints on the way to Ramallah.

[Stamp] P 5: 187 [continued]

Prosecution Case 444/02 Amended

18. ████████ ████████ and ███ after having carried out the shooting attack as set forth above, ran back to the Mazda vehicle in which ████████. was waiting. After the three got into the vehicle, ████████ drove them to Ramallah.

19. In Ramallah, ████████ ████████ ████████ and ███ met ████████ ████████

20. Thereafter, ████████ met the Defendant in Ramallah, returned the MP-5 submachine gun and the Mazda vehicle to him and reported the attack that he had carried out as described above.

21. By his acts described above, the Defendant caused the intentional death of **the late Yoela Chen,** who died at the scene as a result of gunshot wounds from bullets that were fired by Mohamed Mousleh and Tarek A-Nuf.

**Twenty fifth count: (detailed incident 39/02 Binyamin)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, on January 15, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the above mentioned time, in the described in the previous count of the indictment, by his acts set forth in the previous count of the indictment, attempted to cause the intentional death of Rachel Eini, who was traveling in a white Fiat Uno vehicle, license No. 6424905, described in the previous count of the indictment. One of the bullets that were fired by ████████████████ (alias ██████) and ████████████████ using the weapons that had been delivered to them by the Defendant for the purpose of carrying out the shooting attack, as described in the previous count of the indictment, hit Rachel Eini in the head and two other bullets hit her left shoulder, injuring her moderately.

**Twenty sixth count: (Detailed Incident 502/02 Zion)**

[Stamp] P 5: 188

Prosecution Case 444/02 Amended

34

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, caused the intentional death of another person, as follows:

1. The above mentioned Defendant, in January 2002, the Defendant decided that he wanted to execute a suicide attack inside the territory of the State of Israel in order to cause the death of as many Israeli civilians as possible.

2. The above mentioned Defendant telephoned ▒▒▒▒▒▒▒▒ a senior operative of the "Tanzim" of the Fatah, which is an illegal organization, in Nablus. The Defendant asked ▒▒▒▒▒▒ to send him a person who would be prepared to carry out a suicide attack. The Defendant told ▒▒▒▒▒▒ that he himself would see to bringing the suicide terrorist into Jerusalem in order to carry out a suicide attack there.

3. A few days later, on January 22, 2002, in Ramallah, the Defendant met Sa'id Ramadan, a resident of Kfar Tal in the Nablus district, who informed the Defendant that he had been sent by ▒▒▒▒▒▒ for the purpose of carrying out a suicide attack.

4. The Defendant called ▒▒▒▒▒▒▒▒▒▒ (alias ▒▒▒▒▒▒ ) and asked the latter to come to him.

5. ▒▒▒▒▒▒▒▒ met the Defendant and the above mentioned Sa'id Ramadan that day in Ramallah. The Defendant introduced the two to each other. The Defendant and ▒▒▒▒▒▒▒▒ took Sa'id Ramadan to a barber shop to have his hair cut before carrying out the planned suicide attack.

6. Thereafter, the Defendant and ▒▒▒▒▒▒ called ▒▒▒▒▒▒▒▒▒▒ (alias ▒▒▒▒▒ ) and asked the latter to transport a suicide terrorist from Ramallah to Jerusalem in order for the suicide terrorist to carry out a suicide attack in Jerusalem and cause the death of as many Israeli civilians as possible.

7. ▒▒▒▒▒▒ came to Ramallah with ▒▒▒▒▒▒▒▒▒▒ , after the latter agreed to participate in driving the suicide terrorist from Ramallah to Jerusalem. ▒▒▒ ▒▒▒ came to the meeting in his Isuzu pickup vehicle with Israeli license plates.

[Stamp] P 5: 188 [continued]

Prosecution Case 444/02 Amended

8.    According to the instruction of the Defendant, ███████████ and ███████████ traveled in the above mentioned Isuzu vehicle from Ramallah to Jerusalem in order to find a way that had no police or IDF checkpoints, with the aim of driving the suicide terrorist who would carry out the planned attack in Jerusalem later using the same route.

[Stamp] P 5: 188 [continued]

Prosecution Case 444/02 Amended

9.    ██████████ and ██████████ traveled from Ramallah via Rafat and arrived at the Atarot Industrial Zone, where the two returned to the Jerusalem – Ramallah main road and traveled left to the junction leading to the Rama Camp, where they turned right and traveled to Adam Junction. At Adam Junction the two turned right and traveled to Hizma Junction, where they turned right and entered Anta. Through Anta, they arrived at the French Hill Junction, where the two turned right and returned to Ramallah. ██████████ and ██████████ saw that on the way that they were traveling the suicide terrorist could be driven to Jerusalem without being stopped at police or IDF checkpoints.

10.   At the same time, in Ramallah, the Defendant and ██████████ took the above mentioned Sa'id Ramadan to pray and also bought for the above mentioned Sa'id Ramadan food, new clothes and shoes. The Defendant paid with his own money for these purchases in the amount of NIS 1,200.

11.   ██████████, at the instruction of the Defendant, brought an M-16 assault rifle and 3 magazines for the said assault rifle, filled with cartridges two of which were connected with a magazine coupler ("jungle clip").

12.   According to the plan of the Defendant and his above mentioned colleagues, Sa'id Ramadan should have arrived in Jerusalem and shoot there at Israeli civilians with the intent of causing their death until he himself would be killed by the Israeli security forces.

13.   Thereafter, on the same day, the Defendant, ██████████ and Sa'id Ramadan met ██████████ and ██████████ in the area of the City Inn Hotel in Albira. The Defendant introduced Sa'id Ramadan to ██████████ and to ██████████

14.   The Defendant explained to ██████████ and to ██████████ that the above mentioned Sa'id Ramadan was the suicide terrorist that they had to drive to Jerusalem in order for him to carry out a suicide attack by shooting at Israeli civilians with the aim of causing the death of as many Israeli civilians as possible.

15.   ██████████ and ██████████ hid the above mentioned M-16 assault rifle and magazines in the above mentioned Isuzu vehicle.

[Stamp] P 5: 189



16.   The Defendant and ████████████ wished Sa'id Ramadan luck and the three traveled to Jerusalem. The Defendant told ████████████ and ████████ that they would have to take Sa'id Ramadan to carry out the suicide attack in any place in Jerusalem of their choosing.

17.   ████████ drove the Isuzu vehicle, Sa'id Ramadan sat in the seat next to the driver's seat and ████████ sat in the rear seat.

18.   ████████ and ████████ transported Sa'id Ramadan to Jerusalem on a route that they had inspected earlier that day as described above.

19.   In Jerusalem, ████████ and ████████ traveled to Sheikh Jarah St. There they took out the M-16 assault rifle and magazines that were hidden inside the vehicle and handed them over to Sa'id Ramadan. ████████ moved to the seat next to the driver's seat while Sa'id Ramadan moved to the back seat, holding the M-16 assault rifle and the magazines in his hands.

20.   ████████ and ████████ drove Sa'id Ramadan to Hanevi'im Street.

21.   During the journey, Sa'id Ramadan complained to ████████ and ████ ████ that his new shoes, which the Defendant had purchased for him for the attack, were too small and pinched him. ████████ took of his "Reebok" shoes and handed them over to Sa'id Ramadan saying "go up to heaven with "Reebok" shoes".

22.   Upon reaching the junction of Strauss and Hanevi'im Streets, ████████ and ████████ stopped the Isuzu vehicle.

23.   ████████ and ████████ told Sa'id Ramadan to walk down to Jaffa Street and start to shoot at a place where he would see many people.

24.   After Sa'id Ramadan got out of the vehicle with the M-16 assault rifle and the ammunition, ████████ and ████████ drove away from the site in the Isuzu vehicle, departed through the Musrara neighborhood to Highway No. 1 and from there drove by way of the main road to Ramallah.

25.   Sa'id Ramadan, a few minutes after having got out of the vehicle of ████████ and ████████ arrived at Jaffa Street.

[Stamp] P 5: 189 [continued]

Prosecution Case 444/02 Amended

26.    At about 4:20 p.m., while standing opposite Building No. 47 on Jaffa Street or thereabouts, Sa'id Ramadan loaded the M-16 assault rifle that he was carrying, shouted "Allahu Akbar" and discharged automatic gunfire indiscriminately at the people who were on Jaffa Street, at the bus stop at the site, aboard the "Egged" bus No. 27 that was at this stop at the time and at the people who were within the stores nearby with the aim of causing the death of as many people as possible. Sa'id Ramadan, while continuing to fire, fled from the site towards the parking lot in Harav Kook Street. There, Sa'id Ramadan changed magazines and continued to shoot at civilians with the aim of causing their death. Sa'id Ramadan fired through the M-16 assault rifle that he carried more than 38 cartridges. Sa'id Ramadan continued to shoot at civilians until he was killed by civilians and policemen who arrived at the site.

[Stamp] P 5: 189 [continued]

Prosecution Case 444/02 Amended

27.  By his acts described above, the above mentioned Defendant caused the intentional death of **the late Ora (Svetlana) Sandlar**, who died as a result of gunshot wounds caused by the bullets that were fired by Sa'id Ramadan.

28.  After the Defendant learned about the execution of the above mentioned attack, the Defendant approached ███████████ and received from the latter the amount of 1,000 U.S. dollars for executing the said attack. The Defendant gave ███████████, ███████████ and ███████████ 100 U.S. dollars each for their participation in the execution of this attack.

**Twenty seventh count: (Detailed Incident 502/02 Zion)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, at the place set forth in the previous count of the indictment, by his actions described in the previous count of the indictment, caused the intentional death of **the late Sarah Hamburger**, who died of gunshot wounds from the bullets that were fired by Sa'id Ramadan, who was dispatched to carry out the above shooting attack by the Defendant.

**Twenty eighth count: (Detailed Incident 502/02 Zion)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

[Stamp] P 5: 190

Prosecution Case 444/02 Amended

The above mentioned Defendant, at the time set forth, at the place set forth in the twenty sixth count of the indictment, by his actions described in the twenty sixth count of the indictment, attempted to cause the intentional death of as many civilians as possible who at the time were on and near Jaffa Street. As a result of the gunfire at the site that was fired by Sa'id Ramadan, who was dispatched to carry out the above shooting attack by the Defendant, **more than 45 civilians were injured**.

**Twenty ninth count: (Detailed Incident 502/02 Zion)**

**Nature of the offense:** Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The aforesaid Defendant, at the above mentioned time, at the place set forth in the twenty sixth count of the indictment, through his actions described in the twenty sixth count of the indictment, maliciously and unlawfully damaged a large amount of property, including stores on Jaffa Street, an "Egged" bus stop, an "Egged" company bus, No. 27, and many vehicles, which were damaged by the gunfire that was discharged at the site by Sa'id Ramadan, who was dispatched to carry out the said attack by the Defendant.

[Stamp] P 5: 190 [continued]

Prosecution Case 444/02 Amended

**Thirtieth count:**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Section 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in late January – early February, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1.  The above mentioned Defendant, at the above mentioned time, in Ramallah or thereabouts, met ███████████████████████

2.  ██████████ informed the Defendant that his cousin, ███████████████, was prepared to carry out a suicide attack.

3.  At the request of the Defendant, ██████████ arranged a meeting between the Defendant and the above mentioned ██████████

4.  After the above mentioned meeting, the Defendant consented to the suggestion of ████ ██████ to send ██████████ to carry out a suicide attack in Jerusalem in order for ██████████ to cause the death of as many Israeli civilians as possible.

5.  The plan was for ██████████ to carry out a suicide attack using a rifle, i.e. he would shoot at Israeli civilians in Jerusalem with the intent of causing the death of as many Israeli civilians and possible and would continue to fire until he would be killed by the Israeli security forces.

6.  The Defendant took an M-16 assault rifle and a number of magazines for the above mentioned assault rifle filled with cartridges from ██████████████ ██████████ for the purpose of carrying out the planned suicide attack.

7.  The Defendant contacted ███████████████████ ████████████ ██████ (alias ██████████) and ██████████. At the request of the Defendant, the above mentioned three individuals arrived in Ramallah and met the Defendant there.

[Stamp] P 5: 191

Prosecution Case 444/02 Amended

42

8.   The Defendant informed his above mentioned colleagues that he was asking them to bring another terrorist into Jerusalem, who would carry out a suicide attack in Jerusalem, such as the attack described in the twenty-sixth count of the indictment, with the aim of causing the death of as many civilians as possible. The above mentioned colleagues of the Defendant consented to participate in the driving of this suicide terrorist to Jerusalem.

9.   The Defendant provided ████████████ and ████████████ with a gray Subaru vehicle, which belonged to the family of the Defendant. ████████████ returned with the Subaru vehicle to his home in Bir Nabala, while ████████████ traveled with his Isuzu pickup vehicle to his home in Kfar Aqab.

10.   On the following day, The Defendant called ████████████ and ████████████ and instructed them to come to the gas station located in downtown Ramallah, pick up the suicide terrorist from there and drive him to Jerusalem in order for him to carry out the suicide attack there with the aim of causing the death of as many civilians as possible.

11.   ████████████ traveled in the Subaru vehicle until the Kalandia checkpoint, where he parked the vehicle and boarded the Isuzu vehicle of ████████████ who arrived at the site. From there, the two continued to the said meeting place.

12.   In Ramallah, at the above mentioned gas station, ████████████ and ████████████ met the Defendant, who introduced them to ████████████ who was the suicide terrorist. The Defendant handed the above mentioned M-16 assault rifle and the above mentioned three magazines filled with cartridges for M-16 assault rifles over to ████████ ████████

13.   ████████████ and ████████████ hid the M-16 assault rifle and the magazines inside the Isuzu vehicle.

14.   ████████████ and ████████████ traveled together with the suicide terrorist to Jerusalem with the aim of the latter carrying out a shooting attack there and causing the death of as many civilians as possible.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended

15.  ███████, ███████ and ███████ arrived at the Kalandia Checkpoint and bypassed it. Thereafter, ███████ switched to the Subaru vehicle, which he had left at the site earlier and drove to A-Ram Junction. ███████ passed the A-Ram checkpoint in the Subaru vehicle and waited at the site for ███████ and ███████, who had bypassed the A-Ram checkpoint on foot.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended

44

Thereafter, ██████████ returned, boarded the Isuzu vehicle, in which the weapon was hidden, and passed the A-Ram checkpoint while driving alone in the Isuzu vehicle with the weapon.

16. ████████████ drove the suicide terrorist up to a mosque in Shuafat. ████████████ also arrived at this site in the Isuzu vehicle with the weapon and the ammunition.

17. There, the suicide terrorist, ██████████, asked to enter the mosque and to pray prior to carrying out the suicide attack. ██████████ and ██████████ agreed to this request.

18. While ██████████ was praying at the above mentioned mosque, ██████████ and ██████████ traveled in the above mentioned Subaru vehicle to Givat Shaul in Jerusalem with the aim of checking whether there were IDF or police checkpoints on the way. The two decided to drive the suicide terrorist to Givat Shaul with the aim of carrying out the planned shooting attack there, because there were many civilians at this site.

19. When ██████████ and ██████████ returned to the mosque in Shuafat in order to pick up ██████████ and drive him to Givat Shaul with the aim of him carrying out the planned shooting attack there, the two did not find the suicide terrorist in the mosque.

[Stamp] P 5: 191 [continued]

Prosecution Case 444/02 Amended



20.   ████████████ and ████████████ called the Defendant and reported to him that the suicide terrorist had fled from them. The Defendant instructed ████████████ and ████████████ to return to Ramallah.

21.   ████████████ and ████████████ returned to Ramallah, met the Defendant there and handed over to him the above mentioned Subaru vehicle, the above mentioned M-16 assault rifle and the above mentioned magazines. The Defendant returned the above mentioned M-16 assault rifle to ████ (████ ████████████ (████████.

22.   The Defendant informed ████████████ that his cousin had fled when he was on his way to carrying out a shooting attack in Jerusalem.

**Thirty first count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in February 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met ████████ ████ alia ████████ and ████████████ The two above mentioned individuals informed the Defendant that they had a suicide terrorist and requested the help of the Defendant. The Defendant consented to help send the suicide terrorist into the State of Israel in order for him to carry out a suicide attack and cause the death of as many Israeli civilians as possible.

The Defendant reached the apartment in Ramallah in which were ████████████ ████ ████ and a person who wanted to carry out a suicide attack. The Defendant talked to ████ ████████████ (hereinafter: the Suicide Terrorist) and felt that the latter had serious intentions.

[Stamp] P 5: 192

Prosecution Case 444/02 Amended

46

The above mentioned Suicide Terrorist informed the Defendant that his father was also a "martyr" because he had been killed by IDF soldiers.

The Defendant transferred to ████████ an M-16 assault rifles and 4 magazines filled with cartridges in order for him to deliver them to the above mentioned Suicide Terrorist for the purpose of carrying out the planned suicide attack.

On the following day, the Defendant returned to the above mentioned apartment with a video camera. ████████filmed using the above mentioned video camera the above mentioned Suicide Terrorist, while he was reading out a leaflet, in preparation for his departure for carrying out the suicide attack inside the State of Israel. The Defendant and his above mentioned colleagues trained the above mentioned Suicide Terrorist in the use and firing of the M-16 assault rifle. Thereafter, the Defendant transferred the above mentioned Suicide Terrorist to the apartment of the Defendant in downtown Ramallah. The Defendant let the above mentioned Suicide Terrorist sleep in his home in order for him to depart from there on the following day to carry out the planned suicide attack.

When on the following morning the Defendant and ████████████ came to the above mentioned apartment of the Defendant, the two discovered that the suicide terrorist had disappeared. In view of the disappearance of the above mentioned suicide terrorist, the above mentioned plan for executing the suicide attack was not put into action.

**Thirty second count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in February 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

[Stamp] P 5: 192 [continued]

Prosecution Case 444/02 Amended

The above mentioned Defendant, at the time set forth, talked by telephone with ████████ ████████, the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah in the Nablus area. ████████ informed the Defendant that he was sending to him two suicide terrorists. It was agreed between the Defendant and ████████ that the Defendant would have delivered weapons and hand grenades to the above mentioned suicide terrorists and have them brought to the western part of Jerusalem in order for them to carry out the suicide attack in which they would fire at Israeli civilians, with the intent of causing

[Stamp] P 5: 192 [continued]

Prosecution Case 444/02 Amended

the death of as many Israeli civilians as possible and continue to shoot until they would be killed by the Israeli security forces.

According to the instruction of the above mentioned ███████████ on February 17, 2002, ████████████████ a senior operative of the "Al Aqsa Martyrs Brigades", sent from Nablus to Ramallah, to the Defendant, ███████████████████████, ████████████████████████ (████████ (alias "██████), who were accompanied by ████████████████ The two were already armed with two hand grenades.

████████████ and ████████████were supposed to carry out the suicide attack as the Defendant and ████████████had planned.

Within the preparation for the above mentioned suicide attack, in the home of ████████████ ████████, the brother of the above mentioned ████████████████, in the Balata Refugee Camp, ████████████████using a video camera, filmed ████████████and ████████████holding M-16 assault rifles. The two also read before the video camera a leaflet of the "Al Aqsa Martyrs Brigades". ████████████████provided ████████████and to ████████████████training in the use of weapons in preparation for carrying out the planned attack.

On February 17, 2002,████████████████and ████████████ departed from Nablus to Ramallah along with ████████████████ and ████████████████████████████████ explained to the four that they must travel to Ramallah in the taxi of ████████████████████████ explained that████████████ would be responsible for ████████████ and ████████████to meet "Al Aqsa Martyrs Brigades" operatives in Ramallah, who would supply them weapons and driver them to Jerusalem according to this planning.

The above mentioned four individuals were not able to come to Ramallah and meet the Defendant for the purpose of executing the planned suicide attack. The four were arrested at an IDF checkpoint, near the village Douma in the Ramallah region. The two hand grenades that were in the above mentioned taxi were detonated at the site by an explosive ordnance disposal technician.

**Thirty third count:**

**Nature of the offense:** Conspiring to cause intentional death, an offense under Section 22 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 57828-1968 and Section

[Stamp] P 5: 193

Prosecution Case 444/02 Amended

51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in mid-February 2002 or thereabouts, conspired with another person to cause the intentional death of another person, as follows:

The above mentioned Defendant, on February 15, 2002 or thereabouts, in Ramallah or thereabouts, met ███████████ ███████████ and ██ ███████████ (alias "████████").

During the above mentioned meeting, the Defendant asked his above mentioned colleague to bring into Jerusalem a suicide terrorist, who would carry out a suicide attack with the aim of causing the death of as many people as possible. The above mentioned colleagues of the Defendant agreed to the said proposal. The Defendant promised to pay his above mentioned colleagues 300 U.S. dollars in exchange for the transport of the suicide terrorist to Jerusalem. The Defendant informed his above mentioned colleagues that he would bring to them the suicide terrorist in another day or two or so.

The Defendant also gave his above mentioned colleagues a Subaru vehicle bearing Israeli license plates, in order for his above mentioned colleagues to drive the suicide terrorist in it to Jerusalem.

███████████, ███████████ and ██ ███████████ planned to bring the suicide terrorist into Jerusalem in an Isuzu pickup vehicle belonging to ███████████. The above mentioned colleagues of the Defendant planned to transport the suicide terrorist to one of the places in Jerusalem that had many people in it for the suicide terrorist to carry out the planned suicide attack there. ███████████ ███████████ and ███████████ also conducted a tour of Jerusalem and chose the places that in their opinion were suitable for carrying out a shooting attack against Israeli civilians. Among other places, the above mentioned colleagues of the Defendant chose the "Ramada" hotel, the tunnels of the Begin Highway and the French Hill Junction.

The above mentioned plan of the Defendant and his above mentioned colleagues did not go ahead because about two days after the above mentioned meeting, on February 17, 2002, ███████████ was arrested by the Israeli security forces, and after a day, on February 18, 2002, ███████████ was arrested by the Israeli security forces.

[Stamp] P 5: 193 [continued]

Prosecution Case 444/02 Amended

50

According to the instruction of the Defendant, after the arrest of ███████████ [and] ████████ ████████, ███████████████████, met ███████████████████████, the brother of the above mentioned ███████████ and ███████████████, on February 19, 2002 or thereabouts, in Ramallah,. During the said meeting, ███████████████████ and ███████████████ agreed to the suggestion of ███████████ to drive a suicide terrorist into Jerusalem in order for him to carry out a suicide attack there with the aim of causing the death of as many people as possible.

This plan did not go ahead either because ███████████████ himself was arrested on the following day, February 20, 2002, by the Israeli security forces.

[Stamp] P 5: 193 [continued]

Prosecution Case 444/02 Amended

**Thirty fourth count: (Detailed Incident 483/02 Shafat)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on February 25, 2002 or thereabouts, caused the intentional death of another person, as follows:

1. The above mentioned Defendant, in mid-February 2002, in Ramallah or thereabouts, the Defendant decided to send a suicide terrorist to Jerusalem in order to carry out a shooting attack against Israeli targets with the aim of causing the death of as many civilians as possible. The Defendant planned for the suicide terrorist to shoot at Israeli civilians until he would be killed by the Israeli security forces.

2. The Defendant made telephone contact with ▆▆▆▆▆▆▆▆ a senior military operative in the "Tanzim" of the Fatah, an illegal organization, in Nablus. The Defendant asked ▆▆▆▆▆▆ to send a suicide terrorist to him in Ramallah for the purpose of carrying out the planned suicide attack.

3. After a few days, ▆▆▆▆▆▆▆▆▆▆ contacted the Defendant and informed him that he had been sent by ▆▆▆▆▆▆ for the purpose of carrying out the planned suicide attack and that he was in Ramallah.

4. According to the instruction of the Defendant, ▆▆▆▆▆▆▆▆ met ▆▆▆▆▆ . ▆▆ ▆▆ brought ▆▆▆▆ to the Defendant.

5. The Defendant talked to ▆▆▆▆▆ and thereafter took ▆▆▆▆ to a barber shop in order for the latter to have his hair cut in preparation for executing the planned suicide attack.

6. The Defendant purchased clothes for ▆▆▆▆ for which he paid NIS 1,000 out of his own funds.

7. Thereafter, the Defendant led ▆▆▆▆▆ to an apartment in Ramallah, in which the Defendant, ▆▆▆▆▆ and ▆▆▆▆▆▆ lived (hereinafter: "the Apartment").

[Stamp] P 5: 194

Prosecution Case 444/02 Amended

8.  On February 23, 2002, ███████████ (███████) also came to the apartment, bringing an M-16 assault rifle which he had received from the Defendant for executing the planned attack. ███████ (███████ also brought magazines for the above mentioned M-16 assault rifle from the home of his brother, ███████ (███ ███).

9.  In the evening hours on that day, ███████ (███████) and ███████ provided ███████ with information about the place at which ███████ was assigned to carry out the planned attack. The Defendant and his colleagues explained to ███████ that he had to carry out the planned attack in the Neve Ya'akov neighborhood in Jerusalem, at a place about which ███████ and ███████ had gathered information earlier.

10. The Defendant, along with others, filmed ███████ with a video camera in the framework of the preparations for the execution the planned attack.

11. At the request of ███████ (███████, his brother, ███████ (███████ (███████ ███████, contacted ███████ and asked the latter to drive ███████ to Jerusalem.

12. On February 25, 2002, in the evening, ███████ departed from Ramallah towards Jerusalem in the vehicle of ███████, in which the above mentioned M-16 assault rifle, the magazines and a hand grenade, which ███████ (███████ ██ (███ ███) had delivered, were hidden.

13. ███████ arrived at the main road in the Neve Ya'akov neighborhood in Jerusalem.

14. ███████ got out of the above mentioned vehicle at the site specified above, armed with the above mentioned M-16 assault rifle, magazines and a hand grenade. ███████ approached the bus stop of the number 25 "Egged" bus line, which was at the site, and discharged automatic gunfire from the above mentioned M-16 assault rifle at vehicles that passed by and at Israeli civilians who were at the site with the aim of causing the death of as many people as possible. A police car arrived at the site and ███████ discharged automatic gunfire at two policemen of the Israel Police who were in the above mentioned police car with the aim of causing their deaths. The rounds that were fired by ███████ hit the two above mentioned policemen, who rushed towards ███████ and shot at him. As a result of the gunshot wounds from the rounds that were fired by ███████ the late policewoman Galit Arviv was wounded and fell to the ground. ███████

[Stamp] P 5: 194 [continued]

Prosecution Case 444/02 Amended

approached the late policewoman Galit Arviv and fired an additional burst at her from close range. As a result of the gunshot wounds from the bullets that were fired by ███ ███ the late policewoman Galit Aviv died a few hours later.

15. After ███████ ran out of ammunition, he threw the hand grenade that he was carrying at an IDF jeep that had arrived at the site with the intent of causing the death of IDF soldiers. Only after ███████ was wounded and was out of ammunition were the policemen and civilians who were at the site able to overpower him.

16. By his acts described above, the above mentioned Defendant caused the intentional death of the late policewoman **Galit Arviv.**

[Stamp] P 5: 194 [continued]

Prosecution Case 444/02 Amended

54

**Thirty fifth count: (Detailed Incident 483/02 Shafat)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on February 25, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, by his acts described in the previous count of the indictment, attempted to cause the intentional death of as many Israeli civilians as possible. As a result of the gunshot wounds from the bullets that were fired by ████████████ ████ who was dispatched to carry out the said attack by the Defendant, eight Israeli civilians and policemen were wounded.

**Thirty sixth count: (Detailed Incident 483/02 Shafat)**

**Nature of the offense:** Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on January 22, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty fourth count of the indictment, by his acts described in the thirty fourth count of the indictment, maliciously and unlawfully caused damage to the bus stop of "Egged" line 25 in Neve Ya'akov, proximate to homes and vehicles that were at the above mentioned site, which were damaged by the gunfire that was discharged by ████████████████

**Thirty seventh count: (Detailed Incident 4258/02 Yarkon)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

[Stamp] P 5: 195

Prosecution Case 444/02 Amended

**Details of the offense**: The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

1. The above mentioned Defendant, in early March 2002, in Ramallah or thereabouts, made telephone contact with ██████████████ a senior military operative of the "Tanzim" of the Fatah, which is an illegal organization, in Nablus.

2. ██████████informed the Defendant that he was sending him another suicide terrorist in order for the Defendant to dispatch him into the State of Israel in order to commit a shooting attack. The plan was for the suicide terrorist to shoot at Israeli civilians with the intent of causing the death of as many civilians as possible and continuing to fire until being killed by the gunfire of the Israeli security forces.

3. On March 4, 2002, the Defendant contacted ██████████ a policeman in the Naval Police of the Palestinian Authority, who stated that he had come to Ramallah at the instruction of ██████████and that he was the suicide terrorist for the purpose of carrying out the planned shooting attack. According to the instruction of the Defendant, ██████████met ██████████ in Ramallah.

4. On that day, in Ramallah,██████████ met ██████████████ (██████). During the said meeting,██████████introduced ██████████to ██(██████████████████)

5. ██████████ informed ██████████ that the Defendant had brought the above mentioned██████████from Nablus in order for him to carry out a suicide attack with the intent of causing the death of as many Israeli civilians as possible.

6. According to the instruction of the Defendant, ██████████took ██████████to a barber shop in order for him to have his hair cut in preparation for carrying out the planned suicide attack. In addition, ██████████and ██████████(██████████ purchased new clothes for ██████████ ██████████paid for these clothes NIS 1,000, which he had received from the Defendant for this purpose.

7. Thereafter, according to the instruction of the Defendant, ██████████led ██████████ ██████████ to an apartment in downtown Ramallah, in which██████████ ██████████ and the Defendant lived (hereinafter: "the Apartment").

[Stamp] P 5: 195 [continued]

Prosecution Case 444/02 Amended

8.    The Defendant arrived at the Apartment and filmed ███████████ with a video camera in preparation for carrying out the planned suicide attack.

[Stamp] P 5: 195 [continued]

Prosecution Case 444/02 Amended

9. The Defendant instructed ▮▮▮▮▮▮ to drive ▮▮▮▮▮▮ into the State of Israel in order for the latter to carry out the planned suicide attack there. The Defendant instructed ▮▮▮▮▮▮ to bring a weapon to ▮▮▮▮▮▮ for the purpose of carrying out the planned attack.

10. The above mentioned colleagues of the Defendant started to look for a person who would bring ▮▮▮▮▮▮ into the State of Israel in order for the latter to carry out the planned suicide attack there and to cause the death of as many Israeli civilians as possible.

11. ▮▮▮▮▮▮ (▮▮▮▮▮▮ contacted ▮▮▮▮▮▮, the holder of an Israeli identity card living in Jerusalem, and asked the latter to come to Ramallah urgently.

12. ▮▮▮▮▮▮ (▮▮▮▮▮▮ met the above mentioned ▮▮▮▮▮▮ in a café in Ramallah and asked him to drive a suicide terrorist into the State of Israel. ▮▮▮▮▮▮ agreed to this suggestion, but asked for ▮▮▮▮▮▮ (▮▮▮▮▮▮ to make sure to supply a vehicle that was not stolen with Israeli license plates for this purpose.

13. ▮▮▮▮▮▮ (▮▮▮▮▮▮), ▮▮▮▮▮▮ and ▮▮▮▮▮▮ met ▮▮▮▮▮▮ (▮▮▮▮▮▮), who was with ▮▮▮▮▮▮, in Ramallah. ▮▮▮▮▮▮ drove a Ford Transit vehicle with Israeli license plates, license plate No. 7014515 (hereinafter: the Vehicle). The above mentioned persons asked ▮▮▮▮▮▮ for the vehicle and the licenses of the vehicle for the purpose of driving a suicide terrorist into the territory of the State of Israel in order for the suicide terrorist to carry out a suicide attack there. ▮▮▮▮▮▮ handed the vehicle over to ▮▮▮▮▮▮ (▮▮▮▮▮▮ and ▮▮▮▮▮▮ but he asked that he himself be the one to drive it.

14. At this stage, ▮▮▮▮▮▮ and ▮▮▮▮▮▮ went to the apartment. There ▮▮▮▮▮▮ showered and put on the new clothes, which had been purchased for him according to the instruction of the Defendant as set forth above.

15. At about 8:00 p.m., ▮▮▮▮▮▮ ▮▮▮▮▮▮ an ▮▮▮▮▮▮ who traveled in the vehicle, met ▮▮▮▮▮▮ and ▮▮▮▮▮▮ in the Clock Square in Ramallah. ▮▮▮▮▮▮ and ▮▮▮▮▮▮, who were armed with an M-16 assault rifle, six magazines filled with cartridges and two hand grenades, got into the vehicle. ▮▮▮▮▮▮ also arrived at the site, and handed over to ▮▮▮▮▮▮ a commando knife of approximately 25 cm length.

[Stamp] P 5: 196

███████████████ told ██████████ to stab Israeli civilians in order to cause their death after running out of ammunition.

16. All of the above mentioned persons traveled in the vehicle to Refidin Square in Ramallah, because there were not many passersby there.

17. In the above mentioned Refidin Square, ███████████████████, ███████████ and ██████████ field stripped the above mentioned M-16 assault rifle and put it into the side door of the vehicle.

18. ██████████████, █████████ and ████████████ kissed ██████████████ and wished him success.

19. ████████████ informed his friends that he was working in Tel Aviv and therefore knew a place in Tel Aviv at which the planned suicide attack could be carried out.

20. It was decided that after ██████████ and ████████████ would drop off ████████ ██████████ in Tel Aviv in a crowded place, ████████████ would wait a few minutes in order for his above mentioned colleagues to have time to escape from the site in the vehicle and would thereafter discharge automatic gunfire from the above mentioned M-16 assault rifle at Israeli civilians who would be at the site, with the aim of causing the death of as many Israeli civilians as possible and would continue to fire until being killed by gunfire from the Israeli security forces that would arrive at the site.

21. ██████████████ got into the vehicle, which ████████████ was driving, with ████████ ████████ sitting beside him, and the three traveled towards Tel Aviv in order to carry out the planned suicide attack there.

22. During the journey of ██████████, ████████████ and ████████████ to Tel Aviv, ████████████████ talked to them by cellular telephone.

23. On that night, after ██████████, ████████████ and ████████████ had arrived in Tel Aviv, near Ma'ariv Bridge on Petach Tikva Road, ████████████ showed ████████ ████████ a crowded place and instructed him to carry out the planned attack there.

24. ██████████████ took out the above mentioned M-16 assault rifle, magazines and hand grenades, which had been concealed in the door of the vehicle as set forth above.

[Stamp] P 5: 196 [continued]

Prosecution Case 444/02 Amended

59

25. At about 2:15 a.m., on March 5, 2002 or thereabouts, ██████████ nd ████████ let ██████████ who was armed with the above mentioned M-16 assault rifle, hand grenades and commando knife, out of the vehicle near the "Seafood Market" restaurant located on Petach Tikva Road in Tel Aviv (hereinafter: the Restaurant) in order for him to carry out the planned attack.

26. ██████████ and ██████████ drove away from the site towards Jerusalem in the vehicle.

27. ██████████ approached the "Seafood Market" restaurant and discharged automatic gunfire from the M-16 assault rifle at the occupants of the restaurant and passersby in Petach Tikva Road with the intent of causing their death.

28. Thereafter, ██████████ threw the two above mentioned hand grenades at the restaurant with the intent of causing the death of the occupants of the restaurant and passersby, but the two hand grenades did not detonate.

[Stamp] P 5: 196 [continued]

Prosecution Case 444/02 Amended

29. After the M-16 assault rifle, which ▉▉▉▉▉▉ carried, ceased firing due to a stoppage, ▉▉▉▉▉▉ took out the above mentioned commando knife and started to stab Israeli civilians who were at the site with the intent of causing their death.

30. The late policeman Master Sergeant Salim Birkat arrived at the said site. The late Master Sergeant Salim Birkat rushed at ▉▉▉▉▉▉ and overpowered him. The late Master Sergeant Salim Birkat had the chance to inform his commanders of having overpowered the terrorist.

31. At this stage, ▉▉▉▉▉▉ stabbed the late Master Sergeant Salim Birkat in the neck using the above mentioned commando knife with the intent of causing his death. As a result of this stab wound, the late Master Sergeant Salim Birkat died at the site.

32. By his acts described above the above mentioned Defendant caused the intentional death of **the late Master Sergeant Salim Birkat.**

33. ▉▉▉▉▉▉▉▉▉ learned from the television broadcasts that the planned attack had been carried out as set forth above, he contacted the Defendant and updated the latter of the execution of the said attack.

34. Immediately thereafter, the Defendant informed ▉▉▉▉▉▉ the head of the "Tanzim" of the Fatah in the Area, and ▉▉▉▉▉▉▉▉▉, the Head of the "Al Aqsa Martyrs' Brigades", the military arm of the "Tanzim" of the Fatah, of the attack that had been carried out. In addition, the Defendant contacted the Reuters news agency and announced the attack that had been carried out as set forth above.

**Thirty eighth count**: (Detailed Incident 4258/02 Yarkon)

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

[Stamp] P 5: 197

Prosecution Case 444/02 Amended

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh of the indictment, by his actions described in the thirty seventh count of the indictment, caused the intentional death of **the late Yosef Habi**, who was stabbed by ███████████ in the thorax and other parts of his body and died as a result.

**Thirty ninth count: (Detailed Incident 4258/02 Yarkon)**

**Nature of the offense:** Causing intentional death, an offense under Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, caused the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh count of the indictment, by his actions described in the thirty seventh count of the indictment, caused the intentional death of **the late Eliyahu Dahan**, who was stabbed by ███████████ in the thorax, abdomen and back and died as a result.

**Fortieth count: (Detailed Incident 4258/02 Yarkon)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh count of the indictment, by his actions described in the thirty seventh count of the indictment, attempted to cause the intentional death of as many civilians as possible. As a result of the gunshots that were discharged by ███████████ dozens of Israeli civilians were wounded.

[Stamp] P 5: 197 [continued]

Prosecution Case 444/02 Amended

**Forty first count: (Detailed Incident 4258/02 Yarkon)**

**Nature of the offense:** Malicious damage to property, an offense pursuant to Section 53C of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 5, 2002 or thereabouts, maliciously and unlawfully destroyed or damaged property, as follows:

The above mentioned Defendant, at the time set forth, in the place set forth in the thirty seventh count of the indictment, by his actions described in the thirty seventh count of the indictment, maliciously and unlawfully caused extensive damage to the "Seafood Market" Restaurant, the "Mifgash HaSteak" Restaurant, and to the nearby buildings and the vehicles that were in the area, which were damaged by the gunshots that were discharged by ███████████

**Forty second count: (Detailed Incident 568/02 Shafat)**

**Nature of the offense:** Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, whether within the Area or outside of it, on March 8, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1.  The above mentioned Defendant, at the time set forth, talked by telephone with ██████ ████████████████ a military operative in the "Tanzim" of the Fatah, which is an illegal organization, in Nablus.

2.  ████████████ asked the Defendant to meet ██████████████████ who had been released a short time earlier from the prison of the Preventive Security of the Palestinian Authority.

3.  The Defendant met ██████████ in Ramallah. During the talk between the two, ██████ █████ told the Defendant that he had a suicide terrorist and that he needed an explosive belt in order for the suicide terrorist to be able to use it to carry out a suicide attack inside

[Stamp] P 5: 198

Prosecution Case 444/02 Amended

the territory of the State of Israel and thus cause the death of as many Israeli civilians as possible. The Defendant consented to provide ███████ with the requested explosive belt for the purpose of carrying out the planned suicide attack. In addition, the Defendant consented to the request of ███████ to organize a sleeping place in Ramallah for the suicide terrorist.

4. Earlier, the above mentioned ███████ talked to the above mentioned ███████. The above mentioned ███████ announced that he had found a person who was prepared to carry out a suicide attack in Jerusalem, who was ███████ a resident of Samaria. ███████ asked ███████ to transfer ███████ to Jerusalem in order to carry out a shooting attack with the intent of causing the death of Israeli civilians. ███████ agreed to this. ███████ met ███████ ███████ told ███████ that he intended to carry out a suicide attack, after his fiancée, Darin, had also carried out a suicide attack.

5. ███████ called ███████, a resident of Beit Hanina, an operative in the "Popular Front for the Liberation of Palestine" organization, and informed him that he intended to carry out an attack in Jerusalem, by dispatching a suicide terrorist that he had. ███████ asked ███████ to find people who would bring the suicide terrorist into Jerusalem. ███████ agreed to do what he was asked to do.

6. ███████ called his colleague ███████ a resident of Beit Hanina, an operative in the "Popular Front for the Liberation of Palestine" organization, and he met him on March 6, 2002 in Ramallah. ███████ came to this meeting and met ███████ ███████ and ███████ near the "Arabesque" Café. ███████ and ███████ suggested to ███████ to bring a suicide terrorist from Ramallah to Jerusalem for the purpose of carrying out an attack. ███████ instructed ███████ to transport the suicide terrorist to the [neighborhood of] French Hill in Jerusalem, on routes bypassing checkpoints, in order for him to carry out an attack there and cause by doing so the death of Israeli civilians. ███████ and ███████ suggested to ███████ alternatives to the attack execution site: a supermarket near the gas station in the Ramat Eshkol neighborhood, the "Domino's Pizza" restaurant in the [neighborhood of] French Hill or one of the bus stops at the French Hill Junction.

[Stamp] P 5: 198 [continued]

Prosecution Case 444/02 Amended

7.  For the purpose of receiving the explosive belt for the suicide terrorist, the Defendant had ████████ meet ████████████, an operative in Force 17 of the Palestinian Authority, who promised to transfer to ████████ and to the suicide terrorist an explosive belt that he had and to make it available to ████████ a Force 17 operative of the Palestinian Authority by the name of ██████ who would attach the suicide belt to the suicide terrorist.

8.  The Defendant brought the suicide terrorist to the apartment in downtown Ramallah, which the Defendant had rented (hereinafter: "the Apartment").

[Stamp] P 5: 198 [continued]

Prosecution Case 444/02 Amended

9.  On March 8, 2002, ██████████ came to Ramallah at the behest of ██████████. In Ramallah, ██████████, who had come to the meeting by vehicle, and ██████████ waited for ██████████ ██████████ and ██████████ informed ██████████ that he had to lead the suicide terrorist to the bus stop in the direction heading toward the Dead Sea, at the French Hill Junction in Jerusalem. ██████████ and ██████████ made sure that ██████████ was familiar with the bypass routes to the site, and ██████████ ████ told them that he intended to drive the suicide terrorist by bypassing the Kalandia checkpoint through the Quarry Road, and to continue from there to drive the terrorist to the site for carrying out the attack via Beit Hanina and Shuafat, while bypassing the Dahyat Al-Brid checkpoint.

10. Thereafter, ██████████ traveled to the Apartment, where he met the Defendant and ██████████ who had brought an explosive belt with him. ██████████ installed the explosive belt on ██████████ and explained to ██████████ how to activate the explosive belt. In addition, ██████████ shaved off his beard.

11. Thereafter, the Defendant and his above mentioned colleagues hailed a taxi, and the suicide terrorist, ██████████ wearing the explosive belt, got into the taxi on his way to carrying out a suicide attack in Jerusalem with the intent of causing the death of Israeli civilians. ██████████ accompanied ██████████ to the point of meeting with

12. ██████████ and the suicide terrorist, ██████████ continued to travel in the taxi and got out of the taxi on a dirt track near the quarries in Kalandia. From there, ██████████ ████ led the suicide terrorist on foot on their way to executing the planned attack.

13. In the Nuseiba quarters in Beit Hanina in Jerusalem, ██████████ and ██████████ were arrested, at about 4:00 p.m., by Border Guard policemen. When ██████████ tried to activate the explosive belt that he was wearing, he was shot dead by one of the members of the security forces.

**Forty third count: (Detailed Incident 783/02 Binyamin)**

[Stamp] P 5: 199

Prosecution Case 444/02 Amended

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 14(A) and 19 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, on March 17, 2002 or thereabouts, attempted to cause the intentional death of another person, as follows:

1. On March 5, 2002, a senior military operative of the "Al Aqsa Martyrs Brigades" (the military arm of the "Tanzim" of the Fatah) — ███████████████, was killed in Ramallah.

2. About ten days later, ███████████████ decided to avenge the death of ███████████████ by carrying out a lethal attack.

3. ███████████ and ██████████ agreed to join ██████████ to carry out the above mentioned revenge attack.

4. ██████████ contacted the Defendant, and received his approval to carry out the planned attack.

5. Following the approval that was given by the Defendant, ██████████ and ██████████ arrived at the home of the Defendant.

6. The Defendant delivered to the two a "Beretta" type rifle and a Kalashnikov assault rifle with magazines for carrying out the planned attack.

7. On the following day, on March 17, 2002, ██████████ traveled with ██████████ and ██████████ in his "Mazda" type vehicle to the Beit El-Psagot Road, while ██████████ was driving the vehicle, ██████████ held the "Beretta" type rifle, and ██████████ was holding the Kalashnikov assault rifle.

8. The above mentioned persons arrived at the planned attack site at about 6:30 a.m. ██████████ and ██████████ got out of the vehicle, while ██████████ stayed to wait for them in the vehicle for extracting them at the end of the execution of the attack.

[Stamp] P 5: 199 [continued]

Prosecution Case 444/02 Amended

67

9. About a quarter of an hour later, a white Volkswagen Passat vehicle, license No. 7741115, which was being driven by Samir Karash, arrived at the site.

10. ▓▓▓▓▓ and ▓▓▓▓▓ fired bursts at the driver of the vehicle from the weapons, which the Defendant had provided to them for that purpose, with the intent of causing the death of the above mentioned driver of the Volkswagen vehicle.

11. As a result of the gunfire, Samir Karash was injured in his shoulder, sustaining a fracture to his proximal left humerus with crushing and metal fragments along the trajectory of the bullet, and was in need of hospitalization and surgery. In addition, three of the rounds that were discharged by ▓▓▓▓▓ and ▓▓▓▓▓ hit the said vehicle and caused it damage.

12. After completing the execution of the attack, ▓▓▓▓▓ and ▓▓▓▓▓ returned to the vehicle of ▓▓▓▓▓ and the three fled from the attack site to Ramallah.

13. Thereafter, ▓▓▓▓▓ called the Defendant and reported the successful execution of the attack to him.

[Stamp] P 5: 199 [continued]

Prosecution Case 444/02 Amended

Case 1:04-cv-00397-GBD-RLE     Document 907-73     Filed 05/13/15     Page 69 of 107

**Forty fourth count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in early 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met ███ ███ the bodyguard of ███████ the Head of the Preventive Security of the Palestinian Authority in the Area. ███████ informed the Defendant that he wanted to carry out a shooting attack against IDF soldiers who were at the Surda checkpoint and to cause their death. The Defendant provided ███████ with two pistols, a short barreled M-16 assault rifle with telescopic sights and a box of cartridges for the purpose of carrying out the said attack.

A short time later, a shooting attack was carried out at the Surda checkpoint during the course of which an IDF soldier was killed. The Defendant hastened to contact ███████ but the latter said that he was not the one who had carried out the said attack. Thereafter, ███████ returned the weapons to the Defendant, which he had delivered to him earlier for the purpose of carrying out the said attack.

**Forty fifth count:**

**Nature of the offense:** Undermining the security of the area, an offense pursuant to Section 53(A) (4) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in March 2002 or thereabouts, committed an act or an omission constituting an undermining of or damage to, disruption of or danger to the security of the Area or the security of IDF forces and soldiers or the action, use or security of any of the following: a ship, aircraft, port, quay, jetty, dock, airport, railway, sea

[Stamp] P 5: 200

Prosecution Case 444/02 Amended

69

lane, road, dirt road, locomotive, vehicle, any cargo or other public transport or public communication device, or any factory, institute or equipment that is used or is capable of being used for the manufacture, supply, storage, transfer, delivery or distribution of water, fuel, gas or electricity or any property of the State of Israel or the Israel Defense Forces, as follows:

The above mentioned Defendant, at the time set forth, conversed by telephone with ███████ ███ a senior operative in the "Al Aqsa Martyrs Brigades", the military arm of the "Tanzim" of the Fatah, which is an illegal organization.

███████████ old the Defendant that he had a suicide terrorist who was prepared to carry out a suicide attack inside the State of Israel. The Defendant consented to dispatching the suicide terrorist into the territory of the State of Israel in order for him to cause the death of as many Israeli civilians as possible.

On the following day, a person called ████ from Nablus came to the Defendant. ████ informed the Defendant that he had been sent by ██████████ for the purpose of carrying out a suicide attack inside of Israel.

The Defendant talked to ████ and discovered that ████ was a poor marksman. Following this, the Defendant contacted ██████████ again. The Defendant told ██████████ that ███ could carry out the suicide attack using an explosive belt that he would wear on his body. ██████ ███ agreed to the suggestion of the Defendant and promised to have an explosive belt sent to the Defendant for the purpose of carrying out a planned suicide attack.

According to the instruction of the Defendant, ██████████ purchased new clothes for ████ and thereafter accompanied ████ to an apartment in down tom Ramallah, in which ████ ██████████ and the Defendant lived (hereinafter: the Apartment).

The planned attack did not take place in view of the fact that the explosive devices were not sent to the Defendant and because ████ was arrested by the Israeli security forces.

After the arrest of ████ the Defendant talked to the above mentioned ██████████ about what had happened. ██████████ promised to the Defendant to send him additional suicide terrorists in order for the Defendant to dispatch them into the territory of the State of Israel for the purpose of carrying out suicide attacks. ██████████ did not have time to send additional suicide terrorist to the Defendant, because both the Defendant and ██████████ were arrested by IDF forces during Operation "Defensive Shield".

[Stamp] P 5: 200 [continued]

Prosecution Case 444/02 Amended

**Forty sixth count:**

**Nature of the offense:** Attempt to manufacture an explosive object, an offense pursuant to Section 53(A) (3) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14(A) of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in mid-March 2002 or thereabouts, manufactured a firearm, ammunition[,] a bomb, a hand grenade, an explosive or incendiary object, without holding a permit certificate which was issued to him by or on behalf of a military commander, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah, met ███████████ ████████████ who asked the Defendant for money for military activity. In response to this, the Defendant transferred to ██████████ the amount of NIS 8,000, which ██████████████ received.

████████████ with ████████████████████████████ purchased with the above mentioned money various chemicals.

████████████████████████████ manufactured a large explosive device using the above mentioned chemicals.

**Forty seventh count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in March 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, delivered to ████████████████████ the Head of the "Al Aqsa Martyrs' Brigades" – the military arm of the "Tanzim" of the Fatah in the Jenin area, who was then staying in Ramallah, a "14" pistol, without a permit signed by or on behalf of the commander of the Area.

[Stamp] P 5: 201

Prosecution Case 444/02 Amended

**Forty eighth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in March 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, purchased from ██████████████████████████████ a long-barreled M-16 assault rifle for 4,000 Jordanian dinars, without a permit signed by or on behalf of the commander of the Area.

**Forty ninth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in the first half of 2001 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, met ██████ ██████████████████████ and received from the latter 1,500 cartridges for M-16 assault rifles. The Defendant paid the above mentioned ████████████ NIS 3,000 for the above mentioned cartridges. The Defendant carried out that which has been attributed to him in this count of the indictment at the instruction of ██████████████ the head of the "Tanzim" of the Fatah in the Area.

[Stamp] P 5: 201 [continued]

Prosecution Case 444/02 Amended

72

**Fiftieth count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above mentioned Defendant, in the Area, in May 2001 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, in Ramallah or thereabouts, at the request of ▐▐▐▐▐▐▐▐▐▐▐ delivered to the latter a Kalashnikov assault rifle with a magazine and 28 cartridges. The Defendant carried out that which has been attributed to him in this count of the indictment after having received approval to do so from ▐▐▐▐▐▐▐▐, the head of the "Tanzim" of the Fatah in the Area.

▐▐▐▐▐▐▐▐ participated in a procession in Ramallah while holding the above mentioned Kalashnikov assault rifle in the air. Thereafter, ▐▐▐▐▐▐ at the instruction of the Defendant, transferred the above mentioned Kalashnikov assault rifle to ▐▐▐▐▐▐

**Fifty first count:**

**Nature of the offense:** Giving shelter, an offense pursuant to Section 57 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, in the Area, in late 2001 or thereabouts, assisted or gave shelter to an unspecific person who had committed an offense against the security legislation or had been or was involved in any activity which was intended to harm the public welfare, the welfare of the Israel Defense Forces troops and soldiers and the maintenance of public order or concerning whom there are reasonable grounds to suspect that he did so, whether by giving information, shelter, food, beverages, money, clothing, weapons, ammunition, supplies, animal fodder, means of transport, petroleum or fuel of any type and kind whatsoever, or in any other way, as follows:

The above mentioned Defendant, at the time set forth, with ▐▐▐▐▐▐▐ transferred ▐▐▐ ▐▐▐▐▐▐▐▐▐ and Abdullah Barghouti from the prison of the Preventive Security of

[Stamp] P 5: 202

Prosecution Case 444/02 Amended

73

the Palestinian Authority in Bitunia to an apartment, which the Defendant had rented in downtown Ramallah.

The above mentioned ███████████ and Abdullah Barghouti are senior operatives of the Hamas Organization, which is an illegal organization, and are responsible for carrying out a number of attacks against Israeli civilians, including the bombing attack at the "Sbarro" Restaurant in Jerusalem on August 9, 2001. The Defendant and ███████████ provided lodging to ███████████ and Abdullah Barghouti in the above mentioned apartment for several days.

Before ███████████ and Abdullah left the above mentioned apartment of the Defendant, the Defendant provided each of them a "14" pistol.

**Fifty second count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in late 2001 – early 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

The above mentioned Defendant, at the time set forth, talked by telephone with ████████ ███████████ a senior military operative in the "Tanzim" of the Fatah, which is an illegal organization, in Nablus. ███████████ told the Defendant that he needed 1,000 cartridges for M-16 assault rifles. The Defendant promised to bring to ███████████ the requested cartridges. After a few days, a person came on behalf of ███████████ to the Defendant. The Defendant delivered to the later 1,000 cartridges for M-16 assault rifles in order for him to transfer them to Nablus, to ███████████ In exchange for the above mentioned 1,000 cartridges, ███████████ transferred to the bank account of the Defendant the amount of NIS 3,000.

[Stamp] P 5: 202 [continued]

Prosecution Case 444/02 Amended

**Fifty third count:**

**Nature of the offense:** Trading in war materiel, an offense pursuant to Section 2 of the Prohibition of Trading in War Materiel Order (Judea and Samaria) (No. 243), 5728-1968.

**Details of the offense:** The above Defendant, in the Area, in January 2002 or thereabouts, traded in or otherwise handled war materiel, without a permit signed by or on behalf of the commander of the Area, as follows:

At the time set forth, in Ramallah or thereabouts, ███████████████ approached the above mentioned Defendant. ████████ asked the Defendant for three pistols in order to deliver them to a military operative in the "Al Aqsa Martyrs Brigade", the military arm of the "Tanzim" of the Fatah, ████████████████ for the purpose of carrying out a shooting attack at the Surda checkpoint of the IDF.

The Defendant agreed to the request of ████████ and provided the latter with 3 pistols: a 9 mm Belgian pistol, a 9 mm Star pistol and a pistol of a type that is not known to the prosecution, and a box of cartridges for these pistols, containing 50 cartridges for a 9 mm caliber pistol.

On that day, at the headquarters of the Preventive Security of the Palestinian Authority in Bitunia or thereabouts, ████████ transferred the above mentioned three pistols and cartridges to ███ ████████████████

The planned attack was not carried out using these pistols, because on the night before the time at which the above mentioned attack was supposed to be carried out, another shooting attack was carried out at the Surda checkpoint.

After about three days, in Ramallah or thereabouts, ████████ returned the above mentioned pistols with the above mentioned box of cartridges to the Defendant.

The Defendant carried out that which has been attributed to him in this count of the indictment without a permit signed by or on behalf of the commander of the Area.

**Witnesses for the prosecution:**

[Stamp] P 5: 203

Prosecution Case 444/02 Amended

75



1.   ███████████████████████ Badge No. ████████ Judea Investigations Office [taker of the statement of the Defendant on April 14, 2002 and on May 3, 2002, and submitter of the handwriting of the Defendant in Arabic + identity line-up report, photographs + photograph table]

2.   ███████████████████████ Badge No. ██████████ Judea Investigations Office. [taker of the statements of the Defendant on April 21, 2002 and May 13, 2002 and submitter of the two handwriting specimens of the Defendant in Arabic]

3.   ████████████, Badge No. ████████ Aman Lakhish Questioning. [taker of the statement of the Defendant on September 5, 2002].

4.   ███████████████████ Identity No. ████████████ (detained).

5.   ████████████████████ Identity No. ███████████(detained) (Prosecution Case 243/02).

6.   █████████████████████████████ Identity No. ████████████ (detained) (Prosecution Case 242/02).

7.   ████████████████████████ Identity No. ████████████ (detained) (Prosecution Case 241/02).

8.   ████████████████████ Identity No. ████████████ (detained) (Prosecution Case 265/02).

9.   ██████████████████████ Identity No.████████████ (detained)

10.  █████████████████████████, Identity No. ████████████(detained)

11.  ████████████████████████████████████ Identity No.████████████ (detained) (Prosecution Case 339/02).

12.  █████████████████████████████ Identity No. ██████████████(detained) (Prosecution Case 355/02)

13.  ███████████████████████ Identity No. ████████████ (detained) (Prosecution Case 311/02)

[Stamp] P 5: 203 [continued]

Prosecution Case 444/02 Amended



14. ████████████████████████████ Identity No. ████████ (detained) (Prosecution Case 345/02)

15. ██████████████████████ Identity No. ██████████ (detained) (Prosecution Case 356/02).

16. ██████████████████ Identity No. ██████████ (detained) (Prosecution Case 318/02).

17. ████████████████ Identity No. ████████ (detained)

18. ██████████████████ dentity No. ████████ (detained)

19. ██████████████████ Identity No. ██████████ (detained) (Prosecution Case 353/02)

20. ██████████████████ Identity No. ████████ (detained) (Prosecution Case 221/02)

21. ██████████████████ Identity No. ████████ (detained) (Prosecution Case 212/02)

22. ████████████████ Identity No. ████████ (detained).

23. ██████████████████████ Identity No. ██████████ (detained) (Prosecution Case 639/01)

24. ████████████████████████ Identity No. ████████ (detained) (Prosecution Case 174/02).

25. ██████████████████████ Identity No. ██████████ (detained) (Prosecution Case 173/02).

26. ████████████████████████ Identity No. ████████ (detained) (Prosecution Case 322/02)

27. ████████████████████ Identity No. ████████ (detained) (Prosecution case 775/02).

[Stamp] P 5: 203 [continued]

Prosecution Case 444/02 Amended

77

**Detailed Incident 234/01 Jerusalem Special Duties Department.**

28. ███████████ Serial No ███████ rael Defense Forces. (details in the prosecution) [statement]

29. ██████████ Identity No. ████████ (details in the prosecution) [statement]

30. █████████ dentity No. ████████ details in the prosecution) [statement]

31. ████████████████ Badge No. ████████ Forensic Identification – Zion Station. [submitter of seizure and marking report]

32. ███████████████ Badge No █████████ he Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of vehicle inspection report]

33. █████████████ Badge No █████████ nvestigations – Zion Station. [submitter of exhibit cover form]

34. ██████████████████ Badge No. █████████ he Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination] (will be summoned upon explicit demand of the defense only)

35. ████████████████ Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion from Forensic Identification Case ████████████ vill be summoned upon explicit demand of the defense only)

36. ███████████ M.D., License No ████████████ statement – pronouncement of the death of the late Elazar Akiva Fashkos]

37. ███████████ M.D., License No. ████████ Clalit Healthcare Service – Jerusalem. [statement + submitter of death notice]

**Detailed Incident 457/01**

[Stamp] P 5: 204

Prosecution Case 444/02 Amended

78

38.  ████████████████ Serial No. ███████ inyamin Station. [submitter of action report]

39.  ██████████████████████ Badge No. ████████ Binyamin Station. [submitter of memorandum – GMC vehicle + drawing of incident scene + seizure and marking report + exhibit cover form]

40.  ████████████████████ Badge No. ████████ Yehuda Forensic Identification. [submitter of photograph tables + memorandum].

41.  ████████████████████ Badge No. ████████ he Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of photograph tables + vehicle inspection report]

42.  Yosef Cohen, Identity No. 069397198. (details in the prosecution) [wounded in the shooting attack]

43.  ██████████████ Identity No ████████████ details in the prosecution) [arrived first at the scene of the attack]

44.  ████████████ M.D., License No ████████ Hadassah Hospital – Mount Scopus, Jerusalem. [submitter of physician certificate – interim summary] (will be summoned upon explicit demand of the defense only)

---

**Detailed Incident 2159/01 Binyamin**

45.  ████████████████ Badge No ████████ nyamin Station. [submitter of action report]

46.  ████████████████████ Badge No ████████ Binyamin Station. [submitter of photograph tables + seizure and marking report].

47.  ██████████████████████ adge N ████████ the Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of initial incident scene visit report – seizure of cartridge cases and bullet fragments]

48.  ████████████████████ Badge No ████████ Binyamin Station. [submitter of memorandum – exhibit chain + exhibit cover form + crime scene visit report]

[Stamp] P 5: 204 [continued]

Prosecution Case 444/02 Amended

49.    ████████████████████████ Badge No. ████████ the Exhibits Office –
Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant
certificate – receipt of exhibits for examination] (will be summoned upon explicit
demand of the defense only)

50.    ████████████████████ Firearms Laboratory, Forensic Identification, National
Headquarters – Jerusalem. [submitter of expert opinion from Forensic Identification Case
████████████] (will be summoned upon explicit demand of the defense only)

51.    ████████████, M.D., License No ████████ Magen David Adom ambulance service – Lod
station. [submitter of medical reports from scene + death notice + statement]

52.    ████████████ Identity No ████████████, Israel Defense Forces. [statement]

53.    ████████████████ M.D., the National Institution of Forensic Medicine. [submitter of two
expert opinions] (will be summoned upon explicit demand of the defense only)

54.    ████████ Identity No. ████████████ details in the prosecution) [identification of victims]

───────────────────

**Detailed Incident 7915/01**

55.    ████████████████████████ Badge No. ████████ Zion Station. [submitter of action
report]

56.    ████████████████████ Badge No ████████ Forensic Identification – Zion Station.
[submitter of initial scene visit report + photograph tables]

57.    ████████████████████ Zion Station. [finder of cartridge cases at the incident scene
– chain of evidence]

58.    ████████████████████ Badge No. ████████ the Mobile Laboratory, Forensic
Identification, National Headquarters – Jerusalem. [submitter of vehicle inspection report
– seizure of bullet fragments]

[Stamp] P 5: 204 [continued]

Prosecution Case 444/02 Amended

59.  ███████████  Badge No. ████████  Zion Station Special Duties Department. [submitter of exhibit cover form]

60.  ████████████  Badge No ██████ Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt exhibits for examination] (will be summoned upon explicit demand of the defense only)

[Stamp] P 5: 204 [continued]

Prosecution Case 444/02 Amended

81

61. ████████████████ Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion from Forensic Identification Case BI/07 – 4239/01] (will be summoned upon explicit demand of the defense only)

62. ████████████ License No. ████, Hadassah Ein Kerem Hospital, Jerusalem. [submitter of discharge certificate of Moshe Weiss] (will be summoned upon explicit demand of the defense only)

63. ████████████, Hadassah Ein Kerem Hospital, Jerusalem. [submitter of death certificate of the late Meir Weisshaus] (will be summoned upon explicit demand of the defense only)

64. Moshe Weiss, Identity No. 024001505. (details in the prosecution) (severely injured in the attack)

65. ████████ Identity No ████████ details in the prosecution) (eyewitness)

---

**Detailed Incident 481/01 Zion**

66. Tonie Amiel, Identity No. 032441040. (details in the prosecution) (driver of the Honda vehicle)

67. Pini Maimon, Identity No. 025759762. (details in the prosecution) (passenger in the Honda vehicle)

68. Pazit Maimon, Identity No. 040128084. (details in the prosecution) (passenger in the Honda vehicle)

---

**Detailed Incident 8379/01 Zion**

69. ████████████, Badge No ████████ orensic Identification – Zion Station. [submitter of initial scene visit report + seizure and marking report]

[Stamp] P 5: 205

Prosecution Case 444/02 Amended

70. ███████████████████ Identity No. ██████ pecial Duties Department – Zion Station. [submitter of exhibit cover report]

71. █████████████████ Badge No. ██████ the Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of vehicle inspection report – seizure of bullet fragments]

72. █████████████ Badge No █████ pecial Duties Department – Zion Station. [submitter of exhibit cover report]

73. ██████████ Identity N ██████ xhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination] (will be summoned upon explicit demand of the defense only)

74. ███████████████████ Badge No █████ Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination] (will be summoned upon explicit demand of the defense only)

75. ███████████████ Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion from Forensic Identification Case BI/07 – 4723/01] (will be summoned upon explicit demand of the defense only)

76. █████████ Zion Station. [finding of cartridge cases in the field – evidence chain]

77. Malka Cohen, Identity No. 038791386. (details in the prosecution) (injured in the attack)

78. Pinchas Cohen, Identity No. 038348256. (details in the prosecution) (injured in the attack)

79. ██████████ Identity No █████████ details in the prosecution) (eyewitness – cared for casualties)

80. ██████████ M.D., License No █████████ adassah Ein Kerem Hospital, Jerusalem. [submitter of discharge certificate of Pinchas Cohen] (will be summoned upon explicit demand of the defense only)

[Stamp] P 5: 205 [continued]

Prosecution Case 444/02 Amended

81.    ████████████████ License No. ██████ Hadassah Ein Kerem Hospital, Jerusalem. [submitter of discharge certificate of Malka Cohen] (will be summoned upon explicit demand of the defense only)

———————————

**Detailed Incident 39/02 Binyamin**

82.    ████████████████ Badge No█████████rol Unit – Binyamin Station. [submitter of action report]

83.    ████████████████ Badge No. ██████Binyamin Station. [submitter of investigation memorandum / seizure and marking]

84.    ████████████████ Badge No█████Yehuda Forensic Identification. [submitter of photograph tables + collected cartridge cases from the incident scene]

85.    ████████████████ Badge No. ██████the Mobile Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of photograph tables + vehicle inspection report]

86.    ████████████████ Badge No. ██████Binyamin Station. [submitter of exhibit cover report]

87.    ████████████████ Badge No██████Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt exhibits for examination] (will be summoned upon explicit demand of the defense only)

88.    ████████████████ License No. ██████Israel Defense Forces (details in the prosecution) [statement – pronouncement of the death of the late Yoela Chen + care for the casualty]

89.    ████████████ M.D., License No. ██████Hadassah Ein Kerem Hospital, Jerusalem. [submitter of physician certificate – illness summary of Rachel Eini] (will be summoned upon explicit demand of the defense only)

90.    Rachel Eini, Identity No. 075966614. (details in the prosecution) (injured in the attack)

[Stamp] P 5: 205 [continued]

Prosecution Case 444/02 Amended

91.    ████████████ Identity No. ████████ (details in the prosecution) [statement + sketch] (eyewitness)

9.2    ████████████ Identity N ████████ details in the prosecution) (identification of the victim)

---

**Detailed Incident 502/02 Zion**

93.    ████████████████ Badge No. ████████ pecial Duties Department – Zion Station [submitter of memorandum, seizure and marking report]

94.    ████████████████ Special Duties Department – Zion Station [submitter of seizure and marking report]

95.    ████████████ Special Duties Department – Zion Station [submitter of memorandum, seizure and marking report + photographs]

[Stamp] P 5: 205 [continued]

Prosecution Case 444/02 Amended

96. ███████████████ Badge No. ██████ Special Duties Department – Zion Station [submitter of action report – finding of magazine coupler]

97. █████████████ Badge No ██████ questioning – Zion Station [submitter of seizure and marking report]

98. ██████████ Identity No. ██████ details in the prosecution) (eyewitness – pursued the terrorist)

99. ██████████ Badge No ██████, Jerusalem Border Guard. (eyewitness – pursued and shot at the terrorist)

100. ██████████ Badge No ██████ Patrol Unit 2 – Zion Station. (eyewitness – shot at the terrorist)

101. ██████████ Identity No ██████ Jerusalem Subdistrict Unit. (eyewitness – pursued and shot at the terrorist)

102. ██████████ Badge No ██████ Motorcycle Special Patrol Unit – Shalem Station. (eyewitness – pursued the terrorist, disarmed the terrorist after the terrorist was killed)

103. ██████████ Identity N ██████ (details in the prosecution). (eyewitness – a security guard who was at the site – opened fire and shot the terrorist)

104 ██████████ Badge No. ██████ Detectives – Jerusalem Central Unit. (eyewitness – pursued and shot at the terrorist)

105. ██████████ Badge No. ██████ Detectives – Jerusalem Central Unit. (eyewitness – shot at the terrorist)

106. ██████████ Identity No ██████ (details in the prosecution) (eyewitness – driver of "Egged" bus who was at the site of the attack)

107. ██████████ Identity No ██████ details in the prosecution) (eyewitness)

108. ██████████ ██████ Identity No. ██████ details in the prosecution) (eyewitness)

109. ██████████ Identity No. ██████ (details in the prosecution) (eyewitness)

[Stamp] P 5: 206

Prosecution Case 444/02 Amended

86

110. ████████████ Identity No ████████████ (details in the prosecution) (eyewitness)

111. ████████████ Identity N ████████████ etails in the prosecution) (eyewitness)

112. ████████████ dentity No. ████████████ details in the prosecution) (eyewitness)

113. ████████████ Identity No. ████████████ etails in the prosecution) (eyewitness)

114. ████████████ Identity No. ████████████ details in the prosecution) (eyewitness – saw the terrorist arriving at the attack site on foot)

115. ████████████ Identity No. ████████████ (details in the prosecution) (identification of the body of the late Ora (Svetlana) Sandlar)

116. ████████████ M.D., License ████████████ Hadassah Ein Kerem Hospital, Jerusalem. (submitter of death notice of the late Ora (Svetlana) Sandlar) (will be summoned upon explicit demand of the defense only)

117. ████████████ M.D., Hadassah Ein Kerem Hospital, Jerusalem. (submitter of death notice of the late Sarah Hamburger) (will be summoned upon explicit demand of the defense only)

An additional list of witnesses concerning the casualties in the attack on Jaffa Street on January 22, 2002 and medical certificates related to their injury will be delivered during the trial

---

**Detailed Incident 483/02 Shafat**

118. ████████████ Special Duties Department, Jerusalem Central Unit. [submitter of seizure and marking report]

119. ████████████ Badge No. ████████████ Special Duties Department, Jerusalem Central Unit. [submitter of photograph table + two exhibit cover forms]

120. ████████████ Badge No. ████████████ Forensic Identification – Zion Station. [submitter of seizure and marking report + crime scene visit report + transfer of exhibits to Forensic Identification – National Headquarters]

[Stamp] P 5: 206 [continued]

121. ████████████ Patrol Unit 4, Zion Station. [submitter of seizure and marking report]

Prosecution Case 444/02 Amended

87

122. ███████████████ Firearms Laboratory, Forensic Identification, National Headquarters – Jerusalem. [submitter of expert opinion] (will be summoned upon explicit demand of the defense only)

123. ███████████ Hadassah Mt. Scopus Hospital, Jerusalem. [submitter of death certificate] (will be summoned upon explicit demand of the defense only)

124. ███████ Badge No. ████████ (details in the prosecution) [overpowered the terrorist, wounded in the attack]

125. ██████ Identity No. ██████ details in the prosecution) [overpowered the terrorist]

126. █████████ Identity ████████ details in the prosecution) [overpowered the terrorist]

127. █████████ Identity No ██████ details in the prosecution) [eyewitness]

128. █████████ Identity No. ██████ details in the prosecution) [eyewitness]

129. Stas Krisensky, Identity No. 304389240. (details in the prosecution) [wounded in the attack]

130. Lior Skizada, Identity No. 032087587. (details in the prosecution) [wounded in the attack]

131. Keren Kadmi, Identity No. 032777716. (details in the prosecution) [wounded in the attack]

132. Adam Garfield, Identity No. 011935426. (details in the prosecution) [wounded in the attack]

133. Eli Ochana, Identity No. 033404773. (details in the prosecution) [wounded in the attack]

134. Amichai Dahan, Identity No. 039243944. (details in the prosecution) [wounded in the attack]

[Stamp] P 5: 206 [continued]

Prosecution Case 444/02 Amended

135.  Tamara Lifschitz Fisch, Identity No. 306706318. (details in the prosecution) [wounded in the attack]

---

**Detailed Incident 4258/02**

136.  ████████████ Identity No. ███████ volunteer in Yarkon Patrol Unit (details in the prosecution) [two statements, was with the late Salim Birkat]

137.  █████████ Yarkon Identification, Israel Police.

138.  █████████████████ Yarkon Investigations Branch Officer.

139.  █████████████ Yarkon Special Investigations Team.

140.  ████████████ dentity No ████████ (details in the prosecution) [eyewitness – was inside the restaurant]

141.  █████████, Identity No ████████ etails in the prosecution) [security guard at the restaurant, injured in the attack]

142.  ████████ dentity No. 304615230. (details in the prosecution) [security guard at the restaurant]

143.  ████████, Identity No ████████ etails in the prosecution) [eyewitness]

144.  ████████ Identity No ████████ (details in the prosecution) [eyewitness]

145.  ████████ entity No ████████ details in the prosecution) [eyewitness]

146.  Shlomo David, Identity No. 00022280. (details in the prosecution) [severely injured in the attack by stab wound]

147.  █████████████ Identity No. ████████ (details in the prosecution) [eyewitness, injured in the attack]

148.  ████████ dentity No ████████ etails in the prosecution) [eyewitness, injured in the attack]

[Stamp] P 5: 207

Prosecution Case 444/02 Amended

89

149. ███████████ Identity No ███████████ etails in the prosecution) [eyewitness, injured in the attack]

150. ███████████, Identity No. ███████████ (details in the prosecution) [eyewitness, injured in the attack]

151. ███████████ Identity No ███████████ etails in the prosecution) [eyewitness, saw the vehicle in which the terrorist arrived]

152. ███████████ Identity N ███████████ (details in the prosecution) [eyewitness]

153. ███████████ Identity No ███████████ etails in the prosecution) [eyewitness, injured in the attack]

154. ███████████ Identity N ███████████ (details in the prosecution) [eyewitness – statement + drawing of the incident scene]

155. ███████████ Identity No ███████████ etails in the prosecution) [eyewitness]

156. ███████████ Identity No. ███████████ etails in the prosecution) [eyewitness]

157. ███████████ Identity No. 061247623. (details in the prosecution) [eyewitness]

158. ███████████ Identity No ███████████ (details in the prosecution) [eyewitness]

159. ███████████ Identity No ███████████ (details in the prosecution) [eyewitness]

160. ███████████ Identity No. ███████████ (details in the prosecution) [eyewitness]

161. ███████████ Identity No. ███████████ (details in the prosecution) [eyewitness – two statements – saw the terrorist stabbing people]

162. ███████████ Identity No. ███████████ (details in the prosecution) [identification of the body of the late Yosef Habi]

163. Noam Asafi, Identity No. 031877665. (details in the prosecution) [injured in the attack]

164. Yossi Azuz, Identity No. 029416740. (details in the prosecution) [severely injured in the attack]

[Stamp] P 5: 207 [continued]

Prosecution Case 444/02 Amended

165.   Michael Gruber, Identity No. 043401140. (details in the prosecution) [injured in the attack]

166.   ▮▮▮▮▮▮▮▮▮▮ the National Institution of Forensic Medicine, Tel Aviv. [submitter of expert opinion] (will be summoned upon explicit demand of the defense only)

167.   Hospital records – institutional record

An additional list of witnesses concerning the casualties and victims in the attack at the "Seafood Market" Restaurant in Tel Aviv on March 5, 2002 will be delivered during the trial

---

**Detailed Incident 568/02 Shafat**

168.   ▮▮▮▮▮▮ Badge No. ▮▮▮▮ Border Guard. (details in the prosecution) [statement and submitter of action report]

169.   ▮▮▮▮ Badge No. ▮▮▮▮ Border Guard [details in the prosecution].

170.   ▮▮▮▮ Badge No ▮▮▮▮ Border Guard [details in the prosecution].

171.   ▮▮▮▮ Badge No. ▮▮▮▮ Identification – Zion Station [submitter of 2 seizure and marking reports + exhibits from exhibit entry card No. 294/02].

172.   ▮▮▮▮▮▮ Badge No. ▮▮▮▮ Zion Station – Bomb Disposal [submitter of action report]

173.   ▮▮▮▮▮▮▮▮ Badge No. ▮▮▮▮ Forensic Identification – Bomb Disposal Laboratory, National Headquarters, Jerusalem. [submitter of expert opinion and exhibit cover reports] (will be summoned upon explicit demand of the defense only)

174.   ▮▮▮▮▮▮▮▮▮ Badge No. ▮▮▮▮ the Exhibits Office – Forensic Identification, National Headquarters – Jerusalem. [submitter of civil servant certificate – receipt of exhibits for examination] (will be summoned upon explicit demand of the defense only)

[Stamp] P 5: 207 [continued]

175.    ███████████ the National Institution of Forensic Medicine, Tel Aviv. [submitter of expert opinion] (will be summoned upon explicit demand of the defense only)

_____

**Detailed Incident 783/02 Binyamin**

176.    ███████████████████ Badge No. ██████ Binyamin Station. [submitter of action report]

[Stamp] P 5: 207 [continued]

Prosecution Case 444/02 Amended

177. ███████████████ Badge No. ██████ Yehuda Forensic Identification. [submitter of crime scene visit report + photograph tables]

178. ███████████████, Badge No. 57556, Binyamin Station. [submitter of exhibit cover form + memorandum + exhibits from card No. 106/02]

179. Samir Karash, Identity No. 080062771 (details in the prosecution) [wounded in the shooting attack]

180. ████████ M.D., License No. ███████ Hadassah Ein Kerem Hospital, Jerusalem. [submitter of medical report] (will be summoned upon explicit demand of the defense only)

181. Query for finding and projection of vehicle and owner details [institutional record].

---

[Signature]
Michael Kotlik, Captain
Military Prosecutor

Date: September 29, 2002

Reference: 444-02 amended

[Stamp] P 5: 208

Prosecution Case 444/02 Amended

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                              Plaintiffs,

        vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                              Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

### DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief.  The document is designated as P5: 175-208.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience.  I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P5: 175-208.

Rina Ne'eman

ss.: New Jersey

On the [28] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014


Notary Public

MENUT J MHRETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
ID # 2362704

| צבא | הגנה | לישראל |
|---|---|---|
| בבית המשפט הצבאי | תיק ביהי"ם : | 3459/02 |
| בבית | תיק תביעה : | 444/02 |
| במ"י הרכב | תיק פ.א. : | 1282/02 בנימין |
| | | 1283/02 בנימין |
| | | 1284/02 בנימין |
| | | 1285/02 בנימין |
| | | 234/01 מותי"ם י-ם |
| | | 457/01 בנימין |
| | | 2159/01 בנימין |
| | | 7915/01 ציון |
| | | 481/01 ציון |
| | | 8379/01 ציון |
| | | 39/02 בנימין |
| | | 502/02 ציון |
| | | 483/02 שפט |
| | | 4258/02 ירקון |
| | | 568/02 שפט |
| | | 783/02 בנימין |

*[חותמת: כתב אישום זה נהקבל בתאריך 1/10/02 ונרשם ביומן בתיק ק"י ביהמ"ש]*

## במשפט שבין התובע הצבאי – המאשים

### - נ ג ד -

אחמד טאלב מוצטפא ברגותי (מכונה "אל פראנסיי")
ת.ז. 994466860, יליד 15.03.76, תושב אלבירה - רמאללה
עצור מיום 15.04.02

### - ה נ א ש ם -

## כ ת ב - א י ש ו ם   מ ת ו ק ן

### הנאשם הנ"ל מואשם בזאת בביצוע העבירות הבאות:

### פרט ראשון:

**מהות העבירה:** חברות בהתאחדות בלתי מותרת, עבירה לפי תקנות 84(1)(א) ו-85(1)(א) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, החל מסוף שנת 2000 ועד ליום מעצרו, היה חבר או פעל כחבר בהתאחדות בלתי מותרת, דהיינו: הנאשם הנ"ל, החל משנת 1996 ועד ליום מעצרו עבד כחבר וכשומר ראש של ▆▆▆▆▆ שהוא ראש "התנזים" של הפתי"ח.
הנאשם הנ"ל, החל מתחילת שנת 2001 ועד ליום מעצרו פעל במסגרת "התנזים" של הפתי"ח, שהוא התאחדות בלתי מותרת, פעילות צבאית נגד המטרות הישראליות.
במהלך פעילותו הצבאית, הנאשם הנ"ל קבל סיוע כספי מפעילי "התנזים" של הפתי"ח. הנאשם קיבל באמצעות חשבון הבנק שלו סכום של כ-7,000 ש"ח מ▆▆▆▆▆, פעיל צבא בכיר מאיזור שכם, וכן סכום של כ-10,000 ש"ח מ▆▆▆▆▆ פעיל בכיר באיזור ברמאללה.

ת.ת. 444/02 מתוקן

1

במהלך פעילותו הצבאית הנאשם היה בקשר מתמיד עם ראש "יגדודי חללי אלאקצא", הזרוע
הצבאית של "התנזים" של הפתייח בשכם - ██████, ראש "יגדודי חללי אלאקצא"
באיזור טול-כרם - ██████, ראש "יגדודי חללי אלאקצא" באיזור גיניד - ██████
██████ ראש "יגדודי חללי אלאקצא" באיזור בית-לחם (וחברון - ██████
██████ אלאקצא" באיזור - ██████, וכן עם ראש "התנזים" של הפתייח -

במסגרת פעילותו הצבאית הנייל, הנאשם חפיץ ברמאללה כרוזים בדבר לקיחת האחריות לפיגועים
שבוצעו בישראל ובאיזור על-ידי פעילי "התנזים" של הפתייח.

**פרט שני:**

**מהות העבירה:** נשיאת משרה בהתאחדות בלתי מותרת, עבירה לפי תקנות 84(1)(א) ו-85(1)(ב)
לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנייל, באיזור, החל מתחילת שנת 2001 ועד ליום מעצרו, ניהל או עזר
להנהלת התאחדות בלתי מותרת, או החזיק בכל משרה או עמדה בהתאחדות בלתי מותרת או
תחת מרותה, דהיינו:
הנאשם הנייל, במהלך התקופה האמורה, היה אחד האחראיים על ארגון "יגדודי חללי אלאקצא"
(יכתאיב שהדאית אלאקצאי) באיזור רמאללה - הזרוע הצבאית של "התנזים" של הפתייח,
שהוא התאחדות בלתי מותרת. "יגדודי חללי אלאקצא" היו אחראיים לביצוע מספר רב של
פיגועים נגד חיילי צהייל ואזרחים ישראליים באיזור הן בתוך שטחה של מדינת ישראל, אשר
בהן הרוגו מספר רב של אזרחים ישראליים וחיילי צהייל.
בין היתר, הנאשם שימש כאיש קשר בין שאר האחראיים ביגדודי חללי אלאקצאי לבין
ראש "התנזים" של הפתייח - ██████

**פרט שלישי:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנות 84(1)(א) ו-85(1)(ג)
לתקנות ההגנה (שעת חירום), 1945.
**פרטי העבירה:** הנאשם הנייל, באיזור, במהלך התקופה האמורה בפרק האישום הראשון או
בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת,
דהיינו:
הנאשם הנייל, במהלך התקופה האמורה, ברמאללה או בסמוך לכך, במספר רב של הזדמנויות
שונות, חילק כספים לפעילים צבאיים של "התנזים" של פתייח. הנאשם נהג לקבל כספים מפעיל
"התנזים" של הפתייח ██████ לחלק אותם לאנשים רבים אשר ביצעו פיגועים נגד חיילי
צהייל ואזרחים ישראליים. בכל הזדמנות הנאשם מסר לכל אחד מהמפעילים סכומי כסף שונים בין
100 ל-300 דולר ארהייב. כמו כן, הנאשם נהג להעביר סכומים גדולים יותר לפעילים צבאיים
ביהתנזיםיי של הפתייח באמצעות העברות בנקאיות.
בין היתר, הנאשם העביר ל██████, פעיל צבאי בכיר ביהתנזיםיי של הפתייח בטול-כרם, שהוא
סגנו של ██████ - ראש "יגדודי חללי אלאקצא" בטול-כרם, שהוא הזרוע הצבאית של
"התנזים" של פתייח, סכום של 3,000 שייח.
כמו כן, הנאשם העביר ל██████, שהוא ראש "יגדודי חללי אלאקצא",
סכומים בין 1,000 ל-2,000 שייח ובכ-6-7 הזדמנויות שונות וזאת לצורך רכישת כדורים.
בנוסף לכספים, הנאשם נהג לספק לפעילים צבאיים של "התנזים" של פתייח מכשירי טלפון
סלולריים לצורכי פעילותם הצבאית.

ת.ת. 444/02 מתוקן

P 5: 176

**פרט רביעי:**

**מהות העבירה:** סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי
(יהודה והשומרון) (מס' 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בשנת 1998 או בסמוך לכך, סחר או עסק בצורה אחרת
בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו:
הנאשם הנ"ל, במועד האמור, במהלך הפעילים אמארי או בסמוך לכך, רכש מידי ▮▮▮▮
תמי"ק MP-5 תמורת 4,000 דינר ירדני וכן רובי"ר M-16 מקוצר עם כוונת טלסקופית תמורת 5,500
דינר ירדני, וזאת ללא היתר חתום על-ידי מפקד האיזור או מטעמו. הנאשם הנ"ל, במהלך השנים
2001 – 2002, נהג למסור את תמי"ק MP-5 הנ"ל לידי אנשים שונים על מנת שיבצעו באמצעותו
פיגועי ירי נגד אזרחים ישראליים וזאת כפי שיתוארו בהמשך כתב-האישום.

**פרט חמישי:**

**מהות העבירה:** החזקת כלי-יריה ללא היתר, עבירה לפי סעיף 53(א)(1) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס' 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במהלך התקופה האמורה בפרט האישום הראשון, החזיק
ברשותו כלי-יריה, תחמושת, פצצה, רימון-יד או חפץ נפיץ או מבעיר, כלי או חפץ אז דבר המתוכנן
או מסוגל לגרום מוות או חבלה חמורה, ללא תעודת היתר שהוענקה על-ידי מפקד צבאי או
מטעמו, דהיינו:
הנאשם הנ"ל, במהלך התקופה האמורה, ברמאללה או בסמוך לכך, החזיק ברשותו תמי"ק MP-5,
אקדח וכן רובי"ר M-16 מקוצר עם כוונת טלסקופית, וזאת ללא תעודת היתר שהוענקה על-ידי
מפקד צבאי או מטעמו.

**פרט שישי:**

**מהות העבירה:** סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי
(יהודה והשומרון) (מס' 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף שנת 2000 או בסמוך לכך, סחר או עסק בצורה אחרת
בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו:
הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, מסר לידי ▮▮▮▮
▮▮▮ - ראש הזרוע הצבאית של "התנזים" של הפתייח, רוסי"ר קלצ'ניקוב 50-1
כדורים כרוסי"ר קלצ'ניקוב, וזאת ללא היתר חתום על-ידי מפקד האיזור או מטעמו. ▮▮▮
מסר את רוסי"ר קלצ'ניקוב הנ"ל הכדורים הנ"ל לידי ▮▮▮▮, פעיל בכוח 17 של
הרשות הפלסטינית. ▮▮▮ ידווח ל▮▮▮ כי ביצע באמצעות רוסי"ר קלצ'ניקוב
הנ"ל פיגועי ירי נהרג בני הזוג כהנא ז"ל, וכן כי ביצע באמצעות הכדורים הנ"ל פיגועי ירי שבו
נהרג אזרח ישראלי.

**פרט שביעי:**

**מהות העבירה:** סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי
(יהודה והשומרון) (מס' 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, החל מסוף שנת 2000 ועד ליום מעצרו או בסמוך לכך, סחר
או עסק בצורה אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו:
הנאשם הנ"ל, במועד האמור, במהלך התקופה האמורה, ברמאללה או בסמוך לכך, במספר רב של
הזדמנויות שונות, מסר לידי ▮▮▮▮ - ראש הזרוע הצבאית של
"התנזים" של הפתייח, סכומי כסף גדולים של עשרות אלפי שקלים ועשרות אלפי דולרים של
ארה"ב, לצורך רכישת כלי נשק וכדורים לביצוע פיגועי ירי נגד חיילי צה"ל ואזרחים ישראליים.
הנאשם אף נהג להשאיר אצל בבית הכדורים שרכשם בכסף הנ"ל ולמסור אותם לידי
▮▮▮ (וחבריו של האחרון לפי מידת הצורך, וזאת ללא היתר חתום על-ידי מפקד האיזור או
מטעמו.

3

**פרט שמיני:**

**מהות העבירה:** סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי (יהודה והשומרון) (מס׳ 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במהלך שנת 2001 או בסמוך לכך, סחר או עסק בצורה אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו: הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, מסר ל▬▬▬ ▬▬▬▬▬▬▬▬▬, ראש "יחידי חללי אלאקצא", הזרוע הצבאית של "התנזים" של הפת"ח, 100 כדורים לרוסיר M-16, וזאת ללא היתר חתום על-ידי מפקד האיזור או מטעמו.

**פרט תשיעי:**

**מהות העבירה:** פגיעה בביטחון האיזור, עבירה לפי סעיף 53(א)(4) לצו בדבר הוראות בטחון (יהודה והשומרון) (מס׳ 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בתחילת שנת 2001 או בסמוך לכך, עשה מעשה או מחדל שיש בהם פגיעה, היזק, הפרעה או סכנה לביטחונו האיזור או לביטחונן כוחות צה"ל וחייליו או לפעולתם, שימושם או ביטחונם של כל אחד מאלה: אניה, אוירון, נמל, רציף, מזח, מעגן, שדה תעופה, מסילת ברזל, נתיב מים, דרך, דרך-עפר, סכר, כלי רכב, כלי משא או כל אמצעי אחר של חובלה ציבורית, או תקשורת ציבורית, או כל מפעל, מוסד, או ציוד המשמש או מסונף לשמש ליצורם, הספקתם, החסנתם, העברתם, מסירתם או הפצתם של מים, דלק, חיי או כל רכוש של מדינת ישראל או של צה"ל, דהיינו: הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, <u>רכש רכב מדגם לבן גונב, מודל חדיש.</u> הנאשם הנ"ל מסר את הרכב הנ"ל לידי ▬▬▬▬▬▬, אשר יצא ברכב האמור לביצוע פיגועים נגד אזרחים ישראליים וחיילי צה"ל באיזור.

**פרט עשירי** (פ.א. 234/01 מת"ם י-ם)

**מהות העבירה:** גרימת מות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות בטחון (יהודה והשומרון) (מס׳ 378), תש"ל-1970; וסעיף 14(א) לצו בדבר כללי האחריות לעבירות (יהודה והשומרון) (מס׳ 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 25.01.01 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:

1. הנאשם הנ"ל, במועד האמור, נפש ברמאללה עם ▬▬▬▬ (מכונה ▬) ועוד ▬▬▬▬

2. הנאשם ▬▬▬▬ ביקשו <u>מהנאשם</u> רכב לצורך ביצוע פיגוע ירי נגד יהודים. הנאשם מסר לידי ▬▬▬▬ רכב פולקסווגן בונדי גנוב, בצבע כסף, נושא לוחיות רישוי ישראליות, וזאת על מנת שחבריו הנ"ל יבצע ברכב זה פיגוע ירי בכוונה לגרום למותם של אזרחים ישראליים.

3. ▬▬▬▬ נהג ברכב הפולקסווגן ואילו ▬▬▬▬ ישב לידו כשהוא חמוש באקדח 16.

4. ▬▬▬▬ נסעו ברכב הפולקסווגן לאיזור עטרות על מנת לחפש רכב ישראלי במטרה לבצע בעבר פיגוע ירי ולגרום למותם של נוסעי הרכב.

5. סמוך לשעה 18:15, באיזור התעשיה עטרות, ▬▬▬▬ וראבחינו ברכב GMC ספארי, מ.ר. 7901306, (להלן: הרכב) אשר בו נהג אלעזר עקיבא פשקוס ז"ל.

6. ▬▬▬▬ החלו לנסוע אחרי הרכב. הנאשם ▬▬▬▬ עקבו אחרי הרכב מאיזור התעשיה עטרות עד צומת א-ראם ובחזרה.

7. כאשר התעשיה חזר לאיזור התעשיה עטרות נסעו בכביש הראשי, ▬▬▬▬ נסעו ברכב הפולקסווגן בסמוך לרכב.

8. בשלב זה, ▬▬▬▬ פתח את החלון וירה באקדח 16 הנ"ל כ-7-6 כדורים בכוונה לגרום למותו של נהג הרכב. מספר קליעים, אשר נורו על-ידי ▬▬▬▬ פגעו ברכב, כאשר קליע אחד פגע בצוארו ואחד בחזהו של אלעזר עקיבא פשקוס ז"ל שנהג ברכב.

9. משהבחינו ▬▬▬▬ כי הרכב נעצר, השניים נמלטו ברכב הפולקסווגן לרמאללה.

ת.ת. 444/02 מתוקן

10. ברמאללה, ██████ ██████ החזירו את רכב הפולקסווגן לנאשם ודיווחו לו על
הפינוע שביצע.

11. לאחר יום, הנאשם מסר ל-██████ כ-300 דולר ארה"ב עבור ביצוע הפינוע הנ"ל. את הכסף
האמור הנאשם קיבל מידי עלי פרג'י ברגותי.

12. במעשיו המתוארים לעיל, הנאשם הנ"ל גרם בכוונה למותו של אלעזר עקיבא פשקוס ז"יל,
אשר נפטר כתוצאה מפגיעות הקליעים שנורו על-ידי ██████ כפי שתוגר.

## פרט אחד-עשר: (פ.א. 457/01 בנימין)

**מהות העבירה:** נסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51א(א) לצו ל בדבר הוראות ביטחון
(יהודה והשומרון) (מס' 378), תשי"ל-1970 וסעיפים 14(א) ו-19 לצו ל בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 25.02.01 או בסמוך לכך, ניסה לגרום בכוונה למותו
של אחר, דהיינו:

1. הנאשם הנ"ל, במועד האמור, נפגש ברמאללה עם ██████

2. הנאשם וחבריו הנ"ל דנו במצב באיזור. הנאשם וחבריו הנ"ל טענו כי אין פעילות נגד המטרות
הישראליות. הנאשם שאל את חבריו הנ"ל מה ניתן לעשות על מנת לשפר את המצב. חבריו
הנ"ל של הנאשם ביקשו כי הנאשם יפגק להם רכב וכלי נשק, והם יבצעו פיגוע נגד האזרחים
הישראליים בכוונה לגרום למותם.

3. הנאשם הסכים להצעת חבריו הנ"ל. הנאשם מסר לידי חבריו הנ"ל את רכב מסוג פולקסווגן, בורה,
צבע אפור, מדל שנת 2001, נושא לוחיות רשיון ישראליות, וכן תמייק MP-5 עם מחסנית
וכדורים.

4. ██████ נסע ברכבו של הנאשם,
כשהוא חמושים בתמ"ק MP-5 הנ"ל, אשר אותו קיבלו מהנאשם. חבריו הנ"ל של הנאשם
הגיעו לאיזור גשר עטארה.

5. בסמוך לשעה 13:15, חבריו הנ"ל של הנאשם הבחינו ברכב GMC ואנדרוה, מ.ר. 3082518,
אשר בו נהג יוסף כהן, כשהרכב האמור יוצא מיישוב עטרת ופונה לכיוון גשר עטארה.

6. חבריו הנ"ל של הנאשם החליטו לבצע פיגוע ירי לעבר רכב ה-GMC הנ"ל בכוונה לגרום למותם
של הנוסעים בו.

7. חבריו הנ"ל של הנאשם החליטו להמתין עד שרכב הסיטרואן שנסע לפניהם יעקוף את רכב
ה-GMC ואז לעקוף את רכב ה-GMC ולבצע לעברו את פיגוע הירי המתוכנן.

8. ברכב הסיטרואן הנ"ל נסעו ██████ החמושים ב-2 רוסיירי קלצ'ניקוב ורוסייר
M-16. נוסעי רכב הסיטרואן הנ"ל פתחו באש בכלי הנשק הנ"ל לעבר רכב ה-GMC הנ"ל
בכוונה לגרום למותם של הנוסעים בו. 29 קליעים שנורו על-ידי האנשים הנ"ל פגעו ברכב
ה-GMC הנ"ל. 3 קליעים פגעו בראשו ובצוארו של יוסף כהן, אשר נהג ברכב ה-GMC הנ"ל.
כתוצאה מפגיעות הקליעים הנ"ל וכן מפגיעות הרסיסים בכל חלקי גופו, יוסף כהן נפצע
בצורה קשה.

9. לאחר שחבריו הנ"ל של הנאשם הבחינו כי כתוצאה מפגיעת הירי שביצעו מרכב הסיטרואן
שנסע לפניהם, רכב ה-GMC נפגע, ירד מהכביש ונהג הרכב נפצע, חבריו הנ"ל של הנאשם
נמלטו בחזרה לרמאללה.

10. ברמאללה, חבריו הנ"ל של הנאשם החזירו את רכב הפולקסווגן הנ"ל ואת תמ"ק
MP-5 הנ"ל. ██████ דיווחו לנאשם
כי ביצעו פיגוע ירי באמצעות הרכב וכלי הנשק הנ"ל וכי כתוצאה מכך נפצע נהג יהודי.

5

P 5: 179

**פרט שניים-עשר:**

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש יוני 2001 או בסמוך לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו: ████████████ ביחד עם ████████████ במועד האמור, התכוונו לבצע ירי לעבר הישוב פסגות במטרה לגרום למותם של אזרחים ישראליים. ████████████ ראש "התנזים" של הפתיח. האנשים הנ"ל ████████ האנשים הנ"ל ניגשו אל משרדו של ████████ וביקשו מהאחרון לקבל כלי נשק לצורך ביצוע פיגוע ירי נגד אזרחים ישראליים בישוב פסגות. ████ שמע לשמוע את התכנית הנ"ל לבצע פיגוע ירי לעבר הישוב פסגות וחבטיח לספק כלי נשק לצורך ביצוע פיגוע הירי המתוכנן. ████████████ וחבריו הנ"ל ניגשו שוב למשרדו של ████████ ברמאללה. לאחר כשבוע ימים, ████████████ לא היה באותה העת מרואן ברעותי בגונו לבקשת חברו הנ"ל לקבל כלי נשק לצורך ██ הנ"ל. הנאשם הבטיח לדבר עם ביצוע פיגוע ירי לעבר הישוב פסגות. לאחר כשלושון ימים, ████████ וחבריו הנ"ל ניגשו שוב אל משרדו של ████████ ברמאללה. האנשים הנ"ל ביקשו שוב ████ לקבל כלי נשק לצורך ביצוע פיגוע ירי לעבר הישוב פסגות. ████████████ התקיפר אל "██████████" פעיל צבאי בכיר ב"תנזימים" של הפתיח. סוכם כי ████████████ יפגוש את האנשים הנ"ל בכיכר מנ'ארה ברמאללה ושם ימסור להם כלי נשק לצורך ביצוע פיגוע הירי המתוכנן. ████████████ וחבריו הנ"ל נפגשו עוד באותו היום, בכיכר מנ'ארה ברמאללה עם ████████████ במהלך הפגישה האמורה, ████████ הבטיח להעביר לידיהם כלי נשק לצורך ביצוע פיגוע הירי המתוכנן. בלילה של אותו היום, **הנאשם הגיע לביתו של** ████████████ ומסר לידי תמ"ק MP-5 וכדורים לצורך ביצוע פיגוע **נגד** אזרחים ישראליים. לאחר כשעה, ████████ יצא מביתו ביחד עם ████ ברכבו של ████████ כשהם מחזיקים בתמ"ק MP-5 וכדורים הגיעו למקום הנמצא בסמוך לישוב פסגות. שם השניים ירדו מהרכב. ████████ ירח את כל הכדורים שמצו הנאשם בתמ"ק MP-5 הנ"ל לעבר הישוב פסגות מתוך כוונה לגרום למותם של תושבי הישוב פסגות ושל חיילי צה"ל שהיו בישוב פסגות. מיד לאחר הירי, ████████████ חזרו ברכבם הנ"ל לרמאללה.

**פרט שלושה-עשר:**

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 26.06.01 או במועד הסמוך לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו: הנאשם הנ"ל, בחודש יוני 2001 או בסמוך לכך, ברמאללה, בנסיבות המתוארות בפרט האישום תקדום, מסר לידי ████████████ תמ"ק MP-5 לצורך ביצוע פיגועי ירי נגד אזרחים ישראליים וחיילי צה"ל. ████████████ במועד האמור, ביחד עם ████████████ יצא מרמאללה לכוונים הכביש המוביל ממסעף זאב לגבעה הצרפתית שבירושלים, על מנת לבצע שם פיגוע ירי לכוונם בכוונה למותם של אזרחים ישראליים. ████████ וחבריו הנ"ל יצאו כאמור כשהם מחזיקים ברובצה MP-5, אשר נמסר להם מוטרה על-ידי הנאשם כאמור לעיל, ובאקדח 9. וחבריו יצאו לביצוע הפיגוע האמור כשהם מחזיקים בשרטוט של הגבעה הצרפתית שם תוכנו לבצע את פיגוע הירי, אשר נערך על-ידי ████████████ וחבריו הנ"ל יצאו לביצוע הפיגוע האמור בתיאום עם ████████████, ואף ביקשו מהאחרון כי ידריכ ל ████████████ ראש "התנזימים" של הפתיח, אם פי ממבצעי הפיגוע יהורגו במהלך ביצוע פיגוע הירי המתוכנן. ████████ וחבריו לא הצליחו להגיע למקום שבו תוכנו לבצע את פיגוע הירי עקב נוכחות גדולה של כוחות צה"ל באיזור חיזום.

ת.פ. 444/02 מתוקן

**פרט ארבעה-עשר:** (פ.א. 2159/01 בנימין)

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תשל"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 25.08.01 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו: ⬛⬛⬛

1. הנאשם הנ"ל, בחודש אוגוסט 2001, ברמאללה, ⬛⬛⬛ מסר לאנשים כי הכיר מספר פעילי ⬛⬛⬛ (מכונה ⬛⬛⬛"), אשר מבצעים פיגועי ירי לעבר אזרחים ישראליים, ⬛⬛⬛ ביקש לקבל את אישורו של הנאשם להצטרף לחולית הנ"ל ולבצע פיגועים נגד אזרחים ישראליים בכוונה לגרום למותם, הנאשם אישר ל⬛⬛⬛ להצטרף לפעילות האמורה.

2. ⬛⬛⬛ נפגש עם פעילי "התנזים" הנ"ל, שהם ⬛⬛⬛ (המכונה ⬛⬛⬛") ו⬛⬛⬛ השלושה הנ"ל אמרו ⬛⬛⬛ כי בכוונתם לבצע פיגוע ירי במסתרה לגרום למותם של אזרחים ישראליים. השלושה ביקשו כי ⬛⬛⬛ יספק להם כלי נשק לצורך ביצוע פיגועי הירי המתוכנן.

3. ביום 25.08.01, פנו אל ⬛⬛⬛ וביקשו לקבל עד באותו היום כלי נשק לצורך ביצוע פיגוע הירי המתוכנן.

4. באותו היום, מחמד מכלה פנה אל הנאשם, ⬛⬛⬛ ביקש מהנאשם לקבל כלי נשק לצורך ביצוע פיגוע ירי נגד אזרחים ישראליים. לאחר זמן קצר, עוד באותו היום, הנאשם מסר לידי ⬛⬛⬛ תמ"ק MP-5 עם מחסנית חמלאה בכדורים. וזאת על מנת ש⬛⬛⬛ והחברים הנ"ל יבצעו באמצעותו פיגוע ירי ויגרמו למותם של אזרחים ישראליים.

5. בשעות הערב, באותו היום, ברמאללה או בסמוך לכך, ⬛⬛⬛ מסר את תמ"ק MP-5 ⬛⬛⬛ אשר הגיעו ברכב איסוזו טנדר של ⬛⬛⬛ והתחמשות הנ"ל ⬛⬛⬛ יבצעו באמצעות הנשק הנ"ל פיגוע ירי ויגרמו למותם של אזרחים ישראליים.

6. מיד לאחר קבלת הנשק, ⬛⬛⬛ יצאו מרמאללה לכיוון כביש 443 במסתרה לבצע שם את פיגוע הירי המתוכנן. האנשים הנ"ל נסעו בשני כלי רכב - האחד, איסוזו טנדר של ⬛⬛⬛ והשני רכב סובארו גנב שהביא ⬛⬛⬛ לצורך ביצוע פיגוע המתוכנן.

7. בהגיעם לכביש 443, המשיך לנסוע לבדו ברכב האיסוזו, בקלומטר לפני רכב הסובארו ⬛⬛⬛ על מנת להודיע לחבריהן הנ"ל על מחסומי צה"ל והמשטרה בדרך.

8. כל האנשים הנ"ל נסעו בכביש 443 לכיוון תל-אביב, כאשר ⬛⬛⬛ נהג ברכב הסובארו, לידו יושב ⬛⬛⬛ החמוש ברוסי"ר קלצ'ניקוב, ובמושב האחורי יושב ⬛⬛⬛ החמוש בתמ"ק MP-5, אשר עמו גם סיפק הנאשם.

9. באותו היום, 25.08.01, סמוך לשעה 22:30, ליד תחנת הדלק "דור אנרגיה", הבחינו נוסעי רכב הסובארו הנ"ל ברכב פולקסווגן פאסאט, מ.ר. 6902818, אשר בו נסעו בני הזוג יניב ושרון בן שלום ז"ל עם שני ילדיהם הדרוני יוסף סידר ז"ל.

10. ⬛⬛⬛ שנהג ברכב הסובארו, עקף את רכב הפולקסווגן הנ"ל ונסע במקביל אליו. בשלב ⬛⬛⬛ פתחו באש אוטומטית בתמ"ק MP-5, אשר אותו סיפק הנאשם, וברוסי"ר קלצ'ניקוב, לעבר רכב הפולקסווגן הנ"ל במסתרה לגרום למותם של נוסעיו.

11. מספר רב של הקליעים שנורו על-ידי ⬛⬛⬛ פגעו ברכב הפולקסווגן ובנוסעיו.

12. לאחר שנוסעי רכב הסובארו הבחינו כי רכב הפולקסווגן נוסע בזיגזג, הם האיטו את המהירות ונמלטו לכפר בית לקיא. שם המתינו להם ⬛⬛⬛ על רכב האיסוזו של ⬛⬛⬛ ונסעו לכפר בית סירא, שם הם הסתירו את כלי הנשק בסמוך לבניהו של ⬛⬛⬛ לאחר מכן, ⬛⬛⬛ חזרו לרמאללה ברכבו של ⬛⬛⬛

13. מיד לאחר חזרתם לרמאללה, אשר ⬛⬛⬛ נפגש בעין אום שראייט עם ⬛⬛⬛ דיווח ⬛⬛⬛ על הפיגוע שבוצע באמצעות הנשק שנמסר למטרה זו על-ידי הנאשם.

14. לאחר מספר ימים, ⬛⬛⬛ הביא את תמ"ק MP-5 הנ"ל מבית סירא ⬛⬛⬛ העביר את כלי הנשק הנ"ל לידי הנאשם ולאחרון ידיעה ואחרון על פיגוע הירי שבוצע בכלי הנשק הנ"ל.

15. הנאשם העביר למבצעי הפיגוע הנ"ל סכום של 500 דולר ארה"ב עבור ביצוע הפיגוע הנ"ל. את הכסף הנ"ל הנאשם קיבל מידי ⬛⬛⬛

ת.ת. 444/02 מתוקן

16. הנאשם הנ"ל, במעשיו המתוארים לעיל, גרם בכוונה למותו של **יניב בן שלום ז"ל**, אשר נפטר כתוצאה מפגיעות קליעים בראשו ובגב, אשר נורו מתמ"ק MP-5 המותאר לעיל, ומרוסיי"ר קלצ'ניקוב על-ידי היתם חמדאן וחוסאם שחאדה.

**פרט חמישה-עשר:**   (פ.א. 2159/01 בנימין)

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירות (יהודה והשומרון), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 25.08.01 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום הארבעה-עשר, ובמעשיו המתוארים בפרט האישום הארבעה-עשר, גרם בכוונה למותו של **שרון בן שלום ז"ל**, אשר נפטרה כתוצאה מפגיעות קליעים בראשה ובגבה, אשר נורו מתמ"ק MP-5, אשר אותו סיפק הנאשם כמתואר בפרט האישום הארבעה-עשר, וברוסיי"ר קלצ'ניקוב.

**פרט שישה-עשר:**   (פ.א. 2159/01 בנימין)

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 25.08.01 או במועד הסמוך לכך, גרם בכוונה למותו של אחר, דהיינו:
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום הארבעה-עשר, ובמעשיו המתוארים בפרט האישום הארבעה-עשר, גרם בכוונה למותו של **דורון יוסף סורי ז"ל**, אשר נפטר כתוצאה מפגיעות הקליעים, אשר נורו מתמ"ק MP-5, אשר אותו סיפק הנאשם כמתואר בפרט האישום הארבעה-עשר, ומרוסיי"ר קלצ'ניקוב.

**פרט שבעה-עשר:**   (פ.א. 2159/01 בנימין)

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, ביום 25.08.01 או במועד הסמוך לכך, ניסה לגרום בכוונה למותו של אחר, דהיינו:
הנאשם הנ"ל, במועד האמור, במקום האמור בפרט האישום הארבעה-עשר, ניסה לגרום בכוונה למותם של נוסעי רכב פולקסווגן פאסאט, כתוצאה מהירי שבוצע כאמור בפרט האישום הארבעה-עשר.
מתמ"ק MP-5, אשר אותו סיפק הנאשם כמתואר בפרט האישום הארבעה-עשר, ומרוסיי"ר קלצ'ניקוב, נפצעה באורח קל מרסיסים ברגלה בתם של בני הזוג בן שלום ז"ל.

8

P 5: 182

**פרט שמונה-עשר:**

**מהות העבירה:** פגיעה בביטחון האיזור, עבירה לפי סעיף 53(א)(4) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס׳ 378), תש״ל-1970.

**פרטי העבירה:** הנאשם הנ״ל, באיזור, בחודש ספטמבר 2001 או בסמוך לכך, עשה מעשה או
מחדל שיש בהם פגיעה, היזק, הפרעה או סכנה לביטחון האיזור או לביטחון כוחות צה״ל והילוו
או לפעולתם, שימושם או ביטחונם של כל אחד מאלה: אניה, אוירון, נמל, רציף, מזח, מעגן, שדה
תעופה, מסילת ברזל, נתיב מים, דרך, דרך-עפר, קטר, קרון, כלי רכב, כלי משא או כל אמצעי אחר של
הובלה ציבורית, או תקשורת ציבורית, או כל מפעל, מוסד, או ציוד המשמש או מסוגל לשמש
לייצור, חפקתם, חחסונם, העברתם, מסירתם או הפצתם של מים, דלק, גז או חשמל או כל
רכוש של מדינת ישראל או של צה״ל, דהיינו:

אל הנאשם הנ״ל, במועד האמור, ברמאללה או בסמוך לכך, פנו ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇ – ראש "גדודי חללי אלאקצא" – הזרוע הצבאית של "התנזים" של הפת״ח באיזור,
▇▇▇▇▇▇▇▇. האנשים הנ״ל סיפרו לנאשם כי הם יצרו מרגמה וגם
רכשו פצצת מרגמה תמורת 1,500 ש״ח. ▇▇▇▇▇▇▇▇ ביקשו מהנאשם לתת להם כסף, אשר אותו
שילמו תמורת פצצת מרגמה הנ״ל. האנשים הנ״ל אמרו לנאשם כי בכוונתם לירות את פצצת המרגמה
הנ״ל לעבר הישוב פסגות.

הנאשם טען בפני האנשים הנ״ל כי אם הם יצליחו לירות את פצצת המרגמה הנ״ל על הישוב
פסגות, הוא ישלם להם את הכסף עבור הפצצה.
מאוחר יותר, באותו הלילה, האנשים הנ״ל חזרו אל הנאשם והודיעו לו כי הם אכן ירו את פצצת
המרגמה הנ״ל לעבר הישוב פסגות. האנשים הנ״ל מסרו לנאשם כי אינם ▇▇▇▇▇▇ בדיוק
נפלה פצצת המרגמה אותה ירו. לאור האמור, הנאשם שירב לשלם לאנשים הנ״ל כסף עבור פצצת
המרגמה הנ״ל.
מאוחר יותר, הנאשם דיווח אודות ירי פצצת המרגמה לעבר הישוב פסגות על-ידי האנשים הנ״ל
ל▇▇▇▇▇▇ – ראש "התנזים" של הפת״ח.

**פרט תשעה-עשר:** (פ.א. 7915/01 ציון)

**מהות העבירה:** גרימת מות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון (יהודה
והשומרון) (מס׳ 378), תש״ל-1970, וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה
והשומרון) (מס׳ 225), תשכ״ח-1968.

**פרטי העבירה:** הנאשם הנ״ל, בין באיזור ובין מחוצה לו, ביום 15.09.01 או במועד הסמוך לכך,
גרם בכוונה למותו של אחר, דהיינו:

1. אל הנאשם הנ״ל, במועד האמור או בסמוך לכך, פנה ▇▇▇▇▇▇▇▇
(המכונה "▇▇▇▇▇▇▇"), אשר מסר לו כי פנה אליו ▇▇▇▇▇▇▇▇
(המכונה "▇▇▇▇▇▇▇") ביחד עם אדם נוסף וביקשו לקבל תמ״ק MP-5 על מנת לבצע באמצעותו פיגוע ירי
במטרה לגרום למותם של אזרחים ישראליים. ▇▇▇▇▇▇▇▇ ביקש כי הנאשם ימסור לו את
תמ״ק MP-5, אשר אותו כבר מסר ▇▇▇▇▇▇▇ לפני כן לצורך ביצוע פיגועי-ירי.
2. הנאשם הסכים לספק את כלי הנשק המבוקש לצורך ביצוע פיגוע הירי המתוכנן.
3. הנאשם הפנה את ▇▇▇▇▇▇▇▇ לצורך קבלת תמ״ק MP-5 הנ״ל.
   פנה אל ▇▇▇▇▇▇▇▇ וקיבל מהאחרון תמ״ק MP-5 של הנאשם. כמו כן, הנאשם מסר לידי
   ▇▇▇▇▇▇▇▇ אקדח 14 לצורך ביצוע פיגוע הירי המתוכנן.
4. מאוחר יותר באותו היום, ▇▇▇▇▇▇▇ את תמ״ק MP-5 הנ״ל ▇▇▇▇▇▇▇ במטרה
   שהאחרון יבצע באמצעותו פיגוע ירי ויגרום למותם של אזרחים ישראליים.
5. יותר מאוחר באותו היום, ▇▇▇▇▇▇▇ נפגש ברמאללה עם ▇▇▇▇▇▇▇▇
   ▇▇▇▇▇▇▇ (המכונה "▇▇▇▇▇▇▇"). הגיע לפגישה הנ״ל כשהוא חמוש בתמ״ק MP-5 ואקדח 14, אשר
   אותם סיפק הנאשם כאמור לעיל לצורך ביצוע פיגוע ירי.
6. בסביבות השעה 22:00, ביום 15.09.01, האנשים הנ״ל נסעו מרמאללה לירושלים ברכב איסוזו
   טנדר של ▇▇▇▇▇▇▇.
7. ▇▇▇▇▇▇▇ נהג ברכב האיסוזו הנ״ל ונסע ביחד עם ▇▇▇▇▇▇▇ וחבריו על מנת להוציא
   לחם מקום שבו יבצעו את פיגוע הירי המתוכנן וכן על מנת להראות לחבריו איך להגיע
   לאחר ביצוע הפיגוע האמור. ▇▇▇▇▇▇▇ הסיע את חבריו לכביש מס׳ 9 המחבר בין שכונת
   רמות לבין שכונת הגבעה הצרפתית בירושלים. ▇▇▇▇▇▇▇ הראה לחבריו איפה לבצע את

9

הפינוע המתוכנן ואיך להימלט לאחר מכן. בסיום הסיור האמור, החבורה הנ"ל חזרה
לרמאללה.

8. בסביבות השעה 22:30, באותו היום, ■■■■■■■ ביחד עם
■■■■■■ נסע ברכב גנוב בצבע אפור עם לוחיות רישוי ישראליות, אשר אותו סיפק להם
■■■■■■ לצורך ביצוע הפינוע המתוכנן (להלן: הרכב). לפניהם נסע ברכב האיטוזו
הנ"ל ■■■■■■■ וזאת על מנת להדריך באמצעות טלפון סלולרי לחבריו על מחסומי משטרה וצה"ל.

9. ■■■■■■ נהג ברכב הנ"ל, לידו ישב ■■■■■■, ■■■■■■ החמוש בתמ"ק MP-5, אשר אותו
סיפק הנאשם, ובמושב האחורי ישב ■■■■■■ היינם ■■■■■■, החמוש באקדח 14, אשר גם אותו סיפק
הנאשם.

10. החבורה הנ"ל נעצרה בכביש מס' 9 בסמוך לצומת המוביל לשכונת רמת שלמה וזממה לרכב
ישראלי בודד שינוע למקום בסמוך לצער לעבור פיגוע ירי ולגרום למותם של נוסעי הרכב.

11. לאחר מספר דקות, בסמוך לשעה 23:10, הגיע למקום רכב רנו אקספרס לבן, מ.ר. 2273706
(להלן: הרנו) אשר נסע מכיוון שכונת רמת שלמה ופנה לכביש מס' 9 לכיוון שכונת רמות.

12. ■■■■■■ החל לנסוע אחרי הרנו ועקף אותו.

13. כשהרכב נסע במקביל לרנו, ■■■■■■ פתחו באש בתמ"ק MP-5
ובאקדח 14, אשר אותם סיפק הנאשם, לעבר נוסעי הרנו במטרה לגרום למותם.

14. מספר קליעים שנורו על-ידי ■■■■■■ פגעו ברנו ובשני נוסעי הרנו –
משה וייס ומאיר וייסבוזיץ ז"ל. לאחר מכן, ■■■■■■ המשיך לנסוע לכיוון שכונת רמות
ובסמוך למקום שבו בונים גשר חדש פנה ימינה לדרך עפר המובילה לבני נעלבה עם
■■■■■■.

15. לפני הכניסה לבני נעלבה, ■■■■■■ וחבריו שהיו עמו ברכב נמלטו עם
שהומעקו להם במקום בני האיסוזו. משם כולם ביחד המשיכו במכונית לבני נעלבה ולאחר
מכן נמלטו לרמאללה.

16. במעשים המתוארים לעיל, הנאשם גרם בכוונה למותם של מאיר וייסבוזיץ ז"ל, אשר נפטר בבית
החולים מאוחר יותר. באותו היום כתוצאה מפגיעות הקליעים שנורו על-ידי חברי הנאשם
בתמ"ק MP-5 ובאקדח 14, אשר אותם סיפק הנאשם.

## פרט עשרים: (פ.א. 7915/01 ציון)

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס' 378), תשל"ו-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 15.09.01 או במועד הסמוך לכך,
ניסה לגרום בכוונה למותו של אחר, דהיינו:
הנאשם הנ"ל, במועד האמור, בסמוך לשעה 23:10, במקום המתוארו בפרט האישום הקודם,
במעשיו האמורים בפרט האישום הקודם, ניסה לגרום בכוונה למותו של משה וייס, אשר נהג
ברכב רנו האמור בפרט האישום הקודם, מ.ר. 2273706, המתוארו בפרט האישום הקודם.
על-ידי חברי הנאשם, כפי שתוארו בפרט האישום הקודם, פגע בראשו של אשר משה וייס ופצע אותו
באורח קשה.

## פרט עשרים ואחד: (פ.א. 481/01 ציון)

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס' 378), תשל"ו-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 03.10.01 או במועד הסמוך לכך,
ניסה לגרום בכוונה למותו של אחר, דהיינו:

1. הנאשם הנ"ל, בראשית חודש אוקטובר 2001, ברמאללה או בסמוך לכך, נפגש עם
■■■■■■ (מכונה ■■■■■■). ■■■■■■ ביקש מהנאשם לקבל תמ"ק
MP-5, ותוכננו לתמ"ק MP-5 הנ"ל וכן רכב לצורך לבצע פיגוע ירי נגד אזרחים ישראלים
בירושלים בכוונה לגרום למותם.

2. ■■■■■■ (מכונה "■■■■■■") מסר לנאשם כי הוא מתכנן לבצע את
הפינוע המתוכנן ביחד עם ■■■■■■
(המכונה "■■■■■■").

10                                     ת.ב. 444/02 מתוקן

3. תחילה הנאשם אמר ל████ לבצע את הפיגוע המתוכנן מרכבנו של ████. אך
████ טען כי יש צורך בשני כלי רכב, כאשר ברכב אחד ייסעו המתריעים והיורים ייסעו
ברכב השני. לאור האמור, הנאשם מסר ל████ רכב מזדה 323 גנוב, חמושא לחזיות
רישיון ישראליות, אשר אותו רכש לצורך כך בידי ████ תמורת 5,000 ש"ח.

4. לצורך ביצוע פיגוע הירי המתוכנן, הנאשם מסר ל████ ████ תמ"יק MP-5 וחמשושת למ"יק
MP-5 הנ"ל.

5. ביום 03.10.01, יצא ממראללת לכיוון ירושלים במטרה לבצע שם את פיגוע הירי
המתוכנן כשהוא מחוזק בתמ"יק MP-5 הנ"ל ונוסע ברכב המזדה הנ"ל, אשר בו נהג ████.

6. ████ נסע ברכב איסוזו טנדר של ████ ████ לפני רכב המזדה שבו
████ נסע וזאת כדי לאבטח את הדרך מחמ████ מחוזשונ המשטרה וצה"ל בדרך.

7. חבריו הנ"ל של הנאשם הגיעו לבית חנינא החדשה שבירושלים. שם ████ החנה
את רכב המזדה וביחד עם שאר חבריו הסתיר בתוך הרכב את תמ"יק MP-5 הנ"ל.

8. עלו לרכב האיסוזו ומשם המשיכו ברכב האיסוזו ביחד עם ████
████ לכיוון כביש בגין.

9. חבריו הנ"ל של הנאשם הגיעו לכביש בגין. שם, ████ הוראה לשאר חבריו איפה לבצע
████ את פיגוע הירי המתוכנן ואיך להימלט לאחר ביצוע פיגוע הירי. חבריו הנ"ל של הנאשם
החליטו לבצע את פיגוע הירי המתוכנן במנהרה הראשונה של כביש בגין מכיוון רמות וזאת על
מנת שלא ישמעו את קולות הירי. לאחר מכן, כל האנשים הנ"ל חזרו לבית חנינא, למקום שבו
הוחשאר רכב המזדה הנ"ל.

10. עלה לרכב המזדה כשהוא חמוש בתמ"יק MP-5 הנ"ל, ואילו ████ נהג
ברכב המזדה האמור. ████ נסע ברכב המזדה לכביש בגין במטרה
לבצע שם את פיגוע הירי המתוכנן ולגרום למותם של אזרחים ישראליים.

11. ████ נסע בכביש בגין הלוך ושוב מספר פעמים כשהם מחפשים רכב
ישראלי בודד במטרה לבצע לעברו את פיגוע הירי המתוכנן במטרה לגרום למותם של נוסעי
הרכב.

12. בסמוך לשעה 23:35, כשהם נוסעים לכיוון צפון, במנהרה האחרונה לכיוון נסיעתם, ████
████ הבחינו ברכב הונדה אקורד, מ.ר. 1103217, הנוסע בכביש בגין לכיוון
צפון. ברכב ההונדה נסע טוני עמיאל, פיני מימון ופוזי מימון.

13. ████ עקף את רכב ההונדה הנ"ל. בעת ש████ נסע במקביל לרכב
ההונדה הנ"ל, ████ ירה כדור אחד בתמ"יק MP-5, אשר אותו סיפק הנאשם, לעבר
נוסעי רכב ההונדה, בכוונה לגרום למותם. הקליע שגורה על-ידי ████ לא פגע ברכב
ההונדה הנ"ל.

14. לאחר ביצוע פיגוע הירי האמור, ████ המשיכו בנסיעתם לכיוון
כביש מס' 9 המחבר בין שכונת רמות לשכונת הגבעה הצרפתית.

### ◄ פרט עשרים ושניים : (פ.א. 8379/01 ציון)

**מהות העבירה:** ניסיון לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות ביטחון
(יהודה והשומרון) (מס' 378), תשל"ה-1970 וסעיפים 14(א) ו-19 לצו בדבר כללי האחריות לעבירה
(יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, בין באיזור ובין מחוצה לו, ביום 03.10.01 או במועד הסמוך לכך,
ניסה לגרום למותם של אחר, דהיינו :

1. לאחר ש████ ████ (מכונה ████) ו████
ביצעו את פיגוע הירי כפי שתוארו בפרט האישום הקודם, השניים המשיכו בנסיעתם ברכב
המזדה, אשר אותו סיפק הנאשם כפי שתואר בפרט האישום הקודם, לכיוון כביש מס' 9,
המחבר בין שכונת רמות לשכונת הגבעה הצרפתית במטרה להגיע משם לבית חנינא והמשך
לרמאללה.

2. במלקוד תנסיעה הנ"ל, על-פי בקשתו של ████, בדק את תקינותו של
תמ"יק MP-5 הנ"ל, אשר אותו מסר הנאשם, ואף ירה מספר כדורים באוויר.

3. במלקוד תנסיעה בכביש מס' 9 הנ"ל, בסמוך לשעה 23:45, ████
הבחינו ברכב סיאטרו, מ.ר. 6567709, אשר נסע בכביש מס' 9 לכיוון חמבעת הצרפתית. ברכב
הסיקורה הנ"ל נסעו מלכה כהן ונחסב כהן.

4. ████ אשר, כאמור, נהג ברכב המזדה, עקף את רכב הסקודה.

11                                ת.ת. 444/02 מתוקן

P 5: 185