

Date: 1 Av 5763
July 30, 2003

Case No.: 3459/02

## The Military Court

### - Yehuda -

### - Transcript -

Court hearing dated: July 30, 2003

Before the Presiding Judge: LTC Netanel Benishu
Judge: Captain Menachem Lieberman
Judge: Captain Shlomo Katz

The military prosecution: Captain Michael Kotlik and Captain Raid Shanan
Defense counsel: Adv. Ahmed Safia – Present

**Defendant: Ahmed Taleb Moustafa Barghouti  Identity No.: 994466860 / Israel Prison Service – Present**

Interpreter: Staff Sergeant Mohamed Nasraladin

Stenographer: Corporal Sivan Shemesh

**The Presiding Judge opens the meeting and identifies the Defendant**

## Course of Hearing

Prosecutor: There is no evidence for sentencing.

Defense counsel: There is no evidence for sentencing.

Prosecutor's summation: Today a task lies before the Court that is not a straightforward one, which is to sentence the Defendant. This task, which is never easy, today is many times more difficult. The Defendant, who is standing before the Court today, caused, through his acts, the death of 12 innocent civilians. As a result of the acts of the Defendant, many dozens of civilians have been injured. The person who is standing trial today is as of today only 27 years old. A 27 year old man who in the course of two years took the lives of 12 other people of different ages.

[Stamp] P 5: 210

The Defendant headed one of the terrorist organizations in the Area, an organization that appeared only after the Second Intifada broke out, which is the Al Aqsa Martyrs' Brigades; the Defendant commanded the organization in the Ramallah area. The Defendant took care to supply money and weapons to the operatives of the organization in order for them to use them to carry out deadly attacks on the roads of the Area near Ramallah and inside Jerusalem. From the beginning of 2002 to the beginning of Operation Defensive Shield, during which the Defendant was arrested, the Defendant acted with great zeal to execute suicide attacks inside the State of Israel. In some of the attacks, the Defendant succeeded, if one could define the death of innocent civilians as a success, and some of the attacks were not carried out for various reasons. The military prosecution asks to sentence the Defendant to a separate prison sentence for each of the civilians whose lives the Defendant took. In addition, the military prosecution asks to sentence the Defendant to an additional, separate sentence of life imprisonment for all of the other offenses for which he has been convicted, including the injuring of dozens of people. In other words, the military prosecution petitions for a sentence of 13 life imprisonment terms, which are to be served cumulatively. The request of the prosecution relies both on the case law of the Supreme Court in Israel, and the case law of this Court, which regrettably frequently has to hear the cases of various terrorists. I wish to refer the Court to the verdicts on the matter of Nidal Zaloum and Ami Popper v. the State of Israel (Criminal Appeal 399/89, Criminal Appeal 1742/91) and to the verdicts that were handed down by this Court in Case 3250/02 and in […]

[Stamp] P 5: 210 [continued]

Date: 1 Av 5763  
      July 30, 2003

Case No.: 3459/02

[…] Case 3251/02. On the matter of accumulation of the sentences, the military prosecution refers the Court to Criminal Appeal 6535/01 of the Supreme Court in Israel. It is obvious that no sentence that the Court will hand down will bring the murdered victims back to life, restore the casualties to good health or soothe the pain of the bereaved families. The Court is still the only entity in the world that can render justice and that can express in its sentence the attitude of society at large towards the Defendant and towards people who are like him. The military prosecution asks for the Court to examine each of the many acts that the Defendant has committed. The military prosecution asks for the Court to take into account that 12 people are no longer alive in this world. The Court cannot exact vengeance for their blood, but the Court can express, through its sentence, the sanctity of human life, which is frequently talked about when a person is alive, but this value is stressed all the more so after another person takes his life maliciously. I can only refer to the statements of Honorable Justice Hashin in the case of Ami Popper. The military prosecution repeats its request to sentence the Defendant to 13 terms of life imprisonment that are to be served cumulatively.

Defense counsel's summation: The Defendant contended at the beginning of his trial that he does not recognize the authority of the Court to judge him. A decision has been made by the Court. The Defendant has asked me not to plead today for sentencing. He still stands behind what he asserted at the beginning of his trial. I hope that these days will pass and there will be peace between the peoples.

The Defendant in his last address: I say that Sharon must be given a death sentence in this Court. I have no regrets.

[Stamp] P 5: 211

5

Date: 1 Av 5763  
July 30, 2003

Case No.: 3459/02

## The Military Court

### Yehuda

### - Transcript -

Court hearing dated: July 30, 2003

Before the Presiding Judge: LTC Netanel Benishu  
Judge: Captain Menachem Lieberman  
Judge: Captain Shlomo Katz

**Defendant: Ahmed Taleb Moustafa Barghouti  Identity No.: 994466860 / Israel Prison Service – Present**

### Sentence

An amended indictment was filed against the Defendant on October 1, 2002, in which not less than fifty three counts, covering thirty four pages, were attributed to him.

Initially, the Defendant denied the authority of this Court and it appeared, after we rejected his preliminary contentions on that matter, that he intended to deny the charges that were attributed to him. However, on May 5, 2003, the Defendant and his attorney announced that they asked to plead guilty to the indictment as worded.

Therefore, the Defendant was convicted according to his admission, and the only thing left for us to do is to prescribe his sentence.

We have heard very attentively the contentions of the prosecutor. The prosecutor stated that despite the fact that the Defendant is only 27 years old, through his actions as the head of the Al Aqsa Martyrs' Brigades in the Ramallah area, he had the opportunity to sow a great deal of destruction. The prosecutor has stressed the need to attribute great importance to the value of the sanctity of life and express the loss that the Defendant has caused through his acts, resulting from which twelve Israelis lost their lives and dozens more were injured, through a fitting sentence. Therefore, the prosecutor has asked for the Defendant to be sentenced to 13 cumulative terms of life imprisonment.

[Stamp] P 5: 212

The defense counsel was taciturn and stated that at the behest of the Defendant, he abstained from pleading for the sentencing. However, he stated that the Defendant stands behind his assertion that he does not recognize the authority of this Court to judge him.

The Defendant, in his last address, announced that he does not regret his actions.

It shall immediately be said that we have already spoken considerably about the contention of the Defendant that we are not competent to hear his case. After we have analyzed the provisions of international law and the provisions of the applicable domestic law, it has been found unequivocally that not only is this Court competent to try the Defendant, who has committed terrorist acts in places that fall under the jurisdiction of this Court, but also that he is not eligible for the status of prisoner of war, in view of the fact that the actions that he has committed were carried out in complete contravention of the rules of conduct in war, having been directed against innocent civilians. In any case, the attempts of the Defendant to portray his terrible actions in romantic colors of a political struggle are doomed to fail. Terrorism is terrorism and the murder of innocent civilians is intolerable.

[Stamp] P 5: 212 [continued]

Date: 1 Av 5763  
     July 30, 2003

Case No.: 3459/02

The severity of the acts of the Defendant is so great that it seems that words, however piercing, would fail to express the bad feeling experienced by one reading their description in the indictment.

We have repeatedly read during this trial, and in particular prior to its last proceeding, which is the sentencing, the description of the terrible acts of the Defendant, and the more we delved into it, the more we felt that, like all other members of human society, we were standing helpless, for there may be no punishment, however severe, that can turn back the wheel and restore the dead to life and the casualties to their health.

The Defendant served, from 1996 until his arrest, as the driver and bodyguard of Marwan Barghouti, who is the head of the Tanzim of the Fatah Organization. Within this capacity, the Defendant became the right-hand man of his employer, had close ties with the heads of the Al Aqsa Martyrs Brigades, the military arm of the Tanzim throughout the Area, and also served as the contact man between them and Marwan Barghouti.

But it would be natural, in view of this status, for the Defendant to quickly become the address for supplying materiel and weapons for terrorists who asked to carry out attacks against Israelis. In particular, the Defendant forged close ties with a number of operatives from the Ramallah area, who operated as a cell that carried out, with the active assistance of the Defendant, terrorist attacks on the roads of Jerusalem and on roads near it. Thus, the Defendant involved himself, initially in the murder of the late Elazar Akiva Fashkos, who was shot near the Atarot Industrial Zone on January 25, 2001; a month after that in the severe wounding of Yosef Cohen, in the Atara area; in causing the death of the late couple Sharon and Yaniv Ben-Shalom, the wounding of one of their girls, and the killing of the late Doron Yosef Sviri on August 25, 2001; on Highway 443, the murder of the late Meir Weisshaus and the severe wounding of his friend, Moshe Weiss, when they drove near the Ramat Shlomo neighborhood in northern Jerusalem on September 15, 2002; the injuring of Malka and Pinchas Cohen on October 3, 2001, when they drove on the same road; and the murder of the late Yoela Chen and the injury of Rachel Eini, when the two stopped at the fuel station near Givat Ze'ev. Between these incidents, the Defendant was involved, in an identical manner, in the firing of mortar bombs and automatic gunfire at the settlement Psagot, an attempt to carry out a shooting attack at French Hill and firing at a private vehicle on Begin Road in Jerusalem.

[Stamp] P 5: 213

The Defendant also provided the weapons that three other Tanzim operatives used to carry out a shooting attack on the Beit El- Psagot Road on March 17, 2002, in which attack Samir Karash was severely injured. Needless to say, in many of the cases, the Defendant acted with the knowledge and blessing of his commander, Marwan Barghouti.

But if initially the Defendant made do with extending logistic support to the murder cells of the Al Aqsa Martyrs' Brigades, it seems that these acts, however severe they were, were not sufficient to satisfy his wish for destruction. Therefore, the Defendant rapidly deepened his involvement in terrorism and became the originator, planner and executor of deadly suicide attacks.

It was early January 2002 when the Defendant approached a senior operative in the Al Aqsa Martyrs' Brigades from the Nablus area, Nasser Aweis, and asked him to transfer to his responsibility a person who wanted to carry out a suicide attack. A few days later, Sa'id Ramadan arrived and informed the Defendant that he had been sent to carry out such an attack; the Defendant made sure that the man was not in want of anything, provided him weapons and ammunition and arranged his transport by individuals who answered to him, while instructing him, having arrived in Jerusalem, on how to open fire at civilians with the intent of causing their deaths until he himself would be killed. At the end of the necessary preparations, the Defendant's men drove the suicide attacker to Jaffa Street in Jerusalem, where he fired dozens of rounds at passersby, resulting in the death of the late Ora Sandler and the late Sarah Hamburger and the wounding of more than 45 others.

[Stamp] P 5: 213 [continued]

Date: 1 Av 5763  
July 30, 2003

Case No.: 3459/02

A few days later, the Defendant found another candidate to carry out a similar suicide attack in Jerusalem. Consequently, the Defendant again started the necessary preparations. The Defendant contacted other operatives in the Al Aqsa Martyrs' Brigades with whom he was in contact, and concluded with them that they would transfer the suicide terrorist, who would be equipped with an M-16 assault rifle, to Jerusalem in order that he, too, could carry out such shooting. The Defendant provided his colleagues with a vehicle and they in turn set out in the company of the suicide terrorist with the blessing of the Defendant. Upon reaching the Shuafat area, the terrorist stated that he wanted to pray in a mosque before carrying out the attack. Consequently, he entered a mosque that was on the way and the drivers continued to the Givat Shaul neighborhood in order to find a suitable place for executing the attack. However, when they returned to pick up the attacker, they found that he had left the site.

This was not the only occasion on which the plans of the Defendant did not succeed from his perspective, and in February 2002 alone, the Defendant's attempts to send four more suicide terrorists failed after one of them absconded, two were arrested by the security forces and in another case, it was the fellow conspirators of the Defendant who were arrested.

However, the Defendant's killing spree was not over, and in mid-February 2002, he got his hands on another young man who expressed his willingness to carrying out a suicide attack. After the Defendant prepared him for executing this act, filmed him with a video camera, equipped him with an automatic weapon and a hand grenade and had him driven by his henchmen to the Neve Yaakov neighborhood in Jerusalem, the latter opened fire indiscriminately, resulting from which the late police officer Galit Arviv was killed when she rushed towards him, and eight other people were wounded.

Two weeks had not passed and another suicide terrorist, who had been dispatched by a Tanzim operative from Nablus, reached the Defendant. The Defendant also prepared him for his lowly task; after seeing to clothing and a haircut for him and filming him using a video camera, he sent him on his way armed with an automatic weapon and hand grenades and accompanied by his people, to whom he ordered that he be taken into the territories of the State of Israel. The city of Tel Aviv was chosen this time as the target. Upon arriving at the Sea Food Market restaurant, the transporters provided the suicide terrorist with a knife and let him out of the vehicle. The suicide terrorist threw the grenades, fired at the restaurant and stabbed civilians who were there. As a result of these acts, three people were murdered – the late Master Sergeant Salim Barakat, the late Yosef Habi and the late Eliyahu Dahan, and dozens more were injured.

[Stamp] P 5: 214

In early March, Nasser Aweis contacted the Defendant again and asked him to meet Louis Ouda, who had been discharged from the prison of the Preventive Security a short time earlier. In this meeting, Louis asked the Defendant to provide him with an explosive belt and find a lodging place for a suicide terrorist that he had. For his part, Louis saw to the transport of the suicide attacker to Jerusalem and set the possible objectives for an attack in the Ramat Eshkol neighborhood. The Defendant lodged the terrorist in an apartment that he had rented. On March 8, 2002, the Defendant provided him with an explosive belt and sent him, accompanied by another person, in a taxi towards Jerusalem. When they reached the Beit Hanina neighborhood, the two were stopped by Border Guard police and when the terrorist tried to detonate the explosive belt that he was wearing, he was shot dead by the security forces.

Later, the Defendant found another person who was prepared to carry out a suicide act, but the arrest of the Defendant and of Nasser Aweis, who was also involved in the planning of this attack, prevented it from being carried out.

The Defendant also traded in war materiel on a large scale, financed the manufacturing of explosive devices and lodged the two Hamas operatives who were behind the bombing attack of the Sbarro Restaurant in Jerusalem after they had been released from the prison of the Palestinian Authority, and these acts were also carried out with the knowledge, blessing and assistance of his commander, Marwan Barghouti.

[Stamp] P 5: 214 [continued]

Date: 1 Av 5763  
      July 30, 2003

Case No.: 3459/02

We are living in difficult times, and since the violent events erupted in September 2000, the hatred and killing that our enemies are spreading on roads and in cities have intensified. We are facing an enemy with no conscience that lusts after indiscriminate murder. This is how the Defendant acted when he started a carefully planned killing spree whose end nobody could see had he not been arrested by the security forces.

The Defendant headed a well-oiled killing machine, which he constantly fed, sometimes using technical assets only and sometimes using human fuel, with the sole aim of destroying, killing and exterminating Israelis wherever they are. The Defendant stooped to all measures, did not have mercy on anyone and exercised the tentacles of his notorious organization spread around the Area to enlist and to operate as many attackers as possible.

So intense was the will of the Defendant to attack innocent civilians – women, men and children – without mercy, that we doubt whether he is a human being or whether his thirst for bloodletting has reduced him to such a low level that he is no longer fit for this title.

The acts of the Defendant are no acts of heroism, as some of the residents of the Area may mistakenly think, but lowly acts of cowardice that sought to harm, time and time again, the most unprotected people of all without taking any risk, as he made cynical use of members of his own people.

An arch-criminal such as the Defendant, despite having not stained his own hands with blood, has no lesser and possibly greater culpability than those whom he dispatched to carry out attacks (and see the words of Maimonides, *With a Strong Hand, the Laws of Murderers and the Protection of Life*, Chapter B, Halacha B).

And we have already dealt extensively with the especial severity of the offense of murder, which we state as having:

> "... the destruction of the development of the world... and whoever has a hand in such a transgression is completely evil".
>
> **(Maimonides, *ibid*, Chapter D, Halacha H)**

[Stamp] P 5: 215

12

We must further emphasize, in accordance with the tradition of civilized man from days of antiquity, that unlike the Defendant, for us, the sanctity of life is a supreme value, which considers man to be a whole world, as a creation with wishes and desires, an opinion and view, ambitions, dreams as well as hopes and a vision, whose premature end is an unforgiveable crime. And it would be enough were we to mention the known statement of Hazal [Our Sages of Blessed Memory], whereby:

> **"For this reason was man created alone, to teach you that whosoever destroys a single soul, it is as though he had destroyed a complete world."**
>
> **(Sanhedrin Tractate, Folio 37)**

We have been constantly seeking in the case before us a single trace of humanity on the part of the Defendant, but our efforts have been to no avail. Depriving twelve innocent civilians of life and the defiance of the Defendant whereby he has no regrets for his actions have ended our attempts in this regard.

In view of that which has been set forth, we se no difficulty in granting the request of the military prosecution.

[Stamp] P 5: 215 [continued]

Date: 1 Av 5763                                                                             Case No.: 3459/02
       July 30, 2003

What has been done cannot be undone, but we cannot be able to stay indifferent to the the blood of our brothers calling out to us from the ground. In view of the terrible suffering that he has inflicted upon the victims, the casualties and their families, we may only ponder out loud whether it would be fitting to reward him an eye for an eye and bring an end to his life, whose adult portion was in part devoted to cruel destruction of human society.

This call, despite remaining merely theoretical in the current case in which the provisions of Section 47 (A) (8) of the Security Provisions Order, 5730-1970, prevent the full, fitting punishment of the Defendant, is not a single voice. In another instance, this Court pronounced as follows:

> **"Hard days are the days in which we live, centered by an increasing phenomenon of many people having sanctified the taking of life and transformed it from something taboo, lowly and abominable to something fitting and praiseworthy in their own eyes and also in the eyes of some of the public in the area. This transformation of values requires, in our opinion, rethinking of the foundations of sentencing doctrine that the Courts in the Area have employed.**
>
> **... Would it not be fitting, after hundreds of innocent civilians having lost their lives to criminals who lack any basic human emotion, to treat their murderers to the same fate?"**
>
> **(Beit El Case 3255/02)**

And the Military Court in Samaria also pronounced in the trial of the planners of the attack against the Park Hotel in Netanya as follows:

> **"We have asked ourselves foremost whether the time is not ripe to exercise the authority that is bestowed upon the Military Court by sentencing the Defendants to the punishment befitting the offense that they have committed – the death penalty.**

[Stamp] P 5: 216

14

> **... If this case does not justify inflicting the death penalty prescribed for it, what case would? It is time to examine, in the opinion of those judges, whether that which is set forth beside Section 51 has not become a "dead letter" (in more ways than one)".**
>
> **(Samaria Case 6115/02)**

We have therefore reached the view that universal human morality binds us, in view of the atrocity, to inflict upon the Defendant a punishment that will have a degree of eternity and retribution, and which will be akin, albeit on the tiniest scale, to the suffering and the cruel fate that were inflicted upon the victims and their families.

Only by imposing cumulative life imprisonment sentences can we adequately reflect the deprivation of the life of every person that was prematurely taken by the Defendant.

[Stamp] P 5: 216 [continued]

Date: 1 Av 5763                                                                                                                           Case No.: 3459/02
July 30, 2003

In view of our statements above, we have decided unanimously to sentence the Defendant as follows:

For the murder of **the late Elazar Akiva Fashkos**, life imprisonment.

For the murder of **the late Sharon and Yaniv Ben-Shalom**, two terms of life imprisonment.

For the murder of **the late Doron Yosef Sviri**, life imprisonment.

For the murder of **the late Meir Weisshaus**, life imprisonment.

For the murder of **the late Yoela Chen**, life imprisonment.

For the murder of **the late Ora (Svetlana) Sandler**, life imprisonment.

For the murder of **the late Sarah Hamburger**, life imprisonment.

For the murder of **the late police officer Galit Arviv**, life imprisonment.

For the murder of **the late policeman Salim Barakat**, life imprisonment.

For the murder of **the late Yosef Habi**, life imprisonment.

For the murder of **the late Eliyahu Dahan**, life imprisonment.

For the remaining offenses of which the Defendant has been convicted, life imprisonment.

In total we therefore sentence the Defendant to **13 terms of life imprisonment, to be served cumulatively.**

**Right of appeal within 30 days of today.**

**Handed down and announced this day, July 30, 2003, in public and in the presence of the parties.**

| [Signature] | [Signature] | [Signature] |
|:---:|:---:|:---:|
| **Judge** | **Presiding Judge** | **Judge** |

[Stamp] P 5: 217

16

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, et al.,

                Plaintiffs,

vs.

THE PALESTINE LIBERATION
ORGANIZATION, et al.,

                Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 5:210-17.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated bearing the bates number P 5:210-17.

Dated: March 6, 2014

                                                        Rina Ne'eman

ss.: New Jersey

On the _6_ day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
_6_ day of March, 2014

_____
Notary Public

LEONOR TROYANO
ID # 2385580
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/8/2014