

PLAINTIFF'S EXHIBIT 360

**Israel Defense Forces**

| | |
|---|---|
| Before the Military Court | Court Case: 6446/02 |
| in Samaria | Prosecution case: 756/02 |
| before a panel | Detailed incident case: 4968/02 Petach Tikva |
| | 4258/02 Yarkon |
| | 502/02 Zion |
| | 4685/02 Petach Tikva Station |

[Stamp]
The Military Court in Samaria
June 23, 2002
[illegible]

In the trial between:

**The military prosecutor**

- The Prosecutor -

- v. -

**Ibrahim Adnan Najib Abdel Hai**

(detained since June 3, 2002)

Identity No. 411124423, born on August 20, 1979, from the village Burin

- The Defendant -

**Indictment (Amended)**

The above mentioned Defendant is hereby accused of committing the following offenses:

**First count**:

**Nature of the offense:** Membership in an illegal organization, an offense pursuant to Regulations 84(1)(A) and 85(1)(A) of the Defense Regulations (Time of Emergency), 1945.

**Details of the offense**: The above mentioned Defendant, in the Area, during the course of the month of December 2000 or thereabouts, was a member of a military cell belonging to the Al Aqsa Martyrs Brigades, which is an illegal organization;

[Stamp] P 5: 218

Prosecution Case 444/02 Amended

2

In other words: the above mentioned Defendant, at the time that was set forth above, decided to join a military cell in order to engage in military activity against Israeli targets within the framework thereof.

For this purpose, the Defendant approached his colleague, Mohamed Ahmad Mustafa Alqassam (hereinafter – **Mohamed**), and informed him of his wish to engage in military activity. The above mentioned Mohamed told the Defendant that there was a military cell belonging to the Al Aqsa Martyrs Brigades, which carried out shooting and explosive device laying attacks against Israeli targets. Mohamed suggested that the Defendant join this cell, and the Defendant agreed to do so.

[Stamp] P 5: 218 [continued]

Prosecution Case 444/02 Amended

In addition to the Defendant, the members of this cell, which was known as the "Old City" cell, were: Mahdi Abu Gajala, Basel Albizra, Saad Jawabra, Kamal Shihab and Mueid Jamil.

The Defendant, three months from the day when he joined up with the above mentioned military cell, decided following a personal conflict that he had with one of the members of the cell, to discontinue his membership in this cell.

After the Defendant left the above mentioned cell, in March 2001 he encountered the military operative Raed al-Karmi. The Defendant asked Raed al-Karmi to engage in military activity with him.

Raed al-Karmi consented to the request of the Defendant and introduced to him a military operative of the Al Aqsa Martyrs Brigades, Nasser Aweis.

When the military operatives Mohamed Alqassam, Kamal Yusef Shihab, Assad Jawabra knew that the Defendant was working with Nasser Aweis, they asked him to join the cell to which the Defendant belonged. Nasser Aweis consented to their enrollment into the cell.

The membership of the Defendant in the military cell continued until the day of his arrest.

**Second count**:

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 19-20, 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, during October 2001 or thereabouts, attempted with another person to cause the intentional death of another person;

In other words, the above mentioned Defendant, at the time that was set forth above, in the evening hours, departed with his fellow cell members, Mohamed Alqasam, Kamal Yusef Shihab and Saad Jawabra, towards the Dir-Sharaf checkpoint in order to carry out a terrorist attack.

Nasser Aweis gave the Defendant approval to carry out the attack, and provided him with an M-16 rifle with two magazines.

The Defendant and his above mentioned colleagues traveled to the site of the checkpoint using a stolen Volkswagen type vehicle.

[Stamp] P 5: 219

Prosecution Case 444/02 Amended

When they arrived close to the checkpoint, 15 meters away from it, they turned their vehicle in the opposite direction, the Defendant and Mohamed Alqassam opened the rear doors and fired the rifles at the three soldiers who were standing at the checkpoint, while the vehicle in which he was sitting was heading towards Nablus.

The Defendant fired all of the cartridges that were inside the magazine towards the soldiers, and Mohamed Alqassam also fired all of the cartridges that were inside the magazine towards the soldiers.

The soldiers did not shoot back at first; but after the vehicle in which the Defendant was traveling was 300 meters away, the Defendant and his colleagues heard gunshots.

[Stamp] P 5: 219 [continued]

Prosecution Case 444/02 Amended

**Third count**:

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 19-20, 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, during 2001 or thereabouts, was an accomplice in an attempt to cause the intentional death of another person;

In other words, the above mentioned Defendant, at the above mentioned time, was requested by Mahmoud A-Titi, a military operative of the Al Aqsa Martyrs Brigades, organization, to participate in the execution of a shooting attack against an Israeli vehicle.

Mahmoud Titi told the Defendant that he had tracked the movement of a Subaru type vehicle that was being driven by an Israeli officer.

The Defendant agreed to the suggestion of Mahmoud Titi.

Accordingly, the Defendant, along with Mahmoud Titi, Kamal Shihab and Nasser Alhatib, waited in hiding near Rujeib Junction for the vehicle that was traveling from the Elon Moreh area towards Hawara.

The Defendant was armed with an M-16 type rifle, Nasser Alhatib was armed with a Kalashnikov, and Mahmoud Titi was armed with a machine gun, and Kamal Shihab was armed with an M-16 type rifle.

When the vehicle approached to a distance of approximately 200 meters from the site at which the Defendant and the fellow squad members were waiting, the Defendant fired about two rounds at it, Nasser Alhatib fired about 11 rounds and Mahmoud Titi fired about 10 rounds at it.

**Fourth count**:

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Section 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 19-20, 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, during January 2002 or thereabouts, participated in an attempt to cause the intentional death of another person;

[Stamp] P 5: 220

Prosecution Case 444/02 Amended

In other words, at the above mentioned time, Kamal Shihab and Mohamed Alqassam conducted surveillance of a mobile home in the Israeli settlement of Yitzhar. Kamal Shihab and Mohamed Alqassam learned from their surveillance that a person would come to the mobile home every day.

After conducting the surveillance, the Defendant conspired with Kamal Hatib , Kamal Shihab, Iad Hamdan, Mohamed Alqassam to carry out a shooting attack at the mobile home.

The Defendant devised the attack execution plan, and according to the plan, he was in charge of the cell during the execution of the attack.

The Defendant departed with the above mentioned gang, whose members were armed with M-16 type rifles, and English rifle, a Kalashnikov, towards the area of the settlement of Yitzhar.

[Stamp] P 5: 220 [continued]

Prosecution Case 444/02 Amended

When they arrived at the site, they waited on a hill that was approximately 300 meters away, overlooking the area.

After an hour, an open pickup type vehicle arrived at the mobile home, and three people alighted from it.

When the people approached the mobile home, the Defendant and his colleagues fired at them using the weapons in their possession. The Defendant fired approximately 10 rounds.

After the gunfire, the Defendant and his colleagues fled from the site.

**Fifth count**:

**Nature of the offense**: Causing intentional death, an offense under Sections 51(A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Section 14 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, in late February 2002, together with others, caused the intentional death of another person, as follows:

1. The above mentioned Defendant, at the above mentioned time, when he participated in the funeral of Mohamed Ahmed Mustafa Alqassam, attended Rafidia Hospital in Nablus, and during his stay there, Mohamed Burhan said that the late Zahir Turabi (hereinafter – **the Deceased**) was at the hospital. The Defendant told Mahmoud A-Titi about this.

2. After Mahmoud A-Titi heard about this, he abducted the Deceased from the hospital. Thereafter, Mahmoud A-Titi told the Defendant that he had questioned the Deceased about suspicions of collaboration with the State of Israel, and the Deceased confessed to this, and therefore [he] decided to murder the Deceased.

3. The Defendant asked Mahmoud A-Titi to meet him in the evening hours in order for him to take them to a suitable place at which he would murder the Deceased. The Defendant met again Mahmoud A-Titi, Mueid Jamil, Yasser Abu Bakhar, and the Deceased was with them. The Defendant and his colleagues drove, using a Volkswagen type vehicle, to the Engineers neighborhood near Jenid.

[Stamp] P 5: 221

Prosecution Case 444/02 Amended

4. At the above mentioned site, they took the Deceased out of the vehicle. The Defendant asked the Deceased to pray before they murdered him, but the Deceased refused. The Defendant asked him whether he would be prepared to murder the handler from the General Security Service who was responsible for him, but the Deceased refused to do so.

5. And then Mahmoud A-Titi and Mueid Jamil fired at the Deceased approximately 15 rounds, with the intent of causing his death. Thereafter, the Defendant approached the Deceased and fired one round into his head, in order to make sure that he was dead.

6. As a result of this, the death of the Deceased was caused.

[Stamp] P 5: 221 [continued]

Prosecution Case 444/02 Amended

7. The Defendant and his colleagues placed the "confession" of the deceased and a leaflet of the Al Aqsa Martyrs Brigades organization on his body.

**Sixth count**: **(Detailed Incident 502/02 Zion)**

**Nature of the offense**: Causing intentional death, an offense under Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in the Area, on January 22, 2002 or thereabouts, was an accomplice in causing the intentional death of another person, as follows:

1. During the course of his work in the Palestinian Naval Police, the Defendant met Sa'id Ibrahim Ramadan (hereinafter – "**Sa'id**"). During one of their meetings, Sa'id told the Defendant that he wanted to carry out a suicide attack, and the Defendant asked Sa'id to give him an opportunity to check out the matter.

2. The Defendant contacted Nasser Aweis and informed him of the intentions of Sa'id; and the former referred him to Mahmoud A-Titi. The Defendant met Mahmoud A-Titi and informed him of Sa'id's intentions. Mahmoud Titi asked the Defendant to check the sincerity of Sa'id's intentions.

3. The Defendant, with the aim of testing Sa'id, put a "dummy" explosive belt on him and gave him an imaginary telephone number, sent him from the Zawata area to the Tulkarm area, and asked him to call him when he arrived in the Tulkarm area. Said put on the explosive belt and started towards Tulkarm. The Defendant, who found that Sa'id was steadfast, asked him to return, on the pretext that the attack time had changed due to military checkpoints on the way. Sa'id was angry with the Defendant, who asked him to be prepared to carry out the attack at any time.

4. Accordingly, the Defendant contact Mahmoud A-Titi and told him that Sa'id was prepared to carry out the attack, and he asked the Defendant to have him meet Sa'id.

5. During that period, Ahmed Taleb Mustafa Barghouti (hereinafter – **Ahmed**) had contacted Nasser Aweis and asked him to send him a person who was prepared to carry out a suicide attack. Ahmed told Nasser Aweis that he himself would see to driving the suicide terrorist to Jerusalem in order for him to carry out the suicide attack.

[Stamp] P 5: 222

Prosecution Case 444/02 Amended

6. The Defendant brought Sa'id to the home of Mahmoud A-Titi, and in Mahmoud's home was a person called Yasser Abu Bakhar, and another person called Majed al-Masri. Mahmoud and Majed filmed Sa'id, and Yasser wrote Sa'id's will. Sa'id was filmed while holding an M-16 type rifle, a Koran and reading out his will.

7. Thereafter, the Defendant took Sa'id to his family, where he parted from them without informing them of his intentions of committing suicide.

8. Thereafter, the Defendant asked Sa'id to depart to Ramallah on the following day.

[Stamp] P 5: 222 [continued]

Prosecution Case 444/02 Amended

And in the morning of the following day, the Defendant noticed that Sa'id was departing for Ramallah.

9. On January 22, 2002, the above mentioned Sa'id met the above mentioned Ahmed in Ramallah and informed him that he had been sent by Nasser Aweis for the purpose of carrying out a suicide attack.

10. The above mentioned Ahmed called Mohamed Abed Rahman Salam Maslah (alias "Abu Satha") and asked him to come to him. Mohamed Maslah met Ahmed and Sa'id in Ramallah. Ahmed and Mohamed Maslah took Sa'id to a barber shop in order for him to have his hair cut before performing the planned suicide attack.

11. Thereafter, the above mentioned Ahmed and Mohamed Maslah called Fares Sadeq Mohamed Ghanem (alias "Hitawi") and asked him to drive a suicide bomber, referring to Sa'id, from Ramallah to Jerusalem in order for the suicide bomber to carry out a suicide attack there and cause the death of as many Israeli civilians as possible.

12. Fares Ghanem arrived in Ramallah along with Mohamed Sami Ibrahim Abdullah (hereinafter – **Mohamed Abdullah**), after the latter had agreed to participate in driving the suicide terrorist from Ramallah to Jerusalem. Fares Ghanem arrived at the meeting in an Isuzu pickup vehicle with Israeli license plates.

13. At the instruction of the above mentioned Ahmed, Fares Ghanem and Mohamed Abdullah traveled in the Isuzu vehicle from Ramallah to Jerusalem in order to find a route that had no police or IDF checkpoints, with the aim of driving the suicide terrorists later on the same route, to carry out the planned attack in Jerusalem.

14. Mohamed Abdullah and Fares Ghanem traveled from Ramallah through Rafat and arrived at the Atarot Industrial Zone; there the two returned to the main Jerusalem – Ramallah road and took a left to the junction leading to Rama Junction, where they turned right and drove to Adam Junction. At Adam Junction the two turned right and traveled to Hizma junction, where they turned right and entered Anta. Through Anta, they arrived at the French Hill junction, where the two turned right and returned to Ramallah.

[Stamp] P 5: 223

Prosecution Case 444/02 Amended

       Mohamed Abdullah and Fares Ghanem saw that via the route that they had traveled, they could drive the suicide terrorist to Jerusalem without being stopped at police or IDF checkpoints.

15. Mohamed Maslah, at the instruction of Ahmed, brought an M-16 assault rifle and 3 magazines for the above mentioned assault rifle, filled with cartridges, two of the magazines being connected by a magazine coupler ("jungle clip").

16. On the same day, Ahmed, Mohamed Maslah and Sa'id met Mohamed Abdullah and Fares Ghanem in the area of the City Inn Hotel in Al Bira. Ahmed introduced Mohamed Abdullah and Fares Ghanem to the above mentioned Sa'id.

17. Ahmed explained to Mohamed Abdullah and to Fares Ghanem that Sa'id was the suicide terrorist, whom they had to drive to Jerusalem in order for him to carry out the suicide attack there by shooting at Israeli civilians with the aim of causing the death

[Stamp] P 5: 223 [continued]

Prosecution Case 444/02 Amended

of as many civilians as possible.

18. Mohamed Abdullah and Fares Ghanem hid the above mentioned M-16 assault rifle and magazines in the above mentioned Isuzu vehicle.

19. Mohamed Abdullah and Fares Ghanem drove Sa'id to Jerusalem via the route that they had checked out earlier that day, as described above.

20. In Jerusalem, Mohamed Abdullah and Fares Ghanem traveled to Sheikh Jarah Street. There, they took out the M-16 assault rifle and the magazines that were hidden inside the vehicle and handed them over to Sa'id, and continued driving towards Hanevi'im Street. Upon reaching the junction of Strauss and Hanevi'im Streets, the two stopped the Isuzu vehicle.

21. Mohamed Abdullah and Fares Ghanem told Sa'id to alight on foot to Jaffa Street and start shooting wherever he would see many people.

22. After Sa'id alighted from the vehicle, at the above mentioned site, with the M-16 and the ammunition, Mohamed Abdullah and Fares Ghanem drove away in the Isuzu vehicle, through the Musrara neighborhood to Highway No. 1, and from there traveled through the main road to Ramallah. At the same time, a few minutes later, Sa'id arrived at Jaffa Street, armed with the M-16 assault rifle and the ammunition.

23. At about 4:20 p.m., while standing opposite Building No. 47 in Jaffa Street or thereabouts, Sa'id Ramadan loaded the M-16 assault rifle that he was carrying, shouted "Allahu Akbar" and discharged automatic gunfire indiscriminately at the people who were on Jaffa Street, at the bus stop at the site, aboard the No. 27 Egged bus that was at this stop at the time and at the people who were within the stores nearby with the aim of causing the death of as many people as possible. Sa'id Ramadan, while continuing to fire, fled from the site towards the parking lot on Harav Kook Street. There, Sa'id Ramadan changed magazines and continued to shoot at civilians with the aim of causing their death. Sa'id Ramadan fired through the M-16 assault rifle that he carried more than 38 cartridges. Sa'id Ramadan continued to shoot at civilians until he was killed by civilians and policemen who arrived at the site.

24. By his acts as described above, the above mentioned Defendant caused the intentional death of **the late Ora (Svetlana) Sandlar**, who died as a result of gunshot wounds caused by the bullets that were fired by the aforementioned Sa'id.

[Stamp] P 5: 224

Prosecution Case 444/02 Amended

**Seventh count**: **(Detailed Incident 502/02 Zion)**

**Nature of the offense**: Causing intentional death, an offense under Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in and outside of the Area, on January 22, 2002 or thereabouts, was an accomplice in causing the intentional deaths of other persons;

[Stamp] P 5: 224 [continued]

Prosecution Case 444/02 Amended

In other words, by the actions of the Defendant described in the previous count of the indictment, **the late Sarah Hamburger** died, having succumbed to the gunshot wounds from the bullets that were fired by Sa'id Ramadan.

**Eighth count**: **(Detailed Incident 502/02 Zion)**

**Nature of the offense**: Attempt to cause intentional death, an offense pursuant to Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Sections 19-20, 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in and outside of the Area, on January 22, 2002 or thereabouts, was an accomplice in attempting to cause the intentional death of others.

In other words, as a result of the attack described in the previous count of the indictment, the Defendant attempted to cause the death of others. As a result of the attack, more than 45 civilians who were at the site were slightly to severely injured.

**Ninth count**: **(Detailed Incident 4258/02 Yarkon)**

**Nature of the offense**: Causing intentional death, an offense under Sections 51(A) and 7(C) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 14 and 2 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense**: The above mentioned Defendant, in and outside of the Area, on March 5, 2002 or thereabouts, was an accomplice in causing the intentional death of others, as follows:

1. At the above mentioned time, Ibrahim Hasouna approached the Defendant and informed him of his wish to carry out a suicide attack. The Defendant, with the aim of examining the sincerity of the intentions of Ibrahim Hasouna, sent him with a "dummy" explosive belt, took him to the Zawata area, gave him a telephone number and told him to call to let him know when he would reach the Tulkarm area.

2. After the Defendant made sure of the sincerity of the intentions of Ibrahim, they asked him to return and told him that the time of the attack had been deferred. The Defendant took Ibrahim Hasouna to the home of Mahmoud A-Titi, where they filmed him with a video camera.

[Stamp] P 5: 225

Prosecution Case 444/02 Amended

Ibrahim Hasouna read out a will in which he said that the attack was revenge for the death of Mohamed Alqassam and Raed al-Karmi.

3. During that period, Ahmed Taleb Mustafa Barghouti (hereinafter – **Ahmed**) called Nasser Mahmoud Aweis by telephone, and during the call Nasser Aweis informed the above mentioned Ahmed that he was sending him an additional suicide terrorist in order for Ahmed to send him into the State of Israel for carrying out a shooting attack.

4. The Defendant took Ibrahim Hasouna to a place in which he often slept in the Almahfia area. On the following day, on March 4, 2002, he sent him to Ramallah, gave him a telephone number, and asked him to call him once he arrived in Ramallah. Ibrahim Hasouna did so, when he arrived in Ramallah.

[Stamp] P 5: 225 [continued]

Prosecution Case 444/02 Amended

5. Ibrahim Hasouna contacted the above mentioned Ahmed, and told him that he had arrived in Ramallah according to the instruction of Nasser Aweis and that he was the suicide attacker for the purpose of carrying out the planned suicide attack.

6. Ibrahim Hasouna boarded the vehicle, which Mazen Alkadi was driving, with Murad Ajluni sitting beside him, and the three drove towards Tel Aviv, in order to carry out the planned suicide attack there.

7. On that night, after Mazen Alkadi, Murad Ajluni and Ibrahim Hasouna arrived in Tel Aviv, near Ma'ariv Bridge on Petach Tikva Road, Murad Ajluni showed Ibrahim Hasouna a crowded place and instructed him to carry out the planned attack there.

8. Ibrahim Hasouna took out the above mentioned M-16 assault rifle, magazines and hand grenades, which were concealed in the door of the vehicle.

9. At about 2:15 a.m., on March 5, 2002 or thereabouts, Ibrahim Hasouna, who was armed with the above mentioned M-16 assault rifle, hand grenades and commando knife, alighted from the vehicle near the Seafood Market restaurant (hereinafter – **the Restaurant**) in order for him to carry out the planned attack. At the same time, Murad Ajluni and Mazen Alkadi drove away from the site in the vehicle towards Jerusalem.

10. Ibrahim Hasouna approached the Restaurant and discharged automatic gunfire from the M-16 assault rifle at the occupants of the Restaurant and passersby in Petach Tikva Road with the intent of causing their death.

11. Thereafter, Ibrahim Hasouna threw the two hand grenades at the Restaurant with the intent of causing the death of the occupants of the Restaurant and passersby, but the hand grenades did not detonate.

12. After the M-16 assault rifle, which Ibrahim Hasouna carried, stopped firing due to a stoppage, Ibrahim Hasouna took out the above mentioned commando knife that he was carrying and started to stab Israeli civilians who were at the site with the intent of causing their death.

[Stamp] P 5: 226

Prosecution Case 444/02 Amended

18

13. The late policeman Master Sergeant Salim Barikat arrived at the said site, rushed at Ibrahim Hasouna and overpowered him. The late Master Sergeant Salim Barikat had the chance to inform his commanders that he had overpowered the terrorist.

14. At this stage, Ibrahim Hasouna stabbed the late Master Sergeant Salim Barikat using the above mentioned commando knife with the intent of causing his death. As a result of the stab wound, the late Master Sergeant Salim Barikat died at the site.

15. By his acts described above, the above mentioned Defendant caused the intentional death of **the late Master Sergeant Salim Barikat.**

[Stamp] P 5: 226 [continued]

Prosecution Case 444/02 Amended