Felony Case (Tel Aviv) 1137/02              State of Israel v. Nasser Mahmoud Ahmad Aweis

according to Yasir's statement, the vehicle was not hit." In response to a question as to additional terrorist attacks in which Yasir was involved on behalf of the *Kitaab Shuhadaa al-Aqsa*, the Defendant stated: "The terrorist attack in Hadera which was carried out by Said Ramadan … terrorist attacks which were carried out in the Nablus area …"

These facts, in and of themselves, constitute an unimpeachable sign of the accuracy of the assertions made to the police, and accordingly, those assertions should be given considerable weight.

We have found an additional sign of the accuracy of his assertions, in the conflicting versions given by the witness Abu Bakr in court with regard to another assertion which, according to his assertions, had been written down in his own handwriting.

This is a manuscript in Arabic, concerning which Abu Bakr, in his statement P/47A, on page 4, had been asked the following question: "I am showing you a manuscript in Arabic (a total of 10 yellow pages, which I got from the person known as 'Bassam'). Is this your handwriting?

A.    Yes, this is my handwriting and I wrote what I have just told you now in the testimony."

On the other hand, in response to a question by the prosecuting attorney: "Q. I am showing you a statement, which was attached to the statement dated April 15, which is a statement in your handwriting, 10 pages," he replied: "They dictate to people [and make them] write against their will. Take them to court, not us."

[Stamp] P 5: 250 [continued]

Nevo Publishing Ltd.         nevo.co.il     The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02                State of Israel v. Nasser Mahmoud Ahmad Aweis

In response to the question, "Q. That is not your handwriting?" he replied: "That is the handwriting of the Israel Security Agency officers. They wrote those things." Generally speaking, his answers to similar questions were as follows: "Q. Are these things which you wrote yourself? A. When you have tea spilled on you, when you are left for four or five days with no food and no sleep, then you say things just to get out of it. Q. Did you write these things? A. I have an attorney. You have to see how the Israel Security Agency treats people. Q. Do you recognize the handwriting? A. I do not want to answer you. You act like them and you shout at me (answers in Hebrew and English)."

### Summary thus far

We have repeatedly clarified that all of the rules which must be fulfilled in order for the assertions made by the Defendant's accomplices out of court to qualify as evidence under Section 10A of the Evidence Ordinance have been fulfilled. (The above mentioned rules include proving the assertions under law, giving the Defendant an opportunity to examine the witnesses, and the question of whether the testimony in court is substantially different from the words recorded in the statements).

We considered the matter with the requisite care, and we give preference to the assertions made by the four witnesses, the Defendant's accomplices, to the police, over their testimony in the courtroom.

Testimony which requires a supplement may itself serve as a supplement of any kind for any other testimony which requires a supplement. Accordingly, the assertions by the four accomplices can constitute an additional "item" corroborating the Defendant's admissions out of court.

(See Kedmi, *On Evidence*, Part 1; Criminal Appeals 6147/92, State of Israel v. Yosef Cohen, PD 48 (1) 62; Criminal Appeal 6214/94, State of Israel v. John Doe, *Supreme Court Rulings*, Volume XXXVIII, 665; Criminal Appeal 5249/98, State of Israel v. Mirilashvili, PD 53 (3) 550.)

Each of these assertions, including assertions made by one or more of the Four in writing – which should be considered as an integral part of those statements, accordingly (see Criminal Appeal 6411/98, Manbar v. State of Israel, PD 55 (2) 150) – may be relied upon as corroborative evidence, in the form of an additional "item," to be added to other evidence brought against the Defendant, in the form of his own admissions.

As [the Four were] the Defendant's accomplices, and pursuant to the provisions of Section 54A (a) of the Evidence Ordinance, we were required to find "something to reinforce" their testimony.

We were also required to find such a reinforcement pursuant to the provisions of Section 10A (d) of the Evidence Ordinance, which instructs us that a person shall not be

[Stamp] P 5: 251

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

convicted on the basis of an assertion received pursuant to Section 10A of the Evidence Ordinance "unless the evidentiary material contains something to reinforce it."

If we consider the nature of the requirement for reinforcement (the term used is identical in the context of both of the above mentioned sections), it consists of supplementary evidence which verifies [the testimony in question], rather than evidence which embroils [the Defendant]. The reinforcement need not be an independent item of evidence; it may arise from the testimony which requires reinforcement.

We have found such reinforcement, even in excess of that required, in the embroiling evidence which arose from a separate and independent source, as follows:

The Defendant's full confession before the judge in arrest court.

The assertions made by each of the four accomplices with regard to the assertions made by his fellows.

[Stamp] P 5: 251 [continued]

Felony Case (Tel Aviv) 1137/02                State of Israel v. Nasser Mahmoud Ahmad Aweis

The Defendant's choice to remain silent and to refrain from testifying in the trial, against the background set forth above and against the background of the line of defense selected by the Defendant (which we discussed at the beginning of this ruling), which, in and of itself, constitutes evidence which may stand as corroborative evidence, pursuant to Section 162 of the Criminal Code Law, 5742-1982, which states that "a defendant's refraining from testifying is likely to constitute a reinforcement of the weight of evidence for the prosecution, as well as corroboration of the evidence for the prosecution, where such evidence requires corroboration.."

As a *corpus delicti* has been found for us (see the testimony by Witness No. 1 for the prosecution, Brigadier General Moshe Waldman, Witness No. 2 for the prosecution, Brigadier General Aharon Franco, Witness No. 3 for the prosecution, Commander Haggai Dotan, Witness No. 4 for the prosecution, Brigadier General Uri Barlev, Witness No. 8 for the prosecution, Uriel Eliyahu, Witness No. 9 for the prosecution, Staff Sergeant Shai Cohen, Witness No. 10 for the prosecution, G.M., Witness No. 11 for the prosecution, Leon Gorenstein, Witness No. 12 for the prosecution, Konstantin Kardashoff, Witness No. 13 for the prosecution, Adi Maroz, Witness No. 14 for the prosecution, Ben Naim Hanan, Witness No. 15 for the prosecution, Noam Gabbai, Witness No. 16 for the prosecution, Sergeant Major Rami Malka, Witness No. 17 for the prosecution, Efi Yamin, Witness No. 18 for the prosecution, Chief Superintendent Farid Ghanam, Witness No. 19 for the prosecution, Tal Vermot, Witness No. 20 for the prosecution, Superintendent Yehuda Peretz, Witness No. 22 for the prosecution, Avi Ben Ami, Witness No. 24 for the prosecution, Shimon Lugasi, Witness No. 26 for the prosecution, Asaf Azulai, Witness No. 27 for the prosecution, Amir Sher; and see Exhibits P/1 through P/4 inclusive, P/21, P/21A, P/24 through P/37 inclusive, P/48, P/49, P/52 through P/79 inclusive), as the Defendant did not deny the actual making of the admissions before the persons taking his statements or before the Honorable Judge in arrest court, and as the Defendant even confessed again, fully and willingly, before the judge in arrest court, to all of the actions imputed to him, and understood what he was doing and making that confession, and as we have found that the internal weight of his confessions is heavy, the weight required for the additional "item" which is needed in order to verify them is accordingly reduced.

And now, even with regard to the additional item (which, from the standpoint of its purpose, is only intended to show that the Defendant did not invent his statements out of thin air, and is accordingly not required to constitute corroborative evidence which embroils the Defendant, and may consist of confirmatory evidence only), we have found that it, too, has a real weight of its own and easily complies with the more stringent requirement, as it embroils the Defendant in the perpetration of the offenses imputed to him, comes from a separate and independent source, and refers to a real point which is in dispute.

**Offenses Against the Prevention of Terrorism Ordinance and Conspiracy**

[Stamp] P 5: 252

Felony Case (Tel Aviv) 1137/02         State of Israel v. Nasser Mahmoud Ahmad Aweis

In accordance with a pronouncement pursuant to Section 8 of the Prevention of Terrorism Ordinance, 5708 – 1948, it has been ruled that the Tanzim is a "terrorist organization," as this term is defined in Section 1 of the Ordinance (Compendium of Publications (5762 [2001-2002]), p. 800, dated December 6, 2001.

According to expert opinions which were filed with no objection by the Defendant and his defense attorney (P/50, P/51), the following (among other things) was stated: "From the beginning of the violent incidents in the 'territories,' which began in September 2000, the Tanzim played a major and leading role in the perpetration of terrorist activity. Activists in the organization carried out terrorist attacks in various formats, including acts of mass slaughter, within Israel and in Judea and Samaria … The terrorist organizations of the Tanzim in the Gaza Strip and in Judea and Samaria (which, at times, were joined by additional entities in the field) began (in November 2000) to use the name 'al-Aqsa Martyrs' Brigades' [*Kitaab Shuhadaa al-Aqsa*], especially for the purpose of taking responsibility for terrorist attacks against Israeli targets …

In the course of the violent confrontations, the 'Brigades' took responsibility for many terrorist attacks which were perpetrated in various formats in the 'territories' and within the confines of the 'Green Line,' including lethal terrorist attacks. The terrorist organizations of the 'Brigades' are responsible for thousands of shooting attacks and explosive charges on bypass roads in Judea and Samaria, and for scores of acts of mass slaughter within Israel, in which scores of Israeli were killed … The major characteristics of the acts of mass slaughter include the focus by the perpetrators on crowded places (downtown areas and public places which constitute a source of attraction for the general public, such as cafes and restaurants, bus stops, shopping centers and the like) and the performance of suicide bombings (by means of an explosive belt or an explosive charge carried by the perpetrators arriving on the scene) and sacrifice attacks (terrorist attacks in which the perpetrator's chances of escape are slim; in most of the terrorist attacks in this format, the perpetrators have used assault rifles of various types), in which many scores of Israelis were killed …"

[Stamp] P 5: 252 [continued]

Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

The Defendant said, in his statements, that: "After the outbreak of the al-Aqsa intifada, I started to carry out terrorist attacks against Israeli targets, because of the conquest of the Palestinian land … After that, I decided to perpetrate shooting attacks and additional terrorist attacks against Israeli targets in the West Bank and within the Green Line. The terrorist attacks which I perpetrated are as follows:

1. I carried out a shooting attack directed against a guard post of the Israeli army near Joseph's Tomb in Nablus, and that was about two weeks before the army withdrew from the tomb.

2. I carried out a shooting attack directed against a military position on Mt. Gerizim in Nablus …

3. I carried out a shooting attack directed against military vehicles in the vicinity of the Hawara camp, near Nablus.

4. I carried out a shooting attack directed against military vehicles in the vicinity of Nablus, on the west side, near Zuata.

5. I gave hand grenades to two people in order to carry out a terrorist attack in Jerusalem.

6. I gave weapons for the perpetration of a terrorist attack in Netanya …

9. I gave weapons for the perpetration of a terrorist attack in Hadera.

10. I gave weapons for the perpetration of a shooting attack, a sacrifice attack which was supposed to be carried out in Hadera, but the attack did not succeed and the people were killed in the vicinity of Baqa al-Gharbiya.

11. I supplied Said Ramadan with weapons for the perpetration of a suicide attack within Jerusalem.

12. I supplied Abd al-Salaam Hasuna with weapons for the perpetration of a suicide attack within Hadera.

13. I supplied Abd al-Rahman Abdallah with two explosive charges + a Kalashnikov…

14. I supplied Majdi Halus with an explosive charge, which he placed on the road … against an Israeli patrol."

The Defendant answered the questions listed below in the following manner:

[Stamp] P 5: 253

32

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

"Q.    On whose behalf did you carry out the terrorist attacks which you noted above?

A.    On behalf of *Kitaab Shuhadaa al-Aqsa*, which belongs to the Fatah.

Q.    Who is in charge of the Fatah?

A.    Yasser Arafat is in charge, and he is the chairman of the Fatah movement.

Q.    Who is in charge of the Tanzim Fatah?

A.    The secretary of the Fatah movement in the West Bank, Marwan Barghouti …

Q.    Who do the *[Kitaab] Shuhadaa al-Aqsa* belong to?

A.    The *[Kitaab] Shuhadaa al-Aqsa* belong to the Fatah and the Tanzim Fatah.

Q.    What is your relationship with the secretary of the Fatah movement in the West Bank, Marwan Barghouti?

A.    My relationship with Marwan Barghouti, the secretary of the Fatah movement, began in 1992, when we lived in the same neighborhood in Amman, when we were deported by the Israeli authorities, and Marwan came back to the West Bank in about 1994, and I came back in 1995. When I came back to the West Bank, my contacts with Marwan were renewed, and I used to meet with Marwan in the Tanzim office in Nablus. I would also meet with him in the office in Ramallah, and after the outbreak of the al-Aqsa intifada, I continued to be in contact with Marwan Barghouti. We used to organize demonstrations on behalf of the Tanzim Fatah, and we used to distribute posters on behalf of the (Organizational) Coordination Committee [*al-Fasali*]. The people in charge of the Committee were Yusuf Harb on behalf of the Fatah and Jamal Salim on behalf of Hamas, and after he died, another person was given that position. The Chairman of the Committee was Yusuf Harb, and Marwan Barghouti was a member of the Supreme Coordination Committee, and the Supreme Committee used to guide the Organizational Coordination Committee [*al-Fasali*] …

[Stamp] P 5: 253 [continued]

33

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

Q.   Who used to provide the money for the perpetration of terrorist attacks against Israeli targets?

A.   People in the Tanzim Fatah, in the West Bank and in Lebanon, used to provide me with money.

Q.   Who are the people who provided you with money for the purpose of purchasing weapons, in order to perpetrate terrorist attacks against Israeli targets?

A.   I took 12,000 shekels from Majed al-Masri, and I took 8000 shekels from Assam Abu Bakr as expenses, and I received from Munir Maqadah in Lebanon, I received $50,000.

Q.   What does Majed al-Masri do for a living?

A.   [He is] an officer in the Palestinian police in Nablus and a member of the Fatah.

Q.   What does Assam Abu Bakr do for a living?

A.   [He is] in charge of the Fatah movement in Nablus and affiliated with Marwan Barghouti.

Q.   What does Munir Maqadah do for a living?

A.   [He is] in charge of the Fatah in Lebanon and affiliated with Yasser Arafat.

Q.   Was there contact between you and Marwan Barghouti?

A.   I was in contact with Marwan Barghouti al the time.

Q.   Did Marwan Barghouti know that you were carrying out terrorist attacks against Israeli targets?

A.   Yes, he knew, and my name was even published in the press and on television and on the radio. I used to talk with him from time to time, and when the political situation deteriorated and we were in a bad way, he would ask us to continue the terrorist attacks. When Shimon Peres and Omri Sharon met with leaders in the Authority, Marwan Barghouti called me and asked us to stop the terrorist attacks, and I answered him that we would do that. During that period of time, Zini was in the area and Marwan told me that for the time being, because General Zini was meeting with leaders in the Authority, we should not carry out terrorist attacks in the name of [Kitaab] Shuhadaa al-Aqsa. I should note that, when the talks were progressing, no terrorist attacks were carried out.

[Stamp] P 5: 254

34

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

    Q.    Who used to finance Assam Abu Bakr, the one who used to provide you with money for the purchase of weapons?

    A.    Assam Abu Bakr would take money from the Fatah movement, from the budget which was authorized by the Chairman of the Fatah movement, Yasser Arafat.

    Q.    Who used to finance Majed al-Masri, the one who used to provide you with money for the purchase of weapons in order to carry out terrorist attacks against Israeli targets?

    A.    Majed al-Masri told me that he took money from Marwan Barghouti, and Majed was aware of, and participated along with me in, a number of shooting attacks against Israeli targets …

    Q.    Did Marwan Barghouti provide you with money directly?

    A.    Yes, Marwan Barghouti finances [sic] me twice. The first time, he transferred NIS 3,000 to me by means of a deposit in the bank, and the second time, he transferred NIS 5,000 to me by means of a deposit.

    Q.    Did Marwan Barghouti know that you were carrying out terrorist attacks against Israeli targets?

    A.    Yes, he knew, and as I have already stated, my name was even published in the press, and the Israeli authorities told the Palestinian Authority that I was wanted for terrorist attacks, and my name was also published in the Hebrew press and in the local press in the West Bank and the Gaza Strip.

    Q.    Did Marwan Barghouti assist you in providing money, aside from what you have already stated?

    A.    Yes. Once I received a check for NIS 2,300 from him, authorized by Chairman Arafat …" (See the Defendant's statement, P/5)

In addition, he answered questions (P/6) in the following manner:

[Stamp] P 5: 254 [continued]

35

Case 1:04-cv-00397-GBD-RLE   Document 907-93   Filed 05/13/15   Page 10 of 13

Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

"Yes, I had several *noms de guerre* while I was carrying out the terrorist attacks, such as al-Aam, al-Hajj, al-Sheikh, al-Kabir ... and also I took ... two old [anti-]tank missiles in order to take the explosives out of them and to use the explosives to make explosive charges, and I used the explosive charges on the bypass road at Zuata ... I recruited him (the reference is to a person named Luay Odeh) into the *Kitaab Shuhadaa al-Aqsa*, about two months ago, and the purpose of recruiting him into the *Kitaab Shuhadaa al-Aqsa* was in order for him to assist us in terrorist attacks in the Jerusalem area, and in order for him to introduce suicide attackers [*mustashahids*] into Jerusalem. I also asked Luay to teach us how to manufacture explosives that were stronger than the explosives we were using, and Luay explained to me over the phone how to produce a certain material [*umm al-abd*], and I told him that we already know how to produce *umm al-abd* ... About a month and a half ago, I asked Luay to check out a way of introducing a suicide bomber into Jerusalem ... and my role was to coordinate between Mahmoud and Luay, in order to introduce the suicide attacker into Jerusalem. That terrorist attack was carried out, but without success, because policemen shot the suicide attacker before the terrorist attack ... Jazi Husseini asked me to agree to accept a call from a certain person, and a few days after that, Munir Maqadah, who is known as Abu Hussein, called me and asked us to continue perpetrating terrorist attacks and offered me financing, and I expressed my consent, and I gave Abu Hussein my bank account number in the Arab Bank in Nablus, in order for him to transfer money to me. In fact, Abu Hussein transferred money to me about six times, and deposited $3,000 or $5,000 ...

Q.     What did you do with the money that Munir Maqadah transferred to you?

A.     In order to perpetrate terrorist attacks ... According to the agreement with him, he used to provide me with money for the perpetration of terrorist attacks, and I would report to him on the attacks in conversations which I held with him by telephone and over the Internet ... I spoke with him about many terrorist attacks ... and I also reported to him on the suicide attack in Jerusalem and in Hadera, which we carried out ...

Q.     What military connections existed between you and Yasir Abu Bakr?

A.     After the outbreak of the al-Aqsa intifada, Yasir Abu Bakr enlisted in the *Kitaab Shuhadaa al-Aqsa*, and I asked Yasir to participate in terrorist attacks with us, and Yasir agreed to the proposal. I gave him an M-16 weapon, and Yasir carried out a shooting attack with the weapon which I gave him. The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and according to Yasir, the vehicle was not hit ...

Q.     Did Yasir have any contact with suicide bombers?

A.     Yes, Yasir and I worked together to send out suicide attackers with Mahmoud Titi and Ahmad Abu Khadr ... If we needed anything, such as photographing the suicide bombers or distributing posters, we would use Yasir. About two weeks before the army came into Nablus, I

[Stamp] P 5: 255

36

Nevo Publishing Ltd.      nevo.co.il      The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

asked Yasir to try to obtain an explosive belt for a suicide bomber, in order to carry out a terrorist attack within Israel. Yasir, in fact, brought an explosive belt, and we gave it to a suicide bomber, who traveled with another person in order to perpetrate a terrorist attack in Israel, and when he got to Baqa al-Gharbiya, soldiers shot at him and they were both killed …

[Q.]   What kind of vehicle did the suicide attackers travel in?

A.   I do not know, but I gave Ahmad NIS 3,500 in order for him to buy a stolen car to transport the suicide attackers, and Ahmad went with them to Tulkarm and showed them the way and came back by public transportation …"

In his statement, P/7, he answered questions as follows:

"… And Mahmoud contacted me about this, because we are a military squad, and I expressed my consent to that terrorist attack … It should be noted that Ahmad Abu Khadr contacted me, because I am in charge of *Kitaab Shuhadaa al-Aqsa* … and after I heard on the radio that they were killed, I called the media and I told them that this terrorist attack was carried out by *Kitaab [Shuhadaa] al-Aqsa* … but when I announced that we were taking responsibility for the terrorist attack, Mahmoud told me the names … I was also involved in the shooting attack in Netanya which was perpetrated by suicide attacks – I do not know their names. Two days before that terrorist attack, Ahmad Abu Khadr called me and told me that he could bring two people into Israel, in order for them to carry out a suicide action, and I called Mahmoud Titi and asked him if he could bring in suicide attackers and he answered in the affirmative. I gave Ahmad two grenades and Mahmoud Titi gave them two M-16 weapons, and Ahmad Abu Khadr photographed them and explained to them about the terrorist attack … Several hours later, we heard on television that fire had been exchanged between the suicide attackers and police forces near a hotel in Netanya, and that civilians

[Stamp] P 5: 255 [continued]

37

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

and policemen had been wounded in the attack, and two people had been murdered, and two others had been killed by the police. I called the media and took responsibility for the terrorist attack …"

And in statement P/8:

"Q.   Did you have contacts with Abd al-Karim Aweis?

A.   Yes … and I made contact with him and asked him to carry out military operations …

Q.   What did Mahmoud do with the explosive charges which you gave him?

A.   For terrorist attacks, and I do not remember where the attacks were carried out.

Q.   Do you know a man named Majdi Samir Halus?

A.   I know him … He asked me for an explosive charge, so as to carry out a terrorist attack on an Israeli military patrol, and I agreed, and I gave him an explosive charge which I had received …

Q.   Do you know a man named Hathem Abu Khadr?

A.   … and I took about 20 pistols and 20 Kalashnikov rifles from Hathem, through Ahmad, and … an M-16, and I used to pay for those weapons out of my own money …"

In his confession before the judge in arrest court, and as may be seen from the offenses imputed to him in the petition to extend the arrest order (P/23), the Defendant confessed to membership in a hostile organization, *Kitaab Shuhadaa al-Aqsa*, which belongs in Tanzim Fatah; participation in shooting attacks directed against Israeli targets in Samaria; involvement in recruiting suicide bombers; and sending them into Israel – suicide bombers who perpetrated murderous terrorist attacks. He also confessed to recruiting additional activists for the perpetration of terrorist attacks and the manufacture of explosives and explosive charges.

A witness for the prosecution, Ahmad Abu Khadr, sets forth in his statement, P/12: "I confess that, during the month of April 2001, Nasser Aweis proposed that I enlist in *Kitaab Shuhadaa al-Aqsa* and I agreed to that proposal, and since then, I have been an active member in the *[Kitaab] Shuhadaa al-Aqsa* organization, which belongs to Tanzim Fatah, and [I am still a member] to this day. After I joined that organization, Nasser Aweis asked me to distribute posters on behalf of *[Kitaab] Shuhadaa al-Aqsa*, and I did it … and after that, I started to be involved in military activity. I participated in shooting attacks directed against the army, and I participated in laying explosive charges, and I also participated in preparing a number of suicide bombers and sending them to Israel to carry out suicide bombings … Nasser Aweis is a resident of the Balata camp; he is about 29 years old and is also known as al-Hajj Rawaq, and he

[Stamp] P 5: 256

Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

is one of the people in charge of the *Kitaab Shuhadaa al-Aqsa*, and he was my superior in the organization, and Nasser works for the National Security in Nablus and belongs to Tanzim Fatah … The members of the group which I joined in *Shuhadaa al-Aqsa* are 1. Nasser Aweis – who was in charge of the *Kitaab Shuhadaa al-Aqsa* …"

In his statement, P/13, Abu Khadr states as follows: "I confess that, during the month of March, about a month ago, Nasser Aweis asked me to transport a suicide bomber from Nablus … in a stolen Pontiac which I received from Nasser … I notified Amar that I do not know how to manufacture explosive charges, and therefore I took him to Nasser Aweis in the Balata camp and I asked Nasser to get hold of two explosive charges for him, and then Nasser called Mahmoud Titi … About an hour later, Mahmoud Titi came and brought two explosive charges with him … and after that, Amar received the explosive charges and each of us went home, and three days later, I heard that Amar had carried out a terrorist attack on a military jeep … Because Saadi had contacted me several times, I notified Hasser Aweis, who gave his approval for me to go on planning a suicide bombing for Saadi, and therefore I met with Saadi and asked him to carry out a combined attack … A week later, Saadi got back to me and told me that he agreed

[Stamp] P 5: 256 [continued]

39