Felony Case (Tel Aviv) 1137/02       State of Israel v. Nasser Mahmoud Ahmad Aweis

## The Courts

Tel Aviv – Jaffa District Court          Felony Case 001137/02

**Before:**    The Hon. Judge S. Timan – Presiding Judge      May 1, 2003
           The Hon. Judge N. Achituv
           The Hon. Judge O. Salomon-Czerniak

**In the matter of:**      **State of Israel**
                       **represented by Counsel:**    Adv. Devora Chen and
                                               Adv. Tamar Anis

v.

                        **Nasser Mahmoud Ahmad Aweis**
                        **represented by Counsel:**      Adv. Bulus

---

The State of Israel is arguing that these organizations are terrorist organizations, pursuant to their definition in the Prevention of Terrorism Ordinance, and that the Defendant, who played a senior role therein as described, initiated, organized and launched murderous terrorist attacks against Israeli targets in the State of Israel and in the Judea and Samaria region, and that his activity included, *inter alia,* the purchase and production of weapons of various kinds and the transfer thereof, whether directly or indirectly, to the terrorists who actually perpetrated the terrorist attacks on behalf of the terrorist organization.

---

### Verdict

### Judge O. Salomon-Czerniak:

### The charge

     The State of Israel is arguing that, during the period of time that is relevant to the events that are described in the indictment, the Defendant was the Commander of the Nablus and Northern Samaria area of the Tanzim-Fatah organization, as well as the commander of the *Kitaab Shuhadaa al-Aqsa* (al-Aqsa Martyrs' Brigades) organization in that area.

     The State of Israel is arguing that these organizations are terrorist organizations, according to the definition thereof in the Prevention of Terrorism Ordinance, 5708 – 1948, and that the Defendant, who played a senior role therein as described, initiated, organized and launched murderous terrorist attacks against Israeli targets in the State of Israel and in Judea and Samaria, and that his activity included, *inter alia,* the purchase and production of weapons of various kinds and the transfer thereof, whether directly or indirectly, to the terrorists who actually perpetrated the terrorist attacks on behalf of the terrorist organization.

[Stamp] P 5: 237

1


PLAINTIFF'S EXHIBIT 362

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

The State of Israel is arguing that, as a result of the Defendant's actions, many civilians were murdered, wounded and injured, and it is seeking to convict him, as set forth in the eight counts that are included in the indictment, of the offenses that are attributed to him, which are: Membership and activity in a terrorist organization – offenses in contravention of Sections 2 and 3 of the Prevention of Terrorism Ordinance, 5708 – 1948.

Acts of conspiracy to commit a crime – offenses in contravention of Section 499 of the Penal Code, 5737 – 1977.

Acts of murder and attempts to perpetrate such acts – offenses in contravention of Sections 300 (a) (2) and 305 (1) of the Penal Code, 5737 – 1977.

Acts of aggravated assault and attempts to perpetrate such acts – offenses in contravention of Sections 329 (1) and 329 (1) [sic] in combination with Section 25 of the Penal Code, 5737 – 1977.

Unlawfully carrying a weapon – offenses in contravention of Section 144 (b) of the Penal Code, 5737 – 1977.

### The Defendant's line of defense

In the initial stage, the Defendant hired the services of Adv. Bulus and cooperated with him.

The defense attorney received all of the investigative material, and even filed a notice that he would raise various preliminary arguments on behalf of the Defendant, including the argument of the absence of jurisdiction.

A first harbinger of the future line of defense of the Defendant is to be found in the transcript of the session which took place on September 10, 2002. At that session, the defense attorney (before another panel of judges) argued, *inter alia,* that: "After I had explained the matter to him, he said that he did not want an attorney, that he was representing himself. We hope that, within a short time, we will be able to push the deliberations forward – a period of at least two weeks."

At the same session – as may be seen in the transcript – the Defendant said to his attorney, and through the interpreter: "Do not speak on my behalf. I am my own lawyer; I am representing myself." Even at that stage, the Court ruled that: "Adv. Bulus' firm will continue to represent the Defendant, even if the latter decides to conduct the hearing on his own."

At the session which took place on January 22, 2003 (before the other panel), the defense attorney gave notice as follows: "We withdraw from the argument of an absence of jurisdiction. I agree that there was a ruling that a summation be filed within 30 days with

[Stamp] P 5: 238

2

Felony Case (Tel Aviv) 1137/02 _____ State of Israel v. Nasser Mahmoud Ahmad Aweis

regard to the argument of the absence of jurisdiction. However, in light of the developments which took place on the subject of Barghouti and in view of the decision on the part of the District Court to reject the argument, we have decided to withdraw the argument of an absence of jurisdiction in this case."

The defense attorney subsequently filed a petition to release him from representation, and the petition was denied in our ruling of March 2, 2003.

The trial began, continued and concluded in the presence of the Defendant and his attorney, and was fully translated into Arabic. The Defendant and his attorney remained silent throughout. They did not file a response to the indictment (we considered that as tantamount to a plea of not guilty on all counts). They did not raise any preliminary arguments, they did not cross-examine any witnesses and they did not raise any legal arguments. The Defendant did not testify and no witnesses were brought forth on his behalf. They even chose not to present a summation.

This position shall be examined against the background of the notice given in writing by the defense attorney, as follows:

[Stamp] P 5: 238 [continued]

3

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

"... 4. The undersigned spoke with the Defendant on several occasions and attempted to convince him to accept legal representation by an attorney. However, the Defendant has chosen not to be represented by an attorney.

5.      The undersigned explained to the Defendant that he is supposed to represent his interests at the trail. In response, the Defendant clarified that he had decided not to take an active part in the trial proceeding. He is entitled to make his own choices and to take the actions which he has chosen for himself, including by means of a passive line of defense of silence throughout his trial.

6.      The Defendant has requested that, if the Court forces us to appear at sessions, the only thing that we may do is to remain silent.

7.      On March 11, 2003, and following the ruling by the Honorable Court, the undersigned again explained to the Defendant the ruling by Their Honor and his own situation, as well as the fact that, if a legal argument is raised in the course of the session, it is fitting and proper for the undersigned to address it. The Defendant, however, ruled out that possibility and repeated his former statement, to the effect that he is not interested in cooperating and that he does not consider us to be his defense attorneys, and again asked us to remain silent...

10.     The Defendant is perfectly well aware of the meaning of all this. He is not legally incompetent and he has the mental and intellectual capacity to choose how to conduct the trial...

13.     In the absence of cooperation by the Defendant, and [in view of] his instructions to the defense attorney to remain silent throughout the trial, not to examine witnesses and/or raise legal and/or other arguments, not to speak on his behalf and/or to raise factual and/or legal arguments, the undersigned has no choice but to hold his tongue, and will be enjoined from doing otherwise, for obvious reasons originating in the rules of ethics which bind any attorney at law..."

We are convinced, on the basis of that which has been set forth in the notice, oral statements made to us in the matter, and the behavior of the Defendant and his attorney prior to and at all times throughout the trial, that the Defendant has adopted a position which reflects a line of defense which he selected knowingly, deliberately and of his own free will.

What is before us is a choice which results from a calculated, deliberate, conscious, intentional and manipulative move made by a Defendant would understands perfectly well, and who is quite aware of, all of the implications thereof.

The Defendant was given, at all times, every possibility of taking an active role in the deliberations. We even attempted to urge his attorney to do his job in any way he could, even in the absence of any cooperation by the Defendant, and at the very least, where purely legal argumentation was involved.

[Stamp] P 5: 239

4

The distinguished defense attorney explained, yet again, that he would not intervene in the deliberations, even where legal argumentation was involved, because he was bound by the line of defense adopted by his client.

In other words, we are not looking at an unintentional failure to act, or at indifference to the consequences, but rather, at a clear and definitive line of defense.

The Defendant and his defense attorney may be presumed to have been aware, from the outset, of the legal consequences of this line of defense.

### The Defendant's confessions

The Defendant confessed to the offenses that were attributed to him in the indictment, within the framework of his statements to the police.

[Stamp] P 5: 239 [continued]

5

Statements P/5 dated April 21, 2002, P/6 dated April 28, 2007, P/7 dated April 30, 2002, P/8 dated May 1, 2002 and P/9 dated May 14, 2002, were written on the basis of the testimony of Witness No. 5 for the prosecution, an interrogator in the Hostile Terrorist Activity Unit, Roni Amar, in Arabic, in the Defendant's handwriting and after he had explained to the Defendant in Arabic the charges that were being attributed to him and had duly warned him. According to the interrogator's testimony, after the Defendant had confirmed to him that he understood the charges and the nature of the warning, he asked to write the statements in his own handwriting and did so of his own free will.

According to the interrogator's testimony, the Defendant signed the statements before him. The interrogator translated the statements from Arabic to Hebrew (the translation of each statement into Hebrew, P/5A through P/9A, is attached to the respective statement).

Statement P/22, dated June 27, 2002, was taken by Witness No. 7 for the prosecution, interrogator Hadi Halabi, who explained that he took the testimony in the Arabic language, in which he is fluent, after the Defendant had been duly warned, had understood the nature of the interrogation and the warning, and had given his statements of his own free will and volition. The Defendant signed the statement that the interrogator had recorded in Arabic. This interrogator also translated the statement into Arabic and the translation is appended to the statement: (P/22A).

The circumstances under which the statements were taken down in the manner described above, the fact that the overwhelming majority thereof (five out of six statements) were written by the Defendant in his own handwriting, and the fact that the Defendant again confirmed before a military judge (see the transcript of the Court session at which his arrest was extended, P/23, and the testimony by Witness No. 5 for the prosecution) that "I confirm that the assertions and the confessions which I gave in my interrogation in Arabic are true and correct, and that I read them and that I signed them. It is true that I was involved in all of the actions and the terrorist attacks to which I confessed – 'everyone has his job to do'. I do not object to the extension of my arrest as requested." all indicate that this evidence is admissible. There is no reason to suspect that the Defendant was subjected to external pressure which led him to confess to the perpetration of acts in which he had no part.

Examination of the content of the statements, including the confessions, indeed shows that what they contain is a true reflection of the actual state of affairs, on the basis of clear, lucid and logical thinking by a person of sound and settled mind. These statement and confessions carry heavy internal weight which, in and of itself, bears out their veracity.

Obviously, the Defendant's confession before a judge in arrest court, and under the supervision of that judge, was given without any pressure or influence and, as that confession implies severe consequences for the Defendant, it constitutes material corroboration of evidence and carries a special weight, which increases the force of his previous admissions, over and above its strength as an independent item of evidence (see Additional Hearing 3081/91, Kuzali v. State of Israel, PD 45 (4) 441, Criminal Appeal 6613/99, Stephen Smirek v. State of Israel, PD 56 (3) 529, and Criminal Appeal 3338/99, PD 54 (5) 667).

[Stamp] P 5: 240

The requirement for an additional "item," which allays the suspicion that the Defendant was led to confess by internal pressure, has been completely fulfilled by the assertions that have been made in writing, out of court, by other witnesses, which we accept as admissible and credible evidence, as shall be set forth below.

### The accomplices

Witnesses for the prosecution ███████████ (Witness No. 6 for the prosecution), ███████████ (Witness No. 21 for the prosecution), ███████████ (Witness No. 23 for the prosecution) and ███████ (Witness No. 25 for the prosecution), are the Defendant's accomplices in the offenses committed by him (hereinafter: the "Four"). With the exception of Witness No. 6 for the prosecution, ███████████, who was convicted and sentenced before he testified (see the respective protocols of his conviction and sentencing, jointly marked at P/11), the other three were called upon to testify before their own trial ended, and the question arose as to whether their testimony was admissible, in view of the Kinzi doctrine

[Stamp] P 5: 240 [continued]

7

(Criminal Appeal 194/75, Menahem Kinzi v. State of Israel, PD 30 (2) 477), a doctrine which has admitted no flexibility to date (see Criminal Appeal 1774/02, Shimon Kadosh v. State of Israel), which holds that "one defendant should not be made to testify before another defendant, even if separate indictments were filed against them, as long as there is any suspicion that the witness is likely to expect the benefit of reduction of his sentence, in a trial which is still pending against him. This can be avoided either by completing [the witness's] trial before the testimony is given or by transforming him into a State's witness and arranging for a stay of the proceedings, or a declaration by the prosecution that the trial against him will be canceled upon the conclusion of his testimony …"

        The State of Israel mapped out its course in accordance with that which has been set forth in Criminal Appeal 579/88, Suissa v. State of Israel, PD 44 (1) 529. As the State of Israel would have it, the Defendant did not object to having those witnesses testify, although he knew very well, as did his defense attorney, that their trial was not over. He did not bar – as he could have done, from the procedural standpoint – his accomplices' way to the witness stand. By failing to do so, he knowingly waived his right to object to having their testimony heard, and he can no longer attack the admissibility of this evidence, which is *a priori* acceptable testimony under law (Section 2 of the Evidence Ordinance (New Version), 5731 – 1971), and all that is left to decide is the weight of that evidence.

        This is indeed a foreseeable outcome, in accordance with the line of defense selected by the Defendant, and Counsel for the State of Israel should not be found at fault.

        Because this is a foreseeable and probable outcome of the line of defense intentionally adopted by the Defendant, Counsel for the State of Israel is correct in stating that the responsibility for that outcome rests with the Defendant.

        We questioned Counsel for the State of Israel in this matter, because we believed that she might raise the matter in order to "open the way." Let us recall, however, that the State of Israel declared, at the beginning of each testimony, that none of the above mentioned witnesses had been promised any benefit whatsoever, and that it did not intend to use their testimony against them in any way whatsoever.

        In any event, each of the Four was declared a hostile witness, and with regard to the testimony given by each of the above mentioned witnesses, we were asked to act in accordance with the provisions of Section 10A of the Evidence Ordinance (New Version), 5731 – 1971 (hereinafter, the "Evidence Ordinance") and to give preference to his statement in writing, relative to his oral testimony.

        There is accordingly some doubt as to whether the Kinzi doctrine applies under these circumstances, when the risks which underlie the doctrine do not exist.

[Stamp] P 5: 241

8

<u>Felony Case (Tel Aviv) 1137/02</u>          <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

The manner in which the Four testified in Court, as shall be set forth below, was hostile to the State of Israel.

Witness No. 6 for the prosecution, ███████, entered the courtroom, exchanged smiles with the Defendant and saluted him. From that point on, he expressed, both in words and in his behavior, his intention of not cooperating and not answering questions.

That is what he did, although he addressed us once, on his own initiative, and stated that, "I know the Defendant here and I put him above me." Furthermore, he answered a question by Counsel for the State of Israel: "Q. On December 23, 2002, were you in the military court, and did he [should read: did you] confess to this indictment, which I have now filed before this Court, including your involvement in the terrorist attack in Hadera?" "A. We wanted to stop the military operations, and they murdered the leader, █████ and they murdered Palestinian children, and that is what drove me to do this thing." Previously, he had argued that the indictment against him was falsified.

[Stamp] P 5: 241 [continued]

9

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

Witness No. 21 for the prosecution, ▮▮▮▮▮▮▮▮, began his statement with the words: "I do not want to speak; I do not want to testify." He subsequently answered questions on matters of marginal importance, but did not cooperate with regard to material details. Thus, for example, he answered questions such as "When did you make the acquaintance of the Defendant?" or "In which military operation did you participate together with the Defendant?" or "Who was a member of the military squad of which [you were] also a member?" with the following response: "That is my own private business and it is of no concern to the Court." At the same time, after he was declared a hostile witness, he answered the following questions in this manner:

"Q.     Were you a member, from the beginning of the intifada, of a squad which carried out terrorist attacks, and, among other things, was the Defendant, Nasser Aweis, the person who was in charge of that squad?

A.     What is wrong with those things?  What is forbidden about those things?

Q.     Did you tell the police that Nasser Aweis was the one who used to plan the implementation of the terrorist attacks, and that he was the one who used to supply the weapons to all of the squad members?

A.     I have no answer.

Q.     Did you tell the police that you participated in at least 10 shooting attacks against the Army in the Nablus area?

A.     That is my right.

Q.     Did you also tell them exactly where the shooting attacks were directed, toward the settlement of Elon Moreh, toward the IDF roadblock near Hawara?

A.     I refuse to stand before this Court and be judged.  There is nothing for which I must be judged.  Whether I did or did not do – even if I did these things, there is nothing wrong with them.

Q.     You are not the one being judged.  You are testifying here and you have to give answers.

A.     I refuse [to allow] Nasser to be judged for these things.

[Stamp] P 5: 242

10

Felony Case (Tel Aviv) 1137/02 _____ State of Israel v. Nasser Mahmoud Ahmad Aweis

Q.    For which things?

A.    For his struggle against the occupation.

Q.    Did you, on the instruction of Nasser Aweis, plan to carry out a terrorist attack by laying an explosive charge, in the territories near Nablus?

A.    That is of no interest to anyone.

Q.    Did you tell the police that you used to help Nasser Aweis transfer weapons from this activist to that activist?

A.    I did not say those things in order to be judged for them.

Q.    For what purpose did you say them?

A.    That was what they asked me and that was what I told them."

From that point on, he was silent or refused to answer.

Witness No. 23 for the prosecution, ███████████████, also clarified, immediately after taking the witness stand, that "I understand what the interpreter said and I will say nothing." He also made it clear, in the course of his examination – both in words and in his behavior – that he would not cooperate, and that is what he did.

Witness No. 25 for the prosecution, ███████████████ did not deviate from the course that was set by the others. In response to every question, he referred Counsel for the State to his attorney, or alternatively, continued to claim that everything he had said had been forced out of him under pressure by Israel Security Agency personnel, who had spilled tea on him, spit on him, slapped him and kept him tied up for several days.

As we have seen, the testimony of the Four fulfills the condition set forth in Section 10A (a) (3) of the Evidence Ordinance.

[Stamp] P 5: 242 [continued]

11

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

The Four were witnesses at the trial, and the parties were given the opportunity to examine them.   This constitutes compliance with the condition that was set forth in Section 10A (a) (2) of the Evidence Ordinance (see Additional Criminal Hearing 4390/91, State of Israel v. Hajj Yihya, PD 47 (3) 679).

The policemen who had taken the statements testified as to the circumstances under which the testimony by the Four had been taken.

Statements P/12 and P/13 were taken from the witness ▮▮▮▮▮ by Witness No. 28 for the prosecution, ▮▮▮▮▮   According to testimony by the latter, he interrogated ▮▮▮▮▮ in Arabic and wrote down the answers in Hebrew, after having duly warned ▮▮▮▮▮ and after having explained to him the nature of the charges against him. According to ▮▮▮'s testimony, he offered ▮▮▮▮▮ the opportunity of writing down the statement himself in Arabic, but ▮▮▮ ▮▮▮▮▮ explained to him that he was not good at reading and writing and that he did not object to his statement being taken down in Hebrew.  According to ▮▮▮▮ 's testimony, ▮▮▮▮▮'s statement was made of his own free will.

Statements P/14 and P/15 were taken from the witness ▮▮▮▮▮ by Witness No. 34 for the prosecution, ▮▮▮▮▮   According to ▮▮▮▮ s testimony, he introduced himself to ▮▮▮▮▮ as a member of the police force. He, like ▮▮▮▮▮ interrogated the witness in Arabic and translated the testimony into Hebrew simultaneously, after having warned ▮▮▮▮▮ and having explained to him the nature of the offenses that had been attributed to him.  The latter's statements were made of his own free will.

The person who took down Statement P/16 was not among the witnesses for the prosecution.  We shall discuss this fact below.

Statements P/17, P/18 and P/19 were taken from ▮▮▮▮▮ by Witness No. 29 for the prosecution, ▮▮▮  This witness also introduced himself to ▮▮▮▮▮ as a member of the police force, explained his rights and the nature of the charges against him, duly warned him, and informed him that he was entitled to write down the statement himself in Arabic.  This witness as well testified that ▮▮▮▮▮ told him that he did not know how to write in Arabic, and that he did not have a problem with the statement being taken down in Hebrew.

Statement P/20 was taken from ▮▮▮▮▮ by Witness No. 33 for the prosecution, ▮▮▮ ▮▮▮▮▮ explained that the testimony was taken after he "accused" ▮▮▮▮▮ of the offenses of which he was suspected, warned him, translated the content of the warning for him, informed him that he was entitled to write down [the statement] in his own handwriting in Arabic. However, because ▮▮▮▮▮ claimed that he did not know how to write, he took down the statement in Arabic [sic] and then translated what he had written into Arabic.

As ▮▮▮▮▮ according to all of the testimony, claimed that he did not know how to read and write in Arabic, the fact that the statements were written down in Hebrew is of no importance whatsoever, because, even had they been written down in Arabic, ▮▮▮▮▮ would

[Stamp] P 5: 243

12

<u>Felony Case (Tel Aviv) 1137/02</u>          <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

have signed them on the basis of what he was told by the persons who were taking the statements.

We believe the testimony by the policemen who took down statements P/12 through P/20, inclusive, to be credible, and we determine that they were taken from the witness ███ ███ according to proper legal procedure, with his rights respected, and that ███████ gave his statements of his own free will.

More precisely: ███████ himself does not claim that the process of his interrogation was defective in any way. His answer to the prosecuting attorney's question, "I will tell you about all of the operations which you performed with Nasser Aweis, according to instructions by Aweis, in the course of the intifada," in the following words, "All of the things you say are falsified," appears, in light of his behavior and his utterances before us, to be a vaguely defiant statement,

[Stamp] P 5: 243 [continued]

13

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

which is diametrically opposed to his full confession with regard to all of the counts of which he was accused in the amended indictment, dated August 7, 2002 before the three judges on the panel of the military court (see P/11).

We shall add to this the fact that the Defendant refrained from cross-examining these witnesses, and in so doing, augmented the weight of their testimony.

We rule that the making of the assertions that are included in the statements has been proven as required pursuant to Section 10A (a) (1) of the Evidence Ordinance.

Given that all of the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled, we rule that the assertions by ▆▆▆▆▆ constitute admissible evidence.

The circumstances under which statement P/16 was taken have not been proven. The person who took down the statement was not among the witnesses for the prosecution. Notwithstanding that which has been set forth above, Counsel for the State of Israel – although we do not understand her actions in doing so – did not refrain from including that statement among the statements which she claimed to be admissible (see pp. 80-81) of the "Summation by the Prosecution – Outline," which was filed before us in writing). We are ignoring this item of evidence (P/16), which has not been proven to be admissible, and are excluding it from the body of evidence which we took into account.

We may assume, with a great degree of certainty, that ▆▆▆▆▆'s full confession of the offenses that have been attributed to him, before a panel of three judges, substantiates the veracity of his assertions to the police, just as it indicated the admissibility of those assertions, from the standpoint of the circumstances under which they were taken down.

In the course of his testimony in court, insofar as he attempted to distance himself from his assertions in writing, by various means, ▆▆▆▆▆'s testimony was not consistent. From time to time, for one brief moment, the truth emerged – for example, at the very beginning of his testimony, in response to a question by the prosecuting attorney, he answered "The things that I did, and what drove me to do them, were because of the war criminals, Sharon and Mofaz." Subsequently, he added: "We wanted to stop the military operations, and they murdered the leader, ▆▆▆▆▆ and they murdered Palestinian children, and that is what drove me to do this thing," and afterwards: "all of the things that you are saying are fake. Go ask about the causes of these things." And also: "To this very moment, the only people who are under occupation are the Palestinian people, and all of the international laws allow me to struggle against the occupation. Do not exhaust yourself. Do not ask me any questions," and "I know ▆▆▆▆▆ he is a friend of mine, and he served with me in the Authority, and the occupation is what drove ▆▆▆▆▆ to do what he did."

[Stamp] P 5: 244

14

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

The salute which ████████ gave the Defendant when he entered the courtroom, and his declaration to the effect that he knows the Defendant and puts him above himself, attest to the veracity of the Defendant's assertions concerning the hierarchical relationship between them. This relationship is described, *inter alia*, in P/12: "Nasser Aweis is a resident of the Balata camp ... also known as al-Hajj Rawaq, and he is one of the people in charge of the *Kitaab Shuhadaa al-Aqsa*, and he was my superior in the organization, and Nasser works for the National Security in Nablus and belongs to Tanzim Fatah ..."

We give preference to the assertions that were made by ████████ in writing, in his above mentioned statements, which were made out of court, over his testimony in the courtroom.

[Stamp] P 5: 244 [continued]

15

Felony Case (Tel Aviv) 1137/02       State of Israel v. Nasser Mahmoud Ahmad Aweis

     The statements by the witness ███████ P/40A, B, C were taken down by Witness No. 7 for the prosecution, ███████ According to ███ testimony, the statements were taken down and written in Arabic, after he had explained to ███ the offenses of which he was suspected and had duly warned him. According to his testimony, the witness made his statements of his own free will and signed every page of each of the statements before him. ███ testified that he translated the statements into Hebrew, but that ███ was asked to sign, and signed, the original only.

     Statement P/40D was taken from ███████ by Witness No. 35 for the prosecution, ███████ who also testified that he took down the statement in the same way as Halabi.

     We believe that both of [the above mentioned witnesses] took down ███'s statements properly and that the assertions included in those statements were given of ███'s own free will.

     In his testimony before us, ███ did not argue that his statements had been taken down improperly. He did not want to answer a question as to whether he identified his signature, and did not even want to look at it, but did not deny [that the signature was his]. His negative response to a question as to whether he had been duly warned is not convincing. In this case as well, the fact that the Defendant refrained from examining the persons who had taken the statements reinforces their testimony, and we rule that the making of the assertions has been proven as required pursuant to Section 10A (a) (1) of the Evidence Ordinance.

     ███ assertions out of court are admissible as evidence in the present proceeding, given that the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled in their entirety.

     We give preference to ███'s assertions, as expressed in his statements P/40A-D, over his testimony in the courtroom. On the basis of ███'s answers to the questions he was asked, it is easy to discern that his behavior in court reflects his decision not to look like a collaborator, and most of those answers hint at the fact that his assertions as they were made to the police are true.

     It would not be superfluous to cite those answers again:

"Q.    When did you make the acquaintance of Nasser Aweis?

A.    That is my own private business and it is of no concern to the Court.

Q.    In which military activity did you participate together with the Defendant?

A.    That is my own private business and it is of no concern to the Court.

[Stamp] P 5: 245

16

<u>Felony Case (Tel Aviv) 1137/02</u>          <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

Q.    Who was a member of the military squad of which you were also a member?

A.    That is of no concern to the Court.

Q.    Were you a member, from the beginning of the intifada, of a squad which carried out terrorist attacks, and, among other things, was the Defendant, Nasser Aweis, the person who was in charge of that squad?

A.    What is wrong with those things?  What is forbidden about those things?

Q.    Did you tell the police that Nasser Aweis was the one who used to plan the implementation of the terrorist attacks, and that he was the one who used to supply the weapons to all of the squad members?

A.    I have no answer.

Q.    Did you tell the police that you participated in at least 10 shooting attacks against the Army in the Nablus area?

A.    That is my right.

Q.    Those shooting attacks that you talked about were planned by Nasser Aweis and he was the one who supplied the weapons for the shooting?

[Stamp] P 5: 245 [continued]

17

A.     I do not wish to answer.

Q.     Did you also tell them exactly where the shooting attacks were directed, toward the settlement of Elon Moreh, toward the IDF roadblock near Hawara?

A.     I refuse to stand before this Court and be judged. There is nothing for which I must be judged. Whether I did or did not do – even if I did these things, there is nothing wrong with them.

Q.     You are not the one being judged. You are testifying here and you have to give answers.

A.     I refuse [to allow] Nasser to be judged for these things.

Q.     For which things?

A.     For his struggle against the occupation.

Q.     Did you, on the instructions of Nasser Aweis, plan to carry out a terrorist attack by laying an explosive charge, in the territories near Nablus?

A.     That is of no interest to anyone.

Q.     Did you tell the police that you used to help Nasser Aweis transfer weapons from this activist to that activist?

A.     I did not say those things in order to be judged for them.

Q.     For what purpose did you say them?

A.     That was what they asked me and that was what I told them.

Q.     All of the weapons, the rifles, the M-16s, which they transferred, were used for shooting attacks against civilians and soldiers.

A.     I do not want to say anything, and do not go on ...”

Statements P/43A and P/43C by Witness No. 23 for the prosecution, ▮▮▮▮▮▮▮▮▮ were taken by Witness No. 32 for the prosecution, ▮▮▮▮▮▮▮

According to ▮▮▮▮’s testimony, he identified himself to ▮▮▮▮▮ as a policeman, warned him and ascertained that he understood the content of the warning. P/43A was taken in the form of questions and answers and was taken down (as was P/43C) in Hebrew, because the

[Stamp] P 5: 246

18

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

witness ▆▆▆ cannot write in Arabic. ▆▆▆▆ refused to sign P/43A, without explaining his refusal, but signed P/43C. ▆▆▆▆ explained that there were no exceptional events during the taking of both statements. He did not notice that ▆▆▆▆ was injured, ill or tired, because, had this been the case, he would have noted those facts. If there had been anything extremely exceptional, the testimony would not have been taken down, and a memorandum to that effect would have been written. During the taking of P/43C, ▆▆▆▆ showed ▆▆▆▆ an eight page manuscript in Arabic, and the latter confirmed that it was in his handwriting, after having studied the document.

Statements P/43B and P/43D were taken from ▆▆▆▆ by Witness No. 31 for the prosecution, ▆▆▆▆ According to ▆▆▆▆ 's testimony, the two spoke Arabic, but the testimony was taken down in Hebrew. ▆▆▆▆ was duly warned but refused to sign the warning or statement P/43B, although he signed P/43D. According to ▆▆▆▆ 's testimony, during the taking of both statements, manuscripts were shown to ▆▆▆▆ which he identified as being in his handwriting, the manuscripts had been given to ▆▆▆▆ by one of the Israel Security Agency interrogators. ▆▆▆▆ made the statements of his own free will, and with regard to the manuscript which was shown to him during the taking of P/43D, he even answered "Yes, this is my handwriting and I wrote what I have just told you now in the testimony."

Statement P/43E was taken from ▆▆▆▆ by Witness No. 36 for the prosecution, ▆▆▆▆

According to testimony by the latter, he identified himself to ▆▆▆▆ as a member of the police force and explained to him that he was about to interrogate him and what he was suspected of. ▆▆▆▆ made his statements in an orderly manner, and subsequently signed the testimony after his words were translated back to him. According to ▆▆▆▆ 's testimony, he interrogated ▆▆▆▆ after having been given a general background in the form of a memorandum from the Israel Security Agency. In his testimony, however, ▆▆▆▆ told him many details which ▆▆▆▆ could not have known from that memorandum. In his words: "If it is about the circumstances

[Stamp] P 5: 246 [continued]

19

Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

of the relationship, how things occurred and progressed, these are things that he said in his testimony. If they went to an ice cream shop, and what the code was and who set it, this does not appear in the memorandum."

We; believe that the statements made by the witnesses ██████ ██████ and ██████ with regard to the manner in which the interrogation was conducted and the circumstances under which ██████'s assertions were taken down, are credible. ██████ for his part, does not argue that the assertions were taken down improperly. In this case, as well, the fact that the Defendant refrained from cross-examination strengthens the testimony by those who had taken the statements, and the making of the assertions was proven in the trial as required.

Given that all of the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled, we rule that the assertions made by ██████ in writing and included in his statements P/43A-E, are admissible as evidence in the present proceeding.

We prefer ██████'s assertions over his testimony in court. Most of his answers were intended to give the message that he does not recognize the jurisdiction of the Court ("I do not recognize the Court, do not you understand? ... I do not recognize the Court, or Israel either ... I do not recognize the Court"), and not as denial of his assertions.

Nonetheless, from time to time, signs arose in his testimony which indicate that the assertions are true:

"Q.    When did you begin your military activity?

A.    That is none of your business ...

Q.    Is ██████ a relative of yours?

A.    That is none of your business. Why are you asking me personal questions?

Q.    Were you ██████'s driver and bodyguard from 1996 and up to the day of your arrest?

A.    No, what do you want?

Q.    Is that correct?

A.    How do you ask me such questions? I do not recognize you.

Q.    Those are things that you said.

A.    That thing is not mine.

[Stamp] P 5: 247

20

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

Q.    You also said that you were arrested together with ████████████

A.    I have no answers at all. It would be better if you did not ask ...

Q.    You [singular] made sure to prepare Said before the terrorist attack.    You [singular] made sure that there would be someone to drive him to Jerusalem, to the place where you [plural] bought him clothes and shoes and took him to get a haircut.    And you [singular], under the instructions of Nasser Aweis, who was the planner and the organizer, you [singular] also made sure to get an M-16 rifle and clips with bullets for Said Ramadan.

A.    (The witness remains silent and does not answer)

Q.    You yourself told all of those details in your statement.

A.    I say what I want to.    What I feel like saying, I say.

Q.    That is what you felt like saying at the time.

A.    That is not from me, that is not my handwriting.    If Nasser really did all those things, he only wanted to liberate Palestine for us.    That is something to be proud of ...

Q.    Not only did you tell, in your statements, about many instances of shooting attacks and suicide bombings; with regard to all of the terrorist attacks which you have perpetrated, are you sorry for what you did?

[Stamp] P 5: 247 [continued]

21

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

A.    If Sharon is sorry for what he did, then I am sorry for what I did.

Q.    Aren't you sorry that you sent terrorists to blow themselves up here in Israel and to kill?

A.    I want to liberate my country, the one that you are conquering ...

Q.    I am showing you Statement No. 5 dated September 5. In this statement too, I am showing you the warning, the signature on the warning, and the signature on every page of the statement and the signature at the end of the statement.

A.    I do what I want to. There is no one who can stop me. I will write and say whatever I want ..."

It may truthfully be said that the response "I want to liberate my country, the one that you are conquering" is the beginning of an admission.

The following statement, which appears in Criminal Appeal 735/80, Abraham Cohen v. State of Israel, PD 35 (3) 94, also applies to the matter before us: "If Section 10A now states that the Court can prefer the assertion over the testimony in the courtroom, the defense attorney, for his part, could have attempted to strengthen the witness's version in his direct examination, by performing a cross-examination with a view to explaining that the assertion made to the police was a false assertion. The defense attorney, however, did not examine the witness at all."

Statements P/47A-C were taken from the witness ▇▇▇▇▇▇ by Witness No. 31 for the prosecution, ▇▇▇▇▇▇▇▇▇. The witness did not remember the occasion when the testimony was taken, and refreshed his memory on the basis of the assertions. According to his testimony, he identified himself to ▇▇▇▇ as a policeman, conversed with ▇ in Arabic and translated the words for him. According to ▇▇▇▇▇'s testimony, when he translated what he had written in the statements into Arabic, ▇▇▇▇ could have responded, corrected or refused to sign them. According to his testimony, he wrote down only what ▇▇▇▇ told him, and ▇▇▇▇ confirmed to him that the manuscript which had been written down before the Israel Security Agency interrogators was in his handwriting. According to his testimony, had there been exceptional circumstances, he would have noted them, and had any complaints been made, he would have written them down, as he would have written down any visual signs he might have seen. ▇▇▇▇ explained that, when a suspect reports for a police investigation, he is a free man, "and this is his opportunity to give or not to give his version, irrespective of what happened before that in the Israel Security Agency. If there was any problem at all, I would have written it down, because that is my duty. Everything written down in this testimony was said by the subject." ▇▇▇▇ made it clear that, "both in the previous testimonies and in this testimony, I introduced myself as a policeman. That is the first thing. Above and beyond that, they (the reference is to interrogation subjects such as the witness) make the distinction as to who is a policeman

[Stamp] P 5: 248

22

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

and who is a Israel Security Agency interrogator. They encounter us when their arrest is extended, and they cannot make mistakes in this matter ..."

Statement P/47D was taken from ▇▇▇▇▇ by Witness No. 30 for the prosecution, ▇▇▇▇▇▇▇. According to his testimony, he took down the statement after the suspect had been duly warned, and the statement was taken down in Hebrew, but the interrogation was conducted in Arabic. At the end of the statement, he read ▇▇▇▇▇ s words back to him and signed it before him. According to testimony by ▇▇▇ who did not specifically remember the case, if ▇▇▇▇▇ had complained to him, it would have been written down. ▇▇ also clarified that he did not have to recall whether he had identified himself as a policeman, because that was his duty and he does that with every suspect. With regard to the connection between his interrogation as a policeman and the memoranda which are provided to him by the Israel Security Agency, he explained that his interrogation is independent, and that he refers to the memoranda "only in a general way, and if a suspect says that no such thing ever happened, that is what will be written down, at the end of the day – in other words, what he says is what will be written down."

Statements P/47E and P/47F were taken by Witness No. 36 for the prosecution, ▇▇▇▇▇. Because ▇▇▇▇▇ had already argued before us, *inter alia*, that his statements had been taken under pressure by Israel Security Agency personnel, ▇▇▇▇ gave a more extensive explanation (after the learned prosecuting attorney, and we as well, called his attention to ▇▇▇ 's arguments), not only with regard to the manner in which this statements were taken, but also about his interrogation of ▇▇▇▇▇ in light of a previous investigation which had been held for him, as well as for others, by the Israel Security Agency – an investigation performed for counter-intelligence purposes. According to his statement: "When I receive the memorandum of an investigation which comes from the Israel Security Agency personnel, I check the points that come up in it – what that suspect is suspected of having done. After that, we write the content of the warning, the content of the suspicions, we read it out and explain it and make sure

[Stamp] P 5: 248 [continued]

Nevo Publishing Ltd.          nevo.co.il          The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02 _____ State of Israel v. Nasser Mahmoud Ahmad Aweis

that he really has understood the content of the warning and knows what he is being interrogated about. All of this is in Arabic – I speak Arabic fluently. I do not write or read Arabic, but I speak it. Part of the process is that we read it out. I inform him that I am a member of the police force, and he is aware that I am a member of the police force and that he is about to give testimony to the police. After I check the points that were covered by the Israel Security Agency and what he said to them, I construct the suspicions against him – whether it is belonging to an organization or possession of weapons or, alternatively, assistance to wanted persons, or any other offense – and according to that, I make my preparations from the standpoint of the interrogation itself.

The Israel Security Agency is investigating the issue of prevention. The Israel Security Agency is involved in having to thwart future events, that is, future terrorist attacks. My job as a police officer is to be involved only in the subject of the interrogation, which regards the gathering of evidence against the suspect at the time. In other words, if I interrogate someone, I have to work according to the laws of evidence and to understand the law ..."

When the prosecuting attorney confronted ████████ with the fact that the statements had been taken from him by a policeman, and not by Israel Security Agency personnel, he answered: "I never saw a policeman that I was supposed to speak with. They're all Israel Security Agency officers."

Our impression is that the policeman ████████ did indeed identify himself to ████ as a policeman, as the other policemen had done, and that the wording of the statements taken by ████ and the other policemen (████████ and ████ had come from ████████, of his own free will, and was not the result of the behavior exhibited by the Israel Security Agency interrogators toward him.

The Defendant and his Counsel did not cross-examine the policeman, nor did they ask to summon the Israel Security Agency personnel who had drawn up the memoranda of the interrogations. The Defendant and his Counsel did not cross-examine the witness ████████ in an attempt to strengthen his version, to the effect that the statements had been taken from him by unworthy means.

Their refraining from cross-examination does not give rise to the presumption that the version given by the policemen is correct. It does, however, further strengthen our impression of the credibility of the witnesses ████ ████████ and ████ . Under the circumstances of the case at hand, that is, that the Defendant and his Counsel deliberately and tendentiously refrained – as they emphasized to us, on more than one occasion – from cross-examination or from calling relevant witnesses, and given that this cannot be evaluated in light of other, conflicting testimony, and that, in any event, no such testimony was given, we give preference to the policemen's testimony concerning the manner in which ████████'s assertions were taken out of court, over the version by the latter (see Criminal Appeal 38/61, Moshe Ben David Yitzhak v. Attorney General, PD 16 514, Criminal Appeal 639/79,

[Stamp] P 5: 249

24

Aslan v. State of Israel, PD 34 (3) 561, and Criminal Appeal 2603/90, Alfar v. State of Israel, PD 45 (3) 799).

In any event, as ruled in Criminal Appeal 242/85, Hazan v. State of Israel, PD 41 (1), the very fact that an assertion made by a defendant to the police is not admissible in his trial cannot lead to the conclusion that the same assertion will not be admissible in another trial, which involves the case of that defendant's accomplice, pursuant to the provisions of Section 10 (and, to be precise, we have not ruled that such a possibility ever arose).

The content of ████████s statements P/47/A-F has been proven in the courtroom, and, given that all of the conditions required pursuant to Section 10A (a) of the Ordinances have been fulfilled, we accept them as admissible evidence.

We give preference to ████████s assertions over his testimony in court. With regard to most of the questions which set forth the actions committed by ████████ together with the Defendant, ████████ referred the distinguished prosecuting attorney to the Defendant who was seated opposite him – a Defendant who, as stated above, chose not to cross-examine ████████ or any other witness. ████████s words are set forth below:

"Q.    I refer you to Statement No. 3 … where they ask you when you began your military activity and who recruited you for the military activity, and you stated that, at the beginning of 2001, you were in Nasser Aweis's house in the Balata refugee camp, and then Nasser Aweis suggested that you join the al-Aqsa Martyrs' Brigades for military activity, and you agreed.

[Stamp] P 5: 249 [continued]

25

<u>Felony Case (Tel Aviv) 1137/02</u>        <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

A.    These things are not correct, and you can ask him. Look, he is here …

Q.    I refer you to Statement No. 4 … Did you suggest to Nasser Aweis, in the course of your activity, to carry out a terrorist attack on Tel Hashomer Hospital in Israel?

A.    No such thing. Ask him.

Q.    You [plural] planned all of the details, and they [sic] even got hold of a map of the area, and in the end, Nasser said that it would be necessary to wait a while, that it wasn't the right time yet.

A.    No such thing. You can ask him.

Q.    I refer you to the page in … Another of your roles was to assist Nasser Aweis in recruiting more terrorist activists for military activity, so that they would help carry out terrorist attacks.

A.    Nothing like that ever happened. Here he is, ask him …

Q.    You used to report to Nasser Aweis, every time, about a terrorist who you heard was interested in carrying out a terrorist attack.

A.    This is the first time that I have ever heard such things. Aside from that, all of those things belong to the Israel Security Agency. Nasser is here; ask him."

When the prosecuting attorney addressed these questions to ▆▆▆▆ who referred them on to the Defendant, the Defendant did not provide a version of his own, and we are left with the admissions in his statements and with his confession under the discerning eye of the judge in arrest court, which it is only fitting and proper to repeat here:

"I confirm that the assertions and the confessions which I gave in my interrogation in Arabic are true and correct, that I read them and that I signed them. It is true that I was involved in all of the actions and the terrorist attacks to which I confessed – 'everyone has his job to do' … I do not object to the extension of my arrest as requested."

We shall state that the Defendant himself makes the following statement with regard to ▆▆▆▆ (see statement P/6 by the Defendant): "After the outbreak of the al-Aqsa intifada, ▆▆▆▆▆▆ enlisted in the *Kitaab Shuhadaa al-Aqsa*, and I asked ▆▆▆ to participate in terrorist attacks with us, and ▆▆▆ agreed to the proposal, and I gave him an M-16 weapon, and ▆▆▆ carried out a shooting attack with the weapon which I had given him. The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and

[Stamp] P 5: 250

26

<u>Felony Case (Tel Aviv) 1137/02</u>          <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

according to ▪▪▪▪s statement, the vehicle was not hit."  In response to a question as to additional terrorist attacks in which ▪▪▪▪ was involved on behalf of the *Kitaab Shuhadaa al-Aqsa*, the Defendant stated:  "The terrorist attack in Hadera which was carried out by Said Ramadan ... terrorist attacks which were carried out in the Nablus area ..."

These facts, in and of themselves, constitute an unimpeachable sign of the accuracy of the assertions made to the police, and accordingly, those assertions should be given considerable weight.

We have found an additional sign of the accuracy of his assertions, in the conflicting versions given by the witness ▪▪▪▪▪ in court with regard to another assertion which, according to his assertions, had been written down in his own handwriting.

This is a manuscript in Arabic, concerning which ▪▪▪▪▪ in his statement P/47A, on page 4, had been asked the following question:  "I am showing you a manuscript in Arabic (a total of 10 yellow pages, which I got from the person known as ▪▪▪▪▪).  Is this your handwriting?

A.

On the other hand, in response to a question by the prosecuting attorney:  "Q. I am showing you a statement, which was attached to the statement dated April 15, which is a statement in your handwriting, 10 pages," he replied:  "They dictate to people [and make them] write against their will.  Take them to court, not us."

[Stamp] P 5: 250 [continued]

27

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

In response to the question, "Q. That is not your handwriting?" he replied: "That is the handwriting of the Israel Security Agency officers. They wrote those things." Generally speaking, his answers to similar questions were as follows: "Q. Are these things which you wrote yourself? A. When you have tea spilled on you, when you are left for four or five days with no food and no sleep, then you say things just to get out of it. Q. Did you write these things? A. I have an attorney. You have to see how the Israel Security Agency treats people. Q. Do you recognize the handwriting? A. I do not want to answer you. You act like them and you shout at me (answers in Hebrew and English)."

### Summary thus far

We have repeatedly clarified that all of the rules which must be fulfilled in order for the assertions made by the Defendant's accomplices out of court to qualify as evidence under Section 10A of the Evidence Ordinance have been fulfilled. (The above mentioned rules include proving the assertions under law, giving the Defendant an opportunity to examine the witnesses, and the question of whether the testimony in court is substantially different from the words recorded in the statements).

We considered the matter with the requisite care, and we give preference to the assertions made by the four witnesses, the Defendant's accomplices, to the police, over their testimony in the courtroom.

Testimony which requires a supplement may itself serve as a supplement of any kind for any other testimony which requires a supplement. Accordingly, the assertions by the four accomplices can constitute an additional "item" corroborating the Defendant's admissions out of court.

(See Kedmi, *On Evidence*, Part 1; Criminal Appeals 6147/92, State of Israel v. Yosef Cohen, PD 48 (1) 62; Criminal Appeal 6214/94, State of Israel v. John Doe, *Supreme Court Rulings*, Volume XXXVIII, 665; Criminal Appeal 5249/98, State of Israel v. Mirilashvili, PD 53 (3) 550.)

Each of these assertions, including assertions made by one or more of the Four in writing – which should be considered as an integral part of those statements, accordingly (see Criminal Appeal 6411/98, Manbar v. State of Israel, PD 55 (2) 150) – may be relied upon as corroborative evidence, in the form of an additional "item", to be added to other evidence brought against the Defendant, in the form of his own admissions.

As [the Four were] the Defendant's accomplices, and pursuant to the provisions of Section 54A (a) of the Evidence Ordinance, we were required to find "something to reinforce" their testimony.

We were also required to find such a reinforcement pursuant to the provisions of Section 10A (d) of the Evidence Ordinance, which instructs us that a person shall not be

[Stamp] P 5: 251

Felony Case (Tel Aviv) 1137/02 _____ State of Israel v. Nasser Mahmoud Ahmad Aweis

convicted on the basis of an assertion received pursuant to Section 10A of the Evidence Ordinance "unless the evidentiary material contains something to reinforce it."

If we consider the nature of the requirement for reinforcement (the term used is identical in the context of both of the above mentioned sections), it consists of supplementary evidence which verifies [the testimony in question], rather than evidence which embroils [the Defendant]. The reinforcement need not be an independent item of evidence; it may arise from the testimony which requires reinforcement.

We have found such reinforcement, even in excess of that required, in the embroiling evidence which arose from a separate and independent source, as follows:

The Defendant's full confession before the judge in arrest court.

The assertions made by each of the four accomplices with regard to the assertions made by his fellows.

[Stamp] P 5: 251 [continued]

29

<u>Felony Case (Tel Aviv) 1137/02</u>        State of Israel v. Nasser Mahmoud Ahmad Aweis

The Defendant's choice to remain silent and to refrain from testifying in the trial, against the background set forth above and against the background of the line of defense selected by the Defendant (which we discussed at the beginning of this ruling), which, in and of itself, constitutes evidence which may stand as corroborative evidence, pursuant to Section 162 of the Criminal Code Law, 5742-1982, which states that "a defendant's refraining from testifying is likely to constitute a reinforcement of the weight of evidence for the prosecution, as well as corroboration of the evidence for the prosecution, where such evidence requires corroboration.."

As a *corpus delicti* has been found for us (see the testimony by Witness No. 1 for the prosecution, ███████ Witness No. 2 for the prosecution, ███████ Witness No. 3 for the prosecution, ███████ Witness No. 4 for the prosecution, ███████ Witness No. 8 for the prosecution, ███ Witness No. 9 for the prosecution, ███████ Witness No. 10 for the prosecution, ███ Witness No. 11 for the prosecution, ███████ Witness No. 12 for the prosecution, ███████ Witness No. 13 for the prosecution, ███████ Witness No. 14 for the prosecution, ███████ Witness No. 15 for the prosecution, Witness No. 16 for the prosecution, ███████ Witness No. 17 for the prosecution, ███████ Witness No. 18 for the prosecution, ███ Witness No. 19 for the prosecution, ███████ Witness No. 20 for the prosecution, ███████ Witness No. 22 for the prosecution, ███████ Witness No. 24 for the prosecution, ███████ Witness No. 26 for the prosecution, Witness No. 27 for the prosecution, ███████ and see Exhibits P/1 through P/4 inclusive, P/21, P/21A, P/24 through P/37 inclusive, P/48, P/49, P/52 through P/79 inclusive), as the Defendant did not deny the actual making of the admissions before the persons taking his statements or before the Honorable Judge in arrest court, and as the Defendant even confessed again, fully and willingly, before the judge in arrest court, to all of the actions imputed to him, and understood what he was doing and making that confession, and as we have found that the internal weight of his confessions is heavy, the weight required for the additional "item" which is needed in order to verify them is accordingly reduced.

And now, even with regard to the additional item (which, from the standpoint of its purpose, is only intended to show that the Defendant did not invent his statements out of thin air, and is accordingly not required to constitute corroborative evidence which embroils the Defendant, and may consist of confirmatory evidence only), we have found that it, too, has a real weight of its own and easily complies with the more stringent requirement, as it embroils the Defendant in the perpetration of the offenses imputed to him, comes from a separate and independent source, and refers to a real point which is in dispute.

## Offenses Against the Prevention of Terrorism Ordinance and Conspiracy

[Stamp] P 5: 252

30

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

  In accordance with a pronouncement pursuant to Section 8 of the Prevention of Terrorism Ordinance, 5708 – 1948, it has been ruled that the Tanzim is a "terrorist organization," as this term is defined in Section 1 of the Ordinance (Compendium of Publications (5762 [2001-2002]), p. 800, dated December 6, 2001.

  According to expert opinions which were filed with no objection by the Defendant and his defense attorney (P/50, P/51), the following (among other things) was stated: "From the beginning of the violent incidents in the 'territories,' which began in September 2000, the Tanzim played a major and leading role in the perpetration of terrorist activity. Activists in the organization carried out terrorist attacks in various formats, including acts of mass slaughter, within Israel and in Judea and Samaria ... The terrorist organizations of the Tanzim in the Gaza Strip and in Judea and Samaria (which, at times, were joined by additional entities in the field) began (in November 2000) to use the name 'al-Aqsa Martyrs' Brigades' [*Kitaab Shuhadaa al-Aqsa*], especially for the purpose of taking responsibility for terrorist attacks against Israeli targets ...

  In the course of the violent confrontations, the 'Brigades' took responsibility for many terrorist attacks which were perpetrated in various formats in the 'territories' and within the confines of the 'Green Line,' including lethal terrorist attacks. The terrorist organizations of the 'Brigades' are responsible for thousands of shooting attacks and explosive charges on bypass roads in Judea and Samaria, and for scores of acts of mass slaughter within Israel, in which scores of Israeli were killed ... The major characteristics of the acts of mass slaughter include the focus by the perpetrators on crowded places (downtown areas and public places which constitute a source of attraction for the general public, such as cafes and restaurants, bus stops, shopping centers and the like) and the performance of suicide bombings (by means of an explosive belt or an explosive charge carried by the perpetrators arriving on the scene) and sacrifice attacks (terrorist attacks in which the perpetrator's chances of escape are slim; in most of the terrorist attacks in this format, the perpetrators have used assault rifles of various types), in which many scores of Israelis were killed ..."

[Stamp] P 5: 252 [continued]

31

Felony Case (Tel Aviv) 1137/02 _____     State of Israel v. Nasser Mahmoud Ahmad Aweis

The Defendant said, in his statements, that: "After the outbreak of the al-Aqsa intifada, I started to carry out terrorist attacks against Israeli targets, because of the conquest of the Palestinian land ... After that, I decided to perpetrate shooting attacks and additional terrorist attacks against Israeli targets in the West Bank and within the Green Line. The terrorist attacks which I perpetrated are as follows:

1.     I carried out a shooting attack directed against a guard post of the Israeli army near Joseph's Tomb in Nablus, and that was about two weeks before the army withdrew from the tomb.

2.     I carried out a shooting attack directed against a military position on Mt. Gerizim in Nablus ...

3.     I carried out a shooting attack directed against military vehicles in the vicinity of the Hawara camp, near Nablus.

4.     I carried out a shooting attack directed against military vehicles in the vicinity of Nablus, on the west side, near Zuata.

5.     I gave hand grenades to two people in order to carry out a terrorist attack in Jerusalem.

6.     I gave weapons for the perpetration of a terrorist attack in Netanya ...

9.     I gave weapons for the perpetration of a terrorist attack in Hadera.

10.     I gave weapons for the perpetration of a shooting attack, a sacrifice attack which was supposed to be carried out in Hadera, but the attack did not succeed and the people were killed in the vicinity of Baqa al-Gharbiya.

11.     I supplied Said Ramadan with weapons for the perpetration of a suicide attack within Jerusalem.

12.     I supplied ███████████ with weapons for the perpetration of a suicide attack within Hadera.

13.     I supplied ███████████ with two explosive charges + a Kalashnikov...

14.     I supplied ███████ with an explosive charge, which he placed on the road ... against an Israeli patrol."

The Defendant answered the questions listed below in the following manner:

[Stamp] P 5: 253

32

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

"Q.    On whose behalf did you carry out the terrorist attacks which you noted above?

A.    On behalf of *Kitaab Shuhadaa al-Aqsa*, which belongs to the Fatah.

Q.    Who is in charge of the Fatah?

A.    Yasser Arafat is in charge, and he is the chairman of the Fatah movement.

Q.    Who is in charge of the Tanzim Fatah?

A.    The secretary of the Fatah movement in the West Bank, ███████████...

Q.    Who do the *[Kitaab] Shuhadaa al-Aqsa* belong to?

A.    The *[Kitaab] Shuhadaa al-Aqsa* belong to the Fatah and the Tanzim Fatah.

Q:    What is your relationship with the secretary of the Fatah movement in the West Bank, ███████████

A.    My relationship with ████ began in 1992, when we lived in the same neighborhood in Amman, when we were deported by the Israeli authorities, and ████ came back to the West Bank in about 1994, and I came back in 1995. When I came back to the West Bank, my contacts with ████ were renewed, and I used to meet with ████ in the Tanzim office in Nablus. I would also meet with him in the office in Ramallah, and after the outbreak of the al-Aqsa intifada, I continued to be in contact with ███████████ We used to organize demonstrations on behalf of the Tanzim Fatah, and we used to distribute posters on behalf of the (Organizational) Coordination Committee *[al-Fasali]*. The people in charge of the Committee were ███████████ on behalf of the Fatah and ████████ on behalf of Hamas, and after he died, another person was given that position. The Chairman of the Committee was ███████████ and ███████████ was a member of the Supreme Coordination Committee, and the Supreme Committee used to guide the Organizational Coordination Committee *[al-Fasali]* ...

[Stamp] P 5: 253 [continued]

Nevo Publishing Ltd.         nevo.co.il      The Israeli Legal Database

<u>Felony Case (Tel Aviv) 1137/02</u>        <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

Q.    Who used to provide the money for the perpetration of terrorist attacks against Israeli targets?

A.    People in the Tanzim Fatah, in the West Bank and in Lebanon, used to provide me with money.

Q.    Who are the people who provided you with money for the purpose of purchasing weapons, in order to perpetrate terrorist attacks against Israeli targets?

A.    I took 12,000 shekels from ████████ and I took 8000 shekels from ████ as expenses, and I received from ████████ in Lebanon, I received $50,000.

Q.    What does ████████ do for a living?

A.

Q.    What does ████████ do for a living?

Q.    What does ████████ do for a living?

Q.    Was there contact between you and ████████

A.    I was in contact with ████████ al the time.

Q.    Did ████████ know that you were carrying out terrorist attacks against Israeli targets?

A.    Yes, he knew, and my name was even published in the press and on television and on the radio. I used to talk with him from time to time, and when the political situation deteriorated and we were in a bad way, he would ask us to continue the terrorist attacks. When Shimon Peres and Omri Sharon met with leaders in the Authority, ████████ called me and asked us to stop the terrorist attacks, and I answered him that we would do that. During that period of time, ████ was in the area and ████ told me that for the time being, because General ████ was meeting with leaders in the Authority, we should not carry out terrorist attacks in the name of [*Kitaab*] *Shuhadaa al-Aqsa*. I should note that, when the talks were progressing, no terrorist attacks were carried out.

[Stamp] P 5: 254

34

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

Q.    Who used to finance ███████████ the one who used to provide you with money for the purchase of weapons?

A.    ███████████ would take money from the Fatah movement, from the budget which ·

Q.    Who used to finance ███████████ the one who used to provide you with money for the purchase of weapons in order to carry out terrorist attacks against Israeli targets?

A.    ███████████ told me that he took money from ███████████ and ██ was aware of, and participated along with me in, a number of shooting attacks against Israeli targets ...

Q.    Did ███████████ provide you with money directly?

A.    Yes, ███████████ finances [sic] me twice.  The first time, he transferred NIS 3,000 to me by means of a deposit in the bank, and the second time, he transferred NIS 5,000 to me by means of a deposit.

Q.    Did ███████████ know that you were carrying out terrorist attacks against Israeli targets?

A.    Yes, ██████ and as I have already stated, my name was even published in the press, and the Israeli authorities told the Palestinian Authority that I was wanted for terrorist attacks, and my name was also published in the Hebrew press and in the local press in the West Bank and the Gaza Strip.

Q.    Did ███████████ assist you in providing money, aside from what you have already stated?

A.    Yes.  Once I received a check for NIS 2,300 from him, authorized by
       ;See the Defendant's statement, P/5)

In addition, he answered questions (P/6) in the following manner:

[Stamp] P 5: 254 [continued]

<u>Felony Case (Tel Aviv) 1137/02</u>          <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

"Yes, I had several *noms de guerre* while I was carrying out the terrorist attacks, such as █████ ████████ ██████ ... and also I took ... two old [anti-]tank missiles in order to take the explosives out of them and to use the explosives to make explosive charges, and I used the explosive charges on the bypass road at Zuata ... I recruited him (the reference is to a person named ██████████ into the *Kitaab Shuhadaa al-Aqsa*, about two months ago, and the purpose of recruiting him into the *Kitaab Shuhadaa al-Aqsa* was in order for him to assist us in terrorist attacks in the Jerusalem area, and in order for him to introduce suicide attackers [*mustashahids*] into Jerusalem. I also asked █████ to teach us how to manufacture explosives that were stronger than the explosives we were using, and ████ explained to me over the phone how to produce a certain material [*umm al-abd*], and I told him that we already know how to produce *umm al-abd* ... About a month and a half ago, I asked ████ to check out a way of introducing a suicide bomber into Jerusalem ... and my role was to coordinate between ██████ and ███ in order to introduce the suicide attacker into Jerusalem. That terrorist attack was carried out, but without success, because policemen shot the suicide attacker before the terrorist attack ... ██████ asked me to agree to accept a call from a certain person, and a few days' after that, ████ ████████ who is known as █████████████ called me and asked us to continue perpetrating terrorist attacks and offered me financing, and I expressed my consent, and I gave my bank account number in the Arab Bank in Nablus, in order for him to transfer money to me. In fact, █████████ transferred money to me about six times, and deposited $3,000 or $5,000 ...

Q.    What did you do with the money that ██████████ transferred to you?

A.    In order to perpetrate terrorist attacks ... According to the agreement with him, he used to provide me with money for the perpetration of terrorist attacks, and I would report to him on the attacks in conversations which I held with him by telephone and over the Internet ... I spoke with him about many terrorist attacks ... and I also reported to him on the suicide attack in Jerusalem and in Hadera, which we carried out ...

Q.    What military connections existed between you and ████████████?

A.    After the outbreak of the al-Aqsa intifada, ████████████ enlisted in the *Kitaab Shuhadaa al-Aqsa*, and I asked ██████ to participate in terrorist attacks with us, and ████ ████ I gave him an M-16 weapon, and ████ carried out a shooting attack with the weapon which I gave him. The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and according to ████ the vehicle was not hit ...

Q.    Did ████ have any contact with suicide bombers?

A.    Yes, ████ and I worked together to send out suicide attackers with ████████████ and ██████████ ... If we needed anything, such as photographing the suicide bombers or distributing posters, we would use ██████ About two weeks before the army came into Nablus, I

[Stamp] P 5: 255

36

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

asked ▮▮ to try to obtain an explosive belt for a suicide bomber, in order to carry out a terrorist attack within Israel. ▮▮ in fact, brought an explosive belt, and we gave it to a suicide bomber, who traveled with another person in order to perpetrate a terrorist attack in Israel, and when he got to Baqa al-Gharbiya, soldiers shot at him and they were both killed ...

    [Q.]   What kind of vehicle did the suicide attackers travel in?

    A.    I do not know, but I gave ▮▮▮ NIS 3,500 in order for him to buy a stolen car to transport the suicide attackers, and ▮▮▮ went with them to Tulkarm and showed them the way and came back by public transportation ...”

   . In his statement, P/7, he answered questions as follows:

    “... And ▮▮▮ contacted me about this, because we are a military squad, and I expressed my consent to that terrorist attack ... It should be noted that ▮▮▮▮▮ contacted me, because I am in charge of *Kitaab Shuhadaa al-Aqsa* ... and after I heard on the radio that they were killed, I called the media and I told them that this terrorist attack was carried out by *Kitaab [Shuhadaa] al-Aqsa* ... but when I announced that we were taking responsibility for the terrorist attack, ▮▮▮ told me the names ... I was also involved in the shooting attack in Netanya which was perpetrated by suicide attacks – I do not know their names.  Two days before that terrorist attack, ▮▮▮▮▮ called me and told me that he could bring two people into Israel, in order for them to carry out a suicide action, and I called ▮▮▮▮▮ and asked him if he could bring in suicide attackers and he answered in the affirmative.  I gave ▮▮▮ two grenades and ▮▮▮▮ gave them two M-16 weapons, and ▮▮ photographed them and explained to them about the terrorist attack ... Several hours later, we heard on television that fire had been exchanged between the suicide attackers and police forces near a hotel in Netanya, and that civilians

                                                    [Stamp] P 5: 255 [continued]

<u>Felony Case (Tel Aviv) 1137/02</u>        <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

and policemen had been wounded in the attack, and two people had been murdered, and two others had been killed by the police. I called the media and took responsibility for the terrorist attack ..."

And in statement P/8:

"Q.    Did you have contacts with ███████████

A.    Yes ... and I made contact with him and asked him to carry out military operations ...

Q.    What did ████████ do with the explosive charges which you gave him?

A.    For terrorist attacks, and I do not remember where the attacks were carried out.

Q.    Do you know a man named ███████████

A.    I know him ... He asked me for an explosive charge, so as to carry out a terrorist attack on an Israeli military patrol, and I agreed, and I gave him an explosive charge which I had received ...

Q.    Do you know a man named ███████████

A.    ... and I took about 20 pistols and 20 Kalashnikov rifles from ████████ through ████████ and ... an M-16, and I used to pay for those weapons out of my own money ..."

In his confession before the judge in arrest court, and as may be seen from the offenses imputed to him in the petition to extend the arrest order (P/23), the Defendant confessed to membership in a hostile organization, *Kitaab Shuhadaa al-Aqsa*, which belongs in Tanzim Fatah; participation in shooting attacks directed against Israeli targets in Samaria; involvement in recruiting suicide bombers; and sending them into Israel – suicide bombers who perpetrated murderous terrorist attacks. He also confessed to recruiting additional activists for the perpetration of terrorist attacks and the manufacture of explosives and explosive charges.

A witness for the prosecution, ████████████, sets forth in his statement, P/12: "I confess that, during the month of April 2001, Nasser Aweis proposed that I enlist in *Kitaab Shuhadaa al-Aqsa* and I agreed to that proposal, and since then, I have been an active member in the *[Kitaab] Shuhadaa al-Aqsa* organization, which belongs to Tanzim Fatah, and [I am still a member] to this day. After I joined that organization, Nasser Aweis asked me to distribute posters on behalf of *[Kitaab] Shuhadaa al-Aqsa*, and I did it ... and after that, I started to be involved in military activity. I participated in shooting attacks directed against the army, and I participated in laying explosive charges, and I also participated in preparing a number of suicide bombers and sending them to Israel to carry out suicide bombings ... Nasser Aweis is a resident of the Balata camp; he is about 29 years old and is also known as al-Hajj Rawaq, and he

[Stamp] P 5: 256

38

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

is one of the people in charge of the *Kitaab Shuhadaa al-Aqsa*, and he was my superior in the organization, and Nasser works for the National Security in Nablus and belongs to Tanzim Fatah ... The members of the group which I joined in *Shuhadaa al-Aqsa* are 1. Nasser Aweis – who was in charge of the *Kitaab Shuhadaa al-Aqsa* ..."

    In his statement, P/13, ▬▬▬▬ states as follows: "I confess that, during the month of March, about a month ago, Nasser Aweis asked me to transport a suicide bomber from Nablus ... in a stolen Pontiac which I received from Nasser ... I notified ▬▬▬ that I do not know how to manufacture explosive charges, and therefore I took him to Nasser Aweis in the Balata camp and I asked Nasser to get hold of two explosive charges for him, and then Nasser called ▬▬▬▬ ... About an hour later, ▬▬▬▬ came and brought two explosive charges with him ... and after that, ▬▬▬ received the explosive charges and each of us went home, and three days later, I heard that ▬▬▬ had carried out a terrorist attack on a military jeep ... Because ▬▬▬ had contacted me several times, I notified ▬▬▬▬ who gave his approval for me to go on planning a suicide bombing for ▬▬▬ and therefore I met with ▬▬▬ and asked him to carry out a combined attack ... A week later, ▬▬▬ got back to me and told me that he agreed

[Stamp] P 5: 256 [continued]

39

<u>Felony Case (Tel Aviv) 1137/02</u>        <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

to my proposal, provided that he would be joined by two of his friends, ███ and ███
███    So I contacted Nasser and told him wha███ had asked, and Nasser asked me to
check whether the three of them were serious about their intention of carrying out a suicide
attack ... After I trained them in firing an M-16, I videotaped ███ ██d ███ ██n my house, with
each one holding an M-16, and with a Palestinian flag and the flag of *[Kitaab] Shuhadaa al-
Aqsa* behind them, and ███ read out the will that Nasser had sent ... That same day, I reported
to Nasser Aweis that I had a suicide attacker with me, and Nasser asked to meet that terrorist.
The next day, I took ███ to a studio in Nablus to have his picture taken, and from there to
Nasser Aweis's house, and I left him there. Two days later, Nasser asked me to purchase a car
with Israeli license plates, and I bought a stolen black Mitsubishi for NIS 3,500 ... I got the
money for the car from Nasser Aweis. After I bought the car, I went to Nasser's house with the
car, and there I met Nasser and ███ ... I was surprised to find another person there, named
███ ... And then Nasser Aweis told me that those two people, ███ and ███
███ were about to go out and perpetrate a suicide attack in Israel. At that point, Nasser gave
███ an M-16 weapon, and he gave ███ two hand grenades ... About a year ago, Nasser
Aweis asked me to buy him two bags of chemical fertilizer for the purpose of preparing
explosive charges ... I bought them ... and I gave them to Nasser Aweis for the purpose of
preparing explosive charges ... About a year ago, I purchased two M-16 rifles ... I got the
money for those weapons from Nasser Aweis ...

> Q.    Where did you used to get the money for expenses for the military activity?
>
> A.    Nasser Aweis was in charge of me on behalf of *[Kitaab] Shuhadaa al-Aqsa*."

In his statement, P/18: "The plan for the perpetrators of the suicide attack inside the
central bus station in Hadera was that ███ and I ... and Nasser Aweis had the idea of sending
one or two suicide bombers to carry out an integrated terrorist attack involving shooting followed
by bombing, with an explosive charge that they would carry on their person. This would have a
great effect and would cause mass casualties. Nasser Aweis took it upon himself to recruit the
suicide bomber, and I took it upon myself to find an Israeli who would help introduce the suicide
bomber into Israel ... In the end, we did not manage to carry out that terrorist attack ... ███
███ told me ... that he had noticed a number of religious people concentrating in a synagogue
[illegible, probably "between"] Baqa al-Gharbiya and Hadera, and he suggested that we should
organize a suicide bombing there. I agreed, and I notified Nasser Aweis, who was in charge of
me, and he said "OK, we'll take it into account," but in the end, it did not work out. In addition,
███ and [illegible, probably "Nasser"] Aweis and I talked about the possibility of
carrying out a terrorist attack on the main fuel station in Israel, by waiting for a fuel tanker to
arrive to distribute fuel in Nablus and placing an explosive charge in the tanker without the
driver noticing – an explosive charge connected to a mobile phone – and later, when the tanker
re-entered the main station, the explosive charge would be set off by calling the mobile phone
connected to it. This was only a plan; it was not carried out ... I thought we would carry out a
terrorist attack on the Ministry of Defense in Tel

[Stamp] P 5: 257

Nevo Publishing Ltd.        nevo.co.il        The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

Aviv. I talked about it with Nasser Aweis and ████████ and we decided to look for trained activists who would carry out such a terrorist attack ... I would bring the weapons from Nasser Aweis every time anyone went out to perform a terrorist attack ..."

And in statement P/20: "... I am certain that ████████ knew the rifles were intended for suicide attackers who were going out to perform terrorist attacks within Israel, because ███ is the confidant of Nasser Aweis, and that ███ was the one who wrote the posters for Nasser Aweis -- the posters taking responsibility for terrorist attacks which were planned by Nasser Aweis ..."

The witness ████████ states, in statement P/40A: ████████ contacted me and told me that he was planning to set up a military squad belonging to Tanzim Fatah. He suggested that I enlist in the military squad, and ████████ said that the purpose of setting up the squad was to carry out terrorist attacks against the Israeli army in the Nablus area. I agreed [illegible, probably "to this"] and, within the framework of the military squad, I participated in 10 shooting attacks directed against Saqen in the Nablus area. Participating in the shooting attacks along with me was ... Nasser Aweis, about 35 years old, from the Balata camp, who was in charge of the Tanzim in Nablus ...

Q.    Who used to plan and prepare for the perpetration of the terrorist attacks in which you participated?

A.    Nasser Aweis was the one who used to plan for the perpetration of the terrorist attacks, and he was the one who used to supply us with the weapons ..."

[Stamp] P 5: 257 [continued]

41

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

And in statement P/40B: "In the beginning of October 2001, ▮▮▮▮▮▮and I met with Nasser Aweis ... and there Nasser offered to teach us how to prepare explosive charges for the purpose of carrying out terrorist attacks and supplying explosive charges to others in the Tanzim Fatah. After ▮▮▮▮▮▮and I had consented to this, Nasser Aweis came to us, to the apartment where ▮▮▮▮and I live, in Rafidiya, and Nasser Aweis had explosives in his possession, in five bags, 10 kg in each bag. He also had about 10 gas cylinders of various sizes in his possession, as well as electric wires and batteries, and in the apartment, Nasser Aweis taught us how to prepare an explosive charge and set it off. Nasser also taught us how to prepare explosives from the following materials:  1. Agricultural fertilizer containing potassium, 2. Sulfur, 3. Charcoal ... Nasser Aweis provides [sic] us with the materials required for preparation of the explosive charges ... The apartment in Rafidiya served for the preparation of explosives and charges ... We used to give the explosive charges which we prepared to people from Tanzim, for the purpose of carrying out military terrorist attacks against Israeli targets in the West Bank ..."

In statement P/40C: "Q. In your first statement, you stated that Nasser Aweis was the one who used to plan the perpetration of the terrorist attacks and that he was in charge of Tanzim Fatah in Nablus. Did you use to inform Nasser Aweis of the perpetration of the terrorist attacks in which you participated, and of the terrorist attacks which were performed by others with whom you were in contact in Tanzim Fatah?

A.      Yes, ▮▮▮▮▮▮and I would inform Nasser Aweis of every terrorist attack we carried out, as well as other terrorist attacks which were carried out by other people with whom we were in contact ...

Q.      Were you in contact with ▮▮▮▮▮▮

A      No, I had no contact with him.  Nasser Aweis had contact with ▮▮▮▮ and he would inform [him] of the terrorist attacks which were carried out against Israeli targets ..."

And in statement P/40D: "About a month after the terrorist attack on the settlement of Gidonim, ▮▮▮▮▮▮came to me and asked me for the M-16 rifle, which I had taken from the guard whom I murdered in Gidonim. I gave the weapon to ▮▮▮▮▮▮to use in a terrorist attack, and he returned the weapon to me the next day and told me what he had done with the weapon. I would like to add that Nasser Aweis took the M-16 weapon from me twice, in order for Tanzim activists to use it, and in September 2001, Nasser Aweis took the weapon from me for the purpose of placing an explosive charge ... and this was carried out by ▮▮▮▮▮▮an activist in Force 17 ... In October 2001, Nasser Aweis took the weapon from me for a shooting [attack] ... [on] a military position ..."

[Stamp] P 5: 258

42

The witness ▮▮▮▮▮▮▮▮ sets forth, in his statement P/43A: "Q. Why did you call Nasser Aweis? A. Because he is in charge of *[Kitaab] Shuhadaa al-Aqsa* and he does things like that. I asked Nasser Aweis if he could help me by bringing me someone who wanted to carry out a terrorist attack, and I would send him to Jerusalem to carry out a terrorist attack there, and Nasser said he would send me someone ...

In statement P/43C: "After I telephoned Nasser Aweis and told him about the terrorist attack (this was the terrorist attack described in the first count of this indictment, which took place in the Seafood Market restaurant), because Nasser Aweis is in charge of *Kitaab Shuhadaa al-Aqsa* ... Q. Tell me where the money for this activity came from. A. I gave Nasser Aweis my bank account number, and he deposited about 7,000 shekels in my account ...

Q.    Tell me about your contacts with Nasser Aweis.

A.    I had Nasser Aweis's mobile phone number, and we would talk on the phone about the operations, and ▮▮▮▮▮▮▮▮▮ knew about those contacts and that we used to talk. One day, Nasser told me that he would send ▮▮▮ to me, and that I should prepare him and send him out to carry out a suicide bombing ... Then ▮▮ told me that ▮▮▮▮▮▮ had told him not to give me money and weapons at that time. I told Nasser Aweis that, and he said that that was all right, that we would go on, and that he would bring the weapons and money. I remember that Nasser Aweis told me that he had other people who wanted to carry out suicide bombings, and that he would send them to me ..."

[Stamp] P 5: 258 [continued]

43

And in statement [P/]43D: "That night, when the terrorist attack took place at the event hall in Hadera ... I called Nasser Aweis, and he told me that he was in charge of that terrorist attack that is, that *Kitaab Shuhadaa al-Aqsa* had carried out that attack. I agreed with Nasser Aweis that, the next day, he would give me a poster stating that he was taking responsibility for the terrorist attack. The next day, Nasser sent me the poster by fax and I photocopied it 1,000 times and distributed it in Ramallah ..."

In statement P/43E: "I, ███████ use the *nom de guerre* of France, and I was responsible for *Kitaab Shuhadaa al-Aqsa*, together with Nasser Aweis ..."

The witness ███████ stated, in his statement P/47A: "Nasser Aweis is in charge of *Kitaab Shuhadaa al-Aqsa*, and he is wanted in Israel. In September 2001, Nasser Aweis called me and asked me to prepare a poster for him, for the first anniversary of the al-Aqsa intifada ... I prepared such a poster and I gave it to Nasser, at his house in Balata. In addition, after the death of ███████ Nasser Aweis used to call me after terrorist attacks and asked me to write posters, in which *Kitaab Shuhadaa al-Aqsa* took responsibility for the terrorist attacks, and I agreed ... After a terrorist attack took place, Nasser Aweis would call me and tell me where the attack was and who the young man who carried out the suicide bombing was, and I would prepare the posters and would write that *Kitaab Shuhadaa al-Aqsa* took responsibility for the terrorist attack. After that, I would transfer the poster to Nasser Aweis, and he would send it out to journalists by fax. Q. You told me before that Nasser Aweis was in charge of *Kitaab Shuhadaa al-Aqsa* in Balata and was wanted in Israel. Can you tell me about Nasser Aweis's fellow members of the terrorist squad? A. They are a squad of *Kitaab Shuhadaa al-Aqsa*, and Nasser Aweis was in charge of the squad."

And in P/47B: "About three weeks ago, Nasser Aweis called me and asked me to get him two explosive belts urgently, for a suicide bombing. Nasser Aweis told me to bring explosive belts from another person, and not from ███████ because the explosion produced by an explosive belt that ███████ prepared was too weak. They had tried out such an explosive belt, and the explosion was weak ... I contacted ███████ because he has a friend who knows how to manufacture explosive belts ... Two days later, ███████ told me that ███████ had prepared one explosive belt for us ... and I transferred it to ███████ .."

In P/47C: "In the beginning of 2001, I was in Nasser Aweis's home in the Balata refugee camp, and there, Nasser Aweis proposed that I enlist in the al-Aqsa Martyrs' Brigades for military activity, and I agreed. Q. Did Nasser Aweis tell you [plural] what military activity you were supposed to carry out? A. Yes, he said that we would be carrying out terrorist attacks against Israeli targets, and then he proposed that we carry out a terrorist attack involving an explosive charge and shooting, against a military vehicle ... "

[Stamp] P 5: 259

44

In P/47D: "About a month and a half ago, I called the mobile phone of Nasser Aweis, who is in charge of the Tanzim - *Kitaab Shuhadaa al-Aqsa* in Nablus ... and I suggested to Nasser that Tel Hashomer Hospital in Israel was a good place for a terrorist attack. I had heard that there were Israeli soldiers in Tel Hashomer Hospital, and therefore I suggested carrying out a terrorist attack there. Nasser told me to forget about that for the time being, and asked me to talk about it with ▊▊▊▊▊▊▊ a man in his twenties, a senior activist in the Tanzim, Nasser Aweis's assistant ... About two months ago, in the evening, Nasser Aweis contacted me - I told you about him - and asked me to contact GAP [sic] activists and check with them about helping to carry out military activity and terrorist attacks. I told Nasser that I knew a GAP [sic] activist ... Nasser told me to go to him. I met with ... and I told him that I worked with Nasser Aweis ... "

And in statement P/47E: " ... ▊▊▊ told me that he had a man who was willing to carry out a suicide attack. So after a few minutes, I called Nasser Aweis and told him that there was a suicide attacker who was willing to carry out a suicide attack, and Nasser Aweis

[Stamp] P 5: 259 [continued]

45

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

instructed me that the man should go to Ramallah ... After about a week, or five days, I heard on the news that a suicide attacker named ▮▮▮▮ from Nablus, had perpetrated a shooting attack in the area of [illegible] ... in Jerusalem, and two Jews had been killed in that terrorist attack and others had been wounded, and ▮▮▮▮ had been wounded and was in severe condition, because he had been shot by the soldiers. After the news, on the day of the terrorist attack, Nasser Aweis called me and told me that the perpetrator was ▮▮▮▮ an activist in the Tanzim, and instructed me to prepare a poster on behalf of *Kitaab Shuhadaa al-Aqsa*, stating that the organization was taking responsibility ... "

Pursuant to Section 1 of the Prevention of Terror Ordinance, 5708 - 1948, "a 'Terrorist Organization' is an assemblage of persons which, in its operations, makes use of acts of violence which are likely to cause the death or injury of a human being, or threatens such acts of violence. A 'Member of a Terrorist Organization' is a person who belongs to that organization, including a person who participates in its operations, who publishes propaganda on behalf of a Terrorist Organization or of its operations."

Pursuant to Section 2 of the above mentioned Ordinance, a person holding, *inter alia*, a position involved in management or instruction in a Terrorist Organization, or involved in the deliberations or the decision making of a Terrorist Organization, is considered to be an activist in such an organization.

The citations appearing above are only one example of the broad and detailed web spread out for us, on the basis of the statements made by the Defendant and his accomplices, on which we relied - a web of facts which properly substantiates the legal conclusion that the foundations for the offenses against Section 2 and 3 of the Ordinance have been properly made, as well as the conclusions that the organizations to which the Defendant and his accomplices belonged are Terrorist Organizations.

In addition to offenses against the [Prevention of] Terrorism Ordinance, which the State imputes to the Defendant in all of the charges set forth in the indictment, it also imputes to him, in all of the charges, offenses against Section 499 of the Penal Code, 5737 - 1977.

The offense of conspiracy basically consists of an agreement between two or more persons to carry out an illegal act. The engagement must be for the purpose of achieving a common goal, and the engagement must be accompanied by the intention of realizing the common goal. The goal intended, as set forth above, is a goal defined by law as illicit.

The web of facts mentioned above also properly substantiates the conclusion that the Defendant committed the offenses against Section 499 of the Penal Code, 5737 - 1977.

The Defendant's confession with regard to his position, status and activity within the organization to which he belonged - activity was intended to carry out terrorist operations, which

[Stamp] P 5: 260

46

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

even had murderous and damaging results, as shall be set forth below - is fully supported by an additional, substantial item derived from separate and independent sources: the assertions by each of the accomplices, which - each in its own way - embroil the Defendant in the offenses imputed to him, and which relate to a real point which is in dispute. The supplementary evidence which reinforces the testimony by the accomplices has already been discussed above.

The State has proven the actions which are imputed to the Defendant.

**Count No. 1:**

[Stamp] P 5: 260 [continued]

Nevo Publishing Ltd.          nevo.co.il          The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

On March 5, 2002, the terrorist ▄▄▄▄▄▄▄▄ (hereinafter: ▄▄▄▄▄▄) came to the Seafood Market restaurant in Tel Aviv, armed with an M-16 rifle, hand grenades, and a knife, with the intention of carrying out a murderous terrorist attack.

When ▄▄▄▄▄ arrived on the scene, the restaurant was full of scores of people. ▄▄▄▄▄ started firing at the people in the restaurant from the Maariv House Bridge, threw hand grenades - which miraculously did not explode - into the restaurant, and immediately thereafter, entered the restaurant and stabbed people sitting inside, all in order to intentionally cause the death of many persons who were in the restaurant at the time.

In that incident, Sergeant Major Salim Barikat of blessed memory, age 33, who was one of the first policemen to reach the scene of the attack and tackled ▄▄▄▄▄ with the intention of arresting him, Yosef Habi of blessed memory, age 52, and Eliyahu Dahan of blessed memory, age 53, were stabbed to death by ▄▄▄▄▄'s knife. Scores of other persons were wounded, some of them seriously. After the security forces arrived on the scene of the terrorist attack, ▄▄▄▄▄ was shot to death. (See testimony: Witness No. 3 for the prosecution, ▄▄▄▄▄ Witness No. 4 for the prosecution, ▄▄▄▄▄▄▄▄ (presentation P/4); Witness No. 8 for the prosecution, ▄▄▄▄▄ Witness No. 9 for the prosecution, ▄▄▄▄▄ Witness No. 11 for the prosecution, ▄▄▄▄▄ Witness No. 13 for the prosecution, ▄▄▄▄▄ Witness No. 17 for the prosecution, ▄▄▄▄▄ P/32 (activity reports on the preservation of the scene of the crime and the seizure of exhibits); P/33 (an M-16 rifle); P/34 (a bloody knife); P/35 (a board of photographs); P/24 (an activity report); P/25 (an activity report); P/52 through P/57 (expert opinions).

According to an argument that was set forth by the State, the Defendant - who, as set forth above, was ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ - entered into a conspiracy with other activists in the organization, including ▄▄▄▄▄▄▄▄ and ▄▄▄▄▄▄▄ (Witness No. 23 for the prosecution), for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, ▄▄▄▄▄ was recruited, supplied with equipment and transported to Tel Aviv, to the site of the restaurant. Among other things, the Defendant instructed ▄▄▄▄▄ to film ▄▄▄▄▄ before he set out to perpetrate the terrorist attack, as a suicide attack, so that afterward it would be possible to send the [video] cassette, with ▄▄▄▄▄ on film, to various television stations. In fact, after the terrorist attack on the restaurant, the Defendant did call the various television stations and other media and informed them that the Terrorist Organization was responsible for the terrorist attack and had even carried it out.

The admission by the Defendant is as follows:

"Q.    Did you have any involvement with suicide attacks in Tel Aviv?

[Stamp] P 5: 261

48

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

     A.    Yes, ▮▮▮▮▮▮▮ told me, early in March 2002, when he came to my home in Balata camp, that ▮▮▮▮▮▮▮▮ was asking me to provide a person who would carry out a suicide attach (*istishhad*) in Tel Aviv, and informed me that he was about to contact a person named ▮▮▮▮▮▮ originally from Gaza, who was serving in the naval force [sic] in Nablus, and ▮▮▮▮▮ gave ▮▮▮ an M-16 weapon and hand grenades. ▮▮▮▮▮▮contacted me in that matter because we are a military squad, and I expressed my consent for that terrorist attack. He sent ▮▮▮▮▮ to Ramallah by public transportation, and we agreed with ▮▮▮▮▮ that he would meet ▮▮▮▮ in Ramallah. It was further agreed that ▮▮▮ would film ▮▮▮▮ before the terrorist attack was carried out, and that afterward, we would send the [video] cassette to the television stations. In fact, after that, ▮▮▮▮ came to Ramallah, and as far as I know, ▮▮▮▮ brought him into Israel and ▮▮▮▮ came to Tel Aviv, and I Stipulated Award on the news that he had fired at the Israelis in the restaurant and had been killed. Then I called the television stations, and I called [sic] and told them that the terrorist attach had been carried out by *Kitaab Shuhadaa al-Aqsa*.

     Q.    As far as you know, how many people were killed in the terrorist attack in Tel Aviv?

     A.    As far as I know, two or three people were killed and more than 20 people were wounded.

     Q.    Which television stations did you call to tell them that the terrorist attack had been carried out by [your organization]?

     A.    Al-Jazeera, Abu Dhabi, Israel, al-Manar, and the local press.

[Stamp] P 5: 261 [continued]

Nevo Publishing Ltd.    nevo.co.il    The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

Q.      Do you have anything to add about the terrorist attack in Tel Aviv?

A.    No, but at about that time, ████████████ from *Kitaab Shuhadaa al-Aqsa* contacted me and said that there were two people who wanted to carry out a terrorist attack in Israel, and I agreed to that. I informed ████████████ of the matter and asked him if he would be able to bring them in, and it was agreed with ████████████ that ████████████ and ████ would take the two *mustashhids* to Ramallah. After that, I called ████████████ and told him that the people were on their way to him. I should note that ████████████ contacted me because I am responsible for *Kitaab Shuhadaa al-Aqsa.*"

(See P/7)

The "additional item" is as follows:

The witness ████████████ [stated as follows]:

"... Nasser Aweis called me and told me that he had another young man who wanted to carry out a suicide attack, that he was sending him to me, and I said OK. After that, a young man called me and told me that he was coming to me on behalf of Nasser Aweis. I sent ████ to bring him, and I gave ████ NIS 1000 and I told ████ to buy the young man new clothes and to take him to have a haircut. I also told ████ that, after that, he should bring the man to the rented apartment in Ramallah near the Arab Bank, where ████ had been before that. After that, when I arrived at the rented apartment, I saw the young man, who told me that his name was ████████████ that he was 21 years old, and he said he came from Gaza. After that, I told al-Nuf that he should take ████ to Israel, so that he could carry out a terrorist attack there, and I told ████████ that I would also bring him a weapon, for him to carry out a terrorist attack. After that, ████████ bought an M-16 rifle and gave it to ████████████ and after that, ████████ took ████████ to the Amari refugee camp, to ████████ and they stayed there three days. After the three days, ████ called me and told me that he was going out, and after that, I heard that this ████████ had carried out a terrorist attack in Tel Aviv, in a restaurant, and that he had gone there with ████ and ████████ and that both had been caught ... and after several days, ████████ who is an activist in *[Kitaab] Shuhadaa al-Aqsa* and works with Nasser Aweis, called me ... and ████████ told me that he had someone who wanted to carry out a suicide attack, and that he would send him to me, to Ramallah, and I said OK ..." (See P/43A)

The witness ████████████ in P/43C: "Q. Tell me about your activity with regard to the terrorist attack in Tel Aviv at the Seafood [Market] restaurant.

A.    The one who carried out that terrorist attack was ████████████ who came from the Nablus area, from Nasser Aweis ... After that, I called ████████ on his mobile phone – I was in contact with him at the time – and I would tell [sic] him that the terrorist attack

[Stamp] P 5: 262

50

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

had gone out for execution. ████████████ told me that he did not want the terrorist attack
to take place inside Israel, and I told him that it would be all right. After that – this was about
3:00 a.m. – ████████ called me and told me that the terrorist attack had been carried out,
and he told me to watch it on television. At that point, I called ████████ and I told him
that the terrorist attack had been carried out, and that he should watch it on television, and
████████ told me that he was watching it on television. ████████ did not say anything to me about
having heard that the terrorist attack had been carried out within Israel, and not in the West
Bank, as he said it should be. After that, I called Nasser Aweis and I told him about the terrorist
attack, because Nasser Aweis is responsible for *Kitaab Shuhadaa al-Aqsa*."

**Count No. 2:**

[Stamp] P 5: 262 [continued]

51

Nevo Publishing Ltd.          nevo.co.il          The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

On January 17, 2001, the terrorist ███████████ (hereinafter: '███████████) came to the Armon David event hall in Hadera, armed with an M-16 rifle and hand grenades and wearing a vest with ammunition clips, with the intention of carrying out a murderous terrorist attack.

The Bat Mitzvah celebration of a young girl, Nina Kardashov, was taking place in the hall at the time, with scores of guests. ███████████ burst into the hall, shooting in all directions, and before being overcome by some of the guests, succeeded in intentionally causing the death of six of the guests: Anatoly Bakshayev of blessed memory, age 63, Edward Bakshayev of blessed memory, age 48, Boris Malikhov of blessed memory, age 56, Dina Binayev of blessed memory, age 48, Alice Ben Israel (Aharon) of blessed memory, age 32, Avi Yazdi of blessed memory, age 25, and wounding scores of other persons, some of them seriously (see the testimony of Witness No. 1 for the prosecution, ███████████ Witness No. 24 for the prosecution, ███████████ Witness No. 12 for the prosecution, ███████████ Witness No. 20 for the prosecution, ███████████ P/1 (presentation), P/27 (medical documents), P/36 (M-16 rifle), P/44 (cassettes), P/58 (expert opinion), P/59 (death certificate of Anatoly Bakshayev of blessed memory), P/60 (death certificate of Avi Yazdi of blessed memory), P/61 (death certificate of Boris Malikhov of blessed memory), P/62 death certificate of Dina Binayev of blessed memory), P/63 through P/66 (expert opinions).

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – conspired with ███████████ (Witness No. 6 for the prosecution) and additional activists to perpetrate a terrorist attack, which was intended to deliberately cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, ███████████ was recruited, trained in firing an M-16 rifle, supplied with weaponry and ammunition clips for the purpose of the training and the perpetration of the deed, and transported to the site of the terrorist attack in Hadera. Prior to the terrorist attack, ███████████ was photographed on the instructions of the Defendant, reading a will which had been written for him by the Defendant and holding an M-16 rifle which belonged to the Defendant in his hand, so that afterward it would be possible to send the photographs to the media. In fact, after the terrorist attack, the Defendant did instruct ███████████ (Witness No. 25 for the prosecution) to prepare posters which were distributed, and which stated that the Terrorist Organization was responsible for the terrorist attack and had carried it out.

The admission by the Defendant is as follows:

P/5:

"12. I supplied ███████████ with weapons for carrying out the suicide attack in Hadera."

[Stamp] P 5: 263

52

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

P/6:

"A.    I spoke with him about many terrorist attacks, and I remember that I spoke with
him about a shooting attack which I had carried out along with ████████████and █████
and ██████████████near the Hawara refugee camp, directed against a military vehicle. I also
spoke with him about placing explosive charges in the vicinity of Zuata; I had participated in
those terrorist attacks along with ████████████and ██████████████ and █████████████and
██████████████████████and I reported to him about the suicide attack in Jerusalem and in Hadera,
which we had performed.

Q.    Which suicide attack in Hadera?

A.    The one carried out by ██████████████████████████

"[Q.]  Can you explain how the terrorist attack was carried out in Hadera and Jerusalem?

A.    Yes. ██████████████████████a resident of Beit Amrin, contacted ████████████
████████(Witness No. 6 for the Prosecution) and told me [sic] that he wanted to commit suicide
[al-taset shahad] and ████████contacted me and told me. And after ████████████████died, we
decided to carry out a terrorist attack, and ████████photographed ████████████████in the
Balata refugee camp, and I gave him weapons: an M-16 and a hand grenade, and we gave ████████

[Stamp] P 5: 263 [continued]

53

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

████████ NIS 400. He went to Tulkarm by public transportation, where he met with████████ in the home of████████ a resident of Tulkarm. From there, according to the [plan for the] terrorist attack,████████ was responsible for sending him to Hadera, and the terrorist attack was carried out in the hall, and as far as I know, a number of people were killed in that attack."

The "additional item" is as follows:

The witness ████████ P/17, p.3:

"I also confess that I was the one who photographed ████████ of Beit Amrin before he set out to carry out the suicide attack in Hadera, about six months ago."

P/18, p.14:    "To tell the truth, I was the one who recruited ████████ a resident of Beit Amrun [sic]. ████████ is a friend of mine and we worked together in Nablus in the National Security. ████████ asked me, about six months ago, to arrange for him to carry out a suicide attack ... After ████████ asked me to arrange for him to perpetrate a suicide attack in Israel, I contacted Nasser Aweis and told him about ████████ ... and then we decided to send him out for a suicide attack in revenge for the death of ████████ ████████ Nasser asked me to train him in the use of weapons, so that he would be prepared to carry out the terrorist attack successfully. That is what I did; I trained him to use an M-16 rifle ... I took the weapon and eight clips of bullets from Nasser Aweis. The day fater that, I brought ████████ to Nasser Aweis's house in the Balata refugee camp, and, in Nasser Aweis's house and in his presence, I filmed ████████ reading the will written by Nasser and holding an M-16 weapon belonging to Nasser, and making the hand gesture of the *shahadaa*. We filmed him with a video camera and photographed him with an ordinary camera. Nasser took the cassette and the pictures. We gave ████████ an M-16 rifle and six clips of bullets and two hand grenades, which Nasser had brought. After the photography session, at about 8:00 p.m., I went out to look for a taxi, and I found ████████ a taxi driver who lives in Balata, about 26 years old, and I asked him to help us transfer a young man to Tulkarm, without telling him that he was a suicide attacker. He agreed to do that, and took ████████ to Tulkarm. He took the M-16 rifle, the clips of bullets and the hand grenades in a bag, after having disassembled the M-16 into two pieces. When ████████ had gone to Tulkarm in ████ s Taxi, ████ called ████████ ████ and informed him that the man was on his way to him. I should note that Nasser had spoken with ████████ before that and had told him to prepare himself to meet ████████ in order to help him enter Israel. I knew that from Nasser. I was not involved in the conversations between them. I was later told that ████████ had received ████████ in Tulkarm, and that, when ████████ reached Hadera, he prepared a terrorist attack in an event hall, and that he was killed, and that he killed a number of Israelis, I think six in all ..."

████████ P/43D:

[Stamp] P 5: 264

Felony Case (Tel Aviv) 1137/02                    State of Israel v. Nasser Mahmoud Ahmad Aweis

    "The night of the terrorist attack in the event hall in Hadera, I was with ████
████        and ████    in the Orthodox restaurant in Ramallah. Suddenly,
they announced on television that the terrorist attack had taken place in the event hall in Hadera.
I called Nasser Aweis and he told me that he was responsible for that terrorist attack – that is,
that members of the *Shuhadaa al-Aqsa* Brigades had carried out that terrorist attack. I agreed
with Nasser Aweis that, the next day, he would give me a poster stating that he was taking
responsibility for the terrorist attack. The next day, Nasser sent me the poster by fax and I
photocopied it 1,000 times and distributed it in Ramallah."

    **Count No. 3:**

[Stamp] P 5: 264 [continued]

55