Felony Case (Tel Aviv) 1137/02      State of Israel v. Nasser Mahmoud Ahmad Aweis

. On January 22, 2002, the terrorist Said Ramadan came to the corner of Jaffa Road and Lunz Street in downtown Jerusalem, armed with an M-16 rifle and two clips of bullets, with the intention of perpetrating a murderous terrorist attack. Ramadan shot at civilians who were passing there at the time, and intentionally caused the death of Sarah Hamburger of blessed memory, age 79, and Ora (Svetlana) Sandler of blessed memory, age 56, who were innocently walking down the street, and wounded scores of persons, some of them seriously. Ramadan was shot to death by policemen who reached the scene. (See the testimony of Witness No. 22 for the prosecution, ████████ Witness No. 26 for the prosecution, ████ Witness No. 3 for the prosecution, ████ Witness No. 14 for the prosecution, ████ ████ Witness No. 15 for the prosecution, ████████ P/30 (presentation), P/48 (M-16), P/48A (report on the seizure of exhibits), P/77 (photographs from the scene of the incident), P/78 (death certificate of Sarah Hamburger of blessed memory), P/79 (death certificate of Ora Sandler of blessed memory).

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with ████████ and other activists, for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. In order to promote and implement the conspiracy, which was headed by the Defendant, Ramadan was recruited, supplied with equipment, photographed as a suicide attacker – all according to the pattern typical of the Organization, as described in the previous accounts – and transported to the scene of a terrorist attack, Following the terrorist attack, the terrorist's photograph was distributed to the media.

The admission by the Defendant is as follows:

P/5:

"11.   I supplied Said Ramadan with weapons for carrying out the suicide attack in Jerusalem."

P/6:

"Q.   Which terrorist attack in Jerusalem?

A.   The terrorist attack carried out by Said Ramadan in September 2001."

"… And the terrorist attack in Jerusalem was carried out in such a way that Said Ramadan contacted ████████ and said that he had been a friend of ████████ and that he wanted to avenge his killing, and ████████ told me. I then met with Said and I understood that he wanted to carry out the terrorist attack, and I called ████████ in Ramallah and I asked him to take him to Jerusalem, and ████████ agreed. Said went to Ramallah by public transportation, where me met with ████████ The next day, Said went to Jerusalem and

[Stamp] P 5: 265

56

<u>Felony Case (Tel Aviv) 1137/02</u>          <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

shot at a group of policemen and civilians, and in that terrorist attack, two people were killed, and so was Said."

The "additional item" is as follows:

████████████ P/43A:

"I asked Nasser Aweis if he could help me by bringing me someone who wanted to carry out a terrorist attack, and I would send him to Jerusalem to carry out the attack there. Nasser told me that he would send me someone, and after some time, Said Ramadan, from the village of Tel Shekhem, about 25 years old, came to me and said that he would carry out the terrorist attack. I met him next to the movie theater in Ramallah and I called ████████████ and told him to come too, and from there, we went to the barber shop where ████ got a haircut. Then we called ████████ and asked him if he could bring the man into Jerusalem, because he wanted to carry out a suicide attack, and ████ said that he could do it, and then ████ went out in his car to look at the road and see what was happening. Meanwhile, ██████████ [sic] and I

[Stamp] P 5: 265 [continued]

57



took Said to [illegible, probably "pray'] and eat, and I bought him new clothes and shoes with my own money, for NIS 1,200. After that, I told ███████████ [sic] to bring an M-16 rifle and three clips of bullets and give them to Said, and he did. Then ███████████ and ███████████ arrived in an Isuzu which belonged to ██████ and it was in the afternoon when they went with ████ to Jerusalem. We wished them success and they drove off with Said. I did not tell them where to go; they could take him wherever they wanted to.

Q.-A.  We did not film Said on video before the terrorist attack, because Nasser Aweis had already done so.

Q.    At the beginning of your testimony, you told me that you do not know ███████ and all the rest, and now I see that you did meet them. How is that?

A.    I met them in Raad Karami's mourning tent, and that was when I saw them. At about 4:30 p.m., I heard on the news that there had been a shooting attack in Jaffa Road in Jerusalem, and I knew that was Said's terrorist attack. So I called ███████ and asked him if they had been the ones ... who had taken Said to Jaffa Road, and ██████ said that they had dropped him off in Jaffa Road, and that they had heard the shots he fired after he got out of the car. The next day, I took $1,000 from ███████ and I told him that the people had gone out to perpetrate a terrorist attack, and that the weapons had been lost in the terrorist attack. I gave ████ and ████ [sic] and ███████ each $100 for that terrorist attack. After that, ███████ a ████ and another man named ███████ from Qatanduha came to me and asked me why I had not paid them for the terrorist attacks that they carried out, and I said that I would look into it."

### Count No. 4:

On March 9, 2002, the terrorists ███████ and ███████ arrived in the area of Jeremy Hotel on Gad Machnes Street in Netanya, armed with M-16 rifles and fragmentation grenades. The two fired bursts into the lobby of the hotel and threw two fragmentation grenades. The two succeeded in intentionally causing the death of a one year old baby, Avia Malka of blessed memory. As the security forces were overcoming the two, Yihya Israel of blessed memory, age 29, who happened to be nearby, was also shot. As a result of the act committed by the two, scores of additional persons were wounded, some of them seriously. (See the testimony of Witness No. 2 for the prosecution, ███████ Witness No. 10 for the prosecution, ███████ witness No. 16 for the prosecution, ███████ P/28 (report), P/26 (medical documents of Witness No. 11 for the prosecution), P/29-P/30 (assault rifles), P/31 (photographs), P/67 (expert opinion), P/68 (death certificate of Avia Malka of blessed memory), P/69-P/71 (expert opinions).

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with ███████ and ███████ Witness No. for the prosecution), for the purpose of

[Stamp] P 5: 266

58

perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, and in order to carry out [the terrorist attack], ███████ and Said were recruited, equipped with an M-16 rifle, 12 clips of bullets and two hand grenades, photographed reading their wills and holding an M-16 rifle, and transported to the scene of the terrorist attack. After the terrorist attack and in accordance with the typical pattern, the Defendant called the media and informed them that the Terrorist Organization was responsible for the terrorist attack and had carried it out.

The admission by the Defendant is as follows:

P/5:

"6.    I delivered weapons for the perpetration of a terrorist attack in Netanya."

[Stamp] P 5: 266 [continued]

<u>Felony Case (Tel Aviv) 1137/02</u>          <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

P/7:

"Q.     Did you have any involvement with a shooting attack in Netanya?

A.     Yes, I was involved with a shooting attack in Netanya, which was carried out by terrorists whose names I do not know.  About two days before that terrorist attack, ███████ ██████ called me and told me that he would be able to bring two people into Israel, in order for them to carry out a suicide attack, and I contacted ████████████ and asked him if he could bring in suicide attackers, and he answered in the affirmative.  Then I gave ████████ two grenades and ████████████ gave them two M-16 weapons, and ██████████████ photographed them and explained to them about the terrorist attack.  Then ████████████ went with them as far as Baqa al-Sharqiya and left them, and they walked along a dirt road into Israel and went from there to Netanya, and ██████ went back to Nablus.  After a few hours, we heard on television that there had been an exchange of fire between the suicide attackers and police forces near a hotel in Netanya, and that civilians and policemen had been wounded in the terrorist attack, and that two people had been murdered and two others had been killed by the police.  I called the media and took responsibility for the attack.

Q.     Do you have anything to add about the terrorist attack in Netanya?

A.     No."

The "additional item" is as follows:

██████████████ (Witness No. 6 for the prosecution), in P/13:

"I confess that, about a month ago, Nasser Aweis told me that he intended to send two suicide attackers to the city of Netanya, in order to carry out a suicide attack, and asked me to help transport the suicide attackers from Nablus to Kafr Rai, and of course, I agreed.

Q.     Who are those two suicide attackers?

A.     The first suicide attacker is ██████████████ a resident of the Ein Beit Alma camp, and the second one's name is ████████ a resident of the Ashar camp ... and both of them were wounded in a terrorist attack.  That day, Nasser Aweis told me that ████████ [sic] had worked in Netanya and was familiar with the area.  Q. [A.] Nasser Aweis told me that ██████████████ a resident of al-Ain, 28 years old and married, was working for the naval police [sic] in Nablus, and that he was an activist in *Kitaab Shuhadaa al-Aqsa.* ████ is ████ 's and my accomplice in planning and sending the suicide attackers to Netanya, and Nasser asked me to take the two suicide attackers in the stolen Pontiac with Israeli license plates from Nablus to Kafr Rai, and I agree.  On the day of the terrorist attack, I went out at about 3:00 p.m., in a taxi, to the area of Jabal Shamali in Nablus, and there, ██████████████ and the two

[Stamp] P 5: 267

60

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

suicide attackers were waiting for me in the Pontiac. ⬛⬛⬛⬛ was wearing blue jeans and a black shirt, and Said was wearing green pants. There, ⬛⬛⬛⬛ said goodbye to them and I took them to ⬛⬛⬛⬛ in the Pontiac. Q. What weapons did the suicide attackers have? A. Each one of them had an M-16 rifle. I saw ⬛⬛⬛ holding a black plastic bag with an explosive charge in it, and after we got to ⬛⬛⬛ I called Nasser Aweis and told him that we had arrived. Nasser asked to speak to ⬛⬛⬛ and I heard ⬛⬛⬛ telling Nasser that he knew the way from there. Then ⬛⬛⬛ gave the mobile phone to me, and Nasser instructed me to go back to Nablus in the taxi, and that is what I did. When I got back to Nablus, I heard on the news about the terrorist attack in Netanya, in which the two suicide attackers had been killed, and I remember they talked about a terrorist attack in a hotel in Netanya."

P/18:

"Q.    In the second testimony which you gave, you talked about a suicide attack in Netanya, which took place a month before you gave the testimony, and you claimed that your job was to take the two suicide attackers from Nablus to Kafr Rai. Exactly where did you take them from, and do you know whether they were photographed before they went out to perpetrate the terrorist attack?

[Stamp] P 5: 267 [continued]

61

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

A.    In addition to taking the two suicide attackers, ███ and Said, I confess that, the day before the terrorist attack, Nasser Aweis asked me to come to the town square in Nablus and pick up ███ and Said, and then to come to his home in the refugee camp, so that he could give me a will which he had prepared for the two suicide attackers. He also asked me to take the two suicide attackers home, photograph them, and wait for instructions.

That is what I did:  I picked them up, took the will from Nasser along with a video camera, and when I got home, I filmed the two of them, each holding an M-16 in their hands, with Shadi reading the will.

Q.    From whom did they get the weapons?

A.    I took the will and the camera from Nasser. He gave me two M-16 weapons and 12 clips full of bullets and a hand grenade, and I gave them to them."

Count No. 5:

On March 30, 2002, the terrorists ███████ and ███████ (hereinafter ███ and ███) were on their way to carry out a terrorist attack in Israel, armed with an M-16 rifle, hand grenades and an explosive charge. ███ and ███ ran into a force of Border Patrol police near Baqa al-Gharbiya, fired on the policemen and threw a fragmentation grenade.

The two succeeded in intentionally causing the death of a Border Patrol policeman, Master Sergeant Konstantin Danilov of blessed memory, and in wounding another policeman, Senior Master Sergeant Amil Ibrahim. (See the testimony of Witness No. 27 for the prosecution, ███████ Witness No. 18 for the prosecution, ███████ Witness No. 19 for the prosecution, ███████ P/49 (report on the seizure of exhibits), P/72-P/73 (expert opinions), P/74-P/75 (photographs), P/76 (expert opinion).

According to an argument that was set forth by the State, the Defendant – who as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with ███ and ███ (Witness No. 6 for the prosecution), for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, and in order to carry out [the terrorist attack], ███ and ███ were recruited, equipped with an M-16 rifle, hand grenades and an explosive belt. The Defendant also gave instructions to arrange for the arrival of the two in Israel, transferred an amount of money totaling NIS 3500 which was intended for the purchase of a stolen car to be used for transporting them, and instructed ███ to accompany them part of the way. After the terrorist attack, the Defendant called the media and informed them that the Terrorist Organization was responsible for the terrorist attack and had carried it out.

The admission by the Defendant is as follows:

P/5:

[Stamp] P 5: 268

62

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

"10.   I delivered weapons for the execution of a shooting attack, a sacrifice attack (note by the interrogator; a suicide attack), which was supposed to be carried out in Hadera, but the terrorist attack did not succeed and people were killed in the vicinity of Baqa al-Gharbiya."

P/6:

"Q.   Yes,       nd I worked together, to send out suicide attackers with
     and                      from Silat al-Dhaher, and if we needed anything, such as photographing the suicide attackers or distributing posters, we would use        About two weeks before the army came into Nablus, I asked       to try to obtain an explosive belt for a suicide bomber, in order to carry out a terrorist attack within Israel.       in fact, brought an explosive belt, and we gave it to a suicide bomber, who traveled with another person in order to perpetrate a terrorist attack in Israel, and when he got to Baqa al-Gharbiya, soldiers shot at him and they were both killed, and during these exchanges of fire, a Border Patrol policeman was killed in Baqa.

Q.   Where was the terrorist attack that you are talking about supposed to have been carried out?

A.   In Hadera, and we did not define a target, and according to the plan, one of the suicide attackers was supposed to shoot and the other was supposed to blow himself up ...

Q.   What kind of vehicle did the suicide attackers travel in?

A.   I do not know, but I gave       NIS 3,500 in order for him to buy a stolen car to transport the suicide attackers, and       went with them to Tulkarm and showed them the way and came back by public transportation."

P.7:

"After the four of them were arrested on their way to Ramallah,                contacted me and told me that he wanted to carry out a suicide attack next to Israeli soldiers, and he asked me for an M-16 weapon, and I had an explosive belt in my possession, and I did give him an M-16. We agreed that the attack would be carried out within Israel, next to soldiers, and that after [one] suicide attacker blew himself up, another one would fire. According to what            said, he did succeed in locating two people who would carry out the terrorist attack, one from Nablus and the other one from Jiyus.

Q.   How did            get to know the two people who were supposed to carry out the terrorist attack next to the soldiers?

A.   According to what he told me,                was the one who introduced him to the man from Nablus, and            already knew the one from Jiyus.

[Stamp] P 5: 269

63

<u>Felony Case (Tel Aviv) 1137/02</u>          <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

Q.    Who brought the suicide attackers into Israel?

A.    A man named ▓▓▓▓▓▓ from Tulkarm.

Q.    How did they get in, and how was the terrorist attack carried out in Israel?

A.    They got in with a car, which had been stolen by ▓▓▓▓▓▓ and after they had entered Israel and were on their way to Hadera in order to carry out the terrorist attack, a few hours later, we heard on the radio that the Israeli police had suspected the car, and that there had been an exchange of fire with the suicide attackers and they had been killed, and two of the police had been wounded, as far as I know.

Q.    How did the exchange of fire with the police take place?

A.    On the way to Hadera, a police car suspected that the car was stolen and asked them to stop, but they started shooting. After that, the policemen succeeded in killing them. After I heard on the radio that they had been killed, I called the media and informed them that the terrorist attack had been carried out by *Kitaab [Shuhadaa] al-Aqsa.*"

[Stamp] P 5: 269 [continued]

Nevo Publishing Ltd.          nevo.co.il      The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

The "additional item" is as follows:

█████████████ (Witness No. 6 for the prosecution), P/13:

" ... That same day, I reported to Nasser Aweis that I had a suicide attacker with me, and Nasser asked to meet that terrorist. The next day, I took ██████ to a studio in Nablus to have his picture taken, and from there to Nasser Aweis's house, and I left him there. Two days later, Nasser asked me to purchase a car with Israeli license plates, and I bought a stolen black Mitsubishi for NIS 3,500 from a resident of Tubas. I got the money for the car from Nasser ████████ After I bought the car, I went to Nasser's house with the car, and there I met Nasser and ███ and █████████ and I was surprised to find another person there, named ███████ a resident of Nablus, about 20 years old, and that was the first time that I saw that young man. And then Nasser Aweis told me that those two people █████ and ██████ were about to go out and perpetrate a suicide attack in Israel. At that point, Nasser gave ██████ an M-16 weapon, and he gave ██████ two hand grenades, and the plan was for the two of them to enter Israel, wherever they could, and to carry out a suicide attack, shooting with the M-16 and throwing grenades, and after we prepared them, I took them to ██████ and I handed them over to ████████ This was the same ████ who had transported the suicide attacker that I talked about before. On that day, I got to ██████ at around 11:00 a.m. ... And an hour later, ███████ called and said that he had heard that the two of them had been killed in Baqa, after wounding a Border Patrol policeman."

**Count No. 6:**

During the al-Aqsa intifada, on an unknown date, two terrorists whose identities are not known were on their way to carry out a terrorist attack in Jerusalem, armed with Kalashnikov rifles and hand grenades. The terrorists were caught at an IDF roadblock by the security forces, thus miraculously avoiding a murderous terrorist attack with multiple casualties, which the two had set out to perpetrate, with the intent of deliberately causing the death of many Israeli civilians.

According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with █████████████ and █████████ and additional activists, for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians. Within the framework of this organization, which was headed by the Defendant, the terrorists were recruited, equipped with Kalashnikov rifles and hand grenades, and transported on the way to the scene of a terrorist attack.

The admission by the Defendant is as follows:

P/7:

[Stamp] P 5: 270

65

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

" ... At about that time, ███████████ from *Kitaab Shuhadaa al-Aqsa* contacted me and said that there were two people who wanted to carry out a terrorist attack in Israel, and I agreed to that. I informed ████████████ of the matter and asked him if he would be able to bring them in, and it was agreed with ████████████ that ████████ and ████████ would take the two *mustashhids* to Ramallah. After that, I called ████████ and told him that the people were on their way to him. I should note that ████████ contacted me because I am responsible for *Kitaab Shuhadaa al-Aqsa*.

Q.    Did ████████ and ██████████████ know about the terrorist attack?

A.    Ayman works as a driver of a public vehicle, and ████ is a friend of █████████ and I do not know whether they knew about the terrorist attack."

[Stamp] P 5: 270 [continued]

Nevo Publishing Ltd.          nevo.co.il          The Israeli Legal Database

Q.    Where was it agreed that they would meet in Ramallah?

A.    According to what was agreed, ███████████ was supposed to be in contact with the four, and when they got to the Ramallah area, he would call me and I would call ████ and let him know where they were, so that he could meet them.

Q.    Which weapons did they take with them, and how was he [sic] supposed to carry out the terrorist attack?

A.    A shooting attack which included grenade-throwing, and ██████████ gave the suicide attackers two hand grenades, and according to what was agreed, ██████ was supposed to give them two Kalashnikov rifles.

Q.    Where was he [sic] supposed to carry out the terrorist attack?

A.    In West Jerusalem.

Q.    Was the terrorist attack carried out?

A.    The four of them were arrested at a roadblock on their way to Ramallah.

The "additional item" is as follows:

████████████ (Witness No. 6 for the prosecution), P/17:

"In addition, we planned to carry out a suicide attack inside Jerusalem, and we sent the suicide attackers to Ramallah to get an explosive belt, but they were arrested on the way. The two who wanted to carry out the suicide attack are (1)█████████ of Nablus, about 20 years old, a bachelor and unemployed, (2)█████████ a resident of Nablus, about 20 years old, a bachelor who worked as a vehicle mechanic. ██████ was his *nom de guerre*. This was about four or five months ago. Nasser Aweis planned this terrorist attack along with me ... for us to carry out a terrorist attack in the Ministry of Defense in Tel Aviv. I talked about it with Nasser Aweis and █████████ and we decided to look for skilled activists who would carry out such a terrorist attack. In the end, we did not look for activists and we did not carry it out. With regard to the two suicide attackers, ████████ and ████████ who were on their way to Ramallah to get explosive belts so that they could go on to Jerusalem and carry out a suicide bombing, I talked about that in my second testimony. I would like to add a few points which I did not mention ... As I said, I filmed them with a video camera, reading the will, and I put a flag of the *Kitaab Shuhadaa al-Aqsa* behind them, and during the filming, he [sic] waved a Beretta weapon which I had given him. I gave the cassette [to] Nasser Aweis later. That night, the three of us slept in the apartment, and the next morning, I called ████ the taxi driver – let me correct myself. I called a friend of mine named ██████

[Stamp] P 5: 271

67

Felony Case (Tel Aviv) 1137/02    .    State of Israel v. Nasser Mahmoud Ahmad Aweis

███████ and I asked him to send me a taxi to the apartment where I was with the young men, and he sent me a taxi driver named ██████ When he arrived, at 10:00 a.m. the two young men got into the taxi. I asked them to call me the moment they got to Ramallah. According to the plan, I would then call Nasser Aweis and he would arrange to send the people who were supposed to supply the explosive belts to them. I forgot to mention that I gave them a hand grenade, which I had received from Nasser Aweis for them to use. The intention was to throw the grenade before blowing up the explosive belts. The two young men did not reach Ramallah; they were arrested on the way. As soon as the two young men got into the taxi, I informed Nasser Aweis."

### Count No. 7:

During the al-Aqsa intifada, on an unknown date, a terrorist whose identity is not known was arrested on his way to perpetrating a suicide attack in Jerusalem. The man was armed, with a view to intentionally causing the death of many civilians. While he was on his way to the scene of a terrorist attack, near Beit Hanina, that terrorist was arrested by policemen and shot to death.

[Stamp] P 5: 271 [continued]

Nevo Publishing Ltd.    nevo.co.il    The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

     According to an argument that was set forth by the State, the Defendant – who, as set forth above, was one of the senior commanders of the Terrorist Organization – entered into a conspiracy with ▮▮▮ for the purpose of perpetrating a terrorist attack which was intended to intentionally cause the death of many Israeli civilians.    Within the framework of this organization, which was headed by the Defendant, and in order to carry out [the terrorist attack], the terrorist was recruited and supplied with weapons.

     The admission by the Defendant is as follows:

P/6:   "Q.   Do you know a man named ▮▮▮▮▮▮

     A.   Yes, I met him at the al-Najah University, and he belonged to the Popular Front, and I recruited him into the *Kitaab Shuhadaa al-Aqsa* about two months ago, and the purpose of recruiting him into the *Kitaab Shuhadaa al-Aqsa* was in order for him to assist us in terrorist attacks in the Jerusalem area, and in order for him to introduce suicide attacks [*mustashahids*] into Jerusalem.  I also asked ▮▮ to teach us how to manufacture explosives that were stronger than the explosives we were using, and ▮▮ explained to me over the phone how to produce a certain material [*umm al-abd*], and I told him that we already knew how to produce *umm al-abd* … About a month and a half ago, I asked ▮▮ to check out a way of bringing a suicide bomber into Jerusalem, and he said that he would check it out.  According to the plan, ▮▮▮▮ was the one who located a suicide attacker, and my role was to coordinate between ▮▮▮ and ▮▮▮ in order to bring the suicide attacker into Jerusalem.  That terrorist attack was carried out, but without success, because policemen shot the suicide attacker before the terrorist attack, and he was killed at the entrance to Jerusalem from the direction of Ramallah, and I do not know the suicide attacker's name."

     The "item":

No direct and separate "item" was found for the admission on this count.

     However, the facts which have been proven – the fact that the Defendant was a leader in a Terrorist Organization, with the purpose of perpetrating acts of violence which were intended to cause the death and injury of persons, and the fact that the Defendant had a clear motive for carrying out such acts and had an opportunity to carry them out, and even accomplished many of them, as has been proven in each of the other counts – substantiate a conclusion that the cumulative "items" which were found for each of the admissions of the other counts may be considered as the "item" required for this count.  It is necessary to consider the circumstances of the matter, and, for that purpose, the series of offenses in which the Defendant was involved, as a single unit.

**Count No. 8:**

According to an argument that was set forth by the State in Count No. 8:

[Stamp] P 5: 272

Nevo Publishing Ltd.          nevo.co.il          The Israeli Legal Database

<u>Felony Case (Tel.Aviv) 1137/02</u>          <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

"A.    On an unspecified date after the outbreak of the al-Aqsa intifada, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of shooting attacks directed against an IDF guard post which was manned with Israeli soldiers, in the vicinity of Joseph's Tomb in Nablus.

On unknown dates during the subsequent period of time, the Defendant, together with additional activists in the Terrorist Organization, perpetrated shooting attacks against an IDF position which was located in the vicinity of Joseph's Tomb.

B.    Shortly before the month of May 2001, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of shooting attacks directed against an IDF guard post which was manned with Israeli soldiers, on Mt. Gerizim, and against additional IDF positions in adjacent areas.

For the purpose of promoting the objectives of the conspiracy, the Defendant supplied the additional activists who had joined the conspiracy with M-16 rifles.

During the month of May 2001, on a number of occasions, on unknown dates, the Defendant, together with additional activists in the Terrorist Organization, perpetrated shooting attacks.

The shooting attacks were perpetrated by the Defendant and the additional activists, armed with M-16 rifles, against the military position on Mt. Gerizim, against the Ein Beit camp and against army patrols which were patrolling in the area of the Balata camp, as well as against military targets in the area of the Hawara camp.

C.    On an unknown date, after the outbreak of the al-Aqsa intifada, the Defendant entered into a conspiracy with additional activists in the Terrorist Organization, for the perpetration of terrorist attacks against Israeli citizens and IDF soldiers.

Within the framework of the conspiracy and for the purpose of promotion thereof, the Defendant supplied weapons to the activists in the Terrorist Organization for the purpose of carrying out the terrorist attacks.

The activists in the Terrorist Organization, who joined forces in order to carry out the conspiracy, made use of weapons which were supplied to them by the Defendant, in the terrorist attacks set forth below:

1.    The shooting attack on the settlement of Homesh.

2.    Placing an explosive charge on the Zuata-Asira bypass road.

[Stamp] P 5: 273

70

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

    3.    A shooting attack with an M-16 rifle against a military patrol in Deir Sharaf.

    4.    Placing an explosive charge in Sarah."

The State goes on to claim that, in these actions, the Defendant was unlawfully attempting to cause the death of many persons, and that these actions, *inter alia*, are in the nature of a conspiracy to commit a crime, attempted murder, and unlawfully carrying a weapon.

The admission by the Defendant is as follows:

P/5A: "2.    I carried out a shooting attack directed against a military position on Mt. Gerizim in Nablus ...

    3.    I carried out a shooting attack directed against military vehicles in the vicinity of the Hawara camp, near Nablus.

    4.    I carried out a shooting attack directed against military vehicles in the vicinity of Nablus, on the west side, near Zuata ..."

"13.  I supplied ██████ with two explosive charges plus a Kalashnikov, which he placed near Kafr Sara, Nablus.

    14.    I supplied ████ with an explosive charge, which he placed on the road to Dir Sharan, against an Israeli patrol."

[Stamp] P 5: 273 [continued]

71

P/6A: "yes, he participated once, together with me, in carrying out a shooting attack directed against an Israeli military position on Mt. Gerizim ..."

Q.    Which terrorist attacks did you speak about with █████████████

"A.    I spoke with him about many terrorist attacks, and I remember that I spoke with him about a shooting attack which I had carried out along with ███████████ and ████████ and █████████████ near the Hawara camp, directed against a military vehicle. I also spoke with him about placing explosive charges in the vicinity of Zuata; I had participated in those terrorist attacks along with ████████████ and ████████ and █████████ and █████████████."

"Q.    Do you remember all of the terrorist attacks in which you participated directly?

A.    I remember. 1. A shooting attack directed against a military position on Mt. Gerizim. 2. A shooting attack directed against a military vehicle in the vicinity of the Hawara camp. 3. A shooting attack directed at members of the armed forces at Joseph's Tomb. 4. A terrorist attack at Dir Sharan. 5. A shooting attack directed at military vehicles ... 7. A shooting attack directed at vehicles.

Q.    Can you give details about the shooting attack directed against the military position on Mt. Gerizim?

A.    Yes, about seven months ago, I participated, together with ██████████████ and █████████████ in shooting about three times at a military position on Mt. Gerizim ..."

"Q.    Do you have any additional details about the shooting attack directed against a military vehicle in the area of the Hawara camp?

A.    About six months ago, I participated, together with █████████████ in a shooting attack directed at a jeep in the Hawara camp, and each of us fired about half a clip of bullets, and the soldiers fired back at us.

Q.    Can you give details about the shooting attack directed against a car, which you mentioned above?

A.    Yes, I participated, together with ████████████ and ███████████ and █████████ in a shooting attack, and we shot at a tank in the area of Hawara (the camp). We were shooting from Kafr Kalil. That day, the attack was carried out at about 4:00 p.m., and each of us fired a clip of bullets at the tank."

[Stamp] P 5: 274

72

<u>Felony Case (Tel Aviv) 1137/02</u>          <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

"  ... And I took two old [anti-] tank missiles from ████████ in order to take the explosives out of them and to use the explosives to make explosive charges, and I used the explosive charges on the bypass road at Zuata-Asira against military vehicles.

Q.    How many charges did you make out of the missiles which ████████ gave you, and how di d you use them?

A.    After I took the missiles from ████████ I gave them to ████████ from the Balata camp, and ████████ made a charge out of them, and he was the one who placed the charge on the bypass road.

Q.    Do you remember when he placed the charge and whether people were hurt when the charge exploded?

A.    The charge was placed sometime during the al-Aqsa intifada; I do not remember a date, and according to the information which I received, the army blew up the charge before it exploded."

"I sent ████████ to transport ████████ and ████████ and ████████ so that they could place a charge on the road, near ████████ west of Nablus. In the end, however, they did not place the charge, because it was far away. The brought the charge back and they used it in the area of Zuata against a military vehicle, and I do not know if anyone was hurt in that terrorist attack."

Q.    Did you have any contact with ████████

[Stamp] P 5: 274 [continued]

73



Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

A.   Yes.  About 10 months ago, we took a charge from them, and he placed it on the road in Dir Sharan, and he set off the charge against a military patrol."

" ... And I gave him an M-16 weapon, and ▉▉▉ carried out a shooting attack with the weapon which I gave him.  The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and according to ▉▉▉ the vehicle was not hit."

"Q.   Can you explain to me about the terrorist attack in Dir Sharan which you mentioned above?

A.   Yes.  About eight months ago, ▉▉▉▉▉▉▉ [sic] from the Balata camp, who was living in Dir Sharan, came to me and asked me for an explosive charge to carry out at terrorist attack, and I gave him a charge that weighed 15 kg which I had received from ▉▉▉ and the detonation was with wires.  According to what I know, ▉▉▉ placed the charge on the main road at Dir Sharan, and set off the charge at a military patrol, and caused damage to a jeep, and I do not know if people were hurt."

"A.   Yes.  A few months ago, ▉▉▉▉▉▉▉ a resident of Sara, suggested to me, while he was studying at al-Najah University, that we carry out a terrorist attack in the area of Sarah, and he [sic] agreed to this.  I gave him two explosive charges and a Kalashnikov, and when I gave him the charges and the weapon, there was a person with him, named ▉▉▉ ▉▉▉▉▉ a resident of Sara, and they set off the charges at a tank in the area of Hawara, and one charge exploded, and after that, they fired at the tank, and after the terrorist attack, they gave me back the weapon."

P/8:   " ... And another man from Dir Sharan was with him, and ▉▉▉ asked me for an explosive charge, so as to carry out a terrorist attack on an Israeli military patrol, and I agreed, and I gave him an explosive charge which I had received from ▉▉▉▉▉▉ and according to the information in my possession, ▉▉▉ carried out the terrorist attack against a military patrol in the area of Dir Sharan."

"A.   Yes.  About five months ago, ▉▉▉▉▉▉ introduced me to a man named ▉▉▉ who knew how to make explosives and charges, and I took five charges from him, and ▉▉▉ ▉▉▉▉▉▉▉ placed the charges near Zuata, and once ▉▉▉ and I went out to place a charge.  The soldiers identified us, and we ran away, and ▉▉▉▉▉ was with us, and we left the charge behind when we ran away."

The "additional item" is as follows:

▉▉▉▉▉▉ (Witness No. 6 for the prosecution), P/12:

"A.   I confess that, during the month of May in the year 2001, I went out with all those persons to carry out a shooting attack directed against a military position which is located in Mt.

[Stamp] P 5: 275

74

<u>Felony Case (Tel Aviv) 1137/02</u>            <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

Gerizim. On that day, Nasser Aweis gave me an M-16 weapon, and we all set out for the position. We took up a position in the Dahiya area, in Nablus, from where we fired on the [illegible, probably "military"] position, toward Mt. Gerizim. I personally fired [illegible, probably "about 20"] bullets, and each of the other people fired the weapon in his possession, at the position. This was about 10:00 p.m. And then the army started firing at us, and we fled the scene.

     Q.     Did you participate in additional shooting attacks against that military position or against other positions?

     A.     I confess that I participated, about six more times, in shooting attacks directed against that position on Mt. Gerizim, with the same people. In addition, I participated, about four times, in shooting attacks directed against an IDF position which is located in Jabal Shamali, above the Ein Beit Alma camp. Also, of course, I participated in shooting attacks directed against army patrols which were patrolling in the area of the Balata camp. All those times, I fired the M-16 that Nasser Aweis had given me."

[Stamp] P 5: 275 [continued]

Nevo Publishing Ltd.            nevo.co.il            The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

P/13:

" ... And on that day, ███ told me that he intended to carry out a terrorist attack, and accordingly, he asked me to get hold of two explosive charges for him, for the benefit of the terrorist attack. I told ███ that I know [sic] how to manufacture explosive charges, and therefore I took him to Nasser Aweis, in the Balata camp, and I asked Nasser to obtain two charges for me. Then Nasser called ███ and asked him for two charges, and an hour later, ███ came and brought two charges with him, made out of a pipe 30 cm long and 40 cm wide [sic]. Each charge was closed on both sides, and there were white electric [wires] coming out of one side. After that, ███ received the charges, and each of us went home, and three days later, I heard from ███ that a terrorist attack had been carried out against a military jeep in Silat al-Dhaher, during the night, and they had set off the charges against the jeep, but nothing had happened to it."

P/18:

"A.    In my second testimony, I confessed that I – together with my friends, ███████ ███ and ███████ – we carried out two shooting attacks against the settlement of Homesh, and this ... is all true, that the three of us perpetrated shooting attacks, on four or five occasions, against the settlement of Homesh. The fire was directed against the watchtower, at the edge of Homesh, from the direction of Silat al-Ladha, and against the houses in the settlement. This took place in the course of the first three months, at the beginning of the al-Aqsa intifada. In all of those cases, we would arrive in the late hours of the night, after 10:00 p.m., and I remember that, in all of those cases, the soldiers fired back from the watchtower. I confess that I was the one who supplied them with weapons in all of the attacks mentioned above, I fired an M-16, and I gave ███ a Kalashnikov, and I gave ███ a Glock. I would take those weapons from Nasser Aweis, before going out on each of the terrorist attacks.

Q.    From what distance did you fire at the settlement of Homesh?

A.    From about 1 km away.

Q.    Which other shooting attacks did you participate in?

A.    Approximately in the beginning of 2001, ███████ and ███████ and I fired on a security jeep in the settlement of Homesh, from about 500 meters away. This was during the late hours of the night, after 10:00 p.m. I fired an M-16, ███ fired a Kalashnikov, and ███ fired a Carlo – the same weapons which we had used in the previous shooting attack against Homesh, the same weapons which I had taken from Nasser Aiwiss. After he fired, the soldiers fired back, and we fled the scene ... A. He and I did not do anything except what I have already mentioned, but I would like to state that ███████ asked me for a weapon, three

[Stamp] P 5: 276

76

<u>Felony Case (Tel Aviv) 1137/02</u>          <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

months ago, and claimed that he wanted to carry out shooting attacks against IDF soldiers. I agreed to his request and I gave him a Kalashnikov which I had taken from Nasser Aweis, and a week later, ▮▮▮▮ gave me back the weapon, and I do not know if he used it."

    Witness No. 25 for the prosecution, ▮▮▮▮▮▮ P/47B:

    '▮▮▮▮▮▮ about 25 years old, a resident of Nablus, and ▮▮▮▮▮▮ about 27 years old, a resident of Beit Iba – we carried out a terrorist attack involving an explosive charge and shooting, on the bypass road near Beit Iba. When we came to the entrance to Beit Iba, I called Nasser Aweis, and he told me that he was sending us people and weapons for the terrorist attack. Half an hour later, ▮▮▮▮ and ▮▮▮▮▮▮ came to the scene. They arrived in a white car. Each of them had an M-16 rifle, and in addition, there was a 250 machine gun in the car, as well as an explosive charge within a fire extinguisher [*atfaya*]. At about 11:30 p.m., we all went out in the white car to carry out the terrorist attack on the bypass road near Beit Iba. ▮▮▮▮ and ▮▮▮▮▮▮ placed the explosive charge on the road and connected a wire

[Stamp] P 5: 276 [continued]

Nevo Publishing Ltd.          nevo.co.il          The Israeli Legal Database

<u>Felony Case (Tel Aviv) 1137/02</u>          <u>State of Israel v. Nasser Mahmoud Ahmad Aweis</u>

to the explosive charge. This was a charge which was activated by wires and a battery. As soon as they had connected the wires, suddenly IDF soldiers who were staked out there opened fire on them. ▮▮▮▮ was killed and ▮▮▮▮ was wounded in the leg, ▮▮▮▮▮▮ and ▮▮▮▮ [sic] ▮▮▮▮ fired at the IDF soldiers. After that, ▮▮▮▮▮▮ and ▮ [sic] ▮▮▮▮ and I fled the scene."

        Witness 21 for the prosecution, ▮▮▮▮▮▮▮▮ P/40A:

    "<u>A.</u>    In the beginning of the al-Aqsa intifada, [illegible, probably "I participated" or "they participated"] in stone-throwing activity directed at Joseph's Tomb in Nablus, and at the [illegible, probably "military"] forces in Nablus. In June [20]02, ▮▮▮▮▮▮ contacted me and said that he was planning to set up a military squad belonging to Tanzim Fatah. He suggested that I enlist in the military squad, and ▮▮▮▮▮▮ said that the purpose of setting up the squad was to carry out terrorist attacks against the Israeli army in the Nablus area. I agreed to this and, within the framework of the military squad, I participated in 10 shooting attacks directed against the army in the Nablus area. Participating in the shooting attacks along with me were (1) ▮▮▮▮▮▮ (2) ▮▮▮▮▮▮▮ (3) Nasser Aweis, about 35 years old, from the Balata camp, who was in charge of the Tanzim in Nablus ...

        <u>Q.</u>    Who used to plan and prepare for the perpetration of the terrorist attacks in which you participated?

        <u>A.</u>    Nasser Aweis was the one who used to plan for the perpetration of the terrorist attacks, and he was the one who used to supply us with the weapons.

        [Q.]    Which Israeli military positions did you shoot at?

        <u>A.</u>    We carried out shooting attacks directed against a military position on Mt. Alana. We also fired at the settlement of Elon Moreh, and we also fired at the Saqen roadblock near Hawara ...

        The second terrorist attack, in August 2001: Nasser Aweis contacted me [and] ▮▮▮▮ and told us that young men from the Tanzim wanted to place an explosive charge on the bypass road in the area of Beit Ira, and he asked me and ▮▮▮▮▮ to participate in the terrorist attack and to place the charge along with the young men ... The tenth terrorist attack was a shooting attack directed against the funeral ... The funeral [procession] went from Hawara to Yitzhar, and when they got to the entry to the Hawara camp, Nasser Aweis and ▮▮▮▮▮ and ▮▮▮▮ and ▮▮▮▮ and I fired at the participants in the funeral. The army fired back, and Nasser and ▮▮▮▮ and Y▮▮ and I fled the scene and headed toward the camp ..."

        The facts contained in the charges were proven.

                                                [Stamp] P 5: 277

Felony Case (Tel Aviv) 1137/02 _____    State of Israel v. Nasser Mahmoud Ahmad Aweis

### The offenses of murder, attempted murder, causing severe bodily harm and attempt to cause severe bodily harm

The State ascribes to the Defendant offenses of murder with malice aforethought in the first five counts; offenses of attempted murder in all of the accounts; offenses of causing bodily harm with aggravated intent in the first five counts; the offenses of attempt to cause severe bodily harm in Counts No. 6 and No. 7.

With regard to these offenses, a question arises as to the status of the Defendant.

Section 29 (a) of the Penal Code, 5737 – 1977, tells us that a person who perpetrates an offense together with or through another person shall also be considered as the perpetrator of the offense.

[Stamp] P 5: 277 [continued]

Nevo Publishing Ltd.        nevo.co.il        The Israeli Legal Database

It has been proven to us that the Defendant's mental attitude to these offenses is beyond all doubt. The Defendant wanted and desired to achieve the results of the criminal actions, with every fiber of his being, and was the motivating force in the implementation of a joint plan, carried out together, to intentionally cause the death and injury of his victims, as has been proven.

There cannot be even the slightest doubt that he is the perpetrator of the offenses (see Criminal Appeal 4389/93, Mordechai Vabudi v. the State of Israel, PD 50 (3) 239 and the rulings mentioned there; see also Criminal Appeal 2796/95, John Doe v. the State of Israel, PD 51 (3) 388).

The factual infrastructure which has been revealed to us attests to the fact that the acts of murder were carried out, from beginning to end, with malicious intent, based on the decision and the purpose of causing death, founded on cold blooded thought, controlled behavior and settled mind, and following precise and scrupulous preparation.

We do not have even the slightest doubt that the fundamental elements for the offenses of murder with malice aforethought have been fulfilled, the offenses have been proven, and – as set forth above – the Defendant carried them out.

Obviously, the fundamental elements for the offenses of attempted murder have also been properly proven.

The Defendant's plan of intentionally causing the death of many civilians, and the implementation of that plan as described above, as it has been proven, substantiates the fundamental elements of the less severe offenses of causing bodily harm with aggravated intent and attempt to cause bodily harm with aggravated intent. These offenses as well have been properly proven.

### Unlawfully carrying a weapon

The State also ascribes to the Defendant offenses of unlawfully carrying a weapon, in Counts No. 2, 3 and 8.

It has been proven that the Defendant carried, without a permit under any law, M-16 rifles, ammunition and hand grenades, which are in the nature of "weapons," as this term is defined in Section 144 (c) of the Penal Code, 5737 – 1977. The Defendant has confessed to this, as set forth above, and has also confessed that he used the weapons. It is enough for us to mention that which has been set forth in his statements, as follows:

[Stamp] P 5: 278

80

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

"I supplied Said Ramadan with weapons for the perpetration of a suicide attack within Jerusalem … I supplied ████████████ with weapons for the perpetration of a suicide attack within Hadera." (See P/5)

See also the Defendant's confession to the shooting attacks described in detail in Count No. 3, as set forth above.

Because the terrorists Said Ramadan and ████████████ made use of the weapons inside Israel, as has been proven above, and because the facts of Count No. 8 have also been proven, it appears that the fundamental elements of the offenses of possession of weapons have also been proven as required.

[Stamp] P 5: 278 [continued]

81

Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

## Summary

Having found that the State has proven all of the actions that have been attributed to the Defendant in the indictment, according to the burden of proof that is incumbent upon it to do so beyond all reasonable doubt, we hereby convict the Defendant of the following offenses:

Membership and activity in a terrorist organization, in contravention of Sections 2 and 3 of the Prevention of Terrorism Ordinance, 5708 – 1948.

Conspiracy to commit a crime, in contravention of Section 499 of the Penal Code, 5737 – 1977.

Premeditated murder, in contravention of Section 300 (a) (2) of the Penal Code, 5737 – 1977.

Attempted murder, an offense in contravention of Section 305 (1) of the Penal Code, 5737 – 1977.

Causing bodily harm with aggravated intent, in contravention of Section 329 (1) of the Penal Code, 5737 – 1977.

Attempt to cause severe bodily harm, an offense in contravention of Sections 329 (1) of the Penal Code, 5737 – 1977.

Unlawfully carrying a weapon, an offense in contravention of Section 144 of the Penal Code, 5737 – 1977.

O. Salomon-Czerniak
Judge

## Judge S. Timan, Presiding Judge, and Judge N. Achituv:

We have read the detailed and well-founded opinion by our colleague, the Honorable Judge Czerniak, and we concur with the conclusion that has been reached by her.

S. Timan        N. Achituv
Presiding Judge     Judge

[Stamp] P 5: 279

82

Felony Case (Tel Aviv) 1137/02            State of Israel v. Nasser Mahmoud Ahmad Aweis

It has accordingly been decided to convict the Defendant of all of the offenses ascribed to him in the indictment, as set forth in the opinion by the Honorable Judge Czerniak.

_____   _____   _____
S. Timan, Presiding Judge   N. Achituv, Judge   O. Czerniak, Judge

Handed down and notified on this day, 29 Nisan 5763, May 01, 2003, in the presence of Counsel for the parties and the Defendant.

This version is subject to changes in editing and phrasing.

[Stamp] P 5: 280

83

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

Plaintiffs,

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.  The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 5:237-280.

2.  I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.  To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated bearing the bates number P 5:237-280.

Dated: March _6_, 2014

_____
Rina Ne'eman

ss.: New Jersey

On the _6_ day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
_6_ day of March, 2014

_Leonor Troyano_
Notary Public

LEONOR TROYANO
ID # 2365380
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 2/20/14



<div dir="rtl">

פח (ת"א) 1137/02          מדינת ישראל ני נאסר מחמוד אחמד עוויס

בתי המשפט

| בית משפט מחוזי תל אביב-יפו | | פח    001137/02 | |
|---|---|---|---|
| בפ׳ כב׳ השופט ש׳ טימן - אב״ד | | 01/05/03 | |
| ני: | כב׳ השופטת נ׳ אחיטוב | | |
| | כב׳ השופטת ע׳ סלומון-צ׳רניאק | | |

בעניין:     מדינת ישראל

ע״י ב״כ עוה״ד     דבורה חן ותמר אניס

נ ג ד

הנאשם     נאסר מחמוד אחמד עוויס

ע״י ב״כ עו״ד     בולוס

המדינה טוענת כי ארגונים אלה הם ארגוני טרור על פי הגדרתם בפקודה למניעת טרור והנאשם אשר מילא בהם תפקיד בכיר כמתואר, יום, ארגן והפעיל מעשי פיגוע רצחניים כנגד מטרות ישראליות במדינה ובאיו״ש ופעילותו כללה בין השאר גם רכישה וייצור של אמצעי לחימה מסוגים שונים והעברתם בין במישרין ובין בעקיפין לידי המחבלים שביצעו בפועל את הפיגועים מטעם הארגון הטרוריסטי.

<u>הכרעת דין</u>

<u>השופטת ע׳ סלומון-צ׳רניאק:</u>

<u>האישום</u>

המדינה טוענת כי בתקופה הרלבנטית לאירועים המתוארים בכתב האישום, היח הנאשם מפקד אזור שכם וצפון השומרון של ארגון תנזים-פתח וכן מפקד ארגון ״כתאאב שהדאא אלאקצאי״ (נדודי חללי אל אקצא) באזור זה.

המדינה טוענת כי ארגונים אלה הם ארגוני טרור על פי הגדרתם בפקודה למניעת טרור התש״ח-1948 והנאשם אשר מילא בהם תפקיד בכיר כמתואר, יום, ארגן והפעיל מעשי פיגוע רצחניים כנגד מטרות ישראליות במדינה ובאיו״ש ופעילותו כללה בין השאר גם רכישה וייצור של אמצעי לחימה מסוגים שונים והעברתם בין במישרין ובין בעקיפין לידי המחבלים שביצעו בפועל את הפיגועים מטעם הארגון הטרוריסטי.

1

</div>

<div dir="rtl">

פח (ת"א) 1137/02                                    מדינת ישראל נ' נאסר מחמוד אחמד עוויס

המדינה טוענת כי כתוצאה ממעשיו של הנאשם נרצחו נפצעו ונפגעו אזרחים רבים   והיא מבקשת
להרשיעו כמפורט בשמונה האישומים הכלולים בכתב האישום בעבירות המיוחסות לו והן : חברות ופעילות
בארגון טרוריסטי עבירות בניגוד לסעיפים 2 ו - 3 לפקודת מניעת טרור התשי"ח-1948.

מעשי קשירת קשר לביצוע פשע, עבירות בניגוד לסעיף 499 לחוק העונשין תשל"ז-1977.

מעשי רצח ונסיונות למעשים כאלה עבירות בניגוד לסעיפים 300(א)(2) ו- 305(1) לחוק העונשין התשל"ז-
1977.

מעשי גרימת חבלה בכוונה מחמירה ונסיונות למעשים כאלה, עבירות בניגוד לסעיפים 329(1) ו-
329(1) ביחד עם סעיף 25 לחוק העונשין התשל"ז-1977.

נשיאת נשק שלא כדין, עבירות בניגוד לסעיף 144(ב) לחוק העונשין תשל"ז-1977.


<u>קו ההגנה של הנאשם</u>

בתחילת הדרך שכר הנאשם את שרותיו של עו"ד בולוס ושיתף עמו פעולה.

הסנגור קיבל לידיו את מלוא חומר החקירה ואף הודיע כי יטען בשמו של הנאשם טענות מקדמיות
כאלה ואחרות ובהן טענת חוסר סמכות.

ניתן לקו ההגנה העתידי של הנאשם נמצא בפרוטוקול ישיבת 10.9.02. בישיבה זו טען הסנגור (בפני
הרכב אחר) בין השאר "אאחזיר שהסברתי לו את הענין, הוא אומר שהוא לא רוצה עורך דין, שהוא מיצג את
עצמו אמנא מקום שתוך זמן קצר מכל לדחוף קדימה את הדיון, זמן של לפחות שבועיים".

באותה ישיבה – כעלה מהפרוטוקול – אמר הנאשם לעורך דינו ובאמצעות המתורגמן "יאל תדבר בשמי
אני עורך הדין של עצמי, אני מיצג את עצמי" וכבר אז החליט ביהמ"ש כי "משרדו של עו"ד בולוס ימשיך
ליצג את הנאשם גם אם האחרון יחליט לנהל את הדיון בעצמו".

בישיבת 22.1.03   (בפני הרכב האחר) הודיע הסנגור את הדברים הבאים "אנחנו חוזרים בנו מהטענה
של חוסר סמכות. אני מסכים שחיתה החלטה לחגיש לחגישים תוך 30 יום לגבי טענת חוסר הסמכות, אבל
לאור ההתפתחויות שהיו בנושא של ברגותי ולאור החלטת בית המשפט המחוזי לדחות את חטענה הזאת,
החלטנו לחזור מהטענה לחוסר סמכות בתיק זה."

לאחר מכן הגיש הסנגור בקשה לפטור אותו מהיצוג והבקשה נדחתה בהחלטתינו מיום 2.3.03

המשפט החל נמשך ונסתיים בנוכחות הנאשם וסנגורו ובתרגום מלא לשפה הערבית. הנאשם והסנגור
שתקו לאורך כל הדרך. הם לא השיבו לכתב האישום (ראינו בכך כפירה גורפת) הם לא טענו טענות
מקדמיות, לא חקרו עדים בחקירה נגדית ולא העלו טענות משפטיות. הנאשם לא העיד  ולא הובאו עדים
מטעמו. השניים אף בחרו שלא לסכם.

עמדה זו תבהן על רקע הודעתו בכתב של הסנגור לאמור :

2

</div>

"...4. החיים שוחח עם הנאשם בכמה הזדמנויות ונסה לשכנע אותו לקבל ייצוג במשפט עיי עו"ד, אולם הנאשם בחר שלא להיות מיוצג עיי עו"ד.

5. החיים הסביר לנאשם כי הוא אמור לייצג את האינטרסים שלו במשפט, בתשובה הבהיר הנאשם כי החליט שלא לקחת חלק פעיל בהליך המשפטי, זכותו לבחור ולנקוט בדרכים שהוא בוחר לעצמו לרבות באמצעות קו הגנה פסיבי של שתיקה במהלך משפטו.

6. הנאשם ביקש שאם יכפה עלינו הופעה בדיונים עלינו אך ורק לשתוק.

7. ביום 11.3.03 ולאחר החלטות כב' ביהמש"ש שוב הסביר החיים לנאשם את החלטת כבודם ואת הסיטואציה שהוא נמצא בה וכי במידה וישנה טענה משפטית במהלך הדיון מן הראוי שהחיים יתייחס אליה, אולם הנאשם שלל אפשרות זו וחזר על דבריו שאינו מעונין לשתף פעולה ואינו רוצה אותנו כסנגורים שלו ושוב ביקש שעלינו לשתוק...

10. הנאשם מודע היטב למשמעות הדברים, והוא אינו פסול דין ויש לו היכולת השכלית והאינטלקטואלית לבחור כיצד לנהל את המשפט...

13. בהעדר שתוף פעולה מן הנאשם והוראותיו לסנגור לשתוק במהלך המשפט לא לחקור עדים ו/או לטעון טענות משפטיות ו/או אחרות ולא לדבר בשמו ו/או לטעון טענות עובדתיות ו/או משפטיות לא נותר לחיים אלא למלות את פיו מים ויהיה מנוע מלעשות אחרת וזאת גם מטעמים מובנים שמקורם בכללי האתיקה המחייבים כל עו"ד...".

שוכנענו מהאמור בהודעה, מדברים שנאמרו לנו בענין זה בעל פה ומהתנהגות הנאשם וסנגורו ערב המשפט ובכל עת מהלכר, כי הנאשם נוקט עמדה המבטאת את הגנה אותו בחר ביודעין ברצון מלא וחופשי ובשיקול דעת.

לפנינו בחירה שהיא פרי מהלך מחושב, מכוון מודע מושכל ומניפולטיבי אשר נעשתה על ידי נאשם חמבץ היטב וער לכל השלכותיה.

לנאשם ניתנה בכל עת האפשרות המלאה ליטול חלק פעיל בדיון אף ניסינו לדרבן את סנגורו לעשות מלאכתו ככל שיוכל גם בהעדר שיתוף פעולה מצדו של הנאשם ולכל הפחות כאשר מדובר בטיעון משפטי גרידא.

הסנגור הנכבד שב והסביר כי אין הוא מתערב בדיון הגם שמדובר בטיעון משפטי מן הטעם שחזקה עליו מצוות קו ההגנה של הלקוח.

במילים אחרות, לא במחדל עסקינן או באדישות לתוצאה אלא בקו הגנה ברור והחלטי.

חזקה על הנאשם וסנגורו שהם מודעים לראשוניות הדברים לנפקות המשפטיות שנושא עמו קו הגנה זה.

<u>הודאות הנאשם</u>

הנאשם הודה בעבירות המיוחסות לו בכתב האישום במסגרת הודעותיו במשטרה.

3

<div dir="rtl">

פח (תייא) 1137/02                          מדינת ישראל ני נאסר מחמוד אחמד עוויס

ההודעות ת/5 מיום 21.4.02, ת/6 מיום 28.4.02 ת/7 מיום 30.4.02 ת/8 מיום 1.5.02 ו- ת/9 מיום 14.5.02 נכתבו על ידי עדותנו של עיית 5 חוקר בחולית פחיע רוני עמאר בערבית בכתב ידו של הנאשם ולאחר שהסביר לנאשם בערבית את החשדות המיוחסים לו והזהירו כדת וכדין. על פי עדות החוקר, לאחר שהנאשם אישר בפניו כי הוא מבין הן את החשדות והן את מהות האזהרה, ביקש הוא לכתוב את הדברים בכתב ידו ועשה כן מרצונו הטוב והחופשי.

על פי עדות החוקר הנאשם חתם בפניו על ההודעות. החוקר תרגם את ההודעות מערבית לעברית (לכל הודעה צמוד תרגומה לעברית ת/5אי עד ת/9אי כולל בהתאם).

ההודעה ת/22 מיום 27.6.02 נגבתה על ידי עיית מסי 7 החוקר האדי חלבי אשר הסביר כי גבה את העדות בשפה הערבית השפורה על פיו לאחר שהנאשם הוזהר כדין, הבין את מהות החקירה ואת האזהרה ומסר דבריו מרצונו טוב וחופשי. הנאשם חתם על ההודעה שהחוקר רשם אותה בערבית. גם חוקר זה תרגם את ההודעה לערבית והתרגום צמוד להודעה (ת/22א).

נסיבות גביית ההודעות באופן המתואר לעיל, העובדה שברובכן המכריע (חמש מתוך שש הודעות) נכתבו על ידי הנאשם בכתב ידו והעדות שהנאשם שב ואישר בפני שופט צבאי (ראה פרוטוקול משיבת המארכת מעצר ת/23 ועדות עיית מסי 5 ) כי "אני מאשר כאמיתיות וכנכונה האמנות והודעות שמסרתי בחקירתי בערבית קראתי אותם והתמצאתי עליהם. נכון שהייתי מעורב בכל המעשים והפינועים שהודיעתי עליהם. "יכל אחד והתפקיד שלו" איננו מתנגד להארכת המעצר המבוקשתי, הן הנוותנות שראיתוא אלה קבילות ואין חשש כי הופעל על הנאשם לחץ חיצוני אשר הביאו להודות בביצוע מעשים שאין לו חלק ונחלה בהם.

בחינת תוכן של ההודעות ובכללן ההודאות אכן מעלה שלפנינו דבר דבור על אופניו סיפור דברים כהוויתם מתוך מחשבה בחירה בהירות ותגיונית בדעה צלולה ומיושבת והן בעלות משקל פנימי גבוה אשר מצביע לכשעצמו על אמיתותן.

ברי שהודאת הנאשם בפני שופט המעצרים ובפיקוחו נעשתה ללא לחץ או השפעה והיותן נושאת עמה תוצאות חמורות לנאשם, מהווה ראיה מאמתת מהותית ובעלת משקל מיוחד המעצימה את כוחן של הודיותיו הקודמות מלבד היותה עומדת כראיות עצמאית (עיין ד"ע 3081/91 קוזלי ני מייל פייד מח(4) 441 וכן עייפ 6613/99 סטיבן סמיריק ני מייל, פיד נו(3) 529 ועייפ 3338/99 פד נר(5) 667).

הדרישה ליידבר-מהיי נוסף אשר מפיג חשש שמא לחץ פנימי הוא שהביא את הנאשם להודות ,נמלאה עד תום, באמירות בכתב שנתנו עדים אחרים מחוץ לכותלי בית המשפט אותן אנו מקבלים כראיות קבילות ומהימנות כפי שנפרט להלן.

**השותפים**

עדי התביעה _____ (עיית מסי 6), _____ (עיית מסי 21), _____ (עיית מסי 23) ו _____ (עיית מסי 25) הם שותפיו לעבירות של הנאשם (לחלק הארבעה). להוציא עיית מסי 6 _____ אשר דינו הוכרע (נגזר בטרם העיד (עיין כיא פרוטוקול הכרעת דין ו נגזר דין אשר סומנו יחדיו ת/11) שלוש האחרים נקראו להעיד בטרם נסתיים משפטם. ונתעוררה השאלה אם עדותם קבילה אל נוכח הלכת

4

</div>

C:\Users\Owner\Desktop\o bates stamp\Nasser Aweis Conviction.doc

P 5: 240

קינוני (ע"פ 194/75 מנחם קינוני ני מיי פ"ד ל(2) 477), הלכה אשר כבליה לא נתגשמו עדיין (עיין ע"פ 1774/02 שמעוני קדוש ני מיי) והיא מורח לנו ישאין להעיד נאמם אחד נגד נאשם שני, אפולו הוגשו נגדם כתבי אישום נפרדים, כל זמן שיש חשש, כי העד עלול לצפות לטובת הנאה על ידי המתקת דינו במשפט התלוי ועומד נגדו. דבר זה אפשר למנוע בין על ידי כך שמשפטו יתברר לפני מתן תעודות ובין על ידי הפיכתו לעד מלך ועיכוב ההליכים או הצהרה מטעם התביעה שהמשפט נגדו יבוטל עם סיום העדות...".

המדינה ניווטה דרכה בהתאם למה שנקבע בע"פ 579/88 סוויסה נגד מדינת ישראל פ"ד  מד (1 ) 529. לטעמה, הנאשם לא התנגד להעדת עדים אלה אף שידע היטב כפי שידע סנגורו שמשפטם לא נסתיים, הוא לא הציג מתשום - שעמד לרשותו מן הבחינה הדיונית -- בדרכם של שותפיו אל דוכן העדים, בכך ויתר ביודעין על זכותו להתנגד להשמעתם ואין הוא יכול יותר לתקוף את קבילותן של ראיות אלה, אשר מלכתחילה בגדר עדויות כשרות על פי דין הן (ס. 2 לפקודת הראיות (נ"ח) תשל"א-1971) ונותרה שאלת משקלן בלבד.

אכן זוהי תוצאה צפויה על פי קו הגנה שהנאשם בחר בו ואין לבוא בטרוניה על ב"כ המדינה הנכבדה.

הואיל וזו תוצאה צפויה ומסתברת של קו ההגנה אשר ננקט על ידי הנאשם במחשבה תחילה,  צודקת היא שהאחריות עליה רובצת על הנאשם.

שאלנו את ב"כ המדינה בעניין זה משום שסברנו שאפשר היתה מעלה בגדר הנושא את "פתח לו" אך נזכר כי המדינה הצהירה בראשית כל עדות כי לא הובטחות לאיש מעדים אלה טובת הנאה  כלשהי וכי אין בדעתה להפנות עדויות אלה כנגדם בכל דרך שהיא.

בין כה וכה כל אחד  מהארבעה הוכרז כעד עוין ולגבי העדויות של כל אחד מעדים אלה נתבקשנו לנהוג לפי הוראות סעיף 10א לפקודות הראיות (נוסח חדש), תשל"א-1971 (לחלק פקודת הראיות) ולהעדיף אמרתו בכתב על פני עדותו בעל פה.

ספק איפוא אם הלכת קינוזי חלה בנסיבות אלה כשהסכנות אלה ביסוד ההלכה אינן מתקיימות.

הדרך בה העידו הארבעה בבית המשפט כפי שיתואר להלן, היתה עוינת למדינה.

עיית מסי 6 – ████████ נכנס לאולם החליף חיוכים עם הנאשם והצדיע לו. מכאן ואילך גילה דעתו במילים ובהתנהגותו שלא ישתף פעולה ולא יענה לשאלות.

כך נהג אם כי פנה אלינו פעם אחת מיוזמתו ואמר "אני מכיר את הנאשם שכאן ואני שם אותו מעל ראשי למעלה". הוא אף עה לשאלת ב"כ המדינה יש. ב 23.12.02 היתה בבית המשפט הצבאי והודה (צ"ל הודית) בכתב האישום הזה שהגשתי עכשיו לביהמ"ש כולל המערבות שלך בפגוע בחדרה ת. אתנו רצינו לעצור את המעולות הצבאיות והם רצחו את המנהיג ████████ ורצחו ילדים פלשתינאים וזה שדחף אותי לעשות את הדבר הזה" לאחר שלפני כן טען כי כתב האישום נגדו מזוייף.

נבו הוצאה לאור בע"מ   nevo.co.il   המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc

עד/ת מס' 21 ▇▇▇ פתח את דבריו במילים "אני לא רוצה לדבר, אני לא רוצה להעיד" לאחר מכן
ענה על שאלות התובעת לעניינים שונים אך בכל הנוגע לפרטים מהותיים לא שיתף פעולה. כך למשל ענה
לשאלתי מתי הכרת את הנאשם או באיזה פעילות צבאית השתתפת יחד עם הנאשם או לשאלה מי היה
חבר בחוליה הצבאית שבה היה גם הוא חבר, בתשובה "זה דבר פרטי שלי ולא עניין של ביחמישיי". עם
זאת, לאחר שהוכרז כעד עוין כך ענה על השאלות הבאות:

"יש. היית חבר מתחילת האינתיפדה בחוליה שעשתה פיגועים ובין היתר מי שהיה אחראי על החוליה
הזאת זה הנאשם פה נאסר עוויס.

ת. מה חטענת בדברים האלה? מה אסור בדברים האלה?

ש. סיפרת במשטרה שנאסר עוויס הוא זה שהיה מתכנן את ביצוע הפיגועים והוא זה שהיה מספק לכל
חברי החוליה את הנשק

ת. אין לי תשובה

ש. סיפרת במשטרה שהשתתפת בלפחות עשרה פיגועי ירי לעבר הצבא באזור שכם

ת. זו זכותי

ש. סיפרת גם לאן בדיוק היו פיגועי הירי, לעבר התנחלות אלון מורה, לעבר מחסום צה"ל סמוך לחאוורה

ת. אני מסרב לעמוד לדין בבימ"ש זה אין לי על מה לעמוד לדין, אם עשיתי או לא עשיתי אפילו אם
עשיתי את הדברים האלה, אין בזה שום פגם

ש. אתה לא עומד פה לדין אתה כאן מעיד וצריך לתת תשובה

ת. אני מסרב שנאסר יעמוד לדין על הדברים האלה

ש. על איזה דברים

ת. על מאבקנו נגד הכבוש

ש. אתה בחורשת נאסר עוויס תכננתם לעשות של הנחת מטען חבלה בשטחים ליד שכם.

ת. זה לא מעניין אף אחד.

ש. סיפרת במשטרה שהיית עוזר לנאסר עוויס להעביר כלי נשק מפעיל כזה לפעיל כזה

ת. אני לא אמרתי את הדברים האלה כדי לעמוד לדין עליהם

ש. לאיזה צורך אמרת אותם

ת. ככה שאלו אותי ואני סיפרתי".

מכאן ואילך שתק או סרב לענות

עד/ת מס' 23 ▇▇▇ אף הוא הבהיר מיד עם עלותו לדוכן העדים כי "הבנתי מה שאמר המתורגמן
ואני לא אגיד כלום" גם הוא הבהיר במהלך החקירה הן במילים והן בהתנהגות שלא ישתף פעולה וכך עשה.

עד/ת מס' 25 ▇▇▇ בכר לא שינה ממנהגם של האחרים ועל כל שאלה הפנה את בייכ המדינה לערוך
דינו אך הוסיף וטען כי כל הדברים שנאמרו על ידו הוצאו בלתץ אנשי השב"כ לאחר שנפשכו עליו תה, ירקו
עליו, סטרו לו וקשרו אותו למספר ימים.

נוכחנו אם כן לדעת כי עדות הארבעה מקיימות את התנאי הקבוע בסעיף 10א(א)(3) לפקודות הראיות.

C:\Users\Owner\Desktop\ko baies stamp\Nasser Aweis Conviction.doc

פח (ת"א) 1137/02                    מדינת ישראל נ' נאסר מחמוד אחמד עוויס

הארבעה היו עדים במשפט וניתנה להם ההזדמנות לחקור על כן נתקיים התנאי הקבוע בסעיף
10א(א)(2) לפקודת הראיות (עניין דנ"פ 4390/91 מדינת ישראל נ' תאג'י יחיא, פ"ד מו (3) 679).


על הנסיבות בהן נגבו עדויות הארבעה העידו השוטרים גובי ההודעות.

ההודעות ת/12 ות/13 נגבו מהעד ██████ ██ על ידי עיית מסי 28 ██████, על פי עדות האחרון הוא
חקר את ██████ בשפה הערבית תוך שהוא כותב את הדברים בעברית ולאחר שהזוהיר את
כדין והסביר לו את מהות החשדות נגדו. על פי עדות ██████ הוא הציע ל ██████ לרשום בעצמו את הודעתו
בערבית אך זה חסביר כי אינו יודע לקרוא ובכתראה אין הוא מתנגד שהודעתו תרשם בעברית. על פי עדות
██████ הודעתו של אבו חאדר ניתנה מרצון טוב וחופשי.


ההודעות ת/14 ות/15 נגבו מהעד ██████ על ידי עיית מסי 34 ██████. על פי עדות██████ הוא הציג
עצמו בפני ██████ כאיש משטרה גם הוא כמו העד ██████ חקר את ██████ חעד בערבית ותרגם את העדות
לעברית באופן סימולטני ולאחר שהזהיר את ██████ והסביר לו מהות העבירות המיוחסות לו ניתנו
הודעותיו של האחרון מרצון טוב וחופשי.


גובה ההודעה ת/16 לא נמנה על עדי התביעה נתייחס לכך בהמשך.


ההודעות ת/17 ת/18 ות/19 נגבו מ ██████ עיי עיית מסי 29 ██████ גם עד זה הציג עצמו בפני
██████ כאיש משטרה והסביר לו את זכויותיו ואת מהות החשדות נגדו הזהירו כדין והודיע לו על זכותו
לרשום בעצמו את ההודעה בערבית. גם עד זה העיד כי ██████ הצהיר שאינו יודע לכתוב ערבית וכי אין
לו בעיה שהעדות תכתב בשפה העברית.


את ההודעה ת/20 גבה מ ██████ עיית מסי 33 ██████, ██████ הסביר כי העדות נגבתה לאחר
ששהאשים ██████ את ██████ בחשדות המיוחסים לו,הזהירו,תרגם לו את תוכן האזהרה, הודיע לו כי הוא
זכאי לרשום בכתב ידו בערבית אך מאחר ו ██████ טען שאינו יודע לכתוב הוא גבה את העדות בערבית
ושב ותרגם את שכתב לערבית.


מאחר ו ██████ טען על פי כל העדויות שאינו יודע לקרוא ולכתוב בשפה הערבית העובדה שההודעות
נרשמו בעברית אינה מעלה ואינה מורידה משום שגם לו היו נרשמות בערבית היה ██████ חותם עליהן
בהסתמך על דברי גובי ההודעות.


אנו נותנים אמון בעדויות השוטרים גובי ההודעות ת/12 עד ת/20 כולל וקובעים כי נגבו מהעד ██████
██ כדין וכדין תוך שמירה על זכויותיו וכי ██████ מסר הודעותיו מרצון טוב וחופשי.


ודוק, ██████, עצמו אינו טוען כי נפל פגם במהלך חקירתו. תשובתו לתובעת על שאלתה "אני אגיד לך
על כל הפעילות שפעלת עם נאסר עוויס על פי הוראות של עוויס במסגרת האינטיפדה" לאמור "כל הדברים
שאת אומרת אלה דברים מזויפים" נדמית על רקע כלל התנהגותו והתבטאויותיו לפנינו כהתרסה בעלמא

7

העומדת בניגוד קוטעי להוראתנו להודיע למלאה בכל פרטי האישום שיוחסו לו בכתב האישום המתוקן מיום 7.8.02 בפני שלושת שופטי ההרכב של בית המשפט הצבאי (ראה ת/11).

לכך נוסיף את הימנעות הנאשם מחקירתם הנגדית של עדים אלה הימנעות המחזקת את משקל עדותם.

אנו קובעים כי מתן האימרות הכלולות בהודעות הללו הוכח כנדרש על פי סעיף 10א(א)(1) לפקודת הראיות.

משנתקיימו כל התנאים הנדרשים בסעיף 10א(א) לפקודת הראיות, אנו קובעים כי אימרותיו של ▅▅▅ ▅▅▅ הן ראיות קבילות.

נסיבות גביית ההודעה ת/16 לא הוכחו. גובה ההודעה לא נמנה על עדי התביעה. למרות זאת, בצעד לא מובן לנו לא נמנעה ב"ח המדינה מלכלול אותה בין ההודעות הקבילות לטענתה (עיין ע' 80-81 ל' סיכומי התביעה-ראשי פרקים" שנמסרו לנו בכתב). אנו מתעלמים מראיה זו (ת/16) אשר קבילותה לא הוכחה ומוצאים אנו אותה מכלל הראיות שנלקחו על ידנו בחשבון.

רשאים אנו להניח במידת ודאות גבוהה שהוראתנו למלאה של ▅▅▅ בעבירות שיוחסו לו בפני ההרכב של שלושת שופטי מבססת את אמיתות אימרותיו במשטרה, כפי שהצביעה על קבילותן של האימרות מבחינת נסיבות גבייתן.

במהלך עדותו בבית המשפט ועד כמה שניסה להרחיק עצמו מאימרותיו בכתב בדרכים שונות לא היתה משמעותו של ▅▅▅ עקבית. אדי פעם לרגע קט הבליחה האמת, כך למשל מיד עם תחילת העדותו ענה בתשובה לשאלת התובעת "יהדברים שאני עשיתי אותם ומה שדחף אותי לעשות אותם אלה בגלל פשעי המלחמה שרון ומנופי ולאחר מכן "אנחנו רצינו לעצור את הפעולות הצבאיות והם רצחו את המונחנו ▅▅▅ ורצתו ילדים פלשתינאים יזו שדחף אותי לעשות את הדבר הזה" ואח"כ "כל הדברים שאת אומרת אלה דברים מוזיפים, תלכי תשאלי את הסיבות לדברים האלהי" וכן "יעד רגע זה תעם היחידי שהוא תחת כיבוש זה תעם הפלשתינים וכל החוקים הבינלאומיים מרשים לי להיאבק בכיבוש, אל תעייפי את עצמך אל תשאלי אותי שום שאלהי" וכן "את ▅▅▅ אני מכיר אותו הוא חבר שלי וישרת איתי ברשות והכיבוש הוא שדחף אות ▅▅▅ לעשות מה שעשהי".

גם הצהרתו של ▅▅▅ לנאשם עם הכניסה לאולם והצהרתו כי הוא מכיר את הנאשם ושם אותו מעל לראשו למעלה, סימנים הם לאמיתות אימרותיו של הנאשם על הקשר ההירארכי ביניהם כמתואר בין השאר בת/12 "ראשנ עוויס הינו תושב מחנה בלאטה... המכונה אל תני רווק והוא אחד "האחראים בכתאאב שוחדא אל אקצא וישימש כאחראי שלי בארגון ונאצר עובד בבטחון הלאומי בשכם ומשתתף לתנוזים פתח...".

אנו מעדיפים אימרותיו של ▅▅▅ אשר ניתנו בכתב מחוץ לכתלי ביהמ"ש הכלולות בהודעתיו דלעיל על פני עדותו במשפט.

נבו הוצאה לאור בע"מ   nevo.co.il   המאגר המשפטי הישראלי
C:\Users\Owner\Desktop\lo bates stamp\Nasser Aweis Conviction.doc

הודעות העד ███ ת/40א'אי ב' ג' נגבו על ידי ע'ית מסי 7 ███. על פי עדותו של ███ ההודעות נגבו ונרשמו בעדרבית לאחר שהסביר ל███ את החשודות המיוחסים לו והזהירו כדין. לדבריו, העד מסר את הדברים ברצון טוב וחופשי וחתם בפניו בסוף כל עמוד של כל אחת מההודעות. על פי עדותו של ███ את ההודעות תרגם לעברית אך ███ נתבקש לחתום וחתם על המקור בלבד.

את ת/40ד'י גבה מ███ ע'ית מסי 35 ███ גם עד זה העיד כי גבה את ההודעה באותה דרך בה עשה זאת ███.

אנו מאמינים לשניים כי גבו את הודעות ███ בדרך נאותה וכי האימרות הכלולות בהן נמסרו מרצונו הטוב והחופשי ש███.

לפנינו לא העלה ███ טענה כי הדרך בה נגבו הודעותיו פסולה. על השאלה אם מוזהה הוא את תזכימתו לא רצה לענות, לא רצה להסתכל אך לא הכחיש ומענה בשלילה לשאלה אם הוזהירו אותו כדין אינו משכנע. גם כאן הימנעותם האשם מחקירת גובי ההודעות מחזקת את עדותם ואנו קובעים כי מתן האימרות הוכח במשפט כנדרש בסעיף 10א(א)(1) לפקודות הראיות.

אימרותיו של ███ שניתנו מחוץ לכותלי בית המשפט קבילות כראיה בחלק' דין משנתקיימו תנאי סעיף 10א(א) לפקודות הראיות במלואם.

אנו מעדיפים את אימרותיו של ███ כפי שקיבלו ביטוי בהודעותיו ת/40א'אי עד די על פני עדותו בבית המשפט. מתשובותיו של ███ לשאלות שנשאל ניתן להבחין על נקלה כי התנהגותו בבית המשפט משקפת את החלטתו שלא להראות כמשתף פעולה וברובן מרמזות הן עצמן על כך שאימרותיו במשטרה אמיתיות.

לא למותר לשוב ולצטטן :

"יש. מתי הכרת את נאסר עוויס

ת. זה דבר פרטי שלי ולא עניינו של בית המשפט

ש. באיזו פעילות צבאית השתתפת יחד עם נאסר עוויס

ת. זה דבר פרטי שלי ולא עניינו של ביהמש

ש. מי היה חבר בחוליה הצבאים שבה היית חבר גם:...

ת. זה לא עניין של ביהמש

ש. היית חבר מתחילת האינתיפדה בחוליה שעשתה פיגועים, ובין היתר מי שהיה אחראי על החוליה הזאת זה האשם פה נאסר עוויס

ת. מה חטעות בדברים האלה? מה אסור בדברים האלה

ש. ספירת במשטרה שנאסר עוויס הוא זה שהיה מתכנן את בצוע הפיגועים והוא זה שהיה מספק לכל חברי החוליה את הנוק

ת. אין לי תשובה

ש. ספירת במשטרה שהשתתפת בלפחות עשרה פיגועי ירי לעבר הצבא באזור שכם

ת. זו זכותי

ש. אותם עשרה פיגועי ירי שסיפרת עליהם היו בתכנונו של נאסר עוויס והוא זה שסיפק את הנשק את הנשק לירי

9

P 5: 245

ת. אני לא רוצה לענות

ש. סיפרת גם לאן בדיוק היו פיגועי חירוד לעבר התנחלות אלון מורה לעבר מחסום צהל לחאוורה

ת. אני מסרב לעמוד לדין בכימט זה. אין לי על על מה לעמוד לדין. אם עשיתי או לא עשיתי. אפילו אם עשיתי את הדברים האלה, אין בזה שום פגם.

ש. אתה לא עומד פה לדין. את כאן מעיד ונצריך לענות תשובות

ת. אני מסרב שנאסר יעמוד לדין על הדברים האלה.

ש. על איזה דברים

ת. על מאבקנו נגד הכבוש

ש. אתה בהוראת נאסר עוויס תכננתם לעשות של פגוע של הנחת מטען חבלה במשטחים ליד שכן

ת. זה לא מעניין אף אחד

ש. סיפרת במשטרה שהיית עוזר לנאסר עוויס להעביר כלי נשק מפעיל כוח מפעיל כזה לפעול כזה

ת. אני לא אמרתי את הדברים האלה כדי לעמוד לדין עליהם.

ש. לאיזה צורך אמרת אותם

ת. ככה שאלו אותי ואני סיפרתי

ש. כל הנשקים הרובים ה- M16 שהעברתם שמשו לפגועי ירי כנגד אזרחים וחיילים

ת. אני לא רוצה לדבר ואל תמשיכי..."



הודעותיו של עיית 23 ■■■ ת/43א ות/43 ג' נגבו ע"יי עיית מסי ■■ 62

על פי עדותו של ■■■ הוא הזדהה בפני ברגותי כשוטר, הזהירו וודא שהלה הבין את תוכן האזהרה. ת/43א נגבתה בדרך של שאלות ותשובות ונרשמה (כמו גם ת/43ג') בערבית משום שהעד ■■■ אינו כותב ערבית. ■■■ סרב לחתום על ת/43א'י מבלי לתת לכך הסבר ואילו על ת/43ג' חתם. ■■■ הסביר כי במהלך גביית שתי ההודעות לא היו כל איורעוים חריגים הוא את הבמהון ש■■■ פצוע חולה או עיף כי אם כך היה הדבר הוא היה מציין עובדות אלה. אם היה משהו חרוג מאוד העדות לא היתה נגבית והיה על כך מוזכר. במהלך גביית ת/43ג' הציג ■■■ בפני ■■■ כתב יד בן שמונה עמודים בערבית וחאארון אישר שזה היה כתב ידו לאחר שעיין במסמך.

ההודעות ת/43בי ות/43ד'י נגבו מ■■■ ע"יי עיית מסי ■■■ 31 עפייי עדותו ■■■ השניים דיברו ערבית אך העדות נרשמה בערבית ■■■ הוזהר כדין אך סרב לחתום על האזהרה או על ההודעה ת/43בי אך על ת/43ד'י חתם. על פי עדות ■■■ במהלך גביית שתי ההודעות הוצגו ל■■■ כתבי יד אותם זיהה ככתבי יד שלו, כתבי ד'יד הגיע ל■■■ מאחר ומחוקרו השביי"כ. ■■■ מסר את הדברים מרצונו הטוב וחותפשי ולגבי גביית כתב היד שהוצג לו עם גבית ת/43 ד'י אף השיב "כן, זה כתב היד שלי וכתבתי את מה שסיפרתי לך עכשיו בעדותי".

ההודעה ת/43ה'י נגבתה מ■■■ על ידי עיית מסי ■■■ 36

עפ"יי עדות ■■■ אורכן חותא הזדחה בפני ■■■ כאיש משטרה הסביר לו כי הוא עומד לחקור אותו ובמה הוא חשוד. ■■■ מסר את הדברים בצורה מסודרת ואחר כך חתם על העדות לאחר שהדברים תורגמו לו. על פי עדותו של ■■■ הוא חקר את ■■■ כשלפנגיו רקע כללי בדמות זכרון דברים מחשביי"כ אך בעדותו מסר לו ■■■ פרטים רבים שלא היו יכול היה לדעת מוזכרון הדברים ובלשונו ייאם זה בנושא נסיבות הקשר

נבו הוצאה לאור בע"מ    nevo.co.il    המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc

איך הדברים התנהלו וזון, אלה דברים שנתן בעדות שלו. אם הם הלכו לחנות גלידה ומה היה הקוד ומי
קבע זה לא מופיע בזכ"ד".

מהומנים עלינו דברי העדים ███████ על אופן ניהול החקירה ונסיבות גביית אימרותיו של
███ אשר מצדו איננו טוען שאלה נגבו בדרך פסולה. גם כאן הימנעות הנאשם מתקירה נגדית מחזקת
את הדברים שנשמעו מפי גובי ההודעות ומתן האימרות הוכח במשפט כדבעי.

משנתקיימו תנאי סעיף 10א(א) לפקודת הראיות אנו קובעים כי האימרות בכתב שנתן ███████ והכלולות
בהודעותיו ת/43 עד ת/ הי' קבילות כראיה בהליך דנן.

אנו מעדיפים אימרותיו של ███████ על פני עדותו במשפט. מרבית תשובותיו כוונו להחברות המסר שאין
חוא מכיר בסמכותו של בית המשפט (י'אני לא מכיר בביהמ"ש, אתם לא מבינים?... אני לא מכיר בביהמ"ש
ולא בישראל... אינני מכיר בביהמ"ש") ולא בהכחשת אימרותיו.

בכל זאת, מדי פעם פרצו ונתגלו הסימנים המעידים על כך שהאימרות אמיתיות:

"ש. מתי התגלתלת את הפעלות הצבאית שלך

ת. זה לא עניך...

ש. ███████ קרוב משפחה שלך

ת. זה לא עניך למה לא שואלת אותי שאלות אישיות

ש. אתה היית הנהג ושומר הראש של ███████ משנת 96 ועד היום שנעצרת

ת. נו, מה את רוצה

ש. האם זה נכון

ת. איך את שואלת שאלות כאלה? אני לא מכיר בך

ש. אלה דברים שאתה סיפרת

ת. הדבר הזה הוא לא שלי

ש. אתה סיפרת גם שנעצברת יחד עם ███████

ת. אין לי תשובות בכלל יותר טוב שלא תשאלי...

ש. אתה דאגת להכין את סעיד לפני הפגוע הפגוע דאגת לזה שיהיה מי שיסיע אותו לירושלים למקום קניתם לו
בגדים ונעליים לקחתם אותו להסתתר ואתה בהתנקיית נאסר עוויס שהיה מתכנן והמאורגן אתה גם דאגת
להשיג לסעיד רמאדן נשק רובה M16 ומחסניות עם כדורים

ת. (העד שותק ואיננו משיב)

ש. אתה סיפרת בעצמך את כל הפרטים האלה בהודעה שלך

ת. אני אומר מה שאני רוצה מה שבא לי אני אומר

ש. זה מה שאו בא לך להגיד

ת. זה לא ממני זה לא הכתב שלי. אם באמת נאסר עשה את כל הדברים האלה הוא רק רצה לשחרר לנו
את פלסטין זה דבר מרומם את הראש...

ש. לא רק שסיפרת בהודעה שלך על חרבה מקרים של פיגועי ירי התאבדות ובהתייחס לכל הפיגועים
שעשית אתה מצטער על מה שעשית

11

ת. אם שרון מצטער על מה שהוא עשה אז אני מצטער על מה שעשיתי.

ש. אתה לא מצטער על ששלחת מחבלים להתפוצץ פה בארץ ולהרוג!

ת. אני רוצה לשחרר את ארצי זו שאתם כובשים...

ש. מציגה לך את ההודעה מסי 5 מ 5.9 גם בהודעה זו אני מראה לך את האזהרה את החתימה על האזהרה והחתימה על כל עמי בהודעה ואת החתימה בסוף ההודעה

ת. מה שאני רוצה אני עושה. אין אף אחד שימנע בעדי, אני אכתוב ואגיד מה שאני רוצה..."

אמת ניתנת להאמר שהתשובה ש"אני רוצה לשחרר את ארצי זו שאתם כובשים" היא בגדר ראשית הודייה.

יפים לענייננו הדברים שנאמרו בע"פ 735/80 אברהם כהן ני מ"י, פ"ד לה(3) 94, "משקובע עתה סעיף 10א שבית המשפט יכול להעדיף את האמרה על העדות בבית המשפט, יכול היה חסנון לנסות ולחזק מצידו את גירסת העד בחקירתו הראשית, על ידי חקירה נגדית שמטרתה להסביר שהאמרה למשטרה היתה אמירה כוזבת, אך חסנון לא חקר את העד כללי.

הודעות העד [████████] ת/47אי עד גי נגבו על ידי עד התביעה מסי 31 [████]. העד לא זכר את מועד גביית העדות ורען זכרונו מהאמרות. על פי עדותו הוא הודעתה בפני [████████] כשוטר, ניהל את השיחה עם [████] בערבית ותרגם לו את הדברים. על פי עדותו של [████] כאשר תרגם את שנכתב בהודעות יכול היה [████████] להשיב על כך לתקן או לערב לחתום. על פי עדותו הוא רשם רק את מה ש[████] אמר לו [████] אישר בפניו כתב חיד שנעשה בפני חוקרי שב"כ בכתב ידו. על פי עדותו לו היו נסיבות חריגות היה מציין זאת ולו נשמעו תלונות היה רושם אותן כמו שהיה מציין אם היה רואה סימנים וזוואלים. [████████] הבהיר שכאשר חשד מגיע לחקירת משטרתית חוא אדם חופשי יוזו התחזמות שלו למסור או לא למסור את גירסתו וזאת מבלי למה שקדם לכך בשב"כ. אם היתה איזה שהיא בעיה היתי רושם כי כ חובתי כל מה שרשום בעדות זו נאמר מפי המשודי". [████] הבהיר כי "גם בעדויות הקודמות וגם בעדות הזאת, הצגתי עצמי כשוטר, זה הדבר הראשון מעבר לכך הם (הכונים לחתקירים מסוג של העד ) עושים את האבחנה מי שוטר ומי חוקר שב"כ, הם נתקלים איתנו בהארכות המעצר והם לא יכולים לטעות בעניין הזה..."

ההודעה ת/47חי נגבתה מ[████████] על ידי עד תביעה מסי 30 [████] לדבריו גבה ההודעה לאחר שהחשוד הוזהר כדין עדותה נכתבה בעברית אך החקירה התנהלה בערבית. בתום ההודעה הוא קרא בפני [████] את הדברים וזה חתם בפני. על פי עדותו של [████] שלא זכר ספציפית את המקרה הרי אם היה מתלונן בפניו הדבר היה נרשם. עוד הבהיר [████] כי אין לו צורך לחזכר אם הזהרה הזאת כשוטר משום שזו חובתו והוא עושה את זה עם כל חשוד. בתחייחס לקשיו שבין החקירות שלו כשוטר לזכרונות הדברים המונגשים לו מתשב"כ הסביר כי חקירתו עצמאית והוא מתייחס לזכ"יד "רק כעקרי דברים ואם חשוד אומר שלא היו דברים מעולם זה מה שירשם בסופו של דבר כלומר מה שהוא אומר זה מה שירשמי".

ההודעות ת/47חי ות/47טי נגבו על ידי עד מסי 36 [████]. היות ש[████] טען לפנינו בין השאר כי הודעותינו נגבו בלתאי אנשי השב"כ חרחיב [████] דבריו (לאחר שהתובעת המלומדת ואף אנו הפנינו תשומת לבו לטענותיו של [████████]) לא רק על הדרך בה נגבה ההודעות אלא גם על אופן חקירתו את [████] אל נוכח חקירה קודמת שנערכה לו ונערכת גם לאחרים על ידי חשב"כ, חקירה חנעשת לצורך סיכול וכדבריו "כשאני מקבל לידי ת"יד וכ"יד הם בודקים את הנקודות שעולות בו מה חתשדות שיש נגד אותו חשוד ולאחר מכן אנחנו כותבים את תוכן הזהרה התשדות מקריאים ומסבירים ודואגים
12

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc

לראות שאכן מבין את תוכן האזהרה וידע על מה הוא נחקר וזה בשפה הערבית, אני דובר את השפה הערבית על בוריה, אינני כותב ואינני קורא אבל דובר את השפה הערבית, חלק מתהליך שבו אני מקריאים, אני מודיע לו שאני איש משטרה, והוא מודע לכך שאני איש משטרה והוא עומד לתת עדות משטרתית. לאחר שאני בודק באיזה נקודות התייחסות היתה אליו בשב"כ, ועל מה דיבר אני בונה את החשדות נגדו, אם זה השייכות לארגון או החזקת אמל"ח או לתלמוך סיוע למבוקשים או כל עבירה אחרת, ובהתאם לכך אני ערוך גם מבחינת החקירה עצמה.

השב"כ את נושא היסוכל, הוא עסק בתחום שעליו לסכל את הדבר העתידי, כלומר את הפיגוע העתידי. תפקידי כחוקר משטרה הוא לעסוק אך ורק בנושא החקירה המתייחסת לאיסוף הראיות כנגד החושד דאז, זאת אומרת שאם אני חוקר-אדם אני חייב לעבוד על פי דיני הראיות ולהבין את החוק...".

כאשר עימתה התובעת את [redacted] עם העובדה שהתהודעות נגבו ממנו על ידי שוטר ולא על ידי אנשי השב"כ ענה "לא ראיתי שוטר שאני אדבר איתו כולם קציני שב"כ".

התרשמותנו היא שהשוטר [redacted] אכן הזדהה בפני [redacted] כשוטר כפי שנהגו השוטרים האחרים והדברים שנמסרו בהתודעות שגבו [redacted] והשוטרים האחרים ([redacted]) נאמרו להם. מפיו של [redacted] מרצונו הטוב והחופשי ואין הן תוצאת התנהגותם של חוקרי השב"כ כלפיו.

הנאשם ובא כוחו לא חקרו את השוטרים בחקירה נגדית גם לא ביקשו לזמן את אנשי השב"כ עורכי זכרונות הדברים לחקירה. הנאשם ובא כוחו לא חקרו בחקירה נגדית את העד [redacted] כמוטרה לחזק גירסתו כי ההתודעות נגבו ממנו באמצעים פסולים.

המנעות זו אמנם אינה יוצרת חזקה לפניה גירסת השוטרים היא הנכונה אולם היא מוסיפה ומחזקת את התרשמותנו בדבר מהימנות עדותם של [redacted]. בנסיבות דנן, קיים חמצענות מכוחם וגמגומית של הנאשם ובא כוחו — כפי שהדגישו בפנינו לא אחת — מחקירה נגדית של מזמנים של עדים רלבנטים, אשר לא ניתן לשקוך על רקע עדותו אחרות סותרות ממילא את הובאו. אנו מעדיפים עדותם של הדרך בה ניתנו אימרות החוך של [redacted] על פני גירסתו של האחרון (עיין ע"פ 38/61 משה בן דוד יצחק כ. היוחמ"ש פד טו 514 וע"פ 639/79 אסלן ני מ"יי פד לד(3) 561 ע"פ 2603/90 אלפאר כ. מ"יי פד מה(3) 799).

בכל מקרה כמו שנקבע בע"פ 242/85 חון ני מדינת ישראל, פ"ד מא(1), עצם העובדה כי אימרת נאשם במשטרה אינה קבילה במשפטו שלו אין בה כדי להביא לידי כך שאותה אימרה לא תהא קבילה במשפט אחר בו נדון עניינו של שותף על פי הוראות סעיף 10 (לדוק, לא קבעו שנתעוררה אפשרות כזו.)

אימרותיו של [redacted] שניתנו במסברת ההודעות ת/47א עד ני' הוכרו במשפטם ומשנתקיימו כל תנאי הסעיף 10א(א) לפקודת אנו מקבלים אותן כראיות קבילות.

אנו מעדיפים את אימרותיו של [redacted] על פני עדותו בבית משפט. בהתייחס למרבית השאלות המפורטות את מעשיו של אבו בכר יחד עם הנאשם הפנה [redacted] את התובעת הנכבדה לאשם מולו, נאשם אשר בחר כאמור שלא לחקור את [redacted] או כל עד אחר. וכך

"ש. מפנה לחודעה מסי 3... שם שאלו אותך מתי התחלת את הפעילות הצבאים שלך ומי גייס אותך לפעילות הצבאים ואמרת שבתחילת שנת 2001 היית ביבחון של נאסר עוויס במחנה הפליטים בלטה ואז נאסר עוויס הציע לך להתגייס לגדודי חללי אקצא לפעילות צבאים והסכמת.

<div align="center">13</div>

ת. הדברים האלה לא נכונים ואתם יכולים לשאול אותו הנה הנה הוא פה...

ש. מפנה להודעה מס' 4... אתה הצעת לנאסר עוויס במהלך הפעילות שלכם לעשות פגוע בבית חולים תל השומר בישראל

ת. אין דבר כזה תשאלי אותו

ש. תכננתם את כל הפרטים ואפילו השיגו מפה של האזור, ובסופו של דבר נאסר אמר שצריך לחכות קצת, שזה עוד לא הזמן המתאים

ת. אין דבר כזה. את יכולה לשאול אותו

ש. מפנה לעמוד ב... עוד אחד מהתפקידים שלך היה לסייע לנאסר עוויס לגייס עוד פעילים מחבלים לפעילות הצבאית שיעזרו לחוציא אל הפועל פיגועים

ת. לא היו דברים כאלה הנה הוא תשאלי אותו...

ש. היית מודע לכך שנאסר עוויס כל פעם על מחבל שרוצה לעשות פגוע

ת. פעם ראשונה אני שומע את הדברים האלה בנוסף לכך חדברים הם של השבכ נאסר נמצא פה תשאלו אותו".

אל מול השאלות תשלה שהפנתה התובעת ל[███] וזה הפנה אותו מצידו לנאשם, לא הציב הנאשם גירסא מטעמו ונותרנו עם אותן הודיות אשר מסר בהודעותיו ועם הודאתו לעינו הפקוחה של

שופט המעצרים שראוי לחזור עליה כאן "אני מאשר באמיתיות ונכונות האימרות וההודאות שמסרתי בחקירתי בערבית קראתי אותם וחתמתי עליהם. נכון שהייתי מעורב בכל המעשים והפגועים שהעידותי עליהם "כל אחד והתפקיד שלי" אינני מתנגד להארכת המעצר המבוקשתי.

נציין כי הנאשם עצמו מספר ביחס [███] בין השאר את הדברים הבאים (עיין הודעת הנאשם ת/48) "אחרי פרוץ אינתיפאדה אלאקצה התגייס [███] לכתאב שהודאא אל אקצה ובקשתי מ[███] שישתתף עימם בפגועים ו[███] הסכמה להצעה ומסרתי לו נשק מסוג M-16 ו[███] ביצע פגוע ירי מתנשע שמסרתי לו הפגועים היה לעבר רכב ישראלי בכביש שעוקף מזרחית לשכם ועל פי דברי [███] לא פגע ברכב" ובתשובה לשאלה באיזה פיגועים נוספים היה [███] מעורב בשם כתאאב שהודאא אלאקצה "פיגוע חדרה שבוצע על ידי סעיד רמדאן...פגועים שבוצעו באיזור שכם...".

עובדות אלה לכשעצמצן סימן מובהק לאמיתות האימרות שניתנו במשטרה ולכך שיש להעניק להן משקל ניכר.

סימן נוסף לאמיתות אימרותיו מצאנו בגירסאות הסותרות של העד [███] שנמסרו בבית המשפט לגבי אימרה אחרת אשר על פי אימרותיו נעשתה בכתב ידו.

המדובר בכתב · יד בערבית לגבי נשאל [███] בהודעתו ת/47 א' גיליון מס' 4 את השאלה "אני מציג בפניך כתב יד בערבית (סה"כ עשרה עמודים בצבע צהוב אותם קיבלתי מהמכונה "בסאם") האם זה כתב ידך!

ת. כן זה כתב ידי ואני כתבתי את[ה] מה שספרתי לך עכשיו בעדותי"

בעוד לשאול שנשאל ע"י התובעת "יש. אני מציגה לך חודעה שצמודה להודעה מ 15.4 שזו הודעה בכתב ידך 10 עמודים". ענה "הם מכתיבים לאנשים לכתוב בעל כרחם. תעמידו אותם לדין לא אותם הרי

14

לשאלה ״ש. זה לא כתב היד שלך״ ענה ״זה הכתב של קציני השב״כ הם כתבו את הדברים האלה״ ובדרך אף ענה על שאלות דומות ״ש. אלה דברים שאתה כתבת בעצמך ת. כשנשפך עליך תה או כשאתה ארבעה חמישה ימים ללא אוכל וללא שינה או אתה אומר את הדברים כדי להתפטר, ש. אתה את הדברים האלה כתבת ת. יש לי עו״ד אתם צריכים לראות איך השב״כ נוהג עם אנשים ש. אתה מזהה את כתב היד ת. אני לא רוצה לענות לך את מתנהנת כמוהם וצועקת עלי (עונה גם בעברית וגם באנגלית)״

<br/>

### <u>סיכום ביניים</u>

<br/>

חזרנו ובררנו שכל הכללים החייבים להתקיים בטרם יוכשרו כראיה אימרות ארבעת שותפי הנאשם מחוץ לכותלי ביהמ״ש במסגרתו של סעיף 10א לפקודת הראיות נתקיימו ונבכללם הוכחת האימרות במשפט מתן התודדמנות לנאשם לחקור את חדים, השאלה אם העדויות בבית המשפט שונות באופן מהותי מהדברים שנרשמו בהודעות)

<br/>

שקלנו בדבר בזהירות המתחייבת ואנו מעדיפים את אימרותיהם של ארבעת חדים שותפיו של הנאשם המצויות בהודעותיהם במשטרה על פני עדותם במשפט.

<br/>

עדות הטעונה תוספת כלשהי תוכל לשמש כשלעצמה תוספת מכל סוג שהוא לעדויות אחרת הטעונה תוספת. על כן, אימרות ארבעת השותפים יכולות לחוות ״דבר מה״ נוסף להודיות הנאשם מחוץ לכותלי בית המשפט.

<br/>

(עיין, קדמי על ראיות חלק ראשון וכן ע״פ 6147/92 מייי נ׳ יוסף כהן, פ״ד מח(1) 62 ; ע״פ 6214/94 מ״י נ׳ פלוני דינים עליון כרך לח 665 ; ע״פ 5249/98 מ״י נ׳ מירילאשווילי, פ״ד נג(3) 550).

<br/>

על כל אחת מהאימרות ובכללן אימרות שניתנו על ידי חלק מהארבעה בכתב יד – עליהן יש להשקיף כתלק אינטגרלי מאותן הודעות בהתאם (עיין ע״פ 6411/98 מבבר נ׳ מדינת ישראל, פ״ד נה(2) 150) – ניתן לחסתמך כראיה תומכת בדמות ״דבר מה״ נוסף לראיות אחרות שהוכבאו כנגד הנאשם בדמות הודיותיו הוא.

<br/>

כשותפים לנאשם ובהתאם להוראת סעיף 54א(א) לפקודת הראיות נדרשנו למצוא ״דבר לחיזוקה״ של עדותם.

<br/>

נדרש לנו דבר לחיזוק אף בהתאם להוראות סעיף 10א(ד) לפקודת הראיות המורה לנו כי לא יורשע אדם על סמך אימרה שנתקבלה לפי סעיף 10א לפקודת הראיות ״אלא אם יש בחומר הראיות דבר לחיזוקה״.

מבחינת אופייה של דרישת הדבר לחיזוק (המושג זה בחקשר לשני חסעיפים דלעיל) מדובר בתוספת ראיה מאמתת להבדיל מראיה מסבכת. הדבר לחיזוק אינו חייב להיות ראיה עצמאית ויכול הוא לעלות מן העדות הטעונה חיזוק.

<br/>

דבר לחיזוק זה נמצא לנו מעל ומעבר לדרוש בראיות מסבכות שבאו ממקור עצמאי ונפרד והן :

הודאתו המלאה של הנאשם בפני שופט המעצרים

אימרות כל אחד מארבעת השותפים בהתייחס לאימרות רעהו ובהתאם.

<br/>

15

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc

P 5: 251

שתיקת הנאשם והימנעותו מלהעיד במשפטו שבאה על רקע האמור לעיל ועל רקע קו ההגנה שבחר
הנאשם (עליו עמדנו בפתח הדברים) שהיא כשהעצמה ראיה המגיעה לכדי ראית סיוע על פי סעיף 162 לחוק
סדר הדין הפלילי תשמ"ב-1982 המשמיענו כי יהמנעות הנאשם מלהעיד עשויה לשמש חיזוק למשקל
הראיות של התביעה וכן סיוע לראיות התביעה במקום שדרוש להן סיוע".



תו\1 כולל, תו\21, תו\21א, תו\24 עד תו\37 כולל, תו\48, תו\49, תו\52 עד תו\78 כולל, מאתר והנאשם לא הכחיש
את עצם מסירת ההודיות בפני גובי הודעותיו או בפני שופט המעצרים הנכבד. מאתר והנאשם אף חזר
והודה בפה מלא ובגופו הפצה בפני שופט המעצרים בכל המעשים שיוחסו לו תוך הבנת משמעות זה ומאתר
ומצאנו כי משקלן חפניהם של הודאותיו גבוה,קטן בהתאם המשקל הנדרש לייחדור מה'י הנוסף לשם
אימותן.

והנה, גם בענין דבר חמה הנוסף (אשר מבחינת מטרתו לא בא אלא להראות שהנאשם לא בדח דברים
מלבו ועל כך לא נדרש הוא להיות בגדר ראיה מסייעת המסבכת את הנאשם דווקוג ודי בראיה מאשרת),
מצאנו כי הוא בעל משקל של ממש וענה ונקל לדרישת מוגברת ומחמירה בחומתו מכסך את הנאשם
בביצוע העבירות המיוחסות לו, בא ממקור נפרד ועצמאי ומיתיחס לנקודת השנויה ממשית במחלוקת.

### עבירות בנגוד לפקודת מניעת טרור וקשירת קשר

בהתאם להכרוה לפי סעיף 8 לפקודת מניעת טרור, תשיה-1948, נקבע כי התנזים הוא "ארגון
טרוריסטי" כהגדרת סעיף 1 לפקודה (ילקוט הפרסומים (תשס"ב), עמ' 800 מ-06.12.2001.

עפ"י חוות דעת מומחים אשר הוגשו ללא התנגדות הנאשם וסנגורו (ת/50 ת/51) הרי (בכן השאר) "לפן
ראשית הארגוע האלימים בישטחים" שחחלו בספטמבר 2000 נטל ח"ינתנזים" תפקיד מרכזי ומוביל בבצוע
פעילות טרור. פעילי הארגוע ביצעו פיגועים במתנווים שונים לרבות פיגועי הרג המוני בשטח ישראל
ובאזי"ש... התארגניות הטרור של התנזים ב רצעת עזה ואזיי"ש (שלעוותים חברו אלייהם גורמים נוספים
בשטח) החל לחשימוש (נובמבר 2000) בכינוי "ידודי חלקי אל אקצא" ("כתאבב שהדאא אלאקצאיי") במיחד
לצורך קבלת אחריות על פיגועים בעידים ישראליים...

במהלך העימותים האלימים קיבל התנזים "הגדודים" אחריות על פיגועים רבים שבוצעו במתנווים שונים
בי"שטחים" ובתחומי היייקו הירוק" בכללם פיגועים קטלניים. התארגניות הטרור של הייגדודים" אחראית
לאלפי פיגועי ירי ומטעג בצירים העוקפים באזי"יש ולעשרות פיגועי הרג המוני בשטח ישראל בהם נהרגו
עשרות ישראלים... המאפיינים המרכזיים של פיגועי התרג המוני שביצעו התמוטלים כוללים התמקדות המפגעים במקומים
הומי אדם (מרכזי ערים ומתחמים ציבוריים המחווים מקור משיכה לציבור הרחב כגומת בתי קפה
ומסעדות, תחנות אוטובוס ומרכזים מסחריים וכו') והוצאת לפועל של פיגוע התאבדות (באמצעות הגרות
נפץ, או מטעג שנושאות המפגעים עם הגעם ליעד) ופיגועי הקרבה (פיגוע ממנו סיכויי המפגע להמלט
קלושים בברבות המפגים במתנווה זה עשים מבצעת שימוש ברי"סרים מסוגים שונים) בהם נהרגו עשרות
רבות של ישראלים...".

נבו הוצאה לאור בע"מ    nevo.co.il    המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc

הנאשם סיפר בהודעתיו כי "אחרי פרוץ אינתיפאדת אלאקצא התחילתי בביצוע פיגועים נגד מטרות
ישראליות מפאת הכיבוש לאדמה הפלסטינאית... לאחר מכן החלטתי לבצע פיגועי ירי ופיגועים נוספים נגד
מטרות ישראליות בגדה ובתוך תקו הירוק, הפיגועים שביצעתי אותם הם כדלקמן :-

"1. ביצעתי פיגוע ירי לעבר עמדת שמירה על הצבא הישראלי ליד קבר יוסף בשכם זה היה לפני יציאת
הצבא מהחבור בשבועיים לערך

2. ביצעתי ירי לעבר עמדה צבאית בהר גריזים בשכם...

3. ביצעתי ירי לעבר רכבים צבאיים בקרבת מחנה חוארה ליד שכם

4. ביצעתי ירי לעבר רכבים צבאיים בקרבת שכם מהצד המערבי  בקרבת זוואתה

5. מסרתי לשני אנשים רימוני יד על מנת לבצע פיגוע בירושלים

6. מסרתי נשקים לביצוע פיגוע בנתניה...

9. אני מסרתי נשק לביצוע פיגוע בחדרה

10. אני מסרתי נשק לביצוע פיגוע ירי פיגוע חקרבת שחיתה אמורה להתבצע בחדרה אך הפיגוע לא
הצליח והאנשים נהרגו בקרבת באקה אלגרביה

11. סיפקתי לסעיד רמדאן נשק לביצוע פיגוע התאבדות בתוך ירושלים

12. סיפקתי ל███████████ נשק לביצוע פיגוע התאבדות בתוך חדרה

13. סיפקתי ל███████████ שני מטעונים + קלצ'ניקוב...

14. סיפקתי ל███████████ מטען נפץ שהניח אותה בדרך... לעבר סיור ישראלי".

הנאשם ענה לשאלות הבאות כדלקמן :

"ש. בשם מי היית מבצע את הפיגועים שציינת לעיל

ת. בשם כתאאב שוהדאא אלאקצא שהוא משתייך לפת"ח.

ש. מי אחראי על תנועת הפתח

ת. יאסר ערפאת האחראי ויור תנועת פתח

ש. מי אחראי על תנוזים פתח

ת. מזכיר תנועת פתח בגדה המערבית ███████████...

ש. למי משתייכים שוהדאא אל אקצא

ת. שוהדאא אל אקצה משתייכים לתנועת פתח ולתנוזים פתח

ש. מה הקשר שלך למזכיר תנועת פתח בגדה המערבית ███████████

ת. הקשר שלי ק ███████ מזכיר תנועת פתח התחיל בשנת 1992 כשהתגוררנו באותה שכונה באמאן
בעת שגורשנו על ידי השלטונות הישראלים ו█████ חזר לגדה בשנת 1994 לערך ואני חזרתי בשנת 1995
וכשחזורתי לגדה התחדשו הקשרים עם █████והייתי נפגש עם █████ במשרד תנוזים בשם. וכן היינו נפגש
עמו במשרד ברמאללה ואחרי פרוץ האינתיפדה אלאקצה המשכתי לחיות בקשר עם ███████ והיינו
מארגנים הפגנות בשם תנוזים פתח והכרוזים היינו מפיצים בשם ועדת התיזום (הארגונית) (אלפסאלי)
והאחראים בועדה ███████ מטעם פתח ו█████ מטעם חמאס ואחרי מותו קיבל את התפקיד אדם
אחר ויור הועדה היה █████ ו███████ חבר בועדת התיזום העליונה ומהועדה העליונה היו מנהים
ועדת התיזום הארגונית (אלפסאלי)...

<div align="center">17</div>

---

C:\Users\Owner\Desktop\io bates stamp\Nasser Aweis Conviction.doc

ש. מי היה מממן את הכסף לביצוע פיגועים נגד מטרות ישראליות

ת. היה ממממן אותי בכסף אנשים מתניים פתח בגדה ובלבנון

ש. מי הם האנשים שממנו אותך בכסף לקניית נשק על מנת לבצע פיגועים נגד מטרות ישראליות

ת. לקחתי מ██████████ 12,000 שקלים וכן לקחתי מ██████ 8000 שקלים כהוצאות וקיבלתי מ██████████ בלבנון קיבלתי מ██████ 50,000 דולר

ש. במה עוסק ██████

ת. קצין במשטרה הפלסטיניאת בשכם וחבר בפתח

ש. במה עוסק ██████

ת. אחראי תנועת פתח בשכם ומשתייך ל██████

ש. במה עוסק ██████

ת. אחראי פתח בלבנון ומשתייך ליאסר ערפאת

ש. האם היה קשר בינך לבין ██████

ת. הייתי בקשר עם ██████ כל הזמן

ש. האם ██████ חיה יודע שאתה מבצע מבצע פיגועים נגד מטרות ישראליות

ת. כן ידע ושמי אף פורסם בעתונות ובטלבויזיה וברדיו והייתי משוחח עימו מידי פעם וכשהמצב הפוליטי היה מדרדר וער לנו היה מבקש שנמשיך בפיגועים וכשנפשש שימעון פרס ועומרי שרון עם מנהיגים ברשות התקשר אלי ██████ וביקש שנעצור את הפיגועים ואני חשבתי לו שאעשה זאת ובאותה תקופה היה ██████ באיזור ██████ אמר לי שעדיין מאחר ו██████ נפשו עם מנהיגים ברשות שלא נבצע פיגועים בשם שהההאא אלאמקצה ויש לציין כשהתקדמות בשיחות לא בוצעו פיגועים

ש. מי היה ממממן אותך בכסף לקניית נשק ש██████ שהיה ממממן אותך

ת. ██████ היה לוקח כסף מתנועת פתח מהתקציב שהיה מאושר יור תנועה פתח יאסר ערפאת

ש. מי היה ממממן את ██████ שהיה ממממן אותך בכסף על מנת לבצע פיגועים נגד מטרות ישראליות

ת. ██████ סיפר לי שהוא לוקח כסף ██████ ו██████ חיה מודע לכך והשתתף עמי במספר פיגועי ירי נגד מטרות ישראליות...

ש. האם ██████ ממממן אותך בכסף באופן ישיר

ת. כן ממממן אותי ██████ פעמים באופן ישיר בפעם הראשונה העביר לי באמצעות הפקדה בבנק 3,000 ₪ ובפעם השנייה העביר לי דרך הפקדה בבנק 5,000 ₪

ש. האם ██████ ידע שאתה מבצע פיגועים נגד מטרות ישראליות

ת. כן ידע וכפי שציינתי לעיל שמי אף פורסם בעיתונות והשלטונות הישראלים מסרו לרשות הפלסטיניאת שאני מבוקש בגין פיגועים ושמי גם פורסם בעיתונות העברית ובעיתונות המקומית בגדה וברצועה

ש. האם ██████ סייע לך במימון כסף פרט למה שהזכרת לעיל

ת. כן פעם קיבלתי ממנו שיק על סך 2,300 ₪ מאושר על ידי חיור ערפאת...". (עיין הודעת הנאשם ת/5).

עוד ענה לשאלות (עיין הודעה ת/6) כדלקמן :

נבו הוצאה לאור בע"מ   nevo.co.il   המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc

"כן היו לי מספר כינויים במהלך ביצוע הפיגועים כמו ████████ ... וכן לקחתי... שני
טילי טוב ישנים על מנת להוציא מהם את החומר נפץ ואשתמש בחומר למטעני נפץ ובמטענים השתמשתי
על כביש העוקף בואתה... ואני גייסתי אותו (המכונה לאדם בשם ████████) לכתאב שוחדאא אל אקצא
לפני כחודשים לערך והמטרה מגיוסו לשוותהא אל אקצא על מנת שיסייע לנו בפיגועים באזור ירושלים
ושיכניס מתאבדים (מוסתשהידים) לירושלים ואני גם כן ביקשתי מ████████ שילמד אותנו ייצור חומר נפץ
יותר חזק מהחומר שהשתמשנו בו ו████████ הסביר לי בטלפון כיצד מייצרים חומר (אוסאלעבד) והשבתי לו
שאנחנו יודע לייצר אוסאלעבד. ולפני חודש וחצי לערך ביקשתי מ████████ שינדבו דרך להחזיק מתאבד
לירושלים... ותפקידיו היה לתאם בין ████ ו████ על מנת להכניס את המתאבד לירושלים והפיגוע הזה
בוצע אף ללא הצלחה מאחר ושוטרים ירו לעבר המתאבד לפני הביצוע... ████ ביקש ממני
שאסכים לקבל שיחה מאדם ואחרי מספר ימים התקשר אלי ████████ (המכונה ████ ) וביקש
שנשמער בביצוע פיגוע בבצע לי מימון כספי ואני הבעתי את הסכמתי ומסרתי ל████ מספר חשבון
הבנק שלי בבנק ערבי בשכם על מנת שיעביר לי כסף ואכן ████ העביר לי כסף שש פעמים לערך
והפקיד ████ 3,000 או 5,000 דולר...

ש. מה עשית בכסף שהעביר לך ████████

ת. ביצוע ביצוע פיגועים... על פי הסיכום עמו היה ממימן אותנו בכסף לביצוע פיגועים ואני חייתי מדווח
לו אודות הפיגועים במהלך השיחות שניהלתי עמו באמצעות הטלפון והאינטרנט... שוחחתי עמו אודות
הרבה פיגועים... ודיווחתי לרגם כן אודות פיגוע התאבדות בירושלים ובחדרה שביצענו...

ש. איזה קשר צבאי היה בינך לבין ████████

ת. אחרי פרוץ אינתיפאדת אל אקצא התגייס ████████ לכתאב שוחדאא אל אקצא וביקשתי מ████
שישתתף עמנו בפיגועים (████) הסכים להצעה ומסרתי לו נשק מסוג M16 ויאסר ביצע פיגוע ירי מהנשק
שמסרתי לו. הפיגוע היה לעבר רכב ישראלי בכביש העוקף מזרחית לשכם ועל פי דברי ████ לא פגע
ברכב...

ש. האם היה קשר ל████████ עם מתאבדים

ת. כן אני ו████ עבדנו יחד לשלוח מתאבדים עם ████████... ובמידה והיינו
נזקקים לדבר מה כמו צילום המתאבדים או הפצת כרוזים היינו עוזרים ב████ ולפני כניסתם הצבע לשכם
כשבועיים ביקשתי מ████ שינגס לחשוע תגורת נפש למתאבד על מנת לבצע פיגוע בתוך ישראל ו████ אכן
הביא תגורת נפש ומסרנו אותה למתאבד שנסע עם אדם אחר לביצוע פיגוע בישראל וכשהגיע לבאקה אל
גרביה ירו חיילים לעברו וניסה בים ונהרגו... מה סוג הרכב שנסעו בו המתאבדים

ת. לא ידוע לי אך מסרתי ל████ 3,500 על מנת שיקנה רכב גנוב להעברת המתאבדים ו████ נסע
עמם לטול כרם והראה להם את הדרך וחזר ברכב ציבורי...".

ובהודעתו ת/7 בתשובה לשאלות:

"... ו████ פנה אלי בענין זה מאחר ואנחנו חוליה צבאית ואני הבעתי את הסכמתי לפגוע בזה... יש
לציין ש████████ פנה אלי כי אני אחראי כתאב שוחדאא אל אקצה. ואתרי שמשמעתי ברדיו שנהרגו
התקשרתי לכלי תקשורת והודעתי להם שהפיגוע בוצע על ידי כתאב אל אקצה... אך כשהתעדתי שאותנו
לוקחים אחריות על הפיגוע ████ אמר לי את השמות... כך חיה לי קשר בפיגוע חירי בנתניה שבוצע על ידי
מתאבדים שלא ידועים לי שמותיהם ולפני הפיגוע הזה ביומיים הזה בימים התקשר אלי ████████ ואמר לי
שביכולתנו להכניס שני מתאבדים לישראל על מנת שיבצעו פיגוע התאבדות ואני פניתי ל████ (ושאלתי) אותו
אם הוא יכול להכניס מתאבדים. והשיב לי בחיוב ואני מסרתי ל████ שני רימונים ו████ מסר
להם שני נשקים מסוג M16 ו████ צילם אותם והסביר להם על הפיגוע... ואתרי מספר שעות
שמענו בטלוויזיה שחיו חילופי אש בין המתאבדים וכוחות משטרה ליד בית מלון בנתניה ואזרחים

נבו הוצאה לאור בע"מ   nevo.co.il   המאגר המשפטי הישראלי

C:\Users\Owner\Desktop\to bates stamp\Nasser Aweis Conviction.doc

P 5: 255

ושוטרים נפגעו בפיגוע ונרצחו שניים השניים אחרים נהרגו על ידי המשטרה והתקשרתי לכלי התקשורת
ולקחתי אחריות על הפיגוע...".

ובהודעה ת/8

"יש. תאם היה לך קשר עם ▮▮▮▮▮▮

ת. כן... ואני יצרתי איתו קשר וביקשתי ממנו שיבצע פעולות צבאיות...

ש. מה עשה ▮▮▮▮ במטענים שמסרת לו

ת. לפיגועים ולא זכור לי היכן בוצע הפיגועים.

ש. האם אתה מכיר אדם בשם ▮▮▮▮

ת. אני מכיר אותו ....ביקש ממני מטען נפץ על מנת לבצע פיגוע נגד סיור צבאי ישראלי ואני הסכמתי
לכך ומסרתי לו מטען שקיבלתי...

ש. האם אתה מכיר אדם בשם ▮▮▮▮

ת. ...ואני לקחתי מתאתם באמצעות ▮▮▮▮ כעשרים אקדחים וכעשרים רובה קלצ'ניקוב....ו—
M16 ותמורת האמל"ח היתי משלם מכספי...".

במסגרת הודאתו של הנאשם לפני שופט המעצרים וכעולה מהעבירות המיוחסות לו בבקשה להארכת
פקודת המעצר (ת/23) הודה הנאשם בחברות בארגון עוויך "כתאב שוהדא אלאקצא" תשייך לתנגוס פתייח,
בהשתתפות בפגועוני ירי נעבר מטרות ישראליות באזור שומרון, במעורבות בגיוס מתאבדים ושליחתם
לתוך ישראל, מתאבדים שביצעו פיגועי רצח כמו כן הודה בגיוס פעילים נוספים לביצוע פיגועים וביצוע
חומר נפץ ומטענים.

עד התביעה ▮▮▮▮▮▮ מספר בהודעתו ת/12 "אני מודה שבמהלך חודש אפריל משנת 2001 הוצע לי
עייי נאצר עוויז להתגייס לתאבד להכתאב שוהדא אלאקצא והסכמתי להצעה זו וממה אני חבר פעיל בארגון שוהדא
אלאקצא השייך לתנגוס פתייח ועד היום הזה ולאחר שהצטרפתי לארגון הנייל נאצר עוויז ביקש ממני
להפיץ כרוזים בשם שוהדא אלאקצא וכן עשיתי את זה...ואחרי זה התתלתי להיות מערב בפעילות צבאית
השתתפתי בפגועוני ירי נעבר חבבא והשתתפתי בתנמת מטעני חבלה והשתתפתי גם בהכנת מסי מתאבדים
ושליחתם לתוך ישראל לביצוע פיגועי התאבדות... נאצר עוויז הינו תושב מחנה בלאטה כבן 29 שנים
ומכונה אל חאג׳ רוק והוא אחד האחראים בכתאב שוהדא אלאקצא וישמ באחראי שלי בארגון ונאצר
עובד בריטחוני הלאומי בשם ומשתיך לתנגוס פתייח...חברי הקבוצה שאליה הצטרפתי בשוהדאא
אלאקצא הם 1. נאצר עוויס- שימש כאחראי על כתאב שוהדא אלאקצא...".

בהודעה ת/13 מספר ▮▮▮▮▮▮ "אני מודה שבמהלך חודש מרץ לפני כחודש או יותר ביקר ממני נאצר עוויס
להוביל מתאבד משכם... ברכב מסוג פונטיאק גונב שקיבלתי אותו מנאצר... אני הודיעתי ל▮▮▮▮ שאני יודע
לייצר מטעינים ולכן לקחתי אותו לנאצר עוויז לתאבד למחנה בלאטה ובקשתי מנאצר שיסדר לו שני מטעינים ואז
נאצר התקשר ל▮▮▮▮▮▮ ...וכעבור שעה ▮▮▮▮ הגיע והביא עימו שני מטעינים... ואחרי זה ▮▮▮▮
קיבל את המטעינים וכל אחד מאנו הלך לבותו וכעבור שלושה ימים שמעתי מ▮▮▮▮ שביצע פיגוע נגד ג'יפ צבאי ...
ומאחר ו▮▮▮▮ פנה מסי פעמים ולכן הודיעתי לנאצר עוויס שאשר לי להמשיך ולתכנן פיגוע התאבדות עבור
▮▮▮▮ ולכן פגשתי את ▮▮▮▮ והצעתי לו לבצע פיגוע משולב...וכעבור שבוע חזר ▮▮▮▮ ואמר לי שהוא מסכים