Felony Case (Tel Aviv) 1137/02     State of Israel v. Nasser Mahmoud Ahmad Aweis

    Q.    For which things?

    A.    For his struggle against the occupation.

    Q.    Did you, on the instruction of Nasser Aweis, plan to carry out a terrorist attack by laying an explosive charge, in the territories near Nablus?

    A.    That is of no interest to anyone.

    Q.    Did you tell the police that you used to help Nasser Aweis transfer weapons from this activist to that activist?

    A.    I did not say those things in order to be judged for them.

    Q.    For what purpose did you say them?

    A.    That was what they asked me and that was what I told them."

From that point on, he was silent or refused to answer.

Witness No. 23 for the prosecution, [redacted], also clarified, immediately after taking the witness stand, that "I understand what the interpreter said and I will say nothing." He also made it clear, in the course of his examination – both in words and in his behavior – that he would not cooperate, and that is what he did.

Witness No. 25 for the prosecution, [redacted] did not deviate from the course that was set by the others. In response to every question, he referred Counsel for the State to his attorney, or alternatively, continued to claim that everything he had said had been forced out of him under pressure by Israel Security Agency personnel, who had spilled tea on him, spit on him, slapped him and kept him tied up for several days.

As we have seen, the testimony of the Four fulfills the condition set forth in Section 10A (a) (3) of the Evidence Ordinance.

[Stamp] P 5: 242 [continued]

Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

The Four were witnesses at the trial, and the parties were given the opportunity to examine them. This constitutes compliance with the condition that was set forth in Section 10A (a) (2) of the Evidence Ordinance (see Additional Criminal Hearing 4390/91, State of Israel v. Hajj Yihya, PD 47 (3) 679).

The policemen who had taken the statements testified as to the circumstances under which the testimony by the Four had been taken.

Statements P/12 and P/13 were taken from the witness ▆▆▆▆ by Witness No. 28 for the prosecution, ▆▆▆▆. According to testimony by the latter, he interrogated ▆▆▆▆ in Arabic and wrote down the answers in Hebrew, after having duly warned ▆▆▆▆ and after having explained to him the nature of the charges against him. According to ▆▆'s testimony, he offered ▆▆▆▆ the opportunity of writing down the statement himself in Arabic, but ▆▆▆▆ explained to him that he was not good at reading and writing and that he did not object to his statement being taken down in Hebrew. According to ▆▆'s testimony, ▆▆▆▆'s statement was made of his own free will.

Statements P/14 and P/15 were taken from the witness ▆▆▆▆ by Witness No. 34 for the prosecution, ▆▆▆▆. According to ▆▆'s testimony, he introduced himself to ▆▆▆▆ as a member of the police force. He, like ▆▆▆▆ interrogated the witness in Arabic and translated the testimony into Hebrew simultaneously, after having warned ▆▆▆▆ and having explained to him the nature of the offenses that had been attributed to him. The latter's statements were made of his own free will.

The person who took down Statement P/16 was not among the witnesses for the prosecution. We shall discuss this fact below.

Statements P/17, P/18 and P/19 were taken from ▆▆▆▆ by Witness No. 29 for the prosecution, ▆▆▆▆. This witness also introduced himself to ▆▆▆▆ as a member of the police force, explained his rights and the nature of the charges against him, duly warned him, and informed him that he was entitled to write down the statement himself in Arabic. This witness as well testified that ▆▆▆▆ told him that he did not know how to write in Arabic, and that he did not have a problem with the statement being taken down in Hebrew.

Statement P/20 was taken from ▆▆▆▆ by Witness No. 33 for the prosecution, ▆▆▆▆. ▆▆▆▆ explained that the testimony was taken after he "accused" ▆▆▆▆ of the offenses of which he was suspected, warned him, translated the content of the warning for him, informed him that he was entitled to write down [the statement] in his own handwriting in Arabic. However, because ▆▆▆▆ claimed that he did not know how to write, he took down the statement in Arabic [sic] and then translated what he had written into Arabic.

As ▆▆▆▆ according to all of the testimony, claimed that he did not know how to read and write in Arabic, the fact that the statements were written down in Hebrew is of no importance whatsoever, because, even had they been written down in Arabic, ▆▆▆▆ would

[Stamp] P 5: 243

12

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

have signed them on the basis of what he was told by the persons who were taking the statements.

We believe the testimony by the policemen who took down statements P/12 through P/20, inclusive, to be credible, and we determine that they were taken from the witness ▇▇ ▇▇ according to proper legal procedure, with his rights respected, and that ▇▇ gave his statements of his own free will.

More precisely: ▇▇ himself does not claim that the process of his interrogation was defective in any way. His answer to the prosecuting attorney's question, "I will tell you about all of the operations which you performed with Nasser Aweis, according to instructions by Aweis, in the course of the intifada," in the following words, "All of the things you say are falsified," appears, in light of his behavior and his utterances before us, to be a vaguely defiant statement,

[Stamp] P 5: 243 [continued]

Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

which is diametrically opposed to his full confession with regard to all of the counts of which he was accused in the amended indictment, dated August 7, 2002 before the three judges on the panel of the military court (see P/11).

We shall add to this the fact that the Defendant refrained from cross-examining these witnesses, and in so doing, augmented the weight of their testimony.

We rule that the making of the assertions that are included in the statements has been proven as required pursuant to Section 10A (a) (1) of the Evidence Ordinance.

Given that all of the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled, we rule that the assertions by ███████ constitute admissible evidence.

The circumstances under which statement P/16 was taken have not been proven. The person who took down the statement was not among the witnesses for the prosecution. Notwithstanding that which has been set forth above, Counsel for the State of Israel – although we do not understand her actions in doing so – did not refrain from including that statement among the statements which she claimed to be admissible (see pp. 80-81) of the "Summation by the Prosecution – Outline," which was filed before us in writing). We are ignoring this item of evidence (P/16), which has not been proven to be admissible, and are excluding it from the body of evidence which we took into account.

We may assume, with a great degree of certainty, that ███████'s full confession of the offenses that have been attributed to him, before a panel of three judges, substantiates the veracity of his assertions to the police, just as it indicated the admissibility of those assertions, from the standpoint of the circumstances under which they were taken down.

In the course of his testimony in court, insofar as he attempted to distance himself from his assertions in writing, by various means, ███████'s testimony was not consistent. From time to time, for one brief moment, the truth emerged – for example, at the very beginning of his testimony, in response to a question by the prosecuting attorney, he answered "The things that I did, and what drove me to do them, were because of the war criminals, Sharon and Mofaz." Subsequently, he added: "We wanted to stop the military operations, and they murdered the leader, ███████ and they murdered Palestinian children, and that is what drove me to do this thing," and afterwards: "all of the things that you are saying are fake. Go ask about the causes of these things." And also: "To this very moment, the only people who are under occupation are the Palestinian people, and all of the international laws allow me to struggle against the occupation. Do not exhaust yourself. Do not ask me any questions," and "I know ███████ he is a friend of mine, and he served with me in the Authority, and the occupation is what drove ███████ to do what he did."

[Stamp] P 5: 244

14

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

    The salute which ▆▆▆▆ gave the Defendant when he entered the courtroom, and his declaration to the effect that he knows the Defendant and puts him above himself, attest to the veracity of the Defendant's assertions concerning the hierarchical relationship between them. This relationship is described, *inter alia*, in P/12: "Nasser Aweis is a resident of the Balata camp … also known as al-Hajj Rawaq, and he is one of the people in charge of the *Kitaab Shuhadaa al-Aqsa*, and he was my superior in the organization, and Nasser works for the National Security in Nablus and belongs to Tanzim Fatah …"

    We give preference to the assertions that were made by ▆▆▆▆ in writing, in his above mentioned statements, which were made out of court, over his testimony in the courtroom.

[Stamp] P 5: 244 [continued]

Nevo Publishing Ltd.          nevo.co.il     The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

The statements by the witness ▆▆▆▆ P/40A, B, C were taken down by Witness No. 7 for the prosecution, ▆▆▆▆ According to ▆▆▆▆ testimony, the statements were taken down and written in Arabic, after he had explained to ▆▆▆ the offenses of which he was suspected and had duly warned him. According to his testimony, the witness made his statements of his own free will and signed every page of each of the statements before him. ▆▆▆ testified that he translated the statements into Hebrew, but that ▆▆▆ was asked to sign, and signed, the original only.

Statement P/40D was taken from ▆▆▆▆ by Witness No. 35 for the prosecution, ▆▆▆▆ who also testified that he took down the statement in the same way as Halabi.

We believe that both of [the above mentioned witnesses] took down ▆▆▆'s statements properly and that the assertions included in those statements were given of ▆▆▆'s own free will.

In his testimony before us, ▆▆▆ did not argue that his statements had been taken down improperly. He did not want to answer a question as to whether he identified his signature, and did not even want to look at it, but did not deny [that the signature was his]. His negative response to a question as to whether he had been duly warned is not convincing. In this case as well, the fact that the Defendant refrained from examining the persons who had taken the statements reinforces their testimony, and we rule that the making of the assertions has been proven as required pursuant to Section 10A (a) (1) of the Evidence Ordinance.

▆▆▆ assertions out of court are admissible as evidence in the present proceeding, given that the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled in their entirety.

We give preference to ▆▆▆'s assertions, as expressed in his statements P/40A-D, over his testimony in the courtroom. On the basis of ▆▆▆'s answers to the questions he was asked, it is easy to discern that his behavior in court reflects his decision not to look like a collaborator, and most of those answers hint at the fact that his assertions as they were made to the police are true.

It would not be superfluous to cite those answers again:

"Q.     When did you make the acquaintance of Nasser Aweis?

A.      That is my own private business and it is of no concern to the Court.

Q.     In which military activity did you participate together with the Defendant?

A.      That is my own private business and it is of no concern to the Court.

[Stamp] P 5: 245

16

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

Q. Who was a member of the military squad of which you were also a member?

A. That is of no concern to the Court.

Q. Were you a member, from the beginning of the intifada, of a squad which carried out terrorist attacks, and, among other things, was the Defendant, Nasser Aweis, the person who was in charge of that squad?

A. What is wrong with those things? What is forbidden about those things?

Q. Did you tell the police that Nasser Aweis was the one who used to plan the implementation of the terrorist attacks, and that he was the one who used to supply the weapons to all of the squad members?

A. I have no answer.

Q. Did you tell the police that you participated in at least 10 shooting attacks against the Army in the Nablus area?

A. That is my right.

Q. Those shooting attacks that you talked about were planned by Nasser Aweis and he was the one who supplied the weapons for the shooting?

[Stamp] P 5: 245 [continued]

17

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

    A.    I do not wish to answer.

    Q.    Did you also tell them exactly where the shooting attacks were directed, toward the settlement of Elon Moreh, toward the IDF roadblock near Hawara?

    A.    I refuse to stand before this Court and be judged. There is nothing for which I must be judged. Whether I did or did not do – even if I did these things, there is nothing wrong with them.

    Q.    You are not the one being judged. You are testifying here and you have to give answers.

    A.    I refuse [to allow] Nasser to be judged for these things.

    Q.    For which things?

    A.    For his struggle against the occupation.

    Q.    Did you, on the instructions of Nasser Aweis, plan to carry out a terrorist attack by laying an explosive charge, in the territories near Nablus?

    A.    That is of no interest to anyone.

    Q.    Did you tell the police that you used to help Nasser Aweis transfer weapons from this activist to that activist?

    A.    I did not say those things in order to be judged for them.

    Q.    For what purpose did you say them?

    A.    That was what they asked me and that was what I told them.

    Q.    All of the weapons, the rifles, the M-16s, which they transferred, were used for shooting attacks against civilians and soldiers.

    A.    I do not want to say anything, and do not go on …"

Statements P/43A and P/43C by Witness No. 23 for the prosecution, ▇▇▇▇▇, were taken by Witness No. 32 for the prosecution, ▇▇▇▇▇

According to ▇▇▇'s testimony, he identified himself to ▇▇▇ as a policeman, warned him and ascertained that he understood the content of the warning. P/43A was taken in the form of questions and answers and was taken down (as was P/43C) in Hebrew, because the

[Stamp] P 5: 246

18

Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

witness ▮ cannot write in Arabic. ▮ refused to sign P/43A, without explaining his refusal, but signed P/43C. ▮ explained that there were no exceptional events during the taking of both statements. He did not notice that ▮ was injured, ill or tired, because, had this been the case, he would have noted those facts. If there had been anything extremely exceptional, the testimony would not have been taken down, and a memorandum to that effect would have been written. During the taking of P/43C, ▮ showed ▮ an eight page manuscript in Arabic, and the latter confirmed that it was in his handwriting, after having studied the document.

Statements P/43B and P/43D were taken from ▮ by Witness No. 31 for the prosecution, ▮ According to ▮'s testimony, the two spoke Arabic, but the testimony was taken down in Hebrew. ▮ was duly warned but refused to sign the warning or statement P/43B, although he signed P/43D. According to ▮'s testimony, during the taking of both statements, manuscripts were shown to ▮ which he identified as being in his handwriting, the manuscripts had been given to ▮ by one of the Israel Security Agency interrogators. ▮ made the statements of his own free will, and with regard to the manuscript which was shown to him during the taking of P/43D, he even answered "Yes, this is my handwriting and I wrote what I have just told you now in the testimony."

Statement P/43E was taken from ▮ by Witness No. 36 for the prosecution, ▮

According to testimony by the latter, he identified himself to ▮ as a member of the police force and explained to him that he was about to interrogate him and what he was suspected of. ▮ made his statements in an orderly manner, and subsequently signed the testimony after his words were translated back to him. According to ▮'s testimony, he interrogated ▮ after having been given a general background in the form of a memorandum from the Israel Security Agency. In his testimony, however, ▮ told him many details which ▮ could not have known from that memorandum. In his words: "If it is about the circumstances

[Stamp] P 5: 246 [continued]

Nevo Publishing Ltd.        nevo.co.il        The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

of the relationship, how things occurred and progressed, these are things that he said in his testimony. If they went to an ice cream shop, and what the code was and who set it, this does not appear in the memorandum."

We; believe that the statements made by the witnesses ▓▓▓, ▓▓▓▓▓ and ▓▓▓ with regard to the manner in which the interrogation was conducted and the circumstances under which ▓▓▓▓'s assertions were taken down, are credible. ▓▓▓▓▓ for his part, does not argue that the assertions were taken down improperly. In this case, as well, the fact that the Defendant refrained from cross-examination strengthens the testimony by those who had taken the statements, and the making of the assertions was proven in the trial as required.

Given that all of the conditions required pursuant to Section 10A (a) of the Evidence Ordinance have been fulfilled, we rule that the assertions made by ▓▓▓▓▓ in writing and included in his statements P/43A-E, are admissible as evidence in the present proceeding.

We prefer ▓▓▓▓'s assertions over his testimony in court. Most of his answers were intended to give the message that he does not recognize the jurisdiction of the Court ("I do not recognize the Court, do not you understand? … I do not recognize the Court, or Israel either … I do not recognize the Court"), and not as denial of his assertions.

Nonetheless, from time to time, signs arose in his testimony which indicate that the assertions are true:

"Q.    When did you begin your military activity?

A.    That is none of your business …

Q.    Is ▓▓▓▓▓▓▓▓ a relative of yours?

A.    That is none of your business. Why are you asking me personal questions?

Q.    Were you ▓▓▓▓▓▓▓'s driver and bodyguard from 1996 and up to the day of your arrest?

A.    No, what do you want?

Q.    Is that correct?

A.    How do you ask me such questions? I do not recognize you.

Q.    Those are things that you said.

A.    That thing is not mine.

[Stamp] P 5: 247

20

Felony Case (Tel Aviv) 1137/02         State of Israel v. Nasser Mahmoud Ahmad Aweis

    Q.    You also said that you were arrested together with ▮▮▮▮▮▮▮▮

    A.    I have no answers at all. It would be better if you did not ask …

    Q.    You [singular] made sure to prepare Said before the terrorist attack. You [singular] made sure that there would be someone to drive him to Jerusalem, to the place where you [plural] bought him clothes and shoes and took him to get a haircut. And you [singular], under the instructions of Nasser Aweis, who was the planner and the organizer, you [singular] also made sure to get an M-16 rifle and clips with bullets for Said Ramadan.

    A.    (The witness remains silent and does not answer)

    Q.    You yourself told all of those details in your statement.

    A.    I say what I want to. What I feel like saying, I say.

    Q.    That is what you felt like saying at the time.

    A.    That is not from me, that is not my handwriting. If Nasser really did all those things, he only wanted to liberate Palestine for us. That is something to be proud of …

    Q.    Not only did you tell, in your statements, about many instances of shooting attacks and suicide bombings; with regard to all of the terrorist attacks which you have perpetrated, are you sorry for what you did?

[Stamp] P 5: 247 [continued]

Nevo Publishing Ltd.      nevo.co.il      The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

    A.    If Sharon is sorry for what he did, then I am sorry for what I did.

    Q.    Aren't you sorry that you sent terrorists to blow themselves up here in Israel and to kill?

    A.    I want to liberate my country, the one that you are conquering …

    Q.    I am showing you Statement No. 5 dated September 5. In this statement too, I am showing you the warning, the signature on the warning, and the signature on every page of the statement and the signature at the end of the statement.

    A.    I do what I want to. There is no one who can stop me. I will write and say whatever I want …"

It may truthfully be said that the response "I want to liberate my country, the one that you are conquering" is the beginning of an admission.

The following statement, which appears in Criminal Appeal 735/80, Abraham Cohen v. State of Israel, PD 35 (3) 94, also applies to the matter before us: "If Section 10A now states that the Court can prefer the assertion over the testimony in the courtroom, the defense attorney, for his part, could have attempted to strengthen the witness's version in his direct examination, by performing a cross-examination with a view to explaining that the assertion made to the police was a false assertion. The defense attorney, however, did not examine the witness at all."

Statements P/47A-C were taken from the witness ▮▮▮▮▮ by Witness No. 31 for the prosecution, ▮▮▮▮▮ The witness did not remember the occasion when the testimony was taken, and refreshed his memory on the basis of the assertions. According to his testimony, he identified himself to ▮▮▮▮▮ as a policeman, conversed with ▮▮▮▮▮ in Arabic and translated the words for him. According to ▮▮▮▮▮'s testimony, when he translated what he had written in the statements into Arabic, ▮▮▮▮▮ could have responded, corrected or refused to sign them. According to his testimony, he wrote down only what ▮▮▮▮▮ told him, and ▮▮▮▮▮ confirmed to him that the manuscript which had been written down before the Israel Security Agency interrogators was in his handwriting. According to his testimony, had there been exceptional circumstances, he would have noted them, and had any complaints been made, he would have written them down, as he would have written down any visual signs he might have seen. ▮▮▮▮▮ explained that, when a suspect reports for a police investigation, he is a free man, "and this is his opportunity to give or not to give his version, irrespective of what happened before that in the Israel Security Agency. If there was any problem at all, I would have written it down, because that is my duty. Everything written down in this testimony was said by the subject." ▮▮▮▮▮ made it clear that, "both in the previous testimonies and in this testimony, I introduced myself as a policeman. That is the first thing. Above and beyond that, they (the reference is to interrogation subjects such as the witness) make the distinction as to who is a policeman

[Stamp] P 5: 248

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

and who is a Israel Security Agency interrogator. They encounter us when their arrest is extended, and they cannot make mistakes in this matter …"

Statement P/47D was taken from ▇ by Witness No. 30 for the prosecution, ▇ According to his testimony, he took down the statement after the suspect had been duly warned, and the statement was taken down in Hebrew, but the interrogation was conducted in Arabic. At the end of the statement, he read ▇'s words back to him and ▇ signed it before him. According to testimony by ▇, who did not specifically remember the case, if ▇ had complained to him, it would have been written down. ▇ also clarified that he did not have to recall whether he had identified himself as a policeman, because that was his duty and he does that with every suspect. With regard to the connection between his interrogation as a policeman and the memoranda which are provided to him by the Israel Security Agency, he explained that his interrogation is independent, and that he refers to the memoranda "only in a general way, and if a suspect says that no such thing ever happened, that is what will be written down, at the end of the day – in other words, what he says is what will be written down."

Statements P/47E and P/47F were taken by Witness No. 36 for the prosecution, ▇ Because ▇ had already argued before us, *inter alia*, that his statements had been taken under pressure by Israel Security Agency personnel, ▇ gave a more extensive explanation (after the learned prosecuting attorney, and we as well, called his attention to ▇'s arguments), not only with regard to the manner in which this statements were taken, but also about his interrogation of ▇ in light of a previous investigation which had been held for him, as well as for others, by the Israel Security Agency – an investigation performed for counter-intelligence purposes. According to his statement: "When I receive the memorandum of an investigation which comes from the Israel Security Agency personnel, I check the points that come up in it – what that suspect is suspected of having done. After that, we write the content of the warning, the content of the suspicions, we read it out and explain it and make sure

[Stamp] P 5: 248 [continued]

23