Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

that he really has understood the content of the warning and knows what he is being interrogated about. All of this is in Arabic – I speak Arabic fluently. I do not write or read Arabic, but I speak it. Part of the process is that we read it out. I inform him that I am a member of the police force, and he is aware that I am a member of the police force and that he is about to give testimony to the police. After I check the points that were covered by the Israel Security Agency and what he said to them, I construct the suspicions against him – whether it is belonging to an organization or possession of weapons or, alternatively, assistance to wanted persons, or any other offense – and according to that, I make my preparations from the standpoint of the interrogation itself.

The Israel Security Agency is investigating the issue of prevention. The Israel Security Agency is involved in having to thwart future events, that is, future terrorist attacks. My job as a police officer is to be involved only in the subject of the interrogation, which regards the gathering of evidence against the suspect at the time. In other words, if I interrogate someone, I have to work according to the laws of evidence and to understand the law …"

When the prosecuting attorney confronted ▇▇▇ with the fact that the statements had been taken from him by a policeman, and not by Israel Security Agency personnel, he answered: "I never saw a policeman that I was supposed to speak with. They're all Israel Security Agency officers."

Our impression is that the policeman ▇▇▇ did indeed identify himself to ▇▇▇ as a policeman, as the other policemen had done, and that the wording of the statements taken by ▇▇▇ and the other policemen (▇▇▇ and ▇▇▇ had come from ▇▇▇, of his own free will, and was not the result of the behavior exhibited by the Israel Security Agency interrogators toward him.

The Defendant and his Counsel did not cross-examine the policeman, nor did they ask to summon the Israel Security Agency personnel who had drawn up the memoranda of the interrogations. The Defendant and his Counsel did not cross-examine the witness ▇▇▇ in an attempt to strengthen his version, to the effect that the statements had been taken from him by unworthy means.

Their refraining from cross-examination does not give rise to the presumption that the version given by the policemen is correct. It does, however, further strengthen our impression of the credibility of the witnesses ▇▇▇ and ▇▇▇. Under the circumstances of the case at hand, that is, that the Defendant and his Counsel deliberately and tendentiously refrained – as they emphasized to us, on more than one occasion – from cross-examination or from calling relevant witnesses, and given that this cannot be evaluated in light of other, conflicting testimony, and that, in any event, no such testimony was given, we give preference to the policemen's testimony concerning the manner in which ▇▇▇'s assertions were taken out of court, over the version by the latter (see Criminal Appeal 38/61, Moshe Ben David Yitzhak v. Attorney General, PD 16 514, Criminal Appeal 639/79,

[Stamp] P 5: 249

Nevo Publishing Ltd.          nevo.co.il          The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02             State of Israel v. Nasser Mahmoud Ahmad Aweis

Aslan v. State of Israel, PD 34 (3) 561, and Criminal Appeal 2603/90, Alfar v. State of Israel, PD 45 (3) 799).

In any event, as ruled in Criminal Appeal 242/85, Hazan v. State of Israel, PD 41 (1), the very fact that an assertion made by a defendant to the police is not admissible in his trial cannot lead to the conclusion that the same assertion will not be admissible in another trial, which involves the case of that defendant's accomplice, pursuant to the provisions of Section 10 (and, to be precise, we have not ruled that such a possibility ever arose).

The content of ▇▇▇▇'s statements P/47/A-F has been proven in the courtroom, and, given that all of the conditions required pursuant to Section 10A (a) of the Ordinances have been fulfilled, we accept them as admissible evidence.

We give preference to ▇▇▇▇'s assertions over his testimony in court. With regard to most of the questions which set forth the actions committed by ▇▇▇▇ together with the Defendant, ▇▇▇▇ referred the distinguished prosecuting attorney to the Defendant who was seated opposite him – a Defendant who, as stated above, chose not to cross-examine ▇▇▇▇ or any other witness. ▇▇▇▇'s words are set forth below:

"Q.   I refer you to Statement No. 3 … where they ask you when you began your military activity and who recruited you for the military activity, and you stated that, at the beginning of 2001, you were in Nasser Aweis's house in the Balata refugee camp, and then Nasser Aweis suggested that you join the al-Aqsa Martyrs' Brigades for military activity, and you agreed.

[Stamp] P 5: 249 [continued]

Felony Case (Tel Aviv) 1137/02         State of Israel v. Nasser Mahmoud Ahmad Aweis

A. These things are not correct, and you can ask him. Look, he is here …

Q. I refer you to Statement No. 4 … Did you suggest to Nasser Aweis, in the course of your activity, to carry out a terrorist attack on Tel Hashomer Hospital in Israel?

A. No such thing. Ask him.

Q. You [plural] planned all of the details, and they [sic] even got hold of a map of the area, and in the end, Nasser said that it would be necessary to wait a while, that it wasn't the right time yet.

A. No such thing. You can ask him.

Q. I refer you to the page in … Another of your roles was to assist Nasser Aweis in recruiting more terrorist activists for military activity, so that they would help carry out terrorist attacks.

A. Nothing like that ever happened. Here he is, ask him …

Q. You used to report to Nasser Aweis, every time, about a terrorist who you heard was interested in carrying out a terrorist attack.

A. This is the first time that I have ever heard such things. Aside from that, all of those things belong to the Israel Security Agency. Nasser is here; ask him."

When the prosecuting attorney addressed these questions to ▓▓▓▓ who referred them on to the Defendant, the Defendant did not provide a version of his own, and we are left with the admissions in his statements and with his confession under the discerning eye of the judge in arrest court, which it is only fitting and proper to repeat here:

"I confirm that the assertions and the confessions which I gave in my interrogation in Arabic are true and correct, that I read them and that I signed them. It is true that I was involved in all of the actions and the terrorist attacks to which I confessed – 'everyone has his job to do' … I do not object to the extension of my arrest as requested."



We shall state that the Defendant himself makes the following statement with regard to ▓▓▓▓▓▓▓ (see statement P/6 by the Defendant): "After the outbreak of the al-Aqsa intifada, ▓▓▓▓▓▓ enlisted in the *Kitaab Shuhadaa al-Aqsa*, and I asked ▓▓▓ to participate in terrorist attacks with us, and ▓▓▓ agreed to the proposal, and I gave him an M-16 weapon, and ▓▓▓ carried out a shooting attack with the weapon which I had given him. The shooting attack was directed at an Israeli vehicle on the bypass road east of Nablus, and

[Stamp] P 5: 250

26

Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

according to ▅▅▅s statement, the vehicle was not hit." In response to a question as to additional terrorist attacks in which ▅▅▅ was involved on behalf of the *Kitaab Shuhadaa al-Aqsa*, the Defendant stated: "The terrorist attack in Hadera which was carried out by Said Ramadan ... terrorist attacks which were carried out in the Nablus area ..."

These facts, in and of themselves, constitute an unimpeachable sign of the accuracy of the assertions made to the police, and accordingly, those assertions should be given considerable weight.

We have found an additional sign of the accuracy of his assertions, in the conflicting versions given by the witness ▅▅▅ in court with regard to another assertion which, according to his assertions, had been written down in his own handwriting.

This is a manuscript in Arabic, concerning which ▅▅▅ in his statement P/47A, on page 4, had been asked the following question: "I am showing you a manuscript in Arabic (a total of 10 yellow pages, which I got from the person known as ▅▅▅). Is this your handwriting?

A.   Yes, this is my handwriting and I wrote what I have just told you now in the testimony."

On the other hand, in response to a question by the prosecuting attorney: "Q. I am showing you a statement, which was attached to the statement dated April 15, which is a statement in your handwriting, 10 pages," he replied: "They dictate to people [and make them] write against their will. Take them to court, not us."

[Stamp] P 5: 250 [continued]

27

Felony Case (Tel Aviv) 1137/02     State of Israel v. Nasser Mahmoud Ahmad Aweis

In response to the question, "Q. That is not your handwriting?" he replied: "That is the handwriting of the Israel Security Agency officers. They wrote those things." Generally speaking, his answers to similar questions were as follows: "Q. Are these things which you wrote yourself? A. When you have tea spilled on you, when you are left for four or five days with no food and no sleep, then you say things just to get out of it. Q. Did you write these things? A. I have an attorney. You have to see how the Israel Security Agency treats people. Q. Do you recognize the handwriting? A. I do not want to answer you. You act like them and you shout at me (answers in Hebrew and English)."

### Summary thus far

We have repeatedly clarified that all of the rules which must be fulfilled in order for the assertions made by the Defendant's accomplices out of court to qualify as evidence under Section 10A of the Evidence Ordinance have been fulfilled. (The above mentioned rules include proving the assertions under law, giving the Defendant an opportunity to examine the witnesses, and the question of whether the testimony in court is substantially different from the words recorded in the statements).

We considered the matter with the requisite care, and we give preference to the assertions made by the four witnesses, the Defendant's accomplices, to the police, over their testimony in the courtroom.

Testimony which requires a supplement may itself serve as a supplement of any kind for any other testimony which requires a supplement. Accordingly, the assertions by the four accomplices can constitute an additional "item" corroborating the Defendant's admissions out of court.

(See Kedmi, *On Evidence*, Part 1; Criminal Appeals 6147/92, State of Israel v. Yosef Cohen, PD 48 (1) 62; Criminal Appeal 6214/94, State of Israel v. John Doe, *Supreme Court Rulings*, Volume XXXVIII, 665; Criminal Appeal 5249/98, State of Israel v. Mirilashvili, PD 53 (3) 550.)

Each of these assertions, including assertions made by one or more of the Four in writing – which should be considered as an integral part of those statements, accordingly (see Criminal Appeal 6411/98, Manbar v. State of Israel, PD 55 (2) 150) – may be relied upon as corroborative evidence, in the form of an additional "item," to be added to other evidence brought against the Defendant, in the form of his own admissions.

As [the Four were] the Defendant's accomplices, and pursuant to the provisions of Section 54A (a) of the Evidence Ordinance, we were required to find "something to reinforce" their testimony.

We were also required to find such a reinforcement pursuant to the provisions of Section 10A (d) of the Evidence Ordinance, which instructs us that a person shall not be

[Stamp] P 5: 251

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

convicted on the basis of an assertion received pursuant to Section 10A of the Evidence Ordinance "unless the evidentiary material contains something to reinforce it."

If we consider the nature of the requirement for reinforcement (the term used is identical in the context of both of the above mentioned sections), it consists of supplementary evidence which verifies [the testimony in question], rather than evidence which embroils [the Defendant]. The reinforcement need not be an independent item of evidence; it may arise from the testimony which requires reinforcement.

We have found such reinforcement, even in excess of that required, in the embroiling evidence which arose from a separate and independent source, as follows:

The Defendant's full confession before the judge in arrest court.

The assertions made by each of the four accomplices with regard to the assertions made by his fellows.

[Stamp] P 5: 251 [continued]

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

The Defendant's choice to remain silent and to refrain from testifying in the trial, against the background set forth above and against the background of the line of defense selected by the Defendant (which we discussed at the beginning of this ruling), which, in and of itself, constitutes evidence which may stand as corroborative evidence, pursuant to Section 162 of the Criminal Code Law, 5742-1982, which states that "a defendant's refraining from testifying is likely to constitute a reinforcement of the weight of evidence for the prosecution, as well as corroboration of the evidence for the prosecution, where such evidence requires corroboration.."

As a *corpus delicti* has been found for us (see the testimony by Witness No. 1 for the prosecution, ████ Witness No. 2 for the prosecution, ████ Witness No. 3 for the prosecution, ████ Witness No. 4 for the prosecution, ████ Witness No. 8 for the prosecution, ████ Witness No. 9 for the prosecution, ████ Witness No. 10 for the prosecution, ████ Witness No. 11 for the prosecution, ████ Witness No. 12 for the prosecution, ████ Witness No. 13 for the prosecution, ████ Witness No. 14 for the prosecution, ████, Witness No. 15 for the prosecution, Witness No. 16 for the prosecution, ████ Witness No. 17 for the prosecution, ████ Witness No. 18 for the prosecution, ████ Witness No. 19 for the prosecution, ████ Witness No. 20 for the prosecution, ████ Witness No. 22 for the prosecution, ████ Witness No. 24 for the prosecution, ████ Witness No. 26 for the prosecution, ████ Witness No. 27 for the prosecution, ████ and see Exhibits P/1 through P/4 inclusive, P/21, P/21A, P/24 through P/37 inclusive, P/48, P/49, P/52 through P/79 inclusive), as the Defendant did not deny the actual making of the admissions before the persons taking his statements or before the Honorable Judge in arrest court, and as the Defendant even confessed again, fully and willingly, before the judge in arrest court, to all of the actions imputed to him, and understood what he was doing and making that confession, and as we have found that the internal weight of his confessions is heavy, the weight required for the additional "item" which is needed in order to verify them is accordingly reduced.

And now, even with regard to the additional item (which, from the standpoint of its purpose, is only intended to show that the Defendant did not invent his statements out of thin air, and is accordingly not required to constitute corroborative evidence which embroils the Defendant, and may consist of confirmatory evidence only), we have found that it, too, has a real weight of its own and easily complies with the more stringent requirement, as it embroils the Defendant in the perpetration of the offenses imputed to him, comes from a separate and independent source, and refers to a real point which is in dispute.

**Offenses Against the Prevention of Terrorism Ordinance and Conspiracy**

[Stamp] P 5: 252

Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

In accordance with a pronouncement pursuant to Section 8 of the Prevention of Terrorism Ordinance, 5708 – 1948, it has been ruled that the Tanzim is a "terrorist organization," as this term is defined in Section 1 of the Ordinance (Compendium of Publications (5762 [2001-2002]), p. 800, dated December 6, 2001.

According to expert opinions which were filed with no objection by the Defendant and his defense attorney (P/50, P/51), the following (among other things) was stated: "From the beginning of the violent incidents in the 'territories,' which began in September 2000, the Tanzim played a major and leading role in the perpetration of terrorist activity. Activists in the organization carried out terrorist attacks in various formats, including acts of mass slaughter, within Israel and in Judea and Samaria ... The terrorist organizations of the Tanzim in the Gaza Strip and in Judea and Samaria (which, at times, were joined by additional entities in the field) began (in November 2000) to use the name 'al-Aqsa Martyrs' Brigades' [*Kitaab Shuhadaa al-Aqsa*], especially for the purpose of taking responsibility for terrorist attacks against Israeli targets ...

In the course of the violent confrontations, the 'Brigades' took responsibility for many terrorist attacks which were perpetrated in various formats in the 'territories' and within the confines of the 'Green Line,' including lethal terrorist attacks. The terrorist organizations of the 'Brigades' are responsible for thousands of shooting attacks and explosive charges on bypass roads in Judea and Samaria, and for scores of acts of mass slaughter within Israel, in which scores of Israeli were killed ... The major characteristics of the acts of mass slaughter include the focus by the perpetrators on crowded places (downtown areas and public places which constitute a source of attraction for the general public, such as cafes and restaurants, bus stops, shopping centers and the like) and the performance of suicide bombings (by means of an explosive belt or an explosive charge carried by the perpetrators arriving on the scene) and sacrifice attacks (terrorist attacks in which the perpetrator's chances of escape are slim; in most of the terrorist attacks in this format, the perpetrators have used assault rifles of various types), in which many scores of Israelis were killed ..."

[Stamp] P 5: 252 [continued]

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

The Defendant said, in his statements, that: "After the outbreak of the al-Aqsa intifada, I started to carry out terrorist attacks against Israeli targets, because of the conquest of the Palestinian land … After that, I decided to perpetrate shooting attacks and additional terrorist attacks against Israeli targets in the West Bank and within the Green Line. The terrorist attacks which I perpetrated are as follows:

1. I carried out a shooting attack directed against a guard post of the Israeli army near Joseph's Tomb in Nablus, and that was about two weeks before the army withdrew from the tomb.

2. I carried out a shooting attack directed against a military position on Mt. Gerizim in Nablus …

3. I carried out a shooting attack directed against military vehicles in the vicinity of the Hawara camp, near Nablus.

4. I carried out a shooting attack directed against military vehicles in the vicinity of Nablus, on the west side, near Zuata.

5. I gave hand grenades to two people in order to carry out a terrorist attack in Jerusalem.

6. I gave weapons for the perpetration of a terrorist attack in Netanya …

9. I gave weapons for the perpetration of a terrorist attack in Hadera.

10. I gave weapons for the perpetration of a shooting attack, a sacrifice attack which was supposed to be carried out in Hadera, but the attack did not succeed and the people were killed in the vicinity of Baqa al-Gharbiya.

11. I supplied Said Ramadan with weapons for the perpetration of a suicide attack within Jerusalem.

12. I supplied ███ with weapons for the perpetration of a suicide attack within Hadera.

13. I supplied ███ with two explosive charges + a Kalashnikov…

14. I supplied ███ with an explosive charge, which he placed on the road … against an Israeli patrol."

The Defendant answered the questions listed below in the following manner:

[Stamp] P 5: 253

32

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

"Q.     On whose behalf did you carry out the terrorist attacks which you noted above?

A.      On behalf of *Kitaab Shuhadaa al-Aqsa*, which belongs to the Fatah.

Q.      Who is in charge of the Fatah?

A.      Yasser Arafat is in charge, and he is the chairman of the Fatah movement.

Q.      Who is in charge of the Tanzim Fatah?

A.      The secretary of the Fatah movement in the West Bank, ▮▮▮▮▮ …

Q.      Who do the *[Kitaab] Shuhadaa al-Aqsa* belong to?

A.      The *[Kitaab] Shuhadaa al-Aqsa* belong to the Fatah and the Tanzim Fatah.

Q.      What is your relationship with the secretary of the Fatah movement in the West Bank, ▮▮▮▮▮

A.      My relationship with ▮▮▮▮▮ the secretary of the Fatah movement, began in 1992, when we lived in the same neighborhood in Amman, when we were deported by the Israeli authorities, and ▮▮▮▮▮ came back to the West Bank in about 1994, and I came back in 1995. When I came back to the West Bank, my contacts with ▮▮▮▮▮ were renewed, and I used to meet with ▮▮▮▮▮ in the Tanzim office in Nablus. I would also meet with him in the office in Ramallah, and after the outbreak of the al-Aqsa intifada, I continued to be in contact with ▮▮▮▮▮ We used to organize demonstrations on behalf of the Tanzim Fatah, and we used to distribute posters on behalf of the (Organizational) Coordination Committee [*al-Fasali*]. The people in charge of the Committee were ▮▮▮▮▮ on behalf of the Fatah and ▮▮▮▮▮ on behalf of Hamas, and after he died, another person was given that position. The Chairman of the Committee was ▮▮▮▮▮ and ▮▮▮▮▮ was a member of the Supreme Coordination Committee, and the Supreme Committee used to guide the Organizational Coordination Committee [*al-Fasali*] …



[Stamp] P 5: 253 [continued]

33

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

Q. Who used to provide the money for the perpetration of terrorist attacks against Israeli targets?

A. People in the Tanzim Fatah, in the West Bank and in Lebanon, used to provide me with money.

Q. Who are the people who provided you with money for the purpose of purchasing weapons, in order to perpetrate terrorist attacks against Israeli targets?

A. I took 12,000 shekels from ▓▓▓▓ and I took 8000 shekels from ▓▓▓▓ as expenses, and I received from ▓▓▓▓ in Lebanon, I received $50,000.

Q. What does ▓▓▓▓ do for a living?

A. [He is] an officer in the Palestinian police in Nablus and a member of the Fatah.

Q. What does ▓▓▓▓ do for a living?

A. [He is] in charge of the Fatah movement in Nablus and affiliated with ▓▓▓▓.

Q. What does ▓▓▓▓ do for a living?

A. [He is] in charge of the Fatah in Lebanon and affiliated with Yasser Arafat.

Q. Was there contact between you and ▓▓▓▓?

A. I was in contact with ▓▓▓▓ al the time.

Q. Did ▓▓▓▓ know that you were carrying out terrorist attacks against Israeli targets?

A. Yes, he knew, and my name was even published in the press and on television and on the radio. I used to talk with him from time to time, and when the political situation deteriorated and we were in a bad way, he would ask us to continue the terrorist attacks. When Shimon Peres and Omri Sharon met with leaders in the Authority, ▓▓▓▓ called me and asked us to stop the terrorist attacks, and I answered him that we would do that. During that period of time, ▓▓▓ was in the area and ▓▓▓▓ told me that for the time being, because General ▓▓▓ was meeting with leaders in the Authority, we should not carry out terrorist attacks in the name of [Kitaab] Shuhadaa al-Aqsa. I should note that, when the talks were progressing, no terrorist attacks were carried out.

[Stamp] P 5: 254

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

    Q.    Who used to finance ▇▇▇▇▇ the one who used to provide you with money for the purchase of weapons?

    A.    ▇▇▇▇▇ would take money from the Fatah movement, from the budget which was authorized by the Chairman of the Fatah movement, Yasser Arafat.

    Q.    Who used to finance ▇▇▇▇▇ the one who used to provide you with money for the purchase of weapons in order to carry out terrorist attacks against Israeli targets?

    A.    ▇▇▇▇▇ told me that he took money from ▇▇▇▇▇ and ▇▇▇ was aware of, and participated along with me in, a number of shooting attacks against Israeli targets …

    Q.    Did ▇▇▇▇▇ provide you with money directly?

    A.    Yes, ▇▇▇▇▇ finances [sic] me twice. The first time, he transferred NIS 3,000 to me by means of a deposit in the bank, and the second time, he transferred NIS 5,000 to me by means of a deposit.

    Q.    Did ▇▇▇▇▇ know that you were carrying out terrorist attacks against Israeli targets?

    A.    Yes, he knew, and as I have already stated, my name was even published in the press, and the Israeli authorities told the Palestinian Authority that I was wanted for terrorist attacks, and my name was also published in the Hebrew press and in the local press in the West Bank and the Gaza Strip.

    Q.    Did ▇▇▇▇▇ assist you in providing money, aside from what you have already stated?

    A.    Yes. Once I received a check for NIS 2,300 from him, authorized by Chairman Arafat …" (See the Defendant's statement, P/5)

In addition, he answered questions (P/6) in the following manner:

[Stamp] P 5: 254 [continued]