Felony Case (Tel Aviv) 1137/02            State of Israel v. Nasser Mahmoud Ahmad Aweis

Gerizim. On that day, Nasser Aweis gave me an M-16 weapon, and we all set out for the position. We took up a position in the Dahiya area, in Nablus, from where we fired on the [illegible, probably "military"] position, toward Mt. Gerizim. I personally fired [illegible, probably "about 20"] bullets, and each of the other people fired the weapon in his possession, at the position. This was about 10:00 p.m. And then the army started firing at us, and we fled the scene.

      Q.    Did you participate in additional shooting attacks against that military position or against other positions?

      A.    I confess that I participated, about six more times, in shooting attacks directed against that position on Mt. Gerizim, with the same people. In addition, I participated, about four times, in shooting attacks directed against an IDF position which is located in Jabal Shamali, above the Ein Beit Alma camp. Also, of course, I participated in shooting attacks directed against army patrols which were patrolling in the area of the Balata camp. All those times, I fired the M-16 that Nasser Aweis had given me."

[Stamp] P 5: 275 [continued]

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

P/13:

" … And on that day, ▓ told me that he intended to carry out a terrorist attack, and accordingly, he asked me to get hold of two explosive charges for him, for the benefit of the terrorist attack. I told ▓ that I know [sic] how to manufacture explosive charges, and therefore I took him to Nasser Aweis, in the Balata camp, and I asked Nasser to obtain two charges for me. Then Nasser called ▓ and asked him for two charges, and an hour later, ▓ came and brought two charges with him, made out of a pipe 30 cm long and 40 cm wide [sic]. Each charge was closed on both sides, and there were white electric [wires] coming out of one side. After that, ▓ received the charges, and each of us went home, and three days later, I heard from ▓ that a terrorist attack had been carried out against a military jeep in Silat al-Dhaher, during the night, and they had set off the charges against the jeep, but nothing had happened to it."

P/18:

"A.    In my second testimony, I confessed that I – together with my friends, ▓ and ▓ – we carried out two shooting attacks against the settlement of Homesh, and this … is all true, that the three of us perpetrated shooting attacks, on four or five occasions, against the settlement of Homesh. The fire was directed against the watchtower, at the edge of Homesh, from the direction of Silat al-Ladha, and against the houses in the settlement. This took place in the course of the first three months, at the beginning of the al-Aqsa intifada. In all of those cases, we would arrive in the late hours of the night, after 10:00 p.m., and I remember that, in all of those cases, the soldiers fired back from the watchtower. I confess that I was the one who supplied them with weapons in all of the attacks mentioned above, I fired an M-16, and I gave ▓ a Kalashnikov, and I gave ▓ a Glock. I would take those weapons from Nasser Aweis, before going out on each of the terrorist attacks.

Q.    From what distance did you fire at the settlement of Homesh?

A.    From about 1 km away.

Q.    Which other shooting attacks did you participate in?

A.    Approximately in the beginning of 2001, ▓ and ▓ and I fired on a security jeep in the settlement of Homesh, from about 500 meters away. This was during the late hours of the night, after 10:00 p.m. I fired an M-16, ▓ fired a Kalashnikov, and ▓ fired a Carlo – the same weapons which we had used in the previous shooting attack against Homesh, the same weapons which I had taken from Nasser Awiss. After he fired, the soldiers fired back, and we fled the scene … A. He and I did not do anything except what I have already mentioned, but I would like to state that ▓ asked me for a weapon, three

[Stamp] P 5: 276

Felony Case (Tel Aviv) 1137/02         State of Israel v. Nasser Mahmoud Ahmad Aweis

months ago, and claimed that he wanted to carry out shooting attacks against IDF soldiers. I agreed to his request and I gave him a Kalashnikov which I had taken from Nasser Aweis, and a week later, ▇▇▇ gave me back the weapon, and I do not know if he used it."

Witness No. 25 for the prosecution, ▇▇▇ P/47B:

"▇▇▇ about 25 years old, a resident of Nablus, and ▇▇▇ about 27 years old, a resident of Beit Iba – we carried out a terrorist attack involving an explosive charge and shooting, on the bypass road near Beit Iba. When we came to the entrance to Beit Iba, I called Nasser Aweis, and he told me that he was sending us people and weapons for the terrorist attack. Half an hour later, ▇▇▇ and ▇▇▇ came to the scene. They arrived in a white car. Each of them had an M-16 rifle, and in addition, there was a 250 machine gun in the car, as well as an explosive charge within a fire extinguisher [*atfaya*]. At about 11:30 p.m., we all went out in the white car to carry out the terrorist attack on the bypass road near Beit Iba. ▇▇▇ and ▇▇▇ placed the explosive charge on the road and connected a wire

[Stamp] P 5: 276 [continued]

Felony Case (Tel Aviv) 1137/02                State of Israel v. Nasser Mahmoud Ahmad Aweis

to the explosive charge. This was a charge which was activated by wires and a battery. As soon as they had connected the wires, suddenly IDF soldiers who were staked out there opened fire on them. ▮▮▮▮ was killed and ▮▮▮▮ was wounded in the leg. ▮▮▮▮ and ▮▮▮▮ [sic] ▮▮▮▮ fired at the IDF soldiers. After that, ▮▮▮▮ and ▮▮▮▮ [sic] ▮▮▮▮ and I fled the scene."

Witness 21 for the prosecution, ▮▮▮▮ P/40A:

"A.    In the beginning of the al-Aqsa intifada, [illegible, probably "I participated" or "they participated"] in stone-throwing activity directed at Joseph's Tomb in Nablus, and at the [illegible, probably "military"] forces in Nablus. In June [20]02, ▮▮▮▮ contacted me and said that he was planning to set up a military squad belonging to Tanzim Fatah. He suggested that I enlist in the military squad, and ▮▮▮▮ said that the purpose of setting up the squad was to carry out terrorist attacks against the Israeli army in the Nablus area. I agreed to this and, within the framework of the military squad, I participated in 10 shooting attacks directed against the army in the Nablus area. Participating in the shooting attacks along with me were (1) ▮▮▮▮ (2) ▮▮▮▮ (3) Nasser Aweis, about 35 years old, from the Balata camp, who was in charge of the Tanzim in Nablus …

Q.    Who used to plan and prepare for the perpetration of the terrorist attacks in which you participated?

A.    Nasser Aweis was the one who used to plan for the perpetration of the terrorist attacks, and he was the one who used to supply us with the weapons.

[Q.]    Which Israeli military positions did you shoot at?

A.    We carried out shooting attacks directed against a military position on Mt. Alana. We also fired at the settlement of Elon Moreh, and we also fired at the Saqen roadblock near Hawara …

The second terrorist attack, in August 2001: Nasser Aweis contacted me [and] ▮▮▮▮ and told us that young men from the Tanzim wanted to place an explosive charge on the bypass road in the area of Beit Ira, and he asked me and ▮▮▮▮ to participate in the terrorist attack and to place the charge along with the young men … The tenth terrorist attack was a shooting attack directed against the funeral … The funeral [procession] went from Hawara to Yitzhar, and when they got to the entry to the Hawara camp, Nasser Aweis and ▮▮▮▮ and ▮▮▮▮ and I fired at the participants in the funeral. The army fired back, and Nasser and ▮▮▮▮ and ▮▮▮▮ and I fled the scene and headed toward the camp …"

The facts contained in the charges were proven.

[Stamp] P 5: 277

Nevo Publishing Ltd.         nevo.co.il         The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02        State of Israel v. Nasser Mahmoud Ahmad Aweis

**The offenses of murder, attempted murder, causing severe bodily harm and attempt to cause severe bodily harm**

The State ascribes to the Defendant offenses of murder with malice aforethought in the first five counts; offenses of attempted murder in all of the accounts; offenses of causing bodily harm with aggravated intent in the first five counts; the offenses of attempt to cause severe bodily harm in Counts No. 6 and No. 7.

With regard to these offenses, a question arises as to the status of the Defendant.

Section 29 (a) of the Penal Code, 5737 – 1977, tells us that a person who perpetrates an offense together with or through another person shall also be considered as the perpetrator of the offense.

[Stamp] P 5: 277 [continued]

Felony Case (Tel Aviv) 1137/02                State of Israel v. Nasser Mahmoud Ahmad Aweis

It has been proven to us that the Defendant's mental attitude to these offenses is beyond all doubt. The Defendant wanted and desired to achieve the results of the criminal actions, with every fiber of his being, and was the motivating force in the implementation of a joint plan, carried out together, to intentionally cause the death and injury of his victims, as has been proven.

There cannot be even the slightest doubt that he is the perpetrator of the offenses (see Criminal Appeal 4389/93, Mordechai Vabudi v. the State of Israel, PD 50 (3) 239 and the rulings mentioned there; see also Criminal Appeal 2796/95, John Doe v. the State of Israel, PD 51 (3) 388).

The factual infrastructure which has been revealed to us attests to the fact that the acts of murder were carried out, from beginning to end, with malicious intent, based on the decision and the purpose of causing death, founded on cold blooded thought, controlled behavior and settled mind, and following precise and scrupulous preparation.

We do not have even the slightest doubt that the fundamental elements for the offenses of murder with malice aforethought have been fulfilled, the offenses have been proven, and – as set forth above – the Defendant carried them out.

Obviously, the fundamental elements for the offenses of attempted murder have also been properly proven.

The Defendant's plan of intentionally causing the death of many civilians, and the implementation of that plan as described above, as it has been proven, substantiates the fundamental elements of the less severe offenses of causing bodily harm with aggravated intent and attempt to cause bodily harm with aggravated intent. These offenses as well have been properly proven.

Unlawfully carrying a weapon

The State also ascribes to the Defendant offenses of unlawfully carrying a weapon, in Counts No. 2, 3 and 8.

It has been proven that the Defendant carried, without a permit under any law, M-16 rifles, ammunition and hand grenades, which are in the nature of "weapons," as this term is defined in Section 144 (c) of the Penal Code, 5737 – 1977. The Defendant has confessed to this, as set forth above, and has also confessed that he used the weapons. It is enough for us to mention that which has been set forth in his statements, as follows:

[Stamp] P 5: 278

Nevo Publishing Ltd.        nevo.co.il      The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

"I supplied Said Ramadan with weapons for the perpetration of a suicide attack within Jerusalem … I supplied ███████████ with weapons for the perpetration of a suicide attack within Hadera." (See P/5)

See also the Defendant's confession to the shooting attacks described in detail in Count No. 3, as set forth above.

Because the terrorists Said Ramadan and ███████████ made use of the weapons inside Israel, as has been proven above, and because the facts of Count No. 8 have also been proven, it appears that the fundamental elements of the offenses of possession of weapons have also been proven as required.

[Stamp] P 5: 278 [continued]

Nevo Publishing Ltd.        nevo.co.il      The Israeli Legal Database

Felony Case (Tel Aviv) 1137/02          State of Israel v. Nasser Mahmoud Ahmad Aweis

**Summary**

Having found that the State has proven all of the actions that have been attributed to the Defendant in the indictment, according to the burden of proof that is incumbent upon it to do so beyond all reasonable doubt, we hereby convict the Defendant of the following offenses:

Membership and activity in a terrorist organization, in contravention of Sections 2 and 3 of the Prevention of Terrorism Ordinance, 5708 – 1948.

Conspiracy to commit a crime, in contravention of Section 499 of the Penal Code, 5737 – 1977.

Premeditated murder, in contravention of Section 300 (a) (2) of the Penal Code, 5737 – 1977.

Attempted murder, an offense in contravention of Section 305 (1) of the Penal Code, 5737 – 1977.

Causing bodily harm with aggravated intent, in contravention of Section 329 (1) of the Penal Code, 5737 – 1977.

Attempt to cause severe bodily harm, an offense in contravention of Sections 329 (1) of the Penal Code, 5737 – 1977.

Unlawfully carrying a weapon, an offense in contravention of Section 144 of the Penal Code, 5737 – 1977.

O. Salomon-Czerniak
**Judge**

**Judge S. Timan, Presiding Judge, and Judge N. Achituv:**

We have read the detailed and well-founded opinion by our colleague, the Honorable Judge Czerniak, and we concur with the conclusion that has been reached by her.

**S. Timan**           **N. Achituv**
**Presiding Judge**    Judge

[Stamp] P 5: 279

Felony Case (Tel Aviv) 1137/02    State of Israel v. Nasser Mahmoud Ahmad Aweis

It has accordingly been decided to convict the Defendant of all of the offenses ascribed to him in the indictment, as set forth in the opinion by the Honorable Judge Czerniak.

_____    _____    _____
**S. Timan, Presiding Judge**    **N. Achituv, Judge**    **O. Czerniak, Judge**

**Handed down and notified on this day, 29 Nisan 5763, May 01, 2003, in the presence of Counsel for the parties and the Defendant.**

This version is subject to changes in editing and phrasing.

[Stamp] P 5: 280

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK I. SOKOLOW, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> THE PALESTINE LIBERATION ORGANIZATION, *et al.*, <br><br> Defendants. | No. 04 Civ. 00397 (GBD) (RLE) |

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 5:237-280.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated bearing the bates number P 5:237-280.

Dated: March 6, 2014

Rina Ne'eman

ss.: New Jersey

On the  6  day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
 6  day of March, 2014

*Leonor Troyano*
Notary Public

LEONOR TROYANO
ID # 2385580
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/20/2014

פח (ת"א) 1137/02                           מדינת ישראל נ' נאסר מחמוד אחמד עוויס

בתי המשפט

| בית משפט מחוזי תל אביב-יפו | פח 001137/02 |  |
| --- | --- | --- |
| כב' השופט ש' טימן - אב"ד<br>כב' השופטת נ' אחיטוב<br>כב' השופטת ע' סלומון-צ'רניאק | | 01/05/03 |

בעניין:    מדינת ישראל
ע"י ב"כ עוה"ד    דבורה חן ותמר אניס

נ ג ד

הנאשם    נאסר מחמוד אחמד עוויס
ע"י ב"כ עו"ד    בולוס

המדינה טוענת כי ארגונים אלה הם ארגוני טרור על פי הגדרתם בפקודה למניעת טרור והנאשם אשר מילא בהם תפקיד בכיר כמתואר, יזם, ארגן והפעיל מעשי פיגוע רצחניים כנגד מטרות ישראליות במדינה ובאיו"ש ופעילותו כללה בין השאר גם רכישה וייצור של אמצעי לחימה מסוגים שונים והעברתם בין במישרין ובין בעקיפין לידי המחבלים שביצעו בפועל את הפיגועים מטעם הארגון הטרוריסטי.

הכרעת דין

השופטת ע' סלומון-צ'רניאק:

האישום

המדינה טוענת כי בתקופה הרלבנטית לאירועים המתוארים בכתב האישום, היה הנאשם מפקד אזור שכם וצפון השומרון של ארגון תנזים-פתח וכן מפקד ארגון "כתאאב שהדאא אלאקצא" (גדודי חללי אל אקצא) באזור זה.

המדינה טוענת כי ארגונים אלה הם ארגוני טרור על פי הגדרתם בפקודה למניעת טרור התש"ח-1948 והנאשם אשר מילא בהם תפקיד בכיר כמתואר, יזם, ארגן והפעיל מעשי פיגוע רצחניים כנגד מטרות ישראליות במדינה ובאיו"ש ופעילותו כללה בין השאר גם רכישה וייצור של אמצעי לחימה מסוגים שונים והעברתם בין במישרין ובין בעקיפין לידי המחבלים שביצעו בפועל את הפיגועים מטעם הארגון הטרוריסטי.

1

פח (ת"א) 1137/02      מדינת ישראל נ' נאסר מחמוד אחמד עוויס

המדינה טוענת כי כתוצאה ממעשיו של הנאשם נרצחו נפצעו ונפגעו אזרחים רבים והיא מבקשת להרשיעו כמפורט בשמונת האישומים הכלולים בכתב האישום בעבירות המיוחסות לו והן: חברות ופעילות בארגון טרוריסטי עבירות בניגוד לסעיפים 2 ו- 3 לפקודת מניעת טרור התש"ח-1948.

מעשי קשירת קשר לביצוע פשע, עבירות בניגוד לסעיף 499 לחוק העונשין תשל"ז-1977.

מעשי רצח ונסיונות למעשים כאלה עבירות בניגוד לסעיפים 300(א)(2) ו- 305(1) לחוק העונשין התשל"ז-1977.

מעשי גרימת חבלה בכוונה מחמירה ונסיונות למעשים כאלה, עבירות בניגוד לסעיפים 329(1) ו- 329(1) ביחד עם סעיף 25 לחוק העונשין התשל"ז-1977.

נשיאת נשק שלא כדין, עבירות בניגוד לסעיף 144(ב) לחוק העונשין תשל"ז-1977.

**קו ההגנה של הנאשם**

בתחילת הדרך שכר הנאשם את שרותיו של עו"ד בולוס ושיתף עמו פעולה.

הסנגור קיבל לידיו את מלוא חומר החקירה ואף הודיע כי יטען בשמו של הנאשם טענות מקדמיות כאלה ואחרות ובהן טענת חוסר סמכות.

ניצן לקו ההגנה העתידי של הנאשם נמצא בפרוטוקול ישיבת 10.9.02. בישיבה זו טען הסנגור (בפני הרכב אחר) בין השאר "אחרי שהסברתי לו את העניין, הוא אומר שהוא לא רוצה עורך דין, שהוא מייצג את עצמו אנחנו מקווים שתוך זמן קצר נוכל לדחוף קדימה את הדיון, זמן של לפחות שבועיים".

באותה ישיבה – כעולה מהפרוטוקול – אמר הנאשם לעורך דינו ובאמצעות המתורגמן "אל תדבר בשמי אני עורך הדין של עצמי, אני מייצג את עצמי" וכבר אז החליט ביהמ"ש כי "משרדו של עו"ד בולוס ימשיך ליצג את הנאשם גם אם האחרון יחליט לנהל את הדיון בעצמו".

בישיבת 22.1.03    (בפני ההרכב האחר) הודיע הסנגור את הדברים הבאים "אנחנו חוזרים בנו מהטענה של חוסר סמכות. אני מסכים שהיתה החלטה להגיש סיכומים תוך 30 יום לגבי טענת חוסר הסמכות, אבל לאור ההתפתחויות שהיו בנושא של ברגותי ולאור החלטת בית המשפט המחוזי לדחות את הטענה הזאת, החלטנו לחזור מהטענה לחוסר סמכות בתיק זה."

לאחר מכן הגיש הסנגור בקשה לפטור אותו מהיצוג והבקשה נדחתה בהחלטתינו מיום 2.3.03.

המשפט החל נמשך ונסתיים בנוכחות הנאשם וסנגורו ובתרגום מלא לשפה הערבית. הנאשם והסנגור שתקו לאורך כל הדרך. הם לא השיבו לכתב האישום (ראינו בכך כפירה גורפת) הם לא טענו טענות מקדמיות, לא חקרו עדים בחקירה נגדית ולא העלו טענות משפטיות. הנאשם לא העיד ולא הובאו עדים מטעמו. השניים אף בחרו שלא לסכם.

עמדה זו תבחן על רקע הודעתו בכתב הסנגור לאמור:

2

פח (ת"א) 1137/02                                    מדינת ישראל נ' נאסר מחמוד אחמד עוויס

"...4. החי"מ שוחח עם הנאשם בכמה הזדמנויות וניסה לשכנע אותו לקבל ייצוג במשפט ע"י עו"ד, אולם הנאשם בחר שלא להיות מיוצג ע"י עו"ד.

5. החי"מ הסביר לנאשם כי הוא אמור לייצג את האינטרסים שלו במשפט, בתשובה הבהיר הנאשם כי החליט שלא לקחת חלק פעיל בהליך המשפטי, זכותו לבחור ולנקוט בדרכים שהוא בוחר לעצמו לרבות באמצעות קו הגנה פסיבי של שתיקה במהלך משפטו.

6. הנאשם ביקש שאם ביהמ"ש יכפה עלינו הופעה בדיונים עלינו אך ורק לשתוק.

7. ביום 11.3.03 ולאחר החלטת כב' ביהמ"ש שוב הסביר החי"מ לנאשם את החלטת כבודם ואת הסיטואציה שהוא נמצא בה וכי במידה וישנה טענה משפטית במהלך הדיון מן הראוי שהחי"מ יתייחס אליה, אולם הנאשם שלל אפשרות זו וחזר על דבריו שאינו מעוניין לשתף פעולה ואינו רוצה אותנו כסנגורים שלו ושוב ביקש שעלינו לשתוק...

10. הנאשם מודע היטב למשמעות הדברים, והוא אינו פסול דין ויש לו היכולת השכלית והאינטלקטואלית לבחור כיצד לנהל את המשפט...

13. בהעדר שיתוף פעולה עם הנאשם והוראותיו לסנגור לשתוק במהלך המשפט לא לחקור עדים ו/או לטעון טענות משפטיות ו/או אחרות ולא לדבר בשמו ו\או לטעון טענות עובדתיות ו\או משפטיות לא נותר לחי"מ אלא למלות את פיו מים ויהיה מנוע מלעשות אחרת וזאת גם מטעמים מובנים שמקורם בכללי האתיקה המחייבים כל עו"ד...".

שוכנענו מהאמור בהודעה, מדברים שנאמרו לנו בעניין זה בעל פה ומהתנהגות הנאשם וסנגורו ערב המשפט ובכל עת מהלכו, כי הנאשם נוקט עמדה המבטאת קו הגנה אותו בחר ביודעין ברצון מלא וחופשי ובשיקול דעת.

לפנינו בחירה שהיא פרי מהלך מחושב מכוון מודע מושכל ומניפולטיבי אשר נעשתה על ידי נאשם המבין היטב וער לכל השלכותיה.

לנאשם ניתנה בכל עת האפשרות המלאה ליטול חלק פעיל בדיון אף ניסינו לדרבן את סנגורו לעשות מלאכתו ככל שיוכל גם בהעדר שיתוף פעולה מצדו של הנאשם ולכל הפחות כאשר מדובר בטיעון משפטי גרידא.

הסנגור הנכבד שב והסביר כי אין הוא מתערב בדיון הגם שמדובר בטיעון משפטי מן הטעם שחזקה עליו מצוות קו ההגנה של הלקוח.

במילים אחרות, לא במחדל עסקינן או באדישות לתוצאה אלא בקו הגנה ברור והחלטי.

חזקה על הנאשם וסנגורו שהם מודעים מראשית הדברים לנפקות המשפטית לנושא קו הגנה זה.

## הודאות הנאשם

הנאשם הודה בעבירות המיוחסות לו בכתב האישום במסגרת הודעותיו במשטרה.

3

פ"ח (ת"א) 1137/02     מדינת ישראל נ' נאסר מחמוד אחמד עוויס

ההודעות ת/5 מיום 21.4.02, ת/6 מיום 28.4.02 ת/7 מיום 30.4.02 ת/8 מיום 1.5.02 ו- ת/9 מיום 14.5.02 נכתבו על פי עדותו של ע"ת 5 חוקר בחולית פח"ע רוני עמאר בערבית בכתב ידו של הנאשם ולאחר שהסביר לנאשם בערבית את החשדות המיוחסים לו והזהירו כדת וכדין. על פי עדות החוקר, לאחר שהנאשם אישר בפניו כי הוא מבין הן את החשדות והן את מהות האזהרה, ביקש הוא לכתוב את הדברים בכתב ידו ועשה כן מרצונו הטוב והחופשי.

על פי עדות החוקר הנאשם חתם בפניו על ההודעות. החוקר תרגם את ההודעות מערבית לעברית (לכל הודעה צמוד תרגומה לעברית ת/5א' עד ת/9א' כולל בהתאם).

ההודעה ת/22 מיום 27.6.02 נגבתה על ידי ע"ת מס' 7 החוקר האדי חלבי אשר הסביר כי גבה את העדות בשפה הערבית השגורה על פיו לאחר שהנאשם הוזהר כדין, הבין את מהות החקירה ואת האזהרה ומסר דבריו מרצון טוב וחופשי. הנאשם חתם על ההודעה שהחוקר רשם אותה בערבית. גם חוקר זה תרגם את ההודעה לערבית והתרגום צמוד להודעה (ת/22א).

נסיבות גביית ההודעות באופן המתואר לעיל, העובדה שברובן המכריע (חמש מתוך שש הודעות) נכתבו על ידי הנאשם בכתב ידו והעובדה שהנאשם שב ואישר בפני שופט צבאי (ראה פרוטוקול מישיבת הארכת מעצר ת/23 ועדות ע"ת מס' 5 ) כי "אני מאשר כאמיתיות ונכונות האימרות והודאות שמסרתי בחקירתי בערבית קראתי אותם וחתמתי עליהם. נכון שהייתי מעורב בכל המעשים והפיגועים שהודיתי עליהם. "כל אחד והתפקיד שלו" אינני מתנגד להארכת המעצר המבוקשת", הן הנותנות שראיות אלה קבילות ואין חשש כי הופעל על הנאשם לחץ חיצוני אשר הביאו להודות בביצוע מעשים שאין לו חלק ונחלה בהם.

בחינת תוכן של ההודעות ובכללן ההודאות אכן מעלה שלפנינו דבר על אופניו סיפור דברים כהווייתם מתוך מחשבה בהירה והגיונית בדעה צלולה ומיושבת והן בעלות משקל עצמי פנימי גבוה אשר מצביע לכשעצמו על אמיתותן.

ברי שהודאת הנאשם בפני שופט המעצרים ובפיקוחו נעשתה ללא לחץ או השפעה ובהיותה נושאת עמה תוצאות חמורות לנאשם, מהווה ראיה מאמתת מהותית ובעלת משקל מיוחד המעצימה את כוחן של הודיותיו הקודמות מלבד היותה עומדת כראיה עצמאית (עיין ד"נ 3081/91 קוזלי נ' מ"י פ"ד מה(4) 441 וכן ע"פ 6613/99 סטיבן סמירק נ' מ"י, פ"ד נו(3) 529 וע"פ 3338/99 פ"ד נד(5) 667).

הדרישה ל"דבר-מה" נוסף אשר מפיג חשש שמא לחץ פנימי הוא שהביא את הנאשם להודות, נמלאה עד תום, באימרות בכתב שנתנו עדים אחרים מחוץ לכותלי בית המשפט אותן אנו מקבלים כראיות קבילות ומהימנות כפי שנפרט להלן.

<u>השותפים</u>

עדי התביעה ▊▊▊ (ע"ת מס' 6), ▊▊▊ (ע"ת מס' 21), ▊ (ע"ת מס' 23) ו▊ ▊▊ (ע"ת מס' 25) הם שותפיו לעבירות של הנאשם (להלן הארבעה). להוציא ע"ת מס' 6 ▊▊▊ אשר דינו הוכרע ונגזר בטרם העיד (עיין כ"א פרוטוקול הכרעת דין וגזר דין אשר סומנו יחדיו ת/11) שלוש האחרים נקראו להעיד בטרם נסתיים משפטם ונתעוררה השאלה אם עדותם קבילה אל נוכח הלכת

4

פ"ח (ת"א) 1137/02                                          מדינת ישראל נ' נאסר מחמוד אחמד עוויס

קינזי (ע"פ 194/75 מנחם קינזי נ' מ"י פ"ד ל(2) 477), הלכה אשר כבר לא נתגמשה עדיין (עיין ע"פ 1774/02 שמעון קדוש נ' מ"י) והיא מורה לנו ש"אין להעיד נאשם אחד נגד נאשם שני, אפילו הוגשו נגדם כתבי אישום נפרדים, כל זמן שיש חשש, כי העד עלול לצפות לטובת הנאה על ידי המתקת דינו במשפט התלוי ועומד נגדו. דבר זה אפשר למנוע בין על ידי כך שמשפטו יתברר לפני מתן העדות ובין על ידי הפיכתו לעד מלך ועיכוב ההליכים או הצהרה מטעם התביעה שהמשפט נגדו יבוטל עם סיום העדות...".

המדינה ניוותה דרכה בהתאם למה שנקבע בע"פ 579/88 סוויסה נגד מדינת ישראל פ"ד  מד (1 ) 529. לטעמה, הנאשם לא התנגד להעדת עדים אלה אף אף שידע היטב כפי שידע סנגורו שמשפטם לא נסתיים, הוא לא הציב מחסום - שעמד לרשותו מן הבחינה הדיונית – בדרכם של שותפיו אל דוכן העדים, ובכך ויתר ביודעין על זכותו להתנגד להשמעתם ואין הוא יכול יותר לתקוף את קבילותן של ראיות אלה, אשר מלכתחילה בגדר עדויות כשרות על פי דין הן (ס. 2 לפקודת הראיות (נ"ח) תשל"א-1971) ונותרה שאלת משקלן בלבד.

אכן זוהי תוצאה צפויה על פי קו ההגנה שהנאשם בחר בו ואין לבוא בטרוניה על ב"כ המדינה הנכבדה.

הואיל וזו תוצאה צפויה ומסתברת של קו ההגנה אשר ננקט על ידי הנאשם במחשבה תחילה,  צודקת היא שהאחריות עליה רובצת על הנאשם.

שאלנו את ב"כ המדינה בעניין זה משום שסברנו שאפשר היתה מעלה הנושא בגדר את "פתח לו" אך נזכור כי המדינה הצהירה בראשית כל עדות כי לא הובטחה לאיש מעדים אלה טובת הנאה  כלשהי וכי אין בדעתה להפנות עדויות אלה כנגדם בכל דרך שהיא.

בין כה וכה כל אחד  מהארבעה הוכרז כעד עוין ולגבי העדויות של כל אחד מעדים אלה נתבקשנו לנהוג לפי הוראת סעיף 10א לפקודת הראיות (נוסח חדש), תשל"א-1971 (להלן פקודת הראיות) ולהעדיף אמרתו בכתב על פני עדותו בעל פה.

ספק איפוא אם הלכת קינזי חלה בנסיבות אלה כשהסכנות אשר ביסוד ההלכה אינן מתקיימות.

הדרך בה העידו הארבעה בבית המשפט כפי שיתואר להלן, היתה  עוינת למדינה.

ע"ת מס' 6 – ▇▇▇▇▇▇ נכנס לאולם החליף חיוכים עם הנאשם והצדיע לו. מכאן ואילך גילה דעתו במילים ובהתנהגות שלא ישתף פעולה ולא יענה לשאלות.

כך נהג אם אם פנה אלינו פעם אחת מיוזמתו ואמר "אני מכיר את הנאשם שכאן ואני שם אותו מעל ראשי למעלה". הוא אף ענה לשאלת ב"כ המדינה ש". ב 23.12.02 היית בבית המשפט הצבאי והודה (צ"ל הודית) בכתב האישום הזה שהגשתי עכשיו לביהמ"ש כולל המעורבות שלך בפגוע ת. בחדרה. אנחנו רצינו לעצור את הפעולות הצבאיות והם רצחו את המנהיג ▇▇▇▇▇ ורצחו ילדים פלשתינאים וזה שדחף אותי לעשות את הדבר הזה" לאחר שלפני כן טען כי כתב האישום נגדו מזוייף.

פ"ח (ת"א) 1137/02     מדינת ישראל נ' נאסר מחמוד אחמד עוויס

ע"ת מס' 21 ▇▇▇▇ פתח את דבריו במילים "אני לא רוצה לדבר, אני לא רוצה להעיד" לאחר מכן ענה על שאלות הנוגעות לעניינים שוליים אך בכל הנוגע לפרטים מהותיים לא שיתף פעולה. כך למשל ענה לשאלות מתי הכרת את הנאשם או באיזה פעילות צבאית השתתפת יחד עם הנאשם או לשאלה מי היה חבר בחוליה הצבאית שבה היה גם הוא חבר, בתשובה "זה דבר פרטי שלי ולא עניינו של ביהמ"ש". עם זאת, לאחר שהוכרז כעד עוין כך ענה על השאלות הבאות :

ש. היית חבר מתחילת האינתיפדה בחוליה שעשתה פיגועים ובין היתר מי שהיה אחראי על החוליה הזאת זה הנאשם פה נאסר עוויס.

ת. מה הטעות בדברים האלה? מה אסור בדברים האלה?

ש. סיפרת במשטרה שנאסר עוויס הוא זה שהיה מתכנן את ביצוע הפיגועים והוא זה שהיה מספק לכל חברי החוליה את הנשק

ת. אין לי תשובה

ש. סיפרת במשטרה שהשתתפת בלפחות עשרה פיגועי ירי לעבר הצבא באזור שכם

ת. זו זכותי

ש. סיפרת גם לאן בדיוק היו פיגועי הירי, לעבר התנחלות אלון מורה, לעבר מחסום צה"ל סמוך לתאוערה

ת. אני מסרב לעמוד לדין בבימ"ש זה אין לי על מה לעמוד לדין, אם עשיתי או לא עשיתי אפילו אם עשיתי את הדברים האלה, אין בזה שום פגם

ש. אתה לא עומד פה לדין אתה כאן מעיד וצריך לתת תשובות

ת. אני מסרב שנאסר יעמוד לדין על הדברים האלה

ש. על איזה דברים

ת. על מאבקו נגד הכבוש

ש. אתה בהוראת נאסר עוויס תכננתם לעשות פגוע של הנחת מטען חבלה בשטחים ליד שכם.

ת. זה לא מעניין אף אחד.

ש. סיפרת במשטרה שהיית עוזר לנאסר עוויס להעביר כלי נשק מפעיל כזה לפעיל כזה

ת. אני לא אמרתי את הדברים האלה כדי לעמוד לדין עליהם

ש. לאיזה צורך אמרת אותם

ת. ככה שאלו אותי ואני סיפרתי".

מכאן ואילך שתק או סרב לענות

ע"ת מס' 23 ▇▇▇▇ אף הוא הבהיר מיד עם עלותו לדוכן העדים כי "הבנתי מה שאמר המתורגמן ואני לא אגיד כלום" גם הוא הבהיר במהלך החקירה הן במילים והן בהתנהגות שלא ישתף פעולה וכך עשה.

ע"ת מס' 25 ▇▇▇▇ בכר לא שינה ממנהגם של האחרים ועל כל שאלה הפנה את ב"כ המדינה לעורך דינו אך הוסיף וטען כי כל הדברים שנאמרו על ידו הוצאו בלחץ אנשי השב"כ לאחר ששפכו עליו תה, ירקו עליו, סטרו לו וקשרו אותו למספר ימים.

נוכחנו אם כן לדעת כי עדות הארבעה מקיימת את התנאי הקבוע בסעיף 10א(א)(3) לפקודת הראיות.

6