

PLAINTIFF'S EXHIBIT 384

Date: June 2, 2005      1      Case No.: 5398/03

# The Military Court

## Samaria

### – Transcript –

| | | |
|---|---|---|
| Court hearing: June 6, 2005 | Before a panel: | Lt. Col. Erez Hasson – **President of the Court**<br>Major Eliyahu Nimni – **Judge**<br>Captain Erez Seri - **Judge** |

Prosecutor: Captain Irit Deitsh

Defense Counsel: Adv. Darawshe

**Defendant: Majed Ismail Mohamed Masri, Identity No. 904460862**

Stenographer: Sergeant Alina

Interpreter: Sergeant Baha

- The President of the Court has identified the Defendant -

## Verdict

Owing to the large scale of this case, the arguments for the verdict are still being written. However, we shall now provide a summary of the verdict.

We have seen fit to convict the Defendant of the offenses that have been attributed to him in the indictment, with the exception of Count No. 4, which the prosecution has withdrawn. The Defendant is convicted of the following offenses:

**Membership in an illegal organization**, an offense pursuant to Regulation 85(1) (A) of the Defense Regulations (Time of Emergency), 1945.

**Holding of an office**, an offense pursuant to Regulations 85(1) (B) of the Defense Regulations (Time of Emergency), 1945.

**Shooting at a person**, an offense pursuant to Section 58(A) of the Defense Regulation (Time of Emergency) 1945.

[Stamp] P 6: 11

**Attempt to shoot at a person**, an offense pursuant to Section 58(A) of the Defense Regulation (Time of Emergency) 1945 and Sections 19, 20 of the Rules of Liability for an Offense Order (Judea and Samaria (No. 225), 5728-1968.

**Causing intentional death**, an offense under Section 51 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 **(10 counts)**.

**Attempt to cause intentional death**, an offense under Section 51 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 19, 20 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968 **(3 counts)**.

**Conspiring to cause intentional death**, an offense under Section 51 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 21, 22 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

It shall be clarified that on the matter of the primary counts of the indictment, i.e. the offenses of murder, the Defendant is convicted as a primary accomplice, in view of his senior status in the organization; the fact that he was involved in operative stages of executing the murders, including the filming of the suicide terrorist; financing the attack and delivering the weapon that was used in it.

Issued and notified this day, June 2, 2005, in public and in the presence of the parties.

| [Signature] | [Signature] | [Signature] |
|---|---|---|
| **Judge** | **President of the Court** | **Judge** |

[Stamp] P 6: 11 [continued]

Date: June 2, 2005                                    2                                    Case No.: 5398/03

**Evidence for sentencing**

P: There is no evidence for sentencing.

D: There is no evidence for sentencing.

**The Prosecutor summates**:

Today, the Defendant is standing trial for his responsibility as the primary perpetrator of the act of causing the deaths of 10 human beings. Alongside this, the Defendant has been convicted of severe, extensive security activity, actions which, when examined, make clear the single aim and purpose of his determination – the taking of human life. While the Defendant is the last to stand trial, after all the "protagonists", i.e. the perpetrators of the attack in Metzer and in Hermesh, to my mind, in many respects, he may be considered the first and foremost of them.

As an aspect of the severity, it is not possible to ignore his senior status in the Tanzim Organization. We have learned to our regret that although terrorism often strikes out against random victims, it also has its own rules, or to be more precise, interests, which involve cynicism surrounding human life. It is often convenient to carry out one particular attack or another, on a certain occasion, with certain timing, in a certain settlement, on either side of the Green Line. Here, in the view of the prosecution, the Defendant had a pivotal role in passing judgment of sorts on the lives of future unknown victims; if he wanted it, a murder would be carried out; if he did not, the lives of the victims would be spared.

I shall emphasize that prior to the attack in Hermesh, the explicit consent of the Defendant was required for arch-murderer, Mohamed Naifa, to carry out the attack. The consent of the Defendant was given, and only afterward did the next stages take place, which as we might recall led to the death of three human beings. The Defendant went further after carrying out the attack; possibly as a sign of its success, the Defendant transferred money to Mohamed Naifa, exactly because of the "success" of the attack. And if anybody wonders at this, this is no accident, as the Defendant served in a capacity in which he transferred money on different occasions and with routine regularity to key operatives in the organization.

The action of the Defendant had a pivotal contribution to the commission of the attack in Metzer too, as he was the one who effectively transferred the weaponry to the murderers involved. Regarding this contribution it is certainly not necessary to describe at length the causal relationship between his acts here and the outcome.

[Stamp] P 6: 12

With respect to the attack in Jaffa Street in Jerusalem, the Defendant served as the photographer of the suicide terrorist prior to his departure for the attack. The prosecution asserted on more than one occasion before this Honorable Court the cardinality that it finds in this action. I shall briefly emphasize that another severe aspect of the suicide attacks that were unleashed against us is the media coverage that follows them, whose effect is intimidation, incapacitation and sowing of terror in the lives of every Israeli, whoever and wherever he may be. The death images of those suicide attackers are a major contributing factor in that they serve as a graphic example to people who will follow in their footsteps. Moreover, the prosecution contends that the act of photographing [the perpetrator] serves to facilitate directly, in the end, the commission of the offense itself by that suicide attacker inasmuch as this act constitutes encouragement of that suicide attacker and reinforces his decision to depart to carry out the attack.

The prosecution will refer in this matter its pleadings in the case of Iad Nasser, Court Case 5572/03. In that case, the Defendant was sentenced to life imprisonment, but not for the reason that the prosecution requested, which was participation in the photographing of the suicide attacker, but due to the many offenses that were attributed to him. However, I must point out that the prosecution filed an appeal against his case and it is still pending in the Appellate Court.

I also wish to refer to the case of Kamil Shaablu, who was tried in this Court, in which the Court accepted the position of the prosecution with respect to the genuine contribution of the act of the photographing of the suicide attacker.

Today, a circle has been closed. The blood of the victims of the Defendant calls out to the Court and the prosecution will request that he be sentenced to 10 consecutive terms of life imprisonment for each life that he has taken. The prosecution will also request another term of imprisonment, set in years, for the other offenses for which the Defendant has been convicted.

[Stamp] P 6: 12 [continued]

Date: June 2, 2005                              3                          Case No.: 5398/03

**Defense counsel summates**:

The Defendant has denied all along everything that has been attributed to him in the indictment, but his conviction today before the Court constitutes a grievous blow to the Defendant and to his family. The Defendant, in the direct examination and cross examination in the Court and in his interview by the police alike condemned acts of violence against the State of Israel.

This is a defendant who has been subjected to a miscarriage of justice in the legal proceeding before the Court.

The Defendant is a 32 year old man. He is the sole supporter of his family, and has two children. His wife is here and his sick mother is with us too. The Defendant has a great deal of debts and a mortgage. Prior to the event that is the object of the indictment, the Defendant worked as an officer in the Palestinian Police. He worked with devotion and loyalty. The financial situation of the Defendant is very bad. His small children are learning at school and they need their father to support them financially and it is important for their father to with them.

The Defendant is a sick man; he has problems with his legs.

I have other arguments, as I have not yet received the reasons. The Defendant has no blood on his hands – that is what he has contended throughout the proceeding. Even the conduct of the Defendant is not like that of the other defendants, who would have admitted the acts that they had committed, but the Defendant is not doing this.

We ask for the Court to consider the circumstances.


Defendant:

I have brought the evidence to the Court form the outset. The prosecution has sealed my fate from the outset. I have said that I am not scared, except of God alone, and that I am against the murder of Israeli and Palestinian civilians. I was an officer in the Palestinian Police and I have been framed by car thieves. I have respected the Court until now. I hope that you take into account all these things; you care for your children; I have children, too.

[Stamp] P 6: 13

Date: June 2, 2005                                 4                            Case No.: 5398/03

## Sentence

The Defendant has been convicted, as set forth in the verdict, of the offenses that are attributed to him in the indictment (except for the fourth count, which the prosecution withdrew). This is a list of vicious, grave offenses, of unparalleled severity, which reveal the responsibility of the Defendant for the murder of ten human beings, and a list of additional offenses, including attempt to cause intentional death, shooting and more.

The Defendant assumed the function of the head of the Al Aqsa Brigades in the Nablus area, in which capacity he orchestrated many attacks that were dispatched under his guidance, with his financing, with his blessing and using weapons that he had provided.

The Defendant was involved in a series of suicide attacks, in which he and his fellow bloodthirsty organization members dispatched one suicide attacker after another, who sowed murder and death in the streets of Israel's cities. The facts of the indictment, for which the Defendant was convicted, describe at length the detailed stages that preceded the dispatch of the murderers to the scene of the carnage.

The Defendant, in his senior role, was the one who orchestrated this shameful death industry and gave instructions to the operatives who answered to him to send attackers to mass murders. However, the Defendant did not make do with a merely "ministerial function", but was also a full accomplice in dispatching the actual attackers, including the photographing of a suicide attacker in one case, the financing of another attack and the supplying of the instruments of murder in a third event.

This is the place to emphasize facts that also arise in the verdict, that the full responsibility of the Defendant for the acts is also learned both from the degree of his "operative" involvement, and his senior status that arises throughout the evidence material. It has been found that in the Nablus area, the Defendant handed down judgment on matters on life and death, and exploited his authority over others to dispatch murderers. The Defendant is the one who hastened to take responsibility for the murders before the media, as well.

[Stamp] P 6: 14

The Defendant is the one who is responsible, along with his fellow murderous gang members, for the bloody attack in Jaffa Street in Jerusalem, in the settlement of Hermesh and in Kibbutz Metzer. As a result of his acts, ten human beings met their deaths, including two small children in Kibbutz Metzer, whose mother was murdered with them; two residents of the kibbutz, girls who were murdered a short distance from their home in the settlement of Hermesh; and women who walked down the street in Jaffa Street in Jerusalem. The bloody attacks in Jaffa Street, in the settlement of Hermesh and in Kibbutz Metzer shocked the country with their cruelty and vileness

The Defendant did not put an end to his acts, even when his victim count increased, and even when the ages of the victims decreased. In the wake of the murder of little children, the Defendant did not rest from his acts and continued to spin the webs of death through his acts. The Defendant unhesitatingly ordered the human animal, the murderer Sirhan Sirhan, to carry out another murder, which fortunately was not completed.

Indeed, apart from the many murders for which he has been convicted, and apart from the injuries that he has caused to those who survived the terrible attacks of the attackers whom he dispatched, the Defendant also engaged in acts of shooting and attempted shooting.

[Stamp] P 6: 14 [continued]

Date: June 2, 2005                                           5                                      Case No.: 5398/03

As we have stated in the verdict, we have found that the role of the Defendant is one of a full accomplice. Indeed, the fact that the Defendant acted with cowardice and hid behind the video camera and dispatched others to kill and be killed, that he hid behind orders that he gave to others, that he wrapped his cowardice in wads of money, that he took responsibility for the acts of others, the fact of the cowardice of the Defendant does not mean that he will escape the sentence that befits him and others like him. The Defendant is fully responsible for the deaths of ten innocent human beings, and he shall not evade his culpability with respect thereto.

**We sentence the Defendant to 10 consecutive sentences of life imprisonment.**

**Right of appeal pursuant to law from the day of provision of the reasons for the verdict to the parties**

Issued and notified, February 6, 2005, in public and in the presence of the parties.


| [Signature] | [Signature] | [Signature] |
|:---:|:---:|:---:|
| **Judge** | **President of the Court** | **Judge** |

[Stamp] P 6: 15

| | | |
|---|---|---|
| Date: June 28, 2005 | 1 | Case No.: 5398/03 |

## The Military Court

### Samaria

### - Transcript –

Before a panel:   Lt. Col. Erez Hasson – **President of the Court**
Major Eliyahu Nimni – **Judge**
Captain Erez Seri - **Judge**

Prosecutor: Captain Irit Deitsh
Defense Counsel: Adv. Darawshe

**Defendant: Majed Ismail Mohamed Masri, Identity No. 904460862**

- The President of the Court identifies the Defendant -

## Verdict

**The charges and the arena of the dispute**:

On February 6, 2005, we handed down the verdict of the Defendant and sentenced him. As promised, our full reasons for the verdict are as follows.

A grave and lengthy indictment was filed against the Defendant, regarding both the severity and the scope of the offenses. The Defendant is charged with having served in 2002 as the head of the Al Aqsa Brigades in the Nablus area, in which capacity he orchestrated the execution of a number of attacks – including the bloody attack on Jaffa Street in Jerusalem, in the settlement Hermesh and in Kibbutz Metzer – in which 10 people met their deaths, including two toddlers and their mother, and dozens of others were injured. The Defendant is also charged with acts of shooting and attempting to shoot at a person and conspiring to cause intentional death.

The Defendant pled not guilty to all the charges attributed to him, both in his answer to the indictment and (for most charges attributed to him) in his police interview, and the indictment against him is based on many incriminatory statements made by his colleagues and fellow organization members and murderers. It must be noted initially that the central issue in this case pertains to the identification of the Defendant, who is usually referred to by his colleagues as "Bazbaz" – which alias the Defendant denies.

[Stamp] P 6: 16

Alongside the Defendant's denial of his involvement in the acts of murder, there is no genuine dispute concerning the occurrence of the events (in view of the consent of the defense to the submission of the technical evidence material[1]), or, it seems, concerning the part of the other persons involved, most of whom have already been tried and convicted for their acts.

**The evidence**:

**The statements of the Defendant**:

The witness before us, First Sergeant Matanes Hadad, took two of the statements of the Defendant. His testimony indicates that the interviewing of the Defendant took place in an ordinary manner. Indeed, no procedural arguments were made by the Defendant, not in the general sense or towards the witness Hadad in particular, and the defense also consented to the submission of the statements of the Defendant that were taken by the witness.

In its summations, the defense asked that it be determined that the statements of the Defendant should be given less weight, owing to the fact that the statement was not written in Arabic, that it had not been recorded and that the witness did not conduct an identity line-up involving the Defendant.

[Stamp] P 6: 16 [continued]

---

[1] See transcript of September 2, 2003, page 1.

| Date: June 28, 2005 | 2 | Case No.: 5398/03 |

We have not seen fit to accept the arguments of the defense in this regard. A reading of the two statements of the Defendant makes it clear that the Defendant was offered a chance for his statements to be written in his own handwriting, but he refused to do so, and also refused to sign [them]. It shall be noted that in the first statement, the Defendant also explained this refusal by saying that he did not "recognize the legality of the judicial proceedings of the Israeli occupation". It shall be further noted that the act of the offer to write the statement and the refusal thereof were carried out by police investigator Hadad in the presence of his colleague, First Sergeant Lutuf Marai. In view of these things, it is not clear what the advantage of writing the statement in Arabic or Hebrew would have been.

The Defense Counsel did not show us the statutory source of the alleged duty of the investigator to record the interview and why the statement should allegedly be disqualified for this reason. An inspection of the statements and the testimony of the statement taker indicates that the conditions of the "Regulations of Judges", which assess the admissibility of statements, were upheld, including giving a warning as required by law, giving an opportunity to write and sign the statement, reading out the translated statement at the end of the interview and so on. The recording of the investigation is not a condition for the admissibility of the statement according to the laws of the Area, and does not diminish its weight.

Concerning the identity line-up, as the Prosecutor declared[2], the taker of the statement was not in charge of the overall interviewing of the Defendant, and questions on the alleged deficiencies in the interviewing must be addressed to his investigators. We shall attend to the issue of the duty of conducting an identity line-up below.

Concerning the weight of the statements, we have not found any reason to give them less weight. On the contrary, the statements indicate that the interview was conducted in a positive atmosphere, during which the Defendant was also offered a cup of tea and a cigarette and he went out for lunch.[3] The Defendant confirmed that he felt well. In the statements, the Defendant confirmed his relations with the other witnesses of the prosecution, who will be discussed below.

[Stamp] P 6: 17

---

[2] *Ibid*, page 2 lines 22-24.
[3] See **P / 1**, page 2 line 1; page 5 lines 25-26.

The Defendant gave detailed descriptions of money transfers that he made, his relations – which had ups and downs – with other operatives, addresses of websites that he used and other such details that seemed to have come from firsthand knowledge.

Concerning the arguments of the defense in its summations whereby "the Defendant denied that which was attributed to him in the indictment, cooperated with his investigators in his police interview, gave full details and full information, but throughout his interview by the police and his examination in the Honorable Court, the Defendant did not admit the acts that were attributed to him" (Section C of the summations of the defense) – it would have been better for these words, which are completely detached from reality, never to have been written, inasmuch as a simple reading of the statement would have spared the defense the need to write them.

In conclusion – we have seen fit to accept the statements of the Defendant and give them full weight.

**Prosecution witness Mohamed Naifa**:

The witness Mohamed Naifa testified before us on September 2, 2003, and his testimony effectively consisted of the direct examination only, in view of the refusal of the witness to continue his testimony, as set forth on page 6 of the transcript on that day. There is no genuine dispute that he was the person responsible for the bloody attack in the settlement Hermesh and in Kibbutz Metzer.

First, we must address the argument of the defense that the Defendant has fallen victim to a distortion of justice insofar as the cross examination of the witness was not completed and that in such a state of affairs his statements must not be admitted pursuant to Section 10 A. Indeed, the witness was brought in to give testimony and the Court and the parties convened in order to hear his testimony in full. This testimony was interrupted solely due to the wish of the witness, who refused to continue to answer the questions that he was asked. The Court took a list of steps in order to continue the hearing of the testimony, including calling the Defense Counsel of the witness, but the witness persisted with his defiance (see the course of events on pages 6-7 of the transcript of that hearing, including our decision that ended the testimony).

[Stamp] P 6: 17 [continued]

It is well known that since the Supreme Court handed down its famous verdict on the matter of Haj-Yahya, in Additional Criminal Hearing 4390/91, **State of Israel v. Haj Yahya**, PD 47 (3) 661, there has been a rule in effect concerning the status of "the silent witness", a rule which was handed down by an expanded panel of justices of the Supreme Court, which also considered a silent witness to be a witness whom the parties were given an opportunity to examine. As a result, the way is open to filing his statements according to Section 10 A of the Evidence Ordinance. See also on this matter **Judea and Samaria Appeal 114+99/00**, which is also referred to in our decision on that day. The Defense Counsel cited in his summations a list of references from which it may, according to his claim, be learned that in the absence of a cross examination, the weight of the testimony should be canceled altogether, but these are very old judgments, from the 1970s and earlier, all of which were before the Haj-Yahya rule was accepted, and some of which were handed down even before the amendment to Section 10A of the Evidence Ordinance was passed.

[Stamp] P 6: 17 [continued]

Date: June 28, 2005                           3                           Case No.: 5398/03

The other conditions underlying Section 10A have been fulfilled, including the fact that the witness confirmed the giving of his statements[4] and the existence of material contradictions between the testimony and the statement (the Prosecutor stated a long list of contradictions in her summations without the defense having disputed this in its summations. We must mention, for example, the differences in accounts between the testimony and the statement concerning the identification of the Defendant, the background to receiving the sum of $3,000 from him and more).

After we found that the conditions for the admissibility of the statements of Mohamed Naifa pursuant to Section 10A of the Evidence Ordinance had been fulfilled, we also saw fit to prefer the statements of the witness over his partial testimony before us. We shall explain why below:

- Firstly, it is important to point out in general that even from the partial, arbitrary testimony of the witness before us, the witness confirms the highlights of his incrimination of the Defendant in his statement. The witness confirms in his testimony before us, albeit after being evasive several times, that he had received[5] a weapon from a person called "Bazbaz" and had also received from him an amount of $3,000 after the Hermesh attack. However, the witness contended that the Defendant was not the same Bazbaz, but this does not add or diminish anything, because his testimony does not indicate that he had met that "Bazbaz" in any case, but contacted him based on a telephone number that he had received by way of inheritance from Raed Karmi, when he took his place as the head of the Al Aqsa Brigades in the Tulkarm area. He did not receive the weapons and money from "Bazbaz" directly either, but through couriers. This account of the Defendant's, in his statement, albeit partial, also indicates that the transfers of money and weapons from him to the witness were through couriers. This means that even based on the limited account of the witness, his incrimination of the Defendant still remains unchanged.

[Stamp] P 6: 18

---

[4] See transcript of the statement of Mohamed Naifa dated September 2, 2003, page 5 lines 14-30.
[5] *Ibid*, page 3 line 46 to page 4 line 13; page 5 lines 42-45.+

6