Date: June 28, 2005                          8                          Case No.: 5398/03

## The defense case

The testimony of the Defendant in the defense case was short, full of contradictions and unconvincing. Firstly, it must be noted that despite the mountains of evidence material on the part of the prosecution, which has been extensively reviewed above, the Defendant opted to provide almost no comments on this evidence, and his testimony in the direct examination was short and laconic.

But there are contradictions even in the testimony of the Defendant. The argument of the Defendant in his direct examination was that there were many people in the Nablus area called Majed Masri, that it was the largest family in the area, and that he himself knew a person whose name was identical to his own, who also worked for the Palestinian Authority. To support this argument, the Defendant stated that even two of the people who incriminated him, Mansour Sharim and Mohamed Naifa, when they were brought before him for a confrontation during the examination, immediately stated that the Defendant was not the same Majed Masri whom they had referred to in their incriminating statements. However, in the cross examination, the Defendant changed his mind and "to be on the safe side" also added the account that the two had incriminated him owing to a previous conflict that he had had with them, in view of the fact that in the course of his duty he had arrested the two for vehicle theft.

It is clear that the two accounts cannot both be true. And if Mohamed Naifa had told his GSS investigators immediately that the Defendant was not the Majed Masri who was the object of his incriminating statements, why did the Defendant not talk to him, in the spirit of "I have nothing to say to someone who would do such a thing to me"[18]?

These contradictions are compounded by the general trend of the Defendant to distance himself, at any price, from any connection to security activity, even concerning things that he has admitted in his statement, and there is no doubt that these can connect him in any way to the severe counts of the indictment that are attributed to him. Thus, the Defendant, in his testimony, denies any general shooting at security forces, which he admitted in his statement, and any money transfers in which he was involved and other subjects, which are extensively elaborated on pages 26-27 of the summations of the claim. The Defendant, in his attempt to extricate himself, also down-played his connections with Nasser Aweis, despite the fact that the two had been together in the early 1990s in Jordan and Baghdad, as his statements indicate.

[Stamp] P 6: 23

---

[18] See transcript of the Defendant's testimony in the defense case from June 14, 2004, page 9 lines 48-52.

See below, in the chapter dealing with the identification of the Defendant concerning the lies of the Defendant, on the existence of another person who answers to his four-part name.

In conclusion, we have not found that the testimony of the Defendant before us gives us any impression of reliability. The Defendant failed, and did not even make the effort, in his testimony, to refute the great evidence of the prosecution and made do with a categorical, laconic denial, even of the few things that he admitted in his statements. During this, the Defendant complicated matters for himself by giving contradicting versions and actual lies, which do not add to the weight of his testimony.

**Interim summation**:

Therefore, we have found that there is reason to prefer the evidence of the prosecution over the testimony of the Defendant in the defense case; and the statements of the prosecution witnesses over their biased, false testimonies, for the reasons that are set forth above extensively. These pieces of evidence complement one another and reveal an orderly, coherent account that shows up the Defendant to be an arch-terrorist who deals, with other accomplices, in the dispatching of suicide terrorists. We shall now examine whether the responsibility of the Defendant for that which has been attributed to him arises from that evidence.

**The identification of the Defendant:**

It seems that the central question in this case pertains to the matter of identification of the Defendant before us as the figure appearing in the many incriminating statements of the witnesses of the prosecution as the great perpetrator to whom the acts described in the indictment are attributed. The various witnesses of the prosecution describe a person called Majed Masri, give various personal details about him and also state the alias by which he is known, "Bazbaz". The Defendant contended that this was not the case, that he had no nickname, and certainly is not called "Bazbaz". The Defendant further contended that the Masri family was a large family in the Nablus area, and that it would be natural for there to be other people who answer to the name Majed. The Defendant contended that there was another person called Majed Masri who worked for the Palestinian Authority. Is the Defendant before us the same "Bazbaz"?

[Stamp] P 6: 23 [continued]

**Date: June 28, 2005**                    9                    **Case No.: 5398/03**

**First**, it must be noted that the Defendant himself answers this question in his statement[19], in which he confirms his nickname from childhood as "Bazbaz". This is the place to indicate that it is not a common or usual nickname (such as the teknonym-based naming of a person after his firstborn son, such as "Abu Mohamed", of which there are thousands of instances). The uniqueness of this nickname, along with the other personal details of the Defendant, indicates the congruence between him and the Defendant.

But the conviction of the Defendant for the severe offenses that are attributed to him does not rely on this alias only, but also on his personal identification by the witnesses of the prosecution, with whom he had good relations. Concerning the arguments that the prosecution witnesses had "gotten confused" or that they meant another person, extensive examination of the evidence material reveals that there is no substance behind this. The Defendant confirms in his statements his acquaintance with the other "protagonists" of the events, the prosecution witnesses who incriminate him, and also admits to committing security offenses with them. Thus, the Defendant admits[20] his acquaintance with Nasser Aweis and shooting, together with him, at an IDF position, and also performing an attempt at shooting. The Defendant was also expelled with Nasser Aweis from the Area in 1992, and they traveled to Baghdad together[21]. The conjecture that Nasser Aweis did not know the Defendant and had referred to another Majed Masri in his words is truly fallacious in these circumstances. The Defendant further confirms in his statements that he had delivered money to Mansour Sharim and Mohamed Naifa, and that he also confirmed his personal acquaintance with them. He also confirmed the transfer of a Kalashnikov rifle to Mohamed Naifa (according to the account of the Defendant, due to an internal conflict)[22].

[Stamp] P 6: 24

---

[19] **P/ 1**, page 8 lines 22-25.
[20] See **P/ 1**, page 2 lines 5-12.
[21] See **P/ 2**, page 5 lines 13-24.
[22] See **P/ 1**, page 3 line 26 to page 5 line 21.

Therefore, the acquaintance of the Defendant with the witnesses of the prosecution is explicitly shown by his own statements. But the prosecution witnesses did not stand idle, and they went into further detail concerning their acquaintance with the Defendant. Mansour Sharim identified the Defendant by his full name in his testimony before him and stated that the Defendant was his friend[23]. Fahed Sharia gave in his statement[24] an exact description of the Defendant, including his workplace as an officer in the Palestinian Police, his age, marital status and his being a father of two daughters (details that the Defendant himself confirmed in his statement) and added that the nickname of the Defendant was "Bazbaz". The prosecution witness Riad Ouda, who even in his biased testimony[25] confirmed his personal acquaintance with the Defendant in view of their joint service in the Palestinian Police, also noted in his statement[26], which was received and preferred over his testimony, the alias of the Defendant and the fact that he was a member of the "Al Aqsa Brigades" Organization. there is no concern that prosecution witness Ibrahim Habisha would forget the Defendant after he had caused his severe injury when he played with a grenade launcher that he was holding. He also mentioned[27] the Defendant by his name and alias and stated his membership in the terrorist organization. **The prosecution witness Mohamed Naifa stated[28] the cellular telephone number of "Bazbaz", 059-200596, which is surprisingly similar to the number that the Defendant himself gave in his statement[29], 059-200569.**

The Defense Counsel contended that there were genuine flaws in the investigation, insofar as no identity line-up had been held for the witnesses. The Defense Counsel did not provide references to prove his argument and we have not found any substance in it. It seems from all that which has been expansively set forth above that the witnesses know the Defendant well, provided many details that identified him, some of them pointed him out in the courtroom (even if they withdrew their incrimination or gave various odd explanations to account for it). If this is the case, we have before us a situation of witnesses who "pointed out" the Defendant, as a person whom they knew beforehand, rather than the identification of an unfamiliar person using various visual methods (identity line-up), and there is no duty to hold an identity line-up in these circumstances. See also **Y. Kedmi**, On Evidence (1999 edition), second part, pp. 851-852.

This is also the place to address the statistical question of whether it is possible that it is another Majed Masri. The Defendant asked to submit for this purpose a record of the Palestinian Ministry of the Interior concerning the frequency of the name Majed Masri. The defense asked to submit the document based on the testimony of the Defendant.

[Stamp] P 6: 24 [continued]

---

[23] See the transcript of the testimony of Mansour Sharim dated November 30, 2003, page 1 lines 35-50
[24] See **P/ 70**, page 1 lines 19-22.
[25] See transcript of the testimony of Riad Ouda dated March 30, 2004, page 9 lines 18-22, page 10 lines 34-39.
[26] See **P/ 3**, page 4 lines 4-8.
[27] See **P/ 61**, page 2 line 17 and page 3 line 2.
[28] See **P/ 60**, page 25 line 12.
[29] See **P/ 1**, page 2 line 25.

21

**Date: June 28, 2005**                        **10**                        **Case No.: 5398/03**

[The circumstances of the submission were also odd, to say the least. The submission of the document was not requested in the direct examination, but suddenly emerged in the reexamination. The Defendant purported to confirm the list that the Defense Counsel showed, without any explanation as to why this list was authentic or in what ways it was produced.].

The prosecution objected to the submission of the document, and we accepted[30] its position that the document could not be accepted other than through its originator. However, in order to placate him, we suggested – which suggestion the parties accepted – that the prosecution submit an agreed upon document that would be produced by the Ministry of the Interior at the Civil Administration.

An inspection of the query indicates that a number of people in the Nablus area answer to the name of Majed Masri, but all of them are especially old or especially young and do not match the description of the Majed Masri who is mentioned in the testimonies of the prosecution as a person aged about 30 – except for one person, who is the Defendant before us. Concerning the argument of the Defendant[31] that he once learned that there was another person called Majed Ismail Mohamed al-Masri, who took a loan at a bank under his name – inspection of the query will reveal the extent to which this argument is a lie, as the Defendant is the only person who answers to this four part name, not only in the relevant age profile and not just in the Nablus District but throughout the West Bank and even the Gaza Strip.

**Therefore, we determine that the Defendant before us is the same Majed Masri, known as "Bazbaz", who appears in most of the prosecution evidence. We must now examine whether this evidence is enough to lead to the conviction of the Defendant for the acts attributed to him.**

### The counts of the indictment that are attributed to the Defendant

The proof of the counts of the indictment is based on the evidence of the prosecution as set forth below. The Defendant did not address the matter of proving the facts of the indictment from the evidence material (but sufficed with denying them).

**First count of indictment**

[Stamp] P 6: 25

---

[30] See transcript of June 14, 2004, pages 11-12.
[31] *Ibid*, page 11, lines 16-20.

This count of indictment attributes to the Defendant membership in the well-known terrorist organization the "All Aqsa Brigades". The Defendant is incriminated on this count by three of the prosecution witnesses, Fahed Sharia, Ibrahim Habisha and Riad Ouda. These testimonies dovetail with one another, support each other and fulfill the requirement of the evidentiary addition.

**Second count of indictment**

This count of indictment attributes to the Defendant holding an office in the prohibited organization, insofar as he headed the Al Aqsa Brigades in the Nablus area in 2002, commanded the military operations that the organization performed during that bloody year, coordinated the activity of the military operatives, provided them with arms and financing, which he received from Marwan Barghouti and others and used to take responsibility for the acts of the organization in the media.

Contrary to the insistent denials of the Defendant, it seems that the abundant activity in which the Defendant engaged and his status in the organization were burned into the memory of many operatives, who remembered that he commanded them, the money with which he had enriched them and the weapons that he had provided to them. A long list of prosecution witnesses incriminate the Defendant of that which has been attributed to him in this count of the indictment, as expansively set forth in the summations of the prosecution. For example, Mansour Sharim describes the status of the Defendant in the organization, the large amounts of money that he received from him on several occasions for the purpose of carrying out attacks and that the Defendant had taken the responsibility for attacks on behalf of the organization. Thus, Nasser Aweis described the Defendant as the financer who financed him and also received from him a sum of NIS 12,000. Thus, Mohamed Naifa described the Defendant as the commander of the Al Aqsa Brigades in Nablus, as the one who cleared him to carry out attacks and took responsibility for them on behalf of the organization (the witness sent to him for this purpose a photocopy of the will of Sirhan Sirhan, the murderer in the Kibbutz Metzer attack) and as the one who financed the execution of attacks and provided weapons for that purpose. Fahed Sharia also described at length the status of the Defendant as the one who would give him instructions; as the one who organized processions for the organization, for which purpose he ordered him to distribute photographs of martyrs and shoot in processions; and as the one who transferred weapons from one operative to another on a series of occasions. These testimonies support one another and fully satisfy the demand of the evidentiary addition, and the place of the statement of the Defendant is not amiss in this regard. The Defendant did try, as per his habit, to distance himself from both his membership in the organization and the office that he held therein, but in his statement, he also gave details that verified the incriminating statements made by his colleagues, including the fact that he had transferred money to the people who had incriminated him of doing so (Nasser

[Stamp] P 6: 25 [continued]

**Date: June 28, 2005**                         **11**                         **Case No.: 5398/03**

[…] Aweis, Mohamed Naifa, Mansour Sharim), that he had received money from Marwan Barghouti, Munir Makdah (also mentioned by Nasser Aweis) and others, that he had supplied weapons to Naifa, that he had made contact with Arabic television stations, that he had helped build a website for the organization and more.

The facts that are elaborated in this count of the indictment concerning the function of the Defendant, his place in the hierarchy of the organization at the given time and the various actions that he took within his function will be discussed again when we point out the responsibility of the Defendant for the offenses that were carried out on behalf of the organization.

**Third count of indictment**

This count attributes to the Defendant an offense of shooting at a person, insofar as on a number of occasions, he carried out shooting with his fellow organization members at IDF soldiers. Prosecution witness Nasser Aweis incriminated him in the commission of shooting acts with him. The Defendant also indicated in his statement an act of shooting that was carried out with Nasser Aweis, which provides full evidential infrastructure for the conviction of the Defendant for this count of indictment.

**Fourth count of indictment**

The prosecution withdrew this charge and we are exempt from discussing it.

**Fifth count of indictment**

This charge attributes to the Defendant the offense of attempted shooting, insofar as he departed with Nasser Aweis to shoot at IDF soldiers, but in the end they changed their minds after they were discovered by military forces. The Defendant and Nasser Aweis described the event similarly in their statements and we have seen fit to convict the Defendant for this offense.

**The responsibility of the Defendant for the acts of murder by virtue of his function**

The severe counts of indictment numbers 6-18 attribute to Defendant the responsibility for the deaths of 10 people in the suicide attacks on Jaffa Street in Jerusalem, in the settlement Hermesh and in Kibbutz Metzer, and the injury and attempted murder of others in the same events. All of these murderous acts were carried out by suicide terrorists who had been dispatched on behalf of the Al Aqsa Brigades Organization and by the Defendant and his accomplices.

[Stamp] P 6: 26

Naturally, it is not possible to prosecute the suicide terrorist who sacrificed himself on the altar of the shameful ideology. This does not mean that the people who stood behind him, and who used him as a tool for fulfilling their shameful goals, should evade punishment. Penal law has also recognized the possibility of imposing culpability, including full culpability, on a person who pursuant to his function or status (even an unofficial status, see the "Meshulam" case mentioned below) motivated others to commit offenses.

**The responsibility of the heads of the terrorist organization for the acts of the members of the organization – the normative aspect**

It is well known that military legal theory accepts the doctrine of "command responsibility", whereby a higher ranking operative is responsible for the acts of his subordinates that have been carried out by his order and with his approval, even if in effect he took a minor or even insignificant practical part in the acts themselves. We feel that anybody who has eyes in his head cannot fail to reach the categorical conclusion that parallel responsibility, albeit in completely different circumstances, must also be imposed on the heads of criminal and terrorist organizations who direct their criminal activity and order the execution of murders by "remote control".

The statements of Honorable Justice Kedmi in Criminal Appeal 5589/98 **Bisan Sultan v. State of Israel**, Supreme Court Compendium 99(3) 98 applies to this case. In that case, the appellant was convicted of the offense of premeditated murder, after it had been proved that he gave his consent and approval to execute the murder and dispatched the primary perpetrator to carry out the murder, and also guided him concerning the method of execution. Justice Kedmi emphasized that were it not for the consent of the appellant, the murder would not have been carried out, and therefore the giving of the approval to carry out the murder was akin to "**the start signal that is fired to signal an athlete to start a race**", and it constitutes "an act of participation in the commission of the offense". Therefore the appellant was convicted as the co-perpetrator and not for soliciting the act, and was the "mastermind of the gang", while one who solicits is outside the inner circle of execution. The Honorable Justice Kedmi further

[Stamp] P 6: 26 [continued]

stated that in the circumstances described above, in which the appellant gave a "green light to murder" and the operative directions as to the manner of execution, his behavior constituted at least "**a hefty amount of solicitation by way of encouragement**".

In Further Criminal Hearing 1294/96 **Uzi Meshulam _et al._ v. State of Israel**, PD 52 (5) 1, the Honorable Justice A. Matza ruled that: "**Such a participant – who has full control over the execution and whose action includes not only actions of solicitation and preparation but also directing the acting offenders and overseeing their activity – is to be considered a co-perpetrator to all intents and purposes**". He emphasized that presence at the crime scene is not a vital basis for a person to be a co-perpetrator, and said:

> "**In the new legal reality, making presence at the scene a condition for direct responsibility would mean that 'godfathers' and leaders of criminal groups, who dispatch to the scene of the act the "small fry" who answer to them, while they lead the criminal activity remotely, would not be considered as co-perpetrators but only as having solicited the offense. And this possibility, which certainly does not reflect the desirable legal theory, is not mandatory in the legal system that is in place either**".

The same judgment was handed down after a thorough analysis of the character of Rabbi Uzi Meshulam and the conclusions of the judges concerning the authority that he held over his followers.

These principles are expressed not only concerning criminal organizations, but also concerning senior officers in terrorist organizations, in the instructive judgment of the Tel Aviv District Court, in Felony Case 1158/02 **State of Israel v. Marwan Barghouti**. See also similar principles that are cited in the above mentioned Barghouti judgment, which are cited in the articles of M. Kremnitzer "**The Perpetrator in Penal Law, a Character Portrait**", Plilim A (5740-1990) 65, p. 72, and M. Gur-Arieh, "**Parties to an offense – Amendment 39 to the Penal Code in the Test of Case Law**", Megamot Beplilim, p. 83.

**From the specific to the general**

[Stamp] P 6: 27

There is no easier task than proving the senior status of the Defendant in the Al Aqsa Brigades Organization in and around Nablus, and his absolute control over the military activity of the organization while he served as the head of the organization in the city. We have seen that the Defendant acted as the commander of the Al Aqsa Brigades in the Nablus area in 2002, and the operatives of the organization answered to him directly. The Defendant was involved in the distribution of money to the operatives of the organization – money which powered the wheels of terrorism. The Defendant coordinated the activity of the members of the organization in the Area and was in contact with Marwan Barghouti, the commander of the Tanzim Organization. The Defendant provided weapons to operatives for executing their tasks and was also involved in additional aspects of the activity of the organization, such as organizing processions and building a website and other such illicit actions.

The following facts of the count of the indictment will reveal how the Defendant was involved in the preliminary preparations for carrying out suicide attacks and how a military operative contacted him in order to get his approval for murdering innocents. It is blatantly obvious that he considered himself the arbiter of life and death in the Nablus area. At the initiative, with the approval and with the blessing of the Defendant, the suicide attacks described below were launched, and he assumes lawful liability for them.

We shall conclude this chapter by mentioning the symbolic fact that within the framework of his capacity, the Defendant was the one who hastened to assume responsibility on behalf of the organization for the suicide attacks that the organization carried out. However, when standing trial for his actions, the Defendant feigned shyness and did not repeat this, but things seem to speak for themselves, and show why there is no room for letting the Defendant evade the responsibility that he assumes, within the framework of his position, for the murderous acts committed by the organization that he headed and for which he hastened to be proud.

**But the responsibility of the Defendant for the murderous acts does not end with the "ministerial" level alone**, for the Defendant was also involved in performing actual deeds within the execution of the suicide attacks in question, which acts lead him into the framework of the "inner circle" of the perpetrators of the offense, who assume responsibility as direct perpetrators. We shall not discuss the part of the Defendant within the framework of the execution of each of the attacks.

## The general chain of events

The Defendant's denial of the charges against him was general and categorical. The Defendant did not show us any clearly delineated point of dispute, even concerning the parts of the counts of the indictment that had no bearing on him. The defense demanded the proof of every letter and punctuation mark in them, including concerning the events that were carried out after the Defendant was no longer in the picture [Stamp] P 6: 27 [continued]

27