**Date: June 28, 2005**                    13                    **Case No.: 5398/03**

(see the chapter dealing with the testimony of Ahmed Barghouti that is referred to above) and was unable to provide a position even concerning the fact of the occurrence of the attacks.

The act of the defense in persistently using a categorical denial, even to the fact of the death of the victims, is regrettable, particularly when the technical material that substantiates these facts was filed with its consent. Unfortunately, we have not been seized by the concern that the Defendant would be held accountable for murders that were not carried out. The large amount of technical evidence that was filed with the consent of the defense substantiates the facts of the events described and the terrible pictures of the murder victims, including small children and leave no room for doubt in this regard.

In effect there is no genuine dispute concerning the chain of events relating to the stages of execution of the attacks either. If we look further, beyond the dust clouds that the prosecution witnesses have attempted to kick up in their various evasive maneuvers, it seems that they (Mohamed Naifa, Mansour Sharim, Nasser Aweis, Ibrahim Abdel Hai) do not effectively deny the execution processes of the murderous acts and focus primarily on (the denial of) the part of the Defendant. In any case, a reading of their statements extensively and elaborately reveals the chain of these events (including the preparations, arming and filming of the suicide attackers and driving them to the murder scene and so on).

Therefore, we have found that the general chain of events has been adequately proved out of the evidence that was brought before us, and it is doubtful whether it is truly disputed, and we shall now focus our view on the part of the Defendant.

**Counts 6-8 of the indictment, the attack on Jaffa Street**

These counts of the indictment attribute to the Defendant responsibility for the murder of the late Ora Sandler and Sarah Hamburger and an attempt to cause the death of 45 civilians who were injured in the event. The event was executed on behalf and in the name of the Al Aqsa Brigades Organization. The Defendant is charged with having received the suicide terrorist in an apartment in the Balata Camp and having filmed him holding a rifle and a book of the Koran along with Mahmoud Titi. Thereafter, the Defendant dispatched the suicide terrorists, Sa'id, on his last way. After these things, Sa'id departed for Ramallah, where he was sent by Ahmed Barghouti to Jerusalem, where he opened fire [at others] indiscriminately until he was vanquished, but not before he had caused the murder of two women and injured dozens of others.

[Stamp] P 6: 28

Prosecution witness Ibrahim Abdel Hai talks about the part of the Defendant, as set forth in the transcript of his confession in his trial (**P/ 69**, Subsection 6 of the sixth count of the indictment) and the part of the charge relating to the Defendant is based on this testimony. We learn about the background leading up to the event from the statements of Abdel Hai and of Nasser Aweis. The statements of prosecution witnesses 16, 17, Mohamed Masleh and Mohamed Abdullah were filed consensually[32] and their content is considered to be agreed to (**Judea and Samaria Single Judge Appeal 114/01, Abu Hilal**). From these statements, along with the transcript of the confession of Ahmed Barghouti, we learn about the responsibility of that Sa'id after having been sent and filmed by the Defendant. The technical material indicates the deadly results of the event. But it is understood that all of the evidence comes together to provide support that greatly exceeds the high level of support that is required for the testimony of Abdel Hai.

It seems that at present, one does not need much imagination concerning the meaning of the act of filming a suicide terrorist who is reading his will before departing on his last journey, and the act of the Defendant in this context speaks for itself. This act, along with the status of the Defendant referred to above, substantiate his place as part of the "inner circle" of the dispatchers of the suicide terrorist and his full responsibility for the attack and its murderous results.

For these reasons, we convict the Defendant for responsibility for the suicide attack on Jaffa Street in Jerusalem, the injury of the civilians and the attempt to murder others.

### Counts 9-12 of the indictment, the attack in the settlement Hermesh

This attack was executed by Mohamed Naifa, with the assistance of Akram Abu-Bakar, Osama Eshkar and Amjad Yahya. The Defendant is charged (Subsection A & I of the count of the indictment) of being the one to give explicit approval to Mohamed Naifa to carry out the attack, after which he took responsibility for it on behalf of the organization and transferred to Naifa the sum of $3,000. In the event, the late Linory Seroussi, Hadas Turgeman and Orna Eshel were murdered and Yuval Eshel was injured.

[Stamp] P 6: 28 [continued]

---

[32] See transcript of hearing dated June 14, 2004, page 1 lines 21-22.

**Date: June 28, 2005**                          **14**                          **Case No.: 5398/03**

The part of the Defendant arises from the statements of Naifa, which we saw fit, as stated above, to accept. Naifa describes how, after Akram Abu Bakar told him that he had a suicide terrorist who  was prepared to carry out an attack, he contacted the Defendant, who approved his execution of the murderous act (or in the words of the Defendant, "Why not?"[33]). It shall be emphasized from the words of Naifa that he instructed Akram to continue to work on the attack only after his talk with the Defendant and receipt of approval from him. Naifa also describes how, after the attack, the Defendant assumed responsibility for the attack on behalf of the organization and also transferred the amount of money to him.

Naifa's words are supported by none other than the statement of the Defendant, who confirmed that he had handed money over to Naifa the day after the attack for erecting a mourning tent for the martyr[34]. The other persons involved in the attack, whose statements were filed consensually[35], substantiate the facts of the charge in general and the technical material substantiates its deadly results and the injury of Yuval Eshel, whose late wife Orna was murdered before his very eyes.

We can see how the Defendant had complete control over the execution of the attack, and its perpetrators answered to him, by words and by actions, before it and after it. The Defendant assumes full responsibility for the event that was dispatched with his blessing, approval and financing, and which he hastened to assume responsibility for, and we convict him for this responsibility.

**Counts 13-18 of the indictment, the Metzer attack**

In this event, too, the suicide terrorist, Hayat Hadem Sirhan Sirhan, was dispatched by Mohamed Naifa to Kibbutz Metzer. In his shooting spree in the kibbutz, Sirhan murdered the children of the Ochayon family, Matan and Noam, their mother Revital and kibbutz residents, the late Tirza Damari and Yitzhak Dori.

Examination of the statements of Naifa indicates that once again, he contacted the Defendant, informing him that he had another suicide terrorist who was prepared to be dispatched and a request to arm him with a weapon, and the Defendant saw to this. Thereafter, Naifa asked the Defendant to take responsibility for the attack, and had the film of Sirhan reading his will transferred to him.

[Stamp] P 6: 29

---

[33] See **P/ 60**, page 4 line 25.
[34] See **P/1**, page 5 lines 5-9.
[35] See transcript of September 2, 2003, page 3 lines 27-28.

The Defendant himself supports the statements of Naifa significantly (while taking the sting out of those things, as per his habit) by indicating in his statement that he had provided Naifa with a weapon (he contended that this was following an encounter that Naifa had with another person) and that after the attack he called the television station to announce that he objected to carrying out attacks within the State of Israel. Needless to say, this endnote alongside the account of the Defendant is not reliable for our purposes. The Defendant made no effort to repeat this evasive account in his testimony and distanced himself from any involvement with Naifa and providing a weapon.

The other prime suspect involved in the event, Osama Sakar, who did not mention the Defendant, substantiated the facts of the indictment related to the preparations for sending Sirhan on the murder mission and the technical material from the scene of the massacre confirms its deadly results.

The hierarchy of relations between Naifa and the Defendant have already been described above and the acts that were performed before and after the attack substantiate the responsibility of the Defendant pursuant to his authority over the perpetrators of the murder and giving the approval for the attack and taking responsibility for it. But this time too, besides "ministerial responsibility", the Defendant also has significant responsibility for the attack as the one who actually provided the murderers with the weapon that took the lives of the residents of the Kibbutz. There is no doubt that the Defendant bears full responsibility for the murderous event and we convict him of this.

## 19th count of the indictment

This count attributes to the Defendant the offense of conspiring to cause intentional death, insofar as he was involved in the plot to dispatch Sirhan to carry out another attack after the Metzer attack.

This charge is also based on the statements of Mohamed Naifa, who described how it was decided, after finding that Sirhan was still alive after the murderous attack in Kibbutz Metzer, to send him again to carry out a suicide attack,

[Stamp] P 6: 29 [continued]

**Date: June 28, 2005**                    **15**                    **Case No.: 5398/03**

for which purpose he contacted the Defendant. The Defendant gave his consent to the plan and also granted the request of Naifa to provide him with a weapon, and the gang members also departed to Nablus to meet him and take the weapon from him, but they were arrested before they did so.

We have already dealt with the considerable support for the statements of Naifa on a series of matters. There is no doubt that this conspiracy is part of a single "factual sequence", which relates to terrorist attacks that were carried out by Naifa and the Defendant within the framework of the organization and through Sirhan; therefore, we consider these to support the matter of incrimination of the Defendant for this charge too.

We have also discussed the course of action and the connection between the Defendant and Naifa and there is no doubt that the approval of the murderous plan by the Defendant and his commitment to provide a weapon make him an accomplice in the conspiracy.

**In summation, we convict the Defendant of all of that which has been attributed to him, except for the fourth count of the indictment, which the prosecution has withdrawn.**


**Right of appeal as prescribed by law**


Handed down and notified, June 28, 2005, at the office. The court clerk will provide a copy to the parties.


| [Signature] | [Signature] | [Signature] |
| --- | --- | --- |
| **Judge** | **President of the Court** | **Judge** |


[Stamp] P 6: 30

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

       Plaintiffs,

  vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

       Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P6: 11-15.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P6: 11-15.

              Rina Ne'eman

ss.: New Jersey

On the 28 day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014

Notary Public

MIRUT J MIHRETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMICSION EXPIRES SEPT. 7, 2015
I.D.# 2392704

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                         Plaintiffs,

        vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                         Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

### DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief.  The document is designated as P 6: 16-30.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience.  I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P 6: 16-30.

                                                    Rina Ne'eman

ss.:  New Jersey

On the [ 6 ] day of ~~February~~ *March*, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this *March*
6 day of ~~February~~, 2014

*Leonor Troyano*
Notary Public

LEONOR TROYANO
ID # 2385580
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/8/2014

Case 1:04-cv-00397-GBD-RLE    Document 908-44    Filed 05/13/15    Page 11 of 17

תאריך: 06/02/05      1      תיק מס׳: 5398/03

<div dir="rtl">

**בית המשפט הצבאי**

**ש ו מ ר ו ן**

**- פ ר ו ט ו ק ו ל -**

דיון בית משפט מיום: 06/02/05   בפני ההרכב: סא״ל ארז חסון **-אב״ד**
רס״ן אליהו נימני **-שופט**
סרן ארז סרי **-שופט**

תובע: סרו אירית דייטש

סניגור: עו״ד דראוושה

**נאשם: מאג׳ד אסמאעיל מוחמד מצרי   ת.ז.: 904460862**

רשמת: סמל אלינה

מתורגמן: סמל בהאא

**- אב״ד זיהה את הנאשם -**

**הכרעת דין**

עקב היקפיו הגדולים של תיק זה, נימוקי הכרעת הדין נמצאים עדיין בשלבי כתיבתם. עם זאת, נמסור כעת את תמצית הכרעת הדין.

מצאנו לנכון להרשיע את הנאשם בעבירות המיוחסות לו בכת״א, למעט פ״א 4, ממנו חזרה התובעת בסיכומיה. הנאשם מורשע בעבירות הבאות:

**חברות בהתאחדות בלתי מותרת** – עבירה לפי תקנה 85 (1) (א) לתקנות ההגנה (שעת חירום), 1945.

**נשיאת משרה** – עבירה לפי תקנה 85 (1)(ב) לתקנות ההגנה (שעת חירום), 1945.

**ירי לעבר אדם** – עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945.

**ניסיון ירי לעבר אדם** – עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945 ולפי סע׳ 19,20 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס׳ 225), תשכ״ח – 1968.

**גרימת מוות בכוונה** – עבירה לפי סע׳ 51 לצו בדבר הוראות ביטחון (יהודה ושומרון) (מס׳ 378), התש״ל – 1970 **(10 פרטי אישום).**

**ניסיון גרימת מוות בכוונה** – עבירה לפי סע׳ 51 לצו בדבר הוראות ביטחון (יהודה ושומרון) (מס׳ 378), התש״ל – 1970 ולפי סע׳ 19,20 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס׳ 225), תשכ״ח – 1968 **(3 פרטי אישום).**

**קשירת קשר לגרימת מוות בכוונה** – עבירה לפי סע׳ 51 לצו בדבר הוראות ביטחון (יהודה ושומרון) (מס׳ 378), התש״ל – 1970 ולפי סע׳ 21,22 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס׳ 225), תשכ״ח – 1968.

יובהר כי לעניין פרטי האישום המרכזיים, דהיינו עבירות הרצח, מורשע הנאשם כשותף עיקרי וזאת לאור מעמדו הבכיר בארגון, העובדה כי היה מעורב בשלבים אופרטיביים של ביצוע מעשי הרצח ובהם צילום המתאבד, מימון הפיגוע ומסירת כלי הנשק אשר שימש בו.

ניתן והודע היום, 06/02/05, בפומבי ובמעמד הצדדים.

</div>

_____      _____      _____
שופט           אב״ד           שופט

תאריך: 06/02/05    2    תיק מסי: 5398/03

**ראיות לעונש** 1
ת: אין ראיות לעונש 2
ס: אין ראיות לעונש 3
4
**תובעת מסכמת:** 5
היום נותן הנאשם את הדין בגין אחריותו  כמצבע עיקרי לגרימת מותם של 10 בני אנוש. 6
לצד זאת, חורשע הנאשם בפעילות ביטחונית חמורה ענפה, תוך שגם מסקירת מעשים אלו 7
ברורה נחישותו וחתירותו כדי מטרה אחת- גדיעת חיי אדם. הנאשם אמנם נותן את הדין 8
אחרון בזמן, לאחר כל "גיבורי", מבצעי הפיגועים במצר וחרמיש, אולם מטעמי, מבחינות 9
רבות, ניתן לראות בו ראש וראשון להם. 10
11
לא ניתן להתעלם כהיכט לחומרה ממעמדו הבכיר בארגון התנזים. למדנו, לצערנו, כי 12
הטרור, הגם שהינו מכה באופן עיוור בקורבנות מקריים, פעמים רבות יש בו דוזקא חוקיות 13
או ביתר דיוק אינטרסנטיות, ציניות בחיי אדם. לעתים נוח לבצע פיגוע זה או אחר במועד 14
מסויים, בתזמון מסויים, בישוב מסויים, בתוך תחומי הקו הירוק או מחוצה לו. וכאן, 15
לטעמה של התבראיה, ככט תפקידו המכריע של הנאשם כמעין פוסק באותם חיים של 16
קורבנות עולמיים עתידיים, ירצה יבוצע פיגוע רצח, לא ירצה יינצלו הפעם חייהם. 17
18
אדגיש כי עובר לפיגוע בחרמיש נתבקשה הסכמתו המפורשת של הנאשם לביצוע הפיגוע על 19
ידי בכיר המרצחים, מוחמד נאיפה, הסכמתו של הנאשם ניתנה ורק לאחריה יצאו לפועל 20
השלבים הבאים, שהביאו כזכור למותם של שלושה בני אנוש. הנאשם גם הגדיל לעשות 21
לאחר ביצוע הפיגוע, אולי כשלטונטי ההצלחה, העביר הנאשם למוחמד נאיפה, בדיוק בשל 22
"הצלחתה" של הפיגוע סכום כסף. ואם יתמה התומה על כך, גם זה אינו מקרה, שכן 23
הנאשם נשא תפקיד אשר במסגרתו העביר כספים בהזדמנויות רבות ובשיטתיות לפעילים 24
מרכזיים בארגון. 25
גם לביצוע הפיגוע במצר נודעה תרומה מכרעת לפועלו של הנאשם, היות שהוא זה שהעביר 26
למעשה את כלי המשחיט לידי המרצחים, בסופו של דבר. על תרומה זו ודאי שאין צורך 27
להכביר מילים באשר לקשר הסיבתי בין מעשיו כאן ובין קרות התוצאה. 28
29
בנוגע לפיגוע ברחוב יפו בירושלים, שימם הנאשם כצלם של המתאבד לפני יציאתו לפיגוע. 30
התביעה טוענה לא אחת לפני בימ"ש נכבד זה, אודות הקרדיולניות שהיא מוצאת בפעולה זו. 31
אדגיש בקצרה כי פאן נוסף חמור של פיגועי ההתאבדות שבאו בקרבנו הינו ההד 32
התקשורתי שבא בעקבותן, בו יש למעשה להפחיד, לשתק ולזרוע אימה בחייו של כל 33
ישראלי, באשר הוא ישראלי. תרומה רבה לכך יש בצילומי מוות של אותם מתאבדים, זאת 34
גם מהבחינה שהם משמשים דוגמא מצולמת גם לבאים בעקבותם. יותר מכך, לטעמה של 35
התבראיה, באקט הצילום יש כדי לאפשר במישורין, בסופו של דבר, את ביצוע העבירה 36
עצמה על ידי אותו מתאבד בכך שלמעשה יש באקט זה משום עידוד רוחו של אותו 37
מתאבד, חיזוק החלטתו לצאת לביצוע הפיגוע. 38
39
התבראיה תפנה לענייני זה לטיעונניה בתיקין של איאד נאצר, תיק בימ"ש 5572/03. בתיק זה 40
נגזר על הנאשם מאסר עולם ואולם לא מן הטעם שביקשה התבראיה, היינו השתתפותו 41
בצילום המתאבד, אלא אם כי ריבוי העבירות שיוחסו לו. עם זאת, אציין כי התבראיה 42
הגישה ערעור בתיק זה והוא עדנו תלוי ועומד בבימ"ש לערעורים. 43
כן אבקש להפנות לתיקה של כמאל שעבלו, שנידון בבימ"ש זה, שם קיבל ביהמ"ש את 44
עמדתה של התבראיה באשר לתרומה הממשית של אותו אקט של צילום המתאבד. 45
46
היום נסגר מעגל. דמם של קורבנות הנאשם זועק אל ביהמ"ש והתבראיה תבקש כי עונשו 47
ייגזר ל-10 עונשי מאסר עולם מצטברים בגין כל נפש ונפש שנפח אותה קטע. כן תבקש התבראיה 48
מאסר נוסף קצוב בשנים, בגין יתר העבירות בהן הורשע הנאשם. 49
50
51

תאריך:06/02/05          3          תיק מס׳ : 5398/03

**סיכום סניגור:**

1
2  הנאשם הכחיש לאורך כל הדרך את כל המיוחס לו בכת״א, אולם בהרשעתו היום בפני
3  ביהמ״ש מהווה מכה קשה לנאשם ולמשפחתו. הנאשם בחקירה הראשית ובחקירתו
4  הנגדית בביהמ״ש, וגם בחקירתו במשטרה, הוא הוקיע מעשי אלימות נגד מדינת ישראל.
5  מדובר בנאשם שאפילו בהליך המשפטי שהיה בפני ביהמ״ש נגרמו לו עוונת דין.
6  מדובר בנאשם בן 32 שנים. הוא המפרנס היחידי למשפחתו, אשר מורכבת משני ילדים.
7  אשתו נמצאת כאן וגם אימו החולה. לנאשם יש המון חובות ומשכנתא. הנאשם עובר
8  לאירוע נשוא כת״א עבד בתור קצין במשטרה הפלשתינאית. הוא עבד במסירות ובנאמנות
9  מצבו הפיננסי של הנאשם רעוע מאוד. ילדיו הקטנים לומדים בבי״ס ויש צורך שאביהם
10  יתמוך בהם מבחינה כלכלית וחשוב שאביהם יימצא לידם.
11  הנאשם הוא אדם חולה, יש לו בעיות ברגליים.
12  יש לי טיעונים אחרים, הואיל ועוד לא קיבלתי את הנימוקים לידיי. לנאשם אין דם על
13  הידיים- זה מה שהוא טען לאורך כל הדרך. אפילו התנהגותו של הנאשם היום, אינה כמו
14  של הנאשמים האחרים, אשר היו מודים במעשים שעשו, אך הנאשם לא עושה זאת.
15  אנו מבקשים שביהמ״ש יתחשב בנסיבות.
16
17  נאשם :
18  אני מהתחלה הבאתי את הראיות לביהמ״ש. התביעה בהתחלה קבעה את גורלי. אני
19  אמרתי שאני לא מפחד רק מאלוהים ואני נגד רצח של אזרחים ישראלים ופלשתנינים.
20  הייתי קצין במשטרה הפלשתינית והפלילו אותי גבי רכבים. אני כיבדתי את הבימ״ש עד
21  עכשיו. אני מקווה שתיקח בחשבון את כל הדברים האלו, אתה מטפל בילדים שלך, גם לי
22  יש ילדים.
23
24
25
26
27

P 6: 13

תאריך: 06/02/05          4          תיק מס׳ : 5398/03

<div dir="rtl">

## גזר דין

1
2
3
הנאשם הורשע, כאמור בהכרעת הדין, בעבירות המיוחסות לו בכתב האישום (למעט פרט    4
האישום הרביעי, ממנו חזרה התביעה). המדובר בשורת עבירות קשות וחמורות, שאין    5
חמורות מהן, מהן עולה אחריותו של הנאשם לרציחתם של עשרה בני אדם וכן שורת    6
עבירות נוספות ובהם עבירות ניסיון לגרימת מוות בכוונה, ירי ועוד.    7
8
הנאשם נשא בתפקיד ראש ״גדודי אל אקצה״ באזור שכם, ובתפקידו זה משך בחוטיהם    9
של פיגועים רבים אשר יצאו תחת הנחייתו, במימונו, בברכתו ותוך שימוש בכלי הנשק    10
שמסר.    11
12
הנאשם היה מעורב בשורת פיגועי התאבדות כאשר הוא וחבריו לארגון צמא-הדם, שילחו    13
בזה אחר זה מפגעים מתאבדים אשר זרעו בחתנות ערי ישראל רצח ומוות. עובדות כתב    14
האישום, בהם הורשע הנאשם, מתארות ארוכות את השלבים המפורטים שקדמו להוצאת    15
המרצחים לעבר זירת הקטל.    16
17
הנאשם, בתפקידו הבכיר, הוא זה שניצח על תעשיית מוות בזווה זו ומסר הוראות לפעילים    18
הכפופים לו לשלח מפגעים למעשי רצח המוניים. אולם הנאשם לא הסתפק בתפקיד    19
״מיניסטריאלי״ בלבד, אלא שלח ידו גם בשותפות מלאה לשילוח המפגעים ממש, ובכלל    20
זה צילום מתאבד במקרה אחד, מימון פיגוע אחר והספקת כלי הרצח באירוע שלישי.    21
22
כאן המקום להדגיש, את אשר אף עולה מהכרעת הדין, כי אחריותו המלאה של הנאשם    23
למעשים כלמדת הן ממידת מעורבותו ה״אופרטיבית״, אולם גם ממעמדו הבכיר העולה    24
לאורך כל חומר הראיות. מתברר כי הנאשם היה, באזור שכם, פוסק בענייני חיים ומוות,    25
והוא ניצל את מרותו על פני אחרים לשם שילוח מרצחים. הנאשם הוא זה שמיהר אף    26
ליטול אחריות על מעשי הרצח, בפני אמצעי התקשורת.    27
28
29
הנאשם הוא האחראי, ביחד עם שאר חבריו לכנופית המרצחים, לפגיעע הדמים ברחוב יפו    30
בירושלים, בישוב חרמש ובקיבוץ מצר. כתוצאה ממעשיו מצאו את מותם עשרה בני אדם,    31
בהם שני ילדים רכים בקיבוץ מצר, אמם שנרצחה ביחד עמם, שניים תושבי הקיבוץ, נערות    32
שנרצחו מרחק קצר מביתם בישוב חרמש, נשים שהלכו ברחוב יפו בירושלים. פיגועי    33
הדמים ברחוב יפו, בישוב חרמש ובקיבוץ מצר זיעזעו את המדינה באכזריותם ובשפלותם.    34
35
הנאשם לא חדל ממעשיו, גם כאשר הלכו ורבו קורבנותיו, גם כאשר הלך ופחת גילם. גם    36
לנוכח הירצחם של ילדים רכים, לא נח הנאשם ממעשיו והוסיף לצוות את קורי המוות    37
תחת ידו. הנאשם לא היסס והורה לשלוח את חיית-האדם, את הרוצח סירחאן סירחאן,    38
לביצוע מעשה רצח נוסף, אשר למרבה המזל לא יצא אל הפועל.    39
40
ואכן, מלבד מעשי הרצח בהם הורשע, ומלבד הפציעות שגרם לאלו ששרדו את התקפות    41
התופת של המפגעים ששילח, עוד שלח הנאשם את ידו במעשה ירי וניסיון לירי.    42
43

</div>

תאריך:06/02/05          5          תיק מס׳ : 5398/03

1
כפי שציינו בהכרעת הדין, מצאנו כי חלקו של הנאשם הוא של שותפות מלאה. ואכן, 2
העובדה כי הנאשם נהג בפחדנות והסתתר מאחורי מצלמת הווידאו ושלח אחרים להרוג 3
ולההרג, כי התחבא מאחורי מתן הוראות לאחרים, כי עטף בשטרות כסף את מוג לבו, כי 4
נטל אחריות על מעשי אחרים, עובדת פחדנותו של הנאשם אינה מחייבת כי יחמוק מן 5
העונש הראוי לו ולשכמותו. הנאשם אחראי באופן מלא למותם של עשרה בני אדם חפים 6
מפשע, ומאחריותו זו לא יחמוק. 7
8
אנו גוזרים עם הנאשם 10 מאסרי עולם מצטברים. 9
10
11
12
13
זכות ערעור כחוק  החל מיום המצאת נימוקי הכרעת הדין לידי הצדדים 14
ניתן והודע, 06/02/05 , בפומבי ובמעמד הצדדים. 15
16
17
שופט                              אב״ד                              שופט 18
19
20

תאריך: 28/06/05          1          תיק מס': 5398/03

<div dir="rtl">

בית המשפט הצבאי
ש ו מ ר ו ן
-פ ר ו ט ו ק ו ל-

בפני ההרכב: סא"ל  ארז  חסון  -אב"ד
רס"ן  אליהו  נימני  -שופט
סרן  ארז  סרי  -שופט

תובע: סרן אירית דייטש
סניגור: עו"ד דראאושה

נאשם: מאג'ד אסמאעיל מוחמד מצרי  ת.ז.: 904460862

- אב"ד זיהה את הנאשם -

## הכרעת דין

### האישומים וזירת המחלוקת:

ביום 06/02/05 מסרנו את הכרעת דינו של הנאשם וגזרנו את דינו. כמובטח, להלן נימוקינו
המלאים להכרעת הדין:

כנגד הנאשם הוגש כתב אישום קשה וארוך, הן מבחינת חומרת העבירות והן מבחינת היקפן.
מיוחס לנאשם כי בשנת 2002 שימש כראש "גדודי אל-אקצה" באזור שכם ומתוקף תפקידו ניצח
על הוצאתם לפועל של מספר פיגועים - ובהם פיגועי הדמים ברחוב יפו בירושלים, בישיבת חרמש
ובקיבוץ מצר - בהם מצאו את מותם 10 אנשים, בהם 2 פעוטות ואמם, ונפצעו עשרות אחרים. עוד
מיוחסים לנאשם מעשי ירי וניסיון לירי לעבר אדם וקשירת קשר לגרימת מוות בכוונה.

הנאשם כפר בכל המיוחס לו, הן בתשובתו לאישום וכן (במרבית המיוחס לו) בחקירתו
המשטרתית והאישום כנגדו מבוסס על הפללות רבות מאת חבריו ושותפיו לארגון שבחלקם פורט
כבר בתחילת הדברים יש לציין כי הסוגיה המרכזית בתיק זה, נוגע לזיהויו של הנאשם, אשר
לרוב מכונה ע"י חבריו בכינוי "בזבזי" - כינוי אותו מכחיש הנאשם.

לצד הכחשתו של הנאשם את מעורבותו שלו במעשה הרצח, הרי שאין מחלוקת של ממש באשר
לקרות האירועים (לאור הסכמת ההגנה להגשת חומר הראיות הטכני[1]), ונראה כי אף לא לחלקם
של שאר המעורבים, אשר ברובם נפטו והורשעו זה מכבר על מעשיהם.

### חומר הראיות:

#### אמרות הנאשם:

העיד בפנינו גובה 2 אמרותיו של הנאשם, רס"מ מטאנס חדאד. מעדותו עולה כי חקירתו של
הנאשם התנהלה באופן רגיל. ואכן לא נטענו מצד הנאשם כל טענות זוטא, לא בכלל ולא כלפי העד
חדאד בפרט, וההגנה אף הסכימה כי יוגשו אמרותיו של הנאשם שנגבו ע"י העד.

בסיכומיה ביקשה הגנה לקבוע כי יש ליתן משקל מופחת לאמרותיו של הנאשם, וזאת עקב
העובדה כי האמרה לא נכתבה בערבית, כי לא הוקלטה וכי העד לא ערך לנאשם מסדר זיהוי.

_____
[1] ראה פרוטוקול מיום 2/09/03, עמ' 1.

</div>

P 6: 16

לא ראינו לנכון לקבל את טענות ההגנה במישור זה. מעיון בשתי אמרותיו של הנאשם ברור כי הוצע לנאשם לכתוב את אמרותיו בכתב ידו, אולם הוא סירב לעשות כן ואף סירב לחתום. יצוין כי באמרה הראשונה אף נימק הנאשם סירובו זה בכך שהוא אינו "מכיר בחוקיות ההליכים המשפטיים של הכיבוש הישראלי". יצוין עוד כי אקט ההצעה לכתוב את האמרה והסירוב לה, נעשו ע"י חוקר המשטרה חדאד בנוכחות עמיתו לתפקיד, רס"מ לוטוף מרעי. לאור דברים אלו, לא ברור מה הרבותא בכתיבת האמרה בערבית או בעברית.

הסנגור לא הציג בפנינו מהו המקור הסטטוטורי לחובה, כביכול, של החוקר להקליט את החקירה ומדוע יש בכך כדי לפסול את האמרה, כטענתו. מעיון באמרות ובעדות גובה האמרות, עולה כי תנאי "תקנות השופטים", המכשירים קבילותן של אמרות, התקיימו ובכלל זה מתן אזהרה כחוק, מתן הזדמנות לכתיבת האמרה וחתימה עליה, הקראת האמרה המתורגמת בסוף החקירה וכו׳. הקלטת החקירה איננה תנאי על פי דיני האזור לקבילות האמרה ואינה פוגמת במשקלה.

באשר למסדר הזיהוי, כפי שהצהירה התובעת[2], לא היה גובה האמרה ממונה על חקירתו הכוללת של הנאשם ושאלות בתחום מחדלי חקירה, לטענת ההגנה, יש להפנות לחוקריו. באשר לסוגית חובת עריכת מסדרי זיהוי, נדרש בהמשך.

באשר למשקל האמרות, לא מצאנו מקום להפחית ממשקלן, להיפך. ניכר מן האמרות כי החקירה התנהלה באווירה חיובית, ובמהלכה אף הוצעו לנאשם כוס תה וסיגריה והוא יצא לארוחת צהריים[3]. הנאשם אישר כי הוא חש בטוב. באמרות מאשר הנאשם את קשריו עם שאר עדי התביעה, בהם ידובר להלן. הנאשם מוסר תיאורים מפורטים של העברות כספים שביצע, קשריו - שידעו עליות ומורדות - עם פעילים אחרים, כתובות אינטרנט בהן השתמש וכיו"ב פרטים אשר ניכר בהם כי הם באים ממקור ראשון.

באשר לטענת ההגנה בסיכומיה כי "הנאשם הכחיש את המיוחס לו בכתב האישום, שיתף פעולה עם חוקריו בחקירתו המשטרתית נתן פרטים מלאים ואינפורמציה מלאה, אולם בכל חקירתו במשטרה ובבית המשפט הנכבד הנאשם לא הודה במעשים המיוחסים לו" (סעיף ג׳ לסיכומי ההגנה) - מוטב היה לדברים, התלושים לגמרי מן המציאות, שלא היו עולים על הכתב, שכן קריאה תמה באמרה היתה חוסכת את כתיבתם.

סוף דבר - מצאנו לקבל את אמרותיו של הנאשם ולהעניק להן משקל מלא.

**<u>עד התביעה מוחמד נאיפה:</u>**

העיד בפנינו העד מוחמד נאיפה ביום 02/09/03, עדות אשר כללה, למעשה, את החקירה הראשית בלבד, וזאת לאור סירובו של העד להמשיך את עדותו, כמפורט בעמ׳ 6 לפרוטוקול מאותו היום. אין מחלוקת של ממש כי המדובר במי שאחראי לפיגועי הדמים ביישוב חרמש ובקיבוץ מצר.

ראשית עלינו להידרש לטענת ההגנה כי נגרם לנאשם עיוות דין בכך שלא הושלמה חקירתו הנגדית של העד וכי במצב דברים זה אין לקבל את אמרותיו מכוח ס׳ 10 א׳. אכן, העד הובא למסור עדות ובית המשפט והצדדים התכנסו על מנת לשמוע את עדותו במלואה. עדות זו נקטעה בשל רצונו של העד בלבד, אשר סירב להמשיך ולהשיב לשאלות שנשאל. בית המשפט נקט בשורת צעדים על מנת להמשיך את שמיעת העדות ובכלל זה קריאה לסנגורו של העד, אולם העד התמיד במריו (ראה מהלך הדברים בעמ׳ 6-7 לפרוטוקול אותו דיון, ובכלל זה החלטתנו החותמת את העדות).

כידוע, מאז ניתן פסק דינו הנודע של בית המשפט העליון בענין חג׳-יחיא, דנ"פ 4390/91, **מדינת ישראל נ׳ חג׳ יחיא**, פ"ד מז (3) 661, עומדת על מכונה ההלכה בענין מעמדו של ה"עד השותק", הלכה אשר ניתנה ע"י הרכב מורחב של שופטי בית המשפט העליון, אשר ראה אף בעד השותק כעד אשר ניתנה לצדדים הזדמנות לחוקרו, ומכאן שפתוחה הדרך להגשת אמרותיו על פי ס׳ 10 א׳ לפקודת הראיות. עוד ראה לענין זה, **ע׳ איו"ש 114+99/00**, הנזכר אף בהחלטתנו מאותו היום. הסנגור הביא בסיכומיו שורת אסמכתאות מהן ניתן ללמוד - לטענתו - כי בהעדר חקירה נגדית, יש לבטל את משקל העדות כולה, אולם המדובר בפסקי דין ישנים ביותר, משנות השבעים ועוד קודם לכן, אשר כולם נמסרו טרם שנתקבלה הלכת חג׳-יחיא, חלקם אפילו עוד לפני שנחקק תיקון ס׳ 10 א׳ לפקודת הראיות..

---

[2] **שם**, עמ׳ 2, ש׳ 22-24.
[3] ראה **ת/1**, עמ׳ 2, ש׳ 1; עמ׳ 5, ש׳ 25-26.

P 6: 17