תאריך: 28/06/05                             5                    תיק מס׳: 5398/03

1. ליתן הסבר להפללתו המפורשת את הנאשם באמרתו, טען כי זו הוצאה ממנו באמצעים פסולים,
2. כי הוכרח לחתום עליה, כי הופתע למראה כתב האישום שהוגש כנגדו הכולל אשמות בהן לא הודה
3. וכיו״ב. עוד היינו טורחים לפרט את הסתירות שעלו בגרסת העד לעניין זה, אלמלא היה עולה
4. באופן ברור כי את טענות הזוטא באשר למשקל אמרותיו, שמר העד לעדותו בתיקו של הנאשם
5. בלבד, ואילו במשפטו' שלו לא העלה אף אחת מאותן טענות, ואף הסכים להגשת אמרותיו, ובכללן
6. האמרה המדוברת, אשר ביחס אליה עלו לפתע מן האוב טענות הזוטא שבעדותו. אך מובן הוא כי
7. טענות זוטא של נחקר ביחס לאמרתו, אשר מופיעות במשפטי אחרים ולא במשפטו שלו עצמו, אין
8. בהן לשכנע.
9.
10. בשל כל אלו, מצאנו לנכון לדחות את גרסת העד ביחס לאמרתו, לקבל את האמרה (לאחר
11. שהתנאים האמורים בסעיף 10 א׳ התקיימו) ולהעדיפה על פני עדותו.
12.
13. **עד התביעה** ▮
14.
15. עד זה העיד בפנינו ביום 30/03/04. על אף הפללות קשות שהפליל את הנאשם, כשותפו לשילוח
16. המחבל חמתאבד אשר ביצע את הרצח ברחוב יפו בירושלים וכן כשותפו למעשי ירי, הכחיש העד
17. את הדברים בעדותו. כך טען העד כי הוא מכיר את הנאשם בשמו הפרטי בלבד, למרות שלו רק
18. מתוכן עדותו בלבד עולה כי היכרותו עמו מקיפה בהרבה (על אחת כמה וכמה שמאמרותיו
19. ומאמרות הנאשם, עולה כי השניים היו בקשרים הדוקים, ואף גרשו מן האזור ובילו תקופה
20. בירדן ובבגדד – ראה בהמשך). את העובדה כי באמרותיו הוא מפליל את הנאשם, הסביר העד
21. בטענות שהעלה כנגד החוקר ▮ שהכריח אותו לכתוב דברים (העד עצמו לא זכר מיהו
22. החוקר שחקר אותו ולא זיהה אותו, אך ציין כי המדובר בשוטר קירח), אולם לא ידע לפרט מהן
23. אותן טענות (״עם החוקר חזה הייתה הבעיה. איני זוכר את הפרטים[10]״). העד טען כי אינו מזהה
24. את אמרותיו שהוצגו בפניו ואת כתב ידו, אולם דבריו לא עוררו בנו רושם, שכן העד בקושי טרח
25. לעיין באמרות טרם שתשיב.
26.
27. העיד בפנינו החוקר ▮, אשר גבה את אמרותיו של העד ועדותו עוררה בנו רושם מהימן
28. לגמרי. בעדותו אישר החוקר שאמר כי גבה את אמרותיו של העד ▮ וכי הוא (▮ זה שכתב
29. את אמרותיו בכתב ידו (כפי שגם עולה מעיון באמרות עצמן). עוד הכחיש החוקר את טענת העד כי
30. נתן אמרותיו נוספות בהן מסר דברים אחרים, דבר העולה גם מעיון האמרות הנושאות מספר
31. סידורי.
32.
33.
34. אם כן, עדותו של ▮ שהיתה עדות מבולבלת ושרירותית (,הכל רשות אצלכם בתיקים,
35. לא צריך להיכנס לפרטים״ ; ״אני לא חייב לענות לאף אחד״[11]) עוררה בנו רושם של מהימנות.
36. התנאים להגשת אמרותיו במשטרה מכוח ס׳ 10 א׳, התמלאו לאחר שהעד, מתן האמרות
37. הוכח בעדותו של גובה האמרות ▮ והעד סתר את אמרותיו בעדותו. מצאנו לנכון להעדיף
38. את האמרות על פני העדות. מול העדות המבולבלת והבלתי-משכנעת, מצאנו את האמרות
39. כמהימנות ובעלות משקל. כאמור, עולה מקריאה באמרות כי הן ניתנו ע״י העד לאחר שהוזהר
40. כחוק ולאחר שחתם על האמרות, אותן **כתב בכתב ידו**. עולה עוד כי גביית האמרות התנהלה
41. באווירה תיובית, וכי העד שתה קפה ועישן סיגריות במהלך גביית האמרות. גם מעדותו של
42. ▮ עולה כי גביית האמרות התנהלה באופן סטנדרטי ותוך שיתוף פעולה של העד. ממילא יוזכר
43. כי אפילו מתוך השוואה בין עדותו של העד בפנינו לבין תוכן אמרותיו, עולה כי היה באופן כללי
44. מאשר את אחריותו לפיגועים ברחוב יפו וכן במסעדת ״סי פוד מרקט״ בת״א, מאשר את שמות
45. המתאבדים ששלח, והכל מתוך התאמה לתוכן אמרותיו. דהיינו, העד ▮ בעצמו מאשר
46. את נכונות אמרותיו, למעט הקטע הנוגע לנאשם, בלא הסבר של ממש מדוע דווקא חלק זה לוקה.
47.
48. לאור דברים אלו, מצאנו לנכון להעדיף את האמרות על פני העדות.
49.
50.
51.

---

[footnotes]
⁹ ראה פרוטוקול משפטו של העד (שומרון 5004/03) מימים 04/05/03 ו 16/07/03 (ת/ 73+72) וכן פרוטוקול הארכת מעצרו מיום 12/12/02 (ת/ 71). הפרוטוקולים ממשפטו של העד, התקבלו בהתאם לבקשת התובעת בדיון מיום 14/06/04 לאחר שהסנגור חונטר את השאלה לשיקול דעת בית המשפט ובהיות הפרוטוקולים משום תעודה ציבורית המתקבלת בלא עדות עורכה.

[10] ראה פרוטוקול עדותו של ▮ מיום 30/03/04, עמ׳ 3 ש׳ 5-10).

[11] שם, עמ׳ 2 ש׳ 16 ; ש׳ 47-48.

P 6: 20

תאריך: 28/06/05     6     תיק מס': 5398/03

1
2 עד התביעה ▉
3 גם עד זה, בדומה לעד הקודם ולרוב העדים בתיק זה, אישר בעדותו את אחריותו למעשים
4 המיוחסים לו עליהם הודה במשפטו ובאמרותיו ואף נקב בשמותיהם של שותפיו, מלבד אחד –
5 הנאשם. התביעה מייחסת לנאשם כי פעל ביחד עם העד בשלבים הראשונים של הוצאתו לפועל של
6 פיגוע הרצח ברחוב יפו (פרט האישום השישי, ס"ק א-ה'). העד אישר, למעשה, בעדותו, את
7 העובדות המדוברות בחלק הרלוונטי של פרט האישום, למעט חלקו של הנאשם, שהעד ציין כי לא
8 נכח בעת צילומו של המתאבד.
9
10 מתברר כי דווקא בעת משפטו שלו, הודה העד באחריותו למעשה הרצח ברחוב יפו, ובכלל
11 העובדות בחן הודה אף המעשים המיוחסים לו עם הנאשם, כולל צילומו של המתאבד. התביעה
12 ביקשה[12] להגיש את פרוטוקול הודאתו של העד במשפטו מכוח ס' 10 א', ואילו הסנגור חותר את
13 הבקשה לשיקול דעתו של בית המשפט[13]. בהחלטתנו מאותו היום קיבלנו את הבקשה לחגשת
14 הפרוטוקול והלן נצרף נימוקינו.
15
16 הסנגור טען בסיכומיו כי הודאתו של העד במשפטו שלו, במסגרת הסדר טיעון וללא שנשמעו
17 עדים, לא יכולה לשמש כראיה במשפט זה, אולם לא הסביר חסר של ממש מדוע כך הם הדברים,
18 אף לא צירף אסמכתאות לחיזוק טענתו. דעתנו בעניין זה שונה. אך מובן הוא כי תשובה של נאשם
19 לכתב"א הנאמרת באולם בית המשפט ואשר נרשמת בפרוטוקול, היא משום "אמירתו" של אדם
20 בכתב מעונה על תנאי ס' 10 א' (ראה י. קדמי, "על הראיות", חלק ראשון, עמ' 274 פסקה 4.ב.ב.).
21 ולא רק שיש בו בפרוטוקול ההודאה משום אמרת-חוץ לפי ס' 10א', אלא שעל פני המדובר
22 באמרה מתאימנה מאין כמוה אשר חזקה עליה כי נאמרה מרצון טוב וחופשי ובעלת משקל ניכר,
23 כאשר העד מוסר אותה בתשובה לאישומים המופנים אליו גופו ובעוד הוא מיוצג ע"י עו"ד. מכאן
24 שאין כל מניעה מלקבלה לפי ס' 10א' ואף להעניק לה משקל מלא.
25
26 טענתו של העד בעדותו[14] כי כתב האישום הוקרא לו באופן כללי ובכותרות וללא שהוזכרו השמות,
27 רחוקה מלהיות אמת, כפי שמוכיחים הפרוטוקולים ממשפטו. מעיון בפרוטוקול משפטו של העד
28 בתיק 6446/02 מיום 19/12/02 (ת/ 68) רואים אנו כי כתב האישום הוקרא לעד (הנאשם באותו
29 תיק) במלואו לאור העובדה כי לא היה מיוצג באותו שלב וסירב לקבל על עצמו ייצוג (ראה החלטת
30 בית המשפט באותו דיון, עמ' 2). העד/הנאשם, אף חסל למסור תגובה מפורטת, המוכיחה כי עדותו
31 בפנינו כאילו כתב האישום לא הוקרא לו במלואו – שקרית היא בעליל. עיון בפרוטוקול הודאתו
32 של העד בתיקנו מיום 29/06/03 (ת/ 69), יגלה כי לאחר מספר חודשים נמלך העד בדעתו והודה
33 בכתב אישום מתוקן שעה שהוא מיוצג. גם הפעם הובהרה לעד מהות כתב האישום בענייננו. העד
34 הודה בכתב האישום במילים ברורות, הן מפי סנגורו והן כמו פיו. הסנגור ביקש בסיכומיו להיאחז
35 בעובדה כי העד לא הזכיר את הנאשם במסגרת תשובתו לכתב האישום, אולם ברור כי אין בכך
36 להעלות או להוריד. המעיין בפרוטוקול ההודאה, יגלה כי העד הודה בכתב האישום ובעובדות
37 המיוחסות לו ולצד זאת ציין עובדות בולטות מתוך המיוחס לו. קריאה תמה בפרוטוקול תגלה כי
38 הזכרת שמות שותפיו ע"י העד היא לצד הודאתו בעובדות בכתב האישום המיוחס לו, ואיננה
39 משום "רשימה סגורה".
40
41
42 לצד משקלו הברור של פרוטוקול המשפט של העד, נציין כי עדותו בפנינו לא הייתה נקייה
43 מסתירות, למשל לעניין מידת היכרותו עם הנאשם[15].
44
45
46 אם כן – ראינו כי במשפטו הודה ▉ בעובדות עבירת גרימת המוות בכוונה לעניין
47 הפיגוע ברחוב יפו, ובכלל זה חלקו של הנאשם. פרוטוקול זה הוא משום "אמרת-חוץ" של העד,
48 ואנו קיבלנו אותה ומצאנו לנכון להעדיפה על פני עדותו בפנינו, אשר ממנה נשמט חלקו של
49 הנאשם.
50
51
52

---

[12] ראה פרוטוקול הדיון מיום 14/06/04, עמ' 3 ש' 24-26.
[13] שם, עמ' 5 ש' 36-37.
[14] ראה פרוטוקול עדותו של ▉ מיום 30/03/04, עמ' 7 ש' 29-38.
[15] שם, עמ' 4 ש' 35, השווה שם עמ' 7 ש' 10-11.

P 6: 21

תאריך: 28/06/05                                    7                   תיק מס': 5398/03

1  עד התביעה ███████
2
3  נקל לראות כי עד זה איננו נמנה על העדים הבאים לומר את האמת בעדותם, או לשתף פעולה עם
4  בית המשפט שעה שהוא מבקש להתחקות אחרי האמת. מייד עם עלותו לדוכן העדים אטם העד
5  את אוזניו וסירב לענות לשאלות התובעת. לשאלות הסנגור ענה רק לאחר שבירר כי הוא עורך דינו
6  של הנאשם וגם שעה שהשיב אישר את שאינו שנוי במחלוקת ע"י התביעה, דהיינו כי איננו מזכיר
7  כלל וכלל את הנאשם.
8
9  ואכן התביעה איננה חולקת כי העד אינו מזכיר כלל את הנאשם, ואף הצהירה כי לא לשם כך
10 הביאה את העד לעדות, אלא על מנת להוכיח את חלקו השני של פרט האישום השישי, חלק אשר
11 אפילו אליבא דכתב האישום חנאשם לא נטל בו חלק. שאלה נכבדת היא לשם מה כלל צריכים אנו
12 להידרש לשאלת עדותו של העד אשר אין מחלוקת כי כלל אינו מפליל את הנאשם, אולם לאור
13 תשובתו של הסנגור כי אפילו עצם קרות האירוע איננו מוסכם[16], דומה כי אין מנוס מכך.
14
15 לא התלבטנו רבות בבואנו להכריע בשאלת העדפת פרוטוקול ההדאה ממשפטו של העד כנאשם
16 על פני עדותו (?) בפנינו, אשר ספק רב האמנם "עדות" ייקרא לה, ומכל מקום אין היא משכנעת.
17 לעומת עדותו השרירותית וחמגוחכת של העד בפנינו, עומד פרוטוקול ההדאתו של העד במשפט
18 שלו, בעדו הוא מיוצג ע"י עו"ד. מן הטעמים האמורים מעלה לעניין ███████, מצאנו לנכון
19 להעדיף את פרוטוקול המשפט על פני העדות.
20
21
22 עד התביעה ███████
23
24 גם עד זה, בדומה ל███████, תלה את קולר הפללתו הנחרצת את הנאשם, באמצעים פסולים
25 שחופעלו כנגדו במשפטו, אולם גם הוא לא העלה - משום מה - טענות אלו במשפטו שלו[17]. מאותן
26 נימוקים הנזכרים מעלה, המצטרפים לעדותו המגמתית והמתחמקת של העד (התחמק מלחשיב
27 לשאלה האם הוא מכיר את הנאשם, ואף לא ידע למי הכוונה, למרות שנכח רק נאשם אחד בתא
28 הנאשמים), מצאנו לנכון להעדיף על פני עדותו את אמרתו של העד, אשר סימני האמת ניכרים בה
29 בעליל, ובכלל זה העובדה כי כתב אותה בכתב ידו, כי הוזהר כחוק טרם גבייתה והוא חתום
30 בתחתית כל דף בה.
31
32 עד התביעה ███████
33
34 עד זה, בעלותו על הדוכן, חזר על הקו של חבריו וגם הוא אישר את הכתוב את אמרתו ואת המעשים
35 הרשומים שם, למעט נקודה חנוגעת לנסיבות היכרותו עם חנאשם. לטענת העד, החוקר אילץ אותו
36 לכתוב כי נפצע מידיו של מאגיד מצרי לאותו, לטענתו, אינו מכיר כלל שעה שהיו בדרכם לבצע
37 פיגוע הנחת מטען.
38
39 בבקשו להרחיק את הנאשם בכל מחיר מן הפללה המפורשת אותה חפליל, ואגב כך להטיל רפש
40 בחוקרו, נשתכחה מ███████ העובדה הפשוטה כי באמרתו אין כלל מוזכר הנאשם בהקשר
41 של פיגוע מתוכנן, אלא דווקא נראה כי הפציעה היתה במסגרת "תאונת אימונים", כאשר חנאשם
42 החל לשחק במטול רימונים שבידיו, תוך כדי פגישת היכרות של חוליות שונות בארגון. כלומר,
43 לטענת העד כי החוקר ביקש לאלצו להחדות כי נפצע תוך כדי הכנות לפיגוע עם הנאשם, אין שחר -
44 אפילו לא מתוך האמרה הכתובה.
45
46 ממילא גרסתו של העד אינה משכנעת כלל. העד לא ידע ליתן הסבר של ממש כיצד נפצע. הוא אף
47 לא טרח למסור להסבר של ממש כיצד אילץ אותו החוקר להפליל את הנאשם הפללת שווא ומדוע
48 רק חלק זה באמרתו כוזב ואילו כל השאר נכון.
49
50 אל מול כזביו של העד, עומדת אמרתו, אותה כתב בכתב ידו, לאחר אזהרה כחוק ועליה הוא
51 חתום. התנאים לקיום ס' 10 א' מתקיימים, שכן העד מזהה את אמרתו וסותר את תוכנה. לאור
52 העובדה כי עדותו לא עוררה בנו רושם של מהימנות ודווקא אמרתו נושאת עליה את סימני האמת,
53 מצאנו לנכון להעדיפה על פני העדות.
54

---
[16] ראה פרוטוקול הדיון מיום 30/03/04, עמ' 8 ש' 27-31.
[17] ראה פרוטוקול עדותו של ███████ מיום 30/03/04, עמ' 10 ש' 15-17.

תאריך: 28/06/05     8     תיק מס׳: 5398/03

### פרשת ההגנה

עדות הנאשם בפרשת ההגנה היתה קצרה, רווית סתירות ובלתי משכנעת. ראשית יש לציין כי למרות הררי חומר הראיות מטעם התביעה, אשר נסקר בהרחבה לעיל, בחר הנאשם כמעט ולא להתייחס ישירות לראיות אלו ועדותו בחקירה הראשית היתה קצרה ולאקונית.

אלא שאפילו מתוך עדותו של הנאשם, עולות הסתירות. טענת הנאשם בחקירה הראשית היתה כי ישנם אנשים רבים באזור שכם בשם מאג׳יד מצרי, כי המדובר במשפחה הגדולה ביותר באזור והוא עצמו מכיר אדם בשם זהה לשלו העובד אף הוא ברשות הפלסטינית. לחיזוק טענתו זו ציין הנאשם כי אפילו שניים מן המפלילים אותו, ▇▇▇▇▇▇ שעה שהובאו בפניו לעימות במהלך החקירה, ציינו מיד כי הנאשם איננו אותו מאג׳יד מצרי, אליו התכוונו בהפללתם. עם זאת בחקירה הנגדית שינה הנאשם מטעמו ״יולי יותר בטחוני״ הוסיף גם את הגרסה כי חשניים הפלילו אותו בשל סכסוך קודם, וזאת לאור העובדה כי במסגרת תפקידו עצר את השניים בהיותם גנבי רכבים.

ברור כי שתי הגרסאות אינן יכולות לדור בכפיפה אחת. ואם אכן ▇▇▇▇▇▇ ציין מייד בפני חוקרי השב״כ כי הנאשם איננו מאג׳יד מצרי נשוא הפללותיו, מדוע הנאשם איננו מדבר איתו, בבחינת ״עם מי שעושה לי דבר כזה, אין לי מה לדבר״[13].

סתירות אלו מצטרפות למגמתו הכללית של הנאשם להרחיק עצמו, ובכל מחיר, מקשר כלשהו לפעילות בטחונית, גם בדברים שהודה בהם באמרתו, ואין כל ספק שאין בהם לקשרו ולו במאום לפרטי האישום החמורים המיוחסים לו. כך מכחיש הנאשם בעדותו גם ידי כללי לעבר כוחות בטחון, בו הודה באמרתו, העברות כספים בחם היה מעורב ועוד נושאים, המפורטים בהרחבה בעמודים 26-27 לסיכומי התביעה. הנאשם, בניסיונו למלט עצמו, אף הצניע את קשריו עם ▇▇▇▇▇▇, על אף העובדה כי השניים התרועעו בראשית שנות התשעים בירדן ובבגדד, כעולה מאמרותיו.

לשקריו של הנאשם אודות קיומו של אדם אחר אחר העונה לשמו המרובע, ראה להלן בפרק העוסק בזיהוי הנאשם.

סוף דבר, לא מצאנו כי עדותו של הנאשם בפנינו יש בה לעורר רושם של מהימנות. הנאשם נכשל ־ ואף לא טרח ־ בעדותו מלהפריך את שלל ראיות התביעה והסתפק בהכחשה גורפת ולאקונית, גם במעשים המצומצמים בהם הודה באמרותיו. תוך כדי כך הסתבך הנאשם בגרסאות סותרות ושקרים של ממש, אשר אף בהם אין להחמיא למשקל עדותו.

### סיכום ביניים:

הנה כי כן, מצאנו כי יש מקום להעדיף את ראיות התביעה על פני עדות הנאשם בפרשת ההגנה, את אמרות עדי התביעה על פני עדויותיהם המגמתיות והשקריות ־ הכל מן הנימוקים האמורים מעלה בהרחבה. ראיות אלו משתלבות זו בזו ומציגות גרסה סדורה וקוהרנטית ממנה עולה דמותו של הנאשם כרב־מחבלים העוסק, ביחד עם שותפים נוספים, בשילוח מחבלים מתאבדים. כעת נבחן האם אחריותו של הנאשם למיוחס לו, עולה מתוך אותן ראיות.

### זיהויו של הנאשם:

דומה כי השאלה המרכזית בתיק זה נוגעת לעניין זיהויו של הנאשם אשר בפנינו, כדמות המופיעה בהפללות הרבות של עדי התביעה כרב־המעללים לו מיוחסים המעשים המתוארים בכתב האישום. עדי התביעה חשונים מתארים אדם בשם מאג׳יד מצרי, מוסרים פרטים אישיים שונים שלו ואף נוקבים בכינוי בו הוא מוכר, ״בזבוזי״. לטענת הנאשם אין לו הדבר, אין לו כינוי כלשהו, ובוודאי לא ״בזבוזי״. עוד טען הנאשם כי משפחת מצרי היא משפחה גדולה באזור שכם, ומן הסתם יש בה אנשים נוספים הענוים לשם מאג׳ד. לטענת הנאשם, ישנו אדם נוסף בשם מאג׳יד מצרי אשר אף הוא עובד ברשות הפלסטינית. האם הנאשם שבפנינו הוא אותו ״בזבוזי״?

---

[13] ראה פרוטוקול עדות הנאשם בפרשת החגנה מיום 14/06/04, עמ׳ 9, ש׳ 48-52.

תאריך: 28/06/05     9     תיק מס': 5398/03

1
2
3 ראשית, יש לציין כי הנאשם עונה בעצמו על שאלה זו באמרתי[19], בה הוא מאשר את כינויו
4 מילדות "בובו". כאן המקום לציין כי אין המדובר בכינוי שגור או נפוץ (כגון כינוי של אדם על שם
5 בנו בכורו, למשל "אבו מוחמד", כינוי אשר כמוהו ימצאו לאלפים). ייחודו של הכינוי, בצירוף שאר
6 הפרטים האישיים של הנאשם, מצביע על החפיפה בינו לבין הנאשם.
7
8 אלא שהרשעתו של הנאשם בעבירות החמורות המיוחסות לו, אינה נשענת על כינוי בלבד, אלא גם
9 על זיהויו באופן פרסונאלי ע"י עדי התביעה, איתם עמד בקשרים טובים. באשר לטענות כי עדי
10 התביעה "התבלבלו" או כיוונו לאדם אחר, הרי שבחינה מעמיקה של חומר הראיות תגלה כי אין
11 בכך ממש. הנאשם מאשר באמרותיו את היכרותו עם "גיבוריי" האירועים, עדי התביעה
12 המפלילים אותו, ואף מודה בביצוע עבירות בטחוניות עמם. כך מודה[20] הנאשם בהיכרותו עם
13 ▓▓▓▓ ובביצוע ירי עמו לעבר עמדת צה"ל וכן ביצוע ניסיון ירי. ביחד עם ▓▓▓▓ אף גורש
14 הנאשם בשנת 1992 מהאזור וביחד נסעו לבנדוד"[21]. הסברה כי ▓▓▓▓ אינו מכיר את הנאשם
15 וכיוון בדבריו למאגיד מצרי אחר, מופרכת ממש בנסיבות אלו. עוד מאשר הנאשם באמרותיו כי
16 מסר כספים ל ▓▓▓▓ והוא אף מאשר את היכרותו האישית עמם. הוא אף
17 מאשר העברת רובה קלצ'ניקוב לידיו של ▓▓▓▓ (על פי גרסת הנאשם, בשל סכסוך פנימי)[22].
18
19 אם כן, ההיכרות של הנאשם עם עדי התביעה עולה במפורש מאמרותיו של עצמו. אלא שגם עדי
20 התביעה לא טומנים ידם בצלחת ומרחיבים בעניין חיכרותם עם הנאשם. ▓▓▓▓ זיהה את
21 הנאשם בשמו המלא בעדותו ובפנינו וציין כי הנאשם הוא חברו[23]. ▓▓▓▓ מוסר באמרתו את
22 תיאור מדויק של הנאשם, כולל מקום עבודתו כקצין במשטרה הפלסטינית, גילו, מצבו המשפחתי
23 והיותו אב לשתי בנות (פרטים אותם מאשר הנאשם עצמן באמרתו) ומוסיף כי כינויו של הנאשם
24 הוא "בובו", אשר אפילו בעדותו[24]. עד חתביעה ▓▓▓▓ המגמתית אישר את חיכרותו האישית
25 עם הנאשם לאור שירותם המשותף במשטרה הפלסטינית, מציין גם הוא באמרתו[25], שנתקבלה
26 והועדפה על פני עדותו, את כינויו של הנאשם ואת העובדה כי הוא חבר בארגון "גדודי אל אקצה".
27 אין לחשוד בעד התביעה ▓▓▓▓ כי ישכח את הנאשם, לאחר שזה גרם לפציעתו הקשה
28 שעה ששיחק במטול רימונים שהחזיק. גם הוא מוכיר[27] את הנאשם בשמו ובכינויו ומציין את
29 חברותו בארגון הטרור. עד התביעה ▓▓▓▓ מוסר[28] את מספר הטלפון הסלולארי של
30 "בובו", 200596-059, הדומה באופן מפתיע למספר שמוסר הנאשם עצמו באמרתו[29], 059-
31 200569.
32
33
34 טוען הסנגור כי נפלו בחקירה פגמים של ממש בכך שלא נערך לעדים מסדר זיהוי. הסנגור לא
35 הביא אסמכתאות להוכחת טענתו, ואנו לא מצאנו בה כל ממש. ניכר מכל האמור למעלה בהרחבה
36 כי העדים מכירים את הנאשם היטב, מוסרים פרטים מזהים רבים שלו, חלקם אף הצביעו עליו
37 באולם בית המשפט (גם אם חזרו בהם מהפללתם או תירצו אותה בהסברים שונים ומשונים). אם
38 כן - בפנינו מצב של "הצבעה" של העדים על הנאשם, כעל מי שהם מכירים אותו היכרות מוקדמת
39 ולא זיהויו של אדם לא מוכר באמצעים חזותיים שונים (מסדר זיהוי), ואין כל חובת קיום מסדר
40 זיהוי בנסיבות אלו. ראה גם י. קדמי, על הראיות (מהדורת 1999), חלק שני, עמי 851-852.
41
42
43
44 כאן המקום אף להידרש לשאלה הסטטיסטית, האמנם יתכן כי המדובר במאגיד מצרי אחר?
45 הנאשם ביקש להגיש, לצורך כך, רישום של משרד הפנים הפלסטיני באשר לשכיחות השם מאגיד
46 מצרי. את המסמך ביקשה ההגנה להגיש על סמך עדותו של הנאשם.
47

---

[19] ת/ 1, עמ' 8 ש' 22-25.
[20] ראה ת/ 1, עמ' 2 ש' 5-12.
[21] ראה ת/ 2, עמ' 5, ש' 13-24.
[22] ראה ת/ 1, עמ' 3 ש' 26 ועד עמ' 5 ש' 21.
[23] ראה פרוטוקול עדותו של ▓▓▓▓ מיום 30/11/03, עמ' 1 ש' 35-50.
[24] ראה ת/ 70, עמ' 1, ש' 19-22.
[25] ראה פרוטוקול עדותו של ▓▓▓▓ מיום 30/03/04, עמ' 9, ש' 18-22, עמ' 10, ש' 34-39.
[26] ראה ת/ 3, עמ' 5, ש' 4-8.
[27] ראה ת/ 61, עמ' 2 ש' 17 ועד עמ' 3 ש' 2.
[28] ראה ת/ 60, עמ' 5 ש' 12.
[29] ראה ת/ 1, עמ' 2 ש' 25.

תאריך: 28/06/05    10    תיק מס': 5398/03

1  [ גם נסיבות בקשת ההגשה היו, לכל הפחות, מוזרות. הגשת המסמך כלל לא נתבקשה בחקירה
2  הראשית, אלא צצה לפתע בחקירה החוזרת. הנאשם התיימר לאשר את הרשימה שהציג הסנגור,
3  בלא כל הסבר מדוע רשימה זו אותנטית או מה היו דרכי הפקתה..].
4
5  התביעה התנגדה להגשת המסמך, ואנו קיבלנו[30] את עמדתה כי לא ניתן לקבל את המסמך שלא
6  באמצעות עורכו. עם זאת, ועל מנת להפיס את חדעת חצענו - והצדדים קיבלו את הצעתנו - כי
7  התביעה תגיש מסמך מוסכם שיסופק ע"י משרד הפנים במנהל האזרחי.
8
9  מעיון בשאילתא עולה כי מספר אנשים באזור שכם ענוים לשם מאג'ד מצרי, אולם כולם מבוגרים
10 במיוחד או צעירים במיוחד ולא ענוים על תיאורו של מאג'יד מצרי הנזכר בעדויות התביעה, כאדם
11 כבן 30 - כולם למעט אדם אחד, הוא הנאשם שבפנינו.. באשר לטענת הנאשם[31] כי פעם נוכח לדעת
12 שישנו אדם נוסף בשם מאג'יד אסמעיל מוחמד אלמצרי, אשר לקח לווואה בבנק על שמו - עיון
13 בשאילתא יגלה עד כמה הטענה שקרית, שכן הנאשם הוא האדם היחיד העונה לשם מרובע זה, לא
14 רק בחתך הגילאים הרלוונטי ולא רק באזור נפת שכם אלא בכל הגדה ואף רצועת עזה!!
15
16
17 אם כן, אנו קובעים כי הנאשם שבפנינו הוא אותו מאג'ד מצרי, המכונה "בזבז" המופיע לרוב
18 בראיות התביעה. כעת שומה עלינו לבחון האמנם יש באותן ראיות כדי להביא להרשעת הנאשם
19 במיוחס לו.
20
21
22                           פרטי האישום המיוחסים לנאשם
23
24 הוכחת פרטי האישום מתבססת על ראיות התביעה, כמפורט להלן. ההגנה לא נדרשה לעניין הוכחת
25 עובדות האישום מתוך חומר הראיות (אלא הסתפקה בהכחשתם).
26
27                           פרט אישום ראשון
28
29 פרט אישום זה מייחס לנאשם חברות בארגון הטרור הנודע "גדודי אל-אקצה". הנאשם מופלל
30 בפרט זה ע"י שלושה מעדי התביעה, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. עדויות אלו
31 משתלבות זו בזו, מחזקות זו את זו ועונות על דרישת התוספת הראייתית.
32
33                           פרט אישום שני
34
35 אישום זה מייחס לנאשם נשיאת משרה בארגון האסור, דהיינו כי עמד בראש "גדודי אל-אקצה"
36 באזור שכם בשנת 02', פיקד על הפעולות הצבאיות שביצע הארגון באותה שנת-דמים, תיאם את
37 פעולות הפעילים הצבאיים, סיפק לחם נשק ומימון ומימון אותו קיבל מידי ▮▮▮▮▮▮ ואחרים וכן
38 נהג ליטול אחריות על מעשי הארגון בכלי התקשורת.
39
40 בניגוד להכחשותיו הנגרעות של הנאשם, נראה כי שפע העשייה שפעל הנאשם ומעמדם בארגון,
41 נחקקו בזכרונם של פעילים רבים, אשר זכרו לו את פיקודו עליהם, את הכספים שהעתיר עליהם
42 והנשקים שסיפק להם. שורה ארוכה של עדי תביעה מפלילים את הנאשם במיוחס לו בפרט אישום
43 זה, כמפורט בהרחבה בסיכומי התביעה. כך, למשל, ▮▮▮▮▮ מותאר את מעמדו של הנאשם
44 בארגון, את הכספים הרבים שקיבל מידיו במספר הזדמנויות לצורך ביצוע פיגועים וכן כי הנאשם
45 נטל אחריות על פיגועים מטעם הארגון. כך, ▮▮▮▮▮▮ המתאר את הנאשם כאיש הכספים אשר
46 היה ממממן אותו ואף קיבל מידיו סכום של 12,000 ש"ח. כך, ▮▮▮▮▮▮▮▮ המתאר את הנאשם
47 כמפקד "גדודי אל-אקצה" בשכם, כמי שאישר לו לבצע פיגועים וכן נטל עליהם אחריות בשם
48 הארגון (והעד שלח לו לצורך כך את צילום צוואתו של ▮▮▮▮▮▮, הרוצח בפיגוע קיבוץ מצר)
49 וכן כמי שמימן ביצוע פיגועים וסיפק לשם כך כלי נשק. כך גם ▮▮▮▮▮ המתאר ארוכות את
50 מעמדו של הנאשם כמי שחילק לו הוראות, כמי שנהג לארגן תהלוכות מטעם הארגון ולצורך כך
51 הורה לו להפיץ תמונות שהידים וליורות בתהלוכות וכן כמי שחעביר כלי נשק מפעיל אחד למשנהו
52 בשורה הזדמנויות. שורת עדויות אלו מחזקות זו את זו ועונות למכביר על דרישת התוספת
53 הראייתית, אולם גם מקומה של אמרת הנאשם לא נפקד לעניין זה. הנאשם אמנם, כדרכו, מנסה
54 להתרחק מחברותו בארגון ומהתפקיד שנשא בו, אולם גם הוא מוסר באמרתו פרטים הנאמתים
55 את אשר מפלילים אותו חבריו, ובכלל זה כי העביר כספים לאנשים המפלילים אותו בכך (▮

_____
[30] ראה פרוטוקול מיום 14/06/04, עמ' 11-12.
[31] שם, עמ' 11, ש' 16-20.

תאריך: 28/06/05                    11                    תיק מס׳: 5398/03

1  עייי ▇▇▇), כי קיבל כספים מיד ▇▇▇
2  ▇▇▇) ואחרים, כי סיפק נשק לידיו של ▇▇▇ ▇▇▇ כי יצר קשר עם תחנות טלוויזיה ערביות,
3  כי סייע להקים אתר אינטרנט עבור הארגון ועד. (המוזכר גם
4

5  העובדות המפורטות בהרחבה בפרט אישום זה לעניין תפקידו של הנאשם, מקומו בהיארכית
6  הארגון בזמן הנתון והפעולות השונות אשר נקט במסגרת תפקידו, ישובו ויידונו שעה שנבקש
7  להצביע על אחריותו של הנאשם לעבירות שבוצעו מטעם הארגון.
8

### פרט אישום שלישי

12  פרט זה מייחס לנאשם עבירה של ירי לעבר אדם, וזאת בכך שבמספר הזדמנויות ביצע ירי ביחד
13  עם חבריו לארגון לעבר חיילי צה״ל. עד התביעה נאצר עוויס מפליל אותו בביצוע מעשי ירי ביחד
14  עמו. גם הנאשם מציין באמרתו מעשה ירי שביצע ביחד עם ▇▇▇
15  ראייתית מלאה להרשעת הנאשם בפרט אישום זה., כך שבפנינו תשתית
16

### פרט אישום רביעי

19  התביעה חזרה בה מאישום זה, ופטורים אנו מלדון בו.
20

### פרט אישום חמישי

23  אישום זה מייחס לנאשם עבירת ניסיון לירי, כך שביחד עם ▇▇▇ יצא לירות לעבר חיילי
24  צה״ל, אולם בסופו של דבר נמלכו בדעתם לאחר שנחשפו ע״י כוחות הצבא. גם הנאשם וגם ▇▇▇
25  ▇▇▇ מתארים את האירוע באופן דומה באמרותיהם ומצאנו לנכון להרשיע את הנאשם בגין
26  עבירה זו.

### אחריות הנאשם למעשי הרצח מכות תפקידו

32  פרטי האישום החמורים 6-18 מייחסים לנאשם אחריות למותם של 10 בני אדם בפיגועי
33  ההתאבדות ברחוב יפו בירושלים, ביישוב חרמש ובקיבוץ מצר, וכן את פציעתם וניסיון רציחתם
34  של נוספים באותם אירועים. כל מעשי הרציחות הללו בוצעו ע״י מתאבדים מתחתם נשלחו
35  מטעם ארגון ״גדודי אל-אקצה״ וע״י הנאשם ושותפיו.
36

37  מטבע הדברים, אין אפשרות להעמיד לדין את החמבל המתאבד אשר מוסר את נפשו על מזבח
38  האידיאולוגיה הבזויה. אין זאת אומרת כי אלו העומדים מאחוריו, ואשר עשוהו ככלי שרת בידם
39  למילוי מטרותיהם הבזויות, צריכים לחמוק מן העונש. דיני העונשין הכירו גם באפשרות להטיל
40  אחריות, ואף אחריות מלאה, על מי שמכוח תפקידו או מעמדו (ויהיה זה גם מעמד בלתי רשמי -
41  ראה עניין ״משולם״ הנזכר להלן) הניע אחרים לביצוע עבירות.
42

### אחריות ראשי הארגון הטרוריסטי למעשי חברי הארגון - הפן הנורמטיבי

45  כידוע, מקובלת בתורת המשפט הצבאי דוקטרינת ה״אחריות הפיקודית״, לפיה אחראי בעל דרג
46  פיקודי בכיר למעשי פקודיו אשר נעשו על פי הוראתו ואישורו, גם אם בפועל נטל הוא חלק מעשי
47  קטן או אף שולי במעשים עצמם. דומה כי כל בני שעניינים לו בראשוני, לא יוכל לחמוק מן המסקנה
48  החותכת כי אחריות מקבילה, להבדיל אלפי הבדלות, יש להטיל גם על ראשי ארגוני פשע וטרור
49  המכוונים את פעילותם הנפשעת והמורים על ביצועם של מעשי רצח ב״שלט רחוק״.
50

51  יפים לעניין זה דברי כב׳ השופט קדמי בע״פ 5589/98 <u>ביטאן סולטאן נ. מדינת ישראל</u>, תק-על
52  99(3). באותו עניין הורשע המערער בעבירת רצח בכוונת תחילה, כאשר הוכח שנתן את הסכמתו
53  ואישורו לביצוע הרצח, ושלח את המבצע העיקרי להוציא לפועל את הרצח, ואף הנחה אותו לגבי
54  שיטת הביצוע. השופט קדמי הדגיש שלולא הסכמתו של המערער לא היה הרצח מתבצע, ולכן מתן
55  האישור לבצע את הרצח היה משול ״לירית ההזנקה המשלחת ספורטאי למרוץ״, והיא עולה כדי
56  ״מעשה של השתתפות בביצוע העבירה״. לכן הורשע המערער כמבצע בצוותא ולא כמשדל, ובית
57  המשפט הדגיש כי הוא היה מצוי ״במעגל הפנימי של הביצוע״, כמי שהיה לו תפקיד בביצוע, והיה
58  ״המוח של החבורה״, בעוד שמשדל מצוי מחוץ למעגל הפנימי של הביצוע. כב׳ השופט קדמי הוסיף

תאריך: 28/06/05    12    תיק מס׳: 5398/03

1  ואמר כי בנסיבות המתוארות לעיל, כאשר המערער נתן "אור ירוק לרצח" וההנחיות אופרטיביות
2  בדבר דרך הביצוע, היה בהתנהגותו לפחות "מנה גדושה של שידול על דרך העידוד".
3
4  בדנ״פ 1294/96 **עוזי משולם ואח׳ נ׳ מדינת ישראל**, פ״ד נב(5) 1, פסק כב׳ השופט א. מצא כי: "יש
5  לראות במשתתף כזה – שבידיו שליטה מלאה על הביצוע ושעשייתו כוללת לא רק פעולות שידול
6  והכנה, אלא גם הנחיית העברייניים הפועלים ופיקוח על פעילותם – מבצע בצוותא לכל דבר".
7  הוא הדגיש כי נוכחות בזירת העבירה איננה יסוד חיוני להיותו של אדם מבצע בצוותא, ואמר:
8
9  "במציאות המשפטית החדשה, התניית האחריות הישירה בנוכחות, פרושה ש׳סנדיקים׳
10  ומנהיגי קבוצות עברייניים, המשלחים לביצוע את ׳כלבי הרקק׳ הסדים למרותם,
11  בעוד הם מנהיגים את הפעילות הפלילית מרחוק, יראו לא כמבצעים בצוותא אלא רק
12  כמשדלים. ואפשרות זו, שבוודאי אינה משקפת את הדין חרצוי, איננה מתחייבת אף מן
13  הדין המצוי".
14
15  אותו פסק דין ניתן לאחר ניתוח מעמיק של דמותו של הרב עוזי משולם ומסקנת השופטים באשר
16  למרות שהטיל על חסידיו.
17
18  עקרונות אלו באו לידי ביטוי לא רק לעניין ארגוני פשע, אלא גם לעניין נושאי משרה בכירה בארגוני
19  טרור, בפסק דינו המאלף של בית המשפט המחוזי תל אביב, תפ"ח 1158/02 מ״י נ׳ ▮▮▮▮▮▮▮
20  ראה גם עקרונות דומים המצוטטים בפס״ד ▮▮▮▮ חנייל, המובאים במאמריהם של מ. קרמניצר
21  "המבצע בדיני העונשין קווים לדמותו", פלילים-א׳ (תשנ״ן-1990) 65, בעמ׳ 72, ו.מ. גור-אריה,
22  "צדדים לעבירה-תיקון 39 לחוק העונשין במבחן המסיקה", מגמות בפלילים, עמ׳ 83.
23
24  **מן הפרט אל הכלל**
25
26  אין לך משימה קלה מאשר הוכחת מעמדו הבכיר של הנאשם בארגון גדודי אל-אקצה בשכם
27  וסביבותיה ושליטתו המוחלטת בפעילות הצבאית של הארגון בזמן ששימש כראש הארגון בעיר.
28  ראינו כי הנאשם פעל כמפקד "גדודי אל-אקצה" באזור שכם בשנת 02׳, ולמרותו סרו פעילי
29  הארגון באופן ישיר. הנאשם היה מעורב בחלוקת חכספים לפעילי הארגון - כספים אשר חזינו את
30  גלגלי הטרור. הנאשם תיאם על פעילות חברי הארגון באזור ועמד בקשר עם מפקד ארגון התנזים,
31  מרואן ברגותי. הנאשם סיפק כלי נשק לפועלים לביצוע משימותיהם ואף היה מעורב בצדדים
32  נוספים בפעילות הארגון כגון ארגון תהלוכות והקמת אתר אינטרנט ועוד כהנה וכהנה מרעין
33  בישין.
34
35  עובדות פרטי האישום הבאים יגוללו כיצד היה הנאשם מעורב בתכנות המקדימות לביצוע פיגועי
36  ההתאבדות, כיצד פנה פעיל צבאי אליו על מנת לקבל את אישורו לרצח חפים מפשע. נראה בעליל כי
37  ראה עצמו כפוסק בענייני חיים ומוות באזור שכם. ביוזמתו, באישורו ובברכתו של הנאשם יצאו
38  לדרכם פיגועי ההתאבדות המתוארים להלן, ובדין נושא הוא באחריות אליהם.
39
40  נסיים פרק זה ולו באזכור העובדה הסמלית כי במסגרת תפקידו הנאשם הוא זה שמיחר ליטול
41  אחריות בשם הארגון על פיגועי ההתאבדות שביצע הארגון. אמנם, בבואו לתת את הדין על
42  מעשיו, נתקף הנאשם בביישנות מעשה ולא חזר על כך, אולם דומה כי הדברים מדברים בעד
43  עצמם ומצביעים מדוע אין מקום ליתן לנאשם לחמוק מאחריות לו הוא נושא במסגרת תפקידו
44  למעשי הרצח שביצע הארגון בראשו עמד ואשר מיהר להתגאות בהם.
45
46
47  אלא שאחריותו של הנאשם למעשי הרצח לא מהמצה במישור "המיניסטריאלי" בלבד. שכן
48  הנאשם גם שלח ידו בביצוע מעשים של ממש במסגרת הוצאתם לפועל של פיגועי ההתאבדות
49  הנדונים, מעשים המביאים אותו אל מסגרת "המעגל הפנימי" של מבצעי העבירה, הנושאים
50  באחריות כמבצעים ישירים. נדון כעת בחלקו של הנאשם במסגרת הוצאתם לפועל של כל אחד
51  מהפיגועים.
52
53  **השתלשלות האירועים הכללית**
54
55  כפירתו של הנאשם באישומים כנגדו היתה כללית וגורפת. הנאשם לא הציג בפנינו כל זירת
56  מחלוקת מתוחמת, אפילו ביחס לחלקים מתוך פרטי האישום אשר כלל אינם נוגעים לו. תהגנה
57  עמדה על הוכחת כל פסיק ותג בהם, גם ביחס לאירועים שבוצעו לאחר שיצא הנאשם מן התמונה

1　(ראה הפרק הדן בעדותו של אחמד ברגותי הנזכר מעלה) ולא ידעה למסור עמדה אפילו באשר
2　לעצם קרות הפיגועים.
3
4　נוהגה זה של ההגנה להתמיד בהכחשה הגורפת, גם באשר לעצם מותם של הקורבנות, יש להצטער
5　עליו, בפרט שהתחומר הטכני המבסס עובדות אלו הוגש בהסכמתה. לצערנו, לא חתגנב ללבנו
6　החשש שמא עומד הנאשם ליתן את הדין בגין מעשי רצח שלא בוצעו. הראיות הטכניות הרבות
7　שהונגשו בהסכמת ההגנה, מבססות את עובדות האירועים המתוארים והתמונות הקשות של
8　קורבנות מעשי הרצח, בהם פעוטות רבים בשנים, לא מותירות מקום לספק בעניין זה.
9
10　למעשה, אין מחלוקת של ממש גם ביחס להשתלשלות העניינים הנוגעת לשלבי הוצאתם לפועל של
11　הפיגועים. אם נעמיק ראות, מעבר לעניני האבק שביקשו עדי התביעה להעריס בהתמקנויותיהם
12　השונות, נראה כי למעשה הללו ( ) אינם
13　מכחישים את ונהליכי ההוצאה לפועל של מעשי הרצח, ומתמקדים בעיקר ב (בהכחשת) חלקו של
14　הנאשם. מכל מקום, קריאה באמרותיהם, מעלה באופן נרחב ומפורט את השתלשלות אירועים זו
15　(ובכלל זה התכנות, חימוש המתאבדים, צילומס, הסעתם לעבר זירת הרצח וכו').
16
17　אם כן, מצאנו השתלשלות האירועים הכללית, הוכחה כדבעי מתוך הראיות שהובאו בפנינו, וספק
18　האם היא שנויה במחלוקת אמיתית, וכעת נמקד מבטנו לעבר חלקו של הנאשם.
19
20　**פרטי האישום 8-6, הפיגוע ברחוב יפו**
21
22
23　פרטי אישום אלו מייחסים לנאשם אחריות לרציחתן של אורה סנדלר ושרה המבורגר ז"ל וניסיון
24　גרימת מותם של 45 אזרחים שנפצעו באירוע. האירוע הוצא לפועל מטעמו ובשמו של ארגון "גדודי
25　אל-אקצה". מיוחס לנאשם כי הוא קיבל לידיו את המחבל המתאבד בדירה במחנה בלאטה וביחד
26　עם ▓▓▓ צילם אותו כשהוא מחזיק ברובה וספר קוראן. לאחר מכן שילח הנאשם את
27　המתאבד, סעיד, לדרכו האחרונה. לאחר הדברים האלה יצא סעיד לכיוון רמאללה שם משלח ע"י
28　▓▓▓ לירושלים, מקום בו פתח ביריות לכל עבר, עד אשר הוכרע, אולם לא טרם שגרם
29　לרצח שתי נשים ופציעת עשרות רבות.
30
31　על חלקו של הנאשם מספר עד התביעה ▓▓▓, כאמור בפרוטוקול הודאתו במשפט
32　(ת/ 69, ס"ק 6 לפרט האישום השישי בכתב האישום) ועל עדותו מתבסס החלק באישום הנוגע
33　לנאשם. על הרקע לאירוע, למדים אנו מאמרותיהם של ▓▓▓ ושל ▓▓▓. אמרותיהם של
34　עדי התביעה 16,17 הוגשו בהסכמה" ורואים בתוכן כמוסכם
35　(עד"י אני"ש 114/01, ▓▓▓). מאמרות אלו, בצירוף פרוטוקול הודאתו של ▓▓▓,
36　למדים אנו על אחריותו של אותו סעיד לאחר שנשלח וצולם ע"י הנאשם. מן החומר הטכני למדנו
37　על התוצאות הקטלניות של האירוע. אך מובן הוא כי שלל הראיות משתלבות זו בזו ומהוות הרבה
38　מעבר לחיזוק המוגבר הנדרש לעדותו של ▓▓▓
39
40
41　דומה כי בימים אלו אין אדם נדרש לדמיון רב באשר למשמעותו של אקט צילום מתאבד, כשהוא
42　מקריא את צוואתו טרם צאתו לדרכו האחרונה, ומעשהו של הנאשם בהקשר זה מדבר בעד עצמו.
43　אקט זה, בצירוף מעמדו של הנאשם הנזכר מעלה, מבססים את היותו חלק מן "המעגל הפנימי"
44　של משלחי המתאבד ואת אחריותו המלאה לפיגוע ולתוצאותיו הרצחניות.
45
46　מטעמים אלו מרשיעים אנו את הנאשם באחריות לפיגוע ההתאבדות ברחוב יפו בירושלים,
47　לפציעת האזרחים והניסיון לרצוח נוספים.
48
49
50　**פרטי האישום 12-9, הפיגוע ביישוב חרמש**
51
52　פיגוע זה הוצא לפועל ע"י ▓▓▓, בסיועם של ▓▓▓
53　▓. מיוחס לנאשם (ס"ק א'+ט' לפרט האישום) כי הוא זה שנתן אישור מפורש ל▓▓▓
54　לבצע את הפיגוע, ולאחריו אף נטל אחריות עליו בשם הארגון וכן העביר לידיו של ▓ סכום של
55　3,000$. באירוע נרצחו לינוי סרוסי, הדס תורג'מן ואורנה אשל זכרן לברכה וכן נפצע יובל אשל.

---

[14] ראה פרוטוקול הדיון מיום 14/06/04, עמ' 1 ש' 22-21.

חלקו של הנאשם עולה מתוך אמרותיו של ▆▆▆ אותן מצאנו, כזכור, לקבל. ▆▆▆ מתאר כיצד, לאחר שסיפר לו ▆▆▆▆ כי ברשותו מתאבד המוכן לבצע פיגוע, יצר קשר עם הנאשם שאישר לו לבצע את מעשה הרצח (או בלשונו של הנאשם, "ילמד לאו"[33]). יודגש מתוך דבריו של ▆▆▆ כי הורה ל▆▆▆ להמשיך בגלגול הפיגוע, רק לאחר שיחתו עם הנאשם וקבלת האישור ממנו. עוד מתאר טאיפה כיצד, לאחר הפיגוע, נטל הנאשם אתריות לפיגוע בשם הארגון ואף העביר לו את סכום הכסף.

תיזוק לדבריו של ▆▆▆ אנו מוצאים לא אחרת מאשר באמרתו של הנאשם המאשר כי מסר ל▆▆▆ סכום כסף יום לאחר הפיגוע לחקמת סוכת אבלים לשהיד"[34]. שאר המעורבים באירוע, שאמרותיהם הוגשו בהסכמה[35], מבססים את עובדות האישום בכללו והחומר הטכני מבסס את תוצאותיו הקטלניות ופציעתו של יובל אשל, שאשתו אורנה ז"ל נרצחה לנגד עיניו.

רואים אנו כי הנאשם היה בעל שליטה מוחלטת בהוצאתו לפועל של הפיגוע, ומבצעיו סרו למרותו, חן באומר וחן במעשה, חן לפניו וחן אחריו. הנאשם נושא באחריות מלאה לאירוע שיצא בברכתו, באישורו ובמימונו ושעליו הזדרז ליטול אתריות ואנו מרשיעים אותו באחריות לו.

### פרטי האישום 13-18, פיגוע מצר

גם באירוע זה, נשלח המחבל המתאבד, חיית האדם ▆▆▆▆, ע"י ▆▆▆▆▆ לקיבוץ מצר. במסע הירי שלו בקיבוץ רצח ▆▆▆ את ילדי משפחת אוחיון, מתן ונועם, את אמם רויטל וכן את תושבי הקיבוץ תרצה דמארי ויצחק דורי, זכרם לברכה.

מעיון באמרותיו של ▆▆▆▆ עולה כי פעם נוספת פנה לנאשם, בציינו באוזניו כי ברשותו מתאבד נוסף המוכן לשיגור ובבקשה להמשיך בכל נשק, והנאשם דאג לעשות כן. לאחר מכן, פנה ▆▆▆ אל הנאשם כי ייקח אחריות על הפיגוע, ואף דאג להעביר לידיו את סרט הצילום של ▆▆▆ מקריא את צוואתו.

הנאשם בכבודו ובעצמו מחזק את דבריו של ▆▆▆ באופן מובהק (תוך הוצאת העוקץ מן הדברים, כתרגלו) כאשר הוא מציין באמרתו כי מסר ל▆▆▆ כלי נשק (לטענתו, בעקבות סכסוך של ▆▆▆ עם אדם אחר) וכן כי לאחר הפיגוע התקשר לתחנת הטלוויזיה להודיע כי הוא מתנגד לביצוע פיגועים בתוך תחומי מדינת ישראל..למותר לציין כי הסיפא שבצד גרסתו של הנאשם, לא אמין בעינינו. הנאשם לא טרח לחזור אפילו על גרסה מתחמקת זו בעדותו. והרחיק עצמו מכל מעורבות עם ▆▆▆ או מתן כלי נשק.

המעורב העיקרי הנוסף באירוע ▆▆▆▆▆, אשר אינו מזכיר את הנאשם, מבסס את עובדות כתב האישום הנוגעות להכנות לשילוח ▆▆▆ למשימת הרצח והחומר הטכני מזירת הטבח מאשש את תוצאותיו הקטלניות.

דפוס תחירארכיה שבין ▆▆▆ לנאשם, כבר תואר להלן והמעשים שנעשו לפני ואחרי הפיגוע, מבססים את אחריותו של הנאשם מכוח מרותו על מבצעי הרצח ומתן האישור לפיגוע ונטילת האחריות עליו. אלא שגם הפעם, מלבד האחריות "המיניסטריאלית", נושא הנאשם באחריות מובחקת לפיגוע בתור מי שהמציא לידיהם של הרוצחים בפועל את כלי הנשק שקטל את תושבי הקיבוץ. אין ספק כי הנאשם נושא באחריות מלאה לאירוע הרצח ואנו מרשיעים אותו בכך.

### פרט האישום 19

פרט זה מייחס לנאשם עבירת קשירת קשר לגרימת מוות בכוונה, זאת בכך שהיה שותף למזימה לשלוח את ▆▆▆ לביצוע פיגוע נוסף לאחר פיגוע מצר.

גם אישום זה מתבסס על אמרותיו של ▆▆▆▆, המתאר כיצד משנתברר כי ▆▆▆ נותר בחיים לאחר ההתקפה הרצחנית בקיבוץ מצר, הוחלט לשלוח אותו שוב לבצע פיגוע התאבדות,

---

[33] ראה ת/60, עמ' 4 ש' 25.
[34] ראה ת/1, עמ' 5 ש' 5-9.
[35] ראה פרוטוקול מיום 02/09/03, עמ' 3 ש' 27-28.

תאריך: 28/06/05                    15              תיק מס': 5398/03

1   ולשם כך התקשר אל הנאשם. הנאשם מסר את הסכמתו לתוכנית ואף נענה לבקשת ▮
2   להמציא לידיו כלי נשק, ובני החבורה אף יצאו לשכם לפגשו ולקחת מידיו את הנשק, אולם נעצרו
3   קודם לכן.
4
5   אודות התיווכים הרבים לאמרותיו של ▮ בשורת עניינים - עמדנו זה מכבר. אין ספק כי
6   הקשר הנדון, הוא חלק מתוך "מסכת עובדתית" אחת, הנוגעת לפיגועי טרור שבוצעו ע"י ▮
7   והנאשם במסגרת הארגון ובאמצעות ▮, ועל כן רואים בהם כחיזוקים גם לענין הפללתו את
8   הנאשם לענין אישום זה.
9
10  גם באשר לדפוס הפעולה והקשר בין הנאשם ו▮, עמדנו זה מכבר ואין ספק כי אישורו של
11  הנאשם את התוכנית הרצחנית והתחייבותו להמציא כלי נשק, הופכים אותו לשותף בקשירת
12  הקשר.
13
14
15
16  סוף דבר, מרשיעים אנו את הנאשם בכל המיוחס לו, למעט פרט האישום הרביעי, ממנו
17  חזרה התביעה.
18
19
20
21  זכות ערעור כחוק
22  ניתן והודע, 28/06/05, בלשכה. המזכירות תמציא עותק לידי הצדדים.
23
24
25  שופט             אב"ד              שופט
26
27
28