

PLAINTIFF'S EXHIBIT 384

Date: June 2, 2005                                   1                         Case No.: 5398/03

## The Military Court

### Samaria

### – Transcript –

| | | |
|---|---|---|
| Hearing in court on:<br>June 6, 2005 | Before a panel: | Lt. Col. Erez Hasson – **President of the Court**<br>Major Eliyahu Nimni – **Judge**<br>Captain Erez Seri – **Judge** |

Prosecutor: Captain Irit Deitsh

Defense Counsel: Adv. Darawshe

**Defendant: Majed Ismail Mohamed Masri, Identity No. 904460862**

Stenographer: Sergeant Alina

Interpreter: Sergeant Baha

- The President of the Court has identified the Defendant -

## Verdict

Owing to the large scale of this case, the grounds for the verdict are still being written. However, we shall now provide a summary of the verdict.

We have seen fit to convict the Defendant of the offenses that have been attributed to him in the indictment, with the exception of Count No. 4, which the prosecution has withdrawn. The Defendant is convicted of the following offenses:

**Membership in an illegal organization,** an offense pursuant to Regulation 85(1) (A) of the Defense Regulations (Time of Emergency), 1945.

**Holding of an office,** an offense pursuant to Regulations 85(1) (B) of the Defense Regulations (Time of Emergency), 1945.

**Shooting at a person,** an offense pursuant to Section 58(A) of the Defense Regulation (Time of Emergency) 1945.

[Stamp] P 6: 11

**Attempt to shoot at a person**, an offense pursuant to Section 58(A) of the Defense Regulation (Time of Emergency) 1945 and Sections 19, 20 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

**Intentionally causing death**, an offense under Section 51 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 **(10 counts)**.

**Attempt to intentionally cause death**, an offense under Section 51 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 19, 20 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968 **(3 counts)**.

**Conspiring to intentionally cause death**, an offense under Section 51 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970 and Sections 21, 22 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

It shall be clarified that on the matter of the primary counts of the indictment, i.e. the offenses of murder, the Defendant is convicted as a primary accomplice, in view of his senior status in the organization; the fact that he was involved in operative stages of executing the murders, including the filming of the suicide terrorist; financing the attack and delivering the weapon that was used in it.

Handed down and announced on this day, June 2, 2005, in public and in the presence of the parties.

| [Signature] | [Signature] | [Signature] |
|:---:|:---:|:---:|
| **Judge** | **President of the Court** | **Judge** |

[Stamp] P 6: 11 [continued]

2

Date: June 28, 2005                    **1**                    Case No.: 5398/03

### The Military Court

### Samaria

### - Transcript –

| | |
|---|---|
| Before a panel: | Lt. Col. Erez Hasson – **President of the Court** |
| | Major Eliyahu Nimni – **Judge** |
| | Captain Erez Seri - **Judge** |

Prosecutor: Captain Irit Deitsh
Defense Counsel: Adv. Darawshe

**Defendant: Majed Ismail Mohamed Masri, Identity No. 904460862**

**- The President of the Court identifies the Defendant -**

## Verdict

### The charges and the arena of the dispute:

On February 6, 2005, we handed down the verdict of the Defendant and sentenced him. As promised, our full reasons for the verdict are as follows.

A grave and lengthy indictment was filed against the Defendant, regarding both the severity and the scope of the offenses. The Defendant is charged with having served in 2002 as the head of the Al Aqsa Brigades in the Nablus area, in which capacity he orchestrated the execution of a number of attacks – including the bloody attack on Jaffa Street in Jerusalem, in the settlement Hermesh and in Kibbutz Metzer – in which 10 people met their deaths, including two toddlers and their mother, and dozens of others were injured. The Defendant is also charged with acts of shooting and attempting to shoot at a person and conspiring to cause intentional death.

The Defendant pled not guilty to all the charges attributed to him, both in his answer to the indictment and (for most charges attributed to him) in his police interview, and the indictment against him is based on many incriminatory statements made by his colleagues and fellow organization members and murderers. It must be noted initially that the central issue in this case pertains to the identification of the Defendant, who is usually referred to by his colleagues as "Bazbaz" – which alias the Defendant denies.

[Stamp] P 6: 16

1

Alongside the Defendant's denial of his involvement in the acts of murder, there is no genuine dispute concerning the occurrence of the events (in view of the consent of the defense to the submission of the technical evidence material[1]), or, it seems, concerning the part of the other persons involved, most of whom have already been tried and convicted for their acts.

**The evidence:**

**The statements of the Defendant:**

The witness before us, ▓▓▓▓▓▓▓▓▓▓ took two of the statements of the Defendant. His testimony indicates that the interviewing of the Defendant took place in an ordinary manner. Indeed, no procedural arguments were made by the Defendant, not in the general sense or towards the witness ▓▓▓ in particular, and the defense also consented to the submission of the statements of the Defendant that were taken by the witness.

In its summations, the defense asked that it be determined that the statements of the Defendant should be given less weight, owing to the fact that the statement was not written in Arabic, that it had not been recorded and that the witness did not conduct an identity line-up involving the Defendant.

[Stamp] P 6: 16 [continued]

---

[1] See transcript of September 2, 2003, page 1.

2

**Date: June 28, 2005**                          **2**                          **Case No.: 5398/03**

We have not seen fit to accept the arguments of the defense in this regard. A reading of the two statements of the Defendant makes it clear that the Defendant was offered a chance for his statements to be written in his own handwriting, but he refused to do so, and also refused to sign [them]. It shall be noted that in the first statement, the Defendant also explained this refusal by saying that he did not "recognize the legality of the judicial proceedings of the Israeli occupation". It shall be further noted that the act of the offer to write the statement and the refusal thereof were carried out by police investigator ███████ in the presence of his colleague, ███████ In view of these things, it is not clear what the advantage of writing the statement in Arabic or Hebrew would have been.

The Defense Counsel did not show us the statutory source of the alleged duty of the investigator to record the interview and why the statement should allegedly be disqualified for this reason. An inspection of the statements and the testimony of the statement taker indicates that the conditions of the "Regulations of Judges", which assess the admissibility of statements, were upheld, including giving a warning as required by law, giving an opportunity to write and sign the statement, reading out the translated statement at the end of the interview and so on. The recording of the investigation is not a condition for the admissibility of the statement according to the laws of the Area, and does not diminish its weight.

Concerning the identity line-up, as the Prosecutor declared[2], the taker of the statement was not in charge of the overall interviewing of the Defendant, and questions on the alleged deficiencies in the interviewing must be addressed to his investigators. We shall attend to the issue of the duty of conducting an identity line-up below.

Concerning the weight of the statements, we have not found any reason to give them less weight. On the contrary, the statements indicate that the interview was conducted in a positive atmosphere, during which the Defendant was also offered a cup of tea and a cigarette and he went out for lunch.[3] The Defendant confirmed that he felt well. In the statements, the Defendant confirmed his relations with the other witnesses of the prosecution, who will be discussed below.

[Stamp] P 6: 17

---

[2] *Ibid*, page 2 lines 22-24.
[3] See **P / 1**, page 2 line 1; page 5 lines 25-26.

The Defendant gave detailed descriptions of money transfers that he made, his relations – which had ups and downs – with other operatives, addresses of websites that he used and other such details that seemed to have come from firsthand knowledge.

Concerning the arguments of the defense in its summations whereby "the Defendant denied that which was attributed to him in the indictment, cooperated with his investigators in his police interview, gave full details and full information, but throughout his interview by the police and his examination in the Honorable Court, the Defendant did not admit the acts that were attributed to him" (Section C of the summations of the defense) – it would have been better for these words, which are completely detached from reality, never to have been written, inasmuch as a simple reading of the statement would have spared the defense the need to write them.

In conclusion – we have seen fit to accept the statements of the Defendant and give them full weight.

**Prosecution witness** ▮▮▮▮▮▮▮

The witness ▮▮▮▮▮▮▮ testified before us on September 2, 2003, and his testimony effectively consisted of the direct examination only, in view of the refusal of the witness to continue his testimony, as set forth on page 6 of the transcript on that day. There is no genuine dispute that he was the person responsible for the bloody attack in the settlement Hermesh and in Kibbutz Metzer.

First, we must address the argument of the defense that the Defendant has fallen victim to a distortion of justice insofar as the cross examination of the witness was not completed and that in such a state of affairs his statements must not be admitted pursuant to Section 10 A. Indeed, the witness was brought in to give testimony and the Court and the parties convened in order to hear his testimony in full. This testimony was interrupted solely due to the wish of the witness, who refused to continue to answer the questions that he was asked. The Court took a list of steps in order to continue the hearing of the testimony, including calling the Defense Counsel of the witness, but the witness persisted with his defiance (see the course of events on pages 6-7 of the transcript of that hearing, including our decision that ended the testimony).

[Stamp] P 6: 17 [continued]

4

It is well known that since the Supreme Court handed down its famous verdict on the matter of Haj-Yahya, in Additional Criminal Hearing 4390/91, **State of Israel v. Haj Yahya**, PD 47 (3) 661, there has been a rule in effect concerning the status of "the silent witness", a rule which was handed down by an expanded panel of justices of the Supreme Court, which also considered a silent witness to be a witness whom the parties were given an opportunity to examine. As a result, the way is open to filing his statements according to Section 10 A of the Evidence Ordinance. See also on this matter **Judea and Samaria Appeal 114+99/00**, which is also referred to in our decision on that day. The Defense Counsel cited in his summations a list of references from which it may, according to his claim, be learned that in the absence of a cross examination, the weight of the testimony should be canceled altogether, but these are very old judgments, from the 1970s and earlier, all of which were before the Haj-Yahya rule was accepted, and some of which were handed down even before the amendment to Section 10A of the Evidence Ordinance was passed.

[Stamp] P 6: 17 [continued]

Date: June 28, 2005                     3                     Case No.: 5398/03

The other conditions underlying Section 10A have been fulfilled, including the fact that the witness confirmed the giving of his statements[4] and the existence of material contradictions between the testimony and the statement (the Prosecutor stated a long list of contradictions in her summations without the defense having disputed this in its summations. We must mention, for example, the differences in accounts between the testimony and the statement concerning the identification of the Defendant, the background to receiving the sum of $3,000 from him and more).

After we found that the conditions for the admissibility of the statements of ████████████ pursuant to Section 10A of the Evidence Ordinance had been fulfilled, we also saw fit to prefer the statements of the witness over his partial testimony before us. We shall explain why below:

-   Firstly, it is important to point out in general that even from the partial, arbitrary testimony of the witness before us, the witness confirms the highlights of his incrimination of the Defendant in his statement. The witness confirms in his testimony before us, albeit after being evasive several times, that he had received[5] a weapon from a person called "Bazbaz" and had also received from him an amount of $3,000 after the Hermesh attack. However, the witness contended that the Defendant was not the same Bazbaz, but this does not add or diminish anything, because his testimony does not indicate that he had met that "Bazbaz" in any case, but contacted him based on a telephone number that he had received by way of inheritance from ██████████, when he took his place as the head of the Al Aqsa Brigades in the Tulkarm area. He did not receive the weapons and money from "Bazbaz" directly either, but through couriers. This account of the Defendant's, in his statement, albeit partial, also indicates that the transfers of money and weapons from him to the witness were through couriers. This means that even based on the limited account of the witness, his incrimination of the Defendant still remains unchanged.

[Stamp] P 6: 18

---

[4] See transcript of the statement of ██████████ dated September 2, 2003, page 5 lines 14-30.
[5] *Ibid*, page 3 line 46 to page 4 line 13; page 5 lines 42-45.+

- In his various statements, the witness elaborates further than the limited account that he provided in his partial testimony before us. We have seen fit to accept the statements of the witness. Inspection of the statements reveals them to be of very great weight. The witness wrote one of the statements in his own handwriting and started to write the other one, but stopped writing it of his free will. The statements were given by the witness after he was duly warned and he signed the bottoms of the statement pages. In the statements, the witness assumes responsibility for vicious, terrible murderous acts, while providing extensive details on the circumstances that preceded their execution. A comparison of the content of the statements to the rest of the evidence material before us, including the statements of the Defendant, which confirms his acquaintance with the witnesses and the transfer of the weapon and the money to him, further supports the weight of the statements of the witness.

Therefore, we have seen fit to accept the statements of the witnesses, both by virtue of the adoption of their content in general, by the witness during his testimony, and by virtue (to the extent that this relates to the contradictions between the account of the witnesses and the written content of his statements) of Section 10A, for the reasons set forth above.

**Prosecution witness** ██████████████

This witness, who testified before us on November 30, 2003, also bears his share of guilt and is also responsible for a list of vicious murders.

Firstly, we shall address the issue of the request of the prosecution in its summations to accept the statement of the witness pursuant to Section 10A. The request of the prosecution indicates that it had forgotten to submit the statement during the hearing of June 14, 2004, and it now wishes to correct the error. The Defense Counsel objects to submission of the statement at present, because the request is being made after the end of the prosecution case and this represents infringement of the defense of the Defendant.

[Stamp] P 6: 18 [continued]

We can only address, once again, the reference **Judea and Samaria Appeal 114+99/00**, which was mentioned earlier in this verdict in another context, and is also cited by the learned prosecution in its summations. The Appellate Court cites the well-known statements of the late Honorable President Zamora, which seem to have found their place in the pantheon of criminal procedure since having been uttered – as early as in the first criminal appeal that was heard by the Supreme Court of the State of Israel!! Indeed, President Zamora tells us that a criminal procedure is not the same as a chess game in which one wrong move is enough to settle its outcome forever. The Appellate Court has recognized the possibility of summoning witnesses or filing evidence on the part of the prosecution after the end of the procedural stage, even if this means that such motions may be permitted restrictively, even if the prosecution must avoid this, subject to the qualification that this must not impair the defense of the defendant.

In the circumstances of the matter before us, we have not seen a reason to believe that accepting the request of the prosecution, even in the summations stage, is wrong in any way. **First,** there is no doubt that the request of the prosecution was made in good faith and not out of improper tactics. An inspection of the transcript of the hearing of June 14, 2004 will reveal that the prosecution had filed a list of motions for submitting material pursuant to Section 10

[Stamp] P 6: 18 [continued]

8

A, and there is no doubt that the motion to file the statement of the witness ▆▆▆▆▆ had been forgotten inadvertently. **Second,** the request of the prosecution is unsurprising. The prosecution heard the testimony of the witness ▆▆▆▆▆▆, confronted him with his words in the statement, announced in advance and using clear words its intent to hear the testimony of the taker of his statement ▆▆▆▆▆▆[6], and also heard the testimony of the taker of the statement concerning the circumstances in which the statement was taken (a course that has no other explanation except its wish for the statement of the witness to be submitted pursuant to Section 10A). **Third,** the late motion to submit the statement of ▆▆▆▆▆ constitutes no impairment of the defense of the Defendant. The witness testified and was examined by the parties, including a cross examination by Counsel for the Defendant. The Defendant was also given an opportunity to examine the taker of his statement. The Defendant also related in his testimony[7] in the case of the defense to the incrimination of ▆▆▆▆▆ **in his statement** and gave an account concerning it. The motion for filing the statement of the witness represents no impairment of the defense of the Defendant.

Having crossed the hurdle of the procedural stage for the filing of the motion, we quickly discover that the conditions prescribed beside Section 10A for admitting the statement are fulfilled in their entirety, for the witness had testified and the parties were given an opportunity to examine him, the giving of the statement was demonstrated, both in the testimony of the witness who identified his statement and the testimony of the taker of the statement, and in view of the existence of material contradictions between the statement and the testimony. We shall now address the question of whether there is reason to prefer the statement over the testimony. Our answer to this question is affirmative and our reasons are as follows:

[Stamp] P 6: 19

---

[6] See transcript of March 30, 2004, page 11 lines 22-23, where it says "taker of the position of ▆▆▆▆▆▆", should be "statement"

[7] See transcript of the testimony of the Defendant dated June 14, 2004, page 10, lines 12-17

A. The testimony of ███████████ was also confused to the extent that he was requested to give an explanation for the explicit phrases that incriminated the Defendant in his statement, phrases which he asked not to repeat during his testimony. The witness confirmed that he had signed the statement and that the investigator had also read out its content, but asserted his argument that the investigator had written things that were different to what he had said himself when taking the statement. The witness also purported to state with skepticism that the investigator had added things to his statement after it was written before him, but in answer to the question of the Prosecutor, he was not able to elaborate what these things were.

B. It is best not to discuss the weight of the witness' denial of the things stated against the Defendant in his statement, which was given during the cross examination while the witnesses was parroting answers to a series of blatantly leading questions in accordance with the account that the Defense Counsel put into his mouth.[8] Strangely, without an explanation except for the desire to repeat the account that had been prepared in advance, the Defendant was transformed, during the testimony of ███████████, from a friend (in the direct examination) to a bad cop (in the cross examination)

         hich account, unsurprisingly, would recur a few sessions later in the statement of the Defendant. Needless to say, these things did not ring true to us in any way.

C. The witness confirmed in his own words that he was a member of the Al Aqsa Martyrs Organization, and his statements
                                       The witness was also able to provide an exact description of the "change of command" chain of the organization in the Nablus area, from ███████████ through ███████████, but when he was asked about the identity of █ successor (whom the prosecution claimed to be the Defendant), he suddenly became afflicted with feigned forgetfulness, contended that he did not know the identity of the head of the organization in the Nablus area (to whom he answered himself) and did not make the effort to find out who he was either.

[Stamp] P 6: 19 [continued]

---

[8] See transcript of the testimony of ███████████ dated November 30, 2003, page4.

D.  ███████████ s statement stands in contrast to his incoherent, biased testimony before
us. The weight of his statement arises both from the taker of the statement,
███████████ – who testified before us on June 14, 2004, and in his testimony .
and said that the statement had been taken according to the
ordinary rules – and by inspection of the body of the text of the statement itself, which the
witness signed after being warned. A reading of the body of the statement and the
testimony of the taker of the statement reveals that the statement was based on things that
the witness wrote in his own handwriting. It is regrettable that the witness was not allowed
to write his statement in his own handwriting, but in the circumstances of the matter, after
it was proved to our satisfaction – both from our impression of the witnesses and from a
comparison with the remaining evidence material that was put forth before us – that the
written text in the body of the statement reflects the words of the witness, which were read
out to him before he signed them, we did not believe that there was any flaw in the weight
of the statement (see on this matter also the fascinating judgment of the Honorable Judge
Colonel Friedman in Judea and Samaria Appeal 1129 + 1136 + 1130 + 1137/04).

Therefore, we have seen fit to reject the testimony of ███████████ and prefer his statement
over it.

**Prosecution witness ███████████**

This witness testified before us on November 30, 2003 and in his testimony hastened to deny the
explicit incrimination statement that he provided against the Defendant, in which he described
how he drove the Defendant, along with others, to carry out shooting attacks. When he was
requested

[Stamp] P 6: 19 [continued]

11

Date: June 28, 2005                      5                      Case No.: 5398/03

to give an explanation for the explicit incrimination of the Defendant in his statement, he contended that this had been extracted from him using illicit means; that he was forced to sign it; that he was surprised to see the indictment that was filed against him, which included charges to which he had not confessed and so on. We would have made the effort to elaborate the contradictions that arose in the account of the witness on this matter had it not been shown clearly that the witness had kept the procedural arguments concerning the weight of his statements for his testimony in the case of the Defendant only, whereas in his trial[9], he did not raise any of those arguments, and also consented to the submission of his statements, including the statement in question, concerning which he suddenly raised procedural arguments from out of the blue in his testimony. It is also understandable that the procedural arguments of an interviewee concerning his statement, which appear in the trials of others and not in his own trial, are unconvincing.

For all of these reasons, we have seen fit to dismiss the account of the witness concerning his statement, accept his statement (after the conditions set forth in Section 10A have been fulfilled) and prefer it over his testimony.

**Prosecution witness** ███████

This witness testified before us on March 30, 2004. Despite strongly incriminating the Defendant, as his accomplice in dispatching the suicide terrorist who carried out the murder on Jaffa Street in Jerusalem and as an accomplice in shooting acts, the witness denied the things in his testimony. The witness also contended that he knew the Defendant by his first name only, despite just the content of his testimony revealing that his acquaintance with him was much more established (all the more so when his statements and those of the Defendant reveal that the two had close ties, and were even expelled from the Area and spent a period in Jordan and Baghdad – see below). The witness explained the fact that ]                                                    ₹

                                                  ], but he was not able to elaborate what whose
, arguments were .                                                                    [0,"]).
He further contended that he did not recognize his statements that were shown to him or his own handwriting, but these words did not impress us, as the witness barely made the effort to look at the statements before replying.

                                                                      [Stamp] P 6: 20

---

[9] See the transcript of the trial of the witness (Samaria 5004/03) dated May 4, 2003 and July 16, 2003 (P 72 + 73) and the transcript of the remand hearing of December 12, 2002 (P/ 71). The transcripts from the trial of the witness were accepted at the request of the prosecutor in the hearing of June 14, 2004 after the defense counsel left the question to the discretion of the Court and while the transcripts constituted a public certificate that was acceptable without any testimony from its originator.
[10] See transcript of the testimony of ███████ dated March 30, 2004, page 3 lines 5-10).

Investigator ▉▉▉▉▉ testified before us that he took the statements of the witness and his testimony seemed completely reliable to us. In his testimony, investigator ▉▉▉ said that he took the statements of the witness ▉▉▉ and that he (▉▉▉) was the one who wrote his statements in his own handwriting (as also indicated by reading the statements themselves). The investigator also denied the argument of the witness that he had given additional statements in which he said other things, which is also shown by inspecting the statements, which bear serial numbers.

Therefore, the testimony of ▉▉▉▉▉▉, which was confused, arbitrary testimony ("You have it all written down in your files, there is no need to go into detail", "I don't have to answer anyone"[11]) did not impress us as being reliable. The conditions for the submission of his statements to the police pursuant to Section 10A were fulfilled after the witness testified; the fact that statements were given was proved by the testimony of the taker of the statements ▉▉▉▉ ▉▉▉; and the witness contradicted his statements in his testimony. We have seen fit to prefer the statements over the testimony. In contrast to the confused, unconvincing testimony, we have found his statements to be reliable and weighty. In accordance with that which has been set forth, a reading of the statements reveals that they were given by the witness after he was duly warned and after he had signed the statements, **which he wrote in his own handwriting**. It is further shown that his statements were taken in a positive atmosphere, and that the witness drank coffee and smoked cigarettes while the statements were being taken. The testimony of ▉▉▉▉▉ also reveals that the statements were taken in a standard manner, in cooperation with the witness. In any case, it is noted that a comparison of the testimony of the witness before us and the content of his statements also reveals that in general, he confirmed his responsibility for the attacks on Jaffa Street and at the "Sea Food Market" restaurant in Tel Aviv, confirmed the names of the suicide terrorists whom he dispatched, **in accordance with the content of his statements. In other words, the witness ▉▉▉▉▉▉ himself confirmed the correctness of his statements, except for the part dealing with the Defendant, without a genuine explanation as to why this part was deficient.**

In view of these things, we have seen fit to prefer the statements over the testimony.

[Stamp] P 6: 20 [continued]

---

[11] *Ibid*, page 2 line 16; lines 47-48.

Date: June 28, 2005                    6                    Case No.: 5398/03

<u>Prosecution witness</u> ████████████

This witness, like the previous witness and most of the witnesses in this case, also confirmed his responsibility for the acts that are attributed to him in his testimony, to which he confessed in his trial and in his statements, he also stated the names of his accomplices, except for one – the Defendant. The prosecution argues that the Defendant acted along with the witnesses in the first stages of the execution of the murderous attack on Jaffa Street (the sixth count of the indictment, Subsections A-E). The witness confirmed, in his testimony, the facts in question in the relevant part of the count of the indictment, except for the part of the Defendant, regarding whom the witness stated that he was not present at the time of filming the suicide terrorist.

It has been found that during his trial, the witness admitted his responsibility for the murderous act on Jaffa Street, and the facts to which he confessed also included the acts that were attributed to him with the Defendant, including the filming of the suicide terrorist. The prosecution asked[12] to file the transcript of the confession of the witness in his trial pursuant to Section 10A, while the Defense Counsel left the request to the discretion of the Court[13]. In our decision of that day, we granted the request to submit the transcript and we shall attach our reasons for doing so below.

The Defense Counsel argued in his summations that the confession of the witness in his trial, in the framework of a plea bargain and without witnesses having been heard, cannot serve as evidence in this trial; however, he did not provide a genuine explanation as to why this was not the case, and did not attach any references to support his argument either. Our opinion in this matter is different. But it is taken as given that an answer of the Defendant to an indictment that is said in the courtroom and that is written in the transcript, constitutes a "statement" of a person in writing that fulfills the conditions of Section 10A (see Y. Kedmi, **"About Evidence"**, first part, p. 274, paragraph 4.B.). And not only does the transcript of the confession constitute an outside statement pursuant to Section 10A, but on the face of it, this is a statement of unparalleled reliability that is presumed to have been made freely out of good will and has significant weight, insofar as the witness made it in answer to charges that are directed against him in person while being represented by an advocate. This means that there is no impediment to accepting it pursuant to Section 10A and granting it full weight.

[Stamp] P 6: 21

---

[12] See transcript of the hearing dated June 14, 2004, page 3 lines 24-26.
[13] *Ibid*, page 5 lines 36-37.

The argument of the witness in his testimony[14] that the indictment had been read to him in general terms, in outlines only and without the names having been mentioned is far from being the truth, as the transcripts from his trial prove. An inspection of the transcript of the trial of the witness in Case 6446/02 dated December 19, 2002 (P/ 68) reveals that the indictment had been read to the witness (the defendant in that case) in full, in view of the fact that he was not represented at that stage and refused to accept representation for himself (see the decision of the Court in that hearing, page 2). The witness / Defendant also started to provide a detailed answer, which proved that his testimony before us that the indictment had not been read out to him in full was a complete lie. An inspection of the transcript of the confession of the witness in his case dated June 29, 2003 (P/ 69) will reveal that after a few months, the witness changed his mind and confessed to an amended indictment while he was being represented. This time too, the nature of the indictment in our case was made clear to the witness. The witness pled guilty to the indictment in clear words, which were stated both by his Defense Counsel and by him in person. The Defense Counsel asked in his summations to rely on the fact that the witness did not mention the Defendant in the framework of his answer to the indictment, but it is clear that this does not add or diminish anything. A person reading the confession transcript would see that the witness confessed to the indictment and the offenses attributed **and while doing so stated** prominent facts out of that which was attributed to him. A simple reading of the transcript would reveal that the witness's mentioning of the names of his accomplices was alongside his confession to the facts in the indictment that was attributed to him and did not constitute a "closed list".

Alongside the clear weight of the transcript of the trial of the witness, we must point out that his testimony before us was not free of contradictions, for example on the matter of the degree of his acquaintance with the Defendant[15].

**Therefore, we have seen that in his trial,** ▮▮▮▮▮▮▮▮ **admitted the facts of the offense of causing intentional death concerning the attack on Jaffa Street, including the part of the Defendant. This transcript represents an "outside statement" of the witness, and we have accepted it and seen fit to prefer it over his testimony before us, from which the part of the Defendant had been omitted.**

[Stamp] P 6: 21 [continued]

---

[14] See transcript of the statement of ▮▮▮▮▮▮▮ dated March 30, 2004, page 7 lines 29-38.
[15] *Ibid*, page 4 line 35; compare *ibid* page 7 lines 10-11.

**Date: June 28, 2005**                    **7**                    Case No.: 5398/03

**Prosecution witness** ██████████

It is easy to see that this witness is not the type of witness who comes to tell the truth in his testimony, or to cooperate with the Court while it tries to uncover the truth. As soon as he took the witness stand, the witness covered his ears and refused to answer the questions of the Prosecutor. He answered the questions of the Defense Counsel only after finding out that he was the advocate of the Defendant, and when he did respond, he confirmed only things that were not disputed by the prosecution, i.e. he did not mention the Defendant at all.

Indeed, the prosecution does not contest that the witness did not mention the Defendant at all, and even declared that that was not the reason for which it had brought the witness to testify; rather, it was in order to prove the second part of the sixth count of the indictment, a part which the Defendant did not participate in even according to the indictment. It is an important to know why we have to deal with the question of the testimony of the witness that undisputedly does not incriminate the Defendant, but concerning which, in view of the answer of the Defense Counsel, he did not even agree that the event occurred!![16] This seems to be inescapable.

We did not have to think for long when we came to decide the question of preferring the transcript of the confession from the trial of the witness as a defendant over his so-called "testimony" before us, and in any case, this testimony is not convincing. In contrast to the arbitrary, ridiculous testimony of the witness before us, the transcript of the confession of the witness in his trial, while he was being represented by an advocate, still stands. For the reasons stated above concerning ██████████████ we have seen fit to prefer the transcript of the trial over the testimony.

**Prosecution witness** ██████████

This witness, like ██████████ also attributed his decisive incrimination of the Defendant to illicit measures that were employed against him in his trial, but he did not raise, for whatever reason, these arguments in his own trial[17]. For the reasons mentioned above, which are accompanied by the biased, evasive testimony of the witness (he evaded answering the question of whether he knew the Defendant, and also did not know who the object of the question was,

[Stamp] P 6: 22

---

[16] See transcript of the hearing dated March 30, 2004, page 8 lines 31-37.
[17] See transcript of the statement of ██████ dated March 30, 2004, page 10 lines 15-17.

despite only one Defendant being present in the dock), we have seen fit to prefer the statement of the witness over his testimony, which is evidently truthful, including the fact that he wrote it in his own handwriting; that he was duly warned before it was taken; and that he signed the bottom of every page thereof.

**Prosecution witness** ████████████ .

This witness, when he took the stand, repeated the line of his colleagues and also confirmed what had been written in his statement and the acts written therein, except for a point pertaining to the circumstances of his acquaintance with the Defendant

When he attempted to keep the Defendant out of his explicit incrimination of him at any price, tarnishing the reputation of his investigator in his process, ████████ forgot the simple fact that his statement did not even mention the Defendant in the context of a planned attack, but it seemed that the injury was within the framework of a "training accident", which occurred when the Defendant started to play with a grenade launcher that he held, during an introductory meeting with various cells in the organization. In other words, the argument of the witness that the investigator tried to force him to admit that he had been injured during preparations for an attack with the Defendant has no foundation, not even from the written statement.

In any event, the account of the witness is thoroughly unconvincing. The witness was not able to provide a genuine explanation on how he was injured. In addition, he did not make the effort to provide a genuine explanation on how the investigator forced him to incriminate the Defendant falsely and why only this part of his statement was false while all the rest was true.

Against the lies of the witness there is his statement, which he wrote in his own handwriting, after being duly warned, and which he signed. The conditions for the fulfillment of Section 10A are fulfilled, as the witness identifies his statement and contradicts its content. In view of the fact that his testimony did not leave us an impression of reliability and that his statement seems to bear signs of the truth, we have seen fit to prefer it over the testimony.

[Stamp] P 6: 22 [continued]

17

Date: June 28, 2005                         8                         Case No.: 5398/03

The defense case

The testimony of the Defendant in the defense case was short, full of contradictions and unconvincing. Firstly, it must be noted that despite the mountains of evidence material on the part of the prosecution, which has been extensively reviewed above, the Defendant opted to provide almost no comments on this evidence, and his testimony in the direct examination was short and laconic.

But there are contradictions even in the testimony of the Defendant. The argument of the Defendant in his direct examination was that there were many people in the Nablus area called Majed Masri, that it was the largest family in the area, and that he himself knew a person whose name was identical to his own, who also worked for the Palestinian Authority. To support this argument, the Defendant stated that even two of the people who incriminated him, ███████ ███ and ███████████ when they were brought before him for a confrontation during the examination, immediately stated that the Defendant was not the same Majed Masri whom they had referred to in their incriminating statements. However, in the cross examination, the Defendant changed his mind and "to be on the safe side" also added the account that the two had incriminated him owing to a previous conflict that he had had with them, in view of the fact that in the course of his duty he had arrested the two for vehicle theft.

It is clear that the two accounts cannot both be true. And if ███████████.

These contradictions are compounded by the general trend of the Defendant to distance himself, at any price, from any connection to security activity, even concerning things that he has admitted in his statement, and there is no doubt that these can connect him in any way to the severe counts of the indictment that are attributed to him. Thus, the Defendant, in his testimony, denies any general shooting at security forces, which he admitted in his statement, and any money transfers in which he was involved and other subjects, which are extensively elaborated on pages 26-27 of the summations of the claim. The Defendant, in his attempt to extricate himself, also down-played his connections with ███████ despite the fact that the two had been together in the early 1990s in Jordan and Baghdad, as his statements indicate.

[Stamp] P 6: 23

---

[18] See transcript of the Defendant's testimony in the defense case from June 14, 2004, page 9 lines 48-52.

18

See below, in the chapter dealing with the identification of the Defendant concerning the lies of the Defendant, on the existence of another person who answers to his four-part name.

In conclusion, we have not found that the testimony of the Defendant before us gives us any impression of reliability. The Defendant failed, and did not even make the effort, in his testimony, to refute the great evidence of the prosecution and made do with a categorical, laconic denial, even of the few things that he admitted in his statements. During this, the Defendant complicated matters for himself by giving contradicting versions and actual lies, which do not add to the weight of his testimony.

### Interim summation:

Therefore, we have found that there is reason to prefer the evidence of the prosecution over the testimony of the Defendant in the defense case; and the statements of the prosecution witnesses over their biased, false testimonies, for the reasons that are set forth above extensively. These pieces of evidence complement one another and reveal an orderly, coherent account that shows up the Defendant to be an arch-terrorist who deals, with other accomplices, in the dispatching of suicide terrorists. We shall now examine whether the responsibility of the Defendant for that which has been attributed to him arises from that evidence.

### The identification of the Defendant:

It seems that the central question in this case pertains to the matter of identification of the Defendant before us as the figure appearing in the many incriminating statements of the witnesses of the prosecution as the great perpetrator to whom the acts described in the indictment are attributed. The various witnesses of the prosecution describe a person called Majed Masri, give various personal details about him and also state the alias by which he is known, "Bazbaz". The Defendant contended that this was not the case, that he had no nickname, and certainly is not called "Bazbaz". The Defendant further contended that the Masri family was a large family in the Nablus area, and that it would be natural for there to be other people who answer to the name Majed. The Defendant contended that there was another person called Majed Masri who worked for the Palestinian Authority. Is the Defendant before us the same "Bazbaz"?

[Stamp] P 6: 23 [continued]

19

Date: June 28, 2005                    9                    Case No.: 5398/03

First, it must be noted that the Defendant himself answers this question in his statement[19], in which he confirms his nickname from childhood as "Bazbaz". This is the place to indicate that it is not a common or usual nickname (such as the teknonym-based naming of a person after his firstborn son, such as "Abu Mohamed", of which there are thousands of instances). The uniqueness of this nickname, along with the other personal details of the Defendant, indicates the congruence between him and the Defendant.

But the conviction of the Defendant for the severe offenses that are attributed to him does not rely on this alias only, but also on his personal identification by the witnesses of the prosecution, with whom he had good relations. Concerning the arguments that the prosecution witnesses had "gotten confused" or that they meant another person, extensive examination of the evidence material reveals that there is no substance behind this. The Defendant confirms in his statements his acquaintance with the other "protagonists" of the events, the prosecution witnesses who incriminate him, and also admits to committing security offenses with them. Thus, the Defendant admits[20] his acquaintance with ████████ and shooting, together with him, at an IDF position, and also performing an attempt at shooting. The Defendant was also expelled with ████████ from the Area in 1992, and they traveled to Baghdad together[21]. The conjecture that ████████ did not know the Defendant and had referred to another Majed Masri in his words is truly fallacious in these circumstances. The Defendant further confirms in his statements that he had delivered money to ████████ and ████████ and that he also confirmed his personal acquaintance with them. He also confirmed the transfer of a Kalashnikov rifle to ████████ (according to the account of the Defendant, due to an internal conflict)[22].

[Stamp] P 6: 24

---

[19] P/ 1, page 8 lines 22-25.
[20] See P/ 1, page 2 lines 5-12.
[21] See P/ 2, page 5 lines 13-24.
[22] See P/ 1, page 3 line 26 to page 5 line 21.

Therefore, the acquaintance of the Defendant with the witnesses of the prosecution is explicitly shown by his own statements. But the prosecution witnesses did not stand idle, and they went into further detail concerning their acquaintance with the Defendant. ████████████ identified the Defendant by his full name in his testimony before him and stated that the Defendant was his friend[23]. ████████████ gave in his statement[24] an exact description of the Defendant, including his workplace as an officer in the Palestinian Police, his age, marital status and his being a father of two daughters (details that the Defendant himself confirmed in his statement) and added that the nickname of the Defendant was "Bazbaz". The prosecution witness ████████████ who even in his biased testimony[25] confirmed his personal acquaintance with the Defendant in view ████████████ also noted in his statement[26], which was received and preferred over his testimony, the alias of the Defendant and the fact that he was a member of the "Al Aqsa Brigades" Organization. there is no concern that prosecution witness ████████████ would forget the Defendant after he had caused his severe injury when he played with a grenade launcher that he was holding. He also mentioned[27] the Defendant by his name and alias and stated his membership in the terrorist organization. **The prosecution witness** ████████████ **stated[28] the cellular telephone number of "Bazbaz", 059-200596, which is surprisingly similar to the number that the Defendant himself gave in his statement[29], 059-200569.**

The Defense Counsel contended that there were genuine flaws in the investigation, insofar as no identity line-up had been held for the witnesses. The Defense Counsel did not provide references to prove his argument and we have not found any substance in it. It seems from all that which has been expansively set forth above that the witnesses know the Defendant well, provided many details that identified him, some of them pointed him out in the courtroom (even if they withdrew their incrimination or gave various odd explanations to account for it). If this is the case, we have before us a situation of witnesses who "pointed out" the Defendant, as a person whom they knew beforehand, rather than the identification of an unfamiliar person using various visual methods (identity line-up), and there is no duty to hold an identity line-up in these circumstances. See also **Y. Kedmi**, On Evidence (1999 edition), second part, pp. 851-852.

This is also the place to address the statistical question of whether it is possible that it is another Majed Masri. The Defendant asked to submit for this purpose a record of the Palestinian Ministry of the Interior concerning the frequency of the name Majed Masri. The defense asked to submit the document based on the testimony of the Defendant.

[Stamp] P 6: 24 [continued]

---

[23] See the transcript of the testimony of ████████████ dated November 30, 2003, page 1 lines 35-50
[24] See P/ 70, page 1 lines 19-22.
[25] See transcript of the testimony of ████████ dated March 30, 2004, page 9 lines 18-22, page 10 lines 34-39.
[26] See P/ 3, page 4 lines 4-8.
[27] See P/ 61, page 2 line 17 and page 3 line 2.
[28] See P/ 60, page 25 line 12.
[29] See P/ 1, page 2 line 25.

Date: June 28, 2005                    **10**                    Case No.: 5398/03

[The circumstances of the submission were also odd, to say the least. The submission of the document was not requested in the direct examination, but suddenly emerged in the reexamination. The Defendant purported to confirm the list that the Defense Counsel showed, without any explanation as to why this list was authentic or in what ways it was produced.].

The prosecution objected to the submission of the document, and we accepted[30] its position that the document could not be accepted other than through its originator. However, in order to placate him, we suggested – which suggestion the parties accepted – that the prosecution submit an agreed upon document that would be produced by the Ministry of the Interior at the Civil Administration.

An inspection of the query indicates that a number of people in the Nablus area answer to the name of Majed Masri, but all of them are especially old or especially young and do not match the description of the Majed Masri who is mentioned in the testimonies of the prosecution as a person aged about 30 – except for one person, who is the Defendant before us. Concerning the argument of the Defendant[31] that he once learned that there was another person called ɔ took a loan at a bank under his name – inspection of the query will reveal the extent to which this argument is a lie, as the Defendant is the only person who answers to this four part name, not only in the relevant age profile and not just in the Nablus District but throughout the West Bank and even the Gaza Strip.

**Therefore, we determine that the Defendant before us is the same Majed Masri, known as "Bazbaz", who appears in most of the prosecution evidence. We must now examine whether this evidence is enough to lead to the conviction of the Defendant for the acts attributed to him.**

### The counts of the indictment that are attributed to the Defendant

The proof of the counts of the indictment is based on the evidence of the prosecution as set forth below. The Defendant did not address the matter of proving the facts of the indictment from the evidence material (but sufficed with denying them).

**First count of indictment**

[Stamp] P 6: 25

---

[30] See transcript of June 14, 2004, pages 11-12.
[31] *Ibid*, page 11, lines 16-20.

This count of indictment attributes to the Defendant membership in the well-known terrorist organization the "All Aqsa Brigades". The Defendant is incriminated on this count by three of the prosecution witnesses, ███████████████████ and ████████ These testimonies dovetail with one another, support each other and fulfill the requirement of the evidentiary addition.

## Second count of indictment

This count of indictment attributes to the Defendant holding an office in the prohibited organization, insofar as he headed the Al Aqsa Brigades in the Nablus area in 2002, commanded the military operations that the organization performed during that bloody year, coordinated the activity of the military operatives, provided them with arms and financing, which he received from ████████ and others and used to take responsibility for the acts of the organization in the media.

Contrary to the insistent denials of the Defendant, it seems that the abundant activity in which the Defendant engaged and his status in the organization were burned into the memory of many operatives, who remembered that he commanded them, the money with which he had enriched them and the weapons that he had provided to them. A long list of prosecution witnesses incriminate the Defendant of that which has been attributed to him in this count of the indictment, as expansively set forth in the summations of the prosecution. For example, ████████ ████████ describes the status of the Defendant in the organization, the large amounts of money that he received from him on several occasions for the purpose of carrying out attacks and that the Defendant had taken the responsibility for attacks on behalf of the organization. Thus, ████████ ██████ described the Defendant as the financer who financed him and also received from him a sum of NIS 12.000. Thus. ████████████ ⸱

(the witness sent to him for this purpose a photocopy of the will of ████████ and as the one who financed the execution of attacks and provided weapons for that purpose. ████████ also described at length the status of the Defendant as the one who would give him instructions; as the one who organized processions for the organization, for which purpose he ordered him to distribute photographs of martyrs and shoot in processions; and as the one who transferred weapons from one operative to another on a series of occasions. These testimonies support one another and fully satisfy the demand of the evidentiary addition, and the place of the statement of the Defendant is not amiss in this regard. The Defendant did try, as per his habit, to distance himself from both his membership in the organization and the office that he held therein, but in his statement, he also gave details that verified the incriminating statements made by his colleagues, including the fact that he had transferred money to the people who had incriminated him of doing so (████████

[Stamp] P 6: 25 [continued]

23

Date: June 28, 2005                    **11**                    Case No.: 5398/03

[...] ███████████████████ ), that he had received money from ███ ████████████ (also mentioned by ███████████ and others, that he had supplied weapons to ███ that he had made contact with Arabic television stations, that he had helped build a website for the organization and more.

The facts that are elaborated in this count of the indictment concerning the function of the Defendant, his place in the hierarchy of the organization at the given time and the various actions that he took within his function will be discussed again when we point out the responsibility of the Defendant for the offenses that were carried out on behalf of the organization.

**Third count of indictment**

This count attributes to the Defendant an offense of shooting at a person, insofar as on a number of occasions, he carried out shooting with his fellow organization members at IDF soldiers. Prosecution witness ███████████ incriminated him in the commission of shooting acts with him. The Defendant also indicated in his statement an act of shooting that was carried out with ███████████ which provides full evidential infrastructure for the conviction of the Defendant for this count of indictment.

**Fourth count of indictment**

The prosecution withdrew this charge and we are exempt from discussing it.

**Fifth count of indictment**

This charge attributes to the Defendant the offense of attempted shooting, insofar as he departed with ███████████ to shoot at IDF soldiers, but in the end they changed their minds after they were discovered by military forces. The Defendant and ███████████ described the event similarly in their statements and we have seen fit to convict the Defendant for this offense.

**The responsibility of the Defendant for the acts of murder by virtue of his function**

The severe counts of indictment numbers 6-18 attribute to Defendant the responsibility for the deaths of 10 people in the suicide attacks on Jaffa Street in Jerusalem, in the settlement Hermesh and in Kibbutz Metzer, and the injury and attempted murder of others in the same events. All of these murderous acts were carried out by suicide terrorists who had been dispatched on behalf of the Al Aqsa Brigades Organization and by the Defendant and his accomplices.

[Stamp] P 6: 26

24

Naturally, it is not possible to prosecute the suicide terrorist who sacrificed himself on the altar of the shameful ideology. This does not mean that the people who stood behind him, and who used him as a tool for fulfilling their shameful goals, should evade punishment. Penal law has also recognized the possibility of imposing culpability, including full culpability, on a person who pursuant to his function or status (even an unofficial status, see the "Meshulam" case mentioned below) motivated others to commit offenses.

**The responsibility of the heads of the terrorist organization for the acts of the members of the organization – the normative aspect**

It is well known that military legal theory accepts the doctrine of "command responsibility", whereby a higher ranking operative is responsible for the acts of his subordinates that have been carried out by his order and with his approval, even if in effect he took a minor or even insignificant practical part in the acts themselves. We feel that anybody who has eyes in his head cannot fail to reach the categorical conclusion that parallel responsibility, albeit in completely different circumstances, must also be imposed on the heads of criminal and terrorist organizations who direct their criminal activity and order the execution of murders by "remote control".

The statements of Honorable Justice Kedmi in Criminal Appeal 5589/98 **Bisan Sultan v. State of Israel**, Supreme Court Compendium 99(3) 98 applies to this case. In that case, the appellant was convicted of the offense of premeditated murder, after it had been proved that he gave his consent and approval to execute the murder and dispatched the primary perpetrator to carry out the murder, and also guided him concerning the method of execution. Justice Kedmi emphasized that were it not for the consent of the appellant, the murder would not have been carried out, and therefore the giving of the approval to carry out the murder was akin to **"the start signal that is fired to signal an athlete to start a race"**, and it constitutes "an act of participation in the commission of the offense". Therefore the appellant was convicted as the co-perpetrator and not for soliciting the act, and was the "mastermind of the gang", while one who solicits is outside the inner circle of execution. The Honorable Justice Kedmi further

[Stamp] P 6: 26 [continued]

Date: June 28, 2005                    12                    Case No.: 5398/03

stated that in the circumstances described above, in which the appellant gave a "green light to murder" and the operative directions as to the manner of execution, his behavior constituted at least "a hefty amount of solicitation by way of encouragement".

In Further Criminal Hearing 1294/96 <u>Uzi Meshulam *et al.* v. State of Israel</u>, PD 52 (5) 1, the Honorable Justice A. Matza ruled that: "**Such a participant – who has full control over the execution and whose action includes not only actions of solicitation and preparation but also directing the acting offenders and overseeing their activity – is to be considered a co-perpetrator to all intents and purposes**". He emphasized that presence at the crime scene is not a vital basis for a person to be a co-perpetrator, and said:

> "**In the new legal reality, making presence at the scene a condition for direct responsibility would mean that 'godfathers' and leaders of criminal groups, who dispatch to the scene of the act the "small fry" who answer to them, while they lead the criminal activity remotely, would not be considered as co-perpetrators but only as having solicited the offense. And this possibility, which certainly does not reflect the desirable legal theory, is not mandatory in the legal system that is in place either**".

The same judgment was handed down after a thorough analysis of the character of Rabbi Uzi Meshulam and the conclusions of the judges concerning the authority that he held over his followers.

These principles are expressed not only concerning criminal organizations, but also concerning senior officers in terrorist organizations, in the instructive judgment of the Tel Aviv District Court, in Felony Case 1158/02 <u>State of Israel v. ▮▮▮▮▮▮▮▮</u> See also similar principles that are cited in the above mentioned ▮▮▮▮ judgment, which are cited in the articles of M. Kremnitzer "**The Perpetrator in Penal Law, a Character Portrait**", Plilim A (5740-1990) 65, p. 72, and M. Gur-Arieh, "**Parties to an offense – Amendment 39 to the Penal Code in the Test of Case Law**", Megamot Beplilim, p. 83.

**From the specific to the general**

[Stamp] P 6: 27

26

There is no easier task than proving the senior status of the Defendant in the Al Aqsa Brigades Organization in and around Nablus, and his absolute control over the military activity of the organization while he served as the head of the organization in the city. We have seen that the Defendant acted as the commander of the Al Aqsa Brigades in the Nablus area in 2002, and the operatives of the organization answered to him directly. The Defendant was involved in the distribution of money to the operatives of the organization – money which powered the wheels of terrorism. The Defendant coordinated the activity of the members of the organization in the Area and was in contact with ▆▆▆▆▆▆ the commander of the Tanzim Organization. The Defendant provided weapons to operatives for executing their tasks and was also involved in additional aspects of the activity of the organization, such as organizing processions and building a website and other such illicit actions.

The following facts of the count of the indictment will reveal how the Defendant was involved in the preliminary preparations for carrying out suicide attacks and how a military operative contacted him in order to get his approval for murdering innocents. It is blatantly obvious that he considered himself the arbiter of life and death in the Nablus area. At the initiative, with the approval and with the blessing of the Defendant, the suicide attacks described below were launched, and he assumes lawful liability for them.

We shall conclude this chapter by mentioning the symbolic fact that within the framework of his capacity, the Defendant was the one who hastened to assume responsibility on behalf of the organization for the suicide attacks that the organization carried out. However, when standing trial for his actions, the Defendant feigned shyness and did not repeat this, but things seem to speak for themselves, and show why there is no room for letting the Defendant evade the responsibility that he assumes, within the framework of his position, for the murderous acts committed by the organization that he headed and for which he hastened to be proud.

**But the responsibility of the Defendant for the murderous acts does not end with the "ministerial" level alone,** for the Defendant was also involved in performing actual deeds within the execution of the suicide attacks in question, which acts lead him into the framework of the "inner circle" of the perpetrators of the offense, who assume responsibility as direct perpetrators. We shall not discuss the part of the Defendant within the framework of the execution of each of the attacks.

## The general chain of events

The Defendant's denial of the charges against him was general and categorical. The Defendant did not show us any clearly delineated point of dispute, even concerning the parts of the counts of the indictment that had no bearing on him. The defense demanded the proof of every letter and punctuation mark in them, including concerning the events that were carried out after the Defendant was no longer in the picture [Stamp] P 6: 27 [continued]

27

Date: June 28, 2005                    **13**                    Case No.: 5398/03

(see the chapter dealing with the testimony of ███████████ that is referred to above) and was unable to provide a position even concerning the fact of the occurrence of the attacks.

The act of the defense in persistently using a categorical denial, even to the fact of the death of the victims, is regrettable, particularly when the technical material that substantiates these facts was filed with its consent. Unfortunately, we have not been seized by the concern that the Defendant would be held accountable for murders that were not carried out. The large amount of technical evidence that was filed with the consent of the defense substantiates the facts of the events described and the terrible pictures of the murder victims, including small children and leave no room for doubt in this regard.

In effect there is no genuine dispute concerning the chain of events relating to the stages of execution of the attacks either. If we look further, beyond the dust clouds that the prosecution witnesses have attempted to kick up in their various evasive maneuvers, it seems that they ████████████████████████ do not effectively deny the execution processes of the murderous acts and focus primarily on (the denial of) the part of the Defendant. In any case, a reading of their statements extensively and elaborately reveals the chain of these events (including the preparations, arming and filming of the suicide attackers and driving them to the murder scene and so on).

Therefore, we have found that the general chain of events has been adequately proved out of the evidence that was brought before us, and it is doubtful whether it is truly disputed, and we shall now focus our view on the part of the Defendant.

## Counts 6-8 of the indictment, the attack on Jaffa Street

These counts of the indictment attribute to the Defendant responsibility for the murder of the late Ora Sandler and Sarah Hamburger and an attempt to cause the death of 45 civilians who were injured in the event. The event was executed on behalf and in the name of the Al Aqsa Brigades Organization. The Defendant is charged with having received the suicide terrorist in an apartment in the Balata Camp and having filmed him holding a rifle and a book of the Koran along with ████████ Thereafter, the Defendant dispatched the suicide terrorists, Sa'id, on his last way. After these things, Sa'id departed for Ramallah, where he was sent by ████ ████ to Jerusalem, where he opened fire [at others] indiscriminately until he was vanquished, but not before he had caused the murder of two women and injured dozens of others.

[Stamp] P 6: 28

28

Prosecution witness ███████████ talks about the part of the Defendant, as set forth in the transcript of his confession in his trial (P/ 69, Subsection 6 of the sixth count of the indictment) and the part of the charge relating to the Defendant is based on this testimony. We learn about the background leading up to the event from the statements of ████████ and of ██████████. The statements of prosecution witnesses 16, 17, ████████████ and ████████████ were filed consensually[32] and their content is considered to be agreed to (**Judea and Samaria Single Judge Appeal 114/01, Abu Hilal**). From these statements, along with the transcript of the confession of ███████████████, we learn about the responsibility of that Sa'id after having been sent and filmed by the Defendant. The technical material indicates the deadly results of the event. But it is understood that all of the evidence comes together to provide support that greatly exceeds the high level of support that is required for the testimony of ████████.

It seems that at present, one does not need much imagination concerning the meaning of the act of filming a suicide terrorist who is reading his will before departing on his last journey, and the act of the Defendant in this context speaks for itself. This act, along with the status of the Defendant referred to above, substantiate his place as part of the "inner circle" of the dispatchers of the suicide terrorist and his full responsibility for the attack and its murderous results.

For these reasons, we convict the Defendant for responsibility for the suicide attack on Jaffa Street in Jerusalem, the injury of the civilians and the attempt to murder others.

## Counts 9-12 of the indictment, the attack in the settlement Hermesh

This attack was executed by █████████████, with the assistance of ██████████████ and █████████████. The Defendant is charged (Subsection A & I of the count of the indictment) of being the one to give explicit approval to ███████████ to carry out the attack, after which he took responsibility for it on behalf of the organization and transferred to ███ the sum of $3,000. In the event, the late Linory Seroussi, Hadas Turgeman and Orna Eshel were murdered and Yuval Eshel was injured.

[Stamp] P 6: 28 [continued]

---

[32] See transcript of hearing dated June 14, 2004, page 1 lines 21-22.

Date: June 28, 2005                    14                    Case No.: 5398/03

The part of the Defendant arises from the statements of ▮▮▮ which we saw fit, as stated above. to accept. ▮▮▮describes how, after ▮▮▮▮▮▮▮▮▮.

It shall be emphasized from the words of ▮▮▮

1.

▮▮▮s words are supported by none other than the statement of the Defendant, who confirmed that he had handed money over to ▮▮▮ the day after the attack for erecting a mourning tent for the martyr[34]. The other persons involved in the attack, whose statements were filed consensually[35], substantiate the facts of the charge in general and the technical material substantiates its deadly results and the injury of Yuval Eshel, whose late wife Orna was murdered before his very eyes.

We can see how the Defendant had complete control over the execution of the attack, and its perpetrators answered to him, by words and by actions, before it and after it. The Defendant assumes full responsibility for the event that was dispatched with his blessing, approval and financing, and which he hastened to assume responsibility for, and we convict him for this responsibility.

## Counts 13-18 of the indictment, the Metzer attack

In this event, too, the suicide terrorist, ▮▮▮▮▮▮▮▮▮▮, was dispatched by ▮▮▮ ▮▮▮ to Kibbutz Metzer. In his shooting spree in the kibbutz, ▮▮▮ murdered the children of the Ochayon family, Matan and Noam, their mother Revital and kibbutz residents, the late Tirza Damari and Yitzhak Dori.

Examination of the statements of ▮▮▮ indicates that once again,

▮▮▮▮▮▮ ▮▮▮ asked the

[Stamp] P 6: 29

---

[33] See P/ 60, page 4 line 25.
[34] See P/1, page 5 lines 5-9.
[35] See transcript of September 2, 2003, page 3 lines 27-28.

30

The Defendant himself supports the statements of ▮ significantly (while taking the sting out of those things, as per his habit) by indicating in his statement that he had provided ▮ with a weapon (he contended that this was following an encounter that ▮ had with another person) and that after the attack he called the television station to announce that he objected to carrying out attacks within the State of Israel. Needless to say, this endnote alongside the account of the Defendant is not reliable for our purposes. The Defendant made no effort to repeat this evasive account in his testimony and distanced himself from any involvement with ▮ and providing a weapon.

The other prime suspect involved in the event, ▮, who did not mention the Defendant, substantiated the facts of the indictment related to the preparations for sending ▮ on the murder mission and the technical material from the scene of the massacre confirms its deadly results.

The hierarchy of relations between ▮ and the Defendant have already been described above and the acts that were performed before and after the attack substantiate the responsibility of the Defendant pursuant to his authority over the perpetrators of the murder and giving the approval for the attack and taking responsibility for it. But this time too, besides "ministerial responsibility", the Defendant also has significant responsibility for the attack as the one who actually provided the murderers with the weapon that took the lives of the residents of the Kibbutz. There is no doubt that the Defendant bears full responsibility for the murderous event and we convict him of this.

## 19th count of the indictment

This count attributes to the Defendant the offense of conspiring to cause intentional death, insofar as he was involved in the plot to dispatch ▮ to carry out another attack after the Metzer attack.

This charge is also based on the statements of ▮ who described how it was decided, after finding that ▮ was still alive after the murderous attack in Kibbutz Metzer, to send him again to carry out a suicide attack,

[Stamp] P 6: 29 [continued]

31

**Date: June 28, 2005**             **15**                    **Case No.: 5398/03**

for which purpose he contacted the Defendant. The Defendant gave his consent to the plan and also granted the request of ▆▆▆ to provide him with a weapon, and the gang members also departed to Nablus to meet him and take the weapon from him, but they were arrested before they did so.

We have already dealt with the considerable support for the statements of ▆▆▆ on a series of matters. There is no doubt that this conspiracy is part of a single "factual sequence", which relates to terrorist attacks that were carried out by ▆▆▆ and the Defendant within the framework of the organization and through ▆▆▆; therefore, we consider these to support the matter of incrimination of the Defendant for this charge too.

We have also discussed the course of action and the connection between the Defendant and ▆▆▆ and there is no doubt that the approval of the murderous plan by the Defendant and his commitment to provide a weapon make him an accomplice in the conspiracy.

**In summation, we convict the Defendant of all of that which has been attributed to him, except for the fourth count of the indictment, which the prosecution has withdrawn.**

**Right of appeal as prescribed by law**

Handed down and notified, June 28, 2005, at the office. The court clerk will provide a copy to the parties.

| [Signature] | [Signature] | [Signature] |
|:---:|:---:|:---:|
| **Judge** | **President of the Court** | **Judge** |

[Stamp] P 6: 30

32

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                                Plaintiffs,

                                                    No. 04 Civ. 00397 (GBD) (RLE)

        vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                                Defendants.

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P6: 11-15.

2.    I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P6: 11-15.

                                        _____
                                        Rina Ne'eman

ss.: New Jersey

On the 28 day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014


Notary Public

KIRUT J MIHRETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
I.D.# 2386704

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

Plaintiffs,

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1.  The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 6: 16-30.

2.  I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.  To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P 6: 16-30.

_____
Rina Ne'eman

ss.: New Jersey

On the [ 6 ] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

*March* [handwritten, above "February"]

Sworn to me this *March* [handwritten]
_6_ day of ~~February~~, 2014


*Leonor Troyano* [signature]
Notary Public


**LEONOR TROYANO**
**ID # 2385580**
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/8/2014



תיק מס׳: 5398/03          1          תאריך: 06/02/05

בית המשפט הצבאי
ש ו מ ר ו ן
- פ ר ו ט ו ק ו ל -

דיון בית משפט מיום: 06/02/05    בפני החרכב: סא״ל  ארז  חסון  -אב״ד
רס״ן  אליהו  נימני  -שופט
סרן  ארז  סרי  -שופט

תובע: סרן אירית דייטש

סניגור: עו״ד דראושה

נאשם: מאג׳ד אסמאעיל מוחמד מצרי   ת.ז.: 904460862

רשמת: סמל אלינה

מתורגמן: סמל בהאא

- אב״ד זיהה את הנאשם -

הכרעת דין

עקב הקפדת הגדולים של תיק זה, נימוקי הכרעת הדין נמצאים עדיין בשלבי כתיבתם. עם
זאת, נמסור כעת את תמצית הכרעת הדין.

מצאנו לנכון להרשיע את הנאשם בעבירות המיוחסות לו בכתב״א, למעט פ״א 4, ממנו חזרה
התובעת בסיכומיה. הנאשם מורשע בעבירות הבאות:
חברות בהתאחדות בלתי מותרת – עבירה לפי תקנה 85 (1) (א) לתקנות ההגנה (שעת
חירום), 1945.
נשיאת משרה – עבירה לפי תקנה 85 (1)(ב) לתקנות הגנה (שעת חירום), 1945.
ירי לעבר אדם – עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945.
ניסיון ירי לעבר אדם – עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945 ולפי
סעי 19,20 לצו בדבר כללי האחריות לעבירות (יהודה והשומרון) (מסי 225), תשכ״ח –1968.
גרימת מוות בכוונה – עבירה לפי סעי 51 לצו בדבר הוראות ביטחון (יהודה ושומרון) (מסי
378), התש״ל – 1970 (10 פרטי אישום).
ניסיון גרימת מוות בכוונה – עבירה לפי סעי 51 לצו בדבר הוראות ביטחון (יהודה ושומרון)
(מסי 378), התש״ל – 1970 ולפי סעי 19,20 לצו בדבר כללי האחריות לעבירות (יהודה
והשומרון) (מסי 225), תשכ״ח – 1968 (3 פרטי אישום).
קשירת קשר לגרימת מוות בכוונה – עבירה לפי סעי 51 לצו בדבר הוראות ביטחון (יהודה
ושומרון) (מסי 378), התש״ל – 1970 ולפי סעי 21,22 לצו בדבר כללי האחריות לעבירות.
(יהודה והשומרון) (מסי 225), תשכ״ח – 1968.

יובהר כי לעניין פרטי האישום המרכזיים, דהיינו עבירות הרצח, מורשע הנאשם כשותף
עיקרי וזאת לאור מעמדו הבכיר בארגון, העובדה כי היה מעורב בשלבים אופרטיביים של
ביצוע מעשי הרצח ובהם צילום צילום המתאבד, מימון הפיגוע ומסירת כלי הנשק אשר שימש בו.

ניתן והוכרע היום, 06/02/05, בפומבי ובמעמד הצדדים.

_____        _____        _____
שופט                      אב״ד                      שופט

P 6: 11

**ראיות לעונש**
ת: אין ראיות לעונש
ס: אין ראיות לעונש

**תוצאת מסכמת:**

היום נותן הנאשם את הדין בגין אחריותו כמבצע עיקרי לגרימת מותם של 10 בני אנוש. לצד זאת, הורשע הנאשם בפעילות ביטחונית חמורה עניפה, תוך שגם מסקירות מעשיו אלו ברורה נחישותו ותחכומו כדי מטרה אחת- גדיעת חיי אדם. הנאשם אמנם נותן את הדין אחרוני בזמן, לאחר כל "גיבוריו", מבצעי הפיגועים במגר ותרשיש, אולם מטעמי, מבחינות רבות, ניתן לראות בו ראש וראשון להם.

לא ניתן להתעלם כחובט לחומרה ממעמדו הבכיר בארגון התנזים. למדנו, לצערנו, כי הטרור, הגם שחזנו מכח באופן עיוור בקורבנות מקריים, פעמים רבות יש בו דוולקת חוקיות או בתר דיוק אינסטרטנטיות, ציוניות בחיי אדם. לעתים נות לבצע פיגוע זה או אחר במועד מסוימים, בתזמון מסויים, ביישוב מסויים, בתוך תחומי הקו הירוק או מתוגו לי. וכאן, לטעמתו של התביעה, נכנס לתפקידו המכריע של הנאשם כמעין פוסק באתות חיים של קורבנות עלומים עתידיים, ירצה יבוצע פיגוע רצח, לא ירצה יינצלו הפגע חייהם.

אדגיש כי עובר לפיגוע בתרמיש נתבקשה הסכמתו המפורשת של הנאשם לביצוע הפיגוע על ידי בכיר המרצחים, ▬▬▬▬▬, הסכמתו של הנאשם ניתנה ורק לאחריה יצאו לפועל השולבים הבאים, שתבוצע כובעו למותם של שלושה בני אנוש. הנאשם אף הגדיל לעשות לאחר ביצוע הפיגוע, אולי כשלמוני הצלחתה, העביר הנאשם ל▬▬▬▬▬, בדיוק בשל "הצלחתו" של הפיגוע סכום כסף. ואם יומנה תחומה על כך, גם זה אינו מקרה, שכן הנאשם נשא תפקיד אשר במסגרתו העביר כספים בהוזדמניות רבות ובשיטותיות לפעילים מרכזיים בארגון.

גם לביצוע הפיגוע במגר נודעת תרומה מרכזית לפעילו של הנאשם, היות שהוא זה שהכביר למעשה את כלי המשחיט לידי המרצחים, בסופו של דבר. על תרומה זו ודאי שאין צורך להכביר מילים באשר הסיבתיי בין מעשיו כאן ובין קורות התוצאה.

בנוגע לפיגוע ברחוב יפו בירושלים, שימש הנאשם כצלם של המתאבד לפני יציאתו לפיגוע. התביעה טוענת לא אחת לפני בימ"ש כבד זה, אודות הקרדינליות שהיא מוצאת בפעולה זו. אדגיש בקרבה זו פאן נוסף חמור של פיגועי ההתאבדות שבאו בקרבנו הינו ההד התקשורתי שבא בעקבותו, בו יש למעשה להתפאר, לשתוק ולזרוע אימה בחיי של כל ישראלי, באשר הוא ישראלי. תרומה רבה לכך יש בצילומי מותם של אותם מתאבדים, זאת גם מתבחינה שהם משמשים דוגמא מוצלמת גם לבאים בעקבותם. יותר מכך, לטעמה של התביעה, באקט הצילום יש כדי לאפשר למשריין, בסופו של דבר, את ביצוע העבירה עצמה על ידי אותו מתאבד בכך שלמעשה יש באקט זה משום עידוד רוח של אותו מתאבד, חיזוק החלטתו לצאת לביצוע הפיגוע.

התביעה חפכה לעניני זה לשימיונה בתיקנו של אחאד נאצר, תיק בימ"ש 5572/03. בתיקי זה נגזר על הנאשם מאסר עולם ואולם לא מן הטעם שבירקשה התביעה, היינו השתתפותו בצילום המתאבד, אלא אם כי ריבוי העבירות שיוחסו לו. עם זאת, אציין כי התביעה הגישה ערעור בתיק זה והוא עדנו תלוי ועומד בבימ"ש לערעורים.

כן אבקש להפנות לתיקני של כמאל שובל, שנידון בבימ"ש זה, שם קובל ביחמ"ש את עמדתה של התביעה באשר לגרמות הממשית של אותו אקט של צילום המתאבד.

היום נסגר מעגל. דמם של קורבנות הנאשם זועק אל ביחמ"ש והתביעה תבקש כי עונשו ינגזר 10-ל עונש מאסר מאסר עולם מצטברים בגין כל נפש נפס שהוא אותה קטע. כן תבקש התביעה מאסר נוסף קצוב בשנים, בגין יתר העבירות בהן הורשע הנאשם.

תאריך: 06/02/05          3          תיק מסי: 5398/03

**סניגור מטכבם:**

1 הנאשם הכחיש לאורך כל הדרך את כל המיוחס לו בכתייא, אולם בהרשעתו חיום בפני
2 הנאשם הכחיש לאורך כל הדרך את כל המיוחס לו בכתייא, אולם בהרשעתו חיום בפני
3 הנדרית בבירמחייש, וגם בחקירתו במשטרה, הוא הוקיע מעשי אלימות נגד מדינת ישראל.
4 מדובר בנאשם שאפילו בהליך המשפטי שהיה בפני ביהמחייש נגרמו לו עוויות דין.
5 מדובר בנאשם בן 32 שנים. הוא המפורט היחידי למשפחתו, אשר מורכבת משני ילדים.
6 אשתו נמצאת כאן וגם אימו החולה. לנאשם יש המון חובות ומשכנתא. הנאשם עובר
7 לאירוע נשוא כתייא עבד בתור קצין במשטרה הפלשתינאית. הוא עבד במסירות ובנאמנות.
8 מצבו הפיננסי של הנאשם רעוע מאוד. ילדיו הקטנים לומדים בבייס ויש צורך שאביהם
9 יתמוך בהם מבחינה כלכלית (וחשוב שאביהם יימצא לידם.
10 הנאשם הוא אדם חולה, יש לו בעיות ברגליים.
11 יש לי טיעונים אחרים, הואיל ועוד לא קיבלתי את הניומוקים לידיי. לנאשם אין דם על
12 הידיים - זה מה שהוא טען לאורך כל הדרך. אפילו התנהגותו של הנאשם היום, אינה כמו
13 של הנאשמים האחרים, אשר היו מרדים במעשים שעשו, אך הנאשם לא עושה זאת.
14 אנו מבקשים שביהמחייש יתחשב בנסיבות.

15 **נאשם:**
16 אני מהתחתחלה הבאתי את הראיות לביהמחייש. התביעה בהתחלה קבעה את גורלי. אני
17 אמרתי שאני לא מפחד רק מאלוהים ואני נגד רצח של אזרחים ישראלים ופלשתינים.
18 חייתי קצין במשטרה הפלשתינית ופפילו אותי נגבי רכבים. אני כיבדתי את הבמחייש עד
19 עכשיו. אני מקווה שתיקח בחשבון את כל הדברים האלו, אתה מטפל בילדים שלך, גם לי
20 יש ילדים.

P 6: 13

<div dir="rtl">

## גזר דין

1
2
התאשם הורשע, כאמור בהכרעת הדין, בעבירות המיוחסות לו בכתב האישום (למעט פרט
3
האישום הרביעי, ממנו חזרה התביעה). המדובר בשורת עבירות קשות וחמורות, שאין
4
חמורות מהן, מהן עולה אחריותו של הנאשם לרציחתם של עשרה בני אדם וכן שורת
5
עבירות נוספות ובהם עבירות ניסיון לגרימת מוות בכוונה, ירי ועוד.
6
7
8
הנאשם נשא בתפקיד ראש "גדודי אל אקצה" באזור שכם, ובהתפקידו זה משך בחוטיהם
9
של פיגועים רבים אשר יצאו תחת הנחייתו, במימונו, בברכתו ותוך שימוש בכלי הנשק
10
שמסר.
11
12
התאשם היה מעורב בשורת פיגועי התאבדות כאשר הוא וחבריו לארגון צמא-הדם, שילחו
13
בוה אחר זה מפגעים מתאבדים אשר זרעו בחוצות ערי ישראל רצח ומוות. עובדות כתב
14
האישום, בהם הורשע הנאשם, מתארות ארוכות את השלבים המפורטים שקדמו להוצאת
15
המרצחים לעבר זירת הקטל.
16
17
הנאשם, בתפקידו וחבריו, הוא זה שניצח על תעשיית מוות בזוייה זו ומסר הוראות לפעילים
18
הכפופים לו לשלח מפגעים למעשי רצח המונניים. אולם הנאשם לא הסתפק בתפקיד
19
"מיניסטריאלי" בלבד, אלא שלח ידו גם בשותפות מלאה לשילוח המפגעים ממש, ובכלל
20
זה צילום מתאבד במקרה אחד, מימון פיגוע אחר והספקת כלי הרצח באירוע שלישי.
21
22
כאן המקום להדגיש, את אשר אף עולה מהכרעת הדין, כי אחריותו המלאה של הנאשם
23
למעשים נלמדת הן מעמדתו המעורבות ה"אופרטיבית", אולם גם מעמדתו הבכיר חעולה
24
לאורך כל חומר הראיות. מתברר כי הנאשם היה, באזור שכם, פוסק בענייני חיים ומוות,
25
והוא נצל את מרותו על פני אחרים לשם שילוח מרצחים. הנאשם הוא זה שמיתה אף
26
ליטול אחריות על מעשי הרצח, בפני אמצעי התקשורת.
27
28
29
הנאשם הוא האחראי, ביחד עם שאר חבריו לכנופית המרצחים, לפגוע הדמים ברחוב יפו
30
בירושלים, בישעה תרמש ובקיבוץ מצר. כתוצאה ממעשיו מצאו את מותם עשרה בני אדם,
31
בהם שני ילדים רכים בקיבוץ מצר, אמם שנרצחה ביחד עמם, שניים תושבי הקיבוץ, נערות
32
שנרצחו מרחק קצר מביתם בישעה חרמש, נשים שהלכו ברחוב יפו בירושלים, פיגועי
33
הדמים ברחוב יפו, בישעה חרמש ובקיבוץ מצר זעזעו את המדינה באכזריותם ובשפלותם.
34
35
הנאשם לא חדל ממעשיו, גם כאשר הלכו ורבו קורבנותיו, גם כאשר הלך ופחת גילם. גם
36
לנוכח הירצחם של ילדים רכים, לא נח הנאשם ממעשיו והוסיף לטוות את קורי המוות
37
תחת ידו. הנאשם לא היסס והורה לשלוח את חיית-האדם, את הרוצח ███████████
38
לביצוע מעשה רצח נוסף, אשר למרבה המזל לא יצא אל הפועל.
39
40
ואכן, מלבד מעשי הרצח בהם הורשע, ומלבד הפציעות שגרם לאלו ששרדו את התקפות
41
התופת של המפגעים ששילח, עוד שלח הנאשם את ידו במעשה ירי וניסיון לירי.
42
43

</div>

תאריך: 06/02/05                    5          תיק מס׳ : 5398/03

1    כפי שציינו בהכרעת הדין, מצאנו כי חלקו של הנאשם הוא של שותפות מלאה. ואכן,
2    העובדה כי הנאשם נתן בפחדנות והסתתר מאחורי מצלמת הוידיאו ושלח אחרים לחרוג
3    ולהרוג, כי התחבא מאחורי מתן הוראות לאחרים, כי עטף בשטרות כסף את מוג לבו, כי
4    נטל אחריות על מעשי אחרים, עובדת פחדנותו של הנאשם אינה מחייכת כי יחמוק מן
5    העונש הראוי לו ולשכמותו. הנאשם אחראי באופן מלא למותם של עשרה בני אדם חפים
6    מפשע, ומאחריותו זו לא יחמוק.
7
8
9    אנו גוזרים עם הנאשם 10 מאסרי עולם מצטברים.
10
11
12
13
14   זכות ערעור כחוק  תחל מיום המצאת נימוקי הכרעת הדין לידי הצדדים
15   ניתן והודע, 06/02/05 , בפומבי ובמעמד הצדדים.
16
17
18         שופט              אב"ד                   שופט
19
20

תאריך: 28/06/05                         1                    תיק מס':5398/03

בית המשפט הצבאי
ש ו מ ר ו ן
- פ ר ו ט ו ק ו ל -

בפני הרכב: סא"ל ארז חסון        -אב"ד
רס"ן אליהו נימני        -שופט
סרן ארז סרי           -שופט

תובע: סרן אירית דיניש
סניגור: עו"ד דראאושה

נאשם: מאג'ד אסמאעיל מוחמד מצרי   ת.ז.: 904460862

- אב"ד זיהה את הנאשם -

הכרעת דין

האישומים וזירת המחלוקת:

ביום/ 06/02/05 מסרנו את הכרעת דינו של הנאשם וגזרנו את דינו. כמובטח, להלן נימוקינו המלאים להכרעת הדין:

כנגד הנאשם הוגש כתב אישום קשה וארוך, הן מבחינת חומרת העבירות והן מבחינת היקפן. מיוחס לנאשם כי בשנת 2002 שימש כראש "גדודי אל-אקצא" באזור שכם ומתוקף תפקידו ניצח על הוצאתם לפועל של מספר פיגועים - ובהם פיגועי הדמים ברחוב יפו בירושלים, בישיבה חמשה ובקרבוץ מצר - בהם מצאו את מותם 10 אנשים, בהם 2 מפגעות נאבם, ונפצעו עשרות אחרים. עוד מיוחסים לנאשם מעשי ירי וניסיון לירי לעבר אדם וקשירת קשר לגרימת מות בכוונה.

הנאשם כפר בכל המיוחס לו, הן בחשובתו לאישום וכן (במרכית המיוחס לו) בחקירתו המשטרתית והתאשום כנגדו מבוסס על הפללות רבות מאת חברו ושותפו לארגון ולמעשי הרצח. כבר בתחילת הדברים יש לציין כי הסוגיה המרכזית בתיק זה, נוגע לויהתיו של הנאשם, אשר לרוב מכונה ע"י חבריו בכינוי "בזבו" - כינוי אותו מכחיש הנאשם.

לצד הכחשתו של הנאשם את מעורבותו שלו במעשי הרצח, הרי שאין מחלוקת של ממש באשר לקורות האירועים (לאור הסכמת ההגנה להגשת חומר הראיות הטכני), ונראה כי אף לא לחלקם של שאר המעורבים, אשר ברובם נשפטו והורשעו זה מכבר על מעשיהם.

חומר הראיות:

אמרות הנאשם:

העיד בפנינו גובה 2 אמרותיו של הנאשם, רס"מ ████████. מעדותו עולה כי חקירתו של הנאשם התנהלה באופן רגיל. אכן לא נטען מצד הנאשם כל טענת וטוא, לא בכלל ולא כלפי העד ████ בפרט, וההגנה אף הסכימה כי יוגשו אמרותיו של הנאשם שנגבו ע"י העד.

בסיכומיה ביקשה ההגנה לקבוע כי יש ליתן משקל מופחת לאמרותיו של הנאשם, וזאת עקב העובדה כי האמרות לא נכתבה בערבית, כי לא הוקלטה וכי העד לא ערך לנאשם מסדר זיהוי.

¹ ראה פרוטוקול מיום 2/09/03, עמי 1.

P 6: 16

תאריך: 28/06/05          2          תיק מס׳:5398/03

לא ראינו לנכון לקבל את טענת ההגנה במישור זה. מעיון בשתי אמרותיו של הנאשם ברור כי
הוצע לנאשם לכתוב את אמרותיו בכתב ידו, אולם הוא סירב לעשות כן ואף סירב לחתום. יצוין כי
באמרתו הראשונה אף ניסח הנאשם סירובו זה בכך שהוא אינו "מכיר בחוקיות החוקרים
המשפטיים של הכיבוש הישראלי". יצוין עוד כי אקט ההצעה לכתוב את האמרה והסירוב לה,
נעשו ע"י חוקר המשטרה ▉▉▉▉ בנוכחות עמיתו לתפקיד, רסמ"ל ▉▉▉▉. לאור דברים אלו, לא
ברור מה הרבותא בכתיבת האמרה בערבית או בעברית.

הסנגור לא הציג בפנינו מהו המקור הסטטוטורי לחובה, כביכול, של החוקר להקליט את החקירה
ומדוע יש בכך כדי לפסול את האמרה, כטענתו. מעיון באמרות והעדות גופה מאשם, עולה כי
תנאי "יתקבלות השופטים", מכשירים קבילותן של אמרות, התקיימו ובכלל זה מתן אזהרה כחוק,
מתן הזדמנות להרחיב האמרה וחתימה עליה, הקראת האמרה תמתורגמת בסוף החקירה וכו'.
הקלטת החקירה אינה תנאי על פי דיני האזור לקבילות האמרה ואינה פוגמת במשקלה.

באשר למסקרד תזיוזי, כפי שהצגירה התובעת², לא היה גובה האמרה ממונה על חקירתו הכוללת
של הנאשם ושאלות בתחום מחדלי חקירתו, לטענת ההגנה, יש לחפנות לחוקרים. באשר לסוגית
חובת עריכת מסדרי זיהוי, נדרש בהמשך.

באשר למשקל האמרות, לא מצאנו מקום להפחית ממשקל, לחיפך. ניכר מן האמרות כי החקירה
התנהלה באווירה חיובית, ובמהלכת אף הוצע לנאשם כוס תה וסיגריה והוא יצא לארוחות
צורניו². הנאשם אישר כי הוא חש בטוב. באמרתו מאשר הנאשם את קשריו עם שאר עדי
התובעת, בהם דוזבר לחלן. הנאשם מוסר תאוורים מפרטים של העברות כספים שביצעו, קשריו -
שידעו עלינות ומודרות - עם פעילים אחרים, כתובות אינטרנט בהן השתמש וכו"ים פרטים אשר
ניכר בהם כי הם באים ממקור ראשון.                                     "

באשר לטענת ההגנה בסיכומיה כי "הנאשם הכחיש את המיוחס לו בכתב האישום, שיתף פעולה
עם חוקריו בחקירתו המשטרתית נתן פרטים מלאים ואינפורמציה מלאה, אולם בכל החקירות
במשטרה ובבית המשפט הכחיד הנאשם לא הודה במעשים המיוחסים לו" (סעיף ג׳ לסיכומי
ההגנה) - מוטב היה לדברים, התולומים לגמרי מן המציאות, שלא היו עולים על הכתב, שכן קריאה
תמה באמרה היתה חוסכת את כתיבתם.

סוף דבר - מצאנו לקבל את אמרותיו של הנאשם ולהעניק להן משקל מלא.

<u>עד התביעה ▉▉▉▉▉ :</u>

מעדו בפנינו העד ▉▉▉▉ ביום 02/09/03, עדות אשר כללה, למעשה, את החקירה הראשית
בלבד, וזאת לאור סירובו של העד להמשיך את עדותו, כמפורט בעמ' 6 לפרוטוקול מאותו היום.
אין מחלוקת של ממש כי המדובר במי שהתראיי לפינוע חדמים בישוב חרמ ובקיבוץ מצר.

ראשית עלינו להתדרש לטענת ההגנה, החפנה כי נגרם לנאשם עוונת דין בכך שלא הושלמה חקירתו הנגדית
של העד (ר׳ במבצ דברים זה אין לקבל את אמרותיו מכוח סי׳ 10 א׳. אכן, העד הובא למסור עדות
ובית המשפט והדדדים התחכנסו על מנת לשמוע את עדותו במלואה. עדות זו נקטעה בשל רצונו של
העד בלבד, אשר סירב להמשיך ולהשיב לשאלות שנשאל. בית המשפט נקט בשורה צעדים על מנת
להמשיך את שמעעת העדוית ובכלל זה קראנ לסנגור של העד, אולם העד התמנד במריו (ראה
מהלך הדברים בעמ׳ 6-7 לפרוטוקול אותו היום, ובכלל זה החלטתנו החותמת את העדויות.

כידוע, מאז ניתן פסק דינו הנודע של בית המשפט העליון בעניין תני־יחיא, דניף 4390/91, מדיינת
ישראל נ׳ מג׳ יחיא, פ"ד מ"ז מז 3) 661, עומדת על מכונה ההלכה בעניין מעמדו של ה"עד השותקי",
הלכה אשר נותנה ע"י הרכב מורחב של שופטי בית המשפט העליון, אשר ראה אף בעד השותק כעד
אשר נותנה לצדדים הזדמנות לחוקרו, ומכאן שפחנות חדרך להנצאת אמרותיו על פי סי׳ 10 א׳
לפקודת הראיות. עוד ראה לעניין זה, ע׳ איני־יס 99/00+114, הנזכר אף בהחלטתנו מאותו היום.
הסנגור הפנה בסיכומיו שורת אסמכתאות מתן ניתן ללמוד - לטענתו - כי בהעדר חקירה נגדית, יש
לבטל את משקל העדות כולה, אולם המדובר בפסקי דין ישנים ביותר, משנות השבעים ועד קודם
לכן, אשר כולם נמסרו טרם שנתקבלה הלכת תני־יחיא, חלקם אפילו עד לפני שנתקבל תיקון סי׳ 10
א׳ לפקודת הראיות...

¹ שם, עמ׳ 2, ש׳ 24-22.
² ראה ת/ 1, עמ׳ 2 , ש׳ 1 ; עמ׳ 5, ש׳ 26-25.