**Date: June 28, 2005**          5          **Case No.: 5398/03**

to give an explanation for the explicit incrimination of the Defendant in his statement, he contended that this had been extracted from him using illicit means; that he was forced to sign it; that he was surprised to see the indictment that was filed against him, which included charges to which he had not confessed and so on. We would have made the effort to elaborate the contradictions that arose in the account of the witness on this matter had it not been shown clearly that the witness had kept the procedural arguments concerning the weight of his statements for his testimony in the case of the Defendant only, whereas in his trial[9], he did not raise any of those arguments, and also consented to the submission of his statements, including the statement in question, concerning which he suddenly raised procedural arguments from out of the blue in his testimony. It is also understandable that the procedural arguments of an interviewee concerning his statement, which appear in the trials of others and not in his own trial, are unconvincing.

For all of these reasons, we have seen fit to dismiss the account of the witness concerning his statement, accept his statement (after the conditions set forth in Section 10A have been fulfilled) and prefer it over his testimony.

**Prosecution witness** ▉▉▉▉▉▉

This witness testified before us on March 30, 2004. Despite strongly incriminating the Defendant, as his accomplice in dispatching the suicide terrorist who carried out the murder on Jaffa Street in Jerusalem and as an accomplice in shooting acts, the witness denied the things in his testimony. The witness also contended that he knew the Defendant by his first name only, despite just the content of his testimony revealing that his acquaintance with him was much more established (all the more so when his statements and those of the Defendant reveal that the two had close ties, and were even expelled from the Area and spent a period in Jordan and Baghdad – see below). The witness explained the fact that he incriminated the Defendant in his statements by claims that he raised against investigator ▉▉▉▉▉▉, who forced him to write things (the witness himself did not remember the investigator who interviewed him and did not identify him, but stated that he was a bald police officer), but he was not able to elaborate what whose arguments were ("There was a problem with that investigator. I do not remember the details[10]"). He further contended that he did not recognize his statements that were shown to him or his own handwriting, but these words did not impress us, as the witness barely made the effort to look at the statements before replying.

[Stamp] P 6: 20

---

[9] See the transcript of the trial of the witness (Samaria 5004/03) dated May 4, 2003 and July 16, 2003 (**P 72 + 73**) and the transcript of the remand hearing of December 12, 2002 (**P/ 71**). The transcripts from the trial of the witness were accepted at the request of the prosecutor in the hearing of June 14, 2004 after the defense counsel left the question to the discretion of the Court and while the transcripts constituted a public certificate that was acceptable without any testimony from its originator.

[10] See transcript of the testimony of ▉▉▉▉▉▉ dated March 30, 2004, page 3 lines 5-10).

Investigator ▓▓▓▓ testified before us that he took the statements of the witness and his testimony seemed completely reliable to us. In his testimony, investigator ▓▓▓▓ said that he took the statements of the witness ▓▓▓▓ and that he (▓▓▓▓) was the one who wrote his statements in his own handwriting (as also indicated by reading the statements themselves). The investigator also denied the argument of the witness that he had given additional statements in which he said other things, which is also shown by inspecting the statements, which bear serial numbers.

Therefore, the testimony of ▓▓▓▓, which was confused, arbitrary testimony ("You have it all written down in your files, there is no need to go into detail", "I don't have to answer anyone"[11]) did not impress us as being reliable. The conditions for the submission of his statements to the police pursuant to Section 10A were fulfilled after the witness testified; the fact that statements were given was proved by the testimony of the taker of the statements ▓▓▓▓ ▓▓▓▓; and the witness contradicted his statements in his testimony. We have seen fit to prefer the statements over the testimony. In contrast to the confused, unconvincing testimony, we have found his statements to be reliable and weighty. In accordance with that which has been set forth, a reading of the statements reveals that they were given by the witness after he was duly warned and after he had signed the statements, **which he wrote in his own handwriting.** It is further shown that his statements were taken in a positive atmosphere, and that the witness drank coffee and smoked cigarettes while the statements were being taken. The testimony of ▓▓▓▓ also reveals that the statements were taken in a standard manner, in cooperation with the witness. In any case, it is noted that a comparison of the testimony of the witness before us and the content of his statements also reveals that in general, he confirmed his responsibility for the attacks on Jaffa Street and at the "Sea Food Market" restaurant in Tel Aviv, confirmed the names of the suicide terrorists whom he dispatched, **in accordance with the content of his statements. In other words, the witness ▓▓▓▓ himself confirmed the correctness of his statements, except for the part dealing with the Defendant, without a genuine explanation as to why this part was deficient.**

In view of these things, we have seen fit to prefer the statements over the testimony.

[Stamp] P 6: 20 [continued]

---

[11] *Ibid*, page 2 line 16; lines 47-48.

13

Date: June 28, 2005                                6                                Case No.: 5398/03

**Prosecution witness** ███████████

This witness, like the previous witness and most of the witnesses in this case, also confirmed his responsibility for the acts that are attributed to him in his testimony, to which he confessed in his trial and in his statements, he also stated the names of his accomplices, except for one – the Defendant. The prosecution argues that the Defendant acted along with the witnesses in the first stages of the execution of the murderous attack on Jaffa Street (the sixth count of the indictment, Subsections A-E). The witness confirmed, in his testimony, the facts in question in the relevant part of the count of the indictment, except for the part of the Defendant, regarding whom the witness stated that he was not present at the time of filming the suicide terrorist.

It has been found that during his trial, the witness admitted his responsibility for the murderous act on Jaffa Street, and the facts to which he confessed also included the acts that were attributed to him with the Defendant, including the filming of the suicide terrorist. The prosecution asked[12] to file the transcript of the confession of the witness in his trial pursuant to Section 10A, while the Defense Counsel left the request to the discretion of the Court[13]. In our decision of that day, we granted the request to submit the transcript and we shall attach our reasons for doing so below.

The Defense Counsel argued in his summations that the confession of the witness in his trial, in the framework of a plea bargain and without witnesses having been heard, cannot serve as evidence in this trial; however, he did not provide a genuine explanation as to why this was not the case, and did not attach any references to support his argument either. Our opinion in this matter is different. But it is taken as given that an answer of the Defendant to an indictment that is said in the courtroom and that is written in the transcript, constitutes a "statement" of a person in writing that fulfills the conditions of Section 10A (see Y. Kedmi, "**About Evidence**", first part, p. 274, paragraph 4.B.). And not only does the transcript of the confession constitute an outside statement pursuant to Section 10A, but on the face of it, this is a statement of unparalleled reliability that is presumed to have been made freely out of good will and has significant weight, insofar as the witness made it in answer to charges that are directed against him in person while being represented by an advocate. This means that there is no impediment to accepting it pursuant to Section 10A and granting it full weight.

[Stamp] P 6: 21

---

[12] See transcript of the hearing dated June 14, 2004, page 3 lines 24-26.
[13] *Ibid*, page 5 lines 36-37.

The argument of the witness in his testimony[14] that the indictment had been read to him in general terms, in outlines only and without the names having been mentioned is far from being the truth, as the transcripts from his trial prove. An inspection of the transcript of the trial of the witness in Case 6446/02 dated December 19, 2002 (**P/ 68**) reveals that the indictment had been read to the witness (the defendant in that case) in full, in view of the fact that he was not represented at that stage and refused to accept representation for himself (see the decision of the Court in that hearing, page 2). The witness / Defendant also started to provide a detailed answer, which proved that his testimony before us that the indictment had not been read out to him in full was a complete lie. An inspection of the transcript of the confession of the witness in his case dated June 29, 2003 (**P/ 69**) will reveal that after a few months, the witness changed his mind and confessed to an amended indictment while he was being represented. This time too, the nature of the indictment in our case was made clear to the witness. The witness pled guilty to the indictment in clear words, which were stated both by his Defense Counsel and by him in person. The Defense Counsel asked in his summations to rely on the fact that the witness did not mention the Defendant in the framework of his answer to the indictment, but it is clear that this does not add or diminish anything. A person reading the confession transcript would see that the witness confessed to the indictment and the offenses attributed **and while doing so stated** prominent facts out of that which was attributed to him. A simple reading of the transcript would reveal that the witness's mentioning of the names of his accomplices was alongside his confession to the facts in the indictment that was attributed to him and did not constitute a "closed list".

Alongside the clear weight of the transcript of the trial of the witness, we must point out that his testimony before us was not free of contradictions, for example on the matter of the degree of his acquaintance with the Defendant[15].

**Therefore, we have seen that in his trial, ▮▮▮▮▮▮▮▮▮▮ admitted the facts of the offense of causing intentional death concerning the attack on Jaffa Street, including the part of the Defendant. This transcript represents an "outside statement" of the witness, and we have accepted it and seen fit to prefer it over his testimony before us, from which the part of the Defendant had been omitted.**

[Stamp] P 6: 21 [continued]

---

[14] See transcript of the statement of ▮▮▮▮▮▮▮ dated March 30, 2004, page 7 lines 29-38.
[15] *Ibid*, page 4 line 35; compare *ibid* page 7 lines 10-11.

| | | |
|---|---|---|
| **Date: June 28, 2005** | 7 | Case No.: 5398/03 |

**Prosecution witness** █████████

It is easy to see that this witness is not the type of witness who comes to tell the truth in his testimony, or to cooperate with the Court while it tries to uncover the truth. As soon as he took the witness stand, the witness covered his ears and refused to answer the questions of the Prosecutor. He answered the questions of the Defense Counsel only after finding out that he was the advocate of the Defendant, and when he did respond, he confirmed only things that were not disputed by the prosecution, i.e. he did not mention the Defendant at all.

Indeed, the prosecution does not contest that the witness did not mention the Defendant at all, and even declared that that was not the reason for which it had brought the witness to testify; rather, it was in order to prove the second part of the sixth count of the indictment, a part which the Defendant did not participate in even according to the indictment. It is an important to know why we have to deal with the question of the testimony of the witness that undisputedly does not incriminate the Defendant, but concerning which, in view of the answer of the Defense Counsel, he did not even agree that the event occurred!![16] This seems to be inescapable.

We did not have to think for long when we came to decide the question of preferring the transcript of the confession from the trial of the witness as a defendant over his so-called "testimony" before us, and in any case, this testimony is not convincing. In contrast to the arbitrary, ridiculous testimony of the witness before us, the transcript of the confession of the witness in his trial, while he was being represented by an advocate, still stands. For the reasons stated above concerning █████████, we have seen fit to prefer the transcript of the trial over the testimony.

**Prosecution witness** █████████

This witness, like █████████ also attributed his decisive incrimination of the Defendant to illicit measures that were employed against him in his trial, but he did not raise, for whatever reason, these arguments in his own trial[17]. For the reasons mentioned above, which are accompanied by the biased, evasive testimony of the witness (he evaded answering the question of whether he knew the Defendant, and also did not know who the object of the question was,

[Stamp] P 6: 22

---

[16] See transcript of the hearing dated March 30, 2004, page 8 lines 31-37.
[17] See transcript of the statement of █████ dated March 30, 2004, page 10 lines 15-17.

despite only one Defendant being present in the dock), we have seen fit to prefer the statement of the witness over his testimony, which is evidently truthful, including the fact that he wrote it in his own handwriting; that he was duly warned before it was taken; and that he signed the bottom of every page thereof.

**Prosecution witness** ▇▇▇▇▇▇▇▇▇▇

This witness, when he took the stand, repeated the line of his colleagues and also confirmed what had been written in his statement and the acts written therein, except for a point pertaining to the circumstances of his acquaintance with the Defendant. According to the witness, the investigator forced him to write that he had been injured by Majed Masri (whom he claimed not to know at all) while they were on their way to lay an explosive device for an attack.

When he attempted to keep the Defendant out of his explicit incrimination of him at any price, tarnishing the reputation of his investigator in his process, ▇▇▇▇▇▇▇▇ forgot the simple fact that his statement did not even mention the Defendant in the context of a planned attack, but it seemed that the injury was within the framework of a "training accident", which occurred when the Defendant started to play with a grenade launcher that he held, during an introductory meeting with various cells in the organization. In other words, the argument of the witness that the investigator tried to force him to admit that he had been injured during preparations for an attack with the Defendant has no foundation, not even from the written statement.

In any event, the account of the witness is thoroughly unconvincing. The witness was not able to provide a genuine explanation on how he was injured. In addition, he did not make the effort to provide a genuine explanation on how the investigator forced him to incriminate the Defendant falsely and why only this part of his statement was false while all the rest was true.

Against the lies of the witness there is his statement, which he wrote in his own handwriting, after being duly warned, and which he signed. The conditions for the fulfillment of Section 10A are fulfilled, as the witness identifies his statement and contradicts its content. In view of the fact that his testimony did not leave us an impression of reliability and that his statement seems to bear signs of the truth, we have seen fit to prefer it over the testimony.

[Stamp] P 6: 22 [continued]

Date: June 28, 2005          8          Case No.: 5398/03

**The defense case**

The testimony of the Defendant in the defense case was short, full of contradictions and unconvincing. Firstly, it must be noted that despite the mountains of evidence material on the part of the prosecution, which has been extensively reviewed above, the Defendant opted to provide almost no comments on this evidence, and his testimony in the direct examination was short and laconic.

But there are contradictions even in the testimony of the Defendant. The argument of the Defendant in his direct examination was that there were many people in the Nablus area called Majed Masri, that it was the largest family in the area, and that he himself knew a person whose name was identical to his own, who also worked for the Palestinian Authority. To support this argument, the Defendant stated that even two of the people who incriminated him, ▇▇▇ and ▇▇▇ when they were brought before him for a confrontation during the examination, immediately stated that the Defendant was not the same Majed Masri whom they had referred to in their incriminating statements. However, in the cross examination, the Defendant changed his mind and "to be on the safe side" also added the account that the two had incriminated him owing to a previous conflict that he had had with them, in view of the fact that in the course of his duty he had arrested the two for vehicle theft.

It is clear that the two accounts cannot both be true. And if ▇▇▇ had told his GSS investigators immediately that the Defendant was not the Majed Masri who was the object of his incriminating statements, why did the Defendant not talk to him, in the spirit of "I have nothing to say to someone who would do such a thing to me"[18]?

These contradictions are compounded by the general trend of the Defendant to distance himself, at any price, from any connection to security activity, even concerning things that he has admitted in his statement, and there is no doubt that these can connect him in any way to the severe counts of the indictment that are attributed to him. Thus, the Defendant, in his testimony, denies any general shooting at security forces, which he admitted in his statement, and any money transfers in which he was involved and other subjects, which are extensively elaborated on pages 26-27 of the summations of the claim. The Defendant, in his attempt to extricate himself, also down-played his connections with ▇▇▇ despite the fact that the two had been together in the early 1990s in Jordan and Baghdad, as his statements indicate.

                                                                                  [Stamp] P 6: 23

---

[18] See transcript of the Defendant's testimony in the defense case from June 14, 2004, page 9 lines 48-52.

See below, in the chapter dealing with the identification of the Defendant concerning the lies of the Defendant, on the existence of another person who answers to his four-part name.

In conclusion, we have not found that the testimony of the Defendant before us gives us any impression of reliability. The Defendant failed, and did not even make the effort, in his testimony, to refute the great evidence of the prosecution and made do with a categorical, laconic denial, even of the few things that he admitted in his statements. During this, the Defendant complicated matters for himself by giving contradicting versions and actual lies, which do not add to the weight of his testimony.

**Interim summation**:

Therefore, we have found that there is reason to prefer the evidence of the prosecution over the testimony of the Defendant in the defense case; and the statements of the prosecution witnesses over their biased, false testimonies, for the reasons that are set forth above extensively. These pieces of evidence complement one another and reveal an orderly, coherent account that shows up the Defendant to be an arch-terrorist who deals, with other accomplices, in the dispatching of suicide terrorists. We shall now examine whether the responsibility of the Defendant for that which has been attributed to him arises from that evidence.

### The identification of the Defendant:

It seems that the central question in this case pertains to the matter of identification of the Defendant before us as the figure appearing in the many incriminating statements of the witnesses of the prosecution as the great perpetrator to whom the acts described in the indictment are attributed. The various witnesses of the prosecution describe a person called Majed Masri, give various personal details about him and also state the alias by which he is known, "Bazbaz". The Defendant contended that this was not the case, that he had no nickname, and certainly is not called "Bazbaz". The Defendant further contended that the Masri family was a large family in the Nablus area, and that it would be natural for there to be other people who answer to the name Majed. The Defendant contended that there was another person called Majed Masri who worked for the Palestinian Authority. Is the Defendant before us the same "Bazbaz"?

[Stamp] P 6: 23 [continued]

19

Date: June 28, 2005        9        Case No.: 5398/03

**First**, it must be noted that the Defendant himself answers this question in his statement[19], in which he confirms his nickname from childhood as "Bazbaz". This is the place to indicate that it is not a common or usual nickname (such as the teknonym-based naming of a person after his firstborn son, such as "Abu Mohamed", of which there are thousands of instances). The uniqueness of this nickname, along with the other personal details of the Defendant, indicates the congruence between him and the Defendant.

But the conviction of the Defendant for the severe offenses that are attributed to him does not rely on this alias only, but also on his personal identification by the witnesses of the prosecution, with whom he had good relations. Concerning the arguments that the prosecution witnesses had "gotten confused" or that they meant another person, extensive examination of the evidence material reveals that there is no substance behind this. The Defendant confirms in his statements his acquaintance with the other "protagonists" of the events, the prosecution witnesses who incriminate him, and also admits to committing security offenses with them. Thus, the Defendant admits[20] his acquaintance with ▓▓▓▓ and shooting, together with him, at an IDF position, and also performing an attempt at shooting. The Defendant was also expelled with ▓▓▓▓ from the Area in 1992, and they traveled to Baghdad together[21]. The conjecture that ▓▓▓▓ did not know the Defendant and had referred to another Majed Masri in his words is truly fallacious in these circumstances. The Defendant further confirms in his statements that he had delivered money to ▓▓▓▓ and ▓▓▓▓, and that he also confirmed his personal acquaintance with them. He also confirmed the transfer of a Kalashnikov rifle to ▓▓▓▓ (according to the account of the Defendant, due to an internal conflict)[22].

[Stamp] P 6: 24

---

[19] **P/ 1**, page 8 lines 22-25.
[20] See **P/ 1**, page 2 lines 5-12.
[21] See **P/ 2**, page 5 lines 13-24.
[22] See **P/ 1**, page 3 line 26 to page 5 line 21.

Therefore, the acquaintance of the Defendant with the witnesses of the prosecution is explicitly shown by his own statements. But the prosecution witnesses did not stand idle, and they went into further detail concerning their acquaintance with the Defendant. ▮ identified the Defendant by his full name in his testimony before him and stated that the Defendant was his friend[23]. ▮ gave in his statement[24] an exact description of the Defendant, including his workplace as an officer in the Palestinian Police, his age, marital status and his being a father of two daughters (details that the Defendant himself confirmed in his statement) and added that the nickname of the Defendant was "Bazbaz". The prosecution witness ▮ who even in his biased testimony[25] confirmed his personal acquaintance with the Defendant in view of their joint service in the Palestinian Police, also noted in his statement[26], which was received and preferred over his testimony, the alias of the Defendant and the fact that he was a member of the "Al Aqsa Brigades" Organization. there is no concern that prosecution witness ▮ would forget the Defendant after he had caused his severe injury when he played with a grenade launcher that he was holding. He also mentioned[27] the Defendant by his name and alias and stated his membership in the terrorist organization. **The prosecution witness ▮ stated[28] the cellular telephone number of "Bazbaz", 059-200596, which is surprisingly similar to the number that the Defendant himself gave in his statement[29], 059-200569.**

The Defense Counsel contended that there were genuine flaws in the investigation, insofar as no identity line-up had been held for the witnesses. The Defense Counsel did not provide references to prove his argument and we have not found any substance in it. It seems from all that which has been expansively set forth above that the witnesses know the Defendant well, provided many details that identified him, some of them pointed him out in the courtroom (even if they withdrew their incrimination or gave various odd explanations to account for it). If this is the case, we have before us a situation of witnesses who "pointed out" the Defendant, as a person whom they knew beforehand, rather than the identification of an unfamiliar person using various visual methods (identity line-up), and there is no duty to hold an identity line-up in these circumstances. See also **Y. Kedmi**, On Evidence (1999 edition), second part, pp. 851-852.

This is also the place to address the statistical question of whether it is possible that it is another Majed Masri. The Defendant asked to submit for this purpose a record of the Palestinian Ministry of the Interior concerning the frequency of the name Majed Masri. The defense asked to submit the document based on the testimony of the Defendant.

[Stamp] P 6: 24 [continued]

---

[23] See the transcript of the testimony of ▮ dated November 30, 2003, page 1 lines 35-50
[24] See **P/ 70**, page 1 lines 19-22.
[25] See transcript of the testimony of ▮ dated March 30, 2004, page 9 lines 18-22, page 10 lines 34-39.
[26] See **P/ 3**, page 4 lines 4-8.
[27] See **P/ 61**, page 2 line 17 and page 3 line 2.
[28] See **P/ 60**, page 25 line 12.
[29] See **P/ 1**, page 2 line 25.