**Date: June 28, 2005** 10 Case No.: 5398/03

[The circumstances of the submission were also odd, to say the least. The submission of the document was not requested in the direct examination, but suddenly emerged in the reexamination. The Defendant purported to confirm the list that the Defense Counsel showed, without any explanation as to why this list was authentic or in what ways it was produced.].

The prosecution objected to the submission of the document, and we accepted[30] its position that the document could not be accepted other than through its originator. However, in order to placate him, we suggested – which suggestion the parties accepted – that the prosecution submit an agreed upon document that would be produced by the Ministry of the Interior at the Civil Administration.

An inspection of the query indicates that a number of people in the Nablus area answer to the name of Majed Masri, but all of them are especially old or especially young and do not match the description of the Majed Masri who is mentioned in the testimonies of the prosecution as a person aged about 30 – except for one person, who is the Defendant before us. Concerning the argument of the Defendant[31] that he once learned that there was another person called Majed Ismail Mohamed al-Masri, who took a loan at a bank under his name – inspection of the query will reveal the extent to which this argument is a lie, as the Defendant is the only person who answers to this four part name, not only in the relevant age profile and not just in the Nablus District but throughout the West Bank and even the Gaza Strip.

**Therefore, we determine that the Defendant before us is the same Majed Masri, known as "Bazbaz", who appears in most of the prosecution evidence. We must now examine whether this evidence is enough to lead to the conviction of the Defendant for the acts attributed to him.**

### The counts of the indictment that are attributed to the Defendant

The proof of the counts of the indictment is based on the evidence of the prosecution as set forth below. The Defendant did not address the matter of proving the facts of the indictment from the evidence material (but sufficed with denying them).

### First count of indictment

[Stamp] P 6: 25

---

[30] See transcript of June 14, 2004, pages 11-12.
[31] *Ibid*, page 11, lines 16-20.

This count of indictment attributes to the Defendant membership in the well-known terrorist organization the "All Aqsa Brigades". The Defendant is incriminated on this count by three of the prosecution witnesses, ▮ and ▮ These testimonies dovetail with one another, support each other and fulfill the requirement of the evidentiary addition.

**Second count of indictment**

This count of indictment attributes to the Defendant holding an office in the prohibited organization, insofar as he headed the Al Aqsa Brigades in the Nablus area in 2002, commanded the military operations that the organization performed during that bloody year, coordinated the activity of the military operatives, provided them with arms and financing, which he received from ▮ ▮ and others and used to take responsibility for the acts of the organization in the media.

Contrary to the insistent denials of the Defendant, it seems that the abundant activity in which the Defendant engaged and his status in the organization were burned into the memory of many operatives, who remembered that he commanded them, the money with which he had enriched them and the weapons that he had provided to them. A long list of prosecution witnesses incriminate the Defendant of that which has been attributed to him in this count of the indictment, as expansively set forth in the summations of the prosecution. For example, ▮ ▮ describes the status of the Defendant in the organization, the large amounts of money that he received from him on several occasions for the purpose of carrying out attacks and that the Defendant had taken the responsibility for attacks on behalf of the organization. Thus, ▮ ▮ described the Defendant as the financer who financed him and also received from him a sum of NIS 12,000. Thus, ▮ described the Defendant as the commander of the Al Aqsa Brigades in Nablus, as the one who cleared him to carry out attacks and took responsibility for them on behalf of the organization (the witness sent to him for this purpose a photocopy of the will of ▮, the murderer in the Kibbutz Metzer attack) and as the one who financed the execution of attacks and provided weapons for that purpose. ▮ also described at length the status of the Defendant as the one who would give him instructions; as the one who organized processions for the organization, for which purpose he ordered him to distribute photographs of martyrs and shoot in processions; and as the one who transferred weapons from one operative to another on a series of occasions. These testimonies support one another and fully satisfy the demand of the evidentiary addition, and the place of the statement of the Defendant is not amiss in this regard. The Defendant did try, as per his habit, to distance himself from both his membership in the organization and the office that he held therein, but in his statement, he also gave details that verified the incriminating statements made by his colleagues, including the fact that he had transferred money to the people who had incriminated him of doing so (▮

[Stamp] P 6: 25 [continued]

[…] ▇▇▇), that he had received money from ▇▇▇ ▇▇▇ (also mentioned by ▇▇▇ and others, that he had supplied weapons to ▇▇▇ that he had made contact with Arabic television stations, that he had helped build a website for the organization and more.

The facts that are elaborated in this count of the indictment concerning the function of the Defendant, his place in the hierarchy of the organization at the given time and the various actions that he took within his function will be discussed again when we point out the responsibility of the Defendant for the offenses that were carried out on behalf of the organization.

**Third count of indictment**

This count attributes to the Defendant an offense of shooting at a person, insofar as on a number of occasions, he carried out shooting with his fellow organization members at IDF soldiers. Prosecution witness ▇▇▇ incriminated him in the commission of shooting acts with him. The Defendant also indicated in his statement an act of shooting that was carried out with ▇▇▇ which provides full evidential infrastructure for the conviction of the Defendant for this count of indictment.

**Fourth count of indictment**

The prosecution withdrew this charge and we are exempt from discussing it.

**Fifth count of indictment**

This charge attributes to the Defendant the offense of attempted shooting, insofar as he departed with ▇▇▇ to shoot at IDF soldiers, but in the end they changed their minds after they were discovered by military forces. The Defendant and ▇▇▇ described the event similarly in their statements and we have seen fit to convict the Defendant for this offense.

**The responsibility of the Defendant for the acts of murder by virtue of his function**

The severe counts of indictment numbers 6-18 attribute to Defendant the responsibility for the deaths of 10 people in the suicide attacks on Jaffa Street in Jerusalem, in the settlement Hermesh and in Kibbutz Metzer, and the injury and attempted murder of others in the same events. All of these murderous acts were carried out by suicide terrorists who had been dispatched on behalf of the Al Aqsa Brigades Organization and by the Defendant and his accomplices.

[Stamp] P 6: 26

Naturally, it is not possible to prosecute the suicide terrorist who sacrificed himself on the altar of the shameful ideology. This does not mean that the people who stood behind him, and who used him as a tool for fulfilling their shameful goals, should evade punishment. Penal law has also recognized the possibility of imposing culpability, including full culpability, on a person who pursuant to his function or status (even an unofficial status, see the "Meshulam" case mentioned below) motivated others to commit offenses.

**The responsibility of the heads of the terrorist organization for the acts of the members of the organization – the normative aspect**

It is well known that military legal theory accepts the doctrine of "command responsibility", whereby a higher ranking operative is responsible for the acts of his subordinates that have been carried out by his order and with his approval, even if in effect he took a minor or even insignificant practical part in the acts themselves. We feel that anybody who has eyes in his head cannot fail to reach the categorical conclusion that parallel responsibility, albeit in completely different circumstances, must also be imposed on the heads of criminal and terrorist organizations who direct their criminal activity and order the execution of murders by "remote control".

The statements of Honorable Justice Kedmi in Criminal Appeal 5589/98 **Bisan Sultan v. State of Israel**, Supreme Court Compendium 99(3) 98 applies to this case. In that case, the appellant was convicted of the offense of premeditated murder, after it had been proved that he gave his consent and approval to execute the murder and dispatched the primary perpetrator to carry out the murder, and also guided him concerning the method of execution. Justice Kedmi emphasized that were it not for the consent of the appellant, the murder would not have been carried out, and therefore the giving of the approval to carry out the murder was akin to "**the start signal that is fired to signal an athlete to start a race**", and it constitutes "an act of participation in the commission of the offense". Therefore the appellant was convicted as the co-perpetrator and not for soliciting the act, and was the "mastermind of the gang", while one who solicits is outside the inner circle of execution. The Honorable Justice Kedmi further

[Stamp] P 6: 26 [continued]

Date: June 28, 2005                    12                    Case No.: 5398/03

stated that in the circumstances described above, in which the appellant gave a "green light to murder" and the operative directions as to the manner of execution, his behavior constituted at least "**a hefty amount of solicitation by way of encouragement**".

In Further Criminal Hearing 1294/96 <u>Uzi Meshulam *et al.* v. State of Israel</u>, PD 52 (5) 1, the Honorable Justice A. Matza ruled that: "**Such a participant – who has full control over the execution and whose action includes not only actions of solicitation and preparation but also directing the acting offenders and overseeing their activity – is to be considered a co-perpetrator to all intents and purposes**". He emphasized that presence at the crime scene is not a vital basis for a person to be a co-perpetrator, and said:

> "**In the new legal reality, making presence at the scene a condition for direct responsibility would mean that 'godfathers' and leaders of criminal groups, who dispatch to the scene of the act the "small fry" who answer to them, while they lead the criminal activity remotely, would not be considered as co-perpetrators but only as having solicited the offense. And this possibility, which certainly does not reflect the desirable legal theory, is not mandatory in the legal system that is in place either**".

The same judgment was handed down after a thorough analysis of the character of Rabbi Uzi Meshulam and the conclusions of the judges concerning the authority that he held over his followers.

These principles are expressed not only concerning criminal organizations, but also concerning senior officers in terrorist organizations, in the instructive judgment of the Tel Aviv District Court, in Felony Case 1158/02 **State of Israel v.** ▮▮▮▮▮▮▮▮▮▮▮▮ See also similar principles that are cited in the above mentioned ▮▮▮▮▮ judgment, which are cited in the articles of M. Kremnitzer "**The Perpetrator in Penal Law, a Character Portrait**", Plilim A (5740-1990) 65, p. 72, and M. Gur-Arieh, "**Parties to an offense – Amendment 39 to the Penal Code in the Test of Case Law**", Megamot Beplilim, p. 83.

**From the specific to the general**

[Stamp] P 6: 27

There is no easier task than proving the senior status of the Defendant in the Al Aqsa Brigades Organization in and around Nablus, and his absolute control over the military activity of the organization while he served as the head of the organization in the city. We have seen that the Defendant acted as the commander of the Al Aqsa Brigades in the Nablus area in 2002, and the operatives of the organization answered to him directly. The Defendant was involved in the distribution of money to the operatives of the organization – money which powered the wheels of terrorism. The Defendant coordinated the activity of the members of the organization in the Area and was in contact with ███████████ the commander of the Tanzim Organization. The Defendant provided weapons to operatives for executing their tasks and was also involved in additional aspects of the activity of the organization, such as organizing processions and building a website and other such illicit actions.

The following facts of the count of the indictment will reveal how the Defendant was involved in the preliminary preparations for carrying out suicide attacks and how a military operative contacted him in order to get his approval for murdering innocents. It is blatantly obvious that he considered himself the arbiter of life and death in the Nablus area. At the initiative, with the approval and with the blessing of the Defendant, the suicide attacks described below were launched, and he assumes lawful liability for them.

We shall conclude this chapter by mentioning the symbolic fact that within the framework of his capacity, the Defendant was the one who hastened to assume responsibility on behalf of the organization for the suicide attacks that the organization carried out. However, when standing trial for his actions, the Defendant feigned shyness and did not repeat this, but things seem to speak for themselves, and show why there is no room for letting the Defendant evade the responsibility that he assumes, within the framework of his position, for the murderous acts committed by the organization that he headed and for which he hastened to be proud.

**But the responsibility of the Defendant for the murderous acts does not end with the "ministerial" level alone**, for the Defendant was also involved in performing actual deeds within the execution of the suicide attacks in question, which acts lead him into the framework of the "inner circle" of the perpetrators of the offense, who assume responsibility as direct perpetrators. We shall not discuss the part of the Defendant within the framework of the execution of each of the attacks.

### The general chain of events

The Defendant's denial of the charges against him was general and categorical. The Defendant did not show us any clearly delineated point of dispute, even concerning the parts of the counts of the indictment that had no bearing on him. The defense demanded the proof of every letter and punctuation mark in them, including concerning the events that were carried out after the Defendant was no longer in the picture [Stamp] P 6: 27 [continued]

Date: June 28, 2005                              13                              Case No.: 5398/03

(see the chapter dealing with the testimony of ▮▮▮▮▮ that is referred to above) and was unable to provide a position even concerning the fact of the occurrence of the attacks.

The act of the defense in persistently using a categorical denial, even to the fact of the death of the victims, is regrettable, particularly when the technical material that substantiates these facts was filed with its consent. Unfortunately, we have not been seized by the concern that the Defendant would be held accountable for murders that were not carried out. The large amount of technical evidence that was filed with the consent of the defense substantiates the facts of the events described and the terrible pictures of the murder victims, including small children and leave no room for doubt in this regard.

In effect there is no genuine dispute concerning the chain of events relating to the stages of execution of the attacks either. If we look further, beyond the dust clouds that the prosecution witnesses have attempted to kick up in their various evasive maneuvers, it seems that they ▮▮▮▮▮ do not effectively deny the execution processes of the murderous acts and focus primarily on (the denial of) the part of the Defendant. In any case, a reading of their statements extensively and elaborately reveals the chain of these events (including the preparations, arming and filming of the suicide attackers and driving them to the murder scene and so on).

Therefore, we have found that the general chain of events has been adequately proved out of the evidence that was brought before us, and it is doubtful whether it is truly disputed, and we shall now focus our view on the part of the Defendant.

**Counts 6-8 of the indictment, the attack on Jaffa Street**

These counts of the indictment attribute to the Defendant responsibility for the murder of the late Ora Sandler and Sarah Hamburger and an attempt to cause the death of 45 civilians who were injured in the event. The event was executed on behalf and in the name of the Al Aqsa Brigades Organization. The Defendant is charged with having received the suicide terrorist in an apartment in the Balata Camp and having filmed him holding a rifle and a book of the Koran along with ▮▮▮▮▮ Thereafter, the Defendant dispatched the suicide terrorists, Sa'id, on his last way. After these things, Sa'id departed for Ramallah, where he was sent by ▮▮▮▮▮ to Jerusalem, where he opened fire [at others] indiscriminately until he was vanquished, but not before he had caused the murder of two women and injured dozens of others.

[Stamp] P 6: 28

Prosecution witness ▬ talks about the part of the Defendant, as set forth in the transcript of his confession in his trial (**P/ 69**, Subsection 6 of the sixth count of the indictment) and the part of the charge relating to the Defendant is based on this testimony. We learn about the background leading up to the event from the statements of ▬ and of ▬ The statements of prosecution witnesses 16, 17, ▬ and ▬ were filed consensually[32] and their content is considered to be agreed to (**Judea and Samaria Single Judge Appeal 114/01, Abu Hilal**). From these statements, along with the transcript of the confession of ▬, we learn about the responsibility of that Sa'id after having been sent and filmed by the Defendant. The technical material indicates the deadly results of the event. But it is understood that all of the evidence comes together to provide support that greatly exceeds the high level of support that is required for the testimony of ▬.

It seems that at present, one does not need much imagination concerning the meaning of the act of filming a suicide terrorist who is reading his will before departing on his last journey, and the act of the Defendant in this context speaks for itself. This act, along with the status of the Defendant referred to above, substantiate his place as part of the "inner circle" of the dispatchers of the suicide terrorist and his full responsibility for the attack and its murderous results.

For these reasons, we convict the Defendant for responsibility for the suicide attack on Jaffa Street in Jerusalem, the injury of the civilians and the attempt to murder others.

**Counts 9-12 of the indictment, the attack in the settlement Hermesh**

This attack was executed by ▬, with the assistance of ▬ and ▬ The Defendant is charged (Subsection A & I of the count of the indictment) of being the one to give explicit approval to ▬ to carry out the attack, after which he took responsibility for it on behalf of the organization and transferred to ▬ the sum of $3,000. In the event, the late Linory Seroussi, Hadas Turgeman and Orna Eshel were murdered and Yuval Eshel was injured.

[Stamp] P 6: 28 [continued]

---

[32] See transcript of hearing dated June 14, 2004, page 1 lines 21-22.

**Date: June 28, 2005**          14          **Case No.: 5398/03**

The part of the Defendant arises from the statements of ▇ which we saw fit, as stated above, to accept. ▇ describes how, after ▇ told him that he had a suicide terrorist who was prepared to carry out an attack, he contacted the Defendant, who approved his execution of the murderous act (or in the words of the Defendant, "Why not?"[33]). It shall be emphasized from the words of ▇ that he instructed ▇ to continue to work on the attack only after his talk with the Defendant and receipt of approval from him. ▇ also describes how, after the attack, the Defendant assumed responsibility for the attack on behalf of the organization and also transferred the amount of money to him.

▇s words are supported by none other than the statement of the Defendant, who confirmed that he had handed money over to ▇ the day after the attack for erecting a mourning tent for the martyr[34]. The other persons involved in the attack, whose statements were filed consensually[35], substantiate the facts of the charge in general and the technical material substantiates its deadly results and the injury of Yuval Eshel, whose late wife Orna was murdered before his very eyes.

We can see how the Defendant had complete control over the execution of the attack, and its perpetrators answered to him, by words and by actions, before it and after it. The Defendant assumes full responsibility for the event that was dispatched with his blessing, approval and financing, and which he hastened to assume responsibility for, and we convict him for this responsibility.

**Counts 13-18 of the indictment, the Metzer attack**

In this event, too, the suicide terrorist, ▇, was dispatched by ▇ ▇ to Kibbutz Metzer. In his shooting spree in the kibbutz, ▇ murdered the children of the Ochayon family, Matan and Noam, their mother Revital and kibbutz residents, the late Tirza Damari and Yitzhak Dori.

Examination of the statements of ▇ indicates that once again, he contacted the Defendant, informing him that he had another suicide terrorist who was prepared to be dispatched and a request to arm him with a weapon, and the Defendant saw to this. Thereafter, ▇ asked the Defendant to take responsibility for the attack, and had the film of ▇ reading his will transferred to him.

[Stamp] P 6: 29

---

[33] See **P/ 60**, page 4 line 25.
[34] See **P/1**, page 5 lines 5-9.
[35] See transcript of September 2, 2003, page 3 lines 27-28.

30

The Defendant himself supports the statements of ▇ significantly (while taking the sting out of those things, as per his habit) by indicating in his statement that he had provided ▇ with a weapon (he contended that this was following an encounter that ▇ had with another person) and that after the attack he called the television station to announce that he objected to carrying out attacks within the State of Israel. Needless to say, this endnote alongside the account of the Defendant is not reliable for our purposes. The Defendant made no effort to repeat this evasive account in his testimony and distanced himself from any involvement with ▇ and providing a weapon.

The other prime suspect involved in the event, ▇, who did not mention the Defendant, substantiated the facts of the indictment related to the preparations for sending ▇ on the murder mission and the technical material from the scene of the massacre confirms its deadly results.

The hierarchy of relations between ▇ and the Defendant have already been described above and the acts that were performed before and after the attack substantiate the responsibility of the Defendant pursuant to his authority over the perpetrators of the murder and giving the approval for the attack and taking responsibility for it. But this time too, besides "ministerial responsibility", the Defendant also has significant responsibility for the attack as the one who actually provided the murderers with the weapon that took the lives of the residents of the Kibbutz. There is no doubt that the Defendant bears full responsibility for the murderous event and we convict him of this.

### 19th count of the indictment

This count attributes to the Defendant the offense of conspiring to cause intentional death, insofar as he was involved in the plot to dispatch ▇ to carry out another attack after the Metzer attack.

This charge is also based on the statements of ▇ who described how it was decided, after finding that ▇ was still alive after the murderous attack in Kibbutz Metzer, to send him again to carry out a suicide attack,

[Stamp] P 6: 29 [continued]

Date: June 28, 2005          15          Case No.: 5398/03

for which purpose he contacted the Defendant. The Defendant gave his consent to the plan and also granted the request of ▮ to provide him with a weapon, and the gang members also departed to Nablus to meet him and take the weapon from him, but they were arrested before they did so.

We have already dealt with the considerable support for the statements of ▮ on a series of matters. There is no doubt that this conspiracy is part of a single "factual sequence", which relates to terrorist attacks that were carried out by ▮ and the Defendant within the framework of the organization and through ▮; therefore, we consider these to support the matter of incrimination of the Defendant for this charge too.

We have also discussed the course of action and the connection between the Defendant and ▮ and there is no doubt that the approval of the murderous plan by the Defendant and his commitment to provide a weapon make him an accomplice in the conspiracy.

**In summation, we convict the Defendant of all of that which has been attributed to him, except for the fourth count of the indictment, which the prosecution has withdrawn.**

**Right of appeal as prescribed by law**

Handed down and notified, June 28, 2005, at the office. The court clerk will provide a copy to the parties.

| [Signature] | [Signature] | [Signature] |
|:---:|:---:|:---:|
| **Judge** | **President of the Court** | **Judge** |

[Stamp] P 6: 30

32