IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, *et al.*,

                 Plaintiffs,

vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                 Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

### DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P6: 11-15.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P6: 11-15.

                                                                                                  Rina Ne'eman

ss.: New Jersey

On the [28] day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
28 day of February, 2014

_____
Notary Public

HIRUT J MHRETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
I.D.# 2500704

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK I. SOKOLOW, et al.,<br><br>      Plaintiffs,<br><br>vs.<br><br>THE PALESTINE LIBERATION ORGANIZATION, et al.,<br><br>      Defendants. | No. 04 Civ. 00397 (GBD) (RLE) |

### DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 6: 16-30.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P 6: 16-30.

                  _____
                  Rina Ne'eman

ss.: New Jersey

On the [ 6 ] day of ~~February~~ March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this March
6 day of ~~February~~, 2014

_Leonor Troyano_
Notary Public

LEONOR TROYANO
ID # 2385580
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/8/2014

תאריך: 06/02/05       1       תיק מס׳: 5398/03

בית המשפט הצבאי
ש ו מ ר ו ן
- פ ר ו ט ו ק ו ל -

דיון בית משפט מיום: 06/02/05   בפני ההרכב: סא״ל   ארז   חסון   -אב״ד
                                              רס״ן   אליהו  נימני  -שופט
                                              סרן    ארז    שרי    -שופט

תובע: סרן אירית דייטש
סניגור: עו״ד דראושה

נאשם: מאג׳ד אסמאעיל מוחמד מצרי   ת.ז.: 904460862

רשמת: סמל אלינה
מתורגמן: סמל בהאא

- אב״ד זיהה את הנאשם -

הכרעת דין

עקב היקפיו הגדולים של תיק זה, נימוקי הכרעת הדין נמצאים עדיין בשלבי כתיבתם. עם זאת, נמסור כעת את תמצית הכרעת הדין.

מצאנו לנכון להרשיע את הנאשם בעבירות המיוחסות לו בכת״א, למעט פ״א 4, ממנו חזרה התביעה בסיכומיה. הנאשם מורשע בעבירות הבאות:
**חברות בהתאחדות בלתי מותרת** – עבירה לפי תקנה 85 (1) (א) לתקנות ההגנה (שעת חירום), 1945.
**נשיאת משרה** – עבירה לפי תקנה 85 (1)(ב) לתקנות ההגנה (שעת חירום), 1945.
**ירי לעבר אדם** – עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945.
**ניסיון ירי לעבר אדם** – עבירה לפי תקנה 58(א) לתקנות ההגנה (שעת חירום), 1945 ולפי סע׳ 19,20 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס׳ 225), תשכ״ח – 1968.
**גרימת מוות בכוונה** – עבירה לפי סע׳ 51 לצו בדבר הוראות ביטחון (יהודה ושומרון) (מס׳ 378), התש״ל – 1970 **(10 פרטי אישום)**.
**ניסיון גרימת מוות בכוונה** – עבירה לפי סע׳ 51 לצו בדבר הוראות ביטחון (יהודה ושומרון) (מס׳ 378), התש״ל – 1970 ולפי סע׳ 19,20 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס׳ 225), תשכ״ח – 1968 **(3 פרטי אישום)**.
**קשירת קשר לגרימת מוות בכוונה** – עבירה לפי סע׳ 51 לצו בדבר הוראות ביטחון (יהודה ושומרון) (מס׳ 378), התש״ל – 1970 ולפי סע׳ 21,22 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס׳ 225), תשכ״ח – 1968.

יובהר כי לענין פרטי האישום המרכזיים, דהיינו עבירות הרצח, מורשע הנאשם כשותף עיקרי וזאת לאור מעמדו הבכיר בארגון, העובדה כי היה מעורב בשלבים אופרטיביים של ביצוע מעשי הרצח ובהם צילום המתאבד, מימון הפיגוע ומסירת כלי הנשק אשר שימש בו.

ניתן והודע היום, 06/02/05, בפומבי ובמעמד הצדדים.

_____        _____        _____
    שופט                אב״ד                   שופט

תאריך: 06/02/05                    2                    תיק מס׳: 5398/03

1   **ראיות לעונש**
2   ת: אין ראיות לעונש
3   ס: אין ראיות לעונש
4
5   **תובעת מסכמת:**
6   היום נותן הנאשם את הדין בגין אחריותו כמצבע עיקרי לגרימת מותם של 10 בני אנוש.
7   לצד זאת, הורשע הנאשם בפעילות ביטחונית חמורה ענפה, תוך שגם מסקירת מעשים אלו
8   ברורה נחישותו וחתירתו כדי מטרה אחת- גדיעת חיי אדם. הנאשם אמנם נותן את הדין
9   אחרון בזמן, לאחר כל "גיבוריו", מבצעי הפיגועים במצר וחרמיש, אולם מטעמי, מבחינות
10  רבות, ניתן לראות בו ראש וראשון להם.
11
12  לא ניתן להתעלם כחיבט לחומרה ממעמדו הבכיר בארגון התנזים. למדנו, לצערנו, כי
13  הטרור, הגם שהינו מכה באופן עיוור בקורבנות מקריים, פעמים רבות יש בו דווקא חוקיות
14  או ביתר דיוק אינטרסנטיות, ציניות בחיי אדם. לעתים נוח לבצע פיגוע זה או אחר במועד
15  מסויים, בתזמון מסויים, ביישוב מסויים, בתוך תחומי הקו הירוק או מחוצה לו. וכאן,
16  לטעמה של התביעה, נכנס תפקידו המכריע של הנאשם כמעין פוסק באותם חיים של
17  קורבנות עולמים עתידיים, ירצה יבוצע פיגוע רצח, לא ירצה יינצלו הפעם חייהם.
18
19  אדגיש כי עובר לפיגוע בחרמיש נתבקשה הסכמתו המפורשת של הנאשם לביצוע הפיגוע על
20  ידי בכיר המרצחים, ▓▓▓▓▓, הסכמתו של הנאשם ניתנה ורק לאחריה יצאו לפועל
21  השלבים הבאים, שהביאו כזכור למותם של שלושה בני אנוש. הנאשם אף הגדיל לעשות
22  לאחר ביצוע הפיגוע, אולי כשלמוני ההצלחה, העביר הנאשם ל▓▓▓▓▓, בדיוק בשל
23  "הצלחתי" של הפיגוע סכום כסף. ואם יתמה התמוה על כך, גם זה אינו מקרה, שכן
24  הנאשם נשא תפקיד אשר במסגרתו העביר כספים בהזדמנויות רבות ובשיטתיות לפעילים
25  מרכזיים בארגון.
26  גם לביצוע הפיגוע במצר נודעה תרומה מכרעת לפועלו של הנאשם, היות שהוא זה שהעביר
27  למעשה את כלי המשחיט לידי המרצחים, בסופו של דבר. על תרומה זו ודאי שאין צורך
28  להכביר מילים באשר לקשר הסיבתי בין מעשיו כאן ובין קרות התוצאה.
29
30  בנוגע לפיגוע ברחוב יפו בירושלים, שימש הנאשם כצלם של המתאבד לפני יציאתו לפיגוע.
31  התביעה טענה לא אחת לפני בימ״ש נכבד זה, אודות הקרדינליות שהיא מוצאת בפעולה זו.
32  אדגיש בקצרה כי פאן נוסף חמור של פיגועי ההתאבדות שבאו בקרבנו הינו ההד
33  התקשורתי שבא בעקבותן, בו יש למעשה להפחיד, לשתק ולזרוע אימה בחייו של כל
34  ישראלי, באשר הוא ישראלי. תרומה רבה לכך יש בצילומי מוות של אותם מתאבדים, זאת
35  גם מהבחינה שהם משמשים דוגמא מצולמת גם לבאים בעקבותם. יותר מכך, לטעמה של
36  התביעה, באקט הצילום יש כדי לאפשר למישרין, בסופו של דבר, את ביצוע העבירה
37  עצמה על ידי אותו מתאבד בכך שלמעשה יש באקט זה משום עידוד רוחו של אותו
38  מתאבד, חיזוק החלטתו לצאת לביצוע הפיגוע.
39
40  התביעה תפנה לעניין זה לטיעוניה בתיקו של איאד נאצר, תיק בימ״ש 5572/03. בתיק זה
41  נגזר על הנאשם מאסר עולם ואולם לא מן הטעם שביקשה התביעה, היינו השתתפותו
42  בצילום המתאבד, אלא אם כי ריבוי העבירות שיוחסו לו. עם זאת, אציין כי התביעה
43  הגישה ערעור בתיק זה והוא עודנו תלוי ועומד בבימ״ש לערעורים.
44  כן אבקש להפנות לתיקו של כמאל שעבלו, שנידון בבימ״ש זה, שם קיבל ביהמ״ש את
45  עמדתה של התביעה באשר לתרומה הממשית של אותו אקט של צילום המתאבד.
46
47  היום נסגר מעגל. דמם של קורבנות הנאשם זועק אל ביהמ״ש והתביעה תבקש כי עונשו
48  ייגזר ל-10 עונשי מאסר עולם מצטברים בגין כל נפש ונפש אותה נפש קטע. כן תבקש התביעה
49  מאסר נוסף קצוב בשנים, בגין יתר העבירות בהן הורשע הנאשם.
50
51

P 6: 12

תאריך: 06/02/05            3            תיק מס׳ : 5398/03

**סניגור מטכם:**

1. 
2. הנאשם הכחיש לאורך כל הדרך את כל המיוחס לו בכתה״א, אולם בהרשעתו היום בפני
3. ביהמ״ש מהווה מכה קשה לנאשם ולמשפחתו. הנאשם בחקירה הראשית ובחקירתו
4. הנגדית בביהמ״ש, וגם בחקירתו במשטרה, הוא הוקיע מעשי אלימות נגד מדינת ישראל.
5. מדובר בנאשם שאפילו בהליך המשפטי שהיה בפני ביהמ״ש נגרמו לו עוויות דין.
6. מדובר בנאשם בן 32 שנים. הוא המפרנס היחידי למשפחתו, אשר מורכבת משני ילדים.
7. אשתו נמצאת כאן וגם אימו החולה. לנאשם יש המון חובות ומשכנתא. הנאשם עובר
8. לאירוע נשוא כתה״א עבד בתור קצין במשטרה הפלשתינאית. הוא עבד במסירות ובנאמנות.
9. מצבו הפיננסי של הנאשם רעוע מאוד. ילדיו הקטנים לומדים בביה״ס ויש צורך שאביהם
10. יתמוך בהם מבחינה כלכלית וחשוב שאביהם ימצא לידם.
11. הנאשם הוא אדם חולה, יש לו בעיות ברגליים.
12. יש לי טיעונים אחרים, הואיל ועוד לא קיבלתי את הנימוקים לידיי. לנאשם אין דם על
13. הידיים- זה מה שהוא טען לאורך כל הדרך. אפילו התנהגותו של הנאשם היום, אינה כמו
14. של הנאשמים האחרים, אשר היו מודים במעשים שעשו, אך הנאשם לא עושה זאת.
15. אנו מבקשים שביהמ״ש יתחשב בנסיבות.
16. 
17. **נאשם :**
18. אני מההתחלה הבאתי את הראיות לביהמ״ש. התביעה בהתחלה קבעה את גורלי. אני
19. אמרתי שאני לא מפחד רק מאלוהים ואני נגד רצח של אזרחים ישראלים ופלשתינאים.
20. הייתי קצין במשטרה הפלשתינית והפלילו אותי גנבי רכבים. אני כיבדתי את הבימ״ש עד
21. עכשיו. אני מקווה שתיקח בחשבון את כל הדברים האלו, אתה מטפל בילדים שלך, גם לי
22. יש ילדים.
23. 
24. 
25. 
26. 
27.

תאריך: 06/02/05     4     תיק מס': 5398/03

## גזר דין

הנאשם הורשע, כאמור בהכרעת הדין, בעבירות המיוחסות לו בכתב האישום (למעט פרט האישום הרביעי, ממנו חזרה התביעה). המדובר בשורת עבירות קשות וחמורות, שאין חמורות מהן, מהן עולה אחריותו של הנאשם לרציחתם של עשרה בני אדם וכן שורת עבירות נוספות ובהם עבירות ניסיון לגרימת מוות בכוונה, ירי ועוד.

הנאשם נשא בתפקיד ראש "גדודי אל אקצה" באזור שכם, ובתפקידו זה משך בחוטיהם של פיגועים רבים אשר יצאו תחת הנחייתו, במימונו, בברכתו ותוך שימוש בכלי הנשק שמסר.

הנאשם היה מעורב בשורת פיגועי התאבדות כאשר הוא וחבריו לארגון צמא-הדם, שילחו בזה אחר זה מפגעים מתאבדים אשר זרעו בחוצות ערי ישראל רצח ומוות. עובדות כתב האישום, בהם הורשע הנאשם, מתארות ארוכות את השלבים המפורטים שקדמו להוצאת המרצחים לעבר זירת הקטל.

הנאשם, בתפקידו הבכיר, הוא זה שניצח על תעשיית מוות בזויה זו ומסר הוראות לפעילים הכפופים לו לשלח מפגעים למעשי רצח המוניים. אולם הנאשם לא הסתפק בתפקיד "מיניסטריאלי" בלבד, אלא שלח ידו גם בשותפות מלאה לשילוח המפגעים ממש, ובכלל זה צילום מתאבד במקרה אחד, מימון פיגוע אחר והספקת כלי הרצח באירוע שלישי.

כאן המקום להדגיש, את אשר אף עולה מהכרעת הדין, כי אחריותו המלאה של הנאשם למעשים נלמדת הן ממידת מעורבותו ה"אופרטיבית", אולם גם ממעמדו הבכיר העולה לאורך כל חומר הראיות. מתברר כי הנאשם היה, באזור שכם, פוסק בענייני חיים ומוות, והוא ניצל את מרותו על פני אחרים לשם שילוח מרצחים. הנאשם הוא זה שמיהר אף ליטול אחריות על מעשי הרצח, בפני אמצעי התקשורת.

הנאשם הוא האחראי, ביחד עם שאר חבריו לכנופיית המרצחים, לפיגוע הדמים ברחוב יפו בירושלים, ביישוב חרמש ובקיבוץ מצר. כתוצאה ממעשיו מצאו את מותם עשרה בני אדם, בהם שני ילדים רכים בקיבוץ מצר, אמם שנרצחה ביחד עמם, שניים תושבי הקיבוץ, נערות שנרצחו מרחק קצר מביתם ביישוב חרמש, נשים שהלכו ברחוב יפו בירושלים. פיגועי הדמים ברחוב יפו, ביישוב חרמש ובקיבוץ מצר זעזעו את המדינה באכזריותם ובשפלותם.

הנאשם לא חדל ממעשיו, גם כאשר הלכו ורבו קורבנותיו, גם כאשר הלך ופחת גילם. גם לנוכח הירצחם של ילדים רכים, לא נח הנאשם ממעשיו והוסיף לטוות את קורי המוות תחת ידו. הנאשם לא היסס והורה לשלוח את חיית-האדם, את הרוצח ▮ , לביצוע מעשה רצח נוסף, אשר למרבה המזל לא יצא אל הפועל.

ואכן, מלבד מעשי הרצח בהם הורשע, ומלבד הפציעות שגרם לאלו ששרדו את התקפות התופת של המפגעים ששילח, עוד שלח הנאשם את ידו במעשה ירי וניסיון לירי.

תאריך: 06/02/05                    5              תיק מס׳ : 5398/03

1
2  כפי שציינו בהכרעת הדין, מצאנו כי חלקו של הנאשם הוא של שותפות מלאה. ואכן,
3  העובדה כי הנאשם נהג בפחדנות והסתתר מאחורי מצלמת הווידאו ושלח אחרים להרוג
4  ולההרג, כי התתבא מאחורי מתן הוראות לאחרים, כי עטף בשטרות כסף את מוג לבו, כי
5  נטל אחריות על מעשי אחרים, עובדת פחדנותו של הנאשם אינה מחייבת כי יחמוק מן
6  העונש הראוי לו ולשכמותו. הנאשם אחראי באופן מלא למותם של עשרה בני אדם חפים
7  מפשע, ומאחריותו זו לא יחמוק.
8
9  אנו גוזרים עם הנאשם 10 מאסרי עולם מצטברים.
10
11
12
13
14  זכות ערעור כחוק  החל מיום המצאת נימוקי הכרעת הדין לידי הצדדים
15  ניתן והודע, 06/02/05 , בפומבי ובמעמד הצדדים.
16
17
18      שופט                      אב״ד                      שופט
19
20

תאריך: 28/06/05                                    1                    תיק מס': 5398/03

## בית המשפט הצבאי
## ש ו מ ר ו ן
## - פ ר ו ט ו ק ו ל -

בפני ההרכב: סא"ל  ארז  חסון   - אב"ד
            רס"ן  אליהו  נימני  - שופט
            סרן   ארז   סרי    - שופט

תובע: סרן אירית דייטש
סניגור: עו"ד דראושה

נאשם: מאג'ד אסמאעיל מוחמד מצרי   ת.ז.: 904460862

- אב"ד זיהה את הנאשם -

## הכרעת דין

### האישומים וזירת המחלוקת:

ביום/ 06/02/05 מסרנו את הכרעת דינו של הנאשם וגזרנו את דינו. כמובטח, להלן נימוקינו המלאים להכרעת הדין:

כנגד הנאשם הוגש כתב אישום קשה וארוך, הן מבחינת חומרת העבירות והן מבחינת היקפן. מיוחס לנאשם כי בשנת 2002 שימש כראש "גדודי אל-אקצה" באזור שכם ומתוקף תפקידו ניצח על הוצאתם לפועל של מספר פיגועים - ובהם פיגועי הדמים ברחוב יפו בירושלים, ביישוב חרמש ובקיבוץ מצר - בהם מצאו את מותם 10 אנשים, בהם 2 פעוטות ואמם, ונפצעו עשרות אחרים. עוד מיוחסים לנאשם מעשי ירי וניסיון לירי לעבר אדם וקשירת קשר לגרימת מוות בכוונה.

הנאשם כפר בכל המיוחס לו, הן בתשובתו לאישום וכן (במרבית המיוחס לו) בחקירתו המשטרתית והאישום כנגדו מבוסס על הפללות רבות מאת חבריו ושותפיו לארגון ולמעשי הרצח. כבר בתחילת הדברים יש לציין כי הסוגיה המרכזית בתיק זה, נוגעת לזיהויו של הנאשם, אשר לרוב מכונה ע"י חבריו בכינוי "בזבז" - כינוי אותו מכחיש הנאשם.

לצד הכחשתו של הנאשם את מעורבותו שלו במעשי הרצח, הרי שאין ממש מחלוקת של ממש באשר לקרות האירועים (לאור הסכמת ההגנה להגשת חומר הראיות הטכני[1]), ונראה כי אף לא לחלקם של שאר המעורבים, אשר ברובם נשפטו והורשעו זה מכבר על מעשיהם.

### חומר הראיות:

### אמרות הנאשם:

העיד בפנינו גובה 2 אמרותיו של הנאשם, רס"מ ▇▇▇▇▇. מעדותו עולה כי חקירתו של הנאשם התנהלה באופן רגיל. ואכן לא נטענו מצד הנאשם כל טענות זוטא, לא בכלל ולא כלפי העד ▇▇▇▇ בפרט, וההגנה אף הסכימה כי יוגשו אמרותיו של הנאשם שנגבו ע"י העד.

בסיכומיה ביקשה ההגנה לקבוע כי יש ליתן משקל מופחת לאמרותיו של הנאשם, וזאת עקב העובדה כי האמרה לא נכתבה בערבית, כי לא הוקלטה וכי לא ערך לנאשם מסדר זיהוי.

---
[1] ראה פרוטוקול מיום 2/09/03, עמ' 1.

P 6: 16

תאריך: 28/06/05                2                תיק מס': 5398/03

1
2  לא ראינו לנכון לקבל את טענות ההגנה במישור זה. מעיון בשתי אמרותיו של הנאשם ברור כי
3  הוצע לנאשם לכתוב את אמרותיו בכתב ידו, אולם הוא סירב לעשות כן ואף סירב לחתום. יצוין כי
4  באמרה הראשונה אף נימק הנאשם סירובו בכך שהוא אינו "מכיר בחוקיות ההליכים
5  המשפטיים של הכיבוש הישראלי". יצוין עוד כי אקט ההצעה לכתוב את האמרה והסירוב לה,
6  נעשו ע"י חוקר המשטרה ▮▮▮▮ 1 בנוכחות עמיתו לתפקיד, רס"מ ▮▮▮▮. לאור דברים אלו, לא
7  ברור מה הרבותא בכתיבת האמרה בערבית או בעברית.
8
9  הסנגור לא הציג בפנינו מהו המקור הסטטוטורי לחובה, כביכול, של החוקר להקליט את החקירה
10 ומדוע יש בכך כדי לפסול את האמרה, כטענתו. מעיון באמרות ובעדות גובה האמרות, עולה כי
11 תנאי "תקנות השופטים", המכשירים קבילותן של אמרות, התקיימו ובכלל זה מתן אזהרה כחוק,
12 מתן הזדמנות לכתיבת האמרה וחתימה עליה, הקראת האמרה המתורגמת בסוף החקירה וכו'.
13 הקלטת החקירה איננה תנאי על פי דיני האזור לקבילות האמרה ואיננה פוגמת במשקלה.
14
15 באשר למסדר הזיהוי, כפי שהצהירה התובעת[2], לא היה גובה האמרה ממונה על חקירתו הכוללת
16 של הנאשם ושאלות בתחום מחדלי חקירה, לטענת ההגנה, יש להפנות לחוקריו. באשר לסוגיית
17 חובת עריכת מסדרי זיהוי, נדרש בהמשך.
18
19 באשר למשקל האמרות, לא מצאנו מקום להפחית ממשקלן, להיפך. ניכר מן האמרות כי החקירה
20 התנהלה באווירה חיובית, ובמהלכה אף הוצעו לנאשם כוס תה וסיגריה והוא יצא לארוחת
21 צהריים[3]. הנאשם אישר כי הוא חש בטוב. באמרות מאשר הנאשם את קשריו עם שאר עדי
22 התביעה, בהם ידובר להלן. הנאשם מוסר תיאורים מפורטים של העברות כספים שביצע, קשריו -
23 שידעו עליות ומורדות - עם פעילים אחרים, כתובות אינטרנט בהן השתמש וכיו"ב פרטים אשר
24 ניכר בהם כי הם באים ממקור ראשון.
25
26 באשר לטענת ההגנה בסיכומיה כי "הנאשם הכחיש את המיוחס לו בכתב האישום, שיתף פעולה
27 עם חוקריו בחקירתו המשטרתית נתן פרטים מלאים ואינפורמציה מלאה, אולם בכל חקירתו
28 במשטרה ובבית המשפט הנכבד הנאשם לא הודה במעשים המיוחסים לו" (סעיף ג' לסיכומי
29 ההגנה) - מוטב היה לדברים, התלושים לגמרי מן המציאות, שלא היו עולים על הכתב, שכן קריאה
30 תמה באמרה היתה חושכת את כתיבתם.
31
32 סוף דבר - מצאנו לקבל את אמרותיו של הנאשם ולהעניק להן משקל מלא.
33
34 **עד התביעה** ▮▮▮▮:
35
36 העיד בפנינו העד ▮▮▮▮ ביום 02/09/03, עדות אשר כללה, למעשה, את החקירה הראשית
37 בלבד, וזאת לאור סירובו של העד להמשיך את עדותו, כמפורט בעמ' 6 לפרוטוקול מאותו היום.
38 אין מחלוקת של ממש כי המדובר במי שאחראי לפיגועי הדמים ביישוב חרמש ובקיבוץ מצר.
39
40 ראשית עלינו להידרש לטענת ההגנה כי נגרם לנאשם עיוות דין בכך שלא הושלמה חקירתו הנגדית
41 של העד וכי במצב דברים זה אין לקבל את אמרותיו מכוח ס' 10 א'. אכן, העד הובא למסור עדות
42 ובית המשפט והצדדים התכנסו על מנת לשמוע את עדותו במלואה. עדות זו נקטעה בשל רצונו של
43 העד בלבד, אשר סירב להמשיך ולהשיב לשאלות שנשאל. בית המשפט נקט בשורת צעדים על מנת
44 להמשיך את שמיעת העדות ובכלל זה קריאה לסנגורו של העד, אולם העד התמיד במריו (ראה
45 מהלך הדברים בעמ' 6-7 לפרוטוקול אותו דיון, ובכלל זה החלטתנו החותמת את העדות).
46
47 כידוע, מאז ניתן פסק דינו הנודע של בית המשפט העליון בעניין חג'-יחיא, דנ"פ 4390/91, **מדינת**
48 **ישראל נ' חג' יחיא**, פ"ד מז (3) 661, עומדת על מכונה ההלכה בעניין מעמדה של ה"עד השותק",
49 הלכה אשר ניתנה ע"י הרכב מורחב של שופטי בית המשפט העליון, אשר ראה אף בעד השותק כעד
50 אשר ניתנה לצדדים הזדמנות לחוקרו, ומכאן שפתוחה הדרך להגשת אמרותיו על פי ס' 10 א'
51 לפקודת הראיות. עוד ראה לעניין זה, **ע' איו"ש 99/00+114**, הנזכר אף בהחלטתנו מאותו היום.
52 הסנגור הביא בסיכומיו שורת אסמכתאות מהן ניתן ללמוד - לטענתו - כי בהעדר חקירה נגדית, יש
53 לבטל את משקל העדות כולה, אולם המדובר בפסקי דין ישנים ביותר, משנות השבעים ועוד קודם
54 לכן, אשר כולם נמסרו טרם שנתקבלה הלכת חג'-יחיא, חלקם אפילו עוד לפני שנחקק תיקון ס' 10
55 א' לפקודת הראיות..

---
[2] שם, עמ' 2, ש' 22-24.
[3] ראה ת/1, עמ' 2, ש' 1; עמ' 5, ש' 25-26.

תאריך: 28/06/05	3	תיק מס׳: 5398/03

1
2  שאר התנאים העומדים ביסוד ס׳ 10 א׳ התקיימו, ובכלל זה העובדה כי העד אישר את מתן
3  אמרותיו[4] וכן קיומן של סתירות מהותיות בין העדות לבין האמרה (התובעת ציינה שורה ארוכה
4  של סתירות בסיכומיה בלא שההגנה חלקה על כך בסיכומיה. נזכיר, למשל, את הבדלי הגרסאות
5  בין העדות לאמרה לעניין זיהוי הנאשם, הרקע לקבלת הסכום של $3,000 ממנו ועוד).
6
7  לאחר שמצאנו כי התקיימו התנאים לקבילות אמרותיו של ▇▇▇▇ ע״פ ס׳ 10 א׳ לפקודת
8  הראיות, מצאנו אף להעדיף את אמרותיו של העד על פני עדותו החלקית ובפנינו. ננמק מדוע:
9
10 -  ראשית, חשוב לציין באופן כללי, כי אפילו מתוך עדותו החלקית והשרירותית של העד בפנינו,
11     מאשר העד את עיקרי הפללתו את הנאשם באמרתו. העד מאשר בעדותו בפנינו, גם אם לאחר
12     התחמקויות שונות, כי קיבל[5] נשק מידיו של אדם בשם "בזבוזי" ואף קיבל מידיו סכום של
13     3,000 $ לאחר פיגוע חרמש. אמנם העד טוען כי הנאשם איננו אותו בזבז, אולם הדבר אינו
14     מעלה ואינו מוריד, כי הרי גם מתוך עדותו שלו לא עולה כי פגש את אותו "בזבזי", אלא יצר
15     איתו קשר על סמך מספר טלפון שקיבל לידיו בירושה מ▇▇▇▇, שעה שהחליף את מקומו
16     כראש "גדודי אל-אקצה" באזור טול-כרם. גם את הנשקים והכספים לא קיבל מידיו של
17     "בזבזי" ישירות אלא באמצעות שליחים. גם מתוך גרסתו, החלקית אף היא, של הנאשם
18     באמרתו, עולה כי העברות הכספים והנשק מידיו לעד היו באמצעות שליחים. מכאן, שאפילו
19     מתוך גרסתו המצמצמת של העד, עדיין עומדת הפללתו את הנאשם על כנה.
20 -  באמרותיו השונות, מרחיב העד עוד יותר מאשר הגרסה המצמצמת שמסר בעדותו החלקית
21     בפנינו. ראינו לנכון לקבל את אמרותיו של העד. ניכר מעיון באמרות כי המדובר באמרות
22     בעלות משקל רב ביותר. העד כתב את אחת האמרות בכתב ידו והחל לכתוב גם את האחרת,
23     אך הפסיק את כתיבתה מרצונו. האמרות ניתנו ע״י העד לאחר שהוזהר כחוק והוא חתום
24     בתחתית דפי האמרות. באמרות נוטל על עצמו העד אחריות למעשי רצח קשים ואיומים תוך
25     פירוט נרחב של הנסיבות שקדמו לביצועם. השוואה של תוכן האמרות לשאר החומר הראייתי
26     שבא בפנינו - ובכלל זה לאמרות הנאשם, המאשר את היכרותו עם העד וכן את העברת הנשק
27     והכספים לידיו - מחזקת עוד יותר את משקל אמרותיו של העד.
28
29     אם כן, מצאנו לנכון לקבל את אמרותיו של העד, הן מכוח אימוץ תוכן, באופן כללי, ע״י העד
30     במהלך עדותו והן מכוח (בכל שהדברים נוגעים בסתירות שבין גרסת העד לבין הרשום באמרות),
31     מכוח ס׳ 10 א׳, וזאת מן הנימוקים האמורים מעלה.
32
33                                                          עד התביעה ▇▇▇▇▇:
34
35     גם עד זה, שהעיד בפנינו ביום 30/11/03, נושא על גבו קופת שרצים ואף הוא אחראי לשורת מעשי
36     רצח קשים.
37
38     ראשית, נידרש לסוגיית בקשת התביעה בסיכומיה לקבל את אמרתו של העד מכוח ס׳ 10 א׳.
39     כעולה מבקשת התביעה, נשתכחה הגשת האמרה ממנה בזמן הדיון ביום 14/06/04, וכעת מבקשת
40     היא לתקן את הטעות. הסנגור מתנגד להגשת האמרה כעת, מאחר והבקשה נעשית לאחר תום
41     פרשת התביעה ויש בדבר משום פגיעה בהגנת הנאשם.
42
43     לא נותר לנו אלא לשוב ולהיזקק, פעם נוספת, לאזכורו ע׳ איו״ש 99/00+114, אשר נזכר קודם
44     לכן בהכרעת דיננו זו בהקשר אחר, ואף מצוטט ע״י התביעה המלומדת בסיכומיה. בית המשפט
45     לערעורים נדרש לדבריו הידועים של כב׳ הנשיא זמורה המנוח, אשר דומה כי מאז אשר נאמרו -
46     כבר בערעור הפלילי הראשון שנדון בבית משפטה העליון של מדינת ישראל!! - מצאו את מקומם
47     בפנתאון סדר הדין הפלילי. ואכן, הורנו הנשיא זמורה כי סדר דין פלילי איננו כאותו משחק שח-
48     מט אשר די במהלך שגוי אחד לחרוץ את גורלו לעד. בית המשפט לערעורים הכיר באפשרות לזמן
49     עדים או להגיש ראיות מטעם התביעה לאחר תום השלב הדיוני - גם אם יש להתיר בקשת כאמור
50     בצמצום, גם אם על התביעה להימנע מכך והכל בכפוף לסייג כי אין בדבר לפגוע בהגנת הנאשם.
51
52     בנסיבות העניין שבפנינו, לא ראינו מדוע קבלת בקשת התביעה, אפילו בשלב הסיכומים, יש בה
53     פסול כלשהו. **ראשית**, אין ספק כי בקשת התביעה נעשתה בתום לב ולא מתוך שיקול פסול. עיון
54     בפרוטוקול הדיון מיום 14/06/04 יגלה כי התביעה הגישה שורת בקשות להגשת חומר מכוח ס׳ 10

---

[4] ראה פרוטוקול עדותו של מוחמד נאיפה מיום 02/09/03, עמ׳ 5 ש׳ 14-30.
[5] **שם**, עמ׳ 3 ש׳ 46 ועד עמ׳ 4 ש׳ 13 ; עמ׳ 5 ש׳ 42-45+.

תאריך: 28/06/05                4                תיק מס׳: 5398/03

1. א׳, ואין ספק כי הבקשה להגשת אמרתו של העד ▇▇▇ נשתכחה ממנה בהיסח הדעת.
2. **שנית**, כל הפתעה אין בבקשת התביעה. התביעה העידה את העד ▇▇▇, עימתה אותו עם
3. דבריו באמרה, הודיעה מראש ובמילים ברורות על כוונתה להעיד את גובה אמרתו[6],
4. ואף העידה את גובה האמרה ביחס לנסיבות גבייתה (מהלך שאין לו כל הסבר אחר, זולת רצונה
5. להגיש את אמרתו של העד מכוח ס׳ 10 א׳). **שלישית**, כל פגיעה אין בהגנתו של הנאשם בבקשה
6. המאוחרת להגשת אמרתו של ▇▇▇. העד העיד ונחקר ע״י הצדדים, ובכלל זה חקירה נגדית
7. ע״י ב״כ הנאשם. לנאשם ניתנה אף הזדמנות לחקור את גובה אמרתו. הנאשם אף התייחס
8. בעדותו[7] בפרשת ההגנה להפללתו של ▇▇▇ **באמרתו** ומסר גרסה באשר אליה. הבקשה
9. להגשת אמרתו של העד, אין בה כל פגיעה בהגנת הנאשם.
10. 
11. לאחר שצלחנו את משוכת השלב הדיוני להגשת הבקשה, נגלה חיש מהר כי התנאים הקבועים
12. בצדו של ס׳ 10 א׳ לקבלת האמרה, מתקיימים במלואם, שהלא העד אמרתו וניתנה לצדדים
13. הזדמנות לחקרו, מתן האמרה הוכח, הן מעדותו של העד שזיהה את אמרתו והן מעדות גובה
14. האמרה, וכן לאור קיומן של סתירות מהותיות בין האמרה ובין העדות. כעת נדרש לשאלה כלום
15. יש מקום להעדיף את האמרה על פני העדות? תשובתנו לשאלה זו חיובית והלן נימוקינו :
16. 
17. א. גם עדותו של ▇▇▇ היתה מבולבלת ככל שנתבקש ליתן הסבר להפללות המפורשות
18. שהפליל את הנאשם באמרתו, הפללות מהן ביקש הוא לחזור במהלך עדותו. העד אישר כי
19. חתם על האמרה וכי החוקר אף הקריא לו את תוכנה, אולם דבק בטענתו כי החוקר כתב
20. דברים אחרים מאלו שאמר הוא עצמו במהלך גביית האמרה. העד אף התיימר לקבוע
21. בפסקנות כי החוקר הוסיף דברים על אמרתו לאחר שזו נכתבה בפניו, אולם לשאלת התובע
22. לא ידע לפרט על אלו עניינים מדובר.
23. 
24. ב. באשר למשקל גרסת ההכחשה של העד את דבריו כנגד הנאשם באמרתו, אשר ניתנה במהלך
25. החקירה הנגדית בעוד העד משיב כתוכי לסדרת שאלות מדריכות בעליל בהתאם לגרסה ששם
26. הסנגור בפיו, מוטב לא להרחיב את הדיבור[8]. באופן מוזר, וללא הסבר מלבד הרצון לחזור על
27. הגרסה המוכנה מראש, הפך הנאשם, במהלך עדותו של ▇▇▇, מחבר (בחקירה
28. הראשית) לשוטר רשע (בנגדית) אשר עצר אותו בגין גניבת רכבים, נהג בו בקשיחות, דבר
29. שעורר בעד תחושה קשה - גרסה, אשר באופן בלתי מפתיע, עתידה לחזור פעם נוספת מספר
30. ישיבות לאחר מכן בעדות הנאשם. למותר לציין, כי בנו לא עוררו הדברים רושם של מהימנות
31. כלל וכלל.
32. 
33. ג. העד אישר בדבריו כי היה חבר בארגון גדודי אל-אקצה, וכעולה מאמרותיו, אף היה אחראי
34. לשורת מעשי רצח קשים מטעם הארגון, כבעל עמדה בכיר בארגון. העד אף ידע למסור תיאור
35. מדויק של שרשרת "החלפת הפיקוד" על הארגון באזור שכם, החל ב▇▇▇ ועבור
36. ב▇▇▇, אולם משנשאל באשר לזהות מחליפו של ▇▇▇ (לטענת התביעה, הנאשם),
37. נתמלא לפתע שכחה מעושה, טען כי לא ידע את זהות ראש הארגון באזור שכם (אליו היה
38. כפוף הוא עצמו) ואף לא טרח לנסות לברר זאת.
39. 
40. ד. לעומת עדותו המפוזרת והמגמתית של ▇▇▇ בפנינו, עומדת אמרתו. משקלה של זו
41. עולה הן מעדותו של גובה האמרה רס״מ ▇▇▇ - אשר העיד בפנינו ביום 14/06/04
42. ובעדותו הכחיש את טענותיו של העד וציין כי האמרה נגבתה על פי הכללים הרגילים – והן
43. מעיון בגוף האמרה עצמה, עליה חתום העד לאחר אזהרה. מקריאה בגוף הדברים וכעולה
44. מעדות גובה האמרה, נראה כי האמרה מבוססת על דברים שכתב העד בכתב ידו. יש להצטער
45. על כך שלא ניתאפשר לעד לכתוב את אמרתו בכתב ידו, אולם בנסיבות הענין, ולאחר שהוכח
46. להנחת דעתנו – הן מהתרשמותנו מן העדים והן מתוך השוואה לשאר חומר הראיות שבא
47. בפנינו - כי הכתוב בגוף האמרה משקף את דבריו של העד שהוקראו לו טרם שחתם עליהם,
48. לא סברנו כי יש פגם במשקלה של האמרה (ראה לענין זה גם את פסק דינו המאלף של כב׳
49. השופט אל״מ פרידמן בע״י איו״ש 1137/04+1130+1136+1129).
50. 
51. אם כן, מצאנו לדחות את עדותו של ▇▇▇ ולהעדיף על פניה את אמרתו.
52. 
53. **עד התביעה** ▇▇▇
54. 
55. עד זה העיד בפנינו ביום 30/11/03 ובעדותו מיהר להתכחש לאמרת ההפללה המפורשת שמסר כנגד
56. הנאשם, בה הוא מתאר כיצד הסיע את הנאשם, ביחד עם אחרים, לבצע פיגועי ירי. משנתבקש

---

[6] ראה פרוטוקול מיום 30/03/04, עמ׳ 11 ש׳ 22-23, במקום "גובה עמדתו של ▇▇▇", צ״ל "אמרתו".
[7] ראה פרוטוקול עדות הנאשם מיום 14/06/04, עמ׳ 10 ש׳ 12-17
[8] ראה פרוטוקול עדותו של מנצור שריס מיום 30/11/03, עמ׳ 4.

תאריך: 28/06/05    5    תיק מס': 5398/03

1   ליתן הסבר להפללתו המפורשת את הנאשם באמרתו, טען כי זו הוצאה ממנו באמצעים פסולים,
2   כי הוכרח לחתום עליה, כי הופתע למראה כתב האישום שהוגש כנגדו הכולל אשמות בהן לא הודה
3   וכיו״ב. עוד הייני טורחים לפרט את הסתירות שעלו בגרסת העד לעניין זה, אלמלא היה עולה
4   באופן ברור כי את טענותיו הזוטא באשר למשקל אמרותיו, שמר העד לעדותו בתיקו של הנאשם
5   בלבד, ואילו במשפטו⁹ שלו לא העלה אף אחת מאותן טענות, ואף הסכים להגשת אמרותיו, ובכללן
6   האמרה המדוברת, אשר ביחס אליה עלו לפתע מן האוב טענות הזוטא שבעדותו. אך מובן הוא כי
7   טענות זוטא של נחקר ביחס לאמרתו, אשר מופיעות במשפטי אחרים ולא במשפטו שלו עצמו, אין
8   בהן לשכנע.
9
10  בשל כל אלו, מצאנו לנכון לדחות את גרסת העד ביחס לאמרתו, לקבל את האמרה (לאחר
11  שהתנאים האמורים בסעיף 10 א' התקיימו) ולהעדיפה על פני עדותו.
12
13  **עד התביעה** ███
14
15  עד זה העיד בפנינו ביום 30/03/04. על אף הפללות קשות שהפליל את הנאשם, כשותפו לשילוח
16  המחבל המתאבד אשר ביצע את הרצח ברחוב יפו בירושלים, וכן כשותף למעשי ירי, הכחיש העד
17  את הדברים בעדותו. כך טען העד כי הוא מכיר את הנאשם בשמו הפרטי בלבד, למרות שלו רק
18  מתוכן עדותו בלבד עולה כי היכרותו עמו מקיפה בהרבה (על אחת כמה וכמה שמאמרותיו
19  ומאמרות הנאשם, עולה כי השניים היו בקשרים הדוקים, ואף גורשו מן האזור ובילו תקופה
20  בירדן ובבגדד – ראה בהמשך). את העובדה כי באמרותיו הוא מפליל את הנאשם, הסביר העד
21  בטענות שהעלה כנגד החוקר ███ שהכריח אותו לכתוב דברים (העד עצמו לא זכר מיהו
22  החוקר שחקר אותו ולא זיהה אותו, אך ציין כי המדובר בשוטר קירח), אולם לא ידע לפרט מהן
23  אותן טענות ("עם החוקר הזה הייתה הבעיה. אינני זוכר את הפרטים¹⁰"). העד טען כי אינו מזהה
24  את אמרותיו שהוצגו בפניו ואת כתב ידו, אולם דבריו לא עוררו בנו רושם, שכן העד בקושי טרח
25  לעיין באמרות טרם שהשיב.
26
27  העיד בפנינו החוקר ███, אשר גבה את אמרותיו של העד ועדותו עוררה בנו רושם מהימן
28  לגמרי. בעדותו אישר החוקר שאמר כי גבה את אמרותיו של העד (███ וכי הוא (███ זה שכתב
29  את אמרותיו בכתב ידו (כפי שגם עולה מעיון באמרות עצמן). עוד הכחיש החוקר את טענת העד כי
30  נתן אמרות נוספות בהן מכר דברים אחרים, דבר העולה גם מעיון באמרות הנושאות מספר
31  סידורי.
32
33
34  אם כן, עדותו של ███ שהייתה עדות מבולבלת ושרירותית (,הכל רשום אצלכם בתיקים
35  לא צריך להיכנס לפרטים״ ; ״אני לא חייב לענות לאף אחד״¹¹ ) לא עוררה בנו רושם של מהימנות.
36  התנאים להגשת אמרותיו במשטרה מכוח ס' 10 א', התמלאו לאחר שהעד מתן האמרות
37  הוכח בעדותו של גובה האמרות ███ והעד סתר את אמרותיו בעדותו. מצאנו לנכון להעדיף
38  את האמרות על פני העדות. מול העדות המבולבלת והבלתי-משכנעת, מצאנו את האמרות
39  כמהימנות ובעלות משקל. כאמור, עולה מקריאה באמרותיו כי הן ניתנו ע״י העד לאחר שהוזהר
40  כחוק ולאחר שחתם על האמרות, אותן **כתב בכתב ידו**. עולה עוד כי גביית האמרות התנהלה
41  באווירה חיובית, וכי העד שתה קפה ועישן סיגריות במהלך גביית האמרות. גם מעדותו של
42  ███ עולה כי גביית האמרות התנהלה באופן סטנדרטי ותוך שיתוף פעולה של העד. ממילא יוזכר
43  כי אפילו מתוך השוואה בין עדותו של העד בפנינו לבין תוכן אמרותיו, עולה כי הוא באופן כללי
44  מאשר את אחריותו לפיגועים ברחוב יפו וכן במסעדת ״סי פוד מרקט״ בת״א, מאשר את שמות
45  המתאבדים ששלח, **והכל מתוך התאמה לתוכן אמרותיו.** דהיינו, העד ███ בעצמו מאשר
46  **את נכונות אמרותיו, למעט הקטע הנוגע לנאשם, בלא הסבר של ממש מדוע דווקא חלק זה לוקה.**
47
48  לאור דברים אלו, מצאנו לנכון להעדיף את האמרות על פני העדות.
49
50
51

---

⁹ ראה פרוטוקול משפטו של העד (שומרון 5004/03) מימים 04/05/03 ו 16/07/03 (ת/ 73+72) וכן פרוטוקול הארכת
   מעצרו מיום 12/12/02 (ת/ 71). הפרוטוקולים ממשפטו של העד, התקבלו בהתאם לבקשת התובעת בדיון מיום
   14/06/04 לאחר שהסנגור הותיר את השאלה לשיקול דעת בית המשפט ובהיות הפרוטוקולים משום תעודה ציבורית
   המתקבלת בלא עדות עורכה.

¹⁰/ ראה פרוטוקול עדותו של ███ מיום 30/03/04, עמ' 3 ש' 5-10).

¹¹ שם, עמ' 2 ש' 16 ; ש' 47-48.

תאריך: 28/06/05                                  6                     תיק מס': 5398/03

עד התביעה ▇▇▇▇

גם עד זה, בדומה לעד הקודם ולרוב העדים בתיק זה, אישר בעדותו את אחריותו למעשים המיוחסים לו על ידם הודה במשפטו ובאמרותיו ואף נקב בשמותיהם של שותפיו, מלבד אחד – הנאשם. התביעה מייחסת לנאשם כי פעל ביחד עם העד בשלבים הראשונים להוצאתו לפועל של פיגוע הרצח ברחוב יפו (פרט האישום השישי, ס"ק א-ה'). העד אישר, למעשה, בעדותו, את העובדות המדוברות בחלק הרלוונטי של פרט האישום, למעט חלקו של הנאשם, שהעד ציין כי לא נכח בעת צילומו של המתאבד.

מתברר כי דווקא בעת משפטו שלו, הודה העד באחריותו למעשה הרצח ברחוב יפו, ובכלל העובדות בהן הודה אף המעשים המיוחסים לו עם הנאשם, כולל צילומו של המתאבד. התביעה ביקשה[12] להגיש את פרוטוקול הודאתו של העד במשפטו מכוח ס' 10 א', ואילו הסנגור הותיר את הבקשה לשיקול דעתו של בית המשפט[13]. בהחלטתנו מאותו היום קיבלנו את הבקשה להגשת הפרוטוקול והלן נצרף נימוקינו.

הסנגור טען בסיכומיו כי הודאתו של העד במשפטו שלו, במסגרת הסדר טיעון וללא שנשמעו עדים, לא יכולה לשמש כראיה במשפט זה, אולם לא הסביר הסבר של ממש מדוע כך הדברים, אף לא צירף אסמכתאות לחיזוק טענתו. דעתנו בעניין זה שונה. אך מובן הוא כי תשובה של נאשם לכתב"א הנאמרת באולם בית המשפט ואשר נרשמת בפרוטוקול, היא משום "אמירה" של אדם בכתב העונה על תנאי ס' 10 א' (ראה י. קדמי, "על הראיות", חלק ראשון, עמ' 274 פסקה 4.ב.ב.). ולא רק שיש בו בפרוטוקול ההודאה משום אמרת-חוץ לפי ס' 10א', אלא שעל פני המדובר באמרה מהימנה מאין כמוה אשר חזקה עליה כי נאמרה מרצון טוב וחופשי ובעלת משקל ניכר, באשר העד מוסר אותה בתשובה לאישומים המופנים אליו גופו ובעוד הוא מיוצג ע"י עו"ד. מכאן שאין כל מניעה מלקבלה לפי ס' 10א' ואף להעניק לה משקל מלא.

טענתו של העד בעדותו[14] כי כתב האישום הוקרא לו באופן כללי ובכותרות וללא שהוזכרו השמות, רחוקה מלהיות אמת, כפי שמוכיחים הפרוטוקולים ממשפטו. מעיון בפרוטוקול משפטו של העד בתיק 6446/02 מיום 19/12/02 (ת/ 68) רואים אנו כי כתב האישום הוקרא לעד (הנאשם באותו תיק) במלואו לאור העובדה כי לא היה מיוצג באותו שלב וסירב לקבל על עצמו ייצוג (ראה החלטת בית המשפט באותו דיון, עמ' 2). העד/נאשם, אף החל למסור תגובה מפורטת, המוכיחה כי עדותו בפנינו כאילו כתב האישום לא הוקרא לו במלואו – שקרית היא בעליל. עיון בפרוטוקול הודאתו של העד בתיקו מיום 29/06/03 (ת/ 69), יגלה כי לאחר מספר חודשים נמלך העד בדעתו והודה בכתב אישום מתוקן שעה שהוא מיוצג. גם הפעם הובהרה לעד מהות כתב האישום בעניינו. העד הודה בכתב האישום במילים ברורות, הן מפי סנגורו והן בפיו. הסנגור ביקש בסיכומיו להיאחז בעובדה כי העד לא הזכיר את הנאשם במסגרת תשובתו לכתב האישום, אולם ברור כי אין בכך להעלות או להוריד. המעיין בפרוטוקול ההודאה, יגלה כי העד הודה בכתב האישום ובעבירות המיוחסות לו ולצד זאת ציין עובדות בולטות מתוך המיוחד לו. קריאה תמה בפרוטוקול תגלה כי הזכרת שמות שותפיו ע"י העד היא לצד הודאתו בעובדות בכתב האישום המיוחס לו, ואיננה משום "רשימה סגורה".

לצד משקלו הברור של פרוטוקול המשפט של העד, נציין כי עדותו בפנינו לא הייתה נקייה מסתירות, למשל לעניין מידת היכרותו עם הנאשם[15].

אם כן – ראינו כי במשפטו הודה ▇▇▇▇ בעובדות עבירת גרימת המוות בכוונה לעניין הפיגוע ברחוב יפו, ובכלל זה חלקו של הנאשם. פרוטוקול זה הוא משום "אמרת-חוץ" של העד, ואנו קיבלנו אותה ומצאנו לנכון להעדיפה על פני עדותו בפנינו, אשר ממנה נשמט חלקו של הנאשם.

---

[12] ראה פרוטוקול הדיון מיום 14/06/04, עמ' 3 ש' 24-26.
[13] שם, עמ' 5 ש' 36-37.
[14] ראה פרוטוקול עדותו של ▇▇▇▇ מיום 30/03/04, עמ' 7 ש' 29-38.
[15] שם, עמ' 4 ש' 35, השווה שם עמ' 7 ש' 10-11.

תאריך: 28/06/05                    7                    תיק מס': 5398/03

עד התביעה ▇▇▇▇

נקל לראות כי עד זה איננו נמנה על העדים הבאים לומר את האמת בעדותם, או לשתף פעולה עם בית המשפט שעה שהוא מבקש להתחקות אחרי האמת. מיד עם עלותו לדוכן העדים אטם העד את אוזניו וסירב לענות לשאלות התובעת. לשאלות הסנגור ענה רק לאחר שבירר כי הוא עורך דינו של הנאשם וגם שעה שהשיב אישר את שאינו שנוי במחלוקת ע״י התביעה, דהיינו כי איננו מזכיר כלל וכלל את הנאשם.

ואכן התביעה איננה חולקת כי העד אינו מזכיר כלל את הנאשם, ואף הצהירה כי לא לשם כך הביאה את העד לעדות, אלא על מנת להוכיח את חלקו השני של פרט האישום השישי, חלק אשר אפילו אליבא דכתב האישום הנאשם לא נטל בו חלק. שאלה נכבדה היא לשם מה כלל צריכים אנו להידרש לשאלת עדותו של העד אשר אין מחלוקת כי כלל אינו מפליל את הנאשם, אולם לאור תשובתו של הסנגור כי אפילו עצם קרות האירוע איננו מוסכם!![16], דומה כי אין מנוס מכך.

לא התלבטנו רבות בבואנו להכריע בשאלת העדפת פרוטוקול ההודאה ממשפטו של העד כנאשם על פני עדותו (?!) בפנינו, אשר ספק רב האמנם "עדות" ייקרא לה, ומכל מקום אין היא משכנעת. לעומת עדותו השרירותית והמגוחכת של העד בפנינו, עומד פרוטוקול הודאתו של העד במשפטו שלו, בעוד הוא מיוצג ע״י עו״ד. מן הטעמים האמורים מעלה לעניין ▇▇▇▇, מצאנו לנכון להעדיף את פרוטוקול המשפט על פני העדות.

עד התביעה ▇▇▇▇

גם עד זה, בדומה ל▇▇▇▇, תלה את קולר הפללתו הנחרצת את הנאשם, באמצעים פסולים שהופעלו כנגדו במשפט, אולם גם הוא לא העלה - משום מה - טענות אלו במשפטו שלו[17]. מאותן נימוקים הנזכרים מעלה, המצטרפים לעדותו המגמתית והמתחמקת של העד (התחמק מלהשיב לשאלה האם הוא מכיר את הנאשם, ואף לא ידע למי הכוונה, למרות שנכח רק נאשם אחד בתא הנאשמים), מצאנו לנכון להעדיף על פני עדותו את אמרתו של העד, אשר סימני האמת ניכרים בה בעליל, ובכלל זה העובדה כי כתב אותה בכתב ידו, כי הוזהר כחוק טרם גבייתה והוא חתום בתחתית כל דף בה.

עד התביעה ▇▇▇▇

עד זה, בעלותו על הדוכן, חזר על הקו של חבריו וגם הוא אישר את הכתוב באמרתו ואת המעשים הרשומים שם, למעט נקודה הנוגעת לנסיבות היכרותו עם הנאשם. לטענת העד, החוקר אילץ אותו לכתוב כי נפצע מידיו של מאג׳ד מצרי (אותו, לטענתו, אינו מכיר כלל) שעה שהיו בדרכם לבצע פיגוע הנחת מטען.

בבקשו להרחיק את הנאשם בכל מחיר מן הפללה המפורשת אותה הפליל, ואגב כך להטיל רפש בחוקרו, נשתכחה מ▇▇▇▇ העובדה הפשוטה כי באמרתו אין כלל מוזכר הנאשם בהקשר של פיגוע מתוכנן, אלא דווקא נראה כי הפציעה היתה במסגרת "תאונות אימונים", כאשר הנאשם החל לשחק במטול רימונים שבידיו, תוך כדי פגישת היכרות של חוליות שונות בארגון. כלומר, לטענת העד כי החוקר ביקש לאלצו להודות כי נפצע תוך כדי הכנות לפיגוע עם הנאשם, אין שחר - אפילו לא מתוך האמרה הכתובה.

ממילא גרסתו של העד אינה משכנעת כלל. העד לא ידע ליתן הסבר של ממש כיצד נפצע. הוא אף לא טרח למסור הסבר של ממש כיצד אילץ אותו החוקר להפליל את הנאשם הפללת שווא ומדוע רק חלק זה באמרתו כוזב ואילו כל השאר נכון.

אל מול כזביו של העד, עומדת אמרתו, אותה כתב בכתב ידו, לאחר אזהרה כחוק ועליה הוא חתום. התנאים לקיום ס׳ 10 א׳ מתקיימים, שכן העד מזהה את אמרתו וסותר את תוכנה. לאור העובדה כי עדותו לא עוררה בנו רושם של מהימנות ודווקא אמרתו נושאת עליה את סימני האמת, מצאנו לנכון להעדיפה על פני העדות.

---

[16] ראה פרוטוקול הדיון מיום 30/03/04, עמ׳ 8 ש׳ 31-37.
[17] ראה פרוטוקול עדותו של ▇▇▇▇ מיום 30/03/04, עמ׳ 10 ש׳ 15-17.

תאריך: 28/06/05     8     תיק מס׳: 5398/03

### פרשת ההגנה

עדות הנאשם בפרשת ההגנה היתה קצרה, רוויית סתירות ובלתי משכנעת. ראשית יש לציין כי למרות הררי חומר הראיות מטעם התביעה, אשר נסקר בהרחבה לעיל, בחר הנאשם כמעט ולא להתייחס ישירות לראיות אלו ועדותו בחקירה הראשית היתה קצרה ולאקונית.

אלא שאפילו מתוך עדותו של הנאשם, עולות הסתירות. טענת הנאשם בחקירה הראשית היתה כי ישנם אנשים רבים באזור שכם בשם מאג׳ד מצרי, כי המדובר במשפחה הגדולה ביותר באזור והוא עצמו מכיר אדם בשם זהה לשלו העובד אף הוא ברשות הפלסטינית. לחיזוק טענתו זו ציין הנאשם כי אפילו שניים מן המפללים אותו, ▓▓▓▓▓▓ שעה שהובאו בפניו לעימות במהלך החקירה, ציינו מייד כי הנאשם איננו מאג׳ד מצרי, אליו התכוונו בהפללתם. עם זאת בחקירה הנגדית שינה הנאשם מטעמו "וליתר בטחון" הוסיף גם את הגרסה כי השניים הפלילו אותו בשל סכסוך קודם, וזאת לאור העובדה כי במסגרת תפקידו עצר את השניים בהיותם גנבי רכבים.

ברור כי שתי הגרסאות אינן יכולות לדור בכפיפה אחת. ואם אכן ▓▓▓▓▓▓ ציין מייד בפני חוקרי השב״כ כי הנאשם איננו מאג׳ד מצרי נשוא הפללותיו, מדוע הנאשם איננו מדבר איתו, בבחינת "עם מי שעושה לי דבר כזה, אין לי מה לדבר"[18]?

סתירות אלו מצטרפות למגמתו הכללית של הנאשם להרחיק עצמו, ובכל מחיר, מקשר כלשהו לפעילות בטחונית, גם בדברים שהודה בהם באמרתו, ואין כל ספק שאין בהם לקשרו ולו במאום לפרטי האישום החמורים המיוחסים לו. כך מכחיש הנאשם בעדותו גם ירי כללי לעבר כוחות בטחון, בו הודה באמרתו, העברות כספים בהם היה מעורב ועוד נושאים, המפורטים בהרחבה בעמודים 26-27 לסיכומי התביעה. הנאשם, בנסיונו למלט עצמו, אף הצניע את קשריו עם ▓▓▓▓▓▓, על אף העובדה כי השניים התרועעו בראשית שנות התשעים בירדן ובבגדד, כעולה מאמרותיו.

לשקריו של הנאשם אודות קיומו של אדם אחר העונה לשמו המרובע, ראה להלן בפרק העוסק בזיהויו הנאשם.

סוף דבר, לא מצאנו כי עדותו של הנאשם בפנינו יש בה לעורר רושם של מהימנות. הנאשם נכשל - ואף לא טרח - בעדותו מלהפריך את שלל ראיות התביעה והסתפק בהכחשה גורפת ולאקונית, גם במעשים המצומצמים בהם הודה באמרותיו. תוך כדי כך הסתבך הנאשם בגרסאות סותרות ושקרים של ממש, אשר אף בהם אין להחמיא למשקל עדותו.

### סיכום ביניים:

הנה כי כן, מצאנו כי יש מקום להעדיף את ראיות התביעה על פני עדות הנאשם בפרשת ההגנה, את אמרות עדי התביעה על פני עדויותיהם המגמתיות והשקריות - הכל מן הנימוקים האמורים מעלה בהרחבה. ראיות אלו משתלבות זו בזו ומציגות גרסה סדורה וקוהרנטית ממנה עולה דמותו של הנאשם כרב-מחבלים העוסק, ביחד עם שותפים נוספים, בשילוח מחבלים מתאבדים. כעת נבחן האם אחריותו של הנאשם למיוחס לו, עולה מתוך אותן ראיות.

### זיהויו של הנאשם:

דומה כי השאלה המרכזית בתיק זה נוגעת לעניין זיהויו של הנאשם אשר בפנינו, כדמות המופיעה בהפללות הרבות של עדי התביעה כרב-המעללים לו מיוחסים המעשים המתוארים בכתב האישום. עדי התביעה השונים מתארים אדם בשם מאג׳ד מצרי, מוסרים פרטים אישיים שונים שלו ואף נוקבים בכינוי בו הוא מוכר, "בזבז". לטענת הנאשם אין כך הדבר, אין לו כינוי כלשהו, ובוודאי לא "בזבז". עוד טען הנאשם כי משפחת מצרי היא משפחה גדולה באזור שכם, ומן הסתם יש בה אנשים נוספים העונים לשם מאג׳ד. לטענת הנאשם, ישנו אדם נוסף בשם מאג׳ד מצרי אשר אף הוא עובד ברשות הפלסטינית. האם הנאשם שבפנינו הוא אותו "בזבז"?

---

[18] ראה פרוטוקול עדות הנאשם בפרשת ההגנה מיום 14/06/04, עמ׳ 9, ש׳ 48-52.

תאריך: 28/06/05        9        תיק מס׳: 5398/03

**ראשית**, יש לציין כי הנאשם עונה בעצמו על שאלה זו באמרתו[19], בה הוא מאשר את כינויו מילדות "בזבז". כאן המקום לציין כי אין המדובר בכינוי שגור או נפוץ (כגון כינויו של אדם על שם בנו בכורו, למשל "אבו מוחמד", כינוי אשר כמוהו ימצאו לאלפים). ייחודו של הכינוי, בצירוף שאר הפרטים האישיים של הנאשם, מצביע על החפיפה בינו לבין הנאשם.

אלא שהרשעתו של הנאשם בעבירות החמורות המיוחסות לו, אינה נשענת על כינויו בלבד, אלא גם על זיהויו באופן פרסונאלי ע״י עדי התביעה, איתם עמד בקשרים טובים. באשר לטענות כי עדי התביעה "התבלבלו" או כיוונו לאדם אחר, הרי שבחינה מעמיקה של חומר הראיות תגלה כי אין בכך ממש. הנאשם מאשר באמרותיו את היכרותו עם שאר "גיבורי" האירועים, עדי התביעה המפלילים אותו, ואף מודה בביצוע עבירות בטחוניות עמם. כך מודה[20] הנאשם בהיכרותו עם ▓▓▓▓▓▓ ובביצועו ירי עמו לעבר עמדת צה״ל וכן ביצוע ניסיון ירי. ביחד עם ▓▓▓▓▓▓ אף גורש הנאשם בשנת 1992 מהאזור וביחד נסעו לבדד[21]. הסברה כי ▓▓▓▓▓▓ אינו מכיר את הנאשם וכיוון בדבריו למאג׳ד מצרי אחר, מופרכת ממש בנסיבות אלו. עוד מאשר הנאשם באמרותיו כי מסר כספים ל▓▓▓▓▓▓ והוא אף מאשר את היכרותו האישית עמם. הוא אף מאשר העברת רובה קלצ׳ניקוב לידיו של ▓▓▓▓▓▓ (על פי גרסת הנאשם, בשל סכסוך פנימי)[22].

אם כן, ההיכרות של הנאשם עם עדי התביעה במפורש עולה מאמרותיו שלו עצמו. אלא שגם עדי התביעה לא טומנים ידם בצלחת ומרחיבים בעניין היכרותם עם הנאשם. ▓▓▓▓▓▓ זיהה את הנאשם בשמו המלא בעדותו בפנינו וציין כי הנאשם הוא חברו[23]. ▓▓▓▓▓▓ מוסר באמרתו[24] תיאור מדויק של הנאשם, כולל מקום עבודתו כקצין במשטרה הפלסטינית, גילו, מצבו המשפחתי והיותו אב לשתי בנות (פרטים אותם מאשר הנאשם עצמו באמרתו) ומוסיף כי כינויו של הנאשם הוא "בזבז". עד התביעה ▓▓▓▓▓▓, אשר אפילו בעדותו[25] המגמתית אישר את היכרותו האישית עם הנאשם לאור שירותם המשותף במשטרה הפלסטינית, מציין גם הוא באמרתו[26], שנתקבלה והועדפה על פני עדותו, את כינויו של הנאשם ואת העובדה כי הוא חבר בארגון "גדודי אל אקצה". אין לחשוד בעד התביעה ▓▓▓▓▓▓ כי ישכח את הנאשם, לאחר שזה גרם לפציעתו הקשה שעה ששיחק במטול רימונים שהחזיק. גם הוא מזכיר[27] את הנאשם בשמו ובכינויו ומציין את חברותו בארגון הטרור. **עד התביעה** ▓▓▓▓▓▓ **מוסר[28] את מספר הטלפון הסלולארי של "בזבז", 200596-059, הדומה באופן מפתיע למספר שמוסר הנאשם עצמו באמרתו[29], 059- 200569**.

טוען הסנגור כי נפלו בחקירה פגמים של ממש בכך שלא נערך לעדים מסדר זיהוי. הסנגור לא הביא אסמכתאות להוכחת טענתו, ואנו לא מצאנו בה כל ממש. ניכר מכל האמור למעלה בהרחבה כי העדים מכירים את הנאשם היטב, מוסרים פרטים מזהים רבים שלו, חלקם אף הצביעו עליו באולם בית המשפט (גם אם חזרו בהם מהפללתם או תירצו אותה בהסברים שונים ומשונים). אם כן – בפנינו מצב של "הצבעה" של העדים על הנאשם, כעל מי שהם מכירים אותו היכרות מוקדמת ולא זיהויו של אדם לא מוכר באמצעים חזותיים שונים (מסדר זיהוי), ואין כל חובת קיום מסדר זיהוי בנסיבות אלו. ראה גם **י. קדמי**, על הראיות (מהדורת 1999), חלק שני, עמ׳ 851-852.

כאן המקום אף להידרש לשאלה הסטטיסטית, האמנם יתכן כי המדובר במאג׳ד מצרי אחר? הנאשם ביקש להגיש, לצורך כך, רישום של משרד הפנים הפלסטיני באשר לשכיחות השם מאג׳ד מצרי. את המסמך ביקשה ההגנה להגיש על סמך עדותו של הנאשם..

---

[19] ת/ 1, עמ׳ 8 ש׳ 22-25.
[20] ראה ת/ 1, עמ׳ 2 ש׳ 5-12.
[21] ראה ת/ 2, עמ׳ 5, ש׳ 13-24.
[22] ראה ת/ 1, עמ׳ 3 ש׳ 26 ועד עמ׳ 5 ש׳ 21.
[23] ראה פרוטוקול עדותו של ▓▓▓▓▓▓ מיום 30/11/03, עמ׳ 1 ש׳ 35-50.
[24] ראה ת/ 70, עמ׳ 1, ש׳ 19-22.
[25] ראה פרוטוקול עדותו של ▓▓▓▓▓▓ מיום 30/03/04 עמ׳ 9, ש׳ 18-22, עמ׳ 10, ש׳ 34-39.
[26] ראה ת/ 3, עמ׳ 5, ש׳ 4-8.
[27] ראה ת/ 61, עמ׳ 2 ש׳ 17 ועד עמ׳ 3 ש׳ 2.
[28] ראה ת/ 60, עמ׳ 5 ש׳ 12.
[29] ראה ת/ 1, עמ׳ 2 ש׳ 25.