
PLAINTIFF'S
EXHIBIT
390A

Israel Defense Forces

Before the Military Court
in Beit El
Before a single judge

Court Case: 3159/02
Prosecution case: 146/02
Detailed incident case: 357/02, 358/02
Binyamin

### In the trial between: the Military Prosecutor – the Prosecutor

**-v-**

**Bashar Hassan Abed Barghouti**
Identity No. 934469768, born July 1, 1975, a resident of Al-Bira
Detained since January 23, 2002

### The Defendant

## Amended Indictment

### The above mentioned Defendant is accused hereby of committing the following offense:

**Nature of the offense** Failure to prevent an offense, an offense pursuant to Sections 51, 59 and 92 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense**: The above mentioned Defendant, in the Area, on January 20, 2002 or thereabouts, while knowing or having reasonable grounds to suspect that another person was committing or planning to commit a violation of law or security legislation whose sentence exceeds three years imprisonment, did not provide notice of this immediately to a military commander or the nearest police station or any IDF officer or did not act in another reasonable manner to prevent the commission, continuation or completion thereof, as follows:

The Defendant habitually hosted in his home Ahmed Barghouti, the bodyguard and driver of the leader of the Tanzim faction of the Fatah in the West Bank, Marwan Barghouti. Ahmed Barghouti himself is a member of the military apparatus of the Fatah that is called the Al Aqsa Martyrs Brigades, which is responsible for carrying out hundreds of lethal attacks. The above mentioned Ahmed Barghouti participated himself in the execution of shooting attacks against IDF soldiers and reported this to the Defendant.

[Stamp] P 6: 320

Date: January 13, 2003
Ref: Vladi/m146-02

On January 20, 2002, Ahmed Barghouti was being hosted in the home of the Defendant. During that meeting, Ahmed Barghouti reported to the Defendant that his fellow members of the Al Aqsa Martyrs Brigades were the ones who carried out the attack in Hadera and other deadly attacks.

Thereafter, Ahmed Barghouti talked, using his mobile telephone handset, to another person from Nablus, and during the call, Ahmed asked the Defendant whether he could talk with that person using the telephone set in the home of the Defendant rather than using a cellular handset, because it was a subject that should not be discussed by cellular telephone due to fear of eavesdropping. The Defendant agreed, and Ahmed gave the telephone number in the home of the Defendant to the man from Nablus. That man called the home of the Defendant and talked with Ahmed Barghouti. The Defendant overheard the content of the call, in which he asked Ahmed about the arrival of a young man and arming him. Ahmed also instructed that person that the young man who would arrive would then have his hair cut and they talked about the young man having a handsome appearance.

[Stamp] P 6: 320 (continued)

Date: January 13, 2003
Ref: Vladi/m146-02

2

After Ahmed Barghouti completed the above mentioned call, he informed the Defendant that two days later, an attack would be carried out in Jerusalem. In addition, Ahmed Barghouti informed the Defendant that the perpetrator of the attack would be coming from the Nablus area to Ramallah and afterward would depart to carry out the attack in Jerusalem. In addition, Ahmed told the Defendant that the perpetrator of the attack would be coming form the Nablus area to Ramallah, and from there he would depart to Jerusalem, and that that terrorist would be carrying out a suicide attack. Ahmed Barghouti told the Defendant that the executor of the attack was handsome and therefore he would have no problem to depart to Jerusalem. Ahmed Barghouti also told the Defendant that there were owners of a forged Israeli identity card, who were not suspected of carrying out terrorist activity, and they could depart from the Area and carry out attacks in Israel. Ahmed also reported to the Defendant about additional attacks that the members of his cell had carried out and the manner of executing the attacks.

When Ahmed Barghouti informed the defendant of the execution of the attack, the Defendant asked Ahmed Barghouti how the perpetrator of the attack would be arriving from Nablus to Ramallah, and Ahmed responded to him that the terrorist would be arriving in the ordinary way.

Ahmed Barghouti told the Defendant that the planned attack would be carried out to avenge the killing of an operative of the military faction of the Fatah – the Al Aqsa Martyrs Brigades, Raed Karmi. Ahmed Barghouti also told the Defendant that the Al Aqsa Martyrs Brigades had decided to wage war against Israel and had decided to carry out many attacks and kill many people in revenge for the death of Raed Karmi, with whom Ahmed Barghouti had operated.

The Defendant did not act reasonably in order to prevent the planned attack that Ahmed Barghouti had informed him of.

On January 22, 2002, a shooting attack was carried out on the junction of Jaffa and King George Streets in Jerusalem by an operative of the military arm of the Tanzim, the Al Aqsa Martyrs Brigades. In this attack, the terrorist opened fire at passersby in the street with the intent of causing their deaths. In this attack, two women were killed, the late Ora Sandlar and the late Sarah Hamburger, and dozens of others were injured.

After this attack, while the defendant was at work at "Makassed" Hospital, Ahmed Barghouti called him and made sure that the Defendant had heard about the attack that had been carried out. The defendant responded positively and knew that this was the attack that Ahmed had planned as set forth above.

[Stamp] P 6: 321

Date: January 13, 2003
Ref: Vladi/m146-02

3

**<u>Witnesses for the prosecution</u>:**

1. First Sergeant Ya'akov Barazani, Badge No. 99106, Judea Investigations Office, taker of the statement of the Defendant.

2. Sergeant First Class Yitzhak Ya'akovoff, 1008358, Judea Investigations Office, taker of the statement of the Defendant.

3. Cadet Zvi Reisner, seizure and marking report and photographs, investigations, special investigations department.

4. Rinat Gola, 021370200, details in the prosecution.

5. Jeanette Biton, 0031111341, details in the prosecution and certificates.

6. Avishag Nabati, 0380141426, details in the prosecution.

7. Death certificates.


_____
[Signature]
**Dalia Kaufman, Captain**
Military Prosecutor


[Stamp] P 6: 321 (continued)


Date: January 13, 2003
Ref: Vladi/m146-02

4

Date: 20 Shevat 5763                                      Case No.: 3159/02
January 13, 2003

## The Military Court in Beit El

### Transcript of a Hearing in a Single Judge Session

**Before Judge: Major Eli Bar-On**

**Defendant: Bashar Hassan Abed Barghouti Identity No. 934469768 / Megiddo**

## <u>Sentence</u>

The Defendant has been convicted of an offense of failure to prevent an offense pursuant to Section 59 of the Security Provisions Order 5730-1970. In summary, it may be said that on January 20, 2002, the Defendant hosted in his home a relative of his by the name of Ahmed Barghouti, who was a senior operative in the Al Aqsa Martyrs Brigades Organization. During his stay in the home of the Defendant, Barghouti talked, using a mobile telephone handset that he possessed, and at a certain stage of the call, he asked the Defendant to take the call using the landline telephone in the home of the Defendant, for security reasons. The Defendant confirmed the receipt of the call in his home, and Barghouti talked with a person from Nablus, and after the call updated the Defendant that he was planning to execute an attack in Jerusalem. Barghouti also gave the Defendant a large number of details related to that attack, and the Defendant also asked him some questions about the matter. Two days later, an operative of the Al Aqsa Martyrs Brigade carried out a shooting attack in Jerusalem, in which two women met their deaths and dozens of others were injured. After the attack, Ahmad Barghouti called the Defendant and asked him whether he had heard about the execution of the attack, and the Defendant confirmed this.

The parties have asked the Court to sentence the Defendant in a manner that would correspond with the severity of the offense of which he has been convicted. The parties are divided concerning the degree of this sentence. The military prosecution on its part stated that in view of the tragic and terrible outcomes of the attack that was executed, there is room for harsh sentencing of the Defendant. The military prosecution also pointed out that in view of the fact that it was a special kind of offense, the legislator has opted to attach a sentence of 5 years imprisonment to this offense, which is a light sentence relative to the security offenses that are heard before this Court.

[Stamp] P 6: 322

1

In the opinion of the defense, it would not be possible to demand that the Defendant act in a manner that would have been different from the manner in which he did, and in view of the fact that the Defendant was not an accomplice in the commission of the attack in any way, but only abstained from performing acts that would have led to its prevention, he should be treated far more leniently, and ordered released.

There is no doubt that the offense of which the Defendant has been convicted is of a special kind, in view of the fact that it is one of the few offenses that impose a sentence for a person abstaining from performing an act and not for an act that he has committed. The Supreme Court of the State of Israel has recently extensively heard this offense, in the verdict on the case of Margalit Har-Shefi. The verdict that reviews the various opinions that were expressed over the years concerning the justification of inclusion of this offense in the codex eventually reaches the conclusion that due to the plenitude of criminal acts, there is no room to omit this offense from the criminal codex of the State of Israel. Nonetheless, the Court has not evaded passing some degree of criticism in view of the stain of denunciation that tarnishes the duty imposed here on that abstainer.

In view of the circumstances existing in the Area, the offense of failure to prevent an offense imposes additional difficulties. For example, the Defendant before us is required to perform acts to prevent an offense whose existence he heard of

[Stamp] P 6: 322 [continued]

2

while being in territory that was not under the control of the Israeli security forces. The Defendant could have been required to perform at least acts that would have prevented the crime by contacting the security forces that were in his territory, but in the circumstances of the case, the impression is that these security forces were the ones that intended to execute that crime. It is clear that this situation puts the Defendant between the devil and the deep blue sea, and it would appear that his moral duty to act in this case, whose existence is not held in doubt, encountered genuine difficulties if he had indeed attempted to act.

It is not possible to ignore the fact that the default of the Defendant was what eventually allowed the terrible acts that led to the loss of innocent lives to occur, and it is not possible to ignore the fact that the Defendant has not been charged with any participation in the commission of the terrible crime.

The Defendant has a clean record. The Defendant had graduated from medicine studies in Iraq and returned to the Area in order to start his residency as a physician in Makassed Hospital in Jerusalem. The Court has heard the testimony of the father of the Defendant and it could be felt that he was a person who had educated his children to live peacefully with others and devote all of their efforts to studies that would benefit others and not harm them. One could also have felt from the words of the Defendant that he did not have nationalistic, security or criminal motives when he abstained from reporting the imminent criminal act.

In the circumstances of the matter, I believe that leniency is due to the Defendant and that some of the prison sentence that he has deserved may be converted to a monetary fine in order to allow him to return to a normative life, raise a family and educate his children in the spirit of peace and love.

Therefore, I sentence the Defendant as follows:

A.    Imprisonment to be served as per the days of detention that the Defendant has served.

B.    9 months suspended imprisonment, on the condition that for 5 years from the day of his release, the Defendant does not commit an offense pursuant to Sections 57 or 59 of the Security Provisions Order 5730-1970.

C.    A monetary fine of NIS 5,000 or 5 months imprisonment in exchange for it. The fine is to be paid as a condition for release.

[Stamp] P 6: 323

**A right of appeal within 30 days is conferred.**

3

**Handed down and announced today, January 13, 2003, in public and in the presence of the parties.**

_____[Signature]_____
**Judge**

[Stamp] P 6: 323 [continued]

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

       Plaintiffs,

 vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

       Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

**DECLARATION OF RINA NE'EMAN**

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P 6: 320-323.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P 6: 320-323.

             _____
             Rina Ne'eman

ss.:  New Jersey

On the [ 6 ] day of ~~February~~ _March_, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this _March_
_6_ day of ~~February~~, 2014

_Leonor Troyano_
Notary Public

LEONOR TROYANO
ID # 2365530
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/8/2014

| צבא | | המשפט | הגנה | | לישראל |
|---|---|---|---|---|---|
| בבית | המשפט | הצבאי | תיק ביהמ״ש: | 3159/02 | |
| בבית | | אל | תיק תביעה: | 146/02 | |
| בפני | דן | יחיד | תיק פ.א.: | 357/02, | 358/02 |
| | | | בנימין | | |

## במשפט שבין התובע הצבאי – המאשים

### -נגד-

**בשאר חסן עבד ברגותי**
ת.ז. 934469768, יליד 01.07.75, תושב אל-בירה
עצור מיום 23.01.02

### הנאשם

# כתב-אישום מתוקן

## הנאשם הנ״ל מואשם בזאת בביצוע העבירה הבאה:

**מהות העבירה:** אי-מניעת עבירה, עבירה לפי סעיפים 51, 59 ו-92 לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש״ל-1970.

**פרטי העבירה:** הנאשם הנ״ל, באיזור, ביום 20.01.02 או במועד הסמוך לכך, שידע או היה לו יסוד סביר לחשוד כי אדם אחר עובר או מתכנן לעבור עבירה על דין או או תחיקת בטחון שעונשה עולה על שלוש שנות מאסר, לא מסר הודעה על כך מיד למפקד צבאי או לתחנת המשטרה הקרובה או לכל קצין צה״ל או לא פעל באופן סביר אחר כדי למנוע את עשייתה או המשכתה או השלמתה, כדלקמן:

הנאשם נהג לארח בביתו את אחמד ברגותי, שומר ראשו ונהגו של מנהיג פלג "תנזים" של "פתי״ח" בגדה, מרואן ברגותי. אחמד ברגותי עצמו הינו חבר במנגנון הצבאי של הפתי״ח הנקרא "גדודי חללי אל-אקצא", אשר הינו אחראי לביצוע מאות פיגועים קטלניים. אחמד ברגותי השתתף בעצמו בביצוע פיגועי ירי כנגד חיילי צה״ל ודווח על כך לנאשם.

ביום 20.01.02 התארח אחמד ברגותי בביתו של הנאשם. באותה פגישה דווח אחמד ברגותי לנאשם, כי חבריו ב"גדודי חללי אל-אקצא" הם שביצעו את הפיגוע בחדרה וכן פיגועים קטלניים נוספים.

לאחר מכן שוחח אחמד ברגותי באמצעות מכשיר הפלאפון שלו עם אדם משכם ובמהלך השיחה שאל אחמד את הנאשם האם הוא יוכל לשוחח עם אותו אדם באמצעות מכשיר הטלפון שבבית הנאשם ולא באמצעות מכשיר סלולארי, מאחר שמדובר בנושא שאינו לשיחה באמצעות פלאפון ומחשש לציתות. הנאשם הסכים, ואחמד מסר את מספר הטלפון שבבית הנאשם לאדם משכם. אותו אדם התקשר לבית הנאשם ושוחח עם אחמד ברגותי. הנאשם שמע את תוכן השיחה בה שאל אחמד על הגעת בחור וציודו בנשק. כן הנחה אחמד את אותו אדם שהבחור שצריך להגיע יסתפר וכן דיברו על כך שהבחור נראה יפה.

תאריך: 13.01.03
סימוכין: ולד״ר/02-146m

I

P 6: 320

לאחר שאחמד ברגותי סיים את השיחה הנ"ל, הוא הודיע לנאשם כי ביומיים שלאחר מכן יתבצע פיגוע בירושלים. כן ציין אחמד ברגותי בפני הנאשם כי מבצע הפיגוע יגיע מאיזור שכם לרמאללה ואח"כ יצא לבצע את הפיגוע בירושלים. כמו כן מסר אחמד לנאשם כי מבצע הפיגוע יגיע מאיזור שכם לרמאללה, ומשם יצא לירושלים, וכי אותו המחבל יבצע פיגוע התאבדות. אחמד ברגותי ציין בפני הנאשם כי מבצע הפיגוע הינו יפה ולכן לא תהיה לו בעיה לצאת לירושלים. עוד מסר אחמד ברגותי לנאשם כי ישנם בעלי תעודת זהות ישראלית מזויפת, אשר אינם חשודים בביצוע פעילות חבלנית והם יכולים לצאת מן האיזור ולבצע פיגועים בישראל. עוד דווח אחמד לנאשם על פיגועים נוספים שביצעו חברי חולייתו ודרך ביצוע הפיגועים.

כאשר אחמד ברגותי מסר לנאשם על ביצוע הפיגוע, הנאשם שאל את אחמד ברגותי כיצד יגיע מבצע הפיגוע משכם לרמאללה, ואחמד השיב לו כי המחבל יגיע בדרך הרגילה.

אחמד ברגותי מסר לנאשם כי הפיגוע המתוכנן יבוצע כנקמה על הריגתו של פעיל הפלג הצבאי של הפת"ח - "גדודי חללי אל-אקצא", ראאד כרמי. עוד מסר אחמד ברגותי לנאשם כי "גדודי חללי אל-אקצא" החליטו על מלחמה נגד ישראל והחליטו לעשות הרבה פיגועים ולהרוג הרבה אנשים כנקמה על מותו של ראאד כרמי, עימו פעל אחמד ברגותי.

הנאשם לא פעל באופן סביר כדי למנוע את הפיגוע המתוכנן כפי שמסר לו אחמד ברגותי.

ביום 22.01.02 בוצע פיגוע ירי בצומת הרחובות יפו וקינג ג'ורג' בירושלים ע"י פעיל הזרוע הצבאית של תנזים "גדודי חללי אל-אקצא". בפיגוע זה ירה המחבל לעבר עוברים ושבים ברחוב מתוך כוונה לגרום למותם. בפיגוע זה נהרגו שתי נשים, אורה סנדלר ז"ל ושרה המבורגר ז"ל ונפצעו עשרות אנשים.

לאחר הפיגוע בעת שהנאשם היה בעבודתו בבית החולים "מוקאסד", התקשר אליו אחמד ברגותי ווידא עם הנאשם האם שמע על הפיגוע שבוצע. הנאשם השיב בחיוב וידע כי המדובר בפיגוע שתכנן אחמד כאמור לעיל.

## עדי התביעה:

1. רס"מ יעקב ברזני, 99106, לח"ק יהודה, גובה אמרת הנאשם.
2. רס"ר יצחק יעקובוף, 1008358, לח"ק יהודה, גובה אמרת הנאשם.
3. צוער צבי רייזנר, דו"ח תפיסה וסימון + תמונות, חקירות מת"מ.
4. רינת גולן, 021370200, פרטים בתביעה.
5. גינט ביטון, 003111341, פרטים בתביעה + תעודות.
6. אבישג נבטי, 0380141426, פרטים בתביעה.
7. תעודות פטירה.

דליה קאופמן
תובעת

סרן
צבאית

2

תאריך: 13.01.03
סימוכין: ולד"ח02/m146

P 6: 321

<div dir="rtl">

מספר התיק:3159/02                          תאריך: י' שבט, תשס"ג
                                           13 ינואר, 2003

בית    המשפט    הצבאי    בבית    אל                         1
                                                           2
פרוטוקול הדיון בישיבת דן יחיד                              3
                                                           4
                                                           5
בפני השופט: רס"ן אלי בר-און                                6
                                                           7
נאשם: בשאר חסן עבד ברגותי ת.ז 934469768 / מגידו            8
----------------------------------------------------------- 9
                                                           10
**גזר - דין**                                              11
                                                           12
הנאשם הורשע בעבירה של אי מניעת עבירה לפי סעיף 59 לצו בדבר הוראות בטחון    13
תשי"ל 1970. בתמצית ניתן לומר כי ביום 20/01/02 ארח הנאשם בביתו קרוב       14
משפחתו בשם אחמד ברגותי, אשר היה פעיל בכיר בארגון גדודי חללי אל אקצא.     15
במהלך שהותו בבית הנאשם שוחח ברגותי באמצעות מכשיר טלפון נייד שהיה         16
ברשותו, ובשלב מסויים של השיחה ביקש מהנאשם לקבל את השיחה בטלפון          17
הקבוע שבביתו של הנאשם, וזאת מטעמים בטחוניים. הנאשם אישר את קבלת         18
השיחה בביתו, ואכן ברגותי שוחח עם אדם משכם, ולאחר השיחה עדכן את הנאשם    19
כי הוא מתכוון להוציא אל הפועל פיגוע בירושלים. ברגותי אף מסר לנאשם מספר   20
רב של פרטים הנוגעים לאותו הפיגוע, והנאשם אף שאל אותו מספר שאלות בעניין   21
זה. יומיים לאחר מכן, ביצע פעיל של גדודי חללי אל אקצא פיגוע ירי בירושלים,  22
במסגרתו מצאו את מותן שתי נשים ונפצעו עשרות אחרים. לאחר הפיגוע התקשר     23
אחמד ברגותי אל הנאשם ושאל אותו האם שמע על הוצאת הפיגוע אל הפועל,        24
והנאשם אישר זאת.                                           25
                                                           26
הצדדים ביקשו מביהמ"ש כי יגזור על הנאשם עונש אשר יהלום את חומרת העבירה   27
בה הורשע. לעניין מידתו של עונש זה נחלקו דעות הצדדים. התביעה הצבאית       28
מצידה גרסה כי לנוכח התוצאות הטרגיות והנוראיות של הפיגוע שהוצא אל הפועל,  29
יש מקום להחמיר עם הנאשם. התביעה הצבאית אף הפנתה את תשומת הלב לכך       30
שלנוכח העובדה שמדובר בעבירה מיוחדת במינה, בחר המחוקק להצמיד לעבירה זו   31
עונש של 5 שנות מאסר שהוא עונש נמוך ביחס לעבירות הבטחוניות הנידונות      32
בבימ"ש זה. לדעת ההגנה, לא ניתן היה לדרוש מן הנאשם להתנהג באופן שונה מזה  33
שנהג בו, ולנוכח העובדה כי הנאשם לא היה שותף בדרך כלשהי בביצוע הפיגוע, אלא  34
רק חדל מעשיית מעשים אשר הביאו למניעתו, הרי שיש להקל עמו באופן משמעותי,  35
ולהורות על שחרורו.                                         36
                                                           37
אין ספק כי העבירה בה הורשע הנאשם הנה עבירה מיוחדת במינה לנוכח העובדה כי  38
היא אחת העבירות הבודדות אשר מטילות עונש בגין מחדל של אדם לעשות מעשה,   39
ולא בגין מעשה שעשה. ביהמ"ש העליון של מדינת ישראל דן לאחרונה בהרחבה     40
בעבירה זו, בפסק הדין בעניין מרגלית הר שפי. פסק הדין אשר סוקר את הדעות    41
השונות שהובעו במהלך השנים באשר להצדקת הכללתה של עבירה זו בספר         42
החוקים, מגיע בסופו של דבר למסקנה כי לנוכח ריבויים של מעשי הפשע, אין מקום  43
להשמיט עבירה זו מהקודקס הפלילי במדינת ישראל, יחד עם זאת, לא פסח        44
ביחמ"ש גם על העברת ביקורת מסויימת לנוכח כתם המלשינות שמדביקה החובה    45
המוטלת כאן על אותו אדם שחדל.                               46
                                                           47
בנסיבות הקיימות באזור, מעוררת העבירה של אי מניעת עבירה קשיים נוספים. כך   48
לדוגמא נדרש הנאשם שבפנינו לעשות מעשים למניעתה של עבירה שעל קיומה שמע    49

5
</div>

תאריך : י' שבט, תשס"ג       מספר התיק: 3159/02
13 ינואר, 2003

בעת היותו בשטח שאינו נתון לשליטה של כוחות הבטחון הישראלים. ניתן היה    1
לדרוש מן הנאשם כי יעשה לכך הפחות מעשים למניעת הפשע ע"י פנייה לגורמי    2
הבטחון הנמצאים בשטחו, אלא שבנסיבות המקרה מתקבל הרושם שדווקא גורמי    3
הבטחון הללו, הם אלה שהתכוונו להוציא לפועל את אותו פשע. ברור כי סיטואציה    4
זו העמידה את הנאשם בין הפטיש לסדן, ונראה כי חובתו המוסרית לפעול במקרה    5
זה, אשר אין ספק בדבר קיומה, נתקלה בקשיים של ממש לו הוא אכן היה מנסה    6
לפעול.    7
   8
לא ניתן להתעלם מכך שמחדלו של הנאשם אכן איפשר בסופו של דבר את התוצאות    9
הנוראיות שהביאו לאובדן חיי אדם חפים מפשע, אך לא ניתן להתעלם גם מכך כי    10
הנאשם לא מואשם בשותפות כלשהי בביצוע הפיגוע הנורא.    11
   12
עברו של הנאשם נקי. הנאשם סיים לימודי רפואה בעיראק וחזר לאזור כדי להתחיל    13
בהתמחותו כרופא בבית החולים אל מוקסד בירושלים. לפני ביהמ"ש נשמעה עדות    14
אביו של הנאשם וניתן היה להתרשם כי מדובר באדם אשר חינך את בניו לחיות    15
בשלום עם הבריות ולהקדיש את עיקר מאמציהם ללימודים אשר יטיבו עם הזולת,    16
ולא יפגעו בהם. גם מפי הנאשם ניתן היה להתרשם כי לא היו לו מניעים לאומניים,    17
בטחוניים או פליליים עת נמנע מלדווח על מעשה הפשע שהתקרב ובא.    18
   19
בנסיבות הענייו, אני סבור כי ניתן להקל עם הנאשם ולהמיר חלק מעונש המאסר לו    20
היה ראוי בקנס כספי על מנת לאפשר לו לחזור לחיים נורמטיבים, להקים משפחה    21
ולחנך את ילדיו ברוח של שלום ואהבה.    22
   23
אשר על כן, אני גוזר על הנאשם את העונשים הבאים :    24
   25
א.   מאסר בפועל בעשר כימי מעצרו של הנאשם.    26
ב.   9 חודשי מאסר על תנאי, והתנאי הוא כי במשך 5 שנים מיום שחרורו לא    27
יעבור הנאשם עבירה לפי הסעיפים 57 או 59 לצו בדבר הוראות הבטחון    28
תש"ל 1970.    29
ג.   קנס כספי בסך 5,000 ש"ח או 5 חודשי מאסר תמורתו. הקנס ישולם כתנאי    30
לשחרור.    31
   32
זכות ערעור תוך 30 יום.    33
   34
ניתן והודע היום, 13/01/03, בפומבי ובמעמד הצדדים.    35
   36
   37
שופט    38

6