

PLAINTIFF'S EXHIBIT 390 B

Date: 7 Av 5764
       July 25, 2004

File No.:3262/02

## Judea Military Court

**Before the Hon. President of the Court:** Lieutenant Colonel Nathaniel Benichou
Captain Eli Tussia-Cohen
Captain Avraham Einhorn

**The Military Prosecution**
(represented by Captain Sergei Morine)

[Stamp]  Notary
Yitzhak Weinberg

v.

**The Defendant: Fares Sadeq Mohamed Ghanem  Identity No. 25806985 / Israel Prison Service – present**
(represented by counsel, Adv. Osama Sa'adi)

### Decision

An indictment containing 32 counts was brought against the Defendant for the following offenses:

1. Membership in a prohibited association under Regulation 85 of the Defense Regulations (Time of Emergency), 1945, in that, from 2002 until his arrest, he was a member of a military squad, which set itself the goal of carrying out terrorist attacks against Israelis. This squad operated under the auspices of the al Aqsa Martyrs Brigades, the military arm of the Fatah organization. Mohamed Maslah, Mohammed Abdullah, Hussam Shahada, Haitham Hamdan, Zidan Albadawi, Nizar Wahadan and Ali Alian operated together with the Defendant in the squad.

2. Eight offenses of causing death intentionally under Section 51 (a) of the Security Provisions Order, 5730-1970, and Section 14 (a) of the Rules of Liability for an Offense Order, and five offenses of attempting to commit that offense. These offenses encompass a series of terrorist attacks in which the Defendant took part, as a result of which eight Israelis lost their lives and an attempt was made to cause the deaths of many others.

On July 26, 2001, the Defendant met with Hussam Shahada and Ali Alian, members of his squad. Ali Alian, who was armed with two weapons, told the Defendant and Hussam that

[Stamp] P 6: 320

he intended to carry out a shooting attack in the area of Givat Zeev. The Defendant and Hussam expressed their consent to participate in said attack. The three drove to the area of Kfar Aljib, where the Defendant remained in the vehicle in order to serve as a lookout and deterrent while his partners placed themselves near Road 436. At around 10:50 p.m., when they detected a Nissan Almara vehicle carrying Shmuel Landau, Meir Levy and Ronen Landau, and other vehicles, among which was a truck driven by Motti Namir, they opened fire at them. Several bullets that hit the car caused the death of the late Ronen Landau.

On August 25, 2001, Hussam Shahada once again asked the Defendant and Ali Alian to carry out shooting attacks, this time in the area of Road 443. The three decided that they would film the attack and, therefore, they recruited Haitham Hamdan to act as the photographer. The Defendant and his partners approached Mohamed Maslah and requested weapons from him. The latter provided them with an MP5 submachine gun. Then the four drove to the area of Road 443, with the Defendant riding in an Isuzu vehicle about a kilometer ahead of the vehicle in which Hussam, Ali and Haitham were riding, for the purpose of informing his partners of roadblocks along the way. At around 10:30 p.m., near the Dor Energy gas station, they detected a Volkswagen Passat, in which were riding the Ben Shalom couple, their daughter and Doron Yosef Sviri.

[Stamp] P 6: 320 [continued]

Date: 7 Av 5764  
       July 25, 2004

File No.:3262/02

[Stamp]  Notary  
            Yitzhak Weinberg

Ali Alian, who was driving the vehicle, overtook the family's vehicle and drove parallel to it. At that stage, Hussam Shahada and Haitham Hamdan opened fire at the occupants of the vehicle. With that shooting, they intentionally caused the deaths of the late couple Yaniv and Sharon Ben Shalom and of the late Doron Yosef Sviri and the wounding of the daughter of the late Yaniv and Sharon Ben Shalom.

On September 15, 2001, the Defendant met with Mohammed Abdullah, Hussam Shahada, Haitham Hamdan and Ali Alian. The Defendant arrived at this meeting armed with an MP-5 submachine gun and Ali Alian arrived armed with a pistol. The Defendant and his partners decided to go to Jerusalem and carry out a shooting attack with the aim of causing the deaths of Israeli civilians. Therefore, they drove at night from Ramallah to Jerusalem in the Defendant's Isuzu vehicle. The Defendant drove his partners to Road 9, which connects the Ramot neighborhood with the French Hill neighborhood. There the Defendant showed his partners where to carry out the planned attack and how to flee afterwards. At the end of this tour, they returned to Ramallah. At around 10:30 p.m., Mohammed Abdullah, Haitham Hamdan and Hussam Shahada drove to Jerusalem with the aim of carrying out the planned attack. The Defendant drove in his vehicle before the three in order to inform them of roadblocks along the way. The Defendant's partners placed themselves on Road 9 and waited for a single vehicle to pass by. At around 11:10 p.m., a Renault Express vehicle arrived in which Moshe Weiss and Meir Weissboiz were riding. The three overtook the vehicle and Hussam and Haitham opened fire at it, as a result of which Meir Weissboiz was killed and Moshe Weiss was critically wounded in the head.

On January 15, 2002, one day after a senior Tanzim military operative, Raed Karmi, had been killed, the Defendant met with Mohammed Abdullah, Mohamed Maslah, Tarek A-Nuf, Zidan Albadawi and Ahmed Barghouti. The latter said that Marwan Barghouti wanted the Defendant and his partners to carry out a revenge attack immediately. For that purpose, Ahmed gave Mohamed Maslah an MP-5 submachine gun and a pistol. The Defendant and his partners decided to carry out the terrorist attack that same evening. Therefore, they departed in the direction of the Givonim gas station near the entrance to Givat Zeev. The Defendant and his partners parked their vehicle near the site. Mohamed Maslah and Tarek A-Nuf departed to carry out the terrorist attack while the Defendant and

[Stamp] P 6: 321

Mohammed Abdullah waited in order to warn of the arrival of IDF forces, and to drive the shooters from the scene after they had carried out the attack. At around 7:45 p.m., Rochelle Eini and Yoela Chen, who were driving in a Fiat vehicle, arrived at the site and entered the gas station. Mohamed Maslah and Tarek A-Nuf approached the vehicle and shot at it. The late Yoela Chen was killed as a result of that shooting and Rochelle Eini was moderately injured. The Defendant departed from the site in order to see whether there were any roadblocks along the way.

In the middle of January 2002, the Defendant contacted Mohammed Abdullah and informed him that Ahmed Barghouti wanted to bring a suicide terrorist into the city of Jerusalem and suggested that he transport the terrorist together with him. Mohammed Abdullah agreed to the proposal. On January 22, 2002, the Defendant once again contacted Mohammed Abdullah and informed him that everything was ready for carrying out the terrorist attack. The Defendant and Mohammed took a preliminary drive to find a route on which there were no roadblocks. Afterwards, they returned to Ramallah where they were introduced to the suicide terrorist, who was armed with an M-16 rifle. The Defendant and Mohammed concealed the weapon in the vehicle and drove the terrorist to Strauss Street, where the terrorist alighted from the car and they explained to him that he must go to Jaffa Street and there he must open fire. The two fled from the scene. The terrorist opened fire in all directions and murdered the late Ora (Svetlana) Sandler and the late Sarah Hamburger, and wounded 45 other civilians.

3. Four additional offenses of attempting to cause death intentionally under Section 51 (a) of the Security Provisions Order, 5730-1970, and Section 19 of the Rules of Liability for an Offense Order, in that on August 18, 2001, the defendant and his partners decided to carry out a shooting attack in Jerusalem. The Defendant traveled in his Isuzu vehicle in front of his partners with the aim of informing them of roadblocks along the way and he served as the lookout and deterrent. They all reached the intersection near Neve Yaakov,

[Stamp] P 6: 321 [continued]

Date: 7 Av 5764                                                              File No.:3262/02
        July 25, 2004

[Stamp]   Notary
             Yitzhak Weinberg

         where the Defendant's partners opened fired at an Egged bus on the 45 line with the aim of causing the deaths of the passengers. As a result of that shooting, Ruth Shapira, age 6, and Andrew Feizouche were wounded. A number of bullets also hit a transit type of vehicle. On October 3, 2001, he decided to carry out another shooting attack with his partners. To that end, they armed themselves with weapons. The Defendant and his partners drove to Jerusalem with the Defendant examining whether there were roadblocks along the way. The Defendant led his partners to Begin Road and instructed them where to carry out the terrorist attack. From there all of them returned to Beit Hanina. After that, Mohammed Abdullah and Mohamed Maslah drove to Begin Road. At around 11:35 p.m., Mohammed Abdullah shot at a vehicle that was driving along Begin Road. Later, the two drove along Road 9 and there they shot at another vehicle in which Malka and Pinchas Cohen were riding. The two were moderately wounded. The shooters returned to Beit Hanina, where they were picked up by the defendant and the other partners.

         At the end of January 2001, the Defendant contacted Mohammed Abdullah and informed him that Ahmed Barghouti wanted to bring another suicide terrorist into Jerusalem. The Defendant and Mohamed agreed that they would transport the terrorist. Several days later, they picked of the terrorist, who was armed with an M-16 rifle, and they drove him in the direction of Jerusalem. When they reached Shu'afat, the terrorist requested to stop and to pray at the mosque. The Defendant and Mohamed agreed to his proposal and they left the terrorist in the mosque while they drove to Givat Shaul in order to locate a suitable place for carrying out the terrorist attack. From there they returned to Shu'afat, but the terrorist had disappeared.

4.    Eight offenses of possession of a weapon under Section 53 (a) of the Security Provisions Order, 5730-1970, in that in the framework of his actions, as described in Subsection 2 above, he was in possession of various weapons.

5.    Three offenses of conspiracy under Section 22 of the Rules of Liability for an Offense Order, in that in the middle of 2000, he conspired with others to carry out a shooting attack on Road No. 1, in that in July 2001, he conspired with others to carry out terrorist attacks against Israeli targets, and in that in February 2002, he conspired with others to bring a third suicide terrorist into Jerusalem. This plan was not implemented, despite the preparations of the conspirators, due to their arrest.

                                                                                             [Stamp] P 6: 322

6. Trading in war matériel, an offense under Section 2 of the Prohibition on Trading in War Matériel Order, in that in the middle of 2001, he purchased an MP-5 submachine gun.

7. Military training, an offense under Regulation 62 of the Defense Regulations (Time of Emergency), 1945, in that in August 2001, he taught Hussam Shahada and Mohammed Abdullah how to use an M-16 rifle.

8. Malicious damage to property, an offense under Section 53 (c) of the Security Provisions Order, 5730-1970, in that in the framework of the terrorist attack that was carried out on Jaffa Street on January 22, 2002, the terrorist who had been transported by the Defendant damaged a large number of stores, buses, vehicles and other structures.

The arguments of the parties

The Prosecutor requested to convict the Defendant of the offenses with which he was charged on the basis of the evidence that was submitted by the consent of the parties, which indicates the Defendant's culpability as a full partner in all the offenses. The Prosecutor noted that the Defendant had the *mens rea* required for the various offenses, particularly the offenses of causing death intentionally and attempting to cause death intentionally.

[Stamp] P 6: 322 [continued]

Date: 7 Av 5764                                                File No.:3262/02
      July 25, 2004

[Stamp]   Notary
          Yitzhak Weinberg

Counsel for the defense, for his part, initially noted that the Defendant did not take any active part in the act of shooting and did not even hold a weapon. Counsel for the defense further noted that the Prosecution's refrainment from bringing witnesses that were within its reach, who were also partners in the offenses, should be considered the basis for weakening its evidence. Counsel for the defense argued that some of the statements by the witnesses are hearsay evidence that cannot be relied upon and, alternatively, that there is no satisfactory corroborating evidence for the purpose of conviction according to the statements of the witnesses. Counsel for the Defendant also attacked the content of the witnesses' testimony as illogical, unreliable and even as contradicting each other.

Evidence

All the evidence in this file was submitted by consent of the parties and marked as follows:
- P/1: Statement of the witness Hussam Shahada, dated February 18, 2002.
- P/2: Statement of the witness Hussam Shahada, dated February 19, 2002.
- P/3: Statement of the witness Hussam Shahada, dated March 12, 2002.
- P/4: Statement of the witness Hussam Shahada, dated March 15, 2002.
- P/5: Statement of the witness Mohammed Abdullah, dated March 11, 2002.
- P/6: Statement of the witness Mohammed Abdullah, dated April 1, 2002.
- P/7: Statement of the witness Mohammed Maslah, dated February 25, 2002.
- P/8: Statement of the witness Mohammed Maslah, dated March 19, 2002.
- P/9: Statement of the Defendant, dated February 24, 2002.
- P/10: Statement of the Defendant, dated April 7, 2002.
- P/11: Statement of the witness Haitham Hamdan, dated April 3, 2002.
- P/12: Statement of the witness Haitham Hamdan, dated April 11, 2002.

This consent was restricted by the need to present corroborating evidence for the purpose of the conviction pursuant to each one of the above mentioned statements.

Similarly, at the hearing on May 20, 2003, the parties gave notice that the facts described in indictment counts 5, 6, 9, 11-14, 16, 17, 19, 20, 22, 23, 25-28 are not denied and the only thing in dispute between them is the part played by the Defendant in these offenses.

The Defendant also waived his right to testify in the framework of the defense case, provided that the prosecution would not seek to deem that waiver as corroborating evidence.

[Stamp] P 6: 323

As such, and in view of the narrowing of the dispute on many counts of the indictment on the question of the Defendant's culpability for the offenses with which he is charged, all that remains to us is to examine whether the military prosecution has set before us a sufficient evidentiary basis for the purpose of convicting the Defendant.

From this point and hereinafter, we will review the counts of the indictment, one by one.

However, before we turn to that task, a number of preliminaries are required as follows.

**The fundamentals of the offense of causing death intentionally**

Section 51 (A) of the Security Provisions Order, 5730-1970 states as follows:

[Stamp] P 6: 323 [continued]

Date:  7 Av 5764
       July 25, 2004

Case No.: 3262/02

> "He who intentionally causes the death of another person is
> liable for death or another sentence as ordered by the Court".

The factual foundation of this offense is crystal clear. It is necessary for the acts of the Defendant to lead to a deadly outcome. The mental foundation on his part does not require the premeditation necessitated under Section 300(2) of the Israeli Penal Code. It is therefore enough for the Defendant to have formed the decision to carry out the deadly attack and wishing for the deadly outcome.

Concerning the offenses of attempting to cause intentional death, things are just as clear. They were summarized as follows by this Court in another case:

> "There is no need to go into a lengthy analysis of this offense, which has been given comprehensive interpretation in the case law of the Courts. It may be said in a nutshell that in order to prove an attempt to cause death, there is a need, in the factual plane, to show that the defendant has committed an overt act in preparation for the commission of the offense, as stated in Section 20 of the Rules of Liability for an Offense Order, 5728-1968:
>
>> "Has started to execute his intentions… using means that are suitable for executing his intent and also expressing his intent through an overt act".
>
> [See comprehensive interoperation of the overt act in Criminal Appeal 5150/93 Seris v. State of Israel, **Supreme Court Verdict 48 (2) 183 and Criminal Appeal 9511/01** Kovkov v. State of Israel, **and see also Y. Kadmi On Criminal Law, fifth chapter, page 122, and in the Area Judea and Samaria Appeal 102/01** Ghoulma v. the Military Prosecutor. **And concerning the effect of Amendment 39 to the Penal Code** Hamishpat **C (1996) 297].**
>
> Concerning the mental foundation required for the offense, we shall cite the above mentioned Judea and Samaria Appeal 222/93 in which the Military Appellate Court ruled as follows:

[Stamp] P 6: 324

9

> "It has already been ruled that there is no difference between attempted manslaughter and attempted murder (Section 305 of the Penal Code), and in both cases, the genuine lethal intent, i.e. whether the perpetrator wanted the victim to die, must be proved, and less than that is not enough (recklessness concerning that outcome). On the other hand, there is no need to prove that all of the intentions of "premeditation" either (see Y. Kadmi, ibid, Chapter 19, seventh mark and Chapter 20, third mark and the case law cited there, and the guiding verdict in this case, Criminal Appeal 155/59 Deri v. the Attorney General, Supreme Court Verdict 14 233, Criminal Appeal 11/89 Saliman Ben Fahed v. State of Israel – unpublished).
>
> If this holds true for attempted manslaughter, then it applies all the more so to an attempt to cause intentional death. From now on it will be said that if in order to prove the complete offense of causing intentional death it is enough to prove a mental foundation of recklessness concerning the deadly outcome, in offenses of attempting to the same offense, criminal intent of a high level, i.e. wishing the death of the victim, must be proved".

There is therefore a need, on the one hand, for there to be an overt act, and on the other hand there must be awareness of the nature of the act and a wish for a deadly outcome." [see Court Case 4603/01].

- 5 -

[Stamp] P 6: 324 [continued]

Date:  7 Av 5764                                                    Case No.: 3262/02
        July 25, 2004

### The rules of aiding and abetting in the Area

It must first be mentioned that a person may be held liable for an offense as the "principal", i.e. as the person who committed one of the acts enumerated in the elements of the offense, or as an accomplice or an accessory to the offense, whose involvement in the responsibility for its commission lies in behavior that is concomitant to the behavior of the principal, without being one of the components of the *actus reus* of the offense. The words of the Supreme Court in Criminal Appeal 5235/93 **Levi v. State of Israel**, Supreme Court Verdict 48(5) 550 apply to this case:

> "At the foundation of the expansion of criminal liability pursuant to aiding and abetting rules, beyond the primary, complete commission of the offense, lies the view that whoever is prepared to contribute to the fulfillment of a common goal, while being aware at least of the possibility that the fulfillment of that goal involves the undermining of a certain value – is liable to be punished. There is an interrelation between the mental foundation (i.e. the willingness to contribute to the joint undermining of a certain social value) and the factual foundation prescribed in the offense. This is because once this "mental" foundation has been proved, the assignment of roles between the persons involved in the offense is no longer important. This means that the criterion for the existence of aiding and abetting for an offense is the awareness of the parties involved in the criminal incident of the possibility of undermining a certain social value due to their joint activity".

Sections 14 and 15 of the Rules of Liability for an Offense Order, 5728-1968 prescribe the rules of aiding and abetting, aiding and solicitation in the Area.

The relevant clause in our case states as follows:

> "Section 14 (A): if an offense has been committed, each of the persons below will be considered as having participated in the commission of the offense and as guilty of the offense, and may be accused of committing the offense: (1) Any person who has actually performed the act or one of the acts, or has committed the default or one of the defaults constituting the offense.
>
> (2) Any person who by act or default has allowed another person to commit the offense or has aided him in committing the offense.

[Stamp] P 6: 325

11

> (3) Any person who aids another person in the commission of an offense, whether present at the time of the commission of the offense or is absent at the time of the commission of the offense. A person will be considered as having aided if he is present at the place of commission of the offense to overpower resistance or to support the decision of the true perpetrator of the offense or to ensure the execution of the offense that is about to be carried out"

According to subsection 1, the responsibility of a person as a co-perpetrator does not require the execution of the elements of criminal behavior that is required for conviction. It is enough for the defendant to have joined others and contributed to a slight degree to the occurrence of the criminal act [see Criminal Appeal 2798/95 **John Doe v. State of Israel**, Supreme Court Verdict 51 (3) 388 and Supreme Court Verdict 4389/93 **Mordechai v. State of Israel**, Supreme Court Verdict 50 (3) 239].

In the current case it is also fitting to mention that when a number of criminals join forces according to early planning:

> "As a rule, the responsibility of a 'co-perpetrator' is based on a number of persons 'joining forces' to commit a common criminal task, each of the members of the gang having a 'role' as a the overall executor of the 'fulfillment of the task' " [Criminal Appeal 5589/98 Sultan v. State of Israel, and see also the above mentioned **John Doe** case, p. 404].

- 6 -

[Stamp] P 6: 325 [continued]

Date:  7 Av 5764  
       July 25, 2004

Case No.: 3262/02

### Identification of the defendant as the person who has been incriminated by the statements of the witnesses

Witness Hussam Shahada states in P/1 that he knew a person called "Fares Ghanem Hitawi, aged 27, married, who has children, I think three or four; his family has a digging company and they have Baggers and he works on a Bagger". In P/4, the witness adds that his good friend Fares Ghanem Sadak Hitawi lives in Samir Amis.

Witness Mohamed Abdullah states in P/5 that "Fares Sadak Ahmed Ghanem, aged about 27 from Kfar Akab, married with four children and has a digging company", met him in the company of Hussam Shahada. The witness also states in P/6 that "His friend for more than ten years Fares Sadak Ghanem, married and father of four children, works in earthworks and his family has a large earthworks company".

Witness Mohamed Masleh mentions in P/8 "Fares Hitawi, aged about 30, from Samir Amis, working on a Bagger tractor, with a full build, and he has a brown commercial double cabin Isuzu".

Witness Haitham Hamdan mentions in P/11 "Fares Hitawi, aged about 27, married, known as "Abu Adib", works with his father as a Bagger tractor driver, lives in Samir Amis and has a gray Isuzu commercial vehicle".

In his statement P/10, the Defendant confirms that the details that were provided above are his personal details. The Defendant also states that his family has another surname, Al Hitawi, that he lives at the junction of Kfar Akab – Samir Amis, that he works as a Bagger driver in his father's digging company and that the company has a number of vehicles, including a gray Isuzu that he uses according to his needs. The Defendant also confirmed acquaintance with Hussam Shahada, Mohamed Masleh and Mohamed Abdullah. The Defendant also stated that he was married to two wives and a father of four children.

We can see that the identification of the Defendant as mentioned in the statements of the prosecution witnesses poses no difficulty.

### Consensual filing of the evidence material

As set forth, all of the evidence material in this case has been filed consensually.

[Stamp] P 6: 326

13

This consent has important evidential significance, which was discussed by the Appellate Court, when it ruled:

> "It has already been ruled on more than one previous occasion that the consensual filing of written statements, without any denial of or objection to their content, means consent to the words therein" [Judea and Samaria Appeal 85/94 **Abu Mahasen v. the Military Prosecutor, Selected Verdicts of the Military Court in the Held Territories** 9 359 and see also Judea and Samaria Appeal 512/03 **the Military Prosecutor v. Khalilia** and Judea and Samaria Single Judge Appeal 114/01 **the Military Prosecutor v. Abu Hilal** in which the Court discussed again the validity of filing evidence in this manner].

In addition, even if evidence that is inadmissible may be found in the evidence material, the consent of the parties to file it has legitimized it [see Y. Kadmi **On Evidence**, Part B, page 914 and the case law cited therein].

In accordance with that which has been set forth above, the parties have made their consent to the filing of the evidence conditional to the presence of further supporting evidence in order to convict the Defendant pursuant to that evidence. It must immediately be stated that inspection of the evidence reveals that such an addition is abundant, because as the acts of the Defendant constituted a single, ongoing chain of […]

- 7 -

[Stamp] P 6: 326 [continued]

Date:  7 Av 5764                                                                                          Case No.: 3262/02
           July 25, 2004

[…] acts against the security of the Area that was carried out by a single gang, it is enough to verify the details relating to each of the offenses to verify all of the words of each and every witness and provide the required additional evidence. As we shall see, further to our statements, many counts of indictment are substantiated by a number of different sources of evidence and we can therefore determine even at this point that the words of the various witnesses in their statements support one another sufficiently to support the conviction of the Defendant thereby [a lot has been written about the nature of a "supportive evidence" as verifying evidence that may be gained even from statements that by themselves require support; we therefore apply to Y. Kadmi **On Evidence** 172 and Judea and Samaria Single Judge Appeal 9/01 **the Military Prosecutor v. Za'atari,** Selected Verdicts of the Military Court in the Held Territories 11 285].

These words are in the public domain, but the defense counsel asks us to deviate from them and examine the statements with a critical view to the point of negating their evidential weight. We have examined this motion and we believe that it must be dismissed. Firstly, we must point out, with significant degree of outcry, that had the defense counsel asked, at any stage of the trial, to pose conditions to his consent to the filing of the evidence, in contravention of the common, known practice, he should have done so when they were filed, so that the prosecution would have had the opportunity to bring forth its witnesses. Secondly, deviation from a rule that is rooted hereabouts requires grounds of great import, and we have not found in the words of the defense counsel even a shred of reasoning to substantiate such a deviation. The rule of the Military Appellate Court that we have discussed is rooted in healthy logic and common sense whereby if the Defendant disputes words that appear to be his, he must give an account to the contrary. The Defendant before us not only did not contend at any stage of the hearing that the statements of the witnesses did not reflect but truth, but kept silent and opted not to testify when he was given an opportunity to do so. In this state, as the Defendant did not provide an account contravening the account arising from the words of all of the witnesses, we cannot rely on the speculations of the defense counsel.

Moreover, we have repeatedly attended to the question of why we must hand down this verdict while the Defendant did not dispute any of the clear evidence of the prosecution and did not provide any line of defense to the contrary.

We have not found any answer to this question and therefore we must fulfill our lawful duty and settle the question of the responsibility of the Defendant for the offenses that are attributed to him in the indictment.

[Stamp] P 6: 327

### First count of the indictment

That which has been set forth in this account attributes to the Defendant an offense of membership in a military cell that operated under the auspices of the "Al Aqsa Martyrs Brigades".

This count of indictment is properly substantiated in the evidence of the prosecution. See P/6 (pages 1, 2, primarily line 23 onward), P/11 (page 1 line 11 onward) and P/12 (page 1 line 8 and onward).

### Second count of the indictment

This count of indictment is expressed by P/4 (page 7 line 19 onward). Once the Defendant conspired with Hussam Shahada to carry out a shooting attack against vehicles driving on the highway between Tel Aviv and Jerusalem, he must also be convicted of this offense.

- 8 -

[Stamp] P 6: 327 [continued]