165 (c) on p. 2 and Statement Prosecution/165 (m) Sections 2 (c) and 2 (g) that was submitted and verified by an interrogator by the name of "Adam", on p. 201).

Similarly, it is clear from the statements that were made by Ahmed Barghouti that the Defendant would occasionally instruct him to cease or to postpone the perpetration of a terrorist attack (Transcript Prosecution/165 (m) Section 2 (g), which was submitted and verified by an interrogator by the name of "Adam", on p. 201). From this, it becomes apparent that in other cases, they were perpetrated with the Defendant's authorization, even if he did not know in advance about each and every terrorist attack.

32. At the beginning of his interrogation, the Defendant tried to protect his family member, Ahmed Barghouti, and he claimed that he had been arrested with him because he "just happened to be passing by" (Transcript Prosecution/9 Section 10 that was submitted and verified by an interrogator by the name of "Robert", on p. 62). The Defendant claimed that Ahmed Barghouti had stopped working for him as a driver eight months before his arrest and that there was no connection between them with regard to the perpetration of terrorist attacks (Transcript Prosecution/10 Section 1, which was submitted and verified by an interrogator by the name of "Danny", on p. 90; and Transcript Persecution/21 Section 23, which was submitted and verified by an interrogator by the name of "Robert", on p. 63). In his police interrogation, Defendant claimed that Ahmed Barghouti was neither his secretary nor his bodyguard (Prosecution/104 on p. 4). In a meeting between the Defendant and Ahmed Barghouti at the time they were arrested, which was recorded without their knowledge, the two coordinated their positions with respect to the interrogation, and Ahmed Barghouti told the Defendant that he had claimed during the course of his interrogation that he is not connected to the Defendant but only served as his driver; the Defendant said he told them the same thing (Transcription of Conversation Prosecution/127 (c) on pp. 2-3). Ahmed Barghouti told the Defendant at that meeting exactly what he had said during the course of his interrogation with respect to the Defendant and his relationship to the various terrorist attacks that Ahmed Barghouti mentioned during the course of his interrogation (on p. 4).

[Stamp] P 7: 000387

However, during his Israel Security Agency interrogation, the Defendant confirmed that he knew that Ahmed Barghouti was connected to several cells and the perpetration of many terrorist attacks against Israel, and that when he wanted to stop the terrorist attacks, he would also tell this to Ahmed Barghouti. He claimed that he had told Ahmed Barghouti that he "does not permit" carrying out terrorist attacks within Israel (Transcript Prosecution/98 (k) on pp. 18-20). The Defendant said that there was coordination between himself and Ahmed Barghouti, which included reporting and providing money, and that he considered Ahmed Barghouti in charge of military operations in the Ramallah region, together with Abu Hamid, and that the two would carry out terrorist attacks by using several cells (Transcript Prosecution/27 Sections 2-3 that was submitted and verified by an interrogator by the name of "Smith", on p. 85).

The Defendant admitted that he gave money to Ahmed Barghouti and supported his activity although he claimed that Ahmed Barghouti did not report to him **prior** to the perpetration of terrorist attacks (Transcript Prosecution/98 (h) on pp. 3, 17, 20-24; and Transcript/24 Section 4, which was submitted and verified by an interrogator by the name of "Smith", on p. 85).

The Defendant admitted that Ahmed Barghouti would report to him **subsequent to** carrying out terrorist attacks (Transcript Prosecution/98 (g) on pp. 19-25, 40; Transcript Prosecution 98 (k) on p. 9). In his conversation with Agent John Doe No. 1, the Defendant said that Ahmed Barghouti dispatched four suicide terrorist attacks with his approval (Testimony of the agent on p. 106). These statements are consistent with those stated by the Defendant during the course of his interrogation when he took responsibility for several terrorist attacks that he had personally authorized (see Section 66, below).

[Stamp] P 7: 000387 [continued]

The Defendant did not hide the fact that he had given Ahmed Barghouti tens of thousand of dollars for the purchase of a variety of weapons, including assault rifles and pistols, for members of the cells that had mounted terrorist attacks against Israel. Ahmed Barghouti was responsible, on behalf of the Defendant, for the purchase of the weapons. He worked under the command of the Defendant and was in charge of "military operations" in the Ramallah region. The Defendant admitted that he knew that Ahmed Barghouti was connected to terrorist attacks against Israel, including the terrorist attacks in Jerusalem and at the Seafood Market Restaurant in Tel Aviv (with respect to all of these see: Transcript Prosecution/23 Sections 4-5 that was submitted and verified by an interrogator by the name of "Danny", on p. 90; Transcript Prosecution/25 Sections 10-11 that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Prosecution/27 Sections 2, 4 and Prosecution/29 Section 1 that were submitted and verified by an interrogator by the name of "Smith", on p. 85; Prosecution/28 Section 4 that was submitted and verified by an interrogator by the name of "Abu Wadi", on p. 96; Prosecution/65 Section 4 and Prosecution/70 Section 9 that were submitted and verified by an interrogator by the name of "Steve", on p. 53; see also the Defendant's comments in Transcript Prosecution/98 (g) on pp. 2-6, Transcript Prosecution/98 (h) on pp. 20-24, Prosecution/98 (j) on pp. 10-11 and Prosecution/98 (k) on p. 8).

**In order to summarize the relationship between the Defendant and Ahmed Barghouti**, it can be stated that the connection of the Defendant with terrorism operatives was through his family member and close associate, Ahmed Barghouti. As the Defendant stated when he was being questioned about Ahmed: "**He makes contact with the cells, both directly and indirectly. That is to say that without him I would not have direct communication with any**

[Stamp] P 7: 000387 [continued]

cells" (Transcript Prosecution/98 (k) on p. 8). When the Defendant was asked during questioning who headed the terrorist cells that operated under his control, the Defendant said, "**Ahmed Barghouti was partially under my control and partially worked with Nassar (Aweis)**" (Transcript of Conversation Prosecution/98 (k) on p. 34).

### (4) Mohamed Maslah (Abu Satha)

33. Mohamed Maslah "Abu Satha" (hereinafter – "**Abu Satha**") was another field operative who headed a cell that perpetrated murderous terrorist attacks. He was also the Defendant's bodyguard for a time, as well as his close associate. For this activity, Abu Satha was convicted, on the basis of his confession, and sentenced to nine cumulative terms of life imprisonment (Prosecution/155 (a) – (c)). In his testimony, Abu Satha began by stating that he did not have any connection with the Defendant and the Defendant was "**a political person**" who had no connection to the "military operations." Beyond this, Abu Satha was not willing to answer any other questions and therefore was declared a hostile witness and his police statements Prosecution/156 (a) – (c) were submitted in accordance with Section 10 (a) of the Rules of Evidence (on pp. 66 – 68). The Statement Prosecution/156 (a) was not submitted by an interrogator by the name of to whom it was given (the police officer Ya'akov Barazani) and therefore should be ignored. The Statements Prosecution/156 (b) – (c) that were submitted and verified by the police officers Marco Dahan and Moshe Levi (on pp. 198, 210) who testified that the statements were given by Abu Satha of his own free will. The interrogation was conducted in Arabic but the statements were written in Hebrew (which is not in accordance with that which is customary and required).

    In his statement, Abu Satha describes the terrorist attacks that he perpetrated and from his statements it becomes apparent that Ahmed Barghouti, the Defendant's close assistant, was involved in many of them in a concrete manner.

34. The Defendant confirmed during the course of his interrogation that Abu Satha worked in his office and operated under his responsibility, through Ahmed Barghouti, and that he knew that Abu Satha had carried out various terrorist attacks against civilians in Givat Ze'ev and Pisgat Ze'ev (Transcript Prosecution/30 Sections 2 – 3, which was submitted and verified by an interrogator by the name of "Emile", on p. 54, Prosecution/98 (k) on p. 35). When the Defendant was asked about the leaders of the terrorist attacks cells that operated under his control, he included Abu Satha among them, and said "**I am not running away from this**" (Transcript Prosecution/98 (k) on p. 34).

### (5) Jamal Ahawil

35. Jamal Ahawil (hereinafter – "**Ahawil**") was an additional field operative who assisted the Defendant and was his contact person in the Jenin refugee camp.

    Ahawil was not willing to answer any questions during the course of his testimony; he was declared a hostile witness and his police statements were submitted in Prosecution/166, in accordance with Section 10 (a) of the Rules of Evidence (on pp. 164 – 165), by the police officer Matans Hadad to whom it was made (on p. 169). Ahawil gave his statement in his own handwriting and Hadad translated it into Hebrew.

    Ahawil operated within the framework of the al-Aqsa Martyrs Brigades and stated during the course of his interrogation that he had received financial, among other, assistance from the Defendant and that he would distribute this money to other operatives, including some operatives who were wanted by the Israel Defense Forces; some of the money was used for the purchase of weapons (Prosecution/166 on p. 1). Ahawil was in continuous contact with the Defendant and would report to him about the operations of the al-Aqsa Martyrs Brigades and on offenses in the Jenin camp; sometimes operatives from these Brigades would report to the Defendant directly, as was the case with Aweis (Prosecution/166 on p. 5).

    The Defendant, in his police interrogation, denied that he was acquainted with Ahawil (Prosecution/106 on p. 6). However, while being interrogated by the Israel Security Agency, the Defendant did say that Ahawil was a leader from the Jenin refugee camp and a member of the al-Aqsa Martyrs Brigades that belong to the cells of Aweis. The Defendant was well acquainted with Ahawil but claimed that he never gave him weapons or money, although

[Stamp] P 7: 000388 [continued]

Ahawil had asked him for assistance; the Defendant explained that he worked with Aweis, and Aweis was the one who would answer Ahawil's requests (Transcript Prosecution/31 Sections 7 – 9, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58). Similarly, the Defendant confirmed that he sent requests for assistance from Ahawil to Arafat (Transcript Prosecution/67 Section 4 that was submitted and verified by an interrogator by the name of "Emile", on p. 54).

**(6) Nasser al-Shawish**

36. Nasser al-Shawish (hereinafter "**Shawish**") was another operative who was involved in terrorist attacks that were carried out by the al-Aqsa Martyrs Brigades. For this activity, he was convicted, on the basis of his confession, and sentenced to four cumulative life sentences (Prosecution/157 (a) – (d)). Shawish refused to answer any questions during his testimony but did claim that the Defendant was a political leader who did not have any connection to "military affairs." He was declared a hostile witness, denying the things that he said during the course of his interrogation and even claimed that he had not admitted anything (on pp. 69 – 71). Shawish's Statements Prosecution/158 (a) – (b) were submitted in accordance with Section 10 (a) of the Rules of Evidence by the police officers Matans Hadad and Awad Ataaf (on pp. 165, 168).

Regarding his statement, he testified that it was written in Arabic in his own handwriting, of his own free will, and translated into Hebrew by the interrogators. Police officer Hadad testified that he was present at the trial of Shawish and that he verified his statement before his conviction, since he did not have a defense attorney.

37. During the course of his interrogation (Statement Prosecution/158 (a), on p. 6 and Statement Prosecution/158 (b), on pp. 2 – 4) Shawish said that he had received an explosive belt weighing approximately 18 kg from the headquarters of the Counter-intelligence Force in Ramallah in order to store it in his car. Later, he met the Defendant at the hospital where his wife was being treated and Defendant asked to speak with him privately. During the course of their conversation, he was asked by the Defendant if he was acquainted with anyone who knew how to prepare an explosive belt or any one who had an explosive belt. At that time, Shawish called the person who had given him the explosive belt (Muzid Almitzri) called him and received his agreement for giving it to the Defendant. The Defendant informed him that Ahmed Barghouti would discuss the matter with him. The next day Ahmed Barghouti called Shawish and the latter gave him the explosive belt. Shawish heard later that day that the person who was carrying the belt had been caught in Jerusalem on his way to perpetrate a suicide terrorist attack.

[Stamp] P 7: 000389

Shawish was asked during the course of his interrogation if the Defendant knew about the suicide terror attacks and military operations. He answered that the day before the suicide terrorist attack was carried out by Mohammed Hashayka, Shawish met with the Defendant and told him that a person named Abdel Kareem was supposed to be sending the suicide bomber to Israel; the Defendant told Shawish to call him if he needed anything for the terrorist attack and gave him $600 and asked to be informed of details of the terrorist attack (on pp. 6 – 7). The terrorist attack was carried out in Jerusalem, and then the Defendant called Shawish, who told him that the terrorist attack had been perpetrated by the al-Aqsa Martyrs Brigades. The Defendant asked him to bring him the videotape of the suicide [bomber] Hashayka (on pp. 6 – 7 of Statement Prosecution/158 (a)). In his second statement Prosecution/158 (b), Shawish spoke about the financial assistance that he had received from the Defendant (on p. 5).

38. The Defendant denied in his police interrogation that he was acquainted with Shawish and in his statement he also denied the statements made by Shawish (Prosecution/106 on pp. 7 – 9). No additional evidence was presented to us with respect to the events that Shawish described during the course of his interrogation and therefore they are not supported and it is not possible to use them to support findings.

**(7) Ali Aidiya**

39. Ali Aidiya (hereinafter – "**Aidiya**") was a Tanzim operative who was primarily involved in training young people in the use of weapons, and in this matter he received orders from the Defendant. Similarly, he participated in shooting terrorist attacks aimed at soldiers. Aidiya refused to answer any questions during his testimony and claimed that the Defendant was a "man of peace" (on pp. 169 – 171). Therefore, he was declared a hostile witness and his Statement Prosecution/168 was submitted in accordance with Section 10 (a) of the Rules of Evidence by the police officer Ya'akov Barazani, who took the statement in the Arabic language and who translated it into Hebrew (on p. 208).

[Stamp] P 7: 000389 [continued]

40. During the course of his interrogation, Aidiya spoke of the Defendant's participation in the shooting course for young people (Prosecution/168, on pp. 1 – 2) and the terrorist attacks that he himself had perpetrated. Similarly, Aidiya said: "**The head of the Tanzim, Marwan Barghouti, would know about all of the shooting incidents that have been carried out by Tanzim operatives before they had been perpetrated, and he had approved them**" (on p. 5). He noted that several months before his arrest, the Defendant asked him "to buy a weapon of any type" and to transfer it by way of Abu Hamid (Transcript Prosecution/43 Section 3, which was submitted and verified by an interrogator by the name of "Robert", on p. 92), which supports what Aidiya said during the course of his interrogation.

### (8) Ismail Radaida, Muhannad Abu Halawa and Khamal Abu Wahr

41. Ismail Radaida (hereinafter – "**Radaida**") wanted to perpetrate a terrorist attack and approached the Defendant for that purpose. He perpetrated the shooting terrorist attack near Ma'ale Adumin, where the Greek Orthodox monk Germanos Tsibouktzakis [Translator's note: as written], of blessed memory, was murdered (see Chapter E (3), below). For his terrorist activity, Radaida was convicted, on the basis of his confession, and sentenced to life in prison and another 20 consecutive years' imprisonment. In his testimony in this case (on pp. 42 – 44), Radaida refused to answer questions; he was declared a hostile witness and his police statement was submitted on the basis of Section 10 (a) of the Rules of Evidence (Statements Prosecution/151 (a) – Prosecution/151 (c), handwritten Statement Prosecution 151 (d) that was torn, reconstructed and translated and the recording in which Radaida reenacted the murder of the monk and its transcript – Prosecution/151 (a)).

Radaida's statement was submitted by an interrogator by the name of Marco Dahan and Yitzchak Ya'akoboff who heard his statement in Arabic but recorded in Hebrew (which is not in accordance with that which is customary and required), and testified that it was given by Radaida of his own free will. Radaida wrote his Statement Prosecution/151 (d) in his own handwriting, in the presence of Ya'akoboff (on pp. 171, 198). The person who conducted the re-enactment (Marco Dahan) made no reference to this fact in his testimony and therefore the recording of the re-enactment is not to be considered, as it is an external statement of a witness that was not submitted as required by law.

[Stamp] P 7: 000390

42. In his first statement, Radaida (Prosecution/15 (a)) said that he decided to perpetrate the terrorist attack when he saw on television that a Palestinian baby girl had been killed, and therefore he went to the office of the Defendant. The conversation between them was held in private and Radaida told the Defendant that he wanted to perpetrate the terrorist attack and demanded a weapon for that purpose. The Defendant referred Radaida to a person by the name of Muhannad (Abu Halawa) who is known as "Alaa" (hereinafter – "**Muhannad**") and instructed Muhannad to obtain a weapon for Radaida. In his second statement (Prosecution/15 (b)), Radaida added that he made it clear to the Defendant that he required the weapon in order to carry out terrorist attacks against Israeli targets, and then the Defendant had referred him to Muhannad. Muhannad told Radaida that that he would obtain two Kalashnikov rifles for him and that from now on his contact would be with Muhannad and not with the Defendant. About two weeks later, Muhannad called Radaida – who had meanwhile added another person to the terrorist attack – and told him that the weapons were ready. Radaida received weapons and ammunition from Muhannad, who instructed him and his comrade in their operation.

After several days of preparation for the terrorist attack, Radaida and his comrade Yasser went to an observation point on the Ma'ale Adumin Road; they carried out the terrorist attack by shooting at the car in which the monk was traveling, and then fled. The next day, Radaida learned from the news that he had killed a Greek monk and Muhannad called him to complain about this; Radaida explained that he thought it was a settler. During the course of his interrogation, Radaida was asked why he went to the Defendant when he wanted to perpetrate a terrorist attack and he answered that he had seen the Defendant several times on television and understood "**that he is the only person who could help me to obtain a weapon**" (on p. 5).

In his third Statement (Prosecution/15 (c)), Radaida revealed that his original intent was to perpetrate a suicide terrorist attack but the Defendant told him, "**Suicide attacks are the work of Hamas and the Islamic Jihad; the Tanzim carries out attacks against the army and the settlers.**"

[Stamp] P 7: 000390 [continued]

**Radaida** continued, saying, "**Marwan Barghouti said that he was willing to give me weapons and explosives so that I could carry out attacks against soldiers and settlers**" (on p. 1). This version by Radaida also emerges from the document that he wrote in his own hand (Prosecution/15 (d)), although in a more condensed version.

43. Radaida's story is also supported by the Defendant's version during the course of his interrogation (Transcript Prosecution/98 (k) on pp. 37-38; and Transcript Prosecution/98 (d) on pp. 2-4, 11-12, where it mistakenly reads Ismail Aldeba instead of Ismail Radaida). In his police interrogation, the Defendant denied that Muhannad worked in his office or was his deputy and said that Muhannad was not connected to the Tanzim (Statement Prosecution/102 on p. 3, Prosecution/103 on p. 5, Prosecution/105 on p. 2, Prosecution/106 on p. 1). Early during the course of his interrogation by the Israel Security Agency, the Defendant also denied that he was acquainted with Radaida and said that Muhannad worked in his office (Transcript Prosecution/9 Sections 8-9 and Transcript Prosecution/21 Section 22 that were submitted and verified by an interrogator by the name of "Robert", on pp. 62-63).

    However, as the interrogation continued, the Defendant admitted that Radaida had come to him to proprose the perpetration of a suicide terrorist attack and that the Defendant told him, "**We do not work with suicide attacks**." The Defendant referred Radaida to Muhannad and told Muhannad that Radaida "**needs training… find something for him**." Similar the Defendant said, "**Muhannad reached an agreement with him that he would try to carry out an attack here in Ma'ale Adumim or somewhere else, I knew about it later… then they fired on a car and injured some fellow Elhouri… meaning they killed him**" ("Elhouri" means "Priest" in Arabic – A.B.). A similar confession with respect to the recruitment of Radaida by way of Muhannad emerges from points that he had made during the interrogation (see: Transcript Prosecution/22 Sections 12-16 and Transcript Prosecution/40 Section 9 that were submitted and verified by an interrogator by the name of "Mofaz", on p. 58, Transcript Prosecution/23 Section 6 that was submitted and verified by an interrogator by the name of "Danny", on p. 90; and transcript of the interrogation of the Defendant Prosecution/98 (d) on pp. 21-26; and Prosecution/98 (g), on p. 8).

    The Defendant further admitted that he met with Muhannad and gave him money for the purpose of carrying out terrorist attacks, after Muhannad told him that his cell had perpetrated several terrorist attacks, including the murder of the Kahane couple, of blessed memory. The Defendant said that he gave Muhannad a sum of approximately $3,000, as well as weapons (Transcript Prosecution/43 Sections 14-16 that was submitted and verified by

[Stamp] P 7: 000391

an interrogator by the name of "Robert", on p. 62; Transcript Prosecution/59 Section 10 that was submitted and verified by an interrogator by the name of "Wadi", on p. 56; Transcript Prosecution/67 Section 6 that was submitted and verified by an interrogator by the name of "Emile", on p. 54; Transcript Prosecution/68 that was submitted and verified by an interrogator by the name of "Steve", on p. 53).

In the transcript of the interrogation of the Defendant (Prosecution/98 (d), on pp. 21-23) he said that Muhannad informed him that his cell had been caught and explained that Muhannad was referring to "**those for whom we arranged weapons**."

44. The relationship between the Defendant and Muhannad also emerges from remarks that Khamal Abu Wahr (hereinafter – "**Wahr**") made in his statement with respect to money that he had received from Muhannad, with the knowledge and the approval of the Defendant. In this manner, he received from the Defendant, by way of Muhannad, the sum of approximately NIS 25,000, most of which was intended for the purpose of the manufacture of mortars and the purchase of pistols. At a certain stage, the Defendant began to call Wahr directly, in order to clarify his needs. In addition, Wahr said said during the course of his interrogation that the Defendant would also transfer money to him by way of Jamal Ahawil, and that, after the terrorist attack in Meirav, the Defendant had contacted him in order to find out the names of the people who participated in that terrorist attack, in order to transfer money to them (Prosecution/181 (b), on pp. 4-5; and Transcript Prosecution/181 Section 6). Wahr stated during the course of his interrogation that he and Muhannad would decide between them what he needed and then the Defendant would send them the money; the Defendant would call Wahr to verify that the money that he had sent him by way of Muhannad had in fact arrived (Transcript Prosecution/18 (d) Section 6.1). At a certain stage, the relationship between Wahr and Muhannad was broken off and the Defendant told Wahr that he was having financial problems and that he did not have money to buy bullets. At this point, the Defendant referred Wahr to Jamal Ahawil, in order to receive money (Transcript Prosecution/181 (c) Section 15 and Prosecution/18 (d) Section 6.1).

45. Wahr carried out several shooting terrorist attacks in the context of the operations of the al-Aqsa Martyrs Brigades, and he listed the terrorist attacks in which he participated in his police statement and during the course of his interrogation by the Israel Security Agency. During his testimony, he refused to answer questions (on pp. 181-189), and therefore his police statement (Prosecution/181 (a)-b) was submitted in accordance with Section 10 (a) of the Rules of Evidence, by an interrogator by the name of Gadir Salah who testified that Wahr gave the statement of his own free will in Arabic, but that it

[Stamp] P 7: 000391 [continued]