was written down in Hebrew (on p. 209). Similarly, the transcript from Wahr's interrogation by the Israel Security Agency was submitted (Prosecution/181 (c) – (d) which was submitted by an interrogator by the name of "Naveh", on p. 205). Although Wahr's external statements are not supported by additional evidence, there is a great deal of other evidence with respect to the assistance that the Defendant offered to people in the field for the purpose of the purchase of weapons in order to carry out terrorist attacks.

**(9) Nasser (Haloum) Naji Abu-Hamid**

46.   Nasser Haloum Naji Abu-Hamid (hereinafter – "**Haloum**") is the brother of Abu Hamid and he perpetrated shooting terrorist attacks within the framework of the al-Aqsa Martyrs Brigades. Haloum was involved in the terrorist attack in which the police officer Galit Arbiv of blessed memory, was shot to death in Neve Ya'akov, Jerusalem (see Chapter E (10), below). He also participated in the preparation of the fatal terrorist attack at the Seafood Market Restaurant in Tel Aviv (see Chapter E (12), below). He was convicted, on the basis of his confession, and sentenced to five consecutive life sentences (Prosecution/161 a-b).

In his testimony, Haloum refused to answer questions (on pp. 73-76) but claimed that the Defendant was a political leader who has no connection with "military issues." Therefore his police statement (Prosecution/162 a-c) was submitted by police officers Mizrahi and Elkaua'an on pp. 184, 194). Haloum's connection was with Ahmed Barghouti, who was the Defendant's close assistant.

**(10) Ziyad Hamuda**

47.   Ziyad Hamuda (hereinafter – "**Hamuda**") was an operative in the Tanzim. In his testimony, Hamuda refused to respond to questions and his police statement was submitted in accordance with Section 10 (a) of the Rules of Evidence, after he was declared a hostile witness. He claimed that he had signed his statement so that he could undergo surgery for appendicitis (on pp. 166-197). He denied that which he had set forth in his Statement Prosecution/167 (b) and claimed that the Defendant was "a man of peace." The statement by Hamuda was taken by police officer Avi Akiva, who was not brought to testify and therefore, the statement was not filed in a lawful manner and it must be ignored.

Hamuda was convicted, on the basis of his confession, for a long series of security crimes (Prosecution/167 (a)). In the indictment to which Hamuda confessed, it is claimed that he had been recruited to the Tanzim by the Defendant for the purpose of military training, and that he had been promised that the Defendant would see to financial assistance for him. In addition, in the indictment to which Hamuda confessed, it is similarly claimed that that he

[Stamp] P 7: 000392

had asked the Defendant for a weapon, in order to perpetrate a shooting terrorist attack near the settlement of Psagot and that the Defendant had referred him to Muhannad in order to receive the weapon (Items No. 5 and No. 7 of the indictment). In his Israel Security Agency interrogation, the Defendant confirmed that Hamuda had asked him for a weapon but that, to the best of his recollection, he did not receive it (Transcript Prosecution/34 Section 5 that was submitted and then verified by an interrogator by the name of "Itai", on p. 52).

On another occasion, during the course of his interrogation, the Defendant said that it was likely that Hamuda had received an MP5 rifle from him (Transcript of Interrogation Prosecution/98 (e), on p. 67). There is nothing in the evidence that incriminates the Defendant other than the confession by Hamuda to the charges in the indictment, on the basis of which he was convicted and it is not possible to substantiate any findings on the basis of a confession of this type (see Section 132 (c), below). However, a great deal of additional evidence was brought forth with respect to the assistance that the Defendant gave to people in the field in order to purchase weapons for the purpose of the perpetration of terrorist attacks.

### (11) Riad Amor

48. Riad Amor (hereinafter – "**Amor**") was another field operative of the Tanzim who described, during the course of his interrogation, the terrorist attacks in which he took part. During his testimony, he refused to respond to questions (on pp. 172 – 174), and claimed that he did not have any connection with the Defendant. He was declared a hostile witness and his statements Prosecution/169 (a) – (b) were submitted by police officers David Mizrahi and Ya'akov Barazani, who testified that Amor had made these statements and signed them of his own free will (on pp. 186, 208). The statements were taken in Arabic but were written down in Hebrew (which is not in accordance with that which is customary and required). Amor was convicted of perpetrating a large number of terrorist attacks, on the basis of his confession (Prosecution/169 (c) – (d)).

[Stamp] P 7: 000392 [continued]

49. During the course of his interrogation, Amor said that he met the Defendant approximately six months prior to his arrest and that the Defendant told him that he was pleased with the operations of Amor and his comrades in Bethlehem, but that he would prefer that they perpetrate terrorist attacks against the army, not against civilian targets, because "**this creates problems**" and "**it causes a headache for the Chairman**" (Prosecution/169 (a), on p. 3, Prosecution/169 (b), on p. 11). The Defendant claimed in his police interrogation that he is not acquainted with Riad Amor in any way. (Prosecution/14 on p. 9) and there is no evidence to contradict this claim other than an external statement by Amor which requires support that was not found. Notwithstanding, there is a great deal of additional evidence with respect to the general position of the Defendant favoring terrorist attacks against soldiers and settlers.

**(12) Nasser Haj**

50. Nasser Haj (hereinafter – "**Haj**") also worked in the framework of the Fatah and described in his statement Prosecution/178, the terrorist attacks in which he took part. In his testimony, he refused to respond to any questions and later denied everything that he had said during the course of his interrogation (on pp. 175 – 176). Therefore, his statement was filed in accordance with Section 10 (a) of the Rules of Evidence, by an interrogator by the name of Moshe Levy, who testified that Haj gave his statement of his own free will, after he was given a warning with respect to his rights (on pp. 211 – 212).

In his above mentioned statement, Haj said that he, together with other operatives, had approached the office of the Defendant with a request to receive money and weapons. The Defendant told them to look for weapons because he would finance the purchase. Later, the Defendant gave him $1,200 in order to purchase weapons (on pp. 4-5). There is nothing in the evidence that supports this above mentioned external statement by Haj, which requires support, but there is a great deal of additional evidence of the assistance that the Defendant gave to people in the field for the purpose of the purchase of weapons in order to carry out terrorist attacks.

**(13) Tahrir Barghouti**

[Stamp] P 7: 000393

51. Tahrir Barghouti (hereinafter – "**Tahrir**") is a family member of the Defendant who, in accordance with his statements during the course of his interrogation, carried out a large number of shooting terrorist attacks. He refused to respond to questions in Court (on pp. 177 – 178) and therefore his statements were filed in accordance with Section 10 (a) of the Rules of Evidence, (Prosecution/171 (a) – (d)) by police officer Ya'akov Barazani, who took them and testified that the statements were given by Tahrir, of his own free will, in the Arabic language, and that they were later translated into Hebrew (on p. 207).

52. During the course of his interrogation, Tahrir stated that he had asked the Defendant to help him to establish a cell. The Defendant promised to help Tahrir with money and ammunition and to help his people in the event that they were arrested. The Defendant also proposed that Tahrir be in charge of the cell, but that he distance himself from the actual operations. Tahrir explained during the course of his interrogation that he had approached the Defendant in order to receive weapons for the cell that he had established (Prosecution/171 (d), on p. 3). Later, the relationship was continued through Muhannad, who hinted to him that the Defendant was not interested in having him take part in the activity; the Defendant himself explained to Tahrir that this position derived from the fact that the members of the cell were scoundrels (Prosecution/171, on p. 4).

   In his police interrogation, the Defendant denied all of the statements that had been made by Tahrir (Prosecution/104, on pp. 9 – 10). However, in his Israel Security Agency interrogation, the Defendant did admit that Tahrir had approached him with respect to the perpetration of terrorist attacks and had asked for weapons for this purpose. Yet, the Defendant claimed that he did not accede to this request (Transcript Prosecution/30 Section 1 that was submitted and verified by an interrogator by the name of "Emile", on p. 54). There is nothing in the evidence that supports this external statement by Tahrir, which requires support that was not found for the contradiction of the claim of the Defendant. However, there is a great deal of additional evidence of the assistance that the Defendant had rendered to people in the field for the purchase of weapons in order to perpetrate suicide attacks.

**(14) Ahmed Musafar**

[Stamp] P 7: 000393 [continued]

53. Ahmed Musafar was a weapons dealer who supplied weapons to members of the Tanzim and the al-Aqsa Martyrs Brigades. In his testimony (on pp. 186 – 188), he refused to respond to questions and he denied everything that he had stated during the course of his interrogation. Musafar was declared a hostile witness and his police statements were filed in accordance with Section 10 (a) of the Rules of Evidence (Prosecution/179) by an interrogator by the name of Ya'akov Barazani, who testified that the statement had been made after Musafar had been warned about his rights and that he had signed the statement, which had been taken in Arabic but had been written down in Hebrew (on p. 208).

    In his statement, Musafar spoke about his meeting and that of his comrades at the office of the Defendant, two days before Ra'ed Karmi was killed. The Defendant told them that they need to continue their operations in the village where they reside, not in Ramallah, and he promised to help them. After the death of Karmi, Musafar received orders to perpetrate a terrorist attack in revenge; the order came from Mahmoud Jabar, who worked at the office of the Defendant, and therefore Musafar understood that it came from the Defendant (Prosecution/179, on pp. 6 – 7). During the course of his police interrogation, the Defendant denied what Musafar had said (Prosecution/104, on p. 3), and there is no evidence that supports this external statement by Musafar, with the exception of the many pieces of evidence that were presented with respect to the Defendant's call to avenge the death of the Karmi in the form of a terrorist attack.

**(15) Sharif Naji**

54. Sharif Naji (hereinafter – "**Sharif**") was a member of the cell that was led by his brother, Abu Hamid, which carried out terrorist attacks against Israeli citizens. He was also the bodyguard for the Defendant. Sharif was the one who escorted the suicide [terrorist] Ibrahim Hasouna, who perpetrated the terrorist attack on the Seafood Market [restaurant] in Tel Aviv. In his statement, he set forth all of his deeds.

    Sharif, like all of his comrades, refused during his testimony to respond to questions other than claiming that he was acquainted with the Defendant only from television. He was declared a hostile witness and his statement Prosecution/182, to which his handwritten translation into Arabic Prosecution/182a was appended, was submitted by an interrogator by the name of Avi Ben Lulu, who testified that the statement was given by Sharif of his own free will (on p. 210).

[Stamp] P 7: 000394

55. In his statement Prosecution/182, Sharif talked about the shooting terrorist attacks that he had perpetrated against soldiers and settlers, within the framework of the Fatah Tanzim. He explained that he had perpetrated the terrorist attacks so that the *intifada* would continue, specifically because he was interested in peace and added: "**That is what Arafat, Marwan Barghouti and Hussein al-Sheikh were saying on Palestinian television and Al Jazeera… they would say that if the *intifada* were to continue, we can receive more territory and more things from Israel**" (on p. 4). During the course of his police interrogation, Defendant denied having said these things (Prosecution/103, on p. 5).

After Sharif's cell was dismantled, due to the death of Mohammed Omasi, Sharif began to serve as a bodyguard for the Defendant, for a period of approximately six months until his arrest. When interrogated about the Defendant he said: "**I would hear him telling his people that they should continue to carry out terrorist attacks and he would say this freely on Israeli and Arabic television**" (on p. 5). In the second part of his statement, Sharif spoke about his role in a terrorist attack at the Seafood Market Restaurant in Tel Aviv and the involvement of Ahmed Barghouti in the attack (on pp. 5 – 11). During the course of his interrogation, the Defendant denied having any connection at all with Sharif, although he was acquainted with him (Transcript Prosecution/34 Section 4, which was submitted and verified by an interrogator by the name of "Itai", on p. 52). However, the statements that were made by Sharif are supported by many pieces of evidence that were submitted with respect to the manner in which the Defendant would make use of the media in order to call for terrorist attacks against Israel and how he called on his people to do so, as well.

### (16) Amid Abu Radaha

56. Amid Abu Radaha (hereinafter – "**Abu Radaha**") was another Tanzim operative who perpetrated shooting terrorist attacks that targeted soldiers and settlers, as he talked about during the course of his interrogation. During his testimony, he claimed that he did not have any connection with the Defendant or with Ahmed Barghouti and that he did not receive a weapon from the Defendant but rather from the Palestinian Authority.

[Stamp] P 7: 000394 [continued]

He claimed that the interrogators wrote things in his statement that he had not said and denied the contents of his statement (on pp. 192 – 194). Abu Radaha's statement (Prosecution/183) was submitted by an interrogator by the name of Meir Cohen, who testified that the statement was given by Abu Radaha of his own free will and that it was taken in Arabic but written down in Hebrew (which is not in accordance with that which is customary and required) and that he had signed it.

57. In his statement, Abu Radaha stated that the weapons and ammunition that he had used in order to perpetrate the terrorist attack had been received from the Defendant and Ahmed Barghouti, who also gave the members of the cell money for ongoing expenses (on pp. 2 – 6). In his police interrogation, the Defendant denied what Abu Radaha had said (Prosecution/104, on p. 3). However, his statements are supported by many pieces of evidence with respect to the Defendant's activity supplying money and weapons to members of the Tanzim in the field for the perpetration of terrorist attacks against Israel.

**(17) Ashraf Jabar**

58. Ashraf Jabar (hereinafter – "**Jabar**") was also a Tanzim operative who carried out terrorist attacks against Israeli targets, together with others, including Abu Radaha. Jabar refused to respond to questions during his testimony (on p. 185 – 197) and therefore his statement was submitted, together with the diagram that he drew, (Prosecution/184 (a) – (b)) by an interrogator by the name of Moshe Levy, who testified that the statement was given by Jabar of his own free will; it was taken in Arabic and translated into Hebrew (on p. 212).

59. In his statement Prosecution/1848, Jabar talked about the terrorist attacks that he had perpetrated and noted that he had approached the office of the Defendant with a request for ammunition and money for members of the cell; the Defendant promised that he would pay for the ammunition and did indeed do so through Ahmed Barghouti; the bullets were given to him in exchange for NIS 3000. Jabar explained that he gave the bullets to the Defendant because he was the head of the Tanzim and that he would distribute them to Tanzim operatives (on pp. 3 – 4).

During the course of his interrogation, the Defendant confessed that Jabar had asked him for financial support and weapons, but said that he did not remember exactly what he had given him (Transcript Prosecution/48 Sections 2 – 3, that was submitted and verified by an interrogator by the name of "Robert", on p. 62).

[Stamp] P 7: 000395

**D. Statements of the Defendant During Interrogation and Other Evidence with Respect to His Role and Involvement in Terrorist Attacks against Israel**

**(1) The liability of the Defendant for the activity of the terrorist cells and the degree of his control over them**

60. In accordance with that which has been set forth above, during his Israel Security Agency interrogation, the Defendant did not deny that he was the commander and leader of the Fatah field operatives on the West Bank and that he was the commander of the Fatah and the Tanzim in the West Bank, that he had established the al-Aqsa Martyrs Brigades and that he was in charge of their operations. He also confirmed that he was in charge of the supply of money, weapons and explosives to the field cells and that he was in charge of their military operations (see Section 17, above). The Defendant explained during the course of his interrogation that he found himself involved more and more with the "military cells," which would approach him with requests for various types of assistance, since people such as Ra'ed Karmi and Nassar Awis considered him to be the commander. He also said that his connection with the members of the cells was through his assistant and personal driver Ahmed Barghouti. The Defendant made a distinction between terrorist attacks in Israel, for which he refused to take responsibility, and terrorist attacks that the Fatah had carried out in the West Bank, for which he assumed full responsibility during the course of his interrogation (Transcript Prosecution/25 Section 20 that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58). The Defendant emphasized that he was in charge of the operations of the Fatah on the West Bank but was not an expert on the details, such as the type of weapons that had been used, the way in which they had been purchased, the planning of terrorist attacks and their perpetration (Transcript Prosecution/27 Section 1 that was submitted and verified by an interrogator by the name of "Smith", on p. 85).

During the course of some of his interrogations, the Defendant claimed that he was not directly responsible, from the command perspective, for the operations of the field cells (Transcript Prosecution/42 Section 7, that was submitted and authorized by an interrogator by the name of Wadi, on p. 96). However, in later stages

[Stamp] P 7: 000395 [continued]

of his interrogation, the Defendant confessed that he was responsible for the operations of the cells that worked with Ahmed Barghouti and Abu Satha, because they were close to them and he funded their operations; in further detail, he noted that he considered himself to be responsible for three terrorist attacks, in Givat Ze'ev, French Hill and the Atarot Bridge (Introduction to Transcript Prosecution/38 that was submitted and verified by an interrogator by the name of "Smith", on p. 85). By his own description here, the Defendant did not consider himself responsible for terrorist attacks that have been carried out by the cells of Aweis, Manzur Sharam and others and he did not consider himself to be their commander. Of his relationship with Aweis, the Defendant said: "**I have control based upon respect over Nassar but not actual control**" (Transcription of Conversation Prosecution/98 (k) on p. 17). When speaking about the field cells that had carried out terrorist attacks against Israel during the course of his interrogation the Defendant said:

> "**These cells found themselves more than one address. What is an address? An address is someone you can turn to ask for money, to coordinate work. I am one of those addresses, I am one address among several addresses. The heads of the security forces are also addresses.**"

Based upon these statements by the Defendant, it seems that at least some of the cells coordinated their terrorist attacks with him and considered him an address for funding, as indeed emerges from much of the evidence that has been presented to us. In this regard, the Defendant said that his connection with the cells was indirect because he did not want to get involved in the military field and did not want to be involved in "destruction" (Transcription of Conversation Prosecution/90 8 (k), on p. 6). Indeed, for the most part, the Defendant's connection with the terrorist attack cells was through the contact people who were close associates of the Defendant, especially Ahmed Barghouti. As the Defendant said about Ahmed Barghouti: "**He makes contact with these cells either directly or indirectly, meaning that without him I would not have a direct connection with any cell**" (Transcription of Conversation Prosecution/98 (k), on p. 8).

The Defendant claimed that the field cells would have perpetrated terrorist attacks even in the absence of his support and even without the financial and organizational support that he gave them (Transcript Prosecution/63 Section 18 - 20 that was submitted and verified by an interrogator by the name of "Naor", on p. 82). This claim does not in any way mitigate the liability of the Defendant for the terrorist attacks that were carried out by these cells.

[Stamp] P 7: 000396

61. At the beginning of his Israel Security Agency interrogation, the Defendant denied that he was responsible for the provision of money and weapons for the purposes of carrying out terrorist attacks (Transcript Prosecution/14 Section 4, that was submitted and verified by an interrogator by the name of "Gabi", on p. 93, Transcript Prosecution/10 Section 1 that was submitted and verified by an interrogator by the name of "Danny", on p. 90). However, as the interrogation continued, the Defendant admitted (Transcript Prosecution/29 Section 1 (c)-(d) that was submitted and verified by an interrogator by the name of Smith, on p. 85):

   > "**Within the framework of my position as secretary general of the Fatah, I was responsible for everything that was done, such as the supply of money to cells, the purchase of weapons and the perpetration of terrorist attacks. There are many cells in the field, some of them organized under my command by way of a number of people such as Ahmed Barghouti [and] Nassar Aweis. In the field, there are also cells that were not organized by the Fatah and I did not have any connection with them.**"

   The Defendant did not deny his ability to influence terrorist cells that he helped with money and by the provision of weapons; when speaking about these cells he said (Interrogation Transcript Prosecution/98 (d) on p. 32): "**If you buy them weapons, if you give them weapons, if you plan for them, you can influence them.**" However the Defendant also added, "**Influence, you cannot control.**" (*op. cit.*, on p. 37).

62. During the course of his interrogation, the Defendant said that when he made a strategic decision to carry out terrorist attacks against Israel in order to oppose the occupation, he established cells and supplied them, indirectly, with money, weapons and explosives for the purpose of carrying out terrorist attacks. He noted that the terrorist attacks were led by mainly by Abu Hamid, Ahmed Barghouti, and Aweis (Transcript Prosecution/35 Section 1, that was submitted and verified by an interrogator by the name of Danny, on p. 90). From his perspective, the people who handled the military operations in the Ramallah area were Ahmed Barghouti and Abu Hamid, who operated several cells (Transcript Prosecution/27, Section 2) that was submitted and verified by an interrogator by the name of Smith, on p. 85).

[Stamp] P 7: 000396 [continued]

The Defendant confessed that he had supported Ahmed Barghouti and had supplied him with money and that he knew that he was responsible for the perpetration of a variety of terrorist attacks (Transcript Prosecution/98 (h) on pp. 20 – 24). In addition, the Defendant confessed that he had encouraged Ra'ed Karmi to carry out "operations against the occupation," and assisted him financially, while requests for assistance were transferred to Arafat, who approved them (Transcript Prosecution/67 Section 8, that was submitted and verified by an interrogator by the name of "Emile", on p. 54). By contrast, during the course of his police interrogation, the Defendant denied any connection to Ra'ed Karmi (Prosecution/104, on p. 8) and at the beginning of his Israel Security Agency interrogation claimed that he transferred money to him without knowing for what purpose it was intended (Transcript, Prosecution/18 Section 5 that was submitted and verified by an interrogator by the name of "Nadav", on p. 78).

63. The Defendant's connections with terrorism operatives of the Fatah and the regular assistance that he provided for them emerge clearly from the documents that were seized by the Israel Defense Forces from the offices of the organizations including the office of the Defendant during Operation Protective Shield (Binder Prosecution/5).

    The Prosecution submitted an Expert Opinion by an expert from the Division of Identification and Forensic Science (DIFS) of the Israel Police, stating that the Defendant had signed some of the documents and from others it is possible to draw the necessary conclusions from the very fact that they were sent to the Defendant and were found in his office. Major L., the deputy commander of the unit that deals with the collection of captured documents, testified about the capture of the documents, their marking and the manner in which they were sorted (on pp. 46 – 48). The captured documents were transferred to a Israel Security Agency interrogator by the name of "Ogen" (see his testimony on p. 48). During his testimony, he identified the documents that were appended to the transcript from the interrogation of the Defendant (on pp. 48 – 50). In the conversation between the Defendant and Ahmed Barghouti, which was recorded without their knowledge, the Defendant said that this referred to documents that had been seized in his office and the two were very concerned about the fact that the Defendant's "entire archive" had been seized. The Defendant said, "**the entire archive of the office [is] here**" (Prosecution/127 (c), on pp. 61 – 62).

    The Expert Opinion of the DIFS with respect to the Defendant's handwriting (Prosecution/5) was rendered by Yair Ben Shemesh and is based on three samples of his handwriting that the Defendant confirmed during the course of his interrogation as being written in his hand (the three documents in Prosecution/5 are 94 – 96, 112 and 35, which the Defendant related to in Transcript Prosecution/28, Prosecution/28 (b), Prosecution/47,

[Stamp] P 7: 000397