Prosecution/85, and Prosecution/85 (a) that were submitted and verified by the Israel Security Agency interrogators "Wadi", on p. 96 and "Ofir", on p. 37). The interrogator from the DIFS divided the documents into four categories: those with respect to which there is no real doubt were written by the Defendant, those that might reasonably have been written by the Defendant, those that very likely were written by him, and those that the Defendant identified during the course of his interrogation as having been written by him. During the course of his police interrogation, the Defendant denied that his handwriting appeared on any of the documents that he had been shown (Prosecution/108-109).

64. Document Prosecution/5 (3-5) is a report that was sent to the Defendant on May 8, 2001, and which reviews the operations of the al-Aqsa Martyrs Brigades in the Jenin area. This report includes the number of people in the al-Aqsa Martyrs Brigades, their division into Brigades, details of their activities and the results of the terrorist attacks that they had perpetrated.

The activities listed in this document include shooting terrorist attacks on roads in Judea and Samaria, killing and injuring settlers, and terrorist attacks within Israeli territory (Uhm al-Fahm) in which an Israeli officer was killed and a civilian was injured. In addition, it includes a letter that requested financial assistance for the Brigades.

(2) **The Defendant's personal involvement in the terrorist attacks that have been carried out by the cells under his command**

65. Immediately subsequent to his arrest, the Defendant claimed that he was a "political person" who is not involved in military operations or in the perpetration, planning, funding or guidance of terrorist attacks against security forces or against Israelis (Transcript Prosecution/6 Section 3 and Prosecution/9 Section 2 that were submitted and verified by an interrogator by the name of "Robert", on p. 62; Transcript Prosecution/14 Section 4 that was submitted and verified by an interrogator by the name of "Gabi", on p. 93). However, as his Israel Security Agency interrogation continued, the Defendant admitted to deep involvement in "military" operations, which is a euphemism for the perpetration of murderous terrorist attacks against Israeli civilians. In certain instances, it can be understood from the Defendant's statements, he even issued specific orders for the perpetration of terrorist attacks or gave his

[Stamp] P 7: 000397 [continued]

advance approval for their perpetration.

The Defendant claimed during the course of his interrogation that he himself had never planned the details of a terrorist attack and that the cells would involve Ahmed Barghouti and not himself in carrying out terrorist attacks and he did not always agree with them (Transcript Prosecution/72 Section 3 that was submitted and verified by an interrogator by the name of "Danny", on p. 90). Thus, for example, the Defendant emphasized that he rejected all of Ahmed Barghouti's attempts introduce him to people who would perpetrate suicide terrorist attacks (Transcript Prosecution/53 Sections 11 – 13 that was submitted and verified by an interrogator by the name of "Mofaz", on p. 58). In spite of this, the Defendant confessed that **"there is collective responsibility for the activity of Fatah's military members"** (Transcript Prosecution/21 Section 14, which was submitted and verified by an interrogator by the name of "Robert", on p. 63). The Defendant said during the course of his interrogation: "**I did not issue orders to any cells** [that said] '**hey we've come, and hey we want to carry out a certain terrorist attack in a particular place, this we are leaving for it and for its atmosphere, and personal desire…** (Transcript of Conversation Prosecution/98 (k) on p. 9).

According to the Defendant, after Ra'ed Karmi was killed in January 2001, the terrorist attacks were brought into Israeli territory. He tried to use his influence over the cells that followed his orders in order to moderate the terrorist attacks within Israel, but he was not always able to do so (Transcript Prosecution/70 Section 17 (g) that was submitted and verified by an interrogator by the name of "Steve", on p. 53). An example of this is the case of Manzur Sharam, who was responsible for the suicide terrorist attack in Hadera in revenge for the killing of Karmi.

The Defendant discussed this with Aweis and Mansour after the attack and reported it to Arafat (Transcript Prosecution/45 Sections 6 – 11 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96). It should be noted that Manzur Sharam was Ra'ed Karmi's replacement, and this appointment had been approved by the Defendant (see the comments by Ahmed Barghouti in his Statement Prosecution/165 (m) on p. 5).

During the course of his interrogation, the Defendant said that in general he heard about the terrorist attacks after they were perpetrated, from either Aweis or Ahmed Barghouti, and that he would not go into details about how exactly the terrorist attack was carried out and by which cell; during the course of his interrogation, he listed the terrorist attacks about which he received reports after they were perpetrated (Transcript Prosecution/70 Sections 9, 12, 17 that was submitted and verified by an interrogator by the name of "Steve", on

[Stamp] P 7: 000398

page 53; and Transcript Prosecution/39 Section 8 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96). However, throughout the course of his entire interrogation, the Defendant emphasized that with one exception he had not been personally involved in taking public responsibility for terrorist attacks that have been carried out by the al-Aqsa Martyrs Brigades. The person who issued the public statements subsequent to attacks was Aweis, in coordination with Ahmed Barghouti. Beyond this, Ahmed Barghouti served as an extension of the long arm of the Defendant, but the Defendant himself added to the above mentioned comment and said: "**I provide coverage for this issue. Politically in the media… I talk about the issue… I call for a struggle, I appraise the terrorist attacks as part of the struggle etc**…" (Transcript of Conversation Prosecution/98 (m) pages 40 – 46). In other words, the Defendant would take responsibility for the terrorist attacks through the media in an indirect and general manner without relating to a specific terrorist attack, while his subordinates would take specific responsibility for each individual attack.

What is clear from the Defendant's words is that the terrorist cell commanders considered him their leader and he supported them and assisted them by supplying weapons and explosives for the duration of their activity, although he knew that they were perpetrating murderous terrorist attacks against military and civilian targets in the Judea and Samaria region as well as within Israel, including suicide terrorist attacks, which the Defendant claims displeased him. When the Defendant continued supporting these operatives and assisting them after they reported the terrorist attacks to him, even when these were suicide terrorist attacks within Israel, the Defendant thereby expressed his support for their continued activity, including the activity that he supposedly did not support.

During the course of his interrogation, the Defendant himself said that Yasser Arafat had reprimanded him for the terrorist attacks that had been carried out within Israel (Transcript Prosecution/141 Section 10, which was submitted and verified by an interrogator by the name of "Robert", on p. 58); from this it follows that Arafat also considered the Defendant responsible for all of the terrorist attacks that have been carried out by the Tanzim and the cells of the al-Aqsa Martyrs Brigades that were under the command of the Defendant.

[Stamp] P 7: 000398 [continued]

The Defendant gave his approval, if only after the fact, to the terrorist attacks that have been carried out by the cells that accepted his authority: some he supported explicitly and some he supported by his behavior or with his silent agreement. He operated the cells under his command in an indirect manner through his subordinates and close associates such as Ahmed Barghouti, Abu Hamid, Abu Satha and Aweis, while keeping his distance from the people who actually perpetrated the attacks and intentionally avoiding getting himself personally involved with the planning and perpetration of the terrorist attacks. Even taking responsibility for the terrorist attacks was done by the Defendant in a "clean," indirect manner, not by way of a public statement issued by the al-Aqsa Martyrs Brigades, but rather in a political – as it were – implied manner in the media.

66. From that which has been set forth above, it becomes apparent that the Defendant confessed during the course of his interrogation to the things that also emerge from the testimony of the terrorist operatives, meaning that from a command perspective, he was responsible for the operations of the Tanzim and of the al-Aqsa Martyrs Brigade in the West Bank, which considered him their leader; he assisted terrorism operatives by providing money, weapons and explosives in order to carry out terrorist attacks; he personally led some of the terrorism cells, through his close associates; he encouraged the terrorist cells to carry out terrorist attacks against Israel; he received reports from the cells subsequent to the perpetration of terrorist – all of this while knowing that these cells were perpetrating murderous and suicidal terrorist attacks both within Israel and against civilians.

Furthermore: during the course of his interrogation, the Defendant even confessed to **personal** involvement in specific murderous terrorist attacks of the cells that he led, as follows:

**(aa) Terrorist attack at the gas station in Givat Ze'ev**

After the killing of Ra'ed Karmi on January 14, 2002, the Defendant, speaking on Abu Dhabi television, called on the al-Aqsa Martyrs Brigades to perpetrate revenge attacks against Israel (Prosecution/3 from January 14, 2002); however, the Defendant was not satisfied with this public statement. He instructed Ahmed Barghouti to bring to fruition a terrorist attack avenging Karmi. Indeed, in the evening of January 15, 2002, Ahmed Barghouti gave a weapon to Abu Satha for the purpose of perpetrating the above mentioned terrorist attack. On the evening of that day, members of Abu Satha's cell fired at the car of Yoela Chen, of blessed memory, near Givat Ze'ev, murdered her and injured the passenger who was with her (on this terrorist attack, see Chapter E (7), below).

[Stamp] P 7: 000399

The Defendant confessed during the course of his interrogation that after the death of Karmi, he told Ahmed Barghouti that he was interested in a revenge terrorist attack, and that Ahmed and his comrades perpetrated the terrorist attack in Givat Ze'ev and reported to him later that one person was killed in the terrorist attack (Transcript Prosecution/98 (k), on pp. 44 – 45). He even confessed that this terrorist attack was carried out in accordance with his orders and took responsibility for its perpetration (Transcript Prosecution/23 Sections 8 – 10, which was submitted and verified by an interrogator by the name of "Danny", on p. 90; Transcript Prosecution/24 Section 5 and the introduction to Transcript Prosecution/38 that were submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/26 Sections 3 – 6, which was submitted and verified by an interrogator by the name of "Nadav", on p. 79). The Defendant said, "**I said in the mourners' tent, that we need to avenge and respond to an event like this**… ", although he claimed that he did not "command" Ahmed Barghouti. During one of his interrogations, the Defendant confessed, "**We said to Ahmed something like implement a terrorist attack**" (Conversation Transcript Prosecution/98 (g) on p. 19 and also on pp. 20 – 45).

The Defendant explained that the assassination of Karmi led him to lose control of Fatah, and therefore he "**called for a response to the targeted assassination of Ra'ed Karmi in all media outlets… and responses did begin. For the first time, Fatah crossed the red line and carried out terrorist attacks within Israel**" (Transcript of Interrogation Prosecution/98 (j) on pp. 30-31 and Prosecution/98 (k) on pp. 9-

[Stamp] P 7: 000399 [continued]

10, 12-15, 44-45). He noted during the course of his interrogation that the order that was given to perpetrate a terrorist attack in revenge for the killing of Ra'ed Karmi derived from his feeling of responsibility for the death of Karmi during a cease-fire, when the Defendant had called on all of the factions to stop the terrorist attacks because of the commitment given by the head of the Israel Security Agency that there would not be any targeted assassinations against leaders of Fatah; this was the only time when he went against Arafat who, at the time, asked that there be no terrorist attacks (Transcript Prosecution/31 Section 12, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Conversation Transcript Prosecution/98 (j) on pp. 29 – 31; Conversation Transcript Prosecution/98 (k) on pp. 11 – 13).

This confession of the Defendant corresponds with statements that were made by Ahmed Barghouti during the course of his interrogation (see Section 30, above), as well as with statements that were made by Abu Satha (Statement Prosecution/156 (b) on p. 5) and Masafur (see Section 53 above).

### (bb) Murder of the Greek Orthodox monk in Ma'ale Adumim

The Defendant confirmed that when Radaida proposed the perpetration of a suicide terrorist attack, he referred him to Muhannad so that he could direct him towards the type of terrorist attacks that Fatah cells carry out. The result of this was the terrorist attack in Ma'ale Adumim, in which the Greek Orthodox monk was murdered because it was thought he was a Jew (see statements by Radaida in Sections 42 – 43 above and Chapter E (3) below that deals with this terrorist attack).

### (cc) Terrorist attack on the Seafood Market Restaurant in Tel Aviv

During the course of his interrogation, the Defendant clearly connected himself to the terrorist attack at the Seafood Market Restaurant in Tel Aviv, in which three people were murdered (on this terrorist attack see Chapter E (12) below). Although at the beginning of his Israel Security Agency interrogation, the Defendant claimed that he did not have any connection to this terrorist attack, which Aweis was behind, and that Arafat was very angry about the perpetration of this terrorist attack (Transcript Prosecution/25 Section 12-13, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58). However, as his interrogation continued, the Defendant admitted that he knew about the intent to perpetrate this terrorist attack from his close associate Ahmed Barghouti, who was one of the people who planned the terrorist attack, and this was approximately one week **before** it was carried out ; Ahmed informed the Defendant that Ibrahim Hasouna – the terrorist – was ready to perpetrate a terrorist attack. The Defendant emphasized that he was not the one who supervised the perpetration of the terrorist attack and that he had instructed Ahmed Barghouti to perpetrate the attack in Judea and Samaria,

[Stamp] P 7: 000400

in a settlement or at a military roadblock, and not within Israel (Transcript Prosecution/44 Sections 3-7 and Prosecution/53 Section 3, which were submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Transcript Prosecution/50 Section 1, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Transcript Prosecution/52 that was submitted and verified by an interrogator by the name of "Smith" on p. 85).

These statements by the Defendant correspond with his version during the interrogation of Ahmed Barghouti [Translator's note: as written], aside from the fact that the latter said during the course of his interrogation that he reported to the Defendant not a short time prior to the terrorist attack but rather when the terrorist was already on his way, and that the Defendant was involved in wording the announcement taking responsibility after the terrorist attack was carried out (see Section 29 above). The Defendant, in contrast, said that he was not involved in wording the announcement taking responsibility for this terrorist attack although he did admit to giving his approval to the announcement taking responsibility for another terrorist attack that was carried out on the Atara Bridge (Terrorist Attack No. 18 in the appendix to the indictment) (Transcript Prosecution/52 as referenced above and Transcript Prosecution/58 Section 3, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58).

**In conclusion**: Despite what emerges from the words of Ahmed Barghouti, the Defendant admitted that he gave advance approval for perpetrating this particular terrorist attack, even if the orders were to kill other people in a different place.

**(dd) Attempted terrorist attack near the Malha Mall in Jerusalem**

During his interogation, the Defendant said that he had provided assistance, by means of Ahmed Barghouti, to the terrorism operatives who perpetrated attacks in the Hebron area. One day, Ahmed Barghouti reported that one of these operatives (Jihad Jawara) was planning a suicide terrorist attack in Jerusalem. The Defendant said that he issued orders, by means of Ahmed Barghouti, that the terrorist attack should be in the Occupied Territories and not within Israel (for more on this terrorist attack, see Chapter E (20) below). The next day, he received a report that the suicide terrorist attack

[Stamp] P 7: 000400 [continued]

near the Malha Mall in Jerusalem had failed (Transcript Prosecution/36, which was submitted and verified by an interrogator by the name of "Smith", on p. 85). In this case, too, the Defendant approved the terrorist attack against Israel, although in a different location.

### (3) Provision of funds, weapons and explosives for carrying out terrorist attacks

67. At the beginning of his Israel Security Agency interrogation, the Defendant claimed that he was not involved in terrorism and that he never given anyone weapons and had not shot a gun (Transcript Prosecution/10 Section 1, which was submitted and verified by an interrogator by the name of "Danny", on p. 90). However, later in the interrogation the Defendent did admit that he had been responsible for giving money, weapons and explosives to the field cells belonging to the Tanzim and al-Aqsa Martyrs Brigades and that he knew that they were using them for terrorist attacks against Israel.

   As the Defendant said, "**As part of my position as Secretary General of the Fatah, I was responsible for everything that was done, including supplying money to cells, purchasing weapons and carrying out terrorist attacks**." (See the quote in Transcript Prosecution/29 Section 61 as mentioned above, and also Transcript Prosecution/59 Section 7, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96).

   The Defendant explained that he would transmit cells' requests for the purchase of weapons to Yasser Arafat under the heading "Personal Assistance" or "Financial Assistance" (Transcripts Prosecution/22 Section 6 and Prosecution/25 Section 14 that were submitted and verified by an interrogator by the name of "Mofaz", on p. 58). The Defendant also admitted that by purchasing weapons for cells, he acquired influence over their activities (see Section 61, above). In addition, the Defendant admitted that he gave financial assistance to Ahmed Barghoui and Ra'ed Karmi and supported them so they could perpetrate terrorist attacks (see Section 62 above).

   Document Prosecution/5 (70 – 73) that was seized during Operation "Protective Shield" is a letter dated January 20, 2002, from Ra'ed Karmi to the Defendant, in which Karmi requests assistance for a list of operatives, including those who were involved in terrorists attacks in accordance with evidence presented in this case; the Defendant directed the request to Yasser Arafat in his own handwriting (in accordance with the Opinion of DIFS Prosecution/5). Another seized letter is Prosecution/5 (104) in which a wanted man named Salah Abu Hanish wrote to the Defendant asking that he return his weapons that had been confiscated; the Defendant's handwriting appears on the document (Opinion of DIFS Prosecution/5). In Letter Prosecution/5 (103), a group of operatives approached the

[Stamp] P 7: 000401

Defendant with a request to purchase weapons and noted that they have perpetrated many attacks against the army and settlers and have become wanted; the Defendant's handwriting is also found on this document (in accordance with the Expert Opinion of DIFS Prosecution/5).

68. During the course of his interrogation, the Defendant explained that the cells, as well as individual cell members, would approach him to ask for money to fund the purchase of weapons and for other reasons, and he would submit their requests to Yasser Arafat (Transcript Prosecution/19 Section 14, Transcript Prosecution/22 Section 6 and Transcript Prosecution/25 Sections 14, 19, which were submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Transcript Prosecution/70 Section 10, which was submitted and verified by an interrogator by the name of "Steve", on p. 53; transcripts of the Defendant's interrogation: Prosecution/98 (d) on pp. 13 – 16, 20 – 21; Prosecution/98 (k) on pp. 7, 17 – 18, 30; and Prosecution/90 8 (j) on pp. 13 – 14). He said that his requests to Arafat would not specify that the money was intended for the purchase of weapons (Transcript Prosecution/30 Section 6, which was submitted and verified by an interrogator by the name of "Emile", on p. 54). In context of this activity, approximately 15 weapons and ammunition for them were purchased and used for terrorist attacks (Transcript Prosecution/29 Section E, which was submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/60 Section 5, which was submitted and verified by an interrogator by the name of "Emile", on p. 54).

    The Defendant emphasized that the military operations could not have taken place without funding from Arafat (Prosecution/60, as mentioned above, Section 7). He explained the issue: **"There is someone who comes and says 'I want a thousand shekels', he might receive a thousand shekels. I do not ask him, maybe next week he will go shoot, I do not care"** (Prosecutions/98 (k) on p. 30). During the course of his interrogation, the Defendant could not remember the details of the financial assistance that he gave to Fatah field operatives and explained that hundreds of operatives would approach him with requests for financial assistance in order to fund military activities (Transcript Prosecution/49 Section 10, which was submitted and verified by an interrogator by the name of Emile on p. 54).

69. Within the framework of purchasing weapons for terrorism operatives, the Defendant agreed to purchase a mortar for the price of 1,500 dinar, and the Defendant described the operational problems involved in its operation during the course of his interrogation (Transcript Prosecution/29 Section F and Transcript Prosecution/38 Section 2, which were submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/42 Sections 13-15, which were submitted and verified by an interrogator by the name of "Wadi", on p. 96; Transcript of the interrogation of the Defendant Prosecution/98 (k) on pp. 7-8). The Defendant said

[Stamp] P 7: 000401 [continued]

during interrogation that he himself opposed firing mortars at Israel because it had been proven that this does not cause damage to Israelis but could cause significant damage to the Palestinians (Transcript Prosecution/38 as mentioned above). The Defendant's version corresponds with that given by Abu Hamid, who explained that the mortar was fired at the settlement of Psagot but the Defendant asked him not to talk about it with anyone (see Section 25 above).

**(4)** **Assistance for wanted men and the families of the people arrested or killed**

70. The Defendant funded not only terrorism operatives but also members of their families. He admitted during the course of his interrogation that he had transferred to Yasser Arafat requests for assistance to families of suicide terrorists, and even justified this by saying that there is no difference between someone who perpetrated a suicide attack and someone who was killed; in his eyes they were all "martyrs", meaning they had died a holy death (Transcript Prosecution/10 that was submitted and verified by an interrogator by the name of "Danny", on p. 90; Transcript Prosecution/54 Section 5, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Conversation of the Defendant with Agent John Doe No. 3 Prosecution/124 (c) on pp. 7, 22 – 23). Similarly, the Defendant made sure to fund families of Fatah operatives who had been arrested or were wanted (Conversation of the Defendant with Agent John Doe No. 3 Prosecution/124 (c) on pp. 22 – 23).

A large number of documents that are related to this subject were seized during Operation "Protective Shield", which constitute requests for assistance that the wanted men had addressed to the Defendant, asking to purchase weapons or explosives, and in order to relieve them of the necessity of earning a living (see: Prosecution/5 (2 – 12), which the Defendant verified during the course of his interrogation and which was documented in Transcript Prosecution/47 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Prosecution/5 (64 – 65); Prosecution/5 (87); Prosecution/5 (105); Prosecution/5 (117); Prosecution/5 (118)). Moreover, the Defendant took the trouble to arrange for job appointments or places of employment for wanted men (see, for example, the Letters Prosecution/5 (78 – 79), which, in accordance with the Expert Opinion of DIFS Prosecution/5 would be very reasonable to assume that they had been written by the Defendant.

An additional document is Prosecution/5 (133), which includes a request to the Defendant for assistance to members of the Fatah movement who carried out terrorist attacks and were arrested by Israel, and for other wanted men; the Defendant noted on this document: "**It is a priority to include them in the assistance**" and in accordance with the Expert Opinion of DIFS Prosecution/5 this comment was, leaving no real doubt, written by the Defendant.

[Stamp] P 7: 000402