Imad al-Shakir was a Tanzim operative who murdered in an Israeli in Salfit and when he became a wanted man, he asked the Defendant for assistance and even told him about the murder he had perpetrated. He explained in his testimony that he approached the Defendant because the Defendant was known as a person who would help in cases like his but he also described the Defendant as "**a political person who did not participate in military affairs**" (on pp. 182 – 184).

(5) **Recruiting and training operatives for terrorist organizations**

71. During his Israel Security Agency interrogation, the Defendant confirmed the points that Abu Hamid told the Police regarding the financial assistance that the Defendant gave for constructing a military training camp for Tanzim operatives, in order to train them in guerrilla warfare and in the use of weapons (Statement of Abu Hamid Prosecution/149 (c) on pp. 1 – 2). The Defendant even confirmed that he personally interviewed the young people who were training in his office (Transcript Prosecution/28 Sections 10 – 11, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Transcript Prosecution/34 Section 3, which was submitted and verified by an interrogator by the name of "Itai", on p. 52; and Transcript of the Defendant's interrogation Prosecution/98 (k), on p. 9). In his police interrogation, the Defendant denied any connection to the training or instruction of field operatives (Prosecution/106 on p. 3).

In his above mentioned statement (on pp. 6-7), Abu Hamid spoke about how the Defendant appointed Muhannad as the cell commander after the death of the previous commander. During the course of his interrogation, the Defendant also confirmed the statements that Radaida told the Police with respect to the process by which he was recruited by means of the Defendant's involvement (see Section 43 above). From the comments of the Defendant and Radaida, it becomes apparent that the Defendant heard from Radaida that he intended to perpetrate a shooting terrorist attack and, therefore, referred him to Muhannad, who was a senior field commander and had carried out terrorist attacks against Israeli targets. The terrorist attack in which the Greek Orthodox monk was murdered was a result of this contact.

[Stamp] P 7: 000402 [continued]

**(6)   The Defendant's public calls to carry out terrorist attacks against Israel**

72. As already explained above, the Defendant did not deny, during the course of his interrogation, his support for terrorist attacks against military and civilian targets in the West Bank, meaning soldiers and settlers (see Sections 13 – 16 above). The Defendant also explained that he would sometimes instruct the cells that accepted his authority to stop the terrorist attacks and would then inform them to resume them anew, using public television broadcasts (see Section 16 above). The Defendant was aware of the influence his words had on people carrying out terrorist attacks and said, "**I have influence because I speak through the media. That is to say that I state the position using media outlets… My word is heard as if I were speaking in the name of the Fatah movement.**" (Transcript of interrogation Prosecution/98 (d) on p. 33; see also pages 37-39). The Defendant did not deny that cell members would turn to him to ask for assistance because he appeared as a spokesman for Fatah in the media and took a position calling for an armed struggle (Transcript of interrogation Prosecution/98 (e) on p. 61). He admitted that during his public appearances he would encourage the operatives to carry out terrorist attacks within the territories against the army (Transcript of Investigation Prosecution/98 (j) on p. 25, and Transcript Prosecution/29 Section 1 (b), which was submitted and verified by an interrogator by the name of Smith, on p. 85.)

73. The Defendant's public calls for the perpetration of terrorist attacks against Israel were documented by the Intelligence Branch and were submitted in Binder Prosecution/3 (including the original cassettes, Prosecution/3 (a) – (b)) by the head of the Research Division of the Intelligence Branch, Brigadier General Y. Cooperwasser (on p. 38). With respect to this issue, the documents that have been included in Binder Prosecution/3, which do not document the words that the Defendant himself said on radio and television and were recorded, are to be ignored. Newspaper articles or other news items that attribute statements of one type or another to the Defendant are not admissible in accordance with the Rules of Evidence, due to the fact that their testimony is considered to constitute hearsay.

[Stamp] P 7: 000403 [continued]

In general, based on statements that were made by the Defendant in the various media outlets, it can be said that he clearly emerges as someone speaking in the name of the al-Aqsa Martyrs Brigades and the Tanzim, and as their leader. The Defendant calls in these organizations – sometimes clearly and sometimes by inference – for the contination of the perpetration of terrorist attacks against Israel. After each Israeli action, he announced on behalf of the Fatah movement and the al-Aqsa Martyrs Brigades that revenge would not be slow to follow (see, for example, the interviews on Abu Dhabi television on January 14, 2002, and August 15, 2001). Despite the Defendant's claims that he opposed terrorist attacks within Israel, in several interviews he is heard supporting terrorist attacks that have been carried out within Israel and even praised the perpetrators (see justification of the terrorist attack in Netanya in the television interview with Al Jazeera on May 18, 2001; justification for the terrorist attack in Jerusalem on Al Jazeera television on August 9, 2001; and an additional attack in Jerusalem that the Defendant justified on Watan Television on October 31, 2002.)

74. During the funeral of Emad Elanati on October 2, 2000, the Defendant said on Watan Television Ramallah, "**The days in which we just offer sacrifices are over. We must seek revenge. Israelis should be killed. Israelis should be killed. Yes. We have bullets. We have rifles and they are aimed at the occupation.**"

In a telephone interview with the newspaper Asharq al-Awasat on March 1, 2001, the Defendant was asked if Palestinian resistance might evolve from rocks to weapons, and he answered, "**The armed struggle is a part of the *intifada* already and it is not limited to rocks. Since the *intifada* began, we have succeeded in killing 66 of them and injuring 416, and this is a good outcome.**"

On October 29, 2001, the Defendant was interviewed on Watan Television Ramallah and he was asked his reaction to the two terrorist attacks that had been perpetrated that day in Hadera and in Baka al-Gharbiya, and he answered: "**It is the right of Palestinian people, and in essence an obligation of its fighters, to respond to aggression and to avenge the slaughter that has taken place in Beit Rima, Bethlehem and Tulkarm. Therefore, what happened today is a natural response of Palestinian fighters to Israeli acts of slaughter.**"

On March 4, 2002, the Defendant was interviewed for the al-Zamam newspaper, which is published in London, and in accordance with reporter Nitzal Alliyati, the Defendant said

[Stamp] P 7: 000403 [continued]

that the two suicide terrorist attacks (in Beit Yisrael and Ofra) were "**Messages addressed to the Israelis that they should cease their support for Sharon.**"

After the death of Ra'ed Karmi on January 14, 2002, the Defendant spoke on Abu Dhabi television and called on the al-Aqsa Martyrs Brigades to carry out terrorist attacks against Israelis in revenge, (Prosecution/3 – dated January 14, 2002). The Defendant admitted this during the course of his interrogation (Transcript of Conversation Prosecution/98 (g) on p. 78).

On May 19, 2001, Watan Television Ramallah broadcast a procession that was led by the Defendant and a senior official from Hamas. During the procession, the Defendant spoke to the crowd using a loudspeaker and praised those people who had been killed during the course of the *intifada*, including the perpetrator of the terrorist attack in Netanya. In addition, the Defendant promised to continue terrorist attacks against the settlers and praised those perpetrating suicide attacks against settlers.

[Stamp] P 7: 000404

E.  **The Connection of the Defendant to the Terrorist Attacks That Are the Subject of the indictment**

75. In the indictment, the Defendant is charged with involvement in 37 terrorist attacks that were set forth in the appendix to the indictment, and which were perpetrated by field commanders and terrorism operatives who were subordinate to the Defendant.

    In its summation, the Prosecution attributed to the Defendant only 21 terrorist attacks from the list that had been appended to the indictment, and therefore this verdict will relate only to those 21 terrorist attacks for which, in accordance with the Prosecution's claims, evidence was presented that connects the Defendant to the perpetration of the attacks. Discussion of these terrorist attacks will include the evidence that has been set forth with respect to the events of the terrorist attack itself, who planned and perpetrated it, and what the Defendant's relationship was to the terrorist attack or its planners or its perpetrators.

(1) **Murder of Talia and Binyamin Kahane, of blessed memory, near Ofra**

76. On December 31, 2000, at 6:30 a.m., shots were fired from an ambush on the car of the couple, Talia and Binyamin Kahane, of blessed memory, and their five children, on Route No. 60 near the settlement Ofra. As a result of the shots, the car rolled into a ditch alongside the road. The Kahane couple were murdered in this terrorist attack (Death Certificate Prosecution/128 (a)-(b)) and their five children were injured (See the Action Report of Eli Kojman and Superintendent Ofer Chelouche Prosecution/128 (c)-(d), Photograph Boards Prosecution/128 (h)-(i) that were submitted by Kojman and Chelouche during their testimony, on pp. 121, 127; and the Statement of a Public Employee given by Superintendent Ovadya Prosecution/128 (e)). The interrogation conducted by DIFS found, on the basis of the bullet shells from a Kalashnikov rifle that were collected at the scene, that the weapon used in this terrorist attack was also used in terrorist attack No. 6 on the list appended to the indictment, in which Eliahu Cohen, of blessed memory, was murdered near Givat Ze'ev (Expert Opinion of Howard Silverwater Prosecution/128 (f)-(g)).

77. In his police interrogation, Abu Hamid intimated that he was the one who supplied the weapon and ammunition to the terrorist who murdered the Kahane couple, of blessed memory, Ahmed Gandor (Statement by Abu Hamid Prosecution/149 (a) on pp. 4-6, which was collected by staff Sergeant Major Ibrahim Elkura'an, on the basis his testimony on p. 194). In the statement, Abu Hamid said that Gandor asked him for a weapon (Kalashnikov) and ammunition in order to perpetrate a terrorist shooting attack on an Israeli vehicle near Ramallah and the next day the murder of the Kahane couple, of blessed memory, was reported to him, as he learned from the report on the radio.

[Stamp] P 7: 000405

In this case we are permitted to consider only the testimony of Abu Hamid and commanded to ignore the things that Gandor told him about the manner in which the terrorist attack was carried out, because this is hearsay evidence. Consequently, this Court does not have admissible evidence showing that this murder was committed using the weapon that Abu Hamid gave to Gandor. Therefore, we do not have any evidence connecting the Defendant to the murder of the Kahane couple, of blessed memory (the Defendant said during the course of his interrogation that he was acquainted with Gandor, who was killed by an accidentally discharged bullet – Transcript Prosecution/68 Section 2). Indeed, a large quantity of evidence was submitted with respect to the Defendant's comprehensive and supreme responsibility for the terrorist attacks perpetrated by members of Fatah on the West Bank, as the person who led this activity, who called for its perpetration and who assisted its actualization by supplying money, weapons and explosives. However, there is no admissible evidence that this particular terrorist attack was indeed perpetrated by members of the Fatah.

The only admissible evidence in this matter is that the Defendant assisted Abu Hamid to purchase weapons and ammunition for the purpose of carrying out terrorist attacks, as Abu Hamid and the Defendant admitted during interrogation (see Chapter C (2) above) and that Abu Hamid did indeed give a weapon that he purchased with the assistance of the Defendant to Gandor for the purpose of perpetrating a terrorist attack. Beyond this, we have no evidence.

**(2)** **Murder of Akiva Pashkos, of blessed memory, in the Atarot industrial area**

78. On January 25, 2001, at 6:25 p.m., shots were fired from an ambush at the vehicle of Elazar Akiva Pashkos, of blessed memory, in the Atarot industrial area. The deceased was traveling in a GMC van and was shot with a 9 mm caliber pistol (see DIFS Opinion Prosecution/129 (c)). As a result of this shooting, the deceased died (Death Certificate Prosecution/129 (a)) and was found lifeless in his van approximately one minute after the shooting (See the testimony of Herman Sapek on p. 150, report of Superintendent Leor Nadivi, Prosecution/129 (b), and his testimony on p. 132). The event is also depicted by pictures photographed by Avinoam Alia that are appended

[Stamp] P 7: 000405 [continued]

to the public documents that were submitted (Prosecution/129 (d)).

79. Ahmed Barghouti admitted during interrogation that he gave Abu Satha and another person a vehicle in order to perpetrate a terrorist attack, and after several hours, the two reported to him that they had shot a Jew traveling in a GMC in the Atarot area, who was injured by the shots (Statement Prosecution/165 (a) on p. 3, which was submitted by Staff Sergeant Major David Mizrahi on p. 184.)

    Abu Satha admitted that he perpetrated a terrorist attack in the Atarot industrial area and shot a pistol at the driver of a gray GMC Safari (as can be seen in the pictures Prosecution/129 (d) which were photographed after the terrorist attack) and later reported this to Ahmed Barghouti, who was, in accordance with Abu Satha, the Defendant's "**driver and right-hand man**" (Statement Prosecution/156 (b), which was submitted and verified by the police officer Marco Dahan, on p. 198).

80. The Prosecution does not have any evidence that directly connects the Defendant to the above mentioned terrorist attack. However, a large quantity of general evidence has been presented showing that Ahmed Barghouti was the Defendant's close assistant and operated with his knowledge and under his sponsorship for organizing and carrying out terrorist attacks. The Defendant admitted that he funded terrorist attacks in which Ahmed Barghouti was involved, that he supported his activity and that Ahmed Barghouti would report to him after the terrorist attack was completed. The Defendant also admitted that from his perspective, Ahmed Barghouti was responsible for the military operations in the Ramallah area and that he operated in coordination with Defendant. The Defendant explained during the course of his interrogation that his connection with the terrorist cells was through Ahmed Barghouti (see Chapter C (3) above).

    Abu Satha was also close to the Defendant and during one period served as his bodyguard. The Defendant confirmed during the course of his interrogation that Abu Satha worked in his office and under his responsibility, through Ahmed Barghouti, and he knew that the two were carrying out terrorist attacks against civilians in the Jerusalem area (see Chapter see C (4) above).

    The Defendant also said during interrogation that he considered himself responsible for the activities of the cells that worked with Ahmed Barghouti and Abu Satha – unlike other cells – because the two were close to him and he funded their activities (see Section 60 above). The Defendant also acknowledged that he acquired influence over the cells' activities through the assistance and weapons that he gave them (see Section 61 above).

[Stamp] P 7: 000406

All this is in addition to the Defendant's overall responsibility as the commander and leader of all of the terrorism operatives of the Fatah on the West Bank, as he himself admitted (see Section 65 above) and in addition to the fact that the Defendant encouraged terrorism operatives, both publicly and individually, to carry out terrorist attacks.

The difficult legal question of whether this is enough to substantiate the Defendant's criminal liability for the act of murder that was committed in this case – when there is no evidence that ties him directly to the terrorist attack – will be considered in the chapter of conclusions.

**(3) Murder of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory, in Ma'ale Adumim**

81. On June 12, 2001, at 10:30 p.m., shots were fired from an ambush on the road between Jerusalem and Ma'ale Adumim, at the private car of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory. The car, a Peugot utility-type model, had Israeli license plates. Germanos, of blessed memory, was murdered by those shots (Certificate of Death Prosecution/132 (a) and Pathology Expert Opinion of Professor Hiss Prosecution/130 (b)). Superintendent Nissim Mizrahi (on p. 131), who submitted the report of the preliminary visit to the scene and photographs (Prosecution/130 (c)-(d)), and Senior Staff Sergeant Major Avi Levi of DIFS, who submitted a Statement of a Public Employee (Prosecution/130 (f)) both testified on this terrorist attack. The bullet shells that were gathered at the scene were checked by the DIFS (see the expert opinion of Superintendent Avi Kaufman, Prosecution/130 (g)-(i)).

[Stamp] P 7: 000406 [continued]

82. Radaida admitted during interrogation that he perpetrated the above mentioned terrorist attack and described the reasons for it. He said that he asked the Defendant about perpetrating a suicide terror attack. The Defendant referred him to Muhannad and instructed Muhannad to give a weapon to Radaida, and so he did. The Defendant also told Radaida that the Tanzim perpetrates terrorist attacks against the army and the settlers but not suicide terrorist attacks and that he had given him the weapon for this purpose. And indeed, the weapon (Kalashnikov) that Radaida received from Muhannad, in accordance with the Defendant's direct orders, was the one used to murder the monk Germanos, of blessed memory, as he described during the course of his interrogation, explaining that he erroneously thought that he was a settler (see Chapter C (8) above Sections 41-42).

83. The Defendant himself confirmed Radaida's words during the course of his interrogation and said that he had referred him to Muhannad after he asked to commit suicide, and later heard that he had erroneously killed a Greek monk (see Section 43 above). On the basis of all this, the direct personal liability of the Defendant to this terrorist attack is clear.

**(4) Murder of Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory, on Route 443**

84. On August 5, 2001, at 10:30 p.m., the couple Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory (Sharon's brother) were murdered while traveling together with their two children in a Passat model car with Israeli license plates, on Route 443 by the Dor Energy gas station (see Death Certificates and Pathology Opinion Prosecution/131 (a) – (c)).

The results of the terrorist attack were described by police officers Haim Toledano and Advanced Staff Sergeant Major Shaby Ovadya (on pp. 123, 139 and their Action Report Prosecution/131 (d) – (e), accompanied by Photograph Board Prosecution/131 (f)). The bullets that were gathered at the site were sent to DIFS for study and it was found that they were fired from two weapons: an MP5 submachine gun and a Kalashnikov (Expert Opinion Prosecution/131 (f)).

[Stamp] P 7: 000407

85. Ahmed Barghouti said during the course of his interrogation that he gave his MP5 rifle to Abu Satha after Abu Satha requested it for his cell, and a short time later, he heard from Abu Satha and also on the news that a member of his cell perpetrated a terrorist attack in which three Jews were killed near Beit Ghur (Statement Prosecution/165 (a) on p. 2, which was submitted by Staff Sergeant Major Mizrahi, on p. 184). Abu Satha also said during interrogation that he received the MP5 rifle and a full cartridge of bullets from Ahmed Barghouti and gave them to two members of his cell, Hussam and Faris. The two told him that they perpetrated the terrorist attack near Beit Ghur in which three Israelis were killed (Statement Prosecution/156 (b) on p. 3, which was submitted by an interrogator by the name of Dahan on p. 198).

    The terrorist who perpetrated the attack, Hussam Shahada, confirmed during interrogation that he and another person perpetrated the terrorist attack near Beit Ghur on Route 443 by the Dor Energy gas station by firing at a white Passat car (see photographs). He noted that the shots were fired with an MP5 rifle that he received from Ahmed Barghouti and that his partner in the terrorist attack was armed with a Kalashnikov. On the following day, Shahada heard that three Israelis were killed as a result of the terrorist attack and reported this to Ahmed Barghouti, who passed a report on to the Defendant (Statement Prosecution/160 (a) on pp. 4 – 5, which was submitted by Dahan on p. 198). Shahada refused to answer questions during his testimony. Consequently, he was declared a hostile witness and his statements Prosecution/160 (a) – (c) were submitted together with the indictment verdict and sentence in his case (Prosecution/159 (a) – (d)). During his testimony he said only, "**I have said what I had to say and do not want to say anything else**" (on p. 73). Shahada was convicted of perpetrating this terrorist attack.

86. No evidence was presented connecting the Defendant to this terrorist attack other than his indirect connection, in accordance with that which has been set forth above, in the cases of the terrorist attacks in which his close associates, Ahmed Barghouti and Abu Satha, were involved (see Section 80 above). The Defendant supplied money and weapons to the members of the cell, by way of Ahmed Barghouti, in order to carry out terrorist attacks and the weaponry used for this terrorist attack was supplied by Ahmed Barghouti.

    The question of whether this is sufficient to substantiate the Defendant's criminal liability for the acts of murder which were perpetrated during this terrorist attack when there is no evidence connecting the Defendant directly to this terrorist attack, will be examined in the chapter of conclusions.

**(5)** **Murder of Meir Weissboiz, of blessed memory, on Route No. 9 in Jerusalem**

[Stamp] P 7: 000407 [continued]

87. On September 15, 2001, at 9:15 p.m., shots were fired from an ambush on a vehicle traveling on Route No. 9 in Jerusalem, from French Hill towards Golda Meir Boulevard. The vehicle, a white Renault Express, was driven by Moshe Weiss, who testified that he was injured by a bullet that is lodged in his body – in his spine – to this day, and his cousin Meir Weissboiz, of blessed memory, was killed by the shots (on p. 138, Death Certificate Prosecution/132 (b), Action Report of Superintendent Leor Nadivi Prosecution/132 (c) and the testimony of Nadivi on p. 132, and also the Photograph Board Prosecution/132 (c)). Bullet shells were collected at the scene and sent to DIFS for examination, which determined that they were apparently fired from a pistol and an MP5 submachine gun from which the fatal shots that killed the three people mentioned in incident No. 4, above, were fired (DIFS Expert Opinion Prosecution/132 (d)).

88. Hussam Shahada said in his Statement Prosecution/160 (a) on p. 6, that was collected by Advanced Staff Sergeant Major Mark Dahan (on p. 198 of the transcript) that he received the pistol and the MP5 submachine gun from Ahmed Barghouti and traveled with two other people (Faris and Heitham) in the car until they reached Route No. 9 in the direction of Ramot and French Hill. When they saw the white utility vehicle, they began to fire at its passengers and fled to Ramallah. After the incident, Shehada asked Abu Satha, who worked in the office of the Defendant, to report to the Defendant and to Ahmed Barghouti about the shooting. The following day, he heard that one of the passengers who was injured by the shots had died of his wounds (see also Section 85 above, with respect to Shahada's testimony). Shahada's statements are supported by comments said by Ahmed Barghouti and Abu Satha in their interrogations (see Section 85 above).

89. The connection of the Defendant to this terrorist attack, like the attack in Section 4 above, which was also perpetrated by Shahada, is not direct, since no evidence was submitted with respect to the Defendant's involvement in this terrorist attack. The indirect connection of the Defendant to this terrorist attack is derived from the fact that it was executed by his close associates and assistants, Ahmed Barghouti and Abu Satha, whose activities the Defendant funded, including the purchase of weapons.

The legal question of whether this is sufficient to substantiate the criminal liability of the Defendant for the act of murder that was carried out during this terrorist attack, when there is no evidence connecting the Defendant directly to this particular terrorist attack, will be examined in the chapter of conclusions.

**(6) Murder of Eliahu Cohen, of blessed memory, in the shooting terrorist attack on Route 443 near Givat Ze'ev**

[Stamp] P 7: 000408