**Part III:    Evaluation of the Evidence and Its Significance**

131. Since the Defendant chose not to testify or bring any witnesses on his behalf and even instructed the representatives of the Office of the Public Defender that were appointed to represent him to abstain from the cross-examination of the Prosecution witnesses, the evidence against the Defendant is founded on several different layers.

    **First**, comments that were made by the Defendant during the course of his Israel Security Agency interrogation. Some were summarized and written up in the transcript that had been prepared and submitted by the interrogators and some were recorded and transcribed. This category also includes those statements that were made by the Defendant in conversations that were recorded without his knowledge, with his close associate Ahmed Barghouti and with agents John Doe No. 1 and John Doe No. 3.

    **Second**, incriminating testimony against the Defendant that was given by terrorism operatives from the Fatah after their arrest, meaning the statements that they gave during the course of Israel Security Agency and police interrogations, since all of them – as if in unison – refused to answer any questions in Court, when they were brought as Prosecution witnesses.

    **Third**, statements that were made by the Defendant by way of the media, during the period of time prior to his arrest.

    **Fourt**h, documents that were seized in the office of the Defendant and at the offices of the Palestinian Authority during the course of Operation Defensive Shield.

    **Fifth**, testimony that was given by victims of the terrorist attacks, eyewitnesses to the terrorist attacks that are the subject of the indictment, and witnesses involved in their interrogation.

132. With respect to the evaluation of the evidence and its significance, the following comments must be made:

[Stamp] P 7: 000420

A. The Defendant's abstention from testifying during the trial and exposing himself to cross-examination can be used to reinforce the significance of the evidence against him and even in order to support Prosecution evidence in places where support is necessary, in accordance with that which has been set forth in Section 162 (b) of the Criminal Procedures Law [Consolidated Version] 5742 – 1982 (hereinafter – "the **Criminal Procedures Law**"). Similarly, the Defendant's abstention from responding to the indictment, as he did, can be used to reinforce the significance of Prosecution evidence, in accordance with that which has been set forth in Section 152 (b) of the Criminal Procedures Law. These points were made clear to the Defendant by the Court.

This matter acquires additional significance in light of the fact that, in accordance with law, statements made by witnesses who refuse to testify in Court, or who deny the content of their statements during interrogation, require support (see Subsection C (5) below). This is in accordance with the Supreme Court's ruling that a Defendant's abstention from testifying serves as significant reinforcement of the statements given by witnesses during the trial that require reinforcement, in accordance with Section 10 (A) (d) of the Rules of Evidence [New Version] 5731 – 1971 (hereinafter: "the **Rules of Evidence**") (Criminal Appeal 1497/92 **State of Israel v. Tzubari**, PD 47 (4) 177, on p. 202). The Court explained this matter: "**The silent Defendant – differentiated from the silent witness – is acting within the framework of the Law; however, the Court is given the right to interpret his behavior on the basis of its perceptions and understanding**" (on p. 203, see also Additional Proceeding 308/91 **Kuzli v. The State of Israel**, PD 45 (4) 441, on p. 486).

Indeed, the Court is entitled not to give any weight to the silence of the Defendant when there is a reasonable explanation for it (see: Criminal Appeal 277/81 **Halevy v. The State of Israel**, PD 38 (2) 369, on p. 386). However, since the Defendant's preliminary claims with respect to be authority of this Court to try him were rejected, we did not have any reasonable and justifiable explanation for his abstention from giving evidence. It is quite clear that the Defendant, who during the course of

[Stamp] P 7: 000420 [continued]

his interrogation was exposed to the incriminating evidence that had accumulated against him, knew full well that he was unable to contend with it on the legal level and therefore fled to the warm embrace of the political level. Several times during the course of his interrogation, the Defendant said that it was clear to him that he would be tried and convicted and that, therefore, he planned to conduct a political trial.

In this matter, is important to note that in spite of the fact that the Defendant declared that he would not conduct a defense case, as indeed he did not, he did give political speeches and sometimes even related to the evidence presented against him – but from the Defendant's bench and not from the witness stand. By law, we are unable to give any significance to statements that were made in this manner, which did not give the Prosecution the possibility of questioning the Defendant about them. With respect to the many things that the Defendant said on the diplomatic and political levels, both during the trial and during the summations, we are not permitted to relate to them since they are irrelevant to the question of the Defendant's guilt of the crimes with which he is charged. These issues were explained in the Decision with respect to the authority of the Court: a person who acts outside of the framework of legal combat, and who perpetrates acts of terrorism for the purpose of causing injury, without distinction, to the civilian population, exposes himself to the ordinary criminal sanctions of national criminal law (see the decision that was handed down by the Court in this case, dated January 19, 2003 on pp. 29 – 33). Opposition to the occupation, as claimed by the Defendant, does not serve as justification, in accordance with any law, for acts of killing that have been carried out against innocent civilians. Furthermore: The place for this claim – if any – is during sentencing claims, since it relates to the motivation for the crime as distinguished from the criminal intent required in order to prove them.

B. Since the Defendant chose not to conduct a defense case, he also did not raise any claims against the admissibility of the evidence or its significance. However, the Court considered itself obligated to consider this question of its own initiative and to ignore the inadmissible evidence that has been set forth by the Prosecution or which was used in his summation (including hearsay evidence included in witnesses' statements, transcripts and statements that were not submitted by the interrogators who recorded them, expert opinions based on intelligence information and evidence that was not submitted during the trial, and points in the transcript that relate to polygraph findings.)

[Stamp] P 7: 000421

We also examined the evidentiary material from the Defendant's perspective, not only from the perspective of the Prosecution, as described in his summations. In spite of this, we are subject to the general principle by which the Defendant who does not testify in his case is not entitled to rely on comments from external statements that he gave: these statements are valid as evidence against him but not in his favor since it was not possible to question him about those statements (see Criminal Appeal 205/75 **Krantz v. The State of Israel**, PD 30 (2) 471, on p. 474).

C. The Prosecution subpoenaed 21 field commanders and terrorism operatives who were involved in the terrorist attacks that are subject of the indictment to testify about the Defendant's connection to them, in accordance with that which has been set forth above. These witnesses – without exception – refused to answer the questions of the attorney for the Prosecution, and it seems that this was not a personal decision of each individual but rather an order given from above. These witnesses were not willing to testify against their commander and leader; this is clear. In a conversation conducted between the Defendant and Ahmed Barghouti after they were arrested, which was recorded without their knowledge, Ahmed warned the Defendant about the testimony that would be given by terrorism operatives who had been arrested, and the Defendant replied, with laughter in his voice, "**In Court everyone will deny everything they admit… everything will be canceled… the interrogators told me. I told them that no one will admit anything in Court**" (Transcript 127 (c) on p. 109). So the Defendant said, and so it happened.

In these circumstances, all of the terrorism operatives were declared hostile witnesses and their statements during interrogation were submitted under Section 10 (a) of the Rules of Evidence. With respect to these witnesses, we comment as follows:

(1) Most of the Prosecution witnesses testified after they themselves had been tried, and mostly convicted, on the basis of their own confessions for crimes that included their involvement in the terrorist attacks that are the subject of the indictment. In their confessions to the facts

[Stamp] P 7: 000421 [continued]

in the indictments filed against them, these witnesses incriminated the Defendant. However, the law with respect to a Defendant's confessions of this type when they are given by a person who is a witness in Court, is that they are considered an external statement that is covered by Section 10 (a) of the Rules of Evidence, but confessions of this type are not given substantive significance. From the point of view of the witness – the confession that he gives during his trial focuses entirely on the facts that pertain to him, and it is highly doubtful that he was aware at that time of the implications that part of his confession might have on others (see: Criminal Appeal 4541/90 **Eliyahu Sela v. The State of Israel**, Supreme Court Compendium 91 (2) 2086.)

(2) In general, an external statement that is made by a witness is hearsay evidence that is disqualified as evidence on the veracity of its content. An exception to this generalization is stated in Section 10 (A) (a) of the Rules of Evidence, in accordance with which the Court is permitted to accept a statement of this kind and even rely on it and prefer it over the witness's testimony in Court, when a witness in the case refuses to testify or he denies the version that he gave during interrogation.

The purpose of this Section is to deal with the common phenomenon of witnesses who deny the version that they gave during their interrogation, in order to prevent a situation in which it is impossible to confront them in Court with the version that they gave during their interrogation. (See the explanation of the proposed legislation for amending the Rules of Evidence, 5734 – 1974.) And note: a witness who is subpoenaed to testify and has taken his place on the witness stand is considered a "witness in the trial", even if he refuses to answer questions and therefore the above mentioned Section 10 (a) (a) applies to him rather than Section 10 (a) (b), which deals with the case of a witness who it is impossible to bring to Court at all, for reasons that have been listed in that Section. (See: Additional Criminal Proceedings 4390/91 **State of Israel v. Haj Yihye**, PD 47 (3) 673; compare with the expert opinion of A. Stein, "*Section 10 (a) of the Rules of Evidence: Its Proper Interpretation and Rulings of the Supreme Court*", [the journal] Mishpatim 21, 5752 [1992], on p. 325, on pp. 336 – 338.)

(3) According to Section 10 (A) (a) of the Rules of Evidence, admission of an external statement of a witness in the trial, when that witness denies the contents of the testimony he gave during the course of his interrogation, is conditional on proving that the statement was given, that it was given by that witness in the trial, and that the parties were given an opportunity to question him. In our case, these conditions are met for the 21 terrorism operatives mentioned above.

[Stamp] P 7: 000422

(4) The Court is entitled to rely on findings from an external statement that was admitted in accordance with Section 10 (a) of the Rules of Evidence and even to prefer it to testimony given by the witness in Court **"if it sees fit to do so, considering the circumstances of the case, including the circumstances in which the statement was given, the evidence that was presented in Court, the behavior of the witness in Court and signs of the truth revealed during the trial; its reasons shall be recorded"** (see Section 10 (A) (c) of the Rules of Evidence).

(5) According to Section 10 (A) (d) of the Rules of Evidence, a person may not be convicted on the basis of external statements admitted, in accordance with this Section, unless there is something in the evidentiary material to reinforce it. The intent is additional evidence that reinforces the reliability of the external statement and dispels the concern that it not truthful (see: Y. Kedmi, **On Evidence**, on pp. 354 – 365.)

On this issue it should be noted that the external statement of one witness, which itself requires reinforcement, can serve as reinforcement for the external statement of another witness (the above mentioned by Y. Kedmi on p. 366, and the rulings cited therein). As noted above, the Defendant's silence during the trial can also serve as the reinforcement of a witness's external statements, as can abstention from cross-examination (Y. Kedmi, *op. cit.* on pp. 369 – 371, and the rulings cited therein).

The clear ruling is that the Defendant's abstention from cross-examining witnesses also reinforces the Prosecution's evidence (see Criminal Appeal 4736/91 **Patir v. The State of Israel** (Supreme Court Compendium 94 (2) 1866). The Defendant may not thereafter bring any claims based on the fact that the witnesses were not cross-examined

[Stamp] P 7: 000422 [continued]

(see: Criminal Appeal 1632/95 **Uzi Meshulam v. The State of Israel**, PD 49 (5) 534, on p. 550, where the trial was held without the Defendant being present, at his request, and the Defense was instructed not to question the witnesses). A Defendant cannot thwart the legal proceedings being conducted against him by simply abstaining from offering a defense.

**In the case that is currently at hand**, the Defendant's conviction is supported by a broad reliable network of evidence that includes confessions that the Defendant gave during the course of his interrogation, statements that the Defendant made in the media, documents that were seized from the Defendant and the Palestinian Authority and a large amount of testimony given by the terrorism operatives during their interrogations, which supports and reinforces each other. It emerges from the evidentiary infrastructure described above that it is completely clear that the terrorism operatives decided to abstain from testifying during the trial in order to thwart the process and to avoid revealing the versions that they gave during their interrogations. The Defendant expressed anger during the course of his interrogation over the incriminating comments that field operatives said against him (see: Report of the Meeting of the Defendant with Aweis Prosecution/77 (b); comments that the Defendant said to Agent John Doe No. 3 Prosecution/123 on p. 1 and Prosecution/124 (a) Section 1; comments that the Defendant said to Agent John Doe No. 1 Prosecution/112 (a) Sections 6 – 7, Prosecution/ 114 (a) Section 7, Prosecution/115 (a) Sections 13, 14, Prosecution/116 Section 9; and the Defendant's conversation with Ahmed Barghouti Prosecution/127 (c) on pp. 3, 4, 72, 84), and this fact reinforces the conclusion that the terrorism operatives said correct things about the Defendant during their interrogation.

Under these circumstances, the statements given by the witnesses during their interrogations are to be preferred over their testimony in Court since there is much more than "reinforcement" for the statements that they gave during their interrogation. The statements that the terrorism operatives made correspond very well with each other, and together with comments that the Defendant made during the course of his interrogation as well as the documents that were seized from the Palestinian Authority, they reveal a clear picture that points to the Defendant's role and position in the terrorist attacks that are the subject of the indictment.

133. We do not find any reason to cast doubt on the reliability of the Israel Security Agency interrogators who testified that the transcript they recorded during the interrogation of the Defendant reasonably reflects the main points of the Defendant's statements. When considering the significance of these points, it is necessary to consider the guidelines that we explained at length in Serious Crimes Case 1074/02 **State of Israel v. A'asi Muhsin** (District Court Compendium 2003 (2) on p. 3553, Sections 76 – 84). These transcripts

[Stamp] P 7: 000423

are composed of the Defendant's statements, but unlike accepted practice in police interrogations, they contain only a summary of the interrogation; the person being interrogated is not always warned with respect to his rights; the person being interrogated does not read what is being recorded in the transcript and does not sign them; transcripts are not infrequently written in Hebrew even when the interrogation was conducted in Arabic despite the clear guidelines given in Court rulings. In spite of this, it is important to emphasize that these transcripts certainly constitute admissible evidence, although when considering their significance, the extent and manner in which they are recorded and documented must be considered (see: Criminal Appeal 6613/99 **Samrik v. The State of Israel**, Ruling of the Israel Supreme Court 56 (3), 529, on p. 553).

**In the current case**, many of the transcripts were backed up by transcripts of recordings made during the interrogation in which the Defendant is heard speaking his own voice, in the Hebrew language, which a language in which he knows how to express himself quite well. This removes the doubt with respect to their reliability. Similarly, the Defendant was told explicitly throughout his entire interrogation that he is not obligated to say anything, and anything that he does say can be used as evidence against him. The Defendant even met with a lawyer during the course of his interrogation (see below). Furthermore: the statements that the Defendant made during his Israel Security Agency interrogation, as they were written in the transcript and significant parts of which were recorded and transcribed, are well supported by the testimony of the terrorism operatives that have been set forth above, and sometimes also by the documents that were seized from the and the interviews that he gave to the electronic media. In this situation, we do not need to rely only on the transcripts that were recorded by the Israel Security Agency interrogators as the Defendant spoke, and not only on the comments that were said by the terrorism operatives during their interrogations (since they refused to testify in Court and denied the things that they had said during their interrogations). Rather, we are able to form a direct impression based on comments the Defendant said during his Israel Security Agency interrogation, based on the recordings and transcripts.

134. When evaluating the significance of the Defendant's words during his Israel Security Agency interrogation, we considered the fact that although the Defendant himself did not bring any claims in this regard, this was a long and exhausting interrogation. The Defendant was

[Stamp] P 7: 000423 [continued]

interrogated for very long periods of time during which he slept only a little and sat bound to the chair, which he described in a conversation with Agent John Doe No. 1 (Prosecution/112 (c) (1) on pp. 3-4) as torture.

It was made clear to the Defendant that as long as he did not cooperate with his interrogators it would be necessary to continue the interrogation. It was even hinted to him that the way to meet with members of his family would be to cooperate (Transcript Prosecution/12 Section 13). During one of the interrogations, the Defendant was told that his interrogation would not end until he told the truth, as was the case for all of the terrorism operatives who eventually admitted the role of the Defendant in the acts that had been attributed to him (Transcript Prosecution/63 Sections 9 – 10). During one of the interrogations, the Defendant refused to continue with the interrogation until he was given a reasonable amount of time to sleep and the interrogator explained that he would not be allowed to sleep until he admitted to at least the main points with respect to his activities, but the Defendant rejected this proposal (Transcript Prosecution/21 Sections 26 – 28). Similarly, moral pressure was used against the Defendant to encourage him to confess and behave like a leader who takes responsibility for the acts of his subordinates, instead of denying the things that his subordinates did and presenting them as liars (Transcripts Prosecution/16 – Prosecution/17).

When considering the fact that the Defendant had been interrogated for many long hours, it is important to note that the Defendant was arrested and interrogated during Operation Defensive Shield, during a period of time in which many terrorist attacks were being perpetrated against Israel. Under these circumstances, it is clear that it was important to complete the interrogation as quickly as possible, because it was being conducted not only in order to determine his guilt but also, and perhaps primarily, for the purpose of thwarting additional attacks. The Israel Security Agency interrogators explained how important it was to them to quickly reach the terrorism operatives and terrorist cells that were connected to the Defendant, and that the interrogation of the Defendant was primarily for purposes of intelligence (the interrogator by the name of "Itai" on p. 154 and the interrogator by the name of "Wadi", on p. 97.)

Investigation of the felonies with which the Defendant is charged and the intelligence need to obtain information from him as quickly as possible required his continuous interrogation for many hours. This does not bring about the disqualification of the statements of the Defendant, since it is clear that he said to his interrogators only those things that he wanted to say and that there were warranted, relevant reasons to use this means of interrogation, because of the security circumstances that prevailed at that time (see: Y. Kedmi, **On Evidence** [Hebrew], Part One, 5764/2003 Edition, on pp. 55 – 58).

[Stamp] P 7: 000424

135. It was clear during the course of the interrogation that the Defendant had debated a great deal, aloud, to whether he should admit his connection to the terrorist attacks with which he was charged in the indictment. He even explained that this could be an obstacle for him in his future as a leader of the Palestinian people (for example, see Transcript Prosecution/24 Section 7; Transcript Prosecution/68 Section 6). In the end, the Defendant decided to admit to some of the things that he had done, after he understood that the field operatives had confessed during their interrogation and incriminated him, and that the interrogators had solid evidence with respect to the accusations that had been made against him. Therefore, the Defendant admitted only to those things that his people had previously admitted, and this was only after their statements had been presented to him upon his demand, and he repeatedly explained and made clear that he would admit only to those things that would be presented to him and that were correct (Transcript Prosecution/22 Sections 8 – 9, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58, and Transcript Prosecution/23 Section 9, which was submitted and verified by an interrogator by the name of "Danny", on p. 90). The Defendant asked to meet with the head of the Israel Security Agency and said that he would be willing to admit to those things for which he was responsible if he could be shown that others had already admitted to them (Transcript of Interrogation Prosecution/98 (a) on pp. 16 – 18, 26 – 28).

In this context, it should be emphasized that the Defendant himself said, in his conversation with Agent John Doe No. 1, that he learned during the course of his interrogation that the field operatives who had been arrested provided a large amount of reliable information about him. When the agent asked him if the information they give about him was true, he answered, "**much of it, that is to say there is proof and accuracy**" (Transcript of Conversation Prosecution/112 (c) (1) on p. 6). Further, the Defendant told Agent John Doe No. 1 that his driver (Ahmed Barghouti) had provided a confession that connected the Defendant to eight suicide terrorist attacks in Israel, and when the Defendant was asked if Ahmed Barghouti "closed him in with his confessions" – he responded in the affirmative (Transcript Prosecution/114 (a) Section 7). Throughout all of the conversations between the Defendant and Agent John Doe No. 1, it is possible to see that the subject of the confessions that had been given by the field operatives during the course of their interrogations bothered him greatly, and he was aware of the fact that they had provided real information with respect to him (see Reports Prosecution/112 (a) (1), Prosecution/113 (a), Prosecution/.113 (c), Prosecution/114 (a), Prosecution/114 (c), Prosecution/115 (a), Prosecution/115 (g) (1) (a), Prosecution/116.)

The Defendant told John Doe No. 1 that he claimed during the course of his interrogation to be a political leader, but the confessions that had been given by others against him and the large amount of material that was seized from his office and from the offices of the Palestinian Authority would force him "**to talk**

[Stamp] P 7: 000424 [continued]

**during the interrogation**" (Report Prosecution/117 Sections 29, 32 that was submitted by an interrogator by the name of "Robert").

136. The turning point in the interrogation of the Defendant began on April 21, 2002, approximately one week after the Defendant had been arrested, when he decided to tell the facts from his perspective and at his responsibility, but he asked if first the information that his men had given during interrogation could be presented to him, and if he could be allowed to meet with the head of the Israel Security Agency or his deputy (Transcript Prosecution/19 – Prosecution/20). The Defendant accepted the interrogators' proposal to distinguish between his refusal to make incriminating statements to the police, which could be revealed in the future, and his providing details of his activity during the Israel Security Agency interrogation (Transcript Prosecution/20 Sections 10 – 12, Transcript Prosecution/24 Section 7). The Defendant based himself on the assumption that things he said to the police would be revealed to the public and obligate him, as opposed to things that he said during the Israel Security Agency interrogation, which the Defendant planned to deny, as indeed he did during his police interrogation and his trial. The Defendant said this explicitly during the course of his interrogation by the Israel Security Agency, when he was told atht the transcript recorded during the course of his interrogation would be submitted as evidence in Court as if they were police testimony (Transcript Prosecution/25 Section 23, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58).

In this regard, it should be noted that six days after his arrest, the Defendant was questioned and warned in the customary manner, that by law he is not obligated to say anything, and that anything he would say could be used as evidence against him (see Transcript Prosecution/40 Section 1, and testimony of an interrogator by the name of "Mofaz", on p. 59). The interrogator named "Mofaz" testified that these warnings were given to the Defendant during the course of all of his interrogations, and the interrogator named "Emile" also testified to this (on pp. 57, 59 and the warnings included in the Transcript Prosecution/41 Section 1; Prosecution/44, Prosecution/25; Transcript of Interrogation Prosecution/98 (j) on p. 37). Although it was sometimes hinted to the Defendant that he might not actually be brought to trial, because there was a possibility that he would be deported, the Defendant noted that he preferred the option of standing trial, even if it was clear that he would be tried and sent to jail for many years (Transcript Prosecution/10, Prosecution/11, Prosecution/14 and Prosecution/19 Section 5, and Transcript Prosecution/63 Section 25).

[Stamp] P 7: 000425

137. During the course of his interrogation, the Defendant said that he planned to conduct a political trial while ignoring the evidence that would be presented against him during the trial (Transcript Prosecution/42 Section 8 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96; and Transcript Prosecution/56 Section 3 that was submitted and verified by an interrogator by the name of "Smith", on p. 85). During the Defendant's conversation with Agent John Doe No. 1, he explained to him that the tactics he would take during the interrogation – namely he would not admit to anything other than things about which the interrogators already knew and would try to buy time in order to understand what the interrogators knew, so as not to incriminate others. He also told his lawyer that he would not make any statements to the police (see Report Prosecution/118 Section 3, Prosecution/120 Section 2, and his comments to John Doe No. 3 in Report Prosecution/122 Section 1). At this point, it should be noted that the Defendant first met with his lawyer, Adv. Boulos, three days after he was arrested (Exhibit **Prosecution/164**, and Transcript **Prosecution/111** Section 14). During the course of his interrogation, the Defendant met with Adv. Boulos several times (Transcript Prosecution/90 Section 1.)

138. **In conclusion**: We have no reason to assume that the Defendant's confessions during his Israel Security Agency interrogation were given because any sort of illegitimate means had been used against him that led the Defendant to negate his free will, nor did the Defendant ever claimed that this happened. During the course of the trial, as well as at the time of his police interrogation, when statements that he had made during his Israel Security Agency interrogation were presented to the Defendant, he repeatedly claimed that they were "lies and forgeries." He did not claim that any illegitimate means had been used against him during the interrogation and our clear impression is that the interrogators treated the Defendant respectfully, as the Defendant himself said during his Israel Security Agency interrogation (Transcript Prosecution/75 Section 2, Transcript Prosecution/90 Section 1 and Transcript of the Defendant's Interrogation Prosecution/98 (f) on p. 29). At the time that testimony was given during the trial, the Defendant shook hands with some of the Israel Security Agency interrogators, and this fact also indicates that the Defendant does not harbor any negative feelings against his interrogators.

    The Defendant had full control of the statements that he made to his Israel Security Agency interrogators: he decided what things he was willing to say during the course of his interrogation, that he expected were already known to the interrogators anyway, and which things he intended to hide from them. The Defendant was very cautious during the course of his interrogation and on more than one occasion he refused to answer a question that had been asked or

[Stamp] P 7: 000425 [continued]