c.  The Defendant did not have complete control over members of the cell and their commanders. However, he did have a great degree of influence over them, because he was their leader and because of the assistance that he extended to them, including money, weapons and explosives. The influence of the Defendant on members and commanders of the cells is also evident in that he would, on occasion, instruct them to cease the terrorist attacks against Israel and then later call for them to renew the terrorist attacks – sometimes in accordance with orders that he received from Arafat. Yasser Arafat would not give his orders in an explicit manner, but would make sure that his subordinates clearly understood when he was interested in a cease-fire and when he was interested in terrorist attacks against Israel. Arafat himself also considered the Defendant to be the person who controlled people in the field and therefore he would reprimand him when a terrorist attack was carried out against the opinion of the Chairman.

d.  Members of cells in the field and their commanders did have a great degree of independence when carrying out terrorist attacks. They generally did not involve the Defendant in the planning of the terrorist attacks and there is no evidence that they would report to him prior to the perpetration of a terrorist attack (other than a few solitary cases). In spite of this, the Defendant would receive a report from the commanders subsequent to each terrorist attack. This pattern of activities is an outgrowth of the Defendant's desire, and the desire of the field commanders, to protect the Defendant from Israel and to maintain him as a "political figure," who is not involved, as it were, in the murderous terrorist attacks against Israel. For this reason the Defendant did not have direct contact with those who carried out terrorist attacks, other than in exceptional cases. Thus, the Defendant also was careful not to personally assume responsibility on behalf of the Fatah or al-Aqsa Martyrs Brigades after the terrorist attacks had been perpetrated; this was done by the cell commanders. The Defendant was satisfied with taking general responsibility through the media in an indirect overall manner, without relating to any specific terrorist attack, by expressing support for the terrorist attacks that had been perpetrated.

[Stamp] P 7: 000449 [continued]

e. Other than the overall supreme liability of the Defendant for all of the members of the Tanzim and al-Aqsa Martyrs Brigades, insofar as he was the commander, he also had better control over a few cells that operated under the command of people who were his close advisors and benefited from his special assistance and support, such as Ahmed Barghouti, Aweis, Abu Hamid and Abu Satha.

The Defendant took responsibility during an interrogation for the activities of the groups that operate under the command of these people (other than Aweis), although he claimed that he was only one of the "addresses" to which these people turned in order to receive assistance and funding, and that he did not have complete control of them but rather only influence over them.

f. The Defendant generally did not have direct contact with people in the field who perpetrated the terrorist attacks; the connection was through people who were close associates of Defendant and who worked in his environs, including Ahmed Barghouti, Aweis, Abu Hamid and Abu Satha. These people worked in the Defendant's environs and with his support, planned and brought about murderous attacks, using the money, weapons and explosives which the Defendant was careful to supply them with for this purpose.

g. The Defendant was responsible for the supply of money, weapons and explosives to cells in the field through his associates, including Ahmed Barghouti, Aweis, Abu Hamid and Abu Satha. He would refer their requests to Arafat for his approval and was responsible for the purchase of weapons and supplying the cell members through his close associates. The Defendant also proffered assistance to wanted men and to the families of the terrorists.

h. In spite of the fact that the Defendant, like his men, was generally careful not to involve himself personally in the planning and the perpetration of the terrorist attacks, unequivocal evidence was submitted with respect to four terrorist attacks that had been carried out with the knowledge, approval and encouragement of the Defendant. He even initiated two of them.

The terrorist attack at the gas station in Givat Ze'ev, in which Yoela Chen, of blessed memory, was murdered, was carried out as a result of direct orders given by the Defendant to his men, in revenge for the assassination of Ra'ed Karmi, and the Defendant admitted to responsibility for this terrorist attack during the course of his interrogation.

[Stamp] P 7: 000450

Thus, too, in the case of terrorist attack in which the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, was murdered in Ma'ale Adumim as a result of the Defendant's being contacted by the terrorist Radaida, who wished to perpetrate a suicide terrorist attack.

The Defendant referred Radaida to a person who could teach him and supply him with a weapon and instructed him to perpetrate a shooting terrorist attack rather than a suicide terrorist attack. As a result, Radaida set out to perpetrate the terrorist attack and shot a Greek Orthodox monk to death, thinking that he was a Jew.

In addition, the Defendant gave his approval for the terrorist attack at the Seafood Market Restaurant in Tel Aviv, and that was prior to the departure of the terrorist to his target. The Defendant did indeed instruct his people that the terrorist attack should take place in a settlement or near a military roadblock and not within Israel, but he did approve the terrorist attack itself.

Similarly, Defendant gave approval to his men for the perpetration of a suicide terrorist attack by way of the detonation of a car bomb, even though he did instruct them that the terrorist attack should take place in the Occupied Territories and not within Israel. This incident ended with the death of the two terrorists near the Malha Mall in Jerusalem, when they exploded in their car while they were en route to the perpetration of the terrorist attack.

[Stamp] P 7: 000450 [continued]

i. Other than the four terrorist attacks that have been set forth in subsection (h) above, no evidence was submitted that ties the Defendant personally and directly to involvement in the terrorist attacks that are the subject of the indictment. From the Defendant's conversation with his associate, Ahmed Barghouti, which was recorded without their knowledge, there emerges significant concern that the Defendant knew far more than what he and his people have revealed during the course of interrogation, but it is not possible to determine this with the degree of certainty that is required by a criminal court on the basis of the existing evidence.

One way or another: it is clear from the evidence that has been submitted that more than a few of the murderous terrorist attacks that have been set forth in the indictment were planned and executed by field commanders who operated in proximity to the Defendant and with his support, using weapons that the Defendant helped supply and which were given to the terrorists by the cell commanders who were close to the Defendant (Ahmed Barghouti, Aweis, Abu Satha and Abu Hamid). The Defendant received reports from his men with regard to these terrorist attacks after they were perpetrated and gave his consent – at least by way of his silence and behavior – to continuing the attacks.

168. The analysis of the evidentiary material in accordance with that which has been set forth above leads to the conclusion that the Defendant made a substantive contribution to the terrorist attacks that have been carried out by the Fatah cells, the Tanzim and the al-Aqsa Martyrs Brigades, even if he did not take part in the perpetration.

The assistance in the form of the provision of weapons, explosives and money to those cells, the recruitment of field operatives, the making of arrangements for their training and the assistance to their families – all of these created the necessary conditions for the perpetration of acts of murder by the terrorist cells. Without a doubt, the Defendant was aware of this fact. He also knew that the field operatives that he supported were going to continue to perpetrate murderous terrorist attacks against Israel, and he acted with the clear goal of helping them to continue in this way. This is not simply a reasonable suspicion or "turning a blind eye" on the part of the Defendant, but rather genuine knowledge that the members of the cells were perpetrating, and would continue to perpetrate, murderous terrorist attacks against Israel, using the weapons, explosives and money that the Defendant supplied to them for this specific purpose. More than that: the Defendant was not only aware of the acts of murder that some members were perpetrating but rather he gave them assistance, in accordance with that which has been set forth above, out of a goal and aspiration that they would act in this manner.

[Stamp] P 7: 000451

In spite of this, other than the four instances that have been set forth above, there is no evidence that the Defendant had been involved in the planning and the perpetration of the terrorist attacks or that he had known in advance about the terrorist attacks that were going to be perpetrated by the men in the field and the commanders of the cells, whom he supported and for whom he was, effectively, their commander. In fact, Ali Aidiya did say during the course of his interrogation that the Defendant knew about the events and had approved the shooting terrorist attacks that had been perpetrated by members of the Tanzim (see Section 40 above). However, other than this sole testimony, given by a person who was not close to the Defendant, there is no other evidence that the Defendant knew in advance about all of the terrorist attacks that were going to be perpetrated, and he himself denied this claim. The Prosecution also does not claim that Defendant knew in advance about all of the terrorist attacks (see page 47 of its summations).

169. Furthermore: from the evidentiary material, it becomes apparent that the Defendant did not have total control over the commanders of the cells and the men in the field. Although he was considered to be their leader and commander and he did have influence over them, they did in any case have a significant degree of independent discretion in planning the terrorist attacks and their perpetration; there is no evidence that they would consult with the Defendant in this regard. From the overall body of evidence, it becomes apparent that the al-Aqsa Martyrs Brigades were not an organized body under one leader, but rather a collection of field cells, with each one having its own commander. A fact that emerges from the evidentiary material is that the Defendant's men did indeed perpetrate suicide terrorist attacks, and terrorist attacks inside of the Green Line, in contravention of the Defendant's stated position and sometimes contrary even to the opinion of Chairman Arafat. In addition, it emerges from the evidentiary material that the men the field who were involved in the terrorist attacks made an effort to distance the Defendant and to sever him from personal involvement in those terrorist attacks, in order protect him from Israel and to maintain him as a "political figure."

[Stamp] P 7: 000451 [continued]

The Defendant himself also tried to keep as far as possible from "military" activity and any direct connection to the cells that perpetrated the terrorist attacks which were carried out by the field commanders, some of whom were close associates of the Defendant and operated under his control, with his assistance and with his encouragement (such as Ahmed Barghouti, Abu Hamid, Abu Satha and Aweis). This fact reinforces the conclusion that the Defendant generally did not know in advance about the terrorist attacks and was not personally involved in their planning or approval because this pattern of activity was intentionally chosen by him and by his people.

Therefore, the Prosecution states in its summations (on p. 47) that:

> **"Within the context of the organizational arrangement of terrorist organizations, the field commanders and operatives were given extensive powers and a great deal of room for maneuvering when carrying out terrorist attacks, and they were not required to obtain the approval of the Defendant for all of the terrorist activities that were perpetrated, in accordance with the policy that was designed by the Defendant and the organizations' leadership, in accordance with that which has been set forthabove.**
>
> **The Defendant was aware of the activities conducted by the people subordinate to him and he was kept up to date about them, sometimes in advance and sometimes after the fact, in accordance with the these organizations' operational concept as mentioned above."**

170. The law, in accordance with that which has been set forth above, is that assistance must be **consciously directed to a particular crime with a concrete purpose**, and it must be proved that the accessory was aware of the fact that the principal was almost certainly going to perpetrate this crime, meaning – a crime with a concrete purpose. It is not sufficient that the accessory knows that the principal has a vague willingness to commit a crime. Although there is no need to prove that an accessory was aware of all of the details of the crime, such as its exact location (the above mentioned Criminal Appeal 11131/02, in the matter of <u>Yosefov</u>) or the identity of the victim of a crime or the time its commission (the above mentioned Criminal Appeal 426/67, the matter of **Be'eri**): it is sufficient that he was aware of the fact that the principal was going to commit a particular crime of the type that was ultimately committed and in spite of this, he assisted in its commission.

[Stamp] P 7: 000452

However, in the current case – with respect to most of the terrorist attacks that are the subject of the indictment, other than the four terrorist attacks in which the Defendant was personally involved – there is no evidence that the Defendant knew of the intent to commit them, in the sense of an intent to commit a **specific crime with a concrete purpose**, as required by the rulings. The Defendant had general knowledge that the men in the field who belonged to the organization that he led occasionally perpetrated murderous terrorist attacks against Israelis, using the weapons, explosives and money that he took care to provide them. However, no evidence was brought connecting the assistance provided by the Defendant to any specific terrorist attack (other than the murder of the Greek Orthodox monk, which will be discussed below). There is no evidence that the Defendant supplied weapons, explosives or money for the purpose of committing any specific terrorist attack. Indeed, in some cases it was proved that the terrorist attack was carried out using a weapon that was given to the terrorist by one of the Defendant's close associates, such as Aweis, Abu Hamid or Ahmed Barghouti.

Pursuant to the evidence that has been set forth, the assistance that the Defendant rendered to his close associates in this regard was general, and did not relate to any particular terrorist attack or any particular terrorist: in general, the Defendant made certain that men in the field were equipped with weapons, explosives and money, and this was through his close associates and the field commanders who accepted his authority, knowing that the weapons, explosives and money would be used for the purpose of terrorist attacks. However, in accordance with the case law that has been cited above, this is not sufficient in order to convict the Defendant as an accessory for each of the murderous terrorist attacks that have been carried out by the men who received his general assistance, through his associates, for the purpose of the perpetration of terrorist attacks.

171. This is a situation in which a person assists people who accept his authority with the knowledge that they are about to commit a particular

[Stamp] P 7: 000452 [continued]

concrete crime although he does not know where, when, by what manner or by whom his people will commit the crime and who will be its victim. In this case, there is no evidence that ties the Defendant to the commission of a particular crime, with respect to either the factual basis for the crime or its mental basis, since has not been proven that the Defendant knew anything of the plans for the perpetration thereof. In these circumstances, for most of the terrorist attacks that are the subject of the indictment – it is not possible to ascribe to the Defendant the general comprehensive crime of being an accessory to premeditated murder in the cases of these terrorist attacks solely due to his general awareness that his men were carrying out terrorist attacks using the weapons, explosives and money that he took care to obtain for them.

This does not mean that the Defendant does not bear any criminal liability for his deeds that led to the terrorist attacks being perpetrated using the weapons, explosives and money that he took care to obtain for the commanders in the field. For this purpose, there is the general crime of activity in a terrorist organization, which carries a sentence of imprisonment of up to 20 years, and the general crime (for which the Defendant has not been indicted) of providing the means for committing a crime in accordance with Section 498 of the Penal Code, 5737 – 1977. This crime was intended for the case of providing means for implementing **any crime**, when is not possible to prove that the person providing the means had knowledge of the intent to commit a particular crime (see: Criminal Appeal 507/79 **State of Israel v. Eliyahu Asraf**, High Court Decision 33 (3) 620, on pp. 622 – 623). This is the case before us.

172. The above mentioned conclusions relating to the crime of being an accessory also apply to the crime of soliciting murder, with which the Defendant is charged. Just as it is not possible to convict a person in Israel for a general crime of being an accessory to an act of murder, so it is not possible to convict him for a general crime of soliciting an act of murder. Just as the assistance must relate to a particular crime with a concrete purpose, so, too, must solicitation occur between one specific person and another, and the solicitation must relate to a particular crime with a concrete purpose. This conclusion is necessary for solicitation *a fortiori*, since the punishment of one who solicits a crime, unlike the accessory, is identical to the punishment of the principal offender. When a Defendant is not aware in any way of the intent to commit a particular crime, it is not possible to prove the causal relationship, namely: that the principle perpetrator was solicited by him in order to perpetrate the crime.

[Stamp] P 7: 000453

In the case that is currently at hand, with regard to the group of terrorist attacks that are the subject of the indictment (other than the four terrorist attacks that will be discussed below) there is no evidence that the Defendant influenced the field commanders under his leadership or the members of the cells to perpetrate them because, there is no proof that the Defendant even knew of any intent to perpetrate these terrorist attacks. From the evidence submitted, it seems that no one needed to solicit them: the field commanders and the members of the cells acted, in general, on the basis of their independent initiative and judgment, while being careful not to involve the Defendant personally in the planning or the perpetration of the terrorist attacks. Similarly, it is not possible to convict the Defendant of a sweeping crime of the solicitation of the acts of murder that are the subject of this indictment because of what could be called "solicitation that is directed toward the public", meaning: the Defendant's words of incitement to the media, when he called on the people under his leadership and others to carry out terrorist attacks against Israel. Toward this end, there are the general offenses of incitement to violence or terrorism, activity in a terrorist organization, etc. (see Section 161 above).

173. On the basis of the legal principles and the law described above, it is also impossible to consider the Defendant as a joint perpetrator in all of the terrorist attacks that are the subject of the indictment, together with the terrorists and planners who actually perpetrated them, since there is no evidence they he was aware of the intent to perpetrate them (other than the four terrorist attacks in which he was personally involved, as will be described below). Despite the very broad interpretation that rulings have given to the words "participation in the perpetration of a crime by taking action to commit them" and the rulings relating to the liability of a leader in a criminal group – it is not possible to accept the Prosecution's claim that this Defendant should be considered a joint perpetrator in all of the terrorist attacks that are the subject of the indictment. According to the rulings explained above,

[Stamp] P 7: 000453 [continued]

the minimum requirement for assigning the liability of a co-defendant to the leader of a group who was not present at the scene of the crime, is participation in the planning of the crime or in the conspiracy to commit it; the giving of orders or approval prior to the commission of the crime; the supervision of the crimes that have been perpetrated; or the proposal of the idea for the crime, in addition to assistance or planning. Each of these might be considered in accordance with the rulings as "acting to commit the crime", which is the basis for the liability of a joint perpetrator. However, it is not sufficient that the leader controls his men and those who accept his authority, in order to assign to him the responsibility of joint perpetrator for all of the crimes committed by his men, when there is no evidence connecting the leader in any way to their planning or perpetration, and there is not even any evidence that he knew about the intentions to commit them.

The Prosecution must prove that the Defendant is connected in some way to a **particular** crime – both the factual basis of the crime and the mental basis, and this was not proven, with the exception of the four cases that shall be set forth below.

The Prosecution has chosen to stake its case upon the case law that was established in the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam**, in its petition to convict the Defendant as a joint perpetrator in all of the terrorist attacks that are the subject of the indictment.

However, **Meshulam** was convicted as a joint perpetrator, together with his group of disciples who surrounded him and who committed a variety of crimes, after it was determined that he gave orders to his men, supervised their activities, had control over them and intentionally refrained from instructing them to cease committing the crimes (the Honorable Justice A. Matza on pp. 30, 32). In addition, it was determined that he was present at the scene of the crimes immediately prior to their commencement, while simultaneously propelling the criminal plan forward, and was even the one who had planned the operation (the Honorable Presiding Justice A. Barak on pp. 50 – 51); and had planned and carried out the "rebellion" prior to his arrest (the Honorable Justice Cheshin on p. 61).

The Honorable Justice Kedmi also referred in his statements to **Meshulam** as a person whose involvement in the perpetration was manifested by way of planning, guidance and assigning roles, and noted that Meshulam had refrained from instructing his men to cease from committing the crimes (on pp. 63, 66 – 67).

[Stamp] P 7: 000454

These characteristics – of total control over the perpetrators of the crime, presence alongside them at the scene of the crime up until such time as it commenced, involvement in planning the crime, the giving of orders for its perpetration and supervision over the acts of the perpetrators – do not exist in the matter that is currently at hand, where it has not been proven that the Defendant knew in advance of the intent to perpetrate most of the terrorist attacks that are the subject of the indictment.

The Defendant was not personally involved in the initiation, planning of perpetration of the terrorist attacks that are the subject of the indictment (other than the few terrorist attacks that shall be set forth below). The Defendant did not give orders or approval for the perpetration of these terrorist attacks, nor did he assist or solicit the perpetration of [these terrorist attacks] specifically, in accordance with that which has been set forth above. Thus, the issue of the control of the Defendant over the perpetrators and the planners of the terrorist attacks is not devoid of doubt, in accordance with that which has been set forth above. In spite of the fact that the Defendant had the unofficial title of Commander of the Tanzim and the al-Aqsa Martyrs Brigades, there is no proof that the Defendant had played any role in the joint decision to commit the terrorist attacks that are the subject of this indictment, or that he had taken part in the perpetration or planning thereof. In the absence of all of the above, and on basis of the principles that have been established in the case law and in the provisions of the Penal Code, it is not possible to consider the Defendant a joint perpetrator in the terrorist attacks that are the subject of the indictment, with respect to which he had no personal involvement or knowledge, simply by virtue of the fact that he was the uncrowned leader of the Tanzim and the al-Aqsa Martyrs Brigades, or because of his close relationship to the planners of the terrorist attacks and the general assistance that he had provided to them.

174. To summarize the above, the legal situation that prevails in the State of Israel does not make it possible to convict the leader of a criminal group or a terrorist organization as a joint perpetrator of crimes that were committed by members of the said group or organization, not even for being an accessory or solicitor to the perpetration thereof, when he himself was not personally involved, on an individual basis, in any part of the crimes themselves, either prior to or during the course of their commission. This is the situation, even when it is clear that this

[Stamp] P 7: 000454 [continued]