כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

**(14) רצח קונסטנטין דנילוב ז"ל בבאקה אלע'רביה**

**.112** ביום 30.3.02 בשעה 13:00 זיהה צוות של מג"ב רכב שנסע במהירות מופרזת לכיוון באקה אלע'רביה, ובו שני חשודים. בעת שהצוות עקב אחר המחבלים, הם פתחו באש ורצחו את קונסטנטין דנילוב ז"ל (ראה תעודת פטירה ת/141ט). שאר אנשי הצוות ירו על המחבלים, וחגורת הנפץ שהיתה על אחד מהם התפוצצה. שני המחבלים נהרגו, לאחר שקודם לכן השליכו רימונים לעבר הצוות (ראה עדותו של סנ"צ פריד ג'אנם בעמ' 122, שהשתתף באירוע).

צילומי האירוע הוגשו עם תעודת עובד ציבור של פרוספר אוחנה (ת/141ג). בבדיקת מז"פ נקבע כי אחד המחבלים החזיק חגורת נפץ מאולתרת שהתפוצצה על גופו (ת/141ה).

**.113** עויס אמר בחקירתו כי שלח מתאבדים יחד עם מחמוד אל טיטי ואחמד אבו חד'ר, וכי השיג לאחד מהם חגורת נפץ כדי לבצע פיגוע בתוך ישראל. אותו מתאבד נסע עם אדם נוסף כשעליו חגורת נפץ לשם ביצוע פיגוע בישראל, אך נהרג עם חברו בחילופי ירי עם שוטרי משמר הגבול בבאקה אלע'רביה, לאחר שהרגו שוטר מג"ב (הודעה ת/173ב עמ' 9-10 שהוגשה על ידי רס"מ עמר בעמ' 191). עוד סיפר עויס בחקירתו כי הפיגוע הנ"ל היה אמור להתבצע בחדרה (הודעה ת/172ב עמ' 3 שהוגשה על ידי עמר בעמ' 191).

**.114** גם בפיגוע זה ניתן לקבוע על פי ראיות נסיבתיות חד-משמעיות כי הפיגוע בוצע על ידי אנשים שנשלחו על ידי עויס, וצוידו על ידו בחגורת נפץ. ברור מחקירתו של עויס כי הפיגוע אליו התייחס בחקירתו הוא הפיגוע הנדון.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכנן וביצע עויס (ראה סעיף 96 לעיל). השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

**(15) פיגוע ירי בין עטרת לביר-זית**

**.115** ביום 25.2.01 בשעה 13:00 בוצע ירי מן המארב בכביש 465 לכיוון רכבו של יוסף כהן (G.M.C.), שנע מכיוון עטרת אל ביר-זית. הירי בוצע מרכב עוקף. כהן נפצע קשה בפיגוע, ורכבו הדרדר לשוליים (עדותו בעמ' 142). עשרות כדורים נורו לעבר רכבו, והוא נפגע משלושה כדורים בראש ושניים בצוואר, ובדרך נס נותר בחיים (ראה מזכר לגבי מצב הרכב ת/142ג ודו"ח תפיסה וסימון של תרמילי הכדורים ת/142ב שהוגשו על ידי משה לביא בעמ' 124, וכן דו"ח בדיקת הרכב ת/142ד שהוגש על ידי השוטר מזרחי בעמ' 131).

תיאור של זירת הפיגוע מופיע בלוח התצלומים ת/142 שהוגש על ידי רפ"ק מזרחי בעמ' 139).

**.116** אחמד ברגותי סיפר בחקירתו על פיגוע זה (הודעתו ת/165א עמ' 1 שהוגשה על ידי רס"ר מזרחי בעמ' 184, וזכ"ד ת/165ו שהוגש על ידי החוקר "דני" בעמ' 200) כיצד תכנן את הפיגוע יחד עם מוהנד, אבו סטחה ואחרים, שביקשו ממנו נשק ורכב כדי לבצע פיגוע. אחמד ברגותי מסר להם

P 7: 000415

רובה MP-5 וכדורים, וכן נתן להם את רכבו. כעבור כמה שעות הם החזירו לו את הרכב והנשק, וסיפרו לו כי ירו על רכב באיזור גשר עטרה תוך כדי עקיפתו, וכי הנהג של הרכב נפצע. דבריו של אחמד ברגותי מתיישבים עם הראיות לגבי דרך ביצוע הפיגוע, מקום ביצועו ותוצאותיו, ולפיכך יש ראיות נסיבתיות חד-משמעיות מהן עולה כי הפיגוע עליו סיפר אחמד ברגותי הוא הפיגוע הנ״ל בגשר עטרה.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכננו וביצעו אחמד ברגותי ואבו סטחה (ראה סעיף 80 לעיל). השאלה המשפטית האם די בכל אלו כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

**(16) <u>ניסיון פיגוע בפאב ״ביאנקיני״ בירושלים</u>**

**117.** ביום 19.05.01 בשעה 03:00 גילתה דינה דגן, בעלת פאב ״ביאנקיני״ בירושלים, מטען חבלה שהונח בשירותים של המקום על ידי סאעד ג׳אבר, שהיה מוכר לה כפלסטינאי מרמאללה שמכר לה מידי פעם מוצרים לנרגילה. בעדותה (עמ׳ 139-142) סיפרה דגן כי ג׳אבר ישב איתה במסעדה כדי לרשום הזמנה למוצרים, ואז נכנס לשירותים כשאין בידיו דבר. כעבור כמה דקות יצא מהשירותים עם שקית ניילון, הניח אותה במרכז הפאב, וכאשר שאלה אותו מה יש בשקית הוא אמר לה כי היא מכילה בגדים. היא ניגשה לבדוק את השקית, גילתה כי מדובר במטען חבלה מוסתר מתחת למעיל, ובשלב זה ג׳אבר נעלם.

במקום ישבו באותה עת כ- 150-170 בני נוער. דגן גילתה תושיה ואומץ לב ראויים לשבח: היא נטלה את המטען בידיה, צעקה לאחד העובדים הפלסטינאים במקום לפנות את הצעירים, והוא היה גם זה שעזר לה להרחיק את המטען מחוץ למסעדה. המשטרה שהגיעה למקום פוצצה את המטען, באופן שגרם נזק לחנויות באזור. כך עולה מעדותו של חבלן המשטרה אייל אלבו (עמ׳ 119, וכן ראה חוו״ד מומחה במעבדת החבלה, פקד יניב רון, ת/143א, חוו״ד מומחה של מז״פ שניתנה על ידי שרה אברמוביץ-בר, ת/143ב, ולוח תצלומים ת/143א).

**118.** אבו חמיד סיפר בחקירתו (הודעה ת/149ב עמ׳ 10-12, שהוגשה על ידי רס״ר אלקורעאן בעמ׳ 194), כי סאעד אלדין פנה אליו בתחילת חודש מאי 2002, וביקש ממנו להכין עבורו מטען חבלה, על מנת להניחו בירושלים בפאב ברחוב יפו. הלה הסביר לאבו חמיד כי בעלת המקום נוהגת לקנות ממנו מוצרים לנרגילה, וצייר לאבו חמיד את הפאב. אבו חמיד הנחה אותו היכן להטמין את המטען, והסביר לו כיצד לחבר את החוטים למטף כיבוי אש שהכיל את המטען (אכן המטען היה בתוך מטף כעולה מחוו״ד ת/143א).

לאחר מכן שלח אבו חמיד את ג׳אבר לפאב, וג׳אבר כיסה את המטען במעיל. כאשר הגיע ג׳אבר לפאב הוא התקשר לאבו חמיד, אמר לו משפט קוד ממנו הבין אבו חמיד שהוא עומד להניח את הפצצה בפאב, ואבו חמיד אישר זאת.
ג׳אבר התקשר לאבו חמיד וסיפר לו שבעלת המקום ראתה אותו מניח את המטען, והוא שמע בחדשות כי המטען פוצץ על ידי המשטרה.

**119.** מן האמור לעיל עולה כי הוכח בבירור שניסיון הפיגוע בפאב בוצע על ידי ג׳אבר בהנחייתו ובסיועו של אבו חמיד. הפרטים שמסר אבו חמיד בחקירתו תואמים את עדותה של דגן ואת הממצאים בשטח.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת

והעקיפה בפיגועים שתכנן וביצע אבו חמיד, כמבואר לעיל (ראה סעיפים 27, 60-65 לעיל). השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

**(17) פיגוע ירי בכביש 9 ליד הגבעה הצרפתית בירושלים**

**.120** ביום 3.10.01 בשעה 23:30 בוצע ירי לעבר רכב חולף שנע לכיוון הגבעה הצרפתית, בו נסעו מלי ופנחס כהן שנפגעו מן הירי (ראה דו"ח ביקור ראשוני בזירה של רפ"ק ליאור נדיבי, ועדותו בעמ' 132, דו"ח תפיסה וסימון של רפ"ק נדיבי ת/144ב, דו"ח ביקור ראשוני בזירה של רפ"ק עמי לייפר ועדותו בעמ' 130, וחוו"ד של מעבדת נשק ת/144ד).

**.121** אבו סטחה אמר בחקירתו (הודעה ת/156ב עמ' 4-5, שהוגשה על ידי רס"מ דהן בעמ' 198), כי הוא ביצע פיגוע זה יחד עם מוחמד סמי עבדאללה, כשהם נוסעים במכונית מאזדה וברשותו רובה MP-5, אותו קיבל מאחמד ברגותי לצורך ירי לעבר מטרות ישראליות. הוא סיפר בחקירתו כי לאחר שירה לעבר רכב הנוסע במנהרה בכיוון הגבעה הצרפתית הוא הבחין כי מדובר בנהגת, ולכן הפסיק לירות ואמר לחברו שיש מעצור בנשק. לאחר מכן הוא המשיך לנסוע לכיוון הגבעה הצרפתית, ושם ירה לעבר רכב תוך כדי עקיפתו. למחרת שמע ברדיו כי בפיגוע נפצעו גבר ואישה.

**.122** הראיות שהובאו על ידי התביעה לגבי פיגוע זה דלות ביותר, וכוללות אך ורק דו"ח ביקור ראשוני בזירה של המשטרה, באופן שכל מידע לגבי דרך ביצוע הפיגוע הוא בבחינת עדות שמיעה. כמו כן קשה לדעת מעדותו של אבו סטחה אם דבריו מתייחסים לפיגוע הנדון, שכן לא ברור מה מועד הפיגוע אליו מתייחס אבו סטחה, ובאיזה רכב ירה.

כל שיש בפנינו הוא ראיה על כך שאבו סטחה ביצע פיגועי ירי כנגד מטרות ישראליות, תוך שימוש בנשק שקיבל מאחמד ברגותי, שהיה עוזרו ומקורבו של הנאשם. זאת ועוד, אבו סטחה עצמו היה שומר ראשו של הנאשם, והנאשם עצמו אישר כי אבו סטחה עבד במשרדו והיה תחת אחריותו, וכי הוא ידע שאבו סטחה מבצע פיגועים כנגד אזרחים בגבעת זאב ובפסגת זאב (ראה סעיפים 33-34 לעיל).

**(18) ניסיון לפיגוע התאבדות בבית חנינא בירושלים**

**.123** ביום 8.03.02 בשעה 16:15 נלכד המחבל מחמוד סאלח בדרכו לביצוע פיגוע התאבדות בירושלים, כשהוא נושא על גופו חגורת נפץ. המחבל ניסה להפעיל את המטען כאשר שכב על הרצפה, ואז נורה ונהרג (ראה עדותו של סנ"צ דורון ידיד בעמ' 133, ודו"ח מעבדת חבלה ת/145ד).

**.124** אחמד ברגותי סיפר בחקירתו כי לואי עודה ביקש ממנו להכין חגורת נפץ למתאבד, והוא הפנה את עודה אל נאצר שוויש שנתן לו חגורת נפץ. המתאבד שוכן בדירה ששכר אחמד ברגותי ברמאללה, ושם הלבישו עליו את חגורת הנפץ. מאוחר יותר נודע לאחמד ברגותי כי הוא נהרג מירי כוחות צה"ל באיזור בית חנינא בדרכו לביצוע הפיגוע (הודעה ת/165ב עמ' 2, 11, שהוגשה על ידי רס"ר יעקובוף בעמ' 171).

גם עויס סיפר בחקירתו (הודעה ת/173ב בעמ' 4, שהוגשה על ידי רס"מ עמאר בעמ' 191), כי לואי עודה, שגויס על ידו לגדודי חללי אלאקצא, איתר עבורו מתאבד, אך הפיגוע נכשל מכיוון שהמתאבד נורה על ידי שוטרים לפני הביצוע בכניסה לירושלים.

**.125** מן האמור לעיל עולה כי עויס ואחמד ברגותי היה מעורבים בניסיון הפיגוע הנ"ל. אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת

P 7: 000417

והעקיפה בפיגועים שתכננו וביצעו השניים, כמפורט לעיל. השאלה המשפטית האם די בכל אלו כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

**(19) <u>פיגוע ירי בכביש בית אל - פסגות</u>**

**126.** ביום 17.03.02 בשעה 06:45 בוצע ירי מן המארב מנשק אוטומטי לעבר רכבו של סמיר קרש (פולסווגן פסאט), והוא נפצע מן הירי (ראה דו״ח ביקור בזירת העבירה ת/146א ותצלומים של רס״ב אלי קוג׳מן שהוגשו בעדותו בעמ׳ 121).

התביעה לא הגישה ראיות נוספות לגבי פיגוע זה, והדו״ח של קוג׳מן הינו בבחינת עדות שמיעה בכל הנוגע לדרך ביצוע הפיגוע.

התביעה מייחסת בסיכומיה את האחריות לפיגוע זה לאחמד ברגותי, והוא אכן הודה במעורבותו בפיגוע זה והורשע בכך (ת/165 ת/ז-יז פרט אישום 43). פרט לכך לא הפנתה התביעה לכל ראיה אחרת מבין הודעותיו של אחמד ברגותי, או הדברים שמסר בחקירתו בשב״כ. לאור האמור לעיל לא הובאו לגבי פיגוע זה ראיות המאפשרות לקבוע ממצא עובדתי ברור בדבר הקשר של אחמד ברגותי לפיגוע הנ״ל, וגם הראיות לגבי עצם ביצוע הפיגוע דלות ביותר.

**(20) <u>ניסיון פיגוע בקניון מלחה בירושלים</u>**

**127.** ביום 26.03.02 בשעה 10:30 התפוצץ רכב מסוג ״רנו אקספרס״ ובו שני חבלנים שהיו בדרכם לביצוע פיגוע (שאדי אברהים חמאמרה ומוסא יוסף מוחמד חאלד - ראה דו״ח הובלת גופות ת/147ב, שהוגש על ידי אילן גרנות בעמ׳ 135, ודו״ח פעולה ת/147ג שהוגש על ידי רס״מ אסף אזולאי בעדותו בעמ׳ 134).

**128.** אחמד ברגותי סיפר בחקירתו (הודעה ת/165ג עמ׳ 5 שהוגשה על ידי רס״ר יעקובוף בעמ׳ 171, וזכ״ד ת/165יא סעיף 15 שהוגש על ידי חוקר השב״כ ״אדם״ בעמ׳ 201), כי ג׳יהאד ג׳ווערה התקשר אל הנאשם יום לפני שמצאו את המכונית ליד הקניון בירושלים, ואמר לו שהוא רוצה לבצע פיגוע. הנאשם אמר לו שלא יבצע פיגוע בתוך ישראל, והעביר את ג׳ווערה אל אחמד ברגותי על מנת שישוחח איתו. אחמד ברגותי טען כי גם הוא אמר לג׳ווערה שלא לבצע פיגוע בישראל או בירושלים. ואולם, למחרת התקשר ג׳ווערה אל אחמד ברגותי, ואמר לו כי המכונית שהתפוצצה ליד הקניון בירושלים נשלחה על ידו לביצוע פיגוע בירושלים.

**129.** הנאשם עצמו אמר בחקירתו (זכ״ד ת/36 שהוגש על ידי חוקר השב״כ ״סמית״ בעמ׳ 85), כי אחמד ברגותי דיווח לו על כוונת אנשיו של ג׳יהאד לבצע פיגוע התאבדות בירושלים. הנאשם אמר כי הוא הורה לאחמד ברגותי שהפיגוע לא יבוצע בתחומי ישראל, אלא בשטחי יהודה ושומרון. הנאשם אמר בחקירתו בעניין זה, כשהוא מספר על פנייתו של אחמד ברגותי אליו בעניין רצונו של ג׳יהאד לבצע פיגוע (תמליל שיחה ת/98יא עמ׳ 19-20):

| | |
|---|---|
| ״הנאשם: | **... שג׳יהאד, הוא אמר לו שאנחנו יש לנו פעילות. ויש לנו פיגועים וכו׳. אז אני אמרתי לאחמד, אמרתי לו מה שחשוב זה שלא יעשו שום פיגוע בתוך ישראל.** |
| החוקר: | **או.קי וכשבא רשמית ואמר לך שהם רוצים לבצע פיגוע התאבדות, מה אתה אמרת לו?** |
| הנאשם: | **אמרתי לו לא, אני לא מרשה.** |
| החוקר: | **לא. זה לא כמו שסיפרת לי. אמרת לו, אין בעיה. אבל לא ׳בפנים׳ (בתוך** |

**ישראל).**
**הנאשם: כן, לא בישראל... זאת אומרת שאני לא רוצה פיגועים בישראל".**

הנאשם סיפר כי למחרת קיבל דיווח מאחמד ברגותי שפיגוע ההתאבדות נכשל, וכי הרכב התפוצץ לא רחוק מהמחסום, ושני חברי החוליה נהרגו.

**.130** מן האמור לעיל עולה כי הוכחה מעורבותו של הנאשם באישור פיגוע ההתאבדות הנ"ל, וזאת גם על פי גרסתו. הנאשם אמנם הורה שהפיגוע יתבצע במקום אחר, אך לכך אין כל משמעות מבחינת אחריותו הפלילית לניסיון הפיגוע. דברי הנאשם בחקירתו נתמכים בגרסת מקורבו אחמד ברגותי, אם כי הלה "שיפץ" את העובדות, וטען כי הנאשם הורה שלא לבצע את הפיגוע כלל. מדברי הנאשם ברור כי הוא הורה לבצע את הפיגוע במקום אחר.

## חלק שלישי: <u>הערכת הראיות ומשקלן</u>

**131.** הואיל והנאשם בחר שלא להעיד ולא להביא עדים מטעמו, ואף הורה לנציגי הסנגוריה הציבורית שמונו לייצגו להמנע מחקירתם הנגדית של עדי התביעה - מבוססות הראיות כנגד הנאשם על כמה נדבכים שונים.

***ראשית***, דברים שאמר הנאשם בחקירתו בשב״כ, אשר חלקם הועלו על הכתב בתמצית בזכ״דים שרשמו החוקרים, ואשר הוגשו על ידם, וחלקם הוקלטו ותומללו. במסגרת זו כלולים גם דברים שאמר הנאשם בשיחות שהוקלטו ללא ידיעתו עם מקורבו אחמד ברגותי, ועם המדובבים ״פלוני 1״ ו-״פלוני 3״.

***שנית***, עדויות המפלילות את הנאשם, שמסרו פעילי הטרור מקרב הפת״ח לאחר מעצרם. הכוונה להודעות שמסרו בחקירותיהם בשב״כ ובמשטרה, שכן כולם - כאיש אחד - סרבו להשיב על שאלות כלשהן בבית המשפט, כאשר הובאו כעדים מטעם התביעה.

***שלישית***, דברים שאמר הנאשם בכלי התקשורת בתקופה שקדמה למעצרו.

***רביעית***, מסמכים שנתפסו במשרדו של הנאשם ובמשרדי הרשות הפלסטינאית במבצע ״חומת מגן״.

***חמישית***, עדויותיהם של נפגעי הטרור, עדי הראיה לפיגועים נשוא כתב האישום והעדים שעסקו בחקירתם.

**132.** לענין הערכת הראיות ומשקלן יש להעיר את ההערות הבאות:

**א.** המנעותו של הנאשם מלהעיד במשפט ולחשוף עצמו לחקירה נגדית עשויים לשמש חיזוק למשקל הראיות כנגדו, ואף להוות סיוע לראיות התביעה מקום שדרוש להן סיוע, כקבוע בסעיף 162(ב) לחוק סדר הדין הפלילי [נוסח משולב], התשמ״ב-1982 (להלן: ***״החסד״פ״***). כמו-כן, המנעותו של הנאשם מלהשיב על כתב האישום, כפי שעשה, עשויה לשמש חיזוק למשקל ראיות התביעה, כקבוע בסעיף 152(ב) לחסד״פ. דברים אלו הובהרו לנאשם על ידי בית המשפט.

ענין זה מקבל משנה חשיבות לאור העובדה שעל פי הדין נדרש חיזוק להודעות של עדים שסרבו להעיד במשפט, או התכחשו לתוכן הדברים שמסרו בחקירותיהם (ראה ס״ק ג(5) להלן). כך פסק בית המשפט העליון כי הימנעות נאשם ממתן עדות מהווה חיזוק משמעותי להודעות בחקירה שמסרו עדים במשפט, ואשר טעונות חיזוק לפי סעיף 10א(ד) לפקודת הראיות [נוסח חדש], התשל״א-1971 (להלן: ***״פקודת הראיות״***) (ע״פ 1497/92 ***<u>מדינת ישראל נ׳ צוברי</u>***, פ״ד מז(4) 177, בעמ׳ 202). בית המשפט הבהיר באותו ענין: ***״הנאשם השותק - להבדיל מן העד השותק - פועל במסגרת הדין; אולם לבית המשפט נתונה הרשות לפרש את התנהגותו לפי התרשמותו והבנתו״*** (בעמ׳ 203, וראה גם ד״נ 308/91 ***<u>קוזלי נ׳ מדינת ישראל</u>***, פ״ד מה(4) 441, בעמ׳ 486).

אמנם, בית המשפט רשאי שלא ליתן משקל לשתיקת הנאשם כאשר יש לה הסבר סביר (ראה: ע״פ 277/81 ***<u>הלוי נ׳ מדינת ישראל</u>***, פ״ד לח(2) 369, בעמ׳ 386). אולם, משנדחו הטענות המקדמיות של הנאשם בענין סמכות בית המשפט לשפוט אותו - לא היה בידיו כל הסבר סביר ומוצדק להימנעותו ממתן עדות. ברור למדי כי הנאשם, אשר נחשף במהלך

חקירתו לראיות המפלילות שנצברו כנגדו, ידע היטב כי הוא איננו יכול להתמודד איתן במישור המשפטי, ולכן נמלט אל חיקו החם של המישור הפוליטי. כך אמר הנאשם מספר פעמים בחקירתו, כי ברור לו שהוא יועמד לדין ויורשע, וכי הוא מתכוון לנהל משפט פוליטי.

בענין זה חשוב לציין כי למרות שהנאשם הצהיר שהוא איננו מנהל פרשת הגנה, כפי שאכן נהג, הוא נשא נאומים פוליטיים, ולעתים אף התייחס לראיות שהופנו כנגדו - אך זאת מספסל הנאשמים, ולא מדוכן העדים. על פי הדין, איננו יכולים ליתן משקל לדברים שנאמרו בצורה זו, באופן שלא ניתנה לתביעה אפשרות לחקור את הנאשם עליהם. אשר לדברים הרבים שהשמיע הנאשם במישור המדיני והפוליטי, הן במהלך המשפט והן בסיכומיו, איננו רשאים להתייחס אליהם, בהיותם בלתי רלבנטיים לשאלת אשמתו של הנאשם בעבירות המיוחסות לו. דברים אלו הובהרו בהחלטה הנוגעת לענין סמכות בית המשפט: אדם הפועל מחוץ למסגרת של לחימה חוקית, ואשר מבצע פעולות טרור שמטרתן לפגוע ללא אבחנה באוכלוסיה אזרחית, חושף עצמו לסנקציות הפליליות הרגילות של המשפט הפלילי הלאומי (ראה החלטה של בית המשפט בתיק זה מיום 19.1.03 בעמ' 29-33). התנגדות לכיבוש, כפי שטוען הנאשם, איננה מהווה צידוק על פי דין כלשהו לביצוע מעשי הרג כנגד אזרחים חפים מפשע. זאת ועוד: מקומה של טענה זו - אם בכלל - הוא בטיעונים לעונש, שכן היא נוגעת למניע לביצוע העבירות, להבדיל מן הכוונה הפלילית הדרושה לשם הוכחתן.

**ב.** הואיל והנאשם בחר שלא לנהל פרשת הגנה, הוא גם לא העלה טענות כלשהן כנגד קבילות הראיות או משקלן. ואולם בית המשפט ראה עצמו מחויב לבחון שאלה זו ביוזמתו, ולהתעלם מראיות בלתי קבילות שהתביעה הגישה או הסתמכה עליהן בסיכומיה (כגון, עדויות שמיעה הכלולות בהודעות העדים, זכ"דים והודעות שלא הוגשו על ידי החוקרים שרשמו אותם, חוות דעת הנסמכות על ידיעות מודיעיניות וראיות שלא הוגשו במשפט, והתייחסות בזכד"ים לממצאי פוליגרף).
בחנו את חומר הראיות גם מזווית הראיה של הנאשם, ולא רק מנקודת מבטה של התביעה כפי שפורטה בסיכומיה. עם זאת, כפופים אנו לכלל לפיו נאשם שלא העיד במשפטו איננו רשאי להסתמך על דברים הכלולים באמרות חוץ שמסר: אמרות אלו כשרות כראיות כנגדו, אך לא לטובתו, שהרי לא ניתן היה לחקור אותו על אמרותיו (ראה ע"פ 205/75 **<u>קרנץ נ' מדינת ישראל</u>**, פ"ד ל(2) 471, בעמ' 474).

**ג.** התביעה זימנה לעדות 21 מפקדי שטח ופעילי טרור הקשורים לפיגועים נשוא כתב האישום, והקשר של הנאשם איתם פורט לעיל. עדים אלו, בלא יוצא מן הכלל, סרבו להשיב על שאלות ב"כ התביעה, ונראה כי אין מדובר בהחלטה אישית של כל אחד מהם, אלא בהנחיה מגבוה. עדים אלו לא היו מוכנים להעיד כנגד מפקדם ומנהיגם, והדברים ברורים. בשיחה שהתנהלה בין הנאשם לבין אחמד ברגותי בעת מעצרם, ואשר הוקלטה ללא ידיעתם, הזהיר אחמד מפני העדויות שימסרו פעילי הטרור שנעצרו, והנאשם השיב לו, כשהוא נשמע צוחק: **"כולם בבית המשפט יכחישו את מה שהודו בו... כולם יבטלו... אמרו לי החוקרים. אמרתי להם שאיש לא יודה בבית משפט"** (תמליל 127ג' עמ' 109). כך אמר הנאשם, וכך אכן אירע.

בנסיבות אלו הוכרזו כל אותם פעילי טרור כעדים עוינים, והודעותיהם בחקירה הוגשו לפי סעיף 10א. לפקודת הראיות. לגבי עדים אלו יש להעיר כדלקמן:

**(1)** חלק מעדי התביעה העידו לאחר סיום משפטם, ורובם הורשעו, בין היתר, במעורבותם בפיגועים נשוא כתב אישום זה על פי הודאתם. בהודאותיהם בעובדות

P 7: 000421

כתבי האישום שהוגשו כנגדם, מפלילים עדים אלו את הנאשם. אולם, ההלכה בענין זה כי הודאת נאשם שכזו, מפי אדם שהוא עד במשפט, נחשבת אמנם כאמרת חוץ שחל עליה סעיף 10א. לפקודת הראיות, אך אין ליתן להודאה זו משקל של ממש. מבחינתו של העד - ההודאה שהוא מוסר במשפטו מרוכזת כל כולה בעובדות הנוגעות אליו, וספק רב אם הוא מודע אותה שעה להשלכות שיש לחלקים בהודאתו על אחרים (ראה: ע"פ 4541/90 **<u>אליהו סלע נ' מדינת ישראל</u>**, תק-על 91(2) 2086).

(2) ככלל, אמרת חוץ של עד היא עדות שמיעה הפסולה כראיה לאמיתות תוכנה. החריג לכלל נקבע בסעיף 10א(א) לפקודת הראיות ולפיו בית המשפט רשאי לקבל אמירה שכזו, ואף להסתמך עליה ולהעדיפה על עדות העד בבית המשפט, כאשר העד במשפט מסרב להעיד, או שהוא מתכחש לגרסה שמסר בחקירתו.
מטרתו של סעיף זה להתמודד עם התופעה הנפוצה של עדים המתכחשים לגרסה שמסרו בחקירתם, ועל מנת למנוע מצב שבו לא ניתן יהיה לעמת אותם במשפט עם הגרסה שמסרו בחקירתם (ראה: דברי ההסבר להצעת החוק לתיקון פקודת הראיות, תשל"ד-1974). ודוק: עד אשר הוזמן להעיד והתייצב על דוכן העדים נחשב כ"עד במשפט", גם אם סרב להשיב על שאלות, ולפיכך חל עליו סעיף 10א(א) הנ"ל, ולא סעיף 10א(ב) המתייחס למקרה בו לא ניתן כלל להביא עד לבית המשפט מהטעמים המפורטים בסעיף (ראה: דנ"פ 4390/91 **<u>מדינת ישראל נ. חאג' יחיא</u>**, פ"ד מז(3) 673; והשווה דעתו של א. שטיין, "**סעיף 10א. לפקודת הראיות: פרשנותו הראויה ופסיקתו של בית המשפט העליון**", משפטים כ"א תשנ"ב, עמ' 325, בעמ' 336-338).

(3) על פי סעיף 10א(א) לפקודת הראיות, קבלת אמרת חוץ של עד במשפט, אשר מכחיש את תוכן העדות שמסר בחקירתו, מותנת בכך שמתן האמרה הוכח, שנותן האמרה הוא עד במשפט ושניתנה לצדדים הזדמנות לחקרו. תנאים אלה מתקיימים בענייננו לגבי 21 פעילי הטרור הנ"ל.

(4) בית המשפט רשאי לסמוך ממצאיו על אמרת חוץ שהתקבלה לפי סעיף 10א. לפקודת הראיות, ואף להעדיפה על פני עדות העד במשפט, "**אם ראה לעשות כן לנוכח נסיבות הענין, לרבות נסיבות מתן האמרה, הראיות שהובאו במשפט, התנהגות העד במשפט ואותות האמת שנתגלו במהלך המשפט, והטעמים ירשמו**" (סעיף 10א(ג) לפקודת הראיות).

(5) על פי סעיף 10א(ד) לפקודת הראיות, לא יורשע אדם על סמך אמרת חוץ שהתקבלה לפי סעיף זה, אלא אם יש בחומר הראיות דבר לחיזוקה. הכוונה היא לתוספת ראייתית המחזקת את אמינותה של אמרת החוץ, ומפיגה את החשש כי אין בה אמת (ראה: י. קדמי, **על הראיות**, בעמ' 354-365).

בענין זה יש לציין כי אמרת חוץ של עד אחד, שהיא עצמה טעונה חיזוק, יכולה לשמש כחיזוק לאמרת חוץ של עד אחר (ספרו הנ"ל י. קדמי בעמ' 366, והפסיקה המצוטטת שם). כאמור לעיל, גם שתיקת הנאשם במשפט עשויה להוות חיזוק לאמרת חוץ של עד, וכך גם הימנעותו מלחקור עד זה בחקירה נגדית (י. קדמי הנ"ל בעמ' 369-371, והפסיקה המצוטטת שם).

ההלכה הפסוקה היא כי הימנעות נאשם מחקירת עדי התביעה - מחזקת אף היא את ראיות התביעה (ראה: ע"פ 4736/91 **<u>פטאיר נ' מדינת ישראל</u>**, תק-על 94(2) 1866). הנאשם לא ישמע לאחר מכן בטענה שהעדים לא נחקרו בחקירה נגדית

(ראה: ע"פ 1632/95 **<u>עוזי משולם נ' מדינת ישראל</u>**, פ"ד מט(5) 534, בעמ' 550, שבו התנהל המשפט ללא נוכחות הנאשם, על פי רצונו, והסנגור הונחה שלא לחקור את העדים). נאשם איננו יכול לסכל את ההליך המשפטי המתנהל נגדו בעצם הימנעותו מלהתגונן.

**במקרה דנא,** הרשעתו של הנאשם נסמכת על מארג רחב ואמין של ראיות, הכוללות הודאות שמסר הנאשם בחקירתו, דברים שאמר הנאשם בכלי התקשורת, מסמכים שנתפסו אצל הנאשם וברשות הפלסטינאית, ועדויות רבות של פעילי הטרור שנמסרו בחקירתם, ואשר תומכות זו בזו ומהוות חיזוק האחת לרעותה. כפי שעולה מן התשתית הראייתית שפורטה לעיל. ברור לחלוטין כי פעילי הטרור החליטו להימנע ממתן עדויות במשפט על מנת לסכל את ההליך, ולהימנע מחשיפת הגרסה שמסרו בחקירותיהם. הנאשם הביע כעס בחקירתו על הדברים המפלילים שמסרו פעילי השטח נגדו (ראה: דו"ח הפגשה של הנאשם עם עויס ת/77ב; דברים שאמר הנאשם למדובב "פלוני 3" ת/123 עמ' 1 ות/124א ס' 1; דברים שאמר הנאשם למדובב "פלוני 1" ת/112א ס' 7-6, ת/114א ס' 7, ת/115א ס' 13, 14, ת/116 ס' 9, ושיחתו של הנאשם עם אחמד ברגותי ת/127ג עמ' 3, 4, 72, 84), ועובדה זו מחזקת את המסקנה שפעילי הטרור אמרו בחקירתם דברים נכונים לגבי הנאשם.

בנסיבות אלו, יש להעדיף את האמרות שמסרו עדים אלו בחקירותיהם על פני עדויותיהם במשפט, כאשר נמצא הרבה יותר מאשר "חיזוק" לאמרות החוץ שמסרו בחקירות. ההודעות שמסרו פעילי הטרור משתלבות כדבעי האחת ברעותה, ויחד עם הדברים שאמר הנאשם בחקירתו, והמסמכים שנתפסו ברשות הפלסטינאית, נחשפה תמונה ברורה המצביעה על חלקו של הנאשם ותפקידו בפיגועים נשוא כתב האישום.

**.133** לא מצאנו כל סיבה להטיל ספק במהימנותם של חוקרי השב"כ, אשר העידו כי הזכ"דים שרשמו בחקירותיו של הנאשם משקפים בצורה הולמת את עיקרי הדברים שאמר. ככל שמדובר במשקל הדברים, יש להביא בחשבון את הכללים שביארנו בהרחבה בתפ"ח 1074/02 **<u>מדינת ישראל נ' עאצי מוחסין</u>** (תק-מח 2003 (2) עמ' 3553, ס' 84-76). זכ"דים אלה מהווים אמרות של הנאשם, אך בניגוד למקובל בחקירה משטרתית הם כוללים רק תמצית של החקירה; לא תמיד ניתנת לנחקר אזהרה בדבר זכויותיו; הנחקר איננו יכול לקרוא את הדברים הנרשמים בזכ"ד, ואיננו חותם עליו; הזכ"ד נרשם לא פעם בשפה העברית גם כאשר החקירה היא בערבית, בניגוד להנחיה הברורה בפסיקה. עם זאת, חשוב להדגיש כי, זכ"דים אלו בהחלט מהווים ראיות קבילות, כאשר לעניין משקלם יש להביא בחשבון את היקף וצורת הרישום והתיעוד שלהם (ראה: ע"פ 6613/99 **<u>סמירק נ' מדינת ישראל</u>**, פד"י נו(3), 529, בעמ' 553).

**במקרה דנא,** גובו זכ"דים רבים בתמלילי הקלטות מהחקירה, בהם נשמע הנאשם מדבר בקולו, בשפה העברית בה הוא מיטיב להתבטא, דבר המסיר חשש לגבי מהימנותם. כמו כן, נאמר לנאשם במפורש לאורך כל חקירתו כי אינו חייב לומר דבר, וכי הדברים שיאמר עשויים לשמש כראייה נגדו, והנאשם אף נפגש עם עו"ד במהלך חקירתו (ראה להלן). זאת ועוד: הדברים שאמר הנאשם בחקירתו בשב"כ, כפי שנרשמו בזכ"דים והוקלטו ותומללו בחלקים ניכרים מהם, נתמכים היטב בעדויותיהם של פעילי הטרור שפורטו לעיל, ולעיתים גם במסמכים שנתפסו אצל הנאשם, ובראיונות שנתן באמצעי התקשורת האלקטרוניים. במצב דברים זה, אין עלינו לסמוך אך ורק על הזכ"דים שרשמו חוקרי השב"כ מפי הנאשם, ואף לא רק על הדברים שאמרו פעילי הטרור בחקירותיהם (שהרי אלה סירבו להעיד במשפט, או שהתכחשו לדברים שאמרו בחקירותיהם). אלא יכולים אנו להתרשם מדברי הנאשם בחקירתו בשב"כ, בצורה בלתי אמצעית, כפי שאלה הוקלטו ותומללו.

**.134** בענין הערכת משקל דבריו של הנאשם בחקירתו בשב"כ, הבאנו בחשבון - הגם שהנאשם עצמו לא העלה טענות כלשהן בנושא זה - כי מדובר בחקירה ארוכה ומתישה. הנאשם היה נתון

לחקירות ארוכות ביותר במהלכן ישן שינה מועטה, כשהוא יושב כבול על כסא, והוא הגדיר זאת בשיחתו עם המדובב "פלוני 1" (ת/112ג (1) עמ' 4-3) – כעינוי.
לנאשם הובהר כי כל עוד לא ישתף פעולה בחקירה יהיה צורך להמשיכה, ואף נרמז לו כי הדרך לפגוש את בני משפחתו היא לשתף פעולה (זכ"ד ת/12 ס' 13). באחת החקירות נאמר לנאשם כי חקירתו לא תסתיים עד אשר ימסור את האמת, כפי שהיה הדבר לגבי פעילי הטרור שהודו בסופו של דבר בחלקו של הנאשם במעשים המיוחסים לו (זכ"ד ת/63 ס' 10-9). באחת החקירות סרב הנאשם להמשיך בחקירה כל עוד לא יינתן לו פרק זמן סביר לישון, והחוקר הבהיר לו כי לא יתאפשר לו לישון עד אשר יודה לפחות בראשי פרקים לגבי פעילותו, אך הנאשם דחה הצעה זו (זכ"ד ת/21 ס' 28-26). כמו כן, הופעל על הנאשם לחץ מוסרי להודות ולהתנהג כמנהיג הנוטל אחריות על מעשי פקודיו, במקום להתכחש לדברים שעשו פקודיו, ולהציג אותם כשקרנים (זכ"דים ת/16-ת/17).

בענין חקירתו של הנאשם במשך שעות ארוכות, חשוב לציין כי הנאשם נעצר ונחקר במהלך מבצע "חומת מגן", בתקופה של בצוע פיגועי טרור רבים כנגד ישראל. בנסיבות אלו ברור כי היתה חשיבות רבה להשלים את חקירתו במהירות האפשרית, שכן חקירתו התנהלה לא רק לצורך בירור אשמתו, אלא גם, ואולי בעיקר, לצורך סיכול פיגועים נוספים. חוקרי השב"כ הסבירו עד כמה היה חשוב להם להגיע במהרה לפעילי טרור ולחוליות טרור שהיו קשורות לנאשם, וכי חקירת הנאשם היתה בעיקרה מודיעינית (החוקר "איתי" בעמ' 154 והחוקר "ואדי" בעמ' 97).

חקירת הפשעים החמורים בהם הואשם הנאשם, והצורך המודיעיני בקבלת מידע מפיו מהר ככל האפשר, חייבו את חקירתו הרצופה במשך שעות רבות. אין בכך להביא לפסילת הודעותיו של הנאשם, כאשר ברור שהוא מסר לחוקריו רק את הדברים שרצה לומר, וכאשר היתה הצדקה עניינית לדרך חקירה זו בנסיבות הביטחוניות ששררו אז (ראה: י. קדמי, **על הראיות**, חלק ראשון, מהד' תשס"ד-2003 בעמ' 58-55).

**135.** ברור ממהלך החקירה כי הנאשם התלבט רבות, ובקול רם, אם להודות בקשר שלו לפיגועים נשוא כתב האישום, והוא אף הסביר כי הדבר עלול להכשילו בעתיד כמנהיג העם הפלסטינאי (ראה למשל, זכ"ד ת/24 ס' 7, זכ"ד ת/68 ס' 6). בסופו של דבר החליט הנאשם להודות בחלק מהדברים שעשה, לאחר שהבין שפעילי השטח הודו בחקירותיהם והפלילו אותו, וכי יש בידי החוקרים ראיות מוצקות בנוגע לאשמות שייחסו לו. לכן הודה הנאשם רק בדברים שאנשיו הודו בהם קודם לכן, ורק לאחר שדבריהם הוצגו לו על פי דרישתו, והוא אף הבהיר חזור והבהר כי יודה אך רק בדברים שיוצגו בפניו, ואשר הינם נכונים (זכ"ד ת/22 ס' 9-8, שהוגש ואושר על ידי החוקר "מופז" בעמ' 58, וזכ"ד ת/23 ס' 9, שהוגש ואושר על ידי החוקר "דני" בעמ' 90). הנאשם ביקש להיפגש עם ראש השב"כ, ואמר כי הוא מוכן להודות בדברים שיש לו אחריות עליהם, אם יראו לו שאחרים כבר הודו בהם (תמליל חקירה ת/98א' עמ' 18-16, 28-26).

יש להדגיש בהקשר זה כי הנאשם עצמו אמר בשיחתו עם המדובב "פלוני 1", כי הסתבר לו בחקירתו שפעילי השטח שנעצרו מסרו ידיעות רבות ומהימנות לגביו. כאשר נשאל על ידי המדובב אם הידיעות שמסרו לגביו הן אמיתיות השיב: "**רבות, יעני יש הוכחה ודיוק**" (תמליל שיחה ת/112ג (1) עמ' 6). עוד אמר הנאשם למדובב "פלוני 1" כי הנהג שלו (אחמד ברגותי) מסר הודאה הקושרת את הנאשם ל- 8 פיגועי התאבדות בישראל, וכאשר נשאל הנאשם האם אחמד ברגותי "סגר אותו בהודאות" - הוא השיב בחיוב (זכ"ד ת/114א סעיף 7). לכל אורך שיחותיו של הנאשם עם "פלוני 1" ניתן לראות כי נושא ההודאות שמסרו פעילי השטח בחקירותיהם הטריד אותו מאוד, והוא היה מודע לכך שהם מסרו מידע אמיתי לגביו (ראה דו"חות ת/112א(1), ת/113א, ת/113ג, ת/114א, ת/114ג, ת/115א, ת/115ג(1)(א), ת/116).

הנאשם אמר ל"פלוני 1" כי הוא אמנם טוען בחקירתו שהוא מנהיג פוליטי, אך ההודאות שמסרו אחרים כנגדו, והחומר הרב שנתפס במשרדו ובמשרדי הרשות הפלסטינאית יאלצו אותו "**לדבר**

P 7: 000424

**בחקירה**" (דו"ח ת/117 ס' 29, 32 שהוגש על ידי החוקר "רוברט").
זה היה הרקע שהביא את הנאשם להודות בדברים שממילא כבר היו ידועים לחוקרים ממקורות אחרים.

**136.** המפנה בחקירת הנאשם חל ביום 21.4.02, כשבוע לאחר מעצרו של הנאשם, כאשר הוא החליט לספר את העובדות מנקודות ראותו ואחריותו, אך דרש כי קודם לכן יוצגו בפניו הדברים שאמרו אנשיו בחקירה, ושיתאפשר לו להיפגש עם ראש השב"כ או סגנו (זכ"דים ת/19-ת/20). הנאשם קיבל את הצעת החוקרים לעשות אבחנה בין סירובו למסור הודעה מפלילה במשטרה, שתיחשף בעתיד, לבין מסירת פרטים על פעילותו בחקירתו בשב"כ (זכ"ד ת/20 ס' 12-10, זכ"ד ת/24 ס' 7). הנאשם יצא מתוך הנחה שדברים שיאמר במשטרה יחשפו בציבור ויחייבו אותו, וזאת בניגוד לדברים שיאמר בחקירתו בשב"כ - שאותם תכנן הנאשם להכחיש, כפי שאכן עשה בחקירתו במשטרה ובמשפטו. כך אמר הנאשם במפורש בחקירתו בשב"כ, כאשר נאמר לו כי הזכד"ים הנרשמים במהלך חקירתו יוגשו כראיה בבית המשפט כאילו היו עדות משטרתית (זכ"ד ת/25 ס' 23, שהוגש ואושר על ידי החוקר "מופז" בעמ' 58).

בענין זה יש לציין כי שישה ימים לאחר מעצרו נחקר הנאשם, והוזהר בדרך המקובלת כי איננו חייב לומר דבר על פי החוק, וכי הדברים שיאמר עשויים לשמש ראיה כנגדו (ראה זכ"ד ת/40 ס' 1, ועדותו של החוקר "מופז" בעמ' 59). החוקר "מופז" העיד כי אזהרות כאלה ניתנו לנאשם במהלך כל חקירתו, וכך גם העיד החוקר "אמילי" (עמ' 57, 59, ואזהרות הכלולות בזכד"ים ת/41 ס' 1, ת/44, ת/25, תמליל חקירה ת/98י עמ' 37). לעיתים אמנם נרמז לנאשם כי לא בהכרח יועמד לדין, שכן קיימת אפשרות שהוא יגורש, אך הנאשם ציין כי הוא מעדיף את האפשרות של העמדה לדין, ואף אמר כי ברור לו שהוא יועמד לדין ויישלח לכלא לשנים רבות (זכד"ים ת/10, ת/11, ת/14 ו-ת/19 ס' 5, וזכ"ד ת/63 ס' 25).

**137.** הנאשם אמר בחקירתו כי הוא מתכוון לנהל משפט פוליטי, תוך התעלמות מהראיות שתוגשנה נגדו במשפטו (זכ"ד ת/42 ס' 8 שהוגש ואושר על ידי החוקר "ואדי" בעמ' 96, וזכ"ד ת/56 ס' 3 שהוגש ואושר על ידי החוקר "סמית" בעמ' 85). בשיחותיו של הנאשם עם המדובב "פלוני 1", הוא הסביר לו את הטקטיקה בה הוא נוקט בחקירה, לפיה הוא איננו מודה אלא בדברים שהחוקרים יודעים עליו, ומנסה למשוך זמן ולהבין מה החוקרים יודעים עליו, כדי לא להפליל אחרים.

הוא גם אמר לעורך-דינו כי לא ימסור כל הודעה במשטרה (ראה דו"חות ת/118 ס' 3, ת/120 ס' 2, ודבריו ל"פלוני 3" בדו"ח ת/122 ס' 1). יש לציין בהקשר זה כי הנאשם נפגש לראשונה עם פרקליטו, עו"ד בולוס, שלושה ימים לאחר מעצרו (מוצג **ת/164**, וזכ"ד **ת/111** סעיף 14). במהלך חקירתו נפגש הנאשם עם עו"ד בולוס כמה פעמים (זכ"ד ת/90 ס' 1).

**138.** **סיכומו של דבר**: אין לנו סיבה לסבור שהודאתו של הנאשם בחקירתו בשב"כ ניתנה עקב אמצעים פסולים כלשהם שהופעלו כנגדו, אשר הביאו לשלילת רצונו החופשי של הנאשם, והנאשם גם לא טען זאת. במהלך המשפט, וכן בעת חקירתו במשטרה, כאשר הוצגו לנאשם הדברים שאמר בחקירתו בשב"כ, הוא חזר וטען כי מדובר "בשקר וזיוף". הוא לא טען כי הופעלו כנגדו אמצעים פסולים בחקירה, והתרשמנו בבירור שהחוקרים נהגו בנאשם בכבוד, כפי שגם אמר הנאשם בחקירתו בשב"כ (זכ"ד ת/75 ס' 2, זכ"ד ת/90 ס' 1 ותמליל חקירת הנאשם ת/98ו עמ' 29). בעת מתן עדויותיהם במשפט, לחץ הנאשם את ידם של חלק מחוקרי השב"כ, וגם עובדה זו מעידה כי אין בלבו של הנאשם תחושות כלשהן כנגד חוקריו.

לנאשם היתה שליטה מלאה על הדברים שאמר לחוקרי השב"כ: הוא החליט אלה דברים היה מוכן לומר בחקירתו, ואשר להערכתו כבר היו ידועים לחוקרים ממילא, ואלה דברים הוא מתכוון להסתיר מהם. הנאשם היה זהיר ביותר בחקירתו, ולא פעם סירב לענות על שאלות שנשאל, או

שענה בצורה עקיפה ומרומזת. הוא בחר לעצמו טקטיקה במהלך החקירה, לפיה ירחיב בעניינים פוליטיים ויקמץ בעניינים הקשורים לפעולות הטרור, ובכל מקרה לא ימסור אלא פרטים שלהערכתו כבר נמצאים בידיעת החוקרים.

כפי שהעיד המדובב "פלוני 1", אמר לו הנאשם: **"גם אם כל העם הפלסטינאי מודה עליו, הוא יקבע מה יאמר בחקירה"** (ת/110 ס' 10). מכל האמור לעיל, ברור שהנאשם מסר את הודעותיו מרצון חופשי.