שכזו".

בעניין הדרישה למודעות לגבי כוונת המבצע העיקרי לבצע עבירה בעלת יעוד מוחשי, פסק כב' השופט מ. לנדוי (כתוארו אז) בע"פ 426/67 **יוסף בארי ואח' נ' מדינת ישראל**, פד"י כב (1) 477, בעמ' 481, כי כאשר הסיוע מתבטא באספקת כלי לביצוע העבירה, כגון רכב או נשק – די בכך שהמסייע מספק את הכלי ששימש לביצוע העבירה למטרת ביצוע עבירה מאותו סוג שבוצע, ולאו דווקא אותה עבירה ממש. כב' השופט לנדוי אמר שהלכה זו, הנסמכת על פסיקה אנגלית, תחול **"לפחות לגבי אותם מקרים, בהם משאיר המסייע 'שיקול דעת' לעבריין העיקרי, לבחירת שעת הכושר ומקום הכושר להגשמת הכוונה הפלילית המשותפת לשניהם".**

כך פסק כב' השופט לנדוי, במקרה הנ"ל, כי אילו הוכח שהמערער (אשר זוכה לבסוף) מסר את מכוניתו למבצע העיקרי של מעשה השוד על מנת להקל על הסתלקותו ממקום הפשע - לא היה צורך להוכיח שהוא התכוון דווקא לשוד התייריות שנשדדה לבסוף.

157.   הדרישה למודעות הנאשם לקיומה של עבירה ספציפית בעלת יעוד מוחשי, מרוככת גם על ידי **"הכלל בדבר כוונה מועברת"**, המוצא את ביטויו בסעיף 20(ג)(2) לחוק העונשין, התשל"ז-1977.

סעיף זה קובע לגבי הכוונה הפלילית כי: **"אין נפקה מינה אם נעשה מעשה באדם אחר או בנכס אחר, מזה שלגביו אמור היה המעשה להיעשות"** (ראה: י. קדמי, **על הדין בפלילים – עדכון והשלמה**, מהדי 1966, חלק ראשון, בעמי 38). על יסוד כלל זה נפסק עוד לפני שחוקק סעיף 20(ג)(2) לחוק בשנת תשנ"ד, כי: **"המתכוון לרצוח את זה והרג את זה, דינו דין רוצח"** (ע"פ 406/72 **שניר נ' מדינת ישראל**, פד"י כח(1) 234, בעמי 242-243; ע"פ 388/76 **אברהים נ' מדינת ישראל**, פד"י לא(1) 601, בעמי 607; ע"פ 6059/92 **שיבאם נ' מדינת ישראל**, תק-על 93(4) 255; ע"פ 887/96 **בטון נ' מדינת ישראל**, תק-על 97(1) 848). כפי שאמר כב' השופט ח. כהן בעניין **שניר** הנ"ל: **"אין רואים כוונה פלילית כאילו מכוונת היא לאדם מסוים דווקא".** זהו אף הכלל במשפט האנגלי, כפי שציין כב' השופט ח. כהן.

### ג.   עבירת השידול וההאבחנה בין מבצע בצוותא למשדל

158.   סעיף 34ד. לחוק העונשין, תשל"ז-1977 קובע:

**"מלבד אם נאמר בחיקוק או משתמע ממנו אחרת, כל דין החל על הביצוע העיקרי של העבירה המושלמת חל גם על ניסיון, שידול, ניסיון לשידול או סיוע, לאותה עבירה".**

מכאן נובע כי חבותו של המשדל היא כחבותו של המבצע העיקרי, שכן המשדל נחשב כשותף ראשי של המבצע בצוותא – שלא כמו המסייע הנחשב כשותף משני – בשל תרומתו המהותית להתרחשות העבירה, המתבטאת בכך שהוא מביא אדם אחר לידי ביצוע עבירה (ראה: דברי כב' הנשיא א. ברק בע"פ 2796/95 הנ"ל בעניין **פלונים**, בעמי 404, אשר מתייחס אל המשדל, חרף הדברים הללו, כאל "שותף עקיף", ודברי כב' השופטת ד. ביניש בע"פ 8464/99 **אביגדור אסקין נ. מדינת ישראל**, פ"ד נה(2) 65, בעמי 82-83, למול דברי כב' השופט מ. חשין בעניין **פלונים** הנ"ל, בעמי 416, המסתייג מן הביטוי "שותף עקיף", שכן לדעתו תרומתו של משדל הינה תרומה ישירה, ממש כתרומתו של המבצע העיקרי).

P 7: 000441

ההוראה הכלולה בסעיף 34ד. לחוק העונשין, נגזרת מן ההתייחסות אל המשדל כאל שותף ראשי לביצוע העבירה: לכן נקבע בהוראה זו, דבר שהודגש אף בפסיקה, כי עונשו של המשדל זהה לעונשו של המבצע העיקרי (ראה: ע״פ 2796/95 הנ״ל בעניין **פלונים**, בעמ׳ 402-401, 415; ע״פ 8469/99 הנ״ל בעניין **אסקין**, בעמ׳ 82; דנ״פ 1294/96 הנ״ל בעניין **משולם**, בעמ׳ 43-42).

159. בע״פ 2796/95 הנ״ל בעניין **פלונים**, הבהיר כב׳ הנשיא א. ברק (בעמ׳ 404) את אחריותו של המשדל לביצוע העבירה ומהותה, לאמור:

"תרומתו של המשדל מתבטאת בכך שהוא הביא את המבצע לידי קבלת ההחלטה לבצע את העבירה (ראה פלר, בספרו הנ״ל (8), בעמ׳ 228). הוא זה שהשפיע על המבצע – אם המבצע העצמי (או העיקרי) ואם המבצע בצוותא – והביא לידי כך שהתגבשה בו ההחלטה לבצע העבירה, ונעשו צעדים להגשמתה (בגדרי ניסיון או ביצוע מושלם). הוא 'האב הרוחני' של העבירה' (מ. גור אריה "הצעת חוק העונשין (חלק מקדמי וחלק כללי), התשנ״ב–1992" (13), בעמ׳ 46). אכן, החברה מבקשת להגן על עצמה לא רק כלפי מי שמבצע עבירה – אם כמבצע עצמי ואם כמבצע בצוותא – אלא גם כלפי חוג רחב יותר של אנשים המביאים לידי כך שאחרים מבצעים עבירות...

'קירבתו' של המשדל מתבטאת בכך שהוא זה שנטע בלב העבריין העיקרי את המחשבה הפלילית לביצוע עבירה. הוא 'המבצע האינטלקטואלי' – 'auteur intellectuel' של העבירה' (ראה פלר, בספרו הנ״ל (8), בעמ׳ 226-225). הוא זה שהביא לידי כך שאצל המבצע נתגבש הרעיון לבצע את העבירה – אם בכך שהוא נטע בו את הרעיון מראש, ואם על ידי כך שהטה את הכף במקום בו המבצע היסס."

כב׳ השופט מ. חשין פסק בעניין **פלונים** הנ״ל בעמ׳ 415, כי פעילותו של המשדל מתבטאת בעיקרה בכך שבשיחו עם אחר הוא גורם לו לבצע עבירה, אשר לולא המשדל אפשר שלא היתה מתבצעת כלל.

דברים אלו מובילים לשאלת קשר הסיבתי הנדרש בין השידול לבין ביצוע העבירה בידי המשודל. כב׳ הנשיא ברק פסק, בקטע המצוטט לעיל, כי המשדל הוא זה שהשפיע על המבצע להחליט לבצע את העבירה, בין אם נטע בראשו את הרעיון, ובין אם הטה את הכף במקום בו המבצע היסס (עמ׳ 404).

בע״פ 8469/99 הנ״ל בעניין **אסקין**, פסקה כב׳ השופטת ד. ביניש (בעמ׳ 79-78), לגבי מהות השידול ודרישת הקשר הסיבתי, כי: "**העיקר הוא כי התנהגות המשדל תהא בעלת 'אפקטיביות פוטנציאלית' העשויה להשפיע על המשודל לבצע את העבירה נשוא השידול, כך שמתקיים קשר סיבתי בין ההתנהגות המשדלת לתחילת ביצוע העבירה**". ואולם – הוסיפה כב׳ השופטת ביניש (בעמ׳ 79):

"במסגרת יסודות השידול, אין זה הכרחי, ואף אין זה מספיק, כי היוזמה או הרעיון לביצוע העבירה יהיו של 'המשדל'. הרכיב הנסיבתי בעבירת השידול – קיומו של אחר ('משודל') הטעון הנעה מנטלית לצורך קבלת ההחלטה לבצע את העבירה – עשוי להתקיים גם במצבים שבהם הרעיון העבריני עלה לראשונה במחשבתו של 'המשודל',

P 7: 000442

אך טרם גובשה אצלו החלטה לבצעו. במקרה כאמור, אם ההתנהגות המשדלת הביאה להחלטתו הסופית של 'המשודל' לבצע את העבירה, הרי נתקיים היסוד העובדתי הנדרש בעבירת השידול".

**160.** לעניין היסוד הנפשי של עבירת השידול פסקה כב' השופטת ד. ביניש בע"פ 8469/99 הנ"ל בעניין **אסקין**, בעמ' 81:

"ככלל, לצורך התקיימות היסוד הנפשי במסגרת פעולת השידול יש להוכיח התקיימותן של שתי דרישות: ראשית, על המשדל להיות מודע לכך שיש בהתנהגותו כדי להביא את האחר (ה'משודל') לידי ביצוע העבירה נושא השידול. דרישה זו עניינה מודעות לטיב ההתנהגות המשדלת וכן מודעות לקיומו של אחר הזקוק להנעה מנטלית על מנת לבצע את העבירה נושא השידול. שנית, על המשדל להתכוון להביא את המשודל לידי ביצוע העבירה יעד השידול. לשון אחר, השידול צריך להיות מלווה בשאיפה – מטרה – מצד המשדל כי העבירה נושא השידול אכן תבוצע, על כל יסודותיה, על ידי ה"משודל" (ראו פלר בספרו הנ"ל (כרך ב) (18), בעמ' 234)".

**161.** בפסיקה הנוגעת לאחריותו של משדל – להבדיל מן הפסיקה הנוגעת לאחריותו של מסייע – לא צוין שהשידול צריך להתייחס לעבירה מסוימת בעלת ייעוד מוחשי, אולי משום שהדבר ברור מאליו. אך דרישה זו מובנית ביסודות עבירת השידול, ומתבקשת מקל וחומר בעניינו של המשדל, שעונשו זהה לעונשו של המבצע העיקרי (לעומת המסייע שעונשו הוא מחצית מעונשו של המבצע העיקרי). לצורך הוכחת עבירת השידול יש להראות קשר סיבתי בין השידול לבין ביצוע העבירה העיקרית בידי המשודל, ואף מטרה ושאיפה מצד המשדל שהעבירה אכן תבוצע. כל אלו מחייבים שהשידול יתייחס לעבירה ספציפית בעלת ייעוד מוחשי, כפי שנפסק אף לגבי עבירת הסיוע. וכך נאמר בספרו של ש"ז פלר, **יסודות בדיני עונשין**, תשמ"ז – 1987, כרך ב' בעמ' 226:

"ראוי להבהיר מראש כי מושג השידול, כצורת שותפות לדבר עבירה, הוא בעל משמעות שאינה תמיד הולמת את המשמעות הרגילה של מטבע לשון זה. המדובר במשמעות הנותנת ביטוי ליחס בין *פרט לפרט*, משדל למשודל, ולא גם ליחס בין פרט לבין קהל מקום שהפרט מסית, מדיח, מתסיס, קהל מסויים או קהל בלתי מוגדר, ללא הבדל הזהות הפרטית של הנמנים על אותו קהל, לבצע עבירה פלילית".

פעולות כאלה עשויות להצמיח עבירות ספציפיות, ואפילו משתמשים בו בתבה "שדל" לשם הגדרתן, אין זה אותו "שידול", כצורה של שותפות לדבר עבירה, בו נדון בהמשך".

עם זאת, כפי שנפסק לגבי סיוע, אין צורך להוכיח שהמשדל היה מודע לכל פרט מפרטי העבירה נושא השידול, ודי בכך שהוא שידל את המבצע לעבור עבירה מאותו סוג של העבירה שבוצעה לבסוף (ראה סעיף 156 לעיל). זאת ועוד, גם לעניין השידול, כמובן, חל הכלל בדבר כוונה מועברת: אין נפקה מינה שהעבירה נושא השידול נעשתה לבסוף לגבי אדם אחר.

**כללו של דבר:** לא ניתן להרשיע אדם בעבירת שידול כללית לביצוע מעשי רצח, כאשר הוא קורא

לביצוע פיגועים כנגד ישראל; לכך קיימת העבירה של הסתה לאלימות או לטרור (סעיף 144ד2. לחוק העונשין, התשל"ז-1977). כך גם לא ניתן להרשיע אדם בעבירה של סיוע למעשי רצח, כאשר הוא מספק כספים או אמצעי לחימה לשם ביצוע עבירות שונות שאינן מסוימות. לכך קיימת העבירה של מתן אמצעים לביצוע פשע לפי סעיף 498 לחוק העונשין, התשל"ז-1977, שחוקקה במיוחד על מנת להתמודד עם מצבים בהם לא ניתן להוכיח ידיעה ודאית של מוסר האמצעים על כוונת מקבלם לבצע עבירה מסוימת, באופן שלא ניתן לראות בו מסייע (ראה דברי ההסבר להצעת חוק לתיקון פקודת החוק הפלילי (מס׳ 36), תשל"ג-1972, ה"ח תשל"ג 1021, בעמ׳ 20).

162.     אשר לקו המבחין בין משדל לבין מבצע בצוותא, פסק כב׳ הנשיא א. ברק בע"פ 2796/95 הנ"ל בעניין **פלונים** בעמ׳ 406, כי: "**תרומתו של המשדל היא בכך שהוא גרם ליצירת היסוד הנפשי של המבצעים**", וכי: "**ככל שהשידול של המשדל אינטנסיבי יותר וככל שמתלווה אליו לא רק פעולות במישור הנפשי אלא גם פעולות במישור העובדתי, כך מתקרב המשדל למבצע בצוותא**". בעניין **פלונים** הנ"ל הורשע הקטין ט. בעבירת רצח, כמבצע בצוותא ולא רק כמשדל, בשל זריקת רימון לעבר ערבים, אף שהוא סרב להצטרף לפעולה עצמה, משום שנפסק כי הוא השתתף בתכנון העבירה, והיה "**ראש וראשון לכולם**" (עמ׳ 408-409).

בנוגע לאבחנה בין מסייע לבין משדל, אמר כב׳ הנשיא ברק (בעמ׳ 406), כי כאשר הסיוע הוא "רוחני" – עשוי המסייע להפוך למשדל: "**קו הגבול עובר באבחנה בין עזרה למי שכבר גיבש לעצמו מחשבה פלילית (המסייע) לבין תרומה לגיבוש עצם המחשבה הפלילית (המשדל)**".

בדנ"פ 1294/96 הנ"ל בעניין **משולם**, פסק כב׳ השופט י. קדמי (בעמ׳ 63):

"כאמור, אחריותו של ה׳מבצע בצוותא׳ נעוצה – כאמור בסעיף 29 לחוק העונשין – ב׳השתתפות׳ – בביצוע של עבירה תוך ׳עשיית מעשים׳ לביצוע... ובהיעדרו של ׳מעשה השתתפות׳ – כאמור – אין בסיס לאחריות בתור שכזה... לעומת זאת, אחריותו של ׳משדל׳ לביצועה של עבירה על-ידי אחר נעוצה בעשיית ׳מעשה-של-שידול׳, מן המעשים המפורטים בסעיף 30 לחוק העונשין. מעשה כזה אינו מהווה ׳מעשה-של-השתתפות׳ בביצוע, אלא מותיר את העושה ׳מחוץ׳ למסגרת הביצוע."

בעמ׳ 66 אמר כב׳ השופט י. קדמי:

"עיונית, המבחין בין המשדל לבין המבצע בצוותא נעוץ בכך שתרומתו של המשדל לביצועה של העבירה היא ביצירת ה׳יסוד הנפשי׳ הדרוש לביצוע העבירה אצל המשודל, שהוא המבצע העיקרי; בעוד שתרומתו של המבצע בצוותא היא, בעיקרה, במישור ההתנהגותי של הביצוע, שהרי נדרשת ממנו ׳השתתפות׳ תוך עשיית מעשים לביצועה של העבירה (ראה בעניין זה פלר בספרו הנ"ל (כרך ב)     [20], בעמ׳ 196, 228). ואילו מן ההיבט המעשי, קו הגבול בין המשדל למבצע בצוותא מתוח בין מי ש׳משתתף׳ בביצוע – דהיינו נמנה על הגרעין הפנימי של המבצעים – לבין מי ש׳מעורב׳ בביצוע בלבד, דהיינו מצוי מחוץ למעגל הפנימי של המבצעים."

ד.     **אחריותו של מנהיג חבורה עבריינית כמבצע בצוותא או כמשדל**

163.     לעניין קביעת אחריותו של נאשם כמבצע בצוותא או כמשדל, העניקו בתי המשפט משקל מכריע לעובדת היותו של הנאשם מנהיג החבורה העבריינית שביצעה את העבירה העיקרית. בע"פ 2796/95 הנ"ל בעניין **פלונים** הורשע הקטין ט. כמבצע בצוותא, ולא רק כמשדל, בלא שהצטרף

P 7: 000444

לביצוע עבירת הרצח עצמה, משום שהשתתף בתכנון והיה מנהיג החבורה, ובלשונו של כב׳ הנשיא א. ברק "ראש וראשון לכולם".

בע"פ 8469/99 הנ"ל בעניין **אסקין**, הורשע הנאשם כמשדל לביצוע עבירות של הצתה וכניסה ללא רשות למקום פולחן או קבורה, שבוצעו על ידי אדם שהיה כפוף לנאשם וסר למרותו; בית המשפט הדגיש את היותו של הנאשם "מנהיג ומוביל", וכן את העובדה שהנאשם היה זה שנתן את "הסכמתו ואישורו" לביצוע העבירות, וקיבל דיווח לאחר השלמת הביצוע (עמ׳ 77-81, 84, 90-91). עם זאת, יש לציין כי הנאשם באותו מקרה נטל חלק בתכנון העבירה, וסייע בכסף לביצועה. בנסיבות אלו, העירה כב׳ השופטת ד. ביניש, אגב אורחא, כי ייתכן שהיה מקום להרשיעו כמבצע בצוותא, ולא רק כמשדל, באומרה (בעמ׳ 84):

"אף לו היינו אומרים כי עיקר 'תרומתו' של המערער לביצוע העבירה היה במתן 'אישורו' לתוכנית העבריינית ולמימושה, הרי שבנסיבות מיוחדות אפשר ש'הסכמה' לביצוע תהווה השתתפות 'בביצוע עבירה תוך עשיית מעשים לביצועה', כאמור בסעיף 29 לחוק העונשין".

בדבריה אלו הפנתה כב׳ השופטת ביניש לדברי כב׳ השופט י. קדמי בע"פ 5589/98 **ביסאן סולטאן נ. מדינת ישראל**, תק-על 99(3) 98, פסקה 9. באותו עניין הורשע המערער בעבירת רצח בכוונה תחילה, כאשר הוכח שנתן את הסכמתו ואישורו לביצוע הרצח, ושלח את המבצע העיקרי להוציא לפועל את הרצח, ואף הנחה אותו לגבי שיטת הביצוע.

השופט קדמי הדגיש שלולא הסכמתו של המערער לא היה הרצח מתבצע, ולכן מתן האישור לבצע את הרצח היה משול "לירית ההזנקה המשלחת ספורטאי למרוץ", והיא עולה כדי "מעשה של השתתפות בביצוע העבירה". לכן הורשע המערער כמבצע בצוותא ולא כמשדל, ובית המשפט הדגיש כי הוא היה מצוי "במעגל הפנימי של הביצועי", כמי שהיה לו תפקיד בביצוע, והיה "המוח של החבורה", בעוד שמשדל מצוי מחוץ למעגל הפנימי של הביצוע.

כב׳ השופט קדמי הוסיף ואמר כי בנסיבות המתוארות לעיל, כאשר המערער נתן "אור ירוק לרצח" וההנחיות אופרטיביות בדבר דרך הביצוע, היה בהתנהגותו לפחות "מנה גדושה של שידול על דרך העידוד". גם בע"פ 8469/99 הנ"ל בעניין **אסקין**, נפסק כי די היה בכך שהמערער אישר את ביצוע ההצתה, בהיותו המנהיג והמוביל, כדי להגיע למסקנה שהיה במתן אישור זה משום עידוד למבצע העיקרי להוציא את רעיון ההצתה מן הכוח אל הפועל (בעמ׳ 93).

164.   שאלת אחריותו של מנהיג קבוצת עבריינים, אשר איננו משתתף באופן פיזי בביצוע העבירה בידי אלו הסרים למרותו, התעוררה במלוא חריפותה בדנ"פ 1294/96 הנ"ל בעניין **משולם**. בית המשפט פסק בדעת רוב של ששה שופטים, כי רב-עבריינים אשר מנהיג קבוצת עבריינים המבצעת עבירות בשליחותו ועל-פי תכנונו והנחיותיו, איננו רק משדל: הוא נחשב כמבצע בצוותא בשל השליטה המלאה שיש לו על ביצוע העבירה ועל מבצעיה. כב׳ השופטת ד. דורנר סברה בדעת מיעוט כי יש לראות באדם שכזה משדל בלבד (עמ׳ 42-47). דעה אחרת, לפיה יש לראות במנהיג ארגון פשע כ"מבצע באמצעות אחר" לפי סעיף 29(ג) לחוק העונשין, מובעת במאמריהם של מ. קרמניצר "המבצע בדיני העונשין קווים לדמותו", פלילים-א׳ (תש"ן-1990) 65, בעמ׳ 72, ומ. גור-אריה, "צדדים לעבירה-תיקון 39 לחוק העונשין במבחן הפסיקה", מגמות בפלילים, עמ׳ 83. במאמרו של פרופ׳ קרמניצר נאמר בעמ׳ 72:

"דומה כי לא צריך להכביר מילים על כך שהמושגים הרגילים של השתתפות עקיפה (סיוע ושידול) אינם הולמים תופעות עברייניות, כגון פשעי מלחמה, פשעים המתבצעים

P 7: 000445

על ידי מדינה פושעת (פשעי הנאצים) או על ידי ארגון פשע ('המאפיה'). מי שנמצא בעמדת שליטה במערכת כזו (ולא רק ראש ההיררכיה) הנותן פקודה להמית אדם, איננו סתם משדל או מסייע לרצח כאשר פקודתו מתבצעת. האופי המיוחד של מעשהו מתבטא בכך שבעת מתן הפקודה הוא יכול לסמוך על כך שהוראתו תבוצע, מבלי שיהיה עליו להכיר את המבצע הפיזי. הוא

יודע שאם אחד האורגנים הבאים בחשבון לביצוע לא ימלא את המשימה, יבוא אחר במקומו, והעיקר – המשימה תבוצע.

המבצע הישיר שולט אמנם על המעשה (הוא מבצע במו-ידיו את המעשה, מתוך היסוד הנפשי הנדרש, וללא כפייה), ואולם מבחינתו של נותן ההוראה הוא נתפס לגמרי אחרת – כפיגורה אנונימית וניתנת להחלפה, כבורג או גלגל בתוך מנגנון הפעולה של הארגון הנתון בידיו של נותן ההוראה. הפונגיביליות של המבצע הישיר הופכת את השליט בארגון למבצע באמצעות אחר״.

165.   בדנ״פ 1294/96 הנ״ל בעניין **משולם**, פסק כב׳ השופט א. מצא כי: ״יש לראות במשתתף כזה – שבידיו שליטה מלאה על הביצוע ושעשייתו כוללת לא רק פעולות שידול והכנה, אלא גם הנחיית העבריינים הפועלים ופיקוח על פעילותם - מבצע בצוותא לכל דבר״ (עמי 27). הוא הדגיש כי נוכחות בזירת העבירה איננה יסוד חיוני  להיותו של אדם מבצע בצוותא, ואמר (בעמי 30):

״במציאות המשפטית החדשה, התנייית האחריות הישירה בנוכחות, פרושה ש׳סנדקים׳ ומנהיגי קבוצות עבריינים, המשלחים לזירת הביצוע את ׳דגי הרקק׳ הסרים למרותם, בעוד הם מנהיגים את הפעילות הפלילית מרחוק, יראו לא כמבצעים בצוותא אלא רק כמשדלים. ואפשרות זו, שבוודאי אינה משקפת את הדין הרצוי, איננה מתחייבת אף מן הדין המצוי״׳.

כב׳ השופט א. מצא הדגיש לעניין השליטה של המנהיג באנשיו, את העובדה שהנאשם יכול היה להורות לאנשיו לחדול מביצוע העבירה (עמי 32, וראה גם דברי כב׳ השופט קדמי בעמי 63).

כב׳ הנשיא ברק הצטרף לדעתו של כב׳ השופט א. מצא, אך הדגיש גם את העובדה שהנאשם באותו מקרה היה נוכח בזירת ביצוע העבירה עד למעצרו, ובאותה עת הניע את תוכנית העבירה (עמי 50). כב׳ הנשיא ברק פסק (בעמי 51):

״מעמדו של משולם איננו מאפשר לראות בו משדל בלבד. משולם הוא ראש הקבוצה. הוא המנהיג. הוא תכנן את המבצע. זהו מבצע שלו. הוא איננו בעל רעיון עברייני; הוא איננו רק ׳אב רוחני׳ של העבירה. הוא איננו אדם חיצוני המבקש כי מישהו אחר יבצע עבירה. הוא בעל תרומה פנימית לביצוע העברייני... בידיו של משולם, כראש הקבוצה, השליטה האפקטיבית על הארוע העברייני, ואצלו המחשבה הפלילית הנדרשת לגיבוש אחריותו כמבצע בצוותא״.

כב׳ השופט מ. חשין פסק (בעמי 55) אף הוא כי: ״רב-עבריינים פלוני, היוזם, המתכנן, קובע

**משימות והשולח את 'חייליו' לביצוע העבירה"** – נחשב כמבצע בצוותא הגם שאינו נוכח בזירת ביצוע העבירה. הוא הוסיף כי אדם שכזה, שהוא "**הרוח הרעה בכל מעשה העבריינות**" איננו יכול להחשב כמשדל בלבד, שאחריותו תהיה פחותה מאחריותו של המבצע בצוותא. וכך אמר כב' השופט חשין (בעמ' 59):

"נדע מכאן, כי בסווגנו את רב-העבריינים כמשדל – להבדילו ממבצע-בצוותא – כמו הפחתנו באחריותו והקלנו עימו. 'חיילים' ששלח רב-העבריינים לביצוע מעשה פשע, אלה יישאו באחריות מלאה לעבירה שונה ונוספת שביצעו, ואילו הוא – הרב-מוח והמנהיג העליון – ישא באחריות פחותה, אף כש'אדם מן הישוב יכול היה להיות מודע לאפשרות עשייתה' של אותה עבירה שונה ונוספת. מסקנה זו תמוהה ומוזרה וקשה עלי לקבלה."

ועוד אמר כב' השופט חשין (בעמ' 59):

"הנקבל כי הרב-מוח יהא זוטר ל'חייליו' עושי-דברו? אכן, אם הרב-מוח אכן רב-מוח הוא – שבלעדיו לא יוכל תמנון-השותפות-לעבירה להניע את זרועותיו – יקשה עלינו לקבל כי אחריותו תהא פחותה מאחריות המבצע בצוותא. רוחו הרעה של המנהיג שורה על כל המבצע העבריינות, מוחו מילא את הקפיץ מפעיל-העבירה קודם תחילתה, ולעת עשייתה של העבירה הוא 'נמצא' עם העבריינים כמבצע – בצוותא עימהם. הוא ימשיך ו'יימצא' בינותם עד אם יעשה מעשה גלוי לעין למניעת העבירה, לא פחות."

כב' השופט חשין נימק מסקנה זו גם באנלוגיה שהקיש מסעיף 29(ג) לחוק העונשין, בראותו את המנהיג המשלח את "חייליו" לביצוע העבירה כמעין "מבצע באמצעות אחר", ובאומרו: "**'חיילים' ישמעו להוראות מנהיגם עד שיבטלו את רצונם לחלוטין מפני רצונו**" (בעמ' 60). לגבי הנאשם באותו מקרה, הדגיש כב' השופט חשין כי: "**אחריותו נגזרת מתוך תכנון וביצוע 'המרד' קודם מעצרו** – תכנון וביצוע של מנהיג – ואותה אחריות נמשכה והלכה גם לאחר מעצרו וכל-עוד לא עשה מעשה גלוי לעין לעצור את העגלה המתדרדרת במדרון" (עמ' 61).

כב' השופט י. קדמי פסק ברוח דברים אלו (בעמ' 66-67), באומרו:

"במצב דברים זה, במקום שמעורבותו של מנהיג של חבורה, שההחלטה על ביצועה של עבירה, באה לכלל ביטוי בתכנון, בהנחיה ובחלוקת תפקידים, השאלה אם בפנינו 'מבצע בצוותא' או 'משדל', תוכרע על-פי אופייה של ה'מעורבות': אם היתה זו 'מעורבות' שיש בה תרומה של 'השתתפות' בביצוע; או שמא 'מעורבות' חיצונית של שידול בלבד.

יישומה של ההבחנה האמורה אינו תמיד קל, אך תמיד אפשרי. מכל מקום, כאשר מדובר במנהיג – או בראש חבורה – המציג לנוהים אחריו ולעושי דברו דברים תכנית קונקרטית לביצועה של עבירה, כאשר זו כוללת חלוקת תפקידים ומתן הנחיות בדבר אורח הביצוע, לא יכול להיות ספק כי לא ב'משדל' המדובר, אלא במנהיג ש'השתתפותו' בביצוע באה לכלל ביטוי ב'מעשה התכנון' האמור. 'מעשה של תכנון' – להבדיל מ'מעשה-של-שידול' – מהווה מעשה של 'השתתפות' בביצוע, משום שבפועל יש בו משום שלב ראשון של הוצאה לפועל של התכנית העבריינית, קרי: של הביצוע. זאת, להבדיל מן ה'שידול', שאינו חלק

P 7: 000447

מן הביצוע, אלא גורם חיצוני המניע את המבצע.

כפי שהוסבר לעיל, ניתן להסתייע בעניין זה, בבחינת קיומה של 'זיקת שליטה'. קיומה של 'זיקת שליטה' תאשר, כי ראש החבורה הינו 'מבצע בצוותא' על כל הנובע מכך; כאשר במקום שבו אין מתקיימת 'זיקת שליטה' כמוסבר לעיל, תהיה אינדיקציה לאפשרות שהמדובר במעורבות המקימה אחריות של 'משדל' בלבד".

166.   על גישתו דלעיל, חזר כב' השופט י. קדמי בע"פ 4720/98, 5310/98, 5454/98 **נחמן כהן ואח' נגד מדינת ישראל**, דינים עליון, כרך נ"ז 366. במקרה זה הורשע נחמן כמבצע בצוותא, לאחר שהוכח כי היה היוזם, המזמין והמוביל של מזימת הרצח, ומי שאישר את זהות המתנקש המיועד שהוצג בפניו. כב' השופט י. קדמי אמר (בפסקה 9):

"לשיטתי, אותה הצגתי לא פעם בעבר, 'מנהיגה' של חבורה, היוזם ומוביל לביצועה של עבירה ע"י חבורתו, נמנה בין 'מבצעיה'. המנהיג, 'משתתף' בביצוע העבירה במשמעות שיש לדרישה זו בסעיף 29 לחוק העונשין. גורלו קשור בגורלם של המבצעים בפועל; והוא נושא באחריות לביצוע כאילו היה 'לצידם' של המבצעים בשעת הביצוע. זה דינו של 'המנהיג' וזה דינם של ה'מתכננים' וממלאי 'תפקידים חיוניים' אחרים, שתרומתם לביצוע 'מסתיימת' אמנם פורמלית לפני תחילתו, אך היא נותרת חלק בלתי נפרד ממנו. גורלם של אלה – המנהיג, המתכנן ודומיהם – קשור בגורלם של המבצעים בפועל: הם מהווים גוף אחד, שכל איבריו נושאים באחריות למעשים שעושים 'ידיו'.

לשיטתי, מנהיג של 'חבורה' שחברה לביצועה של עבירה, אינו 'משדל' של חבריו לחבורה, אלא מי שעומד בראשם ו'מוביל' אותם להגשמת מזימתם המשותפת. המשדל מצוי מחוץ למעגל הפנימי של ה'ביצוע'; ומעשה השידול הינו שידול 'נטו', לאמור: מעשה עצמאי ונפרד מן המאמץ הכולל של הביצוע. מי ש'משתתף' בביצוע – ולשיטתי, כמתחייב מן האמור לעיל, יש ליתן למושג 'השתתפות' בהקשר זה משמעות רחבה – אינו יכול להיות 'משדל'. בין ה'משדל' לבין ביצוע העבירה 'חוצץ' המבצע שסימנו 'מילוי תפקיד' בביצוע; ובמקום ש'שידול' מלווה ב'מילוי תפקיד' כאמור – לא 'משדל' ניצב בפנינו, אלא 'מבצע בצוותא'"."

3. **מסקנות בעניין אחריותו של הנאשם כמבצע בצוותא, משדל ומסייע**

167. ניתוח חומר הראיות כמפורט לעיל, מביא למסקנות **העובדתיות** הבאות לגבי חלקו ותפקידו של הנאשם בפיגועים נשוא כתב האישום:

א. הנאשם היה מפקד הפת״ח והתנזים בגדה המערבית. הוא היה מנהיג השטח של הפת״ח בגדה, ואחראי על ה״פעילות הצבאית״ של הפת״ח בכל שטחי הגדה. הביטוי בו השתמש הנאשם, קרי: ״הפעילות הצבאית״, איננו אלא שפה נקיה לפיגועי הטרור כנגד ישראל, שבוצעו על ידי חוליות השטח של הפת״ח, שהתארגנו בתנועת התנזים ובמסגרת גדודי חללי אלאקצא. הנאשם הקים את גדודי חללי אלאקצא, והיה אחראי על פעילותם, בהיותו מנהיגם ומפקדם של אנשי חוליות השטח ומפקדיהם. בפעילותו זו היה הנאשם כפוף באופן ישיר ליו״ר הרשות הפלסטינאית יאסר ערפאת. פעילותו ״הצבאית״ של הנאשם כמתואר לעיל, נעשתה במקביל לפעילותו הפוליטית כמזכ״ל הפת״ח בגדה, והיותו חבר הפרלמנט הפלסטינאי.

ב. הנאשם החזיק בדעה כי תנועת הפת״ח חייבת להוביל את ״המאבק המזוין כנגד ישראל״, ולכן תמך בגלוי בביצוע פיגועים כנגד חיילים ומתנחלים. זו היתה עמדתו המוצהרת של הנאשם, אשר הבהיר כי מבחינתו גם נשים וילדים המתגוררים בהתנחלויות נחשבים כאויב שיש לפגוע בו. הנאשם התנגד באופן עקרוני לפיגועים בתוך ישראל, קרי: מעבר לקו הירוק, וכן היה נגד פיגועי התאבדות. ואולם בפועל, הוא לא חדל מלתמוך באנשיו, ולסייע להם באספקת כספים ואמצעי לחימה, גם כאשר נוכח שוב ושוב שהם מבצעים פיגועים, כולל פיגועי התאבדות, בתוך ישראל. בכך הביע הנאשם את הסכמתו לכל סוגי הפיגועים שביצעו אנשי השטח של הפת״ח. עמדתו של הנאשם כמתואר לעיל, באה לידי ביטוי גם בהופעותיו באמצעי התקשורת, בהן עודד את פעילי הפת״ח לבצע פיגועים כנגד ישראל, ואף שיבח את מבצעי הפיגועים – כולל אלו שבוצעו בתוך ישראל.

ג. לנאשם לא היתה שליטה מוחלטת באנשי החוליות ומפקדיהם. אך היתה לו מידה רבה של השפעה עליהם, מכוח היותו מנהיגם, ובשל הסיוע שהגיש להם, אשר התבטא באספקת כספים ואמצעי לחימה. השפעתו של הנאשם על אנשי החוליות ומפקדיהם באה לידי ביטוי בכך שמידי פעם היה מורה להם להפסיק את הפיגועים כנגד ישראל, ולאחר מכן היה קורא לחידוש הפיגועים – בין היתר על פי הנחיות שקיבל מערפאת. יאסר ערפאת לא היה נותן את הנחיותיו בצורה מפורשת, אך דאג שהכפופים לו יבינו היטב מתי הוא מעוניין בהפסקת אש, ומתי הוא מעוניין בפיגועים כנגד ישראל. גם ערפאת ראה עצמו בנאשם כמי ששולט באנשי השטח, ולכן היה נוזף בו כאשר בוצע פיגוע שלא על דעתו של היו״ר.

ד. לאנשי חוליות השטח ולמפקדיהם היתה מידה רבה של עצמאות בביצוע הפיגועים. הם לא נהגו בדרך כלל לערב את הנאשם בתכנון הפיגועים, ואין גם ראיות כי נהגו לדווח לו לפני ביצוע הפיגועים (למעט מקרים בודדים). עם זאת, הנאשם היה מקבל מהמפקדים דיווח לאחר כל פיגוע. מתכונת פעילות זו נבעה מרצונו של הנאשם, כמו גם רצונם של מפקדי החוליות, להגן על הנאשם מפני ישראל, ולשמר אותו כ״דמות פוליטית״, שאיננה מעורבת, כביכול, בפיגועי הרצח כנגד ישראל. מטעם זה לא היה לנאשם קשר ישיר עם מבצעי הפיגועים, למעט מקרים חריגים. כך גם נזהר הנאשם שלא ליטול בעצמו אחריות בשם הפת״ח או גדודי חללי אלאקצא לאחר ביצוע הפיגועים, דבר שנעשה על ידי מפקדי החוליות. הנאשם הסתפק בנטילת אחריות באמצעי התקשורת בצורה עקיפה וכוללנית, מבלי להתייחס לפיגוע ספציפי, וזאת על ידי הבעת תמיכה בפיגועים שבוצעו.

ה. לבד מאחריותו הכוללת והעליונה של הנאשם על כל אנשי התנזים וגדודי חללי אלאקצא, בהיותו מפקדם, הוא שלט בצורה טובה יותר בכמה מן החוליות שהתנהלו תחת פיקודם של אנשים שהיו עוזריו הקרובים, ונהנו מסיוע ותמיכה מיוחדת שלו, כמו אחמד ברגותי, עויס, אבו חמיד ואבו סטחה.

הנאשם נטל אחריות בחקירתו לפעילותן של החוליות שפעלו בפיקודם של אנשים אלה (למעט עויס), אם כי טען שהוא היה רק אחת מן "הכתובות" אליהן פנו אנשים אלה לשם קבלת סיוע ומימון, וכי לא היתה לו שליטה מלאה בהם, אלא רק השפעה עליהם.

ו. לנאשם לא היה בדרך כלל קשר ישיר עם אנשי השטח שביצעו את הפיגועים: הקשר היה באמצעות המקורבים לנאשם, שפעלו בסביבתו, ובהם: אחמד ברגותי, עויס, אבו חמיד ואבו סטחה. אנשים אלו, שפעלו בסביבתו של הנאשם ובתמיכתו, תכננו והוציאו לפועל פיגועי רצח, כשהם משתמשים בכספים ובאמצעי הלחימה שהנאשם דאג לספק להם לצורך כך.

ז. הנאשם היה אחראי על אספקת כספים ואמצעי לחימה לחוליות השטח, באמצעות המקורבים אליו, כגון אחמד ברגותי, עויס, אבו חמיד ואבו סטחה. הוא היה מפנה את הבקשות לאישורו של ערפאת, והיה אחראי על רכישות הנשק ואספקתו לאנשי החוליות באמצעות מקורביו. הנאשם גם הגיש סיוע למבוקשים ולמשפחות המפגעים.

ח. למרות שהנאשם, כמו גם אנשיו, נזהרו בדרך כלל שלא לערב אותו באופן אישי בתכנון והוצאה לפועל של פיגועים, הרי שהובאו ראיות חד-משמעיות לגבי ארבעה פיגועים שבוצעו בידיעתו, באישורו ובעידודו של הנאשם, ושניים מהם אף ביוזמתו.

הפיגוע בתחנת הדלק בגבעת זאב, בו נרצחה יואלה חן ז"ל, בוצע על פי הוראתו הישירה של הנאשם לאנשיו, כנקמה על חיסולו של ראיד כרמי, והנאשם הודה בחקירתו באחריות לפיגוע זה.

כך גם בוצע הפיגוע בו נרצח הנזיר היווני ציפוקטקיס גרמנוס ז"ל במעלה אדומים, בעקבות פניה של המפגע רדאידה אל הנאשם לשם ביצוע פיגוע התאבדות.

הנאשם הפנה את רדאידה אל האדם שידריך אותו ויספק לו נשק, והנחה אותו לבצע פיגוע ירי ולא פיגוע התאבדות. כתוצאה מכך יצא רדאידה לביצוע הפיגוע, וירה בנזיר היווני למוות מתוך מחשבה שהוא יהודי.

בנוסף, נתן הנאשם את אישורו לביצוע הפיגוע במסעדת "סי פוד מרקט" בתל אביב, וזאת בטרם יצא המפגע לדרכו. הנאשם אמנם הורה לאנשיו שהפיגוע יבוצע בהתנחלות או במחסום צבאי, ולא בתוך ישראל, אך הוא אישר את הפיגוע עצמו.

כמו כן, אישר הנאשם לאנשיו לבצע פיגוע התאבדות באמצעות פיצוץ מכונית תופת, אם כי הנחה את אנשיו שהפיגוע יבוצע בשטחים הכבושים ולא בתוך ישראל. הפיגוע הסתיים במותם של שני המחבלים ליד קניון מלחה בירושלים, אשר התפוצצו ברכב בדרכם לביצוע הפיגוע.

ט. זולת ארבעת הפיגועים שפורטו בס"ק ח' לעיל, לא הובאו ראיות הקושרות את הנאשם באופן אישי וישיר למעורבות בפיגועים נשוא כתב האישום. משיחתו של הנאשם עם מקורבו אחמד ברגותי, שהוקלטה ללא ידיעתם, עולה חשש ממשי כי הנאשם ידע הרבה יותר ממה שהוא ואנשיו חשפו בחקירותיהם, אך לא ניתן לקבוע זאת במידת ההוכחות הנדרשת במשפט פלילי על סמך הראיות הקיימות.
כך או כך: ברור מן הראיות שהובאו, כי פיגועי רצח לא מעטים מאלו שפורטו בכתב האישום תוכננו והוצאו לפועל על ידי מפקדי השטח שפעלו בקרבת הנאשם ובתמיכתו, תוך שימוש בנשק שהנאשם סייע ברכישתו, ואשר נמסר למפגעים על ידי מפקדי החוליות המקורבים אל הנאשם (אחמד ברגותי, עויס, אבו סטחה ואבו חמיד). הנאשם קיבל מאנשיו דיווחים על פיגועים אלה לאחר ביצועם, ונתן את הסכמתו - לפחות בשתיקה ובהתנהגות - להמשך ביצועם.

168. ניתוח חומר הראיות כמפורט לעיל, מביא למסקנה הברורה שהנאשם תרם תרומה ממשית לפיגועי הטרור שבוצעו על ידי חוליות הפת"ח, התנזים וגדודי חללי אלאקצא, גם כאשר לא נטל חלק בביצועם.

הסיוע במתן אמצעי לחימה וכספים לאותן חוליות, גיוס פעילי השטח, הטיפול בהדרכתם והסיוע למשפחותיהם - כל אלה יצרו את התנאים שנדרשו לביצוע מעשי הרצח של חוליות הטרור. הנאשם היה מודע, ללא ספק, לעובדה זו, וגם ידע שאנשי השטח הנתמכים על ידו עומדים להמשיך ולבצע פיגועי רצח כנגד ישראל, והוא פעל מתוך מטרה ברורה לסייע להם לפעול בדרך זו. אין מדובר רק בחשד סביר או ב"עצימת עיניים" מצד הנאשם, אלא בידיעה ממשית שאנשי החוליות מבצעים, ועתידים להמשיך לבצע, פיגועי רצח כנגד ישראל, תוך שימוש באמצעי הלחימה והכספים שהעמיד לרשותם למטרה ספציפית זו. יתר על כן: הנאשם לא רק היה מודע למעשי הרצח שמבצעים אנשי החוליות, אלא שהוא שהעניק להם הסיוע, כמפורט לעיל, מתוך מטרה ושאיפה שהם יפעלו בדרך זו.

עם זאת, למעט ארבעה מקרים שיפורטו בהמשך, אין ראיות שהנאשם היה מעורב בתכנון ובביצוע הפיגועים, או כי ידע מראש על הפיגועים העומדים להתבצע על ידי אנשי השטח ומפקדי החוליות שנתמכו על ידו, ושהוא למעשה היה מפקדם. אמנם עלי עיאדיה סיפר בחקירתו כי הנאשם ידע ואישר מראש את כל פיגועי הירי של אנשי התנזים (ראה סעיף 40 לעיל). אך פרט לעדות בודדת זו, מפי אדם שלא היה מקורב לנאשם, אין ראיות אחרות על כך שהנאשם ידע מראש על כל פיגוע העומד להתבצע, והוא עצמו הכחיש טענה זו. גם התביעה אינה טוענת כי הנאשם ידע מראש על כל הפיגועים (ראה עמ' 47 לסיכומיה).

169. זאת ועוד: מחומר הראיות עולה כי לנאשם לא היתה שליטה מוחלטת במפקדי החוליות ואנשי השטח. אמנם הוא נחשב למנהיגם ומפקדם, והיתה לו השפעה עליהם, אך בכל זאת היתה להם מידה לא מבוטלת של שיקול דעת עצמאי בתכנון הפיגועים וביצועם, ואין כל ראיה שהם היו מתייעצים עם הנאשם בעניין זה. ממכלול הראיות עולה כי גדודי חללי אלאקצא אינם גוף המאורגן תחת הנהגה אחת, אלא מקבץ של חוליות שטח, שלכל אחת מהן יש מפקד משלה. עובדה העולה מחומר הראיות, היא כי אנשיו של הנאשם ביצעו פיגועי התאבדות, ופיגועים בתחומי הקו הירוק, בניגוד לעמדתו המוצהרת של הנאשם, ולעיתים גם בניגוד לדעתו של היו"ר ערפאת. בנוסף, מחומר הראיות עולה שאנשי השטח שהיו מעורבים בביצוע הפיגועים השתדלו להרחיק את הנאשם ולנתקו ממעורבות אישית בפיגועים על מנת להגן עליו מפני ישראל, ולשמרו כ"דמות פוליטית".