85. ██████████ said during the course of his interrogation that he gave his MP5 rifle to ██████ after ██████ requested it for his cell, and a short time later, he heard from ██████ and also on the news that a member of his cell perpetrated a terrorist attack in which three Jews were killed near Beit Ghur (Statement Prosecution/165 (a) on p. 2, which was submitted by ██████████████ on p. 184). A██████ also said during interrogation that he received the MP5 rifle and a full cartridge of bullets from ██████ ██████ and gave them to two members of his cell, Hussam and Faris. The two told him that they perpetrated the terrorist attack near Beit Ghur in which three Israelis were killed (Statement Prosecution/156 (b) on p. 3, which was submitted by an interrogator by the name of ████ on p. 198).

The terrorist who perpetrated the attack, ██████████, confirmed during interrogation that he and another person perpetrated the terrorist attack near Beit Ghur on Route 443 by the Dor Energy gas station by firing at a white Passat car (see photographs). He noted that the shots were fired with an MP5 rifle that he received from ██████████ and that his partner in the terrorist attack was armed with a Kalashnikov. On the following day, ██████ heard that three Israelis were killed as a result of the terrorist attack and reported this to ██████████, who passed a report on to the Defendant (Statement Prosecution/160 (a) on pp. 4 – 5, which was submitted by ████ on p. 198). ██████ refused to answer questions during his testimony. Consequently, he was declared a hostile witness and his statements Prosecution/160 (a) – (c) were submitted together with the indictment verdict and sentence in his case (Prosecution/159 (a) – (d)). During his testimony he said only, "**I have said what I had to say and do not want to say anything else**" (on p. 73). ██████ was convicted of perpetrating this terrorist attack.

86. No evidence was presented connecting the Defendant to this terrorist attack other than his indirect connection, in accordance with that which has been set forth above, in the cases of the terrorist attacks in which his close associates, ██████████ and ██████████ were involved (see Section 80 above). The Defendant supplied money and weapons to the members of the cell, by way of ██████████ in order to carry out terrorist attacks and the weaponry used for this terrorist attack was supplied by ██████████

The question of whether this is sufficient to substantiate the Defendant's criminal liability for the acts of murder which were perpetrated during this terrorist attack when there is no evidence connecting the Defendant directly to this terrorist attack, will be examined in the chapter of conclusions.

**(5)** **Murder of Meir Weissboiz, of blessed memory, on Route No. 9 in Jerusalem**

87. On September 15, 2001, at 9:15 p.m., shots were fired from an ambush on a vehicle traveling on Route No. 9 in Jerusalem, from French Hill towards Golda Meir Boulevard. The vehicle, a white Renault Express, was driven by Moshe Weiss, who testified that he was injured by a bullet that is lodged in his body – in his spine – to this day, and his cousin Meir Weissboiz, of blessed memory, was killed by the shots (on p. 138, Death Certificate Prosecution/132 (b), Action Report of ███████████████████████/132 (c) and the testimony of ██████ on p. 132, and also the Photograph Board Prosecution/132 (c)). Bullet shells were collected at the scene and sent to DIFS for examination, which determined that they were apparently fired from a pistol and an MP5 submachine gun from which the fatal shots that killed the three people mentioned in incident No. 4, above, were fired (DIFS Expert Opinion Prosecution/132 (d)).

88. ███████████ said in his Statement Prosecution/160 (a) on p. 6, that was collected by Advanced Staff Sergeant Major ██████████ (on p. 198 of the transcript) that he received the pistol and the MP5 submachine gun from ██████████ and traveled with two other people (████ and ████████) in the car until they reached Route No. 9 in the direction of Ramot and French Hill. When they saw the white utility vehicle, they began to fire at its passengers and fled to Ramallah. After the incident, ████████ asked ██████████, who worked in the office of the Defendant, to report to the Defendant and to ██████████ about the shooting. The following day, he heard that one of the passengers who was injured by the shots had died of his wounds (see also Section 85 above, with respect to ██████████ testimony). ████████s statements are supported by comments said by ██████████ and ██████████ in their interrogations (see Section 85 above).

89. The connection of the Defendant to this terrorist attack, like the attack in Section 4 above, which was also perpetrated by ████████, is not direct, since no evidence was submitted with respect to the Defendant's involvement in this terrorist attack. The indirect connection of the Defendant to this terrorist attack is derived from the fact that it was executed  by his close associates and assistants, ██████████████ and ██████████ whose activities the Defendant funded, including the purchase of weapons.

The legal question of whether this is sufficient to substantiate the criminal liability of the Defendant for the act of murder that was carried out during this terrorist attack, when there is no evidence connecting the Defendant directly to this particular terrorist attack, will be examined in the chapter of conclusions.

**(6) <u>Murder of Eliahu Cohen, of blessed memory, in the shooting terrorist attack on Route 443 near Givat Ze'ev</u>**

90.  On December 21, 2000, at 8:30 p.m., shots were fired from an ambush at the car of Eliahu Cohen, of blessed memory, traveling on Route 443 approximately 1.5 km [0.93 miles] from the settlement Givat Ze'ev (see the Death Certificate Prosecution/133 (a), Pathology Opinion Prosecution/133 (c) and the report of the mobile DIFS Laboratory Prosecution/133 (c) about which ██████████████ testified on p. 127). ██████ ██████████ an eyewitness to the terrorist attack, testified about it (on p. 149). Examination of the bullet shells that were gathered at the scene found that the weaponry used in this terrorist attack was apparently the Kalashnikov rifle that was also used to murder the Kahane couple, of blessed memory (see Opinion Prosecution/133 (d) and Prosecution/128 (f)).

91.  During the course of his interrogation, ██████████ spoke about the activities of the ████ ██████ cell, which perpetrated this terrorist attack (Statement Prosecution/149 (a) on pp. 10 – 12, which was collected by █████; his testimony is on p. 194). Abu Hamid said during interrogation that he supplied █████ with the Kalashnikov rifle and ammunition that he received for this purpose from ████████████ and that he gave █████ permission to perpetrate a shooting terrorist attack on Route 443 where Eliahu Cohen, of blessed memory, was killed. ██████████ also said that the terrorist attack was carried out by ████████ and █████ on the basis of what █████████ told him after the terrorist act. ██████████ was not a witness in this trial, and the interrogation of █████, who did testifiy before us, did not relate to this event and this terrorist attack was not included in the indictment filed against ██████(Prosecution/157 (a)).

In light of that which was mentioned above, we have before us only the testimony of ████ ██████, in which he said that he approved a shooting terrorist attack against an Israeli vehicle on Route 443 in late 2000, and that he supplied the weapon to the perpetrators. We do not have before us any admissible evidence with respect to the identity of the person who perpetrated the terrorist attack, meaning that we do not have any admissible evidence connecting the Defendant to a terrorist attack perpetrated through ████████████

[Stamp] P 7: 000408 [continued]

The only evidence before us is that the Defendant assisted ███████ in purchasing weapons and ammunition for terrorist attacks and that███ gave the weapon that was purchased with the assistance of the Defendant to ███ in order to perpetrate a shooting terrorist attack (this is the same situation as in the case of the murder of the Kahane couple, of blessed memory, which was carried out using the same weapon; see Chapter E (1) above).

**(7)** **Murder of Yoela Chen, of blessed memory, near the Givonim gas station on Route 443**

92. On January 15, 2002, at 7:55 p.m., Yoela Chen, of blessed memory, arrived in a Fiat Uno at the gas station near the Givonim intersection. Rochelle Eini was sitting next to her. Two terrorists approached her car and shot dozens of bullets at the two, from short range. As a result of the shooting, Yoela Chen, of blessed memory, was murdered (Death Certificate 134 (a)) and Rochelle Eini was injured in her head and shoulder. An eyewitness to the event, ████████, testified he saw a young man running away towards the neighboring village of al-Jib after the shooting, and he helped rescue the travelers (on p. 143).████████████ and Senior Staff Sergeant Major █████████ described the incidents in similar manner (on p. 130 of the transcript and Reports Prosecution/134 (b)-(d.1), in addition to the Photograph Board Prosecution/134 (b) and Prosecution/134 (d.2)).

93. The terrorist attack in which Yoela Chen, of blessed memory, was murdered was carried out following direct orders given by the Defendant in revenge for the killing of ████ ████ the day before the terrorist attack, as the Defendant admitted during the course of his interrogation. During the interrogation, the Defendant said that he instructed his close associate, ████████████ to perpetrate this revenge terrorist attack and that ████ reported to him that the terrorist attack had been perpetrated. The Defendant even took responsibility for perpetrating this attack and noted that this was the first time that Fatah had perpetrated an attack deep within Israel (see Section 66 (a) above.)

The Defendant's comments during the course of his interrogation are consistent with thosee of██████████████ and ██████ during their interrogations (see Sections 30 and 53 above; ███████ Statement Prosecution/156 (b) on pp. 5-6 about which collection Dahan testified, on p. 198; and the Statement of ██████████ Prosecution/165 (a) on p. 3 and Prosecution/165 (c) on pp. 1-2, about which collection ██████testified, on p. 184.) They described the terrorist attack that was carried out at the gas station by shooting at a Fiat Uno car in which one woman was murdered and her companion was injured.████████, who actually fired the shots, claimed that he originally decided not to shoot at the two because they were women but after they began to shout, he shot at them, as did his comrade ████

[Stamp] P 7: 000409

 claimed that he perpetrated the terrorist attack in accordance with the orders given by �_▇▇▇▇▇_ while the latter claimed that ▇▇▇▇▇ was the one who initiated the terrorist attack and therefore he gave him the MP5 rifle. ▇▇▇▇▇ claimed in his statement that ▇▇▇▇▇ told him that he had reported his intentions to perpetrate a terrorist attack before he perpetrated it and the Defendant told him not to undertake this terrorist attack.

▇▇▇▇▇ explained that ▇▇▇▇▇ was the Defendant's bodyguard and driver and that the Defendant feared for his life. In the conversation between the Defendant and ▇▇▇▇▇ after they were arrested, which was recorded without their knowledge, the two coordinated versions with respect to this terrorist attack and ▇▇▇▇▇ told the Defendant that he emphasized during the course of his interrogation that he had given the orders to perpetrate this terrorist attack behind the Defendant's back (Transcript of Conversation Prosecution/128 (c) on pp. 14, 17). However, the Defendant, as noted above, admitted that he gave orders to perpetrate this terrorist attack and therefore it is clear that his close associate ▇▇▇▇▇ tried to save him from being directly involved in this terrorist attack, like other terrorist attacks.

## (8)  Murder of six people in David's Palace Banquet Hall in Hadera

94.   On January 17, 2002, at 10:45 p.m., a shooting terrorist attack was carried out at David's Palace Banquet Hall in Hadera. The terrorist, Abdel Salaam Hasouna, shot the security guard at the entrance to the hall, charged in, and began firing an automatic weapon at the crowd, until several people overtook him and he was shot to death (Pathologist's Opinion Prosecution/135 (j)). They were celebrating at the Bat Mitzvah party of Nina Kardashova. As a result of this shooting, six people were murdered and dozens were injured, some of them seriously. Those who were murdered are: Boris Melikhov, of blessed memory, (Death Certificate Prosecution/135 (b)); Dina Binayev, of blessed memory, (Death Certificate Prosecution/135 (c)); Anatoly Bakshayev, of blessed memory, (Death Certificate Prosecution/135 (d)); Avi Yazdi, of blessed memory, (Death Certificate Prosecution/135 (e)); Edward

Bakshayev, of blessed memory, (Death Certificate Prosecution/135 (f)); and Aharon Ben Yisrael-Ellis, of blessed memory, (Death Certificate Prosecution/135 (g)). During his testimony, eyewitness ███████████ related the course of events (on p. 125), and the incident can also be seen in the police presentation and cassettes that were recorded during the incident (Prosecution/135 (a), Prosecution/135 (k) – (l)). An M-16 assault rifle and a grenade that were used by the terrorist were seized at the scene (see Opinion Prosecution/135 (g) – (i) and the testimony of Superintendent Leifer on p. 130).

95.     ████████ was responsible for the perpetration of this terrorist attack and he was the one who provided the terrorist ███████ with the weapon for this purpose (see his statement Prosecution/172 (b), about which collection Major ████ testified on p. 191). This also emerges from the statement given by ████████████ who said that ████ reported to him on the terrorist attack that was carried out in the banquet hall in Hadera (Statement Prosecution/165 (d) about which collection Staff Sergeant Major ███████ testified on p. 171). ██████████ said that he heard about perpetration of the terrorist attack on television while he was with the Defendant and immediately called █████ who took responsibility for perpetrating the terrorist attack.

       ████████████ also related to this terrorist attack during the course of his interrogation and he also explained that it was in revenge for the targeted assassination of ███████ and therefore the terrorist departed from Tulkarm, where █████ had lived (Prosecution/149 (b) on pp. 14-15 about which collection Staff Sergeant Major ███████ testified on p. 194).

96.     There is no direct evidence that the Defendant was directly involved in the planning of the above mentioned terrorist attack or knew about its perpetration in advance. The Defendant claimed that he would hear reports of terrorist attacks from ████████████ and █████ only after they occurred, and in his conversation with Agent John Doe No. 1 he said that he knew about this terrorist attack only after the fact (Report Prosecution/118 Section 4 that was submitted by "███████"). The indirect connection of the Defendant to the terrorist attack in Hadera is created by the fact that he supplied █████ with money, weapons and explosives in order to carry out terrorist attacks and that the latter considered him a leader and commander and therefore reported to him after every terrorist attack. The Defendant admitted to providing █████ with money in order to purchase weapons and said that when he wanted to ensure that the terrorist attacks would cease he would also contact █████ about this (see Section 23, above). In spite of this, the Defendant did not consider himself responsible for the activities of █████ unlike the activities of ████████████ ████ and ████████ (see Sections 60 and 65, above). During the course of his

interrogation, ███ also said that he perpetrated the terrorist attacks that he initiated within the framework of Tanzim Fatah for which the Defendant was responsible, and that the Defendant helped them with funding terrorist attacks and supplying weapons. He noted that the Defendant was his superior (see Sections 21-22, above).

The legal question of whether all this is sufficient to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence directly connecting the Defendant to the terrorist attack – will be examined in the chapter of conclusions.

**(9)   Murder of two women in the shooting terrorist attack at the corner of Jaffa Road and Lunz Street in Jerusalem**

97.   On January 22, 2002, at 4:20 p.m., the terrorist Sa'id Ramadan opened fire with an M-16 rifle at passersby on Jaffa Street, at the corner of Lunz, in Jerusalem until he was shot and killed. As a result of the shooting, Sarah Hamburger, of blessed memory, and Ora Sandler, of blessed memory, were murdered (Death Certificates Prosecution/136 (b) – (c)), and dozens of civilians were injured. Hanan Ben Naim, who killed the terrorist, testified regarding this incident (on p. 121). Similarly, a police presentation with respect to the incident was submitted in addition to the action report of Superintendent Nadivi, who testified during the trial (Prosecution/136 (a), Prosecution/136 (d) and testimony on p. 132). The terrorist's weapon was seized and sent to DIFS (Prosecution/136 (e) and testimony of Sergeant Major Azulai and Superintendent Leifer on pp. 130 – 134).

98.   ██████████ took responsibility for the perpetration of this terrorist attack (see Statement Prosecution/165 (a) on pp. 4 – 5, about which collection ██████ testified on p. 184). He said that he decided to insert a suicide terrorist bomber into Israel and for that was assisted by ████, who sent the terrorist Sa'id Ramadan to him. The two prepared the terrorist for the terrorist attack, took him to pray, bought him clothing and obtained an M-16 rifle and bullets for him. That day, in the afternoon, ██████ heard about the terrorist attack that had been perpetrated in Jerusalem.

There is no direct evidence that connects the Defendant to this terrorist attack and he even said during the course of his interrogation that he and ▓▓▓▓ were angry at ▓▓▓▓ ▓▓▓▓ because this terrorist attack had been perpetrated (Transcript of Conversation Prosecution/98 (k) on p. 32). The indirect involvement of the Defendant in the terrorist attacks that had been carried out by ▓▓▓▓▓▓ and ▓▓▓ by themselves or through others, was explained above. The legal question about whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out by this terrorist attack – where there is no evidence connecting the Defendant directly to the terrorist attacks – will be examined in the chapter of conclusions.

**(10)  Shooting terrorist attack in the Neve Ya'akov neighborhood in Jerusalem, in which police officer Galit Arbiv, of blessed memory, was killed**

99.  On February 25, 2002, at 6:25 p.m., a terrorist attack was carried out by a single terrorist armed with an M-16 rifle and a hand grenade on the main road of the Neve Ya'akov neighborhood in Jerusalem.

From the testimony of an eyewitness, police officer ▓▓▓▓▓▓, it becomes apparent that the terrorist opened fire on vehicles that were traveling on the road and also at civilians and police officers who were at the scene. Police officer Galit Arbiv, of blessed memory, was sitting in the police car with Garfield, and charged at the terrorist with her pistol drawn. The terrorist murdered police officer Arbiv, of blessed memory, by shooting her (Death Certificate Prosecution/137 (b)), seriously injured police officer Garfield, who remains disabled to this day, and police officer Amichai Dahan. The grenade that was thrown by the terrorist did not explode (see Garfield's testimony on p. 127, the testimony of Superintendent ▓▓▓▓ on p. 132 and the reports and photographs that were submitted in Prosecution/137 (c), Prosecution/137 (g) plus Presentation Prosecution/137 (a) and the Photograph Board Prosecution/137 (g)). The terrorist weapons, the hand grenade that did not explode and the spent bullet shells were collected and sent to DIFS for examination (testimony of Superintendent ▓▓▓▓ on p. 130, Opinion of Superintendent ▓▓▓▓ Prosecution/137 (d) – (e) and the Opinion of Superintendent ▓▓▓▓ Prosecution/137 (e)).

100.  The terrorist who was captured during the attack is ▓▓▓▓ in accordance with that which has been set forth by ▓▓▓▓ in his Statement Prosecution/149 (c) on pp. 11 – 12 (which was submitted by Sergeant Major ▓▓▓▓ on p. 207). ▓▓▓▓ said that when he and his brother ▓▓▓▓ saw the terrorist attack in Neve Ya'akov on television, his brother reminded him that the terrorist ▓▓▓▓ had been in their home the previous day, and ▓▓▓▓ said that he was the one who had given ▓▓▓▓

the M-16 rifle and bullets and sent him to perpetrate a terrorist attack after filming a video tape, which he showed his brother ███████ after the terrorist attack. ███████ told his brother ███████ that he had received the weapon and the terrorist ███████ from ███████ In his above mentioned statement, ███████ expressed anger about this and explained that this terrorist attack might entrap the Defendant because of his close ties to ███████ ███████ when it transpired that the terrorist had survived and would be interrogated by the Israel Security Agency.

In his above mentioned statement, ███████ also said that ███████ summoned the Defendant and ███████ to his office as a result of this terrorist attack. ███████ fled and told ███████ that it is likely that they would arrest the Defendant because of this terrorist attack. The Defendant told ███████ later that he explained to ███████ that there was no instruction with respect to a cease-fire at that time and then he – the Defendant – stood behind his people as long as ███████ had not issued a presidential order to stop the terrorist attacks. ███████ also said in his statement that ███████ admitted to him that he had given the weapon to the brother of ███████ in order to perpetrate the terrorist attack in Neve Ya'akov.

101. From that which has been set forth above, it becomes apparent that ███████ did not take part in the planning and perpetration of this terrorist attack, but that it was done by his brother ███████ and by ███████ who were witnesses at the trial. ███████ was convicted, on the basis of his confession, for several acts of terrorism, including responsibility for implementing the above mentioned terrorist attack in Neve Ya'akov (see item 13 in the amended Indictment Prosecution/161 (a), and Ruling Prosecution/161 (b)). ███████ told of his responsibility for the above mentioned terrorist attack, in accordance with that which has been set forth above, in his Statement Prosecution/162 (a)-(b), which was collected by ███████ (his testimony is on p. 194) and Staff Sergeant Major ███████ (his testimony is on p. 184).

In his above mentioned statement (Prosecution/162 (a) on pp. 6-9, Prosecution/162 (b) on pp. 2-4), ███████ said that he prepared ███████ for the terrorist attack, arranged for someone to transport him, and gave him the shrapnel grenade and an M-16 rifle with bullets. While he was preparing ███████ for the terrorist attack, ███████ came to inquire about how preparations for the terrorist attack were progressing. ███████ ███████ wanted the terrorist attack to be perpetrated in a crowded part of Jerusalem; however, they finally agreed that it would perpetrated in northern Jerusalem

[Stamp] P 7: 000411 [continued]

because of the roadblocks, and ▮▮▮▮▮▮▮▮ gave his approval for this.

102. During the course of his interrogation, ▮▮▮▮▮▮▮▮▮ confirmed his connection to the terrorist attack in Neve Ya'akov. In his statement Prosecution/165 (a), he said that ▮▮▮▮ ▮▮▮ sent the terrorist ▮▮▮▮ to him in order to perpetrate the terrorist attack in Neve Ya'akov, and he referred Rami Nur to Haloum Abu Hamid so that he could assist him in entering Jerusalem (Statement Prosecution/165 (a) on p. 6, which was gathered by Staff Sergeant Major Mizrahi in accordance with his testimony on p. 184). ▮▮▮▮▮▮▮ like his friend ▮▮▮▮▮▮▮▮▮, said during the course of his interrogation that he was summoned, together with the Defendant, to ▮▮▮▮ office as a result of this terrorist attack; the Defendant asked him if he was responsible for the terrorist attack and ▮▮▮▮ ▮▮▮▮ responded in the affirmative, and heard from the Defendant that ▮▮▮ was angry about the terrorist attack (Statement Prosecution/165 (c) on p. 5 that was collected by Staff Sergeant Major ▮▮▮ in accordance with his testimony on p. 184).

103. On the basis of the above mentioned, the terrorist attack was planned by ▮▮▮ and ▮▮▮ ▮▮▮▮ During the meeting between ▮▮▮▮▮▮▮ and the Defendant after their arrests, when they were recorded without their knowledge, ▮▮▮ repeated several times and emphasized to the Defendant that during the course of his interrogation he had said that the Defendant heard about this terrorist attack only after it was carried out (Transcript of the Conversation Prosecution/127 (c) on pp. 4, 11).

There is no evidence that connects the Defendant directly to this terrorist attack, other than the connection created by his general, indirect involvement to the terrorist attacks that were planned and perpetrated by ▮▮▮▮▮▮ and ▮▮▮ as explained above (see Sections 80, 86 and 96 above). There is a reason that ▮▮▮▮▮▮ summoned ▮▮▮▮ for clarification after this terrorist attack was carried out, since he also thought that the Defendant was the end-point for complaints in this matter. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the act of murder that was carried out in this terrorist attack – where there is no evidence connecting the Defendant directly to this terrorist attack – will be examined in the chapter of conclusions.

**(11)  Murder of Gad Rejwan, of blessed memory, in the Bashkevitz factory in Atarot**

104. On February 22, 2002, at 6:30 a.m., Gad Rejwan, of blessed memory, was murdered in the Bashkevitz factory in the Atarot industrial area by ▮▮▮▮▮▮▮▮ who had been employed in the factory in the past (Death Certificate Prosecution/138 (a) and Pathologist's Opinion Prosecution/138 (b)). ▮▮▮▮▮▮▮ who was at the scene, said that when he

[Stamp] P 7: 000412

heard shots, he saw a man running from the scene and Gad Rejwan lying on the floor and asking for someone to call for help (on p. 146).

Gad Rejwan, of blessed memory, died from the shooting, and his death was pronounced at the scene (see Action Report 138 (c) and the testimony of Superintendent ████████ on p. 132, as well as the report from the mobile laboratory that was recorded by Superintendent ████████ Prosecution/138 (d) and his testimony on p. 131). The photographs of the scene of this event were submitted as Exhibition Prosecution/138 (d) and 138 (f) by ████████ and ██████ during their testimony. The murder was carried out with a pistol (Opinion Prosecution/138 (e)); a number of the bullets fired from it caused fatal wounds in the body of the deceased (Opinion Prosecution/138 (b)).

105. ████████ said in his Statement Prosecution/149 (b) (on pp. 25-28) that he was approached by ████████ who said that he had worked in the ██████ family's factory and wanted to perpetrate a terrorist attack together with a person named the ████ The three met together and planned the attack; ████████ gave each of them a pistol. Twenty minutes later, ██████ reported to ████████ that they had perpetrated a terrorist attack, and ████████ related how he had shot Rejwan, of blessed memory, to death.

████████ called the police and took responsibility for the terrorist attack in the name of the al-Aqsa Martyrs Brigades (Statement of ████████ that was submitted by Staff Sergeant Major ██████ on p. 194).

106. From that which has been set forth above, it becomes apparent that there is no direct evidence with respect to the identity of the perpetrators, since that which ████████ who did not testify in this Court, told ████████ is inadmissible hearsay evidence.

However, on the basis of unequivocal circumstantial evidence it can be determined that the terrorist attack was carried out by ██████ with ████████ s assistance and authorization, as ████████ said in his testimony. ████████ said that ████████ told him that he was going to perpetrate a terrorist attack in the factory of the Rejwan family, in which he had once worked, and for this purpose he equipped him

with a pistol. A short time later, ██████████ reported to him that he had shot and killed Gad Rejwan, of blessed memory, who was indeed murdered by pistol shots.

There is no evidence that connects the Defendant directly to this terrorist attack, other than the connection created by his general, indirect involvement to the terrorist attacks that were planned and perpetrated by ██████, as explained above (see Sections 27 and 60 – 65 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the act of murder that was carried out in this terrorist attack – where there is no evidence connecting the Defendant directly to this terrorist attack – will be examined in the chapter of conclusions.

**(12)  Terrorist attack in the Seafood Market Restaurant in Tel Aviv**

107.  On March 5, 2002, at 2:30 a.m., a terrorist attack was carried out at the Seafood Market Restaurant in Tel Aviv by the terrorist Ibrahim Hasouna, who arrived at the scene armed with an M-16 rifle, hand grenades and a knife. The incident was described by eyewitnesses ██████████ (on p. 148) and ██████████ (on p. 129), who were present in the restaurant at the time the terrorist attack. With the rifle in his hands, the terrorist opened fire at the people sitting in the restaurant until the weapon jammed and the hand grenade he threw did not explode. At this stage Hasouna began to stab people, including police officer Staff Sergeant Major Salim Barakat, of blessed memory, who tried to stop the shooting spree and was stabbed to death by the terrorist. In addition to Staff Sergeant Major Barakat, Yosef Habi, of blessed memory, and Elihu Dahan, of blessed memory, were also murdered in this terrorist attack (see the Pathologist's Opinion Prosecution/139 (b) through Prosecution/139 (d)). Many others were injured. The terrorist himself was shot and killed during the terrorist attack and it was learned that he was Ibrahim Hasouna (Pathologist's Opinion Prosecution/139 (k) and the DNA Tests Prosecution/139 (g)).

The result of this terrorist attack can be seen on the Photograph Board Prosecution/139 (f) that was submitted by police officer ██████ (on p. 151) and the presentation prepared by the Police (Prosecution/139 (a)). ██████ also submitted the Action Report that he wrote at the time. He was the person who took the terrorist's bloodied knife, a smashed bullet, bullet shells, bullets and the M-16 rifle (Prosecution/139 (e)). The weapon that was seized and brought to the DIFS for examination (Prosecution/139 (h) and testimony of Superintendent Ami Leifer on p. 130).

108.  The terrorist attack at the Seafood Market was carried out by Ibrahim Hasouna and was planned by ██████████ and ████ as ██████████ said during the course of his interrogation (see Section 29 above). ██████████ brother (██████ was

[Stamp] P 7: 000413

also involved in the terrorist attack, as he explained during the course of his interrogation (see Section 55 above). He also connected ███████████ to its planning. During the course of his interrogation, ██████████ said that the terrorist Ibrahim Hasouna had been sent to him by ████ and he gave him money, bought him clothing and made sure that there was someone who could drive him to Israel in order to perpetrate the attack (██████████). He reported to the Defendant by telephone that the terrorist attack was ready to go, and the Defendant said that he did not wish for the attack to be perpetrated within Israel. ██████████ also said that that after the terrorist attack, the Defendant told him to tell ████ not take responsibility for the terrorist attack in the media before he discussed it with the Defendant (see Section 29 above).

During the course of the conversation between the Defendant and ██████████ after their arrests, when they were recorded without their knowledge, ████ made certain to emphasize to the Defendant several times that he had said that he only discussed the terrorist attack on the telephone with the Defendant **after** it had occurred and added, "**Be careful, I was not with you, I was not with you, I talked with you on the telephone**" (Transcript of Conversation Prosecution/127 (c) on pp. 4 – 5, 11). The two coordinated their versions with respect to their interrogation on this point.

During the course of his interrogation, ██████████ also told about his involvement in the terrorist attack (Statement Prosecution/149 (b) on p. 6 that was submitted by Staff Sergeant Major ████████ on p. 194). He supplied hand grenades, and bullets for an M-16 rifle for the purpose of the terrorist attack when he saw that Hasouna was equipped with an M-16 rifle, before he departed for the terrorist attack. When the terrorist attack was reported during the night, including the fact that Hasouna had stabbed a police officer to death, ████ ██████ remembered that ██████████████████ brother) had given the terrorist a knife and explained to him to use it if the rifle jammed.

During the course of his interrogation, ██████████████ explained his involvement in the terrorist attack (Statement Prosecution/162 on p. 9, which was submitted by Staff Sergeant Major ████████ on p.

194, and Statement Prosecution/162 (b) on p. 4 that was submitted by Staff Sergeant Major ███████ on p. 184). ███████ said that he trained Hasouna in the use of the M-16 rifle. ███████ (he is ███████ s brother) said during the course of his interrogation that he accompanied the terrorist to Tel Aviv and obtained a car for the terrorist attack (Statement Prosecution/182, which was submitted by Staff Sergeant Major ███████ on p. 182).

109. The Defendant is indirectly connected to the terrorist attacks that were planned and perpetrated by ███████████ ████████ and ████, in accordance with that which has been set forth above. However, with regard to the terrorist attack at the Seafood Market, which was planned and executed by all three of them, the Defendant is also personally responsible for its perpetration. The subject of the liability of the Defendant for this terrorist attack has been set forth above (see Sections 29, 55 and 66 (c) above). The Defendant admitted during interrogation that he gave ███████████ his approval for this terrorist attack **before** it actually happened, although he did give orders that the terrorist attack should be in the Judea and Samaria region and not within Israel. This also emerges from that which ███████████ said during the course of his interrogation.

**(13)** **Shooting terrorist attack in the Jeremy Hotel in Netanya**

110. On March 9, 2002, at 8:25 p.m., two terrorists entered the Jeremy Hotel in Netanya armed with M-16 rifles and hand grenades. The two of them threw the hand grenades and fired at passersby and tourists. The incident was described by the eyewitness known by his initial "G", who was a squad commander in the "Almog" Border Police unit. He arrived at the hotel within 30 seconds after hearing shots fired and encountered injured people while the terrorists were still shooting. "G" began to chase the terrorists, and both of them were identified on the stairs of a shopping mall in the immediate vicinity; they were shot and killed (see Pathologist's Opinion on the terrorist Shahdi al-Najimi Prosecution/140 (h) and also the Expert Opinion with respect to the second terrorist Prosecution/140 (i)). "G" confirmed in his testimony that, most unfortunately, some of the injured were hurt by shots that had been fired by border police (on pp. 117 – 118). In this terrorist attack, the baby girl Avia Malka, of blessed memory, and Israel Yihye, of blessed memory, were murdered (see the Notification of Death Form Prosecution/140 (b)).

███████████ submitted the report of the DIFS technician's attendance at the scene of the terrorist attack, which describes the resultant findings of the scene (Prosecution/140 (f) and his testimony on p. 118) and photographs of the scene (Prosecution/140 (g)). The Expert

Opinion of the Police Bomb Disposal Department states that a hand grenade was thrown at the hotel, and it exploded (Prosecution/140 (e)). From the report of Staff Sergeant Major ███ it becomes apparent that the two M-16 rifles that were used by the terrorists were seized at the scene (see also the testimony of Superintendent ███ on p. 130).

111. During the course of his interrogation, ███ said that he had perpetrated this shooting terrorist attack in Netanya but that it was carried out by two people whose names he did not know. The two were sent to him by another terrorism operative (███), and ███ organized transportation for the two through ███ and even gave ███ two hand grenades and two M-16 rifles. Several hours after the two were transported to Baka el-Sharkia, from where they entered Israel on foot, ███ heard on television that there had been a terrorist attack at a hotel in Netanya. He called media outlets and assumed responsibility for the perpetration of the terrorist attack (Aweis's Statement Prosecution/174 (b) on p. 5, which was submitted by Advanced Staff Sergeant Major Ronny Amar, on p. 119).

With regard to this terrorist attack: it is again possible to determine on the basis of unequivocal circumstantial evidence that ███ was behind this above mentioned terrorist attack, which was carried out a short time after he equipped the terrorists with M-16 rifles and hand grenades and transported them to the point on the Green Line closest to Netanya. The terrorist attack was indeed perpetrated by two terrorists armed with M-16 rifles and hand grenades just several hours after ███ arranged transportation for them to Netanya, and from all this it is clear that this is the terrorist attack about which ███ talked during the course of his interrogation.

There is no evidence that directly connects the Defendant to this terrorist attack, other than the connection created by his general and indirect involvement in the terrorist attacks that were planned and perpetrated by ███ (see Section 96 above). The legal question of whether this is sufficient

in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(14)  Murder of Constantine Danilov, of blessed memory, in Baka al-Garbiyeh**

112.  On March 30, 2002, at 1:00 p.m., a team of Border Police officers identified a vehicle that was traveling at very high speed in the direction of Baka al-Garbiyeh with two suspicious individuals in it. As the team followed the terrorists, the terrorists began shooting and murdered Constantine Danilov, of blessed memory, (see Death Certificate Prosecution/141 (i)). The other members of the team shot the terrorists and the explosive belt that one of them was wearing detonated. The two terrorists were killed, after they threw a hand grenade at the team (see the testimony of Chief Superintendent ████████ who participated in the incident, on p. 122).

Photographs of the incident were submitted with the Civil Servant Certificate of ████ ████ (Prosecution/141 (c)). The DIFS examination determined that one of the terrorists was carrying an explosive belt that detonated on his body (Prosecution/141 (e)).

113.  During the course of his interrogation, ████ said that he sent the terrorists with ████ ████ and ████████ and that he obtained an explosive belt for one of them, for the perpetration of a terrorist attack within Israel. That same suicide [bomber] traveled, wearing the explosive belt, with another person to perpetrate a terrorist attack in Israel, but was killed with his companion in an exchange of fire with Border Police officers in Baka al-Garbiyeh, after they killed another Border Police officer (Statement Prosecution/173 (b) on pp. 9-10 that was submitted by Advanced Staff Sergeant Major ████ on p. 191). ████ also said during the course of his interrogation that this terrorist attack was supposed to have been perpetrated in Hadera (Statement Prosecution/172 (b) on p. 3 that was submitted by Amar on p. 191).

114.  There is also unequivocal circumstantial evidence that this terrorist attack was carried out by people who were dispatched by ████ after he equipped them with an explosive belt. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(15)  Shooting terrorist attack between Ateret and Bir Zeit**

[Stamp] P 7: 000415

On February 25, 2001, at 1:00 p.m., shots were fired from an ambush on Route 465 in the direction of Yosef Cohen's car (GMC), which was traveling from the direction of Ateret to Bir Zeit. The shots were fired from a passing car. Cohen was seriously injured in the terrorist attack and his car went off the road onto the shoulder (his testimony is on p. 142). Dozens of bullets were fired at his car and he was hit in the head by three [bullets] and in the neck by two [bullets], but he miraculously remained alive (see Transcript with regard to the condition of the car Prosecution/142 (c) and the Report on Seizure and Marking of the Bullet Casings Prosecution/142 (b) that was submitted by ▉▉▉▉▉▉▉ on p. 124, and also the Report of the Car Inspection Prosecution/142 (d) that was submitted by police officer ▉▉▉▉▉ on p. 131).

A description of the scene of the terrorist attack appears on Photograph Board Prosecution/142 that was submitted by Superintendent ▉▉▉▉ on p. 139.

116.   ▉▉▉▉▉▉▉▉ explained about this terrorist attack during the course of his interrogation (Statement Prosecution/165 (a) on p. 1 that was submitted by Staff Sergeant Major ▉▉▉▉▉ on p. 184; and Transcript Prosecution/165 (f) that was submitted by an interrogator by the name of '▉▉▉▉' on p. 200), how he planned this terrorist attack together with ▉▉▉▉▉▉▉▉▉ and others, who asked him for weapons and a car in order to perpetrate a terrorist attack. ▉▉▉▉▉▉▉▉ gave them

an MP5 rifle and bullets, as well as his car. Several hours, later they returned the car and the gun to him and told him that they had shot at a car in the area of the Atara Bridge while passing it, and that the driver of the car had been injured. ███████████'s description is consistent with the evidence with regard to the way in which the terrorist attack was carried out, its location and results; therefore, there is unequivocal circumstantial evidence from which it becomes apparent that the terrorist attack about which ███████████ told is the above mentioned attack near the Atara Bridge.

There is no evidence that ties the Defendant directly to this terrorist attack other than his general indirect connection to the terrorist attacks planned by ███████████ and ███ ███ (see Section 80 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that were carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(16) Attempted terrorist attack in the Biancini Pub in Jerusalem**

117. On May 19, 2001, at 3:00 a.m., Dina Dagan, the owner of the Biancini Pub in Jerusalemm, discovered an explosive device that had been placed in the bathroom on the premises by ███████████, who was known to her as a ███████████ who ███████████ In her testimony (on pp. 139 – 142), Dagan said that Jabar sat with her in the restaurant in order to write an order for products and then went into the bathroom without anything in his hands. Several moments later, he exited the bathroom with a plastic bag that he placed in the center of the pub. When she asked him what was in the bag, he told her that it contained clothes. She approached the bag in order to check it and discovered that it was an explosive device hidden under a jacket, and at this stage ████ disappeared.

At the time, there were approximately 150 – 170 youths in the pub. Dagan displayed praiseworthy resourcefulness and bravery: she picked up the explosive device and yelled to one of the Palestinian employees there to evacuate the young people. He also helped her to move the explosive device outside of the restaurant. The police arrived at the scene and detonated the device, in a manner that caused damage to stores in the area. This is the picture that emerges from the testimony of police sapper Eyal Albo (on p. 119, see also Expert Opinion from the Explosives Laboratory Chief Inspector Yaniv Ron Prosecution/143 (a); Expert Opinion of DIFS given by Sarah Abramowitz-Bar Prosecution/143 (b); and the Photograph Board Prosecution/143 (a)).

[Stamp] P 7: 000416

118. During the course of his interrogation, ▮▮▮▮▮ said (Statement Prosecution/149 (b) on pp. 10 – 12, which was submitted by Staff Sergeant Major Elkura'an, on p. 194) that ▮▮ ▮▮▮▮ approached him at the beginning of May 2002, and asked him to prepare an explosive device so that he could place it in a pub on Jaffa Street in Jerusalem. He explained to ▮▮▮▮▮ that the owner of the establishment was in the habit of purchasing products for hookahs from him and he drew the pub for ▮▮▮▮▮. ▮▮▮▮▮ instructed him where to place the explosive device and explained to him how to connect the wires to a fire extinguisher that housed the charge. (Indeed, it emerges from Opinion Prosecution/143 (a) that the charge was housed in a fire extinguisher.)

Subsequently, ▮▮▮▮▮ sent ▮▮▮ to the pub, and ▮▮▮ covered the device with a jacket. When ▮▮▮ arrived at the pub, he called ▮▮▮▮▮ and used a code sentence to inform ▮▮▮▮▮ that he was about to place the explosive device in the pub, which ▮▮▮▮▮ authorized him to do.

▮▮▮ called ▮▮▮▮▮ and told him that the pub owner had seen him place the explosive device and that he had heard on the news that the explosive device had been detonated by the police.

119. From that which has been set forth above, it becomes apparent that the attempted terrorist attack in the pub was carried out by ▮▮▮, with guidance and assistance from ▮▮▮▮▮. The details that ▮▮▮▮▮ gave during the course of his interrogation are consistent with the testimony of ▮▮▮ as well as the findings at the scene.

There is no evidence that ties the Defendant directly to this terrorist attack other than his general indirect connection

to the terrorist attacks planned by ███████ (see Sections 27, 60-65 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(17)** **Shooting terrorist attack on Route No. 9, near French Hill in Jerusalem**

120. On October 3, 2001, at 11:30 p.m., shots were fired at a passing car that was traveling towards French Hill, in which ████ and ████████ were traveling. They were wounded by the shots (see the Report of Preliminary Visit to the Scene by Superintendent Leor Nadivi and his testimony on p. 132; Seizure and Marking Report by Superintendent Nadivi Prosecution/144 (b), Report of Preliminary Visit to the Scene by Superintendent Leifer and his testimony on p. 130, and the Report of the Weapons Lab Prosecution/144 (d)).

121. During the course of his interrogation, ███████ (Statement Prosecution/156 (b) on pp. 4 – 5, which was submitted by Advanced Staff Sergeant Major Dahan, on p. 198) said that he had perpetrated this terrorist attack together with ██████████ when they were traveling in a Mazda car and he had with him the MP5 rifle, which he had received from ████████ for the purpose of shooting at Israeli targets. During the course of his interrogation, he said that after he shot at the car going into the tunnel in the direction of French Hill, he realized that it was a female driver and therefore he stopped shooting and told his companion that the gun had jammed. After this, he continued traveling in the direction of French Hill, and there he shot at another car while passing it. The next day they heard on the radio that a man and woman had been injured.

122. The evidence that has been set forth by the Prosecution with regard to this terrorist attack is very weak and includes only the reports of the police's preliminary visits to the scene, meaning that any information about the way in which the terrorist attack was carried out is hearsay evidence. Similarly, it is difficult to know if ████████'s statements relate to this terrorist attack since the date of the events he described and the type of car at which he shot are not clear.

The only evidence we have before us is that ██████ perpetrated shooting terrorist attacks against Israeli targets, using a weapon that he received from ████████ who was the Defendant's assistant and close associate. Furthermore, ████████ himself was the Defendant's bodyguard. The Defendant himself confirmed that ████████ worked in his office, was subordinate to him, and that he knew that ██████ carried out terrorist attacks against civilians in Givat Ze'ev and Pisgat Ze'ev (see Sections 33-34 above).

[Stamp] P 7: 000417

**(18)** **Attempted suicide terrorist attack in Beit Hanina in Jerusalem**

123. On March 8, 2002, at 4:15 p.m., the terrorist ▇▇▇▇▇▇ was captured on his way to perpetrating a suicide terrorist attack in Jerusalem, while he was wearing an explosive belt. The terrorist attempted to detonate the charge while he was lying on the ground and was then shot and killed (see the testimony of Chief Superintendent Doron Yedid on p. 133, and the Report from the Explosives Lab Prosecution/145 (d)).

124. During the course of his interrogation, ▇▇▇▇▇▇ said that ▇▇▇▇▇▇ asked him to prepare an explosive belt for a suicide [bomber] and he referred ▇▇▇ to ▇▇▇▇▇▇ who gave him an explosive belt. The suicide [bomber] stayed in an apartment that ▇▇▇ ▇▇▇ rented in Ramallah, and was outfitted with the explosive belt there. Later, ▇▇▇▇▇▇ learned that he had been killed by shots fired by Israel Defense Forces soldiers in the Beit Hanina area, on his way to perpetrating the terrorist attack (Statement Prosecution/165 (b) on pp. 2, 11, which was submitted by Staff Sergeant Major Ya'akoboff, on p. 171).

   ▇▇▇ also related during the course of his interrogation, (Statement Prosecution/173 (b) on p. 4, which was submitted by Advanced Sergeant Major Amar, on p. 191) that Louis Ouda, whom he had recruited for the al-Aqsa Martyrs Brigades, recruited a suicide [bomber] for him but that the terrorist attack failed because the suicide [bomber] was shot by police officers before perpetrating the attack, at the entrance to Jerusalem.

125. From that which has been set forth above, it becomes apparent that ▇▇▇ and ▇▇▇ ▇▇▇ were involved in this attempted terrorist attack. There is no evidence tying the Defendant to this terrorist attack in a direct manner other than the connection derived from his general and indirect involvement

[Stamp] P 7: 000417 [continued]

in terrorist attacks that were prepared and perpetrated by the two, in accordance with that which has been set forth above. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(19)** <u>**Shooting terrorist attack on the Beit El – Psagot Road**</u>

126. On March 17, 2002, at 6:45 a.m., shots were fired from an ambush with automatic weaponry at the car (Volkswagen Passat) of Samir Kersh, and he was injured by the shooting (see the Report of Visit to the Crime Scene Prosecution/146 (a) and photographs of Senior Staff Sergeant Major Eli Kojman that were submitted during his testimony on p. 121).

The Prosecution did not submit any additional evidence about this terrorist attack and Kojman's report is only hearsay evidence with regard to the manner in which the terrorist attack was carried out .

In its summations, the Prosecution attributes responsibility for this terrorist attack to ▇▇▇▇▇▇▇▇ and he did admit to his involvement in this terrorist attack and was convicted for this (Prosecution/165 (g) – (q), Indictment Item No. 43). Other than this, the Prosecution did not refer to any other evidence from statements by ▇▇▇▇▇▇ or things that he said during his Israel Security Agency interrogation. Therefore, no evidence was presented with regard to this terrorist attack that makes it possible to establish a clear, factual foundation for ▇▇▇▇▇▇▇ s connection to this terrorist attack, and the evidence with regard to the actual manner in which the terrorist attack was carried out is very weak.

**(20)** <u>**Attempted terrorist attack in the Malha Mall in Jerusalem**</u>

127. On March 26, 2002, at 10:30 a.m., a Renault Express car with two sappers [Translator's note: as written; this is clearly a typo for terrorists] ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇ – see Corpse Transport Report Prosecution/147b, which was submitted by Ilan Granot on p. 135, and Report Prosecution/147 (c), which was submitted by Senior Staff Sergeant Major Asaf Azulai in his testimony on p. 134) who were on their way to perpetrate a terrorist attack, exploded.

[Stamp] P 7: 000418

128. During the course of his interrogation, ███████████ said (Statement Prosecution/165 (c) on p. 5 that was submitted by Staff Sergeant Major Ya'akoboff on p. 171, and Transcript Prosecution/165 (k) Section 15 that was submitted by Israel Security Agency interrogator "Adam", on p. 201) that ██████████ had called the Defendant the day before the car was found next to the mall in Jerusalem and told him that he wanted to perpetrated a terrorist attack. The Defendant told him not to perpetrate the attack within Israel, and referred ████ to ████████████ to discuss it with him. ██████████████ claimed that he also told ██████ not to perpetrate the terrorist attack in Israel or Jerusalem. However, the next day ██████ called ████████████ and told him that he had sent the car that exploded next to the mall in Jerusalem to perpetrate terrorist attack in Jerusalem.

129. The Defendant himself said during the course of his interrogation (Transcript Prosecution/36 that was submitted by Israel Security Agency interrogator "Smith", on p. 85) that ██████████████ reported to him on the plans of ██████ 's men to perpetrate a suicide terrorist attack in Jerusalem. The Defendant said that he had instructed ████████ ██████████ that the terrorist attack should not take place within Israel, but rather within the Judea and Samaria region. The Defendant said on this matter during the course of his interrogation, when talking about ████████████ s appeal to him about ██████ s desire to perpetrate a terrorist attack (Transcript of Conversation Prosecution/198 (k) on pp. 19-20):



| | |
|---|---|
| **"Defendant:** | **… that ██████ he said to him that we have an action. We have terrorist attacks, etc. So I said to ██████████ I said to him that what is important is that there should be no terrorist attack within Israel.** |
| **Investigator:** | **OK and when he comes officially and tells you that they want to perpetrate a suicide terrorist attack, what did you say to them?** |
| **Defendant:** | **I told him no, I do not allow it.** |
| **Investigator:** | **No. That is not what you told me. You said to him, no problem. But not 'inside' (within** |

[Stamp] P 7: 000418 [continued]

Israel).

**Defendant:** **Yes, not in Israel... that is to say, that I do not want terrorist attacks in Israel."**

The Defendant said that the next day he received a report from ███████████ with regard to the failed attempt at a suicide terrorist attack, and that the car had exploded not far from the roadblock and two cell members were killed.

130. Based on the above, it becomes apparent that there is proof of the Defendant's involvement in approving this suicide terrorist attack, even in accordance with his version. The Defendant did give orders that the terrorist attack be perpetrated in a different place, however this is not significant for his criminal liability for this attempted terrorist attack. That Defendant's version during the course of his interrogation is supported by the version of his close associate, ███████████ even though the latter "renovated" the facts and claimed that the Defendant gave orders not to perpetrate a terrorist attack at all. From the statements by the Defendant, it is clear that he gave orders to perpetrate the terrorist attack in another location.

[Stamp] P 7: 000419

**Part III:     Evaluation of the Evidence and Its Significance**

131.  Since the Defendant chose not to testify or bring any witnesses on his behalf and even instructed the representatives of the Office of the Public Defender that were appointed to represent him to abstain from the cross-examination of the Prosecution witnesses, the evidence against the Defendant is founded on several different layers.

**First**, comments that were made by the Defendant during the course of his Israel Security Agency interrogation. Some were summarized and written up in the transcript that had been prepared and submitted by the interrogators and some were recorded and transcribed. This category also includes those statements that were made by the Defendant in conversations that were recorded without his knowledge, with his close associate █████████ █████████ and with agents John Doe No. 1 and John Doe No. 3.

**Second**, incriminating testimony against the Defendant that was given by terrorism operatives from the Fatah after their arrest, meaning the statements that they gave during the course of Israel Security Agency and police interrogations, since all of them – as if in unison – refused to answer any questions in Court, when they were brought as Prosecution witnesses.

**Third**, statements that were made by the Defendant by way of the media, during the period of time prior to his arrest.

**Fourth**, documents that were seized in the office of the Defendant and at the offices of the Palestinian Authority during the course of Operation Defensive Shield.

**Fifth**, testimony that was given by victims of the terrorist attacks, eyewitnesses to the terrorist attacks that are the subject of the indictment, and witnesses involved in their interrogation.

132.  With respect to the evaluation of the evidence and its significance, the following comments must be made:

[Stamp] P 7: 000420