A. The Defendant's abstention from testifying during the trial and exposing himself to cross-examination can be used to reinforce the significance of the evidence against him and even in order to support Prosecution evidence in places where support is necessary, in accordance with that which has been set forth in Section 162 (b) of the Criminal Procedures Law [Consolidated Version] 5742 – 1982 (hereinafter – "the **Criminal Procedures Law**"). Similarly, the Defendant's abstention from responding to the indictment, as he did, can be used to reinforce the significance of Prosecution evidence, in accordance with that which has been set forth in Section 152 (b) of the Criminal Procedures Law. These points were made clear to the Defendant by the Court.

This matter acquires additional significance in light of the fact that, in accordance with law, statements made by witnesses who refuse to testify in Court, or who deny the content of their statements during interrogation, require support (see Subsection C (5) below). This is in accordance with the Supreme Court's ruling that a Defendant's abstention from testifying serves as significant reinforcement of the statements given by witnesses during the trial that require reinforcement, in accordance with Section 10 (A) (d) of the Rules of Evidence [New Version] 5731 – 1971 (hereinafter: "the **Rules of Evidence**") (Criminal Appeal 1497/92 **State of Israel v. Tzubari**, PD 47 (4) 177, on p. 202). The Court explained this matter: "**The silent Defendant – differentiated from the silent witness – is acting within the framework of the Law; however, the Court is given the right to interpret his behavior on the basis of its perceptions and understanding**" (on p. 203, see also Additional Proceeding 308/91 **Kuzli v. The State of Israel**, PD 45 (4) 441, on p. 486).

Indeed, the Court is entitled not to give any weight to the silence of the Defendant when there is a reasonable explanation for it (see: Criminal Appeal 277/81 **Halevy v. The State of Israel**, PD 38 (2) 369, on p. 386). However, since the Defendant's preliminary claims with respect to be authority of this Court to try him were rejected, we did not have any reasonable and justifiable explanation for his abstention from giving evidence. It is quite clear that the Defendant, who during the course of

[Stamp] P 7: 000420 [continued]

his interrogation was exposed to the incriminating evidence that had accumulated against him, knew full well that he was unable to contend with it on the legal level and therefore fled to the warm embrace of the political level. Several times during the course of his interrogation, the Defendant said that it was clear to him that he would be tried and convicted and that, therefore, he planned to conduct a political trial.

In this matter, is important to note that in spite of the fact that the Defendant declared that he would not conduct a defense case, as indeed he did not, he did give political speeches and sometimes even related to the evidence presented against him – but from the Defendant's bench and not from the witness stand. By law, we are unable to give any significance to statements that were made in this manner, which did not give the Prosecution the possibility of questioning the Defendant about them. With respect to the many things that the Defendant said on the diplomatic and political levels, both during the trial and during the summations, we are not permitted to relate to them since they are irrelevant to the question of the Defendant's guilt of the crimes with which he is charged. These issues were explained in the Decision with respect to the authority of the Court: a person who acts outside of the framework of legal combat, and who perpetrates acts of terrorism for the purpose of causing injury, without distinction, to the civilian population, exposes himself to the ordinary criminal sanctions of national criminal law (see the decision that was handed down by the Court in this case, dated January 19, 2003 on pp. 29 – 33). Opposition to the occupation, as claimed by the Defendant, does not serve as justification, in accordance with any law, for acts of killing that have been carried out against innocent civilians. Furthermore: The place for this claim – if any – is during sentencing claims, since it relates to the motivation for the crime as distinguished from the criminal intent required in order to prove them.

B. Since the Defendant chose not to conduct a defense case, he also did not raise any claims against the admissibility of the evidence or its significance. However, the Court considered itself obligated to consider this question of its own initiative and to ignore the inadmissible evidence that has been set forth by the Prosecution or which was used in his summation (including hearsay evidence included in witnesses' statements, transcripts and statements that were not submitted by the interrogators who recorded them, expert opinions based on intelligence information and evidence that was not submitted during the trial, and points in the transcript that relate to polygraph findings.)

[Stamp] P 7: 000421

We also examined the evidentiary material from the Defendant's perspective, not only from the perspective of the Prosecution, as described in his summations. In spite of this, we are subject to the general principle by which the Defendant who does not testify in his case is not entitled to rely on comments from external statements that he gave: these statements are valid as evidence against him but not in his favor since it was not possible to question him about those statements (see Criminal Appeal 205/75 **Krantz v. The State of Israel**, PD 30 (2) 471, on p. 474).

C.  The Prosecution subpoenaed 21 field commanders and terrorism operatives who were involved in the terrorist attacks that are subject of the indictment to testify about the Defendant's connection to them, in accordance with that which has been set forth above. These witnesses – without exception – refused to answer the questions of the attorney for the Prosecution, and it seems that this was not a personal decision of each individual but rather an order given from above. These witnesses were not willing to testify against their commander and leader; this is clear. In a conversation conducted between the Defendant and ███████████ after they were arrested, which was recorded without their knowledge, ██████ warned the Defendant about the testimony that would be given by terrorism operatives who had been arrested, and the Defendant replied, with laughter in his voice, "**In Court everyone will deny everything they admit... everything will be canceled... the interrogators told me. I told them that no one will admit anything in Court**" (Transcript 127 (c) on p. 109). So the Defendant said, and so it happened.

In these circumstances, all of the terrorism operatives were declared hostile witnesses and their statements during interrogation were submitted under Section 10 (a) of the Rules of Evidence. With respect to these witnesses, we comment as follows:

(1) Most of the Prosecution witnesses testified after they themselves had been tried, and mostly convicted, on the basis of their own confessions for crimes that included their involvement in the terrorist attacks that are the subject of the indictment. In their confessions to the facts

in the indictments filed against them, these witnesses incriminated the Defendant. However, the law with respect to a Defendant's confessions of this type when they are given by a person who is a witness in Court, is that they are considered an external statement that is covered by Section 10 (a) of the Rules of Evidence, but confessions of this type are not given substantive significance. From the point of view of the witness – the confession that he gives during his trial focuses entirely on the facts that pertain to him, and it is highly doubtful that he was aware at that time of the implications that part of his confession might have on others (see: Criminal Appeal 4541/90 **Eliyahu Sela v. The State of Israel**, Supreme Court Compendium 91 (2) 2086.)

(2) In general, an external statement that is made by a witness is hearsay evidence that is disqualified as evidence on the veracity of its content. An exception to this generalization is stated in Section 10 (A) (a) of the Rules of Evidence, in accordance with which the Court is permitted to accept a statement of this kind and even rely on it and prefer it over the witness's testimony in Court, when a witness in the case refuses to testify or he denies the version that he gave during interrogation.

The purpose of this Section is to deal with the common phenomenon of witnesses who deny the version that they gave during their interrogation, in order to prevent a situation in which it is impossible to confront them in Court with the version that they gave during their interrogation. (See the explanation of the proposed legislation for amending the Rules of Evidence, 5734 – 1974.) And note: a witness who is subpoenaed to testify and has taken his place on the witness stand is considered a "witness in the trial", even if he refuses to answer questions and therefore the above mentioned Section 10 (a) (a) applies to him rather than Section 10 (a) (b), which deals with the case of a witness who it is impossible to bring to Court at all, for reasons that have been listed in that Section. (See: Additional Criminal Proceedings 4390/91 **State of Israel v. Haj Yihye**, PD 47 (3) 673; compare with the expert opinion of A. Stein, "*Section 10 (a) of the Rules of Evidence: Its Proper Interpretation and Rulings of the Supreme Court*", [the journal] Mishpatim 21, 5752 [1992], on p. 325, on pp. 336 – 338.)

(3) According to Section 10 (A) (a) of the Rules of Evidence, admission of an external statement of a witness in the trial, when that witness denies the contents of the testimony he gave during the course of his interrogation, is conditional on proving that the statement was given, that it was given by that witness in the trial, and that the parties were given an opportunity to question him. In our case, these conditions are met for the 21 terrorism operatives mentioned above.

[Stamp] P 7: 000422

(4) The Court is entitled to rely on findings from an external statement that was admitted in accordance with Section 10 (a) of the Rules of Evidence and even to prefer it to testimony given by the witness in Court **"if it sees fit to do so, considering the circumstances of the case, including the circumstances in which the statement was given, the evidence that was presented in Court, the behavior of the witness in Court and signs of the truth revealed during the trial; its reasons shall be recorded"** (see Section 10 (A) (c) of the Rules of Evidence).

(5) According to Section 10 (A) (d) of the Rules of Evidence, a person may not be convicted on the basis of external statements admitted, in accordance with this Section, unless there is something in the evidentiary material to reinforce it. The intent is additional evidence that reinforces the reliability of the external statement and dispels the concern that it not truthful (see: Y. Kedmi, **On Evidence**, on pp. 354 − 365.)

On this issue it should be noted that the external statement of one witness, which itself requires reinforcement, can serve as reinforcement for the external statement of another witness (the above mentioned by Y. Kedmi on p. 366, and the rulings cited therein). As noted above, the Defendant's silence during the trial can also serve as the reinforcement of a witness's external statements, as can abstention from cross-examination (Y. Kedmi, *op. cit.* on pp. 369 − 371, and the rulings cited therein).

The clear ruling is that the Defendant's abstention from cross-examining witnesses also reinforces the Prosecution's evidence (see Criminal Appeal 4736/91 **Patir v. The State of Israel** (Supreme Court Compendium 94 (2) 1866). The Defendant may not thereafter bring any claims based on the fact that the witnesses were not cross-examined

[Stamp] P 7: 000422 [continued]

(see: Criminal Appeal 1632/95 **Uzi Meshulam v. The State of Israel**, PD 49 (5) 534, on p. 550, where the trial was held without the Defendant being present, at his request, and the Defense was instructed not to question the witnesses). A Defendant cannot thwart the legal proceedings being conducted against him by simply abstaining from offering a defense.

**In the case that is currently at hand**, the Defendant's conviction is supported by a broad reliable network of evidence that includes confessions that the Defendant gave during the course of his interrogation, statements that the Defendant made in the media, documents that were seized from the Defendant and the Palestinian Authority and a large amount of testimony given by the terrorism operatives during their interrogations, which supports and reinforces each other. It emerges from the evidentiary infrastructure described above that it is completely clear that the terrorism operatives decided to abstain from testifying during the trial in order to thwart the process and to avoid revealing the versions that they gave during their interrogations. The Defendant expressed anger during the course of his interrogation over the incriminating comments that field operatives said against him (see: Report of the Meeting of the Defendant with███████ Prosecution/77 (b); comments that the Defendant said to Agent John Doe No. 3 Prosecution/123 on p. 1 and Prosecution/124 (a) Section 1; comments that the Defendant said to Agent John Doe No. 1 Prosecution/112 (a) Sections 6 – 7, Prosecution/ 114 (a) Section 7, Prosecution/115 (a) Sections 13, 14, Prosecution/116 Section 9; and the Defendant's conversation with ████████████ Prosecution/127 (c) on pp. 3, 4, 72, 84), and this fact reinforces the conclusion that the terrorism operatives said correct things about the Defendant during their interrogation.

Under these circumstances, the statements given by the witnesses during their interrogations are to be preferred over their testimony in Court since there is much more than "reinforcement" for the statements that they gave during their interrogation. The statements that the terrorism operatives made correspond very well with each other, and together with comments that the Defendant made during the course of his interrogation as well as the documents that were seized from the Palestinian Authority, they reveal a clear picture that points to the Defendant's role and position in the terrorist attacks that are the subject of the indictment.

133. We do not find any reason to cast doubt on the reliability of the Israel Security Agency interrogators who testified that the transcript they recorded during the interrogation of the Defendant reasonably reflects the main points of the Defendant's statements. When considering the significance of these points, it is necessary to consider the guidelines that we explained at length in Serious Crimes Case 1074/02 **State of Israel v. A'asi Muhsin** (District Court Compendium 2003 (2) on p. 3553, Sections 76 – 84). These transcripts

[Stamp] P 7: 000423

are composed of the Defendant's statements, but unlike accepted practice in police interrogations, they contain only a summary of the interrogation; the person being interrogated is not always warned with respect to his rights; the person being interrogated does not read what is being recorded in the transcript and does not sign them; transcripts are not infrequently written in Hebrew even when the interrogation was conducted in Arabic despite the clear guidelines given in Court rulings. In spite of this, it is important to emphasize that these transcripts certainly constitute admissible evidence, although when considering their significance, the extent and manner in which they are recorded and documented must be considered (see: Criminal Appeal 6613/99 **Samrik v. The State of Israel**, Ruling of the Israel Supreme Court 56 (3), 529, on p. 553).

**In the current case**, many of the transcripts were backed up by transcripts of recordings made during the interrogation in which the Defendant is heard speaking his own voice, in the Hebrew language, which a language in which he knows how to express himself quite well. This removes the doubt with respect to their reliability. Similarly, the Defendant was told explicitly throughout his entire interrogation that he is not obligated to say anything, and anything that he does say can be used as evidence against him. The Defendant even met with a lawyer during the course of his interrogation (see below). Furthermore: the statements that the Defendant made during his Israel Security Agency interrogation, as they were written in the transcript and significant parts of which were recorded and transcribed, are well supported by the testimony of the terrorism operatives that have been set forth above, and sometimes also by the documents that were seized from the and the interviews that he gave to the electronic media. In this situation, we do not need to rely only on the transcripts that were recorded by the Israel Security Agency interrogators as the Defendant spoke, and not only on the comments that were said by the terrorism operatives during their interrogations (since they refused to testify in Court and denied the things that they had said during their interrogations). Rather, we are able to form a direct impression based on comments the Defendant said during his Israel Security Agency interrogation, based on the recordings and transcripts.

134. When evaluating the significance of the Defendant's words during his Israel Security Agency interrogation, we considered the fact that although the Defendant himself did not bring any claims in this regard, this was a long and exhausting interrogation. The Defendant was

interrogated for very long periods of time during which he slept only a little and sat bound to the chair, which he described in a conversation with Agent John Doe No. 1 (Prosecution/112 (c) (1) on pp. 3-4) as torture.

It was made clear to the Defendant that as long as he did not cooperate with his interrogators it would be necessary to continue the interrogation. It was even hinted to him that the way to meet with members of his family would be to cooperate (Transcript Prosecution/12 Section 13). During one of the interrogations, the Defendant was told that his interrogation would not end until he told the truth, as was the case for all of the terrorism operatives who eventually admitted the role of the Defendant in the acts that had been attributed to him (Transcript Prosecution/63 Sections 9 – 10). During one of the interrogations, the Defendant refused to continue with the interrogation until he was given a reasonable amount of time to sleep and the interrogator explained that he would not be allowed to sleep until he admitted to at least the main points with respect to his activities, but the Defendant rejected this proposal (Transcript Prosecution/21 Sections 26 – 28). Similarly, moral pressure was used against the Defendant to encourage him to confess and behave like a leader who takes responsibility for the acts of his subordinates, instead of denying the things that his subordinates did and presenting them as liars (Transcripts Prosecution/16 – Prosecution/17).

When considering the fact that the Defendant had been interrogated for many long hours, it is important to note that the Defendant was arrested and interrogated during Operation Defensive Shield, during a period of time in which many terrorist attacks were being perpetrated against Israel. Under these circumstances, it is clear that it was important to complete the interrogation as quickly as possible, because it was being conducted not only in order to determine his guilt but also, and perhaps primarily, for the purpose of thwarting additional attacks. The Israel Security Agency interrogators explained how important it was to them to quickly reach the terrorism operatives and terrorist cells that were connected to the Defendant, and that the interrogation of the Defendant was primarily for purposes of intelligence (the interrogator by the name of "Itai" on p. 154 and the interrogator by the name of "Wadi", on p. 97.)

Investigation of the felonies with which the Defendant is charged and the intelligence need to obtain information from him as quickly as possible required his continuous interrogation for many hours. This does not bring about the disqualification of the statements of the Defendant, since it is clear that he said to his interrogators only those things that he wanted to say and that there were warranted, relevant reasons to use this means of interrogation, because of the security circumstances that prevailed at that time (see: Y. Kedmi, **On Evidence** [Hebrew], Part One, 5764/2003 Edition, on pp. 55 – 58).

[Stamp] P 7: 000424

135. It was clear during the course of the interrogation that the Defendant had debated a great deal, aloud, to whether he should admit his connection to the terrorist attacks with which he was charged in the indictment. He even explained that this could be an obstacle for him in his future as a leader of the Palestinian people (for example, see Transcript Prosecution/24 Section 7; Transcript Prosecution/68 Section 6). In the end, the Defendant decided to admit to some of the things that he had done, after he understood that the field operatives had confessed during their interrogation and incriminated him, and that the interrogators had solid evidence with respect to the accusations that had been made against him. Therefore, the Defendant admitted only to those things that his people had previously admitted, and this was only after their statements had been presented to him upon his demand, and he repeatedly explained and made clear that he would admit only to those things that would be presented to him and that were correct (Transcript Prosecution/22 Sections 8 – 9, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58, and Transcript Prosecution/23 Section 9, which was submitted and verified by an interrogator by the name of "Danny", on p. 90). The Defendant asked to meet with the head of the Israel Security Agency and said that he would be willing to admit to those things for which he was responsible if he could be shown that others had already admitted to them (Transcript of Interrogation Prosecution/98 (a) on pp. 16 – 18, 26 – 28).

In this context, it should be emphasized that the Defendant himself said, in his conversation with Agent John Doe No. 1, that he learned during the course of his interrogation that the field operatives who had been arrested provided a large amount of reliable information about him. When the agent asked him if the information they give about him was true, he answered, "**much of it, that is to say there is proof and accuracy**" (Transcript of Conversation Prosecution/112 (c) (1) on p. 6). Further, the Defendant told Agent John Doe No. 1 that his ▇▇▇▇▇▇▇▇▇▇▇▇▇ had provided a confession that connected the Defendant to eight suicide terrorist attacks in Israel, and when the Defendant was asked if ▇▇▇▇▇▇▇▇▇ "closed him in with his confessions" – he responded in the affirmative (Transcript Prosecution/114 (a) Section 7). Throughout all of the conversations between the Defendant and Agent John Doe No. 1, it is possible to see that the subject of the confessions that had been given by the field operatives during the course of their interrogations bothered him greatly, and he was aware of the fact that they had provided real information with respect to him (see Reports Prosecution/112 (a) (1), Prosecution/113 (a), Prosecution/.113 (c), Prosecution/114 (a), Prosecution/114 (c), Prosecution/115 (a), Prosecution/115 (g) (1) (a), Prosecution/116.)

The Defendant told John Doe No. 1 that he claimed during the course of his interrogation to be a political leader, but the confessions that had been given by others against him and the large amount of material that was seized from his office and from the offices of the Palestinian Authority would force him "**to talk**

**during the interrogation**" (Report Prosecution/117 Sections 29, 32 that was submitted by an interrogator by the name of "Robert").

136. The turning point in the interrogation of the Defendant began on April 21, 2002, approximately one week after the Defendant had been arrested, when he decided to tell the facts from his perspective and at his responsibility, but he asked if first the information that his men had given during interrogation could be presented to him, and if he could be allowed to meet with the head of the Israel Security Agency or his deputy (Transcript Prosecution/19 – Prosecution/20). The Defendant accepted the interrogators' proposal to distinguish between his refusal to make incriminating statements to the police, which could be revealed in the future, and his providing details of his activity during the Israel Security Agency interrogation (Transcript Prosecution/20 Sections 10 – 12, Transcript Prosecution/24 Section 7). The Defendant based himself on the assumption that things he said to the police would be revealed to the public and obligate him, as opposed to things that he said during the Israel Security Agency interrogation, which the Defendant planned to deny, as indeed he did during his police interrogation and his trial. The Defendant said this explicitly during the course of his interrogation by the Israel Security Agency, when he was told atht the transcript recorded during the course of his interrogation would be submitted as evidence in Court as if they were police testimony (Transcript Prosecution/25 Section 23, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58).

In this regard, it should be noted that six days after his arrest, the Defendant was questioned and warned in the customary manner, that by law he is not obligated to say anything, and that anything he would say could be used as evidence against him (see Transcript Prosecution/40 Section 1, and testimony of an interrogator by the name of "Mofaz", on p. 59). The interrogator named "Mofaz" testified that these warnings were given to the Defendant during the course of all of his interrogations, and the interrogator named "Emile" also testified to this (on pp. 57, 59 and the warnings included in the Transcript Prosecution/41 Section 1; Prosecution/44, Prosecution/25; Transcript of Interrogation Prosecution/98 (j) on p. 37). Although it was sometimes hinted to the Defendant that he might not actually be brought to trial, because there was a possibility that he would be deported, the Defendant noted that he preferred the option of standing trial, even if it was clear that he would be tried and sent to jail for many years (Transcript Prosecution/10, Prosecution/11, Prosecution/14 and Prosecution/19 Section 5, and Transcript Prosecution/63 Section 25).

[Stamp] P 7: 000425

137. During the course of his interrogation, the Defendant said that he planned to conduct a political trial while ignoring the evidence that would be presented against him during the trial (Transcript Prosecution/42 Section 8 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96; and Transcript Prosecution/56 Section 3 that was submitted and verified by an interrogator by the name of "Smith", on p. 85). During the Defendant's conversation with Agent John Doe No. 1, he explained to him that the tactics he would take during the interrogation – namely he would not admit to anything other than things about which the interrogators already knew and would try to buy time in order to understand what the interrogators knew, so as not to incriminate others. He also told his lawyer that he would not make any statements to the police (see Report Prosecution/118 Section 3, Prosecution/120 Section 2, and his comments to John Doe No. 3 in Report Prosecution/122 Section 1). At this point, it should be noted that the Defendant first met with his lawyer, Adv. Boulos, three days after he was arrested (Exhibit **Prosecution/164**, and Transcript **Prosecution/111** Section 14). During the course of his interrogation, the Defendant met with Adv. Boulos several times (Transcript Prosecution/90 Section 1.)

138. **In conclusion**: We have no reason to assume that the Defendant's confessions during his Israel Security Agency interrogation were given because any sort of illegitimate means had been used against him that led the Defendant to negate his free will, nor did the Defendant ever claimed that this happened. During the course of the trial, as well as at the time of his police interrogation, when statements that he had made during his Israel Security Agency interrogation were presented to the Defendant, he repeatedly claimed that they were "lies and forgeries." He did not claim that any illegitimate means had been used against him during the interrogation and our clear impression is that the interrogators treated the Defendant respectfully, as the Defendant himself said during his Israel Security Agency interrogation (Transcript Prosecution/75 Section 2, Transcript Prosecution/90 Section 1 and Transcript of the Defendant's Interrogation Prosecution/98 (f) on p. 29). At the time that testimony was given during the trial, the Defendant shook hands with some of the Israel Security Agency interrogators, and this fact also indicates that the Defendant does not harbor any negative feelings against his interrogators.

The Defendant had full control of the statements that he made to his Israel Security Agency interrogators: he decided what things he was willing to say during the course of his interrogation, that he expected were already known to the interrogators anyway, and which things he intended to hide from them. The Defendant was very cautious during the course of his interrogation and on more than one occasion he refused to answer a question that had been asked or

[Stamp] P 7: 000425 [continued]

answered in an indirect, implied manner. He chose the tactics that he used during interrogation, namely to expand on political subjects, be brief with respect to those related to acts of terrorism and, in any case not to provide any details other than those which he expected that the interrogators already knew.

As Agent John Doe No. 1 testified, the Defendant told him, "**Even if the entire Palestinian people admits to something, he will decide what to say during interrogation**" (Prosecution/110 Section 10). From all which is stated above, it is clear that the Defendant gave his statements of his own free will.

[Stamp] P 7: 000426

**Part IV:**     **Legal Analysis and Conclusions**

1.     <u>Activity and Membership in a Terrorist Organization</u>

139.  In the indictment, the Defendant is charged with the crimes, among others, of activity and membership in a terrorist organization, in accordance with Sections 1 – 3 of the Prevention of Terrorism Ordinance, 5708 – 1948, which states:

"**1.**     <u>Interpretation</u>
**'Terrorist organization' means a group of persons that uses, in its activities, acts of violence calculated to cause death or injury to a person or threats of such acts of violence; a 'member of a terrorist organization' means a person belonging to it and includes a person who participates in its activities, publishes propaganda in favor of a terrorist organization, its activities or aims, or collects money or goods for the benefit of a terrorist organization or its activities.**

**2.**     <u>Activity in a terrorist organization</u>
**A person fulfilling a managerial or instructional position in a terrorist organization or participating in the deliberations or decision-making of a terrorist organization or acting as a member of a tribunal of a terrorist organization or delivering a propaganda speech at a public meeting or on the radio on behalf of a terrorist organization shall be guilty of an offence and shall be liable, upon conviction, to imprisonment for a term not exceeding twenty years.**

**3.**     *Membership in a terrorist organization*
**A person who is a member of a terrorist organization shall be guilty of an offence and be liable, upon conviction, to imprisonment for a term not exceeding five years."**

Section 7 of the Prevention of Terrorism Ordinance states:

"**7.**     *Proof of the existence of a terrorist organization*
**In order to prove in any legal proceeding that a particular group of persons is a terrorist organization, it shall be sufficient to prove that –**

**(a)     One or more of its members, on behalf of or by order of that group of persons, at any time after 5 Iyar 5708 (May 14, 1948), committed acts of violence calculated to cause death or injury to a person or made threats of such acts of violence; or**

[Stamp] P 7: 000427

    (b)   The group of persons, or one or more of its members on its behalf or by its order, has or have declared that that body of persons is responsible for acts of violence calculated to cause death or injury to a person or for threats of such acts of violence, or has or have declared that that body of persons has been involved in such acts of violence or threats, provided that the acts of violence or threats were committed or made after 5 Iyar 5708 (May 14, 1948)."

140. The fact that Fatah, Tanzim and al-Aqsa Martyrs Brigades are terrorist organizations, in accordance with that which has been set forth in the Expert Opinion of Brigadier General Cooperwasser Prosecution/1, is clearly proven by the seized documents that were taken during Operation Protective Shield, which were presented as evidence in this Court, and also from the testimony of the terrorism operatives and the Defendant himself (see above, Sections 7 – 10; testimony of ███ in Sections 21 – 23; testimony of ███████ in Section 25; testimony of ████████ in Section 29; testimony of ████ in Section 35; testimony of ███ in Section 40; testimony of ████ in Section 55; testimony of ███ in Section 57; and the Defendant's statements from his interrogation as described in Sections 60 – 64). The terrorist attacks that are the subject of this indictment, and many others, were executed by the field operatives of Fatah – members of the Tanzim – and by cells that were organized within the framework that is called "the al-Aqsa Martyrs Brigades". The Defendant was the leader of Fatah in the West Bank and commander of the Tanzim and al-Aqsa Martyrs Brigades, as he admitted during the course of his interrogation and as proven by much additional evidence (see Section 17 and Sections 60 – 65 above).

The Defendant's roles in leadership of the terrorist organizations were also described at length (see Part II, Chapter D above). The Defendant was the commander of terrorist organizations and terrorist cells, even if sometimes they did not follow his orders, and he made an effort to supply them with weapons, explosives and money for the purpose of their activities (see Part II, Chapter D (1) and (3) above). He was also personally involved in some of the terrorist attacks that have been carried out by the organizations that he led (see Part II, Chapter D (2) above). The Defendant also handled assistance for wanted men and the families of people who were arrested or killed, recruited operatives for the terrorist organizations and trained them (see Part II, Chapter D (4) – (5) above). He was the person who expressed the positions of the terrorist organizations in the media (see Chapter D (6) above).

In this case, therefore, we are not dealing merely with "a person fulfilling a managerial or instructional position in a terrorist organization" in accordance with that which has been set forth in Section 2 of the Prevention of Terrorism Ordinance, rather the Defendant was the person who headed these terrorist organizations, created their policy and made propaganda speeches on their behalf in the media.

Therefore, the foundations of Sections 2 and 3 of the Prevention of Terrorism Ordinance, namely membership in a terrorist organization and activity in such an organization, are proven.

[Stamp] P 7: 000428

2.    **Responsibility of the Joint Perpetrator, the Solicitor and the Accessory and the Differences Between Them**

141.  The indictment charges the Defendant with the direct responsibility of a "joint perpetrator" in all of the acts of murder and attempted murder that are the subject of the indictment, which lists 37 different terrorist attacks.

The indictment also charges the Defendant with the crimes of being an accessory to murder and soliciting murder, even though the Prosecution's claim in its summation is that the Defendant should be considered a joint perpetrator in these crimes, and not only an accessory or one who solicits others, because he was a leader of terrorist organizations and the main person responsible for perpetrating murderous terrorist attacks that were executed by these terrorist organizations. Therefore, it is necessary to review the degree of responsibility claimed for the Defendant in the terrorist attacks that are the subject of the indictment: first – as one who committed acts of murder as a joint perpetrator together with the field operatives and the terrorists who actually perpetrated the attacks; second – as the person who solicited others to perpetrate the attacks; third – as an accessory to acts of murder. In this framework, it is necessary to examine the traits that characterize "the joint perpetrator" and to distinguish between them and those that characterize the accessory and the one who solicits [the offense].

142.  In Section 29 (b) of the Penal Code, 5737-1977, the responsibility of the joint perpetrator is defined as follows:

> **"The participants in the perpetration of a crime who take action in order to commit it are joint perpetrators and it makes no difference if all of the actions are done together or if some are accomplished by one and some by**

[Stamp] P 7: 000428 [continued]

another."

Section 30 of the Penal Code, 5737 – 1977, defines the responsibility of the solicitor as follows:

> **"Anyone who causes another to perpetrate a crime by persuasion, encouragement, demand, pleading or any other manner that exerts pressure is soliciting a crime."**

Section 31 of the Penal Code, 5737 – 1977, defines the responsibility of the accessory as follows:

> **"Anyone who, before the commission of crime or during its commission, does anything to make commission of the crime possible, who makes it easier, secures it or prevents the capture of the perpetrator, its discovery or negation or contributes in any other manner to the creation of conditions for committing the crime, is an accessory."**

143. In order for a person to be considered a joint perpetrator who commits a crime together with others, there needs to be a foundation of "taking action in order to perpetrate" the crime, as Section 29 (b) of the law instructs.

Case law has interpreted the concept "perpetrate" broadly when defining the essence of the act that it requires. Similarly, rulings have set flexible criteria with respect to the degree to which the participant needs to be close to the circle of perpetrators and for his ability to influence their deeds (Additional Criminal Hearing 1294/96 **Uzi Meshulam v. The State of Israel** PD 52 (5) 1, on p. 21 (the Honorable Justice A. Matza), on p. 54 – 55 (the Honorable Justice M. Cheshin) and on pp. 63 – 64 (the Honorable Justice Y. Kedmi)).

With respect to the act that is required in order for it to be possible to consider a person to be a joint perpetrator, it has been ruled that it sufficient for the act of perpetrating the crime to be beyond simple preparation (this is also the criteria for the existence of the offense of attempt), and be accompanied by the appropriate mens rea (Additional Criminal Hearing 1294/96, as above, in the case of **Meshulam**, on pp. 23 – 24). This act is not required to be essential for the success of the crime nor does it need to be an act that is part the basic factual foundation of the crime; it is sufficient that the act is included in the plan for the crime or the division of tasks among the participants (the above mentioned Additional Criminal Hearing 1294/96, in the case of **Meshulam**, on pp. 63 – 64 (the Honorable Justice Y. Kedmi)).

A.    **The Joint Perpetrator in Comparison to the Accessory**

[Stamp] P 7: 000429

144. The distinction between the "joint perpetrator" in a crime, in accordance with Section 29 (b) of the Penal Code, and the "accessory", in accordance with Section 31 of the law, has become a matter of major importance since the Penal Code (Amendment No. 39) (Preliminary Part and General Part), 5754 – 1984 went into effect because in accordance with Section 32 of the law in its new version, the punishment of an accessory is half that of a joint perpetrator, whereas in accordance with the previous law their punishment was the same. The maximum punishment for an accessory to murder is 20 years' imprisonment (see Section 32 (1) of the Penal Code) while the mandatory sentence for a joint perpetrator murderer, in the absence of circumstances for reduced responsibility, is life imprisonment.

In Criminal Appeals 8901, 8873, 8710, 8620, and 8573/96 **Mercado** *et al.* **v. The State of Israel ("the Discount Banker's Trial")**, PD 51 (5) 481, the Honorable Justice Goldberg wrote on p. 545:

> **"Amendment No. 39 to the Code expresses the recognition that the moral guilt and the subjective and objective danger adhering to the accessory is less than that of the joint perpetrator. This disparity is the foundation for the distinction in sentencing between the joint perpetrator and the accessory and it is what should guide us when determining the test to be used for distinguishing between a principal offender and an accessory."**

145. The distinction between a "joint perpetrator" and an "accessory" was clarified in Criminal Appeals 4389/93 and 4497/93, **Yossi Mordecai** *et al.* **v. The State of Israel**, PD 50 (3) 239, in Criminal Appeals 2796/95, 2813/95, and 2814/95, **John Does v. The State of Israel**, PD 51 (3) 388, the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam**; the above mentioned Criminal Appeal 8573/96, in the matter of **Mercado**, on pp. 543 – 550; and Criminal Appeal 2111/99 **Heyro v. The State of Israel**, PD 58 (1) 411. The distinction between a joint perpetrator and an accessory is found in both its factual basis and its mental basis. In principle, **"The quality of the accessory's contribution to perpetration of the crime is a lower one than the quality of the contribution of the principal offender"** (the above mentioned Criminal Appeal 8573/96, on p. 545).

[Stamp] P 7: 000430

With respect to the **factual basis** of the crime – the main distinction is between direct and indirect partners in perpetrating the crime. The joint perpetrators are those "**participants who take action in order to perpetrate**" the crime, but each one is not required to personally perpetrate all of the factual bases of the crime (see Section 29 (b) of the Code). In contrast, the accessory does something that in some way contributes to "**creating conditions for committing the crime**" (see Section 31 of the Code). The joint perpetrator is part of the inner circle that commits the crime while the contribution of the accessory to the commission of the crime is entirely external. Therefore, the Court examines the degree of proximity for each participant in the crime, meaning is he part of the inner circle of the criminal task (Criminal Appeal 3390/98 **Rosh v. The State of Israel**, PD 53 (5) 871,

[Stamp] P 7: 000430 [continued]

878)? This, then, is "**the proximity test**" that was explained by the Honorable President Justice A. Barak in the above mentioend Criminal Appeal 4389/93, the matter of **Mordecai**, on p. 250:

> "**The difference between the joint perpetrator and the accessory is expressed in that the joint perpetrators act as a single unit to commit a criminal task. They are all chief offenders... The contribution of each of the joint perpetrators is "internal"... therefore, with respect to the joint perpetrators, it may be possible to divide the work between the offenders so that they act in different places and at different times without each of them completing the crime, but each part is significant for implementing their common plan. Uniform time and place are not essential, as long as the role of each is an internal role for the criminal task.**"

146.  In the rulings that were cited above, the Supreme Court reviewed the various distinctions that have been proposed in rulings and in legal literature in order to set boundaries between a joint perpetrator and an accessory. There are those who emphasize "**the test of control**" as a characteristic of the joint perpetrator: the joint perpetrator has control, together with others, over commission of the crime; he is part of a joint plan for committing a crime, and works together with others in order to carry out it. On the status of the joint perpetrator in light of the "test of control," the Honorable President Justice A. Barak wrote in the above mentioned Criminal Appeal 2796/93, in the matter of **John Does** (see Section 28):

> "**The characteristic of the joint perpetrator is that he is master of the criminal activity. He has functional – substantive control, together with the other joint perpetrators, over the criminal act. He is part of the joint decision to commit the crime and he is part of the overall plan to commit the crime, and works together with the others to realize the forbidden criminal act. He works together with the other joint perpetrators so that each one of them has control – together with the others – over the entire activity. His status with regard to the decision to commit the crime is one of a person who is 'inside.' His contribution is 'internal.' He has a substantial share in completing the joint plan...**"

Similarly, in the ruling that was handed down on the above mentioned Criminal Appeal 8573/96, in the matter of **Mercado**, on pp. 547 – 548. In contrast, in regard to the accessory, the Honorable Presiding Justice A. Barak wrote that the accessory "**is not the father of the idea**" to commit the crime and in Section 30 he wrote as follows:

[Stamp] P 7: 000431

"The accessory is an indirect secondary partner (Mordecai case, Section 14). He is found outside of the inner circle of perpetration. He is an 'external' force. He does not initiate the perpetration and he does not solicit it… He does not decide to commit the crime and he does not control it…"

[Stamp] P 7: 000431 [continued]

(See also the above mentioned Criminal Appeal 4389/93, in the matter of **Mordecai**, Sections 13-14).

147. In contrast to the "test of control," there are those who emphasize the "**test of functionality**," in accordance with which the joint perpetrator is a person who takes a substantial role in committing the crime itself, while the share of the accessory is expressed in an act of assistance and is external to the crime.

This test finds expression in the language of Section 29 (b) of the law ("**participants in the commission of an offense while taking action in order to commit it**"). In the above mentioned Criminal Appeal 2796/93, in the case of **John Does**, (see Section 27) the Honorable President Justice A. Barak wrote with regard to joint perpetrators:

> "**They are the main partners in the commission of the crime. The partnership between them is expressed in that they have taken part in the commission of a crime as direct perpetrators. They work as a single unit to commit a criminal task... Each takes a principal part in the commission of the crime.**"

In continuation of his words (see Section 27), the Honorable President Justice A. Barak wrote:

> "**Being a joint perpetrator requires joint planning. It is based on a division of work among the perpetrators... **"

The Honorable Justice Y. Kedmi wrote clearly about the decisive importance of the "test of functionality" in Criminal Appeal 5206/98 **Halil Abud v. The State of Israel**, PD 52 (4) 185 (see Section 2):

> "'**The joint perpetrators' are not only the partners in the commission of the 'act' of the crime itself; rather, they include everyone who 'took part' in the commission of the crime, in the broadest sense of the word 'commission.' Whereas anyone who only 'contributed' to its commission, without actually taking part – which is to say without having a 'role' in its framework – remains in the 'outer circle' of those who are responsible for its commission. He is not the partner in commission; his role is limited to simple 'assistance' for the commission of the crime.**

> The distinction between those who are included in the 'inner circle' – 'the joint perpetrators' – and those who are included in the 'outer circle' – 'the accessories' – is to be found in the quality and character of their involvement in its commission: if 'they took part in its commission' – meaning if they have a 'role' in its commission, then they are 'co-conspirators'; but if they only 'contributed' to it from the outside – then they are merely 'accessories.'"

Further on in the ruling, the Honorable Justice Kedmi explains that the distinction between the joint perpetrator and the accessory **is not** dependent on the question of whether the Defendant's behavior assisted in the commission of the crime, since a joint perpetrator can also assist its commission; the question is "**if he took part – meaning: if he played a role – in the commission of the crime**."

In Additional Proceedings **1294/96, 1365 Meshulam _et al._ v. The State of Israel**, PD 52 (5) 1, on p. 63, the Honorable Justice Kedmi wrote:

> "'An active partnership' need not be expressed in joint action in committing an 'act' that is an element of the factual basis of the crime, and the broad comprehensive meaning of 'act' expresses 'partnership' in committing the crime. In Section 29 of the Penal Code, the definition of 'active partnership' does not require that the 'act' be done while committing the factual basis of the crime but it certainly expresses 'partnership' in its commission. The 'partnership', as noted, can begin with the suggestion of the idea to the people who are designated to commit the crime."

The Honorable Justice M. Cheshin noted in the same manner that the law does not require that an act of partnership in the commission of a crime be done while the crime is actually being committed or is adjacent to it (on pp. 53 – 54).

148. In the above mentioned Additional Criminal Hearing 1294/96, in the matter of **Meshulam**, the Supreme Court explained that "the test of control" is an auxiliary test that is not the sole or exclusive test, and that it should be combined with other tests and considerations; controlling the commission of the crime is important evidence of a person being a joint perpetrator but the lack of control or a lack of critical physical contribution to commission a crime does not necessarily negate this conclusion (the Honorable President Justice A. Barak on p. 50; the Honorable Justice A. Matza on pp. 24 – 27; the Honorable Justice Y. Kedmi on p. 65). Furthermore, even when the Court is aided by the "test of control" this is done while emphasizing that it does not mean continuous control throughout the commission of the entire crime but rather "control of a certain portion of the crime that was allotted to a particular perpetrator" (the Honorable Justice Y. Kedmi on p. 64).

[Stamp] P 7: 000433

149. With respect to the **mental basis** for the crime – certainly the mental attitude of the accessory is on a lower level than that of the principal perpetrator, with respect to everything that is related to the degree of his awareness of details that are related to the commission of the crime and his desire to realize it. We would rule that for the accessory, it is sufficient if he is aware of the fact that his behavior is contributing to the conditions that are necessary for the commission of the main crime and that the principal is about to commit it. In addition, the accessory needs to have in mind the purpose of assisting the principal perpetrator in the commission of the crime or making it easier for him to carry it out. However, when the principal crime is consequential and it requires an element of haste or special intent – it is not necessary to prove that the accessory acted out of an intent of this type or that he intended that the principal perpetrator would realize his goals. For example, for a crime of murder, it is not necessary to prove that the accessory intended for the principal to murder the victim or that he desired that outcome; it is sufficient that the accessory's intent be to aid the principal perpetrator, whatever the motivations of the accessory might be (these rules were clarified in Criminal Appeal 320/99 **Jane Doe v. The State of Israel**, PD 55 (3) 22, on pp. 31 – 37).

In contrast to this, when dealing with the joint perpetrator, it must be proven that he had a high level of mental involvement and awareness of the details of the crime being committed, in addition to his desire to realize it:

> **"The co-conspirator contributes his contribution to a criminal act with multiple participants with a mental attitude of creating a crime** *onimo auctoris*. **He considers the commission of the crime his business and not that of someone else** (words of S. Z. Feller in his book **Foundations of Criminal Law**, quoted in Criminal Appeal 4389/93, as above, in the case **Mordecai,** on p. 251).

**In summation**: The joint perpetrator, as opposed to the accessory, needs to have a mental basis that is equal to that of the other principals in the crime and he needs to have all of the elements of the mental basis that have been determined by law for the crime in which he has taken part (the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, on p. 402).

In the above mentioned Criminal Appeal 8573/96, in the case of **Mercado**, the Honorable Justice A. Goldberg wrote, on pp. 548 – 549, that the categorization of the Defendant as a joint perpetrator or as an accessory is the result of a combined test of the mental basis and the factual basis – a test which is like a parallelogram of forces:

[Stamp] P 7: 000434

"The greater the mental basis (with regard to his degree of interest in its commission) of the person who committed the crime, the more it is possible to be satisfied with a lower level of the factual basis. In this spirit, it has already been said that 'when the "mental" basis is proven (the awareness – A.G.), the division of the tasks among the participants involved in the event is no longer important' (the above mentioned Criminal Appeal 4188/95, 5235, [43], on p. 550). Conversely, the greater

[Stamp] P 7: 000434 [continued]

> **the factual basis for the commission of the crime, from the perspective of the quality of his contribution to its perpetration, it is possible to be satisfied with the lower level of mental basis."**

These points were confirmed in the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam** (on p. 27, in accordance with that which has been set forth by the Honorable Justice A. Matza).

150. From the rules that have been was cited above, it becomes apparent that participation in planning a crime serves as a clear sign of a joint perpetrator. In this case, is not necessary for him to be physically present at the scene of the crime in order to be considered a joint perpetrator.

In the above mentioned Additional Criminal Hearing 1294/96 in matter of **Meshulam** (on p. 64), the Honorable Justice Y. Kedmi ruled:

> **"'Participation', as stated, can begin with proposing the idea to the people who are intended to commit the crime, and in any case, as far as I am concerned, there is no doubt that planning the perpetration, giving orders and delineating the lines of action, including assigning roles to the participants, constitute an 'act' that expresses 'participation', as stated."**

In Criminal Appeal 3596/93 **Hamoud Abu Sror v. The State of Israel**, PD 52 (3) 481, the Honorable Justice A. Matza wrote on p. 491:

> **"The practical contribution of the appellant to the commission of murder was indeed smaller than that of his two companions. However, his active participation in the preparations and the warning role he played gave him control over bringing the murderous plan into being. From the fact that he participated in the preparation for its perpetration and acted for the success of the plan, it becomes apparent that he had the criminal intent that is required for inclusion in liability for the crime of premeditated murder."**

[Stamp] P 7: 000435

In the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, four adolescents were convicted of premeditated murder, in spite of the fact that only one of them throw the grenade that caused the death of victim of the crime. One (Ze'ev) was convicted as a joint perpetrator because he took part in all of the stages of planning and perpetration, and was present at the scene when the crime was committed, in spite of the fact that he decided not to throw that the fatal grenade himself ("**he did not implement the act of killing. This is meaningless since a joint perpetrator is responsible even if he himself did not commit all of the foundations of the crime...** " – on p. 407). The second (Gershon) was convicted as a joint perpetrator even though he was not even present at the scene of the murder and his entire role was to report the deed to media after it had been committed, because he fulfilled the role that was assigned to him in advance, for the purpose of the perpetration of the crime (on p. 408). The third (Tal) was convicted as a joint perpetrator, in spite of the fact that he, too, was not present at the scene of the murder because

[Stamp] P 7: 000435 [continued]