he had participated in the planning of the crime, and was part of the group that decided to commit the murder and even was its leader (on pp. 408-409).

151. When the principal crime is preceded by a conspiracy to commit the crime, there is a tendency to consider each of the conspirators as a joint perpetrator in the main crime, and only if they took a genuine part in the commission thereof. The reason for this is that the conspiracy to commit a crime is evidence of the fact that each of the conspirators is interested in its commission. According to the statements that have been set forth by S. Z. Feller, which were quoted in the above mentioned Criminal Appeal 8573/96, in the matter of **Mercado**, on p. 550: "**Conspiracy between two or more people to commit a criminal offense includes the development of joint thought in order to realize the goal of the conspiracy – each is a future candidate to be the direct perpetrator, in the spirit of creating *animo auctoris*.**"

In the above mentioned Criminal Appeal 3390/98, in the matter of **Rosh**, on p. 878, the Honorable Justice A. Matza wrote:

> "**The additional test with respect to 'proximity to the act', which requires that the role of each joint perpetrator be an 'internal part of the criminal act', is intended to ensure that commission of a marginal act, which on the basis of its nature could be included in the definition of 'perpetration', will not make the person who commits it responsible as a joint perpetrator when the nature of his mental basis for committing the crime is doubtful (Additional Criminal Hearing 1294/96 *Meshulam v. The State of Israel* (hereinafter – 'the *Meshulam* matter [3],' on pp. 21-22).**
>
> **It is not the same when determining the responsibility of someone who, as a matter of principle, is included as a participant in preparing the criminal plan, and no doubt arises with respect to his having the required criminal intent for inclusion in the planned crime. This type of party to a crime carries the responsibility of a 'joint perpetrator' even if his physical contribution to commission is no greater than that of an accessory (Criminal Appeal 3596/93, *Abu Sror v. The State of Israel*, [4], on p. 491).**"

**152.** With respect to **presence at the scene of the crime**, indeed this is not essential in order for a person to be considered a joint perpetrator, and in the language of the Honorable Presiding Justice A. Barak in the above mentioned Criminal Appeal 2796/95, in the matter of **John Does** (see Section 27): "**Being a joint perpetrator is not necessarily based on uniform place and time**" (see also the above mentioned Additional Criminal Hearing 1294/96, in the matter of **Meshulam**, on pp. 30, 38, 49, 51, 53 – 54 and 64). However, the non-random presence of a person at the scene where a crime is being committed does create an assumption, which may be contradicted, that he is a joint perpetrator in the crime (see: Criminal Appeal 3006/96 **Matias v. The State of Israel**, Supreme Court Laws, Volume 52 526).

**B.    The Crime of the Accessory**

[Stamp] P 7: 000436 [continued]

153. The factual basis and the mental basis of the crime of the accessory in general, and of the accessory to murder specifically, were recently clarified in a verdict that was written by the Honorable Presiding Justice A. Barak in Criminal Appeal 320/99 **Jane Doe v. The State of Israel**, PD 55 (3) 22, on pp. 31 – 37 (which was upheld in Criminal Appeal 11131/02 **Angelika Yosefov v. The State of Israel**, not yet published). The law, as determined by these rulings, can be summarized as follows:

    a. The characteristic behavior of the accessory is that it is an indirect, secondary contribution to the commission of the main crime: the contribution of the accessory is considered indirect and secondary because he does not take part in the main commission of the crime but only makes an indirect contribution to the realization of the main crime. The accessory is an "external" force who is outside the inner circle of the crime (see also: Criminal Appeal 7085/93 **Najar *et al.* v. The State of Israel**, PD 51 (4) 221, on p. 238).

    b. **The factual basis** for the crime of the accessory, which is a crime of behavior, is the action or lack of action which creates the conditions for realization of the factual basis of the crime that is being committed by the principal. The accessory needs to be "able" to assist in the perpetration of the main crime but there is no requirement that this assistance be effective or the condition without which the main crime could not have taken place (see also Criminal Appeal 4317/97 **Poliakov v. The State of Israel**, PD 53 (1) 289, on p. 307). Similarly, it is not necessary that the principle crime actually be committed since the crime of an accessory is not a consequential crime. In addition, it is necessary to prove as part of the factual basis of the crime of the accessory, that the circumstance relating to the criminality of this behavior is secondary and indirect.

    c. The accessory must be directed towards a crime that has a concrete purpose, meaning that the action is done in order to **assist** the commission of a specific crime, rather than simply a crime (see also Criminal Appeal 426/67 **Yosef Be'eri *et al.* v. The State of Israel**, PD 22 (1) 477, on p. 481; the above mentioned Criminal Appeal 7085/93, in the matter of **Najar**, on pp. 238 – 239).

    d. **The mental basis** of the crime of the accessory includes three cumulative conditions:

        (1) Awareness of the nature of the accessory behavior, meaning: of the fact that this behavior contributes to the creation of conditions for the commission of the main crime, which has a concrete goal;

[Stamp] P 7: 000437

(2) Awareness of the existence of the relevant circumstances at the time of the accessory's behavior, meaning: awareness that the principal is committing or about to commit the crime, even though awareness of the specific details of the crime is not necessary (see also the above mentioned Criminal Appeal 7085/93, in the matter of **Najar**, on pp. 238 – 239).

(3) The accessory must be aware of having the goal of assisting the principal in committing the crime or of making it easier for him to commit the crime.

The "ability to anticipate" can be applied to this requirement, meaning: the awareness of the accessory to the fact that his behavior might almost certainly be the contribution that assists the principal is weighed against his purpose for aiding him, even if he is not at all interested in the commission of the main crime (see also the minority opinion of the Honorable Justice Y. England in the above mentioned Criminal Appeal 4317/97 in the matter of **Poliakov**, on pp. 320 – 323 and the expert opinion of the Honorable Justice M. Ilan in Criminal Appeal 807/97 **State of Israel v. Azizian**, PD 53 (5) 747, on pp. 757 – 758).

e.  When the principal crime is consequential and it requires a mental basis of haste or special intent,

[Stamp] P 7: 000437 [continued]

it is not necessary to prove that the accessory acted out of intent of this type or that he intended that the principal perpetrator would realize his goals. For example, in the case of murder, it is not necessary to prove that the accessory intended for the principal to murder the victim or that he wanted that outcome; it is sufficient that the accessory's intent be to aid the principal criminal, whatever the accessory's motivations might be.

154. With respect to the required degree of likelihood that the principal offender will commit the crime, it is important to note that in accordance with the rule that was cited by the Honorable Presiding Justice A. Barak in the above mentioned Criminal Appeal 320/99, in the matter of **Jane Doe**, it is sufficient that the accessory is **aware** of the fact that the principal offender is going to commit a crime with a concrete goal (on pp. 31 – 32 of the ruling). The requirement for awareness at a level of a **almost certain** likelihood relates to the foundation of the purpose, meaning: the accessory's awareness that his behavior is likely almost certainly to contribute to the commission of the principal crime; this type of awareness is equivalent to the goal of assisting the principal criminal. As stated by Presiding Justice A. Barak : "**The mental basis of the goal ('in order that') is therefore directed towards the act of assisting and not towards the act of the main crime**" (on p. 35).

In this context, the question arises of when it can be said that the Defendant was "aware" that the main criminal would be committing a crime with a concrete purpose.

The rule is that "turning a blind eye", which is also referred to as "intentional blindness", is considered to be equivalent to awareness of the nature of the act and other existing circumstances. This ruling is currently expressed in Section 20 (c) (1) of the Penal Code which states as follows:

> **"A person who suspects something about the nature of his behavior or the possibility of existing circumstances is considered that he was aware of them, if he avoided clarification."**

(See: Y. Kedmi, **On Criminal Law**, updated and expanded edition (1966), Part One, on p. 37, and Criminal Appeal 3417/99 **Margalit Har-Shefi v. The State of Israel**, PD 55 (2) 735, on pp. 757 – 758).

In Y. Kedmi's above mentioned book, it is written on p. 37:

[Stamp] P 7: 000438

> **"a.      Section 20 (c) (1) of the amendment anchors in firm instruction the general principle whereby: when a person actually 'suspects' that the nature of his behavior could lead him into the bounds of forbidden behavior, if there is a practical possibility that the circumstances exist that are necessary for a conviction and he refrains from clarifying the 'veracity' of the suspicion, he is considered as someone who was aware of the true nature of his behavior and the existence of the circumstance (if it is found that it actually exists).**
>
> **b.      Here, too… it seems that the level of suspicion needs to be at least 'the level of likelihood' meaning: it is more reasonable that the suspicion is true than that it is unfounded."**

The law in this regard is clarified by Professor S. Z. Feller, **Fundamentals of Criminal Law** (Volume 1, 5744 [1984]), on p. 519, which was also referred to by the Honorable Justice M. Cheshin in the above mentioned Criminal Appeal 3417/99, on p. 758, stating:

> **"Awareness of *the possibility* of the existence of a circumstance, on which the crime is dependent, obligates a person to check, prior to the commission of his action, the situation that pertains to that circumstance, in order to refrain from it, in the event that the existence of that circumstance is confirmed.**

> **If, in spite of the suspicion, the person did not do so, whether because he was determined to complete the act regardless of the circumstances or because it was more expedient for him not to know or based upon any other consideration, it means that he accepted the existence of that circumstance.**
>
> **Therefore, *conscious* disregard of the possibility that there exists a set of circumstances is considered to be equivalent to consciousness that this does exist; since this set of circumstances was apparent to the person but he did not bother to examine the situation or to clarify the circumstances. If it turns out after the fact that the relevant circumstances did in fact exist, awareness of the possibility that they might exist, because of a suspicion, is considered to be equivalent to awareness of their very existence.**

In the above mentioned book by Y. Kedmi, on p. 37, it was stated that the level of suspicion that is necessary in order to implement the law of "turning a blind eye" ranged from the level of "reasonable" prior to the amendment of 5754 [1994] to the Penal Code, to the level of "high." In this matter, Professor Feller, **Fundamentals of Criminal Law** (Volume 1) stated on p. 523 of his book as follows:

> **"In our opinion there is no basis to the assumption that other than the rationality of the suspicion – which is, of course, subjective – or more precisely in lieu of its rationality, the suspicion needs to be of a high level to the point of being nearly certain or lacking in any real doubt in the mind of the person with respect to its veracity…**
>
> **In order to compare "turning a blind eye" to awareness, it is sufficient that there be awareness of this rational suspicion with respect to the possible existence of circumstances and refraining from the clarification of the actual situation at hand."**

And on p. 524 it says:

> **In conclusion, it is sufficient for the suspicion to be anchored in reality, in other words rational, in order to define the act as having been committed by "turning a blind eye" if, prior to the action, the person avoids checking the suspicion and assessing the actual situation. It is not necessary for there to be a high degree of objective likelihood that the suspicion is true.**

[Stamp] P 7: 000439

The test for the existence of "turning a blind eye" that becomes tantamount to awareness is, as set forth above, a subjective one. In spite of this, the Courts regularly determine a Defendant's subjective awareness using the objective test of a reasonable person (see also: Criminal Appeal 15/78 **Moshe Bivas v. The State of Israel**, PD 32 (3) 64, on p. 83; Criminal Appeal 5612/92 **The State of Israel v. Be'eri** *et al.*, PD 48 (1) 302, on p. 363; compare with the application of the test of a reasonable man with respect to awareness of the Defendant of a high likelihood of damage to national security: Criminal Appeal 3116/99 **Yehuda Gil v. The State of Israel**, PD 54 (4) 193, on p. 204).

155. From the rulings that have been been set forth above, especially those that were made in the above mentioned Criminal Appeal 320/99 in the matter of **Jane Doe**, it becomes apparent that a person who suspects that another person is about to commit a certain crime but refrains from clarifying the issue and even helps that person to commit the crimes despite the awareness that he is, almost certainly, helping that person to commit the crime – if it is committed – is considered to be an accessory in accordance with Section 31 of the Penal Code. From these rulings, it becomes apparent that it is not necessary to prove that the accessory expected the commission of the main crime as a nearly certain possibility: it is sufficient that he is aware of the logical, reasonable and realistic possibility that the main crime will be committed and, in spite of this, he assists its commision, based upon an awareness that his behavior is likely, almost certainly, to assist the principal perpetrator. Similarly, it is not necessary to prove that the accessory desired the commission of the principal crime or that he acted out of an intent that the principal crime be committed.

However, in the above mentioned Criminal Appeal 11131/02, in the case of **Yosefov,** the Honorable Justice E. Rivlin ruled that the Prosecution needs to prove that the Defendant knew that his behavior would be likely, almost certainly, to assist the crime of murder committed by the

principal offender and that: **"in order for the doctrine of foreseeability to apply, it is necessary to show, as stated, awareness of near absolute certainty of the possibility of the commission of the crime…"** (see Section 13 of the ruling). This statement is different in its nuances from that in the above mentioned Criminal Appeal 320/99, in the matter of <u>**Jane Doe**</u>, where the Honorable Justice Rivlin said in the above mentioned Criminal Appeal 11131/02, at the beginning of the ruling (see Section 9), that:

> **"The awareness – both with respect to the nature of the accessory conduct and with respect to the commission of the main crime – can be replaced by a suspicion with respect to the accessory nature of the act and awareness of the possibility that they are circumstances for the commission of a crime by the principal, in accordance with the orders of Section 20 (c) (1) of the Penal Code ('turning a blind eye')."**

156. From the rulings above it becomes apparent that it is not necessary to prove that the Defendant was aware of every detail with respect to the crime to which he is an accessory. In this regard, the Honorable Justice E. Rivlin wrote, in the above mentioned Criminal Appeal 1131/02, in the matter of <u>**Yosefov**</u>, the following statements, which are important to our case:

> **"The previous Court has rightly said that awareness that the principal is going to a commit a crime does not mean awareness of all of the details of the crime that he is planning (see for example: Criminal Appeal 7085/93 <u>Najar v. The State of Israel</u>, PD 51 (4) 221, 239). In the matter before us, the appellant knew that Zayid, whom she accompanied, was carrying explosives with him, and that he had already carried out terrorist attacks in the past, and that he was seeking revenge for the death of his brother who had been killed by an action of the security forces. Based on the appellant's testimony, the lower Court had gained the impression that she understood quite well that Zayid was planning to perpetrate a terrorist attack in the city of Tel Aviv. In this context, the question of whether or not she knew the exact location where he intended to place the explosives is of no importance."**

On the same issue, the Honorable Justice Rivlin also wrote:

[Stamp] P 7: 000440

"Indeed, as we have already noted, the accessory does not need to be aware of all of the details of the crime which the principal perpetrator intends to commit. In spite of this, he must be aware, at the time he proffers assistance to the principal, that there is a possibility that he is assisting the principal perpetrator in committing a genuine crime, and in other words – to the fact that the principal perpetrator has a 'concrete purpose' (see also: Criminal Appeal 426/67, Be'eri v. The State of Israel, PD 22 (1) 477, at 481 – 482; Criminal Appeal 5544/91, Moyal v. The State of Israel (not published)). Knowledge of the perpetrator's vague or hypothetical willingness to commit a crime is not enough to transform a person into an accessory.

Therefore it is likely, as we have noted, that the awareness of circumstances of the factual basis – which is to say awareness of the fact that the principal perpetrator is about to commit a crime – will be replaced by awareness of the possibility that he is about to commit a crime.

However, in order for it to be said that the accessory 'turned a blind eye', we must be convinced that there actually existed a rational-subjective suspicion in the accessory's mind that a crime is about to be committed (S. Z. Feller, in his above mentioned book (Volume 1) pages 521 – 524, 530).

Furthermore, the accessory must be aware of the fact that the crime may be committed when he offers the assistance. If the accessory believed, at the time that he performed the acts that were accessory to the crime, that there was no longer any substantial possibility that the principal perpetrator would commit the crime, he then cannot be considered an accessory – even if he evaluated at an earlier stage that a possibility such as

[Stamp] P 7: 000440 [continued]

this existed."

With respect to the requirement for awareness of the principal perpetrator's intentions to commit a crime with a concrete purpose, the Honorable Justice M. Landau (as his title was then) in Criminal Appeal 426/67, **Yosef Be'eri *et al.* v. The State of Israel**, Supreme Court PD 22 (1) 477, at 481, wrote that when the accessory supplies a tool for committing the crime, such as a vehicle or weapon – it is sufficient that the accessory supplied the tool that is used to commit the crime for the purpose of committing a crime of the same type that was committed, but not necessarily for exactly the same crime. The Honorable Justice Landau said that this ruling, which is based on English case law, applies "**at least in those cases in which the accessory leaves it to the principal offender's 'discretion' to choose the appropriate time and place for realizing their joint criminal intentions**."

In the above mentioned case, the Honorable Justice Landau ruled that, even if the appellant (who was acquitted in the end) were to prove that he gave his car to the principal perpetrator of the robbery in order to make it easier for him to escape from the scene of the crime – it is not necessary to prove that he planned to rob the specific tourist who, in the end, was robbed.

157. The requirement that the Defendant be aware of the existence of a specific crime with a concrete purpose also consists of the "rule of transferred intent", which is expressed in Section 20 (c) (2) of the Penal Code, 5737 – 1977.

This Section states with respect to criminal intent that "**it makes no difference if the act was committed against another person or another asset than the one that was planned**" (see: Y. Kedmi, **On Criminal Law – Updated and Completed**, 1996 edition, Part One, on p. 38). On the basis of this principle it was ruled, even before Section 20 (c) (2) of the law was enacted in 5754 [1994], that, "**if he intended to murder this person and he did kill that person, he is judged as a murderer**" (Criminal Appeal 406/72, **Snir v. The State of Israel**, Supreme Court PD 28 (1) 234, at 242 – 243; Criminal Appeal 388/76, **Ibrahim v. The State of Israel**, Supreme Court PD 31 (1) 601, at 607; Criminal Appeal 6059/92, **Shibam v. The State of Israel**, Supreme Court Compendium 93 (4) 255; Criminal Appeal 887/96, **Biton v. The State of Israel**, Supreme Court Compendium 97 (1) 848). As the Honorable Justice H. Cohn wrote in the above-cited **Snir Case**, "**We do not consider that criminal intent must be directed at a particular person specifically.**" This is also a principle of English law, as is noted by the Honorable Justice H. Cohn.

[Stamp] P 7: 000441

C.  **The Crime of Solicitation and the Distinction Between the Joint Perpetrator and the Solicitor**

158. Section 34 (d) of the Penal Code, 5737 – 1977, states:

> **"Unless otherwise stated in the statute or implied therein, every law that applies to the principal perpetrator of a completed crime also applies to an attempt, solicitation, attempt to solicit or aid the same crime."**

This leads to the conclusion that it the liability of the solicitor is the same as that of the primary perpetrator, insofar as the solicitor is considered a main partner of the joint perpetrator – unlike the accessory, who is considered to be a secondary partner – in that he makes a material contribution to the occurrence of the crime, which is reflected in the fact that he caused another person to commit a crime (see: the statements by the Honorable Presiding Justice A. Barak in the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, on p. 404, which relates to the solicitor, despite these points, as an "indirect partner", and the statements by the Honorable Justice D. Beinisch in Criminal Appeal 8464/99, **Avigdor Eskin v. The State of Israel**, PD 55 (2) 65, on p. 82 – 83, in comparison with the statements by the Honorable Justice M. Cheshin in the above mentioned matter of **John Does** on p. 416, who expresses reservations with respect to the expression "indirect partner", insofar as in his opinion, the contribution by the solicitor is a direct contribution, just like the contribution of a primary perpetrator).

[Stamp] P 7: 000441 [continued]

The provision contained in Section 34 (d) of the Penal Code is derived from the reference to the solicitor as a primary partner to the perpetrator of the offense. Therefore, it was established in this provision, which is also emphasized in case law, that the punishment of the solicitor is identical to that of the primary perpetrator. (See: the above mentioned Civil Appeal 2796/95 in the matter of **John Does**, on p. 401 – 402, 415; the above mentioned Criminal Appeal 8464/99 in the matter of **Eskin**, on p. 82; the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam**, on p. 42 – 43.)

159. In the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, the Honorable Presiding Justice A. Barak clarified (on p. 404) the liability of the solicitor for the commission of the crime and its significance, saying:

> **"The contribution of the person who solicits the crime is reflected in the fact that he caused the perpetrator to decide to commit the crime (S. Z. Feller in his above mentioned book (8) on p. 228). He is the one who influenced the perpetrator – whether he is an independent (or principal) perpetrator or a joint perpetrator – to the state at which he made the decision to commit the crime and took measures to carry it out (whether an attempted or a completed crime). He is the 'spiritual father of the crime' (M. Gur-Arye 'Proposed Penal Code (preamble and general), 5752 – 1992' (13), on p. 46). In fact, society wishes to protect itself not only against one who perpetrates a crime – whether he is an independent perpetrator or a joint perpetrator – but also against a broader group of people who cause others to commit crimes...**
>
> **The 'proximity' of the person who solicits the crime is reflected in the fact that he is the one who planted the criminal thought of perpetrating the crime in the principal criminal's heart. He is the '*auteur intellectuel*' of the crime (see Feller in his above mentioned book (8), on pp. 225 – 226). He is the one who causes the perpetrator to develop the idea of perpetrating the crime – whether he planted the idea in advance or whether he tipped the scales when the perpetrator was hesitant."**

The Honorable Justice M. Cheshin ruled in the above mentioned matter of **John Does**, on p. 415, that the act of the person who solicits is primarily reflected in the fact that, in his conversation with another, he causes him to commit a crime that, in the absence of the solicitor, would not have been committed at all.

[Stamp] P 7: 000442

These points lead to the question of the causal relationship required between the solicitation and the commission of the crime by the one who was solicited. The Honorable Presiding Justice Barak ruled, in the passage quoted above, that the solicitor is the one who influenced the perpetrator to decide to commit the crime, whether he planted the idea in advance or whether he tipped the scales when the perpetrator was hesitant (on p. 404).

In the above mentioned Criminal Appeal 8469/99 in the matter of **Eskin**, the Honorable Justice D. Beinisch ruled (on pp. 78 – 79), with regard to the nature of solicitation and the requirement for a causal relationship, that "**the main point is that the behavior of the solicitor has 'potential effectiveness' that is likely to influence the person being solicited to commit the crime which constitutes the object of the solicitation, so that there is a causal relationship between the soliciting behavior and the initial perpetration of the crime.**" However – the Honorable Justice Beinisch continued (on p. 79):

> "**Within the framework of the elements of solicitation, it is not necessary, and it is not even sufficient, for the initiative or the idea for commission of the offense to be that of the 'solicitor.' The circumstantial element of the offense of soliciting – the existence of another (the 'solicitee') who needs to be mentally motivated to make a decision to perpetrate the offense – is likely to exist even in situations where the idea of the offense first arose in the thoughts of the 'solicitee'**

> **but did not develop into a decision to commit it. In such a case, if the behavior of the solicitor caused the final decision of the 'solicitee' to commit the offense, then the factual basis for the offense of solicitation has been established."**

160. With respect to the mental element of the offense of solicitation, the Honorable Justice D. Beinisch ruled in the above mentioned Criminal Appeal 8469/99, in the matter of **Eskin**, on p. 81:

> **"In general, in order to establish the mental element within the framework of the act of solicitation, it must be proved that two requirements have been met: first, the solicitor must be aware that his behavior is capable of bringing another (the 'solicitee') to commit the offense which constitutes the object of the solicitation. This requirement refers to awareness of the quality of the soliciting behavior and also aware of the existence of the other, who requires mental motivation in order to commit the offense which constitutes the target of the solicitation. Second, the solicitor intends to bring the solicitee to the point of committing the offense which constitutes the target of the solicitation. In other words, the solicitation needs to be accompanied by an aspiration – an objective – on the part of the solicitor, for the offense in question, including all of the elements thereof, to actually be perpetrated by the 'solicitee' (S. Z. Feller in his above mentioned book (Volume 2) (18), on p. 234)."**

161. The case law that pertains to the liability of a solicitor – in contrast to the case law that pertains to the liability of an accessory – does not state that the solicitation must relate to a particular offense with a concrete purpose, perhaps because this is self-evident. However, this requirement is built into the elements of the offense of solicitation and is *a fortiori* obvious with regard to the solicitor, whose punishment is identical to that of the principal perpetrator (as opposed to the accessory, whose punishment is half of that of the principal perpetrator). In order to prove the offense of solicitation, it is necessary to show a causal relationship between the solicitation and the commission of the main crime by the solicitee, and, furthermore, to show the solicitor's objective and aspiration for the offense to be committed. All of these require the solicitation to refer to a specific crime with a concrete purpose, as has also been ruled in the case of the accessory. Thus, Prof. S. Z. Feller wrote in his book, **Fundamentals of Criminal Law**, 5747 – 1987, Volume 2, on p. 226:

[Stamp] P 7: 000443

> **"It is appropriate to explain in advance that the concept of solicitation, as a form of partnership in the offense, has a meaning that is not always apparent from the ordinary use of this term. This is a meaning that reflects the relationship between one individual and another, the solicitor and the solicitee, and not the relationship between an individual and a group of persons in a situation where the individual incites, agitates, and provokes a certain group of persons, without any distinction between the individual identities of the persons in that grop, to perpetrate criminal offenses.**
>
> **These actions are likely to give rise to specific offenses, and even if some form of the word "solicit" is used to define them, this is not "solicitation" as a form of partnership in the offense, which we will discuss below."**

However, as has been ruled in the case of the accessory, it is not necessary to prove that the solicitor was aware of all of the details involved in the offense which constituted the object of the solicitation, and it is sufficient for him to have solicited the perpetrator to commit a crime of the same type as the crime that was finally committed (see Section 145 above). Furthermore, in the matter of solicitation as well, obviously, the principle with respect to intent is transferable: it makes no difference if the crime is eventually committed by another person.

**In summation**: It is not possible to convict a person for the general offense of solicitation to commit acts of murder when he calls

for the perpetration of terrorist attacks against Israel; the offense which is appropriate to this purpose is that of inciting to violence or to terrorism exists for this purpose (see Section 144 (d) (2) of the Penal Code, 5737 – 1977). Similarly, it is not possible to convict a person of the general offense of being an accessory to murder when he supplies money or armaments for the perpetration of various non-specific offenses. The offense which is appropriate to this purpose is that of supplying means for the perpetration of a crime in accordance with Section 498 of the Penal Code, 5737 – 1977, that was legislated especially in order to deal with situations in which definite knowledge of the intent to perpetrate a particular offense cannot be proved, so that the person cannot be considered an accessory (see the explanatory note to the Amendment of the Penal Code Draft Law (No. 36) 5733 – 1972, Draft Laws 5733 [1972] 1021, on p. 20).

162. With respect to the line distinguishing between the solicitor and the joint perpetrator, the Honorable Presiding Justice A. Barak ruled in the above mentioned Criminal Appeal 2796/95, in the matter of **John Does**, on p. 406, that **"the contribution of the solicitor lies in the fact that he caused the creation of the mental element in the perpetrators"**, and that **"the more intensive the solicitation by the solicitor, and the more it involves, not only actions on the mental level but also actions on the factual level, the closer the solicitor comes to being a joint perpetrator**." In the above mentioned matter of **John Does**, the minor referred to as "T" was convicted of murder as a joint perpetrator and not only as a solicitor, for having thrown a grenade at Arabs, even though he refused to join the action itself – because it was ruled that he participated in planning the offense and was "**the first and foremost of them all**" (on pp. 408 – 409).

With respect to the distinction between the accessory and the solicitor, the Honorable Presiding Justice A. Barak said (on p. 406) that, when assistance is "spiritual", the accessory may become a solicitor: **"The dividing line distinguishes between assistance to someone who has already developed his own criminal thoughts (the accessory) and contributing to the development of that criminal thought (solicitor)."**

In the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam**, the Honorable Justice Y. Kedmi ruled (on p. 63):

[Stamp] P 7: 000444

> "As set forth above, the liability of the 'joint perpetrator' is founded –
> in accordance with that which has been set forth in Section 29 of the
> Penal Code – on 'participation' – commission of a crime by 'taking
> action' to commit it… and in the absence of an 'act of participation' –
> in accordance with that which has been set forth – there is no basis for
> responsibility of this type… By contrast, the liability of the 'solicitor'
> for the commission of a crime by another person is founded on the
> performance of an 'act of solicitation', one of the acts listed in Section
> 30 of the Penal Code. This act does not constitute an 'act of
> participation' in the perpetration, but rather leaves the person
> performing it 'outside' of the circle of perpetration."

At 66, the Honorable Justice Y. Kedmi wrote:

> "In theory, the distinction between the solicitor and the joint
> perpetrator is founded on the fact that the contribution of the solicitor
> to the commission of the crime is the creation of the 'mental element
> which must be present in the solicitee in order for him to commit the
> offense of which he is the principal perpetrator; whereas the
> contribution of the joint perpetrator is, primarily, on the level of the
> behavior which constitutes the offense, since he is required to
> 'participate' by taking action toward the perpetration of the crime (in
> this regard, see Feller's above mentioned book (Volume 2) [20] on p.
> 196, 228). In practical terms, however, the boundary line between the
> solicitor and the joint perpetrator is drawn between a person who
> 'participates' in the perpetration – meaning someone who belongs to
> the inner core of perpetrators – and someone who is only 'involved' in
> the perpetration, meaning that he is outside the inner circle of
> perpetrators."

## D.  The Responsibility of the Leader of the Criminal Group as a Joint Perpetrator or as a Solicitor

163.  For the purpose of determining a defendant's liability as a joint perpetrator or a solicitor,
Courts have given decisive weight to the fact that the defendant is a leader of the criminal
group that perpetrated the principal offense. According to the above mentioned Criminal
Appeal 2796/95 in the matter of **John Does**, the minor referred to as "T" was convicted as
a joint perpetrator and not simply as a solicitor, although he did not actually join in the

[Stamp] P 7: 000444 [continued]

perpetration of the offense of murder itself, because he participated in the planning and was a leader of the group, and in the language of Honorable Presiding Justice A. Barak, he was "the first and foremost of them all".

In the above mentioned Criminal Appeal 8461/99 in the matter of **Eskin**, the Defendant was convicted for soliciting the offenses of arson and unauthorized entry to a place of ritual or burial, which were committed by a person who was subordinate to the Defendant and accepted his authority; the Court emphasized the fact that the Defendant was "a leader and a guide" and the fact that the Defendant was the one who gave his "consent and authorization" for the perpetration of the offense and received a report after the perpetration was completed (on p. 77 – 81, 84, 90 – 91). In spite of this, it should be noted that the Defendant in that case took part in planning the crime and provided monetary aid for its commission. In those circumstances, the Honorable Justice D. Beinisch noted, as an *obiter dictum*, that it might have been possible to convict him as a joint perpetrator and not only as a solicitor, when she said (on p. 84):

> **"Even if we were to have said that the main 'contribution' of the appellant to the perpetration of the offense was in giving his 'authorization' to the criminal plan and its realization, in these special circumstances, it is possible that 'consent' to the perpetration could be considered participation 'in the perpetration of an offense while taking action toward the perpetration thereof', in accordance with that which has been set forth in Section 29 of the Penal Code."**

In this statement, the Honorable Justice Beinisch refers to the statements by the Honorable Justice Y. Kedmi in Criminal Appeal 5589/98, **Bisan Sultan v. The State of Israel**, Supreme Court Compendium 99 (3) 98, Section 9. In that case, the appellant was convicted for premeditated murder when it was proved that he had given his consent and authorization for perpetration of the murder, and had sent the joint perpetrator to actually commit the murder and had even instructed him in the method to be used.

Judge Kedmi emphasized that, without the consent of the appellant, the murder would not have taken place, and therefore the approval he gave for the murder could be compared to **"the opening shot that starts the athlete running,"** and can be considered "an act of participation in committing the offense." Therefore, the appellant was convicted as a joint perpetrator and as a solicitor, and the Court emphasized that he was found to be "in the inner circle of perpetration", as someone who had a role in its perpetration and was "the brains of the group", whereas someone who solicits a crime is outside of the inner circle of perpetration.

[Stamp] P 7: 000445

The Honorable Justice Kedmi added that in the circumstances described above, in which the appellant had given "a green light for murder" and had provided operational guidelines for how it should be done, his behavior was at least "**a full measure of solicitation by way of encouragement**." Also in the above mentioned Criminal Appeal 8469/99 in the matter of **Eskin**, it was ruled that the fact that the appellant had approved setting the fire as a leader or guide was sufficient to lead to the conclusion that this approval constituted encouragement for the principal perpetrator to transform the idea of arson into action (on p. 93).

164. The question of the liability of the leader of a criminal group who did not physically participate in the offense committed by those who accepted his authority arose, with all due severity, in the above mentioned Additional Procedure 1294/96 in the matter of **Meshulam**. In a majority opinion by six justices, the Court ruled that a master criminal, who is a leader of a group of criminals that commits offenses as his agent and in accordance with his planning and his orders, is not simply a solicitor: he is considered a joint perpetrator because of the complete control that he has over the perpetration of the offense and its perpetrators. The Honorable Justice D. Dorner expressed her belief, in a minority opinion, that a person of this type should be viewed as no more than a solicitor (on pp. 42 – 47). Another opinion, in accordance with which the leader of a criminal organization should be viewed as a "perpetrator by means of another", in accordance with Section 29 (c) of the Penal Code, is expressed in the articles written by M. Kremnitzer, "**The Perpetrator in Criminal Law: Main Characteristics**" [Hebrew], *Plilim* 1 (5750 – 1990) 65, on p. 72, and M. Gur-Arye, "**Aspects of Crime – Amendment 39 to the Penal Code as Tested in Rulings**" [Hebrew], *Megamot Biflilim*, on p. 83. The article by Prof. Kremnitzer states, on p. 72:

> "**It seems that we do not need to explain at length that the usual concepts of indirect participation (accessory and solicitation) are not adequate with regard to criminal phenomena such as war crimes, crimes committed**

[Stamp] P 7: 000445 [continued]

by a criminal state (Nazi crimes) or by a criminal organization (the 'Mafia'). A person who is in a position of control in these types of systems (and not only the person at the top of the hierarchy) who gives the order to kill a person is not simply soliciting or an accessory to murder when his command is perpetrated. The special nature of this act is evident in the fact that,when he gives the command, he can rest assured that his orders will be followed without being acquainted with the physical perpetrator. He knows that if one of the possible organizations that might implement the order does not, another will. The main point is – the task will be done.

The direct perpetrator does indeed control the act (he commits it with his own hands with the required mental basis and not under duress), although from the perspective of the one who gives the order, he is perceived in an entirely different manner – as an anonymous, replaceable figure, much like a bolt or a wheel in the operating mechanism of the organization, which is in the hands of the person who gave the orders. The fungibility of the direct perpetrator transforms the one who controls the organization into a perpetrator by means of another."

165. In the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam**, the Honorable Justice A. Matza ruled that "**a participant of this type – who has full control over the perpetration and overall activity and not only solicits and prepares but also gives orders to the worker-criminals and supervises their activities – is a joint perpetrator in every way**" (on p. 27). He emphasized that presence at the scene of the crime is not an essential basis for person to be a joint perpetrator, and he said (on p. 30):

"In the new legal reality, making direct liability contingent upon presence means that the 'godfathers' and leaders of criminal groups who send 'little fish' who obey their authority to the scene in order to perpetrate the crimes while they direct the criminal activity from a distance would not be considered joint perpetrators but only people who solicit the crime. This possibility, which certainly does not reflect the desirable law, is also not required by the actual law."

The Honorable Justice A. Matza emphasized, with respect to the control the leader has over his people, the fact that the Defendant was able to order his people to desist from committing the crime (on p. 32, and see also the statements by the Honorable Justice Kedmi on p. 63).

[Stamp] P 7: 000446

The Honorable Presiding Justice A. Barak joined the Expert Opinion of the Honorable Justice A. Matza but emphasized the fact that the Defendant in that case was present at the scene of the crime until he was arrested and that he put the criminal plan into motion (on p. 50). The Honorable Presiding Justice Barak ruled (on p. 51):

> **"The status of Meshulam does not allow considering him merely as the solicitor of the crime. Meshulam was the head of the group. He was a leader. He planned the operation. This was his operation. He is not one with a criminal idea: he is not simply the 'spiritual father' of the crime. He is not an external person who is asking someone else commit a crime. He made an internal contribution to the commission of the crime… In Meshulam's hands, as the head of the group, was effective control of the criminal event and he had the criminal thought that was required in order to establish his liability as a joint perpetrator."**

The Honorable Justice M. Cheshin also ruled (on p. 55): "**Master criminal John Doe, who initiates, plans, determines**

[Stamp] P 7: 000446 [continued]

the tasks and sends his 'soldiers' to commit the crime" – is considered a joint perpetrator even if he is not present at the scene of the crime. He added that a person of this type is not considered merely a solicitor, whose responsibility is less than that of a joint perpetrator. The Honorable Justice M. Cheshin stated (on p. 59):

> **"From this, we know that our classification of the master criminal as a solicitor – as opposed to a as joint perpetrator – is like reducing his responsibility and making it easier for him. 'The soldiers' that the master criminal dispatched to commit the crime will bear full responsibility for the various crimes that they committed while he – the mastermind and supreme leader – will bear lesser responsibility, even though 'an ordinary person could have been aware of the possibility' that one of the various crimes was being committed. This conclusion is puzzling, strange and hard to accept."**

The Honorable Justice M. Cheshin further stated (on p. 59):

> **"Would it be acceptable for the mastermind to be beneath the 'soldiers' who do his bidding? If indeed the mastermind is the mastermind – without whom the octopus partners to the crime could not have moved his tentacles – it is difficult for us to accept that his liability could be less than the liability of a joint perpetrator. The evil spirit of the leader pervades the entire criminal operation, his mind wound the operating spring before it was set in action and while the crime was being committed he was 'present' with the criminals as a joint perpetrator, together with them. He will continue to be 'present' with them unless or until he takes overt action to prevent the crime, nothing less."**

The Honorable Justice Cheshin justified this conclusion with an analogy that he drew from Section 29 (c) of the Penal Code when he considered the leader sending his "soldiers" to commit a crime as if he were someone "committing the crime through another" when he said, **"'Soldiers' will obey the orders of their leader to the point that they completely erase their will in favor of his"** (on p. 60). With respect to the Defendant in that case, the Honorable Justice Cheshin emphasized that, **"his liability is derived from the fact that he planned and perpetrated the 'rebellion' prior to his arrest – the planning and perpetration of the leader – that responsibility is continued even after his arrest as long as he did not do anything apparent to stop the wagon from rolling down the hill"** (on p. 61).

The Honorable Justice Y. Kedmi ruled in this spirit when he wrote (on p. 66 – 67):

[Stamp] P 7: 000447

"In this situation, when the involvement of the leader of a group that has decided to commit a crime is expressed through planning, guidance and division of responsibilities, the question of whether the person before the Court is a 'joint perpetrator' or a 'solicitor' will be determined by the nature of his 'involvement': if this was 'involvement' that makes a contribution equivalent to 'participation' in the perpetration or whether it is only the external 'involvement' of solicitation.

The implementation of this distinction is not always easy but it is always possible. In any case, when considering a leader – or the head of a group – who presents his followers and minions with a concrete plan for the commission of a crime, when this includes a division of tasks and orders for the manner of its commission, there can be no doubt that this is not a 'solicitor' but rather a leader whose 'participation" is manifested in the stated 'act of planning.' The 'act of planning' – as distinguished from the 'act of solicitation' – is an act of 'participation' in the act because it is actually the first stage of bringing the criminal plan into being, in other words, of the perpetration. This is unlike 'solicitation', which is not part

[Stamp] P 7: 000447 [continued]

of the perpetration but rather an external motivation for the operation.

As was explained above, assistance in this respect can be found in the examination of the existence of a 'relationship of control.' The existence of a 'relationship of control' will confirm that the group leader is a 'joint perpetrator' with everything that derives therefrom; in an instance where there is no 'relationship of control' as explained above, this will be an indication of the possibility that is a case of involvement that gives rise solely to the liability of a 'solicitor'."

166. The Honorable Justice Y. Kedmi reiterated this approach in Criminal Appeal 4720/98, 5310/98, 5454/98, **Nahman Cohen _et al._ v. The State of Israel**, _Dinin Elyon_, Volume 57 366. In this case, Nahman was convicted as a joint perpetrator after it was proved that he was the one who had initiated, requested and led the murder plot and the one who confirmed the identification of the intended victim when he was presented with it. The Honorable Justice Y. Kedmi wrote (in Section 9):

"As I see things, and as I have explained this on more than occasion in the past, 'the leader' of a group, who initiates and leads the perpetration of a crime by the group, is included among the 'perpetrators." The leader 'participates' in the commission of the crime in accordance with the meaning of this requirement in Section 29 of the Penal Code. His fate is entwined with the fate of the actual perpetrator; he bears liability as if he were 'right next to' the perpetrators while they were committing the crime. This is the legal standing of the 'leader' and this is the legal standing of 'the planners' and those who fulfill other 'essential roles' whose contribution to the act formally 'end' before it actually begins but remain an inseparable part thereof. The fate of these – the leader, the planner and their ilk – is connected to the fate of those who actually commit the act: they are one body, and all of the limbs bear responsibility for what the 'hands' do.

As I see things, the leader of the 'group' whose members have committed a crime did not 'solicit' the members of the group but rather he is their leader who 'guides' them to the realization of their joint scheme. The solicitor is outside of the inner circle of 'commission'; the act of solicitation is pure solicitation, in other words: it is an independent and separate act from the overall effort of perpetration. Whoever 'participates' in the perpetration – and as I see matters, as required by that which has been set forth above, must give the concept 'participation' in this context a broad meaning – cannot be a 'solicitor.' The 'solicitor' and the perpetration of the crime are 'separated' by the perpetrator who is characterized by 'playing a role' in the perpetration, and instead of the 'solicitor' being accompanied by 'participation in a role' in accordance with that which has been set forth above – the person before us is not a 'solicitor' but rather a 'joint perpetrator'."

[Stamp] P 7: 000448

**3.   Conclusions with Respect to the Defendant's Liability as a Joint Perpetrator, Solicitor and Accessory**

167. Analysis of the evidence presented above leads to the following factual conclusions with respect to the share and role of the Defendant in the terrorist attacks that are the subject of the indictment:

a.  The Defendant was the commander of the Fatah and Tanzim in the West Bank. He was a field leader of the Fatah in the West Bank and responsible for the "military operations" of the Fatah in all parts of the West Bank. The expression used by the Defendant, such as "military operations", is nothing more than a euphemism for terrorist attacks against Israel that have been carried out by the field cells of the Fatah, which were organized into the Tanzim movement and the framework of the al-Aqsa Martyrs Brigades. The Defendant established the al-Aqsa Martyrs Brigades and was responsible for their activities as the leader and commander of the members of the field cells and their commanders. For these activities, the Defendant was directly subordinate to ██████████████████████████████. The "military" activity of the Defendant described above continued in parallel with his political activity as Secretary General of the Fatah in the West Bank and as a member of the Palestinian Legislative Council.

b.  The Defendant was of the opinion that Fatah was obligated to lead the "armed struggle against Israel," and therefore publicly supported terrorist attacks against soldiers and settlers. This was the declared position of the Defendant, who explained that from his perspective, women and children living in the settlements were also considered an enemy to be attacked. The Defendant was opposed, a matter of principle, to terrorist attacks within Israel, meaning over the Green Line, and also opposed suicide terrorist attacks. However, in practice he did not cease his support for his men and helped them by supplying money, weapons and explosives even after he learned time and again that they were carrying out terrorist attacks, including suicide terror attacks, inside Israel. Thus, the Defendant expressed his agreement to all types of terrorist attacks that have been carried out by people in the field who were affiliated with Fatah. This position of the Defendant was also expressed in his media appearances, in which he encouraged Fatah operatives and others to carry out terrorist attacks against Israel and also praised those who perpetrate the terrorist attacks – including those that were carried out within Israel.

[Stamp] P 7: 000449

c.  The Defendant did not have complete control over members of the cell and their commanders. However, he did have a great degree of influence over them, because he was their leader and because of the assistance that he extended to them, including money, weapons and explosives. The influence of the Defendant on members and commanders of the cells is also evident in that he would, on occasion, instruct them to cease the terrorist attacks against Israel and then later call for them to renew the terrorist attacks – sometimes in accordance with orders that he received from ███████ ███████ would not give his orders in an explicit manner, but would make sure that his subordinates clearly understood when he was interested in a cease-fire and when he was interested in terrorist attacks against Israel. ███████ himself also considered the Defendant to be the person who controlled people in the field and therefore he would reprimand him when a terrorist attack was carried out against the opinion of the ███████

d.  Members of cells in the field and their commanders did have a great degree of independence when carrying out terrorist attacks. They generally did not involve the Defendant in the planning of the terrorist attacks and there is no evidence that they would report to him prior to the perpetration of a terrorist attack (other than a few solitary cases). In spite of this, the Defendant would receive a report from the commanders subsequent to each terrorist attack. This pattern of activities is an outgrowth of the Defendant's desire, and the desire of the field commanders, to protect the Defendant from Israel and to maintain him as a "political figure," who is not involved, as it were, in the murderous terrorist attacks against Israel. For this reason the Defendant did not have direct contact with those who carried out terrorist attacks, other than in exceptional cases. Thus, the Defendant also was careful not to personally assume responsibility on behalf of the Fatah or al-Aqsa Martyrs Brigades after the terrorist attacks had been perpetrated; this was done by the cell commanders. The Defendant was satisfied with taking general responsibility through the media in an indirect overall manner, without relating to any specific terrorist attack, by expressing support for the terrorist attacks that had been perpetrated.

e. Other than the overall supreme liability of the Defendant for all of the members of the Tanzim and al-Aqsa Martyrs Brigades, insofar as he was the commander, he also had better control over a few cells that operated under the command of people who were his close advisors and benefited from his special assistance and support, such as ███████ ████████████████████████

   The Defendant took responsibility during an interrogation for the activities of the groups that operate under the command of these people (other than ███████, although he claimed that he was only one of the "addresses" to which these people turned in order to receive assistance and funding, and that he did not have complete control of them but rather only influence over them.

f. The Defendant generally did not have direct contact with people in the field who perpetrated the terrorist attacks; the connection was through people who were close associates of Defendant and who worked in his environs, including ███████████████ ████████████████████ These people worked in the Defendant's environs and with his support, planned and brought about murderous attacks, using the money, weapons and explosives which the Defendant was careful to supply them with for this purpose.

g. The Defendant was responsible for the supply of money, weapons and explosives to cells in the field through his associates, including ████████████████ ████████████ He would refer their requests to ██████ for his approval and was responsible for the purchase of weapons and supplying the cell members through his close associates. The Defendant also proffered assistance to wanted men and to the families of the terrorists.

h. In spite of the fact that the Defendant, like his men, was generally careful not to involve himself personally in the planning and the perpetration of the terrorist attacks, unequivocal evidence was submitted with respect to four terrorist attacks that had been carried out with the knowledge, approval and encouragement of the Defendant. He even initiated two of them.

   The terrorist attack at the gas station in Givat Ze'ev, in which Yoela Chen, of blessed memory, was murdered, was carried out as a result of direct orders given by the Defendant to his men, in revenge for the assassination of ████████████, and the Defendant admitted to responsibility for this terrorist attack during the course of his interrogation.

[Stamp] P 7: 000450