Defendant with a request to purchase weapons and noted that they have perpetrated many attacks against the army and settlers and have become wanted; the Defendant's handwriting is also found on this document (in accordance with the Expert Opinion of DIFS Prosecution/5).

68. During the course of his interrogation, the Defendant explained that the cells, as well as individual cell members, would approach him to ask for money to fund the purchase of weapons and for other reasons, and he would submit their requests to Yasser Arafat (Transcript Prosecution/19 Section 14, Transcript Prosecution/22 Section 6 and Transcript Prosecution/25 Sections 14, 19, which were submitted and verified by an interrogator by the name of "Mofaz", on p. 58; Transcript Prosecution/70 Section 10, which was submitted and verified by an interrogator by the name of "Steve", on p. 53; transcripts of the Defendant's interrogation: Prosecution/98 (d) on pp. 13 – 16, 20 – 21; Prosecution/98 (k) on pp. 7, 17 – 18, 30; and Prosecution/90 8 (j) on pp. 13 – 14). He said that his requests to Arafat would not specify that the money was intended for the purchase of weapons (Transcript Prosecution/30 Section 6, which was submitted and verified by an interrogator by the name of "Emile", on p. 54). In context of this activity, approximately 15 weapons and ammunition for them were purchased and used for terrorist attacks (Transcript Prosecution/29 Section E, which was submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/60 Section 5, which was submitted and verified by an interrogator by the name of "Emile", on p. 54).

The Defendant emphasized that the military operations could not have taken place without funding from Arafat (Prosecution/60, as mentioned above, Section 7). He explained the issue: **"There is someone who comes and says 'I want a thousand shekels', he might receive a thousand shekels. I do not ask him, maybe next week he will go shoot, I do not care"** (Prosecutions/98 (k) on p. 30). During the course of his interrogation, the Defendant could not remember the details of the financial assistance that he gave to Fatah field operatives and explained that hundreds of operatives would approach him with requests for financial assistance in order to fund military activities (Transcript Prosecution/49 Section 10, which was submitted and verified by an interrogator by the name of Emile on p. 54).

69. Within the framework of purchasing weapons for terrorism operatives, the Defendant agreed to purchase a mortar for the price of 1,500 dinar, and the Defendant described the operational problems involved in its operation during the course of his interrogation (Transcript Prosecution/29 Section F and Transcript Prosecution/38 Section 2, which were submitted and verified by an interrogator by the name of "Smith", on p. 85; Transcript Prosecution/42 Sections 13-15, which were submitted and verified by an interrogator by the name of "Wadi", on p. 96; Transcript of the interrogation of the Defendant Prosecution/98 (k) on pp. 7-8). The Defendant said

[Stamp] P 7: 000401 [continued]

during interrogation that he himself opposed firing mortars at Israel because it had been proven that this does not cause damage to Israelis but could cause significant damage to the Palestinians (Transcript Prosecution/38 as mentioned above). The Defendant's version corresponds with that given by ▮▮▮▮▮▮▮, who explained that the mortar was fired at the settlement of Psagot but the Defendant asked him not to talk about it with anyone (see Section 25 above).

**(4)** **Assistance for wanted men and the families of the people arrested or killed**

70. The Defendant funded not only terrorism operatives but also members of their families. He admitted during the course of his interrogation that he had transferred to Yasser Arafat requests for assistance to families of suicide terrorists, and even justified this by saying that there is no difference between someone who perpetrated a suicide attack and someone who was killed; in his eyes they were all "martyrs", meaning they had died a holy death (Transcript Prosecution/10 that was submitted and verified by an interrogator by the name of "Danny", on p. 90; Transcript Prosecution/54 Section 5, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Conversation of the Defendant with Agent John Doe No. 3 Prosecution/124 (c) on pp. 7, 22 – 23). Similarly, the Defendant made sure to fund families of Fatah operatives who had been arrested or were wanted (Conversation of the Defendant with Agent John Doe No. 3 Prosecution/124 (c) on pp. 22 – 23).

A large number of documents that are related to this subject were seized during Operation "Protective Shield", which constitute requests for assistance that the wanted men had addressed to the Defendant, asking to purchase weapons or explosives, and in order to relieve them of the necessity of earning a living (see: Prosecution/5 (2 – 12), which the Defendant verified during the course of his interrogation and which was documented in Transcript Prosecution/47 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Prosecution/5 (64 – 65); Prosecution/5 (87); Prosecution/5 (105); Prosecution/5 (117); Prosecution/5 (118)). Moreover, the Defendant took the trouble to arrange for job appointments or places of employment for wanted men (see, for example, the Letters Prosecution/5 (78 – 79), which, in accordance with the Expert Opinion of DIFS Prosecution/5 would be very reasonable to assume that they had been written by the Defendant.

An additional document is Prosecution/5 (133), which includes a request to the Defendant for assistance to members of the Fatah movement who carried out terrorist attacks and were arrested by Israel, and for other wanted men; the Defendant noted on this document: "**It is a priority to include them in the assistance**" and in accordance with the Expert Opinion of DIFS Prosecution/5 this comment was, leaving no real doubt, written by the Defendant.

[Stamp] P 7: 000402

████████ was a Tanzim operative who murdered in an Israeli in Salfit and when he became a wanted man, he asked the Defendant for assistance and even told him about the murder he had perpetrated. He explained in his testimony that he approached the Defendant because the Defendant was known as a person who would help in cases like his but he also described the Defendant as "**a political person who did not participate in military affairs**" (on pp. 182 – 184).

**(5)** **Recruiting and training operatives for terrorist organizations**

71. During his Israel Security Agency interrogation, the Defendant confirmed the points that ████████ told the Police regarding the financial assistance that the Defendant gave for constructing a military training camp for Tanzim operatives, in order to train them in guerrilla warfare and in the use of weapons (Statement of ████████ Prosecution/149 (c) on pp. 1 – 2). The Defendant even confirmed that he personally interviewed the young people who were training in his office (Transcript Prosecution/28 Sections 10 – 11, which was submitted and verified by an interrogator by the name of "Wadi", on p. 96; Transcript Prosecution/34 Section 3, which was submitted and verified by an interrogator by the name of "Itai", on p. 52; and Transcript of the Defendant's interrogation Prosecution/98 (k), on p. 9). In his police interrogation, the Defendant denied any connection to the training or instruction of field operatives (Prosecution/106 on p. 3).

In his above mentioned statement (on pp. 6-7), ████████ spoke about how the Defendant appointed ████████ as the cell commander after the death of the previous commander. During the course of his interrogation, the Defendant also confirmed the statements that ████████ told the Police with respect to the process by which he was recruited by means of the Defendant's involvement (see Section 43 above). From the comments of the Defendant and ████████, it becomes apparent that the Defendant heard from ████████ that he intended to perpetrate a shooting terrorist attack and, therefore, referred him to ████████, who was a senior field commander and had carried out terrorist attacks against Israeli targets. The terrorist attack in which the Greek Orthodox monk was murdered was a result of this contact.

[Stamp] P 7: 000402 [continued]

### (6) The Defendant's public calls to carry out terrorist attacks against Israel

72. As already explained above, the Defendant did not deny, during the course of his interrogation, his support for terrorist attacks against military and civilian targets in the West Bank, meaning soldiers and settlers (see Sections 13 – 16 above). The Defendant also explained that he would sometimes instruct the cells that accepted his authority to stop the terrorist attacks and would then inform them to resume them anew, using public television broadcasts (see Section 16 above). The Defendant was aware of the influence his words had on people carrying out terrorist attacks and said, "**I have influence because I speak through the media. That is to say that I state the position using media outlets… My word is heard as if I were speaking in the name of the Fatah movement.**" (Transcript of interrogation Prosecution/98 (d) on p. 33; see also pages 37-39). The Defendant did not deny that cell members would turn to him to ask for assistance because he appeared as a spokesman for Fatah in the media and took a position calling for an armed struggle (Transcript of interrogation Prosecution/98 (e) on p. 61). He admitted that during his public appearances he would encourage the operatives to carry out terrorist attacks within the territories against the army (Transcript of Investigation Prosecution/98 (j) on p. 25, and Transcript Prosecution/29 Section 1 (b), which was submitted and verified by an interrogator by the name of Smith, on p. 85.)

73. The Defendant's public calls for the perpetration of terrorist attacks against Israel were documented by the Intelligence Branch and were submitted in Binder Prosecution/3 (including the original cassettes, Prosecution/3 (a) – (b)) by the head of the Research Division of the Intelligence Branch, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (on p. 38). With respect to this issue, the documents that have been included in Binder Prosecution/3, which do not document the words that the Defendant himself said on radio and television and were recorded, are to be ignored. Newspaper articles or other news items that attribute statements of one type or another to the Defendant are not admissible in accordance with the Rules of Evidence, due to the fact that their testimony is considered to constitute hearsay.

[Stamp] P 7: 000403 [continued]

In general, based on statements that were made by the Defendant in the various media outlets, it can be said that he clearly emerges as someone speaking in the name of the al-Aqsa Martyrs Brigades and the Tanzim, and as their leader. The Defendant calls in these organizations – sometimes clearly and sometimes by inference – for the contination of the perpetration of terrorist attacks against Israel. After each Israeli action, he announced on behalf of the Fatah movement and the al-Aqsa Martyrs Brigades that revenge would not be slow to follow (see, for example, the interviews on Abu Dhabi television on January 14, 2002, and August 15, 2001). Despite the Defendant's claims that he opposed terrorist attacks within Israel, in several interviews he is heard supporting terrorist attacks that have been carried out within Israel and even praised the perpetrators (see justification of the terrorist attack in Netanya in the television interview with Al Jazeera on May 18, 2001; justification for the terrorist attack in Jerusalem on Al Jazeera television on August 9, 2001; and an additional attack in Jerusalem that the Defendant justified on Watan Television on October 31, 2002.)

74. During the funeral of ▉▉▉▉▉▉ on October 2, 2000, the Defendant said on Watan Television Ramallah, "**The days in which we just offer sacrifices are over. We must seek revenge. Israelis should be killed. Israelis should be killed. Yes. We have bullets. We have rifles and they are aimed at the occupation.**"

In a telephone interview with the newspaper Asharq al-Awasat on March 1, 2001, the Defendant was asked if Palestinian resistance might evolve from rocks to weapons, and he answered, "**The armed struggle is a part of the *intifada* already and it is not limited to rocks. Since the *intifada* began, we have succeeded in killing 66 of them and injuring 416, and this is a good outcome.**"

On October 29, 2001, the Defendant was interviewed on Watan Television Ramallah and he was asked his reaction to the two terrorist attacks that had been perpetrated that day in Hadera and in Baka al-Gharbiya, and he answered: "**It is the right of Palestinian people, and in essence an obligation of its fighters, to respond to aggression and to avenge the slaughter that has taken place in Beit Rima, Bethlehem and Tulkarm. Therefore, what happened today is a natural response of Palestinian fighters to Israeli acts of slaughter.**"

On March 4, 2002, the Defendant was interviewed for the al-Zamam newspaper, which is published in London, and in accordance with reporter Nitzal Alliyati, the Defendant said

[Stamp] P 7: 000403 [continued]

that the two suicide terrorist attacks (in Beit Yisrael and Ofra) were "**Messages addressed to the Israelis that they should cease their support for Sharon.**"

After the death of ███████ on January 14, 2002, the Defendant spoke on Abu Dhabi television and called on the al-Aqsa Martyrs Brigades to carry out terrorist attacks against Israelis in revenge, (Prosecution/3 – dated January 14, 2002). The Defendant admitted this during the course of his interrogation (Transcript of Conversation Prosecution/98 (g) on p. 78).

On May 19, 2001, Watan Television Ramallah broadcast a procession that was led by the Defendant and a senior official from Hamas. During the procession, the Defendant spoke to the crowd using a loudspeaker and praised those people who had been killed during the course of the *intifada*, including the perpetrator of the terrorist attack in Netanya. In addition, the Defendant promised to continue terrorist attacks against the settlers and praised those perpetrating suicide attacks against settlers.

[Stamp] P 7: 000404

E.  **The Connection of the Defendant to the Terrorist Attacks That Are the Subject of the indictment**

75. In the indictment, the Defendant is charged with involvement in 37 terrorist attacks that were set forth in the appendix to the indictment, and which were perpetrated by field commanders and terrorism operatives who were subordinate to the Defendant.

    In its summation, the Prosecution attributed to the Defendant only 21 terrorist attacks from the list that had been appended to the indictment, and therefore this verdict will relate only to those 21 terrorist attacks for which, in accordance with the Prosecution's claims, evidence was presented that connects the Defendant to the perpetration of the attacks. Discussion of these terrorist attacks will include the evidence that has been set forth with respect to the events of the terrorist attack itself, who planned and perpetrated it, and what the Defendant's relationship was to the terrorist attack or its planners or its perpetrators.

(1) **Murder of Talia and Binyamin Kahane, of blessed memory, near Ofra**

76. On December 31, 2000, at 6:30 a.m., shots were fired from an ambush on the car of the couple, Talia and Binyamin Kahane, of blessed memory, and their five children, on Route No. 60 near the settlement Ofra. As a result of the shots, the car rolled into a ditch alongside the road. The Kahane couple were murdered in this terrorist attack (Death Certificate Prosecution/128 (a)-(b)) and their five children were injured (See the Action Report of ▉▉▉ and Superintendent ▉▉▉ Prosecution/128 (c)-(d), Photograph Boards Prosecution/128 (h)-(i) that were submitted by ▉▉▉ and ▉▉▉ during their testimony, on pp. 121, 127; and the Statement of a Public Employee given by Superintendent ▉▉▉ Prosecution/128 (e)). The interrogation conducted by DIFS found, on the basis of the bullet shells from a Kalashnikov rifle that were collected at the scene, that the weapon used in this terrorist attack was also used in terrorist attack No. 6 on the list appended to the indictment, in which Eliahu Cohen, of blessed memory, was murdered near Givat Ze'ev (Expert Opinion of ▉▉▉ Prosecution/128 (f)-(g)).

77. In his police interrogation, ▉▉▉ intimated that he was the one who supplied the weapon and ammunition to the terrorist who murdered the Kahane couple, of blessed memory, ▉▉▉ (Statement by ▉▉▉ Prosecution/149 (a) on pp. 4-6, which was collected by staff ▉▉▉ on the basis his testimony on p. 194). In the statement, ▉▉▉ said that ▉▉▉ asked him for a weapon (Kalashnikov) and ammunition in order to perpetrate a terrorist shooting attack on an Israeli vehicle near Ramallah and the next day the murder of the Kahane couple, of blessed memory, was reported to him, as he learned from the report on the radio.

[Stamp] P 7: 000405

In this case we are permitted to consider only the testimony of ▊▊▊▊ and commanded to ignore the things that ▊▊▊ told him about the manner in which the terrorist attack was carried out, because this is hearsay evidence. Consequently, this Court does not have admissible evidence showing that this murder was committed using the weapon that ▊▊ ▊▊▊ gave to ▊▊▊. Therefore, we do not have any evidence connecting the Defendant to the murder of the Kahane couple, of blessed memory (the Defendant said during the course of his interrogation that he was acquainted with ▊▊▊, who was killed by an accidentally discharged bullet – Transcript Prosecution/68 Section 2). Indeed, a large quantity of evidence was submitted with respect to the Defendant's comprehensive and supreme responsibility for the terrorist attacks perpetrated by members of Fatah on the West Bank, as the person who led this activity, who called for its perpetration and who assisted its actualization by supplying money, weapons and explosives. However, there is no admissible evidence that this particular terrorist attack was indeed perpetrated by members of the Fatah.

The only admissible evidence in this matter is that the Defendant assisted ▊▊▊▊ to purchase weapons and ammunition for the purpose of carrying out terrorist attacks, as ▊▊ ▊▊▊ and the Defendant admitted during interrogation (see Chapter C (2) above) and that ▊▊▊▊ did indeed give a weapon that he purchased with the assistance of the Defendant to Gandor for the purpose of perpetrating a terrorist attack. Beyond this, we have no evidence.

**(2)** **Murder of Akiva Pashkos, of blessed memory, in the Atarot industrial area**

78. On January 25, 2001, at 6:25 p.m., shots were fired from an ambush at the vehicle of Elazar Akiva Pashkos, of blessed memory, in the Atarot industrial area. The deceased was traveling in a GMC van and was shot with a 9 mm caliber pistol (see DIFS Opinion Prosecution/129 (c)). As a result of this shooting, the deceased died (Death Certificate Prosecution/129 (a)) and was found lifeless in his van approximately one minute after the shooting (See the testimony of ▊▊▊▊ on p. 150, report of ▊▊▊▊ ▊▊▊ Prosecution/129 (b), and his testimony on p. 132). The event is also depicted by pictures photographed by Avinoam Alia that are appended



[Stamp] P 7: 000405 [continued]

to the public documents that were submitted (Prosecution/129 (d)).

79. ▉▉▉▉▉ admitted during interrogation that he gave ▉▉▉▉ and another person a vehicle in order to perpetrate a terrorist attack, and after several hours, the two reported to him that they had shot a Jew traveling in a GMC in the Atarot area, who was injured by the shots (Statement Prosecution/165 (a) on p. 3, which was submitted by ▉▉▉▉▉ ▉▉▉▉▉ on p. 184.)

▉▉▉▉ admitted that he perpetrated a terrorist attack in the Atarot industrial area and shot a pistol at the driver of a gray GMC Safari (as can be seen in the pictures Prosecution/129 (d) which were photographed after the terrorist attack) and later reported this to ▉▉▉▉▉, who was, in accordance with ▉▉▉▉, the Defendant's **"driver and right-hand man"** (Statement Prosecution/156 (b), which was submitted and verified by the police officer ▉▉▉▉ on p. 198).

80. The Prosecution does not have any evidence that directly connects the Defendant to the above mentioned terrorist attack. However, a large quantity of general evidence has been presented showing that ▉▉▉▉▉ was the Defendant's close assistant and operated with his knowledge and under his sponsorship for organizing and carrying out terrorist attacks. The Defendant admitted that he funded terrorist attacks in which ▉▉▉▉▉ was involved, that he supported his activity and that ▉▉▉▉▉ would report to him after the terrorist attack was completed. The Defendant also admitted that from his perspective, ▉▉▉▉▉ was responsible for the military operations in the Ramallah area and that he operated in coordination with Defendant. The Defendant explained during the course of his interrogation that his connection with the terrorist cells was through ▉▉▉▉▉ (see Chapter C (3) above).

▉▉▉▉ was also close to the Defendant and during one period served as his bodyguard. The Defendant confirmed during the course of his interrogation that ▉▉▉▉ worked in his office and under his responsibility, through ▉▉▉▉▉, and he knew that the two were carrying out terrorist attacks against civilians in the Jerusalem area (see Chapter see C (4) above).

The Defendant also said during interrogation that he considered himself responsible for the activities of the cells that worked with ▉▉▉▉▉ and ▉▉▉▉ – unlike other cells – because the two were close to him and he funded their activities (see Section 60 above). The Defendant also acknowledged that he acquired influence over the cells' activities through the assistance and weapons that he gave them (see Section 61 above).

[Stamp] P 7: 000406

All this is in addition to the Defendant's overall responsibility as the commander and leader of all of the terrorism operatives of the Fatah on the West Bank, as he himself admitted (see Section 65 above) and in addition to the fact that the Defendant encouraged terrorism operatives, both publicly and individually, to carry out terrorist attacks.

The difficult legal question of whether this is enough to substantiate the Defendant's criminal liability for the act of murder that was committed in this case – when there is no evidence that ties him directly to the terrorist attack – will be considered in the chapter of conclusions.

**(3)** **Murder of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory, in Ma'ale Adumim**

81. On June 12, 2001, at 10:30 p.m., shots were fired from an ambush on the road between Jerusalem and Ma'ale Adumim, at the private car of the Greek Orthodox monk Tsibouktzakis Germanos, of blessed memory. The car, a Peugot utility-type model, had Israeli license plates. Germanos, of blessed memory, was murdered by those shots (Certificate of Death Prosecution/132 (a) and Pathology Expert Opinion of ███████ Prosecution/130 (b)). ███████████████████ (on p. 131), who submitted the report of the preliminary visit to the scene and photographs (Prosecution/130 (c)-(d)), and ████ ███████████████████████ who submitted a Statement of a Public Employee (Prosecution/130 (f)) both testified on this terrorist attack. The bullet shells that were gathered at the scene were checked by the DIFS (see the expert opinion of ████████ ████████ Prosecution/130 (g)-(i)).

[Stamp] P 7: 000406 [continued]

82. ▉ admitted during interrogation that he perpetrated the above mentioned terrorist attack and described the reasons for it. He said that he asked the Defendant about perpetrating a suicide terror attack. The Defendant referred him to ▉ and instructed ▉ to give a weapon to ▉, and so he did. The Defendant also told ▉ that the Tanzim perpetrates terrorist attacks against the army and the settlers but not suicide terrorist attacks and that he had given him the weapon for this purpose. And indeed, the weapon (Kalashnikov) that ▉ received from ▉, in accordance with the Defendant's direct orders, was the one used to murder the monk ▉, of blessed memory, as he described during the course of his interrogation, explaining that he erroneously thought that he was a settler (see Chapter C (8) above Sections 41-42).

83. The Defendant himself confirmed ▉'s words during the course of his interrogation and said that he had referred him to ▉ after he asked to commit suicide, and later heard that he had erroneously killed a Greek monk (see Section 43 above). On the basis of all this, the direct personal liability of the Defendant to this terrorist attack is clear.

(4) **Murder of Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory, on Route 443**

84. On August 5, 2001, at 10:30 p.m., the couple Yaniv and Sharon Ben-Shalom, of blessed memory, and Doron Yosef Sviri, of blessed memory (Sharon's brother) were murdered while traveling together with their two children in a Passat model car with Israeli license plates, on Route 443 by the Dor Energy gas station (see Death Certificates and Pathology Opinion Prosecution/131 (a) – (c)).

The results of the terrorist attack were described by police officers ▉ and ▉ (on pp. 123, 139 and their Action Report Prosecution/131 (d) – (e), accompanied by Photograph Board Prosecution/131 (f)). The bullets that were gathered at the site were sent to DIFS for study and it was found that they were fired from two weapons: an MP5 submachine gun and a Kalashnikov (Expert Opinion Prosecution/131 (f)).

[Stamp] P 7: 000407