with a pistol. A short time later, ▓▓▓▓▓▓ reported to him that he had shot and killed Gad Rejwan, of blessed memory, who was indeed murdered by pistol shots.

There is no evidence that connects the Defendant directly to this terrorist attack, other than the connection created by his general, indirect involvement to the terrorist attacks that were planned and perpetrated by ▓▓▓▓▓▓, as explained above (see Sections 27 and 60 – 65 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the act of murder that was carried out in this terrorist attack – where there is no evidence connecting the Defendant directly to this terrorist attack – will be examined in the chapter of conclusions.

**(12) Terrorist attack in the Seafood Market Restaurant in Tel Aviv**

107. On March 5, 2002, at 2:30 a.m., a terrorist attack was carried out at the Seafood Market Restaurant in Tel Aviv by the terrorist ▓▓▓▓▓▓ who arrived at the scene armed with an M-16 rifle, hand grenades and a knife. The incident was described by eyewitnesses ▓▓▓▓▓▓ (on p. 148) and ▓▓▓▓▓▓ (on p. 129), who were present in the restaurant at the time the terrorist attack. With the rifle in his hands, the terrorist opened fire at the people sitting in the restaurant until the weapon jammed and the hand grenade he threw did not explode. At this stage ▓▓▓▓▓▓ began to stab people, including police officer Staff Sergeant Major Salim Barakat, of blessed memory, who tried to stop the shooting spree and was stabbed to death by the terrorist. In addition to Staff Sergeant Major Barakat, Yosef Habi, of blessed memory, and Elihu Dahan, of blessed memory, were also murdered in this terrorist attack (see the Pathologist's Opinion Prosecution/139 (b) through Prosecution/139 (d)). Many others were injured. The terrorist himself was shot and killed during the terrorist attack and it was learned that he was ▓▓▓▓▓▓ (Pathologist's Opinion Prosecution/139 (k) and the DNA Tests Prosecution/139 (g)).

The result of this terrorist attack can be seen on the Photograph Board Prosecution/139 (f) that was submitted by police officer ▓▓▓▓▓▓ (on p. 151) and the presentation prepared by the Police (Prosecution/139 (a)). ▓▓▓▓▓▓ also submitted the Action Report that he wrote at the time. He was the person who took the terrorist's bloodied knife, a smashed bullet, bullet shells, bullets and the M-16 rifle (Prosecution/139 (e)). The weapon that was seized and brought to the DIFS for examination (Prosecution/139 (h) and testimony of ▓▓▓▓▓▓ on p. 130).

108. The terrorist attack at the Seafood Market was carried out by ▓▓▓▓▓▓ and was planned by ▓▓▓▓▓▓, ▓▓▓▓▓▓ and ▓▓▓, as ▓▓▓▓▓▓ said during the course of his interrogation (see Section 29 above). ▓▓▓▓▓▓'s brother (▓▓▓▓▓▓) was

[Stamp] P 7: 000413

also involved in the terrorist attack, as he explained during the course of his interrogation (see Section 55 above). He also connected ▓▓▓▓ to its planning. During the course of his interrogation, ▓▓▓▓ said that the terrorist ▓▓▓▓ had been sent to him by ▓▓▓▓ and he gave him money, bought him clothing and made sure that there was someone who could drive him to Israel in order to perpetrate the attack (▓▓▓▓. He reported to the Defendant by telephone that the terrorist attack was ready to go, and the Defendant said that he did not wish for the attack to be perpetrated within Israel. ▓▓▓▓ also said that that after the terrorist attack, the Defendant told him to tell ▓▓▓▓ not take responsibility for the terrorist attack in the media before he discussed it with the Defendant (see Section 29 above).

During the course of the conversation between the Defendant and ▓▓▓▓ after their arrests, when they were recorded without their knowledge, ▓▓▓▓ made certain to emphasize to the Defendant several times that he had said that he only discussed the terrorist attack on the telephone with the Defendant **after** it had occurred and added, "**Be careful, I was not with you, I was not with you, I talked with you on the telephone**" (Transcript of Conversation Prosecution/127 (c) on pp. 4 – 5, 11). The two coordinated their versions with respect to their interrogation on this point.

During the course of his interrogation, ▓▓▓▓ also told about his involvement in the terrorist attack (Statement Prosecution/149 (b) on p. 6 that was submitted by ▓▓▓▓ on p. 194). He supplied hand grenades, and bullets for an M-16 rifle for the purpose of the terrorist attack when he saw that ▓▓▓▓ was equipped with an M-16 rifle, before he departed for the terrorist attack. When the terrorist attack was reported during the night, including the fact that ▓▓▓▓ had stabbed a police officer to death, ▓▓▓▓ remembered that ▓▓▓▓ (▓▓▓▓'s brother) had given the terrorist a knife and explained to him to use it if the rifle jammed.

During the course of his interrogation, ▓▓▓▓ explained his involvement in the terrorist attack (Statement Prosecution/162 on p. 9, which was submitted by Staff ▓▓▓▓ on p.

[Stamp] P 7: 000413 [continued]

194, and Statement Prosecution/162 (b) on p. 4 that was submitted by ▮▮▮ on p. 184). ▮▮▮ said that he trained ▮▮▮ in the use of the M-16 rifle. ▮▮▮ (he is ▮▮▮'s brother) said during the course of his interrogation that he accompanied the terrorist to Tel Aviv and obtained a car for the terrorist attack (Statement Prosecution/182, which was submitted by ▮▮▮ on p. 182).

109. The Defendant is indirectly connected to the terrorist attacks that were planned and perpetrated by ▮▮▮, ▮▮▮ and ▮▮▮, in accordance with that which has been set forth above. However, with regard to the terrorist attack at the Seafood Market, which was planned and executed by all three of them, the Defendant is also personally responsible for its perpetration. The subject of the liability of the Defendant for this terrorist attack has been set forth above (see Sections 29, 55 and 66 (c) above). The Defendant admitted during interrogation that he gave ▮▮▮ his approval for this terrorist attack **before** it actually happened, although he did give orders that the terrorist attack should be in the Judea and Samaria region and not within Israel. This also emerges from that which ▮▮▮ said during the course of his interrogation.

**(13) Shooting terrorist attack in the Jeremy Hotel in Netanya**

110. On March 9, 2002, at 8:25 p.m., two terrorists entered the Jeremy Hotel in Netanya armed with M-16 rifles and hand grenades. The two of them threw the hand grenades and fired at passersby and tourists. The incident was described by the eyewitness known by his initial "G", who was a squad commander in the "Almog" Border Police unit. He arrived at the hotel within 30 seconds after hearing shots fired and encountered injured people while the terrorists were still shooting. "G" began to chase the terrorists, and both of them were identified on the stairs of a shopping mall in the immediate vicinity; they were shot and killed (see Pathologist's Opinion on the terrorist ▮▮▮ Prosecution/140 (h) and also the Expert Opinion with respect to the second terrorist Prosecution/140 (i)). "G" confirmed in his testimony that, most unfortunately, some of the injured were hurt by shots that had been fired by border police (on pp. 117 – 118). In this terrorist attack, the baby girl Avia Malka, of blessed memory, and Israel Yihye, of blessed memory, were murdered (see the Notification of Death Form Prosecution/140 (b)).

▮▮▮ submitted the report of the DIFS technician's attendance at the scene of the terrorist attack, which describes the resultant findings of the scene (Prosecution/140 (f) and his testimony on p. 118) and photographs of the scene (Prosecution/140 (g)). The Expert

[Stamp] P 7: 000414

Opinion of the Police Bomb Disposal Department states that a hand grenade was thrown at the hotel, and it exploded (Prosecution/140 (e)). From the report of ▮▮▮ it becomes apparent that the two M-16 rifles that were used by the terrorists were seized at the scene (see also the testimony of Superintendent ▮▮ on p. 130).

111. During the course of his interrogation, ▮▮▮ said that he had perpetrated this shooting terrorist attack in Netanya but that it was carried out by two people whose names he did not know. The two were sent to him by another terrorism operative (▮▮▮), and ▮▮ organized transportation for the two through ▮▮▮, and even gave ▮▮▮ two hand grenades and two M-16 rifles. Several hours after the two were transported to Baka el-Sharkia, from where they entered Israel on foot, ▮▮ heard on television that there had been a terrorist attack at a hotel in Netanya. He called media outlets and assumed responsibility for the perpetration of the terrorist attack (▮▮'s Statement Prosecution/174 (b) on p. 5, which was submitted by ▮▮▮ on p. 119).

With regard to this terrorist attack: it is again possible to determine on the basis of unequivocal circumstantial evidence that ▮▮ was behind this above mentioned terrorist attack, which was carried out a short time after he equipped the terrorists with M-16 rifles and hand grenades and transported them to the point on the Green Line closest to Netanya. The terrorist attack was indeed perpetrated by two terrorists armed with M-16 rifles and hand grenades just several hours after ▮▮ arranged transportation for them to Netanya, and from all this it is clear that this is the terrorist attack about which ▮▮ talked during the course of his interrogation.

There is no evidence that directly connects the Defendant to this terrorist attack, other than the connection created by his general and indirect involvement in the terrorist attacks that were planned and perpetrated by ▮▮ (see Section 96 above). The legal question of whether this is sufficient

[Stamp] P 7: 000414 [continued]

in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(14) Murder of Constantine Danilov, of blessed memory, in Baka al-Garbiyeh**

112. On March 30, 2002, at 1:00 p.m., a team of Border Police officers identified a vehicle that was traveling at very high speed in the direction of Baka al-Garbiyeh with two suspicious individuals in it. As the team followed the terrorists, the terrorists began shooting and murdered Constantine Danilov, of blessed memory, (see Death Certificate Prosecution/141 (i)). The other members of the team shot the terrorists and the explosive belt that one of them was wearing detonated. The two terrorists were killed, after they threw a hand grenade at the team (see the testimony of Chief Superintendent ▮, who participated in the incident, on p. 122).

    Photographs of the incident were submitted with the Civil Servant Certificate of Prosper Ohana (Prosecution/141 (c)). The DIFS examination determined that one of the terrorists was carrying an explosive belt that detonated on his body (Prosecution/141 (e)).

113. During the course of his interrogation, ▮ said that he sent the terrorists with ▮ and ▮, and that he obtained an explosive belt for one of them, for the perpetration of a terrorist attack within Israel. That same suicide [bomber] traveled, wearing the explosive belt, with another person to perpetrate a terrorist attack in Israel, but was killed with his companion in an exchange of fire with Border Police officers in Baka al-Garbiyeh, after they killed another Border Police officer (Statement Prosecution/173 (b) on pp. 9-10 that was submitted by ▮ on p. 191). ▮ also said during the course of his interrogation that this terrorist attack was supposed to have been perpetrated in Hadera (Statement Prosecution/172 (b) on p. 3 that was submitted by ▮ on p. 191).

114. There is also unequivocal circumstantial evidence that this terrorist attack was carried out by people who were dispatched by ▮ after he equipped them with an explosive belt. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(15) Shooting terrorist attack between Ateret and Bir Zeit**

[Stamp] P 7: 000415

On February 25, 2001, at 1:00 p.m., shots were fired from an ambush on Route 465 in the direction of Yosef Cohen's car (GMC), which was traveling from the direction of Ateret to Bir Zeit. The shots were fired from a passing car. Cohen was seriously injured in the terrorist attack and his car went off the road onto the shoulder (his testimony is on p. 142). Dozens of bullets were fired at his car and he was hit in the head by three [bullets] and in the neck by two [bullets], but he miraculously remained alive (see Transcript with regard to the condition of the car Prosecution/142 (c) and the Report on Seizure and Marking of the Bullet Casings Prosecution/142 (b) that was submitted by ▓▓▓▓ on p. 124, and also the Report of the Car Inspection Prosecution/142 (d) that was submitted by police officer ▓▓▓▓ on p. 131).

A description of the scene of the terrorist attack appears on Photograph Board Prosecution/142 that was submitted by ▓▓▓▓ on p. 139.

116. ▓▓▓▓ explained about this terrorist attack during the course of his interrogation (Statement Prosecution/165 (a) on p. 1 that was submitted by ▓▓▓▓ on p. 184; and Transcript Prosecution/165 (f) that was submitted by an interrogator by the name of "Danny" on p. 200), how he planned this terrorist attack together with ▓▓▓▓, ▓▓▓▓ and others, who asked him for weapons and a car in order to perpetrate a terrorist attack. ▓▓▓▓ gave them

[Stamp] P 7: 000415 [continued]

an MP5 rifle and bullets, as well as his car. Several hours, later they returned the car and the gun to him and told him that they had shot at a car in the area of the Atara Bridge while passing it, and that the driver of the car had been injured. ████████'s description is consistent with the evidence with regard to the way in which the terrorist attack was carried out, its location and results; therefore, there is unequivocal circumstantial evidence from which it becomes apparent that the terrorist attack about which ████████ told is the above mentioned attack near the Atara Bridge.

There is no evidence that ties the Defendant directly to this terrorist attack other than his general indirect connection to the terrorist attacks planned by ████████ and ████████ (see Section 80 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that were carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(16) <u>Attempted terrorist attack in the Biancini Pub in Jerusalem</u>**

117. On May 19, 2001, at 3:00 a.m., ████████ the owner of the Biancini Pub in Jerusalemm, discovered an explosive device that had been placed in the bathroom on the premises by ████████, who was known to her as a Palestinian from Ramallah who occasionally sold her products for hookah water pipes. In her testimony (on pp. 139 – 142), ████████ said that ████ sat with her in the restaurant in order to write an order for products and then went into the bathroom without anything in his hands. Several moments later, he exited the bathroom with a plastic bag that he placed in the center of the pub. When she asked him what was in the bag, he told her that it contained clothes. She approached the bag in order to check it and discovered that it was an explosive device hidden under a jacket, and at this stage ████ disappeared.

At the time, there were approximately 150 – 170 youths in the pub. ████ displayed praiseworthy resourcefulness and bravery: she picked up the explosive device and yelled to one of the Palestinian employees there to evacuate the young people. He also helped her to move the explosive device outside of the restaurant. The police arrived at the scene and detonated the device, in a manner that caused damage to stores in the area. This is the picture that emerges from the testimony of police sapper Eyal Albo (on p. 119, see also Expert Opinion from the Explosives Laboratory Chief Inspector ████████ Prosecution/143 (a); Expert Opinion of DIFS given by ████████ Prosecution/143 (b); and the Photograph Board Prosecution/143 (a)).

[Stamp] P 7: 000416

118. During the course of his interrogation, ▬▬▬ said (Statement Prosecution/149 (b) on pp. 10 – 12, which was submitted by ▬▬▬ on p. 194) that ▬▬▬ approached him at the beginning of May 2002, and asked him to prepare an explosive device so that he could place it in a pub on Jaffa Street in Jerusalem. He explained to ▬▬▬ that the owner of the establishment was in the habit of purchasing products for hookahs from him and he drew the pub for ▬▬▬. ▬▬▬ instructed him where to place the explosive device and explained to him how to connect the wires to a fire extinguisher that housed the charge. (Indeed, it emerges from Opinion Prosecution/143 (a) that the charge was housed in a fire extinguisher.)

    Subsequently, ▬▬▬ sent ▬▬▬ to the pub, and Jabar covered the device with a jacket. When ▬▬▬ arrived at the pub, he called ▬▬▬ and used a code sentence to inform ▬▬▬ that he was about to place the explosive device in the pub, which ▬▬▬ authorized him to do.

    ▬▬▬ called ▬▬▬ and told him that the pub owner had seen him place the explosive device and that he had heard on the news that the explosive device had been detonated by the police.

119. From that which has been set forth above, it becomes apparent that the attempted terrorist attack in the pub was carried out by ▬▬▬ with guidance and assistance from ▬▬▬. The details that ▬▬▬ gave during the course of his interrogation are consistent with the testimony of ▬▬▬, as well as the findings at the scene.

    There is no evidence that ties the Defendant directly to this terrorist attack other than his general indirect connection

[Stamp] P 7: 000416 [continued]

to the terrorist attacks planned by ███████ (see Sections 27, 60-65 above). The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(17) Shooting terrorist attack on Route No. 9, near French Hill in Jerusalem**

120. On October 3, 2001, at 11:30 p.m., shots were fired at a passing car that was traveling towards French Hill, in which Mali and Pinhas Cohen were traveling. They were wounded by the shots (see the Report of Preliminary Visit to the Scene by ███████ and his testimony on p. 132; Seizure and Marking Report by ███████ Prosecution/144 (b), Report of Preliminary Visit to the Scene by ███████ and his testimony on p. 130, and the Report of the Weapons Lab Prosecution/144 (d)).

121. During the course of his interrogation, ███████ (Statement Prosecution/156 (b) on pp. 4 – 5, which was submitted by ███████ on p. 198) said that he had perpetrated this terrorist attack together with ███████ when they were traveling in a Mazda car and he had with him the MP5 rifle, which he had received from ███████ for the purpose of shooting at Israeli targets. During the course of his interrogation, he said that after he shot at the car going into the tunnel in the direction of French Hill, he realized that it was a female driver and therefore he stopped shooting and told his companion that the gun had jammed. After this, he continued traveling in the direction of French Hill, and there he shot at another car while passing it. The next day they heard on the radio that a man and woman had been injured.

122. The evidence that has been set forth by the Prosecution with regard to this terrorist attack is very weak and includes only the reports of the police's preliminary visits to the scene, meaning that any information about the way in which the terrorist attack was carried out is hearsay evidence. Similarly, it is difficult to know if ███████'s statements relate to this terrorist attack since the date of the events he described and the type of car at which he shot are not clear.

The only evidence we have before us is that ███████ perpetrated shooting terrorist attacks against Israeli targets, using a weapon that he received from ███████, who was the Defendant's assistant and close associate. Furthermore, ███████ himself was the Defendant's bodyguard. The Defendant himself confirmed that ███████ worked in his office, was subordinate to him, and that he knew that ███████ carried out terrorist attacks against civilians in Givat Ze'ev and Pisgat Ze'ev (see Sections 33-34 above).

[Stamp] P 7: 000417

**(18) Attempted suicide terrorist attack in Beit Hanina in Jerusalem**

123. On March 8, 2002, at 4:15 p.m., the terrorist ▬▬▬▬▬ was captured on his way to perpetrating a suicide terrorist attack in Jerusalem, while he was wearing an explosive belt. The terrorist attempted to detonate the charge while he was lying on the ground and was then shot and killed (see the testimony of ▬▬▬▬▬ on p. 133, and the Report from the Explosives Lab Prosecution/145 (d)).

124. During the course of his interrogation, ▬▬▬▬▬ said that ▬▬▬▬▬ asked him to prepare an explosive belt for a suicide [bomber] and he referred ▬▬ to ▬▬▬▬▬, who gave him an explosive belt. The suicide [bomber] stayed in an apartment that ▬▬▬▬▬ rented in Ramallah, and was outfitted with the explosive belt there. Later, ▬▬▬▬▬ learned that he had been killed by shots fired by Israel Defense Forces soldiers in the Beit Hanina area, on his way to perpetrating the terrorist attack (Statement Prosecution/165 (b) on pp. 2, 11, which was submitted by ▬▬▬▬▬ on p. 171).

Aweis also related during the course of his interrogation, (Statement Prosecution/173 (b) on p. 4, which was submitted by ▬▬▬▬▬ on p. 191) that ▬▬▬▬▬, whom he had recruited for the al-Aqsa Martyrs Brigades, recruited a suicide [bomber] for him but that the terrorist attack failed because the suicide [bomber] was shot by police officers before perpetrating the attack, at the entrance to Jerusalem.

125. From that which has been set forth above, it becomes apparent that ▬▬ and ▬▬▬▬▬ were involved in this attempted terrorist attack. There is no evidence tying the Defendant to this terrorist attack in a direct manner other than the connection derived from his general and indirect involvement

[Stamp] P 7: 000417 [continued]

in terrorist attacks that were prepared and perpetrated by the two, in accordance with that which has been set forth above. The legal question of whether this is sufficient in order to substantiate the Defendant's criminal liability for the acts of murder that have been carried out during this terrorist attack – when there is no evidence connecting the Defendant directly to the terrorist attack – will be examined in the chapter of conclusions.

**(19) Shooting terrorist attack on the Beit El – Psagot Road**

126. On March 17, 2002, at 6:45 a.m., shots were fired from an ambush with automatic weaponry at the car (Volkswagen Passat) of Samir Kersh, and he was injured by the shooting (see the Report of Visit to the Crime Scene Prosecution/146 (a) and photographs of ███████████████████████ that were submitted during his testimony on p. 121).

The Prosecution did not submit any additional evidence about this terrorist attack and ███████'s report is only hearsay evidence with regard to the manner in which the terrorist attack was carried out.

In its summations, the Prosecution attributes responsibility for this terrorist attack to ███████████████, and he did admit to his involvement in this terrorist attack and was convicted for this (Prosecution/165 (g) – (q), Indictment Item No. 43). Other than this, the Prosecution did not refer to any other evidence from statements by ███████████ or things that he said during his Israel Security Agency interrogation. Therefore, no evidence was presented with regard to this terrorist attack that makes it possible to establish a clear, factual foundation for ███████████'s connection to this terrorist attack, and the evidence with regard to the actual manner in which the terrorist attack was carried out is very weak.

**(20) Attempted terrorist attack in the Malha Mall in Jerusalem**

127. On March 26, 2002, at 10:30 a.m., a Renault Express car with two sappers [Translator's note: as written; this is clearly a typo for terrorists] (███████████████ and ███████████████ – see Corpse Transport Report Prosecution/147b, which was submitted by ███████ on p. 135, and Report Prosecution/147 (c), which was submitted by ███████████████████ in his testimony on p. 134) who were on their way to perpetrate a terrorist attack, exploded.

[Stamp] P 7: 000418

128. During the course of his interrogation, ███████ said (Statement Prosecution/165 (c) on p. 5 that was submitted by Staff Sergeant ███████ on p. 171, and Transcript Prosecution/165 (k) Section 15 that was submitted by Israel Security Agency interrogator "Adam", on p. 201) that ███████ had called the Defendant the day before the car was found next to the mall in Jerusalem and told him that he wanted to perpetrated a terrorist attack. The Defendant told him not to perpetrate the attack within Israel, and referred ███ to ███████ to discuss it with him. ███████ claimed that he also told ███ not to perpetrate the terrorist attack in Israel or Jerusalem. However, the next day ███ called ███████ and told him that he had sent the car that exploded next to the mall in Jerusalem to perpetrate terrorist attack in Jerusalem.

129. The Defendant himself said during the course of his interrogation (Transcript Prosecution/36 that was submitted by Israel Security Agency interrogator "Smith", on p. 85) that ███████ reported to him on the plans of ███'s men to perpetrate a suicide terrorist attack in Jerusalem. The Defendant said that he had instructed ███████ that the terrorist attack should not take place within Israel, but rather within the Judea and Samaria region. The Defendant said on this matter during the course of his interrogation, when talking about ███████'s appeal to him about ███'s desire to perpetrate a terrorist attack (Transcript of Conversation Prosecution/198 (k) on pp. 19-20):

> "Defendant:    … that ███, he said to him that we have an action. We have terrorist attacks, etc. So I said to ███, I said to him that what is important is that there should be no terrorist attack within Israel.
>
> Investigator:   OK and when he comes officially and tells you that they want to perpetrate a suicide terrorist attack, what did you say to them?
>
> Defendant:    I told him no, I do not allow it.
>
> Investigator:   No. That is not what you told me. You said to him, no problem. But not 'inside' (within

[Stamp] P 7: 000418 [continued]

                **Israel).**

**Defendant:**    Yes, not in Israel… that is to say, that I do not want terrorist attacks in Israel."

The Defendant said that the next day he received a report from ▓▓▓▓▓ with regard to the failed attempt at a suicide terrorist attack, and that the car had exploded not far from the roadblock and two cell members were killed.

130. Based on the above, it becomes apparent that there is proof of the Defendant's involvement in approving this suicide terrorist attack, even in accordance with his version. The Defendant did give orders that the terrorist attack be perpetrated in a different place, however this is not significant for his criminal liability for this attempted terrorist attack. That Defendant's version during the course of his interrogation is supported by the version of his close associate, ▓▓▓▓▓, even though the latter "renovated" the facts and claimed that the Defendant gave orders not to perpetrate a terrorist attack at all. From the statements by the Defendant, it is clear that he gave orders to perpetrate the terrorist attack in another location.