interrogated for very long periods of time during which he slept only a little and sat bound to the chair, which he described in a conversation with Agent John Doe No. 1 (Prosecution/112 (c) (1) on pp. 3-4) as torture.

It was made clear to the Defendant that as long as he did not cooperate with his interrogators it would be necessary to continue the interrogation. It was even hinted to him that the way to meet with members of his family would be to cooperate (Transcript Prosecution/12 Section 13). During one of the interrogations, the Defendant was told that his interrogation would not end until he told the truth, as was the case for all of the terrorism operatives who eventually admitted the role of the Defendant in the acts that had been attributed to him (Transcript Prosecution/63 Sections 9 – 10). During one of the interrogations, the Defendant refused to continue with the interrogation until he was given a reasonable amount of time to sleep and the interrogator explained that he would not be allowed to sleep until he admitted to at least the main points with respect to his activities, but the Defendant rejected this proposal (Transcript Prosecution/21 Sections 26 – 28). Similarly, moral pressure was used against the Defendant to encourage him to confess and behave like a leader who takes responsibility for the acts of his subordinates, instead of denying the things that his subordinates did and presenting them as liars (Transcripts Prosecution/16 – Prosecution/17).

When considering the fact that the Defendant had been interrogated for many long hours, it is important to note that the Defendant was arrested and interrogated during Operation Defensive Shield, during a period of time in which many terrorist attacks were being perpetrated against Israel. Under these circumstances, it is clear that it was important to complete the interrogation as quickly as possible, because it was being conducted not only in order to determine his guilt but also, and perhaps primarily, for the purpose of thwarting additional attacks. The Israel Security Agency interrogators explained how important it was to them to quickly reach the terrorism operatives and terrorist cells that were connected to the Defendant, and that the interrogation of the Defendant was primarily for purposes of intelligence (the interrogator by the name of "Itai" on p. 154 and the interrogator by the name of "Wadi", on p. 97.)

Investigation of the felonies with which the Defendant is charged and the intelligence need to obtain information from him as quickly as possible required his continuous interrogation for many hours. This does not bring about the disqualification of the statements of the Defendant, since it is clear that he said to his interrogators only those things that he wanted to say and that there were warranted, relevant reasons to use this means of interrogation, because of the security circumstances that prevailed at that time (see: Y. Kedmi, **On Evidence** [Hebrew], Part One, 5764/2003 Edition, on pp. 55 – 58).

[Stamp] P 7: 000424

135. It was clear during the course of the interrogation that the Defendant had debated a great deal, aloud, to whether he should admit his connection to the terrorist attacks with which he was charged in the indictment. He even explained that this could be an obstacle for him in his future as a leader of the Palestinian people (for example, see Transcript Prosecution/24 Section 7; Transcript Prosecution/68 Section 6). In the end, the Defendant decided to admit to some of the things that he had done, after he understood that the field operatives had confessed during their interrogation and incriminated him, and that the interrogators had solid evidence with respect to the accusations that had been made against him. Therefore, the Defendant admitted only to those things that his people had previously admitted, and this was only after their statements had been presented to him upon his demand, and he repeatedly explained and made clear that he would admit only to those things that would be presented to him and that were correct (Transcript Prosecution/22 Sections 8 – 9, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58, and Transcript Prosecution/23 Section 9, which was submitted and verified by an interrogator by the name of "Danny", on p. 90). The Defendant asked to meet with the head of the Israel Security Agency and said that he would be willing to admit to those things for which he was responsible if he could be shown that others had already admitted to them (Transcript of Interrogation Prosecution/98 (a) on pp. 16 – 18, 26 – 28).

In this context, it should be emphasized that the Defendant himself said, in his conversation with Agent John Doe No. 1, that he learned during the course of his interrogation that the field operatives who had been arrested provided a large amount of reliable information about him. When the agent asked him if the information they give about him was true, he answered, "**much of it, that is to say there is proof and accuracy**" (Transcript of Conversation Prosecution/112 (c) (1) on p. 6). Further, the Defendant told Agent John Doe No. 1 that his driver (░░░░░░░░░) had provided a confession that connected the Defendant to eight suicide terrorist attacks in Israel, and when the Defendant was asked if ░░░░░░░░░ "closed him in with his confessions" – he responded in the affirmative (Transcript Prosecution/114 (a) Section 7). Throughout all of the conversations between the Defendant and Agent John Doe No. 1, it is possible to see that the subject of the confessions that had been given by the field operatives during the course of their interrogations bothered him greatly, and he was aware of the fact that they had provided real information with respect to him (see Reports Prosecution/112 (a) (1), Prosecution/113 (a), Prosecution/.113 (c), Prosecution/114 (a), Prosecution/114 (c), Prosecution/115 (a), Prosecution/115 (g) (1) (a), Prosecution/116.)

The Defendant told John Doe No. 1 that he claimed during the course of his interrogation to be a political leader, but the confessions that had been given by others against him and the large amount of material that was seized from his office and from the offices of the Palestinian Authority would force him "**to talk

[Stamp] P 7: 000424 [continued]

**during the interrogation**" (Report Prosecution/117 Sections 29, 32 that was submitted by an interrogator by the name of "Robert").

136. The turning point in the interrogation of the Defendant began on April 21, 2002, approximately one week after the Defendant had been arrested, when he decided to tell the facts from his perspective and at his responsibility, but he asked if first the information that his men had given during interrogation could be presented to him, and if he could be allowed to meet with the head of the Israel Security Agency or his deputy (Transcript Prosecution/19 – Prosecution/20). The Defendant accepted the interrogators' proposal to distinguish between his refusal to make incriminating statements to the police, which could be revealed in the future, and his providing details of his activity during the Israel Security Agency interrogation (Transcript Prosecution/20 Sections 10 – 12, Transcript Prosecution/24 Section 7). The Defendant based himself on the assumption that things he said to the police would be revealed to the public and obligate him, as opposed to things that he said during the Israel Security Agency interrogation, which the Defendant planned to deny, as indeed he did during his police interrogation and his trial. The Defendant said this explicitly during the course of his interrogation by the Israel Security Agency, when he was told atht the transcript recorded during the course of his interrogation would be submitted as evidence in Court as if they were police testimony (Transcript Prosecution/25 Section 23, which was submitted and verified by an interrogator by the name of "Mofaz", on p. 58).

In this regard, it should be noted that six days after his arrest, the Defendant was questioned and warned in the customary manner, that by law he is not obligated to say anything, and that anything he would say could be used as evidence against him (see Transcript Prosecution/40 Section 1, and testimony of an interrogator by the name of "Mofaz", on p. 59). The interrogator named "Mofaz" testified that these warnings were given to the Defendant during the course of all of his interrogations, and the interrogator named "Emile" also testified to this (on pp. 57, 59 and the warnings included in the Transcript Prosecution/41 Section 1; Prosecution/44, Prosecution/25; Transcript of Interrogation Prosecution/98 (j) on p. 37). Although it was sometimes hinted to the Defendant that he might not actually be brought to trial, because there was a possibility that he would be deported, the Defendant noted that he preferred the option of standing trial, even if it was clear that he would be tried and sent to jail for many years (Transcript Prosecution/10, Prosecution/11, Prosecution/14 and Prosecution/19 Section 5, and Transcript Prosecution/63 Section 25).

[Stamp] P 7: 000425

137. During the course of his interrogation, the Defendant said that he planned to conduct a political trial while ignoring the evidence that would be presented against him during the trial (Transcript Prosecution/42 Section 8 that was submitted and verified by an interrogator by the name of "Wadi", on p. 96; and Transcript Prosecution/56 Section 3 that was submitted and verified by an interrogator by the name of "Smith", on p. 85). During the Defendant's conversation with Agent John Doe No. 1, he explained to him that the tactics he would take during the interrogation – namely he would not admit to anything other than things about which the interrogators already knew and would try to buy time in order to understand what the interrogators knew, so as not to incriminate others. He also told his lawyer that he would not make any statements to the police (see Report Prosecution/118 Section 3, Prosecution/120 Section 2, and his comments to John Doe No. 3 in Report Prosecution/122 Section 1). At this point, it should be noted that the Defendant first met with his lawyer, Adv. Boulos, three days after he was arrested (Exhibit **Prosecution/164**, and Transcript **Prosecution/111** Section 14). During the course of his interrogation, the Defendant met with Adv. Boulos several times (Transcript Prosecution/90 Section 1.)

138. **In conclusion**: We have no reason to assume that the Defendant's confessions during his Israel Security Agency interrogation were given because any sort of illegitimate means had been used against him that led the Defendant to negate his free will, nor did the Defendant ever claimed that this happened. During the course of the trial, as well as at the time of his police interrogation, when statements that he had made during his Israel Security Agency interrogation were presented to the Defendant, he repeatedly claimed that they were "lies and forgeries." He did not claim that any illegitimate means had been used against him during the interrogation and our clear impression is that the interrogators treated the Defendant respectfully, as the Defendant himself said during his Israel Security Agency interrogation (Transcript Prosecution/75 Section 2, Transcript Prosecution/90 Section 1 and Transcript of the Defendant's Interrogation Prosecution/98 (f) on p. 29). At the time that testimony was given during the trial, the Defendant shook hands with some of the Israel Security Agency interrogators, and this fact also indicates that the Defendant does not harbor any negative feelings against his interrogators.

The Defendant had full control of the statements that he made to his Israel Security Agency interrogators: he decided what things he was willing to say during the course of his interrogation, that he expected were already known to the interrogators anyway, and which things he intended to hide from them. The Defendant was very cautious during the course of his interrogation and on more than one occasion he refused to answer a question that had been asked or

[Stamp] P 7: 000425 [continued]

answered in an indirect, implied manner. He chose the tactics that he used during interrogation, namely to expand on political subjects, be brief with respect to those related to acts of terrorism and, in any case not to provide any details other than those which he expected that the interrogators already knew.

As Agent John Doe No. 1 testified, the Defendant told him, "**Even if the entire Palestinian people admits to something, he will decide what to say during interrogation**" (Prosecution/110 Section 10). From all which is stated above, it is clear that the Defendant gave his statements of his own free will.

[Stamp] P 7: 000426

Part IV:   Legal Analysis and Conclusions

1. **Activity and Membership in a Terrorist Organization**

139. In the indictment, the Defendant is charged with the crimes, among others, of activity and membership in a terrorist organization, in accordance with Sections 1 – 3 of the Prevention of Terrorism Ordinance, 5708 – 1948, which states:

> "1. **Interpretation**
> 'Terrorist organization' means a group of persons that uses, in its activities, acts of violence calculated to cause death or injury to a person or threats of such acts of violence; a 'member of a terrorist organization' means a person belonging to it and includes a person who participates in its activities, publishes propaganda in favor of a terrorist organization, its activities or aims, or collects money or goods for the benefit of a terrorist organization or its activities.
>
> 2. *Activity in a terrorist organization*
> A person fulfilling a managerial or instructional position in a terrorist organization or participating in the deliberations or decision-making of a terrorist organization or acting as a member of a tribunal of a terrorist organization or delivering a propaganda speech at a public meeting or on the radio on behalf of a terrorist organization shall be guilty of an offence and shall be liable, upon conviction, to imprisonment for a term not exceeding twenty years.
>
> 3. *Membership in a terrorist organization*
> A person who is a member of a terrorist organization shall be guilty of an offence and be liable, upon conviction, to imprisonment for a term not exceeding five years."

Section 7 of the Prevention of Terrorism Ordinance states:

> "7. *Proof of the existence of a terrorist organization*
> In order to prove in any legal proceeding that a particular group of persons is a terrorist organization, it shall be sufficient to prove that –
>
> (a) One or more of its members, on behalf of or by order of that group of persons, at any time after 5 Iyar 5708 (May 14, 1948), committed acts of violence calculated to cause death or injury to a person or made threats of such acts of violence; or

[Stamp] P 7: 000427

(b) **The group of persons, or one or more of its members on its behalf or by its order, has or have declared that that body of persons is responsible for acts of violence calculated to cause death or injury to a person or for threats of such acts of violence, or has or have declared that that body of persons has been involved in such acts of violence or threats, provided that the acts of violence or threats were committed or made after 5 Iyar 5708 (May 14, 1948)."**

[Stamp] P 7: 000427 [continued]

140. The fact that Fatah, Tanzim and al-Aqsa Martyrs Brigades are terrorist organizations, in accordance with that which has been set forth in the ▬▬▬▬▬▬▬▬▬▬ Prosecution/1, is clearly proven by the seized documents that were taken during Operation Protective Shield, which were presented as evidence in this Court, and also from the testimony of the terrorism operatives and the Defendant himself (see above, Sections 7 – 10; testimony of ▬ in Sections 21 – 23; testimony of ▬ in Section 25; testimony of ▬ in Section 29; testimony of ▬ in Section 35; testimony of ▬ in Section 40; testimony of ▬ in Section 55; testimony of ▬ in Section 57; and the Defendant's statements from his interrogation as described in Sections 60 – 64). The terrorist attacks that are the subject of this indictment, and many others, were executed by the field operatives of Fatah – members of the Tanzim – and by cells that were organized within the framework that is called "the al-Aqsa Martyrs Brigades". The Defendant was the leader of Fatah in the West Bank and commander of the Tanzim and al-Aqsa Martyrs Brigades, as he admitted during the course of his interrogation and as proven by much additional evidence (see Section 17 and Sections 60 – 65 above).

The Defendant's roles in leadership of the terrorist organizations were also described at length (see Part II, Chapter D above). The Defendant was the commander of terrorist organizations and terrorist cells, even if sometimes they did not follow his orders, and he made an effort to supply them with weapons, explosives and money for the purpose of their activities (see Part II, Chapter D (1) and (3) above). He was also personally involved in some of the terrorist attacks that have been carried out by the organizations that he led (see Part II, Chapter D (2) above). The Defendant also handled assistance for wanted men and the families of people who were arrested or killed, recruited operatives for the terrorist organizations and trained them (see Part II, Chapter D (4) – (5) above). He was the person who expressed the positions of the terrorist organizations in the media (see Chapter D (6) above).

In this case, therefore, we are not dealing merely with "a person fulfilling a managerial or instructional position in a terrorist organization" in accordance with that which has been set forth in Section 2 of the Prevention of Terrorism Ordinance, rather the Defendant was the person who headed these terrorist organizations, created their policy and made propaganda speeches on their behalf in the media.

Therefore, the foundations of Sections 2 and 3 of the Prevention of Terrorism Ordinance, namely membership in a terrorist organization and activity in such an organization, are proven.

[Stamp] P 7: 000428

## 2. Responsibility of the Joint Perpetrator, the Solicitor and the Accessory and the Differences Between Them

141. The indictment charges the Defendant with the direct responsibility of a "joint perpetrator" in all of the acts of murder and attempted murder that are the subject of the indictment, which lists 37 different terrorist attacks.

    The indictment also charges the Defendant with the crimes of being an accessory to murder and soliciting murder, even though the Prosecution's claim in its summation is that the Defendant should be considered a joint perpetrator in these crimes, and not only an accessory or one who solicits others, because he was a leader of terrorist organizations and the main person responsible for perpetrating murderous terrorist attacks that were executed by these terrorist organizations. Therefore, it is necessary to review the degree of responsibility claimed for the Defendant in the terrorist attacks that are the subject of the indictment: first – as one who committed acts of murder as a joint perpetrator together with the field operatives and the terrorists who actually perpetrated the attacks; second – as the person who solicited others to perpetrate the attacks; third – as an accessory to acts of murder. In this framework, it is necessary to examine the traits that characterize "the joint perpetrator" and to distinguish between them and those that characterize the accessory and the one who solicits [the offense].

142. In Section 29 (b) of the Penal Code, 5737-1977, the responsibility of the joint perpetrator is defined as follows:

    > **"The participants in the perpetration of a crime who take action in order to commit it are joint perpetrators and it makes no difference if all of the actions are done together or if some are accomplished by one and some by**

[Stamp] P 7: 000428 [continued]