These characteristics – of total control over the perpetrators of the crime, presence alongside them at the scene of the crime up until such time as it commenced, involvement in planning the crime, the giving of orders for its perpetration and supervision over the acts of the perpetrators – do not exist in the matter that is currently at hand, where it has not been proven that the Defendant knew in advance of the intent to perpetrate most of the terrorist attacks that are the subject of the indictment.

The Defendant was not personally involved in the initiation, planning of perpetration of the terrorist attacks that are the subject of the indictment (other than the few terrorist attacks that shall be set forth below). The Defendant did not give orders or approval for the perpetration of these terrorist attacks, nor did he assist or solicit the perpetration of [these terrorist attacks] specifically, in accordance with that which has been set forth above. Thus, the issue of the control of the Defendant over the perpetrators and the planners of the terrorist attacks is not devoid of doubt, in accordance with that which has been set forth above. In spite of the fact that the Defendant had the unofficial title of Commander of the Tanzim and the al-Aqsa Martyrs Brigades, there is no proof that the Defendant had played any role in the joint decision to commit the terrorist attacks that are the subject of this indictment, or that he had taken part in the perpetration or planning thereof. In the absence of all of the above, and on basis of the principles that have been established in the case law and in the provisions of the Penal Code, it is not possible to consider the Defendant a joint perpetrator in the terrorist attacks that are the subject of the indictment, with respect to which he had no personal involvement or knowledge, simply by virtue of the fact that he was the uncrowned leader of the Tanzim and the al-Aqsa Martyrs Brigades, or because of his close relationship to the planners of the terrorist attacks and the general assistance that he had provided to them.

174. To summarize the above, the legal situation that prevails in the State of Israel does not make it possible to convict the leader of a criminal group or a terrorist organization as a joint perpetrator of crimes that were committed by members of the said group or organization, not even for being an accessory or solicitor to the perpetration thereof, when he himself was not personally involved, on an individual basis, in any part of the crimes themselves, either prior to or during the course of their commission. This is the situation, even when it is clear that this

[Stamp] P 7: 000454 [continued]

leader has given his blessing to the perpetration of these crimes and gave his men general assistance, that was not for the purpose of the commission of any specific crime.

In the the case that is currently at hand, the Defendant encouraged and motivated the cell commanders and the men in the field to carry out terrorist attacks and he made sure that they would have the money, weapons and explosives that were needed in order to perpetrate the terrorist attacks. He was the leader of the commanders and of the men in the field, and he had a not insignificant degree of influence over them.

Many of the terrorist attacks that are the subject of the indictment were perpetrated and planned by the field commanders who were close to the Defendant and were supported by him. In spite of all of the above, it is not possible to attribute the Defendant, in accordance with Israeli law, the criminal liability of a joint perpetrator, an accessory or a solicitor – to the extent that this pertains to terrorist attacks for which there is no evidence that links the Defendant to them and with respect to which it has not been proven that he knew of the intent to perpetrate them.

Therefore, there is a discrepancy between the general and collective liability of the Defendant for the perpetration of the terrorist attacks that are the subject of this indictment, not to mention the moral responsibility for the perpetration thereof, and the legal possibility of the attribution of criminal liability for the perpetration of specific terrorist attacks to him, when it has not been proven that he knew about the plans to perpetrate them. We are unaware of any precedent for the conviction of a person for the crime of murder, or solicitation of or accessory to murder, when there is no evidence that links him to this act in a specific manner. The Defendant does indeed bear heavy and terrible responsibility for the terrorist attacks that are the subject of this indictment, in which many people have lost their lives, because he was the leader and commander of the terrorist cells that perpetrated the terrorist attacks. However, this is command responsibility that is "quasi ministerial" and not liability that can be substantiated in terms of the laws the Penal Code. We must not extend the provisions of the Penal Code beyond their natural limits, even though in the case that is currently at hand, we are faced with a problem that is difficult for the Court to resolve by way of the existing provisions of the law.

[Stamp] P 7: 000455

This legal outcome is far from being a satisfactory one, and is even infuriating. This is what Prof. M. Kremnitzer was referring to in his statements as cited above, whereby the accepted concepts of accessory and solicitation are not appropriate for the criminal phenomena of organized crime and terrorism, and therefore a proposal has been set forth by Prof. M. Gur-Arye to amend the Penal Code in a manner in which it would be possible to consider a leader of this type to be "perpetrating a crime by way of another person" (see Section 164 above). In the above mentioned Additional Criminal Hearing 1294/96 in the case of **Meshulam**, the Court rejected the possibility of considering the leader of a group of criminals as "perpetrating a crime by way of another person" in accordance with Section 29 (c) of the Penal Code, although Justice M. Cheshin fashioned an analogy based on the provision of the law with respect to the liability of the joint perpetrator as compared to the liability of a solicitor (on pp. 59 – 60).

175. Recently, the Legislature has made an effort to deal with this legal problem, if only partially. The Knesset [Israeli Parliament] enacted the Law on Combating Criminal Organizations, 5763 – 2003, which makes it possible to sentence the head of a criminal organization to imprisonment of up to 20 years, when the organization commits felonies for which the punishment is more than 20 years' imprisonment. This law does not apply to the crimes of the type that are the subject of this indictment, which were perpetrated prior to its enactment; however, it does extend to terrorist organizations and their leaders (see the first addendum that applies the law to crimes in accordance with Section 4 of the Prevention of Terrorism Ordinance, and the explanatory notes to the legislative bill: Legislative Bill 5762 [2002] 3155, on p. 762). From the explanatory notes to the legislative bill, it may be understood that the Legislature is aware of the legal problem that derives from the inability to convict people who head criminal organizations for the crimes that have been committed by their subordinates, due to their distance from the crime. The explanatory notes state (on p. 762):

> **"The proposed Law on Combating Criminal Organizations, 5762 – 2002, is intended to address, on the legislative level, the phenomena of organized crime and the structure of criminal organizations that frequently make it difficult to prove the connection between the heads and leaders of organizations of this type and the crimes that have been committed by others, all in light of the hierarchal structure of some of these organizations,**

[Stamp] P 7: 000455 [continued]

> **which creates distance between the decision makers and the policy makers and those who commit the crimes."**

The explanatory notes to the legislative bill also states (on p. 763) that Section 2 of the law that permits a sentence of up to 20 years' imprisonment for the head of a criminal organization **"is intended to address the difficulty in proving the relationship between officials in criminal organizations and the crimes that have actually been committed. It states that the very act of heading, managing or funding the organization, etc. is sufficient in order to constitute a crime..."**

It was further stated in the explanatory ntoes that with respect to members of criminal organizations at lower echelons, **"it will remain necessary to prove a tie to a specific crime."**

Hence, it is clear that the law is intended to deal with the issue that is also being decided in the case that is currently at hand, specifically, the inability, in accordance with the existing legal situation, to convict the leader of a criminal organization or a terrorist organization for the perpetration, solicitation or constituting an accessory to a specific crime that is committed by the members of the organization.

However, this law does not provide a response to the question that was posed by the Honorable Justice M. Cheshin in the above mentioned Additional Criminal Hearing 1294/96 in the matter of **Meshulam** (on p. 59), in which he asks: **"Would it be acceptable for the mastermind to be beneath the 'soldiers' who do his bidding?"** Even in accordance with this law, the punishment of the person who heads the crime organization is less than the punishment of those who obey him, when they have committed the crime of murder, which carries a sentence of life imprisonment. Furthermore, to the extent that we are dealing with a terrorist organization, this law is not necessary, insofar as in accordance with Section 2 of the Prevention of Terrorism Ordinance, the head of a terrorist organization can, in any event, be sentenced to 20 years imprisonment simply by virtue of the fact that he holds a management role in the organization (see subchapter 1, above).

176. That which has been set forth above pertains to most of the terrorist attacks that have been attributed to the Defendant in the indictment, as these have been set forth in Chapter 5 of Part II of this verdict. For these terrorist attacks, as was explained above, it is not possible to convict the Defendant for the crimes of being an accessory or for the solicitation of acts of murder, and not even for being a joint perpetrator. Notwithstanding, clear, persuasive evidence has been filed with respect to the involvement of the Defendant in three terrorist attacks that have been perpetrated by his men and an additional case attempting to perpetrate a terrorist attack, as follows:

[Stamp] P 7: 000456

A. **The Murderous Terrorist Attack at the Gas Station in Givat Ze'ev**

In this terrorist attack, which occurred on January 15, 2002, Yoela Chen, of blessed memory, was murdered and the passenger who was traveling with her was injured. From the evidence that has been set forth, it emerges clearly that when they were in the mourners' tent that was set up subsequent to the assassination of ████ on January 14, 2002, the Defendant ordered his close associate, ████ to perpetrate a terrorist attack in order to avenge him. ████ gave a weapon to ████ who was also a close associate of the Defendant and obeyed his authority, and members of ████'s cell perpetrated the murder, and immediately thereafter reported to the Defendant on the results thereof.

The Defendant confessed that this terrorist attack was performed upon his orders, and took responsibility for the perpetration thereof, while emphasizing that this was the first terrorist attack that Fatah had carried out within Israel. In this case, the Defendant is directly liable for the commission of murder, insofar as he himself had given the orders for the murder to be carried out.

Certainly. this type of order given by the Defendant to people who obey his authority consitutes solicitation to murder, even if the Defendant did not take specific interest in the venue and the manner in which the terrorist attack was to be carried out. When the Defendant gave orders to perpetrate a revenge terrorist attack, it was clear to him and to his people that the intent was to murder Israelis. However, the liability of the Defendant is not just that of a solicitor but rather that of a joint perpetrator, together with the other perpetrators, who are ████ ████ and his men. The Defendant was part of the joint plan to

[Stamp] P 7: 000456 [continued]

commit the terrorist attack, as the one who initiated the perpetration thereof. He had a high level of emotional involvement and knowledge of the fact that the crime was going to be committed in accordance with his orders. The Defendant not only caused others to commit a crime in this case and not only did he give his approval for the commission of the crime, but he also **ordered** them to commit the crime; and because of his standing as the leader and commander and on account of his relationship with ▬ and ▬, this order can be compared to the pulling of the trigger that caused the murder of Yoela Chen, of blessed memory.

The Honorable Justice D. Beinisch was referring to this state of affairs in the above mentioned Criminal Appeal 8469/99 in the matter of **Eskin**: "**In special circumstances, it is possible that 'consent' to the commission of the crime can be considered to constitute participation 'in the commission of a crime while performing actions with respect to the perpetration thereof' in accordance with that which has been set forth in Section 29 of the Penal Code.**" The Honorable Justice Y. Kedmi also ruled in this manner in the above mentioned Criminal Appeal 5589/98 in the matter of **Sultan**, whereby giving the "**green light to murder**" is analogous to "**the firing of the opening shot that dispatches the athlete to embark upon his race**" and can be considered tantamount to "**an act of participation in the commission of the crime**" (see Section 163 above).

In the above mentioned Additional Criminal Hearing 1294/96 in the matter of the **Meshulam**, the Honorable Justice M. Cheshin stated (on p. 59): "**the evil spirit of the leader pervades the entire criminal operation, his mind wound the spring of the perpetrator of the crime before it was set in action and at the time when the crime was being committed he was 'present' among the criminals as a joint perpetrator with them.**" This also can be said of the Defendant who is before us and therefore he should be convicted for this murderous terrorist attack as a joint perpetrator in premeditated murder and not solely for solicitation.

B. **Murder of the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, in Ma'ale Adumim**

This terrorist attack was also perpetrated the at the order and initiative of the Defendant, on June 12, 2001. The terrorist ▬ asked the Defendant for a weapon in order to perpetrate a suicide terrorist attack.

[Stamp] P 7: 000457

The Defendant instructed him not to perpetrate a suicide terrorist attack, but rather a terrorist shooting attack "as is customary for the Tanzim", and referred him to ▓▓▓▓ in order to receive a weapon and training on how to shoot with it, with the clear knowledge that ▓▓▓▓ was about to carry out a shooting terrorist attack and would murder Israelis in accordance with his instructions. In fact, ▓▓▓▓ did so together with another terrorist, when they received two Kalashnikov rifles from ▓▓▓▓ as well as training on how to use them – all this at the order of the Defendant. In this terrorist attack, the Greek Orthodox monk Tzibouktzakis Germanos, of blessed memory, was murdered in Ma'ale Adumim, because the terrorists mistakenly thought that he was a Jew.

In this case, as well, the liability of the Defendant for the murder of the Greek Orthodox monk is that of a joint perpetrator, not merely that of solicitor. The Defendant not only convinced ▓▓▓▓ to perpetrate the murderous shooting terrorist attack but also instructed him how to do it, helped him to obtain a weapon and training for the purpose of the terrorist attack and ordered him to whom he should turn in order to carry out the terrorist attack. At the same time, the Defendant instructed his people to assist ▓▓▓▓ in the perpetration of the terrorist attack, and they in fact acted in accordance with the orders of the Defendant.

According to case law, solicitation, if it is accompanied by an act of perpetration such as planning or giving orders for perpetration – constitutes participation in the commission of the crime, and not merely solicitation. As the Honorable Presiding Justice A. Barak wrote in the above mentioned Criminal Appeal 2796/95 in the matter of **John Does**: "**the more intensive the solicitation of the solicitor and the more it involves only not only activities on the mental level but also on the factual level, the closer the solicitor moves to becoming a joint perpetrator**." (See Section 161 above). Therefore, in the same case of the minor known as "T", he was convicted as a joint perpetrator and not merely as a solicitor because he participated in the planning of the crime and was "the head and leader of them all".

In this case as well, the liability of the Defendant as the joint perpetrator is derived from his status as leader and commander, and from the instructions that he gave to ▓▓▓▓ and to his people with regard to the manner in which the terrorist attack should be perpetrated. The Defendant was not only an accessory to the terrorist attack and did not only solicit its perpetration by encouraging ▓▓▓▓ to act as he did, but rather the Defendant was

[Stamp] P 7: 000457 [continued]

part of the joint plan to carry out this terrorist attack and he in effect gave orders for the perpetration thereof. We have explained the significance of orders of this kind in subsection (A) above, and accordingly, the Defendant should also be convicted for this terrorist attack as a joint perpetrator in premeditated murder.

C. **Murderous Terrorist Attack in the Seafood Market Restaurant in Tel Aviv**

This terrorist attack was carried out on March 5, 2002, in the Seafood Market Restaurant in Tel Aviv by the terrorist ▬▬▬▬▬ who murdered Yosef Habi, of blessed memory; Elihu Dahan, of blessed memory; and Staff Sergeant Major Barakat, of blessed memory, during the attack. From the evidence that was set forth, it becomes apparent that this terrorist attack was planned and executed by close associates of the Defendant, ▬▬▬▬ ▬▬▬▬ and ▬▬ and that ▬▬▬▬▬ reported to the Defendant before the terrorist attack was carried out that it was about to happen. The Defendant authorized the terrorist attack although he instructed that it not take place within Israel but rather in a settlement or at the military check point in the West Bank. Immediately after the terrorist attack was carried out, ▬▬▬▬▬ called the Defendant in order to report to him about it. The Defendant ordered Aweis not to take responsibility for the terrorist attack since it was carried out within Israel.

From the evidence in accordance with that which has been set forth above, the liability of the Defendant for this terrorist attack as a joint perpetrator is clear. The Defendant was a partner in planning the terrorist attack, gave orders with respect to the location of its execution and approved the perpetration thereof. The fact that the perpetrators did not follow the orders of the Defendant does not detract in any manner whatsoever from his criminal liability. As was explained above, the liability of the Defendant for this terrorist attack is not only in his capacity as a solicitor, because he also gave approval for the perpetration of the murderous terrorist attack, which is an act of participation in the commission of the crime. The Defendant was the part of the plan for the terrorist attack, and gave orders to the people who were perpetrating the terrorist attack with respect to its location, and also received a report from them immediately subsequent to the attack. The leader of a criminal group who authorizes an act of murder and gives orders for the commission thereof bears liability for murder as a joint perpetrator, not only for solicitation, in accordance with the case law that has been set forth above. Therefore, in this case, as well, the Defendant should be convicted for this terrorist attack for liability as a joint perpetrator for the premeditated murder of three people.

[Stamp] P 7: 000458

    **D.**    **The Attempted Terrorist Attack Near the Malha Mall in Jerusalem**

The day before this terrorist attack, the perpetrator of the attack, ▮, informed the Defendant of his plan to detonate a car bomb, and the Defendant authorized the terrorist attack but ordered him not perpetrate it within Israel but rather on the West Bank. In fact, the two terrorists exploded with the car bomb near the Malha Mall in Jerusalem on their way to perpetrate the attack. In this terrorist attack, the Defendant was assisted by his close associate ▮

Here, too, the liability of the Defendant is not simply for solicitation but rather as a joint perpetrator who gave the "green light for murder" together with orders for perpetration. Since the terrorist attack failed, the Defendant is to be convicted, in this case, for the crime of attempted murder.

**Part V:**    **Summation**

177. The Defendant declared during the stage of summations: "**I am opposed to the killing of innocent people, I am against the murder of children and women. We need**

[Stamp] P 7: 000458 [continued]