**to oppose the occupation of the territories, I am against military operations or suicides. It is not true that I am responsible for the fact that there were suicides**" (on p. 24 of the session that took place on September 29, 2003). However, in actuality it has been proved beyond all doubt that the Defendant has taken part in and led murderous activities with the goal of hurting innocent people – both in the areas of Judea and Samaria and within the "Green Line" – including suicide terrorist attacks.

178. The Defendant chose not to defend himself against the serious charges that arise from the evidence that has accumulated against him, in accordance with that which has been set forth above. The claims that he has set forth during the course of the hearing and the statements of summation that he has made focus on the question of this Court's authority to hear this case and the justification for what he considers to be opposition to the Israeli occupation. We addressed these claims on the part of the Defendant in our Preliminary Decision that was handed down on January 19, 2003 – to the extent that this refers to claims that are not limited only to the political level. We have denied these claims and ruled as follows:

   a. Courts in Israel are authorized to hear "external crimes" against the security of the state, or against Israeli citizens or residents, wherever they may be perpetrated in accordance with Sections 13 (a) – (b) of the Penal Code, 5737 – 1977, although most of the crimes that are the subject of the indictment are "internal crimes" that relate to terrorist attacks that have been carried out within Israel.

   b. The Implementation of the Interim Agreement on the West Bank and the Gaza Strip Law (Jurisdictions and other Provisions) 5756 – 1996, which validates the Israeli-Palestinian interim agreement with respect to the West Bank and the Gaza Strip, as well as the Regulation 2 to the addendum to the Law for the Extension the Validity of Emergency Regulations (Judea and Samaria and the Gaza Strip – Jurisdiction Over Offenses and Legal Assistance), 5738 – 1977) do not negate the authority of an Israeli Court to hear the external crimes or the internal crimes that have been attributed to the Defendant. These items of legislation transferred to the Palestinian Authority the jurisdiction with respect to Palestinians who committed a crime within its territory, but not for crimes that have been perpetrated against citizens or residents of Israel in the territory of the State of Israel or in the areas of Judea and Samaria and the Gaza Strip.

   c. The Defendant does not have any immunity from the crimes with which he is charged in this indictment even though he was serving as a member of the Palestinian Legislative Council, for international law does not recognize immunity of this type.

[Stamp] P 7: 000459

    d. The Defendant is not entitled to the status of "prisoner of war" in accordance with the Third Geneva Convention, and therefore there is no reason not to try him for the crimes that he has committed as an illegal combatant. A person who acts outside of the framework of legal combat and against the rules of war, who is involved in perpetrating acts of terrorism for the purpose of causing indiscriminate harm to the civilian population exposes himself to the ordinary criminal sanctions of international criminal law, and is not entitled to any of the protection that is provided under international law.

    e. Opposition to the occupation, as this has been argued by the Defendant, does not constitute justification in accordance with any law for the perpetration of acts of killing that are directed at innocent civilians. Terrorist activity that violates the laws of war and does not distinguish between military targets and civilian targets is not considered to combat activity that is recognized in accordance with the principles of international law, even if the objective is the removal of the occupation – as is being argued by the Defendant.

179. **In conclusion**: In light of all the grounds that have been set forth in this verdict, we have not found any legal foundation for the conviction of the Defendant for the perpetration of the entire list of terrorist attacks that are the subject of this indictment, and the law requires us to convict him for the general crimes with which he has been charged in the indictment, and crimes of murder and attempted murder that pertain to four of the terrorist attacks that appear in the indictment (No. 3,

[Stamp] P 7: 000459 [continued]

No. 7, No. 12 and No. 36 in the Appendix to the indictment).

On the basis of the set of evidence and in light of the legal analysis that appears above, we [hereby] convict the Defendant of the following crimes:

a. **Premeditated murder in accordance with Section 300 (a) (2) of the Penal Code, 5737 – 1977 (for three cases in which five people were murdered)**;

b. **Attempted murder in accordance with Section 305 (1) of the Penal Code, 5737 – 1977**;

c. **Activity in a terrorist organization in accordance with Section 2 of the Prevention of Terrorism Ordinance, 5708 – 1948**;

d. **Membership in a terrorist organization in accordance with Section 3 of the Prevention of Terrorism Ordinance, 5708 – 1948**;

e. Crime of **conspiracy to commit a crime in accordance with Section 499 of the Penal Code, 5737 – 1977** was also proved with regard to four terrorist attacks for which the Defendant was convicted and is subsumed within the principal crimes of premeditated murder and attempted murder.

**Handed down and announced on this day, 29 Iyar 5764 (May 20, 2004) in the presence of Counsel for the Prosecution, the Public Defender and the Defendant.**

| Sarah Sirota, Vice President Presiding Judge | Avraham Tal, Judge | Dr. Amiram Benyamini, Judge |

[Stamp] P 7: 000460

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MARK I. SOKOLOW, et al.,

                Plaintiffs,

vs.

THE PALESTINE LIBERATION ORGANIZATION, et al.,

                Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P7 371-460.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated bearing the bates number P7 371-460.

Dated: March 6, 2014

                                                                    Rina Ne'eman

ss.: New Jersey

On the 6 day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
6 day of March, 2014

*Leonor Troyano*
Notary Public

LEONOR TROYANO
ID # 2385580
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 5/6/2014

בתי המשפט

| | |
|---|---|
| תפ"ח 1158/02 | בבית המשפט המחוזי בתל-אביב-יפו |

בפני הרכב:

כב' השופטת שרה סירוטה, ס.נ.- אב"ד
כב' השופט אברהם טל
כב' השופט ד"ר עמירם בנימיני

מדינת ישראל      המאשימה
המחלקה לעניינים פליליים, בטחוניים
ועניינים מיוחדים בפרקליטות המדינה
ע"י ב"כ עוה"ד ד. חן, ר. חזן, א. בר-
נתן

- נ ג ד -

מרואן בן חטיב ברגותי      הנאשם
יליד 1959, ת.ז. 959251745
מרמאללה (במעצר מיום 15.4.02)
ע"י הסניגוריה הציבורית

# הכרעת – דין

P 7: 000371

# תוכן - עניינים

חלק ראשון: מבוא      עמ' 2

חלק שני: מסכת הראיות      עמ' 6

א. הפת"ח התנזים וגדודי חללי אלאקצא כאירגוני טרור      עמ' 6

ב. מעמדו של הנאשם ותפקידו בארגוני הטרור, ותמיכתו בפיגועים כנגד ישראל      עמ' 8

ג. עדויותיהם של פעילי הטרור מהפת"ח בדבר קשריהם עם הנאשם מעורבותם בפיגועים שביצעו והתייחסות הנאשם בחקירתו לעדויות אלו      עמ' 16

(1) ████████      עמ' 16
(2) ████████      עמ' 20
(3) ████████      עמ' 22
(4) ████████      עמ' 27
(5) ████████      עמ' 27
(6) ████████      עמ' 28
(7) ████████      עמ' 30
(8) ████████      עמ' 30
(9) ████████      עמ' 34
(10) ████████      עמ' 34
(11) ████████      עמ' 35
(12) ████████      עמ' 35
(13) ████████      עמ' 36
(14) ████████      עמ' 37
(15) ████████      עמ' 37
(16) ████████      עמ' 38
(17) ████████      עמ' 39

ד. דברי הנאשם בחקירתו וראיות נוספות בדבר תפקידו ומעורבותו בפיגועים נגד ישראל      עמ' 40

(1) אחריותו של הנאשם לפעילות חוליות הטרור ומידת שליטתו בהן      עמ' 40
(2) מעורבותו האישית של הנאשם בפיגועי הטרור שביצעו חוליות שתחת פיקודו      עמ' 44
   (אא) הפיגוע בתחנת הדלק בגבעת זאב      עמ' 47
   (בב) רצח הנזיר היווני במעלה אדומים      עמ' 48
   (גג) הפיגוע במסעדת "סי פוד מרקט" בתל-אביב      עמ' 48
   (דד) ניסיון לפיגוע ליד קניון מלחה בירושלים      עמ' 49
(3) אספקת כספים ואמל"ח לשם ביצוע פיגועי טרור      עמ' 49
(4) סיוע למבוקשים ולמשפחות העצורים והחללים      עמ' 51
(5) גיוס פעילים לארגוני הטרור והדרכתם      עמ' 52
(6) קריאותיו הפומביות של הנאשם לבצע פיגועים כנגד ישראל      עמ' 53

P 7: 000372

ה. **הקשר של הנאשם לפיגועים נשוא כתב האישום**   עמ׳ 56
(1) רצח טליה ובנימין כהנא ז״ל ליד עפרה............................   עמ׳ 56
(2) רצח עקיבא פשקוס ז״ל באזור התעשיה בעטרות....................   עמ׳ 57
(3) רצח הנזיר היווני ציפוקטקיס גרמנוס ז״ל במעלה אדומים.........   עמ׳ 59
(4) רצח יניב ושרון בן שלום ז״ל ודורון יוסף סוורי ז״ל בכביש 443 ..עמ׳ 59
(5) רצח מאיר וייזבוייז ז״ל בכביש מס׳ 9 בירושלים....................   עמ׳ 61
(6) רצח אליהו כהן ז״ל בפיגוע ירי בכביש 443 ליד גבעת זאב..........   עמ׳ 62
(7) רצח יואלה חן ז״ל ליד תחנת דלק גבעונים בכביש 443..............   עמ׳ 63
(8) רצח 6 אנשים באולם השמחות ״ארמון דוד״ בחדרה................   עמ׳ 64
(9) רצח שתי נשים בפיגוע ירי ברחוב יפו פינת לונץ בירושלים..........   עמ׳ 66
(10) פיגוע ירי בשכונת נוה-יעקב בירושלים בו נהרגה השוטרת גלית
     ארביב ז״ל..................................................................   עמ׳ 66
(11) רצח גד רגואן ז״ל במפעל בשקביץ בעטרות........................   עמ׳ 69
(12) הפיגוע במסעדת ״סי פוד מרקט״ בתל אביב......................   עמ׳ 70
(13) פיגוע ירי במלון ״ג׳ירמי״ בנתניה..................................   עמ׳ 72
(14) רצח קונסטנטין דנילוב ז״ל באבקה אלע׳רביה...................   עמ׳ 73
(15) פיגוע ירי בין עטרת לביר-זית.......................................   עמ׳ 74
(16) ניסיון פיגוע בפאב ״ביאנקיני״ בירושלים.........................   עמ׳ 75
(17) פיגוע ירי בכביש 9 ליד הגבעה הצרפתית בירושלים..............   עמ׳ 77
(18) ניסיון לפיגוע התאבדות בבית חנינא בירושלים..................   עמ׳ 78
(19) פיגוע ירי בכביש בית אל- פסגות..................................   עמ׳ 78
(20) ניסיון פיגוע בקניון מלחה בירושלים..............................   עמ׳ 79

**חלק שלישי: הערכת הראיות ומשקלן**   עמ׳ 81

**חלק רביעי : ניתוח משפטי ומסקנות**   עמ׳ 92
1. **פעילות וחברות בארגון טרוריסטי**   עמ׳ 92
2. **אחריותם של מבצע בצוותא, משדל ומסייע והאבחנה ביניהם**   עמ׳ 94
   א. מבצע בצוותא לעומת מסייע...........................................   עמ׳ 96
   ב. עבירת הסיוע.............................................................   עמ׳ 104
   ג. עבירת השידול והאבחנה בין מבצע בצוותא למשדל.................   עמ׳ 112
   ד. אחריותו של מנהיג חבורה עברײנית כמבצע בצוותא או כמשדל...   עמ׳ 117
3. **מסקנות בעניין אחריותו של הנאשם כמבצע בצוותא, משדל ומסייע**   עמ׳ 123
   א. פיגוע הרצח בתחנת הדלק בגבעת זאב..............................   עמ׳ 135
   ב. רצח הנזיר היווני ציפוקטקיס גרמנוס ז״ל במעלה אדומים.........   עמ׳ 136
   ג. פיגוע הרצח במסעדת ״סי פוד מרקט״ בתל אביב..................   עמ׳ 138
   ד. ניסיון פיגוע ליד קניון מלחה בירושלים.............................   עמ׳ 139

חלק חמישי : סיכום   עמ׳ 139

# הכרעת – דין

חלק ראשון:   מבוא

1. בתאריך 14.8.2002 הוגש נגד הנאשם כתב-אישום, המייחס לו מספר עבירות של **רצח בכוונה תחילה** לפי סעיף 300(א)(2) לחוק העונשין, התשל"ז-1977 (להלן: "**חוק העונשין**"); **סיוע לרצח** לפי סעיף 300(א)(2) ביחד עם סעיף 31 לחוק העונשין; **שידול לרצח** לפי סעיף 300(א)(2) יחד עם סעיף 30 לחוק העונשין; **ניסיון לרצח** לפי סעיף 305(1) לחוק העונשין; **קשירת קשר לביצוע פשע** לפי סעיף 499 לחוק העונשין; **פעילות וחברות בארגון טרור** לפי סעיפים 2 ו-3 לפקודת מניעת טרור, התש"ח-1948.

2. כתב-האישום מייחס לנאשם שותפות, איגרון וביצוע של פעולות-טרור כגד מטרות ישראליות, אשר החלו בספטמבר 2000 במסגרת אירועים המכונים "אינתיפאדת אלאקצא" (להלן: "**האינתיפאדה**"). על-פי הנטען בכתב-האישום, עמד הנאשם בראש אירגוני-טרור באיזור יהודה ושומרון (איו"ש): אירגון ה"פתח" (להלן: "**הפת"ח**"), אירגון ה"תנזים" השייך לפת"ח (להלן: "**התנזים**") ואירגון "גדודי חללי אלאקצא", הכולל את התארגנויות של פעילי טרור של התנזים שביצעו פעולות טרור כנגד מטרות ישראליות (להלן: "**גדודי חללי אלאקצא**"). הנאשם היה זה שתיאם וקישר בין גורמי השטח הבכירים בשלושת האירגונים הנ"ל (כולם יחד יכונו להלן: "**אירגוני הטרור**"), אשר היו אחראים לביצועין של פעולות-טרור נגד מטרות ישראליות.

כתב האישום מפרט את שמותיהם של שמונה פעילי טרור בכירים, שפעלו תחת הנהגתו של הנאשם בביצוע פעולות הטרור, והם ▓▓▓ (להלן: ▓▓▓), ▓▓▓ (להלן: ▓▓▓), ▓▓▓ (להלן: ▓▓▓), ▓▓▓ (אבו חלאווה) (להלן: ▓▓▓), ▓▓▓ (▓▓▓) (להלן: ▓▓▓), ▓▓▓ (להלן: ▓▓▓) ו-▓▓▓ (להלן: ▓▓▓).

הנאשם ומפקדי השטח גייסו פעילים לאירגוני הטרור, הפעילו אותם ודאגו לספק להם אמצעי לחימה (אמל"ח) וכסף. הנאשם עסק גם בהכשרת פעילי הטרור למטרתם ובגיוס כספים לאירגוני הטרור. כמו כן שידל הנאשם ועודד את פעילי הטרור לבצע פיגועים כנגד מדינת ישראל באמצעי התקשורת, בכינוסים שונים ובאמצעות הפצת כרוזי הסתה.

כתב-האישום מייחס לנאשם **בסעיפים 8-15** מעורבות ואחריות לבצוע 37 פיגועים ופעולות-טרור, אשר בוצעו ברובם בתחומי מדינת-ישראל על-ידי מפקדי השטח והפעילים בחודשים דצמבר 2000 ועד אפריל 2002, ושבהם קופחו חייהם של רבים מאזרחי מדינת-ישראל וחיילה, ונפצעו רבים אחרים. חלק ממעשי הטרור מפורטים בכתב האישום, ורובם מפורטים רק בנספח לכתב האישום.

3. **ראיות התביעה כוללות** את עדויותיהם של אנשי מערכת הביטחון, חוקרי השב"כ ואנשי המשטרה שעסקו בחקירת הנאשם; עדויותיהם של אזרחים וגורמים אחרים שהיו עדים לפיגועים נשוא כתב האישום; מסמכים שנתפסו על ידי צה"ל במשרדי הפת"ח ובמשרדו של הנאשם; חוות דעת של מומחים ממערכת הביטחון בעניין פעילות ארגוני הטרור ומעמדו ותפקידו של הנאשם בהם; עדויותיהם של פעילים בארגוני הטרור והדברים שמסרו בחקירתם בשב"כ ובמשטרה; אמרות הנאשם שתועדו על ידי אנשי השב"כ בדו"חות כתובים, ואשר חלקם הוקלטו ותומללו; דברים שאמר הנאשם למדובבים שהוכנסו לתאו במהלך חקירתו ולמקורבו ▓▓▓ שנעצר עמו; דברי הנאשם בכלי התקשורת לפני מעצרו, והודעות הנאשם במשטרה.

תמלילי חקירתו של הנאשם בשב"כ הוגשו על ידי חוקרי השב"כ שניהלו את החקירה שהוקלטה וזיהו את קולו של הנאשם בה ("מופזי" בעמ' 58, "נדבי" בעמ' 79, "סמיתי" בעמ' 86-85 ו"דני" בעמ' 90). שיחתו של הנאשם עם ▓▓▓ הוגשה על ידי החוקר "רוברטי" (עמ' 65). הקלטות מחקירת הנאשם ומחקירת המדובבים פלוני 1 ופלוני 3 תומללו על ידי נתן בסו (עמ' 174).

חוקרי השב"כ שהעידו אישרו את נכונות הכתוב בזכ"דים שרשמו במהלך חקירתו של הנאשם (זכ"דים ת/6 - ת/96). מדובר בדו"חות שנרשמו בעברית לגבי חקירה שהתנהלה בעברית ובערבית

(הנאשם דובר עברית טובה), בהם נרשמו עיקרי הדברים שנאמרו על ידי הנאשם (ראה החוקר "סטיבי" בעמ' 53, החוקר "אמילי" בעמ' 55 והחוקר "רון" בעמ' 60).

4. אשר להודעות הנאשם במשטרה, הרי שהנאשם הודיע בכל חקירותיו במשטרה - בניגוד לדרך בה נהג בעת חקירותיו בשב"כ - כי הוא כופר בזכותה של המשטרה לחקור אותו, ולכן סירב לענות על שאלות החוקרים (ראה הודעות ת/99-ת/109). לפיכך, הודעותיו של הנאשם כוללות שאלות רבות שהוצגו לו על ידי החוקרים, וסירובו להשיב עליהן. במקרים בודדים ביותר התייחס הנאשם בקצרה לדברים שאמר לו החוקר, ובהזדמנויות אלו הכחיש לחלוטין את כל הטענות שהוצגו לו - גם אלה בהם הודה בחקירתו בשב"כ. הנאשם הכחיש כי היה מנהיגם של גדודי חללי אלאקצא והתנזים (הודעה ת/101 עמ' 6, הודעה ת/105 עמ' 2, הודעה ת/106 עמ' 3); הכחיש כי הכיר את פעילי הטרור שהעידו כי היו בקשר עמו (כפי שיפורט להלן), ואפילו הכחיש כי הכיר את ▬ (ת/104 עמ' 8). כל אלו הוכחו, כפי שיבואר להלן, לא רק מפי פעילי השטח, אלא גם מפי הנאשם עצמו, מהמסמכים שנתפסו במשרדו, אשר הנאשם הכחיש בחקירתו כל קשר אליהם, וטען כי כתב ידו לא מופיע עליהם (ראה הודעות ת/108-ת/109).

הודעותיו של הנאשם הוגשו על ידי החוקרים ▬ ורפי נוריאל (עמ' 113, 38), אשר הסבירו כי הנאשם סירב לחתום על האזהרה ועל ההודעה, וכי הוא נחקר בעברית. ▬ אף העיד כי הנאשם סירב למסור טביעת אצבע ולהצטלם. הנאשם אמר באופן כללי בהודעתו ת/106 כי כל ההאשמות כנגדו אינן נכונות, וכי הוא חף מכל אשמה.

5. בפתח משפטו העלה הנאשם טענות מקדמיות הנוגעות לסמכות בית משפט זה לשפוט אותו, ואלה נדחו בהחלטת בית המשפט מיום 19.01.03 (עמ' 1-34 לפרוטוקול). הנאשם בחר שלא להסתייע בשירותי סניגור, ואף דחה נמרצות ובעקביות כל ניסיון של בית המשפט לשכנעו להיעזר בסניגוריה הציבורית או בסניגור מטעמו.

בית המשפט הטיל אמנם על הסניגוריה הציבורית לייצג את הנאשם, חרף בקשותיה החוזרות ונשנות להשתחרר מייצוגו, ולמעשה היא מייצגת את הנאשם גם כיום ונכחה בכל הדיונים. ואולם הסניגוריה הציבורית בחרה להיעתר לבקשת הנאשם שלא להעלות טענות כלשהן מטעמו במהלך המשפט, לרבות טענות משפטיות, ואף לא לחקור את העדים.

כך התנהל ההליך על פי בחירתו של הנאשם, אשר ממשיך לכפור בסמכות בית המשפט לשפוט אותו. בנסיבות אלו בחר הנאשם גם שלא להגיב על כתב האישום. כמו כן נמנע הנאשם מלהעיד בעצמו או להביא עדים מטעמו. עם זאת, הנאשם הגיב מידי פעם על דברי העדים או על טענות שטענה ב"כ המאשימה במהלך הדיון, ודבריו נרשמו בפרוטוקול כלשונם. בנוסף הגיב הנאשם על סיכומי התביעה בעל פה (שהוגשו גם בכתב), בנאום סניגוריה שנשא במסגרת הסיכומים בעל פה, ואשר לא התייחס לגופן של ההאשמות שהועלו כנגדו. למותר לציין כי הנאשם קיבל בעצמו, ובאמצעות הסניגוריה הציבורית, את כל חומר הראיות, הפרוטוקולים והסיכומים.

6. העבירות נשוא כתב האישום הן ברובן "עבירות פנים" הנוגעות לפיגועים שבוצעו בישראל, וחלקן "עבירות חוץ", שבוצעו בתחומי האיזור (קרי: יהודה ושומרון). ואולם, כפי שהבהרנו בהחלטה שניתנה בנוגע לטענותיו המקדמיות של הנאשם, מוסמך בית משפט בישראל לדון בעבירות חוץ כנגד בטחון המדינה, או נגד אזרח או תושב ישראלי, יהא מקום ביצוע העבירה אשר יהא (סעיף 13(א)-(ב) לחוק העונשין, תשל"ז-1977). זו היא אותה "תחולה פרוטקטיבית", אשר נועדה להגן על אזרחים ותושבים ישראלים כנגד פעולות טרור הנעשות בחסותן ובגיבויין של מדינות אחרות (ש"ז פלר, מ. קרמניצר, 'תגובה לחיבור בגנות התחולה הנציונלית של דיני העונשין', פלילים ה 1 (1996) 65, בעמ' 83, והשווה דעתו של י. שחר, שם בעמ' 5). עוד פסקנו בהחלטה שניתנה בטענותיו המקדמיות של הנאשם, כי לא נראה שהתנאים הקובעים בסעיף 14(ב) לחוק העונשין רלבנטיים למקרה זה, אם הם חלים כלל על הסמכות הפרוטקטיבית שבסעיף 13 לחוק (להבדיל מהסמכות

P 7: 000375

הפרסונלית שבסעיף 14), שכן הרשות הפלסטיניאית איננה מדינה. העבירות המיוחסות לנאשם בכתב האישום הן עבירות כנגד בטחון המדינה, כנגד אזרחיה ותושביה, ועל כן הן נופלות במסגרת סעיף 13 לחוק העונשין, ובית משפט זה מוסמך לדון בהן.

חלק שני:    מסכת הראיות

א.    הפת"ח, התנזים וגדודי חללי אלאקצא כאירגוני טרור

7.    ראש חטיבת המחקר באגף המודיעין של צה"ל, תא"ל ▮▮▮▮, הגיש במהלך עדותו (עמ' 38) חוות דעת בה התייחס לפעילותם של הפת"ח, התנזים וגדודי חללי אלאקצא (ת/1). אל חוות הדעת צורפו מסמכי שלל שנתפסו על ידי צה"ל במבצע "חומת מגן" הנוגעים לעניין זה. הפת"ח (ראשי תיבות במהופך בערבית של "התנועה לשחרור פלסטין") דגל מאז יסודו על ידי יאסר ערפאת בשנת 1959 במאבק מזוין כנגד ישראל, אשר התבטא בביצוע פיגועי טרור נגד יעדים ישראליים בארץ ובחו"ל. לאחר חתימת הסכמי אוסלו נדחק עיקרון "המאבק המזוין" למקום משני, אך נותר כאופציה להשגת מטרות הארגון במקרה שהמו"מ עם ישראל לא יצלח. עם פרוץ האינתיפאדה השנייה בחודש ספטמבר 2000, הוביל הפת"ח את פיגועי הטרור בשטחים, וזאת באמצעות שתי ועדות עליונות המנהלות את הפעילות - האחת באזור יהודה ושומרון, והשנייה באזור רצועת עזה. בראש הועדה העליונה של אזור יהודה ושומרון עמד הנאשם עד ליום מעצרו (סעיפים 1-3 לחוו"ד).

הדרג המבצע של הפת"ח כלל את פעילי השטח של התנועה - התנזים (ארגון - בערבית). פעילי התנזים מהווים את חוד החנית בפעילות החבלנית של הפת"ח כנגד ישראל. גדודי חללי אלאקצא הוא שם כיסוי להתארגנויות טרור של הפת"ח, אשר נוטלות אחריות פומבית למעשי הטרור. אנשי "הגדודים" הם למעשה פעילים של הפת"ח, כאשר מרבית ההתארגנויות רואות בנאשם מקור סמכות מרכזי לפעילותן (סעיפים 4-5 לחוו"ד).

התנזים וגדודי חללי אלאקצא מהווים, על פי חוות דעתו של תא"ל ▮▮▮▮ את הזרוע הצבאית הבלתי ממוסדת של הפת"ח, שבראשה עמד הנאשם. מסמך של המצורף כנספח א' לחוו"ד של תא"ל קופרווסר הוא מכתב החתום בידי הפת"ח וגדודי חללי אלאקצא גם יחד. מסמכי שלל אחרים שצורפו לחוות הדעת מראים כי גדודי חללי אלאקצא פונים בבקשה לסיוע כספי מיאסר ערפאת (מסמך 2), וכי הפת"ח וגדודי חללי אלאקצא חתומים על כרוזים המשבחים פעילות טרור שבוצעה בתחומי ישראל (מסמכים 3, 5). במסמך 6 שצורף לחוו"ד, ואשר נשלח ביום 8.5.01 מאת גדודי חללי אלאקצא אל הנאשם, מופיע פירוט פעילותם של גדודי חללי אלאקצא במחוז ג'נין (כולל פיגוע באום אלפאחם), ובקשה לסיוע באמצעי לחימה וכסף לשם המשך הביצוע של פעילות זו. מסמכים אחרים של גדודי חללי אלאקצא שהופנו ליאסר ערפאת, כוללים בקשות לסיוע למבוקשים הנרדפים על ידי ישראל ולמשפחות החללים (נספח ב' ומסמכים 2-4 לנספח זה). חלק מן המסמכים נכתבו על ידי הנאשם. יצויין כי כינויו של הנאשם היה, על שם בנו הבכור, "אבו אלקסאם" (הודעת הנאשם ת/107 עמ' 1, והדרך בה פנה אחויל אל הנאשם בעמ' 164).

8.    על פי חוות דעתו של תא"ל ▮▮▮▮ ביצעו אנשי הפת"ח למעלה מ- 1,200 פיגועים כנגד ישראל (נכון ליום 18.8.02), בהם נהרגו 176 ישראלים ונפצעו רבים אחרים. פיגועים אלו כוללים התאבדות, וירי ממרגמות ונשק קל. במהלך האינתיפאדה עברו התארגנויות הטרור של הפת"ח יותר ויותר לביצוע פיגועי התאבדות בתחומי ישראל (סעיף 5 לחוו"ד). בחודשים שקדמו למבצע "חומת מגן" ביצעו גדודי חללי אלאקצא פיגועי התאבדות בחדרה, ירושלים, תל אביב, מחולה, מחנה 80, מחסום מכבים, נתניה, אשדוד, כפר סבא ואפרת, ובעקבות כך הוכנסו לרשימה האמריקאית של ארגוני הטרור ביום 27.3.02 (סעיף 10 לחוו"ד ונספח ג' המפרט את פיגועי ההתאבדות שבוצעו על ידי תנועת הפת"ח).

9. לגבי חוות הדעת של תא"ל ███ יש לומר, כי מבחינת דיני הראיות איננו רשאים להסתמך על הערכות ומסקנות מודיעיניות אשר מבוססות על מקורות מידע שונים שלא הובאו בפני בית המשפט, בהיותם עדות שמיעה. נוכל לסמוך על חוו"ד זו רק במידה שהיא תואמת ראיות קבילות אחרות שהובאו בפנינו. אולם, פעילות הטרור בחסות הפת"ח של שלושת הארגונים הנ"ל עולה בבירור מראיות ישירות רבות שהובאו במשפט, כולל הודאות שמסרו בחקירותיהם הנאשם ופעילי הטרור, כפי שיפורט בהמשך הכרעת הדין.

███, שהיה אחד ממפקדי השטח הבכירים ביהודה ושומרון, סיפר בהודעתו במשטרה (ת/149(א), בעמ' 2-3, 8-7, 17, 13-17), על הקמת גדודי חללי אלאקצא ביום 1.1.01, על מנת שיהוו מיליציה של הפת"ח, ויבצעו פיגועים כנגד מתנחלים וחיילי צה"ל. הוא מפרט בהודעתו הנ"ל (וכן בהודעתו ת/149 (ג)) את הפיגועים שבוצעו על ידו וע"י אנשיו כנגד מטרות אזרחיות וצבאיות של ישראל, תחת הנהגתו ובסיועו של הנאשם (כפי שיפורט בהמשך).

10. גם מדברים שאמר הנאשם בחקירתו, וממסמכים שנכתבו בכתב ידו, ניתן ללמוד על פעילותם של ארגוני הטרור הנ"ל. הנאשם הסביר את דרך פעולתן של החוליות המכונות "גדודי חללי אלאקצא", שלדבריו ביצעו "פעילות צבאית" (ת/19 סעיף 14, שהוגש ואושר על ידי החוקר "מופז" בעמ' 58). כך גם הסביר הנאשם בחקירתו את הדרך שבה נוצרו גדודי חללי אלאקצא באזור יהודה ושומרון, ופעלו בצורה מפוזרת, וטען כי הפת"ח לא פיקח על פעילותם; אך הוא הודה כי חוליות אלו פנו אליו לקבלת כסף, משום שראו בו **"אחראי של פת"ח בגדה המערבית"** (תמליל ת/98 (ה) עמ' 60-61). כפי שיבואר בהמשך, הפנו פעילי הטרור מגדודי חללי אלאקצא את בקשותיהם לסיוע כספי לשם רכישת נשק וביצוע פיגועים אל הנאשם, והלה היה פונה בשמם ועבורם אל יו"ר הרשות הפלסטינאית ומנהיג הפת"ח, יאסר ערפאת. מכאן ברור הקשר של גדודי חללי אלאקצא לארגון הפת"ח, והקשר של הנאשם לגדודים אלו.

ב.   **מעמדו של הנאשם ותפקידו בארגוני הטרור, ותמיכתו בפיגועים כנגד ישראל**

11. תא"ל ███ הגיש בעדותו חווי"ד נוספת, המתייחסת למעורבותו של הנאשם בטרור (ת/2). לחווי"ד זו צורפה שורה של נספחים הכוללים ראיונות עם הנאשם באמצעי התקשורת השונים ומסמכים שכתב הנאשם או שנמצאו במשרדו. גם חוות דעת זו כפופה להערה שפורטה בסעיף 9 לעיל, בנוגע לקבילותן של הערכות מודיעיניות הנסמכות על מקורות מידע שלא פורטו ולא הובאו בפנינו, ולכן גם בנושא זה נזקק לראיות עצמאיות וקבילות שהובאו במשפט.

12. בחוות הדעת של תא"ל ███ ת/2 נאמר כי הנאשם היה עד למעצרו ראש הועדה העליונה של הפת"ח ביהודה ושומרון, ולפיכך שימש כמנהיג הפת"ח בגדה. זאת ניתן ללמוד מן המסמכים השונים שכתב הנאשם ושנכתבו אליו, ואשר צורפו לחוות הדעת ת/1 ות/2. בתפקידו הנ"ל היווה הנאשם מקור סמכות מרכזי לבכירי הפת"ח, וצינור מקשר בין ראש הרשות הפלסטינאית, יאסר ערפאת, לבין דרגי השטח בתנועה (סעיפים 1-2).

עוד נאמר בחוות הדעת הנ"ל (סעיף 4), כי עם פרוץ האינתיפאדה בחודש ספטמבר 2000, תפס הנאשם חלק מרכזי ביותר בהובלת הטרור נגד ישראל על ידי גורמי פת"ח ובכלל. מעורבותו באה לידי ביטוי בדרכים שונות: **ראשית,** הנאשם היווה מקור השראה והתווה את מדיניות הפיגועים, באמצעות פגישות אישיות עם פעילי הטרור של תנועת הפת"ח והתבטאויות פומביות. **שנית,** הנאשם היה מקור סמכות ומימון לפעילי הטרור של תנועת הפת"ח: הוא נתפס בעיני גדודי חללי אלאקצא כמנהיג המרכזי בפעילותם, שימש כצינור קשר בינם לבין יו"ר הרשות הפלסטינאית והעביר לרשותם סכומי כסף המסתכמים בעשרות אלפי שקלים לצורך פעילות הטרור. **שלישית,** הנאשם העביר הנחיות ישירות לפעילי הטרור - הן במישור האסטרטגי, והן במישור הטקטי הנוגע לפיגועים נקודתיים.

13.    הנאשם לא הסתיר בחקירתו בשב"כ את עמדתו הברורה, לפיה תנועת הפתח חייבת להוביל את "המאבק המזוין כנגד ישראל", וכי זו הדרך היחידה להשגת מטרות העם הפלסטיני לאחר כשלון תהליך השלום, ולאחר שהנאשם עצמו היה פעיל שלום במשך שנים רבות (זכ"ד ת/59 סי 5-2, שהוגש ואושר על ידי החוקר "ואדי" בעמי 96). הוא הבהיר כי כאשר הוא משתמש בביטוי "מאבק מזוין", הוא מתכוון לפיגועים (תמליל חקירה ת/98יא עמי 3-2). הנאשם הסביר כי מנהיגי הפתח חששו מהיחלשות כוחם ברחוב הפלסטיני מול התנועות האיסלאמיות, דבר שדרבן אותם לנקוט קו של פיגועים כנגד ישראל (זכ"ד ת/21 סעיף 5, שהוגש ואושר על ידי החוקר "רוברט" בעמי 63 (בטעות נרשם בפרוטוקול ת/41); זכ"ד ת/23 סי 5, שהוגש ואושר על ידי החוקר "דני" בעמי 90 ; זכ"ד ת/27 סי 12-10 וזכ"ד ת/55 סי 3 שהוגשו ואושרו על ידי החוקר "סמיתי" בעמי 85 ; זכ"ד ת/30 סי 12-8 וזכ"ד ת/58 סי 5 שהוגשו ואושרו על ידי החוקר "אמילי" בעמי 54 ; זכ"ד ת/40 סי 15 שהוגש ואושר על ידי החוקר "מופז" בעמי 58 ; זכ"ד ת/70 סי 3 שהוגש ואושר על ידי החוקר "סטיבי" בעמי 53).

הנאשם אמר בחקירתו כי **"עמדתו המוצהרת הינה מאבק מזוין מול הכיבוש הישראלי, ומי שיש לו נשק שיבצע פיגועים זה הקו הכללי"** (ת/23 סי 5, וכן ראה זכ"ד ת/6 סי 12-11, שהוגש ואושר על ידי החוקר "רוברט" בעמי 62). הוא הסביר כי לפי השקפתו פיגועים שיכאיבו לישראל יקדמו את השלום, ויגרמו לישראלים להבין יש להם מה להפסיד (ת/40 סעיף 15, ות/70 סעיף 4). הנאשם הבהיר כי מבחינתו אזרחים ישראליים החיים בהתנחלויות הם אויב שיש לפגוע בו (זכ"ד ת/63 סי 16, שהוגש ואושר על ידי החוקר "נאורי" בעמי 82). הוא אף אמר כי פיגועים כנגד מתנחלי יהודה ושומרון הם לגיטימיים, גם כאשר מדובר בנשים וילדים (זכ"ד ת/6 סי 13, שהוגש ואושר ע"י החוקר "רוברט" בעמוד 62, זכ"ד ת/77 סי 2 שהוגש ואושר על ידי החוקרים "צדוק" ו"אופיר" בעמי 83, 87).

הנאשם חזר והדגיש במהלך חקירתו כי בויכוח שהתנהל בתוך הרשות והפתח בעניין סוג הפיגועים כנגד ישראל - דגלו ערפאת והוא בקו הקובע כי יש להתמקד בפיגועים כנגד צה"ל והמתנחלים, בעוד שמנהיגים כמו אבו עלא ואבו מאזן התנגדו לכל סוג של אלימות ; רק מעט מאנשי הפתח תמכו בפיגועים בתוך ישראל (ת/27 סעיפים 12-13; ת/30 סעיף 8 ; ת/70 סעיף 3). חרף התנגדותם של ערפאת והנאשם לפיגועים בתוך ישראל, הם איבדו שליטה על החוליות ופעילי השטח במהלך האינתיפאדה (זכ"ד ת/55 סי 3וי, שהוגש ואושר על ידי החוקר "סמיתי" בעמי 85).

14.    עמדתו של הנאשם כמפורט לעיל באה לידי ביטוי גם בדבריו בחקירה שתומללו. לגבי עמדתו של הנאשם כי אין לבצע פיגועי התאבדות בתוך ישראל, הוא הסביר כי פגיעה בהתנחלויות כמוה כפגיעה בצבא, ולכן בעניין זה לא היה ויכוח בתוך הפתח ; אך הוא הודה כי בתקופה האחרונה שלפני מעצרו החל הפתח לבצע גם פיגועי התאבדות בתוך ישראל, ואף אישר כי הפתח נגרר לתוך פעילות זו כדי שלא להשאיר את השליטה בשטח לאירגונים האיסלאמים (ת/98ד עמי 27-29). הנאשם הסביר כי הוא באופן אישי הסתייג מכל פעילות בתוך ישראל, אך תמך "במאבק המזוין כנגד הכיבוש הישראלי", ואף עשה זאת בצורה פומבית בטלויזיה (ת/98ז עמי 7, 10).

הנאשם אישר כי בחמשת החודשים האחרונים שקדמו למעצרו נטל הפתח תפקיד מרכזי בהסלמת רמת האלימות, והנהיג את המלחמה ; הנאשם לא כיחד כי הוא נטל חלק בכך       (ת/98יב עמי 35, ת/98ה עמי 3-4).

הנאשם הדגיש בחקירתו כי הוא תמך בהסכם השלום, ופעל למענו במשך 10 שנים, אך ההסלמה נבעה לדבריו מהעדר תקווה להשגת פתרון פוליטי עם ראש הממשלה שרון (ת/98יב עמי 44-45). הנאשם אף הביע דעתו כי הפלשתינאים טעו כאשר דחו את הצעות ישראל, ועוד יותר מכך את הצעת הנשיא קלינטון, בועידת "קמפ דייויד", שכן לו קיבלו את ההצעות הללו - היתה להם היום מדינה עצמאית (זכ"ד ת/95, שהוגש ואושר על ידי החוקר "אופיר" בעמי 87).

P 7: 000378

15. על גישתו של הנאשם בנושא הפיגועים, ועל תפקידו של הפת"ח בביצוע פיגועים כנגד ישראל, ניתן ללמוד גם משיחות שניהל הנאשם עם המדובבים שהוכנסו לתאו. המדובב שכונה "פלוני 1", הציג עצמו בפני הנאשם כפלשתינאי משכם, הוא מסר לחוקרי השב"כ את הדברים שאמר לו הנאשם לאחר קיום השיחות, ואלו נרשמו בזכ"דים של חוקרי השב"כ שהעידו במשפט ("רוברט" בעמ' 154, "מיקי" בעמ' 155, "אופיר" בעמ' 156 ו"מופז" בעמ' 157), וכן העיד פלוני 1 עצמו (עמ' 107-101). פלוני 1 העיד כי הוא קרא את כל הדו"חות שרשמו אנשי השב"כ על שיחותיו עם הנאשם, ואישר את תוכנם (עמוד 105). בדרך דומה פעל והופעל המדובב פלוני 3, שזיהה את קולו של הנאשם בקלטת ת/124ב (ראה עדותו בעמ' 107-110, ומוצגים ת/122-ת/125).

על פי עדותו של פלוני 1, סיפר לו הנאשם שהוא היה זה שהקים את גדודי חללי אלאקצא והיה אחראי עליהם (עמ' 106). בזכ"ד שנרשם מפיו (ת/117 שהוגש ואושר על ידי החוקר "רוברט" בעמ' 154), אמר פלוני 1 כי הנאשם אמר לו שהאינתיפאדה למעשה היתה מתוכננת לאור המצב המדיני, הרחבת ההתנחלויות והמשך הכיבוש והלחץ על הפלסטינאים בשטחים, וכי ביקורו של אריאל שרון בהר הבית היה רק "הקש ששבר את גב הגמל", והצית את האינתיפאדה שהיתה צפויה ממילא (ראה גם זכ"ד ת/25 ס' 18, שהוגש ואושר על ידי החוקר "מופז" בעמי 58).
לאחר האירוע בהר הבית, ביקשו מנגנוני הביטחון של הפת"ח מערפאת להורות על הפסקת האינתיפאדה, וערפאת לא הגיב. הנאשם עצמו סיפר כי עזב בזעם את הישיבה לאור בקשת המנגנונים, וכי הוא שנוא עליהם משום ש"ימשיך את העם להשלמת המצב". הנאשם אמר לפלוני 1 כי מטרת האינתיפאדה היתה פגיעה בחיילים ובמתנחלים כדי לגרום לעזיבתם, וכדי להוכיח לעולם שהפלסטינאים נלחמים בכיבוש. ואולם לאחר שישראל החלה במדיניות החיסולים, ובעיקר לאחר שפגעה ב▮, עבר הפת"ח לפעול בתוך ישראל במטרה לפגוע באזרחים, על מנת לפגוע בכלכלת ישראל ובתיירות, ולהפעיל לחץ על הרחוב בישראל שילחץ על הממשלה לסגת מהשטחים (שם, ס' 12-13, 17, 20-21). כמו כן אמר הנאשם לפלוני 1 כי מבחינתו הפיגועים מהווים הגנה עצמית של הפלסטינים, אשר מוכנים להושיט יד לשלום, וכי פיגועי ההתאבדות נובעים מן הכיבוש ומן המצב של הפלסטינאים בשטחים (זכ"ד ת/110 ס' 22, 27).

עמדתו של הנאשם התומכת בהמשך האינתיפאדה באה לידי ביטוי גם במכתב ששלח ליאסר ערפאת ביום 31.12.00 (ת/5 (א42)).

16. באשר למדיניות הפיגועים של הפת"ח, הסביר הנאשם בחקירתו כי כאשר ערפאת היה מעוניין בהפסקת אש, הוא היה דואג להעביר הנחיה זו לגורמים רבים, ובהם הנאשם; אך כאשר היה מעוניין בהמשך הפעולות הוא דאג שהפעילים, כולל הנאשם, יבינו זאת מהתגובות, ובעיקר אי-התגובות שלו. הנאשם אמר: "אם הוא (ערפאת) למשל, לא רוצה בהפסקת אש הוא מסתדר אחרת. לא אומר שום דבר" (זכ"ד ת/24 ס' 3ב, שהוגש ואושר על ידי החוקר "סמיתי" בעמ' 85, ותמליל חקירתו של הנאשם ת/98ט עמ' 32-33). הנאשם אמר שערפאת מעולם לא הורה לו בצורה מפורשת לבצע פיגועים. אך הוא הוסיף כי מהעובדה שערפאת התנגד לביצוע פיגועים בתוך ישראל בלבד, ניתן היה להבין שהוא תומך בפיגועים בשטחים, ולכן גם לא הורה להפסיקם; ערפאת אמר בתקשורת כמה פעמים כי "מיליון שאהידים בדרכם לירושלים", והנאשם שאל באופן רטורי האם אין זו הצהרה התומכת בביצוע פיגועים (זכ"ד ת/60 ס' 4-7 שהוגש ואושר על ידי החוקר "אמילי" בעמ' 54; זכ"ד ת/61 ס' 1-8, שהוגש ואושר על ידי החוקר "מיקי" בעמ' 81; זכ"ד ת/62 ס' 3-5 שהוגש ואושר על ידי החוקר "דני" בעמ' 90).
הנאשם הסביר כי לא היה צורך בהוראות ישירות של ערפאת לביצוע פיגועים, שכן הדברים היו מובנים מבין השורות (זכ"ד ת/63 ס' 11-13 שהוגש ואושר על ידי החוקר "נאור" בעמ' 82). הנאשם הוסיף כי גם האינתיפאדה לא פרצה בהוראתו של ערפאת, אך היא לא היתה ממשיכה להתקיים אלמלא תמיכתו בה, אף כי הוא לא היה צריך לתת הנחיה מפורשת לביצוע פיגועים (זכ"ד ת/64 שהוגש ואושר על ידי החוקר "רוברט" בעמ' 62, ות/66 שהוגש ואושר על ידי החוקר "אמילי" בעמ'

P 7: 000379