כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

### (14)    רצח קונסטנטין דנילוב ז"ל בבאקה אלע'רביה

**112.**    ביום 30.3.02 בשעה 13:00 זיהה צוות של מג"ב רכב שנסע במהירות מופרזת לכיוון בבאקה אלעירביה, ובו שני חשודים. בעת שהצוות עקב אחר המחבלים, הם פתחו באש ורצו את קונסטנטין דנילוב ז"ל (ראה תעודת פטירה ת/141ט). שאר אנשי הצוות ירו על המחבלים, וחגורת הנפץ שהייתה על אחד מהם התפוצצה. שני המחבלים נהרגו, לאחר שקודם לכן השליכו רימונים לעבר הצוות (ראה עדותו של ██████ בעמ' 122, שהשתתף באירוע).

צילומים האירוע הוגשו עם תעודת עובד ציבור של ██████ (ת/141ג). בבדיקת מז"פ נקבע כי אחד המחבלים החזיק חגורת נפץ מאולתרת שהתפוצצה על גופו (ת/141ה).

**113.**    ██████ אמר בחקירתו כי שלח מתאבדים יחד עם ██████████, וכי השיג לאחד מהם חגורת נפץ כדי לבצע פיגוע בתוך ישראל. אותו מתאבד נסע עם אדם נוסף כשעליו חגורת נפץ לשם ביצוע פיגוע בישראל, אך נהרג עם חברו בחילופי ירי עם שוטרי משמר הגבול בבאקה אלע'רביה, לאחר שהרגו שוטר מג"ב (הודעה ת/173ב עמי 9-10 שהוגשה על ידי ██████ בעמי 191). עוד סיפר ██████ בחקירתו כי הפיגוע הנ"ל היה אמור להתבצע בחדרה (הודעה ת/172ב עמי 3 שהוגשה על ידי ██████ בעמי 191).

**114.**    גם בפיגוע זה ניתן לקבוע על פי ראיות נסיבתיות חד-משמעיות כי הפיגוע בוצע על ידי אנשים שנשלחו על ידי ██████, וצוידו על ידו בחגורת נפץ. ברור מחקירתו של ██████ כי הפיגוע אליו התייחס בחקירתו הוא הפיגוע הנדון.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכנן וביצע ██████ (ראה סעיף 96 לעיל). השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

### (15)    פיגוע ירי בין עטרת לביר-זית

**115.**    ביום 25.2.01 בשעה 13:00 בוצע ירי מן המארב בכביש 465 לכיוון רכבו של יוסף כהן ( G.M.C.), שנע מכיוון עטרת אל ביר-זית. הירי בוצע ממרכב עוקף. כהן נפצע קשה בפיגוע, ורכבו הדרדר לשוליים (עדותו בעמי 142). עשרות כדורים נורו לעבר רכבו, והוא נפצע משלושה כדורים בראש ושניים בצוואר, ובדרך נס נותר בחיים (ראה מזכר לגבי מצב הרכב ת/142ג ודו"ח תפיסה וסימון של תרמילי הכדורים ת/142ב שהוגשה על ידי ██████ בעמי 124, וכן דו"ח בדיקת הרכב ת/142ד שהוגש על ידי השוטר ██████ בעמי 131).

תיאור של זירת הפיגוע מופיע בלוח התצלומים ת/142 שהוגש על ידי רפ"ק ██████ בעמי 139).

**116.**    ██████ סיפר בחקירתו על פיגוע זה (הודעתו ת/165א עמי 1 שהוגשה על ידי רס"ר ██████ בעמי 184, וכן ת/165ב שהוגש על ידי החוקר "דני" בעמי 200) כיצד תכנן את הפיגוע יחד עם ██████ ██ ואחרים, שביקשו ממנו נשק ורכב כדי לבצע פיגוע. ██████ מסר להם

רובה MP-5 וכדורים, וכן נתן להם את רכבו. כעבור כמה שעות הם החזירו לו את הרכב והנשק, וסיפרו לו כי ירו על רכב באיזור גשר עטרות תוך כדי עקיפתו, וכי הנהג של הרכב נפצע. דבריו של ████████ מתיישבים עם הראיות לגבי דרך ביצוע הפיגוע, מקום ביצועו ותוצאותיו, ולפיכך יש ראיות נסיבתיות חד-משמעיות מהן עולה כי הפיגוע עליו סיפר ████████ הוא הפיגוע הנ"ל בגשר עטרות.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת והעקיפה בפיגועים שתכננו ובוצעו ████████████████ (ראה סעיף 80 לעיל). השאלה המשפטית האם די בכל אלו כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

### (16)   ניסיון פיגוע בפאב "ביאנקיני" בירושלים

**117.**     ביום 19.05.01 בשעה 03:00 גילתה ████████ בעלת פאב "ביאנקיני" בירושלים, מטען חבלה שהונח בשירותים של המקום על ידי ████████, שהיה מוכר לה כפלסטיני מרמאללה שמכר לה מידי פעם מוצרים לנרגילה. בעדותה (עמ' 139-142) סיפרה דגן כי ████████ ישב איתה במסעדה כדי לרשום הזמנה למוצרים, ואז נכנס לשירותים כשאין בידיו דבר. כעבור כמה דקות יצא מהשירותים עם שקית ניילון, הניח אותה במרכז הפאב, וכאשר שאלה אותו מה יש בשקית הוא אמר לה כי היא מכילה בגדים. היא ניגשה לבדוק את השקית, גילתה כי מדובר במטען חבלה מוסתר מתחת למעיל, ובשלב זה ████████ נעלם.

במקום ישבו באותה עת כ- 150-170 בני נוער. דגן גילתה תושיה ואומץ לב ראויים לשבח: היא נטלה את המטען בידיה, צעקה לאחד העובדים הפלסטינאים במקום לפנות את הצעירים, והוא היה גם זה שעזר לה להרחיק את המטען מחוץ למסעדה. המשטרה שהגיעה למקום פוצצה את המטען, באופן שגרם נזק לחנויות באזור. כך עולה מעדותו של חבלן המשטרה ████████ (עמ' 119, וכן ראה חוו"ד מומחה במעבדת החבלה, פקד ████████, ת/143א, חוו"ד מומחה של מז"פ שניתנה על ידי ████████, ת/143ב, ולוח תצלומים ת/143א).

**118.**     ████████ סיפר בחקירתו (הודעה ת/149ב עמ' 10-12, שהוגשה על ידי ████████ בעמ' 194), כי ████████ פנה אליו בתחילת חודש מאי 2002, וביקש ממנו להכין עבורו מטען חבלה, על מנת להניחו בירושלים בפאב ברחוב יפו. הלה הסביר ל████████ כי בעלת המקום נוהגת לקנות ממנו מוצרים לנרגילה, וצייר ל████████ את הפאב. ████████ הנחה אותו היכן להטמין את המטען, והסביר לו כיצד לחבר את החוטים למטף כיבוי אש שהכיל את המטען (אכן המטען היה בתוך מטף כעולה מחוו"ד ת/143א).

לאחר מכן שלח ████████ את ████████ לפאב, ו████████ כיסה את המטען במעיל. כאשר הגיע ████████ לפאב הוא התקשר ל████████, אמר לו משפט קוד ממנו הבין ████████ שהוא עומד להניח את הפצצה בפאב, ו████████ אישר זאת.
████████ התקשר ל████████ וסיפר לו שבעלת המקום ראתה אותו מניח את המטען, והוא שמע בחדשות כי המטען פוצץ על ידי המשטרה.

**119.**     מן האמור לעיל עולה הוכח כי ניסיון הפיגוע בפאב בוצע על ידי ████████ בהנחייתו ובסיועו של ████████. הפרטים שמסר ████████ בחקירתו תואמים את עדותה ש████████ ואת הממצאים בשטח.

אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת

והעקיפה בפיגועים שתכנן וביצע ███████, כמבואר לעיל (ראה סעיפים 27, 65-60 לעיל). השאלה המשפטית האם די בכל אלה כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תיבחן בפרק המסקנות.

### (17) פיגוע ירי בכביש 9 ליד הגבעה הצרפתית בירושלים

**120.** ביום 3.10.01 בשעה 23:30 בוצע ירי לעבר רכב חולף שנע לכיוון הגבעה הצרפתית, בו נסעו מלי ופנחס כהן שנפגעו מן היורי (ראה דו"ח ביקור ראשוני בזירה של רפ"ק ███████ ועדותו בעמ' 132, דו"ח תפיסה וסימון של רפ"ק ███████ ת/144א, דו"ח ביקור ראשוני בזירה של רפ"ק ███████ ועדותו בעמ' 130, וחוו"ד של מעבדת נשק ת/144ד).

**121.** ███████ ███████ אמר בחקירתו (הודעה ת/156ב עמי 4-5, שהוגשה על ידי רס"מ ███████ בעמי 198), כי הוא ביצע פיגוע זה יחד עם ███████, כשהם נוסעים במכונית מאזדה וברשותו רובה MP-5, אותו קיבל מ ███████ לצורך ירי לעבר מטרות ישראליות. הוא סיפר בחקירתו כי לאחר שירה לעבר רכב הנוסע במנהרה בכיוון הגבעה הצרפתית הוא הבחין כי מדובר בנהגת, ולכן הפסיק לירות ואמר לחבריו שיש מעצור בנשק. לאחר מכן הוא המשיך לנסוע לכיוון הגבעה הצרפתית, ושם ירה לעבר רכב תוך כדי עקיפתו. למחרת שמע ברדיו כי בפיגוע נפצעו גבר ואישה.

**122.** הראיות שהובאו על ידי התביעה לגבי פיגוע זה דלות ביותר, וכוללות אך ורק דו"ח ביקור ראשוני בזירה של המשטרה, באופן שכל מידע לגבי דרך ביצוע הפיגוע הוא בבחינת עדות שמיעה. כמו כן קשה לדעת מעדותו של ███████ אם דבריו מתייחסים לפיגוע הנדון, שכן לא ברור מה מועד הפיגוע אליו מתייחס ███████ ובאיזה רכב ירה.

כל שיש בפנינו הוא ראיה על כך ש ███████ ביצע פיגועי ירי כנגד מטרות ישראליות, תוך שימוש בנשק שקיבל מ ███████, שהיה עוזרו ומקורבו של הנאשם. זאת ועוד, ███████ עצמה היה שומר ראשו של הנאשם, והנאשם עצמו אישר כי ███████ עבד במשרדו והיה תחת אחריותו, וכי הוא ידע ש ███████ מבצע פיגועים כנגד אזרחים בגבעת זאב ובפסגת זאב (ראה סעיפים 33-34 לעיל).

### (18) ניסיון לפיגוע התאבדות בבית חנינא בירושלים

**123.** ביום 8.03.02 בשעה 16:15 נלכד המחבל ███████ בדרכו לביצוע פיגוע התאבדות בירושלים, כשהוא נושא על גופו חגורת נפץ. המחבל ניסה להפעיל את המטען כאשר שכב על הרצפה, ואז נורה ונהרג (ראה עדותו של סנ"צ ███████ בעמי 133, ודו"ח מעבדת חבלה ת/145ד).

**124.** ███████ סיפר בחקירתו כי ███████ ביקש ממנו להכין חגורת נפץ למתאבד, והוא הפנה את ███████ אל ███████ שנתן לו חגורת נפץ. המתאבד שוכן בדירה ששכר ███████ ברמאללה, ושם הלבישו עליו את חגורת הנפץ. מאוחר יותר נודע ל ███████ כי הוא נהרג מירי כוחות צה"ל באיזור בית חנינא בדרכו לביצוע הפיגוע (הודעה ת/165ב עמי 2, 11, שהוגשה על ידי רס"מ ███████ בעמי 171).

גם ███████ סיפר בחקירתו (הודעה ת/173ב בעמי 4, שהוגשה על ידי רס"מ ███████ בעמי 191), כי ███████, שגויס על ידו לגדודי חללי אלאקצה, איתר עבורו מתאבד, אך הפיגוע נכשל מכיוון שהמתאבד נורה על ידי שוטרים לפני הגיעתו בכניסה לירושלים.

**125.** מן האמור לעיל עולה כי ███████ ███████ היה מעורבים בניסיון הפיגוע הנ"ל. אין ראיות הקושרות את הנאשם לפיגוע זה בצורה ישירה, זולת הקשר הנובע ממעורבותו הכוללת

והעקיפה בפיגועים שתכננו וביצעו השניים, כמפורט לעיל. השאלה המשפטית האם די בכל אלו כדי לבסס אחריות פלילית של הנאשם למעשה הרצח שבוצע בפיגוע זה - כאשר אין כל ראיה הקושרת את הנאשם ישירות לפיגוע - תבחן בפרק המסקנות.

**(19)   פיגוע ירי בכביש בית אל - פסגות**

**126.**   ביום 17.03.02 בשעה 06:45 בוצע ירי מן המארב מנשק אוטומטי לעבר רכבו של סמיר קרש (פולסווגן פסאט), והוא נפצע מן הירי (ראה דו"ח ביקור בזירת העבירה ת/146א ותצלומים של ████ שהוגשו בעדותו בעמי 121).

התביעה לא הגישה ראיות נוספות לגבי פיגוע זה, והדו"ח של ████ הינו בבחינת עדות שמיעה בכל הנוגע לדרך ביצוע הפיגוע.

התביעה מייחסת בסיכומיה את האחריות לפיגוע זה ל████ והוא אכן הודה במעורבותו בפיגוע זה והורשע בכך (ת/165 ת/ז-יז פרט אישום 43). פרט לכך לא הפנתה התביעה לכל ראיה אחרת מבין הודעותיו של אחמד ברגותי, או הדברים שמסר בחקירתו בשב"כ. לאור האמור לעיל לא הובאו לגבי פיגוע זה ראיות המאפשרות לקבוע ממצא עובדתי ברור בדבר הקשר של ████ לפיגוע הנ"ל, וגם הראיות לגבי עצם ביצוע הפיגוע דלות ביותר.

**(20)   ניסיון פיגוע בקניון מלחה בירושלים**

**127.**   ביום 26.03.02 בשעה 10:30 התפוצץ רכב מסוג "רנו אקספרס" ובו שני חבלנים שהיו בדרכם לביצוע פיגוע (████- ראה דו"ח הובלת גופות ת/147ב, שהוגש על ידי ████ בעמי 135, ודו"ח פעולה ת/147גג שהוגש על ידי ████ בעדותו בעמי 134).

**128.**   ████ סיפר בחקירתו (הודעה ת/165גג עמי 5 שהוגשה על ידי ████ בעמי 171, וזכ"ד ת/165יא סעיף 15 שהוגש על ידי חוקר השב"כ "אדם" בעמי 201, כי ████ התקשר אל הנאשם יום לפני שמצאו את המכונית ליד הקניון בירושלים, ואמר לו שהוא רוצה לבצע פיגוע. הנאשם אמר לו שלא יבצע פיגוע בתוך ישראל, והעביר את ████ אל ████ על מנת שישוחח איתו. ████ טען כי גם הוא אמר ל████ שלא לבצע פיגוע בישראל או בירושלים. ואולם, למחרת התקשר ████ אל ████, ואמר לו כי המכונית שהתפוצצה ליד הקניון בירושלים נשלחה על ידו לביצוע פיגוע בירושלים.

**129.**   הנאשם עצמו אמר בחקירתו (זכ"ד ת/36 שהוגש על ידי חוקר השב"כ "סמית" בעמי 85), כי ████ דיווח לו על כוונת אנשיו של ████ לבצע פיגוע התאבדות בירושלים. הנאשם אמר כי הוא הורה ל████ שהפיגוע לא יבוצע בתחומי ישראל, אלא בשטחי יהודה ושומרון. הנאשם אמר בחקירתו בעניין זה, כשהוא מספר על פניגותו של ████ אליו בעניין רצונו של ████ לבצע פיגוע (תמליל שיחה ת/98יא עמי 20-19):

"**הנאשם:**   ... ש████, הוא אמר לו שאנחנו יש לנו פעולות. ויש לנו פיגועים וכוי. אז אני אמרתי ל████, אמרתי לו מה שחשוב זה שלא יעשו שום פיגוע בתוך ישראל.

**החוקר:**   או.קי וכשבא רשמית ואמר לך שהם רוצים לבצע פיגוע התאבדות, מה אתה אמרת לו?

**הנאשם:**   אמרתי לו לא, אני לא מרשה.

**החוקר:**   לא. זה לא כמו שסיפרת לי. אמרת לו, אין בעיה. אבל לא 'בפנים' (בתוך

ישראל.

**הנאשם:**     **כן, לא בישראל... זאת אומרת שאני לא רוצה פיגועים בישראל".**

הנאשם סיפר כי למחרת קיבל דיווח מ███████ שפיגוע ההתאבדות נכשל, וכי הרכב התפוצץ לא רחוק מהמחסום, ושני חברי החוליה נהרגו.

**130.**     מן האמור לעיל עולה כי הוכחה מעורבותו של הנאשם באישור פיגוע ההתאבדות הנ"ל, וזאת גם על פי גרסתו. הנאשם אמנם הורה שהפיגוע יתבצע במקום אחר, אך לכך אין כל משמעות מבחינת אחריותו הפלילית לניסיון הפיגוע. דברי הנאשם בחקירתו נתמכים בגרסת מקורבו ███████, אם כי הלה "שיפץ" את העובדות, וטען כי הנאשם הורה שלא לבצע את הפיגוע כלל. מדברי הנאשם ברור כי הוא הורה לבצע את הפיגוע במקום אחר.

חלק שלישי :    **הערכת הראיות ומשקלן**

**131.** הואיל והנאשם בחר שלא להעיד ולא להביא עדים מטעמו, ואף הורה לנציגי הסנגוריה הציבורית שמונו לייצגו להמנע מחקירתם הנגדית של עדי התביעה - מבוססות הראיות כנגד הנאשם על כמה נדבכים שונים.

**ראשית,** דברים שאמר הנאשם בחקירתו בשב״כ, אשר חלקם הועלו על הכתב בתמצית בזכ״דים שרשמו החוקרים, ואשר הוגשו על ידם, וחלקם הוקלטו ותומללו. במסגרת זו כלולים גם דברים שאמר הנאשם בשיחות שהוקלטו ללא ידיעתו עם מקורבו ‏▆▆▆▆‏ ועם המדובבים ״פלוני 1״ ו-״פלוני 3״.

**שנית,** עדויות המפלילות את הנאשם, שמסרו פעילי הטרור מקרב הפת״ח לאחר מעצרם. הכוונה להודעות שמסרו בחקירותיהם בשב״כ ובמשטרה, שכן כולם - כאיש אחד - סרבו להשיב על שאלות כלשהן בבית המשפט, כאשר הובאו כעדים מטעם התביעה.

**שלישית,** דברים שאמר הנאשם בכלי התקשורת בתקופה שקדמה למעצרו.

**רביעית,** מסמכים שנתפסו במשרדו של הנאשם ובמשרדי הרשות הפלסטינית במבצע ״חומת מגן״.

**חמישית,** עדויותיהם של נפגעי הטרור, עדי הראיה לפיגועים נשוא כתב האישום ועדים שעסקו בחקירתם.

**132.** לענין הערכת הראיות ומשקלן יש להעיר את ההערות הבאות :

**א.** המנעותו של הנאשם מלהעיד במשפט ולחשוף עצמו לחקירה נגדית עשויים לשמש חיזוק למשקל הראיות כנגדו, ואף להוות סיוע לראיות התביעה מקום שדרוש לחן סיוע, כקבוע בסעיף 162(ב) לחוק סדר הדין הפלילי [נוסח משולב], התשמ״ב-1982 (להלן : **״החסד״פ״**). כמו-כן, המנעותו של הנאשם מלהשיב על כתב האישום, כפי שעשה, עשויה לשמש חיזוק למשקל ראיות התביעה, כקבוע בסעיף 152(ב) לחסד״פ. דברים אלו הובהרו לנאשם על ידי בית המשפט.

ענין זה מקבל משנה חשיבות לאור העובדה שעל פי הדין נדרש חיזוק להודעות של עדים שסרבו להעיד במשפט, או התכחשו לתוכן הדברים שמסרו בחקירותיהם (ראה ס״ק ג)(5) להלן). כך פסק בית המשפט שמסרו עדים במשפט, ואשר טענתט חיזוק לפי סעיף 10א(ד) לפקודת הראיות בחקירה שמסרו עדים במשפט, ואשר טענת חיזוק לפי סעיף 10א(ד) לפקודת הראיות [נוסח חדש], התשל״א-1971 (להלן : **״פקודת הראיות״**) (ע״פ 1497/92 **מדינת ישראל נ׳ צוברי,** פ״ד מז(4) 177, בעמ׳ 202). בית המשפט הבהיר באותו ענין : **״הנאשם השותק - להבדיל מן העד השותק - פועל במסגרת הדין; אולם לבית המשפט נתונה רשות לפרש את התנהגותו לפי התרשמותו והבנתו״** (בעמ׳ 203, וראה גם ד״נ 308/91 **קוזלי נ׳ מדינת ישראל,** פ״ד מה(4) 441, בעמ׳486).

אמנם, בית המשפט רשאי שלא ליתן משקל לשתיקתו הנאשם כאשר יש לה הסבר סביר (ראה : ע״פ 277/81 **הלוי נ׳ מדינת ישראל,** פ״ד לח(2) 369, בעמ׳ 386). אולם, משנדחו הטענות המקדמיות של הנאשם בענין סמכות בית המשפט לשפוט אותו - לא היה בידיו כל הסבר סביר ומוצדק להימנעותו ממתן עדות. ברור למדי כי הנאשם, אשר נחשף במהלך

חקירתו לראיות המפלילות שנצברו כנגדו, ידע היטב כי הוא איננו יכול להתמודד איתן במישור המשפטי, ולכן נמלט אל חיקו החם של המישור הפוליטי. כך אמר הנאשם מספר פעמים בחקירתו, כי ברור לו שהוא יועמד לדין ויורשע, וכי הוא מתכוון לנהל משפט פוליטי.

בענין זה חשוב לציין כי למרות שהנאשם הצהיר שהוא איננו מנהל פרשת הגנה, כפי שאכן נהג, הוא נשא נאומים פוליטיים, ולעתים אף התייחס לראיות שהופנו כנגדו - אך זאת מספסל הנאשמים, ולא מדוכן העדים. על פי הדין, איננו יכולים ליתן משקל לדברים שנאמרו בצורה זו, באופן שלא ניתנה לתביעה אפשרות לחקור את הנאשם עליהם. אשר לדברים הרבים שהנאשם נשא במישור המדיני והפוליטי, הן במהלך המשפט והן בסיכומיו, איננו רשאים להתייחס אליהם, בהיותם בלתי רלבנטיים לשאלת אשמתו של הנאשם בעבירות המיוחסות לו. דברים אלו הובהרו בהחלטה הנוגעת לענין סמכות בית המשפט: אדם הפועל מחוץ למסגרת של לחימה חוקית, ואשר מבצע פעולות טרור שמטרתן לפגוע ללא אבחנה באוכלוסיה אזרחית, חושף עצמו לסנקציות הפליליות הרגילות של המשפט הפלילי הלאומי (ראה החלטה של בית המשפט בתיק זה מיום 19.1.03 בעמ' 29-33). התנגדות לכיבוש, כפי שטוען הנאשם, איננה מהווה צידוק על פי דין כלשהו לביצוע מעשי הרג כנגד אזרחים חפים מפשע. זאת ועוד: מקומה של טענה זו - אם בכלל - הוא בטיעונים לעונש, שכן היא נוגעת למניע לביצוע העבירות, להבדיל מן הכוונה הפלילית הדרושה לשם הוכחתן.

ב.     הואיל והנאשם בחר שלא לנהל פרשת הגנה, הוא גם לא העלה טענות כלשהן כנגד קבילות הראיות או משקלן. ואולם בית המשפט ראה עצמו מחויב לבחון שאלות זו ביוזמתו, ולהתעלם מראיות בלתי קבילות שהתביעה הגישה או הסתמכה עליהן בסיכומיה (כגון, עדויות שמיעה הכלולות בהודעות העדים, זכ"דים והודעות שלא הוגשו על ידי החוקרים שרשמו אותם, חוות דעת הנסמכות על ידיעות מודיעיניות וראיות שלא הוגשו במשפט, והתייחסות בוכד"ים לממצאים פוליגרף).
בחנו את חומר הראיות גם מזווית הראיה של הנאשם, ולא רק מנקודת מבטה של התביעה כפי שפורטה בסיכומיה. עם זאת, כפופים אנו לכלל לפיו נאשם שלא העיד במשפטו איננו רשאי להסתמך על דברים הכלולים באמרות חוץ שמסר : אמרות אלו כשרות כראיות כנגדו, אך לא לטובתו, שהרי לא ניתן היה לחקור אותו על אמרותיו (ראה ע"פ 205/75 <u>**קרנץ נ' מדינת ישראל**</u>, פ"ד ל(2) 471, בעמ' 474).

ג.     התביעה זימנה לעדות 21 מפקדי שטח ופעילי טרור הקשורים לפיגועים נשוא כתב האישום, והקשר של הנאשם איתם פורט לעיל. עדים אלו, בלא יוצא מן הכלל, סרבו להשיב על שאלות ב"כ התביעה, ונראה כי אין מדובר בהחלטה אישית של כל אחד מהם, אלא בהנחיה מגבוה. עדים אלו לא היו מוכנים להעיד כנגד מפקדם ומנהיגם, והדברים ברורים. בשיחה שהתנהלה בין הנאשם לבין ▇▇▇▇▇▇ בעת מעצרם, ואשר הוקלטה ללא ידיעתם, הזהיר ▇▇▇▇▇ מפני העדויות שימסרו פעילי הטרור שנעצרו, והנאשם השיב לו, כשהוא נשמע צוחק : **"כולם בבית המשפט יכחישו את מה שהודו בו... כולם יבטלו... אמרו לי החוקרים. אמרתי להם שאיש לא יודה בבית משפט"** (תמליל 127ג' עמ' 109). כך אמר הנאשם, וכך אכן אירע.

בנסיבות אלו הוכרזו כל אותם פעילי טרור כעדים עוינים, והודעותיהם בחקירה הוגשו לפי סעיף 10א. לפכותה הראיות. לגבי עדים אלו יש להעיר כדלקמן :

(1)     חלק מעדי התביעה העידו לאחר סיום משפטם, ורובם הורשעו, בין היתר, במעורבותם בפיגועים נשוא כתב אישום זה על פי הודאתם. בהודאותיהם בעובדות

כתבי האישום שהוגשו כנגדם, מפלילים עדים אלו את הנאשם. אולם, ההלכה בענין זה כי הודאת נאשם שכזו, מפי אדם שהוא עד במשפט, נחשבת אמנם כאמרת חוץ שחל עליה סעיף 10א. לפקודת הראיות, אך אין ליתן להודאה זו משקל של ממש. מבחינתו של העד - ההודאה שהוא מוסר במשפטו מרוכזת כל כולה בעובדות הנוגעות אליו, וספק רב אם הוא מודע אותה שעה להשלכות שיש לחלקים בהודאתו על אחרים (ראה: ע"פ 4541/90 **אליהו סלע נ' מדינת ישראל**, תק-על 91(2) 2086).

(2) ככלל, אמרת חוץ של עד היא עדות שמיעה הפסולה כראיה לאמיתות תוכנה. החריג לכלל נקבע בסעיף 10א(א) לפקודת הראיות ולפיו בית המשפט רשאי לקבל אמירה שכזו, ואף להסתמך עליה ולהעדיפה על עדות העד בבית המשפט, כאשר העד במשפט מסרב להעיד, או שהוא מתכחש לגרסה שמסר בחקירתו.

מטרתו של סעיף זה להתמודד עם התופעה הנפוצה של עדים המתכחשים לגרסה שמסרו בחקירתם, ועל מנת למנוע מצב שבו לא ניתן יהיה לעמוד אותם במשפט עם הגרסה שמסרו בחקירתם (ראה: דברי ההסבר להצעת החוק תיקון פקודת הראיות, תשל"ד-1974). ודוק: עד אשר הוזמן להעיד והתייצב על דוכן העדים נחשב כ"עד במשפט", גם אם סרב להשיב על שאלות, ולפיכך חל עליו סעיף 10א(א) הנ"ל, ולא סעיף 10א(ב) המתייחס למקרה בו לא ניתן כלל להביא עד לבית המשפט מהטעמים המפורטים בסעיף (ראה: דנ"פ 4390/91 **מדינת ישראל נ. חאג' יחיא**, פ"ד מז(3) 673; והשווה דעתו של א. שטיין, "**סעיף 10א. לפקודת הראיות: פרשנותו הראויה ופסיקתו של בית המשפט העליון**", משפטים כ"א תשנ"ב, עמ' 325, בעמ' 336-338).

(3) על פי סעיף 10א(א) לפקודת הראיות, קבלת אמרת חוץ של עד במשפט, אשר מכחיש את תוכן העדות שמסר בחקירתו, מותנית בכך שמתן האמרה הוכח, שנותן האמרה הוא עד במשפט וניתנה וניתנה לצדדים הזדמנות לחקור. תנאים אלה מתקיימים בעניינינו לגבי 21 פעילי הטרור הנ"ל.

(4) בית המשפט רשאי לסמוך ממצאיו על אמרת חוץ שהתקבלה לפי סעיף 10א. לפקודת הראיות, ואף להעדיפה על פני עדות העד במשפט, "**אם ראה לעשות כן לנוכח נסיבות העניין, לרבות נסיבות מתן האמרה, הראיות שהובאו במשפט, התנהגות העד במשפט ואותות האמת שנתגלו במהלך המשפט, והטעמים ירשמו**" (סעיף 10א(א) לפקודת הראיות).

(5) על פי סעיף 10א(ד) לפקודת הראיות, לא יורשע אדם על סמך אמרת חוץ שהתקבלה לפי סעיף זה, אלא אם יש בחומר הראיות דבר לחיזוקה. הכוונה היא לתוספת ראייתית המחזקת את אמינותה של אמרת החוץ, ומפיגה את החשש כי אין בה אמת (ראה: י. קדמי, **על הראיות**, בעמ' 354-365).

בענין זה יש לציין כי אמרת חוץ של עד אחד, שהיא עצמה טעונה חיזוק, יכולה לשמש כחיזוק לאמרת חוץ של עד אחר (ספרו הנ"ל י. קדמי בעמ' 366, והפסיקה המצוטטת שם). כאמור לעיל, גם שתיקתו הנאשם במשפט עשויה להוות חיזוק לאמרת חוץ של עד, וכך גם הימנעותו מלחקור עד זה בחקירה נגדית (י. קדמי הנ"ל בעמ' 371-369, והפסיקה המצוטטת שם).

ההלכה הפסוקה היא כי הימנעות נאשם מחקירת עדי התביעה - מחזק אף היא את ראיות התביעה (ראה: ע"פ 4736/91 **פטאיר נ' מדינת ישראל**, תק-על 94(2) 1866). הנאשם לא ישמע לאחר מכן בטענה שהעדים לא נחקרו בחקירה נגדית

(ראה: ע"פ 1632/95 **עוזי משולם נ' מדינת ישראל**, פ"ד מט(5) 534, בעמ' 550, שבו התנהל המשפט ללא נוכחות הנאשם, על פי רצונו, והסניגור הונחה שלא לחקור את העדים). נאשם איננו יכול לסכל את ההליך המשפטי המתנהל נגדו בעצם הימנעותו מלהתגונן.

**במקרה דנא,** הרשעתו של הנאשם נסמכת על מארג רחב ואמין של ראיות, הכוללות הודאות שמסר הנאשם בחקירתו, דברים שאמר הנאשם בכלי התקשורת, מסמכים שנתפסו אצל הנאשם וברשות הפלסטינאית, ועדויות רבות של פעילי הטרור שנחקרו בחקירתם, ואשר תומכות זו בזו ומהוות חיזוק האחת לרעותה. כפי שעולה מן התשתית הראייתית שפורטה לעיל. ברור לחלוטין כי פעילי הטרור לא היימנעו ממתן עדויות במשפטו של מנת לסכל את ההליך, ולהימנע מחשיפת הגרסה שמסרו בחקירותיהם. הנאשם הביע כעס בחקירתו על הדברים המפלילים שמסרו פעילי השטח נגדו (ראה: דו"ח הפצעות של הנאשם עם ▮▮▮▮ ת/77ג; דברים שאמר הנאשם למדובב "פלוני 3" ת/123 עמ' 1 ות/124 ס' 1; דברים שאמר הנאשם למדובב "פלוני 1" ת/112 ס' 7-6, ת/114 ס' 7, ת/115 ס' 14, 13, ת/ 116 ס' 9, ושיחתו של הנאשם עם ▮▮▮▮▮ ת/127ג עמ' 3, 4, 72, 84), ועובדה זו מחזקת את המסקנה שפעילי הטרור אמרו בחקירתם דברים נכונים לגבי הנאשם.

בנסיבות אלו, יש להעדיף את האמרות שמסרו עדים אלו בחקירותיהם על פני עדויותיהם במשפט, כאשר נמצא הרבה יותר מאשר "חיזוק" לאמרות החוץ שמסרו בחקירות. ההודעות שמסרו פעילי הטרור משתלבות כדצע האחת ברעותה, ויחד עם הדברים שאמר הנאשם בחקירתו, והמסמכים שנתפסו ברשות הפלסטינאית, נחשפה תמונה ברורה המצביעה על חלקו של הנאשם ותפקידו בפיגועים נשוא כתב האישום.

133.   לא מצאנו כל סיבה להטיל ספק במהימנותם של חוקרי השב"כ, אשר העידו כי הזכ"דים שרשמו בחקירותיו של הנאשם משקפים בצורה הולמת את עיקרי הדברים שאמר. ככל שמדובר במשקל הדברים, יש להביא בחשבון את הכללים שנוארנו בהרחבה בתפ"ח 1074/02 **מדינת ישראל נ' עצאי מוחסין** (תק-מח 2003 (2) עמ' 3553, ס' 84-76). זכ"דים אלה מהווים אמרות של הנאשם, אך בניגוד למקובל בחקירה משטרתית הם כוללים רק תמצית של החקירה; לא תמיד ניתנת לנחקר אזהרה בדבר זכויותיו; הנחקר איננו יכול לקרוא את הדברים הנרשמים בזכ"ד, ואיננו חותם עליו; הזכ"ד נרשם גם לעם בשפה שאיננה גם כאשר החקירה היא בערבית, בניגוד להנחיה הברורה בפסיקה. עם זאת, חשוב להדגיש כי, זכ"דים אלו בהחלט מהווים ראיות קבילות, כאשר לעניין משקלם יש להביא בחשבון את היקף וצורת הרישום והתיעוד שלהם (ראה: ע"פ 6613/99 **סמירק נ' מדינת ישראל**, פ"ד נו(3), 529, בעמ' 553).
**במקרה דנא,** גובו זכ"דים רבים בתמלילי הקלטות מהחקירה, בהם נשמע הנאשם מדבר בקולו, בשפה העברית בו הוא מיטיב להתבטא, דבר המסיר חשש לגבי מהימנותם. כמו כן, נאמר לנאשם במפורש לאורך כל חקירתו כי אינו חייב לומר דבר, וכי הדברים שיאמר עשויים לשמש כראייה נגדו, והנאשם אף נפגש עם עו"ד במהלך חקירתו (ראה להלן). זאת ועוד: הדברים שאמר הנאשם בחקירתו בשב"כ, כפי שנרשמו בזכ"דים והוקלטו ותומללו בחלקים ניכרים מהם, נתמכים היטב בעדויותיהם של פעילי הטרור שפורטו לעיל, ולעיתים גם במסמכים שנתפסו אצל הנאשם, ובראיונות שנתן באמצעי התקשורת האלקטרוניים. במבצע דברים זה, אין עלינו לסמוך אך ורק על הזכ"דים שרשמו חוקרי השב"כ מפי הנאשם, ואף לא רק על הדברים שאמרו פעילי הטרור בחקירותיהם (שהרי אלה סירבו להעיד במשפט, או שהתכחשו לדברים שאמרו בחקירותיהם). אלא יכולים אנו להתרשם מדברי הנאשם בחקירתו בשב"כ, בצורה בלתי אמצעית, כפי שאלה הוקלטו ותומללו.

134.   בעניין הערכת משקל דבריו של הנאשם בחקירתו בשב"כ, הבאנו בחשבון - הגם שהנאשם עצמו לא העלה טענה כלשהו בנושא זה - כי מדובר בחקירה ארוכה ומתישה. הנאשם היה נתון

לחקירות ארוכות ביותר במהלכן ישן שינה מועטה, כשהוא יושב כבול על כסא, והוא הגדיר זאת בשיחתו עם המדובב "פלוני 1" (ת/112 (1) עמ' 4-3) – כעינוי.

לנאשם הובהר כי כל עוד לא ישתף פעולה בחקירה יהיה צורך להמשיכה, ואף נרמז לו כי הדרך לפגוש את בני משפחתו היא לשתף פעולה (זכ"ד ת/12 סי' 13). באחת החקירות נאמר לנאשם כי חקירתו לא תסתיים עד אשר ימסור את האמת, כפי שהיה הדבר לגבי פעילי הטרור שהודו בסופו של דבר בחלקם של הנאשם במעשים המיוחסים לו (זכ"ד ת/63 סי' 9-10). באחת החקירות סרב הנאשם להמשיך בחקירה כל עוד לא יינתן לו פרק זמן סביר לישון, והחוקר הבהיר לו כי לא יתאפשר לו לישון עד אשר יודה לפחות בראשי פרקים לגבי פעילותו, אך הנאשם דחה הצעה זו (זכ"ד ת/21 סי' 28-26). כמו כן, הופעל על הנאשם לחץ מוסרי להודות ולהתנהג כמנהיג הנוטל אחריות על מעשי פקודיו, במקום להתכחש לדברים שעשו פקודיו, ולהציג אותם כשקרנים (זכ"דים ת/16-ת/17).

בעניין חקירתו של הנאשם במשך שעות ארוכות, חשוב לציין כי הנאשם נעצר ונחקר במהלך מבצע "חומת מגן", בתקופה של ביצוע פיגועי טרור רבים כנגד ישראל. בנסיבות אלו ברור כי היתה חשיבות רבה להשלים את חקירתו במהירות האפשרית, שכן חקירתו התנהלה לא רק לצורך בירור אשמתו, אלא גם, ואולי בעיקר, לצורך סיכול פיגועים נוספים. חוקרי השב"כ הסבירו עד כמה היה חשוב להם להגיע במהרה לפעילי טרור ולחוליות טרור שהיו קשורות לנאשם, וכי חקירת הנאשם היתה בעיקרה מודיעינית (החוקר "איתי" בעמ' 154 והחוקר "ואדי" בעמ' 97).

חקירת הפשעים החמורים בהם הואשם הנאשם, והצורך המודיעיני בקבלת מידע מפיו מהר ככל האפשר, חייבו את חקירתו הרצופה במשך שעות רבות. אין בכך להביא לפסילת הודעותיו של הנאשם, כאשר ברור שהוא מסר לחוקריו רק את הדברים שרצה לומר, והנאשם הצדיק עניינית לדרך חקירה זו ובנסיבות הביטחוניות ששררו אז (ראה : י. קדמי, **על הראיות**, חלק ראשון, מהד' תשס"ג-2003 בעמ' 58-55).

135. ברור ממהלך החקירה כי הנאשם התלבט רבות, ובקול רם, אם להודות בקשר שלו לפיגועים נשוא כתב האישום, והוא אף הסביר כי הדבר עלול להשפיע בעתיד באופן שלילי על מנהיגותו עם הפלסטינאי (ראה למשל, זכ"ד ת/24 סי' 7, זכ"ד ת/68 סי' 6). בסופו של דבר החליט הנאשם להודות בחלק מהדברים שעשה, לאחר שהבין שפעילי השטח הודו בחקירותיהם והפלילו אותו, וכי יש בידי החוקרים ראיות מוצקות בנוגע לאשמות שייחסו לו. לכן הודה הנאשם רק בדברים שאנשיו הודו בהם קודם לכן, ורק לאחר שדבריהם הוצגו לו על פי דרישתו, והוא אף הבהיר חזור והבהר כי יודה אך רק לדברים שיוצגו בפניו, ואשר הינם נכונים (זכ"ד ת/22 סי' 9-8, שהוצגו ואושר על ידי החוקר "מומזי" בעמ' 58, וזכ"ד ת/23 סי' 9, שהוצגו ואושר על ידי החוקר "דני" בעמ' 90). הנאשם ביקש להיפגש עם ראש השב"כ, ואמר כי הוא מוכן להודות בדברים שיש לו אחריות עליהם, אם יראו לו שאחרים כבר הודו בהם (תמליל חקירה ת/98א' עמ' 18-16, 28-26).

יש להדגיש בהקשר זה כי הנאשם עצמו אמר בשיחתו עם המדובב "פלוני 1", כי הסתבר לו בחקירתו שפעילי השטח שנעצרו מסרו ידיעות רבות ומהימנות לגביו. כאשר נשאל על ידי המדובב אם הידיעות שמסרו לגביו הן אמיתיות השיב : **"רבות, יעני יש הוכחה ודיוק"** (תמליל שיחה ת/112 ג (1) עמ' 6). עוד אמר הנאשם למדובב "פלוני 1" כי הנהג שלו ( ▆▆▆▆ ) מסר הודאה הקושרת את הנאשם ל- 8 פיגועי התאבדות בישראל, וכאשר נשאל הנאשם האם "סגר אותו בהודאות" - הוא השיב בחיוב (זכ"ד ת/114א עמ' 7). לכל אורך שיחותיו של הנאשם עם "פלוני 1" ניתן לראות כי נושא ההודאות שמסרו פעילי השטח בחקירותיהם הטריד אותו מאוד, והוא היה מודע לכך שהם מסרו מידע אמיתי מדי לגביו (ראה דו"חות ת/112א(1), ת/113א, ת/113ג, ת/114א, ת/114ג, ת/115א, ת/115ג(1)(א), ת/116א).

הנאשם אמר ל"פלוני 1" כי הוא אמנם טוען בחקירתו שהוא מנהיג פוליטי, אך ההודאות שמסרו אחרים כנגדו, והחומר הרב שנתפס במשרדו ובמשרדי הרשות הפלסטינאית יאלצו אותו **"לדבר**

**בחקירה"** (דו"ח ת/117 סי 29, 32 שהוגש על ידי החוקר "רוברטי").
זה היה הרקע שהביא את הנאשם להודות בדברים שממילא כבר היו ידועים לחוקרים ממקורות אחרים.

**136.** המפנה בחקירת הנאשם חל ביום 21.4.02, כשבוע לאחר מעצרו של הנאשם, כאשר הוא החליט לספר את העובדות מנקודות ראותו ואחריותו, אך דרש כי קודם לכן יוצגו בפניו הדברים שאמרו אנשיו בחקירתו, ושיתאפשר לו להיפגש עם ראש השב"כ או סגנו (זכ"דים ת/19-ת/20). הנאשם קיבל את הצעת החוקרים לעשות אבחנה בין סירובו למסור הודעה מפללת במשטרה, שתיחשף בעתיד, לבין מסירת פרטים על פעילותו בחקירתו בשב"כ (זכ"ד ת/20 סי 10-12, זכ"ד ת/24 סי 7). הנאשם יצא מתוך הנחה שדברים שיאמר במשטרה יחשפו בציבור ויחייבו אותו, וזאת בניגוד לדברים שאמר בחקירתו בשב"כ - שאותם תכנן הנאשם להכחיש, כפי שאכן עשה בחקירתו במשטרה ובמשפט. כך אמר הנאשם במפורש בשב"כ, כאשר נאמר לו כי הזכ"דים הרשמים במהלך חקירתו יוגשו כראיה בבית המשפט כאילו היו עדות משטרתית (זכ"ד ת/25 סי 23, שהוגש ואושר על ידי החוקר "מופזי" בעמי 58).

בענין זה יש לציין כי שישה ימים לאחר מעצרו נחקר הנאשם, והוזהר בדרך המקובלת כי איננו חייב לומר דבר על פי החוק, וכי הדברים שיאמר עשויים לשמש ראיה כנגדו (ראה זכ"ד ת/40 סי 1, ועדותו של החוקר "מופזי" בעמי 59). החוקר "מופזי" העיד כי אזהרות כאלה ניתנו לנאשם במהלך כל חקירתו, וכך בא העיד החוקר "אמילי" (עמי 57, 59, ואזהרות הכלולות בזכ"דים ת/41 סי 1, ת/44, ת/25, תמליל חקירה ת/98 עמי 37). לעיתים אמנם נרמז לנאשם כי לא בהכרח יועמד לדין, שכן קיימת אפשרות שהוא יגורש, אך הנאשם ציין כי הוא מעדיף את האפשרות של העמדה לדין, ואף אמר כי ברור לו שהוא יועמד לדין ויישלח לכלא לשנים רבות (זכ"דים ת/10, ת/11, ת/14 ו-ת/19 סי 5, וזכ"ד ת/63 סי 25).

**137.** הנאשם אמר בחקירתו כי הוא מתכוון לנהל משפט פוליטי, תוך התעלמות מהראיות שתוגשנה נגדו במשפטו (זכ"ד ת/42 סי 8 שהוגש ואושר על ידי החוקר "ואדיי" בעמי 96, וזכ"ד ת/56 סי 3 שהוגש ואושר על ידי החוקר "סמיתי" בעמי 85). בשיחותיו של הנאשם עם המדובב "פלוני 1", הוא הסביר לו את הטקטיקה בה הוא נוקט בחקירתו, לפיה הוא איננו מודה אלא בדברים שהחוקרים יודעים עליו, ומנסה למשוך זמן ולהבין מה החוקרים יודעים עליו, כדי לא להפליל אחרים.

הוא גם אמר לעורך-דינו כי לא ימסור כל הודעה במשטרה (ראה דו"חות ת/118 סי 3, ת/120 סי 2, ודבריו לי"פלוני 3" בדו"ח ת/122 סי 1). יש לציין בהקשר זה כי הנאשם נפגש לראשונה עם פרקליטו, עו"ד בולוס, שלושה ימים לאחר מעצרו (מוצג **ת/164**, וזכ"ד **ת/111** סעיף 14). במהלך חקירתו נפגש הנאשם עם עו"ד בולוס כמה פעמים (זכ"ד ת/90 סי 1).

**138.** **סיכומו של דבר**: אין לנו סיבה לסבור שהודאתו של הנאשם בחקירתו בשב"כ ניתנה עקב אמצעים פסולים כלשהם שהופעלו כנגדו, אשר הביאו לשלילת רצונו החופשי של הנאשם, והנאשם גם לא טען זאת. במהלך המשפט, וכן בעת חקירתו במשטרה, כאשר הוצגו לנאשם הדברים שאמר בחקירתו בשב"כ, הוא חזר וטען כי מדובר בי"בשקר וזיוףי". הוא לא טען כי הופעלו כנגדו אמצעים פסולים בחקירה, והתרשמנו בבירור שהחוקרים נהגו בנאשם בכבוד, כפי שגם אמר הנאשם בחקירתו בשב"כ (זכ"ד ת/75 סי 2, זכ"ד ת/90 סי 1 ותמליל חקירת הנאשם ת/98 עמי 29). בעת מתן עדויותיהם במשפט, לחץ הנאשם את ידם של חלק מחוקרי השב"כ, וגם עובדה זו מעידה כי אין בלבו של הנאשם תחושות כלשהן כנגד חוקריו.

לנאשם היתה שליטה מלאה על הדברים שאמר לחוקרי השב"כ: הוא החליט אלה דברים היה מוכן לומר בחקירתו, ואשר להערכתו כבר היו ידועים לחוקרים ממילא, ואלה דברים הוא מתכוון להסתיר מהם. הנאשם היה זהיר ביותר בחקירתו, ולא פעם סירב לענות על שאלות שנשאל, או

שענה בצורה עקיפה ומרומזת. הוא בחר לעצמו טקטיקה במהלך החקירה, לפיה ירחיב בעניינים פוליטיים ויקמץ בעניינים הקשורים לפעולות הטרור, ובכל מקרה לא ימסור אלא פרטים שלהערכתו כבר נמצאים בידיעת החוקרים.

כפי שהעיד המדובב "פלוני 1", אמר לו הנאשם: **"גם אם כל העם הפלסטינאי מודה עליו, הוא יקבע מה יאמר בחקירה"** (ת/110 ס' 10). מכל האמור לעיל, ברור שהנאשם מסר את הודעותיו מרצון חופשי.

חלק רביעי :    **ניתוח משפטי ומסקנות**

**1.    פעילות וחברות בארגון טרוריסטי**

**139.**    בכתב האישום מיוחסות לנאשם, בין היתר, העבירות של פעילות וחברות בארגון
טרוריסטי. סעיפים 1-3 לפקודת מניעת טרור, התש"ח-1948 קובעים לאמור :

## "1.    פירושים

"ארגון טרוריסטי" פירושו חבר אנשים המשתמש בפעולותיו במעשי
אלימות העלולים לגרום למותו של אדם או לחבלתו, או באיומים במעשי
אלימות כאלה ;
"חבר בארגון טרוריסטי" פירושו אדם הנמנה עליו, וכולל אדם המשתתף
בפעולותיו, המפרסם דברי תעמולה לטובת ארגון טרוריסטי, פעולותיו או
מטרותיו, או אוסף כספים או חפצים לטובת ארגון טרוריסטי או
פעולותיו".

## 2.    פעילות בארגון טרוריסטי

אדם הממלא תפקיד בהנהלה או בהדרכה של ארגון טרוריסטי, או משתתף
בדיוניו או בקבלת החלטותיו של ארגון טרוריסטי, או משמש חבר בבית-
דין של ארגון טרוריסטי, או נואם נאום תעמולה באסיפה פומבית או ברדיו
מטעם ארגון טרוריסטי, ייאשם בעבירה, ובצאתו חייב בדין, יהא צפוי
לעונש מאסר עד עשרים שנה.

**3.**    *חברות בארגון טרוריסטי*
אדם שהוא חבר בארגון טרוריסטי, ייאשם בעבירה, ובצאתו חייב בדין,
יהא צפוי לעונש מאסר עד חמש שנים".

סעיף 7 לפקודת מניעת טרור קובע כי :

**7.**    *הוכחה על קיום ארגון טרוריסטי*
כדי להוכיח בכל דיון משפטי, שחבר אנשים מסויים הוא ארגון טרוריסטי, יספיק
להוכיח כי —

(א)    מטעם אותו חבר אנשים או בפקודתו ביצע אחד או יותר מחבריו בכל זמן
שהוא לאחר ה' באייר תש"ח (14 במאי 1948) מעשי אלימות העלולים
לגרום למותו של אדם או לחבלתו, או איומים במעשי אלימות כאלה ; או

(ב)    חבר אנשים, או אחד או יותר מחבריו מטעמו או בפקודתו, הכריז שאותו
חבר אנשים אחראי למעשי אלימות העלולים לגרום למותו של אדם או
לחבלתו, או איומים במעשי אלימות או איומים במעשי אלימות כאלה, או שהכריז שחבר האנשים
היה מעורב במעשי אלימות או איומים במעשי אלימות כאלה, בתנאי שמעשה האלימות או
האיומים נעשו לאחר ה' באייר תש"ח (14 במאי 1948)".

**140.** עובדת היותם של הפת"ח, התנזים וגדודי חללי אלאקצא ארגונים טרוריסטיים, כפי שנאמר בחוות דעתו של ▇▇▇▇ ת/1, הוכחה בבירור ממסמכי השלל שנתפסו במבצע "חומת מגן" והוסער כראיות בפנינו, כמו גם מעדויותיהם של פעילי הטרור והנאשם עצמו (ראה לעיל: סעיפים 7-10; עדותו של ▇▇▇▇ בסעיפים 21-23; עדותו של ▇▇▇ בסעיף 25; עדותו של ▇▇▇ בסעיף 29; עדותו של ▇▇▇ בסעיף 35; עדותו של ▇▇▇ בסעיף 40; עדותו של ▇▇▇ בסעיף 55; עדותו של ▇▇▇ בסעיף 57; ודברי הנאשם בחקירתו כמפורט בסעיפים 60-64). הפיגועים נשוא כתב האישום, ורבים אחרים, בוצעו על ידי פעילי השטח של הפת"ח – אנשי התנזים – ועל ידי חוליות שהתאגדו במסגרת המכונה "גדודי חללי אלאקצא". הנאשם היה מנהיג הפת"ח בגדה, ומפקד התנזים וגדודי חללי אלאקצא, כפי שהודה בחקירתו, וכפי שהוכח בראיות נוספות רבות (ראה סעיף 17 וסעיפים 60-65 לעיל).

תפקידיו של הנאשם בהנהגת ארגוני הטרור פורטו בהרחבה אף הם (ראה חלק שני, פרק ד' לעיל). הנאשם היה מפקדם של ארגוני הטרור וחוליות הטרור, גם אם לעיתים אלה חרגו מהנחיותיו, והוא דאג לספק להם אמצעי לחימה וכספים לצורך פעילותם (ראה חלק שני פרק ד(1) ו-(3) לעיל). הוא אף היה מעורב באופן אישי בחלק מן הפיגועים שביצעו הארגונים שבהנהגתו (ראה חלק שני פרק ד(2) לעיל). הנאשם אף טיפל בסיוע למבוקשים ולמשפחות העצורים והחללים, ובגיוס פעילים לארגוני הטרור והדרכתם (ראה חלק שני פרק ד(4)-(5) לעיל). הוא היה האדם אשר ביטא את עמדתם של ארגוני הטרור באמצעי התקשורת (ראה פרק ד(6) לעיל).

אין מדובר, איפוא, אך ורק "באדם הממלא תפקיד בהנהלה או בהדרכה של ארגון טרוריסטי", כלשון סעיף 2 לפקודת מניעת טרור, אלא הנאשם הוא מי שעמד בראש ארגוני הטרור הנ"ל, התווה את מדיניותם ונשא נאומו תעמולה מטעמם באמצעי התקשורת.
בכך הוכח יסודות סעיפים 2 ו- 3 לפקודת מניעת טרור, קרי חברות בארגון טרוריסטי ופעילות בארגון שכזה.

**2.      אחריותם של מבצע בצוותא, משדל ומסייע וההבחנה ביניהם**

**141.** כתב האישום מייחס לנאשם אחריות ישירה של "מבצע בצוותא" לגבי כל מעשי הרצח וניסיון הרצח נשוא כתב האישום, כאשר מדובר ב- 37 פיגועים שונים.
כתב האישום מייחס לנאשם גם את העבירות של סיוע ושידול לרצח, אם כי טענת המאשימה בסיכומיה היא, כי יש לראות בנאשם מבצע בצוותא של עבירות אלו, ולא רק מסייע או משדל לביצוע, וזאת עקב היותו מנהיג ארגוני טרור, והאחראי העיקרי לביצוע פיגועי הטרור שהוציאו ארגונים אלה לפועל. יש לסקור, את מידת אחריותו הנטענת של הנאשם לפיגועי הטרור נשוא כתב האישום: ראשית - כמי שביצע את מעשי הרצח בצוותא חדא עם פעילי השטח והמפגעים; שנית – כמי ששידל לביצוע מעשים אלה; שלישית – כמי ששסיע לביצוע מעשי הרצח.
במסגרת זו יש לבחון מה הקוום המאפיינים את "המבצע בצוותא", תוך הבחנתם מן המאפיינים את המסייע והמשדל.

**142.** סעיף 29(ב) לחוק העונשין, התשל"ז-1977 קובע את אחריותו של המבצע בצוותא, כדלקמן:

**"המשתתפים בביצוע עבירה תוך עשיית מעשים לביצועה, הם מבצעים בצוותא, ואין**
**נפקה מינה אם כל המעשים נעשו ביחד, או אם נעשו מקצתם בידי אחד ומקצתם בידי**

אחר״.

סעיף 30 לחוק העונשין, התשל״ז-1997 קובע את אחריותו של המשדל כדלקמן :

**״המביא אחר לידי עשיית עבירה בשכנוע, בעידוד, בדרישה, בהפצרה או בכל דרך שיש בה**
**משום הפעלת לחץ, הוא משדל לדבר עבירה״.**

סעיף 31 לחוק העונשין, התשל״ז-1977 קובע את אחריותו של המסייע כדלקמן :

**״מי אשר, לפני עשיית העבירה או בשעת עשייתה, עשה מעשה כדי לאפשר את הביצוע,**
**להקל עליו או לאבטח אותו, או למנוע את תפיסת המבצע, גילוי העבירה או שללה, או כדי**
**לתרום בדרך אחרת ליצירת תנאים לשם עשיית העבירה, הוא מסייע״.**

143.     על מנת שאדם יחשב כמבצע העבירה בצוותא עם אחרים, צריך להתקיים התנאי הבסיסי
של ״עשיית מעשים לביצועה״ של העבירה, כפי שמורה סעיף 29(ב) לחוק.

הפסיקה נתנה פירוש רחב למושג ״ביצועי״, כשהיא מגדירה בצורה רחבה את מהות המעשה הנדרש
לצורך כך. באופן דומה קבעה הפסיקה אמות מידה גמישות בנוגע למידת הקירבה הנדרשת של
המשתתף למעגל המבצעים, וליכולתו להשפיע על הביצוע (דנ״פ 1294/96, 1365/96 **עוזי משולם**
**ואח׳ נ׳ מדינת ישראל**, פ״ד נב(5) 1, בעמ׳ 21 (כב׳ השופט א. מצא), בעמ׳ 55-54 (כב׳ השופט מ.
חשין), ובעמ׳ 63-64 (כב׳ השופט י.קדמי)).

אשר למעשה הנדרש על מנת שניתן יהיה לראות באדם מבצע בצוותא, נפסק כי די במעשה לביצוע
העבירה החורג מהכנה גרידא (זה אף המבחן לקיומה של עבירת ניסיון), ואשר מלווה ביסוד הנפשי
המתאים (דנ״פ 1294/96 הנ״ל בעניין **משולם**, בעמ׳ 23-24). מעשה זה איננו חייב להיות חיוני
להצלחת העבירה, ואף איננו חייב להיות מעשה הנמנה עם רכיבי היסוד העובדתי שבעבירה; די בכך
שהמעשה משולב בתוכנית  העבירה, ומהווה השתתפות בביצועה, כמו למשל תכנון העבירה, מתן
הנחיות לביצועה או חלוקת התפקידים בין המשתתפים (דנ״פ 1294/96 הנ״ל בעניין **משולם**, בעמ׳
63-64 (כב׳ השופט י. קדמי).

א.     **מבצע בצוותא לעומת מסייע**

144.   ההבחנה בין "מבצע בצוותא" של העבירה לפי סעיף 29(ב) לחוק העונשין, לבין "מסייע" לפי
סעיף 31 לחוק, הפכה להיות בעלת חשיבות מעשית רבה לאחר שנכנס לתוקף חוק העונשין (תיקון
מס' 39) (חלק מקדמי וחלק כללי), התשנ"ד-1984, שכן על-פי סעיף 32 לחוק כנוסחו היום - עונשו
של המסייע הוא מחצית מעונשו של המבצע בצוותא, בעוד שעל-פי הדין הקודם עונשם היה זהה.
עונשו המירבי של המסייע לרצח הוא 20 שנות מאסר (סעיף 32(1) לחוק), בעוד שהמבצע עבירת
רצח בצוותא עם אחר, בהעדר נסיבות של אחריות מופחתת, דינו מאסר-עולם חובה.

בע"פ 8573/96, 8620, 8710, 8873, 8901 **מרקדו ואח' נ. מדינת ישראל** ("**משפט
הדיסקונטאים**"), פ"ד נא(5) 481, אמר כבוד השופט א. גולדברג בעמ' 545 :

"*תיקון מס' 39 לחוק מבטא את הכרה שהאשמה המוסרית, והמסוכנות הסוביקטיבית
והאוביקטיבית שבסיוע פחותות מאלה שבביצוע בצוותא. פער זה הוא שעומד ביסוד
ההבחנה בתוצאות העונשיות בין מבצע בצוותא למסייע, והוא זה שגם צריך להנחות אותנו
בקביעת המבחנים המשמשים להבחנה בין מבצע עיקרי למסייע*".

145.   ההבחנה בין "מבצע בצוותא" לבין "מסייע" הובהרה בע"פ 4389/93, 4497/93 **יוסי מרדכי
ואח' נ. מדינת ישראל**, פ"ד נז(3) 239, בע"פ 2796/95, 2813/95, 2814/95 **פלונים נ. מדינת
ישראל**, פ"ד נא(3) 388, דנ"פ 1294/96 הנ"ל בעניין **משולם** ; ע"פ 8573/96 הנ"ל בעניין **מרקדו**,
בעמ' 543-550 ; וע"פ 2111/99 **חיירו נ' מדינת ישראל**, פ"ד נח(1) 411 ההבחנה בין מבצע בצוותא
לבין מסייע מצויה הן ביסוד העובדתי של העבירה, והן ביסוד הנפשי שלה. בעיקרון, "**איכות
תרומתו של המסייע לביצוע העבירה פחותה מאיכות תרומתו של המבצע העיקרי**" (ע"פ 8573/96
הנ"ל, בעמ' 545).

אשר **ליסוד העובדתי** של העבירה - ההבחנה העיקרית היא בין שותף ישיר לביצוע העבירה לבין
שותף עקיף לביצועה. המבצעים בצוותא הם "*משתתפים בביצוע העבירה תוך עשיית מעשים
לביצועה*", אך לא נדרש כי כל אחד מהם יבצע בעצמו את כל היסודות העובדתיים של העבירה
(סעיף 29(ב) לחוק). לעומת זאת, המסייע עושה מעשה שיש בו כדי לתרום בדרך כלשהי "*ליצירת
תנאים לשם עשיית העבירה*" (סעיף 31 לחוק). המבצע בצוותא הוא חלק מן המעגל הפנימי של
ביצוע העבירה, בעוד שתרומתו של המסייע לביצוע העבירה היא חיצונית בלבד. לכן, בוחן בית-
המשפט את מידת הקירבה של כל אחד מן המשתתפים לביצוע העבירה, קרי : האם הוא מהווה
חלק מן המעגל הפנימי של המשימה העבריינית (ע"פ 3390/98 **רוש נ. מדינת ישראל**, פ"ד נג(5) 871

878). זהו, איפוא, **"מבחן הקירבה"**, שהוברר על ידי כב' הנשיא א. ברק בע"פ 4389/93 הנ"ל בעניין **מרדכי**, בעמ' 250:

> "השוני בין המבצע בצוותא לבין המסייע מתבטא בכך שהמבצעים בצוותא משמשים גוף אחד לביצוע המשימה העבריינית. כולם עבריינים ראשיים... תרומתו של כל אחד מהמבצעים בצוותא היא 'פנימית'... אכן, לעניין הביצוע בצוותא ניתכן חלוקת עבודה בין העבריינים, באופן שהם יפעלו במקומות שונים ובזמנים שונים, ובלי שכל אחד מהם מיצה את העבירה, ובלבד שחלקו הוא מהותי להגשמת התכנית המשותפת. אחדות המקום והזמן אינה חיונית, ובלבד שחלקו של כל אחד מהם הוא חלק פנימי של המשימה העבריינית".

**146.**    בפסקי הדין שצוטטו לעיל, סקר בית-המשפט העליון את המבחנים השונים שהוצעו בפסיקה ובספרות המשפטית לשם תיחום הגבולות בין מבצע בצוותא לבין מסייע.    יש אשר שמים דגש על **"מבחן השליטה"**, כמאפיין של המבצע בצוותא: למבצע בצוותא יש שליטה, יחד עם האחרים, על ביצוע העבירה; הוא מהווה חלק מן התוכנית המשותפת לביצוע העבירה, ופעל יחד עם האחרים להגשמתה. על מעמדו של המבצע בצוותא לאור "מבחן השליטה", אמר כבוד הנשיא א. ברק בע"פ 2796/93 הנ"ל בעניין **פלוני** (פסקה 28):

> "המאפיין את המבצע בצוותא שהוא אדון לפעילות העבריינית. בידיו השליטה הפונקציונאלית-מהותית, יחד עם המבצעים בצוותא האחרים, על העשייה העבריינית. הוא חלק מהחלטה משותפת לביצוע העבירה. הוא חלק מהתהניכת הכוללת להגשמת הפעולה העבריינית האסורה. הוא פועל יחד עם המבצעים בצוותא האחרים, כך שכל אחד מהם שולט - יחד עם האחרים – על הפעילות כולה. מעמדו ביחס להחלטות לביצוע העבירה הוא של איש 'פנים'. תרומתו היא 'פנימית'. חלקו הוא מהותי להגשמת התוכנית המשותפת...".

כך גם נפסק בע"פ 8573/96 הנ"ל בעניין **מרקדו**, בעמ' 547-548. לעומת זאת, בהתייחסו למסייע אמר כבוד הנשיא ברק כי המסייע **"אינו אבי הרעיון"** לביצוע העבירה, ובפסקה 30 אמר כדלקמן:

> "המסייע הוא שותף עקיף ומשני (פרשת מרדכי, פסקה 14). הוא מצוי מחוץ למעגל הפנימי של הביצוע. הוא גורם "חיצוני". אין הוא יוזם הביצוע ואף לא משדל לביצוע... אין הוא המחליט על הביצוע ואין הוא שולט על הביצוע...".

(ראה גם ע"פ 4389/93 הנ"ל בעניין **מרדכי**, פסקאות 13-14).

147.    לעומת "מבחן השליטה", יש המדגישים את ה"**מבחן הפונקציונאלי**", לפיו מבצע בצוותא הוא מי שנטל חלק מהותי בביצוע העבירה גופה, בעוד שחלקו של המסייע מתבטא בפעולות עזר החיצוניות לעבירה.

מבחן זה מוצא את ביטויו בלשון סעיף 29(ב) לחוק ("**משתתפים בביצוע העבירה תוך עשיית מעשים לביצועה**"). בע"פ 2796/93 הנ"ל בעניין **פלונים** (פסקה 27), אמר כבוד הנשיא א. ברק בהתייחסו למבצעים בצוותא:

"הם השותפים הראשיים בביצוע העבירה. השותפות ביניהם מתבטאת בכך שהם נטלו חלק בביצוע העבירה כמבצעים ישירים. הם משמשים גוף אחד לביצוע המשימה העבריינית... כל אחד מהם נוטל חלק בביצוע העיקרי של העבירה".

ובהמשך דבריו (פסקה 27) אמר כבוד הנשיא ברק:

"ביצוע בצוותא מחייב תיכנון משותף. הוא מבוסס על חלוקת עבודה בין המבצעים...".

דברים ברורים באשר לחשיבותו המכרעת של ה"מבחן הפונקציונאלי" אמר כבוד השופט י. קדמי בע"פ 5206/98 **חליל עבוד נ. מדינת ישראל**, פ"ד נב(4) 185 (פסקה 2):

"'המבצעים בצוותא' אינם רק אלה המשתתפים בעשיית 'מעשה' העבירה גופו; אלא – נמנה עליהם כל מי ש'נוטל חלק' בביצועה של העבירה, במובן הרחב של המושג 'ביצוע'. ואילו כל מי שרק 'תורם' לביצוע, מבלי לקחת בו חלק – לאמור: מבלי למלא 'תפקיד' במסגרתו – נותר ב'מעגל החיצוני' של האחראים לביצוע. הוא אינו משתתף בביצוע; וחלקו מצטמצם ל'סיוע' גרידא למימושו של הביצוע.

ההבחנה בין הנמנים עם ה'מעגל הפנימי' – 'המבצעים בצוותא' – לבין הנמנים עם ה'מעגל החיצוני' – 'המסייעים' – נעוצה, איפוא, בטיב ואופי מעורבותם בביצוע: אם 'נטלו-חלק-בביצוע' – קרי: אם היה להם 'תפקיד' בביצוע הריהם 'מבצעים בצוותא'; ואילו אם אך 'תרמו' לו מבחוץ – הריהם 'מסייעים' בלבד".

בהמשך דבריו מבהיר כבוד השופט קדמי כי ההבחנה בין מבצע בצוותא למסייע **איננה** תלויה בשאלה האם היה בהתנהגותו של הנאשם משום סיוע לביצוע העבירה, שכן גם מבצע בצוותא מסייע לביצועה; השאלה היא "אם נטל חלק – קרי: אם מילא תפקיד – בביצוע העבירה".

בדנ"פ 1294/96, 1365 **משולם ואח' נגד מדינת ישראל**, פ"ד נב(5)1, בעמ' 63, אמר כבוד השופט י. קדמי:

"'מעשה-של-השתתפות' אינו חייב לבטא פעילות המשולבת בביצוע ה'מעשה', הנמנה עם רכיבי היסוד העובדתי שבעבירה, ומשמעותו רחבה ומקיפה כל 'מעשה' המבטא 'השתתפות' בביצועה של העבירה. סעיף 29 לחוק העונשין, המגדיר 'מעשה-של השתתפות', אינו דורש ש'המעשה' ייעשה *תוך כדי ביצוע* היסוד העובדתי של העבירה, ודי שיהא בו לבטא 'השתתפות' בביצוע. 'השתתפות', כאמור, יכול שתתחיל בהעלאת הרעיון בפני המיועדים לבצע את העבירה..."

כבוד השופט מ. חשין ציין באותו עניין כי החוק איננו דורש שמעשה ההשתתפות בביצוע העבירה ייעשה תוך כדי ביצוע בפועל, או בסמוך לכך (עמ' 53-54).

148.    בדנ"פ 1294/96 הנ"ל בענין **משולם**, הבהיר בית-המשפט העליון כי "מבחן השליטה" הינו מבחן עזר, שאיננו מבחן יחיד ובלעדי, ויש לשלבו עם מבחנים ושיקולים אחרים; שליטה בביצוע מהווה אמנם ראיה חשובה להיותו של אדם מבצע בצוותא, אך היעדר שליטה, או העדר תרומה פיזית חיונית לביצוע העבירה, אינם שוללים בהכרח מסקנה זו (כבוד הנשיא א. ברק בעמ' 50; כבוד השופט א. מצא בעמ' 27-24; כבוד השופט י. קדמי בעמ' 65). זאת ועוד; גם כאשר בית-המשפט נזקק ב"מבחן השליטה", נעשה הדבר תוך הדגשה כי אין מדובר ביכולת שליטה רצופה במהלך ביצוע העבירה כולה, אלא מדובר ב"שליטה **במשבצת הביצוע שהוקנתה למבצע**

**המסיים**" (כבוד השופט י. קדמי בעמ' 64).

**149.** אשר **ליסוד הנפשי** של העבירה – הרי שיחסו הנפשי של המסייע נמצא בדרגה נמוכה יותר מזו של המבצע העיקרי, בכל הנוגע למידת מודעותו לפרטים הנוגעים לביצוע העבירה, ורצונו להגשימה. לגבי מסייע, נפסק כי די בכך שהוא מודע לכך שהתנהגותו תורמת ליצירת התנאים הדרושים לשם ביצוע העבירה העיקרית, ושהמבצע העיקרי עומד לבצעה. בנוסף, לנגד עיני המסייע צריכה לעמוד המטרה לסייע למבצע העיקרי לעבור את העבירה, או להקל עליו את ביצועה. ואולם, כאשר העבירה העיקרית היא תוצאתית, ונדרש בה יסוד של פזיזות או כוונה מיוחדת – אין צורך להוכיח שגם המסייע פעל מתוך כוונה שכזו, או שהוא התכוון לכך שהמבצע העיקרי יגשים את מטרתו. כך למשל, בעבירת רצח אין צורך להוכיח שהמסייע התכוון שהמבצע העיקרי ירצה את הקורבן, או שהוא חפץ בכך: די בכך שהמסייע שם לנגד עיניו את המטרה לסייע לעבריין העיקרי, יהיו מניעיו של המסייע אשר יהיו (הלכות אלו הובהרו בע"פ 320/99 **פלונית נ' מדינת ישראל**, פ"ד נה(3) 22, בעמ' 37-31).

לעומת זאת, כאשר במבצע בצוותא עסקינן, יש להוכיח מעורבות נפשית גבוהה ומודעות מצידו לפרטי העבירה המתבצעת, בנוסף על רצונו להגשימה:

"**המבצע בצוותא** תורם את תרומתו לאירוע עברייני רב-משתתפים מתוך יחס נפשי של **יוצר העבירה** auctoris onimo. הוא רואה את עשיית העבירה כעניינו הוא, ולא של **אחר**" (דברי שי"ז פלר, בספרו **יסודות בדיני עונשין**, שצוטטו בע"פ 4389/93 הנ"ל בעניין **מרדכי**, בעמ' 251).

**כללו של דבר**: המבצע בצוותא, בניגוד למסייע, צריך להיות בעל יסוד נפשי זהה לזה של מבצעי העבירה האחרים, וצריכים להתקיים לגביו כל מרכיבי היסוד הנפשי שנקבעו בחוק לגבי העבירה שהוא נוטל חלק בביצועה (ע"פ 2796/95 הנ"ל בעניין **פלונים**, בעמ' 402).

בע"פ 8573/96 הנ"ל בעניין **מרקדו**, אמר כבוד השופט א. גולדברג, בעמ' 549-548, כי סיווגו של הנאשם כמבצע בצוותא או כמסייע מתקבל כתוצאה ממבחן משולב של היסוד הנפשי והיסוד העובדתי – מבחן אשר כמוהו כמקבילית כוחות:

"**ככל שהיסוד הנפשי של עושה העבירה (מבחינת מידת העניין שלו בביצועה) רב יותר, יש מקום להסתפק בדרגה נמוכה יותר של היסוד העובדתי. ברוח זו כבר נאמר כי 'משהוכח יסוד 'נפשי' זה (המודעות – א' ג'), אין עוד חשיבות לחלוקת התפקידים בין המעורבים באירוע' (ע"פ 4188/95, 5235 הנ"ל [43], בעמ' 550). ולהפך, ככל שמידתו של**

**היסוד העובדתי אצל עושה העבירה, מבחינת איכות תרומתו לביצועה, רבה יותר, כן ניתן
להסתפק בדרגה נמוכה יותר של היסוד הנפשי".**

דברים אלו אושרו בדנ"פ 1294/96 בענין **משולם** הנ"ל (בעמ' 27, מפי כב' השופט א. מצא).

150.    מן ההלכות שצוטטו לעיל עולה, כי השתתפות בתכנון העבירה מהווה סממן מובהק של
מבצע בצוותא, ובמקרה שכזה אין צורך בנוכחות פיזית בזירת העבירה על מנת להיחשב כמבצע
בצוותא.

בדנ"פ 1294/96 הנ"ל בענין **משולם**, בעמ' 64, פסק כב' השופט י. קדמי :

**'"השתתפות', כאמור, יכול שתתחיל בהעלאת הרעיון בפני המיועדים לבצע את העבירה,
ומכל מקום, לשיטתי, אין ספק, שתכנון הביצוע, מתן הנחיות והתווויית קווי הפעולה,
לרבות חלוקת תפקידים בין המשתתפים, מהווים 'מעשה' המבטא 'השתתפות' כאמור".**

בע"פ 3596/93 **חמוד אבו סרור נ. מדינת ישראל**, פ"ד נב(3) 481, אמר כבוד השופט א' מצא בעמ'
491:

**"תרומתו המעשית של המערער לביצוע הרצח אכן היתה קטנה משל שני מרעיו. ואולם
השתתפותו בפעילות המכינה, ותפקיד המתריע אותו מילא, היקנו לו שליטה על הוצאתה
לפועל של התוכנית הרצחנית. מכך שהשתתף בהכנות לביצוע ופעל להצלחת התוכנית
עולה, כי היה בעל המחשבה הפלילית הנדרשת לשכלול אחריותו בגין עבירת רצח בכוונה
תחילה".**

בע"פ 2796/95 הנ"ל בענין **פלונים**, הורשעו ארבעה נערים בביצוע רצח בכוונה תחילה, למרות
שרק אחד מהם השליך את הרימון שגרם למותו של קורבן העבירה. האחד (זאב) הורשע כמבצע
בצוותא משום שנטל חלק בכל שלבי התכנון והביצוע, ונכח בזירת ביצוע העבירה, למרות שהחליט
שלא לזרוק את הרימון הקטלני בעצמו **("הוא לא ביצע את אקט הקטילה. אין בכך כלום, שכן
מבצע בצוותא אחראי גם אם לא ביצע בעצמו את כל יסודות העבירה..." – עמ'** 407). השני (גרשון)
הורשע כמבצע בצוותא, אף כי לא נכח כלל בזירת הרצח, וכל תפקידו היה לדווח לתקשורת על
המעשה לאחר ביצועו, משום שביצוע את התפקיד שהוקצה לו מראש לשם הגשמת העבירה (עמ'
408). השלישי (טל) הורשע כמבצע בצוותא, למרות שגם הוא לא נכח בזירת ביצוע הרצח, משום

P 7: 000435

שהשתתף בתכנון העבירה, היווה חלק מן החבורה שהחליטה לבצע את הרצח, ואף עמד בראשה (עמ' 408-409).

**151.**     כאשר לעבירה העיקרית קדמה קשירת קשר לביצועה, תהא הנטיה לראות בכל אחד מן הקשורים מבצע בצוותא של העבירה העיקרית, ובלבד שנטל חלק ממשי  בביצועה. הטעם לכך הוא שקשירת קשר לביצוע עבירה מעידה על ענין של לכל אחד מהקשורים בביצועה. כדברי ש"יז פלר, שצוטטו בע"פ 8573/96 הנ"ל בענין **מרקדו**, בעמ' 550: "**קשירת קשר בין שני אנשים, או יותר, לביצוע עבירה פלילית, טומנת בחובה גיבוש משותף למימוש מטרת הקשר – כל אחד במעמד עתידי של מבצע ישיר, ברוח יצירת animo auctoris."**

בע"פ 3390/98 הנ"ל בענין **רוש**, בעמ' 878, אמר כבוד השופט א' מצא:

"**המבחן הנוסף בדבר 'קירבת המעשה', שעל-פיו נדרש שחלקו של כל אחד מהמבצעים בצוותא יהיה 'חלק פנימי' של המשימה העבריינית', נועד אך להבטיח שעשיית מעשה גבולי, שלפי טיבו עשוי להיכנס להגדרה של 'ביצוע', לא תטיל על העושה אחריות כמבצע בצוותא כאשר טיב יחסו הנפשי לביצוע העבירה מוטל בספק (דנ"פ 1294/96 משולם נ' מדינת ישראל (להלן – פרשת משולם [3]), בעמ' 21-22).**

**לא כן הדבר ביחס לקביעת אחריותו של מי אשר מעיקרה נימנה עם המשתתפים בהכנת התוכנית העבריינית, ואין מתעורר כל ספק ביחס להיותו בעל המחשבה הפלילית הנדרשת לשכלולה של העבירה המתוכננת. צד כזה לעבירה נושא באחריות כ'מבצע בצוותא', אפילו אם תרומתו הפיזית לביצועה אינה גדולה מתרומתו של מסייע (ע"פ 3596/93 אבו סרור נ' מדינת ישראל [4], בעמ' 491)."**

**152.**     אשר לנוכחות בזירת ביצוע העבירה, הרי שזו איננה הכרחית על מנת לראות באדם מבצע בצוותא, ובלשונו של כבוד הנשיא א. ברק בע"פ 2796/95 הנ"ל בענין **פלונים** (פסקה 27): "**ביצוע בצוותא אינו מבוסס בהכרח על אחידות המקום והזמן**" (ראה גם דנ"פ 1294/96 הנ"ל בענין **משולם**, בעמ' 30, 38, 49, 51, 53-54 ו-64). עם זאת, נוכחות שאינה אקראית של אדם בזירה בה מתבצעת עבירה, יוצרת חזקה הניתנת לסתירה להיותו מבצע בצוותא של העבירה (ראה: ע"פ 3006/96 **מטיאס נ. מדינת ישראל**, דינים עליון, כרך נב 526).

**ב.     עבירת הסיוע**