materials and information needed to enable the Palestinian courts or tribunals to hear such claims as referred to in subparagraph b. above, and, when necessary, for the provision of legal assistance by Israel to the Council in defending such claims.

3. The transfer of authority in itself shall not affect rights, liabilities and obligations of any person or legal entity, in existence at the date of signing of this Agreement.

4. The Council, upon its inauguration, will assume all the rights, liabilities and obligations of the Palestinian Authority.

5. For the purpose of this Agreement, "Israelis" also includes Israeli statutory agencies and corporations registered in Israel.

## ARTICLE XXI
### Settlement of Differences and Disputes

Any difference relating to the application of this Agreement shall be referred to the appropriate coordination and cooperation mechanism established under this Agreement. The provisions of Article XV of the DOP shall apply to any such difference which is not settled through the appropriate coordination and cooperation mechanism, namely:

1. Disputes arising out of the application or interpretation of this Agreement or any related agreements pertaining to the interim period shall be settled through the Liaison Committee.

2. Disputes which cannot be settled by negotiations may be settled by a mechanism of conciliation to be agreed between the Parties.

3. The Parties may agree to submit to arbitration disputes relating to the interim period, which cannot be settled through conciliation. To this end, upon the agreement of both Parties, the Parties will establish an Arbitration Committee.

## CHAPTER 4 - COOPERATION

## ARTICLE XXII
### Relations between Israel and the Council

1. Israel and the Council shall seek to foster mutual understanding and tolerance and shall accordingly abstain from incitement, including hostile propaganda, against each other and, without derogating from the principle of freedom of expression, shall take legal measures to prevent such incitement by any organizations, groups or individuals within their jurisdiction.

2. Israel and the Council will ensure that their respective educational systems contribute to the peace between the Israeli and Palestinian peoples and to peace in the entire region, and will refrain from the introduction of any motifs that could adversely affect the process of reconciliation.

3. Without derogating from the other provisions of this Agreement, Israel and the Council shall cooperate in combating criminal activity which may affect both sides, including offenses related to trafficking in illegal drugs and psychotropic substances, smuggling, and offenses against property, including offenses related to vehicles.

## ARTICLE XXIII
### Cooperation with Regard to Transfer of Powers and Responsibilities

In order to ensure a smooth, peaceful and orderly transfer of powers and responsibilities, the two sides will cooperate with regard to the transfer of security powers and responsibilities in accordance with the provisions of Annex I, and the transfer of civil powers and responsibilities in accordance with the provisions of Annex III.

## ARTICLE XXIV
### Economic Relations

The economic relations between the two sides are set out in the Protocol on Economic Relations signed in Paris on April 29, 1994, and the Appendices thereto, and the Supplement to the Protocol on Economic Relations all attached as Annex V, and will be governed by the relevant provisions of this Agreement and its Annexes.

**ARTICLE XXV**
**Cooperation Programs**

1. The Parties agree to establish a mechanism to develop programs of cooperation between them. Details of such cooperation are set out in Annex VI.

2. A Standing Cooperation Committee to deal with issues arising in the context of this cooperation is hereby established as provided for in Annex VI.

**ARTICLE XXVI**
**The Joint Israeli-Palestinian Liaison Committee**

1. The Liaison Committee established pursuant to Article X of the DOP shall ensure the smooth implementation of this Agreement. It shall deal with issues requiring coordination, other issues of common interest and disputes.

2. The Liaison Committee shall be composed of an equal number of members from each Party. It may add other technicians and experts as necessary.

3. The Liaison Committee shall adopt its rules of procedures, including the frequency and place or places of its meetings.

4. The Liaison Committee shall reach its decisions by agreement.

5. The Liaison Committee shall establish a subcommittee that will monitor and steer the implementation of this Agreement (hereinafter "the Monitoring and Steering Committee"). It will function as follows:

a. The Monitoring and Steering Committee will, on an ongoing basis, monitor the implementation of this Agreement, with a view to enhancing the cooperation and fostering the peaceful relations between the two sides.

b. The Monitoring and Steering Committee will steer the activities of the various joint committees established in this Agreement (the JSC, the CAC, the Legal Committee, the Joint Economic Committee and the Standing Cooperation Committee) concerning the ongoing implementation of the Agreement, and will report to the Liaison Committee.

c. The Monitoring and Steering Committee will be composed of the heads of the various committees mentioned above.

d. The two heads of the Monitoring and Steering Committee will establish its rules of procedures, including the frequency and places of its meetings.

**ARTICLE XXVII**
**Liaison and Cooperation with Jordan and Egypt**

1. Pursuant to Article XII of the DOP, the two Parties have invited the Governments of Jordan and Egypt to participate in establishing further liaison and cooperation arrangements between the Government of Israel and the Palestinian representatives on the one hand, and the Governments of Jordan and Egypt on the other hand, to promote cooperation between them. As part of these arrangements a Continuing Committee has been constituted and has commenced its deliberations.

2. The Continuing Committee shall decide by agreement on the modalities of admission of persons displaced from the West Bank and the Gaza Strip in 1967, together with necessary measures to prevent disruption and disorder.

3. The Continuing Committee shall also deal with other matters of common concern.

### ARTICLE XXVIII
### Missing Persons

1. Israel and the Council shall cooperate by providing each other with all necessary assistance in the conduct of searches for missing persons and bodies of persons which have not been recovered, as well as by providing information about missing persons.

2. The PLO undertakes to cooperate with Israel and to assist it in its efforts to locate and to return to Israel Israeli soldiers who are missing in action and the bodies of soldiers which have not been recovered.

### CHAPTER 5 - MISCELLANEOUS PROVISIONS

### ARTICLE XXIX
### Safe Passage between the West Bank and the Gaza Strip

Arrangements for safe passage of persons and transportation between the West Bank and the Gaza Strip are set out in Annex I.

### ARTICLE XXX
### Passages

Arrangements for coordination between Israel and the Council regarding passage to and from Egypt and Jordan, as well as any other agreed international crossings, are set out in Annex I.

### ARTICLE XXXI
### Final Clauses

1. This Agreement shall enter into force on the date of its signing.

2. The Gaza-Jericho Agreement, except for Article XX (Confidence-Building Measures), the Preparatory Transfer Agreement and the Further Transfer Protocol will be superseded by this Agreement.

3. The Council, upon its inauguration, shall replace the Palestinian Authority and shall assume all the undertakings and obligations of the Palestinian Authority under the Gaza-Jericho Agreement, the Preparatory Transfer Agreement, and the Further Transfer Protocol.

4. The two sides shall pass all necessary legislation to implement this Agreement.

5. Permanent status negotiations will commence as soon as possible, but not later than May 4, 1996, between the Parties. It is understood that these negotiations shall cover remaining issues, including: Jerusalem, refugees, settlements, security arrangements, borders, relations and cooperation with other neighbors, and other issues of common interest.

6. Nothing in this Agreement shall prejudice or preempt the outcome of the negotiations on the permanent status to be conducted pursuant to the DOP. Neither Party shall be deemed, by virtue of having entered into this Agreement, to have renounced or waived any of its existing rights, claims or positions.

7. Neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip pending the outcome of the permanent status negotiations.

8. The two Parties view the West Bank and the Gaza Strip as a single territorial unit, the integrity and status of which will be preserved during the interim period.

9. The PLO undertakes that, within two months of the date of the inauguration of the Council, the Palestinian National Council will convene and formally approve the necessary changes in regard to the Palestinian Covenant, as undertaken in the letters signed by the Chairman of the PLO and addressed to the Prime Minister of Israel, dated September 9, 1993 and May 4, 1994.

10. Pursuant to Annex I, Article IX of this Agreement, Israel confirms that the permanent checkpoints on the roads leading to and from the Jericho Area (except those related to the access road leading from Mousa Alami to the Allenby Bridge) will be removed upon the completion of the first phase of redeployment.

11. Prisoners who, pursuant to the Gaza-Jericho Agreement, were turned over to the Palestinian Authority on the condition that they remain in the Jericho Area for the remainder of their sentence, will be free to return to their homes in the West Bank and the Gaza Strip upon the completion of the first phase of redeployment.

12. As regards relations between Israel and the PLO, and without derogating from the commitments contained in the letters signed by and exchanged between the Prime Minister of Israel and the Chairman of the PLO, dated September 9, 1993 and May 4, 1994, the two sides will apply between them the provisions contained in Article XXII, paragraph 1, with the necessary changes.

13. a. The Preamble to this Agreement, and all Annexes, Appendices and maps attached hereto, shall constitute an integral part hereof.

b. The Parties agree that the maps attached to the Gaza-Jericho Agreement as:

a. map No. 1 (The Gaza Strip), an exact copy of which is attached to this Agreement as map No. (in this Agreement "map No. 2");

b. map No. 4 (Deployment of Palestinian Police in the Gaza Strip), an exact copy of which is attached to this Agreement as map No. 5 (in this Agreement "map No. 5"); and

c. map No. 6 (Maritime Activity Zones), an exact copy of which is attached to this Agreement as map No. 8 (in this Agreement "map No. 8"; are an integral part hereof and will remain in effect for the duration of this Agreement.

14. While the Jeftlik area will come under the functional and personal jurisdiction of the Council in the first phase of redeployment, the area's transfer to the territorial jurisdiction of the Council will be considered by the Israeli side in the first phase of the further redeployment phases.

**Done at Washington DC, this 28th day of September, 1995.**

_____
*For the Government of*
*the State of Israel*

_____
*For the PLO*


**Witnessed by:**

_____
*The United States of America*

_____
*The Russian Federation*

_____
*The Arab Republic of Egypt*

_____
*The Hashemite Kingdom of Jordan*

_____
*The Kingdom of Norway*

_____
*The European Union*

Close

 **Israel Ministry of Foreign Affairs**

## THE ISRAELI-PALESTINIAN INTERIM AGREEMENT-Annex I

28 Sep 1995

AGREEMENT | ANNEX I | ANNEX II | ANNEX III | ANNEX IV | ANNEX V | ANNEX VI | ANNEX VII | MAPS | MAIN POINTS

### THE ISRAELI-PALESTINIAN INTERIM AGREEMENT ON THE WEST BANK AND THE GAZA STRIP
#### Annex I
#### Protocol Concerning Redeployment and Security Arrangements

#### INDEX

ARTICLE I - Redeployment of Israeli Military Forces and Transfer of Responsibility
ARTICLE II- Security Policy for the Prevention of Terrorism and Violence
ARTICLE III - Coordination and Cooperation in Mutual Security Matters
ARTICLE IV - The Palestinian Police
ARTICLE V - Security Arrangements in the West Bank
ARTICLE VI - Security Arrangements in the Gaza Strip
ARTICLE VII - Guidelines for Hebron
ARTICLE VIII - Passages
ARTICLE IX - Movement Into, Within and Outside the West Bank and the Gaza Strip
ARTICLE X - Safe Passage
ARTICLE XI - Rules of Conduct in Mutual Security Matters
ARTICLE XII - Security Arrangements Concerning Planning, Building and Zoning
ARTICLE XIII - Security of the Airspace
ARTICLE XIV - Security along the Coastline to the Sea of Gaza

APPENDIX 1 - Redeployment of Israeli Military Forces
APPENDIX 2 - Deployment of Palestinian Policemen
APPENDIX 3 - Palestinian Civil Police Stations and Posts
APPENDIX 4 - Jewish Holy Sites
APPENDIX 5 - Protocol Regarding Arrangements with Respect to Passages
APPENDIX 6 - List of Hamlets included in Area B

#### ARTICLE I
#### Redeployment of Israeli Military Forces and Transfer of Responsibility

*First Phase of Redeployment*

1. The first phase of Israeli military forces redeployment will cover populated areas in the West Bank - cities, towns, villages, refugee camps and hamlets, as shown on map No. 1. This redeployment will be effected in stages, as set out in the schedule attached to this Annex as Appendix 1, and will be completed prior to the eve of the Palestinian elections, i.e., 22 days before the day of elections.

2. In order to maintain the territorial integrity of the West Bank and the Gaza Strip as a single territorial unit, and to promote their economic

growth and the demographic and geographical links between them, both sides shall implement the provisions of this Annex, while respecting and preserving without obstacles, normal and smooth movement of people, vehicles, and goods within the West Bank, and between the West Bank and the Gaza Strip.

3. Any security arrangements and measures which become effective commensurate with the redeployment of the Israeli military forces will not undermine the importance of, nor will they prejudice, the Palestinian development programs and projects for reconstruction and development of the West Bank and the Gaza Strip, as well as the moral and physical dignity of the Palestinian people in the West Bank and the Gaza Strip.

4. After the inauguration of the Palestinian Council, the unity and integrity of the Palestinian people in the West Bank and the Gaza Strip shall be maintained and respected. All Palestinian people residing in the West Bank and the Gaza Strip will be accountable to the Palestinian Council only, unless otherwise provided in this Agreement.

5. After the inauguration of the Palestinian Council, the Israeli Civil Administration will be dissolved and the Israeli military government will be withdrawn. 6. The Council will assume powers and responsibilities for civil affairs, as well as for public order and internal security, according to this Agreement.

7. Nothing in this Article shall derogate from Israel's security powers and responsibilities in accordance with this Agreement.

8. There will be a period of 10 days prior to each stage of redeployment according to paragraph I of this Article, during which the commanders of the Israeli military forces will acquaint the respective commanders of the different echelons of the Palestinian Police with the respective area and its specific problems.

*Further Redeployments After the Inauguration of the Palestinian Council*

9. The further redeployments of Israeli military forces to specified military locations will be gradually implemented in accordance with the DOP in three phases, each to take place after an interval of six months, after the inauguration of the Council, to be completed within 18 months from the date of the inauguration of the Council.

10. The specified military locations referred to in Article X, paragraph 2 of this Agreement will be determined in the further redeployment phases within the specified time-frame ending not later than 18 months from the date of the inauguration of the Council, and will be negotiated in the permanent status negotiations .

## ARTICLE II
### Security Policy for the Prevention of Terrorism and Violence

1. The Palestinian security policy as defined by the Palestinian Authority on March 9, 1995, for the Gaza Strip and the Jericho Area will also be implemented in the rest of the West Bank in areas which come under Palestinian security responsibility as follows:

a. The Palestinian Police is the only Palestinian security authority.

b. The Palestinian Police will act systematically against all expressions of violence and terror.

c. The Council will issue permits in order to legalize the possession and carrying of arms by civilians. Any illegal arms will be confiscated by the Palestinian Police.

d. The Palestinian Police will arrest and prosecute individuals who are suspected of perpetrating acts of violence and terror.

2. Both sides will, in accordance with this Agreement, act to ensure the immediate, efficient and effective handling of any incident involving a threat or act of terrorism, violence or incitement, whether committed by

Palestinians or Israelis. To this end, they will cooperate in the exchange of information and coordinate policies and activities. Each side shall immediately and effectively respond to the occurrence or anticipated occurrence of an act of terrorism, violence or incitement and shall take all necessary measures to prevent such an occurrence.

3. With a view to implementing the above, each side shall, in accordance with the provisions of this Agreement, carry out the following functions in the areas under its security responsibility:

a. protect all residents of, and all other persons present in, these areas;

b. actively prevent incitement to violence, including violence against the other side or persons under the authority of the other side;

c. apprehend, investigate and prosecute perpetrators and all other persons directly or indirectly involved in acts of terrorism, violence and incitement; and

d. prevent and deal with any attempt to cause damage or harm to infrastructure serving the other side, including, inter alia, roads, water, electricity, telecommunications and sewage infrastructure.

4. Both sides undertake to deal with the issue of persons who are present in the areas in violation of this Agreement, and to take further measures in accordance with procedures to be determined by the JSC.

**ARTICLE III**
**Coordination and Cooperation In Mutual Security Matters**

1. Joint Security Coordination and Cooperation Committee

a. A Joint Coordination and Cooperation Committee for Mutual Security Purposes is hereby established (hereinafter "the JSC"). It will deal with all security matters of mutual concern regarding this Agreement in the West Bank and the Gaza Strip.

b. The JSC shall:

(I) recommend security policy guidelines for the approval of the Joint Israeli-Palestinian Liaison Committee and implement such approved guidelines;

(2) deal with security issues raised by either side;

(3) provide the proper channel for exchanging information between the two sides, needed to solve security problems; (4) provide directives for the Joint Regional Security Committees (hereinafter "the RSCs") and for the Joint District Coordination Offices (hereinafter "the DCOs"); and

(5) subject to the provisions of Article XXVI (the Joint Israeli Palestinian Liaison Committee), and Article XXI (Settlement of Differences and Disputes) of this Agreement, deal with alleged violations, as well as differences relating to the application or implementation of the security arrangements set out in this Agreement.

c. The JSC shall comprise between five and seven members from each side. Decisions of the JSC will be reached by agreement between the two sides.

d. The JSC shall determine its rules of procedure. Meetings of the JSC shall be held every two weeks. In the event that either side requests a special meeting, it shall be convened within forty-eight (48) hours.

e. Unless otherwise agreed by the two sides, JSC meetings will be hosted by each of the sides alternately.

f. The JSC shall develop a comprehensive plan to ensure full coordination between the Israeli military forces and the Palestinian Police during the interim period, starting from the date of signing of this Agreement.

g. This coordination will be implemented through the RSCs in the West Bank and the Gaza Strip and the DCOs, as mentioned hereafter in this

Article.

h. The comprehensive plan will include a plan for the West Bank, consisting of arrangements for the entry of the Palestinian Police and the introduction of police arms, ammunition and equipment, as well as arrangements intended to facilitate the smooth transfer of authority and assumption by the Palestinian Police of its security responsibilities according to this Agreement.

i. The above mentioned comprehensive plan will also include two regional plans that will include arrangements for coordination and cooperation in security matters after the redeployment is effected.

j. These regional plans will be reviewed every six months, or whenever needed, by the JSC and the relevant RSC.

2. Regional Security Committees

a. Two RSCs are hereby established, one in the West Bank and one in the Gaza Strip.

b. Each RSC shall:

(1) guide the relevant DCOs with security policy guidelines; (2) deal with security issues referred to it by the DCOs;

(3) ensure proper transfer of information and guidelines to the relevant DCOs; and

(4) propose to the JSC security policy guidelines, and forward issues to the JSC for determination.

c. The Israeli side and the Palestinian side in the RSCs will maintain contact with each other as follows:

(l) regular as well as special meetings shall be held between the commander of the Israeli military forces and the commander of the Palestinian Police in the West Bank or in the Gaza Strip, as appropriate; and

(2) each side will operate a regional security coordination office 24 hours a day, with direct and constant communication links between the two sides.

d. The RSCs shall commence operations immediately upon the signing of this Agreement and shall determine by agreement their mode of procedure.

3. District Coordination Offices

a. DCOs are hereby established in the West Bank and the Gaza Strip, as set out below.

b. The location of the DCOs is as detailed on attached map Nos. 2 and 4.

c. Each DCO shall:

(l) monitor and manage matters requiring coordination as determined by the JSC and/or the relevant RSC, according to the policy and guidelines established by either of them;

(2) monitor and manage all matters of a joint nature within the respective district of the DCO, including the coordination of activities by one side which may affect the other side;

(3) review, investigate and report to the relevant RSC on the overall situation within the DCO's respective district, with special regard to specific events, incidents and activities occurring in the district; and

(4) direct the Joint Patrols and the Joint Mobile Units set up in accordance with paragraphs 4 and 5 of this Article and Article V, paragraph 2.c below, operating within the DCO's respective district. d. The DCOs shall commence operations immediately upon the signing of this Agreement.

e. Each DCO will be continuously staffed by a team of up to six officers

from each side, comprising one commander and five duty officers.

f. The DCOs will be operated jointly by both sides, 24 hours a day. At least one duty officer from each side, as well as the necessary number of assistants, will be present during each eight-hour shift.

g. With a view to preventing friction and to enabling the two sides to deal with possible incidents, both sides shall ensure that the relevant DCO shall immediately be notified of any of the following events:

(1) routine, scheduled or unscheduled activity or deployment by the Israeli military forces or the Palestinian Police that directly affects the security responsibility of the other side. This includes activity or deployment in the proximity of Settlements or Palestinian populated localities, as the case may be;

(2) events that pose a threat to public order;

(3) activities that disturb the regular flow of traffic on the main roads, including roadblocks and roadworks;

(4) incidents involving both Israelis and Palestinians, such as road accidents, rescue of casualties or persons in mortal danger, engagement steps or any incident in which a weapon is used;

(5) a terrorist action of any kind and from any source;

(6) infiltrations between the West Bank, the Gaza Strip and Israel; and

(7) all cases in which Israelis are hospitalized in the West Bank or the Gaza Strip, or in which Palestinians of the West Bank or the Gaza Strip are hospitalized in Israel.

h. Each DCO shall notify the relevant Israeli and Palestinian headquarters, as well as the Joint Patrols operating in the relevant district, of the occurrence of any of the events listed in subparagraph g. above.

i. The JSC may modify the content of the list of events included in subparagraph g. above.

j. Any event involving injury to Israelis, at any location within the West Bank or the Gaza Strip shall be immediately reported to Israel through the relevant DCO. Israel may employ any means necessary for the evacuation and treatment of such injured persons, and will coordinate such activity through the relevant DCO.

k. The DCOs shall be equipped with the necessary means of communication to enable direct and immediate contact both with the Joint Patrols and the relevant RSC, as well as with each side's respective police or military district headquarters.

4. Joint Patrols

a. The mission of the Joint Patrols shall be to assist in ensuring free, unimpeded and secure movement along the roads designated in Articles V and VI below.

b. Unless the JSC decides otherwise, the Joint Patrols shall each be composed of two 4-wheel drive vehicles, one Palestinian and one Israeli, equipped with adequate communications systems. The vehicles shall be marked so as to be easily distinguishable from all other vehicles in the area. In each vehicle there will be an officer and three uniformed and armed guards.

c. The Joint Patrols will patrol 24 hours a day, in vehicles along their routes of activity, or as directed by the relevant DCO. Joint Patrols on the Lateral Roads in the Gaza Strip will also patrol on foot along their routes of activity, and on the adjacent sides of the roads upon which the security of the traffic along these roads is dependent.

d. On roads under Israeli security responsibility, the Israeli vehicle will be the leading vehicle. On roads under Palestinian security responsibility, the Palestinian vehicle will be the leading vehicle. The Joint Patrols will be

under the direction of the relevant DCO.

e. The Joint Patrols shall continuously monitor movement within their area of operation and shall act to prevent and deal with incidents that may threaten or endanger persons using the roads. They shall report any such incident or threat thereof, as well as any action taken, to the relevant DCO, and to the respective Israeli military and Palestinian police district headquarters.

f. On reaching the scene of an incident, the Joint Patrol will take all measures necessary to deal with the incident, and provide assistance as necessary. The Joint Patrol shall verify that the appropriate measures have been taken and report to the relevant DCO accordingly.

5. Joint Mobile Units

a. The mission of the Joint Mobile Units (hereinafter "JMUs") is to provide rapid response in the event of incidents and emergency situations, in order to ensure free, unimpeded and secure movement along their designated routes of activity, or in their areas of activity. b. The composition of the JMUs will be similar to that of the Joint Patrols.

c. In areas under Israeli security responsibility, the Israeli vehicle will be the leading vehicle. In areas under Palestinian security responsibility, the Palestinian vehicle will be the leading vehicle. The Joint Mobile Units will be under the direction of the relevant DCO.

d. The functions of the JMUs are:

(1) to monitor movement along their designated routes of activity from their stationary locations, from where they may patrol on agreed roads as directed by the relevant DCO, in which case their duties will be the same as those of the Joint Patrols;

(2) in the event of an incident involving both Israelis and Palestinians, to reach the site of the incident in order to provide assistance and to investigate; and

(3) any other function determined by the relevant DCO.

6. Joint Liaison Bureaus

Joint Liaison Bureaus established by the two sides shall operate at crossing points and at terminals as described in Articles V, VI and VIII of this Annex.

7. Other joint activities may be agreed upon in the JSC and/or the RSC.

**ARTICLE IV**
**The Palestinian Police**

1. Duties and Functions

As detailed in the Palestinian law, the Palestinian Police shall carry out its duties and functions in accordance with this Agreement as follows:

a. maintaining internal security and public order;

b. protecting the public and all other persons present in the areas, as well as protecting their property, and acting to provide a feeling of security, safety and stability;

c. adopting all measures necessary for preventing crime in accordance with the law;

d. protecting public installations, infrastructure and places of special importance; e. preventing acts of harassment and retribution;

f. combating terrorism and violence, and preventing incitement to violence; and

g. performing any other normal police functions.

2. Structure and Composition

a. The Palestinian Police shall consist of one integral unit under the control of the Council. It shall be composed of six branches:

(1) Civil Police (Al Shurta);

(2) Public Security;

(3) Preventive Security;

(4) Amn Al Ri'asah;

(5) Intelligence; and

(6) Emergency Services and Rescue (Al Difa'a Al Madani).

In each district, all members of the six Police branches shall be subordinate to one central command.

b. The Palestinian Police shall have a Palestinian Coastal Police unit in accordance with Article XIV of this Annex.

3. Deployment

a. During the interim period, the total number of policemen of the Palestinian Police in all its branches in the West Bank and the Gaza Strip will be no more than 30,000 out of which up to 12,000 policemen may be deployed in the West Bank and up to 18,000 policemen in the Gaza Strip. These numbers may be changed by agreement, if necessary. The Palestinian side will notify Israel of the names of the policemen recruited to the Palestinian Police in the Gaza Strip.

b. In accordance with the stages of the first phase of redeployment of Israeli forces in the West Bank, up to 6,000 of the above-mentioned 12,000 Palestinian policemen may be deployed in the West Bank in Area A and, as set out in paragraph 3 of Article V, in Area B, as detailed in Appendix 2.

c. The remaining 6,000 Palestinian policemen will be deployed in the West Bank according to the phases of the further redeployments or as needed, as agreed upon by the two Parties.

d. The Palestinian Police shall be deployed as shown on attached map Nos. 3 and 5.

4. Recruitment

a. The Palestinian Police shall consist of policemen recruited locally, and from abroad (from among individuals holding Jordanian passports or Palestinian documents issued by Egypt). The number of Palestinian recruits from abroad shall not exceed 5,000 in the West Bank and 7,000 in the Gaza Strip.

b. Palestinian policemen coming from abroad may be accompanied by their spouse and sons and daughters.

c. The Palestinian policemen to be recruited pursuant to this Agreement shall be West Bank or Gaza Strip residents who will be duly trained to perform police functions.

d. The Palestinian side will notify Israel of any candidate for recruitment to the Palestinian Police. Should Israel object to the recruitment of any such candidate, that person shall not be recruited.

e. In accordance with Palestinian law, the employment of policemen who have been convicted of serious crimes, or have been found to be actively involved in terrorist activities subsequent to their recruitment, will be immediately terminated, and their weapons and police identification documentation will be confiscated.

5. Arms, Ammunition and Equipment

a. In the West Bank and the Gaza Strip, uniformed policemen may carry arms, and plainclothes policemen on duty who hold special accreditation may carry personal light arms concealed in their clothing, in accordance