with this Agreement.

b. In the West Bank, the Palestinian Police will possess the following arms and equipment:

(1) up to 4,000 rifles;

(2) up to 4,000 pistols;

(3) up to 120 machine guns of 0.3" or 0.5" caliber; and

(4) up to 15 light, unarmed riot vehicles of a type to be agreed on between the two sides in the JSC.

c. In the Gaza Strip, the Palestinian Police will possess the following arms and equipment:

(1) 7,000 light personal weapons;

2) up to 120 machine guns of 0.3" or 0.5" caliber; and

(3) up to 45 wheeled armored vehicles of a type to be agreed on between the two sides, and of which 22 will be deployed in protecting Council installations. The use of wheeled armored vehicles in the Security Perimeter, on the Lateral Roads and on their adjacent sides, or in the vicinity of the Settlements shall be approved through the relevant DCO. Movement of such vehicles along the central North-South road (Road No. 4) in the Gaza Strip may take place only after providing notification to the relevant DCO.

d. The number of arms or items of equipment specified in subparagraphs b. and c. above may be increased subject to the agreement of both sides.

e. The Palestinian Police will maintain an updated register of all weapons held by its personnel.

f. The Palestinian Police may possess communication systems, subject to Article 36 of Annex III, and distinctive uniforms, identification badges and vehicle markings.

g. In this Annex, the term "weapons" includes firearms, ammunition and explosives of all kinds.

6. Introduction of Arms. Equipment and Foreign Assistance

a. All foreign contributions and other forms of assistance to the Palestinian Police must comply with the provisions of this Agreement.

b. The introduction of arms, ammunition or equipment intended for the Palestinian Police shall be coordinated through the JSC, in accordance with its established practices.

7. Movement

Movement of Palestinian policemen between the West Bank and the Gaza Strip will be conducted in accordance with Article X of this Annex.

**ARTICLE V**
**Security Arrangements in the West Bank**

1. Coordination and Cooperation in the West Bank

As shown on map No. 4, eight DCOs will function in the West Bank, as follows:

a. a DCO for the Jenin District, located at the Quabatiya junction or in its vicinity;

b. a DCO for the Nablus District, located at the Hawara Junction;

c. a DCO for the Tulkarm District, located at the Kaddouri Junction;

d. a DCO for the Qalqilya District located at Tsufin Junction;

e. a DCO for the Ramallah District, located at the Beth El junction or in its

vicinity;

f. a DCO for the Bethlehem District, located at the Panorama Hills in Beit Jala;

g. a DCO for the Hebron District, located at Har Manoakh (Jabal Manoah); and

h. a DCO for the Jericho District, located at Vered Yericho, that will maintain a subordinate Joint Liaison Bureau in the Allenby Terminal.

2. Area A

a. The Council will, upon completion of the redeployment of Israeli military forces it each district, as set out in Appendix 1 to this Annex, assume the powers and responsibilities for internal security and public order in Area A in that district.

b. Jewish Holy Sites

(1) The following provisions will apply with respect to the security arrangements in Jewish holy sites in Area A which are listed in Appendix 4 to this Annex:

(a) While the protection of these sites, as well as of persons visiting them, will be under the responsibility of the Palestinian Police, a JMU shall function in the vicinity of, and on the access routes to, each such site, as directed by the relevant DCO.

(b) The functions of each such JMU shall be as follows:

(i) to ensure free, unimpeded and secure access to the relevant Jewish holy site; and

(ii) to ensure the peaceful use of such site, to prevent any potential instances of disorder and to respond to any incident.

(c) Given the Jewish religious nature of such sites, Israeli plainclothes guards may be present inside such sites.

(2) The present situation and the existing religious practices shall be preserved.

c. Clarifications Concerning the Jericho Area

With regard to the definition of the Jericho Area, as delineated on attached map No. 1, it is hereby clarified that Route No. 90 crossing Auja from South to North and the East-West road connecting Route No. 90 with Yitav, and their adjacent sides, shall remain under Israeli authority. For the purpose of this Article, the width of each such road and its adjacent sides, as shown on attached map No. 1, shall extend at least 12 meters on each side measured from its center.

3. Areas B and C

a. There will be a complete redeployment of Israeli military forces from Area B. Israel will transfer to the Council and the Council will assume responsibility for public order for Palestinians. Israel shall have the overriding responsibility for security for the purpose of protecting Israelis and confronting the threat of terrorism.

b. In Area B the Palestinian Police shall assume the responsibility for public order for Palestinians and shall be deployed in order to accommodate the Palestinian needs and requirements in the following manner:

(l) The Palestinian Police shall establish 25 police stations and posts in towns, villages, and other places listed in Appendix 3 to this Annex and as delineated on map No. 3. The West Bank RSC may agree on the establishment of additional police stations and posts, if required.

(2) The Palestinian Police shall be responsible for handling public order incidents in which only Palestinians are involved.

(3) The Palestinian Police shall operate freely in populated places where police stations and posts are located, as set out in paragraph b.l above.

(4) While the movement of uniformed Palestinian policemen in Area B outside places where there is a Palestinian police station or post will be carried out after coordination and confirmation through the relevant DCO, three months after the completion of redeployment from Area B, the DCOs may decide that movement of Palestinian policemen from the police stations in Area B to Palestinian towns and villages in Area B on roads that are used only by Palestinian traffic will take place after notifying the DCO.

(5) The coordination of such planned movement prior to confirmation through the relevant DCO shall include a scheduled plan, including the number of policemen, as well as the type and number of weapons and vehicles intended to take part. It shall also include details of arrangements for ensuring continued coordination through appropriate communication links, the exact schedule of movement to the area of the planned operation, including the destination and routes thereto, its proposed duration and the schedule for returning to the police station or post. The Israeli side of the DCO will provide the Palestinian side with its response, following a request for movement of policemen in accordance with this paragraph, in normal or routine cases within one day and in emergency cases no later than 2 hours.

(6) The Palestinian Police and the Israeli military forces will conduct joint security activities on the main roads as set out in this Annex.

(7) The Palestinian Police will notify the West Bank RSC of the names of the policemen, number plates of police vehicles and serial numbers of weapons, with respect to each police station and post in Area B.

(8) Further redeployments from Area C and transfer of internal security responsibility to the Palestinian Police in Areas B and C will be carried out in three phases, each to take place after an interval of six months, to be completed 18 months after the inauguration of the Council, except for the issues of permanent status negotiations and of Israel's overall responsibility for Israelis and borders.

(9) The procedures detailed in this paragraph will be reviewed within six months of the completion of the first phase of redeployment.

4. Joint Patrols

a. Joint Patrols led by a Palestinian vehicle will operate on each of the following roads, as indicated on map No. 4:

(l) the main north-south road (Route No. 60) crossing Jenin;

(2) the main north-south road (Route No. 60) crossing Nablus;

(3) the main east-west road (Route Nos. 57 and 60) crossing Nablus;

(4) the main east-west road (Route No. 57) crossing Tulkarm;

(5) the main east-west road (Route No. 55) crossing Qalqilya;

(6) the main north-south road (Route No. 60) crossing Ramallah;

(7) the main east-west road (Route No. 3) crossing Ramallah;

(8) the main north-south road (Route No. 60) crossing Bethlehem;

(9) the main east-west road crossing Beit Jala;

(10) the main north-south road (Route No. 90) crossing Jericho; and

(11) the road crossing Hebron, as set out in Article VII (Hebron) below. The operation of the Joint Patrols in each district will commence after the completion of redeployment in the respective district.

b. Each DCO will be allowed, within 3 months after the completion of the redeployment in its respective district, to decide that Joint Patrols will function on roads crossing areas A, B and C.

5. Joint Mobile Units

a. Joint Mobile Units will operate in Area B and will be led by the Israeli vehicle. Three such Joint Mobile Units shall be located at each

DCO. One will be on alert 24 hours a day. The two others will perform missions as directed by the DCO during daylight hours.

b. A Joint Mobile Unit shall be located at the Auja junction being the intersection of Route No. 90 and the road to Yitav. This unit shall be led by the Israeli vehicle, and may be directed by the DCO to deal with certain incidents occurring on the road between Auja and Jericho in which Palestinians are involved.

c. A Joint Mobile Unit shall be located at the Nahal Elisha junction on the road from Jericho to the Mousa Allami project.

6. Movement of Palestinian Policemen

Movement of uniformed policemen, whether armed or unarmed, as well as armed on-duty plainclothes policemen, in Area C, will be confirmed and coordinated by the relevant DCO. Movement of such policemen between Area A and Area B will be approved by the relevant DCO.

7. Rachel's Tomb

a. Without derogating from Palestinian security responsibility in the City of Bethlehem, the two sides hereby agree on the following security arrangements regarding Rachel's Tomb which will be considered a special case during the Interim Period:

(l) While the Tomb, as well as the main road leading from Jerusalem to the Tomb, as indicated on map No.l, will be under the security responsibility of Israel, the free movement of Palestinians on the main road will continue.

(2) For the purpose of protecting the Tomb, three Israeli guard posts may be located in the Tomb, the roof of the Waqf building, and the parking lot.

b. The present situation and existing practices in the Tomb shall be preserved.

**ARTICLE VI**
**Security Arrangements in the Gaza Strip**

1. The Delimiting Line

a. For the purpose of the present Agreement only, and without prejudice to the permanent status negotiations on borders, the line delimiting the northern and eastern edge of the Gaza Strip follows the fence on the ground, as delineated on attached map No. 2 by an unbroken green line (hereinafter "the Delimiting Line") and shall have no other effect.

b. The Parties reaffirm that, as long as this Agreement is in force, the security fence between the Gaza Strip and Israel shall remain in place, and that the line demarcated by the fence shall be authoritative only for the purpose of this Agreement.

2. Security Perimeter

a. There will be a security perimeter along the Delimiting Line inside the Gaza Strip as delineated on attached map No. 2 by a broken green line (hereinafter "the Security Perimeter").

b. In accordance with the provisions of this Agreement, the Palestinian Police will be responsible for security in the Security Perimeter.

c. The Palestinian Police will enforce special security measures aimed at preventing infiltrations across the Delimiting Line or the introduction into the Security Perimeter of any arms, ammunition or related equipment, except for the arms, ammunitions or equipment of the Palestinian Police, authorized through the relevant DCO.

d. Activities of the Palestinian Police inside the Security Perimeter will be coordinated through the relevant DCO. Security activities in Israel in the vicinity of the Delimiting Line that directly affect the other side will be coordinated with the Palestinian Police through the relevant DCO.

3. The Israeli Settlements

a. In accordance with the DOP, during the interim period, the Gush Katif and Erez settlement areas, as well as the other settlements in the Gaza Strip, as delineated on attached map No. 2 by a blue line, will be under Israeli authority.

b. Palestinians will be free to move along the coast road and along the road from the Netzarim Junction to the seashore.

4. The Yellow Area

a. In the areas delineated by a broken red line and shaded in yellow in attached map No. 2 (hereinafter "the Yellow Area"), and without derogating from Palestinian authority, responsibility will be shared as follows: the Israeli authorities will have the overriding responsibility and powers for security, and the Council will have the responsibility and powers for civil affairs, subject to this Agreement. In addition, with regard to the Yellow Area, cooperation and coordination in security matters, including Joint Patrols, as agreed, will be implemented.

b. Entry of Palestinian policemen into the Yellow Area and their activity therein may take place as agreed upon through the relevant DCO.

c. Without derogating from the above, while the Palestinian side shall have responsibility and powers for public order for Palestinians in the Mawasi Area, Israel shall retain the responsibility and powers for internal security. Accordingly, the area shall be treated as Area B throughout the interim period in accordance with the provisions of paragraph 3 of Article V above. For the purpose of exercising Palestinian public order responsibility and powers, Palestinian uniformed Civil Police (Al Shurta) policemen may enter the Mawasi Area after coordination and confirmation of their movement and activity through the relevant DCO.

5. The Mawasi Area

a. As shown on map No. 2, two Joint Patrols will operate in the Mawasi area, the fishermen's wharves of Rafah and Khan Yunis and along the coast road, led by the Israeli vehicle.

b. Access of Palestinians to the Mawasi area, as delineated on attached map No. 2, will be by the following roads:

(1) Rafah - Tel Sultan - Mawasi;

(2) Khan Yunis - El Bahr Village; and

(3) Deir El Ballah - along the beach to the Mawasi.

c. The Mawasi Beach

(1) Notwithstanding Israeli authority over the Gush Katif settlement area, the Council may operate sections of the Mawasi beach page extending to the east up to the coast road, totaling, together with the Rafah and Khan Yunis wharves, five (5) kilometers. Israel has notified the Palestinian Authority of the locations of these sections.

(2) These sections may be used for the following purposes:

(a) sport and recreation, including boat hire facilities;

(b) operating food establishments,

(c) enlarging the wharves;

(d) expanding the facilities for fishermen, such as offices, warehouses and cold storage facilities; and

(e) an hotel.

(3) In these sections, the Council, in exercising its civil authority, will be able to grant licenses for businesses, collect fees and taxes, set and enforce public health standards and develop and manage the tourist sector.

(4) In each of the fishermen's wharves, the Council may have an office building which shall be protected.

(5) There will not be any construction by Israelis of new sites along the beach.

(6) During a period of three months from the signing of this Agreement, Israel may consider, in light of the security situation, the use by the Council of additional beach sections.

6. The Egyptian Border

The Military Installation Area along the Egyptian border in the Gaza Strip, as delineated on attached map No. 2 by a blue line and shaded in pink, will be under Israeli authority.

The village of Dahaniya will remain part of the Military Installation Area pending a declaration of a general amnesty for the residents of the village, and provision having been made for their protection. Upon realization of the above amnesty and protection, the village of Dahaniya will become part of the Yellow Area.

7. Lateral Roads to the Settlements

a. Without derogating from Palestinian authority and in accordance with the Declaration of Principles:

(l) On the three lateral roads connecting the Israeli settlements in the Gaza Strip to Israel, namely the Kissufim - Gush Katif road; the Sufa - Gush Katif road; and the Karni - Netzarim road, as indicated by a light blue line on attached map No. 2, including the adjacent sides upon which the security of traffic along these roads is dependent (hereinafter "the Lateral Roads"), the Israeli authorities will have all necessary responsibilities and powers in order to conduct independent security activity, including Israeli patrols.

(2) Joint Patrols will operate along the Lateral Roads. Such joint patrols will be led by the Israeli vehicle.

(3) Where the Israeli authorities carry out engagement steps, they will do so with a view to transferring, at the earliest opportunity, the continued handling of the incidents falling within the Palestinian responsibility, to the Palestinian Police.

(4) Overpasses will be constructed on intersections between the Lateral Roads and the central North- South road (Road No. 4).

b. Where the Lateral Roads overlap the Security Perimeter, the two sides, in the exercise of their respective powers and responsibilities, will fully coordinate their activity in order to prevent friction.

8. The Central North-South Road (Road No. 4)

A Joint Patrol led by the Palestinian vehicle will be operated along the central North-South road (Road No. 4) in the Gaza Strip between Kfar Darom and Wadi Gaza.

9. Joint Mobile Units

a. Joint Mobile Units will be located at the following junctions:

(l ) the Nissanit junction;

(2) the Netzarim junction,

(3) the Deir el-Ballah junction; and

(4) the Sufa-Morag junction.

b. At the Netzarim junction, the Israeli side of this Joint Mobile Unit will

check Israeli vehicles, which will then be able to continue their journey without interference. This Joint Mobile Unit will also operate as a Joint Patrol between the Netzarim junction and Wadi Gaza under the direction of the relevant DCO.

10. Coordination and Cooperation in the Gaza Strip

Two DCOs will function in the Gaza Strip as follows:

a. A DCO for the Gaza district, located at the Erez crossing point with subordinate Joint Liaison Bureaus at the Erez and Nahal Oz crossing points.

b. A DCO for the Khan Yunis district, located at the Nuriya Camp with subordinate Joint Liaison Bureaus at the Sufa crossing points and at the Rafah Terminal.

**ARTICLE VII**
**Guidelines for Hebron**

1. a. There will be a redeployment of Israeli military forces in the city of Hebron except for places and roads where arrangements are necessary for the security and protection of Israelis and their movements. The areas of such redeployment are delineated by red and blue lines and shaded in orange stripes on a yellow background on attached map No. 9 (hereinafter "Area H-l").

b. This redeployment will be completed not later than six months after the signing of this Agreement.

2. a. The Palestinian Police will assume responsibilities in Area H-1 similar to those in other cities in the West Bank.

b. All civil powers and responsibilities, set out in Annex III of this Agreement, will be transferred to the Council in the City of Hebron as in the other cities in the West Bank.

c. Palestinian police stations or posts will be established in Area H-l, manned by a total of up to 400 policemen, equipped with 20 vehicles and armed with 200 pistols, and 100 rifles for the protection of those stations.

d. The Palestinian Police shall operate freely in Area H-l. Any activity or movement by it outside this area will be carried out after coordination and confirmation through the DCO established in paragraph 6 of this Article.

e. The Imara will be turned over to the Palestinian side upon the completion of the redeployment, and will become the headquarters of the Palestinian Police in the city of Hebron.

3. According to the DOP, Israel will continue to carry the responsibility for overall security of Israelis for the purpose of safeguarding their internal security and public order.

4. a. In the area of the city of Hebron from which Israel military forces will not redeploy, as delineated by red and blue lines on attached map No. 9 (hereinafter "Area H-2"), Israel will retain all powers and responsibilities for internal security and public order.

b. In Area H-2, the civil powers and responsibilities will be transferred to the Council; except for those relating to Israelis and their property which shall continue to be exercised by Israeli Military Government.

c. In Area H-2, plainclothes unarmed municipal inspectors will monitor and enforce vis-a-vis Palestinians, compliance with the laws and regulations, within the civil powers and responsibilities transferred to the Council in Hebron.

5. The municipality of Hebron will continue to provide all municipal services to all parts of the city of Hebron.

6. a. A DCO will be located at Har Manoakh (Jabal Manoah).

b. Upon completion of the redeployment of Israeli military forces, a JMU

will operate throughout the city of Hebron, including in the Old City, if required to do so by the abovementioned DCO.

c. A Joint Patrol will function in Hebron on the road from Ras e-Jura to the north of the Dura junction via E-Salaam road and on Route No. 35.

d. Three months after the completion of the redeployment, the DCO will consider the reassignment of the Joint Patrol to other parts of Hebron.

7. Measures and procedures for normalizing life in the Old City and on the roads of Hebron will be taken immediately after the signing of this Agreement, as follows:

a. opening of the wholesale market - Hasbahe, as a retail market;

b. removal of the barrier on the road leading from Abu Sneineh to Shuhada Road in order to facilitate the movement on these roads;

c. reopening of the main entrance to the Islamic College;

d. replacement of the closed roadblock at the Ras e-Jura junction by a normally open traffic supervision system;

e. replacement of the roadblock at the Harsina junction by a regular position;

f. opening of the route from the Sa'air Shiukh road to Hebron;

g. opening of the Tnuva Road; and

h. removal of the two barriers in the vicinity of the Raranta School near the North Dura junction.

8. A high level Joint Liaison Committee will be established in order to deal with the security situation in Hebron after completion of the redeployment.

9. a. Since the two sides are unable to reach agreement regarding the Tomb of the Patriarchs / Al Haram Al Ibrahimi, they have agreed to keep the present situation as is.

b. Three months after the redeployment the high level Joint Liaison Committee will review the situation.

10. There will be a Temporary International Presence in Hebron (TIPH). Both sides will agree on the modalities of the TIPH, including the number of its members and its area of operation.

11. Immediately after the completion of the redeployment, measures must be taken to ensure a stable and secure situation throughout the Hebron area, free from efforts to undermine this Agreement or the peace process.

12. Hebron will continue to be one city, and the division of security responsibility will not divide the city.

### ARTICLE VIII
### Passages

1. General

a. While Israel remains responsible during the interim period for external security, including along the Egyptian and Jordanian borders, border crossing shall take place according to the arrangements included in this Article. These arrangements aim at creating a mechanism that facilitates the entry and exit of people and goods, reflecting the new reality created by the DOP, while providing full security for both sides.

b. The arrangements included in this Article shall apply to the following border crossings:

(1) the Allenby Bridge crossing; and

(2) the Rafah crossing.

c. A joint Israeli-Palestinian committee will decide on applying the arrangements included in this Article to the Damya Bridge crossing and, in

parallel, on alternatives.

d. The provisions of the Protocol Regarding Arrangements with Respect to Passages, signed on October 31, 1994 in Casablanca, as amended and attached to this Annex as Appendix 5 (hereinafter "Appendix 5"), will continue to be applicable for the duration of this Agreement, unless otherwise agreed upon. Immediately upon the signing of this Agreement, the CAC shall review the amended Protocol and, in this context, consider the Palestinian request that with regard to the administration of the passages, the Israel Airport Authority be replaced by the Israeli military government.

e. The same arrangements will be applied by the Parties, with the necessary adjustments, to agreed seaports, airports or other international crossings, such as the Abdullah bridge.

f. The two sides are determined to do their utmost to maintain the dignity of persons passing through the border crossings. To this end, the mechanism created will rely heavily on brief and modern procedures.

g. In each border crossing there will be one terminal, consisting of two wings. The first wing will serve Palestinian residents of the West Bank and the Gaza Strip and visitors to these areas (hereinafter "the Palestinian Wing"). The second wing will serve Israelis and others (hereinafter "the Israeli Wing"). There will be a closed Israeli checking area and a closed Palestinian checking area, as set out below.

h. Special arrangements applicable to VIPs crossing through the Palestinian Wing, are set out in Appendix 5.

2. Control and Management of the Passages

a. For the purpose of this Article, "passage" is defined to mean the area from the crossing barrier at the Egyptian border or the Allenby Bridge, passing through and including the terminal and:

(1) with regard to the Allenby Bridge crossing, from the terminal up to the Jericho Area; and

(2) with regard to the Rafah crossing, from the terminal up to the outer limit of the Israel military location along the Egyptian border.

b. (1) Israel will have the responsibility for security throughout the passage, including for the terminal.

(2) An Israeli director-general will have the responsibility for the management and security of the terminal.

(3) The director-general will have two deputies who will report to him.

(a) an Israeli deputy who will be the manager of the Israeli Wing. Israel will have exclusive responsibility for the management of the Israeli Wing; and

(b) a Palestinian deputy, appointed by the Council, who will be the manager of the Palestinian Wing.

(4) Each deputy will have an assistant for security and an assistant for administration. The assignments of the Palestinian deputies for security and administration are set out in Appendix 5.

(5) The Palestinian deputy director-general at the Allenby Bridge terminal will be able to travel between this terminal and the Jordanian terminal for the purpose of exercising his functions.

(6) There will be maximum coordination between the two sides. Both sides will maintain cooperation and coordination on matters of mutual concern.

(7) The director-general will continue to use Palestinian contractors to provide bus services and other administrative and logistical services.

(8) Palestinian policemen present at the terminal will be armed with handguns. Their deployment is set out in Appendix 5. Other Palestinian

officials present at the terminal will be unarmed.

(9) The details of management and security including those relating to the Liaison Bureau referred to in subparagraph 5 below are set out in Appendix 5.

(10) The two sides will work together in order to seek ways for additional arrangements in the Rafah terminal.

c. Except for all the arrangements included in this Article, the current procedures and arrangements applicable outside the terminal shall continue to apply throughout the passage.

d. (l) Once incoming passengers have crossed the terminal, they will proceed to the West Bank or the Gaza Strip, as appropriate, without any interference from Israeli authorities (safe passage).

(2) Outgoing passengers may proceed to the terminal without any interference from Israeli authorities after joint verification that such passengers hold the necessary documentation for exiting the area to Jordan or Egypt, as set out in this Agreement.

3. Arrangements for Entry from Egypt and Jordan Through the Palestinian Wing

a. At the entrance to the Palestinian Wing there will be a Palestinian policeman and a raised Palestinian flag.

b. Before entering the Palestinian Wing, passengers will identify their personal luggage and it will be placed on a conveyor belt. Each side will be able to inspect such luggage inside its own checking area, using its own personnel and, if necessary, may open the luggage for inspection in the presence of the owner and a Palestinian policeman.

c. Persons entering the Palestinian Wing will pass through a magnetic gate. An Israeli policeman and a Palestinian policeman will be posted on each side of this gate. In the event of suspicion, each side will be entitled to require a physical inspection to be conducted in inspection booths to be located adjacent to the gate. Passengers will be inspected by a Palestinian policeman in the presence of an Israeli policeman. Accompanying personal belongings may also be inspected at this point.

d. Having completed the above phase, persons entering the Palestinian Wing will pass through one of two lanes for the purpose of identification and document control, as follows:

(1) The first lane will be used by Palestinian residents of the West Bank and the Gaza Strip. These passengers will pass via a Palestinian counter, where their documents and identity will be checked. Their documents will be checked by an Israeli officer who will also check their identity indirectly in an invisible manner.

(2) The second lane will serve visitors to the West Bank and the Gaza Strip. These passengers will first pass via an Israeli counter, where their documents and identity will be checked. Then they will continue via a Palestinian counter, where their documents and identity will be checked. The two counters will be separated by tinted glass and a revolving door.

e. In the event of suspicion regarding a passenger in any of the two lanes described in subparagraph d. above, each side may question such passengers in its closed checking area. Suspicion justifying questioning in the closed checking area may be one of the following:

(l) the passenger was involved, directly or indirectly, in criminal or planned criminal activity, or in terrorist or planned terrorist activity, and is not a beneficiary of the amnesty provisions of this Agreement;

(2) the passenger conceals arms, explosives or related equipment;

(3) the passenger holds forged or non-valid documentation or the details included in the documentation are inconsistent with those included in the population registry (in case of a resident) or in the data base (in case of a visitor), except that questions relating to such inconsistency will initially be

raised at the counter and the passenger will be questioned in the closed checking area only if the suspicion has not been removed, or

(4) the passenger acts in an obviously suspicious behavior during the passage via the terminal.

If, at the conclusion of this questioning, the suspicion has not been removed, such passenger may be apprehended, after the other side has been notified. In case of a Palestinian suspect being apprehended by the Israeli side, a Palestinian policeman will be asked to meet with the suspect. Following notification to the Liaison Bureau, any further treatment of the apprehended person will be in accordance with Annex IV.

f. In the Palestinian Wing, each side will have the authority to deny the entry of persons who are not residents of the West Bank and the Gaza Strip.

For the purpose of this Agreement, "residents of the West Bank and the Gaza Strip" means persons who, on the date of entry into force of this Agreement, are registered as residents of these areas in the population registry maintained by the military government of the West Bank and the Gaza Strip and by the Council, as well as persons who have subsequently obtained permanent residency in these areas with the approval of Israel, as set out in this Agreement.

g. Following the above procedure, the passengers will collect their luggage and proceed to the customs area as described in Annex V, and as set out in Appendix 5.

h. The Palestinian side will provide passengers whose entry is approved with an entry permit stamped by the Palestinian side and attached to their documents.

At the conclusion of the direct and indirect checking of the documents and identity of passengers passing via the first lane and stamping their entry permits, the Palestinian officer will provide the passenger with a white card issued by the Israeli officer. A Palestinian official posted at the exit of the Palestinian Wing will verify that the passenger holds such white card and will collect the cards with indirect and invisible Israeli checking.

For passengers going through the second lane, the Israeli officer will provide the passengers with a blue card, after checking their documents and identity, and verifying their entry permits. An Israeli and a Palestinian official posted at the exit of the Palestinian Wing will verify and collect the cards. White and blue cards collected will be checked by Israeli and Palestinian officials.

In cases where either side denies the entry of a non-resident passenger, that passenger will be escorted out of the terminal and sent back to Jordan or Egypt, as appropriate, after notifying the other side.

4. Arrangements for Exit to Egypt and Jordan Through the Palestinian Wing

Passengers exiting to Egypt or Jordan through the Palestinian Wing will enter the terminal without their luggage. Thereafter, the same procedures described in paragraph 3 above will apply to them, except that the order of passing via the Israeli and Palestinian counters will be reversed.

5. Joint Liaison Bureau

a. There will be a Joint Liaison Bureau at each crossing point in order to deal with matters arising regarding passengers passing through the Palestinian Wing, issues regarding coordination, and differences regarding the implementation of these arrangements. Without derogating from Israel's responsibility for security, the bureau will also deal with incidents.

b. This bureau will be comprised of an equal number of representatives from each side and will be located at a specified location inside each terminal.