c. This bureau will be subordinate to the relevant subcommittee of the CAC.

6. Miscellaneous

a. Special arrangements will be agreed upon by the two sides regarding the passage of goods, buses, trucks and privately-owned vehicles. Pending this agreement, the current arrangements will continue to apply. The above mentioned arrangements will be agreed upon within six months from the date of signing this Agreement.

b. In order to cross through the border crossings into and out of the West Bank and the Gaza Strip, residents of these areas will use documents as detailed in Annex III

c. The Allenby Bridge terminal will operate from Sunday through Thursday, between the hours of 08:00 and 24:00, and on Fridays and Saturdays, between the hours of 08:00 and 15:00, except on Yom Kippur.

### ARTICLE IX
### Movement Into, Within and Outside the West Bank and the Gaza Strip

1. General

a. Israel declares that work to relocate the Erez crossing point currently within the Gaza Strip to a location within Israel adjacent to the Delimiting Line, is underway. Israel will make every effort to complete this work as soon as possible. A joint Israeli-Palestinian committee will decide, within one month from the signing of this Agreement, the timeframe for completing this work and all related issues. Pending the completion of this work, Israel shall retain control over this crossing point and operate it in accordance with the provisions of this Article.

b. Israelis entering the West Bank and the Gaza Strip shall carry Israeli documentation (if they are above the age of 16) and, if driving a vehicle, a driving license and vehicle registration documentation recognized in Israel. Tourists to Israel entering the West Bank and the Gaza Strip shall be subject to Palestinian laws in accordance with the provisions of this Agreement, shall carry their passports and other relevant documentation, and may be required by the Palestinian Police to identify themselves by presenting their passport or documentation, unless otherwise provided in this Article.

c. Entry of persons from the West Bank and the Gaza Strip to Israel shall be subject to Israeli laws and procedures regulating entry into Israel, and residents of these areas shall be required to carry the identity card as agreed upon in this Agreement, as well as documentation specified by Israel and notified through the CAC to the Council.

d. The provisions of this Agreement shall not prejudice Israel's right, for security and safety considerations, to close the crossing points to Israel and to prohibit or limit the entry into Israel of persons and of vehicles from the West Bank and the Gaza Strip. In addition, the provisions of this Agreement shall not prejudice the use of safe passage.

e. Tourists to the West Bank and the Gaza Strip from countries having diplomatic relations with Israel, who have passed through an international crossing, will not be required to pass any additional entry control before entry into Israel.

2. Passage within the West Bank and between the West Bank and Israel.

a. Without derogating from Israel's security powers and responsibilities in accordance with this Agreement, movement of people, vehicles and goods in the West Bank, between cities, towns, villages and refugee camps, will be free and normal, and shall not need to be effected through checkpoints or roadblocks.

b. Movement between the West Bank and Israel shall be governed by the applicable laws, regulations and rules regulating the movement of

persons and vehicles between the West Bank and Israel, while respecting the importance of the economic and social life, development programs and projects, and emergency health care services of the Palestinian population.

c. The Palestinian Police shall set up checkpoints in areas under its security responsibility on roads connecting the West Bank and Israel, for the purpose of inspection and identification of Palestinian vehicles and passengers in order to prevent illegal introduction of weapons into or from Israel.

3. Passage between the Gaza Strip and Israel

a. Passage between the Gaza Strip and Israel will be via one or more of the following crossing points:

(1) the Erez crossing point;

(2) the Nahal Oz crossing point,

(3) the Sufa crossing point, and

(4) the Karni (commercial) crossing point (for goods only).

b. The Council may set up a checkpoint, within the Gaza Strip, on the road leading to the Erez crossing point and on the road leading to the Nahal Oz crossing point, at locations to be coordinated between the two sides, for the purpose of inspection and identification of passengers and vehicles. Israelis and tourists to Israel passing through these checkpoints may be only required to identify themselves by presenting Israeli documentation or a passport, as set out in subparagraph l.b above. The above requirements shall not apply to uniformed members of the Israeli military forces.

c. The Council may set up a checkpoint, within the Gaza Strip, on the road leading to the Sufa crossing point, at a location acceptable to both sides for the purpose of inspection and identification of Palestinian passengers and vehicles. Israeli vehicles may bypass this checkpoint unimpeded.

d. The Council will allow passage of Israelis and tourists to Israel between the Gaza Strip and Israel, in addition, via the following crossing points:

(l) the Karni (non-commercial) crossing point;

(2 the Kisufim crossing point;

(3) the Kerem Shalom crossing point; and

(4) the Elei Sinai crossing point.

e. Israelis, and tourists to Israel, who have passed through any of the above crossing points into the West Bank and the Gaza Strip shall not be required to undergo inspection, identification or other requirements in addition to the stated provisions for entry into the West Bank and the Gaza Strip outlined in this Article.

f. Arrangements for the movement of goods between the Gaza Strip and Israel through the crossing points are set out in Annex V.

g. A Palestinian liaison officer will be present at each of the crossing points on the Lateral Roads.

**ARTICLE X**
**Safe Passage**

1. General

a. There shall be a safe passage connecting the West Bank with the Gaza Strip for movement of persons, vehicles and goods, as detailed in this Article.

b. Israel will ensure safe passage for persons and transportation during

daylight hours (from sunrise to sunset) or as otherwise agreed by the JSC, but in any event not less than 10 hours a day.

c. Safe passage through Israel between the West Bank and the Gaza Strip will be effected via the following designated crossing points:

(1) the Erez crossing point (for persons and vehicles only);

(2) the Karni (commercial) crossing point (for goods only);

(3) the Tarkumya crossing point; and

(4) an additional crossing point around Mevo Horon.

d. Israel will make such passage available through the routes indicated on attachedmap No. 6.

e. Consistent with Article XXXI, paragraph 6 of the Agreement, the arrangements included in this Article are without prejudice to the permanent status negotiations.

2. Use of Safe Passage

a. As detailed below, persons using the safe passage shall carry, in addition to personal and vehicle documentation, the following documents:

(1) a safe passage card; and

(2) (for drivers only) a vehicle safe passage permit.

Arrangements for the implementation of the safe passage usage, as well as modalities for the issuance by Israel of safe passage cards and vehicle safe passage permits, shall be discussed and agreed in the JSC, in consultation with the CAC.

b. Residents of the West Bank and the Gaza Strip in possession of a permit enabling them to enter Israel will be able to use this permit as a safe passage card. c. Safe passage cards and vehicle safe passage permits shall be stamped by the Israeli authorities at the crossing point, with the time of departure from the crossing point and the estimated time of arrival.

d. Israel may deny the use of its territory for safe passage by persons who have seriously or repeatedly violated the safe passage provisions detailed in this Article.

e. Persons who are denied entry into Israel will use safe passage by means of shuttle buses which will be escorted by the Israel Police and which will operate from 7:00 AM to 2:00 PM on two days of every week. The exact date and times of such operation will be coordinated through the JSC. Applications by persons denied entry to Israel to use safe passage must be submitted to, and agreed upon in, the relevant DCO at least five days prior to the planned journey.

f. Special arrangements will apply with respect to the passage of Palestinian leaders, senior Council officials, distinguished personalities and guests of the Ra'ees of the Council. The CAC will define the scope and nature of the special arrangements, in consultation with the JSC.

g. The movement of Palestinian policemen on duty through the safe passage between the West Bank and the Gaza Strip will be coordinated through the JSC.

h. Any additional matters relating to the usage of safe passage will be coordinated through the JSC.

3. Mode of Use of Safe Passage

a. Persons and vehicles using safe passage under these arrangements shall neither break their journey nor depart from the designated routes, and shall complete the passage within the designated time stamped on their safe passage cards and permits, unless a delay is caused by a medical emergency or a technical breakdown.

b. Persons using the safe passage through Israel shall be subject to Israeli law.

c. Persons and vehicles using the safe passage shall not carry explosives, firearms or other weapons or ammunition, except for special cases that may be agreed in the JSC.

4. General Provisions Regarding the Safe Passage Routes

a. The above arrangements shall in no way affect the status of the safe passage and its routes.

b. The safe passage arrangements will not be available on Yom Kippur, Israel's Memorial Day and Israel's Independence Day.

c. Israel may, for security or safety reasons, temporarily halt the operation of a safe passage route or modify the passage arrangements while ensuring that one of the routes is open for safe passage. Notice of such temporary closure or modification shall be given to the JSC.

d. Israel shall notify the Council of incidents involving persons using safe passage routes, through the JSC.

**ARTICLE XI**
**Rules of Conduct in Mutual Security Matters**

1. Human Rights and the Rule of Law

Subject to the provisions of this Agreement, the Palestinian Police and the Israeli military forces shall exercise their powers and responsibilities pursuant to this Agreement with due regard to internationally-accepted norms of human rights and the rule of law, and shall be guided by the need to protect the public, respect human dignity and avoid harassment.

2. Weapons

a. Each side shall enforce upon civilians, Palestinians or Israelis, in the West Bank and the Gaza Strip, in accordance with their security responsibility, a prohibition on possession or carrying of weapons without a license.

b. The Palestinian Police may grant licenses to possess or carry pistols for civilian use. The modalities for granting such licenses, as well as categories of persons who may be granted such licenses, will be agreed upon in the JSC.

c. Upon the assumption of security responsibility, and in accordance with the Palestinian law, the Palestinian Police shall declare a period of grace of one month, during which period holders of unlicensed weapons will be required to declare that they hold such weapons and to apply for licenses. The Palestinian Police may grant such licenses in accordance with subparagraph b. above, and will enforce the Palestinian security policy set out in Article II, paragraph 1 of this Annex, against persons who hold unlicensed weapons.

d. Israelis may carry weapons licensed in accordance with subparagraph a. above.

e. The Palestinian Police will maintain an updated register of all weapons licensed by it.

f. The Palestinian Police will prevent the manufacture of weapons as well as the transfer of weapons to persons not licensed to possess them.

g. The use of explosives in quarries and for other civilian purposes will be only in accordance with modalities and procedures agreed upon in the JSC.

3. Engagement Steps

a. For the purpose of this Article, engagement" shall mean an immediate response to an act or an incident constituting a danger to life or property that is aimed at preventing or terminating such an act or incident, or at

apprehending its perpetrators.

b. Within the territory under the security responsibility of the Council, in places where Israeli authorities exercise their security functions in accordance with this Annex and in their immediate vicinities, the Israeli authorities may carry out engagement steps in cases where an act or incident requires such action. In such cases, the Israeli authorities will take any measures necessary to bring to an end such an act or incident with a view to transferring, at the earliest opportunity, the continued handling of the incident falling within the Palestinian responsibility to the Palestinian Police. The Palestinian Police will immediately be notified, through the relevant DCO, of such engagement steps.

c. Engagement with the use of firearms in responding to such acts or incidents shall not be allowed, except as a last resort after all attempts at controlling the act or the incident, such as warning the perpetrator or shooting in the air, have failed, or are ineffective or without any promise of achieving the intended result in the circumstances. Use of firearms should be aimed at deterring or apprehending, and not at killing, the perpetrator. The use of firearms shall cease once the danger is past.

d. Any activity involving the use of firearms other than for immediate operational purposes shall be subject to prior notification to the relevant DCO.

e. If a person is injured or otherwise in need of assistance, such assistance will be provided by the side that first reaches the site. If such a person is under the security responsibility of the other side, the assisting side shall notify the relevant DCO and appropriate arrangements shall be made, pursuant to this Agreement, for treatment and hospitalization.

4. Rules of Conduct on Roads for Israelis

a. Israeli military forces and Israeli civilians may continue to use roads freely within the West Bank and the Gaza Strip.

b. On the main roads that are jointly patrolled, vehicles bearing Israeli license plates shall not be stopped except for identification, which shall be conducted by a Joint Patrol, pursuant to the provisions of Article III of this Annex. The Israeli side of such a patrol may carry out identity and vehicle documentation checks. In the event that a vehicle bearing a license plate issued by either the Council or the Civil Administration is stopped, the Palestinian side of the Joint Patrol may carry out identity and vehicle documentation checks.

c. On other roads vehicles bearing Israeli license plates shall not be stopped by the Palestinian Police, except that such vehicles may be stopped in the Gaza Strip, in Area A or in places in Area B where there is a police station or post for the purpose of identification checks of the above-mentioned documentation.

d. Israelis shall under no circumstances be apprehended or placed in custody or prison by Palestinian authorities. However, where an Israeli is suspected of having committed an offense, he or she may be detained in place by the Palestinian Police while ensuring his or her protection, in accordance with the provisions of Annex IV, until the arrival of a Joint Patrol, called immediately by the Palestinian Police, or of other Israeli representatives dispatched by the relevant DCO.

e. Israeli pedestrians may be required to produce identity documentation (if above the age of sixteen). Thereafter, they shall be treated in accordance with the provisions of this Article.

f. Uniformed members of the Israeli military forces, as well as vehicles of the Israeli military forces, shall not be stopped by the Palestinian Police in any circumstances, and shall not be subject to any identification requirements. Without derogating from the above, in the event of suspicion regarding such a person or vehicle, the Palestinian Police may notify the Israeli authorities through the relevant DCO, in order to request appropriate assistance.

g. Verification, pursuant to this Article, of the identity of persons who claim to be Israelis but cannot present appropriate identification documentation, will be confirmed by the Israeli side of a Joint Patrol, called by the Palestinian Police, or by other Israeli representatives dispatched by the relevant DCO.

**ARTICLE XII**
**Security Arrangements Concerning Planning, Building and Zoning**

1. General Provisions

a. Notwithstanding the provisions relating to planning, building and zoning set out elsewhere in this Agreement, the provisions of this Article shall apply with respect to the areas specified below.

b. These arrangements will be reviewed within a period of six months from the signing of this Agreement, and, thereafter, every six months, with a view to modifying them, with due consideration to Palestinian plans for establishing economic projects, and to the security concerns of both sides.

c. The limitations set out below on the construction of buildings and installations in specific areas shall not require the demolition or removal of existing buildings or installations.

2. Provisions regarding the West Bank

a. Buildings or installations shall not be constructed or erected and natural and artificial culture shall not be altered, on either side of the roads delineated in blue on map No. 7 up to a distance of 50 meters from the center of these roads.

b. Bridges or other structures will not be built which may prevent the movement on roads of vehicles of a height of up to 5.25 meters.

c. In the areas shaded in purple on map No. 7, construction will be limited to a height of 15 meters.

d. Any buildings or installations constructed or erected contrary to this paragraph shall be dismantled.

3. Provisions regarding the Gaza Strip

a. The existing buildings, installations and natural and artificial culture in the Gaza Strip within a distance of 100 meters from the Delimiting Line shall remain as they are at present.

b. Within the next 500 meters of the Security Perimeter, and within the Yellow Area, buildings or installations may be constructed, provided that:

(1) one building or installation may be constructed on each plot, the size of which shall not be less than 25 dunams; and

(2) such building or installation shall not exceed two floors, of a size not exceeding 180 sq. meters per floor.

The Council shall maintain the predominantly agricultural character of the remaining areas of the Security Perimeter.

c. Buildings or installations shall not be constructed on either side of the Lateral Roads us to a distance of 75 meters from the center of these Roads.

d. For the purpose of enforcing this Article, the United States has provided both sides with satellite photographs of the Gaza Strip depicting the buildings, installations and natural and artificial culture existing at the time of the signing of the Gaza-Jericho Agreement.

**ARTICLE XIII**
**Security of the Airspace**

1. Operation of aircraft for the use of the Council in the West Bank and the

Gaza Strip shall be initially as follows:

a. Two (2) transport helicopters for VIP transportation within and between the West Bank and the Gaza Strip.

b. Up to 3 helicopters for the purpose of transport missions to approved landing pads.

c. 3 fixed-wing transport aircraft with up to 35 persons capacity, for transporting persons between the West Bank and the Gaza Strip.

2. Changes in the number, type and capacity of aircraft may be discussed and agreed upon in a Joint Aviation Subcommittee of the JSC (hereinafter "the JAC").

3. The Council may immediately establish and operate in the West Bank and the Gaza Strip provisional airstrips for the helicopters and fixed wing aircraft referred to in paragraph 1 above, in accordance with arrangements and modalities to be discussed and agreed upon in the JAC.

4. All aviation activity or use of the airspace by any aerial vehicle in the West Bank and the Gaza Strip shall require prior approval of Israel. It shall be subject to Israeli air traffic control including, inter alia, monitoring and regulation of air routes as well as relevant regulations and requirements to be implemented in accordance with the Israel Aeronautical Information Publication, the relevant parts of which will be issued after consultation with the Council.

5. Aircraft taking off from, and landing in the West Bank and the Gaza Strip shall be registered and licensed in Israel or in other states members of International Civil Aviation Organization (ICAO). Air crews of such aircraft shall be licensed in Israel or in such other states, provided that such licenses have been approved and recommended by the Council and validated by Israel.

6. Palestinian Civil Aviation and airline staff may be recruited locally and from abroad. The number of Palestinians recruited from abroad shall not exceed 400. This number may be changed by agreement, if necessary.

7. Aircraft referred to in this Article shall not carry firearms, ammunition, explosives or weapons systems unless otherwise approved by both sides. Special arrangements for armed guards escorting high ranking officials, will be agreed upon in the JAC.

8. The location of navigational aids and other aviation equipment will be approved by Israel through the JAC.

9. a. The Council shall ensure that only the aviation activity in accordance with this Agreement will take place in the West Bank and the Gaza Strip.

b. Further powers and responsibilities may be transferred to the Council through the JAC.

c. The Council may establish a Palestinian Civil Aviation Department to act on its behalf in accordance with the provisions in this Article and of this Agreement.

10. a. Aviation activity by Israel will continue to be operated above the West Bank and the Gaza Strip, with the same limitations applicable in Israel regarding civil and military flights over densely-populated areas.

b. Israel will notify the Council of emergency rescue operations, searches and investigation of aerial accidents in the West Bank and the Gaza Strip. Searches and investigations of civilian aircraft accidents in which Palestinians or their property are involved, will be conducted by Israel with the participation of the Council.

11. Guided by the principle that the two sides view the West Bank and Gaza Strip as a single territorial unit, as set out in Article IV of the DOP, and in order to enable the smooth operation of flights between the West Bank and the Gaza Strip:

a. The JAC will agree on special arrangements to facilitate flights of the Ra'ees of the Executive Authority of the Council between the West Bank and the Gaza Strip. The Ra'ees and his spouse, and family members of the Ra'ees, his body guards and VIPs when accompanying the Ra'ees will fly without prior inspection of their person, personal belongings, and luggage.

b. The minimum time of notification of VIPs' flights will be four hours. The notification will include the list of passengers.

c. Flights of other persons will be handled in accordance with the procedures agreed in the JAC.

12. Flights between the West Bank and the Gaza Strip may be operated through the Gaza - Tel Aviv (sea shore) corridor.

Monitoring and regulations of this air route will be discussed in the JAC.

13. Commercial, domestic and international air services to, from and between the West Bank and the Gaza Strip may be operated by Palestinian, Israeli or foreign operators approved by both sides, certified and licensed in Israel or in ICAO member states maintaining bilateral aviation relations with Israel. Arrangements for such air services, beginning with a service between Gaza and Cairo using two (2) fixed-wing aircraft with capacity up to fifty passengers each, as well as arrangements regarding the establishment and operation of airports and air terminals in the West Bank and the Gaza Strip, will be discussed and agreed upon by the two sides in the JAC.

Any such international commercial air services will be carried out in accordance with Israel's bilateral aviation agreements. The implementation phase will be discussed and agreed on in the JAC.

**ARTICLE XIV**
**Security along the Coastline to the Sea of Gaza**

1. Maritime Activity Zones

a. Extent of Maritime Activity Zones

The sea off the coast of the Gaza Strip will be divided into three Maritime Activity Zones, K, L, and M as shown on map No. 8 attached to this Agreement, and as detailed below:

(1) Zones K and M

(a) Zone K extends to 20 nautical miles in the sea from the coast in the northern part of the sea of Gaza and 1.5 nautical miles wide southwards.

(b) Zone M extends to 20 nautical miles in the sea from the coast, and one

(1) nautical mile wide from the Egyptian waters.

(c) Subject to the provisions of this paragraph, Zones K and M will be closed areas, in which navigation will be restricted to activity of the Israel Navy.

(2) Zone L

(a) Zone L bounded to the south by Zone M and to the north by Zone K extends 20 nautical miles into the sea from the coast.

(b) Zone L will be open for fishing, recreation and economic activities, in accordance with the following provisions:

(i) Fishing boats will not exit Zone L into the open sea and may have engines of up to a limit of 25 HP for outboard motors and up to a maximum speed of 18 knots for inboard motors. Four months after the signing of this Agreement the Maritime Coordination and Cooperation Center (hereinafter "the MC"), as referred to in paragraph 3 below, will consider raising the limit for outboard motors up to 40 hp. in accordance with the types of the boats. The boats will neither carry weapons nor

ammunition nor will they fish with the use of explosives.

(ii) Recreational boats will be permitted to sail up to a distance of 6 nautical miles from the coast unless, in special cases, otherwise agreed within the Maritime Coordination and Cooperation Center as referred to in paragraph 3 below. Recreational boats may have engines up to a limit of 10 horsepower. Marine motor bikes and water jets will neither be introduced into Zone L nor be operated therein.

(iii) Yachts may sail up to a distance of 6 nautical miles from the coast at a maximum speed of 15 knots.

(iv) Foreign vessels entering Zone L will not approach closer than 12 nautical miles from the coast except as regards activities covered in paragraph 4 below.

b. General Rules of the Maritime Activity Zones

(1) The aforementioned fishing boats and recreational boats and their skippers sailing in Zone L shall carry licenses issued by the Council, the format and standards of which will be coordinated through the JSC.

(2) The boats shall have identification markings determined by the Council. The Israeli authorities will be notified through the JSC of these identification markings.

(3) Residents of Israeli settlements in the Gaza Strip fishing in Zone L will carry Israeli licenses and vessel permits.

(4) As part of Israel's responsibilities for safety and security within the three Maritime Activity Zones, Israel Navy vessels may sail throughout these zones, as necessary and without limitations, and may take any measures necessary against vessels suspected of being used for terrorist activities or for smuggling arms, ammunition, drugs, goods, of for any other illegal activity. The Palestinian Police will be notified of such actions, and the ensuing procedures will be coordinated through the MC.

2. The Palestinian Coastal Police

a. The Palestinian Coastal police (hereinafter the "PCP") may function in Zone L, up to a distance of 6 nautical miles from the coast. In special cases, it may also exercise control over Palestinian fishing boats fishing in Zone L in an additional area of 6 nautical miles, up to the limit of 12 nautical miles from the coastline, after clearance and coordination through the MC.

b. The PCP shall have up to 10 boats, with a displacement of up to 50 tons and maximum speed of up to 25 knots

c. The boats shall carry weapons of up to a 7.62 mm caliber.

d. Boats of the PCP shall fly a Palestinian flag, have police identification markings and shall operate identification lights.

e. The two sides shall cooperate on all sea matters, including mutual help at sea, and pollution and environmental issues.

f. The boats of the Palestinian Coastal Police will initially use the Gaza Wharf.

g. Boats belonging to Israelis are solely subject to the control, authority and jurisdiction of Israel and the Israel Navy.

3. Maritime Coordination and Cooperation Center

a. The MC shall function as part of the JSC, to coordinate civil maritime activities and coastal police affairs off the coast of the Gaza Strip.

b. The MC shall function within the relevant DCO, and will determine its own rules of procedure.

c. The MC shall function 24 hours a day.

d. The MC shall be staffed by members of the Israel Navy and the PCP,

each providing a liaison officer and an assistant liaison officer.

e. A direct radio telephone link (hot line) shall be set up between the Israel Navy vessels and the PCP vessels.

f. The role of the MC is to coordinate:

(1) assistance between the PCP and the Israel Navy as may be necessary to deal with incidents arising at sea;

(2) PCP training involving the use of firearms;

(3) joint activities between the PCP and the Israel Navy when preplanning is operationally necessary;

(4) radio contact between PCP and Israel Navy vessels in the event that "hot line" communication between vessels of the two sides has not been established;

(5) search and rescue operations; and

(6) maritime activities related to an agreed port, when established in the Gaza Strip.

4. Gaza Strip Port

a. Plans for the establishment of a port in the Gaza Strip in accordance with the DOP, its location, and related matters of mutual interest and concern, as well as licenses for vessels and crews sailing on international voyages will be discussed and agreed upon between Israel and the Council taking into consideration the provisions of Article XXX (Passages) of this Agreement. To this end a special committee will be established by the two sides.

b. The Gaza Sea Port Authority referred to in the DOP shall act on behalf of the Council in accordance with the provisions of this Agreement.

c. Pending construction of a port, arrangements for entry and exit of vessels passengers and goods by sea, as well as licenses for vessels and crews sailing on international voyages in transit to the West Bank and the Gaza Strip, shall be through Israeli ports in accordance with the relevant rules and regulations applicable in Israel and in accordance with the provisions of Annex V.

**APPENDIX 1**
**Redeployment of Israeli Military Forces**

A. Stages of the First Phase of Redeployment of Israeli Military Forces

Pursuant to Article I paragraph 1 of this Annex:

The first phase of Israeli military forces redeployment will commence 10 days after the signing of this Agreement. The Israeli Government intends to complete the first phase of redeployment in all areas but the city of Hebron by the end of December 1995, in which redeployment will be completed by six months after the signing of this Agreement. Within two weeks of the signing of this Agreement, the two sides will decide on a precise redeployment schedule on a district-by-district basis.

B. Phases of the Further Redeployments of Israeli Military Forces

Pursuant to Article I paragraph 9 of this Annex, the further redeployments of Israeli military forces to specified military locations will take place in phases as follows:

Phase 1

Six months after the inauguration of the Council.

Phase 2

Twelve months after the inauguration of the Council.

Phase 3

Eighteen months after the inauguration of the Council.

### APPENDIX 2
### Deployment of Palestinian Policemen

1. Pursuant to paragraph 3 b of Article IV of this Annex, the details of the deployment of the 6,000 Palestinian policemen in Areas A and B will be as follows:

(1) in the Jenin District: 1,000 policemen;

(2) in the Tulkarm District: 400 policemen;

(3) in the Qalqilia District: 400 policemen;

(4) in the Nablus District: 1,200 policemen;

(5) in the Ramallah District: 1,200 policemen;

(6) in the Bethlehem District: 850 policemen;

(7) in the Hebron District: 950 policemen including 400 policemen in the City of Hebron; and

(8) in the Jericho District: 600 policemen that will be considered part of the number of policemen allocated to the Gaza Strip in accordance with Article IV of this Annex.

2. Changes in the numbers of policemen in each district during the further redeployment phases, when the number of policemen in the West Bank will increase to 12,000, will be agreed upon in the West Bank RSC.

### APPENDIX 3
### Police Stations and Posts in Area B

1. The Palestinian Police shall establish 25 Civil Police (Al Shurta) police stations and posts in the towns, villages and other places listed below and shown on map No. 3, with personnel and equipment as follows:

a. Jenin District

(l) El-Yamun: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(2) Meithalun: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(3) Kafr Rai: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(4) Jalqamus: 45 policemen, 2 vehicles, 8 rifles, 15 pistols; and

(5) Burqin: 45 policemen, 2 vehicles, 8 rifles, 15 pistols.

b. Nablus District

(l) Asiraat A-Shumaliyya: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(2) Talouza: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(3) Tell: 30 policemen, 2 vehicles, 5 rifles, 10 pistols;

(4) Talfit: 60 policemen, 2 vehicles, 12 rifles, 20 pistols;

(5) Tamun: 50 policemen, 2 vehicles, 9 rifles, 17 pistols; and

(6) Aqraba: 50 policemen, 2 vehicles, 9 rifles, 17 pistols.

c. Tulkarm and Qalqilya District

(1) Shuweika: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(2) Kafr Zibad: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(3) Anabta: 50 policemen, 2 vehicles, 9 rifles, 17 pistols; and

(4) Illar: 45 policemen, 2 vehicles, 8 rifles, 15 pistols.