d. Ramallah District

(l) Arura: 50 policemen, 2 vehicles, 9 rifles, 17 pistols;

(2) Deir Ghassana: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(3) Khirbat Abu Falah: 45 policemen, 2 vehicles, 8 rifles, 15 pistols; and

(4) Bir Zeit: 70 policemen, 3 vehicles, 14 rifles, 23 pistols;

e. Bethlehem District

Tuqua: 50 policemen, 3 vehicles, 9 rifles, 17 pistols.

f. Hebron District

(l) Yata: 80 policemen, 3 vehicles, 15 rifles, 27 pistols;

(2) Dhahiriya: 70 policemen, 3 vehicles, 14 rifles, 23 pistols;

(3) Nuba: 45 policemen, 2 vehicles, 8 rifles, 15 pistols;

(4) Dura: 70 policemen, 3 vehicles, 14 rifles, 23 pistols; and

(5) Bani-Naiem: 45 policemen, 3 vehicles, 8 rifles, 17 pistols.

2. The rifles in each of these police stations will be used only for the purpose of guarding the police station. In special cases, where the use of rifles outside the police station is required for the exercise of public order responsibility, prior notification shall be given to the DCO.

**APPENDIX 4**
**Jewish Holy Sites**

Pursuant to Article V of this Annex the Jewish Holy Sites are as follows:

1. Joseph's Tomb (Nablus)

2. Shalom Al Israel synagogue (Jericho)

**APPENDIX 5**
**Protocol Rewarding Arrangements with Respect to Passages (as amended)**

Pursuant to paragraph 1.d of Article VIII to this Annex:

*SECTION A*
*Definitions*

For the purpose of this Protocol:

a. "The Agreement" means the Interim Agreement:

b. "Annex I" means Annex I to the Interim Agreement;

c. All other terms will have the same meaning as in the Agreement.

*SECTION B*
*Entry and Exit through the Palestinian Wing*

Pursuant to Article VIII of Annex I to the Agreement, the following arrangements will apply with respect to the terminals at the Rafah and Allenby Bridge crossings:

1. Entry from Egypt and Jordan

a. At the entrance to the Palestinian wing there will be a Palestinian policeman and a raised Palestinian flag.

b. Before entering the Palestinian wing, passengers will identify their personal luggage and it will be placed on a conveyor belt. Each side will be able to inspect such luggage inside its own checking area, using its own personnel and, if necessary, may open the luggage for inspection in the presence of the owner and a Palestinian policeman.

c. Persons entering the Palestinian Wing will pass through a magnetic

gate. An Israeli policeman and a Palestinian policeman will be posted on each side of this gate. In the event of suspicion, each side will be entitled to require a physical inspection to be conducted in inspection booths to be located adjacent to the gate. Passengers will be inspected by a Palestinian policeman in the presence of an Israeli policeman. Accompanying personal belongings may also be inspected at this point.

d. Having completed the above phase, persons entering the Palestinian wing will pass through one of two lanes for the purpose of identification and document control, as follows:

(1) the first lane will be used by Palestinian residents of the West Bank and the Gaza Strip. These passengers will pass via a Palestinian counter, where their documents and identity will be checked. Their documents will be checked by an Israeli officer who will also check their identity indirectly in an invisible manner;

(2) the second lane will serve visitors to the Gaza Strip and West Bank. These passengers will first pass via the Israeli counter, where their documents and identity will be checked. Then they will continue via the Palestinian counter, where their documents and identity will be checked. The two counters will be separated by tinted glass and a revolving door.

e. In the event of suspicion regarding a passenger in any of the two lanes described in subparagraph I.d above, each side may question such passenger in its closed checking area. Suspicion justifying questioning in the closed checking area may be one of the following:

(1) the passenger was involved, directly or indirectly, in criminal or planned criminal activity, in terrorist or planned terrorist activity and is not a beneficiary of the amnesty provisions of the Agreement;

(2) the passenger conceals arms, explosives or related equipment;

(3) the passenger holds forged or non-valid documentation or the details included in the documentation are inconsistent with those included in the population registry (in the case of a resident) or in the data base (in case of a visitor), except that questions relating to such inconsistency will initially be raised at the counter and the passenger will be questioned in the closed checking area only if the suspicion has not been removed; or

(4) the passenger acts in an obviously suspicious behavior during the passage via the terminal.

If, at the conclusion of this questioning, the suspicion has not been removed, such passenger may be apprehended, after the other side has been notified. In case of a Palestinian suspect being apprehended by the Israeli side, a Palestinian policeman will be asked to meet with the suspect. Following notification to the Liaison Bureau, any further treatment of the apprehended person will be in accordance with Annex IV to the Agreement.

f. In the Palestinian wing, each side will have the authority to deny the entry of persons who are not residents of the Gaza Strip and West Bank.

For the purpose of the Agreement and this Protocol, "residents of the Gaza Strip and West Bank" means persons who, on the date of entry into force of the Gaza-Jericho Agreement, were registered as residents of these areas in the population registry maintained by the military government of the Gaza Strip and West Bank, as well as persons who have subsequently obtained permanent residency in these areas with the approval of Israel, as set out in the Agreement.

g. Following the above procedure, the passengers will collect their luggage and proceed to the customs area where they will be dealt with as set out in Section H of this Protocol.

h. The Palestinian side will provide passengers whose entry is approved with an entry permit stamped by the Palestinian side and attached to their documents.

At the conclusion of the direct and indirect checking of the documents and

identity of passengers passing via the first lane and stamping their entry permits, the Palestinian officer will provide the passenger with a white card issued by the Israeli officer. A Palestinian official posted at the exit of the Palestinian wing will verify that the passenger holds such a white card and will collect the cards with indirect and invisible Israeli checking.

For passengers going through the second lane, the Israeli officer will provide the passengers with a blue card, after checking their documents and identity, and verifying their entry permits. An Israeli and a Palestinian official posted at the exit of the Palestinian wing will verify and collect the cards. White and blue cards collected will be checked by Israeli and Palestinian officials.

In cases where either side denies the entry of a non-resident passenger, that passenger will be escorted out of the terminal and sent back to Jordan or Egypt, as appropriate, after notifying the other side.

2. Exit to Egypt and Jordan

Passengers exiting to Egypt or Jordan through the Palestinian wing will enter the terminal without their luggage.

Thereafter, the same procedures described in paragraph 1 above will apply to them, except that the order of passing via the Israeli and Palestinian counters will be reversed.

*SECTION C*
*Control and Management of the Passages*

1. General

a. Israel will have the responsibility for security throughout the passage, including for the terminal.

b. An Israeli Director-General will have the responsibility for the management and security of the terminal (hereinafter - "the Director-General").

c. Israel will have exclusive responsibility for the management of the Israeli wing.

d. The Director-General will have two deputies who will report to him:

(1) A Palestinian deputy appointed by the Council, who will be the manager of the Palestinian wing (hereinafter - "the Manager of the Palestinian wing"); and

(2) An Israeli deputy who will be the manager of the Israeli wing (hereinafter - "the Manager of the Israeli wing").

e. The Israeli Director-General will be assisted by a professional team appointed at his discretion. Such team shall include:

(1) an officer who will assist the Director-General with respect to the general security of the terminal (hereinafter - "the security officer");

(2) an expert who will advise the Director-General and the wing managers with respect to the general administration of the terminal (hereinafter - "the administration expert"); and

(3) an expert who will be responsible for the performance of those duties which the Director-General shall require him to perform when the need arises (hereinafter - "the duty officer").

f. The Director-General may appoint any of the persons set out in paragraphs l.d.(2) and l.e above or another specialized Israeli official employed in the terminal to fulfill the role of the Director-General in his absence (hereinafter- "the substitute officer").

g. Each wing Manager will have an assistant for security and an assistant for administration. The assignments of the Palestinian assistants are set out in paragraphs 3 and 4 of this Section.

h. All assignments and functions of the Manager of the Palestinian wing,

the Assistant for administration of the Manager of the Palestinian wing and the Assistant for security of the Manager of the Palestinian wing and any other Palestinian employee shall be exercised in a manner consistent with the Agreement and with this Protocol.

2. Assignments of the Manager of the Palestinian wing

The assignments of the Manager of the Palestinian wing shall be the following:

a. employment of Palestinian staff in the Palestinian wing. The list of Palestinian candidates for employment in the Palestinian wing shall be passed by the Manager of the Palestinian wing to the Director-General for security clearance, which shall be a pre-requisite to their engagement.

The Council shall have, through the Manager of the Palestinian wing, full responsibility for all personnel matters of the Palestinians employed in the Palestinian wing including, inter alia, their salary, their social insurance and claims by such employees with respect to their employment;

b. release of Palestinian staff from employment in the Palestinian wing, whilst informing the Director-General. Upon consultation with the Manager of the Palestinian wing, the Director-General may also decide to release a Palestinian from employment in the Palestinian wing due to security reasons of substantial nature. The Manager of the Palestinian wing shall inform the employee of his release.

Other non-security related grounds for the release of Palestinian employees from employment in the Palestinian wing shall be specified in a procedure to be promulgated by the Director-General upon consultation with the Manager of the Palestinian wing and his two Assistants.

For the purpose of this Protocol, "Palestinians employed in the Palestinian wing" means all Palestinians employed in the Palestinian wing, except the Manager of the Palestinian wing;

c. general training and briefing of Palestinian employees in the Palestinian wing and handling of their work related problems;

d. supervision of the daily opening and closing of the Palestinian wing itself;

e. declaration of an emergency situation in the Palestinian wing. This assignment is without prejudice to the power of the Director-General, the substitute officer and/or the security officer to declare a state of emergency in the Palestinian wing and to act forthwith as deemed fit within their complete discretion, in full cooperation with the Manager of the Palestinian wing.

f. other powers and responsibilities assigned to him under paragraph 3 of Article VIII of Annex I;

g. professional guidance of the Palestinian document control officials with respect to the performance of their assignments;

h. appointment of a person as his substitute and appointment of a duty officer for the Palestinian wing;

i. with respect to the Rafah crossing, the Manager of the Palestinian wing shall also have the following assignments:

(1) responsibility for the efficient movement of passengers traveling abroad, from the entrance to the terminal, through the Palestinian wing and up to their embarkation on the bus or other vehicle leaving the terminal in the direction of Egypt;

(2) responsibility for the efficient movement of passengers arriving from abroad from the sheltered waiting area located near the entrance to the Palestinian wing, through the Palestinian wing and up to their embarkation on the bus or other vehicle leaving the terminal in the direction of the Gaza Strip;

(3) responsibility for the orderly functioning of the service car defined in

Section F of this Protocol with respect to the transportation of VIPs traveling abroad, from the entrance to the terminal to the entrance to the Palestinian wing;

(4) responsibility for the canteen serving passengers traveling abroad through the Palestinian and the Israeli wing;

(5) responsibility to allocate tasks to specific Palestinian service personnel employed and assigned by the Director-General to work in the Palestinian wing;

(6) responsibility to contact Palestinian contractors and to pass to the Director-General their offers regarding tenders with respect to administrative and logistical services in the terminal; and

(7) responsibility for the orderly functioning of the emergency clinic to be established in the Palestinian wing. This clinic will be staffed by a Palestinian physician and a nurse.

These assignments shall also apply, at a later stage, with respect to the Allenby Bridge crossing, with the necessary adjustments; and

j. within the framework of the functions assigned to him pursuant to this paragraph, the promulgation of procedures for the Palestinian employees in the Palestinian wing.

3. Assignments of the Palestinian Assistant for Security

The Palestinian Assistant for Security shall be appointed from the ranks of the Palestinian Police, shall be subordinate to the Manager of the Palestinian wing and his assignments shall be within the Palestinian wing, as follows.

a. implementation of standard security procedures promulgated by the Director-General pursuant to Paragraph 5 of this Section;

b. implementation of other security related measures pursuant to the instructions of the Director-General, the substitute officer and in emergencies or exceptional cases, the security officer;

c. in conjunction with the Manager of the Palestinian wing and after duly informing the Director-General and the security officer, training and briefing of each Palestinian employee in the Palestinian wing as to the performance of his specific security related task;

d. supervision, maintenance and storage of all handguns in the possession of Palestinian policemen present in the Palestinian wing;

e. responsibility for ensuring the due and proper execution of the procedures set out in paragraph 3 of Article VIII of Annex I;

f. ensuring the immediate arrival of a Palestinian policeman pursuant to an Israeli demand for his presence, made pursuant to paragraphs 3.b, 3.c, and/or 3.e of Article VIII of Annex I;

g. ensuring maintenance of secrecy amongst the Palestinian employees with respect to the nature of their employment, the layout of the terminal, security procedures, and all other information, the revelation of which could compromise the general security of the terminal;

h. ensuring decorum and good public order in a routine working context;

i. declaration of an emergency situation in the Palestinian wing, without prejudice to the provisions of paragraph 2.e of this Section; and

j. upon discovery of a suspicious object, immediately to notify the security officer and the Manager of the Palestinian wing. The security officer will then have complete discretion to act as he deems fit in the circumstances.

4. Assignments of the Palestinian Assistant for Administration

The Palestinian Assistant for Administration shall be subordinate to the Manager of the Palestinian wing and shall deal with matters relating to manpower, organization and logistics within the Palestinian wing, as

follows:

a. ensuring the efficient movement of passengers in the Palestinian wing,

b. implementation of standard administration procedures promulgated by the Director-General pursuant to paragraph 5 of this Section;

c. implementation of other non-security related matters pursuant to the instructions of the Manager of the Palestinian wing given upon consultation with the Director-General;

d. escorting the elderly, the ill, children and disabled;

e. ensuring orderly behavior and presentable appearance of Palestinian employees;

f. ensuring cleanliness, the presence and efficient functioning of fire fighting facilities and the supply of provisions;

g. training and briefing of each Palestinian employee in the Palestinian wing, engaged in non-security related matters with respect to the specific nature of his employment; and

h. uninterrupted functioning of the section of the conveyor belt under Palestinian supervision as set out in paragraph 3 of Article VIII of Annex I.

5. Standard Security and Administration Procedures

The Director-General upon consultation with the Israeli and Palestinian wing Managers, shall determine and shall furnish to the persons set out in Paragraphs I.d, I.e and I.g above and to the Liaison Bureau a compendium detailing standard procedures with respect to security and administration of the terminal. Such procedures shall include:

a. procedures in a state of emergency;

b. procedures with respect to inspection of persons, personal belongings and/or luggage pursuant to paragraphs 3.b, 3.c and/or 3.e of Article VIII of Annex I;

c. procedures with respect to road-markings, signs, plaques and flags in the terminal;

d. procedures with respect to handling of luggage and the loading of the conveyor belt;

e. procedures with respect to operation of the conveyor belt;

f. procedures with respect to media and public relations;

g. procedures with respect to public transportation and taxis passing through the terminal, as will be agreed upon between the two sides;

h. procedures with respect to maintenance and upkeep of the terminal;

i. procedures with respect to supply of provisions and services;

j. procedures with respect to general conduct and behavior of employees within the terminal and changing of work shifts;

k. procedures with respect to escorting the elderly, the ill, children and disabled;

l. procedures with respect to escorting VIPs;

m. procedures with respect to people denied exit or entry through the Palestinian wing; and

n. procedures with respect to comportment, personal appearance and identification tags of employees in the terminal.

The Director-General may promulgate, upon consultation with the Israeli and the Palestinian wing Managers, additional procedures not provided for in this paragraph.

All of the abovementioned procedures will be consistent with the

 **Israel Ministry of Foreign Affairs**

## THE ISRAELI-PALESTINIAN INTERIM AGREEMENT-Annex II

28 Sep 1995

AGREEMENT | ANNEX I | ANNEX II | ANNEX III | ANNEX IV | ANNEX V | ANNEX VI | ANNEX VII | MAPS | MAIN POINTS

## THE ISRAELI-PALESTINIAN INTERIM AGREEMENT ON THE WEST BANK AND THE GAZA STRIP
### Annex II
### Protocol Concerning Elections

### INDEX

ARTICLE I - Basis of Elections
ARTICLE II - Right to Vote and the Electoral Register
ARTICLE III - Qualification and Nomination of Candidates
ARTICLE IV - The Election Campaign
ARTICLE V - International Observation of Elections
ARTICLE VI - Election Arrangements Concerning Jerusalem

APPENDIX 1 - Agreed Format for Canvass Information
APPENDIX 2 - Common Terms of Reference for International Observers
APPENDIX 3 - Privileges and Immunities of International Observer Delegations

### ARTICLE I
### Basis of Elections

*General Provisions*

1. Pursuant to Article III of the Declaration of Principles and in accordance with the provisions of this Annex, direct, free and general political elections will be held for the Council and, simultaneously, for the Ra'ees of the Executive Authority.

2. The holding of elections for the position of Ra'ees and for the Palestinian Council shall be governed by this Annex, and the Law on the Election of the Ra'ees and the Palestinian Council (hereinafter "the Election Law") and the regulations made under this law (hereinafter "the Election Regulations"). The Election Law shall be adopted by the Palestinian Authority. The Election Law and the Election Regulations shall be consistent with the provisions of this Agreement. Unless otherwise specifically provided in this Annex, all persons voting or standing as candidates in the elections shall be uniformly subject to the provisions of the Election Law and the Election Regulations.

*The Central Election Commission*

3. The Palestinian Central Election Commission (hereinafter "the CEC"), which will be appointed by the Palestinian Authority, will be responsible for the administration of the elections. The CEC will be responsible for the preparation and conduct of the elections and shall have the powers and competences necessary to fulfill these functions, as defined in the Election Law. All matters related to the elections which are not subject to specific provision in this Agreement shall be subject to determination by the Palestinian Authority or the CEC in accordance with the Election Law, the Election Regulations and any relevant procedures set out in this

Agreement. The CEC and its subordinate bodies shall be independent.

4. a. All of the offices of the CEC and of its subordinate bodies, including the offices of the District Election Commissions (hereinafter "the DECs") and the District Election Offices (hereinafter "the DEOs"), shall be situated in constituencies set out in the Palestinian Election Law in areas under the jurisdiction of the Council.

b. All aspects of the electoral administration (such as publication of lists of electors or candidates, and other information concerning the conduct of the elections, appeals, counting votes, and publication of results) shall take place only in the offices of the relevant DEO.

## ARTICLE II
### Right to Vote and the Electoral Register

1. Right to Vote

a. The right to vote will be universal, regardless of sex, race, religion, opinion, social origin, education, or property status. Every Palestinian who meets the qualification to vote shall have the right to be registered to vote.

b. Only a person whose name appears on the Electoral Register, as defined in paragraph 2 below, and who is 18 years old or older on the day of the elections, will have the right to vote.

c. No person may be registered as an elector in more than one polling district, as defined in paragraph 2 below.

d. The qualification to vote will be the same for the election for the Ra'ees of the Executive Authority of the Council and the election for the Council.

e. Israeli citizens shall not be entered on the Electoral Register.

f. To be qualified to be entered on the Electoral Register, a person must:

(1) be Palestinian;

(2) be 17 years old or older;

(3) have his or her abode in the polling district where he or she is registered to vote;

(4) not be disqualified under subparagraph k. below; and

(5) be entered in the population register maintained by the Palestinian Authority or the Israeli authorities (hereinafter together "the Population Register"), and thus be the holder of an identity card issued by the Palestinian Authority or the Israeli authorities.

g. Any person who:

(l) will be at least 40 years old on January 1, 1996 and can provide satisfactory evidence that he or she has actually lived in the West Bank or the Gaza Strip continuously, except for short absences, for at least 3 years immediately prior to the date of the signing of this Agreement; or

(2) will be less than 40 years old on January 1, 1996 and can provide satisfactory evidence that he or she has actually lived in the West Bank or the Gaza Strip continuously, except for short absences, for at least 4 years immediately prior to the date of the signing of this Agreement,

shall be entitled notwithstanding the fact that he or she was not previously entered in the Population Register, to be entered in the Population Register and to receive the appropriate identity card. The Palestinian Authority and Israel, through the CAC, shall together invite applications to be so entered in the Population Register. Such applications shall be submitted prior to the date of the elections to the Civil Administration or the relevant joint Israeli-Palestinian liaison body as appropriate and shall be dealt with by the Civil Administration or by both sides of such joint liaison body on an expedited basis to assist the process of registration.

h. The inclusion of any person on the Electoral Register at any address

shall be without prejudice to the question of that person's legal abode at that address.

i. In this Agreement, the word "abode" denotes the main permanent fixed address within any polling district at which, at the time of the initial registration canvass, a person actually lives.

j. In this Agreement, the word "address" denotes the community, house, street, neighborhood or other description identifying the specific abode in which a person actually lives, where such information exists.

k. The following persons will be disqualified from being entered on the Electoral Register:

(l) any person deprived of the right to vote by judicial sentence, while that sentence is in force;

(2) any person declared incapable by judicial decision; and

(3) any person detained in a psychiatric institution by judicial decision during the period of that detention.

"Judicial sentence" means a judicial verdict or sentence made by a Palestinian court.

2. The Electoral Register

a. In accordance with the provisions of this Article, the Election Law and the Election Regulations, the CEC shall compile and maintain the list of all persons registered as qualified to vote (hereinafter "the Electoral Register"). A separate section of the Electoral Register (hereinafter "an electoral register") shall be kept for each defined geographical area possessing its own polling station (hereinafter "polling district"). b. In accordance with the arrangements agreed between the two sides, the CEC will compile the initial draft register. The compilation of the register in each polling district will be the responsibility of the Polling Station Commission (hereinafter "PSC") for that district.

c. The PSC must enter on the initial draft register the name of any person who is 18 or over, is qualified to be registered in the particular polling district, is the holder of an identity card issued by the Israeli authorities or the Palestinian Authority, and provides all the required information as long as the PSC believes the information to be correct.

d. The PSC will also enter on the initial draft register the name of any person who is 17 and otherwise meets all the criteria to be entered thereon. Such a person may vote if he or she has reached his or her 18th birthday on or before polling day.

e. The initial draft register will be displayed within each polling district at the site of the PSC. It shall bear upon each sheet the following text:

"This is the initial draft of the register of the persons entitled, if they are 18 years old or more on the day of the election, to vote in this polling district in the election for the Palestinian Council and the Ra'ees of its Executive Authority. The entry on this draft register of any individual is subject to confirmation that he or she is entered in the population register maintained by the Palestinian Authority or the Israeli authorities and thus the holder of an identity card issued by the Palestinian Authority or the Israeli authorities. Any person who believes that he or she has been wrongly omitted, and any person who believes that the information published about him or her is wrong, may submit a claim to the Polling Station Commission. Any person who believes that any other person entered on the draft register is not qualified to appear on this register may submit an objection to the Polling Station Commission. The deadline for receipt of claims and objections is YYMMDD".

f. A subcommittee established by the Joint Civil Affairs Coordination and Cooperation Committee shall consider questions of registration defined in this Agreement and coordinate the implementation of the registration arrangements (hereinafter in this Article "the CAC subcommittee").

g. Within 6 weeks of the compilation of the initial draft register, and following adjudication of all claims and objections, the Palestinian side of the CAC subcommittee will provide the Israeli side with a copy of this register as amended in the computer format agreed between the two sides and set out in Appendix 1 to this Annex. Upon receipt of this information, the Israeli side in the CAC subcommittee will confirm the information contained in the initial draft register with that contained in the Population Register. Subject to compliance with the provisions of Appendix 1, and with any agreed amendments following the experimental input or otherwise, this confirmation will take place within 7 days. Persons whose details do not appear, or whose details are significantly different from those in the Population Register, shall be removed from the initial draft register, unless the Palestinian side can provide satisfactory evidence within 7 days that the person is entered in the Population Register.

h. The publication of the Electoral Register and the display of the relevant electoral register in each polling district shall follow the confirmation provided for in subparagraph g. above. Each electoral register shall bear the following text:

"This is the register of the persons entitled, if they are 18 years old or more on the day of the election, to vote in this polling district in the election of the Palestinian Council and the Ra'ees of its Executive Authority."

i. At least three days prior to its publication, the final Electoral Register shall be forwarded by the CEC to the Israeli side in the CAC subcommittee in the form, and containing the information, described in Appendix 1.

## ARTICLE III
### Qualification and Nomination of Candidates

1. Qualification to be a candidate

a. Every candidate for the Council and every candidate for the position of Ra'ees of the Executive Authority of the Council shall be a registered elector.

b. Every candidate for the Council from the various constituencies set out in the Palestinian Election Law must have a valid address in an area under the jurisdiction of the Council in the constituency for which he or she is a candidate. Every candidate for the position of the Ra'ees must have a valid address in an area under the jurisdiction of the Council. A valid address shall be that of a residential property which is owned or rented or otherwise legitimately occupied by the candidate. This valid address shall be entered in the candidate's nomination paper. Where a candidate has more than one valid address, he may enter all such addresses on his nomination paper.

c. Israeli citizens may not be candidates for election to be a member of the Council or to be the Ra'ees.

2. Nominations

The nomination of any candidates, parties or coalitions will be refused, and such nomination or registration once made will be canceled, if such candidates, parties or coalitions:

(1) commit or advocate racism; or

(2) pursue the implementation of their aims by unlawful or nondemocratic means.

3. Nomination procedures - The Council

a. Nominations shall be submitted to the DEC on the official nomination papers, as specified in the Palestinian Election Law.

b. Following the close of nominations the DEC for each constituency will

immediately publish the provisional Statement of Persons Nominated for its constituency in accordance with the Palestinian Election Law.

c. Upon publication of the provisional Statement of Persons Nominated, any person may, within 7 days, submit an objection to the CEC that a provisionally nominated candidate does not satisfy the criteria set out in paragraphs l.b, 1.c and 2 above.

d. Following the resolution of all appeals, and not later than 22 days before polling day, the DEC will publish the final Statement of Persons Nominated.

4. Nomination procedures - The position of the Ra'ees

a. The nomination of any candidate shall be submitted to the CEC on the official nomination paper, as specified in the Palestinian Election Law.

b. The CEC will publish the provisional Statement of Persons Nominated 3 days after the close of nominations.

c. Upon publication of the provisional Statement of Persons Nominated, any person may, within 2 days, submit an objection to the CEC that a provisionally nominated candidate does not satisfy the criteria set out in paragraphs l.b, 1.c and 2 above.

d. Following the resolution of all appeals (and therefore not later than 22 days before polling day) the CEC will publish the final Statement of Persons Nominated.

**ARTICLE IV**
**The Election Campaign**

1. General campaign provisions

a. All activities carried out by nominated candidates, or by political parties, coalitions, or groupings of electors who have nominated candidates, or for their benefit, that are directly addressed to obtain the electorate's vote, shall constitute campaign activities. Candidates and their supporters may promote their campaign by any legal means.

b. The official campaign period of the election, during which the provisions relating to the election campaign will apply, will start 22 days before polling day and close 24 hours before the polls open. Campaigning on the day before polling day, or on polling day itself, will not be permitted.

2. Rallies and meetings

a. The CEC will publish a list of venues and facilities available for election rallies and meetings, which shall include all recognized public open air meeting places and all public buildings with a recognized public meeting hall. The CEC will also publish a list of routes available for marches. These lists will be posted in each constituency in the respective

DEO. Such campaign activities shall be conducted at venues and facilities included in the lists published by the CEC.

b. Without derogating from the principle that the Palestinian Police will ensure public order during the Palestinian elections, and in order to enable the elections to proceed smoothly, without any interference, obstacle or friction, the two sides agree to deal with, and coordinate with regard to, security issues that may arise in relation to the electoral process in the relevant DCO in each constituency.

c. Security issues relating to the international observers will also be dealt with in the relevant DCO, within the framework of the trilateral Palestinian Israeli-European Union forum, as set out in Article V, paragraph 7 below.

d. Each side shall take all necessary measures with regard to persons under its authority to prevent public disorder during campaign activities, to ensure that such activities do not interfere with the free flow of traffic, and to protect the electoral process from any violence, incitement, hostile propaganda or other undemocratic interference.