e. (l) The representative of a candidate or candidates wanting to hold a rally, meeting or march must submit an application to the relevant DEO giving details of the proposed time and venue.

(2) With regard to applications to hold such a campaign activity in areas in which the Palestinian Police exercises responsibility for public order, but there is no Palestinian police station or post, the DEO shall give prior notification of the activity to the relevant DCO.

(3) With regard to applications to hold such a campaign activity outside the areas in which the Palestinian Police exercises responsibility for public order, the activity shall only take place after coordination and confirmation through the relevant DCO.

## ARTICLE V
### International Observation of Elections

1. International Standards

The election process will be open to international observation. Observation will be conducted according to accepted international standards.

2. Scope of observation

a. All stages of the electoral process will be open to observation. This includes registration of electors, the campaign, the operation of polling stations during polling, the operation of the count in each polling station, and the totaling and scrutiny (including the determination of claims made by candidates or their representatives) at district and central level.

b. The observers will be asked to assess whether all stages of the electoral process are free and fair. The activity of the observers will be limited to observation, reporting and dialogue with the relevant authorities.

c. Observer delegations may wish at any point to make comments or representations about the conduct of the elections to the CEC, which shall consider them and reply appropriately.

d. In order to facilitate the independence of the observation, the mandate and operating instructions of each international observer delegation shall be determined by that delegation in consultation with the international observer coordinating body under the common terms of reference attached as Appendix 2 to this Annex.

3. Source of observers

It is envisaged that observers will be present from all parts of the world.

a. Observer delegations will, in particular, be present from the European Union, the United Nations, the United States of America, the Russian Federation, Canada, Egypt, Japan, Jordan, Norway, South Africa, the Movement of Non-Aligned Nations, the Organization of African Unity and the Islamic Conference Organization. Observer delegations from other governments or intergovernmental organizations may be added to this list upon consultation.

b. Other observers, including those representing non-governmental organizations, will also be present.

4. Coordinating body

The European Union will act as the coordinator for the activity of observer delegations.

5. Accreditation of observers

a. All observers, both international and domestic, shall be accredited through machinery established by the CEC. Accreditation will be issued by the CEC on request and will be conditional on acceptance of the common terms of reference. The accreditation card will contain a trilingual text (Arabic, English and Hebrew).

b. The accreditation card of members of observer delegations and members of the Coordinating Body shall contain the following details:

(1) full name;

(2) country of origin;

(3) the following text: "The bearer of this card is an International Observer and is entitled to Privileges and Immunities in accordance with the Interim Agreement"; and

(4) a photograph.

c. The accreditation card of other observers shall not be the same color as the card for members of observer delegations in subparagraph b. above, and shall contain the following details:

(l) name;

(2) organization;

(3) the words "Election Observer"; .

(4) the following text: "The bearer of this card is an Election Observer entitled to all possible assistance in the conduct of his or her tasks in accordance with the Interim Agreement."; and

(5) a photograph.

6. Privileges and immunities

a. Observer delegations and members of the coordinating body (hereinafter "delegation members") shall be granted, according to international standards, the privileges and immunities necessary for the fulfillment of their activities in accordance with Appendix 3 to this Annex.

b. The names of delegation members will be supplied in advance by the CEC to Israel, following which privileges and immunities will be granted in accordance with Appendix 3 .

7. Trilateral coordination forum for logistics and security

The CEC, Israel and the European Union shall establish a trilateral forum for the purpose of dealing with issues (for example: security of observers, communications, visas, identification, and other questions of logistics) which are raised by observer delegations as requiring assistance, or which otherwise require coordination between the members of the trilateral forum. Other matters relating to the conduct of the elections may be dealt with between the CEC and the European Union bilaterally. The operational modalities of the trilateral forum will be agreed by the parties at its first meeting.

8. Freedom of movement

a. For the purposes of election observation, all measures necessary will be taken to ensure freedom of movement in all areas of operation.

b. Observers will not be accompanied by official representatives of the CEC or of Israel unless they so request.

9. Equipment of observers

a. Members of observer delegations will be identifiable by a distinctive outfit (cap, shirt, jacket etc.) and an overjacket carrying the words "INTERNATIONAL OBSERVER" in Arabic and English. Other observers will be otherwise identified.

b. Observers will not carry arms.

10. Reporting by observer delegations

During and following the election, the coordinating body, each individual observer delegation, and other observers may issue statements and hold press conferences as to their findings.

11. Domestic observers and parallel vote tabulations

Domestic observer organizations will be required to be independent of parties, coalitions and groupings of electors with nominated candidate(s) and will be accredited by the CEC on request. Domestic observer organizations will operate under the common terms of reference for domestic observers attached in Appendix 2. Any parallel vote tabulation organization will also be accredited as a domestic observer organization.

12. Provisions for journalists

Domestic and international journalists will be accredited by the CEC upon production of valid press documentation. Journalists shall enjoy freedom of the press and of movement in all areas in order to cover the electoral process. Journalists shall have access to all electoral facilities during all stages of the electoral process. The electoral authorities may request the presentation of the issued accreditation in order to facilitate this access.

**ARTICLE VI**
**Election Arrangements Concerning Jerusalem**

1. Election Campaigning

A subcommittee of the CAC shall be established comprising representatives of the CEC and Israel, to coordinate issues relating to election campaigning in Jerusalem. Candidates conducting campaign activities in Jerusalem shall apply for the necessary permits through the CEC. The CEC shall obtain the necessary permits from the Israeli side in the CAC subcommittee. In addition, the CEC may disqualify candidates whose election campaigning in Jerusalem fails to comply with the provisions of the Palestinian Election Law and this Agreement.

2. Polling Arrangements

a. Location

A number of Palestinians of Jerusalem will vote in the elections through services rendered in post offices in Jerusalem, in accordance with the capacity of such post offices. The relevant post offices for the purposes of these arrangements shall be:

(1) Salah-a-din post office;

(2) Jaffa Gate post office;

(3) Shuafat post office;

(4) Beit Hanina post office; and

(5) Mount of Olives post office.

b. International Observation

International observers will be present in the above post offices on the day of the elections.

c. Procedure for Voting

(1) Those Palestinians of Jerusalem who will vote in the elections through post offices in Jerusalem shall be notified of the relevant post office by Electoral Registration card provided by the CEC (hereinafter "the electors").

(2) On arrival at the post office, electors shall identify themselves to the relevant postal personnel (hereinafter "the personnel") and present their Electoral Registration card.

(3) The personnel shall provide the electors with the following:

(a) two ballot papers, one for the election of the Ra'ees, and one for the election to the Council; and

(b) two envelopes addressed to the DEO.

(4) The electors shall mark the ballot papers at the post office counter, then place them in the envelopes to be inserted in receptacles, the size

and shape of which shall be agreed between the two sides.

(5) At the end of the day, the receptacles shall be promptly delivered to the office of the relevant DEO. Such delivery shall be open to international observers. These receptacles shall be sealed prior to delivery.

(6) The DEO shall be responsible for the counting and totaling of votes cast through the arrangements set out above as part of the total election count.

**APPENDIX 1**
**Agreed Format for Canvass Information**

1. Computer specifications

a. The data will be provided on a DAT (2GB) tape. If possible, the data will be transferred by means of the TAR program.

b. The data will be provided in a file which accords with Microsoft Windows Arabic Standard.

c. The data will be provided in a flat file and not an export file.

2. General points

a. A table indicating the relationship between the PSC codes and the names of their respective localities will be provided.

b. An experimental input of 100 entries will be tried, not later than two weeks after the start of the canvass.

3. Format of the data

a. The file to be transferred shall be in the following format:

| Content | Type | Length |
|---|---|---|
| ID Number | NUMBER | 9 |
| ID Type | NUMBER | 1 |
| Date of birth | DATE | 6-YYMMDD |
| Sex | NUMBER | 1 |
| PSC code | NUMBER | 5 |

b. The ID Number may have a length of 8 where there is no check digit. In this case, the final space should be left blank.

c. The ID Type field may contain one of three values:

1 Israeli ID (West Bank)

2 Palestinian Authority ID

3 Israeli ID (Jerusalem).

d. The Sex field may contain one of two values:

1 Male

2 Female.

e. When not fully known, dates of birth will be entered as follows:

i. When the day of the month is not known, 00 will be entered.

ii. When the month is not known, 00 will be entered.

iii. Where the entire date of birth is unknown, it will be entered as 000000.

**APPENDIX 2**
**Common Terms of Reference for Observers**

A. International Observers

1. Observers are invited to observe the full Palestinian election process,

from the announcement through registration, campaign, polling, counting, compiling of results and complaints procedures.

2. All bodies sending observers will be free in their choice of observers. All observers will be issued on arrival with accreditation by the CEC.

3. Any accredited observer is free to have contact with any person at any time and anywhere and to attend all election related events.

4. Israel will allow accredited observers to travel through and to get accommodation in Israel.

5. The premises, equipment and property, including papers, documents (including computerized documents), communications, correspondence and databases of observer organizations shall be respected by each side according to its applicable laws. This provision shall apply also to the property of observers created, maintained or used for the purposes of their work or duties.

6. Members of observer delegations will wear their distinctive outfit (caps, shirts, jackets etc., including the words "INTERNATIONAL OBSERVER" in Arabic and English) whenever and wherever they go on duty. Observers who are not members of observer delegations in accordance with Article V, paragraph 3.a of this Annex (hereinafter "other observers") will be otherwise identified.

7. All observers will be responsible for the arrangement of their own accommodation, equipment, means of transport, and medical and other insurance.

8. The CEC and Israel will bear no financial liability in respect of expenditure undertaken by observers, or of injury, damage or loss incurred by observers in the course of their duties or otherwise. The European Union will only bear such liability in relation to members of the coordinating body and to the European Union observers and only to the extent that it explicitly agrees so to do.

9. No restriction shall be placed on introducing foreign currency to fund the activities of observers nor on the repatriation of such funds to any country abroad nor on the free exchange of foreign currency through an authorized dealer in exchange at the market rate of exchange.

10. All necessary measures shall be taken to ensure the security of observers. Enhanced security will be provided as necessary on request.

11. All observers have the right to emergency medical assistance, including emergency evacuation as necessary. The appropriate Israeli and Palestinian authorities undertake to provide such emergency assistance and evacuation.

B. Domestic Observers

1. Domestic observers are invited to observe the full Palestinian election process, from the announcement through registration, campaign, polling, counting, compiling of results and complaints procedures.

2. All domestic observer bodies will be free in their choice of observers. Domestic observers will be issued with accreditation by the CEC.

3. Any accredited domestic observer is free to move and to have contact with any person at any time and anywhere and to attend all election related events.

4. Freedom of speech for domestic observers in regard of words spoken or written in their official capacity shall be guaranteed.

5. The premises, equipment and property, including papers, documents (including computerized documents), communications, correspondence and databases of domestic observer organizations shall be respected by each side, according to its applicable laws. This provision shall apply also to the property of domestic observers created, maintained or used for the purposes of their work or duties.

6. Israel will allow accredited domestic observers from the list provided by the CEC to travel through Israel in the course of their duties.

7. All observers will be responsible for the arrangement of their own equipment, means of transport, and medical and other insurance.

8. The CEC and Israel will bear no financial liability in respect of expenditure undertaken by observers, or of injury, damage or loss incurred by observers in the course of their duties or otherwise.

**APPENDIX 3**
**Privileges and Immunities of International Observer Delegations**

For the purpose of this Appendix, privileges and immunities shall be granted to all accredited members of international observer delegations, and members of the coordinating body and personnel appointed by observer delegations to perform activities related to the election observation (hereinafter "delegation members").

1. Delegation members shall:

a. be immune from personal arrest or detention, and from seizure of any personal belongings,

b. be immune from legal process in respect of words spoken or written or acts done by them in the course of the performance of their mission;

c. enjoy inviolability for all papers and documents, including computerized documentation; and

d. be permitted, for the purposes of their official communications, to use codes and to receive papers and correspondence by courier or sealed bags.

2. The inviolability and freedom of communications and correspondence to and from delegation members shall be assured.

3. The premises, including all archives and databases, property, funds and assets of delegation members shall:

a. be protected and inviolable; and

b. be immune from search, requisition, confiscation, expropriation and any other form of interference, whether by executive, administrative, judicial or legislative action.

4. Without prejudice to their privileges and immunities, it is the duty of all persons enjoying these privileges and immunities to respect the laws and regulations in force in the areas under each side's jurisdiction.

5. The coordinating body and each observer delegation will be able to acquire and use freely and efficiently, from the beginning to the end of its operation, the means of communication necessary for it to fulfill its duty. Within the framework of the trilateral forum as defined in Article V, paragraph 7 of this Annex (hereinafter "the trilateral forum"), the Israeli and Palestinian authorities will ensure access to all necessary communication lines and frequencies.

6. The coordinating body and each observer delegation will have access to either or both of:

a. special license plates and necessary permits, agreed in the trilateral forum, for cars bought or hired locally; and

b. special license plates for cars imported and re-exported.

Comprehensive motor insurance shall be acquired for each such car.

7. Any equipment, materials, articles or goods imported by the coordinating body or any observer delegation in connection with their activities shall be exempt from all custom and import taxes and duties. It is understood, however, that such exemption does not include charges for services provided at Israeli points of entry. In the event of a request to pay

storage charges resulting from an undue delay caused by Israeli authorities as certified by the trilateral forum, storage charges shall be reimbursed.

Questions relating to such imports regarding any prohibitions or restrictions in accordance with the law, shall be raised in the trilateral forum and dealt with under expedited procedures.

Each observer delegation will be allowed to import and re-export all necessary equipment, including cars, which it considers necessary to fulfill its duties. Within the framework of the trilateral forum, Israeli and/or Palestinian customs authorities will perform appropriate customs clearances through a special expedited procedure under the supervision of senior customs officials. All imported equipment, materials, articles or goods exempted from import taxes and duties will be re-exported or donated according to applicable customs procedures agreed upon between the two sides at the conclusion of the mission of the observer delegations.

8. a. Palestinians recruited locally to perform services for the coordinating body or for an observer delegation (hereinafter "local personnel") shall, subject to the provisions of this paragraph, enjoy in the West Bank and the Gaza Strip:

(1) freedom of movement in the exercise of their duties; and

(2) immunity from prosecution in respect of words spoken or written and any act performed by them in the exercise of their duties.

b. Observer delegations and the coordinating body shall provide lists of local personnel to the CEC, which will accredit such local personnel following prior coordination with Israel. Accredited local personnel shall be issued with a certificate in Arabic, English and Hebrew, possession of which shall be necessary to enjoy the freedom of movement and immunity in subparagraph a. above.

c. The certificate will include the following text:

"The bearer of this certificate is officially attached to an international observer delegation. He or she is entitled to drive or travel in a vehicle bearing special observer delegation license plates in the course of his or her legitimate duties. He or she is entitled to limited immunity in the course of such duties, in accordance with the Interim Agreement."

d. Such local personnel shall not enjoy immunity from any legal process related to traffic offenses, or damage caused by such offenses. e. Matters regarding arrangements for entry by local personnel into Israel and for movement by local personnel between the West Bank and the Gaza Strip, including the issuance of entry certificates, will be handled within the trilateral forum by the Israeli representative to that forum, who shall, to that end, maintain ongoing contacts with the appropriate Israeli authorities with a view to expediting all related matters.

f. Local personnel shall not carry arms.

9. The coordinating body, and observer delegations, may display their flag and/or emblem on their office premises and vehicles

10. Within the framework of the trilateral forum, the Palestinian and Israeli authorities will appoint liaison officers as appropriate to ensure that all arrangements relating to requests concerning logistics and security are implemented.

Close



## Israel Ministry of Foreign Affairs

### THE ISRAELI-PALESTINIAN INTERIM AGREEMENT-Annex III

28 Sep 1995

AGREEMENT | ANNEX I | ANNEX II | ANNEX III | ANNEX IV | ANNEX V | ANNEX VI | ANNEX VII | MAPS | MAIN POINTS

### THE ISRAELI-PALESTINIAN INTERIM AGREEMENT ON THE WEST BANK AND THE GAZA STRIP
### Annex III
### Protocol Concerning Civil Affairs

#### INDEX

ARTICLE I - Liaison and Coordination in Civil Affairs
ARTICLE II - Transfer of Civil Powers and Responsibilities
ARTICLE III - Modalities of Transfer
ARTICLE IV - Special Provisions concerning Area C

APPENDIX 1 - Powers and Responsibilities for Civil Affairs
  Article 1 - Agriculture
  Article 2 - Archaeology
  Article 3 - Assessments
  Article 4 - Banking and Monetary Issues
  Article 5 - Civil Administration Employees
  Article 6 - Commerce and Industry
  Article 7 - Comptrol
  Article 8 - Direct Taxation
  Article 9 - Education and Culture
  Article 10 - Electricity
  Article 11 - Employment
  Article 12 - Environmental Protection
  Article 13 - Fisheries
  Article 14 - Forests
  Article 15 - Gas, Fuel and Petroleum
  Article 16 - Government and Absentee Land and Immovables
  Article 17 - Health
  Article 18 - Indirect Taxation
  Article 19 - Insurance
  Article 20 - Interior Affairs
  Article 21 - Labor
  Article 22 - Land Registration
  Article 23 - Legal Administration
  Article 24 - Local Government
  Article 25 - Nature Reserves
  Article 26 - Parks
  Article 27 - Planning and Zoning

Article 28 - Population Registry and Documentation
Article 29 - Postal Services
Article 30 - Public Works and Housing
Article 31 - Quarries and Mines
Article 32 - Religious Sites
Article 33 - Social Welfare
Article 34 - Statistics
Article 35 - Surveying
Article 36 - Telecommunications
Article 37 - Tourism
Article 38 - Transportation
Article 39 - Treasury
Article 40 - Water and Sewage

Schedule 1 - Archaeology - Archaeological Sites of Importance to the Israeli Side
Schedule 2 - Environmental Protection
Schedule 3 - Health
Schedule 4 - Religious Sites
Schedule 5 - Telecommunications - List of Approved Frequencies
Schedule 6 - Telecommunications - List of Approved TV Channels and the Locations of Transmitters
Schedule 7 - Transportation - Transportation Arrangements
Schedule 8 - Water and Sewage - Joint Water Committee
Schedule 9 - Water and Sewage - Supervision and Enforcement Mechanism
Schedule 10 - Water and Sewage - Data Concerning Aquifers
Schedule 11 - Water and Sewage - The Gaza Strip
Side Letter - Bezeq

**ARTICLE I**
**Liaison and Coordination in Civil Affairs**

1. Joint Civil Affairs Coordination and Cooperation Committee

a. A Joint Civil Affairs Coordination and Cooperation Committee (hereinafter "the CAC") is hereby established.

b. The CAC will function with regard to policy matters under the direction of the Joint Liaison Committee, with ongoing coordination being provided by the Monitoring and Steering Committee.

c. The CAC will deal with the following matters:

(1) Civil affairs, including issues concerning the transfer of civil powers and responsibilities from the Israeli military government and its Civil Administration to the Council.

(2) Matters arising with regard to infrastructures, such as roads, water and sewage systems, power lines and telecommunication infrastructure, which require coordination according to this Agreement.

(3) Questions regarding passage to and from the West Bank and the Gaza Strip, and safe passage between the West Bank and the Gaza Strip, including crossing points and international crossings.

(4) The relations between the two sides in civil matters, in issues such as granting of permits.

(5) Matters dealt with by the various professional subcommittees established in accordance with this Annex, which require further discussion or overall coordination.

(6) Other matters of mutual interest.

d. The CAC shall convene at least once a month, unless otherwise agreed.

e. Each side may initiate the convening of a special meeting on short notice.

f. The CAC shall determine by agreement its mode of procedure.

2. Joint Regional Civil Affairs Subcommittees

a. Two Joint Regional Civil Affairs Subcommittees will operate under the CAC, one for the West Bank and one for the Gaza Strip (hereinafter "the RCACs").

b. The RCACs in the West Bank and in the Gaza Strip shall deal with the regional civil affairs matters in the West Bank and in the Gaza Strip respectively, detailed in paragraph I.c above, and with civil matters referred to them by the District Civil Liaison Offices.

c. Each RCAC may establish ad hoc working groups if and when the need arises.

d. Each RCAC shall convene no less than once every two weeks.

e. Matters of principle and policy not settled within the RCACs shall be passed on to the CAC.

3. District Civil Liaison Offices

a. Each side will establish and operate District Civil Liaison Offices in the West Bank (hereinafter "DCLs"). Such DCLs will be established in the following areas: Jenin, Tulkarem, Qalqilya, Nablus, Ramallah, Bethlehem, Hebron and Jericho.

b. In the Gaza Strip DCLs may be established to operate in the districts assigned for the DCOs, as specified in Annex I.

c. The DCLs shall deal with the day to day civil affairs, detailed in paragraph 1.c above, in their respective areas of operation.

d. The DCLs shall operate on a daily basis, representatives of the respective DCLs shall meet daily and the heads of the respective DCLs shall convene official meetings at least once a week.

4. General

a. Means of communication shall be set up with a view to ensuring efficient and direct contact 24 hours a day, in order to deal with any urgent matter arising in the civil affairs field.

b. The CAC and the RCACs shall be comprised of an equal number of representatives from Israel and from the Council.

c. Each side shall inform the other of its representatives to the CAC and the RCACs prior to meetings. Meetings of the CAC and the RCACs shall be organized and hosted by the two sides alternately, unless otherwise agreed.

d. The provisions of this Article shall not impede daily contacts between representatives of Israel and of the Council in all matters of mutual concern.

**ARTICLE II**
**Transfer of Civil Powers and Responsibilities**

Powers and responsibilities of the Israeli military government and its Civil Administration shall be transferred to and assumed by the Council in accordance with the provisions of this Annex and of Appendix I.

**ARTICLE III**

**Modalities of Transfer**

1. In the first phase of redeployment, the transfer of civil powers and responsibilities will be effected concurrently with the stages of this redeployment, as detailed in Annex I, Article I.1 and Appendix 1 thereto.

2. The transfer of civil powers and responsibilities shall be coordinated through the CAC and implemented in accordance with the arrangements set out in this Annex, in a smooth, peaceful and orderly manner.

3. Preparations for the implementation of this Annex shall commence immediately upon the signing of this Agreement.

4. The Israeli authorities shall provide all necessary assistance to the Council including access to offices, registers, records, systems and equipment and all necessary information, data and statistics, required for the transfer of powers and responsibilities.

5. In accordance with the stages of transfer of powers and responsibilities, Israel will transfer from the possession of the Israeli military government and its Civil Administration to the Council, offices located in areas under Palestinian territorial jurisdiction, equipment, registers, files, computer programs, reports, archives, records, maps, scientific data, relevant licenses, installations, registrations (including registrations regarding land situated in the areas under the territorial jurisdiction of the Council) and other movable and immovable property necessary for its functioning.

6. Arrangements regarding the transfer of funds, assets, and contracts, are set out in Article 39 of Appendix 1 (Treasury).

**ARTICLE IV**
**Special Provisions concerning Area C**

1. In Area C, in the first phase of redeployment, powers and responsibilities not related to territory, as set out in Appendix 1, will be transferred to and assumed by the Council in accordance with the provisions of that Appendix.

2. During the further redeployment phases, powers and responsibilities relating to territory, as set out in Appendix 1, will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory, except for the issues that will be negotiated in the permanent status negotiations.

3. In accordance with the DOP, in Area C, the Council will have functional jurisdiction with regard to the powers and responsibilities transferred pursuant to this Annex. This jurisdiction shall not apply to issues that will be negotiated in the permanent status negotiations, as set out in Article XVII, paragraph 1 of this Agreement.

4. The transfer of powers and responsibilities in Area C shall not affect Israel's continued authority to exercise its powers and responsibilities with regard to internal security and public order, as well as with regard to other powers and responsibilities not transferred.

5. The closure of areas or the imposing of other restrictions on the movement of persons or goods in Area C, required for the implementation of the powers and responsibilities transferred to the Council in accordance with this Annex (such as for the prevention of the spreading of diseases), shall require prior Israeli consent.

6. a. The Council may appoint civilian inspectors to monitor compliance with laws and regulations within the powers and responsibilities transferred to it in Area C, in a number necessary for the fulfillment of its functions as agreed in the CAC.

b. Arrangements regarding the operation of such inspectors, including agreed identification documentation, shall be as agreed within the CAC.

c. The civilian inspectors shall not conduct activity which involves arrests or detention of persons, seizure of property or any other activity involving

the use of force.

d. These inspectors shall neither wear uniforms of a police or military nature nor carry arms.

**APPENDIX 1**
**Powers and Responsibilities for Civil Affairs**

In accordance with Article II of this Annex, powers and responsibilities of the Israeli military government and its Civil Administration shall be transferred to and assumed by the Council in accordance with this Annex and the following provisions:

**ARTICLE 1**
**Agriculture**

1. This sphere includes, inter alia, veterinary services, animal husbandry, all existing experimental stations, irrigation water (i.e. usage of irrigation water which has been allocated for this purpose), scientific data, forestry, pasture and grazing, licensing and supervision of agriculture, the farming and marketing (including export and import) of crops, fruit and vegetables, nurseries, forestry products, and animal produce.

2. Irrigation water, as well as facilities, water resources, installations and networks used in agriculture are dealt with in Article 40 (Water and Sewage).

3. Relations in the agricultural sphere between the Israeli side and the Palestinian side, including the movement of agricultural produce, are dealt with in Annex V (Protocol on Economic Relations).

4. The two sides will cooperate in training and research, and shall undertake joint studies on the development of all aspects of agriculture, irrigation and veterinary services.

5. Forestry is part of the Agriculture sphere and is dealt with in Article 14 (Forests).

**ARTICLE 2**
**Archaeology**

1. Powers and responsibilities in the sphere of archaeology in the West Bank and the Gaza Strip will be transferred from the military government and its Civil Administration to the Palestinian side. This sphere includes, inter alia, the protection and preservation of archaeological sites, management, supervision, licensing and all other archaeological activities.

2. In Area C, powers and responsibilities related to the sphere of Archaeology will be transferred gradually to Palestinian jurisdiction that will cover West Bank and Gaza Strip territory except for the issues that will be negotiated in the permanent status negotiations, during the further redeployment phases, to be completed within 18 months from the date of the inauguration of the Council

3. The Palestinian side shall protect and safeguard all archaeological sites, take all measures necessary to protect such sites and to prevent damage to them and take all precautions when carrying out activities, including maintenance and construction activities, which may affect such sites.

4. A Joint Committee of experts from both sides shall be established by the CAC to deal with archaeological issues of common interest.

5. The Palestinian side shall respect academic freedom and rights in this sphere.

6. Subject to academic considerations, and in accordance with the law, when the Palestinian side grants excavation licenses to archaeologists, researchers and academics, it shall do so without discrimination.