4. Solid waste disposal sites.
    5. Hazardous waste disposal sites.
    6. Plants producing, storing, or using hazardous substances.
    7. Airports and landing strips.
    8. Seaports, jetties and harbors.
    9. Refineries.
    10. Industrial parks.
    11. Major dams and reservoirs.
    12. Major roads.

**SCHEDULE 3**

Pursuant to Article 17, paragraph 2 of this Appendix:

**Vaccinations**

The routine vaccination system carried out in the West Bank and the Gaza Strip including:

A. Vaccinations for infants:

1. Vaccination against Hepatitis B.:

I To an infant born in a hospital or in a maternity home: at the ages of

0, 1, 6, months.

II To an infant born at home: at the ages of 1, 2, 6 months.

2 . Triple vaccination against Diptheria, Pertussis and Tetanus (DPT):

Given at the ages of 2, 4, 6, l2 months.

3. Vaccination against Poliomyelitis (Polio):

Sabin vaccine (OPV) given at the ages of 4, 6, 12 months. Salk vaccine (IPV) given at the ages of 2, 4, 12 months.

Note: If, in the future, we will revert to the quadruplex vaccination method which combines DPT with the Salk vaccine against Polio, the method will be: Quadruplex (IPV + DPT): at the ages of 2, 4, 12 months.

DPT: at the age of 6 months.

4. Triple vaccination against Measles Mumps. Rubella (MMR):

Given at the age of 15 months.

(Note: it is necessary to point out that UNRWA gives an additional dose of the Measles vaccine, at the age of 9 months - within the boundaries of the refugee camps).

B) Vaccinations for children and youth:

1. Against Poliomyelitis (OPV = SABIN) at the age of 6 years.

2. Against Measles - at the age of 6 years.

3. Against Tuberculosis - given BCG (after a Tuberculin test = Mantoux test) at the age of 6 years.

(Note: It is necessary to note that UNRWA gives an additional dose of the BCG vaccine immediately after birth).

4. Vaccination against Diptheria and Tetanus - dT (at special concentration suitable for children) is given as a booster vaccination at the age of 6 years.

An additional booster vaccination - DT (at a special concentration suitable for adults) is given at the age of 15 years.

5. Against Rubella, for girls only, at the age of 12 years.

C) Vaccination against Tetanus for pregnant women:

Tetanus Toxoid vaccination is given in order to avoid Tetanus

Neonatorum.

First dose is given at the beginning of the second third of the pregnancy (in the fourth or fifth month) and a second dose before the birth (during the eighth month of pregnancy).

D) Vaccination against Hepatitis B for specific members of the population:

1. A newborn whose mother was found to be suffering with Hepatitis B during her pregnancy or is a carrier of the disease (discovered after a routine test for this disease in pregnant women) - receives vaccination against Hepatitis B. The vaccination is given a number of days after the birth and includes an active and passive vaccine: HBV and HBIG.

2. The husband of a pregnant woman who is sick or is a carrier of the disease (who was checked for Hepatitis B and found healthy) - receives an active vaccination - HBV.

3. Hospital workers, including nurses, technicians and others, who come into contact with blood intensively: in laboratories, haemodialysis units, intensive care units, operating theaters, delivery rooms and emergency rooms, as well as dentists - receive the active vaccination HBV.

E) Vaccination against Meningococcal Meningitis type A:

Given to pilgrims to Saudi Arabia, 10 days before their departure via the Jordan River bridges.

**SCHEDULE 4**

Pursuant to Article 32, paragraph 3 of this Appendix:

*List No. 1*

1. Elazar's Tomb, Ittamar's Tomb and the Tomb of the 70 Elders in Awarta
2. Joshua's Tomb in Kifel-Hares
3. The Cave of Othniel ben Knaz in Hebron
4. The Eshtamoa Synagogue in Samoa
5. The Yata Synagogue
6. Batir
7. Sebastia/Samaria

*List No. 2*

1. Nun's Tomb and Caleb's Tomb in Kifel-Hares
2. The Tombs of Natan the Prophet and Gad the Seer in Halhul
3. The Naran Synagogue - Ein Duk
4. The Jewish Cemetery in Sammerat
5. The Synagogue in Gaza City

**SCHEDULE 5**
**List of Approved Frequencies**

Pursuant to Article 36, paragraph B.5 of this Appendix:

1. L.F.

As soon as any need arises.

2. M.F.

Broadcast network.
Ramallah - 675khz.

3. H.F.

To use it freely.

4. V.H.F.

4.1 V.H.F. - F.M. broadcast

V.H.F. - F.M. broadcast network composed of 8 locations. The specific 8

frequencies will be assigned not later than six months from the date of signing this Agreement.

4.2 V.H.F. - maritime local services

Assignment of frequencies for vessels and fixed stations is subject to the provisions of Annex I and of Article 38 (Transportation).

4.3 V.H.F. - aeronautical local services

Assignment of frequencies for airplanes and fixed stations is subject to the provisions of Annex I and of Article 38 (Transportation).

4.4 V.H.F. - mobile services

Assignment of frequencies for use for mobile and fixed services of Police, Civil and Official networks and other users, in the West Bank and the Gaza Strip is as follows:-

4.4.1 Qalqilya

1. * 150.250
2. * 155.6625
3. 150.3875
4. 150.425
5. 155.5625
6. 162.500
7. 162.525
8. 162.5625
9. 162.6125
10. 162.6625
11. 162.6875
12. 167.5375
13. 167.575
14. 167.6125
15. 167.650
16. 167.6875

4.4.2 Tulkarm

1. * 150.2375
2. * 155.650
3. 150.3125
4. 150.3375
5. 150.3625
6. 155.575
7. 155.750
8. 162.5125
9. 162.575
10. 162.625
11. 162.650
12. 162.675
13. 167.475
14. 167.525
15. 167.5875
16. 167.6625

4.4.3 Jenin

1. * 150.2125
2. * 155.625
3. 150.2625
4. 150.400
5. 150.4375
6. 155.5375
7. 155.600
8. 155.675
9. 155.725
10. 155.7625
11. 162.475
12. 162.550
13. 162.600
14. 167.500
15. 167.550
16. 167.625

4.4.4 Nablus

1. * 150.225
2. * 150.350
3. * 155.6375
4. 150.2875
5. 150.300
6. 150.325
14. 155.7125
15. 155.7375
16. 155.775
17.

|  |  |
|---|---|
| 7. 150.375<br>8. 150.4125<br>9. 150.450<br>10. 155.550<br>11. 155.5875<br>12. 155.6215<br>13. 155.700 | 162.4875<br>18.<br>162.5375<br>19.<br>162.5875<br>20.<br>162.6375<br>21.<br>167.4875<br>22.<br>167.5125<br>23.<br>167.5625<br>24. 167.600<br>25.<br>167.6375<br>26. 167.675 |

### 4.4.5 Ramallah

|  |  |
|---|---|
| 1. * 150.2625<br>2. * 150.3625<br>3. * 155.675<br>4. 150.2125<br>5. 150.2375<br>6. 150.3125<br>7. 150.400<br>8. 150.4375<br>9. 155.5375<br>10. 155.575<br>11. 155.600<br>12. 155.625<br>13. 155.650<br>14. 155.725<br>15. 155.7625 | 16. 162.475<br>17.<br>162.5125<br>18. 162.550<br>19. 162.575<br>20. 162.600<br>21. 162.625<br>22. 162.650<br>23. 162.675<br>24. 167.475<br>25. 167.500<br>26. 167.525<br>27. 167.550<br>28.<br>167.5875<br>29. 167.625<br>30.<br>167.6625 |

### 4.4.6 Bethlehem

|  |  |
|---|---|
| 1. * 150.2875<br>2. * 155.700<br>3. 150.325<br>4. 150.375<br>5. 150.4125<br>6. 150.450<br>7. 155.550<br>8. 155.5875<br>9. 155.6215<br>10. 155.7375 | 11.<br>162.4875<br>12.<br>162.5375<br>13.<br>162.5875<br>14.<br>162.6375<br>15.<br>167.4875<br>16.<br>167.5125<br>17.<br>167.5625<br>18. 167.600<br>19.<br>167.6375<br>20. 167.675 |

### 4.4.7 Gaza

|  |  |
|---|---|
| 1. * 150.3125<br>2. * 155.725 | 16. 162.475<br>17. |

3. * 155.7625
4. 150.2125
5. 150.2375
6. 150.2625
7. 150.3625
8. 150.400
9. 150.4375
10. 155.5375
11. 155.575
12. 155.600
13. 155.625
14. 155650
15. 155.675

162.5125
18. 162.550
19. 162.575
20. 162.600
21. 162.625
22. 162.650
23. 162.675
24. 167.475
25. 167.500
26. 167.525
27. 167.550
28. 167.5875
29. 167.625
30. 167.6625

### 4.4.8 Khan Yunis

1. * 150.325
2. * 155.7375
3. 150.375
4. 150.4125
5. 150.450
6. 155.550
7. 155.5875
8. 155.6215

9. 162.4875
10. 162.5375
11. 162.5875
12. 162.6375
13. 167.4875
14. 167.5625
15. 167.6375
16. 167.675

### 4.4.9 Rafah

1. * 150.3375
2. * 155.750
3. 150.3875
4. 150.425
5. 155.5625
6. 162.500
7. 162.525
8. 162.5625

9. 162.6125
10. 162.6625
11. 162.6875
12. 167.5375
13. 167.575
14. 167.6125
15. 167.650
16. 167.6875

### 4.4.10 Jericho

1. * 150.275
2. * 155.6875
3. 150.3875
4. 150.425
5. 155.5625
6. 162.500
7. 162.525
8. 162.5625

9. 162.6125
10. 162.6625
11. 162.6875
12. 167.5375
13. 167.575
14. 167.6125
15. 167.650
16.

167.6875

### 4.4.11 Hebron

1. * 150.300
2. * 155.7125
3. * 155.775
4. 150.225
5. 150.250
6. 150.275
7. 150.3375
8. 150.350
9. 150.3875
10. 150.425
11. 155.5625
12. 155.6375
13. 155.6625
14. 155.6875
15. 155.750
16. 162.500
17. 162.525
18. 162.5625
19. 162.6125
20. 162.6625
21. 162.6875
22. 167.5375
23. 167.575
24. 167.6125
25. 167.650
26. 167.6875

Notice:

1. The frequencies marked with (*) are assigned for exclusive use by the Palestinian side and can serve for multi-areas networks and for trunking systems.

2. All other frequencies are for use only at the specific area since some of the frequencies are duplicated at various areas in Israel.

3. All frequencies are assigned to be used with BW=2.5KHz and Power=up to 25 watts; all values are in MHz. The frequencies marked with (*) can be used with unlimited power.

5. S.H.F.

5.1 Microwave Links

5.1.1 TV Specific Links

For long distance use at specific locations for TV transmission as detailed below:-

| Location A | Tx Freq (MHz) | Location B | Tx Freq (MHz) | Pol | B.W. (MHz) | Power (dBm) |
|---|---|---|---|---|---|---|
| Ramallah 1 | 7519 | Ramallah 2 | 7680 | H | 34TV | 27 |
| Ramallah 2 | 7624 | Talita | 7463 | V | 34TV | 27 |
| Talita | 7519 | Hebron | 7680 | H | 34TV | 27 |
| Hebron | 7624 | Gaza | 7463 | H | 34TV | 27 |
| Gaza | 7519 | Khan Yunis | 7680 | V | 34TV | 27 |
| Ramallah 2 | 7680 | Nablus | 7519 | V | 34TV | 27 |
| Nablus | 7463 | Jenin | 7624 | H | 34TV | 27 |
| Ramallah 1 | 23G | Ramallah | 23G | V | 34TV | 27 |

The Palestinian side is requested to confirm the above microwave links topology for the TV network.

5.1.2 7GHz Additional Links

The links are for long distance use at any location in the West Bank and the

Gaza Strip for radio, civil networks, Police networks, official networks and other uses. These links can be duplicated in these areas; however, frequency assignment for specific locations should be coordinated through the JTC.

The list of these links at 7GHz band, is:-

| | Freq A (MHz) | Freq B (MHz) | B.W. (MHz) | Power (dBm) |
|---|---|---|---|---|
| 1. | 6640 | 6820 | 10 | 27 |
| 2. | 6720 | 7060 | 10 | 27 |

### 5.1.3 23 GHz Microwave Links

For short distance exclusive use at any location in the West Bank and the Gaza Strip for any service, the following frequencies are assigned:-

| | Freq A (MHz) | Freq B (MHz) | B.W. (MHz) | Power (dBm) |
|---|---|---|---|---|
| 1. | 21255 | 22455 | 28 | 27 |
| 2. | 21295 | 22495 | 28 | 27 |
| 3. | 21495 | 22695 | 28 | 27 |
| 4. | 21610 | 22810 | 28 | 27 |
| 5. | 22310 | 23510 | 28 | 27 |

### 6. U.H.F. Trunking

#### 6.1 Police and Official Networks

The following sub-bands are assigned at 410 to 450 MHz, for exclusive use for mobile service of Police and official trunking networks, in the West Bank and the Gaza Strip.

1. 414 to 415.5 MHz
2. 424 to 425.5 MHz

#### 6.2 Civil and Commercial Networks

The following sub-bands are assigned at 410 to 450 MHz, for exclusive use for mobile services of civil and commercial trunking networks in the West Bank and the Gaza Strip.

1. 412.5 to 414 MHz
2. 422.5 to 424 MHz
3. 428.5 to 430 MHz
4. 438.5 to 440 MHz

### 7. Satellite Services

Frequencies will be assigned upon specific requests, for each station, through the JTC.

### 8. GSM

Mutual participation will be agreed in the JTC according to the planning of each side, and the division of this section of frequencies will take into account the users ratio of each side.

### 9. E.H.F.

As soon as any need arises.

## SCHEDULE 6
### List of Approved TV Channels and the Locations of Transmitters

Pursuant to Article 36, paragraph B.5 of this Appendix:

| | |
|---|---|
| Jericho | Channel 24 |

| | |
|---|---|
| Nablus (Mt. Gerizim) | Channel 5 |
| Jenin | Channel 31 |
| Ramallah | Channel 25 |
| Hebron | Channel 30 |
| Gaza | Channel 31 |

## SCHEDULE 7
**Transportation Arrangements**

Pursuant to Article 38, paragraphs 6, 17 and 19 of this Appendix:

Note: To be attached.

## SCHEDULE 8
**Joint Water Committee**

Pursuant to Article 40, paragraph 15 of this Appendix, the obligations and responsibilities of the JWC shall include:

1. Coordinated management of the water resources as detailed hereunder, while maintaining the existing utilization from the aquifers as detailed in Schedule 10, and taking into consideration the quantities of additional water for the Palestinians as detailed in Article 40.

It is understood that the above-mentioned Schedule 10 contains average annual quantities, which shall constitute the basis and guidelines for the operation and decisions of the JWC:

a. All licensing and drilling of new wells and the increase of extraction from any water source, by either side, shall require the prior approval of the JWC.

b. All development of water resources and systems, by either side, shall require the prior approval of the JWC.

c. Notwithstanding the provisions of a. and b. above, it is understood that the projects for additional water detailed in paragraph 7 of Article

40, are agreed in principle between the two sides. Accordingly, only the geo-hydrological and technical details and specifications of these projects shall be brought before the JWC for approval prior to the commencement of the final design and implementation process.

d. When conditions, such as climatological or hydrological variability, dictate a reduction or enable an increase in the extraction from a resource, the JWC shall determine the changes in the extractions and in the resultant supply. These changes will be allocated between the two sides by the JWC in accordance with methods and procedures determined by it.

e. The JWC shall prepare, within three months of the signing of this Agreement, a Schedule to be attached to this Agreement, of extraction quotas from the water resources, based on the existing licenses and permits. The JWC shall update this Schedule on a yearly basis and as otherwise required.

2. Coordinated management of water and sewage systems in the West Bank, as follows:

a. Existing water and sewage systems, which serve the Palestinian population solely, shall be operated and maintained by the Palestinian side solely, without interference or obstructions, in accordance with the provisions of Article 40.

b. Existing water and sewage systems serving Israelis, shall continue to be operated and maintained by the Israeli side solely, without interference or obstructions, in accordance with the provisions of Article 40.

c. The systems referred to in a and b above shall be defined on Maps to be agreed upon by the JWC within three months from the signing of this Agreement.

d. Plans for construction of new water and sewage systems or modification of existing systems require the prior approval of the JWC.

**SCHEDULE 9**
**Supervision and Enforcement Mechanism**

Pursuant to Article 40, Paragraph 17 of this Appendix:

1. Both sides shall establish, upon the signing of this Agreement, no less than five Joint Supervision and Enforcement Teams (JSETs) for the West Bank, under the control and supervision of the JWC, which shall commence operation immediately.

2. Each JSET shall be comprised of no less than two representatives from each side, each side in its own vehicle, unless otherwise agreed. The JWC may agree on changes in the number of JSETs and their structure.

3. Each side will pay its own costs, as required to carry out all tasks detailed in this Schedule. Common costs will be shared equally.

4. The JSETs shall operate, in the field, to monitor, supervise and enforce the implementation of Article 40 and this Schedule, and to rectify the situation whenever an infringement has been detected, concerning the following:

a. Extraction from water resources in accordance with the decisions of the

JWC, and the Schedule to be prepared by it in accordance with sub paragraph I.e of Schedule 8.

b. Unauthorized connections to the supply systems and unauthorized water uses;

c. Drilling of wells and development of new projects for water supply from all sources;

d. Prevention of contamination and pollution of water resources and systems;

e. Ensuring the execution of the instructions of the JWC on the operation of monitoring and measurement systems;

f. Operation and maintenance of systems for collection, treatment, disposal and reuse, of domestic and industrial sewage, of urban and agricultural runoff, and of urban and agricultural drainage systems;

g. The electric and energy systems which provide power to all the above systems;

h. The Supervisory Control and Data Acquisition (SCADA) systems for all the above systems;

i. Water and sewage quality analyses carried out in approved laboratories, to ascertain that these laboratories operate according to accepted standards and practices, as agreed by the JWC. A list of the approved laboratories will be developed by the JWC;

j. Any other task, as instructed by the JWC.

5. Activities of the JSETs shall be in accordance with the following:

a. The JSETs shall be entitled, upon coordination with the relevant DCO, to free, unrestricted and secure access to all water and sewage facilities and systems, including those privately owned or operated, as required for the fulfillment of their function.

b. All members of the JSET shall be issued identification cards, in Arabic, Hebrew and English containing their full names and a photograph.

c. Each JSET will operate in accordance with a regular schedule of site visits, to wells, springs and other water sources, water works, and sewage systems, as developed by the JWC.

d. In addition, either side may require that a JSET visit a particular water

or sewage facility or system, in order to ensure that no infringements have occurred. When such a requirement has been issued, the JSET shall visit the site in question as soon as possible, and no later than within 24 hours.

e. Upon arrival at a water or sewage facility or system, the JSET shall collect and record all relevant data, including photographs as required, and ascertain whether an infringement has occurred. In such cases, the JSET shall take all necessary measures to rectify it, and reinstate the status quo ante, in accordance with the provisions of this Agreement. If the JSET cannot agree on the actions to be taken, the matter will be referred immediately to the two Chairmen of the JWC for decision.

f. The JSET shall be assisted by the DCOs and other security mechanisms established under this Agreement, to enable the JSET to implement its functions.

g. The JSET shall report its findings and operations to the JWC, using forms which will be developed by the JWC.

## SCHEDULE 10
### Data Concerning Aquifers

Pursuant to Article 40, paragraph 20 and Schedule 8 paragraph 1 of this Appendix:

The existing extractions, utilization and estimated potential of the Eastern, North-Eastern, and Western Aquifers are as follows: Eastern Aquifer:

- In the Jordan Valley, 40 mcm to Israeli users, from wells;
- 24 mcm to Palestinians, from wells;
- 30 mcm to Palestinians, from springs;
- 78 mcm remaining quantities to be developed from the Eastern Aquifer;
- Total = 172 mcm.

North-Eastern Aquifer:

- 103 mcm to Israeli users, from the Gilboa and Beisan springs, including from wells; - 25 mcm to Palestinian users around Jenin; - 17 mcm to Palestinian users from East Nablus springs;
- Total = 145 mcm.

Western Aquifer:

- 340 mcm used within Israel;
- 20 mcm to Palestinians;
- 2 mcm to Palestinians, from springs near Nablus,
- Total= 362 mcm.

All figures are average annual estimates.

The total annual recharge is 679 mcm.

## SCHEDULE 11
### The Gaza Strip

Pursuant to Article 40, Paragraph 25:

1. All water and sewage (hereinafter referred to as "water") systems and resources in the Gaza Strip shall be operated, managed and developed (including drilling) by the Council, in a manner that shall prevent any harm to the water resources.

2. As an exception to paragraph 1., the existing water systems supplying water to the Settlements and the Military Installation Area, and the water systems and resources inside them shall continue to be operated and managed by Mekoroth Water Co.

3. All pumping from water resources in the Settlements and the Military Installation Area shall be in accordance with existing quantities of drinking water and agricultural water. Without derogating from the powers and responsibilities of the Council, the Council shall not adversely affect these quantities.

Israel shall provide the Council with all data concerning the number of wells in the Settlements and the quantities and quality of the water pumped from each well, on a monthly basis.

4. Without derogating from the powers and responsibilities of the Council, the Council shall enable the supply of water to the Gush Katif settlement area and Kfar Darom settlement by Mekoroth, as well as the maintenance by Mekoroth of the water systems supplying these locations.

5. The Council shall pay Mekoroth for the cost of water supplied from Israel and for the real expenses incurred in supplying water to the Council.

6. All relations between the Council and Mekoroth shall be dealt with in a commercial agreement.

7. The Council shall take the necessary measures to ensure the protection of all water systems in the Gaza Strip.

8. The two sides shall establish a subcommittee to deal with all issues of mutual interest including the exchange of all relevant data to the management and operation of the water resources and systems and mutual prevention of harm to water resources.

9. The subcommittee shall agree upon its agenda and upon the procedures and manner of its meetings, and may invite experts or advisers as it sees fit.

**SIDE LETTER**

TO: Major General Oren Shachor
Head of the Israeli side of the
Civil Affairs Committee

September 22, 1995

Re: The Signing of a Commercial Agreement with Bezeq, Israel Telecommunications Corp. Ltd.

1. I hereby inform you that the Palestinian side commits itself to enter into negotiations with Bezeq immediately upon the signing of the Interim Agreement for the purpose of reaching a commercial agreement.

2. The commercial agreement between the Palestinian side and Bezeq will be signed within three months of the signing of the Interim Agreement.

Sincerely,

Jamil Tarifi
Head of the Palestinian side of
the Civil Affairs Committee

*Note: This letter will be attached as a side letter to the Interim Agreement.*

Close

 Israel Ministry of Foreign Affairs

## THE ISRAELI-PALESTINIAN INTERIM AGREEMENT-Annex IV

28 Sep 1995

AGREEMENT | ANNEX I | ANNEX II | ANNEX III | ANNEX IV | ANNEX V | ANNEX VI | ANNEX VII | MAPS | MAIN POINTS

## THE ISRAELI-PALESTINIAN INTERIM AGREEMENT ON THE WEST BANK AND THE GAZA STRIP
### Annex IV
### Protocol Concerning Legal Affairs

### INDEX

ARTICLE I - Criminal Jurisdiction
ARTICLE II - Legal Assistance in Criminal Matters
ARTICLE III - Civil Jurisdiction
ARTICLE IV - Legal Assistance in Civil Matters

### ARTICLE I
### Criminal Jurisdiction

1. a. The criminal jurisdiction of the Council covers all offenses committed by Palestinians and/or non-Israelis in the Territory, subject to the provisions of this Article.

For the purposes of this Annex, "Territory" means West Bank territory except for Area C which, except for the Settlements and the military locations, will be gradually transferred to the Palestinian side in accordance with this Agreement, and Gaza Strip territory except for the Settlements and the Military Installation Area.

b. In addition, the Council has criminal jurisdiction over Palestinians and their visitors who have committed offenses against Palestinians or their visitors in the West Bank and the Gaza Strip in areas outside the Territory, provided that the offense is not related to Israel's security interests.

c. Notwithstanding the provisions of subparagraph a. above, the criminal jurisdiction of each side over offenses committed in Area B shall be in accordance with the provisions of paragraph 2.a of Article XIII of this Agreement.

d. Individuals arrested by the Palestinian Police in Area B for public order and other reasons shall be tried before the Palestinian courts, provided that these courts have criminal jurisdiction.

2. Israel has sole criminal jurisdiction over the following offenses:

a. offenses committed outside the Territory, except for the offenses detailed in subparagraph 1. b above; and

b. offenses committed in the Territory by Israelis.

3. a. In exercising the criminal jurisdiction of their courts, each side shall have the power, inter alia, to investigate, arrest, bring to trial and punish offenders.

b. Activities of the Palestinian Police and the Israeli military forces for the

implementation of subparagraph a. above shall be as set out in the Agreement and Annex I thereto.

4. In addition, and without derogating from the territorial jurisdiction of the Council, Israel has the power to arrest and to keep in custody individuals suspected of having committed offenses which fall within Israeli criminal jurisdiction as noted in paragraphs 1.c, 2 and 7 of this Article, who are present in the areas under the security responsibility of the Council, where:

a. The individual is an Israeli, in accordance with Article II of this Annex; or

b. (1) The individual is a non-Israeli suspected of having just committed an offense in a place where Israeli authorities exercise their security functions in accordance with Annex I, and is arrested in the vicinity in which the offense was committed. The arrest shall be with a view to transferring the suspect, together with all evidence, to the Palestinian Police at the earliest opportunity.

(2) In the event that such an individual is suspected of having committed an offense against Israel or Israelis, and there is a need for further legal proceedings with respect to that individual, Israel may retain him or her in custody, and the question of the appropriate forum for prosecuting such a suspect shall be dealt with by the Legal Committee on a case by case basis.

5. In the case of an offense committed in the areas under the security responsibility of the Council by a non-Israeli against Israel or an Israeli, the Council shall take measures to investigate and prosecute the case, and shall notify Israel of the result of the investigation and any legal proceedings.

6. When a suspicion arises against a tourist in transit to or from Israel through the Territory in the West Bank and the Gaza Strip, that the tourist has committed an offense in the Territory and that tourist is present on roads or in Jewish holy sites specified in Article V, paragraph 7, Article VII, paragraph 9 and Appendix 4 of Annex I, the Palestinian Police may detain him in place and immediately notify the Israeli military forces which shall be authorized to arrest and question him. Where an offense has been committed by a tourist in violation of the prevailing law and further legal proceeding in respect of the tourists are required, such proceedings shall be taken by the Council.

Where such a tourist present outside these areas is detained or arrested by the Council, it shall notify the Israeli authorities within a reasonable time, not exceeding 24 hours, and shall enable them at the earliest opportunity to meet the detainee and to provide any necessary assistance, including consular notification, requested by the detainee.

7. a. Without prejudice to the criminal jurisdiction of the Council, and with due regard to the principle that no person can be tried twice for the same offense, Israel has, in addition to the above provisions of this Article, criminal jurisdiction in accordance with its domestic laws over offenses committed in the Territory against Israel or an Israeli.

b. In exercising its criminal jurisdiction in accordance with subparagraph a. above, activities of the Israeli military forces related to subparagraph a. above shall be as set out in the Agreement and Annex I thereto.

**ARTICLE II**
**Legal Assistance in Criminal Matters**

1. General

a. Israel and the Council shall cooperate and provide each other with legal assistance in criminal matters. Such cooperation shall include the arrangements detailed in this Article.

b. Documents served by one side in the territory under the responsibility

of the other, shall be accompanied by a translation into the official language of the other side.

2. Cooperation in Criminal Matters

a. The Israeli Police and the Palestinian Police shall cooperate in the conduct of investigations. Subject to detailed arrangements to be agreed upon, such cooperation shall include the exchange of information, records and fingerprints of criminal suspects, vehicle ownership registration records, etc.

b. Where an offense is committed in the Territory by an Israeli acting jointly with an individual under Palestinian personal jurisdiction, the Israeli military forces and the Palestinian Police will cooperate in conducting an investigation.

c. The Palestinian authorities shall not arrest Israelis or place them in custody. Israelis can identify themselves by presenting Israeli documentation.

However, when an Israeli commits a crime against a person or property in the Territory, the Palestinian Police, upon arrival at the scene of the offense shall, if necessary, until the arrival of the Israeli military forces, detain the suspect in place while ensuring his protection and the protection of those involved, prevent interference with the scene of the offense, collect the necessary evidence and conduct preliminary questioning, and in any case shall immediately notify the Israeli authorities through the relevant DCO.

d. Without derogating from the jurisdiction of the Council over property located or transported within the Territory, where the property is being transported or carried by an Israeli, the following procedure shall apply: The Palestinian authorities have the power to take any measures necessary in relation to Israeli vehicles or property where such vehicle or property has been used in the commission of a crime and present an immediate danger to public safety or health. When such measures are taken, the Palestinian authorities shall immediately notify the Israeli authorities through the relevant DCO, and shall continue to take the necessary measures until their arrival.

3. When an Israeli is suspected of committing an offense and is present in the Territory, the Israeli military forces shall be able to arrest, search and detain the suspect as required; in areas where the Palestinian Police exercise powers and responsibilities for internal security and public order, such activities shall take place in coordination with the Palestinian Police, in its presence and with its assistance.

4. Israel shall hand over to the Palestinian Police the Palestinian offenders to whom Article I, paragraph 1.b applies, together with any collected evidence.

5. Restraining Orders

Each side shall execute orders issued by the competent organs of the other side restraining a person under the jurisdiction of that side from traveling abroad.

6. Summons and Questioning of Witnesses

a. Where the statement of a witness who is an Israeli or other person present in Israel is required for a Palestinian investigation, the statement shall be taken by the Israeli Police in the presence of a Palestinian Police officer in an Israeli facility at an agreed location.

b. Where the statement of a non-Israeli witness present in the Territory is required for an Israeli investigation, the statement shall be taken by the Palestinian Police in the presence of an Israeli Police officer in a Palestinian facility at an agreed location.

c. In exceptional cases, each side may take a statement requested by the other side itself, without the presence of the requesting side.

7. Transfer of Suspects and Defendants

a. Where a non-Israeli suspected of, charged with, or convicted of, an offense that falls within Palestinian criminal jurisdiction is present in Israel, the Council may request Israel to arrest and transfer the individual to the Council.

b. Where an individual suspected of, charged with, or convicted of, an offense that falls within Israeli criminal jurisdiction, is present in the Territory, Israel may request the Council to arrest and transfer the individual to Israel.

c. Requests under subparagraph a. and b. above shall specify the grounds for the request and shall be supported by an arrest warrant issued by a competent court.

d. Where the request is for the transfer of a suspect who is not a Palestinian requested by the Council;

(l) the arrest warrant shall only be issued pursuant to an application made by or on behalf of the Attorney-General, confirming that there is a reasonable evidentiary basis that the offense was committed by the suspect;

(2) the offense must be punishable by not less than 7 years imprisonment under the law of the requesting side.

e. (l) Individuals suspected of offenses punishable by less than 7 years' imprisonment shall be interrogated by the investigating side in a facility of the other side or at an agreed location.

(2) Interrogation shall take place in the presence of a police officer of the other side.

(3) Upon the request of the investigating side the other side may detain the suspect in custody pending and during questioning. Where the presence of the suspect is required for an objective reason, such as confronting witnesses and identification of sites the suspect shall be transferred for that purpose only.

f. (1) Both sides, upon receipt of a request in accordance with this Article, shall effect the arrest and transfer requested.

(2) If the individual requested is detained in custody or is serving a prison sentence, the side receiving the request may delay the transfer to the requesting side for the duration of the detention or imprisonment.

g. No person shall be transferred in respect of an offense punishable by capital punishment unless the requesting side undertakes that capital punishment shall not be imposed in the case.

h. (l) Both sides shall take all necessary measures to ensure that the treatment of the individuals transferred under this article complies with the applicable legal arrangements in Israel and in the Territory and with internationally- accepted norms of human rights regarding criminal investigations.

(2) suspects transferred under this paragraph shall have the right to be assisted during the investigation period by an advocate of their own choice.

i. Each side may, upon the request of the other side, detain, for no more than seven days, an individual in respect of whom a request for arrest and transfer is to be made, pending the submission of such a request.

j. The transfer of foreigners by Israel to the Council under this Article shall be subject to the applicable conventions to which Israel is a party and in coordination with the foreigner's state of origin.

k. Both sides may agree that an individual convicted in the courts of one side shall serve his sentence in a prison of the other side, subject to arrangements and conditions to be agreed between the sides.