8. Assistance in the Execution of Court Orders for the Purposes of Investigation

a. Israel and the Council shall execute orders issued by each other's courts for the purposes of investigations (e.g., search warrants, orders for the production of documents and seizure orders), subject to the provisions of local law.

b. Where, for the purposes of an investigation, Israel or the Council requires that tests or examinations (such as fingerprinting or blood analysis) be effected in relation to an item situated in territory under the responsibility of the other side, that side shall effect the tests or examinations required and transfer the results to the side conducting the investigation, where feasible.

Where these results are not sufficient for the purposes of the investigation, arrangements shall be made for the transfer of the item to the side conducting the investigation.

9. Legal Assistance in the Conduct of Judicial Proceedings

a. (l) Summons and subpoenas issued by an Israeli court in respect of defendants and witnesses present in the Territory, shall be effected through the Council, which shall be responsible for the service of summons, and the execution of subpoenas by the Palestinian Police.

(2) Subpoenas issued in respect of an Israeli defendant or witness present in the Territory shall be executed by the Israeli military forces. In areas where the Palestinian Police exercise powers and responsibilities for internal security and public order, such activities shall take place in the presence and with the assistance of, the Palestinian Police.

b. Summons and subpoenas issued by a Palestinian court in respect of defendants and witnesses in Israel shall be effected through the Israeli Police who shall be responsible for the service of summons and the execution of subpoenas.

c. Where the evidence of an Israeli witness is required in connection with proceedings conducted by a Palestinian court, the witness shall testify at a Palestinian court sitting at an agreed venue and the witness shall be accompanied by representatives of the Israeli military forces together with the Palestinian Police.

d. Where the evidence of a witness is required in connection with proceedings conducted by a court of one side, a notice of such a request will be given to the authorities of the other side to summon the witness.

10. Nothing in this Annex shall derogate from each side's powers and responsibilities as detailed in Annex I.


ARTICLE III
Civil Jurisdiction

1. The Palestinian courts and judicial authorities have jurisdiction in all civil matters, subject to this Agreement.

2. In cases where an Israeli is a party: the Palestinian courts and judicial authorities have jurisdiction over civil actions in the following cases:

a. the subject matter of the action is an ongoing Israeli business situated in the Territory (the registration of an Israeli company as a foreign company in the Territory being evidence of the fact that it has an ongoing business situated in the Territory);

b. the subject matter of the action is real property located in the Territory;

c. the Israeli party is a defendant in an action and has consented to such jurisdiction by notice in writing to the Palestinian court or judicial authority,

d. the Israeli party is a defendant in an action, the subject matter of the action is a written agreement, and the Israeli party has consented to such jurisdiction by a specific provision in that agreement;

e. the Israeli party is a plaintiff who has filed an action in a Palestinian court. If the defendant in the action is an Israeli, his consent to such jurisdiction in accordance with subparagraphs c. or d. above shall be required, or

f. actions concerning other matters as agreed between the sides.

3. The jurisdiction of the Palestinian courts and judicial authorities does not cover actions against the State of Israel including its statutory entities, organs and agents.

4. Israelis, including registered companies of Israelis, conducting commercial activity in the Territory are subject to the prevailing civil law in the Territory relating to that activity. Enforcement of judicial and administrative judgments and orders issued against Israelis and their property shall be effected by Israel, within a reasonable time, in coordination and cooperation with the Council.

**ARTICLE IV**
**Legal Assistance in Civil Matters**

1. Service of Documents

a. Israel and the Council will be responsible for the service of legal documents, including subpoenas, issued by the judicial organs under the responsibility of the other side.

b. Documents served by one side in the territory under the responsibility of the other, shall be accompanied by a translation into the official language of the other side.

2. Taking of Evidence

Israel and the Council will make arrangements for taking evidence from witnesses when necessary, when such evidence is sought in connection with proceedings conducted by the judicial organs under the responsibility of the other side.

3. Enforcement of Judgments

a. Israel and the Council will enforce judgments rendered by the judicial organs under the responsibility of the other side, provided that the judicial organ concerned has the jurisdiction to render the judgment and further provided that the enforcement is not contrary to public policy. The execution offices under the responsibility of each side shall execute such judgments as if rendered by their own judicial organs.

b. In executing any judgment against Israelis, the Palestinian execution offices may issue orders (e.g., attachments, receivership, eviction) against Israeli property within the Territory. The Palestinian Police shall effect the execution of such orders jointly with the Israeli Police, which undertakes to respect the said orders.

This subparagraph does not relate to attachments effected by the service of documents without requiring any physical actions, such as attachments of bank accounts.

c. Without derogating from the civil jurisdiction of the Palestinian courts and judicial authorities in accordance with Article III, imprisonment orders against Israelis, and orders restraining Israelis from traveling abroad (excluding interim orders before a judgment was given), shall only be issued by Israeli execution offices and effected by the Israeli police.

Close

 Israel Ministry of Foreign Affairs

## THE ISRAELI-PALESTINIAN INTERIM AGREEMENT-Annex V

28 Sep 1995

AGREEMENT | ANNEX I | ANNEX II | ANNEX III | ANNEX IV | ANNEX V | ANNEX VI | ANNEX VII | MAPS | MAIN POINTS

### THE ISRAELI-PALESTINIAN INTERIM AGREEMENT ON THE WEST BANK AND THE GAZA STRIP
### Annex V
### Protocol on Economic Relations

#### Supplement to the Protocol on Economic Relations

1. The clearance of revenues from all import taxes and levies and from excise on fuel products between Israel and the Council, according to this Agreement, will come into full force on the date of completion of the first phase of the redeployment of the Israeli military forces prior to the elections, i.e., 22 days before the day of elections (hereinafter "the said date").

However, in view of the special needs of the Palestinian Authority and in order to assist it in covering current expenses, Israel has agreed to transfer to the Palestinian Authority:

a. One month after the signing of this Agreement - 50% of the revenues collected during this month from import taxes on goods, the final destination of which is the West Bank, and from excise on petroleum purchased by the Palestinian side for the West Bank.

b. Two months after the signing of this Agreement - 50% of the revenues collected during the previous month from import taxes and petroleum excise as aforesaid.

c. On the said date - 100% of the revenues collected during the period since the previous payment according to subparagraph b. above, from import taxes and petroleum excise as aforesaid.

2. In addition, on the said date Israel will transfer to the Palestinian Authority 15 million NIS as an advance payment in respect of the remaining surplus of the Civil Administration's budget as mentioned in paragraph 2 of Article 39 (Treasury) of Annex III.

3. Israel will transfer immediately 12 million NIS to cover the recurrent costs of the eight spheres transferred to the Palestinian Authority starting from September 1, 1995.

4. For the purposes of the implementation of the Protocol on Economic Relations, Israel will deduct 3% from each transfer to the Palestinian side of import taxes and other indirect taxes, in order to cover Israel's administrative costs in collecting these taxes and in handling matters related to them.

5. The two sides will continue discussion through the Joint Economic Committee on the procedures for the set-off of financial obligations between the two sides, including legal entities under their control or management.

6. a. Cigarettes, alcohol, iron and cement will be added to list A2 attached

to the Protocol on Economic Relations in accordance with subparagraphs 2.a.(2) and 2.b of Article III of the Protocol, in quantities according to the Palestinian market needs, taking into account the quantities of these goods included in list Al.

However, with regard to these goods, the Israeli rates of customs, purchase tax, levies, excises and other charges, prevailing at the date of signing of the Agreement, as changed from time to time, shall serve as the minimum basis for the Council.

b. The quantities of electrical equipment in lists Al and A2 will be revised and increased by the JEC to cover all the needs of the Palestinian market.

7. Articles V (Direct Taxation) and VI (Indirect Taxes on Local Production) of the Protocol on Economic Relations shall be replaced by the Articles attached as Appendices 1 and 2 to this Supplement.

## APPENDIX 1

(Replacing Article V of the Protocol on Economic Relations)

### ARTICLE V
### Direct Taxation

1. Israel and the Palestinian side will each determine and regulate independently its own tax policy in matters of direct taxation, including income tax on individuals and corporations, property taxes, municipal taxes and fees.

2. Each tax administration will have the right to levy the direct taxes generated by economic activities within the area under its tax responsibility.

3. Each tax administration may impose additional taxes on its residents (individuals and corporations) who conduct economic activities in areas under the tax responsibility of the other side.

4. Israel will transfer to the Palestinian side a sum equal to:

a. 75% of the income taxes collected from Palestinians from the West Bank and the Gaza Strip employed in Israel.

b. The full amount of the income taxes collected from Palestinians from the West Bank and the Gaza Strip employed in the Settlements.

5. When a Palestinian remits payment to an Israeli the following rules regarding deduction at source shall apply:

a. No tax shall be deducted at source on income from the sales of goods from the areas under Israeli tax responsibility, which are not supplied by means of a permanent establishment in the areas under Palestinian tax responsibility. Where income from the sales of goods is attributable to a permanent establishment in the areas under Palestinian tax responsibility, tax may be deducted at source, but only on such income as is attributable to such permanent establishment.

b. No tax shall be deducted at source on income derived by an Israeli from transportation activities, if the point of departure or the point of final destination is in the areas under Israeli tax responsibility.

6. When an Israeli remits payment to a Palestinian which is income accruing in or deriving in the West Bank and the Gaza Strip, the following rules regarding deduction at source shall apply:

a. No tax shall be deducted at source on income from the sales of goods from the areas under Palestinian tax responsibility which are not supplied by means of a permanent establishment in the areas under Israeli tax responsibility. Where income from the sales of goods is attributable to a permanent establishment in the areas under Israeli tax responsibility, tax may be deducted at source, but only on such income as is attributable to such permanent establishment.

b. No tax shall be deducted at source on income derived by a Palestinian from transportation activities, if the point of departure or the point of final destination is in the areas under Palestinian tax responsibility.

7. Non-deduction at source in accordance with the provisions of paragraphs 5 and 6 above shall be carried out through the use of certificates in the form set out in Schedule 1. Such certificates shall be issued on special paper in order to assure that the certificates are authentic. The certificates will be worded in both Hebrew and Arabic and will be filled out in the language of the other side or in English, and the figures will be written in "Arabic" (not Hindi) numerals.

8. a. In any case, where the appropriate certificate referred to in paragraph 7 has not been presented to the payer prior to the payment of income referred to in paragraphs 5 and 6 above, tax will be deducted at source by the payer according to the applicable law.

b. With regard to income not referred to in paragraphs 5 and 6 above, tax may be imposed by the tax administration responsible for the areas in which the income was accrued or derived.

9. Each side will grant its residents a tax relief for income tax paid by them on income accrued in or derived in the areas under the tax responsibility of the other side.

10. Both sides agree that a special subcommittee will be established to finalize the arrangements and procedures regarding taxation issues (including issues concerning double taxation).


**APPENDIX 2**

(Replacing Article VI of the Protocol on Economic Relations)

**ARTICLE VI**
**Indirect Taxes on Local Production**

1. The Israel and the Palestinian tax administrations will levy and collect VAT and purchase taxes on local production, as well as any other indirect taxes, in their respective areas.

2. The purchase tax rates within the jurisdiction of each tax administration will be identical as regards locally produced and imported goods.

3. While the prevailing concepts and principles of VAT will continue to be applied by both sides in a compatible way, the Palestinian VAT rate shall not be lower than 2% below the Israeli VAT rate (the present Israeli VAT rate is 17%).

4. The Palestinian side will decide on the maximum annual turnover for businesses under its jurisdiction to be exempt from VAT, within an upper limit of 12,000 US $.

5. a. Ongoing permanent businesses will register for VAT purposes with the VAT administration of the side exercising responsibility in the place in which they are situated.

b. When subparagraph a. does not apply, dealers will register for VAT purposes with the VAT administration of the side of their residence, notwithstanding the place of their activity. A corporation will register for VAT purposes according to the residency of the individual holding the majority of its shares which grant rights to distribution of profits.

c. Special cases of dealers having ongoing operations in the other side without having a permanent place of business there, will be dealt with by the joint committee established according to paragraph II below, upon a request of either side.

d. Each side will provide the other side, upon request, information concerning sales of specific dealers from one side to specific dealers from the other side. Israel will provide the Palestinian tax administration assistance in collecting information concerning the activities in Israel of Palestinian dealers registered for VAT purposes with the Palestinian VAT

administration having ongoing operations in Israel, and will enable Palestinian inspectors to follow their activities in Israel, as necessary for tax enforcement purposes and allowed by law.

6. The VAT on purchases by dealers registered for VAT purposes will accrue to the VAT administration with which the dealer is registered.

7. The principles set out in paragraphs 1-6 of this Article shall also apply to wage-and-profit tax on financial institutions.

8. There will be clearance of VAT revenues between the Israeli side and the Palestinian side according to the following conditions:

a. The VAT clearance will apply to VAT on transactions between dealers registered with different VAT administrations.

b. The following procedures will apply to clearance of VAT revenues accruing from transactions by dealers registered for VAT purposes:

(1) For transactions between dealers registered with the different VAT administrations special invoices, clearly marked for this purpose must be used, and they will be accepted for clearance purposes.

(2) These invoices will be worded in both Hebrew and Arabic and will be filled out in any of these two languages or in English, provided that the figures are written in "Arabic" (not Hindi) numerals and that the amounts filled out in the invoice are stated also in NIS. The amount of VAT will be specified both numerically and in words.

(3) For the purposes of tax rebates, such invoices will be valid for six months from their date of issue.

(4) Representatives of the two sides will meet once a month, on the twenty-fifth day of the month, to present each other with a list of invoices submitted to them for tax rebate, for VAT clearance. This list will include the following details regarding each invoice:

(a) the number of the registered dealer issuing it; (b) the name of the registered dealer issuing it; (c) the number of the invoice; (d) the date of issue; (e) the amount of the invoice - with a separate reference to the amount of VAT; and (f) the name and the registration number of the recipient of the invoice.

(5) The clearance claims will be settled within six days from the meeting, through a payment by the side with the net balance of claims against it, to the other side.

(6) Each side will provide the other side, upon request, with invoices for verification purposes. Each tax administration will be responsible for providing invoices for verification purposes for two years after receiving them.

(7) Each side will take the necessary measures to verify the authenticity of the invoices presented to it for clearance by the other side.

(8) Claims for VAT clearance which will not be found valid will be deducted from the next clearance payment.

(9) Once an interconnected computer system for tax rebates to dealers and for VAT clearance between the two sides is operational, it will replace the clearance procedures specified in subparagraph (4) above.

(10) The two tax administrations will exchange lists of the dealers registered with them and will provide each other with the necessary documentation if requested, for the verification of transactions.

(11) The joint subcommittee established under paragraph 11 will deal with the implementation of the provisions of this paragraph.

9. VAT paid on transactions made with dealers registered with the Israeli side by not-for-profit Palestinian organizations and institutions, or by financial institutions, which are registered with the Palestinian side, or by the Palestinian local authorities, or by the Palestinian side itself, will be

remitted to the Palestinian side in accordance with the clearance system set out in paragraph 8 above.

10. VAT paid on transactions made with dealers registered with the Palestinian side by not-for-profit Israeli organizations and institutions, or by financial institutions, which are registered with the Israeli side, or by the Israeli local authorities, or by the Israeli side itself, will be remitted to the Israeli side in accordance with the clearance system set out in paragraph 8 above.

11. The two sides will establish a joint committee composed of representatives of both VAT administrations. This committee will deal with all issues requiring coordination and cooperation with regard to this Article.


### SCHEDULE 1

Pursuant to Article V (Direct Taxation):

Serial No._____

**Certificate of Non-Deduction of Income Tax at Source
by the Palestinian Tax Administration**

To:_____

(name of payer)

1. We hereby
certify that:

_____

(name of recipient)

_____

I.D. Number and/or
dealer number

_____          _____

home address               business address

is entitled to receive the full amount of NIS
_____ for the sale of goods/ transportation
activities without deduction of tax at source.

2. This certification shall apply only to income accruing in or deriving in the West Bank or Gaza Strip, and shall be valid from _____ (date) until _____ (date) and/or for invoice(s) No. _____.

3. This certification is valid only on presentation of the original certificate.

This certificate was issued by          Date of issue

_____          _____


Serial No._____

**Certificate of Non-Deduction of Income Tax at Source
by the Israeli Tax Administration**

To:_____

(name of payer)

1. We hereby
certify that:

_____

(name of recipient)

_____

I.D. Number and/or
dealer number

_____          _____
home address            business address

is entitled to receive the full amount of NIS
_____ for the sale of goods/ transportation
activities without deduction of tax at source.

2. This certification shall apply only to income accruing in or deriving
in Israel, the Settlements and military locations, and shall be valid
from _____ (date) until _____ (date) and/or for invoice(s)
No. _____.


3. This certification is valid only on presentation of the original
certificate.

This certificate was issued by          Date of issue

_____          _____


Close

 Israel Ministry of Foreign Affairs

## THE ISRAELI-PALESTINIAN INTERIM AGREEMENT-Annex VI

10 Feb 1999

AGREEMENT | ANNEX I | ANNEX II | ANNEX III | ANNEX IV | ANNEX V | ANNEX VI | ANNEX VII | MAPS | MAIN POINTS

### THE ISRAELI-PALESTINIAN INTERIM AGREEMENT ON THE WEST BANK AND THE GAZA STRIP
#### Annex VI
#### Protocol Concerning Israeli-Palestinian Cooperation Programs

#### INDEX

ARTICLE I - Objectives
ARTICLE II - Scope
ARTICLE III - Standing Cooperation Committee
ARTICLE IV - Principles of Economic Cooperation
ARTICLE V - Sectors of Economic Cooperation
ARTICLE VI - Scientific and Technological Cooperation
ARTICLE VII - Cultural and Educational Cooperation
ARTICLE VIII - The People-to-People Program
ARTICLE IX - Drugs
ARTICLE X - Methods and Modalities of Cooperation
ARTICLE XI - Miscellaneous

#### ARTICLE I
#### Objectives

1. The two sides are determined to establish dialogue and cooperation on the bases of equality, fairness and reciprocity within the context of the interim period, and to act together in order to ensure that peace, stability and cooperation between them are reinforced and sustained.

In striving to live in peaceful coexistence, the two sides will seek to design and implement various programs which will facilitate the efforts leading to full reconciliation based on the agreed political process, and make it possible for smooth implementation of a permanent settlement based on Security Council Resolutions 242 and 338.

2. To that end, the two sides agree to establish and maintain between them an extensive program of cooperation in fields of human activity including in economic, scientific, social and cultural fields, involving officials, institutions, and the private sector.

3. The two sides will act to meet common challenges which require a coordinated overall approach and, taking into account their respective distinguishing features, they will act with respect for the values and human dignity of the other side.

4. The two sides are committed to strengthening regional cooperation which takes into account the interests of each side, in particular within the framework of the multilateral Middle East peace talks.

#### ARTICLE II

**Scope**

The scope of cooperation between the two sides, as detailed in this Annex, will include, inter alia, the following main aspects:

a. cooperation with regard to environmental protection;

b. economic cooperation,

c. scientific and technological cooperation;

d. cultural and educational cooperation; and

e. cooperation in enhancing the dialogue and relations between the two peoples through a people-to-people program.

**ARTICLE III**
**Standing Cooperation Committee**

1. A Standing Cooperation Committee is hereby established (hereinafter "the SCC").

2. a. The SCC shall be composed of an equal number of members from each side and may be assisted in its meetings by experts and technicians as necessary.

b. The SCC shall adopt its rules of procedure. It shall meet once a month. Meetings may be held more frequently at the request of either side.

c. The SCC shall reach its decisions by agreement.

d. The SCC may set up working groups or bodies for the implementation of this Annex.

3. The SCC shall deal with the matters covered in this Annex. It shall consider and decide on the methods and modalities for the implementation of the various fields of cooperation as detailed in Article IX. It may decide to add new fields of cooperation.

**ARTICLE IV**
**Principles of Economic Cooperation**

1. The two sides recognize the importance of economic growth, especially on the Palestinian side and cooperation based on the principles of equity, fairness, and reciprocity as a key factor in the context of building peace and reconciliation.

2. To this end, the two sides shall promote economic cooperation, including the promotion of joint ventures for their mutual benefit, in accordance with the overall objectives and principles set out in this Annex. This endeavor shall be pursued without derogating from the provisions of Annex III of the Declaration of Principles, Annex V of this Agreement (Protocol on Economic Matters), and any subsequent agreement or understanding reached between them during the interim period.

3. In implementing the various economic cooperation programs, the two sides will ensure that aspects of environmental protection including air, water, marine and land resources, and prevention of environmental risks, hazards and nuisances will be taken into consideration.

4. Without derogating from the existing agreements between them, economic cooperation between the two sides shall focus principally on sectors producing balanced economic, social, and human development and growth. The cooperation aims, among other things, at:

a. developing the infrastructure and a strong base for the Palestinian economy;

b. strengthening the bases for independent and institutional economic decision making processes within the Palestinian side;

c. supporting the establishment of the Palestinian Standards and Specifications Institute, export institute, etc.;

d. working together to promote social development and foster the rise of Palestinian standards of living; and

e. aspiring towards reducing the disparity in the level of the respective economic development of the two sides.

5. Economic cooperation between the two sides shall include exchange of information and ideas on economic issues, matters and transactions involving the two sides.

6. Economic cooperation between the two sides shall take into account changes in economic policies in various economic spheres.

**ARTICLE V**
**Sectors of Economic Cooperation**

1. Industrial Cooperation

The two sides shall promote industrial cooperation, and, in particular.

a. facilitate cooperation between their respective economic institutions and business sectors;

b. examine ways to facilitate the establishment of joint ventures;

c. promote cooperation between small and medium-sized enterprises of both sides;

d. seek ways to increase Palestinian industrial output through, inter alia, the promotion of a program of industrial parks or zones in accordance with an agreed concept and in cooperation with all relevant institutions; and

e. dedicate special efforts to attract the international business sector and in particular multinational firms.

2. Agricultural Cooperation

The two sides recognize the importance of promoting cooperation in the field of agriculture, and shall in particular:

a. promote cooperation between their respective private farming sectors;

b. facilitate and promote smooth trade between the respective markets;

c. examine ways to facilitate the establishment of joint ventures;

d. establish channels for the exchange of information on farming methods, irrigation, water and soil treatment, herbicides, pesticides, etc.;

e. cooperate and coordinate in the field of plant protection and veterinary diseases;

f. promote joint efforts to combat desertification and encourage the development of agricultural projects in arid and semi-arid areas.

3. Environment

a. The two sides shall promote cooperation in preventing the deterioration of the environment, controlling pollution and ensuring the proper protection and rational use of natural resources in their respective areas, with a view to ensuring environmentally sustained development and promoting regional environment projects.

b. Cooperation in the protection of the environment will focus, inter alia, on preparing proposals for projects, studies, and recommendations on:

(I) development and implementation of appropriate treatment of liquid, solid and hazardous wastes and the control, storage, discharge transportation and disposal of hazardous materials, pollutants, and radioactive waste,

(2) prevention and control of marine pollution from ships and from land-based sources;

(3) preventing and minimizing the harmful effects of pollution on soil, water and air quality;

(4) use of appropriate tools of environmental management and environmental monitoring methods, including the adoption of and use of internationally accepted environmental principles and standards of Environment Impact Assessment and environmental information systems;

(5) development of programs of combating desertificationn and protection of nature and endangered species and the preservation of forests and natural reserves; and

(6) promotion of environmental education and awareness programs.

c. Both sides shall cooperate in preventing the transfer of internationally banned and restricted chemicals including, pesticides, insecticides, and fertilizers between their respective areas.

d. Both sides shall cooperate in setting an emergency warning system to respond to events or accidents which may generate environmental pollution, damage, or hazards.

e. The Environmental Experts Committee established under this Agreement will implement the environmental cooperation proposed above in coordination with the SCC.

4. Energy

The two sides shall promote cooperation between them in order to:

a. develop plans to promote the use of environmentally clean alternative sources of energy such as solar and wind energy;

b. enhance cooperation in energy conservation;

c. promote, within the framework of regional cooperation, projects for their mutual benefit in the field of electricity; and

d. develop options for joint ventures which will include the international business sector in the field of energy production, management and supply.

5. Transport

a. The two sides shall promote cooperation in the field of transport and related infrastructure, in order to accommodate any increase in the flow of passengers and goods, and modernize the transportation infrastructure through:

(1) promoting joint technological and research programs; and

(2) assisting and facilitating the establishment of a Palestinian Standards and Specifications Institute in this field based on international standards.

b. The two sides will work towards normal movement of vehicles across the crossing points with Jordan and Egypt.

6. Tourism

a. In order to best utilize the unique advantages provided to the tourism industry in conditions of stability, the two sides shall examine ways to:

(I) increase the volume of incoming tourism;

(2) plan and develop the necessary infrastructure, facilities and services in order to accommodate increased demand;

(3) encourage the involvement of major foreign, regional, as well as multinational tourist conglomerates and entrepreneurs; and

(4) continue and expand the existing vocational training programs, in the various tourist vocations.