Date: July 29, 2009                                            File No.: 3052/06

dialogue, and that he remembered the atmosphere in this interrogation as being exceptionally good, relative to other interrogations which he had conducted. The Defendant cooperated in extensive portions of the interrogation, and there were days in which the very mention of the topic of a subject to the Defendant sufficed for the Defendant himself to provide a detailed version of the matter.

In his cross-examination, the witness stated that he had heard about the Defendant's detention from the media, approximately an hour before he met him at the interrogation facility. The witness further stated that the initial interrogation of the Defendant had been conducted by the interrogator known as "Hadi", and that he was not aware of it at the time, but only retroactively.

The witness stated that the size of the cell in which the Defendant was kept was standard; that there was a window, but it was closed; and that the ventilation was based on a central air conditioning system.

The witness was asked why the Defendant was interrogated continuously on March 15, 2006, starting at 10:55 a.m. and until after midnight, when the Defendant had already been interrogated toward morning, from 2:40 a.m. to 5:45 a.m. The witness answered that this was the initial stage of the interrogation; the Defendant asked to set forth his actions in chronological order, and this took time. The Defendant did not express a desire to stop the interrogation or to go to sleep; in the course of the interrogation, he ate, drank and smoked for his pleasure.

The witness was asked to comment on the statements which appear in the transcripts which were drawn up by the interrogator known as "Gino", such as "You are behaving like a little child, sitting there and lying through your teeth", and whether they preserved the subject's dignity. The witness answered that, in every interrogation, there are points of conflict and disagreement, and still, the dignity of the subject is preserved.

The witness stated that the Defendant was not prevented from meeting with an attorney, but that the entire subject of the contact with the attorney was under the responsibility of the police. To the best of his knowledge, the police notified the attorney of the Defendant's detention; however, the witness did not check this.

The defense attorney referred the witness to the memorandum dated March 19, 2006 at 4:35 p.m., in which the Defendant stated that they were laying trumped-up charges against him, and that they would do better to bring a sword and cut off his head, and asked him whether this sounded like a calm and quiet person. The witness answered that he did not have the impression that the Defendant was a calm and quiet person, but rather, a person who tended toward outbursts of anger. He added that this behavior and similar behaviors on the Defendant's part were at times

Date: July 29, 2009                                                                                         File No.: 3052/06

characteristic of him, although most of the interrogation was conducted in a very positive atmosphere with a great deal of mutual respect.

The witness was asked to explain what a "persuasion talk" is, and stated that it is a conversation in which the suspect is offered a chance to reach an understanding and to confess to the charges attributed to him, and receives an explanation of the nature of the information in the possession of the interrogators. The nature of the talk depends on the subject and his nature. In the case of the Defendant, most of the talk was focused on important current events and general topics, because the Defendant was a person who had traveled to a lot of places; nonetheless, at the end, the conversation always went back to the subject of the interrogation. The witness did not exactly remember what had been said at the talk in question, which was unfruitful from the standpoint of the interrogation; nonetheless, he pointed out that, among other things, the Defendant had been told that it would be better for him to confess.

The witness was asked whether telling the Defendant "to reach an understanding with his interrogators" referred to an agreement in which the Defendant would confess and would then go home, because he was an old man. The witness stated that the Defendant was not told that he would go home, or that he was an old man. The witness stated that nothing would happen if the Defendant did not confess, but that a confession would be in his favor, because then the interrogation would be over.

The witness was asked whether great pressure was not exerted on the Defendant, in such a way as to cause him to want to harm himself, as appears in the memorandum of March 21, 2006. The witness stated that the Defendant had had a fit of rage at the beginning of the interrogation, and that afterwards he had calmed down and had gone on to hold a long, detailed and relaxed conversation.

The witness denied that he had promised the Defendant that, if it was found that the polygraph indicated he was speaking the truth, they would not continue to ask him about things in which he was shown to have been speaking the truth. It is correct that, after the examination, the focus was on other subjects; nonetheless, there was no impediment against returning to the same subjects. According to his statement, the agreement and the understanding with the Defendant only concerned cases in which he was found to be lying.

The witness denied that he had told the Defendant that, if he finished the interrogation, he would be transferred to the prison, where the conditions were better, and accordingly, it would be better for him to finish the interrogation. When he was referred to the memorandum dated April 9, 2006 at 1:30 p.m., Section 8, which says that the Defendant was asked if he did not want to finish his interrogation and to be transferred to the prison, where he could be visited by his

Date: July 29, 2009                                                                                         File No.: 3052/06

family, the witness answered that the question which the Defendant was asked was primarily a way of telling him to finish the interrogation. The witness added that the interrogation did not focus only on the subject of the ship *Karine A*, but also on the subject of his sources of funds and his contacts with the Tanzim / Fatah. The "understanding" in question was that the Defendant would provide information, and not necessarily such that would lead to his incrimination.

**The testimony by the person known as "Hadi"**

This witness is the Israel Security Agency interrogator who interrogated the Defendant on the day of his arrival at the interrogation facility, and another time at a later stage.

The witness stated that the Defendant had been asked how he was and answered that he felt well, although he said that he was suffering from cancer. The Defendant did not complain of pain, and had he done so, [the witness] would have called a doctor or a medic. The witness stated that he had not been given medications by the Defendant's attorney, and that he did not remember that the Defendant had asked for medications. The witness was asked about the time of the first interrogation, 2:40 a.m., and answered that his team leader had demanded that he begin the interrogation, and that is what he did. He also noted that, to the best of his memory, he had not interrogated the Defendant when the latter was handcuffed or shackled, and even if he had been wearing cuffs – which, in his estimation, he had not been – he had not been wearing shackles. The witness denied that he had left the Defendant in the interrogation room for periods of four to seven hours, alone and handcuffed. The witness further denied that he had said, or that he knew that anyone had said, to the Defendant that his house had been destroyed, trees had been uprooted and honey had been destroyed. He denied that he had promised the Defendant that he would be released if he confessed.

The witness confirmed that the Defendant had been told that he was lying, and claimed that this was a legitimate contention on the part of an interrogator. He stated that there had been no use of threats or force in the interrogation and that, if the Defendant had been afraid, this was a subjective matter, but that he had not intentionally frightened him.

In his cross-examination, the witness stated that he knew who the Defendant was and he knew that he had been active in Fatah for a very long time, and was in charge of the procurement and financial system within that organization.

The witness stated that he had given the Defendant a piece of paper, written in Arabic, which set forth his rights as a detainee and an interrogation subject, but that he had not read it out to him himself. He confirmed that the first sentence which he had written in the memorandum was the first sentence which the Defendant had spoken to him, which was: "The Defendant is fed up with the story of *Karine A*."

Date: July 29, 2009                                                                 File No.: 3052/06

The witness was asked to describe his impression of the Defendant's condition at the first interrogation, which had taken place toward morning, and stated that he remembered that an elderly man had come in, who was relatively tired, in accordance with the time at which he arrived. They had an ordinary conversation, and he remembered that the Defendant was a heavy smoker, was given a lot of cigarettes, and that the conversation had been conducted in a positive atmosphere. He did not remember whether the Defendant was agitated or depressed, and did not remember anything else unusual. According to his statement, to the best of his understanding, the Defendant's statement that he was "fed up" is consistent with the fact that he had been under protective or preventive detention following the *Karine A* affair.

The witness insisted that his role was to seek out the truth and that, if the Defendant had given him a reasonable theory in line with the intelligence information, he would have accepted it.

The witness repeatedly stated that he did not remember whether the Defendant was wearing cuffs in the interrogations which he had conducted. However, if there was any use of cuffs, it was only if the witness felt threatened. He added that he did not remember any such thing, and that if the Defendant had shouted or acted wildly, he would have written it down.

The witness repeatedly emphasized that he had given the Defendant the piece of paper with his rights and duties, and that his rights were listed in it. He himself did not tell the Defendant that he had the right to remain silent or to be represented by an attorney.

The witness insisted that, had the Defendant complained to him about not being allowed to bring his medications into the detention facility, or that he felt unwell and was not getting assistance from the prison doctor, he would have written it down. At the same time, he stated that he knew the Defendant was a sick man. He personally was never asked about bringing medications in.

The witness repeatedly emphasized that the search for truth is "sacred" and that it was the objective. Accordingly, when the Defendant told him that he was willing "to confess everything", he explained to him that there was no point in talking that way, and that he should tell [his story] himself, without adding to it or detracting from it. He had the impression that the Defendant was not willing to confess everything and was capable of holding his own in the interrogation. The witness stated that the interrogation of the Defendant was protracted because there were subjects which required elucidation and clarification, and there were other items which he chose to deny or not to explain.

14

Date: July 29, 2009                                           File No.: 3052/06

**The testimony of the person known as "Gino"**

This witness was an interrogator for the Israel Security Agency who participated in the Defendant's interrogation, and stated at the very outset that, because two years had gone by since the date of the interrogation, he did not remember part of it.

The witness was confronted with the preliminary arguments and stated that the Defendant had received medical treatment from the prison infirmary. He remembered that, in one of the transcripts, the Defendant had stated that he had polyps in his stomach, and within a short time, he was taken for examination and medical treatment. The witness stated that, as an interrogator, he is not the authority with regard to the transfer of medications to the Defendant, and that the decisions on that subject are made by the prison doctor. He further stated that he did not remember any case in which the Defendant called his attention to the fact that he needed medication.

The witness denied that the Defendant's feet were shackled in the interrogations at which he was present, and added that the Defendant was handcuffed after he hit himself and after he was warned that, if he continued to hit himself, he would be handcuffed, so that he could not harm himself.

The witness claimed that there was no case in which the Defendant was left handcuffed and alone in the room for four to seven hours, and claimed that he had not told the Defendant that IDF troops had destroyed his house and had destroyed trees and honey. The witness added that he had also not told the Defendant that, if he confessed, he would go free in light of his age.

The witness stated that he had told the Defendant more than once that he was concealing information and refusing to give it to his interrogators, but he had not used violence, threats or attempts at intimidation.

In his cross-examination, the witness was asked about the meaning of the statement to the Defendant that "he had been brought to the interrogation in order to confess with honor". The witness stated that confessing really was an honor, and his objective as an interrogator was to have the subject make a true confession.

The witness stated that the subject of the interrogation was the Defendant's involvement in the matter of the ship *Karine A*, his connection to the financing and smuggling of materiel, and his connections with Iranians and others in Arab countries whose intention it was to carry out hostile terrorist activity against Israel.

Date: July 29, 2009                                                                                               File No.: 3052/06

The witness stated that he had recorded in a memorandum that the Defendant "was behaving like a little child", because, notwithstanding his advanced age, he sometimes behaved childishly in the interrogation. When he was asked to explain what he meant, he answered that childish behavior is when a person is being interrogated on information and gives a cover version which exempts him from liability, even though he knows that his interrogators know what they are talking about with him.

The witness stated that the Defendant had been told that he should not "behave like a rascal", and that his meaning for the word "rascal" was a person who shouts, lies, acts dishonorably and does anything he can to save his skin.

The witness stated that he apparently knew at the time that the Defendant had been interrogated toward morning by the interrogator known as "Hadi", but that he had not seen any impediment to interrogating the Defendant until 6:00 p.m.

The witness was asked about a statement which he had made in the interrogation, which was documented in the memorandum dated March 20, 2006, in which it was written that he had told the Defendant that it was not by chance that his detention had been extended by 18 days, in light of the large amount of information which he was concealing from his interrogators. The argument was raised to him that, in this way, he was actually saying to the Defendant that the more information he concealed, the longer his detention would be. The witness answered that it was understandable that the Court had decided to extend the detention, on the basis of the information which it had before it. The witness was asked about an additional expression which he had used toward the subject, which was documented in the memorandum dated March 27, 2006, in which it was written that he had told the Defendant that "in the end, he would confess". The argument was raised to the witness that, according to common sense, this meant that until the witness confessed, the interrogation would not be over. The witness answered that that was not what was written, and eventually, the Defendant did, in fact, provide a great deal of information.

The witness was asked about the cases in which the Defendant hit himself, and said that he remembered that the Defendant had hit himself with his hands a number of times, and that they had succeeded in calming him down a number of times by asking him to stop it. The witness further stated that, in his opinion, this was childish behavior. The witness was asked whether this was not behavior which attests to the Defendant's desperation, and answered that, in his estimation, it was all a show, because, in fact, after that, the Defendant went on to provide a great deal of information.

16

Date: July 29, 2009                                                                 File No.: 3052/06

**The testimony by the witnesses for the prosecution at the preliminary trial – interim summary**

The testimony which was heard may be divided into testimony by members of the police and testimony by Israel Security Agency personnel. The policemen stated that the interrogation was conducted in a relaxed manner, with no problems whatsoever, and that the Defendant gave information of his own good and free will. It was further stated that the Defendant had been given food and beverages in the course of the interrogations, had not been left alone, and had not been subjected to any threats or promises in the context of his interrogation.

The witnesses on behalf of the Israel Security Agency noted that the Defendant had been treated with respect, in accordance with his status. They did not deny that, in his interrogation, there were moments of "confrontation", in which they accused the Defendant of lying and concealing information; however, they claimed that this is a natural part of an interrogation. The interrogators denied that the Defendant had been left alone in the interrogation room for long periods of time. According to their statements, there were a number of cases in which the subject have been left alone, but for brief periods of time, during which he was placed in handcuffs which were attached to a long chain. It was further stated that the Defendant was not handcuffed in the course of the interrogations, except for cases in which he hit himself and attempted to harm himself. Even in those cases, after the Defendant calmed down, the handcuffs were taken off.

The Israel Security Agency interrogators also denied that they had uttered threats against the Defendant, or that they had told him that his house had been destroyed and the like, or that anyone had promised him that, if he confessed, he would be released due to his age.

With regard to his medical condition, the Israel Security Agency interrogators stated that the Defendant had been treated in the prison infirmary and that, in light of his age, they even ensured that he would receive treatment, at the discretion of the medical personnel, of whom they were not in charge.

**The testimony by the Defendant at the preliminary trial – direct examination**

The Defendant began by stating that he suffers from high blood pressure, hemorrhoids, an ulcer and back pain.

The Defendant described that he was in prison in Jericho under American and British supervision and that, on March 14, 2006, at 8:00 a.m., the IDF instituted a siege on the Muqata in Jericho, until a bulldozer came and destroyed the building. He and others were taken to the Jericho Coordination and Liaison Facility; that evening, he was transferred to the "Russian Compound"

Date: July 29, 2009 									File No.: 3052/06

[a police facility in Jerusalem]. The Defendant told them that he was cold, because he was wearing only his pajamas. From the "Russian Compound", he was transferred to Ashkelon, and he was in handcuffs throughout that entire time.

His interrogation by the Israel Security Agency began that same night, and he was told that he had to confess everything. The Defendant stated that he had told his interrogator that there was nothing against him, that he was a person who was doing his work and following orders.

According to his argument, he was handcuffed and shackled during the interrogation, and noted that his hands were cuffed in front of him. The Defendant stated that he did not receive the medications which he takes on a regular basis, and even though he asked to see a doctor, he was told that he would only see him the next day. The Defendant claimed that he was taken to the doctor only after he pleaded many times to be taken for examination. Following the doctor's examination, he was only given medicine for his blood pressure, but no one took care of his other problems.

The Defendant pointed out that he was kept in a cell 1.5 m x 2 m in size, and that he would fall asleep quickly because he was exhausted, but woke up often because of the pain from which he suffered.

The Defendant said that he did not remember much of his interrogation. He remembered that his interrogators wanted him to confess that he had purchased the *Karine A*, but he had no connection to this. According to his argument, his interrogators spoke to him impertinently; they sometimes addressed him violently and sometimes calmly.

The Defendant claimed that his interrogators told him that they were interested in obtaining an explicit and detailed confession of everything he knew about the *Karine A* affair, and that, if he confessed, he would be able to go home. The Defendant claimed that he had told his interrogators that he was prepared to confess, but not to lie.

The Defendant stated that his attorney had told him that they had destroyed his house, uprooted trees and smashed beehives. According to his statement, the interrogators told him that they had heard about this, and this had a negative effect on him.

The Defendant was asked about his visits to the prison doctor, and stated that, even when he complained, he was given only acetaminophen. When he was told that, after he complained of digestive problems in his interrogation, he was given a medicine called "Gastro", he said that he did not remember that. In another case, the Defendant remembered that he had been given paraffin for his constipation, but said that this only happened once. According to his statement, although he received medication for his blood pressure, he felt that it was of no help to him. The

18

Date: July 29, 2009                                                                                       File No.: 3052/06

Defendant was asked whether he told the doctor about his chronic diseases, and stated that he told him everything, and also that he had asthma, that he had difficulty breathing properly and that he suffered from tachycardia.

He also stated that the policeman who taken his statement sat with the Israel Security Agency report and asked him about it, but that he did not know what the policeman wrote, because the interrogation took place in Arabic and the record was written down in Hebrew.

The defendant was asked if he believed that he would be released if he told the interrogators what they wanted to hear, and he answered "Yes". According to his statement, his interrogators told him about another subject who had been expected to get four life sentences, but that Mohamed Dahlan had intervened in his case and they released him.

The Defendant stated that he did not ask the interrogators to call an attorney, and that his family were the ones who called the attorney on his behalf. The Defendant added that he asked his interrogators if he could see an attorney, and their answer was that if an attorney came and asked about him, they would let him see him.

**The testimony by the Defendant at the preliminary trial – cross-examination**

The Defendant stated that he had felt humiliated during his interrogation. He further stated that he had told his interrogators everything they wanted to hear. The Defendant was then asked at which stage of the interrogation he had "broken". The Defendant did not answer directly; instead, he claimed that, from the very beginning, he had told his interrogators that he would tell them whatever he had to say, and he had in fact told them what he knew. When he was asked if the things that he had said on the first day of his interrogation were said under pressure, he answered that he had said those things because that was what happened and because it was not a secret matter. He further stated that, in his interrogation, he had not lied at any stage, and that he had told what he knew, but that he did not know what had been written down in Hebrew.

According to his statement, his interrogators humiliated him, told him he was a liar and used "dirty" language to him. He further stated that they used to leave him alone in an empty room, in cuffs, and come back only several hours later.

The Defendant stated that, in his interrogation, he acted according to the interrogators' instructions, and that he certainly did not dictate any demands or the terms of the interrogation. When he was asked how he found the strength to tell his interrogators that "the State of Israel owed him money", he did not answer directly. The Defendant confirmed that he smoked during his interrogation and stated that he had taken cigarettes from his interrogators whenever he asked for them. The Defendant was asked what else he had been given and replied "Nothing". When he

19

Date: July 29, 2009					File No.: 3052/06

was asked specifically whether he had received a Koran, coffee, tea and underwear, he answered that he had. According to his statement, he had not asked for them; rather, his interrogators had brought them to him.

The Defendant repeated that he had been under pressure from the very first day, but emphasized that, in his interrogation, he had spoken only the truth. He further stated that he had denied any relationship to the ship *Karine A* and had insisted on that point.

In answer to questions by the Court, he stated that the things which were written down in his statements were translated for him, but that he did not know what was actually written down. The Defendant further stated that, at times, he would get upset in his interrogation ("from all that talking, a person goes crazy"), but that his irritation had only manifested as "exploding inside" and he had not shown it to his interrogators.

**The testimony by Mohamed Hijazi**

This witness stated that he was with the Defendant, in the same cell, at Ashkelon Prison in April 2006, for some two weeks. He stated that the Defendant was sick and weak and had difficulty breathing, walking or standing up. He claimed that, on many occasions, he and his cellmates had knocked on the cell door and asked for a doctor for the Defendant, because "he was going to die", and the guards had given the Defendant "at the very most, acetaminophen". He stated that a doctor had never come to the cell.

In his cross-examination, the witness stated that he was in the cell with the Defendant, to the best of his memory, starting on April 12, 2006. He claimed that, over a two-week period during which he was with the Defendant in the cell, the Defendant had only gone out to the toilet or the shower, and then added that he had also gone out to interrogations. When he was asked to comment on the fact that there were many documents by medics and doctors who had seen the Defendant during that time, he stated that, during the period when they were together, this did not happen. He went on to add that, each time the Defendant came back from an interrogation, he told them (his cellmates) about it. The witness was asked to give the names of other persons who were in prison with him at the time and answered that there were people whose names he remembered, but did not state a single name.

The witness stated that the Defendant had told him that the interrogation made him feel pressured, that he was chained to the chair all the time and treated badly. The Defendant also told him that he was suffering from cancer and he needed medications. The witness said that the Defendant had not told him about the things which he received from his interrogators, such as fruit, cigarettes and underwear.