Date: July 29, 2009                                                                                          File No.: 3052/06

**The decision in the preliminary trial**

It may be said that the preliminary arguments raised claims that had to do with "humiliation", the use of an unfair method of interrogation by creating unfair emotional pressure, as well as enticement and persuasion. The decision in this case is a decision which is based on fact, which is derived from our direct impression of the statements which were made before us.

**Evaluation of the testimony in the preliminary trial – credibility and weight**

**Credibility of the witnesses for the prosecution**

We did not find that the witnesses for the prosecution were lacking credibility, as the defense attempted to argue. In fact, there can be no doubt that the Defendant was under interrogation, in the course of which the interrogators sought to obtain as much information as possible with regard to his activity in the financing of Palestinian terrorism.

Like any interrogation, it was not always conducted under pleasant and comfortable conditions. The Defendant was imprisoned in an interrogation facility, where he was interrogated over a protracted period of time. However, there is a discrepancy between the discomfort which is inherent in the holding of an interrogation and the use of means which are capable of depriving him of his free will and his ability to choose whether to give information which incriminates him.

As may be seen from that which has been set forth in the statements, and the Defendant did not dispute this in his testimony, in the course of his interrogation by the police, he received cigarettes and could smoke as he liked, and was given beverages and food in the course of the interrogation. Thus, for example, in the statement dated March 19, 2006, page 5, line 132, the following sentence appears: "At this stage, the suspect asked to pray, and the suspect's confession was interrupted for that purpose." Further, on page 6, line 164: "In the course of his confession, the suspect was given hot and cold beverages and cookies." In a statement dated March 20, 2006, page 1, line 18, the following sentence appears: "The suspect was given a cigarette and smoked." Further (page 2, line 19), it is written that: "The suspect was given water at his request in order to take a pill." The statement dated March 22, 2006, page 5, line 118, states that he was given hot and cold beverages and cigarettes; a similar sentence appears in the statement dated March 30, 2006, page 6, line 144. The statements which were taken on April 2, 2006 (Prosecution Exhibit No. 9 and Prosecution Exhibit No. 10) state that he was given refreshments. It is difficult to imagine a situation in which an interrogation was conducted in a heavy-handed and cruel manner, according to the arguments that have been set forth by the defense, while at the same time the Defendant was given the opportunity to pray, to smoke as much as he wanted, to eat and drink, and of course, to take medications.

Date: July 29, 2009                                                                                   File No.: 3052/06

It should be stated that refreshments such as food, beverages and cigarettes were also given to the Defendant in the course of his interrogations by the Israel Security Agency. As early as his first interrogation (memorandum dated March 15, 2006, 2:40 a.m.), he was given coffee, and in the following interrogation (memorandum dated March 15, 2006, 10:55 a.m.), he was given lunch, cigarettes and coffee. It can be seen that this treatment continued throughout all of his interrogations, and almost every memorandum states that the Defendant received food, beverages and cigarettes. He was even given a Koran (memorandum dated March 16, 2006, 10:00 a.m.; memorandum dated March 21, 2006, 12:00 noon); he was allowed to go to the toilet (memorandum dated March 20, 2006, 11:40 a.m.) and was given the possibility of discussing with his interrogators problems which concerned the conditions of his imprisonment (memorandum dated April 3, 2006, 11:00 a.m., Section 1). The Defendant did not dispute these statements which appear in the transcripts. This treatment is not typically given to someone whose free will [his interrogators] are trying to crush and whom they are trying to humiliate and hurt.

Over and above the subject of the refreshments which were given to the Defendant, the transcripts from the Israel Security Agency interrogation do not indicate that the subject was "broken" and humiliated, in view of the fact that the Defendant commented many times on topics which are not related to the interrogation, such as general political and diplomatic topics (memorandum dated March 16, 2006, 10:00 a.m., Sections 24-25; memorandum dated March 27, 2006, 4:30 p.m., Section 1; memorandum dated April 11, 2006, 10:00 a.m., Section 12), and even told his interrogators that the State of Israel owed him $275,000 which it had taken from a closet in the Muqata (memorandum dated March 19, 2009, 4:35 p.m., Section 18). Such behavior is not typical of a person who has been broken in his interrogation and is willing to appease his interrogators and to say anything they want him to, only in order for the interrogation to end; rather, it is characteristic of a person who feels sufficiently self-confident to say what is on his mind.

It is important to emphasize that the witnesses for the prosecution did not attempt to embellish the conditions of the interrogation. They did not deny that there were short periods of time when he was left alone in the room, and that he was cuffed at those times; it was, however, argued that those intervals of time were brief. Nor did they deny that the Defendant had been cuffed after he hit himself and began to act wildly (memorandum dated March 21, 2006, 12:00 noon, Sections 2-3). Furthermore, the interrogators did not claim that the Defendant was a relaxed, calm person; rather, they said that the Defendant was a person who was quick to anger, and that he would turn his rage against himself, and accordingly, they were required to handcuff him at times. Nor did they deny that, from time to time, they addressed the Defendant in a manner which was not pleasant for him to hear – for example, they told the Defendant that he was lying, was behaving

Date: July 29, 2009                                                                                         File No.: 3052/06

like a child or a rascal – but it was not proved that they adopted humiliation as a method of interrogation.

This description by the interrogators appears credible to us. We have not found that it contains inconsistencies or contradictions, and it is in line with the statements written down in the transcripts and, to a certain degree, with the testimony by the Defendant in Court. More precisely: there is a significant discrepancy between the testimony by the Defendant in Court and the preliminary arguments which were initially raised by the defense – arguments which they abandoned at the stage of the summations following the Defendant's testimony. It may be said, even at this stage, that the impression which arises from the Defendant's testimony did not match the preliminary arguments which he raised.

**The credibility of the testimony by Mohamed Hijazi**

Before we discuss the credibility of the Defendant's testimony, we shall first state that Mohamed Hijazi's credibility, as we perceived it, was quite poor. We have difficulty understanding how the witness remembered "well" everything which had happened to the Defendant, and how "they pleaded" for medical treatment for him which was not provided, but he could not say who else was imprisoned with him in the cell at the time. Nor can his statements be reconciled with the Defendant's medical file, which shows that, even during the period concerning which the witness Mohamed Hijazi testified, the Defendant was treated a number of times by the prison infirmary. It *prima facie* appears that the testimony by Mohamed Hijazi is testimony which was entirely intended to assist the Defendant at his trial, and which accordingly, at the very least, painted quite an extreme picture of the Defendant's medical condition. It should further be stated that Mohamed Hijazi said that the Defendant complained to him of having been chained to the chair – an argument which the Defendant himself did not repeat. Accordingly, we have not seen fit to attribute any weight whatsoever to the testimony by Mohamed Hijazi.

**The credibility of the Defendant – general**

The Defendant unequivocally stated that, in his interrogation, he did not say anything which was not true. Notwithstanding the Prosecutor's attempt to understand at which stage the Defendant "broke" and began to tell his interrogators things which they ostensibly wanted to hear, the Defendant insisted that he provided all of the information which he had, with no problem whatsoever. The Defendant denied having linked himself to the ship *Karine A*, in contrast with that which has been set forth in the police statements.

It appears that, even though the Defendant claimed that he felt humiliated, this feeling – according to his own argument – did not influence him to say anything which he did not want to

23

Date: July 29, 2009                                                                                                   File No.: 3052/06

say. We shall emphasize that the Defendant did not claim that he had initially refused to tell his interrogators the truthful things which he told them, or that they had been extracted from him against his own free will. The Defendant, throughout his testimony before us, claimed that he had spoken the truth, and that he had done so willingly, because he was not ashamed of the matters involved and they did not contain any secrets.

In accordance with that which has been set forth above, the only thing which the Defendant was not willing to accept were the things which were written down in his statements; according to his argument, those things did not reflect what he had actually said, and because he cannot read Hebrew, he could not know if that is what was written. The Defendant appears to have abandoned the preliminary argument, according to which the police interrogators had threatened him with "chaos" if he did not repeat what was written down in the transcripts by the Israel Security Agency interrogators, as he did not mention this matter at all in his testimony before us.

We shall further state that the direct impression gained from the Defendant's testimony is of someone who exaggerated the strength of the humiliation which he felt and the arguments concerning the treatment which he was given, in accordance with the line of argumentation in the preliminary trial. In any event, even if he subjectively felt humiliated in the situation in which he found himself, we shall emphasize that he was not willing to confirm or to state that he had said anything which was not true, or that he had been broken in his interrogation. Our impression is that the Defendant adopted a line which was "independent" of the defense line in the trial, with regard to things which he thought it was important to tell the Court. The Defendant wanted to say that he had told only true and correct things, of his own free will, but at the same time, to say that he had suffered during his interrogation. This cannot be reconciled with the argument that his statements were taken other than of his own free will. Obviously, a situation of interrogation is not comfortable and is not pleasant, and certainly not for an elderly person who previously held a senior position. At the same time, we did not gain the impression that the Defendant, at any stage of his interrogation, felt distress which prevented him from making demands or which led him to say things other than of his own free will.

**The credibility of the Defendant – the medical treatment**

The Defendant's arguments with regard to medical treatment, or the absence thereof, are not at all in line with what appears in his medical file. Thus, for example, in a document which records his examination before his intake at the incarceration facility on March 14, 2006, a statement appears in which the Defendant "notes chronic diarrhea, takes Colatal as necessary, rules out heart disease, [high blood] sugar, high blood pressure or other problems." On March 15, 2006 at 2:19 p.m., he was examined again at Shikma Prison. In that case as well, even though he was examined by a different doctor, the section in which he was asked about past diseases states the

24

Date: July 29, 2009                                                                                              File No.: 3052/06

words "Rules out"; in addition, it was noted that he uses only one medication, Colatal for his stomach. These records are not in any way in line with his statements to the effect that he suffers from many problems and that he gave that information to the prison doctors. On March 15, 2006 at 6:15 p.m., he was again brought before a doctor, where the record states that the Defendant complained of constipation and heartburn and was given medication. As we can see, as soon as the Defendant complained of any problem whatsoever, not only was he not deprived of access to a doctor; he was, in fact, examined by a doctor only four hours after his previous examination by a doctor. In addition, the Defendant saw a doctor on March 19, 2006, and was given medications in that case as well. It is not superfluous to state that the medications were not "acetaminophen", as he claimed, but other medications (of three different kinds).

The Defendant was examined by a doctor and received treatment for his constipation problem on March 20, 2006 and March 21, 2006 as well. On March 22, 2006, the Defendant was brought for examination at the initiative of the prison authorities, and not at his own request; on the basis of his complaints, it was determined that his blood pressure would be monitored, and medications were prescribed for him. On the same day, at 7:00 p.m., the record states that he was again examined by a doctor "**at the request of an interrogator**".

Not only were different medications of various kinds prescribed for him; his argument, to the effect that he was given paraffin oil only once, is not in line with the medical records, which show that he was given paraffin on a number of occasions, on March 20, 2006, March 21, 2006, March 30, 2006, April 1, 2006, April 3, 2006, April 4, 2006 and April 17, 2006.

Accordingly, it appears that the Defendant's arguments with regard to the lack of medical treatment are unfounded. The Defendant received various medications as required, in accordance with his condition; he saw a doctor many times – once even at the initiative of his interrogator – and received treatment at the discretion of his doctors. It appears that his arguments with regard to medical treatment were intended to intensify the preliminary arguments and are not in any way founded on reality, and this has implications on his poor credibility before us.

**The credibility of the Defendant – the interrogation stage**

Aside from the subject of medical treatment which we have discussed above, the Defendant's attempt to state that he did not receive anything from his interrogators can be pointed out as an additional example of the Defendant's lack of credibility – an argument which was intended to provide an exaggerated portrayal of his difficult state during the interrogation. As soon as he was confronted with the things which he had received (meals, time for prayer, cigarettes, coffee, tea, a Koran, underwear), he "suddenly recalled" and confirmed that these things were indeed given to him; he added, however, that he had not asked for them to be given to him. In addition, the

Date: July 29, 2009                                                     File No.: 3052/06

Defendant himself stated that everything which happened during his interrogation caused him "to explode inside", and that he had not shown this to his interrogators – in contrast with the explicit statements which were written in the transcripts, and to which the interrogators testified, to the effect that the Defendant lost his calm from time to time, and that they were accordingly forced to handcuff him. It is not logical to believe that the interrogators would invent and record a story whereby the Defendant hit himself, and that they were forced to handcuff him as a result, if this did not happen. The Defendant's argument, to the effect that he had only "exploded inside", is not in line with the records kept by the interrogators, nor with their testimony before us, and represents part of the line which he adopted in order to show that, on one hand, they had humiliated him, but, on the other, he had not given into his interrogators. In this matter, we preferred the testimony by the interrogators.

It should be stated that the impression gained from the Defendant's testimony is that of a person who is well aware of the things which were said by him, both in Court and in his interrogation by the Israel Security Agency and the police, but who nonetheless sticks to his story and maintains that injustice was done to him. That injustice, as he sees it, was not caused by the things which he said in his interrogation, but by the humiliation which was practiced upon him, as an independent factor, and not as one which affected him in his interrogation. Another factor in the "injustice" results from the statements which were written down in Hebrew, without his approval, and which were not in line with what he said. More precisely: the Defendant confirmed, in his testimony before us, that the words in his statements, which were ostensibly written down on the basis of what he had said, were translated to him, as the police interrogators had stated; nonetheless, the Defendant claimed that he does not know what was really written, because he does not know Hebrew.

We have not seen fit to believe the Defendant on this point. We did not gain the impression that the Israel Security Agency and police interrogators recorded things which were not told to them by the Defendant, or that they distorted the statements which been written down in Hebrew when they translated them to him, or that they exerted pressure on him which negated his ability to choose whether to tell his interrogators certain things. It appears that the Defendant was well aware of why he was under interrogation, and was well aware of what his interrogators were looking for, and that he behaved accordingly during his interrogation. The Defendant is aware of the fact that he made statements with regard to his activity in the context of *Karine A* – statements which are not in line with his present version, which holds that there is no relationship between him and the arms ship.

Moreover, the statements which are written down in the transcripts of the interrogation indicate that the Defendant gave a great number of details, as he testified before us, as early as the first day of the interrogation. At the same time, the Defendant did not immediately say everything he

26

Date: July 29, 2009                                                                                      File No.: 3052/06

knew, because his interrogation was a "developing interrogation", to which, over the course of time, various items concerning his activity were added. As may be seen from the transcripts, in the beginning, when they raised accusations against him, he customarily denied them; however, when they showed him evidence which refuted his denial, he began to tell what he knew. Such conduct is actually characteristic of a person who acts in a calculated manner and is willing to tell things only when he knows that, in any event, his interrogators have the information already, without volunteering additional information. Even if there had been any possibility of raising an argument, to the effect that the additional details which he gave, following the evidence which was presented to him, were given as a result of the pressure which was exerted during the interrogation, the Defendant himself has contradicted and refuted that argument.

### The credibility of the Defendant – summary

In contrast with the credible impression made by the interrogators from the police and the Israel Security Agency, we can state that the testimony by the Defendant was not especially credible. In accordance with that which has been set forth above, according to the testimony by the Defendant himself, his "humiliation" and his "medical condition" did not in any way detract from his ability to say the things he wished to say, [and did not] cause him to say things which he did not want to say. There was no stage in which the pressure of the interrogation led him to confess anything against his will, and there was no stage at which he "broke".

On the basis of all of the evidence in the preliminary trial, we are convinced that his statements to the police interrogators were taken in a relaxed way and with no improper pressure. In contrast with the arguments raised in the preliminary argumentation, he did not attempt to make the police interrogators aware of errors which appeared in the transcripts, and none of them told him that "chaos" would break out if he did not confess. We are convinced that his interrogators made him no promises that, if he confessed, he would be released; they told him nothing about the destruction of his house (a fact which some of the interrogators had not even known until the date of the hearing before us); and accordingly, we have no choice but to reject his arguments concerning any "humiliation" or enticement and promises which caused him to say things other than of his own free will. The Defendant received full medical treatment as required, and his medical state did not change his ability to say what he had to say, of his own free will.

### Preliminary trial – The ruling

In light of our factual conclusions with regard to the credibility of the witnesses for the prosecution, on one hand, and the lack of credibility of the witnesses for the defense, on the other, we hereby rule that the statements by the Defendant were taken of his own free will and are admissible in this trial.

27

Date: July 29, 2009                                                                 File No.: 3052/06

## The principal trial

### The testimony by Mahmoud Abiyat

This witness stated that he was a member of a military squad which was led by Ataf Abiyat and was tried for offenses of murder which he committed. The witness stated that he and his fellow squad members were soldiers and they received a monthly salary at the end of each month. The witness claimed that he did not know who transferred the salary to them. The witness was confronted with a memorandum from his interrogation by the Israel Security Agency, which stated that the salaries were transferred by Fuad Shubaki. The witness claimed that he did not know Fuad Shubaki and that he had never heard that name. The witness claimed that the person who transferred the salaries to them was named Fuad Shumali, who was a clerk in the Finance Office. In his cross-examination, he stated that he had never seen the Defendant and had not received money from him, and that he did not even know who was responsible for finances in the Palestinian Authority.

### The statements by the Defendant to the police

The Defendant made eight statements to the police, aside from the many memoranda which were taken from him by the Israel Security Agency. We shall now provide a chronological survey of the statements which were taken from him and the things which he said in them – things which, as a general rule, are in line with the statements which he made in his interrogation by the Israel Security Agency.

Prosecution Exhibit No. 5 – statement by the Defendant dated March 19, 2009: In the statement in question, the Defendant spoke of his activity within the framework of the Palestine Liberation Organization (PLO) prior to the year 2000. He subsequently stated that, in 2000, there was a meeting in Yasser Arafat's office, in the presence of Abdel Razeq Majaida, Hajj Ismail Jaber, Ghazi Jibali, Salim Burdani, Mohamed Dahlan, Rashid Abu Shabak, Amin al-Hindi, Musa Arafat and Mahmoud Abu Marzuk. Yasser Arafat told them to buy any weapons which came into Gaza or the West Bank, and any of those senior officials who received an offer (to purchase weapons – Z.L.) would come to the Defendant with paperwork; the Defendant would transfer it to Yasser Arafat, and after Arafat signed, the Defendant would instruct his staff to transfer money to the senior official in question. The Defendant gave detailed examples as to the quantities and types of weapons which were purchased and the amounts of money which were paid for them.

The Defendant added that in July 2001, Fathi Ghazem and Adel Mughrabi smuggled a container from Lebanon with RPG bombs and launchers which came from Hezbollah, with the approval of Yasser Arafat, and the naval forces took them. He paid $50,000 with Arafat's approval.

Date: July 29, 2009                                                                                          File No.: 3052/06

The Defendant added that he had met with Fathi Ghazem in Jordan, and that Ghazem had told him that he had met with Hezbollah operatives and with an Iranian, and had agreed with them that they would transfer three containers of weapons, loaded on a ship. He asked the Defendant to speak with Yasser Arafat about it, so that Arafat would give money. The Defendant spoke with Arafat about it, and Arafat instructed Harbi Sarsur to give money for that purpose. The Defendant also stated that he had gone to Yemen and met Taysir Ajina, who had told him that Adel Mughrabi wanted passports to be prepared for him and for Omar Akawi, and that he (Adel) had come to see the ship *Karine A*, which had arrived in Yemen with the arms.

Prosecution Exhibit No. 1 – statement by the Defendant dated March 20, 2006: In this statement, the Defendant stated that he had met with Fathi Ghazem in Jordan in 2001, and that Ghazem had told him about the contacts with the Iranians, according to which the latter were willing to pay for an arms ship. Fathi told the Defendant that he (the Defendant) would be meeting the Iranian representative in Dubai. The Defendant stated that he came to Dubai and there, together with Adel Mughrabi, he met two Iranian representatives – Abu Mohamed and Ahmed Salem. The Iranians told the Defendant and Adel that they were willing to finance the training of Palestinians in Lebanon and Iran, and that they were willing to help with money and armaments. The Defendant added that Adel wrote up a report for Arafat, and that they told the Iranians that, once they had a reply from Arafat, they would let the Iranians know. According to his argument, when Arafat saw the report, he responded angrily and said that the Iranians were liars. The Defendant, in that statement, provided further details of his contacts with the Iraqis and their consent to donate two million barrels of oil to the Palestinians as a gift.

Prosecution Exhibit No. 6 – statement by the Defendant dated March 22, 2006: In the statement in question, the Defendant provided additional details about the meeting with the Iranians. He stated that the one who made the initial contact with them was Abu Hassan al-Zeinab. The Defendant set up a meeting between him and Fathi Ghazem, and the two of them went to meet the Iranians in Dubai. Following that meeting, Fathi Ghazem told the Defendant that the Iranians wanted to meet him. The Defendant went to Dubai to buy cars and told Fathi that he would meet the Iranians afterward. The Defendant was asked why he had not told Yasser Arafat that he went to meet the Iranians, and answered: "Because Arafat liked me to bring him results, and not just chatter." The Defendant went to Dubai, and after his meeting about the cars, he went to meet the Iranians with Adel Mughrabi. Because he was tired, it was agreed that they would meet again that evening. The Defendant did meet the Iranians again that evening and asked them if they wanted to work with him and cooperate with him, and the Iranians said that they did. Adel spoke with them about military subjects, such as the need for advanced training in the manufacture of hand grenades and grenade launchers, and that they also wanted ammunition and weapons. After that, they (including the Defendant) talked about how to set up an ammunition factory within the Palestinian Authority, and the Defendant even told them that they would need money, and they