Date: July 29, 2009                                                                      File No.: 3052/06

agreed to that as well. The Iranians even stated that they would transfer weapons and ammunition from materiel storehouses which they maintained in Lebanon. One of the Iranians asked to be sent a daily summary of the Israeli media. They agreed to continue meeting, and the Defendant stated that he would ask permission from Yasser Arafat to come to the meetings. Adel wrote up the contents of the meeting and he and the Defendant signed it. When he returned to the Area, the Defendant gave the document to Yasser Arafat, who said the people in question were swindlers who wanted to kill him.

The Defendant stated that, in 2002, he heard that the *Karine A* had been seized. He understood that Yasser Arafat wanted him to "take the matter upon himself", and accordingly, he told the Board of Inquiry that Yasser Arafat had given the instructions and that he had been the contact person between Fathi Ghazem and Adel Mughrabi and Arafat. The Defendant added that he had heard from Fathi about the plan to bring in the ship as early as August 2001, two months before the meeting with the Iranians, and that the meeting with Arafat, at which they agreed on the transfer of $125,000 to Fathi for the ship project, took place after Fathi had been in Syria and Lebanon. The meeting with the Iranians in Dubai was intended to set up Palestinian-Iranian contacts and to put Fathi and Adel in contact with the [Iranian] Revolutionary Guards in Lebanon, and he and Adel had not talked about the ship with the Iranians.

Prosecutor's Exhibit No. 11 – statement by the Defendant dated March 26, 2006: In this statement, the Defendant provided details about various arms deals in which he was involved. He initially stated that a person had come to him and told him that they had found barrels with RPG rockets in the sea and that he wanted $7,000 for them. The Defendant gave an order to pay the price. The Defendant stated that he had received an offer to purchase 10 RPG rockets for $45,000, and that he had transferred the money to the party making the offer. The Defendant went on to state that this was better than having the weapons fall into the hands of Hamas or other organizations. The Defendant stated that, in 2002, Rashid Abu Shabak stole all of the arms which he had purchased, and which were in their storerooms. The Defendant went on to state that Mahmoud Abu Marzuk had contacted him in 2001 and asked for $20,000 to set up a factory for the manufacture of materiel and hand grenades, and that Arafat had instructed the Defendant to give him the money. The Defendant transferred the money and later heard that there had been an explosion in an apartment which was rented by Mahmoud Abu Marzuk.

The Defendant was asked about the purchase of boats for Fathi Ghazem and stated that Arafat had instructed him, in 2000, to transfer $150,000 for the purchase of two fishing boats. The Defendant noted that the money in question was transferred even before he transferred $125,000 to Fathi for the *Karine A*.

Date: July 29, 2009                                                                                   File No.: 3052/06

The Defendant talked about money which he transferred for the purpose of purchasing ammunition in Bethlehem, and that he had financed the salaries of Mahmoud Abiyat's men. According to his argument, some of the money which he transferred was used for salaries (NIS 500 per person) and some was used to purchase ammunition.

Prosecution Exhibit No. 7 – statement by the Defendant dated March 30, 2006: The Defendant was asked about his acquaintance with Mahmoud Zuheiri and stated that the latter was in charge of purchasing materiel in the West Bank, and that he had purchased 1000 Kalashnikov rifles. The Defendant noted that he had transferred the money for the purchase to Mahmoud Zuheiri, in the amount of approximately $2 million.

The Defendant stated that he had paid Jumaa Abu Shukri $570,000 for seven Sagger missiles and 18 rifles; the rifles were defective and they returned them. According to his statement, the missiles were kept in the *diwan* near his home in Gaza, and he later transferred them to Abdel Razeq Majaida. The Defendant went on to provide details about various people who had brought materiel and stated that he used to transfer the money, and that they used to keep the arms in a storeroom within his office. According to his argument, Yasser Arafat would tell him to whom he should transfer the materiel, and he would instruct his deputy to issue arms according to Arafat's instructions.

The Defendant stated that Mahmoud Abu Marzuk manufactured explosive charges for Abdel Razeq Majaida, and that he had transferred the money to Majaida so that it would be transferred to Mahmoud Abu Marzuk. The Defendant also gave information concerning additional arms deals.

The Defendant, in the course of the examination, was shown a document (Prosecution Exhibit No. 8) and stated that it was a paper written by Mahmoud Abu Marzuk, which contained price quotations for arms, and that he had settled accounts with him according to the prices listed.

Prosecution Exhibit No. 9 – statement by the Defendant dated April 2, 2006, 9:50 a.m.: At the beginning of his interrogation, the Defendant was referred to his statement of March 19, 2006, in which he had stated that he smuggled arms in the ship, and he confirmed that he had said that. The Defendant was asked about the involvement of others in smuggling the arms and spoke about it. Among other things, the Defendant stated that, in July 2001, he had given Fathi Ghazem $50,000, on Arafat's instructions, to smuggle bombs and RPG launchers. The Defendant stated that he paid the money for the smuggling and not for the weapons, because the weapons had been given to them free of charge by Hezbollah.

The Defendant was asked to tell about the *Karine A* again, and stated that he had met with Fathi Ghazem in Jordan, and that Ghazem told him that he had met in Lebanon with representatives of

Date: July 29, 2009                                                                 File No.: 3052/06

Hezbollah and of Iran. The latter had agreed to transfer three containers full of materiel to them, financed by the Iranians, and they (the Palestinians – Z.L.) would only have to pay the expenses for the ship. The Defendant stated that they were offered the opportunity to take weapons from Ahmed Jibril, but that they did not do this. When he was asked why, he said: "Because we have arms free of charge from Hezbollah and from the Iranians, so why should we take from him?" He stated that the plan was to bring ships with arms to the Ali Port, and that he and Fathi had spoken with Arafat and told him that $125,000 was needed. Yasser Arafat told the Defendant to give the money, and the Defendant said that he did not have it. Yasser Arafat told Fathi to write a requisition asking for the money, and after Fathi did so, the Defendant took the requisition to Ramallah and transferred it to Arafat, who wrote to Harbi Sarsur and told him to pay the money. Harbi transferred the money to Fathi.

The Defendant was asked to tell about the meeting with the Iranians again. According to his statement, he met with two representatives; he believed the senior representative was a man named Ahmed Salem.

Prosecution Exhibit No. 10 – statement by the Defendant dated April 2, 2006, 2:01 p.m.: (As a parenthetical note, I shall state that the date on this statement was February 4, 2006. This is an error which is clarified in Prosecution Exhibit No. 13, and the correct date is April 2, 2006. Let us not forget that the Defendant could not have been interrogated on February 4, 2006, because he was arrested only a month and a half later.)

The Defendant stated that he had set up a Procurement Committee, which had set up an armaments storeroom, in which everything the Committee purchased was stored. The Defendant was asked about the Scientific Committee and stated that the activity of that committee consisted of teaching courses in the manufacture of materiel. The role of the Committee in the West Bank was to check that the arms purchased were serviceable. The Defendant was shown a document and he stated that this was a document by the Scientific Committee, in which they asked for soldering machines and lathes. The Defendant forwarded the requisition to Arafat, and he did not know what happened to it. The Defendant stated that the Scientific Committee belonged to the Fatah, the al-Aqsa Martyrs Brigades were Fatah operatives, and Yasser Arafat used to give the al-Aqsa Martyrs Brigades money for activities "under the table".

The Defendant stated that people from his office transferred $150,000 to Fathi Ghazem in order for him to purchase two fishing boats. Even before that, the Defendant had transferred $50,000, so that [Ghazem] would give them to the Lebanese to cover the expenses of smuggling barrels of weapons, about which he had spoken previously (in the previous statement).

32

Date: July 29, 2009                                                                                                 File No.: 3052/06

The Defendant stated that Fathi Ghazem met in Lebanon with Adel Mughrabi, Hezbollah and the Revolutionary Guards of the Iranians. The Defendant asked him if he had told Arafat about it, and Fathi said that he had told him about the plan to smuggle the ship and about his meetings in that context. Fathi told the Defendant that he wanted him to talk to Arafat, because Fathi needed $125,000 for the expenses of the ship. The Defendant talked about it with Yasser Arafat, at the airport in Jordan. Yasser Arafat told the Defendant that Fathi should prepare a requisition to receive the funds. Fathi did so and, three days later, the Defendant gave Arafat the document. Arafat gave the Defendant written instructions to transfer the money to Fathi via Harbi Sarsur, and the Defendant forwarded the requisition to Harbi Sarsur by messenger and told Fathi about it.

The Defendant stated that he had transferred money to Mahmoud Zuheiri for him to buy arms "from outside" (that is, from outside the Palestinian Authority). The Defendant stated that he had a storeroom in Ramallah, in which they put all of the arms which they purchased from Mahmoud Zuheiri, and they would distribute the arms on the instructions of Yasser Arafat.

The Defendant stated that in August 2001, he purchased seven missiles from Jumaa Abu Shukri, for which he paid $75,000, and which he transferred to Abdel Razeq Majaida.

The Defendant stated that, in 2001, he was approached by an emissary from Marwan Barghouti with two papers. One of them was a requisition for the purchase of ammunition for the al-Aqsa Martyrs Brigades, in the amount of 25,000 dinars, and the second set forth the names of the fighters in each area, in order for them to be paid their monthly salary. The Defendant forwarded the papers to Yasser Arafat, for him to decide in the matter, and Yasser Arafat gave him an instruction to give Marwan Barghouti the money which he asked for. The Defendant said that he had no money, and then Arafat instructed the Ministry of Finance to transfer the money.

The Defendant stated that, when he came to Yemen, he was greeted by Taysir Ajina, who told him that Adel's and Fathi's ship had arrived. Taysir told the Defendant that they had prepared a passport for Adel Mughrabi and they also wanted to prepare a passport for Omar Akawi, the captain of the ship.

The Defendant went on to state that he transferred money to Ali Mahsin, a senior official in the Yemenite Army, as part of a partnership which was intended for the sale of tracer bullets for a profit. In the end, however, the transaction was not carried out and he got the money back.

<u>Prosecution Exhibit No. 12 – statement by the Defendant dated May 14, 2006</u>: At the outset of the interrogation, the Defendant was shown a document, and the Defendant stated that the document had to do with a requisition which he had received for the purchase of a lathe and cutting blades. The document had been transferred to him by Marwan Barghouti, and the

33

Date: July 29, 2009                                                                                           File No.: 3052/06

Defendant had forwarded the document to Arafat. The document did not come back to him with a payment order. The Defendant remembered that the document had been accompanied by two additional papers. One of them was a requisition for the purchase of arms, and the other was a requisition for the payment of salaries to members of the al-Aqsa Martyrs Brigades, but their names did not appear on his list and so he could not pay them.

The Defendant was asked what he had to add with regard to the Sagger missiles which they purchased, and he said that an instruction had come from Arafat to pay for the missiles, because he was afraid that [other] people would buy them and use them.

**The testimony by the Defendant at the principal trial – direct examination**

The Defendant began his testimony by stating that he was the head of the Finance Department in the Palestinian Authority, and that his powers were those of a clerk who received his instructions from the *Ra'is* ["Boss"], Yasser Arafat, and the deputy *Ra'is*, Abdel Razeq Majaida. According to his statement, he had no authority to make decisions on his own; rather, he only acted according to written instructions.

The Defendant confirmed that, in fact, a meeting of all those in charge of the security organizations had taken place in Yasser Arafat's office in Gaza in 2000. He stated that all of those present at the meeting, except for him, customarily met with Israeli commanders. He claimed that what was said at that meeting was that it would be necessary to collect the weapons which were held by the public and by civilians and, if necessary, they should pay for them. According to his argument, his role was to ascertain who the owners of the weapons were and what the price was and to obtain approval from the *Ra'is*, who would sign the payment order. Only after receipt of an instruction would he release the money for payment.

According to the Defendant, the weapons were taken so that they would not be used by entities such as Hamas and the Islamic Jihad, which did not recognize the Oslo agreements. The Defendant claimed that no weapons were purchased outside the confines of the Authority. The Defendant also claimed that the weapons reached a storeroom in the National Security building, where his offices were also located, but that he was not in charge of the storeroom. To the best of his knowledge, the campaign to collect weapons was known to the public. The Defendant further stated that he did not know how many weapons were purchased or how much money was paid for them. He repeated that every expenditure was approved by Yasser Arafat. The Defendant stated that he was not the one who transferred the weapons and he did not know whether they were transferred to the Tanzim.

The Defendant confirmed that he knew the people whose names appear in the first count of the indictment, including Mahmoud Zuheiri. According to his statement, the latter was

34

Date: July 29, 2009                                            File No.: 3052/06

seconded to his office from Ghazi Jibali, and his job was to bring the signed documents from Yasser Arafat. The Defendant claimed that he did not know whether Zuheiri's position included the purchase of the arms, and, in any event, the Defendant did not have a storeroom under his responsibility. According to his statement, the payments were made by check or in cash, and each amount was written down. The Defendant claimed that he did not see, did not buy and did not issue weapons. He only worked with the documents, and he himself was afraid of weapons. The Defendant again emphasized that he did not know how much money was paid or which weapons were purchased. The only thing he did was receive documents from the various security entities and give payment orders to people. The Defendant denied that he had purchased and distributed pistols or that he knew anything about it.

The Defendant denied having made payment to members of Fatah and denied that he had paid people in the Bethlehem area. According to his argument, there was an instruction from Yasser Arafat to pay NIS 500, but he did not know what they were being paid for. No one told him that those people belonged to the al-Aqsa Martyrs Brigades. The Defendant denied that an emissary had come to him from Marwan Barghouti or that he had seen a financial report which included expenses for the purchase of chemical materials for the production of explosives. He also denied that he had paid other financial expenses of the al-Aqsa Martyrs Brigades, or that he had received an instruction from Yasser Arafat to pay Marwan Barghouti 25,000 dinars, and in any event, he did not have such an amount to transfer.

The Defendant denied any relationship to the arms ship *Karine A*. According to his argument, he only heard about it after he was arrested in Jericho. The Defendant confirmed that he knows Fathi Ghazem, the Deputy Commander of the Palestinian Navy, and confirmed that Fathi Ghazem had given him a document from Yasser Arafat, according to which the Defendant was supposed to pay Fathi $125,000. According to the Defendant, he did not know what the payment was for and he refused to pay, because he did not have such an amount in the budget.

The Defendant confirmed that, when he was in Dubai for the purpose of purchasing vehicles, he was approached by Adel Mughrabi, who asked him to transfer a letter to Yasser Arafat. He met Adel Mughrabi together with other people and received a letter from them. He transferred it to Yasser Arafat and later found out that the content of the letter had to do with the Iranian proposal to help the Palestinian Authority, but he did not know and did not say anything about an arms ship.

The Defendant confirmed that, while he was in Yemen, he met Taysir Ajina at the Palestinian Embassy there, but he was not aware of the fact that, at that time, an arms ship had come into Hudeida Port in Yemen. He confirmed that Taysir told him that they were preparing a Yemenite passport for Adel Mughrabi, but he did not know why.

35

Date: July 29, 2009                                                                File No.: 3052/06

The Defendant stated that the Palestinian Authority had received a gift of two million barrels of crude oil from Iraq, and that he had been given a proposal to make contact with the Iranians, so that they could sell the barrels for the Palestinians and divide the consideration. For this purpose, he met with the Iranian Commercial-Economic Attaché. The Defendant denied any relationship or any knowledge, on his part, with regard to any offer on behalf of the Iranians to help the Palestinians by providing training and weapons, and denied having been present at a meeting at which such a proposal was raised. The Defendant denied that he had signed the minutes of such a meeting. According to his argument, he had only transferred a letter from Adel Mughrabi to Yasser Arafat, and the latter had refused any contact with the Iranians.

**The testimony by the Defendant at the principal trial – cross-examination**

In his cross-examination, the Defendant was asked if he was familiar with the al-Aqsa Martyrs Brigades organization. He answered in the negative and said that he had only heard about them in the media. He claimed that he had also stated in his interrogation that there was no such thing as the al-Aqsa Martyrs Brigades. The Defendant was confronted with two documents which had been presented to him at his interrogation of May 14, 2006, when he had stated that he knew nothing about those documents. When he was told that he had said to the police that one of the documents was a requisition to set up a lathe shop and the second was a requisition for salaries for the al-Aqsa Martyrs Brigades, he claimed that he did not know and had not said those things.

He claimed that he was at a meeting with Yasser Arafat, at which it was decided to purchase armaments. [He attended the meeting] by virtue of his position as a finance person, and the objective was to collect weapons from civilians. According to his statement, the only thing he did was to follow the instructions issued by Yasser Arafat, who approved the purchase of each armament individually.

The Defendant was asked about RPG bombs which arrived on a ship in June 2001, and stated that he had been given an instruction to pay the fishermen who found the bombs, as a monetary reward. The Defendant stated that he did not know where the ship with the bombs had come from, and when he was told that he had said to the police that it had come from Tripoli, he claimed that he had not said that. The same thing happened when he was confronted with the claim that he had told the police and the Israel Security Agency that arms had been purchased from Lebanon and Egypt. According to his statement, the arms which were purchased by him were only purchased from civilians, so that they would not fall into the hands of Hamas, and he did not know what was written in his statements.

Date: July 29, 2009                                             File No.: 3052/06

The Defendant confirmed that he had transferred $20,000 to Mahmoud Abu Marzuk, on the instructions of Yasser Arafat. He claims that he did not know what the reason was for this. When he was told that he had said to the police that it was intended for setting up a factory for the manufacture of materiel and hand grenades, he claimed that Mahmoud Abu Marzuk's house had exploded, and that he had learned afterwards that it had been used for manufacturing explosive charges.

The Defendant claimed that he did not know who Mahmoud Abiyat or Ataf Abiyat were. The Defendant was confronted with his statement to the police, according to which he transferred money to them so that they would not go to Hamas, and he claimed that he said that he had received an instruction from Yasser Arafat to transfer NIS 500 to Ataf Abiyat (the reference is to a monthly salary – Z.L.), whom he does not know personally, but whose name he knows, in contrast to his earlier statement.

The Defendant was confronted with an additional document, which had been presented to him in his interrogation, and which he claimed that he did not recognize. When he was told that, in his interrogation, he had stated that this was a document written by Mahmoud Zuheiri containing quotations for armaments, he said that he had not said that.

The Defendant stated that he was responsible for monies of the Palestinian security organizations, and that he was responsible for paying in accordance with written instructions which were given by Yasser Arafat.

The Defendant was asked by us whether he was familiar with the budget and its items, and confirmed that he was familiar with it, and that a payment order had to match an item which appeared in the budget. Accordingly, they would ask the recipients of the payments to state the purpose for which the requested money was required. If the payment order did not have an appropriate budget item, or if they refused to state the objective of the payment – the Defendant would refuse to pay, or would pass the requisition on to Yasser Arafat. He claimed that the budget item for the purchase of the arms was called "Payment for arms taken from civilians from within the State". The Defendant stated that, if he had received an exceptional instruction – for example, to pay money to a Hamas operative or to purchase textbooks for a school – he would not have performed the operation. In addition, the Defendant stated that he had a good relationship with Arafat and that there had been cases in which he had argued with Yasser Arafat about certain expenses and, in the end, Arafat had told him that he was right. He further stated that he had been praised for his methods of financial management. Only afterwards did he state that, if he had not implemented a payment order, he would have been put on trial. In a redirect examination by the defense attorney, the Defendant stated that any amount which had

Date: July 29, 2009                                            File No.: 3052/06

to be withdrawn from the account of the Palestinian authority required the signature of the three signatories for the account, and he alone could not withdraw "even a penny".

### Evaluation of the testimony – credibility and weight

**The testimony by the Defendant – credibility and weight**

The Defendant's testimony did not make a credible impression on us. He was obviously sticking to a story, according to which he had nothing to do with the arms ship *Karine A*, he had nothing to do with the contacts with the Iranians which concerned the coordination of training and the purchase of arms by the Palestinian Authority, and with regard to the purchase of arms, he was present at a meeting, the objective of which was to purchase arms from civilians so that they would not be used by organizations such as Hamas.

When the Defendant was confronted with things which had been recorded or presented to him in his interrogation, including documents which indicated that he recognized and knew why a certain payment was made, in a way which could not be reconciled with his version in Court, he stated that he had not said what was attributed to him in the interrogation. We cannot accept this. It is puzzling that things which are recorded in his statements, and which are in line with his version in Court, were in fact said by him to the police and were written down, whereas things which are not in line with his version in Court were not said by him, but were written down by the interrogators without his knowledge. This simplistic explanation with regard to the records kept by the interrogators does not sound in any way credible.

Furthermore: some of his arguments are *prima facie* not credible – for example, his statement that he was not familiar with the al-Aqsa Martyrs Brigades and that he did not know what they were, or his argument that he did not know who Ataf Abiyat was, especially when, immediately thereafter, he stated that money had been paid to the person in question by the office in Bethlehem. When he recognized his mistake, he claimed that he did not know Ataf Abiyat personally.

As we have already pointed out with regard to the preliminary trial, we are convinced that the things which are recorded in the Defendant's statements to the police were based on his own words and reflect things which he himself said. Accordingly, we must rule that his argument to the effect that those things were not said by him is mendacious.

Furthermore, the Defendant's arguments to the effect that he was only following orders, and that he did not know why some of the money was being transferred, are not in line with what he stated at the end of his interrogation – that he always ascertained that the payment matched a budget item, which means that he knew what the payment was intended for. His version to the

Date: July 29, 2009                                                                                     File No.: 3052/06

effect that he was only following orders is not reconcilable with his statement that, if he had received an exceptional or strange payment order, he would have refused to carry it out, or with his statement in his interrogation, to the effect that he took action (with regard to the meeting with the Iranians) even before Yasser Arafat told him anything about the matter, because Arafat "wants to see results".

**The testimony by Mahmoud Abiyat – credibility and weight**

The testimony given by Mahmoud Abiyat in Court, as we see it, was devoid of any credibility whatsoever, and accordingly is devoid of any weight. His argument to the effect that he had spoken, in his interrogation, of a person named Shumali and not Shubaki is an argument which was clearly intended to divert the guilt from the Defendant. We are not convinced that there is even a grain of truth in that argument. It should be stated that the Defendant said in his interrogation that he transferred money to Mahmoud Abiyat, and this is in line with Mahmoud's statement to the police. Accordingly, we prefer to accept Mahmoud Abiyat's statements to the police, rather than his testimony in Court.

**The factual infrastructure – summary**

We have seen fit to prefer the content of the Defendant's statements to the police, rather than his testimony before us. Wherever there is a contradiction between the two versions, we have believed that the content of the statements to the police is preferable. The same applies to Mahmoud Abiyat's statements to the police. In light of this factual infrastructure, we must now examine the sections of the indictment which were attributed to the Defendant and to see whether his guilt arises from the evidentiary material before us.

Even before we perform an individual examination of each of the sections of the indictment, in view of the fact that the majority of the indictment is based on the Defendant's own statements, we must determine whether there is any evidentiary supplement, in the nature of an "additional item", to those statements.

In the case that is before us, we did not believe that there would be any real difficulty in this regard. An evidentiary supplement to the Defendant's statements can be found in the statement made by Mahmoud Abiyat, who confirmed the transfer of the salaries to him and to his men in Bethlehem, as the Defendant had stated. In addition, we have before us Prosecution Exhibit No. 8, which is a document which sets forth requisitions for the purchase of weapons and their price, as the Defendant stated.

39

Date: July 29, 2009 File No.: 3052/06

In Leave for Criminal Appeal 4142/04, **Millstein v. Chief Military Prosecutor**, Supreme Court Compendium 2006 (4), 4022, the Honorable Justice Levi considered the nature of the evidentiary supplement of the "additional item" type and ruled as follows (in paragraph 20 of his judgment):

> *"The requirement for the 'additional item' is flexible and open in structure. The type of matters that are likely to satisfy that requirement varies from case to case, and also depends upon the credibility of the confession itself. The greater the weight which is ascribed to the confession in question – the smaller the weight of the 'item' which is required in order to verify the confession; on the other hand, the smaller the weight which is ascribed to the confession – the greater the weight of the 'item'. Accordingly, it has also been ruled that cases are likely to arise in which it is possible to accept an 'item' with a weight which is 'as light as a feather'."*

And as the Honorable Justice Arbel stated in the same ruling (in paragraph 20 of her judgment):

> *"The requirement for an 'additional item' – similar to the 'item of reinforcement' and in contrast to 'corroboration'– is a requirement for an evidentiary supplement 'for verification'. Accordingly, and in contrast to 'corroboration', the 'additional item' does not have to point to the guilt of the Defendant; rather, it is enough to have an item of direct or circumstantial evidence, which is external to the Defendant's confession, which is capable of confirming, to a certain degree, the content of the confession and to indicate the veracity thereof... The requirement for an 'additional item' is intended to remove any suspicion that the Defendant is taking upon himself the responsibility for an action which was committed by another person or which was not committed at all, and therefore, in principle, a very small item of evidence is sufficient to comply with that requirement... Accordingly, case law has stated on more than one occasion that the weight of this item of evidence 'can be extremely light' and can even be 'as light as a feather'. This is enough for the Court to be satisfied that the confession is not 'a mere fiction' and will convince the Court that the story which the Defendant told in his confession is indeed a possible story."*

In the case that is before us, we have a confession by the Defendant, which extends over a large number of statements, both to the police and to the Israel Security Agency. His confession includes great detail with regard to various arms deals, including names, weapons and their prices, and detailed comments on his negotiations with various entities in the Palestinian Authority and with entities outside it (such as the Iranians). The inherent weight of these statements is very high. Both the content thereof and the way in which the statements were made indicate a high degree of credibility which should be given to them (cf. Criminal Appeal 6613/99, **Smirek v. State of Israel**, PD 56 (3) 529, in paragraph 12 of the judgment handed down by the Honorable Justice (as her title was then) Beinisch).

40