

PLAINTIFF'S EXHIBIT 889

Date: July 29, 2009                                                                 File No.: 3052/06

## Military Court of Judea

**Before the Honorable President of the Court: Lieutenant Colonel Zvi Lekach**
    **Judge: Lieutenant Colonel Ronen Atzmon**
    **Judge: Lieutenant Colonel Tal Band**

**The Military Prosecution**
(represented by First Lieutenant Andrei Varshchegin)

– v. –

**The Defendant: Fuad Hejazi Shubaki, Identity No. 410026173 / Prison Service**
(represented by Counsel, Adv. Avigdor Feldman)

---

### Verdict

**The Honorable President of the Court: Lieutenant Colonel Zvi Lekach:**

The Defendant before us is charged with four [indictment] counts which concern the transfer of monies for the purpose of the purchase of materiel, in accordance with that which shall be set forth below.

**First count – Trading in war materiel**: The Defendant is accused of having traded in war materiel, starting in the year 2000 and up to the end of January 2002. It is argued that the Defendant took part in a meeting, at which Yasser Arafat instructed him and the heads of the security organizations to purchase any amount of weapons from any possible place. The Defendant, starting on the date of that meeting, acted together with others toward the purchase of large quantities of materiel. The Defendant, who headed the Palestinian Finance Office, coordinated the requisitions of members of the various organizations, which were transferred to him in the form of paperwork. In order to ascertain that the materiel for which he was paying actually existed, the Defendant required the people who applied to him to bring the weapons to his office, and for that purpose, he maintained a storeroom of materiel in Ramallah and an additional storeroom in the Gaza Strip. After the materiel was transferred to his possession, the Defendant would submit the paperwork to Yasser Arafat for approval, and after he approved it, the Defendant would also sign the requisition and would instruct his staff to transfer the money to the applicant by means of a bank transfer. During the period in question, approximately 1,000 tons of materiel were purchased for $7-10 million. The Defendant arranged for

Date: July 29, 2009                                                                                         File No.: 3052/06

the transfer of the materiel to the Palestinian security organizations, knowing that a considerable part of the staff of those organizations consisted of members of the military arm of the Fatah organization, which was conducting many terrorist attacks at the time.

**Second count – Performance of a service for a prohibited organization**: It is argued that during the period set forth in the first charge of the indictment, the Defendant transferred a monthly salary in the amount of NIS 500 to members of the military squads of the al-Aqsa Martyrs Brigades in the Bethlehem area. At that time, members of the squads in question were conducting many terrorist attacks. In the month of October 2001, the Defendant received a request for the payment of 25,000 dinars from ▮▮▮▮▮▮▮▮▮▮ for the purpose of purchasing materiel and materials for the production of explosive charges, and for the purpose of paying salaries to 268 members of the al-Aqsa Martyrs Brigades. The Defendant forwarded this request to Yasser Arafat, who instructed him to pay the money through the Ministry of Finance.

**Third count – Trading in war materiel**: This count sets forth the Defendant's ostensible role in the funding and organization of the arms ship *Karine A*, which was seized on January 3, 2002, carrying large quantities of materiel of various types, including rockets, mortars and machine guns. It is argued that in September 2001 the Defendant met with ▮▮▮▮▮▮▮▮, who updated him with regard to his contacts with the Iranians, with regard to the financing of the arms ship. ▮▮▮▮▮▮▮▮ informed the Defendant that the Palestinian Authority would have to bear expenses in the amount of $125,000. The Defendant agreed to this, and even agreed to approach Yasser Arafat in order to obtain the financing required. At a later stage, the Defendant forwarded the demand for payment to Yasser Arafat, who signed it. The Defendant transferred Yasser Arafat's instructions by messenger to the office of ▮▮▮▮▮▮▮▮ who was in charge of fuel for the Palestinian Authority. The ship, carrying the war materiel, anchored in Yemen. The Defendant, who was in Yemen at the time, was informed of the arrival of the ship and received a report on the intention to prepare passports for two of the ship's crew. After the ship had sailed from Yemen to the Suez Canal, it was seized by Israel Defense Forces troops on January 3, 2002, in accordance with that which has been set forth above.

**Fourth count – Contact with a hostile organization outside the Area**: This Count concerns contacts which the Defendant maintained with Iranian entities, with a view to coordinating the military cooperation between Iran and the Palestinian Authority. Among other things, possibilities were discussed for setting up ammunition factories within the borders of the Palestinian Authority, transferring materiel from Lebanon via Hezbollah, and military training for members of the Palestinian Authority in Lebanon and in Iran. In addition, a document summarizing the meeting was drawn up, and was later presented by the Defendant to Yasser Arafat.

Date: July 29, 2009                                                                                                File No.: 3052/06

**The scope of the "Not guilty" plea**

It has not been denied that the Defendant was in charge of the financial affairs of the security organizations in the Palestinian Authority, during the period of time relevant to the indictment. However, it has been claimed that he acted with permission and with authority. It has further been claimed that some of the facts that have been set forth in the indictment are not accurate. In addition, it has been claimed that the Defendant's statements, which substantiate the overwhelming majority of the indictment, were taken from him unlawfully.

**Conducting the trial**

In the early stages of this case, preliminary arguments were made but were denied in a decision which was handed down on December 4, 2006. After that decision, and following the entry of a "not guilty" plea by the Defendant, the submission of evidence began. The majority of the evidentiary material was filed by consent; that consent, however, referred only to the evidentiary material which did not directly refer to the Defendant. Thus, for example, there was no dispute that the arms ship *Karine A* was seized.

In accordance with that which has been set forth above, the indictment is principally based on the statements of the Defendant. Because the admissibility of those statements was disputed, a preliminary trial was held. The parties agreed that the decision in the preliminary trial would be handed down within the framework of the verdict in the entire case. Within the principal case, we were required to hear only one witness on behalf of the prosecution, ▓▓▓▓▓▓; all of the rest of the evidentiary material, with the exception of the Defendant's statements, was filed by consent. The Defendant testified for the defense.

The prosecution filed its summation in writing, and the defense, at the end of the process, delivered its summation orally – and, moreover, after a considerable delay of four months.

**The preliminary trial**

**General**

In accordance with that which has been set forth above, in light of an argument that has been set forth by the defense, to the effect that the Defendant's statements were taken in a manner which was not of his own free will, a preliminary trial was held. In the preliminary trial, and in light of the preliminary arguments which were raised, the three police interrogators who had taken the Defendant's statements were heard, along with three interrogators from the Israel Security Agency who had conducted most of the Defendant's interrogation. Testifying for the defense in

Date: July 29, 2009                          File No.: 3052/06

the preliminary trial were the Defendant and Mr. ████████████ who was in the same cell with the Defendant during part of the period during which he was interrogated.

**The preliminary arguments**

a. It was argued that the Defendant had been interrogated throughout two months of protracted interrogations, during most of the hours of the day and night, and had been deprived of sleep.

b. It was argued that the Defendant is a sick man, who requires medication for chronic diseases, and that his medications were not given to him, nor was he provided with an adequate substitute.

c. It was argued that the Defendant was handcuffed and shackled throughout the interrogation, which caused him severe pain and a feeling of severe humiliation. It was further argued that, at times, his interrogators would leave him alone in a room, cuffed, for four to seven hours, which caused the Defendant to be in a state of profound pain, fear and anxiety.

d. During the time he spent under interrogation, IDF troops destroyed the Defendant's house, uprooted many citrus trees and olive trees in his fields and destroyed a ton and a half of honey. The knowledge of the destruction caused the Defendant to experience anxiety and fear for his family's fate. The interrogators exploited this and told the Defendant that if he confessed, he would be allowed to go free and to assist his family members.

e. It was argued that the Defendant had been told that, due to the fact that he was a sick old man and did not have many years to live, his interrogators did not wish to continue interrogating him and keeping him under detention for a long period of time. Accordingly, if he confessed, he would immediately go free. His confessions were issued subject to those promises and as a result of that act of enticement.

f. It was argued that the Defendant's interrogators made false accusations against him and repeatedly told him that he was lying to them. The interrogators adopted methods of physical and emotional exhaustion. The Defendant, who is an elderly man and well respected in his community, felt humiliated as a result of the young interrogators' behavior toward him, and, in light of his grave physical condition as well, he longed for his death and for the moment that the interrogations would be over.

g. It was argued that the Defendant signed his confessions in order to please his interrogators and without knowing what was written in the statements, which were taken down in the

4

Date: July 29, 2009                                                                 File No.: 3052/06

> Hebrew language, which he cannot read. The police interrogators relied on the transcripts that were recorded by the Israel Security Agency, and when he pointed out the inaccuracies and the errors in the transcripts, the police interrogators led him to understand that "chaos" would break out if he repudiated his confessions.

Let us first state that, in light of the testimony given at the preliminary trial by the Defendant himself, who did not bring up a considerable portion of the preliminary arguments, the defense, in its summation, reduced its arguments to the preliminary arguments which concerned the humiliation of the Defendant.

**The evidence at the preliminary trial**

**The testimony of policeman** ▮▮▮▮▮▮▮▮

This witness stated that he is a speaker of Arabic, which he learned at home, in his studies and at work. When he testified before us, he stated that he remembered the Defendant's facial features, but did not remember the details of the interrogation with total accuracy. The witness stated that he customarily first identifies the subject before him and afterwards identifies himself as a policeman. He reads the content of the warning out to him, and after the suspect understands the content thereof and signs it, the testimony is taken in the form of questions and answers. The testimony is taken in Arabic and is written down by him in Hebrew. At the end of each page, he reads it out to the suspect, who signs it. According to that which has been set forth in the statement, he gave the Defendant a cigarette and allowed him to smoke. The witness stated that he had gained the impression that the suspect's condition was "OK" and that he was capable of giving testimony; otherwise, he would have written a memorandum on the matter or would have noted it in the statement, and would have refrained from continuing to collect the testimony. The same applies to exceptional events in the course of the testimony. When he was asked to state examples of special events which he would have written down, had they occurred, he stated that some examples could be that the suspect complained of headaches, that he felt unwell, or that he was not capable of giving the testimony. He stated that, while taking down the statement, he notes events such as giving the suspect a drink, a cigarette and the like.

The witness stated that, in the course of the interrogation which he conducted, the atmosphere was relaxed, and the Defendant did not bring up any problem. When the Defendant asked to smoke, he was given the opportunity to do so, and nothing else exceptional happened. He further stated that, in the course of the interrogation, the Defendant sat opposite him with his legs shackled. The witness stated that he could not possibly have left the Defendant alone in a room for a long period of time, because the room in question is an interrogation room, in which there were other files, including his own personal file, and so he could not possibly have left the room.

Date: July 29, 2009                                                                                      File No.: 3052/06

The witness was asked about the argument to the effect that he had told the Defendant that his house had been destroyed, olive and citrus trees had been uprooted and a ton and a half of honey had been destroyed. He answered that, up to the date of his testimony in Court, he had not even known that the Defendant had citrus trees and honey, and that he (the interrogator), in any event, had said no such thing.

The witness argued that he had never told the Defendant that he had only a few years to live and that, if he confessed, he would immediately be released. He said that this was forbidden, and that he does not use such means.

The witness stated that he had read the transcripts of the Israel Security Agency before taking the testimony and that, on the basis of the transcripts, he had read out the suspicion against him to the Defendant, and that this also constituted a guideline for the testimony which was taken.

The witness denied the argument according to which he had told the Defendant that, if he repudiated his statements to the Israel Security Agency, "chaos" would break out.

The witness was asked whether the Israel Security Agency interrogation and the police interrogation were performed in the same place, and he stated that even though they were performed in the same facility, the testimony was taken in the police interrogators' room. He stated that he did not go into the Israel Security Agency interrogation rooms, and they (the Israel Security Agency) did not go into the police interrogation rooms. He also stated that the police interrogation room looks different from the Israel Security Agency interrogation rooms.

The witness stated that he does not know how to write in Arabic, and therefore, he wrote down the statement in Hebrew, while translating to the Defendant what he had written down; he further stated that he had cautioned the Defendant in Arabic. The witness noted that he did not know how many hours the Defendant had slept before the testimony was taken, nor did he know how many days he had previously been interrogated by the Israel Security Agency and the police. The witness stated that he had before him a memorandum of the things which had been said during the Israel Security Agency interrogation before the statement was taken, but not the chain of events of the entire interrogation or all of the events which preceded it. He stated that he generally had one memorandum before him, but that he did not remember with regard to this case.

**The testimony of policeman** ▮▮▮▮▮▮▮▮

This witness stated, in his testimony before us, that he remembered the interrogation in a general way, but not in detail. He stated that he taken the Defendant's confessions at the Ashkelon facility, after having warned him as required by law. The interrogation was conducted in Arabic

Date: July 29, 2009																	File No.: 3052/06

and the statements were written in Hebrew. Afterward, he read the confessions to the Defendant in Arabic, and [the Defendant] confirmed them with his signature.

The witness stated that he documents exceptional events which take place in the course of an interrogation, in the statements themselves or in a separate memorandum. In the case of the Defendant, he noted in the body of the statements the fact that he gave the Defendant food and drink. He stated that the atmosphere at the interrogation was relaxed. He remembered the Defendant as a handsome, smiling man who cooperated and answered the questions which he was asked.

He remembered that the Defendant needed medication due to the state of his health – and that the medicines were supplied to him by the prison infirmary. He remembered that, on one occasion, a medic entered the room and asked to give the Defendant his daily medication. He stated that after clarifying the matter, he allowed the Defendant to take his medicine, and he documented this in the body of the statement (Confession No. 7, dated April 2, 2006, page 3, line 62).

The witness stated that, to the best of his memory, the Defendant, when he sat opposite him at the interrogation, was not in cuffs. He denied that he had told the Defendant that his house had been destroyed or that trees had been uprooted and honey had been destroyed, and he further denied that he had told the Defendant that if he confessed, he would be released, due to the state of his health and his age, or that if he repudiated things which he had stated in the Israel Security Agency interrogation, "chaos" would break out.

The witness noted that the different fonts in the printed statements resulted from the fact that a structured form was used and denied that anything had been copied from another place. He stated that, in the opening passage of the statement dated March 19, 2006, he had asked the Defendant how he was, and the Defendant had answered, "Thank God, I am all right", and this was written down. He claimed that, because the Defendant is an elderly man, he asked in order to be certain of his condition, and he documented this in the body of the statement. He stated that generally speaking, he knew about the state of the Defendant's health, but he did not exactly remember when he had found out about it. The witness noted that he did not remember that he had read anything exceptional in the Israel Security Agency transcripts prior to the interrogation. The witness insisted that, in the interrogation which he conducted, the Defendant understood that he had the right to remain silent or to tell everything. He added that at the outset of the interrogation, he introduces himself and explains to the subject where he is, and that he reads the warning after that. He always does this, for every suspect, and accordingly he did not document it in the statement, except for his personal particulars, which were recorded. He claimed that he reads everything out to the suspect, including the suspect's personal particulars, in order to ascertain that those are his particulars, as well as the warning.

Date: July 29, 2009                                                                                          File No.: 3052/06

The witness confirmed that the interrogation took place in the police interrogation room, which is located within the Israel Security Agency interrogation facility in Ashkelon.

The witness noted that he does not remember any comment on the Defendant's medical condition in the Israel Security Agency transcripts which he read, and added that, had there been a medical problem, it would have come up. Because the statement was indeed taken, this means that the Defendant was fit to be interrogated. He did not remember an exceptional event with regard to the Defendant's medical condition, but remembered that he had given the Defendant hot and cold beverages and cigarettes, and that the Defendant had smoked a great deal.

The witness noted that the seventh statement was taken, not on February 4, 2006, as written in the statement, but on April 2, 2006, and that this was a clerical error.

**The testimony of policeman** ▮

This witness stated that he remembered the Defendant, but that he was relying on the written text of the statements which he had taken. He stated that he taken the statements in Arabic, wrote them down in Hebrew, and then translated them again verbally into Arabic for the Defendant. In the testimony of March 26, 2006, he accused the Defendant of things which others had said about him, and the Defendant commented on them. The witness did not find, from reading the statement, that there were unusual events in the course of the interrogation; otherwise, according to his statement, they would have been written down. In the testimony of May 14, 2006, he showed the Defendant documents and the Defendant commented on each one of them. He stated that the atmosphere in the interrogation was good, and he noted that the subject was an elderly man. The witness stated that the Defendant remembered details of the documents which were shown to him and that, in his opinion, the Defendant has a good memory.

The witness stated that had the Defendant asked to be examined by a doctor, he would have written it down in the statement and would have stopped taking the statement, because he is aware of the significance of a statement which is taken from a subject who is not in a condition which enables him to give good testimony. He noted that subjects who are brought before him are not cuffed unless it is to be feared that they are dangerous and likely to be wild. In the case of the Defendant, who was an elderly man, there was no need for this.

The witness was asked whether he told the Defendant that they had destroyed his house, uprooted trees and destroyed honey, and answered that this was the first time that he had heard that the Defendant's house had been destroyed. The witness also denied that he had told the Defendant that if he confessed, he would be released immediately because of his advanced age and medical condition. The witness noted that he had not used any means of physical or verbal pressure and emphatically denied that he had led the Defendant to understand that if he

Date: July 29, 2009                                                                 File No.: 3052/06

repudiated the confessions which he had made to the Israel Security Agency, "chaos" would break out. The witness argued that there was no need to exert force or pressure and that everything had taken place in a pleasant atmosphere.

In his cross-examination, the witness stated that he did not know how long the Defendant had been under interrogation before he interrogated him, but that there had been cases in which continuous interrogation had previously taken place, and in such cases, the interrogators waited in order to allow the subject to have rest time as provided by law. He confirmed that he relied on transcripts of the Israel Security Agency, which are written in Hebrew, and he stated that he had translated part of the memorandum for the Defendant, in which he was accused of smuggling weapons. The witness confirmed that he was the one who had asked for an extension of the detention in some cases, but he did not remember which interrogation operations were necessary, and stated that, for that purpose, it would be necessary to examine the reports which were presented to the judge who deliberated on the detention. The witness stated that he did not know who seized the documents which were shown to the Defendant within the framework of the statement of May 14, 2006, or who translated them. He stated that he himself does not read Arabic and accordingly relied on the translation, but that the Defendant was shown the original in Arabic. He further stated that he had translated the testimony by another person, which he had shown to the Defendant, into Arabic, because it was written in Hebrew and the Defendant does not read Hebrew.

**The testimony of the person known as** ▇▇▇▇

This witness was the person in charge of the interrogation of the Defendant on behalf of the Israel Security Agency. The witness stated that he remembered the interrogation and the Defendant. He claimed that this was a complex interrogation, but that, all in all, the atmosphere was very relaxed, with a great deal of mutual respect. The witness added that the Defendant was held in a detention cell like any other detainee, but that, in the interrogation, he was treated very respectfully in accordance with his status. He stated that, throughout almost the entire period of the interrogation, the Defendant was supplied with food from the interrogators' kitchen, smoked cigarettes, and also received a response to special requests such as boxer shorts and a Koran, and there were even cases in which he asked to remain under interrogation because he was bored.

The witness rejected the argument to the effect that the Defendant had not received medical treatment, and stated that, due to the Defendant's age and his complaints, he was examined by a Prison Service doctor and was under close monitoring by the Prison Service infirmary. He added that he personally contacted the Prison Service infirmary and ensured that the Defendant was examined and his medical problems were treated at the professional discretion of the doctors. The witness stated that he had told the Defendant that there was no possibility of bringing in his

9