Date: July 29, 2009                                                                 File No.: 3052/06

medications, but that his attorney could supply a detailed list of the medications which the Defendant uses. At the same time, the witness stated that the responsibility for medical treatment rests with the prison doctor.

The witness was asked to give his impression of the Defendant's condition and stated that he did not have the impression that the Defendant was not capable of being interrogated. He remembered one case in which the Defendant was very tired when he left the cell and a medic was accordingly brought into the interrogation room, and the Defendant explained that it was related to his mental state and not to his physical state on that day. The witness repeatedly pointed out that there were cases in which the Defendant had actually asked to remain in the interrogation room.

The witness was asked to comment on the question of the cuffing of the Defendant during the interrogation. He stated that as a general rule, throughout most of the interrogation, the Defendant was not in cuffs. At the same time, there were cases in which the Defendant became upset and hit himself. Against that background, he was handcuffed so as not to harm himself, and immediately after he calmed down, the cuffs were taken off. He added that, in cases in which he left the interrogation room for a few minutes, the Defendant was handcuffed to the chair, but that the handcuffs concerned were attached to a long chain which allowed his hands to move freely, including smoking. He emphasized that he never left for periods of four to seven hours, as was stated in the preliminary arguments, and that, generally speaking, the intervals in question were of a few minutes, half an hour at the most. He added that the Defendant had not complained to him about this. In answer to a question by the Court, the witness replied that the Defendant did not have a watch.

The witness was asked to comment on the argument to the effect that the Defendant was told that his house had been destroyed, trees had been uprooted and honey had been destroyed. The witness answered that this was the first time that he had heard that the Defendant had honey, nothing was said to the Defendant about his house, and the interrogation had not even touched on this subject. The witness denied that he had told the Defendant that, if he confessed, he could be released to help his family, or that he could be released due to his age and medical condition.

The witness confirmed that, in the course of the interrogation, the Defendant had been subjected to accusations on the basis of the suspicions which the interrogators had, and there were cases in which he was told that he was lying, but there had been no intention of humiliating him. According to his statement, the interrogation was conducted with a great deal of mutual respect, and on a number of occasions during the interrogation, the Defendant even commented favorably on the attitude which had been displayed toward him by the witness. The witness insisted that no use of threats or force was made, that the interrogation was conducted by means of a protracted

Date: July 29, 2009                                                                                         File No.: 3052/06

dialogue, and that he remembered the atmosphere in this interrogation as being exceptionally good, relative to other interrogations which he had conducted. The Defendant cooperated in extensive portions of the interrogation, and there were days in which the very mention of the topic of a subject to the Defendant sufficed for the Defendant himself to provide a detailed version of the matter.

In his cross-examination, the witness stated that he had heard about the Defendant's detention from the media, approximately an hour before he met him at the interrogation facility. The witness further stated that the initial interrogation of the Defendant had been conducted by the interrogator known as ▮▮▮▮, and that he was not aware of it at the time, but only retroactively.

The witness stated that the size of the cell in which the Defendant was kept was standard; that there was a window, but it was closed; and that the ventilation was based on a central air conditioning system.

The witness was asked why the Defendant was interrogated continuously on March 15, 2006, starting at 10:55 a.m. and until after midnight, when the Defendant had already been interrogated toward morning, from 2:40 a.m. to 5:45 a.m. The witness answered that this was the initial stage of the interrogation; the Defendant asked to set forth his actions in chronological order, and this took time. The Defendant did not express a desire to stop the interrogation or to go to sleep; in the course of the interrogation, he ate, drank and smoked for his pleasure.

The witness was asked to comment on the statements which appear in the transcripts which were drawn up by the interrogator known as ▮▮▮▮, such as "You are behaving like a little child, sitting there and lying through your teeth", and whether they preserved the subject's dignity. The witness answered that, in every interrogation, there are points of conflict and disagreement, and still, the dignity of the subject is preserved.

The witness stated that the Defendant was not prevented from meeting with an attorney, but that the entire subject of the contact with the attorney was under the responsibility of the police. To the best of his knowledge, the police notified the attorney of the Defendant's detention; however, the witness did not check this.

The defense attorney referred the witness to the memorandum dated March 19, 2006 at 4:35 p.m., in which the Defendant stated that they were laying trumped-up charges against him, and that they would do better to bring a sword and cut off his head, and asked him whether this sounded like a calm and quiet person. The witness answered that he did not have the impression that the Defendant was a calm and quiet person, but rather, a person who tended toward outbursts of anger. He added that this behavior and similar behaviors on the Defendant's part were at times

11

Date: July 29, 2009                                         File No.: 3052/06

characteristic of him, although most of the interrogation was conducted in a very positive atmosphere with a great deal of mutual respect.

The witness was asked to explain what a "persuasion talk" is, and stated that it is a conversation in which the suspect is offered a chance to reach an understanding and to confess to the charges attributed to him, and receives an explanation of the nature of the information in the possession of the interrogators. The nature of the talk depends on the subject and his nature. In the case of the Defendant, most of the talk was focused on important current events and general topics, because the Defendant was a person who had traveled to a lot of places; nonetheless, at the end, the conversation always went back to the subject of the interrogation. The witness did not exactly remember what had been said at the talk in question, which was unfruitful from the standpoint of the interrogation; nonetheless, he pointed out that, among other things, the Defendant had been told that it would be better for him to confess.

The witness was asked whether telling the Defendant "to reach an understanding with his interrogators" referred to an agreement in which the Defendant would confess and would then go home, because he was an old man. The witness stated that the Defendant was not told that he would go home, or that he was an old man. The witness stated that nothing would happen if the Defendant did not confess, but that a confession would be in his favor, because then the interrogation would be over.

The witness was asked whether great pressure was not exerted on the Defendant, in such a way as to cause him to want to harm himself, as appears in the memorandum of March 21, 2006. The witness stated that the Defendant had had a fit of rage at the beginning of the interrogation, and that afterwards he had calmed down and had gone on to hold a long, detailed and relaxed conversation.

The witness denied that he had promised the Defendant that, if it was found that the polygraph indicated he was speaking the truth, they would not continue to ask him about things in which he was shown to have been speaking the truth. It is correct that, after the examination, the focus was on other subjects; nonetheless, there was no impediment against returning to the same subjects. According to his statement, the agreement and the understanding with the Defendant only concerned cases in which he was found to be lying.

The witness denied that he had told the Defendant that, if he finished the interrogation, he would be transferred to the prison, where the conditions were better, and accordingly, it would be better for him to finish the interrogation. When he was referred to the memorandum dated April 9, 2006 at 1:30 p.m., Section 8, which says that the Defendant was asked if he did not want to finish his interrogation and to be transferred to the prison, where he could be visited by his

12

Date: July 29, 2009                                                                                                    File No.: 3052/06

family, the witness answered that the question which the Defendant was asked was primarily a way of telling him to finish the interrogation. The witness added that the interrogation did not focus only on the subject of the ship *Karine A*, but also on the subject of his sources of funds and his contacts with the Tanzim / Fatah. The "understanding" in question was that the Defendant would provide information, and not necessarily such that would lead to his incrimination.

**The testimony by the person known as ▮▮▮▮▮**

This witness is the Israel Security Agency interrogator who interrogated the Defendant on the day of his arrival at the interrogation facility, and another time at a later stage.

The witness stated that the Defendant had been asked how he was and answered that he felt well, although he said that he was suffering from cancer. The Defendant did not complain of pain, and had he done so, [the witness] would have called a doctor or a medic. The witness stated that he had not been given medications by the Defendant's attorney, and that he did not remember that the Defendant had asked for medications. The witness was asked about the time of the first interrogation, 2:40 a.m., and answered that his team leader had demanded that he begin the interrogation, and that is what he did. He also noted that, to the best of his memory, he had not interrogated the Defendant when the latter was handcuffed or shackled, and even if he had been wearing cuffs – which, in his estimation, he had not been – he had not been wearing shackles. The witness denied that he had left the Defendant in the interrogation room for periods of four to seven hours, alone and handcuffed. The witness further denied that he had said, or that he knew that anyone had said, to the Defendant that his house had been destroyed, trees had been uprooted and honey had been destroyed. He denied that he had promised the Defendant that he would be released if he confessed.

The witness confirmed that the Defendant had been told that he was lying, and claimed that this was a legitimate contention on the part of an interrogator. He stated that there had been no use of threats or force in the interrogation and that, if the Defendant had been afraid, this was a subjective matter, but that he had not intentionally frightened him.

In his cross-examination, the witness stated that he knew who the Defendant was and he knew that he had been active in Fatah for a very long time, and was in charge of the procurement and financial system within that organization.

The witness stated that he had given the Defendant a piece of paper, written in Arabic, which set forth his rights as a detainee and an interrogation subject, but that he had not read it out to him himself. He confirmed that the first sentence which he had written in the memorandum was the first sentence which the Defendant had spoken to him, which was: "The Defendant is fed up with the story of *Karine A*."

13

Date: July 29, 2009                                                                                                   File No.: 3052/06

The witness was asked to describe his impression of the Defendant's condition at the first interrogation, which had taken place toward morning, and stated that he remembered that an elderly man had come in, who was relatively tired, in accordance with the time at which he arrived. They had an ordinary conversation, and he remembered that the Defendant was a heavy smoker, was given a lot of cigarettes, and that the conversation had been conducted in a positive atmosphere. He did not remember whether the Defendant was agitated or depressed, and did not remember anything else unusual. According to his statement, to the best of his understanding, the Defendant's statement that he was "fed up" is consistent with the fact that he had been under protective or preventive detention following the *Karine A* affair.

The witness insisted that his role was to seek out the truth and that, if the Defendant had given him a reasonable theory in line with the intelligence information, he would have accepted it.

The witness repeatedly stated that he did not remember whether the Defendant was wearing cuffs in the interrogations which he had conducted. However, if there was any use of cuffs, it was only if the witness felt threatened. He added that he did not remember any such thing, and that if the Defendant had shouted or acted wildly, he would have written it down.

The witness repeatedly emphasized that he had given the Defendant the piece of paper with his rights and duties, and that his rights were listed in it. He himself did not tell the Defendant that he had the right to remain silent or to be represented by an attorney.

The witness insisted that, had the Defendant complained to him about not being allowed to bring his medications into the detention facility, or that he felt unwell and was not getting assistance from the prison doctor, he would have written it down. At the same time, he stated that he knew the Defendant was a sick man. He personally was never asked about bringing medications in.

The witness repeatedly emphasized that the search for truth is "sacred" and that it was the objective. Accordingly, when the Defendant told him that he was willing "to confess everything", he explained to him that there was no point in talking that way, and that he should tell [his story] himself, without adding to it or detracting from it. He had the impression that the Defendant was not willing to confess everything and was capable of holding his own in the interrogation. The witness stated that the interrogation of the Defendant was protracted because there were subjects which required elucidation and clarification, and there were other items which he chose to deny or not to explain.

Date: July 29, 2009                                          File No.: 3052/06

**The testimony of the person known as** ███

This witness was an interrogator for the Israel Security Agency who participated in the Defendant's interrogation, and stated at the very outset that, because two years had gone by since the date of the interrogation, he did not remember part of it.

The witness was confronted with the preliminary arguments and stated that the Defendant had received medical treatment from the prison infirmary. He remembered that, in one of the transcripts, the Defendant had stated that he had polyps in his stomach, and within a short time, he was taken for examination and medical treatment. The witness stated that, as an interrogator, he is not the authority with regard to the transfer of medications to the Defendant, and that the decisions on that subject are made by the prison doctor. He further stated that he did not remember any case in which the Defendant called his attention to the fact that he needed medication.

The witness denied that the Defendant's feet were shackled in the interrogations at which he was present, and added that the Defendant was handcuffed after he hit himself and after he was warned that, if he continued to hit himself, he would be handcuffed, so that he could not harm himself.

The witness claimed that there was no case in which the Defendant was left handcuffed and alone in the room for four to seven hours, and claimed that he had not told the Defendant that IDF troops had destroyed his house and had destroyed trees and honey. The witness added that he had also not told the Defendant that, if he confessed, he would go free in light of his age.

The witness stated that he had told the Defendant more than once that he was concealing information and refusing to give it to his interrogators, but he had not used violence, threats or attempts at intimidation.

In his cross-examination, the witness was asked about the meaning of the statement to the Defendant that "he had been brought to the interrogation in order to confess with honor". The witness stated that confessing really was an honor, and his objective as an interrogator was to have the subject make a true confession.

The witness stated that the subject of the interrogation was the Defendant's involvement in the matter of the ship *Karine A*, his connection to the financing and smuggling of materiel, and his connections with Iranians and others in Arab countries whose intention it was to carry out hostile terrorist activity against Israel.

Date: July 29, 2009                                                                 File No.: 3052/06

The witness stated that he had recorded in a memorandum that the Defendant "was behaving like a little child", because, notwithstanding his advanced age, he sometimes behaved childishly in the interrogation. When he was asked to explain what he meant, he answered that childish behavior is when a person is being interrogated on information and gives a cover version which exempts him from liability, even though he knows that his interrogators know what they are talking about with him.

The witness stated that the Defendant had been told that he should not "behave like a rascal", and that his meaning for the word "rascal" was a person who shouts, lies, acts dishonorably and does anything he can to save his skin.

The witness stated that he apparently knew at the time that the Defendant had been interrogated toward morning by the interrogator known as ███, but that he had not seen any impediment to interrogating the Defendant until 6:00 p.m.

The witness was asked about a statement which he had made in the interrogation, which was documented in the memorandum dated March 20, 2006, in which it was written that he had told the Defendant that it was not by chance that his detention had been extended by 18 days, in light of the large amount of information which he was concealing from his interrogators. The argument was raised to him that, in this way, he was actually saying to the Defendant that the more information he concealed, the longer his detention would be. The witness answered that it was understandable that the Court had decided to extend the detention, on the basis of the information which it had before it. The witness was asked about an additional expression which he had used toward the subject, which was documented in the memorandum dated March 27, 2006, in which it was written that he had told the Defendant that "in the end, he would confess". The argument was raised to the witness that, according to common sense, this meant that until the witness confessed, the interrogation would not be over. The witness answered that that was not what was written, and eventually, the Defendant did, in fact, provide a great deal of information.

The witness was asked about the cases in which the Defendant hit himself, and said that he remembered that the Defendant had hit himself with his hands a number of times, and that they had succeeded in calming him down a number of times by asking him to stop it. The witness further stated that, in his opinion, this was childish behavior. The witness was asked whether this was not behavior which attests to the Defendant's desperation, and answered that, in his estimation, it was all a show, because, in fact, after that, the Defendant went on to provide a great deal of information.

16

Date: July 29, 2009                                               File No.: 3052/06

**The testimony by the witnesses for the prosecution at the preliminary trial – interim summary**

The testimony which was heard may be divided into testimony by members of the police and testimony by Israel Security Agency personnel. The policemen stated that the interrogation was conducted in a relaxed manner, with no problems whatsoever, and that the Defendant gave information of his own good and free will. It was further stated that the Defendant had been given food and beverages in the course of the interrogations, had not been left alone, and had not been subjected to any threats or promises in the context of his interrogation.

The witnesses on behalf of the Israel Security Agency noted that the Defendant had been treated with respect, in accordance with his status. They did not deny that, in his interrogation, there were moments of "confrontation", in which they accused the Defendant of lying and concealing information; however, they claimed that this is a natural part of an interrogation. The interrogators denied that the Defendant had been left alone in the interrogation room for long periods of time. According to their statements, there were a number of cases in which the subject have been left alone, but for brief periods of time, during which he was placed in handcuffs which were attached to a long chain. It was further stated that the Defendant was not handcuffed in the course of the interrogations, except for cases in which he hit himself and attempted to harm himself. Even in those cases, after the Defendant calmed down, the handcuffs were taken off.

The Israel Security Agency interrogators also denied that they had uttered threats against the Defendant, or that they had told him that his house had been destroyed and the like, or that anyone had promised him that, if he confessed, he would be released due to his age.

With regard to his medical condition, the Israel Security Agency interrogators stated that the Defendant had been treated in the prison infirmary and that, in light of his age, they even ensured that he would receive treatment, at the discretion of the medical personnel, of whom they were not in charge.

**The testimony by the Defendant at the preliminary trial – direct examination**

The Defendant began by stating that he suffers from high blood pressure, hemorrhoids, an ulcer and back pain.

The Defendant described that he was in prison in Jericho under American and British supervision and that, on March 14, 2006, at 8:00 a.m., the IDF instituted a siege on the Muqata in Jericho, until a bulldozer came and destroyed the building. He and others were taken to the Jericho Coordination and Liaison Facility; that evening, he was transferred to the "Russian Compound"

17