Date: July 29, 2009                                                              File No.: 3052/06

Defendant himself stated that everything which happened during his interrogation caused him "to explode inside", and that he had not shown this to his interrogators – in contrast with the explicit statements which were written in the transcripts, and to which the interrogators testified, to the effect that the Defendant lost his calm from time to time, and that they were accordingly forced to handcuff him. It is not logical to believe that the interrogators would invent and record a story whereby the Defendant hit himself, and that they were forced to handcuff him as a result, if this did not happen. The Defendant's argument, to the effect that he had only "exploded inside", is not in line with the records kept by the interrogators, nor with their testimony before us, and represents part of the line which he adopted in order to show that, on one hand, they had humiliated him, but, on the other, he had not given into his interrogators. In this matter, we preferred the testimony by the interrogators.

It should be stated that the impression gained from the Defendant's testimony is that of a person who is well aware of the things which were said by him, both in Court and in his interrogation by the Israel Security Agency and the police, but who nonetheless sticks to his story and maintains that injustice was done to him. That injustice, as he sees it, was not caused by the things which he said in his interrogation, but by the humiliation which was practiced upon him, as an independent factor, and not as one which affected him in his interrogation. Another factor in the "injustice" results from the statements which were written down in Hebrew, without his approval, and which were not in line with what he said. More precisely: the Defendant confirmed, in his testimony before us, that the words in his statements, which were ostensibly written down on the basis of what he had said, were translated to him, as the police interrogators had stated; nonetheless, the Defendant claimed that he does not know what was really written, because he does not know Hebrew.

We have not seen fit to believe the Defendant on this point. We did not gain the impression that the Israel Security Agency and police interrogators recorded things which were not told to them by the Defendant, or that they distorted the statements which been written down in Hebrew when they translated them to him, or that they exerted pressure on him which negated his ability to choose whether to tell his interrogators certain things. It appears that the Defendant was well aware of why he was under interrogation, and was well aware of what his interrogators were looking for, and that he behaved accordingly during his interrogation. The Defendant is aware of the fact that he made statements with regard to his activity in the context of *Karine A* – statements which are not in line with his present version, which holds that there is no relationship between him and the arms ship.

Moreover, the statements which are written down in the transcripts of the interrogation indicate that the Defendant gave a great number of details, as he testified before us, as early as the first day of the interrogation. At the same time, the Defendant did not immediately say everything he

26

Date: July 29, 2009                                                                                   File No.: 3052/06

knew, because his interrogation was a "developing interrogation", to which, over the course of time, various items concerning his activity were added. As may be seen from the transcripts, in the beginning, when they raised accusations against him, he customarily denied them; however, when they showed him evidence which refuted his denial, he began to tell what he knew. Such conduct is actually characteristic of a person who acts in a calculated manner and is willing to tell things only when he knows that, in any event, his interrogators have the information already, without volunteering additional information. Even if there had been any possibility of raising an argument, to the effect that the additional details which he gave, following the evidence which was presented to him, were given as a result of the pressure which was exerted during the interrogation, the Defendant himself has contradicted and refuted that argument.

**The credibility of the Defendant – summary**

In contrast with the credible impression made by the interrogators from the police and the Israel Security Agency, we can state that the testimony by the Defendant was not especially credible. In accordance with that which has been set forth above, according to the testimony by the Defendant himself, his "humiliation" and his "medical condition" did not in any way detract from his ability to say the things he wished to say, [and did not] cause him to say things which he did not want to say. There was no stage in which the pressure of the interrogation led him to confess anything against his will, and there was no stage at which he "broke".

On the basis of all of the evidence in the preliminary trial, we are convinced that his statements to the police interrogators were taken in a relaxed way and with no improper pressure. In contrast with the arguments raised in the preliminary argumentation, he did not attempt to make the police interrogators aware of errors which appeared in the transcripts, and none of them told him that "chaos" would break out if he did not confess. We are convinced that his interrogators made him no promises that, if he confessed, he would be released; they told him nothing about the destruction of his house (a fact which some of the interrogators had not even known until the date of the hearing before us); and accordingly, we have no choice but to reject his arguments concerning any "humiliation" or enticement and promises which caused him to say things other than of his own free will. The Defendant received full medical treatment as required, and his medical state did not change his ability to say what he had to say, of his own free will.

**Preliminary trial – The ruling**

In light of our factual conclusions with regard to the credibility of the witnesses for the prosecution, on one hand, and the lack of credibility of the witnesses for the defense, on the other, we hereby rule that the statements by the Defendant were taken of his own free will and are admissible in this trial.

Date: July 29, 2009                                                      File No.: 3052/06

**The principal trial**

**The testimony by** ▮

This witness stated that he was a member of a military squad which was led by ▮ and was tried for offenses of murder which he committed. The witness stated that he and his fellow squad members were soldiers and they received a monthly salary at the end of each month. The witness claimed that he did not know who transferred the salary to them. The witness was confronted with a memorandum from his interrogation by the Israel Security Agency, which stated that the salaries were transferred by Fuad Shubaki. The witness claimed that he did not know Fuad Shubaki and that he had never heard that name. The witness claimed that the person who transferred the salaries to them was named ▮, who was a clerk in the Finance Office. In his cross-examination, he stated that he had never seen the Defendant and had not received money from him, and that he did not even know who was responsible for finances in the Palestinian Authority.

**The statements by the Defendant to the police**

The Defendant made eight statements to the police, aside from the many memoranda which were taken from him by the Israel Security Agency. We shall now provide a chronological survey of the statements which were taken from him and the things which he said in them – things which, as a general rule, are in line with the statements which he made in his interrogation by the Israel Security Agency.

Prosecution Exhibit No. 5 – statement by the Defendant dated March 19, 2009: In the statement in question, the Defendant spoke of his activity within the framework of the Palestine Liberation Organization (PLO) prior to the year 2000. He subsequently stated that, in 2000, there was a meeting in Yasser Arafat's office, in the presence of ▮ and ▮ Yasser Arafat told them to buy any weapons which came into Gaza or the West Bank, and any of those senior officials who received an offer (to purchase weapons – Z.L.) would come to the Defendant with paperwork; the Defendant would transfer it to Yasser Arafat, and after Arafat signed, the Defendant would instruct his staff to transfer money to the senior official in question. The Defendant gave detailed examples as to the quantities and types of weapons which were purchased and the amounts of money which were paid for them.

The Defendant added that in July 2001, ▮ and ▮ smuggled a container from Lebanon with RPG bombs and launchers which came from Hezbollah, with the approval of Yasser Arafat, and the naval forces took them. He paid $50,000 with Arafat's approval.

Date: July 29, 2009                                                                                   File No.: 3052/06

The Defendant added that he had met with ▮▮▮▮ in Jordan, and that ▮▮▮▮ had told him that he had met with Hezbollah operatives and with an Iranian, and had agreed with them that they would transfer three containers of weapons, loaded on a ship. He asked the Defendant to speak with Yasser Arafat about it, so that Arafat would give money. The Defendant spoke with Arafat about it, and Arafat instructed ▮▮▮▮ to give money for that purpose. The Defendant also stated that he had gone to Yemen and met ▮▮▮▮ who had told him that ▮▮▮▮ wanted passports to be prepared for him and for ▮▮▮▮ and that he ▮▮ had come to see the ship *Karine A*, which had arrived in Yemen with the arms.

<u>Prosecution Exhibit No. 1 – statement by the Defendant dated March 20, 2006</u>: In this statement, the Defendant stated that he had met with ▮▮▮▮ in Jordan in 2001, and that ▮▮▮▮ had told him about the contacts with the Iranians, according to which the latter were willing to pay for an arms ship. ▮▮▮▮ told the Defendant that he (the Defendant) would be meeting the Iranian representative in Dubai. The Defendant stated that he came to Dubai and there, together with ▮▮▮▮, he met two Iranian representatives – ▮▮▮▮ and ▮▮▮▮ The Iranians told the Defendant and ▮▮ that they were willing to finance the training of Palestinians in Lebanon and Iran, and that they were willing to help with money and armaments. The Defendant added that ▮▮ wrote up a report for Arafat, and that they told the Iranians that, once they had a reply from Arafat, they would let the Iranians know. According to his argument, when Arafat saw the report, he responded angrily and said that the Iranians were liars. The Defendant, in that statement, provided further details of his contacts with the Iraqis and their consent to donate two million barrels of oil to the Palestinians as a gift.

<u>Prosecution Exhibit No. 6 – statement by the Defendant dated March 22, 2006</u>: In the statement in question, the Defendant provided additional details about the meeting with the Iranians. He stated that the one who made the initial contact with them was ▮▮▮▮ The Defendant set up a meeting between him and ▮▮▮▮ and the two of them went to meet the Iranians in Dubai. Following that meeting, ▮▮▮▮ told the Defendant that the Iranians wanted to meet him. The Defendant went to Dubai to buy cars and told Fathi that he would meet the Iranians afterward. The Defendant was asked why he had not told Yasser Arafat that he went to meet the Iranians, and answered: "Because Arafat liked me to bring him results, and not just chatter." The Defendant went to Dubai, and after his meeting about the cars, he went to meet the Iranians with ▮▮▮▮. Because he was tired, it was agreed that they would meet again that evening. The Defendant did meet the Iranians again that evening and asked them if they wanted to work with him and cooperate with him, and the Iranians said that they did. ▮▮ spoke with them about military subjects, such as the need for advanced training in the manufacture of hand grenades and grenade launchers, and that they also wanted ammunition and weapons. After that, they (including the Defendant) talked about how to set up an ammunition factory within the Palestinian Authority, and the Defendant even told them that they would need money, and they

29

Date: July 29, 2009                                                        File No.: 3052/06

agreed to that as well. The Iranians even stated that they would transfer weapons and ammunition from materiel storehouses which they maintained in Lebanon. One of the Iranians asked to be sent a daily summary of the Israeli media. They agreed to continue meeting, and the Defendant stated that he would ask permission from Yasser Arafat to come to the meetings. ▆ wrote up the contents of the meeting and he and the Defendant signed it. When he returned to the Area, the Defendant gave the document to Yasser Arafat, who said the people in question were swindlers who wanted to kill him.

The Defendant stated that, in 2002, he heard that the *Karine A* had been seized. He understood that Yasser Arafat wanted him to "take the matter upon himself", and accordingly, he told the Board of Inquiry that Yasser Arafat had given the instructions and that he had been the contact person between ▆ and ▆ and Arafat. The Defendant added that he had heard from ▆ about the plan to bring in the ship as early as August 2001, two months before the meeting with the Iranians, and that the meeting with Arafat, at which they agreed on the transfer of $125,000 to ▆ for the ship project, took place after ▆ had been in Syria and Lebanon. The meeting with the Iranians in Dubai was intended to set up Palestinian-Iranian contacts and to put ▆ and ▆ in contact with the [Iranian] Revolutionary Guards in Lebanon, and he and ▆ had not talked about the ship with the Iranians.

Prosecutor's Exhibit No. 11 – statement by the Defendant dated March 26, 2006: In this statement, the Defendant provided details about various arms deals in which he was involved. He initially stated that a person had come to him and told him that they had found barrels with RPG rockets in the sea and that he wanted $7,000 for them. The Defendant gave an order to pay the price. The Defendant stated that he had received an offer to purchase 10 RPG rockets for $45,000, and that he had transferred the money to the party making the offer. The Defendant went on to state that this was better than having the weapons fall into the hands of Hamas or other organizations. The Defendant stated that, in 2002, ▆ stole all of the arms which he had purchased, and which were in their storerooms. The Defendant went on to state that ▆ had contacted him in 2001 and asked for $20,000 to set up a factory for the manufacture of materiel and hand grenades, and that Arafat had instructed the Defendant to give him the money. The Defendant transferred the money and later heard that there had been an explosion in an apartment which was rented by ▆

The Defendant was asked about the purchase of boats for ▆ and stated that Arafat had instructed him, in 2000, to transfer $150,000 for the purchase of two fishing boats. The Defendant noted that the money in question was transferred even before he transferred $125,000 to Fathi for the *Karine A*.

30

Date: July 29, 2009                                                                File No.: 3052/06

The Defendant talked about money which he transferred for the purpose of purchasing ammunition in Bethlehem, and that he had financed the salaries of ▬▬▬▬ men. According to his argument, some of the money which he transferred was used for salaries (NIS 500 per person) and some was used to purchase ammunition.

<u>Prosecution Exhibit No. 7 – statement by the Defendant dated March 30, 2006</u>: The Defendant was asked about his acquaintance with ▬▬▬▬ and stated that the latter was in charge of purchasing materiel in the West Bank, and that he had purchased 1000 Kalashnikov rifles. The Defendant noted that he had transferred the money for the purchase to ▬▬▬▬ in the amount of approximately $2 million.

The Defendant stated that he had paid ▬▬▬▬ $570,000 for seven Sagger missiles and 18 rifles; the rifles were defective and they returned them. According to his statement, the missiles were kept in the *diwan* near his home in Gaza, and he later transferred them to ▬▬▬▬ ▬▬▬▬ The Defendant went on to provide details about various people who had brought materiel and stated that he used to transfer the money, and that they used to keep the arms in a storeroom within his office. According to his argument, Yasser Arafat would tell him to whom he should transfer the materiel, and he would instruct his deputy to issue arms according to Arafat's instructions.

The Defendant stated that ▬▬▬▬ manufactured explosive charges for ▬▬▬▬ ▬▬▬▬, and that he had transferred the money to ▬▬▬▬ so that it would be transferred to ▬▬▬▬ The Defendant also gave information concerning additional arms deals.

The Defendant, in the course of the examination, was shown a document (Prosecution Exhibit No. 8) and stated that it was a paper written by ▬▬▬▬ which contained price quotations for arms, and that he had settled accounts with him according to the prices listed.

<u>Prosecution Exhibit No. 9 – statement by the Defendant dated April 2, 2006, 9:50 a.m.</u>: At the beginning of his interrogation, the Defendant was referred to his statement of March 19, 2006, in which he had stated that he smuggled arms in the ship, and he confirmed that he had said that. The Defendant was asked about the involvement of others in smuggling the arms and spoke about it. Among other things, the Defendant stated that, in July 2001, he had given ▬▬▬▬ $50,000, on Arafat's instructions, to smuggle bombs and RPG launchers. The Defendant stated that he paid the money for the smuggling and not for the weapons, because the weapons had been given to them free of charge by Hezbollah.

The Defendant was asked to tell about the *Karine A* again, and stated that he had met with ▬▬▬▬ ▬▬▬▬ in Jordan, and that ▬▬▬▬ told him that he had met in Lebanon with representatives of

31

Date: July 29, 2009                                                                 File No.: 3052/06

Hezbollah and of Iran. The latter had agreed to transfer three containers full of materiel to them, financed by the Iranians, and they (the Palestinians – Z.L.) would only have to pay the expenses for the ship. The Defendant stated that they were offered the opportunity to take weapons from ▓▓▓▓ but that they did not do this. When he was asked why, he said: "Because we have arms free of charge from Hezbollah and from the Iranians, so why should we take from him?" He stated that the plan was to bring ships with arms to the Ali Port, and that he and ▓▓▓ had spoken with Arafat and told him that $125,000 was needed. Yasser Arafat told the Defendant to give the money, and the Defendant said that he did not have it. Yasser Arafat told ▓▓▓ to write a requisition asking for the money, and after ▓▓▓ did so, the Defendant took the requisition to Ramallah and transferred it to Arafat, who wrote to ▓▓▓▓ and told him to pay the money. ▓▓▓ transferred the money to ▓▓▓

The Defendant was asked to tell about the meeting with the Iranians again. According to his statement, he met with two representatives; he believed the senior representative was a man named ▓▓▓▓

Prosecution Exhibit No. 10 – statement by the Defendant dated April 2, 2006, 2:01 p.m.: (As a parenthetical note, I shall state that the date on this statement was February 4, 2006. This is an error which is clarified in Prosecution Exhibit No. 13, and the correct date is April 2, 2006. Let us not forget that the Defendant could not have been interrogated on February 4, 2006, because he was arrested only a month and a half later.)

The Defendant stated that he had set up a Procurement Committee, which had set up an armaments storeroom, in which everything the Committee purchased was stored. The Defendant was asked about the Scientific Committee and stated that the activity of that committee consisted of teaching courses in the manufacture of materiel. The role of the Committee in the West Bank was to check that the arms purchased were serviceable. The Defendant was shown a document and he stated that this was a document by the Scientific Committee, in which they asked for soldering machines and lathes. The Defendant forwarded the requisition to Arafat, and he did not know what happened to it. The Defendant stated that the Scientific Committee belonged to the Fatah, the al-Aqsa Martyrs Brigades were Fatah operatives, and Yasser Arafat used to give the al-Aqsa Martyrs Brigades money for activities "under the table".

The Defendant stated that people from his office transferred $150,000 to ▓▓▓▓ in order for him to purchase two fishing boats. Even before that, the Defendant had transferred $50,000, so that ▓▓▓▓ would give them to the Lebanese to cover the expenses of smuggling barrels of weapons, about which he had spoken previously (in the previous statement).

Date: July 29, 2009                                                        File No.: 3052/06

The Defendant stated that ▇ met in Lebanon with ▇, Hezbollah and the Revolutionary Guards of the Iranians. The Defendant asked him if he had told Arafat about it, and ▇ said that he had told him about the plan to smuggle the ship and about his meetings in that context. ▇ told the Defendant that he wanted him to talk to Arafat, because ▇ needed $125,000 for the expenses of the ship. The Defendant talked about it with Yasser Arafat, at the airport in Jordan. Yasser Arafat told the Defendant that ▇ should prepare a requisition to receive the funds. ▇ did so and, three days later, the Defendant gave Arafat the document. Arafat gave the Defendant written instructions to transfer the money to ▇ via ▇, and the Defendant forwarded the requisition to ▇ by messenger and told ▇ about it.

The Defendant stated that he had transferred money to ▇ for him to buy arms "from outside" (that is, from outside the Palestinian Authority). The Defendant stated that he had a storeroom in Ramallah, in which they put all of the arms which they purchased from ▇, and they would distribute the arms on the instructions of Yasser Arafat.

The Defendant stated that in August 2001, he purchased seven missiles from ▇ for which he paid $75,000, and which he transferred to ▇.

The Defendant stated that, in 2001, he was approached by an emissary from ▇ with two papers. One of them was a requisition for the purchase of ammunition for the al-Aqsa Martyrs Brigades, in the amount of 25,000 dinars, and the second set forth the names of the fighters in each area, in order for them to be paid their monthly salary. The Defendant forwarded the papers to Yasser Arafat, for him to decide in the matter, and Yasser Arafat gave him an instruction to give ▇ the money which he asked for. The Defendant said that he had no money, and then Arafat instructed the Ministry of Finance to transfer the money.

The Defendant stated that, when he came to Yemen, he was greeted by ▇ who told him that ▇ and ▇ ship had arrived. ▇ told the Defendant that they had prepared a passport for ▇ and they also wanted to prepare a passport for ▇, the captain of the ship.

The Defendant went on to state that he transferred money to ▇ a senior official in the Yemenite Army, as part of a partnership which was intended for the sale of tracer bullets for a profit. In the end, however, the transaction was not carried out and he got the money back.

Prosecution Exhibit No. 12 – statement by the Defendant dated May 14, 2006: At the outset of the interrogation, the Defendant was shown a document, and the Defendant stated that the document had to do with a requisition which he had received for the purchase of a lathe and cutting blades. The document had been transferred to him by ▇ and the

33

Date: July 29, 2009                        File No.: 3052/06

Defendant had forwarded the document to Arafat. The document did not come back to him with a payment order. The Defendant remembered that the document had been accompanied by two additional papers. One of them was a requisition for the purchase of arms, and the other was a requisition for the payment of salaries to members of the al-Aqsa Martyrs Brigades, but their names did not appear on his list and so he could not pay them.

The Defendant was asked what he had to add with regard to the Sagger missiles which they purchased, and he said that an instruction had come from Arafat to pay for the missiles, because he was afraid that [other] people would buy them and use them.

**The testimony by the Defendant at the principal trial – direct examination**

The Defendant began his testimony by stating that he was the head of the Finance Department in the Palestinian Authority, and that his powers were those of a clerk who received his instructions from the *Ra'is* ["Boss"], Yasser Arafat, and the deputy *Ra'is*, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ According to his statement, he had no authority to make decisions on his own; rather, he only acted according to written instructions.

The Defendant confirmed that, in fact, a meeting of all those in charge of the security organizations had taken place in Yasser Arafat's office in Gaza in 2000. He stated that all of those present at the meeting, except for him, customarily met with Israeli commanders. He claimed that what was said at that meeting was that it would be necessary to collect the weapons which were held by the public and by civilians and, if necessary, they should pay for them. According to his argument, his role was to ascertain who the owners of the weapons were and what the price was and to obtain approval from the *Ra'is*, who would sign the payment order. Only after receipt of an instruction would he release the money for payment.

According to the Defendant, the weapons were taken so that they would not be used by entities such as Hamas and the Islamic Jihad, which did not recognize the Oslo agreements. The Defendant claimed that no weapons were purchased outside the confines of the Authority. The Defendant also claimed that the weapons reached a storeroom in the National Security building, where his offices were also located, but that he was not in charge of the storeroom. To the best of his knowledge, the campaign to collect weapons was known to the public. The Defendant further stated that he did not know how many weapons were purchased or how much money was paid for them. He repeated that every expenditure was approved by Yasser Arafat. The Defendant stated that he was not the one who transferred the weapons and he did not know whether they were transferred to the Tanzim.

The Defendant confirmed that he knew the people whose names appear in the first count of the indictment, including ▮▮▮▮▮▮▮▮▮▮▮▮ According to his statement, the latter was