Date: July 29, 2009                                                                 File No.: 3052/06

seconded to his office from ▮▮▮▮ and his job was to bring the signed documents from Yasser Arafat. The Defendant claimed that he did not know whether ▮▮▮▮ position included the purchase of the arms, and, in any event, the Defendant did not have a storeroom under his responsibility. According to his statement, the payments were made by check or in cash, and each amount was written down. The Defendant claimed that he did not see, did not buy and did not issue weapons. He only worked with the documents, and he himself was afraid of weapons. The Defendant again emphasized that he did not know how much money was paid or which weapons were purchased. The only thing he did was receive documents from the various security entities and give payment orders to people. The Defendant denied that he had purchased and distributed pistols or that he knew anything about it.

The Defendant denied having made payment to members of Fatah and denied that he had paid people in the Bethlehem area. According to his argument, there was an instruction from Yasser Arafat to pay NIS 500, but he did not know what they were being paid for. No one told him that those people belonged to the al-Aqsa Martyrs Brigades. The Defendant denied that an emissary had come to him from ▮▮▮▮ or that he had seen a financial report which included expenses for the purchase of chemical materials for the production of explosives. He also denied that he had paid other financial expenses of the al-Aqsa Martyrs Brigades, or that he had received an instruction from Yasser Arafat to pay ▮▮▮▮ 25,000 dinars, and in any event, he did not have such an amount to transfer.

The Defendant denied any relationship to the arms ship *Karine A*. According to his argument, he only heard about it after he was arrested in Jericho. The Defendant confirmed that he knows ▮▮▮▮, the Deputy Commander of the Palestinian Navy, and confirmed that ▮▮▮▮ had given him a document from Yasser Arafat, according to which the Defendant was supposed to pay ▮▮▮▮ $125,000. According to the Defendant, he did not know what the payment was for and he refused to pay, because he did not have such an amount in the budget.

The Defendant confirmed that, when he was in Dubai for the purpose of purchasing vehicles, he was approached by ▮▮▮▮ who asked him to transfer a letter to Yasser Arafat. He met ▮▮▮▮ together with other people and received a letter from them. He transferred it to Yasser Arafat and later found out that the content of the letter had to do with the Iranian proposal to help the Palestinian Authority, but he did not know and did not say anything about an arms ship.

The Defendant confirmed that, while he was in Yemen, he met ▮▮▮▮ at the Palestinian Embassy there, but he was not aware of the fact that, at that time, an arms ship had come into Hudeida Port in Yemen. He confirmed that ▮▮▮▮ told him that they were preparing a Yemenite passport for ▮▮▮▮, but he did not know why.

35

Date: July 29, 2009                                                File No.: 3052/06

The Defendant stated that the Palestinian Authority had received a gift of two million barrels of crude oil from Iraq, and that he had been given a proposal to make contact with the Iranians, so that they could sell the barrels for the Palestinians and divide the consideration. For this purpose, he met with the Iranian Commercial-Economic Attaché. The Defendant denied any relationship or any knowledge, on his part, with regard to any offer on behalf of the Iranians to help the Palestinians by providing training and weapons, and denied having been present at a meeting at which such a proposal was raised. The Defendant denied that he had signed the minutes of such a meeting. According to his argument, he had only transferred a letter from ▮▮▮▮▮▮▮▮ to Yasser Arafat, and the latter had refused any contact with the Iranians.

**The testimony by the Defendant at the principal trial – cross-examination**

In his cross-examination, the Defendant was asked if he was familiar with the al-Aqsa Martyrs Brigades organization. He answered in the negative and said that he had only heard about them in the media. He claimed that he had also stated in his interrogation that there was no such thing as the al-Aqsa Martyrs Brigades. The Defendant was confronted with two documents which had been presented to him at his interrogation of May 14, 2006, when he had stated that he knew nothing about those documents. When he was told that he had said to the police that one of the documents was a requisition to set up a lathe shop and the second was a requisition for salaries for the al-Aqsa Martyrs Brigades, he claimed that he did not know and had not said those things.

He claimed that he was at a meeting with Yasser Arafat, at which it was decided to purchase armaments. [He attended the meeting] by virtue of his position as a finance person, and the objective was to collect weapons from civilians. According to his statement, the only thing he did was to follow the instructions issued by Yasser Arafat, who approved the purchase of each armament individually.

The Defendant was asked about RPG bombs which arrived on a ship in June 2001, and stated that he had been given an instruction to pay the fishermen who found the bombs, as a monetary reward. The Defendant stated that he did not know where the ship with the bombs had come from, and when he was told that he had said to the police that it had come from Tripoli, he claimed that he had not said that. The same thing happened when he was confronted with the claim that he had told the police and the Israel Security Agency that arms had been purchased from Lebanon and Egypt. According to his statement, the arms which were purchased by him were only purchased from civilians, so that they would not fall into the hands of Hamas, and he did not know what was written in his statements.

Date: July 29, 2009                                                    File No.: 3052/06

The Defendant confirmed that he had transferred $20,000 to ▮▮▮▮▮▮▮▮▮▮ on the instructions of Yasser Arafat. He claims that he did not know what the reason was for this. When he was told that he had said to the police that it was intended for setting up a factory for the manufacture of materiel and hand grenades, he claimed that ▮▮▮▮▮▮▮▮▮▮ house had exploded, and that he had learned afterwards that it had been used for manufacturing explosive charges.

The Defendant claimed that he did not know who ▮▮▮▮▮▮▮▮ or ▮▮▮▮▮ were. The Defendant was confronted with his statement to the police, according to which he transferred money to them so that they would not go to Hamas, and he claimed that he said that he had received an instruction from Yasser Arafat to transfer NIS 500 to ▮▮▮▮▮ (the reference is to a monthly salary – Z.L.), whom he does not know personally, but whose name he knows, in contrast to his earlier statement.

The Defendant was confronted with an additional document, which had been presented to him in his interrogation, and which he claimed that he did not recognize. When he was told that, in his interrogation, he had stated that this was a document written by ▮▮▮▮▮▮ containing quotations for armaments, he said that he had not said that.

The Defendant stated that he was responsible for monies of the Palestinian security organizations, and that he was responsible for paying in accordance with written instructions which were given by Yasser Arafat.

The Defendant was asked by us whether he was familiar with the budget and its items, and confirmed that he was familiar with it, and that a payment order had to match an item which appeared in the budget. Accordingly, they would ask the recipients of the payments to state the purpose for which the requested money was required. If the payment order did not have an appropriate budget item, or if they refused to state the objective of the payment – the Defendant would refuse to pay, or would pass the requisition on to Yasser Arafat. He claimed that the budget item for the purchase of the arms was called "Payment for arms taken from civilians from within the State". The Defendant stated that, if he had received an exceptional instruction – for example, to pay money to a Hamas operative or to purchase textbooks for a school – he would not have performed the operation. In addition, the Defendant stated that he had a good relationship with Arafat and that there had been cases in which he had argued with Yasser Arafat about certain expenses and, in the end, Arafat had told him that he was right. He further stated that he had been praised for his methods of financial management. Only afterwards did he state that, if he had not implemented a payment order, he would have been put on trial. In a redirect examination by the defense attorney, the Defendant stated that any amount which had

Date: July 29, 2009                                                                 File No.: 3052/06

to be withdrawn from the account of the Palestinian authority required the signature of the three signatories for the account, and he alone could not withdraw "even a penny".

### Evaluation of the testimony – credibility and weight

**The testimony by the Defendant – credibility and weight**

The Defendant's testimony did not make a credible impression on us. He was obviously sticking to a story, according to which he had nothing to do with the arms ship *Karine A*, he had nothing to do with the contacts with the Iranians which concerned the coordination of training and the purchase of arms by the Palestinian Authority, and with regard to the purchase of arms, he was present at a meeting, the objective of which was to purchase arms from civilians so that they would not be used by organizations such as Hamas.

When the Defendant was confronted with things which had been recorded or presented to him in his interrogation, including documents which indicated that he recognized and knew why a certain payment was made, in a way which could not be reconciled with his version in Court, he stated that he had not said what was attributed to him in the interrogation. We cannot accept this. It is puzzling that things which are recorded in his statements, and which are in line with his version in Court, were in fact said by him to the police and were written down, whereas things which are not in line with his version in Court were not said by him, but were written down by the interrogators without his knowledge. This simplistic explanation with regard to the records kept by the interrogators does not sound in any way credible.

Furthermore: some of his arguments are *prima facie* not credible – for example, his statement that he was not familiar with the al-Aqsa Martyrs Brigades and that he did not know what they were, or his argument that he did not know who ▬▬▬ was, especially when, immediately thereafter, he stated that money had been paid to the person in question by the office in Bethlehem. When he recognized his mistake, he claimed that he did not know ▬▬▬ personally.

As we have already pointed out with regard to the preliminary trial, we are convinced that the things which are recorded in the Defendant's statements to the police were based on his own words and reflect things which he himself said. Accordingly, we must rule that his argument to the effect that those things were not said by him is mendacious.

Furthermore, the Defendant's arguments to the effect that he was only following orders, and that he did not know why some of the money was being transferred, are not in line with what he stated at the end of his interrogation – that he always ascertained that the payment matched a budget item, which means that he knew what the payment was intended for. His version to the

38

Date: July 29, 2009                                                                 File No.: 3052/06

effect that he was only following orders is not reconcilable with his statement that, if he had received an exceptional or strange payment order, he would have refused to carry it out, or with his statement in his interrogation, to the effect that he took action (with regard to the meeting with the Iranians) even before Yasser Arafat told him anything about the matter, because Arafat "wants to see results".

**The testimony by ██████████ – credibility and weight**

The testimony given by ██████████ in Court, as we see it, was devoid of any credibility whatsoever, and accordingly is devoid of any weight. His argument to the effect that he had spoken, in his interrogation, of a person named ████ and not ████ is an argument which was clearly intended to divert the guilt from the Defendant. We are not convinced that there is even a grain of truth in that argument. It should be stated that the Defendant said in his interrogation that he transferred money to ██████████, and this is in line with ██████████ statement to the police. Accordingly, we prefer to accept ██████████ statements to the police, rather than his testimony in Court.

**The factual infrastructure – summary**

We have seen fit to prefer the content of the Defendant's statements to the police, rather than his testimony before us. Wherever there is a contradiction between the two versions, we have believed that the content of the statements to the police is preferable. The same applies to ██████████ statements to the police. In light of this factual infrastructure, we must now examine the sections of the indictment which were attributed to the Defendant and to see whether his guilt arises from the evidentiary material before us.

Even before we perform an individual examination of each of the sections of the indictment, in view of the fact that the majority of the indictment is based on the Defendant's own statements, we must determine whether there is any evidentiary supplement, in the nature of an "additional item", to those statements.

In the case that is before us, we did not believe that there would be any real difficulty in this regard. An evidentiary supplement to the Defendant's statements can be found in the statement made by ██████████ who confirmed the transfer of the salaries to him and to his men in Bethlehem, as the Defendant had stated. In addition, we have before us Prosecution Exhibit No. 8, which is a document which sets forth requisitions for the purchase of weapons and their price, as the Defendant stated.

39

Date: July 29, 2009                                                      File No.: 3052/06

In Leave for Criminal Appeal 4142/04, **Millstein v. Chief Military Prosecutor**, Supreme Court Compendium 2006 (4), 4022, the Honorable Justice Levi considered the nature of the evidentiary supplement of the "additional item" type and ruled as follows (in paragraph 20 of his judgment):

> *"The requirement for the 'additional item' is flexible and open in structure. The type of matters that are likely to satisfy that requirement varies from case to case, and also depends upon the credibility of the confession itself. The greater the weight which is ascribed to the confession in question – the smaller the weight of the 'item' which is required in order to verify the confession; on the other hand, the smaller the weight which is ascribed to the confession – the greater the weight of the 'item'. Accordingly, it has also been ruled that cases are likely to arise in which it is possible to accept an 'item' with a weight which is 'as light as a feather'."*

And as the Honorable Justice Arbel stated in the same ruling (in paragraph 20 of her judgment):

> *"The requirement for an 'additional item' – similar to the 'item of reinforcement' and in contrast to 'corroboration'– is a requirement for an evidentiary supplement 'for verification'. Accordingly, and in contrast to 'corroboration', the 'additional item' does not have to point to the guilt of the Defendant; rather, it is enough to have an item of direct or circumstantial evidence, which is external to the Defendant's confession, which is capable of confirming, to a certain degree, the content of the confession and to indicate the veracity thereof... The requirement for an 'additional item' is intended to remove any suspicion that the Defendant is taking upon himself the responsibility for an action which was committed by another person or which was not committed at all, and therefore, in principle, a very small item of evidence is sufficient to comply with that requirement... Accordingly, case law has stated on more than one occasion that the weight of this item of evidence 'can be extremely light' and can even be 'as light as a feather'. This is enough for the Court to be satisfied that the confession is not 'a mere fiction' and will convince the Court that the story which the Defendant told in his confession is indeed a possible story."*

In the case that is before us, we have a confession by the Defendant, which extends over a large number of statements, both to the police and to the Israel Security Agency. His confession includes great detail with regard to various arms deals, including names, weapons and their prices, and detailed comments on his negotiations with various entities in the Palestinian Authority and with entities outside it (such as the Iranians). The inherent weight of these statements is very high. Both the content thereof and the way in which the statements were made indicate a high degree of credibility which should be given to them (cf. Criminal Appeal 6613/99, **Smirek v. State of Israel**, PD 56 (3) 529, in paragraph 12 of the judgment handed down by the Honorable Justice (as her title was then) Beinisch).

40

Date: July 29, 2009                                                                                          File No.: 3052/06

But not only the test of the numerous items indicate the credibility which should be ascribed to the Defendant's statements. Rather, in accordance with that which has been set forth above, these statements have external verifying supplements, in the form of the statement given by ▇▇▇▇▇▇ ▇▇▇▇ and in the form of Prosecution Exhibit No. 8. Moreover, the seizure of the arms ship *Karine A* is also in line with the statements which were made by the Defendant. Let us not forget that the Defendant himself did not deny, in his testimony before us, many details which appear in his statements, including a meeting with the Iranians.

In accordance with that which has been set forth above, the independent weight of the statements is high. The additional item, in this case, points to the Defendant's involvement in at least some of the offenses, and verifies all of the Defendant's statements. More precisely: the matters which are set forth in the Defendant's statements are all related to his position and his status as the head of the Finance Department of the Palestinian Security Services. When there is an internal affinity and a pertinent relationship between the various offenses, the evidentiary supplement which exists for one offense may also extend to another offense (see Criminal Appeal 241/87, **Cohen v. State of Israel**, PD 42 (1) 743; Criminal Appeal 7758/04, **al-Qadr v. State of Israel**, Supreme Court Compendium 2007 (3) 710; Criminal Appeal 378/03, **John Doe v. State of Israel**, Supreme Court Compendium 2005 (2) 1128). Accordingly, in the case that is before us, even though an evidentiary supplement exists with regard to only some of the statements made by the Defendant, in view of the pertinent relationship of the actions which are described in the indictment to those which are set forth in his statements, the evidentiary supplements should be considered as verifying all of the things which were stated by the Defendant in his interrogations. Accordingly, even if there is no external evidentiary supplement for a specific section of the indictment, in view of the affinity among all of the charges in this case, the statements made by the Defendant are sufficient to substantiate the conviction, insofar as it arises from the statements.

Now that we have clarified the evidentiary infrastructure before us, we shall address each of the counts of the indictment.

**Count 1 of the indictment:**

The arguments that have been set forth by the defense with regard to this count of the indictment are arguments both in fact and in law. First of all, as to the factual aspect, the defense did not deny that the Defendant took part in the purchase of the materiel as set forth in this count of the indictment; however, it claims that this was a purchase of material which was aimed at taking weapons from residents of the Authority so that they would be in the hands of the Palestinian Authority forces. This argument was raised by the Defendant both in Court and during his interrogation. Second, it was argued that the Defendant was entitled to

41

Date: July 29, 2009                                                                                   File No.: 3052/06

benefit from the defense of "act of state" because all that he did was to act with no independent discretion, but rather, in accordance with the instructions of the chairman of the Authority, Arafat, who approved the transfer of monies from the Authority for the purpose of purchasing the arms. The Defendant's role in this case was to sign documents which approved payment. It was argued that this act is not a war crime or a crime against humanity, because it has not been proved that the Defendant knew that the arms would reach the al-Aqsa Martyrs Brigades organization, which would use them for terrorism.

It was further argued that the Defendant could avail himself of the defense of justification, because obeying the instruction by the Authority, which was aimed at taking weapons from irresponsible entities and transferring them to the responsible control of the Authority, is a legitimate act, which is governed by the defense of justification.

It appears that the arguments that have been set forth by the defense cannot be accepted, even if only on factual grounds.

In order for the defense of "act of state" to be allowed, it is necessary to show that the entity on behalf of which the Defendant operated was a state. As set forth in the ruling on the preliminary arguments, which was handed down by my colleague, the Deputy President, the Palestinian Authority is not a state, and certainly, during the period which is relevant to the indictment, it was much farther from the status of an independent authority. Accordingly, the Deputy President of the Court stated that: "This being the case, I believe that it should be ruled that the Defendant's actions pursuant to the indictment were not acts of state, as they were not committed on behalf of an entity which is a state; rather, at the very most, they were personal actions in the guise of state actions, through the use of resources of an unformed diplomatic entity."

No further support or additional evidence, which could have modified our conclusion with regard to the status of the Palestinian Authority, has been brought before us.

Secondly: the argument to the effect that the collection of the arms was intended to transfer weapons from residents, who were likely to use them for partisan purposes, to responsible entities, is unfounded. The Defendant raised this argument on a number of occasions, including in his interrogation, however, we do not have the impression that this argument is substantiated in any way whatsoever. In accordance with that which has been set forth above, we have already pointed out that our impression of the Defendant is that he is a sophisticated person, who is trying to shrug off the burden of responsibility and liability. Concurrently with the argument that the collection of the arms was intended to prevent irresponsible entities from using them, it appears that the Defendant approved the financing of actions which have absolutely nothing to do with the collection of weapons from

42

Date: July 29, 2009                                                                                          File No.: 3052/06

irresponsible entities. Thus, for example, the subject of the financing of the setup of a factory for the production of explosives by people belonging to the Palestinian Authority itself, the financing of lathe shops, the financing of arms smuggling by outside entities such as Hezbollah and the Iranians, and so forth. If the entire objective had been the collection of "partisan" weapons, why is it necessary to finance the bringing of additional weapons which originate outside the confines of the Palestinian Authority – especially when the weapons in question are of a specifically offensive nature, such as rockets and missiles of various types? If the matter in question concerns only the purchase of weapons from civilians, why did the Defendant act to finance the costs of smuggling the weapons from Hezbollah into the hands of entities within the Palestinian Authority?

The answer to these questions is clear. The collection of weapons has nothing to do with the desire to prevent those "irresponsible" entities from using them for terrorist purposes. The objective of the collection of the weapons was to transfer them to entities within the Palestinian Authority which obeyed Arafat and which made it possible to engage in warfare against Israel, its forces and its civilians. As the Defendant himself stated, in the memorandum dated March 15, 2006, 6:15 p.m., in Section 30: "**Yasser Arafat gave an instruction that all of the weapons would be purchased by the Palestinian Authority, and not by Hamas or other organizations, so that he himself would be able to control everything that happened. In this way, Yasser Arafat would be able to control the strength of the intifada.**"

As we have seen, this is no innocent and "responsible" objective; rather, it is a clear objective which was intended to enable entities of the Palestinian Authority, headed by Yasser Arafat, to use offensive firepower to control the strength of the intifada – that is: the strength of Palestinian terrorism.

It should further be stated that the argument to the effect that the Defendant did not know that the weapons had been transferred to the al-Aqsa Martyrs Brigades organization, which used it for the purposes of terrorism, is an argument which is not in line with the evidentiary material. Thus, for example, in the memorandum dated March 15, 2006, 6:15 p.m., in Section 36, the following appears: "**The subject explained that each of the security organizations purchased materiel in large quantities and the subject approved the payment. All of the al-Aqsa Martyrs organizations used the weapons which were supplied by the security forces, which carried out the massive procurement.**"

As we have seen, the Defendant knew very well that the materiel which was purchased was transferred to the al-Aqsa Martyrs Brigades, which used those weapons. Obviously, the Defendant knew what the al-Aqsa Martyrs Brigades organization was and what its activities were. His attempt to tell us that he did not know what the organization was is an untenable