Date: July 29, 2009                                                    File No.: 3052/06

attempt to represent himself as an innocent person. We do not believe this argument. It is clear to us that the Defendant – who held a senior position in Fatah for decades and was close to Yasser Arafat – knew very well what the al-Aqsa Martyrs Brigades organization was, what its activities were, and knew very well that the organization in question was a tool in the hands of the Palestinian Authority for directing terrorism against the State of Israel and its residents.

It should further be stated that we did not gain the impression that the Defendant was a clerk who followed instructions with no discretion of his own. This results both from the senior nature of his position and from the facts which were brought before us, as well as from the statements which were made by the Defendant in Court. Thus, for example, on no small number of occasions, it transpired that the Defendant acted on his own initiative, with no approval whatsoever – and certainly with no explicit instructions – from Yasser Arafat, in the context of monetary expenditures. This was the case with regard to the "business initiatives" which were intended to make a profit for Fatah; his contacts with the Iranians, which were not known in advance by Yasser Arafat (but only retroactively); and the Defendant's own words to the effect that Yasser Arafat liked to see and to get results, and was not involved in the entire process itself from the outset. We shall also recall that the Defendant, in his own words in his testimony before us, confirmed that he did not transfer money if he did not have the appropriate amount, or if the purpose of the expenditure did not match a recognized item in the budget. This is not in line with a person who merely fulfilled every instruction by Arafat. Moreover, the Defendant stated, in his testimony before us on November 18, 2008, that if he were to receive an instruction which appeared strange to him, he would not carry out the action, and added that: "I had many disputes with the *Ra'is* on such things, and in the end, he came and told me that I was right." These words, which appeared to have been uttered with great pride on the Defendant's part, indicate that the Defendant was not merely a rubber stamp. When he thought there was a problem with this or that instruction by Arafat, he would tell him so, and would even argue with him.

In the case that is before us, and with regard to the action set forth in the indictment, the Defendant did not see fit to argue, even though we know that, had he seen fit to do so, he would have done so. The obvious conclusion is that the Defendant – by virtue of his position, *de facto* in his relationship with Yasser Arafat, and in light of his own actions, as those actions arise from the evidentiary material before us – had the discretion to approve, or not to approve, the transfer of funds. The Defendant knew very well what the purpose of the transfer of funds was, and he knew very well that the arms which were purchased with the monies in question were intended for the purposes of a terrorist organization – the al-Aqsa Martyrs Brigades.

Date: July 29, 2009                                    File No.: 3052/06

**Summary:**

From the factual standpoint, no infrastructure has been laid which enables support of the arguments that have been set forth by the defense with regard to the availability of the defense of justification, or the defense of "act of state", for the Defendant. It has been proved that the Defendant knew very well that the purchases in question were of weapons which were to be transferred to the use of a terrorist organization – the al-Aqsa Martyrs Brigades. This was not a case of the purchase of weapons with a view to taking weapons out of the hands of residents and transferring them to "responsible hands", as has been argued by the defense.

The Palestinian Authority is not a state, and in any event, the transfer of weapons for the purposes of terrorism against the citizens and residents of the State of Israel cannot take shelter under the defense of "act of state", even if a state were involved.

Second: with regard to the defense of justification, even if we were to adopt the method advanced by my colleague, the Deputy President of the Court, who is prepared to recognize the defense of justification for entities in the Palestinian Authority under certain conditions, the act in question is not a legitimate act on the part of the Authority, and the purchase of weapons which are intended for the purposes of the terrorist organization is clearly an illegal act.

Because the Defendant was a partner to the purchase of weapons as set forth in Section 1 of the indictment, we convict him with regard to that which has been set forth in this section of the indictment.

**Count 2 of the indictment:**

This count concerns the transfer of salaries to operatives in the al-Aqsa Martyrs Brigades, as well as the transfer of a requisition by ▮▮▮▮▮▮▮▮▮▮ for the payment of money for materiel.

The basis for this count lies in the statements by the Defendant, but also in the statements which were made by ▮▮▮▮▮▮▮▮ to the police. The Defendant, in fact, confessed in his interrogation that he had transferred salaries to ▮▮▮▮▮▮▮▮ men, and the latter confirms this matter in his statement. Accordingly, the opening passage of this Count of the indictment is based on statements by the Defendant and has been given a significant evidentiary supplement in the statement by ▮▮▮▮▮▮▮▮ Accordingly, and in light of the factual analysis set forth above, there is a solid basis for convicting the Defendant of that which has been set forth in the opening passage of Count 2 of the indictment, because it involved the transfer of monies to terrorist operatives.

45

Date: July 29, 2009                                                                    File No.: 3052/06

The closing passage of Count 2 of the indictment – the subject of the materiel sought by ▮▮▮▮▮▮▮▮▮▮▮ – also appears, in detail, in the Defendant's statements, and, in essence, constitutes part of the general series of offenses which is described in Count 1 of the indictment, which involves the Defendant's share in financing various items of materiel for persons in the Palestinian Authority and for the al-Aqsa Martyrs Brigades.

With regard to the closing passage of this count of the indictment, the defense argued that the Defendant did not commit any offense, because all that he did was to forward the document to Arafat. The Defendant did not pay the amount requested, because his office did not have the budget to do so, and the payment for the requisition came from the budget of the Palestinian Ministry of Finance.

I cannot accept the argument that this was not an offense. The charge which is attributed to the Defendant is "Performance of a service for a prohibited organization". The service which the Defendant performed for the al-Aqsa Martyrs Brigades organization admittedly did not involve the transfer of money from his office; nevertheless, he did perform a service. This service included accepting the requisition and forwarding it to Arafat. The Defendant was the channel through which the requisition was handled and carried out. In accordance with that which has been set forth above, and as we have seen in the analysis of the facts in Count 1 of the indictment, the Defendant was a significant link in all of the acts of procurement and finances. Furthermore, he was also the channel through which all of the financial requisitions reached Yasser Arafat. The same holds true in this case as well. This act is a service for a proscribed organization, and accordingly, it is necessary to convict him of the charges which are attributed to him in the closing passage of this Count of the indictment as well.

It should further be stated that the statements set forth above with regard to the defenses of "act of state" and justification, which were raised by the defense, apply even more forcefully to this count of the indictment, because, in this case, the Defendant granted assistance and a direct service to the terrorist organization known as the al-Aqsa Martyrs Brigades.

**Count 3 of the indictment**:

This count concerns the Defendant's part in the procurement of the ship *Karine A*.

According to an argument that has been set forth by the Defense, the Defendant did not commit any offense whatsoever. The money for the purchase of the ship did not come from his budget, but rather, from the budget of another office, which was headed by ▮▮▮▮▮▮▮▮ The Defendant did not initiate the bringing of the arms ship, and, at most, had indirect and not concrete knowledge of the fact that the ship would be carrying weapons. All that he did was to pass on the information about the ship to Yasser Arafat, who thought it was a plot to murder him.

Date: July 29, 2009                                          File No.: 3052/06

After examining the evidentiary material, we have found that the facts which are attributed to the Defendant in this count of the indictment have been proved as required. In actual fact, not even the defense disputed the fact that the facts set forth in the indictment were proven by the Defendant's statements. I shall comment that, with regard to the purchase of the ship, nothing bears out the allegation that Yasser Arafat refused this matter or thought that it was a plot. What was said by the Defendant referred to his meetings with the Iranians, which are set forth in Count 4 of the indictment, and not to the purchase of the *Karine A*, which Arafat approved with no problems whatsoever, according to the Defendant's own statements.

The central question which the defense raised is whether these acts constitute the offense of trading in war materiel.

The definition of the word "trading" in the Prohibition on Trading in War Materiel Order is as follows: "Purchase, sale, mediation, delivery, storage, transport, transfer, dispatch or repair".

This means that trading in war materiel does not only include acts of purchase and sale, but also mediation and transport of arms.

In the case that is before us, the Defendant took part in the following actions: he accepted the request by ▇▇▇▇▇▇ for financing an arms ship which would come from the Iranians; it was explained to the Defendant that the weapons which would be on board the ship would be financed by the Iranians, and that the Palestinian Authority would have to finance only the ship and its expenses; the Defendant handled the request and passed it on to Yasser Arafat, who approved the conspiracy and agreed to the purchase; the Defendant was the one who transferred the requisition for payment to Arafat, who approved the transfer of the funds; when the Defendant announced that his office did not have an appropriate budget, Arafat gave an instruction for the payment to be made from the office of ▇▇▇▇▇▇ and the Defendant transferred that instruction by means of a messenger from his office; ▇▇▇▇▇▇ was in contact with the Defendant for the purpose of receiving the information as to whether the order for the transfer of the funds had been issued.

These facts indicate that the Defendant was involved in the mediation and the financing of the arms deal. Even if his office did not pay the money directly, the Defendant was the one who made contact with Arafat and brought the subject of the arms deal before him for his consideration, study and decision. The Defendant was the entity which mediated between ▇▇▇▇ ▇▇▇▇ the Iranians and others and Yasser Arafat. The Defendant's role is accordingly not minor, but significant. It may be said that the Defendant was a significant factor in concluding the transaction, because his contacts with Arafat were of supreme importance for the purpose of executing the transaction.

47

Date: July 29, 2009                                              File No.: 3052/06

Even if the Defendant's office did not finance the transaction from the current budget, it should still be stated that the Defendant was involved "up to his neck" in this transaction, and that he constitutes an entity which took real and material action for the purpose of obtaining the financing for the purchase of the ship. Accordingly, he should be considered as having been involved in the purchase of the weapons, in the negotiations which he conducted with the Iranians from the beginning, in the purchase of means of transport of the weapons, and at the very least, in actions which constitute mediation for the purchase of the weapons.

In this case as well, it is obvious that the defenses of "act of state" and justification do not apply. In this case, the initial contact began even before Arafat knew about the subject of the arms ship, so that the Defendant certainly cannot say that his actions merely consisted of following orders.

Accordingly, the Defendant should be convicted of that which is attributed to him in this count of the indictment.

**Count 4 of the indictment:**

This count concerns negotiations which the Defendant conducted with Iranian representatives outside the Area.

The defense did not dispute, with regard to this count, that the Defendant held a meeting with people who represented themselves as Iranians, and held a general conversation with regard to possibilities for Iran's assistance to the Palestinian Authority. The defense argued that the prosecution would have to produce an evidentiary supplement of the "additional item" type in order to prove that such a meeting took place, and that the persons with whom the Defendant spoke were actually Iranians. It was further argued that, as far as the Defendant was concerned, those meetings were full of suspicion and caution and were not based on a desire to cooperate, and that, in fact, Arafat, upon receipt of a document which described the meeting, rejected the idea set forth therein.

First of all, with regard to the required evidentiary supplement, we believe that, in this case, even in the absence of any evidentiary supplement with regard to this count itself, the existence of an evidentiary supplement for other counts constitutes an evidentiary supplement for this count of the indictment as well.

As we pointed out above, a supplement of the "additional item" type is a supplement which is intended to verify the Defendant's statements. Because it is a supplement for the purposes of verification and not of embroilment, there is no necessity for the evidentiary supplement to refer to each and every one of these counts of the indictment separately, provided that there is a relationship between the various counts of the indictment in question.

48

Date: July 29, 2009                                              File No.: 3052/06

In accordance with that which has been set forth above, in the case that is before us, there is an affinity between the Defendant's actions as set forth in this count of the indictment and his actions as set forth in the previous counts of the indictment. All of them concern his work and his status as the Finance Officer in the Palestinian Authority and as a person close to Arafat. Accordingly, the evidentiary supplements which were found with regard to Counts 1 and 2 of the indictment (Prosecution Exhibit No. 8 and the statement by ███████████) also constitute an evidentiary supplement with regard to this count.

Furthermore, it is necessary to reject the argument that has been set forth by the defense, to the effect that these were only contacts with no real intention. While these were apparently initial contacts, nevertheless, by the very nature and quality of initial contacts of this type, they are at times accompanied by suspicion. This does not mean that the Defendant did not want to promote the contacts thereafter; in fact, he even brought the subject of the contacts before Yasser Arafat for decision.

Let us not forget that the elements of the offense in question require only the existence of the contact between the Defendant and another entity which is part of a hostile organization. In the case that is before us, it appears, on the basis of the proven facts, that not only did the Defendant actually meet and hold contacts with operatives of an enemy country; the Defendant acted on the basis of a desire to bring about what had been agreed upon with the Iranians and "to get results" for Arafat. Accordingly, we believe that all of the elements of the offense, in this case, were fulfilled by the Defendant.

I shall further state that, in this case as well, it is obvious that the defenses of justification and "act of state" do not apply, because the Defendant did not receive any order or instruction to carry out that which is attributed to him in this Count; rather, he acted on his own initiative and on his own recognizance, and only retroactively brought the results of the meeting to Arafat for his approval.

This being the case, the Defendant should be convicted of that which is attributed to him in Count 4 of the indictment.

**Conclusion**

We have not seen fit to accept the preliminary argumentation that has been set forth on the part of the Defendant. We have seen fit to attribute full weight to his statements to the police and to the transcripts of his interrogations by the Israel Security Agency, and to prefer his statements, wherever the Defendant argued otherwise before us. In light of the content of the Defendant's statements, we believe that there is a complete factual infrastructure for proving the charges that have been attributed to the Defendant.

Date: July 29, 2009                                            File No.: 3052/06

The Defendant cannot avail himself of any defense in this case. In the case that is before us, the defense of "act of state" does not apply, *inter alia*, because the Palestinian Authority is not a state and, during the relevant period of time, its status was even farther from statehood than it is today. Even if this defense had existed under law in the Area, the Defendant could not have taken shelter under it, in light of the fact that he transferred weapons, knowing that the weapons were meant to be used by a terrorist organization such as the al-Aqsa Martyrs Brigades.

The Defendant cannot avail himself of the defense of justification, because, even in accordance with the broadest interpretation of this defense (which, in accordance with that which has been set forth above, appears in the ruling which was handed down by my colleague, the Deputy President of the Court, with regard to the preliminary arguments), the Defendant took part in actions which are not legitimate, in a way which is not in accordance with the powers which were granted to the Palestinian Authority in the interim agreements; he acted many times on his own initiative, and not as a follower of orders; and even if there were cases in which he followed orders, the acts in question are clearly illegal, since, in accordance with that which has been set forth above, they have to do with the transfer of weapons and resources to terrorist organizations.

In light of that which has been set forth above, we have decided to convict the Defendant of all of the charges which have been attributed to him in the indictment.

**Judge Lieutenant Colonel Ronen Atzmon:**

I concur.

**Judge Lieutenant Colonel Tal Band:**

I concur.

**Handed down and notified this day, July 29, 2009, in public and in the presence of the parties.**

| _____ | _____ | _____ |
| **Judge** | **President of the Court** | **Judge** |

50

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, *et al.*,

                        Plaintiffs,

     vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                      Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

<u>DECLARATION OF RINA NE'EMAN</u>

    Rina Ne'eman hereby certifies as follows:

1.    The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as "Israeli Military Court Case File No. 3052/06 The Military Prosecution v. Fuad Hejazi Shubaki, Verdict dated July 29, 2009."

2.    I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3.    To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated as "Israeli Military Court Case File No. 3052/06 The Military Prosecution v. Fuad Hejazi Shubaki, Verdict dated July 29, 2009."

Dated: March 7, 2014

                                                                           _____
                                                               Rina Ne'eman

ss.: New Jersey

On the 7 day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
7 day of March, 2014

Notary Public

```
SHELLY TESSEIN
Notary Public
State of New Jersey
My Commission Expires Nov. 16, 2017
I.D.# 2427073
```

בית המשפט הצבאי יהודה    1

2

בפני כב׳ הנשיא: סא״ל צבי לקח    3

השופט: סא״ל רונן עצמון    4

השופט: סא״ל טל בנד    5

6

התביעה הצבאית    7

(באמצעות סגן אנדריי ורשצגין )    8

9

נגד    10

11

הנאשם: פואד חג׳אזי שובכי ת.ז. 410026173/שב״ס    12

(באמצעות ב״כ עו״ד אבינדור פלדמן)    13

14

15

16

הכרעת דין    17

18

הנשיא סא״ל צבי לקח:    19

20

הנאשם שלפנינו מואשם בארבעה פרטי אישום שעניינם חברת כספים לצרכי רכישת אמצעי    21

לחימה כפי שיפורט להלן.    22

23

פרט ראשון – סחר בציוד מלחמתי: מיוחס לנאשם כי יחל משנת 2000 ועד לסוף ינואר 2002 עסק    24

בסחר בציוד מלחמתי. נטען כי הנאשם נטל חלק בישיבה בה הורה יאסר ערפאת לו ולראשי    25

מנגנוני הביטחון לרכוש כל כמות של נשק מכל מקום אפשרי. הנאשם פעל ממועד פגישה זו יחד עם    26

אחרים לרכוש כמויות גדולות של אמצעי לחימה. הנאשם שעמד בראש משרד הכספים הפלסטיני    27

ריכז את בקשות אנשי המנגנונים השונים ואלו הועברו אליו כניירות עבודה. על מנת לוודא    28

שאמצעי הלחימה עליהם הוא משלם אכן קיימים, דרש הנאשם מתפונים אליו להביא את כלי    29

הנשק למשרדיו ולצורך כך החזיק מחסן אמצעי לחימה ברמאללה וכן מחסן נוסף ברצועת עזה.    30

לאחר שאמצעי הלחימה הועברו לרשותו, היה הנאשם מגיש את נייר העבודה לאישורו של יאסר    31

ערפאת, ולאחר אישורו של זה, היה הנאשם חותם אף הוא על הבקשה ומאשר לאנשיו להעביר את    32

הכסף לפונה באמצעות העברה בנקאית. במהלך התקופה הנ״ל נרכשו כ- 1000 טונות של אמצעי    33

לחימה תמורת 7-10 מיליון דולר. את אמצעי הלחימה דאג הנאשם להעביר למנגנוני הביטחון    34

הפלסטיניים ביודעו כי חלק ניכר מאנשיהם הינם חברים בזרוע הצבאית של ארגון הפת״ח    35

שביצעה פיגועים רבים אותה עת.    36

37

-1-