PLAINTIFF'S EXHIBIT 889

Date: July 29, 2009

File No.: 3052/06

**Military Court of Judea**

**Before the Honorable President of the Court: Lieutenant Colonel Zvi Lekach**
**Judge: Lieutenant Colonel Ronen Atzmon**
**Judge: Lieutenant Colonel Tal Band**

**The Military Prosecution**
(represented by First Lieutenant Andrei Varshchegin)

– v. –

**The Defendant: Fuad Hejazi Shubaki, Identity No. 410026173 / Prison Service**
(represented by Counsel, Adv. Avigdor Feldman)

---

**Verdict**

**The Honorable President of the Court: Lieutenant Colonel Zvi Lekach:**

The Defendant before us is charged with four [indictment] counts which concern the transfer of monies for the purpose of the purchase of materiel, in accordance with that which shall be set forth below.

**First count – Trading in war materiel**: The Defendant is accused of having traded in war materiel, starting in the year 2000 and up to the end of January 2002. It is argued that the Defendant took part in a meeting, at which [redacted] instructed him and the heads of the security organizations to purchase any amount of weapons from any possible place. The Defendant, starting on the date of that meeting, acted together with others toward the purchase of large quantities of materiel. The Defendant, who headed the Palestinian Finance Office, coordinated the requisitions of members of the various organizations, which were transferred to him in the form of paperwork. In order to ascertain that the materiel for which he was paying actually existed, the Defendant required the people who applied to him to bring the weapons to his office, and for that purpose, he maintained a storeroom of materiel in Ramallah and an additional storeroom in the Gaza Strip. After the materiel was transferred to his possession, the Defendant would submit the paperwork to [redacted] for approval, and after he approved it, the Defendant would also sign the requisition and would instruct his staff to transfer the money to the applicant by means of a bank transfer. During the period in question, approximately 1,000 tons of materiel were purchased for $7-10 million. The Defendant arranged for

Date: July 29, 2009

File No.: 3052/06

the transfer of the materiel to the Palestinian security organizations, knowing that a considerable part of the staff of those organizations consisted of members of the military arm of the Fatah organization, which was conducting many terrorist attacks at the time.

**Second count – Performance of a service for a prohibited organization**: It is argued that during the period set forth in the first charge of the indictment, the Defendant transferred a monthly salary in the amount of NIS 500 to members of the military squads of the al-Aqsa Martyrs Brigades in the Bethlehem area. At that time, members of the squads in question were conducting many terrorist attacks. In the month of October 2001, the Defendant received a request for the payment of 25,000 dinars from [redacted] for the purpose of purchasing materiel and materials for the production of explosive charges, and for the purpose of paying salaries to 268 members of the al-Aqsa Martyrs Brigades. The Defendant forwarded this request to [redacted] who instructed him to pay the money through the Ministry of Finance.

**Third count – Trading in war materiel**: This count sets forth the Defendant's ostensible role in the funding and organization of the arms ship *Karine A*, which was seized on January 3, 2002, carrying large quantities of materiel of various types, including rockets, mortars and machine guns. It is argued that in September 2001 the Defendant met with [redacted] who updated him with regard to his contacts with the Iranians, with regard to the financing of the arms ship. [redacted] informed the Defendant that the Palestinian Authority would have to bear expenses in the amount of $125,000. The Defendant agreed to this, and even agreed to approach [redacted] in order to obtain the financing required. At a later stage, the Defendant forwarded the demand for payment to [redacted] who signed it. The Defendant transferred [redacted] instructions by messenger to the office of [redacted] who was in charge of fuel for the Palestinian Authority. The ship, carrying the war materiel, anchored in Yemen. The Defendant, who was in Yemen at the time, was informed of the arrival of the ship and received a report on the intention to prepare passports for two of the ship's crew. After the ship had sailed from Yemen to the Suez Canal, it was seized by Israel Defense Forces troops on January 3, 2002, in accordance with that which has been set forth above.

**Fourth count – Contact with a hostile organization outside the Area**: This Count concerns contacts which the Defendant maintained with Iranian entities, with a view to coordinating the military cooperation between Iran and the Palestinian Authority. Among other things, possibilities were discussed for setting up ammunition factories within the borders of the Palestinian Authority, transferring materiel from Lebanon via Hezbollah, and military training for members of the Palestinian Authority in Lebanon and in Iran. In addition, a document summarizing the meeting was drawn up, and was later presented by the Defendant to [redacted]

Date: July 29, 2009

File No.: 3052/06

**The scope of the "Not guilty" plea**

It has not been denied that the Defendant was in charge of the financial affairs of the security organizations in the Palestinian Authority, during the period of time relevant to the indictment. However, it has been claimed that he acted with permission and with authority. It has further been claimed that some of the facts that have been set forth in the indictment are not accurate. In addition, it has been claimed that the Defendant's statements, which substantiate the overwhelming majority of the indictment, were taken from him unlawfully.

**Conducting the trial**

In the early stages of this case, preliminary arguments were made but were denied in a decision which was handed down on December 4, 2006. After that decision, and following the entry of a "not guilty" plea by the Defendant, the submission of evidence began. The majority of the evidentiary material was filed by consent; that consent, however, referred only to the evidentiary material which did not directly refer to the Defendant. Thus, for example, there was no dispute that the arms ship *Karine A* was seized.

In accordance with that which has been set forth above, the indictment is principally based on the statements of the Defendant. Because the admissibility of those statements was disputed, a preliminary trial was held. The parties agreed that the decision in the preliminary trial would be handed down within the framework of the verdict in the entire case. Within the principal case, we were required to hear only one witness on behalf of the prosecution, [redacted]; all of the rest of the evidentiary material, with the exception of the Defendant's statements, was filed by consent. The Defendant testified for the defense.

The prosecution filed its summation in writing, and the defense, at the end of the process, delivered its summation orally – and, moreover, after a considerable delay of four months.

**The preliminary trial**

**General**

In accordance with that which has been set forth above, in light of an argument that has been set forth by the defense, to the effect that the Defendant's statements were taken in a manner which was not of his own free will, a preliminary trial was held. In the preliminary trial, and in light of the preliminary arguments which were raised, the three police interrogators who had taken the Defendant's statements were heard, along with three interrogators from the Israel Security Agency who had conducted most of the Defendant's interrogation. Testifying for the defense in

Date: July 29, 2009

File No.: 3052/06

the preliminary trial were the Defendant and [redacted] who was in the same cell with the Defendant during part of the period during which he was interrogated.

**The preliminary arguments**

a. It was argued that the Defendant had been interrogated throughout two months of protracted interrogations, during most of the hours of the day and night, and had been deprived of sleep.

b. It was argued that the Defendant is a sick man, who requires medication for chronic diseases, and that his medications were not given to him, nor was he provided with an adequate substitute.

c. It was argued that the Defendant was handcuffed and shackled throughout the interrogation, which caused him severe pain and a feeling of severe humiliation. It was further argued that, at times, his interrogators would leave him alone in a room, cuffed, for four to seven hours, which caused the Defendant to be in a state of profound pain, fear and anxiety.

d. During the time he spent under interrogation, IDF troops destroyed the Defendant's house, uprooted many citrus trees and olive trees in his fields and destroyed a ton and a half of honey. The knowledge of the destruction caused the Defendant to experience anxiety and fear for his family's fate. The interrogators exploited this and told the Defendant that if he confessed, he would be allowed to go free and to assist his family members.

e. It was argued that the Defendant had been told that, due to the fact that he was a sick old man and did not have many years to live, his interrogators did not wish to continue interrogating him and keeping him under detention for a long period of time. Accordingly, if he confessed, he would immediately go free. His confessions were issued subject to those promises and as a result of that act of enticement.

f. It was argued that the Defendant's interrogators made false accusations against him and repeatedly told him that he was lying to them. The interrogators adopted methods of physical and emotional exhaustion. The Defendant, who is an elderly man and well respected in his community, felt humiliated as a result of the young interrogators' behavior toward him, and, in light of his grave physical condition as well, he longed for his death and for the moment that the interrogations would be over.

g. It was argued that the Defendant signed his confessions in order to please his interrogators and without knowing what was written in the statements, which were taken down in the

Date: July 29, 2009 File No.: 3052/06

Hebrew language, which he cannot read. The police interrogators relied on the transcripts that were recorded by the Israel Security Agency, and when he pointed out the inaccuracies and the errors in the transcripts, the police interrogators led him to understand that "chaos" would break out if he repudiated his confessions.

Let us first state that, in light of the testimony given at the preliminary trial by the Defendant himself, who did not bring up a considerable portion of the preliminary arguments, the defense, in its summation, reduced its arguments to the preliminary arguments which concerned the humiliation of the Defendant.

**The evidence at the preliminary trial**

**The testimony of policeman [redacted]**

This witness stated that he is a speaker of Arabic, which he learned at home, in his studies and at work. When he testified before us, he stated that he remembered the Defendant's facial features, but did not remember the details of the interrogation with total accuracy. The witness stated that he customarily first identifies the subject before him and afterwards identifies himself as a policeman. He reads the content of the warning out to him, and after the suspect understands the content thereof and signs it, the testimony is taken in the form of questions and answers. The testimony is taken in Arabic and is written down by him in Hebrew. At the end of each page, he reads it out to the suspect, who signs it. According to that which has been set forth in the statement, he gave the Defendant a cigarette and allowed him to smoke. The witness stated that he had gained the impression that the suspect's condition was "OK" and that he was capable of giving testimony; otherwise, he would have written a memorandum on the matter or would have noted it in the statement, and would have refrained from continuing to collect the testimony. The same applies to exceptional events in the course of the testimony. When he was asked to state examples of special events which he would have written down, had they occurred, he stated that some examples could be that the suspect complained of headaches, that he felt unwell, or that he was not capable of giving the testimony. He stated that, while taking down the statement, he notes events such as giving the suspect a drink, a cigarette and the like.

The witness stated that, in the course of the interrogation which he conducted, the atmosphere was relaxed, and the Defendant did not bring up any problem. When the Defendant asked to smoke, he was given the opportunity to do so, and nothing else exceptional happened. He further stated that, in the course of the interrogation, the Defendant sat opposite him with his legs shackled. The witness stated that he could not possibly have left the Defendant alone in a room for a long period of time, because the room in question is an interrogation room, in which there were other files, including his own personal file, and so he could not possibly have left the room.

Date: July 29, 2009

File No.: 3052/06

The witness was asked about the argument to the effect that he had told the Defendant that his house had been destroyed, olive and citrus trees had been uprooted and a ton and a half of honey had been destroyed. He answered that, up to the date of his testimony in Court, he had not even known that the Defendant had citrus trees and honey, and that he (the interrogator), in any event, had said no such thing.

The witness argued that he had never told the Defendant that he had only a few years to live and that, if he confessed, he would immediately be released. He said that this was forbidden, and that he does not use such means.

The witness stated that he had read the transcripts of the Israel Security Agency before taking the testimony and that, on the basis of the transcripts, he had read out the suspicion against him to the Defendant, and that this also constituted a guideline for the testimony which was taken.

The witness denied the argument according to which he had told the Defendant that, if he repudiated his statements to the Israel Security Agency, "chaos" would break out.

The witness was asked whether the Israel Security Agency interrogation and the police interrogation were performed in the same place, and he stated that even though they were performed in the same facility, the testimony was taken in the police interrogators' room. He stated that he did not go into the Israel Security Agency interrogation rooms, and they (the Israel Security Agency) did not go into the police interrogation rooms. He also stated that the police interrogation room looks different from the Israel Security Agency interrogation rooms.

The witness stated that he does not know how to write in Arabic, and therefore, he wrote down the statement in Hebrew, while translating to the Defendant what he had written down; he further stated that he had cautioned the Defendant in Arabic. The witness noted that he did not know how many hours the Defendant had slept before the testimony was taken, nor did he know how many days he had previously been interrogated by the Israel Security Agency and the police. The witness stated that he had before him a memorandum of the things which had been said during the Israel Security Agency interrogation before the statement was taken, but not the chain of events of the entire interrogation or all of the events which preceded it. He stated that he generally had one memorandum before him, but that he did not remember with regard to this case.

**The testimony of policeman [redacted]**

This witness stated, in his testimony before us, that he remembered the interrogation in a general way, but not in detail. He stated that he taken the Defendant's confessions at the Ashkelon facility, after having warned him as required by law. The interrogation was conducted in Arabic

and the statements were written in Hebrew. Afterward, he read the confessions to the Defendant in Arabic, and [the Defendant] confirmed them with his signature.

The witness stated that he documents exceptional events which take place in the course of an interrogation, in the statements themselves or in a separate memorandum. In the case of the Defendant, he noted in the body of the statements the fact that he gave the Defendant food and drink. He stated that the atmosphere at the interrogation was relaxed. He remembered the Defendant as a handsome, smiling man who cooperated and answered the questions which he was asked.

He remembered that the Defendant needed medication due to the state of his health – and that the medicines were supplied to him by the prison infirmary. He remembered that, on one occasion, a medic entered the room and asked to give the Defendant his daily medication. He stated that after clarifying the matter, he allowed the Defendant to take his medicine, and he documented this in the body of the statement (Confession No. 7, dated April 2, 2006, page 3, line 62).

The witness stated that, to the best of his memory, the Defendant, when he sat opposite him at the interrogation, was not in cuffs. He denied that he had told the Defendant that his house had been destroyed or that trees had been uprooted and honey had been destroyed, and he further denied that he had told the Defendant that if he confessed, he would be released, due to the state of his health and his age, or that if he repudiated things which he had stated in the Israel Security Agency interrogation, "chaos" would break out.

The witness noted that the different fonts in the printed statements resulted from the fact that a structured form was used and denied that anything had been copied from another place. He stated that, in the opening passage of the statement dated March 19, 2006, he had asked the Defendant how he was, and the Defendant had answered, "Thank God, I am all right", and this was written down. He claimed that, because the Defendant is an elderly man, he asked in order to be certain of his condition, and he documented this in the body of the statement. He stated that generally speaking, he knew about the state of the Defendant's health, but he did not exactly remember when he had found out about it. The witness noted that he did not remember that he had read anything exceptional in the Israel Security Agency transcripts prior to the interrogation. The witness insisted that, in the interrogation which he conducted, the Defendant understood that he had the right to remain silent or to tell everything. He added that at the outset of the interrogation, he introduces himself and explains to the subject where he is, and that he reads the warning after that. He always does this, for every suspect, and accordingly he did not document it in the statement, except for his personal particulars, which were recorded. He claimed that he reads everything out to the suspect, including the suspect's personal particulars, in order to ascertain that those are his particulars, as well as the warning.

Date: July 29, 2009

File No.: 3052/06

The witness confirmed that the interrogation took place in the police interrogation room, which is located within the Israel Security Agency interrogation facility in Ashkelon.

The witness noted that he does not remember any comment on the Defendant's medical condition in the Israel Security Agency transcripts which he read, and added that, had there been a medical problem, it would have come up. Because the statement was indeed taken, this means that the Defendant was fit to be interrogated. He did not remember an exceptional event with regard to the Defendant's medical condition, but remembered that he had given the Defendant hot and cold beverages and cigarettes, and that the Defendant had smoked a great deal.

The witness noted that the seventh statement was taken, not on February 4, 2006, as written in the statement, but on April 2, 2006, and that this was a clerical error.

**The testimony of policeman [redacted]**

This witness stated that he remembered the Defendant, but that he was relying on the written text of the statements which he had taken. He stated that he taken the statements in Arabic, wrote them down in Hebrew, and then translated them again verbally into Arabic for the Defendant. In the testimony of March 26, 2006, he accused the Defendant of things which others had said about him, and the Defendant commented on them. The witness did not find, from reading the statement, that there were unusual events in the course of the interrogation; otherwise, according to his statement, they would have been written down. In the testimony of May 14, 2006, he showed the Defendant documents and the Defendant commented on each one of them. He stated that the atmosphere in the interrogation was good, and he noted that the subject was an elderly man. The witness stated that the Defendant remembered details of the documents which were shown to him and that, in his opinion, the Defendant has a good memory.

The witness stated that had the Defendant asked to be examined by a doctor, he would have written it down in the statement and would have stopped taking the statement, because he is aware of the significance of a statement which is taken from a subject who is not in a condition which enables him to give good testimony. He noted that subjects who are brought before him are not cuffed unless it is to be feared that they are dangerous and likely to be wild. In the case of the Defendant, who was an elderly man, there was no need for this.

The witness was asked whether he told the Defendant that they had destroyed his house, uprooted trees and destroyed honey, and answered that this was the first time that he had heard that the Defendant's house had been destroyed. The witness also denied that he had told the Defendant that if he confessed, he would be released immediately because of his advanced age and medical condition. The witness noted that he had not used any means of physical or verbal pressure and emphatically denied that he had led the Defendant to understand that if he

repudiated the confessions which he had made to the Israel Security Agency, "chaos" would break out. The witness argued that there was no need to exert force or pressure and that everything had taken place in a pleasant atmosphere.

In his cross-examination, the witness stated that he did not know how long the Defendant had been under interrogation before he interrogated him, but that there had been cases in which continuous interrogation had previously taken place, and in such cases, the interrogators waited in order to allow the subject to have rest time as provided by law. He confirmed that he relied on transcripts of the Israel Security Agency, which are written in Hebrew, and he stated that he had translated part of the memorandum for the Defendant, in which he was accused of smuggling weapons. The witness confirmed that he was the one who had asked for an extension of the detention in some cases, but he did not remember which interrogation operations were necessary, and stated that, for that purpose, it would be necessary to examine the reports which were presented to the judge who deliberated on the detention. The witness stated that he did not know who seized the documents which were shown to the Defendant within the framework of the statement of May 14, 2006, or who translated them. He stated that he himself does not read Arabic and accordingly relied on the translation, but that the Defendant was shown the original in Arabic. He further stated that he had translated the testimony by another person, which he had shown to the Defendant, into Arabic, because it was written in Hebrew and the Defendant does not read Hebrew.

**The testimony of the person known as** 

This witness was the person in charge of the interrogation of the Defendant on behalf of the Israel Security Agency. The witness stated that he remembered the interrogation and the Defendant. He claimed that this was a complex interrogation, but that, all in all, the atmosphere was very relaxed, with a great deal of mutual respect. The witness added that the Defendant was held in a detention cell like any other detainee, but that, in the interrogation, he was treated very respectfully in accordance with his status. He stated that, throughout almost the entire period of the interrogation, the Defendant was supplied with food from the interrogators' kitchen, smoked cigarettes, and also received a response to special requests such as boxer shorts and a Koran, and there were even cases in which he asked to remain under interrogation because he was bored.

The witness rejected the argument to the effect that the Defendant had not received medical treatment, and stated that, due to the Defendant's age and his complaints, he was examined by a Prison Service doctor and was under close monitoring by the Prison Service infirmary. He added that he personally contacted the Prison Service infirmary and ensured that the Defendant was examined and his medical problems were treated at the professional discretion of the doctors. The witness stated that he had told the Defendant that there was no possibility of bringing in his

medications, but that his attorney could supply a detailed list of the medications which the Defendant uses. At the same time, the witness stated that the responsibility for medical treatment rests with the prison doctor.

The witness was asked to give his impression of the Defendant's condition and stated that he did not have the impression that the Defendant was not capable of being interrogated. He remembered one case in which the Defendant was very tired when he left the cell and a medic was accordingly brought into the interrogation room, and the Defendant explained that it was related to his mental state and not to his physical state on that day. The witness repeatedly pointed out that there were cases in which the Defendant had actually asked to remain in the interrogation room.

The witness was asked to comment on the question of the cuffing of the Defendant during the interrogation. He stated that as a general rule, throughout most of the interrogation, the Defendant was not in cuffs. At the same time, there were cases in which the Defendant became upset and hit himself. Against that background, he was handcuffed so as not to harm himself, and immediately after he calmed down, the cuffs were taken off. He added that, in cases in which he left the interrogation room for a few minutes, the Defendant was handcuffed to the chair, but that the handcuffs concerned were attached to a long chain which allowed his hands to move freely, including smoking. He emphasized that he never left for periods of four to seven hours, as was stated in the preliminary arguments, and that, generally speaking, the intervals in question were of a few minutes, half an hour at the most. He added that the Defendant had not complained to him about this. In answer to a question by the Court, the witness replied that the Defendant did not have a watch.

The witness was asked to comment on the argument to the effect that the Defendant was told that his house had been destroyed, trees had been uprooted and honey had been destroyed. The witness answered that this was the first time that he had heard that the Defendant had honey, nothing was said to the Defendant about his house, and the interrogation had not even touched on this subject. The witness denied that he had told the Defendant that, if he confessed, he could be released to help his family, or that he could be released due to his age and medical condition.

The witness confirmed that, in the course of the interrogation, the Defendant had been subjected to accusations on the basis of the suspicions which the interrogators had, and there were cases in which he was told that he was lying, but there had been no intention of humiliating him. According to his statement, the interrogation was conducted with a great deal of mutual respect, and on a number of occasions during the interrogation, the Defendant even commented favorably on the attitude which had been displayed toward him by the witness. The witness insisted that no use of threats or force was made, that the interrogation was conducted by means of a protracted

dialogue, and that he remembered the atmosphere in this interrogation as being exceptionally good, relative to other interrogations which he had conducted. The Defendant cooperated in extensive portions of the interrogation, and there were days in which the very mention of the topic of a subject to the Defendant sufficed for the Defendant himself to provide a detailed version of the matter.

In his cross-examination, the witness stated that he had heard about the Defendant's detention from the media, approximately an hour before he met him at the interrogation facility. The witness further stated that the initial interrogation of the Defendant had been conducted by the interrogator known as '█████', and that he was not aware of it at the time, but only retroactively.

The witness stated that the size of the cell in which the Defendant was kept was standard; that there was a window, but it was closed; and that the ventilation was based on a central air conditioning system.

The witness was asked why the Defendant was interrogated continuously on March 15, 2006, starting at 10:55 a.m. and until after midnight, when the Defendant had already been interrogated toward morning, from 2:40 a.m. to 5:45 a.m. The witness answered that this was the initial stage of the interrogation; the Defendant asked to set forth his actions in chronological order, and this took time. The Defendant did not express a desire to stop the interrogation or to go to sleep; in the course of the interrogation, he ate, drank and smoked for his pleasure.

The witness was asked to comment on the statements which appear in the transcripts which were drawn up by the interrogator known as █████, such as "You are behaving like a little child, sitting there and lying through your teeth", and whether they preserved the subject's dignity. The witness answered that, in every interrogation, there are points of conflict and disagreement, and still, the dignity of the subject is preserved.

The witness stated that the Defendant was not prevented from meeting with an attorney, but that the entire subject of the contact with the attorney was under the responsibility of the police. To the best of his knowledge, the police notified the attorney of the Defendant's detention; however, the witness did not check this.

The defense attorney referred the witness to the memorandum dated March 19, 2006 at 4:35 p.m., in which the Defendant stated that they were laying trumped-up charges against him, and that they would do better to bring a sword and cut off his head, and asked him whether this sounded like a calm and quiet person. The witness answered that he did not have the impression that the Defendant was a calm and quiet person, but rather, a person who tended toward outbursts of anger. He added that this behavior and similar behaviors on the Defendant's part were at times

characteristic of him, although most of the interrogation was conducted in a very positive atmosphere with a great deal of mutual respect.

The witness was asked to explain what a "persuasion talk" is, and stated that it is a conversation in which the suspect is offered a chance to reach an understanding and to confess to the charges attributed to him, and receives an explanation of the nature of the information in the possession of the interrogators. The nature of the talk depends on the subject and his nature. In the case of the Defendant, most of the talk was focused on important current events and general topics, because the Defendant was a person who had traveled to a lot of places; nonetheless, at the end, the conversation always went back to the subject of the interrogation. The witness did not exactly remember what had been said at the talk in question, which was unfruitful from the standpoint of the interrogation; nonetheless, he pointed out that, among other things, the Defendant had been told that it would be better for him to confess.

The witness was asked whether telling the Defendant "to reach an understanding with his interrogators" referred to an agreement in which the Defendant would confess and would then go home, because he was an old man. The witness stated that the Defendant was not told that he would go home, or that he was an old man. The witness stated that nothing would happen if the Defendant did not confess, but that a confession would be in his favor, because then the interrogation would be over.

The witness was asked whether great pressure was not exerted on the Defendant, in such a way as to cause him to want to harm himself, as appears in the memorandum of March 21, 2006. The witness stated that the Defendant had had a fit of rage at the beginning of the interrogation, and that afterwards he had calmed down and had gone on to hold a long, detailed and relaxed conversation.

The witness denied that he had promised the Defendant that, if it was found that the polygraph indicated he was speaking the truth, they would not continue to ask him about things in which he was shown to have been speaking the truth. It is correct that, after the examination, the focus was on other subjects; nonetheless, there was no impediment against returning to the same subjects. According to his statement, the agreement and the understanding with the Defendant only concerned cases in which he was found to be lying.

The witness denied that he had told the Defendant that, if he finished the interrogation, he would be transferred to the prison, where the conditions were better, and accordingly, it would be better for him to finish the interrogation. When he was referred to the memorandum dated April 9, 2006 at 1:30 p.m., Section 8, which says that the Defendant was asked if he did not want to finish his interrogation and to be transferred to the prison, where he could be visited by his

family, the witness answered that the question which the Defendant was asked was primarily a way of telling him to finish the interrogation. The witness added that the interrogation did not focus only on the subject of the ship *Karine A*, but also on the subject of his sources of funds and his contacts with the Tanzim / Fatah. The "understanding" in question was that the Defendant would provide information, and not necessarily such that would lead to his incrimination.

**The testimony by the person known as '[redacted]'**

This witness is the Israel Security Agency interrogator who interrogated the Defendant on the day of his arrival at the interrogation facility, and another time at a later stage.

The witness stated that the Defendant had been asked how he was and answered that he felt well, although he said that he was suffering from cancer. The Defendant did not complain of pain, and had he done so, [the witness] would have called a doctor or a medic. The witness stated that he had not been given medications by the Defendant's attorney, and that he did not remember that the Defendant had asked for medications. The witness was asked about the time of the first interrogation, 2:40 a.m., and answered that his team leader had demanded that he begin the interrogation, and that is what he did. He also noted that, to the best of his memory, he had not interrogated the Defendant when the latter was handcuffed or shackled, and even if he had been wearing cuffs – which, in his estimation, he had not been – he had not been wearing shackles. The witness denied that he had left the Defendant in the interrogation room for periods of four to seven hours, alone and handcuffed. The witness further denied that he had said, or that he knew that anyone had said, to the Defendant that his house had been destroyed, trees had been uprooted and honey had been destroyed. He denied that he had promised the Defendant that he would be released if he confessed.

The witness confirmed that the Defendant had been told that he was lying, and claimed that this was a legitimate contention on the part of an interrogator. He stated that there had been no use of threats or force in the interrogation and that, if the Defendant had been afraid, this was a subjective matter, but that he had not intentionally frightened him.

In his cross-examination, the witness stated that he knew who the Defendant was and he knew that he had been active in Fatah for a very long time, and was in charge of the procurement and financial system within that organization.

The witness stated that he had given the Defendant a piece of paper, written in Arabic, which set forth his rights as a detainee and an interrogation subject, but that he had not read it out to him himself. He confirmed that the first sentence which he had written in the memorandum was the first sentence which the Defendant had spoken to him, which was: "The Defendant is fed up with the story of *Karine A*."

Date: July 29, 2009

File No.: 3052/06

The witness was asked to describe his impression of the Defendant's condition at the first interrogation, which had taken place toward morning, and stated that he remembered that an elderly man had come in, who was relatively tired, in accordance with the time at which he arrived. They had an ordinary conversation, and he remembered that the Defendant was a heavy smoker, was given a lot of cigarettes, and that the conversation had been conducted in a positive atmosphere. He did not remember whether the Defendant was agitated or depressed, and did not remember anything else unusual. According to his statement, to the best of his understanding, the Defendant's statement that he was "fed up" is consistent with the fact that he had been under protective or preventive detention following the *Karine A* affair.

The witness insisted that his role was to seek out the truth and that, if the Defendant had given him a reasonable theory in line with the intelligence information, he would have accepted it.

The witness repeatedly stated that he did not remember whether the Defendant was wearing cuffs in the interrogations which he had conducted. However, if there was any use of cuffs, it was only if the witness felt threatened. He added that he did not remember any such thing, and that if the Defendant had shouted or acted wildly, he would have written it down.

The witness repeatedly emphasized that he had given the Defendant the piece of paper with his rights and duties, and that his rights were listed in it. He himself did not tell the Defendant that he had the right to remain silent or to be represented by an attorney.

The witness insisted that, had the Defendant complained to him about not being allowed to bring his medications into the detention facility, or that he felt unwell and was not getting assistance from the prison doctor, he would have written it down. At the same time, he stated that he knew the Defendant was a sick man. He personally was never asked about bringing medications in.

The witness repeatedly emphasized that the search for truth is "sacred" and that it was the objective. Accordingly, when the Defendant told him that he was willing "to confess everything", he explained to him that there was no point in talking that way, and that he should tell [his story] himself, without adding to it or detracting from it. He had the impression that the Defendant was not willing to confess everything and was capable of holding his own in the interrogation. The witness stated that the interrogation of the Defendant was protracted because there were subjects which required elucidation and clarification, and there were other items which he chose to deny or not to explain.

Date: July 29, 2009

File No.: 3052/06

**The testimony of the person known as "[redacted]**

This witness was an interrogator for the Israel Security Agency who participated in the Defendant's interrogation, and stated at the very outset that, because two years had gone by since the date of the interrogation, he did not remember part of it.

The witness was confronted with the preliminary arguments and stated that the Defendant had received medical treatment from the prison infirmary. He remembered that, in one of the transcripts, the Defendant had stated that he had polyps in his stomach, and within a short time, he was taken for examination and medical treatment. The witness stated that, as an interrogator, he is not the authority with regard to the transfer of medications to the Defendant, and that the decisions on that subject are made by the prison doctor. He further stated that he did not remember any case in which the Defendant called his attention to the fact that he needed medication.

The witness denied that the Defendant's feet were shackled in the interrogations at which he was present, and added that the Defendant was handcuffed after he hit himself and after he was warned that, if he continued to hit himself, he would be handcuffed, so that he could not harm himself.

The witness claimed that there was no case in which the Defendant was left handcuffed and alone in the room for four to seven hours, and claimed that he had not told the Defendant that IDF troops had destroyed his house and had destroyed trees and honey. The witness added that he had also not told the Defendant that, if he confessed, he would go free in light of his age.

The witness stated that he had told the Defendant more than once that he was concealing information and refusing to give it to his interrogators, but he had not used violence, threats or attempts at intimidation.

In his cross-examination, the witness was asked about the meaning of the statement to the Defendant that "he had been brought to the interrogation in order to confess with honor". The witness stated that confessing really was an honor, and his objective as an interrogator was to have the subject make a true confession.

The witness stated that the subject of the interrogation was the Defendant's involvement in the matter of the ship *Karine A*, his connection to the financing and smuggling of materiel, and his connections with Iranians and others in Arab countries whose intention it was to carry out hostile terrorist activity against Israel.

Date: July 29, 2009

File No.: 3052/06

The witness stated that he had recorded in a memorandum that the Defendant "was behaving like a little child", because, notwithstanding his advanced age, he sometimes behaved childishly in the interrogation. When he was asked to explain what he meant, he answered that childish behavior is when a person is being interrogated on information and gives a cover version which exempts him from liability, even though he knows that his interrogators know what they are talking about with him.

The witness stated that the Defendant had been told that he should not "behave like a rascal", and that his meaning for the word "rascal" was a person who shouts, lies, acts dishonorably and does anything he can to save his skin.

The witness stated that he apparently knew at the time that the Defendant had been interrogated toward morning by the interrogator known as "Hadi", but that he had not seen any impediment to interrogating the Defendant until 6:00 p.m.

The witness was asked about a statement which he had made in the interrogation, which was documented in the memorandum dated March 20, 2006, in which it was written that he had told the Defendant that it was not by chance that his detention had been extended by 18 days, in light of the large amount of information which he was concealing from his interrogators. The argument was raised to him that, in this way, he was actually saying to the Defendant that the more information he concealed, the longer his detention would be. The witness answered that it was understandable that the Court had decided to extend the detention, on the basis of the information which it had before it. The witness was asked about an additional expression which he had used toward the subject, which was documented in the memorandum dated March 27, 2006, in which it was written that he had told the Defendant that "in the end, he would confess". The argument was raised to the witness that, according to common sense, this meant that until the witness confessed, the interrogation would not be over. The witness answered that that was not what was written, and eventually, the Defendant did, in fact, provide a great deal of information.

The witness was asked about the cases in which the Defendant hit himself, and said that he remembered that the Defendant had hit himself with his hands a number of times, and that they had succeeded in calming him down a number of times by asking him to stop it. The witness further stated that, in his opinion, this was childish behavior. The witness was asked whether this was not behavior which attests to the Defendant's desperation, and answered that, in his estimation, it was all a show, because, in fact, after that, the Defendant went on to provide a great deal of information.

Date: July 29, 2009

File No.: 3052/06

**The testimony by the witnesses for the prosecution at the preliminary trial – interim summary**

The testimony which was heard may be divided into testimony by members of the police and testimony by Israel Security Agency personnel. The policemen stated that the interrogation was conducted in a relaxed manner, with no problems whatsoever, and that the Defendant gave information of his own good and free will. It was further stated that the Defendant had been given food and beverages in the course of the interrogations, had not been left alone, and had not been subjected to any threats or promises in the context of his interrogation.

The witnesses on behalf of the Israel Security Agency noted that the Defendant had been treated with respect, in accordance with his status. They did not deny that, in his interrogation, there were moments of "confrontation", in which they accused the Defendant of lying and concealing information; however, they claimed that this is a natural part of an interrogation. The interrogators denied that the Defendant had been left alone in the interrogation room for long periods of time. According to their statements, there were a number of cases in which the subject have been left alone, but for brief periods of time, during which he was placed in handcuffs which were attached to a long chain. It was further stated that the Defendant was not handcuffed in the course of the interrogations, except for cases in which he hit himself and attempted to harm himself. Even in those cases, after the Defendant calmed down, the handcuffs were taken off.

The Israel Security Agency interrogators also denied that they had uttered threats against the Defendant, or that they had told him that his house had been destroyed and the like, or that anyone had promised him that, if he confessed, he would be released due to his age.

With regard to his medical condition, the Israel Security Agency interrogators stated that the Defendant had been treated in the prison infirmary and that, in light of his age, they even ensured that he would receive treatment, at the discretion of the medical personnel, of whom they were not in charge.

**The testimony by the Defendant at the preliminary trial – direct examination**

The Defendant began by stating that he suffers from high blood pressure, hemorrhoids, an ulcer and back pain.

The Defendant described that he was in prison in Jericho under American and British supervision and that, on March 14, 2006, at 8:00 a.m., the IDF instituted a siege on the Muqata in Jericho, until a bulldozer came and destroyed the building. He and others were taken to the Jericho Coordination and Liaison Facility; that evening, he was transferred to the "Russian Compound"

[a police facility in Jerusalem]. The Defendant told them that he was cold, because he was wearing only his pajamas. From the "Russian Compound", he was transferred to Ashkelon, and he was in handcuffs throughout that entire time.

His interrogation by the Israel Security Agency began that same night, and he was told that he had to confess everything. The Defendant stated that he had told his interrogator that there was nothing against him, that he was a person who was doing his work and following orders.

According to his argument, he was handcuffed and shackled during the interrogation, and noted that his hands were cuffed in front of him. The Defendant stated that he did not receive the medications which he takes on a regular basis, and even though he asked to see a doctor, he was told that he would only see him the next day. The Defendant claimed that he was taken to the doctor only after he pleaded many times to be taken for examination. Following the doctor's examination, he was only given medicine for his blood pressure, but no one took care of his other problems.

The Defendant pointed out that he was kept in a cell 1.5 m x 2 m in size, and that he would fall asleep quickly because he was exhausted, but woke up often because of the pain from which he suffered.

The Defendant said that he did not remember much of his interrogation. He remembered that his interrogators wanted him to confess that he had purchased the *Karine A*, but he had no connection to this. According to his argument, his interrogators spoke to him impertinently; they sometimes addressed him violently and sometimes calmly.

The Defendant claimed that his interrogators told him that they were interested in obtaining an explicit and detailed confession of everything he knew about the *Karine A* affair, and that, if he confessed, he would be able to go home. The Defendant claimed that he had told his interrogators that he was prepared to confess, but not to lie.

The Defendant stated that his attorney had told him that they had destroyed his house, uprooted trees and smashed beehives. According to his statement, the interrogators told him that they had heard about this, and this had a negative effect on him.

The Defendant was asked about his visits to the prison doctor, and stated that, even when he complained, he was given only acetaminophen. When he was told that, after he complained of digestive problems in his interrogation, he was given a medicine called "Gastro", he said that he did not remember that. In another case, the Defendant remembered that he had been given paraffin for his constipation, but said that this only happened once. According to his statement, although he received medication for his blood pressure, he felt that it was of no help to him. The

Date: July 29, 2009 File No.: 3052/06

Defendant was asked whether he told the doctor about his chronic diseases, and stated that he told him everything, and also that he had asthma, that he had difficulty breathing properly and that he suffered from tachycardia.

He also stated that the policeman who taken his statement sat with the Israel Security Agency report and asked him about it, but that he did not know what the policeman wrote, because the interrogation took place in Arabic and the record was written down in Hebrew.

The defendant was asked if he believed that he would be released if he told the interrogators what they wanted to hear, and he answered "Yes". According to his statement, his interrogators told him about another subject who had been expected to get four life sentences, but that [redacted] had intervened in his case and they released him.

The Defendant stated that he did not ask the interrogators to call an attorney, and that his family were the ones who called the attorney on his behalf. The Defendant added that he asked his interrogators if he could see an attorney, and their answer was that if an attorney came and asked about him, they would let him see him.

**The testimony by the Defendant at the preliminary trial – cross-examination**

The Defendant stated that he had felt humiliated during his interrogation. He further stated that he had told his interrogators everything they wanted to hear. The Defendant was then asked at which stage of the interrogation he had "broken". The Defendant did not answer directly; instead, he claimed that, from the very beginning, he had told his interrogators that he would tell them whatever he had to say, and he had in fact told them what he knew. When he was asked if the things that he had said on the first day of his interrogation were said under pressure, he answered that he had said those things because that was what happened and because it was not a secret matter. He further stated that, in his interrogation, he had not lied at any stage, and that he had told what he knew, but that he did not know what had been written down in Hebrew.

According to his statement, his interrogators humiliated him, told him he was a liar and used "dirty" language to him. He further stated that they used to leave him alone in an empty room, in cuffs, and come back only several hours later.

The Defendant stated that, in his interrogation, he acted according to the interrogators' instructions, and that he certainly did not dictate any demands or the terms of the interrogation. When he was asked how he found the strength to tell his interrogators that "the State of Israel owed him money", he did not answer directly. The Defendant confirmed that he smoked during his interrogation and stated that he had taken cigarettes from his interrogators whenever he asked for them. The Defendant was asked what else he had been given and replied "Nothing". When he

was asked specifically whether he had received a Koran, coffee, tea and underwear, he answered that he had. According to his statement, he had not asked for them; rather, his interrogators had brought them to him.

The Defendant repeated that he had been under pressure from the very first day, but emphasized that, in his interrogation, he had spoken only the truth. He further stated that he had denied any relationship to the ship *Karine A* and had insisted on that point.

In answer to questions by the Court, he stated that the things which were written down in his statements were translated for him, but that he did not know what was actually written down. The Defendant further stated that, at times, he would get upset in his interrogation ("from all that talking, a person goes crazy"), but that his irritation had only manifested as "exploding inside" and he had not shown it to his interrogators.

**The testimony by [redacted]**

This witness stated that he was with the Defendant, in the same cell, at Ashkelon Prison in April 2006, for some two weeks. He stated that the Defendant was sick and weak and had difficulty breathing, walking or standing up. He claimed that, on many occasions, he and his cellmates had knocked on the cell door and asked for a doctor for the Defendant, because "he was going to die", and the guards had given the Defendant "at the very most, acetaminophen". He stated that a doctor had never come to the cell.

In his cross-examination, the witness stated that he was in the cell with the Defendant, to the best of his memory, starting on April 12, 2006. He claimed that, over a two-week period during which he was with the Defendant in the cell, the Defendant had only gone out to the toilet or the shower, and then added that he had also gone out to interrogations. When he was asked to comment on the fact that there were many documents by medics and doctors who had seen the Defendant during that time, he stated that, during the period when they were together, this did not happen. He went on to add that, each time the Defendant came back from an interrogation, he told them (his cellmates) about it. The witness was asked to give the names of other persons who were in prison with him at the time and answered that there were people whose names he remembered, but did not state a single name.

The witness stated that the Defendant had told him that the interrogation made him feel pressured, that he was chained to the chair all the time and treated badly. The Defendant also told him that he was suffering from cancer and he needed medications. The witness said that the Defendant had not told him about the things which he received from his interrogators, such as fruit, cigarettes and underwear.

Date: July 29, 2009 File No.: 3052/06

**The decision in the preliminary trial**

It may be said that the preliminary arguments raised claims that had to do with "humiliation", the use of an unfair method of interrogation by creating unfair emotional pressure, as well as enticement and persuasion. The decision in this case is a decision which is based on fact, which is derived from our direct impression of the statements which were made before us.

**Evaluation of the testimony in the preliminary trial – credibility and weight**

**Credibility of the witnesses for the prosecution**

We did not find that the witnesses for the prosecution were lacking credibility, as the defense attempted to argue. In fact, there can be no doubt that the Defendant was under interrogation, in the course of which the interrogators sought to obtain as much information as possible with regard to his activity in the financing of Palestinian terrorism.

Like any interrogation, it was not always conducted under pleasant and comfortable conditions. The Defendant was imprisoned in an interrogation facility, where he was interrogated over a protracted period of time. However, there is a discrepancy between the discomfort which is inherent in the holding of an interrogation and the use of means which are capable of depriving him of his free will and his ability to choose whether to give information which incriminates him.

As may be seen from that which has been set forth in the statements, and the Defendant did not dispute this in his testimony, in the course of his interrogation by the police, he received cigarettes and could smoke as he liked, and was given beverages and food in the course of the interrogation. Thus, for example, in the statement dated March 19, 2006, page 5, line 132, the following sentence appears: "At this stage, the suspect asked to pray, and the suspect's confession was interrupted for that purpose." Further, on page 6, line 164: "In the course of his confession, the suspect was given hot and cold beverages and cookies." In a statement dated March 20, 2006, page 1, line 18, the following sentence appears: "The suspect was given a cigarette and smoked." Further (page 2, line 19), it is written that: "The suspect was given water at his request in order to take a pill." The statement dated March 22, 2006, page 5, line 118, states that he was given hot and cold beverages and cigarettes; a similar sentence appears in the statement dated March 30, 2006, page 6, line 144. The statements which were taken on April 2, 2006 (Prosecution Exhibit No. 9 and Prosecution Exhibit No. 10) state that he was given refreshments. It is difficult to imagine a situation in which an interrogation was conducted in a heavy-handed and cruel manner, according to the arguments that have been set forth by the defense, while at the same time the Defendant was given the opportunity to pray, to smoke as much as he wanted, to eat and drink, and of course, to take medications.

Date: July 29, 2009

File No.: 3052/06

It should be stated that refreshments such as food, beverages and cigarettes were also given to the Defendant in the course of his interrogations by the Israel Security Agency. As early as his first interrogation (memorandum dated March 15, 2006, 2:40 a.m.), he was given coffee, and in the following interrogation (memorandum dated March 15, 2006, 10:55 a.m.), he was given lunch, cigarettes and coffee. It can be seen that this treatment continued throughout all of his interrogations, and almost every memorandum states that the Defendant received food, beverages and cigarettes. He was even given a Koran (memorandum dated March 16, 2006, 10:00 a.m.; memorandum dated March 21, 2006, 12:00 noon); he was allowed to go to the toilet (memorandum dated March 20, 2006, 11:40 a.m.) and was given the possibility of discussing with his interrogators problems which concerned the conditions of his imprisonment (memorandum dated April 3, 2006, 11:00 a.m., Section 1). The Defendant did not dispute these statements which appear in the transcripts. This treatment is not typically given to someone whose free will [his interrogators] are trying to crush and whom they are trying to humiliate and hurt.

Over and above the subject of the refreshments which were given to the Defendant, the transcripts from the Israel Security Agency interrogation do not indicate that the subject was "broken" and humiliated, in view of the fact that the Defendant commented many times on topics which are not related to the interrogation, such as general political and diplomatic topics (memorandum dated March 16, 2006, 10:00 a.m., Sections 24-25; memorandum dated March 27, 2006, 4:30 p.m., Section 1; memorandum dated April 11, 2006, 10:00 a.m., Section 12), and even told his interrogators that the State of Israel owed him $275,000 which it had taken from a closet in the Muqata (memorandum dated March 19, 2009, 4:35 p.m., Section 18). Such behavior is not typical of a person who has been broken in his interrogation and is willing to appease his interrogators and to say anything they want him to, only in order for the interrogation to end; rather, it is characteristic of a person who feels sufficiently self-confident to say what is on his mind.

It is important to emphasize that the witnesses for the prosecution did not attempt to embellish the conditions of the interrogation. They did not deny that there were short periods of time when he was left alone in the room, and that he was cuffed at those times; it was, however, argued that those intervals of time were brief. Nor did they deny that the Defendant had been cuffed after he hit himself and began to act wildly (memorandum dated March 21, 2006, 12:00 noon, Sections 2-3). Furthermore, the interrogators did not claim that the Defendant was a relaxed, calm person; rather, they said that the Defendant was a person who was quick to anger, and that he would turn his rage against himself, and accordingly, they were required to handcuff him at times. Nor did they deny that, from time to time, they addressed the Defendant in a manner which was not pleasant for him to hear – for example, they told the Defendant that he was lying, was behaving

like a child or a rascal – but it was not proved that they adopted humiliation as a method of interrogation.

This description by the interrogators appears credible to us. We have not found that it contains inconsistencies or contradictions, and it is in line with the statements written down in the transcripts and, to a certain degree, with the testimony by the Defendant in Court. More precisely: there is a significant discrepancy between the testimony by the Defendant in Court and the preliminary arguments which were initially raised by the defense – arguments which they abandoned at the stage of the summations following the Defendant's testimony. It may be said, even at this stage, that the impression which arises from the Defendant's testimony did not match the preliminary arguments which he raised.

**The credibility of the testimony by [REDACTED]**

Before we discuss the credibility of the Defendant's testimony, we shall first state that [REDACTED] credibility, as we perceived it, was quite poor. We have difficulty understanding how the witness remembered "well" everything which had happened to the Defendant, and how "they pleaded" for medical treatment for him which was not provided, but he could not say who else was imprisoned with him in the cell at the time. Nor can his statements be reconciled with the Defendant's medical file, which shows that, even during the period concerning which the witness [REDACTED] testified, the Defendant was treated a number of times by the prison infirmary. It *prima facie* appears that the testimony by [REDACTED] is testimony which was entirely intended to assist the Defendant at his trial, and which accordingly, at the very least, painted quite an extreme picture of the Defendant's medical condition. It should further be stated that [REDACTED] said that the Defendant complained to him of having been chained to the chair – an argument which the Defendant himself did not repeat. Accordingly, we have not seen fit to attribute any weight whatsoever to the testimony by [REDACTED]

**The credibility of the Defendant – general**

The Defendant unequivocally stated that, in his interrogation, he did not say anything which was not true. Notwithstanding the Prosecutor's attempt to understand at which stage the Defendant "broke" and began to tell his interrogators things which they ostensibly wanted to hear, the Defendant insisted that he provided all of the information which he had, with no problem whatsoever. The Defendant denied having linked himself to the ship *Karine A*, in contrast with that which has been set forth in the police statements.

It appears that, even though the Defendant claimed that he felt humiliated, this feeling – according to his own argument – did not influence him to say anything which he did not want to

say. We shall emphasize that the Defendant did not claim that he had initially refused to tell his interrogators the truthful things which he told them, or that they had been extracted from him against his own free will. The Defendant, throughout his testimony before us, claimed that he had spoken the truth, and that he had done so willingly, because he was not ashamed of the matters involved and they did not contain any secrets.

In accordance with that which has been set forth above, the only thing which the Defendant was not willing to accept were the things which were written down in his statements; according to his argument, those things did not reflect what he had actually said, and because he cannot read Hebrew, he could not know if that is what was written. The Defendant appears to have abandoned the preliminary argument, according to which the police interrogators had threatened him with "chaos" if he did not repeat what was written down in the transcripts by the Israel Security Agency interrogators, as he did not mention this matter at all in his testimony before us.

We shall further state that the direct impression gained from the Defendant's testimony is of someone who exaggerated the strength of the humiliation which he felt and the arguments concerning the treatment which he was given, in accordance with the line of argumentation in the preliminary trial. In any event, even if he subjectively felt humiliated in the situation in which he found himself, we shall emphasize that he was not willing to confirm or to state that he had said anything which was not true, or that he had been broken in his interrogation. Our impression is that the Defendant adopted a line which was "independent" of the defense line in the trial, with regard to things which he thought it was important to tell the Court. The Defendant wanted to say that he had told only true and correct things, of his own free will, but at the same time, to say that he had suffered during his interrogation. This cannot be reconciled with the argument that his statements were taken other than of his own free will. Obviously, a situation of interrogation is not comfortable and is not pleasant, and certainly not for an elderly person who previously held a senior position. At the same time, we did not gain the impression that the Defendant, at any stage of his interrogation, felt distress which prevented him from making demands or which led him to say things other than of his own free will.

**The credibility of the Defendant – the medical treatment**

The Defendant's arguments with regard to medical treatment, or the absence thereof, are not at all in line with what appears in his medical file. Thus, for example, in a document which records his examination before his intake at the incarceration facility on March 14, 2006, a statement appears in which the Defendant "notes chronic diarrhea, takes Colatal as necessary, rules out heart disease, [high blood] sugar, high blood pressure or other problems." On March 15, 2006 at 2:19 p.m., he was examined again at Shikma Prison. In that case as well, even though he was examined by a different doctor, the section in which he was asked about past diseases states the

words "Rules out"; in addition, it was noted that he uses only one medication, Colatal for his stomach. These records are not in any way in line with his statements to the effect that he suffers from many problems and that he gave that information to the prison doctors. On March 15, 2006 at 6:15 p.m., he was again brought before a doctor, where the record states that the Defendant complained of constipation and heartburn and was given medication. As we can see, as soon as the Defendant complained of any problem whatsoever, not only was he not deprived of access to a doctor; he was, in fact, examined by a doctor only four hours after his previous examination by a doctor. In addition, the Defendant saw a doctor on March 19, 2006, and was given medications in that case as well. It is not superfluous to state that the medications were not "acetaminophen", as he claimed, but other medications (of three different kinds).

The Defendant was examined by a doctor and received treatment for his constipation problem on March 20, 2006 and March 21, 2006 as well. On March 22, 2006, the Defendant was brought for examination at the initiative of the prison authorities, and not at his own request; on the basis of his complaints, it was determined that his blood pressure would be monitored, and medications were prescribed for him. On the same day, at 7:00 p.m., the record states that he was again examined by a doctor "**at the request of an interrogator**".

Not only were different medications of various kinds prescribed for him; his argument, to the effect that he was given paraffin oil only once, is not in line with the medical records, which show that he was given paraffin on a number of occasions, on March 20, 2006, March 21, 2006, March 30, 2006, April 1, 2006, April 3, 2006, April 4, 2006 and April 17, 2006.

Accordingly, it appears that the Defendant's arguments with regard to the lack of medical treatment are unfounded. The Defendant received various medications as required, in accordance with his condition; he saw a doctor many times – once even at the initiative of his interrogator – and received treatment at the discretion of his doctors. It appears that his arguments with regard to medical treatment were intended to intensify the preliminary arguments and are not in any way founded on reality, and this has implications on his poor credibility before us.

**The credibility of the Defendant – the interrogation stage**

Aside from the subject of medical treatment which we have discussed above, the Defendant's attempt to state that he did not receive anything from his interrogators can be pointed out as an additional example of the Defendant's lack of credibility – an argument which was intended to provide an exaggerated portrayal of his difficult state during the interrogation. As soon as he was confronted with the things which he had received (meals, time for prayer, cigarettes, coffee, tea, a Koran, underwear), he "suddenly recalled" and confirmed that these things were indeed given to him; he added, however, that he had not asked for them to be given to him. In addition, the

Defendant himself stated that everything which happened during his interrogation caused him "to explode inside", and that he had not shown this to his interrogators – in contrast with the explicit statements which were written in the transcripts, and to which the interrogators testified, to the effect that the Defendant lost his calm from time to time, and that they were accordingly forced to handcuff him. It is not logical to believe that the interrogators would invent and record a story whereby the Defendant hit himself, and that they were forced to handcuff him as a result, if this did not happen. The Defendant's argument, to the effect that he had only "exploded inside", is not in line with the records kept by the interrogators, nor with their testimony before us, and represents part of the line which he adopted in order to show that, on one hand, they had humiliated him, but, on the other, he had not given into his interrogators. In this matter, we preferred the testimony by the interrogators.

It should be stated that the impression gained from the Defendant's testimony is that of a person who is well aware of the things which were said by him, both in Court and in his interrogation by the Israel Security Agency and the police, but who nonetheless sticks to his story and maintains that injustice was done to him. That injustice, as he sees it, was not caused by the things which he said in his interrogation, but by the humiliation which was practiced upon him, as an independent factor, and not as one which affected him in his interrogation. Another factor in the "injustice" results from the statements which were written down in Hebrew, without his approval, and which were not in line with what he said. More precisely: the Defendant confirmed, in his testimony before us, that the words in his statements, which were ostensibly written down on the basis of what he had said, were translated to him, as the police interrogators had stated; nonetheless, the Defendant claimed that he does not know what was really written, because he does not know Hebrew.

We have not seen fit to believe the Defendant on this point. We did not gain the impression that the Israel Security Agency and police interrogators recorded things which were not told to them by the Defendant, or that they distorted the statements which been written down in Hebrew when they translated them to him, or that they exerted pressure on him which negated his ability to choose whether to tell his interrogators certain things. It appears that the Defendant was well aware of why he was under interrogation, and was well aware of what his interrogators were looking for, and that he behaved accordingly during his interrogation. The Defendant is aware of the fact that he made statements with regard to his activity in the context of *Karine A* – statements which are not in line with his present version, which holds that there is no relationship between him and the arms ship.

Moreover, the statements which are written down in the transcripts of the interrogation indicate that the Defendant gave a great number of details, as he testified before us, as early as the first day of the interrogation. At the same time, the Defendant did not immediately say everything he

knew, because his interrogation was a "developing interrogation", to which, over the course of time, various items concerning his activity were added. As may be seen from the transcripts, in the beginning, when they raised accusations against him, he customarily denied them; however, when they showed him evidence which refuted his denial, he began to tell what he knew. Such conduct is actually characteristic of a person who acts in a calculated manner and is willing to tell things only when he knows that, in any event, his interrogators have the information already, without volunteering additional information. Even if there had been any possibility of raising an argument, to the effect that the additional details which he gave, following the evidence which was presented to him, were given as a result of the pressure which was exerted during the interrogation, the Defendant himself has contradicted and refuted that argument.

**The credibility of the Defendant – summary**

In contrast with the credible impression made by the interrogators from the police and the Israel Security Agency, we can state that the testimony by the Defendant was not especially credible. In accordance with that which has been set forth above, according to the testimony by the Defendant himself, his "humiliation" and his "medical condition" did not in any way detract from his ability to say the things he wished to say, [and did not] cause him to say things which he did not want to say. There was no stage in which the pressure of the interrogation led him to confess anything against his will, and there was no stage at which he "broke".

On the basis of all of the evidence in the preliminary trial, we are convinced that his statements to the police interrogators were taken in a relaxed way and with no improper pressure. In contrast with the arguments raised in the preliminary argumentation, he did not attempt to make the police interrogators aware of errors which appeared in the transcripts, and none of them told him that "chaos" would break out if he did not confess. We are convinced that his interrogators made him no promises that, if he confessed, he would be released; they told him nothing about the destruction of his house (a fact which some of the interrogators had not even known until the date of the hearing before us); and accordingly, we have no choice but to reject his arguments concerning any "humiliation" or enticement and promises which caused him to say things other than of his own free will. The Defendant received full medical treatment as required, and his medical state did not change his ability to say what he had to say, of his own free will.

**Preliminary trial – The ruling**

In light of our factual conclusions with regard to the credibility of the witnesses for the prosecution, on one hand, and the lack of credibility of the witnesses for the defense, on the other, we hereby rule that the statements by the Defendant were taken of his own free will and are admissible in this trial.

Date: July 29, 2009

File No.: 3052/06

**The principal trial**

**The testimony by [REDACTED]**

This witness stated that he was a member of a military squad which was led by [REDACTED] and was tried for offenses of murder which he committed. The witness stated that he and his fellow squad members were soldiers and they received a monthly salary at the end of each month. The witness claimed that he did not know who transferred the salary to them. The witness was confronted with a memorandum from his interrogation by the Israel Security Agency, which stated that the salaries were transferred by Fuad Shubaki. The witness claimed that he did not know Fuad Shubaki and that he had never heard that name. The witness claimed that the person who transferred the salaries to them was named [REDACTED] who was a clerk in the Finance Office. In his cross-examination, he stated that he had never seen the Defendant and had not received money from him, and that he did not even know who was responsible for finances in the Palestinian Authority.

**The statements by the Defendant to the police**

The Defendant made eight statements to the police, aside from the many memoranda which were taken from him by the Israel Security Agency. We shall now provide a chronological survey of the statements which were taken from him and the things which he said in them – things which, as a general rule, are in line with the statements which he made in his interrogation by the Israel Security Agency.

Prosecution Exhibit No. 5 – statement by the Defendant dated March 19, 2009: In the statement in question, the Defendant spoke of his activity within the framework of the Palestine Liberation Organization (PLO) prior to the year 2000. He subsequently stated that, in 2000, there was a meeting in [REDACTED] office, in the presence of [REDACTED] told them to buy any weapons which came into Gaza or the West Bank, and any of those senior officials who received an offer (to purchase weapons – [REDACTED]) would come to the Defendant with paperwork; the Defendant would transfer it to [REDACTED] and after [REDACTED] signed, the Defendant would instruct his staff to transfer money to the senior official in question. The Defendant gave detailed examples as to the quantities and types of weapons which were purchased and the amounts of money which were paid for them.

The Defendant added that in July 2001, [REDACTED] [REDACTED] smuggled a container from Lebanon with RPG bombs and launchers which came from Hezbollah, with the approval of [REDACTED], and the naval forces took them. He paid $50,000 with [REDACTED] approval.

Date: July 29, 2009 File No.: 3052/06

The Defendant added that he had met with [redacted] in Jordan, and that [redacted] had told him that he had met with Hezbollah operatives and with an Iranian, and had agreed with them that they would transfer three containers of weapons, loaded on a ship. He asked the Defendant to speak with [redacted] about it, so that [redacted] would give money. The Defendant spoke with [redacted] about it, and [redacted] instructed [redacted] to give money for that purpose. The Defendant also stated that he had gone to Yemen and met [redacted] who had told him that [redacted] wanted passports to be prepared for him and for [redacted] and that he [redacted] had come to see the ship *Karine A*, which had arrived in Yemen with the arms.

Prosecution Exhibit No. 1 – statement by the Defendant dated March 20, 2006: In this statement, the Defendant stated that he had met with [redacted] in Jordan in 2001, and that [redacted] had told him about the contacts with the Iranians, according to which the latter were willing to pay for an arms ship. [redacted] told the Defendant that he (the Defendant) would be meeting the Iranian representative in Dubai. The Defendant stated that he came to Dubai and there, together with [redacted], he met two Iranian representatives – [redacted]. The Iranians told the Defendant and [redacted] that they were willing to finance the training of Palestinians in Lebanon and Iran, and that they were willing to help with money and armaments. The Defendant added that [redacted] wrote up a report for [redacted] and that they told the Iranians that, once they had a reply from [redacted] they would let the Iranians know. According to his argument, when [redacted] saw the report, he responded angrily and said that the Iranians were liars. The Defendant, in that statement, provided further details of his contacts with the Iraqis and their consent to donate two million barrels of oil to the Palestinians as a gift.

Prosecution Exhibit No. 6 – statement by the Defendant dated March 22, 2006: In the statement in question, the Defendant provided additional details about the meeting with the Iranians. He stated that the one who made the initial contact with them was [redacted]. The Defendant set up a meeting between him and [redacted] and the two of them went to meet the Iranians in Dubai. Following that meeting, [redacted] told the Defendant that the Iranians wanted to meet him. The Defendant went to Dubai to buy cars and told [redacted] that he would meet the Iranians afterward. The Defendant was asked why he had not told [redacted] that he went to meet the Iranians, and answered: "Because [redacted] liked me to bring him results, and not just chatter." The Defendant went to Dubai, and after his meeting about the cars, he went to meet the Iranians with [redacted]. Because he was tired, it was agreed that they would meet again that evening. The Defendant did meet the Iranians again that evening and asked them if they wanted to work with him and cooperate with him, and the Iranians said that they did. [redacted] spoke with them about military subjects, such as the need for advanced training in the manufacture of hand grenades and grenade launchers, and that they also wanted ammunition and weapons. After that, they (including the Defendant) talked about how to set up an ammunition factory within the Palestinian Authority, and the Defendant even told them that they would need money, and they

Date: July 29, 2009

File No.: 3052/06

agreed to that as well. The Iranians even stated that they would transfer weapons and ammunition from materiel storehouses which they maintained in Lebanon. One of the Iranians asked to be sent a daily summary of the Israeli media. They agreed to continue meeting, and the Defendant stated that he would ask permission from [redacted] to come to the meetings. [redacted] wrote up the contents of the meeting and he and the Defendant signed it. When he returned to the Area, the Defendant gave the document to [redacted] who said the people in question were swindlers who wanted to kill him.

The Defendant stated that, in 2002, he heard that the *Karine A* had been seized. He understood that [redacted] wanted him to "take the matter upon himself", and accordingly, he told the Board of Inquiry that [redacted] had given the instructions and that he had been the contact person between [redacted] and [redacted] and [redacted] The Defendant added that he had heard from [redacted] about the plan to bring in the ship as early as August 2001, two months before the meeting with the Iranians, and that the meeting with [redacted] at which they agreed on the transfer of $125,000 to [redacted] for the ship project, took place after [redacted] had been in Syria and Lebanon. The meeting with the Iranians in Dubai was intended to set up Palestinian-Iranian contacts and to put [redacted] and [redacted] in contact with the [Iranian] Revolutionary Guards in Lebanon, and he and [redacted] had not talked about the ship with the Iranians.

<u>Prosecutor's Exhibit No. 11 – statement by the Defendant dated March 26, 2006</u>: In this statement, the Defendant provided details about various arms deals in which he was involved. He initially stated that a person had come to him and told him that they had found barrels with RPG rockets in the sea and that he wanted $7,000 for them. The Defendant gave an order to pay the price. The Defendant stated that he had received an offer to purchase 10 RPG rockets for $45,000, and that he had transferred the money to the party making the offer. The Defendant went on to state that this was better than having the weapons fall into the hands of Hamas or other organizations. The Defendant stated that, in 2002, [redacted] stole all of the arms which he had purchased, and which were in their storerooms. The Defendant went on to state that [redacted] had contacted him in 2001 and asked for $20,000 to set up a factory for the manufacture of materiel and hand grenades, and that [redacted] had instructed the Defendant to give him the money. The Defendant transferred the money and later heard that there had been an explosion in an apartment which was rented by [redacted]

The Defendant was asked about the purchase of boats for [redacted] and stated that [redacted] had instructed him, in 2000, to transfer $150,000 for the purchase of two fishing boats. The Defendant noted that the money in question was transferred even before he transferred $125,000 to [redacted] for the *Karine A*.



Date: July 29, 2009 File No.: 3052/06

The Defendant talked about money which he transferred for the purpose of purchasing ammunition in Bethlehem, and that he had financed the salaries of [redacted] men. According to his argument, some of the money which he transferred was used for salaries (NIS 500 per person) and some was used to purchase ammunition.

Prosecution Exhibit No. 7 – statement by the Defendant dated March 30, 2006: The Defendant was asked about his acquaintance with [redacted] and stated that the latter was in charge of purchasing materiel in the West Bank, and that he had purchased 1000 Kalashnikov rifles. The Defendant noted that he had transferred the money for the purchase to [redacted], in the amount of approximately $2 million.

The Defendant stated that he had paid [redacted] $570,000 for seven Sagger missiles and 18 rifles; the rifles were defective and they returned them. According to his statement, the missiles were kept in the *diwan* near his home in Gaza, and he later transferred them to [redacted] The Defendant went on to provide details about various people who had brought materiel and stated that he used to transfer the money, and that they used to keep the arms in a storeroom within his office. According to his argument, [redacted] would tell him to whom he should transfer the materiel, and he would instruct his deputy to issue arms according to [redacted] instructions.

The Defendant stated that [redacted] manufactured explosive charges for [redacted], and that he had transferred the money to [redacted] so that it would be transferred to [redacted] The Defendant also gave information concerning additional arms deals.

The Defendant, in the course of the examination, was shown a document (Prosecution Exhibit No. 8) and stated that it was a paper written by [redacted] which contained price quotations for arms, and that he had settled accounts with him according to the prices listed.

Prosecution Exhibit No. 9 – statement by the Defendant dated April 2, 2006, 9:50 a.m.: At the beginning of his interrogation, the Defendant was referred to his statement of March 19, 2006, in which he had stated that he smuggled arms in the ship, and he confirmed that he had said that. The Defendant was asked about the involvement of others in smuggling the arms and spoke about it. Among other things, the Defendant stated that, in July 2001, he had given [redacted] $50,000, on [redacted] instructions, to smuggle bombs and RPG launchers. The Defendant stated that he paid the money for the smuggling and not for the weapons, because the weapons had been given to them free of charge by Hezbollah.

The Defendant was asked to tell about the *Karine A* again, and stated that he had met with [redacted] in Jordan, and that [redacted] told him that he had met in Lebanon with representatives of

Hezbollah and of Iran. The latter had agreed to transfer three containers full of materiel to them, financed by the Iranians, and they (the Palestinians – [redacted].) would only have to pay the expenses for the ship. The Defendant stated that they were offered the opportunity to take weapons from [redacted], but that they did not do this. When he was asked why, he said: "Because we have arms free of charge from Hezbollah and from the Iranians, so why should we take from him?" He stated that the plan was to bring ships with arms to the Ali Port, and that he and [redacted] had spoken with [redacted] and told him that $125,000 was needed. [redacted] told the Defendant to give the money, and the Defendant said that he did not have it. [redacted] told [redacted] to write a requisition asking for the money, and after [redacted] did so, the Defendant took the requisition to Ramallah and transferred it to [redacted] who wrote to [redacted] and told him to pay the money. [redacted] transferred the money to [redacted]

The Defendant was asked to tell about the meeting with the Iranians again. According to his statement, he met with two representatives; he believed the senior representative was a man named [redacted]

Prosecution Exhibit No. 10 – statement by the Defendant dated April 2, 2006, 2:01 p.m.: (As a parenthetical note, I shall state that the date on this statement was February 4, 2006. This is an error which is clarified in Prosecution Exhibit No. 13, and the correct date is April 2, 2006. Let us not forget that the Defendant could not have been interrogated on February 4, 2006, because he was arrested only a month and a half later.)

The Defendant stated that he had set up a Procurement Committee, which had set up an armaments storeroom, in which everything the Committee purchased was stored. The Defendant was asked about the Scientific Committee and stated that the activity of that committee consisted of teaching courses in the manufacture of materiel. The role of the Committee in the West Bank was to check that the arms purchased were serviceable. The Defendant was shown a document and he stated that this was a document by the Scientific Committee, in which they asked for soldering machines and lathes. The Defendant forwarded the requisition to [redacted] and he did not know what happened to it. The Defendant stated that the Scientific Committee belonged to the Fatah, the al-Aqsa Martyrs Brigades were Fatah operatives, and [redacted] used to give the al-Aqsa Martyrs Brigades money for activities "under the table".

The Defendant stated that people from his office transferred $150,000 to [redacted] in order for him to purchase two fishing boats. Even before that, the Defendant had transferred $50,000, so that [redacted] would give them to the Lebanese to cover the expenses of smuggling barrels of weapons, about which he had spoken previously (in the previous statement).



Date: July 29, 2009 File No.: 3052/06

The Defendant stated that [redacted] met in Lebanon with [redacted] and the Revolutionary Guards of the Iranians. The Defendant asked him if he had told [redacted] about it, and [redacted] said that he had told him about the plan to smuggle the ship and about his meetings in that context. [redacted] told the Defendant that he wanted him to talk to [redacted] because [redacted] needed $125,000 for the expenses of the ship. The Defendant talked about it with [redacted] at the airport in Jordan. [redacted] told the Defendant that [redacted] should prepare a requisition to receive the funds. [redacted] did so and, three days later, the Defendant gave [redacted] the document. [redacted] gave the Defendant written instructions to transfer the money to [redacted] via [redacted], and the Defendant forwarded the requisition to [redacted] by messenger and told [redacted] about it.

The Defendant stated that he had transferred money to [redacted] for him to buy arms "from outside" (that is, from outside the Palestinian Authority). The Defendant stated that he had a storeroom in Ramallah, in which they put all of the arms which they purchased from [redacted] and they would distribute the arms on the instructions of [redacted]

The Defendant stated that in August 2001, he purchased seven missiles from [redacted] for which he paid $75,000, and which he transferred to [redacted]

The Defendant stated that, in 2001, he was approached by an emissary from [redacted] with two papers. One of them was a requisition for the purchase of ammunition for the al-Aqsa Martyrs Brigades, in the amount of 25,000 dinars, and the second set forth the names of the fighters in each area, in order for them to be paid their monthly salary. The Defendant forwarded the papers to [redacted] for him to decide in the matter, and [redacted] gave him an instruction to give [redacted] the money which he asked for. The Defendant said that he had no money, and then [redacted] instructed the Ministry of Finance to transfer the money.

The Defendant stated that, when he came to Yemen, he was greeted by [redacted] who told him that [redacted] and [redacted] ship had arrived. [redacted] told the Defendant that they had prepared a passport for [redacted]i and they also wanted to prepare a passport for [redacted], the captain of the ship.

The Defendant went on to state that he transferred money to [redacted] as part of a partnership which was intended for the sale of tracer bullets for a profit. In the end, however, the transaction was not carried out and he got the money back.

<u>Prosecution Exhibit No. 12 – statement by the Defendant dated May 14, 2006</u>: At the outset of the interrogation, the Defendant was shown a document, and the Defendant stated that the document had to do with a requisition which he had received for the purchase of a lathe and cutting blades. The document had been transferred to him by [redacted] and the

Date: July 29, 2009

File No.: 3052/06

Defendant had forwarded the document to ████ The document did not come back to him with a payment order. The Defendant remembered that the document had been accompanied by two additional papers. One of them was a requisition for the purchase of arms, and the other was a requisition for the payment of salaries to members of the al-Aqsa Martyrs Brigades, but their names did not appear on his list and so he could not pay them.

The Defendant was asked what he had to add with regard to the Sagger missiles which they purchased, and he said that an instruction had come from ████ to pay for the missiles, because he was afraid that [other] people would buy them and use them.

**The testimony by the Defendant at the principal trial – direct examination**

The Defendant began his testimony by stating that he was the head of the Finance Department in the Palestinian Authority, and that his powers were those of a clerk who received his instructions from ████ According to his statement, he had no authority to make decisions on his own; rather, he only acted according to written instructions.

The Defendant confirmed that, in fact, a meeting of all those in charge of the security organizations had taken place in ████ office in Gaza in 2000. He stated that all of those present at the meeting, except for him, customarily met with Israeli commanders. He claimed that what was said at that meeting was that it would be necessary to collect the weapons which were held by the public and by civilians and, if necessary, they should pay for them. According to his argument, his role was to ascertain who the owners of the weapons were and what the price was and to obtain approval from ████ who would sign the payment order. Only after receipt of an instruction would he release the money for payment.

According to the Defendant, the weapons were taken so that they would not be used by entities such as Hamas and the Islamic Jihad, which did not recognize the Oslo agreements. The Defendant claimed that no weapons were purchased outside the confines of the Authority. The Defendant also claimed that the weapons reached a storeroom in the National Security building, where his offices were also located, but that he was not in charge of the storeroom. To the best of his knowledge, the campaign to collect weapons was known to the public. The Defendant further stated that he did not know how many weapons were purchased or how much money was paid for them. He repeated that every expenditure was approved by ████ The Defendant stated that he was not the one who transferred the weapons and he did not know whether they were transferred to the Tanzim.

The Defendant confirmed that he knew the people whose names appear in the first count of the indictment, including ████ According to his statement, the latter was



Date: July 29, 2009 File No.: 3052/06

seconded to his office from [redacted] and his job was to bring the signed documents from [redacted] The Defendant claimed that he did not know whether [redacted] position included the purchase of the arms, and, in any event, the Defendant did not have a storeroom under his responsibility. According to his statement, the payments were made by check or in cash, and each amount was written down. The Defendant claimed that he did not see, did not buy and did not issue weapons. He only worked with the documents, and he himself was afraid of weapons. The Defendant again emphasized that he did not know how much money was paid or which weapons were purchased. The only thing he did was receive documents from the various security entities and give payment orders to people. The Defendant denied that he had purchased and distributed pistols or that he knew anything about it.

The Defendant denied having made payment to members of Fatah and denied that he had paid people in the Bethlehem area. According to his argument, there was an instruction from [redacted] to pay NIS 500, but he did not know what they were being paid for. No one told him that those people belonged to the al-Aqsa Martyrs Brigades. The Defendant denied that an emissary had come to him from [redacted] or that he had seen a financial report which included expenses for the purchase of chemical materials for the production of explosives. He also denied that he had paid other financial expenses of the al-Aqsa Martyrs Brigades, or that he had received an instruction from [redacted] to pay [redacted] 25,000 dinars, and in any event, he did not have such an amount to transfer.

The Defendant denied any relationship to the arms ship *Karine A*. According to his argument, he only heard about it after he was arrested in Jericho. The Defendant confirmed that he knows [redacted] the [redacted] and confirmed that [redacted] had given him a document from [redacted] according to which the Defendant was supposed to pay [redacted] $125,000. According to the Defendant, he did not know what the payment was for and he refused to pay, because he did not have such an amount in the budget.

The Defendant confirmed that, when he was in Dubai for the purpose of purchasing vehicles, he was approached by [redacted] who asked him to transfer a letter to [redacted] He met [redacted] together with other people and received a letter from them. He transferred it to [redacted] nd later found out that the content of the letter had to do with the Iranian proposal to help the Palestinian Authority, but he did not know and did not say anything about an arms ship.

The Defendant confirmed that, while he was in Yemen, he met [redacted] at the Palestinian Embassy there, but he was not aware of the fact that, at that time, an arms ship had come into Hudeida Port in Yemen. He confirmed that [redacted] told him that they were preparing a Yemenite passport for [redacted] but he did not know why.

Date: July 29, 2009

File No.: 3052/06

The Defendant stated that the Palestinian Authority had received a gift of two million barrels of crude oil from Iraq, and that he had been given a proposal to make contact with the Iranians, so that they could sell the barrels for the Palestinians and divide the consideration. For this purpose, he met with the Iranian Commercial-Economic Attaché. The Defendant denied any relationship or any knowledge, on his part, with regard to any offer on behalf of the Iranians to help the Palestinians by providing training and weapons, and denied having been present at a meeting at which such a proposal was raised. The Defendant denied that he had signed the minutes of such a meeting. According to his argument, he had only transferred a letter from [redacted] to [redacted] and the latter had refused any contact with the Iranians.

**The testimony by the Defendant at the principal trial – cross-examination**

In his cross-examination, the Defendant was asked if he was familiar with the al-Aqsa Martyrs Brigades organization. He answered in the negative and said that he had only heard about them in the media. He claimed that he had also stated in his interrogation that there was no such thing as the al-Aqsa Martyrs Brigades. The Defendant was confronted with two documents which had been presented to him at his interrogation of May 14, 2006, when he had stated that he knew nothing about those documents. When he was told that he had said to the police that one of the documents was a requisition to set up a lathe shop and the second was a requisition for salaries for the al-Aqsa Martyrs Brigades, he claimed that he did not know and had not said those things.

He claimed that he was at a meeting with [redacted] at which it was decided to purchase armaments. [He attended the meeting] by virtue of his position as a finance person, and the objective was to collect weapons from civilians. According to his statement, the only thing he did was to follow the instructions issued by [redacted] who approved the purchase of each armament individually.

The Defendant was asked about RPG bombs which arrived on a ship in June 2001, and stated that he had been given an instruction to pay the fishermen who found the bombs, as a monetary reward. The Defendant stated that he did not know where the ship with the bombs had come from, and when he was told that he had said to the police that it had come from Tripoli, he claimed that he had not said that. The same thing happened when he was confronted with the claim that he had told the police and the Israel Security Agency that arms had been purchased from Lebanon and Egypt. According to his statement, the arms which were purchased by him were only purchased from civilians, so that they would not fall into the hands of Hamas, and he did not know what was written in his statements.

Date: July 29, 2009 File No.: 3052/06

The Defendant confirmed that he had transferred $20,000 to [redacted], on the instructions of [redacted]. He claims that he did not know what the reason was for this. When he was told that he had said to the police that it was intended for setting up a factory for the manufacture of materiel and hand grenades, he claimed that [redacted]s house had exploded, and that he had learned afterwards that it had been used for manufacturing explosive charges.

The Defendant claimed that he did not know who [redacted] or [redacted] were. The Defendant was confronted with his statement to the police, according to which he transferred money to them so that they would not go to Hamas, and he claimed that he said that he had received an instruction from [redacted] to transfer NIS 500 to [redacted] (the reference is to a monthly salary – [redacted]), whom he does not know personally, but whose name he knows, in contrast to his earlier statement.

The Defendant was confronted with an additional document, which had been presented to him in his interrogation, and which he claimed that he did not recognize. When he was told that, in his interrogation, he had stated that this was a document written by [redacted] containing quotations for armaments, he said that he had not said that.

The Defendant stated that he was responsible for monies of the Palestinian security organizations, and that he was responsible for paying in accordance with written instructions which were given by [redacted]

The Defendant was asked by us whether he was familiar with the budget and its items, and confirmed that he was familiar with it, and that a payment order had to match an item which appeared in the budget. Accordingly, they would ask the recipients of the payments to state the purpose for which the requested money was required. If the payment order did not have an appropriate budget item, or if they refused to state the objective of the payment – the Defendant would refuse to pay, or would pass the requisition on to [redacted] He claimed that the budget item for the purchase of the arms was called "Payment for arms taken from civilians from within the State". The Defendant stated that, if he had received an exceptional instruction – for example, to pay money to a Hamas operative or to purchase textbooks for a school – he would not have performed the operation. In addition, the Defendant stated that he had a good relationship with [redacted] and that there had been cases in which he had argued with [redacted] about certain expenses and, in the end, [redacted] had told him that he was right. He further stated that he had been praised for his methods of financial management. Only afterwards did he state that, if he had not implemented a payment order, he would have been put on trial. In a redirect examination by the defense attorney, the Defendant stated that any amount which had