to be withdrawn from the account of the Palestinian authority required the signature of the three signatories for the account, and he alone could not withdraw "even a penny".

**Evaluation of the testimony – credibility and weight**

**The testimony by the Defendant – credibility and weight**

The Defendant's testimony did not make a credible impression on us. He was obviously sticking to a story, according to which he had nothing to do with the arms ship *Karine A*, he had nothing to do with the contacts with the Iranians which concerned the coordination of training and the purchase of arms by the Palestinian Authority, and with regard to the purchase of arms, he was present at a meeting, the objective of which was to purchase arms from civilians so that they would not be used by organizations such as Hamas.

When the Defendant was confronted with things which had been recorded or presented to him in his interrogation, including documents which indicated that he recognized and knew why a certain payment was made, in a way which could not be reconciled with his version in Court, he stated that he had not said what was attributed to him in the interrogation. We cannot accept this. It is puzzling that things which are recorded in his statements, and which are in line with his version in Court, were in fact said by him to the police and were written down, whereas things which are not in line with his version in Court were not said by him, but were written down by the interrogators without his knowledge. This simplistic explanation with regard to the records kept by the interrogators does not sound in any way credible.

Furthermore: some of his arguments are *prima facie* not credible – for example, his statement that he was not familiar with the al-Aqsa Martyrs Brigades and that he did not know what they were, or his argument that he did not know who [redacted] was, especially when, immediately thereafter, he stated that money had been paid to the person in question by the office in Bethlehem. When he recognized his mistake, he claimed that he did not know [redacted] personally.

As we have already pointed out with regard to the preliminary trial, we are convinced that the things which are recorded in the Defendant's statements to the police were based on his own words and reflect things which he himself said. Accordingly, we must rule that his argument to the effect that those things were not said by him is mendacious.

Furthermore, the Defendant's arguments to the effect that he was only following orders, and that he did not know why some of the money was being transferred, are not in line with what he stated at the end of his interrogation – that he always ascertained that the payment matched a budget item, which means that he knew what the payment was intended for. His version to the

Date: July 29, 2009 File No.: 3052/06

effect that he was only following orders is not reconcilable with his statement that, if he had received an exceptional or strange payment order, he would have refused to carry it out, or with his statement in his interrogation, to the effect that he took action (with regard to the meeting with the Iranians) even before [redacted] told him anything about the matter, because [redacted] "wants to see results".

**The testimony by [redacted] – credibility and weight**

The testimony given by [redacted] in Court, as we see it, was devoid of any credibility whatsoever, and accordingly is devoid of any weight. His argument to the effect that he had spoken, in his interrogation, of a person named [redacted] and not Shubaki is an argument which was clearly intended to divert the guilt from the Defendant. We are not convinced that there is even a grain of truth in that argument. It should be stated that the Defendant said in his interrogation that he transferred money to [redacted] and this is in line with [redacted] statement to the police. Accordingly, we prefer to accept [redacted] statements to the police, rather than his testimony in Court.

**<u>The factual infrastructure – summary</u>**

We have seen fit to prefer the content of the Defendant's statements to the police, rather than his testimony before us. Wherever there is a contradiction between the two versions, we have believed that the content of the statements to the police is preferable. The same applies to [redacted] statements to the police. In light of this factual infrastructure, we must now examine the sections of the indictment which were attributed to the Defendant and to see whether his guilt arises from the evidentiary material before us.

Even before we perform an individual examination of each of the sections of the indictment, in view of the fact that the majority of the indictment is based on the Defendant's own statements, we must determine whether there is any evidentiary supplement, in the nature of an "additional item", to those statements.

In the case that is before us, we did not believe that there would be any real difficulty in this regard. An evidentiary supplement to the Defendant's statements can be found in the statement made by [redacted] who confirmed the transfer of the salaries to him and to his men in Bethlehem, as the Defendant had stated. In addition, we have before us Prosecution Exhibit No. 8, which is a document which sets forth requisitions for the purchase of weapons and their price, as the Defendant stated.

Date: July 29, 2009

File No.: 3052/06

In Leave for Criminal Appeal 4142/04, **Millstein v. Chief Military Prosecutor**, Supreme Court Compendium 2006 (4), 4022, the Honorable Justice Levi considered the nature of the evidentiary supplement of the "additional item" type and ruled as follows (in paragraph 20 of his judgment):

> "*The requirement for the 'additional item' is flexible and open in structure. The type of matters that are likely to satisfy that requirement varies from case to case, and also depends upon the credibility of the confession itself. The greater the weight which is ascribed to the confession in question – the smaller the weight of the 'item' which is required in order to verify the confession; on the other hand, the smaller the weight which is ascribed to the confession – the greater the weight of the 'item'. Accordingly, it has also been ruled that cases are likely to arise in which it is possible to accept an 'item' with a weight which is 'as light as a feather'.*"

And as the Honorable Justice Arbel stated in the same ruling (in paragraph 20 of her judgment):

> "*The requirement for an 'additional item' – similar to the 'item of reinforcement' and in contrast to 'corroboration'– is a requirement for an evidentiary supplement 'for verification'. Accordingly, and in contrast to 'corroboration', the 'additional item' does not have to point to the guilt of the Defendant; rather, it is enough to have an item of direct or circumstantial evidence, which is external to the Defendant's confession, which is capable of confirming, to a certain degree, the content of the confession and to indicate the veracity thereof... The requirement for an 'additional item' is intended to remove any suspicion that the Defendant is taking upon himself the responsibility for an action which was committed by another person or which was not committed at all, and therefore, in principle, a very small item of evidence is sufficient to comply with that requirement... Accordingly, case law has stated on more than one occasion that the weight of this item of evidence 'can be extremely light' and can even be 'as light as a feather'. This is enough for the Court to be satisfied that the confession is not 'a mere fiction' and will convince the Court that the story which the Defendant told in his confession is indeed a possible story.*"

In the case that is before us, we have a confession by the Defendant, which extends over a large number of statements, both to the police and to the Israel Security Agency. His confession includes great detail with regard to various arms deals, including names, weapons and their prices, and detailed comments on his negotiations with various entities in the Palestinian Authority and with entities outside it (such as the Iranians). The inherent weight of these statements is very high. Both the content thereof and the way in which the statements were made indicate a high degree of credibility which should be given to them (cf. Criminal Appeal 6613/99, **Smirek v. State of Israel**, PD 56 (3) 529, in paragraph 12 of the judgment handed down by the Honorable Justice (as her title was then) Beinisch).

Date: July 29, 2009 File No.: 3052/06

But not only the test of the numerous items indicate the credibility which should be ascribed to the Defendant's statements. Rather, in accordance with that which has been set forth above, these statements have external verifying supplements, in the form of the statement given by [redacted] and in the form of Prosecution Exhibit No. 8. Moreover, the seizure of the arms ship *Karine A* is also in line with the statements which were made by the Defendant. Let us not forget that the Defendant himself did not deny, in his testimony before us, many details which appear in his statements, including a meeting with the Iranians.

In accordance with that which has been set forth above, the independent weight of the statements is high. The additional item, in this case, points to the Defendant's involvement in at least some of the offenses, and verifies all of the Defendant's statements. More precisely: the matters which are set forth in the Defendant's statements are all related to his position and his status as the head of the Finance Department of the Palestinian Security Services. When there is an internal affinity and a pertinent relationship between the various offenses, the evidentiary supplement which exists for one offense may also extend to another offense (see Criminal Appeal 241/87, **Cohen v. State of Israel**, PD 42 (1) 743; Criminal Appeal 7758/04, **al-Qadr v. State of Israel**, Supreme Court Compendium 2007 (3) 710; Criminal Appeal 378/03, **John Doe v. State of Israel**, Supreme Court Compendium 2005 (2) 1128). Accordingly, in the case that is before us, even though an evidentiary supplement exists with regard to only some of the statements made by the Defendant, in view of the pertinent relationship of the actions which are described in the indictment to those which are set forth in his statements, the evidentiary supplements should be considered as verifying all of the things which were stated by the Defendant in his interrogations. Accordingly, even if there is no external evidentiary supplement for a specific section of the indictment, in view of the affinity among all of the charges in this case, the statements made by the Defendant are sufficient to substantiate the conviction, insofar as it arises from the statements.

Now that we have clarified the evidentiary infrastructure before us, we shall address each of the counts of the indictment.

**Count 1 of the indictment:**

The arguments that have been set forth by the defense with regard to this count of the indictment are arguments both in fact and in law. First of all, as to the factual aspect, the defense did not deny that the Defendant took part in the purchase of the materiel as set forth in this count of the indictment; however, it claims that this was a purchase of material which was aimed at taking weapons from residents of the Authority so that they would be in the hands of the Palestinian Authority forces. This argument was raised by the Defendant both in Court and during his interrogation. Second, it was argued that the Defendant was entitled to

Date: July 29, 2009

File No.: 3052/06

benefit from the defense of "act of state" because all that he did was to act with no independent discretion, but rather, in accordance with the instructions of the [redacted], who approved the transfer of monies from the Authority for the purpose of purchasing the arms. The Defendant's role in this case was to sign documents which approved payment. It was argued that this act is not a war crime or a crime against humanity, because it has not been proved that the Defendant knew that the arms would reach the al-Aqsa Martyrs Brigades organization, which would use them for terrorism.

It was further argued that the Defendant could avail himself of the defense of justification, because obeying the instruction by the Authority, which was aimed at taking weapons from irresponsible entities and transferring them to the responsible control of the Authority, is a legitimate act, which is governed by the defense of justification.

It appears that the arguments that have been set forth by the defense cannot be accepted, even if only on factual grounds.

In order for the defense of "act of state" to be allowed, it is necessary to show that the entity on behalf of which the Defendant operated was a state. As set forth in the ruling on the preliminary arguments, which was handed down by my colleague, the Deputy President, the Palestinian Authority is not a state, and certainly, during the period which is relevant to the indictment, it was much farther from the status of an independent authority. Accordingly, the Deputy President of the Court stated that: "This being the case, I believe that it should be ruled that the Defendant's actions pursuant to the indictment were not acts of state, as they were not committed on behalf of an entity which is a state; rather, at the very most, they were personal actions in the guise of state actions, through the use of resources of an unformed diplomatic entity."

No further support or additional evidence, which could have modified our conclusion with regard to the status of the Palestinian Authority, has been brought before us.

Secondly: the argument to the effect that the collection of the arms was intended to transfer weapons from residents, who were likely to use them for partisan purposes, to responsible entities, is unfounded. The Defendant raised this argument on a number of occasions, including in his interrogation, however, we do not have the impression that this argument is substantiated in any way whatsoever. In accordance with that which has been set forth above, we have already pointed out that our impression of the Defendant is that he is a sophisticated person, who is trying to shrug off the burden of responsibility and liability. Concurrently with the argument that the collection of the arms was intended to prevent irresponsible entities from using them, it appears that the Defendant approved the financing of actions which have absolutely nothing to do with the collection of weapons from

Date: July 29, 2009 File No.: 3052/06

irresponsible entities. Thus, for example, the subject of the financing of the setup of a factory for the production of explosives by people belonging to the Palestinian Authority itself, the financing of lathe shops, the financing of arms smuggling by outside entities such as Hezbollah and the Iranians, and so forth. If the entire objective had been the collection of "partisan" weapons, why is it necessary to finance the bringing of additional weapons which originate outside the confines of the Palestinian Authority – especially when the weapons in question are of a specifically offensive nature, such as rockets and missiles of various types? If the matter in question concerns only the purchase of weapons from civilians, why did the Defendant act to finance the costs of smuggling the weapons from Hezbollah into the hands of entities within the Palestinian Authority?

The answer to these questions is clear. The collection of weapons has nothing to do with the desire to prevent those "irresponsible" entities from using them for terrorist purposes. The objective of the collection of the weapons was to transfer them to entities within the Palestinian Authority which obeyed [redacted] and which made it possible to engage in warfare against Israel, its forces and its civilians. As the Defendant himself stated, in the memorandum dated March 15, 2006, 6:15 p.m., in Section 30: '[redacted] **gave an instruction that all of the weapons would be purchased by the Palestinian Authority, and not by Hamas or other organizations, so that he himself would be able to control everything that happened. In this way, [redacted] would be able to control the strength of the intifada.**"

As we have seen, this is no innocent and "responsible" objective; rather, it is a clear objective which was intended to enable entities of the Palestinian Authority, headed by [redacted], to use offensive firepower to control the strength of the intifada – that is: the strength of Palestinian terrorism.

It should further be stated that the argument to the effect that the Defendant did not know that the weapons had been transferred to the al-Aqsa Martyrs Brigades organization, which used it for the purposes of terrorism, is an argument which is not in line with the evidentiary material. Thus, for example, in the memorandum dated March 15, 2006, 6:15 p.m., in Section 36, the following appears: "**The subject explained that each of the security organizations purchased materiel in large quantities and the subject approved the payment. All of the al-Aqsa Martyrs organizations used the weapons which were supplied by the security forces, which carried out the massive procurement.**"

As we have seen, the Defendant knew very well that the materiel which was purchased was transferred to the al-Aqsa Martyrs Brigades, which used those weapons. Obviously, the Defendant knew what the al-Aqsa Martyrs Brigades organization was and what its activities were. His attempt to tell us that he did not know what the organization was is an untenable

Date: July 29, 2009

File No.: 3052/06

attempt to represent himself as an innocent person. We do not believe this argument. It is clear to us that the Defendant – who held a senior position in Fatah for decades and was close to ██████ – knew very well what the al-Aqsa Martyrs Brigades organization was, what its activities were, and knew very well that the organization in question was a tool in the hands of the Palestinian Authority for directing terrorism against the State of Israel and its residents.

It should further be stated that we did not gain the impression that the Defendant was a clerk who followed instructions with no discretion of his own. This results both from the senior nature of his position and from the facts which were brought before us, as well as from the statements which were made by the Defendant in Court. Thus, for example, on no small number of occasions, it transpired that the Defendant acted on his own initiative, with no approval whatsoever – and certainly with no explicit instructions – from ██████ in the context of monetary expenditures. This was the case with regard to the "business initiatives" which were intended to make a profit for Fatah; his contacts with the Iranians, which were not known in advance by ██████ (but only retroactively); and the Defendant's own words to the effect that ██████ liked to see and to get results, and was not involved in the entire process itself from the outset. We shall also recall that the Defendant, in his own words in his testimony before us, confirmed that he did not transfer money if he did not have the appropriate amount, or if the purpose of the expenditure did not match a recognized item in the budget. This is not in line with a person who merely fulfilled every instruction by ██████ Moreover, the Defendant stated, in his testimony before us on November 18, 2008, that if he were to receive an instruction which appeared strange to him, he would not carry out the action, and added that: "I had many disputes with the ██████ on such things, and in the end, he came and told me that I was right." These words, which appeared to have been uttered with great pride on the Defendant's part, indicate that the Defendant was not merely a rubber stamp. When he thought there was a problem with this or that instruction by ██████ he would tell him so, and would even argue with him.

In the case that is before us, and with regard to the action set forth in the indictment, the Defendant did not see fit to argue, even though we know that, had he seen fit to do so, he would have done so. The obvious conclusion is that the Defendant – by virtue of his position, *de facto* in his relationship with ██████ and in light of his own actions, as those actions arise from the evidentiary material before us – had the discretion to approve, or not to approve, the transfer of funds. The Defendant knew very well what the purpose of the transfer of funds was, and he knew very well that the arms which were purchased with the monies in question were intended for the purposes of a terrorist organization – the al-Aqsa Martyrs Brigades.

Date: July 29, 2009 File No.: 3052/06

**Summary:**

From the factual standpoint, no infrastructure has been laid which enables support of the arguments that have been set forth by the defense with regard to the availability of the defense of justification, or the defense of "act of state", for the Defendant. It has been proved that the Defendant knew very well that the purchases in question were of weapons which were to be transferred to the use of a terrorist organization – the al-Aqsa Martyrs Brigades. This was not a case of the purchase of weapons with a view to taking weapons out of the hands of residents and transferring them to "responsible hands", as has been argued by the defense.

The Palestinian Authority is not a state, and in any event, the transfer of weapons for the purposes of terrorism against the citizens and residents of the State of Israel cannot take shelter under the defense of "act of state", even if a state were involved.

Second: with regard to the defense of justification, even if we were to adopt the method advanced by my colleague, the Deputy President of the Court, who is prepared to recognize the defense of justification for entities in the Palestinian Authority under certain conditions, the act in question is not a legitimate act on the part of the Authority, and the purchase of weapons which are intended for the purposes of the terrorist organization is clearly an illegal act.

Because the Defendant was a partner to the purchase of weapons as set forth in Section 1 of the indictment, we convict him with regard to that which has been set forth in this section of the indictment.

**Count 2 of the indictment:**

This count concerns the transfer of salaries to operatives in the al-Aqsa Martyrs Brigades, as well as the transfer of a requisition by [redacted] for the payment of money for materiel.

The basis for this count lies in the statements by the Defendant, but also in the statements which were made by [redacted] to the police. The Defendant, in fact, confessed in his interrogation that he had transferred salaries to [redacted] men, and the latter confirms this matter in his statement. Accordingly, the opening passage of this Count of the indictment is based on statements by the Defendant and has been given a significant evidentiary supplement in the statement by [redacted] Accordingly, and in light of the factual analysis set forth above, there is a solid basis for convicting the Defendant of that which has been set forth in the opening passage of Count 2 of the indictment, because it involved the transfer of monies to terrorist operatives.

Date: July 29, 2009

File No.: 3052/06

The closing passage of Count 2 of the indictment – the subject of the materiel sought by [redacted] – also appears, in detail, in the Defendant's statements, and, in essence, constitutes part of the general series of offenses which is described in Count 1 of the indictment, which involves the Defendant's share in financing various items of materiel for persons in the Palestinian Authority and for the al-Aqsa Martyrs Brigades.

With regard to the closing passage of this count of the indictment, the defense argued that the Defendant did not commit any offense, because all that he did was to forward the document to [redacted] The Defendant did not pay the amount requested, because his office did not have the budget to do so, and the payment for the requisition came from the budget of the Palestinian Ministry of Finance.

I cannot accept the argument that this was not an offense. The charge which is attributed to the Defendant is "Performance of a service for a prohibited organization". The service which the Defendant performed for the al-Aqsa Martyrs Brigades organization admittedly did not involve the transfer of money from his office; nevertheless, he did perform a service. This service included accepting the requisition and forwarding it to [redacted] The Defendant was the channel through which the requisition was handled and carried out. In accordance with that which has been set forth above, and as we have seen in the analysis of the facts in Count 1 of the indictment, the Defendant was a significant link in all of the acts of procurement and finances. Furthermore, he was also the channel through which all of the financial requisitions reached [redacted]. The same holds true in this case as well. This act is a service for a proscribed organization, and accordingly, it is necessary to convict him of the charges which are attributed to him in the closing passage of this Count of the indictment as well.

It should further be stated that the statements set forth above with regard to the defenses of "act of state" and justification, which were raised by the defense, apply even more forcefully to this count of the indictment, because, in this case, the Defendant granted assistance and a direct service to the terrorist organization known as the al-Aqsa Martyrs Brigades.

**<u>Count 3 of the indictment</u>:**

This count concerns the Defendant's part in the procurement of the ship *Karine A*.

According to an argument that has been set forth by the Defense, the Defendant did not commit any offense whatsoever. The money for the purchase of the ship did not come from his budget, but rather, from the budget of another office, which was headed by [redacted]. The Defendant did not initiate the bringing of the arms ship, and, at most, had indirect and not concrete knowledge of the fact that the ship would be carrying weapons. All that he did was to pass on the information about the ship to [redacted] who thought it was a plot to murder him.

Date: July 29, 2009 File No.: 3052/06

After examining the evidentiary material, we have found that the facts which are attributed to the Defendant in this count of the indictment have been proved as required. In actual fact, not even the defense disputed the fact that the facts set forth in the indictment were proven by the Defendant's statements. I shall comment that, with regard to the purchase of the ship, nothing bears out the allegation that [redacted] refused this matter or thought that it was a plot. What was said by the Defendant referred to his meetings with the Iranians, which are set forth in Count 4 of the indictment, and not to the purchase of the *Karine A*, which [redacted] approved with no problems whatsoever, according to the Defendant's own statements.

The central question which the defense raised is whether these acts constitute the offense of trading in war materiel.

The definition of the word "trading" in the Prohibition on Trading in War Materiel Order is as follows: "Purchase, sale, mediation, delivery, storage, transport, transfer, dispatch or repair".

This means that trading in war materiel does not only include acts of purchase and sale, but also mediation and transport of arms.

In the case that is before us, the Defendant took part in the following actions: he accepted the request by [redacted] for financing an arms ship which would come from the Iranians; it was explained to the Defendant that the weapons which would be on board the ship would be financed by the Iranians, and that the Palestinian Authority would have to finance only the ship and its expenses; the Defendant handled the request and passed it on to [redacted] who approved the conspiracy and agreed to the purchase; the Defendant was the one who transferred the requisition for payment to [redacted] who approved the transfer of the funds; when the Defendant announced that his office did not have an appropriate budget, [redacted] gave an instruction for the payment to be made from the office of [redacted], and the Defendant transferred that instruction by means of a messenger from his office; [redacted] was in contact with the Defendant for the purpose of receiving the information as to whether the order for the transfer of the funds had been issued.

These facts indicate that the Defendant was involved in the mediation and the financing of the arms deal. Even if his office did not pay the money directly, the Defendant was the one who made contact with [redacted] and brought the subject of the arms deal before him for his consideration, study and decision. The Defendant was the entity which mediated between [redacted] the Iranians and others and [redacted] The Defendant's role is accordingly not minor, but significant. It may be said that the Defendant was a significant factor in concluding the transaction, because his contacts with [redacted] were of supreme importance for the purpose of executing the transaction.

Date: July 29, 2009

File No.: 3052/06

Even if the Defendant's office did not finance the transaction from the current budget, it should still be stated that the Defendant was involved "up to his neck" in this transaction, and that he constitutes an entity which took real and material action for the purpose of obtaining the financing for the purchase of the ship. Accordingly, he should be considered as having been involved in the purchase of the weapons, in the negotiations which he conducted with the Iranians from the beginning, in the purchase of means of transport of the weapons, and at the very least, in actions which constitute mediation for the purchase of the weapons.

In this case as well, it is obvious that the defenses of "act of state" and justification do not apply. In this case, the initial contact began even before [redacted] knew about the subject of the arms ship, so that the Defendant certainly cannot say that his actions merely consisted of following orders.

Accordingly, the Defendant should be convicted of that which is attributed to him in this count of the indictment.

**Count 4 of the indictment:**

This count concerns negotiations which the Defendant conducted with Iranian representatives outside the Area.

The defense did not dispute, with regard to this count, that the Defendant held a meeting with people who represented themselves as Iranians, and held a general conversation with regard to possibilities for Iran's assistance to the Palestinian Authority. The defense argued that the prosecution would have to produce an evidentiary supplement of the "additional item" type in order to prove that such a meeting took place, and that the persons with whom the Defendant spoke were actually Iranians. It was further argued that, as far as the Defendant was concerned, those meetings were full of suspicion and caution and were not based on a desire to cooperate, and that, in fact, [redacted] upon receipt of a document which described the meeting, rejected the idea set forth therein.

First of all, with regard to the required evidentiary supplement, we believe that, in this case, even in the absence of any evidentiary supplement with regard to this count itself, the existence of an evidentiary supplement for other counts constitutes an evidentiary supplement for this count of the indictment as well.

As we pointed out above, a supplement of the "additional item" type is a supplement which is intended to verify the Defendant's statements. Because it is a supplement for the purposes of verification and not of embroilment, there is no necessity for the evidentiary supplement to refer to each and every one of these counts of the indictment separately, provided that there is a relationship between the various counts of the indictment in question.

In accordance with that which has been set forth above, in the case that is before us, there is an affinity between the Defendant's actions as set forth in this count of the indictment and his actions as set forth in the previous counts of the indictment. All of them concern his work and his status as the Finance Officer in the Palestinian Authority and as a person close to [redacted] Accordingly, the evidentiary supplements which were found with regard to Counts 1 and 2 of the indictment (Prosecution Exhibit No. 8 and the statement by [redacted]) also constitute an evidentiary supplement with regard to this count.

Furthermore, it is necessary to reject the argument that has been set forth by the defense, to the effect that these were only contacts with no real intention. While these were apparently initial contacts, nevertheless, by the very nature and quality of initial contacts of this type, they are at times accompanied by suspicion. This does not mean that the Defendant did not want to promote the contacts thereafter; in fact, he even brought the subject of the contacts before [redacted] for decision.

Let us not forget that the elements of the offense in question require only the existence of the contact between the Defendant and another entity which is part of a hostile organization. In the case that is before us, it appears, on the basis of the proven facts, that not only did the Defendant actually meet and hold contacts with operatives of an enemy country; the Defendant acted on the basis of a desire to bring about what had been agreed upon with the Iranians and "to get results" for [redacted] Accordingly, we believe that all of the elements of the offense, in this case, were fulfilled by the Defendant.

I shall further state that, in this case as well, it is obvious that the defenses of justification and "act of state" do not apply, because the Defendant did not receive any order or instruction to carry out that which is attributed to him in this Count; rather, he acted on his own initiative and on his own recognizance, and only retroactively brought the results of the meeting to [redacted] for his approval.

This being the case, the Defendant should be convicted of that which is attributed to him in Count 4 of the indictment.

**Conclusion**

We have not seen fit to accept the preliminary argumentation that has been set forth on the part of the Defendant. We have seen fit to attribute full weight to his statements to the police and to the transcripts of his interrogations by the Israel Security Agency, and to prefer his statements, wherever the Defendant argued otherwise before us. In light of the content of the Defendant's statements, we believe that there is a complete factual infrastructure for proving the charges that have been attributed to the Defendant.

Date: July 29, 2009

File No.: 3052/06

The Defendant cannot avail himself of any defense in this case. In the case that is before us, the defense of "act of state" does not apply, *inter alia*, because the Palestinian Authority is not a state and, during the relevant period of time, its status was even farther from statehood than it is today. Even if this defense had existed under law in the Area, the Defendant could not have taken shelter under it, in light of the fact that he transferred weapons, knowing that the weapons were meant to be used by a terrorist organization such as the al-Aqsa Martyrs Brigades.

The Defendant cannot avail himself of the defense of justification, because, even in accordance with the broadest interpretation of this defense (which, in accordance with that which has been set forth above, appears in the ruling which was handed down by my colleague, the Deputy President of the Court, with regard to the preliminary arguments), the Defendant took part in actions which are not legitimate, in a way which is not in accordance with the powers which were granted to the Palestinian Authority in the interim agreements; he acted many times on his own initiative, and not as a follower of orders; and even if there were cases in which he followed orders, the acts in question are clearly illegal, since, in accordance with that which has been set forth above, they have to do with the transfer of weapons and resources to terrorist organizations.

In light of that which has been set forth above, we have decided to convict the Defendant of all of the charges which have been attributed to him in the indictment.

**Judge Lieutenant Colonel Ronen Atzmon:**

I concur.

**Judge Lieutenant Colonel Tal Band:**

I concur.

**Handed down and notified this day, July 29, 2009, in public and in the presence of the parties.**

| ________________ | ________________ | ________________ |
|---|---|---|
| **Judge** | **President of the Court** | **Judge** |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK I. SOKOLOW, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>THE PALESTINE LIBERATION ORGANIZATION, *et al.*,<br><br>Defendants. | No. 04 Civ. 00397 (GBD) (RLE) |

**DECLARATION OF RINA NE'EMAN**

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as "Israeli Military Court Case File No. 3052/06 The Military Prosecution v. Fuad Hejazi Shubaki, Verdict dated July 29, 2009."

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document designated as "Israeli Military Court Case File No. 3052/06 The Military Prosecution v. Fuad Hejazi Shubaki, Verdict dated July 29, 2009."

Dated: March 7, 2014

Rina Ne'eman

ss.: New Jersey

On the 7 day of March, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
7 day of March, 2014

Notary Public

SHELLY TESSEIN
Notary Public
State of New Jersey
My Commission Expires Nov. 16, 2017
I.D.# 2427073

תיק מס׳: 3052/06

תאריך: 29/07/09

**בית המשפט הצבאי יהודה**

**בפני כב׳ הנשיא: סא״ל צבי לקח**
**השופט: סא״ל רונן עצמון**
**השופט: סא״ל טל בנד**

**התביעה הצבאית**
(באמצעות סגן אנדריי ורשצ׳גין)

**נגד**

**הנאשם: פואד חג׳אזי שובכי ת.ז. 410026173/שב״ס**
(באמצעות ב״כ עו״ד אביגדור פלדמן)

---

**הכרעת דין**

**הנשיא סא״ל צבי לקח:**

הנאשם שלפנינו מואשם בארבעה פרטי אישום שעניינם העברת כספים לצרכי רכישת אמצעי לחימה כפי שיפורט להלן.

**פרט ראשון – סחר בציוד מלחמתי**: מיוחס לנאשם כי החל משנת 2000 ועד לסוף ינואר 2002 עסק בסחר בציוד מלחמתי. נטען כי הנאשם נטל חלק בישיבה בה הורה יאסר ערפאת לו ולראשי מנגנוני הביטחון לרכוש כל כמות של נשק מכל מקום אפשרי. הנאשם פעל ממועד פגישה זו יחד עם אחרים לרכוש כמויות גדולות של אמצעי לחימה. הנאשם שעמד בראש משרד הכספים הפלסטיני ריכז את בקשות אנשי המנגנונים השונים ואלו הועברו אליו כניירות עבודה. על מנת לוודא שאמצעי הלחימה עליהם הוא משלם אכן קיימים, דרש הנאשם מהפונים אליו להביא את כלי הנשק למשרדיו ולצורך כך החזיק מחסן אמצעי לחימה ברמאללה וכן מחסן נוסף ברצועת עזה. לאחר שאמצעי הלחימה הועברו לרשותו, היה הנאשם מגיש את נייר העבודה לאישורו של יאסר ערפאת, ולאחר אישורו של זה, היה הנאשם חותם אף הוא על הבקשה ומאשר לאנשיו להעביר את הכסף לפונה באמצעות העברה בנקאית. במהלך התקופה הנ״ל נרכשו כ- 1000 טונות של אמצעי לחימה תמורת 7-10 מיליון דולר. את אמצעי הלחימה דאג הנאשם להעביר למנגנוני הביטחון הפלסטיניים ביודעו כי חלק ניכר מאנשיהם הינם חברים בזרוע הצבאית של ארגון הפת״ח שביצעה פיגועים רבים אותה עת.

**פרט שני – ביצוע שירות עבור התאחדות בלתי מותרת**: נטען כי בתקופה האמורה בפרט האישום הראשון העביר הנאשם לחברי החוליות הצבאיות של ארגון גדודי חללי אלאקצא באזור בית לחם משכורת חודשית בסך 500 ₪. באותה עת ביצעו חברי חוליות אלה פיגועים רבים. בחודש אוקטובר 2001 קיבל הנאשם בקשה לתשלום של 25,000 דינר מידי מרואן ברגותי לצורך רכישת אמצעי לחימה וחומרים לייצור מטענים, ולצורך תשלום משכורות ל-268 חברים בגדודי חללי אלאקצא. הנאשם העביר בקשה זו לידי יאסר ערפאת, אשר הורה לו לשלם את הכסף באמצעות משרד האוצר.

**פרט שלישי - סחר בציוד מלחמתי**: פרט זה מפרט את חלקו לכאורה של הנאשם במימון וארגון ספינת הנשק קארין A, שנתפסה בתאריך 3.1.02 כשעליה כמויות גדולות של אמצעי לחימה מסוגים שונים, ובכלל זה רקטות, מרגמות ומקלעים. נטען כי בחודש ספטמבר 2001 נפגש הנאשם עם פתחי ראזם, וזה עדכן אותו בדבר מגעיו עם האיראנים בכל הנוגע למימון ספינת הנשק. פתחי ראזם הודיע לנאשם כי על הרש"פ לשאת בעלות של 125,000 דולר. הנאשם הסכים לכך ואף הסכים לפנות ליאסר ערפאת לקבלת המימון הדרוש לכך. בשלב מאוחר יותר העביר הנאשם ליאסר ערפאת את דרישת התשלום וזה התם עליה. הנאשם העביר את הוראתו של יאסר ערפאת באמצעות שליח למשרדו של חרבי צרצור, אחראי על הדלק ברש"פ. הספינה ועליה הציוד המלחמתי עגנה בתימן. הנאשם, שהיה בתימן אותה עת, עודכן בדבר הגעת הספינה וקיבל דיווח על הכוונה להכין דרכונים לשניים מאנשי הספינה. לאחר שהספינה הפליגה מתימן לתעלת סואץ, נתפסה בידי כוחות צה"ל ביום 3.1.02, כאמור.

**פרט רביעי – מגע עם ארגון עוין מחוץ לאזור**: פרט זה עניינו מגעים שקיים הנאשם עם גורמים איראניים, במטרה לתאם את שיתוף הפעולה הצבאי בין איראן לבין הרש"פ. בין היתר עלו אפשרויות להקמת מפעלי תחמושת בתחומי הרש"פ, העברת אמצעי לחימה מלבנון דרך החיזבאללה, ואימונים צבאיים לאנשי הרש"פ בלבנון ובאיראן. כמו כן נערך מסמך סיכום המפגש, וזה הוצג לאחר מכן על ידי הנאשם ליאסר ערפאת.

__גדר הכפירה__

לא הוכחש כי הנאשם היה אחראי על ענייני הכספים של מנגנוני הביטחון ברשות הפלסטינית, בתקופה הרלוונטית לכתב האישום. עם זאת נטען כי הוא פעל ברשות ובסמכות. עוד נטען, כי חלק מהעובדות המפורטות בכתב האישום אינן נכונות. בנוסף, נטען כי אמרותיו של הנאשם, המבססות את עיקרו המכריע של כתב האישום, נגבו ממנו שלא כדין.

__ניהול המשפט__

בראשיתו של ניהול התיק הועלו טענות מקדמיות אולם אלה נדחו בהחלטה שניתנה ביום 04.12.06. לאחר החלטה זו, ובעקבות כפירת הנאשם באשמה, החלה פרשת הבאת הראיות. מרבית חומר הראיות הוגש בהסכמה, אולם הסכמה זו התייחסה אך ורק לחומר הראייתי שלא התייחס באופן ישיר לנאשם. כך, למשל, לא הייתה מחלוקת כי נתפסה ספינת הנשק קארין A.

כאמור, כתב האישום מבוסס בעיקרו על אמרות הנאשם. מאחר והייתה מחלוקת על קבילותן של אמרות אלה, נוהל משפט זוטא. הוסכם על ידי הצדדים כי ההכרעה במשפט הזוטא תינתן במסגרת הכרעת הדין בתיק כולו. במסגרת התיק העיקרי נדרשנו לשמוע עד אחד בלבד מטעם התביעה, מחמוד עביאת, וכל יתר חומר הראיות, למעט אמרות הנאשם, הוגש בהסכמה. במסגרת פרשת ההגנה העיד הנאשם.

התביעה הגישה סיכומיה בכתב, והסניגוריה השמיעה לבסוף את סיכומיה בעל פה, הגם שבאיחור ניכר של 4 חודשים.

**משפט הזוטא**

**כללי**

כאמור, לאור טענת ההגנה כי אמרות הנאשם נגבו באופן שאינו חופשי ומרצון, נוהל משפט זוטא. במסגרתו, ולאור טיעוני הזוטא שהועלו, נשמעו שלושת חוקרי המשטרה שגבו את אמרותיו של הנאשם, וכן שלושה חוקרים של שירות הביטחון הכללי שניהלו את עיקר חקירתו של הנאשם. במסגרת פרשת ההגנה במשפט הזוטא העיד הנאשם וכן העיד מר מחמד חיג׳אזי, אשר היה עם הנאשם באותו תא בחלק מהתקופה בה נחקר.

**טיעוני הזוטא**

א. נטען כי הנאשם נחקר לאורך חודשיים חקירות ממושכות במשך רוב שעות היממה תוך שנמנעת ממנו שינה.

ב. נטען כי הנאשם הינו אדם חולה, שנזקק לטיפול תרופתי במחלות כרוניות, ותרופותיו לא ניתנו לו ואף לא סופק לו תחליף הולם.

ג. נטען כי הנאשם היה אזוק בידיו וברגליו במהלך החקירה, דבר שגרם לו לכאבים עזים ולתחושת השפלה קשה. עוד נטען שלעתים היו חוקריו משאירים אותו לבד בחדר כשהוא אזוק, למשך ארבע עד שבע שעות, דבר שהביא את הנאשם למצב של כאב, פחד וחרדה עמוקים.

ד. במהלך שהותו בחקירה, הרסו כוחות צה״ל את ביתו של הנאשם, עקרו עצי הדר ועצי זית רבים בחלקתו והשמידו טון וחצי דבש. הידיעה אודות ההרס הביאה את הנאשם לחרדה ופחד ביחס לגורל בני משפחתו. החוקרים ניצלו זאת כדי לומר לנאשם שאם יודה יוכל לצאת לחופשי ולסייע לבני משפחתו.

ה. נטען כי נאמר לנאשם שבשל העובדה שהוא אדם זקן וחולה ולא נותרו לו שנים רבות לחיות, חוקריו אינם מעוניינים לחקור ולהחזיק אותו במעצר זמן ממושך. על כן, אם יודה יצא מייד לחופשי. הודאותיו ניתנו בכפוף להבטחות אלה ובשל פעולת פיתוי זו.

ו. נטען כי חוקריו של הנאשם הטיחו בו האשמות שווא, וחזרו ואמרו לו שהוא משקר להם. החוקרים נקטו בשיטות של התשה פיזית ונפשית. הנאשם שהינו אדם מבוגר ומכובד

בקהילתו חש מושפל מהתנהגות החוקרים הצעירים כלפיו, ובצירוף מצבו הפיזי הקשה, ייחל למותו ולרגע שבו יסיים את החקירות.

ז. נטען כי הנאשם חתם על הודאותיו על מנת לרצות את חוקריו, ומבלי שידע מה כתוב באמרות שנכתבו בשפה העברית, אותה אינו קורא. חוקרי המשטרה הסתמכו על זכ"דים של השב"כ וכשעמד על אי הדיוקים והטעויות המנויים בזכ"דים נתנו לו חוקרי המשטרה להבין כי "תוהו ובוהו" יתרחש אם יחזור בו מהודאותיו.

נקדים ונאמר, כי לאור עדותו של הנאשם עצמו במשפט הזוטא, אשר לא עמד על חלק ניכר מטיעוני הזוטא, צמצמה ההגנה בסיכומיה את טיעוניה לטענות זוטא שעניינן יחס משפיל כלפי הנאשם.

**<u>הראיות במשפט הזוטא</u>**

**עדותו של השוטר דוד מזרחי**

עד זה מסר כי הוא דובר ערבית מהבית, מלימודיו ומהעבודה. בעת שהעיד בפנינו ציין כי הוא זוכר את תווי פניו של הנאשם, אך לא זכר את פרטי החקירה במאת האחוזים. העד מסר שהוא נוהג לזהות את החשוד שבפניו, ולאחר מכן הוא מזדהה כשוטר. הוא מקריא לו את תוכן האזהרה, ולאחר שהחשוד מבין את תוכנה וחותם עליה, נגבית העדות בצורה של שאלות ותשובות. העדות נגבית בשפה הערבית, ונכתבת על ידו בשפה העברית. בתום כל עמוד הוא מקריא אותו לחשוד בשפתו, וזה חותם עליו. לפי הרשום באמרה הוא כיבד את הנאשם בסיגריה ואיפשר לו לעשן. העד ציין כי התרשם שמצבו של החשוד היה "בסדר" ושהוא מסוגל למסור עדות, שלולא כן היה רושם זכ"ד בעניין, או מציין זאת באמרה, ונמנע מהמשך גביית העדות. כך הדבר גם לגבי אירועים חריגים במהלך העדות. כשהתבקש לציין דוגמאות לאירועים מיוחדים שהיה רושם לו התרחשו, מסר כי הדבר יכול להיות למשל, שחשוד מתלונן על כאבי ראש, כי אינו חש בטוב, או כי אינו מסוגל למסור את העדות. הוא ציין כי תוך כדי גביית האמרה הוא מציין אירועים כגון כיבוד החשוד בשתייה, או מתן סיגריה וכדומה.

העד מסר כי במהלך החקירה שניהל האווירה הייתה נינוחה, והנאשם לא ציין בעיה כלשהי. כשהנאשם ביקש לעשן ניתנה לו האפשרות לעשות כן, ולא היה דבר חריג מעבר לכך. עוד ציין כי במהלך החקירה הנאשם ישב מולו כשרגליו כבולות. העד מסר כי לא יכול להיות שהשאיר את הנאשם בחדר לבד למשך זמן רב, שכן המדובר בחדר חקירה בו נמצאים תיקים נוספים, ובכלל זה תיקו האישי, כך שלא יכול להיות שעזב את החדר.

העד נשאל לגבי הטענה כי נאמר לנאשם שביתו נהרס, שנעקרו עצי זית והדר והושמדו טון וחצי דבש. הוא השיב כי עד למועד מתן העדות בבית המשפט כלל לא ידע שלנאשם עצי הדר ודבש, והוא (החוקר) בכל מקרה לא אמר דבר כזה.

העד טען שמעולם לא אמר לנאשם כי נותרו לו שנים מעטות לחיות וכי אם יודה ישוחרר מייד, ומסר כי הדבר אסור, והוא אינו נוקט אמצעים כאלה.

העד ציין כי עיין בזכ"דים של השב"כ לפני גביית העדות, וכי על סמך הזכ"ד הקריא לנאשם את החשד נגדו, וזה היווה גם קו מנחה לעדות שנגבתה.

העד הכחיש את הטענה לפיה אמר לנאשם שאם יחזור בו מדבריו בשב"כ יקרה "תוהו ובוהו".

העד נשאל האם חקירת השב"כ והמשטרה התנהלו באותו מקום, ומסר כי אף שמדובר באותו מתקן, העדות נגבתה בחדר החוקרים של המשטרה. הוא ציין כי הוא לא נכנס לחדרי החקירות של השב"כ, והם (השב"כ) לא נכנסים לחדרי החקירות של המשטרה. הוא אף ציין שחדר החקירות של המשטרה נראה שונה מחדרי החקירות של השב"כ.

העד מסר כי אינו יודע לכתוב בערבית ולכן כתב את האמרה בעברית, חזר על כך שאת מה שכתב תרגם לנאשם, וכן ציין כי הזהיר את הנאשם בערבית. העד ציין כי לא ידע כמה שעות ישן הנאשם לפני העדות שגבה, וגם לא ידע כמה יממות נחקר קודם לכן על ידי השב"כ והמשטרה. העד ציין כי היה בפניו זכ"ד של הדברים שנאמרו במהלך החקירה בשב"כ טרם גביית ההודעה, אך לא השתלשלות של כל החקירה או כל האירועים שקדמו לה. הוא מסר כי בדרך כלל נמצא בפניו זכ"ד אחד, אך הוא אינו זוכר לגבי מקרה זה.

**עדותו של השוטר משה לוי**

עד זה ציין בעדותו בפנינו כי הוא זוכר את החקירה באופן כללי, אך לא לפרטי פרטים. הוא מסר כי את הודעותיו של הנאשם גבה במתקן אשקלון, לאחר שהזהירו כחוק. החקירה התנהלה בשפה הערבית והאמרות נכתבו בשפה העברית. לאחר מכן הקריא את ההודעות לנאשם בערבית והוא אישר אותן בחתימת ידו.

העד מסר כי הוא מתעד אירועים חריגים המתרחשים במהלך חקירה באמרות עצמן או בזכ"ד נפרד. במקרה של הנאשם הוא ציין בגוף האמרות את העובדה שנתן לנאשם לאכול ולשתות. הוא מסר כי האווירה בחקירה הייתה נינוחה. הוא זכר את הנאשם כאדם בעל סבר פנים יפות, חייכן, ששיתף פעולה וענה לשאלות שנשאל.

הוא זכר שהנאשם נזקק לטיפול תרופתי עקב מצבו הבריאותי – וכי תרופות סופקו לו על ידי מרפאת הכלא. הוא זכר כי פעם אחת נכנס חובש לחדר וביקש לתת לנאשם את התרופה היומית שלו. הוא מסר כי לאחר בירור שעשה, איפשר לנאשם ליטול את תרופתו, והוא תיעד זאת בגוף האמרה (הודעה מס' 7 מיום 2.4.06 גיליון 3 ש' 62).

העד מסר כי עד כמה שהוא זוכר הנאשם ישב מולו בחקירה לא אזוק. הוא הכחיש שאמר לנאשם כי ביתו נהרס או כי עצים נעקרו ודבש הושמד, ואף הכחיש כי אמר לנאשם שאם יודה הוא

ישוחרר בשל מצבו הבריאותי וגילו, או כי אם יחזור בו מדברים שמסר בחקירת השב״כ יקרה ״תוהו ובוהו״.

העד ציין כי הגופנים (FONT) השונים באמרות המודפסות נובעים מכך שהמדובר בטופס מובנה, והכחיש כי דובר בהעתקה ממקום אחר. הוא ציין כי בפתח הדברים באמרה מיום 19.3.06 שאל את הנאשם לשלומו, והנאשם ענה ״ברוך השם בסדר״ והדבר נרשם. הוא טען כי כיוון שהנאשם אדם מבוגר הוא שאל כדי להיות בטוח לגבי מצבו, ותיעד זאת בגוף האמרה. הוא מסר כי באופן כללי ידע על מצבו הבריאותי של הנאשם, אך לא זכר בדיוק מתי נודע לו עניין זה. העד ציין כי הוא לא זכר שקרא משהו יוצא דופן בזכ״דים של השב״כ לפני החקירה. העד עמד על כך שבחקירה שהוא ערך, הנאשם הבין כי יש לו זכות לשתוק או לספר כל דבר. הוא הוסיף כי בפתח החקירה הוא מציג את עצמו ומסביר לנחקר היכן הוא נמצא ולאחר מכן מקריא את האזהרה. עניין זה הוא מבצע תמיד לכל חשוד ולכן הוא לא תיעד זאת באמרה, למעט פרטיו האישיים הרשומים. הוא טען כי הוא מקריא כל דבר, גם את פרטיו האישיים של החשוד בפניו כדי לוודא שאכן אלו פרטיו, וגם את האזהרה.

העד אישר כי חחקירה בוצעה בחדר חקירות של המשטרה, המצוי במתחם חקירות של השב״כ באשקלון.

העד ציין כי אינו זוכר התייחסות למצבו הרפואי של הנאשם בזכ״דים של השב״כ אותם קרא, והוסיף כי אם הייתה בעיה רפואית הדבר היה עולה. מכיוון שהאמרה אכן נגבתה, משמעות הדבר הינה שהנאשם היה כשיר לחקירה. הוא לא זכר אירוע יוצא דופן לגבי מצבו הרפואי של הנאשם אבל זכר שהוא כיבד את הנאשם בשתייה חמה וקרה ובסיגריות, ושהנאשם עישן הרבה.

העד ציין כי ההודעה השביעית נגבתה לא בתאריך 4.2.06 כפי שרשום באמרה, אלא בתאריך 2.4.06, והמדובר בטעות סופר.

**עדותו של השוטר יעקב ברזני**

עד זה מסר כי הוא זוכר את הנאשם אך הוא מסתמך על הכתוב באמורות שגבה. הוא ציין כי הוא גבה את האמרות בשפה הערבית, רשם אותן בעברית, ולאחר מכן תרגם אותן שוב בעל פה לערבית עבור הנאשם. בעדות מיום 26.3.06 הוא הטיח בנאשם דברים שאמרו עליו אחרים, והנאשם התייחס אליהם. העד לא מצא מעיון באמרה כי היו אירועים חריגים במהלך החקירה, אחרת, לדבריו, היו אלה נרשמים. בעדות מיום 14.5.06 הוא הציג לנאשם מסמכים וזה התייחס לכל אחד מהם. הוא ציין כי האווירה בחקירה הייתה טובה, וציין כי מדובר באדם מבוגר. העד מסר כי הנאשם זכר פרטים מתוך המסמכים שהוצגו לו, ולהערכתו יש לנאשם זיכרון טוב.

העד מסר כי אם הנאשם היה מבקש להיבדק על ידי רופא, הוא היה רושם זאת באמרה ואף מפסיק את גבייתה, שכן ידועה לו משמעותה של אמרה שנגבתה מנחקר שאינו במצב המאפשר למסור עדות בצורה טובה. הוא ציין כי נחקרים המובאים בפניו אינם אזוקים אלא אם כן ישנו

חשש כי הם מסוכנים ועלולים להתפרע. במקרה של הנאשם דובר באדם מבוגר ולא היה בכך צורך.

העד נשאל האם אמר לנאשם כי הרסו את ביתו, עקרו עצים והשמידו דבש, וענה כי זאת הפעם הראשונה שהוא שומע על כך שנהרס ביתו של הנאשם. העד אף הכחיש כי אמר לנאשם שאם יודה אזי בשל גילו המבוגר ומצבו הרפואי ישוחרר מיד. העד ציין כי לא השתמש באמצעי לחץ פיזי או מילולי כלשהו, והכחיש בתוקף כי נתן לנאשם להבין שאם יחזור בו מהודאותיו בשב״כ יקרה ״תוהו ובוהו״. העד טען כי לא היה צורך להפעיל כוח או לחץ, והכל התרחש באווירה טובה.

בחקירתו הנגדית ציין העד כי אינו יודע כמה זמן נחקר הנאשם לפני שהוא חקר אותו, אך היו מקרים שבהם הייתה תקירה רצופה לפני כן, ואז המתינו החוקרים על מנת לאפשר לנחקר זמן מנוחה כחוק. הוא אישר כי הוא מסתמך על זכ״דים של השב״כ, הכתובים עברית, וציין כי תרגם לנאשם חלק מהזכ״ד בו יוחסה לו הברחת נשקים. העד אישר כי הוא זה שביקש הארכת מעצר בחלק מהמקרים, אולם לא זכר מהן פעולות החקירה שהתבקשו, ואמר כי לצורך כך יש לבחון את הדו״חות שהוצגו לשופט שדן במעצר. העד ציין כי לא ידע מי תפס את המסמכים שהוצגו לנאשם במסגרת האמרה מיום 14.5.06, או מי תרגם אותם. הוא ציין כי הוא עצמו אינו קורא ערבית, ולכן הסתמך על התרגום, אולם לנאשם הציג את המקור בערבית. עוד ציין כי את העדות של אחר אותה הציג לנאשם תרגם לו לערבית כיוון שזו הייתה כתובה בעברית והנאשם אינו קורא עברית.

**עדותו של המכונה ״יורי״**

עד זה היה הממונה על חקירת הנאשם מטעם שירות הביטחון הכללי. העד מסר כי הוא זוכר את החקירה ואת הנאשם. הוא טען כי דובר בחקירה מורכבת כשבסך הכל האווירה הייתה מאוד נינוחה, עם הרבה מאוד כבוד הדדי. העד הוסיף שהנאשם הוחזק בתא מעצר ככל העצורים, אולם זכה בחקירה ליחס מאוד מכובד בהתאם למעמדו. הוא ציין כי כמעט בכל תקופת החקירה הנאשם כובד באוכל ממטבח החוקרים, עישן סיגריות, וקיבל מענה גם לבקשות מיוחדות כגון לבנים מסוג ״בוקסר״, ספר קוראן, ואפילו היו מקרים שהוא ביקש להישאר בחקירה כי שיעמם לו.

העד דחה את הטענה כאילו הנאשם לא זכה לטיפול רפואי, ואמר כי מפאת גילו של הנאשם ועקב תלונותיו נבדק על ידי רופא שב״ס והיה במעקב צמוד של מרפאת שב״ס. הוא הוסיף שהוא אישית היה בקשר עם מרפאת שב״ס ווידא שהנאשם נבדק ובעיותיו הרפואיות טופלו בהתאם לשיקול דעתם המקצועי של הרופאים. העד ציין כי מסר לנאשם שאין אפשרות להעביר לו תרופות, אולם עורך דינו יכול להעביר פירוט של התרופות בהן הנאשם עושה שימוש. יחד עם זאת, העד מסר שהאחריות על הטיפול הרפואי נתונה בידי רופא הכלא.

העד התבקש לומר את התרשמותו ממצבו של הנאשם, ומסר כי לא התרשם שהנאשם לא יכול היה להיחקר. הוא זכר מקרה אחד בו הנאשם יצא מהתא עייף מאוד ולכן הובא חובש לחדר

התקירה, והנאשם הסביר כי הדבר קשור למצבו הנפשי ולא הפיזי באותו חיום. העד חזר וציין כי היו מקרים בהם הנאשם ביקש להישאר בחדר החקירות דווקא.

העד התבקש להתייחס לשאלת אזיקתו של הנאשם בחקירה. הוא מסר כי ככלל, במרבית החקירה לא היה הנאשם אזוק כלל. יחד עם זאת, היו מקרים בהם הנאשם התעצבן וסטר לעצמו. על רקע זה נאזק כדי לא לפגוע בעצמו, ומיד לאחר שנרגע הוסרה האזיקה. הוא ציין כי במקרים בהם יצא מחדר החקירה למספר דקות היה הנאשם אזוק לכסא, אולם מדובר באזיקים עם שרשרת ארוכה המאפשרת תנועת ידיים חופשית כולל עישון. הוא הדגיש כי מעולם לא יצא לפרקי זמן של 4-7 שעות כפי שנטען בטיעוני הזוטא, ובדרך כלל דובר במספר דקות ולכל היותר לחצי שעה. הוא הוסיף כי הנאשם לא התלונן על כך בפניו. לשאלת בית המשפט ענה העד כי לנאשם לא היה שעון.

העד התבקש להתייחס לטענה כי נאמר לנאשם שביתו נהרס, עצים נעקרו ודבש הושמד. העד ענה כי זו הפעם הראשונה שהוא שומע על כך שלנאשם היה דבש, לא נאמר לנאשם דבר הנוגע לביתו והחקירה כלל לא הגיעה לנושא זה. העד הכחיש כי נאמר לנאשם שאם יודה יוכל להשתחרר לעזור למשפחתו או כי יוכל להשתחרר בשל גילו ומצבו הרפואי.

העד אישר כי במהלך החקירה הוטחו בנאשם האשמות על בסיס החשדות שהיו בידי החוקרים, והיו מקרים בהם נאמר לו שהוא משקר, אולם לא הייתה כוונה להשפילו. לדבריו, החקירה נוהלה בהרבה כבוד הדדי ובמספר פעמים בחקירה אף ציין הנאשם לחיוב את היחס שקיבל מהעד. העד עמד על כך שלא נעשה שימוש באיומים או בכוח, כי החקירה התנהלה בשיג ושיח ארוך, וכי הוא זוכר את האווירה בחקירה זו כיוצאת דופן לטובה ביחס לחקירות אחרות שניהל. הנאשם שיתף פעולה בחלקים נרחבים של החקירה, והיו ימים בהם די היה לומר לנאשם כותרת של נושא והנאשם מסר גרסה מפורטת בעניין.

בחקירתו הנגדית מסר העד כי נודע לו על מעצרו של הנאשם מכלי התקשורת כשעה לפני שפגש אותו במתקן החקירה. עוד ציין העד כי את חקירתו הראשונה של הנאשם ניהל החוקר המכונה "האדי", ואילו הוא לא היה מודע לה באותו זמן, אלא רק בדיעבד.

העד מסר כי גודלו של התא בו שהה הנאשם הוא סטנדרטי, יש בו חלון אולם זה סגור והאוורור מתבסס על מערכת מיזוג מרכזית.

העד נשאל מדוע הנאשם נחקר ברצף ביום 15.3.06 החל משעה 10:55 ועד לאחר חצות, וזאת כאשר הנאשם כבר נחקר לפנות בוקר משעה 02:40 ועד 05:45. העד ענה כי דובר בתחילת החקירה, הנאשם ביקש לפרט את פעולותיו באופן כרונולוגי וזה לקח זמן. הנאשם לא הביע רצון להפסיק את החקירה או ללכת לישון, ובמהלכה הוא אכל, שתה ועישן להנאתו.

העד התבקש להתייחס לאמירות המופיעות בזכ"דים שערך החוקר המכונה "ג'יינו", כמו "אתה מתנהג כמו ילד קטן, יושב ומשקר במצח נחושה" והאם הן שומרות על כבודו של הנחקר. העד ענה כי בכל חקירה יש נקודות של עימות ואי הסכמה, ועדיין כבודו של הנחקר נשמר.

העד ציין כי הנאשם לא היה מנוע מפגש עם עו״ד, אך כל נושא הקשר עם עו״ד הוא באחריות המשטרה. למיטב ידיעתו זו הודיעה לעו״ד על מעצרו של הנאשם, אולם הוא לא בדק זאת.

הסניגור הפנה את העד לזכ״ד מיום 19.3.06 בשעה 16:35, בו אמר הנאשם שמלבישים לו האשמות ועדיף שיביאו חרב ויקטעו את ראשו, ושאל האם זה מצביע על אדם שקט ושליו. העד השיב כי הוא לא התרשם שהנאשם הוא אדם שקט ושליו, אלא אדם שנוטה להתפרצויות חימה. הוא הוסיף כי התנהגות זו ודומות לה של הנאשם אפיינו אותו לעיתים, למרות שרוב החקירה נוהלה באווירה חיובית מאוד עם הרבה כבוד הדדי.

העד התבקש להסביר מהי ״שיחת שכנוע״ ומסר כי זו שיחה במהלכה מוצע לנחקר להגיע להבנה, להודות במיוחס לו ומוסבר לו אופי המידע שברשות החוקרים. אופי השיחה תלוי בנחקר ובאופיו. במקרה של הנאשם, עיקר השיחה עסק ברומו של עולם ובנושאים כלליים, כיוון שהנאשם הינו אדם שהסתובב בהרבה מאוד מקומות, אך בסוף השיחה תמיד חוזרת לנושא החקירה. העד לא זכר בדיוק מה נאמר באותה שיחה שלא הניבה פירות חקירתיים, אולם ציין שבין היתר נאמר שעדיף לנאשם להודות.

העד נשאל האם אמירה לנאשם ש״יגיע להבנה עם חוקריו״ פירושה הסכם שהנאשם יודה ואחר כך ילך הביתה כי הוא זקן. העד ציין כי לא נאמר לנאשם שילך הביתה או כי הוא זקן. העד אמר שלא קרה דבר כשהנאשם לא הודה, אולם הודאה היא לטובתו שכן כך תסתיים החקירה.

העד נשאל האם לא הופעל לחץ גדול על הנאשם באופן שגרם לו לרצות לפגוע בעצמו, כפי שמופיע בזכ״ד מיום 21.3.06. העד אמר כי דובר בהתקף זעם של הנאשם בתחילת החקירה, ולאחר מכן הוא נרגע וחזר לשיחה נינוחה, ארוכה ומפורטת.

העד הכחיש שהבטיח לנאשם שאם יימצא דובר אמת בפוליגרף לא ימשיכו לשאול אותו על אותם דברים בהם יצא דובר אמת. נכון הוא שלאחר הבדיקה התמקדו בנושאים אחרים, אך אין מניעה לחזור לאותם נושאים. לדבריו, הסיכום וההבנה עם הנאשם היו רק למקרה בו יצא דובר שקר.

העד הכחיש כי אמר לנאשם שאם יסיים את החקירה יעבור לבית הסוהר, שם התנאים טובים יותר ולכן עדיף לו לסיים את החקירה. כשהופנה לזכ״ד מיום 9.4.06 שעה 13:30 סעיף 8 בו נכתב שהנאשם נשאל אם אינו רוצה לסיים את חקירתו ולעבור לכלא, שם יזכה לביקורי משפחתו, ענה העד כי השאלה שהוצגה לנאשם הייתה בעיקר דרך לומר לו לגמור את החקירה. העד הוסיף כי החקירה לא התמקדה רק בנושא הספינה ״קארין A״ אלא גם בנושא מקורותיו הכספיים וקשריו לתנזים פת״ח. ה״הבנה״ בה מדובר היא שהנאשם ימסור מידע, לאו דווקא זה המוביל להפללתו.

תאריך: 29/07/09

תיק מס': 3052/06

**עדותו של המכונה "האדי"**

עד זה הוא חוקר השב"כ שחקר את הנאשם ביום בו הגיע למתקן החקירה, ופעם נוספת בשלב מאוחר יותר.

העד מסר שהנאשם נשאל לשלומו וענה כי הוא חש בטוב אם כי אמר לו שהוא סובל מסרטן. הנאשם לא התלונן על כאבים, ואם היה עושה זאת הוא היה מזמין רופא או חובש. העד אמר כי לא נמסרו לידיו תרופות מעורך דינו של הנאשם, וכלל לא זכור לו שהנאשם ביקש תרופות. העד נשאל לגבי שעת החקירה הראשונה, 02:40 וענה כי נדרש להתחיל בחקירה על ידי ראש הצוות וכך עשה. עוד ציין כי למיטב זכרונו לא חקר את הנאשם כשזה אזוק, וגם אם היה עם אזיקים, ולהערכתו לא היה, לא דובר באזיקי רגליים. העד הכחיש כי הוא השאיר את הנאשם פרקי זמן של 4-7 שעות בחדר החקירות לבדו כשהוא אזוק. העד אף הכחיש שאמר או כי הכיר אמירה לנאשם שביתו נהרס, עצים נעקרו והושמד דבש. הוא הכחיש כי הבטיח לנאשם כי ישוחרר אם יודה.

העד אישר כי נאמר לנאשם שהוא משקר, וטען כי המדובר בטענה לגיטימית מצדו של חוקר. הוא מסר כי לא היה שימוש באיומים או בכוח בחקירה, ואם הנאשם פחד זה עניין סובייקטיבי אך הוא לא הפחיד אותו בכוונה.

בחקירתו הנגדית מסר העד כי הוא ידע מיהו הנאשם וידע שהוא פעיל ותיק מאוד בפת"ח, והיה אחראי על מנגנון הרכש והכספים בארגון זה.

העד ציין כי מסר לנאשם דף המפרט בשפה הערבית את זכויותיו כעצור וכנחקר, אך הוא לא הקריא לו אותו בעצמו. הוא אישר כי המשפט הראשון שרשם בזכ"ד היה המשפט הראשון שאמר לו הנאשם, והוא כי "נמאס לנאשם מהסיפור של קארין A".

העד התבקש לתאר את התרשמותו ממצבו של הנאשם בחקירה הראשונה שהתנהלה לפנות בוקר, ואמר כי הוא זכר שנכנס איש מבוגר, עייף יחסית, בהתאם לשעה בה הגיע. הם שוחחו כרגיל, והוא זכר כי הנאשם היה מעשן כבד, קיבל הרבה סיגריות, וכי השיחה התנהלה באווירה חיובית. הוא לא זכר אם הנאשם היה נסער או מדוכא, ולא זכר דבר חריג אחר. לדבריו, למיטב הבנתו, האמירה של הנאשם ש"נמאס לו" מתיישבת עם העובדה שהיה במעצר הגנתי או מניעתי בעקבות פרשת קארין A.

העד עמד על כך שתפקידו להגיע לחקר האמת, ואם הנאשם היה מוסר תזה הגיונית שהייתה מתיישבת עם המידע המודיעיני, הוא היה מקבל אותה.

העד חזר ואמר כי הוא לא זוכר אם הנאשם היה אזוק בחקירות שערך, אבל אם היה שימוש באזיקים הרי זה רק אם העד הרגיש מאוים. הוא הוסיף כי הוא לא זוכר דבר כזה, ואם הנאשם היה צועק או משתולל הוא היה רושם זאת.

העד חזר והדגיש כי מסר את דף הזכויות והחובות לנאשם, ושם רשומות זכויותיו. הוא עצמו לא אמר לנאשם כי זכותו לשמור על זכות השתיקה או להיות מיוצג בידי עו"ד.

העד עמד על כך שאם הנאשם היה מתלונן בפניו על שלא נותנים לו להכניס למתקן המעצר את תרופותיו, או כי הוא מרגיש רע ואינו מקבל עזרה מרופא הכלא, הוא היה רושם זאת. עם זאת, ציין כי ידע שהנאשם הוא אדם חולה. הוא אישית לא קיבל כל פנייה על הכנסת תרופות.

העד חזר והדגיש כי חקר האמת הוא "קדושי" והוא המטרה, ולכן כאשר הנאשם אמר לו שהוא מוכן "להודות בכל דבר", הסביר לו כי אין מקום לדיבורים אלה ועליו לספר בעצמו מבלי להוסיף או לגרוע. הוא התרשם שהנאשם לא מוכן להודות בכל דבר, וידע לעמוד על שלו בחקירה. העד אמר כי חקירת הנאשם נמשכה מאחר שהיו נושאים שדרשו ליבון והבהרה, והיו ידיעות אחרות שהוא בחר להכחיש או לא להסביר אותן.

**עדותו של המכונה "ג'ינו"**

עד זה היה חוקר שב"כ שנטל חלק בחקירתו של הנאשם, וציין בפתח דבריו כי מאחר שחלפו שנתיים ממועד החקירה, חלק ממנה הוא לא זכר.

העד עומת עם טיעוני הזוטא, ומסר כי הנאשם קיבל טיפול רפואי ממרפאת הכלא. הוא זכר שבאחד הזכ"דים מסר הנאשם שיש לו פוליפים בקיבה, ותוך זמן קצר הוצא לבדיקה ולטיפול רפואי. העד מסר כי כחוקר הוא אינו הסמכות בנוגע להעברת תרופות לנאשם, וכי ההחלטות בנושא זה הן של רופא הכלא. עוד ציין כי לא זכור לו מקרה בו הנאשם הסב את תשומת ליבו לכך שהוא זקוק לטיפול תרופתי.

העד הכחיש כי הנאשם היה אזוק ברגליו בחקירות בהן נכח, והוסיף כי הנאשם נאזק בידיו לאחר שחבט בעצמו ולאחר שהוזהר כי אם ימשיך לחבוט בעצמו ייאזק, על מנת שלא יוכל לפגוע בעצמו.

העד טען כי לא היה מקרה בו הושאר הנאשם אזוק לבדו בחדר למשך 4-7 שעות, וטען כי לא אמר לנאשם שכוחות צה"ל הרסו את ביתו והשמידו עצים ודבש. העד הוסיף כי אף לא נאמר על ידו לנאשם שאם יודה הוא יצא לחופשי לאור גילו.

העד ציין כי לא פעם אמר לנאשם שהוא מסתיר מידע ומסרב לתיתו לחוקריו, אולם לא השתמש באלימות, איומים או ניסיונות הפחדה.

בחקירתו הנגדית נשאל העד ביחס למשמעות האמירה לנאשם כי "הובא לחקירה על מנת להודות בכבוד". העד מסר כי להודות באמת זה כבוד, ומטרתו כחוקר היא שהנחקר יודה הודאת אמת.

העד ציין כי נושא החקירה היה מעורבותו של הנאשם בנושא הספינה קארין A, קשריו למימון וחברחת אמל"ח, וקשריו לאיראנים ולאחרים ממדינות ערב, שמטרתם ביצוע פח"ע נגד ישראל.

העד מסר כי רשם בזכ"ד שהנאשם "התנהג כילד קטן", שכן חרף גילו המבוגר התנהג לפעמים בחקירה בצורה ילדותית. כשהתבקש להסביר למה הכוונה ענה, שהתנהגות ילדותית היא כשאדם נחקר על מידע ומוסר גרסת כיסוי הפוטרת אותו מאחריות, אף שהוא ידע שחוקריו יודעים על מה הם מדברים איתו.

העד ציין שנאמר לנאשם כי אל לו "להתנהג כמו פרחח", ובמילה "פרחח" כוונתו הייתה לאדם שצועק, משקר, חסר כבוד שעושה הכול כדי להציל את עורו.

העד ציין כי ככל הנראה ידע באותה עת על כך שהנאשם נחקר לפנות בוקר על ידי החוקר המכונה "האדי", אולם לא מצא כל מניעה מלחקור את הנאשם עד השעה 18:00.

העד נשאל על דבריו מחקירה שתועדה בזכ"ד מיום 20.3.06, בה נרשם שאמר לנאשם שאין זה מקרה שמעצרו הוארך ב-18 ימים לאור המידע הרב שהוא מסתיר מחוקריו. נטען בפניו כי בכך הוא אמר לנאשם למעשה, כי ככל שיסתיר מידע מעצרו יתמשך. העד השיב על כך שניתן להבין שבית המשפט החליט להאריך את המעצר בהסתמך על המידע שהיה בפניו. העד נשאל על התבטאות נוספת שלו כלפי הנחקר שתועדה בזכ"ד מיום 27.3.06. שם נרשם כי אמר לנאשם ש"בסופו של דבר יודה". נטען בפני העד כי ההגיון אומר שהמשמעות הינה שעד שהנאשם לא יודה – החקירה לא תסתיים. העד השיב כי זה לא מה שנכתב, ובסופו של דבר הנאשם אכן העביר הרבה מידע.

העד נשאל על המקרים בהם הנאשם היכה את עצמו ונאמר כי הוא זוכר שהנאשם היכה את עצמו מספר פעמים בכפות ידיו, ומספר פעמים הצליחו להרגיע אותו על ידי בקשות שיפסיק זאת. עוד ציין העד כי לדעתו זו התנהגות ילדותית. העד נשאל אם אין התנהגות זו מעידה על ייאוש של הנאשם, והשיב כי להערכתו זו הייתה הצגה, שכן עובדה שלאחר מכן הנאשם מסר עוד הרבה מידע.

**עדויות עדי התביעה במשפט הזוטא - סיכום ביניים**

ניתן לחלק את העדויות שנשמעו לעדויות אנשי המשטרה ולעדויות אנשי השב"כ. אנשי המשטרה מסרו כי החקירה נוהלה בנינוחות, ללא בעיה כלשהי, וכי הנאשם מסר דברים מרצונו הטוב והחופשי. עוד נמסר כי הנאשם כובד במהלך החקירות במזון ובמשקה, לא הושאר לבדו, ולא הושמעו כלפיו איומים כלשהם, או הבטחות בהקשר לחקירתו.

עדי השב"כ ציינו כי הנאשם קיבל יחס של כבוד בהתאם למעמדו. הם לא הכחישו כי היו בחקירתו מקרים של "עימות" במסגרתם הטיחו בנאשם כי הוא משקר וכי הוא מסתיר מידע, אולם טענו כי הדבר הינו טבעי בחלק מחקירה. החוקרים הכחישו כי הנאשם הושאר פרקי זמן ארוכים לבדו בחדר החקירות. לדבריהם, אמנם היו מספר מקרים בהם הושאר הנחקר לבדו, אולם דובר בפרקי זמן קצרים, במהלכם היה אזוק בידיו באזיקים עם שרשרת ארוכה. עוד צויין כי הנאשם לא היה

אזוק במהלך החקירות, למעט במקרים בהם סטר לעצמו וניסה לפגוע בעצמו. גם במקרים אלה, לאחר שהנאשם נרגע, הוסרו האזיקים.

גם חוקרי השב"כ הכחישו כי השמיעו כלפי הנאשם איומים, או כי מסרו לו שביתו נהרס וכיו"ב, או כי הובטחו לו הבטחות שאם יודה ישוחרר מפאת גילו.

בכל הנוגע למצבו הרפואי, ציינו חוקרי השב"כ כי חטיפול בנאשם היה על ידי מרפאת הכלא, ולאור גילו אף דאגו לכך שיקבל טיפול בהתאם לשיקול הדעת של גורמי הרפואה, עליהם אינם אחראים.

**עדות הנאשם במשפט הזוטא – החקירה הראשית**

הנאשם פתח וציין כי הוא סובל מיתר לחץ דם, טחורים, אולקוס וכאבי גב.

הנאשם תיאר כי היה בכלא יריחו תחת פיקוח אמריקאי ובריטי, וכיצד ביום 14.3.06 בשמונה בבוקר החל מצור של צה"ל על המוקטעה ביריחו, עד אשר הגיע דחפור והרס את המבנה. הוא ואחרים נלקחו למת"ק יריחו ובשעות הערב הועבר למגרש הרוסים. הנאשם ציין כי היה לו קר כיוון שהיה לבוש בפיג'מה בלבד. ממגרש הרוסים הועבר לאשקלון, וכל אותו זמן היה נתון באזיקים.

חקירתו בשב"כ החלה באותו הלילה ונאמר לו כי הוא חייב להודות בכל דבר. הנאשם ציין כי אמר לחוקרו שאין נגדו דבר, והוא אדם שמבצע את עבודתו וממלא הוראות.

לטענתו, היה אזוק במהלך החקירה בידיו וברגליו, וציין כי ידיו היו מלפנים. הנאשם אמר כי לא קיבל את התרופות שהוא נוטל דרך קבע, ואף שביקש לראות רופא נאמר לו כי יראה אותו רק למחרת. הנאשם טען כי נלקח לרופא רק לאחר שהתחנן פעמים רבות שיועבר לבדיקה. לאחר בדיקת הרופא ניתנה לו תרופה רק נגד לחץ דם, אולם לא טיפלו בבעיותיו האחרות.

הנאשם ציין כי הוחזק בתא שגודלו מטר וחצי על שני מטר, והוא היה נרדם מהר מרוב עייפות, אולם עקב הכאבים מהם סבל התעורר הרבה.

הנאשם אמר כי אינו זוכר רבות מחקירתו. הוא זכר שחוקריו רצו שהוא יודה שהוא קנה את קארין A, אולם אין לו קשר לכך. לטענתו, חוקריו דיברו אליו בחוצפה, פעמים התייחסו אליו בצורה אלימה ופעמים בצורה רגועה.

הנאשם טען כי חוקריו אמרו לו שהם מעוניינים בהודאה מפורשת ומפורטת על כך שהוא יודע על הפרשייה של קארין A, ושאם יודה׳- יוכל ללכת הביתה. הנאשם טען כי אמר לחוקריו שהוא מוכן להודות אך לא לשקר.

הנאשם מסר כי עורך דינו אמר לו שהרסו את ביתו, ונרפו עצים וכוורות. לדבריו, החוקרים אמרו לו שהם שמעו על כך, והעניין השפיע עליו באופן שלילי.

הנאשם נשאל על ביקוריו אצל רופא הכלא, ואמר כי גם כשהיה מתלונן היה מקבל רק אקמול. כשנאמר לו שלאחר שהתלונן בחקירתו על בעיות עיכול קיבל תרופה בשם "גסטרו" ענה כי אינו זוכר זאת. במקרה אחר זכר הנאשם שקיבל פראפין לבעיית העצירות שלו, אולם טען כי זה היה חד פעמי. לדבריו, אף שקיבל תרופות ללחץ דם, הרגיש כי זה לא עזר לו. הנאשם נשאל אם סיפר לרופא על המחלות הכרוניות שלו, ואמר כי סיפר הכל וגם כי יש לו אסטמה, כי הוא מתקשה לנשום בצורה טובה וכי הוא סובל מפעימות לב מואצות.

עוד ציין כי השוטר שגבה את אמרתו ישב עם דו"ח השב"כ ושאל אותו לגביו, אולם הוא אינו יודע מה כתב השוטר, שכן החקירה התנהלה בערבית והדברים נרשמו בעברית.

הנאשם נשאל אם האמין שישוחרר אם ימסור את מה שחוקריו רצו לשמוע וענה שכן. לדבריו, חוקריו סיפרו לו על נחקר אחר שהיה צפוי לקבל 4 מאסרי עולם, אולם מוחמד דחלאן התערב בעניינו והם שחררו אותו.

הנאשם מסר כי לא ביקש מהחוקרים שיתקשרו לעו"ד, ומשפחתו היא זו שהתקשרה לעו"ד עבורו. הנאשם הוסיף כי ביקש מחוקריו לראות עו"ד ותשובתם הייתה שאם יבוא עו"ד וישאל עליו הם יתנו לו לראות אותו.

**עדות הנאשם במשפט הזוטא – החקירה הנגדית**

הנאשם מסר כי הרגיש מושפל בחקירתו. עוד מסר כי אמר לחוקריו את כל מה שהם רצו לשמוע. לאחר מכן נשאל הנאשם באיזה שלב של החקירה "נשבר". הנאשם לא השיב על כך ישירות ותחת זאת טען כי מההתחלה אמר לחוקריו שמה שיש לו לומר הוא יספר, ואת מה שהוא ידע הוא אכן סיפר. כשנשאל אם הדברים שמסר ביום הראשון לחקירתו נאמרו לאחר לחץ, ענה כי סיפר את הדברים כי זה מה שקרה וכיון שלא דובר בעניין סודי. עוד טען כי בחקירתו לא שיקר בשום שלב, וסיפר את מה שהוא ידע, אולם אינו יודע מה נרשם בעברית.

לטענתו, חוקריו השפילו אותו, אמרו לו שהוא שקרן ודיברו אליו בצורה "מלוכלכת". עוד טען כי היו עוזבים אותו בחדר ריק לבד כשהוא אזוק, וחוזרים רק כעבור כמה שעות.

הנאשם אמר כי בחקירתו פעל לפי הוראות החוקרים ובודאי לא הכתיב דרישות או את תנאי החקירה. כשנשאל כיצד מצא את הכוח לומר לחוקריו כי "מדינת ישראל חייבת לו כסף", לא השיב תשובה ישירה. הנאשם אישר כי עישן בחקירתו ואמר כי לקח סיגריות מחוקריו בהתאם לבקשתו. הנאשם נשאל מה עוד קיבל והשיב "כלום". כשנשאל באופן ספציפי, אם קיבל קוראן, קפה, תה ולבנים, ענה שקיבל. לדבריו הוא לא ביקש זאת אלא חוקריו הביאו לו.

הנאשם חזר על כך שהיה נתון בלחץ כבר מהיום הראשון, אולם הדגיש כי בחקירתו מסר רק את האמת. עוד ציין כי הכחיש כל קשר לספינה קארין A וכי התעקש על כך.

לשאלות בית המשפט ענה כי הדברים הרשומים באמרותיו תורגמו לו, אולם הוא לא ידע מה נרשם בפועל. עוד ציין הנאשם כי היה מתעצבן לעיתים בחקירתו ("מרוב הדיבורים הבן אדם משתגע") אולם עצביו התבטאו בכך שהוא "התפוצץ מבפנים" ולא הראה זאת לחוקריו.

**עדותו של מוחמד חיג'אזי**

עד זה מסר כי היה עם הנאשם באותו תא בכלא אשקלון באפריל 2006, למשך כשבועיים. הוא מסר כי הנאשם היה חולה וחלש והיה קשה לו לנשום, ללכת או לעמוד על רגליו. הוא טען כי פעמים רבות הוא וחבריו לתא דפקו על דלת התא וביקשו רופא עבור הנאשם, כי "הוא הולך למות" והסוהרים נתנו לנאשם "מקסימום אקמול". הוא ציין כי מעולם לא הגיע רופא לתא.

בחקירתו הנגדית ציין העד כי היה עם הנאשם בתא החל מ-12/04/06 למיטב זכרונו. הוא טען כי בתקופה של השבועיים שהיה יחד עם הנאשם בתא יצא זה רק לשירותים ולמקלחת, ולאחר מכן הוסיף כי יצא גם לחקירות. כשנשאל לתגובתו לכך שישנם מסמכים רבים של חובשים ורופאים כי ראו את הנאשם באותה תקופה, ענה כי בתקופה שהיו ביחד זה לא קרה. עוד הוסיף כי כל פעם שהנאשם חזר מחקירה הוא סיפר להם (לחבריו לתא) על כך. העד התבקש לומר שמות אנשים נוספים איתם ישב באותה תקופה וענה כי יש אנשים שהוא זוכר את שמותיהם, אך לא נקב בשם כלשהו.

העד ציין כי הנאשם אמר לו שהחקירה גורמת לו ללחץ נפשי, שהוא כל הזמן היה כפות לכיסא ושהוא קיבל יחס רע. עוד אמר לו הנאשם שהוא סובל מסרטן והוא צריך תרופות. העד אמר כי הנאשם לא סיפר על הדברים שקיבל מחוקריו, כגון פירות, סיגריות ותחתונים.

__הכרעה במשפט הזוטא__

ניתן לומר שטיעוני הזוטא מעלים טיעונים בתחום ה"השפלה", נקיטה בשיטת חקירה בלתי הוגנת על ידי יצירת לחץ נפשי בלתי הוגן כמו גם פיתוי והשאה. ההכרעה במקרה זה הינה הכרעה עובדתית, הנובעת מהתרשמותנו הבלתי אמצעית מהדברים שנאמרו בפנינו.

תיק מס׳: 3052/06

תאריך: 29/07/09

**הערכת העדויות במשפט הזוטא – מהימנות ומשקל**

**מהימנות עדי התביעה**

לא מצאנו כי עדי התביעה היו חסרי אמינות, כפי שביקשה לטעון ההגנה. אכן, אין ספק כי הנאשם היה נתון בחקירה במהלכה ביקשו החוקרים לקבל מידע רב ככל האפשר מהנאשם בנוגע לפעילותו במימון הטרור הפלסטיני.

ככל חקירה, היא לא התנהלה בתנאים נוחים ונעימים. הנאשם היה כלוא במתקן חקירות, ונחקר תקופה ממושכת. יחד עם זאת, ישנו פער בין חוסר הנוחות האינהרנטי לקיומה של חקירה, לבין נקיטת אמצעים שיכולים לשלול את רצונו החופשי ואת יכולתו לבחור אם למסור מידע מפליל על עצמו.

כעולה מהכתוב באמרות, ועל כך לא חלק הנאשם בעדותו, במהלך חקירתו במשטרה הוא קיבל סיגריות לעישון כאוות נפשו, וכובד בשתייה ובמזון במהלך החקירה. כך למשל, באמרה מיום 19.3.06 גליון 5 ש׳ 132 נרשם ״בשלב זה החשוד מבקש להתפלל והודאת החשוד מופסקת לעניין זה״, וכן נרשם בגליון 6 ש׳ 164 במהלך הודאתו כובד החשוד בשתייה חמה, שתייה קרה ועוגיות״. באמרה מיום 20.3.06 עמ׳ 1 ש׳ 18 נכתב ״החשוד מקבל סיגריה ומעשן״ ובהמשך (עמ׳ 2 ש׳ 19 נרשם כי ״החשוד מקבל מים לבקשתו כדי לבלוע כדור״. באמרה מיום 22.3.06 גליון 5 ש׳ 118 נרשם כי כובד בשתייה חמה, שתיה קרה וסיגריות, ובאמרת מיום 30.3.06 גליון 6 ש׳ 144 נרשם דבר דומה. גם באמרות שנגבו ביום 2.4.06 (ת/9 ות/10) נרשם כי קיבל כיבוד. קשה לתאר מצב בו חקירה מתנהלת באופן דורסני ואכזרי, כטענת ההגנה, ואגב כך ניתנת לנאשם האפשרות להתפלל, לעשן כרצונו, לאכול ולשתות, וכמובן ליטול תרופות.

יש לומר כי כיבוד כגון אוכל שתייה וסיגריות ניתן לנאשם גם במהלך חקירותיו בשב״כ. כבר בחקירתו הראשונה (זכ״ד מיום 15.3.06 שעה 02:40) כובד בקפה, ובחקירה שלאחר מכן (זכ״ד מיום 15.3.06 שעה 10:55) כובד בארוחת צהריים, סיגריות וקפה. ניתן לראות כי יחס זה נמשך לאורך כל חקירותיו, וכמעט בכל זכ״ד מופיע כי הנאשם קיבל אוכל, שתייה וסיגריות. אף ניתנו לו קוראן (זכ״ד 16.3.06 שעה 10:00, זכ״ד מיום 21.3.06 שעה 12:00), האפשרות לצאת לשירותים (זכ״ד מיום 20.3.06 שעה 11:40) והאפשרות להעלות בעיות הנוגעות לתנאי כליאתו בפני חוקריו (זכ״ד מיום 3.4.06 שעה 11:00, סעיף 1). הנאשם לא חלק על קביעות אלה שבזכ״דים. יחס זה אינו אופייני למי שמבקשים לרמוס את רצונו החופשי, להשפילו ולפגוע בו.

מעבר לנושא התקרבות שהוגשה לנאשם, מחזכ״דים מחקירת השב״כ לא עולה כי דובר בנחקר ״שבור״ ומושפל, שכן הנאשם התייחס פעמים רבות לנושאים שאינם קשורים לחקירה, כנושאים פוליטיים ומדיניים כלליים (זכ״ד מיום 16.3.06 שעה 10:00 סעיפים 24-25, זכ״ד מיום 27.3.06 שעה 16:30 סעיף 1, זכ״ד מיום 11.4.06 שעה 10:00 סעיף 12), ואף אמר לחוקריו כי מדינת ישראל חייבת לו 275 אלף דולר שלקחה מארון במוקטעה (זכ״ד מיום 19.3.09 שעה 16:35, סעיף 18). התנהגות כזו אינה אופיינית למי שנשבר בחקירתו ומוכן לרצות את חוקריו ולומר כל דבר שהם

רוצים רק על מנת שתחקירה תסתיים, אלא למי שמרגיש מספיק בטוח בעצמו כדי לומר את אשר על ליבו.

חשוב להדגיש כי עדי התביעה לא ניסו לייפות את תנאי החקירה. הם לא הכחישו כי היו תקופות קצרות בהן הושאר לבדו בחדר, ואז נותר אזוק, אולם נטען כי דובר בפרקי זמן קצרים. הם אף לא הכחישו כי הנאשם נאזק לאחר שסטר לעצמו והחל להשתולל (זכ״ד מיום 21.3.06 שעה 12:00 סעיפים 2-3). החוקרים אף לא טענו כי הנאשם היה אדם נינוח ושליו, אלא אמרו כי הנאשם הינו אדם מהיר חימה, ואת זעמו היה מפנה כלפי עצמו, ולכן נדרשו לאזקו לעתים. הם גם לא הכחישו כי מדי פעם פנו לנאשם במילים שלא נעמו לאוזנו – כגון אמירה שהנאשם משקר, מתנהג בילדותיות או כפרחח – אך לא הוכח כי נקטו השפלה כשיטת חקירה.

תיאור זה של החוקרים נראה לנו אמין. לא מצאנו כי יש בו פירכות או סתירות, והוא תואם את הדברים הרשומים בזכ״דים, ובמידה מסוימת את עדותו של הנאשם בבית המשפט. ודוק: ישנו פער משמעותי בין עדות הנאשם בבית המשפט, לבין טיעוני הזוטא שהעלתה ההגנה בתחילה – טיעונים שנזנחו בשלב הסיכומים לאור עדות הנאשם. כבר עתה ניתן לומר שהרושם העולה מעדותו של הנאשם לא תאם את טיעוני הזוטא שמסר.

**אמינות עדותו של מוחמד חיג׳אזי**

בטרם נדון במהימנותו של הנאשם נקדים ונאמר כי אמינותו של מוחמד חיג׳אזי בעינינו הייתה נמוכה מאוד. תמוה בעינינו כיצד העד זכר ״היטב״ את כל שקרה לנאשם, וכיצד ״התחננו״ לטיפול רפואי עבורו שלא ניתן, אולם לא ידע לומר מי עוד היה כלוא איתו בתא בתקופה זו. דבריו אף אינם מתיישבים עם תיקו הרפואי של הנאשם, ממנו עולה כי גם במהלך התקופה עליה העיד מוחמד חיג׳אזי, טופל הנאשם מספר פעמים על ידי מרפאת הכלא. על פניו נראה היה כי עדותו של מוחמד חיג׳אזי הינה עדות שכל מטרתה לסייע לנאשם במשפטו, וכך, לכל הפחות, הוקצן עד מאוד מצבו הרפואי של הנאשם. עוד יש לומר כי מוחמד חיג׳אזי אמר שהנאשם התלונן בפניו על כך שהוחזק כפות לכיסא – טענה שהנאשם עצמו לא חזר עליה. לפיכך, לא מצאנו לנכון להעניק לעדותו של מוחמד חיג׳אזי משקל כלשהו.

**מהימנות הנאשם – כללי**

הנאשם טען, באופן חד משמעי, כי לא מסר בחקירתו דבר שאינו אמת. למרות ניסיונו של התובע להבין באיזה שלב ״נשבר״ הנאשם והחל למסור לחוקריו דברים בהתאם לרצונם כביכול, עמד הנאשם על כך כי מסר את כל הידוע לו בלא בעיה כלשהי. הנאשם הכחיש כי קשר עצמו לספינה קארין A, בניגוד למופיע באמרות המשטרתיות.

נראה כי הגם שהנאשם טען כי חש מושפל, לא היה בכך, בהתאם לטענתו, כדי להשפיע עליו לומר דבר שלא היה ברצונו לומר. נדגיש כי הנאשם לא טען שגם את דברי האמת שמסר סירב למסור לחוקריו, וזו הוצאה ממנו שלא באופן חופשי ומרצון. הנאשם טען לאורך עדותו בפנינו כי מסר

דברי אמת, כי דברים אלה נמסרו מרצונו כיוון שלא התבייש בהם וכיוון שלא היה בהם משום סוד כלשהו.

כאמור, הדבר היחיד שהנאשם לא היה מוכן לקבל היו הדברים הרשומים באמרותיו, ולטענתו המדובר בדברים שלא נרשמו מפיו, ומכיוון שאינו יודע לקרוא עברית, לא יכול היה לדעת כי אלה נכתבו. נראה כי הנאשם זנח את טיעון הזוטא לפיו חוקרי המשטרה איימו עליו ב"תוהו ובוהו" אם לא יחזור על הרשום בזכ"דים של חוקרי השב"כ, שכן לא הזכיר זאת בעדותו בפנינו כלל.

עוד נציין כי הרושם הבלתי אמצעי מעדות הנאשם היה של מי שהגזים בעוצמת ההשפלה שחש ובטענות בנוגע ליחס שקיבל, בהתאם לקו הנטען במשפט הזוטא. מכל מקום, גם אם סובייקטיבית חש השפלה במצב אליו נקלע, נדגיש כי הוא לא היה מוכן לאשר ולומר כי מסר דבר שאינו נכון, או כי נשבר בחקירתו. הרושם שלנו הוא כי הנאשם נקט קו "עצמאי" מקו ההגנה במשפט, ביחס לדברים שהוא חשב שצריך להשמיע לבית המשפט. הנאשם רצה לומר שמסר רק דברים נכונים ואמיתיים מרצונו, אך באותה עת לומר שסבל בחקירתו. הדברים אינם יכולים לחתיישב עם הטענה כי אמרותיו נגבו שלא מרצונו החופשי. ברור שסיטואציה של חקירה אינה נוחה ואינה נעימה, ודאי לא לאדם מבוגר שהחזיק בעבר בעמדה בכירה. עם זאת, לא התרשמנו כי הנאשם חש בשלב כלשהו בחקירה מצוקה שמנעה ממנו לבוא בדרישות או שהובילה אותו לומר דברים שלא מרצונו הטוב והחופשי.

**מהימנות הנאשם – הטיפול הרפואי**

טענותיו של הנאשם בנוגע לטיפול רפואי או העדרו אינן מתיישבות כלל עם המצוי בתיקו הרפואי. כך, למשל, במסמך המתעד את בדיקתו לפני קליטתו במתקן הכליאה ביום 14.3.06 נכתב מפיו של הנאשם כי "מציין שלשול כרוני, נוטל COLATAL לפי הצורך, שולל מחלת לב, סוכר, יל"ד או בעיות אחרות". ביום 15.3.06 בשעה 14:19 נבדק שוב בכלא שקמה. גם במקרה זה, ואף שנבדק על ידי רופא אחר, הרי בחלק בו נשאל על מחלות בעבר נרשם "שולל", וכן נרשם כי הוא משתמש בתרופה אחת והיא COLATAL לקיבה. רישומים אלה אינם מתיישבים כלל עם דבריו כי הוא סבל מבעיות רבות וכי מסר את הדברים לרופאי הכלא. ביום 15.3.06 בשעה 18:15 שוב הובא בפני רופא, ושם נרשם כי הנאשם התלונן על עצירות וצרבת וניתן לו טיפול תרופתי. עינינו הרואות, כי ברגע בו התלונן הנאשם על בעיה כלשהי, לא רק שלא נמנעה ממנו גישה לרופא, אלא הוא נבדק על ידי רופא ארבע שעות בלבד לאחר פעם הקודמת בה נבדק על ידי רופא. כמו כן ראה הנאשם רופא ביום 19.3.06, וגם במקרה זה ניתנו לו תרופות. לא למותר לציין כי התרופות אינן "אקמולי" כפי שנטען, אלא תרופות אחרות (משלושה סוגים שונים).

הנאשם נבדק על ידי רופא וקיבל טיפול לבעיית העצירות גם בימים 20.3.06, ו-21.3.06. ביום 22.3.06 הובא הנאשם לבדיקה יזומה, היינו ביוזמת רשויות הכליאה ולא לבקשתו, ובעקבות תלונותיו נקבע כי ייערך לו מעקב לחץ דם יומי ואף נרשמו לו תרופות. באותו יום בשעה 19:00 נרשם כי נבדק שוב על ידי רופא **"על פי בקשה של חוקר"**.

לא רק שנרשמו לו תרופות שונות ומסוגים שונים, אלא גם טענתו כי קיבל רק פעם אחת שמן פראפין אינה תואמת את הרישומים הרפואיים, מהם עולה כי קיבל פראפין במספר הזדמנויות, בתאריכים 20.3.06, 21.3.06, 30.3.06, 1.4.06, 3.4.06, 4.4.06 ו-17.4.06.

לפיכך, נראה כי טענותיו של הנאשם בכל הנוגע להעדר טיפול רפואי - אין להן על מה לסמוך. הנאשם קיבל תרופות שונות כנדרש בהתאם למצבו, ראה רופא פעמים רבות – אחת מהן אפילו ביוזמת חוקרו – וזכה לטיפול בהתאם לשיקול דעת רופאיו. נראה כי טענותיו בנוגע לטיפול הרפואי נועדו להעצים את טיעוני הזוטא, בלא שיש להן בסיס כלשהו במציאות, והדבר משליך על חוסר אמינותו בפנינו.

**מהימנות הנאשם – שלב החקירה**

מלבד הנושא הרפואי, עליו עמדנו לעיל, ניתן להצביע על ניסיונו של הנאשם לומר כי לא קיבל דבר מחוקריו כדוגמא נוספת לחוסר האמינות של הנאשם– טענה שנועדה להפריז בתיאור מצבו הקשה בחקירה. מרגע שעומת עם הדברים שקיבל (ארוחות, זמן לתפילה, סיגריות, קפה, תה, קוראן, תחתונים), "פתאום נזכר" ואישר כי אלה אכן ניתנו לו, אולם הוסיף כי ניתנו לו שלא לבקשתו. בנוסף, הנאשם עצמו ציין כי כל מה שהיה בחקירתו גרם לו "להתפוצץ מבפנים"; והוא כלל לא הראה זאת לחוקריו – בניגוד לדברים מפורשים שנכתבו בזכ"דים ועליהם העידו החוקרים, כי הנאשם איבד את שלוותו מפעם לפעם, ועל כן נאלצו לאזוק אותו. אין זה הגיוני כי החוקרים ימציאו וירשמו כי הנאשם סטר לעצמו וכי נאלצו לאזוק אותו בעקבות כך, אם הדבר לא התרחש. טענת הנאשם כי הוא רק "התפוצץ מפנים" אינה מתיישבת עם רישומי החוקרים ועדויותיהם בפנינו, והיא חלק מחקו בו נקט על מנת להראות כי השפילו אותו מצד אחד, אולם הוא לא נכנע לחוקריו מצד שני. אנו העדפנו את עדותם של החוקרים בעניין זה.

יש לומר כי הרושם מעדותו של הנאשם היה של אדם המודע היטב לדברים שנאמרו על ידו הן בבית המשפט והן בחקירתו בשב"כ ובמשטרה, אולם הוא דבק בגרסת שנעשה לו עוול. עוול זה, לשיטתו, לא נגרם מהדברים שהוא אמר בחקירתו, אלא כתוצאה מהחשפלה שננקטה כלפיו כעומדת בפני עצמה, ולא ככזו שהשפיעה עליו בחקירה. עוד גורם ל"עוול" זה נובע מדברים שנרשמו בעברית ללא אישורו ושלא בהתאם לדברים שאמר. ודוק: הנאשם אישר בעדותו בפנינו כי הדברים הרשומים לכאורה מפיו באמרותיו תורגמו לו, כפי שציינו חוקרי המשטרה, אולם טען כי אינו יודע מה נכתב כיוון שאינו יודע עברית.

לא מצאנו להאמין לנאשם בנקודה זו. לא התרשמנו כי חוקרי השב"כ והמשטרה רשמו דברים אחרים מאלה שמסר להם הנאשם, או כי סילפו את הדברים שנרשמו בעברית עת תרגמו לו אותם, או כי הפעילו עליו לחץ ששלל את יכולתו לבחור אם למסור דברים לחוקריו. נראה כי הנאשם ידע היטב מדוע הוא נמצא בחקירה, ידע היטב מה מחפשים חוקריו, ובהתאם לכך התנהל בחקירתו. הנאשם מודע לכך שמסר דברים בנוגע לפעילותו ביחס לקארין A – דברים שאינם מתיישבים עם גרסתו הנוכחית כי אינו קשור לספינת הנשק.

יתר על כן, הדברים הרשומים בזכ״די החקירה מצביעים על כך שהנאשם מסר פרטים רבים, כפי שהעיד בפנינו, כבר ביומו הראשון בחקירה. יחד עם זאת, הנאשם לא מסר מיד את כל הידוע לו, שכן חקירתו הייתה ״חקירה מתפתחת״, ונוספו בה עם הזמן פרטים שונים בנוגע לפעילותו. כעולה מהזכ״דים, בתחילה כשהוטחו בו טענות נהג להכחיש, אולם כשהציגו לו ראיות המפריכות את הכחשתו החל לספר את הידוע לו. התנהלות כזו מלמדת דווקא על אדם המתנהל באופן מחושב, ומוכן לספר דברים רק כאשר הוא יודע שממילא יש לחוקריו את המידע על כך, מבלי שהוא מנדב מידע נוסף. אם הייתה יכולה לעלות טענה כאילו הפרטים הנוספים שמסר בעקבות הראיות שהוצגו לו נמסרו בעקבות הלחץ שהופעל בחקירה, אזי הנאשם עצמו סתר והפריך טענה זו.

**מהימנות הנאשם - סיכום**

אל מול הרושם האמין של חוקרי המשטרה והשב״כ, אנו יכולים לומר כי עדותו של הנאשם לא הייתה אמינה במיוחד. כאמור, על פי עדותו של הנאשם עצמו, ״השפלתו״ ו״מצבו הרפואי״ לא שינו דבר מיכולתו לומר את הדברים שרצה לומר, או לגרום לו לומר דברים שלא רצה. לא היה שלב בו הלחץ בחקירה הוביל אותו להודות בדבר כלשהו בניגוד לרצונו, ולא היה שום שלב בו ״נשבר״.

מכלל הראיות במשפט הזוטא שוכנענו כי אמרותיו בפני חוקרי המשטרה נגבו באופן נינוח וללא כל לחץ פסול. בניגוד למה שנטען בטיעוני הזוטא הוא לא ניסה להעמיד את חוקרי המשטרה על טעויות שנפלו בזכ״דים, ואף אחד מהם לא אמר לו כי יקרה ״תוהו ובוהו״ אם לא יודה. שוכנענו כי חוקריו לא מסרו לו הבטחות כי אם יודה ישוחרר, לא אמרו לו דבר בכל הנוגע להרס ביתו (דבר אותו חלק מהחוקרים כלל לא ידעו עד מועד הדיון בפנינו) ולפיכך, אין לנו אלא לדחות את טענותיו בדבר ״השפלה״ כלשהי או פיתוי והבטחות כלשהן שגרמו לו לומר דברים שלא מרצונו החופשי. הנאשם קיבל טיפול רפואי מלא וכנדרש, בניגוד לדבריו, ולא היה במצבו הרפואי כדי לשנות את יכולתו לומר את דבריו באופן חופשי ומרצון.

<u>**משפט הזוטא - הכרעה**</u>

לאור מסקנותינו העובדתיות בכל הנוגע לאמינות עדי התביעה מחד גיסא, ולהעדר האמינות של עדי ההגנה מאידך גיסא, אנו קובעים כי אמרותיו של הנאשם נגבו באופן חופשי ומרצון והינן קבילות במשפט זה.

<u>**המשפט העיקרי**</u>

**עדותו של מחמוד עביאת**

עד זה מסר כי היה חבר בחוליה צבאית עליה היה אחראי עאטף עביאת, ונשפט על עבירות רצח אותן ביצע. העד מסר כי הוא וחבריו לחוליה היו חיילים, והם קיבלו משכורת חודשית בסוף כל חודש. העד טען כי הוא לא יודע מי העביר להם את המשכורות. העד עומת עם זכ״ד מחקירתו

בשב"כ בו נרשם כי את המשכורות העביר פואד שובכי. העד טען כי אינו מכיר את פואד שובכי, ומעולם לא שמע את השם הזה. העד טען כי מי שהעביר להם את המשכורות היה אדם בשם פואד שומאלי, שהיה פקיד במשרד הכספים. בחקירתו הנגדית ציין כי מעולם לא ראה את הנאשם ולא קיבל ממנו כסף, וכלל אינו יודע מי אחראי הכספים ברש"פ.

**אמרות הנאשם במשטרה**

הנאשם מסר שמונה אמרות משטרתיות, מלבד הזכ"דים הרבים שנגבו ממנו בשב"כ. להלן נסקור כרונולוגית את האמרות שנגבו ממנו ואת הדברים שמסר בהן – דברים התואמים ככלל את הדברים שמסר בחקירתו בשב"כ.

<u>ת/5 – אמרת הנאשם מיום 19.3.09</u>: באמרה זו מסר הנאשם אודות פעילותו במסגרת הארגון לשחרור פלסטין (אש"ף) לפני שנת 2000. בהמשך האמרה מסר כי בשנת 2000 הייתה פגישה במשרדי יאסר ערפאת בנוכחות ע/ראזק מג'אידה, חאג' אסמעיל ג'אבר, ע'אזי ג'באלי, סלים בורדני, מחמד דחלאן, רשיד אבו שבאב, אמין אל הינדי, מוסא ערפאת ומחמוד אבו מרזוק. יאסר ערפאת אמר להם לקנות כל נשק שייכנס לעזה או לגדה וכל אחד מהבכירים הללו שהייתה לו הצעה (לרכישת נשק – צ.ל.), היה מגיע אל הנאשם עם נייר עבודה, הנאשם היה מעבירו ליאסר ערפאת, ולאחר שזה חתם היה הנאשם מאשר לאנשיו להעביר כסף לאותו בכיר. הנאשם מפרט דוגמאות לכמויות וסוגי הנשק שניקנו וסכומי הכסף ששולמו תמורתם.

הנאשם הוסיף כי ביולי 2001, פתחי ראזם ועאדל מוגרבי הבריחו מלבנון מיכל עם פצצות אר.פי.ג'י ומטולים שהגיעו מהחיזבאללה, באישורו של יאסר ערפאת, והכוח הימי לקח אותם. הוא שילם לפתחי ראזם 50,000 דולר באישור ערפאת.

הנאשם הוסיף כי פגש בירדן את פתחי ראזם, שמסר לו כי נפגש עם פעילי חיזבאללה ועם איראני וסיכם איתם כי הם יעבירו שלושה מיכלים עם נשק על גבי ספינה. הוא ביקש מהנאשם לדבר על כך עם יאסר ערפאת, כדי שיתן כסף. הנאשם מסר על כך לערפאת וזה נתן הוראה לחרבי צרצור שיתן לכך כסף. הנאשם גם מסר כי פגש בתימן את תייסיר עג'ינה שסיפר לו שעאדל מוגרבי ביקש שיכינו לו ולעומר עכאווי דרכון, וכי הוא (עאדל) בא לראות את הספינה קארין A שהגיעה לתימן עם הנשק.

<u>ת/1 – אמרת הנאשם מיום 20.3.06</u>: באמרה זו מסר הנאשם כי פגש בשנת 2001 בירדן בפתחי ראזם וזה מסר לו אודות מגעים עם האיראנים, לפיהם האחרונים מוכנים לשלם עבור ספינת נשק. פתחי אמר לנאשם כי צריך שהוא (הנאשם) יפגוש בנציג האיראני בדובאי. הנאשם מסר כי הגיע לדובאי ושם יחד עם עאדל מוגרבי פגש שני נציגים איראנים – אבו מחמד ואחמד סאלם. האיראנים מסרו לנאשם ולעאדל כי הם מוכנים לממן אימונים של פלסטינים בלבנון ובאירן וכי הם מוכנים לעזור בכסף ובנשק. הנאשם הוסיף כי עאדל כתב דו"ח לערפאת והם אמרו לאיראנים כי לאחר שתהיה תשובה מערפאת הם יודיעו על כך לאיראנים. לטענתו, כשערפאת ראה את

הדו״ח הוא הגיב בכעס ואמר כי האיראנים שקרנים. עוד מסר הנאשם באמרה זו על מגעיו עם העיראקים ועל הסכמתם להעניק במתנה שני מיליון חביות נפט לפלסטינים.

ת/6 – אמרת הנאשם מיום 22.3.06 : באמרה זו מסר הנאשם פרטים נוספים אודות הפגישה עם האיראנים. הוא מסר כי מי שיצר קשר ראשוני עמם היה אבו חסן אל זינב. הנאשם הפגישו עם פתחי ראזם והשניים יצאו לפגוש את האיראנים בדובאי. לאחר מפגש זה מסר פתחי ראזם לנאשם כי האיראנים מבקשים לפגוש אותו. הנאשם יצא לדובאי לקנות מכוניות ואמר לפתחי שלאחר מכן יפגוש את האיראנים. הנאשם נשאל מדוע לא סיפר ליאסר ערפאת כי יצא לפגוש באיראנים, וענה ״כי יאסר ערפאת אהב שאני מביא לו תוצאות ולא דיבורים״. הנאשם יצא לדובאי, ולאחר פגישתו בנוגע למכוניות יצא לפגוש את האיראנים עם עאדל מוגרבי. מאחר שהיה עייף סוכם שייפגשו שוב בערב. הנאשם אכן פגש שוב באיראנים בערב, שאל אותם אם הם רוצים לעבוד יחדיו בשיתוף פעולה, והאיראנים מסרו שכן. עאדל דיבר עמם על נושאים צבאיים כעל הצורך באימונים מתקדמים לייצור רימוני יד ומטולים, וכי הם רוצים גם תחמושת ונשק. אחרי כן הם (ובכלל זה הנאשם) שוחחו על כיצד מקימים מפעל לייצור תחמושת בשטחי הרש״פ, והנאשם אף אמר להם כי צריך כסף, והם הסכימו גם לכך. האיראנים אף מסרו כי יעבירו נשק ותחמושת ממחסני אמל״ח שיש להם בלבנון. אחד האיראנים ביקש כי ישלחו לו סיכום יומי של התקשורת הישראלית. הם סיכמו להמשיך ולהיפגש והנאשם אמר כי הוא יבקש רשות מיאסר ערפאת לבוא לפגישות. עאדל כתב את תוכן הפגישה והוא והנאשם חתמו על כך. כשחזר לאזור מסר הנאשם את המסמך ליאסר ערפאת, שאמר כי המדובר באנשים רמאים שרוצים להרוג אותו.

הנאשם מסר כי בשנת 2002 שמע על תפיסת קארין A. הוא הבין שיאסר ערפאת רוצה שהוא ״ייקח את הנושא עליו״ ולכן מסר בועדת החקירה כי יאסר ערפאת נתן את ההוראות והוא היה איש קשר בין פתחי ראזם ועאדל מוגרבי לערפאת. הנאשם הוסיף כי שמע מפתחי על התכנון להביא את הספינה עוד באוגוסט 2001, חודשיים לפני המפגש עם האיראנים, וכי הפגישה עם ערפאת, בה סוכם על העברת 125,000 דולר לפתחי לפרוייקט הספינה, הייתה אחרי שפתחי היה בסוריה ובלבנון. הפגישה עם האיראנים בדובאי נועדה ליצור קשר פלסטיני-איראני וקשר של פתחי ועאדל מול משמרות המהפכה בלבנון, והוא ועאדל לא דיברו על הספינה עם האיראנים.

ת/11 – אמרת הנאשם מיום 26.3.06 : באמרה זו מסר הנאשם אודות פרטי עסקאות נשק שונות להן היה שותף. בתחילה מסר כי הגיע אליו אדם וסיפר לו שמצאו בים חביות עם טילי אר.פי.ג׳י וביקש עבור זה 7,000 דולר. הנאשם הורה לשלם את הסכום. הנאשם סיפר כי קיבל פנייה לרכישת 10 טילי אר.פי.ג׳י תמורת 45,000 דולר, והוא העביר את הכסף לפונה. הנאשם הוסיף ומסר כי הדבר עדיף על כך שהנשק יגיע לחמאס או לארגונים אחרים. הנאשם סיפר כי בשנת 2002 גנב רשיד אבו שבאכ את כל הנשק שרכש ושהיה במחסנים שלהם. הנאשם הוסיף וסיפר כי מחמוד אבו מרזוק פנה אליו בשנת 2001, ביקש 20,000 דולר כדי להקים מפעל לייצור אמל״ח ורימוני יד, וערפאת הורה לנאשם לתת לו את הכסף. הנאשם העביר את הכסף ושמע מאוחר יותר כי היה פיצוץ בדירה ששכר מחמוד אבו מרזוק.

הנאשם נשאל לגבי רכישות של סירות עבור פתחי ראזם ומסר כי ערפאת הורה לו בשנת 2000 להעביר 150,000 דולר לרכישת 2 סירות דייגים. הנאשם ציין כי כסף זה העביר עוד לפני שהעביר לפתחי 125,000 דולר עבור הקארין A.

הנאשם סיפר על כספים שהעביר לצורך רכישת תחמושת בבית לחם וכן כי מימן משכורות לאנשי מחמוד עביאת. לטענתו, חלק מהכספים שהעביר שימשו למשכורות (500 ש״ח לאדם) וחלק שימש לרכישת תחמושת.

ת/7 – אמרת הנאשם מיום 30.3.06: הנאשם נשאל אודות היכרותו עם מחמוד זוהירי ומסר כי זה היה אחראי על רכישת אמל״ח בגדה וכי הוא רכש 1000 רובי קלצ׳ניקוב. הנאשם ציין כי הוא העביר למחמוד זוהירי את הכסף לרכישה בסך של כ-2 מיליון דולר.

הנאשם מסר כי שילם לג׳ומעה אבו שכרי 570,000 דולר תמורת 7 טילי סאגר ו-18 רובים מקולקלים אותם החזירו. לדבריו, את הטילים החזיק ב׳דיוואן׳ ליד ביתו בעזה ומאוחר יותר העבירם לע/ראזק מג׳אידה. הנאשם הוסיף ומסר פרטים אודות אנשים שונים אשר הביאו אמל״ח, וציין כי הוא היה מעביר את הכסף, ואת הנשק היו מחזיקים במחסן בתוך המשרד שלו. לטענתו, יאסר ערפאת היה נותן לו הוראה למי להעביר את האמל״ח, והוא היה מורה לסגנו לתת נשקים בהתאם להוראותיו של ערפאת.

הנאשם מסר כי מחמוד אבו מרזוק ייצר מטענים לע/ראזק מג׳אידה, והוא העביר למג׳אידה את הכסף על מנת שיועבר למחמוד אבו מרזוק. הנאשם מסר מידע גם אודות עסקאות נשק נוספות.

לנאשם הוצג במהלך החקירה מסמך (ת/8) והוא ציין כי המדובר בנייר של מחמוד אבו מרזוק עליו רשומות הצעות מחירים של נשקים, ובהתאם למחירים שצויינו התחשבן איתו על הכסף.

ת/9 – אמרת הנאשם מיום 2.4.06 שעה 09:50: בראשית חקירתו הופנה הנאשם לאמרתו מיום 19.3.06, בה מסר שהבריח נשקים בספינה, והוא אישר כי סיפר זאת. הנאשם נשאל על מעורבותם של אחרים בהברחת הנשקים וסיפר על כך. בין היתר מסר הנאשם כי ביולי 2001 מסר לפתחי ראזם 50,000 דולר בהוראת ערפאת עבור הברחת פצצות ומטולי אר.פי.ג׳י. הנאשם ציין כי את הכסף העביר עבור ההברחה ולא עבור האמל״ח, שכן זה ניתן להם בחינם מהחיזבאללה.

הנאשם התבקש לספר שוב אודות קארין A ומסר כי פגש את פתחי ראזם בירדן, שסיפר לו כי נפגש בלבנון עם נציגי חיזבאללה ואיראן. אלה הסכימו להעביר להם 3 מיכלים עם אמל״ח במימון האיראנים, והם (הפלסטינים – צ.ל.) יצטרכו לשלם רק עבור הוצאות הספינה. הנאשם מסר כי הוצע להם לקחת נשק מאחמד ג׳יבריל אולם הם לא עשו זאת. כשנשאל למה, ענה ״כי יש לנו נשק בחינם מהחיזבאללה ומהאיראנים אז למה לקחת ממנו״. הוא מסר כי התכנון היה להביא ספינות עם נשק לנמל עלי, והוא ופתחי שוחחו עם ערפאת ואמרו לו שצריך 125,000 דולר. יאסר ערפאת אמר לנאשם לתת את הכסף והנאשם אמר כי אין לו. יאסר ערפאת אמר לפתחי לכתוב נייר בקשה

עם הדרישה לכסף, ולאחר שפתחי עשה זאת, הנאשם לקח את הבקשה לרמאללה, העבירה לערפאת וזה כתב לחרבי ברצור שישלם את הכסף. חרבי העביר את הכסף לפתחי.

הנאשם התבקש לחזור ולספר על המפגש עם האיראנים. לדבריו, פגש בשני נציגים, שלהערכתו הבכיר בהם היה אחד בשם אחמד סאלם.

<u>ת/10 – אמרת הנאשם מיום 2.4.06 שעה 14:01</u>: (במאמר מוסגר אציין כי התאריך הרשום על גבי אמרה זו הינו 4.2.06. המדובר בטעות שהובהרה בת/13, והתאריך הנכון הוא 2.4.06. בל נשכח כי לא ייתכן שביום 4.2.06 הנאשם נחקר, כיוון שנעצר רק כחודש וחצי לאחר מכן).

הנאשם מסר כי הקים ועדת רכש, שהקימה מחסן נשק בו שמו כל מה שהועדה קנתה. הנאשם נשאל על הועדה המדעית ואמר כי פעילות ועדה זו הינה העברת

1 הנאשם מסר כי בשנת 2001 הגיע אליו שליח ממרואן ברגותי עם שני ניירות – באחד [illegible]