UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697439 Date: 12/16/2014

RELEASED IN FULL



PLAINTIFF'S
EXHIBIT
1142

REPORT AND DETERMINATIONS PURSUANT TO SECTION 804 OF THE FOREIGN
RELATIONS AUTHORIZATION ACT, FISCAL YEARS 1990 AND 1991
(P.L. 101-246), AS AMENDED, AND SECTIONS 603-604 AND 699 OF
THE FOREIGN RELATIONS AUTHORIZATION ACT, FISCAL YEAR 2003
(P.L. 107-228)

This report and related Presidential Determinations are
transmitted in accordance with section 804 of the Foreign
Relations Authorization Act, Fiscal Years 1990 and 1991
(P.L. 101-246) (the PLO Commitments Compliance Act of
1989 -- PLOCCA), as amended, and sections 603-604 and 699 of the
Foreign Relations Authorization Act, Fiscal Year 2003
(P.L. 107-228) (the "Act"). It covers the period from
December 16, 2003 until June 15, 2004. Events occurring after
June 15 will be covered in a subsequent report that will cover
the period June 16, 2004 until December 15, 2004.

This report describes compliance by the Palestine
Liberation Organization (PLO) and the Palestinian Authority
(PA), as appropriate, with respect to commitments set forth in
section 602 of the Act, and any additional commitments in
Chairman Arafat's September 9, 1993, letters to Israeli Prime
Minister Rabin and Norwegian Foreign Minister Holst and to those
contained in, and resulting from, the good faith implementation
of the Declaration of Principles (DOP).

The commitments made by the PLO and cited in the Act are:

(A)    Recognition of the right of the State of Israel to
       exist in peace and security.

(B)    Acceptance of United Nations Security Council
       Resolutions 242 and 338.

(C)    Resolution of all outstanding issues in the conflict
       between the sides through negotiations and exclusively
       peaceful means.

(D)    Renunciation of the use of terrorism and all other
       acts of violence and responsibility over all PLO
       elements and personnel in order to assure their
       compliance, prevent violations and discipline
       violators.

In addition, the PLO has committed itself to submit to the
Palestine National Council (PNC) changes to the PLO Covenant

REVIEW AUTHORITY: Charles Daris, Senior
Reviewer

UNCLASSIFIED U.S. Department of State Case No. F-2013-19349  Doc No. C05697439  Date: 12/16/2014

2

necessary to eliminate articles that deny Israel's right to
exist, and strengthen cooperation with Israel on a wide range of
security issues.  The Wye River Memorandum of October 23, 1998,
signed by Prime Minister Netanyahu and Chairman Arafat, further
detailed both parties' commitments related to the 1995 Interim
Agreement, including Palestinian obligations regarding security
cooperation and revision of the PLO Charter.  In the
Sharm el-Sheikh Memorandum of September 4, 1999, signed by Prime
Minister Barak and Chairman Arafat, both sides reiterated their
commitment to implement the obligations emanating from the Wye
River Memorandum, and further undertook to ensure the effective
handling of any incident involving a threat or act of terrorism.
This specifically included cooperating in the exchange of
information, coordinating policies, and taking measures to
prevent an act of terrorism, violence, or incitement.

I.  Overview of the Reporting Period

    The sustained violence between Israelis and Palestinians,
which broke out on September 28, 2000, continued at a very high
level during this reporting period.

    Terrorist groups including Hamas, Palestinian Islamic Jihad
(PIJ), the Popular Front for the Liberation of Palestine (PFLP),
the Al Aqsa Martyrs Brigades (AAMB), and the Popular Resistance
Committees continued to be very active during the reporting
period.  These groups utilized a variety of terrorist tactics,
including suicide bombs, rocket attacks, pipe bombs, mortar
attacks, roadside bombings and ambushes, drive-by shootings, and
shooting at Israeli homes and military and civilian vehicles.

    There were a number of major suicide bombings committed by
Palestinians during the reporting period.  Most, if not all, of
these attacks were clearly aimed at causing civilian casualties.
During this period Israel maintained a steady pace of incursions
into Palestinian-controlled territory, and at the end of the
reporting period, the Israeli military controlled access to all
major West Bank cities.  In mid-May, the IDF undertook Operation
Rainbow, the largest incursion into Gaza since the current
intifada began in September 2000.  Palestinian civilians
suffered many casualties during these incursions.

UNCLASSIFIED U.S. Department of State  Case No. F-2013-19349  Doc No. C05697439  Date: 12/16/2014

UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697439 Date: 12/16/2014

3

II.  Determinations as to Palestinian Compliance with Their
     Commitments Required by Section 603 of the Act

A.  "Recognition of the right of the State of Israel to exist in
peace and security":  The PLO and PA have not complied with this
commitment.  Neither the PLO nor the PA has retracted its
recognition of Israel and acceptance of a two-state solution.
However, as detailed below, PA and PLO failure to take action
against terrorist groups or others engaged in violence has
called into question their commitment to recognizing Israel's
right to exist in peace and security.

B.  "Acceptance of United Nations Security Council Resolutions
242 and 338":  The PLO and PA have complied with this
commitment.  Neither the PLO nor the PA has retracted its
acceptance of Security Council Resolutions 242 and 338.

C.  "Resolution of all outstanding issues in the conflict
between the sides through negotiations and exclusively peaceful
means":  The PLO and PA have not complied with this commitment.
A commitment to a peaceful resolution of the conflict remains
the official position of the PLO and PA.  As of the end of the
reporting period, however, the failure to take action against,
and in some cases the provision of support for, terrorist groups
or others engaged in violence, contradicted that official
policy.

D.  "Renunciation of the use of terrorism and all other acts of
violence and responsibility over all PLO elements and personnel
in order to assure their compliance, prevent violations, and
discipline violators":  The PLO has not complied with its
commitments to assume responsibility over all PLO elements and
personnel to assure their compliance with the renunciation of
the use of terrorism, prevent violations, and discipline
violators.  Similarly, the PA has not taken sufficient steps to
prevent violence by PA personnel.  Some PLO and PA officials
supported the armed intifada as a proper path towards an
acceptable end to the conflict, even as they called for renewed
negotiations.  Available evidence is that elements with varying
degrees of affiliation with the PLO and PA, specifically the Al
Aqsa Martyrs Brigades, Tanzim, and members of PA security
forces, were involved in acts of violence against Israelis.
While there is no conclusive evidence that these groups carried
out specific attacks with the prior approval and encouragement
of the PLO and PA leaderships, it is clear that these armed
elements were not disciplined.  In fact, there is strong

UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697439 Date: 12/16/2014

4

evidence that some members of the PA security forces were allowed to continue serving even though their participation in terrorist incidents was well known.

Until the installation of Prime Minister Abbas, the PA and PLO senior leadership had made only sporadic and ineffective efforts to issue clear instructions to refrain from violence or to assume responsibility over violent elements. However, Prime Minister Abbas was forthright in his opposition to terror and violence, and Prime Minister Qurei and other senior leaders in the PLO and PA have routinely condemned suicide bombings, especially those aimed at civilians within the Green Line. In response to a January 29 bus bombing in Jerusalem, Qurei issued a statement that "The Prime Minister and the Cabinet denounce the bus bombing resulting in the deaths and injury of numerous people as well as the continuing violence directed against our own people." On March 31, Qurei issued his strongest condemnation to date of suicide bombings, saying, "We have condemned these attacks, which are morally wrong." Despite these strong words, however, condemnations of terror were generally not followed up with concrete sustained actions to prevent further acts of violence.

During the reporting period, some senior PLO and PA leaders did little to prevent -- and in some cases encouraged -- acts of violence and an atmosphere of incitement to violence in the Palestinian media and through the public statements of Palestinian officials. While the PLO and PA officials often condemned terror attacks against civilians within Israel, they failed consistently to condemn attacks on Israeli settlers and soldiers in the occupied territories. This omission amounted to tacit support for such attacks.

The new PA government has a divided security structure. The cabinet, chaired by the Prime Minister, has command responsibilities in terms of day-to-day orders and implementation of policy for the police, and the Preventive Security Service. But these services and the other major services -- the National Security Forces and the General Intelligence -- receive policy guidance from the National Security Council, chaired by Arafat (with Prime Minister Qurei as the deputy chair). Arafat retains sole control of other, smaller elements of the PA security apparatus, including Force 17 and Military Intelligence. He also retains his title as "supreme commander of the Palestinian Armed Forces" as stipulated in the Palestinian Basic Law.

UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697439 Date: 12/16/2014

5

Past PLOCCA reports have discussed direct payments from the PA to Fatah party activists, some of whom were deeply involved in the ongoing violence. Such payments continued during this reporting period. However, as part of continuing efforts to achieve transparency and accountability in financial and personnel management, all security service salaries have been paid directly into employees' bank accounts via direct deposit since March 2004.

Despite Prime Minister Qurei's public condemnations of violence, security resources were not deployed consistently and effectively against terrorism during the reporting period. This was the case even in Gaza, where the PA retained some security capabilities. Nonetheless, Palestinians from the West Bank, not Gaza, perpetrated the vast majority of suicide and other attacks committed inside Israel. A general atmosphere of impunity persisted, allowing terrorist groups to act without fearing either legal or political consequences.

III. Imposition of Sanction

Section 604 subsection (a) of the Act requires that if in the report transmitted pursuant to section 603, the President determines that the PLO or PA, as appropriate, has not complied with each of the commitments specified in the Act, or if the President fails to make a determination with respect to such compliance, the President shall impose one or more of a specified list of sanctions.

In accordance with that requirement, and with reference to my determinations of non-compliance by the PLO and PA with certain commitments, I am imposing the sanction specified in section 604 (a)(2) of the Act, calling for a down-grade in status of the PLO office in the United States. (Please see the Presidential Determination attached hereto.)

IV. Waiver of Sanction

The United States has a national security interest in helping Israel and the Palestinians end the ongoing violence and move forward with negotiations. A just, lasting, and comprehensive peace between Israel and its neighbors has been a long-standing and bipartisan goal of U.S. foreign policy in the Middle East. To be able to advance these interests, we must maintain our ties and contacts with all sides. Encouraging a new Palestinian leadership and reform of Palestinian institutions is a key part of our strategy towards the region.

UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697439 Date: 12/16/2014

6

Downgrading or closing the PLO office would make it more
difficult for us to continue to stay in contact with and support
Palestinian reformers who share those goals. Furthermore,
downgrading or closing the PLO office at this critical time
would also complicate our relations throughout the region. For
these reasons, and consistent with the justification provided to
the Congress in waiving the provisions of section 1003 of the
Anti-Terrorism Act of 1987 (P.L. 100-204), pursuant to the
authority vested in me under section 534 (d) of the Foreign
Operations, Export Financing, and Related Programs
Appropriations Act, Fiscal Year 2002 (P.L. 107-115), I am
invoking the waiver authority granted by section 604 (c) of the
Act, based on my determination that such a waiver is in the
national security interest of the United States. Please see the
Presidential Determination attached hereto.

V. Other PLOCCA Requirements

Security Cooperation

     In addition to the commitments detailed above, PLOCCA
requires the President to report on Palestinian compliance with
its commitment to strengthen cooperation with Israel on a wide
range of security issues. Our assessment is that the PLO and PA
did not comply with that commitment. While some low-level
security contacts have continued, and PA security forces have
acted to thwart attacks, sustained effective security
cooperation was still not the norm throughout the reporting
period. In addition, the ongoing violence and Israel's
retaliation against PA security elements continued to have a
profoundly negative effect on the ability of the PLO and
remaining PA security forces to carry out their security
responsibilities and the PLO's commitment to strengthen security
cooperation with Israel. Israel also targeted individuals whom
it asserts were involved in planning or carrying out terrorist
attacks.

PLO Charter

     As mentioned in previous reports, the PLO convened its
Executive Committee and the Palestinian Central Council to
reaffirm the letter of January 22, 1998, from Chairman Arafat to
former President Clinton concerning the nullification of the PLO
Charter provisions that are inconsistent with the letters
exchanged between the PLO and the Government of Israel on
September 9-10, 1993. The Israeli government stated at that
time that the Palestinians had met their obligations concerning

UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697439 Date: 12/16/2014

UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697439 Date: 12/16/2014

7

the revision of the PLO Charter, and our assessment was
therefore that the PLO complied with the commitment to amend its
charter.

## Arab League Boycott of Israel

As previously reported, the PLO reiterated its stand
against the Arab League boycott of Israel when it signed the
September 28, 1995 Joint Declaration of the Washington Summit
which called, inter alia, for an end to the boycott as soon as
possible. Additionally, then-senior Palestinian Authority
economic and trade official Ahmed Qurei (now Palestinian prime
minister) made the following commitment in an October 17, 1996,
letter to then-U.S. Trade Representative Mickey Kantor: "The
PLO and the Palestinian Authority and its successors will
support all efforts to end the boycott of Israel and will not
enforce any elements of the boycott within the West Bank and
Gaza Strip." That remains the Palestinian position on the Arab
League boycott, although in practice the PA has occasionally
tried to prevent the entry of Israeli goods into the Gaza Strip
in response to Israeli blocking of Palestinian exports.

## Status of the PLO Office

The State Department's Office of Foreign Missions
designated the PLO office in Washington a "foreign mission"
under the Foreign Missions Act on June 21, 1994. The
designation was published in the Federal Register on July 20,
1994. The PLO office and personnel are not accorded diplomatic
status, privileges or immunities. The office may not portray
itself as a diplomatic mission or embassy, but may portray
itself as representing the PLO. Mr. Hassan Abdel Rahman
currently heads the office. On April 14, 2004, President Bush
exercised his authority to permit the PLO Office to remain open
for an additional 6 months.

## Assistance to Palestinians

The United States has continued to work with the
international donor community to meet the humanitarian and
developmental needs of the Palestinian people. In accordance
with U.S. law, the United States generally provides no foreign
assistance funds directly to the Palestinian Authority,
Palestinian Legislative Council, PLO, or to any international
funds established to contribute money directly to these
entities. However, a 2003 use of the "unanticipated
contingencies" authority of section 451 of the Foreign

UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697439 Date: 12/16/2014

UNCLASSIFIED U.S. Department of State Case No. F-2013-19349 Doc No. C05697439 Date: 12/16/2014

8

Assistance Act of 1961, as amended, to make available $20 million in FY03 Economic Support Fund assistance as a cash grant to the PA was an exceptional event that resulted from the launch of the roadmap. The United States Government did this in support of the ambitious financial accountability reform efforts of PA Finance Minister Salam Fayyad. The funds were earmarked for the repayment of PA debts to Israeli utility companies and for repair and reconstruction projects in the West Bank and Gaza. All expenditures were pre-approved and monitored by USAID.

United States foreign assistance to the West Bank and Gaza provides funds to contractors and non-governmental organizations hired to carry out specific projects, and these organizations are audited by USAID. In some cases, U.S. assistance is in the form of contracts to provide technical assistance to agencies of the PA in areas of high priority to the United States and other international donors, including health, water, and financial transparency. Furthermore, USAID and Embassy Tel Aviv's country team jointly monitor all Palestinian NGOs that are the recipients of funds to ensure that there are no links to terrorist organizations or to organizations that advocate or practice violence. In some cases -- primarily related to water projects -- equipment, materials, and infrastructure developed by contractors and NGOs have been turned over to PA agencies or instrumentalities. In April 2004, however, implementation of two large infrastructure projects in the Gaza Strip was suspended in light of the deteriorating security situation and the PA's inability or unwillingness to bring to justice the perpetrators of the October 15, 2003 attack on a U.S. Embassy convoy that left three American contract security personnel dead.

The United States Agency for International Development continues to implement its procedures for the monitoring and supervision of activities performed by United States Government-funded non-governmental organizations and contractors to ensure that funds are only used for their intended purposes. The Secretary of State has certified, in accordance with section 566(a) of the Consolidated Appropriations Act, 2004 (P.L. 108-199), that procedures have been established to ensure that the Comptroller General will have access to appropriate U.S. financial information in order to review the uses of United States assistance for the ESF Program for the West Bank and Gaza.