UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

MARK I. SOKOLOW, *et al.*,

                              Plaintiffs,

            vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                              Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL**

Arnold & Porter LLP
399 Park Avenue
New York, NY  10022-4690
(212) 715-1113 [tel]
(212) 715-1399 [fax]

*Counsel for Plaintiffs*

May 21, 2015

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.  LEGAL STANDARD ............................................................................................ 1

II.  THE JURY'S VERDICT WAS SUPPORTED BY OVERWHELMING EVIDENCE .... 1

    A.  Common Evidence Supported the Jury's Findings on Scope of Employment
       and Material Support.......................................................................................... 2

        1.  Scope of Employment................................................................. 2

        2.  Material Support ......................................................................... 4

    B.  Each of the Attacks Was Supported by Ample Specific Evidence........................ 6

        1.  January 22, 2002 Jaffa Street Shooting....................................... 6

        2.  January 27, 2002 Wafa Idris Bombing ....................................... 8

        3.  March 21, 2002 King George Street Bombing ......................... 10

        4.  June 19, 2002 French Hill Bombing.......................................... 12

        5.  July 31, 2002 Hebrew University Bombing ............................... 13

        6.  January 29, 2004 Bus No. 19 Bombing .................................... 15

    C.  Proximate Cause and Knowledge ..................................................................... 16

    D.  Defendants Did Not Present Countervailing Evidence......................................... 17

III.  PLAINTIFFS' LIABILITY EXPERTS OFFERED PROPER TESTIMONY ................. 18

    A.  Expert Testimony Is Appropriate and Customary In Terrorism Cases................. 19

    B.  Alon Eviatar and Israel Shrenzel Were Appropriately Qualified as Experts........ 20

        1.  Alon Eviatar ............................................................................. 20

        2.  Israel Shrenzel.......................................................................... 21

    C.  Plaintiffs' Experts Did Not Offer Lay Opinions On Ultimate Issues .................. 22

    D.  Shrenzel and Evitar Did Not Offer Improper State of Mind Testimony ............. 24

    E.  Plaintiffs' Experts Properly Opined On Defendants' Policies............................. 24

    F.  The *Gilmore* Court's Opinion About Eviatar Is Inapposite................................. 25

IV.    DEFENDANTS' RULE 403 ARGUMENTS ARE FRIVOLOUS ................................. 26

    A.    Rule 403 Did Not Require Plaintiffs to Sanitize Their Case ................................ 26

    B.    Admission of the PA Police Magazines Was Proper ............................................. 27

    C.    Admission of Indictments and Custodial Statements in this Case Was Proper .... 30

    D.    Defendants Were Not Limited In Presentation of Their Defense At Trial .......... 31

    E.    Exclusion of Defendants' Proposed Trial Exhibits 29 and 70 Was Proper .......... 34

V.    THE COURT'S DECISION NOT TO SEVER WAS A PROPER EXERCISE OF DISCRETION .................................................................................................................... 35

    A.    Demonstrative Aids And Organizational Tools Prevented Jury Confusion ......... 35

    B.    Any Spillover Prejudice Was Cured by Instructions ............................................. 36

VI.    THE COURT'S JURY INSTRUCTIONS WERE SOUND ............................................. 37

    A.    The Court Correctly Included An Instruction On *Respondeat Superior* .............. 37

    B.    The Court's Agency and *Respondeat Superior* Instructions Were Sound ............ 39

VII.    PLAINTIFFS' SUMMATION WAS APPROPRIATE ..................................................... 41

VIII.    THE JURY'S DAMAGES VERDICT DOES NOT SHOCK THE CONSCIENCE ....... 43

    A.    The Court Correctly Permitted Counsel to Recommend Specific Damages ........ 43

    B.    The Jury Verdict Does Not Shock the Conscience ............................................... 44

IX.    THE COURT SHOULD DENY THE "RENEWED" MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION ................................................................. 47

    A.    Defendants Waived Their Jurisdictional Arguments ............................................. 47

    B.    Alternate Grounds Establish Personal Jurisdiction ............................................... 50

        1.    The Fifth Amendment Applies and Is Less Restrictive than the Fourteenth Amendment ........................................................................ 51

        2.    The Court Has Specific Jurisdiction Even Under Fourteenth Amendment Case Law ........................................................................... 53

CONCLUSION ........................................................................................................................ 59

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>C</u>ASES:

*Abecassis v. Wyatt*,
    785 F. Supp. 2d 614 (S.D. Tex. 2011) ....................................................................................37

*Almonte v. N.Y. City Hous. Auth.*,
    No. 89 Civ. 7677 (SWK),
    1990 WL 113125 (S.D.N.Y. July 30, 1990) ..........................................................................38

*Anderson v. Branen*,
    17 F.3d 552 (2d Cir. 1994).....................................................................................................39

*Apollo Fuel Oil v. United States*,
    195 F.3d 74 (1999).................................................................................................................16

*AT&T Co. v. Winback & Conserve Program*,
    42 F.3d 1421 (3d Cir. 1994)............................................................................................38, 39

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    305 F.3d 120 (2d Cir. 2002)..................................................................................................58

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) ...................................................................................5, 6, 13, 42

*Boim v. Quranic Literacy Inst.*,
    No. 00 C 2905, 2005 WL 433463 (N.D. Ill. Feb. 18, 2005),
    *aff'd in relevant part, rev'd on other grounds sub nom.*
    *Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) .................................................................................................44

*Boim v. Quranic Literary Fund*,
    291 F.3d 1000 (7th Cir. 2002) ...............................................................................................45

*CA, Inc. v. Stonebranch, Inc.*,
    No. 12 Civ. 5988(SFL)(ARL),
    2014 WL 917269 (E.D.N.Y. Jan. 27, 2014),
    *adopted in relevant part*,
    2014 WL 931223 (E.D.N.Y. Mar. 7, 2014)..........................................................................48

*Calderon-Cardona v. Democratic Peoples Republic of Korea*,
    723 F. Supp. 2d 441 (D.P.R. 2010)........................................................................................47

*Campuzano v. Islamic Republic of Iran*,
    281 F. Supp. 2d 258 (D.D.C. 2003) ................................................................................45, 46

*Chew v. Dietrich*,
143 F.3d 24 (2d Cir. 1998)................................................................51, 52, 53, 58

*Chloe v. Queen Bee of Beverly Hills, LLC*,
616 F.3d 158 (2d Cir. 2010)..............................................................53, 54, 58

*Compton v. Luckenbach Overseas Corp.*,
425 F.2d 1130 (2d Cir.1970).......................................................................1

*Cross v. N.Y. City Transit Auth.*,
417 F.3d 241 (2d Cir. 2005)........................................................................1

*CV Holdings, LLC v. Bernard Techs., Inc.*,
14 A.D.3d 854 (3d Dept 2005) ..................................................................48

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014)..........................................................................49, 50

*DiSorbo v. Hoy*,
343 F.3d 172 (2d Cir. 2003).......................................................................45

*Doe v. Guthrie Clinic, Ltd.*,
22 N.Y.3d 480 (2014) ...............................................................................12

*Duch v. Jakubek*,
588 F.3d 757 (2d Cir. 2009)......................................................................41

*Estate of Klieman v. PA*,
2015 WL 967624 (D.D.C. Mar. 3, 2015),
*appeal filed*, No. 15-1034 (D.C. Cir. Apr. 8, 2015)..................................55, 57, 58

*Estate of Parsons v. PA*,
651 F.3d 118 (D.C. Cir. 2011) ..............................................................38, 39

*Estate of Ungar v. PA*,
325 F. Supp. 2d 15 (D.R.I. 2004),
*aff'd*, 402 F.3d 274 (1st Cir. 2005) ......................................................46, 47

*Garnett v. Undercover Officer C0039*,
No. 1:13 Civ. 7083 (GHW),
2015 WL 1539044 (S.D.N.Y. Apr. 6, 2015)..............................................39

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 523 (E.D.N.Y. 2012) .....................................................19

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 542 (E.D.N.Y. 2012) .....................................................37

*Gilmore v. Palestinian Auth.*,
   8 F. Supp. 3d 9, 16 (D.D.C. 2014) ..................................................................50

*Gilmore v. Palestinian Interim Self-Government Auth.*,
   No. 1-853,
   2014 U.S. Dist. LEXIS 102093 (D.D.C. July 28, 2014).................................25, 26

*Goodyear Dunlop Tires Operations, SA v. Brown*,
   131 S. Ct. 2846 (2011) ..............................................................................49, 50

*Gordon v. N.Y. City Bd. of Educ.*,
   232 F. 3d 111 (2d Cir. 2000).............................................................................40

*Gucci Am., Inc. v. Li*,
   768 F.3d 122 (2d Cir. 2014).......................................................................49, 50

*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947).........................................................................................52

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004).........................................................................................52

*Handley v. Ind.& Mich. Elec. Co.*,
   732 F.2d 1265 (6th Cir. 1984) .........................................................................51

*Haskell v. Kaman Corp.*,
   743 F.2d 113 (2d Cir. 1984).............................................................................36

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984).........................................................................................53

*Higgens v. Islamic Republic of Iran*,
   No. 99 Civ. 00377,
   2000 WL 33674311 (D.D.C. Sept. 21, 2000) ....................................................45

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010).............................................................................................52

*Holland v. Islamic Republic of Iran*,
   496 F. Supp. 2d 1 (D.D.C. 2005) .....................................................................45

*Holzsager v. Valley Hosp.*,
   646 F.2d 792 (2d Cir. 1981)......................................................................49, 50

*In re Air Crash Near Nantucket Island*,
   462 F. Supp. 2d 360 (E.D.N.Y. 2006) ..............................................................46

*In re Boesky Sec. Litig.*,
    36 F.3d 255 (2d Cir. 1995)..................................................................................12

*In re Grand Jury Subpoena*,
    707 F.2d 663 (2d Cir. 1983)................................................................................56

*In re Magnetic Audiotape Antitrust Litig.*,
    334 F.3d 204 (2d Cir. 2003)................................................................................56

*In re Parmalat Sec. Litig.*,
    474 F. Supp. 2d 547 (S.D.N.Y. 2007)................................................................38

*In re Roman Catholic Diocese of Albany, N.Y., Inc.*,
    745 F.3d 30 (2d Cir. 2014)..................................................................................49

*Ira S. Bushey & Sons v. United States*,
    398 F.2d 167 (2d Cir. 1968)..........................................................................38, 41

*Ismail v. Cohen*,
    899 F.2d 183 (2d Cir. 1990)................................................................................45

*J. McIntyre Mach., Ltd. v. Nicastro*,
    131 S. Ct. 2780 (2011)........................................................................................54

*Jenco v. Islamic Republic of Iran*,
    154 F. Supp. 2d 27 (D.D.C. 2001)......................................................................47

*Kennedy v. Mendoza-Martinez*,
    372 U.S. 144 (1963)............................................................................................57

*Kerman v. City of New York*,
    No. 96 Civ. 7865 (LMM),
    1997 WL 666261 (S.D.N.Y. Oct. 24, 1997).......................................................36

*Kirsch v. Fleet Street, Ltd.*,
    148 F.3d 149 (2d Cir. 1998)................................................................................44

*Knox v. PLO*,
    442 F. Supp. 2d 62 (S.D.N.Y. 2006)........................................................37, 45, 46

*Kwon v. Yun*,
    606 F. Supp. 2d 344 (S.D.N.Y. 2009)................................................................38

*Leibovitch v. Syrian Arab Republic*,
    No 08-C-1939, 2011 WL 444762 (N.D. Ill. Feb. 1, 2011),
    *rev'd on other grounds sub nom. Liebovitch v. Islamic Republic of Iran*,
    697 F.3d 561 (7th Cir. 2012) ..............................................................................19

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013)............................................................................56

*Lightfoot v. Union Carbide Corp.*,
   110 F.3d 898 (2d Cir. 1997)............................................................................43

*Linde v. Arab Bank PLC*,
   706 F.3d 92 (2d Cir. 2013)..............................................................................53

*Linde v. Arab Bank PLC*,
   04 Civ. 2799 (BMC),
   2015 U.S. Dist. LEXIS 45903 (E.D.N.Y. Apr. 8, 2015) ...........................37, 39, 42

*Linde v. Arab Bank, PLC*,
   922 F. Supp. 2d 316 (E.D.N.Y. 2013) .............................................................19

*Linde v. Arab Bank*,
   920 F. Supp. 2d 282 (E.D.N.Y. 2011) .............................................................31

*Livnat v. PA.*,
   13-CV-00498 (E.D. Va. June 5, 2013) ............................................................50

*Livnat v. PA*,
   No. Civ. 14-668 (CKK),
   2015 WL 558710 (D.D.C. Feb. 11, 2015),
   *appeal filed*, No. 15-7024 (D.C. Cir. Mar. 18, 2015) ............................................57

*Lore v. City of Syracuse*,
   670 F.3d 127 (2d Cir. 2012)............................................................................44

*Marcic v. Reinauer Transp. Cos.*,
   397 F.3d 120 (2d Cir. 2005)............................................................................41

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)........................................................................................52

*Max Daetwyler Corp. v. R. Meyer*,
   762 F.2d 290 (3d Cir. 1985)............................................................................51

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos*,
   553 F.2d 842 (2d Cir. 1977)............................................................................48

*Mileski v. Long Island R.R.*,
   499 F.2d 1169 (2d Cir. 1974)..........................................................................44

*Mohamad v. Rajoub*,
   No. 11-18,
   2011 WL 3664462 (Aug. 19, 2001)................................................................49

*Monaghan v. SZS 33 Assocs., L.P.*,
    827 F. Supp. 233 (S.D.N.Y. 1993)......................................................................35

*Moorhouse v. Boeing Co.*,
    501 F. Supp. 390 (E.D. Pa. 1990) .....................................................................36

*Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*,
    476 F. Supp. 2d 414 (S.D.N.Y. 2007)...............................................................40

*Mullen v. Princess Anne Volunteer Fire Co.*,
    853 F.2d 1130 (4th Cir. 1988) .....................................................................27, 29

*Neirbo Co. v. Bethlehem Shipbuilding Corp.*,
    308 U.S. 165 (1939).........................................................................................49

*Nimely v. City of N.Y.*,
    414 F.3d 381 (2d Cir. 2005).............................................................................22

*Owen v. Thermatool Corp.*,
    155 F. 3d 137 (2d Cir. 1998)............................................................................39

*Patterson v. Balsamico*,
    440 F.3d 104 (2d Cir. 2006).............................................................................41

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
    290 F. Supp. 2d 54 (D.D.C. 2003) ...................................................................53

*Reilly v. Natwest Mkts. Grp.*,
    181 F. 3d 253 (2d Cir. 1999)............................................................................41

*Republic of Panama v. BCCI Holdings (Luxembourg) SA*,
    119 F.3d 935 (11th Cir.1997) ..........................................................................51

*Richardson Greenshields Secs., Inc. v. Metz*,
    566 F. Supp. 131 (S.D.N.Y. 1983)...................................................................48

*Riviello v. Waldron*,
    47 N.Y.2d 297 (1979) ........................................................................................2

*Robinson v. Runyon*,
    149 F.3d 507 (6th Cir. 1998) ...........................................................................29

*Rodriguez v. Senor Frog's de la Isla*,
    642 F.3d 28 (1st Cir. 2011)...............................................................................43

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)..........................................................................16, 17

*Schermerhorn v. Local 100*,
  91 F. 3d 316 (2d Cir. 1996)......................................................................39, 41

*SEC v. LovesLines Overseas Mgmt., Ltd.*,
  No. 04 Misc. 302 (RWR) (AK),
  2007 WL 581909 (D.D.C. Feb. 21, 2007) ...........................................................51

*SEC v. Straub*,
  921 F. Supp. 2d 244 (S.D.N.Y. 2013)..................................................................58

*SEC v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013)..................................................................22

*SEC v. Unifund SAL*,
  910 F.2d 1028 (2d Cir. 1990)........................................................................52, 56

*Shrader v. CSX Transp., Inc.*,
  70 F.3d 255 (2d Cir. 1995)..................................................................................47

*Stanford v. Kuwait Airways Corp.*,
  89 F.3d 117 (2d Cir. 1996)..................................................................................16

*Strauss v. Microsoft Corp.*,
  No. 91 Civ. 5928(SWK),
  1995 WL 326492 (S.D.N.Y. June 1, 1995) .........................................................29

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001)..................................................................................38

*Sutherland v. Islamic Republic of Iran*,
  151 F. Supp. 2d 27 (D.D.C. 2001)......................................................................47

*Taber v. Maine*,
  67 F.3d 1029 (2d Cir. 1995)................................................................................41

*United States v. Al Kassar*,
  660 F.3d 108 (2d Cir. 2011)..........................................................................53, 56

*United States v. Chavez*,
  229 F.3d 946 (10th Cir. 2000) ............................................................................25

*United States v. Cross*,
  308 F.3d 308 (3d Cir. 2002)................................................................................26

*United States v. DeMuro*,
  677 F.3d 550 (3d Cir. 2012)................................................................................26

*United States v. Figueroa,*
  618 F.2d 934 (2d Cir. 1980)...........................................................................26, 27

*United States v. Gartmon,*
  146 F.3d 1015 (D.C. Cir. 1998) ............................................................................26

*United States v. Kassir,*
  No. S2 04 Cr. 356(JFK),
  2009 WL 910767 (S.D.N.Y. Apr. 2, 2009)..............................................20, 21, 22

*United States v. Koppers Co.,*
  652 F.2d 290 (2d Cir. 1981)..............................................................................39, 40

*United States v. Paracha,*
  No. 03 Cr. 1197(SHS),
  2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) ......................................................21, 22

*United States v. Roldan-Zapata,*
  916 F.2d 795 (2d. Cir. 1990)..................................................................................9

*United States v. Toner,*
  728 F.2d 115 (2d Cir. 1984)..................................................................................31

*United States v. Twentieth Century Fox Film Corp.,*
  882 F.2d 656 (2d Cir. 1989)..................................................................................16

*United States v. Yousef,*
  327 F.3d 56 (2d Cir. 2003)..............................................................................53, 56

*United States v. Zichettello,*
  208 F.3d 72 (2d. Cir. 2000)....................................................................................9

*Wachsman v. Islamic Republic of Iran,*
  603 F. Supp. 2d 148 (D.D.C. 2009) ......................................................................19

*Weiming Chen v. Ying-Jeou Ma,*
  595 F. App'x 79 (2d Cir. 2015) .............................................................................47

*Wilson v. City of Aliceville,*
  779 F.2d 631 (11th Cir. 1986) ..............................................................................29

*World-Wide Volkswagen v. Woodson,*
  444 U.S. 286 (1980)...............................................................................................51

## STATUTES:

18 U.S.C. § 2331(1)(B).............................................................................................54

18 U.S.C. § 2331(3) .................................................................................................37

28 U.S.C. § 2339B ................................................................................13, 14

Fed. R. Civ. P. 12................................................................................48, 50

Fed. R. Civ. P. 42(b) ..................................................................................35

Fed. R. Civ. P. 50........................................................................................1

Fed. R. Civ. P. 59........................................................................................1

Fed. R. Evid. 403 ..............................................................26, 27, 29, 34

Fed. R. Evid. 704(a) ...................................................................................22

Fed. R. Evid. 804(b)(1) ..............................................................................14

## OTHER AUTHORITIES:

N.Y. Pattern Jury Instr., Civil, 2:235 ..............................................30, 40, 41

N.Y. Pattern Jury Instr., Civil, 2:236 ........................................................40

N.Y. Pattern Jury Instr., Civil, 2:277A ......................................................44

*Restatement (Third) of Agency* § 7.07 (2006)............................................38

Leonard B. Sand, 4-72 *Modern Fed. Jury Instr.*, Civil P. 72.01 ................40

Charles A.Wright & Arthur R. Miller, *et al.*,
     *Personal Jurisdiction in Federal Question Cases*,
     4 Fed. Practice & Procedure Civil § 1068.1 (3d ed.)........................51, 52

# I.     LEGAL STANDARD

In reviewing a Rule 50 motion, a court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Cross v. N.Y. City Transit Auth.,* 417 F.3d 241, 247 (2d Cir. 2005) (citations omitted).  The burden on the moving party is "particularly heavy where the jury has deliberated in the case and actually returned its verdict . . . ."  *Id.* at 248.  On a Rule 59 motion, the court "may not disturb the jury's verdict unless there was no substantial evidence to support it."  *Compton v. Luckenbach Overseas Corp.,* 425 F.2d 1130, 1133 (2d Cir.1970).  "The judge's duty is essentially to see that there is no miscarriage of justice."  *Id.*

# II.    THE JURY'S VERDICT WAS SUPPORTED BY OVERWHELMING EVIDENCE

The jury's verdict was supported by overwhelming evidence that defendants provided material support and resources to the terrorists and terror groups who committed the six attacks at issue in this case, and that PA employees committed or supported five of those six within the scope of their employment.  The core evidence before the jury included:  (1) financial records showing payments from the PA to actual terrorists; (2) convictions of PA security officers for terrorism and high-level PLO and PA officials for orchestrating the terror campaign; (3) official reports from the U.S. and Israeli Governments confirming the link between defendants and the terrorists; (4) personnel records showing pay and promotion of convicted terrorists; (5) PA intelligence records showing knowledge and approval of the conduct of convicted terrorists; (6) PA publications encouraging terrorism; and (7) evidence of a wide-spread policy supporting and approving terror by employees and non-employees, including a law institutionalizing payments to terrorists, hundreds of employees and non-employees in jail for terror crimes and on the payroll as a result of "their fight for their country," and payments to the families of suicide terrorists.

A.      **Common Evidence Supported the Jury's Findings on Scope of Employment and Material Support**

1.      **Scope of Employment**

The jury's findings on *respondeat superior* liability were supported by overwhelming evidence applicable to all five attacks that went to the jury on this theory.

First, the jury heard extensive testimony about the connection between the time, place and occasion for the terrorist attacks.  *See Riviello v. Waldron*, 47 N.Y.2d 297, 304 (1979).  Plaintiffs' experts testified about the four-year period of violence known as the Al-Aqsa Intifada during which all of the attacks occurred.  Tr. 414-514 (Eviatar) (explaining duration and nature of Al-Aqsa Intifada).[1]  They also heard about the role of defendants' leader, Yasser Arafat, throughout that period.  Tr. 457, 770-71 (Eviatar) (explaining significance of Arafat's dress and appearances in public with weapons).  According to plaintiffs' expert, Israel Shrenzel, Arafat set the tone during the intifada, and his employees followed suit:

> The motivation [was] what Arafat preached, what Arafat decided, what Arafat condoned, what orders and what atmosphere was created by the PA, an atmosphere of an all-out attack against Israel . . . . Palestinian operatives ask themselves, what is expected from me? . . . What Arafat wants for me?  What Fatah wants for me?  What should I perform as a member of the security apparatuses?  [T]he answer was:  You should participate—his understanding was:  I should take active role in the attacks against Israel.

*Id.* at 1562.  The jury was entitled to consider Arafat's role as a public figure and the leader of the PA's security forces in assessing the scope of employment of the terrorists convicted here.

The record on the other *Riviello* factors was even more extensive.  47 N.Y.2d at 304 (factors include whether the act was one commonly done by such an employee, and whether specific act was one that the employer could reasonably have anticipated).  The jury heard about a PA

---

[1] This brief cites the trial transcript (Jan. 13, 2015 – Feb. 23, 2015) as "Tr. __" and plaintiffs' trial exhibits as "Ex. __."

law that actually institutionalizes payments to terrorists.  Ex. 512.  Under that law, "[a]nyone who is kept in prisons of the occupation for offenses of participating in the struggle against the occupation" gets a PA salary.  *Id.*  That includes PA employees who were tasked with maintaining security but instead plotted to kill innocent people.  *See* Ex. 1143 (2013 amendment to prisoner's law mandating that defendants  "shall continue to pay the salary of an imprisoned employee"); Tr. 745 ("[M]any hundreds from among the Palestinian security apparatuses were involved in terrorist activities during the Intifada.").  Even those who were *not* PA employees at the time they committed the attack were embraced by the PA for their crimes.  *E.g.*, Exs. 66 (Abdullah), 85 (Ghanem); Ex. 17 ([Idris] was martyred during a heroic martyrdom operation against the Zionists in the occupied city of Jerusalem.").  The evidence of how common it was for defendants' employees to be involved in acts of terror was corroborated by the U.S. government in an official report assessing the PLO: "[A]vailable evidence indicates that . . . members of other security forces, were frequently involved in acts of violence against Israelis."  Ex. 496.

Defendants argue that "lockstep promotions . . ., payments to a prisoner . . . and references to security and moral status" are "flimsy pieces of evidence."  Defs. Mem. at 48-49.  Assessing the effect of those policies was the jury's task.  Defendants' own witness, Michael Sfard, admitted to the jury that it would not be difficult for defendants to identify and remove from the payroll those prisoners who had been convicted of terror.  Tr. 3237.  The jury was entitled to credit the expert testimony and documents in the context of convicted terrorists.  Such policies speak volumes about the PA's attitude toward terror, and the jury was entitled to conclude that these policies were a substantial contributing factor motivating terrorists/employees, who could easily have understood that their crimes would generate financial reward and public honor.

Finally, the jury saw actual magazines published by the PA and directed at defendants' security forces.  In these official "political guidance" publications, the PA encouraged its employees to "liquidat[e]," and "exterminat[e]" Jewish civilians.  Tr. 1569-70; *see, e.g.*, Exs. 198 ("They are becoming martyrs as a sacrifice for the Palestinian dream, and in compliance with the call of Al Aqsa. . . ."); 965 ("[W]e cannot but bow reverentially and respectfully to our heroic martyrs who have watered the soil of our beloved nation . . . to prove to the whole world that our Palestinian land is our right, and that blood is a small price to pay on the path to liberating and defending it.").  A U.S. Government report corroborated the incendiary atmosphere created by the defendants.  *See* Ex. 496 ("[S]ome senior PLO and PA leaders did little to prevent—and in some cases encouraged—acts of violence and an atmosphere of incitement to violence . . . .").  Based on these magazines alone, the jury could have concluded that the PA reasonably anticipated that its security forces—the recipients of these magazines—would carry out terror attacks.

## 2.     Material Support

The record contained substantial evidence that defendants provided material support and resources to Fatah's military wing, the Al-Aqsa Martyrs Brigades ("AAMB").  The jury learned about AAMB from the PLO's own website:  "Al-Aqsa Martyrs Brigades:  This is the military wing of the Fatah movement. . . . It carried out a number of quality military operations and offered many martyrs."  Ex. 1052.  According to a U.S. Government report, "[m]embers of AAMB are drawn largely from grass roots Fatah Tanzim."  Ex. 496.  Defendants' own documents confirmed the overlap.  *See, e.g.*, Exs. 130, 131, 136, 140, 142, 143, 146, 153, 157, 159.

The evidence showed that the PA funded Fatah, AAMB, and defendants' employees, who were members of these organizations.  For example, the jury saw documents showing actual payments from the PLO and the PA to Fatah terrorists and approval of terrorism as "quality operations."  Exs. 831, 962, 963; *see* Tr. 641 (Eviatar testimony regarding Raed al-Karmi, listed in

Ex. 962); *id.* at 644-647 (comparing names on Ex. 963 with descriptions in Ex. 831). The jury saw pages and pages of financial records showing payments from the PA to Fatah. Exs. 20, 173, 958; *see* Tr. 478-480. They saw and heard evidence that such payments continued throughout the intifada. Ex. 631 at 1 (Israel Defense Forces ("IDF") report indicating that "large sums of money are transferred on a monthly basis in order to finance terrorist infrastructures"). They saw evidence that Arafat worked through "'intermediaries,'" such as Marwan Barghouti and Fuad Shubaki, to distribute money for terror operations. Ex. 631 at 2. Barghouti's and Shubaki's convictions for orchestrating the terror campaign were in the record. Exs. 451, 889.

Corroborating the evidence of defendants' material support of terror was a report issued by the United States government in June 2002: "Documents . . . show direct payments from the PA to Fatah party activists, some of whom were also affiliated with the Al-Aqsa Martyrs Bri-gade, who had been involved in violence. The *payments were likely made with the knowledge that the intended recipients had been involved in violence and terrorism*." Ex. 496 (emphasis added). On the basis of this evidence, it was more than reasonable for the jury to conclude that the PA provided material support to AAMB throughout the relevant time period.

The jury was also entitled to find that defendants provided material support by rewarding convicted terrorists monetarily, even if those rewards came after the fact.[2] A well-publicized and consistently applied policy of compensating terrorists could certainly be a substantial contrib-uting factor to terrorism. Tr. 1560 (Shrenzel) ("The money was a factor. It was a contributing factor to their motivation . . . ."). "[O]ne who donates money to Hamas in order to fund such payments thus could be thought to be promoting terrorism. Yet, the same could be said of a do-

---

[2]  Defendants argue that this Court ruled that such payments could not be presented as material support. Defs. Mem. at 16, 30. However, the Court's summary judgment ruling about post-attack payments was limited to whether those payments were evidence of defendants' liability on a theory of ratification, *not* whether they were material support of terrorism. DE 646 at 11 n.11.

nor who instead makes payments directly to the family members of terrorists rather than giving the money to Hamas." *Boim v. Holy Land Found. for Relief & Dev*., 549 F.3d 685, 711 (7th Cir. 2008) (Rovner, J., concurring in part).

The jury was also entitled to find that the PA and PLO were agents for each other in providing material support. The jury heard evidence of multiple governmental bodies, including those with direct significance here, that simply switched between being under the PA and being under the PLO. Tr. 3133 (Prisoner Ministry); Tr. 3132 (Martyrs Foundation). According to defendants' own witness, Hanan Ashrawi, the decision to move the ministries back and forth was a "presidential decision." Tr. 3133. In addition, the jury saw document after document on joint PA/PLO letterhead. Exs. 14, 25, 36B, 48, 88, 89, 104, 105, 106, 108, 113, 116, 123, 127. They heard extensive testimony that Arafat had ultimate decision-making authority for all these bodies and ultimate control over the entities' finances. *See* Dep. of Hussein al-Sheikh at 140-42 ("Fatah and PLO are the same because the Fatah and the PLO budget are with Arafat."); Dep. of Salam Fayyad at 76 ("[A]fter the PA came into being, the PLO . . . ceased to have its own independent sources of funding largely. . . . [F]unding for its own operations did come from the PA.").

### B. Each of the Attacks Was Supported by Ample Specific Evidence

In addition to the common evidence, the jury had ample specific evidence on each attack to support their findings on both material support and *respondeat superior* liability.

### 1. January 22, 2002 Jaffa Street Shooting

The record on defendants' liability for the January 22 shooting was overwhelming. It established that: (1) six of the eight perpetrators were PA employees at the time they planned and carried out the attack; (2) defendants approved of their employees' actions and manifested that approval through their own words and policies; and (3) AAMB was responsible for the shooting.

Defendants suggest that the only evidence of *respondeat superior* liability for the January 22, 2002 attack was that the "shooter happened to be employed by the PA's Maritime Police." Defs. Mem. at 43. But in fact, the shooter *and five others* were PA employees at the time they planned and carried out the attack. *See* Exs. 36C (Ahmed Barghouti); 3 (Nasser Aweis), 360 (Abdel Hai); 36B (Majed al-Masri); 109 (Mohamed Mousleh). All five were convicted for their roles. Exs. 357-58 (Barghouti); 362 (Aweis); 360-61 (Abdel Hai); 384 (al-Masri); 418-20 (Mousleh). That is not a coincidence, as defendants' partial review of the evidence suggests; but a pattern evincing the scope of employment for PA's security officers during the Intifada.

In further support of *respondeat superior* liability, the jury also heard evidence of defendants' approval of their employees' conduct following the attack. Defendants did not condemn a single one of these terrorists. Instead, they were all kept on the payroll; the security employees were even promoted. Ex. 36C (Barghouti); 112 (Aweis); Ex. 36B (al-Masri).[3] This is true even of Majed al-Masri, a PA civil police officer, who had received a "final warning" from his superiors in 2001 that, going forward, he would be subject to "dismissal *should he violate instructions*" and required "all competent authorities" to execute the order. Ex. 127. Apparently, al-Masri's involvement in a terrorist attack against civilians in Israel did not "violate instructions," because he is still on the PA's payroll today. Ramadan (the suicide shooter) received a posthumous promotion. Exs. 89, 123. His family receives a salary from the PA to this day. Ex. 60 at 3; Ex. 62 at 3.

Finally, defendants' own words were consistent with defendants' expressed policy of supporting the use of terrorism to achieve political goals. According to the PLO's Martyr Insti-

---

[3] Employment records for Ibrahim Abdel Hai were not produced, but the record supports the conclusion that he too was paid and promoted following the January 22 shooting, consistent with PA law and policy. Ex. 512; DE 632-1 (stipulation).

tute, Ramadan was "martyred while performing his national duty."  Ex. 60 at 2.  According to the PA's General Intelligence Service, he was "good in terms of security and morals."  Ex. 153. Similarly, after Nasser Aweis—a PA officer and the leader of the January 22 plot—was convicted of 14 counts of murder, the Ministry of Prisoner embraced Aweis' imprisonment as being "a result of his fight for his country."  Ex. 76; *see* Ex. 96 (same in al-Masri's prisoner file).  Nasser Aweis, too, was deemed "good in terms of security and morals" by the GIS.  Ex. 140; *see* Ex. 142 (same in Barghouti's GIS file); Ex. 159 (same in Mousleh's GIS file).  All this evidence supported the jury's finding that PA employees committed the January 22 attack within the scope of their employment.

The record of defendants' material support for the January 22 shooting was also overwhelming.  First, every one of the perpetrators convicted of carrying out the shooting—even those who were not defendants' employees at the time—was on the PA's payroll following the attack and remains on the PA's payroll today.  Exs. 1120, 1121.  Those payments constitute material support.  *See supra* Part II.A.2.  Moreover, the jury heard and saw evidence that AAMB took credit and was responsible for the January 22 shooting.  Tr. 1469-70 (Shrenzel); Ex. 153 (GIS document confirming same).  The jury saw the shooter's "martyr video"—filmed shortly before his suicide mission—in which the shooter read his final will in front of an AAMB banner, wearing an AAMB headband.  Ex. 196, Clip 6.  Given the extensive evidence of defendants' material support to AAMB, *see supra* Part II.A.2, the jury was entitled to find the PA and PLO liable for knowingly provided material support and resources for the attack.

### 2.     January 27, 2002 Wafa Idris Bombing

The jury's verdict on the January 27, 2002 bombing was supported by evidence showing that:  (1) defendants attempted to cover up their role in the attack; (2) the perpetrators planned

and obtained materials for the attack from an office at the Muqataa; and (3) the AAMB claimed

responsibility for the bombing.

First, plaintiffs introduced a "letter and handwritten notes created by [PA] employees"

showing that the PA attempted to cover up the January 27 bombing.  Ex. 233 (the "Tirawi Let-

ter"); Tr. 1300 (parties' stipulation on Ex. 233).  A cover-up is evidence of a consciousness of

guilt.  *See*, *e.g*., *United States v. Zichettello*, 208 F.3d 72, 105 (2d. Cir. 2000) (efforts "to conceal

the scheme" are evidence of a "consciousness of guilt"); *United States v. Roldan-Zapata*, 916

F.2d 795, 803-04 (2d. Cir. 1990) (same).  The Tirawi Letter states that the commander of the

General Intelligence Service, Tawfik Tirawi, called Wafa Idris's family "before anyone claimed

responsibility for the attack," to request that "that the family would not announce that Wafa was

the one who carried out the attack[.]"  Ex. 233.  Shrenzel opined that the letter reflected not only

a cover-up, but also Tirawi's direct involvement based on Tirawi's other terror activities.  Tr.

1594.  His opinion was also supported by a handwritten note on the letter, by a PA official, stat-

ing that the letter itself shows that the PA's "General Intelligence [was] involved in the issue of

Wafa Idris."  Ex. 233.  The jury even heard from defense witness Amnah Reehan, the letter's

author herself, that the information was "important" and distributed to very senior PA security

officers.  Tr. 3547, 3549-50.  Based on this evidence alone, it was reasonable for the jury to con-

clude that defendants' employees were involved in the planning and perpetration of the attack.

Plaintiffs' evidence on this attack extended beyond the Tirawi letter.  The jury also saw

evidence of *why* the PA would want to cover up the January 27 bombing after it occurred:  the

perpetrators planned and obtained a bomb for the attack from a man who held an office at the

Muqataa, defendants' headquarters in the West Bank:

> I called [redacted] and told him that Wafa was prepared to carry
> out an attack and [redacted] asked for us to come to his office in

the Mukataa on Friday, January 25, 2002.  And we came to the office, Wafa and I . . . .  On Saturday, January 26, 2002, . . . at 4:00 p.m. Wafa called me . . . and asked me to come to take her, and I came and took her in my vehicle and she traveled to [redacted]'s office in the Mukataa . . . . [Redacted] asked me to bring a bag behind the door of his office . . . .  I took the bag in my hand.  [Redacted] told me to be careful when I bring the bag, and not to open it and to put it next to Wafa on the floor. [Redacted] told Wafa to pick up the bag and see what it weighed, and she said that it was not very heavy.  Wafa asked how to activate the explosive device, and [redacted] said that he would explain it to her on the following day.  We went out, Wafa and I, from the Mukataa and I went home.  Ex. 467, sheets 2 and 3.

Based on this evidence, the jury reasonably concluded that Noor and Idris planned the attack alongside defendants' employee, and that that employee supplied the bomb for the attack. This evidence—in conjunction with the evidence that the head of the PA's GIS sought to cover up the attack after it occurred—amply supports the jury's verdict that a PA employee knowingly provided material support for the attack or committed it within the scope of his employment.

Finally, the jury heard evidence that the AAMB was responsible for the January 27 bombing. Tr. 1469-70.  Similarly, the jury heard evidence that the PA put Munzar Noor on the payroll after he was arrested for his involvement in the attack.  Ex. 26.  Wafa Idris' family also receives a salary from the PA to this day.  Ex. 17.  Together with plaintiffs' extensive evidence of defendants' material support to AAMB, *see supra* Part II.A.2, this evidence supported the jury's finding of liability for knowingly provided material support and resources for the attack.

### 3.     March 21, 2002 King George Street Bombing

Defendants try to suggest that the record on the March 21, 2002 attack is thin by simply ignoring plaintiffs' evidence.  In reality, the jury's verdict on the March 21 bombing was based on substantial evidence, showing that: (1) the head of the plot was a senior officer in the PA's GIS who remains on the PA payroll to this day; (2) senior PA leadership, including Arafat him-

self, were involved in the arrest, interrogation and release of the suicide bomber from jail mere weeks before the attack; and (3) the AAMB was responsible for the bombing.

Plaintiffs' evidence on *respondeat superior* liability focused on the plot—orchestrated by senior employees of the PA's GIS—to release Mohamed Hashaika from PA prison mere weeks before the attack. *See* Ex. 1060; Tr. 1173-74. On February 10, 2002, the PA arrested and interrogated Mohamed Hashaika upon learning that he had wanted to perpetrate a suicide attack in Israel. Ex. 1060. Tawfiq Tirawi, head of the GIS, informed Arafat personally of the arrest by letter. *Id.* One month later, Hashaika was out of prison, with a bomb strapped to his chest that he detonated right behind Alan and Yehonathon Bauer. The evidence showed that Abdel Karim Aweis—a senior intelligence officer working under Tirawi at the GIS—was the one who orchestrated Hashaika's release in early March 2002. Ex. 356, Count 39 ("In early March 2002, Muhammed Hashaika was remanded in the 'Mukata'ah' complex . . . Following the request of [Aweis], who is [in] the general intelligence of the [PA], Muhammed Hashaika was released from the said remand.").

Defendants suggest that evidence of Hashaika's release "without further detail" is insufficient to support a verdict. Defs. Mem. at 46. That ignores Abdel Karim Aweis' conviction (Ex. 356), as well as expert testimony on Hashaika's release (Tr. 1580-81, 1586-87) and the PA's "revolving door" policy (Tr. 762). There was also a thundering silence from the defendants. Defendants asked the jury to believe that Hashaika escaped, but they did not submit a shred of evidence to controvert the evidence that Aweis released Hashaika. No evidence of a search for Hashaika. No reports, no bulletins, no wanted posters. No witnesses with firsthand knowledge of Hashaika's "escape." It was eminently reasonable, therefore, for the jury to conclude that Aweis released a known terrorist from prison within the scope of his employment.

The jury heard additional evidence showing that Abdel Karim Aweis acted within the scope of his employment.  After Aweis was convicted of 5 counts of murder and over 100 counts of attempted murder, defendants promoted him.  Ex. 58.  They also kept him on the payroll.  Exs. 58, 128.  Defendants admit that Aweis was involved in the March 21 attack, but they say he was acting for "personal motives."  Defs. Mem. at 46.  Even if that were true, it is of no consequence in light of the substantial evidence that Aweis planned the attack within the scope of his employment, and that defendants approved of his conduct.  *In re Boesky Sec. Litig.*, 36 F.3d 255, 265 (2d Cir. 1995) (employees' personal motives foreclose employers' liability for intentional and criminal acts only if those acts were "solely" to benefit the employee.); *see Doe v. Guthrie Clinic, Ltd.*, 22 N.Y.3d 480, 484 (2014) (same).

Finally, the record was undisputed that the AAMB was responsible for the March 21 suicide bombing.  Tr. 1470.  Yet, after the attack, the PA put every perpetrator convicted of planning and carrying out the March 21 bombing on the payroll.  Exs. 1120, 1121.  These payments constitute material support.  The jury also saw video of Kahira Sa'adi, one of the women responsible for driving Hashaika to the attack site, who testified that she received training prior to the attack.  Ex. 372.  Together with plaintiffs' extensive evidence of defendants' material support to AAMB, *see supra* Part II.A.2, this evidence supported the jury's finding of liability for knowingly provided material support and resources for the attack.

### 4.    June 19, 2002 French Hill Bombing

The evidence in the record proved that the June 19, 2002 French Hill bombing was an AAMB attack and occurred *after* the group was designated as a foreign terrorist organization.  Ex. 537 (U.S. designation of AAMB as foreign terrorist organization in March 2002).  The PA's own General Intelligence Service indicated as much, stating that Sa'id Awada—the suicide bomber in the June 19 bombing—was "a member of Fatah and the al-Aqsa [Martyrs'] Brigades"

and that he died "in Jerusalem during an operation of the al-Aqsa [Martyrs'] Brigades." Ex. 139; *see* Tr. 1382 (Q.  And are you satisfied that the [June 19] attack was an Al Aqsa attack?  A.  Absolutely.).[4]  After Awada killed 7 civilians in a suicide bombing, defendants began monthly payments to his family.  Ex. 19.

The evidence also proved that defendants provided AAMB with material support in the form of funding in June 2002.  Shrenzel testified that "Arafat himself provided financial aid to AAMB squads just a few days after the attack that we are discussing, namely, a few days after June 19."  Tr. 1381.  Defendants did not dispute this evidence.[5]  The jury was entitled to find defendants liable for the June 19 bombing based on this testimony, in conjunction with plaintiffs' extensive evidence of defendants' general material support to AAMB, *see supra* Part II.A.2.

### 5.    July 31, 2002 Hebrew University Bombing

The record also supports the jury's verdict on the July 31, 2002 attack.  The evidence showed that: (1) a senior employee of the PA, who is still on the payroll today, provided material support, in the form of personnel, to Hamas by releasing the bomb maker from prison before he went on a killing spree; (2) the same senior PA employee harbored the bomb maker after the release; and (3) Hamas took credit for the attack.

Amazingly, defendants ask this Court to throw out the jury's verdict on the Hebrew University bombing without even acknowledging the core evidence of defendants' liability—that PA officials released Abdullah Barghouti, a notorious Hamas bomb-maker, from prison, in violation

---

[4]  Defendants call into question the basic facts of the June 19 bombing based on a typo in the martyr file of the suicide bomber in the attack, Said Awda.  Defs. Mem. at 46.  The jury heard testimony about this typographical error (Tr. 1382) and was entitled to credit it.

[5]  It is not necessary to prove that the funds were actually used to carry out a predicate act.  Even a small amount of funding to a large and disbursed organization like Hamas can be a substantial contributing factor causing a terrorist attack, under traditional principles of tort law.  *See Boim*, 549 F.3d at 695-99 (explaining why small dollar knowing donations to terror organizations can result in liability for provision of material support).

of 28 U.S.C. § 2339B.  *See* Tr. 807-09 (testimony of Mosab Yousef). [6]  Mosab Yousef testified that senior PA officials, including Jibril Rajoub and Marwan Barghouti, made a deal with Hamas that the PA would arrest Abdullah Barghouti but release him shortly thereafter.  Tr. 807-09.  Ahmed Barghouti pled guilty in part to personally "transfer[ing] . . . Abdullah Barghouti from the prison of the Preventative Security of the Palestinian Authority in Bitunia to an apartment, which [he] had rented downtown."  Ex. 357, Count 51.  Abdullah Barghouti himself stated that he was released from prison.  Ex. 427.  On top of this evidence, the jury heard testimony from plaintiffs' expert, Alon Eviatar, about the PA's "revolving door" policy, which was a way to placate Israel and the United States but keep terrorists on the street  Tr. 762-66.  Defendants attempted to convince the jury that Abdullah Barghouti had "escaped" from PA prison.  Tr. 2884.  But without any reliable evidence of an escape—no written reports, no bulletins, no wanted posters, no witnesses with firsthand knowledge—the jury rejected defendants' hearsay testimony of the alleged "escape."  Based on the credible evidence in the record, the jury was entitled to conclude that senior PA officials made a deal to release, and in fact released, Barghouti from prison.

Upon his release from the PA's prison, Abdullah Barghouti once again began working for Hamas.  The PA's own intelligence files say that "Abdullah received approximately $117,000, which he was supposed to use for financing the military wing of the Hamas movement."  Ex. 164 at 02:010034; Ex. 452, Count 2.  Abdullah Barghouti's conviction and interrogation records also show that, following his release, he manufactured a string of bombs at the behest of, and for use by, Hamas.  Exs. 452, 427 at P7: 130; Tr. 823-24.  The PA's own intelligence files say that Abdullah Barghouti "is responsible for manufacturing explosives for the Izz al-Din [al-Qassam]

---

[6]  Defendants only mention of plaintiffs' evidence regarding Abdullah Barghouti's release is in a footnote, in which they state that the evidence was admitted in error.  Defs. Mem. at 48 n.14.  Mosab Yousef's testimony—which was given at a deposition that plaintiffs took *in this case*—was properly admitted under Rule 804(b)(1).

Brigades" of Hamas.  Ex. 164 at 01:010038.  One of those explosives was the bomb used in the

Hebrew University attack, for which Hamas claimed credit.  Tr. 991.

Following this series of events, the PA retained Ahmed Barghouti as an employee, and

put Abdullah Barghouti and other Hamas perpetrators of the bombing on their payroll.  Exs.

1120, 1121.  These payments constitute material support and are evidence of the scope of PA

employment of Ahmed Barghouti.  The PA's own documents indicate that certain of these terror-

ists are "good in terms of security and morals."  Exs. 73, 164 (Abdullah Barghouti); Exs. 36C,

113, 142 (Ahmed Barghotui).  Ahmed Barghouti was even promoted.  Ex. 36C.

Based on this compelling record, the jury reasonably concluded that defendants provided

material support to Hamas, and that Ahmed Barghouti did so in the scope of his employment.

### 6.      January 29, 2004 Bus No. 19 Bombing

Finally, the jury was entitled to conclude that defendants were also liable for the January

29, 2004 bus bombing that killed Scott Goldberg and grievously injured his eight surviving fami-

ly members.  Defendants suggest that other than the fact that AAMB claimed credit for the Janu-

ary 29, 2004 bombing, "[n]o other evidence ties either the PA or the PLO to the January 29 at-

tack."  Defs. Mem. at 48.  But the evidence showed that the suicide bomber *and three others* of

the perpetrators were PA employees at the time they planned and carried out the attack.  *See* Exs.

7 (Ahmed Salah); 10 (Hilmi Hamash), 116 (Abdel Maqdad).  All three were convicted for their

roles.  Exs. 260, 261 (Salah); 313 (Hamash); 275, 295 (Maqdad).  All three remain on the PA

payroll to this day; all have been promoted since they were convicted; and all three, according to

the PA, are unremarkable in terms of security and morals.  Exs. 48, 131 (Salah), 114, 130

(Hamash); 116, 129 (Maqdad).  Again, this is not a coincidence; it is a pattern that the jury was

entitled to recognize and use to evaluate the scope of employment in the PA's security apparatus.

15

Defendants claim that the suicide bomber, Ali Ja'ara, had been fired prior to boarding the bus on January 29, 2004.  But according to defendants' own records, Ja'ara "worked as a First Sergeant in the police until he was martyred."  Ex. 22.  His personnel files show that he was even promoted posthumously in April 2004, just 2 months after killing 11 people.  Ex. 8.

Finally, the jury heard undisputed evidence that the Bus No. 19 bombing was an AAMB attack.  Ex. 132 (Ja'ara GIS file stating that a "group belonging to the al-Aqsa Martyrs' Brigades claimed responsibility for the operation"); Tr. 1469-70 (Shrenzel).  Together with other evidence of defendants' material support to AAMB, *see supra* Part II.A.2, this evidence supported the jury's finding of liability for knowingly provided material support and resources for the attack.

### C.   Proximate Cause and Knowledge

The foregoing evidence provided the jury with an ample basis to conclude that defendants' conduct was both knowing and a proximate cause of plaintiffs' injuries.

Intent (even criminal intent) is imputed to an employer when employees or agents with such intent act "within the scope of their authority."  *See United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 660 (2d Cir. 1989); *Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (1999) (a corporation can be guilty of "knowing" or "willful" violations of regulatory statutes through the doctrine of *respondeat superior*.").  Similarly, the jury had ample evidence of knowledge of senior officials (summarized above), including criminal convictions, government reports, intelligence files, prisoner files, martyr files, and captured documents.

Proximate cause is generally a question of fact for the jury.  *See Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 125-27 (2d Cir. 1996) (reversing judgment as a matter of law in a terror case, where "district court impermissibly substituted its judgment for that of the jury" on proximate cause).  There can be no doubt that the terrorists injured the plaintiffs here.  Thus, with vicarious liability, causation was proven.  Even without vicarious liability, the Second Circuit's

analysis in *Rothstein v. UBS AG* supports the jury's finding that defendants proximately caused plaintiffs' injuries on these facts.  708 F.3d 82 (2d Cir. 2013).  In *Rothstein*, the complaint "[did] not allege that UBS was a participant in the terrorist attacks that injured plaintiffs."  *Id.* at 82, 97.  Here, in contrast, the evidence showed that defendants *were* participants in the attacks.  *See supra* Part II.A.2.  The *Rothstein* complaint did "not allege that UBS provided money to" terrorist organizations.  *Id.*  Here, in contrast, the evidence reviewed above showed that defendants *did* provide money, weapons, personnel, and services to terrorists and terror organizations.

### D.   Defendants Did Not Present Countervailing Evidence

Defendants did not present credible evidence to refute the record established by plaintiffs.  During opening statements, defendants forecasted their theory of the case:  "Crazy, wrong, contemptible, but not my clients."  Tr. 83-84; *see* Defs. Mem. at 42-43.  With respect to both material support and *respondeat superior* liability, defendants tried to convince the jury that there was no connection between themselves and the six terror attacks at issue in the case.

The jury rejected defendants' theory because it could not be squared with the evidence.  It did not make sense to say that defendants found their employees' actions reprehensible when they kept terrorists on the payroll, promoted them, and characterized their imprisonments as being "a result of [their] fight for [their] country."  It did not make sense to say that the PA had no control over its employees when their records reflect uninterrupted monthly payments, they published monthly political guidance magazines inciting terror, and Arafat admitted to having "total control," Ex. 239 clip 2.  It did not make sense to say that terrorists escaped from PA prison (versus having been released intentionally by those with access) when there was not a single document or percipient witness to show that a search was conducted for such dangerous fugitives.

What affirmative evidence did defendants offer?  Four photographs of Yasser Arafat (Defs. Tr. Exs. ("DTE") 71-74), a map (DTE 75), and a pair of letters exchanged between Israel

and the PLO in 1993 (DTE 17).  They also brought six witnesses, none of whom had any personal knowledge about the attacks or any of the perpetrators.  They did not call a single supervisor of the PA employees who were convicted of perpetrating the attacks in this case.  They did not call any of the perpetrators' co-workers.  They did not call any percipient witnesses to the various alleged "escapes" of terrorist operatives from PA prison.  They even blocked depositions of the perpetrators themselves.  DE 229; DE 290.  With a complete dearth of evidence to support defendants' theory that "it wasn't us," the jury was more than entitled to reject it.

Defendants' real problem is that they tried the case as a reasonable doubt case, *see* Tr. 3727-3728) ("[t]here is no conclusive evidence that the senior leaderships of the PA or PLO were involved in planning or approving specific acts of violence."); Tr. 3738 (arguing that a document relating to the Wafa Idris attack "cannot provide us with a conclusive final proof of his final knowledge of the attack."), and they relied on witnesses to say only that they did not support terror.  *See, e.g.,* Tr. 2899 (Faraj), 3126 (Ashrawi).  Defendants failed to bring any witnesses who served in the police forces with the convicted terrorists, they did not offer evidence that defendants issued reports rebuking the PA employees, or that defendants investigated the PA employees who committed terrorist attacks; they did not bring supervisors to condemn the actions of their underlings.  Indeed, they did not bring anyone with any personal knowledge of the events in question.  The jury found defendants liable based on the plaintiffs' evidence and defendants' lack of evidence.

## III.    PLAINTIFFS' LIABILITY EXPERTS OFFERED PROPER TESTIMONY

The Court was well within its discretion in allowing expert testimony from Alon Eviatar and Israel Shrenzel.

## A.      Expert Testimony Is Appropriate and Customary In Terrorism Cases

In terrorism cases, expert testimony is particularly useful to explain the workings of terror

organizations, which are often murky and difficult for jurors to understand.  As Judge Weinstein

explained:  "[E]ach proffered witness's testimony must be approached applying a strong policy

in favor of full admissibility required for the jury to understand the complex details of this case.

Those particulars are remote from the normal life experience upon which jurors rely when decid-

ing cases.  Admissibility of expert reports and testimony is therefore strongly favored."  *Gill v.*

*Arab Bank, PLC*, 893 F. Supp. 2d 523, 530-31 (E.D.N.Y. 2012).

Courts in this Circuit and elsewhere have routinely qualified former intelligence officers

like Eviatar and Shrenzel as experts in terrorism cases.  In *Gill*, for example, Judge Weinstein

qualified several terrorism experts, many of whom had worked for Israeli security and intelli-

gence agencies.  893 F. Supp. 2d at 531–34.  Similarly, in *Linde v. Arab Bank, PLC*, 922 F.

Supp. 2d 316, 329–31 (E.D.N.Y. 2013), Judge Gershon found that three former Israeli security

officials were qualified, including one from the Palestinian Affairs Department of the Israel Min-

istry of Defense's Coordinator of Governmental Activities in the Palestinian Territories

("COGAT") (like Eviatar), and one who worked for the Israeli Security Agency ("ISA") (like

Shrenzel).  In *Leibovitch v. Syrian Arab Republic*, No 08-C-1939, 2011 WL 444762, at *3–4

(N.D. Ill. Feb. 1, 2011), *rev'd on other grounds sub nom. Liebovitch v. Islamic Republic of Iran*,

697 F.3d 561 (7th Cir. 2012), the court relied on an expert who served for three decades as an

IDF intelligence officer studying Iran's support for terrorism in Israel.  And in *Wachsman v. Is-*

*lamic Republic of Iran*, 603 F. Supp. 2d 148, 153 n.1 (D.D.C. 2009), the court relied on an offi-

cial from the IDF's Military Intelligence Branch as an expert on Islamic terrorism.

### B.    Alon Eviatar and Israel Shrenzel Were Appropriately Qualified as Experts

### 1.    Alon Eviatar

Alon Eviatar is a Lieutenant Colonel who spent 27 years with the IDF.  Tr. 363.  He

served as an intelligence officer for twelve years. Tr. 364-65.  He served for fifteen years in

COGAT, the "unit [that] is charged on behalf of the government of Israel and the Israel Defense

Forces with the entire system of coordination and liaising with the Palestinian Authority, with

international organizations, and all of the other official organizations that operate in the areas of

the Palestinian Authority."  Tr. 366.  During his service, Eviatar "traveled throughout the West

Bank on a daily basis," Tr. 367, "regularly investigated . . . all the relevant materials from the

Palestinian media . . . maintained very close ties with hundreds of Palestinians . . . met . . . with

thousands of Palestinians from all the various . . . parts of society, official and unofficial, in all

possible roles and functions, from the various movements . . . [and] maintained professional ties

with research institutes [and] academic institutes which have interests in the Palestinian arena."

Tr. 367-68.  He is fluent in Arabic.  Tr. 364.

Eviatar analyzed the information about which he testified by cross referencing it with

other sources.  He never based his findings "on a single source."  Tr. 408.  Instead, he "check[ed]

additional material to make sure that it corresponds with other material.  [He] examine[d] the

identity of the people whose names appear in the documents, and [he] also coordinate[d] that

with all of the knowhow that [he has] accumulated over the course of the years."  *Id*.  Eviatar's

methodologies in analyzing documents and information in preparation for his testimony was

"identical to all of the professional tools and instruments that [he] made use of and that [he]

worked with during the course of [his] years in the military."  *Id*.  This was an appropriate meth-

odology for a terrorism expert.  Other members of this Court have approved experts whose

methodology was similar—"gathering multiple sources of information, including original and

20

secondary sources, cross-checking and juxtaposing new information against existing information and evaluating new information." *United States v. Kassir*, No. S2 04 Cr. 356(JFK), 2009 WL 910767, at *6 (S.D.N.Y. Apr. 2, 2009); *accord United States v. Paracha*, No. 03 Cr. 1197(SHS), 2006 WL 12768, at *22-23 (S.D.N.Y. Jan. 3, 2006) (approving the expert opinion where the expert "relied on multiple sources of information that he gathered and vetted through his process of cross-referencing and peer review, and explained that he has been gathering information relevant to [the subject of his testimony] for several years.").

Accordingly, the Court properly qualified Eviatar as an expert.  Tr. 409.

### 2.    Israel Shrenzel

Israel Shrenzel spent 17 years with the ISA, "a government body charged with frustration or prevention of terrorism and espionage."  Tr. 1016-17.  During his last ten years at the ISA, Shrenzel was the "head of the department that dealt with the analysis of Palestinian affairs, especially the policies of the PLO, the PA and the various other Palestinian organizations."  Tr. 1017. His department "tried to understand the ideas, the ideologies, the motivation and the declaration and of course the deeds of the PA as a whole and of the various organizations within the PA and even those that were not part of the PA, such as Hamas and PIJ . . . ."  Tr. 1017 -18.  He also "analyz[ed] the positions of various important individuals in the PA area."  *Id.* at 1018.  As part of his work, Shrenzel interacted with anti-terror personnel around the world, including in the United States.  Tr. 1018.  Shrenzel is fluent in Arabic.  Tr. 1070; 1073-74.

In order to prepare his opinions and testimony, Shrenzel and his team gathered information regarding the five attacks that were the subject of his testimony, including the indictments, verdicts and sentencing documents pertaining to the individuals convicted of those attacks, as well as United States and Israeli government reports, newspapers, publicly available videos and clips, and files supplied by the defendants.  Tr. 1019; 1074.  He and his team ana-

lyzed the documents "to understand what actually happened, who was involved, and what was the links of the perpetrators to the PA, to the defendants, and what was, let's say, the attitude of the defendants toward that attack and towards its perpetrators." Tr. 1074-75. Shrenzel's methodology was very similar to the methodology he used at the ISA. Tr. 1019; 1069 -1070, 1075. Just as with Eviatar, other judges in this District have approved similar experts, with similar methodologies. *Kassir*, 2009 WL 910767, at *6; *Paracha*, 2006 WL 12768, at *22-23.

Accordingly, the Court properly qualified Shrenzel as an expert. Tr. 1076.

### C. Plaintiffs' Experts Did Not Offer Lay Opinions On Ultimate Issues

Defendants claim that Eviatar and Shrenzel offered "lay opinions" on "ultimate issues." Defs. Mem. at 12-13. That is wrong. Eviatar and Shrenzel's opinions were well within the bounds of their expertise. Nor did they opine on whether defendants were ultimately liable for any of the attacks.

Defendants cite two cases in support of their argument. In both cases, the court either excluded expert testimony or found expert testimony improper where the experts offered opinions on crucial issues *about which they had no expertise*. *Nimely v. City of N.Y.*, 414 F.3d 381, 398 (2d Cir. 2005) (expert testimony that police officers, who were also fact witnesses, were "telling the truth"); *SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (expert testimony that securities disclosure documents provided all "economically material" information).

Here, in contrast to the experts in *Nimely* and *Tourre*, Eviatar and Shrenzel gave opinions within the areas of their expertise. Defendants do not even set forth which statements they believe fall outside Eviatar and Shrenzel's expertise. Instead, defendants simply offer a string of citations that they claim represent instances where Shrenzel and Eviatar opined on "ultimate issues." Defs. Mem. at 12. This is not enough to claim error. *See* Fed. R. Evid. 704(a) ("[a]n opinion is not objectionable just because it embraces an ultimate issue"). Moreover, and contra-

22

ry to defendants' assertion, the cited portions of the transcript do *not* actually represent testimony on the ultimate issue of whether "the PA and PLO were ultimately responsible for the attacks committed by Fatah, Hamas, and the AAMB regardless of the facts of a specific attack." Defs. Mem. at 13. In none of the cited portions of the transcript did Eviatar or Shrenzel opine that the PA and/or the PLO were ultimately responsible for any of the six attacks at issue.[7]

Defendants also claim that Shrenzel improperly opined about Tawfiq Tirawi's role in the Wafa Idris bombing and improperly stated that an official of the PA considered Sa'id Ramadan's attack against civilians a performance of national duty. *See* Defs. Mem. at 13-14. These complaints also have no merit. Defendants opened the door to Shrenzel's opinions about Tirawi's role in the attack by asking questions during cross examination implying that Tirawi was actually innocent. *See* Tr. 1514-15. Plaintiffs were entitled to meet this line of questioning on redirect.[8] As for Shrenzel's statements about Ramadan, his testimony was straight from defendants' martyr file, which was already before the jury. *Compare* Tr. 1101 (Shrenzel) *with* Ex. 60 (Ramadan martyr file).

---

[7]  *See* Tr. at 728-31 (operatives in Fatah and AAMB viewed Marwan Barghouti as the link between them and Arafat); Tr. 737 (defendants' GIS files indicated that there are "common interests" between Marwan Barghouti and the GIS); Tr. 745-46 (hundreds of Palestinian security employees were involved in terrorist activities during Intifada); Tr. 767 (there was cooperation and coordination between defendants and Hamas in the perpetration of joint acts of terror); Tr. 839-42 (Ibrahim Hamad received money from the PA pursuant to PA law after he was convicted for role in Hebrew University attack and others); Tr. 1162-64 (testimony about the relationship between the individuals convicted for the January 22, 2002 attack and the PA); Tr. 1205-06 (same for March 21, 2002 attack, as well as testimony that PA did not take steps to prevent the attack in light of the upcoming designation of the AAMB as an FTO); Tr. 1379-81 (Arafat provided financial aid to AAMB squads just a few days after the June 19, 2002 attack); Tr. 1428 (AAMB took responsibility for and perpetrated the January 29, 2004 attack).

[8]  Defendants later argue that Shrenzel improperly testified that Tirawi supplied explosives to Hashaika "even though this testimony derived from a custodial statement placing the blame on another person. . . ." *See* Defs. Mem. at 15. This was in response to defendants' implications during cross that Tirawi was innocent. Tr. 1596-99 (Court's reasoning explaining why Tirawi testimony was admissible). In any event, defendants could have used the custodial statement to cross examine Shrenzel, but they chose not to do so.

23

### D.        Shrenzel and Evitar Did Not Offer Improper State of Mind Testimony

Defendants next argue that Shrenzel and Eviatar offered improper state of mind testimony.  Defs. Mem. at 14.  This too is incorrect.

Shrenzel's testimony about the motivations of people such as Sa'id Ramadan was in direct response to defendants' questions about the motives of the perpetrators.  Defendants asked Shrenzel multiple questions implying that the perpetrators could not have been motivated by post-attack payments by the PA.  *See* Tr. 1561.  It was entirely proper for Shrenzel to respond by giving his opinion on what *did* motivate the perpetrators during his redirect examination.[9]

Eviatar's testimony about Marwan Barghouti was also proper.  He testified that Marwan Barghouti was "very close to Arafat," Tr. 725, and "was the leader of Fatah in the West Bank and commander of the Tanzim and Al Aqsa Martys Brigades," Tr. 729-30.  One obvious evidential basis for this testimony was Barghouti's conviction.  *See* Ex. 451.  Moreover, this testimony came directly from Eviatar's expertise—surely an intelligence agent who spent his professional career studying the PA would know the relationship between Arafat and his direct subordinate.

### E.        Plaintiffs' Experts Properly Opined On Defendants' Policies

Defendants also complain about Eviatar's and Shrenzel's testimony concerning defendants' policies of paying convicted terrorists and releasing known terrorists from jail.  Defs. Mem. at 15-16.  But these policies were squarely within both Eviatar and Shrenzel's areas of expertise.  Among other things, Eviatar spent fifteen years in COGAT, which is charged with "the entire system of coordination and liaising with the Palestinian Authority," Tr. 366, and Shrenzel spent

---

[9]  Shrenzel's testimony about the contents of the police magazines during his redirect examination, including that the magazines referred to Jews as "descendants of monkeys and pigs," was similarly appropriate testimony to rebut defendants' implications during cross examination that the magazines were innocuous.  Tr. 1564-67.  Since defendants opened the door, their complaints about this testimony are also without merit.

ten years as the "head of the department [within the Israeli Security Agency] that dealt with the analysis of Palestinian affairs, especially the policies of the PLO, the PA and the various other Palestinian organizations." Tr. 1017.

Moreover, *defendants* opened the door to testimony about the purpose of such payments by raising it in their opening statement. During opening statements, defendants' counsel argued that payments to convicted terrorists and the families of martyrs were a form of social welfare: "These payments are routine in my client's society. My client is essentially a social welfare state." Tr. 86. "It is widely recognized that a party who raises a subject in an opening statement 'opens the door' to admission of evidence on that same subject by the opposing party." *See United States v. Chavez*, 229 F.3d 946, 952 (10th Cir. 2000) (collecting cases). Defendants cannot now claim that Eviatar and Shrenzel's opinions rebutting this trial theme were improper. [10]

## F.    The *Gilmore* Court's Opinion About Eviatar Is Inapposite

Defendants claim that Eviatar's testimony was improper because another court, in another case decided that Eviatar could not testify as an expert on a subject that was different than the subjects about which Eviatar testified here. *See* Defs. Mem. at 18-19. In *Gilmore v. Palestinian Interim Self-Government Auth.*, No. 1-853, 2014 U.S. Dist. LEXIS 102093 (D.D.C. July 28, 2014), the plaintiffs sought to offer Eviatar to opine that a particular individual perpetrated an attack. The court had excluded all other evidence of the individual's role in the attack, and as such, Eviatar's testimony would have been based *exclusively* on information the court had ruled was inadmissible, and it would have been the *only* evidence linking that individual to the attack.

---

[10]  Like his testimony on defendants' policies, Eviatar's testimony that Israeli government reports were reliable was also proper and within the scope of his expertise. *See* Defs. Mot. at 23 (challenging admission of IDF reports). Eviatar's experience in the IDF and COGAT provided him with the experience to judge the accuracy and reliability of those reports. Moreover, he testified that he always cross checked information to ensure its accuracy. *See supra* Part III.B.1. Defendants cannot plausibly complain that his methodology in assessing those reports was unreliable.

*See Gilmore*, 2014 U.S. Dist. LEXIS 102093, at \*51-53.  The court found that, although Eviatar detailed his methodology in his report, his methodology was not applied in the context of the hearsay documents.  *Id*. at \*50-51.  The court concluded that, although an expert can rely on inadmissible evidence in forming his or her opinion, Eviatar's testimony that a particular individual perpetrated the *Gilmore* attack would be "simply repeating hearsay evidence without applying any expertise . . . ."  *Id*. at \*56.

Here, by contrast, Eviatar's opinions were based on admissible evidence, and Eviatar detailed both his methodology, as well how he applied that methodology to form his opinions, to the Court and the jury.  *See* Tr. 363-403.  Moreover, rather than assessing who had actually committed a specific attack, Eviatar's opinions in this case were limited to background information about the PLO, the PA, Fatah, AAMB, and Hamas; the policies and practices of the PA and the PLO as they relate to the support of terrorism; the relationship between the defendants and AAMB; and the relationship between the defendants and Hamas.  Each of these areas is well within Eviatar's areas of expertise, all were topics on which he was more than qualified to give opinions, and none were excluded in *Gilmore*.

## IV.    DEFENDANTS' RULE 403 ARGUMENTS ARE FRIVOLOUS

### A.    Rule 403 Did Not Require Plaintiffs to Sanitize Their Case

Defendants complain that the Court improperly allowed plaintiffs to introduce inflammatory and prejudicial evidence, and "limited the PA's and PLO's ability to respond."  Defs. Mem. at 17-18, 19-24.  "Rule 403 does not provide a shield for defendants who engage in outrageous acts . . . .  It does not generally require the [proponent] to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone."  *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998); *see United States v. DeMuro*, 677 F.3d 550, 559 (3d Cir. 2012) (same); *United States v. Cross*, 308 F.3d 308, 325 (3d Cir. 2002) (same).  Evidence is unduly prejudicial only

"when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).

 The fact that testimony and documents concerning post-attack payments, the PA's "revolving door" policy, and the police magazines were harmful to defendants was no reason to exclude it.  To the contrary, "the Federal Rules favor placing even the nastier side of human nature before the jury if to do so would aid its search for truth." *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1135 (4th Cir. 1988).  Moreover, as set forth above, defendants opened the door to much of this testimony by arguing in opening statements that the post-attack payments were a form of social welfare, and by cross-examining Shrenzel about the motivations of the perpetrators in carrying out terror attacks.  Tr. 86 (opening); 1560-62 (Shrenzel).

Moreover, defendants' suggestion that the Court "created an unfair playing field" (Defs. Mot. at 21) is baseless.  The Court applied Rule 403 evenly throughout the trial, excluding evidence proffered by *both* sides.  *E.g.*, Tr. 994-97 (excluding many probative police magazines offered by plaintiffs); Tr. (1/6/15) at 63-69 (excluding photographs offered by plaintiffs); Tr. 632-33 (excluding videos offered by plaintiffs, such as BBC video of Arafat leading a chant to "give us weapons Abu Amar"); Tr. 3248-49 (excluding testimony of defense witness Issa about the total numbers of Palestinians arrested since 1967).  Just as the Court excluded much of plaintiffs' evidence that it deemed was more prejudicial than probative, the Court reasonably exercised its discretion to exclude defendants' repeated and improper attempt to inject evidence of an overtly political nature.

### B.    Admission of the PA Police Magazines Was Proper

Defendants complain that the police magazines had only "tenuous connections to the PA and PLO."  Defs. Mem. at 19.  Nothing could be further from the truth.  Plaintiffs offered exten-

sive testimony that these magazines were published by an official PA/PLO propaganda bureau and distributed to the PA's security forces during the relevant time period.  Tr. 1206-1216; 1269-1274 (Shrenzel).  Defendants did not offer any evidence in response.[11]

Moreover, the magazines were highly probative, containing powerful evidence of three important facts.  *First*, they showed that PA security personnel could have reasonably believed that orchestrating or participating in terror attacks was furthering their employer's interests and political goals, as articulated in these magazines.  *Second*, they were evidence that it was reasonably foreseeable to the PA that its security personnel would commit violent and dangerous criminal acts against Israeli civilians.  *Third*, the magazines reflect an apparent intent to influence U.S. Government policy.  *See, e.g.*, Ex. 200 (  "[T]he Palestinian people reject the yellow policy of the U.S. and its leader Bush, and our people shall continue the popular struggle . . . until achievement of the sought-after and historical goal . . . which we have taken on . . . through waterfalls of blood that Palestinian people have offered up on a daily basis . . ."); *id.* ("[A]ll efforts by Palestinian forces should be turned towards inflaming the popular Intifada until the image of the infamous child who challenges Israeli tanks with stones appears, for this image evokes Arab and Muslim sympathy, and [of] the free world, and moves it . . .  to needed additional U.S. and European pressure on Israel . . ."); Ex. 175 ("The European nations and the U.S., who have strategic interests in the region, are called upon to see the necessity of urgent and immediate action to stop Israeli practices against the Palestinian people.  Without this, their vital interests shall be directly jeopardized.").

---

[11]  Defendants submitted a declaration to argue that some of the magazines were not "official statements of the Palestinian Authority or its security forces."  *See* DE 759 at 2, Ex. 1 at ¶ 9. They offered no such evidence at trial.

The Court correctly concluded that the magazines were probative.  *E.g.*, Tr. (1/12/2015) at 158 ("[T]here is some relevance about heightened rhetoric . . . by the PLO or the PA that they claim is urging people to commit violence.").  This ruling is amply supported by case law. Courts have repeatedly held that a defendant's own words are not unduly prejudicial under Rule 403.  *E.g.*, *Mullen*, 853 F.2d at 1132-35; *Robinson v. Runyon*, 149 F.3d 507, 514-15 (6th Cir. 1998); *Wilson v. City of Aliceville*, 779 F.2d 631, 635-36 (11th Cir. 1986); *Strauss v. Microsoft Corp.*, No. 91 Civ. 5928(SWK), 1995 WL 326492, at *4-*5 (S.D.N.Y. June 1, 1995).

Moreover, in response to defendants' Rule 403 objections, the Court admitted only *eight* of the twenty exhibits that plaintiffs had offered.  *E.g.*, Tr. 994, 1232-33.  Defendants even used certain of the admitted magazines to advance their *own* theory of the case during cross-examination.  Tr. 1563-67.  They cannot now claim that the magazines were not relevant.

Defendants also claim that it was error for the Court to admit a Fatah circular (Ex. 185) and a supposedly "highly prejudicial" photograph of Arafat and Sheikh Ahmad Yassin, the then-leader of Hamas (Ex. 1128).  *See* Defs. Mem. at 19.  With respect to the photograph, defendants never articulated, nor pressed, an objection to this exhibit.  *See* DE 758 (raising objections to only 4 of 45 exhibits identified for use with Eviatar on 1/20/15); Tr. 768-69 (admission of Ex. 1128).  With respect to the Fatah circular, the Court engaged in a careful Rule 403 analysis and found that the exhibit was more probative than prejudicial.  *E.g.*, Tr. 994-95.  Moreover, the circular set forth the official positions and policies of Fatah, which was dominated and controlled by Arafat.  Tr. 443-44 (Eviatar).  The jury was entitled to conclude that this circular represented statements approved by individuals (including Arafat) who dominated and controlled the PA. Tr. 1472-74 (Shrenzel).  Admission of these exhibits was correct.

29

### C.    Admission of Indictments and Custodial Statements in this Case Was Proper

Defendants complain that the Court admitted indictments and custodial statements of the convicted perpetrators in this case, without requiring plaintiffs to redact information about unrelated crimes.  Defs. Mem. at 20.  This argument should be rejected out of hand.  Plaintiffs presented evidence at trial that defendants, pursuant to official policy, pay convicted terrorists *on account of their crimes*.  *See, e.g.*, Exs. 512, 1120.  Defendants make prisoner payments—even to this day—to terrorists who are sitting in jail (and to those who have been released).  *Id.*  Defendants also make continuing payments to the families of suicide terrorists.  *See, e.g.*, Exs. 17 (Idris), 19 (Awada), 22 (Ja'ara), 23 (Hashaika), 60 (Ramadan).  Evidence of these individuals' involvement in terrorism—especially where it was ongoing and extensive, as demonstrated by unredacted indictments and custodial statements—is highly relevant to defendants' policies and practices as they relate to support for terrorism.  As for those perpetrators who are also PA employees, the evidence was also highly probative of the employer-employee relationship as spelled out in actual practice—a relevant inquiry for *respondeat superior* liability.  N.Y. Pattern Jury Instr., Civil 2:235.  The Court was correct in its ruling:  "I do not find . . . it is somehow unduly prejudicial if there is evidence that a reasonable jury could conclude that the people that the defendants were dealing with and compensating were known to be involved in the acts of violence."  Tr. (1/6/15) at 57.

Moreover, there was no prejudice resulting from the indictments and custodial statements at issue here because the same information was contained in defendants' own GIS files.  Abdullah Barghouti's indictment (*see* Defs. Mem. at 20-21) is one example.  At trial, plaintiffs offered the deposition testimony of Mosab Yousef, the son of a Hamas leader, who recounted that senior PA officials entered into a deal with Hamas to "arrest" Abdullah Barghouti but release him

shortly thereafter.  Tr. 807-09.[12]  Barghouti himself stated that he was released from prison.  Ex. 427, Sheet 12.  Following his release, Barghouti went on a killing spree, manufacturing a string of bombs at the behest of, and for use by, Hamas, including the Hebrew University bomb.  Exs. 452, 427.  The PA's own intelligence files reflect the same facts, stating that Barghouti "is responsible for manufacturing explosives for the Izz al-Din [al-Qassam] Brigades."  Ex. 164.  Admission of Barghouti's and the other perpetrators' indictments and custodial statement did not unfairly prejudice defendants—defendants' own conduct, corroborated by their own GIS files, confirmed liability.

### D.    Defendants Were Not Limited In Presentation of Their Defense At Trial

Defendants claim they were entitled to make a political argument to the jury, which "needed to understand the Palestinian perspective on the Israeli occupation to understand the PA's actions.  Defs. Mem. at 22.  They claim that "where the line is for encouraging resistance against a devastating occupation [is a] serious question[] for the PA and PLO."  *Id.* at 23-24.

As the Court correctly ruled throughout the trial, those arguments were wholly inadmissible.  *See United States v. Toner*, 728 F.2d 115, 123 (2d Cir. 1984) ("This was not a trial as to who was, or is, right or wrong in the dispute in Northern Ireland."); *Linde v. Arab Bank*, 920 F. Supp. 2d 282 (E.D.N.Y. 2011).  And yet, the Court indulged defendants to a remarkable degree.

The real problem for defendants was *not* that the Court did not allow them to attempt to contextualize their conduct.  In fact, the evidence that defendants complain was excluded (Def. Mem. at 21-24) was put into evidence through the defense witnesses and during the cross-examinations of Eviatar and Shrenzel.  Thus, the problem for defendants was that the jury simply

---

[12]   These officials made the deal despite the fact that, prior to his arrest, Abdullah Barghouti was involved in several devastating terrorist attacks.  Ex. 452, Counts 12-28.  Indeed, the evidence includes an admission by defendants that the "PA was notified by Israel and/or the United States between September 1, 2000 and July 31, 2002 to detain or arrest Abdullah Barghouti."  Tr. 774.

did not credit defendants' "context."  For example, defendants claim that they were unable to show that "the PA lost control over the average Palestinian during the time of the attacks because of the failure to have a Palestinian state and the actions of Israel."  Defs. Mem. at 21-22.  However—and despite defendants' concession that this type of evidence should be excluded (*see* DE 524 at 1-2)—the record is replete with such references.[13]

Defendants also complain that they were unable to offer evidence that the payments made to terrorists and their families "actually reduce terrorism."  Defs. Mem. at 22-23.  Again, the record shows that defendants repeatedly put such evidence before the jury.  *E.g.*, Tr. 2889-95, 3065, 3078 (Faraj) (purpose of prisoner and martyr benefits "was to rehabilitate them and . . . contribute and change them and change the culture, and also to engage them in an active manner"); 3249 (Issa) (same).  It was within the Court's discretion to preclude further testimony as cumulative:

---

[13] *E.g.*, Tr. at 858 (referencing IDF soldiers in "the occupied Palestinian territory in the West Bank"); 944 (IDF "incursions" into West Bank); 972-76 (lack of Palestinian control); 977-90, 1484-85 (mistreatment and "assassinations" of Palestinians by Israel; degradation of the PA's control over security); 1493-96 (homes were demolished), 1564-67 (PA magazine: Israel has "airplanes, tanks, rockets and all the lethal and internationally prohibited weapons"); 2854-63 (Faraj) (Palestinian government buildings and prisons destroyed); 3090-91 (Ashrawi) (Palestinians were "expelled or . . . in refugee camps . . . [U]nder occupation we weren't allowed to belong to PLO institutions."), 3117-22 (Ashrawi) (Palestinian government buildings, prisons, and other infrastructure destroyed); 3248-49 (Issa) ("[T]he reason for establishing a special ministry for the security prisoners is actually a political reason.  These are so many.  Since Israeli occupied, since 1967 until recently, more than 850,000—[objection sustained]."), 3276-77 (Shehadeh) (Palestinian government buildings and prisons destroyed), 3298 (Al Sheikh) (same).

Defendants also argue that the Court's exclusion of Glenn Robinson was unduly prejudicial.  This is dishonest at best.  Defendants did not call Robinson to testify on the many topics that would have been permissible because he would have said things that defendants did not want the jury to hear.  For example, Robinson published a study concluding that "Arafat retained virtually exclusive control over the Palestinian security forces until his death in November 2004," and "[t]he *al-Aqsa Martyrs Brigades* are an armed faction affiliated with Fatah."  Proposed Ex. 521 at 37-38; *see* Robinson Dep. 49.  In another article, Robinson stated that Arafat "epitomized one man rule" and "maintained a firm grip on the security forces until his dying day."  Proposed Ex. 520.  Defendants did not call Robinson because he would have hurt their case.

> THE COURT:  Don't we already have that testimony?
>
> MR. ROCHON:  We have some of it.
>
> THE COURT:  We have all of it.  Nothing that you said is not be-
> fore this jury.

Tr. 3251-52.

Contrary to defendants' assertion that the "unfairness from this Court's rulings extended even to background about the PA's formation" (*see* Defs. Mem. at 22), defendants also filled the record with testimony about the supposed renunciation of terror in 1993, as well as the Oslo Accords in 1995.  *E.g.*, Tr. 937-39 (Eviatar cross); 2831, 2855-58, 3104-14, 3283-89, 3292-95 (defense case).  The Court, as well as the parties, were well aware of this:

> THE COURT:  Quite frankly, I don't think this jury needs a whole
> lot more testimony about the Oslo Accords for what it's worth.
>
> MR. ROCHON:  I was going for zero.  If I had my way, we'd be
> done by now.

Tr. 3155.  Later in the trial, counsel for defendants even joked about how much testimony the jury had about the Oslo Accords:  "The other areas have been well covered.  Would you like more on Oslo?"  Tr. 3308.

As for testimony concerning the PA's "physical ability to arrest people" (Defs. Mem. at 22-23), the problem was one of competent evidence from personal knowledge:  "If you have someone who investigated these individuals in the police department who will come in here and say, I was looking for this guy, I could not find this guy because I was tripping over tanks, then you bring that person in here and you let that person say that."  Tr. 3263; 3265-66.  Defendants tried to slip in hearsay testimony on this topic through Faraj, but the Court properly prevented Faraj from saying more.  Tr. 3380 ("He has no firsthand knowledge of how this guy walked out

of prison or escaped.  Ran, walked, crawled, however he got out of prison.").  If defendants had

non-hearsay evidence about the PA's ability to arrest, the Court would have allowed it:

> I am letting you put in any person that was at the prison when they
> were released, any person that was there the day before, any person
> that can give me some facts [to] back up your theory of these peo-
> ple must have escaped. . . . [Y]ou have no witness who is willing to
> come into this courthouse who is an employee of the defendant
> who will say they escaped on Tuesday because the building was
> bombed. . . .  You have brought nobody in this case at all during
> this trial to say how any individual who was locked up by the PA
> or the PLO got out of jail.  Not a single fact.

Tr. 3393.  Defendants' counsel responded:  "If you let me put in hearsay evidence, I would have

had it."  *Id.* at 3394.

### E.   Exclusion of Defendants' Proposed Trial Exhibits 29 and 70 Was Proper

In an attempt to put the State of Israel on trial, defendants offered two irrelevant docu-

ments.  Proposed DTE 29 (report by anti-Israel U.N. committee criticizing policies of Israel);

Proposed DTE 70 (State Department "country report" on human rights practices of Israel).  They

now complain that these exhibits were improperly excluded.  Defs. Mem. at 23.  However, the

Court correctly applied Rule 403 to that evidence, finding that the reports had no probative value

and were unduly prejudicial.  Tr. 924-26 (the Court:  "It is unduly prejudicial.  You are doing

exactly what I said you cannot do.  You cannot simply say, oh, the Israelis are bad guys because

they bulldozed my house, and therefore that has some relevance to the jury's determination of

whether the PA or the PLO was complicit in terrorism.").  The exhibits are also hearsay.

Defendants argue that these evidentiary rulings hampered their ability to challenge cer-

tain findings in IDF reports.  Defs. Mem. at 23.  Not so.  Defendants used their opening (Tr. 90),

their cross-examination of Eviatar (Tr. 858-59; 985-90), and their closing (Tr. 3705-07) to argue

that the IDF reports were biased.  Moreover, challenging the IDF reports would not have

changed the outcome, as the IDF reports were corroborated by other evidence in the case, such as

raw captured documents (Exs. 962, 963), expert testimony (Tr. 643-44; 660-61; 805-07), deposition testimony (Tr. 2079-82 (Al-Sheikh)), and reports by the U.S. State Department (Exs. 496, 634, 635, 1142).  The jury was entitled to credit that evidence.

## V.   THE COURT'S DECISION NOT TO SEVER WAS A PROPER EXERCISE OF DISCRETION

Defendants argue that the decision not to sever this case was reversible error.  That decision was an entirely proper exercise of the Court's discretion.  Severance is "reserved for truly extraordinary situations of *undue* prejudice."  *Monaghan v. SZS 33 Assocs., L.P.*, 827 F. Supp. 233, 246 (S.D.N.Y. 1993) (emphasis in original).  The primary interest under Rule 42(b), which governs severance, is efficiency.  *See* DE 571 at 1-2.  Efficiency is paramount, particularly where, as here, different incidents are unified by a defendant's common plan and practice.  *See* DE 571 at 7-8 (citing cases).  Indeed, at trial, plaintiffs presented hours of testimony and countless exhibits that served as evidence for all six of the attacks in the case.  *See supra* Part II.A.

Given the extent of overlap in the issues and evidence, it was well within the Court's discretion to try all six attacks together.  Indeed, these considerations supported the Court's decision not to sever:  "[A] significant amount of evidence might even otherwise be admissible, even if other plaintiffs were not in the same case. And I see no undue prejudice to the defendant in efficiently trying all of these related issues."  Tr. (11/20/14) at 3-4; *see* Tr. (9/16/14) at 5-6 ("[O]bviously, if it's appropriate to sever, I will sever.  But, obviously, that's not going to save us time.  It is going to add time to separate trials.").

### A.   Demonstrative Aids And Organizational Tools Prevented Jury Confusion

Defendants argue that a single trial was prejudicial and confusing to the jury.  They are wrong.  There is no indication that the jury had any difficulty differentiating between attacks and perpetrators.  In opposing defendants' original motion to sever, plaintiffs pointed out that a well

organized trial would overcome the risk of confusion.  DE 571 at 6.  At trial, plaintiffs provided the jury with summary exhibits and demonstrative aids.  Exs. 1120, 1121 (summary charts of defendants' pay and promotions of employee and non-employee terrorists); 1193 (chart summarizing date, location, and victims of each attack, passed out to jurors as index cards throughout trial).  Plaintiffs also prepared "attack binders" for the jury, organized by perpetrator, with an index and tabs containing a photograph of each perpetrator and his or her relevant documents, such as the conviction, intelligence and payroll records.  Plaintiffs also created "attack charts" for several attacks, which depicted photographs of those responsible for each attack.  *See* Ex. A hereto.

The jury's notes during deliberations indicated that these aids worked as intended.  On the first day of deliberations, the jury asked for the binders of exhibits, as well as the "attack charts."  Tr. 3913-14.  In the end, it was defendants who objected to putting the aids before the jury because those demonstratives had not been formally moved in evidence.  Tr. 3919.  Their strategy may have been to *hope for* a "dizzying array" of evidence before the jury, but the evidence was actually well organized and accessible to the jury.

### B.       Any Spillover Prejudice Was Cured by Instructions

Potential spillover prejudice is "normally dealt with through an appropriate charge and curative instructions."  *See, e.g.*, *Kerman v. City of New York*, No. 96 Civ. 7865 (LMM), 1997 WL 666261, at *5 (S.D.N.Y. Oct. 24, 1997); *see also* cases cited in DE 571 at 10-11.[14]  That is exactly what happened here.  The Court instructed the jury that "[p]roof of liability relating to one terrorist attack would not automatically constitute proof of liability relating to any other at-

---

[14]  In support of their argument that "jury instructions could not remedy [the] prejudice," defendants cite two cases that have nothing to do with Rule 42(b).  *See* Defs. Mem. 27.  In both cases, the issue was whether non-party witnesses could testify about other bad acts of the defendants, and not whether to sever.  *Haskell v. Kaman Corp.*, 743 F.2d 113, 121 (2d Cir. 1984); *Moorhouse v. Boeing Co.*, 501 F. Supp. 390, 393-94 (E.D. Pa. 1990).  In both cases, there was only one plaintiff and only one incident.

tack.  You must consider each of the six attacks separately."  Tr. 3887.  The Court made that crystal clear in its verdict sheet, with specific, individualized questions for each attack.  DE 825.

The Court's denial of the motion to sever was a proper exercise of discretion in a case where the witnesses and documents overlapped, allegations were made against two defendants for each incident, and the jury instructions addressed any potential spillover prejudice.

## VI.   THE COURT'S JURY INSTRUCTIONS WERE SOUND

### A.   The Court Correctly Included An Instruction On *Respondeat Superior*

Defendants claim that *respondeat superior* does not apply in ATA cases.  Defs. Mem., Part III.A.  They are wrong.  *See Linde v. Arab Bank*, 04 Civ. 2799 (BMC), 2015  U.S. Dist. LEXIS 45903, at *152 (E.D.N.Y. Apr. 8, 2015) ("Judge Gershon rejected defendant's effort to impose a standard higher than traditional *respondeat superior*.  She was correct to do so."); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 558 (E.D.N.Y. 2012) ("*Gill II*") ("Plaintiff is correct in contending that the ATA provides for corporate liability on a theory of *respondeat superior*."); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 650 (S.D. Tex. 2011) (plaintiffs' "allegations [were] sufficient to survive a motion to dismiss on the *respondeat superior* claim" under the ATA).

Congress imposed liability on *any* "entity" violating the ATA.  18 U.S.C. § 2331(3) (defining "person" as "an individual or entity capable of holding a legal or beneficial interest in property").  An entity can only act through its agents or employees.  Moreover, "when enacting the ATA's civil remedy provision, [Congress] 'intended to incorporate general principles of tort law . . . into the [civil] cause of action under the ATA.'"  *Gill II*, 893 F. Supp. 2d at 558.  The ATA's "legislative history, in combination with the language of the statute itself, evidences an intent to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law."  *Knox v. PLO*, 442 F. Supp. 2d 62, 77 (S.D.N.Y. 2006).

Under traditional tort principles, a defendant is liable for the acts of its employees "en-gaging in a course of conduct subject to the employer's control." *Restatement (Third) of Agency* § 7.07 (2006). In the leading case of *Ira S. Bushey & Sons v. United States*, 398 F.2d 167, 170 (2d Cir. 1968) (Friendly, J.), the court explained that *respondeat superior* applies where the em-ployee's tortious "conduct was not so 'unforeseeable' as to make it unfair to charge the [defend-ant] with responsibility." Indeed, "for purposes of *respondeat superior* liability, even an em-ployee who commits an intentional tort may be found to have acted within the scope of his em-ployment." *Kwon v. Yun*, 606 F. Supp. 2d 344, 363 (S.D.N.Y. 2009); *Almonte v. N.Y. City Hous. Auth.*, No. 89 Civ. 7677 (SWK), 1990 WL 113125, at *3 (S.D.N.Y. July 30, 1990) (jury could hold Housing Authority liable for beating administered by its police officers because such con-duct was foreseeable). As Judge Brown explained in *Estate of Parsons v. Palestinian Authority*, "[r]espondeat superior liability is an elementary principle of tort law and must therefore inform our interpretation of the federal torts created in the Anti-Terrorism Act. Thus, the Palestinian Authority is liable for the acts its employees committed within the scope of their employment." 651 F.3d 118, 148 (D.C. Cir. 2011) (concurring opinion).

Defendants suggest that a rejection of aiding and abetting liability requires a rejection of *respondeat superior* liability. Defs. Mem. at 38-40. That is incorrect. The unavailability of aid-ing and abetting liability is irrelevant to the "quite separate matter of whether a principal may be held liable for the . . . violation of its agent on the basis of the principal's status" as employer. *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 552 (S.D.N.Y. 2007) (following *Suez Equity Inves-tors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001)); *see AT&T Co. v. Winback & Conserve Program*, 42 F.3d 1421, 1430-31 (3d Cir. 1994) (under agency theories like *respondeat superior*, the "principal is held liable not because it committed some wrongdoing

outside the purview of the statute which assisted the wrongdoing prohibited by the statute, but because its status merits responsibility for the tortious actions of its agent.").

Defendants' argument that *respondeat superior* liability should not be permitted because of the ATA's treble damages provision is equally unsupported.  Defs. Mem. at 40-41.  As Judge Cogan held in *Linde v. Arab Bank*, a treble damages provision alone is not sufficient to overcome the presumptive application of general *respondeat superior* principles in an ATA case. 2015 U.S. Dist. LEXIS 45903, at *153 (E.D.N.Y. Apr. 8, 2015) (citing *Estate of Parsons v. PA*, 651 F.3d 118, 148 (D.C. Cir. 2011) (Brown, C.J., concurring)).  Defendants do not point to a single case holding that the treble damages provision of the ATA precludes *respondeat superior* liability.

### B.   The Court's Agency and *Respondeat Superior* Instructions Were Sound

A jury instruction need only "sufficiently cover[] the essential issues."  *See Owen v. Thermatool Corp.*, 155 F. 3d 137, 139 (2d Cir. 1998).  And, "a jury instruction will be deemed adequate if 'the charge, taken as a whole, is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it.'"  *Garnett v. Undercover Officer C0039*, No. 1:13 Civ. 7083 (GHW), 2015 WL 1539044, at *14 (S.D.N.Y. Apr. 6, 2015) (quoting *Schermerhorn v. Local 100*, 91 F. 3d 316, 322 (2d Cir. 1996)).  A new trial is not warranted unless "[a] jury instruction . . . misleads the jury as to the correct legal standard or does not adequately inform the jury on the law[,]" and, defendants can "show that in viewing the charge given as a whole, they were prejudiced by the error." *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994).

Defendants cannot possibly meet their heavy burden here.  This Court used tried and true models for its instructions.  The Court's instruction that "[i]n order to prove that a defendant is liable for a particular claim under the ATA, plaintiffs must demonstrate the involvement of a senior official or other person having duties of such responsibility that his or her conduct may

39

fairly be considered to represent the PLO or PA" came directly from the Second Circuit's decision in *United States v. Koppers Co.*, 652 F.2d 290, 298 (2d Cir. 1981). The Court's agency instruction came from Judge Sand's *Modern Federal Jury Instructions*, which was modeled after a charge given by Judge Weinfeld. *See* Tr. 3897; 4-72 *Modern Fed. Jury Instr.*, Civil P 72.01. Similarly, the Court's *respondeat superior* instructions followed the New York pattern jury instructions almost word for word. *Compare* Tr. 3899-900, *with* N.Y. Pattern Jury Instr., Civil 2:235-2:236. A more demanding standard would have been dangerous at best. *Cf. Gordon v. N.Y. City Bd. of Educ.*, 232 F. 3d 111, 116 (2d Cir. 2000) (in a retaliation case, court's charge that the *agents*, as opposed to the entity, must have known about the prior discrimination claim to find retaliation warranted a new trial because "[n]either this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff had engaged in protected activity").

Defendants contend that the agency instruction was inadequate on the theory that it did not explicitly say that a defendant must have the "power to control" the agent for an agency relationship to exist. Defs. Mem. at 33. But this element was fairly encompassed in the portion of the charge requiring the jury to find "that the agent had authority to act in the manner in which he or she is alleged to have acted." Tr. 3897. "The essence of control in an agency sense is in the necessity of the *consent of the principal* on a given matter." *Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 422-23 (S.D.N.Y. 2007) (emphasis added). Defendants cite no case from this Circuit or elsewhere finding Judge Sand's pattern instruction inadequate.

Finally, defendants' assertion that the *placement* of the agency instruction in the jury charge rendered the charge insufficient is frivolous. *See* Defs. Mem. at 31-33. The Court included its agency instruction just before the instructions on authority and *respondeat superior*.

40

The instruction was not "buried" in the midst of unrelated instructions.  In any event, jury instructions must be considered *as a whole*.  *Schermerhorn*, 91 F.3d at 322.

## VII.   PLAINTIFFS' SUMMATION WAS APPROPRIATE

Defendants' complaints about summation are meritless.  Attorneys have "'wide latitude in formulating their arguments'" to the jury, and "'[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal.'"  *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (citing *Reilly v. Natwest Mkts. Grp.*, 181 F. 3d 253, 271 (2d Cir. 1999)).  "A party seeking a new trial on the basis of opposing counsel's improper statements to the jury faces a heavy burden . . . ."  *Marcic v. Reinauer Transp. Cos.*, 397 F. 3d 120, 124 (2d Cir. 2005).

Defendants assert that plaintiffs misstated the law and facts on *respondeat superior.*  Defs. Mem. at 29.  They contend that only a "sufficiently high level" official can bind a defendant, relying on *Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir. 2009).  But *Duch* was a hostile work environment case.  A low-level employee is never acting within the scope of employment by engaging in sexual harassment, and the only viable claim when a low-level employee creates a hostile environment is a failure to supervise claim.  *Id.*  In contrast, in a case involving other kinds of misconduct, the jury is entitled to consider a variety of factors to determine whether the employee causing harm was acting within the scope of employment—just as this Court instructed.  *See* Tr. 3900 (tracking N.Y. Pattern Jury Instr., Civil 2:235).

Contrary to defendants' position, employers are responsible for the acts of *all* employees—even drunken sailors—when those acts "arise 'out of and in the course of'" employment.  *Ira S. Bushey & Sons v. United States*, 398 F.2d 167, 171-72 (2d Cir. 1968).  The rule of *respondeat superior* in the Second Circuit is that "'the employer should be liable for those faults that may be fairly regarded as risks of his business, whether they are committed in furthering it or not.'"  *Taber v. Maine*, 67 F.3d 1029, 1037 (2d Cir. 1995).  As plaintiffs' counsel put it to the

41

jury, a customer service representative who is on the job and solves a problem for a customer can fairly be considered to represent the entity. Tr. 3781-82. That is because such a representative is acting within the scope of employment. Defendants also complain that there was no record support for the statement in plaintiffs' closing that "hundreds of low-level employees" had murdered civilians, but Eviatar testified precisely that "many hundreds from among the Palestinian security apparatuses were involved in terrorist activities during the Intifada." Tr. 745.

Defendants also assert that plaintiffs misstated the law on material support. They contend (without citation) that their well-publicized and consistently applied policy of keeping convicted terrorists on the payroll (or adding them to the payroll upon arrest) did not constitute material support as a matter of law. Defs. Mem. at 30. Surely the jury was entitled to conclude that the knowing employment and payment for many years to convicted terrorists was the provision of material support of terror. *See supra* Part II.A.2. This is the basic theory of every ATA claim against every financial institution that finances terror, including several criminal cases to which very large financial institutions have pled guilty and paid record-breaking fines. *See, e.g.*, *Linde v. Arab Bank*, 04 Civ. 2799 (BMC), 2015 U.S. Dist. LEXIS 45903 (E.D.N.Y. Apr. 8, 2015). A ruling that terror financing is *only* material support if paid in advance would jeopardize such prosecutions and make no sense—people are paid all the time after they provide a service, and the jury was entitled to conclude that the promise of the payment was a substantial contributing factor here. Tr. 1560; *Boim*, 549 F.3d at 711.

Defendants contend that certain statements concerning Fatah and AAMB—particularly the statement that "Fatah and the PLO are the same because the Fatah and the PLO budget are with Arafat," Tr. 3796—were improper "alter ego arguments." But that was a direct quotation from the deposition of Hussein al Sheikh, one of Arafat's top deputies and a senior PA Minister.

Al-Sheikh Dep. 140.  Moreover, the jury was fully entitled to conclude that Fatah was acting as

an agent for the PLO, based on Al-Sheikh's testimony and other evidence in the record.  *See,*

*e.g.*, Tr. 443-44 (Eviatar).

Finally, the Court cured any possible prejudice by instructing the jury that their verdict

must "be guided by [the Court's] complete instructions on the law and not the lawyers' view of

what the law is and how you should apply it.  If any attorney has stated a legal principle different

from any that I state to you in my instructions, it is my instructions you must follow."  Tr. 3871-

72.  The Court gave the further instruction that "[i]n determining the facts, you must rely upon

your own recollection of the evidence.  What the lawyers have said in their opening statements,

in their closing arguments, in their objections or in their questions is not evidence."  Tr. 3872.

## VIII.   THE JURY'S DAMAGES VERDICT DOES NOT SHOCK THE CONSCIENCE

### A.      The Court Correctly Permitted Counsel to Recommend Specific Damages

Defendants complain that counsel suggested specific dollar amounts for non-economic

damages during summations.  As defendants concede, the Second Circuit has refused to adopt a

rule prohibiting counsel from doing so.  *See* Defs. Mem. at 34.  Instead, the Second Circuit "fa-

vor[s] a more flexible approach," with the decision "best left to the discretion of the trial judge."

*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 912 (2d Cir. 1997).

Although defendants cite a decision by the First Circuit prohibiting such suggestions, the

First Circuit conceded that "our outright ban is clearly out of step with prevailing federal prac-

tice.  The Second, Fourth, Sixth, Seventh, Eighth and Tenth circuits leave it to district judges to

decide whether and how lawyers may discuss pain and suffering damages with juries."  *Rodri-*

*guez v. Senor Frog's de la Isla*, 642 F.3d 28 n.3 (1st Cir. 2011).  Moreover, this Court correctly

instructed the jury to guard against any potential prejudice, with an instruction straight from the

New York Pattern Jury Instructions permitting suggested awards.  Tr. 3904; N.Y. Pattern Jury Instr.–Civil 2:277A.

Defendants cry foul because the jury made their determination of damages "[w]ithout the benefit of any counter-figures from other sources."  Defs. Mem. at 35 (citing *Mileski v. Long Island R.R.*, 499 F.2d 1169, 1172 (2d Cir. 1974)).  But the lack of counter-figures was solely a result of defendants' trial strategy.  The Court ensured that defendants knew the amounts plaintiffs would be seeking before plaintiffs recommended the amounts to the jury (Tr. 3659-61), and there was nothing to stop defendants from proposing counter amounts.  Tr. 3664 ("I thought it was appropriate and fair, but not necessary, to require him to tell you so you have a full opportunity if you think you want to give the jury guidance with regard to whether or not certain things were caused by the acts, certain injuries weren't caused by them. . . .").  Defendants decided against putting on a damages case at trial; they cannot now complain that the trial was unfair because they chose not to provide the jury with counter-figures.

## B.     The Jury Verdict Does Not Shock the Conscience

"Where there is no particular discernible error, [the Second Circuit has] generally held that a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'"  *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998)); *Boim v. Quranic Literacy Inst.*, No. 00 C 2905, 2005 WL 433463, at *5 (N.D. Ill. Feb. 18, 2005), *aff'd in relevant part, rev'd on other grounds sub nom. Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (denying remittitur for jury award of $52 million in terror case because Court could not say award was "'monstrously excessive'" or "surprising, given the nature of the case, and given that the defendants offered no alternative to the plaintiffs' pleas and figures.").  In determining whether an award is excessive, courts look to awards in

44

comparable cases. *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003). A verdict stands if it falls "within [a] reasonable range" established by similar cases. *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990). Here, the jury's damage awards were well within the range awarded in other terror cases:

- $17 million to a terror victim who endured a brain injury, a destroyed sinus cavity and left ear drum, permanently impaired vision, and loss of the ability to taste and smell. *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 263 (D.D.C. 2003).

- $15 million per parent for pain and suffering of losing a child in a terror attack. *Boim v. Quranic Literary Fund*, 291 F.3d 1000 (7th Cir. 2002) (affirming jury award of $52 million, including $22 million in economic damages).

- $12 million for child's pain and suffering due to loss of father to terror attack. *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 34-35 (D.D.C. 2005) ("exceptional and attentive father" whose children had "behavioral problems caused—in part—by the lack of a father figure").

- $12 million to wife of hostage victim killed. *Higgens v. Islamic Republic of Iran*, No. 99 Civ. 00377, 2000 WL 33674311 (D.D.C. Sept. 21, 2000).

- $12 million to terror victim hospitalized for one month due to chest injury (shrapnel perforated lung), requiring surgery to remove screws lodged in his spleen and chest, as well as a bolt in his foot. *Campuzano*, 281 F. Supp. 2d at 264-67.

- $12 million to terror victim who required surgery to remove nuts and bolts in both ankles, a spike in his left leg, and glass in his eye, and suffers from a permanent limp, nerve damage, hypersensitivity to light, a risk of glaucoma, and PTSD. *Campuzano*, 281 F. Supp. 2d at 266.

- $10 million to wife of deceased terror victim whose "financial stability and plans for the future were destroyed," and $5 million to children and parents. *Knox v. PLO*, 442 F. Supp. 2d 62, 79 (S.D.N.Y. 2006).

- $10 million to terror victim with a perforated eardrum, shrapnel injuries that caused nerve damage to the upper lip,

45

debilitating headaches and an 8-day hospital stay.
*Campuzano*, 281 F. Supp. 2d at 265.

- $7 million to terror victim who was taken to hospital but
  not admitted because she did not have physical injuries
  other than ringing in ears (which became permanent), and
  who later received psychiatric treatment for emotional inju-
  ries. *Campuzano*, 281 F. Supp. 2d at 265

- $6 million to wife of bombing victim who must act as nurse
  to husband as a result of his injuries. *Campuzano*, 281 F.
  Supp. 2d at, 267-68 (D.D.C. 2003).

- $2.5 million for pain and suffering of a sibling killed in a
  terrorist attack. *E.g., Estates of Ungar v. PA*, 325 F. Supp.
  2d 15, 67 (D.R.I. 2004), *aff'd*, 402 F.3d 274 (1st Cir. 2005);
  *Knox v. PLO*, 442 F. Supp. 2d 62 (S.D.N.Y. 2006).

Defendants attempt to counter these awards with cases that did not involve terror and,

significantly, did not permit recovery for a family member's pain and suffering. *See* Defs. Mem.

at 35-36 (citing cases); *id*. at Ex. A (citing, *e.g.*, *In re Air Crash Near Nantucket Island*, 462 F.

Supp. 2d 360, 368-69 (E.D.N.Y. 2006) (Death on the High Seas Act)). These cases are irrele-

vant. The jury had significant evidence that terror cases are different from ordinary tort cases.

*See, e.g.*, Tr. 2175 (R. Sokolow); 2195 (A. Bauer); 2431-32 (S. Gould); 2342-43 (S. Waldman);

2321 (M. Waldman); 2272, 2279 (L. Mandelkorn); 2388 (R. Gould); 2627 (D. Miller); 2721 (R.

Blutstein); 2532 (S. Goldberg). The amounts awarded by the jury are reasonably within the

range of terror cases.

Defendants also claim that family members of those who were wounded or killed should

not be permitted to recover damages for emotional distress if they were not present at the scene

of the attack. But no court has ever imposed a "physical presence" requirement under the ATA.

To the contrary, courts have awarded significant damages to plaintiffs who endured the trauma

and emotional impact of having a relative killed or injured in a terrorist attack without being pre-

sent. *See, e.g.*, *Knox v. PLO*, 442 F. Supp. 2d 62, 79 (S.D.N.Y. 2006); *Estates of Ungar v. PA*,

325 F. Supp. 2d 15, 67 (D.R.I. 2004) ($85 million to family members who were not present); *see generally Calderon-Cardona v. Democratic Peoples Republic of Korea*, 723 F. Supp. 2d 441, 461 (D.P.R. 2010) (collecting cases).  As this Court already ruled on summary judgment, a physical presence requirement makes no sense where, as here, persons not at the scene were intended victims of the tortious conduct.  *See, e.g.*, *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001).

## IX.   THE COURT SHOULD DENY THE "RENEWED" MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

The standard on a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court over-looked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  A "motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided."  *Weiming Chen v. Ying-Jeou Ma*, 595 F. App'x 79, 80 (2d Cir. 2015).  Defendants' motion fails this test—it contains no "controlling decisions or data" that were not included in their many previous personal jurisdiction challenges—and so should be summarily denied.

### A.   Defendants Waived Their Jurisdictional Arguments

If the Court is to entertain the jurisdictional issue at all, it should make express findings of fact on defendants' consent and waiver.  Defendants gave express written consent "to allow the case to proceed before this Court."  DE 476-#3.  They did so having made a strategic decision to avoid a decision on plaintiffs' cross-motion to change venue.  Defendants moved to dismiss the action for lack of proper venue, arguing that the improper venue also defeated personal jurisdiction.  DE 94.  Plaintiffs opposed that motion and cross-moved to transfer the case to the Eastern District of New York.  DE 96.  Then, defendants voluntarily consented to have the case

continue in this Court.  *See* DE 476-#3.  Their consent to this forum as the venue for this case

necessarily included consent to personal jurisdiction.  *See Richardson Greenshields Secs., Inc. v.

Metz*, 566 F. Supp. 131, 133 (S.D.N.Y. 1983) ("A waiver of objection to venue would be mean-

ingless . . . if it did not also contemplate a concomitant waiver of objection to personal jurisdic-

tion.") (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos*, 553 F.2d 842, 844 (2d

Cir. 1977)); *CA, Inc. v. Stonebranch, Inc.*, No. 12 Civ. 5988(SFL)(ARL), 2014 WL 917269, at

*6 (E.D.N.Y. Jan. 27, 2014), *adopted in relevant part* 2014 WL 931223 (E.D.N.Y. Mar. 7, 2014)

(federal courts consistently hold that an agreement to submit to venue necessarily serves as con-

sent to personal jurisdiction) (collecting cases).[15]  Defendants got the benefit of their bargain—a

trial in Manhattan instead of Brooklyn—in consideration for their commitment to be bound by a

trial in this Court.  They made the waiver for their own strategic reasons and must be held to it.

Separately, defendants are also barred from now asserting a personal jurisdiction defense

because they failed to include that defense in their Rule 12(c) motion for judgment on the plead-

ings, filed in January 2012.  DE 187.  Rule 12(g) provides in relevant part that "a party that

makes a motion under this rule must not make another motion under this rule raising a defense or

objection that was available to the party but omitted from its earlier motion."  Fed. R. Civ. P.

12(g)(2).  And Rule 12(h) provides that a party waives any defense based on personal jurisdic-

tion that is omitted from a Rule 12(c) motion.  Fed. R. Civ. P. 12(h).

---

[15]  *Accord CV Holdings, LLC v. Bernard Techs., Inc.*, 14 A.D.3d 854, 855 (3d Dept 2005) ("Alt-
hough defendant now contends that this clause cannot be deemed a consent to personal jurisdic-
tion because it uses the word 'venue' instead of 'jurisdiction,' we agree with plaintiff that to in-
terpret the provision as defendant urges would render it meaningless inasmuch as a court that
lacks jurisdiction cannot, at the same time, be the proper venue for an action.").  While this ques-
tion usually arises in the context of pre-litigation contracts, a stipulation during litigation is mere-
ly a form of contract.  The fact that the stipulation here was drafted and executed by experienced
litigation counsel means the cases regarding pre-litigation contracts apply here *a fortiori*.

To be sure, "a defendant does not waive a personal jurisdiction argument . . . if the 'argument that the court lacked jurisdiction over [the] defendant would have been directly contrary to controlling precedent in this Circuit.'" *Gucci Am., Inc. v. Li*, 768 F.3d 122, 135-36 (2d Cir. 2014). However, previously unavailable defenses must be raised "as soon as their cognizability is made apparent." *Holzsager v. Valley Hosp.*, 646 F.2d 792, 796 (2d Cir. 1981). Even a new defense is subject to waiver "by failure to assert it seasonably, by formal submission in a cause, or by submission [to the court's jurisdiction] through conduct." *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939).

The "at home" defense to general jurisdiction *was* available and "apparent" to these defendants in 2012, because the previous year the Supreme Court decided *Goodyear Dunlop Tires Operations, SA v. Brown*, 131 S. Ct. 2846 (2011). *Goodyear* was the "pathmarking opinion" that established the "at home" test. *Id.* at 2851. As the Supreme Court stated in *Daimler AG v. Bauman*, "the Court made plain in *Goodyear* and repeats here [that] general jurisdiction requires affiliations 'so "continuous and systematic" as to render [the foreign corporation] essentially at home in the forum State.'" 134 S. Ct. 746, 758 n.11, 760 n.16 (2014)(quoting *Goodyear*). The Second Circuit too has confirmed that the "essentially at home" standard was set forth in *Goodyear* and merely clarified in *Daimler*. *In re Roman Catholic Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 37-38 (2d Cir. 2014).

Defendants well understood that they had a basis to argue against general jurisdiction under *Goodyear*. They not only cited *Goodyear* to the Supreme Court in 2011,[16] they moved to dismiss another case for lack of personal jurisdiction prior to *Daimler*, arguing that they were not

---

[16]  Resp'ts Brief, *Mohamad v. Rajoub*, No. 11-18, 2011 WL 3664462, at *17 (Aug. 19, 2001).

"at home" in the United States.  *See* Mem. in Supp. of Mot. to Dismiss (DE 6) at 19-20, *Livnat v. PA.*, 13-CV-00498 (E.D. Va. June 5, 2013).

The Second Circuit's decision in *Gucci* strongly supports a finding of waiver here.  In *Gucci* there was no waiver because the non-party bank was not a defendant and did not make a Rule 12 motion.  As the Circuit explained:  "the waiver provisions of that rule are inapplicable because the Bank is not a 'party' that could fail to assert its personal jurisdiction defense in an answer or a motion to dismiss."  *Gucci*, 768 F.3d at 136 n.14.  Moreover, the issue in *Gucci* was purely one of a bank "branch office" rule unique to New York law.  *Id.* at 136.  In this case, this Court's general jurisdiction ruling was unequivocally not based on the mere presence of a branch office.  *See* DE 478, Tr. (4/11/14) at 63-64 ("I haven't ruled that a local office is sufficient.").  And, unlike the bank in *Gucci*, it is simply an empirical fact that *Goodyear*'s "at home" defense had been "made apparent" (*Holzsager*, 646 F.2d at 796) to these defendants no later than mid-2011, as evidenced by their citation of the *Goodyear* standard to the Supreme Court in August 2011.  "Defendants [the PA and PLO] themselves, represented by the same counsel . . . twice invoked *Goodyear*'s "at home" standard before *Daimler* was decided."  *Gilmore v. Palestinian Auth.*, 8 F. Supp. 3d 9, 16 (D.D.C.  2014).

## B.    Alternate Grounds Establish Personal Jurisdiction

The Court was absolutely correct on general jurisdiction because defendants' stateless status is indeed "exceptional."  *See Daimler*, 134 S. Ct. at 761 n.19.  Other cases purporting to apply *Daimler* failed to recognize that the PA and PLO are stateless entities, which brings this case within the "exceptional" circumstances foreshadowed in *Daimler*.  There is absolutely no need for the Court to revisit *Daimler*.  However, the Court should also not accept defendants' false dichotomy of "general jurisdiction or no jurisdiction."  Merely stating defendants' position on specific jurisdiction shows its absurdity:  they contend that a person can kill American citi-

zens for the purpose of affecting the conduct of the U.S. Government and yet remain outside the reach of the United States courts. That cannot be the law.

### 1. The Fifth Amendment Applies and Is Less Restrictive than the Fourteenth Amendment

This case is controlled by the Fifth Amendment, which governs cases arising under federal law.[17] The Sixth Circuit has held that due process under the Fourteenth Amendment operates differently than due process under the Fifth Amendment because only the Fourteenth Amendment "'ensure[s] that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.'"[18] Similarly, the Third Circuit has held: "Those strictures of fourteenth amendment due process analysis which attempt to prevent encroachment by one state upon the sovereignty of another do not apply with equal force to the adjudication of a federal claim in a federal court."[19] Professors Wright & Miller expounded on the unique importance of federal concerns:

> Presumably, when Congress has undertaken to enact a nationwide service statute applicable to a certain class of disputes, that statute should be afforded substantial weight as a legislative articulation of federal social policy. . . . [D]ue process will not prevent jurisdiction in an otherwise appropriate forum when the federal interest in furthering objectives or policies rises to a constitutional level, or implicates other especially weighty or uniquely federal concerns. . . . The Fourteenth Amendment function of protecting the several states' status as coequal sovereigns seemingly ought to

---

[17] *See, e.g., Chew v. Dietrich*, 143 F.3d 24, 27-28 & n.4 (2d Cir. 1998) (applying Fifth Amendment in case under Jones Act).

[18] *Handley v. Ind.& Mich. Elec. Co.*, 732 F.2d 1265, 1271 (6th Cir. 1984) (quoting *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 291-92 (1980)).

[19] *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 294 (3d Cir. 1985). Other courts have read the Fifth Amendment as requiring the same analysis as the Fourteenth, though in "in a less demanding" fashion. *Republic of Panama v. BCCI Holdings (Luxembourg) SA*, 119 F.3d 935, 942 (11th Cir.1997); *see generally SEC v. LovesLines Overseas Mgmt., Ltd.*, No. 04 Misc. 302 (RWR) (AK), 2007 WL 581909, at *2 (D.D.C. Feb. 21, 2007) (collecting cases).

be of no relevance to the parallel analysis under the Due Process
Clause of the Fifth Amendment.[20]

Thus, although the Second Circuit has said (in a case that did not have national security

implications) that the Fifth and Fourteenth Amendment analyses are "basically the same," *Chew*

*v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998), it has applied the minimum contacts test under

the Fifth Amendment to *permit* jurisdiction over defendants engaged in commercial activities

entirely overseas. *E.g., SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990).

Moreover, due process is a flexible concept, requiring a balancing of the private interests,

the value of alternate procedures, and the Government's interests at stake in any given context.

*See Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (plurality opinion) (quoting *Mathews v. El-*

*dridge*, 424 U.S. 319, 335 (1976)). The PLO and the PA assert a private interest in avoiding liti-

gation in the United States—an interest that is not a particularly strong one in comparison to dep-

rivation of life or liberty often confronted by the courts.[21] As for the value of alternative proce-

dures, accepting defendants' position that they should not be subject to an ATA suit anywhere

would mean that there would be no recourse for these American victims. Finally, the Govern-

mental interests are at their apex in this context. Indeed, "the Government's interest in combat-

ing terrorism is an urgent objective of the highest order . . . .". *Holder v. Humanitarian Law*

*Project*, 561 U.S. 1, 4 (2010). In combating terror, the Federal Government has the power—

consistent with the Due Process Clause—to use drone strikes for targeted killings, to capture

suspects and bring them to the United States to face criminal justice, to bar those who support

---

[20] Wright & Miller, *Personal Jurisdiction in Federal Question Cases*, 4 Fed. Practice & Proce-
dure, Civ. § 1068.1 (3d ed.).

[21] *Cf. Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (in a forum non convenience analysis,
private interests of a litigant "are the relative ease of access to sources of proof; availability of
compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing,
witnesses; possibility of view of premises, if view would be appropriate to the action; and all
other practical problems that make trial of a case easy, expeditious and inexpensive").

terror from doing business with U.S. persons, to freeze assets, and to impose embargoes.  The ATA is one more weapon in the arsenal of fighting terror, and a relatively tame one at that, enabling victims to hold sponsors of terror legally accountable under U.S. law.  "Congress conceived of the ATA, at least in part, as a mechanism for protecting the public's interest through private enforcement."  *Linde v. Arab Bank PLC*, 706 F.3d 92,112 (2d Cir. 2013).

It would be a bizarre result if the Due Process Clause permitted targeted killings, renditions, and *ex parte* asset freezes but forbade Congress from allowing jurisdiction in civil actions seeking redress for the same conduct.  As one court has observed, "if federal courts may constitutionally exercise criminal jurisdiction over [foreign terrorists], the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts."  *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 59 (D.D.C. 2003).  In the terrorism context, the Second Circuit has been especially protective of federal power to exercise jurisdiction over persons acting abroad to harm the interest of the United States or its citizens.  *United States v. Yousef*, 327 F.3d 56, 112 (2d Cir. 2003); *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011).

## 2.     The Court Has Specific Jurisdiction Even Under Fourteenth Amendment Case Law

Even under the Fourteenth Amendment, specific jurisdiction may be exercised where a claim "arises out of *or relates to* defendants' contacts" with the forum (here, the United States).  *Chew*, 143 F.3d at 28 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)) (emphasis added); *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 167 (2d Cir. 2010) (district court "too narrowly construes the nexus requirement, which merely requires the cause of action to 'relate to' defendant's minimum contacts with the forum").

"The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011).  The Second Circuit has identified several ways of meeting the minimum contacts requirement for specific jurisdiction, including (a) contact with the forum that is part of an overall "plan" directed at least in part to the jurisdiction, (b) in-state effects of completely extraterritorial activity, and (c) sufficient related activity within the jurisdiction.

      a.      **A Plan Directed at the United States.**  To give rise to specific jurisdiction, the offending conduct may be "a part of a larger business plan purposefully directed at [the relevant jurisdiction]." *Chloe*, 616 F.3d at 167.  In *Chloe*, the court had specific jurisdiction over a seller of counterfeit goods because a single sale was part of a larger "plan" directed at customers in New York.  *Id.* at 166-67.

Here, defendants' overall "plan" was directed in material part at the United States.  By definition, terrorism is violent or dangerous criminal conduct that appears intended to "influence the policy" or "affect the conduct" of a government.  18 U.S.C. § 2331(1)(B).  Defendants' political goal was to obtain territorial concessions from Israel, and the evidence at trial supported the conclusion that one goal of the terror campaign was influencing U.S. policy and affecting the conduct of the U.S. Government in favor of achieving those territorial objectives.  This evidence revealed a two-pronged approach:  (a) carrying out a massive terror campaign in Israel in which many Americans and others were killed and injured, in order to influence the conduct and policies of the governments of the United States and Israel; and (b) advancing the argument in the United States and elsewhere that the terror campaign would stop when defendants achieved their

political goals.  To begin, defendants repeatedly and openly stated their intention to use their terror campaign to influence U.S. policy.  *See, e.g.*, Ex. 175; 200 ("The European nations and the U.S., who have strategic interests in the region, are called upon to see the necessity of urgent and immediate action to stop Israeli practices against the Palestinian people.  Without this, their vital interests shall be directly jeopardized.").

At the same time as their terror campaign, defendants' representatives met with senior U.S. officials on "scores" of occasions to discuss U.S. policy toward the PA and the PLO. Tr. 3115-16; 3133-34 (Ashrawi).  Exactly as planned by defendants, the topic of discussion was "stopping terrorism."  *Id.*  Defendants' substantive "anti-terror" message in the U.S. reflected a tight link to the goals of the terror campaign:  the "violence" would end only after Israel withdrew from "occupation" of territory that defendants wished to control.  *See* DE 476 (summarized in Proposed Ex. 1119).  If organized criminals damaged a restaurant in New Jersey and then peacefully came to Manhattan to encourage the owners to pay protection money to "end the violence in Jersey," no one would think twice if a civil or criminal case were brought against the racketeers in this District.[22]

Not only did defendants *intend* to affect U.S. Government policy, they *actually* affected it, though the impact of defendants' conduct on the United States sometimes differed from that they sought to achieve.  The State Department concluded that "members of other [PA] security forces, were frequently involved in acts of violence against Israelis."  Ex. 496.  In March 2002, the Secretary of State designated AAMB—whose members were drawn mainly from PA security

---

[22]  In *Klieman. v. PA,* the District Court concluded that an allegation that the PA and PLO would use violence to attempt to influence the U.S. government lacked plausibility because it was unsupported by specific factual allegations.  04 Civ. 1173 (PLF), 2015 WL 967624, at *8 (D.D.C. Mar. 3, 2015), *appeal filed*, No. 15-1034 (D.C. Cir. Apr. 8, 2015).  Here, in contrast, this Court is not dealing with *allegations*, but with *evidence* that this was *exactly* the defendants' stated intent.

forces—as a foreign terrorist organization, stating that "the Al Aqsa Martyrs Brigades . . . has committed or poses a serious risk of committing acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States."  Ex. 537.  And in June 2002, the President called on the Palestinian people to elect new leadership "not compromised by terror."  President Bush's Remarks on Middle East (June 24, 2002), Excluded Ex. 1278.

      **b.**     **Effects on the United States and its Citizens.**  "The effects test is a theory of personal jurisdiction typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013).  The Second Circuit has repeatedly upheld the exercise of jurisdiction where defendants acted abroad but "expressly aimed" their conduct at U.S. interests.  The court has upheld specific jurisdiction against Fifth Amendment challenges where the defendant engaged in insider trading abroad,[23] attended a price-fixing meeting in a foreign country,[24] assisted from abroad in the evasion of U.S. tax laws,[25] placed a bomb on a non-U.S. airliner traveling between non-U.S. cities,[26] and even conspired to sell arms abroad "with the understanding that they would be used to kill Americans and destroy U.S. property" abroad.  *Al Kassar*, 660 F.3d at 118.

      The United States has a strong interest in asserting jurisdiction over those who kill and injure U.S. citizens or engage in terror in order to influence U.S. Government policy or affect U.S. Government interests.  The attacks in this case were carried out by AAMB and Hamas.  The

---

[23]  *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990).

[24]  *In re Magnetic Audiotape Antitrust Litig*., 334 F.3d 204 (2d Cir. 2003).

[25]  *In re Grand Jury Subpoena*, 707 F.2d 663 (2d Cir. 1983).

[26]  *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003).

Executive Branch designated these entities as foreign terrorist organizations, because each "has committed or poses a serious risk of committing acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States." *See* Ex. 537; Tr. 3894 (jury instruction that Hamas was designated in 1997).

Congress has protected the security of the United States by passing extraterritorial legislation imposing criminal and civil legal consequences for engaging in terror or supporting terror. As discussed above, to hold that those who perpetrate such crimes are immune from jurisdiction in the United States unless their violent actions physically occur on U.S. soil would be a perversion of the Constitution, for a core mission of the Federal Government is to protect its citizens from foreign terrorism. "[W]hile the Constitution protects against invasions of individual rights, it is not a suicide pact. . . . Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs. Latitude in this area is necessary to ensure effectuation of this indispensable function of government." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963).

Defendants rely on *Livnat* and *Klieman* to challenge jurisdiction.[27] We disagree with the reasoning of those cases to the extent, if any, that they are not based on a mere failure of proof by those plaintiffs, or of the insufficiency of the allegations made by those plaintiffs, and purport to hold as a matter of law that a terror organization which carries out a violent attack on a U.S. citizen conducted as part of a terror campaign designed to influence the policies of the U.S. government is exempt from the jurisdiction of the U.S. courts. Indeed, the *Livnat* court suggested that a jurisdictional nexus must be "with the forum itself rather than with its citizens." *Livnat*, 2015 WL 558710, at *12. That is exactly what happened and was shown in this case: defend-

---

[27] *Livnat v. PA*, No. Civ. 14-668 (CKK), 2015 WL 558710, at *9 (D.D.C. Feb. 11, 2015) *appeal filed*, No. 15-7024 (D.C. Cir. Mar. 18, 2015); *Klieman*, 2015 WL 967624, at *6.

ants' terror activities were not mindless nor were they aimed at the plaintiffs and decedents individually; on the contrary, the terror campaign was aimed at the United States Government itself. *See, e.g.*, Exs. 175, 200.

c.    **Activity in the United States.**  This Court found in 2011 that defendants were continuously and systematically present in the United States.  DE 87 at 14-15.  (The Court also found, like every other court to have considered the issue, that the defendants' D.C. office and employees "simultaneously served as an office for the PLO and the PA," and that the activities of the D.C. office were "attributable to both the PLO and the PA."  DE 87 at 8-9.)   The exercise of specific jurisdiction is particularly appropriate where, as here, the defendant is *also* systematically and continuously present in the United States.  *See, e.g.*, *Chew*, 143 F.3d at 28; *SEC v. Straub*, 921 F. Supp. 2d 244, 253-54 & n.6 (S.D.N.Y. 2013); *see Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) ("[W]hile these [New York] contacts may not have directly given rise to the plaintiff's cause of action, they certainly 'relate to' it."); *Chloe*, 616 F.3d at 167.[28]  Here, as in *Bank Brussels*, the U.S. activities furthered defendants' political goal of gaining territory—the same political goal of their terror campaign.

\*     \*     \*

The Court obviously has jurisdiction over these defendants.  They affirmatively consented to proceeding in this district; they waived their objections to jurisdiction; and it cannot be the law that a defendant can kill Americans for the purpose of affecting U.S. government policy and avoid being held accountable in a court of the United States.

---

[28]  The District Court in *Klieman* said that "[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit."  2015 WL 967624, at \*7.  That is certainly not the law of the Second Circuit.  *See Chew*, 143 F.3d at 28 (rejecting causation test); *Chloe*, 616 F.3d at 167 (district court "too narrowly construes the nexus requirement, which merely requires the cause of action to 'relate to' defendant's minimum contacts with the forum").

## CONCLUSION

The Court and the jury devoted enormous time, energy and resources to the just resolution of this case. Defendants' lengthy motion for a new trial demonstrates only one thing: the Court gave them a fair trial. The Court should deny the motion and enter final judgment.

Dated:   New York, New York
         May 21, 2015

ARNOLD & PORTER LLP

By:_____

Kent A. Yalowitz
   kent.yalowitz@aporter.com
Lucy S. McMillan
   Lucy.McMillan@aporter.com
Carmela T. Romeo
   carmela.romeo@aporter.com
Tal R. Machnes
   tal.machnes@aporter.com

399 Park Avenue
New York, New York  10022
(212) 715-1000

59