UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

MARK I. SOKOLOW, *et al.*,

                   Plaintiffs,

    vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                  Defendants.

---

No. 04 Civ. 00397 (GBD) (RLE)

<br>

**MEMORANDUM IN SUPPORT OF
APPLICATION FOR AN ORDER DIRECTING
DEFENDANTS TO DEPOSIT FUNDS INTO THE REGISTRY OF THE COURT**

**AND IN**

**OPPOSITION TO MOTION TO STAY EXECUTION
OF JUDGMENT AND TO WAIVE THE BOND REQUIREMENT**

<br>

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000

*Attorneys for Plaintiffs*

May 29, 2015

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................. 1

I.     DEFENDANTS MUST POST ADEQUATE SECURITY TO OBTAIN A STAY .......... 2

     A.     The Court Should Order Defendants to Deposit $30 Million Per Month into the Registry of the Court ............................................................................................... 4

          1.     Defendants Were Able To Make Monthly Payments of $20 Million in the *Knox* and *Ungar* Cases .................................................................... 5

          2.     The Record In This Case Shows Defendants' Improved Financial Condition Since the *Knox* and *Ungar* Cases ................................................ 7

II.     DEFENDANTS DO NOT QUALIFY FOR WAIVER OF THE BOND REQUIREMENT .......................................................................................................... 8

III.     IN THE ALTERNATIVE, THE COURT SHOULD HOLD AN EVIDENTIARY HEARING TO EXAMINE DEFENDANTS' ABILITY TO POST A BOND ............... 16

IV.     THERE IS NO NEED TO SOLICIT THE VIEWS OF THE STATE DEPARTMENT ............................................................................................................. 17

CONCLUSION ..................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Capitol Records, Inc. v. MP3tunes, LLC*,
    No. 07-CV-9931, 2014 WL 6769551 (S.D.N.Y. Nov. 25, 2014)..............................................3

*Cipes v. Mikasa, Inc.*,
    404 F. Supp. 2d 367 (D. Mass. 2005),
    *aff'd*, 439 F.3d 52 (1st Cir. 2006) ..........................................................................................12

*Cohen v. Metro. Life Ins. Co.*,
    334 F. App'x 375 (2d Cir. 2009) ............................................................................................3

*de la Fuente v. DCI Telecommc'ns, Inc.*,
    269 F. Supp. 2d 237 (S.D.N.Y.),
    *aff'd in part and remanded on other grounds*, 82 F. App'x 723 (2d Cir. 2003) .................3, 8

*Dillon v. City of Chicago*,
    866 F.2d 902 (7th Cir. 1988) .............................................................................................8, 12

*Estate of Ungar ex rel. Strachman v. PA*,
    44 A.D.3d 176 (1st Dept. 2007)............................................................................................10

*Estate of Ungar v. Orascom Telecom Holding S.A.E.*,
    578 F. Supp. 2d 536 (S.D.N.Y. 2008)................................................................................9, 10

*Estate of Ungar v. PA*,
    344 F. App'x 631 (2d Cir. 2009) ............................................................................................9

*Estate of Ungar v. PA*,
    400 F. Supp. 2d 541 (S.D.N.Y. 2005),
    *aff'd*, 332 F. App'x 643 (2d Cir. 2009)..................................................................................9

*Estate of Ungar v. PA*,
    412 F. Supp. 2d 328 (S.D.N.Y. 2006),
    *aff'd*, 332 F. App'x 643 (2d Cir. 2009)..................................................................................9

*Estate of Ungar v. PA*,
    No. Civ. A. 05-MC-180 (GK), 2006 WL 1274986 (D.D.C. May 9, 2006) ..............................9

*Estates of Ungar ex rel. Strachman v. PA*,
    715 F. Supp. 2d 253 (D.R.I. 2010)................................................................................. *passim*

*FDIC v. Ann-High Assocs.*,
    No. 07-6095, 1997 WL 1877195 (2d Cir. Dec. 2, 1997)........................................................3

*FDIC v. Porco*,
   147 A.D.2d 422 (1st Dept. 1989),
   *aff'd*, 75 N.Y.2d 840 (1990)............................................................................................15

*In re Carlson*,
   224 F.3d 716 (7th Cir. 2000) ...................................................................................11, 12

*In re Nassau Cnty. Strip Search Cases*,
   783 F.3d 414 (2d Cir. 2015)...........................................................................3, 8, 12, 14

*Knox v. PLO*,
   248 F.R.D. 420 (S.D.N.Y. 2008) ..........................................................................10

*Knox v. PLO*,
   628 F. Supp. 2d 507 (S.D.N.Y. 2009).............................................................1, 4, 6

*Knox v. PLO*,
   No. 03 Civ. 4466 (VM)(THK), 2009 WL 1591404 (S.D.N.Y. Mar. 26, 2009),
   *Report & Recommendation adopted*, 628 F. Supp. 2d 507 (S.D.N.Y. 2009)................. *passim*

*Monks v. Long Term Disability Benefits Plan for Certain Hourly Emps. Of Champion*
   *Int'l Corp.*,
   No. 1:08-cv-752, 2012 WL 1598294 (S.D. Ohio May 7, 2012)...............................................13

*PMA v. Strachman*,
   62 A.D.3d 213 (1st Dept. 2009)............................................................................9, 10, 16

*Prudential Ins. Co. of Am. v. BMC Indus., Inc.*,
   630 F. Supp. 1298 (S.D.N.Y. 1986)..........................................................................4

*Quiroz v. Dickerson*,
   No. 3:10-CV-00657-LRH-WGC, 2013 WL 5947459 (D. Nev. Nov. 1, 2013)................12, 13

*Ray Legal Consulting Grp. v. DiJoseph*,
   37 F. Supp. 3d 704 (S.D.N.Y. 2014).........................................................................4

*Thomas & Marker Constr., Co. v. Wal-Mart Stores, Inc.*,
   No. 3:06-CV-406, 2009 WL 1119582 (S.D. Ohio Apr. 27, 2009) ..........................................13

*Trans World Airlines, Inc. v. Hughes*,
   314 F. Supp. 94 (S.D.N.Y. 1970),
   *aff'd as modified*, 449 F.2d 51 (2d Cir. 1971),
   *rev'd on other grounds*, 409 U.S. 363 (1973).........................................................................3

*United States v. N.Y.S. Supreme Ct., Erie Cnty.*,
   No. 07 Civ. 27S (WMS), 2008 WL 305011 (W.D.N.Y. Feb. 1, 2008) ....................................4

*Ungar v. Arafat,*
   634 F.3d 46 (1st Cir. 2011) ........................................................................................9

*United States v. O'Callaghan,*
   805 F. Supp. 2d 1321 (M.D. Fla. 2011),
   *aff'd,* 500 F. App'x 843 (11th Cir. 2012) ................................................................12

*United States v. Stanley,*
   No. 5:11-cv-117 (DCB) (RHW), 2013 WL 6330505 (S.D. Miss. Dec. 5, 2013) ...................11

## RULES AND REGULATIONS

Fed. R. Civ. P. 62 .................................................................................................. *passim*

Fed. R. Civ. P. 67 .................................................................................................. *passim*

## STATUTE

DCL § 270 ..................................................................................................................15

DCL § 272 ..................................................................................................................16

DCL § 273-a ..........................................................................................................15, 16

## PRELIMINARY STATEMENT

Defendants PA and PLO have moved for an unsecured stay of enforcement, claiming that they are in a "liquidity crisis."  Because an unsecured stay of enforcement would leave plaintiffs with no protection whatsoever—indefinitely delaying and possibly extinguishing their ability to receive the long-overdue compensation awarded them by the jury—defendants would not be entitled to such a stay even if their description of their financial situation was truthful, which (as shown below) it is not.

Contrary to defendants' all-or-nothing approach, however, there is an equitable middle road here:  the Court should order defendants to deposit installment payments of $30 million per month into the registry of the Court starting immediately, in an amount that will both protect plaintiffs and moot defendants' unfounded claims of financial "crisis."  A stay of enforcement should be conditioned on compliance with that order.

This is not the first time that these defendants have cried "wolf."  The equitable order that plaintiffs seek here was adopted by other federal judges—including Judge Marrero and Magistrate Judge Katz of this Court—in cases where terror judgments were entered against the PA and PLO.  In those cases, exactly as they have done here, the PA and PLO filed fulsome briefs supported by self-serving, attorney-crafted declarations from their top ministers claiming that they were on the brink of financial collapse and unable to provide security or payment to the plaintiffs in those cases.  Defendants' arguments were uniformly rejected by the federal courts, and they were required to make monthly installment payments either into the courts' registry or to the plaintiffs in order to provide adequate security.  *See Knox v. PLO*, No. 03 Civ. 4466 (VM)(THK), 2009 WL 1591404, at *1, *5-*7, *11 (S.D.N.Y. Mar. 26, 2009), *Report and Recommendation adopted*, 628 F. Supp. 2d 507 (S.D.N.Y. 2009); *Estates of Ungar ex rel.*

*Strachman v. PA*, 715 F. Supp. 2d 253, 265-67 (D.R.I. 2010).

This Court, too, should order defendants to pay monthly installments into the registry of the Court and condition any stay on prompt compliance with that order. Defendant PA has an annual operating budget that is nearly ***double*** what it was when the *Knox/Ungar* cases were decided—approximately $3.5 billion dollars.[1] Remarkably, defendants use a material portion of this budget—more than $60 million a year—to pay prisoners convicted of crimes for what defendants call "the struggle against the occupation"—their euphemism for terrorism.[2]

Accordingly, the Court should order defendants to deposit $30 million per month into the registry of the Court (up to the full amount of the judgment) during the pendency of the appeal, and condition a stay of enforcement on compliance with that order. In the alternative, the Court should permit plaintiffs to conduct appropriate discovery and hold a fact-finding hearing regarding defendants' assets, which are far more substantial than claimed in defendants' declaration.

## I.   DEFENDANTS MUST POST ADEQUATE SECURITY TO OBTAIN A STAY

Federal Rule of Civil Procedure 62(b) provides, in part, that "[o]n appropriate terms for the opposing party's security, the court may stay the execution of a judgment—or any proceedings to enforce it—pending disposition of" motions for judgment as a matter of law or for a new trial. Rule 62(d) provides, in part: "If an appeal is taken, the appellant may obtain a stay by

---

[1] Ex. A-3 to Bishara Decl., PA Ministry of Finance, Monthly Report for Dec. 2014 at Table 1 (budget of $~3.5 billion); Ex. A-5 to Bishara Decl., PA Ministry of Finance, Monthly Report for Dec. 2013 at Table 1 (budget of ~ $3.3 billion); Ex. 1 to Romeo Decl., PA Ministry of Finance, Monthly Report for Dec. 2012, *available at* http://www.pmof.ps/en/41 (budget of ~$3.18 billion). "Bishara Decl." refers to the declaration of Shukry Bishara, dated April 30, 2015, submitted by defendants in this case. "Romeo Decl." refers to the declaration of Carmela T. Romeo, dated May 29, 2015, submitted by plaintiffs in this case.

[2] *See, e.g.*, Ex. A-3 to Bishara Decl., PA Ministry of Finance, Monthly Report for Dec. 2014 at Table 8a.

supersedeas bond….The stay takes effect when the court approves the bond."

The primary purpose of Rule 62 is to ensure that the prevailing party will recover in full, if the judgment at issue should be affirmed, while protecting the defendant against the risk that payment cannot be recouped if the judgment should be reversed. *In re Nassau Cnty. Strip Search Cases*, 783 F.3d 414, 417 (2d Cir. 2015); *Cohen v. Metro. Life Ins. Co.*, 334 F. App'x 375, 378 (2d Cir. 2009). It is well-settled that the bond requirement should not be eliminated or reduced unless doing so "'does not unduly endanger the judgment creditor's interest in ultimate recovery.'" *de la Fuente v. DCI Telecommc'ns, Inc.*, 269 F. Supp. 2d 237, 240 (S.D.N.Y.), *aff'd in part and remanded on other grounds*, 82 F. App'x 723 (2d Cir. 2003).

Asserted financial hardship does not relieve defendants of the need to secure their judgment debt. To the contrary, an appellant "must be prepared to assume some financial burden to achieve 'business as usual.'" *Trans World Airlines, Inc. v. Hughes*, 314 F. Supp. 94, 98 (S.D.N.Y. 1970), *aff'd as modified*, 449 F.2d 51 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973); *see Capitol Records, Inc. v. MP3tunes, LLC*, No. 07-CV-9931, 2014 WL 6769551, at *2 (S.D.N.Y. Nov. 25, 2014) ("[S]ome level of financial hardship is not sufficient to eliminate the bond requirement.").

Thus, although a district court may, in its discretion, grant a stay without requiring the posting of a bond in the *full* amount of the judgment, such a stay must be conditioned on "'the appellant provid[ing] an acceptable alternative means of securing the judgment.'" *In re Nassau Cnty. Strip Search Cases*, 783 F.3d at 417 (quoting *FDIC v. Ann-High Assocs.*, No. 07-6095, 1997 WL 1877195, at *1 (2d Cir. Dec. 2, 1997)). Here, the obvious "alternative means" is a monthly payment stream into the registry of the Court (up to the full amount of the judgment) during the pendency of post-trial and appellate proceedings.

– 3 –

**A.     The Court Should Order Defendants to Deposit $30 Million Per Month into the Registry of the Court**

There is no question that defendants have the ability to pay *some* amount on account of the judgment every month.  After all, they are now making monthly payments to the very terrorists who killed and injured plaintiffs.

This Court has authority to order defendants to deposit $30 million a month into the registry of the court on notice to all parties.  "Rule 67 is a 'procedural device…intended to provide a place of safekeeping for disputed funds pending resolution of a legal dispute[.]'"  *Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 729 (S.D.N.Y. 2014) (quoting *Prudential Ins. Co. of Am. v. BMC Indus., Inc.,* 630 F. Supp. 1298, 1300 (S.D.N.Y. 1986)).  "'It is within the court's discretion to permit or deny such a deposit.'"  *Id.* (quoting *United States v. N.Y.S. Supreme Ct., Erie Cnty.,* No. 07 Civ. 27S (WMS), 2008 WL 305011, at *3 (W.D.N.Y. Feb. 1, 2008)).

In 2009, Judge Marrero of this Court ordered defendants to deposit into the registry of the Court an initial installment payment of $20 million, followed by installment payments of $5 million per month, up to a total amount of $120 million as security for the judgment in that case. *Knox v. PLO*, 628 F. Supp. 2d 507 (S.D.N.Y. 2009).  Shortly thereafter, in 2010, Judge Martin of the United States District Court for the District Rhode Island—on the exact same record— ordered defendants to pay $15 million per month toward the outstanding judgment in that case. *Ungar*, 715 F. Supp. 2d 253.  Compared to the record in those cases, defendants' financial condition has improved materially.  Given defendants' improved financial condition as compared to the record they submitted in *Knox* and *Ungar*—and in light of the difficulties and delay that plaintiffs are certain to face in collecting their judgment following appeal—a deposit of $30 million per month is balanced, fair, and reasonable.

### 1.     Defendants Were Able To Make Monthly Payments of $20 Million in the *Knox* and *Ungar* Cases

The *Knox* and *Ungar* cases are instructive.  In *Knox*, the plaintiffs obtained a $192 million judgment.  In *Ungar*, the plaintiffs obtained a $116 million judgment.  In *Knox* and *Ungar*, defendants made exactly the same hardship claims that they raise here.  They claimed "that the Palestinian government has been running at a substantial deficit and is in a desperate financial situation, and that they are heavily dependent on foreign financial assistance just to maintain critical government functions."  *Knox*, 2009 WL 1591404, at *1.[3]  They also claimed "severe budget shortfalls."  *Id.* at *6.

Now, as then, defendants claim that they are suffering "an [intensified] liquidity crisis"— this time on account of Israel's temporary freezing of "the remittance of customs clearance revenues due to the PA[.]"  Defs.' Mem. at 1.  (Defendants acknowledge the freeze has been lifted.)

The *Knox* and *Ungar* courts rejected defendants' arguments then, and this Court should follow suit.  A comparison of defendants' factual assertions in this case with those from *Knox* and *Ungar* shows that defendants are just recycling the same litany of arguments.

|  | ***Knox/Ungar*** | ***Sokolow*** |
|---|---|---|
| **"Clearance" Tax Revenues** | "The clearance revenues account for the vast majority of the PNA's revenue—$896 million of $1.194 billion total revenue for 2007," or approximately 75%.<br><br>*Knox*, 2009 WL 1591404, at *6. | "Custom clearance revenues…account for approximately 70% of the PA's expected revenues each month."<br><br>Defs.' Mem. 17; Bishara Decl. ¶ 13 (clearance revenue of $2.054 billion for 2014). |

---

[3] In *Ungar*, the Court had the exact same record (the declarations of Hatem Yousef and PA Prime Minister Salam Fayyad) that defendants had submitted in *Knox*.  *See Ungar*, 715 F. Supp. 2d at 266-67 & n.18.

| | | |
|---|---|---|
| **Dependence on Foreign Aid** | "Aid from donor countries is the largest [additional] source of funding for the PNA."<br><br>*Knox*, 2009 WL 1591404, at *6. | "[A]part from…clearance revenues, the PA is 'almost entirely dependent on foreign aid….'"<br><br>Defs.' Mem. 7. |
| **Deficit** | Defendants forecast "a growth in the PNA's deficit…to $1.6 billion in calendar year 2007."<br><br>*Knox*, 2009 WL 1591404, at *6. | Defendants have a "total budget deficit [of] $1.698 billion in 2012; $1.57 billion in 2013; and $1.59 billion in 2014."<br><br>Defs.' Mem. 18-19; Bishara Decl. ¶ 25. |
| **Land Holdings** | "Defendants argue that they do not own and control hundreds of thousands acres of land."<br><br>*Knox*, 2009 WL 1591404, at *8. | Defendants argue that "the PA has minimal state holdings from which it receives dividends…."<br><br>Defs.' Mem. 17. |
| **PLO Assets** | Defendants claim that "since the creation of the PA, in 1993, the PA has been the primary source of revenue for the PLO. The PLO is financially dependent on the PA, as evidenced by the fact that in the first quarter of 2008, the PA expended $7.2 million on PLO wages, salaries, and operating expenses."<br><br>*Knox*, 2009 WL 1591404, at *7. | Defendants claim that "the PLO receives its only funding from the PA….The PLO does not own any businesses that generate revenue, and owns no commercial real estate or buidlings, plants or equipment, other than overseas missions and diplomatic offices used by PLO employees in the course of performing their diplomatic functions."<br><br>Defs.' Mem. 17-18. |

In June 2009, Magistrate Judge Katz of this Court examined in detail (following extensive discovery) the ability of the PA and the PLO to provide security in the *Knox* case. He recommended that "security [be posted] in the amount of $20 million, with additional deposits of $5 million per month, up to a maximum of $120 million in total security." *Knox*, 2009 WL 1591404, at *12. Judge Marrero adopted Magistrate Judge Katz's Report and Recommendation in full. 628 F. Supp. 2d 507 (S.D.N.Y. 2009).

At approximately the same time, in May 2010, Judge Martin of the District of Rhode Island examined the same information and ordered defendants to satisfy the *Ungar* judgment from a $15-million-per-month payment stream of tax revenue that had been collected by the State of

Israel (which the Ungar plaintiffs had attached).  *Ungar*, 715 F. Supp. 2d at 269.[4]

### 2.   The Record In This Case Shows Defendants' Improved Financial Condition Since the *Knox* and *Ungar* Cases

The PA's operating budget has since increased by 40%—specifically from $2.5 billion in 2007 to $3.5 billion in 2014.[5]  Its "clearance" tax revenues have nearly tripled—from $896 million in 2007 to $2.1 billion in 2014.[6]  Its operating deficit has remained approximately the same.[7]

The PA now has enough free cash flow to pay $60 million a year to prisoners who committed crimes that defendants euphemistically call "the struggle against the occupation" (*i.e.*, terrorists) and another $4.5 million a year to released criminals—people who perform absolutely *no* services whatsoever for the PA.[8]  In addition—and not included in the amounts above—the PA continues to pay the salaries of all employees convicted of murder and attempted murder (as well as other terror-related crimes such as membership in a terrorist organization) if they were employees of the PA when they committed these crimes—people who should have been fired for cause but instead are rewarded for their crimes ***while they sit in jail doing nothing***.

Under Rule 67, this Court should order defendants to begin making monthly deposits into the Court's registry of $30 million per month—that is, increasing by 50% the combined monthly

---

[4] Defendants eventually settled both cases.  *See* DE 215 in *Knox v. PLO*, No. 03 Civ. 4466 (VM)(THK) (S.D.N.Y.); DE 657 in *Ungar v. PA*, No. CA 00-105L (D.R.I.).

[5] *Compare* Ex. 2 to Romeo Decl., Fayyad Decl. Exs. B & E (Table 1) (2007 figure) *with* Bishara Decl. ¶ 13 (2014 figure) *and* Ex. A-3 to Bishara Decl. (2014 figure; PA Ministry of Finance, Monthly Report for Dec. 2014 at Table 1).

[6] *Compare Knox*, 2009 WL 1591404, at *6 (2007 figure; citing Fayyad Decl. ¶ 17 & Ex. E (Table 1)) *with* Bishara Decl. ¶ 13 (2014 figure).

[7] *Compare Knox*, 2009 WL 1591404, at *6 (2007 figure; citing Fayyad Decl. ¶ 14 & Ex. B) *with* Bishara Decl. ¶ 25 (2014 figure).

[8] *See, e.g.*, Ex. A-3 to Bishara Decl., PA Ministry of Finance, Monthly Report for Dec. 2014 at Table 8a.

amount that defendants were able to pay in *Knox* and *Ungar*, based on the increased revenues and increased expenditures, and a smaller deficit as a percentage of those expenditures.

## II.    DEFENDANTS DO NOT QUALIFY FOR WAIVER OF THE BOND REQUIRE-MENT

A supersedeas bond is "designed to protect the appellee," and it "should not be eliminated or reduced unless doing so 'does not unduly endanger the judgment creditor's interest in ultimate recovery.'"  *de la Fuente*, 269 F. Supp. 2d at 240 (citation omitted).  The appellant bears the burden "of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond in the full amount of the judgment."  *Id.*

In determining whether waiver of the bond requirement is warranted, the Second Circuit has adopted "non-exclusive factors that a district court may consider."  These include:

> "(1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position."

*In re Nassau Cnty. Strip Search Cases*, 783 F.3d at 417-18 (quoting *Dillon v. City of Chicago*, 866 F.2d 902, 904-05 (7th Cir. 1988)).  (Defendants fail even to cite this case.)

Here, the five factors point to *requiring* security, not waiving it.

### Factors 1 and 2—Complexity and Amount of Time for Collection Process

Collection efforts could be complex and lengthy.  Defendants have a track record of evading payment and may have few assets in the United States at this time.  Indeed, in *Ungar*,

– 8 –

the plaintiffs spent some six years attempting to collect their judgment against the PA and PLO in numerous federal and state courts, and in Israel.[9]  Moreover, the federal trial court in Rhode Island found that the PA and PLO were transferring assets out of the U.S. and refusing to honor the Ungars' judgment, and issued an injunction to prevent further dissipation of assets.[10]  Other federal and state courts also found repeatedly that the PA and PLO were contumacious judgment debtors:

| | |
|---|---|
| **2005** | Judge McMahon of this Court held:  "***the PLO and PA have refused to satisfy the judgment voluntarily***." <br><br> *Estate of Ungar v. PA*, 400 F. Supp. 2d 541, 544 (S.D.N.Y. 2005) (emphasis added), *aff'd*, 332 F. App'x 643 (2d Cir. 2009). |
| **2006** | Magistrate Judge Lisa Margaret Smith noted the Ungars' "multiple attempts to ascertain information about the assets of and debts owed to the Defendants" and the "apparent intent of the Defendants to evade the Rhode Island District Court's entry of default judgment, and the likelihood that Plaintiffs will never be able to satisfy the default judgment absent information of ***an elusive and amorphous judgment debtor***[.]" <br><br> *Estate of Ungar v. PA*, 412 F. Supp. 2d 328, 334 (S.D.N.Y. 2006) (emphasis added), *aff'd*, 332 F. App'x 643 (2d Cir. 2009). |
| **2006** | Judge Gladys Kessler rejected defendants' arguments against collection of $200,000 from defendants' bank account, saying they were "legally irrelevant," factually unsupported, and had "no legal basis." <br><br> *Estate of Ungar v. PA*, No. Civ. A. 05-MC-180 (GK), 2006 WL 1274986, at *2 (D.D.C. May 9, 2006). |

---

[9] Some of the *Ungar* plaintiffs' extensive, multi-forum efforts to collect their judgment are detailed in *Ungar v. Arafat*, 634 F.3d 46 (1st Cir. 2011); *Estate of Ungar v. PA*, 344 F. App'x 631 (2d Cir. 2009); *Estate of Ungar v. Orascom Telecom Holding S.A.E.*, 578 F. Supp. 2d 536 (S.D.N.Y. 2008); and *PMA v. Strachman*, 62 A.D.3d 213 (1st Dept. 2009).

[10] Ex. 3 to Romeo Decl., *Ungar v. PA*, C.A. No. 00 - 105L, Order dated 5/5/05.

| 2007 | The First Department said that the PA had a "***documented history of engaging in dilatory tactics*** to plaintiffs' detriment in the underlying and other litigation."<br><br>*Estate of Ungar ex rel. Strachman v. PA*, 44 A.D.3d 176, 182 (1st Dept. 2007) (emphasis added). |
|------|---|
| 2008 | Judge McMahon again stated that defendants "***have refused to satisfy the default judgment voluntarily***."<br><br>*Ungar v. Orascom Telecom Holding S.A.E.*, 578 F. Supp. 2d 536, 537-38 (S.D.N.Y. 2008) (emphasis added). |
| 2009 | The First Department stated that it was an undisputed fact that "***the PA and PLO did not intend to honor the judgment***" in *Ungar*.<br><br>*PMA v. Strachman*, 62 A.D.3d 213, 216 (1st Dept. 2009) (emphasis added).<br><br>The First Department also found that the PA had engaged in a fraudulent conveyance to evade the judgment.<br><br>*Id.* at 224-25. |
| 2010 | Judge David L. Martin stated:  "***Defendants have made it 'abundantly clear that [they] will never satisfy the judgment*.'"**<br><br>*Estates of Ungar ex rel. Strachman v. PA*, 715 F. Supp. 2d 253, 269 (D.R.I. 2010) (emphasis added). |

Given these defendants' long history of evading U.S. judgment creditors for years, this Court should have no confidence that they will honor the judgment if it is affirmed.

Moreover, the difficulties that plaintiffs will face post-appeal will be exacerbated by the risk that defendants likely have few assets left in the United States.  *E.g.*, *Knox v. PLO*, 248 F.R.D. 420, 432 (S.D.N.Y. 2008) (requiring security precisely because, "as foreign entities," the PA and PLO "likely have a substantial portion of their assets beyond the jurisdiction of United States courts, potentially making Plaintiffs' satisfaction of any future judgment more difficult—especially when considered with the Defendants' history of defaults.").

Defendants have offered no evidence that the transitory assets that happened to be in the United States at the time of the *Ungar* enforcement proceedings (which consisted almost entirely of third-party debts, liquid deposits, and funds attached in transit) are still in existence and in the United States. Defendants have also offered no evidence that they have refrained from engaging in fraudulent conveyances during the pendency of this case. Indeed, as we explain below, the one thing the Court can be sure of is that defendants *have* engaged in fraudulent conveyances in violation of the Debtor and Creditor Law.[11]

### Factors 3 and 4—Degree of Confidence in the Availability of Funds And Ability to Pay the Judgment

The Court can have no confidence in the availability of funds and ability to pay the judgment. In this regard, a defendant's "history of evasion" of judgment debts is grounds to deny a motion for an unsecured stay. As the Seventh Circuit has explained, "waiver is appropriate only if the appellant has a clearly demonstrated ability to satisfy the judgment in the event the appeal is unsuccessful and there is no other concern that the appellee's rights will be compromised by a failure adequately to secure the judgment." *In re Carlson*, 224 F.3d 716, 719 (7th Cir. 2000) (denying stay because the judgment debtor "signaled his intent to evade his obligations"); *United States v. Stanley*, No. 5:11-cv-117 (DCB) (RHW), 2013 WL 6330505, at *3 (S.D. Miss. Dec. 5, 2013) (denying stay because the court had "little confidence, given Dr. Stanley's history of evasion, in the availability of funds from the defendant to pay the judgment if it is upheld on appeal").

---

[11] This leaves Israel as plaintiffs' most promising venue for enforcement. That possibility is a small comfort against delay: the *Ungar* plaintiffs filed their domestication action in the Jerusalem District Court in June 2005, and obtained a ruling finding their U.S. federal judgment enforceable more than three years later, in August 2008. Defendants then filed an appeal in Israel's Supreme Court—a process which can take additional years.

In *Nassau County*, the Second Circuit found that the County had "demonstrated the existence of appropriated funds, 'available for the purpose of paying judgments without substantial delay or other difficulty'"; accordingly, "there [was] no practical reason to require Nassau County to post a bond or deposit funds in order to secure a Rule 62(d) stay pending appeal." 783 F.3d at 418. Defendants here present the opposite picture. They claim that they *do not* have funds available to pay the judgment and offer no indication, much less evidence, that they are ready, willing, or able to pay the judgment promptly. In fact, the purported absence of immediately available funds is the lynchpin of their entire motion.

Other cases have held that under the *Dillon* factors (which the Second Circuit adopted in *In re Nassau County*, a case not even cited by defendants), inability to pay the judgment actually requires **denial** of a request for an unsecured stay. *See In re Carlson*, 224 F.3d at 719 (denying request for waiver of bond based on *Dillon* factors because this case "presents the polar opposite of a situation in which waiver is appropriate," as there is "every reason to lack confidence that Carlson will pay up eventually"); *Quiroz v. Dickerson*, No. 3:10-CV-00657-LRH-WGC, 2013 WL 5947459, at *2 (D. Nev. Nov. 1, 2013) (denying request for waiver of bond based on *Dillon* factors because plaintiff "faced a serious risk of being unable to collect on the judgment in this matter" and defendant had argued that "'[c]ollection activity will financially annihilate [him]'"); *United States v. O'Callaghan*, 805 F. Supp. 2d 1321, 1325 (M.D. Fla. 2011) (denying request for waiver of bond based on *Dillon* factors in part because "[o]ne typical ground for reducing or waiving the bond requirement pending appeal is that a judgment debtor is sufficiently solvent to 'facilely respond to a money judgment'"—which the debtor was not), *aff'd*, 500 F. App'x 843 (11th Cir. 2012); *Cipes v. Mikasa, Inc.*, 404 F. Supp. 2d 367, 370 (D. Mass. 2005) (in case where defendant argued that it *could* pay the judgment, court denied request for waiver of bond based

on *Dillon* factors because defendant's finances had "been declining for several years" and thus

its "ability to pay the judgment following appeal is not sufficiently guaranteed to warrant waiver

of the supersedeas bond requirement"), *aff'd*, 439 F.3d 52 (1st Cir. 2006).

In addition, the case law compels a defendant seeking a stay without the posting of a

bond to include in its motion a reasonable plan for paying the judgment post-appeal, but these

defendants have offered no such plan.  That failure should be a "red flag" for this Court.  *E.g.*,

*Quiroz*, 2013 WL 5947459, at *2 (noting that defendant had not "presented to the Court a finan-

cially secure plan for maintaining solvency during the period of appeal"); *Monks v. Long Term

Disability Benefits Plan for Certain Hourly Emps. Of Champion Int'l Corp.*, No. 1:08-cv-752,

2012 WL 1598294, at *4 (S.D. Ohio May 7, 2012) ("Defendant has put forth no assurance that

funds will actually be available to pay the judgment, if necessary, at the conclusion of the appeal,

Defendant has failed to meet its burden of persuading the Court that the bond requirement should

be waived.").[12]

---

[12] Note also that the PA and PLO are both temporary entities. The full name of the PA is
"Palestinian **Interim** Self-Government Authority," reflecting the fact that its role is merely to
govern parts of the West Bank and Gaza Strip during an "interim" period, until the final status of
those territories is resolved.  If a "State of Palestine" is established (a goal toward which the
defendants work daily), the territory currently governed by the PA will come under the sovereign
government of that State, and the PA could be superseded and have no further role or existence.
Likewise, the Palestine Liberation Organization will have accomplished its purpose and there is
no reason to expect that it will continue to exist.  Nor have defendants offered any reason to
believe that a newly-minted State of Palestine would assume the legal obligations of the by-then
extinct PA and PLO.  Another possibility is that the PA and its government apparatus will be
taken over entirely by Hamas—as has already occurred in Gaza—which would further
jeopardize plaintiffs' ability to collect on the judgment.  Therefore, every delay in securing
payment of the judgment in this case increases the risk to plaintiffs that the defendants in this
case will no longer exist when plaintiffs are permitted to enforce.  *Cf. Thomas & Marker Constr.,
Co. v. Wal-Mart Stores, Inc.*, No. 3:06-CV-406, 2009 WL 1119582, at *28 (S.D. Ohio Apr. 27,
2009) ("[W]hat may clearly appear to be a financially healthy company one day, may become a
bankrupt company the next day.  Therefore, the Court declines to find that no supersedeas bond
is necessary in this case.").

In sum, defendants' submission—with its claims of indigence and inability to pay the judgment, and no assurance that defendants will even remain in existence in the coming years—affirmatively **mandate** security to protect plaintiffs. The only equitable solution here (short of requiring full security) is to establish a reasonable installment payment plan to ensure that most or all of the judgment debt will accumulate in the registry of the Court during the pendency of the appeal—and a reasonable monthly installment payment is $30 million.

### Factor 5—Whether A Bond Will Place Other Creditors in an Insecure Position

The Court cannot reasonably conclude that defendants are "in such a precarious financial situation that the requirement to post a bond would place other creditors…in an insecure position." 783 F.3d at 417-18. Defendants' financial condition was _worse_ when the courts ordered them to pay the installment payments as set forth in _Knox_ and _Ungar_ in 2009 and 2010. Additionally, defendants' financial condition is _better_ than they are representing to the Court. For example, the PA has concealed from the Court that it is the owner of the "Palestine Investment Fund," which, as of the end of 2012, had a portfolio valued at $782.8 million. _See_ Romeo Decl. Ex. 4 at 10. This fact alone calls the truthfulness of the Bishara declaration into serious doubt.

Furthermore, defendants should not be heard to complain that they cannot afford to post security in this case, while they continue to make—and have been making since the commencement of this litigation in 2004—fraudulent conveyances in violation of New York law through payments to prisoners and released prisoners convicted of murder and other terror offenses. The prisoner payments alone consume more than $50 million per year for which the prisoners perform no services other than sitting in jail. Tr. 501 (no services); 602-03 ($4.25 million per month). The salaries of convicted terrorist employees and payments to the families honoring terrorist "martyrs" add even more to that figure.

Put another way—despite their status as defendants in this action—over the last eleven years defendants have *knowingly reduced their assets available for satisfying a judgment* in this case by paying hundreds of millions of dollars to reward and honor terrorists.  Evidence at trial established that the PA has a law that institutionalizes these payments.  Ex. 512.  Under this law, "[a]nyone who is kept in prisons of the occupation for offenses of participating in the struggle against the occupation" gets a PA salary.  *Id.*  That includes offenses such as suicide bombings and shootings against civilians in public areas.  That includes PA employees who were tasked with maintaining security, but instead plotted to kill innocent people—and, in fact, did so.  *See* Ex. 1143 (2013 amendment to prisoner's law mandating that defendants "shall continue to pay the salary of an imprisoned employee"); Tr. 745 (Eviatar) ("[M]any hundreds from among the Palestinian security apparatuses were involved in terrorist activities during the Intifada.").  Even perpetrators who were ***not*** PA employees at the time they committed their crimes are put on the PA's payroll.  *E.g.*, Exs. 66 (Mohamed Sami Ibrahim Abdullah), 73 (Abdullah Barghouti), 85 (Fares Ghanem).  The families of suicide terrorists reap benefits as well, precisely because of their role as terrorists.  *E.g.*, Ex. 17 (Wafa Idris "was martyred during a heroic martyrdom operation against the Zionists in the occupied city of Jerusalem.  Therefore, we recommend that she is considered one of the Al-Aqsa Intifada Martyrs according to the regulations").

DCL § 273-a provides:  "Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages…is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment."[13]  *See FDIC v. Porco*, 147 A.D.2d 422,

---

[13] The DCL defines "conveyance" as "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance."  DCL § 270.  "Fair consideration" occurs (1) "in exchange for such property, or

Footnote continued on next page

422-23 (1st Dept. 1989), *aff'd*, 75 N.Y.2d 840, 841-42 (1990).  As a matter of public policy, committing murder and other acts of terrorism cannot constitute "fair consideration."

The prisoner payments described above are in clear violation of New York law, as they constitute a continuing fraudulent conveyance so long as the judgment in this action is not satisfied.

This would not be the first time that a court has found that the PA has engaged in a fraudulent conveyance in violation of New York's Debtor and Creditor Law.  In *PMA v. Strachman*, the First Department found that the PA had engaged in a fraudulent conveyance by waiving its right to receive certain profit payments from the Palestinian Monetary Authority ("PMA") after the Ungar plaintiffs' attempted to attach the PMA's debt to the PA.  62 A.D.3d 213, 224-25 (1st Dept. 2009).

## III.   IN THE ALTERNATIVE, THE COURT SHOULD HOLD AN EVIDENTIARY HEARING TO EXAMINE DEFENDANTS' ABILITY TO POST A BOND

If the Court is not satisfied that defendants are capable of posting security in the amount of $30 million per month as a condition of a stay, defendants' motion to stay execution of judgment without a bond requires an evidentiary hearing.  In advance of this hearing, plaintiffs will serve discovery on defendants and non-parties who may have information about defendants' assets, including, for example, deposition notices for Mr. Bishara and a Rule 30(b)(6) witness knowledgeable about the PLO's assets, document requests and interrogatories on defendants, and information subpoenas on financial institutions.

Again, with respect to the PA, the concealment from the Court that it is the owner of the

---

Footnote continued from previous page

obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied;" or (2) "when such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained."  DCL § 272.

Palestine Investment Fund, which currently has a portfolio valued at $782.8 million (as of the end of 2012), is telling. *See* Romeo Decl. Ex. 4 at 10.

And with respect to the PLO, defendants did not even offer a witness with knowledge of PLO assets. Shukry Bishara has *only* worked within the PA, and aside from his role in approving the annual budget to be disbursed to the PLO (*see* Bishara Decl. ¶ 3), he is without any basis to state that the PLO has no other income-producing revenues or assets. *Knox* is instructive here as well. There, at least, defendants submitted a declaration of the *PLO's Secretary General*, Yasser Abed Rabbo, to testify to what Bishara purports to testify to about the PLO's assets. However, underscoring that the PLO *does* have income and assets other than what comes from the PA, defendants later submitted a supplemental declaration of Salam Fayyad conceding, and correcting the record, that "in addition to the PLO's operations account maintained by the PA, the PLO holds $10.7 million in two bank accounts in Jordan." *Knox*, 2009 WL 1591404, at *7. There is thus no reason to believe Mr. Bishara's claim that the PLO has no assets.

Based on the foregoing record, the equitable path in this case is for the Court to order defendants to immediately begin making monthly $30 million installment payments into the registry of the Court until security for the entire judgment has been posted.

## IV.   THERE IS NO NEED TO SOLICIT THE VIEWS OF THE STATE DEPARTMENT

There is no need to for the Court to solicit the views of the State Department—or any other agency of the United States. In 2005 and 2006, defendants told the State Department that allowing terror victims (including the *Ungar* plaintiffs) to enforce their judgments would lead to financial ruin and political destabilization in the Middle East. *See* Romeo Decl. Ex. 8 (June 18, 2005 letter from Salam Fayyad to Sec. Condoleezza Rice); Romeo Decl. Ex. 5 (Apr. 27, 2006 letter from Afif Safieh to Sec. Rice). In response, the Secretary of State plainly expressed the

view that these defendants *should* participate in the litigation process in good faith—*even* if, and *notwithstanding that*, it subjects them to large judgments.  Ex. 6 to Romeo Decl. (Jan. 12, 2007 letter from Sec. Rice to Abbas).

Obviously, the interests of the United States go beyond those expressed by the Department of State.  In 2008, the United States *refused* to file a statement of interest in the *Knox* case, in response to the inquiry of the Court concerning whether it should vacate the default judgment entered in that case:  "The United States respectfully informs the Court that it declines to file a Statement of Interest concerning the Rule 60 issues presented by this case, but will continue to monitor this and other cases like it."  Romeo Decl. Ex. 7 (Feb. 29, 2008 Letter to Judge Marrero from Jeffrey Buckholtz).   The Government explained that it supported compensation for terror victims, and also expressed concern about the financial condition of the PA.  Judge Marrero balanced those concerns with the payment stream described above.

Finally, and most fundamentally, Congress and the President have already decided—through the enactment of the Anti-Terrorism Act—that combating terrorism and compensating its victims with potentially large awards against those who support international terrorism *is* in the interest of the United States.

Accordingly, there is no need for this Court to solicit the views of the United States or any particular agency.

## CONCLUSION

The Court should order defendants to deposit $30 million per month into the registry of the Court (up to the full amount of the judgment) and deny defendants' motion to stay execution of the judgment in this case and to waive the bond requirement.

Dated: New York, New York
         May 29, 2015

**ARNOLD & PORTER LLP**

By: /s/ Kent A. Yalowitz
    Kent A. Yalowitz
      KENT.YALOWITZ@APORTER.COM
    Lucy S. McMillan
      LUCY.MCMILLAN@APORTER.COM
    Carmela T. Romeo
      CARMELA.ROMEO@APORTER.COM
    Tal R. Machnes
      TAL.MACHNES@APORTER.COM

399 Park Avenue
New York, New York 10022
(212) 715-1000

– 19 –