# EXHIBIT 8

| Palestinian National Authority |  | السلطة الوطنية الفلسطينية |
|---|---|---|
| Ministry of Finance | | وزارة المالية |
| Office of the Minister | | مكتب الوزير |

No. : MoF/C.G./826/2005          الرقم :

Date : June 18, 2005          التاريخ :

The Honorable Dr. Condoleezza Rice
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Dr. Rice:

I am writing to request your immediate assistance in addressing what has become a serious obstacle to the continued, effective participation of the Palestinian National Authority ("PNA") in the Middle East Peace Process and the PNA's role as a strong and viable partner of the United States of America and the Government of the State of Israel in that process.

It is now apparent that, under the guise of enforcing a default judgment obtained against the PNA in a U.S. Court, the Plaintiffs in that action are attempting to use the United States judicial system to take control over and freeze the assets of the PNA all over the world. *See The Estate of Yaron Ungar, et al. v. The Palestinian Authority, et al.*, Case No. 00-105L (D.R.I.) (the "*Ungar* Case"). We believe that Plaintiffs' attempt to use the United States Courts in this manner is not supported by United States law, and also runs counter to international law and the laws of several foreign states in which the PNA operates. Nevertheless, if Plaintiffs' efforts prove successful, they could completely undermine the PNA's ability to continue to operate as a functioning government. Even now, the enforcement actions being taken by Plaintiffs and the mere *threat* that Plaintiffs may be successful are causing substantial harm to the Palestinian people and the PNA and, thereby, threatening the Peace Process itself.

Background Facts
In the *Ungar* Case, Plaintiffs, representatives of the estate of Yaron Ungar and certain of his relatives, sought to recover damages arising out of the death of Mr. Ungar, an American citizen, who was killed in Israel on June 9, 1996 by three members of the Islamic Resistance Movement ("Hamas"). The defendants named in the *Ungar* Case include Hamas and various individual members of Hamas (the "Hamas Defendants"), the Palestinian Authority and the Palestine Liberation Organization (the "PLO"). Plaintiffs asserted claims under the United States' Anti-Terrorism Act— which we understand provides a right of action in favor of any "national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate survivors, or heirs"—as well as claims

---

Ramallah/ Tel : 00970-2-2400650. Fax: 00970-2-2400595      P.O. Box 795 Ramallah
Gaza / Tel : 00970-8-2826188. Fax: 00970-8-2820696      P.O.Box 4007- Abu-Khadra complex-Gaza
E-mail : cbomof@palnet.com
mofbud@hally.net

CONFIDENTIAL MATERIAL      PPF 0038828

under Israeli law. Plaintiffs originally filed the *Ungar* Case in the United States District Court for the District of Rhode Island ("District Court") in March 2000.
The Hamas Defendants never appeared in the action and, in September 2000, a default judgment was entered against them. The PNA did appear in the *Ungar* Case, but for the sole purpose of contesting jurisdiction. The PNA ultimately filed three motions to dismiss Plaintiffs' claims—one directed at Plaintiffs' initial complaint, a second directed at Plaintiffs' amended complaint, and a third after Plaintiffs moved for a default judgment. The PNA and the PLO argued to the District Court, *inter alia*, that they were not subject to the personal jurisdiction of the District Court, that the issues asserted by Plaintiffs presented non-justiciable political questions, and that the PNA and the PLO were entitled to the defense of sovereign immunity under the United States' Foreign Sovereign Immunities Act. The District Court denied all three motions to dismiss. To preserve its legal position both in the United States and overseas (with respect to any potential efforts by Plaintiffs to seek enforcement of the default judgment in other countries), the PNA and the PLO continued to maintain that the District Court lacked both personal jurisdiction over them and subject matter jurisdiction over the dispute and, accordingly, did not file an unqualified appearance and answer to Plaintiffs' complaint.
Plaintiffs ultimately moved for a default judgment based on the PNA and the PLO's failure to file an answer and their refusal to subject themselves to open-ended civil discovery. The District Court granted Plaintiffs' motion for a default judgment on July 12, 2004, and entered judgment in the amount of approximately $116,415,000 against the PNA and the PLO on July 13, 2004. The PNA and the PLO appealed, and the First Circuit Court of Appeals affirmed the judgment against them by order dated March 31, 2005.[1]

Enforcement Proceedings
Shortly after the First Circuit affirmed Plaintiffs' judgment against the PNA and the PLO, Plaintiffs began to take aggressive steps to enforce the default judgment entered by the District Court. On April 19, 2005, Plaintiffs obtained an *ex parte* temporary restraining order ("TRO") purportedly in an effort to preserve assets Plaintiffs might seek in satisfaction of that judgment. The TRO was expressly limited to "*assets of The Palestinian Authority and the Palestine Liberation Organization however titled . . . located within the jurisdiction of the United States or of any State thereof.*"

On May 5, 2005, the District Court converted that temporary restraining order into a Preliminary Injunction. By its express terms, the Preliminary Injunction was also limited to assets and property of the PNA and the PLO within the United States. The Injunction also expressly provided that the PNA "are permitted to withdraw normal expenses necessary for the daily operations of their offices in Washington D.C. and at the United Nations, from existing bank accounts used by Defendants for that purpose as of the date of this Order."

---

[1] In addition to the *Ungar* Case, the Plaintiffs' counsel, working with parties in Israel, has filed other actions in the United States seeking millions and millions of dollars from, *inter alia*, the PNA and the PLO. *See, e.g., Knox, et al. v. PLO, et al.*, 1:03-cv-04466 (S.D.N.Y.). We believe that these separate actions are part of a concerted effort to impose crippling financial liability on the PNA, thereby undermining its ability to function as a partner in the Peace Process.

2

**CONFIDENTIAL MATERIAL**                                                              PPF 0038829

Despite the specificity of the District Court's Orders, however, Plaintiffs' counsel prepared a "Notice of Injunction" (the "Notice") in which they broadly assert that the Injunction

> applies to all assets of the PA and PLO however titled, and that assets of the PA and PLO are held and/or titled under the names Palestinian Authority, Palestine Liberation Organization, Palestinian National Authority (PNA), Palestine Investment Fund (PIF), Palestinian Pension Fund, Palestine Commercial Services Company (PCSC), Palestine Pension Fund, Insurance and Pension General Corporation, Palestinian National Fund, Palestine Monetary Fund (PMF), SAMED, PECDAR and Palestine Monetary Authority (PMA).

The Notice also states that the "Injunction applies to officers, agents, servants, employees, attorneys, partners and fiduciaries of the PA and PLO and any natural or legal person in privity with them and/or acting on their behalf and/or is in active concert and participation with them" and threatens any recipient of the Notice who does not comply with the Injunction with contempt of court and/or monetary damages. Despite the fact that the Notice does not reflect the limited jurisdictional reach of the Court's Preliminary Injunction, Plaintiffs' counsel claims to have sent this Notice to several hundred banks and financial institutions across the United States.

As a result of receiving this Notice, a number of financial institutions have frozen assets of the PNA, including the various bank accounts used by the PNA to operate its offices in Washington, D.C. The PNA's bank in Washington, Wachovia, has attempted to clarify with the Court and the Plaintiffs whether the PNA's accounts can be used to pay the necessary expenses needed to run its office, without success. As a result, the PNA has been unable to pay the employees in its Washington office and satisfy certain other routine obligations of a functioning government. In addition, we have been informed by Arab Bank that it has received a copy of Plaintiffs' Notice and that, as a result, it may have to freeze the PNA assets located anywhere the world. This step, if taken, will completely undermine the PNA's ability to function and its efforts to establish reliable, functioning institutions of government.

In addition, as a direct result of Plaintiffs' enforcement actions, the assets and funds of entities *independent* of the PNA have also been frozen, despite the fact that such assets are not even within the scope of the Preliminary Injunction. These assets have been frozen as a direct result of Plaintiffs' dissemination of the misleading Notice and representation that the assets of these independent entities actually belong to the PNA and, thus, are subject to enforcement and execution in the *Ungar* Case.

For example, the Palestine Monetary Authority ("PMA"), the Central Bank operating in the West Bank and Gaza, has informed us that a substantial portion of its funds has been frozen, including, at least, funds it maintains on deposit with the Bank of New York. In addition to freezing the assets of the PMA, Plaintiffs' enforcement

3

**CONFIDENTIAL MATERIAL**

PPF 0038830

actions also have resulted in the freezing of the assets of The Palestinian Pension Fund for the State Administrative Employees in the Gaza Strip ("Pension Fund") – assets that, again, clearly are not within the scope of the Preliminary Injunction. The Pension Fund is an entity independent of the PNA, originally created under Egyptian legislation in 1964 for the benefit of civil administration workers in the Gaza Strip and administered by Israel following the 1967 War. As part of the Middle East Peace Process, the PNA assumed the Civil Administration's obligations with respect to the Pension Fund and the assets of the Pension Fund subsequently were transferred from Israel, to be used solely for the purpose of payments of pensions and severance compensation for those Palestinians employed in the civil administration and who contributed to the fund. The pension monies belonging to these Palestinian workers are now frozen.

Request for Intervention
As set forth above, the enforcement actions taken by Plaintiffs and their supporters in the *Ungar* Case already have resulted in the freezing of numerous assets of both the PNA and various independent entities that are *not* subject to the District Court's Preliminary Injunction. The freezing of these assets poses an imminent threat to the continuing operation of critical institutions on which the Palestinian people depend for a functioning civil society. In addition, it also has significantly impaired the ability of the PNA to carry on its governmental function and, in fact, threatens to bankrupt the PNA.

We write to you because the further deterioration of the current state of affairs directly undermines the PNA's continued participation in the Middle East Peace Process and poses a significant obstacle to the PNA's role as a viable partner alongside the United States and Israel. In particular, we believe that the actions of the Plaintiffs in the *Ungar* Case directly interfere with the United States Government's conduct of foreign relations in the Middle East, to the grave detriment of the Palestinian people. More specifically, we believe that actions taken by the Plaintiffs under the authority of the District Court are inconsistent with the United States' longstanding commitment to, and investment in, the Middle East Peace Process. Indeed, we understand the United States' latest financial commitment to the Palestinian people to be part of a broader foreign policy judgment that a strong and viable PNA is a critical part of the road map and lasting peace in the region.

We urgently request that the United States Department of State take whatever action it can, consistent with the Constitution and laws of the United States, to end Plaintiffs' efforts to use the United States Courts to undermine the foreign policy of the United States and interfere in the Middle East Peace Process.

Sincerely,

Salam Fayyad
Minister of Finance

4

**CONFIDENTIAL MATERIAL**                                                                      PPF 0038831