UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MARK I. SOKOLOW, et al., | ) |
| Plaintiffs, | ) |
| v. | ) |
|  | ) |
|  | ) |
|  | ) No. 1:04-cv-0397 (GBD) (RLE) |
| PALESTINE LIBERATION | ) |
| ORGANIZATION, et al., | ) |
| Defendants. | ) |
|  | ) |
|  | ) |

**REPLY MEMORANDUM OF THE PALESTINIAN AUTHORITY AND THE
PALESTINE LIBERATION ORGANIZATION IN SUPPORT OF THEIR
RENEWED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION,
AND, IN THE ALTERNATIVE, MOTION FOR JUDGMENT AS A MATTER OF LAW
OR NEW TRIAL UNDER RULE 50(b) AND RULE 59**

Dated:  June 2, 2015

Gassan A. Baloul (Bar No. 4324919)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza
23rd Floor
New York, NY 10112
Telephone: (212) 872-9800
Facsimile: (212) 872-9815
gassan.baloul@squirepb.com

John A. Burlingame *(admitted pro hac vice)*
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC  20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
john.burlingame@squirepb.com

*Attorneys for Defendants Palestinian Authority
and Palestine Liberation Organization*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................2

I.  This Court Lacks Jurisdiction Over The PA And PLO ...........................................2

   A.  The PA And PLO Have Not Waived Their Personal Jurisdiction
       Defense............................................................................................................3

       1.  The PA and PLO Have Consistently Objected to Personal
           Jurisdiction.........................................................................................3

       2.  The PA and PLO Could Not Waive A Defense That Was
           Not Available Until the Supreme Court's Decision in Daimler..........6

   B.  The Jurisdictional Inquiry Under The Fifth Amendment Is The Same
       As Under The Fourteenth Amendment .............................................................8

   C.  The Court Does Not Have Specific Jurisdiction ..............................................9

II.  New Separate Trials Are Required By A Series Of Substantial Errors That
    Created Unfair Prejudice To Defendants .............................................................. 14

   A.  The Court Allowed Plaintiffs to Present Improper Expert Testimony........ 14

   B.  Other Evidentiary Errors Unfairly Contaminated the Trial .......................... 19

   C.  This Court's Evidentiary Rulings Limited Defendants' Ability to
       Present a Full Defense .................................................................................. 20

   D.  The Court's Failure to Sever the Trials Significantly Prejudiced
       Defendants..................................................................................................... 22

   E.  The Court's Jury Instructions Did Not Cure the Unfair Prejudice and
       Confusion from Plaintiffs' Improper Closing Arguments............................. 24

   F.  The Jury's Damage Award Cannot Stand...................................................... 25

III.  This Court Should Grant Judgment As A Matter Of Law Because The ATA
     Does Not Allow For Respondeat Superior Liability And Plaintiffs Failed To
     Meet Their Burden At Trial ................................................................................. 27

   A.  The ATA Does Not Allow for Respondeat Superior Liability ...................... 27

   B.  Judgment as a Matter of Law is Appropriate Because There was
       Insufficient Admissible Evidence Connecting Each Individual Attack
       to the PA or PLO .......................................................................................... 27

CONCLUSION.................................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*U.S. ex rel Barko v. Halliburton Co.*,
   952 F. Supp. 2d 108 (D.D.C. 2013) ..................................................................................7

*Bender v. City of New York*,
   78 F.3d 787 (2d Cir. 1996) ............................................................................................26

*Boim v. Holy Land Found. for Relief & Dev.*,
   549 F.3d (7th Cir. 2008) ..........................................................................................29, 30

*Boim v. Quaranic Literary Fund*,
   291 F.3d 1000 (7th Cir. 2002) .......................................................................................26

*Brewer v. Islamic Rep. of Iran*,
   664 F. Supp. 2d 43 (D.D.C. 2009) .................................................................................26

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) .......................................................................................................10

*CA, Inc. v. Stonebranch, Inc.*,
   No. 12-5988, 2014 U.S. Dist. LEXIS 32165 (E.D.N.Y. Jan. 27, 2014) ...........................5

*Chew v. Dietrich*,
   143 F.3d 24 (2d Cir. 1998) ...............................................................................................8

*Consorti v. Armstrong World Indus.*,
   72 F.3d 1003 (2d Cir. 1995) ...........................................................................................25

*CV Holdings, LLC v. Bernard Techs., Inc.*,
   14 A.D.3d 854 (N.Y. App. Div. 3d Dep't 2005) ...............................................................5

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014).................................................................................................*passim*

*Donk v. Miller*,
   2000 U.S. Dist. LEXIS 1871 (S.D.N.Y. Feb. 22, 2000)....................................................5

*EEOC v. Evans Fruit Co.*,
   2013 U.S. Dist. LEXIS 24624 (E.D. Wash. Feb. 20, 2013) ...........................................23

*Estate of Esther Klieman v. Palestinian Authority*,
   2015 U.S. Dist. LEXIS 25167 (D.D.C. Mar. 3, 2015) ................................................*passim*

*Fed. Home Loan Bank v. Ally Fin., Inc.,*
   2014 U.S. Dist. LEXIS 140975 (D. Mass. Sept. 30, 2014) ....................................................7

*Giles v. Rhodes,*
   2000 U.S. Dist. LEXIS 13980 (S.D.N.Y. Sept. 27, 2000) ...................................................18

*Gill v. Arab Bank, PLC,*
   893 F. Supp. 2d 523 (E.D.N.Y. 2012) ...................................................................... 15, 18

*Gilmore v. Palestinian Interim Self-Government Auth.,*
   53 F. Supp. 3d 191, 212 (D.D.C. 2014) ................................................................... 16, 18

*Gonzalez v. City of Schenectady,*
   2002 U.S. Dist. LEXIS 28953 (N.D.N.Y Dec. 28, 2002)...................................................26

*Goodyear Dunlop Tires Operations, SA v. Brown,*
   131 S. Ct. 2846 (2011) ................................................................................... 6, 7, 8

*Gucci Am. v. Bank of China,*
   768 F.3d 122 (2d Cir. 2014) .......................................................................... 6, 7, 8, 30

*Hawknet, Ltd. v. Overseas Shipping Agencies,*
   590 F.3d 87 (2d Cir. 2009) ........................................................................................6

*Estate of Heiser,*
   466 F. Supp. 2d 229 (D.D.C. 2006) .................................................................... 26, 27

*Hunter Douglas, Inc. v. Comfortex Corp.,*
   44 F. Supp. 2d 145 (N.D.N.Y. 1999) ......................................................................22

*IDS Life Ins. Co. v. SunAmerica Life Ins. Co.,*
   136 F.3d 537 (7th Cir. 1998)....................................................................................5

*Laydon v. Mizuho Bank, Ltd.,*
   2015 U.S. Dist. Lexis 44007 (S.D.N.Y. Mar. 31, 2015) (Daniels, J.) ("*Laydon II*") .................. 10, 12

*Laydon v. Mizuho Bank, Ltd.,*
   2015 U.S. Dist. LEXIS 44005 (S.D.N.Y. Mar. 31, 2015) (Daniels, J.) ("*Laydon I*").....................6, 7

*Linde v. Arab Bank, PLC,*
   920 F. Supp. 2d 282 (E.D.N.Y. 2011)....................................................................15

*Linde v. Arab Bank, PLC,*
   No. 04-cv-2799, (E.D.N.Y. May 28, 2013) ........................................................... 15, 17

*Livnat v. Palestinian Auth.,*
   2015 U.S. Dist. LEXIS 16522 (D.D.C. Feb. 11, 2015)..............................................*passim*

*LNC Invs., Inc. v. First Fidelity Bank, N.A. N.J.,*
    173 F.3d 454 (2d Cir. 1999) ................................................................................................25

*Lynch v. Town of Southampton,*
    492 F. Supp. 2d 197 (E.D.N.Y. 2007) ................................................................................26

*In re Magnetic Audiotape Antitrust Litig.,*
    334 F.3d 204 (2d Cir. 2003) ................................................................................................12

*Malcolm v. Nat'l Gypsum Co.,*
    995 F.2d 346 (2d Cir. 1993) ................................................................................................22

*In re Marc Rich & Co., A.G.,*
    707 F.2d 663 (2d Cir. 1983) ................................................................................................13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos,*
    553 F.2d 842 (2d Cir. 1977) ..................................................................................................5

*Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    709 F. Supp. 1279 (S.D.N.Y. 1989) ......................................................................................5

*Morales v. City of New York,*
    2000 U.S. Dist. LEXIS 18711 (S.D.N.Y. Dec. 29, 2000) ...................................................25

*Nairn v. Nat'l R.R. Passenger Corp.,*
    837 F.2d 565 (2d Cir. 1988) ................................................................................................25

*Richardson Greenshields Sec., Inc. v. Metz,*
    566 F. Supp. 131 (S.D.N.Y. 1983) ........................................................................................5

*Rosario v. Kuhlmann,*
    839 F.2d 918 (2d Cir. 1988) ................................................................................................22

*Safra v. Palestinian Auth.,*
    2015 U.S. Dist. LEXIS 16492 (D.D.C. Feb. 11, 2015) ...............................................*passim*

*SEC v. Straub,*
    921 F. Supp. 2d 244 (S.D.N.Y. 2013) ..............................................................................9, 14

*SEC v. Tourre,*
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................................................19

*SEC v. Unifund Sal,*
    910 F.2d 1028 (2d Cir. 1990) ..............................................................................................12

*In re Terrorist Attacks on Sept. 11, 2001,*
    538 F.3d 71 (2d Cir. 2008) ..................................................................................................13

*In re Terrorist Attacks on Sept. 11, 2001,*
    714 F.3d 659 (2d Cir. 2013) ................................................................................................12

*In re: Terrorist Attacks on September 11, 2001,*
    718 F. Supp. 2d 456 (S.D.N.Y. 2010) (Daniels, J.),
    *aff'd in part, rev'd in part on other grounds,* 714 F.3d 659 (2d Cir. 2013) .............................8, 13

*United States v. Al-Moayad,*
    545 F.3d 139 (2d Cir. 2008) ................................................................................................19

*United States v. Elizondo,*
    277 F. Supp. 2d 691 (S.D. Tex. 2002) .................................................................................20

*United States v. Jones,*
    16 F.3d 487 (2d Cir. 1994) ..................................................................................................23

*United States v. Weiland,*
    420 F.3d 1062 (9th Cir. 2005) .............................................................................................20

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) ..................................................................................................13

*Vasbinder v. Scott,*
    976 F.2d 118 (2d Cir. 1992) ................................................................................................25

*Walden v. Fiore,*
    134 S. Ct. 1115 (2014) ..........................................................................................9, 10, 11, 12

**Other Authorities**

Fed. R. Civ. P. 12 .................................................................................................... 4, 5, 6

Fed. R. Civ. P. 42 ...........................................................................................................22

Fed R. Civ. P. 50 ..............................................................................................................4

Fed. R. Evid. 403 ............................................................................................................20

## INTRODUCTION

Remarkably, in a 60-page opposition, **_Plaintiffs do not attempt to defend this Court's ruling that it has general jurisdiction_** over the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO"). Indeed, Plaintiffs muster no analysis of the trio of recent district court decisions from the District of Columbia that found no general jurisdiction over the PA and/or PLO in the wake of _Daimler_ (and that declined to follow this Court's ruling to the contrary), preferring to pretend the decisions do not exist. Therefore, Plaintiffs have now conceded that the foundation behind this Court's decision to go to trial – that it could exercise general personal jurisdiction over the PA and PLO – was erroneous. That error dictates the dismissal of this action.

Appreciating the error, Plaintiffs try to salvage the jurisdictional ruling by claiming waiver and invoking specific jurisdiction. But it is difficult to conceive of a defendant doing more to preserve the record on this issue, and the Court has already considered – and rejected – Plaintiffs' waiver argument. Specific jurisdiction fares no better. This Court previously questioned Plaintiffs' counsel at length on this issue, challenging the coherence of Plaintiffs' specific jurisdiction theory. Failing to take that cue, Plaintiffs' opposition brief here still does not elucidate the point. Instead, Plaintiffs raise specific jurisdiction arguments that the D.C. district courts expressly rejected and that cannot be squared with the record or existing caselaw in this area.

Plaintiffs' opposition confirms that this Court cannot exercise jurisdiction over the PA and PLO, and therefore it should dismiss this case. Beyond jurisdiction, Plaintiffs' response to the balance of the Rule 50/59 motion is selective – focusing on arguments they want to discuss while disregarding or minimizing points they find inconvenient.

Nowhere is this more pronounced than with respect to their discussion of the evidence and experts. While Plaintiffs brandish evidence regarding the attacks, they glide past the critical question of the supposed link between the attacks and the PA and PLO. Of course, they relied on experts to

try to establish that bridge at trial, recycling veterans of the purported new field of "terrorism experts" who regularly populate these cases, but who previously have been excluded for lack of true expertise.  Their testimony cannot withstand scrutiny, nor can it be reconciled with fundamental tenets of *Daubert*.  The experts sifted through evidence (much of which, such as IDF reports, were not susceptible to cross-examination), acting as fact-finders and telling the jury how it should rule on the ultimate issue.  Rather than lend their expertise, they offered lay opinions on who bore responsibility for the attacks (and who thought what and why).  A verdict based on such testimony cannot withstand appellate scrutiny.

The Court should grant the PA and PLO's Rule 50/59 motion and either enter judgment for Defendants or, alternatively, order a new trial.

## <u>ARGUMENT</u>

### I.      **This Court Lacks Jurisdiction Over The PA And PLO.**

Incredibly, after all of the briefing in this case on personal jurisdiction, nowhere in their opposition do Plaintiffs contend that the PA or PLO are "essentially at home" in the United States such that this Court can exercise general jurisdiction over them under *Daimler AG v. Bauman,* 134 S. Ct. 746 (2014).  Merely positing that this case is "exceptional" under *Daimler* (Opp. at 50) does not make it so.  As the PA and PLO demonstrated in their motion, three separate decisions have recently rejected this Court's jurisdictional analysis, determining that those courts could not exercise general jurisdiction over the PA and/or PLO consistent with *Daimler*: *Safra v. Palestinian Auth.*, 2015 U.S. Dist. LEXIS 16492 (D.D.C. Feb. 11, 2015); *Livnat v. Palestinian Auth.*, 2015 U.S. Dist. LEXIS 16522 (D.D.C. Feb. 11, 2015); and *Estate of Esther Klieman v. Palestinian Authority*, 2015 U.S. Dist. LEXIS 25167 (D.D.C. Mar. 3, 2015) (appeals pending in all three cases).

Other than "disagree[ing] with the reasoning" of *Safra, Livnat,* and *Klieman* (Opp. at 57), Plaintiffs do not substantively address – let alone distinguish – these cases.  Nor could they, as the

jurisdictional facts relating to the PA and PLO in these cases mirror the jurisdictional facts here. The decisions in these cases – along with the evidence adduced at trial establishing that the PA and PLO are "at home" in Palestine – are precisely the "significant change in the law" that this Court invited the PA and PLO to bring to its attention as a basis to reconsider its prior rulings. Apr. 11, 2014 Tr. at 63:1-13 (Doc. 478). The fact that Plaintiffs duck these decisions is telling, particularly since they face a higher jurisdictional bar post-trial than the *prima facie* standard (another point that they tacitly concede). Nor do Plaintiffs identify a single piece of evidence in the record that supports their (now-discarded) theory of general jurisdiction. In short, Plaintiffs acknowledge that this Court cannot exercise general jurisdiction.

Desperate to shift the focus away from general jurisdiction, Plaintiffs retreat to rehashing their waiver and specific jurisdiction arguments – arguments that this Court has previously found unpersuasive. Unlike the PA and PLO, however, Plaintiffs present no new, intervening change in the law that would support such reconsideration. To the contrary, they ignore the *Livnat, Safra*, and *Klieman* decisions that reject their theories.

### A.      The PA And PLO Have Not Waived Their Personal Jurisdiction Defense.

This Court has previously rejected Plaintiffs' waiver argument. *See, e.g.,* Doc. 657 at 3 n.2 ("Defendants' motions asserting lack of personal jurisdiction are not denied based on a theory of waiver."); Nov. 20, 2014 Tr. at 11-12 ("[W]ith regard to *Daimler*, I did not preclude the defendants from making that argument based on waiver.") (Doc. 648); Apr. 11, 2014 Tr. at 63 (inviting Defendants to "renew your application" in the event of a "change in the law"). Plaintiffs offer no basis for the Court to revisit these conclusions.

### 1.      The PA and PLO Have Consistently Objected to Personal Jurisdiction.

After complaining about the frequency with which the PA and PLO raised their personal jurisdiction defense (Doc. 424 at 2), Plaintiffs (with no small amount of irony) again contend that

the PA and PLO have waived such a defense.  It is difficult to imagine how a defendant could more readily preserve personal jurisdiction given the record of objections before the Court:

- In July 2007, Defendants filed a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) (Doc. 45).  In September 2008, the Court denied the motion without prejudice to renew following jurisdictional discovery (Doc. 58).

- Defendants renewed their motion to dismiss for lack of personal jurisdiction in 2010 (Doc. 82), and the Court denied the renewed motion on March 30, 2011(Doc. 87).

- On January 31, 2014, just 17 days after the Supreme Court's decision in *Daimler*, Defendants moved for reconsideration of the Court's March 30, 2011 decision (Doc. 421).  The Court denied the motion from the bench on April 11, 2014 (Doc. 537).

- Defendants moved to certify the personal jurisdiction issue for interlocutory appeal (Doc. 472), which the Court denied (Doc. 543).

- Defendants moved for summary judgment in May 2014, arguing that the Court does not have personal jurisdiction (Doc. 497 at 49-50).  On December 1, 2014, the Court denied the personal jurisdiction component of the motion (Doc. 657).

- Defendants sought mandamus from the Second Circuit on the *Daimler* issue in December 2014 (Case No. 14-4449).

- Defendants also raised their personal jurisdiction defense in a Rule 50(a) motion at trial and at the close of evidence – neither of which the Court has ruled on yet (Doc. 795 at 22-23; Doc. 819 at 23-25).

- In objecting to Plaintiffs' proposed judgment, Defendants again noted their position that the Court lacked personal jurisdiction over them (Doc. 829 at 1-2).

In sum, the PA and PLO timely raised and preserved their personal jurisdiction defense, calling to mind the *Klieman* court's rejection of the look-alike waiver argument there: "Defendants persistently have objected to personal jurisdiction throughout this case, including by filing two motions near the commencement of the action and a prior motion for reconsideration. . . . Plaintiffs therefore had ample notice of defendants' objection to personal jurisdiction through the litigation of this case."  2015 U.S. Dist. LEXIS 25167, at *11.  Likewise, here, as acknowledged by Plaintiffs'

counsel (Doc. 424 at 2), Plaintiffs had ample notice throughout the litigation of the personal jurisdiction objections.

Turning a blind eye to this record, Plaintiffs fixate instead on a June 2011 letter from defense counsel (Doc. 476-3) consenting to **venue** in the Southern District, which **followed** the Court's denial of the PA and PLO's personal jurisdiction and transfer motions.   Venue and personal jurisdiction are separate defenses, and waiving one does not necessarily waive the other, particularly when the other has already been rejected by the Court.   Not surprisingly, Plaintiffs cite no authority supporting this position, and we are aware of none.[1]   Nor do Plaintiffs identify any authority for their contention that the PA and PLO somehow waived personal jurisdiction by not including it their Rule 12(c) motion – again, that motion followed this Court's denial of the Rule 12(b)(2) motion.   To the contrary, having "raised the defense in a timely fashion," *see IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998), the PA and PLO could participate in the litigation on the merits without waiving the defense, as "it is settled law that a defendant who has properly objected to a lack of personal jurisdiction in an answer or motion to dismiss may thereafter fully participate in the action without waiving the objection."   *Donk v. Miller*, 2000 U.S. Dist. LEXIS 1871, at *7-8 (S.D.N.Y. Feb. 22, 2000); *see also Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989) (no waiver when defendants "promptly challenged the

---

[1] The cases cited in the Opposition (at 48) are inapposite, as all involve forum selection clauses addressing parties' pre-dispute agreements to venue and jurisdiction.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos*, 553 F.2d 842, 843-44 (2d Cir. 1977) (ruling that a forum selection clause requiring arbitration in New York constituted consent to personal jurisdiction in New York); *Richardson Greenshields Sec., Inc. v. Metz*, 566 F. Supp. 131, 133 (S.D.N.Y. 1983) (forum-selection clause in a customer's agreement); *CA, Inc. v. Stonebranch, Inc.*, No. 12-5988, 2014 U.S. Dist. LEXIS 32165, at *8 (E.D.N.Y. Jan. 27, 2014) (choice of forum provision in an employment agreement); *CV Holdings, LLC v. Bernard Techs., Inc.*, 14 A.D.3d 854, 854 (N.Y. App. Div. 3d Dep't 2005) (forum selection clause in a promissory note).  None involves the situation where a defendant consents to venue following denial of a personal jurisdiction motion.

court's jurisdiction [by a Rule 12 motion] and their participation in the case has only followed their assertion of that defense").

> **2.**    **The PA and PLO Could Not Waive A Defense That Was Not Available Until the Supreme Court's Decision in *Daimler*.**

Plaintiffs' waiver theories also run afoul of *Gucci Am. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014), because *Daimler*'s "at home" standard was not available when the PA and PLO purportedly waived that defense.  In *Gucci*, the Bank of China, a nonparty appellant, appeared in the district court and did not contest personal jurisdiction; however, while the case was on appeal, the Supreme Court handed down *Daimler*.  The Second Circuit refused to find waiver, explaining: "a defendant does not waive a personal jurisdiction argument—even if he does not make it in the district court—if the 'argument that the court lacked jurisdiction over the defendant would have been directly contrary to controlling precedent in this Circuit.'"  *Id.* at 135-36 (quoting *Hawknet, Ltd. v. Overseas Shipping Agencies,* 590 F.3d 87, 92 (2d Cir. 2009) ("a party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made")).  The Second Circuit held that, prior to *Daimler*, precedent dictated that the bank was subject to general jurisdiction, meaning it could not have waived its personal jurisdiction objection.  *Gucci*, 768 F.3d at 135-36.

Applying *Gucci,* this Court has held elsewhere that the failure to raise personal jurisdiction in motions to dismiss filed in June 2013 did not constitute waiver because "the[ ] Rule 12(b)(2) jurisdictional defense was not available before *Daimler*."  *Laydon v. Mizuho Bank, Ltd.,* 2015 U.S. Dist. LEXIS 44005, at *23 (S.D.N.Y. Mar. 31, 2015) (Daniels, J.) ("*Laydon I*").  Plaintiffs try to circumvent *Gucci* by insisting that the "at home" standard emerged in 2011 in the wake of *Goodyear Dunlop Tires Operations, SA v. Brown,* 131 S. Ct. 2846 (2011).  *See* Opp. at 49.  But this argument cannot be squared with *Gucci, Laydon,* or other decisions that have considered and expressly rejected this contention.

The orders on appeal in *Gucci* were decided after *Goodyear* but before *Daimler*.  *Gucci,* 768 F.3d at 128. Declining to find waiver, the Second Circuit held that *Daimler* addressed "for the first time" whether the continuous and systematic contacts of a defendant's local offices or subsidiaries could support the exercise of general jurisdiction.  *Id.* at 134-35.  Likewise, this Court in *Laydon I* declined to find waiver when the defendants did not raise such defenses in motions to dismiss filed after *Goodyear* but prior to *Daimler*.  *Laydon I,* 2015 U.S. Dist. LEXIS 44005, at *23.[2]

> *Daimler* "announce[d] [a] new rule" that continuously and systematically doing business in a forum is no longer sufficient for the exercise of general jurisdiction.  *Daimler,* 134 S. Ct. at 769-70 (Sotomayor, J., concurring).  "Although the 'at home' language first appeared in the Supreme Court's 2011 decision in *Goodyear*, the reach of this language was not immediately clear. … It was only after the Supreme Court issued its decision in *Daimler* that the scope of *Goodyear's* 'at home' test was appreciated."  *Klieman,* 2015 U.S. Dist. LEXIS 25167, at *12-13.  In other words, prior to *Daimler*, it was not clear whether *Goodyear* simply confirmed existing law or applied beyond stream-of-commerce cases.  *Klieman,* 2015 U.S. Dist. LEXIS 25167, at *12-13 (citing *U.S. ex rel Barko v. Halliburton Co.*, 952 F. Supp. 2d 108, 115-16 (D.D.C. 2013) ("declining to apply the *Goodyear* 'at home' test outside of the stream of commerce context"); 4 Wright & Miller, Fed. Prac. & Proc. § 1067.5 (3d ed. Supp. 2013) ("If the *Goodyear* opinion stands for anything . . . it simply reaffirms that defendants must have continuous and systematic contacts with the forum in order to be subject to general jurisdiction.")).  *See also Fed. Home Loan Bank v. Ally Fin., Inc.*, 2014 U.S. Dist. LEXIS 140975, at *25-27 (D. Mass. Sept. 30, 2014) (noting that, prior to *Daimler*, the analysis was a "holistic

---

[2] In *Laydon I,* this Court did find, however, that defendants waived their jurisdictional defenses by waiting until seven months after *Daimler* to raise the matter.  *Laydon I,* 2015 U.S. Dist. LEXIS 44005, at *24-26.  Plaintiffs could not make such an argument here, as the PA and PLO asked the Court to reconsider its assertion of personal jurisdiction just days after *Daimler*.  Doc. 421.

consideration of 'a corporation's activities in their entirety, nationwide and worldwide" but that *Daimler* now required "a tighter assessment of the standard than perhaps was clear from *Goodyear*").

Given Defendants' consistent preservation of their personal jurisdiction objections throughout this litigation, and in light of *Gucci,* Plaintiffs present no grounds for this Court to reconsider its prior finding that "Defendants' motions asserting lack of personal jurisdiction are not denied based on a theory of waiver."  Doc. 657 at 3 n.2.

### B.   The Jurisdictional Inquiry Under The Fifth Amendment Is The Same As Under The Fourteenth Amendment.

As their next bid for avoiding the consequences of *Daimler*, Plaintiffs posit that it should not apply because the Fifth Amendment, rather than the Fourteenth Amendment, supplies the due process standard here.  Opp. at 51-53.  This argument irreconcilably conflicts with the Second Circuit's finding that "the due process analysis is basically the same under both the Fifth and Fourteenth Amendments.  The principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered."  *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998).  Here, that is a distinction without a difference, because the PA and the PLO are no more "at home" in the United States as a whole than they are "at home" in New York.

Recognizing that *Chew* spells the demise of their argument, Plaintiffs suggest that this Court can safely disregard *Chew* because it did not involve "national security implications." (Opp. at 52).  Plaintiffs provide no case law support for eradicating due process protections in the name of "national security," and that path has proven unavailing in other contexts.  Indeed, this Court, invoking *Chew,* held in the 9/11 MDL—a "national security" case to be sure—that the due process analysis is the same regardless of whether the Fifth or Fourteenth Amendment controlled.  *See In re: Terrorist Attacks on September 11, 2001,* 718 F. Supp. 2d 456, 469 (S.D.N.Y. 2010) (Daniels, J.)*, aff'd in*

*part, rev'd in part on other grounds,* 714 F.3d 659 (2d Cir. 2013). *See also SEC v. Straub,* 921 F. Supp. 2d

244, 253 (S.D.N.Y. 2013) ("[B]ecause the language of the Fifth Amendment's due process clause is

identical to that of the Fourteenth Amendment's due process clause, the same general principles

guide the minimum contacts analysis."). *Livnat, Safra,* and *Klieman* all rejected this very argument:

> [N]otwithstanding Plaintiffs' argument to the contrary, there is no indication that a
> more flexible jurisdictional inquiry is required in a case governed by the Due Process
> clause of the Fifth Amendment, such as this one, rather than under the Due Process
> clause of the Fourteenth Amendment.  It is undisputed that, because the inquiry here
> is pursuant to the Fifth Amendment, the relevant contacts are Defendant's contacts
> with the United States rather than individual state.  . . . But the inquiries are
> otherwise the same.

*Livnat,* 2015 U.S. Dist. LEXIS 16522, at *23; *Safra,* 2015 U.S. Dist. LEXIS 16492, at *22-23; *Klieman,*

2015 U.S. Dist. LEXIS 25167, at *18 n.4 ("[t]he minimum contacts analysis . . . is the same under

the Fifth Amendment and Fourteenth Amendment").  Nor can Plaintiffs demand a more "flexible"

inquiry premised upon Congress's intention for the Anti-Terrorism Act to apply extraterritorially.

Opp. at 52.  The *Livnat* and *Safra* court rejected that argument, explaining that "while Congress can

establish jurisdiction to the full extent allowed by the Due Process clause, it is beyond Congress's

power to establish jurisdiction outside the constraints of that clause."  *Livnat,* 2015 U.S. Dist. LEXIS

16522, at *25; *Safra,* 2015 U.S. Dist. LEXIS 16492, at *24 (same).  Whether under the Fifth or the

Fourteenth Amendment, the PA and the PLO are not "at home" in a U.S. forum.

### C.     The Court Does Not Have Specific Jurisdiction.

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident

defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v.*

*Fiore,* 134 S. Ct. 1115, 1121 (2014) (internal quotations and citation omitted).  In order for a court to

exercise specific personal jurisdiction, "the defendant's suit-related conduct must create a *substantial*

*connection* with the forum State," or, in this case, the United States.  *Id.*  (emphasis added).  As the

Supreme Court explained, "the relationship must arise out of contacts that the 'defendant *himself'*

creates with the forum." *Id.* at 1122 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). And, the "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with the other persons affiliated with the State." *Id.* at 1123; *see also Laydon v. Mizuho Bank, Ltd.*, 2015 U.S. Dist. Lexis 44007, *10 (S.D.N.Y. Mar. 31, 2015) (Daniels, J.) ("*Laydon II*") ("[T]he plaintiff cannot be the only link between the defendant and the forum.") (*quoting Walden*, 134 S. Ct. at 1122).

Plaintiffs' attempt to justify specific jurisdiction is largely premised on arguments now foreclosed by *Walden* and its progeny.  Insisting that "one goal of the [Defendants'] terror campaign was influencing U.S. policy," Plaintiffs describe a "two-pronged approach" that includes "carrying out a massive terror campaign in Israel" and "advancing the argument in the United States and elsewhere that the terror campaign would stop when defendants achieved their political goals." Opp. at 54-55.  This argument shows little regard for this Court's prior views on the subject, runs afoul of the D.C. decisions, stands inconsistent with recent Supreme Court guidance on specific jurisdiction, and is not supported by the "evidence" highlighted by Plaintiffs.

This Court has considered, and consistently refused to endorse, Plaintiffs' specific jurisdiction theory in this case.  *See* Docs. 87, 657 (exercising general – but not specific – personal jurisdiction over Defendants).  Indeed, in view of the lack of coherence of Plaintiffs' argument, this Court repeatedly pressed Plaintiffs to explain the basis for their claim: "I don't understand how the nonviolent rhetoric in the United States is what you want to latch on to sufficient for specific jurisdiction.  Under what theory?  . . . What is your legal theory of specific jurisdiction?  I don't understand." Apr. 11, 2014 Tr. at 47:16-18, 24-25.  *See also id.* at 43:20-22 ("Remind me of what your specific jurisdiction argument was because I didn't understand as articulated.").  Plaintiffs never

provided a satisfactory answer to those questions, nor do they now.  In fact, given that the recent decisions in *Safra, Livnat,* and *Klieman* rejected the very theories of specific jurisdiction now advanced by Plaintiffs, there is all the more reason for the Court to adhere to its longstanding refusal to exercise specific jurisdiction.

*Klieman* rejected a comparable theory premised on the notion that "while engaged in the terror campaign in Israel, defendants simultaneously conducted a publicity campaign in the United States intended to pressure the United States government to persuade Israel to withdraw from Gaza and the West Bank." *Klieman,* 2015 U.S. Dist. LEXIS 25167, at *22.  Describing this "theory" as "tenuous at best," the *Klieman* court found "[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit." *Id.* (citing *Walden,* 134 S. Ct. at 1121).  As the Supreme Court explained in *Walden,* "defendant's suit-related conduct must create a substantial connection with the forum State."  134 S. Ct. at 1121.  Plaintiffs' argument that the Second Circuit does not require this substantial connection is, at a minimum, no longer tenable in light of *Walden.  See* Opp. at 58 n.28.  Moreover, in *Safra* and *Livnat,* the court found "insufficient links" between the attacks at issue in those cases and the United States to support specific jurisdiction under "Plaintiffs' theory that the Palestinian Authority generally uses acts of terrorism in order to influence U.S. government policy."  *See Livnat*, 2015 U.S. Dist. LEXIS 16522, at *34; *Safra*, 2015 U.S. Dist. LEXIS 16492, at *33-34.   Against this backdrop, Plaintiffs offer no authority that would endorse such a "tenuous" theory.

Similarly, Plaintiffs' argument that the "effects test" permits specific jurisdiction cannot be squared with the Supreme Court's decision in *Walden,* as recognized by *Klieman, Livnat,* and *Safra.* The court in *Klieman* rejected plaintiffs' argument that premised specific jurisdiction on the notion that injury to Americans was a "foreseeable result" of the defendants' conduct in Israel.  2015 U.S. Dist. LEXIS 25167, at *25-27.  This "foreseeability test" has been "rejected by the Supreme Court

repeatedly," and, regardless, the plaintiffs failed to make a showing that the "defendants' alleged conduct – providing support for terrorist organizations in Israel – focused on the United States, or that the resulting harm was disproportionately suffered in the United States." *Id.* The Second Circuit has likewise refused to endorse the foreseeability theory: "[T]he fact that harm in the forum is foreseeable, however, is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013)*; see also Laydon II*, 2015 U.S. Dist. Lexis 44007, *11 ("[F]oreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.") (citations/quotations omitted).

In *Livnat* and *Safra,* the court similarly rejected specific jurisdiction based on the "effects test": "Plaintiffs' argument that specific jurisdiction may be based on the effects of the Palestinian Authority's acts on the U.S. *citizens* living in Israel is vitiated by the Supreme Court's holding in *Walden* that the 'minimum contacts analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'" *Livnat*, 2015 U.S. Dist. LEXIS 16522, at *35 (quoting *Walden,* 134 S. Ct. 1122) (internal marks omitted); *Safra*, 2015 U.S. Dist. LEXIS 16492, at *34. Refusing to exercise jurisdiction over the PA, the court distinguished that scenario from "an attack on an American embassy or an attack that would be likely to 'cause pain or sow terror' in the U.S. in anywhere near the same extent as an attack on an American embassy would cause," which might support specific jurisdiction. *Livnat*, 2015 U.S. Dist. LEXIS 16522, at *37-38; *Safra*, 2015 U.S. Dist. LEXIS 16492, at *37-38. As in *Livnat, Safra,* and *Klieman*, this is not an instance in which "defendants acted abroad but 'expressly aimed' their conduct at U.S. interests."[3]

---

[3] This case is also distinguishable from the cases Plaintiffs rely upon. *See, e.g., SEC v. Unifund Sal*, 910 F.2d 1028, 1033 (2d Cir. 1990) (defendant traded options of a U.S. corporation listed exclusively on a U.S. stock exchange, and "[t]hat activity created the near certainty that United States shareholders . . . would be adversely affected"); *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206-08 (2d Cir. 2003) (defendant directed the activities of employees of its U.S. subsidiary and a

Opp. at 56. *See also In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d at 480 ("The Second Circuit identified a defendant's alleged intentional, tortious conduct that is expressly aimed at the United States as being a necessary prerequisite to the exercise of specific jurisdiction.") (*citing In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 94-96 (2d Cir. 2008)).

Against that backdrop, the two exhibits (Exhibits 175 and 200, cited at Opp. 55, 58) identified by Plaintiffs cannot support their assertion that "defendants repeatedly and openly stated their intention to use their terror campaign to influence U.S. policy." Opp. at 55. To the contrary, Exhibit 175 provides that Palestinians should *not* encourage "strik[ing] against American interests throughout the world" and notes that "Arab and Islamist communities in [the European nations and U.S.] play a prominent role pressuring these governments, by turning out for impressive, peaceful marches aimed at getting foreign nations to exert positive and effective pressure on Israel." (Ex. 175 at P1: 1009). And, Exhibit 200 explains that a "ceasefire would be in Palestinians' unadulterated best interests." (Ex. 200 at P1: 3065). Perhaps appreciating the lack of relevance of these exhibits, Plaintiffs retreat to "rhetoric" that the Court has held inadmissible and found has "absolutely no probative value." Dec. 16, 2014 Tr. at 61:19-63:11 (Doc. 687). More importantly, Plaintiffs do not – and cannot – explain how this "rhetoric" provides any basis for specific jurisdiction.

Plaintiffs' final plea for specific jurisdiction (*i.e.*, that the Court may exercise jurisdiction if a defendant is "systematically and continuously present in the United States") makes no sense. The opinion of this Court that Plaintiffs rely upon focused on general, not specific, personal jurisdiction, finding that the contacts at issue "provided a sufficient basis to exercise *general* jurisdiction over the

---

conspiracy that was "purposefully directed" at the U.S.); *In re Marc Rich & Co., A.G.*, 707 F.2d 663, 667-68 (2d Cir. 1983) (conspiracy to violate U.S. tax laws that occurred in the U.S., and some of the members of the appellant's board were U.S. residents); *United States v. Yousef*, 327 F.3d 56, 77-78 (2d Cir. 2003) (defendants convicted of involvement with a conspiracy to bomb U.S. commercial airliners as well as the 1993 bombing of the World Trade Center).

Defendants." (Doc. 87 at 14, emphasis added). Moreover, Plaintiffs' conclusory assertion that these particular contacts suffice for jurisdiction cannot explain how this litigation "arises out of or relates to the defendant's contact with the forum," *SEC v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) (internal quotations and citations omitted), because there simply is no such nexus.

## II.     New Separate Trials Are Required By A Series Of Substantial Errors That Created Unfair Prejudice To Defendants.

### A.     The Court Allowed Plaintiffs to Present Improper Expert Testimony.

Plaintiffs' defense of the "expert" testimony of Eviatar and Shrenzel in fact highlights the improper nature of their roles as mere cheerleaders for inferences that Plaintiffs wanted the jury to draw. The Court aptly summarized why experts cannot be used as inferers-in-chief:

> THE COURT: You think it takes an expert for you to make the inference that if somebody is committing terrorist acts that you want to argue to the jury that they should infer from that that they approved of those terrorist acts because they didn't fire him? You think you need an expert to make that argument? I don't think the expert has any greater opinion on that issue than you or I.

Dec. 16, 2014 Tr. at 206:22-207:3.

Despite the Court's clear rule-of-the-road, Plaintiffs' "experts" did nothing more than sign-post for the jury the route that they wanted the jury to take. One of the major topics of "expert" testimony concerned PA social and political policies, including prisoner and related payments and promotions. Each "expert" offered his view about the effect those policies had on the population. *See* Jan. 16, 2015 Tr. at 571:1-8; 592:5-11; 603:14-24 (Eviatar) (such policies are not "social welfare payments" but are "economic incentives [that] prod and assist the prisoner to go ahead and carry out...terror attacks") and Jan 28, 2015 Tr. at 1577:19-1578:9 (Shrenzel) ("this is a reflection of the policy of the PA. They wanted him to do to it [commit a terrorist attack]. He did it.").

- 14 -

Plaintiffs are forced to concede that this type of testimony improperly invaded the province of the jury.   Opp. at 3 ("Assessing the effect of those policies was the jury's task").   But they refuse to reconcile that concession with their experts' actual testimony.

Although Eviatar and Shrenzel did not have "any greater opinion on that issue than you or I," they repeatedly offered the jury their personal viewpoint that PA policies had the effect of supporting terrorism.   This pontification reflects no more "expertise", and has no greater evidentiary weight, than a former KGB agent testifying that crime in America results from welfare payments.

An old adage tells us that everyone is entitled to his opinion, but *Daubert* reminds us that not everyone is entitled to share that opinion with a jury.   *Linde* further explains that expert testimony cannot include subjective views and factual inferences about state of mind, intent, motive or the ultimate issues to be decided by the jury.   *Linde v. Arab Bank, PLC*, No. 04-cv-2799, Doc. 954 at 1-3, 8 (E.D.N.Y. May 28, 2013); *id.* at Doc. 780, *id.* at Dec. 19, 2011 Tr. at 6:4-19, 7:15-22 (filed Dec. 22, 2011)*; Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011).   Underscoring the point, Plaintiffs mistake the general experience and background of their "experts" as a substitute for a reliable methodology.   (Opp. at 20-22).

Plaintiffs rely heavily on *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523 (E.D.N.Y. 2012) and other authorities for the proposition that terrorist cases support some looser notion of expert testimony.   Opp. at 19.   But as the Court previously observed, this was not a complex case:

> [L]ook, the evidence is not as complex as you guys want to make it out to be. It is not that complicated a case.   Either you're going to be able to tie them to these incidents or you're not; and if the jury finds that there is evidence that a reasonable jury can conclude that they were participants in these terrorist acts or that the people who they employed knew that they had the permission and encouragement of the employer during the course of their employ[ment] to do these, or they had some direct participation, they're going to find them liable.   As you say, each one of the acts is very straightforward, not complicated.

- 15 -

Dec. 16, 2014 Tr. at 200:7-17. The key question was whether Plaintiffs could "tie" the attacks to the PA/PLO, and Plaintiffs should not have been able to seek refuge in expert testimony that was nothing more than the "commonsense and general deductive principles that any non-expert finder of fact would rely upon." *See Gilmore v. Palestinian Interim Self-Government Auth.*, 53 F. Supp. 3d 191, 212 (D.D.C. 2014) (excluding Mr. Eviatar).

Although the law bars experts from providing mere "factual inferences" (*see supra*), Mr. Shrenzel repeatedly shared his personal views on Defendants' state of mind with the jury, or as he coined it, the "attitude of the defendants." *See* Opp. at 22-23, *citing* Dec. 22, 2014 Tr. 1074-75 (Mr. Shrenzel's opinions are based on his team analyzing documents "to understand what actually happened, who was involved, and what was [sic] the links of the perpetrators to the PA, to the defendants, *and what was, let's say, the attitude of the defendants* toward that attack and towards its perpetrators" (emphasis added)).  Indeed, in persuading the Court to allow these experts at trial, Plaintiffs promised (pretrial) that their experts "will not testify directly as to state of mind."  Doc. 540 at 8.  At trial, however, Plaintiffs executed a bait-and-switch by wielding their experts to opine on state of mind, intent, motive, as well as simply summarizing the evidence and opining on the ultimate issues to be decided by the jury.  Examples abound, including:

- Tr. 839:22-840:6 (Eviatar) (summarizing facts not in evidence and speculating that "Ibrahim Hamid gave the order to perpetrate this terrorist attack.  He led it, he planned it, he helped by providing the resources.  By saying that, I mean the explosives, for example.  He gave instructions to members of the cell, and he in essence was the conductor, in quotation marks, of that terrorist attack");

- Tr. 1096:21-1097:10 (Shrenzel) (describing and summarizing with a flourish "generally what happened" in the January 22 shooting attack, including that "a Palestinian policeman opened indiscriminate fire against a crowd" and "Later he was captured and killed by Israeli security forces that rushed to the scene");

- Tr. 1101:11-22 (Shrenzel) (speculating what the PA "means when they say he was martyred" including that "an official of the PA considers such an attack against civilians in the center of Jerusalem as a performance of a national duty");

- Tr. 1162:25-1164:3 (Shrenzel) (giving his opinion "on the relationship between perpetrators and the PA with regard to terror" – the exact issue the jury was tasked with deciding);

- Tr. 1205:2-1206:22 (Shrenzel) (characterizing evidence not before the jury to argue as to "the relationship between PA's policies and the perpetrators" including what "we've already demonstrated in the previous attack");

- Tr. 1381:4-11 (Shrenzel) (arguing that "We have strong evidence, as a matter of fact, that Arafat himself provided financial aid to AAMB squads just a few days after the attack");

- Tr. 1428:6-18 (Shrenzel) (giving his opinion that "I believe it was an AAMB attack");

- Tr. 1578:1-9 (Shrenzel) (stating "what policy it reflects to give promotions to individuals" by arguing "it reflects a policy of praise, of appreciation, of endorsing what he did. And this is really unthinkable, yes?").

This type of testimony improperly crossed the *Daubert* line because it was more akin to a lawyer's summation than expert opinion. *Linde v. Arab Bank, PLC*, No. 04-cv-2799, Doc. 954 at 1 (E.D.N.Y. May 28, 2013). The "experts" embellished their testimony with legal conclusions like "joint venture," offered mind-reading inferences about why terrorists "probably" acted as they did, and unabashedly announced their role as advocates for "our case." Exemplifying each of these *Daubert* defects, Mr. Shrenzel testified over objection that:

> It's a bit complicated story but a very interesting one, and *I think it contributes to our case* so I will go on and describe it. This fellow Hashaika, he was, as I said, a member of the police, and *he looked for opportunities to carry out a suicide attack. He first contacted the Islamic Jihad, and he went out on a mission to carry out an explosive attack, a suicide attack* on, as we understand it, the 10th of February, 2002. *Probably it was some kind of a joint venture between the PIJ and Fatah.* Now, this attack was not carried out. He was sitting in a vehicle with Nasser Shawish and, as we understand from various sources, they decided not to carry it out, *probably* because of Israeli checkpoints and other obstacles to carrying out of this attack…Promise me to complete the story.

Jan. 22, 2015 Tr. at 1168:6-1169:1 (emphasis added). Assumptions, speculation, and equivocation punctuated this testimony, all of which is inimical to the rigors of *Daubert*.

Plaintiffs try to justify much of this testimony by accusing the PA and the PLO of "open[ing] the door," but that simply is not true. First, *Daubert* invests in the district courts a special

- 17 -

obligation to serve as gatekeeper against inadmissible expert testimony; *Daubert* does not permit improper expert testimony to infect a trial based on an argument that a party has opened a door. *Giles v. Rhodes*, 2000 U.S. Dist. LEXIS 13980 at *63-64 (S.D.N.Y. Sept. 27, 2000). Second, the PA and PLO had objected to the entirety of such testimony (*see* Docs. 500, 555, 574, 717, Dec. 16, 2014 Tr. at 190-208), but those objections were overruled, forcing the defense to question the witnesses.

Even then, the PA and PLO could not adequately cross-examine the hearsay Israeli Defense Force reports relied on by Messrs. Eviatar and Shrenzel because the reports were developed and obtained through confidential government investigations without attribution or sources; and at the same time, the jury was encouraged to put unfairly prejudicial value and weight on those inadmissible reports. *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 541-42 (E.D.N.Y. 2012) (disallowing testimony from former Israeli security officers based on hearsay reports created during confidential investigations because they would not be subject to adequate cross-examination).

In sum, Messrs. Eviatar and Shrenzel improperly used their "expert" label to summarize inadmissible evidence with an advocate's spin, act as mind-readers of the knowledge, intent and motives of out-of-court actors, and advocate that the jury award what they saw as a just verdict in "our case." The massive judgment that Plaintiffs now seek to harvest from the jury's verdict cannot be allowed to rest on armchair experts. *Gilmore* may have been the first decision to catalog the reasons why Mr. Eviatar could not offer his inferences as expertise, but it should not be the last. *Gilmore*, 53 F. Supp. 3d at 211-14 (finding no "particular methodology" to Mr. Eviatar's analysis, and rejecting it for "'reviewing and weighing the evidence' in precisely the same manner as would an ordinary trier of fact"). While Plaintiffs seek to distinguish the facts of *Gilmore*, the same flaws in Mr. Eviatar's *methodology* that doomed his testimony in that case also exist here.

Plaintiffs concede that Messrs. Eviatar and Shrenzel were "key" and "important" drivers of their case. *See* Dec. 16, 2014 Tr. at 190:17; 197:24-25. The error in allowing their testimony to shape

- 18 -

the jury's verdict therefore cannot be viewed as harmless.  *See SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (cautionary instruction not enough to cure).

### B.    Other Evidentiary Errors Unfairly Contaminated the Trial.

Augmenting the improper inferences of their experts, Plaintiffs built their case on arguments about the impact of PA social welfare payments and the significance of polemical statements made by terrorists and in political publications.  The PA and PLO were unfairly prejudiced by the admission of this testimony, which obscured the real issue in the case—not whether these terrorist attacks occurred and injured plaintiffs, but whether the PA and the PLO materially supported the terrorists.  Plaintiffs' evidence was "overwhelming" only in the sense that the evidence of these tragic attacks and of the terrorists' self-justifying statements truly overwhelmed the jury's ability to focus on the utter absence of evidence linking the PA and the PLO to those attacks.

Plaintiffs do not dispute that they emphasized the welfare payments as a sufficient basis, standing alone, for the jury to find liability, instead arguing that the PA and PLO waived any objection by opening the door to the issue.  Opp. at 26-27.  This waiver argument rewrites history. *Plaintiffs* first argued in their opening that PA social welfare payments had the purpose and effect of "celebrat[ing]" and "glorifying" murder (Jan. 13, 2015 Tr. at 57:18-61:10), and the Court denied the defense motion for a mistrial after Plaintiffs' opening (*id.* at 71:19-74:6).  In light of Plaintiffs' statements and that ruling, the PA and PLO had no choice but to address those points.

Relatedly, Plaintiffs cannot justify the admission of the magazine articles that contained highly inflammatory speech but shed little (if any) light on any actions by the PA or PLO.  *See United States v. Al-Moayad,* 545 F.3d 139, 160 (2d Cir. 2008) ("[G]iven the highly charged and emotional nature of the testimony and its minimal evidentiary value, the [trial] court's decision was arbitrary.").  Seeking to minimize any claim of prejudice, Plaintiffs stress than the Court did not enable them to admit all of the magazines they wanted (Opp. at 29) – but that fails to address the substance of the

ones that made it to the jury.  Just as important to the prejudice created by the magazines is Plaintiffs' tacit concession that the only evidence that the PA was responsible for the magazines was Mr. Shrenzel's say-so.  Opp. at 27-28.  Admission cannot be supported on so slender a reed.  Rule 403 applies with particular force here because Plaintiffs adduced no evidence that the authors had authority to make these statements on behalf of the PA or PLO.  Mr. Shrenzel's proclamations were unsupported by any defensible methodology or expertise.

This Court should also reject Plaintiffs' defense of the indictments and custodial statements containing allegations of murder and violence unrelated to the attacks at issue.  Opp. at 30-31. Plaintiffs argue that the statements show that the PA had employees that were criminals and quote this Court's statement that the PA was "compensating" criminals.  Opp. at 30.  While the records show that a handful of PA employees – out of more than 155,000 – had criminal records, allowing Plaintiffs to read the indictments into the record exposed the PA and PLO "to a significant risk of unfair prejudice, because the jury would have been likely to base its verdict on the [indictments'] determination . . . rather than rely on its own evaluation of the underlying facts."  *United States v. Elizondo*, 277 F. Supp. 2d 691, 700-01 (S.D. Tex. 2002); *United States v. Weiland*, 420 F.3d 1062, 1077-79 (9th Cir. 2005) ("both the large number of admitted convictions and the fact that the jury viewed them without redacting the nature of the underlying offense increased the risk of prejudice while adding little to the case of the prosecution.").  Any relevance from this evidence was substantially outweighed by the likelihood that the jury would be inflamed by the detailed descriptions of murder and violence unrelated to the attacks at hand and therefore indict the PA with guilt by association.

## C.     This Court's Evidentiary Rulings Limited Defendants' Ability to Present a Full Defense.

This Court should also grant a new trial based on its improper exclusion of defense evidence.  Plaintiffs' chief response to this argument is to list their evidence that this Court

excluded—which did not amount to much.  *See* Opp. at 27.  Plaintiffs then argue that the PA and PLO were able to contextualize some of the evidence presented by Plaintiffs, while admitting that many of the explanations could only be made through the cross-examination of hostile witnesses. Opp. at 31-35.  But this Court's exclusion of the PA and PLO's affirmative testimony (Mot. at 21-23) truly limited their ability to confront the evidence against them.

For example, the PA and PLO could not fully develop testimony regarding the PA's lack of control over the average Palestinian during the time of the attacks.  Feb. 11, 2015 Tr. at 3304:18-3306:14.  Nor could Defendants develop testimony from a witness who ran the Social Affairs Ministry who would have explained the prisoner payments.  Opp. at 30; Feb. 11, 2015 Tr. at 3251:3-3256:25.  In addition, the Court precluded the introduction of critical rebuttal evidence that would have impeached and explained IDF reports asserting PA responsibility for the attacks and concluding that the PA controls Fatah and Hamas.  Jan. 21, 2015 Tr. at 921:22-928:5 & Feb. 11, 2015 Tr. at 3306:2-3308:6.

In similar vein, a new trial is also needed to cure the prejudice from allowing Plaintiffs to attack the PA's social support system without allowing the PA to provide context.  Incredibly, Plaintiffs posit that the trial was not about whether the PA was right or wrong to encourage resistance against Israel, nor about where the PA should have drawn the line.  Opp. at 31.

*But that was exactly what they made the trial about*—Plaintiffs repeatedly emphasized what they characterized as the PA's anti-Israel stance and statements, demonized the PA's decision to provide welfare support for the blameless Palestinian citizens who were survivors and dependents of attackers, and claimed that continuing payments to certain individuals endorsed their crimes. Because Plaintiffs portrayed the PA's social welfare policies as encouraging terrorism, it was imperative that the jury learn **why** the PA had those policies.  The United States and Europe provide

financial support to the PA in understanding of the vital role the PA plays in the region, including its counter-terrorism efforts.  The jury deserved a chance to reach the same understanding.

Plaintiffs claim that this Court properly excluded defense testimony on these issues as cumulative. Opp. at 32-33.  But that disregards the reality that Eviatar and Schrenzel were allowed to bloviate endlessly on what they discerned as the true purpose of PA social welfare payments (*see* Mot. at 21-23), while defense witnesses were allowed only scarce minutes to respond.  Among other items, this Court limited defense evidence about the purposes of the prisoner payments, Feb. 11, 2015 Tr. at 3251:3-3256:25, the PA's relationship with the Palestinian man on the street, Feb. 11, 2015 Tr. at 3304:18-3306:1, and IDF reports concluding that the PA controls Fatah and Hamas, Jan. 21, 2015 Tr. at 921:22-928:5 & Feb. 11, 2015 Tr. at 3306:2-3308:6.[4]  Defendants' limited and piecemeal opportunity to present certain evidence does not remedy the prejudice of these evidentiary rulings because an incomplete defense is no real defense at all.  *See Rosario v. Kuhlmann*, 839 F.2d 918, 924 (2d Cir. 1988) ("the right to present a defense is one of the minimum essentials of a fair trial") (citation/quotation omitted).

### D.    The Court's Failure to Sever the Trials Significantly Prejudiced Defendants.

Plaintiffs cannot hide behind the cloak of efficiency to defend a consolidated trial.  The avoidance of prejudice is "the Court's most important consideration in deciding whether to order separate trials under Rule 42(b)."  *See Hunter Douglas, Inc. v. Comfortex Corp.*, 44 F. Supp. 2d 145, 154 (N.D.N.Y. 1999) (citation omitted).  In short, "[t]he benefits of efficiency can never be purchased at the cost of fairness."  *Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350 (2d Cir. 1993).  The logical

---

[4] Plaintiffs accuse Defendants of "dishonesty" regarding  Glenn Robinson (Opp. at 32, n.13), but the record shows that defense counsel did not call Mr. Robinson because the Court indicated that it would find the bulk of Mr. Robinson's testimony inadmissible—and after Plaintiffs' counsel specifically requested the Court to preclude Mr. Robinson from testifying. (Feb. 11, 2015 Tr. at 3304:2-3308:10).

extension of Plaintiffs' reasoning is that a single trial could be had regarding every attack during a multi-year period, regardless of any connection other than the asserted liability of the defendants.

Mass trials are rightly condemned, regardless of "efficiency," when multiple defendants are thrown together to defend themselves against charges of fomenting social unrest in Third World countries. Efficiency is no more acceptable an excuse in our system for conducting a single trial of multiple separate torts, simply because Plaintiffs sought to conduct an inquest whether the PA and the PLO had anything to do with multiple attacks in different places, at different times. Inevitably, the jury was allowed—and, indeed, was openly invited by Plaintiffs' "experts" and counsel—to speculate that, with so many attacks, there must be some fire to go with the smoke.

Photo arrays and "attack binders," Opp. at 36, do not begin to address the enormous prejudice caused by the volume of evidence of unrelated attacks presented at trial. The jury faced six distinct attacks, each with its own discrete set of Plaintiffs, and 44 alleged perpetrators, many with similar names but different organizational ties. Simply because an encyclopedia has an index does not reduce the sheer volume and confusing nature of its contents. Rather than reducing prejudice, Plaintiffs' "demonstrative aids" magnified the harm arising from a consolidated trial – by reinforcing the notion that the PA and PLO must be guilty of something.

Nor could jury instructions cure the substantial spillover prejudice: "[t]he presumption that a jury will adhere to a limiting instruction evaporates when there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense." *United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994) (citation omitted). Therefore, in similar situations involving numerous plaintiffs bringing different claims against two defendants, courts have found that "[s]pecially crafted jury instructions and verdict forms cannot eliminate the danger of unfair prejudice and jury confusion." *See e.g., EEOC v. Evans Fruit Co.*, 2013 U.S. Dist. LEXIS 24624, at *4 (E.D. Wash. Feb. 20, 2013). New, separate trials are accordingly warranted.

**E.      The Court's Jury Instructions Did Not Cure the Unfair Prejudice and Confusion from Plaintiffs' Improper Closing Arguments.**

The Court's instruction on agency was improper, confusing and should not have been given. Mot. at 28-34; Opp. at 37-40.  Nor did the Court address the harm caused by Plaintiffs' improper closing.  Plaintiffs only confirm the error by emphasizing their nearly limitless view of agency:

- "As plaintiffs' counsel put it to the jury, a customer service representative who is on the job and solves a problem for a customer can fairly be considered the represent the entity.  Tr. 3781:82" (Opp. at 41-42);

- "Eviatar testified precisely that 'many hundreds from among the Palestinian security apparatuses were involved in terrorist activities during the Intifada.' Tr. 745" (Opp. at 42);

- "…the jury was fully entitled to conclude that Fatah was acting as an agent for the PLO, based on Al-Sheikh's testimony and other evidence in the record.  *See, e.g.,* Tr. 443-44 (Eviatar)" (Opp. at 43).

These statements explain how Plaintiffs spun their summation and what they intended the jury to take away from it.  Plaintiffs' position runs roughshod over the Court's directive that agency theories of liability were "absolutely not" applicable to low level employees.  Feb. 18, 2015 Tr. at 3619:2-10 (Court instructing the attorneys that as to low level employees, "I don't want you to argue it that way"); *see also* Feb. 11, 2015 Tr. at 3356:17-3358:25 (Court's refusal to give an alter ego jury instruction).  Instead, the Court explained that Plaintiffs had to prove the involvement of a senior official, the equivalent "in the U.S. context" of "the President of the United States and/or the Secretary of State."  Feb. 18, 2015 Tr. at 3591:7-15, 3618:13-3619:22.  Plaintiffs failed to do so, nor do they claim otherwise.

As for the instruction that would have enabled the jury to understand that Plaintiffs had to prove senior-level responsibility, the Court stressed that it "applies to every single claim that's on this verdict form.  If they can't find this, they should not find liability against your client. . . ."  Feb. 18, 2015 Tr. at 3586:7-16.  Despite their importance, the defense request for a "prefatory statement" to emphasize the point (Feb. 18, 2015 Tr. at 3593:25-3594:5), and the defense request for

clarification regarding authorization and control in the agency instruction (Doc. 592 at 19-21; Doc. 803; Doc. 813), the instructions did not incorporate the correct legal standard.  *LNC Invs., Inc. v. First Fidelity Bank, N.A. N.J.*, 173 F.3d 454, 463 (2d Cir. 1999).  Particularly in light of Plaintiffs' closing, the Court should have clarified that senior-level responsibility applied to all aspects of any agency finding.

### F.    The Jury's Damage Award Cannot Stand.

While district courts may permit counsel to ask for specific dollar amounts, the Second Circuit "emphasize[s] that specifying target amounts for the jury to award is *disfavored*" and "encourage[s] trial judges to bar such recommendations."  *Consorti v. Armstrong World Indus.*, 72 F.3d 1003, 1016 (2d Cir. 1995) (citation omitted; emphasis added).  Plaintiffs' counsel intended the jury to heed his suggested damages amounts, and the jury did.  *See* Ex. A & B to Rule 50/59 motion.

The resulting $218,500,000 damages award (before trebling) directly resulted from counsel's suggestions "anchor[ing] the jurors' expectations of a fair award at a place set by counsel, rather than by the evidence."  *Consorti*, 72 F.3d at 1016.  "While it is properly within the province of the jury to calculate damages, []there is 'an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law.'"  *Morales v. City of New York*, 2000 U.S. Dist. LEXIS 18711, *11 (S.D.N.Y. Dec. 29, 2000) (internal citations omitted).  Moreover, "while a defendant's conduct is obviously germane to the damages issue, 'even outrageous conduct will not support an oppressive or patently excessive award of damages.'"  *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992) (citations omitted).

To assess whether an award is grossly excessive (and/or shocks the conscience[5]), courts do review awards in other cases involving similar injuries.  *See Nairn*, 837 F.2d at 568.  In this vein,

---

[5] In applying the "shock the conscience" test, the Second Circuit has found a jury verdict of at least $400,000 for pain and suffering for a 15 % functional impairment to be excessive.  *Nairn v. Nat'l R.R.*

Plaintiffs cite to seven cases (involving default judgments) as illustrative of the ranges by which this Court should assess the jury's award for non-economic damages. *See generally* Opp. at 45-46, encapsulated in the following chart:

| Plaintiff | Plaintiffs' Proposed Range |
|---|---|
| Victim | $7 million-$17 million |
| Spouse | $6 million-$12 million |
| Parent | $5 million[6] |
| Child | $5 million-$12 million |
| Sibling | $2.5 million |

But even with that benchmark, the jury's verdict far exceeded default awards for non-economic damages. The jury awarded two victims damages for $20 million and $25 million, $13 million to a spouse, more than $5 million to six parents, and more than $2.5 million to four siblings. An upward departure of $1 million is considered "exceptional" – but here, many of the awards exceed that by several fold. *Brewer v. Islamic Rep. of Iran*, 664 F. Supp. 2d 43, 57-58 (D.D.C. 2009).

Similarly, Plaintiffs ignore the damages framework established in *Estate of Heiser*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) because the majority of the jury awards grossly exceed the *Heiser* parameters. Plaintiffs also contend that a family member may recover damages for emotional distress even if not present at the scene of the attack. But because damages under the ATA must be consistent with "general common law tort principles" (*Boim v. Quranic Literacy Inst.*, 291 F.3d 1000,

---

*Passenger Corp.*, 837 F.2d 565, 568 (2d Cir. 1988); *see also Bender v. City of New York*, 78 F.3d 787, 792 (2d Cir. 1996)(finding an emotional distress award excessive where it exceeded a reasonable award by $150,000); *Lynch v. Town of Southampton*, 492 F. Supp. 2d 197, 205-208 (E.D.N.Y. 2007)(finding an emotional distress award to "shock the judicial conscience" where it exceeded a reasonable award by $200,000); *Gonzalez v. City of Schenectady*, 2002 U.S. Dist. LEXIS 28953, *22-23 (N.D.N.Y Dec. 28, 2002)(finding emotional distress damages that exceeded $35,000 beyond what was the upper limit range of damages "shocks the Court's conscious").

[6] Contrary to Plaintiffs' assertion, *Boim v. Quaranic Literary Fund*, 291 F.3d 1000 (7th Cir. 2002), does not address parental awards.

1010 (7th Cir. 2002)), the discrepancies between such principles and the significant damages awarded dictate a new trial.

Whether viewed through the prism of default judgment cases that Plaintiffs offer, the *Heiser* framework, or general tort law principles, the damages awarded here by the jury are excessive – and that excess will only be magnified by trebling.  A new trial is accordingly warranted.

## III.  This Court Should Grant Judgment As A Matter Of Law Because The ATA Does Not Allow For *Respondeat Superior* Liability And Plaintiffs Failed To Meet Their Burden At Trial.

### A.    The ATA Does Not Allow for *Respondeat Superior* Liability.

This issue has been fully briefed on numerous occasions, and Plaintiffs offer nothing new on this point in their opposition.  Therefore, the PA and PLO rest on the arguments raised in the Rule 50/59 motion and previously on *respondeat superior* and the related jury instruction.

### B.    Judgment as a Matter of Law is Appropriate Because There was Insufficient Admissible Evidence Connecting Each Individual Attack to the PA or PLO.

Improper expert testimony created a trial environment that encouraged the jury to believe that any attack against Israelis was necessarily caused by the PA or PLO.  Plaintiffs' own summaries of the evidence for the individual attacks ratifies the point—showing that many attacks had absolutely no evidence that could support PA or PLO liability.  Because of space constraints, the PA and PLO will only address a few of these attacks, and will rely on their prior briefing for the balance.

   *1.    June 19, 2002 bombing.*  The only evidence Plaintiffs cite regarding this attack concerns the AAMB's responsibility and the fact that family members of one attacker received social welfare payments.  Opp. at 12-13.  Plaintiffs therefore retreat to their arguments that Defendants are responsible for AAMB attacks because the PA made payments to *Fatah*, the major political party of the West Bank.  *See id.* at 4-6.  Those arguments ignore that Fatah was not then, and is not now, designated as a terrorist organization by either Israel or the United States.  Plaintiffs resort to hearsay reports about the PA's state of mind regarding Fatah "activists" that were "also affiliated with the

[AAMB]." *Id.* at 5 (citing Ex. 496). But they provided no substantiation to support those hearsay assertions. Without actual evidence of that critical link to the AAMB, the PA's payments to Fatah (*see* Exs. 20, 173) could not support liability any more than could the military training and support that the United States has frequently provided to Fatah.[7]

The only other evidence Plaintiffs feature regarding this attack is a statement by Mr. Shrenzel, over objection, that President Arafat authorized payments to the AAMB *after* the attacks. Opp. at 13. Even if post-attack payments could be material support (which they cannot), Plaintiffs ignore the fact that Shrenzel provided no evidence for this point beyond his own say-so. *See* Jan 23, 2015 Tr. at 1381. More importantly, Shrenzel implied that the payments were from President Arafat himself, not the PA or PLO.

2.   *January 29, 2004 bombing.* The only trial evidence that Plaintiffs cite for this attack is that the AAMB claimed responsibility, that some of the attackers were PA employees, and the social welfare payments. Opp. at 15-16. As with the other bombings, there was *no evidence* that the attackers were, or believed they were, performing their duties as PA employees. *Id.* Despite the many transcripts and videos introduced by Plaintiffs where the attackers described their motivations, not once did any of them mention the PA, their jobs with the PA, or the PA's welfare system, as an incentive or inspiration for the attack. Nor did Plaintiffs provide any evidence that the PA trained its employees to conduct terrorism. That is a failure of proof that cannot be cured by speculation from Plaintiffs' experts about the possible motivations of terrorists.

Nor does the "atmosphere of an all-out attack against Israel" supposedly created by President Arafat justify Mr. Shrenzel's speculation that PA employees believed they had a duty as

---

[7] *See, e.g.,* M. Kalman, *U.S. training Fatah in anti-terror tactics,* Chronical Foreign Services, SF Gate (Dec. 16, 2006), available at: www.sfgate.com/news/article/U-S-training-Fatah-in-anti-terror-tactics-2465370.php; D. Murphy, *Israel, US, and Egypt back Fatah's fight against Hamas,* Christina Science Monitor (May 25, 2007), available at: www.csmonitor.com/2007/0525/p07s02-wome.html (both articles last visited June 1, 2015).

*employees* to attack.  *Id.* at 2.  Indeed, the ostensible PA statements, as described by Plaintiffs' experts, were that *all Palestinians* had a duty to resist Israeli occupation—a rhetorical appeal to nationality, not an employment relationship.  There was no evidence connecting PA employment with an increased likelihood of terror attacks.

    3.    *January 22, 2002 shooting.*  Once again, the only connection to this attack was through the AAMB and the PA employees that received social welfare payments.  Opp. at 6-8.  While Plaintiffs detail the PA's policies of supporting grieving families and paying prisoners, in the end they resort to arguing that the PA is liable for these attacks because the Palestinian approach to social welfare supposedly encourages rather than discourages attacks.  *Id.*  Setting aside the experts' lack of any credentials (or methodology) to make that sociological judgment, these arguments ring just as hollow now as they did at trial.  This Court already rejected Plaintiffs' claim that social welfare policies, such as "post-attack financial support to the families of terrorists," is a "violation of the ATA."  (Doc. 646 at 11 n.11).  It allowed those policies before the jury, not to show material support, but only as "circumstantial evidence . . . that the PA employees were acting within the scope of their employment."  *Id.*  Plaintiffs improperly made those payments the linchpin of their closing arguments for material support.  *See* Feb. 19, 2015 Tr. at 3787, 3789.

    This Court's decision prohibiting a link between social welfare payments and "material support" was correct.  Not only does Section 2339C(a)(1) speak of "material support" in prospective, not retrospective terms,  as shown by the banking cases cited by Plaintiffs, but the ATA also does not criminalize post-attack humanitarian assistance to individuals.  *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d at 685, 699 (7th Cir. 2008)(noting that medical aid to "Hamas fighters . . . with no questions asked about the patients' moral virtue" and the U.N.'s work to aid "individual refugees" regardless of terror connections did not violate that ATA).  The Seventh Circuit distinguished between individuals and terrorist organizations, explaining that such assistance to the

former "would be helping not a terrorist group but individual patients." *Id.*  PA's social welfare payments go to imprisoned *individuals* (who by definition lack the mobility and means to perform more attacks), and to the desperately poor Palestinian families who have no other means of financial support (and whose homes often have been destroyed by Israeli bulldozers).  There was no evidence at trial that the individuals receiving welfare payments used them for terror or remitted them to Hamas or the AAMB.

Importantly, any finding that the welfare payments constitute material support would create international comity problems.  *See Gucci Am.*, 768 F.3d at 139 (international comity "'refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states.'") (citation omitted).  Plaintiffs' claim is akin to an argument that the U.S. Government should be liable in tort to individual victims because its drug policies (such as incarcerating so many nonviolent drug offenders) have led to recidivism and a significant increase in violent drug crimes.  Just as a jury should not decide whether the U.S. is liable because its policy choices may have resulted in more drug-related violence, so should a jury not be allowed to decide whether the PA is liable under the ATA based on the jury's perception of the wisdom of the PA's policy choices for grieving families and prisoners.

This Court should grant judgment as a matter of law on each of the individual attacks (including those detailed in the motion) because Plaintiffs' evidence was insufficient to support liability under the ATA.

## **CONCLUSION**

This Court should enter judgment for the PA and the PLO given the lack of personal jurisdiction over them, or alternatively, grant new, separate trials if it does not enter judgment as a matter of law in favor of the PA and the PLO.

Dated:  June 2, 2015                    Respectfully Submitted,


                                        /s/ Gassan A. Baloul
                                        Gassan A. Baloul (Bar No. 4324919)
                                        SQUIRE PATTON BOGGS (US) LLP
                                        30 Rockefeller Plaza
                                        23rd Floor
                                        New York, NY  10112
                                        Telephone: (212) 872-9800
                                        Facsimile: (212) 872-9815
                                        gassan.baloul@squirepb.com

                                        John A. Burlingame (admitted pro hac vice)
                                        SQUIRE PATTON BOGGS (US) LLP
                                        2550 M Street, NW
                                        Washington, DC 20037
                                        Telephone: (202) 457-6000
                                        Facsimile: (202) 457-6315
                                        john.burlingame@squirepb.com

                                        *Attorneys for Defendants Palestinian Authority
                                        and Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2015, a true and correct copy of the foregoing was filed with the Clerk via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

/s/ Gassan A. Baloul
Gassan A. Baloul (Bar No. 4324919)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza
23rd Floor
New York, NY  10112
Telephone: (212) 872-9800
Facsimile: (212) 872-9815
gassan.baloul@squirepb.com