**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK I. SOKOLOW, et al.,<br>Plaintiffs,<br><br>v.<br><br>PALESTINE LIBERATION ORGANIZATION, et al.,<br><br>Defendants. | No. 1:04-cv-0397 (GBD) (RLE) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR RULE 62 MOTION TO STAY EXECUTION OF THE JUDGMENT AND TO WAIVE THE BOND REQUIREMENT**

Dated: June 15, 2015

Gassan A. Baloul (Bar No. 4324919)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 872-9800
Facsimile: (212) 872-9815
gassan.baloul@squirepb.com

John A. Burlingame *(admitted pro hac vice)*
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
john.burlingame@squirepb.com

*Attorneys for Defendants Palestinian Authority and Palestine Liberation Organization*

## TABLE OF CONTENTS

INTRODUCTION ........ 1

I. Defendants' Financial Condition Has Materially Degraded Since *Knox* and *Ungar*. ........ 3

II. Plaintiffs' Baseless Claims of Fraud and Concealment Are Easily Disproven By Plaintiffs' Own Evidence and by Decisions of Other Judges of this Court. ........ 6

A. Defendants Have No Access To or Control Over the PIF. ........ 6

B. Plaintiffs' Fraud Claim Is Belied By the U.S. Government's Continuing Financial Support of the PA, and Fails Under New York Law. ........ 7

III. Both the Traditional Four-Factor Stay Test and Plaintiffs' Supplemental *Dillon* Factors Test Favor a Stay Without a Bond. ........ 7

A. Defendants Satisfy the Traditional Four-Factor Stay Test, Which Plaintiffs Concede. ........ 7

B. Plaintiffs' Supplemental *Dillon* Factor Test Strongly Supports a Stay and Waiver of Security Here. ........ 9

CONCLUSION ........ 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acevedo-Garcia v. Vera-Monroig*,
296 F.3d 13 (1st Cir. 2002) .......... 9

*Augustin v. Nassau County Sheriff's Dep't (In re Nassau County Strip Search Cases)*,
783 F.3d 414 (2d Cir. 2015) .......... 3, 9

*Dillon v. Chicago*,
866 F.2d 902 (7th Cir. 1988) .......... 7, 9

*Estates of Ungar v. Palestinian Auth.*,
715 F. Supp. 2d 253 (D.R.I. 2010) .......... 5

*Estate of Esther Klieman v. Palestinian Auth.*,
2015 U.S. Dist. LEXIS 25167 (D.D.C. Mar. 3, 2015) .......... 8

*Hilton v. Braunskill*,
481 U.S. 770 (1987) .......... 7

*Hirschfeld v. Board of Elections*,
984 F.2d 35 (2d Cir. 1993) .......... 7

*Knox v. Orascom Telecom Holding S.A.E.*,
477 F. Supp. 2d 642 (S.D.N.Y. 2007) .......... *passim*

*Knox v. PLO*,
No. 03-4466, 2009 U.S. Dist. LEXIS 52610 (S.D.N.Y. Mar. 26, 2009) .......... 5

*Knox v. PLO*,
628 F. Supp. 2d 507 (S.D.N.Y. 2009) .......... 5

*Livnat v. Palestinian Auth.*,
2015 U.S. Dist. LEXIS 16522 (D.D.C. Feb. 11, 2015) .......... 8

*Olympia Equipment Leasing Co. v. Western Union Tel. Co.*,
786 F.2d 794 (7th Cir. 1986) .......... 3, 9

*Palestine Monetary Auth. v. Strachman*,
62 A.D.3d 213 (N.Y. App. Div. 1st Dep't 2009) .......... 7

*Safra v. Palestinian Auth.*,
No. 14-669, 2015 U.S. Dist. LEXIS 16492 (D.D.C. Feb. 11, 2015) .......... 8

*Schmude v. Sheahan*,
No. 00-4580, 2004 U.S. Dist. LEXIS 9513 (N.D. Ill. May 24, 2004) ........ 9

*SDF9 COBK LLC v. AF & AR LLC*,
No. 12-3078, 2015 U.S. Dist. LEXIS 68667 (E.D.N.Y. May 15, 2015) ........ 9

*Texaco, Inc. v. Pennzoil Co.*,
784 F.2d 1133 (2d Cir. 1986) ........ 8, 10

*Estate of Ungar v. Orascom Telecom Holding S.A.E.*,
578 F. Supp. 2d 536 (S.D.N.Y. 2008) ........ *passim*

**Other Authorities**

Cook, J. ""Lawfare", Israel's Continuation of War by Other Means," Global Research, http://www.globalresearch.ca/lawfare-israels-continuation-of-war-by-other-means/5443491 (Apr. 17, 2015) ........ 1

"Our Mission: Bankrupting Terror," http://israellawcenter.org/about/our-mission/ ........ 1

Fed. R. Civ. P. 60(b) ........ 5

Fed. R. Civ. P. 62 ........ *passim*

Fed. R. Civ. P. 69 ........ 5

# INTRODUCTION

Plaintiffs do not contest that a Rule 62 stay is justified here. Plaintiffs also do not challenge that this Court's exercise of personal jurisdiction over the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") has been undermined by recent D.C. federal court decisions dismissing three virtually identical cases for lack of jurisdiction over the PA and PLO.[1]

Instead, Plaintiffs present a false picture of the PA's financial condition to support their request that the Court force the PA to divert $360 million per year—*almost 10% of the PA's annual expenditures*—into the Court's registry in what they claim is an "equitable solution" to "protect Plaintiffs."[2] In truth, as Plaintiffs' counsel has declared repeatedly to the international media, their goal is entirely political: to use *Sokolow* to create "financial instability" in order to "obstruct" and "bankrupt" the PA and PLO, and thereby extinguish any chance for Palestinian Statehood: "If they want to become a State, they have to show that they can meet their obligations."[3] To that end, Plaintiffs seek to destabilize the PA—as any government would be by the sudden and recurring loss of 10% of its annual budgeted expenditures.

Plaintiffs also make outrageous accusations that Defendants have concealed additional PA assets, when other judges of this court have soundly rejected these same allegations—in cases

---

[1] *See* Doc. 895 (Defs.' Rule 50(b) and Rule 59 Motions, asserting challenges to personal jurisdiction); *see also* Doc. 898 (Defs. Rule 62 Motion) (incorporating Rule 50/59 Motions, including the jurisdiction challenge).

[2] *See* Exh. B, The Government of Palestine's Report to the Ad Hoc Liaison Committee dated May 27, 2015 ("AHLC Report"), at 17. All of the conversions herein from new Israeli shekels (NIS) to U.S. dollars are based on the prevailing exchange rate. An exchange rate of 3.95 NIS per dollar is used for all conversions herein for April 2015 and later. *See* Exh. A, April 2015 Operations, at 1. *See also* Opp. at 14.

[3] Cook, J. ""Lawfare", Israel's Continuation of War by Other Means," Global Research, http://www.globalresearch.ca/lawfare-israels-continuation-of-war-by-other-means/5443491 (Apr. 17, 2015) (quoting Plaintiffs' counsel, Nitsana Darshan-Leitner, in December 2014); *see also http://israellawcenter.org/about/our-mission/(*"By using legal action and civil lawsuits, [Plaintiffs' counsel] assists in bankrupting terror groups and grinding their activity to a halt. Through its innovative lawsuits on behalf of terror victims, [Plaintiffs' counsel] has succeeded in obstructing terror groups from operating within global financial and commercial systems.") (last visited June 14, 2015); "Our Mission: Bankrupting Terror," http://israellawcenter.org/about/our-mission/ (last visited June 14, 2015).

litigated by Plaintiffs' same lawyers.[4] Plaintiffs baselessly dub Palestinian social welfare payments as "fraudulent conveyances," ignoring that the U.S. government has consistently provided significant sums of foreign assistance to the PA, which would not have continued if the U.S. believed that underwriting the PA and PLO amounted to abetting a fraud or supporting terrorism.[5]

Subtracting 10% of the PA's annual expenditures for years to come, simply to secure these private Plaintiffs' jury award, would trigger potentially ruinous foreign policy consequences, as Secretary of State Kerry recently warned:

> If the Palestinian Authority ceases or were to cease, security cooperation – or even decide to disband as a result of their economic predicament, and that could happen in the near future if they don't receive additional revenues – then we would be faced with yet another crisis that could also greatly impact the security of both Palestinians and Israelis. And that would have the potential of serious ripple effects elsewhere in the region.[6]

With so much at stake, the PA and PLO respectfully urge the Court to solicit the views of the United States on the key issue of whether the PA can continue to govern, and to play an essential role in regional security and the Israel-Palestine peace process, if Plaintiffs are allowed to wreak havoc on the PA's annual expenditure budget in return for a stay pending appeal.

Contrary to Plaintiffs' portrayal, the PA's financial condition is far more dire than when the PA was ordered to make installment payments on the judgment as a condition of vacating or paying defaults in the *Knox* and *Ungar* cases in 2009 and 2010. Now, even after receiving the frozen clearance revenues from Israel in April 2015, the PA has had to continue withholding payments to

---

[4] *See Estate of Ungar v. Orascom Telecom Holding S.A.E.*, 578 F. Supp. 2d 536, 550-51 (S.D.N.Y. 2008) (McMahon, J.) ("Whether the PIF is simply an investment vehicle for the PA, it is nonetheless a separate corporate entity. Plaintiffs' own exhibits demonstrate that the PIF is a separate entity."); *Knox v. Orascom Telecom Holding S.A.E.*, 477 F. Supp. 2d 642, 647 (S.D.N.Y. 2007) (J. Marrero) (same); *see also infra* Part II.A (demonstrating that PA/PLO have no access or control over Palestinian Investment Fund ("PIF")).

[5] The United States has provided Palestine with $1.302 billion in foreign aid since 2007. *See* Bishara Decl. at ¶ 67. During that time the United States has been Palestine's second largest single contributor of charitable aid. *See id.*

[6] Kerry Remarks at Press Availability, *avail. at* http://translations.state.gov/st/english/texttrans/2015/02/20150222313730.html#axzz3UxB1agI, at 2 (last visited March 20, 2015).

private and public sector vendors and lenders to pay for priority budget obligations like social services and public safety. As of April 2015, the PA had incurred $1.15 billion in total arrears; $307.7 million in bank overdrafts; and, $2.292 billion in loans, not including $6.96 million of interest on existing debt that it has withheld to fund other budget obligations.[7] If the Court has any remaining doubt about the PA's financial condition, the PA's Finance Minister stands ready to testify directly to the Court at an evidentiary hearing to supplement his extensive Declaration and supporting financial records, and the recent reports by the International Monetary Fund, World Bank and other neutral observers.

As a straightforward matter of Rule 62's requirements, Second Circuit law endorses waiver of a bond or other security under these circumstances, when "the requirement would put the defendant's other creditors in undue jeopardy"—a consideration "of increasing importance in an age of titanic damage judgments."[8] Defendants' current financial condition presents the precise scenario in which the Second Circuit favors waiver of the bond requirement.

## I. Defendants' Financial Condition Has Materially Degraded Since *Knox* and *Ungar*.

The PA and PLO submitted to this Court extensive financial records and testimony from the PA's Minister of Finance[9] establishing that Defendants cannot afford to provide security for an appeal without causing irreparable harm to government operations, Palestinian citizens and numerous third party creditors and others.[10] Plaintiffs offer no substantive analysis of Defendants' evidence, but superficially compare select 2007 numbers in the *Knox* and *Ungar* decisions to argue

---

[7] Bishara Decl. ¶¶ 51 & 54; Exh. A (April 2015 Operations), at 3, 11.

[8] *Olympia Equipment Leasing Co. v. Western Union Tel. Co.*, 786 F.2d 794, 796 (7th Cir. 1986) (cited with approval in *Augustin v. Nassau County Sheriff's Dep't (In re Nassau County Strip Search Cases)*, 783 F.3d 414, 417 (2d Cir. 2015)).

[9] Plaintiffs also claim that PA Finance Minister Shukry Bishara cannot testify regarding the PLO's financial condition. Yet Minister Bishara testified in his Declaration that, in his capacity as Finance Minister, he approves both the PLO's budget and the monthly disbursements the PLO receives under that budget from the PA. *See* Bishara Decl. at ¶ 3. Minster Bishara also testified that the PLO does not receive revenue from any source other than the PA. *See id.* at ¶ 7.

[10] *See, e.g.* Bishara Decl., ¶¶ 9; 10, 16, 19, 26, 30, 31, 33, 35, 40, 42, 43, 45, 46, 47, 49, 51, 54, 55, 56, 57, 58, 65, 71, 72.

that Defendants' financial condition has "improved materially" since then. Opp. at 4.

Plaintiffs simply have their facts wrong, which is hardly surprising given the Finance Minister's superior knowledge of the PA's finances. For example, while Plaintiffs trumpet Defendants' $1.16 billion increase in clearance revenue since 2007, *see* Opp. at 7, they ignore that this revenue growth was dwarfed by a $2 billion increase in expenditures necessary to fund basic government services during the same period, and an accompanying $2.3 billion deficit.[11] Plaintiffs also do not account for the impact on Defendants' financial condition of $400 million in PA bank overdrafts, $4.977 billion in total debt—which severely restricts any future borrowing by the PA—or the $1.15 billion in accumulated arrears for withheld payments that the PA owes to the public and private sector.[12] Plaintiffs similarly fail to account for the fact that foreign aid growth has been stagnant since 2007, and is now declining, or that 45% of the aid Palestine receives must presently go to the emergency reconstruction in Gaza following devastating Israeli military strikes in 2014, thereby swelling the PA's expected deficit to $2.294 billion including development expenditure.[13]

The following chart illustrates that Defendants' financial condition has drastically degraded since *Knox* and *Ungar*:[14]

| | *Knox/Ungar* (2007) | *Sokolow* (2015) |
|---|---|---|
| Projected Expenditures | $2.543 billion | $4.516 billion |
| PA Deficit | $1.660 billion | $2.294 billion |
| Debt | $211.6 **million** | $4.977 **billion** |
| Wage/Salaries | $1.283 billion | $2.055 billion |
| Unemployment | Gaza: 30%; West Bank: 18% | Gaza: 41%; West Bank: 19% |
| Foreign Aid | $1.012 billion | $1.233 billion |

[11] *See* Bishara Decl. ¶ 23; *see* Ex. B, AHLC Report, at 17.

[12] *See* Bishara Decl. ¶¶ 49, 54, 55, 56.

[13] *See id.* ¶¶ 64-65, 68; *see* Ex. B, AHLC Report, at 17.

[14] For *Knox/Ungar*, *see* Opp. Ex. 2, Fayyad Decl., ¶¶ 14, 16, 18, 25; Fayyad Decl., at Exh. B; and Exh. C, Supp. Fayyad Decl., ¶ 13. For *Sokolow*, *see* Bishara Decl., ¶¶ 13, 23, 55; Ex. 14 to Bishara Decl., at 1; and, Ex. B, AHLC Report, at 17.

If the Court has any remaining doubt, the PA's Minister of Finance is prepared to testify at an evidentiary hearing. He will explain, for example, that the PA's 2015 net income is NIS 11 billion, but its expenditures total NIS 15 billion—leaving a deficit of roughly $1.15 billion, before taking development expenditures and foreign aid into account. Minister Bishara will confirm that, even after receiving 2015 expected foreign aid ($800 million), the PA's annual financing gap is roughly $35 million per month.[15] This means that Plaintiffs' requested monthly security will effectively *double* the PA's monthly financing gap, raising it to approximately $760 million per year.

Plaintiffs' reliance on *Knox* and *Ungar* is further inappropriate because the two cases were decided under entirely different legal standards. In fact, *Ungar* explicitly stated that defendants did not ask for relief under Rule 62 (which governs here), and implied that the result might have been different otherwise. *See Estates of Ungar v. Palestinian Auth.*, 715 F. Supp. 2d 253, 259 (D.R.I. 2010).

Further, *Ungar* applied Rhode Island law under Rule 69 to order installment payments to enforce a default judgment. *Ungar*, 715 F. Supp. 2d at 259, 264-67. That court reviewed only the PA and PLO's income, and not their expenses or indebtedness, and further, did not examine financial hardship or irreparable harm to the defendants or third parties. Similarly, *Knox* applied Rule 60(b) to vacate an existing default judgment, and did not consider the irreparable harm to the PA and third parties, or the public interest. *Knox v. PLO*, No. 03-4466, 2009 U.S. Dist. LEXIS 52610, at *3, 4, 35 (S.D.N.Y. Mar. 26, 2009) (Katz, M.J. recommendation), adopted in *Knox v. PLO*, 628 F. Supp. 2d 507 (S.D.N.Y. 2009).

Plaintiffs' resort to outdated financial data and inapposite case law should be disregarded in favor of Defendants' extensive evidence, which establishes that neither the PA nor the PLO can shoulder $360 million in annual security payments without undermining the PA. If the Court requires the PA to subtract $360 million annually from the already-imbalanced PA fiscal equation,

---

[15] *See* Exh. E (PA Public Budget 2015 Briefing), at 3.

the inevitable result will be irreparable harm to the PA and its third-party creditors, to Palestinians and to regional security.

## II. Plaintiffs' Baseless Claims of Fraud and Concealment Are Easily Disproven By Plaintiffs' Own Evidence and by Decisions of Other Judges of this Court.

### A. Defendants Have No Access To or Control Over the PIF.

Plaintiffs assert that Defendants concealed that the PA is "the owner of the '[PIF],'" *see* Opp. at 14. To the contrary, as Plaintiffs' counsel know well, and two other judges of this Court have ruled, the PIF is a distinct legal entity from the PA and the PLO. *See Ungar*, 578 F. Supp. 2d at 550-51 ("Whether the PIF is simply an investment vehicle for the PA, it is nonetheless a separate corporate entity. Plaintiffs' own exhibits demonstrate that the PIF is a separate entity."); *Knox*, 477 F. Supp. 2d at 647 (same); *see also* Opp., Ex. 4 (2012 PIF Annual Report), at 7 (describing PIF as public, independently managed company owned by its shareholders).

PIF assets thus are not available to the PA or PLO to post as security for a stay pending appeal. Indeed, when Plaintiffs' (same) counsel tried to reach PIF assets in pursuing a judgment against the PA in *Ungar*, the Court refused: "In order to grant Plaintiffs the relief that they seek, this Court would necessarily be disregarding the PIF's corporate form if it ordered Orascom to turn over assets it owes to the PIF, in order to satisfy Plaintiffs' judgment against the PA." *Ungar*, 578 F. Supp. 2d at 548. The PIF Bylaws are conclusive on this question: the PIF is a "Public Shareholding Company . . . owned entirely by the Palestinian people," the shares of which are "registered in the name of the Palestinian people."[16] It is neither a government entity nor owned by the government.[17]

---

[16] Exh. D, Bylaw of the Palestine Investment Fund Company of 2007 and its Amendments ("PIF Bylaws"), at Art. 1, Art.6, & Art. 8.

[17] *Id.* at Art. 1 & Art. 6. Further, the PIF "shall be an independent juridical person . . . deemed to be a subject of the private law and shall exercise its commercial and investment activities under such a capacity." *Id.* at Art. 2. The PIF "shall have an independent financial liability," and "shall enjoy full financial independence of the budget of the Palestinian National Authority and its various government departments." *Id.*

**B. Plaintiffs' Fraud Claim Is Belied By the U.S. Government's Continuing Financial Support of the PA, and Fails Under New York Law.**

The Palestinian government administers social welfare programs in accordance with Palestinian law, and provides critical aid to prisoner and detainee populations and their families. Plaintiffs cannot disguise their hostility toward these social welfare programs, but they overreach substantially in characterizing them as "fraudulent conveyances." Opp. at 14. This tactic has been used before in other cases against Palestine. But, as other courts have held, a fraudulent conveyance requires conveyance without consideration, an existing judgment, and failure to satisfy existing judgment—none of which exists here. *See Palestine Monetary Auth. v. Strachman*, 62 A.D.3d 213, 224-25 (N.Y. App. Div. 1st Dep't 2009).

As importantly, the United States government historically has been Palestine's second largest single source of foreign aid, including during the *Knox* and *Ungar* litigation.[18] It defies reason, therefore, that while in the midst of a war on terror, the U.S. government would distribute more than $1.3 billion in foreign aid to the PA if the U.S. government believed that the PA was making "fraudulent conveyances" of those funds to support terrorism.

Indeed, given the longstanding U.S. government support for the PA, and Secretary Kerry's recent reminder of the need to preserve the PA's viability (*see supra* at 2), Defendants respectfully urge the Court to seek the views of the U.S. government if it has any remaining doubt about the foreign policy impact of impounding a substantial part of the PA's budget to provide security pending appeal.

**III. Both the Traditional Four-Factor Stay Test and Plaintiffs' Supplemental *Dillon* Factors Test Favor a Stay Without a Bond.**

**A. Defendants Satisfy the Traditional Four-Factor Stay Test, Which Plaintiffs Concede.**

This Court should grant a stay pending appeal because Defendants have satisfied the four

[18] Bishara Decl. at ¶ 67 ($1.302 billion since 2007).

elements of the traditional stay test. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Hirschfeld v. Board of Elections*, 984 F.2d 35, 39 (2d Cir. 1993). Plaintiffs do not oppose a stay pending this Court's decision on post-trial motions and pending appeal. Instead, they seek to condition that stay on the annual sequestration of $360 million from the PA.

The PA and PLO detailed their evidence in support of each of those four factors in their Opening Brief. *See* Doc. 898, at Part I. As to the first factor, Plaintiffs do not contest that Defendants' likelihood of success on appeal in this case is exponentially bolstered by the recent D.C. federal court decisions dismissing three nearly identical cases against the PA/PLO for lack of personal jurisdiction.[19] As to the second factor, Plaintiffs do not contest the reality that immediate enforcement of a judgment will cause irreparable injury to the PA and PLO, and to the Palestinian people if PA government funds are diverted away from aiding Palestinians and supporting regional security, and are used instead to pay Plaintiffs. *See Texaco, Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1153 (2d Cir. 1986) ("The irreparability of the harm increases in proportion to its irreversibility. . . . But when, as in the present case, the interim injury is the irrevocable destruction of his business, resulting in bankruptcy or liquidation, a reversal will not undo the injury, which cannot be measured in damages and would in no event be recoverable.").

As to the third factor, Plaintiffs make no claim that they will suffer "substantial injury" from a stay, although they speculate baselessly about the future political landscape of the PA. *See* Opp. at 13 n.12. As to the fourth factor, Plaintiffs purport to divine a public interest in "large awards" under the Antiterrorism Act, Opp. at 17-18, but any such interest is far outweighed by the U.S. public interest in preserving the stability of the PA, as recently underscored by Secretary Kerry. *See* Doc. 898 at 12-13; *supra* at 2.

---

[19] *Safra v. Palestinian Auth.*, No. 14-669, 2015 U.S. Dist. LEXIS 16492 (D.D.C. Feb. 11, 2015); *Livnat v. Palestinian Auth.*, 2015 U.S. Dist. LEXIS 16522 (D.D.C. Feb. 11, 2015); and *Estate of Esther Klieman v. Palestinian Auth.*, 2015 U.S. Dist. LEXIS 25167 (D.D.C. Mar. 3, 2015).

### B. Plaintiffs' Supplemental *Dillon* Factor Test Strongly Supports a Stay and Waiver of Security Here.

Because the traditional four-factor stay test so strongly favors a stay without collateral security, Plaintiffs focus instead on the "*Dillon* factors" that guide a court's decision to waive the bond requirement pending appeal.[20] *See* Opp. at Part II; *see also Augustin v. Nassau County Sheriff's Dep't (In re Nassau County Strip Search Cases)*, 783 F.3d 414, 418 (2d Cir. 2015); *Dillon v. Chicago*, 866 F.2d 902, 904 (7th Cir. 1988). Notably, however, *Nassau County* is clear that the *Dillon* factors are meant to protect those who "ultimately prevail[] on appeal," underscoring the predominance in the Rule 62 analysis of a party's likelihood of success on appeal. *Id.*, 783 F.3d at 418; *see supra* Part III.A.

*Dillon*'s instruction, moreover, is that no bond is required when a defendant, as here, already is unable to pay other creditors. *See Dillon*, 866 F.2d at 905 (quoting *Olympia Equip. Leasing Co.*, 786 F.2d at 795). Federal courts applying the *Dillon* factors conclude that an unsecured stay is appropriate in two types of situations: "(1) the defendant's ability to pay is so plain that the posting of a bond would be a waste of money; or (2) the bond would put the defendant's other creditors in undue jeopardy." *See Nassau County*, 783 F.3d at 418 (citing *Olympia Equip. Leasing Co.*, 786 F.2d at 800); *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 17 (1st Cir. 2002). In that second scenario—the one at issue here—the decision whether to waive a bond is governed solely by the fifth *Dillon* factor. *See Nassau County*, 783 F.3d at 417-18. The fifth *Dillon* factor focuses on the judgment debtor's financial position so as not to "place other creditors of the defendant in an insecure position" and "to protect the judgment debtor from the risk of losing money if the decision is reversed." *Nassau County*, 783 F.3d at 417-418; *see also Dillon*, 866 F.2d at 904-05 (same).

Plaintiffs do not dispute that the PA and PLO already have substantial unpaid arrears and

[20] *See also SDF9 COBK LLC v. AF & AR LLC*, No. 12-3078, 2015 U.S. Dist. LEXIS 68667, *3-5 (E.D.N.Y. May 15, 2015) (citing *Nassau County* and applying traditional stay factors to decide bond waiver); *see also Schmude v. Sheahan*, No. 00-4580, 2004 U.S. Dist. LEXIS 9513, *7-9 (N.D. Ill. May 24, 2004) (explaining that *Dillon* factors are only applicable once a court determines "whether a stay is warranted").

debts to the private sector, to multilateral financial institutions, and to the PA's nearly 155,000 public sector employees. *See* Doc. 898 at 16-22. Without question, these creditors and other third parties will be jeopardized by requiring the PA to forfeit nearly 10% of its expenditure budget as appeal security. *See, e.g., Texaco, Inc.*, 784 F.2d at 1152.

**CONCLUSION**

This Court should stay execution of the judgment without requiring a bond under Rule 62(b) until it decides Defendants' post-trial motions, and then (if necessary) should stay execution of the judgment under Rule 62(d) pending appeal to the Second Circuit. If it denies a stay, the Court should place restrictions on any permitted collection efforts by Plaintiffs to exclude certain categories of funds and, further, require Plaintiffs to enter any recovered assets into the Court's registry to avoid the dissipation of assets during the appeal.

Dated: June 15, 2015

/s/ Gassan A. Baloul
Gassan A. Baloul (Bar No. 4324919)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza, 23rd Floor
New York, NY 10112
Telephone: (212) 872-9800
Facsimile: (212) 872-9815
gassan.baloul@squirepb.com

John A. Burlingame *(admitted pro hac vice)*
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
john.burlingame@squirepb.com

*Attorneys for Defendants Palestinian Authority and Palestine Liberation Organization*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2015, a true and correct copy of the foregoing was filed with the Clerk via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

/s/ Gassan A. Baloul
Gassan A. Baloul (Bar No. 4324919)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza
23rd Floor
New York, NY 10112
Telephone: (212) 872-9800
Facsimile: (212) 872-9815
gassan.baloul@squirepb.com