
PLAINTIFF'S EXHIBIT 348

| | | |
|---|---|---|
| Israel | Defense | Forces |
| Before the Military Court | Court File: | 3529 |
| In Beit El | Prosecution File: | 451/02 |
| Before a panel | Detailed incident file: | 1328/02, 1329/02 |
| | | 2069/02 Binyamin |

### In the trial between the military prosecutor – The Prosecutor

### - v. -

**Kahira Sa'id Al-Sa'di**
Identity No.: 903946960, born on August 21, 1976, resident of A-Ram
Detained since May 8, 2002

### The Defendant

**Indictment**   *(Amended)* [Signature] *July 15, 2004*

**The above mentioned Defendant is accused hereby of committing the following offenses:**

**First count:**

**Nature of the offense:** *Accessory to* causing intentional death, an offense pursuant to Section 51 (A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, when in the Area or outside of it, on March 21, 2002, or thereabouts, caused the intentional death of another person, as follows:

The Defendant, who resided at the Jenin refugee camp, moved to A-Ram with her family at the beginning of 2002. When she was in Ramallah, the Defendant and her husband, ▮▮▮▮ met with ▮▮▮▮, a ▮▮▮▮, who is responsible for carrying out dozens of attacks, in the Area and in Israel, and who had also moved his activities and residence from the Samaria area to the Ramallah area. After the meeting, the Defendant and her husband, ▮▮▮▮ visited the home of ▮▮▮▮ several times.

[Stamp] P 5: 142

1

During these meetings, ▓▓▓▓▓ suggested to the Defendant that she accompany suicide bombers to Jerusalem to the place where the attacks would be carried out and thereby cause the deaths of many Israeli citizens. The Defendant agreed to help ▓▓▓▓▓ if she were to be asked.

Later, following the death of ▓▓▓▓▓ the brother of ▓▓▓▓▓ call the Defendant and asked her if she had heard about his death. The Defendant cried over the phone and apologized because she was unable to go to Ramallah.

▓▓▓▓▓ planned to carry out the suicide bombing through the suicide terrorist named Mohamed Hashaika, who was wearing an explosive belt. In order to take the suicide terrorist the place in Jerusalem where the attack would be carried out, the military operative, ▓▓▓▓▓ had recruited ▓▓▓▓▓ However, the military operative ▓▓▓▓▓ was concerned that ▓▓▓▓▓ was afraid to carry out the attack and ▓▓▓▓▓ was also wearing traditional Arab clothing. Therefore, ▓▓▓▓▓ called the Defendant and asked her to come to Ramallah. They met next to the Abu Rayah Hospital in Ramallah and ▓▓▓▓▓ was accompanied by another military operative, ▓▓▓▓▓ In a small blue car parked next to them sat the suicide terrorist, Mohamed Hashaika, who was wearing the explosive belt; the driver of the car, ▓▓▓▓▓ and ▓▓▓▓▓ sitting next to him, on the way to carry out the foregoing attack. ▓▓▓▓▓ told the Defendant that in the car were a terrorist on his way to carry out a suicide attack and another woman.

[Stamp]   This indictment was received _____
          on date: _July 8, 2002_
          and was entered into the log in case _____1_____
          by the Court _____[Signature]_____

[Stamp] P 5: 142 [continued]

2

███ asked the Defendant to travel together with the suicide terrorist and the young woman, ███ to carry out the attack because the Defendant was wearing pants and her head was uncovered. The Defendant got into the car and sat in the back seat next to the suicide terrorist, ███ sat in the front next to the driver of the car, ███ ███ gave a copy of the Koran to the suicide terrorist. About two hundred meters from the Kalandiya checkpoint, the driver, ███ stopped the car and kissed the suicide terrorist; and the Defendant, together with the suicide terrorist and ███ got out of the car. ███ hailed a taxi and asked the driver to take them by the A-Ram checkpoint; she paid the taxi driver 50 NIS. ███ even bought flowers, which she gave to the suicide terrorist. The Defendant, the suicide terrorist and ███ crossed the A-Ram checkpoint on foot, while passing the IDF soldier check. Afterwards the three of them took another taxi and ███ asked the driver to take them to Jaffa Street in Jerusalem because they wanted to celebrate Mothers' Day, and because they don't have Israel identity cards, he should drive them along roads where there were no IDF checkpoints. The Defendant, ███ and the suicide terrorist walked along Jaffa Street looking for a crowded place where the suicide terrorist could blow up the bomb and cause the deaths of many civilians. While walking, the Defendant told ███ to walk behind them and not next to them because she was wearing traditional Arab clothing and so they would not look suspicious.

The Defendant noticed that there were many people on the street and told ███ that this was a good spot for carrying out the suicide attack in order to cause the deaths of many civilians. ███ agreed with the Defendant and sent the suicide terrorist to carry out the planned attack. The suicide terrorist told the Defendant to fall back and he went to blow up the explosive belt he was wearing in order to cause the deaths of many civilians. The Defendant and ███ hurried away from the place and a few minutes around 4:20 p.m., the suicide bomber triggered the explosive belt he was wearing in King George Street in Jerusalem.

As a result of the blast, three civilians were killed and another 81 were injured. Massive damage was also caused to property.

The Defendant heard the explosion and understood that the suicide bomber, Mohamed Hashaika, had blown himself up.

2

3

[Stamp] P 5: 143

The Defendant remained in place when the terrorist, Mohamed Hashaika, blew himself up and she was hit by bits of flesh of the victims. Because they thought she was injured, civilians took her into a nearby store where she washed her face. Later, the Magen David Adom paramedics wanted to take her to the hospital, but she refused and left the place. After walking around the streets of Jerusalem for about two and a half hours, she went home by shuttle taxi, arriving home in the evening. Before going into her house, the Defendant called the military operative ▇▇▇ and updated him regarding the execution of the attack. The Defendant asked after ▇▇▇ ▇▇▇ from whom she was separated, and ▇▇▇ calmed her down and told the Defendant that ▇▇▇ had reached Ramallah a long time before she had.

Two days later, the Defendant went to ▇▇▇'s home and reported to him concerning the execution of the attack. ▇▇▇ was also present at this meeting. ▇▇▇ also informed the Defendant that the girl who was with her, ▇▇▇, got back safely.

A few days later, ▇▇▇ invited the Defendant, her husband and her brother to a meal at a restaurant in Ramallah. At this meeting ▇▇▇ gave the Defendant's brother, ▇▇▇, a firearm, which ▇▇▇ showed to the Defendant. The Defendant's brother was given the firearm for the purpose of carrying out an attack. ▇▇▇ also promised the Defendant help in paying [her] rent.

By her actions described above, the Defendant *was an accessory to* ~~caused~~ *causing* the intentional death of the late Zippora Shemesh, who was killed as a result of the suicide bombing carried out by the suicide terrorist, Mohamed Hashaika, in King George Street. Zippora Shemesh was pregnant when she was killed.

**Second count:**

**Nature of the offense:** *Accessory to* causing intentional death, an offense pursuant to Section 51 (A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, when in the Area or outside of it, on March 21, 2002, or thereabouts, caused the intentional death of another person, as follows:

By her actions described in the first count, the Defendant *was an accessory to* ~~caused~~ *causing* the intentional death of the late Sergeant Major Gadi Shemesh, who was killed as a result of the suicide bombing carried out by the suicide terrorist, Mohamed Hashaika, in King George Street.

2

[Stamp] P 5: 143 [continued]

### Third count:

**Nature of the offense:** *Accessory to* causing intentional death, an offense pursuant to Section 51 (A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, when in the Area or outside of it, on March 21, 2002, or [handwriting; illegible] thereabouts, caused the intentional death of another person, as follows:

By her actions described in the first count, the Defendant *was an accessory to* ~~caused~~ *causing* [Signature] the intentional death of the late Yitzhak Cohen, who was killed as a result of the suicide bombing carried out by the suicide terrorist, Mohamed Hashaika, in King George Street.

### Fourth count:

**Nature of the offense:** *Accessory to* [Signature] attempting to cause intentional death, an offense pursuant to Section 51 (A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Section 19 of the order regarding Rules of Liability for an Offense (Judea and Samaria) (No. 225), 5728-1968.

**Details of the offense:** The above mentioned Defendant, when in the Area or outside of it, on March 21, 2002, or thereabouts, was an accessory to attempting to cause the intentional death of another person, as follows:

By her actions described in the first count, the Defendant *attempted to cause* ~~caused~~ intentional deaths of the civilians who were at the scene of the bombing carried out by the suicide bomber, Mohamed Hashaika, who she took to the scene of the bombing. As a result of the bombing, 81 civilians were injured.

[Stamp] P 5: 144

5

**Fifth count:** [Hand drawn lines through the entire section]

**Nature of the offense:** Giving shelter, an offense pursuant to Section 57 of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, being in the Area during the months of March and April 2002, assisted or gave shelter to some person who had committed an offense against security legislation or had been or was involved in some activity that was intended to harm the public welfare, the welfare of the Israel Defense Forces troops and soldiers and the maintenance of public order or concerning whom there are reasonable grounds to suspect that he did so, as follows:

On March 30, 2002, military operatives ▇▇▇▇▇▇▇▇▇▇▇ and the Defendant's brother, ▇▇▇▇▇▇▇▇▇▇ were detained. While at the Ofer detention facility, ▇▇▇ went under another name and was released with the Defendant's brother, who also pretended to be someone else. The Defendant hid her brother and ▇▇▇▇ at her house for about twenty six days. The Defendant sent her husband to Jenin to get a birth certificate in the name of ▇▇▇▇▇▇▇ the person that ▇▇▇ impersonated, in order to help in ▇▇▇ impersonation. The Defendant's husband, ▇▇▇▇▇ went to Jenin and got said birth certificate.

Finally, ▇▇▇ was detained again on May 3, 2002, by the IDF forces at the Defendant's home.

**Sixth count:** [Hand drawn lines through the entire section]

**Nature of the offense:** Possession of a firearm, an offense pursuant to Section 53 (A)(1) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, being in the Area in April 2002 or thereabouts, was in possession of a firearm without a permit certificate granted by or for a military commander, as follows:

While hiding out at the Defendant's house, military operative ▇▇▇▇▇▇ brought with him his firearm, which he had hidden before he was detained the first time.

3

[Stamp] P 5: 144 [continued]

**Seventh count:**

**Nature of the offense:** Possession of a bomb, an offense pursuant to Section 53 (A) (1) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, being in the Area in April 2002 or thereabouts, was in possession of a bomb or explosive or incendiary device, without a permit certificate granted by or for a military commander, as follows:

While hiding out at the Defendant's house, the above mentioned ▓▓▓ bought coal which he crushed with the help of her brother, ▓▓▓ and placed in a bag. This materiel was intended for preparing explosive devices, which ▓▓▓ prepared with the help of ▓▓▓ according to instructions of ▓▓▓

▓▓▓ told the Defendant that they were preparing this materiel to prepare an explosive device that they planned to place against an IDF jeep or tank at the Kalandiya refugee camp. For carrying out the attack, the two of them bought a video camera to film the attack. ▓▓▓ also told the Defendant that the device would be activated using a mobile phone.

**Eighth count:** [Hand drawn lines through the entire section]

**Nature of the offense:** Possession of a firearm, an offense pursuant to Section 53 (A) (1) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970.

**Details of the offense:** The above mentioned Defendant, being in the Area at the beginning of May 2002 or thereabouts, was in possession of a firearm without a permit certificate granted by or for a military commander, as follows:

After ▓▓▓ was detained on May 3, 2002, the Defendant kept ▓▓▓ firearm in her possession and later informed ▓▓▓ brother that the firearm was in her possession. The Defendant travelled from A-Ram to Jenin with ▓▓▓ firearm to give it back to his brother. During this journey the Defendant also took ▓▓▓ video camera with her, with which he was meant to film the planned attack, and other of his possessions. During the journey, they were stopped by IDF forces, but they did not find the firearm which was hidden on the Defendant's body.

**Ninth count:**

**Nature of the offense:** Conspiring to cause intentional death, an offense under Section 51 (A) of the Security Provisions Order (Judea and Samaria) (No. 378), 5730-1970, and Section 22 of the Rules of Liability for an Offense Order (Judea and Samaria) (No. 225), 5728-1968.

[Stamp] P 5: 145

7

**Details of the offense:** The above mentioned Defendant, being in the Area in May 2002 or thereabouts, conspired with another person to cause the intentional death of another person, as follows:

████████ and his friend, ████████ a Global Islamic Jihad Movement operative, decided to carry out a suicide bombing attack with a terrorist who would wear an explosive belt. ████████ who had expressed his willingness to carry out the attack, was intended to carry it out. In order to carry out the attack, ████ decided to ask the Defendant to take the terrorist to the place of the attack. ████ went to the Defendant's house in A-Ram and told her that there was a terrorist willing to carry out a suicide bombing attack in Jerusalem. The Defendant agreed to take the terrorist to the place of the attack and thereby cause the deaths of many civilians.

The day after ████████ was detained, on May 4, 2002, ████ brother ████ called the Defendant and asked for her help in taking a firearm from Ramallah to Jenin. ████ asked the Defendant not to involve her husband in this. The Defendant agreed and ████ told her that he would give her mobile phone number to the person who had possession of the firearm. About two hours later, ████████ called the Defendant and asked her about the detainment of ████ and her brother, ████████ At that time the Defendant refused to travel to Ramallah to meet him because her husband was home. In another call by ████████ to the Defendant, her husband took the mobile phone and afterwards travelled to Ramallah himself in order to meet with ████████ The Defendant reported to ████ brother ████ that her husband had gone to meet with ████████

████████ told the Defendant's husband the he wanted to transfer an explosive belt. Her husband ████ refused and was angry with her.

On May 8, 2002, the day on which she was detained, the Defendant went to Manara Square in Ramallah and met with ████████ ████████ told the Defendant that he knew that she had taken a suicide bomber to carry out an attack and asked her to take another suicide bomber into Jerusalem, to Jaffa Street or some other crowded place for the Defendant to carry out the suicide attack there. The Defendant agreed to take part in carrying out the suicide attack and to take the suicide bomber to the place where the attack would be carried out in Jerusalem.

████████ asked her not to go back home to A-Ram so that she wouldn't be detained and she promised that she would go to her mother's house in Azariya.

The planned suicide attack was not carried out because the Defendant was detained on that same day.

4

[Stamp] P 5: 145 [continued]

### Witnesses for the prosecution:

1. ▮▮▮▮▮▮▮▮▮▮ Badge No. ▮▮▮, Judea Investigations Office, taker of the statement of the Defendant & identification photograph.

2. ▮▮▮▮▮▮▮▮▮▮, Badge No. ▮▮▮ Judea Investigations Officer, taker of the statement of the Defendant.

3. ▮▮▮▮▮▮▮▮▮▮ Identity No. ▮▮▮, detainee in Prosecution File 484/02. *Israel Prison Services*

4. ▮▮▮▮▮▮▮▮▮▮ Identity No. ▮▮▮ detainee in Prosecution File 422/02. *Israel Prison Services*

5. ▮▮▮▮▮▮▮▮▮▮ Identity No. ▮▮▮, detainee. *Israel Prison Services*

6. ▮▮▮▮▮▮▮▮▮▮, Identity No. ▮▮▮ detainee. *Israel Prison Services*

7. ▮▮▮▮▮▮▮▮▮▮ Identity No. ▮▮▮ detainee.

8. ▮▮▮▮▮▮▮▮▮▮ Identity No. ▮▮▮ detainee.

9. Identity line-up photographs by ▮▮▮▮▮▮▮▮▮▮ Judea Investigations Office.

A detailed list of witnesses from Prosecution File No. 02069/02, minorities (bombing case), will be provided during the trial.

[Signature]

**Dalia Kaufman**  **Captain**
**Military**  **Prosecutor**

Date: July 7, 2002
Reference: 451/ 02

5

[Stamp] P 5: 146

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK I. SOKOLOW, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> THE PALESTINE LIBERATION ORGANIZATION, *et al.*, <br><br> Defendants. | No. 04 Civ. 00397 (GBD) (RLE) |

## DECLARATION OF RINA NE'EMAN

Rina Ne'eman hereby certifies as follows:

1. The attached translation from Hebrew to English is an accurate representation of the document received by Rina Ne'eman Hebrew Language Services, to the best of my knowledge and belief. The document is designated as P5: 142-146.

2. I am a professional translator with a B.A. in International Relations from the Hebrew University of Jerusalem (Israel) and 30 years of translation experience. I am fluent in Hebrew and English, and I am qualified to translate accurately from Hebrew to English.

3. To the best of my knowledge and belief, the accompanying text is a true, full and accurate translation of the Hebrew-language document bearing the bates number, P5: 142-146.

_____
Rina Ne'eman

ss.: New Jersey

On the 25 day of February, 2014 before me, the undersigned, personally appeared Rina Ne'eman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is signed to this Declaration and acknowledged to me that he executed the same in his capacity, and that by his signature on this Declaration, the individual executed the Declaration.

Sworn to me this
26 day of February, 2014

*[signature]*
Notary Public

HIRUT J MHRETE
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 7, 2015
I.D. # 2332704

| צבא | הגנה | לישראל |
|---|---|---|
| בבית המשפט | הצבאי | תיק ביהמ"ש: 3529/? |
| בבית | אל | תיק תביעה: 451/02 |
| בפני | הרכב | תיק פ.א.: 1328/02, 1329/02, 2069/02 בנימין |

## במשפט שבין התובע הצבאי – המאשים

### -נגד-

קאהירה סעיד עלי סעדי
ת.ז. 903946960, ילידת 21/8/76 , תושבת א-רם
עצורה מיום 8/5/02

### הנאשם

15/7/04

### כתב-אישום (מתוקן)

### הנאשם הנ"ל מואשם בזאת בביצוע העבירות הבאות:

**פרט ראשון:** (110)

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות בטחון, (יהודה והשומרון) (מס' 378) תש"ל – 1970.

**פרטי העבירה:** הנאשמת הנ"ל, בהיותה באיזור ומחוצה לו, ביום 21/3/02 או בסמוך לכך, גרמה בכוונה למותו של אחר, כדלקמן:
הנאשמת אשר התגוררה במחנה פליטים ג'נין, עברה לגור בתחילת שנת 2002 יחד עם משפחתה בא-רם. בהיותה ברמאללה, נפגשה הנאשמת ובעלה ■■■■ עם ■■■■, קצין במשטרה הפלסטינית, האחראי לביצוע עשרות פיגועים, באיזור ובישראל ואשר העביר גם הוא את פעילותו ומגוריו מאיזור השומרון, לאיזור רמאללה. לאחר הפגישה התארחו הנאשמת ובעלה ■■■■ בביתו של ■■■■ מספר פעמים.
בהמשך הפגישות הציע ■■■■ לנאשמת להוביל מחבלים מתאבדים לירושלים למקום ביצוע הפיגועים ובכך לגרום למותם של אזרחים ישראלים רבים. הנאשמת הסכימה לסייע כ■■■■ ככל שתתבקש.
בהמשך לאחר מותו של ■■■■, אחיו של ■■■■ התקשר ■■■■ לנאשמת ושאל אותה האם שמעה על מותו. הנאשמת בכתה בטלפון והתנצלה כי אינה יכולה להגיע לרמאללה.

■■■■ תכנן ביצוע פיגוע התאבדות באמצעות מחבל מתאבד, מחמד תשאיקה שמו אשר הולבש חגורת נפץ. לצורך הובלת המחבל המתאבד למקום ביצוע הפיגוע בירושלים, גייס ■■■■ הפעיל הצבאי ■■■■ את ■■■■ לבושה בלבוש ערבי מסורתי. לפיכך, התקשר ■■■■ אולם הפעיל הצבאי ■■■■ חשש כי ■■■■ חושש לבצע את הפיגוע, וכן היתה ■■■■ לנאשמת וביקש שתגיע לרמאללה.
השניים נפגשו ליד בית החולים אבו ראיה ברמאללה כאשר ■■■■ היה מלווה בפעיל צבאי נוסף, ■■■■. ליד השניים חנה רכב קטן בצבע כחול, בו ישבו המחבל המתאבד, מחמד תשאיקה כשהוא לבוש בחגורת הנפץ, ■■■■ ו■■■■ נהג הרכב ו■■■■ אשר גוייסה על ידו לביצוע הפיגוע האמור. ■■■■ מסר לנאשמת כי בתוך הרכב ישנו מחבל בדרכו לבצע פיגוע התאבדות וכן אישה נוספת.

```
כתב אישום זה נתקבל
בתאריך 05/2/8
ונרשם ביומן בחייק      1
ב' ביהמ"ש              6
```

P 5: 142

ביקש מהנאשמת לנסוע יחד עם הנחבל המתאבד, הצעירה ▓▓▓▓▓ לביצוע הפיגוע
מאחר שהנאשמת היתה לבושה במכנסיים וראשה גלוי ללא כיסוי. הנאשמת נכנסה לרכב והתיישבה בכיסא
האחורי ליד המחבל המתאבד. ▓▓▓▓▓▓ ישבה מקדימה ליד נהג הרכב, ▓▓▓▓▓
נתנה למחבל המתאבד ספר קוראן. כמאתיים מטרים לפני מחסום קלנדיה עצר הנהג ▓▓▓▓▓
את הרכב, ביקש נשיקה מהמחבל המתאבד והנאשמת יחד עם המחבל המתאבד ו▓▓▓▓ ירדו
מהרכב. ▓▓▓▓ תפסה מונית וביקשה מהנהג שיסיע אותם תוך עקיפת מחסום א רם, ושילמה לנהג המונית
50 ₪ בתמורה. ▓▓▓▓ אף קנתה פרחים אותם היא נתנה למחבל המתאבד. את מחסום א רם עברו
הנאשמת, המחבל המתאבד ו▓▓▓▓ ברגל תוך כדי עקיפת בדיקת חיילי צה"ל. לאחר מכן עלו
השלושה למונית נוספת ו▓▓▓▓ ביקשה מנהג המונית שיסיע אותם לרחוב יפו בירושלים כיוון שהם רוצים
לחגוג את יום האם ואין להם תעודת זהות ישראלית, שיסיע אותם בדרכים בהם אין מחסומי צה"ל.
הנאשמת, ▓▓▓▓ והמחבל המתאבד הלכו לאורך רחוב יפו על מנת לאתר מקום הומה אדם בו יתפוצץ
המחבל המתאבד ויגרום למותם של אזרחים רבים. במהלך הליכתם, הנאשמת הורתה ל▓▓▓▓ ללכת
מאחוריהם ולא לידם כיוון שהיתה לבושה בלבוש ערבי מסורתי ועל מנת שלא להחשידם.

הנאשמת הבחינה כי ברחוב ישנם אנשים רבים והשיבה ל▓▓▓▓ כי זהו מקום טוב לבצע פיגוע
התאבדות על מנת לגרום למותם של אזרחים רבים. ▓▓▓▓ הסכימה עם הנאשמת ושילחה את
המחבל המתאבד לבצע את הפיגוע המתוכנן. המחבל המתאבד ביקש מהנאשמת ומ▓▓▓▓ לחזור אחרונית
והלך לפוצץ את חגורת הנפץ שעל גופו על מנת לגרום למותם של אזרחים רבים. הנאשמת ו▓▓▓▓ הלכו
מהמקום וכעבור מספר דקות בסמוך לשעה 16.20 פוצץ המחבל המתאבד את חגורת הנפץ שעל גופו ברחוב
קינג ג'ורג'י בירושלים.
כתוצאה מהתפוצצות נהרגו שלושה אזרחים ונפצעו 81 נוספים. כמו כן נגרם נזק רב לרכוש.

הנאשמת שמעה את קול הפיצוץ והבינה כי המחבל המתאבד מחמד חשאיקה פוצץ את עצמו.

הנאשמת נותרה במקומה בעת שהמתחבל, מחמד חשאיקה פוצץ את עצמו  וחלקי בשר של הנפגעים פגעו בה.
מאחר שחשבו כי נפצעה, הכניסוה אורחים לתוך חנות שהיתה במקום, שם שטפה פניה. בהמשך ביקשו
כותות מד"א לפנות את הנאשמת אולם היא סרבה ועזבה את המקום. לאחר שהסתובבה כשעתיים וחצי
ברחובות העיר ירושלים, נסעה לביתה במונית שירות, לשם הגיעה בשעות הערב.
לפני שנכנסה לביתה, התקשרה הנאשמת לפעיל הצבא▓▓▓▓▓▓▓▓ ועדכנה אותו בדבר ביצוע הפיגוע.
הנאשמת התעניינה בגורלה של ▓▓▓▓ אשר התנתקה ממנה ו▓▓▓▓ הרגיעה והודיע לה כי
הגיעה לרמאללה זמן רב לפני הנאשמת.

לאחר יומיים נסעה הנאשמת לביתן של ▓▓▓▓ ודווחה לו בקשר לביצוע הפיגוע. בפגישה זו נוכח גם
▓▓▓▓. כן עדכן ▓▓▓▓ את הנאשמת כי הבחורה אשר היתה עימה, ▓▓▓▓ חזרה בשלום.

לאחר מספר ימים הזמין ▓▓▓▓ את הנאשמת, בעלה ואחיה לארוחה במסעדה ברמאללה. בפגישה זו
מסר ▓▓▓▓ לאחי הנאשמת ▓▓▓▓ אקדח, אותו הראה ▓▓▓▓ לנאשמת. האקדח נמסר
לאחי הנאשמת לצורך ביצוע פיגוע. ▓▓▓▓ גם הבטיח לנאשמת סיוע בשכר דירה.

הנאשמת במעשיה המתוארים לעיל גרמה בכוונה למותה של ציפורה שמש ז"ל אשר נהרגה כתוצאה
מהתפוצצות המחבל המתאבד, מחמד חשאיקה ברחוב קינג ג'ורג'י. ציפורה שמש ז"ל היתה בהריון במותה.

**פרט שני:**

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות בטחון, (יהודה והשומרון)
(מס' 378) תשי"ל – 1970.

**פרטי העבירה:** הנאשמת הנ"ל, בהיותה באיזור ומתוצה לו, ביום 21/3/02  או בסמוך לכך, גרמה בכוונה
למותו של אחר, כדלקמן:
הנאשמת במעשיה המתוארים בפרט אישום ראשון, גרמה בכוונה למותו של רס"מ גדי שמש ז"ל אשר נהרג
כתוצאה מהתפוצצות המחבל המתאבד, מחמד חשאיקה ברחוב קינג ג'ורג'י.

2

**פרט שלישי:**

**מהות העבירה:** גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות בטחון, (יהודה והשומרון) (מס' 378) תשי"ל – 1970.

**פרטי העבירה:** הנאשמת הנ"ל, בהיותה באיזור ומחוצה לו, ביום 21/3/02 או בסמוך לכך, גרמה בכוונה למותו של אחר, כדלקמן:
הנאשמת במעשיה המתוארים בפרט אישום ראשון, גרמה בכוונה למותו של יצחק כהן ז"ל אשר נהרג כתוצאה מהתפוצצות המחבל המתאבד, מחמד חשאיקה ברחוב קינג ג'ורג'.

**פרט רביעי:**

**מהות העבירה:** נסיון גרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות בטחון, (יהודה והשומרון) (מס' 378) תשי"ל – 1970 וסעיף 19 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח - 1968.

**פרטי העבירה:** הנאשמת הנ"ל, בהיותה באיזור ומחוצה לו, ביום 21/3/02 או בסמוך לכך, ניסתה לגרום בכוונה למותו של אחר, כדלקמן:
הנאשמת במעשיה המתוארים בפרט אישום ראשון, ניסתה לגרום בכוונה למותם של האזרחים שהיו במקום התפוצצות המחבל המתאבד, מחמד חשאיקה, אותו הובילה למקום הפיגוע. כתוצאה מההתפוצצות נפצעו 81 אזרחים.

**פרט חמישי:**

**מהות העבירה:** מתן מקלט, עבירה לפי סעיף 57 לצו בדבר הוראות בטחון, (יהודה והשומרון) (מס' 378) תשי"ל – 1970.

**פרטי העבירה:** הנאשמת הנ"ל, בהיותה באיזור, במהלך חודשים מרץ ואפריל 2002 עזרה ונתנה מקלט לכל אדם שעבר עבירה על תחיקת הבטחון, אז העוסק או שהיה עוסק בפעל פעולה שמטרתה לפגוע בשלום הציבור, שלום כוחות צה"ל וחייליו וקיום הסדר הציבורי או שיש יסוד לחשוד כי עשה כן, כדלקמן:

ביום 30/3/02 נעצרו הפעילים הצבאיים, ███████ ואחי הנאשמת ███████.
בהיותו במתקן המעצר עופר ███████ ועודה בקש אור ישחרר ממעצרו יחד עם אחי הנאשמת אשר אף הוא התחזה לאחר. הנאשמת הסתירה בביתה את אחיה ואת ███████ במשך כעשרים ושישה ימים. הנאשמת אף שילחה את בעלה לגניני על מנת שיקח משם תעודת לידה ע"ש ███████, האיש שאליו התחזה ███████ וזאת על מנת לסייע ל ███████ בהתחזותו. בעלה של הנאשמת ███████ נסע לגניני וקיבל את המסמך האמור.
לבסוף נעצר ███████ שוב ביום 3/5/02 ע"י כוחות צה"ל בביתה של הנאשמת.

**פרט שישי:**

**מהות העבירה:** אחזקת כלי יריה, עבירה לפי סעיף 53(א)(1) לצו בדבר הוראות בטחון, (יהודה והשומרון) (מס' 378) תשי"ל – 1970.

**פרטי העבירה:** הנאשמת הנ"ל, בהיותה באיזור, בחודש אפריל 2002 או בסמוך לכך, החזיקה כלי יריה ללא תעודת היתר שהוענקה ע"י מפקד צבאי או מטעמו, כדלקמן:
בעת שהסתתר בבית הנאשמת, הביא הפעיל הצבאי ███████ לביתה את האקדח שלו, אותו הסתיר קודם מעצרו הראשון.

3

P 5: 144

**פרט שביעי:**

**מהות העבירה:** אחזקת פצצה, עבירה לפי סעיף 53(א)(1) לצו בדבר הוראות בטחון, (יהודה והשומרון) (מסי 378) תש״ל – 1970.

**פרטי העבירה:** הנאשמת הנ״ל, בהיותה באיזור, בחודש אפריל 2002 או בסמוך לכך, החזיקה פצצה או חפץ נפיץ או מבעיר ללא תעודת היתר שהוענקה ע״י מפקד צבאי או מטעמו, כדלקמן:

בהיותו מסתתר בבית הנאשמת, רכש ▓▓▓▓ הנ״ל פחם אותו ריסק יחד עם אחיה, ▓▓▓▓ ושם בשקיות. חומר זה נועד עבור הכנת מטעני חבלה, אותם הכינו ▓▓▓▓ יחד עם ▓▓▓▓ ובהנחיית ▓▓▓▓ מסר לנאשמת כי הם מכינים חומר זה לצורך הכנת מטען חבלה אותו הם מתכננים להניח כנגד ג׳יפ או טנק של צה״ל במ.פ. קלנדיה. השניים רכשו לצורך ביצוע הפיגוע מצלמת וידאו על מנת לצלם את הפיגוע. ▓▓▓▓ אף מסר לנאשמת כי המטען יופעל באמצעות פלאפון.

**פרט שמיני:**

**מהות העבירה:** אחזקת כלי יריה, עבירה לפי סעיף 53(א)(1) לצו בדבר הוראות בטחון, (יהודה והשומרון) (מסי 378) תש״ל – 1970.

**פרטי העבירה:** הנאשמת הנ״ל, בהיותה באיזור, בתחילת חודש מאי 2002 או בסמוך לכך, החזיקה כלי יריה ללא תעודת היתר שהוענקה ע״י מפקד צבאי או מטעמו, כדלקמן:

לאחר מעצרו של ▓▓▓▓, ביום 3/5/02 הנאשמת החזיקה באקדחו של ▓▓▓▓ ולאחר מכן הודיעה לאחיו של ▓▓▓▓ כי האקדח נמצא ברשותה. הנאשמת נסעה מא-רם לגינין עם האקדח של ▓▓▓▓ על מנת להחזירו לאחיו. בנסיעה זו לקחה הנאשמת גם את מצלמת הוידאו של ▓▓▓▓ שבה אמור היה לצלם את הפיגוע המתוכנן וחפצים נוספים שלו. במהלך הנסיעה נעצרה המכונית ע״י כוחות צה״ל אולם אלה לא גילו את האקדח שהיה מוסתר על גופה של הנאשמת.

**פרט תשיעי:**

**מהות העבירה:** קשירת קשר לגרימת מוות בכוונה, עבירה לפי סעיף 51(א) לצו בדבר הוראות בטחון, (יהודה והשומרון) (מסי 378) תש״ל – 1970 וסעיף 22 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מסי 225), תשכ״ח - 1968.

**פרטי העבירה:** הנאשמת הנ״ל, בהיותה באיזור, בחודש מאי 2002 או בסמוך לכך, קשרה קשר עם אחר לגרום בכוונה למותו של אחר, כדלקמן:

▓▓▓▓ וחברו ▓▓▓▓, פעיל ג׳יהאד אסלאמי צבאי התליטו לבצע פיגוע התאבדות, באמצעות מחבל אשר ילבש חגורת נפץ. ▓▓▓▓ שהביע את רצונו לבצע את הפיגוע אמור היה לבצע, לצורך הוצאת הפיגוע לפועל החליטו ▓▓▓▓ לפנות לנאשמת על מנת שתוביל את המחבל למקום הפיגוע. ▓▓▓▓ נסע לבית הנאשמת בא –רם ואמר לה כי ישנו מחבל המוכן לבצע פיגוע התאבדות בירושלים. הנאשמת הסכימה להוביל את המחבל למקום הפיגוע ובכך לגרום למותם של אזרחים רבים.

יום לאחר מעצרו של ▓▓▓▓, ביום 4/5/02 התקשר אל הנאשמת אחיו של ▓▓▓▓, וביקש את עזרתה בהעברת כלי נשק מרמאללה לגינין. ▓▓▓▓ ביקש מהנאשמת שלא תערב בכך את בעלה. הנאשמת הסכימה ו ▓▓▓▓ אמר כי ימסור את הפלאפון שלה למי שמחזיק בנשק. כעבור כשעתיים התקשר לנאשמת ▓▓▓▓, ושאל אודות מעצרם של ▓▓▓▓ ואחיה ▓▓▓▓. באותו מועד הנאשמת סרבה לנסוע לרמאללה להפגש עימו כיוון שבעלה היה בבית. בשיחה נוספת של ▓▓▓▓ לנאשמת, לקח בעלה את הפלאפון ולאחר מכן נסע בעצמו לרמאללה על מנת להפגש עם ▓▓▓▓. הנאשמת דווחה לאחיו של ▓▓▓▓, כי בעלה נסע להפגש עם ▓▓▓▓ מסר לבעלה של הנאשמת כי הוא מבקש שיעביר חגורת נפץ. הבעל ▓▓▓▓ סרב וכעס עליה.

ביום 8/5/02, יום מעצרה , נסעה הנאשמת לכיכר מנרה ברמאללה ונפגשה עם ▓▓▓▓. ▓▓▓▓ אמר לנאשמת כי הוא יודע שהיא הובילה מחבל מתאבד לביצוע פיגוע ובקש ממנה להוביל מחבל מתאבד נוסף לתוך ירושלים, לרחוב יפו או למקום הומה אדם אחר על מנת שהנאשמת תבצע שם פיגוע התאבדות. הנאשמת הסכימה להשתתף בביצוע פיגוע ההתאבדות ולהוביל את המחבל המתאבד למקום ביצוע הפיגוע בירושלים.

▓▓▓▓ ביקש שלא תחזור לביתה של רם על מנת שלא תיעצר והיא הבטיחה לנסוע לבית אימה בעזריה.

פיגוע ההתאבדות המתוכנן לא יצא לפועל עקב מעצרה של הנאשמת באותו יום.

4

P 5: 145

<u>עדי התביעה:</u>

1. ███████ לחייק יהודה, גובה אמרת הנאשמת + זיהוי תמונה.
2. ███████, לחייק יהודה, גובה אמרת הנאשמת.
3. ███████ עצורה בת.ת. 484/02, ש.ב.ס.
4. ███████ עצור בת.ת. 422/02, ש.ב.ס.
5. ███████, עצור, ש.ב.ס.
6. ███████, עצור. ש.ב.ס.
7. ███████, עצור.
8. ███████ עצור.
9. מסדר זיהוי תמונות – ע"י ███████, לחייק יהודה.

רשימת עדים מפורטת מתיק פי"א 02069/02 מיעוטים (תיק הפיגוע) תמסר במהלך המשפט.

דליה קאופמן
תובעת

סרן
צבאית

תאריך: 7/7/02
סימוכין: 451/02

5

P 5: 146