UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK I. SOKOLOW, *et al.*, <br><br>                   Plaintiffs, <br><br> vs. <br><br> THE PALESTINE LIBERATION ORGANIZATION, *et al.*, <br><br>                   Defendants. | No. 04 Civ. 00397 (GBD) (RLE) |

**REPLY IN SUPPORT OF
APPLICATION FOR AN ORDER DIRECTING
<u>DEFENDANTS TO DEPOSIT FUNDS INTO THE REGISTRY OF THE COURT</u>**

 

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000

*Attorneys for Plaintiffs*

July 13, 2015

## **TABLE OF CONTENTS**

**Page**

I.   DEFENDANTS ARE NOT ENTITLED TO WAIVER OF THE BOND REQUIREMENT UNDER THE *DILLON* FACTORS ........................................................................ 2

II.  DEFENDANTS' FINANCIAL CONDITION HAS NOT MATERIALLY CHANGED SINCE *KNOX* AND *UNGAR* ............................................................................ 4

III. DEFENDANTS PRESENT A MISLEADING AND INCOMPLETE RECORD ABOUT THEIR FINANCIAL CONDITION .................................................................. 7

    A.   The PA Owns and Receives Dividends From The PIF .......................................... 7

    B.   Al-Sanabel Trading and Investment Company is a Significant PLO Asset ........... 8

IV.  THE STATE DEPARTMENT HAS ALREADY EXPRESSED ITS VIEWS AS TO DEFENDANTS' PARTICIPATION IN U.S. LITIGATION .................................... 10

CONCLUSION ............................................................................................................................ 10

Defendants claim that they should not be required to post one penny of security against the judgment arising from the jury's finding that they perpetrated and provided material support for six acts of international terrorism against plaintiffs and their decedents. Defendants do not offer a sound application of the governing legal standard and they provide no proffer whatsoever of an amount that they can agree to post as security for the judgment. The Court should not accept defendants' incredible representation that they have no ability to post security in *any* amount. Defendants have an annual budget in the billions of dollars. They pay terrorists and the families of terrorists tens of millions of dollars every year, without regard to need.

In reality, analysis of the PA's own information indicates that even if the Court accepted all of the PA's factual representations, the PA alone could pay $20 to $25 million per month *just using a modest portion of the savings identified by reforms planned by the PA Ministry of Finance itself or recommended by the IMF and the World Bank*, as detailed in the declaration of Bradley Wendt, a municipal finance expert from Charles River Associates and formerly of Goldman Sachs.

Moreover, as discussed below, defendants have misrepresented the availability of funds from the PIF and the PLO. Specifically, defendants failed to disclose a significant PLO asset, called "the Al-Sanabel Trading and Investment Company, Ltd.," and misstated the PA's ownership of, and income stream from, the Palestine Investment Fund ("PIF"). Remarkably, defendants did not even proffer a declarant with knowledge concerning the PLO's assets. Adding even a modest amount from these resources easily would cover the $30 million per month requested by plaintiffs.

**I.    DEFENDANTS ARE NOT ENTITLED TO WAIVER OF THE BOND RE-
QUIREMENT UNDER THE *DILLON* FACTORS**

The Second Circuit's controlling case is *In re Nassau County Strip Search Cases*, 783 F.3d 414 (2d Cir. 2015). Defendants claim that the case merely announces a "supplemental" test to the traditional stay factors. Not true. The Second Circuit said that the five-factor test it adopted was to be applied "*in contrast to the traditional stay factors*" because the five factors "more directly address the primary purpose of Rule 62(d): to ensure recovery for a party who ultimately prevails on appeal, and to protect the judgment debtor from the risk of losing the money if the decision is reversed." 783 F.3d at 417-18 (emphasis added).[1]

As an initial matter, defendants' status as governmental/political entities does not excuse them from posting security. "Courts are generally reluctant to waive the bond requirement for governmental entities unless funds are readily available and an effective procedure is in place for paying the judgment." *Wilmer v. Bd. of Cnty. Comm'rs of Leavenworth Cnty., Kan.*, 844 F. Supp. 1414, 1419 (D. Kan. 1993) (collecting cases), *aff'd sub nom. Wilmer v. Bd. of Cnty. Comm'rs of Leavenworth Cnty.*, 28 F.3d 114 (10th Cir. 1994). Here, defendants admit that no such funds are readily available. This plainly militates for a gradual build-up of the security—unless readily available funds are identified and sequestered by the defendants.

Moreover, it is simply not the law (as defendants contend) that fiscal imprudence or existing indebtedness entitles a defendant to waiver of the bond requirement. Quite the opposite is true. The starting point is that the bond requirement is ***not*** waived where the Court lacks confi-

---

[1] Because the traditional stay test is irrelevant here, plaintiffs did not re-re-re-brief the jurisdiction issues. Suffice it to say that plaintiffs have repeatedly supported and defended this Court's correct holding that general jurisdiction exists over these defendants and have repeatedly explained why there are additional grounds for the exercise of jurisdiction that are amply supported by the record.

– 2 –

dence in the judgment debtor's willingness or ability to pay. Case after case so holds.[2] Plaintiffs relied on these cases in their opening brief (DE 920 at 11-13), but defendants have nothing to say about them.

Even as to the one *Dillon* factor defendants focus on—whether defendants are in "such a precarious financial situation that the requirement to post a bond would place other creditors…in an insecure position"—defendants simply have not met their burden. Defendants offered no analysis of their cash flows, let alone identified creditors who would be placed "in an insecure position." As one court confronting a similarly recalcitrant defendant said, "even if [defendant] *had* made a showing that its creditors would be injured by the posting of a supersedeas bond and that the full bond is not required to preserve the status quo, it has offered *nothing* in place of the supersedeas bond—no partial bond, no substitute collateral." *Corp. Comm'n of Mille Lacs Band of Ojibwe Indians v. v. Money Ctrs. of Am., Inc.*, Civ. No. 12-1015 RHK/LIB, 2013 WL 6630905, at *1-*2 (D. Minn. Dec. 17, 2013) (emphasis in original). That is true here, too.

In fact, financial analysis—based on defendants' own information and the recommendations of the IMF, the World Bank, the United Nations, and the *PA's own Ministry of Finance*—

---

[2] *E.g.*, *In re Carlson*, 224 F.3d 716, 719 (7th Cir. 2000) (denying request for waiver under *Dillon*: this case "presents the polar opposite of a situation in which waiver is appropriate," as there is "every reason to lack confidence that Carlson will pay up eventually"); *Quiroz v. Dickerson*, No. 3:10-CV-00657-LRH-WGC, 2013 WL 5947459, at *2 (D. Nev. Nov. 1, 2013) (denying request for waiver under *Dillon* because plaintiff "faced a serious risk of being unable to collect on the judgment in this matter" and defendant had argued that "'[c]ollection activity will financially annihilate [him]'") (alterations in original); *United States v. O'Callaghan*, 805 F. Supp. 2d 1321, 1325 (M.D. Fla. 2011) (denying request for waiver under *Dillon*: "[o]ne typical ground for reducing or waiving the bond requirement pending appeal is that a judgment debtor is sufficiently solvent to 'facilely respond to a money judgment'"—which the debtor was not), *aff'd*, 500 F. App'x 843 (11th Cir. 2012); *Cipes v. Mikasa, Inc.*, 404 F. Supp. 2d 367, 370 (D. Mass. 2005) (in case where defendant argued that it *could* pay the judgment, court denied request for waiver under *Dillon* because defendant's finances had "been declining for several years" and thus its "ability to pay the judgment following appeal is not sufficiently guaranteed to warrant waiver of the supersedeas bond requirement"), *aff'd*, 439 F.3d 52 (1st Cir. 2006).

shows that a monthly payment of $30 million will have very little impact on defendants' overall financial condition.  As for the PA, Bradley Wendt, a municipal finance and capital markets expert, opines that merely by implementing recommended reforms that would result in billions of dollars of savings, the PA can pay $20 million to $25 million per month.  Affidavit of Bradley Wendt, dated July 13, 2015 ("Wendt Aff."), ¶ 10.  This is in addition to amounts that the PA should pay by putting a halt to the payment of terrorists and in addition to amounts that defendants can pay from resources that defendants failed to disclose to this Court.

Even if defendants had provided persuasive evidence that their financial situation was "precarious"—which they did not—evidence of financial weakness or mismanagement is not a basis to waive the bond requirement entirely.  It is instead a reason to require "substitute security."  "Courts do not excuse appellants in a precarious financial situation from filing a supersedeas bond in order to alleviate the burden on the appellant, but rather to protect the appellant's creditors.  For this reason, when a full supersedeas bond would cause the appellant 'undue financial burden' and harm its other creditors, the court may exercise its discretion to 'fashion some other arrangement for substitute security through an appropriate restraint on the judgment debtor's financial dealings, which would furnish equal protection to the judgment creditor.'" *Ojibwe Indians*, 2013 WL 6630905, at *2 (quoting *Poplar Grove Planting & Ref. Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979)); *see Olympia Equip. v. W. Union Tel. Co.*, 786 F.2d 794, 796 (7th Cir. 1986) (defendants who would be bankrupted by bond are "candidate[s] for alternative security").

## II. DEFENDANTS' FINANCIAL CONDITION HAS NOT MATERIALLY CHANGED SINCE *KNOX* AND *UNGAR*

In *Knox* and *Ungar*, defendants claimed that they faced "substantial unpaid arrears and debts."  *E.g.*, *Knox v. PLO*, No. 03 Civ. 4466 (VM)(THK), 2009 WL 1591404, at *5 (S.D.N.Y.

Mar. 26, 2009) ("Defendants argue that they have been 'teetering on the edge of bankruptcy'"), *Report & Recommendation adopted*, 628 F. Supp. 2d 507 (S.D.N.Y. 2009).  Yet they were ordered by two District Judges to pay a combined $30 million per month.[3]  Defendants were eventually able to resolve both of those large terror judgments without suffering financial ruin.[4]  Thus, defendants' creditors are in no worse a position now than when *Knox* and *Ungar* were decided—especially for the reasons discussed below in Sections III and IV of this memorandum.

Defendants try to portray themselves as having a "far more dire" financial condition today than they did back then.  But that attempt, which is merely hyperbole, cannot be squared with the record.  According to defendants' own submission, the PA's "clearance" tax revenues have nearly tripled (from $896 million in 2007 to $2.1 billion in 2014).[5]  Its operating budget has increased by 40% (from $2.5 billion in 2007 to $3.5 billion in 2014).[6]  And its operating deficit has remained stable.[7]

Moreover, according expert Bradley Wendt, who has evaluated the finances of countless governmental entities, the PA's financial situation has also improved in the following ways:

- "The PA's net revenue has grown consistently at a compound average growth rate

---

[3] Defendants argue that because *Knox* and *Ungar* involved default judgments and different procedural devices, this Court should disregard those courts' assessments of their ability to pay the judgments at issue in those cases.  We disagree.  The cases did not turn on *procedural posture*.  They turned on defendants' financial ability to pay.

[4] DE 215 in *Knox v. PLO*, No. 03 Civ. 4466 (VM)(THK) (S.D.N.Y.); DE 657 in *Ungar v. PA*, No. CA 00-105L (D.R.I.).

[5] *Compare Knox*, 2009 WL 1591404, at *6 (2007 figure; citing Fayyad Decl. ¶ 17 & Ex. E (Table 1)) *with* Bishara Decl. ¶ 13 (2014 figure).

[6] *Compare* Ex. 2 to Romeo Decl., Fayyad Decl. Exs. B & E (Table 1) (2007 figure) *with* Bishara Decl. ¶ 13 (2014 figure) *and* Ex. A-3 to Bishara Decl. (2014 figure; PA Ministry of Finance, Monthly Report for Dec. 2014 at Table 1).

[7] *Compare Knox*, 2009 WL 1591404, at *6 (2007 figure; citing Fayyad Decl. ¶ 14 & Ex. B) *with* Bishara Decl. ¶ 25 (2014 figure).

> [ ] of nearly 9% per year over the past five years." Wendt Aff. ¶ 19.

- "[T]he PA is projected to achieve operating revenue growth at a compound average rate of about 7% per year over the next four years." Wendt Aff. ¶ 21.

- "The IMF notes that the PA's wage increases have consistently outpaced inflation." Wendt Aff. ¶ 27.

- "Based on a recent set of projections prepared by the IMF . . . the PA's baseline operating budget is expected to be balanced by 2018 without introducing new material fiscal initiatives." Wendt Aff. ¶ 18.

In fact, the PA's financial situation has improved so significantly that, in 2011, the PA even gave incarcerated terrorists a "major raise in salaries." Tr. 893-94. In short, defendants are raising more revenue—and spending more freely—than they did at the time of *Knox* and *Ungar*.

To be sure, the PA and the PLO have other debt. Most governments do. However, that debt has not interrupted "business as usual" for these defendants. According to Mr. Wendt, "[t]he PA's current level of public debt and arrears [17% of GDP] is sustainable in the medium term and can be gradually amortized over the next decade . . . . By comparison the debt-to-GDP ratios for many countries are higher: Tunisia (44.5%), Jordan (66.8%), Morocco (59.7%), Germany (55.2%), and the United States (94.3%)." Wendt Aff. ¶ 48 (footnotes omitted).

Finally, defendants do not address the case law in this Circuit holding that asserted financial hardship does *not* relieve defendants of the need to secure or pay their judgment debt. An appellant "must be prepared to assume some financial burden to achieve 'business as usual.'" *Trans World Airlines, Inc. v. Hughes*, 314 F. Supp. 94, 98 (S.D.N.Y. 1970), *aff'd as modified*, 449 F.2d 51 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973); *see Capitol Records, Inc. v. MP3tunes, LLC*, No. 07-CV-9931, 2014 WL 6769551, at *2 (S.D.N.Y. Nov. 25, 2014) ("[S]ome level of financial hardship is not sufficient to eliminate the bond requirement.").

### III. DEFENDANTS PRESENT A MISLEADING AND INCOMPLETE RECORD ABOUT THEIR FINANCIAL CONDITION

#### A. The PA Owns and Receives Dividends From The PIF

Defendants claim that the PIF is "owned entirely by the Palestinian people," not the PA, so that "PIF assets [worth about three-quarters of a billion dollars] . . . are not available to the PA." (DE 925 at 6). This claim is false.

The PA is the sole shareholder of the PIF. This fact is confirmed in an official "Certificate of a Public Shareholding Company" issued by the *PA's own Companies Controller*, which identifies the PA as the PIF's sole shareholder. Ex. 9 to the Supplemental Declaration of Carmela T. Romeo ("Romeo Supp. Decl."). In support of their claim that the PIF is owned "by the Palestinian people," defendants point to purported PIF by-laws from 2007. But defendants fail to mention that these so-called "by-laws" are a fiction: they were cobbled together for litigation purposes as an exhibit for submission to U.S. courts hearing enforcement proceedings brought by the plaintiffs in *Ungar* against the PA's rights in the PIF. As the plaintiffs demonstrated in that case, the 2007 by-laws were not certified nor were they were approved by the lawful directors of the PIF at that time. *Strachman v. PA*, 3:05-MC-00208-PCD (D. Conn.) at DE 171, p.15 n.10; *see also id.*, DE 97-98.

Annual reports of the PIF put the lie to the contention that the PIF is owned by the "Palestinian people" rather than the PA. For example, the PIF's annual reports contain detailed information regarding the "shareholder's account," that is, the balance of payments between the PIF and the PA. *See* Exs. 10-11 to Romeo Supp. Decl.[8] Likewise, the PIF's 2014 Annual Report confirms that the PIF distributes dividends to its "shareholder," which it pays into "*the Pal-*

---

[8] Moreover, any putative attempt to change the PA's ownership of the PIF during the pendecy of this case would be a fraudulent conveyance under DCL § 273-a.

*estinian Treasury.*" Ex. 11 to Romeo Supp. Decl. at 17 (emphasis added). Similarly, the PIF's 2013 Annual Report states: "PIF assets have reached US$771 million by end of 2013, after the PIF's Board approval of US$20 million in dividend distribution *to the Palestinian [T]reasury*, bringing total dividend distribution since inception to US$713.6 million." Ex. 10 to Romeo Supp. Decl. at 9.

Not only does the PA own all the shares of the PIF, but over the past 12 years the PA has received income of *nearly a billion dollars* from the PIF. This is reflected, for example, in the PIF's 2014 Annual Report, where PIF Chairman of the Board Mohammed Mustafa—who is also the PA's Deputy Prime Minister and Minister of National Economy (Ex. 11 to Romeo Supp. Decl. at 15)—expressly confirmed that "[t]he Government of Palestine [*i.e.*, the PA] has received around $906 million in dividends, taxes, and license fees through PIF's investments since 2003." *Id.* at 6, 12. The report also confirms: "Since 2003, PIF has transferred over $728 million to the government in dividends." *Id.* at 9. The report states that "[s]ince inception, PIF has been a **_reliable income stream_** for the government." *Id.* at 12 (emphasis added).[9]

### B. Al-Sanabel Trading and Investment Company is a Significant PLO Asset

On February 17, 2009, the PLO registered a company called the "Al-Sanabel Trading and Investment Company Ltd." ("Sanabel") in the Palestinian Authority's company registrar. Decla-

---

[9] In an apparent attempt to divert the Court's attention from defendants' ownership of, and income from, the PIF, defendants cite cases before Judge McMahon and Judge Marrero dealing with the wholly separate, and (here) irrelevant questions of whether the PIF is a separate legal entity and whether a proceeding to enforce a judgment against the PA by obtaining assets of the PIF can be brought in federal court under the parameters of enforcement jurisdiction outlined in *Epperson v. Entertainment Express, Inc.*, 242 F.3d 100, 104 (2d Cir. 2001), or whether such a proceeding must be brought in state court. Neither of those issues is relevant in any manner to the fact that (1) the PA solely owns the PIF, which is worth approximately three-quarters of a billion dollars; and (2) the PA has received approximately three-quarters of a billion dollars in dividends from the PIF over the past 12 years.

ration of Eitan Arusy, dated July 9, 2015 ("Arusy Decl."), ¶ 9.  Sanabel was incorporated as a private limited liability shareholding company with a share capital of US $50,000,000.  *Id.*  Sanabel's official registration certificate shows that its sole shareholders are four senior PLO and Fatah officials:  (1) Mahmoud Abbas (Chairman of the PLO and the PA); Mo'in ("Ramzi") Khoury (Director-General of the PLO's Treasury, known as the Palestinian National Fund); Mostafa Abu Al-Rub (Financial Advisor to Abbas); and Mohammad Shtayyeh (Fatah Central Committee member, who has served in numerous official PA and PLO positions).  *Id.* at ¶ 10.  Following Sanabel's registration, the PLO transferred assets that were held by "Samed" and "Al-Sachra"—the two companies established by the PLO in the 1970s to hold and manage the PLO's assets and investments (*id.* at ¶ 8)—into Sanabel.  *Id.* at ¶ 11.[10]

Sanabel owns real estate in the West Bank, East Jerusalem, and even in the heart of Israel—West Jerusalem, Jaffa, Acre, and Haifa.  *Id.* at ¶ 12.  Sanabel also owns real estate in France, Bulgaria, Czech Republic, Switzerland, and the UK.  *Id.* at ¶ 15.  Its core business is the promotion of commercial and industrial projects both inside and outside of the PA.  *Id.* at ¶ 12.

Sanabel is also invested in a number of ventures, including the Palestinian Stock Exchange (owns 17%); the Palestine Insurance Company (owns 43.81%); the Palestinian distribution company "Wassel Group" (also known as the "Palestinian Company for Distribution and Logistics;" owns 7.95%); and various agricultural projects and industrial factories (including a wholly-owned agriculture subsidiary named the "Al-Sanabel Company for Agricultural and Veterinarian Investment").  *Id.* at ¶ 16.  Additionally, outside of the West Bank, Sanabel holds all of the assets formerly held by Samed, estimated to be worth $150 million.  *Id.* at ¶ 13.  Sanabel owns twenty-six factories.  *Id.*  Finally, the estimated worth of Sanabel's liquid assets is $200

---

[10] At one time, Samed alone held PLO assets of over a billion dollars.  Arusy Decl. ¶ 8.

million.  *Id.* at ¶ 17.

*   *   *

The PIF and Sanabel are two examples of how defendants have presented a misleading and incomplete record to this Court as to their financial condition.  If defendants are not required to post security in the form of a monthly stream of cash payments into the registry of the Court, discovery will have to commence into these entities.

**IV.  THE STATE DEPARTMENT HAS ALREADY EXPRESSED ITS VIEWS AS TO DEFENDANTS' PARTICIPATION IN U.S. LITIGATION**

There is no need for the Court to solicit the views of the State Department—or any other agency of the United States.  In 2007, in response to the same argument that enforcement of terror judgments against these defendants would lead to financial ruin and political destabilization in the Middle East, Secretary of State Condoleezza Rice stated plainly:  "I encourage you, as I would any government, to respond to U.S. legal proceedings in good faith and [in] a timely manner[.]  The United States is not party to these enforcement proceedings, and our role is therefore limited under our adversarial system of justice."  Ex. 6 to Romeo Decl. (Jan. 12, 2007 letter from Sec. Rice to Abbas).  Moreover, in 2008, the United States declined to file a statement of interest in the *Knox* case.  Romeo Decl. Ex. 7 (Feb. 29, 2008 Letter to Judge Marrero from Jeffrey Buckholtz).  No different result should obtain here.

**CONCLUSION**

The Court should order defendants to deposit $30 million per month into the registry of the Court (up to the full amount of the judgment) during the pendency of the appeal.

Dated: New York, New York
July 13, 2015

**ARNOLD & PORTER LLP**

By: /s/ Kent A. Yalowitz
    Kent A. Yalowitz
        KENT.YALOWITZ@APORTER.COM
    Lucy S. McMillan
        LUCY.MCMILLAN@APORTER.COM
    Carmela T. Romeo
        CARMELA.ROMEO@APORTER.COM
    Tal R. Machnes
        TAL.MACHNES@APORTER.COM

399 Park Avenue
New York, New York 10022
(212) 715-1000