

# U.S. DEPARTMENT OF STATE
DIPLOMACY IN ACTION

## Israel and the occupied territories

**Country Reports on Human Rights Practices**
Bureau of Democracy, Human Rights, and Labor
2003
February 25, 2004

(The Report on the **occupied territories** is appended at the end of this Report.)

Israel is a parliamentary democracy with a multiparty system and free elections. There is no constitution; a series of "basic laws" provide for fundamental rights. The legislature, or Knesset, has the power to dissolve the Government and limit the authority of the executive branch. On January 28, elections for the Knesset were held. Likud Party leader Ariel Sharon was re-elected Prime Minister. The judiciary is independent.

Since the Intifada began in September 2000, and during the year, Palestinians from the West Bank and Gaza continued to perpetrate terrorist attacks against Israeli targets. Terrorist organizations such as the Islamic Resistance Movement (Hamas), Hizballah, Islamic Jihad in Palestine, and the Popular Front for the Liberation of Palestine (PLFP), among others, committed numerous acts of terrorism in Israel and the occupied territories. Between January and November, approximately 130 terrorist attacks occurred within Israel and Jerusalem, killing more than 145 Israelis and injuring more than 720. Israeli security forces prevented numerous terrorist attacks against citizens on a daily basis.

Israel occupied the West Bank, the Gaza Strip, East Jerusalem, and the Golan Heights after the 1967 War. (The human rights situation in the occupied territories is discussed in the annex appended to this report.) The international community does not recognize Israel's sovereignty over any part of the occupied territories. Since 1991, the Israelis and the Palestinians made repeated attempts at negotiating peace. Despite meetings between high-level Israeli and Palestinian officials, efforts to resolve the conflict yielded few results.

Internal security is the responsibility of the Israel Security Agency (ISA), formerly the General Security Service (GSS) and also known as Shin Bet or Shabak, which is under the authority of the Prime Minister's office. The police are under the authority of the Minister of Internal Security. The Israel Defense Forces (IDF) is under the authority of a civilian Minister of Defense. The IDF included a significant portion of the adult population on active duty or reserve status and played a role in maintaining security. The Foreign Affairs and Defense Committee in the Knesset reviewed the activities of the IDF and the ISA. Security forces were under effective government control. Members of the security forces committed serious human rights abuses in the occupied territories and against Palestinian detainees.

The country's population is approximately 6.7 million (including Israeli settlers in the occupied territories). The country has an advanced industrial economy with a relatively high standard of living. During the year, unemployment was approximately 11 percent, but was substantially higher in the country's peripheral regions, among lower-skilled workers and the country's Arab citizens. The country's economic growth was accompanied by an increase in income inequality. The longstanding gap in levels of income within the Jewish population and between Jewish and Arab citizens increased. Arab citizens populated most of the 17 towns in Israel with the highest unemployment rates. During the year, the country relied heavily on foreign workers, principally from Asia, Africa and Eastern Europe, who were employed in agriculture and construction and constituted approximately 10 percent of the labor force.

The Government generally respected the human rights of its citizens; however, there continued to be problems with respect to its treatment of its Arab citizens. Israeli and international human rights organizations continued to report allegations that security forces tortured detainees during interrogation and that police officers beat detainees. The conditions in military detention camps and Israeli interrogation centers for Palestinian security detainees held in Israel remained poor, and did not meet international standards. Human rights groups issued complaints regarding torture, insufficient living space, and inadequate medical care for those detained in interrogation centers. During the year, the Government detained without charge thousands of persons in Israel, the West Bank, and Gaza. According to human rights nongovernmental organizations (NGOs) in the country, some security prisoners were sentenced on the basis of coerced confessions.

The Government did little to reduce institutional, legal, and societal discrimination against the country's Arab citizens, who constituted approximately 20 percent of the population but did not share fully the rights and benefits provided to, and obligations imposed on, the country's Jewish citizens. The Government interfered with individual privacy in some instances. The Government interfered with an individual's ability to marry within the country by not recognizing Jewish marriages other than those performed by the Orthodox Jewish establishment and by prohibiting civil marriages. Discrimination and societal violence against women persisted, although the Government continued to take steps to address these problems. Discrimination against persons with disabilities persisted. Trafficking in women into the country for the purpose of forced prostitution was a continuing problem. There was evidence of labor trafficking among the country's estimated 236,000 foreign workers. Abuse of foreign workers, including prostitutes, some of whom were trafficked to and employed illegally in the country, continued.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life



DEFENDANT'S EXHIBIT
NO. 10

There were no political killings in Israel during the year.

On September 1, the Orr Legal Commission of Inquiry (COI), established in 2000 to investigate the demonstrations of October 2000, during which police killed 12 Arab citizens and 1 Palestinian, released a report of its findings. The report criticized then Prime Minister Ehud Barak and then Minister of Internal Security Shlomo Ben-Ami for their handling of the situation and recommended personnel action and, in some cases, criminal investigations, against several government and police officials. The report also criticized police practices with regard to the Israeli-Arab population and noted the historical, societal, and governmental discrimination against Arab citizens.

On September 14, the Government established a ministerial committee to advise the Government on implementation of the COI recommendations within 60 days. By year's end, the committee's tenure had been extended.

Several Israeli-Arab advocacy groups alleged that police and security forces wrongfully killed other Arab citizens since the killings of the 12 Arab citizens in the October 2000 demonstrations. On July 22, Israeli Border Police shot and killed unarmed 28-year-old Morassi Jibali, a passenger in a car that the police claimed had failed to stop upon order. The police claimed the victim had been mistaken for a terrorist. It was later discovered that the driver had tried to avoid the roadblock as he was driving without a license. On July 24, the police shot and killed an unarmed Bedouin man, Nasser Abu al Qia'an, who was behind the wheel of a car near a junction. Several witnesses reportedly stated that the victim's car had stopped in traffic, and that a police officer shot Qia'an at point blank range. Police claimed that the victim had tried to run them over. Commenting on a pattern within the Israeli police forces, the COI wrote in its report that the "police must learn to realize that the Arab sector in Israel is not the enemy and must not be treated as such."

On September 11, police and residents of an Arab community, Kfar Qassem, clashed when police reportedly searched for Palestinians who allegedly entered Israel illegally. The police shot and wounded one Israeli Arab when, according to police reports, village residents began to throw stones at them. At year's end, the police were still investigating the incident.

According to the Government, there was a 50 percent decrease in the number of terrorist attacks in the country by Palestinian groups or individuals as compared to 2002. The Government reported that these attacks resulted in the deaths of about 213 Israelis, including about 50 members of the IDF (see Sections 1.a. and 1.c. of the annex). Terrorists injured approximately 900 Israelis during the year. The Government and Israeli society continued to function on a heightened state of alert due to continuous and numerous threats of attacks from these groups.

On January 5, a double suicide bombing killed 23 persons, including 15 Israeli citizens and 8 foreign nationals, and injured approximately 120 persons near the Tel Aviv Central Bus Station. On June 11, 17 people were killed and over 100 wounded in a suicide bombing on a bus on Jaffa Road in Jerusalem. On August 19, 23 persons were killed and over 130 wounded when a suicide bomber detonated a bomb on a bus in Jerusalem. On October 4, 20 people were killed and more than 60 wounded in a suicide bombing at Maxim's restaurant in Haifa.

b. Disappearance

There were no reports of politically motivated disappearances during the year.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Laws, judicial decisions, and administrative regulations prohibit the physical abuse of detainees. During the year, there continued to be allegations that security forces tortured Palestinian detainees from the occupied territories during interrogation. The Attorney General has the authority to accept a "necessity defense" in deciding whether to prosecute those accused of alleged abuses. There also were numerous allegations that security officers beat Palestinian detainees from the occupied territories during arrest and on the way to interrogation or detention facilities.

The Public Committee Against Torture in Israel (PCATI) submitted approximately 80 complaints of alleged torture by the ISA to the State Prosecutor during the year. According to the PCATI, the Government did not respond to 27 complaints, and approximately 30 cases were still under investigation. The Government, according to PCATI, claimed that 3 detainees had since been released from detention, and 12 others either withdrew their complaints or refused to meet with the investigator. Human rights groups maintained that no ISA agent has been criminally charged with torture or other ill treatment for the past several years. NGOs and international organizations reported government use of sleep deprivation, prolonged shackling and tightening of shackles, enforced positioning, forcing the detainee to run blindfolded and then tripping him, threats of violence, humiliation, threats against detainees' family members, and threats of house demolition against detainees held for interrogation. Human rights groups further complained that the investigators who did field work for the State Prosecutor's office on such claims were ISA agents and, therefore, biased in favor of their colleagues.

The law provides for the right to live in conditions that do not harm the health or dignity of the detainee, access to adequate health care, a bed for each detainee, and exercise and fresh air daily. Conditions varied in incarceration facilities in the country and the occupied territories that were administered by the Israeli Prison Service (IPS), the IDF, or the national police. IPS prisons, which generally housed citizens accused or convicted of common crimes, generally met international standards. There were some enlargements of IPS facilities to address overcrowding during the year, including the addition of 400 prison cells since June. Expansions and initiatives to renovate and repair existing facilities were underway at year's end.

In July 2002, Physicians for Human Rights (PHR) filed a petition with the Supreme Court calling for improved prison conditions. In June, the Supreme Court issued a permanent injunction prohibiting prisoners from being forced to sleep on the floor and demanded every prisoner be provided a bed. The Minister of Internal Security stated publicly that all persons held in the IPS would receive a bed, daily outdoor exercise, telephone and visitation rights, and less crowded facilities. During the year, the Government has begun to ease overcrowding in some facilities thereby freeing up more bed space.

Conditions in interrogation facilities for Palestinians were generally poorer than those of detention facilities and prisons.

In Israel, security detainees were held in IDF detention camps such as the Megiddo and Ketsiot facilities, and in special sections of police detention facilities. In August, hundreds of Palestinian prisoners at Megiddo Prison rioted against the Government's decision to transfer some of them to the Ketsiot detention camp in the south. Ketsiot is further away from most prisoners' homes in the West Bank, making it difficult for families to visit. However, the Government transferred the prisoners.

1/19/2015                                                    Israel and the occupied territories

Conditions in IDF facilities for security detainees were more basic than those of IPS facilities. Detention camps were mainly open-air, makeshift facilities, composed of tents on concrete floors with no heating. Beds were composed of mattresses on wooden palettes on the floor. A new wing opened at the Ketsiot facility alleviated overcrowding to some degree. According to the Government, security detainees may receive financial assistance from the Palestinian Authority (PA), including food required for observing religious holidays from their families and other persons or organizations and medical supplies from the International Committee for the Red Cross (ICRC) and other aid organizations. The IDF detention facilities held mainly male Palestinian detainees. The total number of Palestinian prisoners held by Israel on security grounds reached approximately 6,000 by year's end.

Approximately 650 Palestinians from Gaza and the West Bank were held in administrative detention (that is, not charged or tried and considered security threats) at year's end.

Conditions at the Russian Compound interrogation center in Jerusalem remained extremely poor. According to a PHR report released in November, prisoners in the Russian Compound holding cells were routinely handcuffed with their hands behind their backs to their feet, sometimes for hours. A major Israeli newspaper further reported that the Jerusalem police confirmed the use of this practice but noted it was used only in "extreme cases." According to the PHR, the Israeli Supreme Court has prohibited the use of painful handcuffing. In response to a petition by the PHR, the Attorney General notified the PHR that the Police Commissioner had been instructed to stop the use of this handcuffing position. The PHR report also stated that medical examinations given to arriving prisoners were used to determine if the prisoner could withstand "the application of violent approaches to those jailed." In addition, the report claimed that the Russian Compound was overcrowded.

Since the intifada began, only Israeli lawyers or Palestinian lawyers with Jerusalem identification cards were permitted to visit Palestinian prisoners in jails as advocates or monitors, which reduced significantly the availability and timeliness of legal aid for such prisoners.

Conditions at some national police detention facilities remained poor. Such facilities were intended to hold criminal detainees prior to trial but often became de facto prisons. Those individuals held included some security detainees and some persons who were convicted and sentenced. Inmates in the national police detention facilities often were not accorded the same rights as prisoners in the IPS ones.

Women were held separately from men, and children held separately from adults. Israeli citizens 18 years and over were treated as adults within the criminal justice system. Military orders, however, provide that Palestinian youth age 16 and above are treated as adults. According to one international organization, as of November, about 180 Palestinian minors were held by Israeli authorities for security violations. In September, according to media reports, the IDF detained a 12-year-old Palestinian boy for security reasons. He was released in December. Overcrowding, poor physical conditions, lack of social workers, and denial of visits by parents remained problems for Palestinian youth. According to the National Council for the Child, detention centers for Israeli juveniles had problems with poor infrastructure and overcrowding.

Various institutions, including government ministries, the Knesset, the ICRC, or human rights groups regularly monitored incarceration facilities (see Section 1.d. of the annex). However, in August, in response to a Supreme Court petition, the Government admitted the existence of a secret IDF detention facility. The Government prohibited the media from publishing the exact location of the prison, the names of persons held, and prison conditions. The Government has not allowed the ICRC, Knesset members, or the media access to the facility. Prisoners, their lawyers, and their families did not know the prison's exact location. On December 1, Supreme Court ordered the Government to release information on this prison by February 20, 2004.

d. Arbitrary Arrest, Detention, or Exile

The law prohibits arbitrary arrest; however, the Government did not always observe this prohibition. Defendants are considered innocent until proven guilty and have the right to writs of habeas corpus and other procedural safeguards. The law permits, subject to judicial review, administrative or preventive detention (i.e., detention without charge or trial), which was used in a small percentage of security cases. In such cases, the Minister of Defense may issue a detention order for a maximum of 1 year, which can be extended every 3 months. Within 24 hours of issuance of a detention order, detainees must be brought before a district judge who can confirm, shorten, or overturn the order. If the order is confirmed, an automatic review takes place after 3 months. Detainees have the right to be represented by counsel and to appeal detention orders to the High Court of Justice; however, according to the Association for Civil Rights in Israel (ACRI) and Adalah, the Legal Center for Arab Minority Rights in Israel, the police can delay a suspect's meeting with counsel for up to 48 hours in certain extreme cases. If the detainee is suspected of committing a "security offense," the police can delay notification of counsel for up to 10 days with the consent of a judge, which was usually granted. The court can delay the suspect's meeting with counsel for an additional 21 days. The Government may withhold evidence from defense lawyers on security grounds.

The 1997 Arrest and Detention Law limited the grounds for pretrial detention in criminal and security cases and reduced to 24 hours the length of time a person may be held without charge; however, this law does not extend to administrative detention cases. Human rights groups noted abuse of detention orders in cases in which the accused did not pose a clear danger to society.

Some protections afforded to citizens were not extended to Palestinian detainees, who fell under the jurisdiction of military law even if they were detained in Israel.

At year's end, the Government held approximately 8,400 Palestinians in custody. Those held were a combination of common criminals (approximately 1,250), administrative detainees (approximately 650), and ordinary security detainees (approximately 5,650). In 2000, a High Court ruling declared illegal the holding of Lebanese detainees in Israeli prisons as "bargaining chips" to extract concessions or the release of Israeli prisoners held in Lebanon. Since 1989 and 1994, the Government has held, without explicit charges, both Sheikh Obeid, a Lebanese Hizballah leader, and Mustafa Dirani, a head of security for the Amal militia. The Government claimed both were security threats and that Dirani personally oversaw the detentions of Israeli MIA Ron Arad, to whose release the Government linked Dirani's detention. In 2002, in response to the High Court's 2000 decision that detaining Lebanese captives indefinitely as "bargaining chips" violated the administrative detention law, the Knesset passed the Illegal Combatant Law. This law allows the IDF to detain anyone if there is a basis to assume that he or she "takes part in hostile activity against Israel, directly or indirectly" or "belongs to a force engaged in hostile activity against the State of Israel." Detainees can be held indefinitely and without charge or trial. This law allowed for Dirani's continued incarceration. In June 2002, the ICRC began regularly visiting both Obeid and Durani. At year's end, Obeid, Dirani, and some 25 other Lebanese prisoners (3 on administrative custody as illegal combatants, 19 on security grounds, and 5 on

criminal grounds) remained in custody. In October, the Tel Aviv District Court disclosed that a Lebanese citizen imprisoned in the country for 5 years but eligible for release, had been detained under administrative detention for the past year because the IDF decreed him an illegal combatant.

The law prohibits forced exile of citizens, and the Government generally respected this prohibition in practice.

e. Denial of Fair Public Trial

The law provides for an independent judiciary, and the Government generally respected this provision in practice. The judiciary generally provided citizens with a fair and efficient judicial process. However, in practice, Arab citizens often received harsher punishments than Jewish citizens did. Palestinians from the occupied territories are prosecuted under a separate system of military law and courts.

The judicial system is composed of civil, military, religious, labor relations, and administrative courts, with the High Court of Justice as the ultimate judicial authority. The High Court of Justice is both a court of first instance (in cases involving government action) and an appellate court (when it sits as the Supreme Court). All courts in the judicial system, including the High Court of Justice, have appellate courts of jurisdiction.

The law provides for the right to a hearing with representation by counsel, and authorities generally observed this right in practice. A regional and national system of public defenders operated by the Ministry of Justice employed approximately 700 attorneys through 5 regional offices. The Public Defenders Office represents all eligible persons, including Palestinians from the occupied territories. Under the system, all persons who were accused of crimes punishable by sentences of 10 years or longer received mandatory legal representation. Defendants who lack means and who are facing possible prison sentences of 5 to 9 years are provided with a public defender on a discretionary basis. Judges also have discretionary power to appoint an attorney in all cases. Counsel represented approximately 70 percent of defendants. All nonsecurity trials were public except those in which the interests of the parties were determined to be best served by privacy.

Cases involving national security may be tried in either military or civil courts, and may be partly or wholly closed to the public. The prosecution must justify closing the proceedings to the public in such cases, and the Attorney General determines the venue. Adult defendants have the right to be represented by counsel even in closed proceedings but may be denied access to some evidence on security grounds. Under the law, convictions may not be based on any evidence denied to the defense, although that evidence may be used to influence a judge's decision.

The 1970 regulations governing military trials are the same as evidentiary rules in criminal cases. Convictions may not be based solely on confessions; however, according to PCATI, in practice, some security prisoners have been sentenced on the basis of the coerced confessions made by both themselves and others. Counsel may assist the accused, and a judge may assign counsel to those defendants when the judge deems it necessary. Charges are made available to the defendant and the public in Hebrew, and the court can order that they be translated into Arabic if necessary. Sentencing in military courts was consistent with that in criminal courts. Defendants in military trials have the right to appeal through the Military High Court. Defendants in military trials also can petition the civilian High Court of Justice (sitting as a court of first instance) in cases in which they believed there were procedural or evidentiary irregularities.

According to human rights organizations, the legal system in practice often imposed harsher punishments on Israeli-Arab citizens than on Israeli-Jewish citizens. A study released in December by Haifa University indicated that there is serious discrimination against Israeli-Arabs in the criminal justice system, including a tendency to render heavier prison terms to Israeli-Arabs. For example, human rights advocates claimed that Arab citizens were more likely to be convicted of murder (which carries a mandatory life sentence for adults) than Jewish citizens. The courts reportedly also were more likely to detain without bail Arab citizens until the conclusion of proceedings. According to the Government, as of December 1, of the 3,572 citizens held in detention, 1,177 were Arab. In May, the former mayor of the Israeli-Arab city of Umm al-Fahm and leader of the Islamic Movement-Northern Branch in Israel, Sheikh Raed Salah, was arrested for allegedly funneling funding to charity organizations associated with a terrorist organization. The current mayor of Umm al-Fahm and other leaders of the Islamic Movement were also arrested. Despite Salah's and the serving mayor's status and ties to the community, they were detained without bail. At year's end, they remained imprisoned pending conclusion of their trial. Human rights groups have criticized their remand during trial as discriminatory.

There were no reports of political prisoners.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law generally protected privacy of the individual and the home; however, there also were laws that provide that authorities may interfere with mail and monitor telephone conversations in certain circumstances. In criminal cases, the law permits wiretapping under court order; in security cases, the Ministry of Defense must issue the order. Under emergency regulations, authorities may open and destroy mail based on security considerations. The Government indirectly interferes with an individual's ability to marry by recognizing only religious marriages in Israel. Muslims may marry through the Shari'a court system, and Christians under church jurisdiction. Israeli Jews can only marry in Orthodox Jewish services. Those who wish to have a civil marriage, Jews who wish to marry according to Reform or Conservative Judaism, those not recognized as being Jewish, and those marrying someone from another faith must marry in civil marriages abroad. While civil marriages are available in nearby Cyprus and are recognized by the Government, this requirement presents a hardship to those seeking such an alternative or having no other choice but to marry in a civil ceremony.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The cumulative rulings of the Supreme Court provide for freedom of speech. The Prevention of Terrorism Ordinance of 1948 prohibits persons from expressing support for illegal organizations. On occasion, the Government prosecuted persons for allegedly speaking or writing on behalf of terrorist groups.

All newspapers were privately owned and managed. Newspaper licenses were valid only for Israel; separate licenses were required to distribute publications in areas in the occupied territories still under the Government's authority. There were 12 daily newspapers, 90 weekly newspapers, more than 250 periodical publications, and 8 Internet news sites.

Directed by a government appointee, the quasi-independent Israel Broadcast Authority controlled television Channel 1 and Kol Israel (Voice of Israel) radio, both

major sources of news and information. There were two privately owned commercial television channels. The Second Television and Radio Authority, a public body that also supervised 14 private radio stations, supervises both channels. There were five cable television companies that carried both domestic and international networks and produced shows specifically for the Israeli audience.

In 2001, the Attorney General announced that he would file an indictment against Knesset Member Azmi Bishara for making statements perceived by some as supportive of Hizballah during Bishara's June visit to Syria (a country still in a state of war with Israel) and during a 2000 visit to the Israeli-Arab city of Umm al-Fahm. In November 2001, the Knesset voted to lift Bishara's immunity so that he could face prosecution. In November, the Nazareth Magistrate Court decided in a preliminary hearing to uphold the charges against Bishara. At year's end, the case was still pending.

The law prohibits hate speech and incitement to violence and individuals, groups, and the press freely addressed public issues and criticized government policies and officials without reprisal. In the past, the Government has investigated a significantly higher number of Arab Members of the Knesset (MKs) than Jewish MKs for the use of hate speech and incitement to violence; however, during the year, there were no reports that the Government investigated any Arab or Jewish MK.

In November, a three-member Supreme Court panel unanimously ruled that the Film Censorship Board's decision to prohibit the screening of the film "Jenin, Jenin" violated freedom of speech. The film depicts fighting in the West Bank refugee camp of Jenin during April 2002. In response to an appeal by the Attorney General, the State Prosecutor, soldiers who fought in Jenin, and families of soldiers who died there, the Supreme Court issued a temporary injunction in December barring the screening of the controversial film until the court decided whether to rehear the case before an expanded panel. Critics claimed that the film contains lies about the events and incites violence against Israel.

The law provides for freedom of the press, and the Government generally respected this right in practice. The law authorizes the Government to censor any material reported from Israel or the occupied territories that it regards as sensitive on national security grounds. Foreign correspondents and news agencies complained of harassment by the Government Press Office (GPO), which falls under the Prime Minister's office. Specifically, foreign agencies complained that their Palestinian employees, whom the agencies claimed were necessary for adequate coverage of events in the territories, were denied press cards (and thereby unable to travel unhindered in the occupied territories) for no valid reason. Since January 2002, the Government has denied press credentials to all Palestinians, based on security grounds. Press credentials were not required in Israel or the occupied territories; however, they were important to facilitate access to official events. As a general rule, Israeli journalists/technicians cover the occupied territories only under IDF protection.

Foreign and domestic media harshly criticized the GPO's proposed eligibility rules for Israeli and foreign journalists as a Government attempt to control the press. The new eligibility rules published in November would have required Israeli and foreign journalists to fill out a 25-page application as well as to a pay a fee. The GPO would provide copies of the applications to the ISA for security checks while the GPO examined them. The GPO indicated that it could revoke passes already granted if the ISA found unspecified derogatory information. In the past, only Palestinian journalists were subject to a vetting process by the ISA. After meeting with press representatives, the GPO rescinded the controversial rules.

The security forces detained without charge several foreign media employees. On April 24, security forces arrested without charge Agence France-Presse photographer Hossam Abu Alan, and on April 30, Reuters cameraman Yusri Al Jamal. Both were released 6 months later without charge. Abu Alan's equipment was confiscated and never returned. Security forces also detained without charge other Palestinians working for foreign agencies. Most were released shortly thereafter. None were charged and they were told only that their detention was based on their alleged assistance to terrorist organizations.

In 2002, the Ministry of Interior closed an Israeli-Arab newspaper, Sawt al-Haqq Wal-Hurriya. The newspaper was affiliated with the northern branch of the Islamic movement in the country and had previously published articles the Government believed supported terrorism. The newspaper has since been allowed to open and continued to publish regularly during the year. A censorship agreement between the Government and media representatives, and applicable to all media organizations in the country, provided that military censorship was to be applied only in cases involving national security issues that had a near certainty of harming the country's defense interests. All media organizations may appeal the censor's decision to the High Court of Justice. Moreover, a clause prohibits the military censor from closing a newspaper for censorship violations and from appealing a court judgment against it. News previously printed or broadcast abroad may be reported in Israel without the censor's review, which permits the media to run previously censored stories that have appeared in foreign sources.

During the year, journalists and professional journalist groups claimed that the Government placed limitations on their freedom of movement within the occupied territories, between the West Bank and Gaza, and between the occupied territories and Israel during violent unrest. The Government and security forces have stated that they did not target journalists due to their profession; however, three journalists were killed, and at least five were injured while covering events in the occupied territories during the year (see Section 2.a. of the annex).

The GPO, on security grounds, required foreign journalists to sign an agreement stating that they would submit to the military censor certain news stories and photographs; however, they rarely were challenged for not doing so. In practice, foreign and Israeli journalists sometimes submitted articles and photographs for military censorship; however, the requirement was not systematically followed or enforced, live broadcasts precluded such submission. The military censor decides whether a violation has occurred after the fact. In December, two major Israeli papers were fined for failing to submit material to the censor.

The Government generally respected academic freedom; however, the Government continued to interfere with the education of Israeli-Arab students because a member of the ISA monitored and approved the appointment of teachers and administrators in Arab schools.

b. Freedom of Peaceful Assembly and Association

The law provides for freedom of assembly and association, and the Government generally respected these rights in practice. During the year, there were a number of peaceful demonstrations for and against peace negotiations with the Palestinians. According to an Israeli-Arab advocacy NGO, Mossawa Center, on December 27, security forces dispersed a small demonstration in Tel Aviv by surrounding the group and arresting many of the participants. The security forces then declared the demonstration, which had been approved, illegal.

The law provides for the right of association, and the Government generally respected this provision in practice.

c. Freedom of Religion

The law provides for freedom of religion, and the Government generally respected this right; however, it imposed some restrictions. Approximately 80 percent of citizens consider themselves Jewish, although some persons in that group are not considered Jewish under Orthodox Jewish law or are related by marriage to a Jewish citizen. Muslims, Christians, and Druze make up the remaining 20 percent of the population. The law recognizes certain "religious communities" as carried over from those recognized under the British Mandate. These communities include the Eastern Orthodox Church, several Catholic orders, Maronites, and Jews. Three additional communities have subsequently been recognized by the Government—the Druze, the Evangelical Episcopal Church, and the Baha'i. Several other religious communities are not officially recognized. According to the Government, this lack of official recognition does not affect the ability of these communities to practice their religion freely or to maintain communal institutions.

Each recognized religious community has legal authority over its members in matters of marriage and divorce. For so-called "unrecognized religions," there were no local religious tribunals that had jurisdiction over their members in matters of personal status. The principle consequence of non-recognition is that they do not receive government funding for their religious services, as do many of the recognized communities. The fact that there was no recognized Muslim community is a vestige of the Ottoman period, during which time Islam was the dominant religion, and does not affect the rights of Muslims to practice their faith. Legislation enacted in 1961 afforded the Muslim courts exclusive jurisdiction to rule in matters of personal status concerning Muslims. Secular courts have primacy over questions of inheritance, but parties, by mutual agreement, may bring cases to religious courts. Jewish and Druze families may ask for some family status matters, such as alimony and child custody in divorces, to be adjudicated in civil courts as an alternative to religious courts. Christians may ask only that child custody and child support be adjudicated in civil courts as an alternative to religious courts. Despite not having legal recognition, Muslims, since 2001, also have the right to bring matters such as alimony and property division associated with divorce cases to civil courts in family-status matters. However, paternity cases remain under the exclusive jurisdiction of the Muslim or Shari'a Court.

Under the Law of Return, the Government grants automatic citizenship and residence rights to Jewish immigrants and their families; the Law of Return does not apply to those not officially recognized by the Orthodox establishment as Jews or to persons of Jewish descent who have converted to another faith (see Section 2.d.). Persons qualifying under the Law of Return as Jews may, nonetheless, fail to meet stricter criteria defining who is a Jew by some government organizations. Members of unrecognized religious groups (particularly evangelical Christians, but also Russian immigrants and others who considered themselves Jewish but were not recognized as such by all Israeli institutions) at times faced problems obtaining marriage certificates or burial services. However, informal arrangements provided relief in some cases.

Many Jewish citizens objected to exclusive Orthodox control over Jewish marriages, and it has been at times a source of serious controversy in society, particularly in recent years, as thousands of immigrants from the former Soviet Union have not been recognized as Jewish by Orthodox authorities (see Section 1 f.).

The 1996 Alternative Burial Law established the individual right to be buried in an alternative civil cemetery and that these cemeteries were to be located throughout the country. The Orthodox Rabbinate must certify the Jewish heritage of Russian immigrants in order for them to receive full Jewish burial rights; however, many Russian immigrants could not obtain approval to be buried in a Jewish cemetery. Several non-Orthodox Jewish and secular groups have complained, however, that the Ministry of Religious Affairs has been slow to implement this law and that there have been an inadequate number of civil cemeteries designated. According to one organization advocating the timely implementation of the 1996 law, many persons who would like a civil interment were forced to finance civil burials privately through a kibbutz, which was costly.

At year's end, the Israeli Religious Action Center, a civil rights NGO in the country, petitioned the Supreme Court to overturn the government practice whereby the Adoption Service of the Ministry of Social Affairs places non-Jewish children only with Orthodox Jewish homes. Pursuant to law, the adopted child must be of the same religion as the parents who adopt him or her. Since conversions to non-Orthodox forms of Judaism are not recognized in the country, the Government argued that by placing these children with Orthodox parents, they would not face any limbo periods during which their conversions could be questioned.

Under the Jewish religious courts' interpretation of personal status law, a Jewish woman may not receive a final writ of divorce without her husband's consent. Consequently, there were thousands of so-called "agunot" in the country who were unable to remarry or have legitimate children because their husbands either disappeared or refused to grant a divorce.

In April, the Women of the Wall, a group of more than 100 Orthodox, Conservative, and Reform women, lost their 14-year legal battle to hold formal women's prayer services at the Western Wall. The High Court ruled that the group instead would be permitted to hold such services at nearby Robinson's Arch.

Some Islamic law courts have held that Muslim women may not request divorces but that a woman may be forced to consent if a divorce is granted to the husband.

The Government provided proportionally greater financial support to Orthodox Jewish institutions than to non-Orthodox or non-Jewish groups, such as Muslim, Christian, and Druze groups. For example, the budget for the Ministry of Religious Affairs for 2000 (the most recent available) allocated only 2.9 percent of its resources to the non-Jewish sector, although Muslims, Christians, and Druze constituted approximately 20 percent of the population. In 2000, the High Court of Justice ordered the Government to allocate resources equitably to cemeteries of the Jewish and Arab communities. During the year, some non-Jewish cemeteries reported enhanced financing and some money to complete long-standing infrastructure and improvement projects. However, Muslim groups complained that the Government still did not equitably fund the construction and upkeep of Muslim holy sites in comparison to Jewish Orthodox sites, and, that it has been reluctant to refurbish mosques in areas where there was no longer a Muslim population.

In previous years, for security reasons the Government imposed restrictions on citizens who performed the Hajj, including requiring that they obtain permission from the Ministry of Interior and that they be over the age of 30. The Government justified these restrictions on the grounds that Saudi Arabia remained officially at war with Israel and that travel to Saudi Arabia therefore was considered subject to security considerations. However, Israeli Muslims were no longer required to obtain permission from the Ministry of the Interior to travel to Saudi Arabia on the Hajj. Because Israel and Saudi Arabia have no diplomatic relations, Israeli Muslims must travel through another country, usually Jordan, to obtain travel documents for Saudi Arabia. The average number of pilgrims from Israel is 4,500 per year.

Missionaries were allowed to proselytize, although the Church of Jesus Christ of Latter-day Saints voluntarily refrained from doing so under an agreement with the Government. The law prohibits anyone from offering or receiving material benefits as an inducement to conversion; however, there have been no reports of the enforcement of this law.

The 1967 Protection of Holy Sites Law protects holy sites of all religions, and the penal code makes it a criminal offense to damage any holy site. In May, the Government demolished a mosque in the Bedouin village of Tal el-Malah in southern Israel that was constructed without a building permit. This action forced approximately 1,500 residents to travel over 12 kilometers to the nearest mosque. Difficulties in reaching more distant mosques prevented some residents from engaging in public prayer, as required by their religious beliefs.

During the year, the Government continued to refuse recognition to the duly elected Greek Orthodox Patriarch, Elrinalos I. Many local Greek Orthodox Christians perceived the Government's actions as interference with the internal workings of their church. During the year, the Government appointed a ministerial committee chaired by Foreign Minister Silvan Shalom to determine the status of the Patriarch.

For a more detailed discussion, see the 2003 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The law provides for these rights and the Government generally respected them in practice for citizens, except with regard to military or security zones or in instances in which citizens may be confined by administrative order to their neighborhoods or villages. Since the Intifada began in September 2000, the Government has imposed restrictions on the movement of persons between Israel and the West Bank and Gaza, and between cities inside the West Bank and Gaza (see Section 2.d. of the annex).

Citizens generally were free to travel abroad and to emigrate, provided they had no outstanding military obligations and were not restricted by administrative order. Citing confidential security reasons, in 2002, the Government restricted the right of Sheik Raed Salah, leader of the Northern Branch of Israel's Islamic Movement, from foreign travel. The Minister of Interior repeatedly renewed the 6-month travel ban and it remained in effect at year's end. Since imposition of this travel ban, Sheikh Salah has been arrested, detained, and put on trial for allegedly funneling funding to terrorist groups in the occupied territories. His case remained pending at year's end.

The law provides that a male spouse of a non-Jewish citizen may acquire citizenship and enter the country after the spouse passes a 4 1/2-year, multi-stage period of adaptation in Israel, except if the man has a criminal record or is suspected of posing a threat to security. Non-Jewish female citizens who marry non-citizen men, including men from the occupied territories, generally were allowed to retain their citizenship.

In May 2002, the Government stopped processing all residency and citizenship applications for Palestinian spouses, as well as family unification applications in general, on security grounds. The Government stated that 23 Palestinians who received some sort of status prior to May 2002 were suspected of being involved in terrorist incidents. Spouses and children who have resided in the country legally since that time have done so via a series of temporary residency permits. On July 31, the Knesset enacted the "Citizenship and Entry Into Israel Law," which bars Palestinians from the occupied territories from acquiring residence or citizenship rights through marriage to Israelis. The law requires annual Knesset renewal in maximum 1-year increments. According to one human rights organization, the El-Sana family is representative of the group of newly married couples who would be affected by this new law. In March, Morad El-Sana, an Israeli Arab, married Abeer El-Sana, a resident of Bethlehem in the West Bank. Pursuant to the new law, the Ministry of Interior denied El-Sana's request for his wife to receive status in Israel. Several advocacy groups have submitted petitions to the Supreme Court to challenge this law. The law would have an adverse impact on the country's Arab citizens, since they are more likely than Jews to have married Palestinians from the occupied territories. Advocacy groups claimed that approximately 16,000 cases—either approved or pending applications—could be adversely affected by this new law. The Government may issue permits to children under the age of 12 to reside in the country to prevent them from being separated from their parents who were lawfully staying in the country. The law provides for the extension of residency and other permits to remain in country that were obtained by the resident prior to the commencement of the law, and allows for the granting of a permit for temporary stay to a resident who submitted an application for citizenship prior to enactment of the law but had not yet received a determination. In November, the Supreme Court ordered the Government to further justify this citizenship law and issued injunctions preventing the deportation of three Palestinian spouses married to Israeli Arabs, until the Court delivered a final judgment on the petitions. At year's end, the Supreme Court had not issued a decision on the legality of this law.

During the year, the Government placed limits on journalists' freedom of movement within the occupied territories, between the West Bank and Gaza, and between Israel and the occupied territories (see Section 2.a.).

Citizens are required to enter and leave the country on their Israeli passports only. In addition, no citizen or passport-holder is permitted to travel to countries officially at war with Israel without special permission from the Government. In 2002, there were credible reports that the Government confiscated both the Israeli and Vatican passports of Archimandrite Theodosios Hanna, an Israeli citizen and official of the Greek Orthodox Church in Jerusalem. Credible reports from the media and an NGO indicated that while in several Gulf countries, Hanna gave clear endorsements of terrorist activities, including suicide bombings. The police held and interrogated Hanna at the Russian Compound on his travel, relations with PA President Yasser Arafat, and his position on the Intifada. When summoned to collect his passports, Hanna was informed that he would have to sign a statement promising not to incite violence against the state, make statements in support of terrorist activity, or to visit states hostile to the country without Ministry of Interior permission. Hanna refused to sign and was denied his passports. The Government continued to deny Hanna his passports at year's end.

The Law of Return provides automatic citizenship and residency rights to Jewish immigrants and their Jewish or non-Jewish family members. Children of female converts to Judaism are eligible to immigrate only if the children were born after the woman's conversion. The Law of Return does not apply to non-Jews or to persons of Jewish descent who have converted to another faith. In 2002, several non-Jewish Israeli citizens from the former Soviet Union told diplomats that the Ministry of Interior was attempting to strip their citizenship and return them to their home countries because they had divorced their Jewish spouses. At least one of those potential deportees had served a full term in the IDF. The Israel Religious Action Center (IRAC) reported that it had successfully petitioned the court to block the removal of several of these individuals and that it did not have information about all the cases. The IRAC reported that it had represented cases during the year of non-Jews or those whose Jewish identity was in question who immigrated to the country with their Jewish spouse but then divorced shortly thereafter.

These persons were then threatened by the Ministry of the Interior with having their citizenship revoked. The IRAC reported that it during the year had successfully petitioned the High Court to rescind the Ministry's decisions in some specific cases.

The law does not provide for the granting of asylum or refugee status in accordance with the 1951 U.N. Convention Relating to the Status of Refugees and its 1967 Protocol. In practice, the Government provided protection against refoulement and granted refugee status or asylum to Jews. The law does allow non-citizen Jews to live in the country as permanent residents. The Government cooperated with the office of the U.N. High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting Jewish refugees. The Government does not return refugees against their will to their home countries; solutions are determined on an individual basis in observance of 1951 treaty obligations and in cooperation with the UNHCR. Individuals present in the country on tourist or work visas, or those in the country illegally, sometimes filed petitions with the local UNHCR representative as the first step in seeking refugee status, and there was individual adjudication of those with genuine claims to refugee status. Before 2002, refugee status was adjudicated in Geneva; beginning in 2002, a Government interministerial committee reviewed pending cases to determine if the facts merited designation of refugee status. The Minister of the Interior has the final authority to determine status, but within the past year has generally accepted the recommendation of the committee. If a person is granted refugee status, it is government policy to grant renewable temporary visas. However, the Government attempts to find a third country for persons from a state with which the country is at war. In those cases, the Government attempts to find a third country in which the individuals can live. The Government provides refugees all the protections under refugee conventions.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides citizens with the right to change their government peacefully, and citizens exercised this right in practice through periodic, free, and fair elections held on the basis of universal suffrage for adult citizens. National elections were held on January 28, when the Likud Party led by Ariel Sharon again won a plurality of Knesset seats, and Sharon was asked to form a government of which he became Prime Minister. The country is a parliamentary democracy with an active multi-party system in which political views were wide-ranging. Relatively small parties, including those whose primary support is among Israeli Arabs, regularly won seats in the Knesset. Elections were by secret ballot.

There were 18 women in the 120-member Knesset, and women chaired 5 of the Knesset's 21 committees (including the Committee on the Status of Women). There were 3 women in the Cabinet and 4 women on the 14-member High Court of Justice. There were 8 Arabs and 2 Druze in the 120-member Knesset; most of these 10 represented parties that derived their support largely or entirely from the Arab community. One Arab Christian served on the 14-member High Court of Justice. No Muslim or Druze citizens served on the court.

In August, the ministerial committee on Arab Affairs, headed by Prime Minister Sharon, approved a plan to appoint "at least one Arab board member to every government company within one year."

The Basic Law prohibits the candidacy of any party or individual who denies the Jewish and democratic existence of the State of Israel, incites racism, or supports (in action or speech) the armed struggle of enemy states or terror organizations. The Central Election Committee decided under provisions of this law to disqualify Dr. Ahmed Tibi, Azmi Bishara, and the Arab Bal'ad Party list from running in the January elections; however, the Supreme Court overturned this decision.

The Knesset Elections Committee for the 16th Knesset denied MK Azmi Bishara's right to run in the January 29 elections for expressions and other statements he made in public appearances and in the newspapers, for his opposition to the status of Israel as a Jewish state, and for supporting armed struggle of an enemy country or terror organization against the State of Israel. The Supreme Court overruled the Committee's decision and allowed him to participate in the election campaign, and he was elected as a member of the Knesset.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A wide variety of local and international human rights groups operated without government restriction, investigating and publishing their findings on human rights cases. In 2002, Human Rights Watch (HRW) reported harassment by IDF soldiers and difficulty in gaining permission for expatriate staff to enter the country.

In March 2002, the Ministry of Interior issued an order to border officials to bar entry to all foreign nationals who were affiliated with some Palestinian human rights NGOs and solidarity organizations. During the year, there have been numerous cases where persons affiliated with Palestinian NGOs and humanitarian organizations providing assistance in the occupied territories were denied entry into Israel and, in some cases, deported. The Government's stated policy is to deny entry to those persons it considers security risks. In May, Israeli border police denied entry at the Allenby Bridge from Jordan to nine European youth who were working on a project associated with the European Union. The group was returning to Israel following the expiration of their initial 3-month visas. After the youth waited for several hours at the border to enter the country, the border police told them that the Ministry of Interior had denied them entry. After being denied on a subsequent request, the group was turned back into Jordan. In May, an advocacy organization filed a petition with a district court challenging the Ministry's decision, and the Minister of Interior rescinded prohibition on their entry.

In May, the Government prohibited entry of foreign nationals and members of international NGOs into the Gaza Strip unless they signed a form accepting limitations on their freedom of movement to certain areas and absolving the IDF of any responsibility for their safety. Failure to honor the conditions set forth in the form could result in arrest and/or deportation.

In May, Adalah reported that the Government requested information and documents relating to activities Adalah had allegedly taken beyond the scope of its mandate, including association with a political party and financial mismanagement. Adalah challenged this request and charged that many of the questions went beyond the inquiry's scope and outside the Registrar's authority.

NGOs must register with the Government by submitting an application and paying approximately $20 (85 shekels) to the Office of the Registrar. The office investigates the organization to confirm its stated purpose and ensure conformity with the law. If approved, the organization then receives a license to operate as an NGO. It must subsequently register with the tax office to receive tax-exempt status. Registered Israeli NGOs receive state funding; however, some Israeli-Arab NGOs complained of difficulties in both registering and receiving state funding. In 2002, the Government denied registration to a new Palestinian NGO, Tawasul. The Government said that it merely wanted the organization to change its name, due to its similarity to those of other registered NGOs (see Section 2.b.). In April,

however, the Government registered Tawasul as an NGO.

Section 5 Discrimination Based on Race, Sex, Disability, Language, or Social Status

The law prohibits discrimination on the basis of sex or marital status. The law also prohibits discrimination by both government and nongovernmental entities on the basis of race, political beliefs, or age. Local human rights groups were concerned that these laws often were not enforced, either as a result of institutionalized discrimination, or because resources for implementing those laws, or mechanisms for their enforcement, were lacking. During the year, NGOS complained of discrimination and police harassment against homosexuals in Tel Aviv. According to a February 200 report submitted to the U.N. by the Government, allocation of resources to different population groups was inconsistent with the law's prohibition on discrimination.

Approximately 93 percent of the country's land area is public domain under the management of the Israel Lands Administration (ILA), which, as a matter of policy, does not sell but only leases land. Of that 93 percent, some 14 percent is owned by the Jewish National Fund (JNF), an organization established in 1897 for the purchase and management of land for the Jewish people. The JNF's statute prohibits the sale or lease of land to non-Jews, although reports indicate it has done so. Foreigners and citizens of all religions were allowed freely to purchase or lease the 7 percent of land not controlled by the Government or the JNF.

At year's end, the Government had still not implemented the 2000 High Court of Justice ruling that the Government cannot discriminate against Israeli Arabs in the distribution of State resources, including land. The Court held that the ILA must provide an Israeli-Arab family, the Ka'adans, with title to a plot of land they wanted to buy in the Jewish community of Katzir. The court ruled specifically that the ILA cannot discriminate on the basis of nationality or religion when dispensing land to its citizens. The High Court determined that its ruling would not affect previous land allocations and that differentiating between Jews and non-Jews in land allocation might be acceptable under unspecified "special circumstances." The community council was instructed to develop and publish criteria for its decisions and a plan for implementation; however, the ILA through the local council did not implement the court's 2000 decision. In October, the Arab family petitioned the court to compel the ILA's allocation of the plot of land in Katzir. To avoid returning to court, the ILA agreed to offer the Arab family a similar plot of land in an adjacent newly constructed community. On December 17, the Supreme Court issued an interim injunction ordering the ILA to set aside a plot of land in Katzir for the Ka'adans; however, at year's end, the ILA still had not done so.

The Association of Gay Men, Lesbians, Bisexuals and Transgender in Israel complained that there had been several incidents where police in Tel Aviv had allegedly engaged in verbal and physical harassment of homosexuals in a Tel Aviv public park. Representatives of that organization subsequently met with representatives of the police to discuss ways to improve relations between the police and the homosexual community. According to reports, the police appointed contact persons in all police districts who would serve as liaisons to the homosexual community.

Women

The Equality of Women Law provides for equal rights for women in the workplace, the military, education, health, housing, and social welfare, and entitles women to protection from violence, sexual harassment, sexual exploitation, and trafficking. The law prohibits domestic violence; however, violence against women was a problem, despite the steps taken by the Government to prosecute these crimes and by other organizations to raise public awareness about this problem.

In 2001, the Government enacted the Prevention of Stalking and amended the Prevention of Family Violence Law to include a duty to inform service requiring a number of public and private sector professional personnel to inform suspected victims of their right to turn to the police, welfare service, or Centers for the Prevention of Domestic Violence for assistance.

According to the Ministry of Public Security, 13 women were killed by their husbands between January and November. Between January and October, according to the Government, women lodged 10,000 complaints of domestic violence. At the end of September, 522 women with 809 children stayed in battered women's shelters. The Government estimated that 5,500 women were treated in centers for prevention and treatment of domestic violence. Annually, approximately 4,000 women and 3,350 girls were victims of violence and were treated by the various social services departments in the local municipalities. Social workers have taken statements from approximately 1,200 girls who were victims of domestic violence. The Government also reported that between January and October, women and girls filed 2,024 complaints of sexual assault with the police. By the end of September, aid centers received 5,063 calls from victims of sexual assault, 852 of whom were victims of incest. During the year, sexual assault victims treatment centers treated approximately 100 women, and the Agency for Women and Girls treated approximately 1,100 women and girls, 480 of whom were victims of incest. Social workers for children who were victims of sexual offenses, took statements during the year from 240 girls who claimed they were victims of sexual assault committed by family members.

Rape is illegal; however, NGOs consider the incidence of rape a matter of concern in the country.

One women's organization claimed that during the year, it had information about three cases of Arab women killed by male relatives in family honor cases. That organization also stated that a Bedouin women's organization suspected 10 cases of honor killings of women in the Negev. Several of the women had reportedly disappeared. There was no accurate estimate of the number of family honor cases as families often attempted to cover up the cause of such deaths.

Prostitution is not illegal; however, the operation of brothels and organized sex enterprises is outlawed. NGOs reported that there may be prostitutes under the age of 18 but there is currently no accurate estimate. NGOs speculate that there are approximately 100-200 prostitutes under 18 years of age.

Trafficking in women remained a significant problem. Criminal networks reportedly trafficked hundreds of women, primarily from the former Soviet Union, into the country by criminal networks to work as prostitutes (see Section 6.f.).

The law prohibits sexual harassment. There were no accurate statistics regarding the extent of sexual harassment in the workplace; however, there was a dramatic increase in the number of complaints of sexual harassment following enactment in 1998 of the law prohibiting sexual harassment. According to the Government, from January to October, victims filed 167 complaints of sexual harassment to the police.

The law provides for class action suits and requires employers to provide equal pay for equal work, including side benefits and allowances; however, women's rights advocates claimed that deep wage gaps remained. Women's advocacy groups reported that women routinely received lower wages for comparable work, were promoted less often, and had fewer career opportunities than their male counterparts. According to the Central Bureau of Statistics, women averaged only 79 percent of men's wages in 2002. According to press reports, women filled only 2 percent of senior management positions in large companies.

Religious courts adjudicate personal status law in the areas of marriage and divorce. Jewish and Muslim women are subject to restrictive interpretations of their rights in both systems. Under personal status law, Jewish women are not allowed to initiate divorce proceedings without their husbands' consent; consequently there were estimated to be thousands of "agunot" who may not remarry or have legitimate children because their husbands either disappeared or refused to grant a divorce.

In accordance with Orthodox Jewish law, the 1995 Rabbinical Courts Law allows rabbinical tribunals to impose sanctions on husbands who refuse to divorce wives who have ample grounds for divorce, such as abuse. One foreign citizen has been in prison since 1999 for refusing to grant his wife a divorce. However, in some cases, rabbinical courts failed to invoke these sanctions. In addition, there were cases in which a wife failed to agree to a divorce, but rabbinical authorities allowed the man to "take a second wife," a remedy not available to wives. Such restrictive practices have been used by husbands to extort concessions from their wives in return for agreeing to a divorce. Rabbinical courts also may exercise jurisdiction over, and issue sanctions against, non-citizen Jews present in the country.

Some Islamic law courts in the country have held that Muslim women may not request a divorce, but that women may be forced to consent if a divorce is granted to a man.

Children

The Government has stated its commitment to the rights and welfare of children; however, in practice, resources at times were insufficient, particularly with respect to low-income families. Government spending was proportionally lower in predominantly Arab areas than in Jewish areas, which adversely affected children in Arab villages and cities. In November, the Central Bureau of Statistics reported that in 2002, 16 percent of children in Israel lived in households with no working parent (13.1 percent of Jewish children and 26 percent of Arab children). In December, the Child Welfare Council of Israel published a report stating that Israeli children were growing poorer and increasingly falling victim to violence, sexual exploitation, and drug and alcohol addiction. The report states that nearly 656,000 children, or one-third of all Israeli children, lived below the poverty line in 2002 and that the situation in the non-Jewish sector was worse, with 54.4 percent of children living in poverty.

Education is compulsory up to the age of 15 or until the child reaches the 10th grade, whichever comes first. Education is free until age 18. Arab children comprised approximately one-quarter of the public school population, but historically, government resources allocated for them were proportionally less than that for Jewish children. Many schools in Arab communities were dilapidated and overcrowded, lacked special education services and counselors, had poor libraries, and had no sports facilities.

During the year, the Mossawa Center reported that only about one third of the 1,500 classrooms that were scheduled to be built in Arab communities had been made available by year's end. According to the Government's February 2002 report to the U.N., government investment per Arab pupil was approximately 60 percent of investment per Jewish pupil.

High school graduation rates for Arabs were significantly lower than for Jews. Preschool attendance for Bedouin children was the lowest in the country, and the dropout rate for Bedouin high school students was the highest. In August, the Supreme Court ordered the Ministry of Education to provide two appropriate classrooms for eight hearing impaired Arab children in response to a petition filed by an advocacy group. According to Adalah, the Government provided classroom space in existing school facilities; however, the condition of the classrooms remained unsuitable.

In 2000, the Commission to Examine the Implementation of the Special Education Law (the Margalit Commission) published its detailed recommendations on how to improve special education in the Arab sector. Over the past 3 years, the Government increased the number of classroom hours for special education in the Arab sector by 12,000 weekly hours.

The Government operated a number of school systems: one for secular Jews, at least two for religious Jews, and one for Israeli Arabs. Most Jewish children attended schools where the language of instruction was Hebrew and the curriculum included Jewish history. Most Israeli-Arab children chose schools where the language of instruction was Arabic and the curriculum had less of a "Jewish" focus. Israeli-Arab children overall received an education inferior to that of Jewish children in the secular system. The Education Ministry allocated money per class, and acknowledged that due to the larger classes of Arab students, it allocated less money per student in the Arab system than in the Jewish system. In addition, Jewish schools received additional state and state-sponsored funding for school construction and special programs through other government agencies.

In 2001, Adalah requested that the Government discontinue ISA monitoring and approval of teachers and administrators in Arab schools and claimed that in its role at the Ministry of Education, the ISA discriminated against persons on the basis of their political affiliation. In August, members of the Knesset also criticized ISA involvement in the appointment of teachers and principals in Arab schools during a Knesset committee's session on the status of Israel's Arab education system. Arab members of the Knesset also criticized the lower academic achievements of Arab students and stated that this was an indication of discrimination in the system.

On a practical level, several factors prevented foreign workers from marrying or maintaining a normal family life while in the country. Work visas apply only to the worker; a family cannot be brought with the worker into Israel. According to NGOs, if two foreign workers marry while in the country, one of their work permits will not be renewed, forcing that spouse to leave the country. These same NGOs stated that if a foreign worker attempted to reunify his or her family by having his or her spouse apply for a separate work permit, and this arrangement became known to authorities, at least one of the spouses would not have their work permits renewed, and that spouse will either have to leave the country or remain in an illegal status. Foreign workers who wished to marry a citizen must apply for a permit from the Ministry of the Interior to allow them to stay in Israel. NGOs noted that the process was burdensome and that workers encountered serious delays while their status was adjudicated.

If a legal foreign worker becomes pregnant while in the country, the child born to that worker is entitled to remain with their parent as long as the parent maintains a legal work permit and until age 18. The child is entitled to receive limited health and education benefits until the age of 18; however, it is not clear whether children received these benefits as a matter of practice. After the age of 18, these individuals must leave the country and if found in the country, are subject to deportation. Other minor children of foreign workers (who usually enter the country though tourist visas) are subject to deportation as a matter of law; however, at

year's end, the Immigration Authority deported these children.

The Government has legislated against sexual, physical, and psychological abuse of children and has mandated comprehensive reporting requirements regarding these problems. Although there was a sharp increase in reported cases of child abuse in recent years, activists believed that this largely was due to increased awareness of the issue rather than a growing pattern of abuse. There were five shelters for children at risk of abuse.

Persons with Disabilities

The Government provided a range of benefits, including income maintenance, housing subsidies, and transportation support for persons with disabilities, who constituted approximately 2.4 percent of the population. Existing anti-discrimination laws do not prohibit discrimination based on disability, and persons with disabilities continued to encounter difficulties in areas such as employment and housing. A law requiring access for persons with disabilities to public buildings was not widely enforced. There was no law providing for access to public transportation for persons with disabilities. At a Knesset meeting in December, the Commissioner for Equality for the Disabled stated that a survey of buildings in 2002 indicated that most contractors have ignored laws calling for access for the disabled. The Commissioner also accused the Government of not doing enough to provide employment for the disabled despite requirements in the law. According to the Commissioner, 595 out of 50,000 public-service workers were disabled. The Attorney General told the Knesset committee that laws protecting and assisting the disabled were not being implemented due mainly to a lack of funding.

National/Racial/Ethnic Minorities

The Government did not allocate sufficient resources or take adequate measures to provide Israeli Arabs, who constitute approximately 20 percent of the population, with the same quality of government services, as well as the same opportunities for government employment, as Jews. In addition, government spending was proportionally far lower in predominantly Arab areas than in Jewish areas; on a per capita basis, the Government spent two-thirds as much for Arabs as for Jews. The Government noted in a 2002 report to the U.N. that "the Arab population is typified by larger families, lower levels of education, and lower income than the total Israeli population."

The COI report (see Section 1.a.) stated that the "Government handling of the Arab sector has been primarily neglectful and discriminatory," that the Government "did not show sufficient sensitivity to the needs of the Arab population, and did not take enough action to allocate state resources in an equal manner." As a result, "serious distress prevailed in the Arab sector in various areas. Evidence of distress included poverty, unemployment, a shortage of land, serious problems in the education system, and substantially defective infrastructure." On September 14, the Cabinet appointed a special ministerial committee to advise the Government on how to implement those recommendations within 60 days. The committee's tenure was extended at year's end.

Minister of Finance Benjamin Netanyahu's statement in December at a major public policy conference that Israeli Arabs presented a "demographic problem" in the country elicited strong criticism, especially from civil rights groups and Israeli-Arab leaders.

Municipalities, including Arab municipalities, were responsible for issuing building permits within the municipal boundaries. Some Israeli-Arab and civil rights NGOs claimed that outside of Arab-governed municipalities, the Government was more restrictive in issuing building permits to Arabs than to Jews. In addition, Israeli law does not recognize many long-established Israeli-Arab and Bedouin communities. All buildings constructed in these unrecognized villages are considered illegal and it is impossible to obtain building permits for construction to accommodate the natural growth of communities. The COI report stated that the Government "must allocate land to this sector according to the same egalitarian principles it uses with other sectors." The COI also found that "suitable planning should be carried out as soon as possible to prevent illegal construction caused by lack of existing town planning that make it difficult to obtain building permits." Israeli-Arab advocacy organizations have challenged the Government's plan to demolish more illegal buildings in the Arab sector, calling for the initiation of a comprehensive planning process, with the participation of the affected communities. These groups alleged that state-approved plans for development were lacking in many of the areas of unrecognized villages, such as the Negev. Pursuant to Israeli law, such a plan must exist to obtain building permits. Several ministers were reportedly considering establishing a separate department to expedite demolitions of illegal buildings in Arab areas. The department would reportedly focus on three geographic areas: the Bedouin villages in the Negev, Arab villages in the Galilee, and the Arab village "triangle" in the central area of Israel.

The Bedouin sector was the weakest of all the population groups in the country. Bedouin living in unrecognized villages had no way to obtain building permits. The COI report stated that the living conditions and the hardships of the Bedouin community should be afforded "special attention." According to a well-known Bedouin advocacy organization, during the year, the Government destroyed over 35 Bedouin houses, a mosque, 13 shops and a water container. For example, in May, security forces demolished two houses in the unrecognized Bedouin villages of Kherbat Al Ras and Al Fara'h in the Negev. According to this same organization, hundreds of security forces and aircraft arrived in Kherbat Al Ras and Al Fara'h, closed all the main entryways and demolished the two houses, leaving the inhabitants homeless. In 2002, the Government destroyed 52 Bedouin homes in the unrecognized village of al-'Araqib. The Government continued to prohibit building in that village.

Israeli-Arab organizations have challenged publicly the 1996 "Master Plan for the Northern Areas of Israel," which listed as priority goals increasing the Galilee's Jewish population and blocking the territorial contiguity of Arab villages and towns, on the grounds that it discriminated against Arab citizens; the Government continued to use this document for planning in the Galilee. A hearing on objections to this plan was held in March but at year's end, there had not been a response from the National Council for Building and Planning, and the plan had not been implemented.

Israeli Arabs were underrepresented in the student bodies and faculties of most universities and in higher level professional and business ranks. During the 1999-2000 school year, Arab students comprised 9 percent of all students studying for bachelor's degrees and 4 percent of all students studying for advanced degrees. The Bureau of Statistics notes that the median number of school years of the Jewish population is 3 years more than that of the Arab population. In the 1999-2000 school year, according to the Bureau, 12 percent of students in the Arab education system and 6 percent in the Hebrew school system dropped out of school in the 9th to 11th grades. Well-educated Arabs often were unable to find jobs commensurate with their level of education. In 2002, Arab citizens held fewer than 60 of the country's 5,000 university faculty positions. The Government stated that it was committed to granting equal and fair conditions to Israeli Arabs, particularly in the areas of education, housing, and employment. A small number of Israeli Arabs have risen to responsible positions in the civil service, generally in the Arab departments of government ministries. According to the advocacy NGO Sikkuy's 2002-2003 Report, Israel's Civil Service Commission

provided data showing that Israeli Arabs comprised 6.1 percent of all civil service workers in Israel. In September, the Government approved an affirmative action plan to promote the hiring of Israeli Arabs in the civil service.

In 2000, the Knesset passed a bill requiring that minorities and underrepresented populations be granted "appropriate representation" in the civil service and on the boards of government corporations. The Government took some steps toward implementing the law in 2002, including setting aside civil service positions for Arab candidates and appointing more Israeli Arabs to corporate boards. For example, in 2002, an Arab citizen was appointed to the board of Ben Gurion Airport. But, according to one advocacy organization, as of December 2002, Arab citizens held only 37 out of 671 positions (approximately 5.5 percent) on the boards of directors of governmental companies. The Government's affirmative action plan for Israeli Arabs would also include the appointment of more Arabs to the boards of government companies; however, there had been no implementation by year's end.

Israeli Arabs continued to complain of discriminatory treatment at the airport. In September, the Airport Authority hired 12 Arab security officers to serve as airport security personnel following the mistreatment of an Israeli-Arab senior commander in the border police. The senior commander complained of being humiliated at Ben-Gurion Airport by security personnel.

Israeli Arabs were not required to perform mandatory military service and in practice, few Israeli Arabs served in the military or worked in companies with defense contracts or in security-related fields. The Israeli Druze and Circassian communities were subject to the military draft, and the overwhelming majority accepted service willingly. Some Bedouin and other Arab citizens who were not subject to the draft served voluntarily. Those who did not serve in the army had less access than other citizens to those social and economic benefits for which military service was a prerequisite or an advantage, such as housing, new-household subsidies, and government or security-related industrial employment.

In 2002, NGOs challenged in court a government plan to pay less social security child allowance benefits to families in which at least one parent did not serve in the IDF than to families in which at least one parent did. Advocacy and civil rights organizations argued that the law would discriminate against most Israeli Arabs who were exempt from and did not serve in the military. In July, the Supreme Court dismissed the petition as the relevant provision of the law was cancelled by the Knesset's passage of the new economic plan.

Israeli-Arab groups alleged that many employers used the prerequisite of military service to avoid hiring non-Jews. In 2001, the municipality of Tel Aviv advertised for parking lot attendants; "military service" was a prerequisite.

There were approximately 130,000 Bedouin in the Negev; of this number, approximately half lived in 7 state-planned communities and the other half lived in 45 settlements that were not recognized by the Government. The recognized Bedouin villages receive basic services from the Government; however, they remain among the poorest communities in the country. The Government reported that Bedouins who move to these state-planned communities were compensated for abandoned property, provided grants, as well as new land free of charge.

The unrecognized villages were declared illegal by the National Planning and Building Law of 1965, which rezoned the lands on which they sat as nonresidential, and the Government claimed ownership of the land. New building in the unrecognized villages was considered illegal and subject to demolition. According to the Government, recognizing these villages would conflict with its attempts to establish new villages in "an orderly manner and would leave disputes over the land unresolved." Residents of the unrecognized villages paid taxes to the Government; however, their villages were not eligible for government services. Consequently, such villages were denied basic health, education, water, electricity, employment opportunities, and other services. Only 13 of the unrecognized villages had elementary schools. There are no high schools in any of the unrecognized villages. Private efforts have supplied some unrecognized villages with water, and the courts have ordered the provision of limited health and education services.

The Government has yet to fulfill its commitment to resolve the legal status of unrecognized Arab villages. Since 1994, 8 villages have been recognized officially, but nearly 100 more, of varying size and with a total population of nearly 70,000 persons, remained illegal. At year's end, the Government still had not implemented a 1999 High Court decision requiring a study into the infrastructure needed in each village.

In March, without prior warning, two ILA airplanes, accompanied by a large number of police forces and other security forces, sprayed a chemical herbicide on houses and more than 2,000 dunams (500 acres) of crops belonging to residents of Abda, an unrecognized Bedouin village in the Negev. According to a reputable advocacy organization, elderly persons and children were in the fields at the time of the spraying. In addition, in April, the ILA sprayed chemical herbicide on about 2,000 dunams (500 acres) of land belonging to several unrecognized villages to compel the residents to move into one of the seven townships.

In February 2002, the ILA sprayed from the air chemical herbicide over 12,000 dunams (12 sq. km) of Bedouin wheat fields in the Negev that had been planted on unrecognized land. Bedouin communities depend on agriculture for sustenance.

There continued to be claims by Arab groups that land expropriation for public use affected the Arab community disproportionately; that Arabs have been allowed too little input in planning decisions that affect their schools and municipalities; that mosques and cemeteries belonging to the Islamic Waqf (religious endowment) have been neglected or expropriated unjustly for public use; and that successive governments have blocked the return to their homes of citizens displaced in the early years of the country's history. The Government has yet to agree with the pre-1948 residents of the northern villages of Bir Am and Ikrit, and their descendants, regarding their long-term demand to be allowed to rebuild their houses. In 1997, a special interministerial panel recommended that the Government allow the villagers to return to Bir Am and Ikrit. The High Court granted the Government several extensions for implementing the recommendation.

In October 2001, after the expiration of the most recent extension, the State Prosecutor's Office submitted an affidavit to the High Court asking it to reject the villagers' appeal, stating that the Government had legally appropriated the land, and that the precedent of returning displaced persons to their villages would be used for propaganda and political purposes by the Palestinian Authority. In June, the Supreme Court rejected a petition by former residents of Ikrit to return to their homes. The three justices accepted the Government's claim that despite promises given by previous governments to former Ikrit residents that they would be allowed to return, the State's interest justified rejecting the petition. The former residents would have to accept alternatives offered by the State. At year's end, no information was available regarding these alternatives.

Section 6 Worker Rights

a. The Right of Association

Citizen workers may join and establish labor organizations freely. Most unions belong to Histadrut (the General Federation of Labor in Israel) or to a much smaller rival federation, the Histadrut Haovdim Haleumit (National Federation of Labor). These organizations are independent of the Government. Histadrut members elect national and local officers and officials of its affiliated women's organization, Na'amat, from political party lists of those already in the union. Plant or enterprise committee members are elected individually. Approximately 650,000 workers were members of Histadrut during the year, and much of the non-Histadrut work force was covered by Histadrut's collective bargaining agreements.

Palestinians from the West Bank and Gaza Strip who worked in Israel were not able to join Israeli trade unions or organize their own unions in Israel. Palestinian trade unions in the occupied territories were not permitted to conduct activities in Israel (see Section 6.a. of the annex). However, nonresident workers in the organized sector were entitled to the protection of Histadrut work contracts and grievance procedures. They may join, vote for, and be elected to shop-level workers' committees if their numbers in individual establishments exceed a minimum threshold. Palestinian participation in such committees was minimal.

Labor laws apply to Palestinians holding East Jerusalem identity cards and to the Syrian Druze living on the Golan Heights.

Unions were free to affiliate with international organizations.

b. The Right to Organize and Bargain Collectively

Citizen workers exercised their legal rights to organize and bargain collectively. The law specifically prohibits anti-union discrimination. No anti-union discrimination was reported.

Nonresident workers could not organize their own unions or engage in collective bargaining, but they were entitled to be represented by the bargaining agent and protected by collective bargaining agreements. The country's immigration officials estimate there are 236,000 foreign workers in the country. They did not pay union dues, but were required to pay an agency fee in lieu of dues, which entitled them to union protection by Histadrut's collective bargaining agreements. The Ministry of Labor could extend collective bargaining agreements to nonunionized workplaces in the same industrial sector. The Ministry of Labor also oversaw personal contracts in the unorganized sectors of the economy.

The right to strike was exercised regularly. Unions must provide 15 days' notice prior to a strike. Strike leaders—even those organizing illegal strikes—were protected by law. If essential public services are affected, the Government may appeal to labor courts for back-to-work orders while the parties continue negotiations. There were a number of strikes in both the public and private sectors during the year by employees protesting the effects of privatization. Worker dismissals and the terms of severance arrangements often were the central issues of dispute. During the year, there were several major strikes of municipal workers. Histadrut called strikes both in the spring and fall of the year protesting wage, pension, and benefit issues. At year's end, port workers were in court-mediated negotiations over privatization issues.

There are no export processing zones.

c. Prohibition of Forced or Bonded Labor

The law prohibits forced or bonded labor, including by children, and there were no reports that such practices occurred for citizens and or nonresident Palestinians working in Israel; however, civil rights groups charged that unscrupulous employers often took advantage of illegal workers' lack of status to hold them in conditions that amount to involuntary servitude (see Section 6.e.). The problem was notable concerning non-Palestinian illegal workers.

Women were trafficked for the purpose of prostitution (see Section 6.f.).

d. Status of Child Labor Practices and Minimum Age for Employment

Children who have attained the age of 15 years, and who fall under the compulsory education law (which applies to all children except those who have completed grade 10), may be employed only as apprentices under the Apprenticeship Law. Children who are 14-years old may be employed during official school holidays in light work that will not harm their health. Working hours of those 16 to 18 years of age are restricted to ensure time for rest and education. The Government enforced all of these restrictions in practice.

There were no reliable data regarding illegal child workers. The estimated small number of child workers reportedly was concentrated among the country's illegal Arab population. Illegal child employment was found primarily in urban, light industry.

e. Acceptable Conditions of Work

The minimum wage is calculated periodically and adjusted for cost of living increases. In 2001, the minimum wage was raised to 47.5 percent of the average wage. At year's end, the minimum wage was less than $900 (approximately 3,555 NIS) per month. During the year, the minimum wage often was supplemented by special allowances and was considered by the government to be sufficient to provide a worker and family with a decent standard of living. Some union officials and social commentators disputed that the minimum wage was adequate to provide a decent standard of living. Union officials expressed concern over enforcement of minimum wage regulations, particularly with respect to employers of illegal nonresident workers, who were sometimes paid less than the minimum wage.

By law, the maximum hours of work at regular pay are 45 hours a week, 8 hours a day, and 7 hours in night work on the day before the weekly rest. That rest period must be at least 36 consecutive hours and include the Sabbath for Jews and a choice of Friday, Saturday, or Sunday for non-Jews.

Employers must receive a government permit to hire Palestinian workers from the occupied territories, certifying that no citizen is available for the job. All Palestinians from the occupied territories working in Israel were employed on a daily basis and, unless they were employed on shift work, were not authorized to spend the night in Israel. Palestinians without valid work permits were subject to arrest.

The employment service of the Ministry of Labor, which disbursed wages and benefits collected from employers, paid Palestinian nonresident workers. The

Ministry deducted a 1 percent union fee and the workers' required contributions to the National Insurance Institute (NII), the agency that administered the Israeli social security system, unemployment benefits, and other benefits. Despite these deductions, Palestinian workers were not eligible for all NII benefits. They continued to be insured for injuries suffered while working in the country, maternity leave, as well as the bankruptcy of a worker's employer. However, they did not have access to unemployment insurance, general disability payments, or low-income supplements.

Since 1993, the Government has agreed to transfer the NII fees collected from Palestinian workers to the Palestinian Authority, which is to assume responsibility for all the pensions and social benefits of Palestinians working in Israel. Mechanisms for transferring the funds and mechanisms for providing these services in the PA controlled territories, have not been established. At year's end, the funds had not been transferred and were held in a trust.

Following the outbreak of violence in 2000, the Government implemented a closure policy, which prevented nearly all Palestinians from getting to their places of employment in Israel (see Section 2.d.).

Along with union representatives, the Labor Inspection Service enforced labor, health, and safety standards in the workplace, although resource constraints, such as adequate staffing, affected overall enforcement. Legislation protects the employment rights of safety delegates elected or appointed by the workers. In cooperation with management, these delegates were responsible for safety and health in the workplace.

Workers did not have the legal right to remove themselves from dangerous work situations without jeopardy to continued employment. However, collective bargaining agreements provided some workers with recourse through the work site labor committee. Any worker may challenge unsafe work practices through government oversight and legal agencies.

Public debate continued regarding the role in the workplace and society of non-Palestinian foreign workers, whom the Government estimated to be 236,000, about half of whose legal status had lapsed and who were thus undocumented and both living and working illegally. The majority of such workers came from Eastern Europe and Southeast Asia, and worked in the construction and agricultural sectors. The law does not allow foreign workers the ability to obtain citizenship or permanent residence status, unless they are Jewish, in which case they would qualify under the laws that allow for Jewish persons to immigrate. According to NGOs, foreign workers and their families, especially those who entered the country illegally, experienced uncertainty in addressing legal and social problems, including exploitation or abuse in the workplace, because they fear immediate discharge and subsequent deportation if they raise these issues with government ministries.

NGOs alleged that foreign workers were being lured to the country with the promise of jobs that in fact did not exist. Work visas were tied to specific jobs, and quotas to bring in foreign workers were assigned by the Government to employers. Technically, it is illegal for Israeli manpower companies who provide the workers to the employers, to receive payments from the worker, but NGOs and news articles alleged that the companies made thousands of dollars from each worker brought into the country, usually as a payment from the foreign partner. Some foreign workers paid up to $10,000 (45,000 NIS) to employment agencies to obtain permits to work in the country.

According to NGOs, there were a significant number of cases where workers have been dismissed shortly after arriving in Israel. These NGOs alleged that the manpower companies worked with deportation authorities to deport the newly arrived workers, who were then replaced with newly arriving workers, earning the manpower companies more fees. NGOs argued that most workers expected to work for some time in Israel to recoup their initial payments; those faced with the absence of jobs for which they had made arrangements often sought illegal employment for fear of returning home with large debts. According to NGOs, there have been cases where workers have killed themselves rather than face this prospect.

Illegal foreign workers facing deportation were brought before a special court established to deal with issues related to deportation, and workers may contest the deportations. Many workers lacked fluency in Hebrew, which hindered the process. NGOs exist to aid workers facing deportations, and there have been cases in which the worker's status was reinstated. The court also provided a forum where deportable workers can claim that they were not paid or given benefits according to the law. In some cases, the court delayed deportation until employers paid all claims, including severance. However, some NGOs suggested that illegal workers often lived in situations amounting to involuntary servitude, due primarily to their tenuous legal status and lack of recourse. NGOs noted cases in which the police injured foreign workers during arrest. In some cases, these NGOs claimed, the workers were so seriously injured that they were not ultimately detained, due to the potential cost of care for their injuries and police fears of possible investigation of police misconduct. At least one foreign worker killed himself while in detention.

In 2002, the editor of the foreign worker newspaper Manila-Tel Aviv Times was deported shortly after giving interviews to other publications on the subject of foreign worker rights under the law; foreign worker advocates claimed the deportation was politically motivated. During the year, another reporter from the publication was deported after advising foreign workers in an article on strategies for avoiding detention and deportation. Human rights groups claimed that since foreign worker residency permits were tied to specific employment, even legal foreign workers had little leverage to influence their work conditions.

f. Trafficking in Persons

The law prohibits trafficking women for the purpose of prostitution; however, it remained a serious problem. The penal code also stipulates that it is a criminal offense, punishable by between 5 and 7 years imprisonment, to force or coerce a person to engage in prostitution and makes it a criminal offense to induce a woman to leave the country with the intent to "practice prostitution abroad." The Equality of Women Law (see Section 5) stipulates that every woman is entitled to protection from violence, sexual harassment, sexual exploitation, and trafficking. The operation of brothels and "organized sex enterprises" is outlawed, as are many of the abuses committed by traffickers and pimps, such as assault, rape, abduction, and false imprisonment; however, brothels operated openly in at least several major city.

Women were trafficked primarily from the former Soviet Union, including Moldova, Russia, Uzbekistan, and Ukraine. According to some local NGOs, several hundred women are trafficked into the country annually. NGOs reported that the number of trafficked women entering the country fell from previous years because of increased security at Ben Gurion airport, but women still were being trafficked across the Egyptian border.

NGOS reported that traffickers often lured women into traveling to the country by offering them jobs in the service industry. In many cases, traffickers met women at the border and confiscated all their official documents. Many trafficked women were forced to live and work under extremely harsh conditions and to give most

of the money they earned to their traffickers. The women reportedly often were raped and beaten, then auctioned to pimps who repeated the procedure. If the women escaped from their traffickers, they were often afraid to report their situations to the police because the traffickers threatened to hunt them down and hurt them. According to press reports, it was common for trafficked women to be told that they must repay the costs of their travel to the country through servicing up to 25 clients a day. They were paid little or no money for this work and once the debt had been repaid, they were auctioned again.

In previous years, some victims accused individual police officers of complicity with brothel owners and traffickers. The Government claimed that it reviewed cases involving allegations of police involvement; however, NGOs reported that the review process was slow and questioned whether all complaints were taken seriously. An NGO reported that sex trafficking victims reported seeing police officers at the brothels; the report was based on interviews with trafficking victims in 2001-2002.

According to the Government, from January to December, police opened 51 trafficking in persons investigations and approximately 400 investigations involving related offenses such as pandering, causing a person to engage in prostitution, soliciting prostitution and kidnapping.

During the year, the police arrested 92 persons for trafficking in persons, with 65 detained until the conclusion of their trials. Another 93 persons were arrested for related offenses. Government sources provided a partial list of judgments rendered during the year. Of the 13 cases presented, 7 were appealed to the Supreme Court. Three cases involved plea bargains, and the range of sentences rant form 16 months to 15 years imprisonment.

Police often detained trafficked women following raids on brothels; the number of such raids increased during the year. The Ministry of Interior has broad powers to deport illegal aliens and to hold them in detention pending deportation. The Government estimated that more than 500 women deported from the country during the year had been trafficking into the country. Trafficked women could not apply for legal status to remain as refugees or protected persons unless they were Jewish and filed under the Law of Return.

Authorities generally placed trafficked women who were arrested in a special detention facility prior to deportation. Trafficked women often did not challenge a deportation order because they did not speak the language or were unaware of the appeals procedure. The Government transferred women willing to testify against their traffickers to a hotel or hostel and provided them funds on which to live. Many women were reluctant or afraid to testify in trials due to threats and intimidation by their traffickers. The country has no witness protection program for non-citizens. NGO reports and witness testimony indicated that only in limited circumstances did the Government attempt to determine whether or not a trafficked woman or girl would be at risk of abuse if she were deported to her country of origin, even in cases in which the woman or girl had testified in criminal proceedings. During the year, the Government did undertake its first repatriation with NGO assistance in an attempt to protect a Moldovan victim at risk after returning to Israel to testify against her trafficker.

The law criminalizes trafficking in persons for the purposes of sex. The maximum penalty for aggravated trafficking of trafficking of minors is 20 years in prison and the penalties proscribed by law are commensurate with those for rape and assault; however, the majority of cases were resolved through plea bargains. According to media reports on specific cases reviewed over the year, it appears that sentences have increased since 2002.

The Government provided limited funding to NGOs for assistance to victims. In November, the Government finalized a plan, begun more than a year earlier, to establish a shelter available for trafficked women; however, at year's end, no shelter had been made available. The Government provided funding to an NGO, which has distributed Russian-language leaflets with information to assist trafficking victims.

**The occupied territories** (Including Areas Subject to the Jurisdiction of the Palestinian Authority)

Israel occupied the West Bank, Gaza Strip, Golan Heights, and East Jerusalem during the 1967 War. Pursuant to the May 1994 Gaza-Jericho Agreement and the September 1995 Interim Agreement, Israel transferred most responsibilities for civil government in the Gaza Strip and parts of the West Bank to the newly created Palestinian Authority (PA). The 1995 Interim Agreement divided the territories into Areas A, B, and C, denoting different levels of Palestinian and Israeli control. The PA controls security and civil affairs in Area A, civil affairs and shared responsibilities with Israel in Area B, and Israel controls certain civil functions and all security in Area C. In parts of the West Bank and Gaza, Israel exercised civil authority through the Israeli Ministry of Defense's Office of Coordination and Liaison (MATAK). The approximately 193,170 Israeli settlers (a decrease of approximately 15,000 since 2002) living in Area C of the West Bank and in the Gaza Strip were subject to Israeli law and, as citizens, received preferential treatment from Israeli authorities compared to Palestinians in the protection of their personal and property rights.

These distinctions were not in force during the year following Israel's reassertion of security control over most PA-controlled areas in 2002, which Israel carried out citing the PA's failure to abide by its security responsibilities. The international community considered Israel's authority in the occupied territories to be subject to the Hague Regulations of 1907 and the 1949 Geneva Convention relating to the Protection of Civilians in Time of War. The Israeli Government considered the Hague Regulations applicable and maintained that it largely observed the Geneva Convention's humanitarian provisions. Palestinians and international human rights groups maintained that Israel consistently violated these provisions. (This annex on the occupied territories should be read in conjunction with the report on Israel).

The "Intifada," or Palestinian uprising, began in September 2000. Since 2000, the security situation has deteriorated both within Israel and within the occupied territories. Israeli and Palestinian violence associated with the Intifada has claimed 2,369 Palestinian lives, 856 Israeli lives, and the lives of 48 foreign nationals, including 41 American citizens. Israeli military operations and armed attacks and terrorism by Palestinians against Israeli targets--including civilians within Israel, settlers, and soldiers in the occupied territories and Israel marked the conflict. On October 15, three American security personnel were killed and one wounded when a bomb detonated under their car as they drove in Gaza as part of a diplomatic motorcade. At year's end, the PA continued to investigate the incident. The attacks by Palestinians also included suicide bombings, roadside bombings, shooting at Israeli vehicles and military installations, firing of antitank missiles and mortars, and use of hand grenades. Israel Defense Forces (IDF) military actions against Palestinians included violence and abuse at checkpoints, incursions into Palestinian-controlled towns and villages, targeted killings, demolitions of homes, property, and public buildings, firing toward civilian areas with tanks and fighter aircraft, and intense gun battles with Palestinian gunmen. By year's end, Israel asserted military control over all major West Bank cities except Jericho and Bethlehem, demolished homes, including those of suicide bombers and wanted men, conducted mass arrests, and forcibly relocated some suspects. In response to the ongoing terrorist threat originating in the West Bank, Israel began construction of a security barrier to be built along parts of the Green Line and in the West Bank.

In 1996, Palestinians chose their first popularly elected government in democratic elections that generally were free and fair; an 88-member Palestinian Legislative Council (PLC) and the Chairman of the Executive Authority were then elected. The PA has a cabinet of 24 ministers serving under Prime Minister Ahmad Quray. President Arafat asserts executive authority over the government and Prime Minister. Most senior government positions in the PA are held by individuals who are members of, or loyal to, President Yasir Arafat's Fatah faction of the Palestinian Liberation Organization (PLO).

The Independence of the Judiciary Law and the PA Basic Law define the authorities of the three governmental branches and prescribed direct election of a president accountable to a cabinet and the elected PLC. At year's end, neither law was implemented fully and the respective roles of the Ministry of Justice and the High Judicial Council remained unclear. The PA courts were perceived as inefficient, and the PA executive and security services frequently ignored or failed to carry out court decisions.

Israeli security forces in the West Bank and Gaza Strip consisted of the IDF, the Israel Security Agency (the ISA-formerly the General Security Service, or GSS), the Israeli National Police (INP), and the paramilitary border police. Israeli military courts tried Palestinians accused of committing acts of violence and terror in Israeli-controlled areas. Members of the Israeli security forces committed numerous, serious human rights abuses.

The Palestinian Police Force (PPF) included the Palestinian Public Security Force, the Palestinian Civil Police, the Preventive Security Force (PSF), the General Intelligence Service, or Mukhabarat, the Palestinian Presidential Security Force, and the Palestinian Coastal Police. Other quasi-military security organizations, such as the Military Intelligence organization, also exercised de facto law enforcement powers. Palestinian police were responsible for security and law enforcement for Palestinians and other non-Israelis in PA-controlled areas of the West Bank and Gaza Strip. Israeli settlers in the occupied territories were not subject to PA security force jurisdiction. Members of the PA security forces committed numerous, serious human rights abuses.

The occupied territories comprise the Gaza Strip, the West Bank, and East Jerusalem. The population of the Gaza Strip was approximately 1,397,011, not including some 7,781 Israeli settlers. In the Gaza Strip, 62 percent of the land consists of Area A; 6 percent of Area B; and 32 percent of Area C. In the West Bank, 18.1 percent of the land consists of Area A; 21.6 of Area B; and 60.3 percent of Area C. The population of the West Bank (excluding East Jerusalem) was approximately 2,237,194 not including some 187,854 Israeli settlers. In the West Bank, Area A includes 55 percent of the Palestinian population; 41 percent of the Palestinian population is in Area B; and 4 percent is in Area C (which also contains Israeli settlements). The population of East Jerusalem, within the municipal boundaries established by Israel in 1967 was approximately 385,600, including 177,333 Israeli settlers.

The economy of the West Bank and Gaza Strip is small, underdeveloped, and highly dependent on Israel and international assistance. Israeli curfews and closures, as well as the continuing conflict, severely impacted the economy. The economy relied primarily on agriculture, services, and small manufacturing. Before the beginning of the Intifada, up to 146,000 workers from the West Bank and Gaza (approximately 25 percent of the Palestinian work force) were employed in Israel. During heightened terrorist activity in Israel or periods of unrest in the West Bank or Gaza, Israeli-imposed closures on Palestinian cities, curfews, and strict limitations on movement within the West Bank and Gaza impeded Palestinians from reaching jobs or markets and disrupted internal and external trade. In addition, the IDF and settlers destroyed sections of Palestinian-owned agricultural land and economic infrastructure. The Government of Israel stated that some of these actions, such as the destruction of groves alongside roadways and security fences by the IDF, were necessary for security reasons. Unemployment in the West Bank and Gaza was estimated at 30 percent, and approximately 63 percent of Palestinian households were living below the poverty line (54 percent of families in the West Bank and 84 percent of families in Gaza). These circumstances effectively prevented any amelioration of worker rights in the occupied territories. During the year, the US Agency for International Development (USAID) and Johns Hopkins University reported that 7.8 percent of Palestinian children under 5 suffered from acute malnutrition, 11.7 percent suffered chronic malnutrition, and 44 percent were anemic.

Israel required Palestinians to obtain Israeli permits for themselves and their vehicles to cross from the West Bank or Gaza into Israel and Jerusalem. Citing security concerns, Israel applied partial "external closure," or enhanced restrictions, on the movement of persons and products, often for lengthy periods. During times of violent protest in the West Bank or Gaza, or when it believed that there was an increased likelihood of such unrest or of terrorist attacks in Israel, Israel imposed a tightened, comprehensive version of external closure, generally referred to as "total external closure." Total external closures also were instituted regularly during all major Israeli holidays and during some Muslim holidays. During such closures, Israel prevented Palestinians from leaving the occupied territories.

Israel also placed Palestinians in the West Bank under strict "internal closure" for the entire year, allowing only Palestinians with special permits for work or health services to leave cities and pass through checkpoints on main roads. Most Palestinians were unable to leave their towns or were forced to travel without authorization on secondary roads. Israeli forces further restricted freedom of movement of Palestinians by imposing extended curfews on Palestinian towns or neighborhoods. These curfews did not apply to Israeli settlers in the same areas.

Israel's overall human rights record in the occupied territories remained poor and worsened in the treatment of foreign human rights activists as it continued to commit numerous, serious human rights abuses. Security forces killed at least 573 Palestinians and 1 foreign national and injured 2,992 Palestinians and other persons during the year, some of whom were innocent bystanders. Israeli security forces targeted and killed at least 44 Palestinians, many of whom were terrorists or suspected terrorists. Israeli forces undertook many of these targeted killings in areas where civilian casualties were likely, killing 47 bystanders in the process, including children. The Israeli Government said that it made every effort to reduce civilian casualties during these operations.

Israeli security units often used excessive force when confronting Palestinian demonstrations, while on patrol, pursuing suspects, and enforcing checkpoints and curfews, which resulted in numerous deaths. In response to Palestinian attacks on Israeli targets, Palestinian civilian areas suffered extensive damage as a result of IDF retaliation, which included shelling, bombing, and raiding. Israeli soldiers placed Palestinian civilians in danger by ordering them to facilitate military operations, which exposed them to live fire between armed Palestinians and Israeli soldiers. The Government of Israel said that is has reiterated to its forces that this practice is prohibited unless the civilian gives his voluntary consent; however, in practice, most Palestinians who agreed to assist such operations often did so out of fear of the soldiers even if they were not directly coerced. Palestinians who took part in such operations without being harmed still faced the risk of being branded as collaborators and risked being attacked by other Palestinians.

Israeli forces sometimes arbitrarily destroyed, damaged, or looted Palestinian property during these operations. Israeli security forces often impeded the provision of medical assistance to Palestinian civilians by strict enforcement of internal closures that prevented passage of ambulances, asserting in some cases that emergency vehicles have been used to facilitate terrorist transit and operations. Israeli security forces harassed and abused Palestinian pedestrians and

drivers who attempted to pass through the approximately 430 Israeli-controlled checkpoints in the occupied territories. Israel conducted mass, arbitrary arrests in the West Bank during military operations, summoning and detaining males between the ages of 15 and 45. Israel provided poor conditions for Palestinians in its prisons. Facilities were overcrowded, sanitation was poor, and food and clothing at times were insufficient. Israeli security forces and police officers beat and tortured detainees. Prolonged detention, limits on due process, and infringements on privacy rights remained problems.

Israel carried out policies of demolitions, strict curfews, and closures that directly punished innocent civilians. Israel demolished the homes of families and relatives of suspected terrorists as well as buildings suspected terrorists used as hideouts. Israel's demolitions left hundreds of Palestinians not involved in terror attacks homeless. Israel often demolished homes after suspects had already been killed or arrested. Israel maintained that such punishment of innocents would serve as a deterrent against future terrorist attacks.

The IDF destroyed numerous orchards, olive and date groves, and irrigation systems on Palestinian-controlled agricultural land. Israel constructed parts of a large security barrier on land inside the West Bank isolating residents and limiting access to hospitals, schools, social services, and agricultural property. At year's end, Israel was engaged in a process of reconsideration and reassessment of the routing and operation of the security barrier. A number of petitions in connection with the routing and operation of the barrier were pending before Israel's Supreme Court. In several instances, Israel killed, injured, and obstructed human rights monitors and NGO workers through the use of excessive deadly force and the imposition of strict closures. Israel censored Palestinian publications in East Jerusalem, raided and closed media outlets in the territories, blocked publications and broadcasts, and periodically detained or harassed members of the media and clergy. IDF fire allegedly killed two journalists covering clashes between Palestinians and Israeli security forces, both of whom had clearly identified themselves as noncombatants, and injured at least three others. The Israeli authorities placed strict limits on freedom of assembly and severely restricted freedom of movement for Palestinians. Israeli security forces failed to prevent Israelis from entering Palestinian-controlled areas in the West Bank who injured or killed several Palestinians. In some cases, Israeli soldiers escorted Israeli civilians who beat Palestinians and damaged Palestinian property.

The PA's overall human rights record remained poor, and it continued to commit numerous, serious abuses. Many members of Palestinian security services and the Fatah faction of the PLO participated with civilians and terrorist groups in violent attacks against Israeli civilians inside Israel, Israeli settlers, foreign nationals, and soldiers.

Palestinian security forces used excessive force against Palestinians during demonstrations. PA security officials abused prisoners and arbitrarily arrested and detained persons. Prolonged detention without respect for due process remained a problem. The PA provided poor conditions for prisoners. PA courts were inefficient and failed to ensure fair and expeditious trials. Internal closure in the occupied territories obstructed courts from holding sessions or issuing rulings during most of the year. The PA executive and security services frequently ignored or failed to enforce court decisions. PA security forces infringed on the right to privacy and restricted the freedom of speech and press. Palestinian groups harassed and abused journalists. Such restrictions and harassment contributed to the practice of self-censorship by many Palestinian commentators, reporters, and critics. During the year, informal reports of domestic abuse of women and "honor crimes" persisted. Societal discrimination against women and persons with disabilities and child labor remained problems.

Israeli civilians, most often settlers, harassed, attacked, and occasionally killed Palestinians in the occupied territories. During the year, settlers attacked and killed at least one Palestinian. Settlers also caused significant economic damage to Palestinians by attacking and damaging greenhouses and agricultural equipment, uprooting olive trees, and damaging other valuable crops. The settlers did not act under government directive in the attacks, and Israeli soldiers sometimes restrained them, but in several cases Israeli soldiers accompanied them or stood by without acting.

Palestinian terrorists and gunmen were responsible for the deaths of 376 Israelis killed in the occupied territories. Palestinian extremists targeted Israelis in drive-by shootings and ambushes, suicide and other bombings, mortar attacks, and armed attacks on settlements and military bases. Palestinian terrorist and militant groups used minors to prepare attacks or carry them out, exploitation that amounted to forced conscription. During the year, Palestinians acting individually or in groups, including off-duty members of the PA security services, killed 25 Israeli civilians and 39 Israeli security personnel. Most of the attacks were organized by a number of Palestinian terrorist groups, including the militant Islamic Resistance Movement (HAMAS), the Palestine Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine (PFLP), and the Fatah-affiliated al-Aqsa Martyrs Brigades. The Democratic Front for the Liberation of Palestine (DFLP) and Fatah-affiliated groups also participated in the attacks. Palestinian civilians also killed at least five Palestinians in the occupied territories who allegedly had collaborated with Israel. Most of the deaths were shootings perpetrated by small groups of unidentified Palestinian gunmen. The PA conducted no investigations and made no arrests in any of these killings.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

Israeli security forces killed at least 573 Palestinians in the West Bank and Gaza. Israeli civilians, mostly settlers, as well as extremist groups believed to be associated with settlers, killed at least one Palestinian. Palestinian militants and civilians killed an estimated 64 Israeli civilians and security personnel in the occupied territories. Palestinian civilians killed at least five Palestinians suspected of spying for the Israeli Government (see Sections 1.c. and 1.g.).

Israeli security forces killed most Palestinians during armed clashes, targeted killings, incursions into Palestinian-controlled areas, at checkpoints, or as a result of sometimes excessive or indiscriminate fire toward Palestinian civilian areas. During these incidents, Palestinian protesters frequently threw stones and Molotov cocktails, and in some cases, also fired weapons at IDF soldiers (see Sections 1.c. and 1.d.). Israeli security forces used a variety of means to disperse protesters, including tear gas, rubber-coated metal bullets, and live ammunition. The IDF did not regularly investigate the actions of security force members who killed and injured Palestinians under suspicious circumstances. Since the start of the intifada, the IDF has opened only 11 investigations into the improper use of deadly force despite the fact that human rights organizations have raised numerous allegations.

Israeli security forces used excessive force against protesters, in response to threats while on patrols, in pursuing fleeing suspects, and in responding to trespassers in restricted areas, at times resulting in death. Israel also used excessive lethal force against rock-throwers in some instances. For example, on September 15, IDF soldiers shot and killed 10-year-old Ahmad Abu Latifa near the Qalandia checkpoint north of Jerusalem. The boy was among a group of

youths who were throwing rocks at Israeli soldiers.

IDF soldiers shot and killed suspects who were avoiding arrest, but in a number of cases who posed no apparent mortal threat to the soldiers at the time of the incidents. For example, on February 10, IDF soldiers in Nablus shot and killed PFLP member Imad Mabrouk when he attempted to escape arrest. On July 3, IDF soldiers in Qalqilya shot and killed al-Aqsa Martyrs Brigades militant Ahmad Shawar when he attempted to run away after being ordered to halt.

IDF soldiers fired without warning on unarmed Palestinian trespassers in or near restricted areas, on several occasions killing Palestinians. For example, on March 5, an IDF soldier shot and killed 75-year-old Abdallah Shehadeh al-Ash'hab as he rode a donkey collecting firewood on his property, which was located near the Netzarim settlement in the Gaza Strip.

On November 29, IDF soldiers in Gaza shot and killed Palestinian police officer Sayed Abu Safra when he attempted to prevent a mentally disabled Palestinian from nearing the perimeter fence surrounding the Israeli settlement of Nissanit. The IDF expressed "sorrow and regret" over the incident.

During the year, the IDF targeted for killing at least 44 Palestinians suspected of involvement in terrorism. In the process, IDF forces killed more bystanders than targeted individuals, including children. IDF forces killed at least 47 bystanders of those targeted and injured a number of others, including bystanders, relatives, or associates. Israel stated that it only targeted individuals believed to be "ticking bombs" on the verge of carrying out terrorist attacks. In practice, however, the IDF targeted some leaders of terrorist organizations generally considered not to be directly engaged in carrying out attacks.

Israeli security forces put large numbers of Palestinian civilian lives in jeopardy by undertaking targeted killings in crowded areas where civilian casualties were likely. For example, on April 9, Israeli forces fired four missiles at a car in a densely populated area of Gaza city in order to kill two suspected terrorists, Sa'ad ad-Din al-Arabeit, 35, and Ashraf al-Halabi, 25. Israeli forces killed five other Palestinians in the effort, including two children, 13-year-old Ahmad Hamsa al-Ashraf, and 16-year-old Samid Hasan Qasem.

Beginning on June 11, Israeli forces conducted 5 targeted killings in Gaza City within 48 hours, killing 23 Palestinians, including 18 bystanders. Israel conducted the fifth such attack on June 12, firing five rockets at a car traveling in central Gaza City. The rockets killed wanted Hamas terrorist Yasser Muhammad Ali Taha, 31, and six bystanders, including an 18-month-old child and a pregnant woman.

Israeli security personnel used excessive force while operating checkpoints, killing a number of Palestinians (see Section 1.g.). On July 25, an IDF soldier at a checkpoint outside Bartaqa ash-Sharqiya near Jenin fired on a car waiting for permission to pass. The shots killed 3-year-old Palestinian Mahmoud Jawadat Sharif Kabaha, who was sitting in the car. An investigation into the incident was ongoing at year's end.

Israeli forces put civilian lives in jeopardy by using imprecise, heavy weaponry in operations against terrorist infrastructure conducted in civilian areas. Frequently, and often following Palestinian shooting attacks, IDF retaliation excessively damaged Palestinian towns and cities in the West Bank and Gaza. Israeli forces fired tank shells, heavy machine-gun rounds, and rockets from aircraft at targets in residential and business neighborhoods where Palestinian gunfire was believed by the IDF to have originated.

On April 27, the Israeli Supreme Court of Justice ruled in an October 2002 case brought by the Palestinian Center for Human Rights (PHCR) and Physicians for Human Rights-Israel against the IDF's use of flechette tank shells in Gaza. The imprecise anti-personnel munitions launch thousands of small metal darts over an area of several thousand square feet; use of such munitions in densely populated civilian areas makes the likelihood of civilian casualties very high. The Gaza Strip has a population density of approximately 3,300 persons per square kilometer and is one of the most densely populated areas in the world. The High Court of Justice denied the petition and stated that it would not intervene in the IDF's choice of weapons. Unlike in previous years, there were no reports that the IDF used flechette shells during the year.

On September 9, Israeli soldiers targeting gunmen hiding in a building in a residential area of Hebron opened fire on the building with tank shells. The shelling continued for more than 4 hours, and shrapnel killed 11-year-old Palestinian Muhammad Mansour Sayouri, who was hit in the head while standing in the kitchen of another residential building approximately 150 feet south of the structure being targeted.

Israeli security forces killed numerous civilians during military incursions into Palestinian-controlled cities and towns. Such incursions usually were conducted in response to Palestinian suicide bombings, shooting attacks that had killed Israeli civilians, settlers, or soldiers, or to make arrests. Israeli security forces also conducted military incursions on the basis of intelligence information about possible future attacks. Palestinians often responded with gunfire and by booby-trapping civilian homes and apartment buildings with deadly, indiscriminate devices. As part of such actions, the IDF usually raided and often leveled buildings, including homes.

On May 1, the IDF launched an incursion into Gaza City, home to approximately 365,000 Palestinians. The raid in a densely populated neighborhood led to a shootout with Palestinian militants. During the fighting, the IDF killed five innocent Palestinian bystanders, including a 1-year-old boy, a 13-year-old boy, a 14-year-old boy, a 57-year-old man, and a 38-year-old man who attempted to treat the wounded. IDF fire killed Amir Ahmad Muhammad 'Ayad, the 1-year-old baby boy who was inside his home during the incursion. The IDF also killed seven Palestinian gunmen during the clash. The IDF demolished two homes before withdrawing from the city.

Israeli forces used excessive force to enforce curfews in reoccupied Palestinian areas, resulting in deaths. For example, on April 17, IDF soldiers enforcing a curfew in Tulkarm opened fire on and killed a Palestinian civilian found out of his home.

Israeli security forces at checkpoints often impeded the provision of medical assistance to sick and injured Palestinians. The Government's implementation of control measures resulted in delayed access to medical treatment for at least one Palestinian who subsequently died (see Section 1.g.).

Israel forces allegedly beat and killed a Palestinian prisoner in December 2002. On December 30, 2002, Israeli Border Police in Hebron arrested 'Imran Abu Hamdiyeh, a 17-year-old Palestinian. Palestinians found Hamdiyeh dead in Hebron's industrial area later that day. An autopsy sponsored by Palestinian and Israeli human rights groups concluded that Hamdiyeh died due to "blunt force injury." On April 18, Israel arrested four Israeli Border Police officers on charges that they had beaten Hamdiyeh to death. The trial was ongoing at year's end.

1/19/2015                                    Israel and the occupied territories

Palestinian security officers and members of Arafat's Fatah faction attacked and killed Israeli citizens, Israeli settlers, foreign nationals, and soldiers. They often fired at Israelis from within or close to the homes of Palestinian civilians or in other locations with knowledge that civilians were present, drawing Israeli return fire and increasing the potential for the noncombatants to be injured. Arafat issued several "ceasefire" orders and publicly denounced attacks on civilians without lasting effect, but took no action to arrest or try violators or against terrorist groups including those affiliated with the PLO. The PA did not prevent terrorist attacks, enforce a ban on militant groups, or prevent such groups from seeking shelter in civilian areas. Some PA officials made public statements justifying Palestinian attacks on Israelis. Additionally, some Fatah leaders made public statements urging Palestinians to continue all aspects of the Intifada, including violent attacks on Israelis.

Palestinian civilians harassed, attacked, and killed Israelis, especially settlers and soldiers. During the year, Palestinians, acting as individuals or in unorganized or small groups, including some members of PA security services, killed 25 Israeli civilians, 39 Israeli soldiers, and injured hundreds of others in acts of violence and terrorism in the occupied territories (see Section 1.c.). The Palestinian attacks consisted of suicide bombings, shootings, bombings involving improvised, indiscriminate explosive devices, and stone-throwing at Israeli drivers.

On May 17, a Hamas-affiliated suicide bomber strapped with explosives blew himself up outside the Cave of Machpela/Ibrahimi Mosque in Hebron, killing himself and two Israeli settlers.

On January 23, Hamas-affiliated Palestinian gunmen fired on an IDF jeep driving in southern Hebron and killed three IDF soldiers.

Israeli settlers, acting individually, or in small groups, harassed, attacked, and occasionally killed Palestinians in the West Bank and Gaza Strip (see Section 1.c.). During the year, settlers killed at least one Palestinian. On April 30, a settler security guard at the Moshav Petza'el settlement in the Jordan Valley shot and killed Palestinian laborer Ra'ik Mas'id Daraghmeh, 35, who had stopped to relieve himself in a field near the settlement.

On January 25, a settler near the West Bank village of Budrus allegedly shot and killed Palestinian shepherd Ahmad Subuh, 24. A companion of Subuh's claims to have seen a settler drive away from the scene, but no suspect had been arrested by year's end.

Palestinian civilians also killed at least eight Palestinians in the occupied territories who allegedly collaborated with Israel. Most of the deaths were shootings perpetrated by small groups of unidentified Palestinian gunmen, sometimes affiliated with terrorist groups. The PA made no arrests in any of these killings.

b. Disappearance

There were no reports of politically motivated disappearances during the year.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Israel employs physical pressure and degrading treatment as interrogation methods against arrested Palestinians in the occupied territories. The law, based on a 1999 High Court decision, prohibits the use of a variety of abusive practices, including violent shaking, painful shackling in contorted positions, sleep deprivation for extended periods of time, and prolonged exposure to extreme temperatures. However, the High Court decision allowed for the security forces to request "special permission" to use "moderate physical pressure" against detainees considered to possess information about an imminent attack. In 2002, the Israeli GSS acknowledged use of physical pressure against 90 Palestinians who had been defined as "ticking bombs."

Interviews and studies by human rights groups during the year claim that torture is employed. The Public Committee Against Torture in Israel assessed that in the beginning of this year hundreds of Palestinians were subjected to torture or other cruel, inhuman, or degrading treatment by Israel security agencies, an increase from the dozens reported in 2002.

Israeli and Palestinian human rights groups noted that jailers made it difficult to visit prisoners during the interrogation period and that some detainees were reluctant to report abuse out of fear of retribution.

The case of Daoud Dirawi was representative of numerous allegations of physical abuse which human rights groups received. For example, on February 21, Israeli authorities arrested Dirawi, a Palestinian lawyer, for being in Jerusalem without proper identification. Police initially detained Dirawi at the al-Qeshle police station in Jerusalem before transferring him to the Asyun military prison in the Negev. Dirawi told his attorney that soldiers beat him severely en route to the Asyun prison. Dirawi sustained serious bruises and a broken lower jaw. Dirawi states that he was tied up upon arrival with his hands locked above him and that he was kept in this position outdoors in the rain through the night. On March 4, Israel sentenced Dirawi to 6 months of administrative detention without pressing formal charges against him and rejected his appeal. Israel renewed his administrative detention for another 6 months. At year's end, Dirawi remained under administrative detention.

The law prohibits the admission of forced confessions as evidence. However, most convictions in security cases before Israeli courts were based on confessions made well before legal representation was made available to defendants. A detainee may not have contact with a lawyer until after interrogation, a process that may last days or weeks. The Israeli Government did not allow representatives of the International Committee of the Red Cross (ICRC) access to detainees until the end of their legal period of isolated detention. Detainees sometimes stated in court that their confessions were coerced, but judges rarely excluded such confessions.

The IDF injured approximately 2,992 Palestinians, including innocent bystanders and journalists, during armed clashes, retaliatory strikes, targeted killings, and other military actions. During the year, Israeli gunfire allegedly killed two journalists and injured at least three others during Israeli military actions (see Sections 1.a., 1.g., and 2.a.).

Israeli authorities abused Palestinians at checkpoints, subjecting them to verbal and physical harassment. Each day, tens of thousands of Palestinians traveling between Palestinian towns and villages faced as many as 730 different barriers to movement. At year's end, Israel had established 60 checkpoints, 9 occasionally manned checkpoints, 479 earthen mounds blocking roads, 102 cement roadblocks, 39 road gates, and 41 gates in a separation barrier. As many as several thousand Palestinians encountered some form of abuse from soldiers at checkpoints. Palestinians were subjected to excessive delays in passing through checkpoints. For example, on May 12, an IDF soldier at the Hawarah checkpoint outside Nablus decided to only let Palestinians pass through who were

able to identify the Israeli political figure on the 100 Shekel note. On April 30, an IDF soldier abused Qassem Awisat, 19, a resident of Qalqilya, when he attempted to pass through the Seida checkpoint in the Tulkarm district. The soldier pulled Awisat aside and etched a Star of David on his arm using shards of broken glass. The Israeli human rights organization B'tselem documented Awisat's testimony of the incident and photographed the injury to his arm. Israeli soldiers forced Palestinian civilians to wait in the rain or inclement weather for excessive periods of time.

The IDF subjected Palestinians in the West Bank and Gaza to beatings, tire slashings, and gunfire directed against them or their vehicles because they were traveling on, or trying to circumvent, roads on which the IDF blocked passage to Palestinians as it attempted to enforce internal closures between Palestinian cities and towns in the West Bank and Gaza (see Section 2.d.).

Israeli security personnel on patrol abused and in some cases tortured Palestinian civilians. For example, Israeli soldiers on patrol in June attacked 20 Palestinian youths who were trying to cross a dirt road near a military checkpoint north of Jerusalem. The soldiers beat the youths with their rifles and threw several of them in a sewage ditch before leaving the scene. In June, Israeli Border Police in Tulkarm took the identity card of shepherd Nazih Salah 'Awad Damiri, 24, and forced him to mime sexual intercourse with his donkey.

Israeli fire injured seven Palestinian medical personnel. Israeli fire also damaged 12 Palestinian Red Crescent Society (PRCS) ambulances (see Sections 1.a and 1.g.).

Article 13 of the PA Basic Law prohibits the use of torture or force against detainees; however, PA security forces tortured and abused Palestinian detainees. The abuse generally took place after arrest and during interrogation, and reportedly was widespread. Palestinian security officers were not issued formal guidelines regarding the proper conduct of interrogations; most convictions were based largely on confessions.

PA security officials tortured and abused prisoners by threatening, hooding, beating, and tying detainees in painful positions, forcing them to stand for long periods of time, depriving them of sleep and food, and burning detainees with cigarettes and hot instruments. Palestinians also alleged that PA authorities have shaken them violently while in PA custody. International human rights groups have documented widespread arbitrary and abusive conduct by the PA. The organizations stated that the use of torture was widespread and not restricted to those persons detained on security charges. Human rights groups stated that Palestinians who were suspected of belonging to radical Islamic groups were more likely to be treated poorly, as were alleged collaborators with Israel. Observers noted that documentation of abuses was very limited, due partly to the hesitancy of alleged victims to file or make public claims of torture and abuse against the PA authorities.

Palestinian security officers and Fatah Tanzim members with firearms attacked and injured Israelis. In some cases, they fired at Israeli civilians or soldiers from within or close to the homes of Palestinian civilians, drawing Israeli return fire (see Section 1.a.). Palestinian security forces consistently failed to prevent armed Palestinians in areas under PA control from opening fire on Israeli settlers or other civilians, soldiers, or military targets.

Israeli settlers harassed, attacked, and occasionally killed Palestinians in the West Bank and Gaza Strip (see Section 1.a.).

Some settlers attacked Palestinian homes and damaged crops, olive trees, greenhouses, and agricultural equipment, usually in areas located near settlements, causing extensive economic damage to Palestinian-owned agricultural land and depriving innocent farmers of their livelihood. In October, settlers disrupted the Palestinian olive harvest by firing on Palestinians picking olives, beating harvesters returning home and stealing the harvest, and invading Palestinian property and picking the olives themselves. For example, October 23, settlers from the Yitzhar settlement near Nablus threw stones and fired warning shots at Palestinian farmers harvesting olives in the village of Burin. The harvesters were forced to disperse. On October 22, Yitzhar settlers also stole 6 120-pound bags of olives from a farmer in Burin.

Although human rights monitors reported that the IDF provided greater protection to Palestinian farmers than they did in the past, settlers carried out such actions in areas in which the IDF was responsible for security. Israel often enforced security by applying curfews and closures only to Palestinians, which on occasion prevented Palestinians from defending themselves and their property from attacks by settlers. Palestinians also complained that when the IDF provided protection it gave insufficient time for Palestinians to complete the harvest. Burin farmers, for example, complained that they only received 2 days of IDF protection to complete a harvest of some 1,000 olive trees.

The Government of Israel generally did not prosecute settlers for their acts of violence against Palestinians, and settlers rarely served prison sentences if convicted of a crime against a Palestinian. However, in August Israel arrested nine settlers for plotting and carrying out attacks on Palestinian civilians. On August 8, two of those settlers were charged with possessing army explosives and preparing for a terrorist attack on Palestinian civilians. Those two were released after a plea bargain. Three other settlers were convicted during the year. In September, two were sentenced to 15 year terms and one was sentenced to 12 years. The remaining detained settlers were still under trial at year's end.

On January 19, a group of settlers in Hebron stabbed Iyad Salhab, 25, three times in the waist, thigh, and face. IDF soldiers stood by while the stabbing attack took place, but intervened when a larger group of twenty or more settlers ran toward the scene. Salhab was treated with stitches and was briefly hospitalized.

Palestinians harassed, attacked, and occasionally killed Israelis, especially settlers (see Section 1.a.).

Israel provided poor conditions for Palestinians in Israeli prisons. Facilities were overcrowded, sanitation was poor, and at times food and clothing were insufficient. Israel crowded Palestinian prisoners, exceeding capacity of the facilities. Israel was unprepared to accommodate properly the hundreds of Palestinians that were arrested in sweeps that accompanied Israeli operations during the year. In January, Palestinian prisoners in the Ofer prison camp near Ramallah, which held close to 1,000 Palestinian detainees, conducted a protest against poor treatment.

Israel significantly expanded its use of solitary confinement, holding increasing numbers of prisoners in isolation. At year's end, Israel held 120 Palestinian prisoners in some form of solitary confinement compared to 15 at the end of 2002.

Israel neglected the medical needs of some Palestinian prisoners. The Mandela Institute, a Palestinian prisoners advocacy group, alleged that such neglect contributed to at least one death in custody. Bashir Oweiss, a Palestinian from Nablus, died of a stroke on December 8 after allegedly receiving negligent medical care as his condition deteriorated. Oweiss was arrested on November 1 and sentenced on November 27 to 6-months of administrative detention. Oweiss

suffered a stroke on December 4. According to the Mandela Institute, poor treatment at the Megiddo hospital caused Oweiss' condition to deteriorate that night. The hospital then transferred him to Afula hospital where he died 3 days later.

Israel permitted independent monitoring of prison conditions by the ICRC and other groups, although human rights groups reported they sometimes encountered difficulties gaining access to specific detainees.

The PA provided poor conditions for its prisoners. In many cases, facilities were old, dilapidated, and neglected. There were separate facilities to hold juvenile prisoners. Most Palestinian prison facilities and detention centers were destroyed during the current conflict, and prisoners were kept informally in houses or other buildings.

The PA permitted independent monitoring of its prisons, although human rights groups, humanitarian organizations, and lawyers reported difficulties arranging visits or gaining access to specific detainees. Human rights organizations stated that their ability to visit PA prisons and detention centers varied depending on which security organization controlled the facility. Human rights organizations stated that the police, the Preventive Security Force, and Mukhabarat generally allowed them to inspect facilities and visit prisoners and detainees. However, they stated that the Military Intelligence Organization usually did not grant them access to facilities that they controlled. Human rights monitors stated that prison authorities did not consistently permit them to have access to PA detention facilities, and that they rarely were permitted to see inmates while they were under interrogation.

The PA generally permitted the ICRC access to all detainees held by the PA, and allowed regular inspections of prison conditions; however, the PA denied access to some detainees for 14 days immediately following his or her arrest. When abuses occurred, they frequently happened during that 2-week period.

d. Arbitrary Arrest, Detention, or Exile

Israeli security personnel may arrest without warrant or hold for questioning a person suspected of having committed a criminal or security offense. During the year, Israel conducted mass, arbitrary detentions in the West Bank. Most of those detained were released several days or weeks thereafter. Israeli Military Order 1507 permits the Israeli army to detain people for 10 days during which detainees were barred from seeing a lawyer or appearing before court. Israel conducted mass detentions under this order's authority. On May 12 and 13, Israeli forces arrested 83 Palestinians in Hebron.

Israel used administrative detention to hold hundreds of Palestinians without trial or charge. At year's end, Israel held 649 Palestinians in administrative detention.

Individual administrative detention orders could be issued for up to 6-month periods and could be renewed indefinitely. A number of Palestinians under administrative detention during the previous several years have had their detention orders renewed repeatedly.

Israel conducted de facto detentions at checkpoints by confiscating Palestinian identification cards and car keys. Palestinians were unable to leave the scene until IDF soldiers returned the items. For example, on the morning of June 3, IDF soldiers confiscated the car keys and identification cards of three Palestinian residents of East Jerusalem driving to Hebron. The soldiers did not return the keys until the afternoon and never returned the identification cards at all.

On November 23, IDF soldiers at the Hawwara checkpoint outside Nablus demanded that two Palestinians stop and clean the checkpoint. When the men refused, the soldiers handcuffed, blindfolded and detained them for several hours. When B'tselem investigated the incident the soldiers admitted to the action and claimed their superiors had ordered them to do it.

Israeli authorities intermittently issued special summonses for those suspected of involvement in or knowledge of security offenses. Israeli military order 1369 provides for a 7-year prison term for anyone who does not respond to a special summons delivered to a family member or posted in the MATAK office nearest the suspect's home address. Bail rarely was available to those arrested for security offenses.

Israel's age standard in prosecuting youth as adults differs based on national origin. Israeli youth under the age of 18 cannot be tried as adults; however, Palestinian youth who are 16 years of age can be tried as adults.

Israeli authorities must inform detainees of their right to an attorney and whether there are any orders prohibiting such contact. Higher-ranking officials or judges may extend the period during which a detainee is denied access to counsel. For example, access to counsel was denied routinely while a suspect was being interrogated, which may last up to several weeks.

Israel hampered or prevented contacts between Palestinians, their lawyers, families, and human rights organizations in Israeli prisons and detention facilities. The law provides that in the occupied territories, Israeli authorities must inform the family of a person's arrest and place of detention "without delay." Such notification rarely was given, and Palestinian suspects often were kept incommunicado for much longer than 48 hours. Israeli authorities stated that they attempted to post notification of arrests within 48 hours, but that senior officers may delay notification for up to 12 days. Additionally, a military commander may appeal to a judge to extend this period in security cases for an unlimited period of time. Even if family members or others became aware of a person's arrest, it often was difficult for them to obtain information regarding where a detainee was being held or whether the detainee had access to an attorney. Palestinians often located detained family members through alternative means. Palestinians may check with a local ICRC office or the Israeli human rights organization HaMoked to determine whether it has information regarding the whereabouts of a family member.

The Israeli Government routinely transferred Palestinians arrested in the occupied territories to facilities in Israel, especially the prison in Ashkelon and the military detention centers in Megiddo and the Negev Desert. Israeli authorities in some instances scheduled appointments between attorneys and their detained clients, but subsequently moved the clients to another prison without notice prior to the meetings. Authorities reportedly used such tactics to delay lawyer-client meetings for as long as 90 days. Palestinian prisoners had difficulty obtaining legal representation because of restrictions in place on Palestinian lawyers. Since the Intifada began, only Israeli citizens or Palestinian lawyers with Jerusalem identification cards were permitted to visit Palestinian prisoners in Israeli prisons as advocates or monitors. This significantly reduced the availability and timeliness of legal aid for such prisoners due to a reduction from 1,300 to approximately 100 lawyers available to handle such cases. Lawyers with Jerusalem identification cards reported frequent, repeated, and lengthy delays in meeting with prisoners.

Human rights groups stated that Palestinian lawyers from the Gaza Strip had a more difficult time obtaining permission to meet their clients than their West Bank

counterparts, and that they were denied entry into Israel more frequently than West Bank lawyers.

Male family members between 16 and 40 years of age, and any family members with security records, usually were barred from visiting relatives in Israeli facilities. Relatives of Palestinian prisoners also stated that in some instances they learned that visitation rights were canceled only when they arrived at the prison after having traveled for many hours from the occupied territories. Following the outbreak of violence in 2000, the Israeli Government banned all family visits for Palestinian prisoners in Israeli prisons, although some visitation rights were restored intermittently after ICRC intervention (see Section 1.c.).

Evidence used at hearings for administrative detentions in security cases was secret and unavailable to the detainee or his attorney during the hearings; the detainee and defense lawyer were required to leave the courtroom when secret evidence was presented. Israeli authorities maintained that they were unable to present evidence in open court because doing so would compromise the method of acquiring the evidence. Judges, not military officials, may renew administrative detention orders beyond a 6-month period. Detainees may appeal detention orders, or the renewal of a detention order, before a military judge, but their chances for success were very limited. No information was available regarding whether any detainees were successful in such appeals.

During the year, the total number of Palestinian prisoners and administrative detainees in Israeli prisons rose. According to the IDF, there were 5,944 Palestinian security prisoners held in IDF and Israeli Prisons Service jails, compared to 4,511 at the end of 2002. The IDF also held an unspecified number of Palestinian detainees in waiting facilities in the occupied territories.

Israel forcibly transferred 20 Palestinians suspected of terror activity but not convicted in court from the West Bank to Gaza. Israel forcibly transferred three Palestinians in 2002 and none in 2001.

On May 18, Israel transferred Mahmoud Suleiman Sa'id as-Sa'di as-Saffouri, 31, from his home in Jenin in the West Bank to the Gaza Strip. Israel conducted the transfer on the basis of a military order issued on April 10. Israel first detained as-Saffouri on June 19 and held him without charge in the West Bank before expelling him to Gaza for 2 years. From November to December, Israel relocated 18 Palestinians from the West Bank to Gaza. Israel in mid-October issued military orders calling for the transfers. All of the appeals to the Israeli High Court by the detainees were struck down.

The 2001 PA Criminal Procedures Law allows police to hold detainees without charges for 24 hours. Judges can authorize detention for another 15 days. Court approval is necessary for detention without charges for a maximum total of 45 days. A trial must start within 6 months of arrest, or the detainee must be released. In practice, however, many Palestinians were held in detention without charge for months.

The Independence of the Judiciary Law and the PA Basic Law define the authorities of the three governmental branches and prescribes direct election of a president accountable to his cabinet and to the elected PLC; however, neither law has yet been fully implemented. Without such laws to constrain them, PA security officers refuse to carry out some High Court of Justice orders to release detainees.

PA security forces arbitrarily arrested and detained persons, and security officials often ignored laws that protect the rights of detainees. The PA ignored court decisions calling for the release of alleged security criminals. Lawyers and PA judicial officials acknowledged that, in contravention of the law, PA security services sometimes arrested and detained persons without informing judicial officials. On May 17, the PA High Court of Justice ordered Taysir Abu Meghasib and Mehdi Abu Seif released from detention for lack of evidence. The PA Military Intelligence Service in Gaza had arrested both men in 2001 and 2002 respectively on charges of collaborating with Israel. Despite this ruling, Meghasib and Seif remained imprisoned at year's end.

At year's end, an unknown number of suspected collaborators and at least 20 political prisoners were in custody in PA prisons. Alleged collaborators often were held without sufficient evidence, and denied access to lawyers, their families, or doctors. On May 1, the PA Military Intelligence Service released political prisoner Farouk Abu Hassan after 91/2 years of illegal detention.

PA authorities generally permitted prisoners—except those held for security offenses—to receive visits from family members and human rights monitors. PA security officials did not always permit lawyers to see their clients. In principle detainees may notify their families of their arrest, but this was not always permitted.

PA security services had overlapping or unclear mandates that often hampered the protection of human rights. Under existing law in the West Bank, only the PA's civil police force is authorized to make arrests. In practice all security forces detained persons at various times. The operating procedures and regulations for the conduct of PA security personnel in the various services still were not well developed and have not been made fully available to the public.

Families, lawyers, and even the Ministry of Justice were often unable to track detainees' whereabouts and to determine their numbers. In general the PA did not inform families of a relative's arrest, or did so only sporadically. Most PA security officers remained unaware of proper arrest, detention, and interrogation procedures, as well as basic human rights standards. Israeli operations during the Intifada destroyed most PA prisons, and the use of informal detention centers in homes and apartment buildings spread.

PA security forces continued to harass journalists, political activists, and human rights advocates who criticized the PA and its policies (see Section 2.a.).

Neither the Israeli Government nor the PA used forced exile, or forcibly deported anyone from the occupied territories, during the year.

e. Denial of Fair Public Trial

Israeli law provides for an independent judiciary, and the Government generally respected this in practice. Palestinians accused by Israel of security offenses in the occupied territories usually were tried in Israeli military courts. Security offenses are defined broadly and may include charges as varied as rock throwing or membership in outlawed terrorist organizations, such as HAMAS or the PFLP. Military prosecutors brought charges. Serious charges were tried before three-judge panels; lesser offenses were tried before one judge. The Israeli military courts rarely acquitted Palestinians of security offenses, but sentences in some cases were reduced on appeal.

Israeli military trials followed evidentiary rules that were the same as those in regular criminal cases. Convictions may not be based solely on confessions, although in practice some security prisoners were convicted on the basis of alleged coerced confessions of both themselves and others. The prosecution must justify closing the proceedings to the public in security cases, and the Attorney General determines the venue. Counsel may assist the accused during trial, and a

judge may assign counsel to those defendants when it is deemed necessary. Charges are made available to the defendant and the public in Hebrew, and the court may order that the charges be translated into Arabic if necessary. Sentencing in military courts was consistent with that in civilian criminal courts. Defendants in military trials had the right to appeal through the Military High Court. Defendants in military trials also may petition to the civilian High Court of Justice (as a court of first instance) in cases in which they believe there are procedural or evidentiary irregularities. The court may hear secret evidence in security cases that is not available to the defendant or his attorney. While a conviction may not be based solely on such evidence, it reportedly may influence the judge's decision.

Trials sometimes were delayed, sometimes excessively, because witnesses, including Israeli military or police officers, did not appear, the defendant was not brought to court, files were lost, or attorneys failed to appear, sometimes because they were not informed of the trial date or travel restrictions prevented Palestinian lawyers from reaching the court (see Section 2.d.). Palestinian legal advocates argued that these delays were designed to pressure defendants to settle their cases without trial or to pressure some defendants to plead guilty to minor offenses so that an expedited trial could be held.

In expedited trials a charge sheet was drawn up within 48 hours and a court hearing was scheduled within days. There frequently was no testimony provided by Palestinian witnesses either for or against Palestinians on trial. Israeli authorities stated that this was due to the refusal of Palestinians to cooperate with the authorities. Palestinian authorities stated that the absence of Palestinian witnesses was due to strict travel restrictions. Tension resulting from the security situation, and the closures imposed on the West Bank and Gaza, posed additional barriers to cooperation. Confessions usually were given in Arabic but translated into Hebrew for the record because, authorities maintained, many Israeli court personnel could speak Arabic but few could read it. As a result, many Palestinian prisoners signed confessions written in Hebrew, which many could not read or understand.

Crowded facilities and poor arrangements for attorney-client consultations in prisons hindered legal defense efforts. Appointments to see clients were difficult to arrange, and prison authorities often failed to produce clients for scheduled appointments with their attorneys.

Israeli settlers in the West Bank and Gaza Strip accused of security and ordinary criminal offenses were tried under Israeli law in the nearest Israeli district court. Civilian judges presided, and the standards of due process and admissibility of evidence were governed by the laws of Israel, not military orders. Settlers rarely were prosecuted in Israeli courts of crimes against Palestinians, and, in the rare instances in which they were convicted, regularly received lighter punishment than Palestinians convicted in Israeli courts (see Section 1.a.). The Government of Israel maintains a special department within the police force to investigate violence by settlers; however, the establishment of such a unit has not noticeably diminished settler violence. During the year, 9 settlers were indicted for violence in the occupied territories and three were convicted for related crimes

The Israeli Government maintained that it held no political prisoners, but Palestinians claimed that many of the 553 Palestinian administrative detainees being held without charge were political prisoners.

The Government of Israel held thousands of persons for security related offenses (see Section 1.d.).

The PA courts were inefficient, lacked staff and resources, and often did not ensure fair and expeditious trials. The PA executive and security services frequently failed to carry out court decisions and otherwise inhibited judicial independence. There has been significant reduction in major previous problems including torture, extrajudicial killings, and arbitrary detention (see Sections 1.a., 1.c., and 1.d.).

The PA court system is based on legal codes that predate the 1967 Israeli occupation and Israeli military orders. The Gaza legal code is based on Ottoman, Egyptian, British Mandate, and PA directives and laws. The West Bank legal code is derived from pre-1967 Jordanian law (informed substantially by Ottoman and British Mandate law), and PA directives and laws. Israeli military decrees issued during the occupation remained valid in both the West Bank and Gaza.

A High Judicial Council (HJC) maintained authority over most court operations. In each governorate there must be at least one conciliation court and a court of first instance that hears appeals from the conciliation court, and which has original jurisdiction for more serious cases. Legislation dictates that three courts of appeals sit in Gaza, Ramallah, and Jerusalem to review decisions of the first instance courts. In practice, there was no Jerusalem appeals court, and the Ramallah court handled its responsibilities. A High Court does exist, officially designated as sitting in Jerusalem, but it meets in Ramallah and Gaza City. The High Court also serves as the Constitutional Court until additional legislation establishes a separate one. The High Court also serves as the Court of Cassation and as an administrative court until administrative courts are established by legislation. Most of the changes required by the legislation started to take effect during the year, and very limited resources and restriction of movement have hampered the transition.

The delivery of justice often was slow and uneven. The ability of the courts to obtain enforcement of their decisions was extremely weak. In addition, closures, curfews, and the inability of lawyers, members of the judiciary, and public to travel seriously impeded administrative functions and implementation of reform. The court system in general was struggling to recover from years of neglect and conflict; most of the problems predated PA jurisdiction and were aggravated by lack of resources and attention since the PA assumed control of the courts. Judges and staff lacked sufficient resources and suffered from a lack of skills and training. Court procedures and record keeping were in some instances obsolete, although donor-funded activities started to improve some of the systems. A heavy caseload even before the Intifada exacerbated these systemic problems. During the past 3 years, the revolving court caseload reportedly increased by over 50 percent (see Section 2.d.).

The Intifada and related Israeli military actions have adversely affected the administration of justice in the West Bank and Gaza. For example, fighting and aerial attacks in Operation Defensive Shield in 2002 caused damage to the Court of First Instance and Conciliation in Ramallah and the PA's main forensic lab. Many, if not most, of the PA's police stations in West Bank and Gaza were similarly damaged or destroyed.

Apart from damage to the physical infrastructure of the legal system, travel restrictions, curfews, and closures significantly impeded the administration of justice. For example, judges and prosecutors were frequently unable to reach their courthouses and offices during periods of closure. If allowed access, they often had to travel for long periods of time to reach their workplaces, substantially reducing the amount of time devoted to their legal duties. Citizens who attempted to use the courts to address complaints were at times denied physical access to the courts due to closures, or were affected by communications problems that resulted from the curtailment of travel and passage from community to community. Notices of trial schedules, court dates, etc., reached intended recipients late, if at all.

The High Judicial Council slowly gained authority over judicial matters that formerly were administered by the Ministry of Justice. Institutional and interpersonal

tension continued to exist between the two bodies. Both the Ministry of Justice and High Judicial Council claimed to be working towards the same aim: the independence of the judiciary. During the year, both institutions opted for a pragmatic approach to that goal. For example, the Deputy Minister of Justice and the Attorney General worked together as members of the HJC. Ministry of Justice and HJC officials jointly undertook the development of by-laws for the establishment of the Judicial Training Institute.

During the year, the PA abolished State Security Courts, which were responsible for numerous human rights abuses over the past several years. Cases previously assigned to the courts before their abolition were still adjudicated, however, and it remained unclear at year's end whether the institution would continue to exist in some form. On July 27, PA Minister of Justice Abdel-Karim abu Salah issued a ministerial decree that put an end to the powers and the jurisdiction of the State Security Courts and the State Security prosecution. Two sessions of a State Security Court regarding commercial fraud subsequently took place in Gaza in September. The PA Attorney General claimed that these sessions were conducted in error and assured that measures have been taken to prevent future mistakes. He said that the PA prosecutor trying the cases had misinterpreted the governing statute. The PA High Judicial Council during the year cast further doubt on the depth of this reform measure by raising the possibility of "special courts" that could be established to handle State Security cases. In July, the PA began formal work to establish a Court Police Unit.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

Israeli military authorities on many occasions entered private Palestinian homes and institutions without a warrant, citing security concerns. An officer of the rank of lieutenant colonel or above could authorize such action. In conducting searches, both in areas under Israeli control and during incursions into areas ostensibly under PA control, IDF personnel forcibly entered and in some cases, beat occupants and destroyed property.

Israeli forces arbitrarily destroyed or looted Palestinian property and solicited bribes during military operations. A B'tselem investigation revealed that IDF soldiers stationed at the Qalandiya checkpoint outside Jerusalem in October and November solicited bribes from Palestinian truck drivers to facilitate the passage of their vehicles. Authorities stated that beatings and arbitrary destruction of property during searches were punishable violations of military regulations and that compensation was due to victims in such cases. However, the Israeli Government stated that it did not keep consolidated information regarding the claims against the Ministry of Defense for damages resulting from IDF actions.

Israeli security forces demolished and sealed the homes (owned or rented) of Palestinians suspected of terrorism or the relatives of such suspects, without any judicial review (see Section 1.g.). During the year, according to Israeli human rights organization B'tselem, Israeli forces demolished 219 homes (compared to 250 in 2002) and sealed three others as punishment for terror activity and deterrence against future attacks. Israel also demolished many homes in the Gaza Strip between the Rafah refugee camp and the border with Egypt claiming that the houses concealed tunnels used for weapons and other smuggling from Egypt or provided cover for attacks against Israeli soldiers.

The IDF destroyed numerous citrus orchards, olive and date groves, and irrigation systems on Palestinian-owned agricultural land in both the West Bank and Gaza. The IDF destroyed these groves or orchards for security reasons, stating that Palestinians had been shooting from those areas. The IDF also cleared and took control of West Bank land, including land held by private Palestinians, in order to facilitate construction of the separation barrier. B'tselem estimated that at least 10,000 dunams of land has been taken over for construction of the separation barrier. Israel asserts that it has sought to build the barrier on public lands where possible, and where private land was used, provided opportunities for compensation to the owners.

The PA required the Attorney General to issue warrants for entry and searches of private property; however, Palestinian security services frequently ignored these requirements. Police searched homes without the consent of their owners. In some cases, police forcibly entered premises.

g. Use of Excessive Force and Violations of Humanitarian Law in Internal Conflicts

Israeli security forces often used excessive force against Palestinians and others. The IDF killed or injured Palestinians or others in non life-threatening situations. IDF fire killed or injured innocent bystanders, including journalists and Palestinian civilians, when they fired into crowds at demonstrations (see Sections 1.a. and 2.a.). Palestinian medical groups have estimated that approximately 10 percent of the injuries will result in permanent disabilities, and another 10 percent will require medical rehabilitation (see Section 5).

Israel obstructed the movement of and occasionally fired upon and assaulted medical personnel and ambulances. In the past, Israel alleged that terrorists have used ambulances to transport weapons or to commit terrorist acts. During the year, the PRCS reported that ambulances came under fire 57 times and emergency teams came under fire 79 times. The PRCS also reported that IDF soldiers and Israeli settlers injured 7 PRCS medical staff members and damaged 12 ambulances in these incidents. PRCS reported that its ambulances were delayed or denied access to areas on 584 separate occasions.

On March 11, a PRCS ambulance entered an ongoing firefight in Tel al-Sultan in Gaza to retrieve a Palestinian injured in tank shelling and gunfire. When the crew located an injured Palestinian and moved to take him into the ambulance an IDF tank opened fire in the ambulance's direction. The ambulance driver was hit in the left hand by shrapnel from a tank shell before managing to flee the scene.

On February 2, Israeli soldiers raided the medical center of the Union of Palestinian Medical Relief Committees (UPMRC) in the Old City of Nablus. The soldiers destroyed three hospital beds, furniture, a defibrillator, and various containers of medicine.

On May 20, an IDF soldier at the Surda checkpoint in Ramallah assaulted ambulance driver Talal 'abd al-Malek Muhammad 'Ida, 45. A soldier in a jeep summoned 'Ida as he attempted to coordinate his passage through the checkpoint and punched him in the face. 'Ida was treated with stitches at a Ramallah hospital.

On June 14, the UPMRC reported that IDF soldiers outside the village of Deir Ghassaneh halted an ambulance at gunpoint and then boarded it. The ambulance was driving to the town to pick up injured Palestinians. The soldiers hid in the rear of the ambulance and told the ambulance team to drive to the town with them inside. The soldiers told the UPMRC staff not to reveal the soldiers' presence in the ambulance. The soldiers used the cover of the ambulance to arrest people seized the identification cards of the ambulance crew members when they refused to continue driving and did not return until 3 days later.

During the Intifada, the IDF also used excessive force in responding to a number of incidents at checkpoints (see Section 1.a.).

Israeli soldiers placed Palestinian civilians in danger by ordering them to facilitate military operations, which exposed them to live fire between armed Palestinians and Israeli soldiers. Since the beginning of the Intifada, IDF soldiers have ordered Palestinian civilians to enter buildings to check whether they were booby-trapped; to expel their occupants; to remove suspicious objects from the road; and to walk in front of soldiers to protect them from gunfire. For example, on May 14 Israeli Border Police officers forced a Palestinian driving a car in Jenin to park the vehicle in front of a private home and then proceeded to use the car, which held three passengers, as a shield during a gun battle with armed Palestinians. One Border Police officer forced Muhammad Aradeh, 19, out of the car and made him to kneel while firing over his head. On March 6, IDF soldiers conducting an incursion into Awarta village near Nablus ordered 'Ula 'Awad to lead them through an apartment building and a neighboring house and knock on doors as they conducted searches. The officers threatened to shoot 'Awad as he conducted the search.

In 2002, the Israeli High Court of Justice granted an injunction against the use of Palestinians as "shields" for Israeli forces. Israel admitted the use of such practices, in violation of existing procedures, and reiterated that IDF forces "are absolutely forbidden to use civilians of any kind as a means of living 'shield' against gunfire or attack by the Palestinian side, or as 'hostages.'" However, this ruling did not prevent IDF soldiers from carrying out the same practices under another name. IDF soldiers are openly permitted to employ the "neighbor procedure," which allows them to seek the assistance of Palestinian civilians in operations so long as that assistance is consensual. Human rights groups asserted that Palestinians who agreed to assist such operations often did so out of fear of the soldiers even if they were not directly coerced. Palestinians who took part in such operations without being harmed still faced the risk of being branded as collaborators and risked being attacked by other Palestinians.

Israel also placed civilians in danger by occupying Palestinian homes, quartering soldiers there, and conducting military operations from them. For example, in December, IDF soldiers conducted raids in the Old City of Nablus and detained residents of buildings in a single apartment while using the upper floors for military activities.

The IDF fired tank rounds, as well as rockets from helicopters and military aircraft, on targets in cities and towns in the West Bank and Gaza during operations undertaken in response to attacks on Israeli soldiers, settlers, and other civilians (see Section 1.a.).

Israeli forces demolished the homes of the families and relatives of those convicted of or suspected of committing terror attacks, effectively punishing innocent Palestinians not implicated in the attacks. Israel's demolitions left hundreds of Palestinians not directly implicated in the attacks homeless. During the year, Israeli forces demolished 219 homes and sealed three others for punitive reasons, compared to 250 in 2002, and 10 in 2001. The numbers of such demolitions increased as Israel re-occupied areas previously under exclusive PA control and gained access to such homes. For example, on March 3, Israeli forces in the Bureij refugee camp in the Gaza Strip carried out the punitive destruction of the home of arrested Hamas leader Muhammad Saleh Hassan Abu Taha. The destruction of the home left seven residents of the building homeless and severely damaged an adjacent home, causing a wall to collapse that killed a 40-year-old pregnant woman next door.

Israel demolished entire apartment buildings that had been used as past shooting points by Palestinian gunmen, effectively punishing innocent civilians unconnected with the attacks. For example, on September 5, Israel demolished a seven-story residential building in Nablus after exchanging fire with and killing Muhammad al-Hanbali, 26, a Hamas militant who was hiding inside the building. IDF soldiers removed Hanbali's body from the building and then planted explosives on the first floor of the building and leveled the structure. The demolition left 15 Palestinian families homeless with all of their belongings destroyed.

Israel's extensive curfews on Palestinian towns punished entire innocent populations. The curfews affected every aspect of life for Palestinians, damaging livelihood and causing food shortages. The Israeli Government's sustained imposition of internal and external closures and curfews in the West Bank and Gaza during the year severely impacted Palestinian society and economy, contributing to shortages of basic food, water, and the provision of medical care and supplies.

The external and internal closures contributed to increased unemployment and poverty in the occupied territories. Approximately 146,000 West Bank and Gaza workers, representing roughly 25 percent of the Palestinian work force, depended on day jobs in Israel, Israeli settlements, and Jerusalem and were prevented from leaving the occupied territories. The closures on Palestinian cities and towns also impeded Palestinians from reaching jobs or markets in the occupied territories and disrupted internal and external trade. Closures, and the destruction of large swathes of Palestinian-owned agricultural land and economic infrastructure by the IDF and settlers, contributed to an unemployment rate that was estimated at 30 percent at the end of the year. Closures particularly isolated and hurt the roughly 200,000 Palestinians who lived in rural villages. Rural villages rarely were self-sustaining communities and did not have the full range of services--such as medical care, education, or municipal provision of water--that larger urban areas had, increasing their isolation when community members were not able to travel outside the area to obtain access to services and provisions. Other rural villages under full Israeli control were further isolated from major Palestinian population centers.

Israeli security forces' implementation of control measures at checkpoints often impeded the provision of medical assistance to sick and injured Palestinians. Since the beginning of Intifada, The Government's implementation of control measures resulted in delayed access to medical treatment for at least 39 Palestinian who subsequently died (see Section 1.g.).

The ICRC stated that the prolonged closure of Palestinian cities significantly obstructed the delivery of medical care. The closures made it extremely difficult for patients living outside large cities who need repeated medical treatment, such as dialysis or physical therapy, to reach medical centers on a regular basis. The PRCS has estimated that more than one-third of Palestinians who have been injured in the Intifada required some type of physical rehabilitation and at least 10 percent have permanent disabilities. Medical professionals reported that many Palestinians delayed all but emergency medical care because of the restrictions and economic conditions. Preventive treatment, such as vaccinations, antenatal and postnatal care, and family planning often was postponed; and the number of births at home, in ambulances, and at checkpoints remained high. Medical observers reported that as the Intifada continued, the impact on public health would be negative.

On June 14, Israeli soldiers detained for 1 hour the ambulance of Muhammad Hassan Abu Qibeta, a 65-year-old diabetic Palestinian from Yattaon his way to a hospital in Hebron. Qibeta had reportedly suffered a heart attack before reaching the checkpoint, and died there after waiting at the checkpoint for an hour. Closures and curfews also have affected the provision of emergency medical care, including by impeding the ability of medical staff to reach work. Israeli security services stopped and searched all ambulances at each checkpoint, which frequently added life-threatening delays in reaching hospitals, due to the fact that

some had to use substandard local roads when denied access through any of the checkpoints. Israeli security forces often impeded the provision of medical assistance to Palestinian civilians by strict enforcement of internal closures. The PCRS reported that its average response time to emergency calls in "outer city" areas was 40 to 50 minutes, compared to a past average of 10-15 minutes.

Israeli soldiers frequently harassed and abused Palestinian emergency services staff at the checkpoints (see Section 1.c.).

Palestinian militants placed Palestinian civilians in danger by firing on Israeli forces from civilian areas.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Israeli Government generally respected freedom of speech in the occupied territories; however, IDF soldiers routinely harassed and occasionally detained Palestinian and other journalists covering stories in the West Bank and Gaza. Israel frequently denied journalists travel permits and revoked or delayed issuing press credentials, all of which amounted to de facto censorship. Israel censored and prohibited public expressions of anti-Israeli sentiment and of support for Islamic extremist groups. The IDF allegedly killed two journalists covering clashes between Palestinians and Israeli security forces, both of whom were identified as noncombatants, and injured at least four others. During the year, Israel raided the premises of several television and radio stations.

During the year, the Israeli Government continued to enforce selectively its standing prohibition on the display in East Jerusalem of Palestinian political symbols, such as flags, national colors, and graffiti. Such displays were punishable by fines or imprisonment. Israeli enforcement of existing censorship regulations remained stringent regarding press coverage of the Intifada. Israeli authorities monitored Arabic newspapers based in East Jerusalem for security-related issues, and newspapers sometimes were ordered to halt publication of stories about the security situation until the information first appeared in the Israeli media. Military censors reviewed Arabic publications for material related to the public order and security of Israel. Reports by foreign journalists were subject to review by Israeli military censors for security issues, and the satellite feed used by many foreign journalists was monitored. In periods of heightened security, the Israeli Government often closed areas to journalists when it imposed a curfew or closure. Israeli authorities denied entry permits to West Bank Palestinian journalists traveling to their place of employment in Jerusalem during closures of the territories, and the journalists had difficulty renewing their Israeli issued press credentials (see Section 2.d.).

The IDF required a permit for Palestinian publications sold in areas of the occupied territories under its control. Publications may be censored or banned for content considered anti-Semitic or anti-Israeli. Possession of banned materials was punishable by a fine and imprisonment. The Israeli Government prohibited the delivery and distribution of publications, including newspapers, in the Gaza Strip on the Jewish holiday of Yom Kippur (when import of any item is prohibited) and on numerous other occasions when the closure of the Gaza Strip was particularly tight. On several occasions during the year, usually following terrorist incidents, the Israelis banned Palestinian daily newspapers from entering Gaza. However, during such periods, Israeli newspapers were allowed into Gaza. During internal closures, the Israeli Government also occasionally blocked the delivery of Palestinian daily newspapers to Palestinian cities in the West Bank.

Israel also harassed Palestinian media organizations. On January 31, Israeli forces conducted an incursion on the city of Hebron and shut down all local radio and television stations in the course of imposing curfew. During the incursion, IDF soldiers raided the offices of the al-Nawras and al-Majd television stations and the Marah radio station.

During the year, Israeli soldiers killed two journalists. On May 3, the IDF killed James Miller, 34, a cameraman for a British television network. Miller was filming a documentary in the Shaja'iya neighborhood of Gaza City and was wearing a vest marking him as a journalist. IDF sources claimed that they were returning Palestinian fire; however, Palestinians at the scene claimed that there was no such fire. Human rights groups rejected Israel's account of the incident after independent investigations of the circumstances of the shooting.

On April 19, an IDF soldier shot and killed Nazeeh Darwaza, 45, a cameraman for the Associated Press Television Network and Palestinian Television. Dawazah was filming a wounded child during an IDF incursion in Nablus and was wearing a jacket labeling him as press. On July 30, Reporters Sans Frontieres released a statement criticizing Israel for an incomplete and botched investigation into Darwaza's death. The IDF did not charge any soldiers in this case.

On March 6, Israeli tank fire in the Jabalya refugee camp in the Gaza Strip injured two Reuters journalists, Ahmad Jadallah and Shams Odeh. Jadallah suffered severe shrapnel injuries and Odeh suffered a fractured foot. On January 28, Israeli gunfire during an incursion into Jenin injured Reuters reporter Seif ad-Din Ad-Daheleh, 20.

Israeli soldiers confiscated journalists' press cards, detained, and beat them on several occasions. For example, on May 19, IDF soldiers in Beit Sahour detained licensed photographers Sha'aban Qandil and Joseph Hadal and beat them. Qandil and Hadal were driving in a car marked "press" and labeled with "TV" stickers. Both men suffered broken bones from the beating.

The PA restricted freedom of speech and freedom of the press. During the year, the PA limited free expression, particularly regarding human rights and alleged security issues. Press freedom is subject to a 1995 press law that does not protect the press adequately. PA security services closed media outlets, banned publications or broadcasts, and periodically harassed or detained members of the media (see Section 1.d.). Palestinian commentators and human rights groups stated that, as a result, journalists practiced self-censorship.

On January 6, PA General Intelligence Organization (Mukhabarat) officers arrested the Gaza-based correspondent for al-Jazeera Seif ad-Din Shahin, 34. The arrest came after Shahin conducted an interview with an anonymous alleged member of the Fatah-affiliated al-Aqsa Martyrs Brigades who criticized the Fatah movement. The PA detained him for 18 hours in an effort to make him reveal his source and reconsider broadcasting critical commentary.

On March 17, PA police in Gaza City shut down the Palestinian weekly newspaper ar-Risalah, a weekly publication affiliated with the Islamic National Salvation Party (Khalas). The PA first shut down the paper in March 2001. The PA Supreme Court ordered it reopened in April 2002, but PA police did not comply with the court order. The staff of the paper began issuing it again in October 2002 and continued until the closure in March.

On September 13, masked, armed Palestinians broke into the offices of the al-Arabiya satellite channel in Ramallah. They destroyed equipment and briefly

1/19/2015                                    Israel and the occupied territories

detained three staff members. The PA created a board of inquiry to investigate the attack and later arrested and charged a PA security officer with leading the effort and relieved him of duty.

On September 14, armed Palestinians in Gaza City identifying themselves as members of the PA customs service intercepted a vehicle distributing copies of the Palestinian daily newspaper al-Ayyam. The attackers confiscated approximately 1,400 copies of the newspaper. The PA customs department later denied any connection to the incident, and the attackers have not been identified.

There were three Palestinian dailies and several Palestinian weekly newspapers. There also were several monthly magazines and three tabloids.

The Israeli Government required one Palestinian-owned newspaper, Al-Quds, to submit its entire contents, including advertising, to the military censor by 4 p.m. each day. The editor claimed that this process caused his journalists to practice self-censorship.

In addition to the official Palestinian Broadcast Corporation television and radio, also known as Voice of Palestine, there were approximately 20 independently owned televisions stations and 9 radio stations in the West Bank.

The Internet was available widely.

Israeli severely restricted academic freedom by disrupting the operations of West Bank and Gaza schools, colleges, and universities during the year. Israel disrupted Palestinian education through closures, curfews, and military actions that shut universities down entirely. Students and staff at all educational levels had difficulty traveling to and from educational facilities because most areas were under some form of internal closure for the entire year. In addition, Israeli forces imposed curfews on many Palestinian areas, some for 24 hours a day, for extended periods (see Sections 2.d. and 5). Students from Gaza were unable to reach West Bank universities since early October 2000, when Israel closed the safe passage route between Gaza and the West Bank. Israeli shelling and gunfire during military operations damaged a number of schools in the West Bank and Gaza.

In January, Israel shut down the two principal higher education facilities in Hebron by military order. The military order, which was valid for 6 months and was extended in June, closed down Hebron University and the Hebron Polytechnic School. The closure blocked the education of over 5,000 Palestinian students.

The PA Ministry of Education reported that since 2001 the IDF had confiscated 3 schools in Hebron and subsequently quartered soldiers there after converting them to military barracks. Those three schools were the Jawhar Girls Elementary School, the Osama Girls Elementary School, and the Ma'arif Boys Elementary School. The Ministry of Education also reported that IDF forces raided schools 26 times during the year. Since the start of the Intifada, the IDF reportedly raided or fired on schools 295 times, shut down 9 schools completely, and forced the suspension of classes at 1,125 schools and nearly all higher education institutions.

The PA generally had authority over all levels of education in the West Bank and Gaza Strip, and it controlled the budgets of all public colleges. During the year, the PA did not interfere with education in the West Bank and Gaza Strip.

b. Freedom of Peaceful Assembly and Association

The Israeli Government placed severe limits on freedom of assembly for Palestinians in the occupied territories, largely through the imposition of internal closures and curfews (see Section 2.d.). Israeli military orders banned public gatherings of 10 or more persons without a permit. Extensive curfews during the year made assembly of any kind impossible in most major Palestinian cities. Those Palestinians who chose to take part in even peaceful demonstrations often did so only by breaking curfew restrictions and IDF prohibitions against demonstrations.

Israeli security forces killed many Palestinians and injured several thousand during demonstrations and other often violent clashes (see Sections 1.a. and 1.c.). The Israeli and Palestinian authorities regularly disputed whether Palestinians fired at security forces during such demonstrations. Israeli security forces resorted to live fire, even in instances when Palestinians did not direct gunfire at them at them first. In 2001, the IDF changed its definition of "life-threatening" situations to include rock-throwing in some cases.

The PA imposed some formal limits on freedom of assembly; however, while it required permits for rallies, demonstrations, and large cultural events, these permits rarely were denied. In Gaza police approval was required for political meetings at several specific large meeting halls. Written permission also was required for buses to transport passengers to attend political meetings. In West Bank cities, the PA required permits for outdoor rallies and demonstrations and prohibited calls for violence, displays of arms, and racist slogans, although this rarely was enforced.

The Israeli Government continued to place severe restrictions on freedom of association in East Jerusalem. In 2001, Israeli forces closed the Orient House, the preeminent Palestinian political institution in Jerusalem, and other East Jerusalem institutions located in Orient House, including: The Chamber of Commerce, the Land Research Center, the Higher Council for Tourism, a women's center, a prisoner's rights society, and a historical preservation group. Orient House remained closed at year's end; however, during the year, several institutions opened up alternative offices outside Jerusalem in the neighborhoods of al-Ram and Dahiat al-Barid.

During the year, Israeli police closed the Arab Graduates Club, a social club frequented by Fatah activists and run by PA Deputy Waqf Minister and Jerusalem Fatah Secretary General Salah Zuheikeh. In 2002, the Israeli police closed the Multi-Sectoral Review Project, the Land Research Center, the East Jerusalem offices of the Federation of Palestinian Chambers of Commerce, and the Jerusalem Cultural Association and the Union of Sports Clubs. At year's end, all of these organizations remained closed.

The PA placed some limits on freedom of association; however, the PA permitted Palestinian charitable, community, professional, and self-help organizations to operate.

c. Freedom of Religion

Israeli law provides for freedom of worship, and the Government generally respected this right in practice in the occupied territories. Israel did not ban any group on religious grounds, and permitted all faiths to operate schools and institutions.

Israel's imposed internal and external closure of the West Bank and Gaza, significantly impeded freedom of worship for Muslims and Christians. Israeli closure policies prevented tens of thousands of Palestinians from reaching their places of worship in Jerusalem and the West Bank, including during religious holidays such as Ramadan, Christmas, and Easter. On numerous occasions, the Israeli Government prevented worshippers under the age of 45 from attending Friday prayers inside the Haram al-Sharif/Temple Mount, the third holiest site in Islam and the holiest site in Judaism. The Israeli Government stated that such actions were necessary for security reasons. However, in June, armed Israeli police officers began escorting groups of Christian and Jewish tourists into the Haram al-Sharif/Temple Mount against the wishes of the Waqf authorities. Israeli police spokesmen indicated that the visits were an effort by the Government of Israel to re-assert the right of non-Muslims to visit the shrine.

During the year, the Government of Israel's continued closure policy prevented a number of Palestinian religious leaders (both Muslim and Christian) from reaching their congregations.

The PA has no law that specifically protects religious freedom; however, the PA generally respected religious freedom in practice.

Islam is the official religion of the PA, and its Islamic institutions and places of worship received preferential treatment. The PA required individuals to be at least nominally affiliated with some religion. Religion must be declared on identification papers, and all personal status legal matters must be handled in either Shari'a or Christian ecclesiastical courts. The PA had a Ministry of Waqf and Religious Affairs that paid for the construction and maintenance of mosques and the salaries of many Palestinian imams. The Ministry also provided some Christian clergymen and Christian charitable organizations with limited financial support. The PA did not provide financial support to any Jewish institutions or holy sites in the occupied territories.

The PA required that religion be taught in PA schools. The PA ran separate religious instruction classes for Muslim and Christian students.

For a more detailed discussion, see the 2003 International Religious Freedom Report.

d. Freedom of Movement Within the Occupied Territories, Foreign Travel, Emigration, and Repatriation

The Israeli Government severely restricted freedom of movement for Palestinians. During the year, Israel prohibited most Palestinians from the West Bank and Gaza from entering Israel, and the IDF continued to enforce a massive network of checkpoints and roadblocks across the occupied territories, which impeded the movement of people and goods between Palestinian cities, villages, and towns. Numerous cities were placed under strict curfews that ran for weeks and even months. Israel lifted some checkpoints and eased some movement following the release of the roadmap in May, but in most cases the restrictions were later reinstituted. During the year, the restrictions on movement were the most severe that Israel had imposed since it occupied East Jerusalem, the West Bank, and Gaza in 1967.

Israel constructed parts of a large security barrier in the West Bank. The result was division of approximately 5,000 Palestinian residents from the rest of the West Bank and severe disruption of their access to hospitals, schools, social services, and agricultural property. At the end of the year, the total land area secluded by the separation barrier from the remainder of the West Bank was approximately 96,000 dunams.

Since 1993, Israel has required that all West Bank and Gaza residents obtain permits to enter Israel and Jerusalem. However, Israel often denied applicants permits with no explanation and did not allow effective means of appeal. Palestinian officials and members of the clergy with VIP passes, including PA cabinet officials, members of the Palestinian Council were regularly subjected to long delays and searches at Israeli checkpoints in the West Bank, despite the fact that they were traveling on special passes issued by the Israeli Government. These practices continued at an increased level from previous years, severely restricting PA officials from conducting administrative functions and implementing reform.

On October 2, Israel issued military orders that required Palestinians residing between the separation barrier and the Green Line to obtain residency permits in order to remain in these areas. At year's end, the permit requirement applied to approximately 5,000 Palestinians who were located in such areas, dubbed "seam zones."

Even in periods before the Intifada, Palestinians in the West Bank and Gaza Strip found it difficult to obtain permits to work, visit, study, or obtain medical care in Israel. Israeli authorities permitted only a small number of Gazans to bring vehicles into Israel and sometimes did not permit West Bank vehicles to enter Jerusalem or Israel. Except for senior PA officials, Palestinians of all ages crossing between the Gaza Strip and Israel were not permitted to travel by automobile across the main checkpoint. Instead they were forced to travel along a narrow walkway almost a mile long. Israelis moving into and out of the Gaza Strip were permitted to use their automobiles. Israeli regulations prohibited Palestinian residents of Jerusalem from entering the West Bank, although this ban only intermittently was enforced. Israeli authorities also required that these Palestinian residents provide written notice to the Israeli Government if they intended to travel to the Gaza Strip; however, provision of such notice did not ensure that the Government would permit the travel.

Since 1993 Israel applied varying levels of "closure," or enhanced restrictions, on the movement of Palestinians and their goods, often for lengthy periods, in response to Palestinian terrorist attacks and other changing security conditions. The Government of Israel imposed a tightened version of closure, called "comprehensive, external closure" during periods of violent protest in the West Bank or Gaza, or when it believed that there was an increased likelihood of such unrest. Comprehensive closures also were instituted regularly during major Israeli holidays and during some Muslim holidays. During such closures, the Israeli Government cancelled travel permits and prevented Palestinians--even those with valid work permits--from leaving the occupied territories. During comprehensive closures, the authorities severely restricted the movement of goods between Israel and the occupied territories and between the West Bank and Gaza. Due to the ongoing unrest, Israel imposed strict and consistent external closure throughout the year for the second straight year, compared with 210 days in 2001 and 88 days in 2000.

During periods of unrest in the West Bank and Gaza, in the aftermath of terrorist attacks, or during military exercises, the Israeli Government prohibited travel between towns and villages within the West Bank. These "internal" closures resulted in the cutoff of goods, including food and fuel, and restricted the movement of persons. During the year, Israel expanded internal closures further, sometimes in response to specific acts of violence and sometimes as a preventive measure imposed on entire cities and towns. The internal closures were even more severe when Palestinians were prohibited from using primary roads and physical barricades close off many secondary roads.

The Israeli Government further constrained the movement of Palestinians and goods in the West Bank and Gaza by imposing total closures on specific areas or villages, sometimes for weeks at a time, and by intermittently closing the Allenby and Rafah crossing points to Jordan and Egypt. Israel also consistently imposed curfews in some areas, often for extended periods. During the curfews, Palestinians generally were confined to their homes for all but a few hours per week during which they were allowed to buy food and other provisions.

The prolonged closures and curfews imposed by the Government of Israel on Palestinian cities and towns during the year had a severely negative impact on every sector of the Palestinian economy. They impeded Palestinians from reaching jobs or markets and disrupted internal and external trade (see Section 1.g.).

The prolonged closure also seriously impacted students' ability to attend school and university (see Sections 2.a. and 5,). The Government of Israel stated that they were necessary security measures (see Section 1.g.).

The Israeli Government required all Palestinian residents to obtain permits for foreign travel and restricted the travel of some political activists. Bridge-crossing permits to Jordan may be obtained at post offices without a screening process.

Israel offered East Jerusalem residents Israeli citizenship following Israel's occupation of Jerusalem in 1967. Most have chosen not to accept Israeli citizenship, choosing instead to seek a residence permit or Jerusalem identification card. which Israel occupied during the 1967 War, Israel applied the 1952 Law of Permanent Residency and its 1974 amendments to Jerusalem identification card holders. The law states that a Jerusalem resident loses the right of residence if he or she leaves Israeli territory for more than 7 years, acquires the nationality of another country, or acquires permanent residence in another country. Such persons are permitted to return only as tourists and sometimes are denied entry. The Government of Israel does not apply these same restrictions to Israeli citizens.

In 2000, the Israeli Ministry of Interior published new instructions regarding residency rights in Jerusalem. According to these instructions, permanent residents whose identity cards had been revoked after 1995 but who returned to live in Jerusalem from 1998 on were entitled to restoration of their identity cards, provided that they could demonstrate that Jerusalem was the "center of their lives." In addition to the provision on restoration of identity cards, the new guidelines allowed for the revocation of residency in cases in which East Jerusalem Palestinians obtained new citizenship or residency rights while living abroad. Human rights groups reported that such revocations have taken place infrequently.

In December, three Palestinians deported from abroad to the West Bank and Gaza were denied entry at Allenby border crossing. The three were returned to the deporting country, where they currently reside as stateless persons.

Israeli restrictions also affected family reunification. Most Palestinians who were abroad before or during the 1967 War, or who lost their residence permits for other reasons since then, were not permitted to reside permanently with their families in Jerusalem or the occupied territories. Foreign-born spouses and children of Palestinian residents also experienced difficulty in obtaining permission to reside with their family members; children of Israeli residents did not suffer such hardships. For example, a Palestinian with a West Bank identification card must apply to the Government of Israel for permission to live with his or her Jerusalem-resident spouse in Jerusalem. In May 2000, the Israeli Knesset declared a freeze on providing residency permits. At year's end, the freeze remained in effect. Palestinians reported delays of several years or more before spouses were granted residency permits. The Government of Israel occasionally issued limited-duration permits, which must be renewed. Renewing the permits may take up to 8 months, a common delay that resulted in many Palestinians falling out of status. Palestinians also reported extensive delays in registering newborn children with Israeli authorities.

The PA issued passports and identification cards for Palestinians who resided in the West Bank and Gaza, and the Israeli Government required residents of the West Bank and Gaza to use their Palestinian passports to exit and enter Israel. Bearers of Palestinian passports did not need special exit permits from the PA; however, when leaving the area via Ben Gurion Airport, the Israeli Government required Palestinians to obtain permits to transit Israel to reach the airport and the Government of Israel rarely granted such permits. Since 2001, Israeli authorities rarely granted these requests except in humanitarian or special interest cases. Without this permit, travelers must depart via land crossings and may experience delays lasting days or weeks. Palestinian residents of the West Bank and Gaza were prohibited from using the Sheikh Hussein or Arava crossings. As a result, most Palestinians could exit and enter the West Bank and Gaza only via the Allenby Bridge or Rafah crossing points, respectively, which were closed completely several times during the year. Internal closures made it difficult for Palestinians to reach even these crossing points and begin the wait at the border.

Palestinians who held Jerusalem identification cards, issued by the Israeli Government, must obtain special travel documents from the Israeli Government to travel abroad. Upon request the Jordanian Government also issued travel documents to Palestinians in the West Bank and East Jerusalem. Palestinians who wish to travel to Jordan must leave their Israeli identification documents with Israeli authorities at the Allenby Bridge. The Israeli authorities also required that Palestinians from East Jerusalem obtain a special permit to cross the Allenby Bridge, which they must purchase from the Ministry of Interior. Restrictions on residency, reentry, and family reunification only applied to Palestinian residents of the occupied territories.

The PA generally did not restrict freedom of movement.

Section 3 Respect for Political Rights: The Right of Citizens To Change Their Government

In 1996, Palestinian residents of the West Bank, Gaza Strip, and East Jerusalem chose their first popularly elected government in elections that generally were free and fair; the 88-member Palestinian Legislative Council and Chairman of the Executive Authority were elected. PLO Chairman Yasir Arafat won almost 89 percent of the vote in a two-person race for Chairman. Approximately 700 candidates competed for Council seats. Voters elected Council members to multimember electoral districts. As many as 35 of the elected members were independent candidates. International observers concluded that the election could reasonably be regarded as generally free and fair, despite some irregularities. During the year, the Council debated numerous draft laws and resolutions. Some members of the Council stated that it lacked power in relation to the executive branch.

The last municipal elections in the West Bank and Gaza took place in 1996. PA officials announced plans to hold new elections in June 2004. Incumbent municipal officials serve until the following elections. In the case of the death or resignation of an incumbent, the Ministry of Local Government appoints a replacement, with the approval of the PA Chairman.

1/19/2015                                                    Israel and the occupied territories

Most Palestinians in East Jerusalem do not recognize the jurisdiction of the Israeli municipality of Jerusalem. While all Palestinians with residency permits are eligible to vote in municipal elections, only a very small percentage of Jerusalem's Palestinian population actually voted. There were no Palestinian residents of Jerusalem on the city council. There were 5 women on the 88-member Council, and 1 woman served in a ministerial-level position.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

During the year, Israel obstructed human rights monitors and NGO workers through the excessive use of deadly force and the imposition of strict closures, at times resulting in death and serious injuries. Beginning on May 9, Israel required foreigners entering the Gaza Strip to sign a waiver that purports to absolve Israel of responsibility for death or injuries caused by Israeli soldiers. The waiver stated that those entering the Gaza Strip "accept that the Government of the State of Israel and its organs cannot be held responsible for death, injury and/or damage/loss of property which may be incurred as a result of military activity."

Israel demonstrated disregard for the work of human rights monitors in official statements, and soldiers attempted to disrupt their work. On May 21, Israeli Minister of Foreign Affairs Silvan Shalom said, "Most human rights offices in the West Bank and Gaza Strip provide shelter for Palestinian terrorists."

On March 16, an Israeli bulldozer clearing land in Rafah in the Gaza Strip crushed and killed Rachel Corrie, 23, a US Citizen peace activist. Corrie was standing in front of the bulldozer and was wearing a reflective vest. Eyewitness demonstrators stated that they believe the driver knew Rachel was in front of the bulldozer as he proceeded forward. The IDF conducted two investigations into the case, including a polygraph of the operator, and found no negligence on the part of the operator. The operator knew that there were demonstrators in the area, but claimed he did not see Corrie at the time she was struck. However, the report of the IDF Judge Advocate General recommended several remedial measures including remedying blindspots from the cabs of armored bulldozers, for improved safety during future operations.

On March 20, Israeli soldiers in Nablus shot US citizen Eric Hawanith during a demonstration, wounding him in the chest and leg with three rubber-coated steel bullets.

On April 7, Israeli gunfire very likely appears to have struck 24-year-old peace activist and US citizen Brian Avery in Jenin, although the IDF denied responsibility for the incident. Avery and another activist, both with the International Solidarity Movement, were walking outside during curfew in the city when an IDF armored personnel carrier approached them. Avery was shot in the face and remained hospitalized in stable condition at year's end.

On April 12, IDF soldiers shot Thomas Hundall, 22, a British activist with the International Solidarity Movement. Hundall was attempting to move Palestinian children to safety during a clash. Hundall was declared brain dead on arrival at a hospital in Rafah.

On July 28, Israeli soldiers fired tear gas and rubber coated bullets on a nonviolent demonstration conducted at a section of the security barrier in 'Anin village, near Jenin. The rubber bullets wounded six demonstrators. The demonstrators were from the International Solidarity Movement, the Popular Committees Against the Wall, Ta'ayush, and the Palestinian National Initiative.

On May 31, IDF soldiers harassed residents of at-Tuwani village south of Hebron and threatened them with abuse if they accepted further solidarity visits from the Israeli peace group Ta'ayush. One soldier tore down a tent that Ta'ayush activists had set up in the town for meetings with local residents.

On December 26, Israeli soldiers aimed live fire at demonstrators attempting to penetrate the separation barrier built near the town of Qalqilya. The gunfire wounded a 25-year-old US citizen and seriously wounded Israeli citizen Gil Na'amati, 21. Na'amati was shot in both legs. The IDF launched an internal inquiry into the incident, but no soldiers were charged with wrongdoing at year's end.

In many cases, such groups refused to apply for special travel permits in order to protest Israel's regulation of their activities. Israeli, Palestinian, and international humanitarian and human rights NGOs monitored the Israeli Government's human rights practices in the occupied territories. Some of these organizations were critical of the Israeli Government's practices and cooperation. The Israeli Government permitted human rights groups to publish and hold press conferences.

The U.N. Relief and Works Agency (UNRWA) reported continued delays but some overall improvement in treatment of its personnel and vehicles at checkpoints. Other humanitarian groups, such as PRCS, continued to complain of unacceptable delays.

During the year, Israeli settlers in Hebron continued their longstanding harassment of members of the Temporary International Presence in Hebron (TIPH), an NGO comprised of civilians, which monitored relations between Israeli and Palestinian security forces, Palestinian civilians, and settlers in the city. The settlers damaged a number of TIPH vehicles.

At year's end, the Government of Israel continued to withhold information regarding the documents and property taken during the 2001 seizure of Orient House (see Section 2.b.).

Local human rights groups, most of which were Palestinian, and several international organizations monitored the PA's human rights practices. PA officials usually met with their representatives. Public criticism from these groups has been somewhat less forthcoming since the outbreak of the Intifada, with several NGOs voluntarily deciding to focus their efforts on the Palestinian struggle for basic rights and defer comprehensive critiques of the PA's human rights performance. During the year, human rights organizations reported that they sometimes were denied access to detainees in Palestinian prisons (see Section 1.c.). Observers noted that documentation of abuses was very limited because victims were hesitant to file or make public claims of abuse against PA authorities.

Some PA security organizations, including the General Intelligence Organization in the West Bank and the police, appointed officials to act as liaisons with human rights groups. These officers met with human rights organizations and members of the diplomatic community to discuss human rights cases.

The ICRC and other human rights groups, including the Palestinian Independent Commission for Citizens' Rights and the Mandela Institute, regularly visited PA prisons and detention centers. During the year, some human rights and international humanitarian organizations reported that they occasionally encountered delays in obtaining access to detainees in Palestinian prisons. PA officials reportedly were less responsive to queries regarding the PA's policies toward and treatment of collaborators and members of Islamist opposition groups than to queries on other detainees (see Sections 1.c. and 1.d.).

The PA issued registration certificates for 150 of the approximately 350 new and existing NGOs that submitted applications under the 2000 NGO law. The

remaining applications still were under review at year's end (see Section 2.d.).

Section 5 Discrimination Based on Race, Sex, Disability, Language, or Social Status

Palestinians were disadvantaged under Israeli law and practices compared with the treatment received by Israeli settlers. This included discrimination in residency and land use.

In the Palestinian territories several Palestinians alleged that PA security officers tortured them because of their sexual orientation. Homosexuals were persecuted by both the public and by PA security officers. Homosexuals were subject to harassment and physical abuse, and some were arrested.

Women

The law does not explicitly prohibit domestic violence, but assault and battery are crimes. There were reports indicating that domestic violence increased during the Intifada.

In the occupied territories, so-called honor crimes resulted infrequently when family members beat or killed women in response to such alleged violations of their family's honor. The PA kept no statistics on the frequency of such crimes, but human rights groups reported that they occurred infrequently. Victims of violence often were encouraged by relatives to remain quiet and were punished themselves or blamed for the "shame" that had been brought upon them and their families. Public discussion of the problems of rape, domestic violence, and violence related to "family honor" generally remained muted, but gained greater attention in the Palestinian community as a result of a significant effort by Palestinian women's groups. The crimes almost exclusively were tied to alleged sexual interactions of female family members with men who were not their husbands. This could include rape, a sexual encounter with any man except a woman's husband, or merely being seen alone with a male who was not her family member. Women's groups sought to educate women on these problems, but women's rights advocates stated that few resources were available to shelter the victims of violence because women's shelters are not accepted culturally in Palestinian society. Activists also maintained that society was not receptive to providing counseling or outreach services to victims of violence, which these advocates saw as more widespread than was acknowledged. According to women's groups, there was no reliable data on the incidence of violence against women.

There were increasing anecdotal reports from women's and humanitarian groups that the incidence of domestic abuse rose significantly during the year. Spousal abuse, sexual abuse, and "honor killings" occurred, but societal pressures prevented most incidents from being reported.

Rape is illegal but spousal rape is not. During the year, there were no figures available regarding the extent of the problem.

Palestinian women endured various forms of social prejudice and repression within their own society. Some girls, especially in rural areas, did not finish the mandatory level of schooling because husbands did not approve of their intentions to continue their education. Cultural restrictions occasionally prevented women from attending colleges and universities. Muslim women who married outside of their faith were considered apostates by Shari'a law, an offense that could result in death. Christian women who married Muslim men often were disowned by their families and sometimes were harassed and threatened with death by members of their community. Local officials sometimes attempted to convince such women to leave their communities in order to protect themselves.

Before the Intifada began in 2000, a growing number of Palestinian women worked outside the home, where they often encountered discrimination and occasionally experienced sexual harassment. There were no special laws that provide for women's rights in the workplace. Women were underrepresented in most aspects of professional life. Despite the fact that there is a small group of women who were prominent in politics, medicine, law, teaching, and NGOs, women for the most part were seriously underrepresented in the decision-making positions in these fields.

Personal status law for Palestinians is based on religious law. For Muslim Palestinians, personal status law is derived from Shari'a (Islamic law). The varied ecclesiastical courts ruled on personal status issues for Christians. In the West Bank and Gaza, Shari'a pertaining to women is part of the Jordanian Status Law of 1976, which includes inheritance and marriage laws. Under the law, women in most cases are not entitled to inheritance, while their male siblings are. The marriage law allows men to take more than one wife, although few did so. Women were permitted to make "stipulations" in the marriage contract to protect them in the event of divorce and questions of child custody; however, only an estimated 1 percent of women took advantage of this provision, leaving most women at a disadvantage in the areas of divorce or child custody. Ecclesiastical courts also often favored men over women in divorce and child custody cases.

Children

The PA provided substantial but incomplete protection for children's rights and welfare in areas under its control. The PA provided compulsory education to children and banned child labor, but did not legislate against child abuse or contain the practice of early marriage. Palestinian militants manipulated children to assist in violent attacks.

The PA provides for compulsory education through the ninth grade, when children usually reach 15 years of age. However, women who chose to marry were prevented by their families in certain sectors of society at times from completing the mandatory level of schooling. Especially in rural areas and refugee camps, boys often left school before they reached the mandatory age in order to help support their families.

The internal closure across the occupied territories and extended periods of curfew in most major cities significantly impeded the ability of both students and teachers to reach educational facilities (see Sections 2.a. and 2.d.). In areas under curfew, all classes were cancelled.

The separation barrier's construction has resulted in missed days of schooling and hardships for Palestinian children. The separation barrier, located east of the village of Khirbat Jabara, separates the village from rest of the West Bank. The village has no primary school and 183 children from the town have had their schooling disrupted by being forced to pass through a gate in the separation barrier in order to reach the nearest primary school in the village of ar-Ras.

Numerous education and health care professionals acknowledged that students were badly affected by the violent security situation, which interfered with learning and manifested itself in lack of focus, nightmares, daytime and nighttime incontinence, and other behavioral problems. Closures and curfews impeded school attendance, and UNRWA reported that more than 35,000 teacher workdays were lost in the 2002-03 academic year. UNRWA reported that test scores in its West Bank and Gaza schools dropped dramatically.

The PA Ministry of Health provided for children's immunizations. The PA insurance program provided basic medical care for children, for a small monthly fee.

1/19/2015                                        Israel and the occupied territories

Economic problems and checkpoint obstacles affected the availability of food to Palestinian children. During the year, USAID and Johns Hopkins University reported that 7.8 percent of Palestinian children under 5 suffered from acute malnutrition, 11.7 percent suffered chronic malnutrition, and 44 percent were anemic.

The law does not explicitly prohibit child abuse. Abuse existed but was not a widespread problem. The law penalizes parents or families that failed to protect children from abuse. PA courts may provide protection for children in "difficult situations," including cases of neglect or abuse. The Ministry of Social Affairs may intervene by bringing a case before a court, which would decide how to best protect the child. The judge may decide to place a child in an official protective institution, or with an alternate family. There was one protective institution for children in Gaza and one in the West Bank.

The law provides that no children 14 or under can work, and children aged 15-18 can be employed only for certain types of work and under certain conditions (see Section 6.d.). While there was no juvenile court system, judges specializing in children's cases generally adjudicated on juvenile cases. In cases in which the child was the victim, judges had the discretion to remove the child from a situation considered harmful. However, the system was not sophisticated in the protection it afforded children.

Palestinians living in East Jerusalem continued to be discriminated against in terms of their access to municipal services, compared to other residents of Jerusalem. According to the Association for Civil Rights in Israel, the Government of Israel and the municipality have not kept their pledge to the High Court to build three new infant-care clinics in East Jerusalem. In addition, East Jerusalem schools remained underfunded and overcrowded, and many students were denied an education in public schools due to lack of space. In 2001, the Israeli Government agreed to build 245 new classrooms within the next 4 years to alleviate this problem. However, by year's end, only 30 classrooms had been built and only 36 were under construction.

International and domestic NGOs, including UNICEF, Save the Children, and Defense for Children International, promoted the rights and welfare of children in the occupied territories. There also were numerous Palestinian social welfare organizations that focused on developing and providing educational, medical, and cultural services to children. A number of other groups specialized in addressing the needs of children with disabilities.

Palestinian terrorist groups used minors to prepare attacks or carry them out and as human shields. These youths were recruited to throw pipe bombs and plant explosives. On January 11, two Palestinian youth attempted to infiltrate the Israeli Netzarim settlement in Gaza. The IDF captured both youths after shooting and wounding one of them. Neither was armed. The IDF released a video in November showing Palestinian gunmen firing on IDF forces while taking cover around a donkey-drawn cart with children near them.

Persons with Disabilities

There was no mandated accessibility to public facilities in the occupied territories under either Israeli law or Palestinian authority. Many Palestinians with disabilities were segregated and isolated from Palestinian society; they were discriminated against in most spheres, including education, employment, transportation, and access to public buildings and facilities. There were approximately 130,000 Palestinians with disabilities in the West Bank and Gaza prior to the outbreak of the current Intifada. The Health, Development, Information, and Policy Institute estimated that one-tenth of the approximately 23,000 Palestinians injured in the Intifada will have permanent disabilities.

Some Palestinian institutions cared for and trained persons with disabilities; however, their efforts consistently were under-funded.

Section 6 Worker Rights

a. The Right of Association

Labor affairs in the West Bank were governed by Jordanian Law 21 of 1965, as amended by Israeli military orders, and in Gaza by PA decisions. The law permits workers to establish and join unions without government authorization. Following a process to consolidate trade unions in the West Bank, there were 12 trade unions. Four trade unions were in Gaza.

Israeli labor law governs Palestinian workers in Jerusalem, and they were free to establish their own unions. The Israeli Government restricted unions in Jerusalem from joining West Bank trade union federations; however, this restriction was not enforced. Individual Palestinian workers in Jerusalem may belong simultaneously to unions affiliated with West Bank federations and the Israeli Histadrut Labor Federation.

West Bank unions were not affiliated with the Israeli Histadrut Federation. Palestinians from the West Bank and Gaza who worked in Israel or Jerusalem were not full members of Histadrut, but they were required to contribute 1 percent of their wages to Histadrut. Their partial membership entitled them to limited benefits, including compensation in the case of on-the-job injuries, maternity leave, and compensation in the case the employer declares bankruptcy. (Full members of Histadrut also received health insurance, social security benefits, pensions, and unemployment benefits.) Negotiations between Histadrut and West Bank union officials to return half of this fee to the Palestinian Union Federation were completed in 1996, but funds have yet to be transferred. Palestinian labor officials claim that they are owed $6.5 million (NIS 30 million). Palestinians from the occupied territories who worked in Israel were not permitted to join Israeli trade unions or to organize their own in Israel.

The majority of West Bank and Gaza unions belonged to the Palestinian General Federation of Trade Unions (PGFTU). The union estimated that it had 290,000 members in the West Bank and Gaza Strip, drawing from 12 trade syndicates in the West Bank and 8 in Gaza. The PGFTU estimated that actual organized membership of dues-paying members, included approximately 75 percent of all Palestinian workers. The PGFTU was involved in the completion of the negotiations with Histadrut regarding workers' fees. The reorganization of unions under the PGFTU was intended to enable the West Bank and Gaza unions to better represent the union members' interests.

There are no laws in the occupied territories that specifically protect the rights of striking workers. In practice, such workers had little or no protection from an employer's retribution. Palestinian unions that seek to strike must submit to arbitration by the PA Ministry of Labor. If the union disagrees with the final arbitration and strikes, a tribunal of senior judges appointed by the PA decides what, if any, disciplinary action is to be taken, such as a fine. During the year, there were several local labor strikes in West Bank cities.

The PGFTU participated in some programs of the International Confederation of Free Trade Unions, but was not a member. The PGFTU became an ICFTU

affiliate in November 2002.

b. The Right to Organize and Bargain Collectively

A majority of workers in the occupied territories were self-employed or unpaid family helpers in agriculture or commerce. Only 35 percent of employment in the occupied territories historically has consisted of wage jobs. Most of this employment has been through UNRWA, the PA, or municipalities. Collective bargaining was protected. Committees of 3 to 5 members adjudicated labor disputes in businesses employing more than 20 workers. The PGFTU reported several local labor strikes in West Bank cities during the year. Existing laws and regulations do not offer real protection against antiunion discrimination.

There are no export processing zones (EPZs) in the occupied territories, although the Gaza Industrial Estate did enjoy free trade access to foreign markets. Israeli closures and curfews impeded the right to organize and bargain collectively.

c. Prohibition of Forced or Bonded Labor

PA law does not prohibit specifically forced or bonded labor, including forced and bonded labor by children, and during the year there were no reports of such practices.

d. Status of Child Labor Practices and Minimum Age for Employment

The minimum legal working age in the West Bank and Gaza is 15 years, and there are special limits governing the conditions of employment for juveniles between 15 and 18 years, including prohibitions against working at night, under conditions of hard labor, or in jobs that require them to travel outside their area of domicile. However, in practice many Palestinian children under the age of 15 were engaged in some form of work. Most such employment was believed to involve work on family farms and in family shops, or as urban street vendors. Some employment of children also reportedly occurred in small manufacturing enterprises, such as shoe and textile factories. The PA's capacity to enforce existing labor laws was limited. It had only 40 labor inspectors to inspect an estimated 65,000 enterprises. The ILO and UNICEF were working with the PA to study the nature and extent of the problem and to develop the capacity to enforce and update child labor laws. During the year, the ILO began work in the occupied territories to implement its International Program for the Elimination of Child Labor.

e. Acceptable Conditions of Work

There was no minimum wage in the West Bank or Gaza Strip. Prior to the outbreak of the Intifada in 2000, which severely disrupted employment patters for the majority of working Palestinians, the average wage for full-time workers appeared to provide a worker and family with a decent standard of living. The majority of Palestinians currently were unemployed or underemployed and the standard of living has dropped dramatically over the last 2 years. The dependency ratio increased more than 50 percent since the start of the Intifada. In 2000 one Palestinian supported 4.3 persons in the West Bank and 5.9 persons in Gaza. During the year, those figures reached 6.9 persons and 9.4 persons, respectively. As wage earners were forced to support 50 percent more persons, the standard of living seriously deteriorated.

In the West Bank, the normal workweek was 48 hours in most areas; in Gaza, the workweek was 45 hours for day laborers and 40 hours for salaried employees. There was no effective enforcement of maximum workweek laws.

The PA Ministry of Labor was responsible for inspecting workplaces and enforcing safety standards in the West Bank and Gaza. The Ministry's ability to enforce the standard was limited due to lack of resources for inspections and other constraints; however, it carried out inspections. The Ministry reported that closures, curfews, and ongoing Israeli military operations further limited its ability to carry out inspections. The Ministry of Labor stated that new factories and workplaces met international health and safety standards, but that older ones failed to meet such standards. There was no specific legal protection afforded workers that allows them to remove themselves from an unhealthy or unsafe work setting without risking loss of employment.

Like all Israeli workers, Palestinians who worked in Israel were required to contribute to the National Insurance Institute (NII), which provided unemployment insurance and other benefits. Palestinians from the West Bank and Gaza were eligible for some, but not all, NII benefits. According to the Interim Agreement, Palestinians who worked in Israel and Jerusalem benefit from NII in cases of injuries that occurred in Israel, the bankruptcy of a worker's employer, and allowances for maternity leave.

There were outstanding cases of Palestinian workers who attempted to sue their Israeli employers for nonpayment of wages but were unable to travel to the relevant courts because they were unable to receive the proper permits.

f. Trafficking in Persons

Palestinian law does not prohibit trafficking in persons; however, there were no reports that persons were trafficked to, from, or within the occupied territories.