UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK I. SOKOLOW, et al., | ) |
|                 Plaintiffs, | ) |
| v. | ) |
| PALESTINE LIBERATION ORGANIZATION, et al., | ) No. 1:04-cv-0397 (GBD) (RLE) |
|                 Defendants. | ) |

**DEFENDANTS' AUTHORIZED SUBMISSION IN RESPONSE
TO JULY 13, 2015 "REPLY"**

Dated: August 7, 2015

Gassan A. Baloul (Bar No. 4324919)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 872-9800
Facsimile: (212) 872 9815
gassan.baloul@squirepb.com

Mitchell R. Berger (MB-4112)
John A. Burlingame (*admitted pro hac vice*)
Alexandra E. Chopin (*admitted pro hac vice*)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
Mitchell.Berger@squirepb.com
John.Burlingame@squirepb.com
Alexandra.Chopin@squirepb.com

*Attorneys for Defendants Palestinian Authority
and Palestine Liberation Organization*

**TABLE OF CONTENTS**

I.  Defendants' Insolvency Weighs In Favor Of A Stay Without Bond, Not In Favor Of A Payment Plan or Other Substitute Security. .................................................................. 2

    A.  *Nassau County* Does Not Supplant the Traditional Four-Factor Test to Stay Judgment Execution; Both Tests Favor a Stay and Waiver of the Bond or Other Collateral. ........................................................................................................ 2

II. The PA's Operating Income Cannot Be Materially Increased In the Near Term to Pay or Secure A Judgment, and Defendants Do Not Have Significant Other Assets. .............. 5

    A.  The PA Is Effectively Insolvent and Cannot Timely and Fully Repay Its $5.4 Billion In Creditors. ................................................................................................. 5

    B.  The PA Cannot Raise Additional Funds Or Divert Revenue From Its Creditors or Existing Obligations. ..................................................................... 7

    C.  The PA And PLO Do Not Have Access To Significant Other Assets Or Investments. ........................................................................................................ 9

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acevedo-Garcia v. Vera-Monroig*,
    296 F.3d 13 (1st Cir. 2002) ..................................................................................................1, 3

*Augustin v. Nassau County Sheriff's Dep't (In re Nassau County Strip Search Cases)*,
    783 F.3d 414 (2d Cir. 2015) ............................................................................................*passim*

*Cayuga Indian Nation of N.Y. v. Pataki*,
    188 F. Supp. 2d 223 (N.D.N.Y 2002) ........................................................................................1

*Corporate Comm'n of the Mille Lacs Band of Ojibwe Indians v. Money Ctrs. of Am.*,
    No. 12-1015, 2013 U.S. Dist. LEXIS 176796 (D. Minn. Dec. 17, 2013) ...........................1, 5

*Dillon v. Chicago*,
    866 F.2d 902 (7th Cir. 1988) ..................................................................................................1, 3

*In re Garcia Avila*,
    296 B.R. 95 (Bankr. S.D.N.Y. 2003) .........................................................................................5

*Harris v. Butler*,
    961 F. Supp. 61 (S.D.N.Y. 1997) (Scheindlin, J.) .....................................................................1

*Hilton v. Braunskill*,
    481 U.S. 770 (1987) ...................................................................................................................3

*Olympia Equip. Leasing Co. v. Western Union Tel. Co.*,
    786 F.2d 794 (7th Cir. 1986) ......................................................................................... 1, 4, 5, 6

*Poplar Grove Planting and Refining Co., Inc. v. Bache Halsey Stuart, Inc.*,
    600 F.2d 1189 (5th Cir. 1979) ...................................................................................................1

*In re Roblin Indus., Inc.*,
    78 F.3d 30 (2d Cir. 1996) ...........................................................................................................5

*SDF9 COBK LLC v. AF & AR LLC*,
    No. 12-3078, 2015 U.S. Dist. LEXIS 68667 (E.D.N.Y. May 15, 2015) ..................................3

*SEC v. Pittsford Capital Income Partners L.L.C.*,
    No. 06-6353, 2007 U.S. Dist. LEXIS 1241 (W.D.N.Y. Jan. 5, 2007) ......................................4

*Texaco Inc. v. Pennzoil Co.*,
    784 F.2d 1133 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 1 (1987) ................................1

*United States SEC v. Citigroup Global Mkts., Inc.*,
   673 F.3d 158 (2d Cir. 2012) .................................................................................................... 3

*United States SEC v. Daspin*,
   557 Fed. Appx. 46 (2d Cir. 2014) ........................................................................................... 3

**Other Authorities**

Rule 62 ........................................................................................................................................ 2, 3

Rule 62(d) .................................................................................................................................*passim*

# INTRODUCTION

Second Circuit law, and the other Circuits' law on which it is based, dictates that Rule 62(d) bond or collateral conditions must not "put the defendant's other creditors in undue jeopardy"[1] or "place other creditors of the defendant in an insecure position."[2] Instead, a Rule 62(d) stay should only "preserve the *status quo*" pending appeal,[3] and must not "effectively improve the judgment creditor's position instead of preserve it."[4] Plaintiffs' request for monthly multi-million dollar payments to provide Rule 62(d) security cannot be granted without violating this rule.

The PA owes at least $5.4 billion to other creditors whose claims are earlier both in time and in establishment of their legal right to be repaid, and often are collateralized by interests in revenue streams due to the PA from Israel and domestic sources—the same revenue streams that Plaintiffs seek to capture for their proposed Rule 62(d) monthly payments. The PA cannot currently repay its antecedent creditors on a timely basis or in full because it is effectively insolvent (as is the PLO, which is financially dependent on the PA). Rule 62(d) principles accordingly prohibit Plaintiffs from leapfrogging ahead of the PA's antecedent creditors by obtaining a "security" fund from this court reserved exclusively for Plaintiffs' benefit. Creating that fund would force the PA's other creditors into an insecure position by diminishing PA income and assets otherwise available to pay them.

Beyond the Rule 62(d) obstacle to creating a fund that gives Plaintiffs priority over the PA's antecedent creditors, the World Bank declared in July that the "PA is currently not in a position to

---

[1] *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 17 (1st Cir. 2002); *Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 786 F.2d 794, 796 (7th Cir. 1986).

[2] *Augustin v. Nassau County Sheriff's Dep't (In re Nassau County Strip Search Cases)*, 783 F.3d 414, 418 (2d Cir. 2015) (adopting the five factors set forth in *Dillon v. Chicago*, 866 F.2d 902, 904-05 (7th Cir. 1988)).

[3] *Poplar Grove Planting and Refining Co., Inc. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1190-91 (5th Cir. 1979) ("[T]he purpose of a supersedeas bond is to preserve the *status quo* while protecting the non-appealing party's rights pending appeal"); *see also Cayuga Indian Nation of N.Y. v. Pataki*, 188 F. Supp. 2d 223, 254 (N.D.N.Y 2002) (same); *Harris v. Butler*, 961 F. Supp. 61, 62 (S.D.N.Y. 1997) (Scheindlin, J.) (same) (citing *Texaco Inc. v. Pennzoil Co.*, 784 F.2d 1133, 1154 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 1 (1987)).

[4] *Corporate Comm'n of the Mille Lacs Band of Ojibwe Indians v. Money Ctrs. of Am.*, No. 12-1015, 2013 U.S. Dist. LEXIS 176796, at *5 (D. Minn. Dec. 17, 2013)

take on additional expenditures."[5] The IMF warned in May that the "potential large financial liabilities related to [the *Sokolow*] litigation" would so "shock" the system as to threaten the PA's very existence.[6] As the PA's Finance Minister reconfirms, the PA cannot materially divert revenue or reduce expenditures to pay the judgment or to collateralize a stay pending appeal, and neither the PA nor the PLO has access to other substantial assets or funding.[7] According to the IMF, Plaintiffs' requested multi-million dollar installment payments therefore "would further undermine the already fragile financial position of the PA, leading to private sector arrears, a fall in demand, and in the extreme case, to a breakdown of essential government services and social instability" and the possible destabilization of Palestine's banks.[8]

Plaintiffs' unsecured rights as would-be judgment creditors cannot be given priority over the PA's $5.4 billion of secured and other pre-existing creditors, who already are competing for the PA's insufficient funds. If the PA collapses (and, with it, the PLO) because of the added financial weight of the *Sokolow* judgment, then the Plaintiffs likely will get nothing. A stay pending appeal without a bond or other collateral merely acknowledges that reality, and preserves the *status quo*.[9]

I.   **Defendants' Insolvency Weighs In Favor Of A Stay Without Bond, Not In Favor Of A Payment Plan or Other Substitute Security.**

   A.   ***Nassau County*** **Does Not Supplant the Traditional Four-Factor Test to Stay Judgment Execution; Both Tests Favor a Stay and Waiver of the Bond or Other Collateral.**

The traditional four-factor test is controlling law in this Circuit on the question of a Rule 62

---

[5] Exh. A-4, World Bank letter dated July 16, 2015, at 2.

[6] Exh. A-5, IMF May 2015 Report, at 5, 8, 9.

[7] As proof of these facts, Defendants have herewith submitted a supplemental Declaration of the PA's Finance Minister, Shukry Bishara (Exh. A), a Declaration of Abdel Hamid Al Abwah (Exh. B), the Declaration of Bilal Kamal (Exh. C), and the recent reports of the World Bank, IMF and U.N. *See* Exhs. A-3, World Bank May 2015 Report; A-4, World Bank letter dated July 16, 2015; A-5, IMF May 2015 Report; A-24, UNDP March 2015 Report.

[8] Exh. A-5, IMF May 2015 Report, at 8.

[9] Within the above context, the Court's July 28 guidance concerning these issues (Tr. (7/28/15) at 13-15, 96-97) is under active consideration at the highest levels of the PA so that counsel may address these issues further at the August 24 hearing.

stay.[10] Defendants have previously explained why the split of legal authority on general personal jurisdiction demonstrates their likelihood of success on appeal, and why the facts overwhelmingly demonstrate that, absent an appeal and waiver of the bond under that test, the PA and PLO, the Palestinian people, and the Middle East region—at a minimum—face irreparable injury and harm to the public interest, while Plaintiffs face no appreciable harm not already presented by Defendants' insolvency. *See* Doc. 898 (Rule 62 Motion), at 3-13.

When confronting an insolvent judgment debtor seeking waiver of the bond requirement under Rule 62(d), the Second Circuit gives its courts discretion to also consider supplemental "non-exclusive" factors, which "more directly address the primary purpose of Rule 62." *Nassau County*, 783 F.3d at 417-18 (discussing supplemental Rule 62(d) factors from *Dillon v. Chicago*, 866 F.2d 902, 904-05 (7th Cir. 1988), "which we now adopt as non-exclusive factors that a district court may consider") (emphasis added)).

*Nassau County*'s non-exclusive Rule 62(d) factors emerged from a line of cases that announced that waiver of a bond is appropriate in either of two situations: "(1) the defendant's ability to pay is so plain that the posting of a bond would be a waste of money; or (2) the bond would put the defendant's other creditors in undue jeopardy." *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 17 (1st Cir. 2002) (*per curiam*). The second situation is the one unmistakably applicable here.

The fifth *Nassau County* factor controls the analysis in that second situation, and provides that a stay without security is warranted if "the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position." *Nassau County*, 783 F.3d at 417-18 (quoting *Dillon*, 866 F.2d at 904). The PA's financial

---

[10] *See, e.g., United States SEC v. Daspin*, 557 Fed. Appx. 46, 47-48 (2d Cir. 2014) ("In deciding whether to grant a stay pending appeal, we consider [the traditional stay test]"); *United States SEC v. Citigroup Global Mkts., Inc.*, 673 F.3d 158, 162 (2d Cir. 2012) ("In determining whether to issue a stay, the governing precedents direct that we consider the following factors: [citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987), and the traditional stay test]"); *see also SDF9 COBK LLC v. AF & AR LLC*, No. 12-3078, 2015 U.S. Dist. LEXIS 68667, *3-5 (E.D.N.Y. May 15, 2015) (applying traditional four-factor test that "a district court must consider," and granting Rule 62(d) stay) (emphasis added).

situation is indeed "precarious": it is laboring under a $500 million "financing gap," that is, the gulf between budgeted expenditures and the money available to pay them.[11] Plaintiffs propose widening that gap by 72%, with the addition of $360 million monthly installment payments solely for their benefit. Minister Bishara explains comprehensively why the PA cannot materially increase revenues or decrease expenses to fund the payments Plaintiffs seek.[12] The World Bank has ended any debate on the feasibility of Plaintiffs' request for monthly payments, however, with its assessment that the "PA is currently not in a position to take on additional expenditures." *See supra* n.5.

The source of the fifth factor in *Nassau County* is *Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 786 F.2d 794, 798 (7th Cir. 1986), which held that a court "is not required to ignore the interests of other creditors when deciding how much security to make the defendant post." *Olympia Equipment* did not permit the judgment creditor to execute on the judgment, because doing so might "so jeopardize the collectability of other creditor's claims as to throw the company into bankruptcy." *Id.* at 799. A bond should be designed "to make the judgment creditor as well off during the appeal as it would be if it could execute at once, but no better off." *Id.* at 800 (Easterbrook, J., concurring); *SEC v. Pittsford Capital Income Partners L.L.C.*, No. 06-6353, 2007 U.S. Dist. LEXIS 1241, *2-3, *6-7 (W.D.N.Y. Jan. 5, 2007) (refusing to permit judgment creditors to execute against assets because "only a handful of victims would receive close to full compensation while the pro rata shares available to the hundreds of other victims would be significantly diminished").

In *Olympia Equipment*, Judge Easterbrook specifically considered the claim, which Plaintiffs make here, that insolvency makes a bond necessary—and rejected it. Instead, he observed that the "bond or irrevocable letter of credit prefers the judgment creditor over other creditors. . . . The bond does not preserve the judgment creditor's position; it improves the position, perhaps

---

[11] Exh. A, Bishara Supp. Decl., at ¶ 17.

[12] *See* Exh. A, Bishara Supp. Decl., at ¶¶ 6, 16, 23; Exh. A-5, IMF May 2015 Report, at 5, 8, 9; Exh. A-4, World Bank letter dated July 16, 2015; Exh. A-3, World Bank May 2015 Report, at 14.

dramatically," which "may send the debtor over the brink." *Id.* at 800; *see also Corporate Comm'n of the Mille Lacs Band of Ojibwe Indians v. Money Ctrs. of Am.*, No. 12-1015, 2013 U.S. Dist. LEXIS 176796, at *5 (D. Minn. Dec. 17, 2013) (not requiring complete security when doing so "would effectively improve the judgment creditor's position instead of preserve it"). Creating for Plaintiffs a fund that is not available to other, antecedent creditors creates inequity and scrambles existing legal priority order.

*Olympia Equipment* rests on the same principles underpinning bankruptcy law, which similarly seeks to respect and preserve the priority rights and ranking of existing creditors.[13] Neither bankruptcy law nor this Circuit's Rule 62(d) jurisprudence will permit would-be judgment creditors like Plaintiffs to obtain payment preference over the PA's $5.4 billion in antecedent creditors, and thereby disrupt the *status quo*.[14] Once judgment enters, Plaintiffs should become only unsecured judgment creditors who must take their place in line with Defendants' other unsecured creditors.[15] It would impermissibly alter the *status quo* and "place other creditors of the defendant in an insecure position," *Nassau County*, 783 F.3d at 418, to condition a Rule 62(d) stay on the creation of a fund exclusively for Plaintiffs' benefit.

**II.    The PA's Operating Income Cannot Be Materially Increased In the Near Term to Pay or Secure A Judgment, and Defendants Do Not Have Significant Other Assets.**

    **A.    The PA Is Effectively Insolvent and Cannot Timely and Fully Repay Its $5.4 Billion In Creditors.**

The PA has made balancing its budget a high priority, but "this goal is largely aspirational, because the PA cannot borrow or print money in the absence of a national currency, [and] cannot

---

[13] *See, e.g., In re Roblin Indus., Inc.*, 78 F.3d 30, 40 (2d Cir. 1996) ("Any creditor that received a greater payment than others of [its] class is required to disgorge so that all may share equally."); *In re Garcia Avila,* 296 B.R. 95, 112 (Bankr. S.D.N.Y. 2003) (enjoining unsecured New York judgment creditors from executing on judgment, because doing otherwise would "hurt the Debtors' innocent creditors" and "diminish the recovery available to other creditors").

[14] *See supra* n. 3.

[15] *See Olympia Equipment*, 786 F.2d at 799 ("A judgment creditor is an unsecured creditor . . . . Unsecured creditors usually fare poorly in bankruptcies."); *In re Garcia Avila,* 296 B.R. at 113-14 ("[D]istribution to an unsecured creditor under any insolvency law depends on the amount of property available to the creditors and the relative priorities of their claims.").

5

raise taxes on an already overburdened and underserved population."[16] Compounding these challenges, in the wake of Israel's four-month freeze of Palestinian clearance revenues, the World Bank stated in May that "[t]he expectation that the Palestinian economy will rebound significantly in 2015 <u>vanished</u> following the Israeli decision to freeze the transfer of Palestinian taxes."[17]

As a result, the PA is essentially insolvent,[18] with a 2015 deficit expected to reach $2.294 billion.[19] Even with foreign aid, both the World Bank and IMF agree that the PA faces an enormous "financing gap" in 2015 of approximately $42 million in monthly expenses, or "close to half a billion U.S. dollars," for which funding is not available.[20] The PA's creditors are owed more than $5.4 billion, meanwhile, and the financing gap forces the PA to continue to accumulate significant arrears on current payment obligations.[21] Donor aid has declined materially during the past two years, and the PA has reached its borrowing limits from local banks.[22]

The PA is already at the financial precipice. Plaintiffs' Rule 62(d) monthly payment proposal would put the PA "over the brink." *Olympia Equipment,* 786 F.2d at 800. It is unimaginable that the United States government, or any other serious policymaker, could welcome or accept that result.

Plaintiffs' "U.S. municipal finance" expert, Mr. Wendt, is unconstrained by any such public policy concerns, and thus summarily dismisses or ignores the PA's antecedent obligations as something that can be paid later.[23] The PA cannot do so, either for humanitarian reasons,[24] or because "[m]any of the PA's obligations are secured by pledges or assignments of cash flows owed

---

[16] Exh. A-5, IMF May 2015 Report, at 24-25 (Risk Assessment Matrix).

[17] Exh. A-3, The World Bank, "Economic Monitoring Report to the Ad Hoc Liaison Committee," May 27, 2015 ("World Bank May 2015 Report"), at 13 (emphasis added).

[18] Exh. A, Bishara Supp. Decl., at ¶¶ 12, 18-20 n. 37.

[19] *See id.* at ¶ 17.

[20] *See id.*

[21] Exh. A, Bishara Supp. Decl., at ¶ 21; Exh. A-7, ("Palestinian Authority Debt and Arrears Estimated As of July 2015").

[22] *See infra* at nn.28-33.

[23] Doc. 931 (Wendt Aff.), at ¶¶ 48-51.

[24] Exh. A, Bishara Supp. Decl., at ¶ 7, 11, 49.

to the PA, including, most notably, the clearance revenues due to be remitted to the PA by the Israeli government, and foreign aid intended to support PA government services."[25] Mr. Wendt's other judgment-payment proposals are equally unconcerned with the realities on the ground in Palestine, and to significant public and foreign policy concerns.[26]

### B. The PA Cannot Raise Additional Funds Or Divert Revenue From Its Creditors or Existing Obligations.

Without any consideration of humanitarian concerns, Mr. Wendt opines that the PA can divert for Plaintiffs' benefit portions of the foreign aid payments that have been earmarked for the benefit of the Palestinian people.[27] That aid is critical to fund humanitarian and government services, and "foreign governments would terminate their aid to Palestine if those donations were diverted to the Plaintiffs."[28] The prospect for the PA to generate additional foreign aid to cover its $500 million financing gap (much less the additional $360 million Plaintiffs seek annually) "is highly unlikely,"[29] in any event, because donor aid has declined by about 20% annually since 2013, and is expected to decline by a further 25% in 2015.[30] At least half of that aid is restricted for specific uses,[31] moreover.

Likewise, the World Bank and IMF conclude that additional borrowing from local banks is both risky and unlikely to be available: the PA faces major challenges to full and timely repayment of the vast sums it has already borrowed,[32] and cannot borrow more because the PA has almost reached the "40 percent government-mandated threshold for public debt."[33]

Not surprisingly, then, a centerpiece of Mr. Wendt's platform is that the PA should return to

---

[25] Exh. A, Bishara Supp. Decl., at ¶¶ 7, 18-19.

[26] Exh. A, Bishara Supp. Decl., at ¶ 35.

[27] Exh. A, Bishara Supp. Decl., at ¶ 34.

[28] Exh. A, Bishara Supp. Decl., at ¶ 34.

[29] Exh. A-4, World Bank letter dated July 16, 2015, at 1.

[30] Exh. A, Bishara Supp. Decl., at ¶ 22; see Doc. 899 (Bishara Decl.), at Exh. 11 (PA April 8, 2015 Presentation).

[31] Exh. A, Bishara Supp. Decl., at ¶ 34.

[32] Exh. A, Bishara Supp. Decl., at ¶ 22 (citing Exh. 4, World Bank letter dated July 16, 2015, at 2).

[33] Exh. A, Bishara Supp. Decl., at ¶ 23 (Exh. 5, IMF May 2015 Report, at 26).

emergency cash-rationing of the type instituted during the 2015 clearance revenue freeze, including by not paying its employees and commercial vendors.[34] "Such emergency rationing would not only fail to create the hoped-for liquidity, but would further imperil an already precarious financial status quo."[35] Indeed, after *just one month* of similar measures, the IMF warned in January 2015 that the cuts were causing "a growing risk of social unrest and strikes that could lead to political instability";[36] Mr. Wendt's plan would force equivalent cuts *for more than 30 months*.[37] And, during the prior cash rationing, PA employees endured temporary 40% wage cuts, but were always going to be reimbursed the difference—Mr. Wendt's proposal would require PA employees to <u>permanently forfeit 51% of their wages for 30 months</u>.[38] Given extremely high unemployment and poverty rates in Palestine, this proposal is neither realistic nor humane.

Although well outside the scope of his claimed expertise in U.S. municipal financing, moreover, Mr. Wendt's core proposals dictate that the PA implement near-term political, social and economic policy changes in Palestine, which "observers familiar with the political, social and economic realities in Palestine know will endanger regional security and stability, and promote social unrest and chaos in the region."[39] Mr. Wendt bases this proposal on recent IMF, World Bank and United Nations reports, but noticeably absent from his affidavit are these same reports' warnings that these policy goals are unlikely to succeed, particularly in the time frame Mr. Wendt proposes.[40]

For example, Mr. Wendt claims that the PA can generate $230 million in revenue if it *merely* resolves entrenched, and seemingly intractable, commercial disputes with Israel, but offers no

---

[34] Doc. 931 (Wendt Aff.), at ¶ 12.

[35] Exh. A, Bishara Supp. Decl., at ¶ 28.

[36] Doc. 899 (Bishara Decl.), ¶ 33 (citing Exh. 14 thereto).

[37] Doc. 931 (Wendt Aff.), at ¶ 10 (emergency cash rationing would be necessary for 30 months).

[38] Exh. A, Bishara Supp. Decl., at ¶ 30.

[39] Exh. A, Bishara Supp. Decl., at ¶ 8.

[40] Exh. A, Bishara Supp. Decl., at ¶¶ 50-59 (unlikely success of policy proposals).

solution to Israel's long-standing refusal to engage in good faith discussions about those disputes, including as recently as July.[41] Mr. Wendt proposes, similarly, that the PA "pay its security employees half of their wages for 30 months, or fire nearly half of its employees, the largest share of whom would be security and safety personnel,"[42] but says nothing about the United States and Israel's critical reliance on PA security forces to restrain terror groups and maintain security in Palestine.[43]

Mr. Wendt's other recommendations fail to account for the enduring occupation of Palestine by Israel, that Israel prohibits Palestine from developing a substantial part of the Palestinian territory to create economic value, or the extreme conditions in Gaza following the war in 2014.[44] Mr. Wendt proposes that the PA generate $550 million per year by taxing Gaza *and* $560 million by firing its employees in Gaza.[45] Gaza has what the World Bank believes to be the highest unemployment rate in the world, with more than 80% of Gazans dependent on aid, and fully *two-thirds* of Gazans are refugees, more than half a million of whom live in refugee camps.[46] Even if Gaza were not controlled by Hamas,[47] which restricts the PA's access to Gaza, Mr. Wendt does not explain how Gazans could pay these taxes under such grievous conditions.

### C. The PA And PLO Do Not Have Access To Significant Other Assets Or Investments.

The PA and PLO cannot fund multi-million dollar Rule 62(d) installment payments by accessing assets of legally separate entities. The Palestinian Investment Fund's assets ("PIF") belong to the Palestinian people, who are PIF's shareholder.[48] The PIF is "entirely financially and

---

[41] Exh. A, Bishara Supp. Decl., at ¶¶ 36-40.

[42] *See id.* at ¶ 10; Doc. 931 (Wednt Aff.) at ¶¶ 11(b), 30, 35-40.

[43] Exh. A, Bishara Supp. Decl., at ¶¶ 46-47.

[44] *See id.* at ¶ 11.

[45] Doc. 931 (Wendt Aff.), at ¶ 53(c) & (d).

[46] Exh. A, Bishara Supp. Decl., at ¶ 12.

[47] Exh. A, Bishara Supp. Decl., at ¶ 41.

[48] Exh. B, Declaration of Abed Al Abwah ("Al Abwah Decl."), at Exh. B (Companies Controller certificate).

administratively independent" from the PA.[49] The PA receives minimal dividends ($11 million in 2014) from PIF to fund budgeted government services, which are accounted for in the PA budget.[50] Annual PIF dividends "cannot exceed PIF's retained earnings for that year" and cannot be increased by liquidating PIF assets or raiding PIF's mandatory minimum capital.[51] The PIF is "prohibited from liquidating assets to fund dividends in excess of retained earnings, and may not distribute any portion of the company's required minimum capital as a dividend."[52]

Likewise, Al Sanabel for Trade and Investment Co. ("Sanabel") is not an asset of the PLO.[53] The "PLO is not a shareholder in Sanabel," moreover, and does not own Sanabel.[54] Instead, "Sanabel is owned, operated and managed as a private company by individuals in their personal capacity," and "holds only domestic investments within Palestine," which are valued at approximately $5 million.[55]

Dated: August 7, 2015

/s/ Gassan A. Baloul
Gassan A. Baloul (Bar No. 4324919)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 872-9800
Facsimile: (212) 872 9815
gassan.baloul@squirepb.com

Mitchell R. Berger (MB-4112)
John A. Burlingame *(admitted pro hac vice)*
Alexandra E. Chopin *(admitted pro hac vice)*
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW

---

[49] Ex. B, Al Abwah Decl. at ¶ 3-6, 9-12; PIF Bylaws at Art. 2 ¶¶ 1-2.

[50] *See* Doc. 899 (Bishara Decl.), at ¶ 14 and Bishara Decl. Exh. 6, at 3, 5; June Operations, at Table 1, Table 4 ("Investments Profits").

[51] *See id.*

[52] Ex. B, Al Abwah Decl. at ¶ 12.

[53] Doc. 930 (Arusy Aff.), at ¶¶ 12, 15, 17 (citing "confidential sources").

[54] Exh. C, Declaration of Bilal Mousa Kamal ("Kamal Decl."), at ¶¶ 4, 5.

[55] *Id.*

10

...

Washington, DC 20037  
Telephone: (202) 457-6000  
Facsimile: (202) 457-6315  
Mitchell.Berger@squirepb.com  
John.Burlingame@squirepb.com  
Alexandra.Chopin@squirepb.com  

*Attorneys for Defendants Palestinian Authority and Palestine Liberation Organization*