**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Exhibit A

| | |
|---|---|
| MARK I. SOKOLOW, et al., <br> Plaintiffs, <br><br> v. <br><br> PALESTINE LIBERATION <br> ORGANIZATION, et al., <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )      No. 1:04-cv-0397 (GBD) (RLE) <br> ) <br> ) <br> ) <br> ) <br> ) |

### SUPPLEMENTAL DECLARATION OF SHUKRY BISHARA, MINISTER OF FINANCE OF THE PALESTINIAN AUTHORITY

Pursuant to 28 U.S.C. § 1746, I, Shukry Bishara, declare under penalty of perjury as follows:

1.      I am the Minister of Finance for the Palestinian Authority ("PA"). My background is set forth in detail in my Declaration dated April 30, 2015. I submit this Supplemental Declaration to provide further confirmation that the PA and Palestine Liberation Organization ("PLO") do not have the ability to make multi-million dollar installment payments, as the Plaintiffs have requested, to provide security to the Plaintiffs pending the PA's and the PLO's appeal from the judgment in this action. In particular, I respond to assertions made in the recent report of Bradley Wendt, on Plaintiffs' behalf, that the PA can generate an additional $20 to $30 million each month in "operating income" to secure or to pay the *Sokolow* judgment.

2.      Included with this Declaration are true and accurate copies of PA financial statements and related reports, including the PA's most recent monthly financial reports for May

and June 2015.[1]

I.     **Executive Summary.**

3.     Since April 30, 2015, when I made my first Declaration in this case, the financial condition of the PA (and, with it, the PLO) has continued to deteriorate for four key reasons:  (1) the lagging effect of the recent war in Gaza, which severely and adversely impacted the Palestinian economy and investor confidence in Palestine; (2) the lagging effect of the freeze by the Israeli government of clearance revenues due to the PA during the first quarter of 2015, which represent 70% of the PA's operating income; (3) the significant decline in donor aid to the PA, which has dropped by approximately 20% each year between 2013 and 2015 and, (4) the reallocation of significant aid for relief and rehabilitation and reconstruction purposes in the wake of the Gaza war.

4.     Israel's freeze of Palestinian clearance revenues has caused severe harm in 2015—so much so that, in late May, the World Bank made the sobering announcement that "[t]he expectation that the Palestinian economy will rebound significantly in 2015 <u>vanished</u> following the Israeli decision to freeze the transfer of Palestinian taxes."[2]

5.     Based on these factors, the World Bank confirmed in July 2015 that the "PA is currently not in a position to take on additional expenditures."[3]

6.     For its part, the International Monetary Fund ("IMF") announced in May 2015 that the PA is facing substantial risks outside the PA's control that are highly likely to emerge in the near term, jeopardizing and preventing economic recovery in 2015 and beyond. Among the most

---

[1] Exh. 1, PA Fiscal Operations for May 2015 ("PA May 2015 Operations"), at Table 1 (Revenues, Expenditures and Financing Sources (Commitment Basis)); *see* Exh. 2, PA Fiscal Operations for June 2015 ("PA June 2015 Operations"), at Table 1 (Revenues, Expenditures and Financing Sources (Commitment Basis)).

[2] Exh. 3, The World Bank, "Economic Monitoring Report to the Ad Hoc Liaison Committee" dated May 27, 2015 ("World Bank May 2015 Report"), at 13 (emphasis added).

[3] Exh. 4, World Bank letter dated July 16, 2015, at 2.

pressing and substantial of these is the threat to the PA's viability from the "potential large financial liabilities related to [the *Sokolow*] litigation,"[4] which "would further undermine the already fragile financial position of the PA, leading to private sector arrears, a fall in demand, and in the extreme case, to a breakdown of essential government services and social instability. A fiscal crisis could spread to banks, which are heavily exposed to the public sector."[5]

      7.    Given these circumstances, and the recent findings by these independent authorities, Mr. Wendt's estimates that the PA can generate an additional $20 to $30 million each month in "operating income" to secure or to pay the *Sokolow* judgment are generally absurd and often reckless. To begin with, Mr. Wendt fails entirely to discuss the PA's $5 billion in pre-existing creditor obligations, which are senior in time to the claim of the unsecured *Sokolow* Plaintiffs, and which are often secured or, if unsecured, must take priority for humanitarian reasons or for the survival of Palestinian society.[6] Mr. Wendt also postulates unrealistic annual growth rates in net revenues of 7%,[7] in total disregard of the realities on the ground and the operating environment and micro-fiscal context that Palestinian economy operates under.

      8.    Although noticeably outside the scope of his claimed expertise in U.S. municipal financing, Mr. Wendt also advocates implementing near-term political and economic changes in Palestine, which observers familiar with the political, social and economic realities in Palestine know will endanger regional security and stability, and promote social unrest and chaos in the region. The IMF, World Bank, United Nations and Ministry of Finance warn that these same measures are

---

[4] Exh. 5, IMF, "West Bank and Gaza Report to the Ad Hoc Liaison Committee" dated May 18, 2015 ("IMF May 2015 Report"), at 8.

[5] Exh. 5, IMF May 2015 Report, at 8; *see also* Exh. 6, IMF "Statement at the End of an IMF Mission to the West Bank and Gaza," dated June 18, 2015, at 2 available at http://www.imf.org/external/NP/SEC/PR/2015/pr15282.htm (last visited July 22, 2015).

[6] Exh. 7, Chart - "Palestinian Authority Debt and Arrears Estimated As of July 2015."

[7] Dkt. 931 (Wendt Aff.), at ¶ 21.

unlikely to succeed, particularly in the time frame Mr. Wendt contemplates. Ignorant of the realities on the ground, Mr. Wendt proposes raising revenues and cutting expenditures by: (a) on the revenue side, "resolving commercial issues with Israel,"[8] collecting tax revenue and electricity payments from Gaza, and improving the PA's West Bank tax collection and enforcement;[9] and, (b) on the expense side, freezing wages, allowances and promotions; cutting the public security, healthcare and education budgets; and terminating payments to PA employees in Gaza.[10]

9.      I address each of these recommendations in greater detail below, but to illustrate the unfeasibility of Mr. Wendt's proposals: A centerpiece of Mr. Wendt's platform is that the PA should return to an emergency cash-rationing budget like the one instituted during the 2015 clearance freeze.[11] Such emergency rationing would not only fail to create the hoped-for liquidity, but would further imperil an already precarious financial *status quo*. After *just one month* of similar measures, the IMF warned in January 2015 that the cuts were causing "a growing risk of social unrest and strikes that could lead to political instability."[12] Mr. Wendt's plan would force the PA to implement equivalent emergency cuts *for more than 30 months*.[13]

10.      Likewise, Mr. Wendt fails to address how the PA is to meet the imminent security challenges that confound this region, and yet pay its security employees half of their wages for 30 months, or fire nearly half of its employees, the largest share of whom would be security and safety

---

[8] Dkt. 931 (Wendt Aff.), at ¶¶ 43, 53.

[9] Dkt. 931 (Wendt Aff.), at ¶ 53.

[10] Dkt. 931 (Wendt Aff.), at ¶¶ 44, 53.

[11] Dkt. 931 (Wendt Aff.), at ¶ 12.

[12] Doc. 899 (Bishara Decl.), ¶ 33 (citing Exh. 14 thereto, IMF Statement at the End of an IMF Mission to the West Bank and Gaza dated January 29, 2015, at 2, available at http://www.imf.org/external/np/sec/pr/2015/pr1524.htm (last visited March 1, 2015).

[13] Doc. 931 (Wendt Aff.), at ¶ 10 (noting that, under his recommended cash management plan, emergency cash rationing would be necessary for 30 months).

personnel.[14] Both the United States *and* Israel have recognized the critical contributions of the PA security forces to improving security in the West Bank, including to successfully constrain Hamas's ability to conduct terror attacks.[15]

11.     Mr. Wendt's other recommendations fail to account for the enduring occupation of Palestine by Israel, that Israel prohibits Palestine from developing a substantial part of the Palestinian territory to create economic value, or the extreme conditions in Gaza following the war in 2014. Under these circumstances, material improvements to West Bank tax revenue generation are at least five to six years away. The PA remains largely unable to collect taxes and other payments due from the residents of Gaza, because PA employees are not able to operate in Gaza, and because Gaza has a 43% unemployment rate, which the World Bank believes to be the highest in the world, with youth unemployment exceeding 60%.[16] Although Mr. Wendt proposes the PA no longer pay healthcare expenses and electrical power needs for Palestinians living in Gaza, the PA cannot simply abandon its humanitarian commitment to the 1.8 million Palestinian people living in Gaza, and thereby dramatically increase human suffering.

**II.     The PA's Financial Condition Has Continued to Deteriorate, And The PA's Financial Prospects Remain Bleak In The Face Of Imminent Political, Economic and Social Risks That Will Disrupt the PA's Economic *Status Quo.***

12.     The PA is, for all practical purposes, insolvent. On a consistent basis, the PA lacks the funds to meet its current obligations by a material margin. Fundamentally, this is because the PA has limited control over its financial situation and economic destiny due primarily to the following

---

[14] Exh. 8, W. Booth, "Israel Backs Down and Returns Frozen Funds to Palestinians," *The Washington Post,* available at https://www.washingtonpost.com/world/israel-backs-down-and-returns-funds-to-palestinians/2015/03/27/c57b46d4-617b-4cfd-9b41-d85fce0737ac_story.html (last visited July 22, 2015) (statement by Palestinian police chief, Maj. Gen. Hazim Attallah, that "[t]here is no police force in the world whose officers, no matter how dedicated, will come to work and be willing to risk their lives for half-salaries").

[15] Exh. 9, U.S. Department of State Country Reports on Terrorism 2014 dated June 2015, at 177-81.

[16] Exh. 4, World Bank letter dated July 16, 2015, at 1; Exh. 10, IMF Survey "Donor Support Crucial to West Bank and Gaza's Recovery" dated May 19, 2015 ("IMF Survey"), at 2, *available at* http://www.imf.org/external/pubs/ft/survey/so/2015/int051915a.htm.

factors: (1) the PA does not and cannot issue its own currency and therefore has no control over its monetary supply; (2) the PA is unable to collect taxes, invest in or develop roughly 63% of the area assigned to the PA under the Oslo Accords (specifically, "Area C"); (3) the PA does not control the borders to the territory under its administration due to the Israeli occupation; and, (4) the tragic conditions in Gaza, which is uniformly poor and plagued by one of the highest unemployment rates in the world[17] stemming from Israel's restrictions on Palestinians' free movement between Gaza and the West Bank. The already extreme conditions in Gaza have been exacerbated by recurring cycles of warfare with Israel over the last decade, with the most recent war occurring in 2014. More than 80% of Gazans are dependent on aid, and fully *two-thirds* of Gazans are refugees, more than half a million of whom "live in the eight recognized Palestine refugee camps, which have one of the highest population densities in the world."[18] Because of a $101 million shortfall, the United Nations Relief and Works Agency expect that they will not be able to open schools in September in Gaza unless additional funding arrives soon.[19] Because of these many challenges, Gaza consumes roughly 40% of the PA's annual expenditures and is a cost center, not a revenue source, for Palestine.

13.     The PA is focused on creating economic recovery and growth in Palestine, despite daunting challenges. The IMF and World Bank acknowledge these efforts, and report that the PA did a "commendable job managing the acute fiscal crisis due to the Israeli decision to withhold clearance revenues in Q1 2015."[20]

14.     Nevertheless, the financial picture "remains bleak" because of the "sluggish

---

[17] Exh. 4, World Bank letter dated July 16, 2015, at 1.

[18] Exh. 11, United Nations Relief and Works Agency for Palestine Refugees in the Near East website, at 2, *available at* http://www.unrwa.org/where-we-work/gaza-strip (last visited August 3, 2015).

[19] "UNRWA sends emergency financial report to UN Secretary-General amid fears school year for half a million students could be delayed," dated August 5, 2015 *available at* http://www.unrwa.org/newsroom/press-releases/unrwa-sends-emergency-financial-report-un-secretary-general-amid-fears (last visited August 5, 2015).

[20] Exh. 3, World Bank May 2015 Report, at 11-12; *see also* Exh. 5, IMF May 2015 Report, at 11-12.

reconstruction process in Gaza, the instability of clearance revenues, and high political uncertainty."[21]

15.      The IMF and World Bank also report that there exist substantial risks outside the PA's control that are highly likely to emerge in the near term, jeopardizing and preventing any economic recovery in 2015 and beyond. For example, given the volatility in the Palestinian-Israeli relationship, and that the Israeli-Palestinian peace process is frozen, the clearance revenues remain at risk of being withheld again by Israel at a moment's notice.[22] Consequently, "[e]conomic prospects in 2015 are highly uncertain, and risks are elevated. Further interruptions in [clearance revenue] transfers or continued shortfalls in donor aid would lead to drastic fiscal retrenchment with adverse economic, and potentially social, consequences."[23]

16.      The IMF also issued an express warning about the threat to the PA's viability from the "potential large financial liabilities related to [the *Sokolow*] litigation."[24] The IMF agrees with the PA that the "shock" to the system from paying such a large judgment or security pending appeal would cripple the PA and threaten its very existence.[25]

## III.   The PA's 2015 Financing Gap Is Half a Billion Dollars Before The *Sokolow* Award, Which The PA Has No Money To Pay.

17.      The PA presently operates at a substantial deficit, which is expected to reach $2.294 billion in 2015.[26] Even with foreign aid, both the World Bank and IMF agree that the PA faces an

---

[21] Exh. 3, World Bank May 2015 Report, at 5.

[22] Exh. 5, IMF May 2015 Report, at 24 (Risk Assessment Matrix).

[23] *Id.*, at 1.

[24] *Id.*, at 8.

[25] *Id.*, at 5, 8, 9.

[26] This amount is comprised of the PA's operating budget deficit plus the required development expenditures to rebuild Gaza. *See* Exh. 12, The Government of Palestine's Report to the Ad Hoc Liaison Committee dated May 27, 2015

enormous "financing gap" in 2015 of approximately $42 million in monthly expenses, or "close to half a billion U.S. dollars"[27] annually for which funding is not available.

A. **The PA Cannot Divert Revenue Away From Its Creditors To Bridge The Financing Gap, Or To Pay or Provide Security On the *Sokolow* Verdict.**

18.     The PA cannot divert revenue away from its long line of pre-existing creditors to pay installments on the *Sokolow* verdict. Many of the PA's obligations are secured by pledges or assignments of cash flows owed to the PA, including, most notably, the clearance revenues due to be remitted to the PA by the Israeli government, and foreign aid intended to support PA government services.[28] Mr. Wendt summarily dismisses or ignores these pre-existing, legally

---

("AHLC Report"), at 17 ("Current Balance" NIS 4462 million plus "Development Expenditure" NIS 4600 million equals "Balance" NIS 9062; the exchange rate used is 3.95 NIS per dollar, *see* Doc. 925, at n. 2);

All of the conversions in this declaration from new Israeli shekels (NIS) to U.S. dollars are based on the prevailing exchange rate at the relevant time. The exchange rate for May 2015 was 3.88 NIS per dollar. *See* Exh. 1, PA May 2015 Operations, at 1 (Revenues, Expenditures and Financing Sources (Commitment Basis)). The average exchange rate for January through May of 2015 was 3.93 NIS per dollar; that exchange rate is used herein when converting average monthly amounts from the January through May 2015 time period. The exchange rate for June 2015 was 3.84 NIS per dollar. *See* Exh. 2, PA June 2015 Operations, at 1 (Revenues, Expenditures and Financing Sources (Commitment Basis)). The average exchange rate for January through June of 2015 was 3.92 NIS per dollar; that exchange rate is used herein when converting average monthly amounts from the January through June 2015 time period. In addition, the amounts calculated from Doc. 898 (April 30 Bishara Decl.) and Doc. 899 use the following exchange rates (*see* Doc. 899 at n. 4): for 2013, the average rate was 3.61 NIS per dollar for the year; for 2014 the average rate was 3.57 NIS per dollar for the year; for January 2015, the exchange rate was 3.93; for February 2015, the rate was 3.90; for March 2015, the rate was 4.00. Amounts calculated from Doc. 925 use the following exchange rate (Doc. 925 at n. 2): for April 2015, the rate was 3.95.

[27] Exh. 4, World Bank letter dated July 16, 2015, at 1; Exh. 10, IMF Survey, at 3 ("[T]he IMF staff project a large financing gap this year, of nearly half a billion dollars."). A financing gap "means that expenditure is higher than revenue, donor aid, and other financing combined." Exh. 10, IMF Survey, at 3.

[28] For example, the August 2014 loan agreement with the Bank of Palestine to borrow NIS 350 million provides in Article 7 that "any account held by the State of Palestine in the branches of the First Party and any amounts deposited in such accounts shall be security for repayment of the loan." Exh. 13, Loan Agreement between Bank of Palestine and the State of Palestine dated August 17, 2014, at Art. 7; *see also*, Exh. 14, Loan Agreement between Bank of Palestine and Ministry of Finance, the State of Palestine dated March 3, 2015, at Art. 6 (the loan "shall be repaid if the Israeli side releases all the withheld clearance revenues"); Exh. 15, July 21, 2015 letter from Bank of Palestine to the Ministry of Finance (stating that increase in overdraft limit "will be guaranteed by the local revenues"); Exh. 16, Loan Agreement between The National Bank and the State of Palestine dated August 14, 2014, at Art. 6 (authorizing "the Bank to use any taxes due by the Bank (namely the income tax imposed on the Bank employees and the value-added tax due by the Bank) to pay the installments and the interest due on the loan"); Exh. 17, Annex to the Overdraft Facility Agreement between The National Bank and the Ministry of Finance, the State of Palestine dated March 4, 2015, at Art. 1 (stating that the increase in overdraft limit must be repaid "no later than 5 April 2015 or on the date on which the Israeli clearance revenue transfer for the months of January, February and March 2015 is made").

controlling creditor obligations as something the PA should simply pay later,[29] when, in fact, they cannot be ignored or paid after the *Sokolow* Plaintiffs.

19.     The PA, like most governments, has obtained loans and overdraft accounts on commercial terms that must be repaid with interest from local banks to assist with funding PA operations. The PA's bank and other creditors include:

a.   For the PA's domestic debt totaling $1.272 billion of which $828.1 million is short term debt and $444.1 million is long term,[30] the bank debt includes: i) $668,007,043 in loans (Al-Quds Bank - $137,818,064.37; Bank of Palestine - $131,683,828.78; Egyptian Arab Land Bank - $53,981,615.65; Palestinian Investment Bank - $23,432,702.63; Arab Bank - $78,850,888.11; National Bank - $60,735,646.65; Housing Bank for Trading & Financing - $111,501,026.54; Jordan Ahli Bank - $29,630,615.33; Palestine Commercial Bank – 11,253,189.11; Jordan Commercial Bank - $20,956,631.88; and Jordan Kuwait Bank - $8,162,834.10), ii) $369,392,029 in overdrafts (Bank of Jordan - $30,817,742.75; Cairo Amman Bank - $85,096,046.54; Bank of Palestine - $93,011,689.78; and Arab Bank - $160,466,550.83), and iii) $220,942,675 for Petroleum Authority loans and overdrafts (Palestinian Islamic Bank - $50,055,827.62; Arab Islamic Bank - $48,966,797.45; Bank of Palestine - $25,588,541.16; Arab Bank - $50,030,441.80; and National Bank - $46,301,066.81);[31]

b.   foreign financial institutions, including the Al Aqsa Fund, which is owed $517.5 million; the Arab Fund for Economic & Social Development, which is owed $55.6

---

[29] Dkt. 931 (Wendt Aff.), at ¶¶ 48-51.

[30] Exh. 2, PA June 2015 Operations, at Table 7a Public Debt (million USD).

[31] Exh. 25; PA Ministry of Finance Local Loans Report.

million; and, the Islamic Development Bank, which is owed $45.2 million;[32]

c.  international and regional institutions, such as the World Bank, which is owed $273.2 million; the European Investment Bank, which is owed $47.7 million; OPEC, which is owed $20.3 million; and, the International Fund for Agriculture Development; which is owed $2.6 million;[33]

d.  bilateral loans, with $77.8 million owed to Spain; $27.6 million owed to Italy; and, $5.3 million owed to China;[34]

e.  the Israeli government, which (under the prior PA Finance Minister) advanced NIS 900 million ($233.8 million)[35] to the PA as against future receipts of clearance revenues, with a current balance of 560 million ($146.9 million);[36]

f.  two Israeli refineries (Bazan and Paz), from which the PA buys fuel on credit terms, and which at present are owed $174,363,895 secured by an assignment of clearance revenues due to the PA from the Israeli government;[37]

g.  other Palestinian entities, including the PPF, to which the PA owes approximately $1.84 billion; and, the Palestinian Monetary Authority ("PMA").[38]

20.  Beyond these debts, as of June 2015, according to World Bank estimates, the PA also

---

[32] Exh. 2, PA June 2015 Operations, at Table 7a Public Debt (million USD).

[33] *Id.*

[34] *Id.*

[35] This conversion uses the average exchange rate for 2012 of 3.85 NIS per dollar.

[36] Exh. 18, Commetments Report dated July 23, 2015 ("July Commetments Report"). The current Ministry of Finance is presently investigating this arrangement, which the Israeli government claims as a basis for offsetting clearance revenues due to the PA.

[37] *Id.*

[38] Exh. 18, July Commetments Report.  The PA can no longer can borrow from the PMA under a provision of the Budget Law enacted at the suggestion of the World Bank, in keeping with the best practices of Central Banks.

owes $800 million in arrears on payments due to private sector vendors.[39] Arrears are due for payment immediately, but the PA simply lacks the funds to pay them.[40]

21.    Because of its funding shortage, the PA continues to accumulate arrears to manage its financing gap. The PA incurred $70 million (NIS 271.8 million) in additional arrears in May 2015, and incurred a further $80.6 million (NIS 309.5 million) in arrears in June.[41]

### B.    The PA Cannot Obtain Additional Funds To Cover the Financing Gap, Or To Pay or Provide Security on the *Sokolow* Verdict.

22.    Although the IMF has urged that "scaled up donor support for the PA is urgently needed,"[42] the prospect for the PA to generate additional foreign aid to cover its $500 million financing gap "is highly unlikely."[43] To the contrary, donor aid has declined by about 20% annually during each of the past two years, and is expected to decline by a further 25% in 2015.[44] This decline is due primarily to two factors: (1) increased demand for aid from elsewhere in the region, most notably due to Syrian refugees, the conflict in Yemen, and conditions in both Libya and Iraq; and, (2) "donor fatigue," meaning the frustration of donors who believe that their many years of support have not materially improved conditions in Palestine, due to our entrenched problems stemming

---

[39] Exh. 4, World Bank letter dated July 16, 2015, at 2.

[40] Specifically, the PA's accumulated arrears in 2015 include: wage and salaries ($93.42 million (NIS 366.2 million)); social contributions ($89.24 million (NIS 349.8 million)); private vendors supplying the PA with goods and services ($191.1 million (NIS 749.1 million)); social transfers ($20.61 million (NIS 80.8 million)); minor capital arrears ($3.47 million (NIS 13.6 million)); and, interest on loans from domestic and external banks ($14.44 million (NIS 56.6 million)). Exh. 2, PA June 2015 Operations, at Table 3 (Fiscal Operations and Arrears).

[41] Exh. 2, PA June 2015 Operations, at Table 3 (Fiscal Operations and Arrears).

[42] Exh. 6, IMF "Statement at the End of an IMF Mission to the West Bank and Gaza," dated June 18, 2015, *available at* http://www.imf.org/external/NP/SEC/PR/2015/pr15282.htm (last visited July 22, 2015).

[43] Exh. 4, World Bank letter dated July 16, 2015, at 1.

[44] Exh. 19, PA Public Budget 2015 Briefing, at 1; Exh. 3, World Bank May 2015 Report, at 13 (2015 foreign aid); *see* Doc. 899 (Bishara Decl.), at Exh. 11, PA April 8, 2015 Presentation, at 4 (projecting 22% decline in 2015 foreign aid).

from Israeli occupation, and lack of progress in the peace process.[45]

23.     The PA also cannot bridge its financing gap with additional borrowing from local banks, because the domestic banks in Palestine already concentrate too much of their loan portfolio in the form of loans to the PA. As the IMF noted, "[w]orryingly, almost 43 percent of banks' loan portfolios constitute loans to the PA and its employees,"[46] when Palestinian banks ordinarily consider it unsafe to carry more than 25% exposure to a single borrower or towards correlated risks.[47] The high concentration in domestic bank loans to the PA crowds out the private sector,[48] moreover, which needs borrowing capacity in order to grow the Palestinian economy. Meanwhile, the PA is unable to repay the vast sums it has already borrowed from the local banks.[49] In addition, the IMF has stated that the PA has almost reached the "40 percent government-mandated threshold for public debt."[50] The PA cannot borrow any additional funds if its public debt to GDP ratio reaches this 40% mark.  In light of these facts, if the PA collapses, because of *Sokolow* or for other reasons discussed in this Declaration and in my prior one, then the Palestinian banking system will collapse, and may sweep with it the entire private sector.[51] The PA's own financial reports and the World Bank and IMF reports therefore conclude that additional borrowing from local banks is both

---

[45] *See* Exh. 5, IMF May 2015 Report, at 25 (Risk Assessment Matrix).

[46] Exh. 5, IMF May 2015 Report, at 7.

[47] Exh. 20, IMF, "West Bank and Gaza Selected Issues," Sept. 11, 2013, at 3, *available* at http://www.imf.org/external/country/WBG/RR/2013/091113a.pdf.) (Public Debt law); Exh. 21, The World Bank, "Bank Regulation and Supervision Survey Dataset," at Line 370, *available at* http://econ.worldbank.org/WBSITE/EXTERNAL/EXTDEC/EXTGLOBALFINREPORT/0,,contentMDK:23267421~pagePK:64168182~piPK:64168060~theSitePK:8816097,00.html.(25% limit).

[48] Exh. 22, Minister of Finance Speech to the LDF dated May 18, 2015, at 14.

[49] Exh. 4, World Bank letter dated July 16, 2015, at 2.

[50] Exh. 5, IMF May 2015 Report, at 26.

[51] *See* Exh. 3, World Bank May 2015 Report, at 13 ("This high credit concentration is a serious risk that can threaten the viability of the overall sector, particularly given the ability of Israel to freeze the transfer of PA revenues."); *see also* Exh. 5, May 18, 2015 IMF Report, at 24 (Risk Assessment Matrix).

risky and unlikely to be available.

24.      With these problems, it is unrealistic to believe that the PA can balance its budget or eliminate its $500 million financing gap under the current circumstances.  While the Ministry of Finance has made balancing the PA budget a high priority, this goal is largely aspirational, because the PA cannot borrow or print money in the absence of a national currency, cannot raise taxes on an already overburdened and underserved population, and is now confronting the imminent risks that jeopardize the economic *status quo*, which the IMF identified in its May 2015 report.[52]

C.      **The PA Cannot Accumulate More Arrears or Implement Emergency Cash Rationing To Bridge the Financing Gap, Or To Pay or Provide Security on the *Sokolow* Verdict Without Threatening the Viability of the PA.**

25.      While Mr. Wendt believes that expenditure cuts should be implemented by reducing salaries or firing employees, particularly security personnel in Gaza,[53] such cuts and accumulation of arrears are not a viable solution, and both come with short- and medium-term consequences that will harm the Palestinian economy and threaten its continued existence.[54]

26.      The PA has made the reduction of this stock of arrears a strategic priority. When the private sector is not paid for goods and services it has delivered to the PA, this results in the withdrawal of liquidity from the market. The Ministry of Finance estimates that the non-payment of $800 million for goods, services and other items owed to the private sector, on an economic multiplier basis, is tantamount to withdrawing 40% of Palestine's GDP. This is because the private sector lacks the cash to create the multiplier effect of paying its employees and suppliers, who in turn make purchases that stimulate a consumer economy. In the plainest terms, the effect of the

---

[52] Exh. 5, IMF May 2015 Report, at 24-25 (Risk Assessment Matrix).

[53] Doc. 931 (Wendt Aff.), at ¶¶ 30, 40, 53.

[54] Exh. 5, IMF May 2015 Report, at 10 ("In the absence of policy measures or additional donor support, new arrears will be accumulated, leading to higher debt and posing risks to debt sustainability.").

PA's accumulation of arrears is to "undermine the private sector, slow the economy, and derail efforts to boost revenues."[55]  Further, "private suppliers to the government would not be paid, and the impact of that would ripple through the economy and undermine confidence in the private sector. These developments would, in turn, affect revenue collection."[56]

27.     These are not the paper projections of an economist—Palestine has already experienced the "severe fiscal strains" of the four-month freeze and consequential cash rationing and arrears accumulation in early 2015, which were enough to ruin hopes of an economic recovery this year.[57] By April 2015, the severe blow to the Palestinian economy was evident: GDP had contracted by -.37 as compared to the already feeble growth in 2013, while January 2015 exports declined 5% and imports declined 10%.[58] For its part, the IMF pronounced that "partial wage payments and other public spending cuts during January-March will likely lead to some reduction in private consumption for the year as a whole, and confidence effects related to the fiscal crisis will limit private investment."[59]

28.     In the face of such cautionary analysis regarding the dangers of arrears accumulation, Mr. Wendt nevertheless insists that the PA do just that. Mr. Wendt states that, "as demonstrated by the emergency cash rationing budget implemented by the PA in January 2015,"[60] the PA can raise

---

[55] *See* Doc. 899 (Bishara Decl.), at Exh. 4, West Bank and Gaza – IMF Assessment Letter for the Norwegian Authorities dated April 8, 2015, at 3.

[56] Exh. 10, IMF Survey, at 3.

[57] *See* Doc. 899 (Bishara Decl.), at Exh. 4, West Bank and Gaza – IMF Assessment Letter for the Norwegian Authorities dated April 8, 2015, at 2.  The World Bank announced that any "expectation that the Palestinian economy will rebound significantly in 2015 vanished following the Israeli decision to freeze the transfer of Palestinian taxes." Exh. 3, World Bank May 27, 2015 Report, at 13.

[58] Doc. 899 (Bishara Decl.), at ¶ 28; Bishara Decl., at Exh. 11, PA April 8, 2015 Presentation, at 4.

[59] *See* Doc. 899 (Bishara Decl.), at Exh. 4, West Bank and Gaza – IMF Assessment Letter for the Norwegian Authorities dated April 8, 2015, at 2.

[60] Doc. 931 (Wendt Aff.), at ¶ 12.

$30 million each month to secure the *Sokolow* judgment, and can pay $655 million of the damages awarded to the *Sokolow* Plaintiffs in 30 months' time by freezing wages, allowances and promotions, and by cutting the number of employees and their compensation. This proposed "solution" is preposterous; implementing another emergency cash-rationing budget would not only fail to create the hoped-for liquidity, but also would further imperil an already precarious financial *status quo*.

29.     In fact, the emergency cash rationing that the PA instituted during the Israeli clearance revenue freeze for the first four months of 2015 demonstrates, without question, that the PA cannot actually afford to make such severe budget cuts.[61] Between December 2014 and April 2015, while the clearance revenue freeze was in effect, the PA borrowed an additional $160 million in loans to help cover expenditures,[62] overdrew its bank accounts by more than $400 million,[63] and accumulated approximately $460 million in additional arrears.[64]

30.     There is a critical distinction between the clearance revenue freeze—when the PA employees endured delays of 40% of their wage payments, but were always going to be reimbursed the difference—and Mr. Wendt's proposal, which would require PA employees to <u>permanently forfeit 51% of their wages for 30 months</u>.[65] Given the extremely high unemployment and poverty rates in Palestine, and the fact that the PA's employees only recently started receiving full wages again in April, forcing PA employees to surrender permanently more than 50% of their wages for 30 months is neither a realistic nor a humane solution. Extensive adverse social consequences resulted

---

[61] Doc. 899 (Bishara Decl.), ¶¶ 30-33.

[62] Doc. 899 (Bishara Decl.), ¶ 44; *see also* Ex. 3, World Bank May 2015 Report, at 12 ("[T]he PA had to increase its domestic borrowing by NIS809 million, leading to a total stock of domestic debt of NIS 5.2 billion, as of March 2015.").

[63] Doc. 899 (Bishara Decl.), ¶ 49.

[64] *Id.,* ¶ 54 (NIS 1.837 billion in arrears from January to March, at an exchange rate of 3.94).

[65] *See id.,* at ¶ 38; Exh. 22, Minister of Finance Speech to the LDF dated May 18, 2015, at 7.  The PA's average wages and salaries expense in 2015 has been $142 million (NIS 556.5 million) per month. Exh. 2, PA June 2015 Operations, at 2 (Revenues, Expenditures and Financing Sources (Cash Basis)).

from underpaying employees by 40% for four months in 2015; instituting a 51% permanent wage cut over 30 months, in what is, for many households and extended families, a principle source of income, would be unimaginable in its ramifications.[66] As it is, to protect the most vulnerable members of Palestinian society—those living below the poverty line—the PA makes "social safety net transfers" to approximately 123,000 families.[67]

31.     To fully appreciate the devastating impact of such wage cuts, then, it is important to understand the extreme poverty the Palestinian people now suffer. The World Bank's report in this regard is sobering:

> Unemployment and poverty have reached staggering rates and the quality of life for the large majority of Gaza's citizens is hardly bearable. The feeling of hopelessness is pervasive, in particular following the summer 2014 war. The access and quality of basic services such as electricity, water and sewerage is rapidly deteriorating and pandemics of infectious diseases are a real threat.[68]

## IV.   Mr. Wendt Proposes Political and Economic Policy Changes That Are Neither Achievable Nor Sustainable In Palestine.

32.     I have reviewed Mr. Wendt's assertions that the PA can generate an additional $20 to $30 million each month in "operating income" to secure the *Sokolow* judgment, and thereby pay what Mr. Wendt refers to as the "$655 million" damages award in *Sokolow*.  I note, first, that Mr. Wendt seems to be unaware that the *Sokolow* Plaintiffs have requested an additional award of nearly $500 million in the form of prejudgment interest.  Mr. Wendt's failure to account for this massive additional liability that the Plaintiffs seek to impose on the PA undermines both the calculations in, and the premise of, his report.

33.     Even setting aside the prejudgment interest issue, the Plaintiffs' request for $30

---

[66] Exh. 22, Minister of Finance Speech to the LDF dated May 18, 2015, at 7.

[67] *See* Exh. 2, PA June 2015 Operations, at Table 8a ("Social Assistance Benefits").

[68] Exh. 3, World Bank May 2015 Report, at 25; *see also* Exh. 4, World Bank letter dated July 16, 2015, at 1.

million per month would add $360 million annually to the PA's current, and likely growing, $500 million financing gap. For the PA to pay the monthly security <u>and</u> cover the monthly financing gap, the PA would have to raise $72 million each month rather than $30 million—31% of the PA's 2015 $235.7 million average monthly revenues.[69] Looking at this obligation from the expenditure perspective, similarly, the PA would have to cut its average monthly expenditures of $271.4 million by 27% to realize an additional $72 million each month.[70]

34.    Significantly, Mr. Wendt defines the PA's "operating income" as "includ[ing] donations that fund operating expenses."[71] Mr. Wendt's proposals for how the PA can and should pay the *Sokolow* Plaintiffs envision that the PA would divert to the Plaintiffs portions of the aid donated by foreign governments to the PA to operate vital government services for the benefit of the Palestinian people. At least half of the donor support for PA operating expenses is earmarked for payment of specific purposes, such as the EU's designation of funds to pay pre-vetted and selected PA employees as well as pre-set social welfare transfers, and such funds cannot be used for any other purpose.  There is no doubt in my mind that foreign governments would terminate their aid to Palestine if those donations were diverted to the Plaintiffs, and away from their intended purpose of supporting the PA and the Palestinian people.

35.    If Mr. Wendt indeed has ever been to Palestine, then he ought to know better than to make recommendations that are utterly at odds with the political, social and economic realities on the ground. While I do not question his claim to be knowledgeable about how U.S. municipalities finance themselves, I respectfully suggest that he has no appreciation of the massive problems that

---

[69] Exh. 2, PA June 2015 Operations, at Table 2 (Revenues, Expenditures and Financing Sources (Cash Basis)).

[70] *See id.*

[71] Doc. 931 (Wendt Aff.), ¶ 18.  Mr. Wendt further defines the PA's "operating income" as "the difference between its operating revenues and operating expenses (excluding development grants and related expenditures)."

Palestinians face as they struggle to build their economy and society under the enduring occupation by Israel. Furthermore, it does not appear to me based on Mr. Wendt's statements in his affidavit that he has sufficient understanding of macroeconomic fiscal issues to reach the conclusions he does. I address each of Mr. Wendt's recommendations in turn below.

36.     **Commercial Disputes with Israel.** One of the longest-standing problems faced by the PA government has been to convince the Israeli government to engage in meaningful, good faith discussions to resolve entrenched commercial disputes.

37.     For example, as I have done with prior Israeli Finance Ministers, I have been trying to initiate a constructive dialogue with the new Israeli Finance Minister, Moshe Kahlon, in hopes of resolving long-standing commercial disputes with Israel of the type to which Mr. Wendt alludes in his report.[72]

38.     In recent correspondence, I described for Minister Kahlon the critical need to resolve disputes related to the purchase of power from the Israeli Electricity Company; to access comprehensive data regarding the imports of goods and services by the Palestinian Authority and Palestinian businesses from the Israeli market, particularly related to VAT, customs, and other trade related excise paid; the need for regular and uninterrupted transfer of taxes levied on Palestinian workers in Israel, in addition to the health insurance fees that ought to be remitted to the Palestinian Authority; the need to adjust the pro-rata fee sharing of border crossing revenues in accordance with stipulated agreements; to resolve disputes related to transfer taxes from commercial establishments and Israeli businesses collected in Area C, as well as other land registration fees levied in Area C; and, to resolve disputes related to the processing fees that Israel charges on a monthly basis for the transfer of monies owed to the Palestinian Authority.[73] It has been especially challenging to engage

---

[72] Exh. 23, Minister Bishara letter No. MoF/S.I./1219/2015 dated July 15, 2015.

[73] *See id.*

Israel over its unjustified deductions from the clearance revenues that Israel is obligated to remit to the PA under the Oslo Accords. Particularly galling is that Israel deducts a 3% "processing fee" each month simply for remitting the PA's own money to it.

39.     My attempts to open a dialogue with Israel have been generally ignored.[74] That Israel has thus far refused to engage in a productive dialogue makes it even more difficult to address the financial challenges between the PA and Israel. Indeed, there has actually been a step in the opposite direction, with the Israeli claim for NIS 2 billion (approximately $500 million) for supposedly unpaid electrical-service charges.

40.     Given this impasse, if Mr. Wendt has a magic wand that can produce a solution with the Israeli government, then I, as the PA's Finance Minister, would be pleased to learn of it.   Mr. Wendt's report offers nothing in that regard. In fact, his report is oblivious to the history of our problems with the Israeli government on this front, and inattentive to the hardening of attitudes toward the PA in the recently elected Israeli government.

41.     **Collection of Taxes and Payments in Gaza.**  In order to institute the collection of taxes and other payments due from the residents of Gaza, as Mr. Wendt suggests,[75] the PA would need to operate an effective enforcement capability in Gaza. But Mr. Wendt says nothing about the impact of the fact that Gaza is effectively governed by a *de facto* government controlled by Hamas, which is openly hostile to the PA government in the West Bank. Despite many efforts by the PA and the international community to restore PA control in Gaza, the *de facto* government has limited the PA's access to Gaza; with the exception of two PA Ministries (Health and Education), PA employees are not allowed to operate in Gaza.  In addition, as part of its military siege of Gaza, the Israeli government controls access from the West Bank to Gaza. Indeed, I, as Finance Minister,

---

[74] *See id.*

[75] Doc. 931 (Wendt Aff.), ¶ 53.

19

need Israeli government authorization to travel to Gaza.

42.     Mr. Wendt also inexcusably disregards the fact that Gaza is deeply impoverished, with 39% living under the poverty line, and is experiencing a 43% overall unemployment rate—with over 60% of youth unemployed.[76] There are no industries to speak of in Gaza, and only a few micro local enterprises. I am not surprised that Mr. Wendt has no concrete suggestions on how the PA could collect taxes and other payments from Gaza given its access restrictions, or how Palestinians in Gaza could make these payments under such grievous conditions.

43.     **West Bank Tax Collection and Enforcement**.  It has been, and will continue to be, a priority for the PA Ministry of Finance to improve tax collection and enforcement in the West Bank.  However, aside from the incremental improvements in tax collection discussed in the exhibits to my initial Declaration,[77] progress of the kind proposed by Mr. Wendt is at least five to six years away, assuming that all things remain equal and unchanged over that period. This is an unrealistic assumption, given the unique circumstances that the PA faces—most notably the enduring occupation by Israel, and the Israeli prohibition on the development and generation of economic value from Area C. I respectfully submit that there has been no parallel situation in economic history for any country operating with similar burdens to materially improve its tax revenue generation.

44.     **Freezing Public Sector Wages, Allowance and Promotions**.  It has been a priority of the PA Ministry of Finance to constrain the growth of the public sector wage bill. The PA already has put in place sweeping, even drastic, measures, most notably our "zero net hiring" program (which I described in my initial Declaration),[78] by which there is an absolute cap on growth in the number of public sector employees. Further, the PA has resisted public sector union demands

---

[76] Exh. 4, World Bank letter dated July 16, 2015, at 1.

[77] *See* Doc. 899 (Bishara Decl.), at ¶ 26.

[78] *See* Doc. 899 (Bishara Decl.), at ¶ 26.

for workforce and wage growth by, among other things, instituting legal limits on the actions of the public sector unions.

45.     Managing the public sector wage bill is a major fiscal and labor policy challenge. For example, Palestine's labor legislation mandates an annual cost of living increase of 1.25%,[79] which the PA cannot abrogate. In addition, a prior government administration agreed to a series of wage settlements, which had built-in inflationary impacts on the wage bill in 2013 and 2014. Even without these challenges, Mr. Wendt's salary freeze and cut recommendations are unachievable in the near term. PA public sector wages are significantly lower than reasonable levels particularly considering that Palestinians in the West Bank and Gaza share more or less the same cost of living that Israelis do; the minimum wage in Israel has been raised to NIS 5000 ($1,302) per month, yet roughly 50% of PA public sector employees earn less than NIS 2000 ($521) per month. In fact, I am paid only NIS 11,000 ($2,865) per month as Finance Minister. I can only imagine that the *Sokolow* Plaintiffs paid Mr. Wendt more than my entire annual salary for him and his team to produce his report. Third, given our commitment to regional security, we added 450 security personnel in a one-time move during 2014, 300 of whom were new graduates of the Istiqlal University, formerly known as the Palestinian Academy of Security Studies.[80]

46.     **Cutting Public Security and Other Personnel.**   The United States recently acknowledged and complimented the PA's vital role in combatting terrorism and contributing to regional security. The U.S. State Department has observed that the PA devotes great resources to its productive counterterrorism efforts.[81] The PA security team has succeeded in stabilizing security

---

[79] Exh. 22, Minister of Finance Speech to the LDF dated May 18, 2015, at 10.

[80] *Id.*, at 18.

[81] Exh. 9, U.S. Department of State Country Reports on Terrorism 2014 dated June 2015, at 177.

conditions in the West Bank, but Mr. Wendt calls this PA security commitment "outsized."[82] The U.S. government's own views conclusively refute anything Mr. Wendt has to say on this subject. The last thing that the PA, the U.S. government, or indeed Israel, should want is for the PA to break up the PA's successful security team and risk creating regional instability. The risk is real, furthermore, that if the PA fires its security personnel, those individuals will be susceptible to recruitment by radical Palestinian elements—if only to draw a salary.

47.     The PA's counterterrorism efforts in Gaza are limited by Hamas's control of the area, and by Israel's military presence in the majority of the West Bank. Despite those limitations, the United States *and* Israel recognize the Palestinian Authority Security Forces ("PASF") as a leading contributor to the improved security environment in the West Bank, and that PASF successfully constrained those terrorist groups' ability to conduct attacks.[83] The State Department has observed, further, the PASF and public prosecutors received training to enable better investigations of terrorism-related crimes, and "PASF personnel continued to conduct operations against and detain Hamas elements."[84]

48.     The PA cannot cut other public sector employees without creating an enormous problem, moreover, because the PA has had to withhold $1.84 billion in contributions to the Palestinian Pension Fund because of its funding shortage.[85]  The PA cannot now pay PA public sector employees years' worth of retirement payments. Firing public sector employees, as Mr. Wendt proposes, would increase unemployment and poverty, and dramatically increase the likelihood of

---

[82] Dkt. 931 (Wendt Aff.), at ¶ 33.

[83] Exh. 9, U.S. Department of State Country Reports on Terrorism 2014 dated June 2015, at 177-81.

[84] *Id.*, at 179-80.

[85] Exh. 18, July Commetments Report.

social unrest[86] if the PA takes employees out of the workforce and forces them into retirement without pension benefits.

49.   **Terminating Payments to PA Employees in Gaza.**   The PA cannot abandon its humanitarian commitment to Palestinians living in Gaza without causing further devastation. The PA has committed to pay healthcare expenses and electrical power needs for Palestinians in Gaza, which the Israeli government controls. The PA is able to defray some of the healthcare costs using United States' technical assistance. But, the PA cannot simply abandon the PA employees who live in Gaza who refuse to associate themselves with the *de facto* local Hamas government, on the basis of Mr. Wendt's say-so. The certain consequence of doing so is that those affected will lose their only source of livelihood, making them vulnerable to recruitment by radical and extreme Palestinian elements.

## V.   The IMF, World Bank and United Nations Raise Doubt About The Success Of The Policy Directives That Form The Basis Of Mr. Wendt's Proposals to Increase PA Operating Income.

50.   Mr. Wendt claims that his conclusions about available "fiscal initiatives and financial opportunities" are based on analyses and reports by the IMF, World Bank, United Nations and Ministry of Finance.[87] But, Mr. Wendt conveniently omits from his assumptions the critical information and the warnings of the IMF, World Bank, U.N. and Ministry of Finance about the challenges and obstacles precluding the success of those initiatives.

51.   For example, Mr. Wendt first opines that "the PA's baseline operating budget is expected to be balanced by 2018 without introducing new material fiscal initiatives."[88] The PA's

---

[86] *See* Doc. 899 (Bishara Decl.), at ¶ 33 (citing Exh. 14 thereto, IMF Statement at the End of an IMF Mission to the West Bank and Gaza dated January 29, 2015, at 2, available at http://www.imf.org/external/np/sec/pr/2015/pr1524.htm (last visited March 1, 2015).

[87] Doc. 931 (Wendt Aff.), at ¶ 53.

[88] Doc. 931 (Wendt Aff.), at ¶¶ 18, 53 (relying on data contained on May 18, 2015 IMF Report, at 21).

budget will not be balanced by 2018, and the IMF data clearly state as much. Instead, the IMF projects PA deficits in excess of $1 billion dollars in 2015 through 2018—whether or not the budget item includes costly but essential development expenditures.[89]

52.     Mr. Wendt tries to overcome the PA's deficits by including foreign charitable aid as a source of revenue for the PA in determining that the PA will balance its budget by 2018.[90] Putting aside my prior testimony that foreign aid cannot and should not be used to pay litigation security (which Mr. Wendt ignores),[91] foreign aid cannot be taken for granted as a constant or sustainable source of financing. The IMF actually projects PA financing gaps (meaning, once again, that expenditures are higher than revenue, donor aid, and other financing combined) of $483 million in 2015, $327 million in 2016, $263 million in 2017 and $209 million in 2018.[92] Contrary to Mr. Wendt's assertion, then, the IMF does not project that the PA's budget will be balanced by 2018, even if the PA includes foreign aid as a source of revenue.

53.     Mr. Wendt's recommendation to resolve outstanding commercial issues with Israel[93] ignores the IMF's observation that "[s]ince the breakdown of peace talks in April 2014, Israeli-Palestinian relations have been deteriorating . . . Israeli-Palestinian relations have worsened over the past year, the security situation remains fragile, and the future of the peace process is uncertain."[94]

---

[89] Exh. 5, IMF May 2015 Report, at 21 (projecting PA Recurrent Balance deficits in 2015 of $1.223 billion, in 2016 of $1.166 billion, in 2017 of $1.071 billion, and in 2018 of $1.008 billion; projecting "Overall Balance" deficits (including developmental expenditures) in 2015 of $1.923 billion, in 2016 of $1.883 billion, in 2017 of $1.808 billion, and 2018 of $1.366 billion.

[90] Doc. 931 (Wendt Aff.), at ¶ 19.

[91] Doc. 899 (Bishara Decl.), at ¶¶ 68-71. In addition, while Mr. Wendt contends that foreign aid is a source of "operating revenue" for the PA, the PA accounts for foreign aid as a source of financing (not revenue) on its financial reports. The IMF similarly records foreign aid under "Total financing" as "External financing for recurrent expenditures" and "External financing for development expenditures." Exh. 5, IMF May 2015 Report, at 21.

[92] Exh. 5, IMF May 2015 Report, at 21.

[93] Doc. 931 (Wendt Aff.), at ¶¶ 43, 53.

[94] Exh. 5, IMF May 2015 Report, at 1, 4.

The PA has spared no effort to resolve the important outstanding commercial disputes with Israel, to no avail.

54.    Mr. Wendt also relies on selected sections of a World Bank report to insist that the PA could generate $550 million per year by reinstituting tax collections and electricity billing in Gaza.[95] Mr. Wendt neglects the portions of that same World Bank report stating that such revenue enhancement measures can only be pursued "once governance arrangements over the territory [Gaza]" are reinstituted.[96] To be clear, the World Bank explained that "revenue mobilization and civil service reform" in Gaza can only be achieved "[o]nce the Palestinian Authority is fully in charge of Gaza's public sector."[97] As previously discussed, Gaza is under the control of a *de facto* government that is hostile to the PA and the PA has very limited access to Gaza—certainly not enough to regulate and enforce taxation. Further, in light of the humanitarian and economic crisis in Gaza, even if it could immediately implement taxation, doing so would undermine the PA's social obligations in Gaza. "These [poverty and unemployment] numbers, however, fail to portray the degree of suffering of Gaza's citizens due to poor electricity and water/sewerage availability, war-related psychological trauma, limited movement, and other adverse effects of wars and the blockade."[98] "*With time*, assuming progress on national reconciliation and improvement in relations with Israel, additional revenue *could* be derived from Gaza."[99]

55.    Notably, while the World Bank has made policy recommendations for sustained economic recovery, increasing employment, reducing poverty and increasing quality of life in Gaza,

---

[95] Doc. 931 (Wendt Aff.), at ¶¶ 11, 53 (based on estimates provided in the World Bank May 2015 Report, at 9).

[96] Exh. 3, World Bank May 2015 Report, at 9.

[97] *Id.*, at 26.

[98] *Id.*, at 6.

[99] Exh. 5, IMF May 2015 Report, at 38 (emphasis added).

none of these recommendations includes taxation or civil service employee reform until after "the Palestinian Authority is fully in charge of Gaza's public sector."[100]  Further, as the World Bank stated in July, the PA must not only try to augment revenues but must also not take on any added expenditures (which would include $30 million per month in litigation security), and must work to cut existing expenditures to close the $500 million financing gap.[101]

56.    Mr. Wendt also claims to have adopted an IMF observation that there is potential for raising additional domestic tax revenue in the West Bank by eliminating taxation exemptions, increasing the number of taxpayers, and improving tax compliance.[102] The PA has implemented and is implementing every tax revenue generation measure it can in the West Bank, but this will take time, as the IMF agrees—the measures needed for improving tax collections can only be achieved "gradually," which requires that "political circumstances are favorable."[103] Mr. Wendt also fails to address the PA's "limited options to independently set indirect taxes, such as VAT and customs taxes."[104]  The IMF concludes that "[r]ealistically, however, short-term revenue gains are likely limited, and expenditure rationalization efforts continue to be needed to close financing gaps."[105]

57.    Even if the PA were to implement these tax reforms, they would be inadequate to eliminate the PA's financing gap, and the PA would still depend heavily on foreign aid.[106] The IMF has reported that, "[i]n addition to the PA's own efforts, successful [tax] revenue mobilization will

---

[100] Exh. 3, World Bank May 2015 Report, at 25-26.

[101] Exh. 4, World Bank letter dated July 16, 2015, at 2.

[102] Doc. 931 (Wendt Aff.), at ¶¶ 41, 53; Exh. 5, May 2015 IMF Report, at 36.

[103] Exh. 5, IMF May 2015 Report, at 38.

[104] *Id.*, at 36.

[105] *Id.*, at 38.

[106] Exh. 5, IMF May 2015 Report, at 10.

depend on cooperation with Israel."[107] The PA obviously has no control over what measures or policies Israel will cooperate with the PA on when trying to implement them.

58.    Mr. Wendt's proposal to eliminate employees in Gaza who, he contends, do not provide any government services[108] says nothing about United Nations Development Program ("UNDP") observations that the integration of the two administrations in Gaza and establishing governance procedures as "a major challenge" that will take many months to reconcile, and will require a "paradigm shift in the Israeli approach to economic restrictions and a change in economic environment."[109] Mr. Wendt says nothing about the UNDP's position that the most difficult challenge in governing Gaza will be maintaining law and order and establishing, unifying and harmonizing the police, security and civil defense system "essential for Gaza's political and economic sustainability."[110]

59.    Mr. Wendt does not acknowledge the harm, further, to private sector production and investment that Israeli restrictions on movement and access cause the Palestinian economy, although his source material from the World Bank and IMF plainly do so.[111] The PA cannot solve these problems unilaterally; there are complex political questions and relationships on every side. The growth of the Palestinian economy cannot occur "unless there is an improvement in the political climate that would lead to a lifting of Israeli restrictions in the West Bank and the blockade of Gaza."[112]

---

[107] *Id.*, at 11.

[108] Doc. 931 (Wendt Aff.), at ¶¶ 40, 53.

[109] Exh. 24, K. Nashashibi, "Palestinian Public Finance Under Crisis Management: Restoring Fiscal Sustainability" ("UNDP March 2015 Report"), at 38, 49, 56.

[110] *Id.*, at 49.

[111] Exh. 5, IMF May 2015 Report, at 12; Exh. 3, World Bank May 2015 Report, at 6.

[112] Exh. 5, IMF May 2015 Report, at 13.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 5, 2015.

Shukry Bishara
Minister of Finance and Planning
The Palestinian Authority