F7S9SOK1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARK I. SOKOLOW, et al.,

                    Plaintiffs,

            v.                              04 CV 397 (GBD)

PALESTINE LIBERATION
ORGANIZATION, et al.,

                    Defendants.

------------------------------x
                                            New York, N.Y.
                                            July 28, 2015
                                            11:19 a.m.

Before:
                    HON. GEORGE B. DANIELS,

                                            District Judge

                        APPEARANCES

ARNOLD & PORTER LLP
      Attorneys for Plaintiffs
BY:   KENT A. YALOWITZ
      TAL MACHNES
      CARMELA T. ROMEO

SQUIRE PATTON BOGGS
      Attorneys for Defendants
BY:   GASSAN A. BALOUL
      MITCHELL R. BERGER
      ALEXANDRA E. CHOPIN
      JOHN A. BURLINGAME

F7S9SOK1

1              (In open court; case called)

2              MR. YALOWITZ:  Good morning, your Honor.  Nice to see

3      you.

4              THE COURT:  Good morning.

5              MR. YALOWITZ:  Ken Yalowitz, Tal Machnes, Carmela

6      Romeo, Arnold & Porter.

7              MR. BALOUL:  Good morning, your Honor.

8              Gassan Baloul.  Here with me is Mitch Berger, and Alex

9      Chopin, and John Burlingame from Squire Patton Boggs.

10             THE COURT:  Let's start this with -- I want to start

11     backwards.  I received a letter from the government yesterday.

12     And the government, the U.S. Attorney's Office has requested

13     that they have an opportunity to consider whether to weigh in

14     on the issue of -- I believe on the issue with respect to a

15     stay of execution of judgment.  They have asked to have until

16     August 10 to do that.  I'll hear from the parties on that but

17     I'm prepared to give them an opportunity to do that and

18     postpone the decision, ultimate decision on that until they've

19     had an opportunity to determine whether they wish to weigh in

20     and what their position is if they do wish to weigh in.

21             I guess I should start with -- do you have a position

22     with regard to that, Mr. Yalowitz?

23             MR. YALOWITZ:  I don't have a problem with the Court's

24     views.

25             THE COURT:  Then I will give them that.

F7S9SOK1

1              A related issue though is I guess I should turn to the

2      defense.  There was a letter that I believe I read after that

3      or in conjunction with that asking if I was going to give them

4      time to respond, asking for an opportunity to respond to the

5      submission the defense characterizes, the unauthorized Rule 62

6      surreply papers, and giving defense an opportunity to respond

7      to that, particularly respond to the two experts that were

8      accompanied with that.

9              I guess my first basic question is for the defense to

10     tell me -- what is your preference?  Do you want me to strike

11     it or do you want to respond to it?

12             MR. BERGER:  Your Honor, Mitch Berger for the PA and

13     the PLO.  Our first preference, as we asked in our July 16

14     letter, would be to have the court strike that material.

15             THE COURT:  So you don't want to address this issue at

16     all?

17             MR. BERGER:  We would be happy to address it if the

18     court is going to consider it.  I'm always in this awkward

19     position when unauthorized papers, which in our view they are,

20     are submitted.  The court has to read them for purposes of

21     making a decision on the motion to strike.  I suppose we're

22     better off responding substantively and fully and if that's an

23     offer from the court, we'd gladly accept that, and we'd ask to

24     have until August 10.

25             THE COURT:  I'm basically giving you the choice if you

F7S9SOK1

1    want me to strike it, I will first consider striking it, but if

2    you want to respond and you think that you should respond and

3    put in whatever affidavits or evidence that you think is

4    appropriate, then I will give you the opportunity to do that.

5    But I'm perfectly willing to at first consider whether to

6    strike it; and if it's appropriate to strike, then I'll hear

7    from either one of you on this issue.

8              MR. BERGER:  Your Honor, may I confer just one moment?

9              THE COURT:  Yes.

10             (Pause)

11             MR. BERGER:  Your Honor, thank you for that

12   opportunity.

13             I think we would prefer at this point to be able to

14   respond substantively to the surreply papers.  In view of the

15   U.S. Government's expression of an interest in this, we believe

16   our substantive submission is going to be of interest to the

17   government and be helpful to the court.  So we'd accept that,

18   your Honor, if that's available from the court as relief.

19             THE COURT:  That's why I proposed it.

20             So Mr. Yalowitz, do you have any position with regard

21   to that?

22             MR. YALOWITZ:  I think they should say whatever they

23   want to say.  I think the court should decide this on a full

24   record.  I don't think that my submission was unauthorized, but

25   we don't need to debate that.  They should put in whatever they

F7S9SOK1

1    want to.  I leave it to your Honor, in terms of timing, if you

2    want that on August 10, if you want it earlier than August 10.

3    I don't have a view on that.

4           THE COURT:  Well this is what I'd like.  I'm going to

5    give the U.S. Attorney's Office until August 10 to make their

6    submission.  I would encourage them -- I don't know if either

7    side has been in communication with them, but I would encourage

8    them to submit it as early as possible.  On or before that

9    date.

10          If you want to submit something in response to the

11   plaintiffs' papers can you do so by the 6th or the 7th?

12          MR. BERGER:  Of August?  Yes, your Honor.  We can get

13   that done.

14          THE COURT:  So Thursday is the 6th.  And Friday is

15   the 7th.  My suggestion would be Thursday so you can provide

16   the parties with copies, and the government can review it

17   before they make their final submission, if they're going to

18   make it by the 10th.  But I would encourage you to do it as

19   early as possible so I can review it.  What I think I may do,

20   unless the parties tell me that's awkward, I may go ahead and

21   schedule us to meet Thursday, the 13th unless --

22          MR. BERGER:  Your Honor, I'll be out of the country

23   from the 13th through the 19th.  If it's possible to do it

24   after then, that would be better for me since I believe I'll

25   have the lead on that issue.

F7S9SOK1

1          MR. YALOWITZ:  Or the 12th might be a possibility.

2          THE COURT:  Are you going to be out that whole week?

3          MR. BERGER:  I'm departing on the 12th.  I'm

4    returning on the 19th.  The 13th happens to be the first day

5    I was planning to be gone.

6          THE COURT:  Do you want it before then or do you want

7    it after then?

8          MR. BERGER:  Your Honor, I really think it depends on

9    what the government winds up submitting.  I have a good idea

10   what we're going to submit.  But I think the parties and the

11   court will probably want to evaluate whatever it is the

12   government does.

13         But if the court wishes to be here on the 10th or

14   the 11th of August, which would certainly work for me -- I

15   don't mean to impose my schedule on the court, but those would

16   be available dates.  Otherwise I'd ask to do it either the

17   20th or thereafter.

18         THE COURT:  Well, I think the 20th makes more sense

19   because then I can review all of the papers.  If everything

20   comes in on -- the final papers come in on the 10th I could

21   try to review it on the 10th.  I'd rather have some time to

22   review it and digest the positions.

23         MR. YALOWITZ:  What time, your Honor?

24         THE COURT:  I'm being reminded that I have a trial

25   scheduled that week.

F7S9SOK1

1          MR. BERGER:  Your Honor, in my experience -- I'm

2      certain in the Court's experience as well -- the government

3      tends to say that by certain dates they'll take an action but

4      then the court gets a status report that says it's going to

5      take a little more time.  So perhaps erring on the side of a

6      little bit later might build in a margin for that.

7          THE COURT:  I was trying to take a week off myself.

8      But I schedule it and it rarely happens.

9          Could we do either the 21st or the 22nd?  That

10     would give me a little bit of flexibility.

11         MR. YALOWITZ:  Did you -- you may have --

12         THE COURT:  I'm sorry.  I'm looking at September.

13     Either the 24th or the 25th.

14         MR. BERGER:  I'll be available either of those dates,

15     your Honor, at the court's convenience.

16         MR. YALOWITZ:  Sounds great, the 24th.

17         THE COURT:  Then let's do the 24th.

18         Let's do the 24th at 10.  I'll make sure I'm here on

19     that date.  We'll put that issue aside for now.  Let me make

20     sure I have myself organized here.

21         MR. BERGER:  Your Honor, may I just follow-up on that

22     with a question so I understand the court.  So we will not

23     address the Rule 62 motion at all today?  That will be taken up

24     on the 24th?

25         THE COURT:  Yes.  Once I have your submission and the

F7S9SOK1

1    government's submission, then we'll address it appropriately at

2    that time.

3             MR. BERGER:  Thank you, your Honor.

4             THE COURT:  Let me go back to the simpler issue and

5    then we can discuss the substantive motion or the trial

6    motions.  Let me go back -- I know there was a dispute about

7    exhibits submitted, if I have my notes.

8             This is my position with regard to supplementing the

9    record or putting things into the record particularly on the

10   record for appeal.  And then we can discuss it if you disagree.

11   Basically any exhibits that were admitted into evidence can be

12   submitted.  And any exhibits offered in evidence but ruled

13   inadmissible can be submitted.  So that the circuit will have

14   the full record of what was fully admitted and what was offered

15   to be admitted and rejected.  If it doesn't fall into that

16   category, without application to the court previously, we're

17   not going to stuff the record.  And nothing -- none of those

18   category of documents to be submitted will be filed under seal

19   without prior authorization of the court to specifically file

20   it under seal.  And it is not likely that if -- clearly if

21   there were documents that we used at the trial in open court

22   it's not likely that I'm going to say that that has to be filed

23   under seal.  And I would need some compelling reason to either

24   file anything that was offered and the record is clear for the

25   court that it was offered and discussed on the record for its

F7S9SOK1

1    admissibility and it was rejected.  So to the extent that the

2    parties have posttrial submitted documents that don't fall into

3    those two categories or submitted under seal without an

4    accompanying order by this court to submit it under seal those

5    documents should be retrieved -- withdrawn.

6          Now if there's something that I've missed or there's

7    some compelling reason to do something different, then I'd like

8    to hear it; but otherwise I think the relevant documents and

9    the appropriate documents to be filed on the record are the

10   exhibits that were admitted into evidence and exhibits that

11   were either offered at the trial and rejected or were arguments

12   were heard previous to the trial and those exhibits were --

13   there was a ruling by the court that those exhibits were

14   inadmissible and would not be admitted at the trial.  I think

15   that's a basic reasonable rule.

16         Mr. Yalowitz, do you have any position one way or the

17   other?

18         MR. YALOWITZ:  Yes.  First of all, I agree with the

19   categories that your Honor described.  I'm sorry to report that

20   the level of cooperation we're getting with successor counsel

21   is lower than the level of cooperation we were getting from

22   counsel who tried the case, which I know it would be hard for

23   you to believe.

24         THE COURT:  I'm sure we can improve that.

25         MR. YALOWITZ:  I need your help.  So what I'd like to

F7S9SOK1

 1    do is have docket entry 906 removed from the record, expunged

 2    and deleted from the PACER system.

 3              THE COURT:  906?

 4              MR. YALOWITZ:  906.

 5              THE COURT:  I'm not sure what 906 is but if it doesn't

 6    fall into that category then the answer is yes.

 7              MR. YALOWITZ:  906 is a compilation of 79 trial

 8    exhibits, alleged trial exhibits, only six of which fall --

 9    eight of which fall into those two categories.  So, the only

10    way I can think of to fix this is to remove 906 and give the

11    defendants permission to refile a list of their trial exhibits

12    with a clear indication of the six that were admitted and the

13    two that were proffered and not admitted.  Because if they

14    don't have clear instructions I'm concerned that we're going to

15    be wasting time trying to get this straightened out.  And I'd

16    like it just to be resolved in a clean and final fashion.

17              THE COURT:  What's the defense's suggestion about how

18    we efficiently deal with this.

19              MR. BURLINGAME:  John Burlingame on behalf of the

20    Palestinian Authority and the PLO.

21              First off, your Honor, we agree with the Court's

22    ruling and will abide by it completely.  In terms of the most

23    efficient way to proceed, we are happy to withdraw the prior

24    filings and submit those documents consistent with your Honor's

25    ruling.

F7S9SOK1

1          THE COURT:  Thank you.  Seems to be clear cooperation.

2          MR. YALOWITZ:  It's amazing what being together in

3     front of you can achieve.

4          MR. BERGER:  Your Honor, I'm so delighted Mr. Yalowitz

5     just reminded me.

6          THE COURT:  This is a mutual admiration society.

7          MR. BERGER:  Just reminded me of an issue where I

8     thought a little cooperation would help clarify the record in

9     light of your Honor's prior rulings.

10         My understanding is that it's the court's intent to

11    preserve the status quo until we can meet again on the 24th

12    of August.  So I just wanted to make sure that it's the court's

13    intent not to enter judgment and therefore not to have to deal

14    with the question of stay until we meet again on the 24th.

15         THE COURT:  I don't intend to take any action that

16    will disturb the status quo before that date.

17         MR. BERGER:  Thank you, your Honor.

18         MR. YALOWITZ:  We're eager to get judgment entered,

19    your Honor.

20         THE COURT:  I see.

21         MR. YALOWITZ:  And depending on how far we get today

22    we can discuss measures that would be appropriate given the

23    open issue on the motion.  But if we can make progress and we

24    can get judgment entered, that would be useful.  I would

25    separate that from the issue of enforcement.

F7S9SOK1

1          THE COURT:  I understand.  We can discuss that when we

2    discuss that today.  I can give you at least some guidance or

3    maybe even make a decision with regard to that or we can make a

4    joint decision with regard to that, and then depending on

5    whether -- what decisions are made in that regard, we'll see

6    how it affects those other decisions.

7          MR. BERGER:  I didn't want to jump the queue.  Of

8    course, the court is going to answer the 50, 59 motions.  My

9    only point was there's good authority in this district from

10   Judge Casey, oddly enough in a case called Casey, that says the

11   court's got the authority without having to issue a bond or

12   anything, simply to direct the clerk not to enter judgment

13   while 50, 59 motions are under advisement of the court.  And

14   that's the easiest way to preserve the status quo and that's

15   what we're recommending to the court.

16         THE COURT:  Judgment will not be entered until I say

17   so and I have not yet said so.  So we'll discuss it.  It won't

18   be a surprise to anybody.

19         This is what I want to do with regard to any other

20   filings that will take place in this case.  I want at least

21   prior to 24 hours that you file a document I want the other

22   side to have it.  That's part of the way -- if you intend to

23   file something, then you serve it on the other side at least

24   somewhere between 24 and -- more than 24 hours before you file

25   it so the other side knows that it's going to be filed.  If

F7S9SOK1

1    they've some objection to immediately make, they can send me a

2    letter and I can address it or they can at least be prepared to

3    argue against it so that we don't have to keep going back and

4    forth.  So I want to know that by the time I get anything that

5    the other side has had it for at least 24 hours.  So that

6    should make it a little bit more efficient.

7            I think to give you some guidance and give the

8    government some guidance in terms of addressing the Rule 62

9    motion.  These are basically my choices.  I could just simply

10   enter judgment and that's that.  I could enter judgment, stay

11   execution of the judgment and impose a bond.  I could impose a

12   substantial bond or I could impose a minimal bond or no bond at

13   all.  I could -- it is probably -- unless I have a compelling

14   reason, it is not likely that I will not enter judgment but the

15   question is, my view at this point is that if it is appropriate

16   to stay execution of the judgment, I may consider that given

17   the inevitable appeal.  With regard to a bond, I'm willing to

18   consider not imposing a substantial bond but I am hesitant to

19   impose no bond because I want some demonstration by the defense

20   that they're willing to pay.  They have to pay.  And I think

21   it's unfair -- my reaction is at this point, that's not my

22   ruling here, but my reaction is -- I understand the PA and the

23   PLO's position.  I will look at the documentation when I get it

24   with regard to how compelling the financial condition is one

25   way or the other.  But it seems to me that a minimal -- if I

F7S9SOK1

1    were to stay execution of judgment, a minimum bond that would

2    at least be of some significant demonstration that there is a

3    demonstration that the defendant is willing and able to pay a

4    judgment if a judgment is entered and is affirmed on appeal.

5    And other than having the plaintiffs have to run around the

6    world trying to figure out whether they can catch the

7    defendant -- a defendant who may simply take the position that

8    they under no circumstances will pay and they will do

9    everything they can to avoid paying.  I don't assume that

10    that's the case but I want some demonstration consistent with

11    their ability to do so that minimally there is some

12    demonstration of that respect for the law.

13            So those are my choices.  You should try to figure out

14    what you think is reasonable.  I know what you want but I --

15    it's more important for you to give me something that you think

16    I'm going to think is reasonable.  I know that the plaintiff

17    wants all of their money.  I know that the defendant doesn't

18    want to pay any of it.  So that's reasonable from your

19    perspectives, but it's not reasonable for me to resolve the

20    outstanding question of there being an outstanding judgment and

21    how that judgment is to be addressed.

22            As you formulate what your ultimate positions are and

23    why you take those positions and once we get, if we get some

24    contribution from the defendant -- from the government and I'll

25    also encourage the U.S. Attorney's Office if they decide

F7S9SOK1

1    they're not going to weigh in, then if they would tell us that

2    as early as possible so that we can all efficiently move

3    forward and not expect that we're going to have to factor in an

4    opinion by them when there is no forthcoming opinion.

5            That's my inclination at this point.  I'm open to

6    being convinced by either side that they should get more or

7    less.  But that -- I think that is -- those are the

8    considerations that I think I'm weighing at this point in terms

9    of what's appropriate.

10           MR. YALOWITZ:  May I be heard on that for a moment,

11   your Honor?

12           THE COURT:  Yes.

13           MR. YALOWITZ:  That's great.

14           So I certainly agree it's in the Court's discretion to

15   evaluate the size of a bond in light of the defendants'

16   financial condition.

17           One thing that I thought was pretty clear from the

18   Second Circuit cases is if the defendant is not in a position

19   where payment is essentially assured because -- like Nassau

20   County, they've got funds set aside, which is not our case --

21   that the court also has the power and perhaps the duty to look

22   at alternative means of securing a judgment as well.  I don't

23   know how long the circuit is going to take.  I don't know if

24   the defendants are going to ask for cert after the circuit

25   makes its ruling.  But one thing I would like to see is a

F7S9SOK1

1        mechanism where they're demonstrating ongoing good faith by

2        making a deposit into the court's registry.  I know we talked

3        about that in our papers.

4                    THE COURT:  Right.  You suggested a $30 million

5        deposit per month.

6                    MR. YALOWITZ:  I'm not going to negotiate against

7        myself, but obviously your Honor has discretion in that regard.

8        Judge Marrero, I think, imposed 5 million a month at a time

9        when they had a much lower income stream than they do now.

10       Judger Martin in the District of Rhode Island imposed a $10

11       million payment stream, again, at a time when they had a much

12       lower income stream.  And I think those were happening at the

13       same time so they demonstrated ability to pay.

14                   And I don't think it's a secret that those cases both

15       settled on mutually agreeable terms after a period of time.

16       So, the payment stream is a way of accommodating the

17       defendants' concern about having a very large payment due.

18       It's a way of accommodating their concern about being disrupted

19       by collection activities which they may not like and which may

20       be disruptive in the way they go about performing their duties.

21       But it gives them -- it requires them to show some good faith

22       and it requires them to make some sacrifice that is

23       commensurate with the finding of the jury of liability in this

24       case and consistent with the damages that the jury awarded.

25                   So I'm sure your Honor has that under consideration.

F7S9SOK1

1    You didn't expressly list that as one of the options and --

2            THE COURT:  I have not at this point ruled on either

3    side's application or rejected out of hand either side's

4    application.  Again, I don't even know what the record will be

5    once I give them an opportunity to respond to your submission

6    and if I get a submission by the United States government.

7            MR. BERGER:  Your Honor, if I may be heard on that?

8            THE COURT:  Yes.

9            MR. BERGER:  Because what we had in mind was to try

10    not to overburden the court with a supplemental submission.

11    But Mr. Yalowitz raised a legal issue where we'd like to

12    respond to his memorandum, his surreply memorandum as well,

13    because it's an important point as the court is considering

14    these important issues.  One is the other prong of the Nassau

15    case that he neglected to mention that says you can't order

16    security that makes other creditors who are preexisting

17    insecure.  And the PA has $5 billion of creditors who are ahead

18    of line of plaintiffs here.  And what the cases do say is if

19    you are a judgment creditor, you're unsecured in the State of

20    New York.  You can't jump the queue and become a secured

21    creditor when you're behind a very long line of other creditors

22    by getting bond security.  That's one of the issues that we'll

23    address in our supplemental submission.

24            The other point Mr. Yalowitz addressed, I wanted to

25    come back to, is I think we're merging two separate issues and

F7S9SOK1

1    it's actually easier if we tease them apart.  One is a stay

2    under Rule 62(b) until the court has decided the 50, 59

3    motions.  There the law is clear, under the Casey case that I

4    mentioned to the court, that no security is necessary.  All the

5    court need do is direct the clerk not to enter judgment, to

6    preserve the status quo until the court has had time to

7    consider the issue.

8           What Mr. Yalowitz is talking about is a stay pending

9    appeal under 62(d).  Certainly that's where Nassau factors come

10   in.  But Nassau is quite clear.  Second Circuit is quite clear.

11   Nassau is a 62(d) case only.

12          THE COURT:  That's the only issue that I think is

13   going to be of import.

14          MR. BERGER:  So with respect --

15          THE COURT:  I intend to decide the motions quickly and

16   I intend to not enter any judgment before I decide those

17   motions.

18          MR. BERGER:  Excellent, your Honor.

19          I just -- one other thing as the court is thinking

20   about this.  Which is the --

21          THE COURT:  It may be today.  So it may be moot.

22          MR. BERGER:  If, however, the court enters it today,

23   then I would ask the court to think about one other issue which

24   is under many of the cases that are decided at the circuit

25   level, Mr. Yalowitz in fact cited some in his surreply brief

F7S9SOK1

1    and we'll point this out in our response, is that it says the

2    purpose of the security pending appeal is to preserve the

3    status quo.  And it's a change of the status quo if you take a

4    creditor who is unsecured and jump them ahead of the line of

5    other creditors.  And that's why if the creditor is dealing

6    with a debtor that is so hopelessly insolvent, that you cannot

7    take a situation where they may never collect anything and

8    force the accumulation of security for them because that alters

9    the status quo.  It takes them from the unsecured creditors to

10    secured creditors.  And as the court can appreciate in the

11    bankruptcy context, that would totally alter the status quo if

12    you took unsecured creditors and made them secured creditors.

13          So one reason, your Honor, is simply, in our

14    submission, to hold off on deciding these issues until we have

15    the government's view and we have our supplemental submission,

16    your Honor, again on August 24.  There is a lot of fine

17    balancing here.  As I told you, we have $5 billion of other

18    creditors.  The government, the United States is obviously

19    concerned about these issues.  We want to makes a supplemental

20    submission.  It's complex to be sure.  Mr. Yalowitz, with whom

21    I always agree because we're going to have this cooperation,

22    says we should decide this on a full record.  So I would just

23    respectfully suggest that today is not the day to make that

24    decision.

25          THE COURT:  I agree.

F7S9SOK1

```
 1              So you'll get used to, as they say, my style and my

 2      style is to let you know where I'm thinking and give you some

 3      guidance so you can be helpful to me.  So let's move past that

 4      and that's -- we give that up for review and consideration.

 5              Before we go to the substantive motions let me address

 6      the issue of -- and I guess I'll turn to Mr. Yalowitz because,

 7      Mr. Yalowitz, I want to address the issue of prejudgment

 8      interest.  And I can tell you that in my review of the papers

 9      and my research has not convinced me that this is an

10      appropriate case for prejudgment interest.  I'll -- let me just

11      layout where I'm thinking.

12              MR. YALOWITZ:  If I may, your Honor.  Ms. Romeo is

13      going to take the lead.  You might want to hear from her before

14      you express your views -- I'll defer to her.

15              MS. ROMEO:  Whichever you prefer, your Honor.

16              THE COURT:  Well maybe -- I think it may be more

17      useful for you to hear from me and you can address what my

18      concerns are.

19              MS. ROMEO:  Fair enough.

20              THE COURT:  My concerns are several.  One is given the

21      treble damages in this case and what I perceive to be the

22      intent behind the treble damages, particularly the punitive

23      deterrent aspect of the punitive damages, that does not fall on

24      the side of the ledger which says prejudgment interest is

25      appropriate under those circumstances.
```

F7S9SOK1

1          Also, the nature of the request to the jury seems to

2    be a record where the jury did not -- the jury, because

3    99 percent of the jury award was pain and suffering, it clearly

4    was past, present, future pain and suffering.  If you believe

5    that that's not what they did -- I believe that that's what was

6    requested and I believe that that's what the jury awarded.

7          Also, even more specific than that, and part of what

8    is even part of the substantive rulings that the defense's

9    substantive motion is based on, not only was the jury given the

10   opportunity and rendered a verdict that indicates that it was

11   for past, future, and -- present and future pain and suffering,

12   primarily.  In this case the plaintiff and the parties were

13   allowed to specifically suggest what the jury should give.  And

14   I don't have any basis to conclude that what was suggested to

15   the jury was somehow limited in time with regard to what --

16   particularly what the plaintiffs felt was appropriate

17   compensation, full compensation for all of the victims up until

18   the date of that verdict.

19          So, those are the -- I understand the general requests

20   for prejudgment interest.  But given the particular nature of

21   the statute and given the particular facts of this case and the

22   particular arguments that were made and consistent with the

23   kind of award that the jury gave out with regard to the

24   individual plaintiffs, I would need some compelling reason why

25   this is a case appropriate for prejudgment interest where the

F7S9SOK1

1    jury has awarded approximately 215 million.

2              MS. ROMEO:  218.5.

3              THE COURT:  Yes.  Thank you.  218.5 in damages and I

4    believe we only have evidence in this case that minimal, tens

5    of thousands -- and I don't even know if we reached that

6    amount -- was damage which was something other than past,

7    present and future pain and suffering and that that award is,

8    by statute, trebled three times the amount that the jury

9    awarded to ultimately be a judgment to plaintiffs of

10   collectively of over $650 million.  So that's my view at this

11   point but I will hear you to convince me that I should come to

12   a different position.

13             MS. ROMEO:  Sure, your Honor.  I actually have a

14   little bit to say on all of those points for you.

15             First, I'll start with an example.  If we take the

16   Goldberg family.  And you look at what the children got.  The

17   oldest got 8 million versus the youngest who got 2 million

18   which is an indication that -- I mean the youngest would have a

19   longer life to live with pain and suffering, for example.  And

20   that number is a lot less than what the oldest got.  So just to

21   give one snippet of an example.

22             THE COURT:  That would be an assumption that they're

23   compensating on length of injury rather than nature of the

24   injury.

25             MS. ROMEO:  It's an indication that from a record --

F7S9SOK1

1    that it's not compensating for future losses, right.  So in

2    this case, when you look at the record, we actually proposed a

3    special verdict form which would have broken out all of these

4    various components.  It would have asked future versus past.

5    It would have asked noneconomic versus economic.  All of that.

6    And the defendants objected to that.  And the jury got a

7    general verdict form which didn't instruct them on discounting

8    the jury award for present value.

9            THE COURT:  Well, do you think there's anything on

10   this record that would indicate that the plaintiffs were

11   arguing anything other than past, present, and future pain and

12   suffering?

13           MS. ROMEO:  Plaintiffs --

14           THE COURT:  I haven't combed the record specifically

15   but I wouldn't be surprised if there's something in the record

16   that specifically articulated by the plaintiffs to be what the

17   jury was requested.  So the jury clearly considered it and the

18   jury clearly -- the assumption would be that the jury awarded

19   damages considering on the basis of factors that the plaintiff

20   requested this.

21           MS. ROMEO:  Right.  But the issue is compensating the

22   plaintiffs for the delay of time on the damages award.  So the

23   issue here is that we have plaintiffs who have been waiting

24   over a decade for their judgment.  And in the terrorism context

25   there are a number of cases that talk about prejudgment

F7S9SOK1

1    interest being an element of complete compensation in order to

2    fully compensate a plaintiff who has been in a similar

3    litigation, whether it's ATA or under the Foreign Sovereign

4    Immunities Act.

5        THE COURT:  But that's not technically appropriate.

6    You cannot get prejudgment interest on future pain and

7    suffering.

8        MS. ROMEO:  Correct.  Correct.

9        THE COURT:  So you can't -- I have no record in order

10   to measure what you're saying is supposed to be some sort of

11   additional compensation for the pain -- interest on ten years

12   ago pain and suffering.  Particularly in light of how the case

13   was tried and what went before the jury.  And particularly in

14   light of the fact that the -- even if we were to agree that the

15   jury considered and awarded what they thought was appropriate

16   for each plaintiff for past, present, and future pain and

17   suffering.  Your argument is less compelling about loss of the

18   use of monies given the fact that the award is automatically

19   trebled.

20       MS. ROMEO:  So if I may, your Honor.

21       THE COURT:  Yes.

22       MS. ROMEO:  Just a couple points on that.  Gierlinger

23   v. Gleason, which is a Second Circuit case that sets forth the

24   touchstone for this whole analysis, in that case we had a

25   general -- they actually had a special verdict form but it

F7S9SOK1

1    didn't break down the numbers in that manner.  And the court

2    said by looking at the record you couldn't discern -- you

3    couldn't discern what was the past or the future.  And in that

4    case the court actually reversed the district court's denial

5    because it didn't -- the form didn't ask the jury to engage in

6    that present value analysis specifically.  It didn't instruct

7    the jury that you are supposed to take your damages award and

8    discount it for present value.

9            In this case the only time that the jury ever heard

10   about present value was in the context of Michael Soudry and

11   Dov Weinstein who spoke to those very, very small amount of

12   economic damages.

13           So if you back that out --

14           THE COURT:  Right.

15           MS. ROMEO:  -- the jury didn't have any indication

16   that they should be awarding their award accounting for that

17   passage of time.  So they weren't asked to do that by counsel

18   or the court.

19           THE COURT:  Well --

20           MS. ROMEO:  That's one point that we wanted to make.

21           THE COURT:  They were asked to do something in

22   substitution for that.  They were asked to award past,

23   present -- the value of past, present, and future pain and

24   suffering and as they say they now argue it as error.  But the

25   plaintiffs also had the benefit of I specifically let you

F7S9SOK1

1    suggest what number you said was appropriate to fully

2    compensate the plaintiffs.  And you did so over the -- I don't

3    know exactly -- I will say at this point I don't have a clear

4    recollection over the defense objection.  But it was the

5    plaintiff that said look, I'm asking you to consider these

6    numbers because these are the numbers that fully compensate my

7    client.  Now, there was no specific -- you're right.  There was

8    no specific instruction with regard to loss use of monies.  And

9    nor was one requested.

10            Go ahead.

11            MS. ROMEO:  Please continue.

12            THE COURT:  I have to come back to my train of

13    thought.

14            MS. ROMEO:  We actually did request an instruction

15    back when we were doing this whole process with the jury

16    instruction with the defendants.

17            THE COURT:  The instruction said what?

18            MS. ROMEO:  We requested an instruction discussing the

19    application of present value to noneconomic damages and the

20    fact that it doesn't apply to future damages and all of that.

21    Defendants objected to that.  That was not put in the jury

22    instruction.  So we had actually requested that and didn't get

23    it.

24            THE COURT:  I'm not sure what it is specifically

25    you're saying you requested that was relevant to prejudgment

F7S9SOK1

1    interest.

2              MS. ROMEO:  Sure I can actually take a look at that

3    and get you the number if you let us confer.

4              The point being, though, as your Honor noted the jury

5    was not instructed that they were supposed to do that.  If you

6    look at Gierlinger -- the court was very clear that if you --

7    when you don't have that guidance as to what the jury did, you

8    can't presume what the jury did.  We don't know if the jury

9    understood that when we argued -- suggested amounts to them

10   that they were supposed to discount it.  In fact, the fact that

11   they heard it only in connection with economic damages, which

12   we can't be sure they even awarded because if you look at the

13   numbers that were awarded to the plaintiffs, they're all whole

14   numbers.  So they don't account for even that small sliver of

15   economic damages.

16             THE COURT:  Those are whole numbers because you asked

17   for whole numbers.

18             MS. ROMEO:  But my point is --

19             THE COURT:  You didn't even argue -- you say you may

20   not have gotten, now in hindsight you say you may not have

21   gotten specific instruction that you say would have given a

22   clear indication that prejudgment interest is inappropriate.

23   But you never were restricted in terms of how you wanted to

24   argue about what would fully compensate your clients.  And you

25   were given full opportunity to do so.  And quite frankly I have

F7S9SOK1

1    to go back to the -- I'd have to go back to the jury

2    instructions because I'm not sure that the jury instructions

3    didn't at least -- I thought it did -- inform them that what

4    they are supposed to determine is past, present, and future

5    compensation for past, present and future injury, the pain and

6    suffering and their losses.  There was no real evidence of an

7    economic loss.

8         MS. ROMEO:  Correct.  It was limited to three estates

9    and two plaintiffs, and it was a small number.

10        THE COURT:  And I don't even know if that -- I can say

11   it was even with regard to two estates and three plaintiffs.

12        I remember very early in the trial specific testimony

13   about what I recollect was one victim and the economic impact

14   on that one victim.  That's the only testimony I recollect that

15   there was any economic evidence presented with regard to any

16   plaintiff.

17        You think there was economic evidence offered with

18   regard to someone other than that single plaintiff?

19        MS. ROMEO:  It was three estates and two plaintiffs.

20        THE COURT:  Well when you say three estates, you

21   think -- you're saying that --

22        MS. ROMEO:  That was obviously the lost earnings from

23   the past, those three estates and -- right, it was obviously --

24        THE COURT:  I just don't remember clearly.

25        MS. ROMEO:  Just to answer your question, your Honor.

F7S9SOK1

1          THE COURT:  My recollection is it was in the amount of

2     tens of thousands of dollars.

3          MS. ROMEO:  Your recollection is I believe also my

4     recollection.

5          THE COURT:  If that much.

6          MS. ROMEO:  That's also my recollection.

7          THE COURT:  I assume my -- I'm not --

8          MS. ROMEO:  One was maybe 50,000.  One was maybe

9     138,000 if my memory still serves me correctly, and the third

10    one I'm kind of blanking on, but it would be somewhere around a

11    hundred.

12         THE COURT:  So you're talking about a hundred thousand

13    dollars of a $650 million recovery.

14         MS. ROMEO:  Correct.

15         But the case law in the terrorism context is clear

16    that prejudgment interest is appropriate in cases where it's

17    noneconomic damages as well.  So the fact that it's an award

18    that's primarily noneconomic damages doesn't preclude the court

19    from deciding that it's appropriate in the case.

20         THE COURT:  Right.

21         MS. ROMEO:  Also, the existence of the trebling that

22    your Honor mentioned, that may be a factor in the analysis.

23         THE COURT:  It is a factor in the analysis.  It has to

24    be a factor.

25         MS. ROMEO:  And the court can give that due

F7S9SOK1

1  consideration and must give that due consideration in the

2  analysis, but it also does not preclude the court from granting

3  prejudgment interest because in a number of cases, some of

4  those cases I just mentioned in the terrorism context; so

5  September 11, there's a couple of out of D.C., Baker, Pugh,

6  there's a bunch of them.  Those cases involved punitive

7  damages.  They involved the possibility of trebling, if it was

8  an ATA case.  In fact, the Second Circuit dealt with the Lanham

9  case in 2014 where there was a trebled award.  And the statute

10  in that particular section provided for treble damages.  And

11  the court still granted prejudgment interest, approved the

12  grant of prejudgment interest.

13          THE COURT:  Let me take your example that you gave me

14  where you said okay they gave less money to the child -- the

15  younger person than they gave to the older person.  Well what

16  is a reasonable basis for me to determine what is appropriate

17  for a ten-year-old child in terms of the awarding of

18  prejudgment interest if by your own argument that most of the

19  losses were future losses not past losses.

20          MS. ROMEO:  Well our argument actually is we don't

21  know what portion of the award the jury awarded to past or

22  future.

23          THE COURT:  That's not a reasonable argument to make.

24  There is no way a reasonable jury could have concluded that a

25  person who is ten, fifteen years old and is going to live his

F7S9SOK1

1    life span until 80, that if they're giving past, present, and

2    future pain and suffering and you've argued that this person is

3    going to have significant pain and suffering for the rest of

4    their life, there is no reasonable argument that most of that

5    pain and suffering has yet to occur.

6             MS. ROMEO:  Correct.  But in that case -- prejudgment

7    interest is not appropriate on the future losses.

8             THE COURT:  Right.  That's all I'm saying.

9             MS. ROMEO:  We agree with you.  So in that case the

10   prejudgment interest is even more appropriate here because then

11   they awarded all of their damages for past pain and suffering

12   or for --

13            THE COURT:  But if ten percent of the damages is past

14   pain and suffering --

15            MS. ROMEO:  Right.

16            THE COURT:  -- why is it appropriate -- particularly

17   in light of the treble damages and in light of the fact that

18   the jury has awarded significant money for future damages, why

19   is it appropriate to give prejudgment interest on the entire

20   amount under these circumstances?

21            MS. ROMEO:  Well --

22            THE COURT:  Because you give prejudgment interest --

23            MS. ROMEO:  Can I clarify your question?

24            THE COURT:  Yes.

25            MS. ROMEO:  So you mean on the entire amount, so the

F7S9SOK1

1      judgment that was entered per each plaintiff, on that amount?

2              THE COURT:  Yes.  That's what you're asking for, isn't

3      it?

4              MS. ROMEO:  Correct.

5              Our position is we can backout the economic damages,

6      right?

7              THE COURT:  How are we going to do that now?

8              MS. ROMEO:  We have calculations that were submitted

9      by both sides that back them out.

10             THE COURT:  I don't know how the jury awarded this.

11     How do we back it out?  The jury said --

12             MS. ROMEO:  Well, it's a very small number.  The

13     economic damages are a very small number.

14             THE COURT:  I'm not talking about the economic

15     damages.  The economic damages are not determinative of this

16     issue at all.  Because, as I said, the economic damages is

17     .01 percent of -- I don't even know how I can measure the

18     economic damages as opposed to the -- we're talking about pain

19     and suffering.  We're talking about a very strong, direct

20     argument that Mr. Yalowitz made about why these plaintiffs were

21     entitled to these amounts and why anything less than that would

22     not fully compensate them for their injuries.

23             Let's put it this way.  He was persuasive to the

24     extent that they've awarded it.  But I don't -- I'm not sure

25     what it is that you say I'm measuring and what it is you're

F7S9SOK1

1    saying we're compensating for specific economic loss that is

2    compelled under this factual scenario and under this statute

3    and under the numbers that have been awarded that would be

4    appropriate for prejudgment interest and how do I -- and you

5    say prejudgment interest on the total award.

6            MS. ROMEO:  Our position is that the Second Circuit is

7    clear that -- if you look at Gierlinger, this is at page 875.

8    They make -- the Second Circuit makes a comment that in the

9    present case it's clear from the record that the jury's award

10   represented damages for lost past, right, not future income.

11   So they look at the record in that case.  The jury in that

12   case --

13           THE COURT:  But that's not true here.

14           MS. ROMEO:  Well, in this case --

15           THE COURT:  You're not arguing that here.

16           MS. ROMEO:  Well in this case we don't know, just like

17   your Honor noted, we don't know how much they gave to the past

18   pain and suffering versus the future pain and suffering.

19           THE COURT:  We can be confident that they gave

20   something because that's what they were asked.

21           MS. ROMEO:  Correct.

22           THE COURT:  That's what they were instructed that they

23   should do.

24           MS. ROMEO:  In this case the denial of prejudgment

25   interest in its entirety was what was reversed by the Second

F7S9SOK1

1    Circuit.  Our position is that some amount of prejudgment

2    interest is appropriate.  So that's the first inquiry which is:

3    Is prejudgment interest appropriate?  Period.

4          Then there's a little (1)(a) there well if that is

5    appropriate, what's the appropriate amount on the facts of this

6    case to compensate these plaintiffs?  And then there's even

7    that third question which says what's the appropriate rate at

8    which to compensate the plaintiffs.

9          So our position is right now we're on position one,

10   which is the factors that Gierlinger sets out, the case law in

11   the terrorism context, the facts of this case, the extensive

12   testimony that was presented at trial by the plaintiffs, of

13   which the defendants did not cross, they did not put up

14   anything to refute what the plaintiffs had suffered in this

15   case.  And the case had been going on for over a decade.

16   Plaintiffs who are tar -- you know were victims of targeted

17   attacks by foreign defendants, some amount of prejudgment

18   interest is appropriate notwithstanding the treble damages

19   provision.

20          THE COURT:  Well if I remember correctly, and you can

21   correct me if I'm wrong.

22          MS. ROMEO:  Sure.

23          THE COURT:  But I think Ungar that you relied upon in

24   your bond application is specifically a case that said that

25   prejudgment interest isn't appropriate under the ATA.

F7S9SOK1

1          MS. ROMEO:  I think that just goes to say that it's a

2     determination that -- it's based on the facts of a particular

3     case.

4          THE COURT:  I'm trying to figure out why this case is

5     more compelling for prejudgment interest than some other ATA

6     case.  This case seems to be less compelling for prejudgment

7     interest because the way -- you have to tell me what you asked

8     them for.  Because I'm only going to assume that they gave you

9     what you asked them for.  So what do you think you asked them

10    for.

11         MS. ROMEO:  Two things on that.  One thing we wanted

12    to note was that we did request the standard Sand instruction

13    on discounting.  And this may not change your views at all but

14    we just wanted to put that into the record that we did request

15    that and that was not ultimately given to the jury.

16         So we -- so -- this is what the jury instructions --

17    look at technology -- okay.

18         Generally, paraphrased, the jury instructions asked

19    for damages for physical injury, for pain and suffering, for

20    mental anguish, for expenses, for loss of love and

21    companionship, for past and future lost earnings, for shock,

22    for all injuries and disabilities sustained from the terrorist

23    attack.  There's nothing in there that says compensate for the

24    value of time of -- of the value of time.  And our position is

25    the fact that they heard about discounting on Friday morning

F7S9SOK1

1    five weeks into the trial with respect to a really small

2    number, the jury -- we can't know that the jury knew that it

3    was their job -- the jury wasn't instructed that there were

4    treble damages in the case so they don't know that their award

5    is getting tripled.

6               THE COURT:  The one thing you avoid is articulating to

7    me what you think you asked them for.

8               MS. ROMEO:  We asked them --

9               THE COURT:  What did you think you were asking them

10   for?

11              MS. ROMEO:  So we asked them --

12              THE COURT:  I assume that what you asked for is what

13   you got.

14              MS. ROMEO:  So we asked them for a damages award to

15   compensate the plaintiffs for their injuries.

16              THE COURT:  Right.

17              MS. ROMEO:  However we did not ask them for that to be

18   discounted to present value to account for the passage of time.

19              THE COURT:  So what do you think they should have

20   taken from your argument?

21              MS. ROMEO:  That they should give a damages award.

22              THE COURT:  That would do what?  Compensate for what

23   period of time?

24              MS. ROMEO:  Well they were instructed.  So I --

25              THE COURT:  Well, no, you tell me.  You guys threw a

F7S9SOK1

1    number at them.  And they played with that number.  What did

2    that number include?

3              MS. ROMEO:  Well that number is --

4              THE COURT:  I assume that it included exactly what

5    we're talking about.  I don't think I have to assume it.  I

6    think if I go back to the record it will be fairly clear that

7    you didn't leave anything out that you thought that the

8    plaintiffs should have been compensated for past, present, or

9    future.

10             MS. ROMEO:  Well I may have to defer to my colleagues

11   on that but I know that our damages -- our damages figures were

12   based on -- that we suggested were based on comparable cases on

13   damages awards of plaintiffs.

14             THE COURT:  Right.

15             MS. ROMEO:  With similar -- correct.

16             THE COURT:  Based on that appropriately because that's

17   supposed to be a measure of what is supposed to fully

18   compensate a victim of this kind of attack.

19             MS. ROMEO:  I would have to check -- I don't know if

20   those cases included the passage of time, of the time value of

21   money.  Because you get a damages award and then you discount

22   it.  And if the jury is not asked to do that, then that's a

23   determination for the court to make and that award gets

24   adjusted out of the presence of the jury.

25             THE COURT:  The problem is, is they make an argument,

F7S9SOK1

1    which I probably will reject, but they make an argument that it

2    was error for me to even let you give a number.  But it's clear

3    you chose that number.  So unless you say there's something in

4    this record that indicates that the number you chose was

5    somehow discounted, then it's not a legitimate argument to

6    make.  Because you had a full opportunity to tell the jury what

7    you thought would fully compensate these plaintiffs.

8         It's a two-edged sword.  It doesn't help you on the

9    prejudgment interest.  But it isn't particularly compelling for

10   them to say that was error because the reality is I think in

11   most of the individual instances they gave less money than you

12   asked for.  They were very discerning with regard -- I think

13   the request, if I remember it, the request totaled, as I

14   totaled it up, somewhere between 300 and 400 million dollars.

15   And the jury awarded 215.5.  So they obviously made a

16   discerning decision about what they thought was appropriate

17   given what you asked them for and why you asked them to give

18   them that number.

19        MS. ROMEO:  Just to be clear what we asked for in

20   summation tracked the jury charge and the jury charge --

21        THE COURT:  No.  The jury charge tracked what you

22   asked for in summation.  That's the way --

23        MS. ROMEO:  Even taking that aside.  They did track

24   each other.

25        THE COURT:  I didn't make this up.

F7S9SOK1

1          MS. ROMEO:  So they tracked each other and

2     specifically what I read to you earlier doesn't talk about

3     future pain and suffering.  It said pain and suffering.  So

4     that whole amount could have been all past pain and suffering.

5          THE COURT:  Is that -- that's what you were thinking

6     at the time?  It's going to be difficult for me to be convinced

7     that that's what Mr. Yalowitz was talking about at the time

8     given the passion that he argued his case with and the amounts

9     of money that he requested from the jury.

10         MS. ROMEO:  Our point is we may have all known that

11    but we're not sure the jury did and, quite frankly --

12         MR. YALOWITZ:  May I just say I was really in the

13    moment.  I wasn't thinking about the future.

14         THE COURT:  In the moment ties you down for a

15    lifetime.  So that doesn't get to change the moment you were

16    in.

17         MS. ROMEO:  Our position is that Gierlinger, the

18    guidance articulated in that case also weigh in favor of

19    awarding some amount of prejudgment interest at an appropriate

20    rate to compensate these plaintiffs for over a decade of

21    litigation.

22         THE COURT:  You think that should add up to what?

23         MS. ROMEO:  Well, we put in a --

24         THE COURT:  You gave me a figure.  I forgot what it

25    was.

F7S9SOK1

1          MS. ROMEO:  I can give you that figure.  We put in a

2   report by Michael Soudry, who testified at trial, and who you

3   may remember.  If you look at the accrued interest prior to

4   trebling that number is 164 thousand 872,335.

5          THE COURT:  Give me that again.

6          MS. ROMEO:  I'm sorry 164 million.  I apologize.

7          THE COURT:  If it was a thousand --

8          MS. ROMEO:  Sorry.  I guess maybe they would accept

9   that if that was the case.

10          THE COURT:  So it's what?

11          MS. ROMEO:  It's 164 million.

12          THE COURT:  Right.  And that.

13          MS. ROMEO:  And change.

14          THE COURT:  But that's not the total amount.

15          MS. ROMEO:  Well that's the amount of the accrued

16   interest if we don't look at trebling.

17          THE COURT:  Is that what you're asking for?

18          MS. ROMEO:  I don't think you're going to give that,

19   so.

20          THE COURT:  I'm trying to figure out what you're

21   asking for.

22          MS. ROMEO:  Our position is that that could be

23   supported, that that is within the Court's discretion to treble

24   that amount.

25          THE COURT:  What are you asking me to do?

F7S9SOK1

1          MS. ROMEO:  We believe that an amount of prejudgment

2    interest is appropriate at the prime rate.

3          THE COURT:  You think I should give these -- you think

4    on this record given the fact that the jury awarded them

5    218.5 -- 218-and-a-half million dollars -- no, that's not

6    right -- $218 million and that it's going to be trebled to over

7    $650 million that to appropriately compensate these plaintiffs

8    I should add another $165 million just in interest?

9          That's the most accurate way I can characterize your

10   application.

11         MS. ROMEO:  Yes.  We believe that that's appropriate

12   based on the factors of this case.  We believe that it's within

13   the Court's discretion.  We believe that the case law supports

14   it.  We believe that the instruction by the Second Circuit in

15   Gierlinger would also support it.  And -- because we also

16   believe that the prime rate is appropriate here.  It's been

17   used in a number of cases.  It's been commented on by a number

18   of courts that that is what a creditworthy customer would get

19   from a bank for a short term loan.  So, in fact, that rate's

20   even generous to the defendants because they're here arguing

21   that there's five billion creditors in front of us and they're

22   not creditworthy.  So we think that the primary rate is even

23   generous.  So our position --

24         THE COURT:  Well let me give you a final question

25   because I want to hear from the other side on this before we

F7S9SOK1

1    probably have to spill into the afternoon for substantive

2    motions.

3                MS. ROMEO:  Sure.

4                THE COURT:  I couldn't understand from your expert

5    what it is that that 165 is supposed to be -- well I guess your

6    expert doesn't opine on that.  What is that supposed to be

7    compensating?

8                MS. ROMEO:  So what he did --

9                THE COURT:  Interest on what?

10               MS. ROMEO:  He took all of the families from the

11   various attacks.

12               THE COURT:  Right.

13               MS. ROMEO:  And took the average prime rate, which all

14   ranges between 4.5 to 4.6 percent.

15               THE COURT:  From when?

16               MS. ROMEO:  From the date of the attack.

17               And he calculated the accrued interest on the verdict

18   amount.  So we've got this chart here that's attached to --

19   it's docket entry 884(2).  So you'll have a column that has the

20   verdict.  You'll have a column that has the accrued interest at

21   that average prime rate.  And then you have a column that adds

22   those two and then trebles that number because this calculation

23   isn't trebled.

24               THE COURT:  Wouldn't it be an accurate statement that

25   none of the plaintiffs suffered that amount of damages as of

F7S9SOK1

1  the date of the incident?

2          MS. ROMEO:  But the prejudgment interest is intended

3  to compensate the plaintiffs for the passage of time.  So it's

4  not intended to compensate them for the injuries that they

5  suffered from that date.

6          THE COURT:  Yes, but -- no.  It's supposed to

7  compensate them for the lost use of those funds.

8          MS. ROMEO:  Sure.

9          THE COURT:  They would not have had those funds as of

10  that date.

11          MS. ROMEO:  So we -- so taking that point your Honor,

12  we would be amenable to starting prejudgment interest when the

13  case was commenced.

14          One of the things that --

15          THE COURT:  That's what makes it more difficult for me

16  because I can't choose -- I can but it doesn't seem appropriate

17  to choose an arbitrary date to do that.

18          MS. ROMEO:  Okay.

19          THE COURT:  When you say the only reason you're

20  arguing is, is because that is -- you argued that that would on

21  this record somehow be full compensation.  Why is that

22  logically any place to start?

23          MS. ROMEO:  Because that's when the injuries were --

24  that's when the injuries were suffered.

25          THE COURT:  No.  The date of the trial?

F7S9SOK1

1           MS. ROMEO:  No, no.

2           THE COURT:  The date that the suit started?

3           MS. ROMEO:  No.  The date of the attacks.

4           THE COURT:  I know that, but you just gave me an

5     alternative.

6           MS. ROMEO:  If you're not inclined to grant

7     prejudgment interest starting from the date of the attack-- our

8     position is that the law supports that.  Our position is that

9     you start it from when the injuries accrue.

10          THE COURT:  I don't disagree with your premise that it

11    is within my discretion in the appropriate circumstance to

12    articulate a reasonable basis on which to award prejudgment

13    interest, although we could -- we could debate and I'm not sure

14    that it would -- I'm not sure yet whether it would be my

15    position that the ATA doesn't -- it is just not appropriate

16    under the ATA, under the section of the ATA.  But this

17    discussion is assuming that it's appropriate under the ATA

18    given the treble damages that is obviously there to further

19    compensate victims beyond their loss.

20          I think the factors that I point to are factors to be

21    considered.  But as I think about the amount of the award, ATA

22    and the nature of how the case was tried and what was before

23    the jury and what logically I have to conclude, I have to

24    conclude that they gave you what you asked for and you weren't

25    restricted in what you were asking for in terms of what you

F7S9SOK1

1    thought that they should be compensated.

2            Now, you're right.  I do vaguely remember that in your

3    original, prior to trial submission there may have been some

4    jury instruction with regard to that issue.  But clearly that

5    was not an issue that was pressed at trial.  I'm not going to

6    debate whether or not you preserved your right to complain

7    about it, not giving that instruction, simply because I didn't

8    give every single instruction that you requested weeks before

9    the trial.  But clearly we all had an opportunity and all the

10   parties took the opportunity to debate those issues that they

11   felt were critical to this case for the jury's determination on

12   which they should be instructed once the case was -- once the

13   sides rested and even prior to resting.

14           This was not one of them.  It was not.  I think it is

15   a stretch and maybe a disingenuous argument to argue that

16   somehow the reason it wasn't there was because you said it was

17   appropriate to give and you thought it was error if I didn't

18   give it and I refused to give it and so therefore you preserved

19   that issue.  That's not anywhere close to the way it happened.

20           MS. ROMEO:  Our position is that we put it in the jury

21   instructions.  We put it in the verdict form.  It didn't make

22   it in.  Our position is simply --

23           THE COURT:  You approved that verdict form so you

24   can't blame me for that.

25           MS. ROMEO:  No, no, no.  That's not our position.  Our

F7S9SOK1

1    position is just simply looking at what the jury was asked to

2    do and looking at the guidance from the Second Circuit that

3    prejudgment interest in some amount is appropriate; that denial

4    of it in its entirety would not be appropriate.

5            And just one small thing I'd like to make a point on.

6    You've noted the treble damages and obviously the treble

7    damages exist in the ATA, and it has an aspect -- a punitive

8    aspect.  But the ATA is a remedial statute.  So Judge Rakoff

9    has said that.  And Judge Marrero has said that.  It's a

10   remedial statute.

11           So it's not a situation -- actually in Gierlinger, I

12   think they talk about another case where, for example,

13   prejudgment interest was denied in a case where a farmer

14   exceeded his quota and got a penalty.  So he got a penalty.

15   And you can't get prejudgment interest on -- that's a penalty.

16   That's punitive.

17           This is not the same thing.  Here these plaintiffs are

18   getting a damages award.  They're victims of a terror attack

19   perpetrated by foreign defendants.  The jury found that the

20   defendants materially supported terrorism.  The jury found that

21   the defendants employed persons who went out within the scope

22   of their employment and committed these attacks.  This has

23   taken over a decade to get here.  The defendants have delayed

24   and delayed and delayed.  They were delaying the holiday right

25   before trial.

F7S9SOK1

1            One of the other things that the Second Circuit says

2      to look at is whether a defendant is innocent, whether the

3      defendant wasn't willfully aware of what was going on.  Whether

4      the plaintiffs have some fault in the delay that has passed.

5            So our position is just simply that the jury was not

6      instructed to discount for future value -- or for present

7      value, excuse me, and that based on the balancing test and

8      within the sound discretion of this court some amount is

9      appropriate at the prime rate.  And if the court is inclined to

10     give us a ruling that some amount at the prime rate is

11     appropriate, we can work with defendants and figure out a

12     computation as to what would be appropriate in this case.

13            THE COURT:  Well ultimately you are not taking the

14     position, I assume, and it would not be a reasonable position

15     for you to take that an award of -- a recovery of $650 million

16     is not full compensation for the injuries suffered?

17            MS. ROMEO:  Our position --

18            THE COURT:  Since you didn't ask for $650 million.

19            MS. ROMEO:  Right.  Our position is that no amount of

20     money can compensate these plaintiffs for their injuries,

21     whether it's a billion dollars or not.  That's the starting

22     premise.

23            THE COURT:  That's not the starting premise because

24     you gave them an amount of money that would compensate.

25            MS. ROMEO:  It had to be grounded in testimony and

F7S9SOK1

1    fact.

2              THE COURT:  Nobody -- in any case nobody undoes the

3    past or the consequences of the future.  But legally the

4    question really -- the part that isn't, in some other cases

5    that's compelling is:  Is there really -- the lost use of this

6    money, have these plaintiffs really suffered that, given the

7    recovery that they got and given that the recovery is

8    automatically trebled?  And the answer to that on this record

9    is they're not compensated any less than they would have been

10   compensated had they gotten an award the day of the incident.

11             You're right.  I'm not going to debate about whether

12   or not anyone could ever be fully compensated being the victim

13   of these horrific acts.  But the question is, is whether or not

14   they -- what would have in the law compensated them on the date

15   of the injury, that's the date that you've given me.

16             MS. ROMEO:  Correct.

17             THE COURT:  That the loss of the use of that money

18   between this and the date of trial leads one to argue that or

19   state that the plaintiffs have not been fully compensated to

20   the extent that the law could compensate them.  That was never

21   anybody's argument.

22             What Mr. Yalowitz told this jury that there were

23   certain specific sums that he gave this jury would be

24   reasonable for them to award, to compensate these victims.

25             MS. ROMEO:  Right, your Honor.

F7S9SOK1

1          THE COURT:  That wasn't $650 million.

2          MS. ROMEO:  But he said reasonable.  He didn't say

3     full compensation.  He didn't talk about --

4          THE COURT:  Even now I'm not here trying to make

5     full -- I'm not trying to give full compensation.  I'm trying

6     to figure out what's reasonable compensation and have they

7     reasonably lost the use of this money when they've -- if they

8     cut you a check tomorrow for $650 million it would be difficult

9     for you to argue --

10          MS. ROMEO:  We'll take it.

11          THE COURT:  -- that they lost their prejudgment

12    interest, the use of the money -- they could have had more

13    money had they gotten compensated in a different manner.

14    That's not the determinative factor.  But it is the main -- the

15    driving force here is whether or not prejudgment interest is

16    appropriate because, as you argue, that their loss of their, as

17    you say, what you say is they deserve $650 million plus another

18    $165 million.  That's what you say that they should get.

19          So I understand the argument and I want to quickly go

20    back and look at the cases but, as you say, I have some

21    resistance to thinking that on the record here where I have --

22    I'm on the verge of entering a $650 million judgment that $165

23    million just in prejudgment interest is appropriate even though

24    the only reason we're at $650 million is because the statute

25    automatically trebles the 218 million dollars that the

F7S9SOK1

1    plaintiffs recovered.

2              MS. ROMEO:  We'll just end to say we leave the

3    decision to the sound discretion of this court based on the

4    record and if you have any further questions I'm happy to

5    answer them.

6              THE COURT:  Let me see if Mr. Berger wants to talk me

7    out of it.

8              MR. BERGER:  Yes, your Honor.  Actually I'm here to

9    tell you that the Court's initial assessment that the court

10   would need a compelling reason to award prejudgment interest in

11   this case is sound.  And I can do this much more quickly than

12   Ms. Romeo.  I have a dozen reasons why on the record and on the

13   law no award of prejudgment interest is supported by the law or

14   supported by the record.

15             Number one, your Honor's initial instinct is

16   absolutely correct.  I went back and quoted this in the brief

17   before the court.  It's in our brief of March 16, 2015, docket

18   888, at page 8, quoting Mr. Yalowitz to the jury.  Your Honor

19   said well, you asked them for everything and they gave you what

20   you asked for.  What Mr. Yalowitz said is:  Make them whole.

21   Make these families whole.  Don't leave out anything to

22   compensate them.  I think that's what your Honor was recalling

23   in terms of the ask.

24             In terms of the charge that went along with the ask,

25   at the transcript on pages 3903 and 3904, it was a standard

F7S9SOK1

1    instruction that said:  Look, use your best judgment.  Fully

2    compensate them for the damages that have been proven.  Don't

3    be hyper-technical.  Use your common sense.

4         They asked for everything.  They got what they asked

5    for.

6         Now let's talk about the law.  Actually, one more

7    factual correction.  I know it seems extraordinary to your

8    Honor that they're asking for $165 million in prejudgment

9    interest.  But actually they're underselling themselves.

10   They're actually asking for $495 million in prejudgment

11   interest because they want that 165 to be trebled.  In other

12   words, what they have asked the court to do is enter a judgment

13   that is five-and-a-half times the amount of base damages

14   awarded by the jury.  Because they treble the base damages.

15   And they treble $165 million.  And they say that's

16   $1.15 billion.

17        No wonder the United States of America is interested

18   in making sure they're not going to implode the Palestinian

19   Authority by saddling it with a judgment that is one-quarter

20   the size of their annual budget.

21        This is nothing to be joking about, of course, because

22   this would be the end of the Palestinian Authority.  And that's

23   why we're here to argue about these issues.  This is as

24   important as staying the judgment.

25        Now as a matter of law.  I'm not quite sure that the

F7S9SOK1

1    Pugh and Baker cases out of the District of Columbia were

2    correctly categorized.  So let me rewind the tape.

3              Your Honor, what we didn't hear about today, your

4    Honor was your own award in the terrorist attacks cases.  I was

5    involved in those cases.  So I know a little bit about them.

6    Number one, they were default judgments.  Nobody litigated or

7    presented for the Court's consideration, either yours or

8    Magistrate Judge Maas, the issue of whether prejudgment

9    interest was appropriate.

10             But it certainly doesn't matter because, as you know,

11   that was an FSIA case.  And the FSIA does not have trebling.

12   So at least there, there was an argument that prejudgment

13   interest might be appropriate as a matter of the statute

14   because the FSIA is not designed to be a punitive statute.

15             In the Ungar case, as your Honor alluded, a case that

16   when we were talking about other issues was one of the

17   plaintiffs' favorite cases.  We were talking about how much

18   could be deposited.  But when it comes to prejudgment interest

19   they don't like the Ungar case so much.  The Ungar case

20   correctly held that because the ATA trebling function is a

21   punitive function as a matter of law prejudgment interest is

22   inappropriate.

23             So let's look at the Pugh and the Baker cases which

24   were cited as reasons why that's authority in ATA cases.

25   That's not quite true.  Pugh and Baker involved claims under

F7S9SOK1

1    both the FSIA against the foreign state Libya and against

2    individuals who could be sued under the ATA.

3          When you look at the Pugh decision, it says those

4    claims awarded under the FSIA get prejudgment interest.  Those

5    claims awarded under the ATA get trebling only.

6          That's precisely the kind of dichotomy your Honor

7    followed in the terrorist attacks cases correctly, which is

8    FSIA cases are eligible for prejudgment interest; ATA cases are

9    not.  So it's not quite accurate to say well Pugh and Baker

10   were ATA cases.  They were both FSIA and ATA cases and when you

11   actually parse the cases it's clear that ATA claims don't get

12   prejudgment interest.

13         Ms. Romeo said we give this to the Court's sound

14   discretion, as indeed do we.  But the number one guiding factor

15   in the Court's discretion, as you know, is that plaintiffs

16   cannot be overcompensated.  They're asking for a judgment that

17   is five-and-a-half times the base amount of damages.  That is

18   presumptively overcompensation.

19         Why were there whole dollar awards given by the jury?

20   You heard them say they based it on other cases where terrorism

21   awards were made.  Those cases are called the Heiser cases.  We

22   know it has to be that because there are only two cases that

23   have ever been litigated and gone to a verdict in front of a

24   jury under the ATA, this case and the Outer banks cases across

25   the river.  So we know they weren't basing it on that.  They're

F7S9SOK1

1    basing it on the Heiser cases which have presumptive round

2    dollar amounts that are awarded as damages.

3             They're meant to be all-in sums.  That's why the

4    Heiser cases say this is full compensation.  You don't get

5    interest on top of it.  Every single ruling by Judge Lamberth

6    in the Heiser cases makes clear that prejudgment interest is

7    not an add-on.  It's meant to be all in.

8             Ms. Romeo said well there's this anomalous thing that

9    the siblings -- the kids get less and the spouses get more.

10    It's not anomalous under Heiser.  Heiser says these are all-in

11    damages not only for pain and suffering but for consortium,

12    loss of companionship.  Of course a spouse would get more for

13    their life companion dying than a child who was born and might

14    be a year order two old.  That's why they're graduated awards.

15    There's nothing anomalous about those awards.  Those awards

16    mirror what the Heiser framework is intended to do.  And

17    importantly the Heiser framework is all-in with no prejudgment

18    interest on top of that.

19             So the only other thing I would say is that the Ungar

20    case sums it up best.  After all, it's a case under the ATA

21    against the same defendants you have before you here.  There is

22    no reason to differentiate that case from this one.  The ATA

23    hasn't changed in any meaningful way since that time.  Treble

24    damages are meant to fully compensate.  It's a two hundred

25    percent multiplier.  That's more than any contract one could

F7S9SOK1

1    possibly hope for.  It's meant to cover any items of damages

2    that might have been left on the side.  It would be overkill to

3    award prejudgment interest here and, frankly, in light of the

4    interpretation of the ATA it would be insupportable.

5            I'm happy to answer any questions your Honor has but

6    that's all I've got to say on prejudgment interest.

7            THE COURT:  All right.  Ms. Romeo did you want to

8    say --

9            MS. ROMEO:  Do you have any further questions?

10           THE COURT:  No.

11           MS. ROMEO:  Otherwise we rest on our papers as for all

12   of the other arguments.

13           THE COURT:  I'm going to give the court reporter a

14   break.  So let's take a lunch.  Then I'm going to give the

15   defense with regard to the substantive motions, trial motions

16   and then we'll see where we are when we do that.  Let's say

17   2:10.

18           MR. YALOWITZ:  Can we leave our things in the

19   courtroom?

20           THE COURT:  Sure.  Don't leave anything important --

21   valuable.  I chose the wrong word.  Don't leave anything that

22   costs a lot of money.

23           (Luncheon recess)

24

25

F7SYSOK2

1              THE COURT:  Mr. Berger, I'll let you address any

2     substantive issues you want to address.  Obviously, I put it

3     there are two different motions, basically one dealing with the

4     sufficiency of the evidence, one dealing with errors, alleged

5     errors, in admission or exclusion of evidence, and the

6     jurisdictional issue which are separate issues.

7              I'll allow you to address whichever ones you would

8     like to address.

9              MR. BERGER:  Thank you, your Honor.  With the Court's

10    permission, I would like to divide up those issues.  I was

11    going to address jurisdiction.  Mr. Burlingame was going to

12    address the remainder.

13             THE COURT:  That's fine.

14             MR. BERGER:  Thank you, your Honor.

15             Your Honor, I recognize I'm new to this case.  I guess

16    I would start by correcting a few premises.  I read

17    Mr. Yalowitz's July 21 letter which said that the jurisdiction

18    issue was a re, re, re-arguement of the issue.  I think I got

19    all three res right.

20             But from our perspective, having read the

21    transcripts -- I went back and read the transcript of the

22    argument, your Honor, of the April 2014 when your Honor

23    addressed the Daimler issues in this case.

24             What your Honor said at that point at page 64 of the

25    transcript was that any subsequent Daimler-based dismissals of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7SYSOK2

1    the PA or the PLO -- I'm quoting here -- "would be a

2    significant change in the law," that would provide a "real

3    opportunity at that point to renew" a dismissal application.

4          Indeed, your Honor said at page 69 that the Court was

5    willing to consider any such compelling new case law.  So

6    rather than re, re, re-arguement, we're here today to take the

7    Court up on that invitation to come back and talk about the

8    dismissals based on Daimler of the PA and the PLO that

9    postdated what your Honor did in both April 2014 and then on

10   summary judgment in December of 2014.

11         THE COURT:  I just wanted to have the two opinions in

12   front of me.  Those were certainly among the things I want to

13   talk about.

14         MR. BERGER:  I guess, while we're waiting for copies,

15   I don't even need to go beyond what your Honor did in the

16   Laydon case.  After your Honor decided what to do about

17   jurisdiction in this case, in the Laydon case this year,

18   your Honor took a view of Daimler that really reflects our

19   position.

20         And Laydon sets the stage, I think, for the importance

21   of the DC cases here.  Your Honor recognized that apart from

22   the exceptional case -- these are the court's words -- the home

23   of an organizational defendant is the only place where it is at

24   home under both Daimler and Gucci, the Second Circuit's

25   decision, no matter where else it has branch offices.

F7SYSOK2

1          Really, that's the construct that not only are we

2     urging here, but it's the one that both the two DC judges in

3     three cases applied to the PA and the PLO.  So that's the first

4     reason we're back asking for renewed consideration of the

5     jurisdictional issue.

6          The other one is one where it makes it clear we're not

7     asking for reconsideration as such, although I hear that all

8     the time from the plaintiffs, in fact, under the Dorchester

9     Financial Securities case, the Second Circuit at 722 F.3d 81 at

10     86 to 87, Second Circuit 2013, it states the same principle I

11     read in many of your Honor's decision in the terrorist attacks

12     case.

13          When you're look at personal jurisdiction, there's an

14     escalating burden at each step of the case, and you can decide

15     at a pretrial level and Rule 12 motion, or you can decide on a

16     pretrial motion and Rule 56 that the evidence does tip so

17     decidedly in the defendant's favor that you must dismiss on

18     jurisdiction, and that's what your Honor decides in this case.

19          That doesn't relieve the plaintiff of its burden at

20     trial to establish by a preponderance of the evidence that

21     there is in fact jurisdiction over the defendant.

22          THE COURT:  The evidence hasn't changed.

23          MR. BERGER:  The evidence hasn't changed.

24          THE COURT:  You have two new opinions, but you don't

25     have any new evidence.  The evidence is the same.

F7SYSOK2

1              MR. BERGER:  There was no evidence put in the trial.

2      The only evidence in the record was put into the motions before

3      your Honor.  No evidence was presented to the jury --

4              It is, frankly, difficult to see how a jury could have

5      found by a preponderance of the evidence or how your Honor

6      could have found at the close of the plaintiffs' case that by a

7      preponderance of the evidence before the jury at trial in this

8      case, subject to cross-examination, that there was jurisdiction

9      sufficient to hold the defendants here.

10             THE COURT:  I'm not sure I understand your argument.

11     If I do, then I reject it offhand.  You're not arguing that the

12     burden at the trial is for the plaintiff to prove to the jury

13     personal jurisdiction?

14             MR. BERGER:  I am making that argument.

15             THE COURT:  You are making that argument?

16             MR. BERGER:  I think that's what Dorchester holds.

17             THE COURT:  That the jury has to make a determination

18     with regard to personal jurisdiction?

19             MR. BERGER:  Yes, your Honor.  I don't mean to restate

20     the point.

21             THE COURT:  I don't mean to keep interrupting.  It's

22     not that you're restating your point.  I genuinely don't

23     understand that argument.  I never heard that argument, that a

24     factual issue for the jury is personal jurisdiction.

25             MR. BERGER:  If your Honor had decided before trial

F7SYSOK2

1    that jurisdiction had been established to the point where the

2    plaintiffs could prevail on summary judgment, not obtain a

3    denial of summary judgment -- it's the defense motion that was

4    denied -- but obtain summary judgment in their favor on

5    jurisdiction, then the issue wouldn't have gone to trial

6    because your Honor would have decided that the facts were such

7    that it didn't create a triable issue.

8            The maximum extent to which the Court could have

9    resolved the jurisdictional issue before trial on the defense

10   motion was simply to decide that the weight of the evidence was

11   such that the defendants couldn't obtain summary judgment.

12           Your Honor, I've seen it in many of your Honor's

13   decisions.  So I don't mean to --

14           THE COURT:  I just don't understand the trial point

15   that you're making.  I don't understand.  You're not -- this

16   jury never considered personal jurisdiction.  You're not

17   arguing that they did.

18           MR. BERGER:  I'm arguing that because they didn't and

19   were never given any evidence on jurisdiction that the clear,

20   continuing burden that the plaintiffs had, including

21   jurisdiction by a preponderance of the evidence, was something

22   that they never even sought to go to trial.  They couldn't be

23   relieved of that burden by pretrial rules.

24           THE COURT:  Personal jurisdiction is a legal question.

25   It's not a factual question for the jury.  You can't cite a

F7SYSOK2

1    case -- I'm not sure I understand your argument because you

2    can't cite a case to me where the issue of personal

3    jurisdiction was given for decision by the jury.

4            MR. BERGER:  Your Honor, I think most of the time the

5    jurisdictional issue is resolved in the defense favor before

6    trial so that it doesn't come up.

7            When it's not, the reason why there was, with all due

8    respect, jurisdictional discovery that your Honor ordered in

9    this case is because it's not a legal issue.

10           THE COURT:  The jurisdiction is not for the jury's

11   purposes.  It's for the judge's purposes.  It's for the judge

12   to have a record to determine whether or not the facts support

13   the assertion of jurisdiction.

14           Jurisdiction is not -- this isn't venue.  Venue could

15   be a criminal case.  Venue could be an issue for the jury, to

16   be given to the jury.  I'm not sure -- are you saying the error

17   was not asking the jury to find that there was personal

18   jurisdiction?

19           MR. BERGER:  Your Honor, I'm not saying this was an

20   issue of error at all.  I'm saying this was a failure of proof

21   on the plaintiffs' part.

22           THE COURT:  They proved it to me.  You're saying they

23   haven't proved it to the jury?

24           MR. BERGER:  That's a helpful question.  If I can

25   reflect it back on the court So that I can understand how best

F7SYSOK2

1    to direct my argument, if what your Honor is saying is that

2    your summary judgment ruling, the Court's summary judgment

3    ruling in December of 2014, was a factual finding by the Court

4    or a legal finding, however the Court wishes to characterize

5    it, that the PA and PLO were at home, since that issue was

6    established in the plaintiffs' favor before trial --

7        THE COURT:  How is that a factual issue?  That's a

8    legal determination.  The factual issues are those items that

9    define whether or not one is at home.

10       For example, quite frankly, I don't know of any fact

11   with regard to contacts and the PLO or the PA's activity.  I

12   can't recollect offhand what fact, if any fact, was in dispute.

13       There's no dispute about the activities in New York,

14   the activities in DC, what kinds of activities, particularly UN

15   activities, that can't be used for jurisdictional purposes,

16   what other activity.  There was undisputed evidence about

17   officers and staff and PR.

18       What do you say was factually in dispute?

19       MR. BERGER:  Your Honor, I would say the question that

20   is purely a factual question bounded by legal standards that

21   the Supreme Court decided in Daimler and the Second Circuit

22   decided in Gucci is the materiality of the in forum factual

23   conducts as established by the facts when weighed against the

24   home office activity.

25       THE COURT:  That's not a fact.  That's not an

F7SYSOK2

1    independent fact.  That is a judgment.  That is a legal

2    judgment of whether or not the facts are sufficient to be

3    material.  Materiality is not something that you can inherently

4    prove.

5              MR. BERGER:  Your Honor, it doesn't sound like I'm

6    going to persuade the Court.  I respectfully disagree.

7              THE COURT:  I'm not disagreeing with you.  I'm

8    literally not understanding your argument.  Maybe I am

9    understanding your argument.

10             I'm not sure -- I thought where you were headed and

11   where you were in your papers was that because that -- one, I

12   thought your argument was pretty much that the facts that were

13   before me were pretty much exactly the same as the facts that

14   before the court in DC.  That was the first thing.

15             So there wasn't a dispute about the facts.  You said I

16   considered the exact same set of undisputed facts as the DC

17   court except that I made a different legal judgment.  So I'm

18   not quite sure where the problems of the jury is in all this

19   and what you say how there's some factual dispute here.

20             MR. BERGER:  Fair enough, your Honor.  Let me put it

21   in the context with the graduated burden on jurisdiction, and

22   then I'll come back to the DC case.

23             It's, of course, always within the province of the

24   court on a Rule 12 motion, as it was in the three DC cases, to

25   say that under any set of facts, there's no jurisdiction.

F7SYSOK2

1    That's sort of the one way out.

2         But when a court denies a Rule 12 motion on

3    jurisdiction, it's not finding that there's jurisdiction.  It's

4    denying a motion to dismiss for lack of jurisdiction.

5         Dorchester Financial, all these Second Circuit cases

6    say, fine.  What happens is then you carry the jurisdictional

7    issue to the next thing.  Ball is quite clear, a Second Circuit

8    case, that if you get denied on a Rule 12 motion on

9    jurisdiction, you may renew it on a full factual record after

10    discovery on summary judgment.

11         On summary judgment the court has three options.

12    Perhaps that's where I'm misunderstanding the Court.  The Court

13    can say the plaintiffs have failed to carry the burden of

14    proving jurisdiction, or it can say there's a triable issue of

15    fact with respect to jurisdiction.

16         The Court can say, I'm granting summary judgment in

17    the plaintiffs' favor that there is jurisdiction.  The Court

18    did not expressly grant summary judgment in the plaintiffs'

19    favor on jurisdiction.  That necessarily carried the issue to

20    the jury where plaintiffs presented no proof.

21         I don't think I need to spend more time with it

22    because I suspect I'm going to take up too much of Court's time

23    without getting to the DC cases, and I'd like to do that as

24    well because our argument has been that at each stage of this

25    burden -- Rule 12, Rule 56, and at trial -- the facts cannot

F7SYSOK2

1    prove that the PA and the PLO were at home.

2            Now, if I can just pause here for a moment and explain

3    the relevance of this issue in two places.  Obviously here

4    we're talking about whether or not the case should have been

5    dismissed for lack of jurisdiction.

6            When we get in a month to the Rule 62 issue, the fact

7    that two other judges in three cases disagreed with your Honor

8    doesn't necessarily mean -- and I may not convince your Honor

9    that you're wrong, but it certainly shows there's a meaningful

10   basis for a difference of opinion on this issue which is going

11   to go through the substantial likelihood of success factor for

12   Rule 66.  So I just want to put that marker down for future

13   reference.

14           Here it's only human nature, your Honor, that after so

15   much time was invested in taking this case to trial that

16   there's a reluctance to revisit jurisdiction.

17           But I read with great care the April 2014 transcript

18   of the argument where your Honor asked a lot of questions about

19   how to apply at home, and I tried to come up with my own

20   answers to some of those questions and timing for the DC

21   circuit cases.

22           So let me give -- I'm sorry.  The DC district cases

23   where I think the findings that they made are instructive of

24   why it's worth reconsidering the jurisdictional issue.

25           One question your Honor asked in April of 2014 is is

F7SYSOK2

there a difference between your home base and being at home.
In other words, can you be incorporated or have your principal
place of business here and that's your home base, but there are
other places where, because of your substantial continuous
activity you might be at home.  That was one of the issues
your Honor focused on.

        The other was because these are non-sovereign
governments, I made the exceptional case under Daimler.  Those
are the two issues I'd like to talk about that tied with the DC
cases.

        First not only do the DC cases find that there is no
difference between home base and at home -- they are one and
the same -- but several other Southern District cases reach
that same conclusion, not in the context of the PA and the PLO,
but generally.

        So beyond what your Honor held in Laydon Judge Oetken
recently held in the Reich case, 38 F.Supp 3d at 457 that at
home is a singular place.  You can only be at home in one
place.  That's what Judge Oetken held.

        As to the other aspect of the question that your Honor
raised, Judge Forrest recently held in the F.Tv. case -- I have
a Lexis site, 2015 U.S. Dist. Lexis 63637 at pages 15 to 16,
what she held is, okay.  Substantial and continuous activity is
no longer sufficient under Daimler and Gucci find yourself at
home.

F7SYSOK2

1              And then Judge Torres in another case -- this one is

2    called Epstein, 2015 U.S. Dist. Lexis 82114 at pages 7 to 8,

3    Judge Torres held that under Daimler, substantial and

4    continuous activity is no longer an option.  It has to be "so

5    substantial" as to render it at home in that state.

6              So we have three other judges in this court saying

7    it's a singular place.  It's the place that you are so

8    substantially connected that it is essentially your home base.

9              So, your Honor, our submission would be, even under

10   the Southern District law it's clear there's no difference

11   between home base and at home.

12             The same principals are applied to the DC trio cases,

13   the three DC cases, to say that the home base of the PA and the

14   PLO is in Palestine.  Therefore, that's the only place, the

15   singular place, where they're at home.

16             The second thing they hold is that it's not an

17   exceptional circumstance under Daimler that the defendant is a

18   foreign organization defendant that is not a corporation.

19             As Judge Kollar-Kotelly held in the Livnat and Safra

20   cases, as in Daimler, that exception was meant to refer to

21   non-corporate form.  Exception was meant to refer to an

22   historical incident.

23             The Perkins case that's cited in Daimler where the

24   company had to relocate from Asia during World War II and

25   temporarily relocated to Ohio.  You heard about that in great

F7SYSOK2

1    length in April of 2014.  I won't repeat it.  That's the

2    exception.

3            THE COURT:  Why would I necessarily find that

4    exception does not include a non corporation?  This is a

5    corporate test that Daimler is using.  I would assume just the

6    opposite, that Daimler might contemplate a situation where the

7    standard application of the law which involved corporations

8    doesn't exactly fit because the entity is not a corporation and

9    doesn't have the kind of forum indicia that is easily

10   determined by looking at a place of incorporation and a

11   principal place of business.

12           MR. BERGER:  Your Honor, I think the fact that two

13   judges in DC and your Honor differ on that suggests that

14   reasonable minds do in fact differ.

15           THE COURT:  I'm not sure we do differ on that because

16   I'm not quite sure -- I don't have a recollection that either

17   one of those courts said that specifically that an exceptional

18   circumstance does not include a non corporate entity.

19           Are you saying that they made such a determination?

20           MR. BERGER:  Well, the Livnat and Safra cases dealt

21   explicitly with that point and came to the conclusion that the

22   non-sovereign status of the defendants, the PA and the PLO as

23   governmental entities, were not an exceptional circumstance --

24           THE COURT:  I know.  That's not the point you just

25   made.  You said not being a corporation can't be an exceptional

F7SYSOK2

1  circumstance.

2          MR. BERGER:  I didn't say that.  Daimler divided the

3  world into individuals and organizations.  There was no

4  suggestion -- this is the point Judge Kollar-Kotelly makes.

5          When you divide the world up into individuals over

6  whom you can obtain jurisdiction by handing them a summons and

7  complaint within the jurisdiction and entities over whom

8  jurisdiction can be exercised only if they're at home, there

9  was no suggestion in Daimler that there was this other category

10  out there of non-corporate organizations with different

11  corporations.  It was a binary world in which it was either

12  people or things.

13          And that's the point Judge Kollar-Kotelly was making

14  that in the world of things, in the world of organizations,

15  there is no suggestion in Daimler that other types of

16  organizations -- not-for-profit associations, clubs -- that any

17  of them would be subject to some different type of due

18  processing analysis.

19          THE COURT:  That's true, and I don't disagree with

20  you.  The question is not whether or not it's subject to

21  different due processing analysis.

22          The question is whether or not you have to examine the

23  same factors.  You can't examine exactly the same factors

24  because a corporation has a place of incorporation.  A non

25  corporation does not.

F7SYSOK2

1          So I can't look at the place of incorporation and say

2    that that's the test that's going to apply to both a

3    corporation and a non corporation.

4          And also the other test is the principal place of

5    business, and the traditional analysis of a principal place of

6    business is a company that's engaged in commercial activities.

7          So it's not a question of whether or not it is

8    determinative that the PLO is not a corporation, but it clearly

9    demands a slightly different analysis than if I was looking at.

10         What all of the similar cases to Daimler have looked

11   at so far is that they've looked at a corporate structure and

12   used exactly what Daimler said.  Daimler said that there is a

13   test that you use, and that test is you look at the principal

14   place of business of the corporation, you look at the place of

15   incorporation of a corporation, or you look at other factors

16   which may be exceptions to that analysis.  And the exceptional

17   part of that analysis is what is not yet clearly defined.

18         I'm not sure when you say that the court says -- what

19   is your position as to what the DC courts believe would qualify

20   as the exceptional circumstance?

21         MR. BERGER:  I think they all -- your Honor, to answer

22   the questions you raised, they all have in mind the exception

23   means precisely what Daimler said, which was the occasionally

24   temporary dislocated corporation that moved its principal place

25   of business for a short period of time.

F7SYSOK2

1          THE COURT:  Daimler is not limited to that.  Daimler

2     doesn't limit its exceptional circumstance to just that.

3          MR. BERGER:  No.  It's the one example that it gives.

4     I think it's telling that other judges of this court have

5     referred to the singular place where one can be at home because

6     I suspect your Honor would say the PA and the PLO are at home

7     in Palestine.

8          If we have that as a basis for agreement, the question

9     becomes can they be at home anywhere else.  My submission is

10    no, they can't.

11         THE COURT:  It depends also -- you see, part of my

12    problem in having disagreed with those judges' analysis -- and

13    you have me in an awkward position because it's difficult for

14    me to say that your arguments are unreasonable.

15         They're not unreasonable.  Judges that I know and

16    respect take similar positions.  You're not making this up.

17    You're telling me that there's a different way to view this.

18         Part of my question is -- the Supreme Court hasn't

19    defined -- what does "at home" -- where do you have to be at

20    home?

21         The first question is is at home the place where you

22    can be legitimately sued because that's the place where you're

23    at home?  So the analysis, the at-home analysis, is an analysis

24    that tells the plaintiff where they can sue you.

25         So the first question is that one has to question

F7SYSOK2

1    whether or not the availability -- whether there is an

2    availability of a jurisdiction in which you're at home for the

3    purposes of a lawsuit in the West Bank.

4            MR. BERGER:  Well, your Honor, I guess I would come at

5    it from the other perspective.  I understand the question.  I

6    would say that this Court does not have to fully plumb the

7    boarders of what's an exception.

8            But what I do know is that this isn't the exceptional

9    case because -- I read enough of the trial transcript to know

10   that your Honor heard enough about the Oslo courts to last

11   forever, but I'm going to take a risk and say one more thing

12   about the Oslo courts.

13           The Oslo courts, for all practical purposes, was the

14   chartering corporation of the PLO.  The PLO, under the guise of

15   the United States, got together and said, let's create this

16   thing.  We're going to assign a jurisdiction to it, and it only

17   can operate in the Palestinian territories.

18           THE COURT:  They didn't say we'll assign a

19   jurisdiction.

20           MR. BERGER:  No.  They said these are the only areas

21   over which the PA may exercise are areas A, B, and C.

22           THE COURT:  Is it your position that the plaintiff

23   could have sued the PA in the West Bank?

24           MR. BERGER:  I'm not an expert on Palestinian law.  I

25   do know they've been sued in Israel.  It's not like there's no

F7SYSOK2

1    other place to do it.

2            THE COURT:  Would you argue that Israel is at home in

3    Israel?

4            MR. BERGER:  I'd like to say when I show up there, no,

5    they're not at home in Israel.  That's not the Israeli

6    standard.

7            THE COURT:  I'm not using the Israeli standard.  I'm

8    using the US Daimler standard in terms of trying to determine

9    whether -- look.  You can see my concern.

10           My concern is this:  That I think the Supreme Court

11   meant that when you're trying to apply the Daimler test, are

12   you searching for a place that the plaintiffs can assert

13   jurisdiction and sue the defendant?

14           Or are you just searching for a place on some island

15   somewhere in the Pacific that is not part of the country where

16   they claim, well, that's where we're at home?

17           I don't think that that's what the Supreme Court

18   meant.  I think the Supreme Court did not mean that if you can

19   find a home in which there is no legal basis on which to sue

20   that you are protected from suit if your most significant

21   contact otherwise happened to be in the United States.

22           MR. BERGER:  Your Honor, I think the definitions meet

23   in the middle.  When you say the most significant contact,

24   that's the equivalent of having your principal place of

25   business.  Daimler says, as your Honor said, we have to find

F7SYSOK2

1    the most significant place.

2           THE COURT:  The most significant jurisdiction.  You

3    would agree that the analysis would be different if the court

4    meant that we were saying you have to look for the most

5    significant contacts that you have in a place that a person

6    could legally bring suit.  You would agree that that analysis

7    would be good.

8           MR. BERGER:  If that were the test, that would be as

9    your Honor applied it and as your Honor came back.  I

10   respectfully suggest that your Honor's analysis does not apply

11   Daimler correctly because Daimler was meant to abrogate the

12   substantial and continuous activity test.

13          For all practical purposes -- your Honor, I say this

14   with the greatest respect -- your holding on jurisdiction is

15   effectively reinstating substantial and continuous activity as

16   a basis for general jurisdiction.

17          THE COURT:  No, it's not, because, unfortunately,

18   no one has yet from your table even before you has ever been

19   able to answer the question of where could the plaintiffs sue

20   the PLO.

21          MR. BERGER:  The answer to that, your Honor, is not in

22   the United States.  It's not a foreign --

23          THE COURT:  Again, even you can't answer that

24   question.  You didn't answer -- that's not the answer to the

25   question.  I said where, and you answered not.  That's not the

F7SYSOK2

1    answer to a where question.

2              You can understand at least my concern that what you

3    want me and what the DC courts have done -- it may turn out to

4    be the prevailing position.

5              But I cannot give -- no one can give me an answer to

6    that question.  That I think is a critical question to me.  You

7    can't just say that I'm at home in no place where you could

8    possibly sue an entity -- sue me.  I'm at home -- I've found a

9    home which makes me immune from suit.

10             You can't say that because that's not the principal --

11   the principal place of business is clearly what usually goes

12   along with that is the fact that you've made yourself subject

13   to those laws and the privileges of doing business there, and

14   you know that by doing so, you expose yourself to general

15   jurisdiction.

16             So somebody who says, well, you ran me over with a

17   truck can find a place where they can get redress.  It has been

18   trouble -- in my analysis of interpreting Daimler the way that

19   you want me to interpret it, the DC courts have interpreted it,

20   to simply say, well, I've applied a strictly Daimler corporate

21   test.

22             I find that this doesn't qualify as an exception, even

23   though there's nothing like it.  I don't know what else

24   qualifies as an exception.  You have to admit that this

25   situation -- there's no other comparable situation than the

F7SYSOK2

1    situation that we're talking about now.

2            MR. BERGER:  Actually, not, your Honor.

3            THE COURT:  Which one?

4            MR. BERGER:  It's the Northern Cypress government

5    case, which is not a recognized foreign sovereign, also out of

6    the DC court.  Judge Friedman decided that one too and held

7    that the Northern Cypress government, not recognized as a

8    sovereign by anyone in the world, is not at home in the United

9    States because it's only at home in Northern Cypress.

10            Your Honor, the hidden premise why I think we're

11    disagreeing with one another -- my views are irrelevant --

12            THE COURT:  No.  Your views can be persuasive.  I'm

13    not looking for precedent here.  There isn't precedent.  I'm

14    looking for persuasive analysis.  So, if I can agree with the

15    other judges or you that their analysis or your analysis is

16    persuasive, I will adopt it.

17            MR. BERGER:  Let me say two things:  The hidden

18    premise in the court's framework of analysis is there has to be

19    a place in the United States where you can be sued.

20            THE COURT:  No.

21            MR. BERGER:  The PA can clearly be sued in Palestine.

22    That's where it's at home.

23            THE COURT:  I don't know.  I've been asking that

24    question.  I asked you, and you said you didn't know.

25            MR. BERGER:  I believe it's inevitable.  They have

F7SYSOK2

1     courts.  They are subject to suit in Palestine.

2              THE COURT:  I don't know that.

3              MR. BERGER:  If I could prove that to your Honor as a

4     matter of fact, although I don't think I have to, if I could,

5     would that change the Court's analysis?

6              THE COURT:  I don't know.  Nobody has made that

7     argument.  I've asked the question of where they could be sued

8     and nobody to this day said maybe I think it might be

9     Palestine.

10             MR. BERGER:  I think clearly it could be Palestine.

11    They may have sovereign immunity defenses, but the

12    United States has sovereign immunity defenses.  They can be

13    sued in the United States.

14             THE COURT:  Those are issues -- we know what the law

15    is.  Those are issues of sovereign immunity, waiver, that kind

16    of thing.  They're not personal jurisdiction issues.

17             So the question is, all right.  Did the ATA intend to

18    provide a basis to sue defendant.  And whether Daimler stands

19    for the proposition that even though you have a cause of

20    action -- an entity that is not a corporation and doesn't have

21    a traditional principal place of business but has significant

22    contacts and no one has really established that the contacts

23    are particularly greater in another country than the United

24    States --

25             MR. BERGER:  Well, they're plainly greater in

F7SYSOK2

1    Palestine.

2            THE COURT:  I say another country.  I've had this

3    conversation with your predecessor.

4            MR. BERGER:  I know you have.

5            THE COURT:  I'm not talking about Palestine.  I'm

6    talking about a jurisdiction where you can give me a country in

7    which you say that they are subject to lawsuit under Daimler

8    given the nature of their activity.

9            Other than Palestine, the West Bank, or Gaza Strip,

10   no one has proffered with any particularity any position, place

11   in the world, where some other country other than the US meets

12   the test of the PA or the PLO being at home.

13           You say that the US does not meet that test.  But from

14   your table, I've heard continuously that no other country meets

15   that test.

16           MR. BERGER:  Your Honor, I think I understand why

17   we're not only perhaps talking past each other but why your

18   decision are talking past the DC cases.  The language

19   Judge Kollar-Kotelly uses in Safra refers to terror.  You keep

20   saying sovereign country.  I think that's where the two

21   decisions miss each other.

22           THE COURT:  I'm not saying sovereign country.  I'm

23   saying jurisdiction.  Jurisdiction, in my mind, is defined as

24   the place where one can file a lawsuit.

25           MR. BERGER:  As I'll just quote, this is from Judge

F7SYSOK2

1    Kollar-Kotelly's decision in which she says, "It is common

2    sense that the single ascertainable place where a government

3    such as the Palestinian Authority should be amenable to suit

4    for all purposes is the place where it governs.  Here that

5    place is the West Bank, not the United States."

6            THE COURT:  Even if that's true, on what basis does

7    she make that statement?

8            MR. BERGER:  I think she used Daimler, frankly.

9            THE COURT:  No.  The factual assertion.  Is that true?

10           MR. BERGER:  I believe it is true.  That's the Oslo

11   court's point, your Honor, which is the place where the

12   Palestinian Authority is at home is in the three areas --

13           THE COURT:  No.  She said that's the place where they

14   can be sued.  What's the record for that?

15           MR. BERGER:  The record for that, your Honor, I

16   suppose is plaintiffs haven't alleged that they can't be sued.

17           THE COURT:  I know, but is that just her logic?

18           MR. BERGER:  It is logic.  It is logic.

19           THE COURT:  I'll give that some weight, but no one has

20   given me such information.  No one has given me anything that

21   would establish that as a fact.

22           MR. BERGER:  That's the point, your Honor, indeed that

23   I think is also where the DC cases and yours disagree which is,

24   in essence, frankly, your Honor, it's a burden shifting that

25   defies what personal jurisdiction is supposed to be.

F7SYSOK2

1          The burden is supposed to be on the plaintiffs to show

2     that we're at home in the United States.  It's not our burden

3     to show we're at home some other place.

4          THE COURT:  I totally agree with that.  It's more

5     difficult for me to accept your argument if it's premised on a

6     fact that they can be sued in Palestine, and I have nothing in

7     this record that gives me a basis to make that conclusion

8     except, as you say, pure logic.

9          Logic would dictate otherwise.  It would dictate that

10    the PA would subject itself to suit in the territory,

11    jurisdiction, the territory in which they are governed, and

12    no one has given me an example of that having ever happened.

13         MR. BERGER:  If I can may it this way, your Honor:  I

14    recognize -- this is meant with all respect -- this issue is

15    likely to be sorted out by the Second Circuit.

16         THE COURT:  I agree.

17         MR. BERGER:  So I want to make it clear that what I

18    think the Court is doing is asking questions germane to forum

19    non conveniens but not to general jurisdiction.

20         Forum non conveniens, if I said, don't have the case

21    here.  Have it there, the burden is on me to say, courts

22    operate in this jurisdiction.  They can get a fair trial in

23    this jurisdiction.  I'm going to come forward with those facts.

24         THE COURT:  I don't disagree with you.  I'm clearly

25    not shifting the burden, but I listen to what you say to me.

F7SYSOK2

1    So if you say to me they can be sued in the Palestinian

2    territory, then I'm going to say back to you, okay.  What basis

3    do you have to conclude that?

4         And if you say, just pure logic, I think that's less

5    of a basis than if you said to me, Judge, that's easy.  Here

6    are 50 cases in which in the courts in the territory in which

7    PA is a defendant and has been sued by somebody who got run

8    over by a truck.  Those are natural questions that I'll ask.

9         MR. BERGER:  I think I finally get the point where

10   we're missing each other, your Honor.  It's my fault, which is

11   Judge Kollar-Kotelly said the Palestinian Authority should be

12   amenable to suit in Palestine.  She didn't say it is amenable

13   to suit.

14        THE COURT:  What basis does she have to say that?

15        MR. BERGER:  Because it's clearly where it's at home.

16        THE COURT:  I don't know what that means it should be.

17   Does that mean there ought to be, or does that mean it would be

18   nice if it was the case?  Or does that mean that if the law

19   would require that?  I'm not sure what she means by that.

20        MR. BERGER:  I think it means that's the only base

21   where it should be possible but not necessarily is possible.

22   Every day of the week, your Honor, including in your terrorist

23   attack cases where I spent six years litigating jurisdictional

24   issues before you, you dismissed a number of overseas

25   defendants for both lack of specific jurisdiction and lack of

F7SYSOK2

1    general jurisdiction.

2              Your Honor's decisions in that case were not motivated

3    by a need to find a place in the United States, despite the

4    fact that these were ATA claims where congress' desire to have

5    a remedy to be executed in the United States --

6              THE COURT:  Those were pre Daimler.

7              MR. BERGER:  Those decisions are a fortiori post

8    Daimler because your Honor applied a substantial continuous

9    activity test for general jurisdiction in those cases, and we

10   all agreed that whatever happened under Daimler, the test got

11   harder, not easier.

12             So anything that your Honor held terrorist attacks and

13   the Second Circuit affirmed, those are still --

14             THE COURT:  That was a contacts test.  That contact

15   test no longer exists simply because the contacts were strong

16   or weak and wouldn't change the analysis now is not the issue.

17             The issue as you're arguing it to me is no longer the

18   test.  The test is whether or not they are at home.  So I would

19   have to analyze that now as to whether or not they were at

20   home.  I may come up with the same determination.

21             I can't say that my analysis in those cases at that

22   time is transferable.  You would argue that it's not

23   transferable today under Daimler; that I have to come up with

24   the same result.  I would have to give it a different analysis.

25   I just used a substantial contacts.

F7SYSOK2

1              MR. BERGER:  Substantial contacts, if you think of it,

2      is one concentric circle.  At home is a much smaller circle

3      than substantial contacts.  So anything your Honor held in

4      terrorist attacks is bound to be true under Daimler.

5              I'll give you an 11th Circuit case that was decided

6      just last month which sums it up trying to say what I'm saying,

7      11th Circuit in a case called Carmouche is in order to meet the

8      at-home test, the activities in the forum must closely

9      approximate the activities that would ordinarily characterize a

10     corporation placed in a corporation or principal place of

11     business."  It has to be fungible with principal place of

12     business or incorporation.  In the United States is not either

13     of those for the PA.

14             THE COURT:  Where is either of those?

15             MR. BERGER:  Both of those for the PA is in the West

16     Bank for sure.  That's the geographic place.  Your Honor has

17     asked an additional question which is can you be sued in that

18     geography, and I respectfully submit that is not a question

19     Daimler requires us to answer.

20             THE COURT:  That's the issue that, as you say, I can't

21     say I can give you the answer on that because I don't think

22     there is an answer until either the Second Circuit or the

23     Supreme Court gives an answer.

24             You said you made the distinction.  You said is that

25     the geographic location where they're at home.  I'm looking for

F7SYSOK2

1    the jurisdiction where they're at home.  I consider geographic

2    location and jurisdiction to be two different legal concepts

3    with two live legal consequences.

4              MR. BERGER:  I take that, your Honor.  I take also the

5    point about the Second Circuit likely to sort that out --

6              THE COURT:  The DC court --

7              MR. BERGER:  We'll be taking up that issue there.  I'm

8    going to try to sharpen the issue for the Court of appeals if

9    we could deal with the argument that the plaintiffs advance for

10   specific jurisdiction.

11             I have never taken your Honor's -- any of the Court's

12   ruling as believing there was a basis for specific jurisdiction

13   of the PA and the PLO.  I'm happy to argue that.  The three

14   cases in DC also say there's no basis for specific jurisdiction

15   on look-alike theories.

16             I think a determination from the Second Circuit with

17   your Honor's ruling clarified in the context of the 50, 59

18   motions.  I am predicating it only on the basis of general

19   jurisdiction, and I reject the specific jurisdiction.

20             THE COURT:  I don't think that I even ever addressed

21   the specific issues.

22             MR. BERGER:  If I may briefly, I'd like to do that.

23             THE COURT:  If you can remind me where I have, but

24   that's not the way the issue was presented to me.  So I don't

25   have a recollection that I was asked to rule on that and the

F7SYSOK2

1    parties argued that issue.

2              MR. BERGER:  There was argument in April 2014 on the

3    specific jurisdiction theory, your Honor.  The colloquy between

4    you and Mr. Yalowitz, as the Court said -- and I really don't

5    think I followed your specific jurisdiction theory there.  You

6    can give it to me again.

7              I think what's important is that we need clarity

8    because, particularly in our opposition to our 50, 59 motion on

9    this issue, they have in fact argued specific jurisdiction.

10              Both the Livnat/Safra case by Judge Kollar-Kotelly and

11    the Klieman case by Judge Friedman say there's no specific

12    jurisdiction.

13              Under Woldon, the other Supreme Court case, the one

14    focused on specific jurisdiction -- and that's what I would say

15    foreclosures specific jurisdiction here.  I think we would be

16    doing the Second Circuit a great service if we can at least

17    focus the issue that they have to resolve.

18              As I understand it, plaintiffs are arguing that there

19    are three bases for asserting specific jurisdiction.  One is

20    that there was supposedly a publicity campaign in the

21    United States to pressure the US on its policy towards Israel,

22    and that was a US-focused activity that the terrorist acts in

23    Israel allegedly had the collateral effect impacting Americans'

24    thinking about the Middle East, policymakers' thinking about

25    the Middle East, and there was injury to Americans that was

F7SYSOK2

1    foreseeable when the attacks took place in the Middle East.

2           All of those are foreclosed by Waldon.  The most

3    important contribution about Waldon is it says specific

4    jurisdiction can no longer be based in a nationwide context.

5    Attacks on Americans.

6           It can only be based on attacks on America.  Nothing

7    in their specific jurisdiction theory shows an attack on this

8    jurisdiction as opposed to attacks that had effects on

9    Americans.

10           Now, one of the things that keeps getting argued by

11    the plaintiffs is that so long as it's merely related to acts

12    in America that overseas actions can be subject to specific

13    jurisdiction, and they point to a case that was overtaken by

14    Waldon.

15           Waldon makes it clear that mere relatedness by an

16    overseas action in the United States is not enough.  What

17    Waldon holds is there has to be a substantial connection

18    between the overseas action and the United States.

19           So if somebody attacks the World Trade Center, that is

20    clearly substantially attacking the United States.  If somebody

21    attacks a settlement in Israel in which Americans live, that is

22    connected to Americans, but it is not connected to America, and

23    that's what Waldon requires.

24           It's easy to apply the DC cases here because the same

25    cast of characters on the plaintiffs' side bring all of these

F7SYSOK2

1    cases.  They have the same theories on all of these cases.

2           That's why the Livnat and Safra opinions literally are

3    clones of one another.  That's why Judge Friedman in the

4    Klieman case was able to arrive at that.  There is a great deal

5    of cross-pollination of these theories.

6           That's the same set of theories here which is there's

7    some spillover effect some collateral effect.  When I go back

8    and reread the specific jurisdiction section of your Honor's

9    jurisprudence in the terrorist attacks cases, your Honor

10   correctly cited the test, which the Supreme Court denied twice

11   in these cases, that it has to be an intentionally tortuous

12   activity expressly aimed or purposely directed at the

13   United States.

14          So, first of all, they failed the first test.  What

15   they say takes place in terms of policy advocacy and the like.

16   That's not intentionally tortuous.  That's legitimate.

17          Your Honor I think raised a question isn't that First

18   Amendment activity.  In order to get to that issue, free speech

19   is not intentionally tortuous.  That's what's required under

20   the specific jurisdiction test.

21          Was an intentionally tortuous activity like a

22   terrorist attack in Israel expressly aimed or purposely

23   directed at the United States?  No.

24          It was expressly aimed or purposely directed at the

25   settlement in Israel that was attacked.  That's why none of

F7SYSOK2

1    these sort of collateral effects on the United States tests

2    could be sufficient for specific jurisdiction.

3              So I think we can conclude there's no basis for

4    specific jurisdiction, and the open question that your Honor

5    and I have debated -- and I appreciate your Honor's indulgence

6    on general jurisdiction.  I'll happily answer any questions

7    that your Honor might have.  I appreciate the indulgence.

8              THE COURT:  What I'll do is I'll give the court

9    reporter a break, and I will hear from plaintiffs to address

10   the issues.

11             MR. BERGER:  Thank you, your Honor.

12             THE COURT:  (Recess)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7S9SOK3

1          THE COURT:  Do you want to be heard, Mr. Yalowitz?

2          MR. YALOWITZ:  Okay.  I'll be really brief.  I just

3   want to say I think that with regard to specific jurisdiction,

4   we have talked about it, but there's never been any rulings,

5   and I don't propose any right now.  The plaintiffs are very

6   comfortable with the court's general jurisdiction ruling.  We

7   have raised alternative issues which you're very familiar with

8   and in terms of Waldon, in terms of the Fifth Amendment issues,

9   whether they have constitutional rights, the waiver issue,

10  everybody has had the chance to ventilate that.  I don't think

11  we need to go over that.  The only thing I want to say is that

12  by not going over it that doesn't mean I agree with anything

13  that they said about any of it at all whatsoever.  I want to be

14  one hundred percent clear.  There's nothing they've said that I

15  necessarily agree with.

16         THE COURT:  I've heard you repeat that probably ten

17  times over the last two years.

18         MR. YALOWITZ:  Okay.  That's all I have to say about

19  that.

20         With regard to Daimler, I think the comments that you

21  made were really spot-on and reflected -- I have to say I

22  thought reflected a judicial mind.  You know, lawyers come in

23  and they say well here's the test and here's how I apply it and

24  here's the test.  You sit in a different position on the bench

25  and you think about well what does this mean for the real live

F7S9SOK3

1    people who are supposed to apply these rules and live with

2    them.  And I really liked it.  I thought it was really spot-on.

3    I think that it's routed in Daimler in this way which I'll

4    explain.

5            In Daimler, Justice Ginsburg said we're -- this

6    decision that we're making that the stakes shouldn't be

7    exercising general jurisdiction, she didn't say anything about

8    the United States but about individual states, is routed in

9    international comity because we've heard from our European

10   nation counterparts, not judges but the European nations have

11   complained that their corporations are being subject to general

12   jurisdiction suit in judicial jurisdictions like Mississippi or

13   California, whatever, where it's a problem for the European

14   corporations and they said in Europe they don't have that rule.

15   And that's the point of international comity.  You're supposed

16   to give as full effect as you can to the laws of a foreign

17   sovereign.  And in this exceptional case we're not dealing with

18   a foreign sovereign.  There is no foreign sovereign saying it's

19   a problem for us if the PA or the PLO or an unregistered

20   ship -- I mean it's like that.  It's a stateless entity.

21           And so it's not only your point, which I agree with,

22   that you're looking for a place where they are at home and

23   subject to suit.  It's -- you're looking for a place where

24   they're at home subject to suit by another sovereign, and

25   that's what's driving Daimler and that's what's driving Gucci.

F7S9SOK3

1    They said the same thing in Gucci.  It's about international

2    comity.  It's really just another I agree and here's another

3    thing.  That's really all I need to say about that unless you

4    have thoughts or questions or things you want to talk.

5        THE COURT:  That's a point for me to consider.  I

6    think -- I don't think I disagree with that.  I think that the

7    comity, and I think we discussed that and I've discussed that

8    in one of the opinions on this issue, the comity issue -- I

9    think that was significant in Daimler.  And Daimler is not just

10   talking about -- Daimler isn't just a due process argument

11   on -- to benefit the defendant.  Daimler is also, and depending

12   on which justice that you would discuss it with, more or less

13   significant in a comity context in saying to other governments

14   and so that they will say the same thing to us that, no, we

15   have a greater interest in resolving these disputes.  You do

16   not.  They're at home here.  And to regulate how business is

17   supposed to efficiently effectively operate, international

18   comity has to say that the place where you're at home is the

19   jurisdiction that should decide these issues.  And I think

20   that's recognized in Daimler.  And maybe it's reading too much

21   into Daimler but I think that that is what's recognized in

22   Daimler.

23       And I think that partially what drives my analysis of:

24   Okay, where is the competing jurisdiction?  Who says that they

25   have the interest to resolve this dispute and resolve it fairly

F7S9SOK3

1    for both sides?  What is driving the court to say that, look,

2    where -- the jurisdiction and the sovereignty that regulates by

3    law the relationships of individuals and entities because

4    that's -- and has the strongest interest to do so, a at-home

5    test finds that location.  And it gives you an opportunity not

6    to be dragged into a foreign jurisdiction under foreign laws

7    but as importantly, if not more importantly, it gives that

8    jurisdiction an opportunity to resolve these disputes in the

9    context that it has an interest in regulating the

10   relationships, particularly of corporations, but relationships

11   vis-a-vis individuals and corporate entities and other

12   noncorporate entities that have a like structure and conduct

13   themselves in a like business manner.

14          That's primarily what Daimler is dealing with.  It is

15   not a real debate to try to figure out whether the PLO is an

16   exceptional circumstance that falls within the definition of

17   usual or exception.  The standard case that Daimler is talking

18   about, those cases are not PLO.  They are corporate

19   relationships that Daimler knows that there isn't -- in most

20   cases there's an easy, direct way to establish those

21   relationships.

22          Corporations have two anchors.  They have the

23   principal place of business that we recognize and they have

24   their place of incorporation that we recognize.  And those are

25   all standard tests that we standardly use.  When we use

F7S9SOK3

1    something outside of that test and it is not -- and Daimler

2    implies that what we use is no longer the significance of --

3    simply the significance of the contacts, then it seems to me

4    that exceptional has many definitions, one of which -- if I put

5    exceptional on one side and the usual on the other side, I

6    would have to put the PLO in the exceptional category than the

7    usual category.  Otherwise we wouldn't even be having this

8    debate about territory, jurisdiction, where -- Oslo Accords,

9    whether they're a recognized country or government, whether

10    they really -- do we really think that they can be sued if

11    these plaintiffs wanted to sue them.

12            Is that what is intended by Daimler?  Did Daimler

13    really intend to say to these plaintiffs you want to sue the

14    PLO, you go to the West Bank?  That's a legitimate question.

15    That's a legitimate question.

16            Do I know the answer to that question?  I don't know.

17    I didn't write Daimler.  I wasn't in any debate on Daimler.

18    I'm only trying to apply it in a way where the Second Circuit

19    has yet to give any guidance on it and, quite frankly, I know

20    that -- I know where the other judges ended up.  They believed

21    that that is the right position and they may, in fact, have the

22    right position.  But I know in watching their analysis and what

23    they were asking from the parties and how they were approaching

24    it, this was not an easy question for them either.  They have

25    just as much or as little guidance to go on as I do.

F7S9SOK3

1          So, as you say, most of our arguments are just based

2     on our perspectives, our analysis of what the consequences are.

3     And as I always say, there are no right answers here.  There

4     are only answers that work and ones that don't.  I'm looking

5     for the answer that works because there is no right answer.

6     Nobody said this is the way you're supposed to do it clearly.

7          I am not convinced that the analysis by the court in

8     the -- the courts in D.C. provide a reasonable alternative for

9     a plaintiff who finds themselves in a Daimler analysis to try

10    to bring a claim.  And I'm not sure that Daimler intended that

11    effect.  And if Daimler really did intend that effect, then I

12    think the Second Circuit or the Supreme Court should say that.

13    Because it is not, from my perspective, it is clearly an

14    exceptional circumstance and simply because it's an exceptional

15    circumstance doesn't mean that the analysis still wouldn't,

16    under the exceptional circumstances, fall within any

17    defendant's favor, even analyzing it under the exceptional

18    circumstances.

19         Obviously, arguments can be made that they are neither

20    at home or -- they're not at home in the United States.  Those

21    arguments can be made whether you analyze it under what one

22    might think is a usual test or exceptional circumstance.  But

23    it does not appear to me that this is what the Supreme Court

24    had in mind when it thought about how Daimler -- what effect

25    Daimler would have and how it would be applied.  And I'm not

F7S9SOK3

1    sure this is what they meant.

2           So I think the record on that, I think the Second

3    Circuit needs to address it.  I think the D.C. Circuit needs to

4    address it.  Whether or not they end up at the same place or

5    they end up at different places and the Supreme Court ends up

6    having to address it specifically will be another issue.  But I

7    don't -- I think the same facts and the same law exist before

8    me and the D.C. judges.  And I think we just come to a

9    different point and a different conclusion.  And I think that

10   that issue -- I'm not -- I have no reason at this point to

11   change my analysis simply because I'm disagreed with.  I don't

12   see that the judge's analysis in D.C. addressed or solved my

13   concern.  And my concerns are as I've articulated.

14          So it is likely -- I think I'm just going to sit down

15   and read through them one more time.  But it's likely that I --

16   my position -- there is no real compelling reason and there's

17   nothing in the D.C. cases that they have considered that I did

18   not consider that would make me believe that it makes sense for

19   me to reverse and change course and change my analysis of how

20   the situation should be applied in this very unusual set of

21   circumstances.

22          Did you want to specifically highlight, Mr. Berger,

23   any of your arguments with regard to the sufficiency of the

24   evidence or the evidentiary rulings?

25          MR. BERGER:  Your Honor, with the Court's permission,

F7S9SOK3

1    Mr. Burlingame will do that relatively briefly.

2              If I could just make one request of the court, in

3    light of what you and Mr. Yalowitz were talking about.  I heard

4    the court say that you'll sit down and read through these cases

5    one more time.  Given the colloquy you and Mr. Yalowitz had

6    about international comity and international concern, I

7    respectfully suggest the United States government wouldn't be

8    asking for the opportunity to weigh in if there weren't

9    international concerns so it might be serviceable to wait and

10   hear what the U.S. government has to say as we think about

11   these issues going forward.

12             MR. YALOWITZ:  We would oppose that.

13             THE COURT:  Oppose what?

14             MR. YALOWITZ:  Waiting on entry of judgment.  The

15   United States has said they're considering the issue of a stay,

16   whether to weigh in on the issue of a stay.  I'm perfectly

17   happy to get judgment entered and preserve the status quo while

18   you have the motion for a stay under consideration.  I'm not

19   going to start collection activity tomorrow.  Preserve the

20   status quo.

21             But we would very much like to get judgment entered.

22   As you know, we've been clear on that.

23             THE COURT:  Well my position at this point is that I

24   will -- if I am to enter judgment I will enter judgment as

25   early as the next day we meet.  And depending on what -- if I

F7S9SOK3

1   get -- as I say, certain assumptions could be made about the

2   government weighing in.  But the letter I got didn't yet tell

3   me whether they intended to weigh in.  They wanted to consider

4   it.  And we'll see if they have a position and whether that

5   position does, in fact, support one side or the other.  I don't

6   know what they want to say or if they're going to say anything.

7   So I'm not going to make any assumptions about that.  But, I

8   intend to at least consider what they have to say about either

9   staying the judgment or if they weigh in on the bond because,

10  quite frankly, that may affect whether or not I enter judgment

11  and stay it, enter judgment and don't impose a bond, just enter

12  judgment and let the parties do what they will with regard to

13  how they might enforce that judgment.  But as I said you

14  understand I've already expressed to you what my concerns are

15  and I think the -- at least the lawyers for the defense should

16  take this opportunity to go back to their clients and figure

17  out how their clients will react if they're told to put up a

18  bond.  Because if I'm told that they say, okay, thanks but no

19  thanks, then my decision might be different.  So I'm not going

20  to prejudge that and I'm sure we will promptly resolve that

21  issue within the next several weeks.

22          MR. YALOWITZ:  On that issue, I know we're going to

23  talk about it next time we're together but I just can't help

24  but think about the thing you just said, which I don't know how

25  many times I heard you say it in the last two years, "I'm

F7S9SOK3

1    concerned about what works." And I feel that way too with the

2    collection issue. And anyway that's really what was driving my

3    application for the deposit into the registry.

4            THE COURT: I understand.

5            MR. YALOWITZ: I think you hear that.

6            THE COURT: Mr. Burlingame, did you want to be heard

7    on some of these issues?

8            MR. BURLINGAME: Yes, your Honor. Taking your Honor's

9    cue from this morning, I will try to distill the arguments and

10    just stick with a couple of the highlights. What I'd like to

11    focus on, your Honor, in particular is the expert witness

12    testimony in this case on liability. I don't think that there

13    was any question, your Honor, that the experts in this case,

14    particularly Mr. Eviatar and Shrenzel, were critical links to

15    liability. With your Honor's permission I'd like to put up a

16    demonstrative that has already been cleared by Mr. Yalowitz.

17            I don't purport to make this an exhibit with any type

18    of mathematical precision, your Honor. It's solely for

19    illustrative purposes. But we went back through and tried, in

20    fairness, to tally up the liability witnesses and allocate how

21    much time each of them has spent. And our approximation was

22    that between Mr. Kaufman, Mr. Eviatar and Mr. Shrenzel, those

23    three experts took about 87 percent of the plaintiffs' case in

24    terms of on the witness stand during the liability phase of

25    this trial.

F7S9SOK3

1          THE COURT:  That's not necessarily indicative of what

2     you want to argue from that because the defense asked one

3     question of all of the other witnesses, one single question of

4     one witness.  There was no cross-examination of the majority of

5     the witnesses who testified in this case.  So, it's not to

6     imply that somehow the length of time that the experts were on

7     the stand -- they were on the stand for some of that time

8     because the defendants had an interest in cross-examining them

9     and didn't have any interest in cross-examining the plaintiffs

10    and other witnesses.

11         MR. BURLINGAME:  Understood, your Honor.  This is

12    simply just to illustrate the focus on this trial, on the

13    liability stage, was by and large on the expert witnesses.

14         Your Honor set some very clear ground --

15         THE COURT:  No.  I can't agree with that.  I can't

16    agree with that.  If you look at the substance of the

17    testimony, that's not true.  The victims came in, and you will

18    probably agree just reading the cold transcript, the victims

19    came here and gave very detailed, powerful, emotional testimony

20    with regard to the activities that were at issue here.  Most of

21    the testimony by the experts was not substantive testimony with

22    regard to liability.

23         MR. BURLINGAME:  Your Honor, I agree that, for

24    example, Mr. Kaufman spent considerable time on general

25    background, explaining what an expert is entitled to do and

F7S9SOK3

1    should do in cases like this, to help orient the jury on things

2    that would be unfamiliar to a New York jury.

3            This goes back to the July 2014 hearing that you held

4    in this case where you and Mr. Yalowitz were exchanging

5    comments about the scope of the expert witness testimony in

6    this case.

7            I want to touch briefly on that.  In July of 2014

8    Mr. Yalowitz explained that he wanted to use expert witnesses

9    to help orient the jury, to talk about what the PA is, to talk

10   about what the general intelligence is.  And that is absolutely

11   proper testimony, we would agree, with respect to a case like

12   this.

13           Fast forward to the December 16, 2014 hearing where

14   there were substantial discussion about the scope of expert

15   testimony.  Your Honor had a number of questions and, frankly,

16   concerns about the scope of the expert testimony there.  You

17   made very clear in setting the ground rules that the experts

18   were not going to opine on ultimate issues, that the experts

19   were not going to provide state-of-mind testimony, that the

20   experts were not simply going to come in and summarize the

21   facts for the jury, in other words doing the same thing that

22   Mr. Yalowitz did during his closing arguments, that the experts

23   were not going to simply come in and connect factual dots.

24   Those were all very appropriate ground rules, your Honor.

25           The plaintiffs have cited a couple of cases involving

F7S9SOK3

1    terrorism, the Gill case, the Linde case.  And those cases

2    stand for the unsurprising proposition that in cases like this

3    experts can come in and they can help orient the jury in areas

4    where this jury is -- they're not going to have much of an idea

5    what is going on.  Those experts also were allowed to opine on

6    what those cases call attribution testimony.

7             In other words, your Honor, so whether a specific

8    terrorist attack was conducted by a particular terrorist

9    organization, Hamas, here are the hallmarks of a Hamas attack.

10   Those experts though were not allowed to come in and testify on

11   causation.  The ultimate issue in this case was causation:

12   Were the PA and the PLO liable either directly under material

13   support or indirectly under the doctrine of respondeat superior

14   that these six attacks that this jury had to decide?  All of

15   this fits squarely within the Second Circuit's guidance in the

16   United States v. Mejia case.

17            Your Honor that case talked about the evolution of the

18   use of experts in organized crime situations.  The Second

19   Circuit has recognized that when it comes to gang activity or

20   organized crime that's going to be beyond the ken of a jury and

21   that the experts can come in and they can do things like help a

22   jury understand an insular lexicon used by a criminal

23   enterprise.  What does the term capo mean?  What does a dime

24   bag mean?  What does crew mean?

25            But the Second Circuit cautioned what experts ought

F7S9SOK3

1   not do in those situations is come in and interpret

2   conversations with respect to the case at issue.  They should

3   simply come in and supply specific definitions on what the

4   Second Circuit calls an insular lexicon.  The Second Circuit

5   also said that it's appropriate in these organized crime

6   situations for an expert to come in and talk about the

7   organizational structure of a particular criminal enterprise,

8   the hierarchy, if there's particular initiation rights; all of

9   that completely appropriate.

10          But, again, they can't come in -- and this is exactly

11  what the Second Circuit said -- they can't come in and just

12  overwhelm the trial and start summarizing facts, connecting the

13  dots, that they've got to stick with the broader picture.

14          The ground rules that your Honor set for this truly

15  were absolutely consistent with the Second Circuit's guidance

16  in the Mejia case.  But during the trial the plaintiffs'

17  experts were allowed to do things like testify to state of

18  mind, to causation.  They were allowed not only to provide a

19  definition on an insular lexicon but to actually come in and

20  explain to the jury what their opinion is on what a particular

21  document meant to somebody else.

22          THE COURT:  What is difficult for me to follow in your

23  papers is that you say that I set appropriate parameters for

24  the witness to testify as an expert.  So, therefore, what I

25  need -- what your argument has got to be premised on is areas

F7S9SOK3

1    where you say -- not just general attacks on the witnesses and

2    experts and the general nature of their testimony, but areas in

3    which they testify.  And the defense objected to that testimony

4    as being inappropriately beyond those bounds, and demonstrate

5    why that is prejudicial reversible error.

6            So, I'm not quite sure -- for example, you say state

7    of mind.  What is your example that I set proper parameters in

8    that regard that the witness went beyond those parameters and

9    that the defense made a contemporaneous objection to it, I

10   overruled that objection, and allowed the witness to improperly

11   go beyond that point and why you say that that's what caused

12   the jury's determination of liability against the defendant

13   where they would otherwise not have found the defendant liable

14   if that hadn't occurred?

15           MR. BURLINGAME:  Sure.  Let me specifically address

16   your Honor's question and give you a couple of examples.  If I

17   might approach the ELMO, your Honor.

18           THE COURT:  Yes.

19           MR. BURLINGAME:  So this is one example here.  This is

20   the redirect of Mr. Shrenzel.

21           MR. YALOWITZ:  I'm sorry, your Honor.  Could I just

22   have a minute to try to find a copy of that.

23           THE COURT:  It might be easier if you have an extra

24   copy to just give me a copy rather than use the ELMO since

25   there is nobody in the box to look at the ELMO.  I'm the only

F7S9SOK3

1    one you're trying to show it to.

2              MR. BURLINGAME:  Let me just describe, your Honor.

3              THE COURT:  If you only have one copy that's fine but

4    I'll follow you if you have a second copy.

5              MR. YALOWITZ:  What page are we at?

6              MR. BURLINGAME:  Page 1594.  This is the redirect of

7    expert witness Shrenzel beginning on line three.

8    "Q.  So Mr. Shrenzel, have you had a chance to consider the

9    role of Tawfiq Tirawi in connection with the -- based on

10   Exhibit 233?

11             "Objection, your Honor.

12             "Overruled.  You can answer.

13             "Yes.  I would say the following.  This very document

14   cannot provide us with conclusive final proof of his prior

15   knowledge of the attack.  But given our overall knowledge

16   about --

17             "Objection.

18             "The Court:  He can finish.

19             "-- the profound involvement of Tirawi during the

20   whole period, in the series of attacks of covering up, of

21   providing weapons, for example, the explosives used in the

22   Hashaika attack, if we take all of the Tirawi file into

23   consideration, I think it's more likely than not that he had

24   prior knowledge and involvement in the attack.  That's my

25   professional assessment."

F7S9SOK3

1              Your Honor, that was his professional assessment based

2     on his reading of Exhibit 233, a memo in the case.  That cuts

3     squarely across the weight of what the Second Circuit in Mejia

4     says an expert ought not do.  An expert ought not come in and

5     start opining on what a particular document in a particular

6     case means.  He's not describing any insular lexicon here.

7     He's giving the jury his view of what this means and he's

8     imputing knowledge to the head of the Palestinian Authority's

9     general intelligence, Mr. Tirawi, that he had prior advance

10    notice that Wafa Idris was the suicide bomber on the

11    January 27, 2002 attack.

12             Was that an important piece of testimony?  I

13    respectfully submit it was because Mr. Yalowitz emphasized it

14    during his closing arguments.

15             Beginning on page 3824 of the transcript, line 24.

16    This is Mr. Yalowitz.  "Here is Shrenzel again.  And he quotes,

17    given our overall knowledge about the profound involvement of

18    Tirawi during the whole period in the series of attacks, of

19    covering up, of providing weapons, for example, the explosives

20    used in the Hashaika attack, if we take all of that Tirawi file

21    into consideration, I think it's more likely than not that he

22    had prior knowledge and involvement in that attack."

23             Your Honor, that ties in with one of the sufficiency

24    arguments that we make.  And I'm not going to go through the

25    sufficiency arguments.  But I do want to be very responsive to

F7S9SOK3

1    your question and show why this expert testimony was so

2    critical and frankly so helpful to the plaintiffs' case.

3    Because in the January 27 Wafa Idris bombing there were really

4    two core pieces of evidence that were emphasized.  The first,

5    Tirawi's supposed prior knowledge of the attack.  The other

6    being that Wafa Idris allegedly received the bomb from an

7    unidentified person who worked in the intelligence group at the

8    Mukataa.  Those are the two critical pieces of evidence.

9         Your Honor may recall there was actually -- that was

10   the one attack where there was some Rule 50 argument during the

11   case and your Honor said that you would go back and reconsider

12   that.

13        So this is a clear example of critical, inappropriate

14   expert testimony that was used to advance a finding of

15   liability on behalf of my clients in connection with the

16   January 27 attack.

17        There are some other examples that I'd like to use.

18   And your Honor will recall that you went to great lengths to

19   avoid inflammatory and unfairly prejudicial rhetoric in this

20   case.

21        At the trial transcript, beginning about page 996.

22   You specifically excluded from evidence Exhibit 201, your

23   Honor.  That was one of these so-called police magazines that

24   talked about liquidating and exterminating the Jews.  You

25   appropriately excluded that type of incendiary rhetoric from

F7S9SOK3

1    the trial.

2            Reading from what your Honor said at the time, again,

3    transcript page 996, beginning line 16.  "I will give you some

4    reasons specifically.  I will just give you an example of 201

5    is the first one on here talking about liquidating the Jews,

6    describing them as a chronic parasite disease, cutting out some

7    or all of their organs and destroying its function.  I think

8    that is a bit over the top to simply be evidence that it is

9    some signal or indication that they intend to do terrorist acts

10   or they intend to do terrorist acts involved in this case.  I

11   think it is highly inflammatory and prejudicial and the undue

12   prejudice outweighs whatever probative value that particular

13   statement may have."  Your Honor continued.

14           But during the trial -- and I'll refer to transcript

15   page 1569, beginning at line 6.  Again, Mr. Shrenzel, on his

16   redirect.

17   "Q.  Do you recall seeing issues of these magazines calling on

18   people to engage in liquidation or extermination or things

19   likes that?

20           "Objection.

21           "Overruled.  You can answer.

22   "A.  They were.  They even reached that part, our part that

23   speaks about the Jews and descendents of monkeys and pigs; that

24   there are anti-Semitic expression.  Usually they refrain from."

25           And then the lawyer for the Palestinian Authority in

F7S9SOK3

1  the middle of the answer, in front of a jury, stood up and

2  objected again.

3          "Overruled."

4          So the witness continues, "They refrain from directly

5  saying please go out and kill all Jews or all Israeli citizens.

6  But, again, it is the explicit but no less than that, the

7  implicit messages of these magazines.  And, as I said, it is

8  really a very -- it was, I believe, a contributing factor.

9          "This accompanied the instructions.  This accompanied

10  the decision of Arafat.  You see there was a political decision

11  to launch a wide-scale attack and to support it; then there was

12  the actual support; and then there was the whole issue of

13  propaganda, of creating the proper atmosphere in which people,

14  a 17-year-old former constructor would go out and detonate

15  himself.  Yes?  Or policemen as we saw, reading the Shurta,

16  either reading -- yes, as I said, I don't have the specific

17  evidence that Said Ramadan read the specific portion, but he

18  was exposed to the atmosphere that is reflected here; and for

19  him it was clear, this is what my superiors expect from me."

20          Once again, in the middle of an answer in front of

21  jury the lawyer for the Palestinian Authority objected.

22  "A.  They want me to go out and --"

23          You overrule the objection.

24          "They want me to go out and shoot indiscriminately in

25  the streets of Jerusalem.  He could also have understood it

F7S9SOK3

1    from the spirit of that magazine."

2         So here is an example of the expert coming in

3    testifying to things that you said wouldn't come into this

4    case.  He's talking about what this evidence that was excluded

5    from trial meant to Said Ramadan, the shooter in the

6    January 22, 2002 attack.  And that it was a contradicting

7    factor.  It was part of the causation in this case.

8         THE COURT:  I have to go back and look at the

9    transcript because I don't remember the context in which

10   those -- that testimony was elicited nor what, if anything, the

11   defense did to open the door to that testimony.  So I'd have to

12   go back and look at the testimony.  But I believe that in some

13   instances there was testimony that was elicited after the

14   defense opened the door to certain issues.  But I'll have to go

15   back and look at it.

16        MR. BURLINGAME:  Your Honor, let me give you some help

17   in going back and looking at it because the argument was made

18   at the time that the defense had somehow opened the door to

19   this type of terrible, terrible type of testimony.  And the

20   argument was that the Palestinian Authority attorney opened

21   that door during Mr. Shrenzel's cross.

22        What the attorney did is he read a portion of an

23   exhibit that had been entered into evidence and had been

24   referred to during Mr. Shrenzel's direct examination by

25   Mr. Yalowitz.  There was an objection to the attorney reading

F7S9SOK3

1    the balance of that exhibit, and your Honor properly said no,

2    it's in evidence, you can read it.

3         I would refer you to the portion of the transcript

4    beginning about -- page 1563.  Nowhere in connection with the

5    cross-examination of Mr. Shrenzel was this type of door opened

6    whatsoever.  And to illustrate how prejudicial this was, we can

7    simply go back to Mr. Yalowitz's closing argument.  He says,

8    beginning on page 3806.  Talking about the defendant's own

9    magazines.  Liquidation and extermination.  And he says,

10   referring to Shrenzel, "They were.  They were.  You see, there

11   was a political decision to launch a wide-scale attack and to

12   support it.  Then there was the whole issue of propaganda, of

13   creating the proper atmosphere."  And he goes on.  He is

14   quoting from the improper ultimate issue, state of mind, and

15   completely unfairly prejudicial testimony that he solicited

16   from his expert witness on redirect examination.

17        THE COURT:  Again, I don't remember the context.  But

18   I have a vague recollection, which could be wrong, that the

19   defense had specifically cross-examined this witness with

20   regard to some of those kinds of statements in the magazines

21   that he put in front of the witness.  But I'll have to go back.

22        MR. BURLINGAME:  Your Honor, let me try to give you a

23   few other examples.  For example Mr. Shrenzel was allowed,

24   contrary to the Second Circuit's guidance in Mejia, to talk

25   about the strength of particular evidence in this case.

F7S9SOK3

1   Transcript page 1381.

2   "Q.  As of June 2002 was the financing continuing?"

3           There was an objection.  It was overruled.

4           "Yes.  We have strong evidence, as a matter of fact,

5   that Arafat himself provided the financial aid to AAMB squads

6   just a few days after that attack that we were discussing,

7   namely a few days after June 19," another piece of testimony

8   that Mr. Yalowitz read during his closing argument at page

9   3830.

10          One other thing that the experts were permitted to do,

11  contrary to the guidance of the Second Circuit in Mejia, your

12  Honor, was not to explain what policies were.  The jury heard

13  testimony from these expert witnesses as to what these policies

14  meant to individuals; again, inappropriate state-of-mind

15  testimony.

16          In their opposition to the Rule 50 motion, the

17  plaintiffs even noted that assessing the effective policies was

18  the jury's task.  The jury was entitled to conclude that these

19  policies were a substantial contributing motivating factor for

20  these terrorist/employees.

21          I could not agree with that statement more, your

22  Honor.  It was the jury's task to assess the effect of those

23  policies.  It was not the expert witness's task to tell the

24  jury what those policies meant to people.  But that's what they

25  did.

F7S9SOK3

1          Page 591 of the transcript.  This is expert Eviatar.

2     "Q.  During the course of your years dealing with the

3     Palestinian arena, did you form an opinion on the incentives

4     that these policies created?

5          "Objection."

6          The objection was overruled.

7          The witness continues, "This entire substantial

8     economic package which is significant for every Palestinian

9     citizen, represents a positive incentive that multiplies his

10    motivation.  He doesn't have to worry about any economic

11    affairs.  Not only that, these economic incentives prod and

12    assist the prisoner to go ahead and carry out those things that

13    he wants to do.  I am referring to terror attacks and terror

14    incidents of this type."  The effect of the so-called martyr

15    payments that your Honor heard much testimony about was to

16    contribute to these terror attacks.

17         This is the direct examination of Mr. Eviatar.  There

18    was no argument that we somehow opened the door to that on

19    cross because cross hasn't occurred.  The best that the

20    plaintiffs have been able to do is point to a portion of the

21    opening statement of the lawyer for the Palestinian Authority

22    commenting that these were social welfare policies.  And that

23    was in response to pages and pages of opening statement by

24    Mr. Yalowitz about what these policies were?

25         THE COURT:  On this point I don't understand what --

F7S9SOK3

1   why you contend that the witness's opinion that providing

2   payments to individuals after they, and their families, after

3   they commit terrorist acts would not be a factor that would

4   either motivate or make it easier for this person to decide to

5   do a terrorist act.

6           MR. BURLINGAME:  Your Honor, that is a fair and

7   logical argument that Mr. Yalowitz made to the jury.  But it

8   did not --

9           THE COURT:  So why is it prejudicial?

10          MR. BURLINGAME:  Because it does not require expert

11  testimony.

12          THE COURT:  But that doesn't make it prejudicial

13  because the expert said it.

14          MR. BURLINGAME:  Your Honor, where the experts talk

15  over and over, as they do, about contributing factors and all

16  tether it to these so-called martyr payments, it does make it

17  prejudicial, your Honor.

18          THE COURT:  Well if it's a legitimate argument to make

19  and you might -- I can understand if you want to argue that

20  that is based in logic rather than based in expertise, so the

21  jury should be able to conclude that and any reasonable person

22  should be able to conclude that without an expert's testimony.

23  But if that's the case then what's the prejudicial effect?  You

24  say the reversible error in the witness saying what logically

25  one might conclude?

F7S9SOK3

1              MR. BURLINGAME:  Because it's ultimate issue testimony

2      on what contributed to these attacks.  It's being presented

3      through an expert witness -- with all due respect, your Honor,

4      without the court, in this particular instance -- and I know

5      that you faced mountains of letters each night.

6              THE COURT:  This is true.

7              MR. BURLINGAME:  You were tireless in your efforts

8      throughout this trial.  I mean that's evident from reading the

9      transcript.  But here, your Honor -- and this goes back to the

10     fundamental tenants of *Daubert*.  Before experts ought to be

11     allowed to testify, the court needs to perform its gatekeeper

12     function.  And I call it the so-called three-legged stool.  But

13     is the expert's opinion based upon reliable facts and data, is

14     it reliably applied -- is there a reliable methodology that was

15     applied and did the expert apply that methodology reliably

16     here.

17              This testimony is not based on any facts or data.

18     It's just simply how the expert views a certain policy of the

19     Palestinian Authority.  And it goes to ultimate issue

20     testimony, your Honor.  So, again --

21              THE COURT:  Your argument about ultimate issue

22     testimony.  The federal rules of evidence don't preclude that

23     anymore.

24              MR. BURLINGAME:  I agree.

25              THE COURT:  That's not a legal basis on which to say

F7S9SOK3

1    that there was error, whether you want to argue it's reversible

2    error or harmless error.  That is not disallowed by the rule.

3              MR. BURLINGAME:  I agree experts often do come in and

4    testify on ultimate issues.  But in what your Honor said at the

5    July 2004 hearing was this is a fact-based case, not an

6    expert-based case, the December 16 hearing your Honor politely

7    admonished all of the attorneys in this case.  You said

8    essentially timeout.  You guys are making this case way too

9    complicated.  It's not that complicated of a case.  This is a

10   case -- it's a tort case.  Was there respondeat superior

11   liability or was there direct liability here?  And when there

12   is that type of case for an expert to come in over and over

13   again to talk about the effect of policies, what motivated

14   people to take their taxis, not applying any type of expert

15   testimony that's beyond the jury's ken and it becomes an echo

16   chamber.  And that's what happened here, your Honor.  We had

17   testimony after testimony from the experts reread by

18   Mr. Yalowitz during his closing argument when much of that

19   testimony were things that Mr. Yalowitz was fully capable of

20   and indeed demonstrated his ability during the closing argument

21   to make those arguments, to connect those dots for the jury.

22   But that was his job.  He shouldn't have been able to multiply

23   that through his expert witness testimony.

24             Your Honor, there are more examples that I can

25   provide.

F7S9SOK3

1          THE COURT:  But with regard to the experts I hear

2    you're arguing that not that those arguments could not have

3    been made and those facts could not have been put before the

4    jury to make those arguments; that because the experts

5    expressed those opinions that made it prejudicial to your

6    client and your client was otherwise found liable when they

7    would not have had the experts not opined.

8          MR. BURLINGAME:  It made it overwhelmingly prejudicial

9    to my client.

10          Let me give you another example here.  And I

11    appreciate your Honor's patience.

12          Once again in Shrenzel.  This is on page 1577.  Of the

13    transcript.  "Can you tell us what policy it reflects to give

14    promotions to individuals such as Abdel Karim Aweis who had

15    been convicted of murder?"

16          "Objection.

17          "No.  I'm going to allow that.

18    "A.  I think I have discussed it several times but let me

19    reiterate.  It reflects a policy of praise, of appreciation, of

20    endorsing what he did.  And this is really unthinkable, yes?

21    It's like let's say a convicted murderer that belongs to the

22    security forces of a certain country, it's unheard of, and it's

23    totally illogical that he gets promoted, and it's a reflection,

24    as I tried to explain on Monday and today, this is a reflection

25    of the policy of the PA.  They wanted him to do it.  He did it.

F7S9SOK3

They praised him for that.  And they continue their support for him."

He just made a closing argument from the witness stand under the guise of expert testimony and that very quote was repeated by Mr. Yalowitz during his closing testimony at page 13 -- I'm sorry 3839.

Your Honor, there were many pages where the experts became -- the chronicler of the factual background here, again, something that the Second Circuit in Mejia cautioned against. You can have your expert come in and talk about structure, organization, or insular lexicon; but they ought not become a chronicler of the facts for the jury.  But there were pages and pages where their experts were just summarizing the attacks. Again, going to just reading documents.  They weren't supplying any type of insular meaning to certain terms like capo or crew.

Page 1122 of the transcript.

"In the context of this document, what is your understanding of the phrase as a result of his fight for his country?"

Objection was overruled.

His answer, "That his actions resulted in fifteen life imprisonments, namely fifteen or around fifteen cases of murder, not only the ones we deal with here now.  And he is sitting in jail because of those crimes.  And an official document of the PA describes it as a fight for his country.

F7S9SOK3

1    Those crimes are considered a fight for his country."

2              Again, perfectly appropriate argument on closing for

3    Mr. Yalowitz.  Completely inappropriate under the Second

4    Circuit's guidance in Mejia and, frankly, under *Daubert*.  He's

5    not applying this testimony to any facts or data.  There is no

6    methodology.  And it's not reliably applied.  He's taking the

7    witness stand to tell the jury what a document means when a

8    jury is well equipped to figure that out on its own.  That's

9    what juries do.

10              Your Honor, the overall combined effect of all of

11   this, as I said, was to be a force multiplier or create this

12   insurmountable echo chamber where the experts are coming in

13   talking about causation, contributing factors, motivation.

14   They're spewing around rhetoric that had no place in this

15   courtroom as your Honor acknowledged when you excluded that

16   type of incendiary rhetoric.  But the jury was told over and

17   over, again and again about the supposed state of mind of

18   individuals at the PA, what policies of the PA, what the

19   consequences or effect of those policies had on individuals.

20   And they wrapped this up and the closing argument time and

21   again just quoted that expert testimony.  It became completely

22   unfair and insurmountable, your Honor.

23              I do appreciate your Honor's willingness to go back

24   and look at the record on some of these instances.  We've cited

25   others in the brief.

F7S9SOK3

1          But this just became an overwhelming part of an

2     already highly emotionally charged trial.

3          So what the jury heard at the end of the day was all

4     this talk about Palestinian militants and the experts saying

5     well it's because of these policies of the PA that are

6     contributing to that.

7          I understand that that was the theory of the case.

8     But that theory needed to be espoused by the lawyers through

9     facts presented, not expert testimony on things like causation.

10          Your Honor, this kind of brings me -- I did want the

11     expert witness portion to be the focus of this.  I would like

12     to just briefly address another aspect of the cumulative

13     prejudice argument.  And this relates to the fact that each of

14     these six attacks was not separately severed for trial.  And I

15     understand your Honor has broad discretion in that.  I'm

16     familiar with the case law.  And there undoubtedly were certain

17     areas of overlap.  The so-called martyr payments, for example,

18     we heard a lot about that, and explaining them.  Putting into

19     context what the Palestinian Authority is, what the PLO is, the

20     structure of it.  Those things certainly would have been

21     redundant over some of the six different trials that the

22     defendants had urged occurred here.

23          But there was also, again, an overwhelming weight of

24     unfair prejudice that came in because different attack evidence

25     polluted the other.  And let me give you an example.

F7S9SOK3

1          Again, using the January 27 Wafa Idris attack.  I've

2     already explained, your Honor, the general intelligence head,

3     Mr. Tirawi the expert's testimony about his -- what his

4     supposed knowledge was based upon an internal general

5     intelligence memorandum.  But in connection with the March 21,

6     2002 attack by Mr. Hashaika, the jury heard evidence through

7     the expert that Mr. Tirawi was somehow involved in the release

8     of Mr. Hashaika from the prison.

9          (Continued on next page)

F7SYSOK4

1          MR. BURLINGAME:  (Continuing) This is going to the

2     revolving-door policy, your Honor.

3          THE COURT:  I can't agree with you that the jury heard

4     that from the expert.  The jury heard that from a number of

5     sources and had at least a basis to conclude that based on

6     several documents.

7          MR. BURLINGAME:  But he also heard it from the expert.

8          THE COURT:  That's not the sole source of that

9     information.

10          MR. BURLINGAME:  But, your Honor, the jury did hear it

11     from the expert transcript, page 1168, asking about information

12     relating to the Hashaika attack.

13          So here we have the so-called "release."  We have the

14     alleged release from prison of Mr. Hashaika, but the

15     revolving-door policy had nothing to do with the Wafa Idris

16     attack, but the jury heard a lot, particularly through

17     Mr. Eviatar about the revolving-door policy.

18          The so-called "revolving-door policy" only applied to

19     two of the attacks, the March 21 attack and the July 31 Hebrew

20     University bombing, which was conducted by the RDD bomb maker

21     which was allegedly Abdullah Barghouti.

22          The jury, in connection with the January 27 attack,

23     heard all this evidence about a release from prison by PA

24     officials.  They heard about Abdullah Barghouti who was a

25     notorious bomb maker.  They heard that Abdullah Barghouti was

F7SYSOK4

1    responsible for the deaths of 66 people.

2            They heard testimony that was germane to the January

3    27 Wafa Idris attack about Ahmed Barghouti, a different

4    Barghouti -- I think as your Honor commented, there were a

5    number of Barghoutis in this case, but Ahmed Barghouti whose

6    role supposedly in the January 27 attack was to kind of

7    facilitate.  He wanted to conduct the attack.  He set

8    everything in motion.  That was his involvement in the January

9    27 attack.

10           The jury heard evidence about Abdullah Barghouti,

11   about Ahmed Barghouti providing a safe house to Abdullah

12   Barghouti in connection with the July 31 Hebrew University

13   bombing.

14           They heard evidence about 66 other crimes or murders

15   committed by Ahmed Barghouti, and they heard evidence about

16   Mr. Tirawi's alleged involvement in other prisoner releases.

17           Those same type of examples affect each of the

18   attacks, your Honor.  So, again, you go back to the point that

19   at the end of the day, what did this jury hear?  They heard

20   about a lot of low-level Palestinian Authority people engaging

21   in terrible heinous crimes.  No question about that.

22           It all came down to the jury was left with this

23   impression of these Palestinian militants, all at the behest of

24   the Palestinian Authority and the PLO, going around engaging in

25   all these terrible crimes.

F7SYSOK4

1          You layer that on with the expert testimony,

2    your Honor.  It did become just an overwhelming and unfairly

3    prejudicial aspect of this trial.

4          THE COURT:  Well, I would have to conclude that much

5    of this evidence, if not all of this evidence, even if there

6    were separate trials, would have been inadmissible at both

7    trials.  I'm not sure that that's true.

8          Part of the burden the plaintiffs had was to establish

9    a policy, and they attempted to establish a consistent policy

10   by the PA and the PLO to support and be involved in terrorist

11   attacks.

12         I can't say that that would not have been relevant

13   information for one attack -- that information about one attack

14   wouldn't be relevant, even if there were separate trials of

15   another attack.

16         MR. BURLINGAME:  Understood, your Honor.  Let's stick

17   with the January 27 example.  Abdullah Barghouti -- there was

18   no evidence that he had anything to do with the January 27,

19   2002, attack.

20         The jury, hearing evidence about this notorious bomb

21   maker who killed many innocent people, who was supposedly

22   released from prison -- all of that has absolutely nothing to

23   do with the January 27 attack.

24         THE COURT:  I can't necessarily say that.  The

25   evidence -- the evidence that he was released from prison could

F7SYSOK4

1    have been admissible evidence in the other attack to

2    demonstrate the policy, intent, state of mind, and consistent

3    practice of the PA and PLO.  That was their argument.

4           It wouldn't necessarily be excluded if the argument

5    was we're not involved.  Remember.  The argument was a very

6    straightforward defense, we are not involved in supporting

7    terrorist attacks.

8           It wasn't that we were involved in one but not

9    involved in another.  It was a consistent debate between both

10   sides as to whether or not the PA and the PLO had a policy and

11   made a consistent decision to support terrorist acts and did

12   in fact support a number of terrorist acts consistent with that

13   policy.

14          MR. BURLINGAME:  Your Honor, when it comes down to the

15   January 27 Wafa Idris attack, the question to the jury was did

16   the PA -- were they directly liable for that attack.  Did they

17   provide materials for it.

18          There's no linkage, for example, between Abdullah

19   Barghouti and the January 27 attack as a matter of direct

20   causation.

21          THE COURT:  It's not a causation question.  It's an

22   issue of whether or not the fact that there's evidence that

23   they were involved in this other attack, whether it makes it

24   more likely than not or it leaves evidence for the jury to

25   consider whether consistent with that they think it's more

F7SYSOK4

1    likely that they were involved.

2              MR. BURLINGAME:  I take your Honor's point.  What the

3    trial became by the refusal to sever was a series of prior bad

4    acts from other events that unfairly contaminated the issues

5    with respect to each of the attacks individually.

6              The notion of having all of this crossover -- it did,

7    in a cumulative nature, unfairly impact the jury's decision.

8              THE COURT:  Thank you.

9              Did you want to respond?

10             MR. YALOWITZ:  Your Honor, Ms. Machnes is going to

11   lead our discussion.  Before she does, I think Ms. Romeo -- do

12   you want to make your application?

13             MS. ROMEO:  Your Honor, I'm going to excuse myself.  I

14   am getting married this weekend.

15             THE COURT:  You think that's a good excuse.

16             MS. ROMEO:  So hopefully my application is granted to

17   be excused early to finish some last-minute items.

18             THE COURT:  Good luck.

19             MS. ROMEO:  Thank you.

20             MR. YALOWITZ:  Ms. Machnes will lead our team on this

21   issue.

22             THE COURT:  Are you getting married too?

23             MS. MACHNES:  I am not getting married.

24             Your Honor, given the late hour, I think I'm just

25   going to focus on responding to the points that the defendants

F7SYSOK4

1    raised.  I am prepared to respond to any of the other issues

2    that they raised in their papers if the Court has any

3    questions.

4         I think it's useful, although I'm sure that the Court

5    is aware, of the standards, under Rules 50 and 59, to just

6    recite those first off because they're very high standards, and

7    they create an enormous burden for the defendants here.  I'm

8    surprised we didn't hear anything about them.

9         Rule 50 says that the Court should give a directed

10   verdict only if there is such a complete absence of evidence

11   supporting the verdict that the jury's findings can only have

12   been the result of sheer surmise or conjecture.  That's from

13   Second Circuit case Diesel v. the Town of Lewisboro, 232 F.3d

14   92 at page 103.

15        Under Rule 59, we have another very high burden.  The

16   Court should grant a new trial only if the Court is convinced

17   that the jury reached a seriously erroneous verdict or that the

18   result is a miscarriage of justice.

19        With those terms and conditions and on this record,

20   these are not difficult motions to deny.  I'll give a quick

21   summary of the evidence that we had on the six attacks that

22   went to the jury.

23        We had convictions.  We had confessions.  We had

24   government reports.  We had a host of evidence from the

25   defendants' own files, including employment records, prisoner

F7SYSOK4

1    records, martyr files.  We had videos of suicide terrorists

2    that were in this case.  So, with a record of that extensive

3    evidence, we do not believe that the jury's verdict should be

4    disturbed.

5           So, turning to the defendants' objections to the

6    experts, I don't think that I heard any objections in fact to

7    their qualifications.  I think the defendants admitted that

8    background testimony, at least, is proper given the

9    qualifications of Eviatar and Shrenzel, who testified here.

10          Also this chart that they put up is skewed, not only

11   because it doesn't account for cross-examination, as the Court

12   mentioned, but also a lot of that testimony that the experts

13   were giving was presenting the defendants' own documents to the

14   jury.

15          So it's not fair to say that the experts themselves

16   were the critical links on liability.  Actually, it's the

17   defendants' own documents that were the critical links on

18   liability.

19          Turning to the specific examples that the defendants

20   just went over, I think it's important to note, just overall,

21   for example, that one of the improper examples the defendants

22   had in their papers that wasn't mentioned here was when

23   Shrenzel testified as to who was responsible or which terror

24   organization was responsible for each attack.

25          At one point he said that the Al Aqsa Martyrs Brigades

F7SYSOK4

1    was responsible for the January 22 attack.  That was an example

2    of improper testimony in their papers.  Except now in this

3    argument we just heard Mr. Burlingame say that attribution

4    testimony is proper for expert testimony.

5            I think that just shows that the examples that they're

6    citing are, for the post part, not actual examples of improper

7    testimony or inadmissible testimony.

8            The examples that we did go over here -- I'll start

9    with the Tirawi example with respect to Exhibit 233.  The first

10   response to that is that the defendants actually opened the

11   door, as your Honor said, on cross-examination by suggesting

12   that Tirawi was innocent.  Mr. Shrenzel had the right to

13   respond truthfully that that wasn't the case in his view.

14           Second of all, his testimony about Tirawi with respect

15   to the January 22 attack was actually harmless because whether

16   or not Tirawi was the person that let Hashaika out of jail was

17   not actually critical to a finding of liability on the January

18   22 attack.

19           It was enough.  It was sufficient for the jury that

20   they had a letter or a memo indicating that the general

21   intelligence generally, whether it was Tirawi or somebody else

22   was involved in the attack, and they could have found liability

23   regardless of Tirawi's involvement.

24           Also there were perfectly -- they were perfectly free

25   to cross-examine Shrenzel on Tirawi's involvement.  They chose

F7SYSOK4

1    not to do so, and they can't complain about it now.

2            The second example they gave was again about the

3    police magazines.  We heard that objection through the trial.

4    As we argued then, the defendants again opened the door by

5    applying on cross-examination that the magazines were somehow

6    innocent or peaceful.

7            And, again, Shrenzel had the right to respond by

8    saying that the magazines in general, even beyond the ones that

9    came into evidence, were not innocent or peaceful, and that's

10   just what he did.

11           The truth is the whole reason that -- the whole reason

12   that the magazines that said things like exterminate the Jews

13   or eradicate the Jews was not before the jury anyway was

14   because your Honor made a Rule 403 determination that those

15   magazines should not come in.

16           But it's not the defendants' right to somehow sanitize

17   their case or keep prejudicial information out of the jury's

18   purview unless it's unduly prejudicial just because they want

19   to say that it's prejudicial.  That's not their right.

20           Shrenzel, again -- it was perfectly within his right

21   to respond truthfully as to how he believed the magazines were

22   not innocent or peaceful but they were actually full of

23   incitement and full of violence and hateful speech.

24           The next example that we have was Shrenzel's testimony

25   about the financing that Arafat gave to the Al Aqsa Martyts

F7SYSOK4

1  Brigades in June of 2002.  Again, the defendants could have

2  cross-examine Shrenzel on that statement.  They chose not to.

3           He had a reasonable evidentiary basis for that

4  conclusion.  He stated it.  The defendants chose not to

5  cross-examine him.  Again, this was also harmless.

6           We had other evidence in the record that there was

7  financing going on during this time by the defendants to the Al

8  Aqsa Martyts Brigades.  We had Israel government reports.  We

9  had United States government reports that financing was going

10  on, all the way up until and through 2004.

11          We had payment records themselves showing actual

12  payments going to A & B.  So again, even if it was somehow

13  inadmissible testimony, it was harmless.

14          Finally, we had the defendants' objections to our

15  experts' testimony on policies, the policies about promotions,

16  martyr payments, and employees staying on the payroll after

17  they committed terrorist attacks.

18          Again, the defendants mention this, and they sort of

19  brush it aside.  But the truth is that the defendants did open

20  the door to that testimony in their opening statement by

21  suggesting that those payments and treatment of prisoners and

22  families and martyrs were -- the motivation for that was

23  somehow for creating a welfare state as opposed to anything

24  else.

25          We were permitted -- we cited case law to the effect

F7SYSOK4

1   in our papers to respond to that through our experts'

2   testimony, and that's what happened.

3           Also there was nothing that prevents an expert from

4   testifying about the policies that are at issue in a trial.

5   It's not like we had Shrenzel saying, these policies make the

6   defendants liable here.  He was just saying what the effects

7   and the incentives that were created by those policies were.

8   He didn't take any question away from the jury in the testimony

9   that he did give.

10          Finally, as your Honor said, even if this was somehow

11  inadmissible testimony, it was not prejudicial.  It was

12  something that the jury could have come to the conclusion of

13  based on the existence of those policies, and Shrenzel wasn't

14  creating some crazy conclusions for the jury in that testimony.

15          Finally, I'll just say briefly we heard their

16  objection to statements of our experts that was reading

17  information from documents and summarizing documents.

18          That is completely permissible under the federal

19  rules.  Experts and witnesses are permitted to summarize

20  evidence, especially the example we saw here.

21          I'm not sure if the defendants had more of an issue

22  with the question that was asked, but Shrenzel was asked to

23  explain what his statement meant.  First of all, that's

24  allowed.  Second of all, he didn't actually explain it.  He

25  just sort of repeated the statement that came directly from the

F7SYSOK4

1    defendants' documents.

2            So, overall, I think those examples, and if we go back

3    and look at the other examples of the defendants given their

4    papers of supposedly inadmissible testimony, you'll see that

5    it's not actually examples of what they're saying was wrong.

6            They're fully permissible.  They're fully permissible

7    under the rules, and they're not actually even incident,

8    for example, of ultimate-issue testimony or state-of-mind

9    testimony.

10           Now I will briefly address their objections to the

11   severance decision.  We also obviously don't think that was a

12   basis -- that was an incorrect use of discretion or a basis for

13   a new trial or a directed verdict.

14           Nothing that the defendants said changes the fact that

15   the Court had complete discretion to avoid the prejudice to the

16   plaintiffs and the inefficiency of everyone's time and effort

17   that would have resulted from severing the case into at least

18   six different trials.

19           The law requires you balance the prejudice to the

20   parties against -- you balance the prejudice of the parties

21   against the inefficiency and timing resources that would result

22   from severance.  On the prejudice side, we had in fact

23   prejudice that would have resulted to the plaintiffs had the

24   Court severed the case.

25           First of all, as the Court was just discussing with

F7SYSOK4

1    defendants, severance would have affected our ability to

2    establish that the defendants had a policy and practice of

3    supporting and promoting terrorist attacks during the four-year

4    period that this all took place.

5            There also would have been significant prejudice to

6    the plaintiffs in terms of time and expense of six trials.

7    Would he have had Eviatar come in six times, Shrenzel come in

8    six times, Kaufman come in six times -- all of those people

9    that set the stage for the jury.

10            We would have had some of our damages experts come in

11    multiple times.  We would have had to pick a jury, which was

12    very complicated in this case.  We would have had to pick that

13    jury six times, six different sets of jury instructions.  Those

14    are just a few of the inefficiencies that would have resulted

15    if the case had been severed.

16            To the extent that there was any potential prejudice

17    from trying all the attacks together, the Court protected the

18    defendants in multiple ways against that potential prejudice.

19    Your Honor gave the jury an instruction, a very clear

20    instruction, that they were to consider each of the six attacks

21    separately.

22            You instructed "Proof of liability relating to one

23    terrorist attack would not automatically constitute proof of

24    liability relating to any other attack.  You must consider each

25    of the six attacks separately."

F7SYSOK4

1          In addition to that, we had a verdict sheet that split

2     their determinations up by attack.  It was a separate page for

3     every attack.  That protected the defendants against any

4     potential spillover prejudice.

5          You allowed us to organize our evidence by attack,

6     which throughout the trial told the jury there are six

7     different attacks.  So any potential prejudice that might have

8     resulted from trying all six attacks together -- I don't think

9     there was any.  If there had been any, it was all protected.

10    It was all dealt with through those three ways.

11         I think that's all we need to respond to the

12    defendants.  If your Honor has any other questions, we're happy

13    to address them.

14         THE COURT:  Do you have any response?

15         MR. BURLINGAME:  I know the day is getting late,

16    your Honor.  I don't want to repeat arguments that are in the

17    briefs.

18         With respect to this opening the door, the referring

19    that we've heard again and again with respect to that's the

20    reason these experts were allowed to testify as to what they

21    did, I do want to just specifically mention again the Tirawi

22    testimony.

23         Counsel said that that's because we implied on

24    Mr. Shrenzel's cross-examination that he was innocent.  As with

25    all the testimony, your Honor, I invite you to go back and look

F7SYSOK4

1    at the transcript.

2            He was asked by the lawyer for the Palestinian

3    Authority, was Mr. Tirawi convicted in any of this?  The

4    answer -- I don't have it right in front of me, but his answer

5    was no, because we can't find him.  We'd love to find him,

6    because, if we could, he would be sitting in an Israeli jail.

7            That is a fair summary of the testimony on

8    cross-examination.  In no way, shape, or form, your Honor,

9    should that open the door to this type of inadmissible

10   causation state-of-mind testimony that came pouring in under

11   now the guise of opening the door.  That same opening the door

12   argument fails time and again with the examples I gave,

13   your Honor.

14           So I would encourage your Honor, as you said you

15   would, to go back and look carefully at the transcript before

16   reaching a final decision.  Thank you.

17           THE COURT:  What I'm going to do is I'm going to try

18   to prepare to rule on all of these issues by the 24th.  So

19   you'll know where we are, and I'll give defendants submission

20   with regard to judgment.  We'll discuss that further on that

21   day before I rule on any outstanding motion.

22           MR. YALOWITZ:  Your Honor, assuming that the Court

23   lands on not giving prejudgement interest -- I know you haven't

24   reached a final decision on that.  If that's where you land,

25   would it be of assistance to the Court to have a form of order

F7SYSOK4

1    that provides for that -- form of judgment?  You may have one,

2    but I just want to make sure we have the right information.

3              THE COURT:  I've looked at the proposed judgment.

4    What I'm doing -- I also have a draft of a standing judgment

5    consistent with our verdict form from the clerk's office.

6              There are some things that have to be added to that.

7    For example, I don't think that there's a provision in there --

8    they track the jury verdict and didn't refer to the provision

9    on damages.  So that has to be added.

10             So what I probably will do is I will probably, in any

11   event, in the meantime also, try to, if it's appropriate, to

12   try -- if I'm going that way, to circle what I think what the

13   judgment should look like on that issue so you can have a

14   chance to look at that before the 24th and I can get some

15   feedback from both sides on that.

16             Then you can discuss it if I'm going to issue a

17   judgment to issue immediately either on the 24th or soon

18   thereafter after we discuss the other issue.

19             MR. YALOWITZ:  That's great.  We'll look forward to

20   receiving that.  Obviously, if there's anything that we can

21   provide to the Court --

22             THE COURT:  I think I have two drafts from you.

23             MR. YALOWITZ:  One thing that we did, which may not be

24   intuitively obvious, is we broke out the jury award and then

25   the trebling.  And there was a reason we did that, which has to

F7SYSOK4

1    do with enforcement in other nations.

2                 THE COURT:  When you say broke out, what is it that

3    you were trying to address?

4                 MR. YALOWITZ:  I'm not really -- I can't explain

5    exactly why we needed it that way.  But I can tell you what we

6    did.

7                 THE COURT:  Yes.

8                 MR. YALOWITZ:  To put this in the bucket of what

9    works.  We said -- I have it somewhere here, but we said

10   damages for Leonard Mandelkorn, $10 million.  Automatic

11   trebling under the Anti-terrorism Act, $20 million.  Total, $30

12   million.

13                So in our form of judgment, it will say that.  I'm not

14   sure whether that's because some foreign court needs to trace

15   through from the verdict to the final amount or whether it's

16   because --

17                THE COURT:  It was important for you to do that

18   individually as to each because I had been contemplating, after

19   seeing what I had the from clerk's office, doing one that is

20   consistent with the jury verdict and then having a separate

21   paragraph indicating that each amount is to be trebled.

22                MR. YALOWITZ:  I can make some further inquiry on

23   that.

24                THE COURT:  If you can give me your reasoning for why

25   that's important, I can factor it in.

F7SYSOK4

1          MR. YALOWITZ:  I'll make some further inquiry on that.

2     I understand what you're saying is you give the jury verdict,

3     and then you have a paragraph that says each of the foregoing

4     amounts are tripled, and then you have a total judgment.

5          That's useful for the defendant, because then the

6     defendant knows exactly how much.  It may not be useful for the

7     plaintiff.  Let me look at it a little bit.

8          THE COURT:  I'll try to get it to you fairly quickly

9     while I'm looking at the other issues so if that's where we

10     are, then we can quickly address those issues.

11          MR. YALOWITZ:  We did it the other way.  I think

12     you've probably seen we did it the other way.

13          THE COURT:  Yes.

14          MR. BERGER:  First of all, knowing Mr. Yalowitz's

15     devotion to cooperation, perhaps he could share with us in

16     advance and inform the Court what his rationale is for doing

17     that.

18          THE COURT:  My rule that I stated earlier applies to

19     everything that I get.  I want you to have it at least 24

20     hours, more than 24 hours before.

21          MR. BERGER:  That's the second housekeeping question.

22     We have an August 6 deadline for supplemental submission.  If

23     that 24-hour rule applies to that, then I respectfully ask that

24     we have that extra day of the 7th if we have to get that to

25     Mr. Yalowitz.

F7SYSOK4

1          THE COURT:  That's appropriate.  The 7th is a Friday.

2     If you want to get it to Mr. Yalowitz Thursday or earlier, or

3     if you want to do it earlier than that.

4          MR. BERGER:  Thank you, your Honor.  Finally,

5     your Honor, speaking for all counsel, I very much appreciate

6     how much time your Honor devoted to us today.

7          THE COURT:  I will see you on that day.  Thank you

8     very much.

9          (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25