F16SSOK1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  MARK I. SOKOLOW, et al.,

4              Plaintiffs,

5        v.                          04 CV 397 (GBD)
   PALESTINE LIBERATION ORGANIZATION, et al.,
6
             Defendants.
7
   ------------------------------x
8                                    New York, N.Y.
                                     January 6, 2015
9                                    11:00 a.m.

10  Before:

11                  HON. GEORGE B. DANIELS,

12                                    District Judge

13                      APPEARANCES

14  ARNOLD & PORTER LLP
        Attorneys for Plaintiffs
15  BY:  KENT A. YALOWITZ
        PHILIP W. HORTON
16      TAL MACHNES
        SARA PILDIS
17      CARMELA T. ROMEO

18  MILLER & CHEVALIER, CHARTERED
        Attorneys for Defendants
19  BY:  MARK J. ROCHON
        LAURA G. FERGUSON
20      BRIAN A. HILL
        MICHAEL SATIN

21

22

23

24

25

F16SSOK1

1          (Case called)

2          THE COURT:  Good morning.  Let me first deal with some

3     procedural issues.  I understand that, as we speak, the motion

4     for the circuit has been submitted today on the calendar.  I

5     believe it is my recollection that the panel that is hearing

6     argument today, which consists of Judge Lynch, Judge Chin, and

7     Judge Colton, my review of the docket is that they only have

8     10, 15 minutes of oral argument today on other cases and all

9     the other cases are submitted.  They may be finished oral

10    argument maybe, from my experience, if it is a visiting judge,

11    maybe they are the robing room as we speak discussing the

12    submissions and discussing this issue.  Even if while we speak

13    I get some notification from them, I'll let all the parties

14    know while we are discussing the other issues.

15          There are a number of issues that need to be resolved

16    procedurally.  First of all, I reviewed your request for

17    modification of the jury questionnaire.  I have made some

18    changes.  I wouldn't call it a redline copy, but you have a

19    copy that indicates what changes that I have made and in

20    response to your request and a clean copy with regard to the

21    questionnaire.  You should take a look at that when you can.

22          I anticipate that we are still on schedule to bring

23    this jury panel in here.  You have at least two to 300 jurors

24    coming in here tomorrow and being prepared to have them proceed

25    with the questionnaire.  If you have some strong views about

F16SSOK1

1    something that you requested that you feel that I have not

2    adequately addressed and you want to raise that now or before

3    we see the jury tomorrow, let me know.  What you have been

4    given is not what I think is an appropriate response to give in

5    the nature of the request and the nature of the objection to

6    get some relevant information that you think might be helpful

7    in selecting a jury.

8         I have also given you a draft, which is only a draft,

9    of the basic comments that I am going to make to the jury in

10    the jury room before they fill out the questionnaires to

11    appropriately tell them what their task is going to be and what

12    will be expected from them so that we can have them efficiently

13    and effectively and candidly give us responses to the

14    questionnaire.

15         There was an issue raised the last time we spoke and

16    then raised by letter from the defendants with regard to the

17    number of jurors.  I will agree with the parties, and my

18    recollection is wrong at least the more current recollection,

19    that I believe that the appropriate number of jurors is between

20    six and 12.  We will pick 12 as requested by defense.  We will

21    get a verdict with whatever number six or more that are here at

22    the end of this trial.  Hopefully it will be the 12, but any

23    number between six and 12.  Therefore, the jury selection

24    process will focus on finding 12 qualified jurors.

25         Bear with me so I can keep everything organized in my

F16SSOK1

1    mind in terms of everything.  Over the last few weeks, there

2    was some concern or objection raised by the defense with regard

3    to the process of selecting or at least seating jurors for

4    possible selection.  I did hear briefly I think it was on by

5    the defense.  What I have attempted to do is to give the

6    parties an opportunity to choose jurors from among those people

7    that they felt at least affirmatively or otherwise qualified

8    based on the questionnaires to be jurors.

9         I am not sure what really motivates the defense's

10   objection to that, since the alternative is to put ahead of the

11   people the defense says that they believe will qualify and they

12   may want to see as jurors, to put ahead of them people who the

13   plaintiffs feel are people they want and the defendant hasn't

14   designated those people as people that they want.  I am not

15   sure why you would want that.

16        This was not a trick question.  It wasn't to prejudice

17   you.  I wanted to give both sides an opportunity to know that

18   the first people that are available to choose from are people

19   that you have made a decision, both sides made the decision,

20   all things being equal, that that is the person that you would

21   take, unless you wanted to exercise a preemptory challenge.  If

22   you don't want that, I will consider whether or not, unless

23   there is a challenge for cause, whether you have a preference

24   or not that even if both sides have a preference for a juror,

25   if there is a juror that sits before them, there is a number

F16SSOK1

1    before them at random, that juror is going to be the juror

2    rather than the one that you both want.  As I always say, be

3    careful what you ask for, you may get it.

4            Defense, is it your position that you prefer that,

5    unless there is a challenge for cause, that the person that you

6    have now designated as somebody you thought was qualified as a

7    juror and the other side has designated that they thought was

8    qualified as a juror, that that person should go ahead of the

9    person you both believe would qualify to sit as a juror?  Maybe

10   you didn't understand my process.

11           MR. ROCHON:  There is a good chance I didn't.  Let's

12   see.  I think the court anticipated that the parties would send

13   in the chart ex parte so that I would not see Mr. Yalowitz's

14   and he would not see mine.  That was one of our concerns, just

15   to make sure that we are aware if people are being bypassed as

16   unacceptable, and we have a concern that maybe they're being

17   bypassed for reasons we would like to address with the court or

18   Mr. Yalowitz, that gives us concerns.  I see the court's

19   expression.  Maybe I had something wrong?

20           THE COURT:  That is not what I intended.  Again, I

21   didn't intend to prejudice you or anybody with regard to that.

22   I don't have any problems telling you how these people were

23   received and how they will be seated.  I anticipate that, since

24   we only need 12, the number is even smaller, the first 18

25   jurors hopefully will be the first 18 people that you both said

F16SSOK1

1    that you would like, you think should be voir dired and you

2    think all things being equal, other than exercising your

3    peremptories, this person is acceptable to you.  That is the

4    way I intended to do it.

5         Now, if I can't get 18 of those people or more of

6    those people, I probably would try to do 25, 30, at least.  If

7    I can't seat those people, then after I have exhausted the

8    people you both say you are okay, this person sort of looks

9    fine to me, I will start alternating between the person that

10   they say is fine and you don't say you have an objection for

11   cause, and then the person you said was fine and didn't have an

12   objection for cause.

13        We may never get there because you may both give me 30

14   people that you both say, or 40 people that you both say are

15   acceptable for voir dire, and I will seat those 30 or 40 and

16   then you will further inquire of them and you then will

17   exercise your peremptories with regard to that.

18        MR. ROCHON:  I apologize for interrupting.  I think my

19   question may be -- I have got the chart that you gave us --

20        THE COURT:  Right.

21        MR. ROCHON:  -- say Juror No. 8, does the court

22   anticipate that either acceptable or objection for cause will

23   be for each one of the jurors, either there is a box acceptable

24   or checked for cause?

25        THE COURT:  Or no box at all.

F16SSOK1

1          MR. ROCHON:  Therefore, some people simply would be

2    bypassed that you don't think would be for cause, but they're

3    being bypassed for other reasons.

4          THE COURT:  I am not going to bypass them.  If we have

5    to get to those people, then unless it is obvious to me from

6    the questionnaire, which that is not going to be a magical

7    thing, if you say you have a challenge for cause, I would think

8    that it is going to be fairly obvious to everybody that there

9    is a basis for a challenge for cause.  I am going to ask you

10    specifically on what question, answer to what question did you

11    say disqualifies this juror.

12          No, there is no automatic secret challenge for cause.

13    We will never get to challenges for cause if you give me enough

14    people that you think both sides think are acceptable for voir

15    dire.  I will tell you, look, the first 10 people in this box

16    are people you both checked off the box acceptable for voir

17    dire.  You will know that.  Then the next eight are people who

18    have been alternating, that first it was one that the

19    plaintiffs said was acceptable, the next one was the one that

20    the defendants said were acceptable.  So we have got a

21    sufficient number and you can choose from there.  You know

22    there is nobody in the box that you didn't say that --

23          MR. ROCHON:  Was acceptable.

24          THE COURT:  -- was acceptable or that you said that

25    you had a challenge for cause.  Now, I don't know where you

F16SSOK1

 1    want me to put a person that one side says is acceptable for

 2    voir dire and the other side says it is a challenge for cause.

 3    I guess I would put them in the box and we can fight with

 4    whether or not there is a challenge for cause.

 5              Again, that person is going to take the seat of

 6    somebody that you said that you thought was acceptable and they

 7    said that you thought was acceptable, then you would have to

 8    use your preemptory to get rid of that person if I disagree

 9    that there was a challenge for cause.

10              MR. ROCHON:  Your Honor, maybe if I could, one of the

11    things that would cure our concerns is that if we submit ours

12    ex parte, and plaintiff submits theirs ex parte, once you have

13    both, I would ask the court to then share with each side the

14    other's list.  I think each side should know what the other has

15    said.

16              THE COURT:  That is fine.  The only thing that can do

17    is complicate things, because I don't know what we could fight

18    about at that point.  I don't know what difference it makes.

19    It is not going to affect whether or not you are going to

20    choose among the first 18.  You only have three peremptories.

21              That is what I am trying to understand now.  If there

22    are 18 people in the box who you both said are acceptable, what

23    is the point of wasting time debating about who you said you

24    would have challenged if they were in the box?  I don't

25    understand the point of spending time on it.

F16SSOK1

1          I don't have any problem sharing it with you.  Maybe

2     there is something you think that you can read the mind of the

3     other side that is relevant to the case by seeing who they

4     checked off.  If you want me to, I don't have any problems with

5     that.  I just want to know that we buy into the process that I

6     am trying to put to you in a situation where, when you look at

7     those people in the box, you are going to say yes, those are

8     the people that I said I want to choose from.

9          MR. ROCHON:  Right.

10         THE COURT:  You will know that those are also the

11    people that the other side said they want to choose from.  Then

12    all you have to do is exercise your peremptories after we have

13    some more general inquiry of those individuals.

14         MR. ROCHON:  Your Honor, I still would ask that you

15    share with each side the list after they're given to you ex

16    parte.  In other words, I don't want to have people gaining the

17    system to time.  Not that Mr. Yalowitz would.  If ours was

18    late, I wouldn't want him to say that we were gaining him.

19         Having done that, your Honor -- for example, I'll give

20    you a concern.  This is where this comes from.  I am not

21    accusing plaintiffs of anything.  I have never tried a case

22    with you or plaintiffs.  It is all new to me.  If for some

23    reason their list, for instance, has excluded everyone who is

24    under 40 as acceptable and age is not a permissible basis upon

25    which to exclude people from service, our list doesn't do that,

F16SSOK1

1    and we have not excluded people solely on the basis of age or

2    national origin or race.  I am not saying they would do this,

3    but what would happen then is our acceptables would intercept

4    with them.

5              THE COURT:  Right.

6              MR. ROCHON:  But they would have, in that instance,

7    excluded people from that simply by virtue of a characteristic,

8    which may not be acceptable.  The only way to know that

9    happened is to see what they submitted.  If it gives me a

10   concern, I'll raise it.  I doubt it will happen with these

11   counsel, this case, and this court.

12             THE COURT:  I don't have any problems with that.  The

13   reality of what you discuss is technically not what you're

14   entitled to.  What you're entitled to is a fair and impartial

15   jury.  If I say to you I am giving you 30 people that you both

16   said should be what you wanted to voir dire, I don't know what

17   basis you have to complain that they struck somebody else.

18             MR. ROCHON:  Right.

19             MR. YALOWITZ:  Your Honor --

20             THE COURT:  Again, as I say, what it does, it only

21   makes it more difficult for you, because now you are going to

22   have to exercise your peremptories.  I mean, the only other

23   process, if you say that we should go through each juror one by

24   one and see if there is a valid challenge for cause and if

25   there is no valid challenge for cause, that is the person that

F16SSOK1

1    you're going to seat one, regardless of whether or not you

2    checked off both, checked off seat number two as being a

3    certain person that you both said was acceptable, then you take

4    the risk that I am going to seat five people that they said

5    they wanted and five people who you never checked off that you

6    wanted.  Why would you want that?

7            MR. YALOWITZ:  Your Honor --

8            THE COURT:  Wait.  Wait a minute.  Just let him finish

9    his thought.  I will come to you.

10           MR. ROCHON:  Your Honor, the only thing I ask for is

11   we eventually see each side's list.  Then if there is an issue,

12   we can raise it.  I really don't anticipate one.

13           In response your question, you are entitled to a fair

14   and impartial, also a random selection of a jury or a fair

15   cross section.  We want to make sure that there is nothing that

16   impedes that.

17           MR. YALOWITZ:  Your Honor, I was rising with

18   trepidation to agree with Mr. Rochon that if he wants to see

19   the lists after they have been submitted sometime between

20   Friday evening and Tuesday morning, that solves his worry, I

21   don't have a problem with it.  I hate to agree with him on

22   anything.

23           THE COURT:  I am sure as we move along, you will end

24   up agreeing more and more, and probably against me.

25           The only thing that I need is I need a buy-in to the

F16SSOK1

1  process.  If I don't have a buy-in to the process, then I can

2  scrap it and at whatever the mercy is of who shows up in the

3  box, even though you both had a preference for someone else.

4          MR. ROCHON:  I accept the process with that

5  modification.

6          THE COURT:  That's fine.  Then we can do that.

7          Because, as I say, you will see exactly what I have

8  done.  You will see that if I have -- I may do 20 or 30 at

9  least.  If I have 30 people that you both checked off as

10 acceptable for voir dire and neither one of you said that you

11 thought that was a challenge for cause or hesitated in any way

12 by not checking a box, I guess you could always try to outsmart

13 the other by not checking any box.  That would not necessarily

14 be to your advantage.  Then I would have to fall back to the

15 process of simply alternating and not giving you the people

16 that you say this looks like a good juror.

17         I want the people that both sides say from the

18 questionnaire, this looks like a good juror.  I think you would

19 both want that, because otherwise it goes from the random

20 selection to a haphazard possibility that you may get people

21 that you really didn't want, and there is a person sitting

22 right next to them that you both said you wanted that I

23 excluded simply because you said you didn't have an opportunity

24 to manipulate the process.

25         I will do that.  Hopefully, if you give me enough

F16SSOK1

1    people that you both think from the questionnaires looked like

2    there is no real challenge for cause or that person's profile

3    is not somebody you have a preference against, then just let me

4    know.  To the extent that you both think this person might be a

5    fair and impartial juror, that person will be randomly in that

6    box in the order in which they were randomly given numbers.

7    The only thing that affects that order is your preference, your

8    joint preference.  I don't see that as a constitutional issue.

9            MR. YALOWITZ:  Your Honor, could we come back to the

10   jury questionnaire for a moment?

11           THE COURT:  Sure.

12           MR. YALOWITZ:  I haven't looked at it yet myself.  My

13   colleagues have glanced at it, and it occurs to me both sides

14   asked the court to include in additional questions.  We saw

15   some of the questions the defendants requested and that the

16   court included.  We don't have to do it right now.  If there

17   was an oversight on the court's part with regard to the

18   questions plaintiffs requests which were in there, I would just

19   ask that the court take a second look at that.

20           THE COURT:  I can tell you that I don't believe there

21   was an oversight.  I looked very carefully at it.  I can tell

22   you specifically what my reaction was.

23           MR. YALOWITZ:  I don't want to relitigate it with your

24   Honor.  There has been just such a flurry of paper, I just want

25   to make sure we are making volitional decisions.

F16SSOK1

1          THE COURT:  I will go off the December 31 letter.

2   Under 1A, your first bullet point, I agreed with you that I was

3   not going to insert religion into the question.

4          MR. YALOWITZ:  Great.

5          THE COURT:  I think community groups and all the other

6   categories are appropriate for them to check off, if it happens

7   to be a significant portion of their life is dedicated to

8   organized activity --

9          MR. YALOWITZ:  I agree.

10          THE COURT:  -- that is of a religious nature.  I don't

11   want to imply that religion has anything to do with this case.

12          MR. YALOWITZ:  I couldn't agree more.

13          THE COURT:  I agree with you.  I did not insert

14   religion into those questions.  I agreed with the defense with

15   regard to the asking questions about knowledge and feelings

16   about the PA and PLO.  I agreed that also, with regard to the

17   names of the individuals, officials, public officials, and

18   entities that were added as a question and ask them whether

19   that affects them.

20          MR. YALOWITZ:  I was really more thinking about

21   section B.

22          THE COURT:  Right.  I just don't remember from your

23   letter what 45A was.  There was an objection to 45A.  I think I

24   addressed it.  I have it here in my handwriting overruled with

25   regard to the objection.  I don't remember specifically which

F16SSOK1

1    question it was.

2         You didn't object to 46A.  That puts the language in

3    there.  Again, the language is not exactly as you have asked,

4    but it is more consistent with the way I usually ask those

5    types of questions and more consistent with the way questions

6    are asked, similar questions are asked, which I keep the

7    language consistent.

8         I did put in the question with regard to terrorist

9    acts.  I put in a general question with regard to terrorist

10   acts.  I think the question had to do with whether or not they

11   knew anyone who was a victim of terrorist acts.  I gave that a

12   general question.  Then I modified the question with regard to

13   Israel, the West Bank and the Gaza Strip by saying:  Do you

14   know of anyone who was injured or killed, period, and let them

15   explain.

16        MR. YALOWITZ:  You went with the broader questions.

17        THE COURT:  I went with the broader questions.  If

18   they were killed as a soldier, they could write that down, if

19   that is what you're interested in. I think that is a more

20   neutral way to ask the question to get information.

21        With regard to the ones you asked for, I don't think

22   it is appropriate to ask them whether or not someone who

23   commits a serious crime should perpetrate as childhood to be a

24   factor in determining the innocence or guilt.  I don't know why

25   this plays a part in this case.  No one is going to offer such

F16SSOK1

1    evidence.  Nobody is going to make such an argument.  In an

2    attempt to, I am going to tell the jury that has absolutely any

3    place here.  I am not going to make that decision.

4         MR. YALOWITZ:  I agree with that.  It is more a

5    question designed at understanding how people think about the

6    world, it is not a question designed towards the case.  It is a

7    question that gets at how do you think about things.  It is

8    really more designed to help us understand a person in a way

9    that may be different from --

10        THE COURT:  The other problem I have with this, this

11   is not a criminal case.  I don't want to imply that this is

12   one.  This is a civil case.  I made clear that this was a civil

13   case.  I put in language that this was a civil case involving

14   liability and involving the determination of damages.  I want

15   them to understand that, so my reaction to that question is

16   that its a bigger danger that that could prejudice a juror

17   rather than elicit any valuable information that would indicate

18   that they're somehow unqualified.

19        MR. YALOWITZ:  We accept that ruling.  That's fine.

20        THE COURT:  Quite frankly, I have never had to ask any

21   juror in a civil case whether or not they think people who are

22   injured by the actions of defendants who are liable, whether or

23   not they think that they should be compensated any money.  I

24   think that is a fairly basic principle.  I think jurors accept

25   that.  I think all jurors accept that.  I think that my

F16SSOK1

1    instructions will be very clear that that is what the law

2    demands.

3            I agree with you, if somebody were to say that no, I

4    don't think anybody should be compensated if they are injured,

5    I guess that person would raise serious questions in my mind

6    whether that person is qualified to sit in any civil case.

7            MR. YALOWITZ:  That is what I am getting at.  There

8    are people out there that have that view.  It may be a good

9    view or bad view, but it is not the view we have in our legal

10   system.  I am looking for that kind of sport juror that that is

11   his or her view.

12           THE COURT:  My position is that I have never had to

13   ask that question, and sufficient questions, particularly

14   general questions about whether they can sit as jurors and both

15   sides into this, that if that is a genuine issue with regard to

16   a juror, that they will say so.  But I have never asked a jury

17   that because I don't want to imply that there is any question

18   with regard to that.

19           MR. YALOWITZ:  We are in your hands on this, your

20   Honor.  Really, I am happy to go through them, I just didn't

21   want to make sure that -- I just want to make sure that you had

22   thought about it.  You obviously have.  We have got a lot of

23   ground to cover today.

24           THE COURT:  Quickly, I'll just tell you, I think we

25   have sufficient questions about what they read, any knowledge

F16SSOK1

1    about issues in this case, that I don't need to ask them

2    whether they follow Middle East news and events.  I think that

3    there are plenty of questions that would indicate the extent of

4    their knowledge and what they read.

5            Also, I don't think it is appropriate to interject a

6    question that relates specifically to the World Trade Center

7    being possibly destroyed by western conspiracy and terrorist

8    attack.  This is not the World Trade Center case and I don't

9    want the jurors to at all feel that that is the starting point

10   for any issue of this case, something that has to do with the

11   World Trade Center.

12           I have asked a general question whether or not they

13   know anybody who has been the victim of or suffered physical

14   injury or death as a result of a terrorist attack.  If they

15   know somebody in 9/11, most people in New York knows of

16   somebody who was probably been injured or killed in 9/11.

17           MR. YALOWITZ:  Yeah.  My 9/11 question is a little

18   different.  I am looking to ferret out cooks.  There are cooks

19   in the world who walk around and say 9/11 was a conspiracy of

20   the U.S. government and crazy stuff like that.

21           THE COURT:  My attitude, in the years I have been

22   doing this, is the way you ferret out cooks is not to ask them

23   the direct question, Are you crazy?

24           MR. YALOWITZ:  I always deny it.

25           THE COURT:  If they knew that, they would tell you.

F16SSOK1

 1    They wouldn't be crazy.

 2              MR. YALOWITZ:  I'm ready to move on, your Honor.  I

 3    just wanted to touch the base.

 4              THE COURT:  I wanted you to know what I thinking is.

 5    I think it is helpful to know how I approach the issues.

 6              MR. YALOWITZ:  Very good.

 7              THE COURT:  The last thing was I think I had

 8    sufficient questions about the Israeli Palestinian conflict.

 9    If you want to look at those questions again, I don't think we

10    need additional questions.  I think they have a full

11    opportunity to give us and reveal information about the extent

12    of their knowledge.

13              I will tell you that, quite frankly, basically, I

14    decided to add question 61.  That's the first place I am going

15    when I get these questions.  If that box is checked no, I have

16    got a real concern regardless of what else they say.  That is

17    what you really want to know, if they hesitate at all.

18              They can consider whether you still voir dire them and

19    check off acceptable to voir dire.  You can say, look, I don't

20    want to bother with this.  We have plenty of people.  Move on

21    to somebody basically sure to all of us they can be fair to all

22    parties in this case, consistent with the instructions that I

23    give them before they even start the questioning.  Those are my

24    thoughts.  I did thoroughly review that and the specific

25    changes that are reflected.  I think we can put those issues

F16SSOK1

1    aside.

2          This is no particular order.  Let me go to the request

3    for clarification.  Usually when I get a request for

4    clarification, I usually respond yes, I meant exactly what I

5    said.  That is usually the clarification.  The bottom line is,

6    yes, I mean exactly what I said.  That it is not a *sua sponte*

7    order of redaction.  It is an order that out-of-court

8    statements incriminating other individuals are not admissible

9    against these defendants as statements.  It is not consistent

10   with <u>Williamson</u>.  It is not consistent with cases beyond that.

11   That is my ruling.

12          Now, if you don't want to redact it, fine.  You don't

13   have to redact it.  You're not getting that document in

14   unredacted.  It is not a *sua sponte* ruling that you should

15   redact something.  It is a ruling that, no, you're not going to

16   offer evidence of someone who made a statement out of court

17   accusing someone of committing a crime, that you want to use

18   that accusation as evidence that these defendants are liable.

19   I think we went through that in detail that that was clear.

20          MR. YALOWITZ:  May I be heard on that?

21          THE COURT:  Yes.

22          MR. YALOWITZ:  I want to take the case of count 51 of

23   the conviction of Ahmed Barghouti.  I want to try to be very

24   clear about why I think that count needs to come in unredacted.

25   Reason number one, it is a conviction under 803.22.

F16SSOK1

1          THE COURT:  Okay.

2          MR. YALOWITZ:  The conviction includes the plea of

3   guilt and the indictment.

4          THE COURT:  I don't have any disagreement with that.

5          MR. YALOWITZ:  That count 51 of the indictment comes

6   in unredacted.

7          THE COURT:  Well, no, it only includes that

8   information in the indictment whether defendant is

9   incriminating himself, if you want the substance of what he

10  said.  His plea is not a plea for someone else.

11         MR. YALOWITZ:  Understood.

12         THE COURT:  It is a plea for himself.  It is his

13  statement that I am guilty of committing acts that you accuse

14  me of committing criminally.

15         MR. YALOWITZ:  Correct.  And the act that he was

16  accused of committing was aiding and abetting Abdullah

17  Barghouti my giving him a safe house.  That is the act he was

18  committing.

19         THE COURT:  The act was aiding and abetting a person

20  to commit a terrorist act by giving that person a safe house.

21         MR. YALOWITZ:  Aiding and abetting a senior Hamas

22  operative in who blew up the Sbarro Pizza restaurant.  I guess

23  at the end of the day I am asking the jury --

24         THE COURT:  The guy's name is not part of the offense.

25         MR. YALOWITZ:  Okay.

F16SSOK1

```
 1            THE COURT:  That is the bottom line.  It is not part
 2   of the offense.  He is guilty of it regardless of whether it
 3   was Barghouti, Mickey Mouse, whoever.
 4            MR. YALOWITZ:  Look, at the end of the day, the
 5   indictment says aiding and abetting a senior Hamas operative
 6   who did this particular crime, and then the jury can match it
 7   up.  So I am not going to sit here and tell you it kills my
 8   case, but it sure makes them work harder for something
 9   because --
10            THE COURT:  Yes, because you want the jury to assume
11   that that fact is true because it was in the indictment and
12   because he pled guilty to that indictment.  That is not a
13   proper inference under these circumstances.  The only
14   legitimate inference is that, one, the conviction either by
15   plea or by trial has established the guilt of this defendant
16   and this defendant alone, and by accepting the allegations that
17   they say were the conduct that he was involved in that
18   constituted the criminal offense, he is admitting that he
19   committed criminal acts and he is admitting that he committed
20   the legal criminal acts that they have accused him of.
21            Now, beyond that, to simply say that because they
22   accused him of doing it with someone else, his plea of guilty
23   is evidence that the somebody else is also guilty.  That is
24   exactly what Williamson says you don't want to do.  That is not
25   appropriate.
```

F16SSOK1

1          MR. YALOWITZ:  Well, let me give you two levels of

2    answer to that, if I may, your Honor.

3          THE COURT:  Yes.

4          MR. YALOWITZ:  The first is the thing that Ahmed

5    Barghouti was accused of and pled guilty of was providing

6    material support to an individual.

7          THE COURT:  Right.

8          MR. YALOWITZ:  We are not offering the name of the

9    individual to prove that he is guilty.  We have a separate

10   conviction of him.

11         THE COURT:  Right.

12         MR. YALOWITZ:  We are offering it to prove that Ahmed

13   Barghouti gave material support to this guy.  We are going to

14   give separate evidence --

15         THE COURT:  No, because it was irrelevant to his plea.

16   It was irrelevant to his plea.  That's the problem.  That he

17   gave it to this guy has nothing to do with what he pled guilty

18   to.  It didn't make him more or less guilty.  He was guilty

19   because he provided material support to someone and he

20   acknowledged that.  Who it was, it is obvious why you want who

21   it was.

22         MR. YALOWITZ:  Of course.

23         THE COURT:  Because you want to point the finger at

24   the defendants.  That is a link to say, because he said they

25   did it, that you should conclude that they did.

F16SSOK1

1          MR. YALOWITZ:  No.

2          THE COURT:  You can't --

3          MR. YALOWITZ:  I am not being clear.  So it is a lot

4    of Barghoutis.  Abdullah Barghouti is the bomb maker.

5          THE COURT:  I see.

6          MR. YALOWITZ:  Ahmed Barghouti is their guy.

7          THE COURT:  I understand.

8          MR. YALOWITZ:  Their guy comes and says, I helped the

9    bomb maker.

10          THE COURT:  Okay.

11          MR. YALOWITZ:  He says that.  That is in the redacted

12    indictment, I helped the bomb maker.

13          THE COURT:  Right.

14          MR. YALOWITZ:  The jury can link that up.  I get that.

15    It sure is easier for them if we can give the name of the bomb

16    maker.

17          THE COURT:  Why?

18          MR. YALOWITZ:  Because then they can link it up more

19    easily.

20          THE COURT:  Link what up?  I don't understand how that

21    is somehow more probative than prejudicial, if he has already

22    admitted that he helped the bomb maker.  You already even have,

23    I assume, independent evidence of who the bomb maker was.

24          MR. YALOWITZ:  We do.  The jury can link it up.

25          THE COURT:  So how is that not just cumulative?

F16SSOK1

1          MR. YALOWITZ:  It is not just cumulative.  It is

2     really going to help -- I think if you look at the statements,

3     it is really going to help the jury --

4          THE COURT:  The only prompt that I would reconsider is

5     that if it is clearly established by other evidence that

6     identifies that person.

7          MR. YALOWITZ:  Okay.

8          THE COURT:  If it is clearly establishes by other

9     evidence that identifies that person, obviously it is probative

10    value is slaughtered, but even prejudice is slaughtered.  If it

11    is clear that this is the bomb maker and it is clear that he

12    says, I helped the bomb maker, it doesn't make a bit of

13    difference to the jury whether or not they have to make that

14    connection or whether or not the redacted name says it is the

15    same guy who the proof shows made the bomb.

16         MR. YALOWITZ:  Unredacted sure makes it easier for

17    them to make the link.

18         THE COURT:  For what?

19         MR. YALOWITZ:  Now they have got the name.  They don't

20    have to --

21         THE COURT:  They can get the name directly from you.

22         MR. YALOWITZ:  All right.

23         THE COURT:  Then you say, look --

24         MR. YALOWITZ:  I suppose they can get it from --

25         THE COURT:  -- we have the defendant in the criminal

F16SSOK1

1    case admitting that he helped the bomb maker.  The other

2    evidence that we presented to you showed you exactly who that

3    bomb maker was.

4             MR. YALOWITZ:  Right.

5             THE COURT:  That bomb maker was X.  It is very clear

6    that he helped.  The evidence demonstrates that he helped; not

7    his out-of-court incriminating statement, but the evidence

8    indicates that he helped this individual do the bomb.  I don't

9    understand where you say you are missing.

10            MR. YALOWITZ:  Look, I think it makes it easier.  I

11   think we have got to take them one at a time.

12            THE COURT:  Let's say to the extent that you have

13   other independent evidence that there is very little legitimate

14   argument that it is in dispute, the facts have been disputed

15   before the jury, I don't have any problems with out-of-court

16   statements that are made that are consistent with in-court

17   statements.  But to the extent that your only evidence or your

18   primary evidence is someone who at some point in time during

19   the confession or during a plea also incriminated a third

20   person who you want to tie to the defendants, that is the basic

21   rule that precludes offering evidence for that purpose.

22            The only grounds you gave me that it would be

23   admissible is a statement against interest.  The Supreme Court

24   has made clear that that part of the statement is not against

25   the interest of the person who was acknowledging his only

F16SSOK1

1    responsibility.  So you cannot use that to say because it

2    doesn't have the reliability that evidence has.  The other side

3    doesn't let you test the reliability by having somebody in

4    court come and make that accusation.

5         MR. YALOWITZ:  Let me say why I agree with the general

6    statement you made, but disagree with it as applied to a few

7    pieces of evidence in this case.

8         Obviously, the general statement is correct.  If a guy

9    sits there and says, you know, Marwan brought -- if the guy

10   sits there and says Joe brought Sam to a safe house, what does

11   that have to do with the declarant?  It is not against

12   interest.

13        But the Supreme Court says, if the declarant now says,

14   Joe and I brought the guy to a safe house, that is Williamson.

15   They say if Joe and I -- I forget the guys -- but Joe and I

16   brought Sam to Bill's house or something, and it is clear that

17   Sam and Joe and Bill are all criminals, it is self-inculpatory

18   and the whole thing is self-inculpatory.

19        Now, in a joint trial, you have got Bruton issues, so

20   you redact the names because you have got confrontation clause

21   issues.  We don't have confrontation clause issues in this

22   case.  Williamson says Sam and I brought Joe to this place.

23   That is self-inculpatory and the names Sam and Joe come in, at

24   least they're not hearsay.

25        THE COURT:  Against Sam or Joe?

F16SSOK1

1          MR. YALOWITZ:  They can't come in against Sam or Joe

2    because of confrontation clause issues.  We don't have

3    confrontation clause issues in this case.

4          THE COURT:  I think you're stretching that example

5    given by the Supreme Court in the case to a point that it

6    conflicts with the general principle laid down in that case.

7    That is not what the Supreme Court meant.

8          The Supreme Court could not have meant that.  That is

9    exactly the opposite of what they specifically said you can't

10   do.  You can't just fold it into a more general statement of

11   his guilt simply because that is part of the statement.  You

12   have got to give me some reason why that statement has some

13   relevance, other than the relevance that is cleared that you

14   want it for here, that you want the jury to conclude that the

15   defendants were involved because that person who acknowledges

16   his own guilt said the defendant was involved.

17         MR. YALOWITZ:  Here is what I want to do.  Maybe this

18   will work, your Honor.  I want to say, thing number one,

19   Abdullah admits that he was the bomb maker and made the bomb

20   and he pled guilty to it.  There is no question he made the

21   Sbarro bomb, he made the Hebrew University bomb, he made six

22   bombs in between.  He is the guy who is the bomb maker.

23         THE COURT:  Okay.

24         MR. YALOWITZ:  That is proof to a fair thee well.

25         THE COURT:  Okay.

F16SSOK1

1          MR. YALOWITZ:  Thing number two, now we have got Ahmed

2    coming in, and Ahmed says, I helped Abdullah.  The first

3    sentence is like Marwan and I brought Abdullah to the safe

4    house --

5          THE COURT:  Right.

6          MR. YALOWITZ:  -- which is like exactly what the

7    Supreme Court was saying, Joe and I brought Sam, whatever, it

8    is so close.  Then right after that, it says Abdullah was a

9    senior Hamas operative who made the Sbarro Pizza bomb.  In the

10   context of that statement, there is no doubt Marwan and I

11   brought him to a safe house is self-inculpatory.

12         THE COURT:  As I said, you may be able to convince me

13   that the redaction is unnecessary if it is clear from the

14   independent evidence that you otherwise presented that that was

15   the bomb maker and that that bomb maker had a relationship with

16   the speaker.  If it is only an acknowledgment or a repeat of

17   the evidence that is independently presented, that is a

18   different question.  I can weigh the prejudicial value against

19   the potential prejudice.

20         Quite frankly, there is very little potential

21   prejudice, but less probative value too.  There is very little

22   potential prejudice in them arguing that, even though there is

23   not much genuine evidence about the dispute of the evidence

24   that he is the bomb maker.

25         I have admitted the statement that, I helped the bomb

F16SSOK1

1    maker.  That somehow is great prejudice by having that person

2    identify the bomb maker that has already been independently

3    demonstrated, but that is not most of your situations here.

4    Most of your situations here is that I did it and this PA or

5    PLO person did it too.  That is in conflict.

6            MR. YALOWITZ:  There is one situation that you

7    described that I think which is the Abu Talal situation where

8    the confesser said, Abu Talal and Wafa Idris and I sat together

9    and discussed Wafa Idris' suicide mission.  That, again, in my

10   mind is like Joe and Sam -- Joe and I took the gun to Sam's

11   house.  There is no dispute.

12           THE COURT:  The purpose is what you're offering.  Your

13   problem is the purpose you want to offer it, it must be true

14   because he said that this person must have been there because

15   he said it.  You have double and triple layers of hearsay that

16   you're trying to present that evidence through.  You can't

17   present it for that purpose that way.  You can't simply say, I

18   have proved that he was there because somebody said so when

19   they were in an interrogation several years ago or when they

20   pled guilty.

21           MR. YALOWITZ:  He didn't plead guilty.  He was

22   convicted.  It is part of the conviction.  It is not a guilty

23   plea, it is part of the conviction based on evidence presented

24   at trial and the finding of fact concluded it was true.

25           THE COURT:  But part of the problem that you have in

F16SSOK1

1    that regard is that that is not the direct statement even by

2    that witness.

3            MR. YALOWITZ:  It is.  It was admitted with his

4    permission.

5            THE COURT:  No, no, no.  He acknowledged the

6    indictment.  He did not say out of his own mouth those words

7    that you have in the indictment.  He did not say that.

8            MR. YALOWITZ:  It is not --

9            THE COURT:  You have a double stretch that you want to

10   say that because he says I am guilty as alleged against me in

11   the indictment that that is somehow a statement against his own

12   interest by him of every word that is in the indictment.

13           MR. YALOWITZ:  He didn't plead, your Honor.

14           THE COURT:  I am saying it makes it even worse.  Then

15   it is not a statement against his own interest.  He didn't make

16   the statement, somebody else made the statement.

17           MR. YALOWITZ:  Your Honor.

18           THE COURT:  He didn't personally acknowledge that

19   particular statement.  He said, okay, I am not saying I didn't

20   do it the things that you said in the indictment, I am not

21   pleading guilty.

22           MR. YALOWITZ:  He didn't do that either.  His defense

23   was, he said, I admit what I said in my confession is true.  I

24   admit that's true, but as a legal matter, I shouldn't be held

25   liable for that.

F16SSOK1

```
1             THE COURT:  Except that I don't remember that being
2    his statement, the way you just characterized it; I admit what
3    I said in my confession is true.  I don't think he used those
4    words.
5             MR. YALOWITZ:  We have to go back and check.  You
6    could be right, your Honor.  My point is a little different
7    one.  You could be right.  I don't want to quibble with you.
8             Those custodial statements were admitted in evidence
9    against the defendant without objection from the defendant.
10            THE COURT:  Right.
11            MR. YALOWITZ:  Then the defendant said, my argument is
12   that with the facts in the record, I should be legally excused
13   from liability and the court should issue a decision in which
14   it said, these are the facts.  He sat together with Abu Talal,
15   who was the handler of Wafa Idris, and they discussed a suicide
16   mission.  Then this whole case went up on appeal and, again,
17   the appeals court reiterated all those facts.
18            THE COURT:  That wouldn't be admissible in a U.S.
19   court.  It may be admissible in an Israeli court.  That is not
20   the way it works.  They can't simply say it is a fact.  They
21   say it is a fact because they got that from somebody else out
22   of court.
23            MR. YALOWITZ:  It was admitted in evidence.
24            THE COURT:  You don't have the person here to testify
25   as to any of those facts.
```

F16SSOK1

1              MR. YALOWITZ:  The facts were found by a court based

2      on evidence that was admitted in evidence in that court on the

3      consent of the defendant.  I think they come in under 803.22.

4      I think they come in as self-inculpatory statements.  Surely,

5      at a minimum, they come in for notice, because when you have a

6      senior intelligence officer who is publicly accused of

7      organizing a terror attack and you don't investigate it and you

8      just keep him on the payroll and give him promotions, then at

9      least I can argue to the jury, look, we aren't offering it for

10     the truth, if you don't let me offer it for a truth, you were

11     an intelligence agent, you are supposed to check up on your

12     paper.

13             THE COURT:  I don't have any problems with that, if

14     you have a witness you can put on the stand and that witness is

15     going to say, yeah, I had notice of this and despite knowing

16     this, I did X.  Then bring that witness.

17             MR. YALOWITZ:  I don't have their witnesses.

18             THE COURT:  That's your witness, not their witness.

19     You said you want to present evidence that they were on notice.

20     If you have evidence that somebody is going to say that they

21     were on notice, or if you have evidence that somebody is going

22     to say, I told them, then bring that person in.

23             MR. YALOWITZ:  All right.

24             THE COURT:  That's a different question.  I understand

25     the hurdle on this issue that you have to overcome, but it

F16SSOK1

1    doesn't change the rules.  The rules are that you have to have

2    some direct testimony of someone who can be cross-examined

3    under oath that certain events happened.  It has to be

4    firsthand knowledge, not hearsay, or it has to be some

5    exception to the rule.  You acknowledge that this is not

6    firsthand knowledge and not hearsay.

7            MR. YALOWITZ:  I think it is a self-inculpatory

8    statement.

9            THE COURT:  You are saying there is an exception to

10   the rule that applies even though it is not a statement by a

11   witness under oath in the courtroom.

12           MR. YALOWITZ:  Correct.

13           THE COURT:  It is admissible otherwise because it is a

14   statement against interest.

15           MR. YALOWITZ:  Correct.  I would like to offer it for

16   the truth.  If I can't offer it for the truth, I have other

17   tools at my disposable in my tool kit.  I can offer it for

18   notice, I can offer it --

19           THE COURT:  Whatever evidence that you have, whatever

20   witness that you will call who will say that is an agent or

21   employee of the defendants who said I had notice or someone who

22   will get on the stand and say I gave them notice, you can call

23   that witness.

24           MR. YALOWITZ:  Or as an intelligence agency, they

25   should be expected to --

F16SSOK1

1          THE COURT:  No, no, no.  That doesn't work.  I would

2     expect the CIA to know a whole lot, but they didn't stop 9/11.

3     As an intelligence agency, I don't know what they are supposed

4     to know.  I don't know how good, how bad --

5          MR. YALOWITZ:  We have experts who can say --

6          THE COURT:  You have been given appropriate leeway to

7     utilize the documents that were in their possession which

8     either reflect what they knew at the time or doesn't reflect

9     what they didn't know or in hindsight reflects what they knew.

10    If you have such documents that reflect that knowledge, that

11    shows that they possess that knowledge, or you have some

12    witness employed by them who says they have that knowledge, you

13    have some witness to say, I gave them that knowledge, you can

14    call them.

15          Otherwise, I think the situation you are in is you

16    want inference upon inference that somehow, because of the

17    proceedings that were going on, criminal proceedings, that they

18    should have known that --

19          MR. YALOWITZ:  It is not just that they should have

20    known.  They had a practice of paying the lawyers for these

21    individuals, and they have record after record of the lawyers

22    coming back to intelligence headquarters and saying, here is

23    what happened.

24          THE COURT:  Okay.

25          MR. YALOWITZ:  When we ask them for the records on

F16SSOK1

1    this guy Abu Talal, they gave me two skinny reports and

2    withheld the rest.  You and I talked about that issue.  You

3    overruled my objection, and I am living with that.

4              THE COURT:  My recollection is not that I said that

5    they had the right to withhold.  Is that what you're saying I

6    said?

7              MR. YALOWITZ:  No.

8              THE COURT:  I thought they said they gave you

9    everything they had.  That's my recollection.

10             MR. YALOWITZ:  They didn't.  They never said they gave

11   me everything they had.

12             THE COURT:  I don't have a recollection of you arguing

13   to me that they had further documents in their possession and

14   they refused to give them to you and I would not order them to

15   turn them over.

16             MR. YALOWITZ:  Well, no, it is in between.

17             THE COURT:  Right.

18             MR. YALOWITZ:  As is so often the case, it is in

19   between.  I said there are a lot of documents missing that are

20   referred to in the documents.

21             THE COURT:  Right.

22             MR. YALOWITZ:  You say the report of X and you didn't

23   give me the report of X.  I said did you conduct a search.

24   Mr. Hill refused to answer my question.  I said if you didn't,

25   if you don't answer my questions, I am going to assume you

F16SSOK1

1    didn't conduct an adequate search.  He will refuse to answer my

2    question.

3            So then I come to Judge Ellis.  I say, look, there is

4    missing documents and particularly this guy Abu Talal, one

5    thing we know is he conducted military activities, they have a

6    document that says that, there is more information in the other

7    office.  They have a document that says that.  They don't give

8    us the information.  We ask to take a deposition of the guy who

9    did the search, we got shut down on that.

10           It is obvious what happened to me here is they did a

11   desultory search, they didn't look for the records on this key

12   guy, and I have a pattern in which the lawyers, the criminal

13   defense lawyers, come back to the intelligence service and tell

14   them exactly what is going on.  And yet there is no record on

15   this key intelligence guy because they didn't look for it.  I

16   think I have enough to go to the jury based on that.

17           THE COURT:  If you want to demonstrate that the

18   records that you have are incomplete and that there is

19   something missing, because you want to argue that either it has

20   been hidden, destroyed, whatever you think your theory is of

21   why it is missing --

22           MR. YALOWITZ:  Right.

23           THE COURT:  -- then you bring in the appropriate

24   witnesses and you let them give the appropriate testimony.  But

25   at this point, that is not the issue that I am addressing now.

F16SSOK1

1              MR. YALOWITZ:  It is a piece of the inference that I

2      need.  We have public information that the guy was implicated

3      as the master mind of the most infamous suicide bombing

4      organized by the Al Aqsa Martyrs Brigades.  The most

5      significant one, publicly identified.

6              We have a pattern in which the lawyers go back to

7      headquarters and say, this is what is being told to the

8      interrogators.  We have missing documents about this guy.  And

9      when we give an interrogatory saying, who is this guy publicly

10     identified, they say, well, the guy that is being identified is

11     Kamel Al Ahmed, identification number such and such, but we

12     have no idea whether he did it or not.

13             THE COURT:  I am not sure what issue we are addressing

14     at this point.

15             MR. YALOWITZ:  Whether I can give the name.

16             THE COURT:  What does that have to do with whether you

17     can give the name?  I don't understand how that advances that

18     argument one bit.

19             MR. YALOWITZ:  As a piece of the notice puzzle, the

20     fact that he was publicly identified is relevant.  If you're

21     not going to admit it for the truth, it is relevant to the

22     inference that the jury is entitled to draw that the defendants

23     were on notice that he was involved and they didn't investigate

24     it and they kept him on the payroll.

25             THE COURT:  Unless you have something that equates to

F16SSOK1

1    actual notice, then my ruling is that what you want to

2    accomplish, the probative value is outweighed by the potential

3    prejudice because there is a greater danger that the jury is

4    going to accept this as true, simply because someone said it

5    out of court, than there is that they are supposed to draw

6    inference upon inference that because it was in the public

7    domains, someone relevant to this case must have known about

8    it.  That's a bigger leap.

9            If you have some direct evidence there is some

10   knowledge of this, you want to establish that with witnesses,

11   that's fine.  But no, you're not going to back door it at that

12   point to get this evidence in when it is clearly evidence that

13   is not admissible.

14           MR. YALOWITZ:  The other thing that happened here,

15   your Honor -- I don't want to leave this point.  I am afraid

16   that if we don't make this link, we still have the material

17   support, but it is not the vicarious liability, which is I

18   think the much more natural case here given the role of the

19   guy.

20           The other thing is, before I came on the case, my

21   predecessors requested Hague assistance to take the deposition

22   of Nuwar and all these other guys, and the defendants opposed

23   it.  So the guy is unavailable to me and always was

24   unavailable.  So to get whip-sawed, where you can't go take his

25   deposition and ask him about it, and then you can't get in his

F16SSOK1

1    self-inculpatory statement which sounds a lot like saying, Sam

2    and I took the gun to Joe's house, you know, I mean, there is a

3    real issue of procedural fairness here.

4              THE COURT:  As I say, the only argument you made

5    originally was that it was a statement against interest, penal

6    interest.  I am ruling that the statements that you want to use

7    and the purpose for which you want to use them do not qualify

8    under the rules of statement against penal interest.

9              I don't see any other basis that you demonstrated that

10   those documents that don't have the reliability of the

11   statement against penal interest, because they don't qualify

12   that they should be offered for the purpose that you want to

13   offer it and for the truth of the statements that were made out

14   of court.  That is my ruling on that.

15             Now, you are going to have to address either today or

16   I suggest when we meet again on Monday, you have to address

17   today or Monday, whether or not you genuinely, in response to

18   their renewed summary judgment motion, whether you genuinely

19   have without that proof with regard to each of the claims.  To

20   the extent you don't have other independent proof of those

21   claims, then the case is not going to go to the jury.  That is

22   just the rule.

23             I understand why this is important to you, because a

24   couple of the issues they claim that is your only evidence that

25   they have any connection to this.  If that evidence doesn't

F16SSOK1

 1    come in, you have absolutely no other evidence of which a

 2    reasonable jury could conclude that they were connected to

 3    this.  If you can't articulate you do have some other evidence,

 4    then either I am going to preclude you from moving forward or

 5    grant them summary judgment or give a directed verdict on that,

 6    if the evidence is not going to come in.

 7          MR. YALOWITZ:  Look, obviously on the Abdullah

 8    Barghouti, Ahmed Barghouti story, I am not concerned about

 9    that, based on our conversation.

10          The Wafa Idris story, if you are not going to let me

11    put the name of Abu Talal in front of the jury, that is a

12    significant hurdle to me.

13          THE COURT:  I understand that.  I am not going to let

14    you put in that the evidence against him is an accusation by

15    another person made out of court during the confession.

16          MR. YALOWITZ:  If you are not going to let me put it

17    in as a self-inculpatory statement and you are not going to let

18    me put it in as a conviction and you are not going to let me --

19          THE COURT:  It is not a conviction against them.  Your

20    problem is, if it doesn't qualify as a statement against

21    interest, the issue with regard to the conviction is whether or

22    not the only thing you are proving by the conviction is what

23    that person was convicted of.  You can't prove the case against

24    somebody else based that on conviction.

25          MR. YALOWITZ:  What he was convicted of was

F16SSOK1

1    conspiring -- he was an informant for the intelligence service.

2    He was convicted of conspiring with somebody who worked for the

3    intelligence service whose name is redacted and Wafa Idris, who

4    everybody agrees was the suicide bomber.  I assume I don't have

5    to redact her name.  Everybody agrees she was the suicide

6    bomber.

7            THE COURT:  Right, I understand.

8            THE VIDEOGRAPHER:  So he was convicted of conspiring

9    with her and a guy in the general intelligence service.

10           THE COURT:  Okay.

11           MR. YALOWITZ:  I gave an interrogatory to the

12   defendants saying, who is this guy that was identified as the

13   conspirator?  They said, well, we know who the guy is, we are

14   not admitting he was the conspirator.  We just don't know.

15   That, to me, seems like a pretty significant omission --

16           THE COURT:  What does that have to do with the

17   conviction, the admissibility of the conviction?

18           MR. YALOWITZ:  No, I'm sorry.  I am just thinking out

19   loud about the summary judgment issue that your Honor raised.

20   I am saying, I think I understand your inclination on the

21   redacting of the name.  I think I have enough to go on if the

22   name is redacted, as long as it is clear that it is the same

23   guy.

24           THE COURT:  I don't know how you're going to establish

25   it is the same guy.  You may or may not.  I don't know.

F16SSOK1

1          MR. YALOWITZ:  Because the conviction will say Mr. X

2     and then the interrogatory says who is Mr. X?  They say Mr. X

3     is, you know, this person and we have no idea whether he did it

4     or not.

5          THE COURT:  Okay.

6          MR. YALOWITZ:  If I have that, I think it is

7     reasonable for the jury to say, you have a responsibility to

8     know whether your employees are engaged in conspiring to send

9     suicide bombers.  If you turn a blind eye to that, you can be

10    responsible.  I think even without getting the name in, I don't

11    have a problem with this second renewed supplemental summary

12    judgment.

13         THE COURT:  Have you responded to that?

14         MR. YALOWITZ:  Your Honor, we have been so buried in

15    paper, we have not responded.

16         THE COURT:  You have been buried in paper?  I have got

17    twice as much as you have got.  My only question is, are you --

18         MR. YALOWITZ:  I have not responded to it.  Frankly, I

19    did not intend to.

20         THE COURT:  That's what I was going to ask.  Am I

21    supposed to be waiting for any further response on this?

22         MR. YALOWITZ:  If you are going to grant it, then I

23    need to respond.

24         THE COURT:  I don't know if I am going to grant that.

25    I don't know.  I have to look at it more carefully.  As I say,

F16SSOK1

1    to the extent that you cannot articulate for me how you intend

2    to prove those facts without that evidence, I am going to grant

3    it.  If you can articulate a reasonable basis on which you

4    believe you will attempt to, and that a reasonable jury could

5    conclude based on direct or circumstantial evidence or other

6    reasonable inference the claims that you have, that they say

7    you're no longer viable because of the rulings, then I am going

8    to let you go forward.

9            That is the only thing.  If you want to respond at

10   all, I just need for you to articulate for me, without those

11   statements, out-of-court statements, what is your proof?  If

12   you can't give me any proof, I am not going to waste any time

13   on it.

14           MR. YALOWITZ:  Look, I agree with that.

15           THE COURT:  If you can articulate some proof, then I

16   will at least consider whether or not you should be able to go

17   forward on that basis and let the jury make that determination.

18           MR. YALOWITZ:  Why don't we do this, why don't I

19   respond by a letter?

20           THE COURT:  That would be fine.

21           MR. YALOWITZ:  Without a formal thing, I will say my

22   request will be that you deny the motion without briefing.

23           THE COURT:  Right.

24           MR. YALOWITZ:  I will summarize what the evidence

25   looks like based on the -- I think really what we are talking

F16SSOK1

1    about is the Idris case, because the Abdullah Barghouti case,

2    it is clear.

3                THE COURT:  I tried to make it sharp.  To the extent

4    they're now renewing their motion as to all of those

5    plaintiffs, you should at least say something why there is

6    still sufficient evidence in this case, despite those rulings,

7    to go to a legitimate --

8                MR. YALOWITZ:  I will try to --

9                THE COURT:  That's all I need.  I just need a

10   paragraph.

11               MR. YALOWITZ:  I'll try to get you that on Friday.  We

12   are working around the clock here.

13               THE COURT:  So am I.

14               MR. YALOWITZ:  It is part of the tactic here, you

15   know.

16               THE COURT:  I want to resolve this on Monday.  Try to

17   get it to me before Friday, if you can.  Try to get it to me.

18               MR. YALOWITZ:  I am otherwise occupied the next two

19   days, as you know.

20               THE COURT:  Let's just go past that.

21               MR. YALOWITZ:  Thank you.

22               THE COURT:  There are a couple of smaller things.

23               Yes, sir.  You want to talk me out of it?

24               MR. ROCHON:  No.  It is just that yesterday, you may

25   have noticed that plaintiffs have indicated that as to another

F16SSOK1

```
 1    incident, the Guetta incident, that they are not going to be
 2    relying on the identifications.
 3            THE COURT:  Yes, the photo.
 4            MR. YALOWITZ:  We will address that case in the
 5    letter.  We are fine on that.
 6            THE COURT:  The photo is no longer going to be
 7    evidence?
 8            MR. YALOWITZ:  I am not offering the ID.  I will
 9    include that in the letter.
10            THE COURT:  All right.
11            MR. ROCHON:  That's all I have.
12            THE COURT:  I thought you were clear about that.  You
13    don't have to waste time on that.
14            MR. ROCHON:  What I was rising to say is that it seems
15    like that was the main evidence of any liability Mr. Yalowitz
16    is going to address in his letter, and I appreciate him doing
17    so.
18            THE COURT:  Yes, that will be important.
19            Let me just quickly --
20            MR. YALOWITZ:  Your Honor, my colleagues want me to be
21    really clear, because this redaction project is an enormous,
22    logistical undertaking.  The names of the suicide bombers do
23    not have to be redacted, have I got that right?
24            THE COURT:  I don't have any problems if there is
25    independent evidence of who the suicide bombers are and that
```

F16SSOK1

1    you are not relying on these statements as evidence of the

2    suicide bombers.  I don't see that to be the issue.

3           MR. YALOWITZ:  Thank you.  I just want to be crystal

4    clear on that.

5           THE COURT:  I can only say that, in the abstract,

6    because I don't know if the defense is going to genuinely try

7    to dispute the other evidence that you intend to offer as to

8    who the bombers, suicide bombers.

9           MR. HILL:  All I would ask, your Honor, is that the

10   plaintiffs, if they want to do that, identify the other

11   admissible evidence that they are claiming would establish that

12   fact.  Because there is a lot of evidence.  They have thousands

13   of trial evidence that they are trying to --

14          THE COURT:  I am going to do it this way.  If you

15   genuinely are going to dispute who committed the bombing or who

16   committed the act, then you should say so.  To the extent that

17   you all know who the individuals were who have been held

18   responsible for personally being involved in those acts --

19          MR. HILL:  Let me consult with my colleague about it.

20          THE COURT:  You may want to talk to them.  I think we

21   are pretty much talking about the guys on the scene or the guys

22   where there is no evidence or contention that they personally

23   were employed or otherwise an agent, direct agent being

24   directed by the PLO or the PA.

25          MR. YALOWITZ:  The other name, your Honor, that we

F16SSOK1

1    would like to not have to redact, because it appears so often,

2    is Yasser Arafat.  Nobody is arguing that, you know, Yasser, he

3    is dead, he has not got any -- but where it says, you know, I

4    spoke with Arafat, it is not to inculpate him, it is to deal

5    with their approval knowledge.

6              THE COURT:  I am not sure if that is an issue.

7              MR. ROCHON:  I think it might be an issue.  It depends

8    on the document.  We have so many, we have to kind of work

9    through today, hopefully, the plaintiff's exhibit list, which

10   has now shrunk since our previous hearing.

11             Once we are through that and know what they're

12   actually going to be allowed to admit and we can address it, I

13   might recommend to plaintiffs, not that they need to take my

14   advice, we might talk about whether exhibits are getting in,

15   whether they deal with whether or not they are redacted.

16             THE COURT:  Okay.  They are not getting in unless they

17   are redacted.  That's my position.

18             MR. ROCHON:  Right.  They can do it however they want.

19   As to Yasser Arafat, we think his name appears often.  Often

20   those exhibits may never gain admission.  I don't want them to

21   go through a redaction.

22             MR. YALOWITZ:  That is very gracious of Mr. Rochon.

23             THE COURT:  That's a waste of time.  Do you have a

24   reason and a legal ground for redacting Yasser Arafat's name in

25   the document?

F16SSOK1

1          MR. ROCHON:  I am sure in some exhibits we would.  I

2     bet in many we would not.  Therefore, I don't think it can be

3     discussed in the abstract.  My suggestion, it might be better

4     to first determine which of the 1200 exhibits would come in

5     before we do that, because there is a lot of random reference

6     to Yasser Arafat in books and media and all these third-party

7     sources that may, in our view, never come in. I don't know that

8     I want to discuss that.

9          THE COURT:  I don't know what else we are talking

10    about in terms of the admissibility.  We discussed the

11    admissibility.

12         MR. ROCHON:  I thought we had, too.  The defendants

13    feel that your discussions on admissibility have not rendered

14    the plaintiff's exhibit list to be less than -- it is still the

15    same it was with before you gave your indications as to what

16    would come in.

17         THE COURT:  You should have a better idea than they do

18    what I ruled in and out.  That is what we are going to proceed

19    on.  If you think there is something that is prejudicial to

20    you, unduly prejudicial with regard to Yasser Arafat's name, it

21    is your responsibility to identify that and your responsibility

22    to make sure you know whether or not they intend to use it and

23    whether or not you are going to ask them to ask me to tell them

24    to redact it if it is going to come in.  If you are simply

25    going to maintain the position that it just should be

F16SSOK1

1    inadmissible in and of itself, that's fine.

2              MR. ROCHON:  The fact that Yasser Arafat had a

3    position in the PLO, PA, is obviously not an accusation.  It is

4    simply a statement as to that.  We would not be seeking to

5    redact, I am sure.  If there is a statement that Yasser Arafat

6    did X or provided funds to so-and-so, I imagine made by a third

7    person, we would seek to redact that.

8              THE COURT:  You can assume they are probably going to

9    seek to try to get it in.  You should pull that document out

10   and let it be known to them and/or to me as quickly as possible

11   that you want this redacted.

12             MR. ROCHON:  We will do that.  I think some of this

13   will be easier once we are through the afternoon session,

14   whenever the court addresses the other objections to their

15   exhibits.

16             THE COURT:  Let me get past some quicker things.

17   Let's pass some quick things before lunch, and we can get

18   through more substantive things.

19             There was a request by the plaintiffs for exclusion of

20   some information.  I will just describe it, rather than

21   describe it in detail as derogatory information about a

22   deceased plaintiff.  Can I assume that you don't intend to

23   offer that kind of evidence?

24             MR. HILL:  The answer is yes, that count is going to

25   be dismissed anyway once you get to summary judgment.  We don't

F16SSOK1

1    intend to raise that issue.

2             MR. YALOWITZ:  Well, your Honor, I just want to be

3    clear, I mean, that is a non-answer.

4             THE COURT:  It is not a non-answer.  I take it that it

5    is not coming in, period.

6             MR. YALOWITZ:  Thank you, your Honor.

7             THE COURT:  All right.  With regard to Mark Sokolow's

8    position relationship to the firm.

9             MR. HILL:  Again, that one should be dismissed.  It

10   would only come in if he claims the injuries are preventing him

11   from working, in which case we can identify that is a partner

12   of a major law firm.

13            THE COURT:  You don't intend to put into this case

14   that he has a particular relationship with this firm for any

15   independent purpose.

16            MR. HILL:  Not independently of his testimony.  If his

17   testimony would make it relevant where he works today, I

18   reserve the right to raise that.

19            MR. YALOWITZ:  Your Honor, it is the name of the firm

20   that is of concern to me.

21            THE COURT:  I understand.  The name of the firm,

22   they're not saying he is associated with the firm that is

23   representing the plaintiffs.

24            MR. HILL:  If I cross him and say, you are with an Am

25   Law 100 firm, as opposed to in regards to this particular

F16SSOK1

 1    firm --

 2              THE COURT:  My ruling is that will stay out, unless he

 3    opens the door to that.  And if he does so, then you will make

 4    an application before me to be able to elicit it and tell me

 5    how you want to elicit it and why it is not appropriate.

 6    Otherwise, I am going to assume that we are not going to

 7    discuss that.

 8              MR. HILL:  Understood, your Honor.

 9              THE COURT:  The plaintiff also wanted to add two new

10    indictments where they say that the defendants, although they

11    didn't plead guilty, they acknowledge that the indictments, the

12    truth of the indictments or the facts in the indictment.  I

13    don't have any reason to treat that any differently than a plea

14    in terms of the nature of what is being said and what is being

15    used, but the same rule applies with regard to the redactions

16    and the accusations that you're relying on for the truth, which

17    are not incriminatory statements.

18              MR. YALOWITZ:  Thank you, your Honor.

19              THE COURT:  Does the defense want to make a strenuous

20    argument to that?  Let me go past that.

21              MR. HILL:  We do have one point on one of those.

22              MR. SATIN:  The only issue is there have been

23    statements of admissions to facts for which the court then

24    found the person guilty.  But the court was clear, we find the

25    person guilty with respect based on the statements to these

F16SSOK1

1    counts in the indictments but not others.  It might not have

2    been.  I am not sure exactly.

3         In some cases where there have been so-called guilty

4    pleas or statements by perpetrators for which a person was

5    found guilty, the court was clear that it was not finding that

6    person guilty for everything in the indictment.  Obviously, the

7    only part of the indictment that should be admitted is the part

8    for which the court found him guilty based on his statements.

9         THE COURT:  How many of these such statements,

10   indictments, are there?

11        MR. SATIN:  Total indictments like the one I just

12   described?

13        THE COURT:  Like the one --

14        MR. SATIN:  One comes to mind at the moment.

15        THE COURT:  You should identify that one or whatever

16   ones you think fall into that category and see if you can agree

17   upon an appropriate redaction.  If you can agree on appropriate

18   redaction, let me know.  It seems to me, if you are correct as

19   you have described it, that the defendant has given a general

20   acknowledgment of his guilt, but the court did not find him

21   guilty of a particular set of acts, then those set of acts are

22   not in the indictment or not admissible, unless there is a --

23   that's why I say I have concerns about just a general, yes, I

24   agree that I did what you accuse me of generally.  If they

25   found him not guilty of that, that is obviously not a

F16SSOK1

1    conviction.

2              MR. SATIN:  The only other issue --

3              MR. YALOWITZ:  I mean --

4              THE COURT:  Do you know which one he is talking about?

5              MR. YALOWITZ:  Of course.  We will look at what they

6    want to do.  This guy represented himself.  He didn't have a

7    lawyer.  He made a lot of statements during the course of the

8    trial.  And one of the things he said was, okay, I sent the

9    suicide bomber, but I sent him in a taxi.  I didn't send him

10   with this woman, who I believe there is a evidence he had a

11   personal relationship with the woman.  Whatever, he said, I

12   sent him in the taxi.  It is not correct that I recruited this

13   woman.

14             So then like they stop the trial and the prosector

15   said, look, he has admitted to doing all the things, and the

16   court said, all right, based on his statements during trial, we

17   convict him.  And with regard to the count that included

18   sending, you know, a Mohamed Hashaika suicide bomber, subject

19   to his statements at that hearing, so it is fine.  We can deal

20   with it.

21             THE COURT:  Sounds to me that, on that issue, you have

22   neither a conviction nor do you have a self-incriminatory

23   statement.

24             MR. YALOWITZ:  On the issue of whether he recruited

25   that woman?  Fine.

F16SSOK1

1          THE COURT:  Right.  If you have neither a conviction

2    on that issue or self-incriminatory statement, then reference

3    to those facts in the indictment are not probative.

4          MR. YALOWITZ:  It is fine.  We can take them out.  She

5    also pled guilty.  We can get it in through her.  It is not a

6    problem.

7          THE COURT:  I want to make sure.  You guys know better

8    than I.

9          MR. SATIN:  The only last thing really quickly on the

10   redaction issue, I know the court's ruling was related to

11   involving the attacks at issue in the case.  Many of the

12   indictments involved attacks not at issue in this case.  Those

13   should be redacted in the entirety.

14         MR. YALOWITZ:  They should not be redacted in their

15   entirety, your Honor.  It is highly probative of the policy of

16   the PA that these guys, it is not that they did a one-off, it

17   is that they were engaged in terror attack after terror attack

18   and they kept him on the payroll and they gave him promotions.

19         THE COURT:  I am not quite sure, other than you are

20   sort of making a relevance argument, I am not quite sure what

21   ground you say that that is inadmissible.

22         MR. SATIN:  A few things.  It would be, one,

23   relevance.  It is not relevant.

24         THE COURT:  Other than relevance.

25         MR. SATIN:  The prejudice to us based on these other

F16SSOK1

1    attacks coming into evidence now.  The jury is going to hear

2    about terrorist attacks, other attacks not at issue in this

3    case.  I also think it is consistent with the law of the case.

4              THE COURT:  I am not sure, to the extent that you say

5    that you're objecting to terrorist attacks committed by other

6    people, that there is no evidence that the PA or the PLO had

7    anything to do with it.  To the extent that there is evidence

8    that they were aware that the people that they were

9    compensating were involved in committing terrorist acts, I find

10   that to be relevant and admissible.  With regard to their

11   knowledge, their state of mind, what needs to be proven in

12   terms of their support of terrorist and terrorist acts that has

13   been alleged in this case.

14             MR. SATIN:  Certainly, I think one error we dispute is

15   this question of PA and PLO awareness of those particular acts.

16             THE COURT:  I agree.

17             MR. SATIN:  The plaintiffs have made the claim I think

18   a few times that these were publicly available records.  That

19   is not necessarily the case.

20             THE COURT:  Okay.

21             MR. SATIN:  These are military court files.  Someone

22   can't walk through and find out this information.

23             THE COURT:  All right.

24             MR. SATIN:  So that fact that the court is sort of

25   based its argument on is not, in fact, true.

F16SSOK1

1          THE COURT:  I am not resolving that fact.  Either they

2     will have evidence, direct or circumstantial, that the PA

3     and/or the PLO knew and you will have evidence, direct or

4     circumstantial, that they didn't or the jury is going to

5     independently resolve that issue.

6          MR. SATIN:  Even if --

7          THE COURT:  As a general rule, based on the grounds on

8     which you raise an objection, I do not find that it is

9     irrelevant.  And I do not find that in the abstract, it is

10    somehow unduly prejudicial if there is evidence that a

11    reasonable jury could conclude that the people that the

12    defendants were dealing with and compensating were known to be

13    involved in the acts of violence.  They can assess the

14    knowledge and the intent, the state of mind of the defendants

15    with regard to these acts.  I think that evidence is relevant.

16         MR. SATIN:  Our position is it should be just with the

17    respect to the attacks at issue in this case, not other

18    attacks.

19         THE COURT:  That is like saying, well, yesterday,

20    Chase Bank on the corner was robbed.  I didn't have anything to

21    do with it.  John Doe robbed the bank, except John Doe robbed

22    nine other banks and he gave me half the money.  You can't say

23    it is irrelevant that John Doe, that I took half the money when

24    John Doe robbed nine other banks, because that is not the bank

25    that is at issue.  It is my relationship with this guy and

F16SSOK1

1    knowing whether or not he is a bank robber is really what is

2    relevant.

3            I can't accept that argument in the abstract.  If you

4    can give me, with regard to some specific piece of evidence,

5    why you say that that doesn't reflect or shouldn't be used to

6    reflect that there is evidence for the jury to consider that

7    there was support for this terrorist or this individual or for

8    this type of activity, then I will hear it.

9            No, I can't give you a carte blanche, as they say,

10   ruling that no, they can only offer the evidence that you paid

11   a person to commit one of these terrorist acts if they have

12   evidence that you paid other people to commit other terrorist

13   acts.  You can't say it is irrelevant.  No, I can't accept

14   that.  If we can either deal with it more specifically with

15   regard to certain exhibits, we will deal with that.

16           I think that takes me into the next issue which is

17   related to that.  The defendants request the exclusion of

18   testimony about post-attack payments to non-PLO/PA employees.

19   I disagree, I think that is relevant.  Matter of fact, I am not

20   quite sure, as they say, I don't know how this would play

21   itself out.  You know the witnesses, I don't.

22           I am not sure why that is the objection of the

23   defendants rather than the objection of the concern of the

24   plaintiff.  I thought your position was that -- I assume you

25   don't want to present to the jury evidence that the only people

F16SSOK1

1    you paid were PLO and PA employees, because if that is your --

2    I thought your position was you make routine payments to

3    everybody.

4         Why would you want to exclude the routine payments

5    that you made to non-PLO employees?  If that is what you want

6    to do, remember, when you talk about precluding evidence, my

7    ruling is that the evidence doesn't come in, period, from

8    either side.  If I am precluding this evidence, I want to make

9    sure I understand this.  You don't want any evidence before

10   this jury that the PA or the PLO made payments to non-PA or PLO

11   employees?  You want only evidence that they made payments to

12   PA and PLO employees?  I'm not sure you have thought that out.

13   Is that what you want?

14        MR. ROCHON:  Yes.

15        THE COURT:  You are not going to get it.  To the

16   extent that you're making payments to people who you know are

17   permitting terrorist acts, I think it is your responsibility to

18   explain why.  If a reason is we only give money to people if

19   they are employed by us, I assume that is not the reason you

20   are going to give, because that is not the truth.

21        MR. ROCHON:  We are not going to give the reason

22   anymore.  You just said those payments are coming in.

23        THE COURT:  Look, I don't know.  You may convince me.

24   I just haven't heard the logical argument.  If you want to

25   convince me that I should keep out the fact that any other

F16SSOK1

1    payments were made to non-PLO employees, so the record before

2    this jury when they go in the jury room is that the only people

3    you made payments to or made other payments to were people who

4    were PLO employees, then the jury can decide for themselves why

5    does that make sense.

6           If you have no interest in those terrorist attacks,

7    why are you only paying people who you know committed terrorist

8    attacks who are employed by you, not you want to make -- the

9    problem with making that argument is that we know that is not

10   true.

11          MR. ROCHON:  Right.

12          THE COURT:  That's the problem with keeping that out,

13   because it gives the jury a false impression of what the true

14   facts are.

15          MR. ROCHON:  Right.  Our argument is based on whether

16   that the evidence wasn't relevant unless they were employees

17   because the court suggested that the evidence was relevant

18   under the *respondeat superior* theory that the plaintiffs were

19   presenting.  Obviously, if someone is not your employee, you

20   cannot be liable under *respondeat superior*.

21          THE COURT:  I know, but the problem is the question

22   for the jury -- I have to look at this from the jury's point of

23   view.  The question for them is what would motivate a person to

24   make a martyr payment?  You can give them whatever explanation

25   that you think is the appropriate explanation, but you can't

F16SSOK1

1    give them the explanation that it is only appropriate because

2    they are employees of the PA, Because that is not true.

3            You paid people who were not employees of the PA that

4    you had no obligation to pay.  Either you did that for one of

5    two reasons.  One, because that was your general policy for

6    other business and political reasons, or two, because you were

7    supporting territory.  There are only one of two choices.

8            I think the jury is entitled to know what the true

9    facts are, that martyr payments are made and they're entitled

10   to argue from that, that the only common denominator is that

11   these people are terrorists.  You have the right to argue, no,

12   that is not the common denominator.  The common denominator is

13   something else.  That's a jury determination.  I don't think it

14   can be excluded on that basis.

15           MS. FERGUSON:  Your Honor, if I can focus on one

16   category of payments.  There is a lot of evidence and proffered

17   expert opinion on this evidence of payment through prisoners

18   through the administrative detainees.  So people who are

19   employed by the PA are not paid through that system.

20           THE COURT:  Okay.

21           MS. FERGUSON:  So it is those payments are not

22   relevant to a *respondeat superior* theory of liability.

23           THE COURT:  Well, I don't consider it only relevant to

24   a *respondeat superior* liability.

25           MS. FERGUSON:  Then if we focus on the material

F16SSOK1

1    support case, they are post-attack payments, which would not be

2    evidence of material support.

3            THE COURT:  Not necessarily.  Not necessarily.  It

4    doesn't move it in the other direction.  If it goes this way,

5    it goes that way.  If after I go out and mug somebody, I come

6    back and you give me $10, there is a reasonable inference that

7    is unexplained that maybe I had some connection with that, as

8    opposed to if I came to you and said, give me $10, I said why

9    should I give you $10?  I didn't ask you to do that.

10            The jurors would use their own common sense to

11   determine whether it makes sense that you would do this under

12   these circumstances.  If you have a reasonable explanation as

13   to why you would do this under these circumstances, it is not

14   evidence that you were involved.  But if you have no reasonable

15   explanation of why you would pay people for doing it after they

16   committed terrorist acts, it is reasonable for the jury to say,

17   well, that doesn't convince me that he had nothing to do with

18   this.  It takes me in the direction that you might have

19   something to do with this.  I think it is probative.  That is

20   my position.

21            We are going to end in five minutes, then we will come

22   back.  I will address this because I just don't remember what

23   the issue really was.  There were eight exhibits that the

24   plaintiffs asked to be admissible, statements against

25   defendants.  The defendants argue they want statements against

F16SSOK1

1    interest.

2              MR. YALOWITZ:  Maybe I can refresh your recollection.

3    So this is a guy like Abdullah Barghouti who pleads guilty to

4    66 counts of murder and then he is going to be sentenced.

5              THE COURT:  Right.

6              MR. YALOWITZ:  You live with it every day.  There are

7    people who say, I regret it and I am sorry.  That's a statement

8    against interest because they're admitting their guilt.  There

9    are people who say, I am proud of what I did and I would do it

10   again.  That's a statement against interest; he is about to be

11   sentenced.  Then there are people who say that you have before

12   you an innocent man and that is not a statement against

13   interest.  So these are all statements of people who said

14   either I am proud of it or I did it, but I regret it.

15             THE COURT:  I don't understand what the dispute was.

16   What is the objection?

17             MR. SATIN:  Your Honor, we have a few different

18   objections.  One, I think the best way to discuss them is to

19   talk about what the statements are.  I don't know if the court

20   has them in front of them.

21             THE COURT:  I have a few of them.

22             MR. SATIN:  With the court's permission, can I take

23   two minutes to just read them?

24             THE COURT:  No.  Let's do this first.  Let me go to

25   another issue first.  I wondered if we could look at something

F16SSOK1

1    over lunch.  I want to go to the photos.  I just want to get

2    the photos, then we can take a lunch break and discuss that

3    further after lunch, then we can come back to that.

4           There are several objections to the photos, and this

5    is my reaction to the photos.  I will let in most of the

6    photos, but most of the gruesome photos I am not going to

7    allow.  I think it is more prejudicial than probative.

8           The photos that are basically depicting body parts

9    and/or significant amounts of blood, particularly my

10   understanding is most of those photos are not photos of any

11   plaintiff or plaintiff's relative in this case.

12          MR. YALOWITZ:  That is what I was going to say.  Two

13   that were -- that is fine.  You have got the two areas where I

14   just want to think about it is you have some photos that

15   plaintiffs saw.  So a kid who went and looked at the photos of

16   the bus being blown up where his dad was murdered.

17          THE COURT:  Is his dad on the bus?

18          MR. YALOWITZ:  Yes, so that goes to his trauma.  You

19   have body bags where there was coverage of a girl in a body bag

20   and her hair kind of spilling out of the body bag and the dad

21   saw that on the news.  That is one category.

22          Then the other category is you have things that the

23   plaintiffs saw because they were in the attacks.  Rena Sokolow

24   saw the head of the suicide bomber.  We have a photograph from

25   the autopsy of the head.

F16SSOK1

1          THE COURT:  Why is that so much more revealing than

2     her testimony?

3          MR. YALOWITZ:  She saw it.  I think the jury is

4     entitled to see it.

5          THE COURT:  She saw it to her damage.  Why should the

6     jury see it to their damage?  She can testify to it.  You think

7     that that will raise your dollar value?

8          MR. YALOWITZ:  I think that is why the defendants

9     don't want it in.

10         THE COURT:  Let me just tell you this, and we can

11    discuss which one is next.  Let me just go through what I have

12    as Exhibit 1.  I don't know what the pages are.  I don't have

13    any problem with the first photo.

14         MR. YALOWITZ:  I'm sorry, your Honor.  Just bear with

15    me a minute.

16         THE COURT:  Maybe you can just write this down and

17    look at it.  I will tell you the ones I have a problem with and

18    you can convince me later.

19         The first one, I don't have a problem with.  The

20    second one I do.  I guess it is Bates number page 6380.  I have

21    a problem with that one.  I have a problem with the one after

22    that, 81.  I don't have a problem with 82.  I don't have a

23    problem with the next one, which is 87.  I don't have a problem

24    with the next one, which is 90.  I have a problem with 91.  I

25    don't have a problem with 95.  I don't have a problem with 96.

F16SSOK1

1    I don't have a problem with 97.

2              Let me make sure I have this.

3              I have a problem with 99.  I don't have a problem with

4    00.  I don't have a problem with 01.  I have a problem with 02.

5    I have a problem with 03.  The next one, I don't know if it has

6    a Bates number, a small picture of two people.  I don't have a

7    problem with that.  The one right after that is an aerial shot

8    down.  I don't have a problem with that.  The one that is there

9    page 8185, I do have a problem with.

10             The one after that, I think 165 or 185 -- 185, again,

11   I have a problem with that.  Page 239, those two photos, I

12   don't have a problem with.  240 I don't have a problem with.

13   241 I don't have a problem with.  239 I don't have a problem

14   with.  240 I don't have a problem with.  241 I don't have a

15   problem with.

16             I have a problem with 187.  I have a problem with --

17   187, after that, the next photo.  The 186 six right after that,

18   I have a problem with those two photos.  The 186, again, I

19   guess it is the next photo, I have a problem with that photo.

20   Is that five or eight seven?  587 I don't have a problem with.

21   561, the next one, I don't have a problem.  388 I do have a

22   problem with that.  287, I don't have a problem with that.  I

23   don't have a problem with the next one.  I think it is 519.  I

24   don't have a problem with the next one, 518, I believe.  I have

25   a problem with 564.  I have a problem with 565.  I have a

F16SSOK1

1    problem with 566.  I don't have a problem with 567.  I don't

2    have a problem with 568.  I don't have a problem with 569.  I

3    don't have a problem with 570.  I don't have a problem with

4    571.  I don't have a problem with 572.  No problem with 573.

5    No problem with 574.  I have a problem with 564.

6            MR. YALOWITZ:  What's the court's rule with 564?

7            THE COURT:  I have a problem with that.

8            I have a problem with the next one, 565.  I have a

9    problem with the next one, 566.  I don't have a problem with

10   567.  I don't have a problem with 568.  I don't have a problem

11   with 569.  I don't have a problem with 570.  I don't have a

12   problem with 571.  I don't have a problem with 572.  I don't

13   have a problem with 573.  I don't the have a problem with 574.

14   I don't have a problem with the next one, which is marked

15   plaintiff's exhibit 1124.  I don't see a Bates stamp.

16           MR. YALOWITZ:  On 1124?

17           THE COURT:  No problem.

18           MR. YALOWITZ:  Thank you.

19           THE COURT:  1123, no problem.  1122, no problem.  I'm

20   sorry, I do have a problem with that.

21           1122, plaintiff's exhibit which is page 528.  The

22   other shots, I don't have a problem with the individual photos.

23   I think the objection was really as to the photos of people

24   holding guns.  My problem is, I just don't know who these

25   people are.  You would have to tell me who these people are.

F16SSOK1

1          MR. YALOWITZ:  I think, just going from

2    recollection -- I apologize, I don't have the exhibit in front

3    of me, but Ali Jara has a gun in the background.  He is a

4    suicide bomber.  He is dead.  Mohamed Hashaika has a headband

5    and a gun.  I'm not sure where our photo lands with the gun

6    whether it is cropped or not.  We know she is a suicide bomber.

7          THE COURT:  Is there anybody who is holding a gun who

8    is not an actual suicide bomber?

9          MR. YALOWITZ:  There is one guy who has photos with

10   guns who was liquidated by the IDF for being a multi-terror

11   attack killer.  I don't think the photo we are going to use of

12   him has him with a gun, I think we just want his face.  I just

13   would have to look at it over lunch.

14         THE COURT:  You tell me who, and they have to tell me

15   why -- my initial reaction, to the extent these were suicide

16   bombers, the fact they are holding guns is not particularly

17   either revealing or objectionable.  You expect them to be

18   dedicated to some form of violence.  It is not an issue.

19         If somehow it is implying something that is unfair to

20   the defendants, then you can let me know what that is after

21   lunch.  That is pretty much, if you want to take a look at

22   those photos between now and Monday or take a look at them over

23   lunch, we can discuss it further.

24         MR. YALOWITZ:  I need to take a look.  You called some

25   balls and strikes.  I'll look at it.

F16SSOK1

1          THE COURT:  Once you look at the photos, you can see

2     my pattern.

3          MR. YALOWITZ:  I can guess.

4          THE COURT:  To the extent that you have photographs, a

5     lot of the photographs came in. I don't know if you need them

6     all.  I am just dealing with the objections.  To the extent

7     that people want to talk about what they saw, they were there,

8     how it affected them, I think that is appropriate.  It is part

9     of the damages.  I think some of these photos are a bit much.

10    It's hard for me to make a determination that it is not more

11    prejudicial than probative.

12         MR. HILL:  Your Honor, could I raise one issue?  This

13    is a question of whether the plaintiffs observed the photos.

14    Many of these were not produced during fact discovery.  I

15    deposed most of the plaintiffs.  I did not give them an

16    opportunity to ask them whether they saw particular photos.  If

17    plaintiffs could be directed to identify which plaintiffs saw

18    any of these photos.  Right now, I have no idea who allegedly

19    saw what.

20         THE COURT:  Do you have a witness that you are going

21    to associate with these photos, utilizing these photos?

22         MR. YALOWITZ:  Yes.  Look, we have asked for so many

23    post discovery -- the answer is yes, we are not just going to

24    put the photos loose in front of the jury.  We are going to

25    talk about them with the witness.  The idea of giving the

F16SSOK1

1    defendants more discovery right now would really stick in my

2    craw because these people have been scorched Earth,

3    uncooperative, shut me down, and to have the gall to ask me to

4    identify which of my clients saw, which of the photos on the

5    eve of trial, they will find out in the testimony.

6              THE COURT:  You have similar issues with some of their

7    witnesses too.

8              MR. YALOWITZ:  What do you mean?

9              THE COURT:  I have some motions by you to preclude

10   witnesses that you say were not identified.

11             MR. YALOWITZ:  Right.

12             THE COURT:  Even though you may be hurt, your feelings

13   may be hurt, the same rule applies to both sides.

14             MR. YALOWITZ:  I agree.

15             THE COURT:  I am going to apply the same rule.  You

16   tell me what rule to apply to them, that's the rule I will

17   apply to you.

18             MR. YALOWITZ:  I want them to keep out witnesses they

19   didn't get rule 26(a) disclosures for.

20             THE COURT:  And your witnesses too?

21             MR. YALOWITZ:  I don't have any witnesses.  We

22   didn't --

23             MR. HILL:  These are documents that weren't produced

24   during discovery.  They shouldn't be allowed.  If the rule is

25   discovery is at the end, they shouldn't come in.

F16SSOK1

```
1              THE COURT:  Shouldn't that apply to both testimony and
2     exhibits?  Isn't that the rule?
3              MR. YALOWITZ:  No, because I collected these from
4     third-party sources.
5              THE COURT:  What does that have to do with it?
6              MR. YALOWITZ:  Because if they are in my possession,
7     custody, and control, I have got to turn them over.
8              THE COURT:  They were in your custody and control when
9     you collected them.
10             MR. YALOWITZ:  When I collected them, I turned them
11    over.
12             THE COURT:  You say you didn't have these in your
13    possession or didn't have these in your possession and they
14    were not requested of you during discovery?
15             MR. YALOWITZ:  I did not have them in my possession
16    during fact discovery.  I got them from public sources, and as
17    I got them, I turned them over.
18             THE COURT:  If you turned them over in a timely
19    manner --
20             MR. YALOWITZ:  I did.
21             THE COURT:  -- that's the rule.  If you didn't turn
22    them over in a timely manner, then they're excluded.  That's
23    the same rule with regard to exhibits and the same rule with
24    regard to witnesses.
25             Let's take a lunch break.  I will see you at 2:30.
```

F16SSOK1

1            MS. ROMEO:  Before we break, some procedural issues we

2    can talk about in the afternoon.  I have a proposed AV order

3    that I would like to hand up.

4            THE COURT:  Sure.  Give them to my law clerk.

5            (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

160SOK2

1          THE DEPUTY CLERK:  All rise.

2          THE COURT:  Be seated.

3          Okay, as I assume everyone is aware by now, the Second

4     Circuit has denied the Petition for Re-Mandamus and Motion For

5     A Stay, so.

6          MR. YALOWITZ:  Your Honor, I'm sorry, I didn't mean to

7     interrupt.  I just wanted to come back to the photos, which we

8     had an opportunity to review over lunch.

9          First of all, the guys with guns, as I thought, there

10    are three suicide terrorists who were shown photographs with

11    guns.  And then there are two guys who were liquidated by the

12    IDF, who were shown with guns.  Those are the only gun people

13    in the photographs that I saw.

14         THE COURT:  And what you refer to as the "liquidated

15    guys," what is the purpose of that?

16         MR. YALOWITZ:  Just to show who they were and what

17    their relation was.

18         THE COURT:  I'm not sure what the relevance of the

19    liquidation is.

20         MR. YALOWITZ:  For example, one, one guy was killed.

21    And immediately thereafter, the defendant's top -- well, Marwan

22    Al-Barghouti, top PLO and PA guy, ordered a bunch of terrorist

23    attacks, one of which was the Wafa Idris attack.  One was the

24    January 22 attack.  So it's really to help the jury understand

25    the timing.

160SOK2

1          THE COURT:  I'm sure you confused me, so I don't know

2    if they will understand the timing.

3          What do those two people have to do with this case?

4          MR. YALOWITZ:  One of them was -- I don't think we're

5    going to use, so we don't need to talk about him.

6          THE COURT:  Tell me that so we can get rid of his

7    photo.

8          MR. YALOWITZ:  Freitakh.

9          THE COURT:  All right.

10          MR. YALOWITZ:  Raed al-Karmi.

11          THE COURT:  All right.  So do you know which photo in

12    your exhibits that you are talking about that you are not going

13    to use.

14          MR. YALOWITZ:  That we're not going to use?

15          THE COURT:  Yeah.

16          MR. YALOWITZ:  I could look at it and tell you.

17          THE COURT:  As long as the defense knows, that's all

18    right.  Do you know what photo you are saying, now, is not

19    going to be used?

20          MR. YALOWITZ:  If they don't --

21          MR. HILL:  The one of the guy standing in front of the

22    flames.

23          MR. YALOWITZ:  Let me see.  Yeah, that's good.

24          THE COURT:  Okay.  All right.  Not going to use it, so

25    who is the other guy?

160SOK2

1              MR. YALOWITZ:  Other guy's name is Raed al-Karmi.  So

2     here's the story with him.  One of the defendant's lines of

3     defense is we couldn't control the violence.  We were just

4     trying to tamp it down.  And other people, away from us,

5     committed violent acts, all right, against our wishes.

6              That's their defense.  Rogue employees.  So, in

7     December of 2001, the Yasser Arafat declared a ceasefire of

8     terror activities.  December 16th, 2001.  And the ceasefire

9     wasn't perfect, but it held for a significant period of time.

10    About four weeks.

11             THE COURT:  You are still giving me more information

12    that is not helpful.  Tell me who the guy is and why he has

13    anything to do with this case.

14             MR. YALOWITZ:  The terrorist who was killed.

15             THE COURT:  Okay, by whom?

16             MR. YALOWITZ:  By the Israeli defense forces.

17             THE COURT:  Not involved in any of the terrorist

18    attacks at issue in the case.

19             MR. YALOWITZ:  Correct.

20             THE COURT:  When you say he was a terrorist, he

21    was convicted of committing some terrorist act?

22             MR. YALOWITZ:  He was killed because he was a

23    terrorist.

24             THE COURT:  Okay.  So when you say "terrorist," and

25    that's -- they have dispute issues with that.  But when you say

160SOK2

1    "terrorist," do you mean that he previously committed a

2    particular terrorist act?

3            MR. YALOWITZ:  He committed many terrorist attacks

4    and --

5            THE COURT:  Okay.

6            MR. YALOWITZ:  -- and managed the financial and

7    operational activities of a group of --

8            THE COURT:  All right.

9            MR. YALOWITZ:  -- warrior brother terrorists.

10           THE COURT:  So he was killed by the Israelis.

11           MR. YALOWITZ:  Correct.

12           THE COURT:  So what does that have to do with the

13   defendant?

14           MR. YALOWITZ:  Immediately after that, the defendants

15   dissolved the ceasefire and started a series of terror attacks.

16   So he is an important part of the chronology that puts the lie

17   to their defense.

18           THE COURT:  What evidence are you going to present,

19   other than temporal proximity, that they engaged in terrorist

20   attacks because he was killed?

21           MR. YALOWITZ:  Marwan Al-Barghouti's confession.

22   Marwan Al-Barghouti's --

23           THE COURT:  Going to say what?

24           MR. YALOWITZ:  I sat in the mourners' tent at Raed

25   al-Karmi's funeral, and said this has to be avenged.

160SOK2

1          THE COURT:  Who said it?

2          MR. YALOWITZ:  Marwan Al-Barghouti said that.

3          THE COURT:  Okay.  And what's the purpose of the

4    photo?

5          MR. YALOWITZ:  Just to help the jury keep track of the

6    guy.  Because there is a lot of guys with Arabic names.

7          THE COURT:  Who cares what this guy is.  He has no

8    other role, other than you say he was designated a terrorist,

9    was killed by the Israelis, and in response, they did further

10   acts of terror.

11         MR. YALOWITZ:  He shows up in other things.  Shows up

12   in documents of terror financing where Arafat is approving

13   direct payments to the guy and his underlings.  So he shows up

14   in the case.  He is not a core player.  But he shows up enough.

15   I just want a board with a picture, so when we talk about him,

16   the jury knows who the heck he is.

17         THE COURT:  I don't think they have a problem with the

18   picture, I think they have a problem with the gun.

19         So if you want a picture of him, that's not a problem.

20   What they have a problem with, is the picture of the gun, so.

21         MR. YALOWITZ:  I wasn't the guy who stood and posed

22   with the gun.  I mean he possessed with the gun.

23         THE COURT:  I'm sure that's not the only picture he

24   posed with.  Which picture are we talking about?

25         MR. YALOWITZ:  Help me out.  I only have -- do you

160SOK2

 1    know, do you have it, Mr. Hill?

 2            MR. HILL:  I only know because you told me, but

 3    according to you, it is the one with the blue background where

 4    the guy is holding some sort of machine gun.

 5            MR. YALOWITZ:  Right.  That's him.

 6            THE COURT:  Is that --

 7            MR. YALOWITZ:  That's him.

 8            MR. HILL:  Part of the objection is there is no

 9    witness who is going to say that's him.

10            MR. YALOWITZ:  Oh, yeah.  Okay.

11            THE COURT:  All right.  So this guy, how are you going

12    to get this picture in?

13            MR. YALOWITZ:  Well, first of all, I don't need it in

14    evidence.

15            THE COURT:  Well, then, you don't show it to the jury.

16            MR. YALOWITZ:  All right, well --

17            THE COURT:  That's the rule.

18            MR. YALOWITZ:  All right.  Then I have somebody who

19    can identify him.

20            THE COURT:  Only what you get in evidence, will the

21    jury see.

22            MR. YALOWITZ:  Fine.  I have somebody who can identify

23    him.

24            THE COURT:  All right.  Are you going to have somebody

25    identify this person?

160SOK2

1          MR. YALOWITZ:  Correct.

2          THE COURT:  And who will that be?

3          MR. YALOWITZ:  Alon Eviatar.

4          THE COURT:  And in what context?

5          MR. YALOWITZ:  I'm going to put his picture up and say

6    who is that.

7          THE COURT:  Okay, all right.  And then again, the

8    context in which the jury is going to look at this photo is

9    this is the person that was killed by the Israels, identified

10   by them as a terrorist and, as a result, after this killing --

11         MR. YALOWITZ:  A slew of suicide terror attacks inside

12   of Israel was begun by the Al Aqsa Martyrs Brigades led by

13   Marwan Al-Barghouti.

14         THE COURT:  And the --

15         MR. YALOWITZ:  Who, by the way, your Honor, just so

16   we're clear, between the date that this guy was killed and the

17   day of the first of these series of attacks, Marwan

18   Al-Barghouti published an Op-Ed piece xxx in the Washington

19   Post saying if the Israelis want security, they have to accede

20   to territorial demands.  And then --

21         THE COURT:  That's politics, that's not terror.

22         MR. YALOWITZ:  Okay, but it's the same guy.

23         THE COURT:  Well, yeah, but what does that -- I don't

24   understand what you are proving by that.  He could have said

25   if -- if they want peace, that they should draw a line in the

160SOK2

1   sand, and they should live on one side and we should live on

2   the other side.  What does that have to do with advancing any

3   issue in this case?

4            MR. YALOWITZ:  Because one of the elements in that

5   case is a -- the apparent intent to influence the conduct of a

6   government through violence.  So when the guy goes and

7   publishes an Op-Ed piece in the Washington Post saying --

8   Washington Post?  What's he doing publishing an Op-Ed piece in

9   the Washington Post if he is not trying to influence the to --

10           THE COURT:  Well, the Pope could have published that

11   same statement --

12           MR. YALOWITZ:  And then he goes and he commands a

13   bunch of terror attacks.

14           THE COURT:  Okay.

15           MR. YALOWITZ:  So it's the same guy.

16           THE COURT:  Okay.  I'm not saying that that is

17   necessarily inadmissible.  I just don't see where you are going

18   to persuade the jury, just because he made that statement that

19   that makes him a terrorist.  But that's not the issue, so I

20   don't really --

21           MR. YALOWITZ:  The issue is, it links him to the

22   apparent intent to influence the policy of the United States

23   government.

24           THE COURT:  How?  I mean that's -- we know that's the

25   political view of every terrorist or nonterrorist on that side

160SOK2

1   of the issue.

2               MR. YALOWITZ:  Usually they don't write it in the

3   Washington Post, though.

4               THE COURT:  Why not?

5               MR. YALOWITZ:  You don't see it.

6               THE COURT:  Everybody says it, right?  Most of them

7   say it.  You don't say that nonterrorists don't hold that same

8   position.

9               MR. YALOWITZ:  I agree with that.  It's -- standing

10  alone, the Washington Post doesn't teach us anything.  Standing

11  alone, the Washington Post is just the Washington Post.

12              THE COURT:  Okay.

13              MR. YALOWITZ:  It's the context of the other evidence.

14              THE COURT:  All right.  So the bottom line is that --

15  how many pictures do you have with guns?

16              MR. YALOWITZ:  There is five in there.

17              THE COURT:  You are going to use four.

18              MR. YALOWITZ:  I'm going to use four.

19              THE COURT:  And three of those individuals --

20              MR. YALOWITZ:  Suicide.

21              THE COURT:  -- are people perpetrating suicide attacks

22  that are at issue in this case.

23              MR. YALOWITZ:  Correct.

24              THE COURT:  And the one is one who was killed by the

25  Israelis, having identified him as the perpetrator of several

160SOK2

1    other attacks?

2            MR. YALOWITZ:  Correct.

3            THE COURT:  And then in response to that, you say the

4    evidence is going to indicate that the defendants decided to

5    increase the level of violence.

6            Is that your theory?

7            MR. YALOWITZ:  To stop their ceasefire.

8            THE COURT:  Okay.

9            MR. YALOWITZ:  Which indicates that they controlled

10   the violence.

11           THE COURT:  Okay.

12           MR. YALOWITZ:  Because they stopped it.

13           THE COURT:  Okay.

14           MR. YALOWITZ:  And started it again.

15           THE COURT:  Okay, all right.

16           MR. YALOWITZ:  And if I may, your Honor?

17           MR. ROCHON:  Your Honor --

18           MR. YALOWITZ:  Did you want to hear from Mr. Rochon on

19   the question of the guns?

20           THE COURT:  If you're finished with the pictures.

21           MR. YALOWITZ:  I'm not finished with pictures.  I'm

22   finished with the guns.

23           THE COURT:  Let me deal with the guns.

24           Do you have anything else to say about the guns?

25           MR. ROCHON:  You can see how far afield we are getting

160SOK2

1    from this evidence that is on trial through this argument.  So

2    in an effort, supposedly, to get this photograph in, we are

3    talking about someone name Marwan Al-Barghouti, who is not

4    ours.  He was a legislator, not a PA employee.  And whether or

5    not he then spoke to people to try to instigate other actions,

6    which are not our actions, right, xxx Carney, the guy they are

7    talking about, supposedly did all of the other terror acts that

8    are not charged or part of the complaint here.  And so the

9    notion that this guy is going to be a big part of the trial, so

10   the notion we need a picture of him with a gun is sort of

11   eating up the general premise, which is we should be here to

12   try seven incidents and any connection to them.  And, suddenly,

13   we are talking about Washington Post Op-Eds by Marwan

14   Al-Barghouti.  There is a great danger if we don't keep this

15   evidence under control of a trial that simply becomes about

16   everything bad that happens over there, as opposed to liability

17   over the seven incidents that are currently before the Court.

18         And Mr. Yalowitz has got a theory of, I guess the

19   Second Intifada, and Marwan Al-Barghouti, and whether this

20   guy's assassination contributed to it.  He doesn't have a

21   statement from the PA saying the ceasefire is over.  He infers

22   that the ceasefire was over because, suddenly, violence

23   occurred.  And the fact that violence occurred is unfortunately

24   all too common during this period.  The question is whether the

25   PA or the PLO should be liable.

160SOK2

1          And so the concern I have is this guy with this gun

2     becomes a vehicle to get in all this unrelated stuff, not

3     related to the complaint.

4          The other thing I constantly need to remind the Court

5     is that there are two defendants on trial.  Every time somebody

6     says he was their guy, you got PLO people, you have PA

7     employees.  Those are two different defendants.  And we have to

8     keep those things separate in the trial, both in comments of

9     counsel, legal rulings, instructions to the jury, as well.

10         So Mr. Yalowicz's argument that starts with this man

11    with the gun, it sprawls into all these ancillary issues that

12    we need to the keep under control.  So we focus on the seven

13    incidents and whether we are liable for them.

14         THE COURT:  All right.

15         MR. YALOWITZ:  I thought we were talking about the

16    guys with the guns, and not having a closing argument.  But can

17    I talk about -- there is two photos that I just want to come

18    back to the Court on.

19         THE COURT:  Go ahead.

20         MR. YALOWITZ:  All right, thank you.

21         The first is, it's 1122.  It's little boy laying on

22    the ground.

23         THE COURT:  1122?

24         MR. YALOWITZ:  Yeah.

25         THE COURT:  Okay.

160SOK2

1              MR. YALOWITZ:  Do you have it before you?

2              THE COURT:  Yes.

3              MR. YALOWITZ:  All right.  I know you have seen it.

4      It's a little boy laying on the ground, seven years old.  That

5      is one of the plaintiffs, your Honor.

6              THE COURT:  That's one of the plaintiffs?

7              MR. YALOWITZ:  Yeah.

8              THE COURT:  Let me just find the photo.

9              MR. YALOWITZ:  And the man leaning over him talking on

10     the phone, is his dad.

11             THE COURT:  Sorry just a sec.  What is before or after

12     that?

13             MR. YALOWITZ:  Well, it's --

14             MR. ROCHON:  The one after -- I think would be this

15     one, Judge.

16             THE COURT:  Okay, the head shot.

17             MR. ROCHON:  That's the one after.  The one he is

18     referring to is this one.

19             MR. YALOWITZ:  Thank you.

20             THE COURT:  You say 1122?

21             MR. YALOWITZ:  1122, yeah.

22             THE COURT:  All right.  Quite frankly, this is one of

23     my borderline photos.  So having told me that this is one of

24     the plaintiffs, I'm going to allow that one in.

25             MR. YALOWITZ:  Thank you.  Thank you, your Honor.

160SOK2

1          THE COURT:  My position is still the same as to the

2     others.  Unless you have some specific thing to argue, other

3     than this shows --

4          MR. YALOWITZ:  Well, the only one I want to reserve on

5     that we have already discussed it is the head of Wafa Idris.

6     And I want to the reflect on it.  And as we go through trial, I

7     understand right now your Honor's inclination is not to admit

8     it because of 403, but maybe when you hear the testimony, you

9     might revisit it.

10          THE COURT:  I can't think of any of the photos, or few

11     of the photos, that are more prejudicial than that.

12          MR. YALOWITZ:  Well, that's kind of the point of

13     having lived through it, isn't it?

14          THE COURT:  Not necessarily.

15          MR. YALOWITZ:  All right.  Well, as I said, I --

16          THE COURT:  I mean the point is, is that, you know,

17     certain things occur to certain people.  The fact that you have

18     the body part of a terrorist, you know, that's not as

19     significant as the victim who is the plaintiff who is laying on

20     the ground.

21          MR. YALOWITZ:  Understood.  Look, I understand your

22     Honor's rulings.  And in limine rulings are always subject

23     to -- I'm not saying I'm going to come back, but I'm not saying

24     I'm not going to come back, that's all I'm saying.

25          THE COURT:  If the case develops to where that seems

160SOK2

1    to be, as things gel that seems to be the claim or the defense,

2    then you can deal with that.

3        MR. YALOWITZ:  Right, thank you.

4        THE COURT:  I'll tell you on the other pictures, the

5    guns, on the issue of the people who are supposedly or

6    allegedly or actually the perpetrators of the acts in question,

7    I don't have any problems with those photos.  So borderline of

8    the photo of this other person, I think has minimal probative

9    value, but in light of those other photos, I don't think it has

10   a particularly significant prejudice to the defendant because a

11   person who is killed is photographed.

12       MR. HILL:  This may go without saying, but I assume

13   the plaintiffs are going to have to put on a sponsoring witness

14   authenticate that the photos are --

15       THE COURT:  They will be identified and authenticated.

16       MR. HILL:  I don't think they have a witness with a

17   factual knowledge, but we'll sort that out at trial.

18       THE COURT:  I need a witness who is going to say who

19   this person is.  I don't need a witness who took the picture, I

20   need a witness who says they recognize that photograph and can

21   identify it, and it is actually the photograph of the person

22   who they are identifying it to be.  That there is no genuine

23   dispute about that.  Then that's a normal foundation to come

24   in.

25       MR. YALOWITZ:  I should say, you know, I keep hearing

160SOK2

1   this kind of malarkey about foundational witnesses.  There is

2   no genuine dispute of who these photographs are of.

3           THE COURT:  That's fine but I'm not going to relieve

4   you of all of your obligations.

5           MR. YALOWITZ:  I get it, I get it.  I'm not shirking

6   my obligations.  But this case is gonna go on for a very long

7   time, if every time we offer an exhibit there is a pop-up from

8   the defendants and a sidebar about, you know --

9           THE COURT:  That's not going to happen.

10          MR. YALOWITZ:  All right, thank you.

11          THE COURT:  That's why I am spending the time, now, to

12  give you some guidance.  And my guess is that pretty much when

13  you get to each exhibit you are going to pretty much know what

14  my position is with regard to that type of exhibit, and the

15  purpose for which you are offering it, and what you need to do

16  to get it in evidence.  So that's my view with regard to the

17  photographs.

18          MR. YALOWITZ:  Thank you.

19          THE COURT:  And we can put that aside.  And, then, I

20  can always give you a further ruling with more information in

21  the context of how this trial develops.

22          Let me just move on quickly to.

23          THE COURT:  We also need, before we can print the

24  questionnaire, we need a final version of the attachment.

25  There is supposed to be an attachment.  I believe a number of

160SOK2

1  witnesses, potential witnesses, I think that was the

2  attachment.

3        MR. HILL:  Well, the parties exchanged updated witness

4  lists yesterday, so it would be relatively easy to come up with

5  that list of names and get it to your Honor.

6        How shall we do that, mechanically?

7        THE COURT:  E-mail it to my law clerk, so we can just

8  attach it and have it.  So we are making copies and ready for

9  the jury for tomorrow morning.

10        MR. HILL:  We'll do that, as soon as we get to the

11  computer.  I know you need it tonight, so we'll get it to you

12  as soon as we can.

13        THE COURT:  Defendants have a request with regard to

14  using the words, *terror, terrorist, terrorism*.  I am not

15  comfortable saying that there is gonna be some blanket rule

16  that nobody can use those terms.  I mean you have to give me --

17  I mean I know that there is some proffer, and I'm still working

18  on that.  Between now and Monday, I know there is some proffer

19  of expert testimony about who is supposed to be a terrorist and

20  what euphemisms there are for terrorism and that kind of stuff.

21  Some of which I think is inadmissible.  But I don't -- I mean,

22  look, the statute that defines terrorism, and I will define

23  terrorism.  And if the parties are misusing that term, the

24  other side, or the Court can make it very clear that that is

25  not an appropriate use of that term.  And the appropriate use

160SOK2

1    of the term is the legal term that they have to decide.  And

2    so, you know, I will be careful to watch the misuse of that

3    term.  But as a blanket statement, I'm not going to say people

4    can't use that term.  But use it in what you think is an

5    appropriate context, given the nature of the claims in this

6    case.  But I will entertain any motions on a

7    question-by-question basis.  If it appears to me that it is

8    being misused, the -- I'm not sure whether there is an issue

9    left, although there is some discussion from the parties, there

10   is an issue left with regard to, quote, "inflammatory rhetoric"

11   about the Israeli/Palestinian conflict.  I think I made clear

12   it is out, period.  I mean it's not -- particularly, if there

13   are statements that are made by people, other than officials or

14   representatives of the PA or the PLO are clearly not

15   admissible, let me put that first, say that.  So, you know, you

16   can -- these statements about what people say, or children say,

17   or what newspapers say, there is no admissibility for that.

18   And, particularly, if it simply demonstrates animosity toward

19   Israel, you know, as they say, that's not going to be a

20   surprise to the jurors in this case, that people on both sides

21   are gonna make statements with heightened rhetoric with regard

22   to the other side.

23          So, you know, poems about pigs and statements about

24   fangs and all of that --

25          MR. YALOWITZ:  Statements about?

160SOK2

| 1 | THE COURT:  Fangs. |

2          -- has no probative value.  Particularly, I don't

3     think any of these statements that were alluded to are

4     statements that are being attributed to PA or PLO officials.

5          MR. YALOWITZ:  I just want to be crystal clear about

6     this.

7          THE COURT:  Yeah.

8          MR. YALOWITZ:  The defendants cherrypicked some

9     statements and put them in a letter, late last night, and then

10    they attached a huge exhibit.  Filled, you know, a huge list

11    and misrepresented to the Court that that list contains the

12    things that they quoted.

13         THE COURT:  Yeah.

14         MR. YALOWITZ:  So I don't -- I understand the Court's

15    ruling.

16         THE COURT:  Yeah, I'm not --

17         MR. YALOWITZ:  The core evidence, which is very, very

18    inflammatory.  I'll tell you, it is very inflammatory.  The

19    core evidence is the defendant's own statements, especially

20    their statements to their own police in their political

21    guidance magazines which are printed and created by an official

22    organ of the Palestine authority called the Directorate for

23    Political Guidance.  And those magazines are distributed for

24    the benefit and education of the police force.  And they have

25    got some of the most hateful things in them.  And that goes to

160SOK2

1    respondeat superior.  That goes to what is the policy, what is

2    the scope of employment, what are you telling your security

3    forces to do when you say stuff like:  Make a bloody sacrifice

4    for the State of Palestine.  Or:  The Jews are the scourges of

5    the earth.

6            THE COURT:  Well, I'm going to put it to you this way.

7    You may get the first statement or something similar to the

8    first statement, but you are not going to get the second

9    statement.  If you are going to --

10           MR. YALOWITZ:  Your Honor, it's their words, not mine.

11           THE COURT:  If you say you have some statement --

12   listen, if you say you have some statement that is a statement

13   about what they are telling the people to do, to do, that's one

14   thing.  And you say that what they are telling them to do is to

15   do violence, that's one thing.  But if you are just saying they

16   are calling them bad names, no, that's not -- that doesn't

17   bring you to a violent terrorist act.  So if to the extent --

18           MR. YALOWITZ:  It's incitement, your Honor.

19           THE COURT:  If you have statements by representatives

20   of the PA or PLO directing acts of violence, specifically

21   directing acts of violence, I may allow you to present that.

22   But simply by saying I think they are bad people, or I think

23   they are X, Y, Z, don't you hate them, no, that's -- that's --

24           MR. YALOWITZ:  Well, wait a minute, wait a minute,

25   wait a minute.

160SOK2

1          THE COURT:  No.

2          MR. YALOWITZ:  Wait a minute.  Could you imagine if

3     the New York police department had a political guidance unit

4     and distributed to all of the officers in the field which said:

5     Red-headed men are the worst of the world --

6          THE COURT:  Right.

7          MR. YALOWITZ:  -- and this is in a time, and in an

8     environment, where people are shooting red-headed men.

9          THE COURT:  Okay.  So how does that advance the

10    argument that the police officers killed the red-headed man.

11         MR. YALOWITZ:  We have already got convictions of the

12    police officers.  This goes to scope of employment.  This goes

13    to scope of employment.  They are saying, these defendants sit

14    here in the courthouse and say, oh, these were rogue employees.

15    But their own words will bury them, your Honor, because those

16    words are words in which they are encouraging and inciting the

17    very violence that is occurring.

18         THE COURT:  Any statements that you have that are

19    telling people to commit violence, I will allow.  But simply

20    statements that, I don't like these people, they are bad

21    people, no.

22         MR. YALOWITZ:  Well, it's not just explicit

23    statements.

24         THE COURT:  I agree.  And I'm telling you it is just

25    explicit statements in this case.  Unless you can tell me,

160SOK2

1   specifically, what statement you say that the jury's more

2   reasonable conclusion is that this means that this person is

3   more likely telling them to commit an act of violence, as

4   opposed to not commit an act of violence.  So if you can give

5   me some statement that I can say that a reasonable jury could

6   conclude that that says go out and do an act of violence, I'm

7   likely to give you that.

8           MR. YALOWITZ:  All right.

9           THE COURT:  But that statement is not just bad --

10  calling the other side bad names.

11          MR. YALOWITZ:  What I'm going to do is I'm going to go

12  back and look at these magazines with that in mind.  And I'm

13  going to send you the set that I think complies with your

14  order.  Because I don't want to get tripped up on this.

15          THE COURT:  You are going to have to identify who you

16  say is making this statement.

17          MR. YALOWITZ:  That's not going to be a problem.  We

18  have expert testimony, very familiar.  These are published.

19  These are magazines published by the defendant's Department of

20  Political Guidance, which exists for the purpose of educating

21  the police force on their duties and responsibilities and the

22  way they should discharge them.

23          THE COURT:  If you have some evidence in those

24  documents, in those publications that are directing the police

25  officers to conduct acts of violence, then there is a good

160SOK2

1    chance I will allow you to put that in.

2           MR. YALOWITZ:  I'm going to look at them.

3           THE COURT:  Simply saying you shouldn't trust them and

4    you shouldn't like them, and you should hate them --

5           MR. YALOWITZ:  Well, you should hate them.  In the

6    context of they have got 700 guys in jail for killing

7    civilians --

8           THE COURT:  Okay.

9           MR. YALOWITZ:  -- and they published political

10   guidance saying, dehumanizing the very people that are being

11   murdered.  And I mean that's incredibly powerful evidence of

12   scope of employment.

13          THE COURT:  That they committed the murder?

14          MR. YALOWITZ:  That they committed it consistent with

15   the policy of the defendant.

16          THE COURT:  All right.

17          MR. YALOWITZ:  And within the scope of their

18   employment.

19          THE COURT:  I am not simply going to allow you to put

20   in heightened rhetoric that are not evidence directly of

21   directing someone to commit an act of violence.

22          MR. YALOWITZ:  I think --

23          THE COURT:  So you should tell me what language you

24   want to use, and why you think this is indicative of a signal

25   to do a terrorist act, and convince me that that is the natural

160SOK2

1    way, the ones you put to that.  I assume you have just as many

2    strong statements that are unrelated to acts of violence.

3         MR. YALOWITZ:  I'm not sure I'm following your Honor,

4    but I'm going to look at them and I'm going to send them to

5    you.

6         THE COURT:  All right.  Well, that's my guidance at

7    this point.

8         MR. YALOWITZ:  All right.

9         THE COURT:  I have not looked at the videos, but I'm

10   not sure what the purpose of the videos is supposed to be.

11   What do you say the videos demonstrate?

12        MR. YALOWITZ:  I'm sorry, what videos are we talking

13   about, your Honor?

14        THE COURT:  Suicide killers for sake of Allah, and the

15   raw footage.

16        MR. YALOWITZ:  So I'll give you an example.  There is

17   a woman who was a driver.  She drove Mohamed Hashaika into

18   Jerusalem, snuck him in in order to help him blow himself up in

19   front of civilians.  She guided him to the spot.  She told him

20   Allah will grant you paradise, you know.

21        THE COURT:  So what does that have to do with he

22   video?

23        MR. YALOWITZ:  She says that on the video.  She says

24   this is what I did.  It is an interview of her.

25        THE COURT:  It's an interview of her by whom?

160SOK2

1        MR. YALOWITZ:  Documentary filmmaker, interviewed her

2    in jail.

3        THE COURT:  Okay.  And you want --

4        MR. YALOWITZ:  To play the video.

5        THE COURT:  It is evidence of what?

6        MR. YALOWITZ:  Evidence that she did it.

7        THE COURT:  It is her admission of her involvement in

8    the act, is that what you are trying to say?

9        MR. YALOWITZ:  Correct.

10       THE COURT:  Okay.  Is that the suicide killers?

11       MR. YALOWITZ:  I think it's called *Brides of Allah*.

12       THE COURT:  And this is a portion of this video you

13   want to play?

14       MR. YALOWITZ:  Correct.

15       THE COURT:  How much of a portion of the video?

16       MR. YALOWITZ:  Two minutes, three minutes; something

17   like that.

18       THE COURT:  And the portion of the video is her

19   saying, what?

20       MR. YALOWITZ:  Her saying:  I guided him to the --

21       THE COURT:  Guided who?

22       MR. YALOWITZ:  I guided the suicide bomber to the

23   spot.  I told him Allah will protect you, Allah will grant you

24   paradise.  He blew himself up.

25       THE COURT:  What is the point you are trying to make?

160SOK2

1          MR. YALOWITZ:  She did it.

2          THE COURT:  What does that have to do with this case,

3     that's what I'm asking.  She is, who?  What is her relationship

4     to this case?

5          MR. YALOWITZ:  She was convicted of --

6          THE COURT:  I know.  But is she a PA employee.  What

7     is the relationship to this?

8          MR. YALOWITZ:  She was recruited by PA employees to

9     join the conspiracy, and then the PA put her on the payroll as

10    a reward for her actions.

11         THE COURT:  All right.  So you want to show that

12    portion of the video where she admits doing the act.

13         MR. YALOWITZ:  Correct.

14         THE COURT:  And you want to offer independent evidence

15    that, after she did the act, she was rewarded by the PA; is

16    that it?

17         MR. YALOWITZ:  Correct.

18         THE COURT:  Okay.

19         MR. YALOWITZ:  You got it.

20         THE COURT:  Okay, all right.

21         MR. ROCHON:  When counsel says "rewarded," I think we

22    all agree what he is talking about is regular prisoner payments

23    that they all get, not suggesting something other than the

24    regular payments that are made.

25         THE COURT:  I am not sure he is not suggesting.  I

160SOK2

1    mean you call it "regular payments."

2              MR. ROCHON:  I know.  But all of them get them.  He

3    said "rewarded for this." I know that is his

4    characterization --

5              THE COURT:  Is it the "all of them get them" that you

6    don't want before the jury, is that what we're talking about?

7              MR. ROCHON:  If one were listening to this record, one

8    would think that there is something special for this act,

9    because he said "rewarded."

10             THE COURT:  That's what he is trying to let the jury

11   consider.

12             MR. YALOWITZ:  I think the jury could draw that

13   inference.

14             THE COURT:  They are saying that, look, if you get

15   killed by a terrorist attack, you get a payment.  If you get

16   run over by a truck, you don't get a payment.  There is some

17   logic to that, isn't it?

18             MR. ROCHON:  If you get locked up by the Israelis, you

19   get a payment.  She is locked up by Israelis.  Her payments are

20   related to being locked up.

21             THE COURT:  I know, but this is a factual issue that

22   can go before the jury.  But the bottom line is that, look, I

23   don't know whether you are going to be able to make these

24   links.  But the bottom line, if there is only that portion of

25   that tape that you want to play where she is admitting that she

160SOK2

1   committed the terrorist acts, consistent with all of my other

2   rulings, I don't see any reason why that, in and of itself, is

3   inadmissible.  Is there some reason why that, in and of itself,

4   is inadmissible?

5           MR. HILL:  First of all it's the first time we ever

6   heard that they want to play two minutes.  In discovery, we

7   have had no idea what they wanted to offer, now we know it is a

8   portion.  So if we could have a specific timestamp for each of

9   these of what they actually want to offer, that would help us

10  figure out whether or not we have a continuing objection to it.

11  But this is an out-of-court statement offered for the truth of

12  the matter asserted by an unsworn declarant.

13          THE COURT:  But it is a statement against penal

14  interest.

15          MR. ROCHON:  No, your Honor.  She's serving a life

16  sentence.  There is no possibility that criminal liability will

17  attach to -- will attach to her making this statement.

18          THE COURT:  No, that's not true.  That's never true.

19  Anything could happen.  They could decide to pardon her.  She

20  could decide that she is so sorry, or so old that they should

21  let her go.  They may decide that they will never let her go

22  because she never shows a single ounce of remorse.

23          MR. ROCHON:  They did, in fact, release her.

24          THE COURT:  Well, then I'm saying that belies your

25  argument.  That their argument is it doesn't make it not a

160SOK2

1  statement against penal interest simply because she's is

2  already in jail.

3            MR. ROCHON:  Yes.

4            MR. HILL:  Yes, it does, your Honor.

5            THE COURT:  Most people who make a statement of penal

6  interest are in jail when they make those statements.

7            MR. HILL:  No, but most of these statements are

8  preconviction.  This is a post-conviction statement.  The rules

9  are very clear.  It has to be against her interest, because it

10  could lead to criminal liability.  This is someone who was

11  already suffering criminal liability for the crime that is

12  stated here.  So it might have been against her penal interest

13  to make this statement before she was convicted.  But post

14  conviction, she cannot receive any additional criminal

15  liability.  As opposed the sentence, I understand that point.

16  But that's not what the rule says.  The rule talks about

17  criminal liability.  So she's already adjudged liable of this

18  crime at the time she makes the statement.  So the statement is

19  not against her penal interest at that point, because she is

20  already liable.

21            THE COURT:  All right.

22            MR. HILL:  So it can't come in for the truth of the

23  matter asserted.  And then the question is well, why would it

24  come in?

25            THE COURT:  You don't dispute the truth of the matter

160SOK2

1    asserted.

2            MR. HILL:  Well, that's the other point.  If you are

3    going to allow the conviction, this is purely cumulative.  What

4    Mr. Yalowicz is telling you is this is outrageous stuff.  It

5    talks about how this is God's will, and she praises God, and

6    stuff like that.  It's going to be very inflammatory to the

7    jury to hear this person saying these things, as opposed to

8    establishing the fact of her involvement in the crime.

9            THE COURT:  Very few people don't say those things.

10           MR. HILL:  Well, it's gonna be more prejudicial than

11   probative.  It's going to be cumulative.

12           THE COURT:  All right.  Everyone involved in these

13   acts make those statements.

14           MR. HILL:  Yes.  And they are prejudicial.

15           THE COURT:  Not unexpected by a jury.

16           MR. HILL:  But they not probative of the defendant's

17   liability.  This is a nonemployee making essentially a

18   political or religious statement about the crime, that there is

19   independent evidence of that you have indicated you are going

20   to admit.  So if it's the facts of the crime that the

21   plaintiffs want to prove, this is cumulative of that fact.

22           THE COURT:  Well, the plaintiff should give you what

23   portions they want to play.

24           MR. HILL:  Fair enough.

25           THE COURT:  And I'll rule on it.  If it is already

160SOK2

1    evidence that she has committed this crime, and the evidence is

2    that they may give her payments after committing this crime.  I

3    mean I don't even know what the sequence of events is.  Is it

4    that she was given these payments before or after she made this

5    video.

6              MR. ROCHON:  Before.

7              MR. YALOWITZ:  Both.

8              THE COURT:  So the payments began before she made the

9    video.

10             MR. YALOWITZ:  Correct.

11             THE COURT:  I assume the payment your client --

12             MR. YALOWITZ:  One could argue that it is a statement

13   by an employee.

14             THE COURT:  Well, I don't know.

15             MR. YALOWITZ:  Within the scope of her employment.

16             THE COURT:  I don't know.  Was she employed at the

17   time?

18             MR. YALOWITZ:  Well, they put her on the payroll.  I

19   think there is a fact dispute about whether or not that makes

20   her an employee.

21             THE COURT:  I don't think that is a fact dispute.

22   about whether that makes her an employee.  If she's an

23   employee, she's working for them.

24             MR. YALOWITZ:  Well, she's in jail.

25             THE COURT:  Well, so then you have to tell me what she

160SOK2

1    is being employed as.

2              MR. YALOWITZ:  Apparently to spread around propaganda.

3              THE COURT:  What?

4              MR. YALOWITZ:  Apparently to spread around propaganda.

5              THE COURT:  Well, that's a nice theory, but I'm trying

6    to figure out whether you are making that up as you go, or you

7    have some proof.

8              MR. YALOWITZ:  I think it is an admission against

9    penal interest.  I think it's pretty obvious.  Mr. Hill just

10   has the wrong clip in mind about God's will, and so on.

11             THE COURT:  You tell me exactly what portions you are

12   going to play.

13             MR. HILL:  There's three videos, so we're going to get

14   the specific information.

15             THE COURT:  What's the other tape?

16             MR. YALOWITZ:  Other tape is Adbullah Barghouti, the

17   bomb maker.

18             THE COURT:  What is the purpose of offering his

19   statement?

20             MR. YALOWITZ:  Again, he describes his crimes.

21   Describing his crimes.

22             THE COURT:  Okay.  So what's the purpose of that?

23             MR. YALOWITZ:  To show that he did it.

24             THE COURT:  Well, I thought you already showed that he

25   did it.

160SOK2

1              MR. YALOWITZ:  Well, to bring life to the -- it's one

2      thing to have a paper conviction.  It is another thing to see

3      the person, and they -- it gives the --

4              THE COURT:  So this is in what context, just another

5      jailhouse interview?

6              MR. YALOWITZ:  Correct, correct.

7              THE COURT:  Okay.  And he says I did it?

8              MR. YALOWITZ:  Correct.

9              THE COURT:  And other than just --

10             MR. YALOWITZ:  I want to --

11             THE COURT:  -- using that to further emphasize the

12     fact that he did it, is there a purpose, is there a related

13     purpose?

14             MR. YALOWITZ:  It's to give life so that the jury

15     understands what is involved.

16             But with regard to Abdullah Al-Barghouti, I want to

17     take a look.  Because I'm not as sure of what, if anything, I'm

18     going to use on that.

19             THE COURT:  All right.

20             MR. YALOWITZ:  So if I'm going to use something on

21     that, I will send it to Mr. Hill.

22             THE COURT:  Is that *For the Sake of Allah*.

23             MR. YALOWITZ:  *For the Sake of Allah*.

24             THE COURT:  If you are going to use anything on that,

25     you should send it to them before Monday.

160SOK2

1          MR. YALOWITZ:  You got it.  I'm sorry, before when?

2          THE COURT:  Monday.

3          MR. YALOWITZ:  All right.

4          THE COURT:  All right.  Let them know if you think

5    there is any possibility that you are going to use it.  You

6    should tell them what it is.  You can always change your mind

7    not to use it.  But I'm not going to let you say you are not

8    going to use it and then you say, yeah, we're going to do it.

9          What's the difference between the footage and raw

10   footage.  I don't understand the point of that.  Do you have

11   some reason to want to play both the footage

12         MR. YALOWITZ:  No, I'm not going to play both.  Trust

13   me, we're not going to watch hours of irrelevant video.  I told

14   you, I have been doing this a long time.  I'm not going to

15   screw it up.

16         THE COURT:  I certainly hope not.

17         MR. YALOWITZ:  And you're not going to let me.

18         THE COURT:  Indeed, I wouldn't let either side.

19         MR. YALOWITZ:  And I'm not going to let you screw it

20   up.

21         THE COURT:  I hope not.

22         All right.  Inflammatory rhetoric.  You know, you have

23   not had an opportunity, I'll just put it that way, yet, to

24   respond to stuff about the newspaper Articles and that sort of

25   thing.

160SOK2

1           MR. YALOWITZ:  You mean the stuff that came in after

2   the close of business last night?

3           THE COURT:  Yeah.

4           MR. YALOWITZ:  Yeah, I have not had an opportunity to

5   read that, right.

6           THE COURT:  You can respond to that, but I can give

7   you my general --

8           MR. YALOWITZ:  That's great.

9           THE COURT:  -- view.  In the abstract, that newspaper

10  article, unless you are offering a quotation, word for word,

11  from a representative of the PA and the PLO, newspaper articles

12  about what they think is going on over in the Middle East are

13  not particularly probative or admissible.  I couldn't care less

14  what Time Magazine thinks, or what the BBC thinks is going on.

15          MR. YALOWITZ:  Well, the BBC has, for example, video

16  of Arafat, so I want to show video of Arafat.

17          THE COURT:  As I said, that may or may not fall into

18  the category that I just gave you.  I have not seen it.  So if

19  there is a statement by Yasser Arafat that you believe is a

20  statement to be attributed to the PA or PLO, and that statement

21  is evidence of an element of the claim that you have brought

22  here, then it is a statement by the defendants, admission by

23  defendants, and it is admissible.

24          MR. YALOWITZ:  Thank you.

25          THE COURT:  But just the characterization by some

160SOK2

1    reporter, or the opinion of some reporter, about what is going

2    on, I don't see how any of that --

3              MR. YALOWITZ:  Well, that's not going to happen.

4              THE COURT:  All right.

5              MR. HILL:  There is a large volume of these materials.

6    Could the plaintiffs be directed to identify the particular

7    statements they are planning to offer so we can raise it with

8    the Court if we have any issues?

9              THE COURT:  Well, I don't know, I mean --

10             MR. YALOWITZ:  That's just busy work, your Honor.  I'm

11   really trying to get my witnesses ready.  I'm trying to get my

12   opening ready.  We have done so much busy work for these --

13             THE COURT:  The only thing I'm going to say is that I

14   would suggest that you identify with them as specifically as

15   possible what you intend to offer --

16             MR. YALOWITZ:  And let me just say another thing, your

17   Honor.

18             THE COURT:  -- because I'm not going to spend a lot of

19   time.  I would say there is a basic rule of trying a case.  You

20   give me 30 seconds to make a decision, you are going to get 30

21   seconds worth of thought.

22             MR. YALOWITZ:  I agree.

23             THE COURT:  If you give me a week to make this

24   decision, I might say you are going get a week's worth of

25   thought, but at least you will get a more thoughtful response.

160SOK2

1    I'm not going to spend any time arguing about why they didn't

2    know you were getting ready to offer this portion of this text.

3    And that rule goes for both sides.  So you'd better be real

4    clear about what it is that you think you are going to offer,

5    and real clear that it is not a surprise to the other side.

6              MR. YALOWITZ:  Let me just say, your Honor, I invited

7    the defendants to my office months ago.  And they rebuffed it.

8    I was prepared to sit with them well in advance of trial and

9    talk through every exhibit.  And they told me to buzz off.

10             THE COURT:  All right.

11             MR. YALOWITZ:  So for them to sit around, now, and

12   say, oh, it's unfair surprise, I was ready to be transparent

13   with them.  And they rejected the offer.  So I'm fully prepared

14   to -- you know, I have looked at my evidence.  I have sent

15   thing to you that I think may be an issue I want to get before

16   you.  But I'm not going to sit there, now, and go through,

17   exhibit by exhibit, on a blanket basis --

18             THE COURT:  The only thing that I'm going to evaluate

19   at the time is whether or not, in fairness, there is any reason

20   not to let you go forward simply because they now argue

21   surprise.

22             MR. YALOWITZ:  I understand.

23             THE COURT:  So you make your own judgment about

24   whether or not it is reasonable, logical, and fairly clear to

25   them what it is that you would want out of these articles or

160SOK2

1    these things you intend to offer.  Because I'm not going to

2    spend a lot of time, in the middle of the trial spending the

3    jury's time, having to go through, word for word, articles.

4            MR. YALOWITZ:  I agree.

5            THE COURT:  I'm going to ask you a very simple

6    question.  Show me the language that you want to put in front

7    of this jury, show me the language that you don't want in front

8    of this jury, and tell me why.  And then I'm going to rule and

9    we'll move on.

10            MR. YALOWITZ:  Good.

11            THE COURT:  If I even bother to ask that.

12            All right.

13            MR. ROCHON:  The only thing we offer on that issue is

14    Mr. Yalowitz has said, we've talked about videos.  And there at

15    least you know who is making the statement.  The newspaper

16    articles, no matter if they have got quotation marks around it

17    and it's coming from the PA employee of all time, allegedly, it

18    is just a newspaper article that cannot establish the person

19    who said it.  Newspaper articles, it will not come as a great

20    surprise, frequently misquote people, and not a way to prove

21    what a person said.  If the Court gives that additional

22    guidance, then Mr. Yalowitz will be on notice, right now.  I'm

23    concerned he can still put in a newspaper article because it

24    purports to quote Yasser Arafat.

25            THE COURT:  Well, you are right, that is not the rule.

160SOK2

1    And he's required to lay a proper foundation for its

2    admissibility.  Now, whether he can or cannot is a different

3    question.

4              MR. ROCHON:  Agreed.

5              THE COURT:  But, you know, I can't deal with that

6    issue.  If somebody wants to -- you know, I mean there are a

7    number of different ways to do this.  Somebody can say they

8    heard him say it.  Somebody can say they heard him say it on

9    that occasion.  Or heard them saying it many times in the past.

10   Or there can be some reason why it is clear that, from the

11   context, that the statement is a reliable statement.  I don't

12   know.  I don't know about the foundation.

13             But, in general, my position is that nothing short of

14   direct quotations from representatives of the defendant that

15   you are attributing to them as admissions, is admissible.

16   Unless you give me some other reason why I care, as they say,

17   Time Magazine, or the jury should care that Time Magazine, to

18   the extent that the statements are presented in a way that

19   there is reliability to the fact that the person made the

20   statement.  And I can rule on whether or not I think this is

21   sufficient basis for reliability to come into evidence.

22             So if there is some critical statement that you want

23   in, Mr. Yalowitz, and you want to know very early on whether

24   you are going to get that in, then I suggest that you do

25   discuss it with the other side to see if they are going to

160SOK2

1    fight about it, so that you could be prepared to give me a

2    convincing argument of why it should go in, and why it should

3    go in in the form that you say it should go in.

4          MR. YALOWITZ:  Let me give you three thoughts on that,

5    your Honor.

6          First of all, there is no more "very early on."

7          Second of all, I am assured that whatever I say to the

8    defendants, they will object to everything I do.

9          Third of all, I know the rule.  I am not gonna offer

10    newspaper articles for the truth.  There may be some other

11    reason we want a newspaper article.  It may be that a guy is

12    quoted saying I'm a terrorist and I'm proud of it.  And then

13    you wonder, well, why does his employer keep him on the

14    payroll.  He is out in public and they are on record notice

15    talking about how -- he is on the record talking about how he

16    is a terrorist and they keep him on the payroll.  That may be

17    admissible for notice.  But I don't really -- I am not offering

18    statements like that for the truth.

19          MR. ROCHON:  Well, your Honor, I guess I know Mr.

20    Yalowitz said the rule of admissibility, as he knows the rules.

21    But the notion that you get to put in a newspaper article, not

22    for the truth because someone's supposedly said something

23    there.  And from that, you are supposed to infer that other

24    people read it and are on notice of it, suggests that we need

25    your help, not relying on Mr. Yalowitz for the rules of

160SOK2

1    evidence here. Because that should not come in.

2            MR. YALOWITZ: Oh, please.

3            THE COURT: Look --

4            MR. YALOWITZ: Your Honor, this is going to be a very

5    long trial if there is going to be personal sniping like this.

6            THE COURT: No, it's not going to be a very long trial

7    because of personal sniping. The bottom line is, look, I can't

8    rule until I see it, and I see it in context.

9            MR. YALOWITZ: Right.

10           THE COURT: Until you present it to me, and tell me

11   what context you want it, I'm not going to rule. But I'm

12   telling you, now, this is very helpful to me, because I know

13   the various possibilities here. And I know what my reactions

14   are to various possibilities. And I can tell you, right now,

15   just because something is in a newspaper article, doesn't

16   necessarily follow that you have gotten it admitted in evidence

17   as to notice, if there is no reasonable way for anybody to

18   conclude that the person sitting in the West Bank that you want

19   to say had notice, happened to turn on BBC that day and see the

20   broadcast.

21           MR. YALOWITZ: I agree. You have to contextualize it,

22   you have to understand why it is germane, and why a jury could

23   reasonably infer that they got notice from it.

24           THE COURT: All right.

25           MR. YALOWITZ: I understand that.

160SOK2

1              THE COURT:  All right.

2              MR. ROCHON:  Well, your Honor, just so it is clear, we

3     are objecting --

4              MR. YALOWITZ:  I took evidence from Judge Weinstein, I

5     still remember it.

6              MR. ROCHON:  I don't know what grade he got, but it

7     was a while ago.

8              MR. YALOWITZ:  I got an E.

9              MR. ROCHON:  Evidence.  For evidence.

10             MR. YALOWITZ:  What did you get?

11             MR. ROCHON:  Your Honor, we object to any evidence

12    coming in, of these statements, supposedly not for the truth

13    because they give notice, unless we get -- we're objecting to

14    that.

15             THE COURT:  All right.

16             MR. ROCHON:  And I know Mr. Yalowitz says we are

17    slippery and all that.  We have got a thousand exhibits.  He

18    has not yanked one since you started giving your preliminary

19    rulings.  We got a list yesterday that's the same list all

20    along.  So how are we supposed to know what he's going to use

21    or not.  You have already given a lot of indication as to what

22    is in or not.  It has not changed the exhibit list yet.

23             THE COURT:  So he's still going to try to get it in.

24             MR. ROCHON:  Well, if he is, in the face of what you

25    have said, he ought to put us on notice and let us argue it

160SOK2

1    with you.  He says it is gonna be a long trial.  We are not

2    going to waste the jury's time if we can get through this now

3    and he's got some clear instructions that he is not going to be

4    able to put in prejudicial statement, saying, oh, it's not for

5    the truth, the oldest trick in the book and then say, oh, it is

6    for notice.  I have been dealing with this not for the truth,

7    it's prejudicial for 30 years.  Everybody pulls the*, it is not*

8    *for the truth*, when in fact we all know it is a damaging

9    statement and the most likely interpretation of it is for the

10   truth.  So we need to get some clarity here.

11          THE COURT:  This is the ruling that I'm going to

12   impose, and I impose in cases where I have lawyers who can't

13   resolve this on their own.

14          I want the other side to have a list, the day before,

15   of every exhibit that you intend to offer in evidence the next

16   day.  That is going to be the rule in this trial for both

17   sides.  If they have not seen it at least the day before, then

18   it is not coming in by that ruling, okay.  Very simple.  So my

19   suggestion is that you get it to them early, and you make sure

20   that they have it, and you make sure that they know exactly

21   what is the accurate list.  And if I find that you are giving

22   them a list of a thousand exhibits the day before and you are

23   using 10, then I'm going to consider that that is an abuse of

24   the process, and I'm going to think about imposing some

25   sanctions.  So let's be reasonable about this.  As you can

160SOK2

1    understand, we are at the point where there is no more guessing

2    and theorizing about this.  It is time to make up your mind

3    about what evidence you can reasonably get in before this jury

4    and what you are going to ask the jury to determine.

5              So you should be ready a week from today to know

6    exactly what exhibits you are putting before the jury and how

7    you are going to argue the case, coupled with the guidance that

8    I'm trying to give you, now, with regard to these other issues,

9    and then we'll take a short break.

10             Let me just go to -- I think there was -- remind me.

11    Let me come back.  We were supposed to come back to the eight

12    exhibits.

13             MR. ROCHON:  Right, eight.

14             THE COURT:  Let's go back to that.  The statements

15    that I looked at, and I guess I'm looking at the January 5th

16    letter from the defendant.  Is that the quotations that you

17    were talking about.

18             MR. SATIN:  Yes, this is our exhibits that they have

19    proffered to the Court.

20             THE COURT:  My reaction is this.  Let me just

21    basically go through your bullet points.

22             (Continued on next page)

23

24

25

F16SSOK3

1          THE COURT:  Beginning with the first bullet point, I

2    don't have any problems with, I have no regrets.  I don't have

3    any problems with, from the second bullet point, I am proud of

4    the acts I have committed and that is a just reason for my

5    having done them.  On the next bullet point, I have no problem

6    with, I do not regret my actions.  On the next bullet point, I

7    have no problems with, I do not regret any of the acts that I

8    have carried out.  On the next bullet point, I have no problems

9    with, I was the organizer of five suicide terrorist attacks and

10   it is an honor for me to defend my people.  I do not regret my

11   actions.

12          I have no problems with those statements.  I have no

13   problems with, I would ask the court to judge me as a person

14   and not as its enemy.  Ultimately, I made no mistakes.  The

15   last bullet point, I don't have any problems with any of it, I

16   made a mistake and I regret that I did it, but the part that I

17   did, I admit, but what I did is part of what I carried out

18   without thinking of the consequences and I hope it will be

19   clear to everyone that when I reached a mature age, I thought

20   about my actions and saw that the actions that I had performed

21   were violent and bad actions against humanity.  I don't have

22   any problems with that.

23          Do you have any problems with any of that.

24          MR. SATIN:  We do, your Honor.

25          THE COURT:  What that I just quoted do you have a

F16SSOK3

1    problem with?

2              MR. SATIN:  The statements, I have no regrets, I am

3    proud, all the statements you just read are general statements.

4    They're not linked to any specific offenses.  This jury will

5    know by that point in the presentation of evidence that these

6    people have been convicted of these crimes already.

7              THE COURT:  They will know what crimes that they are

8    referring to.

9              MR. SATIN:  But it doesn't further their case at all.

10             THE COURT:  What is your prejudice?  I don't

11   understand what your prejudice is.  You don't want them to say

12   I regret it, I don't regret it?  I am not sure what it is that

13   you don't want the jury to hear and why.

14             MR. SATIN:  Well, those statements don't show any

15   liability on the part of the PA and PLO.  They want to admit

16   the fact of the conviction to --

17             THE COURT:  What don't you want the jury to hear?  If

18   they are worthless, that is not a good argument.  Why do you

19   think it hurts you?  Why don't you want the jury to hear it?

20             MR. SATIN:  Because it dehumanizes even further the

21   people who have committed these crimes.

22             THE COURT:  So don't ask them.

23             MR. SATIN:  By association with those individuals, it

24   draws prejudice to the defense.  There is no probative value,

25   because the facts that they were convicted of is already in

F16SSOK3

1    front of the jury.

2              THE COURT:  All right.

3              MR. SATIN:  That is sort of the relevant prejudice

4    issue.  There is also this issue of does it fall under a

5    hearsay exception.  The only one proffered to the court is the

6    statement against penal interest.

7              THE COURT:  What part of this are you claiming is

8    hearsay?

9              MR. SATIN:  I have no regrets.  It is a hearsay

10   statement of --

11             THE COURT:  It is not.  You have got to go back to

12   hearsay 101 with respect to that.  It is not a statement

13   offered for the truth of the content of the statement.  It is

14   not asserting a fact that can be independently proven.  It is a

15   feeling.  A present sense impression by the person.

16             I either regret it or I don't regret it.  It is not

17   like I was in New Jersey on Tuesday.  That is a statement

18   offered for the truth of the out-of-court assertion.  I don't

19   regret it is not hearsay.  You need to give me a different

20   argument.

21             MR. SATIN:  Couple things on that.  A state of mind of

22   those individuals who made those statements isn't at issue in

23   this case.  That does not advance the liability, doesn't

24   advance the plaintiff's case against the defendants, either the

25   PA or PLO.  The state-of-mind exception, to the extent it falls

F16SSOK3

1    within that, can only be applicable if state of mind is

2    relevant to the ultimate question for the jury and it is not.

3        THE COURT:  The problem I have with that argument is

4    that the state of mind of the defendants is at issue and it may

5    or may not -- I don't know the context of each one of these

6    statements -- it may or may not be relevant that particularly,

7    if payments are made by the defendants to these individuals

8    after they have made these statements, that one could infer

9    that it reflects a state of mind of the defendant as well as a

10   state of mind of the speaker.

11       MR. SATIN:  Then the admissibility of this statement

12   would have to be conditionally relevant upon a witness coming

13   into this courtroom and say, I was aware that this person made

14   this statement, which is found in a Hebrew language military

15   court record that is not, in fact, open to the public.  They

16   don't have that person.  So to the extent it is relevant upon

17   that proof, if just doesn't exist in this case.

18       THE COURT:  Mr. Yalowitz, what is the purpose?

19       MR. YALOWITZ:  The purpose of this is to, first of

20   all, on vicarious liability, the state of mind of the shooters

21   and the conspirators is relevant.  The state of mind of those

22   people is imputed.  In addition, the defendants have said,

23   Mr. Satin has said he is going to attack the reliability of

24   these convictions.  He is going to say, oh, you can't count on

25   these convictions.  Maybe they weren't good convictions.

F16SSOK3

```
 1              If the defendant at the end of the proceedings stands
 2     up and says, I have no regrets, if I could have killed more
 3     Jews, I would.  That sounds like a guy who is guilty and the
 4     jury ought to be able to hear that.  Not just I have no
 5     regrets, but if I could have killed more Jews, I would.
 6              THE COURT:  But you are making an argument based on
 7     what you think that they're going to attack.  Suppose they
 8     don't attack it.
 9              MR. YALOWITZ:  He said that last -- okay.
10              THE COURT:  That is fine and dandy.  But quite
11     frankly, I think logically, at least where I sit, it is not
12     going to be their most persuasive argument to sit up here and
13     try to defend the people convicted of these terror acts.  If
14     that is the theory and defense, that's fine.  I doubt that is
15     what the jury is really going to be talking about in the jury
16     room afterwards.
17              MR. ROCHON:  It will not be our theory.
18              THE COURT:  Excuse me?
19              MR. ROCHON:  It will not be our theory.
20              THE COURT:  I didn't think so.
21              MR. YALOWITZ:  Wait a minute.  Wait a minute.  They
22     have got a guy named Michael Sfard on their witness list.  As
23     of yesterday, it was their theory.  If they will represent --
24              THE COURT:  It may still be their theory.  You really
25     think they are going to go pretty far with that?
```

F16SSOK3

```
1          MR. YALOWITZ:  I don't think you're going to let them.
2          THE COURT:  Even if I let them, do you think --
3          MR. ROCHON:  I can help Mr. Yalowitz, because if you
4    allow the convictions in, and you have said you will, we are
5    not going to attack the Israeli military tribunal system once
6    you ruled these convictions are admissible.
7          THE COURT:  I thought we already had this discussion.
8          MR. ROCHON:  We already lost that.  Mr. Sfard is
9    unlikely to testify at this trial.
10          MR. YALOWITZ:  Why is he on the witness list?
11          MR. ROCHON:  The same reason Mr. Yalowitz has a lot of
12    people not testifying in this case.  You never know.  I am not
13    going to be accused of not listing him.  I'm sure he won't call
14    off his people either.
15          THE COURT:  Before we finish that, let me just veer
16    back off on another issue.  Not only do I want you to make sure
17    that you tell the other side what the exhibits are for the next
18    day, I want you to tell the other side what are the likely
19    witnesses for the next day.
20          MR. ROCHON:  Can we do --
21          MR. YALOWITZ:  That's fine.
22          MR. ROCHON:  I apologize, your Honor.  Can we do --
23          THE COURT:  If it is less, you should tell them
24    minimally who are the next witnesses for the next day, if you
25    anticipate they'll be more than three witnesses.  If you don't
```

F16SSOK3

1    anticipate there is going to be more than three witnesses, you

2    should tell them what you anticipate the next three witnesses

3    to be.

4              MR. YALOWITZ:  Fine.  We can do a rolling three

5    witness ahead.

6              THE COURT:  Right.

7              MR. YALOWITZ:  That's fine.

8              MR. ROCHON:  We would like to have more advanced

9    notice.  Maybe two, three days' notice of when witnesses are

10   coming up.  They have a lot of witnesses on their list.  They

11   have the right to call them in the order they prefer.  I am not

12   trying to limit that.  Because the day before can be 5:00

13   o'clock, testifying the next day, and in order to prepare for

14   the next day's trial and anticipate objections and not to

15   unduly inconvenience the jury, even three days before who they

16   are going to call.  Not the exhibits, but who they are going to

17   call would be helpful to moving this trial along.

18             We had an exchange of letters talking about doing this

19   a week in advance, and I don't need a week notice, but three

20   days to allow each side to prepare.  We will give the same to

21   the other side.  If they know if Mr. Sfard suddenly be called

22   anyway, they have plenty of time.

23             MR. YALOWITZ:  I am fine with --

24             THE COURT:  What do you want to do?

25             MR. YALOWITZ:  I am fine with more than a day.

F16SSOK3

1              THE COURT:  What are you fine with?

2              MR. YALOWITZ:  I am just trying to think it through.

3              THE COURT:  What do you want?  They have to give you

4        notice.

5              MR. YALOWITZ:  I tried to work it out with them.

6              THE COURT:  I didn't ask you to work it out.  I said,

7        what do you want?

8              MR. YALOWITZ:  I will take 72 hours.  72 hours is

9        fine.

10             MR. ROCHON:  Deal.

11             THE COURT:  That solves that problem.

12             MR. YALOWITZ:  Amazing how agreeable people get when

13       they step in the courtroom.

14             THE COURT:  Now, I don't quite see the relevance of

15       these statements, because I don't have the context or the time

16       frame for these statements in relationship to what you say is

17       relevant to the jury's determination.  What I get from this is

18       you just want to show the jury that they are not sorry.

19             MR. YALOWITZ:  Not just that they're not sorry, but

20       that they did it for political purposes.

21             THE COURT:  Where does it say they --

22             MR. YALOWITZ:  If I could have killed more Jews, I

23       would have.

24             THE COURT:  What makes you think that is political as

25       opposed to religion as opposed to territorial as opposed --

F16SSOK3

1           MR. YALOWITZ:  It is territorial.  Their political

2    objective.

3           THE COURT:  Do you think that is going to be a

4    surprise to a jury in this box?

5           MR. YALOWITZ:  I think it is evidence I am entitled to

6    give to the jury that the employees of the defendant who are on

7    their payroll said in open court, I don't regret this, and if I

8    could have killed more, I would have.  If you want to redact

9    the word Jews to avoid some prejudice, if you release me, I am

10   going to go for my weapons and these are people who are still

11   on the payroll.  This really goes to the state of mind of the

12   defendants.

13          THE COURT:  Where are you taking these statements

14   from?

15          MR. YALOWITZ:  From the transcripts of their hearing

16   immediately before they were sentenced.  It is not just that

17   they don't regret it.  It goes to the state of mind of the

18   defendants.  It goes to the appearance of intent, to do these

19   things to commit these crimes in order to coerce a civilian

20   population or intimidate a government, coerce or intimidate

21   civilian population for a government or influence the policy of

22   the government: I have got to prove every element of my case

23   here.

24          THE COURT:  My view at this point is still the same as

25   what it was when I read this.  I don't agree with the defense

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F16SSOK3

1    and I don't agree with you.  I don't think the statements that

2    I read are particularly prejudicial, but I don't think that

3    statements, as you want them completely, is more probative of

4    anything than prejudicial.

5         The statements about giving @Sharom the death

6    sentence, I don't know why you can possibly argue that that is

7    somehow relevant to committing a terrorist act because the

8    person says that Sharom should get the death sentence.

9         MR. YALOWITZ:  If you had a guy in the U.S. Marshal's

10   office who killed a bunch of civilians and made statements like

11   this in front of his sentencing, you wouldn't want that guy on

12   the payroll of the marshals while he was in jail.  If the

13   marshals had a policy of keeping guys like that on the payroll,

14   that would say something about whether they approved of his

15   actions.  That would say something about whether, in the scope

16   of his employment, he thought it was okay to do stuff like

17   that, particularly when there is a whole pattern of guys like

18   that.  That's why I want that evidence before the jury.

19        THE COURT:  Well, it seems to me that you're making an

20   argument that is over-shadowed by stronger evidence.

21        MR. YALOWITZ:  I understand your views.

22        THE COURT:  You are telling me that I shouldn't want a

23   person who would make these statements, as opposed to I

24   shouldn't want a person who has just gone out and killed a

25   bunch of innocent people?

F16SSOK3

1        MR. YALOWITZ:  Because it is worse.

2        THE COURT:  That is the only thing I hear you saying.

3        MR. YALOWITZ:  It's worse.

4        THE COURT:  It's worse?

5        MR. YALOWITZ:  You bet that.

6        THE COURT:  It is worse because they don't regret it?

7        MR. YALOWITZ:  Right.

8        THE COURT:  Why it is worse because he says that

9   Sharom  should be given the death sentence?

10        MR. YALOWITZ:  I don't know the jury is going to know

11   who Sharom is anyway.  You give me some of the other things.  I

12   don't need Sharom in that sense.

13        THE COURT:  If I could have murdered more Jews, I

14   would not hesitate?

15        MR. YALOWITZ:  That is a guy that they're rewarding.

16        THE COURT:  They are not rewarding him for that

17   statement.  By your theory, they were rewarding him for

18   committing a terrorist act.  That's the only relevant thing to

19   this jury.  Quite frankly, even if they were rewarding him for

20   that statement, that wouldn't be the claim here.

21        MR. YALOWITZ:  Right.  But it is a statement in the

22   context of pleading guilty or dealing with a sentence post

23   trial.

24        THE COURT:  My view is this, if you want statements

25   about their feelings about what the crimes that they committed

F16SSOK3

1    and what they did, and as I say, I don't regret it, I'm proud

2    of it, I was the organizer of terrorist acts, that's fine.

3    That is consistent with the conviction and that is consistent

4    with the statements that were already admitted against the

5    person's penal interest.

6             MR. YALOWITZ:  All right.

7             THE COURT:  Simply, as they say, the one thing I have

8    got to be sensitive in this case is I don't want either side to

9    simply try to whip up the emotions of the jury on issues that

10   are not substantive.  I have to be very careful about that.  It

11   is a delicate balance to reach in terms of gruesome

12   photographs, in terms of outrageous statements, hateful

13   statements, or political views.

14            MR. YALOWITZ:  I understand that the court is

15   sensitive to that.  I respect it.  You can't handcuff me too

16   tight on these things.

17            THE COURT:  I am not.  I think I am giving you great

18   leeway.  I am trying to keep you focused on what I am going to

19   focus this jury.  This jury is going to simply decide whether

20   or not there is enough evidence in this case to demonstrate the

21   PA and/or the PLO's involvement in the terrorist acts that they

22   claim that they were injured in as a result of and what is

23   reasonable compensation to them for the injuries that were

24   suffered.  That is the issue.

25            It is not because somebody is a bad person, it is not

F16SSOK3

1    because they did it and it is so outrageous that you could

2    really want to be associated with this kind of person.  It is

3    none of that.  Is it evidence that they were involved in the

4    attack.  And as we had this discussion before, it is not even

5    after they did it, I said, good job.  That doesn't prove your

6    case.  What proves your case is that they had involvement in

7    these activities either before or during these acts of

8    violence.

9         MR. YALOWITZ:  That is true on vicarious liability.

10   First of all, you do have ratification.  If you have got an

11   employee, you and I know if you have an employee who you have a

12   prior association with -- you and I talked about this.

13        THE COURT:  Right.

14        MR. YALOWITZ:  I am not saying somebody off the street

15   away from you.  You have a prior association with this person.

16   They are your agent.  They are your employee.

17        THE COURT:  It is the prior association.  It is clear.

18        MR. YALOWITZ:  Right.  They do something away from you

19   and you learn about it --

20        THE COURT:  Right.

21        MR. YALOWITZ:  -- and you say, good job, here is some

22   money, and you have a policy of doing that, that suggests

23   ratification.  If you have knowledge of the facts, the jury is

24   entitled to conclude that is ratification.  We talked about

25   that.

F16SSOK3

1          THE COURT:  But they're entitled to conclude that

2     based on what acts you took to reward the person --

3          MR. YALOWITZ:  Correct.

4          THE COURT:  -- for the violent activity.

5          MR. YALOWITZ:  Correct.

6          THE COURT:  Not for how he felt about the violent

7     activity.

8          MR. YALOWITZ:  I accept that.  I accept that.

9          THE COURT:  He can praise him as much as he wants, as

10    long as he is not approving of, condoning, or encouraging him

11    to commit the act that he committed.

12          MR. YALOWITZ:  I didn't understand that last part.

13          THE COURT:  I said he can praise him as much as he

14    wants for the act, if he agrees with the act, as long as he is

15    not adopting, condoning, approving of, or encouraging that

16    person to take that act.

17          MR. YALOWITZ:  I think I understand that, but if there

18    is a prior association, I think we agree if there is a prior

19    association and the employer has knowledge of the act --

20          THE COURT:  Right.

21          MR. YALOWITZ:  -- and through words and actions

22    indicates approval --

23          THE COURT:  Right.

24          MR. YALOWITZ:  -- then the jury is entitled to find

25    that the employer has adopted that act.

F16SSOK3

1          THE COURT:  That may be true, but it has nothing to do

2     with the statements you just gave me.

3          MR. YALOWITZ:  We agree on that.

4          THE COURT:  That has nothing to do with the statements

5     you say you want to offer about, oh, I should have killed more

6     Jews.

7          MR. YALOWITZ:  We agree on that.

8          THE COURT:  That is not part of the element of this

9     claim.  I will give you some of this, if you want some of this.

10         MR. YALOWITZ:  I do.  I want all of it.  I will take

11    what you give me.

12         THE COURT:  I know you want all of it, but I don't see

13    that there is a particularly strong, valid objection to the

14    person who is convicted of the offense to say, I have no

15    regrets, that somehow that that is in admissible.

16         MR. YALOWITZ:  Did I miss the court's ruling on the

17    last bullet in the beginning?

18         THE COURT:  In the beginning?

19         MR. YALOWITZ:  It starts in the beginning.

20         THE COURT:  Yes.  It is on the second page?

21         MR. YALOWITZ:  Yes.

22         THE COURT:  My position was I didn't have a problem

23    with, I was the organizer of five suicide terrorist attacks.

24         MR. YALOWITZ:  I'm sorry, just above two, sort of

25    through the bottom third of the page.

F16SSOK3

1          MR. ROCHON:  In the beginning.

2          MR. YALOWITZ:  It is not in the beginning of the

3    document.  The words of the statement are in the beginning.

4          THE COURT:  I see.  I am not quite sure what he is

5    talking about.  It was difficult for me to understand what he

6    was trying to say.

7          MR. YALOWITZ:  This was a guy who was convicted of not

8    reporting an impending terror attack.

9          THE COURT:  What does that have to do with this case?

10   You're not saying he was rewarded for not reporting it, that

11   could make out your claim?

12         MR. YALOWITZ:  No.  It is his state of mind of why he

13   didn't report it.  State of mind of why he didn't report it is,

14   if I had reported it to the Palestinian authority, they would

15   have killed me, that is why I didn't report it.  It goes to his

16   state of mind.

17         THE COURT:  I'm sorry, where does it say that?

18         MR. YALOWITZ:  Right toward the bottom.  As we hear

19   every day, this would have meant a death penalty for me from

20   the authority or the resistance people.

21         THE COURT:  I see.  What fact does that establish?

22         MR. YALOWITZ:  It goes to the issue of their control,

23   their approval of terror of this attack.

24         THE COURT:  This is not their statement.

25         MR. YALOWITZ:  It is a person convicted of not

F16SSOK3

1    reporting a terror attack in which their employees

2    participated.

3          THE COURT:  His opinion is, I didn't do it because if

4    I did, I thought that they would kill me?

5          MR. YALOWITZ:  I didn't report it because they would

6    have killed me.

7          THE COURT:  How is that a credible fact, that if he

8    hadn't reported it, they would have killed him, or that is an

9    accurate assessment by him of what he thought might happen,

10   that would, in fact, happen?

11         MR. YALOWITZ:  Who would know better than him?  He is

12   there living in the West Bank.

13         THE COURT:  I don't know how he would know.

14         MR. YALOWITZ:  He would know because one of the

15   perpetrators was in his house planning the attack.

16         THE COURT:  You want to offer this person's statement

17   for the conclusion, for the jury to draw their conclusion that

18   they communicated to people that if they --

19         MR. YALOWITZ:  If they reported on impending terror

20   attacks.

21         THE COURT:  That the PA would have killed them?

22         MR. YALOWITZ:  Right.  The PA or the resistance

23   people.

24         THE COURT:  How does he know this?

25         MR. YALOWITZ:  Who would know better than him?  He was

F16SSOK3

1    living with one of the convicted individuals.

2              THE COURT:  You say who would know better than

3    somebody who was in a conversation where somebody in the PA

4    said, I am going to kill you if you do X?  Why is this reliable

5    at all as a factual statement?

6              MR. YALOWITZ:  I think a guy who comes to court

7    admitting that he didn't report a terror attack and explains

8    why is a pretty credible source for why he didn't report a

9    crime.

10             THE COURT:  Because he thought he was going to be

11   killed?

12             MR. YALOWITZ:  Because he thought he was going to be

13   killed.

14             THE COURT:  What he thought doesn't make it a fact.

15   He doesn't say, They told me they were going to kill me.

16             MR. YALOWITZ:  I think it is a reasonable inference

17   that the jury could draw.

18             THE COURT:  Well, it is several layers of hearsay.

19             MR. YALOWITZ:  I don't think it is hearsay.  I think

20   he is admitting his culpability.

21             THE COURT:  He was admitting culpability.  That's not

22   what you're offering this for.  You're offering this for the

23   jury to conclude that, if he had said this, that the PA

24   directed to kill him.

25             MR. YALOWITZ:  That he had a reasonable fear.

F16SSOK3

1          THE COURT:  The only way he could have a reasonable

2     fear is if they put that fear in him.

3          MR. YALOWITZ:  I am sure he didn't make it up.

4          THE COURT:  You're sure he didn't make it up.  The

5     other side is not so sure that he didn't make it up.

6          MR. YALOWITZ:  They are pretty sure too, but they

7     won't admit it.  They are pretty sure too.

8          THE COURT:  I think I understand why you want to offer

9     it.  I don't think it is admissible for that purpose.

10         MR. YALOWITZ:  All right.

11         MR. SATIN:  Your Honor, can I revisit one little

12    piece?  I am not going to reargue what the court has ruled.

13         THE COURT:  Sure.

14         MR. SATIN:  I understand the court has ruled that the

15    statements, I am proud of it, I don't regret it, comes in, is

16    that correct?

17         THE COURT:  Yes.

18         MR. SATIN:  On the top of page 2, the second bullet

19    point from the bottom from the top starts, I was the organizer.

20         THE COURT:  Right.

21         MR. SATIN:  The sentence that the court had said was

22    admissible, the first sentence, I was the organizer of five

23    suicide terror attacks and it is an honor for me to defend my

24    people.  The court's ruling would be the first part of that

25    statement where he says, I was the organizer, but it is an

F16SSOK3

1    honor for me to defend my people is not.  We would ask the

2    court, consistent with its ruling, not allow in that second

3    part after the comma.

4            THE COURT:  Again, I don't understand the nature --

5    let's put it this way.  Let me articulate it this way.  Why

6    wouldn't you want the jury to hear that?

7            MR. ROCHON:  We do not.

8            THE COURT:  Why do you not want the jury to hear that?

9    What are you afraid that they are going to inappropriately

10   conclude?

11           MR. SATIN:  We would think that they might or they

12   would infer that he was saying that I am a part of the

13   government or part of this entity doing it on their behalf.

14           THE COURT:  That's not what it says.  It says he did

15   it to defend his people.

16           MR. SATIN:  A lot of people might associate someone

17   saying, I did it on behalf of people, as though a government

18   represents people.  That is the inference that could be drawn

19   from it.

20           THE COURT:  He is saying he is doing it on behalf of

21   the Palestinian people.  Isn't that the only inference?

22           MR. SATIN:  Except that we represent an entity that

23   represents the Palestinian people.  That inference could be

24   drawn by that.

25           THE COURT:  No.  If I say I am doing this as an

F16SSOK3

1    American, it doesn't mean that President Obama told me to do

2    it.  That doesn't follow at all.  That is not what he says.  He

3    says, I am doing this for the Palestinian authority.  He says,

4    I am doing it for my people; not their people or someone else's

5    people, not my government, not their government.  I am doing it

6    for my people.

7         I think it is common sense reading, any jury is going

8    to say that makes sense.  We know that is the view of a lot of

9    people who are involved in activities over there, that they

10   believe that they're defending their people, their homeland,

11   their family, their friends.  What does that got to do with the

12   PA?

13        MR. SATIN:  Were that to be the case that he did it as

14   an honor to defend his people, that does not advance their

15   case.  If the reason the court is letting it in, I was the

16   organizer of the attacks, as evidence that he did it, to I

17   suppose preempt the defense, even though we said we won't

18   challenge the reliability of those convictions, the fact of why

19   this person did it is irrelevant.  It doesn't matter why he did

20   it.  What is important is the purposes of the presentation to

21   the jury is whether he did it.

22        THE COURT:  I don't think my view has changed.  I will

23   consider it further.  Again, be careful what you ask for.  You

24   may get it.  I'm not sure why this hurts you.  This is not

25   something that would be unexpected for a jury to hear.  The

F16SSOK3

1    jury would be surprised if someone didn't say this.  That is

2    exactly what they think is in many jurors' minds is the nature

3    of the Israeli-Palestinian conflict.

4          Both sides have strong views and they think that

5    they're representing and doing for their people, their

6    community, their friends and family and relatives.  It would be

7    one thing if he said he was doing it for money.  He says, I am

8    doing it for my people.  I think he has an honorable reason why

9    he is taking these acts.  That doesn't infer anything about the

10   PA or the PLO, unless they make some other connection.  I will

11   think about it.

12         MR. ROCHON:  One of our concerns on these things is

13   that they're being introduced as declarations against penal

14   interest, we understand that.  These are not mostly employees

15   of the PA.

16         THE COURT:  I understand.

17         MR. ROCHON:  So the PA doesn't want these statements

18   attributed to it for those purposes because we are not

19   defending these actions.  I don't want Mr. Yalowitz --

20         THE COURT:  I understand.

21         MR. ROCHON:  -- or the plaintiff's time to stand up

22   and say this guy said it was an honor to defend our people,

23   that our defense theory on behalf of our clients is defending

24   these actions?

25         THE COURT:  I understand that.  Look, I have tried a

F16SSOK3

1      lot of cases.  I will give you appropriate leeway to try the

2      case the way you think you want to try it.  If I was trying the

3      case and that was the issue of I was confronted with, ladies

4      and gentlemen, he didn't say he did this for the Palestinian

5      Liberation Organization or the business for the PA.  He said he

6      did this for his people.

7              When you want to agree with it or disagree with what

8      he thinks is a principle stand, he is not accusing us.  He is

9      saying he made an independent judgment to do this because this

10     is what he believes.  That is what I would say to a jury and

11     they would say, you know what, that makes a lot of sense to me.

12             I think it is time for the parties to start to

13     focusing on how a jury is going to assess this case.

14             MR. YALOWITZ:  It is really aggravating because we

15     have got a lot of work to do here.  Mr. Satin says he wasn't

16     going to reargue the ruling, he then stood up and reargued the

17     ruling.  We all got wrapped up around the axle of about six

18     words or something.  If this is how they are going to try the

19     case, we are the never going to get it done.

20             THE COURT:  If you keep objecting how they try the

21     case, you won't get it done either.  I understand your point.

22             MR. YALOWITZ:  I'll keep my mouth shut.

23             THE COURT:  That is why I am here.  It is time for the

24     parties to start to focus.  You know we are going to trial.  We

25     have got a lot of work to do.  This case is going to turn out

F16SSOK3

1   to be a lot more direct, simple, and straightforward for this

2   jury than lawyers think.  It is time to strip away the legalese

3   and the lawyer stuff and start thinking about this case like a

4   jury, because that is what you're going to have to start doing

5   starting tomorrow, and figure out whether the jury is really

6   going to sparse these kinds of statements the way you're

7   barring it now in terms of wanting to keep everything out.

8           You need two things to keep something out.  To make an

9   objection, you need a ground for it to object and you need a

10  reason to want to object.  I think I understand your ground for

11  objection, I just don't understand the reason why you're

12  objecting to this statement.  This says absolutely nothing

13  about the PA or PLO or anything about that or played any part

14  in his decision to be involved in five terrorist attacks.

15          You may see the world differently than I do.  Maybe

16  you see it as something dangerously close to accusing the PA or

17  the PLO.  Fine.  Then if you want to convince me that this is

18  critical to keep out, I will always re-evaluate it in context.

19  I just don't want to keep spinning around and around on this.

20  That is my view at this point.  I wouldn't expect that that

21  ruling would make either side happy, because neither side knows

22  exactly what it wants.

23          Let's see if we can wind this up.  I am still working

24  on jury instructions.  Hopefully by Monday we will have

25  something to give you, at least a draft.  I am still looking at

F16SSOK3

1   some of the expert testimony.  Some of it is beyond the

2   concerns that I raised.  The more I look at it, I am not in a

3   position at this point where I feel that I can simply say I am

4   precluding an expert.  I have been focusing on what the expert

5   is really going to say and whether they have got a lot to say,

6   little to say, some stuff is inadmissible stuff and whether or

7   not there is an expert that I would say, don't show up, or I

8   can say, look, he can show up, he is going to testify on these

9   matters, which is going to take five minutes rather than the

10  matters that you thought were going to take three hours.  They

11  are not going to opine on certain issues or express opinions.

12          Let me address whatever you want to address, but I am

13  going to characterize it as the trial exhibits, the 31 trial

14  exhibits.  I don't have a total position on all of them, so I

15  need a little bit more information.  I am going off of page 2

16  of the December 30 letter.  There are a couple of questions.

17  The ones I don't have questions with, I will still come back.

18          Let me start with number two.  The U.S. government

19  reports that basically, if this is accurately characterized --

20  at the bottom of it, I haven't gone through the entire binder

21  to get the detail on the dockets -- I don't have a problem with

22  number two.  I don't know if the defense has a problem with it.

23  If it is simply the report and the findings and the

24  determination that AAMB is now designated as a foreign

25  terrorist organization, I don't have any problems with that.

F16SSOK3

1          The issues I have with the jury instructions is

2     because there are certain dates that you can use and certain

3     dates that you can't.  I know that you're focused on that.

4     There are certain designations that happened after terrorist

5     acts on some, so I am trying to find a convenient way of

6     keeping those separate and to instruct on that.

7          With regard to the designation and the report, unless

8     there is something in these reports that the defendants would

9     articulate to me that they say shouldn't be before the jury, I

10    think that, in abstract, I don't have a problem with that.

11         Let me go to three.  I have problems with a couple of

12    those.  No problems on the others.  I am not sure what the

13    purpose of the 417 reports are.  I don't see why they are

14    inadmissible.

15         MR. YALOWITZ:  Sure.  So Guetta attack was in the same

16    time and the same place with the same MO as all these other 417

17    attacks.  It is offered to show pattern.

18         THE COURT:  By whom?

19         MR. YALOWITZ:  By the 417 terrorists.

20         THE COURT:  How do you intend to use that as evidence

21    against the defendant?

22         MR. YALOWITZ:  I think the jury is entitled to infer.

23         THE COURT:  That?

24         MR. YALOWITZ:  That the attack perpetrated on the

25    Guetta family was by the same 417 terror cell.

F16SSOK3

1              THE COURT:  Why does that make the defendant liable?

2              MR. YALOWITZ:  Because 417 is defendant's employees.

3     So if 417 is acting pursuant to policy, pursuant to --

4              THE COURT:  I'm sorry.

5              MR. YALOWITZ:  That's okay.

6              THE COURT:  What I didn't understand is, this is just

7     my ignorance of the fact, you are not saying that 417 is a PA

8     entity?

9              MR. YALOWITZ:  It is.

10             THE COURT:  I thought you were saying that it had PA

11    employees.

12             MR. YALOWITZ:  No.  They call it 417, but it is like

13    the U.S. Secret Service.

14             THE COURT:  So 417 is an entity within the PA?

15             MR. YALOWITZ:  Correct.

16             THE COURT:  I didn't know the difference between the

17    March 5 report and the January 26 report.  They don't have

18    anything to do with any of the incidents here.

19             MR. YALOWITZ:  Right.  Our incident, they show a

20    pattern, same geographic location, same kind of target, same

21    MO, and our case fits the pattern.

22             THE COURT:  I know, but do you have some other

23    evidence that 417 was involved in one of the terrorist attacks

24    here, or are you just trying to use the inference that this

25    terrorist attack was like one of the ones the 417 did so they

F16SSOK3

1    must have been responsible for this?

2              MR. YALOWITZ:  It is not quite the way you said it,

3    but my evidence is that in that geographic location, which was

4    the West Bank, during that time period, which was the beginning

5    of the intifada, there was a series of attacks on civilians

6    perpetrated by the employees of the most disciplined military

7    unit of the Palestinian authority, which was called 417.

8              THE COURT:  Okay.

9              MR. YALOWITZ:  The most disciplined.  Those

10   individuals who are identified in this report, and others,

11   committed a whole series of attacks and our case fits the

12   pattern.  There is no other reasonable explanation for who

13   would have done this.

14             THE COURT:  Who was identified and/or convicted of

15   perpetrating the attack here that you want to say is similar to

16   the 417 attack, and is there any evidence that those

17   individuals are associated with the 417?

18             MR. YALOWITZ:  The report indicates the 417

19   individuals.  I am not going to the jury with an ID of any of

20   those employees.

21             THE COURT:  But you don't have anybody who is

22   identified as the perpetrator of the act?

23             MR. YALOWITZ:  That is correct.

24             THE COURT:  Which one are you talking about here that

25   is, except to the 417?

F16SSOK3

1           MR. YALOWITZ:  The Guetta attack, January 8.

2           THE COURT:  At this point, there is no evidence as to

3     who committed the Guetta attack.

4           MR. YALOWITZ:  There is no perpetrator ID, that is

5     correct.

6           THE COURT:  There is no individual that has been

7     identified.

8           MR. YALOWITZ:  Correct.

9           THE COURT:  You want to offer evidence that there is

10    such a similarity between January 26 and the March 5 attacks to

11    the Guetta attack, that those people must have committed the

12    Guetta attack.

13          MR. YALOWITZ:  That it is more likely than not that

14    those people committed the attack because it fits the pattern

15    and there is no reasonable explanation other than them.

16          THE COURT:  What is that pattern?

17          MR. YALOWITZ:  With my expert, we made a little map

18    that takes all of these attacks and puts them on the map where

19    they were and when they were.  As part of my letter I am going

20    to send you about the summary judgment, I will send you that

21    map.

22          THE COURT:  Are you talking about geographic

23    similarity?  Are you talking about some other kind of pattern?

24          MR. YALOWITZ:  Geographic, *modus operandi*, and time

25    period, and target, Jewish civilians.

F16SSOK3

1          THE COURT:  What was the date of the Guetta attack?

2          MR. YALOWITZ:  January 8, 2001.

3          THE COURT:  If the Israeli Minister of Foreign Affairs

4    investigated and recorded on these other two incidents, there

5    is nothing in their reports that makes a conclusion that that

6    was related to the Guetta.

7          MR. YALOWITZ:  Correct.  It is an inference I am

8    asking the jury to draw.

9          THE COURT:  It is not an inference that they drew?

10          MR. YALOWITZ:  They didn't report up or down on the

11    Guetta attack.  They didn't say it wasn't.

12          THE COURT:  Right.

13          MR. YALOWITZ:  They didn't say it was.  They were

14    silent.

15          THE COURT:  I have to look at that more carefully.  I

16    will wait for your letter.  It just did not seem to me, unless

17    I can see a real strong MO that a jury could reasonably

18    conclude that it is more likely than not that the same people

19    committed this act --

20          MR. YALOWITZ:  You have to look at it.  I know you

21    will look at it carefully.

22          One point of clarification, the Ministry of Foreign

23    Affairs publishes the English language version of the report,

24    because they are putting it out, but the investigation is done

25    by the Israeli Security Agency, which is a legally authorized

F16SSOK3

1    agency to conduct investigations on terror attacks.  It is a

2    statement about a legally authorized investigation.  I don't

3    think there is really any doubt about admissibility.  I hear

4    the court's concern is you want to think about it is enough to

5    go to the jury with the MO, the time period, the geographic

6    region, and the similarity of victims.

7            THE COURT:  Is it your theory to argue to the jury

8    that the evidence supports that 417 as an entity planned all of

9    these attacks or that some of the members of 417 individually

10   planned these attacks?

11           MR. YALOWITZ:  When you come to the vicarious

12   liability piece, I don't think it is that hard because, number

13   one, we have expert testimony that it is a highly disciplined

14   unit.

15           Number two, we have the head of the unit who went to

16   jail for committing terrorist activities.  We have expert

17   testimony that he was very, very close to Arafat himself.

18           Number three, you have these political guidance

19   magazines telling members of the security forces that our

20   policy is you have to fight and sacrifice and be part of the

21   intifada.  The reports are useful to see the pattern.  They

22   don't go to the vicarious liability piece.

23           MS. FERGUSON:  Your Honor, just to be clear, we do

24   object to the admissibility of this document under the public

25   records exception.  I can walk through the analysis if you

F16SSOK3

1    would like.  I want to make sure that we maintain our objection

2    under the public records exception.

3              THE COURT:  Sure.  You say that this doesn't qualify

4    because they don't have --

5              MS. FERGUSON:  They have to authenticate foreign

6    public records.  That is number one.  They haven't done that.

7    This is a print-off off of the Israeli Ministry of Foreign

8    Affairs website.  The Israeli Ministry of Foreign Affairs is

9    not duly authorized to conduct these sorts of investigations.

10   Mr. Yalowitz says that it is the Israeli Security Agency, but

11   we don't have that report.  We don't have those.

12             Mr. Yalowitz also would need to lay an evidentiary

13   foundation for the nature of the investigation, the nature of

14   the findings.  I mean, this is a couple levels of hearsay.

15   They haven't met the foundation as to each level.

16             THE COURT:  Mr. Yalowitz, I'll put it to you this way,

17   you will have to lay some foundation because I am not sure at

18   this point what I am going to consider to be enough, but you

19   can't just get up and say, I found this on Wikipedia.

20             MR. YALOWITZ:  Right.

21             THE COURT:  You know what I am saying?

22             MR. YALOWITZ:  I would say, your Honor, number one,

23   there they go again.  It is every objection in the book.

24             Number two, there is no genuine dispute as to the

25   authenticity of this document.  We can get an Internet hotspot

F16SSOK3

1   in here and go to the website and pull it off and look at see

2   that it is a government website.

3           But we have, as an expert witness, a former ISA agent

4   who can explain what the ISA is, what they do, how their

5   investigations work, that this was a legally authorized

6   investigation.

7           THE COURT:  Has this person looked at these documents?

8           THE VIDEOGRAPHER:  Of course.

9           THE COURT:  Has this person seen the source from which

10  these documents came?

11          MR. YALOWITZ:  No.

12          THE COURT:  Okay.

13          MR. YALOWITZ:  No, but that is the nature of a

14  government report.  You don't have to go back into the guts.

15          THE COURT:  They know where you got them from?

16          MR. YALOWITZ:  You mean like the website?

17          THE COURT:  Yes.

18          MR. YALOWITZ:  Yes, yes, yes.  I thought you meant --

19          THE COURT:  Yes.  Is this person going to say, yeah, I

20  know this website.

21          MR. YALOWITZ:  Absolutely.

22          THE COURT:  This website produces this kind of

23  information, it is associated with the Israeli government or

24  with this agency, this is, in fact, a form in which reports are

25  done?

F16SSOK3

1               MR. YALOWITZ:  Absolutely.

2               MS. FERGUSON:  Your Honor --

3               THE COURT:  I don't know if you are going to meet that

4     threshold.

5               MS. FERGUSON:  Your Honor, we don't have the report of

6     the Israeli Security Agency, we have the Ministry of Foreign

7     Affairs summarizing some portion of it.

8               THE COURT:  Okay.

9               MS. FERGUSON:  The Ministry of Foreign Affairs is the

10    arm that disseminates, I will say, propaganda.  We don't

11    actually understand and see what the actual investigation and

12    findings of that investigation are.  This is just the Ministry

13    of Foreign Affairs' spin on it or summary of it.

14              THE COURT:  Let me look at it more carefully.

15    Mr. Yalowitz, obviously you should be prepare to do as much as

16    you can to lay a sufficient foundation --

17              MR. YALOWITZ:  Of course.

18              THE COURT:  -- that this is a reliable and trustworthy

19    document.

20              MR. YALOWITZ:  You bet.  Of course.

21              THE COURT:  I will get back to you.  I am not sure I

22    have a problem with it.  I don't know what the next bullet

23    point about Yasser Arafat with regard to ongoing financing.  I

24    don't know what you say the evidence is.  What do you have?

25              MR. YALOWITZ:  Sure.  These documents that I am

F16SSOK3

1    thinking about, really the next three bullets talk about a

2    certain kind of document, which is they have raw documents

3    seized from the PA.

4              THE COURT:  Right.

5              MR. YALOWITZ:  And they have them in Arabic and then

6    they have a translation.

7              THE COURT:  Okay.

8              MR. YALOWITZ:  And then they have some analysis.

9    Arabic documents --

10             THE COURT:  What do you have, all of those?

11             MR. YALOWITZ:  That's what the report consists of.

12   The report is an analysis, and then as an appendix they have

13   the raw documents on which the analysis is based.

14             THE COURT:  All right.

15             MR. YALOWITZ:  The analysis states facts and

16   conclusions.

17             THE COURT:  From where?

18             MR. YALOWITZ:  From the documents.

19             THE COURT:  Okay.

20             MR. YALOWITZ:  First of all, some of the documents I

21   want to show to the jury, some of those raw documents, I want

22   to have my experts explain --

23             THE COURT:  What kind of raw documents?

24             MR. YALOWITZ:  -- what they are.

25             THE COURT:  Financial documents?

F16SSOK3

1          MR. YALOWITZ:  Like it is a memo that says, please pay

2     Raed al-Karmi.  He is the guy with the gun, please pay him

3     $600.  Then Arafat writes okay.

4          THE COURT:  Okay.

5          MR. YALOWITZ:  That is a good example of one of those

6     raw documents.

7          THE COURT:  I don't understand.  Is that part of the

8     first bullet or second bullet?

9          MR. YALOWITZ:  Your Honor, in candor, we have had so

10     many letters flying --

11          THE COURT:  I am shocked.

12          MR. YALOWITZ:  -- I can't tell you which bullet it is.

13     I don't know the bullets on the letter, but I know the

14     documents.

15          THE COURT:  You say, I am just looking at the report,

16     the documents, the evidence of the Arafat and the PA

17     apparatuses in the financing, ongoing financing at the time of

18     the organization.

19          MR. YALOWITZ:  Right.

20          THE COURT:  What is the form of that evidence?

21          MR. YALOWITZ:  That is what I am saying.  You have an

22     Arabic document -- like what I just described, where Marwan

23     Barghouti says pay Raed al-Karmi six hundred bucks and Arafat

24     says okay.

25          THE COURT:  These documents are what you purport to

F16SSOK3

1    be, they're evidence?

2             MR. YALOWITZ:  We know that because the reports

3    represent them to be that and because our experts are familiar

4    with the operations of the ISA.

5             THE COURT:  Who is the IDA?

6             MR. YALOWITZ:  The Israeli Defense.  That's the army,

7    the Israeli defense.

8             THE COURT:  And IMFA?

9             MR. YALOWITZ:  Israel Ministry of Foreign Affairs.  So

10   then that part of the document I think is kind of easy.

11            THE COURT:  Where are you getting these documents?

12   Again, are they complaining because you're getting them off of

13   Wikipedia or --

14            MR. YALOWITZ:  We are not going to offer a government

15   report that our expert hasn't gone back to the source and said,

16   is this your report?  Let me check and make sure.  Is this an

17   authentic government report?  They will be able to say, yes, I

18   know it is authentic.  It has all the markings of the agency.

19   I used to work with that agency, I know, I went and checked.  I

20   talked to the guy who wrote the report.

21            This notion that like, oh, these documents are

22   inauthentic in some way is such malarkey.  If we can focus on

23   the merits instead of all these hindl-dreck objections, we

24   would do a lot better.

25            THE COURT:  Your IMFA status report on the Zinni list,

F16SSOK3

1     you are offering that to show that these people, after having

2     been identified as committing terrorist acts, continued to be

3     employed by the PA?

4          MR. YALOWITZ:  Correct.

5          THE COURT:  Is that the main objective?

6          MR. YALOWITZ:  Correct.

7          THE COURT:  The IBF report you say will demonstrate a

8     logical conclusion that money is flowing from the PA and PA

9     apparatuses to designated terrorist organizations.

10         MR. YALOWITZ:  Predesignation, just plain old terror

11    organizations and then post designation to designated terror

12    organizations.

13         THE COURT:  So you are not saying that the flow of

14    money was interrupted.

15         MR. YALOWITZ:  The designation didn't seem to bother

16    them.

17         THE COURT:  All right.

18         MS. FERGUSON:  Your Honor, if I could just address

19    these past few documents we talked about.  One, this document

20    on the most wanted terrorist status report doesn't fall within

21    the public records exception.  Again, it is just the Ministry

22    of Foreign Affairs as sort of the public relations arm of the

23    Israel.

24         THE COURT:  Let me ask you this as Mr. Yalowitz would

25    argue.  Is it true?

F16SSOK3

1              MS. FERGUSON:  The question is --

2              THE COURT:  That is the real question.

3              MS. FERGUSON:  The question is does it come within the

4     exception of the hearsay?

5              THE COURT:  That wasn't my question.

6              MS. FERGUSON:  I have no idea.

7              THE COURT:  Is it true?

8              MS. FERGUSON:  I have no idea.

9              THE COURT:  That's unanswered.  You're not saying that

10    you're in a position to say that this is untrue and you are not

11    saying that you're in a position to say that these reports are

12    accurate reports?

13             MS. FERGUSON:  That's right.  I am saying it is

14    uncommon within the public records exception because --

15             THE COURT:  You wouldn't know whether or not these

16    people were still employed by the PA as represented in this

17    bullet point, you wouldn't know that?

18             MR. YALOWITZ:  Two of the guys, your Honor, are Abdel

19    Karim Aweis and Nasser Aweis.  They are still on the payroll

20    today.

21             MR. HILL:  This doesn't say that.

22             THE COURT:  Both are still employed by the PA and that

23    they committed terrorist acts.  That's what I was just asking.

24    I am trying to genuinely figure out whether or not --

25             MS. FERGUSON:  That is not what the report says.

F16SSOK3

1          MR. YALOWITZ:  The report says they were on a list of

2     33 terrorists handed to Arafat.

3          THE COURT:  Right.

4          MR. YALOWITZ:  We have Arafat on videotape admitting

5     he got the list from General Anthony Zinni.  Then these are

6     guys who work in the intelligence service.  You would think

7     that the intelligence service could find their own employees.

8     I mean, they are paying them to come to work.  They're the

9     intelligence service.  Instead of arresting them, they are

10    letting them run terror operations.  They do terror operations,

11    including the two of the ones in our case.

12         THE COURT:  That is not what this says.

13         MR. YALOWITZ:  No, I am telling you the facts.  You

14    want to know the truth, this is the truth.

15         THE COURT:  I don't know where you're getting those

16    facts.  I am dealing with what you say is admissible evidence

17    and you say the only admissible evidence on this issue that I

18    am concerned about right now is that the report says that they

19    were handed over or identified as individuals who committed

20    terrorist acts and you say identified to Arafat.

21         MR. YALOWITZ:  Right.

22         THE COURT:  Having been given this information, they

23    continued to be employed, continuously employed, by the PA.

24         MR. YALOWITZ:  That they weren't arrested.  In other

25    words --

F16SSOK3

1            THE COURT:  That is not what this says.

2            MR. YALOWITZ:  Well --

3            THE COURT:  It says both are still employed by the PA.

4            MR. YALOWITZ:  Where are you, your Honor?

5            THE COURT:  I am looking at the IMFA published report

6     on the Zinni list.

7            MS. FERGUSON:  I am looking at a Exhibit 354.

8            THE COURT:  I am just looking at your bullet point.

9            MR. YALOWITZ:  That sentence is just color.  I can

10    prove that from other stuff.

11           THE COURT:  I know, I am trying to get the import of

12    this statement and that is not --

13           MR. YALOWITZ:  The only thing the document does is it

14    says these guys were on the Zinni list.

15           THE COURT:  Right.

16           MR. YALOWITZ:  And we, the Israeli authorities,

17    arrested them in April.

18           THE COURT:  You are going to have evidence that this

19    Zinni list was given to Arafat?

20           MR. YALOWITZ:  In December, correct.

21           THE COURT:  And that even though they got the list --

22           MR. YALOWITZ:  They didn't arrest him.

23           THE COURT:  -- they didn't arrest him or terminate

24    him.

25           MR. YALOWITZ:  Correct.  Exactamundo.

F16SSOK3

1            THE COURT:  What about that is not true?

2            (Continued on next page)

F160SOK4

1          MS. FERGUSON:  The question is whether the document

2     establishes --

3          THE COURT:  No, see, you can't do that.  You're not

4     going to be persuasive that way.  When I ask you a question,

5     answer my question, not give me another question.

6          What about that is not true?

7          MR. ROCHON:  Do you have the exhibit in front of you?

8          THE COURT:  Yes, I do.

9          MR. ROCHON:  Okay, if you look at exhibit 354 that

10    we're talking about, instead of his letter, then we can get to

11    this issue.  This is the thing we don't agree with, what is in

12    here as being true.  What it says is, it says that Israel

13    presented Zinni with this list, and talks about five of these

14    people and says that five of these have been arrested by Israel

15    and goes on and describes this.

16         We don't agree that, number one, that this was given

17    to our client.  We don't agree that it was public --

18         THE COURT:  You deny it, that it was given to your

19    client?

20         MR. ROCHON:  We have no evidence that it was given --

21         THE COURT:  That's two different issues.  I asked you

22    whether you deny it was given to your client.  You say you

23    don't deny it, because you don't know.

24         MR. ROCHON:  Yeah, I can't say that I know, because I

25    haven't spent every minute of my life with Yasser Arafat before

F160SOK4

```
1    he died.  And they claim they gave it to Arafat.  So how can I
2    possibly say --
3              MR. YALOWITZ:  Mr. Rochon doesn't know the evidence.
4              MR. ROCHON:  Excuse me, sir?
5              THE COURT:  Is your argument -- is your argument that
6    you think that this is inaccurate information to give to the
7    jury, or do you just want to put a stumbling block in their way
8    and not let them use it.
9              MR. ROCHON:  We believe this is inaccurate
10   information.
11             THE COURT:  What is inaccurate?
12             MR. ROCHON:  We don't know --
13             THE COURT:  So how can you say this is inaccurate, if
14   you don't know what accurate is.
15             MR. ROCHON:  Because accuracy, if you ask me to admit
16   that it is accurate, I certainly cannot do that.  If you say do
17   I think it inaccurate, I would say yes, because it seems to me
18   to lack any evidentiary foundation.
19             THE COURT:  That doesn't make it inaccurate, that it
20   doesn't have evidentiary foundation.  That's lawyer talk.  I'm
21   asking you is it true, and you guys want to tell me it lacks
22   evidentiary foundation.
23             MR. ROCHON:  One of our disconnects, as the Court
24   might imagine, for the Palestinian authority or PLO to sit in a
25   court and be sued and have most of the evidence come in from
```

F160SOK4

1    off some website at foreign affairs -- and it is on their

2    website -- as supposedly proving the truth of underlying facts

3    under the public records exception, is obviously very

4    difficult.

5         THE COURT:  No, not necessarily.  Because you should

6    know whether those facts are true or not.  And your records

7    should show whether they are true or not.  Your in the best

8    position, and a better position than the other side to know

9    whether this information is true or not.

10        MR. ROCHON:  Actually, no, your Honor.

11        THE COURT:  You're not?  Why?

12        MR. ROCHON:  Because --

13        THE COURT:  They say they gave this information to

14   you.

15        MR. ROCHON:  Well, what do you mean?

16        THE COURT:  Your records should indicate that you

17   either have this information or you don't have this

18   information.

19        MR. ROCHON:  We have no evidence of this being --

20        THE COURT:  I understand that.  But that's not saying

21   that there is any reason for me to think that they are in a

22   better position to know this, than you are in a better position

23   if somehow your clients don't know what they knew.

24        MR. ROCHON:  One reason --

25        THE COURT:  I mean that's your argument.

F160SOK4

1          MR. ROCHON:  Well, for instance, they have all of this
2     stuff on 417 that they are talking about.
3          THE COURT:  You know what 417 is.
4          MR. ROCHON:  I have no knowledge of 417's --
5          THE COURT:  Your client does.
6          MR. ROCHON:  Well, if I could finish, your Honor.
7          I, and my client, don't have knowledge of 417 engaging
8     in the acts that the plaintiffs, and apparently some report
9     that is then summarized on some website ascribes to them.  I
10    have not seen the report that has summarized it.
11         THE COURT:  And your clients were totally unaware
12    there was such a report.
13         MR. ROCHON:  The Ministry of Foreign Affairs website
14    is a public website.
15         THE COURT:  That's not what I asked.  I asked a very
16    simple question.  You gave me an avoidance.
17         MR. ROCHON:  I have been aware of it -- through the
18    litigation, I have been aware of it.
19         THE COURT:  Your clients were not aware of this report
20    prior to the lawyers becoming aware of it.
21         MR. ROCHON:  Of the Ministry of Foreign Affairs.
22         THE COURT:  Of the 417 reports.
23         MR. ROCHON:  I have no reason to believe they were
24    aware.  But I certainly don't think they monitor the Foreign
25    Affairs website to establish the truth or lack thereof of

F160SOK4

1    Israel's disagreements with my client.

2              MR. YALOWITZ:  Your Honor, can we go back to --

3              MR. ROCHON:  Fundamentally, the question is -- I know

4    the Court often says is it true in the face of an evidentiary

5    objection.

6              THE COURT:  Okay --

7              MR. ROCHON:  And --

8              THE COURT:  -- I want to know if there is a legitimate

9    objection, or are you just saying I get you on the -- I get you

10   on technicality.  If you want the technicality, I give it to

11   you, if you deserve it.  But I am trying to figure out,

12   generally, whether you are saying that this is unreliable

13   evidence and you know it not to be true, and you don't want the

14   jury to get a false impression.  To say you don't want the jury

15   to get the true impression simply because you have a rule that

16   you can make them jump over a hoop, so before they can give the

17   jury the true impression.  I'm trying to get some sense of

18   whether or not you got a --

19             MR. ROCHON:  This is quintessentially unreliable

20   information --

21             THE COURT:  Okay.

22             MR. ROCHON:  -- is what we're saying to the Court.

23             THE COURT:  That's what I'm asking.

24             MR. ROCHON:  As far as what was happening, in

25   particular who was doing shootings in the West Bank during a

F160SOK4

period of time of incredible unrest, my client is not in a

position to tell you who did or who did not do those.  My

client is also not in a position to allow you to rely on

Israeli Ministry of Foreign Affairs summaries of various

reports they supposedly looked at.

THE COURT:  I know.  But you're not on strong ground

to argue to me that your clients are not in a position to tell

me whether or not in fact they were given information about

people accused of terrorist acts.  That they were told that

these people were in their employ, asked to arrest them, and

they decided not to arrest them and decided to continue to pay

them.  It is not a strong argument to make to me or to the

jury, I have no idea.

MR. ROCHON:  Right.

THE COURT:  That's not a strong argument.

MR. ROCHON:  Well, right now, what I'm arguing is as

to admissibility of evidence.

THE COURT:  I know what you are arguing.

MR. ROCHON:  As far as if the Court were to admit it,

despite it's not reaching the argument of evidentiary basis

that is asserted, we would have to make arguments to the jury.

We have inquired into this issue of the so called Zinni list,

and have not been able to the corroborate that it was ever

provided.

MR. YALOWITZ:  May I be heard on that?

F160SOK4

1          THE COURT:  No, no.

2          MR. YALOWITZ:  All right.

3          MR. ROCHON:  I know that plaintiffs have a different

4     view of that.  But in our -- we have asked numerous people in

5     the security apparatus about the supposed provision of the

6     Zinni list, and we have not gotten any confirmation of that.

7     There is, people referred to a so-called Zinni list.  I have

8     not seen a complete Zinni list.  There is a portion of a fax

9     that I have seen that is, I think, the plaintiffs claim is this

10    so-called Zinni list.  It does not include any of the

11    perpetrators in this case that I can tell, although the fax

12    quality is very bad.

13          So the concern we have, your Honor, is that, no, I

14    don't think this evidence is reliable.

15          THE COURT:  Okay.

16          MR. ROCHON:  B, that we have tried to make inquiries

17    as to the Zinni list.  And as to 417 stuff, we don't believe

18    that it is either reliable or the basis for the assertions.

19    In terms of whether or not the 417 evaluations investigation

20    that the plaintiffs want to rely on as their sole evidence of

21    the Guetta incident, is what they have is a summary of the

22    Israeli Ministry of Foreign Affairs website, which we have seen

23    is there, I can see it today if I want.  And it purports to

24    summarize some other report that we have not seen, that I don't

25    think Mr. Yalowicz' expert has seen.

F160SOK4

1           THE COURT:  All right.

2           MR. ROCHON:  And so, clearly, that other report may or

3   may not meet the exception, but a summary of a report is not a

4   report.

5           THE COURT:  I understand.

6           MR. ROCHON:  The summary of a 9/11 Commission report

7   is not the 9/11 Commission report.

8           THE COURT:  I understand that.  Okay, but, so, Mr.

9   Yalowicz.

10          MR. YALOWITZ:  Thank you, your Honor.  This is really

11  important.  Mr. Rochon made a representation of fact to the

12  Court that Arafat never saw the Zinni list.  I want the Court

13  to remember that, because I'm going to show Arafat on videotape

14  admitting that he got the Zinni list.

15          So when Mr. Rochon makes a representation of fact,

16  check up on it.  That's all I need to say about that.

17          THE COURT:  Let's go to the easy one.

18          I don't see any problems with the -- is there some

19  objection to the Israeli Police and Ministry of Health report

20  with regard to the bombing incident?

21          MR. HILL:  They're expert opinions.  And so they can't

22  come in under 702, unless the witness is here to be

23  cross-examined.

24          THE COURT:  What's the expert opinion.

25          MR. HILL:  Appear to be ballistics reports and autopsy

F160SOK4

1    reports and things of that nature.  So to the extent they

2    contain 702-type opinion evidence, that cannot come in.

3    Because the witness is not here to be cross-examined.  Plus,

4    they were not disclosed as testifying experts in discovery.

5            THE COURT:  Well, I'm not sure what the form of the

6    reports are.  But I'm not sure that they don't, independently,

7    just like any other medical reports, would be admissible, as --

8            MR. HILL:  Well, there is two issues.  One is whether

9    they are hearsay.  And so even assuming that they met the

10   public records exception for that, they also contain --

11           THE COURT:  I'm not sure where you find they are

12   hearsay.  They are not renditions of the acts as they took

13   place.  They are just assessments of the scene and the

14   aftermath of the attack.

15           MR. HILL:  Well, your Honor will need to look at them.

16   Some of them do include evidence about ballistics, types of

17   weapons, all of those crime scene investigation type things are

18   the sort of things you would need expertise to testify to.

19           THE COURT:  Again, that's a very nice, technical

20   argument, but are you disputing anything?

21           MR. HILL:  I have no idea.

22           THE COURT:  You have no idea.

23           MR. HILL:  These are -- look, these are documents that

24   plaintiffs want to offer --

25           THE COURT:  Look, you have a pretty good idea of what

F160SOK4

1    in what manner these attacks were carried out.

2              MR. HILL:  Your Honor, honestly, we don't.  All we

3    have is hearsay these.  Did not occur in our territory.  They

4    were not overseen by investigations by our clients.  These are

5    all investigations done by the Israeli government.  We don't

6    have any firsthand knowledge of these crime scenes, or the

7    ballistics, or the sorts of things that plaintiffs want to

8    offer these documents --

9              THE COURT:  What is it that you think they are going

10   to put before the jury that is gonna hurt you that you don't

11   want them to hear?

12             MR. HILL:  We would have to go through each report one

13   by one, do you want to do that?

14             THE COURT:  No, I want you to tell me, in general, why

15   you are standing here arguing that it shouldn't come in?

16             MR. HILL:  Very prejudicial to us.

17             THE COURT:  Why?  In what way?  Prejudicial means they

18   are going to put before the jury something that you don't want

19   them to put before the jury that is going to hurt you unfairly.

20   What is that?

21             MR. HILL:  The whole detail of the horror of the

22   scene.  It is not relevant to our liability.

23             THE COURT:  Okay, that's -- if that's your argument, I

24   understand your argument.  You want to keep out the detail of

25   the horror of the scene.

F160SOK4

1              MR. HILL:  Yes.

2              THE COURT:  Okay.

3              MR. HILL:  And the opinions and the hearsay that it is

4    based on.

5              THE COURT:  So even if it accurately reflects the

6    horror of the scene --

7              MR. HILL:  We are --

8              THE COURT:  -- you don't want it in, because you don't

9    want the jury to know how bad the scene was.

10              MR. HILL:  Not relevant to our liability, and to the

11    extent the plaintiffs didn't perceive the scene, it's not a

12    relevant to their damages and so it shouldn't come in.  It

13    doesn't have any probative value.

14              THE COURT:  It does have probative value.  The jury is

15    clearly entitled to know what happened on that day.

16              MR. HILL:  Yes, but they don't need to know the

17    details of the bomb and the dispersal of the weapons and

18    anything else.

19              THE COURT:  Why would they not be entitled to know

20    that?  You wouldn't be arguing that they were not entitled to

21    know that.  If there was an expert saying I was there, or

22    witnesses who were there say I saw it and this is what

23    happened.  And I did this.  And I took tests.  You wouldn't be

24    arguing to me they are not entitled to hear that.

25              MR. HILL:  Some of these you have already ruled on,

F160SOK4

1   the gorey photos.

2         THE COURT:  I'm not talking about gorey photos.  I'm

3   talking about the report itself, the details of the worded

4   record.

5         MR. HILL:  Well, I have objections both to the form of

6   the evidence, which is my 702 and 801 objection.

7         THE COURT:  Okay.

8         MR. HILL:  And I have a relevance and probative

9   objection.  And I'm making both of them.

10         THE COURT:  Your relevance and probative objections

11   are very weak.  That's like saying to me that this is a trial

12   about a bank robbery, but the jury shouldn't hear the details

13   of how the bank robbery took place.

14         MR. HILL:  Right.

15         THE COURT:  It's a legitimate argument to make.

16         MR. HILL:  The defendant's liability does not turn on

17   what the crime scene looked like afterwards.

18         THE COURT:  It may.  It may.

19         MR. HILL:  No, it doesn't.

20         THE COURT:  They have to prove that there was a

21   terrorist act, and they have to prove what the terrorist act

22   was, and they have to prove your involvement in that terrorist

23   act.

24         MR. HILL:  Right.  And this doesn't go --

25         THE COURT:  How are they supposed -- what -- are you

F160SOK4

1    going to concede that there was a terrorist act?

2              MR. HILL:  Your Honor has already indicated that you

3    are going to admit evidence of the convictions, which include

4    the facts of the attack, it includes the identities --

5              THE COURT:  No, it doesn't.  It doesn't include the

6    entire facts of the attack.  The jury is entitled to have

7    somebody -- you wouldn't be arguing that if there were five

8    witnesses to an attack, the jury can't hear what they say

9    happened at the time the attacks took place.

10             MR. HILL:  No.  And if the plaintiffs, who perceived

11   the attack, are going to testify about their personal knowledge

12   of the attack, I would concede that they would be entitled to

13   testify to that.

14             THE COURT:  Right.  Then there is no relevance or

15   prejudice objection.

16             MR. HILL:  Yes, there is, your Honor.  Because I don't

17   have this witness here to cross-examine.  This is a hearsay

18   statement by an expert witness, out of court, offered for the

19   truth, offered for the opinions --

20             THE COURT:  In the abstract, I understand your

21   argument.  Your arguments are very weak.  Because when I look

22   behind the veil, I can't decipher what it is you say is

23   genuinely the factual dispute, okay.  That's what weakens your

24   arguments on a lot of these issues.  I understand your

25   technical argument.  They are very well articulated as lawyers,

F160SOK4

1    okay. But in real life, I'm trying to understand what the

2    prejudice is, understand what is it you don't want the jury to

3    hear, understand why you say that this gives the jury a false

4    impression of the facts that you think they should have to

5    resolve this dispute. And I don't hear it. You are weak on

6    good reasons for keeping a lot of this stuff out, although you

7    may be very strong on, quote, legal grounds to -- if I wish, to

8    rule that, yes, that's a legal ground for me to keep it out.

9             MR. HILL: Well, your Honor, I mean --

10            THE COURT: But, you know, you --

11            MR. HILL: We do make the objections under the rules

12    of evidence --

13            THE COURT: That's fine. I'm telling you, if you have

14    a good argument to make about why it really is damaging to you,

15    all you have to do is tell me that, and I'll keep it out. But

16    I'm trying to beg that from you. And the fact that --

17            MR. HILL: The reports --

18            THE COURT: -- all of the weeks and months that I

19    begged that from you, I can't get that from you, gives me less

20    concern that somehow you are being unfairly disadvantaged by

21    all of this evidence.

22            MR. HILL: I'll give an example. There is a report on

23    here about the January 22 shooting. Neither of the plaintiffs

24    who were injured there have a perception of the aftermath of

25    that shooting.

F160SOK4

```
 1              THE COURT:  Okay.
 2              MR. HILL:  In our view, the photos of the bus stop,
 3    and the ambulances, and the buildings, and the bullet ridden
 4    cars, it's not going to come in for anything that is probative
 5    in this case.  One of the plaintiffs was rendered unconscious
 6    immediately.  She has no recollection of the event.  The other
 7    one fell onto a bus and was driven away and did not see the
 8    aftermath.  That was the testimony we got at depositions.  We
 9    ought to not have a hearsay report with photographs of the
10    crime scene.  They are not relevant to plaintiffs injuries or
11    our liability.
12              THE COURT:  I understand that argument.  That's a
13    lawyer's argument.  That's like saying that, you know, there
14    was an attack in the subway, and somebody came up behind me and
15    hit me in the head with a hammer.  So, the jury shouldn't hear
16    any evidence about what happened after I got hit in the head
17    with the hammer, because I don't remember anything.  That's
18    just not a logical argument to make.  I don't understand the --
19    well, let's put it this way, that's a logical argument, but
20    that's not a reasonable argument.  And there is a difference.
21    And lawyers talk in logic.  Jurors think in reason.  I'm trying
22    to figure out, that's not an argument to make, oh, they were
23    rendered unconscious as soon as the attack occurred, so none of
24    the things that happened while they were unconscious is
25    relevant for the jury to hear.  That's not a legitimate
```

F160SOK4

1    argument to make.  I mean you have to give me a better argument

2    than that.  But, I think I understand your technical argument.

3    I don't understand how you say you are being unduly prejudiced.

4    But, you know, I will evaluate it again in that context.

5              I guess the only other thing I skipped over, something

6    about the confiscation of terrorist funds.  I'm not sure what

7    you were going to -- is that the IMFA report.

8              MR. ROCHON:  Bottom of page 3, your Honor.

9              MR. YALOWITZ:  Let me consult for one second on that

10   one.  That's the June 19th attack.  Let me consult on that for

11   a second.

12             THE COURT:  All right.

13             MR. YALOWITZ:  Okay.  So, this is a case where the

14   Court dismissed the vicarious liability claim, so --

15             THE COURT:  Still in this case.

16             MR. YALOWITZ:  So I think it is still in, and let me

17   explain why.  I'll tell you what the report is, and I'll tell

18   you why I want it, and you can consider it.

19             All right.  So, the report is a terror fund.  It's a

20   report of a terror fund freezing operation.  So the Attorney

21   General's office, the Israeli Security Agency, and somebody

22   else, probably the IVF, investigated and found people who were

23   financing terror, and seized their bank accounts.  And these

24   pair of documents reported on that operation.  So it was a

25   legally-authorized investigation.  And, in fact, it is I mean

F160SOK4

1    it's like OFAC.  You know, OFAC makes an announcement, we seize

2    the funds of, you know, John Doe, then it is evidence.

3              THE COURT:  So whose funds did they seize?

4              MR. YALOWITZ:  The seized the funds of Naef Abu Sharkh

5    was a PA employee.  Now, your Honor --

6              THE COURT:  Seized his personal funds?

7              MR. YALOWITZ:  Yes.

8              THE COURT:  Okay, so --

9              MR. YALOWITZ:  Now, your Honor said that's not enough

10   to go to the jury on vicarious liability.  We accept that

11   ruling.

12             THE COURT:  Okay.  I'm trying to figure out, I mean --

13             MR. YALOWITZ:  What's left.  Why do we still want the

14   report.

15             THE COURT:  And why is that evidence that the PA's

16   funds were being used?

17             MR. YALOWITZ:  No.  No, well, there is other evidence.

18   And this is why I still want the document.  There is other

19   evidence that he was a -- that this individual was a conduit

20   for funds to and through Al Aqsa Martyrs Brigades which, by the

21   time of the attack, was a designated terror organization.

22             THE COURT:  What does that have to do with the PA?

23             MR. YALOWITZ:  The evidence is that the PA supplied

24   money to Al Aqsa Martyrs Brigade through him.

25             THE COURT:  And what's the evidence of that?

F160SOK4

1          MR. YALOWITZ:  There is other evidence.

2          THE COURT:  Why do you say that?  Is there evidence of

3   that or was that somebody's conclusion?

4          MR. YALOWITZ:  There are confessions of other people

5   who said I got money from that guy, from Naef Abu Sharkh.

6          THE COURT:  How does that still say that that is the

7   PA's money.

8          MR. YALOWITZ:  I have to look, but I think that the --

9   I think that it's a reasonable inference that, in the context

10  of a pattern of giving money to the Al Aqsa Martyrs Brigade

11  through operatives, like Naef Abu Sharkh, this guy was one of

12  the people that Al Aqsa -- that was one of the Al Aqsa members.

13         THE COURT:  And how do you intend to demonstrate that

14  there was a pattern, such a pattern.

15         MR. YALOWITZ:  Well, we have the raw documents.  We

16  have the government reports.  We have convictions.  We have

17  confessions.  So, we have got --

18         THE COURT:  Well, wait, no.  I'm just focusing on the

19  providing of cash money.

20         MR. YALOWITZ:  That's what I'm talking about.  That's

21  what I'm talking about.  We have raw documents saying give this

22  guy 600 bucks, give that guy 300 bucks, give that guy 800

23  bucks.

24         THE COURT:  Okay, but that doesn't -- I don't know

25  which guy you are talking about.  Are you talking about --

F160SOK4

1            MR. YALOWITZ:  And then we have other documents that
2     can match those up that say these were Al Aqsa fighters.  Or
3     these were Fatah fighters.
4            THE COURT:  And this money was given, for what
5     purpose?
6            MR. YALOWITZ:  Well, I think the reasonable
7     inference -- we have documents saying here's who the Fatah
8     fighters are.  And you have documents that say give these guys
9     money.  And it's the same guys.  I think it is reasonable to
10    infer that you're giving money to these guys for killing
11    civilians.
12           THE COURT:  And is there any other relationship or
13    reason to give these guys money?
14           MR. YALOWITZ:  Not that I have been able to discern.
15    I mean we have intelligence reports from the defendant's
16    intelligence service saying here's a detailed report on the
17    various Fatah fighters.  This guy did a great quality
18    operation, which is a suicide mission, you know, which I can
19    tell you is a suicide mission that killed civilians.  So you
20    have to piece it together.  It is a mosaic.
21           THE COURT:  Okay.
22           MR. YALOWITZ:  But, in my opinion, this report is a
23    piece of the mosaic.
24           THE COURT:  All right.
25           Yes.

F160SOK4

1            MS. FERGUSON:  Calling it a report, again, it is

2     another Israeli Ministry of Foreign Affairs website release.

3     It is not as though they did some investigation.  And, in fact,

4     it is evident from the document, I'm looking at plaintiff's

5     exhibit 339, that the Ministry of Foreign Affairs is reporting

6     on something, quote, "communicated by the GPO," which I believe

7     is the Government Press Office, who then is reporting on

8     providing I guess GPO or Ministry of Foreign Affairs you know

9     statement about Naef Abu Sharkh.  And the Court already looked

10    at this document and found that it didn't create any evidence

11    in the Naef Abu Sharkh to the Mandelkorn incident.  It doesn't

12    come in under any hearsay exception.

13            And I would also just like to point out that this

14    whole notion that there is some pattern of funding of AANB or

15    Fatah activists, you know, Mr. Yalowicz quickly goes to

16    custodial statements and convictions where he is relying on the

17    very thing the Court said we can't rely, somebody indicating a

18    third-party blame shifting.  And he has submitted all these raw

19    documents.  There is only two raw documents that even

20    admissible show any payment.  They are not of any of the

21    perpetrators at issue and of very small amounts of money and

22    don't say anything about why they were provided.  So this is

23    really a house of cards here.  And I want to make that clear,

24    because it sounds like there is more evidence than there is.

25            THE COURT:  All right.  Let's do this.  I'm going to

F160SOK4

1    try to resolve all of these issues by Monday when we talk.  I

2    would like to get together again on Monday morning.

3              Tomorrow, let's convene again at 9:30 in the

4    courtroom.

5              MR. YALOWITZ:  Your Honor, may I, before we break,

6    I --

7              THE COURT:  Let me finish my thought.

8              MR. YALOWITZ:  I'm sorry.

9              THE COURT:  I just want to, procedurally, let you know

10   how we have got this scheduled.

11             We are going to start here at 9:30, continue some of

12   these conversations.  We'll talk about other issues if we need

13   to, tomorrow, as we are getting the jurors together.

14             What we're going to do, is I'm going to, once they

15   have given the jurors orientation, it should be about 200.

16   They are going to be given numbers, randomly.  When they tell

17   me that they are ready tomorrow to give out the questionnaires,

18   we will simply go down to the jury room and we will convene

19   down there.  I'll give the jury the preliminary instructions,

20   substantially the same or similar to what I just gave out,

21   telling them that this is what the case is, this is what we're

22   asking them to do.  And, then, I will have the jury room call

23   the numbers out one at a time, so they can get their

24   questionnaire.  And then they will all get their questionnaire,

25   and they will fill out their questionnaires.  And we should,

F160SOK4

1    hopefully we can do that process before lunch.  And they can

2    either fill out their questionnaires by lunchtime or by early

3    afternoon.  And we'll have the questionnaires by early

4    afternoon, at the latest.

5          I will give the questionnaires to the parties.  You

6    should go right away and make arrangements to make the copies,

7    give me back the originals, and give me back the original and

8    make copies for each one of you.  And then start going through

9    the questionnaires.  I'll also start going through the

10   questionnaires, the same process that you are going through.

11   I'll need your responses by Friday, the earlier the better, if

12   you can get it, no later than 3:00.  If you can get it to me

13   2:00 or 3:00 so we can exchange them, and give me -- if you

14   want to -- you can go ahead and exchange them if you want, your

15   responses, and then e-mail them to me so you'll have the forms.

16   You'll have each other's forms.  It won't be a mystery as to

17   what I'm going to do.  And you'll probably go through the same

18   process.  As I said, I'm just going to go down and compare the

19   two.  And every time I see a match, in that order, we'll order

20   that they be seated.  And those are the jurors that we're going

21   to further select from.  Hopefully, we'll get 20 or 30, at the

22   minimum.  If not, then I'll do the process, as I indicated.

23   I'll pick the first person on the list that the plaintiffs say

24   is acceptable, and then the second person will be the second

25   person on that list, that the defendants said was acceptable,

F160SOK4

1    but that the plaintiff didn't challenge, say they had a valid

2    challenge for cause.

3            So we will have all of those we will make calls to.  I

4    need it by Friday, so that early Friday we can all know who

5    those possible people are gonna be.  Let me say I'll shoot for

6    30 at this point.  I think that should be more than enough.

7    There may be some other people who come up with good reasons

8    why they can't serve, either for challenge for cause or some

9    scheduling problem.  So 30 should be enough to get us 12

10   jurors, as I say, three peremptories per side.

11           So I will be able to tell the jury room before the end

12   of the day Friday that they can contact the jurors, say the

13   first 50 jurors that we have on that list, to come back on

14   Tuesday morning.  And I'll have them report back to the jury

15   room on Tuesday.  And when they all report back to the jury

16   room.  Then we'll bring them up from the jury room here.  And

17   then be conscious of, not overly aggressive, but be conscious

18   of, you know, minimal contact between potential jurors and

19   jurors and the parties and the audience and press, and that

20   sort of thing.  So, I'm still working on that process to get

21   them in and out, so people don't get on the elevator with

22   jurors, and talk about stuff in the hallways.  Obviously, my

23   rule is don't speak to any of the jurors.  And I'll instruct

24   them to not speak with you.  And even anybody in the audience,

25   they should obviously not talk about the case.  They really

F160SOK4

1    shouldn't, no one should talk about the case unless you are in

2    a room.  I will give both sides a witness room.  You can use it

3    any way you want.  Small witness room on the side for the

4    witnesses, or for you to store stuff while trying the case.

5            So Monday morning the jury room, we'll call the

6    jurors, tell which one should report, which ones shouldn't.  If

7    there is a real issue with the list, let me know if you can as

8    early as possible, Friday, Saturday, Sunday, or before Monday,

9    you know, by then.  Because the phone calls will start to be

10   made telling people that they should report the next day and

11   telling people which people shouldn't have to report.  So I

12   think that we'll meet Monday at 9:30.  And we'll continue and

13   we'll finish up.  I'll give you definitive rulings as I can on

14   the issues that are still outstanding.  And then we'll be

15   prepared to move forward.

16           On Tuesday, I may ask some basic questions to each of

17   the jurors.  But, obviously, I'm not going to repeat all of the

18   questions.  I just want to get some feel for their personality

19   and/or make sure that they can reaffirm that they could be fair

20   and impartial jurors on both sides, and nothing has changed

21   since they filled out the questionnaire.

22           And, then, I'll have people, both sides, exercise

23   their challenges to the first -- again, no sense to exercise

24   challenge to anyone other than the first 18 in the box, because

25   you only have three challenges, and you are not going to end up

F160SOK4

1    with 12.  So a challenge to juror number 19 is a wasted

2    challenge.  So we will do that.

3            And then I would anticipate the parties should be

4    ready to open on Tuesday and be prepared to start with the

5    first witness, depending on how long the opening is gonna be.

6    And a steady flow of witnesses.

7            And then we can talk a little bit more about what the

8    real length of the trial is but, frankly, I don't think it

9    should take 10 weeks.  And I think, given the nature of the

10   issues, and some of the rulings that I think we're talking

11   about, it's a good seven or eight weeks, not much more than

12   that.

13           MR. ROCHON:  In that regard, your Honor, I thought --

14   I think your current presentation to give the jurors says 10 to

15   12 weeks.  I would ask, I mean I know you want to keep an

16   outside limit, so we never go longer than you predicted, I

17   recognize your credibility is important, you might want to give

18   them a bottom number that is more optimistic than 10; 6 to 12,

19   7 to 12, something like that, so we don't get people who will

20   answer their questions more aggressively if they think it is --

21           THE COURT:  I'm sensitive to that.  And what I need

22   from you, by Monday -- and we can agree upon a time frame -- is

23   that you just have to give me a realistic approximation of how

24   many witnesses each side thinks that they will call and how

25   long it would take to present their evidence, okay.  So I can

F160SOK4

1    know the number of people we have to deal with.  And give me

2    the number of people, there are a lot of documents, and maybe

3    deposition testimony that we still have to address.  So if you

4    can give me your best estimate of how many live witnesses we

5    are going to see, and how long you think it might take.  So if

6    we're talking, you know, four weeks, for plaintiff and three

7    weeks for defense, we're probably more likely talking two to

8    three weeks for the plaintiff, one to two weeks for the

9    defendants.  So you're right, I don't want to scare the jurors

10   off, making them think that it is going to be too long.

11           I'm usually pretty good with giving them an accurate

12   count of what the length of the trial will be.  And I do

13   usually likely make it end a little earlier than I expected,

14   but I don't want to give them too much of a time frame, because

15   this is going to be a major commitment for them.  And so we'll

16   address that on Monday.

17           And we'll go, I'm going to start clearing my calendar

18   so that we can start 9:45 in the morning and go until just

19   before 5:00 every day until we finish.  And I'll sprinkle some

20   other cases in between in terms of short appearances or over

21   the lunch period.  But, otherwise, you can expect that I would

22   expect a steady flow of evidence and witnesses every day until

23   we finish.  I think that, you know, I think we can efficiently

24   get through that in a reasonable amount of time.

25           MR. ROCHON:  On that, I apologize.  If we show that we

F160SOK4

move things along after couple of weeks, I would ask the Court

to consider taking Fridays off, if we are making good progress.

I know we don't want to do that until we see how we're doing,

but --

        THE COURT:  It's more likely we'll take a couple of

Fridays off, a few Fridays off.  I don't want to get into the

pattern that every Friday we have off.  I think the jurors

don't like that, either.  I mean they like that -- I mean if we

have five weeks of trial and you take every Friday off that

adds another week to the trial.  So that's why I'm concerned

about adding another two or three weeks.  I'm probably going to

commit to the jurors -- I mean, remember, we have president's

day off.  We have also Lincoln's birthday off.  And that's

Thursday.  And Monday is president's day, February.  So it's

likely that I'm going to give everybody the day after Lincoln's

birthday off.  So it will be Thursday, Friday, and Monday.  And

everybody will have off as a long weekend.  I'll at least shoot

for that.  And probably, depending on how we get through

January, and how much more we have to do, I mean if it really

does look like we're two to three weeks out, I might think

about going ahead and committing telling them that we'll have

the next few Fridays off.  We'll talk about that and be

flexible for that.  So we're committed to this and ready to go.

        MR. ROCHON:  Your Honor, tomorrow, then, after you're

done handing out the questionnaires, I think counsel are then

F160SOK4

1    done with the Court at that point, we'll come back and get --

2    someone will come back and get the questionnaires for each, but

3    we wouldn't be reconvening with you.

4            THE COURT:  No reason to reconvene after that.  We

5    have to get the questionnaires back.  And, hopefully, we'll

6    have them back as early as possible for the end of the day.

7    And then you can spend the rest of the time that you have

8    discussed to give you the rest of the time to go through them

9    and so you can get them back to me as quickly as possible, and

10   we can be prepared to get an adequate number of qualified

11   jurors that can sit fairly in the case.

12           MR. ROCHON:  And second, your Honor, we'll e-mail you

13   our list, and then we'll send ours to plaintiffs once we know

14   they have sent theirs, as well.

15           MR. YALOWITZ:  I'm sorry?

16           MR. ROCHON:  We'll e-mail the Court ours, and you'll

17   do the same, and we'll exchange after we have each sent --

18           MR. YALOWITZ:  I thought we'll pick a time and send

19   them to the Court and copy each other.

20           MR. ROCHON:  Fine, pick a time.  I'm fine.  We'll work

21   with that, as well.

22           THE COURT:  As far as I'm concerned, you can give them

23   to each other before you give them to me, I don't care.  I

24   don't want that to be an issue.  I will wait.  I would say

25   exchange them with each other before you send them to me,

F160SOK4

1    because once I get them in hand, I want to know at that point

2    you both have the other side's.

3              MR. YALOWITZ:  That's fine.

4              MR. ROCHON:  One other preparation thing, your Honor.

5    I know the Court is going to be ruling on some of the expert

6    issues on Monday.  If the plaintiffs anticipate calling an

7    expert as one of their first couple of witnesses on Tuesday or

8    Wednesday, we would like to try to get -- we are talking, I

9    think might be unusual, I assume they might not do that.  We

10   would like clearance on that.  Because it will take longer to

11   adjust to those, and all of their fact witnesses and all their

12   plaintiffs.  So if we can try to get a sense of when they are

13   going to call their experts, at least know those first couple

14   of days, that would be helpful.

15             THE COURT:  Right, I --

16             MR. YALOWITZ:  Didn't we just go over the 72 hour

17   rule, I thought.  Wasn't that today?  I thought we agreed on

18   the 72 hours.

19             THE COURT:  That's what I was going to say I want

20   to -- you know, you think you can get them that?

21             MR. YALOWITZ:  I think I can live up to my agreement

22   to get them in 72 hours in advance.  We talked about other

23   agreements and they were not interested, and now we have made

24   an agreement, I can live with that.

25             THE COURT:  So when would you do that for Tuesday.

F160SOK4

1          MR. YALOWITZ:  So, on Tuesday morning.  Let's see,

2    Monday morning, Sunday morning, Saturday morning; 72 hours in

3    advance.  I can do that.

4          THE COURT:  Can we skip the weekends.

5          MS. FERGUSON:  Yeah.

6          THE COURT:  Friday afternoon.

7          MR. YALOWITZ:  I can give it to them Friday afternoon.

8    If it falls on a weekend, 5:00 Friday.

9          THE COURT:  Falls on weekend or holiday, before the

10   end of the previous business day.

11         MR. YALOWITZ:  Sure, gladly, no problem.  See, how --

12   okay, I have just a couple of -- I apologize, I know it is

13   getting late.

14         But, first of all, can we get our AV people in here on

15   Friday, so they can work with the Court's AV --

16         THE COURT:  Yes.

17         MR. YALOWITZ:  As I remember, like the Court has an.

18   AV department that will put little screens for the jurors?

19         THE COURT:  Yeah, we have some courtrooms that are set

20   up with each one, one for each.  See, we don't have that here.

21   We can probably dispurse a few.  It depends.  I would be a

22   little sparing with that, because it usually ends up starting

23   to get in people's way.  The better thing is to let them put

24   the big screen up.  You have the smaller screens and, you know,

25   decide whether or not you want a couple of screens in the jury

F160SOK4

1    box, at all, as opposed to the large screen.

2              MR. YALOWITZ:  Big one up there.  Okay, we'll figure

3    that out.

4              THE COURT:  Talk that out with them.

5              MR. YALOWITZ:  I love those little touch screens where

6    you can circle stuff.

7              THE COURT:  Yeah, whatever you guys --

8              MR. YALOWITZ:  Okay.  So, then, also, our -- we have

9    our lead interpreters so patient all day.  And I think she

10   wants to get in here, maybe Friday, as well, or even in

11   advance.  She can, with the Court's permission, if she can

12   contact chambers and/or the courtroom deputy or somebody, and

13   just get in here and make sure that the set-up is as she wants

14   it for her team, that would be great.

15             THE COURT:  That's fine.  I'll make Friday available

16   for all of you to --

17             MR. YALOWITZ:  That's fine.

18             Third thing.  We wrote a letter.  We exchanged

19   letters, Mr. Rochon and I, some weeks ago, maybe even a month

20   ago, in which we agreed to split the costs of the court

21   reporter and the interpreters.  And we'll hand up -- I'll try

22   to get an order to the Court.  I know you are going to be

23   shocked, but apparently there is some debate about the contours

24   of the agreement we reached.  And, you know, I didn't think

25   splitting costs was all that complicated, but --

F160SOK4

1            THE COURT:  Are you going to try to get daily copy?

2            MR. YALOWITZ:  I was thinking about next day, but if

3    you want daily --

4            THE COURT:  No, I will take whatever you --

5            MR. YALOWITZ:  If you want daily, I'll just borrow

6    your copy.

7            THE COURT:  I don't think the reporters will let me do

8    it that way.

9            So you check with the court reporters and figure out

10   what you really want, because they are going to have to

11   logistically make sure they can staff it to get it to you.  I

12   mean I don't know if there is any real reason to have real time

13   here, we have done that, and --

14           MR. YALOWITZ:  I think the interpreters -- all of our

15   witnesses are not foreign language speakers.  Some are.  And I

16   think the interpreters really want that for those witnesses, so

17   I think we --

18           THE COURT:  Two sides try to agree and then try to see

19   what you can work out with the court reporters in terms of

20   whether you are going to do daily copy for the next day, or you

21   are going to do real time, or --

22           MR. YALOWITZ:  We'll figure that out.  And I hope

23   we'll be able to hand up an agreed order but, you know, we have

24   not been very successful so far.

25           And then the final thing is, in opening, I would like

F160SOK4

1    to be able to put a few -- I mean I'm not going to overdo it,

2    but put are three or four documents and photographs up in front

3    of the jury.  I am very sensitive to the Court's view that you

4    don't put anything up in front of the jury unless it is in

5    evidence.  Maybe I'll send you the documents and photographs

6    and just ask the Court's permission.

7         THE COURT:  What I am most concerned about, first, is

8    anything any side wants to use, whether it is just illustrative

9    or demonstrative or it's going to be an exhibit in evidence,

10   whatever you are going to use during opening, show it to the

11   other side before Tuesday.  And so I want to know if the other

12   side has an objection as to you're using that, whatever it is,

13   whatever type of objection, before trial.  My suggestion is to

14   try to figure that out early on, maybe even by Friday.  Because

15   if there is a legitimate objection and you have to make a

16   change, you know --

17        MR. YALOWITZ:  Your Honor, I can assure you I will not

18   offer a document that the defendants don't object to. It's just

19   the way they roll.

20        THE COURT:  That's not going to be my issue.  My issue

21   is going to be whether I agree with them or not.  If I agree

22   with them, you have to be ready to change or go without.  So

23   make it early on, and I can rule.  And I mean we already talked

24   about some things, different wordings and stuff like that.

25   Those things can be changed at the last minute.  But,

F160SOK4

1    otherwise, both of you should know, before you open, what it is

2    that you are going to use in opening.  And if there is an

3    objection to that, I want to hear it on Monday.  If there is

4    not an objection to it, then I'm probably not going to be

5    concerned about preventing you.

6            MR. YALOWITZ:  Why don't I commit to getting it --

7    I'll consult with the defendants.  I'll commit to getting it to

8    the Court Thursday.  And then if we can get the defendants to

9    commit to giving their objections Friday.  I promise it won't

10   be a lot of documents, it won't be a lot of slides, but

11   something.  So that I'm not looking at stuff at 7:00 Sunday

12   night, like I was last night.  It is ridiculous.

13           THE COURT:  It makes a lot more sense to me.

14           MR. YALOWITZ:  All right.

15           THE COURT:  All right, then.

16           MR. ROCHON:  Thank you, your Honor.

17           (Adjourned)

18

19

20

21

22

23

24

25