UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK I. SOKOLOW, et al.,

     *Plaintiffs*,

  v.

PALESTINE LIBERATION ORGANIZATION,
et al.,

     *Defendants*.

Case No. 04 Civ. 397 (GBD)

 

**PLAINTIFFS' OPENING MEMORANDUM
CONCERNING APPLICATION AND CONSTITUTIONALITY OF THE
<u>PROMOTING SECURITY AND JUSTICE FOR VICTIMS OF TERRORISM ACT</u>**

 

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
T: (212) 836-8000
F: (212) 836-8689

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................1

PROCEDURAL BACKGROUND ......................................................................................2

LEGAL STANDARD ....................................................................................................6

ARGUMENT ..............................................................................................................7

I.    Defendants Consented to Personal Jurisdiction Under the PSJVTA ...................7

      A.    Defendants Consented to Jurisdiction under Subparagraph (1)(A) ......................8

            1.    Defendants Paid Terrorists' Families and Other Designees after
                  April 18, 2020 ...............................................................................8

            2.    More than 175 Terrorists in Defendants' Pay-For-Slay Programs
                  Have Killed or Injured Americans ...........................................14

            3.    Defendants' Payments Were Made "By Reason Of" the Terrorists'
                  Imprisonment or Death..........................................................15

      B.    Defendants Consented to Jurisdiction Under Subparagraph (1)(B) ...................16

            1.    Defendants' Office and Activities Meet Subparagraph (1)(B) ...............16

            2.    Defendants Do Not Meet Any Exception in Subparagraph (3) ...............19

II.   Alternatively, the Court Should Order Jurisdictional Discovery ....................24

III.  The PSJVTA Is Constitutional..........................................................................25

      A.    The PSJVTA Does Not Violate the Due Process Clause.....................................25

            1.    The PSJVTA Gave Defendants Fair Warning .........................................26

            2.    The PSJVTA Reasonably Advances Legitimate Government
                  Interests.................................................................................29

      B.    The PSJVTA Does Not Invade the Judicial Power ...............................................33

CONCLUSION............................................................................................................37

# TABLE OF AUTHORITIES

**Cases**                                                                    Page(s)

*A.I. Trade Fin., Inc. v. Petra Bank*,
  989 F.2d 76 (2d Cir. 1993) ...................................................................................6

*Adam v. Saenger*,
  303 U.S. 59 (1938) ...............................................................................................7

*Ahmad v. Wigen*,
  726 F. Supp. 389 (E.D.N.Y. 1989)......................................................................15

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
  671 F.3d 140 (2d Cir. 2011) ...............................................................................24

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
  902 F.2d 194 (2d Cir. 1990) .................................................................................6

*Balt. & Ohio RR. Co. v. Harris*,
  79 U.S. (12 Wall.) 65 (1870) ................................................................................7

*Bank Markazi v. Peterson*,
  136 S. Ct. 1310 (2016) ........................................................................................30

*Bendix Autolite Corp. v. Midwesco Enters.*,
  486 U.S. 888 (1988) ..............................................................................................7

*Bostock v. Clayton Cty., Georgia*,
  140 S. Ct. 1731 (2020) ...................................................................................6, 23

*BouMatic, LLC v. Idento Operations, BV*,
  759 F.3d 790 (7th Cir. 2014) ..............................................................................28

*Bryan v. United States*,
  524 U.S. 184 (1998) ............................................................................................27

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ....................................................................... 25, 26, 27, 29

*Capitol Recs., LLC v. Vimeo, LLC*,
  826 F.3d 78 (2d Cir. 2016) .................................................................................22

*Chi. Life Ins. Co. v. Cherry*,
  244 U. S. 25 (1917) ...............................................................................................7

*Comm'r v. Clark*,
  489 U.S. 726 (1989) ............................................................................................22

*Cty. of Sacramento v. Lewis,*
     523 U.S. 833 (1998) ....................................................................................... 26, 29

*Daimler A.G. v. Bauman,*
     571 U.S. 117 (2014) ............................................................................................... 29

*Demjanjuk v. Petrovsky,*
     776 F.2d 571 (6th Cir. 1985) ................................................................................. 15

*Dunn v. United States,*
     442 U.S. 100 (1979) ............................................................................................... 22

*Eain v. Wilkes,*
     641 F.2d 504 (7th Cir. 1981) ................................................................................. 15

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council,*
     485 U.S. 568 (1988) ............................................................................................... 23

*Ehrenfeld v. Mahfouz,*
     489 F.3d 542 (2d Cir. 2007) .................................................................................. 24

*Epic Sys. Corp. v. Lewis,*
     138 S. Ct. 1612 (2018) ........................................................................................... 23

*Gamble v. United States,*
     139 S. Ct. 1960 (2019) ........................................................................................... 32

*Gen. Contracting & Trading Co. v. Interpole, Inc.,*
     940 F.2d 20 (1st Cir. 1991) ...................................................................................... 7

*Hamdan v. Rumsfeld,*
     548 U.S. 557 (2006) ............................................................................................... 35

*Hancock v. Am. Tel. & Tel. Co.,*
     701 F.3d 1248 (10th Cir. 2012) ............................................................................... 9

*Harisiades v. Shaughnessy,*
     342 U.S. 580 (1952) ............................................................................................... 30

*Heller v. Doe,*
     509 U.S. 312 (1993) ............................................................................................... 25

*Hess v. Pawloski,*
     274 U.S. 352 (1927) ................................................................................................. 7

*Holder v. Humanitarian Law Project,*
     561 U.S. 1 (2010) .............................................................................................. 30, 31

iii

*In re Pazienza,*
    619 F. Supp. 611 (S.D.N.Y. 1985) ........................................................................ 15

*Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,*
    456 U.S. 694 (1982) ............................................................................. 7, 26, 28

*Jesner v. Arab Bank, PLC,*
    138 S. Ct. 1386 (2018) ...................................................................................... 36

*Katz v. Donna Karan Co., L.L.C.,*
    872 F.3d 114 (2d Cir. 2017) ............................................................................. 24

*Kennedy v. Mendoza-Martinez,*
    372 U.S. 144 (1963) .......................................................................................... 30

*Klinghoffer v. SNC Achille Lauro,*
    795 F. Supp. 112 (S.D.N.Y. 1992) .................................................................... 20

*Klinghoffer v. SNC Achille Lauro,*
    937 F.2d 44 (2d Cir. 1991) ........................................................................ 20, 21

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) .......................................................................................... 22

*Lafayette Ins. Co. v. French,*
    59 U.S. (18 How.) 404 (1855) ............................................................................ 7

*Linde v. Arab Bank, PLC,*
    882 F.3d 314 (2d Cir. 2018) ............................................................................. 14

*Meese v. Keene,*
    481 U.S. 465 (1987) .......................................................................................... 20

*Miller v. French,*
    530 U.S. 327 (2000) .......................................................................................... 34

*Nat'l Equip. Rental, Ltd. v. Szukhent,*
    375 U.S. 311 (1964) .......................................................................................... 26

*Neirbo Co. v. Bethlehem Shipbuilding Corp.,*
    308 U.S. 165 (1939) ............................................................................................ 7

*NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760,*
    377 U.S. 58 (1964) ............................................................................................ 23

*Olberding v. Ill. Cent. R.R. Co.,*
    346 U.S. 338 (1953) ............................................................................................ 7

iv

*Oppel v. Empire Mut. Ins. Co.*,
   92 F.R.D. 494 (S.D.N.Y. 1981) ...................................................................28

*Owen Equip. & Erection Co. v. Kroger*,
   437 U.S. 365 (1978) ...................................................................................22

*Pa. Fire Ins. Co. v. Gold Issue Mining & Milling Co.*,
   243 U.S. 93 (1917) .......................................................................................7

*Patchak v. Zinke*,
   138 S. Ct. 897 (2018) ............................................................................33, 36

*Perez v. Brownell*,
   356 U.S. 44 (1958) .....................................................................................30

*Plaut v. Spendthrift Farm*,
   514 U.S. 211 (1995) ...............................................................33, 34, 35, 36

*Regan v. Wald*,
   468 U.S. 222 (1984) ...................................................................................30

*Robinson v. Overseas Mil. Sales Corp.*,
   21 F.3d 502 (2d Cir. 1994) .......................................................................34

*Roell v. Withrow*,
   538 U.S. 580 (2003) ...............................................................................7, 26

*Shatsky v. Palestine Liberation Org.*,
   955 F.3d 1016 (D.C. Cir. 2020) ..................................................................7

*Simon v. S. Ry. Co.*,
   236 U.S. 115 (1915) .....................................................................................7

*Sioux Tribe of Indians v. United States*,
   97 Ct. Cl. 613 (1942) .................................................................................35

*Sokolow v. Palestine Liberation Org.*,
   138 S. Ct. 1438 (2018) .................................................................................4

*Spann v. Colonial Vill., Inc.*,
   899 F.2d 24 (D.C. Cir. 1990) ......................................................................7

*State of Israel v. Motor Vessel Nili*,
   435 F.2d 242 (5th Cir. 1970) ....................................................................15

*Stone v. INS*,
   514 U.S. 386 (1995) ...................................................................................17

*Strauss v. Crédit Lyonnais, S.A.*,
  925 F. Supp. 2d 414 (E.D.N.Y. 2013).................................................................15

*Sullivan v. Finkelstein*,
  496 U.S. 617 (1990).........................................................................................23

*In re Terrorist Attacks on Sept. 11, 2001*,
  298 F. Supp. 3d 631 (S.D.N.Y. 2018)........................................................25, 34

*In re Terrorist Attacks on Sept. 11, 2001*,
  349 F. Supp. 2d 765 (S.D.N.Y. 2005)................................................................6

*Trainmen v. Toledo, P. & W.R. Co.*,
  321 U.S. 50 (1944)...........................................................................................36

*United States v. Aguilar*,
  515 U.S. 593 (1995).........................................................................................22

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936).........................................................................................30

*United States v. Dhafir*,
  461 F.3d 211 (2d Cir. 2006).............................................................................25

*United States v. Garcia*,
  689 F.3d 362 (5th Cir. 2012)............................................................................22

*United States v. Palestine Liberation Org.*,
  695 F. Supp. 1456 (S.D.N.Y. 1988).................................................................16

*United States v. Palestine Liberation Org.*,
  695 F. Supp. 1456 (S.D.N.Y. 1988).................................................................17

*United States v. Sioux Nation*,
  448 U.S. 371 (1980).........................................................................................35

*United States v. Sioux Nation of Indians*,
  518 F.2d 1298 (Ct. Cl. 1975)...........................................................................35

*United States v. Smith*,
  499 U.S. 160 (1991).........................................................................................21

*Waite v. All Acquisition Corp.*,
  901 F.3d 1307 (11th Cir. 2018)........................................................................28

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016)...............................................................................4

*Waldman v. Palestine Liberation Org.*,
    925 F.3d 570 (2d Cir. 2016) ....................................................................5, 17

*Weiss v. Nat'l Westminster Bank PLC*,
    278 F. Supp. 3d 636 (E.D.N.Y. 2017)..............................................................15

*Wellness Int'l Network v. Sharif*,
    135 S. Ct. 1932 (2015) ...........................................................................7, 26, 27

## Constitutional Provisions

U.S. Const. art. III, § 2 .......................................................................................35

## Statutes

18 U.S.C.
    § 2332f(b)(2)(B).............................................................................................29
    § 2333 ..............................................................................................1, 22, 24
    § 2334 ........................................................................................................5
    § 2334(e) ...................................................................................5, 6, 19, 21
    § 2334(e)(1) .............................................................................................7, 8
    § 2334(e)(1)(A).............................................................................................8
    § 2334(e)(1)(A)(i)..........................................................................................8
    § 2334(e)(1)(A)(ii).........................................................................................8
    § 2334(e)(1)(B) .........................................................................................16, 17
    § 2334(e)(1)(B)(i)..........................................................................................8
    § 2334(e)(1)(B)(iii) .....................................................................................8, 17
    § 2334(e)(3)(A).............................................................................................20
    § 2334(e)(3)(B).............................................................................................8
    § 2334(e)(3)(F).............................................................................................8
    § 2334(e)(4) .............................................................................................17, 21
    § 2339C(b)(2)(C)(iii).......................................................................................29

22 U.S.C.
    § 2378c-1 ...............................................................................................12, 33
    § 5201(a)(4) ...............................................................................................14
    § 5202 ........................................................................................................4

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132,
    § 301(a)(1), 110 Stat. 1214, 1247 .....................................................................31

Anti-terrorism Clarification Act of 2018, Pub. L. No. 115-253 § 4(a), 132 Stat
    3183, 3184 ....................................................................................................5

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 2(a), 130 Stat.
    852, 852 (2016).............................................................................................31

Promoting Security and Justice for Victims of Terrorism Act, Pub. L. No. 116-94, div. J., tit. IX, § 903(d)(1)(A), 133 Stat. 3082, 3085 (2019) ....................................... 1, 22, 24

**International Conventions**

Int'l Convention for the Suppression of the Financing of Terrorism, art. 7(2)(a), S. Treaty Doc. No. 106-49, 39 I.L.M. 270 (Dec. 9, 1999) ......................................................... 29

Int'l Convention for the Suppression of Terrorist Bombings, Jan. 12, 1998, art. 2(a), S. Treaty Doc. 106-6, 2149 U.N.T.S. 256 .................................................................... 29

**Rules**

Federal Rule of Civil Procedure 12(h)(1) ................................................................... 28

Federal Rule of Evidence 801(d)(2)(A)–(D) .............................................................. 13

**Legislative Materials**

163 Cong. Rec. H9649 (Dec. 5, 2017) ....................................................................... 33

163 Cong. Rec. H9650 (Dec. 5, 2017) ....................................................................... 33

163 Cong. Rec. H9652 (Dec. 5, 2017) ....................................................................... 33

164 Cong. Rec. H6617–18 (July 23, 2018) ............................................................... 1, 4

164 Cong. Rec. S5103 (July 19, 2018) ......................................................................... 4

165 Cong. Rec. S7182 (Dec. 19, 2019) ............................................................... 1, 20, 23

166 Cong. Rec. S627 (Jan. 28, 2020) ......................................................................... 23

*The Constitution of the United States of America: Analysis and Interpretation*, S. Doc. No. 112-9 (2012 & Supp. 2017) ............................................................................ 7

H.R. Rep. No. 115-858 (2018) ..................................................................................... 4

Reported Roll-Call Vote on S. 2132, Senate Judiciary Committee (Oct. 17, 2019) ................... 23

**Other Authorities**

*Black's Law Dictionary* (10th ed. 2014) ................................................................... 22

Br. of Sen. Grassley, Rep. Nadler, *et al.*, *Sokolow v. Palestine Liberation Org.*, No. 19-764 (Jan. 15, 2020) ........................................................................................ 6

Louis Henkin, *Foreign Affairs and the Constitution* (1972) ........................................ 30

*Oxford English Dictionary* (online ed. 2020) ............................................................................21

Palestinian Authority Law No. 19 of 2004, Art. 7 ......................................................................10

Antonin Scalia & Bryan A. Gardner, *A Note on the Use of Dictionaries*, 16 Green
    Bag 2d 419 (2013) ..........................................................................................................21, 22

U.S. Dep't of Justice, *Remarks by Assistant Attorney General for National
    Security John C. Demers on ISIS Militants Charged with Deaths of Americans
    in Syria* (Oct. 7, 2020) ........................................................................................................32

4 Wright & Miller's Fed. Prac. & Proc. § 1067.3 (4th ed. 2008) ................................................28

2-406 Weinstein's Fed. Evid. § 406.03 ........................................................................................9

Jim Zanotti, Cong. Research Serv., RS22967, *U.S. Foreign Aid to the Palestinians*
    4 (2018) ..............................................................................................................................9

## INTRODUCTION

In 2016, the Second Circuit, breaking with decades of unanimous precedent, held that the Palestine Liberation Organization (PLO) and the Palestinian Authority (PA) were not subject to personal jurisdiction in the United States. Congress disapproved of the Second Circuit's decision and twice enacted remedial legislation. Lead sponsors of the legislation explained why Congress acted: Congressman Jerold Nadler said that the court had "wrongly" concluded "that the district court lacked personal jurisdiction" and that the remedial legislation would "secure a measure of justice for terrorism victims." 164 Cong. Rec. H6617–18 (July 23, 2018). Senator Charles Grassley, the original sponsor of the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333, said that the Second Circuit's decision had "made it impossible for American victims injured abroad to hold sponsors of international terrorism accountable in our own courts," "nullified the fundamental purpose of the ATA, to protect Americans wherever in the world they may be," and "disrespected Congress's power to protect U.S. citizens and U.S. interests." 165 Cong. Rec. S7182 (Dec. 19, 2019).

Congress gave the PLO and PA a clear choice: they would subject themselves to personal jurisdiction in ATA cases only if, following the law's effective date, they: (A) continued paying the designees of terrorists who murdered or injured U.S. citizens; or (B) failed to limit their U.S. presence and activities to official business of the United Nations. Congress instructed that the law be "liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism." Promoting Security and Justice for Victims of Terrorism Act (PSJVTA), Pub. L. No. 116-94, div. J., tit. IX, § 903(d)(1)(A), 133 Stat. 3082, 3085 (2019).

The Second Circuit remanded for this Court to determine the law's applicability. It applies. After the new law took effect, the PLO and the PA paid the designees of more than 175 terrorists who harmed U.S. citizens and engaged in U.S. conduct beyond "official business of the United Nations."

The Second Circuit also instructed this Court to address any constitutional issues. Defendants have indicated that they plan to argue that the PSJVTA's application to this case violates the Due Process Clause and the doctrine of separation of powers. These arguments are meritless. The PSJVTA gave Defendants fair warning of exactly what conduct would subject them to jurisdiction in U.S. courts, and for what claims. It also reasonably advances the government's legitimate interests in deterring and disrupting terrorism, protecting the lives and safety of U.S. nationals, and promoting peace and stability in the Middle East. As for separation of powers, Defendants rely on the rule that Congress cannot force the judiciary to reopen a closed case decided on the merits. But as Defendants *concede*, nothing in the PSJVTA *requires* the judiciary to reopen this case, which was dismissed without prejudice on a non-merits ground.

## PROCEDURAL BACKGROUND

**1.** Plaintiffs suffered injuries and lost loved ones in terror attacks that took place in Israel. In 2004, Plaintiffs sued the PLO and PA under the ATA for their role in perpetrating these terror attacks. In 2011, this Court denied Defendants' motion to dismiss for lack of personal jurisdiction, agreeing with "every federal court to have considered the issue that the totality of activities in the United States by the PLO and the PA justifies the exercise of general personal jurisdiction." Mem. Decision & Op. at 7 (Mar. 30, 2011) (D.E. 87); *see id.* at 7 n.10 (citing cases).

In 2015, this Court presided over a seven-week jury trial. The jury heard 24 days of testimony from 48 witnesses and reviewed 327 exhibits. Answering specific interrogatories, the jury found that officers of the PA acting within the scope of their employment planned and perpetrated the terror attacks, and that the PLO and PA knowingly provided material support and resources used by Hamas and the Al-Aqsa Martyrs Brigades—two U.S.-designated foreign terrorist organizations—to prepare for or carry out the attacks. D.E. 825 at 4, 6, 8.

Overwhelming documentary evidence supported this verdict. PA security officers pleaded

guilty to or were convicted for planning or participating in each of the attacks. Pls.' Trial Ex. 1121 (D.E. 910-54). The evidence included: the convictions of PA employees and their co-conspirators, Trial Tr. 148–346 (D.E. 837); payroll and promotion records of those same employees, including postconviction (and even posthumous) pay and promotions, Trial Tr. 1106–10 (D.E. 845); video interviews of the terrorists, Trial Tr. 1291–92 (D.E. 847); internal PA documents expressing approval of the terrorists, Trial Tr. 1124–26 (D.E. 845); U.S. State Department reports implicating Defendants in the systemic terror campaign, Trial Tr. 850–53 (D.E. 841); and even official PA "political guidance" magazines distributed to PA security officers at the time of the attacks urging "open, bloody and fierce" action by PA security forces "letting the United States of America know" that terror will "threaten U.S. interests," Pls.' Trial Ex. 913 (D.E. 758-4). The PLO and PA had implemented a consistent policy of rewarding the surviving terrorist perpetrators with generous salaries—which continued for years even as the recipients served life sentences for multiple murders—and of providing "martyr" payments to the families of the suicide terrorists in honor of their attacks. Trial Tr. 593, 603, 1109–10 (D.E. 839, 845).

The jury also heard wrenching testimony from Plaintiffs. Alan Bauer and his seven-year-old son were walking down a crowded street when an ex-PA police officer directed by a PA security officer blew himself up, sending shrapnel ripping through the boy's brain. Trial Tr. 1167, 2191 (D.E. 845, 857). The damage was permanent. Trial Tr. 2195, 2228–30 (D.E. 857). A PA police officer blew himself up on a bus, killing Scott Goldberg while on his way to work; he left a widow and seven children. Trial Tr. 308–10, 2438, 2441 (D.E. 835, 861). His sixteen-year-old daughter retrieved his belongings: "We found a watch that had blood on it. We found his knapsack, his side knapsack with his books, and everything had a smell of burnt flesh and blood." Trial Tr. 2493 (D.E. 861).

The Court entered judgment on the verdict for 40 of the Plaintiffs. D.E. 980.

**2.** The Second Circuit vacated and remanded. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317. It held that United States courts could not exercise personal jurisdiction over the PLO or the PA because they were not "at home" in the United States, as required for general jurisdiction, *id.* at 332–35; their liability-creating conduct was not sufficiently connected to the United States to support specific jurisdiction, *id.* at 335–44; and they had not consented to the exercise of personal jurisdiction, *id.* at 343. The Second Circuit entered judgment on August 31, 2016. App. Ct. D.E. 211. The Supreme Court denied review on April 2, 2018. 138 S. Ct. 1438.

**3.** Congress took up bipartisan legislation to supersede "recent Federal court decisions" that had "severely undermined the ability of American victims to bring terrorists to justice." 164 Cong. Rec. S5103 (July 19, 2018) (Sen. Grassley); *see* 164 Cong. Rec. H6617–18 (July 23, 2018) (Rep. Nadler). The House Judiciary Committee explained that the bill's "purpose" was "to better ensure that victims of international terrorism can obtain justice in United States courts," by addressing "lower court decisions that have allowed entities that sponsor terrorist activity against U.S. nationals overseas to avoid the jurisdiction of U.S. courts" in civil ATA cases. H.R. Rep. No. 115-858, at 2–3 (2018).

That legislation became the Anti-Terrorism Clarification Act (ATCA). The ATCA provided that a defendant could consent to jurisdiction under the ATA in two ways: (1) acceptance of United States foreign assistance would be deemed consent to personal jurisdiction; and (2) a defendant "benefiting from a waiver or suspension" of 22 U.S.C. § 5202, which forbids the PLO and its successors and agents from expending funds or maintaining facilities "within the jurisdiction of the United States," would be deemed to consent to personal jurisdiction if the defendant "continues to maintain any office, headquarters, premises, or other facilities or establishments within

the jurisdiction of the United States." Pub. L. No. 115-253 § 4(a), 132 Stat 3183, 3184 (2018) (adding 18 U.S.C. § 2334(e), set out as originally enacted in a note to 18 U.S.C. § 2334). At the time that Congress enacted the ATCA, Defendants were receiving U.S. foreign assistance—indeed, they had received billions of dollars of such assistance—and were operating facilities in the United States.

**4.** Five days after the ATCA became law, Plaintiffs filed a motion in the Second Circuit to recall the court's mandate in light of the new statute. App. Ct. D.E. 255. On June 3, 2019, the Second Circuit entered an order denying that motion. *Waldman v. Palestine Liberation Org.*, 925 F.3d 570. The court recognized that "the passage of a new law might warrant recalling a mandate in some circumstances," but concluded that the ATCA had failed to restore jurisdiction. The court reasoned that: (1) Defendants had adjusted their conduct by refusing all forms of U.S. assistance, *id.* at 574; (2) the remaining provisions of the ATCA did not reach Defendants because they were not at that time "benefiting from a waiver or suspension" of the type specified in the statute, *id.* at 574–75; (3) Defendants' townhouse on East 65th Street in New York City "is not considered to be within the jurisdiction of the United States," because it is used in part (but not exclusively) as a representative office to the United Nations, *id.* at 575; and (4) the "Court's interest in finality also weighs against recalling the mandate," *id.*

**5.** Plaintiffs again petitioned for Supreme Court review. *Sokolow v. Palestine Liberation Org.*, No. 19-764 (filed Dec. 13, 2019). While the petition was pending, Congress enacted the Promoting Security and Justice for Victims of Terrorism Act (PSJVTA), clarifying and expanding the bases on which a defendant could consent to personal jurisdiction. Pub. L. No. 116–94, div. J, title IX, § 903, which further amended 18 U.S.C. § 2334(e).

Plaintiffs asked the Supreme Court to vacate the Second Circuit's judgment and remand

for further consideration in light of the PSJVTA. A bipartisan group of legislators who had sponsored the ATCA and PSJVTA, led by former Senate Judiciary Committee Chairman Grassley and House Judiciary Committee Chairman Nadler, supported the request. Br. of Sen. Grassley, Rep. Nadler, *et al.*, *Sokolow v. Palestine Liberation Org.*, No. 19-764 (Jan. 15, 2020) (Grassley–Nadler Br.), *available at* https://bit.ly/3f6GfSq. On April 27, 2020, the Supreme Court granted the petition, vacated the Second Circuit's judgment, and remanded "for further consideration in light of the [PSJVTA]." 140 S. Ct. 2714.

In response to the Supreme Court's order, the Second Circuit remanded to this Court "for the limited purposes of determining the applicability of the PSJVTA to this case, and, if the PSJVTA is determined to apply, any issues regarding its application to this case including its constitutionality." D.E. 1006 at 3–4. On September 15, 2020, this Court ordered Plaintiffs to submit this memorandum and accompanying evidence.

## LEGAL STANDARD

After the pleading stage, "personal jurisdiction must be established by a preponderance of the evidence." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993). The Court may proceed, "as with any summary judgment motion, to determine if undisputed facts exist that warrant the relief sought. If the defendant contests the plaintiff's factual allegations, then a hearing is required, at which the plaintiff must prove the existence of jurisdiction by a preponderance of the evidence." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). Jurisdictional discovery may be necessary if a disputed issue "is not determinable on the current record." *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 792 (S.D.N.Y. 2005), *aff'd in part and remanded in part*, 714 F.3d 659 (2d Cir. 2013).

**ARGUMENT**

## I.    Defendants Consented to Personal Jurisdiction Under the PSJVTA

"Consent has always been sufficient to create [personal] jurisdiction, even in the absence of any other connection between the litigation and the forum." *The Constitution of the United States of America: Analysis and Interpretation*, S. Doc. No. 112-9, at 1999 (2012 & Supp. 2017).[1] Indeed, consent to jurisdiction under conditions specified by statute or rule has been an accepted part of the legal landscape for generations.[2] A defendant may consent to personal jurisdiction "at any stage of a proceeding, including … on appeal," even if the defendant had previously objected to the exercise of personal jurisdiction.[3]

The PSJVTA contains two operative provisions, codified at 18 U.S.C. § 2334(e)(1). Sub-paragraph (1)(A) provides that a defendant "shall be deemed to have consented to personal juris-diction" in ATA cases if, after April 18, 2020, it "makes any payment, directly or indirectly—"

> (i) to any payee designated by any individual who, after being fairly tried or plead-ing guilty, has been imprisoned for committing any act of terrorism that injured or

---

[1]    *Available at* https://www.govinfo.gov/content/pkg/GPO-CONAN-2017/pdf/GPO-CONAN-2017.pdf.

[2]    *See, e.g.*, *Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932, 1948 (2015); *Roell v. Withrow*, 538 U.S. 580, 590 (2003); *Bendix Autolite Corp. v. Midwesco Enters.*, 486 U.S. 888, 889 891–93 (1988); *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703–04 (1982); *Olberding v. Ill. Cent. R.R. Co.*, 346 U.S. 338, 340–41 (1953); *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 174–75 (1939); *Adam v. Saenger*, 303 U.S. 59, 67–68 (1938); *Hess v. Pawloski*, 274 U.S. 352, 356–57 (1927); *Pa. Fire Ins. Co. v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 95–96 (1917); *Chi. Life Ins. Co. v. Cherry*, 244 U. S. 25, 29-30 (1917); *Simon v. S. Ry. Co.*, 236 U.S. 115, 130 (1915); *Balt. & Ohio RR. Co. v. Harris*, 79 U.S. (12 Wall.) 65, 81 (1870); *Lafayette Ins. Co. v. French*, 59 U.S. (18 How.) 404, 407 (1855).

[3]    *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1029 (D.C. Cir. 2020); *accord Gen. Contracting & Trading Co. v. Interpole, Inc.*, 940 F.2d 20, 22 (1st Cir. 1991) ("having objected to the absence of *in personam* jurisdiction, a defendant may rescind the objection, *i.e.*, consent to the forum court's jurisdiction, at any stage of the proceedings"); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 32 (D.C. Cir. 1990) (R.B. Ginsburg, J.) ("personal jurisdiction … can be waived at any stage of a proceeding").

killed a national of the United States, if such payment is made by reason of such imprisonment; or

(ii) to any family member of any individual, following such individual's death while committing an act of terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual ... .

18 U.S.C. § 2334(e)(1)(A).

Subparagraph (1)(B) separately provides that a defendant "shall be deemed to have consented to personal jurisdiction" in ATA cases if, after January 4, 2020, the defendant "conducts any activity while physically present in the United States on behalf of the Palestine Liberation Organization or the Palestinian Authority" or "continues to maintain any office, headquarters, premises, or other facilities or establishments in the United States." 18 U.S.C. § 2334(e)(1)(B)(i), (iii). Paragraph (B) is subject to specific exceptions for conduct "undertaken exclusively for the purpose of conducting *official business* of the United Nations" and for "official activities conducted ancillary to [excepted] activities." 18 U.S.C. § 2334(e)(3)(B), (F) (emphasis added).

Plaintiffs need satisfy only one of the two subparagraphs of § 2334(e)(1). As discussed below, Plaintiffs satisfy both.

## A.    Defendants Consented to Jurisdiction under Subparagraph (1)(A)

Section 2334(e)(1)(A) provides that a defendant consents to personal jurisdiction in ATA cases by (1) making payments after April 18, 2020, directly or indirectly, to terrorists, their family members, and other designees of individuals convicted for, or killed while, committing acts of terrorism, (2) that injured or killed nationals of the United States, (3) where the payments were made by reason of the perpetrator's imprisonment or death. *See* 18 U.S.C. § 2334(e)(1)(A)(i)–(ii). Below, we demonstrate that each element has been met.

### 1.    Defendants Paid Terrorists' Families and Other Designees after April 18, 2020

Three forms of evidence confirm that, after April 18, 2020, Defendants paid designees of

individuals convicted for, or killed while committing, acts of terrorism that harmed U.S. nationals.

*First*, Defendants' longstanding practice—enacted into PA law—of making monthly and other payments to designees of all individuals imprisoned for terror crimes and families of all suicide terrorists is, in itself, powerful evidence that Defendants have continued to make them after April 18, 2020. Where, as here, organizations have a particular "'need for regularity,' evidence of their routine practice is 'particularly persuasive'" evidence that they followed their practice on a particular occasion. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1262 (10th Cir. 2012) (quoting 2-406 Weinstein's Federal Evidence § 406.03). That is especially true where, as here, the organization has not disclaimed its longstanding practice.

*Second*, since April 2020, even as Defendants came under pressure to halt the payments, they have repeatedly and forcefully announced that they are continuing to make the payments.

*Third*, U.S. government reporting from October 2020 confirms that the PLO and PA made payments in the past six months to "Palestinian terrorists in Israeli prison, released Palestinian terrorists, and the families of Palestinians who were wounded or died while committing terrorist acts or in connection with terrorism." Yalowitz Dec. Ex. 27.

### a.    Defendants Have a Longstanding Practice of Making Payments to Terrorists, Their Families, and Other Designees

"The Palestinian practice of compensating families who lost a member (combatant or civilian) in connection with Israeli-Palestinian violence reportedly dates back to the 1960s. Palestinian payments on behalf of prisoners or decedents in their current form apparently 'became standardized during the second *intifada* [uprising] of 2000 to 2005.'" Jim Zanotti, Cong. Research Serv., RS22967, *U.S. Foreign Aid to the Palestinians* 4 (2018) (footnotes omitted), https://crsreports. congress.gov/product/pdf/RS/RS22967/59; *accord* Declaration of Arieh Spitzen ("Spitzen Decl.") ¶¶ 12–21.

Defendants have even created bureaucracies to administer these programs: the Institution for Families of the Martyrs and the Injured (the "Institution"), and the Commission for Prisoners and Ex-Prisoners Affairs (the "Commission"). Spitzen Decl. ¶¶ 12, 17. The Institution makes monthly (and other) payments to family members of each suicide terrorist—called a "shahid," or martyr—approved after evaluating information about the decedent and his or her family, a description of the circumstances of his or her death, and proof of death. *Id.* ¶ 12. As an example, Defendants' "martyr file" for Wafa Idris—the suicide terrorist who harmed the Sokolow family—states that "Idris blew herself up in a crowd … that resulted in killing one and injuring more than one hundred in addition to her immediate death." *Id.* ¶ 13 & Ex. 3. The Institute's staff concluded "She was martyred during a heroic martyrdom operation against the Zionists in the occupied city of Jerusalem. Therefore we recommend that she is considered one of the al-Aqsa Intifada Martyrs according to the regulations." *Id.* The director of the Institution approved the application, "with an allocation of 600 Shekels a month." *Id.*

The Commission provides monthly salaries and other financial benefits for prisoners convicted of terrorist crimes (and their designees) upon receipt of proper documentation, including the "verdict itself, in Hebrew." *Id.* ¶ 23. These salaries are a legal entitlement, according to the PA's Prisoners and Ex-Prisoners Law, which states:

1.  The [PA] must give every prisoner a monthly salary specified by the system, to be proportionate with the cost of living.

2.  Prisoners' family members shall receive a portion of the prisoners' salary based on the standard of legal expenditure in effect.

3.  The prisoner shall appoint an agent to collect his monthly salary or what remains of it.

Law No. 19 of 2004, Art. 7, translated and admitted in evidence as Pls.' Ex. 512 (D.E. 909) and attached to the Spitzen Declaration as Exhibit 1; Pls.' Ex. 1143 (D.E. 910); Trial Tr. 494–505,

568–91 (D.E. 837, 839); *see also* Spitzen Decl. ¶ 24.

Defendants pay thousands of individuals under these programs. *See* Spitzen Decl. ¶¶ 10, 40–41 & Ex. 12. At trial in this case, Defendants established that there were approximately 4,000 "security [*i.e.*, terrorist] prisoners" in Israel, and the Court received evidence that Defendants were paying such individuals a total of approximately $4 million per month as of 2011. Trial Tr. 602–03, 909–10 (D.E. 839, 843). In 2014, Defendants paid $75 million to such prisoners. *See* Decl. of Bradley Wendt ¶ 23 (D.E. 931).

Payment records showing monthly payments from Defendants to the families or designees of nineteen such prisoners and the families of five such suicide terrorists—all of whom killed or injured U.S. nationals in this case alone—were admitted as evidence at trial.[4] Defendants stipulated shortly before trial that "the Palestinian Authority's practices concerning the promotions of prisoners, payments to prisoners' families, and payments to martyrs' families have not materially changed" since fact discovery closed in 2012. D.E. 632-1.

Both the PA and the PLO have participated in making the payments and administering these programs. Spitzen Decl. 27–28. At trial, ten documents indicated that the PA was administering the pay-for-slay program and making payments under it, Trial Exs. 2, 3, 7, 8, 9, 10, 49, 62, 109, 128; one document indicated that both the PLO and the PA were doing so, Trial Ex. 108; and twelve documents attributed responsibility to the "State of Palestine," a name that both Defendants use to identify themselves, Trial Exs. 25, 48, 58, 88, 89, 104, 105, 106, 112, 116, 118, 123. The evidence at trial also showed that, since the founding of the PA, the PLO has largely ceased to have its own independent sources of current funding and its annual budget is now covered by the

---

[4]    Pls.' Trial Exs. 2, 3, 7, 8, 9, 10, 25, 48, 49, 58, 62, 88, 89, 104, 105, 106, 108, 109, 112, 116, 118, 123, 127, 128, 1120, 1121 (D.E. 547, 909, 927).

PA.[5] Both the Institution and the Commission are funded by the PA's Ministry of Finance. *See* Spitzen Decl. ¶¶ 16, 26. As the State Department put it in a recent report, "the PA continued to make payments through the PLO to Palestinians connected to terrorism." Yalowitz Decl. Ex. 27.

The PA's Prisoners and Ex-Prisoners Law remains in force, and payments to families and designees of terrorist remains official policy. After the trial in this action, U.S. and Israeli policy-makers created incentives for Defendants to end these payments. Spitzen Decl. ¶¶ 29–30. For example, in the Taylor Force Act, Congress halted annual assistance payments worth hundreds of millions of dollars to Defendants unless they ceased the payments to terrorists. 22 U.S.C. § 2378c-1. Yet Defendants have repeatedly stated that they are continuing to make these payments and have no intention of stopping. Spitzen Decl. ¶¶ 32–40 & Exs. 4–12. In the words of Defendants' Chairman, Mahmoud Abbas, "if we were left with just one penny, it would be given to the families of martyrs and prisoners." Spitzen Decl. ¶ 38 & Ex. 10.

### b. Defendants Admit They Continued Their Pay-For-Slay Programs After the PSJVTA's Trigger Date

After April 18, 2020, Defendants repeatedly admitted that they continued the prisoner and martyr payments without interruption. Spitzen Decl. ¶ 29–41. To take a few examples, on June 8, 2020, PA Prime Minister Mohammad Shtayyeh gave an interview on PA television in which he said "we continued to pay the prisoners and the shahids in full" and that to stop the payments would require closing "40,000 bank accounts that belong to prisoners." Spitzen Decl. ¶ 35 & Ex. 7.

On July 5, 2020, the chairman of the Commission, Qadri Abu Bakr, stated to WAFA (Defendants' official news service) "that the Finance Ministry had transferred all of the prisoners'

---

[5]    *See* Trial Tr. 3789 (D.E. 877) (referencing deposition testimony of Salam Fayyad, p. 76:2–7, *Saperstein v. Palestinian Auth.*, No. 04-20225-CIV (S.D. Fl. Mar. 9, 2010) ("[A]fter the PA came into being, the PLO … ceased to have its own independent sources of funding largely. … [F]unding for its own operations did come from the PA.").

allowances into their bank accounts, along with the date the allowances were to be paid." *Id.* ¶ 36 & Ex. 8. He "demanded that all banks commit to paying the prisoners' allowances and refrain from closing any of the accounts, or cancelling any of the ATM cards, considering that failing to pay the prisoners' allowances would violate the directives of the [Palestine] Monetary Authority and the [PA] government, and that it would violate the agreement that had previously been concluded." *Id.*

On July 9, 2020, Mr. Abu Bakr gave another interview. When asked about prisoner payments, he stated: "Regarding the salaries, everything was 100% on Wednesday [July 8, 2020], obviously, after contact, of course, with a number of the banks that had stopped the payments. And nearly all the prisoners—we did not receive a single call from any prisoner. They went to the banks and it was paid to them." *Id.* ¶ 37 & Ex. 9.

On July 27, 2020, WAFA reported that the PA's General Intelligence Service presented a special "grant" to 25 families of martyrs and eight families of prisoners affiliated with the General Intelligence Service. *Id.* ¶ 39 & Ex. 10.

On September 7, 2020, Mr. Abu Bakr confirmed again on television: "when the Israelis blocked the clearinghouse, a full salary was paid to them. One hundred percent was paid to the prisoners … ." *Id.* ¶ 39 & Ex. 11. Such salaries number in the thousands. *Id.* ¶¶ 40–41.

These statements by Defendants' senior officials about matters within the scope of their authority—either recorded on video or reported through Defendants' own official press service— constitute party admissions under Fed. R. Evid. 801(d)(2)(A)–(D).

Finally, Defendants have never disclaimed their pay-for-slay policies. Defendants have not repealed their laws and regulations entitling imprisoned terrorists and the families of "shahids" to guaranteed payments and benefits. Indeed, far from renouncing these policies, Defendants have

13

recently announced additional measures to secure the continuing flow of these payments, insisting that halting any such payments "would violate the directives of the Monetary Authority and the government." Spitzen Decl. ¶ 36 & Ex. 8.

### c. The U.S. Government Reports that Defendants Paid Terrorists' Designees

The State Department produces semi-annual reports pursuant to the PLO Commitments Compliance Act of 1989 and related federal laws. *See* Letter from Kent A. Yalowitz to Hon. George B. Daniels (Dec. 30, 2014) & Exs. 1–4 (Plaintiffs' Trial Exs. 496, 634, 635, and 1142) (D.E. 693). The Court admitted these reports in evidence. Trial Tr. 850 (D.E. 841).

The most recent report covers the six months ending October 4, 2020. Yalowitz Decl. Ex. 27. It states that "the PA continued to make payments through the PLO to Palestinians connected to terrorism," and specifies that "[t]he recipients of the payments included Palestinian terrorists in Israeli prison, released Palestinian terrorists, and the families of Palestinians who were wounded or died while committing terrorist acts or in connection with terrorism." *Id.*

### 2. More than 175 Terrorists in Defendants' Pay-For-Slay Programs Have Killed or Injured Americans

Palestinian terror attacks on American citizens began in the 1960s. Some of the highest-profile attacks included the murder of a dual U.S.-Israeli citizen at the Olympic Games in Munich in 1972; the murder of a U.S. Ambassador in 1973; and the murder of Leon Klinghoffer on the Achille Lauro cruise ship. Yalowitz Decl. ¶¶ 5–9, 17–18. More than thirty years ago, Congress found that "the PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens of American citizens abroad." 22 U.S.C. § 5201(a)(4). Since then, *hundreds* of U.S. citizens have been murdered or injured in such terror attacks. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 317 (2d Cir. 2018); *see also* Yalowitz Decl. ¶¶ 4–201.

A chart summarizing information concerning 178 terrorists convicted for, or killed while,

perpetrating terror attacks that killed or injured U.S. citizens is attached to this memorandum as Exhibit A. At least 72 died while committing acts of terrorism that killed or injured U.S. nationals. *See* Ex. A hereto; Yalowitz Decl. ¶¶ 4–201; Spitzen Decl. ¶¶ 42–45. And another 106 were imprisoned after pleading guilty (51) or being convicted (55) for committing acts of terrorism that killed or injured U.S. nationals. *See* Ex. A hereto; Yalowitz Decl. ¶¶ 4–201; Kaufman Decl. ¶¶ 7–8. There can be no dispute that those who stood trial were "fairly tried." Israel's courts provide due process, as U.S. courts have uniformly found. *Demjanjuk v. Petrovsky*, 776 F.2d 571, 583 (6th Cir. 1985), *vacated on other grounds*, 10 F.3d 338 (6th Cir. 1993); *Eain v. Wilkes*, 641 F.2d 504, 512 n.9 (7th Cir. 1981); *Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 646–47 (E.D.N.Y. 2017); *Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 448 (E.D.N.Y. 2013); *Ahmad v. Wigen*, 726 F. Supp. 389, 416–18 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990). The protections for the accused in such courts are detailed in the record in this case as well. Kaufman Decl. ¶¶ 15–26 & Ex. A. The Court therefore should determine that these convictions were fair, absent particularized proof of a cognizable degree of unfairness in a specific case. "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. This presumption applies to the acts of foreign officials as well as American." *See State of Israel v. Motor Vessel Nili*, 435 F.2d 242, 252 (5th Cir. 1970) (footnotes omitted); *In re Pazienza*, 619 F. Supp. 611, 620 (S.D.N.Y. 1985) ("[W]e should proceed upon the rebuttable presumption of regularity on the part of the Government of Italy in the enforcement of its criminal laws, until proof appears to the contrary.").

### 3. Defendants' Payments Were Made "By Reason Of" the Terrorists' Imprisonment or Death

The statute provides that a defendant's payments constitute consent if made "by reason of"

the death or imprisonment of the terrorist. In practical terms, this language indicates that Congress was focused on payments to families and other designees of terrorists specifically because of the death or imprisonment of the terrorists. The evidence described above meets that provision: the payments simply would not have been made but for the relevant individual's death or imprisonment. *See* Spitzen Decl. ¶¶ 12, 17.

### B. Defendants Consented to Jurisdiction Under Subparagraph (1)(B)

Defendants have independently consented to jurisdiction through their conduct within the United States by continuing, after the PSJVTA's effective date, to maintain an office and engage in activities that come within no statutory exception.

### 1. Defendants' Office and Activities Meet Subparagraph (1)(B)

Section 2334(e)(1)(B) provides, in part, that "a defendant shall be deemed to have consented to personal jurisdiction in such civil action [under the ATA] if, regardless of the date of the occurrence of the act of international terrorism upon which such civil action was filed, the defendant—," after January 4, 2020:

> (i) continues to maintain any office, headquarters, premises, or other facilities or establishments in the United States; * * * or,

> (iii) conducts any activity while physically present in the United States on behalf of the Palestine Liberation Organization or the Palestinian Authority.

18 U.S.C. § 2334(e)(1)(B). Defendants have done both of these.

### a. Defendants Continued to Maintain an Office

Defendants own and maintain an office located in a townhouse at 115 East 65th Street in New York City. Yalowitz Decl. ¶ 216–18. Their maintenance of this office was first held to be the basis for personal jurisdiction in *United States v. Palestine Liberation Org.*, 695 F. Supp. 1456, 1461 (S.D.N.Y. 1988). But in its 2019 decision in this case, the Second Circuit held that the UN Headquarters Treaty meant that Defendants' East 65th Street townhouse is not "within the

jurisdiction of the United States." *Waldman*, 925 F.3d at 575. Congress superseded that holding by deleting the phrase "within the jurisdiction of" from § 2334(e)(1)(B) and adding paragraph (e)(4), which provides:

> Notwithstanding any other law (including any treaty), any office, headquarters, premises, or other facility or establishment within the territory of the United States that is not *specifically* exempted by paragraph (3)(A) [for facilities "used exclusively for the purpose of conducting official business of the United Nations"] shall be considered to be in the United States for purposes of paragraph (1)(B).

18 U.S.C. § 2334(e)(4) (emphasis added). These changes reflect a clear and unequivocal intent by Congress to supersede prior law, including any treaty. *See Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *see also United States v. Palestine Liberation Org.*, 695 F. Supp. at 1468–69 (describing statutory language needed to supersede treaty). And, as we demonstrate below, the East 65th Street facility is not "specifically exempted by paragraph (3)(A)." *See infra* pp. 19-20.

### b.    Defendants Conducted Activities in the United States

After January 4, 2020, Defendants engaged in at least three distinct forms of activity "while physically present in the United States on behalf of the Palestine Liberation Organization or the Palestinian Authority." 18 U.S.C. § 2334(e)(1)(B)(iii).

*First*, for many years, Defendants have offered consular services—such as power of attorney documents, birth and death certificates, and other forms—through consular agents located in the United States, including Ahmad Alahmad, Samir Farhat, and Awni Abu Hdba. Yalowitz Decl. ¶ 207. Those services were provided through Defendants' Washington, D.C., office until that office was closed by order of the U.S. Department of State on October 10, 2018. *Id.* Since then, Defendants have provided consular services through agents located elsewhere in the United States; they announced in the Arabic-language press that "the government of the State of Palestine will unequivocally honor its promises to its citizens living in the United States" and that they "would

find alternate ways of continuing to provide consular services, and guarantee the continued provision of services to citizens." *Id.* Ex. 34. And they have taken actions to fulfil that promise. For example, in 2019, Defendants' agent Awni Abu Hdba, acting on behalf of Defendants, participated in the authentication of a certificate of admission to the bar of this Court while located in New Jersey. *Id.* ¶ 207 & Ex. 34 (Russel Decl.). Plaintiffs' independent investigation indicates that certain of these agents continued their prior conduct after January 4, 2020. Yalowitz Decl. ¶ 223. If Defendants assert that they have terminated such activities, discovery will be warranted to test this denial. *See infra* p. 23.

*Second*, on February 11, 2020, Mahmoud Abbas, Chairman of the PLO and of the PA, held a press conference in New York City, during which he criticized the anticipated U.S.-sponsored Israeli-Palestinian peace plan. Among other things, Chairman Abbas said: "A few days ago, the so-called deal of the century was introduced by America and totally went against international law and does not make way for a two-state solution. This cannot be a basis for any future negotiations as it will not make way for a joint peace." Yalowitz Decl. ¶ 208.

*Third*, Defendants maintain and regularly update a website and Twitter and Facebook accounts in the name of the "State of Palestine," through which they publish communications in English that appear intended to influence the U.S. public and U.S. policymakers. Since January 4, 2020, Defendants have used this website and these social media accounts to publish numerous articles and translated speeches largely targeted at criticizing the Israeli and U.S. policies that concern issues of interest to Defendants. *Id.* ¶ 209–15. For example, on February 11, Defendants asserted that the proposed U.S. peace plan "contains diktats, consecrates occupation and annexation by military force, and would lead to an Apartheid system, an anachronistic reality being implemented today in Palestine. It rewards occupation instead of holding it accountable for the crimes

it has committed for decades against our people and land." *Id.* ¶ 214.a. On July 29, Defendants published a video captioned: "The reality of occupation and #annexation in #Jerusalem summed up. Ethnic cleansing, land theft, oppression, persecution and other #IsraeliCrimes continue in the absence of #accountability." *Id.* ¶ 215.z. And on August 17, Defendants published a letter on their website asserting that "Israel carries on with its illegal colonization and annexation measures in our land and with its repression of the Palestinian people through measures of collective punishment, dispossession, displacement and other violations of their rights." *Id.* ¶ 213.m. These communications (and many more of similar ilk, *see* Yalowitz Decl. ¶¶ 213–15) appear to have been made at least in part by employees and agents physically in the United States (*id.* ¶ 212) and are hosted on computers physically in the United States. *Id.* ¶ 210-211 & Ex. 37.

**2.    Defendants Do Not Meet Any Exception in Subparagraph (3)**

Defendants' U.S. conduct does not meet any exception in the PSJVTA. Section 2334(e) provides, in part:

> (3) Exception for certain activities and locations.—In determining whether a defendant shall be deemed to have consented to personal jurisdiction under paragraph (1)(B), no court may consider—
>
> > (A) any office, headquarters, premises, or other facility or establishment used exclusively for the purpose of conducting official business of the United Nations;
> >
> > (B) any activity undertaken exclusively for the purpose of conducting official business of the United Nations; * * * or,
> >
> > (F) any personal or official activities conducted ancillary to activities listed under this paragraph.
>
> (4) Rule of construction.—Notwithstanding any other law (including any treaty), any office, headquarters, premises, or other facility or establishment within the territory of the United States that is not specifically exempted by paragraph (3)(A) shall be considered to be in the United States for purposes of paragraph (1)(B).

Exception (A) does not apply. Defendants cannot reasonably contend that their East 65th

Street office is used "*exclusively* for the purpose of conducting official business of the United Nations." 18 U.S.C. § 2334(e)(3)(A) (emphasis added). For example, one employee who works at this facility lists her job as "Director of Public Relations." Yalowitz Decl. ¶ 212 & Ex. 38. Defendants' "public relations" activities—their press conferences and media releases discussed immediately above—are not official business of the United Nations. To the contrary, such materials are propaganda—that is, "political material intended to influence the foreign policies of the United States." *Meese v. Keene*, 481 U.S. 465, 470 (1987).

As the Second Circuit held nearly thirty years ago, "media" appearances and "other proselytizing" "may properly be considered as a basis for jurisdiction" precisely because such activities simply are "*not* conducted in furtherance of the PLO's [U.N.] observer status." *Klinghoffer v. SNC Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991) (emphasis added). On remand in the *Klinghoffer* case, Judge Stanton of this Court exercised personal jurisdiction, holding that "speeches," "interviews," "media appearances," and distribution of "informational pamphlets" were all "sufficiently separate from [PLO's] UN activities that they may be considered in determining" whether to exercise personal jurisdiction. 795 F. Supp. 112, 114 (S.D.N.Y. 1992). The PSJVTA codified this rule. As the PSJVTA's lead sponsor explained, unless respondents "limit their presence to official business with the United Nations and their U.S. activities commensurate with their special diplomatic need to be in the United States, they will be consenting to personal jurisdiction in ATA cases." 165 Cong. Rec. S7182 (Dec. 19, 2019) (Sen. Lankford).

Exception (B) similarly does not apply. It covers "activity undertaken *exclusively* for the purpose of conducting official business of the United Nations." For reasons just explained, public relations activities—such as Defendants' press conferences and social media posts—are not "official business" of the UN.

Exception (F) also does not apply. It is a catch-all for "personal or official activities conducted *ancillary* to activities listed under this paragraph." As a threshold matter, the "ancillary" activities exception does not apply at all to the "maintain[s] any office" prong. Under paragraph (4) of § 2334(e), "any office … premises, or other facility or establishment within the territory of the United States that is not *specifically exempted by paragraph (3)(A)* shall be considered to be in the United States for purposes of paragraph (1)(B)." 18 U.S.C. § 2334(e)(4) (emphasis added). Had Congress intended the catch-all (paragraph (3)(F)) to apply to Defendants' office, paragraph (4) would have said so. It does not. That omission indicates that Congress did not deem Exception (F) available for the "maintain[s] any office" prong. *See United States v. Smith,* 499 U.S. 160, 167 (1991) ("Where Congress explicitly enumerates certain exceptions … additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

Similarly, Exception (F) does not reach consular services, because consular services, which are directed primarily at Palestinians who live in or travel to the United States, have nothing to do with the United Nations.

Finally, press conferences and social media releases do not come within Exception (F) either. The word "ancillary" is defined as "activities and services that provide essential support to the functioning of a central service." *Oxford English Dictionary* (online ed. 2020).[6] By that definition, press conferences and media releases are not "ancillary" to official UN business because they do not provide "essential support." Indeed, they simply are "not conducted in furtherance of the PLO's [U.N.] observer status." *Klinghoffer*, 937 F.2d at 51.

Defendants seek to rely on an alternate sense of the word "ancillary" used to denote legal

---

[6] The Oxford English Dictionary is considered to be among the "most useful and authoritative for the English language generally." Antonin Scalia & Bryan A. Gardner, *A Note on the Use of Dictionaries*, 16 Green Bag 2d 419, 423 (2013).

proceedings that are "supplementary" and "subordinate." *See Black's Law Dictionary* (10th ed. 2014) ("supplementary; subordinate"). But that sense of the word is not as broad as Defendants suggest,[7] and trying to shoehorn a loose exception into this statute would be improper.[8] Courts read statutory exceptions "narrowly in order to preserve the primary operation of the [main] provision." *Comm'r v. Clark*, 489 U.S. 726, 739 (1989). "When a statute sets forth a general principle, coupled with an exception to it, it is logical to assume, in the face of ambiguity in the exception, that the legislature did not intend the exception to be so broad as to leave nothing of the general principle." *Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 91 (2d Cir. 2016).

Here, the statute itself instructs that it be "liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism." PSJVTA, § 903(d)(1)(A) (18 U.S.C. § 2333 note). Compliance with that command requires construing the "ancillary" exception narrowly, in accordance with its principal definition. In addition, it would make no sense for Congress to have tightly focused Exceptions (A) and (B) on facilities used and activities undertaken for the "*exclusive* purpose" of "official business of the United Nations," only then to add a catch-all exception that makes the term "exclusively" superfluous. Courts typically "place metes and bounds on [even] very broad language of [a] catchall provision," *United States v. Aguilar*, 515 U.S. 593, 599 (1995), rather than "allow a catchall term" to "dictate the particulars" of the statutory scheme, *Epic Sys.*

---

[7]    *See, e.g.*, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379–80 (1994) ("ancillary jurisdiction" of a federal court does permit jurisdiction over dispute concerning settlement of federal case); *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 376 (1978) ("ancillary jurisdiction" did not allow plaintiff to bring claims in federal court against non-diverse party, even though claims arose from same "core of operative facts"); *Dunn v. United States*, 442 U.S. 100, 111 (1979) (informal interview and submission of affidavit not "ancillary proceedings" within meaning of Organized Crime Control Act); *United States v. Garcia*, 689 F.3d 362, 364 (5th Cir. 2012) (related state-court prosecution not "ancillary proceeding" within meaning of Criminal Justice Act).

[8]    "Because common words typically have more than one meaning, [a court] must use the context in which a given word appears to determine its aptest, most likely sense." Scalia & Gardner, 16 Green Bag 2d at 423.

*Corp. v. Lewis*, 138 S. Ct. 1612, 1617 (2018). Indeed, the PSJVTA's lead sponsor, Senator Lankford, explained that "the exception in the language for 'ancillary' activities is intended to permit only *essential support or services* that are *absolutely necessary* to facilitate the conduct of *diplomatic activities* expressly exempted in the bill." 165 Cong. Rec. S7182 (Dec. 19, 2019) (emphasis added). Ancillary actives would involve providing food and lodging to diplomatic personnel, not issuing press releases to influence U.S. policy.

Defendants have indicated that they will attempt to rely on a counter-statement by Senator Leahy that "ancillary activities are those which may *not* be essential for the minimal functioning of the mission but which support the mission's primary operations," such as "the issuance of a press release, or a meeting or public appearance." 166 Cong. Rec. S627 (Jan. 28, 2020). That counter-statement is unreliable for three reasons. *First*, it was made five weeks *after* the PSJVTA became law. Arguments based on "subsequent legislative history" "should not be taken seriously." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1747 (2020) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring)). *Second*, Senator Leahy voted against the PSJVTA when it was in committee, *see* Reported Roll-Call Vote on S. 2132, Senate Judiciary Committee (Oct. 17, 2019), https://bit.ly/330H0JJ. "The views of opponents of a bill with respect to its meaning … are not persuasive … . It is the *sponsors* that we look to when the meaning of the statutory words is in doubt." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 585 (1988) (emphasis added); *see NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66 (1964).[9] *Third*, Senator Leahy's statement cannot be reconciled with the ordinary meaning of the word "ancillary" or with the rule of

---

[9] Senator Leahy's after-the-fact "clarification" came following repeated lobbying of his staff by Defendants' counsel. *See* Squire Patton Boggs, FARA Supplemental Statement attachment D-3 (July 31, 2020) (Yalowitz Decl. Ex. 60).

construction requiring the statute be "liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism." PSJVTA, § 903(d)(1)(A) (18 U.S.C. § 2333 note).

## II.    Alternatively, the Court Should Order Jurisdictional Discovery

If the Court determines that Plaintiffs have not met their burden on this record, the Court should order jurisdictional discovery. The Second Circuit has "encouraged district courts to 'give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction' where necessary." *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 121 (2d Cir. 2017) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 149 (2d Cir. 2011)); *see Ehrenfeld v. Mahfouz*, 489 F.3d 542, 550 n.6 (2d Cir. 2007).

Here, discovery is likely to lead to additional information confirming consent to personal jurisdiction. *See* Yalowitz Decl. ¶¶ 219–24.

*First*, Defendants' own records will likely fill any gap in determining that they paid terrorists, their families, and other designees who killed or injured U.S. nationals. The Court admitted "prisoner" files, "martyr" files, and payment records as evidence at trial, *see supra* p. 11 & n.4, so any assertion that Defendants have changed their prisoner and "martyr" programs—contrary to the PA's Prisoners and Ex-Prisoners Law—should be tested with the tools of discovery. And, in addition to the 178 terrorists identified on Exhibit A to this Memorandum and in the accompanying declarations, another 129 individuals appear in press reports and other sources as having been convicted for, or killed while, participating in terror attacks that harmed U.S. citizens. Yalowitz Decl. ¶ 220. Defendants' own bureaucratic processes require the families of these individuals to submit evidence of conviction or death, Spitzen Decl. ¶¶ 12–13, 17 & Ex. 3, so discovery of the prisoner and "martyr" files of these individuals would no doubt increase the figures presented here.

*Second*, Defendants are likely engaged in additional undisclosed activities in the United States. Tellingly, after Defendants' counsel met with Senator Leahy's staff, the Senator mentioned

meetings by Defendants "with advocates regarding relevant issues … and civil society activities." Yalowitz Decl. ¶ 222 & Exs. 60–61. Defendants have not disclosed which "advocates" they are meeting with, what "relevant issues" they might be attempting to influence, and what "civil society activities" they are engaged in. Discovery would reveal the scope and extent of these activities—information that is solely within Defendants' control.

## III.    The PSJVTA Is Constitutional

Acts of Congress are "accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993); *accord United States v. Dhafir*, 461 F.3d 211, 218 (2d Cir. 2006).

Defendants challenge the PSJVTA under the Due Process Clause and the separation of powers doctrine. The challenges are meritless. The PSJVTA satisfies the Due Process Clause because it gives defendants fair warning of exactly what conduct will subject them to personal jurisdiction with respect to specific claims in a specific forum and reasonably advances legitimate government interests. And the PSJVTA does not invade the judicial power for the exact reasons identified by this Court when it applied a new statute to the *September 11* cases: there is no bar to applying retroactive legislation where it is the judiciary—not Congress—directing that a judgment be reopened. *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 660–61 (S.D.N.Y. 2018) (Daniels, J.).

### A.    The PSJVTA Does Not Violate the Due Process Clause

Federal legislation concerning consent to personal jurisdiction may be evaluated under two potentially relevant due process standards. *First*, fair notice requires that any consent-to-jurisdiction arrangement provide persons with "fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (alterations and quotation marks omitted). *Second*, the Due Process Clause also protects against "the exercise of power without any reasonable justification in the service of a legitimate

25

governmental objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

The PSJVTA satisfies both standards. It gave Defendants fair warning that their conduct would subject them to personal jurisdiction in ATA cases if they engaged in specified post-enactment activity. And the exercise of personal jurisdiction in such cases reasonably advances the federal government's legitimate interests in combatting international terrorism, protecting U.S. citizens abroad, compensating victims of terrorism, and advancing the Middle East peace process.

### 1.    The PSJVTA Gave Defendants Fair Warning

"Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). A defendant may consent to personal jurisdiction by, for example, entering a contract and "agree[ing] in advance to submit to the jurisdiction of a given court," *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964), or through "the voluntary use of certain state procedures," *Bauxites*, 456 U.S. at 704. So long as a defendant's conduct is "knowing and voluntary," the court's exercise of jurisdiction is consistent with due process. *Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932, 1948 (2015); *see Roell v. Withrow*, 538 U.S. 580, 590 (2003); *Burger King Corp.*, 471 U.S. at 472 n.14.

The PSJVTA easily meets this "fair warning" standard. It describes with precision what actions would cause the PLO and PA to be "deemed to have consented" to personal jurisdiction in civil cases under the ATA if those actions are taken after specified dates. Upon enactment of the relevant provisions, the PLO and PA had fair warning and the opportunity to choose whether or not to continue such actions and thereby consent to jurisdiction.

These provisions operate similarly to other legal arrangements through which a defendant may validly consent to personal jurisdiction. For example, a defendant that consents by contract to suit in a particular forum is aware in advance of the forum in which it may be subject to suit,

and the causes of action for which it may be sued. *Burger King Corp.*, 471 U.S. at 472 n.14. Similarly, a defendant that asserts a claim in a particular forum is deemed to have consented to the assertion of counterclaims against it in the same forum. *Wellness Int'l Network v. Sharif*, 135 S. Ct. at 1948. Here, Defendants were free to structure their affairs to avoid jurisdiction, as they did in December 2018, when they acknowledged that "the terms of ATCA envision that the Government of Palestine will make a choice whether or not to accept U.S. 'assistance, however provided' after January 31st, 2019, under the referenced Foreign Assistance programs" and informed the United States that "[t]he Government of Palestine unambiguously makes the choice not to accept such assistance." Letter from Hon. Rami Hamdallah to Hon. Michael R. Pompeo (Dec. 26, 2018), filed as Ex. 1 to the United States' Response to February 6, 2019, Order in *Klieman v. Palestinian Auth.*, No. 15-7034 (D.C. Cir. Feb. 15, 2019).

By setting out expressly the conduct that is deemed consent to personal jurisdiction in the courts of the United States, specifying the relevant dates, and specifying the cause of action for which they would be deemed to have consented to personal jurisdiction, the PSJVTA gave the PLO and PA fair warning that particular conduct would subject them to personal jurisdiction and a reasonable period of time to structure their conduct accordingly.[10] Even beyond "the background presumption that every citizen knows the law," *Bryan v. United States*, 524 U.S. 184, 193 (1998), Defendants were specifically informed of the PSJVTA's passage on December 26, 2019. *See* Letter from Tejinder Singh to Hon. Mark Langer, *Shatsky v. Palestine Liberation Org.*, No. 17-7168 (D.C. Cir. Dec. 26, 2019), Doc. No. 1821532. They have long been aware that they were paying

---

[10] The United States took exactly this position as *amicus curiae* in a related case with regard to the PSJVTA's predecessor, the ATCA. *See* U.S. Br. at 10–14, *Klieman v. Palestinian Auth.*, No. 15-7034 (D.C. Cir. Mar. 13, 2019), Doc. No. 1777372 ("Section 4 [of the ATCA] operates similarly to other legal arrangements through which a defendant may validly consent to personal jurisdiction.").

the designees of convicted terrorists and the families of suicide terrorists who murdered and injured U.S. nationals, at minimum through their participation in this case and other ATA cases.

Defendants have suggested that a statutory consent provision violates due process if it provides that the defendant manifests consent to jurisdiction by engaging in conduct unconnected to the wrongs for which the plaintiffs seek redress. That is obviously incorrect. For example, under Federal Rule of Civil Procedure 12(h)(1), a defendant's failure to raise its personal-jurisdiction defense on a timely basis is a constructive consent that satisfies due process even though the conduct specified in Rule 12(h)(1) is unconnected to the primary conduct at issue in the case. "[T]here is no due process problem in applying Rule 12(h)(1) and deeming defendant to have waived his defense of lack of personal jurisdiction by failing to raise it in a timely fashion." *Oppel v. Empire Mut. Ins. Co.*, 92 F.R.D. 494, 497 n.11 (S.D.N.Y. 1981) (Weinfeld, J.); *see Bauxites*, 456 U.S. at 704-05 (describing Rule 12(h)(1) as an example of a constitutionally valid consent provision). Thus, even without minimum contacts, "personal jurisdiction can be based on the defendant's consent to have the case adjudicated in the forum." 4 Wright & Miller's Fed. Prac. & Proc. § 1067.3 (4th ed. 2008); *see Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) ("Even where neither the forum state's long-arm statute nor the due process minimum contacts analysis is satisfied, a court may exercise personal jurisdiction over a party if the party consents."); *BouMatic, LLC v. Idento Operations, BV*, 759 F.3d 790, 793 (7th Cir. 2014) ("Idento asserts that it would violate the Due Process Clause of the Fifth Amendment to base personal jurisdiction on consent. That is nonsense. The Supreme Court has stated that personal jurisdiction can rest on consent.").

In *Daimler A.G. v. Bauman*, 571 U.S. 117 (2014), the Court expressed concern that defendants should be able "to structure their primary conduct with some minimum assurance as to where that conduct will and will not render [them] liable to suit." 571 U.S. at 139 (quoting *Burger*

*King*, 471 U.S. at 472). The PSJVTA satisfies that standard by setting out exactly what a defendant must do to avoid consenting to jurisdiction under the ATA and by affording sufficient lead time for any necessary change in conduct. Defendants easily could have ceased engaging in non-U.N. business within the United States after January 4, or ceased paying the designees and families of terrorists after April 18—but they elected not to do so. And, even without consent, the considerations that animated *Daimler* are simply absent here, where the "primary conduct" at issue is terrorism—conduct for which the international community provides no safe haven. The International Convention for the Suppression of the Financing of Terrorism, adopted by 191 signatories, expressly permits the exercise of jurisdiction by a State where an offender's terrorism-supporting conduct "was directed towards or resulted in the carrying out of" a terror attack "against a national of that State." Art. 7(2)(a), S. Treaty Doc. No. 106-49, 39 I.L.M. 270 (Dec. 9, 1999).[11] That Convention further provides that State's exercise of jurisdiction and imposition of liability over violators "may be criminal, civil, or administrative." Art. 5(1). In short, Defendants did not structure any primary conduct in reliance on any form of immunity from jurisdiction in the United States.

### 2.    The PSJVTA Reasonably Advances Legitimate Government Interests

The Due Process Clause requires Congress to legislate reasonably, in the service of a legitimate governmental objective, avoiding arbitrary or irrational legislation. *See Lewis*, 523 U.S. at 846. The normal presumption that Congress has acted constitutionally has particular force when Congress exercises its "broad power under the Necessary and Proper Clause to enact legislation

---

[11]    *See*   https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-11&chapter =18&clang=_en; *see also* Int'l Convention for the Suppression of Terrorist Bombings, Jan. 12, 1998, art. 2(a), S. Treaty Doc. 106-6, 2149 U.N.T.S. 256 (permitting jurisdiction "over any such offence" when "the offence is committed against a national of that State"), joined by 170 nations (https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-9&chapter=18& clang=_en). The United States has implemented these conventions asserting such jurisdiction, 18 U.S.C. §§ 2332f(b)(2)(B), 2339C(b)(2)(C)(iii).

for the regulation of foreign affairs." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963); *see Perez v. Brownell*, 356 U.S. 44, 59–62 (1958) (Necessary and Proper Clause affords Congress "power to regulate the relations of the United States with foreign countries"); *see also* Louis Henkin, *Foreign Affairs and the Constitution* 74–76 (1972). And legislation concerning foreign affairs and national security "warrants respectful review by courts." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317 (2016); *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010) (giving "deference" to policy and factual judgments of the political branches because anti-terror statute "implicates sensitive and weighty interests of national security and foreign affairs"); *Regan v. Wald*, 468 U.S. 222, 243 (1984) (deferring to executive judgment "[i]n this vast external realm"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (matters such as the conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 321–22 (1936) ("We should hesitate long before limiting or embarrassing such powers.").

The PSJVTA easily meets this due process standard. As the Secretary of State put it, the PSJVTA advances "critical U.S. interests by seeking to enable U.S. victims of terrorism to vindicate their rights in U.S. courts while simultaneously protecting our own national security interests and those of our close ally, Israel." Letter from Sec. Michael R. Pompeo to Sen. Charles E. Grassley (June 19, 2019) (Yalowitz Decl. Ex. 62). Indeed, the PSJVTA reasonably advances at least *four* important federal interests: the nation's determination to combat international terrorism, the duty of the United States to protect its citizens, the national interest in compensating victims of terrorism, and the United States' specific objective of advancing the Middle East peace process in an atmosphere of stability.

30

*First*, the PSJVTA advances the United States' interest in combating terrorism, which is "an urgent objective of the highest order." *Humanitarian Law Project*, 561 U.S. at 4.[12] By imposing civil liability on the PLO and PA in cases when they or their employees or agents engage in or provide material support for terrorism, the ATA creates a financial incentive for these entities to modify their policies and practices in order to protect human life. Thus, in the United States' 2015 Statement of Interest in this case, the State Department highlighted the national security and foreign policy interests served by enforcing judgments obtained under the ATA, which "reflects our nation's compelling interest in combatting and deterring terrorism at every level, including by eliminating sources of terrorist funding and holding sponsors of terrorism accountable for their actions." D.E. 935-1, ¶ 5. The ATA, and by extension the PSJVTA, "contributes to U.S. efforts to disrupt the financing of terrorism and to impede the flow of fund or other support to terrorist activity." *Id.*

*Second*, the PSJVTA reasonably advances the United States' responsibility to protect U.S. citizens wherever in the world they travel. The murder of a U.S. national abroad is an "act of violence against … a person under the particular protection of [U.S.] laws," and Congress may reasonably determine that "special protection for U.S. nationals serves key national interests." *Gamble v. United States*, 139 S. Ct. 1960, 1967 (2019). By deterring and disrupting terrorism, the United States' interest in protecting American citizens is advanced. As the Assistant Attorney General for National Security recently stated, "if you have … American blood on your hands, you will face American justice." U.S. Dep't of Justice, *Remarks by Assistant Attorney General for*

---

[12]    Congress has found that "international terrorism is a serious and deadly problem that threatens the vital interests of the United States." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 301(a)(1), 110 Stat. 1214, 1247 (codified at 18 U.S.C. § 2339B note); *see* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 2(a), 130 Stat. 852, 852 (2016) ("International terrorism … threatens the vital interests of the United States.").

*National Security John C. Demers on ISIS Militants Charged with Deaths of Americans in Syria* (Oct. 7, 2020), https://www.justice.gov/opa/speech/remarks-assistant-attorney-general-national-security-john-c-demers-isis-militants-charged.

*Third*, the PSJVTA advances the United States' interest in supporting "fair compensation for American victims of terrorism from those responsible for their losses." Statement of Interest of the United States, D.E. 935-1 ¶ 12. In an *amicus* brief filed in the Supreme Court in this case, co-sponsors of the PSJVTA and the ATCA explained that "[c]ivil litigation under the ATA plays an essential role in reinforcing … governmental antiterrorism efforts," with "advantages over criminal enforcement efforts, including a less stringent burden of proof, an absence of constitutional restrictions on investigation, and broader discovery rights than those accorded governmental actors/parties," and "an important failsafe function by ensuring that legal norms are not wholly dependent on the current attitudes of public enforcers." Grassley–Nadler Br. at 19 (quotation marks and citations omitted).

*Fourth*, the PSJVTA's contribution to the disruption and deterrence of terrorism in the Middle East furthers the specific U.S. foreign policy objective of achieving a Middle East peace agreement. As stated by President Clinton in 1995 (and reiterated by presidents since), "grave acts of violence committed by foreign terrorists … disrupt the Middle East peace process," and therefore such attacks "constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." E.O. 12947, Prohibiting Transactions with Terrorists Who Threaten to Disrupt the Middle East Peace Process (Jan. 23, 1995); *accord* E.O. 13886, Modernizing Sanctions to Combat Terrorism (Sept. 9, 2019).

By linking the PLO and PA's pay-for-slay programs to consent to jurisdiction in ATA suits, the PSJVTA advances these goals by imposing civil liability in anti-terrorism cases on the PLO

and PA if they elect to continue making payments to the beneficiaries of terrorists who harmed American citizens. Conversely, an election by the PLO and PA to halt such payments would advance the related goals of the Taylor Force Act, which sets up a financial incentive for the PLO and PA to terminate "payments for acts of terrorism against Israeli citizens and United States citizens." Taylor Force Act, Pub. L. No. 115-141, tit. X, div. S, § 1004(a)(1)(B), 132 Stat. 348, 114 (2018) (codified at 22 U.S.C. § 2378c-1). Such payments "clearly incentivize terrorist attacks, and they further threaten prospects for peace, pushing the chance for a Palestinian state further and further out of reach." 163 Cong. Rec. H9650 (Dec. 5, 2017) (Rep. Engel).[13]

### B.    The PSJVTA Does Not Invade the Judicial Power

Defendants have suggested that applying the PSJVTA to this case would violate the separation of powers. They are wrong. "The separation of powers, among other things, prevents Congress from exercising the judicial power." *Patchak v. Zinke*, 138 S. Ct. 897, 905 (2018). In *Plaut v. Spendthrift Farm*, the Supreme Court held that a statute violates the separation of powers if it "*require[s]* federal courts to reopen final judgments." 514 U.S. 211, 215 (1995) (emphasis added); *see Miller v. French*, 530 U.S. 327, 344 (2000) ("Congress cannot retroactively command Article III courts to reopen final judgments … ."). In contrast, in *Miller v. French*, the Court upheld a statute that automatically stayed certain judgments because the statute does not "by itself tell judges when, how, or what to do." 530 U.S. at 346 (quotation marks omitted).

Here, the statute does not tell judges "when, how, or what to do." Indeed, Defendants have

---

[13]    *See also* 163 Cong. Rec. H9649 (Dec. 5, 2017) (Rep. Royce) (the goal of "peaceful coexistence between the Palestinians and Israelis" is "undermined every day that the PA makes payments for acts of terrorism"); *id.* at H9650 (Rep. Deutch) ("it is impossible for the Palestinian Authority to demonstrate that commitment to peace while paying terrorists for attacks on innocent civilians"); *id.* at H9652 (Rep. Smith) ("the PA cannot be a partner for peace until it stops subsidizing terrorism").

conceded that "Congress did not … instruct [the Second Circuit] to recall its mandate," and that "the PSJVTA has no provision requiring the reopening of closed cases." Defendants-Appellants Post-Argument Letter Br. at 14, *Sokolow v. Palestine Liberation Org.*, No. 15-3135 (2d Cir. July 17, 2020), D.E. 354. Rather, Congress properly left the decision whether to reopen the case to the judiciary. In the words of *Plaut*, the PSJVTA "does not impose any legislative mandate to reopen upon the courts, but merely reflects and confirms the courts' own inherent and discretionary power … to set aside a judgment." 514 U.S. at 233–34. The Second Circuit expressly held in abeyance Plaintiffs' motion to recall the mandate. D.E. 1006 at 3–4. As Defendants concede, the decision to reopen the judgment in this case was not made by Congress. Rather, the PSJVTA left that decision with the judiciary. As this Court held in the *September 11* cases, that makes *Plaut* inapplicable. *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d at 660–61.

In *Plaut*, the Supreme Court emphasized that the judgments that petitioners sought to reopen in that case had been dismissed *on the merits*. 514 U.S. at 228–29. That is not the case here, where Plaintiffs' claims were dismissed without prejudice for lack of personal jurisdiction. This difference is meaningful: following dismissal for lack of personal jurisdiction, a plaintiff "is free to institute the suit anew … under circumstances supporting jurisdiction." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 n.4 (2d Cir. 1994). Moreover, "a jurisdiction-conferring … statute usually takes away no substantive right but simply changes the tribunal that is to hear the case." *Hamdan v. Rumsfeld*, 548 U.S. 557, 576–77 (2006) (citations and quotation marks omitted). A statute that merely empowers the judiciary to reopen a case previously dismissed for lack of jurisdiction therefore does not "interfere" with the judicial power, as would a statute requiring the reopening of a case previously decided on the merits. *See Plaut*, 514 U.S. at 230. Instead, it is a constitutionally authorized exercise of express congressional power to regulate the jurisdiction of

34

the federal courts. U.S. Const. art. III, § 2.

Moreover, because the PSJVTA concerns personal jurisdiction—and in particular the circumstances in which a party may consent to personal jurisdiction—this case is more like *United States v. Sioux Nation*, 448 U.S. 371 (1980), than like *Plaut*. In *Sioux Nation*, the Court of Claims ruled that the plaintiffs presented a "moral, rather than legal" claim under the Takings Clause. *Sioux Tribe of Indians v. United States*, 97 Ct. Cl. 613, 670 (1942). The Court of Claims later held that its earlier determination had preclusive effect. *United States v. Sioux Nation of Indians*, 518 F.2d 1298, 1302 (Ct. Cl. 1975). Congress then enacted a statute "providing for Court of Claims review of the merits" of the claim "without regard to the defenses of res judicata and collateral estoppel." *Sioux Nation*, 448 U.S. at 389. The Supreme Court held that this "waiver … does not violate the doctrine of separation of powers," because Congress "only was providing a forum so that a new judicial review of the Black Hills claim could take place" and "in no way attempted to prescribe the outcome" of that review. *Id.* at 407. Just as Congress was free in *Sioux Nation* to waive the preclusive effect of a prior judgment on behalf of the takings defendant (the United States), *see id.* at 397, so too Congress was free to enact the PSJVTA, which merely creates a statutory mechanism under which Defendants themselves could *elect* to waive the effect of the Second Circuit's earlier personal jurisdiction ruling in their favor by engaging in specifically defined conduct deemed to constitute consent to suit. And indeed, *Plaut* itself recognizes that "[w]aiver subject to the control of the courts themselves would obviously raise no issue of separation of powers." 514 U.S. at 231–32.

Finally, Congress enacted, and the President signed, the PSJVTA pursuant to the political branches' authority over foreign affairs and national security, as well as Congress's plenary "'control over the jurisdiction of the federal courts.'" *Patchak*, 138 S. Ct. at 906 (quoting *Trainmen v.*

*Toledo, P. & W.R. Co.,* 321 U.S. 50, 63–64 (1944)). The decision whether to enlist the judiciary in the enforcement of foreign policy and national security interests of the United States "belongs to those answerable to the people and assigned by the Constitution to defend this nation." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1419 (2018) (Gorsuch, J., concurring). As the Department of Justice explained with respect to the ATCA (predecessor to the PSJVTA), "Congress has particular authority to enact such a [consent-to-jurisdiction] statute with respect to the Palestinian Authority and the Palestine Liberation Organization—*sui generis* foreign non-sovereign entities that exercise governmental power" and that "have a unique relationship with the United States government premised on those entities' renunciation of terrorism and commitment to peace in the Middle East." U.S. Br. at 1–2, 15, *Klieman v. Palestinian Auth.*, No. 15-7034 (D.C. Cir. Mar. 13, 2019), Doc. No. 1777372.

**CONCLUSION**

For the foregoing reasons, the Court should find that Defendants have consented to jurisdiction under the PSJVTA and hold that the PSJVTA is constitutional.

Dated: November 12, 2020
      New York, New York

                          Respectfully submitted,

                          ARNOLD & PORTER
                             KAYE SCHOLER LLP

By: _____
                          Kent A. Yalowitz
                            *Kent.Yalowitz@arnoldporter.com*
                          David Russell
                            *David.Russell@arnoldporter.com*
                          250 West 55th Street
                          New York, NY 10019
                          T: (212) 836-8344

                          Stephen K. Wirth
                            *Stephen.Wirth@arnoldporter.com*
                          601 Massachusetts Ave. NW
                          Washington, DC 20001
                          T: (202) 942-6739