# EXHIBIT A

Nick Kaufman, Advocate
King George 33/3, Jerusalem 94261, Israel
Tel: +972-2-625-3357 Fax: +972-2-622-3052
Mobile: +972-544-863-077 E-mail: nick@nick-kaufman.com
Website: www.nick-kaufman.com

# EXPERT OPINION

---

<u>My Instructions</u>

I have been requested to deliver an expert opinion on the quality of justice dispensed by the Israeli military courts on the West Bank ("IMC") which include the Judea Military Court ("JMC") (covering the southern West Bank), the Samaria Military Court ("SMC") (covering the northern West Bank) and the Combined Appeals Court ("CAC"). In the course of giving my opinion, I was requested to pay particular attention to the cases of those defendants convicted of participation in offences of relevance to the case of *Sokolow et al., v. The Palestine Liberation Organization & The Palestinian Authority* ("*Sokolow*") currently being litigated in the United States District Court for the Southern District of New York.

<u>My Expertise</u>

I have been practising criminal law since 1991. Formerly a member of the Bar of England & Wales, I am currently a registered member of the Bar of Israel (from 1995). In 1993, I was enlisted into the Israel Defence Force ("IDF") where, as a new immigrant, I served for approximately 15 months in the International Law Department of the Office of the Military Advocate General. Upon release, I joined a Tel Aviv law firm (Herzog, Fox & Ne'eman), thereafter relocating to Jerusalem where I was employed for 16 years as an assistant district attorney in Jerusalem. In this role, I prosecuted crimes of all natures ranging from the least significant of car thefts to murder and serious sexual offences. I acquired particular experience handling cases involving offences against the security of the State of Israel which were investigated by the Israel General Security Services (otherwise known as *Sherut Ha-Bitachon Ha-Klali* or *Shabak*).

From 2003-2004 and from 2009-2010, on approved leaves of absence from the Office of the District Attorney of Jerusalem, I served as an assistant prosecutor at the International Criminal Tribunal for the Former Yugoslavia and the International Criminal Court respectively.

After returning to Israel in 2010, and working for one more year in the Office of the District Attorney of Jerusalem, I left the civil service for private practice. Since then, I have handled many cases of both an international nature and of a domestic nature – primarily as criminal defence counsel. Among my international clients, both former and present, I include Jean-Pierre Bemba (the ex-Vice President of the Democratic Republic of the Congo), Callixte Mbarushimana (the alleged General-Secretary of the FDLR operating out of the Democratic Republic of the Congo), Aisha and Saadi Gaddafi (the children of the former Libyan leader – Colonel Muammar Gaddafi) and Charles Blé Goudé (former Minister of Youth in Côte d'Ivoire).

In addition to the aforementioned, since 2002, as a requirement of my military reserve duty in the IDF, I am required to sit, from time-to-time, as a judge at the JMC. In this capacity, I have presided over countless trials and detention remand applications – both contested and agreed. As a result of the aforementioned experience, I am extremely familiar with the workings of the IMC.

The opinion set out below is, thus, delivered with the benefit of the aforementioned experience.


Prior Testimony in Courts of Law / List of Publications

As mentioned previously, I am strictly a legal practitioner. I have never given testimony previously in a court of law nor have I ever published any articles.


Terms of Engagement

I agreed to $10,000 USD for preparing the opinion in this case given time restraints and the amount of material which I was required to review. This sum has already been paid and was not made conditional on the outcome of the case.

<u>Materials made available.</u>

In addition to the case files which were photocopied and prepared for me by representatives of counsel for the Plaintiffs, I have reviewed the statement of claim (complaint) in the matter of <u>*Sokolow*</u>. Most of the case files submitted for my review document proceedings at first instance. Where, however, I was provided with appellate proceedings – I have indicated this fact.

<u>My Opinion</u>

In examining the nature of justice dispensed by the IMC, I have taken, for my starting point, those notions of due process enshrined in the Universal Declaration of Human Rights which are of relevance to my mandate.[1] These include, *inter alia*, the prohibition of torture[2] (in so far as the defendants may claim that abusive practices are applied by Israeli investigating authorities in order to obtain a confession), the right to equal protection of the law and equality before the law,[3] the right to a fair and public hearing by an independent and impartial tribunal[4] and, finally, the right to the presumption of innocence and a competent defence.[5] After giving a general overview of how these basic principles are applied by the IMC, I shall examine how they were enforced and protected in the context of the cases of relevance to *Sokolow*.

By way of introduction, it should be stated that although the State of Israel does not recognize the *de jure* applicability of the 4th Geneva Convention of 1949 to the West Bank, it nevertheless, applies, *de facto*, such principles contained therein which do not conflict with its security interests. Among those principles is the obligation to be found at Article 66 which permits the military commander of an occupied territory to establish criminal courts so long as they sit in the occupied territory itself. By virtue of Military Ordinance No. 378 of 1970 ("MO 378"), the IDF established just such a system of justice in the West Bank which, over the years, has evolved to the extent that, today, it almost parallels the system of justice in force in the State of Israel. Indeed, as an ultimate recourse, defendants at the IMC may, in certain circumstances, petition the Israel Supreme Court for judicial review of decisions pertaining to their fundamental human rights

---

[1] http://www.un.org/en/documents/udhr/index.shtml
[2] UDHR, Article 5.
[3] UDHR, Article 7.
[4] UDHR, Article 10.
[5] UDHR, Article 11.

## The Prohibition of Torture

The laws of evidence of the State of Israel and the safeguards accruing to a suspect or accused contained therein have been incorporated into the legislation of the West Bank by virtue of Article 9 of MO 378 as amended on 23 December 1992:

> "*Military courts shall conduct themselves in accordance with the same laws of evidence which apply in the Courts of the State of Israel*".

Where it is alleged that statements have been produced as a result of illegal inducements, threats or, worse, torture, the law as applied by the IMC on the West Bank recognizes the *"suppression hearing"* concept familiar to practitioners in the United States  and which is, also, utilized in the Israeli civilian courts. Before a statement is introduced to the detriment of a defendant, the judge will hold a "trial within a trial" during which the police officer or General Security Service agent who registered the statement is cross-examined by counsel for the defence. The judge will then decide upon the admissibility of the statement. The criminal procedure applied at the IMC is, in this respect, identical to the law applied in the Israeli civilian judicial system and offers defence counsel a valuable tool to tackle what they might perceive to be unlawfully obtained evidence. The same rationale applies to the statements of co-perpetrators or other hostile witnesses the introduction of whose testimony is sought by the Prosecution in order to incriminate an accused. Although a previous out-of-court statement may be admitted into evidence as an exception to the hearsay rule, it is a necessary pre-condition for such that both the witness and the person who registered the latter's statement be present for cross-examination in Court. The latter requirement gives defence counsel the perfect opportunity to cross-examine the police-officer or security agent who took the statement and to put to him any allegation of unlawful inducement. Furthermore, the out-of-court statement will not be preferred to the evidence heard in court unless the judge/s hearing the case is/are satisfied that other evidence admitted during the trial corroborates it.

## The Right to a Fair and Public Hearing

Article 11 of MO 378 mandates that hearings at the military courts be public unless the trial judge/s should order otherwise in which case, an opportunity is given to defence counsel to oppose such an application:

> "*The military court shall hold cases brought before it in public. However, a military court may order that a case brought before it shall be conducted wholly or in part behind closed doors if it considers it appropriate to do so in the interests of the security of the Israeli Defence Forces, justice, or for public safety.*"

Speaking from experience, I have noted, on occasion, the desire of an accused to request a hearing *in camera* so that he may communicate information of a sensitive nature; whether it pertain to his own medical condition or to the fact that he believes himself to be suspected of being a GSS collaborator. I have also noted that family members often use the public trials as an opportunity to visit the accused in cases where they are, otherwise, refused entry into Israeli territory for security reasons and thus access to the detention centres. Given this phenomenon and the extreme heat in the summer months, a purpose-built shelter was, in recent years, installed at the JMC. It is, furthermore, my experience that human-rights NGOs – both Israeli and international – visit the JMC on a frequent basis in order to monitor the conduct of proceedings. The IDF is sensitive to such criticism and, the President of the JMC, has on occasion met with foreign dignitaries and senior human rights officers to hear and address concerns.

It goes without saying that the right to a fair hearing also includes the right to understand the nature of the proceedings. As a consequence, if the defendant does not understand the Hebrew language, he will be provided with simultaneous translation (as a general rule effected by a native Arabic speaker – a Druze or Bedouin soldier). In this respect, I note Article 12 of MO 378:

> "*If the accused does not understand Hebrew the military court shall appoint him an interpreter who will translate for him the statements made during the course of the hearing and the decisions of the court, unless the accused willingly renounces his right to have the proceedings translated wholly or in part. The accused has the right to object to a particular translator and to request that he/she be replaced*".

I should add that most counsel practising before the IMC, save a few exceptions, understand and speak both Arabic and Hebrew.

Independent and Impartial Tribunals

Article 7 of MO 378 sets out the principle of judicial independence stating that with respect to matters of jurisdiction, there is no authority other than the law and security legislation enacted by the Military Commander of the West Bank.

Until 2001, the military courts on the West Bank mirrored the military courts for the prosecution of IDF soldiers in the State of Israel in the sense that two non-lawyer military officers would sit alongside a professional judge presiding over a trial chamber. By 2002, however, the procedure had changed and it is now the rule that two professional lawyers - either career army officers or reserve officers (with criminal law experience) sit alongside the presiding judge[6] who is invariably a career army officer at the rank of Lieutenant-Colonel or higher (but never less than a Captain). The quality of the judiciary is maintained by regular continuing legal education which is a mandatory requirement for all including reserve officers such as myself.

The Presumption of Innocence

Article 29 of MO 378 states as follows:

> "*If the accused does not admit the truth of any charge, or the court refuses to accept a plea of guilt, the court shall proceed to hear the case brought by the military prosecutor and his witnesses and any other evidence which it deems fit*".

The Israeli law of evidence, which has been incorporated into the legislation applied by the IDF on the West Bank, assumes that a defendant is innocent until proved otherwise and obliges the Prosecution to make out its case beyond a reasonable doubt.

The Right to Counsel

Article 8 of MO 378 states as follows:

> "*Every case for the prosecution which is to be tried before a military court shall be conducted by a military prosecutor appointed by the Area Commander. The accused may be defended by an advocate*".

---

[6] Amendment No. 89 to Military Ordinance No. 378 of 1970.

6

An accused has the right to appoint a legal representative to protect his interests although he cannot be obliged to accept such legal representation against his will. As will be seen in some of the cases that I examine hereinafter, an accused may, from time to time, choose to dispense with counsel for ideological reasons.

The Cases

In reviewing the materials which have been placed at my disposal, I will give a brief summary of the proceedings which occurred in each case and deliver my opinion as to whether the defendant concerned was afforded due process. Each case corresponds to an annex contained in the table below and the materials made available to me are appended to my opinion as an integral part thereof. I should stress that  I reserve the right to amend my opinion at a later date in order to factor in any necessary changes which may be necessitated by the production of additional material which may not, for whatever reason, have been made available to me.

| Annex/Case # | Israeli  ID # | Name of Defendant |
|---|---|---|
| 1 | 902442607 | מונזר מחמוד חליל נור<br>Moonzer Mahmood Halil Nur |
| 2 | 980136675 | ע/כרים ראתב יונס עוויס<br>Abd-el Karim Ratheb Younis Aweis |
| 3 | 993006188 | נאצר ג'מאל מוסא שוויש<br>Nasser Jamal Mussa Shwaysh |
| 4 | 903946960 | קאהירה סעיד עלי סעדי<br>Kahira Sa'id Ali Sa'adi |
| 5 | 081021198 | סנאא מחמד שחאדה<br>Sana'a Mohammed Shchada |

| 6 | 030300028 | עבדאללה ברגותי<br>Abdallah Bargouti |
|---|---|---|
| 7 | 991260886 | אבראהים חאמד<br>Ibrahim Hamed |
| 8 | 994466860 | אחמד ברגותי<br>Ahmed Bargouti |
| 9 | 902845643 | מחמד מצלח<br>Mohammed Messalah |
| 10 | 979469954 | מחמד סאמי איברהים עבדאללה<br>Mohmmed Sami Ibrahim Abdallah |
| 11 | 025806985 | פארס ע'אנם<br>Pharess Ghanem |
| 12 | 904460862 | מאג'ד אל מסרי<br>Majid al-Masri |
| 13 | 920629276 | עלי מוחמד חמאד אבו הלאיל<br>Ali Mohmamed Hamed Abu-Halil |
| 14 | 410066625 | ע/א רחמאן (זאהר) יוסף ע/א רחמאן מקדאד<br>Abd-al-Rahman (Zahar) Youssef Abd-al-Rahman Mekadad |
| 15 | 901415984 | חילמי ע/א כרים מוחמד המאש<br>Hilmi Abd-al-Karim Mohammed Hamash |
| 16 | 901739656 | אחמד צאלח אחמד צאלח<br>Ahmed Salah Ahmed Salah |
| 17 | 907377113 | מוחמד עיסא מוחמד מעאלי<br>Mohammed Issa Mohammed Ma'ali |

| 18 | 911744878 | אחמד מוחמד אחמד סעד<br>Ahmed Mohammed Ahmed Sa'ad |
|----|-----------|--------------------------------------------------|
| 19 | 411124423 | אברהים ע/א חי<br>Ibrahim Abd-al Hai |
| 20 | 429934439 | בשאר ברגותי<br>Bashar Bargouti |
| 21 | 906194063 | עז אלדין חמאמרה<br>Uzz-a-din Hamamra |

1. **Moonzer Mahmood Halil Nur – ID No. 902442607**
   **Case No. 3465/02  - Appeal No. 1009/05**

This defendant was tried, at first instance, for various offences and incidents including the co-perpetration of homicide on Jaffa Street in Jerusalem on 27 January 2002, attempted homicide and kidnapping. The defendant was, in fact, acquitted of kidnapping at the conclusion of the evidential hearings. After being sentenced to life imprisonment, the defendant appealed both his sentence and conviction. Simultaneously, the Prosecution appealed the sentence arguing, *inter alia*, that the defendant should have received an additional consecutive life sentence for the attempted homicide of approximately 150 bystanders present on Jaffa Street (including members of the Sokolow family). The defendant's appeal was rejected on both grounds whereas the Prosecution's appeal was allowed.

Of note is the fact that the defendant was represented, at trial and on appeal, by counsel – Attorney Ali Gozlan with who I am familiar and know to represent many accused at the JMC. In its judgment, the trial court observed that much of the evidential material was submitted with the consent of defence counsel including, most importantly, the statements of the accused himself which contained self-incriminating information: namely, that the accused had sat with a female suicide bomber (who he had met, on an occasion, at the Muqata'a) and discussed the details of a proposed attack. Defence counsel sought to diminish the role of the accused by arguing that his client did not possess specific intent for the purpose of homicide nor did he truly act in concert with the physical perpetrator. Defence counsel argued, in a nutshell, that the evidence arising out of his client's statements only supported the

contention that he knew of a plan to place a bomb rather than encouraging the female bomber in her homicidal and suicidal enterprise.

In my opinion, the defendant was afforded due process. At no stage did defence counsel challenge the admissibility of the statements which were the basis for his client's conviction. To the contrary, comprehensive legal arguments were made that the accused's statements did not make out a guilty state of mind (apart from the offence of failing to prevent the commission of a crime). Furthermore, in his grounds of appeal, the defence counsel did not argue that there had been any procedural irregularity during the trial at first instance.

2. **Abd-el Karim Ratheb Younis Aweis – ID No. 980136675**
   **Case No. 3478/02**

This defendant was charged, on an indictment filed on 30 June 2002, with various offences including the manufacture and use of improvised explosive devices and attempted homicide. At the arraignment hearings, the defendant was represented by Attorney Samara who, on 15 January 2003, announced to the Court that his client would plead guilty to an amended indictment which was soon to be filed. Indeed, on 22 January 2003, the Prosecution submitted its amended indictment which it had signed on 14 January 2003 and presumably discussed with Attorney Samara prior to the hearing of 15 January 2003. The defendant, through his counsel, pleaded guilty to the amended indictment which comprised a total of 46 counts including 3 counts of homicide and 1 count of attempted homicide in relation to a "Tanzim" sponsored suicide-bombing committed on King George Street in Jerusalem on 21 March 2002. According to the information placed at my disposal, this was the attack in which members of the Bauer family were injured.

The accused himself spoke at the hearing which took place on 22 January 2003 and confirmed his guilty plea. It is important to note that the accused was, also, at pains to stress that as far as his guilty plea to one of the counts was concerned, it should not be interpreted as incriminating his brother - Hassan. Such a comment strongly supports an argument that the accused was well aware of the charges leveled at him and was sufficiently well informed and aware of the consequences of his guilty plea.

The sentencing hearing took place on 12 March 2003 and the accused himself, as is the custom, was given the opportunity of having the last word. This is what he had to say:

> "*The acts which I did – I am proud of them and there is justification for what I did. The reason for them is the Israeli occupation and the Israeli army which every day kills civilians and the last among them is the killing of my brother Samar. If I could kill more Jews, I would not hesitate. What I would like to state here is this: the Intifada will continue and also the attacks will continue within Israeli territory until the State of Palestine is created and the army withdraws from the Occupied Territories*".

The defendant was, thereafter, sentenced to six consecutive life-sentences.

Nothing in the materials with which I have been provided leads me to believe that this defendant was denied due process. No application was made by defence counsel to correct the transcript documenting his client's speech at the sentencing hearing. It must therefore be assumed that the words appearing in the transcript correctly reflect the defendant's thoughts and beliefs and that they were uttered freely and spontaneously.

### 3. Nasser Jamal Mussa Shwaysh – ID No. 993006188
### Case No. 3739/02

This defendant was prosecuted for homicide in respect of the same attack mentioned immediately above; namely, the bombing committed on 21 March 2002 on King George Street in Jerusalem. The defendant was also convicted of various firearms offences committed against IDF soldiers and installations as well as orchestrating another suicide bombing (committed on 25 January 2002 in Tel Aviv) – all in his capacity as a senior commander in the Al-Aqsa Martyrs' Brigade.

I have noted that the defendant was not represented by counsel at trial. Nevertheless, at the arraignment hearing held on 6 October 2002, the defendant had the following to say:

> "*I do not want to be represented by a lawyer. I have understood what the Court has told me concerning the need to be represented but I maintain this refusal*".

The defendant, in any event, displayed a thorough understanding of the charges alleged – pleading guilty to some and denying others. Of particular interest is the fact that with respect to one count of attempted homicide (count no. 24), the defendant admitted co-perpetrating a shooting attack on a military checkpoint but clarified that

it was not his intention that the physical perpetrator (who was killed while committing the attack) should enter Israeli territory to kill civilians. The defendant also raised a preliminary issue relating to the competence of the Court to try him – arguing that he was a prisoner of war. Having effectively denied the charges relating, *inter alia*, to the attack on King George Street, the case was set down for trial with the presiding judge repeating his recommendation that the defendant do his best to hire a lawyer to represent him.

Also of note is the defendant's apparent understanding of the concept of self-incrimination and an accused's right to avoid such. At the hearing conducted on 21 November 2002, the defendant turned to a witness in open court and gave her the following advice:

> "*Don't testify about the weapons – whether or not I gave you and you gave me…it is a criminal offence for you and you can receive years in prison – so keep your mouth shut…*"

In any event, in so far as the attack perpetrated on King George Street, Jerusalem is concerned, the defendant was incriminated at trial by the above discussed Abd-el Karim Ratheb Younis Aweis who was called as a witness for the Prosecution on 14 November 2002 and, as will be remembered, expressed pride for the acts that he had perpetrated. The defendant acknowledged that the Court had explained to him his right to cross-examine Aweis but he, nevertheless, declared that he had no questions for the witness given that the latter had given one statement in which he had not confessed any guilt and was thus a witness who had given conflicting evidence. This evidence was later corroborated by the defendant himself, who gave evidence on 10 December 2002 after requesting that another witness for the defence give evidence before him – something which is an exception to the general rule. During his testimony, the Court asked for the defendant's comments on the attack perpetrated on King George Street and the events that preceded it. At page 8 of the transcript, line 8 onwards, the defendant admitted that he knew that Aweis had armed the suicide bomber (Mohammed Hashaika) with an explosives belt and confessed to transferring the latter by car to a location from where he made his way to Jerusalem by hitch-hiking. The defendant admitted that he was prominent in taking responsibility for the attack on behalf of his organization – the Al-Aqsa Martyrs' Brigade. On 14 January 2003, and on the basis of the aforementioned admissions, the defendant was convicted of the offences relating to the King George Street attack.

At the sentencing hearing held on 10 March 2003, the defendant delivered an extremely lengthy monologue in which he denounced the Israeli occupation of Palestinian land and, at page 3 of the transcript, line 30 onwards, stated as follows:

> "*What caused me to take up arms and prepare bombs and send suicide bombers? What caused me and the 7000 prisoners and 3000 killed during the last two years of the Intifada – I say – is the occupation*".

To conclude, despite being unrepresented at trial, I am not of the opinion that the defendant was denied due process or confessed to something that he did not do.


4. **Kahira Sa'id Ali Sa'adi – ID No. 903946960**
   **Case No. 3529/02 – Appeal 1777/04**

This female defendant was initially charged, on 7 July 2002, inter alia, with the homicide of three civilians and the attempted homicide of many others by assisting a suicide bomber to enter Israel and leading him to the place where he detonated himself. The suicide-bombing concerned, in this instance, is the same incident as mentioned in cases 2 and 3 above.

The defendant was represented throughout the criminal proceedings by Attorney Abu-Ganem and Attorney Azbarga who agreed to submit evidential material of a technical nature while insisting on the cross-examination of a witness – once again – the above-mentioned co-perpetrator Abd-el Karim Ratheb Younis Aweis.

There is no reason to doubt that the defendant was ably represented and made fully aware of the charges leveled at her. Indeed, on 1 June 2004, the defendant's counsel concluded a plea bargain with the Prosecution in the context of which the indictment was amended and the defendant admitted guilt for aiding and abetting homicide and attempted homicide as opposed to co-perpetrating the same offences. After a sentencing hearing, the defendant was sentenced, on 29 August 2004, to three life sentences and an additional 30 years imprisonment – all to run consecutively.

Procedural issues of note include the fact that the Court, on 29 August 2004, before submissions were heard as to the appropriate sentence, informed the parties that one of the members of the judicial tribunal had business relations with Attorney Abu-Ganem from time to time. Such a declaration suggests that the Court was fully aware of the need to disclose any conflicting interests so that the impartiality of the tribunal be preserved.

I also note that at the sentencing hearing, defence counsel conducted a comprehensive plea in mitigation which included hearing testimony from the defendant's husband in an attempt to persuade the judges to impose a sentence of less than life imprisonment.

While it is not far-fetched, by any means, to argue that aiding and abetting homicide should attract a sentence of less than life imprisonment, it is hard to fault the Court's final decision given the nature of the defendant's admitted involvement in the crimes to which she pleaded guilty. In any event, it is not within my mandate to pronounce upon the reasonableness of the sentence but, rather, whether the defendant received a fair trial and appropriate representation. To this end, the plea bargain was an acceptable achievement for the defence lawyer. The fact that the Court chose not to follow such leniency through to sentence has nothing to do with due process but rather legitimate judicial discretion. In any event, an appeal was filed on behalf of the defendant which, on 31 July 2005, was allowed to the extent that her sentence was reduced from three consecutive life sentences and an additional 30 years to one life sentence alone.

### 5. Sana'a Mohammed Shchada – ID No. 081021198
   ### Case No. 3544/02 - Appeal 1776/04

The facts of this case are virtually identical to that of the previous female defendant (Kahira Sa'id Ali Sa'adi - Case No. 4) to such an extent that both cases were co-joined on appeal. This defendant, also, led the suicide bomber, who perpetrated the attack on 21 March 2003, to King George Street where he detonated himself.

The defendant was represented by Attorney Ahlam Hadad – an extremely experienced attorney with whom I am familiar and who I know to represent many individuals facing trial at the JMC.

On 29 April 2004, as with the previous case, the parties reached a plea bargain with the original counts of co-perpetrated homicide being substituted for counts of aiding and abetting homicide. At the hearing, the defendant confirmed her attorney's submissions by clarifying to the Court that she understood the contents of the amended indictment and admitted the facts contained therein.

Two weeks later a sentencing hearing was held during which the defendant's counsel sought to mitigate her client's criminal responsibility by arguing that her "aiding and abetting" was purely technical. Defence counsel also cited precedent which, in her

opinion, obliged the trial court to maintain a unified sentencing policy. At the conclusion of her counsel's comprehensive plea in mitigation, the defendant made the following short statement:

> "*I would ask the Court to judge me as a human being and not as its enemy. At the end of the day, I made no mistake. What caused me to do this were pressures and the circumstances.*"

On 7 July 2004, the defendant was sentenced to one life sentence. As mentioned, above the disparity between her sentence and that of Kahira Sa'id Ali Sa'adi prompted the latter's appeal which was later upheld. This defendant also filed an appeal which was rejected.

To conclude, this defendant was ably represented and I am not of the opinion that she was denied due process or confessed to deeds that she did not perform.


### 6. Abdallah Bargouti – ID No. 030300028
### Case No. 3380/03

This defendant was charged on 29 May 2003 with more than 100 offences – including, at counts 87-95 inclusive, offences of homicide and attempted homicide relating to the bombing perpetrated at the Hebrew University Campus on Mount Scopus in Jerusalem on 31 July 2002. The defendant's alleged role in the said bombing was by way of manufacturing the explosives which caused the lethal blast.

During the criminal process, the defendant was represented by Attorney Bassoul who, at the very first remand hearing on 1 June 2003, informed the Court that his client wished to plead guilty. The defendant, himself, acknowledged that he had understood the said indictment and admitted liability for the charges presented against him. The defendant was thus convicted and the sentencing hearing took place on 9 November 2003. Of significance is the fact that the defendant excused his lawyer from making a plea in mitigation and delivered his own lengthy speech notable for its non-conciliatory tone. Extracts thereof are cited below:

> "*I worked as an engineer but after the intifada when I saw the arbitrary murders and the unreasonable revenge exacted on the Palestinian people I decided that I would free (…) despite the occupation and I used all my power and knowledge to free my homeland. I do not regret even one of the acts that I carried out and the Court knows that I taught dozens of engineers who will do the work better than me. You will see in*

*the future cases ten times worse than mine. I promise you. With respect to the attacks which you claim that I perpetrated, they began when the [targeted] assassinations began – when you eliminated Jamal Mansoor and Jamal Salim. I committed the first attack in Sbarro Café because of an [Israeli] attack in Nablus…. After Ariel Sharon the terrorist gave the order to bomb Salah Schehada's house I carried out the attack at the University and that was because you crossed a red line by bombing civilians from the air. When you stopped gas and petrol reaching my compatriots in Jenin and Ramallah, I tried to blow up the petrol installation in Gelilot and I am sorry that I did not succeed as keen as I was that the attack should succeed and destroy everything in the vicinity….if you want to prevent these things you should leave my land and return to where you came from and I hope you will not ask to many questions about the things that I did because you will see a lot more. I have one piece of advice for the Israeli people: and that is what Ahmed Yassin promised namely that we will destroy the State of Israel by 2023. I assure you that it will happen much before that date…I do not understand how you are judging me on my grandfather's land … and how it is that the murderer is judging the murdered.*"

For the homicide of 66 individuals, the defendant was sentenced to 66 consecutive life sentences with an extra consecutive life sentence being imposed for the other offences to which he had pled guilty. There is no doubt in my mind that this defendant was eager to plead guilty for ideological reasons and was not minded, in any way at all, to benefit himself of any the procedural safeguards which could have been afforded him. The above cited extract shows that the defendant confessed, freely and without any compunction whatsoever, to committing the attack at the Hebrew University.

### 7. Ibrahim Hamed – ID No. 991260886
### Case No. 4696/06

This defendant was represented throughout the criminal process, bar one hearing, by counsel Attorney Salah Mohammed. It is worth noting that the evidential material in this case was vast given that it related to approximately 70 counts and over 300 witnesses for the Prosecution. More than three years passed without a single witness being heard and with most of the hearings held in the interim dealing with questions of disclosure. While such a delay is considered exceptional, it is worth noting that the Court itself expressed its displeasure. Part of the disclosure issues concerned immunity certificates issued by the Israeli authorities in order to prevent

16

the disclosure of material which might harm vital security interests. The fact that the Defence is entitled by law to challenge these certificates is an extra guarantee of due process. On receiving such a defence challenge, an appeals tribunal is required to review whether or not the accused will receive a fair trial if the information (in respect of which immunity is sought) is not released; namely, if it is exculpatory.

After a number of hearings during which disclosure issues were discussed and tentative dates for trial were fixed, the Prosecution presented, on 27 June 2010, an amended indictment. The first witness – the above mentioned – Abdallah Bargouti was heard on 7 July 2010 and the evidential hearings continued until 9 October 2011 when the accused was informed of his right to testify in his own defence. It should be noted, that a number of GSS agents were cross-examined by the Defence as to the methods which they adopted in interrogating those witnesses which were liable to incriminate the defendant.

On 9 October 2011, the defendant declined to testify after it had been clearly explained to him by the Court, in the presence of his counsel, that such refusal could comprise corroboration where the Prosecution was obliged to provide such an evidentiary supplement.

On 30 October 2011, and in the presence of his client, counsel for the defence had the following to say:

> "*I have been asked by the accused to tell the Court that his view of the Court – right from the start – is that he does not recognize the competence of the Court to try him. The accused also informs the Court – without pleading guilty to the acts attributed to him and set out in the indictment, that he views this Court as sitting in occupied territory and incompetent to judge. Defence counsel will elaborate on these submissions in his closing arguments. For these reasons, the defendant will not testify and will not be cross-examined by the Prosecution because he does not recognize the competence of the Prosecution or of the Court*".

While such a defence strategy flies in the face of accepted practice, it cannot be argued that it was a strategy that was adopted without the full consent of the defendant. Since a considerable portion of the Prosecution case against him was built on the evidence of co-perpetrators which, as a matter of law, require corroboration, the voluntary refusal of the defendant to testify was a major factor leading to his conviction – as the Court indeed pointed out at page 40, line 22 of its 60 page judgment delivered on 27 June 2012.

At page 56 of its judgment, the Court gave its reasons for convicting the defendant of homicide and attempted homicide on counts 44-53 which concerned the attack perpetrated at the Hebrew University in Jerusalem on 31 July 2002. The evidence against the defendant comprised a note taken from the investigative interview of a co-perpetrator called Arman – who stated as follows:

> "*Concerning the the attack at the University, the interviewee stated that the idea was that of Abu-Sa'ad and the Sheikh* [i.e. the defendant -  N.K.] *gave his approval only requesting that there were arabs in the vicinity, they should not execute the attack*".

The Court had previously discussed the admissibility of Arman's evidence in light of the general attack launched by Defence counsel on the credibility of the investigative agents tasked with documenting the evidence of co-perpetrator witnesses.

Finally, the Court proceeded to examine whether giving an order for an attack constituted full participation in a crime or a lesser mode of liability. On the basis of legal precedent the Court concluded that the defendant's criminal liability should not be defined as inchoate.

Immediately after rendering its judgment, defence counsel repeated his client's refusal to recognize the Court's competence to try him and, further, requested that his client be excused from attending the sentencing hearing. At the conclusion of the Prosecution submissions as to sentence, defence counsel declined to proffer a plea in mitigation.

On 1 July 2012, the defendant was sentenced to 54 consecutive life sentences.

To conclude, it is my opinion that the defendant's rights were protected at all times by counsel who clarified that his client's refusal to mount a proactive defence was grounded in ideological reasons. Counsel was afforded an opportunity to cross-examine all essential witnesses and the judgment convicting the defendant was reasoned and comprehensive.

### 8.  Ahmed Bargouti – ID No. 994466860
   <u>Case No. 3459/02</u>

On 15 May 2003, this defendant pleaded guilty to more than 50 counts documented in an amended indictment filed on 1 October 2002. Among other offences, the defendant admitted to jointly instructing one Sa'id Ramadan to carry out a "suicide" shooting attack on Jaffa Street in Jerusalem on 22 January 2002. The defendant also

admitted sheltering Abdallah Bargouti (Case 6 above) prior to the latter carrying out the attack perpetrated at the Hebrew University on 31 July 2002.

On 30 July 2003, the Court held a hearing at the conclusion of which, and before he was sentenced to 13 consecutive life sentences, the defendant stated as follows:

> "*I say that the death penalty should be imposed on* [Ariel – N.K.] *Sharon in this Court. I regret nothing*".

Nothing in the materials with which I was provided leads me to believe that this defendant was denied due process. He was represented by Attorney Nasr-a-din who stated that his client had instructed him not to present any defence nor to enter a plea in mitigation because he did not recognize the competence of the Court to try him.

### 9.  Mohammed Messalah – ID No. 902845643
### Case No. 3250/02 (Sentenced jointly in Case No. 3275/02)

This defendant was represented by Attorney Akram Samara who, on 12 January 2003, announced that his client would plead guilty, *inter alia*, to homicide and attempted homicide by way of jointly instructing the aforementioned Sa'id Ramadan to carry out a "suicide" shooting attack on Jaffa Street in Jerusalem on 22 January 2002.  As part of the aforementioned plea bargain, which entailed an amendment to the original indictment filed against the accused, the Prosecution gave an undertaking not to use the defendant's confessions in investigation against his alleged co-perpetrators at trial. For the 22 January 2002 attack and others, the defendant was sentenced, on 25 March 2003 to 9 consecutive life sentences.

From the reasoned sentencing judgment, it is apparent that the defendant justified the deeds to which he had pleaded guilty as a reaction to "the Occupation". Nothing in the materials made available to me suggests that the defendant was denied due process and/or admitted something that he did not, in fact, do.

### 10. Mohammed Sami Ibrahim Abdallah – ID No. 979469954
### Case No. 3251/02

This defendant was tried for various offences of homicide and attempted homicide including transporting the aforementioned Sa'id Ramadan to Jaffa Street in

Jerusalem on 22 January 2002 with the intent that the latter should shoot at civilians with an M-16 semi-automatic rifle.

At the trial proceedings which commenced on 5 August 2002, the defendant was represented by Attorney Fateen who, on 12 January 2003, announced that he had reached a plea bargain with the Prosecution whereby the defendant would plead guilty to an amended indictment.

During the sentencing hearing, the accused himself stated that he had committed the offences for which he had been convicted because of the occupation adding that he regretted nothing and that he would even encourage those continuing the struggle for freedom. On 13 May 2003, the defendant was sentenced to 5 consecutive life sentences.

There is nothing in the documentation with which I have been provided to suggest that the defendant did not receive a fair trial. The defendant's utterances during the sentencing hearing confirmed the ideological basis for his offences and the voluntary nature of his confession.


### 11. Pharess Ghanem – ID No. 025806985
### Case No. 3262/02

On 21 April 2002, a 32 count indictment was filed charging this defendant, inter alia, with several accounts of homicide and attempted homicide. Of relevance to the case of *Sokolow* is the charge that he transported the suicide "shooter" – Sa'id Ramadan from Ramallah to Jerusalem on 22 January 2002  together with Mohammed Sami Ibrahim Abdallah (Case 10 above) at the request of Ahmed Bargouti (Case 8 above).

The defendant maintained his innocence during investigation and at trial where he was initially represented by Attorney Samara who, on 25 December 2002, agreed to submit evidential material to the court *in lieu* of live testimony. On 16 March 2003, the defendant announced that it was his intention to change his legal representation and to replace Attorney Samara with Attorney Osama Sa'adi. The latter appeared before the Court for the first time on 31 March 2003 and requested an adjournment in order to familiarize himself with the investigative material. Thereafter, on 24 April 2003, Attorney Sa'adi requested a further continuance in order reach procedural agreements with the Prosecution. On 20 May 2003, the parties informed the court of those matters which were disputed by the defence and on 21 September 2003, submitted further evidence *in lieu* of live testimony. On 29 April 2004, defence counsel stated that his client would waive the right to testify in his own defence but added that, with the agreement of the Prosecution, such a decision would not corroborate the Prosecution evidence where such corroboration was required. After

a few additional adjournments, the parties submitted their closing submissions in writing.

On 25 July 2004, the Court rendered its judgment, convicting the defendant of all the offences with which he had been charged. In finding him guilty for the offences related to the shooting attack on 22 January 2002, the Court relied on the incriminating testimonies of Mohammed Sami Ibrahim Abdallah (Case 10 above) and Mohammed Messalah (Case 9 above) which had been submitted *in lieu* of *viva voce* testimony and were deemed mutually corroborative.

At the sentencing hearing held on the same day as the verdict, defence counsel made a comprehensive plea in mitigation touching on the unique personal circumstances of his client.  The defendant was sentenced immediately thereafter to 9 consecutive life sentences.

In forming my opinion concerning this case, I have noted that the defendant was represented by Attorney Osama Sa'adi - one of the most experienced and prominent defence counsel practising both in Israel and on the West Bank. I am personally familiar with this lawyer having appeared opposite him in my former role as a prosecutor and having sat as a judge in cases in which he has argued. I know Attorney Sa'adi to be a fearless advocate and ready, at any opportunity, to criticize any perceived breaches of his clients' rights and far from shy of reprimanding the Court itself. Although not achieving the result which he desired, Attorney Sa'adi well protected his client's rights and provided him with a solid defence. Nothing in the material with which I have been provided suggests that the defendant was denied due process.


### 12. Majid al-Masri – ID No. 904460862

This defendant was not tried in the JMC but at the Samaria Military Court. According to the indictment filed against him, the defendant was charged with 19 offences including, at counts 6-8, homicide and attempted homicide in respect of the attack perpetrated on Jaffa Street, Jerusalem on 22 January 2002.

The defendant was ably represented by Attorney Amjad Derowshe throughout his trial which commenced on 4 June 2003. The defendant contested all the charges leveled at him and evidential hearings were heard for the best part of two years with the judges delivering a reasoned judgment on 28 June 2005 (notifying the verdict orally on 6 February 2005). The evidential hearings were conducted in textbook fashion with no out of the ordinary occurrences. The judges even found it appropriate, on 14 June 2004, to award defence counsel costs for wasted time incurred by a police officer who failed to appear to testify.

21

The accused gave evidence in his own defence which was found, in the judgment, not to be credible. The prosecution evidence incriminating the defendant was largely based on the testimony of co-perpetrators. The defendant presented two lines of defence arguing, on the one hand, that there were many people from his area who shared his name while maintaining, on the other hand, that those who incriminated him did so because of some personal vendetta. The judges found these two lines of defence to be contradictory. With respect to the attack on Jaffa Street, the defendant was convicted on the basis of the cumulative testimonies or guilty pleas of co-perpetrators mentioned in this opinion: Ibrahim Abd-al Hai, Nasser Aweis, Mohammed Messalah, Mohammed Sami Ibrahim Abdallah and Ahmed Bargouti. Each of these testimonies corroborated each other and gave the judges a clear picture of the defendant's role in the Jaffa Street attack – namely sending the suicide "shooter" to perpetrate his attack after filming him reading his last will and testament.

On 6 February 2005, the Court held a sentencing hearing during which the defendant continued to maintain his innocence. At the conclusion, the defendant was sentenced to 10 consecutive life sentences.

From perusal of the transcripts of the trial proceedings, I am of the opinion that due process was observed and that the defendant was convicted after the evidence had been tested by competent counsel.


### 13. Ali Mohmamed Hamed Abu-Halil – ID No. 920629276
### Case No. 2306/04

This defendant was charged, *inter alia*, with co-perpetrating homicide and attempted homicide by way of procuring the materials for the explosives used in the suicide bombing attack on the No. 19 bus in Jerusalem on 29 January 2004.

The defendant was represented at trial by Attorney Ahraj who, on 4 August 2005, announced that his client would plead guilty to the facts contained in the indictment but would, also, argue that his client's mode of participation should be redefined as aiding and abetting rather than the co-perpetration charged by the Prosecution. Accordingly, the Court put off the case for written closing submissions.

On 26 February 2006, the Court rendered its judgment wherein it concurred with the defendant's line of defence, convicting him, in total, of 19 counts of aiding and abetting homicide and 2 counts of attempting to aid and abet homicide.

At the sentencing hearing on 5 March 2006, Attorney Ahraj submitted precedent (Appeal Case No. 1706/05) in order to distinguish his client's case from others and in order to request a sentence which he felt appropriate for aiding and abetting homicide; between 20-25 years homicide. Attorney Ahraj stressed the limited role which, he claimed, the accused had played in the bombing attack – taking instructions, on one occasion alone, from Abd-al-Rahman Youssef Abd-al-Rahman Mekadad (see below).

The defendant was sentenced to 21 life sentences – all to run concurrently. In its reasoned sentencing decision delivered on 23 November 2006, the Court reiterated, on the one hand, the sentencing policy adopted by the military judiciary of imposing life sentences on those who aid and abet suicide attacks. On the other hand, the Court found it appropriate to distinguish between the defendant and those who co-perpetrated such attacks by determining that he would serve all his life sentences concurrently.

To conclude, the defendant did not deny involvement in the offences with which he was charged and the arguments made on his behalf suggest his full cooperation with competent counsel whose argument as to the mode of liability was, in fact, accepted by the Court. Having reviewed the materials placed at my disposal, there is nothing to suggest that the defendant was denied due process.

### 14. Abd-al-Rahman Youssef Abd-al-Rahman Mekadad  - ID No. 410066625 Case No. 2271/04

This defendant was charged on an indictment containing 29 offences including homicide and attempted homicide for the procurement and the manufacture of the chemicals and explosives used in the suicide bombing attack on the No. 19 bus in Jerusalem on 29 January 2004.

The defendant was represented by Attorney Osamah Awdeh at trial which commenced on 30 June 2004. On 27 July 2006, after technical procedural hearings over the space of two years, the parties agreed to allow the Court to decide the defendant's guilt on the basis of evidential material submitted with the consent of defence counsel. During his closing speech, defence counsel had the following to say:

> "*…the defendant's case is that he does not wish me to make closing submissions and that all the facts contained in the indictment are correct and that his case is that he murdered and wounded all the people mentioned in the indictment but he did so in the context of his struggle*

*against the occupation. It is the defendant's right to do this, therefore although he murdered he believes that he is not pleading guilty*".

The defendant immediately confirmed his counsel's words:

"*I confirm that the facts contained in the indictment are correct and what was said by my lawyer. I am not pleading guilty. The Court can decide whether I am guilty or not.*"

The Court, unsurprisingly, found the defendant guilty of all the offences with which he was charged in the indictment – including those relating to the attack on the No. 19 bus on 29 January 2004.

During the sentencing hearing which was held immediately thereafter, the defendant elaborated on the reasons for his in-court confession:

"*I admit killings all those people from Israel, but I am not guilty because it is my right. It is a response to dozens of thousands that you have killed of our people without any reason, just because you think yourselves the best in the world and you continue this method in your way of life – you will not hear of or feel peace or security. The reason for this is your politics and the occupation.*

*I will speak about myself. I promise you, dear judges, if there will be peace we will be friends in peace and if you continue in the same way, I will be the first to* [not clear – N.K.] *and I promised you that the day will come when I will sit in your place and judge you for what you have done to the Palestinian people. This is my promise which will be realized soon. I promise you that I will come out of jail and whatever my punishment this will be an honour for me, my wife and my son aged 3. I hope that when he grows up there will be something called "peace". If there will be war – such as you are used to – killing children and babies – I expect him to be a greater fighter and to resist more than me.*"

The defendant was sentenced, on the same day, to 21 consecutive life sentences and an additional 15 years.

There is nothing in the material with which I have been provided to suggest that the defendant did not receive a fair trial. His confession was voluntary and ideologically motivated.

### 15. Hilmi Abd-al-Karim Mohammed Hamash – ID No. 901415984
   Case 2303/04 – Appeal No. 3084/07

On 23 May 2004, this defendant was charged, *inter alia*, with homicide and attempted homicide for recruiting the suicide bomber who perpetrated the No. 19 bus attack in Jerusalem on 29 January 2004 and for purchasing the materials used to manufacture the explosives. At trial, which commenced on 4 July 2004, he was represented by Attorney Osamah Awdeh who, for the best part of a year, requested adjournments for the purpose of reaching a plea bargain with the Prosecution. Eventually, on 4 April 2005, the case was set down for trial with substantial evidence being submitted by consent of the parties on 17 November 2005. After several more hearings in which material was submitted to the Court without oral testimony being heard, the Prosecution concluded its case. On 25 May 2006, the defendant gave evidence. The Prosecution submitted its closing submissions in writing whereas counsel for the defence argued orally on 1 August 2006.

Three weeks later, on 24 August 2006, the Court rendered a reasoned judgment finding the defendant guilty on all counts. With respect to the bombing of the No. 19 bus, the judges had carefully examined the evidence rejecting the defendant's version that he was unaware that the materials (which he admitted acquiring) were intended for use in a suicide bombing. To this end, the judges relied on the evidence of a co-perpetrator - Ahmed Salah Ahmed Salah (Case 16 below) which was corroborated by the testimony of another two witnesses.

At the sentencing hearing which took place on 19 September 2006, defence counsel tried to distinguish the role of the defendant from that played by others involved in the lethal attack on the No. 19 bus arguing that his involvement was, essentially, peripheral.

On 25 September 2006, the defendant was sentenced to twelve consecutive life sentences with written reasons for the sentence being delivered in open court on 28 June 2007. The defendant launched an appeal against both his conviction and the severity of his sentence. The appeal against the conviction is of relevance since by arguing that he should have been convicted of aiding and abetting as opposed to full co-perpetration, the defendant impliedly acknowledged that he bore a modicum of criminal liability for involvement in the offences for which he had been convicted. In any event, on 16 January 2008, the defendant's appeal was rejected on both grounds.

The material which was placed at my disposal does not reveal any procedural irregularity and it is my opinion that the defendant's case was handled appropriately and in accordance with recognized principles of due process.

### 16. Ahmed Salah Ahmed Salah – ID No. 901739656

**Case No. 2270/04**

This defendant was tried for various offences of homicide and attempted homicide including preparing and priming the bomb which was detonated by a suicide bomber on the No. 19 bus in Jerusalem on 29 January 2004. The defendant was tried jointly with Abd-al-Rahman Youssef Abd-al-Rahman Mekadad (Case No. 14 above) and represented by the same lawyer (Attorney Osamah Awdeh) who made identical submissions on his behalf – even to the extent of announcing his desire to plead guilty on 27 July 2006.

This is an extract of what the defendant had to say before sentencing:

> "*…When I committed the crimes with which I have been charged, it was a natural response to what had happened in Khan Younis. On that day 19 civilians were killed including infants. When we discussed this and tried to understand what had happened, the Israeli media reported that a wanted person had been pursued and during the said pursuit civilians were killed. They argued that the target of the operation was the wanted person despite the fact that 17 others were killed – the objective was obtained. I responded to these events. I made a list of wanted Israelis. The first objective was to get to the pilot who bombed Gaza or to the (tank) driver who shelled the same area with the innocent children who were killed – the same tank driver who wrote on the shell that "this is a present for the children" – you train your children for terror from the age of 5. Because of these things, I learnt the subject and targeted officers from various units….with respect to the second attack – you can look and you will see that there are names of soldiers on that bus. My target was those soldiers who kill children in Gaza. The objective of the Israelis is to reach one wanted person despite killing with him twenty innocent people and we act in similar fashion.*"

The defendant was sentenced to the same sentence that was received by Abd-al-Rahman Youssef Abd-al-Rahman Mekadad; namely, 21 consecutive life sentences and an additional 10 years for the non-homicidal offences.

My opinion with respect to the due process afforded this defendant is identical to my opinion in the matter of Abd-al-Rahman Youssef Abd-al-Rahman Mekadad.

**17. Mohammed Issa Mohammed Ma'ali – ID No. 907377113**
  **Case No 2268/04**

This defendant was tried, *inter alia*, for the suicide bombing of the No. 19 bus in Jerusalem committed jointly with Ali Mohmamed Hamed Abu-Halil (Case 13), Ahmed Salah Ahmed Salah (Case 16), Abd-al-Rahman Youssef Abd-al-Rahman Mekadad (Case 14) and Hilmi Abd-al-Karim Mohammed Hamash (Case 15) on 29 January 2004. This defendant's alleged role, according to the indictment filed on 20 May 2004, was accompanying the bomber to Jerusalem in the full knowledge that the latter was carrying on his person a belt of explosives.

The defendant was represented throughout the proceedings by Attorney Ahraj. The trial proceedings commenced on 30 June 2004 and, after a few adjournments, concluded with the defendant's guilty plea on 27 September 2004. Sentencing took place on the same day and defence counsel had the following to say:

> "*In conversation with my client, his friends asked him "why?". This question was also addressed to me by my client and other prisoners. Until now I could not give them an answer, despite the fact that I know it. Why does a young man of my client's age decide to die? To die does not necessarily mean to lose one's life' death is also to be in prison for all of one's life. He was dead already at home. There is no difference between his living conditions and those of his friends. I think that the time has come that someone with courage should say who the guilty party really is. Is it the defendant, who by chance is here today? Tomorrow there will be someone else…I say that the guilty party is the occupation*".

On 12 January 2005, the defendant was sentenced to 21 consecutive life sentences.

It is worth noting that the defendant's interviews with the investigating authorities, where he also admitted his guilt, were submitted to the Court. No attempt was made at trial by the defence lawyer to argue that these confessions were unlawfully obtained. Furthermore, nothing in the materials with which I have been supplied suggests that the defendant was denied due process or that his guilty plea was anything other than genuine.

### 18. Ahmed Mohammed Ahmed Sa'ad – ID No. 911744878
### Case No. 2305/04 – Appeal No. 3685/08

On 2 December 2004, this defendant was charged with over twenty crimes including offences of homicide. Throughout the hearings at first instance, he was represented by Attorney Osama Awdeh who, in due course, reached a procedural agreement with the Prosecution whereby the charged mode of liability for the offences of

homicide was changed from co-perpetration to aiding and abetting and the defence was free to argue for an acquittal.

Prior to the aforementioned, on 20 July 2006, defence counsel remarkably admitted to allowing his client to plead guilty to facts for which he (defence counsel) did not appreciate that there was no evidence. As a result, the Court acceded to an exceptional request to vacate its earlier judgment of 13 June 2006 and rehear closing submissions which were presented on 8 August 2006. A new judgment was handed down on 18 September 2006 whereby the defendant was found guilty, *inter alia*, of aiding and abetting the suicide bombing which was carried out on the No. 19 bus on 29 January 2004 by way of acquiring the materials necessary for manufacturing explosives.

During the sentencing hearing, on 19 September 2006, the defendant had the following to say concerning the commission of his crimes:

> "...I made a mistake and I regret it. I did it but what I did do I did without thinking of the consequences and I hope it will be clear to all that when I matured I thought about my acts and I realized that that these acts that I did are violent, bad and contrary to humanity. But that is in the past and I cannot change the past...Everything that I am saying to you – don't think that I am saying it because I have been influenced by custody or punishment. I really believe it and that there is justice. I am now thinking with reason and I know that this is the right path. I am learning in the Open University with you (in Israel) and I want to continue my psychology studies in Israel".

On 21 September 2006, the defendant was sentenced to 30 years imprisonment with the detailed reasons for this sentence being delivered on 15 January 2008. By this stage, the defendant had changed his counsel and appealed both conviction and sentence (which was later rejected).

Despite being represented, at first instance, by counsel who effectively admitted malpractice, the Court was keen to ensure that the defendant's rights and interests were not harmed and, to this end, vacated their first verdict. The defendant's speech in mitigation makes clear his remorse and reinforces my opinion that he voluntarily confessed to the physical elements of the crimes of which he was found guilty. The second verdict was well reasoned and, in dealing with the mental elements of the offence of aiding and abetting homicide, rejected the defendant's argument that he had no idea for what purpose the chemicals he had acquired were intended.

### 19. Ibrahim Abd-al Hai – ID No. 411124423
#### Case No. 6446/02

This individual was tried at the SMC for various counts of homicide and attempted homicide perpetrated in the context of his membership of the Al-Aqsa Martyrs' Brigade. Of relevance to the matter at hand is his involvement in the shooting attack carried out on Jaffa Street on 22 January 2002. More particularly, after hearing of Sa'id Ramadan's desire to carry out a suicide attack, the defendant was alleged to have facilitated his introduction to the people who could realize such a nefarious intent and assisted in his training.

At one of the first hearings, on 19 December 2002, the defendant signaled his intention to dispense with counsel in the following fashion:

> "*I waive my right to be represented by counsel, I do not recognize the fact that an Israeli court can try a Palestinian…I do not want a lawyer. I want to represent myself, democracy ordains that the Court should listen to an accused and to the charges against it. I don't care about Bargouti nor about the press, my family and the people of my military base are all I care about. I respect my lawyer and I realize that I have a right to be represented, I am serious about what I said to the Court. I want to represent myself. I was arrested in Territory A, those who need to be judged are the officers who killed children playing football. I am an officer in the Palestinian Authority and I resigned from the police and I am a soldier who fights soldiers, they came to me in my military base – not me to them. You charge me and I charge you. If you charge me with an attack in Tel Aviv, charge yourselves with the murder of Salah Schehada's 11 children. Apart from what you have told me – whether I plead guilty or not – before you try me you should try Israelis*".

Faced with a defendant who was incriminating himself prior, even, to the commencement of trial, the judges requested that Attorney Faress Abu-Hassan, present in the court-room, speak to the defendant in an attempt to persuade him to take a lawyer to protect his interests. Despite this, the defendant was steadfast in his decision to represent himself. As a result, the judges rendered a decision permitting the continuation of the trial ruling that the defendant's refusal to accept counsel was motivated by ideology rather than a failure to understand the nature of the proceedings. The indictment was then put to the defendant and this is what he had to say:

> "*Without any reference to the indictment, I want to tell you that I am one of the national soldiers. Regarding the first count, I was a member of Fatah and I admit that Mohammed Ahmed recruited me to that unit of the Al-Aqsa Martyrs' Brigade which is called the "Old City" unit….all that is written in the indictment, I do not plead guilty to it because I do not*

*recognize the investigation that was carried out against me. All the acts which I did are correct and I do not regret them; like I lost members of my family and it's my right to defend those who remain. I am not speaking on behalf of the Palestinian people; I did nothing to harm the Israeli people; only when the IDF killed by younger brother did I act.*"

The case was then put off for trial by which stage the defendant had accepted counsel who, on 4 May 2003, requested a continuance in order to negotiate a plea bargain with the Prosecution. On 29 June 2003, in the presence of his new lawyers – Attorney Igbariah and Attorney Iraqi, the defendant pleaded guilty to an amended indictment including admitting to the fact that he and Nasser Aweis had sent Sa'id Ramadan to central Jerusalem to commit the attack of 22 January 2002. On 9 July 2003, sentencing submissions were heard with the defendant, once again, repeating his political ideology. On 21 September 2003, the Court sentenced the defendant to 8 consecutive life sentences and an additional 50 years.

Nothing in the information with which I have been provided leads me to believe that the defendant was denied due process. The judges at the SMC were keen to protect the defendant's interests by urging him to seek legal assistance. At the end of the day, the defendant was motivated by an ideological desire to admit his crimes.

### 20. Bashar Bargouti – ID No. 429934439
### Case 3159/02 – Appeal No. 23/03

This defendant was originally charged with two offences of giving shelter to Ahmed Bargouti (Case No. 8) on 20.1.02  and one offence of failing to prevent a serious crime( – the crime in question being the shooting attack perpetrated on Jaffa Street Jerusalem on 21 January 2002. The defendant had allegedly overheard details concerning the future commission of this attack and failed to report it to the relevant authorities.

At trial, which commenced on 10 July 2002, the defendant was represented by Attorney Ahmed Safiah and, thereafter, by Attorney George Shukri. On 13 January 2003, after running two evidential hearings, Attorney Shukri reached a plea bargain with the Prosecution. In the context of this plea bargain, the indictment was amended in order to enable the defendant to plead guilty to failing to prevent the shooting attack of 21 January 2002 while the two offences of "giving shelter" were deleted. At the conclusion of the sentencing hearing which was held on the same day, the defendant was sentenced to a term of imprisonment which reflected the period of time he had spent on remand, a 9 month suspended sentence and a 5000 NIS fine. Since the upshot of the sentence was the defendant's immediate release,

the Prosecution requested (and received) a stay of execution of the sentence in order to launch an appeal.

The Prosecution's appeal was heard three days later and allowed with the defendant's sentence being increased to 3 years imprisonment.

Although, the ultimate sentence imposed on the defendant could be deemed harsh in the circumstances, I am not of the opinion, on the basis of the materials supplied to me, that he was denied due process. Indeed, after consulting his lawyer – who had offered him extremely fine representation – the defendant voluntarily pled guilty to an amended indictment and made a personal petition at the conclusion of the sentencing hearing requesting clemency. The court in first instance was suitably impressed by the plea in mitigation so as to release the defendant on the spot.

### 21. Uzz-a-din Hamamra – ID No. 906194063
### Case No. 2269/04

While not tried for any incident of direct relevance to _Sokolow_, this individual was, nevertheless, prosecuted for other offences which he committed jointly with Ali Mohmamed Hamed Abu-Halil (Case 13 above) and Abd-al-Rahman Youssef Abd-al-Rahman Mekadad (Case 14 above).[7] The defendant was represented throughout the proceedings by Attorney Ahraj. No evidence was heard in this case because the parties agreed to present closing submissions on the basis of evidential material which, on 30 March 2006, had been submitted to the Court with the consent of defence counsel. The accused elected not to give evidence in his defence after having admitted to most of the facts of the indictment bar two reservations; 1) he did not formulate the idea for committing a suicide-bomb attack although he knew of the intention to perpetrate it and 2) he did not take an active role in preparing the explosives but was merely present while they were being prepared. On 22 June 2006, the Court delivered its judgment convicting the defendant on all counts and, on 20 July 2006, sentenced him to 9 consecutive life sentences.

It is reasonable to presume that defence counsel's arguments, although ultimately unsuccessful, were necessitated by the exigencies of the evidence. From the transcripts of the proceedings, I have noted that the defendant acted as a legal adviser to the special forces of the Palestinian Authority. Although, I am not aware of the exact duties that the defendant may have performed in such a capacity, I assume that were he to have believed that his rights and interests were being infringed at

---

[7] The incident in question was the suicide bombing of the No.14 bus in Jerusalem on 22 February 2004.

trial – he would have notified such to the Court through his counsel. I have no reason to believe that this defendant was denied due process.


***


**I hereby declare, under penalty of perjury under the laws of the United States, that the foregoing opinion consisting of [.....] pages, each initialed by me, is true and correct to the best of my knowledge and belief.**


*Nili Kaufman*                    April 10, 2013

_____    _____

Signature                    Date