# Exhibit 5

FOREIGN RELATIONS OF THE UNITED STATES, 1969–1976, VOLUME E–6, DOCUMENTS ON AFRICA, 1973–1976

## 224. Briefing Memorandum From the Assistant Secretary of State for African Affairs (Easum) to the Under Secretary of State (Sisco)[1,2]

Washington, July 1, 1974   [Page 1]

*U.S. Reaction to Sudanese Decision re Eight Palestinian Terrorists*

I am attaching a paper which discusses the options available to us in dealing with President Nimeiri's decision to release the Black September terrorists to the PLO. The paper is intended to provide a basis for your meeting with Ambassador Brewer, me and others at 3 P.M. this afternoon. Following that meeting, we will refine the paper further in light of your comments.

Attachment                                                                                                                                                                              [Page 2]

## Paper

Washington, undated

U.S.-Sudanese Relations Following Commutation of Sentences Of Khartoum Terrorists

*The Problem:*

How shall we react to the fact that President Nimeiri commuted to seven years the life sentences of the eight Palestine terrorists who killed U.S. Ambassador Noel, his Deputy Moore and Belgium Charge Eid and released them "to the PLO" for execution of the sentences.

*Analysis/Background*

President Nimeri's decision is offensive in both form and substance. A reduction to seven years of the sentence for those convicted of the murder of President Nixon's personal representative and his deputy is bad enough, but Nimeiri's decision to turn the convicted men over to the PLO for execution of sentences is tantamount to outright release. Nimeiri's decision violates assurances conveyed by his personal representative, Minister Abdullah to President Nixon in March, 1973 that the murderers would receive a just punishment. The speed with which the review process occurred and the Sudanese government's failure to inform us in advance of the decision is particularly offensive.

The way in which we react to Nimeiri's decision will directly affect not only our bilateral relations with Sudan but the credibility of U.S. policy on terrorism which was enunciated following the Munich Olympic murders. In deciding among the options available to us, we should also consider how they may affect our position in the Arab world, particularly our bilateral relations with Egypt and Saudi Arabia, which appear to have different, and opposing, views on this matter. The Administration's handling of this problem also affect the morale of its Foreign Service personnel, especially those serving in posts exposed to terrorist threats. Finally, there is intense domestic interest in this matter reflected in editorial comment. Press, public and Congressional demands for strong U.S. action against Sudan have already begun.

There are four broad options we can take with regard to U.S.-Sudanese relations, from each of which flows a series of practical decisions involving U.S. diplomatic representation, economic assistance and commercial activity. Each also involves considerations about the U.S. role in the Middle East. Our ability to invoke these options may be influenced by a Congressional prohibition     [Page 3]

against any further assistance to Sudan. If this does not happen the options open to us are: (1) temporary freeze, followed in due course as circumstances permit by a gradual resumption of normal relationships; (2) moderate cutback in ties; (3) severe cutback in ties over the forseeable future; (4) break in diplomatic relations.

*The Options*

1. *Partial freeze, followed by quiet resumption of status quo in near future.*

Under this option we would:

—retain Ambassador Brewer in the U.S. for several weeks.

—defer action on funding AID assistance agreements (a $10 million program loan which had been scheduled for FY 74) or any new ExIm loan applications.

—fulfill existing AID and ExIm commitments (an $11 million AID loan for an agricultural project and two ExIm preliminary commitments totalling $10 million).

—go ahead with plans to establish a two-man Defense Attache office in Khartoum nitxt within the next month to six weeks.

—continue our small ($50,000/yr) military training program.

—go ahead after a short period with plans to reinstitute OPIC programs.

—continue after a short period to encourage U.S. business activity.

Adopting this option would involye a policy decisiOn to minimize the effects of the terrorist release On U.S.-Sudanese relations and U.S. relations with other Arab states. The steps we have already taken (public denunciation of the action and the recall of Ambassador Brewer for consultations) would be the principal public signals of displeasure to the Sudanese Government. Any additional steps deferring or freezing U.S. programs would be taken to the extent necessary to satisfy domestic public opinion. The programs would be reinstituted as soon as circumstances permitted.

*Pro*: [Page 4]

This course of action will permit us, after a short period of strain, to retain friendly ties with a regime whose foreign and domestic policies have evolved over the past three years in directions we consider quite constructive. These ties have resulted in greatly decreased Soviet influence and burgeoning U.S. exports. The close relationship we have developed with Sudanese [*text not declassified*] offices made possible Sudan's role in setting up contacts with the ELF with regard to the Tenneco case. The level of U.S. reaction proposed in Option 1 would protect this channel, which is the only viable one we have at the moment in our efforts to free the remaining Tenneco hostages. This option recognizes the no-win political situation in which the GOS was placed by the terrorist action and the fact that, despite the release, the terrorists were jailed in Khartoum for 16 months and convicted of murder in an open Arab court, which is more than many non-Arab states, in much less politically difficult positions, have done.

*Con*:

The lack of substantial tangible U.S. reaction to the release of the murderers of U.S. diplomats may give a signal to terrorists, other governmennts and the Foreign Service that the United States is not prepared to act firmly to attempt to protect its official personne1 and would deal a blow to the credibility to our worldwide anti-terrorist efforts. After our strong statement condemning Nimeiri's action, Arab and worldwide respect for the United States may require a firmer stance. Public and Congressional opinion is likely to react against any resumption in the near future of "business as usual." The Sudanese decision violates assurances by President Nimeiri to President Nixon that justice would be served, and as such may require a stronger reaction.

2. *Moderate cutback in ties*

Under this option we would:

—retain Ambassador Brewer in the U.S. for a minimum of three months.

—defer action on any new AID assistance agreements or ExIm loan applications and permit re-allocation of funds set aside for a proposed $10 million AID program loan held over from FY 74.

—fulfill existing AID and ExIm commitments. [Page 5]

—defer opening Defense Attache's office in Khartoum.

—suspend future military training.

—defer reinstituting OPIC programs.

—discourage U.S. business activity involving possible military purchases (preliminary discussions between Northrup and the GOS on F5E's are pending).

Selecting this option involves a policy decision that the effect of Nimeiri's action will be to chill U.S.-Sudanesen relations for some time. At the same tine, the steps proposed under this option would not be likely to provoke a Sudanese reaction sufficiently strong to make extremely difficult the resumption of normal ties at some appropriate later date.

*Pro*:

Publicly announced elimination of projected assistance will provide a substantial indication of our unhappiness with the Sudanese decision to that Government, the American public and the world at large. It is appropriate that the U.S. reaction to the assassination of an American Ambassador and another diplomat should be stronger than our reaction to other forms of terrorism. Any action short of this might be politically unacceptable given the climate of Congressional and public opinion. At the same time, this level of U.S. reaction might not be sufficiently severe to jeopardize the Khartoum channel to the ELF in the Tenneco kidnapping case.

*Con*:

The U.S. reaction to the release of terrorists in numerous other cases has been confined to public and private statements. We may be accused of using the impoverished and politically powerless Sudan as the whipping boy to vent our frustration over our inability to end terrorism. The Sudanese Government was placed in an extremely difficult political position, and did in fact jail the terrorists for sixteen months and convict them of murder. It thus took the action it conceived to be in its best interests, which is exactly what we would do. Our action could provide the Soviet Union with the opportunity to regain the major position of influence it held in the Sudan until mid-1971. There could be fall-out effects detrimental to our relations with moderate Arab states such as Egypt, [Page 6] particularly if Nimeiri or others contrast our sharp response against the Sudan with a less punitive reaction against Egypt for giving sanctuary to the terrorists.

3. *Severe cutback in ties over foreseeable future.*

Under this option we would:

—reassign Ambassador Brewer and not replace him.

—defer action on any new AID assistance agreements and exclude Sudan from FY 76 Congressional presentation.

—stop disbursements of the Rahad loan, which is an IBRD-sponsored agricultural project to which we have agreed to contribute $11 million.

—seek suspension of action on the current ExIm loans totalling approximately $10 million for which preliminary commitments have been given.

—cancel plans to open a Defense Attache's office.

—cancel our small military traing program, except of officers already here.

—cancel plans to reinstitute OPIC programs.

—discourage all U.S. business activity.

This option requires a decision that, despite the trial and the real pressure Nimeiri was under, Sudan's action was sufficiently unacceptable that only minimal diplomatic and commercial ties will be maintained. It involves steps (i.e. stopping disbursements on Rahad and blocking two pending ExIm loans) likely to produce a strong reaction from the Sudanese leadership, possibly as strong as breaking relations with us.

*Pro*:

We could encounter substantial criticism of our recent assistance to Sudan. Stopping disbursements on the Rahad project should effectively silence such criticism. Further, since Rahad is the most important single project currently underway in Sudan and our withdrawal could conceivably cause it to collapse and would almost surely cause a costly delay, the decision to withdraw would bring home to the Sudanese leadership far more clearly than stopping some hypothetical future assistance that there are tangible costs associated with their decision to release the terrorists. Moreover, the fact that they would probably have to turn, albeit with the likelihood of success, to their brother Arab states to replace our contribution has a certain poetic justice, since pressure from some of those states no doubt contributed to their decision. Such a strong U.S. reaction might conceivably serve as an example to other states facing similar decisions, thus possibly strengthening our anti-terrorist campaign.

*Con*: [Page 8]

The arguments of Option 2 apply with greater force to this Option. In addition, our actions would be a Sufficiently serious blow to the Sudanese that the leaders would probably have to consider some retaliation, which could range from a press campaign against the U.S. actions to a break in relations. Moreover, Nimeiri could allege an affront to his "dignity," appeal for countervailing Arab aid and seek turn Arab opinion against the United States. The Sudanese public might understand a freeze on new U.S. assistance, but question withdrawal from a commitment previously made. The Rahad Project is a particularly significant development assistance program (involving the IBRD and Kuwait as co-donors). It will provide substantially greater income a more satisfying life to some 16,000 impoverished Sudanese families. In practical terms, these families would suffer from collapse of the project. Our trade with Sudan is so clearly in favor of the U.S. that it should be encouraged regardless of the state of political relations. Although businessmen should be given information sufficient to make their own decision about activity with Sudan, they should not be actively discouraged by the U.S. Government. This option would almost inevitably affect the effective cooperation we have received from the Sudanese in efforts to obtain release of the four Tenneco captives.

*4. Break diplomatic relations*.

*Pro*:

A break in relations provides the strongest diplomatic means of expressing our displeasure, since it ends both political and economic assistance ties.

*Con*:

A break goes far beyond actions we have taken when other countries have released terrorists. It would end completely our diplomatic access to the Sudanese Government, which, except for this important issue, has followed foreign and domestic policies congenial to U.S. interests. It provides greater opportunities than do other options for increased USSR influence.

---

1. Source: National Archives, RG 59, Central Policy Files, 1974, P850149–0644. Secret; Exdis. Drafted by Smith, cleared in L/AF, NEA/EGY, S/CCT, AF, and AF/E.↵
2. Easum sent Sisco a background paper on the commutation of the sentences of the BSO terrorists and four options for a U.S. reaction, ranging from a temporary freeze to a complete break in diplomatic relations.↵