# Exhibit 11

[*Translation*]

6/87  Gen. Reg.



# ITALIAN REPUBLIC
On behalf of the Italian People

## THE COURT OF APPEALS OF GENOA

Consisting of:

| | |
|---|---|
| Attorney Corrado TANAS | President |
| Attorney Gianfranco BONETTO | Judge Rapp. |
| Mr. Silvano PERFUMO          ) | Lay Juror |
| Ms. Clara GIGANTE            ) | Lay Juror |
| Mr. Rodolfo CALLEGARI        ) | Lay Juror |
| Ms. Valeria ZANINI           ) | Lay Juror |
| Ms. Giuseppina LAGNO         ) | Lay Juror |

issue the following

### JUDGMENT

in Case (1)          Formal Proceedings

Against

1) ABUL ABBAS, born 12/10/1948 in Afrin (Syria), resident in Tunis (Tunisia)
   <u>FUGITIVE</u>          - *In Absentia;*

2) OZZUDIN BADRATKAN or EZ EL DIN BADRAKHAN, born in 1946 in Jordan, resident in Tunis (Tunisia),
   <u>FUGITIVE</u>          - *In Absentia;*

3) ZIAD EL OMAR, born in 1950, in El Oms or Damascus (Syria), resident in Tunis (Tunisia),
   <u>FUGITIVE</u>          - *In Absentia*

22/87     *Reg. Judg.*



JUDGMENT
dated 5/23/1987



Registered
JULY 27, 1987



*i*

Served  JUL 27, 1987
pursuant to Art. 151 PCC
[Signed]
Massimo Bracch
Court Clerk



Formal proceeding or through direct summons

[*Translation*]

4)      ABDULRAHIM KALED, born in Adem (Yemen) in 1936, resident in Athens (Greece), and living in Tunis (Tunisia),
<u>FUGITIVE</u>      - *In Absentia;*

5)      ABBAS MOHAMMED ISSA, born in Damascus (Syria) on 9/14/1961, resident in Tunis (Tunisia); arrested on 9/28/1985
<u>PRISONER</u> - *Present;*

6)      BEN KADRA MOHAMED, born in Damascus (Syria) on 12/22/1953, resident in Tunis (Tunisia),
<u>FUGITIVE</u>      - *In Absentia;*

7)      ABU KIFAH, 30 years-old, resident in Al Manzah 6, Tunis (Tunisia)
<u>FUGITIVE</u>      - *In Absentia*

8)      AL MOLQI MAGIED, born in Altagi on 7/10/1962; arrested 10/11/1985
<u>PRISONER</u> - *Present;*

9)      FATAIER ABDELATIF IBRAHIM, born in Beirut (Lebanon) in 1965 and resident there; arrested 10/11/1985,
<u>PRISONER</u> - *Present;*

10)     AL ASSADI AHMAD MAROUF, born in Damascus (Syria) on 2/8/1962, resident in Beirut (Lebanon); arrested 10/11/1985,
<u>PRISONER</u> - *Present;*

11)     JARBUA MOHAMED, born in Aleppo (Syria) in 1958, resident in Al Manzah 6, Tunis, (Tunisia),
<u>FUGITIVE</u>      - *In Absentia;*

12)     KAZEM ALI ABU, 25 years-old, resident in Al Manzah 6, Tunis (Tunisia,
<u>FUGITIVE</u>      - *In Absentia;*

13)     SA'AD YUSUF AHMAD YUSUF, born in Tyre (Lebanon) in 1962, resident in Tunis (Tunisia),
<u>FUGITIVE</u>      - *In Absentia* - actually, <u>PRISONER</u> - *Present;*

14)     GANDURA SAID MOWFFAQ, born in Damascus (Syria) on 3/10/1949; arrested on 10/26/1985; released on 7/10/86, domiciled at law office of attorney E. Lamberti, Genoa.
<u>FREE</u>      *In absentia*

[*Translation*]

## DEFENDANTS

Criminal Proceedings 9/86 - GR (*General Register*)

ABUL ABBAS;  OZZUDIN BADRATKAN aka ES EL DIN BADRAKHAN; ZIAD EL OMAR; ABDULRAHIM KALED; ABBAS MOHAMMED ISSA; ABU KIFAH; AL MOLQI MAGIED; FATAIER ABDELATIF IBRAHIM; AL ASSADI AHMAD; JARBUA MOHAMED; KAZEM ALI ABU; SA'AD YUSUF:

A)      of the crime provided and punished by Articles 81 Paragraphs 110, 112 1 and 2, 648, 61  2, CC and Decree 12/15/79 No. 625 converted into Law 6/2/80 No. 15 because, with several executive actions of a same criminal design, in concurrence with each other, and in a number greater than five, in order to profit and for the purpose of terrorism, as well as committing the crimes listed below and by promoting and organizing cooperation in the same, they acquired or received in Genoa Norwegian passport No. E0496903 in the name of Stale Wan, stolen from Stale Wan, committed in Genoa 8/8/1985, as well as two passports: one Moroccan in the name of Altarif Asdaad Mohamed, the other Iraqi, in the name of Kala Mohamed Adnan Zaynab, both crime proceeds.
In Genoa, 9/28/1985 to 10/3/1985.

B)      of the offense provided and punished by Articles 81 Paragraph, 110, 112, 1 and 2, 477, 482, 61 2 CC and Art 1 DL 12/15/79 No. 625, conv. in Law 2/6/80 No. 15, because, with several executive actions of a same criminal design, in cooperation with each other and in a number greater than five and for the purpose of terrorism, as well as to commit the crimes referred to in the following charges and promoting and organizing cooperation in the same crimes, falsified the Norwegian, Moroccan and Iraqi passports referred to in the previous charge.
In Genoa,  9/28/1985 to 10/3/1985.

C)      of the offense provided and punished by Articles 81, Paragraph 110, 112 1 and 2, 489 CC, and Art 1 Decree 12/15/79 No. 625 converted into Law 2/6/80 No. 15, because with several executive actions of a same criminal design, in cooperation with each other and in a number greater than five and for the purpose of terrorism, as well as to commit the crimes referred to in the following charges and promoting and organizing cooperation in the crimes themselves, made use of Moroccan passports

3

(registered to the fictitious names of Sadok Mohamed, Naser Omar Mohamed, Naser Mohamed and Gemani Mohamed, Altari Mohamed) and Iraqi (in the name of Kalaf Mohamed Adnan Zaynab).

In Genoa, 9/28/1985 and 10/3/1985.

D)    of the offense provided and punished by Articles 81, Paragraph 110, 112 1 and 2, 494 CC, and Art 1 Decree 12/15/79 No. 625 converted into Law 2/6/80 No. 15, because with several executive actions of a same criminal design, in cooperation with each other and in a number greater than five and for the purpose of terrorism, as well as to procure an advantage, as well as to commit the offenses referred to in the following charges and by promoting and organizing the cooperation of the same offenses, some of them adopted the false personal details of Stale Wan, Zerlenga Walter, Alonso Antonio, Diamantino Ribeira, Floros Petros, Altarifi Assad.

In Genoa, 9/28/1985 and 10/3/1985.

<u>ABUL ABBAS, OZZUDIN BADRATKAN o EZ EL DIN BADRAKHAN, ZIAD  EL OMAR, ABDULRAHIM KALED, ABBAS MOHAMMED ISSA, BEN KADRA MOHAMED, ABU KIFAH, JARBUA MOHAMED, KAZEM ALI BU, SA'AD YUSUF:</u>

E)    of the offenses provided and punished by Articles 81, Paragraph 110, 112 1, 61 2 CC, 9, 10, 12 Law 10/14/74 No. 497 and Art 1 Decree 12/15/79 No. 625 converted into Law 2/6/80 No. 15, because with several executive actions of a same criminal design, in cooperation with each other and in a number greater than five, for the purposes of terrorism and for the purpose of committing kidnapping, aggravated by the purpose of terrorism, aggravated injuries, hijacking of the M/S "A. Lauro", private violence and other acts of violence aimed at asserting political claims (Art. 289 bis, 582, 585 CC, and 1 DL 625/79, 1138 CN), without license by the authority, illegally introduced into State:  4 Kalashnikov AK caliber 7.62 machine guns, 8 hand grenades -  pineapple type, 9 detonators, weapons and war devices, as well as 3 magazines for each aforementioned machine gun, and a total of no less than 360 ammunition of various types per war weapon - after having hidden them in the gas tank of a Renault 9 car, Tunisian license plate 6/III/YV 38, driven by Al Khadra, Abu Kifah and Abbas Mohammed Issa;  and embarked on the M/S "Habib" in Tunis on 9 / 27/1985 and arrived in Genoa the day after. The aforementioned weapons ad munition was held and carried in a public place open to the public

In Genoa and on M/S "A. Lauro", in national, territorial and foreign waters; from 9/28/1985 to 10/9/1985.

[*Translation*]

ABUL ABBAS, OZZUDIN BADRATKAN o EZ EL DIN BADRAKHAN, ZIAD EL OMAR, ABDULRAHIM KALED, ABBAS MOHAMMED ISSA, BEN KADRA MOHAMED, ABU KIFAH, AL MOLQI MAGIED, FATAIER ABDELATIF IBRAHIM, AL ASSADI AHMAD, KAZEM ALI BU, SA'AD YUSUF:

F)      of the offense provided and punished by Article 81 Paragraph. 110, 112, n.1,2,3 and 289 bis paragraph. 1 to 3 CC because, in cooperation with each other, in a number greater than five, promoted and organized cooperation in crime, with several executive actions of a same criminal design, after having introduced into the territory of the Italian State and transported aboard the "Lauro" - flying the flag national and moored in the port of Genoa - the weapons, detonators and explosives referred to in the preceding charge; with the specific contribution of Ziad and Abdulrahim Kaled, against whom there are aggravating circumstances for having promoted and organized the criminal activity, carrying out preventive inspections on the aforementioned ship, and a cruise on 8/31/1985, and exercising authority as military leaders of the others; for having induced them to commit the crime for purposes of terrorism, they kidnapped 189 person of the crew of the ship, 194 transit passengers and other passengers, voluntarily causing the death of one of these, Leon Klinghoffer, on board the national ship "A . Lauro" in foreign and international waters at a distance of no less than three hours' navigation off the Egyptian coast, on 7-9/10/1985.

G)      of the offense provided and punished by Articles 81 Paragraph., 110, 112 no. 1 and 2, 61 no. 2 CC, 1138  Navigation Code; 1 Decree 16/12/1979 n.625, converted into law 6/2/80 n.15, because with several executive actions of a same criminal design, in cooperation and being more than five in number, for the purpose of perpetrating the aggravated kidnapping referred to in the preceding charge and terrorism, and by promoting and organizing cooperation in the crime, they took possession of the M/S "A. Lauro" flying the national flag; committing the act with violence and threats with weapons against the Captain and officers of the ship; and committing the deed by fraudulent means, consisting in pretexts to approach them.

On the national ship "A. Lauro" in foreign and international waters on 7-9/10/1985.

ABUL ABBAS, OZZUDIN BADRATKAN o EZ EL DIN BADRAKHAN, ZIAD EL OMAR, ABDULRAHIM KALED, ABBAS MOHAMMED ISSA, ABU KIFAH, AL MOLQI MAGIED, FATAIER ABDELATIF IBRAHIM, AL ASSADI AHMAD, KAZEM ALI BU, SA'AD YUSUF:

[*Translation*]

H)      of the offense provided and punished by Articles 110, 112, 1 and 2, 582, 583, 585 CC and Art.1  Decree 625 of 12/15/79, converted into Law 2/6/80 15 because, in cooperation with each other and being more than five in number, promoting and organizing cooperation in the crime, for the purposes of terrorism, with a machine gun caused in Langella Pasquale voluntary personal injuries judged to have been healed beyond a 40th day, i.e., in 136 days, without calculable criminal consequences.

On board M/S "A. Lauro", flying the Italian flag in international waters on 8/10/1985.

I)      of the crime provided and punished by Articles 81 Paragraph., 110 n.1 and 2, 610 Paragraph CC and Art.1 O.L. 15/12/1979 625 conv. in law 6/2/80 n.15 because, with several executive actions of a same criminal design, in cooperation with each other in a number greater than five, promoting and organizing cooperation in the front and for the purpose of terrorism, with violence exercised with the weapons, forced De Souza Manuel and Alberti Ferruccio to throw the corpse of Leon Klinghoffer into the sea.

On board M/S "A. Lauro", flying the Italian flag in foreign waters, on 8/10/1985

L)      of the offense referred to in Articles 110, 112 1 and 2, 411, 61 2 CC; Art.1 Decree 15/12/79 625, converted into Law 6/2/80 15 because, in cooperation with each other, being more than five in number, to conceal the crime referred to in the previous charge and for the purpose of terrorism, promoting and organizing cooperation in the crime, got rid of the corpse of Leon Klinghoffer, throwing it into the sea from M/S "A. Lauro", flying the Italian flag in foreign waters on 8/10/1985.

ABBAS ABUL:

of the offense referred to in Articles 81, Paragraph. 306, 1, 2, 3, CC and 1 Decree 625 of 12/15/79, converted into law no.15 of 8/2/80, since for the purpose of terrorism, pursuing political intent with violence, with multiple executive acts of a same criminal design; recruiting and choosing the material authors of the operation; training them specifically for this; providing them with false personal identification documents, weapons, explosive devices, money and logistical structures; studying and preparing a plan in writing which preceded the seizure of the vessel, its crew and passengers, in order to obtain the release of 51 detainees in Israeli prisons, against the release of hostages previously kidnapped; with the partly implemented threat to kill a passenger - chosen at random from among passengers of US, Israeli and British nationality - until their requests were accepted; and using for the

purpose, for illicit purposes, men and means of the political-military organization to which they belong; created, organized and directed, participating in it, an armed gang aimed at perpetrating a crime against the internal personality of the Italian State; and, in particular, to seize M/S "ACHILLE LAURO", its crew and passengers, for the aforementioned purposes.

In Tunis, national and international waters, on Italian territory and in Genoa, where the aforementioned seizure had begun, until 9/10/1985.


EZ EL DIN BADRAKHAN aka OZZUDIN BADRATKAN:

N)      of the offense referred to in Articles 81 Paragraph. 306, 1st, 2nd and 3rd CC and 1 Decree 15/12/79 n.625, converted to Law 6/2/80 n.15, then the for purposes of terrorism, pursuing political intentions with violence; with several executive acts of a criminal design; training the men chosen for the material execution of the kidnapping; providing them with false personal identity documents, weapons, bombs, money and logistical structures; directing them,  organized, subsidized and participated in a group of people constituted in an armed band for the purpose of perpetrating a crime against the Italian State, consisting in kidnapping M/S "Achille Lauro", its crew and passengers in order to obtain this way and with the partly implemented threat, to kill one hostage every five minutes among hostages of US, Israeli and British nationality if their request, the release of 51 detainees in Israeli prisons, were not accepted.

In Tunis, in national and international waters, on Italian territory and in Genoa, where the aforementioned kidnapping, ending on 9/10/1985.


ZIAD EL OMAR:

O)      of the offense referred to in Articles 81 Paragraph., 306  1, 2 and 3 CC and 1 Decree 15 December 19; 9  625, converted to Law 6/2/80  15, since for the purposes of terrorism, pursuing political intentions with violence; with multiple executive acts of a same criminal design; contributing to the training of the material perpetrators of the kidnapping; providing them with false documents of personal identification, weapons, explosive devices and money as well as logistic structures; helping to direct their activities, organized, subsidized and participated in a group of persons constituted in an armed band aimed at perpetrating a crime against the Italian State; consisting in kidnapping M/S "A. Lauro", its crew and passengers in order to obtain, with a partially implemented threat, to kill, one every five minutes, hostages of US, Israeli and British nationality if their request, the release of 51 detainees in Israeli prisons, were not accepted.

7

In Tunis, in international and national waters, on the Italian territory and in Genoa, where the aforementioned seizure began, until 9/10/1985

AL MOLQI MAGIED:

P)        of the offense referred to in Articles 81 Paragraph., 306 Paragraph,  CC and 1 Decree 15/12/79 n.625, converted to Law 6/2/80 15, since for the purposes of terrorism, pursuing political intent with violence - and with multiple executive acts of a same criminal plan - he participated, directing a group of material executors of the kidnapping, a group constituted as an armed gang aimed at perpetrating a crime against the Italian State; consisting in kidnapping M/S "Achille Lauro", its crew and its passengers, in order to obtain this way and with a partially  implemented threat, to kill, one every five minutes, hostages of US, Israeli and British nationality if their request, the release of 51 detainees in Israeli prisons, were not accepted.

In Tunis, in international and national waters, on the Italian territory and in Genoa, where the aforementioned seizure began, until 9/10/1985.

AL ASSADI AHMAD, ABDELATIF IBRARIM FATAIER, JARBUA  MOHAMED:

Q)        of the offense referred to in Article 306 Paragraph CC, and Decree 15/12/79 625, converted to Law 15 of 2/6/80, since for the purposes of terrorism, pursuing political intent with violence, they participated in a group of people constituted in an armed band aimed at perpetrating a crime against the Italian State, consisting in the seizure of M/S "Achille Lauro", its crew and passengers, in order to obtain via a - partly implemented - threat, to kill, one every five minutes, hostages of US, Israeli and British nationality if their request, the release of 51 detainees in Israeli prisons, were not accepted.

In Tunis, on the territory of the Italian state and in Genoa ending on  9/10/1985.

ABU KIFAH e BEN KADRA MOHAMED:

R)        of the crime referred to in Articles 306 1, Paragraph, CC and 1 Decree 51/12/79 625, converted to Law 6/2/80 15, since for the purposes of terrorism, pursuing political intent with violence, with several executive acts of a same criminal design, they participated and organized, transporting and conveying the weapons and explosive devices used by the material executors of the kidnapping, to a group of people constituted as an armed gang aimed at perpetrating a crime against the Italian State, consisting in kidnapping M/S "Achille Lauro", its crew and passengers, in order to

obtain via a - partly implemented - threat, to kill, one every five minutes, hostages of US, Israeli and British nationality if their request, the release of 51 detainees in Israeli prisons, were not accepted. In Tunis in Genoa, until 9/10/1985.

ABBAS MOHAMED ISSA:

S)        of the offense referred to in Articles 306, 1, 2  and 3, and 1 Decree 12/15/1979  625, converted to Law 6/2/1980 15, since, for the purposes of terrorism, pursuing political intentions with violence; with several executive acts of a same criminal design, participated and organized, transported and conveyed the devices used by the material authors of the seizure; carried out written instructions regarding the operation and control and direct the activities of a group of persons, constituted as an armed gang whose purpose was to commit a crime against the the Italian State, consisting in kidnapping M/S "Achille Lauro", its crew and passengers, in order to obtain via a - partly implemented - threat, to kill, one every five minutes, hostages of US, Israeli and British nationality if their request, the release of 51 detainees in Israeli prisons, were not accepted. In Tunis and Genoa, until the moment of the arrest.

ABDULRAHIM KHALED (alias PETROS FLOROS):

T)        of the offense referred to in Articles 81 Paragraph. 306, 1st, 2nd and 3rd CC and 1 Decree 15/12/79 n.625, converted into Law 6/2/80 15, since for purposes of terrorism, pursuing political intent with violence, with several executive acts of a same criminal design he participated, organizing and planning the operation stated below, instructing and directing the material executors of the same, a group of persons constituted as an armed gang whose purpose was to perpetrate a crime against the Italian State, consisting in kidnapping M/S "Achille Lauro", its crew and passengers, in order to obtain via a - partly implemented - threat, to kill, one every five minutes, hostages of US, Israeli and British nationality if their request, the release of 51 detainees in Israeli prisons, were not accepted. In Tunis, in national and international waters and in Genoa, where the aforementioned kidnapping began, ending on 9/10/1985.

ABU ALI' KAZEM:

U)        of the offense referred to in Articles 81 Paragraph. 306, 1st and 2nd  CC and 1 Decree 625 of 15 December 1979, converted to Law 6/2/80 15, since for purposes of terrorism, pursuing  political intentions with violence and with several executive acts of a same criminal design, participated and

performed functions organizing the transfer to Italy of the members of the group of material executors for the kidnapping - an armed gang set up to perpetrate a crime against the Italian State consisting in kidnapping M/S "Achille Lauro", its crew and passengers, in order to obtain via a - partly implemented - threat, to kill, one every five minutes, hostages of US, Israeli and British nationality if their request, the release of 51 detainees in Israeli prisons, were not accepted.

In Tunis, on the territory of the Italian State and in Genoa, where the aforementioned kidnapping began, ending on 9/10/1985

SA'AD YUSUF AHMAD7USUF alias MASER YOUSEF HISHAM:

V)      of the offense referred to in Articles 81 Paragraph. 306 1, 2 and 3, CC, and 1 Decree 15/12/79 625 converted into Law 6/2/80 15, since for the purposes of terrorism, pursuing political intentions with violence, with several executive acts of a same criminal design, organized, directed, and prepared the kidnapping indicated below and, in particular, movement and accommodation in Italy of the material authors, providing them, inter alia, with money and forged identity documents, guiding them and providing them with the necessary logistical information, constantly taking care of the connection with the managers of the operation not present on the national territory and, in general, providing for their material needs in view of the indicated operation, carried out managerial functions, and was involved with in a group of persons constituted in an armed band aimed at perpetrating a crime against the Italian State, consisting in kidnapping M/S "Achille Lauro", its crew and passengers, in order to obtain via a - partly implemented - threat, to kill, one every five minutes, hostages of US, Israeli and British nationality if their request, the release of 51 detainees in Israeli prisons, were not accepted.

 In Tunis, in various Italian cities and in Genoa, where the aforementioned kidnapping had begun, until 9/10/1985

GANDURA MOWFFAQ:

W)      of the crime provided and punished by Articles 61 2, 495, 1, 2, and 3, 2 CC, Art.1  Decree 625, 12/15/79, converted to Law 6/2/80 15, because, for the purpose of terrorism, he falsely claimed to be called Houssari Ibrahim, during interrogation as defendant.

Established in Genoa on 10/26/1985.

Y)      of the crime provided and punished by Articles 61 2, 372 CC, Art. 1 Decree 625 December 15, 1979, converted into Law 6/2/80 15, because, for the purpose of terrorism, deposing as witness before the AG, giving a false declaration, denied the truth and kept silent about facts he knew and the was questioned about, in particular about Floros Petros, aka Abdulrahim Kaled.
Established in Genoa on 10/26/1985.


Z)      of the crime provided and punished by Articles 378, 61 2, CC, Art. 1 Decree 625 December 15, 1979 converted into Law 6/2/80 15, because, for the purpose of terrorism, after the commission of the crimes referred to in the charges at the end of letter V, and without committing them, he helped the aforementioned Floros Petros aka Abdulrahim Kaled, whom he knew was involved, as a defendant of serious crimes, in the criminal proceedings concerning the "Achille Lauro" affair; did not reveal that he knew him under his real or assumed identity, his residential address, is role within the PLF and in the aforementioned criminal affair.
Established in Genoa, on 10/26/1985.


## **APPELLANTS**


The Defendants as well as the P.M. against all the defendants except Abu Kifah and Kazem Ali Bu, against the sentence of the Court of Assizes of Genoa of 10/7/1986 which thus decided:


In view of Articles 483 - 488 CPC,

Declares


**Abul Abbas, Ozzudin Badratkan *aka* Ez El Din Badrakhan, Ziad El Omar**  -  GUILTY
of the crime of receiving stolen goods ascribed in charge a), limited to the hypothesis of the passport in the name of Stale Wan and excluding the reference to Art. 81 Paragraph. C.P .;


of the crime of forgery of the same passport, ascribed in charge b), excluding the reference to Art. 81 Paragraph. C.P


the crime of use of false passports, as recorded in charge c);

the crime of attribution of false personal details, as described in charge d);

the crime of illegal introduction, possession and carrying weapons as described in charge e);

the crime of kidnapping for the purpose of terrorism, as described in charge f);

of the crime of taking possession of M/S "Achille Lauro" ascribed in charge g), excluding the reference to Art. 81 Paragraph CC

of the crime of personal injury, as described in charge h) ;

Declares

**Abdulrahim Kaled** - GUILTY:

of the crime of receiving stolen goods ascribed in item a) of the section, limited to the hypothesis of the passport in the name of Stale Wan and excluding the reference to Article 81 Paragraph. CC;

of the crime of forgery of the same passport, ascribed in charge b), excluding the reference to Article 81 Paragraph. CC;

the crime of use of false passports, as described in charge c);

of the crime of attribution of false personal details, ascribed in charge d);

of the crime of introduction, possession and illegal carrying of weapons, as stated in charge e);

Declares

**Abbas Mohammed Issa** - GUILTY:

of the crime of use of false passports ascribed in charge c), excluding the aggravating circumstance referred to in Article 112  2 of the Criminal Code, of the crime of attribution of false personal details, ascribed in charge d); excluding the aggravating circumstance referred to in Art. 112  2 CC;

Declares

12

**Ben Kadra Mohamed**  -  GUILTY

of the crime of illegal introduction, possession and carrying weapons, as stated in the heading a) of the section;

Declares

**Al Molgi Magied, Fataier Abdelatif Ibrahim and Al Assadi  Ahmad Marouf**  -  GUILTY

of the crime of receiving stolen goods ascribed in charge a), limited to the hypothesis of the passport in the name of Stale Wan, and excluding the reference to Article 81 Paragraph. CC and excluding the aggravating agent referred to in Article 112  2 C.C;

of the crime of forgery of the same passport, ascribed in charge b), excluding the reference to Article 81 Paragraph. PC, and excluding the aggravating circumstance referred to in Article 112 n.2 CC;

of the crime of use of false passports ascribed in charge c), excluding the aggravating circumstance referred to in Article 112  2 CC;

of the crime of attribution of false personal details ascribed in charge d), excluding the aggravating circumstance referred to in Art. 112 2 CC;

of the crime of kidnapping for the purpose of terrorism, ascribed in charge f), excluded for Al Molqi the aggravating circumstance pursuant to Article 112  3 CC, and for Fataier Abdelatif and for Al Assadi Ahmad Marouf the aggravating circumstances referred to in Article 112  2 and 3 CC;

of the crime of taking possession of M/S "Achille Lauro", ascribed in charge g), excluding the reference to Art. 81 Paragraph CC and excluding, for Fataier Abdelatif and Al Assadi Ahmad.Marouf, the aggravating circumstance referred to in Art. 112 2 CC;

of the crime of personal injury ascribed in charge h) excluded, for Fataier Abdelatif and Al Assadi Ahmad Marouf, the aggravating circumstance referred to in Art. 112 2 CC;

13

[*Translation*]

In addition, Declares

**Al Molqi Magied**  -  GUILTY

of the crime of private violence and getting rid of a corpse, ascribed in charges I and L, excluding the reference to Article 110 PC and excluding the aggravating circumstances referred to in Art.112 1 and 2 CC;

Declares

**Sa'ad Yusuf Ahmed Yusuf**  -  GUILTY:

of the crime of receiving stolen goods ascribed in charge a), limited to the hypothesis of the passport in the name of Stale Wan and excluding the reference to Article 81 Paragraph. CC; of the crime of forgery of the same passport, ascribed in charge b), excluding reference to Art. 81 Paragraph, CC;

the crime of use of false passports, as described in charge c);

the crime of attribution of false personal details, as described in charge d);

of the crime of introduction, possession and illegal carrying of weapons, as in charge e);

Declares

**Gandura Said Mowaffaq**  -  GUILTY

of the crime of false Declaration on one's personal identity, ascribed in charge v), excluding the aggravating circumstance of the purpose of terrorism and the aggravating circumstance of which 61 2 CC;

Therefore

grants Abbas Mohammed Issa, Al Molqi Magied, Fataier Abdelatif Ibrahim, Al Assadi Ahmad Marouf, Gandura Said Mowffaq, the general extenuating circumstances referred to in Article 61 bis CC; to Al Assadi Ahmad Marouf, the extenuating circumstances under Article 4 Law 15 of 6/2/80; to Abbas Mohammed Issa the general extenuating circumstances prevailing on the aggravating circumstances, given that the crimes ascribed to the various defendants fulfil the prerequisite of continuity,

14

[*Translation*]

Sentences

Abul Abbas, Ozzudin Badratkan o Ez El Din Badrakhan, Ziad El Omar, each, to life imprisonment, with daytime solitary confinement for a period of two months;

Abdulrahim Kaled, to the penalty of Seven years Six months' imprisonment, and a fine of Three million Lire;

Abbas Mohammed Issa, to the penalty of Six month imprisonment;

Ben Kadra Mohamed, to the penalty of Six years Four months' imprisonment, and a litigation fine of One million Eight hundred thousand Lir;

Al Molqi Magied, to the penalty of Thirty years' imprisonment;

Fataier Abdelatif Ibrahim, to the penalty of Twenty-four years Two months' imprisonment;

Al Assadi Ahmad Marouf, to the penalty of Fifteen years Two months' imprisonment;

Sa'ad Yusuf Ahmad Yusuf, to the penalty of Six years Six months' imprisonment, and a fine of Two million lire;

Gandura Said Mowffaq, to the penalty of 8 months' imprisonment.

All jointly and severally ordered to pay legal costs.

In view of Articles 29 and 32 CC

Orders

Abul Abbas, Ozzudin Badratkan aka Ez El Din Badrakhan, Ziad El Omar, Abdulrahim Kaled, Ben Kadra Mohamed, Al Molqi Magied, Fataier Abdelatif Ibrahim, Al Assadi Ahmad Marouf and Sa'ad Yusuf Ahmad Yusuf perpetual disqualification from public office;  for Abul Abbas, Ozzudin Badratkan aka Ez El din Badrakhan, Ziad El Omar, to be legally banned, and regarding the other above mentioned defendants, a legal ban during the sentence period.

In view of Article 36 CC and 484 CPC

Orders

the publication of the Life Imprisonment sentence, by posting, in the Municipality of Genoa, as well as the publication of the same sentence, publication once and as an excerpt, in the newspapers "Il Secolo XIX" and "Il Lavoro", at the expense of the defendant.

15

[*Translation*]

In view of Article 228 and 230 CC

Orders

that, once their sentence is served, Al Molqi Magied, Fataier Abde-latif Ibrahim and Al Assadi Ahmed Marouf are subject to the security measure of supervised liberty for a period of time not less than three years.

In view of Article 240 CC and 62 CPC

Orders

the confiscation of the bullet and two casings; the return to the respective owners of all garments and other objects seized except for the money, which shall remain as guarantee of payment of money owed under Art. 189 CC;

In view of Article 185 CC - 489 CPC.

Sentences

jointly and severally, Abul Abbas, Ozzudin Badratkan aka Ez El Din Badrakhan, Ziad El Omar, Al Molqi Magied, Fataier Abdelatif Ibrahim, Al Assadi Ahmed Marouf, to pay compensation for damages against civil parties, damages to be settled in separate proceedings; assigns to the civil parties Lisa Klinghoffer and Ilsa Klinghoffer the sum of Lire Thirty million each, to be charged in the final settlement; also sentences the same defendants, jointly and severally, to refund the civil parties for the costs of representation in the proceedings: to Lisa Klinghoffer a total of Lire Three million; to Ilsa Klinghoffer a total of Lire Eight million; to the "Achille Lauro and others" company a total of Lire Twelve million; to Langella Pasquale a total of Lire One million and five hundred thousand; to Scala Ciro a total of One million five hundred thousand Lire; to Lavinio De Luca One million two hundred thousand Lire.

In view of Article 479 CPC.

Acquits

Abdulrahim Kaled of the crimes ascribed to him in charges f), g) and h) due to insufficient evidence;

16

Acquits

Abbas Mohammed Issa of the crimes of receiving and falsifying a passport belonging to Stale Wan for not having committed the deed;

Acquits

Abul Abbas, Ozzudin Badratkan o Ez El Din Badrakhan, Ziad El Omar, Abdulirahim Kaled, Abbas Mohammed Issa, Fataier Abdelatif Ibrahim, Al Assadi Ahmad Marouf, Sa'ad Yusuf Ahmad Yusuf, of the crimes ascribed to them in charges I and L, for not having committed the deed;

Acquits

Abbas Mohammed Issa, Ben Kadra Mohamed, Sa'ad Yusuf Ahmad Yusuf, of the crimes under charges f) and g); Abbas Mohammed Issa and Sa'ad Yusuf Ahmad Yusuf of the crime ascribed to them in charge h), for not having committed the deed;

Acquits

Abul Abbas, Ozzudin Badratkan o Ez El Din Badrakhan Ziad El Omar, Abdulrahim Kaled, Abbas Mohammed Issa, Ben Kadra Mohamed, Al Molqi Magied, Fataier Abdelatif Ibrahim, Al Assadi Ahmad Marouf, Sa'ad Yusuf Ahmad Yusuf each of the crime of organized crime because the deed does not subsist;

Acquits

Gandura Said Mowffaq of the crimes of perjury and personal aiding and abetting, ascribed to him in charges Y and Z, because the deed does not subsist.

In view of Article 10 CC, 5 and 477 CPC.

Declares

not to proceed against Abul Abbas, Ozzudin Badratkan or Ez El din Badrakhan, Ziad El Omar Abdulirahim Kaled, Abbas Mohammed Issa, Al Molqi Magied, Fataier Abdelatif Ibrahim, Al Assadi Ahmad Marouf, Sa'ad Yusuf Ahmad Yusuf, in relation to crimes of receiving stolen goods and falsification of Moroccan and Iraqi passports, since these crimes were committed abroad. Thus, the charges under a) and b) have been modified, lacking a request by the Minister of Grace and Justice.

In view of Article 407 and 412 CPC

17

Declares

with regard to <u>Abu Kifah, Jarbua Mohamed and Kazem Ali Bu</u>, the nullity of the summons order and the order for indictment, due to failure to establish a trial relationship due to absolute uncertainty about the defendant's identity.

Declares

Finally, the sentence inflicted on Gandura Moldffaci is fully served; and

Orders

consequently, his immediate release if not detained for another cause.

**THE FACTS**

On October 3, 1985, the Italian-flagged M/S "Achille Lauro" sailed from Genoa for a cruise destined to call at the ports of Naples, Alexandria, Port Said, Ashdod, Limassol and Piraeus, before returning to the port of departure. There were 673 passengers on board, plus about 50 in Naples, and about 400 crew. On 7 October, after four days' smooth sailing, the ship left the Egyptian port of Alexandria, where about 600 passengers disembarked and would, after a visit to the Pyramids, be re-embarked at Port Said, the next port of call. At 1.15pm, when the ship was ten miles from the coast, two individuals armed with machine guns and hand grenades burst onto the bridge and ordered Captain Gerardo De Rosa to stop the engines "to avoid bloodshed." The two, later identified as the current defendants Al Molqi Magied and Al Asker Bassam, ordered passengers and crew members via radio to concentrate in the tapestry room, under the surveillance of accomplices, in turn identified as Fataier Ibrahim and Al Assadi Ahmad Marouf. While the meeting of the passengers was in progress, a sailor, a certain Pasquale Langella, having made the criminals suspicious with a misinterpreted movement, was singled out and were shots fired at the ground, and Langella was hit by shrapnel that injured his legs, causing him injuries from which he recovered in a total of 136 days. In the tapestry room, the Anglo-American passengers, a total of 18, were separated from the others and placed on one side of the hall, and in the center the terrorists placed cans of diesel, admonishing the hostages that they would not hesitate to blow up the ship at the first attempt at revolt. Once this operation was completed, and after part of the crew had been allowed to reach their respective

18

maneuvering posts, the Captain was ordered to resume navigation towards the Syrian port of Tartus. The Captain informed the port authorities of Port Said about the ship's hijacking and the taking hostage during a brief radio conversation, which took place under the threat of the hijackers' weapons.

Captain De Rosa was forced by the hijackers to send another radio message, around 6 pm of the same day. The hijackers asked for the release of 50 Palestinians detained in the State of Israel, and in particular of Al Qantari, protagonist of a terrorist act in the Jewish state and captured and imprisoned there. During the voyage, the hijackers announced to the Captain that it was their intention, having reached Syria, to go ashore with the US hostages. (In the meantime the US hostages had been separated from the British nationals and concentrated on a deck below the Bridge.) Similar statements were made to some other hostages, specifying that negotiations would be conducted on the ground through the British and American consuls, and that if the negotiations were not successful the hostages would be killed one by one. The morning of the following October 8 the ship arrived within sight of the Syrian port of Tartus and laid anchor about seven miles off the coast, the presence of shoals preventing a closer approach. At 11.30 the hijackers established radio contact with the Syrian station. The hijacker engaged in the conversation appeared exultant at first but then, as the dialogue in Arabic continued, inclined to show increasingly evident signs of growing irritation. From the recording of that conversation, it would later be learned that the hijackers requested an intervention by the International Red Cross and the American Ambassador, and threatened to blow up the ship if aircraft or military boats approached it. It will also be noted that the Syrian authorities, faced with such requests, tried to procrastinate and, in essence, did not appear willing to cooperate with the ongoing act of terrorism. The fact is that the four hijackers started a close consultation among themselves, revealing a strong state of disturbance. At a certain point, one of them (who seemed to be the boss - the current defendant Al Molqi) left the bridge, to return after about fifteen minutes, carrying two passports. Showing one passport to the Captain, he made a sign with his finger and his companion Al Asker, one of the four who could express himself in English, explained to De Rosa that with that gesture the head of the hijackers had meant that the passport holder had been the first hostage to be killed. The passport shown was in the name of the American citizen Leon Klinghoffer. The other passport that Al Molqi held belonged to another American citizen, evidently chosen as the next victim. At 4.30 pm the hijackers ordered the Captain to weigh anchor and set off for Libya. While the ship took that direction, the American hostages were again led into the tapestry

[*Translation*]

room, and reunited with the other passengers.  At the same time a new message was sent by radio, in which the terrorists announced that two passengers had been killed and that it was necessary to hurry. Later, however, around 6 pm, following new radio conversations in Arabic, the hijackers, suddenly euphoric, announced the intervention of a certain Abul Kaled.  According to the hijackers, Abul Kaled was put in charge by Arafat, the PLO's leader.  Kaled ordered a change in route: no longer towards Libya but towards Port Said.  The "Achille Lauro" arrived within sight of the Egyptian port at 6 o'clock the following day, October 9, and anchors were dropped 15 miles off the coast.  At this point, an intense exchange of messages began between the ship and the Egyptian port.

Al Asker, the hijacker who spoke English, announced that the real purpose of the terrorist unit was to carry out a massacre in the Israeli port of Ashdod and then take refuge on board the ship. However, suspecting that they had been discovered by someone on board, they were forced to change the original plan to one consisting of the seizure of the ship and its occupants.  The land interlocutor of the hijackers, Abul Kaled, who will later be better identified as the current appellant Abul Abbas, during the aforementioned conversations, urged Al Molqi, the head of the commandos —who promptly fulfilled the task — to warn the Captain and the crew that their real target was a raid in the port of Ashdod, not the hijacking of the ship.  Abul Abbas wished it to be known that their initiative was not of a terrorist nature and apologized to the Captain for what had happened due to their need to change the original plan. At 4.30 pm on October 9 the ship's hijacking, lasting a total of 51 hours, ended.  The four hijackers went off on an Egyptian tug and the hostages of the "Achille Lauro" were released.

The Egyptian authorities took over the direction of the investigation, which lasted for a few days. On the morning of 11 October, the four hijackers were sent aboard an Egyptian plane to Tunis, to be delivered to the PLO. The plane was intercepted in flight by US military aircraft and forced to land at the Sicilian airport of Sigonella. There, the four terrorists, after agitated events, were taken over by the carabinieri while the other occupants of the Egyptian plane were allowed to leave.

Criminal proceedings were initiated by the Public Prosecutor's Office of Syracuse, simultaneously with another proceeding started by the Public Prosecutor's Office of Genoa, on the assumption of the respective territorial jurisdiction.  On October 30, 1985, the Court of Cassation,

[*Translation*]

resolving the conflict raised by the two aforementioned offices, declared the jurisdiction of the Genoa Public Prosecutor's Office, where the investigation was concentrated.

Questioned in the immediacy of the fact, the four hijackers claimed that they had started their enterprise in Libya, with the organizational collaboration of a certain Ziad El Omar: their intent was to carry out a terrorist raid against the state of Israel. They admitted to having hijacked the ship and taken the passengers hostage, but denied that they had killed Klinghoffer or even knew of his death.

Meanwhile, the investigators' attention focused on a certain Abbas Mohamed Issa, a Syrian citizen, who on September 28, 1985 and, therefore, before the start of the "Achille Lauro" cruise had been arrested in Genoa by the Guardia di Finanza, because he was found in possession, upon disembarking from the Tunisian ferry Habib, of two passports: one Moroccan passport and one Iraqi passport, in the name of different persons. The detainee admitted that he was serving in the "Front for the Liberation of Palestine," directed by Abul Abbas, and that he been instructed by Abul Abbas, whose bodyguard he had been for several years, to deliver to Genoa a letter addressed to a "commando" of the FLP operating in said city and preparing to seize an Israeli ship to obtain Palestinian prisoners in exchange. The letter in question contained instructions regarding the action, and was destroyed by him before he was arrested.

Another person whom attracted the attention of the investigators was Gandura Said Mowfaaq, self-proclaimed "lieutenant colonel" of the PLO ("Palestine Liberation Organization")) and arrested in Rome for holding false passports. Gandura Said was taken to Genoa, where he was recognized by Al Assadi who, of the four arrested in Sigonella, had been the first to show willingness to cooperate with the investigators. Gandura Said was recognized as a militant of the PLO engaged in organizational activities specific to that movement. Nevertheless Gandura insisted that his identity was the identity on one of the false passports found in his possession (Hussari).

Al Assadi's cooperative attitude was soon imitated by his three comrades, who in the course of various and widespread interrogations provided a detailed reconstruction of the story. From their revelations, the following was learned.

21

In the summer of 1985 the four future terrorists — Al Molqi, Al Asker, Fataier and Al Assadi — were in the military training camp of Bashar (Algeria) under the orders of Ez El Din Badrakhan. Badrakhan himself pointed them out to Abul Abbas, the head of the FLP, as suitable for the realization of an enterprise that Abbas himself had been intending for some time.  It was to be a terrorist action which, by being in contrast with the negotiation strategy pursued at the time by Arafat's PLO (of which Abul Abbas's FLP was a minority component) demonstrated the greater productivity of terrorism, which Abul Abbas intended to extend to third countries, compared to Arafat's diplomatic line. From the Bashar military camp, the four — together with Jarbua Mohamed, a fifth terrorist candidate who was later excluded from the company due to reduced physical aptitude —had been transferred to the Birar camp and from there to Tunis, where they met with Abul Abbas. At the end of August, separately, they had been sent to Rome, where they had benefited from the logistical assistance of Sa'ad Yusuf Ahmad, a leading exponent of the FLP. In the month of September he had brought the four components of the future operational unit to Genoa, making them meet with Abdulrahim Kaled, lieutenant colonel of the FLP, who in the previous months had carried out at least one cruise, if not two, on the "Achille Lauro" "for reconnaissance purposes, to finalize the details of the enterprise."  On October 3, the components of the operational unit had received the weapons and ammunition they would use on board: they had arrived in Genoa, by means of the Habib ferry, on a car driven by the previously named (and arrested) Abbas Issa and by Ben Kadra and Abu Kifah.  On that day, October 3, the four designated hijackers, their escort Sa'ad Yusuf, the weapons carriers Ben Kadra and Abu Kifah, Abdulrahim Kaled, met in a hotel in Genoa; also present were Ez El Din Badrakhan, head of the military training camp, and Ziad El Omar, who arrived in Genoa two days earlier from Tunis with the final verbal instructions, to be handed to Al Molqi, head of the operational unit.  Ten people in all met at the Laurens Hotel.  On the afternoon of that same October 3, the components of the operational team —Al Molqi, Fataier, Al Asker and Al Assadi — occupied the cabins reserved for them by Sa'ad Yusuf on the "Achille Lauro."  Abdulrahim Kaled also embarked with them but in Alexandria, alleging his wife's sudden illness, left the ship before the kidnapping began.  From then on the events unfolded as already briefly described.

Defendant Al Molqi Magied declared himself personally responsible for wounding sailor Langella.  He explained that, having ordered everyone to meet in the dining room, they had not been obeyed by Langella: for this reason he had fired a burst of machine gun on the floor and a bullet rebound, or a splinter, had injured the sailor in the calf. Then, while the ship was off Tartus, radio

conversations had been initiated with the Syrian authorities in order to obtain, with the latter's mediation, the intervention of the International Red Cross and the American Ambassador. Al Molqi had been under the impression that the Syrians were making fun of him. He consulted with his comrades and came to the conclusion that to unblock the situation all that remained was to start killing hostages. Therefore, shortly after 3 pm he went to the bridge where Klinghoffer sat. The latter, due to his paralytic condition, had not been reunited with the other hostages. There, Molqi ordered a Portuguese waiter to drag Klinghoffer's wheelchair to the stern; there he fired two shots at him, in the head and the chest. Then he had ordered the Portuguese waiter to throw the corpse into the sea, but the waiter was unable to do it by himself. Molqi then ordered an Italian crew member to help the Portuguese waiter lift the body and throw it into the sea. Then he had forced the two men, in the throes of an obvious nervous breakdown, to clean the blood-stained deck. Molqi had decided to kill the American — as he explained later — to make it clear to everyone that the hijackers had no mercy for anyone: just like the Americans, who, by arming Israel, killed or had killed, without distinction, women, children and invalids of the Palestinian people.

The Portuguese waiter Manuel De Souza and the Italian sailor Ferruccio Alberti confirmed, for their part, the terrorist's story.

An attempt was made, in the course of the investigation, to analyze the ideological reasons and practical aims of the terrorist action. On this point, the statements by the defendants, despite their overt desire to cooperate, were not at all clarifying. The defendants claimed that the real purpose of the operation was a raid to be carried out in the Israeli port of Ashdod: since they were accidentally discovered on board the ship, they were forced "at the last moment, to modify the plan and to seize the ship and passengers, an event which was not part of the original plan." The defendants, however, were unable to clarify what the alleged raid in the Israeli port was about. In this regard, they provided, in separate instances, contrasting versions. At first they claimed that they intended to attack Ashdod customs, kill Israeli officials and take control of the port; further, they wanted to commit suicide, fire bursts of machine guns and sacrifice themselves by detonating the bombs they would bring with them. According to another version, they had promised not to take any American passenger hostage, but ask the Israelis, after the ship had docked in Ashdod, an exchange with the Palestinians detained in that country. Should there be no favorable response, they would kill a hostage every five minutes, then seize the ship and set sail for another port. According to another

[*Translation*]

version, the plan consisted in hitting the Israeli boats that had approached the ship in the port of Ashdod, seize the Arrivals Hall, kill everyone there and then return to the ship, seize it and ask for the exchange of prisoners.  Again, the plan to dock in Ashdod, capture as many Israelis as possible and propose an exchange with Palestinian prisoners held in Israel.  If the exchange were not granted, the hijackers would die along with the hostages.  Another version: they did not want to kill anyone, but only to enter the port of Ashdod, demand the liberation of the Palestinians and return on aboard with them, or be killed on sacred Palestinian soil — hijacking the ship had not been envisaged as an alternative hypothesis.  A variant of this version excluded the return on board and provided for the repatriation by land, from Ashdod.  Due to the strength of Israeli security services operating in that port (well known to the Palestinians if only due the previous reconnaissance trips carried out by Abdulrahim Kaled) the plan was certainly not feasible; and the hijackers never mentioned the project to the Captain or other people on board in the hours following the kidnapping.  Moreover, the terrorist action had actually begun when the environmental circumstances were more favorable, i.e., after most passengers had disembarked to go to the Pyramids, which implied that the moment of the action had been chosen on a well-thought-out plan and not due to contingent circumstances.  Finally, it did not appear, at all, that during the leg from Genoa to Alexandria the terrorists had been discovered: Al Assadi and Al Asker, themselves, frankly admitted that they had not been surprised by crew members or anyone else, and stated that they suspected that the raid on Ashdod was a mere pretext intended to conceal the real objective, only known to the head of the operational unit, Al Molqi, who had received verbal and secret instructions — not to be revealed to his accomplices — from Ziad El Omar upon boarding.

On November 18, 1985, when the relevant proceedings ended, Abbas Issa and the four members of the operative unit were brought to direct trial before the Court of Genoa to answer for the crimes concerning weapons.  At the end of the trial they were found guilty of the charges and were sentenced to different penalties.

Later, on November 20, it was ascertained through registry records that defendant Al Asker Bassam was under eighteen at the time of events.  His case was referred to the relevant Juvenile Court.

[*Translation*]

A formal proceeding was carried out regarding the other defendants. The shipowners, in the person of the extraordinary Commissioner and the International Association of Jewish Jurists, whose constitution was declared invalid, were constituted civil parties Before the investigating judge.

The investigating judge arranged for the transcription and translation of all radio conversations for which there was documentation and the completion of various expert assessments. In particular, an autopsy report on the remains of the victim, Leon Klinghoffer, recovered at sea, made it possible to establish that the death of the American was instantaneous and caused by a gunshot, with entry into the right frontoparietal area and exit in the left parietal area; another shot had struck the victim in the chest; the destructive effects found on the head were compatible with the action carried out by a high-speed, armor-piercing projectile, with considerable kinetic energy, like the bullets found on board the ship. As for sailor Langella, he sustained a gunshot wound in the right popliteal region, that healed without sequelae within 136 days.

Finally, a ballistics report ascertained that weapons of war had been used in the terrorist raid, including automatic Kalaschnikov assault rifles, with selector burst, and pineapple-type hand grenades.

At the conclusion of the investigation, when, due to obstacles interposed by Monaco's authorities, it was impossible to obtain the tape containing a recording of the communications between the ship and the Monte Carlo radio station, defendants Abul Abbas, Ez El Din Badrakhan, Ziad El Omar, Abdulrahim Kaled, Abbas Mohamed Issa, Ben Kadra Mohamed, Abu Kifah, Al Molqi Magied Fataier Abdullatif Ibrahim, Al Assadi Ahmad Marouf, Jarbua Mohamed, Kazem Ali Bu, Sa'ad Yusuf Ahmad Yusuf, Gandura Said Mowfaaq and Floros Petros were indicted.

At the opening of the trial, before the Genoa Court of Appeals, Ilsa and Lisa Klinghoffer, the victim's daughters, Pasquale Langella, Ciro Scala and Lavinio De Luca, members of the crew, filed a civil action. On the other hand, filing of a civil action proposed by the International Association of Jewish Jurists was once again declared invalid.

During the questioning, Al Assadi confirmed the confession already made, while Al Molqi and Fataier, reiterating a procedural line announced in the last stages of the investigation, retracted it.

*[Translation]*

Abbas Issa partially modified the statements made in the preliminary investigation. During the trial, one of the lay jurors, Silvio Ferrari, submitted a justified statement of abstention. It was accepted and one of the alternates took over from the actual juror.

As a result of the trial, with a judgment dated July 10, 1986 the Court of Appeals confirmed the existence of the purpose of terrorism and subversion with regard to all the crimes for which a sentence was issued. The Court argued that the objective of the terrorist action was not the alleged raid in the Israeli port of Ashdod but the kidnapping of the Italian ship and the taking of hostages. Consequently, the Court identified the most serious offense as being the offense under charge F) (kidnapping for the purpose of terrorism or subversion aggravated by the homicide of a hostage). On the other hand, the Court excluded the crime of armed gang, recognizing the conditions and the qualifying features (in particular, the essentiality of the purpose, to be identified in a crime against the personality of the Italian State, and the establishment of the association bond). It granted the defendants who were present, but denied it to the fugitives, generic extenuating circumstances and defined the individual responsibilities, with the resulting penalties — better specified in the epigraph, according to the distinctions and clarifications discussed later.

The Republic's Public Prosecutor and the defense appealed the judgment.

The Public Prosecutor challenged the acquittal regarding certain charges, of Abdulrahim Kaled, Abbas Issa, Ben Kadra and Sa'ad Yusuf. He criticized that generic extenuating circumstances were granted to Al Molqi, head of the terrorist group and material perpetrator of the barbaric assassination of Klinghoffer, and insisted that the crime of constituting an armed also be recognized.

Abul Abbas was seeking acquittal, at least for lack of evidence, of all the crimes ascribed to him. In the alternative, the mitigating circumstance referred to in Art. 116, Criminal Code ("CC"), the extenuating circumstances referred to in Art. 56, Paragraph 3 and 4, CC, and generic extenuating circumstances.

For Ez El Din Badrakhan and Ziad El Omar the nullity of the judgment of first instance was deduced due to the unlawful constitution of the judge (with reference to the replacement of a lay juror with another alternate.) On the merits, acquittal was requested with a full or at least doubtful formula

26

from all the locally ascribed crimes; in the alternative, the mitigating circumstance pursuant to Art. 62, 1, CC and generic extenuating circumstances.

For Abbas Issa, Al Molqi Magied and Fataier Abdullatif a request was made to delisting the most serious crime of kidnapping for the purpose of terrorism in the corresponding 'common' case, not aggravated by the aforementioned purpose; for Fataier alone, acquittal of crime of homicide was also requested, or the mitigating circumstance referred to in Art. 116; the mitigation pursuant to Art. 62 n.1, to be considered prevalent together with the generic ones already granted, and the containment of the sentence to the minimum allowed; for Abbas alone, the exclusion of the purpose of terrorism in relation to the crimes for which the appellant was convicted, the granting of the mitigation pursuant to Art. 62, 1, CC, and the containment of the sentence; for Al Molqi alone, the mitigation pursuant to Art. 62, 1, its prevalence (with generics) and containment of the sentence imposed.

For Al Assadi, acquittal of the crime referred to in Art. 289 bis, or the mitigating circumstance referred to in Art. 116; in the alternative, the mitigation pursuant to Art. 62, 1, and recognition of continuation with the crimes for which the appellant had already received a final sentence (concerning weapons).

For Abdulrahim Kaled, Sa'ad Yusuf and Ben Kadra they asked for acquittal of all the crimes ascribed to them for lack of evidence, the declassification of the crime provided and punished by Art. 289 bis, CC in that provided and punished by Art. 605, CC, the exclusion of the aggravating circumstance of the purpose of terrorism and the granting of that referred to in Art. 62,1, CC.

Finally, for Gandura Said, acquittal was requested with a better formula for the only crime in relation to which a sentence was issued; and, in the alternative, the extenuating circumstance pursuant to Art. 62, 1, CC and the containment of the penalty within the minimum allowed.

In the meantime, between the first instance trial and the appeal trial, the defendant Sa'ad Yussuf was extradited from Germany to Italy. He appeared at the opening hearing of this trial and proclaimed himself unrelated to the facts he was accused of, asserting that at the time they were

27

committed he was in Beirut. Al Assadi, on the other hand, reiterated his call of fairness towards the Sa'ad Yusuf, while co-defendants Al Molqi and Fataier Abrahim claimed not to know him.

The defense of Al Molqi, Abbas Issa and Fataier proposed the objection of nullity of the first instance judgment, due to the irregular constitution of the Court. On the merits, the Civil Parties, the Attorney General and defense concluded as per separate minutes.

## THE LAW

Preliminary consideration must be given to some questions of a procedural nature raised in the context of appeal or of this appeal trial: some of them concern the regularity of the process as a whole, others the position of individual defendants.

First, in several respects, the regular constitution of a first instance judge is being challenged. According to an objection raised by the defense of Al Molqi, Fataier and Abbas Issa, the circumstance that the President of the Court of Assize and the adjudicator were appointed to hold their respective offices by a Decree of the President of the Republic, on a complaint filed by the Council Superior of the judiciary, after the opening of the trial of first instance would render void the entire phase of the proceeding, pursuant to Art. 185, 1, CPC. The exception refers to a recent jurisprudential approach, which by reversing a previous orientation (Cass. Section I, 8 October 1956, Married; Id Section I, 26 June 1964, Spataro), recognizes the absolute nullity in the case in question. This Court cannot fail to recognize that the procedure for the designation of magistrates to the Courts of Appeals differs from the typical "hierarchical or merits scale" designation referred to in Articles 45 and 54 of the current judicial system due to the special and derogatory nature of the *ad hoc* regulations under it (Art. 8 Law 287, April 10, 1951). In fact, we wanted to ensure that the procedure to appoint a court of appeals judge be a more guaranteed rite than the 'scale' method, in order to exclude any indirect influence by heads of offices on the conduct of proceedings where people participate. Therefore, as pointed out by the Supreme Court, the thesis that would like to assimilate, and take back to the same regulatory criterion, the "scale" procedure and that provided in Art. 8 is unacceptable,

Given the above, it seems to this Court that there is no nullity when judges are assigned to the court of appeals by presidential decree for the judicial year in question.  The Court does not deny that the appointment (*rectius*, the appointment to office, because the decree does not establish the public employment relationship; it simply , but merely assigns a specific annual appointment to a judge already vested with judicial functions) has constitutive effect.  The Court is of the opinion that the effectiveness of the decree does not occur from the date of its issuance, but extends over the entire period of time that the decree itself expressly establishes, that is, for the entire judicial year in relation to which it is issued.  It is indeed improper to attribute retroactive effect to an "act of duration" which contains within itself the initial term of its effectiveness (in this case established by law to coincide with the beginning of the judicial year).  More specifically, in order to highlight that the measure was adopted late with respect to its initial physiological date, the decree in question should recognize that characteristic "retrospective efficacy" that the administrative doctrine usually assigns to administrative acts that should have been issued on a certain date but were not issued due to delays accumulated in carrying out the related procedures.

Therefore, the Court considers that the effectiveness of the presidential decree, with effect from the beginning of each judicial year, cannot be denied except on the assumption that the Decree itself is flawed in the part in which it provides for the time prior to its enactment. This would require the identification of the flaw that specifically hinders the full effectiveness of the provision over time and for the duration that the law assigns to it.  But the flaw in no case is identifiable merely because the provision was issued late with respect to its natural date, because the delay constitutes, in the absence of specific punishments, a mere irregularity unsuitable to produce the ineffectiveness of the provision.  In the present case, it appears that the judges appointed to that office by the Decree of the President of the Republic relating to that judicial year actually participated in the first instance proceeding.  Illegitimacy, however partial, of the decree has not been objected and this Court has grounds for detecting ex officio, albeit for the sole purpose of disapplying the provision in question. Appointment of a first instance judge, inasmuch as it complies with the presidential decree for the year, therefore appears to be regular and the objection of nullity, proposed by the defense is unfounded.

Still on the subject of judicial appointment, the defense of Ez El Din Badrakhan and Ziad El Omar pleads the nullity of Art. 185 CPC due to the abstention by one lay juror, in the first instance

proceedings, and his replacement by an alternate juror, following a letter sent to the abstained judge by the local Public Prosecutor's Office, with which serious reasons were envisaged opportunities that could have determined the refusal of the judge himself. In essence, the lay juror was asked to evaluate, at his discretion, the reasons given, and he was invited to choose between spontaneous abstention and the risk of being disqualified. By opting for the first solution, the lay juror precluded the second: therefore, this Appeal Juror remains inhibited from any appreciation of the validity of the reasons that could have been deduced in support of the alleged challenge. In any case, it seems clear to this Court that it was a completely spontaneous option, suggested by a free and responsible evaluation of the opposing interests at stake. And regardless of the fact that, in principle, investigations aimed at ascertaining alleged vices of will pertaining to procedural acts (which are not of a negotiating nature.) It is established that no complaint was formulated by the juror regarding alleged violence against him.

Ultimately, it is a question of justified abstention, by reasons of expediency at the discretion of the interested party and, as such, unquestionable here. The constitution of the tribunal with an alternate juror is also a consequence of the resignation of the original juror. Given that it was ascertained that the replacing juror had participated in the hearing since its inception, no nullity is configurable for this reason.

The appeals filed by Abdulrahim Kaled, Sa'ad Yusuf and Ben Kadra Mohamed must be declared invalid pursuant to Art. 209, CPC, for failure to specify the reasons. The dry and apodictic formulas in which the declaration of appeal is expressed ("they should have been acquitted" the aggravating circumstance of the (sic) penalty for terrorism had to be excluded, "extenuating circumstances should have been granted...") do not reflect any criticism of the contrary rulings of the challenged judgment, nor do they propose any argument on which the evaluation of this Court can be exercised. Some of these requests, then, appear even lacking the most elementary challenging interest: for the appellants, their defense asked for a sentence pursuant to Art. 605 instead of Art. 289 bis, CC. If we consider that they were acquitted of from this last charge, it follows that the request for de-listing the crime, if accepted, would entail an evident *reformatio in peius* against them. The appeal lacks the necessary admissibility requirement.

The appeal is invalid.  The issues proposed by the defense of Sa'ad Yusuf with regard to the regularity of his summons in the first instance trial are overcome, due to alleged insufficiency of research carried out against the defendant - fugitive at the time.  But it is worth remembering that Sa'ad Yusuf was a wanted person, as is clear from the relative report, sought in all the places where there was news of a relatively recent stay, by various Israeli and Arab police forces.  No specific search was made in his presumed place of birth (Tire, Lebanon) because there was no information relating to his actual presence in that place and due to the well-known difficulties in establishing useful information relations with the area police authorities due to the civil war.

Valid is instead the appeal lodged by the Public Prosecutor against the same defendant, with regard to the crimes referred to in charges F), G), H), I), L), V), from which Sa'ad Yusuf was acquitted in the first instance. However, the fact is that the extradition granted by the German government pending a first and second instance trial refers only to the crimes for which the Lebanese was sentenced.  Consequently, the crimes in the appeal proposed by the Public Prosecutor are invalid to the State.  The Public Prosecutor,  however, at a hearing announced his intention to request supplement of extradition with reference to these charges, and requested the removal of the relative documents, in view of a possible separate trial.  In the Court's opinion, there is no impediment to this request, which leaves the procedural position of the judge completely unaffected, postponing it to the outcome of the renewed extradition request.  Hence the separation of proceedings against Sa'ad Yusuf, limited to the afore mentioned charges.

Having thus completed the examination of procedural issues, now we can to address the substantial aspects of the case.

During the proceeding, there was a long discussion about what the real mission was for the operational group, and whether the plan carried out was exactly what was planned at the outset.  The hijackers themselves tried to make believe that the original program had been modified "in progress" due to arising difficulties, but then fell into serious contradictions in an attempt to clarify what the real goal was, why it had been abandoned.  There is no need here to enumerate the many reasons on which the first instance judges widely insisted, that made the very idea of military action in the heavily guarded Israeli port of Ashdod appear completely unattainable.  Al Assadi and Al Asker themselves ended up admitting that the project was not serious and that they had, ultimately, only

been informed about it after the fact. It is therefore legitimate to ask why the plan was drawn up and, at a certain point, indicated as a failed goal by the four temerarious individuals. It is worth remembering, in this regard, that an action in the port of Ashdod only began to be talked about after the terrorist enterprise was interrupted, following the peremptory intervention of Abul Abbas from Port Said. It was Abul Abbas himself, in radio contact with Al Molqi, who insisted that he report to the captain of the ship and the crew that the hijackers' intent was, in fact, to land at Ashdod and carry out military action "against the Israelis." This enables us to provide the following answer to the above question. The terrorist plan, whose purpose was the hijacking of a ship and taking passengers hostage to exchange them with Palestinian militants detained in Israel, was interrupted following a complex set of circumstances of international order (US unwillingness to exercise pressure on Israel for the exchange, Syria's refusal to cooperate, pressure on the PLO and its consequent embarrassment because it gave endorsement to what had then turned out to be a pure act of terrorism), which convinced the masterminds that it was useless, and probably negative in terms of the Palestinian cause's international image. Thus, after the plan failed, (there is no doubt that the action did not achieve its goals, whatever they were), it became necessary to redesign the operation in such a way as not to compromise the framework of international relations within which out of necessity or convenience, Palestinian nationalism moves. It is easy to understand that military action against Israel would have had a different and less unfavorable resonance than a terrorist enterprise deliberately directed against the people and assets of a third State, whether benevolent or unprejudiced towards the political reasons of that movement. If the plan was devised by exponents of Palestinian dissent to put the PLO's diplomatic line in difficulty (Abul Abbas against Arafat, to simplify) is a question that escapes any procedural verification and is beyond the interests of this investigation. However, one imagines that the clear difficulties encountered by the defendants in trying to provide a credible version of the "Ashdod plan" can be explained by the fact that the members of the operational group, forced on the Cairo-Tunis voyage to an unexpected hijacking on the Sicilian airport of Sigonella and arrested there, did not have the material time to agree on a common line and to prepare for the challenges and interrogation that would inevitably be brought against them. Hence the uncertainty and the heavy contradictions revealed, highlighted by the first instance judgment, to which it is useful to refer on this point. Hence, also, the fluctuations in their defensive line, where they try to meet very different needs: the will to cooperate with the investigators, but also to reaffirm their "fighter status" and repudiation of any terrorist connotation attributed to their group. And, at the same time, a human inclination to propitiate the judges'

32

benevolence, reiterating that every hostile intention was directed against Israel, the declared enemy, and not against the country that was judging them, whose flag protected the hijacked ship and its occupants.

However, the defendants must be judged on the basis of what they actually did, namely they hijacked a ship, kidnapped passengers, killed a hostage. Neither can the defensive line of Abul Abbas be accepted, where he states that the events were the result of a foolhardy, absurd plan implemented by the four individuals in total deviation from orders received. It is worth remembering that the four defendants are not inexperienced improvisers of senseless actions, but militants with iron nerves and steel will, hardened for such undertakings by long and meticulous training, devoted to the cause of their people with a total dedication bordering on fanaticism. In addition, hijacking a ship, kidnapping its occupants are, as noted by the first instance judges, carefully prepared actions, carried out at the most favorable moment (when most of the passengers had just disembarked and the control of the few remaining on board was easier), on the basis of news and findings acquired during previous *ad hoc* reconnaissance (it will be remembered that Abdulrahim Kaled took at least one previous cruise on the ship — where he later accompanied hijackers —also providing them with information with regard to the location of decks and the rooms. His presence on board, from Genoa until the hours immediately preceding the action, would have made no sense if the undertaking had not been carried out on the ship itself and its function had not been that to facilitate the operators with knowledge of on-board services and the movements to be carried out.)

The action against the ship and its passengers was, in short, a planned, deliberate and organized action (the hijackers even practiced the use of the compass, of no use for an action to be carried out in the port of Ashdod.) Here it matters little whether it was an action for its own sake, as one could reasonably suppose, or an integral part of a larger plan, destined to unfold "also" in the port of Ashdod. It is certain that the various versions of the "Ashdod plan" provided by the defendants "also" involve hijacking a ship and kidnapping of all or part of its occupants. Thus, it is legitimate to conclude that the facts actually committed are not an improvised variant of a different project rashly abandoned in the imminence of its implementation but a very objective, exclusive, alternative or complementary plan to the original design, wanted and preordained by the executors and the masterminds.

[*Translation*]

These premises result in plain consequences in relation to the legal classification of the facts. The violent action was directed against property belonging and subject to the Italian State in order to exert pressure on it, in view of the political aims pursued by the organizers of the action. True, no direct request was addressed to the Italian State, but this does not exclude the Italian State's objective involvement in the affair due to the responsibilities, including of an international nature, that the hijacking of the ship and the kidnapping of passengers of various nationalities entailed, and for the inevitable repercussions on internal political equilibrium. This way of asserting political objectives (coinciding with the ultimate aims of Palestinian nationalism) through violence and intimidation, exercised on an indiscriminate group of people, and call the State, sovereign over the ship and guarantor of security of persons and property, into question has an undoubted terrorist nature, according to the meaning reflected Art. 1, Law No. 15, of February 6, 1980 (*see* Cass. Section I, January 14, 1985, Pinna appeal.) In support of this conclusion it should be remembered that the existence of the aggravating circumstance was considered in relation to the related crimes for which the four hijackers (and Abbas M. Issa) were tried separately, with a very direct proceeding. There is now res judicata on this point, as the Supreme Court (February 2, 1987 hearing, No. 39790/86) rejected an appeal which also raised the question relating to the existence of the aggravating circumstance, considered by the first instance judges in relation to those crimes. Although the justification for this judgment has not yet been filed, it can nevertheless be affirmed, having received news of the disposition, that there currently is a judgment that recognizes the existence of the aggravating circumstance with respect to crimes inherent to the same material matter, and instrumental with respect to the more serious facts which are the subject of this proceeding. Thus, only by being in absurd contrast with the judgment, which defines a segment of a same story, could it be argued today that there is no aggravating circumstance with regard to the residual segment, and has only now reached the judicial phase of the appeal. Therefore, the rulings of the first instance judges, that considered aggravated under Art. 1, Law 15/80, all crimes committed by the defendants, are affirmed.

The allowance of the most serious fact charged to the defendant also appears correct: the killing of US citizen Leon Klinghoffer, after kidnapping him and the other passengers and crew members. The defense argues that the fact should rather be classified as common murder and kidnapping of an ordinary person, because it would not be a crime (or crimes) against the personality of the Italian State. However, it should be noted that the very existence of the aggravating

circumstance leads inexorably to the opposite solution, since the murder committed in the context of a kidnapping action, for terrorist purposes, integrates the hypothesis contemplated by Art. 289 bis CC, which is a complex case, consisting of the two common hypotheses, plus the required specializing element of willful misconduct.  Nor can it be said that the purpose of terrorism is subsumed by the incriminating rule in a different meaning from the meaning in Art. 1, L. 15/80. Reasons of a literal, historical and systematic nature support the assumption, peaceful in doctrine and in jurisprudence, that the notion of <u>terrorism</u>, settled in culture and in emergency legislation, reflects a uniform perception of the phenomenon of political violence characteristic of these years, in the various but not dissimilar forms in which it manifests itself, and has been used as such by the legislature in order to condense an experiential reality of common perception into a given normative (think of the similar concept of <u>mafia</u>, which appeared only recently in positive legislation).

The existence of the crime of armed gang must also be considered.  On this point, the judgment of first instance deserves partial reform, because it excluded said charge against all the defendants.  The first instance judges decided on the exclusion by noting that all the crimes perpetrated aboard the "Achille Lauro" are attributable to Abul Abbas' PLF (Palestinian Liberation Front.).  This Front has a military structure, but its purpose is purported to be "to contribute to the return of the Palestinians to their land of origin."  This being its purpose, the military organization could not be defined as "armed gang," in the sense understood by the national legislature, because it implies as the reason for being of the organization the will to commit a crime against the person of Italian state.  Nor can a contingent and instrumental choice be enough, added the first instance judges, as would have happened in the present case.  The aim must permeate the very essence of the gang and have an institutional character.  Also, the purpose of the gang should not be confused with individual actions performed: the ultimate and essential goal of the PLF, despite having carried out hostile acts against the Italian State, is the liberation of Palestine.  Its military structure — which was used, in part, in the specific event here — exists only for the above purpose.

The misunderstanding of this approach lies in taking for granted that the facts committed on the "Achille Lauro" are to be attributed to the F.L.P. or to its direct emanation and that, therefore, the constitutive elements of the armed gang must be found on the nature of the Front and its organization. The cognitive faculties of this Court, however, do not come to appreciate the intrinsic reality of the organization as mentioned above, its relations with the other components of the Palestinian

movement, its tactical inclinations, its strategic orientations, in the broadest and most magmatic context of the armed, diplomatic and political struggle fought by the Palestinian people. Excessive and exorbitant, compared to the needs of the trial, appears every judgment on the PLF, which, moreover, and according to commonly accessible media information, has made no claims on the facts regarding this trial. Whether the PLF is responsible for the crimes committed is a question that transcends the judicial perspective which this Court is bound to abide by. Nor, on the other hand, does any challenged charge imply any direct reference to that specific expression of the Palestinian movement.

We must adhere to an approach that strictly adheres to the legislative approach. In light of which, any aggregation of men and weapons for the purpose of committing one or more crimes against the person of the State must be considered an "armed gang." The ultimate political or ideological end that the organization promises to achieve is of no interest, but the practical aims identified in the criminal pattern referred to in Art. 302, CC are. An "armed gang" will thus be made up of all those who provide an effective contribution to the instrumental organization of men and weapons, being aware that their contribution is intended to favor the realization of a crime assumed as the aim of their immediate organization, their being together. The presence of a material element and a psychological element must be verified with regard to each individual defendant, in order to ascertain his personal responsibility (with particular regard to that of the masterminds). However, it cannot be denied that the ten people gathered in Genoa on October 3, 1985 at the Hotel Laurens (the four designated hijackers, the two arms couriers, and with them Ez El Din Badrakhan, Ziad El Omar, Abdulrahim Kaled and Sa'ad Yusuf) intent on exchanging weapons and instructions, for the specific purposes of terrorism recognized in a final judgment, are an associative structure uniquely qualified as "armed gang." The fact is impressionistically evident, and the Court of First Instance, informed of it, believes it can avoid the obvious legal consequences by observing that to that organizational structure, so uniquely and intentionally aimed at committing some of the crimes — typical goals of an armed gang — lacks, however, the connotation of "stable" gang, essential to the juridical qualification of the facts under the aspect of  under Art. 306, CC. A certain degree of "stability" would be helpful, according to the first instance judges, to define the identity of the gang, to give it autonomy, and, in substance to distinguish it from its matrix, the PLF, of which it would still be a direct emanation. The misunderstanding, already highlighted, of tracing the overall responsibility of the terrorist group to the PLF, imagined the top and extreme hierarchical instance of the structure

36

intended to operate on the "Achille Lauro," is thus renewed.  This Court can only reaffirm its conviction that there is no procedural data capable of endorsing this reconstructive hypothesis, which remains legitimate in the strictly historical/political field.  As we shall see shortly, the identification of the masterminds led to a group of individuals whose identification with the leaders of the Front is not proven and, above all, is not necessary to attribute criminal responsibilities.  The PLF remains, in short, an ideological point of reference (as well as the PLO or, more generally, the Palestinian movement) to which the creators and implementers of the event may well have referred.  However, their distinct, personal responsibility as masterminds or executors of the operation, remains unchanged.  In addition, with regard to the "stability" of the associated structure (the gang), it will be worth remembering that the raid on the Achille Lauro had a vast organizational background, ranging from the specific training given to the hijackers, after their selection in the PLO military camps, to reconnaissance trips carried out on the same ship by Abdulrahim Kaled, the subsequent prolonged stay in Italy of the members of the operational group, assisted by Sa'ad, in order to make them familiar with the environment and develop in them the psychological determination for the risky mission to be carried out.  It is unrealistic to deny that the associative bond has persisted long enough to give autonomous individuality to an organizational structure set up to carry out the crimes that were actually committed. The autonomy of the gang, moreover, is also reflected in the roles performed individually, according to the respective attributions and competences, and unified by the identity of the purpose pursued.  Also, under this perspective, the gang, which avails itself of support and assistance from the vast soil of Palestinian national claims, reveals itself as a self-sufficient organism, compact and adequate to achieve a specifically established objective.

Recognized leader of the gang, inspirer and maximum organizer of the terrorist enterprise is Abul Abbas, a prominent exponent of the Palestinian movement, who after having avoided arrest following the hijacking to Sigonella of the plane on which he was traveling became a fugitive and remained so throughout the course of the proceedings.  His leadership, unanimously proclaimed by the defendants and made evident by the tenor of the decisive radio conversation he had with the hijackers from Port Said, is not called into question by his own defense who, instead, base his appeal on the assumption that his plan and designs were totally different.  This thesis has already been discussed and we have seen its inconsistency.  Devoid of any procedural confirmation is the assertion that the original program was abandoned because of disobedience by unreliable Al Molqi - who decided, at the last moment, and through cowardice, not to sacrifice his own life in a deadly assault

37

on Ashdod and to fall back, instead, on the apparently more peaceful hijacking of the ship and its implications.  It goes without saying that no one had forced Al Molqi to undertake such a reckless undertaking, and that it is not enough to proclaim that the leader of the hijackers "is a man, a sergeant" (p. 10, grounds for appeal) to conclude that he recited a "pantomime" (ibid), destined to deceive masterminds and fellow team members.  Also, we do not see, for the purposes of a defensive line, what further clarification could be made at a Minister of Foreign Affairs hearing, requested by the defense; nor the usefulness of discussing the appropriateness of the means in relation to the project (it is claimed that 4 machine guns and a few hand grenades would have been insufficient means to seize the Italian ship.  However, the hijacking did take place, with such trifling means, and all the expected terrorist effects, including the killing of the hostage, happened.)  Moreover, the facts proclaim that there was no disobedience on the part of Al Molqi:  see the agreeing statements by the couriers, who never reported differences between the head of the group and the masterminds; see the text, of peremptory eloquence, of the radio conversation exchanged at Port Said between Al Molqi and Abul Abbas, where the complete subordination of the former to the latter is obvious in every word; see the lucid statement by Al Assadi, according to which, after landing at Port Said, Abul Abbas did not reproach the hijackers for how things had gone but exchanged gestures of affection, solidarity and gratitude with them, from which transpired full adherence to the choices made.

Therefore, there is no room, not even for a subordinate thesis, to allow Abbas a mitigating circumstance under Art. 116, on the assumption of a substantial gap between planned action and completed action.  And there is no room, from a legal point of view, not even for the extenuating circumstances referred to in Art. 56, c, 3 and 4, CC, also invoked, but without foundation, by the appellant's defense.  It is certainly true that the terrorist raid ended following an intervention, via radio from Port Said, by Abbas (whether spontaneous or necessitated by superior considerations or impositions is another matter) and that it was precisely that circumstance that showed the undisputed authority of the mastermind.  However, the fact remains that when Abbas' initiative produced its effects in relation to the conclusion of the event, all its criminal aspects had been completed.  Klinghoffer killed, a wounded crew member, kidnapped ship passengers, kept in a state of total and inhuman awe for several days, a ship hijacked from its pre-established cruise itinerary: the only missing results were political, the exchange of prisoners intended by the hijackers had not happened.  Precisely because the operation had failed it was necessary to put an end to it.  Abbas had no choice but to ratify the failed mission, due to failure to achieve the ultimate objectives, and the ascertained

impossibility of achieving them later. Obviously, Abbas did not prevent any event (understood in a criminal sense; the reason for the action, its atypical and meta-juridical purpose, is another thing), but intervened when the crimes had already been committed. The events represent are full responsibility with regard to the criminal hypotheses, for which he is now required to answer.

The members of the gang are to be considered the four material operators, with managerial responsibilities for Al Molqi, and the caveat that the minor Al Asker, although equally guilty and responsible, has been dealt with separately. Regarding Fataier Ibrahim and Al Assadi, their responsibility is disputed and request, in the alternative, the mitigating circumstance referred to in Art. 116, CC, on the assumption that they did not know the true objectives of the action, a knowledge that was only shared with Al Molqi, head of the operational group. The elements on which this presumption is based are singularly fragile. It is assumed, first of all, that the instructions about the real objectives of the raid were specified in a letter, sent to Genoa by Abbas M. Issa and destroyed without the "minor" members of the operational unit having any direct knowledge of it. The events relating to that letter do not appear clear, and its content unknown in the proceeding. However, there is no evidence or reason to believe that the purpose of the raid was stated in that written document. (There was a risk of the bearer being discovered and unmasked. Also, of the four hijackers only one — Al Asker — could read and write!) And there is no evidence or reason to believe that the material performers did not have, during the long preparatory phase, more direct and precise information about what they were going to do. The defense notes — and here is the second argument! — that the need to keep the mission's true objectives secret up to the last minute would explain the logic of "compartmentalization," typical of terrorist organizations (the fewer people know, the better.) However, a logic of this kind has its *raison d'être* in our country's own terrorism, which moves in unsafe areas, threatened by infiltrators and informers, turncoats and would be turncoats. The terrorism involved in this case relies on few initiates, it is devoid of connections, it develops in a foreign social environment, cannot even communicate because it does not know the local language, and immediately arouses suspicion. The four group members were chosen through a very careful selection, among people with the most desperate perspectives, not hesitating to even sacrifice their lives. Can we believe that that they underwent many months' specific training (including knowledge of nautical charts and the use of a compass) without ever being told what type of mission they were preparing for? Such alleged ignorance of one's own tasks is contrary to logic and incompatible with the most obvious organizational needs. Moreover, Al Asker himself, does justice to it, denying the

39

[*Translation*]

false defensive thesis: "from the moment we arrived in Genoa, he clarifies, we knew that the plans prepared for us including hijacking a ship and killing hostages; to be honest, I must say that this killing, after the ultimatum addressed to the Israelis had expired, was foreseen from the beginning. There were no differences between us, even if the murder was materially committed by Magied" (11/7/85, p. 49 back): equal positions and perfectly equivalent roles.

After all, what alternative could there be to killing hostages, once the fatal mechanism of the ultimate threat had been triggered? Common experience teaches that such an event is one of the most frequent results of a kidnapping actions for terrorist purposes: intimidation would be mild and ineffective if the threatened evil were not, under certain conditions, implemented. Hence the full responsibility, not diminished, of the hijackers and their conscious masterminds, with regard to the crimes committed on board the ship.

And among the couriers, who remained extraneous to the material execution of the plan, the responsibility of Abdulrahim Kaled, Ziad El Omar, Ez El Din Badrakhan must be confirmed. The appeal by the Public Prosecutor concerns the acquittal of the above three of the crime of an armed gang, and the first offense referred to in charges F), G, H); the appeal by the defense concerns the conviction of Ziad El Omar and Ez El Din Badrakhan for crimes other than armed gang. Their guilt must be recognized in relation to all the crimes under discussion.

Abdulrahim Kaled, Ziad El Omar and Ez El Din Badrakhan are full members of the gang that operated, as we have seen, on board the Achille Lauro. Their responsibility for the crimes committed derives from the fact that they belonged to the gang and the reported impossibility of believing that the members did not know, or foresee, the consequences of their actions, taken in common consent and active cooperation by all.

Abdulrahim Kaled is the one who went on a previous cruise (according to Al Molqi more than one cruise) on the ship for reconnaissance purposes, i.e., he carried out an essential preparatory activity for the plan's success. The hypothesis that he did not know what the plan was about is unreal: How could he have carried out his study mission, to evaluate risks and opportunities, if he had not known the plan whose feasibility he was checking? The argument seemed stringent even to the first instance judges, who also considered it offset by doubts and perplexities, based on

40

circumstances which, in the opinion of this Court, confirmed, instead, the defendant's full involvement in the group's action plan. First, Al Molqi confirmed that Kaled had participated in the meetings in Tunis with Abbas, and Magied was present, during which the detailed plan of the raid was drawn up (November 8, 1985 interrogation.) The circumstance would seem conclusive, but the first instance judges emphasize a second statement by Al Molqi himself (February 17, 1986 interrogation) in which Kaled is no longer mentioned in relation to the Tunisian meeting. But the second statement, the Court noted, is a summary. Al Molqi recalls what has already been said, and does not stop to name those present at the meeting (nor does he deny, therefore, that Kaled was among them). There is no contrast between the two statements, but only a different expository criterion, analytical in the first and synthetic in the second. Again: Abdulrahim Kaled was present in Genoa on October 1985, when the couriers met at the Hotel Laurens and exchanged weapons and ammunition. It is even Kaled himself who accompanied the members of the operational unit on board, arranged them in their respective cabins and embarked with them. The first instance judges believed that even on this occasion the defendant did not know what he was doing: due to the principle of "compartmentalization" they relegated him to the role of stone guest, kept at a suspicious distance from the heart of events of which he was also a material participant. This Court has already expressed its opinion on the alleged rule of "compartmentalization", whose tralatitious nature in the present case is made evident by the fact that those directly involved never mentioned it. If human acts and behaviors make sense, Abdulrahim Kaled's attitude in Genoa on October 3 is that of a person fully involved in a project to whose execution he is making an absolutely decisive contribution. Finally, and this is the argument that led the first instance judges to embrace a thesis of doubt, Abdulrahim Kaled disembarked from the ship in Alexandria, with apparent haste, just as the decisive face of the raid was about to take place. It has been argued that in so doing, Kaled would have shown his wish to distance himself from his comrades, separating his own responsibilities from that of others. You may discuss as long as you like the defendant's hidden intentions and the rather theatrical circumstances in which he disembarked. However, it is certain that he was part of the plan review on the eve. Al Assadi assures this categorically when he reports that, before his departure, "in Genoa, Ziad El Omar (alia Abul Oz) told us that once we arrived in Egypt Abdulrahim Kaled (alias Abu Amar) was to disembark" (interrogation February 14, 1986, f.56). Disembarkation at the end of his mission, therefore, in accordance with pre-established plans.

[*Translation*]

Even more macroscopic, if we may say so, is the implication of Ez El Din Badrakhan and Ziad El Omar in the story. This was not doubted by the first instance judges, who acquitted them from being in an armed gang for the reasons of principle already set out and refuted, but confirmed full responsibility with regard to the crimes committed on board the ship. The managerial and organizational role of the two individuals in the criminal enterprise is well highlighted in the challenged judgment: the defense does not dispute it either, limiting itself to arguing that the plan to which they contributed concerned the raid on Ashdod and not the hijacking of the Achille Lauro. Badrakhan is at the top of the terrorist organization, the highest level after Abul Abbas. It is he who selected future hijackers in the military training camp that he personally directed, proposed them to Abbas, sent them to Italy; he was with them in Genoa, at the time of boarding and he was with them in Port Said when the mission ended, and accompanied them on the plane that was diverted to Sigonella. As for Ziad El Omar, he participated in the selection and assisted the future hijackers in their training, for this purpose by going to Italy, where they stayed during the month preceding the start of operations. He was with them in Genoa on October 1-3. There, with the authority of the leader that he was, he dismisses the fifth designated hijacker — Jarbua — deemed unsuitable for the type of action planned. Finally, he communicated to the members of the operational team the final instructions, which he personally brought from Tunis. Their responsibility, having regard to the foregoing, should be extended to the crime of armed gang, challenged respectively in charges N) and O) of the section.

Involvement in the gang (and resulting crimes) by Abbas Mohamed Issa and Ben Kadra Mohamed appears not to be proven: the appeal made against them by the Public Prosecutor cannot, therefore, be accepted. The two are responsible, together with not better identified Abul Kifah, for transporting from Tunis to Genoa the weapons destined for the criminal expedition. They also appear personally linked to Abul Abbas, because they were his bodyguards. The second circumstance is cause for suspicion. The first circumstance shows a significant material contribution to the operational needs of the gang. There are no concrete reasons to believe that there was a psychological component: awareness. In other words, that they were committing a crime against the person of the Italian State which, together with the material behavior, integrates criminal liability pursuant to Art. 306 CC, and related charges.

42

In this regard, it should be noted that according to what the detained defendants attested in their interrogations, at the time of the facts there were Palestinian logistical bases in Genoa, established and intended to operate in this country in view of the purposes of the nationalist movement.  And the defendants themselves specify that the bases were supplied with weapons directly from Tunisia because the weapons available on the local market were too expensive.  In this context — which, of course, would require in-depth analyzes beyond the immediate interests of this procedural matter — it is no surprise that a single transport operation may have been carried out without the couriers fully knowing the possible uses of the items entrusted to them.  One could even imagine, without much effort, that at the time the weapons were brough over, their destination was not yet identified, although the temporal coincidence appears too weighty to justify such a hypothesis.  However, the fact remains that Ben Kadra's role was extinguished by the fulfillment of that task, and it is no need to evoke the "compartmentalization" rule to conclude that there was no need to inform the courier of the subsequent developments of the program, about whose further execution he need not be informed.

As far as Abbas Issa is concerned, two further circumstances put forward by the prosecution should be pointed out: he was the bearer of the letter mentioned above and from some admissions it would seem that he was not completely unaware of how much was cooking in the pot.  The errand concerning the letter —intended for Al Molqi but destroyed by Issa, without reading it, when he was about to be arrested — would prove, according to the appellant Public Prosecutor, that the current defendant was an important connection between sender and recipient.  This Court, reiterating that the content of the letter is unknown in the proceeding, notes that the inference of the Public Prosecutor remains at a conjectural level: even important letters can be entrusted to a qualified fiduciary or simple postman.  The admissions, then, refer to knowledge of a plan that involved the seizure of an Israeli ship and its occupants and a subsequent exchange with prisoners held in Israel.  The Public Prosecutor notes that this project is, actually, what was more or less carried out —the difference being the ship to be hijacked which, according to Abbas Issa, was going to be Israeli and not Italian.  This is no small difference, given the resulting legal consequences.  Hijacking an Israeli ship would have excluded any criminal value involving offense to the person of the Italian state.  The Prosecutor's thesis is that Abbas Issa meant "Italian" when he said "Israeli." The small loophole would depend on instinctive needs for self-defense.  Thus, the Court points out, a trial on intentions

[*Translation*]

takes place; and the logic governing a criminal trial does not allow us to draw useful deductions from the simple assonance of words.

However, the decisive circumstance in favor of Abbas Issa is that when the plan was triggered on October 3, 1985, with the boarding of the operational unit on the Achille Lauro, he had been detained for several days in Genoese prisons. This prevented him from taking part in the decisive meeting held at the Laurens Hotel, where the plan was definitively finalized and from the programmatic and preparatory phase to the immediate implementation. It is in that circumstance that the choices become irrevocable, the words become deeds make the responsibility of their authors definitive and irreversible (Jarbua, the hijacker discarded on that afternoon of October 3 leaves the scene: it would be difficult to hold him responsible for crimes not committed just because, up to that point, he had been willing to commit them.) It goes without saying that even the detained courier can maintain his psychological adhesion to the common program (as well as revoke it), but this involves a verification, a positive confirmation of the persistence of an associative relationship beyond the material conditions that prevented it from being practiced. There is no such confirmation, and the prisoner's assertion that he had no knowledge of what his free comrades were concretely doing remains undeniable. Hence the confirmation of his acquittal, within the limits of the challenged judgment.

For all the defendants, a mitigation pursuant to Art. 62, 1, CC is requested. This request cannot be accepted: the first instance sentence must be fully confirmed on this point. The extenuating circumstance presupposes a positive appreciation of the motive for the action and the judgment must be formulated with objective criteria, not according to the agent's personal point of view. Well, it is completely erroneous to see a connection, legally relevant, of effect by cause, between the crimes committed and the aspiration of the Palestinian people to regain their land of origin. It may be that the defendants thought they were acting within this patriotic logic, but it is certain that the actions and crimes they committed have been deprecated, with clear and resolute stress, precisely by those organizations and people who, for international recognition, interpret the aspirations of their people at more representative levels. It is true, however, that such actions are to be considered counterproductive also for the purposes of the evoked cause, for the horror they arouse in public opinion, for the mistrust and sense of hostility that reverberate on their authors, for the need of retaliation or at least of self-protection that they generate in third countries, destined to backfire,

44

[*Translation*]

against the pure legitimate aspirations of people whose cause is so absurdly managed.  There is no good or bad terrorism; an idealistic horizon does not conceal the infamy of practical results.  State justice cannot formulate positive judgments in relation to facts that the legal system considers antisocial, both in themselves and for the purposes immediately pursued.  Rather, it is true that the crimes in question express ire, anger, despair, and the will to transform one's own individual impotence, and people's impotence, into collective impotence.  All this is understandable from a human point of view, but does not result in any ethical or social value.  In the end, even the dark story of the Achille Lauro is only an episode in a conflict that opposes the existential case of the Palestinian people to the historical right of Israel, a clash of two causes that resulted in a common tragedy.  It is not up to the justice of the Italian State  —  whose people are heartily sensitive to the pain of the dispersed nation but who is also linked by clear and convinced diplomatic relations with the State of Israel, and is not unaware of its historical tribulations  ”  to take sides in favor of one or the other, expressing meta-juridical appraisals leaning towards one party rather than the other party in conflict.

Things are different with regard to the generic extenuating circumstances, which the Court of First Instance granted to the executors and denied to the Masterminds/Instigators, and which today the defense would like to see extended to the latter while the Public Prosecution criticizes such concession, in his opinion too generous, to Al Molqi , head of the operative group.  Here atypical personological considerations come into play, criteria for the measurement of the sentence that call into question the judge's sensitivity and discretion.  This Court, having evaluated the various reasons set out, is of the opinion that the first instance judges made good use of the powers granted to them and that the rulings adopted must be confirmed here.

With regard to Al Molqi's situation, the Public Prosecutor notes that by comparing, on the one hand, his personal and living conditions (born in a refugee camp, learning to use weapons from childhood, youth spent entirely in military camps); and, on the other hand, the objective gravity of his crimes, which border on barbarism, and the procedural behavior leading to a useless retraction, the reasons contrary to excessive indulgence are clearly preponderant over favorable reasons.  In this Court's opinion, the judgment is too severe. While agreeing on the obvious gravity of the facts, some remarks cannot be ignored, which militate in favor of the defendant.

[*Translation*]

In his procedural behavior, indeed, two moments must be highlighted: First, the defendant is open to admitting his crimes, and is  characterized by a serene self-reflection on his deeds. Subsequently, however, there is a sort of retraction, where the defendant actually tries to claim fighter status —which is contradicted, according to the defendants view of himself, by the charges against him being characterized as "terrorist."  The defendant — it is the Court's understanding — recognizes his responsibility, but denies that he is a terrorist.  This is why he chose to not cooperate with the investigators after the investigation revealed legal fact qualifications that the defendant cannot accept.  A tortuous and, if you like, questionable defense line, but not without fundamental dignity, which cannot be twisted against the proponent.

The gravity of the facts is not disputed.  However, we must recognize that this type of crime lacks a selfish component to make it appear intolerable, e.g., a massacre committed for the purpose of robbery, mafia and camorra crimes, rape and violence that have no other purpose than self-gratification.  Rightly or wrongly, Al Molqi believes that he is serving a "cause," for which he does not hesitate to expose his young life, without any prospect of profit.  It is not the Court's intention to exalt the gesture, which remains infamous, but cannot fail to recognize the thin thread that distinguishes this crime from similar, no less infamous crimes.

Finally, the defendant's dangerous nature is eminent but reflected, so to speak.  His criminal attitude results from external conditions, against which he too, in his own way, is fighting.  Since the penalty must be commensurate with the man and not with the circumstances of his actions, it seems to the Court that the attenuation linked to the "generic" that were granted to him does not contradict the sense of justice which sees in a man, and not in life, or history, or politics, the object of judgment.

Things are different for the masterminds or instigators.  Their personal conditions may be similar, but there is no certain proof of this in the process. Nothing is known for sure about what they said or thought; no one has sent an authentic memory of himself to this Court.  They remained in the dark, because that is where they act.  They do not expose themselves, they do not take risks.  Their face is the black, shapeless mask of terrorism.  There is no tangible proof of repentance, none of them said  "I will not do it again."  This Court is called to judge shadows, whose only distinctive feature is that they are persistently fearsome.  Granting them generics extenuating circumstances would be tantamount to granting a kind of credit card, to be spent in the future — as if to say, everything you

[*Translation*]

do will find ready indulgence in us.  The Court can only refer to the considerations already expressed by the first instance judges and acknowledge that there are no conditions for a different appreciation of their responsibility.

Generic extenuating circumstances are, therefore, to be confirmed limited to the defendants who benefited from them at the first instance.  The above considerations, which want to underline the serious and problematic aspect of said benefit, make the judgment of equivalence fully justified, with the aggravating withholdings, which the first instance judges (subject to the peculiar position of Abbas Issa).  It is, generally, more about the measurement of the sentence, a reduction of which is requested by various parties and with a variety of arguments.  The Court is of the opinion that concrete quantification cannot ignore the exceptional gravity of the facts, their unscrupulousness and even ferocity, the alarm aroused and the objective dangerous nature of the protagonists - which is the other side of their undeniable fanaticism.  There is no disproportion between the extent and nature of the offenses and the extent of the sanction, so that the penalties inflicted at first instance must be confirmed, with the following clarifications and corrections:

—    The offenses referred to in charges B), C) and B), limited to the hypothesis for which Abul Abbas, Al Molqi Magied, Fataier Abelatif, Al Assadi Amahad, Ziad El Omar, Ez El Din Badrakhan and Abbas Mohamed Issa were condemned, were extinguished by amnesty, with no preventing circumstances of a subjective nature;

—    With regard to Abdulrahim Khaled, the punishment envisaged for the most serious crime (charge F) has not alternative - life imprisonment - to which, due to the presence of several criminal hypotheses (Art. 72, CC), two months' day isolation must be added.  This is followed by legal interdiction, plus notification of the sentence (by posting it in the Municipality of Genoa and by publication in excerpt, once, in the newspapers "Il Secolo and" Il Lavoro ", at the expense of the convicted person); and probation for a period no less than three years;

—    Against Al Molqi Magied, Fataier Abelatif, Al Assadi Kaled, maintain the sentence issued on May 8, 1986 by the Genoa Court of Appeals, which became final on February 2, 1987:  crimes concerning carrying and possession of the weapons used in the raid.  The most recent jurisprudential orientation allows, as is well known, to consider a continuation even if the procedure already defined

47

concerns criminal cases that are punished with less severe legal penalties (Cass. June 21, 1986, Nicolini appeal).  The penalties against them must therefore be established as follows:

Thirty years' imprisonment for Al Molqi Magied, on the basis of thirty years (Art. 289 bis, CC), including any increase resulting from continuation;

Twenty-five years' imprisonment for Fataier Abelatif, on the basis of twenty-four years (Art. 289 bis, CC), increased by one year continuation;

Sixteen years' imprisonment for Al Assadi Ahmad, who already benefits from a mitigation pursuant to Art. 4, Law 15/1980, on the basis of fifteen years, increased by one year continuation.

— In the sentence imposed on Al Assadi Ahmad and Fataier Abelatif, the increase calculated for crimes other than those relating to weapons must be distinguished, to the extent of two months' imprisonment (see first instance sentence).  This penalty measure is covered by the amnesty referred to in Presidential Decree 865/86: hence the relative declaration.

—    Moot due to amnesty is the only crime still ascribed to Gandura Said (charge W).  His request for acquittal on the merits is without foundation.  He states that he lied about his personal details "for fear of reprisals"  By whom?  For what mysterious reasons? - given he was not aware of the facts, and did not cooperate with the investigation.

—    Abdulrahim Kaled is required to pay damages to the civil parties, jointly and severally with co-defendants already convicted at the first instance;

—    Abul Abbas, Ez El Din Badrakhan, Ziad El Omar, Al Molqi Magied, Fataier Abelatif and Al Assadi Ahmad are required to reimburse, jointly and severally, the expenses incurred by the civil parties for the present level of judgment, and Abdulrahim Kaled also to reimburse expenses for the previous degree, to be paid as follows:  Three million Lire to Ilsa Klinghoffer, Two million Lire to Lisa Klinghoffer, and Ten million Lire for the "Achille Lauro" company et al.

The Court confirms the rest of the challenged Judgment.

[*Translation*]

**For the aforementioned reasons:**

In view of Articles 209, 213, 523 of the Code of Criminal Procedure (CPC),

In partial reform of the sentence of 10 July 1986 issued by the High Court of Genoa, appealed by the Public Prosecutor and by the accused ABUL ABBAS, EZ EL DIN BADRAKHAN, ZIAD EL OMAR, ABDULRAHIM KALED, ABBAS MOHAMMED ISSA, AL MOLQI MAGIED, PATAIER ABBELATIF IBRAHIM, AL ASSADI AHMAD MAROUF, SA'AD YUSUF AHEAD YUSUF e GANDURA SAID MOWFRAQ,

Declares invalid, for generic reasons, the appeals filed by ABDULRAHIM KALED, BEN KADRA MOHAMED and SA'AD YUSUF, and sentences the appellants to pay the higher court costs;

Declares ABUL ABBAS also guilty of the crime under charge M);  AL MOLQI MAGIED of the crime referred to in charge P); FATAIER ABDELATIF and AL ASSADI AHMAD of the crime referred to in charge Q); ABDULRAHIM KALED of the crimes referred to in charges F), G), H) e T);  EZ EL DIN BADRAKHAN of the crime referred to in charge N);  and ZIAD EL OMAR of the crime referred to in charge O); and, considered the continuation of all the crimes as well as those for which they have already been convicted AL MOLQI MAGIED, FATAIER ABDELATIF, AL ASSADI AHMAD  with the Court of Appeal of Genoa judgment of May 8, 1986, which became final on February 2, 1987, whereby ABDULRAHIM KALED was sentenced in the first degree, determines the sentence in Life imprisonment plus Two months daytime isolation for ABUL ABBAS, ABDULRAHIM KALED, ZIAD EI OMAR and EZ EL DIN DABRAKHAN;  Thirty years' imprisonment for AL MOLQI MAGIED; Twenty-five years' imprisonment for FATAIER ABDELATIF; Sixteen years' imprisonment for AL ASSADI AHMAD;

For ABDULRAHIM KALED orders a legal interdiction and the publication of the sentence, by posting, in the Municipality of Genoa and publication as an excerpt, one time only, in the newspapers "Il Secolo XIX" and "Il Lavoro" at the expense of the convicted person; orders that Abdulrahim Kaled himself, having served his sentence, be subjected to a probation security measure for a period no less than three years;

In view of Article 1 et seq., Decree 865, December 16, 1986,

49

[*Translation*]

Declares not to proceed against ABUL ABBAS, AL MOLQI MAGIED, FATAIER ABDELATIF, AL ASSADI AHAMD, ZIAD EL OMAR, EZ EL DIN BADRAKHAN in relation to the crimes referred to in charges B), C), D) limited to the cases for which they were sentenced; with regard to ABBAS Mohamed Issa in relation to charges C) and D) limited to the cases for which he was sentenced; and with regard to GANDURA SAID, in relation to charger W, because the crimes were extinguished due to an amnesty;

Declares the Two-month sentence imposed on FATAIER ABDELATIF and AL ASSADI AHMAD condoned;

Sentences ABDULRAHIM KALED jointly and severally with the co-defendants already sentenced, to compensation for damages in favor of the civil parties;

Sentences ABUL ABBAS, EZ EL DIN BADRAKHAN, ZIAD EL OMAR, AL MOLQI MAGIED, FATAIER ABDELATIF, AL ASSADI AHMAD to reimburse, jointly and severally, the expenses incurred by the civil parties in the present proceedings and ABDULRAHIM KALED also the costs of the first instance trial, Three Million Lire payable to ILSA KLINGHOFFER, Two million for LISA KLINGHOFFER and Ten million for the "Achille Lauro and others" company;

Orders the proceeding against SA'AD YUSUF, limited to the charges under F), G), H), 1), L) and V, to be separated and placed on the judge's calendar again.

The Court confirms the rest of the challenged Judgment.

Genoa, May 23, 1987.

Judge Rapporteur                                              President
[*Signed*]                                                        [*Signed*]

REGISTERED BY THE COURT CLERK
on JULY 27 1987                                          *Seal of the Court*

50

[*Translation*]

[*Handwritten Notes*:]


*Cassation Appeal:*
*5-25-87        Defendants 9, 8, 13,10*
*                AG for 8, 5, 6*
*                xxx Boccioli for 13*
*                Mancini for 5, 9, 8, 15*
*                Boccherini for 2 and 3*
*                Bori for 4, 6, 7, 11, 12, and 1.*
*Court Clerk*
*Reports in absentia notified to the accused.*
*Judgment passed for Gandura Said*
*Proceedings to Cassation on 11.30.87*
*Court Clerk*

*The Court of Cassation on 5/10/88 declared inadmissible the appeals lodged by the Attorney General, by Abdulrahim Kaled, Abbas Mohamed Issa, Ben Kadra Mohamed, Abu Kifah, Al Assadi Ahmad Marouf, Jarbua Mohammed, Kazem Ali Bu. Rejects all other appeals.*
*Court Clerk*

*Judgment becomes final on 10.5.88 for all defendants, including Gandura.*
*Court Clerk.*

*13.6.88 Executive extracts for each accused (excluding the last 4) to the PG, Police Headquarters Genoa., Investigation Office.*
*Court Clerk*

*The Court of Appeal of Genoa established in Council Chamber on 11/29/1993, declared two years' prison condoned, the entire sentence* illegible *and the temporary sentence* illegible *of the heavier sentence imposed on Ben Kadra Mohammed with the sentence of 23.5.1985 of this court.*
*Genoa, 1.1994*
*Auxiliary*

*The Court of Appeal of Genoa, with regard to Articles 6, 127, 130 CPC, provides that the personal details of defendant BEL KADRA MOHAMED, born in Damascus (Syria) on 12.22.1953, be rectified in that of MONZER AL KASSAM, born in Yabrow, (Syria) on 1.7.1945.*
*Genoa, 12/18/1986.*

Court Clerk
L. SERVATO
[*Signed*]

# CERTIFICATION OF TRANSLATION

I, AURA M. COLMANNI, hereby certify under penalty of perjury that I hold a Master's Degree in Translation from Sorbonne University (E.S.I.T.), Paris, France; that I am competent to translate from Italian into English; and that the translation of the attached document - **Genoa Court of Appeals, May 23, 1987 Judgment** - is true and accurate to the best of my abilities.

_____

**AURA M. COLMANNI** - Translator

601 Massachusetts Ave, NW
Washington, D.C., 20001

November 3, 2020

6/87 Reg. Gen.

mod. 125



## REPUBBLICA ITALIANA
### IN NOME DEL POPOLO ITALIANO

## LA CORTE D'ASSISE DI APPELLO DI GENOVA

Composta dei Signori:

| | | | |
|---|---|---|---|
| Dott. Corrado | TANAS | Presidente | |
| " Gianfranco | BONETTO | Consigliere | |
| Sig. Silvano | PERFUMO | | |
| " Nicolò | ABBATTISTA | | |
| " Clara | GIGANTE | | Giudici |
| " Rodolfo | CALLEGARI | | Popolari |
| " Valeria | ZANINI | | |
| " Giuseppina | LAGNO | | |

ha pronunciato la seguente

### SENTENZA

nella causa (1)

Procedimento formale

c o n t r o

1) ABUL ABBAS, nato il 10/12/1948 ad Afrin
(Siria) e res.Tunisia (Tunisi) –
L A T I T A N T E – contumace

2) OZZUDIN BADRATKAN o EZ EL DIN BADRAKHAN,
nato nel 1946 in Giordania, res.Tunisi
(Tunisia) –
L A T I T A N T E – contumace

3) ZIAD EL OMAR, nato a El Oms o Damasco (Si
ria) nel 1950, res.in Tunisi (Tunisia)
L A T I T A N T E – contumace

N. 22/87 Reg. Sent.

MARCA DA BOLLO
€11,06

SENTENZA

in data 23.5.1987

MARCA DA BOLLO
€11,06

depositata il

**27 LUG. 1987**

Il Cancelliere
Il Segretario
(Massimo Bracc...)

Li 27 LUG. 1987
fatto avviso di che all'ar-
ticolo 151 C. p. p.

Il Cancelliere
Il Segretario
(Massimo Bracch)

(1) Procedimento formale o
per citazione diretta.

- 2 -

4) ABDULLRAHIM KALED, nato ad Adem (Yemen) nel 1936, res.
   Atene (Grecia) e dimorante in Tunisi (Tunisia) -
   L A T I T A N T E - *contumace*

5) ABBAS MOHAMMED ISSA, nato a Damasco (Siria) il 14/9/1961
   res. in Tunisi (Tunisia); arr.il 28/9/1985-
   D E T E N U T O - *presente*

6) BEN KADRA MOHAMED, NATO A Damasco (Siria) il 22/12/1953
   res.in Tunisi (Tunisia) -
   L A T I T A N T E - *contumace*

7) ABU KIFAH, di anni 30, res.Tunisi (Tunisia) Al Manzah, 6
   L A T I T A N T E - *contumace*

8) AL MOLQI MAGIED, nato ad Altagi il 10/7/1962, arr. il
   11/10/1985 -
   D E T E N U T O - *presente*

9) FATAIER ABDELATIF IBRAHIM, nato a Beirut (Libano) nel
   1965 ed ivi residente - arr.il 11/10/1985-
   D E T E N U T O - *presente*

10) AL ASSADI AHMAD MAROUF, nato a Damasco (Siria) l'8/2/1962
    res.in Beirut (Libano) - arr.il 11/10/1985 -
    D E T E N U T O - *presente*

11) JARBUA MOHAMED, nato ad Aleppo (Siria) nel 1958, res.
    Tunisi 'Tunisia) Al Manzah, 6 -
    L A T I T A N T E - *contumace*

12) KAZEM ALI BU, di anni 25 - res.Tunisi (Tunisia) Al Manzah
    n.6 -
    L A T I T A N T E - *contumace*

13) SA'AD YUSEF AHMAD YUSEF, nato a Tiro (Libano) nel

1962, res.Tunisi (Tunisia) -

L A T I T A N T E - *ANZI : DETENUTO, presente*

14) GANDURA SAID MOWFFAQ, nato in Damasco (Siria) il

10/3/1949; arr.il 26/10/1985-scarcerato il 10/7/86

elettivamente domiciliato presso l'Avv.E.Lamberti

di Genova -

L I B E R O - *contumace*

I M P U T A T I :

Proc.pen.9/86 R.G.

ABUL ABBAS, OZZUDIN BADRATKAN o EZ EL DIN BADRAKHAN, ZIAD
EL OMAR, ABDULLRAHIM KALED, ABBAS MOHAMMED ISSA, ABU KIFAH,
AL MOLQI MAGIED, FATAIER ABDELATIF IBRAHIM, AL ASSADI
AHMAD, JARBUA MOHAMED, KAZEM ALI BU, SA'AD YUSEF:

A) del reato p.e p. dagli artt.81 cpv., 110, 112 n.1 e 2,
648, 61 n.2 C.P. e 1 D.L. 15/12/79 n.625 conv.in legge
6/2/80 n.15 poichè, con più azioni esecutive di un medesimo
disegno criminoso, in concorso tra loro, ed in numero supe
riore a cinque, ed al fine di trarne profitto e di terrori
smo, nonchè di commettere i reati di cui sotto e promuoven
do ed organizzando la cooperazione nei medesimi, acquista-
vano, o ricevevano, in Genova, il passaporto norvegese n.
E0496903 intestato a Stale Wan; proveniente dalla rapina
in danno dello stesso Stale Wan, commessa in Genova l'8/8/
1985 nonchè due passaporti: uno marocchino intestato ad
Altarif Asdaad Mohamed, l'altro iracheno, intestato a Kala
Mohamed Adnan Zayyab, provento da delitto.
In Genova, fra il 28/9/1985 ed il 3/10/1985.

B) del reato p.e p. dagli artt.81 cpv., 110, 112 n.1 e 2
477, 482, 61 n.2 C.P. e art.1 D.L.15/12/79 n.625, conv.in
legge 6/2/80 n.15, perchè, con più azioni esecutive di un
medesimo disegno criminoso, in concorso tra loro ed in nu
mero superiore a cinque ed al fine di terrorismo, nonchè
di commettere i reati di cui ai capi seguenti e promuoven
do e organizzando la cooperazione nei reati medesimi, fal
sificavano i passaporti norvegesi, marocchini ed iracheno
di cui al capo precedente.
In Genova, fra il 28/9 ed il 3/10/85.

C) del reato p.e p. dagli artt.81 cpv., 110, 112 n.1 e 2,
489 C.P. e art.1 D.L. 15/12/79 n.625 conv.in Legge 6/2/80

n.15, perchè, con più azioni esecutive di un medesimo di
segno criminoso, in concorso tra loro ed in numero supe-
riore a cinque ed al fine di terrorismo, nonchè di com-
mettere i reati di cui ai capi seguenti e promuovendo ed
organizzando la cooperazione nei reati medesimi, faceva-
no uso di passaporti falsi marocchini (intestati alle ge-
neralità fittizie di Sadok Mohamed, Naser Omar Mohamed,
Naser Mohamed e Gemavi Mohamed, Altari Mohamed) ed irake
no (intestato a Kalaf Mohamed Adnan Zayneb).
In Genova, fra il 28/9 ed il 3/10/85.

D) del reato p.e p. dagli artt.81 pcv., 110, 112 n.2 e 2,
494 C.P. ed art.1 D.L. 15/12/79 n.625 conv.in Legge 6/2/
80 n.15, perchè con più azioni esecutive di un medesimo
disegno criminoso, in concorso tra loro ed in numero su-
periore a cinque ed al fine di terrorismo, nonchè di pro
curarsi un vantaggio, nonchè di commettere i reati di cui
ai capi seguenti e promuovendo ed organizzando la coope-
razione nei reati medesimi, attribuivano ad alcuni di lo
ro le false generalità di Stale Wan, Zerlenga Walter,
Alonso antonio, Diamantino Ribeira, Floros Petros, Alta-
rifi Assad.
In Genova, tra il 28/9 ed il 3/10/85.

ABUL ABBAS, OZZUDIN BADRATKAN o EZ EL DIN BADRAKHAN, ZIAD
EL OMAR, ABDULLRAHIM KALED, BEN KADRA MOHAMED, ABU KIFAH,
JARBUA MOHAMED, KAZEM ALI BU, SA'AD YUSUF:

E) dei reati p.e p. dagli artt.81 pcv., 110, 112 n.1, 61
n.2 C.P., 9, 10, 12 legge 14/10/74 n.497 e 1 D.L.15/12/79
n.625 conv.in Legge 6/2/80 n.15, poichè, con più azioni
esecutive di un medesimo disegno criminoso, in concorso
materiale e morale tra loro in numero superiore a cinque
persone, per finalità di terrorismo ed allo scopo di com
mettere i reati di sequestro di persona, aggravato dalla
finalità di terrorismo, lesioni aggravate, dirottamento
della M/N "A.Lauro", violenza privata ed altri atti di
violenza diretta a far valere istanze politiche (art.li
289 bis., 582, 585 C.P. e 1 D.L.625/79, 1138 C.N.), sen
za licenza dell'autorità e, comunque, illegalmente intro
ducevano nello Stato, dopo averli celati in un sottofon
do del serbatoio di benzina dell'autovettura Renault 9
targata tunisina 6/III/TV 38, condotta da Al Khadra, Abu
Kifah ed Abbas Mohamed Issa ed imbarcata sulla M/N "Habib"
in Tunisi il 27/9/1985 e giunta a Genova il giorno dopo,
detenevano e portavano in luogo pubblico ed aperto al
pubblico, n.4 mitra Kalashinkov AK calibro 7,62, n.8
bombe a mano, tipo ananas, n.9 detonatori, armi ed ordi
gni da guerra, nonchè n.3 caricatori per ogni mitra ac-
cennato, e un totale di non meno di n.360 munizioni di
vario tipo per arma da guerra.
In Genova e sulla M/N "A.Lauro", in acque nazionali, terri
toriali ed estere, dal 28/9 al 9/10/1985.

ABUL ABBAS, OZZUDIN BADRATKAN o EZ EL DIN BADRAKHAN, ZIAD
EL OMAR, ABDULLRAHIM KALED, ABBAS MOHAMMED ISSA, BEN KADRA
MOHAMED, ABU KIFAH, AL MOLQI MAGIED, FATAIER ABDELATIF
IBRAHIM, AL ASSADI AHMAD, KAZEM ALI BU, SA'AD YUSUF:

F) del reato p.e p. dagli artt.81 cpv. 110, 112 n.1,2,3 e
289 bis commi 1 e 3 C.P. perchè, in concorso tra loro, in
numero superiore a cinque e promuovendo ed organizzando la
cooperazione nel reato, con più azioni esecutive di un mede
simo disegno criminoso, dopo avere introdotto nel territo-
rio dello Stato Italiano ed aver trasportato a bordo della
"Lauro" battente bandiera nazionale ed ormeggiata nel por-
to di Genova, le armi, i detonatori e gli esplosivi di cui
al capo che precede, con lo specifico contributo dello Ziad
e dell'Abdullrahim Kaled, nei cui confronti sussistono le
aggravanti per aver promossa ed organizzata l'attività cri-
minosa, compiendo preventivi sopralluoghi sulla nave anzi-
detta e la crociera del 31/8/1985 e nell'esercizio della lo
ro autorità di capi militari degli altri, per averli indot-
ti a commettere il reato per finalità di terrorismo, seque-
stravano n.189 persone dell'equipaggio della nave, n.194
passeggeri di transito ed altri passeggeri cagionando volon
tariamente la morte di uno di questi, tale Leon Klinghoffer.
A bordo della nave nazionale "A.Lauro" in acque estere ed
internazionali a distanza di non meno di tre ore di naviga-
zione dalle coste egiziane, dal 7 al 9/10/1985.

G) del reato p.e p. dagli artt.81 cpv., 110, 112 n.1 e 2,
61 n.2 C.P., 1138 u.p. Cod.Navigazione; 1 D.L. 16/12/1979
n.625, convertito in legge 6/2/80 n.15, perchè con più azio
ni esecutive di un medesimo disegno criminoso, in concorso
tra loro, ed in numero superiore a cinque, ai fini della
perpetrazione del reato di sequestro di persona aggravato di
cui al capo che precede e di terrorismo, e promuovendo ed
organizzando la cooperazione nel reato, si impossessavano
della M/N "A.Lauro" battente bandiera nazionale, commetten
do il fatto con violenza e minacce con le armi di cui al ri
spettivo, superiore capo di imputazione, contro il comandan
te gli Ufficiali della stessa e commettendo, tra l'altro, il
fatto con mezzi fraudolenti, consistiti in pretesti per av
vicinarli.
Sulla nave nazionale "A.Lauro" in acque estere ed internazio
nali dal 7 al 9/10/1985.

ABUL ABBAS, OZZUDIN BADRATKAN o EZ EL DIN BADRAKHAN, ZIAD EL
OMAR, ABDULLRAHIM KALED, ABBAS MOHAMMED ISSA, ABU KIFAH, AL
MOLQI MAGIED, FATAIER ABDELATIF IBRAHIM, AL ASSADI AHMAD, KA-

./.

ZEM ALI BU, SA'AD YUSUF:

H) del reato p.e p. dagli artt.110, 112 n.1 e 2, 582,
583, 585 C.P. ed art.1 D.L. 15/12/79 n.625 conv.legge
6/2/80 n.15 perchè, in concorso tra loro essendo in nu
mero superiore a cinque, promuovendo ed organizzando la
cooperazione nel resto, per finalità di terrorismo,
esplodendo alcune raffiche di mitra, cagionavano a Lan-
gella Pasquale lesioni personali volontarie giudicate
guarite oltre il quarantesimo giorno e, cioè, in gior-
ni 136, senza postumi penalmente valutabili.
A bordo della M/N "A.Lauro" battente bandiera italiana
in acque internazionali il giorno 8/10/1985.

I) del reato p.e p. dagli artt.81 cpv., 110 n.1 e 2, 610
cpv. C.P. ed art.1 D.L. 15/12/1979 n.625 conv.in legge
6/2/80 n.15 perchè, con più azioni esecutive di un mede
simo disegno criminoso, in concorso tra loro in numero
superiore a cinque, promuovendo ed organizzando la coo
perazione nel resto ed al fine di terrorismo, con vio-
lenza esercitata con le armi, costringevano De Souza
Manuel ed Alberti Ferruccio a gettare in mare il cadave
re di Klinghoffer Leon.
A bordo della M/N "A.Lauro" battente bandiera italiana,
in acque estere, il giorno 8/10/1985.

L) del reato di cui agli artt.110, 112 n.1 e 2, 411 p.p.
61 n.2 C.P.; art.1 D.L.15/12/79 n.625, convertito in Leg
ge 6/2/80 n.15 perchè, in concorso tra loro, essendo in
numero superiore a cinque, per occultare il reato di cui
al capo precedente ed al fine di terrorismo, promuoven-
do ed organizzando la cooperazione nel reato, sopprime-
vano il cadavere di Leon Klinghoffer, gettandolo in mare.
Da bordo della M/N "A.Lauro", battente bandiera italiana,
in acque estere il giorno 8/10/1985.

ABBAS ABUL:

del reato di cui agli artt.81 cpv.306, 1, 2, 3, co. C.P.
e 1 D.L. 15/12/79 n.625, convertito in legge 6/2/80 n.15,
poichè per finalità di terrorismo, perseguendo intenti po
litici con la violenza, con più atti esecutivi di un mede
simo disegno criminoso, reclutando e scegliendo gli auto-
ri materiali dell'operazione, addestrandoli specificata-
mente a questa, munendoli di falsi documenti di identifi
cazione personale, di armi, ordigni esplosivi, denaro e
strutture logistiche, studiando e predisponendo anche per

iscritto un piano che precedeva il sequestro del natan
te, del suo equipaggio e dei passeggeri, onde ottenere
la liberazione di 51 detenuti nelle carceri israeliane,
contro la liberazione degli ostaggi in precedenza se-
questrati e con la minaccia, in parte attuata, di ucci
dere uno scelto a caso tra i passeggeri di nazionalità
statunitense, israeliana e brittannica fino a quando le
sue richieste non fossero state accolte, nonchè utiliz-
zando all'uopo, per fini illeciti, uomini e mezzi della
organizzazione politico-militare di appartenenza, costi
tuiva, promuoveva, organizzava e dirigeva, partecipando
vi, una banda armata finalizzata a perpetrare un reato
contro la personalità interna dello Stato Italiano, e,
in specie, di sequestrare la M/N "ACHILLE LAURO", il suo
equipaggio e i passeggeri di questa, onde realizzare
l'intento sopra accennato.
In Tunisi, acque nazionali ed internazionali, nel terri
torio Italiano ed in Genova, ove aveva iniziato il seque
stro anzidetto, fino al 9/10/1985.


EZ EL DIN BADRAKHAN alias OZZUDIN BADRATKAN:

N) del reato di cui agli artt.81 cpv. 306, 1°, 2° e 3° co.
C.P. e 1 D.L. 15/12/79 n.625, conv.con L.6/2/80 n.15, poi
chè per finalità di terrorismo, perseguendo intenti poli
tici con la violenza, con più atti esecutivi di un mede-
simo disegno criminoso, addestrando gli uomini prescelti
per l'esecuzione materiale del sequestro, munendoli di
falsi documenti d'identità personale, di armi, ordigni,
denaro e strutture logistiche, indirizzandone l'attività,
dirigeva, organizzava, sovveniva e partecipava ad un grup
po di persone costituito in banda armata allo scopo di
perpetrare un reato contro la personalità interna dello
Stato Italiano, consistente nel sequestro della M/N "Achil
le Lauro", del suo equipaggio e dei passeggeri di questa
onde ottenere in tal modo e con la minaccia, in parte at
tuata, di uccidere uno ogni cinque minuti, gli ostaggi di
nazionalità statunitense, israeliana e britannica, se non
fossero state accolte le richieste in questo senso, la li
berazione di 51 detenuti nelle carceri israeliane.
In tunisi, in acque nazionali ed internazionali, nel ter
ritorio italiano ed in Genova, ove aveva inizio il seque-
stro anzidetto, fino al 9/10/1985.


ZIAD EL OMAR:

O) del reato di cui agli artt.81 cpv., 306 1°, 2°, 3° co.
C.P. e 1 D.L. 15 dicembre 1979 n.625, conv.con L.6/2/80

n.15, poichè per finalità di terrorismo, perseguendo in-
tenti politici con la violenza, con più atti esecutivi
di un medesimo disegno criminoso, concorrendo all'adde-
stramento degli esecutori materiali del sequestro, mu-
nendoli di falsi documenti di identificazione persona-
le, di armi, ordigni esplosivi e denaro nonchè struttu
re logistiche, concorrendo a dirigerne ed indirizzarne
l'attività, organizzava, sovveniva e partecipava ad un
gruppo di persone costituito in banda armata finalizza
ta a perpetrare un reato contro la personalità interna
dello Stato italiano, consistente nel sequestro della
M/N "A.Lauro", del suo equipaggio e dei passeggeri del
la stessa onde ottenere, in tal modo con la minaccia,
in parte attuata, di uccidere, uno ogni cinque minuti,
gli ostaggi di nazionalità statunitense, israeliana e
britannica se non fossero state accolte le richieste
in tal senso, la liberazione di 51 detenuti nelle car
ceri israeliane.
In Tunisi, in acque internazionali e nazionali, sul ter
ritorio italiano ed in Genova, ove aveva inizio il se-
questro anzidetto, fino al 9/10/1985.

AL MOLQI MAGIED:

P) del reato di cui agli artt.81 cpv., 306 cpv. e u.c.
C.P. e 1 D.L. 15/12/79 n.625, conv.con L.6/2/80 n.15,
poichè per finalità di terrorismo, perseguendo intenti
politici con la violenza e con più atti esecutivi di
un medesimo disegno criminoso partecipava, dirigendo il
gruppo degli esecutori materiali del sequestro, ad un
gruppo di persone costituito in banda armata finalizza
ta a perpetrare un reato contro la personalità interna
dello Stato italiano, consistente nel sequestro della
M/N "Achille Lauro", del suo equipaggio e dei passeg-
geri della stessa, onde ottenere in tal modo e con la
minaccia, in parte attuata, di uccidere, uno ogni cin
que minuti, gli ostaggi di nazionalità statunitense,
israeliana e britannica se non fossero state accolte le
richieste in tal senso, la liberazione di 51 detenuti
nelle carceri israeliane.
In Tunisi, in acque internazionali e nazionali, sul ter
ritorio italiano ed in Genova, ove aveva inizio il se-
questro anzidetto, fino al 9/10/1985.

AL ASSADI AHMAD, ABDELATIF IBRAHIM FATAIER, JARBUA
MOHAMED:

Q) del reato di cui all'art.306 cpv. C.P. e 1 D.L.15/

12/79 .n.625 conv. con L.6/2/80 n.15, poichè per finalità di terrorismo, perseguendo intenti politici con la violenza, partecipavano ad un gruppo di persone costituito in banda armata finalizzata a perpetrare un reato contro la personalità interna dello Stato italiano, consistente nel sequestro della M/N "Achille Lauro", del suo equipaggio e dei passeggeri della stessa, onde ottenere in tal modo e con la minaccia, in parte attuata, di uccidere, uno ogni cinque minuti, gli ostaggi di nazionalità statunitense, israeliana e britannica se non fossero state accolte le richieste in tal senso, la liberazione di 51 detenuti nelle carceri israeliane.
In Tunisi, nel territorio dello stato italiano ed in Genova, fino al 9/10/1985.

ABU KIFAH e BEN KADRA MOHAMED:

R) del reato di cui agli artt.306 1° co. e cpv. C.P. e 1 D.L. 51/12/79 n.625, conv. con L.6/2/80 n.15, poichè per finalità di terrorismo, perseguendo intenti politici con la violenza, con più atti esecutivi di un medesimo disegno criminoso, partecipavano ed organizzavano, trasportando e conferendo le armi e gli ordigni esplosivi utilizzati dagli esecutori materiali del sequestro, ad un gruppo di persone costituito in banda armata finalizzata a perpetrare un reato contro la personalità interna dello Stato italiano, consistente nel sequestro della M/N "Achille Lauro", del suo equipaggio e dei passeggeri della stessa, onde ottenere in tal modo e con la minaccia, in parte attuata, di uccidere, uno ogni cinque minuti, gli ostaggi di nazionalità statunitense, israeliana e britannica se non fossero state accolte le richieste in tal senso, la liberazione di 51 detenuti nelle carceri israeliane.
In Tunisi e Genova, fino al 9/10/1985.

ABBAS MOHAMED ISSA:

S) del reato di cui agli artt.306, 1°, 2° e 3° co. e 1 D.L. 15/12/1979 n.625, conv. con L.6/2/1980 n.15, poichè, per finalità di terrorismo, perseguendo intenti politici con la violenza, con più atti esecutivi di un medesimo disegno criminoso, partecipava ed organizzava, conferendo e trasportando le armi e gli ordigni utilizzati dagli autori materiali del sequestro, nonchè recando le istruzioni scritte in merito all'operazione e svolgendo attività di controllo e direzione dell'operazione stessa, un gruppo di persone costituito in banda armata finalizzata a perpetrare un reato contro la personalità interna

dello Stato italiano, consistente nel sequestro della
M/N "Achille Lauro", del suo equipaggio e dei passeg-
geri del natante, onde ottenere in tal modo e con la
minaccia, in parte attuata, di uccidere, uno ogni cin
que minuti, gli ostaggi di nazionalità statunitense,
israeliana e britannica se non fossero state accolte
le richieste in tal senso, la liberazione di 51 dete
nuti nelle carceri israeliane.
In Tunisi e Genova, fino al momento del fermo.

ABDULLRAHIM KHALED (alias PETROS FLOROS):

T) del reato di cui agli artt.81 cpv. 306, 1°, 2° e
3° co. C.P. e 1 D.L. 15/12/79 n.625, conv.in L.6/2/
80 n.15, poichè per finalità di terrorismo, perseguen
do intenti politici con la violenza, con più atti ese
cutivi di un medesimo disegno criminoso partecipava,
organizzando e studiando la operazione di sequestro
di seguito indicata, istruendo e dirigendo gli ese-
cutori materiali della stessa, ad un gruppo di perso
ne costituito in banda armata finalizzata a perpetra
re un reato contro la personalità interna dello Sta-
to italiano, consistente nel sequestro della M/N
"Achille Lauro", del suo equipaggio e dei passeggeri
del natante, onde ottenere in tal modo e con la minac
cia, in parte attuata, di uccidere, uno ogni cinque
minuti, gli ostaggi di nazionalità statunitense, israe
liana e britannica se non fossero state accolte le ri
chieste in tal senso, la liberazione di 51 detenuti
nelle carceri israeliane.
In Tunisi, in acque nazionali ed internazionali ed in
Genova, ove aveva inizio l'accennato sequestro, fino
al 9/10/1985.

ABU ALI' KAZEM:

U) del reato di cui agli artt.81 cpv. 306, 1° e 2° co.
C.P. e 1 D.L. 15 dicembre 1979 n.625, conv.con L.6/2/80
n.15, poichè per finalità di terrorismo, perseguendo
intenti politici con la violenza e con più atti esecu-
tivi di un medesimo disegno criminoso, partecipava e
svolgeva funzioni organizzative, curando il trasferi-
mento in Italia dei componenti il gruppo degli esecu-
tori materiali del sequestro e la loro sistemazione, ad
una banda armata costituita per perpetrare un reato con
tro la personalità interna dello Stato italiano consi-
stente nel sequestro della M/N "Achille Lauro", del suo
equipaggio e dei passeggeri del natante, onde ottenere
in tal modo e con la minaccia, in parte attuata, di uc

- 11 -

cidere, uno ogni cinque minuti, gli ostaggi di naziona
lità statunitense, israeliana e britannica, se non fos
sero state accolte le richieste in tal senso, la libe-
razione di 51 detenuti nelle carceri israeliane.
In Tunisi, nel territorio dello Stato italiano ed in
Genova ove aveva inizio l'accennato sequestro, fino al
9/10/1985.

## SA'AD YUSUF AHMAD YUSUF alias NASER YOUSEF HISHAM:

V) del reato di cui agli artt.81 cpv. 306 1°, 2° e 3°
co. C.P. e 1 D.L.15/12/79 n.625 conv. con L.6/2/80 n.15,
poichè per finalità di terrorismo, perseguendo intenti
politici con la violenza, con più atti esecutivi di un
medesimo disegno criminoso, organizzavva, dirigendo e
predisponendo gli atti preparatori del sequestro di se
guito indicato e, in ispecie, il movimento e la siste-
mazione in Italia degli autori materiali del fatto, mu-
nendoli tra l'altro di denaro e documenti d'identità
falsificati, guidandoli e fornendo loro le informazioni
logistiche necessarie, curando costantemente il collega
mento con i dirigenti dell'operazione non presenti nel
territorio nazionale e, in genere, sovvenendo alle loro
necessità materiali in vista dell'indicata operazione,
svolgeva funzioni direttive e partecipava ad un gruppo
di persone costituitosi in banda armata finalizzata a
perpetrare un reato contro la personalità interna dello
Stato italiano, consistente nel sequestro della M/N
"Achille Lauro", del suo equipaggio e dei passeggeri
della stessa, onde ottenere in tal modo e con la minac
cia, in parte attuata, di uccidere, uno ogni cinque mi
nuti, gli ostaggi di nazionalità statunitense, israe-
liana e britannica se non fossero state accolte le ri-
chieste in tal senso, la liberazione di 51 detenuti nel
le carceri israeliane.
In tunisi, in varie città italiane ed in Genova, ove ave
ve inizio il menzionato sequestro, fino al 9/10/1985.

## GANDURA MOWFFAQ:

W) del reato p.e p. dagli artt.61 n.2, 495, 1°, 2° e 3°
co. n.2 C.P., art.1 D.L. 15/12/79 n.625, conv.in L.6/2/
80 n.15, perchè, al fine di terrorismo, dichiarava fal-
samente di chiamarsi Houssari Ibrahim, durante un inter
rogatorio reso all'A.G. come imputato.
Accertato in Genova il 26/10/1985.

Y) del reato p.e p. dagli artt.61 n.2, 372 C.P., art.
1 D.L. 15 dicembre 1979 n.625, conv.in L.6/2/80 n.15,
perchè, al fine di terrorismo, deponendo come teste
davanti all'A.G., affermando il falso, negava il vero
e tacava ciò che sapeva intorno ai fatti sui quali era
interrogato, ed, in particolare Floros Petros, alias
Abdullrahim Kaled.
Accertato in Genova, il 26/10/1985.

Z) del reato p.e p. dall'art.378, 61 n.2 C.P., art.
1 D.L. 15 dicembre 1979 n.625 conv. in L.6/2/80 n.15,
perchè, al fine di terrorismo, dopo la commissione dei
delitti di cui ai capi di accusa fino alla lettera V,
e senza concorrere negli stessi, aiutava il predetto
Floros Petros, alias Abdullrahim Kaled, che egli sa-
peva coinvolto, come imputato di gravi reati, nel
procedimento penale afferente la vicenda della "Achil
le Lauro", non rivelando di conoscerlo con le sue ge-
neralità vere o di copertura, il di lui indirizzo abi
tativo; il suo ruolo nell'ambito della F.L.P. e nella
suddetta vicenda criminosa.
Accertato in Genova, il 26/10/1985.

A P P E L L A N T I

Tutti gli imputati nonchè il P.M. nei confronti di tut
ti gli imputati ad eccezione di Abu Kifah e Kazem Ali
Bu, avverso la sentenza della Corte di Assise di Geno
va del 10/7/1986 che così decideva:

Visti gli artt.483 - 488 C.P.P.,

d i c h i a r a

Abul Abbas, Ozzudin Badratkan o Ez El Din Badrakhan,
Ziad El Omar

c o l p e v o l i

del delitto di ricettazione ascritto nel capo a) della
rubrica, limitatamente alla ipotesi del passaporto in-
testato a Stale Wan ed escluso il riferimento all'art.
81 cpv. C.P.;
del delitto di falsificazione dello stesso passaporto,
ascritto nel capo b), escluso il riferimento all'art.
81 capv. C.P.;
del delitto di uso di passaporti falsi, così come ascrit
to nel capo c);
del delitto di attribuzione di false generalità, così co
me ascritto nel capo d);

- 13 -

del delitto di introduzione, detenzione e porto illegale
di armi così come ascritto nel capo e);
del delitto di sequestro di persona a scopo di terrori-
smo, così come ascritto nel capo f);
del delitto di impossessamento della motonave "Achille
Lauro" ascritto nel capo g), escluso il riferimento all'art.
81 cpv. C.P.
del delitto di lesione personale, così come ascritto nel
capo h);

d i c h i a r a

Abdullrahim Kaled colpevole:
del delitto di ricettazione ascritto nel capo a) della ru-
brica, limitatamente alla ipotesi del passaporto intesta-
to a Stale Wan ed escluso il riferimento all'art.81 cpv.
C.P.;
del delitto di falsificazione dello stesso passaporto,
ascritto nel capo b), escluso il riferimento all'art.81
cpv. C.P.;
del delitto di uso di passaporti falsi, così come ascrit
to nel capo c);
del delitto di attribuzione di false generalità, così co
me ascritto nel capo d);
del delitto di introduzione, detenzione e porto illegale
di armi, così come ascritto nel capo e);

d i c h i a r a

Abbas Mohammed Issa colpevole:
del delitto di uso di passaporti falsi ascritto nel capo
c), esclusa l'aggravante di cui all'art.112 n.2 C.P.;
del delitto di attribuzione delle false generalità, ascrit
to nel capo d), esclusa la aggravante di cui all'art.112
n.2 C.P.;

d i c h i a r a

Ben Kadra Mohamed colpevole del delitto di introduzione,
detenzione e porto illegale di armi, così come ascritto
nel capo a) della rubrica;

d i c h i a r a

Al Molqi Magied, Fataier Abdelatif Ibrahim e Al Assadi
Ahmad Marouf

c o l p e v o l i

del delitto di ricettazione ascritto nel capo a) della ru
brica, limitatamente alla ipotesi del passaporto intesta-
to a Stale Wan, ed escluso il riferimento all'art.81 cpv.
C.P. ed esclusa l'aggravante di cui all'art.112 n.2 C.P.;

del delitto di falsificazione dello stesso passapor-
to, ascritto nel capo b), escluso il riferimento allo
art.81 cpv. C.P., ed esclusa l'aggravante di cui
all'art.112 n.2 C.P.;
del delitto di uso di passaporti falsi ascritto nel ca
po c), esclusa l'aggravante di cui all'art.112 n.2
C.P.;
del delitto di attribuzione di false generalità ascrit
to nel capo d), esclusa l'aggravante di cui all'art.
112 n.2 C.P.;
del delitto di sequestro di persona a scopo di terro-
rismo, ascritto nel capo f), esclusa per Al Molqi la
aggravante di cui all'art.112 n.3 C.P. e per Fataier
Abdelatif e per Al Assadi Ahmad Marouf le aggravanti
di cui all'art.112 n.2 e 3 C.P.;
del delitto di impossessamento della motonave "Achil
le Lauro", ascritto nel capo g), escluso il riferimen
to all'art.81 cpv. C.P. ed esclusa, per Fataier Abdela
tif e per Al Assadi Ahmad Marouf, l'aggravante di cui
all'art;112 n.2 C.P.;
del delitto di lesione personale ascritto nel capo h)
esclusa, per Fataier Abdelatif e Al Assadì Ahmad Marouf,
la aggravante di cui all'art.112 n.2 C.P.;
dichiara,inoltre, <u>Al Molqi Magied</u>:

c o l p e v o l e

del delitto di violenza privata e di soppressione di
cadavere, ascritto nei capi I e L, escluso il riferi-
mento all'art.110 C.P. ed esclusa le aggravanti di cui
all'art.112 n.1 e 2 C.P.;

d i c h i a r a

<u>Sa'ad Yusuf Ahmad Yusuf</u> colpevole: del delitto di ri
vettazione ascritto nel capo a) della rubrica, limita
tamente alla  ipotesi del passaporto intestato a Stale
Wan ed escluso il riferimento all'art.81 cpv. C.P.;
del delitto di falsificazione dello stesso passaporto,
ascritto nel capo b), escluso il riferimento all'art.
81 cpv. C.P.;
del delitto di uso di passaporti falsi, così come a-
scritto nel capo c);
del delitto di attribuzione di false generalità, così
come ascritto nel capo d);
del delitto di introduzione, detenzione e porto ille-
vale di armi, così come ascritto nel capo e);

d i c h i a r a

<u>Gandura Said Mowaffaq</u> colpevole del delitto di falsa

- 15 -

dichiarazione sulla propria identità personale, ascrit
ta nel capo v) della rubrica, escluse l'aggravante del
la finalità di terrorismo e l'aggravante di cui all'art.
61 n.2 C.P.; e

p e r t a n t o

concedendo ad Abbas Mohammed Issa, Al Molqi Magied,
Fataier Abdelatif Ibrahim, Al Assadi Ahmad Marouf, Gan
dura Said Mowffaq, le attenuanti generiche di cui allo
art.61 bis C.P. ed, inoltre, ad Al Assadi Ahmad Marouf,
l'attenuante di cui all'art.4 legge 6/2/80 n.15, consi
derando per Abbas Mohammed Issa le attenuanti generiche
prevalenti sulla ritenuta aggravante, ritenendo i delit
ti ascritti ai diversi imputati unificati dal vincolo
della continuazione,

c o n d a n n a

Abul Abbas, Ozzudin Badratkan o Ez El Din Badrakhan,
Ziad El Omar, ciascuno, alla pena dell'ergastolo, con
l'isolamento diurno per un periodo di due mesi;
Abdullrahim Kaled, alla pena della reclusione per sette
anni e sei mesi e della multa in lire tre milioni;
Abbas Mohammed Issa, alla pena della reclusione per sei
mesi;
Ben Kadra Mohamed, alla pena della reclusione per sei
anni e quattro mesi e della multa in lire un milione e
ottocentomila;
Al Molqi Magied, alla pena della reclusione per trenta
anni;
Fataier Abdelatif Ibrahim, alla pena della reclusione
per ventiquattro anni e due mesi;
Al Assadi Ahmad Marouf, alla pena della reclusione per
quindici anni e due mesi;
Sa'ad Yusuf Ahmad Yusuf, alla pena della reclusione per
sei anni e sei mesi e della multa in lire due milioni;
Gandura Said Mowffaq, alla pena della reclusione per ot
to mesi;
tutti in solido al pagamento delle spese processuali;
    Visti gli artt.29 e 32 C.P.

d i s p o n e

per Abul Abbas, Ozzudin Badratkan o Ez El Din Badrakhan,
Ziad El Omar, Abdullrahim Kaled, Ben Kadra Mohamed, Al
Molqi Magied, Fataier Abdelatif Ibrahim, Al Assadi Ahmad
Marouf e Sa'ad Yusuf Ahmad Yusuf la interdizione perpe-
tua dai pubblici uffici, per Abul Abbas, Ozzudin Badratkan
o Ez El din Badrakhan, Ziad El Omar, la interdizion'e le
gale, e per gli altri imputati sopra-indicati la interdi

- 16 -

zione legale durante il periodo della pena.
     Visti gli artt.36 C.P.-484 C.P.P.

                    d i s p o n e

la pubblicazione della sentenza di condanna all'erga
stolo, mediante affissione, nel Comune di Genova,

                    d i s p o n e

altresì la pubblicazione della stessa sentenza, per
una sola  volta e per estratto, sui giornali "Il Se-
colo XIX" ed "Il Lavoro", a spese dei condannati.
     Visti gli artt.228 e 230 C.P.

                    d i s p o n e

che, a pena espiata, Al Molqi Magied, Fataier Abde-
latif Ibrahim ed Al Assadi Ahmad Marouf siano sotto
posti alla misura di sicurezza della libertà vigila
ta per un periodo di tempo non inferiore a tre anni.
     Visti gli artt.240 C.P. e 622 C.P.P.

                    d i s p o n e

la confisca del proiettile e dei due bossoli seque-
strati e la restituzione ai rispettivi proprietari
di tutti gli indumenti e gli altri oggetti sequestra
ti ad eccezione del denaro che rimane a garanzia
del pagamento dei crediti indicati nell'art.189 C.P.;
     Visti gli artt.185 C.P. - 489 C.P.P.

                    c o n d a n n a

in solido, Abul Abbas, Ozzudin Badratkan o Ez El Din
Badrakhan, Ziad El Omar, Al Molqi Magied, Fataier
Abdelatif Ibrahim, Al Assadi Ahmad Marouf, al risar
cimento danni nei confronti delle parti civili, dan
ni da liquidarsi in separato giudizio; assegna alle
Parti civili Lisa Klinghoffer e Ilsa Klinghoffer la
somma di Lire trentamilioni ciascuna, da imputarsi
nella liquidazione definitiva, condanna inoltre gli
stessi imputati, in solido, a rivalere le parti ci
vili delle spese di costituzione e rappresentanza
nel procedimento, liquidate a favore di Lisa Klin-
ghoffer in complessive lire tre milioni, a favore
di Ilsa Klinghoffer in complessive lire otto milio
ni, a favore delle società "Achille Lauro ed altri",
in complessive Lire dodici milioni, a favore di Lan
gella Pasquale in complessive lire un milione e cin
quecentomila, a favore di Scala Ciro in complessive
lire un milione e cinquecentomila, a favore di La-
vinio De Luca in complessive lire un milione e due

- 17 -

centomila.
        Visto l'art.479 C.P.P.

                a s s o l v e

Abdullrahim Kaled dai delitti ascrittigli nei capi f),
g) e h) per insufficienza di prove;

                a s s o l v e

Abbas Mohammed Issa, dai delitti di ricettazione e fal
sificazione del passaporto intestato a Stale Wan, per
non aver commesso il fatto;

                a s s o l v e

Abul Abbas, Ozzudin Badratkan o Ez El Din Badrakhan,
Ziad El Omar, Abdullrahim Kaled, Abbas Mohammed Issa,
Fataier Abdelatif Ibrahim, Al Assadi Ahmad Marouf,
Sa'ad Yusuf Ahmad Yusuf, dai delitti loro ascritti nei
capi I e L, per non aver commesso il fatto;

                a s s o l v e

Abbas Mohammed Issa, Ben Kadra Mohamed, Sa'ad Yusuf
Ahmad Yusuf, dai delitti loro ascritti nei capi f) e
g), Abbas Mohamme Issa e Sa'ad Yusuf Ahmad Yusuf dal
delitto loro ascritto nel capo h), per non aver commes
so il fatto;

                a s s o l v e

Abul Abbas, Ozzudin Badratkan o Ez El Din Badrakhan
Ziad El Omar, Abdullrahim Kaled, Abbas Mohammed Issa,
Ben Kadra Mohamed, Al Molqi Magied, Fataier Abdelatif
Ibrahim, Al Assadi Ahmad Marouf, Sa'ad Yusuf Ahmad
Yusuf  dal delitto di banda armata a ciascuno singolar
mente ascritto, perchè il fatto non sussiste;

                a s s o l v e

Gandura Said Mowffaq  dai delitti di falsa testimonian
za e favoreggiamento personale, ascrittogli nei capi
Y e Z, · perchè il fatto non sussiste.
        Visti gli artt.10 C.P., 5 e 477 C.P.P.

                d i c h i a r a

non doversi procedere nei confronti di Abul Abbas,
Ozzudin Badratkan o Ez El din Badrakhan, Ziad El Omar
Abdullrahim Kaled, Abbas Mohammed Issa, Al Molqi Magied,
Fataier Abdelatif Ibrahim, Al Assadi Ahmad Marouf,
Sa'ad Yusuf Ahmad Yusuf, in relazione ai delitti di ri
cettazione e di falsificazione dei passaporti marocchi
no ed iracheno, trattandosi di delitti risultati commes

- 18 -

si all'estero, così modificate le imputazioni di cui
ai capi a) e b), mancando la richiesta del ministro
di Grazia e Giustizia.
     Visti gli artt.407 e 412 C.P.P.

                    d i c h i a r a

relativamente a Abu Kifah, a Jarbua Mohamed e a Kazem
Ali Bu, la nullità del decreto di citazione e dell'or
dinanza di rinvio a giudizio, per mancata costituzio-
ne del rapporto processuale perchè vi è incertezza as
soluta sulla persona dell'imputato.

                    d i c h i a r a

infine, interamente scontata la pena inflitta a Gandu
ra Said Mowffaq e

                    d i s p o n e

conseguentemente, la sua immediata scarcerazione se
non detenuto per altra causa.

- 19 -

f a t t o

Il 3 ottobre 1985 la motonave "Achille Lauro", di
bandiera italiana, salpava da Genova per una crociera
destinata a toccare i porti di Napoli, Alessandria, Port
Said, Ashod, Limassol e Pireo, prima di rientrare a quello
di partenza. Aveva a bordo 673 passeggeri, cui se ne aggiun
geva una cinquantina a Napoli, e circa 400 persone di equi
paggio. Dopo quattro giorni di tranquilla navigazione il
7 ottobre la nave lasciava il porto egiziano di Alessandria,
dove erano sbarcati circa 600 passeggeri che, dopo una visi
ta alle Piramidi, sarebbe stati reimbarcati al successivo
scalo di Port Said. Alle 13,15, quando la nave si trovava
a dieci miglia dalla costa, due individui armati di mitra
e bombe a mano facevano irruzione sul ponte di comando e
intimavano al Comandante Gerardo De Rosa di fermare le macchi
ne "per evitare spargimento di sangue". I due, in seguito
identificati negli attuali imputati Al Molqi Magied e Al
Asker Bassam, ordinavano via radio a passeggeri e membri
dell'equipaggio di concentrarsi nella sala degli arazzi,
sotto la sorveglianza di complici, a loro volta identifica
ti in Fataier Ibrahim e Al Assadi Ahmad Marouf. Mentre la
riunione dei passeggeri era in corso un marinaio, tale

- 29 -

Langella Pasquale, avendo insospettito i malviventi con un
movimento mal interpretato, veniva fatto segno a colpi di
arma da fuoco esplosi per terra e raggiunto da schegge di
proiettile che lo ferivano alle gambe, cagionandogli lesio
ni dalle quali guarirà in complessivi giorni 136.    Nella
sala degli arazzi i passeggeri di nazionalità angloamericana,
complessivamente 18, venivano separati dagli altri e sistema
ti su un lato della sala, al centro della quale i terroristi
disponevano taniche di gasolio, ammonendo gli ostaggi che non
avrebbero esitato a far saltare la nave al primo tentativo
di rivolta.    Completata questa operazione, e dopo che a una
parte dell'equipaggio era stato consentito di raggiungere i
rispettivi posti di manovra, veniva intimato al Comandante
di riprendere la navigazione verso il porto siriano di Tar-
tous. Dell'avvenuto sequestro della nave  e della presa in
ostaggio dei passeggeri il Comandante informava le autorità
portuali di Port Said nel corso di una breve conversazione
radio, avvenuta sotto la minaccia delle armi dei dirottatori.
Altro messaggio radio il Comandante De Rosa era costretto a
lanciare, attorno alle ore 18 di quello stesso giorno, per
intimazione dei dirottatori, i quali chiedevano la liberazio
ne  di cinquanta Palestinesi detenuti nella Stato di Israele,
e in particolar modo di tal Al Qantari, protagonista di un
atto terroristico nella stato ebraico e ivi catturato e
imprigionato.    Durante la navigazione i dirottatori annun-
ciavano al Comandante che era loro intenzione, raggiunta la



- 21 -

Siria, scendere a terra con gli osaggi statunitensi (che nel
frattempo erano stati separati da quelli di nazionalità bri-
tannica e concentrati in un ponte sottostante quello di coman
do). Analoghe dichiarazioni fornivano ad alcuni ostaggi, pre
cisando che trattative sarebbero state condotte a terra per
il tramite dei consoli inglese e americano, e che se tali trat
tive non si fossero concluse positivamente gli ostaggi sarebbe
stati uccisi uno per uno.    La mattina del successivo 8 ottobr
la nave giungeva in vista del porto siriano di Tartous e veniv
fatta ancorare a circa sette miglia dalla costa, la presenza
di secche impedendo un maggior avvicinamento. Alle 11,30 i
dirottatori stabilivano un contatto radio con la stazione siri
na: il dirottatore impegnato nella conversazione appariva dapp
ma esultante ma poi, via via che il dialogo in lingua araba
proseguiva, propenso a mostrare segni sempre più evidenti di
crescente irritazione.  Dalla registrazione di quella conversa
zione si apprenderà, in seguito, che i dirottatori sollecitava
no un intervento della Croce Rossa Internazionale e dell'Amba
sciatore americano, e minacciavano di far saltare la nave se
aerei o imbarcazioni militari si fossero ad essa avvicinati.
Si constaterà, inoltre, che le autorità siriane, di fronte
a tali richieste, cercavano di tergiversare e, nello sostanza,
non apparivano disposte ad alcuna collaborazione con l'atto di
terrorismo in corso.  Sta di fatto che i quattro dirottatori
avviavano fra loro una fitta consulatazione, palesando un fort
stato di turbamento.  Ea un certo punto quello di loro che app
riva il capo — l'attuale imputato Al Molqi — si allontanava da
ponte di comando, per ritornarvi dopo un quarto d'ora cir
recando con sè due passaporti. Mostrandone uno al Comandante

- 22 -

faceva un segno col dito e il suo compagno Al Asker, unico
dei quattro in grado di esprimersi in inglese, spiegava al
De Rosa che con quel gesto il capo dei dirottatori aveva inte
so significare che il titolare del passaporto era stato il
primo a essere ucciso. Il passaporto esibito risultava inte
stato al cittadino americano Leon Klinghoffer. L'altro passa
porto che Al Molqi aveva con sè risultava intestato ad altra
cittadina americana, evidentemente prescelta quale prossima
vittima.    Alle 16,30 i dirottatori intimavano al Comandante
di salpare le ancore e far rotta verso la Libia. Mentre la
nave assumeva la direzione indicata gli ostaggi americani
venivano nuovamente condotti nella sala degli arazzi, sra e
riuniti agli altri passeggeri. Nel contempo veniva inviato un
nuovo messaggio via radio, col quale i terroristi annunciavano
che due passeggeri erano stati uccisi e che occorreva far
presto.    Più tardi, però, verso le 18, a seguito di nuove
conversazioni radio in lingua araba, i dirottatori, fattisi
improvvisamente euforici, annunciavano l'intervento di tal
Abul Kaled, a loro dire incaricato del capo dell'OLP Arafat,
e ordinavano di cambiare rotta: non più verso la Libia ma in
direzione di Port Said. La "Achille Lauro" giungeva in vista
del porto egiziano alle ore 6 del giorno dopo, 9 ottobre, e
venivano fatte calare le ancore a 15 miglia dalla costa.    A
questo punto si avviava tra la nave e il porto egiziano una
fitto scambio di messaggi e Al Asker, il dirottatore capace
di esprimersi in inglese, annunciava che il vero scopo del
nucleo terroristico era quello di fare una strage nel porto

- 23 -

isaraeliano di Ashod per poi riparare a bordo della nave:
sospettando di esser stati scoperti da qualcuno a bordo
erano stati però costretti a mutare il disegno originario
in quello consistente nel sequestro della nave e dei suoi
occupanti. L'intelocutore di terra dei dirottatori, il nomi
nato Abul Kaled che sarà in seguito meglio identificato nell'
attuale appellante Abul Abbas, nel corso delle accennate con-
versazioni sollecitava il capo del commando Al Molqi, che pron
tamente adempiva all'incarico, di avvertire il comandante e il
personale di bordo che il loro vero obbiettivo era quello indi
cato, e cioè un raid nel porto di Ashod, non il sequestro della
nave. Abul Abbas desiderava si sapesse che la loro iniziativa
non era di natura terroristica, e si scusava col Comandante
per quanto era accaduto per la sopravvenuta necessità di modi
ficare il piano originario. Alle 16,30 del 9 ottobre il seque
stro della nave, durato complessivamente 51 ore, aveva termine.
I quattro dirottatori si allontanavano su un rimorchiatore
egiziano e gli ostaggi dell' "Achille Lauro" venivano restituiti
al loro stato di libertà.

     Le autorità egiziane assumevano la direzione dell'inchie
sta, che si protraeva per qualche giorno. La mattina dell'11
ottobre i quattro dirottatori venivano avviati a bordo di un
aereo egiziano alla volta di Tunisi, per essere consegnati all'
OLP. L'aereo veniva intercettato in volo da velivoli militari
statunitensi e costretto ad atterrare all'aeroporto siciliano
di Sigonella. Ivi i quattro terrosisti, dopo concitate vicende,
venivano presi in consegna dai Carabinieri mentre agli altri
occupanti l'aereo egiziano era permesso di ripartire.

- 24 -

Procedimento penale era insaturato dalla Procura della
Repubblica di Siracusa, contestualmente ad altro avviato
dalla Procura della Repubblica di Genova, sul presupposto
della rispettiva competenza territoriale. Il 30 ottobre
1985 la Corte di Cassazione, risolvendo il conflitto ଉ
sollevato dai due uffici menzionati, dichiarava la competen
za della Procura di Genova, presso cui l'istruttoria veniva
concentrata.

Interrogati nell'immediatezza del fatto i quattro dirotta
tori affermavano di aver iniziato la loro impresa in Libia,
con la collaborazione organizzativa di tal Ziad El Omar: il
loro intento era quello di compiere un raid terroristico
contro lo Stato di Israele. Ammettevano di aver sequestrato
la nave e preso in ostaggio i passeggeri, ma negavano di aver
ucciso il Klinghoffer e perfino di aver avuto notizia della
sua morte.

Intanto l'attenzione degli inquirenti si soffermava su
tal Abbas Mohamed Issa, cittadino siriano, che il 28 settem
bre 1985 - e dunque prima dell'inizio della crociera dell'
"Achille Lauro - era stato arrestato a Genova dalla Guardia
di Finanza, perchè trovato in possesso, all'atto dello sbarco
dal traghetto tunisino "Habib", di due passaporti, uno marocchi
no e uno iracheno, intestati a persone diverse. Il fermato
ammetteva di militare nel "Fronte per la Liberazione della
Palestina", diretto da Abul Abbas, e di esser stato incaricato da
costui, del quale da vari anni era guardia del corpo, di reca-
pitare a Genova una lettera destinata a un "commando" del
FLP che operava in questa Città e che si preparava a sequestra

- 25 -

re una nave israeliana per ottnere lo scambio con prigionieri
palestinesi. La lettera in questione conteneva le istruzioni
per l'impresa ed era stata da lui distrutta prima di essere
arrestato.

Altro personaggio su cui insisteva l'attenzione degli
inquirenti era tal Gandura Said Mowffaq, tratto in arresto
a Roma per detenzione di passaporti falsi e autoproclamatosi
"tenente colonelle" dell'OLP (Organizzazione per la liberazio
ne della Palestina"). Condotto a Genova e sottoposto a rico
gnizione da parte di Al Assadi, che dei quattro arrestati a
Sigonella era stato il primo a dar segno di voler collaborare
con gli inquirenti, veniva riconosciuto come militante dell'
OLP impeganto in attività organizzative proprie di tale movi
mento. Ciò nondimeno il Gandura insisteva nel proclamare che
la propria identità era quella risultante da uno dei falsi
passaporti trovati in suo possesso (Hussari).

L'atteggiamento collaborativo dell'Al Assadi era ben
presto imitato dai tre suoi compagni, che nel corso di vari
e diffusi interrogatori fornivano una dettagliata ricostruzio
ne della vicenda. Dalle loro rivelazioni si apprendeva quanto
segue.

Nell'estate del 1985 i quattro futuri terroristi - Al
Molqi, Al Asker, Fataier e Al Assadi - si trovavano nel campo
di addestramento militare di Bashar (Algeria) agli ordini di
Ez El Din Badrakhan. Dallo stesso Badrakhan erano stati segna
lati ad Abul Abbas, responsabile del FLP, come idonei alla
realizzazione di un'impresa cui lo stesso Abbas attendeva da
qualche tempo: doveva trattarsi di un'iniziativa terroristica

– 26 –

che ponendosi in contrasto con la strategia del negoziato,
per-seguita in quel tempo dall'OLP di Arafat (di cui il FLP
di Abul Abbas era una componente minoritaria) dimostrasse la
maggior produttività del terrorismo, che Abul Abbas intendeva
estendere ai paesi terzi, rispetto alla linea diplomatica
di Arafat.   Dal campo militare di Bashar i quattro  – insie
me con un quinto candidato terrorista, tale Jarbua Mohamed,
poi escluso dall'impresa per ridotta attitudine fisica –
erano stati trasferiti al campo di Birar e di qui a Tunisi,
dove si erano incontrati con Abul Abbas.  Alla fine di agosto,
separatamente, erano stati avviati a Roma, dove avevano fruito
dell'assistenza logistica  di Sa'Ad Yusuf Ahmad, esponente di
spicco del FLP.  Costui nel mese di settembre aveva condotto
a Genova i quattro componenti il futuro nucleo operativo,
facendoli incontrare  con Abdullrahim Kaled, tenente colonnello
del FLP, che a scopo ricognitivo aveva effettuato nei mesi
precedenti almeno una crociera, se non due, sull' "Achille
Lauro" per mettere a punto i particolari dell'impresa.  Il
3 ottobre i componenti del nucleo operativo avevano ricevuto
le armi e le munizioni di cui si serviranno a bordo: esse
erano giunti a Genova, a mezzo del traghetto Habib, su una
autovettura  condotta dal già nominato (e arrestato) Abbas
Issa e da tali Ben Kadra e Abu Kifah. Quel giorno, il 3 otto
bre, si erano trovati a Genova, riuniti in un albergo, i
quattro dirottatori designati, il loro accompagnatore Sa'Ad
Yusuf, i vettori delle armi ~~Ben Kadra e~~ Ben Kadra e Abu Kifah,



- 27 -

Abdullrahim Kaled; il responsabile del campo militare di
addestramento Ez El Din Badrakhan, e Ziad El Omar, giunto a
Genova due giorni prima da Tunisi con le ultime istruzioni
verbali, da affidare al capo del nucleo operativo, Al Molqi.
In tutto dieci persone, riunite all'Albergo  Laurens. Nel
pomeriggio di quello stesso 3 ottobre i componenti del nucleo
operativo – Al Molqi, Fataier, Al Asker e Al Assadi, avevano
occupato le cabine loro prenotate da Sa'Ad Yusuf sull' "Achille
Lauro". Insieme con loro si era imbarcato anche Abullrahim
Kaled che peraltro ad Alessandria, adducendo un'improvvisa
malattia della moglie, era sbarcato dalla nave prima che il
sequestro della stessa fosse cominciato.  Di qui in avanti le
vicende si era sviluppate come già sommariamente descritto.

L'imputato Al Molqi Magied si dichiarava personalmente
responsabile del ferimento del marinaio Langella. Egli spiega
va che, avendo intimato a tutti di riunirsi nella sala da
pranzo, non era stato obbedito dal Langella: per questo aveva
sparato una raffica di mitra sul pavimento e una pallottola
di rimbalzo o una scheggia aveva ferito il marinaio a un pol-
paccio.  Mentre, poi, la nave si trovava al largo di Tartous
erano state avviate conversazioni radio con le autorità siria
ne al fine di ottenere, con la mediazione di questa, l'inter-
vento della Croca Rossa Internazionale dell'Ambasciatore ameri
cano. Al Molqi aveva avuto l'impressione che i siriani lo pren
dessero in giro. Si era consultato con i compagni ed era giunto
alla conclusione che per sbloccare la situazione non restasse
che dare il via all'uccisione degli ostaggi.  Poco dopo le 15,
pertanto, era sceso sul ponte dove si trovava il Klinghoffer,
che a causa della sua condizione di paralitico non era stato



- 28 -

riunito agli altri ostaggi. Ivi aveva ingiunto a un cameriere
portoghese di trascinare a poppa la carrozzella del Klinghoffer;
quindi aveva sparato due colpi contro costui, al capo e al petto.
Poi aveva intimato al portoghese di gettare in mare in cadavere,
ma il cameriere non ce l'aveva fatta. Allora aveva bloccato un
italiano, altro membro dell'equipaggio, costringendolo ad aiuta
re il portoghese a sollevare il cadavere e a scagliarlo in mare.
Quindi aveva costretto i due, in preda a un'evidente crisi ner-
vosa, a pulire il pavimento sporco di sangue. Si era deciso a
uccidere l'americano — spiegava l'imputato — perchè fosse chiaro
a tutti che i dirottatori non avevano pietà per nessuno: proprio
come gli Americani, che armando Israele, uccidevano o facevano
uccidere, senza distinzione, donne, bambini e invalidi del popolo
palestinese.

Il cameriere portoghese De Souza Manuel e il marittimo
italiano Alberti Ferruccio confermavano, per la loro parte, il
racconto del terrorista.

Si tentava, nel corso dell'istruzione, di approfondire le
ragioni ideologiche e gli scopi pratici dell'azione terroristica.
Sul punto le dichiarazioni degli inquisiti, nonostante la loro
conclamata volontà di collaborare, non apparivano per nulla
illuminanti. Essi sostenevano che il vero scopo dell'operazione
era un raid da effettuarsi nel porto israeliano di Ashod: siccom
casualmente scoperti a bordo della nave erano stati costretti,
all'ultimo momento, a mpdificare il piano e a sequestrare nave
e passeggeri, evento, questo, che non faceva parte del pro
getto originario. Gli imputati, tuttavia, non riuscivano a chia
rire  in che cosa dovesse consistere l'asserito raid nel porto
israeliano. In proposito fornivano, in distinte riprese, versio
ni fra loro contrastanti. In un primo tempo asserivano esser

9

-23-

loro intenzione attaccare la dogana di Ashod, uccidere funzio
nari israeliani e assumere il controllo del porto; più avanti,
che volevano compiere un'azione suicida, sparare raffiche di
mitra e immolarsi facendo esplodere le bombe che avrebbero
portato con loro.  Stando a un'altra versione si riprometteva
no di prendere in ostaggio i passeggeri americani e chiedere
agli Israeliani, dopo che la nave aveva attraccato ad Ashod,
lo scambio con i Palestinesi detenuti in quel Paese, e in caso
di mancata risposta uccidere un ostaggio ogni cinque minuti,
sequestrare la nave e fare rotta verso un altro porto. Secondo
un'altra versione il piano consisteva nel colpire  le imbarca-
zioni israeliane che nel porto di Ashod si fossero avvicinate
alla nave, impadronirsi della sala di sbarco, ammazzare tutti
quelli che vi si trovavano e poi ritornare alla nave, seque-
starla e chiedere lo scambio dei prigionieri.  Ancora: si pensa
va di sbarcare ad Ashod, catturare il maggior numero possibile
di Israeliani e proporre il loro scambio con i prigionieri
palestinesi detenuti in Israele: se lo scambio non fosse stato
accordato essi dirottatori sarebbero morti insieme agli ostaggi.
Oppure: non si voleva uccidere nessuno, ma solo entrare nel
porto di Ashod, esigere la liberazione dei Palestinesi e torna
re o bordo con questi o farsi uccidere sul sacro suolo palestine
se: il sequestro della nave non era previsto neppure come
ipotesi alternativa. Una variante di questa versione escludeva
il ritorno a bordo e prevedeva il rimpatrio via terra, da Ashod
    Tutti questi confusi e contraddittori disegni apparivano
comunque impraticabili. lo sbarco di armati ad Ashod, avuto

- 30-

riguardo all'imponenza dei servizi di sicurezza israeliani
funzionanti in quel porto (e ben noti ai Palestinesi, se non
altro per la precedente ricognizione effettata da Abullrahim
Kaled) era sicuramente inattuabile; nè di tale progetto i
dirottatori avevano mai fatto cenno al Comandante o ad altri
nelle ore successive al sequestro. L'azione terroristica, del
resto, era stata concretamente avviata quando le circostanze
ambientali si presentavano più favorevoli: dopo, cioè, che la
maggior parte dei passeggeri era sbarcata per recarsi alle
Piramidi, il che faceva intendere che il momento dell'azione
era stato scelto in base a un piano ben meditato e non era
dovuto a circostanze contingenti. Infine, non risultava affatto
che durante la navigazione da Genova ad Alessandria i terrori
sti fossero stati scoperti o disturbati: gli stessi Al Assadi
e Al Asker ammettevano francamente che nessuna sopresa vi era
stata da parte di membri dell'equipaggio o di altri, e formulava
no il sospetto che il raid su Ashdod fosse un mero pretesto
destinato a coprire i veri obbiettivi dell'impresa, noti al
solo comandante del nucleo operativo, Al Molqi, che aveva ri-
cevuto, all'atto dell'imbarco, istruzioni verbali e segrete da
Ziad El Omar, non rivelate ai complici.

Il 18 novembre 1985, previo stralcio del relativo proce-
dimento, Abbas Issa e i quattro componenti il nucleo operati-
vo, venivano tratti a giudizio direttissimo davanti al Tribu-
nale di Genova per rispondere dei reati concernenti le armi;
e a conclusione del dibattimento, riconosciuti colpevoli dei
reati loro ascritti, venivano condannati a pene diverse.

- 31 -

Il successivo 20 novembre, accertato attraverso registra
zioni anagrafiche che l'imputato Al Asker Bassam era, all'epoca
dei fatti, minore degli anni diciotto, veniva disposto lo stral
cio della sua posizione per essere rimessa al competente Tribu
nale per i Minorenni.

Nei confronti degli altri imputati si procedeva con rito
formale. Davanti al Giudice istruttore si costituivano Parti
civili la società armatrice della nave, in persona del suo
Commissario straordinario e l'Associazione Internazionale dei
Giuristi Ebrei, la cui costituzione, peraltro, veniva dichiara
ta inammissibile.

Il Giudice istruttore disponeva la trascrizione e la tra
duzione di tutte le conversazioni radio di cui esisteva la do-
cumentazione e l'espletamento di vari accertamenti peritali.
In particolare, perizia autoptica  sui resti della vittima,
Leon Klinghoffer, recuperati in mare, consentiva di stabilire
che la morte dell'americano era stata istantanea e determinata
da colpo di arma da fuoco con ingresso in sede frontoparietale
destra e uscita in sede parietale sinistra; altro colpo di arma
da fuoco aveva attinto la vittima al torace; gli effetti
distruttivi  riscontrati al capo erano compatibili con l'azione
esplicata da un proiettile perforante animato da altissima
velocità e considerevole energia cinetica, del tipo dei proietti
li repertati a bordo della nave. Quanto al marinaio Langella
si accettava che egli aveva riportato una ferita da arma da
fuoco in regione poplitea destra, guarita senza postumi nel
termine  di gg. 136.

Infine, perizia balistica accertava che nell'impresa
terroristica erano state usate armi da guerra, tra cui fucili

- 32 -

d'assalto Ka-laschinkov automatici, a raffica con selettore, e bombe a mano tipo ananas.

A conclusione dell'istruttoria, nel corso della quale era risultato impossibile, per difficoltà frapposte dalle autorità monegasche, acquisire il nastro contenente la registrazione delle comunicazioni intercorse via radio, fra la nave e l'emittente di Monte Carlo, veniva ordinato il rinvio a giudizio degli imputati Abul Abbas, Ez El Din Bradakhan, Ziad El Omar, Abdullrahim Kaled, Abbas Mohamed Issa, Ben Kadra Mohamed, Abu Kifah, Al Molqi Magied, Fataier Abedelatif Ibrahim, Al Assadi Ahmad Marouf, Jarbua Mohamed, Kazem Ali Bu, Sa'Ad Yusuf Ahmad Yusuf, Gandura Said Mowffaq e Floros Petros per rispondere dei reati loro rispettivamente ascritti.

In apertura di dibattimento, davanti alla Corte di Assise di Genova, si costituivano parte civile le figlie della vittima, Ilsa e Lisa Klinghoffer, Langella Pasquale, Scala Ciro e De Luca Lavinio membri dell'equipaggio. Veniva, invece, dichiarata ancora una volta inammissibile la costituzione di parte civile riproposta dall'Associazione Internazionale Giuristi Ebrei.

Nel corso dell'interrogatorio Al Assadi confermava la confessione già resa, mentre Al Molqi e Fataier, ribadendo una linea processuale preannunciata nelle ultime fasi dell'istruzione, la ritrattavano. Abbas Issa modificava in parte le dichiarazioni rese in istruttoria.

Durante il dibattimento uno dei giudici popolari effettivi Ferrari Silvio, presentava motivata dichiarazione di astensione Essa veniva accolta e al giudice effettivo subentrava uno dei supplenti.

- 33 -

In esito al giudizio, con sentenza 10 luglio 1986, la
Corte di Assise affermava la sussistenza della finalità di
terrorismo e di eversione ih ordine a tutti i reati per i quali
veniva pronunciata condanna, argomentando che l'obbiettivo
dell'azione terroristica doveva ritenersi non già l'asserito
raid nel porto israeliano di Ashod  bensì il sequestro della
nave italiana e la presa in ostaggio dei suoi passeggeri; indi
viduava di conseguenza il più grave reato in quello contestato
sub F) (sequestro di persona a scopo di terrorismo o di eversion
aggravato dall'omicidio dell'ostaggio), ritenuto nei termini
enunciati nel capo di imputazione; escludeva, invece, il reato
di banda armata, non ravvisandone i presupposti e i tratti quali
ficanti (in particolare, l'essenzialità del fine, da individuar
si inx un reato contro la personalità dello Stato italiano, e
la stabilità del vincolo associativo).  Concedeva agli imputati
presenti, negandole ogni ai latitanti, le attenuanti generiche
e definiva le singole responsabilità, con le conseguenti pene,
così come meglio precisato in epigrafe, secondo le distinzioni
e le precisazioni di più avanti si dirà.

Contro tale sentenza proponevano appello il Procuratore
della Repubblica e la difesa dei condannati.

Il P.M. si doleva dell'assoluzione , per taluni capi di
imputazione, di Abdullrahim Kaled, Abbas Issa, Ben Kadra e Sa
'Ad Yusuf; censurava la concessione delle generiche allo stesso
capo del nucleo terrorista, Al Molqui, esecutore materiale del
barbaro assassinio del Klinghoffer, e insisteva perchè fosse
riconosciuta la sussistenza anche del reato di banda armata.

- 34 -

Per Abul Abbas si chiedeva l'assoluzione, quanto meno
per insufficienza di prove, da tutti i reati ascrittigli. In
subordine: la diminuente di cui all'art. 116 C.P., le attenuan
ti di cui all'art. 56, comma 3° e 4° C.P. e le attenuanti
generiche.

Per Ez El Din Badrakhan e Ziad El Omar si deduceva la
nullità della sentenza di primo grado per irrituale costitu
zione del giudice (con riferimento alla sostituzione di un giu
dice popolare titolare con uno supplente). Nel merito si chie
deva l'assoluzione con formula piena o quanto meno dubitativa
da tutti i reati loro ascritti; in subordine l'attenuante di
cui all'art. 62 n. 1 C.P. e le attenuanti generiche.

Per Abbas Issa, Al Molqi Magied e Fataier Abedelatif si
sollecitava la derubricazione del più grave reato di sequestro
a scopo di terrorismo nella corrispondente fattispecie 'comune',
non aggravata dalla finalità anzidetta; per il solo Fataier
si chiedeva inoltre l'assoluzione dal reato di omicidio, ovvero
la diminuente di cui all'art. 116; l'attenuante di cui all'art.
62 n.1, da ritnersi prevalente insieme alla già concesse gene-
riche, e il contenimento della pena nel minimo cohsentito; per
il solo Abbas Issa l'esclusione della finalità di terrorismo
in relazione ai reati per gui l'appellante aveva riportato con-
danna, la concessione dell'attenuante di cui all'art. 62 n.1 C.P.
e il contenimento della pena; per il solo Al Molqi l'attenuante
di cui all'art. 62 n.1, la sua prevalenza (con le generiche) e
il contenimento della pena inflitta.

Per Al Assadi si chiedeva l'assoluzione dal reato di cui
all'art. 289 bis, ovvero la diminuente di cui all'art. 116; in
subordine l'attenuante di cui all'art. 62 n.1 e il riconosciment
della continuazione con i reati per cui l'appellante aveva già
riportato condanna definitiva (concernenti le armi).

- 35 -

Per Abullarahim Kaled, Sa'Ad Yusuf e Ben Kadra si chiede
va l'assoluzione da tutti i reati loro ascritti per insufficien
za di prove, la derubricazione del reato p.e p. dall'art. 289
bis C.P. in quello p.e p. dall'art. 605 C.P., l'esclusione della
aggravante della finalità di terrorismo e la concessione di
quella di cui all'art. 62 n.1 C.P.

Per Gandura Said, infine, si chiedeva l'assoluzione con
formula meglio vista per l'unico reato in ordine al quale era
stata pronunciata condanna e, in subordine, l'attenuante di cui
all'art. 62 n.1 C.P. e il contenimento della pena entro il
minimo consentito.

Nelle more tra il giudizio di primo grado e quello di
appello veniva estradato in Italia, dalla Germania, l'imputa
to Sa'Ad Yussuf: egli comparendo all'udienza di apertura del
presente giudizio si proclamava estraneo ai fatti di cui era
incolpato, asserendo che all'epoca della loro commissione si
trovava a Beirut. Al Assadi, per contro, ribadiva la sua
chiamata di correità nei riguardi del Sa'Ad Yusuf, mentre i
coimputati Al Molqi e Fataier Abrahim asserivano di non cono-
scerlo.

La difesa di Al Molqi, Abbas Issa e Fataier prponeva
eccezione di nullità del giudizio di primo grado per irregola
re costituzione della Corte. Nel merito Parti Civili, Procura
tore Generale e difensori concludevano come da separato ver-
bale.

o o o o o o o o o o

-36-

d i r i t t o

Va dato conto, preliminarmente, di alcune questioni di
ordine processuale sollevate in sede di gravame o nel corso
del presente giudizio di appello: talune di esse riguardano
la regolarità del processo nel suo insieme, altre la posizio
ne di singoli imputati.

Sotto diversi profili, anzitutto, si contesta la regola
re costituzione del giudice di primo grado. Secondo un'ecce
zione sollevata dalla difesa di Al Molqi, Fataier e Abbas
Issa la circostanza che il Presidente della Corte di Assise
e il Giudice a latere siano stati designati a ricoprire i
rispettivi uffici con Decreto del Presidente della Repubblica
emesso, su conforme proposta del Consiglio Superiore della
Magistratura, successivamente all'apertura del dibattimento
di primo grado renderebbe nulla, ex art. 185 n.1 C.P.P.,
quell'intera fase del procedimento. L'eccezione si richiama
a un recente indirizzo giurisprudenziale, che invertendo un
precedente orientamento (Cass. Sez. I, 8 ottobre 1956, Sposa
to; Id Sez. I, 26 giugno 1964, Spataro), ravvisa la nullità
assoluta nel caso in questione. Questa Corte non può non
riconoscere che il procedimento di designazione dei magistra
ti alle Corti di assise si distingue dalla tipiche designazio-
ni "tabellari" di cui agli artt. 45 e 54 del vigente Ordinamen
to Giudiziario per il carattere speciale e derogatorio della



- 3 7 -

normativa ad hoc che lo contempla (art. 8 legge 10 aprile
1951 n.287). Si è voluto, infatti, assicurare al procedimen
to di individuazione dei magistrati preposti alle corti di
assise un rito più garantito rispetto a quello "tabellare",
al fine di escludere ogni indiretta influenza dei capi degli
uffici nella conduzione dei procedimenti per i quali è previ
sta la partecipazione del popolo. Sicchè risulta inaccetta
bile, come ha puntualmente messo in evidenza il Supremo Colle
gio, la tesi che vorrebbe assimilate, e ricondotte al medesimo
criterio regolatore, la procedura "tabellare" e quella contem-
plata nel citato art. 8.

  Tanto premesso,pare a questa Corte che nessuna nullità
si verifichi quando alla corte di assise risultino applicati
i magistrato che il Decreto presidenziale  designa a tale uffi
cio per l'anno giudiziario al quale si riferisce. La Corte non
nega  che la nomina  (rectius, l'assegnazione all'ufficio , per
chè il decreto non instaura il rapporto di pubblico impiego,
ma si limita ad attribuire uno specifico incarico annuale a
magistrato già investito di funzioni giurisdizionali) abbia
efficacia costitutiva, ma è dell'avviso che l' efficacia del
decreto non si produca dalla data della sua emissione, ma si
espanda per tutto l'arco di tempo che il decreto stesso espressa
mente stabilisce, e cioè per l'intero anno giudiziario in relazio
ne al quale è emanato. E' invero improprio attribuire effica
cia retroattiva a un "atto di durata" che contenga in sè il ter
mine iniziale della propria efficacia (nella specie stabilito
per legge in coincidenza con l'inizio dell'anno giudiziario).

- 38 -

Più esattamente, al fine di far risaltare che il provvedimento è stato adottato in ritardo rispetto al suo termine iniziale fisiologico, dovrebbe riconoscersi al decreto de quo quella caratteristica "efficacia retrotratta" che la dottrina amministrativistica suole assegnare agli atti amministrativi "ad oggetto anteatto", cioè agli atti che avrebbero dovuto essere emenati a una certa data ma non lo sono stati per ritardi accumulati nell'espletamento delle relative procedure.

Pare, dunque, alla Corte che l'efficacia del decreto presidenziale, con decorrenza dall'inizio di ciascun anno giudiziario, non possa essere negata se non sul presupposto che il Decreto medesimo sia viziato nella parte in cui provvede per il tempo antecedente alla sua emanazione. Ciò imporrebbe l'individuazione del vizio che specificamente osti all'integrale efficacia del provvedimento nel tempo e per la durata che la legge gli assegna. Ma tale vizio in nessun caso è individuabile nel mero fatto che il provvedimento sia stato emanato in ritardo rispetto alla sua data naturale, perchè il ritardo costituisce, in assenza di specifiche comminatorie, una mera irregolarità inidonea a produrre l'irefficacia del provvedimento. Nella specie risulta che al provedimento di primo grado hanno effettivamente partecipato i magistrati designati a tale ufficio col Decreto del Presidente della Repubblica relativo a quell'anno giudiziario. L'illegittimità, per quanto parziale, di tale Decreto non è stata eccepita nè questa Corte ha motivo di rilevarla d'ufficio, sia pure al solo fine di disapplicare il provvedimento in questione. La costituzio-

-39-

ne del giudice di primo grado, in quanto conforme al Decreto
presidenziale sopravvenuto entro l'anno, appare pertanto re-
golare e l'eccezione di nullità prospettata dalla difesa con
seguentemente infondata.

Ancora in tema di costituzione del giudice la difesa di
Ez El Din Badrakhan e Ziad El Omar eccepisce la nullità di
cui all'art. 185 C.P.P. a causa dell'astensione di uno dei
giudici popolari, nel procedimento di primo grado, e della
sua sostituzione con un giudice supplente, in conseguenza di
una lettera inviata al giudice astenuto dalla locale Procura
della Repubblica, con la quale si prospettavano gravi ragioni
di opportunità che avrebbero potuto determinare la ricusazio
ne del giudice medesimo. In sostanza, il giudice popolare
veniva sollecitato a valutare discrezionalmente i motivi
addotti e lo si invitava a scegliere tra l'astensione spontanea
o il rischio di essere ricusato. Optando per la prima solu-
zione il giudice popolare ha precluso la seconda: resta, dun-
que, inibito a questo Giudice di appello ogni apprezzamento
in ordine alla fondatezza dei motivi che avrebbero potuto
essere dedotti a sostegno della ventilata ricusazione. In ogni
caso pare evidente a questa Corte che si trattò di opzione
del tutto spontanea, suggerita da una libera e responsabile
valutazione dei contrapposti interessi in gioco. E indipen-
dentemente dal fatto che non sono ammesse, in linea di massi
ma, indagini volte ad accertare presunti vizi della volontà
afferenti ad atti processuali (che non hanno natura negoziale
è assodato che nessuna denunzia risulta proposta dal giudice
in questione per presunte violenze nei suoi confronti.

-40-

Si tratta, in definitiva, di astensione giustificata da ragioni di opportunità, discrezionalmente apprezzate dall'interessato e come tali insindacabili in questa sede. L'integrazione del collegio col giudice supplente è pura conseguenza della sopravvenuta rinuncia del titolare: poichè è accertato che il supplente ha partecipato al dibattimento fin dal suo inizio nessuna nullità è configurabile per questo motivo.

Gli appelli presentati nell'interesse di Abdullrahim Kaled, Sa'Ad Yusuf e Ben Kadra Mohamed vanno dichiarati inammissibili ex art. 209 C.P.P. per mancata specificazione dei motivi. Le secche e apodittiche formule nelle quali si estrinseca la dichiarazione di appello ("avrebbero dovuto essere assolti...", "doveva essere esclusa l'aggravante della penalità (sic) di terrorismo...", "dovevano essere concesse le attenuanti...") non riflettono alcuna critica alle contrarie statuizioni della sentenza impugnata nè propongono alcun argomento sul quale possa esercitarsi la valutazione di questa Corte. Talune di tali richieste, poi, appaiono addirittura carenti del più elementare interesse a impugnare: per gli appellanti si chiede da parte della loro difesa condanna ex art. 605 anzichè ex art. 289 bis C.P.; ove si consideri che da tale ultima imputazione essi sono stati assolti ne risulta che la richiesta derubricazione del reato, se accolta, comporterebbe un'evidente reformatio in peius nei loro confronti. Anche in questa prospettiva, dunque, l'impugnazione risulta carente dei necessari requisiti di ammissibilità.



- 41 -

    Inammissibile l'appello, restano superate le questioni
proposte dalla difesa di Sa'Ad Yusuf in ordine alla regola
rità della sua citazione nel giudizio di primo grado, per
asserita insufficienza delle ricerche espletate nei confronti
dell'imputato allora latitante (ma varrà la pena di ricordare
che il Sa'Ad Yusuf è stato ricercato, come risulta dal relati
vo verbale, in tutti i luoghi in cui si aveva notizia di un
suo soggiorno più o meno recente, tramite diverse polizie,
israeliana e dei paesi arabi: non vennero disposte specifiche
ricerche nel presunto luogo di nascita — Tiro nel Libano — perch
non si avevano informazioni relative a una sua effettiva presen
za in quel luogo e per le ben note difficoltà di instaurare
utili rapporti informativi con le autorità di polizia della
zona, sconvolta dalla guerra civile).

    Ammissibile è invece l'appello interposto dal Procuratore
della Repubblica nei confronti del medesimo imputato, con riguar
do ai reati di cui ai capi  F), G), H), I), L), V), dai quali
Sa Ad Yusuf è stato assolto in primo grado.  Sta di fatto,
peraltro, che l'estradizione concessa dal governo Tedesco nelle
more (il giudizio di primo e quello di secondo grado è riferita
ai soli reati per i quali il libanese ha riportato condanna.
Risultano, di conseguenza, improcedibili, allo stato, i reati
ai quali si riferisce l'impugnazione proposta dal P.M.  Dato
atto di ciò, il P.G. in udienza ha tuttavia preannunciato lo
intendimento del suo ufficio di sollecitare un supplemento di
estradizione con riferimento a tali imputazioni, e ha richiesto
lo stralcio degli atti relativi, in vista di un eventuale

- 42 -

giudizio separato.  Nulla osta, ad avviso di questo Corte,
all'accoglimento di tale richiesta, che lascia del tutto
impregiudicata, rimettendola all'esito della rinnovata
domanda di estradizione, la posizione processuale del giu
dicando.  Di qui la separazione del procedimento a suo
carico, limitatamente alle imputazioni di cui si è detto.

Esaurito in tal modo l'esame delle questioni processua
li, è possibile affrontare gli aspetti sostanziali della
tematica che qui interessa.

Si è lungamente discusso, nel corso del processo, su
quella che sarebbe stata la vera missione rimessa al nucleo
operativo, e se il piano portato a esecuzione fosse proprio
quello che era stato previsto in partenza. Gli stessi dirotta
tori hanno cercato di far credere che il programma originario
era stato modificato "in itinere" a causa di difficoltà im-
provvisamente insorte, ma sono poi caduti in gravi contraddi
zioni nel tentativo di chiarire quale fosse l'obbiettivo
reale e quali i motivi per cui esso sarebbe stato abbandonato.
Non occorre qui enumerare le molte ragioni, sulle quali ampia
mente insistono i giudici di primo grado, che fanno apparire
del tutto irrealizzabile l'idea stessa di un'azione militare
nel presidiatissimo porto israeliano di Ashod: gli stessi
Al Assadi e Al Asker hanno finito con l'ammettere che quel
progetto non era serio e che essi,in definitiva, ne erano
stati informati solo a cose fatte.  E' lecito allora domandarsi
perchèv quel disegno sia stato elaborato e, a un certo punto,

- 43 -

indicato come obbiettivo fallito dei quattro temerari.  Varrà
la pena di ricordare, a questo proposito, che di un'azione
nel porto di Ashod si cominciò a parlare solo dopo che l'impre
sa terroristica era stata interrotta, a seguito del perentorio
intervento di Abul Abbas da Port Said.  Fu proprio Abul Abbas,
nel contatto radio con Al Molqi, a insistere perchè costui
riferisse al comandante della nave e all'equipaggio che lo
intento dei dirottatori era, appunto, quello di sbarcare ad
Ashod e compiere un'azione militare "nei confronti degli Israe
liani".  Ciò permette di accreditare la seguente risposta al
quesito di cui sopra. L'impresa terroristica, che aveva come
scopo il dirottamento della nave e la presa in ostaggio dei
passeggeri, in vista dello scambio con militanti palestinesi
detenuti in Israele, venne interrotta a seguito di un complesso
di circostanze di ordine internazionale  (mancata disponibilità
USA a esercitare pressioni su Israele per lo scambio, rifiuto
della Siria a collaborare, pressioni sull'OLP e suo conseguente
imbarazzo nel prestare avallo a quella che si era ormai rivela
ta una pura azione di terrorismo), che avevano convinto i
mandanti dell'inutilità e del probabile pregiudizio, in termini
di immagine internazionale, che sarebbe derivato alla causa
palestinese dalla sua ulteriore prosecuzione.  Sicchè dopo il
fallimento dell'impresa (perchè non vi è dubbio che l'azione
non ha comunque raggiunto i suoi scopi, quali che fossero),
diventava necessario ridisegnare l'operazione in modo tale da
non compromettere il quadro dei rapporti internazionali entro
i quali, per necessità o convenienza, si muove l'irridentismo
palestinese: ed è intuibile che un'azione militare  contro



- 44 -

Israele avrebbe avuto una risonanza diversa e meno sfavore
vole di un'impresa terroristica deliberatamente rivolta
contro persone e beni di stati terzi, benevoli o non preve
nuti verso le ragioni politiche di quel movimento. Se, poi,
l'impresa sia stata escogitata da esponenti del dissenso pa
lestinese per mettere in difficoltà la linea diplomatica
dell'OLP (Abul Abbas contro Arafat, semplificando) è questio
ne che sfugge a ogni verifica processuale , e che comunque
esorbita dagli interessi della presente indagine. Può comun
que immaginarsi che le trasparenti difficoltà incontrate
dagli imputati nel tentativo di fornire una versione credi-
bile del "piano Ashod" si spieghino col fatto che i componen
ti il nucleo operativo, costretti nel viaggio Cairo-Tunisi a
un imprevisto dirottamento sull'aeroporto siciliano di Signo-
nella e quivi tratti in arresto, non abbiano avuto il tempo
materiale di concordare una linea comune e di prepararsi alle
contestazioni che inevitabilmente sarebbero state loro mosse.
Di qui l'incertezza e le pesanti contraddizioni rivelate,
poste in puntuale rilievo dalla sentenza di primo grado, cui
sul punto giova fare integrale rinvio. E di qui anche le
oscillazioni che contraddistinguono la loro linea difensiva,
nella quale tentano di comporre esigenze assai diverse: volon
tà di collaborare con gli inquirenti, ma anche riaffermazione
del proprio "status" di combattenti e ripudio d'ogni connota-
zione  terroristica attribuita alla loro impresa, e insieme
umana inclinazione a propiziarsi la benevolenza dei giudici,
ribadendo che ogni intenzione ostile era rivolta contro Israe
le, il nemico dichiarato, e non, contro il Paese che li giudi-
ca, la cui bandiera proteggeva la nave dirottata e i suoi occu
panti.



- 45 -

Gli imputati, tuttavia, vanno giudicati sul metro di
ciò che hanno concretamente fatto, vale a dire il dirotta
mento della nave, il sequestro dei passeggeri, l'uccisione
di un ostaggio. Nè può seguirsi la linea difensiva di Abul
Abbas, là dove assume che tali avvenimenti sarebbero il ri
sultato di un assurdo colpo di testa, attuato dai quattro
componenti il nucleo operativo nella più completa difformi
tà dagli ordini ricevuti. Varrà la pena di ricordare che
i quattro non sono sprovveduti improvvisatori di azioni sen
za senso, ma militanti dai nervi di ferro e dalla volontà
di acciaio, temprati a tali imprese da lungo e meticoloso
tirocinio, votati alla causa del loro popolo con una dedi-
zione totale, al limite del fanatismo. E il dirottamento
della nave e il sequestro degli occupanti sono, come bene
hanno rilevato i primi giudici, azioni accuratamente prepa
rate , portate a esecuzione nel momento più favorevole
(quando la maggior parte dei passeggeri era appena sbarcata
e il controllo dei pochi rimasti a bordo si presentava più
agevole), sulla scorta di notizie e rilievi acquisiti nel
corso di precedenti ricognizioni ad hoc (si ricorderà che
Abdullarhim Kaled aveva eseguito almeno una previa crociera
sulla nave, a bordo della quale aveva poi accompagnato i
dirottatori, fornendo loro materiale informativo anche con
riguardo alla dislocazione dei ponti e delle sale: la sua
presenza a bordo, da Genova fino alle ore immeditamente pre
cedenti all'azione, non avrebbe avuto senso alcuno se l'impre
sa non fosse stata da compiere sulla nave stessa e la sua

-46-

funzione non fosse stata quella di agevolare gli operatori nella conoscenza dei servizi di bordo e dei movimenti da effettuare).

L'azione contro la nave e contro i passeggeri è, insomma, un'azione prevista, voluta e organizzata (si pensi che i dirottatori si erano perfino esercitati nell'uso della bussola, di nessuna utilità per un'azione da svolgersi nel porto di Ashod!): e qui poco importa se si trattasse di un'azione fine a se stessa, come parrebbe ragionevole supporre, o costituisse parte integrante di un più ampio disegno, destinato a svilupparsi "anche" nel porto di Ashod. E' certo che le varie versioni del "piano Ashod" fornite dagli imputati, implicano "anche" il dirottamento della nave e il sequestro di tutti o parte dei suoi occupanti. Sicchè è lecito concludere che i fatti realmente commessi non costituiscono la improvvisata variante di un progetto diverso inconsultamente abbandonato nell'imminenza della sua attuazione, bensì l'obbiettivo stesso, esclusivo, alternativo o complementare, del disegno orginario, voluto e preordinato dagli esecutori e dai loro mandanti.

Da tali premesse discendono piane conseguenze in ordine alla qualificazione giuridica dei fatti. L'azione violenta risulta diretta contro beni appartenenti e persone soggette allo Stato italiano, allo scopo di esercitare una pressione su questo, in vista dei fini politici perseguiti dagli organizzatori dell'impresa. E' vero che nessuna diretta richiesta è stata rivolta allo Stato italiano, ma ciò non esclude il suo obbiettivo coinvolgimento nella vicenda, a causa delle responsabilità, anche di ordine internazionale, che il dirottamento della nave e il sequestro di passeggeri di varia nazionalità



- 47 -

comportavano, e per gli inevitabili contraccolpi sugli
equilibri politici interni.  Questo modo di far valere
istanze politiche  (coincidenti con i fini ultimi dell'
irridentismo palestinese) attraverso la violenza e l'in-
timidazione, esecitata su una generalità indiscriminata
di persone, e la chiamata in causa dello Stato, titolare
della sovranità sulla nave e garante della sicurezza di
beni e persone, riveste un indubbio carattere terroristi
co, secondo l'accezione riflessa nell'enunciato legislati
vo di cui all'art. 1 legge 6 febbraio 1980 n.15  (cfr.
Cass. Sez. I, 14 gennaio 1985, ric. Pinna).    E a conforto
di tale conclusione va ricordato che la sussistenza della
aggravante  è stata ritenuta in relazione ai connessi
reati per i quali i quattro dirottatori (e Abbas M. Issa)
sono stati giudicati separatemente, con rito direttissimo.
Sul punto si è ormai formato il giudicato, avendo la Supre
ma Corte  (udienza del 2 febbraio 1987, ric. n. 39790/86)
respinto il ricorso col quale si sollevava anche la questio
ne relativa alla sussistenza dell'aggravante, ritenuta dai
primi giudici in rapporto a quei reati.  Benchè non risul
ti ancora depositata la motivazione di tale sentenza, può
nondimeno affermarsi, avuta notizia del dispositivo, che
esiste oggi come oggi un giudicato col quale si riconosce
la sussistenza dell'aggravante  rispetto a reati inerenti
alla stessa vicenda materiale, e strumentali rispetto ai
più gravi fatti che formano oggetto del presente procedimen
to.  Sicchè solo ponendosi in assurdo contrasto con quel
giudicato, che definisce un segmento della medesima vicenda,

- 48 -

si potrebbe oggi sostenere che l'aggravante non sussista
con riguardo al segmento residuo, approdato solo ora alla
fase giudiziale dell'appello. Anche per questa via, dunque,
risultano confermate le statuizioni dei primi giudici, che
hanno ritenuti aggravati ex art. 1 L. 15/80 tutti i reati
per i quali è stata affermata la responsabilità dei giudi
candi.

   Corretta appare altresì la qualificazione del più gra
ve fatto addebitato agli imputati: l'uccisione del cittadi
no statunitense Leon Klinghoffer, previo sequestro suo e
degli altri passeggeri e componenti dell'equipaggio. Sostie
ne la difesa che il fatto andrebbe piuttosto rubricato come
omicidio comune e sequestro di persona comune, perchè non
si tratterebbe  di reato (o di reati) contro la personalità
dello Stato italiano. Ma va dato atto che proprio la sussi
stenza dell'aggravante menzionata porta inesorabilmente
alla soluzione opposta, giacchè l'omicidio commesso nel
contesto di un'azione di sequestro, finalizzato a scopi
di terrorismo, integra l'ipotesi contemplata dall'art. 289
bis C.P., che è fattispecie complessa, costituita dalle due
ipotesi comuni, cui si aggiunge l'elemento specializzante
del dolo specifico richiesto.  Nè può affermarsi che la
finalità di terrorismo sia sussunta dalla norma incrimina
trice  in un'accezione diversa da quella contemplata dall'
art. 1 L. 15/80.  Ragioni di ordine letterale, storico e
sistematico confortano l'assunto, pacifico in dottrina e
in giurisprudenza, che il concetto di terrorismo, accampato



- 43 -

nella cultura e nella normativa dell'emergenza, rifletta
un'intuizione unitaria del fenomeno della violenza politi
ca caratteristica di questi anni, nelle diverse ma non
dissimili forme in cui si è venuto manifestando, e sia
stato come tale utilizzato dal legislatore nell'intento
di condensare in un dato normativo (si pensi al similare
concetto di mafia, apparso solo di recente nella legisla
zione positiva) una realtà sperimentale di comune percezio
ne.

E va altresì ritenuta la sussistenza del reato di ban
da armata: sul punto merita parziale riforma la sentenza
di primo grado, che quella imputazione ha escluso nei con-
fronti di tutti gli imputati. A tale esclusione i primi
giudici sono pervenuti osservando che l'insieme dei delitti
perpetrati a bordo dell'Achille Lauro è attribuibile al
F.L.P. (Fronte per la liberazione della Palestina) di Abul
Abbas. Tale Fronte ha bensì una struttura militare, ma
quanto al fine esso si propone di "contribuire al ritorno
dei Palestinesi nella loro terra di origine". Tale essendo
lo scopo che connota quell'organizzazione militare, essa
non potrebbe definirsi "banda armata", nel senso inteso dal
legislatore nazionale, perchè esso implica come ragion
d'essere e fine essenziale dell'organizzazione la volontà
di commettere reati contro la personalità dello Stato italia
no. Nè può bastare, aggiungono i primi giudici, una scelta
contingente e strumentale, come sarebbe accaduto nel caso
di specie: occorre che il fine permei la stessa costituzio
ne della banda e abbia, rispetto ad essa, carattere istituzio-



-50-

nale. E il fine della banda non va confuso con le singole
azioni compiute: il F.L.P. pur avendo compiuto atti osti-
li contro lo Stato italiano, ha come scopo ultimo ed essen
ziale la liberazione della Palestina, e solo in funzione
di tale intento si è dato la struttura militare che, in
parte, è stata utilizzata per realizzare la specifica impre
sa che qui interessa.

L'equivoco di questa impostazione sta nel dare per
scontato che i fatti commessi sull'Achille Lauro siano
da attribuire  al F.L.P. o a una sua emanazione diretta
e che, dunque, sulla natura del Fronte e sulla sua orga-
nizzazione debbano essere riscontrati gli elementi costi-
tutivi della banda armata. Le facoltà cognitorie di questa
Corte non giungono, tuttavia, ad apprezzare il'intrinseca
realtà dell'organizzazione come sopra evocata, i suoi
rapporti con le altre componenti del movimento palestinese,
le sue inclinazioni tattiche, i suoi orientamenti strategici,
nel più ampio e magmatico contesto della lotta  – armata,
diplomatica e politica – condotta dal popolo palestinese.
Ultroneo ed esorbitante, rispetto alle esigenze del pro-
cesso,appare ogni giudizio sul F.L.P. , dal quale peraltro,
stando alle informazioni giornalistiche comunemente accessi
bili, non è mai pervenuta alcuna specifica rivendicazione
dei fatti oggetto del presente processo.  Se il F.L.P. sia
responsabile dei delitti commessi è questito che trascende
la prospettiva giudiziale cui questa Corte è tenuta ad
attenersi, nè d'altra parte le imputazioni contestate impli

- 51 -

cano alcun diretto riferimento a quella specifica espressio
ne del movimento palestinese.

Occorre attenersi a un'ottica che aderisca strettamente
all'impostazione legislativa. Alla luce della quale deve
ritenersi "banda armata" qualsiasi aggregazione di uomini e
armi costituita al fine di commettere uno o più delitti
contro la personalità dello Stato. Non interessano i fini
ultimi, politici o ideologici, che l'organizzazione si ripro
mette di conseguire, bensì gli scopi pratici, identificati
nelle tipizzazioni criminose di cui all'art. 302 C.P. La
"banda armata" risulterà così costituita da tutti coloro
che forniscono un apporto fattivo all'organizzazione strumen
tale di uomini e armi, avendo coscienza che il loro apporto
è destinato a favorire la realizzazione del delitto assunto
come scopo del proprio immediato organizzarsi e stare insieme.
La concorrenza dell'elemento materiale con quello psicologico
andrà verificata nei riguardi di ciascun singolo imputato, al
fine di accertare la sua personale responsabilità (con parti-
colare riguardo a quella dei mandanti). Non potrà però negarsi
che le dieci persone riunite in Genova il 3 ottobre 1985
all'Albergo Laurens (i quattro dirottatori designati, i due
addetti al trasporto delle armi, e con loro Ez El Din Badra-
khan, Ziad El Omar, Abdularhim Kaled e Sa'Ad Yusuf),intente
a scambiarsi armi e istruzioni, per le specifiche finalità
di terrorismo ormai riconosciute con sentenza passata in giu
dicato, costituissero una struttura associativa univocamente
qualificabile come "banda armata". Il fatto è di impressio-

- 5 2 -

nistica evidenza e la Corte di primo grado, che ne è avver
tita, crede di evitare le ovvie conseguenze giuridiche osser
vando che quella struttura organizzativa, così univocamente
e intenzionalmente rivolta a commettere alcuni dei reati-
-fine tipici della banda armata, mancherebbe però il conno-
tato della "stabilità" essenziale alla qualificazione giuri
dica del fatto sub specie di art. 306 C.P.    Un certo grado
di "stabilità" servirebbe, secondo i primi giudici, a defini
re l'identità della banda, a conferirle autonomia, e, in
sostanza a farla distinguere dalla sua matrice, il F.L.P.,
di cui costituirebbe pur sempre una diretta emanazione. Si
rinnova così l'equivoco, già evidenziato, di far risalire la
responsabilità complessiva dell'impresa al F.L.P., immaginato
vertice ed estrema istanza gerarchica della struttura destina
ta ad operare sull'Achille Lauro.    Questa Corte non può che
ribadire il proprio convincimento che non vi siano dati di
processuale percezione atti ad avallare questa ipotesi rico-
struttiva, che resta pur legittima  in campo strettamente
storico-politico.  Come tra poco si vedrà l'individuazione
dei mandanti rimanda a un gruppo di persone fisiche, la cui
identificazione con i dirigenti del Fronte non è dimostrata
ma, soprattutto,  non è per nulla necessaria per la configura
zione delle loro penali responsabilità. Il F.B.P. resta,
insomma, un punto di riferimento ideologico (così come l'OLP
o più in generale il movimento palestinese) al quale ben
possono essersi riferiti gli ideatori e i realizzatori della



-53-

impresa, senza che ciò, peraltro, faccia venir meno la
distinta, personale responsabilità di quelli che sono
individualmente riconosciuti come mandanti o esecutori
dell'operazione. E quanto alla "stabilità" della struttu
ra associativa varrà la pena di ricordare che il raid sull'
Achille Lauro ha un vasto retroterra organizzativo, che va
dallo specifico addestramento impartito ai dirottatori,
previa loro selezione nei campi militari dell'OLP, ai viaggi
di ricognizione effettuati sulla stessa nave da Abdullarhim
Kaled, fino al successivo prolungato soggiorno in Itali.
dei componenti il nucleo operativo, assistiti da Sa'Ad Yusuf,
al fine di farli impratichire dell'ambiente e maturare in
loro la determinazione psicologica alla rischiosa missione
da compiere. E' contro la realtà negare che il vincolo
associativo sia perdurato quanto basta per conferire autonoma
individualità alla struttura organizzativa messa in piedi
al fine di portare a esecuzione i reati concretamente commes-
si; l'autonomia della banda, del resto, si rispecchia anche
nei ruoli singolarmente espletati, secondo le rispettive
attribuzioni e competenze, e unificati dall'identità dello
scopo perseguito. Anche in questa prospettiva la banda, che
pure si avvale di supporti, assistenza e sostegno nel vasto
humus del rivendicazionismo palestinese, si rivela come un
organismo autosufficiente, compatto e adeguato ala consegui
mento dell'obbiettivo specificamente stabilito.

Capo riconosciuto della banda, ispiratore e massimo orga
nizzatore dell'impresa terroristica è Abul Abbas, esponente

-54-

di rilievo del movimento palestinese, che dopo aver evitato
l'arresto a seguito delㄹa dirottamento dell'aereo su cui
viaggiava a Sigonella, si è reso latitante e tale è rimasto
per tutti il corso del procedimento.  La sua leadership,
concordemente proclamata dagli arrestati e resa evidente
dal tenore della decisiva conversazione radio avuta con i
dirottatori da Port Said, non è messa in discussione dalla
sua stessa difesa, che fonda invece l'appello interposto a
suo favore sull'assunto che altra e diversa sarebbe stata
l'impresa da lui voluta.  Si è già discusso di questa tesi
e se ne è vista l'inconsistenza; priva di qualsiasi riscon
tro processuale è l'affermazione secondo cui l'abbandono
del programma originario sarebbe dipeso da una disobbedien
za dell'inaffidabile Al Molqi, risoltosi all'ultimo momento,
per un sussulto di viltà, a non sacrificare la propria vita
nel mortale assalto di Ashod per ripiegare sull'apparente-
mente più tranquillo dirottamento della nave e i suoi risvol
ti consequenziali.  Va da sè che nessuno aveva obbligato
Al Molqi ad affrontare un'impresa tanto temeraria, e che
non basta proclamare che il capo dei dirottatori "è un uomo,
un sergente" (p. 10, motivi di appello) per concludere che
quella da lui recitata è tutta una "pantomima" (ibidem),
destinata a trarre in inganno mandanti e compagni di parti
ta.  E non si vede, ai fini propri della linea difensiva,
quale ulteriore chiarimento potrebbe apportare l'audizione
del Ministro degli Esteri, sollecitata dall'estensore dei
motivi, previa rinnovazione del dibattimento, nè di quale
utilità risulti discettare sulla congruità dei mezzi in

- 55 -

rapporto al progetto (si sostiene che quattro mitraglia-
trici e poche bombe a mano sarebbero stati mezzi inido-
nei per sequestrare la nave italiana, ma si dimentica che
il sequestro è realmente avvenuto, con quei mezzi irriso-
ri, e tutti gli effetti terroristici previsti, compresa la
uccisione dell'ostaggio, si sono puntualmente verificati).
I fatti, del resto, conclamano che non vi fu disobbedienza
da parte di Al Molqi: si vedano in tal senso le concordi
dichiarazioni dei correi, che mai riferiscono di divergenze
tra capo della spedizione e mandanti; si veda il testo, di
perentoria eloquenza, della conversazione radio scambiata
a Port Sai tra Al Molqi e Abul Abbas, dove la completa subor
dinazione del primo al secondo traspare da ogni parola; si
veda la lucida attestazione di Al Assadi, secondo il quale,
dopo lo sbarco a Port Said, Abul Abbas non mosse rimprovero
alcuno ai dirottatori, per come erano andate le cose, ma
scambiò con loro gesti di affetto, solidarietà, gratitudine,
dai quali traspariva piena adesione per le scelte compiute.

Non vi è spazio, dunque, nemmeno per la tesi subordina
ta, che vorrebbe veder riconosciuta all'Abbas la diminuente
di cui all'art. 116, sul presupposto di uno scarto consisten
te fra azione programmata e azione compiuta.    E non vi è
spazio, sotto il profilo giuridico, nemmeno per le attenuan
ti di cui all'art. 56, c. 3° e 4° C.P., parimenti invocate,
ma senza fondamento, dalla difesa dell'appellante.    E' certa
mente vero che il raid terroristico ebbe termine a seguito

- 56 -

di un intervento, via radio da Port Said, dell'Abbas
(se spontaneo o necessitato da considerazioni o imposi
zioni superiori è altra cosa)., e che proprio in quell(
intervento si rivelò l'indiscussa autorità del mandante.
Ma sta di fatto che quando l'iniziativa dell'Abbas pro-
dusse i suoi effetti in ordine alla conclusione della
impresa, questa era già compiuta in tutti i suoi risvolti
penalmente rilevanti.  Ucciso Klinghoffer e ferito un mem
bro dell'equipaggio, sequestrati gli occupanti della nave
e in tale stato di totale e disumana soggezione mantenuti
per più giorni, dirottata la nave dal suo prestabilito
itinerario crocieristico: gli unici effetti mancati erano
quelli politici, perchè lo scambio di prigionieri prospetta
to dai dirottatori non era avvenuto. Ma proprio perchè la
operazione era fallita occorreva porvi fine: ad Abbas non
restò che ratificare l'insuccesso, dovuto al mancato raggiun
gimento degli obbiettivi ultimi e alla constatata impossibi
lità di raggiungerli in prosieguo.Ad evidenza risulta quin-
di che Abbas non impedì alcun evento (inteso in senso pena-
listico; altra cosa è il motivo dell'azione, il suo scopo
atipico e metagiuridico), ma intervenne  quando i reati
erano già stati commessi e gli atti compiuti integravano
la sua piena responsabilità in rapporto alle ipotesi crimino
se di cui oggi è tenuto a rispondere.

    Partecipi della banda sono poi da ritenere i quattro
operatori materiali, con responsabilità direttive per Al
Molqi e con l'avvertenza che la posizione del minore Al
Asker è stata definita separatamente, col riconoscimento



- 57 -

della sua colpevolezza anche con riguardo a tale specifica
incolpazione. Per Fataier Ibrahim  e per Al Assadi si conte
sta la loro responsabilità e si chiede, insubordine, la di-
minuente di cui all'art. 116 C.P. sul presupposto che essi
avrebbero ignorato i veri obbiettivi  dell'azione, la cui
conoscenza sarebbe rimasta affidata al solo comandante del
nucleo oprativo, Al Molqi.  Gli elementi su cui si fonda
tale presunzione sono d'una fragilità davvero singolare.
Si assume, anzitutto, che le istruzioni con le quali si
specificavano i veri obbiettivi del raid sarebbero state
contenute in una lettera recata a Genova da Abbas M. Issa
e andata distrutta senza che i componenti "minori" del nu-
cleo operativo ne avessero avuto diretta conoscenza.  Le
vicende relative a quella lettera non  appaiono chiare, e
il suo tenore resta imprecisato nel processo.  Non vi prova
alcuna, tuttavia, nè ragione di credere che l'obbiettivo del
raid fosse enunciato proprio in quel documento scritto (col
rischio che il latore venisse scoperto e smascherato, e tenu
to conto che dei quattro dirottatori solo uno − Al Asker −
sapeva leggere e scrivere!), e non vi è prova nè ragione
di credere  che gli esecutori materiali non abbiano avuto,
nel corso della lunga fase preparatoria, più dirette e pre
cise informazioni sul da farsi.  Osserva la difesa  − ed ecco
il secondo argomento! − che la necessità di tenere coperti
fino all'ultimo i veri obbiettivi dell'impresa sarebbe dipesa
dalla logica della "compartimentazione", propria delle organizza
zioni terroristiche (meno persone sanno meglio è).   Ma una

- 58 -

logica del genere ha la sua ragion d'essere nel terrorismo
nostrano, che si muove in aree malsicure, insidiate da in-
filtrati e delatori, pentiti e pentendi, laddove il terro-
rismo che qui interessa si affida a pochi iniziati, privi
di agganci e vischiosità con l'ambiente sociale estraneo e
neppure in grado di comunicare con esso per l'ignoranza
della lingua e la sospettosità immediatamente suscitata.
E i quattro furono scelti in esito a un'accuratissima sele-
zione, fra persone rotte alle prospettive più disperate,
non esitanti di fronte allo stesso sacrificio della vita.
E' impensabile che costoro siano stati sottoposti a un tiro
cinio di mesi, con addestramento specifico (che comprendeva
la conoscenza delle carte nautiche e l'uso della bussola)
senza che mai sia stato loro rivelato un qualche dettaglio
circa il tipo di missione per il quale si stavano preparan
do. Questa pretesa ignoranza del proprio stesso incarico è
contraria alla logica e incompatibile con le più ovvie esi-
genze organizzative. Lo stesso Al Asker, del resto, ne fa
giustizia, smentendo le posticce tesi defensionali:"fin da
quando eravamo a Genova, chiarisce, sapevamo che nei piani
predisposti per noi erano previsti il sequestro della nave
e l'uccisione degli ostaggi; per onestà devo dire che tale
uccisione, dopo che fosse scaduto l'ultimatum rivolto agli
Israeliani, era prevista fin dall'inizio; non c'erano diver
sità fra noi, anche se l'omicidio l'ha materialmente commesso
Magied" (interrogatorio 7.11.85, f. 49 retro): posizioni pari
tetiche e ruoli perfettamente fungibili ed equivalenti.



- 61 -

Del resto, quale alternativa poteva esservi all'uccisio
ne degli ostaggi, una volta innescato il fatale meccanismo
della minaccia ultimativa?   La comune epserienza insegna
che eventi del genere costituiscono  sbocchi tra i più fre-
quenti delle azioni di sequestro a scopo terroristico: la
intimidazione riuscirebbe blanda e inefficace se il male
minacciato non fosse, a certe condizioni, destinato ad avve-
rarsi.  Di qui la responsabilità piena, non diminuita, dei
dirottatori e dei loro consapevoli mandanti in ordine ai
reati commessi a bordo della nave, in esecuzione del piano
che li prevedeva quanto meno alla stregua di esiti possibili
o alternativi dell'azione posta in essere.

E tra i correi, rimasti estranei all'esecuzione materia-
le del piano,  va affermata la responsabilità di Abdullrahim
Kalled, Ziad El Omar, Ez El Din Badrkhan; l'appello del P.M.
riguarda l'assoluzione dei tre dal delitto di banda armata
e del primo dai reati di cui ai capi F), G), H); l'appello
della difesa riguarda la condanna del secondo e del terzo
per i reati diversi dalla banda armata: la loro colpevolezza
va riconosciuta in relazione a tutti i reati in discussione.

Abdullrahim Kaled, Ziad El Omar e Ez El Din Badrakhan
sono componenti a pieno titolo della banda che ha operato,
nel modo che si è visto, a bordo dell'Achille Lauro: la loro
responsabilità per i reati commessi discende dalla loro appar
tenenza alla banda e dalla segnalata impossibilità  di rite-
nere  che alcuno dei componenti non sapesse o non prevedesse
quali conseguenze sarebbero derivate dall'azione posta in
essere col comune consenso e la collaborazione operosa di
tutti.

- 62 -

Abdullrahim Kaled è colui che effettua la crociera preventiva (secondo Al Molqi, più crociere preventive) sulla nave a scopo ricognitorio: svolge, cioè, un'attività propedeutica essenziale per la buona riuscita dell' impresa. L'ipotesi che egli non sapesse di che impresa si sarebbe trattato appare fuori dalla realtà: come avrebbe potuto svolgere la sua missione di studio, valutando rischi e opportunità dell'azione, se non avesse avuto come termine di riferimento il piano di cui andava verificando la praticabilità? L'argomento pare stringente anche ai primi giudici, che pure lo ritengono controbilanciato da dubbi e perplessità, fondati su circostanze che, ad avviso di questa Corte, confermano, invece, il pieno coinvolgimento dell' imputato nel piano d'azione della banda. Al Molqi, anzitutto, conferma che Kaled aveva partecipato a Tunisi ad incontri con Abbas, presente esso Magied, nel corso dei quali si era messo a punto il piano dettagliato del raid (interrogatorio 8 novembre 1985). La circostanza parrebbe conclusiva, ma i giudici di primo grado enfatizzano una seconda dichiarazione dello stesso Al Molqi (interrogatorio 17 febbraio 1986) nella quale non si nomina più il Kaled in relazione all'incontro tunisino. Ma la seconda dichiarazione, osserva la Corte, è meramente riassuntiva: Al Molqi richiama cose già dette e non si sofferma a fare nomi sui presenti all'incontro (neanche nega, dunque, che Kaled fosse tra costoro). Tra le due dichiarazioni non vi è contrasto, ma solo un diverso criterio



- 63 -

espositivo, analitico nella prima e sintetico nella secon
da. Ancora: Abdullrahim Kaled è presente a Genova il 3
ottobre 1985, quando i correi si incontrano all'Albergo
Laurens e si scambiano armi e munizioni. E' addirittura
lo stesso Kaled che accompagna a bordo i componenti il
nucleo operativo, li sistema nelle rispettive cabine e si
imbarca con loro. I primi giudici opinano che neppure in
questa occasione l'imputato sapeva quel che faceva: per
il principio della "compartimentazione" lo relegano al ruo
lo del convitato di pietra, tenuto a diffidente distanza
dal cuore degli avvenimenti, ai quali pure materialmente
partecipava. Questa Corte ha già espresso il proprio avvi
so circa l'asserita regola della "compartimentazione", il
cui carattere tralaticio, nella presente vicenda, è reso
evidente dal fatto che i diretti interessati non vi accenna
no mai. Se gli atti e i comportamenti umani hanno un senso,
l'atteggiamento di Abdullrahim Kaled in Genova il 3 ottobre
è quello di persona pienamente coinvolta nel progetto alla
cui esecuzione  sta portando un contributo assolutamente
decisivo.  Infine — ed è questo l'argomento che risolve
i primi giudici a sposare la tesi del dubbio — Abdullrahim
Kaled sbarca  ad Alessandria dalla nave, con apparente preci
pitazione, proprio mentre sta per scattare la fase decisiva
del raid.  Si è sostenuto che nel fare ciò il Kaled avrebbe
dimostrato di voler prendere le distanze dai compagni, scinde
re le responsabilità proprie da quelle altrui. Si può discu-
tere finchè si vuole sulle recondite intenzioni dell'imputato



- 64 -

e sulle circostanze, non prive di qualche platealità, in
cui lo sbarco fu effettuato. Ma è certo che quest'ultimo
rientravá nelle previsioni della vigilia: lo assicura in
modo categorico Al Assadi quando riferisce che, prima della
partenza, "a Genova, Ziad El Omar (alias Abul Oz) ci aveva
detto che una volta arrivati in Egitto Abdullrahim Kaled
(alias Abu Amar) doveva sbarcare dalla nave" (interrogatorio
14 febbraio 1986, f.56).  Sbarco per fine missione, dunque,
in conformità a piani prestabiliti. .

Anche più macroscopica, se così si può dire, è l'implica
zione nella vicenda di Ez El Din Badrakhan e Ziad El Omad:
di ciò non dubitano i primi giudici, che li assolvono dalla
imputazione di banda armata per le ragioni di principio già
esposte e confutate, ma ne affermano la piena responsabilità
con riguardo ai reati commessi sulla nave.  Il ruolo direttivo
e organizzativo dei due nella criminosa impresa è ben lumeggia
to nella sentenza impugnata: nè la difesa lo contesta, limitan
dosi a sostenere che il piano alla cui elaborazione essi aveva
no contribuito riguardava il raid ad Ashod  e non il dirotta-
mento dell'Achilla Lauro.  Badrakhan è ai vertici dell'orga-
nizzazione terroristica, il più alto livello dopo Abul Abbas.
E' lui che seleziona i futuri dirottatori nel campo di addestra
mento militare che personalmente dirige, li propone ad Abbas,
li invia in Italia; è con loro a Genova, all'atto dell'imbarco
ed è con loro a Port Said, quando la missione si interrompe e li
accompagna sull'aereo che verrà dirottato a Sigonella.  Quanto
a Ziad El Omar, egli partecipa alla selezione e assiste i futuri



- 65 -

dirottatori nel tirocinio, all'uopo recandosi in Italia,
dove essi soggiornano nel mese che precede l'avvio delle
operazioni. E' con loro a Genova dal 1º al 3 ottobre, e
quimi, con l'autorità di capo che gli è riconosciuta, con
geda il quinto dirottatore designato – Jarbua – ritenuto
inidoneo al tipo di azione programmata; infine comunica
ai componenti il nucleo operativo le ultime, decisive
istruzioni, che ha personalmente recato da Tunisi.    La
loro responsabilità, avuto riguardo a quanto premesso, va
estesa al reato di banda armata, contestato rispettivamente
ai capi  N) e O) della rubrica.

        Non provata appare invece la partecipazione alla
banda  (e alla consumazioni dei conseguenti reati) di Abbas
Mohamed Issa e Ben Kadra Mohamed: l'appello proposto nei
loro confronti dal Procuratore della Repubblica non può,
pertanto, essere accolto. I due sono responsabili, insieme
al non meglio identificato Abul Kifah, del trasporto a Genova,
da Tunisi, delle armi destinate alla criminosa spedizione;
essi appaiono inoltre personalmente legati ad Abul Abbas,
del quale esercitano le funzioni di guardie del corpo.  La
seconda circostanza  è motivo di sospetto; la prima evidenzia
un contributo materiale, di rilevante entità, alle esigenze
operative della banda. Non vi sono però ragioni concrete per
ritenere sussistente, a loro carico, quella componente psico-
logica  – la consapevolezza, cioè, di cooperare alla commissio
ne di un reato contro la personalità dello Stato italiano –
che insieme  al comportamento materiale integra la penale
responsabilità ex art. 306 C.P. e imputazioni connesse.

- 66 -

Va segnalato, a questo riguardo, che secondo quanto attestano nei loro interrogatori gli imputati detenuti, esistevano all'epoca dei fatti, in Genova, basi logistiche palestinesi stabilmente istituite e destinate a operare in questo Paese in vista dei fini propri di quel movimento irridentista. E precisano gli stessi imputati che tali basi venivano rifornite di armi direttamente dalla Tunisia, perchè quelle reperibili sul mercato locale risultavano troppo costose. In tale contesto — che, com'è ovvio, esigerebbe approfondimenti che trascendono gli interessi immediati di questa vicenda processuale — non può destare sorpresa che una singola operazione di trasporto sia stata effettuata senza che i vettori abbiano avuto personale e compiuta conoscenza dei possibili impieghi delle cose loro affidate. Potrebbe immaginarsi addirittura, senza sforzo per la realtà, che all'atto del trasporto la destinazione delle armi non fosse ancora individuata, benchè la coinci denza temporale appaia troppo pregnante per giustificare una simile ipotesi. Sta di fatto, però, che il ruolo di Ben Kadra si esaurì nell'espletamento di quell'incarico e non è necessario evocare la regola della "compartimentazione" per concludere che non vi era necessità di informare il corriere dei successivi sviluppi del programma, alla cui ulteriore esecuzione era destinato a rimanere estraneo.

Per quanto riguarda Abbas Issa vanno segnalate due ulteriori circostanze prospettate dall'accusa: egli fu latore della lettera cui si è già accennato, e da qualche ammissione



- 67 -

fatta parrebbe desumersi che non era del tutto all'oscuro
di quanto bolliva in pentola.  La commissione concernente
la lettera  – che era destinata ad Al Molqi, e di cui Issa
si sbarazzò senza averla letta, nel momento in cui stava
per essere arrestato – proverebbe, secondo il P.M. appellan
te, che l'attuale imputato svolgeva importanti funzioni di
raccordo fra mittente e destinatario.  Questa Corte, riba-
dito che il contenuto della missiva non è processualmente
noto, osserva che l'illazione del P.M. resta sul piano con
getturale: lettere anche importanti possono essere affidate
a qualificati fiduciari o a semplici postini.  Le ammissio-
ni, poi, si riferiscono alla conoscenza di un piano che
prevedeva il sequestro di una nave israeliana e dei suoi
occupanti e il successivo scambio con prigionieri detenuti
in Israele.  Il P.M. osserva che tale progetto è più o meno
quello che venne poi realizzato: la differenza riguarda la
nave da sequestrare, che secondo Abbas Issa doveva essere
israeliana e non italiana.  Non è differenza di poco conto,
per le conseguenze giuridiche che ne sarebbero derivate:
il sequestro di una nave israeliana avrebbe escluso ogni
valenza penalistica implicante offesa alla personalità dello
Stato italiano. La tesi dell'accusa è, però, che Abbas Issa
dicendo "israeliana" intendesse "italiana": la piccola scappa
toia dipenderebbe da istintive esigenze di autodifesa.  Con
il che, rileva la Corte, si fa il processo alle intenzioni;
nè la logica che governa la prova penale permette di trarre
utili deduzioni dalla semplice assonanza delle parole.



- 68 -

Ma la circostanza decisiva a favore di Abbas Issa
è che quando il piano scattò, il 3 ottobre 1985, con l'imbarco
del nucleo operativo sull'Achille Lauro, egli era detenuto
da vari giorni nelle carceri genovesi. Ciò gli impedì di
prender parte alla decisiva riunione tenuta all'Albergo
Laurens, dove il piano fu definitivamente messo a punto e
dalla fase programmatica e preparatoria si passò a quella
immediatamente attuativa. E' in quella circostanza che le
scelte diventano irrevocabili, le parole divenute fatti rendo
no definitiva e irreversibile la responsabilità dei loro
autori (Jarbua, il dirottatore scartato , proprio quel pome
riggio del 3 ottobre, esce di scena: sarebbe difficile rite-
nerlo responsabile di reati non commessi solo perchè, fino
a quel punto, era stato disposto a commetterli). Va da sè
che anche il correo detenuto può tenar ferma la propria ade-
sione psicologica al programma comune (così come può revo-
carla), ma ciò comporta una verifica di specie, un riscontro
positivo del permanere del rapporto associativo al di là
delle condizioni materiali che impediscono di praticarlo:
tale riscontro non vi è, e l'affermazione del detenuto di
aver ignorato ciò che i compagni in libertà andavano concre-
tamente realizzando, rimane priva di smentita. Di qui la
conferma della sua assoluzione, nei limiti cui alla sentenza
impugnata.

Per tutti gli imputati si chiede, da parte delle
rispettive difese, l'attenuante di cui all'art. 62 n.1 C.P.
Tale richiesta non può trovare accoglimento: sul punto

-63-

va pienamente confermata la sentenza di primo grado. La
attenuante de qua postula un apprezzamento positivo del
movente dell'azione e il giudizio va formulato con crite
rio obbiettivo, non secondo l'ottica personale dell'agen
te. Ebbene, è del tutto erroneo vedere un collegamento,
giuridicamente rilevante, di effetto a causa, tra i de-
litti commessi e l'aspirazione del popolo palestinese a
riconquistare la terra di origine: può darsi che gli impu
tati abbiano avuto l'idea di muoversi entro questa logica
patriottica, ma è certo che le azioni e i reati che hanno
commesso sono stati deprecati, con chiari e risoluti accenti,
proprio da quegli organismi e da quelle persone che, per
riconoscimento internazionale, interpretano ai livelli
più rappresentativi le aspirazioni della loro gente. E'
vero, invece, che azioni del genere sono da considerare
controproducenti anche ai fini della causa evocata, per
l'orrore che suscitano nella pubblica opinione, per la
diffidenza e il senso di ostilità che si riverberano sui
loro autori, per l'esigenza di ritorsione o quanto meno di
autotutela che generano nei Paesi terzi, destinata a ritor
cersi, comprimendole, contro le pur legittime aspirazioni
del popolo la cui causa è con assurdamente gestita. Non esiste
un terrorismo buono e uno cattivo; gli orizzonti ideali
non velano l'infamia dei risultati pratici; la giustizia
dello Stato non può formulare giudizi positivi in relazio
ne a fatti che l'ordinamento considera antisociali, sia
per il modo in sè sia per gli scopi immediatamente perse-
guiti. E' vero, piuttosto, che i reati in questione espri



-70-

mono ira, rabbia, disperazione, e volontà di trasformare
la propria impotenza, individuale e di popolo, in un'impo
tenza collettiva.  Tutto ciò è comprensibile, umanamente,
ma non si risolve in alcun valore, etico o sociale. Alla
fin fine anche la cupa vicenda dell'Achille Lauro non è
che un episodio del conflitto che oppone le ragioni esi
stenziali del popolo palestinese al diritto storico di
Israele, scontro di due ragioni sfociato in una comune
tragedia.  Non spetta alla giustizia dello Stato italiano,
il cui popolo è accoratamente sensibile al dolore della
nazione dispersa, ma che pure è legato da chiari e con-
vinti rapporti diplomatici con lo Stato di Israele, e non
è ignaro delle sue storiche tribolazioni, prender partito
a favore dell'uno o dell'altro, concedendosi apprezzamenti
metagiuridici, che propendano per l'una piuttosto che per
l'altra parte in conflitto.

Le cose stanno diversamente con riguardo alle atte-
nuanti generiche, che la Corte di primo grado ha concesso
agli esecutori materiali negandole ai loro mandanti, e che
oggi la difesa vorrebbe veder estese a questi ultimi, men
tre il P.M. ne censura la concessione, a suo avviso troppo
generosa, al capo stesso del nucleo operativo, Al Molqi.
Qui vengono in gioco considerazioni personologiche atipi
che, criteri di commisurazione della pena che chiamano in
causa la sensibilità e la discrezione del giudicante. Questa
Corte, valutate le diverse ragioni esposte, è dell'avviso
che i primi giudici abbiano fatto buon uso dei poteri loro

- 71 -

rimessi e che le statuizioni assunte debbano essere qui confermate.

Con riguardo alla posizione di Al Molqi il P.M. rileva che, comparando da un lato le sue condizioni personali e di vita (la nascita in un campo per profughi, l'apprendimento dell'uso delle armi fin dall'infanzia, la giovinezza trascor sa interamente in campi militari) e dall'altro la gravità obbiettiva dei delitti, che sconfinano nella barbarie, e il cattivo comportamento processuale approdato a un'inutile ritrattazione, le ragioni contrarie a un'eccessiva indul- genza finiscono con l'apparire nettamente preponderanti su quelle ad essa favorevoli. Ad avviso di questa Corte il giu dizio è troppo severo. Pur convenendo sulla palese gravità dei fatti,non possono sottacersi alcuni rilievi, che militano a favore del prevenuto.

Nel suo comportamento processuale, invero, vanno distinti due momenti: il primo, ampiamente confessorio e contraddistin- to da una serena autoriflessione sul significato della gesta compiute; il secondo, formalmente sfociato in una specie di ritrattazione, ma in realtà è rivolto a rivendicare il proprio stato di combattente, contraddetto - secondo la perso nale visione dell'interessato - dalla contestazione della natu ra "terroristica" degli addebiti. L'imputato, pare di capire, riconosce la propria responsabilità, ma nega di essere un ter- rorista: a questa impostazione è da riportare la sua scelta di no collaborare più con gli inquirenti dopo che l'istrutto- ria ha fatto emergere qualificazioni giuridiche dei fatti che

- 72 -

l'imputato ritiene di non poter accettare.  Una linea di
difesa tortuosa e, se si vuole, discutibile, ma non priva
di una sua fondamentale dignità, che non può essere ritorta
contro chi la propone.

Non si discute, poi, la gravità del fatto, ma va rico-
nosciuto che nella sua perpetrazione non si ravvisano quelle
componenti egoistiche che fanno apparire intollerabili, ad
esempio, i massacri compiuti a scopo di rapina, i delitti di
mafia e di camorra, gli stupri e le violenze che non hanno
altro scopo che l'autogratificazione del colpevole. A torto
o a ragione Al Molqi crede di servire una "causa", per la
quale non esita ad esporre, senza alcuna prospettiva di torna
conto individuale, la propria giovane vita. La Corte non intende
in alcun modo esaltare il gesto, che resta infame, ma non può
non ravvisare il filo sottile che lo distingue da analoghi,
non meno infami delitti.

Infine, la pericolosità dell'imputato è eminente, ma per
così dire riflessa. L'attitudine criminale di lui nasce da
condizioni esterne, contro le quali egli pure, a suo modo,
combatte.  Poichè la pena va commisurata all'uomo e non alle
circostanze del suo agire, pare alla Corte che l'attenuazione
legata alle "generiche" concessegli non contraddica il senso
della giustizia, che vede nell'uomo, e non nella vita o nella
storia o nella politica, l'oggetto del giudizio.

Le cose stanno diversamente per i mandanti. Le loro condi
zioni personali possono intuirsi analoghe, ma non ve ne è
prova certa nel processo.  Di ciò che hanno detto o pensato

- 73 -

nulla si sa di sicuro; nessuno ha fatto pervenire a questa
Corte memoria autentica di sè. Sono rimasti nel buio, perchè
quello è il sito del loro agire. Non si sono esposti di per
sona, non hanno rischiato. La maschera nera e informe del
terrorismo è il loro volto. Non vi sono prove tangibili
di resipiscenza; nessuno di loro ha detto: non lo farò più.
Questa Corte è chiamata a giudicare delle ombre, il cui solo
tratto distintivo è la perdurante temibilità. La concessione
delle generiche suonerebbe come una specie di carta di credi
to, da spendere in futuro; come dire: tutto ciò che farete
troverà in noi pronta indulgenza. La Corte non può che ri-
chimarsi alle considerazioni già espresse dai primi giudici
e dare atto che non sussistono i presupposti per un diverso
apprezzamento della loro responsabilità.

Le generiche sono perciò da confermare limitatamente
agli imputati che ne hanno beneficiato in primo grado. Le
considerazioni sopra svolte, che vogliono sottolineare la
delicatezza del beneficio e gli aspetti di problematicità
che ne accompgnano il riconoscimento, rendono pienamente
giustificato il giudizio di equivalenza, con le ritenute
aggravanti, cui sono pervenuti i primi giudici (fatta salva
la peculiare posizione di Abbas Issa). Il discorso figuarda,
più in generale, la commisurazione della pena, di cui da varie
parti e con varietà di argomenti si sollecita la riduzione.
Questa Corte è dell'avviso che la sua quantificazione concreta

- 174 -

non possa prescindere dall'eccezionale gravità dei fatti,
dai connotati di spregiudicatezza e perfino di ferocia
che li contraddistinguono, dall'allarme suscitato e dalla
obbiettiva pericolosità dei protagonisti, che è l'altra
faccia del loro innegabile fanatismo. Non vi è sproporzio
ne fra entità e natura dei reati e misura della sanzione,
sicchè le pene inflitte  in primo grado vanno confermate,
con le precisazioni e le correzione che seguono:

    - I reati di cui ai capi B), C) e D), limitatamente alle
ipotesi per cui Abul Abbas, Al Molqi Magied, Fataier Abela-
tif, Al Assadi Amahad, Ziad El Omar, Ez El Din Badrakhan e
Abbas Mohamed Issa hanno riportato condanna, sono estinti
per amnistia, alla cui applicazione non ostano circostanze
di indole soggettiva: donde la relativa declaratoria.

    - Nei riguardi di Abdullarihim Kaled la pena editta pre-
vista per il reato più grave (capo F) è senza alternative
quella dell'ergastolo, cui, per la concorrenza di più ipotesi
criminose (art. 72 cpv. C.P.), vanno aggiunti due mesi di
isolamento diurno.  Seguono l'interdizione legale, la pubbli
cazione della sentenza (mediante affissione nel Comune di
Genova e mediante pubblicazione per estratto, una sola volta,
sui quotidiani "Il Secolo XIX" e "Il Lavoro", a spese del
condannato),la misura della libertà  vigilata per un tempo
non inferiore a tre anni.

    - Nei confronti di Al Molqi Magied, Fataier Abelatif,
Al Assadi Kaled è da ritenere la continuazione per i reati

- 75 -

per i quali hanno già riportato condanna con sentenza 8
maggio 1986 della Corte di appello di Genova, passata in
giudicato il 2 febbraio 1987. Trattasi dei reati concernen
ti il porto e la detenzione delle armi impiegate nel raid:
l'orientamento giurisprudenziale più recente permette, com'è
noto, di ritenere la continuazione anche se il procedimento
già definito riguarda ipotesi criminose punite con pene
edittali meno gravi (Cass. s.u. 21 giugno 1986, ric. Nico-
lini). Le pene nei loro confronti vanno pertanto determina
te come segue:

anni trenta di reclusione per Al Molqi Magied, sulla
base di anni trenta (art. 289 bis C.P.), nella quale resta
assorbito l'aumento derivante dalla continuazione;

anni venticinque di reclusione per Fataier Abelatif,
sulla base di anni ventiquattro (art. 289 bis C.P.), aumenta
ta di un anno per la continuazione;

anni sedici di reclusione per Al Assadi Ahmad, che già
fruisce dell'attenuante di cui all'art. 4 L. 15/1980, sulla
base di anni quindici, aumentata di un anno per la continua
zione.

— Nella pena inflitta ad Al Assadi Ahmad e a Fataier
Abelatif va distinto l'aumento computato per i reati diversi
da quelli concernenti le armi, nella misura di due mesi di
reclusione (v. sentenza di primo grado). Tale misura di
pena è coperta dal condono di cui al D.P.R. 865/86: donde
la relativa declaratoria.

— Estinto per amnistia è l'unico reato ancora ascritto
a Gandura Said (capoW). La sua richiesta di proscioglimento

- 76 -

nel merito è priva di fondamento; egli assume di aver
mentito in ordine alle proprie generalità"per timore di
rappresaglie": da parte di chi? per quali misteriosi mo
tivi vista la sua estraneità ai fatti e il nessun apporto
fornito alle indagini?

   - Abdullrahim Kaled è tenuto al risarcimento dei danni
a favore delle costituite parti civili, in solido con i
coimputati che hanno già riportato la stessa condanna in
primo grado;

   - Abul Abbas, Ez El Din Badrakhan, Ziad El Omar, Al
Molqi Magied, Fataier Abelatif e Al Assadi Ahmad sono
tenuti a rifondere, in solido, le spese sostenute dalla
Parti civili per il presente grado di giudizio, e Abdullrahim
Kaled altresì quelle del precedente grado, spese da liqui-
darsi  nella misura di tre milioni di lire per Ilsa Kling-
hoffer, due milioni di lire per Lisa Klinghoffer e diedi
milioni di lire per la Società "Achille Lauro e altri".

   Conferma nel resto.


                         P. Q. M.

   Visti gli artt. 209, 213, 523 c.p.p.,

   In parziale riforma della sentenza 10 luglio 1986
della Corte di Assise di Genova, appellata dal Procurato
re della Repubblica e dagli imputati ABUL  ABBAS, EZ EL DIN
BADRAKHAN, ZIAD EL OMAR, ABDULLRAHIM KALED, ABBAS MOHAMED
ISSA, AL MOLQI MAGIED, FATAIER ABDELATIF IBRAHIM, AL ASSADI
AHMAD MAROUF, SA'AD YUSUF AHMAD YUSUF e GANDURA SAID MOWFEAQ,

- 77 -

Dichiara inammissibile, per genericità dei motivi, gli appelli proposti nell'interesse di ABDULLRAHIM KALED, BEN KADRA MOHAMED e SA'AD YUSUF, e condanna gli appellanti al pagamento delle maggiori spese processuali;

Dichiara ABUL ABBAS colpevole anche del reato di cui al capo M), AL MOLQI MAGIED del reato di cui al capo P), FATAIER ABDELATIF e AL ASSADI AHMAD del reato di cui al capo Q), ABDULLRAHIM KALED dei reati di cui ai capi F), G), H) e T), EZ EL DIN BADRAKHAN del reato di cui al capo N) e ZIAD EL OMAR del reato di cui al capo O) e, ritenuta la continuazione fra tutti i reati nonchè con quelli per cui hanno già riportato condanna AL MOLQI MAGIED, FATAIER ABDELATIF, AL ASSADI AHMAD con sentenza 8 maggio 1986 della Corte di appello di Genova, passata in giudicato il 2 febbraio 1987, e con quelli per i quali ABDULLRAHIM KALED ha riportato condanna in primo grado, determina le pena in quella dell' ergastolo con due mesi di isolamento diurno per ABUL ABBAS, ABDULLRAHIM KALED, ZIAD EL OMAR ed EZ EL DIN DABRAKHAN, in anni trenta di reclusione per AL MOLQI MAGIED, anni venti cinque di reclusione per FATAIER ABDELATIF, anni sedici di reclusione per AL ASSADI AHMAD;

Dispone nei confronti di ABDULLRAHIM KALED l'interdizio ne legale e la pubblicazione della sentenza di condanna, mediante affissione, nel Comune di Genova e per estratto e per una sola volta sui quotidiani "Il Secolo XIX" e "Il La- voro" a spese del condannato; dispone che lo stesso Abdullrahim Kaled , a pena espiata, sia sottoposto alla misura di sicurezza

-78-

della libertà vigilata per un tempo non inferiore a tre
anni;

Visti gli artt. 1 e ss. D.P.R. 16 dicembre 1986
n.865,

Dichiara non doversi procedere nei confronti di
ABUL ABBAS, AL MOLQI MAGIED, FATAIER ABDELATIF, AL ASSADI
AHAMD, ZIAD EL OMAR? EZ EL DIN BADRAKHAN in ordine ai reati
di cui ai capi B), C), D) limitatamente alle ipotesi per
le quali hanno riportato condanna, e nei confronti di ABBAS
Mohamed Issa  in ordine ai reati di cui ai capi C) e D)
limitatamente alle ipotesi per le quali ha riportato con-
danna, e nei confronti di GANDURA SAID  in ordine al reato
di cui al capo W per essere i reati stessi estinti per
sopravvenuta amnistia;

Dichiara condonati due mesi della pena come sopra
inflitta a FATAIER ABDELATIF e AL ASSADI AHMAD;

Condanna ABDULLRAHIM KALED in solido con i coimputati
già condannati, al risarcimento del danno a favore delle
costituite parti civili;

Condanna ABUL ABBAS, EZ EL DIN BADRAKHAN, ZIAD EL
OMAR, AL MOLQI MAGIED, FATAIER ABDELATIF, AL ASSADI AHMAD
alla rifusione, in solido, delle spese sostenute dalle
costituite parti civili nel presente giudizio e ABDULLRAHIM
KALED  altresì delle spese del giudizio di primo grado, che
liquida nella misura di lire tre milioni  per ILSA KLINGHOFFER,
due milioni per LISA KLINGHOFFER e dieci milioni per la
Società "Achille Lauro e altri";

- r J -

Dispone la separazione del procedimento a carico di SA'AD YUSUF limitatamente alle imputazioni di cui ai capi F), G), H), I), L) e V e ne ordina il rinvio a nuovo ruolo.

Conferma nel resto la sentenza impugnata.

Genova, 23 maggio 1987.

Il Cons. rel.

Il Presidente



DEPOSITATO IN CANCELLERIA

addì 27 LUG. 1987

Il Segretario
(Massimo Bracchi)

CORTE DI ASSISE DI APPELLO GENOVA

Ricorso in Cassazione:

25-5-87: imp. 9), 8), 13), 10) —

P.G. per 8), 5), 6) —

Avv.ti Bocciardi per 13),
Mancini per 5), 9), 8), 15),
Bacherini per 2) e 3),
Boré per 4), 6), 7), 11) 12) e 1) —

Il Cancelliere

notificati estratti contumaciali agli imputati il 4.6.87
Sentenza passata in giudicato per Gaudina Saad il 9..8..
Atti alla Cassazione il 30/11/87 —

Il Cancelliere

La Corte di cassazione, in data 10/5/88
ha dichiarato inammissibili i ricorsi
proposti dal Procuratore Generale, da
Abdullrahim Kaled, Abbas Mohamed
Issa, Ben Kadra Mohamed, Abu Kifah,
Al Asradi Ahmad Marouf, Jarbaa Mohamed
Kazem Ali Bu. Rigetta tutti gli altri
ricorsi —
Sentenza passata in giudicato il 10.5.88
per tutti gli imputati escluso il Gaudina

Il Cancelliere

13.6.88 Estratti esecutivi per ciascun imputato (esclusi
ultimi 4) alla P.G., Questure Genova. Uff. Istruz.

Il Cancelliere

La Corte d'Assise d'Appello di Genova riunita in Camera di Consiglio, in data 29 novembre 1993, dichiarava condonati anni due di reclusione, l'intera pena pecuniaria e la pena accessoria temporanea della maggior pena inflitta a Ben KADRA Mohamed con la sentenza 23.5.1987 di questa Corte.

Genova, lì 13.1.1994 ~~29 dicembre 1993~~    l'ausiliario Servato

LA CORTE DI ASSISE DI APPELLO DI GENOVA VISTI GLI ART. 66, 127, 130 C.p.p. DISPONE CHE LE GENERALITA' DEL CONDANNATO BEL KADRA MOHAMED NATO A DAMASCO (SIRIA) IL 22/12/1963 SIANO RETIFICATE IN QUELLA DI MONZER AL KASSAM NATO A YABROUT (SIRIA) IL 1/7/1965.

GENOVA 18/12/1996

L' ASSISTENTE GIUDIZIARIO
(L. SERVATO)