Exhibit 27

**Yalowitz, Kent A.**

| | |
|---|---|
| **From:** | ███████████████████████ |
| **Sent:** | Wednesday, November 4, 2020 2:34 PM |
| **To:** | Yalowitz, Kent A. |
| **Subject:** | █████████████ |

External E-mail

Report Pursuant to Section 804 of the Palestine Liberation Organization Commitments
Compliance Act of 1989 ("PLOCCA") (Title VIII, P.L. 101-246) and
Sections 603-604 and 699 of the Foreign Relations Authorization Act,

FY 2003 ("the Act") (P.L. 107-228)

This report and related determinations are transmitted in accordance with the provisions cited
above and cover the period from April 5, 2020 through October 4, 2020. This report describes
compliance by the Palestine Liberation Organization (PLO) and the Palestinian Authority (PA),
as appropriate, with respect to commitments specified in section 602(1) of the Act, and any
additional commitments in then-Chairman Yasser Arafat's September 9, 1993, letters to Israeli
Prime Minister Rabin and Norwegian Foreign Minister Holst and to those contained in, and
resulting from, the good-faith implementation of the Declaration of Principles. The
commitments made by the PLO are cited in the Act. In addition, in 1998, the PLO, through the
Palestine National Council (PNC), voted to affirm the PLO's decision to annul articles of the
PLO covenant that deny Israel's right to exist and to strengthen cooperation with Israel on a wide
range of security issues. As described in prior reports, both parties' further commitments are set
out in the Wye River Memorandum of October 23, 1998, and the Sharm el Sheikh Memorandum
of September 4, 1999, which are intended to ensure the effective handling of any incident
involving a threat or act of terrorism by cooperating in the exchange of information; coordinating
policies; and taking measures to prevent acts of terrorism, violence, or incitement.
I. Overview of the Reporting Period: The Administration engaged in efforts to advance an
enduring and comprehensive peace between Israel and the Palestinians, including engagement
with key stakeholders in the region and other members of the international community as
President Trump advanced his "Peace to Prosperity: A Vision to Improve the Lives of the
Palestinian and Israeli People" released in early 2020. On September 15, the United States
hosted the leaders of Israel, UAE, and Bahrain at the White House to sign the Abraham Accords
Declaration, and other instruments between Israel, the UAE, and Bahrain. Together, these
agreements will serve as the foundation for a comprehensive peace across the entire region.
Economic growth in the West Bank was partially constrained by restrictions that Israel states
are security-based, important, and necessary to preventing and countering Palestinian terrorism.
These include restrictions on Palestinian access to land, water, natural resources, and movement
and access, which can slow the transportation of goods and increases the costs of trade.
Economic growth was further curtailed by COVID-19 restrictions and PA President Mahmoud
Abbas's May 19 decision to end civil and security coordination with Israel and the United States.
Despite fiscal constraints associated with the PA's decision to end coordination and
concomitantly stop accepting clearance revenues (taxes collected by Israel on the PA's behalf),

UNCLASSIFIED
-2-

1

the PA continued to make payments through the PLO to Palestinians connected to terrorism. This is despite Israel's decision to suspend extension of sovereignty into the West Bank. The recipients of the payments included Palestinian terrorists in Israeli prison, released Palestinian terrorists, and the families of Palestinians who were wounded or died while committing terrorist acts or in connection with terrorism. In accordance with the July 2018 Israeli Deduction Law, Israel is to withhold a sum equal to what the PA paid these individuals from its monthly clearance transfers to the PA. Israel did not have to take this step since the Palestinians have refused transfers since May. The Israeli government issued an order in February 2020 enabling fines and criminal penalties under the Israeli legal system on any bank in the West Bank or Gaza that facilitates these payments, though it has thus far suspended its implementation. The PA argues these transfers are social payments for families who have lost their primary breadwinner. The United States and Israel argue that the payments incentivize, encourage, and reward terrorism, given higher monthly payments for lengthier prison sentences tied to more severe crimes.

In Gaza, U.S.-designated foreign terrorist organizations that are supported by Iran, such as Hamas, Palestinian Islamic Jihad (PIJ), and other militant groups posed a serious threat to Israel's security. Their repeated attacks against Israel, Hamas's refusal to surrender security control of Gaza, cuts to Gaza-based PA employees' salaries given the PA's poor fiscal standing, COVID-19 restrictions, and Israel's security-based movement and access restrictions, including on the import of goods Israel wishes to deny Hamas to restrict its ability to build its arsenal used for terrorism against Israel, were the primary factors in the worsening economic and humanitarian situation in Gaza. At least 70 percent of Gaza's residents needed some form of humanitarian assistance during the reporting period.

PA security forces continued to maintain law and order in areas of the West Bank under full PA security control (Area A). The PA ceased security coordination with Israel following President Abbas's May 19 announcement. Nevertheless, Israel and the PA continued to arrest members of U.S.-designated foreign terrorist organizations, such as Hamas and PIJ operating in the West Bank. However, despite efforts by Israel and the PA, terrorist attacks on Israelis by Palestinian residents of the West Bank continued during the reporting period.

II. Determinations as to Palestinian Compliance with their Commitments Required by Section 603 of the Act:

"Recognition of the right of the State of Israel to exist in peace and security:" President Abbas has stated a commitment to nonviolence, a two-state solution, and previous PLO commitments, including recognition of the right of the State of Israel to exist in peace. However, Abbas and others within the PLO and PA have also made public statements inconsistent with this commitment. Some PA schools and media outlets continue to promote the idea that Israel does not have a right to exist and support the elimination of Israel on maps that show "Palestine" covering over Israel with indications "Palestine" will be "liberated" in the future.

"Acceptance of United Nations Security Council Resolutions 242 and 338:" The PLO and PA expressed their acceptance of UN Security Council Resolutions 242 and 338 as the basis for achieving a peaceful and comprehensive resolution of the Arab-Israeli conflict.

UNCLASSIFIED

-3-

"Resolution of all outstanding issues in the conflict between the sides through negotiations and exclusively peaceful means:" On May 19, Abbas gave a speech in which he announced "The Palestine Liberation Organization and the State of Palestine are absolved, as of today, of all the agreements and understandings with the American and Israeli governments and of all the obligations based on these understandings and agreements, including the security ones ...The Israeli occupation authority, as of today, has to shoulder all responsibilities and obligations in front of the international community as an occupying power over the territory of

the occupied state of Palestine, with all its consequences and repercussions based on international law and international humanitarian law." Abbas announced the PA was joining more international agreements and conventions but stated support for a "two-state solution, with our readiness to accept the presence of a third party on the borders between them, on the condition that negotiations will be held to achieve that under international auspices and through an international peace conference based on international legitimacy." Abbas also called upon countries who oppose the Trump Administration's Vision for Peace "to take deterrent steps and impose serious sanctions" against Israel, countries to also "recognize the state of Palestine ... and to implement the Security Council resolutions on providing international protection to our people in their occupied state."

During the reporting period, the PA continued to provide support to the ICC prosecutor who was conducting a preliminary examination into the situation in the "state of Palestine," including in terms of alleged Israeli war crimes. The ICC pre- trial chamber is expected to issue a ruling on the prosecutor's request that the pre-trial chamber rule on the scope of territorial jurisdiction before the prosecutor launches a formal investigation. The United States and Israel have made clear their views about the fact this investigation should not proceed but have not formally engaged with the ICC. Several other countries, who are states parties to the Rome statute of the ICC, have filed their views that the ICC does not have jurisdiction in this case. "Renunciation of the use of terrorism and all other acts of violence and responsibility over all PLO elements and personnel in order to assure their compliance, prevent violations, and discipline violators:" The PA took steps during this reporting period to prevent terrorism and other acts of violence in the West Bank areas under its control, including arrests of Hamas members and, while not necessarily coordinated, the acquiescence of PA security forces in allowing Israeli security forces to operate against threats. Israeli authorities, among others, have noted the importance of the PA security forces' continued commitment to security, despite political and financial uncertainty, even amid concerns over the PA's cut in formal security coordination with Israel.

At the same time, the PLO and PA leaders have praised Palestinian terrorists and claimed that all forms of resistance are legitimate. In a June interview, Jibril Rajoub, Secretary-General of the PLO's preeminent party, Fatah, said, "If this occupation causes escalation, I believe that we will decide to start a confrontation... I also say that international legitimacy permits us resistance in all its forms, and nothing is forbidden... Our resistance in the occupied lands is against all the occupation's symbols. Whether it is the settlers, their farms, their army, or all their brats and the like." Official Palestinian media have also celebrated Palestinian prisoners and "martyrs" for their role in attacks on Israelis. One example was the early May broadcast of "The Giants of Palestinian History" television program, on which several individuals involved in serious attacks

UNCLASSIFIED

-4-

were celebrated. This glorification of violence was echoed in PA public schools and media outlets, including social media accounts affiliated with PLO parties.

Since 2007, the PA has taken effective measures to prevent individuals involved in terrorist activities from serving in security services. During the reporting period, PA security forces continued to combat potential terrorist activity, including through detentions and arrests of members of Hamas and members of other terrorist and extremist organizations.

The PLO and PA had no effective security control in Gaza, which remained under the de facto control of Hamas during the reporting period. Militants have exploited the limits of PA control and the PA has not fully complied with its commitments to assume responsibility over all elements and personnel to prevent violations and discipline violators.

The Popular Front for the Liberation of Palestine (PFLP) and the Democratic Front for the Liberation of Palestine (DFLP), which are both part of the PLO, remained supportive of terrorist activity. Both organizations advocated and defended the PA's security coordination

cut with Israel and the United States. Both organizations maintained active militant wings in Gaza that operated jointly with Hamas, PIJ, and other terrorist groups during the reporting period as they escalated tensions, including through aerial explosive balloons launched from Gaza in late August and early September.

III. Imposition of Sanction under Section 604: Pursuant to section 603 of the Act, the Deputy Secretary of State has determined that the PLO and the PA are not in compliance with certain commitments to prevent violations, discipline violators, and assume responsibility over all PLO elements, as noted in this report. Thus, the sanction specified in section 604(a)(2) of the Act, denial of visa for PLO and PA officials has been imposed.

IV. Waiver of Sanction: The Administration is committed to advancing an enduring and comprehensive peace between Israel and the Palestinians. The Administration presented the political framework "Peace to Prosperity: A Vision to Improve the Lives of the Palestinian and Israeli People" on January 28, 2020. The Administration urges the Palestinian leadership to engage on the vision. Therefore, a blanket denial of visas to PLO members and PA officials is not consistent with the Administration's willingness to negotiate with the PLO and PA leadership.

For these reasons, and consistent with the justification provided to Congress upon the President's exercise of his authority on April 7, 2010, under section 7034(b) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2010 (Div. F, P.L. 111-117), to waive the provisions of section 1003 of P.L. 100-204, the Deputy Secretary is invoking the waiver authority granted by Section 604(c) of the Act, based on his determination that such a waiver is in the national security interests of the United States. Please see the determination attached hereto.

V. Other PLOCCA Requirements: In addition to a report on compliance with the commitments detailed above, section 804(b) of the PLOCCA requires a report (covering the same reporting period) on the PLO's progress toward achievement of certain additional measures

UNCLASSIFIED

-5-

consistent with its commitments. Previous commitments, policy, and information from past PLOCCA reports remain as stated, unless new information is provided below.

• Measures Taken to Prevent Violence and Punish Offenders: PA security forces continue to prevent violence and punish offenders in the West Bank. PA security forces continue to operate against terrorist groups in areas under full PA security control in the West Bank (Area A) and in some parts of areas under joint Israeli-Palestinian security control (Area B). Offenders are arrested and tried in accordance with legal arrangements in place under the PA. In areas of the West Bank outside PA control (parts of Area B and all areas where Israelis have full civil and security control (Area C)), the PA has ended official security coordination with Israel but has de-conflicted its engagements.

• PLO Charter: As previously reported, the PLO complied with its commitment to amend its charter.

• Arab League Boycott of Israel: As previously reported, the PLO and the PA officially disavowed the Arab League boycott. Nevertheless, the PA expressed its strong disapproval of Arab states normalizing relations with Israel. Referring to the UAE's diplomatic normalization agreement with Israel, President Abbas said, "We consider this a stab in the back and we absolutely reject it." PA diplomats also worked to encourage statements, including from the Arab League, condemning normalization. The PA also expressed support for the Boycott, Divestment, and Sanction (BDS) movement against Israel.

• Assistance to Palestinians: The Department of State and USAID continue to vet, monitor, and supervise the distribution and use of U.S.-provided assistance in line with requirements under relevant laws to ensure that U.S. foreign assistance is not diverted for

terrorist purposes. As of February 1, 2019, at the request of the PA, the United States ceased providing assistance under the authorities specified in the Anti-Terrorism Clarification Act (ATCA) in the West Bank and Gaza Strip. All USAID economic support funding assistance in the West Bank and Gaza ceased, as did U.S. security assistance to the PA from the International Narcotics and Law Enforcement (INCLE) funding stream. The United States announced in April $5 million in international disaster assistance funding to support Palestinian efforts against COVID-19.

• Additional PLOCCA Reporting Requirements: There are no new developments in the cases of Abu al-Abbas, Force 17, or the Hawari group.

VI. Report on Transfer of Proscribed Weapons to Persons or Entities in the West Bank and Gaza: Terrorist groups and their sympathizers continued to smuggle illegal weapons and

cash into the Gaza Strip via the few remaining underground tunnels located along the Egypt-Gaza border throughout the reporting period, despite Egyptian military operations in the

Sinai. We do not believe the Egyptian or Jordanian governments were complicit in weapons smuggling.

We have seen efforts by Egypt during this period to deter smuggling and extremist activity; Egyptian and Israeli security forces have destroyed nearly all smuggling tunnels. The smuggling

UNCLASSIFIED
-6-

of arms into Gaza, however, and future tunnel construction remain serious concerns. Egyptian military operations in Sinai are ongoing.

No basis exists to determine that smugglers along the Egypt-Gaza border received official support from any foreign person or entity to which U.S. assistance might be given or to which defense articles or services might be sold by the United States.

Attachments:
Determination
Executive Summary

UNCLASSIFIED

UNCLASSIFIED
Executive Summary

Major points in the report are as follows:

• Palestinian Authority (PA) security forces continued to maintain law and order in areas of the West Bank under full or partial PA security control. Israeli--Palestinian security coordination continued at both the tactical and leadership levels until May 11 when PA President Mahmoud Abbas suspended coordination. Security coordination resumed as of late September. Israeli security officials assessed that this coordination prevented numerous terrorist attacks. More effort is required by the Palestine Liberation Organization (PLO) and PA to comply fully with commitments to "prevent violations and discipline violators" and "assume responsibility over all PLO elements." The PA remained committed to peace and nonviolence, continued to recognize Israel's right to exist in peace and security, accepted UNSCRs 242 and 338, and called upon all Palestinians – even those outside the PLO and PA, to refrain from violence.

• Despite some comments to the contrary by some members, the PLO and PA claim to remain committed to a peaceful and negotiated solution to the conflict. During the reporting period,

the Administration released brokered agreements between Israel and the UAE and Bahrain to normalize relations, and remained engaged in efforts to advance an enduring and comprehensive peace between Israel and the Palestinians. This included engaging with stakeholders in the region and other members of the international community. The United States continued to oppose one-sided actions in international bodies or treaties that seek to circumvent or prejudge outcomes that can only be negotiated, including Palestinian statehood, or that seek to delegitimize Israel or undermine its security.

• In response to the Middle East Peace Commitments Act requirement that the President (in this case, the Secretary or Deputy Secretary of State) impose one or more of the sanctions in the event of a finding of noncompliance by the PLO or PA, the report and draft determination reflect the decision by the Deputy Secretary of State to deny visas to PLO members and PA officials. In light of the continued utility of engagement with PLO and PA officials aimed at advancing U.S. foreign policy interests, the package reflects a decision to simultaneously invoke the authority given by the Act to waive the sanction on the basis of U.S. national security interests. This course of action was also taken in the last iteration of this report.

• As required by section 699 of the Act, the report also addresses arms smuggling by foreign persons or entities, primarily Palestinian terrorist groups, and concludes that such terrorist groups continued their efforts to smuggle weapons into Gaza from or through Egypt (primarily through the Sinai). It notes that Egypt made effort during this period to deter smuggling. There is no indication that smugglers have official support from any foreign person or entity to which assistance might be given or defense articles sold by the United States; therefore, no sanctions determinations under the legislation are required.

