L5JPSOKO

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MARK I. SOKOLOW, ET AL.,

4                    Plaintiffs,

5              v.                          04 CV 397 (GBD)
                                           Videoconference
6    PALESTINE LIBERATION ORGANIZATION,    Oral Argument

7    ET AL.,

8                    Defendants.

9    ------------------------------x
                                           New York, N.Y.
10                                         May 19, 2021
                                           10:33 a.m.
11
     Before:
12
                      HON. GEORGE B. DANIELS,
13
                                           District Judge
14
                  APPEARANCES VIA VIDEOCONFERENCE
15
     ARNOLD & PORTER, LLP
16        Attorneys for Plaintiffs
     BY:  KENT A. YALOWITZ
17
     SQUIRE PATTON BOGGS, LLP
18        Attorneys for Defendants
     BY:  MITCHELL R. BERGER
19

20

21

22

23

24

25

L5JPSOKO

1              (The Court and all parties appearing via

2     videoconference)

3              THE COURT:  Good morning, everyone.

4              MR. BERGER:  Good morning, your Honor.

5              THE COURT:  I guess let's start with Mr. Yalowitz.

6     Are you going to argue for your motion?

7              MR. YALOWITZ:  Sure.  Thank you, your Honor.  I'd be

8     glad to lead off.  First of all, I'm very glad to see you

9     again.  I'm sorry it's not in person.

10             I'd like to cover three topics.  I'm happy to just

11     talk or answer questions.  I just want to be as helpful as I

12     can to the Court, but the topics that I think are at issue

13     based, on the Second Circuit's limited mandate, are:  No. 1 is

14     the PSJVTA applicable to this case; and No. 2, if it is, any

15     issues, any legal issues, related to the applicability,

16     including the constitutionality of the statute.

17             So I would cover, No. 1, the applicability; and No. 2,

18     the due process clause issues that the defendants are arguing;

19     and No. 3, the separation of powers issues that the defendants

20     are arguing, if that's okay with the Court.

21             THE COURT:  Sure.  That will be helpful.

22             MR. YALOWITZ:  Okay, great.  So as the Court is aware,

23     as we have learned together, there are two prongs to the

24     revised section 18, U.S.C., Section 2334(e).  The first prong

25     is what's known as pay-for-slay, and the second prong is the

L5JPSOKO

1    U.S. activities.  The plaintiffs came with a showing that there

2    were 178 either convicted or killed individuals, who were

3    convicted for or killed while perpetrating terror attacks that

4    injured or killed U.S. citizens.

5            The statute says if those such individuals are paid

6    after April of 2020, that will be deemed to be consent.  We

7    came with evidence, No. 1, that there was a bureaucratic system

8    of making those payments; No. 2, that the defendants made

9    numerous admissions by officers speaking in the scope of their

10   authority that they were, in fact, continuing to make those

11   payments; and No. 3, U.S. government reports stating that

12   investigations conducted or pursuant to law or under a duty to

13   report, the fruits of those investigations indicated that the

14   payments were continuing to be made.

15           The defendants had an opportunity to contest the 178

16   individuals, and they elected not to.  And, in essence, we're

17   on what could be deemed a summary judgment standard.  We're not

18   at the pleadings stage.  It's my burden to show by a

19   preponderance of the evidence that the statute is being met.  I

20   came with that evidence, and the defendants had the opportunity

21   to contest it.  Electing not to contest it, those facts should

22   be found by the Court.

23           THE COURT:  Well, let me focus a little bit in terms

24   of the way I've read the papers.  It seems to me that with

25   regard to the payments, that there doesn't seem to be either a

L5JPSOKO

1    genuine factual dispute as to what's occurring presently, and

2    that doesn't seem to be their primary argument against that

3    portion, saying that the facts don't match the statute.

4            With regard to the U.S. activities, that's a different

5    argument.  They say, well, look, with regard to the payments to

6    individuals, our argument is more so a due process

7    constitutional argument slash a -- well, it's technically

8    articulating it as a forced consent.  Is there really any such

9    thing as a forced consent?  You know, you either consent or you

10   don't.  You either want to tell us that what we do is

11   appropriate for asserting jurisdiction over us, or you tell us

12   it's not.

13           You don't tell us whether we agree to it because we're

14   not agreeing to it, and we're only going to be dragged into

15   court if you say that you have authority to drag us into court.

16   And we're not going to consent to show up unless you force us

17   to do so.

18           And now with regard to the second prong, they are

19   genuinely disputing or directly disputing whether or not the

20   requirements of the statute itself, putting aside

21   constitutionality, requirements of the statute have actually

22   been met that, you know, that's an analysis of what UN

23   activities are going on, what other ancillary UN activities are

24   going on, and whether or not there are other activities that

25   could be characterized as not related to UN activity that can

L5JPSOKO

1   be a basis for jurisdiction.  That's more of a factual

2   analysis.

3          But it seems to me that you don't need both.  You need

4   one.

5          MR. YALOWITZ:  Right.

6          THE COURT:  And so it seems to me that the more

7   important analysis is whether or not if you have one or the

8   other, whether or not that's consistent with the due process

9   clause of the Fifth Amendment, and whether or not I have

10  precedent to say that even if, under a general analysis, the

11  current general analysis that the Supreme Court has given us

12  and the Second Circuit has given us as to how to analyze due

13  process and particularly due process contact, that should be

14  sufficient for someone to reasonably expect that they'd be

15  hauled into court.

16         Whether or not saying to someone, well, we know you

17  really didn't agree to this, but we're going to deem you to

18  have agreed to it for the purpose of jurisdiction.  We're not

19  going to say it really is jurisdiction.  We're going to say it

20  really is your consent to jurisdiction and whether or not

21  that's consistent with the due process constitutional analysis.

22         I mean, one example that I might give, and you can

23  address is, well, would it be sufficient for a state or a

24  jurisdiction to say, well, if you were in New York last week

25  and then you have a car accident this week in New Jersey,

L5JPSOKO

1   whether or not we can say that your having been in New York

2   last week, unrelated to this car accident, is either consistent

3   with due process or it is consistent with us being able to say

4   that we gave you fair notice of that, and you came to New York,

5   you were in New Jersey and you had an accident; so you

6   shouldn't have come to New York the week before.  So even

7   though it has nothing to do with the accident, we have the

8   authority to say you consented because you were in New York the

9   week before.

10           So I mean, are we genuinely talking about consent

11   here, or are we really talking about an assertion of

12   jurisdiction over a party's objection, even though they don't

13   have the contact that the Supreme Court and the Second Circuit

14   has now relied upon as being sufficient with due process?  Can

15   we simply manufacture consent and articulate in a way that that

16   consistent with due process?

17           MR. YALOWITZ:  Okay.  So here's how I like to think

18   about it.  I think that the due process clause, or at least the

19   due process clause of the 14th Amendment, does work for three

20   things, and the Fifth Amendment does at least two.

21           So, first of all, as you say, Judge, fair notice.  You

22   have to have fair notice.  You can't have like gotcha.  You

23   can't have, you know, we didn't -- well, we secretly decided

24   that the law was going to apply to you in some way.

25           No, it has to be clear, direct.  You have to have

L5JPSOKO

```
 1   actual notice or at least fair notice.  There's no question
 2   that fair notice exists here.  There's no argument that they
 3   were unaware of the statute.  There was no argument that they
 4   were not aware of how it was going to work.  Fair notice,
 5   there's no dispute.
 6              Second --
 7              THE COURT:  Before you go to the second point --
 8              MR. YALOWITZ:  Yes.
 9              THE COURT:  -- because it is partially unclear to me
10   what is the relief that you're asking for.  Because when you
11   talk about fair notice, you know, are you talking about for the
12   original lawsuit, for reviving the original lawsuit, or for a
13   new lawsuit?
14              MR. YALOWITZ:  So first of all, it's for any lawsuit
15   that is pending, and the new lawsuit is definitely pending.
16   There's no question about that.
17              THE COURT:  Right.  Fair notice -- yes, I understand
18   that.
19              MR. YALOWITZ:  The old lawsuit, whether it's pending
20   or not depends on what the Second Circuit decides to do.
21   They've held that question in abeyance.
22              THE COURT:  Right.
23              MR. YALOWITZ:  So if they decide to reopen it because
24   it's judicially efficient to reopen it, there's a societal cost
25   to making everybody retry the case, there's a judicial cost,
```

L5JPSOKO

1    juries, witnesses, third parties, resources.  If they say, the

2    judiciary says, in its discretion that we're going to reopen

3    the case, then the case is pending, the old case is pending,

4    consent applies.  But if they don't reopen the case, then you

5    can't -- Congress can't force the judiciary to reopen a case.

6    That's up to the Second Circuit and Supreme Court.

7            THE COURT:  Well, why would fair notice apply to the

8    claims that were brought back in 2004?

9            MR. YALOWITZ:  Yes, so the defendants were well aware

10   that these claims existed.  They knew that there was a new

11   lawsuit on file.  They knew that there was a pending motion to

12   reopen the old case.  So in the circumstances of this case,

13   there's no question they had fair notice.

14           THE COURT:  I didn't follow that because fair notice

15   of what?  They did not have fair notice of their potential

16   liability under the statute at anytime prior to the statute

17   being enacted.

18           MR. YALOWITZ:  Well, right, but they had fair notice

19   on the day the statute was enacted.

20           THE COURT:  Well --

21           MR. YALOWITZ:  And if they did the conduct that the

22   statute indicate, that they would be subject to personal

23   jurisdiction for these claims either in the new case, without

24   question, or in the old case, if the courts granted the motion

25   to recall the mandate.  The day the statute was passed, they

L5JPSOKO

1    knew that, or at least when they got notice of the statute.

2             THE COURT:  From your prospective, is it relevant for

3    me to analyze what it is that they had fair notice of?  I mean,

4    when they had fair notice?  Put aside the new case because

5    we're not addressing the new case here.

6             MR. YALOWITZ:  Right.  They haven't contested it.  I

7    mean, for the sake of good order, if the Court wanted to

8    assess -- you know, they received actual notice of the statute

9    at least December 2019.

10            And if you look at what was there -- what did they

11   understand the consequences would be?  So whatever it was,

12   December 26th, 2019, they get a copy of the statute in a letter

13   from opposing counsel, and what do they understand the

14   consequences are going to be?  They know that there's a pending

15   petition for certiorari appealing the denial of the motion to

16   recall the mandate, and if they engaged in the conduct, then

17   they're going to be subject to the statute.

18            And, in fact, there's then a litigation in the U.S.

19   Supreme Court about this very issue, and they say to the

20   Supreme Court of the United States, well, you shouldn't grant

21   the petition because we don't know whether we're going to get

22   engaged in this conduct.  That's something that's going to

23   develop in the future, and we don't know, nobody knows, and

24   until somebody knows, then you shouldn't grant the petition.

25            THE COURT:  So you're not asking me to ultimately rule

L5JPSOKO

| | |
|---|---|
| 1 | on whether or not the prior judgment should be reinstated, or |
| 2 | whether or not this case should be tried again? |
| 3 | MR. YALOWITZ:  I think you might have an opinion on |
| 4 | that, but I don't think that's within the scope of the remand. |
| 5 | THE COURT:  Okay. |
| 6 | MR. YALOWITZ:  I mean, you could -- I don't think that |
| 7 | that's within the scope of what they're asking here. |
| 8 | THE COURT:  Okay.  So practically, what are you asking |
| 9 | me to do, and where do you think the case should go from there? |
| 10 | MR. YALOWITZ:  Sure.  So I think you should -- and I |
| 11 | want to come back to the due process issue. |
| 12 | THE COURT:  Sure. |
| 13 | MR. YALOWITZ:  But I think you -- I would expect to |
| 14 | see an opinion from you that answers sort of three questions: |
| 15 | No. 1, does the statute apply as of -- you know.  Based on |
| 16 | findings of facts and conclusions of law, you know, here are |
| 17 | the undisputed facts and these facts -- you know, these facts |
| 18 | meet the statute, these facts don't meet the statute.  Whatever |
| 19 | your judgment is based on, No. 1, the questions of fact and |
| 20 | No. 2, the conclusions of law.  That's No. 1. |
| 21 | No. 2, is the due process clause violated by this |
| 22 | statute, assuming that it applies.  And I think there's, you |
| 23 | know, basic agreement that it applies in some fashion. |
| 24 | And No. 3 is the separation of powers violated as a |
| 25 | result of the application of the statute to this case. |

L5JPSOKO

1          So that's what -- and then, you know, it's like you're

2     not -- nobody's asking you to make an order.  It's like a

3     memorandum decision or something.  I mean, it's a little weird

4     because normally on a remand, you know, the Court is supposed

5     to take some action, but I think really what they're looking

6     for is some findings of fact and conclusions of law.

7          Okay.  So I want to come back to sort of three buckets

8     of the due process clause.  Bucket No. 2 we talked about, fair

9     notice.  Bucket No. 2 is arbitrary government action.  That's

10    as old as the Magna Carta.  Due process says you can't be

11    arbitrary if you're the government.

12         So what does that look like?  If Congress passes a law

13    that says, you know, anybody who crosses a river, you know, the

14    Rubicon in Italy, is subject to jurisdiction of the Western

15    District of Oklahoma, I would say, okay, well, what is that

16    doing?  Like, why would they do that?  That just seems

17    arbitrary.  What's the legitimate government interest, and how

18    is it related to putting people in the Western District of

19    Oklahoma?  It makes no sense.

20         It's the same thing with the hypothetical that you

21    had.  You know, you're in New York on Tuesday, and you got in a

22    car accident in New Jersey a week later, how does that help the

23    State of New York?  Nobody from New York is injured.  It didn't

24    happen in New York.  It's an arbitrary -- it feels to me

25    arbitrary, and that's where the -- you know, all those state

L5JPSOKO

1    registration statutes are going off on these two issues, fair

2    warning and arbitrary.

3              They say, first of all, like if you look at -- I'm

4    sure you have, but when you look back again at the *Brown*

5    *against Lockheed* case, Judge Carney is saying, look, I'm really

6    worried because you've got some routine bureaucratic thing that

7    nobody -- you know, they fill out a form, nobody knows that

8    there's going to be any consequence to it, and all of a sudden,

9    you're subject to general jurisdiction.  That's not fair

10   warning, No. 2.

11             And No. 2, it's hard for me to see a legitimate

12   interest in the State of Connecticut to adjudicate a dispute

13   between people from Georgia, an accident that happened in

14   Georgia, with a corporation headquartered, you know, in some

15   other place and incorporated some other place.  Where's the

16   legitimate interest of Connecticut, other than they want to

17   give extra employment to plaintiffs' lawyers?  Maybe that's an

18   interest, but they don't say that.

19             THE COURT:  Well, let me change the hypothetical,

20   though.  Let's say New York decided that they wanted to write a

21   law that says you have consented to be sued in New York if you

22   engage in an accident in any state and a New Yorker is injured.

23             MR. YALOWITZ:  Yes.

24             THE COURT:  How would that analysis be different?

25             MR. YALOWITZ:  So --

L5JPSOKO

1           (Indiscernible crosstalk)

2           THE COURT:  -- closer analogy to this.  And I get into

3    an accident in Wyoming, the person turns out to be a New York

4    resident, and New York says -- and they don't say that that

5    gives us jurisdiction.  They say that constitutes your consent

6    to jurisdiction.

7           MR. YALOWITZ:  Yes.

8           THE COURT:  How would that be different?

9           MR. YALOWITZ:  So I don't think that statute is

10   constitution, that hypothetical.

11          THE COURT:  How is that different than what we have

12   here?  That's what I'm trying to find out.

13          MR. YALOWITZ:  So first of all, I think -- I have some

14   questions about whether that's actually consent.  I mean, an

15   accident is an unintentional act, but suppose the statute said

16   if you intentionally hurt someone --

17          THE COURT:  Let's say it's robbery.  Yes, the statute

18   says if you injure -- if you commit a crime in which a New

19   Yorker is injured, we consider that to be consent to be sued in

20   New York, even if you robbed a bank in California and shot the

21   bank teller.

22          MR. YALOWITZ:  Right.

23          THE COURT:  So why would that constitute consent?

24          MR. YALOWITZ:  Yes.  So I think that the problem with

25   that statute is the third bucket of the due process clause,

L5JPSOKO

1    which is minimum contacts.  And we know, I mean, short of -- we

2    know from *Walden against Fiore* that that statute doesn't fly

3    under U.S. Supreme Court law because that was the case with the

4    people from California or Nevada, or from Nevada and they were

5    in Georgia and they got -- you know, they got their money

6    confiscated.  They were gambling and they got their money

7    confiscated by law enforcement people in Georgia, and they sued

8    in Nevada.  And the Supreme Court said, well, just because you

9    hurt somebody from Nevada, that's not good enough.

10           THE COURT:  But the corresponding statute doesn't

11   require any U.S. forum.

12           MR. YALOWITZ:  Right, right.  And so the question

13   is -- I mean, this is the question in the case.  Do you have to

14   have minimum contacts in order to -- does a federal statute

15   require minimum contacts or else it's unconstitutional?

16           We know that the State is bound by federalism in ways

17   that the federal government is not.  We know that federalism,

18   that's -- like, *Bristol Myers* says that and Worldwide

19   Volkswagen says that, that the State -- there are certain

20   things that the State, like a nation could do, but a state in

21   the United States can't do because of federalism.

22           And we know that there's a lot of statutes on the

23   books that say if you kill an American or if you hurt an

24   American overseas, if you do things that are bad for U.S.

25   citizens overseas, you're subject to U.S. jurisdiction.  You

L5JPSOKO

1    know, they rendition people, they extradite people, and the

2    defense is, well, I didn't know that it was an American or, you

3    know, I wasn't directing my activities at U.S. soil.  And the

4    answer is, well, you don't have to have minimum contacts

5    against the United States.

6            THE COURT:  Except the difference here is that that's

7    not what the statute -- the difference here --

8            (Interruption)

9            I'm sorry, we are getting background noise.  Somebody

10   has to mute.

11           (Pause)

12           Do we know who that is?  Does anybody recognize that

13   phone number that's ending 2801?  You have to mute your phone.

14           What was I getting ready to say?

15           MR. YALOWITZ:  I think we're back.

16           THE COURT:  So, I had a specific question.  I'm sorry,

17   what where were we?

18           MR. YALOWITZ:  So we were talking about why is the

19   federal government different from the State governments, and

20   the answer is, with consent, you don't need minimum contacts.

21           THE COURT:  Well, see, that's the difference.  That's

22   what I was going to ask you about, because this is not a

23   question of whether or not there's sufficient minimum contact

24   to assert jurisdiction over the defendant.  It is a question of

25   whether or not it constitutes consent.

L5JPSOKO

1          MR. YALOWITZ:  Right.

2          THE COURT:  Consent doesn't require any kind of

3     contact.

4          MR. YALOWITZ:  Right, right.

5          THE COURT:  And there's no rule that I can write that

6     says, okay, consent with contact is better or different than

7     consent without contact.

8          MR. YALOWITZ:  Right.

9          THE COURT:  So I don't see why -- unless you can

10    explain to me why, I don't see why a minimum contact test is

11    the test for consent.

12         MR. YALOWITZ:  I agree with that.  I a hundred percent

13    agree with that.  I think federalism limits the States in ways

14    it doesn't limit the United States.

15         THE COURT:  So you think that the United States can

16    assert jurisdiction, consistent with constitutional principles

17    can set jurisdiction over defendants who have absolutely no

18    contact with the United States?

19         MR. YALOWITZ:  Correct.

20         THE COURT:  On the basis of saying that certain

21    activity constitutes appropriate jurisdiction, or on the basis

22    of saying if you do certain things, that's implied consent?

23         MR. YALOWITZ:  I'm sorry, I just missed the first

24    part, Judge.

25         THE COURT:  Whether or not engaging in certain

L5JPSOKO

1    activity constitutes jurisdiction --

2              MR. YALOWITZ:  Right.

3              THE COURT:  -- as opposed to engaging in certain

4    activity --

5              MR. YALOWITZ:  Is deemed to be consent.

6              THE COURT:  -- is deemed to be implied consent.

7              MR. YALOWITZ:  Right.  It's law of the case that what

8    they did to these people does not meet minimum contacts.

9              THE COURT:  Okay.

10             MR. YALOWITZ:  I disagree with that, but unless the

11   Supreme Court says otherwise, that's law of the case.

12             THE COURT:  Okay.  That's what I was trying to figure

13   out, whether or not you were arguing that.  Go ahead.

14             MR. YALOWITZ:  So it is post-enactment conduct.  If

15   it's voluntarily and knowing, fair warning, volitional, then

16   the Congress has the power to say, okay, based on our foreign

17   policy powers, our power to control -- our plenary power to

18   control the jurisdiction of the judicial branch, we have

19   constitutional power to do that, unless there's some clause of

20   the constitution that says they can't, like, you know, it's an

21   ex post facto or Eighth Amendment violation or something like

22   that.

23             So the question is, is there something in the due

24   process clause that says if you -- that minimum contacts is

25   required for consent, and the answer is no.

L5JPSOKO

1          THE COURT:  No.  Okay.  But you're not arguing that

2     Congress has the authority to change what constitutionally

3     constitutes jurisdiction as laid out by the Supreme Court?

4          MR. YALOWITZ:  That Congress does not have that power.

5          THE COURT:  Okay.  So Congress --

6          MR. YALOWITZ:  Congress may think they have that

7     power, but the courts will not respect it.

8          THE COURT:  From my perspective, that means they don't

9     have it.

10         So what gives them the power to do, through consent,

11    which is not -- well, to do through -- and I will phrase it,

12    through implied consent what they could not do directly?

13         MR. YALOWITZ:  That is a necessary and proper -- it's

14    a necessary and proper incident of their foreign policy powers,

15    of their power to control plenary jurisdiction, and so as long

16    as it's volitional, fair warning, not arbitrary, it's not

17    unconstitutional.

18         THE COURT:  I'm not sure that that's the analysis.  As

19    long as it's all those things, it may be within their power to

20    do so, but that doesn't end the constitutional analysis.  The

21    constitutional analysis is still a due process one.

22         MR. YALOWITZ:  Right.  And as I say, there's three

23    buckets to the due process.

24         THE COURT:  Right.

25         MR. YALOWITZ:  Bucket No. 1 is do they have fair

L5JPSOKO

warning, you know, volitional conduct?  Bucket No. 2, is it

rationally related to a legitimate government interest?  Bucket

No. 3, do you have to have minimum contacts?

And my position, which I think is the Supreme Court's

position, is you do not have to have minimum contacts in order

to deem somebody to consent.

THE COURT:  I mean, I don't think that that's an

unusual principle.  I mean, obviously, if you and I sign a

contract, and I consent to being sued in New York, even though

my company is in China, I don't have to have any contacts with

New York --

MR. YALOWITZ:  That's right.

THE COURT:  -- to enforce that agreement because I

consented.

MR. YALOWITZ:  Right.  As long as the contract wasn't

like procured by duress or fraud or, you know, you were misled

or something like that, but that's exactly right.

The Supreme Court said that in the *Carnival Cruise*

case.  They were like, you know, they consented; we don't have

to get into a minimum contacts analysis.  And it's the same

with rule 12(b).  If you -- rule 12(h), whatever it is, 12(h).

If you don't make your personal jurisdiction motion at the

outset of the case, you're deemed to have consented.

Even if there's no minimum contact, even if you have a

hundred percent correct, you know, you never set foot in the

L5JPSOKO

1    place, you don't make that motion, or if you don't raise the

2    issue on appeal.  You know, you can consent to jurisdiction

3    late in the case.  So it's -- and you don't need minimum

4    contacts.  That's just traditional due process law.

5            THE COURT:  But isn't it also -- as I try to analyze

6    this, to call this consent, isn't this just asserting

7    jurisdiction over a party that really isn't agreeing to be

8    sued?

9            MR. YALOWITZ:  So like, I think about the *Bauxite*

10   case, which was the case where they didn't participate in

11   jurisdictional discovery, and so the District Court said, okay,

12   well, I'm deeming you to consent to personal jurisdiction

13   because you're refusing to participate in my processing.  As a

14   sanction, you're now deemed to consent.  They didn't -- they

15   didn't say, yeah, well, okay.  Actually, we agree.  They fought

16   it all the way to the Supreme Court.

17           So the fact that these defendants are fighting it

18   doesn't -- is not relevant to the legal analysis.  The legal

19   analysis is did they do a thing that they knew would lead to a

20   jurisdictional consequence, and the best example of that, in my

21   mind, is Congress passed a statute called the ATCA.

22           ATCA said if you take our money, you are subject to

23   jurisdiction in terror cases, and the Palestinian Authority

24   wrote a letter to the Secretary of State saying, we're not

25   taking your money.  And so they know how to not consent.  And

L5JPSOKO

1    then, you know, the Court said, okay, well, they didn't take

2    the money; so they didn't consent.  That's pretty simple.

3            They could have avoided all of this by saying, all

4    right, well, we're not going to pay these terrorists.  That's

5    not that complicated.  Most people don't pay people who are

6    sitting in jail for committing terror attacks.  I mean, you

7    know, that's not -- it's not like a big, heavy lift to say

8    don't pay people who killed civilians.  That's pretty standard

9    issue stuff, you know.

10           So I mean, one of their arguments is, well, we were

11   coerced, and I think what they're saying is we didn't -- I

12   mean, I don't really understand the coercion argument.  You

13   know, I think what they're saying is, well, we're like the

14   corporations that want to do business in Connecticut, and

15   you're asking us too high of a price to do business in

16   Connecticut.  We're a nationwide company.  We can't

17   realistically not do business in Connecticut because we don't

18   want to be subject to general jurisdiction.  Like, that's a

19   real issue.

20           I get that's a real issue because, you know,

21   corporations have interstate commerce protections and contract

22   clause protections, and you know, that's a normal thing in our

23   society, for nationwide corporations to be able to sell

24   products in all 50 states.

25           This is not like that.  This is a -- there's like a

L5JPSOKO

1    longstanding U.S. policy going back since you and I were young

2    people, that we don't want the Palestinians paying terrorists.

3    We don't want the Palestinians committing terror attacks.  We

4    don't want the Palestinians to kill U.S. citizens, and we are

5    going to do all we can with what power we have to prevent that.

6              THE COURT:  What the analysis, though, of both the

7    Supreme Court and the Second Circuit is, or at least expects me

8    to go through, is to try to figure out whether or not Congress

9    can pass legislation that controls the conduct, the

10   extra-territorial conduct of individuals and entities that have

11   absolutely no presence in the United States, and demand that

12   they conform their conduct, which is outside of the U.S., to

13   certain standards that we hold, or more appropriate standards

14   than what they to conform to, and whether or not that assertion

15   of jurisdiction is consistent with due process.

16             You know, to tell France, you know, okay, we

17   decided -- now, I understand the arbitrary and rationality

18   related argument, but the basic argument that, oh, we tell

19   France, we no longer want you to sell champagne.  Okay?  If you

20   sell champagne, we consider that to be consent to be sued in

21   the United States for anything you do in the United States or

22   anything any person wants to sue you for in the world.

23             Well, I don't think that the Second Circuit or the

24   Supreme Court is implying that the rule extends that far.

25             MR. YALOWITZ:  Right, because that's irrational.

L5JPSOKO

1              THE COURT:  Okay.  And your argument is, is that's

2    simply a rationality analysis --

3              MR. YALOWITZ:  Right.

4              THE COURT:  -- or arbitrary government action

5    argument?

6              MR. YALOWITZ:  Right.

7              THE COURT:  Well --

8              MR. YALOWITZ:  Right.  But if they said -- and, you

9    know, I'm flipping through my papers.  I'm going to have to

10   look for it, but there are a lot of cases that say the United

11   States has an interest in protecting U.S. citizens when they're

12   abroad.

13             And that's different than the State of New York has an

14   interest in protecting their citizens when they're in Nevada.

15   No case says that, but there are a lot of cases that say that

16   when a U.S. citizen travels overseas, the protection of U.S.

17   law travels with them.

18             So, yeah, there's no question that the U.S. has power

19   to project U.S. law extraterritorially.  And the defendant's

20   position is, well, but there still has to be minimum contacts

21   with U.S. soil, and so that would cripple the power of

22   Congress.  I mean, that's the upshot of what they're saying.

23             There's a passage in their brief where they kind of

24   say, you know, there's all these things that would be legal if

25   our position is wrong, like imposing jurisdiction because

L5JPSOKO

1    people use U.S. currency or imposing jurisdiction because

2    people license U.S. software.

3            And it turns out that the United States of America

4    has, in fact, asserted jurisdiction in just those

5    circumstances.  They've said, you know, you transact -- if you

6    have a corresponding banking account, then we're allowed -- our

7    financial regulators are allowed to look at any account in your

8    bank, even if it doesn't touch the United States.

9            And they've said, if you retransmit -- if you

10   retransmit software or U.S. origin military goods, you're

11   committing a U.S. crime, and we can impose criminal penalties,

12   we can impose civil penalties.

13           So the position of the defendants would really cripple

14   a lot of U.S. federal statutes, and I don't think that

15   that's -- I don't think that's required by the Constitution,

16   and I don't think it's appropriate.

17           THE COURT:  Well, let me just go back to one earlier

18   issue.  I understand what analysis that you urge upon me with

19   regard to the payment and the financial support of individuals

20   who have been convicted of or found guilty of terrorist acts.

21           I'm not sure I identify any real dispute of fact, but

22   with regard to the U.S. activities, it's a little more

23   difficult for me to say that, okay, I want to concentrate on

24   this activity.  And it's clearly an undisputed fact that this

25   activity is non-related, activity that is not related to their

L5JPSOKO

1     UN business.

2              MR. YALOWITZ:  Right.

3              THE COURT:  How am I supposed to analyze that?

4              MR. YALOWITZ:  Let me -- we'll just a -- I mean, this

5     is an area where there's -- some things are known, some things

6     are unknown, and some things you have to decide.  So --

7              THE COURT:  Wait.  But not on a summary judgment

8     motion, not factual.

9              MR. YALOWITZ:  Well, I think the known facts are

10    generally not subject to dispute.  I don't think they're

11    disputing the facts and, you know, I've asked for discovery if

12    you can't resolve it.  But let's see if we can -- I think

13    there's enough known that we can probably resolve it.

14    Although, I don't want to withdraw my request for discovery for

15    some things if we need to get there.

16              So there are three sets of facts.  Set No. 1 is what

17    we've called like consular activities.  So they notarize school

18    records, or they notarize birth certificates, and they put a --

19    you know, we put something in the record.  One of our guys sent

20    his Southern District Bar certificate to be, you know,

21    authenticated, and it has all the stamps from Palestine on it.

22    So that's like what we call consular activities.  That doesn't

23    have anything to do with UN business.

24              That's just like, you know, I put a stamp on something

25    in Anaheim, or I gathered something in Anaheim and send it to

L5JPSOKO

1    Canada and get it back.  I've engaged in an activity on behalf

2    of the Palestinian Authority and the PLO in Chicago, or in

3    Anaheim or in New Jersey, but it doesn't have anything to do --

4    it's not like making a speech at the UN or urging, you know,

5    world peace.  That's just kind of routine stuff that is a

6    service for human beings individually.

7            THE COURT:  In my reading of the statute, maybe I've

8    misread it and you can point it out to me, any language.  But

9    my reading of the statute, the statute doesn't concentrate on

10   activity.  It concentrates on places and people.

11           MR. YALOWITZ:  So, it did, and then Congress changed

12   it in 2019.

13           THE COURT:  And which language are you addressing at

14   this point, the activities language?

15           MR. YALOWITZ:  I'm just looking over at my other

16   screen.  I'll move it so it doesn't look like --

17           THE COURT:  Yes, it may have just --

18           MR. YALOWITZ:  So if you look at 18, U.S.C.

19   2334(e)(1)(B) --

20           THE COURT:  Which -- do you have a page on your brief?

21           MR. YALOWITZ:  Oh, yes.

22           THE COURT:  Please.

23           MR. YALOWITZ:  It is --

24           THE COURT:  I know I read it somewhere.

25           MR. YALOWITZ:  Yes.  Page 16, page 16 of my opener.

L5JPSOKO

1          THE COURT:  16?

2          MR. YALOWITZ:  Yes, which is like 26 of 47, if you're

3    looking at the top header.

4          THE COURT:  All right.  Page 16.  Defendants' office

5    and activity meet subparagraph 1(B)?

6          MR. YALOWITZ:  Right, right.  And then romanette (i)

7    is:  Continues to maintain any office, headquarters, premises,

8    or other facilities or establishments in the United States.

9          Romanette --

10         THE COURT:  As I said before, one deals with a place.

11         MR. YALOWITZ:  Right.  And then romanette (iii)

12   conducts any activity while physically present in the United

13   States on behalf of the Palestine Liberation Organization or

14   the Palestinian Authority.

15         THE COURT:  Okay.  I got you.  Thank you.

16         MR. YALOWITZ:  So when they have -- here's what the

17   record is on these consular activities.  They had an office in

18   Washington.  One of the things that the office in Washington

19   did was these consular activities.  They had a website, in

20   those days, with a list of like agents around the country, who

21   you could contact to get your stuff notarized.

22         And then when the Trump administration closed the

23   office, they announced, you know, we're going to continue our

24   program, and then they did continue the program.  And so

25   that's -- and that's, you know -- in my view, that's an

L5JPSOKO

1   activity on behalf of the PLO or the PA.

2            THE COURT:  I'm sorry, which is an activity?

3            MR. YALOWITZ:  Like, collecting, notarizing a birth

4   certificate.

5            THE COURT:  You're talking about the consular

6   activities?

7            MR. YALOWITZ:  Right.

8            THE COURT:  You're saying the consular activities,

9   that I can determine that that authority or that activity is

10  unrelated to UN business?

11           MR. YALOWITZ:  Right.  Right.

12           Then, the second category is they give -- there's like

13  press, media appearances, press appearances.

14           THE COURT:  Go ahead.  That was what I was concerned

15  about because I'm not sure how media appearances, in and of

16  itself, is or isn't related to UN activity.  I guess, as they

17  say, it depends on what the media is and, you know, what it's

18  related to.

19           MR. YALOWITZ:  Well, yeah.  I mean, let me sort of

20  take you through my reading, recognizing the defense has a

21  different reading of the statute.  And this is just a legal --

22  I don't think there's any dispute that, you know, Riyad Mansour

23  appeared at Seton Hall and gave a seminar.  There's no dispute

24  that he gave an interview to NPR and, you know, so there's no

25  factual dispute.  But the parties have a divergent reading of

L5JPSOKO

1    the statute.

2             THE COURT:  So how do I determine whether that's a

3    legitimate advance in UN interest or advance in other interest?

4             MR. YALOWITZ:  So the question -- how you come out on

5    that question depends on how you construe exception 3(f) in the

6    statute.  And 3(f) is on -- bear with me, please -- 3(f) is on

7    page 19 of my brief, which is any personal or official

8    activities conducted ancillary to activities listed under this

9    paragraph.

10             THE COURT:  Right.

11             MR. YALOWITZ:  And because I think everybody agrees

12    that like -- I mean, there's also an exception A, or A and B,

13    for activity undertaken exclusively for the purpose of

14    conducting official business of the United Nations.

15             THE COURT:  Right.

16             MR. YALOWITZ:  But I don't think they're arguing that

17    giving a speech at Seton Hall is an official business of the

18    United Nations.  What they're saying is, well, it's related

19    because I'm talking about peace in the Middle East, I'm talking

20    about our position, I'm talking about our aspirations for

21    sovereignty and, you know, all things which are related to our

22    presence at the United Nations.

23             THE COURT:  But what would be your position, in

24    another unrealistic hypothetical in this case.  What would be

25    your position on Fidel Castro coming to the United States to

L5JPSOKO

1    attend a UN event and going to a church and giving a speech?

2    Is it your position would be that, indisputably, that that

3    speech at the church is not UN business?

4             MR. YALOWITZ:  Yeah, it's definitely not official

5    business of the UN.  I mean, there's no question.

6             THE COURT:  Well, it may not be official business of

7    the UN.  It's official business of the country that is related

8    to --

9             MR. YALOWITZ:  Right.

10            THE COURT:  -- a UN activity.

11            MR. YALOWITZ:  It is definitely related.  And so the

12   question both in your hypothetical and in the Seton Hall speech

13   because, you know, it's the same, is:  What is the meaning of

14   the word "ancillary" as used in paragraph (f)?

15            THE COURT:  The meaning I give to it is "related to."

16            MR. YALOWITZ:  Well, that's the defendants' --

17            THE COURT:  That's not your definition, that it's

18   related to UN activity?

19            MR. YALOWITZ:  That's not my argument.

20            THE COURT:  What is your definition of "ancillary"?

21            MR. YALOWITZ:  My definition of "ancillary" is

22   "necessary."

23            THE COURT:  Well, ancillary is not necessary.

24   Necessary, as they say, is necessarily not ancillary.

25            MR. YALOWITZ:  Okay.

L5JPSOKO

1          THE COURT:  If it's necessary UN activity, it doesn't

2     qualify as ancillary UN activity.

3          MR. YALOWITZ:  Okay.

4          THE COURT:  It qualifies as UN activity.

5          MR. YALOWITZ:  Let me say this about it.  You may

6     ultimately disagree with me on this, and I don't need this to

7     win the case.  But if you want, I can take you through why I

8     think I'm right on this, and then you can decide.

9          THE COURT:  You're saying it has to be necessary?

10          MR. YALOWITZ:  Right.

11          THE COURT:  I'm not even sure that's even a

12     requirement for -- I mean, what's the opposite of ancillary?

13          MR. YALOWITZ:  Unnecessary.

14          THE COURT:  No, no.  The opposite -- no, what's the

15     opposite of ancillary?  Ancillary is not direct.  So the

16     opposite of ancillary is a stronger connection to UN activity.

17          MR. YALOWITZ:  Oh, I don't think so.  I think this is

18     one of those cases, Judge, where there are two usages of the

19     word.

20          THE COURT:  But we have --

21          MR. YALOWITZ:  You're using --

22          THE COURT:  (A) says that it has to be -- and that's

23     your argument -- used exclusively for the purpose of UN

24     activity; and (B) says it has to be activity undertaken

25     exclusively for the purpose of conducting official business.

L5JPSOKO

1              (F) makes an exception.  (F) obviously, doesn't

2     require that it be exclusively, the purpose be exclusively for

3     the purpose of conducting UN activity.  It can be ancillary.

4     It can be related to that activity, but you say "related to" is

5     not the appropriate definition to give to "ancillary."

6              MR. YALOWITZ:  That is my argument.  And as I said, I

7     don't -- at the end of the day, you may disagree with me, and

8     that's your job, not mine, is to construe the statute.

9              But let me take you through why I think I'm right, and

10     then you can decide.  So one sense of the meaning of the word

11     ancillary, as you say, is related, loosely related.  So, you

12     know, it was on the same trip or it's, you know, something like

13     that.

14              It serves that purpose, and some other purpose.  But

15     there's another definition of ancillary, a narrower definition

16     of ancillary.  And that narrower definition of ancillary is

17     well documented, and it's the definition in the Oxford English

18     dictionary.  And the definition in the Oxford English

19     dictionary, which I quote in full in my reply brief -- and I'm

20     just looking for it here -- is on page 12 of my reply brief:

21     Subservient, subordinate, ministering to, pertaining to maid

22     servants, designating activities and services that provide

23     essential support to the function of a central service or

24     industry; also, staff employed in these supporting roles.

25              So that's a narrower sense of ancillary.

L5JPSOKO

1          THE COURT:  I don't know of any legal definition of
2    ancillary.
3          MR. YALOWITZ:  Yeah, the legal definition of ancillary
4    actually isn't very illuminating because you have like
5    ancillary jurisdiction, and it's just -- it doesn't really
6    apply here in a way that --
7          THE COURT:  Well, that's what I don't understand, and
8    I'll have to analyze that for your argument.  But I don't
9    understand why you say that the legal definition of ancillary,
10   which is not as convenient for you as the dictionary definition
11   of it, should be disregarded, and we should take your maid
12   servant's definition of it.
13         MR. YALOWITZ:  Yeah, I don't think either side is
14   arguing for the legal, like ancillary jurisdiction argument,
15   because it's just different.  It's like -- I think that
16   defendants are arguing for what you were saying, which is that
17   it just means related.  It just means kind of linked in some
18   way.
19         THE COURT:  So let me see the extent of your argument.
20   If they invited -- if they invited some UN officials to a
21   lunch --
22         MR. YALOWITZ:  Yes.
23         THE COURT:  -- and they had a lunch with UN officials,
24   would that fall under your definition of ancillary?  It's not
25   necessary.

L5JPSOKO

1          MR. YALOWITZ:  There's a different -- I mean, there's

2     a different exception for that, which is --

3          THE COURT:  Let's start first with this exception.

4     Would that fall under your definition of ancillary or outside

5     of your definition of ancillary?

6          MR. YALOWITZ:  So I would say that meeting with other

7     UN officials is necessary for conducting UN business.  I don't

8     see how you conduct UN business -- you don't have to be on the

9     floor of the General Assembly to be conducting UN business.

10         THE COURT:  Suppose you're not conducting UN business.

11    Suppose your Ambassador -- it's your Ambassador's birthday, and

12    you think it's in your best, interest given your UN contact, to

13    invite members of the UN to a reception, and they show up at

14    that reception.  Is it your position that that is either for

15    the purpose of conducting official business, or that's

16    ancillary, or that falls under some other definition?

17         MR. YALOWITZ:  Yeah, I mean, it obviously falls under

18    (D), which is meeting with officials of foreign governments.

19    So it's like the statute allows that.  But, you know, I take

20    your question more to be like, okay, well, they're having a

21    birthday party for the staff.  Well, you know, what is that?

22    Or they hire domestic help.

23         And, you know, look, I think that Congress was trying

24    to be narrow here.  Congress was trying to -- the statute has a

25    rule of construction in it.  The rule -- so we're not

L5JPSOKO

1     construing this word in a vacuum.  I concede that "ancillary"

2     has some ambiguity to it.

3          THE COURT:  Well, it doesn't have ambiguity to it.  It

4     is here to expand the definition of what is UN business because

5     the other definitions say that they are allowed to engage in

6     activity that is exclusively for the purpose of UN business,

7     and this is, obviously, giving them not a lesser exception, a

8     greater exception --

9          MR. YALOWITZ:  Okay.  So I --

10          THE COURT:  -- for activity that is not solely

11     exclusively for conducting official UN business.

12          MR. YALOWITZ:  Exactly.  So I would say -- the

13     birthday party example, I would say, is ancillary, and I'm

14     going to explain why I think that.

15          THE COURT:  Okay.

16          MR. YALOWITZ:  I think it is ancillary.  So having a

17     birthday party is not consenting to jurisdiction, and let me

18     explain why I think that.  There is a case, a Supreme Court

19     case that the defendants rely on that is actually incredibly

20     illuminating on this exact subject.  It's called *Wisconsin*

21     *against William Wrigley Gum Company*.  I forget the corporate

22     name, but it's Wrigley gum.

23          So there's a statute, a federal statute, that says if

24     all you're doing is soliciting business in an estate, then

25     you're not subject to taxation in that state.  It's a commerce

L5JPSOKO

1    clause statute.

2           So the Wrigley gum company sends sales reps into

3    Wisconsin, and they do a bunch of stuff there.  You know, they

4    go -- they're salespeople.  They go there.  They restock the

5    gum.  They make sure the gum is fresh.  They put signage up,

6    you know, all the stuff that people used to do back when brick

7    and mortar was how we bought stuff.

8           And the Supreme Court says, well, it's not just

9    soliciting business that's protected, it's also ancillary

10   activities.  Ancillary activities are protected and don't

11   trigger taxation.

12          So then the Supreme Court says, okay, well, what does

13   that mean?  How do we apply that to, you know, the various

14   activities that these individuals are engaged in?  And the key

15   example is they go and they check and see if the chewing gum is

16   fresh, and if it's not fresh, they replace it.  And the Supreme

17   Court says, well, that serves two purposes.  Obviously, it

18   supports sales.  People buy fresh gum, and if people buy stale

19   gum, they aren't going to buy Wrigley gum anymore.  They're

20   going to say that gum is stale, I don't want Wrigley gum.

21          So it, obviously, is supporting sales, but it also

22   has -- supporting solicitation, but it also has a second

23   purpose, a second function, which is that it creates a direct

24   sale.  And if you create a direct sale, you're not just

25   soliciting, you're actually selling.  And the Supreme Court

L5JPSOKO

1    says because that activity does both, that is not ancillary.

2    That doesn't meet our narrow definition of the word ancillary.

3            So the Supreme Court in the *Wrigley* case is using that

4    Oxford English definition, not the -- you know, the looser

5    definition of ancillary.  So the question then is, okay, well,

6    which -- you know, which definition is right for that -- this

7    statute?  That's the question that you have to answer, and do I

8    take the narrower definition or do I take the broader

9    definition?

10           THE COURT:  Well, the argument that I got from your

11   papers, and which I'm not sure that I can agree with the

12   statement, is this statement in the last full paragraph, on

13   page 21, which says, by that definition, where you're talking

14   about the definition of ancillary that they want -- that you

15   want to use, by that definition, press conferences and media

16   releases are not ancillary to official UN business because they

17   do not provide "essential support."  Indeed, they simply are

18   "not conducted in furtherance of the PLO (UN) observer

19   statute."

20           Well, my response would be:  It depends.  Right?

21           MR. YALOWITZ:  Right.

22           THE COURT:  I can't make that kind of a blanket

23   statement that a particular -- that no press conference

24   furthers their UN status or business, and that no media

25   releases could qualify as conducting UN business.  It depends

L5JPSOKO

1    on what its purpose is, what the activity is, what the issue

2    happens to be at the UN at the time.  So --

3              MR. YALOWITZ:  So --

4              THE COURT:  The statement that you want me to make a

5    blanket statement that a press conference can't be related to

6    UN activity, that's a little difficult for me to make on this

7    record.

8              MR. YALOWITZ:  Well, okay.  So let me say two things

9    about that, and in the context of that, I'll take you to the

10   third piece of -- which is -- and this really captures it.

11             They send letters to the UN General Secretary like

12   once a month complaining about Israel, and then they retransmit

13   or rebroadcast those letters to -- on their Twitter feed; so

14   it's the exact same letter.  And my argument is the

15   retransmission is different from sending the letter.

16             And the same way when you watch a baseball game, you

17   know, they say the retransmission or rebroadcast of this game,

18   without the express written permission of Major League

19   Baseball, is prohibited.  Because the retransmission is

20   something different from the original transmission.

21             So my argument is when they Tweet a letter to 40,000

22   followers, they're doing that because they want the publicity.

23   They're doing that because they want to get people, you know,

24   agreeing with their positions, people in the general public.

25             THE COURT:  Well, why is that necessarily not

L5JPSOKO

1    ancillary to the letter that they sent.  If they send a letter

2    to the Secretary General of the UN urging a certain position,

3    and in conjunction with that, they publicize that letter to the

4    public to get public support for that position that they're

5    taking at the UN, how do I say that one is separated from the

6    other, one is UN business and the other is not?

7            MR. YALOWITZ:  Okay.  So let's break it down into two

8    pieces.  Piece No. 1 is, is it official business of the United

9    Nations?  Clearly, it's not.  In the same way that my

10   retransmission of a baseball game is not official business of

11   Major League Baseball.  It's my business.  It's related to

12   Major League Baseball, but it's not official business of Major

13   League Baseball.  So sending a Tweet is not.

14           And that was the holding in *Klinghoffer*, and that's

15   what I'm quoting.

16           THE COURT:  Well, it doesn't say it has to be official

17   business of the UN.  It has to be their official business

18   related to the UN.

19           MR. YALOWITZ:  So, well, bear with me because I'm

20   thinking about -- there's two exceptions.  It's either an

21   activity undertaken exclusively for the purpose of conducting

22   official business of the United Nations.  Tweeting their letter

23   is not that.

24           So then the question is, okay, well, isn't it

25   ancillary?  I mean, it's related.  That's what they're arguing,

L5JPSOKO

1    it's ancillary, it's related.  Like, we retransmit our UN

2    letters because we want people to know what we're saying to the

3    UN.  And they probably would even go a step further and say,

4    you know, it's part of our business with the UN to let people

5    know what we're saying.

6          And so my argument -- and again, I don't want to get

7    too far down the rabbit hole on this, but I want you to

8    understand my argument.  My argument is when they retransmit a

9    letter to the Secretary General, their best case is they're

10   doing it for two reasons; reason No. 1 is they want people to

11   know what they're saying to the UN, and reason No. 2 is they

12   want people to agree with them out in the world.

13         And that, to me, is just like the replacing the stale

14   gum, the Wrigley gum, doing it for two reasons.  One reason is

15   ancillary, it's to support their UN business, and the second

16   reason is publicity.  And publicity is just not -- it's

17   related, but it doesn't meet that narrow sense of ancillary.

18   It meets the related.  If you say ancillary means related, you

19   know, I understand that argument, but my position is when you

20   have a rule of construction -- when you have a rule of

21   construction that says we want to construe the statute

22   liberally to support the purpose of Congress to assist terror

23   victims, and when you have a Legislative history that says

24   we're codifying the *Klinghoffer* case, and when you have this

25   sort of catch-all at the end of a long series of things that,

L5JPSOKO

1    if you take the defendant's position, would swallow the rule,

2    those are reasons -- those are statutory -- traditional tools

3    of statutory construction that tell you, adopt the narrower

4    sense.

5            THE COURT:  The difficulty I'm having -- and I have to

6    analyze it further.  The difficulty I'm having is to be able to

7    categorically say that what you just described is not them

8    engaging in UN business.  You know, there are a lot of things

9    that you do to engage in UN business.  There may be votes that

10   have to be taken.  You may have to persuade other members of

11   the UN of your position that's going to be addressed at the UN.

12   You may need public support for that position.  You may need to

13   communicate to your constituents, and even those who disagree

14   with you, why you're taking that position at the UN and why

15   that's a legitimate position to take.

16           But you want to take the narrowest view of UN business

17   to exclude everything that I would do that I say, I did this

18   because I'm advancing our interests, as UN members, with the

19   UN.  And you're saying that, well, no, it's got -- the letter

20   that you sent to the UN is UN business, but you're distributing

21   that letter to the public to tell the public that that's what

22   you said to the UN.  It's not UN business.  That's a real

23   narrow definition of UN business.

24           MR. YALOWITZ:  I would say it's UN business plus, and

25   my reading of ancillary is the "plus" makes it not ancillary.

L5JPSOKO

1          THE COURT:  Okay.  All right.

2          MR. YALOWITZ:  And then, but I agree with you that

3   those retransmissions are the defendant's best facts, or

4   least-bad facts.  But when you go to like promoting a movie

5   about surfing in Gaza, you know, I'm not sure what official UN

6   business that's about.  I mean, maybe they -- maybe there is

7   some -- I don't -- you know, surfing in Gaza, okay.  Or when

8   you fire off Tweets saying, you know, today is the day we

9   remember our racist adversaries or horrible people.  I'm not

10  sure that that's official UN business.  It's just they're

11  firing off, you know, grievance-laced Tweets.

12         THE COURT:  Except on this motion, the "not sure" is

13  less than your burden.  Your burden is it is factually

14  indisputable that I can determine that a particular activity

15  that you designated that they engaged in, is not ancillary to

16  their UN activity.

17         MR. YALOWITZ:  Yeah.  That was --

18         THE COURT:  You're asking me for that.

19         MR. YALOWITZ:  That was a rhetorical understatement.

20  I'm sure that surfing in Gaza is not official UN business.

21  They're not bringing Kofi Annan over to Gaza to go surfing.

22  That's not going to happen.  It was -- anyway, I think you have

23  my argument then.

24         THE COURT:  Then let me hear from --

25         MR. YALOWITZ:  That's sort of a --

L5JPSOKO

1           THE COURT:  Yes, I understand.

2           MR. YALOWITZ:  So do you want to talk about the --

3    they have like a couple of kind of fall-back due process

4    issues, like retroactivity and unconstitutional conditions, and

5    we haven't talked about separation of powers.

6           THE COURT:  Let me see how Mr. Berger addresses some

7    of my questions, and then I'll see.

8           MR. YALOWITZ:  Okay.  That's fine.  Thank you, your

9    Honor.

10          MR. BERGER:  Good morning, your Honor.  Mitchell

11   Berger.  Mr. Yalowitz spoke for a while, so I have quite a bit

12   to say in response, but let me deal with some of the easy ones

13   first.

14          His snarky remark about surfing in Gaza.  Easy one.

15   It was a Tweet on UN International Sports Day.  It's identified

16   in the hashtag.  Every mission to the United Nations issued

17   some kind of statement on UN International Sports Day.  We're

18   not talking about surfing.  We're talking about UN

19   International Sports Day.  That's official United Nations

20   business.

21          No. 2, consular activity.  Whatever he submitted, of

22   course, predates the PSJVTA.  In a related case before Judge

23   Vyskocil, there was jurisdictional discovery on this issue, and

24   the notary about whom Mr. Yalowitz submitted his affidavit, or

25   his colleague's affidavit, was cross-examined under oath.  And

L5JPSOKO

1    he said, without contradiction, I am not an agent of the

2    Palestinian Authority or the PLO.  I am a notary in the State

3    of New Jersey.  As I do for my clients, I interact with

4    organizations to which they need to submit notarized documents.

5    So there's no factual support for his notion that we're engaged

6    in consular activities.

7           The old website of the old mission to which he

8    conferred, simply contained a list of notaries.  That does not

9    make him agents of the United States, and here's why you would

10   know that.  Your Honor is familiar with the Foreign Agents

11   Registration Act.  If these notaries were agents of the PLO or

12   the PA, they would have to register under FARA, and they

13   didn't.

14          But let me start with the broader point on due

15   process, and tell your Honor why, according to the Second

16   Circuit in this case Mr. Yalowitz's due process test simply

17   can't be the test.

18          In the first appeal in this case, the plaintiffs made

19   a consent-to-jurisdiction argument.  They said the PA and the

20   PLO consented to jurisdiction because, according to the

21   statutory terms of the Anti-Terrorism Act, jurisdiction is

22   established if you appoint an agent for service of process and

23   if service is made.  Therefore, they argued, by accepting

24   service, we consented to jurisdiction.

25          The Second Circuit said -- first, they addressed

L5JPSOKO

1    plaintiff's argument that defendants consented to personal

2    jurisdiction under the ATA by appointing an agent for service

3    of process.  This is at 835 F.3d 337 and 333 -- 343.  What the

4    Second Circuit said is what your Honor said earlier.  The

5    Second Circuit said "the statute does not answer the

6    constitutional question of whether due process is satisfied."

7              So let's look at that jurisdictional provision of the

8    original ATA.  It gave fair notice to defendants that if they

9    appointed an agent for service of process, they could be

10   subject to jurisdiction.  That's item one on Mr. Yalowitz's

11   test.

12             It was reasonably related, the plaintiffs argued, to a

13   legitimate government objective to bring before the Court those

14   who were alleged to be implicated in terrorism.  They submitted

15   amicus briefs from United States Senators saying this is an

16   important part of the ATA, it serves an important governmental

17   purpose.

18             What the Second Circuit said, it doesn't matter if the

19   statute is fair notice.  It doesn't matter that the statute is

20   related to a legitimate government objective.

21             (Interruption)

22             THE COURT:  Anyone who is not speaking, please mute

23   your phone.

24             MR. BERGER:  So we know, as a result of the Second

25   Circuit's first appeal decision in this case, that fair notice

L5JPSOKO

1    and reasonable relationship to a government objective is not

2    enough to satisfy due process.

3          What did the Second Circuit say?  More is required.

4    Minimum contacts.  Mr. Yalowitz says we accept that it's law of

5    the case that minimum contacts aren't satisfied.

6          So what happens when, to your Honor's point, there is

7    a Legislative attempt to use forced consent?  I thought your

8    Honor's phrase helps me frame my argument perfectly.  The

9    answer to that, according to the Brown decision in the Second

10   Circuit, is that it has to be free and voluntary consent,

11   particularly when there is no explicit consent.  That's at 814

12   F.3d 626 and 640.

13         Well, that sounds nice, but how do we put some meat on

14   the bones of what is free and voluntary consent?  I think

15   that's where your Honor's questions were driving here.  Here is

16   the key point, and Mr. Yalowitz made it for me; so I'm going to

17   take it and use it to explain this point.  He said, look at

18   what happened under the predecessor to the PSJVTA.  The thing

19   called ATCA, the Anti-Terrorism Clarification Act.

20         It said you, the defendants, are deemed to consent to

21   jurisdiction if you accept either of two benefits:  One,

22   continued foreign aid; or, two, a waiver to continue running

23   your embassy in Washington.  The United States government, in

24   the *Klieman* case, as picked up by the Second Circuit in its

25   decision, said the following -- and this is what frames the

L5JPSOKO

1    difference between ATCA and the PSJVTA, and explains why the

2    PSJVTA does not satisfy due process.

3            What the government said, in defending the

4    constitutionality of ATCA, was that these were benefits that

5    the PA could potentially obtain, or the PLO, from the United

6    States, foreign aid or a waiver.  And it said, at pages 12 to

7    13 of its March 13, 2019, brief:  The political branches have

8    long imposed conditions on these benefits.

9            So what is the test for knowing and voluntary

10   consent -- forced consent, as your Honor said -- when it's not

11   explicit?  The answer is, and it's very clear in the case law,

12   and your Honor has made a similar holding that I'll give to you

13   in a moment, that there has to be an exchange of benefits.

14   There has to be a quid pro quo.

15           You have to say to me, hey, if you take this benefit

16   from me, then you have submitted to jurisdiction.  That's the

17   corporate registration model.  Right?  You register to do

18   business in the State.  You accept the benefit from the State.

19   You are deemed to have accepted a benefit, in return for which

20   you consent to jurisdiction.

21           Your Honor, I'll give you a 2013 holding that you made

22   in the *Absolute Activist Master Value Fund* case, where you were

23   addressing due process issues.  Your Honor held:  Courts look

24   for circumstances, or a course of conduct, from which it is

25   proper to infer an intention to benefit from and, thus, an

L5JPSOKO

1    intention to submit to the laws of the forum.

2         So that's the test.  There has to be a quid pro quo.

3    There has to be an exchange of benefits.  ATCA involved a true

4    set of benefits, foreign aid, which the United States

5    government was not obliged to offer, or a waiver of a

6    prohibition.  That's what makes the PSJVTA different.  It is,

7    as all of your Honor's hypotheticals suggested, not an offer to

8    the PA and the PLO that here's a benefit for you to accept, but

9    if you accept it, it comes with a hook.  It comes with

10   jurisdiction.

11        It is simply waiving a Legislative magic wand and

12   saying, if you continue doing, four months from now, everything

13   that you were already doing, now we're going to deem that that

14   is a consent to jurisdiction.  And that is simply contrary to

15   what due process requires.

16        THE COURT:  But consistent with the other cases,

17   that's not exclusively -- that's not the only way to

18   characterize it.  The choice of --

19        (Interruption)

20        I'm sorry, someone is speaking?

21        (Interruption)

22        Please mute your phone.  The telephone number ending

23   in 663, you need to mute.

24        What the statute said, particularly with regard to

25   activity, is that if you wish to engage in these activities

L5JPSOKO

that are non-UN activities, then you need to consent to

jurisdiction.  If you wish to give up that benefit, then you

don't have to subject yourself to jurisdiction.

          Now, I don't want to try to characterize that in the

other category of activity that they're talking about, in terms

of payments to individuals who have been killed or

incarcerated, but I'm not sure that the characterization,

whether it's an appropriate constitutional characterization is

another question.

          But I'm not sure that I can simply say, well, the

difference between the cases that you've cited in this analysis

in the past is that there's some quid pro quo that they're

giving up in exchange for not being subject to jurisdiction,

and in this case, there is no such thing.

          I'm not sure that -- you know, look, the choice is

still there, and the choice is there to be made going forward,

that if you want the benefit of doing these other things,

you're going to have to subject yourself to the jurisdiction.

If you don't want the benefit of doing those other things, then

you don't engage in those activities, and you won't be subject

to jurisdiction.

          I'm not sure I see the big distinction between

somehow, in one case there's a benefit that's being conferred,

and in this case, there is no benefit being conferred.

          MR. BERGER:  Your Honor, I think you've put your

L5JPSOKO

1    finger on the framework, but here's why we think that this is

2    essential to due process, and why it's missing here.

3          First of all, the plaintiffs in their reply brief

4    really helped frame this issue.  They concede, and you can find

5    this at pages 17 and 26 of their reply brief, that there is no

6    benefit that the PA and the PLO receive under the PSJVTA, no

7    benefit.  That's their position, but it's correct, as a matter

8    of law, that there is no benefit.

9          But let me give you the Supreme Court's most recent

10   statement on what jurisdictional due process requires in the

11   *Ford* case.  What the Supreme Court said there is that

12   jurisdictional due process turns fundamentally on -- and I'm

13   quoting here -- reciprocal obligations, reciprocal obligations,

14   between the defendant and the forum, and that's exactly what an

15   exchange of benefits is.  Your Honor can find that at 141,

16   Supreme Court, pages 1025 and 1030.  Reciprocal obligations by

17   which a defendant avails itself of the right to do business in

18   the forum and is, therefore, subject to the forum's regulation.

19          Here's why --

20          THE COURT:  Why is it, in this case, that the question

21   is whether -- even if it's framed that way, whether or not the

22   right to do non-UN business is being exchanged for

23   jurisdiction?

24          MR. BERGER:  And, your Honor, I think that's exactly

25   the right question to ask, and here's the reason why plaintiffs

L5JPSOKO

1    are right when they say there is no benefit to the PA and the

2    PLO under the PSJVTA.

3            The behavior -- and this is why we contest the U.S.

4    activity predicate of the statute.  All of the behavior in

5    which the PA and the PLO is alleged to have engaged in falls

6    squarely within 30, 40-years old judicial precedent in the

7    Southern District and in the Second Circuit saying that this is

8    not a benefit that the United States confers on the PA and PLO.

9            That activity is mandated *a priori* by the UN

10   Headquarters Agreement, and that is why in the *United States v.*

11   *PLO* decision out of the Southern District, the Court held we

12   have to construe the 1987 Anti-Terrorism Act, which prohibits

13   any PLO activity in the United States, we have to carve out

14   from that any UN-related activity because the United States

15   can't prohibit that, as a signatory to the UN Headquarters

16   Agreement.

17            THE COURT:  The statute doesn't prohibit that.

18            MR. BERGER:  The statute --

19            THE COURT:  The statute does not prohibit UN activity.

20            MR. BERGER:  This statute neither allows nor disallows

21   UN activity.  It is -- Mr. Yalowitz -- if I can make this

22   point, your Honor, it's very important.  Mr. Yalowitz used this

23   word in his argument today and he uses it in his brief.  He

24   says what the PLO did is simply codified, preexisting,

25   judicially established rules concerning what the PLO can do and

L5JPSOKO

 1    what it can't do as an invitee of the United Nations under the

 2    UN Headquarters Agreement.  That's in their brief at page 20

 3    and their reply brief at pages 26 through 27.

 4          The statute doesn't allow anything.  The statute

 5    doesn't disallow anything.  It does, in Mr. Yalowitz's words,

 6    simply codify preexisting law.  By codifying preexisting

 7    judicial law, it neither adds to nor subtracts from what the

 8    defendants can already do.

 9          Now, there may be a factual question, as your Honor

10    raised earlier, about does it fit within the ambit of what was

11    previously authorized by the Southern District in the *U.S. v.*

12    *PLO* case and the *Mendelsohn v. Meese* case, and by the Second

13    Circuit in the *Klinghoffer* case.

14          But the answer is, and I'm happy to go through those

15    standards from those cases, but it's quite clear that

16    everything that the PLO UN mission and its personnel have

17    alleged to have done, fall within the ambit of the preexisting

18    protection of the UN Headquarters Agreement.  The UN

19    Headquarters Agreement is untouched by the PSJVTA.  It doesn't

20    add to.  It doesn't prohibit anything.  It doesn't confer any

21    benefit.

22          Your Honor's template certainly is a fair one, if

23    there were benefit, like the ones under the ATCA, USA, a waiver

24    to operate a mission.  Then the U.S. government would certainly

25    take the position that there is an exchange of benefits, but

1    that was the U.S. government's position as to why ATCA was

2    constitutional.

3          The U.S. government surely would take the position

4    that the PSJVTA neither allows nor disallows additional

5    behavior.  What is clear is that anything that is UN related

6    and in furtherance -- in furtherance, your Honor, sounds an

7    awful lot like ancillary, doesn't it -- in furtherance of UN

8    activity was allowed under the *Klinghoffer* decision.

9          And, indeed, your Honor held earlier in this case,

10   Second Circuit characterized it in the first appeal, 835 F.3d

11   at 317.  Your Honor held earlier in this case, activities

12   involving defendants' New York office were exempt from

13   jurisdictional analysis under an exception for United

14   Nations-related activity, articulated in *Klinghoffer*.  That's

15   preexisting law.

16          Mr. Yalowitz says, along comes the PSJVTA, it doesn't

17   change preexisting law, it simply codifies it.  That's not

18   getting --

19          THE COURT:  Mr. Berger, that sounds like a logical

20   argument, but I'm not sure I can accept the position that

21   simply because there was a previous benefit that was conferred,

22   that it can't be an exchange of benefits for certain rights

23   going forward.

24          The PLO doesn't have any constitutional, independent

25   right to run a mission in the United States.  It doesn't.  The

L5JPSOKO

1    U.S. could simply say, and can take the position -- I believe

2    they've taken a position in the past, and they could take the

3    position in the future -- that they would no longer allow that

4    in the United States, and they will no longer allow them to

5    have a UN mission in the United States.

6          They're not entitled to a U.S. mission by any

7    unchangeable U.S. or international law.  So for Congress to

8    come back and say, look, from now on, our position is this,

9    we're not going to let you come to the United States and have a

10   mission for free.  We're going to say to you, in the future,

11   that if you want to maintain a mission in the United States,

12   then you're going to have to agree to subject yourself to

13   jurisdiction.

14          MR. BERGER:  So they can't, your Honor.

15          THE COURT:  There's nothing I know in the previous

16   analysis that would necessarily restrict the U.S. government

17   from taking that position.

18          MR. BERGER:  There is, your Honor, respectfully.

19          THE COURT:  Okay.

20          MR. BERGER:  What restricts the U.S. government from

21   taking that position, because that was the position the U.S.

22   government took when the 1987 Anti-Terrorism Act was passed,

23   and Judge Palmieri, in the *United States v. PLO*, said that may

24   be what Congress said, but Congress is constrained by the U.S.

25   government's antecedent accession to the UN Headquarters

L5JPSOKO

1    Agreement, so it can't.  And it can't burden UN participation

2    without abrogating UN Headquarters Agreement, which it hasn't.

3            Now, amazingly, plaintiffs argue that the PSJVTA did

4    abrogate the UN Headquarters Agreement.  That's because they

5    know that the UN Headquarters Agreement is actually the source

6    of defendants' rights, and so it's essential for them to argue

7    that the PSJVTA abrogates the UN Headquarters Agreement.

8            But that can't be so for at least three reasons:  One

9    is, Mr. Yalowitz talks about submission of letters to the UN.

10   There's no notice whatsoever, no evidence of any notice

11   whatsoever, that the United States government has informed the

12   United Nations that it has abrogated the UN Headquarters

13   Agreement.  In fact, it would probably come as a shock to

14   people at the UN.

15           THE COURT:  But this seems to be a red herring for me

16   because you're absolutely right, this has absolutely nothing to

17   do with the UN observer status of the PLO.  That has not

18   changed.  That has not become an exchange of some other

19   promise --

20           (Interruption)

21           Whoever is on number 6770, would you -- sir?  Sir?

22           (Interruption)

23           Mute your phone, please.  Mute your phone.  Sir?  Sir?

24           (Interruption)

25           Okay.  Maybe we'll take care of it.  All right.  I'm

L5JPSOKO

1   sorry, Mr. Berger.

2              MR. BERGER:  That's no problem, your Honor.  I think

3   where we agree --

4              THE COURT:  That doesn't seem to take me in one

5   direction or the other because that's not what this fight is

6   about.  This fight is not about changing its observer status.

7   This statute doesn't say anything about the observer status.

8   It doesn't give any conditions on whether that they're going to

9   maintain their observer status.

10             It talks about whether or not they're going to be able

11  to do activities unrelated to the observer status and saying

12  that you don't have the right to do that, and you're not going

13  to be able to do that unless you consent to the jurisdiction.

14  So --

15             MR. BERGER:  So, your Honor --

16             THE COURT:  So relying on the observer status part of

17  it doesn't seem to advance this argument one way or the other.

18             MR. BERGER:  Respectfully, your Honor, I think it

19  does, and here's why.  The reason why the PLO cannot do things

20  that are unrelated to its UN observer mission, exactly the

21  hypothetical that your Honor is positing, is that the 1987

22  Anti-Terrorism Act makes it illegal for the PLO to do anything

23  in the United States.  Full stop.

24             The court said, you've got to carve out the UN stuff.

25  So now there's a clear dividing line, UN, non-UN.  That's

L5JPSOKO

1    preexisting law.  Several things are true.  Four different

2    judicial decisions -- two out of the Southern District, two out

3    of the Second Circuit -- define what is the protected zone of

4    UN activities.

5         The two Second Circuit decisions are, No. 1,

6    *Klinghoffer*, which says anything in furtherance of the PLO UN

7    mission is protected.  The other is in this case, when the

8    Second Circuit, in the first appeal -- second appeal, rather,

9    said nothing in *Klinghoffer* suggests that the PLO's engaging in

10   activities unrelated to its observer status transforms it into

11   an office or other facility within the jurisdiction of the

12   United States.  But the Court does not have to parse this

13   stuff --

14        THE COURT:  That's not this issue.  That is a separate

15   item.  This issue is not about defining jurisdiction.  It's

16   about defining consent.

17        MR. BERGER:  But, your Honor, consent cannot occur,

18   which is, you can't wave a wand and say to me, you know,

19   Mr. Berger, you have been going to your office every day in

20   order to prepare to litigate this case, but if you continue

21   doing so, 120 days from now, you're deemed to have consented to

22   jurisdiction.

23        What the due process requires is more than saying I'm

24   giving you advance notice.  You have to give me something in

25   return for that, and so, your Honor, I respectfully suggest

L5JPSOKO

1    that the reciprocal obligations test, the Supreme Court's test

2    in *Ford*, you meet it in only one of two ways.  You meet it

3    either by having minimum contacts with the jurisdiction, or you

4    meet it by an exchange of benefits.  Those are reciprocal

5    obligations.  I understand your Honor's point, which is --

6              THE COURT:  You can't exchange benefits that you

7    hadn't previously extended.

8              MR. BERGER:  Yes, you can.  That is exactly right.

9    That is my submission.  You can't tell me that something you

10   already constrained, as a matter of law, to do, which the

11   courts told you 35 years ago you are constrained to do this,

12   that is not a benefit, to say I will continue obeying the

13   law --

14             THE COURT:  Well, who is constrained to do what?

15             MR. BERGER:  The United States government is

16   constrained by the UN Headquarters Agreement, under its

17   authoritative construction by the Southern District and the

18   Second Circuit to allow what I will call a protected zone of UN

19   protected activities.

20             THE COURT:  And that's not at issue here.  That's what

21   I don't understand about your argument.  This statute doesn't

22   affect that right whatsoever.

23             MR. BERGER:  But your Honor, that's where I think

24   we're missing each other with respect to --

25             THE COURT:  I know because you keep saying that that's

L5JPSOKO

1    what's at issue here, and the UN status has not been changed.

2    It's not been affected.  It is not at issue.  It is not in

3    dispute.

4            MR. BERGER:  But that, your Honor, respectfully, is a

5    factual question of where the line is drawn.  The premise of

6    your Honor's question --

7            THE COURT:  That's a different issue.  You can either

8    argue that the factual basis isn't there for me to make that

9    determination, or you can argue what I just heard you argue,

10   that categorically, they can't make this requirement because

11   somehow they're changing the rights without some exchange of

12   benefits.  So that's two different arguments.

13           MR. BERGER:  I have three points in response to that.

14   One is that line was drawn in the 1987 ATA.  It's codified at

15   52 U.S.C. -- I mean, 22 U.S.C. 5202.

16           THE COURT:  You tell me what was codified.  You can't

17   say it was codified if it affects the judgment of whether or

18   not they can say that if you want to conduct non-UN business,

19   you have to agree to these terms.

20           MR. BERGER:  Right.  But, your Honor, my point is,

21   let's start with what the previous state of the law was, which

22   frames the lack of an exchange of benefits.  I'll refer your

23   Honor to the *Mendelsohn v. Meese* decision, which was the

24   companion 1988 case to *U.S. v. PLO*, 695 F.Supp. 1456 at 1484.

25           It frames your Honor's point about the benefit.  What

L5JPSOKO

1    it says is the purpose of section 1003 of the 1987 ATA, which

2    is codified at 22 U.S.C. 5202, is "to deny the PLO the benefits

3    of operating in the United States."  That's preexisting law.

4    PLO --

5            THE COURT:  No, no, no.  Those cases were talking

6    about the benefits of UN observer status.

7            MR. BERGER:  Well, your Honor --

8            THE COURT:  What other benefits are any of those cases

9    addressing?

10           MR. BERGER:  They're addressing whether or not other

11   than UN-related issues.

12           THE COURT:  What issues?

13           MR. BERGER:  For example, this is the reason why a

14   waiver is required for a U.S. mission in Washington.  Right?

15   It says, the purpose of this 1987 law is to deny the PLO the

16   benefits of operating in the United States.  What the cases

17   then did is they say, that's the starting point, zero in the

18   United States.  From that, we carve out UN-related things.

19           THE COURT:  Right.

20           MR. BERGER:  But the purpose is, and it comes with an

21   enforcement mechanism.

22           THE COURT:  I know, but how has that changed?  How is

23   what's being done somehow inherently inconsistent with that

24   analysis when that status has not changed?

25           MR. BERGER:  Your Honor, I think we're saying the same

L5JPSOKO

1    thing but drawing different conclusions from it.

2              THE COURT:  Okay.

3              MR. BERGER:  That hasn't changed.  The fact that it

4    hasn't changed from 1987 means -- let me put this in --

5              THE COURT:  It can't change.

6              MR. BERGER:  What's that?

7              THE COURT:  It means that it can't change.

8              MR. BERGER:  It means that it hasn't been changed, and

9    so I would use a contractual analogy, which is, you can't

10   create contraction, a new consequence, without fresh

11   consideration.

12             There's nothing new here that the U.S. government is

13   offering to the PA and the PLO.  It's not like saying I'll give

14   you aid next year, I'll give you a waiver next year.  It's

15   recycled law from 1987, in Mr. Yalowitz's word codified.  It

16   can't be a benefit.

17             THE COURT:  I know, but there was no law -- there was

18   no guarantee, and there was no right of the PLO to conduct

19   non-UN business in the United States.

20             MR. BERGER:  All right.  Your Honor, that's --

21             THE COURT:  It's a right that the government couldn't

22   deny or exchange or put conditions on.  They don't have that

23   right today.

24             MR. BERGER:  The government can't, as a matter of the

25   UN Headquarters Agreement, put any burdens on the UN presence.

L5JPSOKO

1        THE COURT:  Right.

2        MR. BERGER:  The government has, for decades, burdened

3    everything else and prohibited it in the United States.  So

4    Mr. Yalowitz --

5        THE COURT:  So the argument you just made because you

6    claim that they never put any restrictions on the UN business,

7    and they put restrictions on the kinds of business they could

8    value and the business that they could do.  How is that

9    different than what's happening here?

10        MR. BERGER:  Your Honor, I'm saying that all the

11    PSJVTA does is say, we're not changing the preexisting state of

12    the law.  That's Mr. Yalowitz's argument, too.

13        My point is if you're not changing, despite the fact

14    that Congress could, Congress hasn't.  Congress hasn't said

15    anything in the PSJVTA that is any different from preexisting

16    law.  That being the case, there is no fresh consideration like

17    there was under ATCA, to say I'm now attaching new

18    consequences, and here --

19        THE COURT:  Well, okay.  But I don't want to -- I

20    didn't mean to interrupt you, but I don't want to play

21    semantics with you because what you say that they have said,

22    they have not said it in the context and for the meaning that

23    you want to use it.

24        What Congress has done is Congress has said, look, we

25    don't like the fact that you can injure and kill U.S. citizens

L5JPSOKO

1    abroad and still come to the United States and do whatever

2    business you want to do.  That's the current state of the

3    agreement.  So from now on -- and we've observed this case,

4    it's been thrown out because the court says there's no

5    jurisdiction.

6            Well, we want to protect the interests of U.S.

7    citizens; so, therefore, we are going to say, from now on, if

8    you want to do these other activities, unrelated to your UN

9    presence because we know we don't have the right case law and

10   precedent and indicate you don't have the right to restrict

11   your UN presence, but if you want to do other activities

12   unrelated to that UN presence, from now on, we put several

13   conditions on you in exchange for your being able to do that in

14   the future.

15           One, is that you don't pay people who are injured or

16   killed or jailed with regard to what we claim are terrorist

17   acts; and, two, if you want to continue to have the benefits of

18   not being sued in the United States, you are going to have to

19   not do any non-UN business in the United States.  Otherwise, if

20   you want to do non-UN business in the United States, you're

21   going to have to agree in the future to subject yourself to

22   jurisdiction.  That's your choice.

23           If you don't want to do it, you don't have the right

24   to do business in the United States, other than UN business.

25   If you want to do business in the United States other than UN

L5JPSOKO

1  business, you're going to have to agree to these terms.  You're

2  saying that --

3          MR. BERGER:  Okay, your Honor.

4          THE COURT:  -- you don't have the right to do that.

5          MR. BERGER:  Right.  You Honor, you and I, I think,

6  are on exactly the same wavelength here, and it boils down to

7  this question.  Because from 1987 forward, Congress has already

8  said if you come into this country and you do activities

9  unrelated to the United Nations, you've committed a crime.

10         So now what your Honor is saying, Congress can say,

11  not only is it a crime, it can say, there are civil

12  consequences in terms of jurisdictional attachment.  But your

13  Honor's construct, at least, agrees with me, which is to say

14  there's that quid pro quo.  There is the, if you want to do

15  this, then this follows.  That's my point, your Honor.  That

16  now reduces to a factual question.  Are we doing things that

17  fall outside of what your Honor calls "other activities" and

18  here's why the answer is no.

19         THE COURT:  That part of the argument I understand.  I

20  just don't understand that I can make a determination simply

21  that Congress, by passing this statute, went beyond its

22  authority because there was no exchange of benefits.

23         MR. BERGER:  But, your Honor, that is our argument,

24  which is, there's only one way to tell whether the standard, as

25  articulated in *Brown*, which plaintiffs concede.  What is free

L5JPSOKO

and voluntary consent?  It can't be a seat-of-the-pants

determination.  There has to be a bright-line test.

THE COURT:  Right.

MR. BERGER:  Our argument is that free and voluntary

consent requires an identifiable exchange of benefits when

legislation demands this.  So like Mr. Yalowitz talks about

cases like *Bauxite*.  *Bauxite* doesn't involve Legislative deemed

consent.  It involves an act of judicial submission.

Your Honor, if I show up in front of you making this

argument, that my client is not subject to jurisdiction, and I

offend you and you hold me in contempt, it's not a question of

an exchange of benefits.  It's I've submitted to the Court's

jurisdiction.  But you have to take judicial submissions,

judicial acts, and move them to the side.  It's the same thing

like rule 12(h).  If I don't preserve my jurisdictional

defense, that's a judicial act.

THE COURT:  But the problem is --

(Indiscernible crosstalk)

MR. BERGER:  -- legislation.

THE COURT:  The problem I have with both arguments on

this issue is that you have yet to convince me that this is a

new definition of jurisdiction.  It is not a new definition of

jurisdiction.  It is whether or not this is an appropriate

definition for consent, and that's not what the cases deal

with.  That's the uniqueness of this case.

L5JPSOKO

1          This legislation is written in terms of consent.  It

2     is not written in terms of obligations.  It's not written in

3     terms of how you define jurisdiction.  It doesn't even say

4     anything about whether or not the Supreme Court's definition of

5     jurisdiction, as applied by the Second Circuit, has any

6     infirmity whatsoever.

7          It's if you do these acts, if you want to do these

8     acts, you will have to consent to these terms.  And so that's

9     what is sort of hard for me to jump on those cases that you

10    guys are citing on both sides and say, oh, yeah, that resolves

11    this issue.  It doesn't resolve this issue.

12         This issue is about whether or not you -- it is if you

13    do the acts that the statute says that you cannot do unless

14    you're going to consent, by doing those acts, have you

15    consented.  That's the simple question, isn't it?

16         MR. BERGER:  Right.

17         THE COURT:  Before I get to the due process

18    constitutional issue, that's the simple question.

19         MR. BERGER:  So, your Honor, I think we're saying a

20    lot of the same things because your characterization there was

21    an "if then" clause, if you do this, then jurisdiction follows.

22    So put aside exchange of benefits.  Maybe "benefits" is

23    confusing the discussion.

24         I call it a quid pro quo.  If I do this, then this

25    happens to me.

L5JPSOKO

1          THE COURT:  Right.

2          MR. BERGER:  What Mr. Yalowitz said that tests for due

3    process is fair notice, no arbitrary government action and

4    minimum contacts.  But when there's not minimum contacts,

5    because what your Honor said is we're not talking about

6    jurisdiction, we're talking about consent.  So you have to have

7    fair notice for sure.  You have to have no arbitrary government

8    action.

9          But what the Second Circuit told us in *Brown* is it

10   also needs to be free and voluntary.  So what is free and

11   voluntary?  And that's what we're talking about.  And what my

12   submission is, your Honor, is that free and voluntary is, as

13   your Honor defined it, if I do this, then this happens.  At

14   least now there's an "if, then" progression to the argument.

15         And I agree that if the United States wanted to put

16   some additional burden on non-U.S. activity, beyond existing

17   criminal prohibitions, then maybe that would fit our "if, then"

18   quid pro quo scenario.  But it raises the factual question, and

19   this is the whole purpose of why we don't concede the U.S.

20   activities section has been met.  How do I tell?

21         I've already addressed two parts of that.  I've

22   already said there's no evidence of consular activities.  It's

23   fully rebutted by discovery in another case.  Happy to submit

24   that here.  We have also, I think, addressed this nonsense

25   about surfing in Gaza, which was UN Sports, clearly UN related.

L5JPSOKO

1          So how do we tell what is UN related?  And let me give

2     your Honor what I think is a very easy test -- two easy tests

3     that avoid the need to parse constantly, does this fall and

4     fall within that?  No. 1, by official United Nations mandate,

5     Palestine, as an observer member of the United Nations,

6     non-member state, belongs to something called the UN Committee

7     on the Exercise of the Inalienable Rights of the Palestinian

8     People.

9          Here's the committee's mandate.  The committee's

10     mandate absorbs everything to which Mr. Yalowitz has pointed,

11     speeches, social media and the like.  What the committee's

12     mandate say -- and I'm going to quote here, I'm not trying to

13     be polemical.  We all know that these are hot-button issues

14     currently.  Let me quote the UN mandate to the UN Committee on

15     the Exercise of the Inalienable Rights of the Palestinian

16     People.  It is to focus on diplomatic efforts and initiatives

17     to support the achievement without delay of an end to Israeli

18     occupation that began in 1967 and of the two-state solution on

19     the basis of 1967 lines, which includes "continuing to mobilize

20     the international community to stay steadfast in its support

21     for the inalienable rights of the Palestinian people."

22          "Mobilizing the international community," that's the

23     Tweets, that's the speeches, that's the radio appearances, and

24     your Honor was already onto this earlier.  We don't even have

25     to worry about what's ancillary.  This is a core part of the

L5JPSOKO

1    official duties of the UN mission.

2            But here's the second test that also makes it easy

3    because, your Honor, we're in agreement that non-UN activities

4    are already criminal under 22, U.S.C. 5202.  Well, 22, U.S.C.

5    5203 says that if Palestine UN mission personnel exceed the

6    protected area -- the one that your Honor defined -- then the

7    Attorney General may bring an action for enforcement to enjoin

8    that activity.

9            There has been no evidence of any enforcement activity

10   whatsoever.  That was the status quo when the PSJVTA was

11   passed, and very importantly, the Second Circuit -- and I give

12   your Honor a case cite for this -- presumes that Congress

13   legislates against the backdrop of existing law, and that

14   includes its enforcement history.  You can find that *Pharaohs*

15   *GC, Incorporated v. Small Business Administration*, 990 F.3d

16   217.

17           In other words, Congress is presumed to have enacted

18   legislation, in this case the PSJVTA, knowing that the status

19   quo of what the UN mission and its personnel were doing was

20   within the permitted zone of UN activity because there had been

21   no enforcement action.  So Congress could say, I'm going to

22   attach a new consequence to that activity, jurisdiction, not

23   just criminal provision, but there still has to be evidence

24   that that activity exceeded what is allowed.  And our

25   submission is, there is no evidence that it exceeds the

L5JPSOKO

1      protected area.

2              THE COURT:  The problem that I have, and I have to

3      think out, is that you're giving me examples that apply to how

4      one defines jurisdiction.  And, for me, this is not the

5      determinative issue of how one defines jurisdiction.

6              The question is whether or not this is consent.  And

7      so you can focus me, let me basically tell you where I am at

8      this stage.  First of all, this argument about the activities

9      does not seem to me to be the determinative argument on this

10     motion.

11             Why?  It's because even if I accept your argument on

12     this activity, that does not address the issue of the payment

13     of monies to persons designated to the terrorists who have

14     injured U.S. citizens or their families.  There doesn't seem to

15     be any real genuine dispute.  The conduct that's being

16     addressed is still going on, and that if you strictly go by the

17     language of the statute, that that activity falls within that

18     statute, and there's no question that that activity is still

19     going on.

20             So the question doesn't seem to be determinative as to

21     whether or not they're violating the letter of the law of the

22     statute.  The question is whether or not it is consistent with

23     due process to say that even though you continue to do that,

24     and because you continue to do that, it constitutes consent to

25     jurisdiction, and whether or not that meets the requirements of

L5JPSOKO

1    constitutional due process.

2            So no matter how I look at it, whether I accept your

3    argument, unless you want to give me an argument that somehow

4    there's a genuine dispute as to whether or not, in fact, a

5    prohibited activity with regard to payment to individuals who

6    have injured U.S. citizens, whether or not there's some real

7    dispute as to whether those payments are still taking place.

8            So the question really is whether or not that

9    restriction and/or the restriction on activity is still

10   prohibited legislation because it is unconstitutional to do

11   that because it is inconsistent with due process.  So unless

12   I'm convinced one way or the other on the due process argument,

13   it seems to me that neither one of the arguments are

14   determinative of this issue.

15           MR. BERGER:  So, your Honor, let me address that

16   because I think the payments, from Palestine's point, is, if I

17   can borrow your Honor's phrase, a red herring.  Here is why you

18   can't possibly predicate jurisdiction, by consent or otherwise,

19   on the payments in Palestine.

20           It's like one of your analyses about what happens in

21   New Jersey, which is, United States government has no authority

22   to regulate what the PA and the PLO do in Palestine.  Now, if

23   what the PA and the PLO do in Palestine, by making payments,

24   has a direct effect on the United States, then it would be

25   minimum contacts jurisdiction.

L5JPSOKO

1          THE COURT:  I'm not sure I agree with that statement,

2     that United States has no ability to affect what goes on in

3     other countries.  We do it all the time.

4          MR. BERGER:  We do it as --

5          THE COURT:  We tell people all the time, unless you

6     comply with these conditions, we are not going to give you, as

7     you say, a certain benefit.  So I don't think I can accept that

8     if the U.S. says it's in their best interest, in order to

9     protect U.S. citizens, to demand this from other countries,

10    even if it's not happening in the United States, I'm not sure I

11    can accept the premise that they don't have an interest or the

12    right or the ability to do so.

13         MR. BERGER:  Well, so your Honor provided the answer.

14    I think to that construct, earlier in a remark you made to

15    Mr. Yalowitz, you said do you agree that Congress can't change

16    a due process analysis, that that's beyond their power.  He

17    said, well, they'd like to think they can, but they can't.

18         The Second Circuit in this case already considered the

19    two things that are at issue in the PSJVTA.  They considered

20    payments in Palestine, and they considered advocacy in the

21    United States.  And it held that neither of those, as a

22    constitutional matter, could support jurisdiction.  You can

23    find that at 835 F.3d 341 to 42.

24         So now, the question is, having been told by the

25    Second Circuit that payments in Palestine and advocacy in the

L5JPSOKO

1    United States does not create a jurisdictional nexus that

2    satisfies due process, can Congress wave a wand and say, okay,

3    I know it doesn't satisfy minimum contacts, but I'm now going

4    to say if you keep doing this, that which does not satisfy due

5    process, then you are deemed to consent to jurisdiction, and

6    the answer to that is clearly, no, for two reasons.

7         One is it's a Legislative effort to alter the due

8    process standards.  That's the separation of powers point.  The

9    other, the due process point, is there has to be something

10   within the power of the United States to give or take away --

11   not give or take away jurisdiction -- give or take away a

12   benefit and you can't say that that's the case.

13        So, for example, if Congress said any bank in the

14   Middle East that processes payments for terrorists, which is

15   clearly injurious to the United States, that that subjects you

16   to jurisdiction in United States courts, well, guess what,

17   that's already the Anti-Terrorism Act and the Second Circuit

18   important held that's not good enough.

19        THE COURT:  Again, you both are doing this.  You

20   characterize it in a way that the issue that doesn't exist

21   before me.  That is not the issue before me.  This is an issue

22   of consent.  Okay?  This is not an issue of what confers

23   jurisdiction.  I agree with you, and Mr. Yalowitz would have to

24   agree, that there's nothing in this legislation that confers

25   jurisdiction, the power of conferring jurisdiction to Congress.

L5JPSOKO

Congress has not done that.

As a matter of fact, the reality is the concern that you raise is probably exactly why Congress decided to word it this way, to avoid a constitutional attack on the legislation, that the legislation is changing the definition of jurisdiction, or is loosening the requirements for jurisdiction.

So the question is not whether or not this is a legitimate assertion of jurisdiction.  The question is whether or not this -- as it would be in any context if it wasn't jurisdiction -- whether or not this is a legitimate assertion of the principle of consent, informed, voluntary, on-notice consent.

So I can't disagree with you, the way you characterize it, you know, with regard to what their powers are or lack of powers to assert jurisdiction.  But Congress isn't asserting jurisdiction.  They're not changing the definition of jurisdiction.  They are saying that regardless of what is required for jurisdiction, if you want to engage in certain activities, you're going to have to consent.

MR. BERGER:  So, your Honor --

THE COURT:  The question is, where do I go for guidance in terms of what would be a valid consent?

Now, you already said one point, which is a legitimate point, that, look, consent can't be you're forcing me to do

L5JPSOKO

1    this.

2           Well, you know, as they say, you know, 40 years ago,

3    when I used to drive my car, I didn't have to wear seatbelt.

4    Now, to get in the car to drive my car, I have to consent to

5    put on a seatbelt.  All right?  So the question is not whether

6    or not seatbelt jurisdiction has been expanded.  The question

7    is, look, if I don't want to wear a seatbelt, then I shouldn't

8    get in the car.

9           So the question here is, all right, is it critical to

10   your argument that I define this as Congress changing the

11   definition of jurisdiction or somehow expanding jurisdiction,

12   or is this a more limited analysis of whether or not this is an

13   appropriate definition of consent, and whether or not the kinds

14   of constitutional analysis that one has to go through to

15   determine the assertion of jurisdiction, whether or not this

16   Court or any court has to go through that same analysis in

17   determining whether or not this is a valid consent.

18           MR. BERGER:  So, your Honor, I think the Second

19   Circuit has given us the guideposts and has framed your

20   question.  So your Honor said it's not a question of asserting

21   jurisdiction, but is it a valid exercise of deeming consent.  I

22   said that's Legislative concept.  It's Legislatively implied

23   consent because we all agree there's no explicit consent.

24           What the Second Circuit told us in *Brown*, it raises

25   the meta-question.  It doesn't answer the granular question.

L5JPSOKO

1    Is that when there is no explicit consent, then implied consent

2    to jurisdiction must be free and voluntary.  Well, that's

3    great, but what does free and voluntary mean?  That's really

4    your Honor's question, what is free and voluntary?  How do I

5    tell?

6            Your Honor gave me the seatbelt analogy.  Right?  Put

7    on the seatbelt.  Well, guess what, that involves an exchange

8    of benefits, which is, you can't avail yourself of the right to

9    drive on the roads of New York State unless you are wearing a

10   seatbelt.  That's the tradeoff.  That's the quid pro quo and --

11           THE COURT:  But the analogy you gave me earlier was,

12   well, before that, I could drive without a seatbelt.  Now they

13   can't change the law and say I can't drive without a seatbelt.

14           MR. BERGER:  But there's a quid pro quo, which is

15   going forward.  What it said was, here's the deal, which is

16   something within our power, as the forum.  It is our right, as

17   New York State, to say to you, you can't drive on our roads,

18   that's the quid pro quo.

19           THE COURT:  But I don't understand why you're

20   conducting non-UN business is not that quid pro quo.

21           MR. BERGER:  Your Honor, if --

22           THE COURT:  Right to conduct non-UN business.

23           MR. BERGER:  If it were non-UN business, then my point

24   is that is simply attaching -- I'm not disagreeing with your

25   Honor.  I'm saying that's attaching an additional consequence

L5JPSOKO

1    to an existing rule that already prohibits non-UN business.

2            What I'm saying is there are ways to tell whether

3    we're engaging in non-UN business that are clean and simple,

4    one of which is that has been the rule since 1987.  Whether the

5    consequence is criminal prosecution or whether the consequence

6    is jurisdiction doesn't matter.  There's a consequence.

7            You can tell that there is no U.S. activity that falls

8    outside the line because there has been no enforcement, but

9    here's -- your Honor, we're all struggling for what's the test.

10   Right?  We all know it has to be free and voluntary.

11           THE COURT:  But would you say, on that analysis, that

12   Congress doesn't have the power to pass a law that says in the

13   future, if you want to do business in the United States, if you

14   decide to pay ransom to individuals to kill U.S. soldiers, that

15   you have to agree not to do that, or you would have to consent

16   to jurisdiction in the United States?  You would say they

17   wouldn't have the power to do that?

18           MR. BERGER:  I would say that they don't have the

19   power to do it in the ransom instance because the quid pro quo

20   has to be something within the power of the government to give.

21           The government does have the power to say, you can't

22   conduct non-UN activities in the United States without this

23   consequence.  It doesn't have the power to say that you can't

24   do these activities overseas because, otherwise, let's look at

25   what the Second Circuit did in the first appeal here.

L5JPSOKO

1          THE COURT:  But the semantics of it is the statute

2     doesn't say.  The statute doesn't say -- it doesn't tell them

3     what they can do or what they can't do.  It doesn't even say

4     you can't kill U.S. citizens.

5          MR. BERGER:  That's right.  Your Honor, I --

6          THE COURT:  It says if you kill U.S. citizens, we will

7     consider that, in the future, to be your consent to being sued

8     not only for that activity but any other activity that you

9     might be able to be sued on, based on your consent to be sued

10    because you knew if you killed a U.S. citizen, that we were

11    going to assert jurisdiction.  You went ahead and did it

12    anyway.  What is --

13         MR. BERGER:  Congress clearly does not have that power

14    under the Constitution.  Take the *Daimler* case --

15         THE COURT:  I don't understand why they don't have the

16    power.  They don't have the power to do that in conflict with

17    constitutional due process requirements, but I just don't

18    understand your argument that they don't have the power to say,

19    if you want to do business in the United States and you're

20    going to engage in activities to kill U.S. citizens, or you

21    want to engage in activities that kills U.S. citizens, that if

22    you engage in that activity, we will consider that a consent to

23    the jurisdiction of our courts.

24         MR. BERGER:  Right, and here's why Congress can't do

25    that --

L5JPSOKO

1          THE COURT:  We put you on notice that we don't want

2     this activity to take place, and as you say, we don't have the

3     ability to prevent you from doing so, but if you do so, that's

4     going to be your consent to be sued for the consequences of

5     doing that, and sued generally for any other activity that you

6     might otherwise be sued for under general jurisdiction.  Why is

7     that such a complicated concept?

8          MR. BERGER:  It's not complicated.  It's just

9     unconstitutional, and here's why --

10          THE COURT:  Why is it unconstitutional, other than

11     it's due process or not?

12          MR. BERGER:  It's a violation of due process because

13     it is not something that the United States government can

14     regulate and provide a benefit.  Let me put this in a --

15          THE COURT:  I just don't understand that.

16          MR. BERGER:  Let me use a hypothetical like the one

17     your Honor had that emulates something like the *Daimler* case or

18     the *Bristol Myers* case or the like, which is, if Congress says

19     to Daimler, you make Mercedes Benz's.  You sell them overseas.

20     If they have a defect in them, then you're on notice that 120

21     days from now, if an American citizen dies because you've made

22     a defective product overseas and somebody dies in an overseas

23     accident, then you can be sued in the United States for that.

24     That clearly violates the rule in Daimler that you cannot sue

25     them when there is no U.S. connection, and it doesn't change

L5JPSOKO

1    the due process rule just because you add the words "and you're

2    deemed to have consented to jurisdiction."

3              THE COURT:  That's my question.

4              MR. BERGER:  You can't do that because -- and that's

5    exactly what's going on here.  Look, we all know intuitively

6    that what Congress has done here is an attempt to say, okay,

7    now I've read two different Second Circuit opinions.  I'm going

8    to figure out Legislatively a way to get around both of those

9    things and get this case to where the Constitution says it

10   can't be.  And our position is you can't do that just by adding

11   the words "deemed consent."  How do we know?

12             THE COURT:  Just articulate, from your perspective, if

13   I had to rule in your favor, if I had to articulate why this

14   violates due process, that's all I'm -- you know, that's where

15   I'm focused.  Everything you say, I understand your argument,

16   but they all take me back to the same place.  They all take me

17   back to a due process constitutional argument.

18             It doesn't take me to -- I'm not going to be able to

19   resolve this issue based on whether you did or didn't engage in

20   certain activities, or based on whether or not they can or

21   can't take legislation that they say they're going to assert to

22   protect the interests of citizens abroad.

23             All of that analysis is not going to determine whether

24   Congress can pass a law that says if you engage in that

25   activity, you've consented to jurisdiction.

L5JPSOKO

1          What I need to do is I need to articulate why is it

2     that you say -- and I'm not sure if there's any other real

3     constitutional argument, other than the broader constitutional

4     argument -- that it violates due process.  I'm having

5     difficulty articulating why it violates due process, and let me

6     simplify it for you by simple analysis.  I'm having more

7     difficulty articulating why it's unfair to make that a

8     requirement.

9          MR. BERGER:  And I think fairness --

10          THE COURT:  The notice and having given you the

11     opportunity to make your choice as to whether or not you want

12     to continue to engage in this activity.  Because if you are

13     going to continue to engage in this activity, we're no longer

14     going to give you the benefit of the personal jurisdictional

15     protection that you might otherwise have because you're doing

16     this, even though we have made it clear to you if you do this,

17     it will constitute consent.

18          MR. BERGER:  Okay.  So, your Honor, in the latter part

19     of your analysis, you said we will no longer give you the

20     benefit of constitutional due process, and clearly Congress --

21          THE COURT:  I didn't say that.  The benefit of

22     constitutional due process.

23          MR. BERGER:  Right.  So here's --

24          THE COURT:  I'm going to give you the benefit of

25     engaging in that activity and, at the same time, protecting you

L5JPSOKO

1  from being sued personally in the United States.

2            MR. BERGER:  Right.  So, your Honor, I think we're a

3  lot closer than perhaps you think, which is, I have one word --

4  remember like at the end of The Graduate, the movie The

5  Graduate, one word, plastic?

6            THE COURT:  Plastics?

7            MR. BERGER:  Plastics, right.  So I've got one word

8  for you, and this is the test, reciprocity.  That's the quid

9  pro quo point, the exchange-of-benefits point.  The closest

10  analogy we have to this statute, and this why I harp on this

11  point, is its predecessor, ATCA.

12            ATCA was also a deemed consent statute that was

13  designed to work around the Second Circuit's decision, and the

14  only respect why the government defended its constitutionality

15  was that it recognized that there were benefits, reciprocal

16  benefits, at issue, and the government's position was the

17  political branches can impose condition on those benefits.  So

18  that's the test, your Honor.

19            I understand your point.  You're not going to get into

20  the granular, is this actually met or not.  So the question is,

21  is there any reciprocal aspect to the PSJVTA?  Our argument is,

22  no, there is no reciprocity because everything that the statute

23  says -- that if you keep doing this, we will impose

24  jurisdiction -- is not something that is a benefit within the

25  power of the United States government to give.  Totally unlike

L5JPSOKO

1   ATCA, where government aid or a waiver was a benefit totally

2   under the power --

3           THE COURT:  I don't understand that in the context of

4   non-UN business activity.

5           MR. BERGER:  Right, but so, your Honor, I agree with

6   your Honor.  I would --

7           THE COURT:  Congress clearly has the right to restrict

8   that or to give it unfettered, you know, condition, without

9   condition.  They have the right to do that.

10          MR. BERGER:  We agree on that, your Honor.  If it is

11  something that the United States government can allow or

12  disallow, and the United States --

13          THE COURT:  In this case, they can allow it.

14          MR. BERGER:  -- and the United States government can

15  allow or disallow non-UN activity by the PLO in the United

16  States, and we know that because it already does disallow that.

17          THE COURT:  Right, that is a fact.

18          MR. BERGER:  Then the statute is properly analyzed on

19  a reciprocity analysis, and it becomes a fact-specific question

20  in every case about whether the activity that is involved is

21  non-UN activity.

22          But the test is still the same, which is the only

23  identifiable benefit in the PSJVTA is non-UN related business,

24  which the statute has defined broadly to include -- and this is

25  the important part about ancillary.  Mr. Yalowitz skipped over

L5JPSOKO

1    this part.  It says personal or official activities that are

2    ancillary to the United Nations business.  That's very wrong.

3    Personal activities, why would they include the word personal?

4    So it becomes a fact-specific question.

5            So the issue is not, is there reciprocity.  It's the

6    only identifiable reciprocal aspect of the statute.  It becomes

7    a fact question, if that's the holding, about whether they've

8    proven facts -- and they haven't -- that then allow that

9    reciprocity to be met.

10           But you've asked me, your Honor, what is

11   fundamentally --

12           THE COURT:  There's no fact question in dispute with

13   regard to whether they are meeting the condition of not paying

14   benefits to those who are convicted of --

15           MR. BERGER:  Right.

16           THE COURT:  -- committing what they consider to be

17   terrorist acts.

18           MR. BERGER:  But our --

19           THE COURT:  There's no factual dispute there.

20           MR. BERGER:  That is not factually in dispute.  It is

21   legally in dispute because what we are arguing is that there is

22   no reciprocity there.  It is not subject to the United States

23   regulation; so therefore, there is no reciprocity, no benefit.

24           So while those facts aren't in dispute legally, we

25   strongly contest whether that's fair.  We don't legally contest

L5JPSOKO

1    whether the United States can prevent non-UN-related activity

2    in the United States.  That's the only identifiable benefit.

3         Your Honor keeps trying to get me to be clearer.  I'm

4    trying to be.  What is my test?  You said it's a forced consent

5    case.  How do I know whether forced consent meets due process

6    or not?  And I have given you my one-word "plastics"

7    reciprocity test.

8         Now the question becomes what's reciprocity?  Our

9    argument is there's no reciprocity when it comes the payments

10   that are undisputed.  There is no -- there is only reciprocity

11   when it comes to non-UN-related U.S. business, but the facts

12   don't show that that is satisfied here.

13        THE COURT:  You would agree that there is no

14   reciprocity requirement with regard to consent?

15        MR. BERGER:  No, I think it's essential to consent.  I

16   think the only way --

17        THE COURT:  I mean, no.  There's absolutely no

18   requirement of reciprocity, or even consideration, for

19   consenting to jurisdiction.

20        MR. BERGER:  Your Honor, if it's explicit consent,

21   then, yes, the due process clause still requires that you make

22   sure.  So, for example, if I explicitly consent --

23        THE COURT:  Where is that?

24        MR. BERGER:  If I explicitly consent, your Honor, by

25   virtue of a forum selection payment, the Court still examines

L5JPSOKO

1    whether that was a free and voluntary, non-coerced consent.

2            THE COURT:  No, a free and voluntary, non-coerced is

3    not reciprocity.  Okay?  There's no requirement of reciprocity

4    for consent.  There's a requirement that, as you said, if you

5    want to argue that it's free and voluntary, that's one thing.

6            But I don't have to say, oh, what did you get for your

7    consent?  And if I can't point to something that I gave you in

8    exchange for your consent, then your consent to jurisdiction is

9    invalid.  That's not a requirement for consent, as you just

10   articulated.  You left out reciprocity and you said,

11   appropriately, that that has to do more with a voluntary and

12   knowing agreement.

13           MR. BERGER:  So, your Honor, the question becomes what

14   is free and voluntary?

15           THE COURT:  Right.

16           MR. BERGER:  The reason why I say reciprocity is

17   required is that's the test for free and voluntary.  It is not

18   only advanced notice.

19           THE COURT:  Reciprocity has never been the test for

20   free and voluntary consent.

21           MR. BERGER:  Your Honor, I respectfully suggest it has

22   always been the test.

23           THE COURT:  It may be the test for a contractual

24   agreement, but I don't have to show you reciprocity in order to

25   demonstrate that you consented to something.

L5JPSOKO

1          If we signed a contract and I said, okay, we're going

2     to do X, Y and Z, and then we signed the contract and I said,

3     well, you know what, I know we said that we were both going to

4     sign this contract, but you have my consent to just take the

5     contract and keep it with you and never sign it and never send

6     it back.  You're telling me that my analysis involves whether

7     or not there was some reciprocity to enforce --

8               MR. BERGER:  Contract always --

9               (Indiscernible crosstalk)

10              THE COURT:  -- consent?

11              MR. BERGER:  Your Honor, a contract is always a

12    bargained-for exchange.  It always involves reciprocities,

13    always eternal contract.  You're ask me --

14              THE COURT:  Consent is given with or without a

15    contract.  All right?  So I want to know why I'm supposed to be

16    able to say -- I understand your reciprocity argument with

17    regard to an exchange of promises.  I don't see why I have to

18    sit here and try to analyze whether there was some exchange or

19    benefit in order to determine whether one party consented to

20    something.

21              MR. BERGER:  Your Honor --

22              THE COURT:  That's never been the analysis.  That's

23    not the analysis with regard to consent.

24              MR. BERGER:  But your Honor --

25              THE COURT:  The analysis with regard to consent, as

L5JPSOKO

1   you said, is it was knowing and voluntary.

2           MR. BERGER:  Your Honor --

3           THE COURT:  I could consent to do things that I get

4   nothing in exchange for, but I may be bound by that consent.

5           MR. BERGER:  Your Honor, well, here's what I think we

6   agree on, which is that free and voluntary standards have to be

7   met as a matter of due process when there's not explicit

8   consent.  So we don't have explicit concept.

9           THE COURT:  Okay.  Well, that part of it I understand,

10  and I can understand that analysis.

11          MR. BERGER:  Right.  That's what *Brown* says; so that's

12  Second Circuit law, it must be free and voluntary.

13          THE COURT:  Right.

14          MR. BERGER:  All we're talking about now is how do you

15  sit there and say it's free and voluntary or it's not?  It's

16  not a Potter Stewart thing, where you say, well, "I know it

17  when I see it" because that's not really legal rule.  So the

18  question that we have been wrestling with is, what is the test

19  for free and voluntary, since we all agree it has to be free

20  and voluntary.  And so --

21          THE COURT:  The test for free and voluntary is that I

22  am on notice.  I'm aware of the consequences.  They can't force

23  me to engage in that conduct that they want to affect, and if I

24  want to engage in the conduct that they want to affect, that

25  I -- well, even from your reciprocity argument, in exchange for

L5JPSOKO

1    the right to do that, I will consent to jurisdiction.

2            In exchange for the right to give benefit to

3    individuals, I am going to agree to subject myself to

4    jurisdiction in exchange for the right to conduct business in

5    the United States that's non-UN business.  I'm going to

6    knowingly and voluntary agree to consent to jurisdiction.

7            If I don't want to consent -- non-consent doesn't mean

8    if I don't consent, I still get what I want.  That's not the

9    definition of consent.  Consent is, I know what's being asked

10   of me, I am conceding that point, I'm agreeing to that point,

11   and I know what the consequences are to enforcing such an

12   agreement.

13           And so if they tell me that you have to consent, it

14   will be consent to jurisdiction if you do the following acts,

15   then my voluntary decision is whether or not I'm going to do

16   that act.

17           MR. BERGER:  Right.  So let me be as clear about this

18   as possible because I understand where your Honor is coming

19   from, and I just need to be clear that that test for consent

20   would violate the mandate in the first appeal in this case,

21   which talked about what the standards are for consent to

22   jurisdiction.

23           It has to be more, according to the Second Circuit,

24   than advanced notice and a reasonable relationship to a

25   government goal.  That's why the Second Circuit rejected the

L5JPSOKO

1    plaintiffs' consent argument in the first appeal because that

2    was the argument they made there.

3         They said the Anti-Terrorism Act puts the defendants

4    on notice that if they engage in these acts, they appoint an

5    agent for service of process, and they are served with process,

6    that's sufficient for jurisdiction.  They said that was couched

7    as a consent, quote, unquote, argument by the plaintiffs in the

8    first appeal when they said due process requires something

9    more.

10        We agree, it requires something more.  What I said

11   that something more is is reciprocity.  Your Honor doesn't

12   agree with me, but I want to be clear about my argument because

13   I think holding that only advance notice and reasonable

14   relationship to a government goal would violate the mandate in

15   the first appeal.

16        THE COURT:  I understand that.  I just don't -- I

17   mean, I'll look at it again with that eye, but I don't have any

18   recollection that any court has defined it as reciprocity.

19        MR. BERGER:  Well, your Honor, and that's why the only

20   other thing -- and this is the point I was making earlier that

21   I would commend to your Honor.  The closest analogy we have to

22   the PSJVTA is its immediate predecessor, the ATCA, and the only

23   basis on which it's constitutionality, its due process

24   constitutionality, was defended by the U.S. government was on

25   an exchange-of-benefits theory.  So that's what I would say is,

L5JPSOKO

 1   you know, the closest --

 2          THE COURT:  Your argument is this isn't a consent;

 3   that this is, in fact, an assertion of jurisdiction under the

 4   guise of consent.

 5          MR. BERGER:  That's a fair summary, your Honor, and

 6   I'm saying the reason you can tell the difference between

 7   consent and an assertion of jurisdiction is whether it involves

 8   reciprocity.

 9          THE COURT:  I want to try to wind up.  Is there

10   anything else you wanted to add?  Let me see if Mr. Yalowitz

11   wanted to add anything.

12          Mr. Yalowitz, you're on mute.  I'm sorry,

13   Mr. Yalowitz.

14          MR. YALOWITZ:  Sorry about that.

15          THE COURT:  That's all right.

16          MR. YALOWITZ:  I probably need about five minutes,

17   your Honor.

18          THE COURT:  Okay.  So I mean, do you agree with this

19   reciprocity argument?

20          MR. YALOWITZ:  I agree with you, that it's never been

21   the law that consent requires reciprocity or consideration.

22   Consent is just consent.  I consent.  You can consent because

23   you feel like it.  You can consent because you, out of the

24   goodness of your heart, want to consent.  You can consent

25   because you're getting something.  I've never heard of any case

L5JPSOKO

1    that says you can't consent unless you're given some benefit.

2            And by the way, while Mr. Berger was talking, I

3    searched his 60-page brief, and I didn't see anything about

4    reciprocity or quid pro quo or anything like that the 60-page

5    brief to you.  He --

6            MR. BERGER:  I'm happy to identify those pages if

7    Mr. Yalowitz has trouble finding them, if he's going to make a

8    waiver argument.

9            THE COURT:  All right.  Mr. Berger, I let you --

10    Mr. Yalowitz respond.

11            MR. YALOWITZ:  Okay.  Well, he didn't say -- the word

12    "reciprocity" and the word "quid pro quo" this is a new

13    argument he's making, and it's a meritless argument because

14    there's just nothing -- there's nothing in the law that says

15    you have to have a benefit.  The *Bauxite* case didn't give a

16    benefit.  They just said we're not giving discovery, and so

17    they said, okay, well, then you're deemed to consent.  So

18    that's the first thing I want to say.

19            The second thing I want to say is, you know, I welcome

20    scrutiny of the paragraph in the Second Circuit opinion, where

21    they talked about consent.  What they said was due process is

22    not satisfied in this case because the court doesn't have

23    general jurisdiction or a specific jurisdiction, and the

24    service-of-process statute doesn't change that.  That's what

25    they said.

L5JPSOKO

1          They said that the statute, the service-of-process

2     statute does not answer the constitutional question of whether

3     due process is satisfied.  So we're not in the

4     service-of-process statute.  We're in the post-statutory

5     context.  That's the other thing.

6          Now, the other thing I want to talk about, the last

7     thing I want to talk about with regard to due process is the

8     DOJ briefed in the *Klieman* case, which I really commend to the

9     Court.  It's a very helpful brief, and it's not being

10    characterized fairly by the defendants.

11         I just want to read from page 14 of that brief, again

12    without belaboring it:  Defendants insist that they are not at

13    home in the United States, but the "at home" test for general

14    jurisdiction is relevant only in the absence of consent.  A

15    forum's ability to exercise jurisdiction by consent is separate

16    and apart from the forum's ability to exercise general or

17    specific jurisdiction over an out-of-state defendant, who has

18    not consented to suit there.  So that's what the Department of

19    Justice said.

20         And then later on, in response to the defendant's

21    unconstitutional conditions test, they talked about benefits,

22    and because the unconstitutional conditions test is you can't

23    condition a benefit on the relinquishment of a constitutional

24    right unless you have a reasonable basis to do that.  And, of

25    course, if you do have a reasonable basis to do that, you can.

L5JPSOKO

|      |                                                                        |
|------|------------------------------------------------------------------------|
| 1    | And like that's the breath test, right?  If you get a                  |
| 2    | driver's license, you consent to a breath test if you're pulled        |
| 3    | over by a cop.  So I really commend the Department of Justice.          |
| 4    | Don't believe what the defendants are saying about the                 |
| 5    | Department of Justice brief, read it.  And it's very, very             |
| 6    | good.                                                                   |
| 7    | And the other thing I just, while I'm thinking about                   |
| 8    | it, Judge, for good order, you know, there is a statute, 28,           |
| 9    | U.S.C., 2403, that talks about the Court notifying the Attorney        |
| 10   | General if there's a constitutional question.  And the Second         |
| 11   | Circuit has suggested that, you know, that's a mandatory              |
| 12   | requirement.  You know, we did file our -- file and serve our         |
| 13   | rule 5.1 statement, but I think the Court could give them that        |
| 14   | notice as well, just for good order.                                   |
| 15   | THE COURT:  I have it in front of me, as a matter of                   |
| 16   | fact.                                                                   |
| 17   | MR. YALOWITZ:  Yes, okay.                                               |
| 18   | THE COURT:  It was a November 12 notice of                             |
| 19   | constitutional question.                                               |
| 20   | MR. YALOWITZ:  Right.  Right.  I gave them --                           |
| 21   | THE COURT:  I haven't heard from them.  I don't know                   |
| 22   | if the parties have heard from the Justice Department.                  |
| 23   | MR. YALOWITZ:  Only that they have confirmed that they                 |
| 24   | received the notice.                                                    |
| 25   | THE COURT:  Okay.                                                       |

L5JPSOKO

1          MR. YALOWITZ:  So it's not sitting in a mail room

2     somewhere.

3          THE COURT:  Okay.

4          MR. YALOWITZ:  But again, I think what they said about

5     the ATCA is the correct constitutional analysis.  You know,

6     it's useful.  It's very useful, but just for good order, I

7     think the Court could issue that, the same one that Judge

8     Furman did in the *Ford* case.

9          Okay.  I also want to talk about this.  This idea that

10    the defendants say the United States does not have the

11    authority to regulate conduct outside of the territorial

12    borders of the United States and, therefore, like, that's just

13    like crazy talk.

14         And I really would commend to the Court the case of

15    *Gamble against United States*, *Gamble against United States*,

16    which is a 2019 case from the Supreme Court, which talks about

17    how the United States has an interest in the protection of

18    human life of U.S. citizens when they're outside of the United

19    States.  And a murder of a United States citizen outside of the

20    territory of the United States is not just an affront to the

21    person murdered or the family of the person murdered, it's an

22    affront to the sovereignty of the United States of America.

23         And so, you know, that comes into the interest

24    analysis.  Right?  Is there a legitimate -- does the United

25    States have a legitimate interest that this statute is

L5JPSOKO

1    rationally related to.  That's the second thing I want to talk

2    about.

3        The final thing that I want to talk about is this

4    issue of codifying -- the PSJVTA codified the *Klinghoffer* case.

5    And those are my words, and I stand by them, and it goes to the

6    issue of the non-UN activities.  And so I want to read to you

7    what Judge Stanton said in the *Klinghoffer* case.  If I can find

8    it here.  I want to read to you what Judge Stanton said in the

9    *Klinghoffer* case.  He said -- this is his 1992 decision; so

10   this is on remand from the Second Circuit.  He said -- and this

11   is really what I'm going on in my argument -- "There remain

12   other PLO activities within New York sufficiently separate from

13   its UN activities that they may be considered" -- may be

14   considered -- "in determining whether it was doing business in

15   New York within the meaning of CPLR 301.  Mr. Terzi and others

16   in the PLO's New York office gave speeches and interviews every

17   month or so to live audiences and media appearances in

18   New York.  The PLO's New York office purchased informational

19   pamphlets from various organizations and generated their own

20   informational materials and distributed them to those seeking

21   information about the PLO."

22       So that's what I'm going on, that that's media

23   appearances, informational materials, Judge Stanton said those

24   are not protected activities under the UN umbrella.

25       And then I want to talk about -- the last thing I want

L5JPSOKO

1   to leave you with on this, and we spent a lot of time on the

2   U.S. -- is the DC Circuit in the *Klieman* case, which now fast

3   forward to 2019, the DC Circuit is talking about *Klinghoffer*.

4   And they say Klinghoffer reasons that only those activities not

5   conducted in furtherance of the PLO's observer status may

6   properly be considered as a basis for jurisdiction, and offers

7   some examples.

8          And again, he talks about the proselytizing, speaking

9   in public every month or two to media.  And then he said

10  that -- the DC Circuit says:  Plaintiffs rely here on rather

11  similar promotional activities.  And then they -- the final

12  thing they say is that they decided that the fact that those

13  activities were going on didn't trigger jurisdiction because

14  the ATCA was only triggered by a waiver, not a violation.

15         He says, and this is the DC Circuit:  Plaintiffs would

16  equate government failure to prosecute allegedly excessive

17  propaganda activities with provision of a waiver or suspension,

18  but the statute -- that's the ATCA -- permits no such equation.

19  ATCA section 4 is triggered by a waiver, not a violation.

20         So, you know, the whole argument that, like,

21  informational materials and media appearances is just part of

22  their UN business, that's not what *Klinghoffer* held.  That's

23  not what the DC Circuit said in *Klieman*.

24         And so if we agree that it was codifying that -- and

25  by the way, the best evidence I have that it was codifying

L5JPSOKO

1    prior was the statement of the sponsor right before the vote,

2    Senator Langford, who said:  We're codifying prior law.  So I

3    think that's pretty strong evidence.

4           So that's the piece of my argument that of the two

5    senses of ancillary, you would go to with a narrower one.

6           So if your Honor has questions about things that

7    Mr. Berger said, he said a lot of things I disagree with, but I

8    know you don't want to assume by my silence that I agree.

9           THE COURT:  Sure.

10          Mr. Berger, do you have anything else you wanted to

11   add?

12          MR. BERGER:  Just a couple of points, your Honor.  I

13   think one thing Mr. Yalowitz and I agree on is the *Klieman*

14   brief from the Justice Department is highly instructive.  It's

15   available in Westlaw at 2019 Westlaw 1200589.

16          When your Honor takes a look at pages 12 to 13 in the

17   brief, you will see that Mr. Yalowitz is incorrect, that the

18   reciprocity point is dealt with under unconstitutional

19   conditions.  It's dealt with as a matter of Fifth Amendment due

20   process.

21          The last point I want to make about *Klinghoffer*, this

22   is an important one, is Judge Stanton's findings Mr. Yalowitz

23   talked about were relevant under the now-discarded

24   doing-business standard.  They are not relevant under current

25   due process standards.  So they provide no evidence here of

L5JPSOKO

1    whether or not the PA or PLO is subject to jurisdiction.

2            I was wondering, your Honor, if you would find it

3    helpful to have closing briefs, given how much we have thrown

4    at you in the argument.  I apologize for the length of ours,

5    but we didn't get a chance, until today, to respond to his

6    reply brief.  So if your Honor would find those useful, we

7    could submit simultaneous closing briefs that recap points of

8    what we have covered today, and if your Honor doesn't want

9    that, we certainly don't want to bury you in more paper.

10            THE COURT:  Mr. Yalowitz?

11            MR. YALOWITZ:  I don't think we need more briefs.

12            THE COURT:  I don't think we do either.  If something

13    that you want is of urgency and you want to submit it by

14    letter, a short letter, really less than five pages, but even

15    much less than that, then you should exchange those letters.

16    And then you should give the other side that letter before you

17    file it, and then I'll address it.

18            But I think the briefs are very complete, and this

19    argument was very helpful.  I want to get the transcript.  And,

20    obviously, it's not like this is a case I know nothing about.

21            MR. BERGER:  That's the other thing that Mr. Yalowitz

22    and I would agree on is that your Honor knows lots and lots

23    about this case, and we appreciate your time today.

24            THE COURT:  All right.  Thank you, gentlemen.

25    I'll get back to you as quickly as I can.
                    (Adjourned)