# Arnold & Porter

Kent A. Yalowitz
+1 212.836.8344 Direct
Kent.Yalowitz@arnoldporter.com

July 6, 2021

**BY ECF**

Hon. George B. Daniels
United States District Court
 for the Southern District of New York
500 Pearl Street
New York, New York 10007-1312

    Re:    *Sokolow et al. v. Palestine Liberation Organization et al.*
               No. 04 Civ. 397 (GBD)

Dear Judge Daniels:

    I write in response to defendants' brief in *Fuld v. Palestine Liberation Organization,* which makes two new arguments with regard to defendants' U.S. activities; and one new argument—"reciprocity"—with respect to the constitutional issue. None has merit.

    **1. U.S Activities.**—Although the pay-for-slay facts are undisputed, plaintiffs request that the Court *also* make findings of fact with regard to defendants' U.S. activities—particularly with regard to defendants' (a) so-called "consular" services and (b) propaganda activities. Such findings will aid the Second Circuit in its consideration of the issues when the case returns to that court.

    **a. Consular Services.**—Defendants filed two deposition transcripts with the *Fuld* brief. Defendants contend that the transcripts demonstrate that there were no activities on their behalf in the United States after the PSJVTA. *Fuld* Br. 22-23. That is incorrect. The facts are as follows:

1. Before 2018, defendants' Washington, D.C. office "assist[ed] Palestinians in the US with Consular Services, such as Power of Attorney documents, Birth and Death certificates and other forms." Gen'l Delegation of the PLO, FARA Supp. Statement, p. 4 (Oct. 9, 2018) (Ex. 5). As Fuad Ateyeh testified, "attesting to documents for use in Palestine was a service that was provided by the PLO's Washington, D.C. office." Ateyeh Dep. 36 (Ex. 10).

2. Defendants' pre-2018 website listed eight notaries as part of their so-called consular-service offerings, including Fuad Ateyeh (San Francisco) and Awni Abu Hdba (Patterson, New Jersey). Ex. 4. These individuals notarized documents "in connection with the Palestinian Authority" and submitted them to defendants' Washington, D.C. office, which "legalized" or "certified" them. Abu Hdba Dep. 110-12 (Ex. 9).

3. Pre-2018 documents reflected defendants' state of mind that persons involved in the certification process were acting for the benefit of defendants. One of defendants' employees described his certification activities as "rendered to" the PLO. Hakam Takash, FARA Registration Statement (May 21, 2012) (Ex. 2). Similarly, defendants' preprinted "Contract for Notary Services" (*see* Abu Hdba Dep. 128 (Ex. 9)), stated that "[a]uthorized" notaries were "to provide notary services for use by the [PLO Delegation to the U.S.]," and that such services "should not be considered an avenue for commercial gain." Ex. 3, p.1.

**Arnold & Porter**

Hon. George B. Daniels,
Page 2

4. In 2018, after the State Department ordered defendants to close their Washington, D.C. office, their official spokesman, Saeb Erekat, announced that defendants "would find alternate ways of continuing to provide consular services, and guarantee the continued provision of services to its citizens." Ex. 7.

5. After January 4, 2020, a list of "available" notaries continued to exist. Ateyeh Dep. 42 (Ex. 10). Notaries on the list received documents in the United States; notarized them; sent them to Palestinian officials in Mexico and Canada for certification; and then sent the certified documents to PA officials for use in territories administered by the PA. Ateyeh Dep. 45-56 (Ex. 10); Abu Hdba Dep. 57-62, 69-70, 78-79, 97-98 (Ex. 9). More than 75% of the documents Ateyeh notarized were "for use in Palestine." Ateyeh Dep. 44 (Ex. 10).

6. The notaries' activities occurred in the United States. Abu Hdba Dep. 102 (Ex. 9).

In sum, defendants authorized U.S. notaries to perform notarial acts "in connection with" defendants' certification and legalization of documents required for use in PA governmental agencies. Defendants' own documents (Exs. 2-5) and statements (Exs. 6-7) reflect their understanding and intent that these activities were *for their own benefit*. The notaries were integral to the certification process. "Traditional [l]egalization" of documents for use abroad involves a series of "certification[s]," beginning with execution "before a notary." Lucinda A. Low, *et al.*, *Int'l Lawyer's Deskbook* 298 (2d ed. 2002); *compare* 22 C.F.R. § 92.4 (U.S. consular agents perform "notarial acts" for documents "required for use" in the United States).[1] After defendants' Washington, D.C. office was closed, they stated that they "would find alternative ways of continuing to provide consular services" in order to "guarantee the continued provision of services" to Palestinians in the United States. Ex. 7. They did so by continuing to use the same notaries as before.

The notarial services thus were performed "on behalf of" the PLO and PA within the meaning of § 2334(e)(1)(B), which must be construed "liberally" in order "to carry out the purposes of Congress to provide relief for victims of terrorism." PSJVTA § 903(d)(1)(A) (18 U.S.C. § 2333 note). The phrase *on behalf of* means "in the interest of," "as a representative of," or "for the benefit of." *Madden v. Cowen & Co.*, 576 F.3d 957, 973 (9th Cir. 2009) (quoting *Webster's Third New Int'l Dictionary* 198 (2002)). Even a private person may act "on behalf of" a government entity. *See Rine v. Imagitas, Inc.*, 590 F.3d 1215, 1225 (11th Cir. 2009). The case of *Sanchez-Ramirez v. Consulate Gen. of Mexico*, No. C 12-3485 PJH, 2013 WL 4013947, at *9 (N.D. Cal. Aug. 5, 2013), *aff'd*, 603 F. App'x 631 (9th Cir. 2015), is instructive. There, the court concluded that an individual who provided "notarial services" to Mexican nationals was "assist[ing] in official governmental functions such as the provision of notarial services" and that his employment was "'intertwined' with government activity." *Id.* Here, too, the notaries assisted in defendants' official governmental functions. Indeed, defendants' *own* preprinted contract—stating that the "[a]uthorized" notaries were providing a "service for use by" the PLO (Ex. 3)—reflected defendants' understanding that

---

[1] Because defendants are not a foreign state, their D.C. office never enjoyed any form of immunity or diplomatic status. *See* Letter from Eric J. Boswell to Abdel Rahman (June 22, 1994) (Ex. 1); *accord* KPFA Radio Interview of Hakam Takash (Oct. 11, 2018) (Ex. 6) ("We had all the responsibilities of a consulate but we were never allowed the…privileges of a consulate").

# Arnold & Porter

the notaries were acting for the benefit of (*i.e.*, on behalf of) the PLO and PA.

**b. Propaganda.**—Defendants now assert that their distribution of propaganda comes within Exception (B), for activities "undertaken exclusively for the purpose of conducting official business of the United Nations." 18 U.S.C. § 2334(e)(3)(B). To the contrary, defendants' propaganda activities are exactly the type that the Second Circuit held to be *non*-UN-related, and therefore cognizable for jurisdictional purposes—even when conducted by defendants' UN mission personnel. *Klinghoffer v. SNC Achille Lauro*, 937 F.2d 44, 52 (2d Cir. 1991) ("speak[ing] in public and to the media in New York in support of the PLO's cause"). In *Klieman v. Palestinian Authority*, 923 F.3d 1115, 1130 (D.C. Cir. 2019), the D.C. Circuit observed that defendants' Twitter and Facebook social media posts—which have continued since January 4, 2020—were "rather similar promotional activities" to those supporting jurisdiction in *Klinghoffer.*

Defendants argue that because a certain UN committee wants to "raise international awareness" of the "inalienable rights of the Palestinian people," and defendants' promotional activities further that "cause," the promotional activities have now transformed into "official business of the United Nations" within the meaning of § 2334(e)(1)(B). Br. 24-25. By defendants' logic, *anything* done in furtherance of the UN's expansive aspirations qualifies as "official business." The UN's Economic and Financial Committee, for instance, aims to promote the "eradication of poverty." *See The GA Handbook: A practical guide to the United Nations General Assembly* at 71, https://www.eda.admin.ch/dam/mission-new-york/en/documents/UN_GA_Final.pdf. Thus, any activity by defendants purporting to further this "cause" would qualify as "official business of the United Nations" under § 2334(e)(1)(B). The court should decline defendants' invitation to disregard *Klinghoffer* on the theory that the UN has so expanded the scope of official business that the decision has become obsolete. Accepting that invitation would mean that the PSJVTA's UN activities exception entirely swallows the rule.

In reality, self-promotion is well understood to differ from the official business of a deliberative body. In an analogous context, courts have held that a deliberative body's "official business" simply does not include self-promoting public relations activities by its members. *See Hoellen v. Annunzio*, 468 F.2d 522, 526 (7th Cir. 1972); *Rising v. Brown*, 313 F. Supp. 824, 826–27 (C.D. Cal. 1970). Contrary to defendants' suggestion, the UN's Office of Legal Affairs has never opined that self-promotion by a non-member observer is "official business of the United Nations," which that office has defined as the "performance of official duties on behalf of the United Nations," attending to "the business of the Organization," or "an official act." *See* 1968 U.N. Jurid. Y.B. 194–95; 1985 U.N. Jurid. Y.B. 148. Self-promotion is none of those things.

**2. "Reciprocity."**—In *Fuld*, defendants have abandoned the principal constitutional argument they made in this case, instead pivoting to a new one: they now argue that "'deemed' consent to jurisdiction cannot be squared with Due Process unless there is reciprocity—that is, an express or implied exchange by which a defendant impliedly agrees to jurisdiction in return for a benefit conferred by the forum." *Fuld* Br. 1; *compare* Def. Br. 2 (arguing that consent jurisdiction is forbidden "where the constitutional minimum contacts test is not satisfied"). This "reciprocity" argument did not appear in defendants' briefing in the Supreme Court, the Second Circuit, or this Court for good reason—it is wrong on the law.

# Arnold & Porter

Hon. George B. Daniels,
Page 4

  **a.** "'[I]mplied consent' [is] a traditional basis for personal jurisdiction" in which "voluntary consent to jurisdiction need not be supported by consideration" at all. *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 380 (S.D.N.Y. 2001) (Lynch, J.) (quoting 4 Wright & Miller's *Fed. Prac. & Proc.* § 1067.3 (2d ed. 1990)). A defendant may consent to jurisdiction by engaging in disfavored conduct that satisfies a rational standard clearly established in advance. The most obvious examples are cases in which a defendant is deemed to have consented to the exercise of personal jurisdiction by failing to engage in jurisdictional discovery. *See, e.g.*, *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704-05 (1982). These defendants have previously engaged in that form of deemed consent. *See Knox v. Palestine Liberation Org.*, 229 F.R.D. 65, 70 (S.D.N.Y. 2005). Such cases involve no bargain with the state and no reciprocity; the defendants simply failed to comply with discovery orders.

  In *Bauxites*, the Supreme Court held that such conduct was one category in which "actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not." 465 U.S. at 704-05. A defendant's failure to raise a timely objection to the exercise of personal jurisdiction is another such category, similarly triggering deemed consent to personal jurisdiction, as the Court explained in *Bauxites*. *Id*. These defendants have previously engaged in that form of deemed consent, as well. *See Gilmore v. Palestinian Auth.*, 843 F.3d 958, 964 (D.C. Cir. 2016). Again, such cases involve no bargain with the state and no reciprocity. They reflect a determination that certain conduct by a defendant, which crossed clearly established lines, has amounted to "a legal submission to the jurisdiction of the court." *Bauxites*, 465 U.S. at 704-05. In none of those cases did defendant have an implicit "reciprocal bargain" with the United States.

  More generally, consent requires no "bargain" with anyone to be effective, even when constitutional rights are at stake. Persons may consent without reciprocity to law-enforcement searches, *United States v. Gomez*, 877 F.3d 76, 98 (2d Cir. 2017), to the adjudication of rights by a non-Article III court, *Wellness Int'l Network v. Sharif*, 575 U.S. 665, 678 (2015), to the presence of individuals on private property, *Machleder v. Diaz*, 801 F.2d 46, 59 (2d Cir. 1986), or even to the publication of libelous statements, *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015).

  **b.** Defendants rely (*Fuld* Br. 7-8) on snippets from two district court cases. Those cases contained *dicta* about a "bargain with the state" as a way of explaining their holdings that a state registration-to-do-business statute "necessarily incorporates the Due Process 'minimum contacts' requirement." *In re Mid-Atl. Toyota Antitrust Litig.*, 525 F. Supp. 1265, 1278 (D. Md. 1981); *see Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993). But those two anomalous holdings have not gained traction in the decades since the cases were decided.

  Today, it is black-letter law that even *without* minimum contacts, "personal jurisdiction can be based on the defendant's consent to have the case adjudicated in the forum." 4 Wright & Miller's *Fed. Prac. & Proc.* § 1067.3 (4th ed. 2008); *see* cases cited in Reply Br. 17-18. Thus, the Second Circuit has acknowledged the continuing vitality of cases holding that "a defendant may consent to personal jurisdiction without regard to what a due process analysis of its contacts would yield." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 641 (2d Cir. 2016). As in *Brown* itself, consent-by-registration statutes should be evaluated based on traditional due process standards:

# Arnold & Porter

Hon. George B. Daniels,
Page 5

such statutes must give fair warning to the defendant and further the state's legitimate interests.

  **c.** Defendants misrepresent the position of the United States in the *Klieman* case, asserting that the United States argued that "reciprocity was central to the constitutionality of the PSJVTA's predecessor." *Fuld* Br. 10. The word "reciprocity" does not appear in the government's brief in that case. The government instead argued—consistent with plaintiffs' position here—that the constitutional standards are fair warning and a reasonable relationship between the statute and a legitimate government interest. Thus, the government asserted: (1) the statue "operates similarly to other legal arrangements through which a defendant may validly consent to personal jurisdiction" by giving the defendants "fair warning that particular conduct will subject them to personal jurisdiction" (U.S. Br. at 10-11 (Ex. 8 hereto), citing *Bauxites*, 456 U.S. at 703, and *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985)); and (2) the statute reflected the exercise of foreign policy powers in furtherance of the government's interest to "halt, deter, and disrupt international terrorism" in a "reasonable" manner "consistent with this legislative purpose" (*id.* at 11-13 (quoting H.R. Rep. No. 115-858 at 7-8)).

  **d.** With regard to their U.S. activities, defendants' theory suffers from an additional flaw—they *did* receive a "benefit" by engaging with the society and economy of the United States. Defendants incorrectly contend that "the Anti-Terrorism Act of 1987 expressly denied [them] the 'benefit' of engaging in any activity in the United States." *Fuld* Br. 12. That is false. It is true that, as foreign governmental political entities, defendants are subject to expulsion at the Executive's discretion and have no right to distribute propaganda. *See Palestine Information Office v. Shultz*, 853 F.2d 932, 934 (D.C. Cir. 1988). It is also true that the 1987 law had a broad legislative purpose—that defendants "should not benefit from operating in the United States." 22 U.S.C. § 5201(b). But the operative provisions of the 1987 law were more limited in scope—prohibiting defendants only from "expend[ing] funds" or "maintain[ing] an office" within the jurisdiction of the United States, 22 U.S.C. § 5202. In addition, Executive Branch practice has reflected a "'failure to prosecute' allegedly excessive propaganda activities." *Klieman*, 923 F.3d at 1131. Thus, the 1987 law and the U.S. government's prosecutorial choices left defendants with the opportunity to engage in *some* activities in the United States—a "benefit" even under their theory.

  **e.** Defendants argue that *legislative* jurisdiction (which they call jurisdiction to prescribe) is more expansive than *adjudicatory* jurisdiction (which they call jurisdiction to adjudicate). *Fuld* Br. 15-16. Yet defendants concede that Congress has ample constitutional authority to forbid or regulate the conduct that triggers jurisdiction under the PSJVTA—including the extraterritorial conduct at issue here. *Id.* And they identify no decision in which Congress's authority to regulate extraterritorial conduct was upheld, while its authority to provide jurisdiction to enforce such regulation in domestic courts was invalidated. Nor does it make sense that Congress would have power to enact extraterritorial legislation that can never be enforced. In any event, "jurisdiction to adjudicate" is a concept of customary international law, *see Restatement of Foreign Relations Law (Fourth)* § 401 (2018), and "[n]ever does customary international law prevail over a contrary federal statute." *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 302-03 (D.C. Cir. 2005); *see United States v. Yousef*, 327 F.3d 56, 91 (2d Cir. 2003) ("United States law is not subordinate to customary international law").

# Arnold & Porter

Hon. George B. Daniels,
Page 6

                                                Respectfully yours,

                                                Kent A. Yalowitz

cc: ECF Counsel

**Arnold & Porter**

Hon. George B. Daniels,
Page 7

## Index of Exhibits

| Exhibit Number | Exhibit Description |
|---|---|
| 1 | Letter from Eric J. Boswell to Abdel Rahman (June 22, 1994) |
| 2 | Hakam Takash, Short-Form FARA Registration Statement (May 21, 2012) |
| 3 | Pre-Printed Contract for Notary Services (Hdba Deposition Ex. 8) |
| 4 | PLODelegation.org website (excerpt, captured Sept. 10, 2018) |
| 5 | General Delegation of the PLO, FARA Supplemental Statement Excerpt (Oct. 9, 2018) |
| 6 | Transcription of KPFA Radio Interview with Hakam Takash (Oct. 11, 2018) |
| 7 | Said Erekat, "PLO's General Delegation to the United States to Close Its Doors," *al-Quds* (Nov. 10, 2018) |
| 8 | Brief of the United States, *Klieman v. Palestinian Auth.*, No. 15-7034 (D.C. Cir. Mar 13, 2019). |
| 9 | Transcript of Awni Abu Hdba Deposition (Apr. 7, 2021) |
| 10 | Transcript of Fuad Ateyeh Deposition (Apr. 8, 2021) |