UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK I. SOKOLOW, et al.,

> *Plaintiffs*,

> v.

PALESTINE LIBERATION ORGANIZATION,
et al.,

> *Defendants*.

Case No. 04 Civ. 397 (GBD)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR RECONSIDERATION AND ADDITIONAL FINDINGS OF FACT**

ARNOLD & PORTER
   KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
T: (212) 836-8000
F: (212) 836-8689

*Attorneys for Plaintiffs*

March 24, 2022

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 1

    A.    In 1987, the U.S. Government Lawfully Excluded the PLO from U.S.
Territory to Further U.S. Interests in Curbing International Terrorism ................. 1

    B.    In 1988, the PLO Halted Its Non-U.N. Activities in the United States ................. 3

    C.    From 1994 to 2018, the U.S. Government Permitted the PLO to Return to
the United States on the Condition that It Oppose Terrorism ............................... 4

    D.    Defendants Have Continued Their Non-U.N. Activities in the United States
After 2018 ............................................................................................................ 5

    E.    Defendants Continued Their Non-U.N. Activities After January 4, 2020 ............. 6

FACTS ........................................................................................................................... 6

    A.    Defendants' Public Relations Activities ............................................................... 6

    B.    Defendants' U.S. Facility ..................................................................................... 9

    C.    Defendants' Notarization Activities ..................................................................... 9

LEGAL STANDARD .................................................................................................... 11

ARGUMENT ................................................................................................................. 12

I.    The U.S. Government Has an Absolute Right to Exclude the PLO and PA
from U.S. Territory to Further the U.S. Interest in Curbing International
Terrorism and Has Exercised That Right ........................................................... 13

II.    Territory-Based Deemed Consent Is a Traditional Basis for Exercising
Personal Jurisdiction .......................................................................................... 15

III.    Defendants' U.S. Activities Meet the PSJVTA ................................................. 20

    A.    "Consular" Activities ........................................................................................ 21

    B.    Public Relations ................................................................................................ 23

        1.    Exception (B) Does Not Apply ............................................................... 23

        2.    Exception (E) Does Not Apply ............................................................... 28

C.    Defendants' Office ................................................................................................. 32

CONCLUSION ........................................................................................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Baltimore & Ohio Railroad Co. v. Harris*,
    79 U.S. (12 Wall.) 65 (1870) ................................................................16

*Bendix Autolite Corp. v. Midwesco Enters., Inc.*,
    486 U.S. 888 (1988) ..........................................................................18

*Bostock v. Clayton Cty., Georgia*,
    140 S. Ct. 1731 (2020) ......................................................................32

*Brown v. Lockheed Martin Corp.*,
    814 F.3d 619 (2d Cir. 2016) ........................................................15, 18

*Burnham v. Superior Ct. of Cal.*,
    495 U.S. 604 (1990) ............................................................15, 16, 19

*Capitol Recs., LLC v. Vimeo, LLC*,
    826 F.3d 78 (2d Cir. 2016) ................................................................30

*Cho v. Blackberry Ltd.*,
    991 F.3d 155 (2d Cir. 2021) ..............................................................12

*Comm'r v. Clark*,
    489 U.S. 726 (1989) ..........................................................................30

*Cooper Tire & Rubber Co. v. McCall*,
    863 S.E.2d 81 (Ga. 2021) ..................................................................18

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ..........................................................................18

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) ......................................................................30

*First Am. Corp. v. Price Waterhouse LLP*,
    154 F.3d 16 (2d Cir. 1998) ................................................................16

*Florez v. Cent. Intel. Agency*,
    829 F.3d 178 (2d Cir. 2016) ..............................................................12

*Great Minds v. Fedex Off. & Print Servs., Inc.*,
    886 F.3d 91 (2d Cir. 2018) ................................................................21

*Hawkins v. i-TV Digitalis Tavkozlesi zrt.*,
   935 F.3d 211 (4th Cir. 2019) ...........................................................................15

*Hess v. Pawloski*,
   274 U.S. 352 (1927)........................................................................................17

*Hoellen v. Annunzio*,
   468 F.2d 522 (7th Cir. 1972) ..........................................................................25

*In re Coudert Bros. LLP*,
   809 F.3d 94 (2d Cir. 2015)..............................................................................12

*In re Tribune Co. Fraudulent Conv. Litig.*,
   946 F.3d 66 (2d Cir. 2019)..............................................................................21

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ..................................................................................17, 18

*Klieman v. Palestinian Auth.*,
   923 F.3d 1115 (D.C. Cir. 2019) ..................................................................6, 25

*Klinghoffer v. SNC Achille Lauro*,
   795 F. Supp. 112 (S.D.N.Y. 1992) ...............................................................4, 24

*Klinghoffer v. SNC Achille Lauro*,
   937 F.2d 44 (2d Cir. 1991).................................................................... *passim*

*Knox v. PLO*,
   229 F.R.D. 65 (S.D.N.Y. 2005) ...................................................................5, 24

*Madden v. Cowen & Co.*,
   576 F.3d 957 (9th Cir. 2009) ..........................................................................21

*Mallory v. Norfolk S. Ry. Co.*,
   No. 3 EAP 2021, 2021 WL 6067172 (Pa. Dec. 22, 2021)......................................18

*Meese v. Keene*,
   481 U.S. 465 (1987)........................................................................................23

*Mississippi Pub. Corp. v. Murphree*,
   326 U.S. 438 (1946)........................................................................................18

*Natural Organics v. Nutraceutical Corp.*,
   426 F.3d 576 (2d Cir. 2005)............................................................................12

*Palestine Information Office v. Shultz*,
   853 F.2d 932 (D.C. Cir. 1988) .....................................................................2, 14

*Puricelli v. Argentina*,
  797 F.3d 213 (2d Cir. 2015)............................................................................12

*Rising v. Brown*,
  313 F. Supp. 824 (C.D. Cal. 1970) ................................................................25

*Sanchez-Ramirez v. Consulate Gen. of Mexico*,
  No. C 12-3485 PJH, 2013 WL 4013947 (N.D. Cal. Aug. 5, 2013)................23

*Sokolow v. PLO*,
  No. 04 Civ. 397 (GBD), 2011 WL 1345086 (S.D.N.Y. Mar. 30, 2011) ...........4, 24

*St. Clair v. Cox*,
  106 U.S. 350 (1882).......................................................................................17

*Sullivan v. Finkelstein*,
  496 U.S. 617 (1990).......................................................................................32

*Ungar v. Palestinian Auth.*,
  153 F. Supp. 2d 76 (D.R.I. 2001) .............................................................5, 24

*Ungar v. Palestinian Auth.*,
  325 F. Supp. 2d 15 (D.R.I. 2004) .............................................................5, 24

*United States v. Afrasiabi*,
  No. 21 Cr. 46 (ERK) ...............................................................................26, 27

*United States v. Aguilar*,
  515 U.S. 593 (1995).......................................................................................30

*United States v. Jacobson*,
  15 F.3d 19 (2d Cir. 1994)...............................................................................11

*United States v. Palestine Liberation Org.*,
  695 F. Supp. 1456 (S.D.N.Y. 1988).............................................2, 3, 4, 14

*United States v. Smith*,
  499 U.S. 160 (1991).......................................................................................32

*Waite v. All Acquisition Corp.*,
  901 F.3d 1307 (11th Cir. 2018) .....................................................................15

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016)......................................................................5, 24

*Washington v. Superior Ct. of Wash.*,
  289 U.S. 361 (1933).......................................................................................17

*Wisconsin Department of Revenue v. William Wrigley, Jr., Co.*,
   505 U.S. 214 (1992)....................................................................................................29

**Statutes**

18 U.S.C. § 2333 note...........................................................................................21, 25, 30

18 U.S.C. § 2334................................................................................................ *passim*

22 U.S.C. § 611 *et seq.*...............................................................................................26

22 U.S.C. § 4309A.......................................................................................................26

Pub. L. 100-204, Title X, § 1002 (codified at 22 U.S.C. § 5201)....................................2

Pub. L. 100-204, Title X, § 1003 (codified at 22 U.S.C. § 5202)............................ *passim*

Pub. L. 103-125, 107 Stat. 1309 ...................................................................................4

Pub. L. 115-253, 132 Stat. 3183 (2018) (formerly codified at 18 U.S.C.
   § 2334(e)(1)) ...........................................................................................................6

**Other Authorities**

165 Cong. Rec. S7182 (Dec. 19, 2019) ......................................................................31

166 Cong. Rec. S627 (Jan. 28, 2020) ..........................................................................31

52 Fed. Reg. 37035 (1987) ...........................................................................................2

59 Fed. Reg. 4777 (1994) ..............................................................................................4

83 Fed. Reg. 46990 (2018) ............................................................................................5

1968 U.N. Jurid. Y.B. 194–95 ......................................................................................28

1985 U.N. Jurid. Y.B. 148 .............................................................................................28

Annex to General Assembly Resolution 52/250, Participation of Palestine in the
   work of the United Nations (July 13, 1998) ...............................................................28

*The Constitution of the United States of America: Analysis and Interpretation*, S.
   Doc. No. 112–9 (2012 & Supp. 2017)......................................................................15

Department of Justice Website at https://efile.fara.gov/pls/apex/f?p= 185:200:
   2678417446722::NO:RP,200:P200_REG_NUMBER:2165 ......................................5

Department of Justice Website at https://efile.fara.gov/pls/apex/f?p=185:200:
   2678417446722::NO:RP,200:P200_REG_NUMBER:5244 ......................................5

Executive Business Meeting, Comm. on the Judiciary (Oct. 17, 2019),
https://www.judiciary.senate.gov/meetings/10/17/2019/executive-business-
meeting................................................................................................................32

Fed. R. Civ. P. 52(b) ...................................................................................................12

Fed. R. Civ. P. 59(e) ...................................................................................................12

*Fowler's Dictionary of Modern English Usage* (4th ed. 2015)....................................28

*The GA Handbook: A practical guide to the United Nations General Assembly*,
https://www.unitar.org/sites/default/files/media/publica-
tion/doc/un_pga_new_handbook_0.pdf..........................................................25

Hakam Takash, FARA Registration Statement (May 21, 2012),
https://efile.fara.gov/docs/5244-Short-Form-20120521-12.pdf....................10

Lucinda A. Low, *et al.*, *Int'l Lawyer's Deskbook* (2d ed. 2002) ..................................10

16 Moore's Federal Practice—Civil § 108.53 (2020) .................................................15

*Oxford English Dictionary* (online ed.), https://www.oed.com/view/Entry/7258.......28

*Permanent Observer Mission of the African Union*, 2014 U.N. Jur. Y.B. 328 ...........28

*Permanent Observer Mission of the Org. of the Islamic Conf.*, 1999 U.N. Jur.
Y.B. 409 ...........................................................................................................28

*Privileges and Immunities of a Person Designated by a Member State*, 1976 U.N.
Jur. Y.B. 229 ....................................................................................................28

*Report of the Committee on Relations with the Host Country* ¶¶ 32-33 (Oct. 14,
1982), Supp. No. 26 (A/37/26) (Statement of the Legal Advisor) .................28

Restatement (Third) of Agency § 1.01 (2006).............................................................21

*Scope of Privileges and Immunities of a Permanent Observer Mission*, 1982 U.N.
Jur. Y.B. 206 ....................................................................................................28

Squire Patton Boggs, FARA Supplemental Statement attachment D-3 (July 31,
2020), https://efile.fara.gov/docs/2165-Supplemental-Statement-20200731-
34.pdf ...............................................................................................................31

U.S. Dep't of Justice, Off. of Legal Counsel, *Statutory Restrictions on the PLO's
Washington Office* (Sept. 11, 2018)..........................................................5, 15

*Webster's Third New International Dictionary* (2002) .........................................21, 28

4 Wright & Miller's *Fed. Prac. & Proc.* § 1067.3 (4th ed.)........................................15

Plaintiffs respectfully submit this memorandum in support of their motion for reconsideration and for additional findings of fact.

## INTRODUCTION

This Court should make factual findings regarding the PSJVTA's "U.S. activities" prong, and should consider specifically that prong's constitutionality. The Second Circuit remanded for this Court to determine "the applicability *of the PSJVTA* to this case," not merely the applicability of one of the PSJVTA's two jurisdiction-triggering prongs. Mandate at 3 (emphasis added). The U.S. activities prong fits squarely within a long line of Supreme Court jurisprudence holding that where a sovereign may exclude an entity from its territory, it may condition the admission of the entity into its territory on the entity's consent to the reasonable exercise of personal jurisdiction. Such consent is constitutional both because of its long historical pedigree and because of the benefits conferred on the visiting entity by the sovereign. Defendants' U.S. activities meet the requirements of the PSJVTA's U.S.-activities prong, and the determination by the political branches that those activities trigger jurisdiction is constitutional even if the Court's decision concerning the pay-for-slay prong were to be upheld.

## BACKGROUND

The U.S. Government has repeatedly exercised its power to exclude these Defendants from the United States. Currently, the U.S. Government is permitting these Defendants to conduct certain activities in the United States on the condition that any such activities (with specified exceptions) shall be deemed to be consent to the exercise of personal jurisdiction in cases brought under the Anti-Terrorism Act of 1992.

### A.    In 1987, the U.S. Government Lawfully Excluded the PLO from U.S. Territory to Further U.S. Interests in Curbing International Terrorism

In 1974, the United Nations invited the PLO to attend U.N. sessions as a permanent

1

observer.[1] In 1978, the PLO opened an office in Washington, D.C.[2] The PLO engaged in numerous activities in the United States using these facilities, including fundraising and public relations.[3]

In 1987, the U.S. Government took steps to terminate these activities. The Secretary of State determined that "it [was] reasonably necessary to protect the interests of the United States to require that the Palestine Information Office [in Washington, D.C.] cease … representing the PLO because of U.S. concern over terrorism committed and supported by individuals and organizations affiliated with the PLO and as an expression of our overall policy condemning terrorism."[4] In *Palestine Information Office v. Schulz*, the D.C. Circuit held that the Secretary of State's determination that closing the PLO's office in Washington, D.C., to further "the national interest in curbing international terrorism" was "clearly within the constitutional power of the government."[5]

In addition, Congress enacted the Anti-Terrorism Act of 1987, in which it found that the PLO had been implicated in the murders of dozens of American citizens abroad, including a U.S. Ambassador, and determined that "the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States … and should not benefit from operating in the United States."[6] In § 1003 of that statute, which remains in force today, Congress made it unlawful to expend funds from the PLO or any successor or agent and to maintain an office or other facility within the jurisdiction of the United States at the behest and direction of the PLO or any successor or agent.[7]

---

[1] *United States v. Palestine Liberation Org.*, 695 F. Supp. 1456, 1459 (S.D.N.Y. 1988).

[2] *Palestine Information Office v. Shultz*, 853 F.2d 932, 935 (D.C. Cir. 1988).

[3] *See Klinghoffer v. SNC Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991).

[4] 52 Fed. Reg. 37035, 57035 (1987).

[5] *Palestine Info. Off.*, 853 F.2d at 934, 940.

[6] Pub. L. 100-204, Title X, § 1002 (codified at 22 U.S.C. § 5201).

[7] *Id.* § 1003 (codified at 22 U.S.C. § 5202).

2

The Government then sought injunctive relief under § 1003 to close the PLO's mission to the United Nations. In *United States v. Palestine Liberation Organization*, the court held that the PLO was subject to personal jurisdiction in the United States and enjoyed no "diplomatic immunity due to its presence as an invitee of the United Nations."[8] The PLO argued that it had a right under existing treaties to be present in the United States to engage in activities related to the United Nations, but the court held that "Congress *has the power* to enact statutes abrogating prior treaties, including those concerning the United Nations."[9] Nevertheless, Congress had "failed to provide unequivocal interpretive guidance in the text of [§ 1003], leaving open the possibility that [§ 1003] could be viewed as a law of general application and enforced as such, without encroaching on the position of the Mission at the United Nations."[10] The court therefore construed § 1003 not to impair activities "by the PLO Observer Mission in its discharge of its functions at the United Nations."[11] The court also held: "[i]f the PLO is benefiting from operating in the United States, as the [statute] implies, the enforcement of its provisions outside the context of the United Nations *can effectively curtail that benefit*."[12]

### B.    In 1988, the PLO Halted Its Non-U.N. Activities in the United States

Following the decisions described above, the PLO closed its Washington, D.C. office and halted its non-U.N. activities in New York. These facts were determined in the *Klinghoffer* case, within the context of adjudicating the PLO's challenge to personal jurisdiction. The Second Circuit held that due regard for the United States' treaty obligations to the United Nations required the

---

[8] *Palestine Liberation Org.*, 695 F. Supp. at 1461.

[9] *Id.* at 1465 (emphasis in original).

[10] *Id.* at 1469.

[11] *Id.* at 1468.

[12] *Id.* at 1470 (emphasis added).

courts to "distinguish those activities the PLO conducts as an observer at the U.N. from those activities it conducts for other purposes" in determining whether to exercise personal jurisdiction over the PLO; and it held that activities such as public speeches are "not conducted in furtherance of the PLO's observer status."[13] The court explained that as a result of § 1003, "were the PLO not a permanent observer at the U.N., it would not be entitled to enter New York at all."[14]

On remand, the district court found that PLO representatives had given "speeches and interviews," and had generated and distributed "informational materials," and those activities are "separate from its U.N. activities."[15] The court also found that these activities had stopped in 1988 after passage of § 1003: "No evidence has been presented of such activities at the time of service of the 1988 … complaints," and "those plaintiffs are not entitled to the benefit of a presumption of continuity of such activities after passage of the Anti-Terrorism Act of 1987."[16]

### C.    From 1994 to 2018, the U.S. Government Permitted the PLO to Return to the United States on the Condition that It Oppose Terrorism

In 1993, Congress enacted the Middle East Peace Facilitation Act, which authorized the President to suspend the 1987 statute upon certification that the PLO was abiding by its anti-terror commitments.[17] The President made the certification in 1994, permitting the PLO to return to the United States.[18] Once the PLO began to benefit from operating in the United States (in the words of the 1987 statute), Defendants resumed their public relations activities.[19]

---

[13] *Klinghoffer*, 937 F.2d at 51.

[14] *Id.* (citing *United States v. Palestine Liberation Org.*, 695 F. Supp. at 1471).

[15] *Klinghoffer v. SNC Achille Lauro*, 795 F. Supp. 112, 114 (S.D.N.Y. 1992).

[16] *Id.* at 115.

[17] Pub. L. 103-125, 107 Stat. 1309.

[18] 59 Fed. Reg. 4777 (1994).

[19] *See Sokolow v. PLO*, No. 04 Civ. 397 (GBD), 2011 WL 1345086, at *5 (S.D.N.Y. Mar. 30,

In 2017, the President did not renew the statutory waiver pursuant to § 1003 because of Defendants' failure to meet the statutory criteria; however, the President exercised his constitutional (*i.e.*, non-statutory) plenary foreign affairs powers to permit the PLO to continue to engage in certain activities, including "outreach to Palestinian-Americans, Palestinians in the United States, or interested Americans on matters relevant to the Palestinian community" to "enlist 'public sympathy' for their cause"—activities that the State Department described as "public diplomacy."[20] Following that determination, Defendants continued to maintain an office in Washington; continued to expend funds; and continued to issue press releases and to generate and distribute information in support of their cause.[21]

In September 2018, the State Department instructed Defendants to cease all public operations in their Washington office.[22]

### D.    Defendants Have Continued Their Non-U.N. Activities in the United States After 2018

In 2018, Congress passed the Anti-Terrorism Clarification Act (ATCA), which provided that an entity "benefiting from a waiver or suspension of § 1003" would be subject to personal

---

2011), *rev'd sub nom. Waldman v. PLO*, 835 F.3d 317 (2d Cir. 2016), *vacated*, 140 S. Ct. 2714 (2020); *Knox v. PLO,* 229 F.R.D. 65 (S.D.N.Y. 2005), *aff'g* No. 03 Civ. 4466 (VM) (THK), 2005 WL 712005, at *4 (S.D.N.Y. March 21, 2005); *Ungar v. Palestinian Auth.*, 325 F. Supp. 2d 15, 53 (D.R.I. 2004), aff'd, 402 F.3d 274 (1st Cir. 2005); *Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88 (D.R.I. 2001).

[20] U.S. Dep't of Justice, Off. of Legal Counsel, *Statutory Restrictions on the PLO's Washington Office* at 22 (Sept. 11, 2018).

[21] Copies of Foreign Agents Registration Act ("FARA") reports filed by the General Delegation of the PLO may be found on the Department of Justice Website at https://efile.fara.gov/pls/apex/f?p=185:200:2678417446722::NO:RP,200:P200_REG_NUMBER:5244. Copies of FARA reports filed by the PA's foreign agent, Squire Patton Boggs, may be found on the Department of Justice Website at https://efile.fara.gov/pls/apex/f?p=185:200:2678417446722::NO:RP,200:P200_REG_NUMBER:2165.

[22] 83 Fed. Reg. 46990 (2018).

jurisdiction in federal court in the United States in certain circumstances.[23]

After the ATCA's passage, Defendants continued to expend funds and engage in non-U.N. activities within the United States, including making press appearances and social media posts from their New York office with their "Palestine U.N." accounts on the U.S.-based social media platforms Facebook and Twitter.[24] In *Klieman v. Palestinian Authority*, the D.C. Circuit agreed that these activities were "rather similar" to the ones at issue in *Klinghoffer*, but found the ATCA inapplicable because it "is triggered by a *waiver* of § 1003—not its *violation*."[25]

### E. Defendants Continued Their Non-U.N. Activities After January 4, 2020

In 2019, Congress enacted, and the President signed, the PSJVTA. The statute's U.S. activities prong, in its current form, deems "any activity while physically present in the United States on behalf of" the PLO or PA to be consent to personal jurisdiction if such activity occurs after January 4, 2020, unless that activity is "exclusively for the purpose of conducting official business of the United Nations" or "ancillary" to that activity. 18 U.S.C. § 2334(e)(1)(B)(iii), (3)(B), (3)(F).

### FACTS

After the PSJVTA's effective date of January 4, 2020, Defendants engaged in activities in the United States, as follows:

### A. Defendants' Public Relations Activities

After January 4, 2020, Defendants' officers gave press interviews in English in the United

---

[23] Pub. L. 115-253, 132 Stat. 3183 (2018) (formerly codified at 18 U.S.C. § 2334(e)(1)).

[24] App. to Supp. Mem. to Recall Mandate at A-29 to A-207, *Waldman v. Palestine Liberation Org.*, No. 15-3135 (2d Cir.), ECF No. 305.

[25] 923 F.3d 1115, 1131 (D.C. Cir. 2019) (emphasis in original), *vacated*, 140 S. Ct. 2713 (2020).

States to media outlets including MSNBC,[26] NPR,[27] and Voice of America.[28] Officers who gave press conferences or interviews were: (a) Mahmoud Abbas, Chairman of the PLO and President of the PA;[29] (b) Riyad Mansour, Permanent Observer to the United Nations;[30] and (c) Feda Abdel-hady-Nasser, Deputy Permanent Observer to the United Nations.[31]

After January 4, 2020, Defendants maintained publicly available social media accounts on Twitter and Facebook. Defendants updated these social media accounts with hundreds of posts, almost all of which were in English.[32] The updates were made by Defendants' employee while physically in the United States.[33] During this period, Defendants employed social media techniques to "ensure that … the postings reach[ed] the broadest possible audience."[34] This included re-tweeting posts by celebrities and U.S. politicians.[35] One purpose of Defendants' social media posts was to "raise public awareness" and "bring attention" to issues of interest to defendants.[36]

---

[26] Mansour Dep. 110-11 (Ex. 3 hereto).

[27] Abdelhady-Nasser Dep. 189-91 (Ex. 1 hereto); Yalowitz Second Supp. Decl. (May 7, 2021) Ex. B [ECF 1027-2].

[28] Yalowitz Second Supp. Decl. (May 7, 2021) Ex. E [ECF 1027-5].

[29] *See* Yalowitz Decl. (Nov. 12, 2020) ¶ 208 [ECF 1018].

[30] Mansour Dep. 86, 110-13 (Ex. 3 hereto); Yalowitz Second Supp. Decl. (May 7, 2021) Ex. B [ECF 1027-2].

[31] Abdelhady-Nasser Dep. 114, 189-91 (Ex. 1 hereto) & Ex. 4 (Ex. 4 hereto).

[32] Ghannam Dep. 144-201 (Ex. 2 hereto); *see* Yalowitz Decl. (Nov. 12, 2020) ¶ 215 & Exs. 35-36, 57-58 [ECF 1018-35, 1018-36, 1018-57, 1018-58]; Yalowitz Second Supp. Decl. (May 7, 2021) Exs. C, D [ECF 1027-3 & 1027-4].

[33] Ghannam Dep. 144-45, 154-55 (Ex. 2 hereto); *see* Yalowitz Decl. (Nov. 12, 2020) ¶ 215 & Exs. 35-36, 57-58 [ECF 1018-35, 1018-36, 1018-57, 1018-58]; Second Supp. Yalowitz Decl. (May 7, 2021) Exs. C, F [ECF 1027-3 & 1027-6].

[34] Ghannam Dep. 147 (Ex. 2 hereto).

[35] Ghannam Dep. 187, 199 (Ex. 2 hereto); *see* Second Supp. Yalowitz Decl. (May 7, 2021) Ex. D [ECF 1027-4].

[36] Ghannam Dep. 166, 168, 169-70, 175, 178, 181, 182, 183-84, 189, 190, 195, 201 (Ex. 2 hereto).

After January 4, 2020, Defendants' officers in the United States held numerous in-person or virtual meetings with individuals or organizations who had no formal connection to the United Nations.[37] Many such meetings involved speaking to students or community groups.[38] Dr. Mansour and Ms. Abdelhady-Nasser participated in such meetings in their official capacities on behalf of Defendants.[39]

For example, while in New York, Dr. Mansour attended (via Zoom) a meeting of the Beit Sahour USA Convention in Michigan in November 2020.[40] Dr. Mansour participated in this event on behalf of the Defendants.[41] In his comments, he commended "movements and organizations and solidarity committees" at "American universities," who are "supporting justice for the Palestinian people and lobbying the government, lobbying Congress," adding: "we urge them to become even more active, especially in light of the arrival of a new administration in Washington."[42]

Dr. Mansour also made an in-person appearance at the Beit Hanina Cultural Center in Brooklyn, and (while in New York) participated by video in conferences organized by the Arab-American Anti-Discrimination Committee, Seton Hall University, Israa University, and

---

[37] Mansour Dep. Ex. 4 (seven "civil society" meetings) (Ex. 8 hereto); Abdelhady-Nasser Dep. Exs. 5 (23 "civil society" meetings), 6 (19 "civil society" meetings) (Exs. 5, 6 hereto); *see* Abdelhady-Nasser Dep. 59 (defining "civil society" as "NGOs, academia, journalists, cultural institutions and others"), 72 (no formal connection) (Ex. 1 hereto).

[38] *E.g.*, Abdelhady-Nasser Dep. 60-61, 72, 84, 86, 94, 109-10, 114, 117 (Ex. 1 hereto); Mansour Dep. 70, 90, 92-93 (Ex. 3 hereto); *see* Yalowitz Supp. Decl. (Feb. 9, 2021) Exs. C, D [ECF 1023-3 & 1023-4].

[39] Abdelhady-Nasser Dep. 86 (Ex. 1 hereto); Mansour Dep. 52, 92, 93, 96-97, 107, 112 (Ex. 3 hereto).

[40] Mansour Dep. 93-94 & Mansour Dep. Ex. 8 (Exs. 3, 9 hereto).

[41] Mansour Dep. 93-94, 96-97 (Ex. 3 hereto).

[42] Mansour Dep. Ex. 8 (Ex. 9 hereto).

Bridgewater State University.[43] One purpose of Defendants' public appearances was to "advocate for the Palestinian cause."[44]

**B.    Defendants' U.S. Facility**

At all times since January 4, 2020, Defendants have owned a townhouse at 115 East 65th Street.[45] The townhouse has offices for Dr. Mansour and other staff of the mission.[46]

During the relevant period, Dr. Mansour made press appearances and public appearances (such as university lectures) and spoke with non-U.N. groups from his office in the East 65th Street townhouse.[47]

Defendants updated their Twitter and Facebook accounts from the Townhouse at least 60 times.[48]

**C.    Defendants' Notarization Activities**

After January 4, 2020, Defendants' agents in the United States provided services in the United States by notarizing documents and coordinating their legalization for use in territories administered by Defendants.

For many years, Defendants' Washington, D.C. office provided what Defendants called "consular services"—that is, they legalized documents for use in territories administered by the

---

[43] Mansour Dep. 44-52, 67-68, 90-91, 97, 106 (Ex. 3 hereto); Mansour Dep. Ex. 4 (Ex. 8 hereto).

[44] Mansour Dep. 92, 97, 99, 107, 112 (Ex. 3 hereto); Abdelhady-Nasser Dep. 87 (Ex. 1 hereto) (agreeing that one purpose of such meetings "was to put forward the Palestinian view" and explaining: "Everything that I do, in my capacity as the Ambassador Deputy Permanent Observer of the State of Palestine, I represent the perspective, the view, the cause of the Palestinian people.").

[45] *See* Mansour Dep. 120 (Ex. 3 hereto); *see* Yalowitz Decl. (Nov. 12, 2020) Ex. 59 [ECF 1018-59].

[46] Mansour Dep. 14, 177-82 (Ex. 3 hereto).

[47] Mansour Dep. 65, 67, 70, 75, 77, 86, 91, 94, 98, 107, 111, 113 (Ex. 3 hereto).

[48] Ghannam Dep. 152-53 (Ex. 2 hereto).

PA,[49] by processing "paperwork that's produced in the U.S. that needs to be used in Palestine," such as "birth certificates."[50] Put another way, "attesting to documents for use in Palestine was a service that was provided by the PLO's Washington, D.C. office."[51]

Defendants' pre-2018 website, "PLODelegation.org," listed eight notaries in the United States who provided some part of this service, including Fuad Ateyeh (San Francisco) and Awni Abu Hbda (Patterson, New Jersey).[52] These individuals notarized documents "in connection with the Palestinian Authority" and submitted them to Defendants' Washington, D.C. office, which "legalized" or "certified" them.[53] Execution of a document before a notary is the first step in "[t]raditional [l]egalization" of a document for use abroad.[54]

Documents from that period reflected Defendants' state of mind that persons involved in the certification process were acting for the benefit of Defendants. One of Defendants' employees described his certification activities as "rendered to" the PLO.[55] Similarly, Defendants' preprinted "Contract for Notary Services"[56] stated that "[a]uthorized" notaries were "to provide notary

---

[49] Gen'l Delegation of the PLO, FARA Supp. Statement, p. 4 (May 7, 2018), https://efile.fara.gov/docs/5244-Supplemental-Statement-20180507-29.pdf.

[50] Russell Decl. at 5, 22-25, Yalowitz Supp. Decl. (Feb. 9, 2021) Ex. B [ECF 1023-2].

[51] Ateyeh Dep. 36, Letter to the Court re: Response to Defendants' Arguments in *Fuld v. PLO* (July 6, 2021) Ex. 10 [ECF 1035-10].

[52] Russell Decl. at 6, 36-49, Yalowitz Supp. Decl. (Feb. 9, 2021) Ex. B [ECF 1023-2].

[53] Abu Hbda Dep. 110-12, Letter to the Court re: Response to Defendants' Arguments in *Fuld v. PLO* (July 6, 2021) Ex. 9 [ECF 1035-9].

[54] Lucinda A. Low, *et al.*, *Int'l Lawyer's Deskbook* 298 (2d ed. 2002).

[55] Hakam Takash, FARA Registration Statement, p. 1 (May 21, 2012), https://efile.fara.gov/docs/5244-Short-Form-20120521-12.pdf.

[56] *See* Abu Hbda Dep. 128, Letter to the Court re: Response to Defendants' Arguments in *Fuld v. PLO* (July 6, 2021) Ex. 9 [ECF 1035-9].

services for use by the [PLO Delegation to the U.S.]."[57]

In 2018, after the State Department ordered Defendants to close their Washington, D.C. office, their official spokesman, Saeb Erekat, announced that Defendants "would find alternate ways of continuing to provide consular services, and guarantee the continued provision of services to [their] citizens."[58]

After January 4, 2020, Defendants' agents in the United States continued to provide components of consular services by notarizing documents and coordinating their legalization for use in territories administered by Defendants. Defendants continued to maintain a list of "available" notaries.[59] Notaries on the list received documents in the United States; notarized them; sent them to Palestinian officials in Mexico and Canada for certification; and then sent the certified documents to PA officials for use in territories administered by the PA.[60] According to one notary on the list, more than 75% of the documents he notarized were "for use in Palestine."[61] The notaries' activities occurred in the United States.[62]

## LEGAL STANDARD

The purpose of a limited remand pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), is to allow the district court to address novel legal arguments "in the first instance" and

---

[57] Letter to the Court re: Response to Defendants' Arguments in *Fuld v. PLO* (July 6, 2021) Ex. 3 at 1 [ECF 1035-3].

[58] Russell Decl. at 6, 29, Yalowitz Supp. Decl. (Feb. 9, 2021) Ex. B [ECF 1023-2].

[59] Ateyeh Dep. 42, Letter to the Court re: Response to Defendants' Arguments in *Fuld v. PLO* (July 6, 2021) Ex. 10 [ECF 1035-10].

[60] Ateyeh Dep. 45-56, Abu Hbda Dep. 57-62, 69-70, 78-79, 97-98, Letter to the Court re: Response to Defendants' Arguments in *Fuld v. PLO* (July 6, 2021) Exs. 9-10 [ECF 1035-9 & 1035-10].

[61] Ateyeh Dep. 44, Letter to the Court re: Response to Defendants' Arguments in *Fuld v. PLO* (July 6, 2021) Ex. 10 [ECF 1035-10].

[62] Abu Hbda Dep. 102, Letter to the Court re: Response to Defendants' Arguments in *Fuld v. PLO* (July 6, 2021) Ex. 9 [ECF 1035-9].

"conduct any further fact-finding that may be required." *Florez v. Cent. Intel. Agency*, 829 F.3d 178, 189 (2d Cir. 2016) (quotation sources omitted). Where a mandate "directs a district court to conduct specific proceedings and decide certain questions, generally the district court must conduct those proceedings and decide those questions." *Puricelli v. Argentina*, 797 F.3d 213, 218 (2d Cir. 2015). The district court should carry out the mandate "scrupulously and fully." *In re Coudert Bros. LLP*, 809 F.3d 94, 98 (2d Cir. 2015) (cleaned up).

Rule 52(b) allows a court to "amend its findings—or make additional findings—and [to] amend the judgment accordingly." Where a party considers the district court's findings incomplete, Rule 52(b) provides an appropriate framework for requesting additional findings to "reduce the risk that district courts are unnecessarily required on remand" to make additional findings.[63]

A Rule 59(e) motion is appropriate if the moving party "can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."[64]

## ARGUMENT

The Second Circuit remanded for this Court to determine "the applicability of the PSJVTA," including both of its jurisdiction-triggering prongs. Mandate at 3. In its Memorandum and Order, this Court focused only on Defendants' pay-for-slay payments. To fulfil the remand, this Court should address the U.S.-activities prong as well.

The U.S.-activities prong merits separate consideration from the pay-for-slay prong because it fits squarely within the long-established rule that a sovereign may allow an entity to enter into its territory only upon consent to suit as specified by law. The United States unquestionably

---

[63] *See Natural Organics v. Nutraceutical Corp.*, 426 F.3d 576, 579 n.1 (2d Cir. 2005).

[64] *Cho v. Blackberry Ltd.*, 991 F.3d 155, 170 (2d Cir. 2021) (cleaned up).

has the power to exclude the PLO and PA from its territory altogether, and has specified that consent to suit is a condition of activities in the United States on behalf of the PLO and PA. Two factors make this a particularly strong basis for the constitutional exercise of personal jurisdiction: *First*, the long historical pedigree of the rule of consent to jurisdiction by presence within a sovereign's territory weighs heavily in favor of constitutionality. *Second*, the U.S.-activities prong is also fundamentally fair because it is linked to benefits and protections enjoyed by the Defendants within U.S. territory.

As a factual matter, the record shows that Defendants have engaged in the type of persistent, purposeful activities within the United States that the Political Branches have determined are jurisdictionally dispositive. No court has addressed the effect of these activities or this aspect of the statute; nor has any court consider the line of precedent Plaintiffs have invoked in support of the constitutionality of the U.S.-activities prong. They merit attention before a court of the United States strikes down an Act of Congress as unconstitutional at the behest of a foreign government.

## I. The U.S. Government Has an Absolute Right to Exclude the PLO and PA from U.S. Territory to Further the U.S. Interest in Curbing International Terrorism and Has Exercised That Right

As the Government points out, the ability of the PLO and PA "to operate within the United States is dependent on the judgments of the political branches, which have long imposed restrictions on these entities' U.S. operations based in part on the same concerns that motivated enactment of the ATCA and PSJVTA—namely, concerns about their historical support for acts of terrorism."[65] The Government is correct. The PLO and PA are permitted to operate in the United States solely by the grace of the U.S. Government, and not by any constitutional right to be present on U.S. soil. As the D.C. Circuit held in *Palestine Information Office*, excluding the PLO is

---

[65] DOJ Brief at 11-12 [ECF 1043] (collecting statutes).

"clearly within the constitutional power of the government."[66] It added: "We can conceive of no argument that the executive branch, acting as here pursuant to an express congressional grant of authority, is without constitutional authority to close a foreign mission."[67] The court also recognized the Government's "strong interest in being able to close foreign missions of entities that we do not recognize that are located on American soil."[68] It emphasized also "the strong interest of the government in defending the country against foreign encroachments and dangers," *id.* at 941-42 (cleaned up), and credited the State Department's determination that this interest was advanced by excluding the PLO from the United States "to demonstrate U.S. concerns over terrorism committed and supported by organizations affiliated with the PLO" and to send "a strong signal of how we feel about the question of international terrorism and groups that associate with it."[69]

The Second Circuit is in accord: "were the PLO not a permanent observer at the U.N., it would not be entitled to enter New York at all."[70] Other authorities confirm that if Congress and the President wish to exclude the PLO Mission entirely, they may do so. As the court explained in *United States v. Palestine Liberation Organization*, "Congress *has the power* to enact statutes abrogating prior treaties, including those concerning the United Nations."[71] Similarly, the Department of Justice's Office of Legal Counsel opines that it is within the President's constitutional authority to close the PLO office and enforce § 1003's restrictions upon a determination that doing

---

[66] 853 F.2d at 940.

[67] *Id.*

[68] *Id.*

[69] *Id.* at 942 (quotation marks omitted).

[70] *Klinghoffer*, 937 F.2d at 51.

[71] 695 F. Supp. at 1465 (emphasis in original).

so "is in the interest of United States foreign policy."[72]

## II. Territory-Based Deemed Consent Is a Traditional Basis for Exercising Personal Jurisdiction

The exercise of territory-based deemed consent in this case satisfies due process. It is black-letter law that even *without* minimum contacts, "personal jurisdiction can be based on the defendant's consent to have the case adjudicated in the forum."[73] Thus, the Second Circuit has acknowledged the continuing vitality of cases holding that "a defendant may consent to personal jurisdiction without regard to what a due process analysis of its contacts would yield."[74]

The reasoning of the Supreme Court in *Burnham v. Superior Court* guides the analysis. In *Burnham*, the Court unanimously upheld personal jurisdiction over a foreign individual who did not have "minimum contacts," but rather was served with process in California during a brief visit. Writing for a plurality, Justice Scalia held that, regardless of minimum contacts, such jurisdiction was constitutional because "tag" jurisdiction is "[a]mong the most firmly established principles of personal jurisdiction," and "its validation is its [historical] pedigree."[75] The Second Circuit followed *Burnham* to uphold "tag" jurisdiction on a partnership, because "historical pedigree of transient jurisdiction provides a defendant voluntarily present in a particular state with clear notice that

---

[72] U.S. Dep't of Justice, Off. of Legal Counsel, *Statutory Restrictions on the PLO's Washington Office* at 24-25 (Sept. 11, 2018).

[73] 4 Wright & Miller's *Fed. Prac. & Proc.* § 1067.3 (4th ed.); *see* 16 Moore's Federal Practice—Civil § 108.53 (2020) ("Consent is a traditional basis of jurisdiction that may be upheld even in the absence of minimum contacts between the defendant and the forum state.") (citation omitted); *The Constitution of the United States of America: Analysis and Interpretation*, S. Doc. No. 112–9, at 1999 (2012 & Supp. 2017); *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 228 (4th Cir. 2019) ("unless the party consents to jurisdiction, there must be … minimum contacts") (citation omitted); *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) ("Even where neither the forum state's long-arm statute nor the due process minimum contacts analysis is satisfied, a court may exercise personal jurisdiction over a party if the party consents.").

[74] *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 641 (2d Cir. 2016).

[75] 495 U.S. 604, 621 (1990) (Scalia, J.).

15

he is subject to suit in the forum."[76]

In contrast, the concurrence in *Burnham* acknowledged that tradition is an *important* factor, but argued that fairness is also relevant, finding that the exercise of personal jurisdiction is fair where a defendant in the physical territory of a sovereign, even briefly, and receives "significant benefits," such as guarantees of "health and safety," freedom to travel, and "the fruits of the State's economy."[77]

Both modes of reasoning compel a finding that due process is satisfied in this case by territory-based deemed consent to personal jurisdiction. Cases upholding personal jurisdiction on the basis of deemed consent by physical presence in the territory of a sovereign date to the nineteenth century. And a benefit-based fairness analysis strongly supports the conclusion that the PSJVTA's U.S.-activities prong comports with due process.

Begin with tradition. For more than a century and a half, the Supreme Court has consistently held that if a sovereign is permitted to exclude an entity from its territory, the sovereign has the right to permit entry on the condition that the entity consent to suit. Only two years after the Fourteenth Amendment was ratified, the Supreme Court decided *Baltimore & Ohio Railroad Co. v. Harris*.[78] The Baltimore & Ohio (B&O), incorporated and headquartered in Baltimore, ran a railroad from Washington, D.C., to the Ohio River. Harris boarded a train in Washington and sustained severe injuries in a train wreck in Virginia. The Supreme Court upheld the assertion of personal jurisdiction in Washington, D.C. It explained that Congress had no obligation to permit the B&O to operate in the District of Columbia, and so Congress was within its rights to determine

---

[76] *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 21 (2d Cir. 1998) (internal quotation marks omitted).

[77] *Id.* at 637–38 (Brennan, J., concurring).

[78] 79 U.S. (12 Wall.) 65 (1870).

that such a corporation "may exercise its authority in a foreign territory [*i.e.*, the District of Columbia] upon such conditions as may be prescribed by the law of the place. One of these conditions may be that it shall consent to be sued there. If it does business there, it will be presumed to have assented, and will be bound accordingly."[79]

Later cases similarly approved statutes that implied consent to service of process and personal jurisdiction "as a condition upon which a foreign corporation shall be permitted to do business within her limits," so long as the state's jurisdictional interest was "reasonable" and the defendant had actual "notice of [the] suit."[80] In *Hess v. Pawloski*, the Court explained that the "power of a state to exclude foreign corporations, although not absolute," "is the ground on which" the "transaction of business in [the] state" supports the implication of "consent to be bound by the process of its courts."[81] There, the Court upheld a statute providing for "implied consent" to jurisdiction by out-of-state motorists, because "the state may make and enforce regulations reasonably calculated to promote care on the part of all, residents and nonresidents alike, who use its highways."[82] As the Supreme Court summarized the rule in another case upholding a statutorily "designated" corporate agent for receiving service of process:

> The state need not have admitted the corporation to do business within its borders. … It has repeatedly been said that qualification of a foreign corporation in accordance with the statutes permitting its entry into the state constitutes an assent on its part to *all the reasonable conditions imposed*…. And for this reason a state may not exact arbitrary and unreasonable terms respecting suits against foreign corporations as the price of admission.[83]

---

[79] *Id.* at 81.

[80] *St. Clair v. Cox*, 106 U.S. 350, 356 (1882).

[81] 274 U.S. 352, 355 (1927).

[82] *Id.* at 356.

[83] *Washington v. Superior Ct. of Wash.*, 289 U.S. 361, 364-65 (1933) (emphasis added).

*International Shoe* did not overturn this rule. The *International Shoe* Court itself cited deemed-consent cases with approval, explaining that in appropriate circumstances, corporate actions "may be deemed sufficient to render the corporation liable to suit," because they "were of such a nature as to justify" "resort to the legal fiction that it has given its consent."[84] Indeed, only one month after *International Shoe*, the Supreme Court applied a consent-to-jurisdiction statute, explaining: "By designating an agent to receive service of process and consenting to be sued in the courts of the state, the corporation had consented to suit in the district court."[85] And the Court continued to assume the validity of such statutes long after that.[86]

To be sure, in *Daimler*, the Supreme Court significantly restricted the availability of *general* jurisdiction "over a foreign corporation that has not consented to suit in the forum" to cases in which the defendant corporation is "essentially at home in the forum state."[87] Based on that case, courts today are divided on whether *states* can condition doing any business in the state on consent to general (*i.e.*, all-purpose) jurisdiction.[88]

But *Daimler* and its progeny do not foreclose jurisdiction over the PLO here pursuant to *federal* law. For one thing, the PSJVTA does not subject the PLO to general jurisdiction within the United States; it authorizes jurisdiction in only a narrow class of suits brought by victims of

---

[84] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945).

[85] *Mississippi Pub. Corp. v. Murphree*, 326 U.S. 438, 442 (1946).

[86] *See, e.g., Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 892 (1988) (stating that a corporation could appoint "a resident agent for service of process in Ohio and subject itself to the general jurisdiction of the Ohio court").

[87] *Daimler AG v. Bauman*, 571 U.S. 117, 122, 129 (2014) (internal quotation marks omitted).

[88] *Compare Brown*, 814 F.3d at 640 (such statutes present a "difficult constitutional question"), *and Mallory v. Norfolk S. Ry. Co.*, No. 3 EAP 2021, 2021 WL 6067172 at *18 (Pa. Dec. 22, 2021) (striking down such a statute), *with Cooper Tire & Rubber Co. v. McCall*, 863 S.E.2d 81, 90 (Ga. 2021) (upholding statute).

18

terrorism. That distinguishes this case from cases concerning business-registration statutes requiring consent to *general* jurisdiction.[89] Those cases, moreover, raise serious questions about whether such state statutes reasonably advance a legitimate governmental interest in the context of our federal system; and, as the Government points out, those statutes implicate important issues not present here, including fair warning and federalism concerns.[90] Here, the PSJVTA unquestionably advances a legitimate—indeed, compelling—governmental interest in curbing international terrorism and protecting American citizens abroad. That uniquely federal interest does not implicate any federalism concerns, and there is no question that the PLO and PA had fair warning that their continued conduct in the United States would subject them to personal jurisdiction. We are aware of no case that has abandoned the rule that a sovereign with unquestioned power to exclude an entity may admit the entity to its territory subject to the condition that the entity be deemed to consent to the exercise of personal jurisdiction by the sovereign in cases that are reasonably related to the sovereign's legitimate interests.

In addition, Defendants are receiving substantial benefits from their U.S. activities, for reasons even stronger than those Justice Brennan found compelling in his concurrence in *Burnham*. Defendants are using U.S.-based agents to manage accounts at U.S.-based social media companies, giving U.S.-based interviews to U.S.-based media companies, and meeting with U.S.-based community groups, all for the purpose of influencing the U.S. public and the U.S. government in the service of their own political interests. Defendants' agents enjoy substantial freedoms and are able to convey Defendants' message to a large segment of the society of the United States because they benefit from large companies functioning in our economy and dependent on our legal and physical

---

[89] *See, e.g.*, cases cited *supra,* n. 88.

[90] DOJ Mem. 17-19 [ECF 1043].

infrastructure. Defendants' agents enjoy public benefits such as police and fire protection. Indeed, Defendants have piggybacked on state law, using U.S.-based, state-authorized notaries for the purpose of legalizing documents to allow Defendants' agencies in their home territory to engage with U.S.-based individuals and entities. Again, these agents' abilities to conduct activities on Defendants' behalf is enhanced by the U.S. economy and by U.S. government services. It is eminently fair to condition Defendants' receipt of such benefits on their consent to personal jurisdiction in cases involving a compelling U.S. interest—that of curbing international terrorism—particularly when the U.S. government has the absolute right to exclude them from U.S. territory in furtherance of that very same U.S. interest.

## III. Defendants' U.S. Activities Meet the PSJVTA

The PSJVTA provides that a defendant "shall be deemed to have consented to personal jurisdiction" in ATA cases if, after January 4, 2020, it "continues to maintain any office, headquarters, premises, or other facilities or establishments in the United States" or conducts any activity while physically present in the United States on behalf of the Palestine Liberation Organization or the Palestinian Authority."[91] This provision is subject to three exceptions relevant here:

> (A) any office, headquarters, premises, or other facility or establishment used exclusively for the purpose of conducting official business of the United Nations;
>
> (B) any activity undertaken exclusively for the purpose of conducting official business of the United Nations; * * * or,
>
> (F) any personal or official activities conducted ancillary to activities listed under this paragraph.[92]

Three categories of Defendants' post-enactment conduct meet these statutory terms.

---

[91] 18 U.S.C. § 2334(e)(1)(B).

[92] 18 U.S.C. § 2334(e)(3).

## A.    "Consular" Activities

As described above, Defendants' authorized U.S. notaries performed notarial acts in the United States "in connection with" Defendants' own certification and legalization of documents required for use in PA governmental agencies by notarizing the documents, sending them to Defendants' offices in Canada and Mexico for certification, receiving certified documents back from those offices, and then sending the certified documents on to PA officials for use in territories administered by the PA. *See supra* pp. 10-11 & nn. 53-62 . In short, these services were performed "on behalf of" the PLO and PA and in the United States within the meaning of § 2334(e)(1)(B), which, according to the statute itself, must be construed "liberally" in order "to carry out the purposes of Congress to provide relief for victims of terrorism."[93] The phrase *on behalf of* means "in the interest of," "as a representative of," or "for the benefit of."[94]

Workaday principles of agency confirm that these relationships were among "the mundane ubiquity of lawful agency relationships, in which 'one person, to one degree or another, acts as a representative of or otherwise acts on behalf of another person.'"[95] As the *Restatement (Third) of Agency* explains, an agency relationship arises when a principal "manifests asset" to an agent that the agent will "act on the principal's behalf and subject to the principal's control," and the agent "consents to so act."[96] The parties' own labeling is not controlling, and manifestation of assent can be through words or conduct.[97]

---

[93] PSJVTA § 903(d)(1)(A) (18 U.S.C. § 2333 note).

[94] *Madden v. Cowen & Co.*, 576 F.3d 957, 973 (9th Cir. 2009) (quoting *Webster's Third New Int'l Dictionary* 198 (2002)).

[95] *Great Minds v. Fedex Off. & Print Servs., Inc.*, 886 F.3d 91, 95 (2d Cir. 2018) (quoting *Restatement (Third) of Agency* § 1.01 cmt. c (2006) (ellipses omitted).

[96] *Restatement (Third) of Agency* § 1.01 (2006); *see In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 80 (2d Cir. 2019) (following Restatement).

[97] *Id.* §§ 1.02, 1.03.

21

Here, the relationship between Defendants and the notaries meets all three elements of a lawful agency relationship. *First*, Defendants manifested asset to the notaries acting on their behalf by listing their names and addresses on their website and by preparing a pre-printed form of agreement stating that "[a]uthorized" notaries were "to provide notary services for use by the [PLO Delegation to the U.S.]."[98] When the U.S. Government required Defendants to close their Washington office in 2018, Defendants further manifest their assent by announcing that they "would find alternate ways of continuing to provide consular services, and guarantee the continued provision of services to [their] citizens."[99]

*Second*, the notaries manifested their asset to act as agents by their words and conduct. As one testified, "they called me, and they asked me, and I said I agree. * * * I told him, 'yes, I agree.'"[100] They also manifested their asset to act for Defendants by actually sending notarized documents to Palestinian officials in Mexico and Canada for certification; receiving the certified copies; and then retransmitting the certified documents on to PA officials for use in territories administered by the PA. *See supra* p. 11 & nn. 60-62.

*Third*, Defendants maintained control of the key element of the relationship—certification of the documents for use in territories they administer—as shown by the pre-printed contract stating that Defendants "will maintain the right to reject to authenticate documents notarized by [the notary] for any reason and is not required by this contract to reveal, explain or justify those

---

[98] Letter to the Court re: Response to Defendants' Arguments in *Fuld v. PLO* (July 6, 2021) Ex. 3 at 1 [ECF 1035-3]; *see* Russell Decl. at 6, 36-49, Yalowitz Supp. Decl. (Feb. 9, 2021) Ex. B [ECF 1023-2].

[99] Russell Decl. at 6, 29, Yalowitz Supp. Decl. (Feb. 9, 2021) Ex. B [ECF 1023-2].

[100] Abu Hbda Dep. 116-17, Letter to the Court re: Response to Defendants' Arguments in *Fuld v. PLO* (July 6, 2021) Ex. 9 [ECF 1035-9].

reasons."[101] The case of *Sanchez-Ramirez v. Consulate General of Mexico* confirms that the notaries were providing a service in furtherance of a governmental function. There, the court held that an individual who provided "notarial services" to Mexican nationals was "assist[ing] in official governmental functions such as the provision of notarial services" and that his employment was "'intertwined' with government activity."[102] Although the individual was a full-time employee, the court's determination turned not on his employment status, but on the *function* he performed. Here, too, the notaries acted in furtherance of Defendants' official governmental functions.

### B.    Public Relations

After the PSJVTA's effective date, Defendants made public appearances and maintained and regularly updated a website and social media accounts in English to influence the U.S. public and U.S. policymakers. These activities, which were conducted in the United States, included press conferences in the United States by their Chairman, Mahmoud Abbas, appearances by their top official in the United States, Riyad Mansour, at an undergraduate seminar hosted by Seton Hall University, and a "webinar" hosted by a U.S. not-for-profit group. Defendants criticized U.S. policies, aired grievances against the Government of Israel, and engaged in self-promotion. These activities constituted the distribution of "political material intended to influence the foreign policies of the United States," *i.e.*, "propaganda."[103] As such, they do not come within either of the statutory exceptions that defendants invoke.

### 1.    Exception (B) Does Not Apply

The public relations activities do not come within Exception (B), which is limited to those

---

[101] Letter to the Court re: Response to Defendants' Arguments in *Fuld v. PLO* (July 6, 2021) Ex. 3 at 2 [ECF 1035-3].

[102] *Sanchez-Ramirez v. Consulate Gen. of Mexico*, No. C 12-3485 PJH, 2013 WL 4013947, at *9 (N.D. Cal. Aug. 5, 2013), *aff'd*, 603 F. App'x 631 (9th Cir. 2015).

[103] *Meese v. Keene*, 481 U.S. 465, 470 (1987).

activities "undertaken *exclusively* for the purpose of conducting *official business* of the United Nations."[104] To the contrary, they are exactly the type of activities by Defendants' U.N. representatives that the Second Circuit and other courts have repeatedly held *not* to be official U.N. business. In *Klinghoffer*, the Second Circuit held that "speak[ing] in public and to the media in New York in support of the PLO's cause" are "non-U.N. activities," and expressed its understanding that such activities would violate § 1003.[105] On remand in *Klinghoffer*, Judge Stanton held that "speeches," "interviews," "media appearances," and distribution of "informational pamphlets" are "sufficiently separate from [the PLO's] U.N. activities that they may be considered in determining" to exercise personal jurisdiction.[106] In *Ungar v. Palestinian Authority*, the court followed *Klinghoffer* to find, repeatedly, that Defendants' "speeches and interviews" constituted non-U.N. activities which served as a basis for the court to exercise jurisdiction.[107] In *Knox v. PLO*, the court drew the inference that discovery about Defendants' non-U.N. activities "would only confirm the propriety of this Court's assertion of personal jurisdiction over them."[108] And in this case, the Court followed *Klinghoffer* to exercise personal jurisdiction after finding as a fact that Defendants had engaged in activities beyond those "commensurate with their special diplomatic need for being present" at the United Nations.[109] Finally, in *Klieman v. Palestinian Authority*, the D.C. Circuit observed that Defendants' Twitter and Facebook social media posts—which have continued since January 4,

---

[104] 18 U.S.C. § 2334(e)(3)(B) (emphasis added).

[105] *Klinghoffer*, 937 F.2d at 52.

[106] 795 F. Supp. at 114.

[107] *See* 325 F. Supp. 2d at 53; 153 F. Supp. 2d at 88.

[108] *Knox v. PLO*, 229 F.R.D. 65 (S.D.N.Y. 2005), *aff'g* No. 03 Civ. 4466 (VM) (THK), 2005 WL 712005, at *4 (S.D.N.Y. March 21, 2005).

[109] *Sokolow v. PLO*, No. 04 Civ. 397 (GBD), 2011 WL 1345086, at *5 (S.D.N.Y. Mar. 30, 2011), *rev'd sub nom. Waldman v. PLO*, 835 F.3d 317 (2d Cir. 2016), *vacated*, 140 S. Ct. 2714 (2020).

2020—were "rather similar promotional activities" to those supporting jurisdiction in *Klinghoffer*, and suggested that they were a "violation" of § 1003.[110]

In addition, self-promotional activities by a member of a deliberative body are not *official business* of the deliberative body. In an analogous context, courts have held that a deliberative body's "official business" simply does not include self-promoting public relations activities by its members.[111] Defendants have argued, however, that because a U.N. committee wants to "raise international awareness" of the "inalienable rights of the Palestinian people," and Defendants' promotional activities further that cause, Defendants' promotional activities have now transformed into "official business of the United Nations" within the meaning of § 2334(e)(1)(B). By that logic, *anything* done in furtherance of the U.N.'s expansive aspirations qualifies as "official business." The U.N.'s Economic and Financial Committee, for instance, aims to promote the "eradication of poverty."[112] Thus, any activity by Defendants purporting to further this "cause" would qualify as "official business of the United Nations" under § 2334(e)(1)(B) according to Defendants' theory. The Court should decline Defendants' invitation to disregard *Klinghoffer* on the theory that the U.N. has so expanded the scope of official business that the decision has become obsolete. Accepting that invitation would mean that the PSJVTA's U.N.-activities exception entirely swallows the rule—exactly the opposite of Congress's instruction that the statute be "liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism."[113]

---

[110] 923 F.3d at 1131.

[111] *See Hoellen v. Annunzio*, 468 F.2d 522, 526 (7th Cir. 1972); *Rising v. Brown*, 313 F. Supp. 824, 826-27 (C.D. Cal. 1970).

[112] *See The GA Handbook: A practical guide to the United Nations General Assembly* at 71, https://www.unitar.org/sites/default/files/media/publication/doc/un_pga_new_handbook_0.pdf.

[113] PSJVTA § 903(d)(1)(A) (18 U.S.C. § 2333 note).

Accepting Defendants' theory would also conflict with U.S. law and U.N. practice.

U.S. law is clear that the "conduct of any activities … outside the United Nations Headquarters District by any individual … authorized by the United Nations to conduct official business in connection with that organization or its agencies … may be permitted or denied or subject to reasonable regulation, as determined to be in the best interests of the United States and pursuant to this chapter."[114]

Recently, the United States indicted an individual employed by the Permanent Mission of the Islamic Republic of Iran to the United Nations. (Iran, unlike Defendants, is a member of the United Nations and maintains a U.N. mission despite its lack of diplomatic relations with the United States.[115]) The indictment charges that the defendant violated the Foreign Agents Registration Act,[116] which imposes registration and disclosure obligations on persons who act as publicity agents and public-relations counsel for foreign principals.[117]

According to evidence presented by the United States in that case, the defendant (Afrasiabi) is an employee of Iran's U.N. Mission, who, among other things, "[i]n the course of his employment," "made television appearances to advocate for" Iran's views on world events, and "authored articles and opinion pieces" espousing Iran's position on various matters of foreign policy.[118] The evidence on the docket in that case includes extensive quotations from written correspondence and

---

[114] 22 U.S.C. § 4309A(b)(1).

[115] *See* Compl. & Aff. in Support of Application for Arrest Warrant, ¶ 5, *United States v. Afrasiabi*, No. 21 Cr. 46 (ERK), ECF No. 1.

[116] 22 U.S.C. § 611 et seq.,

[117] Indictment, *United States v. Afrasiabi*, No. 21 Cr. 46 (ERK) (E.D.N.Y. Jan. 25, 2021), ECF No. 6.

[118] *See* Compl. & Aff. in Support of Application for Arrest Warrant, ¶ 13, *United States v. Afrasiabi*, No. 21 Cr. 46 (ERK), ECF No. 1.

describes telephone conversations between Afrasiabi and individuals in Iran's U.N. Mission on matters of substance relating to these public relations activities.[119] While representatives of U.N. members enjoy immunity "while exercising their functions," such immunity does not extend to public-relations activities like those engaged in by Afrasiabi.[120] The same is true of Defendants' public-relations activities, which are subject at all times to U.S. regulation.

United Nations practice also undermines Defendants' position that their public relations activities are official business of the United Nations. The actual U.N. document inviting the PLO to function as an observer sets out the particular "modalities" of its "participation in the sessions and work" of the United Nations. Public relations are not among them:

1. The right to participate in the general debate of the General Assembly.

2. Without prejudice to the priority of Member States, Palestine shall have the right of inscription on the list of speakers under agenda items other than Palestinian and Middle East issues at any plenary meeting of the General Assembly, after the last Member State inscribed on the list of that meeting.

3. The right of reply.

4. The right to raise points of order related to the proceedings on Palestinian and Middle East issues, provided that the right to raise such a point of order shall not include the right to challenge the decision of the presiding officer.

5. The right to co-sponsor draft resolutions and decisions on Palestinian and Middle East issues. Such draft resolutions and decisions shall be put to a vote only upon request from a Member State.

6. The right to make interventions, with a precursory explanation or the recall of relevant General Assembly resolutions being made only once by the President of the General Assembly at the start of each session of the Assembly.

7. Seating for Palestine shall be arranged immediately after non-member States and before the other observers; and with the allocation of six seats in the General Assembly Hall.

---

[119] *E.g., id.* ¶¶ 36-38, 40-42, 44-45, 47-48, 50-56, 58-59, 69-75, 84-93.

[120] *See* Order, *United States v. Afrasiabi*, No. 21 Cr. 46 (ERK) (Feb. 19, 2021) ("The UN's agreements and alleged informal practices are not a basis to dismiss the indictment, which is founded on U.S. federal law.").

8.  Palestine shall not have the right to vote or to put forward candidates.[121]

In addition, the U.N.'s Office of Legal Affairs has defined "official business of the United Nations," as the "performance of official duties on behalf of the United Nations," attending to "the business of the Organization," or "an official act."[122] The Legal Advisor has also linked a claim of immunity for observers to conduct "in their official capacity *before relevant United Nations organs*."[123] In sum, an observer's own public-relations and community-engagement activities are simply not official business of the United Nations.

## 2.  Exception (E) Does Not Apply

Press conferences and social media releases also do not come within the catch-all exception for "personal or official activities conducted *ancillary* to activities listed under this paragraph," 18 U.S.C. § 2334(e)(3)(F), because they are not "ancillary" to official U.N. business. Ancillary means "providing necessary support to the essential operations of a central organization."[124] It is defined as:

1. Subservient, subordinate, ministering (to)

2. *lit.* (after Latin.) Of or pertaining to maid-servants....

3. Designating activities and services that provide essential support to the functioning of a central service or industry; also, of staff employed in these supporting roles. Now used esp. of non-medical staff and services in hospitals....[125]

---

[121] Annex to General Assembly Resolution 52/250, Participation of Palestine in the work of the United Nations (July 13, 1998).

[122] 1968 U.N. Jurid. Y.B. 194-95; 1985 U.N. Jurid. Y.B. 148.

[123] *Permanent Observer Mission of the African Union*, 2014 U.N. Jur. Y.B. 328 (emphasis added); *see Permanent Observer Mission of the Org. of the Islamic Conf.*, 1999 U.N. Jur. Y.B. 409; *Scope of Privileges and Immunities of a Permanent Observer Mission*, 1982 U.N. Jur. Y.B. 206; *Privileges and Immunities of a Person Designated by a Member State*, 1976 U.N. Jur. Y.B. 229; *see also Report of the Committee on Relations with the Host Country* ¶¶ 32-33 (Oct. 14, 1982), Supp. No. 26 (A/37/26) (Statement of the Legal Advisor).

[124] *Fowler's Dictionary of Modern English Usage* 48 (4th ed. 2015).

[125] *Oxford English Dictionary* (online ed.), https://www.oed.com/view/Entry/7258; *see Webster's Third New International Dictionary* at 80 (2002) ("subordinate or auxiliary to a primary or

The Supreme Court's decision in *Wisconsin Department of Revenue v. William Wrigley, Jr., Co.*, illustrates the correct usage of the word "ancillary." That case concerned the reach of the term "solicitation of orders" in a federal statute, which the Court read as covering not only "actual requests for purchases," but also "activities that are entirely ancillary to requests for purchases."[126] The Court explained that an activity is "ancillary" to the main activity if "the only reason to do it is to facilitate" the main activity—which is to say, only if it "serve[s] no purpose apart from [its] role in facilitating" the main activity.[127] Thus, "ancillary" activities were those serving "no independent business function apart from their connection to the soliciting of orders."[128] In contrast, "activities that the company would have reason to engage in anyway" were *not* "ancillary."[129] The Court then applied its holding to the activity of sales representatives replacing stale chewing gum at stores. The Court acknowledged that replacing the stale gum facilitated the solicitation of orders by encouraging consumers to buy gum; but the activity was not "ancillary" because it *also* resulted in sales, "thereby providing a business purpose for supplying the gum quite independent from the purpose of soliciting consumers."[130]

Here, as in *Wrigley*, Defendants' activities are "ancillary" to official U.N. business *only* if they serve "no independent purpose" other than to facilitate U.N. business. For example, taking a cab to the U.N. Headquarters in order to deliver a speech is not "official business of the United

---

principal legal document, proceeding, office, or officer").

[126] *Wisconsin Department of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 226, 228 (1992) (emphasis omitted).

[127] *Id.* at 229, 234.

[128] *Id.* at 228-29.

[129] *Id.* at 229.

[130] *Id.* at 233-34.

Nations,"[131] but it serves no independent purpose but to facilitate the speech's delivery and therefore is "ancillary" to the conduct of official U.N. business. In contrast, tweeting out accusations that Israel engages in racism, ethnic cleansing, terror, and gratuitous cruelty,[132] and retweeting statements from U.S. politicians about Defendants' relationship with Israel,[133] have an obvious independent purpose: to influence U.S. policymakers and the U.S. public on issues of interest to Defendants. Such activities are thus *not* "ancillary" to official U.N. business.

Canons of construction also support a narrow reading of Exception (F). Courts read statutory exceptions "narrowly in order to preserve the primary operation of the [main] provision."[134] "When a statute sets forth a general principle, coupled with an exception to it, it is logical to assume, in the face of ambiguity in the exception, that the legislature did not intend the exception to be so broad as to leave nothing of the general principle."[135] Courts typically "place metes and bounds on [even] very broad language of [a] catchall provision,"[136] rather than "allow a catchall term" to "dictate the particulars" of the statutory scheme.[137] Indeed, the statute itself instructs that it be "liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism."[138] Reading the catch-all broadly would violate these canons and contravene Congress's instruction.

---

[131] *See* 1977 U.N. Jurid. Y.B. at 247.

[132] Yalowitz Declaration (Nov. 12, 2020) ¶¶ 213-15 & Exs. 35-36, 52-58 [ECF 1018-35, 1018-36, 1018-52, 1018-53, 1018-54, 1018-55, 1018-56, 1018-57, 1018-58].

[133] *Id.* ¶ 215 (o) & Ex. 35.

[134] *Comm'r v. Clark*, 489 U.S. 726, 739 (1989).

[135] *Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 91 (2d Cir. 2016).

[136] *United States v. Aguilar*, 515 U.S. 593, 599 (1995)

[137] *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1617 (2018).

[138] PSJVTA § 903(d)(1)(A) (18 U.S.C. § 2333 note).

Finally, the PSJVTA's legislative history also supports applying the main modern meaning of "ancillary," as explained by the bill's lead sponsor:

> What our bill … does is strike a balance between Congress's desire to provide a path forward for American victims of terror to have their day in court and the toleration by the Members of this body to allow the PA/PLO to conduct a very narrow scope of activities on U.S. soil—such as activities pertaining to official business at the United Nations … —without consenting to personal jurisdiction in civil ATA cases. This delicate balance is supported by a bipartisan coalition of Members of Congress, the executive branch, and American victims of international terrorism and their families.
>
> For 25 years, the Federal courts struck this balance by holding that the PLO's and PA's presence and activities in the United States subject them to jurisdiction in our courts unless they can demonstrate that their offices in the United States deal exclusively with the official business of the United Nations and that their activities in this country are commensurate with their special diplomatic need for being present here.
>
> The courts correctly held that the PLO's and PA's fundraising and public relations activities such as press releases and public appearances, whether characterized as diplomatic public speaking or proselytizing, are not essential to their diplomatic functions at the United Nations Headquarters. The bill codifies the distinction recognized in these cases while giving the PLO and PA a clear choice. Unless they limit their presence to official business with the United Nations and their U.S. activities commensurate with their special diplomatic need to be in the United States, they will be consenting to personal jurisdiction in ATA cases.
>
> In this regard, the exception in the language for "ancillary" activities is intended to permit only essential support or services that are absolutely necessary to facilitate the conduct of diplomatic activities expressly exempted in the bill.

165 Cong. Rec. S7182 (Dec. 19, 2019).

Defendants rely on a post-enactment "clarification" by Senator Leahy that "ancillary activities are those which may *not* be essential for the minimal functioning of the mission but which support the mission's primary operations."[139] This "clarification" arose following several meetings between Defendants' own lobbyists and Senator Leahy's staff.[140] In committee, Senator Leahy

---

[139] 166 Cong. Rec. S627 (Jan. 28, 2020).

[140] *See* Squire Patton Boggs, FARA Supplemental Statement attachment D-3 (July 31, 2020), https://efile.fara.gov/docs/2165-Supplemental-Statement-20200731-34.pdf.

had opposed the bill, but said he would support it on the floor to "get recourse for victims" if changes were made to protect the opportunity for "quiet discussions" at the U.N.[141] Senator Leahy's post-enact statement is not a valid interpretive source because arguments based on "subsequent legislative history" "should not be taken seriously."[142]

### C.    Defendants' Office

Defendants maintain an office in their townhouse at 115 East 65th Street in Manhattan, which they use to conduct promotional activities. *See supra* p. 9 nn. 45-48. This brings it within paragraph (4), which provides that "any office … premises, or other facility or establishment within the territory of the United States that is not *specifically exempted by paragraph (3)(A)* shall be considered to be in the United States for purposes of paragraph (1)(B)." Paragraph (3)(A), referenced in paragraph (4), provides an exemption for an office "used exclusively for the purpose of conducting official business of the United Nations." As demonstrated above, Defendants use their New York office to conduct promotional activities, which are not "*official business* of the United Nations." By the strict terms of paragraph (4), they cannot invoke the exemption for "ancillary activities" in connection with the office, because paragraph (4)'s rule of construction specifies only the exception in paragraph (3)(A), not the catch-all in paragraph (3)(F). "Where Congress explicitly enumerates certain exceptions … additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."[143]

---

[141] "I want to be able to … try to get recourse for victims. I don't want to do something that may selectively close doors to the U.N., where, as you know as well as I, many times it's the quiet discussions held between the United States and others at the U.N. that solve a lot of problems." Executive Business Meeting, Comm. on the Judiciary, at 1:02:37–1:03:07 (Oct. 17, 2019), https://www.judiciary.senate.gov/meetings/10/17/2019/executive-business-meeting.

[142] *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1747 (2020) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring)).

[143] *United States v. Smith*, 499 U.S. 160, 167 (1991).

## CONCLUSION

For the foregoing reasons, the Court should comply with the Second Circuit's mandate and make additional findings of fact regarding whether Defendants have satisfied the PSJVTA's "U.S. activities" prong. The Court should also hold that that prong is constitutional.

Dated:  March 24, 2022
New York, New York

Respectfully submitted,

ARNOLD & PORTER
KAYE SCHOLER LLP

By: _____

Kent A. Yalowitz
*Kent.Yalowitz@arnoldporter.com*
Avishai D. Don
*Avishai.Don@arnoldporter.com*
David C. Russell
*David.Russell@arnoldporter.com*
250 West 55th Street
New York, NY 10019
T: (212) 836-8344

– and –

Dirk C. Phillips
*Dirk.Phillips@arnoldporter.com*
Stephen K. Wirth
*Stephen.Wirth@arnoldporter.com*
601 Massachusetts Ave. NW
Washington, DC 20001