UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK I. SOKOLOW, et al.,

                              Plaintiffs,

-against-                                              Case No. 04 Civ. 397 (GBD)

PALESTINE LIBERATION
ORGANIZATION, et al.,

                              Defendants.

---

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR RECONSIDERATION**

**SQUIRE PATTON BOGGS (US) LLP**

Gassan A. Baloul (GB-4473)
gassan.baloul@squirepb.com
Mitchell R. Berger (MB-4112)
mitchell.berger@squirepb.com
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

*Attorneys for Defendants Palestine Liberation
Organization and Palestinian Authority*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................ii

INTRODUCTION .......................................................................................................... 1

I.      This Court's analysis applies to both of the PSJVTA's factual predicates....................... 4

II.     This Court should reject Plaintiffs' two new legal arguments............................................ 6

        A.      Tag jurisdiction under *Burnham* cannot apply under *Waldman I* and
                because *Burnham* only applies to individuals.......................................................... 7

        B.      While the acceptance of reciprocal statutory benefits can support
                jurisdiction, the PSJVTA does not provide any benefit to Defendants. ............... 8

III.    This Court should reject Plaintiffs' factual claims regarding the PSJVTA's U.S.
        activities prong.......................................................................................................... 12

        A.      Plaintiffs' motion for reconsideration simply repeats factual claims they
                made in previous briefs.......................................................................................... 12

        B.      If this Court reaches these issues, it should hold that Plaintiffs' evidence
                does not satisfy the factual predicates of the PSJVTA. ...................................... 14

                1.      The "consular services" evidence proves that the state-licensed
                        notaries are not agents of the PA or PLO. ............................................... 15

                2.      Palestine's UN Mission performs exactly the same activities as
                        other UN Missions—all of which are UN business................................. 18

                3.      The office of Palestine's UN Mission is specifically exempted
                        from jurisdictional consideration by the PSJVTA. ................................. 22

                4.      This Court should use the natural meaning of "ancillary" to
                        describe activities supplemental and adjacent to official UN
                        business. ................................................................................................... 25

CONCLUSION.............................................................................................................. 27

CERTIFICATE OF SERVICE ......................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*,
    684 F.3d 36 (2d Cir. 2012)...................................................................................9

*APL Co. v. Kemira Water Sol's*,
    890 F. Supp. 2d 360 (S.D.N.Y. 2012).................................................................21

*Blue Buffalo Co. v. Comptroller*,
    221 A.3d 1130 (Md. Ct. Spec. App. 2019).........................................................33

*Brown v. Lockheed Martin Corp.*,
    814 F.3d 619 (2d Cir. 2016)...............................................................................16

*Burnham v. Superior Court of Cal.*,
    495 U.S. 604 (1990) ................................................................................. *passim*

*Cimontubo - Tubagens Soldadura, LDA v. Petróleos De Venez., SA*,
    2021 U.S. Dist. LEXIS 210973 (S.D.N.Y. Nov. 1, 2021) .....................................9

*College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999)...............................................................................17

*Comm. Union Ins. v. Alitalia Airlines, SPA*,
    347 F.3d 448 (2d Cir. 2003)...............................................................................21

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014).........................................................................................13

*Daimler v. Bauman*,
    571 U.S. 117 (2014).........................................................................9, 12, 14, 34

*In re del Valle Ruiz*,
    939 F.3d 520 (2d Cir. 2019)...............................................................................14

*Dunnegan v. 220 E. 54th St. Owners, Inc.*,
    2021 U.S. Dist. LEXIS 90810 (S.D.N.Y. May 12, 2021).....................................18

*Enron Power Mktg. v. Luzenac Am.*,
    2006 U.S. Dist. LEXIS 62922 (S.D.N.Y. Aug. 31, 2006).....................................31

*Ezell v. Payne*,
    No. 16-1166, 2017 U.S. Dist. LEXIS 31809 (W.D. La. Jan. 31, 2017) .................23

*Fuld v. Palestine Liberation Org.*,
No. 20-3374, 2022 U.S. Dist. LEXIS 3102 (S.D.N.Y. Jan. 6, 2022) ............................ *passim*

*Hess v. Pawloski*,
274 U.S. 352 (1927) ........................................................................................7, 8, 15, 16

*Hieshetter v. Amann*,
No. 1:19-725, 2020 U.S. Dist. LEXIS 10287 (W.D. Mich. Jan. 22, 2020) ...........................22

*Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee*,
456 U.S. 694, 102 S. Ct. 2099 (1982) ........................................................................18

*Estate of Klieman v. Palestinian Auth.*,
923 F.3d 1115 (2019) ................................................................................7, 8, 30

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione*,
937 F.2d 44 (2d Cir. 1991) ........................................................................... *passim*

*Martinez v. Aero Caribbean*,
764 F.3d 1062 (9th Cir. 2014) ...............................................................................14

*Mendelsohn v. Meese*,
695 F. Supp. 1474 (S.D.N.Y. 1988) ........................................................................13

*Mohamad v. Rajoub*,
No. 17-2385, 2018 U.S. Dist. LEXIS 41238 (S.D.N.Y. Mar. 12, 2018) ...............................14

*Pelczar v. Pelczar*,
833 F. App'x 872 (2d Cir. 2020) ..............................................................................9

*Reynolds-Naughton v. Norwegian Cruise Line*,
386 F.3d 1 (1st Cir. 2004) ........................................................................................32

*Sanchez-Ramirez v. Consulate Gen. of Mexico*,
No. 12-3485, 2013 U.S. Dist. LEXIS 109888 (N.D. Cal. Aug. 5, 2013) .........................22, 23

*Sanders v. Cnty of Bradford*,
No. 3:11-01723, 2014 U.S. Dist. LEXIS 184620 (M.D. Pa. Nov. 21, 2014) .........................22

*Shatsky v. PLO*,
No. 1:18-cv-12355, Op. and Order, Dkt 165 (S.D.N.Y. Mar. 18, 2022). ..............7, 8, 11, 18

*Sokolow v. PLO*,
2011 U.S. Dist. LEXIS 36022 (S.D.N.Y. Mar. 30, 2011) ....................................................28

*Sokolow v. PLO*,
2022 U.S. Dist. LEXIS 43096 (S.D.N.Y. Mar. 10, 2022) ...........................................9, 10, 11

*In re Tribune Co. Fraud. Conveyance Litig.*,
    946 F.3d 66 (2d Cir. 2019)......................................................................................21

*United States v. Afrasiabi*,
    No. 21-cr-0046 (E.D.N.Y.) .....................................................................................21

*Ungar v. Palestinian Auth.*,
    No. 18-302 (S.D.N.Y. Sept. 12, 2005)....................................................................28

*United States v. PLO*,
    695 F. Supp. 1456 (S.D.N.Y. 1988)........................................................13, 16, 29

*Wachovia Mortg. v. Toczek*,
    841 F. App'x 267 (2d Cir. 2021) ..............................................................................9

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014)............................................................................................12

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016)..............................................................................12, 14

*Waldman v. PLO*,
    925 F.3d 570 (2d Cir. 2019)....................................................................................29

*White v. Pacifica Found.*,
    973 F. Supp. 2d 363 (S.D.N.Y. 2013).....................................................................22

*Williams v. Nat'l Notary Assoc.-Fla.*,
    No. 3:08-357, 2008 U.S. Dist. LEXIS 118569 (M.D. Fla. Nov. 4, 2008) ..............23

*Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*,
    505 U.S. 214 (1992)................................................................................................33

*Worthington v. Palmer*,
    No. 3:15-410, 2015 U.S. Dist. LEXIS 159441 (E.D. Va. Nov. 24, 2015)...............22

**Statutes**

18 U.S.C. § 2334) ........................................................................5, 17, 25, 26, 27

22 U.S.C. § 4309a.........................................................................................27

22 U.S.C. § 5201 ..........................................................................................11

22 U.S.C. § 5202..........................................................................................11

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)....................................................31

*Notarial and Authentication Services of U.S. Consular Officers Abroad*, State
Department Bureau of Consular Affairs,
https://travel.state.gov/content/travel/en/records-and-
authentications/authenticate-your-document/Notarial-Authentication-Services-
Consular.html..................................................................................................................23, 24

Oxford English Dictionary (Online ed., 2020) ..............................................................32

Restat. (Third) 3d of Agency § 1.01, cmt f. .................................................................16

Statement of Sen. Leahy, Cong. Rec.—Sen., S267, 116th Cong. (Jan. 28, 2020) .......32

UN G.A. Res. 3236, A/RES/3236 (XXIX) (Nov. 22, 1974) .........................................26

UN Juridical Yearbook, Chapter VI, § A(13) (2000). ...................................................28

UN G.A. Res. No. A/73/L.32 (Nov. 23, 2010) .............................................................25

UN G.A. Res. No. A/C.4/73/L.18 (Nov. 14, 2018) ......................................................25

UN G.A. Res. No. A/C.4/73/L.18 (Nov. 14, 2018) ......................................................25

UN G.A. Res 67/19, *State of Palestine in the United Nations*, A/RES/67/19 (Nov.
29, 2012). ...................................................................................................................28

UN Meetings Coverage, GA/12325 (António Guterres: "If there is a hell on earth,
it is the lives of children in Gaza") (May 20, 2021) ...................................................25

UN Press Release, *State of Palestine to Gain Enhanced Rights, Privileges in
General Assembly Work, Sessions When It Assumes 2019 Group of 77
Chairmanship* (Oct. 16, 2018) *at*:
https://www.un.org/press/en/2018/ga12078.doc.htm. ...............................................28

UN Programme of Work for 2020, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7,
2020), at: https://www.un.org/unispal/document/palestinian-rights-committee-
programme-of-work-for-2020-a-ac-183-2020-1/. ....................................................26

UN Report, CEIRPP, UN Doc. A/75/35, at:
https://www.un.org/ga/search/view_doc.asp?symbol=A/75/35, ¶ 31 .......................26

United Nations, UNISPAL, Civil Society and the Question of Palestine:
Overview, at: https://www.un.org/unispal/data-collection/civil-society/
(visited April _, 2022)...............................................................................................26

Webster's Third New Int'l Dictionary, Unabridged (2002) ...........................................32

Wolters Kluwer Bouvier Law Dictionary Desk Ed. (2012) ..........................................32

## Factual Sources

Arnold & Porter, Lobbying Disclosure Act Reports for Plaintiffs in Sokolow v.
PLO, 2018-2020, available at https://www.opensecrets.org/federal-
lobbying/clients/reports?cycle=2018&id=F219414 ...............................................33

CGTN America (Sept. 10, 2020), at https://america.cgtn.com/2020/09/10/un-
general-assembly-interview-with-saudi-ambassador-to-un....................................27

MSNBC (May 30, 2019), at https://www.msnbc.com/ali-velshi/watch/israeli-
amb-to-un-on-new-vote-political-chaos-in-israel-60583493582...........................27

CNN News (Nov. 23, 2020), at
https://www.cnn.com/videos/world/2020/11/23/connect-the-world-omar-
hilale-western-sahara.cnn.........................................................................................26

CNN News Update (Sept. 22, 2020), at:
https://www.cnn.com/2021/03/09/world/meanwhile-in-america-march-9-
intl/index.html;.........................................................................................................26

*Liechtensteinian Ambassador Christian Wenaweser critiques current state of the
UN*, Daily Princetonian (Feb. 28, 2020), at
https://www.dailyprincetonian.com/article/2020/02/princeton-christian-
wenaweser-un-liechtenstein-ambassador-trump-indifferent; ...................................27

NBC News (Jan. 26, 2021), at https://www.nbcnews.com/politics/national-
security/iran-s-un-ambassador-says-iran-waiting-president-biden-make-
n125560827...............................................................................................................27

Reuters News (Mar. 29, 2021), at
https://www.youtube.com/watch?v=qIbZIpzUoXk................................................27

*Francophone panel discussion marked the launch of the festival*, Princeton
University, at https://fit.princeton.edu/node/4156; ..................................................27

*UN condemned Israel 17 times in 2020*, Times of Israel (Dec. 23, 2020), at:
www.timesofisrael.com/un-condemned-israel-17-times-in-2020-versus-6-
times-for-rest-of-world-combined ...........................................................................25

## **Introduction**

There is nothing new in Plaintiffs' motion for reconsideration, which recycles Plaintiffs' longstanding allegations and the same jurisdictional-discovery borrowed from the *Shatsky* litigation that Plaintiffs long ago tendered to this Court. Just as in the two other cases (*Shatsky* and *Fuld*) that held the PSJVTA unconstitutional—after holding that the statute applied by its terms— no additional factual resolution is required for this Court to adhere to its conclusion that the PSJVTA violates Due Process. That constitutional conclusion remains unaltered by any further factual debate for several reasons.

First, "Congress simply took conduct in which the PLO and PA had previously engaged — conduct that the Second and D.C. Circuits had held was insufficient to support personal jurisdiction in *Waldman I*, *Livnat*, *Shatsky*, and *Klieman* — and declared that such conduct "shall be deemed" to be consent. … But the conduct to which Congress attached jurisdictional consequence in the PSJVTA is not 'of such a nature as to justify the fiction' that Defendants actually consented to the jurisdiction of the Court." *Fuld v. Palestine Liberation Org*., No. 20-3374, 2022 U.S. Dist. LEXIS 3102, *18 (S.D.N.Y. Jan. 6, 2022). This is purely a legal question.

Second, in attempting to convert such constitutionally-insufficient conduct into "consent," Congress offered no benefit to Defendants that might have satisfied the reciprocity test of *Hess v. Pawloski*, 274 U.S. 352, 356 (1927). *Hess* "hold[s] that a defendant's receipt of a benefit can be deemed to be consent" to jurisdiction. *Fuld*, at 38 n.10. But, the PSJVTA provides no benefit to Defendants—as Plaintiffs were the first to tell this Court. *See* ECF 1022 at 26-27. To the contrary, Palestine's UN Mission personnel operate under U.S. government obligations long pre-dating the PSJVTA under the UN Headquarters Agreement. The well-known and unchanged activities of Palestine's UN Mission personnel have never been challenged by the U.S. government—an intervener here—as falling outside the UN ambit. The absence of any *benefit* conferred by the

PSJVTA—the fulcrum for reciprocity consent under *Hess*—is purely a legal question that does not require further factual resolution by this Court.

Third, Defendants are not subject to "tag" jurisdiction under *Burnham*—a concept that Plaintiffs try to confect into some form of consent—because *Burnham* applies only to <u>individuals</u>. In this very case, however, the Second Circuit held that Defendants are subject to general jurisdiction, if at all, only under *Daimler*'s different set of rules governing <u>entities</u>. This, too, is a purely legal question that does not require further factual resolution. Still further, only legal analysis—not additional factual finding—is required to confirm that the PSJVTA cannot constitutionally provide any form of specific jurisdiction because Plaintiffs' claims indisputably do not arise from or relate to the activities specified in the PSJVTA's factual predicates. The Court of Appeals held as much in *Waldman I*, as did the D.C. Circuit in *Livnat*, *Shatsky*, and *Klieman*.

Fourth, accepting the facts as Plaintiffs allege and as reflected in the *Shatsky* jurisdictional discovery materials, the activities of third-party notaries do not alter the constitutional analysis of the PSJVTA. Those facts fail to establish that Defendants exercise any measure of control over such notaries—in fact, they establish exactly the opposite; and, <u>control</u> is the *sine qua non* of a principal-agent relationship. Because Defendants do not exercise control over those state-licensed notaries in New Jersey and California, the notaries' activities are not imputable to Defendants for jurisdictional purposes.

None of this analytic framework is new to this Court. Back in May 2021, in confronting the constitutional questions presented by the PSJVTA, this Court correctly explained that "I'm not going to be able to resolve this issue based on whether you did or didn't engage in certain activities." ECF 1029 at 80. Rather, this Court continued, the real question is "whether Congress can pass a law that says if you engage in that activity, you've consented to jurisdiction." *Id*. This

Court ultimately held that the PSJVTA did not create free and voluntary consent as required by the Due Process Clause. *Sokolow v. PLO*, 2022 U.S. Dist. LEXIS 43096, *15 (S.D.N.Y. Mar. 10, 2022). For all of these reasons, the PSJVTA is unconstitutional regardless of whether either PSJVTA factual predicate was satisfied in this case.

Indeed, Plaintiff's motion for reconsideration recycles the same facts as before, but attempts to dress them up with new legal theories. Plaintiffs thus fail to satisfy the standard for reconsideration: "A motion for reconsideration is 'not a vehicle for relitigating old issues, ... or otherwise taking a 'second bite at the apple.'" *Cimontubo - Tubagens Soldadura, LDA v. Petróleos De Venez., SA*, 2021 U.S. Dist. LEXIS 210973, at *2 (S.D.N.Y. Nov. 1, 2021) (Daniels, J.); *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (applying the same standard to motions under Rule 59). "[R]econsideration is generally denied," and "is not warranted where the party seeks 'solely to relitigate issues already decided,'" *Wachovia Mortg. v. Toczek*, 841 F. App'x 267, 272 (2d Cir. 2021). Even Plaintiffs' new legal theories merely repackage arguments this Court has considered through hundreds of pages of briefing over the past two years. *Pelczar v. Pelczar*, 833 F. App'x 872, 875-76 (2d Cir. 2020) ("A motion to reconsider 'should not be granted where the moving party seeks solely to relitigate an issue already decided.'") (citation omitted). In any case, Plaintiffs' new legal theories are inconsistent with the holdings of *Daimler* and *Waldman I*.

If this Court nonetheless undertakes further factual analysis, it should hold that all of the activities of Palestine's UN Mission are well within official UN business and activities with U.S. and foreign government officials under 18 U.S.C. 2334(c)(3)—and in any event would be jurisdictionally-exempt activities "ancillary" thereto. The social media and civil society activities of Palestine's UN Mission are the same as those of other UN Missions, and are focused on the

Mission's official business as explicitly described by the relevant UN committee on the Question of Palestine. The state-licensed notaries, touted by Plaintiffs, testified without contradiction that Defendants exercise no control over them, negating any agency theory. Finally, the UN Mission office is not considered to be in the United States under the relevant treaties between the United States and the United Nations. This Court should deny Plaintiff's motion for reconsideration.

**I.    This Court's analysis applies to both of the PSJVTA's factual predicates.**

This Court's constitutional analysis applies equally to both the payment and activity prongs under the facts alleged by Plaintiffs, as neither set of facts is constitutionally sufficient to establish consent to personal jurisdiction. After holding that the PSJVTA applies because the payment predicate is satisfied, the Court moved to the broader constitutional inquiry: Whether Defendants "are 'deemed to consent to personal jurisdiction'" by "meet[ing] ***any*** of the factual predicates identified in 18 U.S.C. 2334(e)(1)(A) or (B)". *Sokolow*, 2022 U.S. Dist. LEXIS 43096, *15 (emphasis added). With the word "any," this Court recognized that its constitutional analysis applied to both of the statute's factual predicates. This Court's opinion found no evidence that Defendants had voluntarily intended to submit to personal jurisdiction, such as by "refus[ing] to comply with discovery orders regarding personal jurisdiction." *Id.* at *17-18. It explained that the "conduct at issue is unrelated to the underlying issues in the litigation," and "Defendants did not violate any discovery orders." *Id.* at *18-20. It concluded that any "finding that Defendants have impliedly consented to personal jurisdiction based solely on their conduct in violation of the PSJVTA would violate the due process clause of the constitution." *Id.* at *20. Though the court highlighted the payment predicate, that legal conclusion applies equally to both factual predicates.

This Court also invoked Judge Furman's opinion in *Fuld v. Palestine Liberation Org.*, No. 20-3374, 2022 U.S. Dist. LEXIS 3102 (S.D.N.Y. Jan. 6, 2022), which applied a similar analysis. Like this Court, *Fuld* first found that the PSJVTA applied based on the payment predicate. *Id*. at

*11-12.  Then the court considered whether the exercise of jurisdiction under the PSJVTA's two predicates would be consistent with due process.  *Id.* at 14-15.  Looking for knowing and voluntary consent, *Fuld* concluded that "the PSJVTA does not constitutionally provide for personal jurisdiction over Defendants in this case."  *Id.* at 18.  Examining both factual predicates, the court concluded that "[n]either form of conduct, as alleged in this case, even remotely signals approval or acceptance of the Court's jurisdiction."  *Id.* at *19.

The *Fuld* plaintiffs made the same factual claims as the *Sokolow* Plaintiffs, alleging that Defendants "provided consular services in the United States, and conducted press-conferences, distributed informational materials, and engaged the United States media in order to influence American foreign policy and public opinion."  *Id.* at *9.  They also pled that Defendants maintained an office in the United States that was not used solely for official United Nations business and ancillary matters.  *Id.* at *9-10.  The *Shatsky* plaintiffs make all of the same claims as well.

But exactly like this Court, *Fuld* and *Shatsky* were able to resolve the constitutional question based on the PSJVTA's failure to provide valid "consent" under the Plaintiffs' allegations concerning the U.S. activities prong.  Because he was acting on a motion to dismiss, Judge Furman accepted **all** of Plaintiffs' factual allegations—but found them to be constitutionally insufficient. The alleged activities were far "too thin to support a meaningful inference of consent to jurisdiction in this country."  *Id.* at *19.  The "predicate conduct" that was alleged by the plaintiffs "would have to be a much closer proxy for actual consent than the predicate conduct at issue is here."  *Id.* at *20.  In *Shatsky*, Judge Vyskocil came to the same conclusion that "it is not reasonable to infer an intention to consent to suit in U.S. courts from the factual predicates in the PSJVTA."  *Shatsky v. PLO*, No. 1:18-cv-12355, Op. & Order, ECF 165, p. 9 (S.D.N.Y. Mar. 18, 2022).

Because the three sets of plaintiffs allege identical facts, there is no reason why the constitutional due process analysis would be any different in this case. The alleged activities simply do not show free and voluntary consent, as a matter of law, and so they cannot support jurisdiction under the Due Process Clause. As explained in *Fuld*, in the absence of the forum contacts required by *Daimler v. Bauman,* 571 U.S. 117 (2014), and *Walden v. Fiore*, 134 S. Ct. 1115 (2014), due process requires conduct "'of such a nature as to justify the fiction' that the party actually consented to submit itself to the jurisdiction of the court." *Fuld*, 2022 U.S. Dist. LEXIS 3102 at *18 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)).

This is no surprise: the Second Circuit held the same thing in *Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016) ("*Waldman I*"), finding that the same types of activities that were later listed in the PSJVTA did not create jurisdiction under the Due Process Clause. This Court should deny Plaintiffs' motion for reconsideration because further factual development regarding the U.S.-activities prong of the PSJVTA would not make any difference to the constitutional analysis.

## II.    This Court should reject Plaintiffs' two new legal arguments.

Struggling to create a new theory that focuses on the activities prong, Plaintiffs have abandoned their claim that rational-basis review applies to the PSJVTA. They instead propose two novel legal rules that have never been accepted by any court. They first create a new theory of jurisdiction out of whole cloth, called "territory-based deemed consent jurisdiction." Plaintiffs argue that Congress can deem any actions occurring within the territorial jurisdiction of the United States to constitute consent under *Burnham*'s "tag" jurisdiction. *Burnham*, however, only applies to individuals, and not to entities like Defendants. More fundamentally, it does not cure the PSJVTA's fundamental problem: the lack of any conduct by Defendants from which it would be reasonable to infer consent to jurisdiction under the Due Process Clause.

To support their new jurisdictional theory, Plaintiffs' argue that exercising jurisdiction over Defendants is fair because the PA and PLO have the benefit of operating in the territory of the United States. This argument goes nowhere, given that Congress has categorically barred any such operations. Plaintiffs' attempt to shoehorn the UN Mission into that theory fails as a matter of law both because the Mission is not considered to be in the United States and because the PSJVTA does not provide any benefit to Defendants—due to the already-existing prohibitions from operating in the United States under the ATA. Indeed, the ATA is a "wide gauged restriction of PLO activity within the United States," *United States v. PLO*, 695 F. Supp. 1456, 1471 (S.D.N.Y. 1988), that Congress enacted for the express purpose of "deny[ing] the PLO the benefits of operating in the United States." *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1484 (S.D.N.Y. 1988)

> **A.     Tag jurisdiction under *Burnham* cannot apply under *Waldman I* and because *Burnham* only applies to individuals.**

This Court should reject Plaintiffs' attempt to craft a new, hybrid theory of "territory-based deemed consent jurisdiction." Motion at 16. They argue for personal jurisdiction based on activities that the PSJVTA treats as "deemed" consent, invoking "tag" jurisdiction under *Burnham v. Superior Court of Cal.*, 495 U.S. 604 (1990). Though they now claim that *Burnham* "guides the analysis" (Motion at 15), this is the first time Plaintiffs have ever cited *Burnham* in their PSJVTA briefs. But *Burnham* does not, in any case, support this theory—courts are unanimous that it only applies to individuals, and not to entities. And Plaintiffs cannot find a single case to support their idea of "territory-based deemed consent."

Rather than dream up new forms of jurisdiction, this Court is obliged to follow *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014), which held that general jurisdiction requires an entity be "at home" in the forum. In *Waldman I*, the Second Circuit specifically found that *Daimler* governs the question of personal jurisdiction over Defendants as unincorporated associations. 835

- 7 -

F.3d at 331-32. *Waldman I* held that Defendants are not subject to general jurisdiction based on their alleged presence in the forum. *Id*. at 333-34. The Second Circuit expressly considered and rejected Plaintiffs' jurisdiction theory based on the same types of alleged activities in the forum. *Id*. Similarly, because their ATA claims do not arise from Defendants' alleged U.S. activities, *Waldman I* held that the claims also cannot support specific jurisdiction. *Id*. at 337.

But even without the binding result of *Waldman I*, "tag" jurisdiction under *Burnham* only applies to individuals and not to entities like Defendants. After *Daimler*, "'tag' jurisdiction—personal service on an individual within the state—remains a valid method of acquiring personal jurisdiction over an individual, *though not over a corporation through the persons of its officers*.'" *Mohamad v. Rajoub*, No. 17-2385, 2018 U.S. Dist. LEXIS 41238, *15 (S.D.N.Y. Mar. 12, 2018) (emphasis added). As a result of the Supreme Court's decision in *Daimler*, "*Burnham* does not apply to corporations. A court may exercise general personal jurisdiction over a corporation only when its contacts 'render it essentially at home' in the state." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1064 (9th Cir. 2014). While an individual can be "physically present" in a forum, the rules for the presence of an entity are necessarily different. *See In re del Valle Ruiz*, 939 F.3d 520, 526 n.7 (2d Cir. 2019) ("Tag jurisdiction refers to a court's exercise of personal jurisdiction over an ***individual*** who is served, and thus 'tagged,' while physically present in the forum."). Plaintiffs rely heavily on pre-*Daimler* cases (and even pre-*International Shoe* cases) because their "territory-based consent" theory is not compatible with current law.

  **B.**  **While the acceptance of reciprocal statutory benefits can support jurisdiction, the PSJVTA does not provide any benefit to Defendants.**

Plaintiffs attempt to support their "territory-based consent" theory under *Burnham* with a second new argument: they claim personal jurisdiction is reasonable because Defendants receive the benefit of operating within the United States. This position will come as a surprise to Congress,

as 22 U.S.C. §5201 states that "the PLO and its affiliates … should not benefit from operating in the United States."  To that end, Section 5202 categorically forbids anyone from receiving "anything of value" from the PLO and from expending "funds" from the PLO.  That section also bans anyone from having "an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by" the PLO and its affiliates.  22 U.S.C. §5202.  As a result, the PLO has been absolutely barred from operating in the United States.  Long before the PSJVTA, the PLO benefited from a waiver of those provisions and operated an office in Washington, D.C., but there has been no such waiver (or acceptance of such a waiver) during the PSJVTA's tenure.

Plaintiffs' position on benefits may also surprise this Court, because Plaintiffs previously argued that the PSJVTA provided no "benefit" to Defendants (as part of Plaintiffs' effort to avoid the unconstitutional conditions doctrine).  *See* ECF 1022 at 26-27 ("although Defendants identify a constitutional right they have relinquished—the right to object to personal jurisdiction—they fail to identify a 'benefit' they are receiving from the government").  Based on Plaintiffs' concession, Defendants argued at the oral argument that, because the PSJVTA provide them no "benefit," the reciprocity required by *Hess* was absent.  Hearing Tr., ECF 1029 at 50 (Defendants' counsel: "jurisdictional due process turns fundamentally on -- and I'm quoting here -- reciprocal obligations, reciprocal obligations, between the defendant and the forum").

Defendants agree that *Hess* and its progeny allow consent to be inferred from a defendant's conduct—but only when the conduct itself reflects a defendant's implicit agreement to submit to jurisdiction in exchange for the "privilege" or "benefit" of engaging in the specified activity— which the forum conditions on consent.  *See Hess*, 274 U.S. at 354-57 ("acceptance by a non-resident of the rights and privileges [to drive on public roads]" constituted "signification of his

agreement" to consent to jurisdiction); *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 632-33 (2d Cir. 2016) (explaining business registration statutes condition the benefit of doing business in the state on consent to jurisdiction in state court). *Fuld* also recognized those "cases holding that a defendant's receipt of a benefit can be deemed to be consent." *Fuld*, 2022 U.S. Dist. LEXIS 3102, *38 n.10.

The activities purportedly giving rise to "deemed" consent in this case do *not* evince any implied agreement to jurisdiction because they do not involve the acceptance of any benefit from the forum (the United States). As explained above, U.S. law already prohibits, or imposes liability for, each type of U.S. activity on which "deemed" consent is based, and the PSJVTA does not waive these prohibitions. U.S. law, in the form of its treaties with the United Nations, also already granted the UN the power to name Palestine as an invitee that fully participates in the UN through its UN Mission. *See U.S. v. PLO*, 695 F. Supp. at 1470 (Palestine's UN mission exists pursuant to the UN treaties); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione*, 937 F.2d 44, 51 (2d Cir. 1991) (Palestine's "participation in the UN is dependent on the legal fiction that the UN Headquarters is not really United States territory at all"). Given the absence of a benefit offered to Defendants in the PSJVTA, there is nothing for them to accept or reject, and thus no implied agreement to consent to jurisdiction.

The Supreme Court has long held that Congress may condition the grant of benefits on a party's willingness to consent to jurisdiction in a federal forum—but requires that the act of accepting the benefits be knowing and voluntary. In *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999), for example, the Court rejected the Government's argument that a State defendant impliedly consented to jurisdiction for false advertising claims by knowingly and voluntarily engaging in interstate marketing, after a statute

made clear that such activity would subject it to suit. *Id.* at 671-72. The Supreme Court held that "[t]here is a fundamental difference between a State's expressing unequivocally that it waives its immunity, and Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity. In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals. That is very far from concluding that *the State* made an 'altogether voluntary' decision to waive its immunity." *Id.* at 680-81. "'[C]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights.'" *Id.* More is required to show that the defendant "*in fact consents* to suit." *Id.* at 680 (emphasis added).

As explained by Judge Furman, *College Savings Bank* "all but compels the conclusion that personal jurisdiction is lacking here." *Fuld* at 22-23. Quoting the Supreme Court, he continued that "although Congress has put the PA and PLO 'on notice that Congress intends to subject [them] to suits' in the United States …. 'That is very far from concluding that' either the PLO or the PA 'made an altogether voluntary decision to' submit to such suits." *Id.*, quoting *College Savings Bank*, 527 U.S. at 680-81. Plaintiffs' theory that notice is all that is required for consent "would effectively mean that there are no due process limitations on the exercise of personal jurisdiction. Congress or a state legislature could provide for jurisdiction over any defendant for any conduct so long as the conduct post-dated enactment of the law at issue." *Id.* at 27.

The "benefits" posited by the Plaintiffs are in fact no benefits at all, and are therefore constitutionally inadequate to imply or deem consent. Similarly, Plaintiffs have asserted "federal interests" since the beginning of this case but this Court, *Waldman I, Fuld*, and *Shatsky* uniformly rejected the claim that the due process standards for "knowing and voluntary" should be undermined by the Government's interest. In the end, "the requirement that a court have personal

jurisdiction flows not from Art. III, but from the Due Process Clause ... and protects an individual liberty interest"—as such, personal jurisdiction is not a Congressional gift to litigants that can be taken away at will. *Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee*, 456 U.S. 694, 702, 102 S. Ct. 2099, 2104 (1982).

### III. This Court should reject Plaintiffs' factual claims regarding the PSJVTA's U.S. activities prong.

This Court previously considered the parties arguments whether: (1) certain public notaries were acting on behalf of Defendants as their agents; (2) the activities of Palestine's UN Mission are either official UN business or "ancillary" thereto; and (3) the "use" of Palestine's UN Mission "office" is defined by the "activities" of Mission personnel. Plaintiffs now merely repeat those prior arguments. This Court need not entertain these arguments again to reaffirm that application of the PSJVTA to Defendants is unconstitutional. But if this Court does engage in any further factual resolution, the record evidence demonstrates that none of the activities of the PA or PLO are sufficient to trigger the U.S. activities prong.

### A. Plaintiffs' motion for reconsideration simply repeats factual claims they made in previous briefs.

This Court has already considered all of the factual claims made in Plaintiffs' motion for reconsideration. Reconsideration is improper where a party "attempts to take a second bite at the apple." *Dunnegan v. 220 E. 54th St. Owners, Inc.*, 2021 U.S. Dist. LEXIS 90810, at *3 (S.D.N.Y. May 12, 2021) (Daniels, J.). This Court rejects such arguments that are merely *"regurgitating arguments made previously at oral argument and in its briefs." Id.* (emphasis added). This Court therefore need not indulge Plaintiffs' request to revisit the same issues and facts this Court previously considered.

Plaintiffs claimed in previous briefs, using the same evidence, that certain American notaries are actually Defendants' agents. ECF 1015 at 17-18, 21 ("Defendants have offered

consular services … through consular agents located in the United States, including … Awni Abu Hbda").  Defendants responded that the alleged activities, even if true, would not satisfy the PSJVTA.  ECF 1021 at 20 (pointing out that document authentication "would easily be considered 'incidental' or 'supplemental'").  Plaintiffs again made those claims at the oral argument this Court held in May 2021.  ECF 1029 at 25, 27-28.  Defendants then directed the Court to the actual depositions (*see* ECF 1031), which showed that Defendants exercise no control over the notaries, have not delegated them any authority, and do not compensate them in any way.  *See* ECF 1034, taking judicial notice of Defendants' brief in *Fuld*, ECF 42, p. 22-23; *id*. at *Fuld*, ECF 50 at 9.  *See infra* at III.B.1 (discussing control as a required element of agency).

Similarly, this Court has already considered Plaintiffs' evidence about social media posts, website posts, and events like President Abbas' press conference.  *See* ECF 1015 at 18 (Abbas "held a press conference in New York City" and "Defendants maintain and regularly update a website and Twitter and Facebook accounts").  In response, Defendants pointed out that President Abbas' press conference together with an Israeli statesman was a "foreign official" meeting and that the point of the conference was to discuss the Security Council meeting President Abbas had just left—thus qualifying under *both* the government official and UN business PSJVTA subsections.  *Id*. at 13-14.  Defendants also showed that all "written communications" quoted in Plaintiffs' brief "plainly fall within the UN's definition of 'official' business, as they are official UN communications archived on the UN's website with official UN designations."  ECF 1021 at 13.  Defendants further pointed out that their Twitter and Facebook accounts parallel the official social media accounts of the U.S., U.K., and Holy See—and that the Mission's social media accounts discuss subjects that fall "squarely within ongoing, official UN General Assembly and Security Council matters."  *Id*. at 13-14.

Plaintiffs also discussed the social media posts at great length at the May 2021 hearing. ECF 1029 at 26-30, 38-40. This Court, however, pointed out that successful UN business in the modern world requires more than closed-door meetings between diplomats:

> [T]here are a lot of things that you do to engage in UN business. …. You may have to persuade other members of the UN of your position that's going to be addressed at the UN. You may need public support for that position. You may need to communicate to your constituents, and even those who disagree with you, why you're taking that position at the UN and why that's a legitimate position to take.

ECF 1029 at 41. In their motion for reconsideration, Plaintiffs yet again offer their exceedingly narrow view of how they think the UN should conduct its own business—rather than addressing the actual activities of today's UN bodies and UN missions.

The parties have also repeatedly briefed Plaintiffs' claim that the UN Mission office itself triggers the factual predicates of the PSJVTA because Defendants' social media posts and various meetings usually occur in that office. *See* ECF No. 1015 at 16-17, 19-21. Among other things, Defendants explained that the activities are official business and that the Mission's office is not considered to be within the United States. ECF No. 1021 at 11-12. None of these arguments are anything that this Court has not seen multiple time—itself a reason to deny Plaintiffs' motion.

### B.    If this Court reaches these issues, it should hold that Plaintiffs' evidence does not satisfy the factual predicates of the PSJVTA.

As discussed above, even assuming that Plaintiffs have met the U.S. activities prong, the alleged conduct is "too thin" to imply submission to jurisdiction. *Fuld* at 19. None of the facts are in dispute—the notaries' deposition testimony is undisputed, the Twitter and Facebook posts are in the record. The ***only*** issue is a legal one—whether those facts show that the Palestinian UN Mission is undertaking activities in the United States sufficient to show that the PA and PLO have freely and voluntarily submitted to personal jurisdiction. Plaintiffs, on the other hand, treat constitutional due process as a game of "gotcha," as if tweets about the Israel-Palestine conflict

- 14 -

that arguably cross an imaginary line (which only Plaintiffs can see) were enough to satisfy due process.

If this Court nevertheless opts to make formal fact findings regarding the "activities" prong of the PSJVTA, it should find that Plaintiffs have not met their burden of proving that the predicate has been met in the first instance. ECF 1029 at 3 (Plaintiffs' counsel: "It's my burden to show by a preponderance of the evidence that the statute is being met."). All of Defendants' activities are well within the PSJVTA's exclusions under 18 U.S.C. 2334(e)(3). The state-licensed notaries testified that Defendants have no control or authority over them. The social media and civil society activities of Palestine's UN Mission are *exactly* the same as the activities of other UN Missions and are focused on the Mission's official business as explicitly laid out by the relevant UN committee. And the Mission's physical office is not "in the United States" in any case under the treaties between the United States and the United Nations.

### 1.    The "consular services" evidence proves that the state-licensed notaries are not agents of the PA or PLO.

The depositions in the record prove that the notaries are not agents of the PA or PLO. In an agency relationship, "the principal must maintain control over key aspects of the undertaking." *Comm. Union Ins. v. Alitalia Airlines, SPA*, 347 F.3d 448, 462 (2d Cir. 2003); *In re Tribune Co. Fraud. Conveyance Litig.*, 946 F.3d 66, 79 (2d Cir. 2019) (same). As such, an "agency relationship exists *only* if the agent is acting on behalf of and subject to the control of the principal." *APL Co. v. Kemira Water Sol's*, 890 F. Supp. 2d 360, 369 (S.D.N.Y. 2012) (citation omitted). Under both federal and New York law, "[t]he element of control often is deemed the essential characteristic of the principal-agent relationship." *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 377 (S.D.N.Y. 2013) (citation omitted). Under the Restatement, which Plaintiffs cite, "[a]n essential element of

agency is the principal's right to control the agent's actions."  Restat 3d of Agency § 1.01, cmt f.
Plaintiffs failed to show that Defendants controlled the notaries in any way.

Both notaries testified repeatedly that (1) they never conducted notarial services on behalf
of Defendants;[1] (2) they do not have, nor have they ever had, authority to act on behalf of
Defendants;[2] (3) Defendants had no power to control or limit their actions;[3] and (4) Defendants
never compensated them.[4]  The alleged "consular services" are nothing more than the traditional
activities of *any* state-licensed notary public.  Individuals go to these notaries, who are licensed
under state law, to have documents notarized.[5]  Where requested by a client, they send the
notarized documents to the PLO consulates in *Canada* or *Mexico* for authentication.[6]  These
actions are performed "on behalf of" their clients, not pursuant to any authority granted by
Defendants.

It is well-established that public notaries do not act on behalf of any government—not even
the licensing government.  *Worthington v. Palmer*, No. 3:15-410, 2015 U.S. Dist. LEXIS 159441,
*16 (E.D. Va. Nov. 24, 2015) ("a notary public is not a state official"); *Sanders v. Cnty of Bradford*,
No. 3:11-01723, 2014 U.S. Dist. LEXIS 184620, at *12 n.6 (M.D. Pa. Nov. 21, 2014) (same);
*Hieshetter v. Amann*, No. 1:19-725, 2020 U.S. Dist. LEXIS 10287, at *18 (W.D. Mich. Jan. 22,
2020) (same); *Ezell v. Payne*, No. 16-1166, 2017 U.S. Dist. LEXIS 31809, at *19 (W.D. La. Jan.
31, 2017) (same).  As explained in *Williams v. Nat'l Notary Assoc.-Fla.*, No. 3:08-357, 2008 U.S.
Dist. LEXIS 118569, *11-12, 16 (M.D. Fla. Nov. 4, 2008), "[w]hile performing functions that

---

[1] ECF 1035-9, Awni Abu Hbda Dep. (04/07/2021) at 155:9-18 ("Hbda Dep."); ECF 1035-10, Fuad Ateyeh Dep. (04/08/2021) at 69:11-23 ("Ateyeh Dep.").
[2] Hbda Dep. at 92:8-15; Ateyeh Dep. at 22:24-24:23.
[3] Hbda Dep. at 92-32, 128-29, 199, 155; Ateyeh Dep. at 22-24, 43, 46.
[4] Hbda Dep. at 93:9-12; 119:12-15, 149:6-25; Ateyeh Dep. at 43:15-23.
[5] Hbda Dep. at 64:23-65:4; Ateyeh Dep. at 31:7-12; Hbda Dep. at 36:22-24 (commissioned as a notary by New Jersey); Ateyeh Dep. at 19:24-25 (licensed as a notary by California).
[6] Hbda Dep. at 39:23-40:20, 56:23-57:7, 61:18-20, 75:10-16, 83:12-84:5, 90:19-91:4, 97:4-98:5; Ateyeh Dep. at 31:13-20, 32:21-33:10.

have some connection to activities in which the State is involved, [notaries public] do not act for the state, and their actions are not fairly attributable to the State."

Plaintiffs rely on *Sanchez-Ramirez v. Consulate Gen. of Mexico*, No. 12-3485, 2013 U.S. Dist. LEXIS 109888, *16 (N.D. Cal. Aug. 5, 2013), but that notary was "employed by defendant Consulate General of Mexico," *id*. at *2, received "life insurance, an annual bonus[,] … thirty days' vacation," "health benefits and relief from … taxes." *Id*. at *29. He held an A-2 visa, which applies to travel "on behalf of [a] national government *to engage solely in official activities for that government*." *Id*. at *16 n.2 (citation omitted; emphasis added). The reasoning in *Sanchez* does not apply to notaries that are not employed, paid, or controlled by Defendants.

The United States authenticates documents from foreign notaries in the same way the PLO consulates in Canada and Mexico authenticate documents from American notaries. The State Department advises Americans abroad that they can "have a document notarized by a local foreign notary" and then U.S. consular officers will authenticate the document for use in the United States.[7] Those foreign notaries are not acting for the U.S. government; only U.S. consular officers act on behalf of the U.S. Government. In the same way, PLO consular employees in Canada and Mexico act on behalf of the PLO, but the "foreign" U.S. notaries do not when they send a notarized document to Canada or Mexico to be authenticated there.[8] A finding otherwise would result in

---

[7] *Notarial and Authentication Services of U.S. Consular Officers Abroad*, State Department Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/records-and-authentications/authenticate-your-document/Notarial-Authentication-Services-Consular.html ("How do you get a documents notarized overseas?").

[8] *Compare id.* ("What is authentication? An authentication is the placing of the consular seal over the seal of a foreign authority whose seal and signature is on file with the American Embassy or Consulate. A consular authentication in no way attests to the authenticity of the contents of a document but merely to the seal and signature of the issuing authority."), *with* Hbda Dep. at 62-22 ("Q. But the purpose of submitting the document to the foreign embassy is to obtain a signature or a stamp on the document from an official of the government whose embassy that is; is that correct? A. Yes; correct."); *id.* at 72:13-75:16 (describing the seals and stamps used by the General Palestinian Delegation in Canada when authenticating documents notarized by Mr. Hbda for his clients); Ateyeh Dep. at 46:20-47:16 (explaining the seals used by the Special Palestinian Mission in Mexico when authenticating documents notarized by Mr. Ateyeh for his clients).

thousands of foreign notaries becoming U.S. agents, to the surprise of both the notaries and the U.S. government.

Plaintiffs also cite actions taken by the PLO's delegation in Washington, DC—which was closed long before the January 2020 effective date of the PSJVTA. Plaintiffs claim that Mr. Hbda was listed on a website as an Arabic-speaking notary helping Palestinian-Americans, but the website was of the PLO Delegation to the United States, which closed before the PSJVTA was passed.[9] Plaintiffs also refer to a "pre-printed contract," yet that agreement was sent by the PLO's U.S. delegation *in 2014* and was never signed by either notary.[10] If those notaries were agents of Defendants, then they would have had to register under FARA or face prosecution. Plaintiffs cite to only one FARA statement, but it was filed by an *employee* of Defendants in their Washington office from 2012, Mr. Hakam Takash. Motion at 10. Plaintiffs fail to disclose that Mr. Takash was the *Palestinian Consul* to the United States when the Washington delegation was open. In any case, Ambassador Mansour confirmed that Palestine had not provided any consular services in the United States after January 2020.[11] Unsurprisingly, therefore, no notary is registered under FARA as an agent of Defendants, and the U.S. government—an intervener here—has never suggested that they should have registered.

> **2.    Palestine's UN Mission performs exactly the same activities as other UN Missions—all of which are UN business.**

Just like every other mission to the United Nations, Palestine's UN Mission has a website, a social media account, and engagement with civil society organizations. Plaintiffs argue that the PSJVTA is a gag order to stop the UN Mission from complaining about Israel's human rights abuses, because discussing the Israel-Palestine question is not UN business. *See* Motion at 23-24,

---

[9] Hbda Dep. at 115-118
[10] Hbda Dep. at 128-130, 132-136.
[11] Mansour Dep. at 146-48.

30.  Yet the Israel-Palestine question is an ***omnipresent*** topic at the UN, with formal resolutions and speeches condemning Israel's violence against Palestinian civilians[12] and UN Missions tweeting about Israel's appalling record in Palestine.[13]  As a result, Israel complains about being too-often criticized by the UN.[14]  Plaintiffs similarly argue that Palestine's UN Mission cannot discuss "the eradication of poverty," Motion at 25, but that is also a frequent topic for social media posts for nearly all UN organizations.[15]  Plaintiffs ignore the modern reality that the UN and UN Missions frequently communicate through websites and social media about the Israel-Palestinian conflict: public discussion of that conflict is *most certainly* official UN business.[16]

Because Congress did not define what constitutes "official" business, this Court should use the UN's own view that extends to anything "directly related" to a "mission or project."  UN Juridical Yearbook at 154-55 (1985).  More specifically, the UN has provided its own description of the official business of Palestine's UN Mission.  As explained by the UN Committee on the Exercise of the Inalienable Rights of the Palestinian People ("CEIRPP"), the Palestinian mission is expected to "participate[] in the work of [the CEIRPP]" as part of its UN-invitee status.[17]  That

---

[12] *See, e.g.,* Meetings Coverage, GA/12325 (António Guterres: "If there is a hell on earth, it is the lives of children in Gaza") (May 20, 2021), G.A. Res. No. A/C.4/73/L.18 (Nov. 14, 2018) (condemning "the excessive use of force by the Israeli occupying forces against Palestinian civilians, resulting in the death and injury of civilians"); G.A. Res. No. A/73/L.32 (Nov. 23, 2010) (condemning "acts of violence, intimidation and provocation by Israeli settlers against Palestinian civilians … settlement construction and expansion, home demolitions, evictions ...").

[13] *See, e.g.,* Twitter: @UKUN_NewYork ("What hope is there for 2-state solution when communities are simply removed from the map?") (Oct 14, 2016), @FranceONU (Feb. 24, 2020) ("No further settlements. No colonization."); @Turkey_UN (Apr. 23, 2020) ("All illegal settlement and demolition activities must stop.").

[14] *UN condemned Israel 17 times in 2020*, Times of Israel (Dec. 23, 2020), at: www.timesofisrael.com/un-condemned-israel-17-times-in-2020-versus-6-times-for-rest-of-world-combined/

[15] *See, e.g.,* @UNDP (discussing "Int'l Day for the Eradication of Poverty) (Oct. 17, 2020); @ChinaMission2UN (China "is ready to cooperate with other UN member states … in poverty alleviation") (Apr. 26, 2022).

[16] *See, e.g.,* @Turkey_UN (discussing UN meeting about Palestine and supporting "an independent, sovereign & contiguous State of #Palestine") (Feb. 8, 2022); @MYNewYorkUN1 (Malaysian UN Mission expressing "Malaysia's support to the Palestinian cause"); *see also* G.A. Res. No. A/C.4/73/L.18 (Nov. 14, 2018) which condemns "the excessive use of force by the Israeli occupying forces against Palestinian civilians, resulting in the death and injury of civilians," and G.A. Res. No. A/73/L.32 (Nov. 23, 2010), which condemns "acts of violence, intimidation and provocation by Israeli settlers against Palestinian civilians … settlement construction and expansion, home demolitions, evictions ...."

[17] Report, CEIRPP, UN Doc. A/75/35, at: https://www.un.org/ga/search/view_doc.asp?symbol=A/75/35, ¶ 31.

work focuses on efforts to "mobilize the international community to stay steadfast in its support for the inalienable rights of the Palestinian people" and to raise "awareness of the political, human rights and humanitarian developments on the ground … to mobilize the broadest possible international support."[18]

The CEIRPP "has a mandate from the United Nations General Assembly" to network with "more than 1,000 civil society organizations from all regions of the world, active on the question of Palestine."[19]  Together with Palestine's UN Mission, the CEIRPP and other UN bodies and missions use the internet to communicate with each other and with the international community. These activities are not "propaganda," but instead are the official UN business at the heart of one of the longest-standing and most important UN issues: the Question of Palestine.  UN G.A. Res. 3236, A/RES/3236 (XXIX) (Nov. 22, 1974).

Other UN organs, missions, and observers engage in exactly the same kinds of official activities as Palestine's UN Mission.  American news media regularly interview UN Ambassadors on issues important to the United Nations.  CNN interviewed the UN Ambassador from Morocco; it also covered a New York press conference given by China's UN Ambassador.[20]  NBC interviewed Iran's UN Ambassador, and Reuters interviewed Ethiopia's UN representative.[21]  The Saudi Arabian UN Ambassador spoke with an English-language Chinese news service about the

---

[18]Programme of Work for 2020, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7, 2020), at: https://www.un.org/unispal/document/palestinian-rights-committee-programme-of-work-for-2020-a-ac-183-2020-1/.
[19] United Nations, UNISPAL, Civil Society and the Question of Palestine:  Overview,  at: https://www.un.org/unispal/data-collection/civil-society/.
[20] CNN News Update (Sept. 22, 2020), at: https://www.cnn.com/2021/03/09/world/meanwhile-in-america-march-9-intl/index.html (covering a news conference held in New York by China's UN Ambassador); CNN News (Nov. 23, 2020), at https://www.cnn.com/videos/world/2020/11/23/connect-the-world-omar-hilale-western-sahara.cnn (interview with Morocco's UN ambassador).
[21] NBC News Interview (Jan. 26, 2021), at https://www.nbcnews.com/politics/national-security/iran-s-un-ambassador-says-iran-waiting-president-biden-make-n1255608 (interview with Iran's UN ambassador); Reuters News (Mar. 29, 2021), at https://www.youtube.com/watch?v=qIbZIpzUoXk (interview with Ethiopia's UN ambassador).

Israeli-Palestinian issue.[22]  UN missions of all kinds are encouraged to frequently talk with civil society organizations and university and student groups.[23]

Plaintiffs' counter arguments are inapt.  They claim that a member of Iran's UN Mission was indicted for media appearances on behalf of Iran.  He was *not* a member of Iran's UN mission—but instead received secret, illegal payments improperly funneled through that mission.[24] The defendant *admitted* he was not a "diplomat" of Iran's UN mission.  He was therefore indicted under the Foreign Agents Registration Act (FARA), which does not apply to UN missions.  By contrast, the United States—an intervener here—has long been aware of the media activities of Palestine's UN Mission, but does not claim that the Mission has gone beyond the parameters of official UN business, has failed to register under FARA, or that it has broken any law prohibiting Palestinian government activity in the United States.  *See* ECF 1043 (brief of United States).

Plaintiffs also ignore that Palestine's UN Mission has changed significantly since the 1991 TV interviews that were viewed as not in furtherance of its UN status in *Klinghoffer.*  As this Court noted, the PLO "participated in at least 158 public interviews" in just a few years, mostly on "on major national news networks such as CNN, Fox News Channel, ABC, and MSNBC."  *Sokolow v. PLO*, 2011 U.S. Dist. LEXIS 36022, *19-21 (S.D.N.Y. Mar. 30, 2011).  However, Palestine now debates in the General Assembly, addresses the Security Council, and, in 2012, gained

---

[22] CGTN America (Sept. 10, 2020), at https://america.cgtn.com/2020/09/10/un-general-assembly-interview-with-saudi-ambassador-to-un (interview with Saudi Arabia's UN ambassador); MSNBC (May 30, 2019), at https://www.msnbc.com/ali-velshi/watch/israeli-amb-to-un-on-new-vote-political-chaos-in-israel-60583493582 (interview with Israel's UN ambassador).

[23] *See Francophone panel discussion marked the launch of the festival*, Princeton University, at https://fit.princeton.edu/node/4156 (discussion panel with UN representatives from Mali, Ivory Coast, and Romania); *Liechtensteinian Ambassador Christian Wenaweser critiques current state of the UN*, Daily Princetonian (Feb. 28, 2020), at https://www.dailyprincetonian.com/article/2020/02/princeton-christian-wenaweser-un-liechtenstein-ambassador-trump-indifferent; Oxford Union Society (Mar 7, 2021), at https://www.youtube.com/watch?v=iWDv-mfdNmA (event featuring the European Union's UN ambassador).

[24] *See* Indictment [Dkt.6], Affidavit [Dkt. 16], Motion [Dkt. 44], *U.S. v. Afrasiabi*, No. 21-cr-0046 (E.D.N.Y.).

"Observer State" status[25] allowing it to, *inter alia*, chair the Group of 77.[26]  Its current speech is exactly like that of every other UN mission—and while the U.S. sued (in *U.S. v. PLO*) to stop the *Klinghoffer* media blitz, subsequent administrations have seen no problem.

Palestine's UN Mission now benefits from strong protections, which include "immunity from legal process in respect of words spoken and written or any act performed in the exercise of the observer functions."  UN Juridical Yearbook, Chapter VI, § A(13) (2000).  As such, "[a]ny measure which might impede … its ability to discharge its official functions" would "contravene" the UN Charter, the Headquarters Agreement, and "General Assembly resolutions."  *Id.*  The United States later warned courts of the "political and legal quagmire" that could result from infringing upon the Palestinian UN Mission's protected status.  U.S. Statement of Interest, *Ungar v. Palestinian Auth.*, No. 18-302, at 25-27 (S.D.N.Y. Sept. 12, 2005).  In view of Palestine's continually-evolving status at the United Nations – gaining additional rights in 1998, 2000, 2012, and 2018 – Plaintiffs' reliance on inapt sources from the 1990s (*see* Motion at 27-28) is a strange choice to seek to limit the scope of the UN Mission's current official duties.

### 3. The office of Palestine's UN Mission is specifically exempted from jurisdictional consideration by the PSJVTA.

While Plaintiffs claim that the UN Mission's physical office triggers the PSJVTA, the Second Circuit already rejected that argument in *Waldman v. PLO*, 925 F.3d 570, 575 (2d Cir. 2019).  When Plaintiffs pointed to the same types of activities, the Second Circuit explained that "the plaintiffs in this case have not shown that the defendants have established or continued to

---

[25] UN G.A. Res 67/19, *State of Palestine in the United Nations*, A/RES/67/19 (Nov. 29, 2012).
[26] UN Press Release, *State of Palestine to Gain Enhanced Rights, Privileges in General Assembly Work, Sessions When It Assumes 2019 Group of 77 Chairmanship* (Oct. 16, 2018) *at*: https://www.un.org/press/en/2018/ga12078.doc.htm.

maintain an office or other facility within the jurisdiction of the United States. …. The Observer Mission is not considered to be within the jurisdiction of the United States." *Id*.

The leading case on the application of the treaty-based rights of Palestine's UN Mission is *United States v. PLO*, which has been accepted as binding law by the United States.  That case explains how "the United Nations has, from its incipiency, welcomed various non-member observers to participate in its proceedings," including the Palestinian Mission, which "is present at the United Nations as its invitee."  695 F. Supp. at 1458-59.  When the UN's right to invite Palestinians was challenged, the "court upheld the presence of a PLO representative in New York." *Id*.  Since that time, Palestine "has maintained its Mission to the United Nations without trammel, largely because of the Headquarters Agreement" and the U.S. "has, for fourteen years, acted in a manner consistent with a recognition of the PLO's rights in the Headquarters Agreement." *Id*. at 1459, 1466.  Those rights come "not only from the language of the Headquarters Agreement but also from forty years of practice under it." *Id*. at 1465.

Consistent with decades of U.S. compliance with the Headquarters Agreement, the PSJVTA's provisions exclude the UN Mission as a basis for deeming consent to jurisdiction.  The PSJVTA provides that certain offices are considered "in the United States" for PSJVTA predicate purposes only if they are not "exempted by paragraph (3)(A)." § 2334(e)(4).  In turn, paragraph 3(A) provides that any office is exempt if it is "used exclusively for the purpose" of conducting UN business or meeting with foreign officials. § 2334(e)(3)(a).  Furthermore, and as discussed in more detail below, with respect to Defendants' activities at their offices, courts may not consider "any personal or official activities conducted ancillary to" Defendants' official UN business. § 2334(e)(3)(F).

Plaintiffs argue that Palestine's UN Mission is "in the United States" under the rule of construction in §2334(e)(4), which specifically exempts any office also "exempted by paragraph (3)(A)." But the only possible purpose of the PSJVTA's exemption is to help preserve the "legal fiction that the UN Headquarters is not really United States territory at all." *Klinghoffer*, 937 F.2d at 51. Because activities must be performed "in the United States" to trigger the U.S. activities predicate, the Mission's communications and other activities performed in the Mission office cannot satisfy the statute's factual predicates. Plaintiffs' reasoning is ultimately circular, arguing that the UN Mission office is "in the United States" because activities performed inside that office render that office "in the United States."

Further, as explained above, the social media and civil society activities of Palestine's UN Mission personnel—whether inside or outside of Mission premises—are the same as those of other UN Missions, and are focused on the Mission's official business as explicitly described by the relevant UN committee on the question of Palestine. *See supra* at III.B.2. Plaintiffs are also wrong to claim that *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1130-31 (2019), found a "violation" of the ATA by Defendants. *See* Motion at 25. The D.C. Circuit was only contrasting the plaintiffs' allegations that Defendants had violated the ATA (having taken their factual claims at face value) with the formal Executive-branch "waiver" that was necessary to trigger the Anti-Terrorism Clarification Act. *Klieman*, 923 F.3d at 1131.

Plaintiffs also assume that Congress meant to overturn the longstanding protections of the Headquarters Agreement without actually saying so. This turns the canon of construction on its head. But the rule is that Congress "would have said so" when it intends to abrogate the decades-old protections in the treaty. *Enron Power Mktg. v. Luzenac Am.*, 2006 U.S. Dist. LEXIS 62922, *36 (S.D.N.Y. Aug. 31, 2006) ("Congress is unlikely to intend any radical departures from past

practice without making a point of saying so.") (citation omitted).  Indeed, the only possible purpose of the PSJVTA's rule-of-construction is to help preserve the "legal fiction that the UN Headquarters is not really United States territory at all."  *Klinghoffer*, 937 F.2d at 51.  The Mission's communications and other activities performed in the Mission office therefore cannot satisfy the statute's factual predicates.

Plaintiffs also cite to 22 U.S.C. § 4309a, a statute that undermines their own claims.  It explicitly acknowledges the United States' "obligation" under the Headquarters Agreement to allow any individuals "<u>authorized by the United Nations</u> to conduct official business" to obtain "facilities in order to conduct such activities within or in proximity to the United Nations Headquarters District."  § 4309a(a)(1) (emphasis added).  The statute reserves the ability for "reasonable regulation including regulation of the *location* and *size* of such facilities."  *Id*. (emphasis added).  This reservation applies to all UN missions, is of extremely limited scope, and has nothing to do with the issues before this Court.

### 4.    This Court should use the natural meaning of "ancillary" to describe activities supplemental and adjacent to official UN business.

This Court need not decide the scope of the PSVJTA's "ancillary" catch-all because all of the actions of the UN Mission fall under official UN business.  But the statute does allow for "any personal or official activities" ancillary to UN business or government meetings.  PSJVTA, §2334(e)(3) (emphasis added).  Ancillary means "supplementary," Black's Law Dictionary (11th ed. 2019), "incidental or peripheral," The Wolters Kluwer Bouvier Law Dictionary Desk Ed. (2012), or "subordinate, subsidiary," Webster's Third New Int'l Dictionary, Unabridged (2002). The Oxford English Dictionary (Online ed., 2020) lists hotels, road vehicles, and canals as services ancillary to a railway.  Those services are "supplementary" but not essential or necessary to the railway's operations—the very words Plaintiffs use to define ancillary.  Moreover, the word "any"

must be broad because very few, if any, personal activities would qualify as "necessary" to perform official UN business.

The PSJVTA thus allows Defendants to "meet with advocates regarding relevant issues, make public statements, and otherwise engage in public advocacy and civil society activities that are ancillary to the conduct of official business without consenting to personal jurisdiction." Statement of Sen. Leahy, Cong. Rec.—Sen., S267, 116th Cong. (Jan. 28, 2020). Worried about an earlier version of the bill (which was supported by Senator Lankford), Senator Leahy formed a "bipartisan" group for a "negotiation that resulted in" the ancillary activities exemption on the "understand[ing] that it is in our national interest to permit certain activities related to the official representation of the PA and PLO." *Id.* Senator Leahy voted for the final bill. Having voted for the bill *and negotiated the language at issue*, his views deserve "special weight." *Reynolds-Naughton v. Norwegian Cruise Line*, 386 F.3d 1, 5 (1st Cir. 2004) ("the sponsors of the language [at issue] ... would ordinarily get special weight").

Plaintiffs, on the other hand, rely on Senator Lankford. He sponsored an early version of the bill *before* Senator Leahy negotiated the introduction of the "ancillary" exception. Once the language was changed, however, he voted *against* the bill. *See* S7182, 116th Cong. (Dec. 19, 2019). Senator Lankford's comments, quoted by Plaintiffs, were made after passage of the Omnibus bill was certain, and he sought to minimize the "ancillary" exception by describing the bill that he originally sponsored—rather than the bill Congress actually passed. Plaintiffs note Defendants' lobbying efforts, yet Plaintiffs also lobbied Congress regarding Senator Lankford's version of the PSJVTA.[27] The difference is that it was Senator Leahy's version of the bill that actually became law, and not the Lankford-sponsored version that Plaintiffs sought.

---

[27] See Arnold & Porter, Lobbying Disclosure Act Reports for Plaintiffs in Sokolow v. PLO, 2018-2020, available at https://www.opensecrets.org/federal-lobbying/clients/reports?cycle=2018&id=F219414.

Finally, Plaintiffs cite *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 228-34 (1992), which distinguished between activities that are "essential" and those that are "ancillary" because they have a "connection" to an activity. But *Wrigley* did not interpret the word ancillary in a statute, rather "ancillary" was the Supreme Court's shorthand description for the "independent business function" test under tax law. But even under the independent business function test, the Supreme Court found that ancillary activities were those that a company would not "have reason to engage in anyway" without the proper purpose. *Id.* The activities of the UN Mission easily meet that test—the Mission and its Ambassadors would not even *exist* without the United Nations. Moreover, *Wrigley* and cases interpreting *Wrigley* take broad views of what is "entirely ancillary," including advertising and educating consumers and downstream sellers as "ancillary" to sales. *See Blue Buffalo Co. v. Comptroller*, 221 A.3d 1130, 1139-40 (Md. Ct. Spec. App. 2019). If education and advertising are ancillary to selling chewing gum, they are at least equally ancillary to selling Palestine's UN agenda. That said, this Court need not decide the scope of the "ancillary" catch-all because the actions of Palestine's UN Mission fall under official UN business—and because those facts, in any case, do not show consent under the Due Process Clause.

## Conclusion

Plaintiffs' motion for reconsideration does nothing but recycle previously-made factual arguments (and require Defendants to repeat their own arguments). But even taking every factual allegation by Plaintiffs at face value, those facts are insufficient to show "free and voluntary" consent to personal jurisdiction under the Constitution. This Court thus need not make any further factual findings to adhere to its conclusion that the PSJVTA violates Due Process under either or both of its factual predicates. This Court should deny Plaintiffs' motion for reconsideration because it pushes novel legal arguments unmoored from *Daimler* and *Waldman I* but also restates the same evidence that this Court has reviewed many times before.

Respectfully submitted,

Squire Patton Boggs (US) LLP

Gassan A. Baloul (GB-4473)
gassan.baloul@squirepb.com
Mitchell R. Berger (MB-4112)
mitchell.berger@squirepb.com
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

*Attorneys for Defendants Palestine Liberation
Organization and Palestinian Authority*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2022, a true and correct copy of the foregoing was filed with the Clerk via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

/s/ *Gassan A. Baloul*
Gassan A. Baloul (GB-4473)
