UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK I. SOKOLOW, et al.,

                       *Plaintiffs*,

     v.

PALESTINE LIBERATION ORGANIZATION,
et al.,

                       *Defendants*.

Case No. 04 Civ. 397 (GBD)

---

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION
FOR RECONSIDERATION AND ADDITIONAL FINDINGS OF FACT**

ARNOLD & PORTER
    KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
T: (212) 836-8000
F: (212) 836-8689

*Attorneys for Plaintiffs*

May 25, 2022

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

PROCEDURAL DEVELOPMENTS ........................................................................... 1

FACTS ......................................................................................................................... 2

      A.    Defendants' Notarization Activities ........................................................ 2

      B.    Defendants' Public Relations Activities ................................................ 7

      C.    Defendants' U.S. Facility ..................................................................... 10

APPLICATION OF FACTS TO THE STATUTE ...................................................... 10

      A.    Defendants' Notarization Activities ...................................................... 10

      B.    Defendants' Public Relations Activities .............................................. 10

      C.    Defendants' U.S. Facility ..................................................................... 15

APPLICATION OF DUE PROCESS CASE LAW .................................................... 15

CONCLUSION .......................................................................................................... 18

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Baltimore & Ohio Railroad Co. v. Harris,*
   79 U.S. (12 Wall.) 65 (1870) ................................................................16

*Bostock v. Clayton Cnty., Georgia,*
   140 S. Ct. 1731 (2020).........................................................................15

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985)..............................................................................15

*Burnham v. Superior Ct.,*
   495 U.S. 604 (1990) .........................................................1, 15, 16, 17

*Capitol Recs., LLC v. Vimeo, LLC,*
   826 F.3d 78 (2d Cir. 2016)....................................................................11

*Comm'r v. Clark,*
   489 U.S. 726 (1989)..............................................................................11

*Cowen v. Bank United of Texas, FSB,*
   70 F.3d 937 (7th Cir. 1995) ....................................................................3

*Daimler AG v. Bauman,*
   571 U.S. 117 (2014)..............................................................................16

*Epic Sys. Corp. v. Lewis,*
   138 S. Ct. 1612 (2018)...........................................................................11

*Fuld v. Palestine Liberation Org.,*
   No. 20 Civ. 3374 (JMF) (S.D.N.Y. June 7, 2020) ............................1, 15

*Great Minds v. Fedex Off. & Print Servs., Inc.,*
   886 F.3d 91 (2d Cir. 2018).......................................................................3

*Hess v. Pawloski,*
   274 U.S. 352 (1927)..............................................................................16

*Hoellen v. Annunzio,*
   468 F.2d 522 (7th Cir. 1972) ................................................................12

*In re Tribune Company Fraudulent Conveyance Litigation,*
   946 F.3d 66 (2d Cir. 2019).......................................................................5

*In re United States,*
    945 F.3d 616 (2d Cir. 2019)................................................................12

*Klinghoffer v. SNC Achille Lauro,*
    795 F. Supp. 112 (S.D.N.Y. 1992)...............................................8, 12

*Klinghoffer v. SNC Achille Lauro,*
    937 F.2d 44 (2d Cir. 1991)....................................................... *passim*

*Mallory v. Norfolk S. Ry. Co.,*
    266 A.3d 542 (2021)..........................................................................16

*Mihalik v. Credit Agricole Cheuvereux N. Am., Inc.,*
    715 F.3d 102 (2d Cir. 2013)..............................................................11

*N. Haven Bd. of Ed. v. Bell,*
    456 U.S. 512 (1982)..........................................................................14

*Palestinian Info. Office v. Shultz,*
    853 F.2d 932 (D.C. Cir. 1988)....................................................8, 16

*Rine v. Imagitas, Inc.,*
    590 F.3d 1215 (11th Cir. 2009) ..........................................................6

*Rising v. Brown,*
    313 F. Supp. 824 (C.D. Cal. 1970) .................................................12

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
    490 U.S. 477 (1989)..........................................................................16

*Sanchez-Ramirez v. Consulate General of Mexico,*
    2013 WL 5013947 (N.D. Cal. 2013) ............................................6, 7

*Sedima, SPRL v. Imred Co., Inc.,*
    473 U.S. 479 (1985)..........................................................................11

*St. Clair v. Cox,*
    106 U.S. 350 (1882)..........................................................................16

*Ungar v. Palestinian Auth.,*
    153 F. Supp. 2d 76 (D.R.I. 2004).....................................................12

*Ungar v. Palestinian Auth.,*
    325 F. Supp. 2d 15 (D.R.I. 2004)................................................8, 12

*United States ex rel. Casanova v. Fitzpatrick,*
    214 F. Supp. 425 (S.D.N.Y. 1963)...............................................12, 13

*United States v. Aguilar*,
  515 U.S. 593 (1995) ..................................................................................................11

*United States v. Hudson*,
  491 F.3d 590 (6th Cir. 2007) .......................................................................................6

*United States v. Lupton*,
  620 F.3d 790 (7th Cir. 2010) .......................................................................................6

*United States v. Sardariani*,
  754 F.3d 1118 (9th Cir. 2014) .................................................................................3, 6

*United States v. Shulick*,
  18 F.4th 91 (3d Cir. 2021) ...........................................................................................6

*Washington v. Superior Ct. of Wash.*,
  289 U.S. 361 (1933) ...................................................................................................16

*Wisconsin Department of Revenue v. William Wrigley, Jr. Co.*,
  505 U.S. 214 (1992) ...................................................................................................14

## **Statutes**

18 U.S.C. § 2333 .....................................................................................................11, 13

18 U.S.C. § 2334 .....................................................................................................11, 15

22 U.S.C. § 613 .............................................................................................................12

22 U.S.C. § 4309A .........................................................................................................12

Foreign Agents Registration Act, (22 U.S.C. §§ 611 *et seq.*) .........................................7

## **Other Authorities**

116th Cong. 1st Sess. (Oct. 21, 2019) ...........................................................................14

116th Cong., 1st Sess. (July 16, 2019) ..........................................................................14

General Assembly Resolution 52/250 ............................................................................13

*Restatement (Third) Agency* (2006) ....................................................................3, 4, 5, 6

## INTRODUCTION

The Second Circuit's stay indicates that this Court should make findings of fact about Defendants' U.S. activities. Plaintiffs respectfully ask the Court to make findings on three topics: (a) Defendants' notarization activities; (b) their public relations activities; and (c) their U.S. facility.

These activities meet the statutory requirements. Defendants' notarization activities have nothing to do with the United Nations, and the notaries are their agents under simple and common agency rules. Defendants' public relations activities encompass issues that don't fall within the Observer Mission's work at the United Nations, such as urging community groups with no connection to the United Nations to lobby the United States Congress. Defendants used their U.S. facility to engage in these public relations activities.

Finally, exercising jurisdiction under the PSJVTA based on Defendants' U.S. activities satisfies the Due Process Clause for reasons this Court has not yet addressed. As Defendants themselves concede, when a defendant "chooses to take advantage of a forum's offerings (e.g., driving on public roadways, doing business in the state), courts properly assume that the defendant has freely and voluntarily accepted the conditions (including consent to personal jurisdiction) that the state places on such activity." Def. Mem. at 6-7 in *Fuld v. Palestine Liberation Org.*, No. 20 Civ. 3374 (JMF) (S.D.N.Y. June 7, 2020) [ECF 42]. This traditional basis for personal jurisdiction meets the *International Shoe* test because Defendants have "clear notice" of the conduct that gives rise to jurisdiction and their relationship to the United States is not "so attenuated as to make the exercise of such jurisdiction unreasonable" in the context of the government interests at stake. *See Burnham v. Superior Ct.*, 495 U.S. 604, 633-38 & nn.7, 11 (1990) (Brennan, J., concurring).

## PROCEDURAL DEVELOPMENTS

On the same day that Plaintiffs filed the present motion for reconsideration and findings of

1

fact, Defendants filed a letter with the Second Circuit asserting that this Court had "fulfilled the terms of the panel's limited remand" and that appellate jurisdiction was "automatically restored." Dkt. No. 371-1, No. 15-3135 (2d Cir.) (Mar. 14, 2022). The Circuit then recalled its mandate and reinstated the appeal. Dkt. Nos. 375-77, No. 15-3135 (2d Cir.) (Mar. 24, 2022).

Plaintiffs moved for a stay of appellate proceedings "pending the District Court's consideration of Plaintiffs' pending motion for reconsideration, which asks the District Court to make full findings of fact and law regarding the PSJVTA as contemplated by [the Second Circuit's] mandate." Dkt. No. 382, No. 15-3135 (2d Cir.) (Mar. 25, 2022). Defendants opposed the motion. They argued: "There is no reason, and no basis, to defer this Court's consideration of these issues when Plaintiffs had a full and fair opportunity to present their arguments to Judge Daniels, and Judge Daniels fulfilled the cabined tasks assigned to him in this Court's Jacobson remand some 19 months ago." Dkt. No. 384 at 1, No. 15-3135 (2d Cir. Apr. 4, 2022). On reply, Plaintiffs argued that, "in the context of the specific remand in this case, the District Court's work is incomplete," urging the Second Circuit to "give the District Court the opportunity to compete the work appropriate for the full consideration of this case, to avoid piecemeal appellate adjudication of the weighty issues at stake." Dkt. No. 391, No. 15-3135 (2d Cir. Apr. 11, 2022).

The Court of Appeals granted Plaintiffs' request and issued an order staying the appeal pending this Court's decision. Dkt. 397 (2d Cir. Apr. 15, 2022).

## FACTS

### A.    Defendants' Notarization Activities

The Court should find as a fact that, after the statute's trigger date (January 4, 2020), at least two notaries acted in the United States on behalf of Defendants. These two individuals were among eight on an approved list of notaries created by Defendants and published on their website

several years earlier. ECF-1023-2, pp. 43-49 of 56. They notarized documents in the United States and sent the documents to Palestinian officials in Mexico and Canada for certification. Ateyeh Dep. 46:13-19, 48:10-12, 50:12-51:18 (ECF-1035-10); Hbda Dep. 61:18-63:7, 69:10-70:7, 78:15-22, 97:4-98:18 (ECF-1035-9). Defendants certified these documents and sent them back to these notaries. Ateyeh Dep. 48:13-15 (ECF-1035-10), Hbda Dep. 98:9-18 (ECF-1035-9). Upon receipt, the notaries then sent the certified documents on to other Palestinian officials in Ramallah for use by the Palestinian Land Authority or other PA departments. Ateyeh Dep. 53:8-57:12 (ECF-1035-10), Hbda Dep. 98:9-18 (ECF-1035-9). In some cases, the notaries communicated first with authorities in these departments before communicating with officials in Canada. Hbda Dep. 98:9-18 (ECF-1035-9).

Defendants do not dispute that these acts occurred after January 4, 2020. They instead contend that the notaries were not Defendants' agents or, in the words of the statute, did not act "on behalf of" Defendants. Def. Opp. 15-18. That is incorrect. The notaries were Defendants' agents because Defendants relied on them to perform a step in Defendants' certification of documents as authentic for use by Defendants' Land Authority and other agencies. A notary is "an agent of the state" who acts by applying a notary seal, which the state "relies upon" in order "to confirm the authenticity of a signature on a document." *United States v. Sardariani*, 754 F.3d 1118, 1121 (9th Cir. 2014). People are also agents when they act as couriers, *see Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 942 (7th Cir. 1995), or even photocopiers, *see Great Minds v. Fedex Off. & Print Servs., Inc.*, 886 F.3d 91, 95 (2d Cir. 2018).

An agency relationship exists whenever a person (the principal) "manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third)*

*Agency* § 1.01 (2006). Here, Defendants manifested their assent to eight notaries acting on their behalf and subject to their control by:

- Listing the notaries' names and addresses on Defendants' own website (ECF 1023-2, pp. 43-49 of 56);

- Preparing and sending to at least one notary a pre-printed form of contract stating that "[a]uthorized" notaries were "to provide notary services for use by the [PLO Delegation to the U.S.]" (ECF 1035-3 ¶ 1);

- Announcing that they would "find alternate ways of continuing to provide consular services" and to "guarantee the continued provision of services" after the U.S. government closed their Washington, D.C. office (ECF 1023-2 at p. 29 of 56); and

- Receiving documents notarized by notaries on the list, certifying them, returning them to the notaries, and then re-receiving them for official use in Ramallah (Ateyeh Dep. 46:13-19, 48:10-15, 50:12-51:18, 53:8-57:12 (ECF-1035-10); Hbda Dep. 61:18-63:7, 69:10-70:7, 78:15-22, 97:4-98:18 (ECF-1035-9).

Defendants assert that the essential element of "control" is missing from these facts, but Defendants' own preprinted form shows that Defendants maintained decision-making control over the key element of the relationship—actual certification of the documents for use in Defendants' Land Authority and other agencies. The form states that Defendants "will maintain the right to reject to authenticate documents notarized by [the notary] for any reason and is not required by this contract to reveal, explain or justify those reasons." ECF 1035-3 ¶ 11. To be sure, the pre-printed form was prepared in 2014 and was not signed by either of the two notaries deposed. Def. Opp. 18. But the document manifests *Defendants'* assent that the notaries would prepare documents "for use by" Defendants and subject to Defendants' control. ECF 1035-3 ¶ 1.

After January 2020, Defendants did not terminate this assent, as the testimony summarized above shows. Nor do Defendants claim that they changed their behavior following the PSJVTA's trigger date. Indeed, Defendants continued to accept documents from the notaries while maintaining control over the key aspect of the relationship—whether or not to certify a document. Thus, in

March 2020, one of the notaries on Defendants' list (Saad Malley) transmitted a document for certification to Defendants, but Defendants *rejected* the certification request without providing a reason. Russell Reply Declaration (May 25, 2022) ¶¶ 3-7 (Ex. 1 hereto).

This evidence demonstrates the necessary element of control. The Second Circuit's holding in *In re Tribune Company Fraudulent Conveyance Litigation*, 946 F.3d 66, 80 (2d Cir. 2019), is on point. There the Court held that a financial depository called Computershare was acting as the agent of the Tribune Company in connection with a tender offer. *Id.* at 77-78. On the element of control, the Court held that Tribune "maintained control over key aspects of the undertaking" because Tribune stated that the tender offer would be completed "only when, as and if we give oral or written notice to Computershare of our acceptance of the shares." *Id.* (court's alterations omitted). So too, here. Defendants maintained control because they stated that they "will maintain the right to reject to authenticate documents," ECF 1035-3 ¶ 11, and in fact did reject documents submitted for certification, Russell Reply Declaration ¶ 7 (May 25, 2022) (Ex. 1).

Defendants assert that two of the eight notaries on the list "testified repeatedly that . . . Defendants had no power to control or limit their actions." Def. Opp. 15-16 & nn. 1-4. Defendants mischaracterize the testimony. Contrary to Defendants' assertions, the notaries confirmed that they did not have authority *themselves* to certify a document on behalf of Defendants. Hbda Dep. 92:8-15 (ECF 1035-9); Ateyeh Dep. 23:3-24:23 (ECF 1035-10). That testimony is consistent with the documentary evidence that *Defendants* (the principals) "maintain[ed] the right to reject" documents prepared by the notaries (the agents). ECF 1035-3 ¶ 11. In a situation where the agent lacks decision-making authority, "the scope of the agency would be very narrow. But despite the narrowness of its scope, an agency relation imposes legal consequences when the agent's acts are within its scope." *Restatement (Third) of Agency* § 1.01 com. h.

Defendants point out that the notaries did not receive money from Defendants. Def. Opp. 16 n.4 (citing Hbda Dep. 92:23-93:12; 119:12-15, 149:6-25 (ECF 1035-9); Ateyeh Dep. 43:15-23 (ECF 1035-10)). However, a person may act "on behalf of" a government entity even if the government does not pay the person. That was the holding in *Rine v. Imagitas, Inc.,* 590 F.3d 1215, 1225 (11th Cir. 2009), where the court held that a firm that mailed driver's license renewal forms was acting on behalf of the state of Florida, even though the firm received no money from the State but earned money by selling advertising to include in the mailings.

Defendants also point out that their own representative and two of the notaries testified that they were not acting "on behalf of" Defendants. *See* Def. Opp. 16 n.1 (citing Hbda Dep. 155:9-18 (ECF 1035-9); Ateyeh Dep. 69:11-23 (ECF 1035-10)); *id.* at 18 n.11 (citing Mansour Dep. 146-48 (ECF 1066-3)). However, the parties' own characterization of a legal conclusion does not control, especially when made for the purpose of "circumventing an otherwise-applicable statute." *Restatement (Third) Agency* § 1.02 coms. a, b (2006); *see United States v. Shulick*, 18 F.4th 91, 104 (3d Cir. 2021) (holding that parties cannot contract around a statutory definition of "agent") (citing and following *United States v. Lupton*, 620 F.3d 790, 800-01 (7th Cir. 2010); *United States v. Hudson*, 491 F.3d 590, 594 (6th Cir. 2007)).

Defendants offer three additional legal arguments about their relationship with the notaries, but those are unavailing. First, Defendants assert the notaries are not "officials" of the states in which they are licensed. Def. Opp. 16. That is irrelevant. It is the notaries' relationship with *Defendants* that is in issue, and the notaries assisted *Defendants* in the performance of *Defendants'* governmental functions. Thus, other courts have held that notaries are agents of the government they help authenticate documents for. *See United States v. Sardariani*, 754 F.3d at 1121; *Sanchez-Ramirez v. Consulate General of Mexico*, 2013 WL 5013947 *9 (N.D. Cal. 2013), *aff'd*, 603 F.

App'x 631 (9th Cir. 2015). Whether the notaries were or were not *officers* of another entity is irrelevant to whether they were or *agents* of the Defendants. Defendants effectively concede that the "reasoning in *Sanchez*" applies to notaries "controlled by Defendants." Def. Opp. 17.

Second, Defendants try to analogize themselves to the U.S. State Department, asserting that a finding that the notaries at issue here acted on Defendants' behalf "would result in thousands of foreign notaries becoming U.S. agents." Def. Opp. at 17-18. That is nonsense. Of the 4.5 million notaries in the United States,[1] Defendants selected eight to establish relationships with, asked them to become their authorized agents, and listed them on Defendants' website. Defendants then gave the notaries preprinted forms reiterating Defendants' right to control the notaries' behavior. The U.S. State Department does not publish lists of authorized foreign notaries and there is no evidence that it has ever sent a foreign notary a preprinted form like the one at issue in this case.

Third, Defendants argue that "if those notaries were agents of Defendants, then they would have to register under" the Foreign Agents Registration Act, 22 U.S.C. §§ 611 *et seq.* Def. Opp. 18. That is incorrect. The registration requirement applies *only* to persons who engage in discrete types of conduct: political activities, public relations, fundraising, and representation before U.S. agencies or officials. 22 U.S.C. § 611(c)(1).

### B.    Defendants' Public Relations Activities

The Court should find as a fact that after January 4, 2020, Defendants engaged in public relations activities in the United States.

Since they first opened an office in the United States in the 1970s, Defendants have consistently engaged in public relations activities "in the hopes of promoting" their cause with "the

---

[1] *See* The National Notary at 12-13 (Aug. 2017), https://www.nationalnotary.org/file%20library/nna/knowledge%20center/outside%20pdfs/mag17_aug_p12-13.pdf

American public." *Palestinian Info. Office v. Shultz*, 853 F.2d 932, 935 (D.C. Cir. 1988) (cleaned up); *see Ungar v. Palestinian Auth.*, 325 F. Supp. 2d 15, 51, 53 (D.R.I. 2004) (noting "extensive non-U.N. activity by the Palestinian Defendants," including "extensive public relations, educational, and propaganda activities throughout the United States," which had occurred "for almost ten years"), *aff'd*, 402 F.3d 274 (1st Cir. 2005). As the Second Circuit has held, such activities are "not conducted in furtherance of the PLO's observer status" at the United Nations. *Klinghoffer v. SNC Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991); *see Klinghoffer v. SNC Achille Lauro*, 795 F. Supp. 112, 114-15 (S.D.N.Y. 1992) (PLO representatives giving "speeches and interviews" and distributing "informational materials" was "separate from its U.N. activities").

Defendants' public relations activities continued following the PSJVTA's trigger date. Defendants' representatives held numerous in-person and virtual meetings with individuals or organizations who had no formal connection to the United Nations, including meetings with students and community groups. *See* ECF 1023-3; 1023-4; 1066-9; Abdelhady-Nasser Dep. 69:21-72:24; 84:2-85:2; 86:1-23; 94:11-95:12; 109:23-110:17; 114:1-115:25; 117: 14-120:11 (ECF 1066-1); Mansour Dep. 44:10-19; 48:5-7; 49:1-5; 67:8-68:25; 74:16-75:16; 90:10-94:21; 96:19-97:10; 106:10-107:25 (ECF 1066-3). Defendants' Advisor on Media Affairs testified that Dr. Mansour received many requests from groups to speak "on issues that don't fall within the Observer Mission's policy work at the United Nations." Ghannam Dep. 57:7-58:6. (ECF 1066-2).

One such meeting took place on November 14, 2020, with an organization called Beit Sahour USA. Mansour Dep. 93:12-93:3 (ECF 1066-3). Based in Flint, Michigan, Beit Sahour USA is a general-interest organization that promotes the "general welfare of the communities that derive their ancestry from the city of Beit Sahour," a town in the West Bank. *See* https://www.beitsahourusa.org/our-mission/ (Last visited May 22, 2022). Dr. Mansour gave a speech to the group in

his official capacity. *Id.* 96:19-97:10. Dr. Mansour commended "young Palestinian Americans" for "supporting justice for the Palestinian People and lobbying the government, lobbying Congress . . . to acknowledge and recognize that the Palestinian people should be granted the right to self determination," and added "I call upon the young men and women of your community, especially those who are attending university, to be given all the support that they should be given and to recognize their activism and their role in supporting the just cause of the Palestinians. And we urge them to become even more active, especially in light of the arrival of a new administration in Washington, D.C., of President-elect Biden.." ECF 1066-9 at p. 3 of 5. Dr. Mansour himself confirmed that he participated this meeting for the purpose of "advocating for the Palestinian cause." Mansour Dep. 96:19-97-10 (ECF 1066-3). The Beit Sahour organization is not affiliated with the United Nations, nor is it listed on the United Nations website as being accredited to or having been granted observer status with the United Nations' Committee on the Exercise of the Inalienable Rights of the Palestinian People. *See* https://www.un.org/unispal/data-collection/civil-society/list-of-intl-civil-society-partners/national-civil-society-partners-of-the-committee/ (Last visited May 22, 2022).

After January 4, 2020, Defendants also gave press interviews in English in the United States to English-language media outlets including MSNBC, NPR, and Voice of America. Mansour Dep. 110:22-112:3 (ECF 1066-3); Abdelhady-Nasser Dep. 114:1-13; 189:19-23; 190:19-191:9 (ECF 1066-1); ECF 1027-3; ECF 1027-5; ECF 1066-4 p. 8 of 9 ("Call with NPR").

After January 4, 2020, Defendants also maintained publicly available English-language social media accounts on Twitter and Facebook, which they updated "a large number" of times, Ghannam Dep. 151:21-154:5 (ECF 1066-2), while physically in the United States, *id.* 154:14-155:4. One purpose of Defendants' social-media postings was "raise public awareness" of issues

of importance to them. *Id.*166:22-25; *see id.* 168:4-9 ("raising public awareness"), 169:25-170:3 ("raise public awareness"), 173:15-174:6 ("the purpose of this Twitter [post] was encourage the public to watch the video"), 175:17-21 ("the purpose of this tweet was to elevate public awareness"), 178:18-23 ("purpose of the Twitter post was to disseminate this letter publicly to draw attention to the issue"), 187:11-14 ("the Observer Mission retweeted [actor Mark] Ruffalo's tweet to the attention of a broader audience"), 189: 5-9 ("part of the purpose of that hashtag was to magnify the attention, the public attention that this Twitter posting would receive"), 196:15-23 ("[t]he purpose of this tweet is to share information that is left up to the general public to decipher in any way that they see fit").

## C.    Defendants' U.S. Facility

The Court should find as a fact that after January 4, 2020, Defendants used their Upper East Side townhouse to give press interviews, to make public appearances (such as university lectures), to meet remotely with non-U.N. groups, and to update their Twitter and Facebook accounts. Mansour Dep. 65:21-23; 67:21-23; 74:25-75:5; 86:21-22; 91:13-15; 94:17-19; 98:23-25; 107:1-4; 111:16-20; 113:20-25 (ECF 1066-3); Ghannam Dep. 152:5-13; 153:13-20 (ECF 1066-2). These activities, too, were "not conducted in furtherance of the PLO's observer status" at the United Nations. *Klinghoffer*, 937 F.2d at 51.

## APPLICATION OF FACTS TO THE STATUTE

## A.    Defendants' Notarization Activities

Defendants effectively concede that if the notaries are found to have acted on behalf of Defendants in the United States, the PSJVTA has been met. No exception applies to such activities.

## B.    Defendants' Public Relations Activities

Defendants devote extensive effort to persuade the Court that their public relations activities come within the exception for activities undertaken "exclusively for the purpose of conducting

official business of the United Nations." 28 U.S.C. § 2334(e)(3)(B). The Second Circuit has already held to the contrary. *See Klinghoffer*, 937 F.2d at 51.

The Court should also reject Defendants' argument on the facts; Dr. Mansour's speeches obviously covered issues that don't fall within the Observer Mission's policy work at the United Nations, such as his speech to the Beit Sahour community group in which he urged members of the group to lobby Congress. ECF 1066-9 (quoted *supra* pp. 6-7).

With regard to their social media and press releases, Defendants argue for an expansive reading of the statutory exception for activities "exclusively for the purpose of official business of the United Nations"; Plaintiffs argue for a narrow construction. Even if Defendants' reading of the exception were plausible (and it is not), ambiguity would have to be resolved in Plaintiffs' favor, because Congress has directly prescribed that the PSJVTA "should be liberally construed to carry out the purposes of Congress *to provide relief for victims of terrorism*." PSJVTA § 903(d)(1)(A) (18 U.S.C. § 2333 note) (emphasis added). Courts must follow such rules of construction. *See Sedima, SPRL v. Imrex Co., Inc.*, 473 U.S. 479, 497-498 (1985) (following statute's admonition that it is to "be liberally construed to effectuate its remedial purpose"); *Mihalik v. Credit Agricole Cheuvereux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (reversing district court for failure to follow statutory rule of construction). Yet Defendants have nothing to say about the statutory instruction. They do not even cite it. They are also silent on the canon of construction that courts read statutory exceptions "narrowly in order to preserve the primary operation of the [main] provision." *Comm'r v. Clark*, 489 U.S. 726, 739 (1989); *see Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1617 (2018); *United States v. Aguilar*, 515 U.S. 593, 599 (1995); *Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 91 (2d Cir. 2016). Defendants do not attempt to explain any of these cases.

Even without these controlling rules of construction, Plaintiffs' narrow reading is the

correct one because it comports with background principles of U.S. law and U.N. practice. With regard to U.S. law, Defendants have nothing to say about cases holding that self-promotion is not official business of a deliberative body. *See Hoellen v. Annunzio*, 468 F.2d 522, 526 (7th Cir. 1972); *Rising v. Brown*, 313 F. Supp. 824, 826-27 (C.D. Cal. 1970). They ignore the portion of the Foreign Missions Act that permits regulation "in the best interests of the United States" of "*any* activities . . . outside the United Nations Headquarters District by any individual . . . authorized by the United Nations to conduct official business in connection with that organization," 22 U.S.C. § 4309A(b)(1) (emphasis added). And they are likewise silent about the holdings of numerous courts in this District and elsewhere following *Klinghoffer*, 937 F.2d at 52, to hold that speeches and releases "to the media in New York in support of the PLO's cause" are "non-U.N. activities." *Id.*; *see Klinghoffer*, 795 F. Supp. at 114 (PLO's public relations activities were "sufficiently separate from its UN activities" where its officials "gave speeches and interviews . . . to live audiences and in media appearances"); *see Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88 (D.R.I. 2004) (PLO's "public speaking engagements outside of the U.N." are "activities unrelated to its observer status"); *Ungar*, 325 F. Supp. at 53 (noting "extensive non-U.N. activity by the Palestinian Defendants," including "extensive public relations, educational, and propaganda activities throughout the United States").

Defendants argue that *Klinghoffer* is no longer good law, Def. Opp. 21-22, but "[a] district court bound by circuit authority . . . has no choice but to follow it, even if convinced that such authority was wrongly decided." *In re United States*, 945 F.3d 616, 627 (2d Cir. 2019) (quotation marks omitted). Defendants also argue, incorrectly, that the Foreign Agents Registration Act "does not apply to UN missions." Def. Opp. 21. In fact, that statute has no exemption for U.N. Missions or their personnel, 22 U.S.C. § 613, and such personnel are not exempt from the statute. *United*

*States ex rel. Casanova v. Fitzpatrick*, 214 F. Supp. 425, 437 (S.D.N.Y. 1963) (Weinfeld, J.) ("resident member" of a United Nations mission subject to FARA).

With regard to U.N. practice, Defendants have nothing to say about General Assembly Resolution 52/250, which sets out the specific functions for their "participation in the sessions and work" of the United Nations. Defendants point to a snippet in an advisory opinion by the U.N. Office of Legal Affairs asserting that they have functional immunity "in the exercise of the observer functions," Def. Opp. 22, but they simply ignore numerous a large number of similar opinions, both before and after the one they rely on, clarifying that the assertedly immunized conduct is that taking place "before relevant United Nations organs." *E.g.*, *Permanent Observer Mission of the African Union*, 2014 U.N. Jur. Y.B. 328 (emphasis added); *Permanent Observer Mission of the Org. of the Islamic Conf.*, 1999 U.N. Jur. Y.B. 409. They also ignore that office's opinions defining "official business of the United Nations," as the "performance of official duties on behalf of the United Nations," attending to "the business of the Organization," or "an official act." 1985 U.N. Jurid. Y.B. 148; 1968 U.N. Jurid. Y.B. 194-95. Defendants' public relations activities, which are directed to the general public, do not meet that definition.

Defendants also say that their activities are "ancillary" to official UN activities. Defendants argue for a broad meaning of the word "ancillary": Plaintiffs argue for a narrower meaning of that word. Defendants again ignore the PSJVTA's own rule of construction, PSJVTA § 903(d)(1)(A) (18 U.S.C. § 2333 note), that the statute be construed liberally to provide relief for victims of terrorism. But even apart from Congress's directive to construe the statute in favor of plaintiffs, urging people to lobby the United States Congress is not "ancillary" to official business of the United Nations; rather it is one of those "issues that don't fall within the Observer Mission's policy work at the United Nations." *See* Ghannam Dep. 57:7-58:6 (ECF 1066-2).

13

Defendants attempt to shoehorn this case into usage of "ancillary" in *Wisconsin Department of Revenue v. William Wrigley, Jr. Co.*, 505 U.S. 214, 228-34 (1992), arguing that it is official business of the United Nations for them to "sell" their "UN agenda" to the American public. But the *Wrigley* case uses the word "ancillary" to describe activity that serves "no independent business function." Taking a cab to the United Nations is "ancillary" to activity "exclusively for the purpose of conducting official business of the United Nations" because it serves no *independent* function apart from appearing before relevant United Nations organs. *See id.* at 214. Employing social media to ensure that the postings reach the broadest possible segment of the general public and bring attention to issues of interest to Defendants very much serves an independent function—promoting Defendants' political views. Even where activity serves both an official purpose and an independent purpose, it is not "ancillary" in the sense of the word used in *Wrigley*.

Defendants also urge the court to disregard the lead legislative sponsor's explanation of the meaning of the word "ancillary" consistent with this usage. Defendants' theory is that that when Senator Lankford described the narrow scope of to be given the word "ancillary" just before the Senate passed the PSJVTA, he was supposedly describing "the bill he originally sponsored" and not the bill being voted on. Def. Opp. 26. The trouble with that theory is that the bill as introduced and as reported out of the Senate Judiciary Committee did not contain the word "ancillary." S. 2132, 116th Cong., 1st Sess. (July 16, 2019); S. 2132, 116th Cong. 1st Sess. (Oct. 21, 2019). The word "ancillary" was (according to Defendants' theory) the innovation proposed by Senator Leahy after the bill was reported out of committee. Def. Opp. 26. Thus, the bill's lead sponsor was explaining the about-to-be-enacted text. His views "are an authoritative guide to the statute's construction." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 527 (1982). Defendants' argument, in contrast, is based on comments by a non-sponsor inserted into the Congressional Record five weeks

after enactment—that is to say, an argument based on subsequent legislative history. Such arguments "should not be taken seriously." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1747 (2020) (quotation marks omitted).

## C.    Defendants' U.S. Facility

Defendants' facility is not exempt from the PSJVTA because it was not "used *exclusively* for the purpose of conducting official business of the United Nations." 18 U.S.C. § 2334(e)(3)(A) (emphasis added). Defendants used their U.S. facility for public relations and for meetings with student and community groups, including the Beit Sahour USA meeting. *See supra* pp. 6-7. Urging members of a community group to lobby the United States Congress is not official business of the United Nations. Because the office was not used "exclusively for the purpose of official business of the United Nations," the office is not "specifically exempted by paragraph (3)(A)," but rather is "considered to be in the United States" within the meaning of the statute. 18 U.S.C. § 2334(e)(4).

### APPLICATION OF DUE PROCESS CASE LAW

As Defendants concede, when a defendant "chooses to take advantage of a forum's offerings (e.g., driving on public roadways, doing business in the state), courts properly assume that the defendant has freely and voluntarily accepted the conditions (including consent to personal jurisdiction) that the state places on such activity." Def. Mem. at 6-7 in *Fuld v. Palestine Liberation Org.*, No. 20 Civ. 3374 (JMF) (S.D.N.Y. June 7, 2020) [ECF 42].

That concession is correct. "Territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there," *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985), because "jurisdiction is often a function of geography." *Burnham*, 495 U.S. at 637 (Brennan, J., concurring).

The Supreme Court has identified two ways to evaluate rules permitting the exercise of

personal jurisdiction based physical presence—tradition and fairness. Under the tradition-based analysis, a longstanding rule allowing the exercise of personal jurisdiction based on physical presence "constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of 'traditional notions of fair play and substantial justice.'" *Burnham v. Superior Ct.*, 495 U.S. 604, 619 (1990) (Scalia, J., for a plurality). Under that test, the rule's "validation is its pedigree." *Id.* at 621. Invoking this standard, we cited Supreme Court cases holding that if a sovereign is permitted to exclude an entity from its territory, the sovereign has the right to permit entry on reasonable conditions, including that the entity consent to suit. *See Washington v. Superior Ct. of Wash.*, 289 U.S. 361, 364-65 (1933); *Hess v. Pawloski*, 274 U.S. 352, 355 (1927); *St. Clair v. Cox*, 106 U.S. 350, 356 (1882); *Baltimore & Ohio Railroad Co. v. Harris*, 79 U.S. (12 Wall.) 65 (1870). Oddly, Defendants do not even acknowledge these cases. Yet these cases are not merely evidence of tradition that the power to exclude includes the power to admit subject to consent to jurisdiction; the cases are actual, on-point Supreme Court holdings. And they are directly comparable, because Defendants have no right to be present in the United States. As the Second Circuit has explained, Defendants are "allowed to come to New York [for U.N. purposes] only because" the United States has voluntarily adopted the U.N. Headquarters Agreement. *Klinghoffer*, 937 F.2d at 51; *see id.* ("[W]ere the PLO not a permanent observer at the UN, it would not be entitled to enter New York at all."); *Shultz*, 853 F.2d at 940.[2]

---

[2] Defendants and others have argued that the consent cases are outdated in light of *Daimler AG v. Bauman*, 571 U.S. 117 (2014). *See, e.g.*, *Mallory v. Norfolk S. Ry. Co.*, 266 A.3d 542, 567 (2021), *cert. granted*, No. 21-1168 (Apr. 25, 2022). But it is not for this Court to disregard or discount directly relevant Supreme Court precedent. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

Under the fairness-based analysis, a rule of law "fortified by a century of judicial practice" is "entitled to a strong presumption that it comports with due process." *Id.* at 636-37. Even so, the court must still evaluate whether the defendant has "clear notice that he is subject to suit," *id.* at 636 (Brennan, J., concurring) (alterations omitted) and whether the "exercise of such jurisdiction [is] unreasonable," *id.* at 637 (internal quotation marks omitted). Under this standard, the PSJVTA satisfies due process because Defendants have "clear notice" of the conduct that gives rise to jurisdiction and their relationship to the United States is not "so attenuated as to make the exercise of such jurisdiction unreasonable" in the context of the government interests at stake. *See Burnham*, 495 U.S. at 633-38 & nn.7, 11 (1990) (Brennan, J., concurring).

Defendants now say that they are not "accepting any benefit" from the United States. Def. Opp. 9. That is incorrect. Defendants' very presence in the United States is a matter of legislative grace, and they certainly have no right to engage in non-U.N. activities here. Defendants have also benefited from their U.S. presence in numerous ways. They used a network of U.S.-based agents to assist them with document-certification services to persons having business in the West Bank. They also used U.S.-based agents located in their Upper East Side townhouse to manage accounts at U.S.-based social media companies, to give U.S.-based interviews to U.S.-based media companies, and to meet with U.S.-based community groups, all for the purpose of influencing the general public and the U.S. government in the service of their own political interests. These agents enjoy substantial freedoms. They are able to further Defendants' objectives, reaching a large segment of the society of the United States because they benefit from the U.S. economy, the U.S. legal system, and the U.S. legal, industrial, and social infrastructure. Their agents are in the United States on a continuous basis, and they enjoy far greater benefits than those provided to the transient visitor in *Burnham*. *See Burnham*, 495 U.S. at 638 (Brennan, J., concurring).

17

## CONCLUSION

For the foregoing reasons, the Court should hold that the PSJVTA is constitutional.

Dated: May 25, 2022
       New York, New York

                                  Respectfully submitted,

                                  ARNOLD & PORTER
                                     KAYE SCHOLER LLP

                          By:    _____
                                  Kent A. Yalowitz
                                     KENT.YALOWITZ@ARNOLDPORTER.COM
                                  David C. Russell
                                     DAVID.RUSSELL@ARNOLDPORTER.COM
                                  250 West 55th Street
                                  New York, NY 10019
                                  T: (212) 836-8344

                                     – and –

                                  Dirk C. Phillips
                                     DIRK.PHILLIPS@ARNOLDPORTER.COM
                                  Stephen K. Wirth
                                     STEPHEN.WIRTH@ARNOLDPORTER.COM
                                  601 Massachusetts Ave. NW
                                  Washington, DC 20001

                                  *Counsel for Plaintiffs*

18