UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK I. SOKOLOW, et al.,

                Plaintiffs,

-against-

PALESTINE LIBERATION
ORGANIZATION, et al.,

                Defendants.

Case No. 04 Civ. 397 (GBD)

---

# DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION

**SQUIRE PATTON BOGGS (US) LLP**

Gassan A. Baloul (GB-4473)
gassan.baloul@squirepb.com
Mitchell R. Berger (MB-4112)
mitchell.berger@squirepb.com
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

*Attorneys for Defendants Palestine Liberation Organization and Palestinian Authority*

## **INTRODUCTION**

This Court, along with the courts in *Fuld* and *Shatsky*, has already held that the conduct at issue cannot support an inference that Defendants intended to submit to personal jurisdiction in the United States. In their reply in support of reconsideration, Plaintiffs continue to repackage their evidence and arguments in an effort to set aside well-established due process standards and convert constitutionally-inadequate conduct into consent. Their new evidence satisfies neither the PSJVTA's predicates nor constitutional due process requirements. And their territoriality theory is squarely foreclosed by the Second Circuit's holding in *Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016) ("*Waldman I*"), that the mere presence of the PA and PLO in the United States does not create personal jurisdiction under the Due Process Clause.

In support of their reply, Plaintiffs improperly introduce a new declaration that attempts to put a new spin on their prior assertions that the conduct of state-licensed notaries can be imputed to Defendants under the U.S. activities prong. But the declaration in fact confirms that these notaries are not controlled by (and therefore are not "agents" of) Defendants, and do not act on Defendants' behalf. Plaintiffs also fall back on activities of Defendants' UN Mission—such as conducting meetings with "students and community groups" and "advocating for the Palestinian cause" in press interviews—but these activities fall under the PSJVTA's exemption for United Nations business and activities ancillary thereto. As before, Plaintiffs offer no new grounds for exercising jurisdiction under the PSJVTA and no basis for altering this Court's sound constitutional conclusion that the PSJVTA violates due process.

## ARGUMENT

**I.   Plaintiffs' New Evidence Regarding a Third-Party Notary Does Not Satisfy the "U.S. Activities" Prong of the PSJVTA.**

To support their misguided theory that the activities of independent, third-party notaries somehow give rise to jurisdiction over Defendants under the PSJVTA, Plaintiffs rely on a reply declaration describing events from 2020 that could have been—but was not—submitted in support of Plaintiffs' motion for reconsideration. Plaintiffs' reliance on new evidence in their reply brief obviously is improper, warranting this sur-reply. *See Anghel v. N.Y. State Dep't of Health*, 947 F. Supp. 2d 284, 293 (E.D.N.Y. 2013). Where new issues are raised for the first time on reply, a sur-reply is appropriate. *See id.* (permitting sur-reply where other party raised "at least one new argument in its reply").

Even if the Court were to consider this new evidence, however, it suffers from the same flaws as Plaintiffs' earlier submissions. The facts alleged in the reply declaration confirm that under the Restatement test and Second Circuit law, the notaries were not acting "on behalf of" or as "agents" of Defendants. Rather, the notaries transmitted documents <u>on behalf of their clients</u> to Palestinian officials in Canada, Mexico, and Palestine, who in turn retained control over whether to accept or reject those <u>documents</u> for use in Palestinian legal proceedings. Palestinian officials did not, however, control the <u>notaries</u>.

Further, based on Plaintiffs' own description of these events, none of Defendants' activities with respect to those documents took place in the United States; indeed, the notaries transmitted the documents to Palestinian officials in Canada and Mexico precisely because Defendants had ceased operating their U.S. Mission in Washington, D.C. well before passage of the PSJVTA. Accordingly, Plaintiffs' allegations regarding the activities of third-party notaries fail to establish

any conduct <u>by or on behalf of Defendants</u> in the United States following the PSJVTA's effective date, and therefore cannot give rise to personal jurisdiction.

### A.     Plaintiffs' Evidence Confirms the Notaries Are Not "Agents" of Defendants.

The new evidence relied upon in Plaintiffs' reply declaration recites the same basic fact pattern already described in the deposition testimony of two other notaries (Awni Abu Hbda and Fuad Ateyeh). In February 2020, David Russell, an associate at Plaintiffs' law firm, contacted Saad Malley, a "U.S. based" notary, and "asked him to certify a document for use with the Palestinian government." ECF 1067-1, Russell Decl., at 1. Two years earlier, prior to the closure of Defendants' U.S. Mission in Washington, D.C., Malley was listed on the Mission's website as one of several Arabic-speaking U.S. notaries who might assist Palestinian citizens. *Id.* After mailing the document to Malley, Russell states that he "spoke by telephone with Mr. Malley," who "told me that he had received the certificate and had mailed it to the Palestinian Foreign Ministry."[1] *Id.* at 1-2. Mr. Russell further states that he spoke with Malley again the following day, and Malley "told me that the Palestinian Foreign Ministry had denied his request to certify the document." *Id.* at 2. Most of the declaration is plainly hearsay, and the record does not contain any testimony from Malley describing his submission of Russell's documents or any interactions with the Foreign Ministry in Palestine.[2] Nonetheless, the declaration appears to outline the same process previously described by Hbda and Ateyeh, in which an Arabic-speaking notary licensed by a U.S. state notarizes and submits documents on behalf of a private client (in this case, Mr. Russell) to Palestinian officials outside the United States, for potential use in Palestinian legal proceedings. *See* ECF 1064, Opp. to Recon. at 16 (describing testimony of Hbda and Ateyeh).

---

[1] The Ministry of Foreign Affairs is located in Palestine. *See* State of Palestine, Ministry of Foreign Affairs, available at: https://www.mofa.ps/en/.

[2] Indeed, Russell's conclusory declaration does not even provide a copy of the document purportedly submitted for certification, or any correspondence between Russell and Malley.

Such evidence, even if credited, does not satisfy the "U.S. activities" prong of the PSJVTA, for two reasons.  <u>First</u>, based on Plaintiffs' own evidence, none of the activities of Palestinian officials in certifying, accepting, or rejecting documents for use in Palestinian legal proceedings took place in the United States.  To the contrary, following the closure of Palestine's U.S. Mission in Washington, D.C. in 2018, Palestinian officials no longer provide any services in the United States.  For that reason, third-party notaries such as Hbda, Ateyeh, and Malley transmit documents to Palestinian officials <u>outside the United States</u> (in Canada, Mexico, or Palestine) for authentication and certification.  *See* ECF 1064, Opp. to Recon. at 16 ("where requested by a client," Hbda and Ateyeh "send the notarized documents to the PLO consulates in Canada or Mexico for authentication"); *see also* ECF 1067, Pls.' Reply at 3 (conceding notaries "sent the documents to Palestinian officials in Mexico and Canada for certification," and then "sent the certified documents on to other Palestinian officials in Ramallah for use by the Palestinian Land Authority or other PA departments").  The reply declaration merely confirms that any "activities" conducted by Defendants in certifying, accepting, or rejecting documents for use in Palestine take place outside the United States, and therefore do not trigger personal jurisdiction under the "U.S. activities" prong.  *See* ECF 1067-1, Russell Decl. at 1-2 (stating Malley sent document to Foreign Ministry in Palestine, which refused certification).

<u>Second</u>, the reply declaration similarly confirms that U.S.-based notaries submitting documents on behalf of private clients such as Mr. Russell do not act as "agents" of Defendants.  As Plaintiffs concede, an agency relationship requires that the principal assent to another person (the "agent") (1) acting "on the principal's behalf" and (2) "subject to the principal's control."  ECF 1067, Pls.' Reply at 3.  Neither of those requirements is satisfied here.

- 4 -

- 5 -

As both Hbda and Ateyeh explained in their prior depositions, licensed notaries act <u>on behalf of their clients</u>—not Defendants—in submitting a client's documents for authentication and certification by foreign officials. *See* ECF 1035-9, Hbda Dep. at 39-40, 51, 59, 69-70, 75, 92, 97, 102, 154-55; ECF 1035-10, Ateyeh Dep. at 21-27, 31-36, 43-44, 55-56, 68-69 (testifying that U.S. notaries submitted documents to Palestinian consulates on behalf of their clients, not on Defendants' behalf). The reply declaration reinforces this basic point, as Malley transmitted documents <u>at Russell's request</u> to the Foreign Ministry for certification. ECF 1067-1, Russell Decl. at 1. There is no evidence Defendants were aware of—much less "assented to"—Malley's efforts to certify a document for Russell to "use with the Palestinian government." *See id.*

The reply declaration similarly confirms that U.S.-based notaries submitting documents for authentication or certification overseas are not subject to Defendants' "control." Indeed, Russell's declaration provides clear evidence of Defendants' <u>lack of control</u> over Malley's activities. In response to Russell's request that Malley submit a document for certification, Malley asked him to provide an apostille for the document. *Id.* After receiving an apostille from Russell, Malley then submitted the document to the Foreign Ministry for certification. *Id.* There is no evidence Defendants exercised any control over Malley's provision of notarial services, or instructed Malley to process Russell's request in a particular manner. To the contrary, the Foreign Ministry's subsequent denial of the request to certify the document plainly indicates Defendants did <u>not</u> assent to Malley's request, and that Malley acted on his own accord (on behalf of his client) in unsuccessfully seeking certification from the Foreign Ministry. *Id.* at 1-2. This, again, is consistent with the deposition testimony of Hbda and Ateyeh, who repeatedly testified that Defendants did not exercise any control over their provision of notarial services. *See* ECF 1035-

9, Hbda Dep. at 83-84, 92-93, 119, 147-50, 154-55; ECF 1035-10, Ateyeh Dep. at 21-25, 43-44, 52, 60, 62-63, 68-69.

Plaintiffs conflate "control" over the <u>document certification process</u> in Palestine with "control" over the <u>notaries themselves</u>, asserting the notaries were Defendants' agents because "Defendants maintained decision-making control over the key element of the relationship—actual certification of the documents for use in Defendants' Land Authority and other agencies." ECF 1067, Pls.' Reply at 4; *see also id.* at 5 (asserting Defendants' rejection of Malley's request for certification of the document "demonstrates the necessary element of control"). In determining whether an agency relationship exists, however, the type of "control" that matters is whether "<u>the agent</u> … is subject to the control of the principal."[3] *APL Co. Pte. Ltd. v. Kemira Water Sol's*, 890 F. Supp. 2d 360, 369 (S.D.N.Y. 2012) (emphasis added). In this case, Defendants retained control over whether they would <u>certify documents</u> transmitted by the notaries for use in Palestine. But there is no evidence Defendants exercised control over the <u>notaries</u> themselves, and thus no basis for finding the notaries served as Defendants' "agents" in the United States.

### B.  Plaintiffs' Allegations Regarding "Lists" of Notaries and "Pre-Printed Forms" Do Not Transform the Notaries into Defendants' Agents.

In the absence of any evidence that the notaries acted on behalf of and subject to the control of Defendants, Plaintiffs attempt to manufacture an agency relationship by relying on "lists" of Arabic-speaking notaries and "pre-printed forms" that pre-date the PSJVTA. As Defendants have

---

[3] Contrary to Plaintiffs' assertions (at 5), the Second Circuit's decision in *Tribune Company* is inapposite. In that case, Tribune Company "retained" Computershare to serve as its depository for a tender offer, and "manifested its intent to grant authority to Computershare" to act as its agent "by depositing the aggregate purchase price for the shares with Computershare." *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 78-80 (2d Cir. 2019). In this case, by contrast, there is no evidence that Defendants "retained" the notaries to act as their agents. To the contrary, the notaries were "retained" by their individual clients to submit documents to Defendants.

-6-

explained in prior briefing, none of these materials provides any evidence of an agency relationship between the notaries and Defendants.

Plaintiffs rely heavily on outdated information previously posted on the website of Palestine's U.S. Mission in Washington, D.C. in 2018—despite the fact that Defendants closed the Mission and took down the website at the behest of the U.S. government, prior to passage of the PSJVTA. Although Plaintiffs treat the information as if it were current, it is not. Indeed, Plaintiffs have to resort to the "Wayback Machine"—a website that continuously archives Internet pages—to resurrect the information they now provide to this Court. *See* ECF-1023-2, at 37-49.

The Mission's archived website lists the documents necessary for a passport or other then-available services from the Palestinian U.S. Mission, observing that some of those documents must be notarized. *Id*. at pp. 37-42. The next few pages list eight U.S.-licensed, but Arabic-speaking, notaries public. *Id*. at 43-49. Critically, the website does not claim these U.S.-licensed notaries were acting as Defendants' agents, nor does it indicate Defendants provided those notaries with authority to certify or authenticate documents on behalf of Defendants. Rather, the website simply identifies eight Arabic-speaking notaries who might be of assistance to Palestinians or others visiting the (now-defunct) website.

Contrary to Plaintiffs' assertions, there is nothing unusual or legally-significant about the Mission's decision to provide such information on its website. Although Plaintiffs claim—without support—that the "U.S. State Department does not publish lists of authorized foreign notaries" (Reply at 7), that is incorrect. The U.S. Embassy in Australia, for example, expressly directs website visitors to local notaries, and provides no less than seven regional lists of notaries (complete with contact information) maintained by the Embassy.[4] The U.S. Embassy in the United

---

[4] Under the heading "Using an Australian Public Notary" the State Department instructs "Step 1: Have your documents executed in front of an Australian Notary Public." *See* https://au.usembassy.gov/u-s-citizen-services/notaries-public/.

Kingdom similarly recommends local notaries through the UK's "Notary Society" website.[5]  U.S. embassies also frequently recommend local attorneys and notaries by name.[6]  The U.S. Embassy in Iraq provides lists of Iraqi lawyers and doctors through its American Citizen Services Unit, which are not listed on the web-page "for security reasons."[7]  The embassy's website also provides a list of security services, both American and international.[8]  And in a direct parallel to the Palestine U.S. Mission's old website, the U.S. Embassy in Zambia provides a list of local attorneys and specifically notes they speak English "as a first language."[9]  Plaintiffs fail to acknowledge this practice, let alone demonstrate that by directing U.S. citizens to these service providers, the U.S. government has suddenly taken on hundreds of "agents" in foreign countries.

Plaintiffs' reliance on a pre-printed form agreement from the PLO's now-closed Washington delegation is equally unavailing.  As Plaintiffs concede, this pre-printed form "was <u>prepared in 2014 and was not signed by either of the two notaries deposed</u>."[10]  ECF 1067, Pls.' Reply at 4 (emphasis added); *see also* ECF 1035-9, Hbda Dep. at 128-130, 132-136; ECF 1035-10, Ateyeh Dep. at 36:18-21.  Accordingly, there is no evidence in the record supporting Plaintiffs' bald assertion that this unsigned, 2014 agreement somehow "manifests Defendants' assent" to the provision of notarial services following the passage of the PSJVTA.  *See* ECF 1067, Pls.' Reply at 4.  In any event, contrary to Plaintiffs' assertions, the pre-printed form did not provide that its (non-existent) signatories were acting on behalf of Defendants.  ECF 1035-3 (unsigned copy of

---

[5] Click "Legalization through the British system" and then "Notary Society's website."  *See* https://uk.usembassy.gov/u-s-citizen-services/notary/
[6] *See* https://ca.usembassy.gov/u-s-citizen-services/local-resources-for-u-s-citizens/) which contains a PDF list of attorneys (*see, e.g.*, https://ca.usembassy.gov/wp-content/uploads/sites/27/ottawa_attorneys-2019.pdf), which also specifies whether the office provides notary or translation services.
[7] *See* https://iq.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/attorneys/
[8] *See* https://iq.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/security-companies/
[9] *See* https://zm.usembassy.gov/services/#local, then click on "List of Attorneys," available at: https://uploads.mwp.mprod.getusinfo.com/uploads/sites/44/2022/01/List_of_Attorneys_Updated_February_2020.pdf
[10] Plaintiffs also have not provided any evidence that the third notary relied upon in their new declaration (Malley) or any other notary ever signed the pre-printed form.

contract). Rather, the pre-printed form merely provided local notaries with the procedures they would need to follow to have the U.S. Mission authenticate notarized documents for use in Palestine. *Id.* As explained above, the PLO's U.S. Mission was closed at the U.S. government's direction in 2018, ending all of the Mission's U.S. activities. The closure of the Mission therefore terminated whatever relationship the notaries had with the U.S. Mission when the form was prepared in 2014, and provides no evidence of an ongoing agency relationship post-dating passage of the PSJVTA.

Finally, Plaintiffs' reliance on out-of-circuit case law addressing the legal status of notaries (Reply at 6-7) is misplaced. In *Sardariani*, the Ninth Circuit held that a notary public is a "person authorized by a state to administer oaths [and] certify documents," and thus "act[s] under the authority and as an agent of the [licensing] state" when certifying a document. *See United States v. Sardariani*, 754 F.3d 1118, 1121 (9th Cir. 2014). That holding is of no help to Plaintiffs here, as the notaries at issue are licensed by individual U.S. states (New Jersey and California)—not by Defendants. Accordingly, under *Sardariani*, the notaries act "under the authority and as … agent[s] of" New Jersey and California—not Defendants—when authenticating or certifying documents for their clients.

Similarly, *Sanchez-Ramirez* addresses the legal status of notaries who—unlike the notaries at issue in this case—were "employed by defendant Consulate General of Mexico," which provided the notaries with "life insurance, an annual bonus[,] … thirty days' vacation," "health benefits and relief from … taxes." *Sanches-Ramirez v. Consulate Gen. of Mexico,* 2013 U.S. Dist. LEXIS 109888 at *2, 29 (N.D. Cal. Aug. 5, 2013). The notaries also held A-2 visas, which authorized travel to the United States "on behalf of [a] national government to engage solely in official activities for that government." *Id.* at *16 n.2. The court's conclusion that notaries

employed and paid by the Mexican government to provide consular services qualified as "civil servants" has no bearing on this case, where the record indisputably establishes that the third-party notaries were not employed or compensated by Defendants.[11]

## II. The Activities of Palestine's UN Mission Do Not Trigger Personal Jurisdiction under the "U.S. Activities" Prong of the PSJVTA.

In addition to presenting new evidence regarding the purported activities of Arabic-speaking, U.S.-based notaries, Plaintiffs also continue to assert that "public relations activities" carried out by officials at Palestine's UN Mission satisfy the "U.S. activities" prong. *See* ECF 1067, Pls.' Reply at 7-15. Plaintiffs go so far as to assert that the 30-year-old decision in *Klinghoffer*—which predates both the passage of the PSJVTA and the PLO's enhanced status at the UN by several decades—"already held" that Defendants' post-PSJVTA activities do not constitute "official business" of the UN. *Id.* at 11. Such claims are inconsistent not only with the modern realities of the work of UN Missions, but also with the statutory text of the PSJVTA, which expressly prohibits courts from considering Defendants' UN activities, meetings with officials of the United States or other foreign governments, and "any personal or official activities conducted ancillary to [such] activities." 18 U.S.C. § 2334(e)(3) (emphasis added).

As Defendants explained in prior briefing, as part of Palestine's UN status, the UN expects Palestine's Mission to participate in the work of the UN Committee on the Exercise of the Inalienable Rights of the Palestinian People ("CEIRPP"). *See* ECF 1064, Defs. Opp. at 18-21.

---

[11] The Eleventh Circuit's decision in *Rine v. Imagitas, Inc.*, 590 F.3d 1215 (11th Cir. 2009) does not involve notaries and is likewise of no help to Plaintiffs. The entity in that case contracted with the Florida Department of Highway Safety & Motor Vehicles ("DHSMV") to carry out the state function of mailing motor vehicle registration information to drivers. *Id.* at 1225. Pursuant to a Florida statute, the state agency was authorized to contract with vendors to produce public materials and carry out public functions "on behalf of" the state agency. *Id.* The state agency "retained control over the entire … program" including all motor vehicular records, mandated approval of each ad, and reserved the right to reject any solicitation that might conflict with the interests of the state. *Id.* at 1215, 1219, 1225. Hence, the state controlled all central aspects of the mailings and the private vendor merely acted on its behalf. *Id.* at 1222, 1225. Plaintiffs offer no such evidence that Defendants contracted with the notaries to act on Defendants' behalf or exercised control over the notaries' services.

The CEIRPP "has a mandate from the United Nations General Assembly" to "mobilize the international community to stay steadfast in its support for the inalienable rights of the Palestinian people" and provide "the broadest possible international support," including by interacting with "civil society organizations from all regions of the world, active on the question of Palestine." *Id.* at 19-20. The types of activities described in Plaintiffs' reply brief—such as conducting meetings with "students and community groups" and "advocating for the Palestinian cause" in press interviews—are precisely the types of activities falling under CEIRPP's mandate.

Other activities, such as UN Ambassador Mansour's comments at a Beit Sahour meeting urging Palestinian-American students to "recognize their activism and their role in supporting the just cause of the Palestinians" by "becom[ing] even more active" and lobbying elected officials" (Reply at 8-9), are part of or "ancillary" to Defendants' UN/CEIRPP "mobiliz[ation]" work. As Ambassador Mansour and other UN Mission witnesses explained, the United States is a permanent member of the UN Security Council, so advocating the Palestinian cause before American officials is particularly important to the UN Mission's mandate. *See* ECF 1038-2, Ghannam Dep. at 58-60, 66-67 of 69; ECF 1038-3, Mansour Dep. at 29, 47-48 of 64; ECF 1038-1, Abdelhady-Nasser Dep. at 79-80 of 82. By its express terms, the PSJVTA prohibits a court from considering such UN-related activities and outreach to foreign government officials, as well as "any personal or official activities conducted ancillary to" these activities. *See* 18 U.S.C. § 2334(e)(3). The fact that Palestine's UN officials discuss the Palestinian cause with civil society organizations or the press therefore provides no basis for personal jurisdiction under the PSJVTA.

Plaintiffs attempt to characterize such conduct as "self-promotion" rather than protected, UN or ancillary activity, asserting that Defendants' "public relations activities" and social media posts fall outside the activities exempted from consideration by the PSJVTA. If Defendants were

truly engaged in political propaganda and "self-promotion" rather than UN-related activities, however, then they would have to register as "foreign agents" under FARA—as Plaintiffs themselves concede. *See* ECF 1067, Pls.' Reply Br. at 13 (arguing UN personnel are not exempt from FARA). Yet despite the fact that, according to Plaintiffs, Defendants have been engaged in such political activities in the United States since the 1970s (Reply at 7), the U.S. Government has never contended that Defendants' officials must register as foreign agents, nor has it prosecuted an official for conducting such activities in the United States without registering under FARA. The U.S. Government has, of course, intervened in this case, and is fully aware of Plaintiffs' allegations. The lack of any objection by the U.S. Government over the past 50 years provides clear evidence that, contrary to Plaintiffs' assertions, Defendants have not exceeded the bounds of conducting protected, UN-related activities in the United States.[12]

### III.     Plaintiffs' "Territoriality" Arguments Do Not Satisfy Due Process.

Plaintiffs' theory of "territorial presence"—the legal framework Plaintiffs introduced for the first time on reconsideration—relies wholly on the fragmented, non-majority opinions in *Burnham v. Superior Ct.*, 495 U.S. 604 (1990). But as Defendants have explained, "tag" jurisdiction under *Burnham* applies only to individuals, not to entities like Defendants. *See* ECF 1064, Defs' Opp. to Recon. at 7-9 (collecting authority). The various opinions in *Burnham* itself do not address application of tag jurisdiction to entities. *See Martinez v. Aero Caribbean*, 764 F.3d 1062, 1067-68 (9th Cir. 2014) (noting *Burnham* opinions do not address "artificial persons"

---

[12] Plaintiffs also accuse Defendants of "ignor[ing]" the Foreign Missions Act, which they claim permits regulation of UN officials for any activity outside the UN Headquarters District. ECF 1067, Pls.' Reply at 12. The Foreign Missions Act has nothing to do with the scope of activities that may give rise to personal jurisdiction under the PSJVTA. Rather, the PSJVTA expressly prohibits a court from considering Defendants' activities in furtherance of official UN business, meetings with government officials, and any conduct "ancillary" to such activities.

and declining to extend *Burnham* to corporations).  Plaintiffs offer no response to this critical distinction.

*Burnham* cannot be used to extend tag jurisdiction beyond individuals because no opinion in *Burnham* was endorsed by a majority of the Court.  The Second Circuit recognizes that, where no opinion receives a majority vote, the case should have binding precedential value only on the narrowest ground that a majority of justices agreed upon—i.e., the ground "most nearly confined to the precise fact situation before the Court." *United States v. Martino*, 664 F.2d 860, 872-73 (2d Cir. 1981).  As other courts have held, given that no opinion in *Burnham* garnered a majority, *Burnham* should be limited to its facts, which involved personal jurisdiction only over an individual, natural person.  *See, e.g.*, *WorldCare Ltd. Cor. v. World Ins. Co.*, 767 F. Supp. 2d 341, 351 (D. Conn. 2011) ("[T]here was no plurality opinion written in *Burnham*, suggesting that perhaps the holding should be limited to the particular facts set forth therein.").

Exercising personal jurisdiction over entities based solely on physical presence is also squarely at odds with the Second Circuit's holdings in *Waldman I* on both general and specific jurisdiction.  *Waldman I* held that the Defendants' purported presence in the United States through, among other things, its Washington, D.C. Mission did not render Defendants "essentially at home" under *Daimler*.  835 F.3d 317, 332-33 (2d Cir. 2016).  *Waldman I* held the connection between these same activities and the ATA claims was too attenuated under *Walden* to give rise to specific jurisdiction.  *Id.* at 341-42.  Finally, *Waldman I* held that personal jurisdiction was not established by merely serving process on the representative of the PLO and PA present in Washington, D.C. *Id.* at 343.  Plaintiffs nonetheless seek to contradict *Waldman* by arguing that Defendants' "very presence in the United States" provides grounds for personal jurisdiction.  ECF 1067, Plfs' Reply at 17.

The Second Circuit's holdings are law of the case and not subject to reconsideration by this Court. It is well-settled that, "where the mandate limits the issues open for consideration on remand, the district court ordinarily may not deviate from the specific dictates or spirit of the mandate by considering additional issues on remand." *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry.*, 762 F.3d 165, 175 (2d Cir. 2014) (citation omitted); *see Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) ("[W]here a case has been decided by an appellate court and remanded, the court to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court."). The Court of Appeals remanded the case to this Court "for the limited purposes" of deciding: (1) "the applicability of the PSJVTA to this case," and (2) "if the PSJVTA is determined to apply, any issues regarding its application to this case including its constitutionality." Remand Order, Case No. 15-3135, ECF. 369 (Sept. 8, 2020). Plaintiffs' attempt to establish personal jurisdiction based on their new territoriality theory reaches beyond the application of the PSJVTA and contravenes *Waldman I*'s prior holdings that Defendants' mere presence in the United States does not give rise to personal jurisdiction.

Plaintiffs also continue to press their new "territorial exclusion" argument, under which they contend the United States may condition entry to its territory on consent to suit. This argument is a distortion of *Hess v. Pawloski*, 274 U.S. 352 (1927)—a decision that actually supports Defendants' position that exercising personal jurisdiction over Defendants under the PSJVTA does not comport with due process. Plaintiffs accuse Defendants of not acknowledging *Hess* and related caselaw, ECF 1067, Plfs' Reply at 16. But as Defendants have repeatedly explained, while *Hess* provides a useful conceptual framework for deemed consent, it is not satisfied here because the PSJVTA confers no benefit on Defendants. *See, e.g.*, ECF 1064, Defs' Opp. to Recon. at 9-10. As Judge Furman agreed, *Hess* "hold[s] that a defendant's receipt of a

benefit can be deemed to be consent" to jurisdiction. *Fuld v. PLO*, No. 20-CV-3374 (JMF), 2022 U.S. Dist. LEXIS 3102, at *38 n.10 (S.D.N.Y. Jan. 6, 2022). Plaintiffs find no support in *Hess*, however, because they insisted at the outset of these remand proceedings that the PSJVTA does not confer any benefit on Defendants. ECF 1022 at 26-27. Even though Plaintiffs now find their prior concession inconvenient, the fact remains that the PSJVTA does not confer on Defendants the benefit of operating in the United States and Plaintiffs do not demonstrate otherwise. *See* ECF 1064, Defs' Opp. to Recon. at 6-7, 11-12. Nor does Palestine's UN Mission exist due to the PSJVTA's "legislative grace," Plfs' Reply at 17, but rather by virtue of antecedent obligation undertaken by the United States through the United Nations Headquarters Agreement. *See U.S. v. PLO*, 695 F. Supp. 1456, 1465-71 (S.D.N.Y. 1988). Palestine's UN Mission, furthermore, cannot provide grounds for personal jurisdiction because it is expressly excluded from the PSJVTA's predicates. *See* ECF 1064, Defs' Opp. to Recon. at 22-27.

*Hess* and its progeny more broadly stand for the proposition that implied consent requires conduct from which it is reasonable to infer that Defendants freely and voluntarily intended to submit to jurisdiction. Plaintiffs' freestanding "fairness" argument sidesteps this requirement and amounts to nothing more than a repackaging of the notice-plus-government interest test rejected by this Court in its initial decision, and by the courts in *Fuld* and *Shatsky*. This Court has already held that the conduct at issue does not demonstrate legal submission by the Defendants to personal jurisdiction. *Sokolow v. PLO*, 2022 U.S. Dist. LEXIS 43096, at *19-20 (S.D.N.Y. Mar. 10, 2022). And without needing to reach the question whether reciprocity (*i.e.*, a benefit to Defendants under the PSJVTA) was required or satisfied here, Judge Furman in *Fuld* likewise concluded Defendants' alleged activities were far "too thin to support a meaningful inference of consent to jurisdiction in this country." *See Fuld* 2022 U.S. Dist. LEXIS 3102, at*19. To hold otherwise

would "push the concept of consent well beyond its breaking point" because "the predicate conduct alleged here is not 'of such a nature as to justify the fiction' of consent." *Id.* at *38. Judge Vyskocil came to the same conclusion, holding "it is not reasonable to infer an intention to consent to suit in U.S. courts from the factual predicates in the PSJVTA." *Shatsky v. PLO*, No. 1:18-cv-12355, Op. & Order, ECF 165, p. 9 (S.D.N.Y. Mar. 18, 2022). Plaintiffs' arguments for reconsideration do not alter that analysis. If "fairness" alone were the jurisdictional test, moreover, then *Waldman I* would have presumably evaluated the ATA through this lens, rather than holding that the statute "does not answer the constitutional question." 835 F.3d at 343.

## CONCLUSION

Every factual claim in Plaintiffs' reply brief is insufficient to show "free and voluntary" consent by Defendants to personal jurisdiction under the Constitution. This Court thus need not make any further factual findings to adhere to its conclusion that the PSJVTA violates Due Process under either or both of its factual predicates. This Court should deny Plaintiffs' motion for reconsideration.

Respectfully submitted,

Squire Patton Boggs (US) LLP

*[signature]*

Gassan A. Baloul (GB-4473)
gassan.baloul@squirepb.com
Mitchell R. Berger (MB-4112)
mitchell.berger@squirepb.com
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

*Attorneys for Defendants Palestine Liberation Organization and Palestinian Authority*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2022, a true and correct copy of the foregoing was filed with the Clerk via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

/s/ *Gassan A. Baloul*
Gassan A. Baloul (GB-4473)