# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT
_____

August Term, 2015

Argued: April 12, 2016      Decided: August 31, 2016

Docket Nos. 15-3135-cv(L); 15-3151-cv(XAP)
_____

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF
PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA
BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR,
BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA,
INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA,
NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A
NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW,
INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW,
JAMIE A. SOKOLOW, MINOR, BY HER NEXT FRIENDS AND GUARDIAN MARK I.
SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW,
SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA
RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN
J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS
YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER,
YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN
J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT
FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL
BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND
REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS
DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN,
KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN,
INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN
BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE
COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR.,
INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS
RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND

GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG, TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*Plaintiffs – Appellees – Cross-Appellants*,

—v.—

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY AND OR PALESTINIAN COUNCIL AND OR PALESTINIAN NATIONAL AUTHORITY,

*Defendants – Appellants – Cross-Appellees*,

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESTATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1–99, HASSAN ABDEL RAHMAN,

*Defendants.*

————————————————————

Before: Leval and Droney, <u>Circuit Judges</u>, and Koeltl, <u>District Judge</u>.[*]

1    The defendants-appellants-cross-appellees ("defendants")

2   appeal from a judgment of the United States District Court for

3   the Southern District of New York (Daniels, <i>J.</i>) in favor of the

4   plaintiffs-appellees-cross-appellants ("plaintiffs").  A jury

5   found the defendants---the Palestine Liberation Organization and

6   the Palestinian Authority---liable under the Anti-Terrorism Act

7   ("ATA"), 18 U.S.C. § 2333(a), for various terror attacks in

8   Israel that killed or wounded United States citizens.  The jury

9   awarded the plaintiffs damages of $218.5 million, an amount that

10  was trebled automatically pursuant to the ATA, 18 U.S.C.

11  § 2333(a), bringing the total award to $655.5 million.  The

12  defendants appeal, arguing that the district court lacked

13  general and specific personal jurisdiction over the defendants,

14  and, in the alternative, seek a new trial because the district

15  court abused its discretion by allowing certain testimony by two

16  expert witnesses.  The plaintiffs cross-appeal, asking this

17  Court to reinstate claims the district court dismissed.

18       We vacate the judgment of the district court and remand the

19  case with instructions to dismiss the action because the federal

20  courts lack personal jurisdiction over the defendants with

---

[*]   The Honorable John G. Koeltl, of the United States District
Court for the Southern District of New York, sitting by
designation.

1  respect to the claims in this action.  We do not reach the

2  remaining issues.

3  _____

4  KENT A. YALOWITZ, Arnold & Porter, LLP, for Plaintiffs-
5  Appellees-Cross-Appellants.
6
7  GASSAN A. BALOUL (Mitchell R. Berger, Pierre H. Bergeron, John
8  A. Burlingame, Alexandra E. Chopin, on the brief), Squire Patton
9  Boggs (US), LLP, for Defendants-Appellants-Cross-Appellees.
10
11 David A. Reiser, Zuckerman Spaeder, LLP, and Peter Raven-Hansen,
12 George Washington University Law School, on the brief for Amici
13 Curiae Former Federal Officials in Support of Plaintiffs-
14 Appellees-Cross-Appellants.
15
16 James P. Bonner, Stone, Bonner & Rocco, LLP, and Steven R.
17 Perles, Perles Law Firm, on the brief for Amici Curiae Arthur
18 Barry Sotloff, Shirley Goldie Pulwer, Lauren Sotloff, and the
19 Estate of Steven Joel Sotloff in Support of Plaintiffs-
20 Appellees-Cross-Appellants.
21
22 _____

23 John G. Koeltl, District Judge:
24
25     In this case, eleven American families sued the Palestine

26 Liberation Organization ("PLO") and the Palestinian Authority

27 ("PA") (collectively, "defendants")[1] under the Anti-Terrorism Act

28 ("ATA"), 18 U.S.C. § 2333(a), for various terror attacks in

29 Israel that killed or wounded the plaintiffs-appellees-cross-

30 appellants ("plaintiffs") or their family members.[2]

_____

[1] While other defendants, such as Yasser Arafat, were named as
defendants in the case, they did not appear, and the Judgment
was entered only against the PLO and the PA.
[2] The plaintiffs are United States citizens, and the guardians,
family members, and personal representatives of the estates of

Case 15-3135, Document 205-1, 08/31/2016, 1854576, Page5 of 61

1    The defendants repeatedly argued before the District Court

2  for the Southern District of New York that the court lacked

3  personal jurisdiction over them in light of their minimal

4  presence in, and the lack of any nexus between the facts

5  underlying the plaintiffs' claims and the United States.  The

6  district court (Daniels, *J.*) concluded that it had general

7  personal jurisdiction over the defendants, even after the

8  Supreme Court narrowed the test for general jurisdiction in

9  Daimler AG v. Bauman, 134 S. Ct. 746 (2014).  See Sokolow v.

10  Palestine Liberation Org., No. 04-cv-397 (GBD), 2014 WL 6811395,

11  at *2 (S.D.N.Y. Dec. 1, 2014); see also Sokolow v. Palestine

12  Liberation Org., No. 04-cv-397 (GBD), 2011 WL 1345086, at *7

13  (S.D.N.Y. Mar. 30, 2011).

14    After a seven-week trial, a jury found that the defendants,

15  acting through their employees, perpetrated the attacks and that

16  the defendants knowingly provided material support to

17  organizations designated by the United States State Department

18  as foreign terrorist organizations.  The jury awarded the

19  plaintiffs damages of $218.5 million, an amount that was trebled

20  automatically pursuant to the ATA, 18 U.S.C. § 2333(a), bringing

21  the total award to $655.5 million.

---

United States citizens, who were killed or injured in the
terrorist attacks.

1       On appeal, the defendants seek to overturn the jury's

2  verdict by arguing that the United States Constitution precludes

3  the exercise of personal jurisdiction over them.  In the

4  alternative, the defendants seek a new trial, arguing that the

5  district court abused its discretion by allowing certain

6  testimony by two expert witnesses.  The plaintiffs cross-appeal,

7  asking this Court to reinstate non-federal claims that the

8  district court dismissed, and reinstate the claims of two

9  plaintiffs for which the district court found insufficient

10  evidence to submit to the jury.

11       We conclude that the district court erred when it concluded

12  it had personal jurisdiction over the defendants with respect to

13  the claims at issue in this action.  Therefore, we VACATE the

14  judgment of the district court and REMAND the case to the

15  district court with instructions to DISMISS the case for want of

16  personal jurisdiction.  Accordingly, we do not consider the

17  defendants' other arguments on appeal or the plaintiffs' cross-

18  appeal, all of which are now moot.

19                                    **I.**

20                                    **A.**

21       The PA was established by the 1993 Oslo Accords as the

22  interim and non-sovereign government of parts of the West Bank

23  and the Gaza Strip (collectively referred to here as

24  "Palestine").  The PA is headquartered in the city of Ramallah

6

1  in the West Bank, where the Palestinian President and the PA's

2  ministers reside.

3       The PLO was founded in 1964.  At all relevant times, the

4  PLO was headquartered in Ramallah, the Gaza Strip, and Amman,

5  Jordan. Because the Oslo Accords limit the PA's authority to

6  Palestine, the PLO conducts Palestine's foreign affairs.

7       During the relevant time period for this action, the PLO

8  maintained over 75 embassies, missions, and delegations around

9  the world.  The PLO is registered with the United States

10 Government as a foreign agent.  The PLO has two diplomatic

11 offices in the United States: a mission to the United States in

12 Washington, D.C. and a mission to the United Nations in New York

13 City.  The Washington, D.C. mission had fourteen employees

14 between 2002 and 2004, including two employees of the PA,

15 although not all at the same time.[3]  The Washington, D.C. and New

16 York missions engaged in diplomatic activities during the

17 relevant period.  The Washington, D.C. mission "had a

18 substantial commercial presence in the United States." Sokolow,

19 2011 WL 1345086, at *4.  It used dozens of telephone numbers,

20 purchased office supplies, paid for certain living expenses for

21 Hassan Abdel Rahman, the chief PLO and PA representative in the

---

[3] The district court concluded that "the weight of the evidence
indicates that the D.C. office simultaneously served as an
office for the PLO and the PA." Sokolow, 2011 WL 1345086, at
*3.

7

1    United States, and engaged in other transactions.  Id.  The PLO

2    also retained a consulting and lobbying firm through a multi-

3    year, multi-million-dollar contract for services from about 1999

4    to 2004.  Id.  The Washington, D.C. mission also promoted the

5    Palestinian cause in speeches and media appearances.  Id.

6         Courts have repeatedly held that neither the PA nor the PLO

7    is a "state" under United States or international law.  See

8    Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 47-48 (2d Cir.

9    1991) (holding the PLO, which had no defined territory or

10   permanent population and did not have capacity to enter into

11   genuine formal relations with other nations, was not a "state"

12   for purposes of the Foreign Sovereign Immunities Act); Estates

13   of Ungar v. Palestinian Auth., 315 F. Supp. 2d 164, 178-86

14   (D.R.I. 2004) (holding that neither the PA nor the PLO is a

15   state entitled to sovereign immunity under the Foreign Sovereign

16   Immunities Act because neither entity has a defined territory

17   with a permanent population controlled by a government that has

18   the capacity to enter into foreign relations); see also Knox v.

19   Palestine Liberation Org., 306 F. Supp. 2d 424, 431 (S.D.N.Y.

20   2004) (holding that neither the PLO nor the PA was a "state" for

21   purposes of the Foreign Sovereign Immunities Act).

22        While the United States does not recognize Palestine or the

23   PA as a sovereign government, see Sokolow v. Palestine

24   Liberation Org., 583 F. Supp. 2d 451, 457-58 (S.D.N.Y. 2008)

1  ("Palestine, whose statehood is not recognized by the United

2  States, does not meet the definition of a 'state,' under United

3  States and international law . . . .") (collecting cases), the

4  PA is the governing authority in Palestine and employs tens of

5  thousands of security personnel in Palestine.  According to the

6  PA's Minister of Finance, the "PA funds conventional government

7  services, including developing infrastructure; public safety and

8  the judicial system; health care; public schools and education;

9  foreign affairs; economic development initiatives in

10  agriculture, energy, public works, and public housing; the

11  payment of more than 155,000 government employee salaries and

12  related pension funds; transportation; and, communications and

13  information technology services."

14                              **B.**

15      The plaintiffs sued the defendants in 2004, alleging

16  violations of the ATA for seven terror attacks committed during

17  a wave of violence known as "the al Aqsa Intifada," by

18  nonparties who the plaintiffs alleged were affiliated with the

19  defendants.  The jury found the plaintiffs liable for six of the

20  attacks.[4] At trial, the plaintiffs presented evidence of the

21  following attacks.

---

[4] The district court found claims relating to an attack on
January 8, 2001 that wounded Oz Guetta speculative and did not
allow those claims to proceed to the jury.  The plaintiffs argue
that this Court should reinstate the Guetta claims.  Because we

1  **i.  January 22, 2002: Jaffa Road Shooting**

2  On January 22, 2002, a PA police officer opened fire on a

3  pedestrian mall in Jerusalem.  He shot "indiscriminately at the

4  people who were on Jaffa Street," at a nearby bus stop and

5  aboard a bus that was at the stop, and at people in the stores

6  nearby "with the aim of causing the death of as many people as

7  possible."  The shooter killed two individuals and wounded

8  forty-five others before he was killed by police.  The attack

9  was carried out, according to trial evidence, by six members of

10 the PA police force who planned the shooting. Two of the

11 plaintiffs were injured.

12 **ii.  January 27, 2002: Jaffa Road Bombing**

13 On January 27, 2002, a PA intelligence informant named Wafa

14 Idris detonated a suicide bomb on Jaffa Road in Jerusalem,

15 killing herself and an Israeli man and seriously wounding four

16 of the plaintiffs, including two children.  Evidence presented

17 at trial showed that the bombing was planned by a PA

18 intelligence officer who encouraged the assailant to conduct the

19 suicide bombing, even after the assailant had doubts about doing

20 so.

21

22

conclude that there is no personal jurisdiction over the
defendants for the ATA claims, it is unnecessary to reach this
issue.

###### iii. March 21, 2002: King George Street Bombing

On March 21, 2002, Mohammed Hashaika, a former PA police officer, detonated a suicide bomb on King George Street in Jerusalem.  Hashaika's co-conspirators chose the location because it was "full of people during the afternoon."  Hashaika set-off the explosion while in a crowd "with the aim of causing the deaths of as many civilians as possible."  Two plaintiffs were grievously wounded, including a seven-year-old American boy.  Evidence presented at trial showed that a PA intelligence officer named Abdel Karim Aweis orchestrated the attack.

###### iv.  June 19, 2002: French Hill Bombing

On June 19, 2002, a seventeen-year-old Palestinian man named Sa'id Awada detonated a suicide bomb at a bus stop in the French Hill neighborhood of Jerusalem.  Awada was a member of a militant faction of the PLO's Fatah party called the Al Aqsa Martyr Brigades ("AAMB"), which the United States Department of State had designated as a "foreign terrorist organization" ("FTO").  The bombing killed several people and wounded dozens, including an eighteen-year-old plaintiff who was stepping off a bus when the bomb exploded.

###### v.  July 31, 2002: Hebrew University Bombing

On July 31, 2002, military operatives of Hamas---a United States-designated FTO---detonated a bomb hidden in a black cloth bag that was packed with hardware nuts in a café at Hebrew

11

1   University in Jerusalem.  The explosion killed nine, including

2   four United States citizens, whose estates bring suit here.

3       **vi.  January 29, 2004: Bus No. 19 Bombing**

4       On January 29, 2004, in an AAMB attack, a PA police officer

5   named Ali Al-Ja'ara detonated a suicide vest on a crowded bus,

6   Bus No. 19 traveling from Malha Mall toward Paris Square in

7   central Jerusalem.  The suicide bombing killed eleven people,

8   including one of the plaintiffs.  The bomber's aim, according to

9   evidence submitted at trial, was to "caus[e] the deaths of a

10  large number of individuals."

11                              **C.**
12

13      In 2004, the plaintiffs filed suit in the Southern District

14  of New York.  The defendants first moved to dismiss the claims

15  for lack of personal jurisdiction in July 2007.  The district

16  court denied the motion, subject to renewal after jurisdictional

17  discovery.  After the close of jurisdictional discovery, the

18  district court denied the defendants' renewed motion, holding

19  that the court had general personal jurisdiction over the

20  defendants.  See Sokolow, 2011 WL 1345086, at *7.

21      The district court concluded, as an initial matter,  that

22  the service of process was properly effected by serving the

23  Chief Representative of the PLO and the PA, Hassan Abdel Rahman,

24  at his home in Virginia, pursuant to Federal Rule of Civil

25  Procedure 4(h)(1)(B) (providing that a foreign association "must

12

1  be served[ ] . . . in a judicial district of the United States .

2  . . by delivering a copy of the summons and of the complaint to

3  an officer, a managing or general agent . . . ."); see also 18

4  U.S.C. § 2334(a) (providing for nationwide service of process

5  and venue under the ATA); Sokolow, 2011 WL 1345086, at *2.

6      The district court then engaged in a two-part analysis to

7  determine whether the exercise of personal jurisdiction

8  comported with the due process protections of the United States

9  Constitution.  First, it determined whether the defendants had

10 sufficient minimum contacts with the forum such that the

11 maintenance of the action did not offend traditional notions of

12 fair play and substantial justice.  Sokolow, 2011 WL 1345086, at

13 *2 (citing Frontera Res. Azerbaijan Corp. v. State Oil Co. of

14 Azerbaijan Republic, 582 F.3d 393, 396 (2d Cir. 2009)).

15     The district court distinguished between specific and

16 general personal jurisdiction---specific jurisdiction applies

17 where the defendants' contacts are related to the litigation and

18 general jurisdiction applies where the defendants' contacts are

19 so substantial that the defendants could be sued on all claims,

20 even those unrelated to contacts with the forum---and found that

21 the district court had general jurisdiction over the defendants.

22 Id. at *3.  The court considered what it deemed the defendants'

23 "substantial commercial presence in the United States," in

24 particular "a fully and continuously functional office in

13

1    Washington, D.C.," bank accounts and commercial contracts, and

2    "a substantial promotional presence in the United States, with

3    the D.C. office having been permanently dedicated to promoting

4    the interests of the PLO and the PA."   Id. at *4.

5        The district court concluded that activities involving the

6    defendants' New York office were exempt from jurisdictional

7    analysis under an exception for United Nations' related activity

8    articulated in Klinghoffer, 937 F.2d at 51-52 (UN participation

9    not properly considered basis for jurisdiction); see Sokolow,

10   2011 WL 1345086, at *5.  The district court held that the

11   activities involving the Washington, D.C. mission were not

12   exempt from analysis and provided "a sufficient basis to

13   exercise general jurisdiction over the Defendants."  Id. at *6

14   ("The PLO and the PA were continuously and systematically

15   present in the United States by virtue of their extensive public

16   relations activities.").

17       Next, the district court considered "'whether the assertion

18   of personal jurisdiction comports with "traditional notions of

19   fair play and substantial justice"---that is, whether it is

20   reasonable under the circumstances of the particular case.'"

21   Id. (quoting Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84

22   F.3d 560, 568 (2d Cir. 1996)).  The court found that the

23   exercise of jurisdiction did not offend "traditional notions of

24   fair play and substantial justice," pursuant to the standard

14

1   articulated by <u>International Shoe Co. v. Washington</u>, 326 U.S.

2   310, 316 (1945), and its progeny.  See <u>Sokolow</u>, 2011 WL 1345086,

3   at *6-7.  The district court concluded that "[t]here is a strong

4   inherent interest of the United States and Plaintiffs in

5   litigating ATA claims in the United States," and that the

6   defendants "failed to identify an alternative forum where

7   Plaintiffs' claims could be brought, and where the foreign court

8   could grant a substantially similar remedy."  <u>Id.</u> at *7.

9       In January 2014, after the Supreme Court had significantly

10  narrowed the general personal jurisdiction test in <u>Daimler</u>, 134

11  S. Ct. 746, the defendants moved for reconsideration of the

12  denial of their motion to dismiss.

13      On April 11, 2014, the district court denied the

14  defendants' motions for reconsideration, ruling that <u>Daimler</u> did

15  not compel dismissal.  The district court also denied the

16  defendants' motions to certify the jurisdictional issue for an

17  interlocutory appeal.  See <u>Sokolow</u>, 2014 WL 6811395, at *1.  The

18  defendants renewed their jurisdictional argument in their

19  motions for summary judgment, arguing that this Court's decision

20  in <u>Gucci America, Inc. v. Weixing Li</u>, 768 F.3d 122 (2d Cir.

21  2014), altered the controlling precedent in this Circuit,

22  requiring dismissal of the case.  See <u>Sokolow</u>, 2014 WL 6811395,

23  at *1.  The district court concluded that it still had general

24  personal jurisdiction over the defendants, describing the action

15

1 as presenting "'an exceptional case,'" id. at *2, of the kind

2 discussed in Daimler, 134 S. Ct. at 761 n.19, and Gucci, 768

3 F.3d at 135.

4     The district court held that "[u]nder both Daimler and

5 Gucci, the PA and PLO's continuous and systematic business and

6 commercial contacts within the United States are sufficient to

7 support the exercise of general jurisdiction," and that the

8 record before the court was "insufficient to conclude that

9 either defendant is 'at home' in a particular jurisdiction other

10 than the United States." Sokolow, 2014 WL 6811395, at *2.

11     Following the summary judgment ruling, the defendants

12 sought mandamus on the personal jurisdiction issue.  This Court

13 denied the defendants' petition.  See In re Palestine Liberation

14 Org., Palestinian Authority, No. 14-4449 (2d Cir. Jan. 6, 2015)

15 (summary order).

16     The case proceeded to trial in January 2015.  During the

17 trial, the defendants introduced evidence about the PA's and

18 PLO's home in Palestine.  The trial evidence showed that the

19 terrorist attacks occurred in the vicinity of Jerusalem.  The

20 plaintiffs did not allege or submit evidence that the plaintiffs

21 were targeted in any of the six attacks at issue because of

22 their United States citizenship or that the defendants engaged

23 in conduct in the United States related to the attacks.

16

1    At the conclusion of plaintiffs' case in chief, the
2    defendants moved for judgment as a matter of law under Federal
3    Rule of Civil Procedure 50(a), arguing, among other grounds,
4    that the district court lacked personal jurisdiction over the
5    defendants.  The Court denied the motion.  The defendants
6    renewed that motion at the close of all the evidence and again
7    asserted that the court lacked personal jurisdiction.

8    During and immediately after trial, the District Court for
9    the District of Columbia issued three separate decisions
10   dismissing similar suits for lack of personal jurisdiction by
11   similar plaintiffs in cases against the PA and the PLO.  See
12   Estate of Klieman v. Palestinian Auth., 82 F. Supp. 3d 237, 245-
13   46 (D.D.C. 2015), *appeal docketed*, No. 15-7034 (D.C. Cir. Apr.
14   8, 2015); Livnat v. Palestinian Auth., 82 F. Supp. 3d 19, 30
15   (D.D.C. 2015), *appeal docketed*, No. 15-7024 (D.C. Cir. Mar. 18,
16   2015); Safra v. Palestinian Auth., 82 F. Supp. 3d 37, 47-48
17   (D.D.C. 2015), *appeal docketed*, No. 15-7025 (D.C. Cir. Mar. 18,
18   2015).

19   In light of these cases, on May 1, 2015, the defendants
20   renewed their motion to dismiss for lack of both general and
21   specific personal jurisdiction.  The defendants also moved, in
22   the alternative, for judgment as a matter of law or for a new
23   trial pursuant to Federal Rules of Civil Procedure 50(b) and 59.
24   The district court reviewed the decisions by the District Court

1   for the District of Columbia, but, for the reasons articulated

2   in its 2014 decision and at oral argument, concluded that the

3   district court had general personal jurisdiction over the

4   defendants.  The district court did not rule explicitly on

5   whether it had specific personal jurisdiction over the

6   defendants.

7        The jury found the defendants liable for all six attacks

8   and awarded the plaintiffs damages of $218.5 million, an amount

9   that was trebled automatically pursuant to the ATA, 18 U.S.C.

10  § 2333(a), bringing the total award to $655.5 million.

11       The parties engaged in post-trial motion practice not

12  relevant here, the defendants timely appealed, and the

13  plaintiffs cross-appealed.

14                              **II.**

15                              **A.**

16       "We review a district court's assertion of personal

17  jurisdiction *de novo*."  <u>Dynegy Midstream Servs. v. Trammochem</u>,

18  451 F.3d 89, 94 (2d Cir. 2006).[5]

---

[5] The standard of review in this case is complicated because the
issue of personal jurisdiction was raised initially on a motion
to dismiss, both before and after discovery, and as a basis for
Rule 50 motions at the conclusion of the plaintiffs' case and
after all the evidence was presented. This Court typically
reviews factual findings in a district court's decision on
personal jurisdiction for clear error and its legal conclusions
*de novo*. See <u>Frontera Res.</u>, 582 F.3d at 395. In this case, the
parties agree that this Court should review *de novo* whether the
district court's exercise of personal jurisdiction was

18

1    To exercise personal jurisdiction lawfully, three

2    requirements must be met. "First, the plaintiff's service of

3    process upon the defendant must have been procedurally proper.

4    Second, there must be a statutory basis for personal

5    jurisdiction that renders such service of process

6    effective. . . . Third, the exercise of personal jurisdiction

7    must comport with constitutional due process principles." Licci

8    ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59-60

9    (2d Cir. 2012) (footnotes and internal citations omitted),

10   certified question accepted sub nom. Licci v. Lebanese Canadian

11   Bank, 967 N.E.2d 697 (N.Y. 2012), and certified question

12   answered sub nom. Licci v. Lebanese Canadian Bank, 984 N.E.2d

13   893 (N.Y. 2012).

14       Constitutional due process assures that an individual will

15   only be subjected to the jurisdiction of a court where the

16   maintenance of a lawsuit does not offend "traditional notions of

17   fair play and substantial justice." Int'l Shoe, 326 U.S. at 316

18   (internal quotation marks omitted). Personal jurisdiction is "a

19   matter of individual liberty" because due process protects the

20   individual's right to be subject only to lawful power. J.

21   McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 884 (2011)

---

constitutional. See Pls.' Br. at 27; Defs.' Br. at 23. In any
event, the issues relating to general jurisdiction are
essentially legal questions that should be reviewed de novo.
Assuming without deciding the question, we review the district
court's assertion of personal jurisdiction de novo.

1  (plurality opinion) (quoting <u>Ins. Corp. of Ir. v. Compagnie des</u>

2  <u>Bauxites de Guinee</u>, 456 U.S. 694, 702 (1982)).

3       The ATA provides that process "may be served in any

4  district where the defendant resides, is found, or has an agent

5  . . . ." 18 U.S.C § 2334(a).  The district court found that the

6  plaintiffs properly served the defendants because they served

7  the complaint, pursuant to Federal Rule of Civil Procedure

8  4(h)(1)(B) (providing that service on an unincorporated

9  association is proper if the complaint is served on a "general

10  agent" of the entity), on Hassan Abdel Rahman, who "based upon

11  the overwhelming competent evidence produced by Plaintiffs, was

12  the Chief Representative of the PLO and the PA in the United

13  States at the time of service." <u>Sokolow</u>, 2011 WL 1345086, at *2.[6]

14       The defendants have not disputed that service was proper

15  and that there was a statutory basis pursuant to the ATA for

16  that service of process.  Therefore, the only question before

17  the Court is whether the third jurisdictional requirement is

18  met---whether jurisdiction over the defendants may be exercised

19  consistent with the Constitution.

20                              **B.**

21       Before we reach the analysis of constitutional due process,

22  the plaintiffs raise three threshold issues: First, whether the

---

[6] The district court found that the defendants are
"unincorporated associations."  <u>See</u> <u>Sokolow v. Palestine</u>
<u>Liberation Org.</u>, 60 F. Supp. 3d 509, 523-24 (S.D.N.Y. 2014).

1  defendants waived their objections to personal jurisdiction;

2  second, whether the defendants have due process rights at all;

3  and third, whether the due process clause of the Fifth Amendment

4  to the Constitution and not the Fourteenth Amendment controls

5  the personal jurisdiction analysis in this case.

6      First, the plaintiffs argue that the defendants waived

7  their argument that the district court lacked personal

8  jurisdiction over them. The plaintiffs contend that the

9  defendants could have argued that they were not subject to

10 general jurisdiction under the "at home" test before Daimler was

11 decided because the "at home" general jurisdiction test existed

12 after Goodyear Dunlop Tire Operations, S.A. v. Brown, 564 U.S.

13 915 (2011). This argument is unavailing because this Court in

14 Gucci looked to the test in Daimler as the appropriate test for

15 general jurisdiction over a corporate entity. See Gucci, 768

16 F.3d at 135-36.  The defendants did not waive or forfeit their

17 objection to personal jurisdiction because they repeatedly and

18 consistently objected to personal jurisdiction and invoked

19 Daimler after this Court's decision in Gucci.  Furthermore, the

20 district court explicitly noted that the "Defendants' motions

21 asserting lack of personal jurisdiction are *not* denied based on

22 a theory of waiver."  Sokolow, 2014 WL 6811395, at *2 n.2

23 (emphasis added).

21

Second, the plaintiffs argue that the defendants have no due process rights because the defendants are foreign governments and share many of the attributes typically associated with a sovereign government.  Foreign sovereign states do not have due process rights but receive the protection of the Foreign Sovereign Immunities Act.  See Frontera Res., 582 F.3d at 396-400.  The plaintiffs argue that entities, like the defendants, lack due process rights, because they do not view themselves as part of a sovereign and are treated as a foreign government in other contexts. The plaintiffs do not cite any cases indicating that a non-sovereign entity with governmental attributes lacks due process rights. All the cases cited by the plaintiffs stand for the proposition that *sovereign* governments lack due process rights, and these cases have not been extended beyond the scope of entities that are separate sovereigns, recognized by the United States government as sovereigns, and therefore enjoy foreign sovereign immunity.

While sovereign states are not entitled to due process protection, see id. at 399, neither the PLO nor the PA is recognized by the United States as a sovereign state, and the executive's determination of such a matter is conclusive.  See Zivotofsky v. Kerry, 135 S. Ct. 2076, 2088 (2015); see also Ungar, 315 F. Supp. 2d at 177 ("The PA and PLO's argument must fail because Palestine does not satisfy the four criteria for

statehood and is not a State under prevailing international legal standards."); <u>Knox</u>, 306 F. Supp. 2d at 431 ("[T]here does not exist a state of Palestine which meets the legal criteria for statehood. . . ."); <u>accord</u> <u>Klinghoffer</u>, 937 F.2d at 47 ("It is quite clear that the PLO meets none of those requirements [for a state]."). Because neither defendant is a state, the defendants have due process rights. <u>See</u> <u>O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on Sept. 11, 2001)</u>, 714 F.3d 659, 681-82 (2d Cir. 2013) ("<u>O'Neill</u>") (dismissing for lack of personal jurisdiction claims against charities, financial institutions, and other individuals who are alleged to have provided support to Osama Bin Laden and al Qaeda); <u>Livnat</u>, 82 F. Supp. 3d at 26 (due process clause applies to the PA (collecting cases)).

Third, the plaintiffs and *amici curiae* Former Federal Officials argue that the restrictive Fourteenth Amendment due process standards cannot be imported into the Fifth Amendment and that the due process clause of the Fifth Amendment to the Constitution,[7] and not the Fourteenth Amendment,[8] applies to the

---

[7] The Fifth Amendment states in relevant part: ". . . nor shall any person . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. V.

[8] The Fourteenth Amendment states in relevant part: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV., § 1.

1   ATA and controls the analysis in this case. The argument is

2   particularly important in this case because the defendants rely

3   on the standard for personal jurisdiction set out in Daimler and

4   the Daimler Court explained that it was interpreting the due

5   process clause of the Fourteenth Amendment. Daimler, 134 S. Ct.

6   at 751.

7        The plaintiffs and amici argue that the Fourteenth

8   Amendment due process clause restricts state power but the Fifth

9   Amendment should be applied to the exercise of federal power.

10  Their argument is that the Fourteenth Amendment imposes stricter

11  limits on the personal jurisdiction that courts can exercise

12  because that Amendment, grounded in concepts of federalism, was

13  intended to referee jurisdictional conflicts among the sovereign

14  States.  The Fifth Amendment, by contrast, imposes more lenient

15  restrictions because it contemplates disputes with foreign

16  nations, which, unlike States, do not follow reciprocal rules

17  and are not subject to our constitutional system.  See, e.g., J.

18  McIntyre Mach., 564 U.S. at 884 (plurality opinion) ("Because

19  the United States is a distinct sovereign, a defendant may in

20  principle be subject to the jurisdiction of the courts of the

21  United States but not of any particular State. This is

22  consistent with the premises and unique genius of our

23  Constitution.").  To conflate the due process requirements of

24  the Fourteenth and Fifth Amendments, the plaintiffs and amici

24

1  argue, would impose a unilateral constraint on United States

2  courts, even when the political branches conclude that personal

3  jurisdiction over a defendant for extraterritorial conduct is in

4  the national interest.[9]

5       This Court's precedents clearly establish the congruence of

6  due process analysis under both the Fourteenth and Fifth

7  Amendments.  This Court has explained: "[T]he due process

8  analysis [for purposes of the court's *in personam* jurisdiction]

9  is basically the same under both the Fifth and Fourteenth

10  Amendments.  The principal difference is that under the Fifth

11  Amendment the court can consider the defendant's contacts

12  throughout the United States, while under the Fourteenth

13  Amendment only the contacts with the forum state may be

14  considered."  Chew v. Dietrich, 143 F.3d 24, 28 n.4 (2d Cir.

15  1998).

16       Indeed, this Court has already applied Fourteenth Amendment

17  principles to Fifth Amendment civil terrorism cases.  For

---

[9] The plaintiffs also point to the brief filed by the United
States Solicitor General in Daimler to support their argument
that the due process standards for the Fifth and Fourteenth
Amendments vary.  However, the United States never advocated
that the Fourteenth Amendment standard would be inapplicable to
Fifth Amendment cases and, instead, urged the Court not to reach
the issue.  See Brief for the United States as Amicus Curaie
Supporting Petitioner, DaimlerChrysler AG v. Bauman, 134 S. Ct.
746 (2014) (No. 11-965), 2013 WL 3377321, at *3 n.1 ("This Court
has consistently reserved the question whether its Fourteenth
Amendment personal jurisdiction precedents would apply in a case
governed by the Fifth Amendment, and it should do so here.").

1  example, in O'Neill, 714 F.3d at 673-74, this Court applied

2  Fourteenth Amendment due process cases to terrorism claims

3  brought pursuant to the ATA in federal court. See In re

4  Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 93 (2d Cir.

5  2008), *abrogated on other grounds by* Samantar v. Yousuf, 560

6  U.S. 305 (2010); see also Tex. Trading & Milling Corp. v. Fed.

7  Republic of Nigeria, 647 F.2d 300, 315 n.37 (2d Cir. 1981)

8  (declining to apply different due-process standards in a case

9  governed by the Fifth Amendment compared to one governed by the

10 Fourteenth Amendment), *overruled on other grounds by* Frontera

11 Res., 582 F.3d at 400; GSS Grp. Ltd v. Nat'l Port Auth., 680

12 F.3d 805, 816-17 (D.C. Cir. 2012) (applying Fourteenth Amendment

13 case law when considering minimum contacts under the Fifth

14 Amendment).

15      *Amici* Federal Officials concede that our precedents settle

16 the issue, but they argue those cases were wrongly decided and

17 urge us not to follow them. We decline the invitation to upend

18 settled law.[10]

19      Accordingly, we conclude that the minimum contacts and

20 fairness analysis is the same under the Fifth Amendment and the

---

[10] *Amici* argue for "universal"---or limitless---personal
jurisdiction in terrorism cases. This Court has already rejected
that suggestion. See United States v. Yousef, 327 F.3d 56, 107-
08 (2d Cir. 2003) (per curiam) ("[T]errorism---unlike piracy,
war crimes, and crimes against humanity---does not provide a
basis for universal jurisdiction.").

1    Fourteenth Amendment in civil cases and proceed to analyze the

2    jurisdictional question.

3                                    III.

4          Pursuant to the due process clauses of the Fifth and

5    Fourteenth Amendments, there are two parts to the due process

6    test for personal jurisdiction as established by International

7    Shoe, 326 U.S. 310, and its progeny: the "minimum contacts"

8    inquiry and the "reasonableness" inquiry.  See Bank Brussels

9    Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d

10   Cir. 2002) (Sotomayor, J.).  The minimum contacts inquiry

11   requires that the court determine whether a defendant has

12   sufficient minimum contacts with the forum to justify the

13   court's exercise of personal jurisdiction over the defendant.

14   See Daimler, 134 S. Ct. at 754; Calder v. Jones, 465 U.S. 783,

15   788 (1984); Int'l Shoe, 326 U.S. at 316; Metro. Life Ins., 84

16   F.3d at 567-68.  The reasonableness inquiry requires the court

17   to determine whether the assertion of personal jurisdiction over

18   the defendant comports with "'traditional notions of fair play

19   and substantial justice'" under the circumstances of the

20   particular case.  Daimler, 134 S. Ct. at 754 (quoting Goodyear,

21   564 U.S. at 923); Burger King Corp. v. Rudzewicz, 471 U.S. 462,

22   476-78 (1985).

23         International Shoe distinguished between two exercises of

24   personal jurisdiction: general jurisdiction and specific

                                     27

1   jurisdiction.  The district court in this case ruled only on the

2   issue of general jurisdiction. We conclude that general

3   jurisdiction is absent; the question remains whether the court

4   may nonetheless assert its jurisdiction under the doctrine of

5   specific jurisdiction.

6       A court may assert general personal jurisdiction over a

7   foreign defendant to hear any and all claims against that

8   defendant only when the defendant's affiliations with the State

9   in which suit is brought "are so constant and pervasive 'as to

10  render [it] essentially at home in the forum State.'"  Daimler,

11  134 S. Ct. at 751 (quoting Goodyear, 564 U.S. at 919); see also

12  Goodyear, 564 U.S. at 924.  "Since International Shoe, 'specific

13  jurisdiction has become the centerpiece of modern jurisdiction

14  theory, while general jurisdiction [has played] a reduced

15  rule.'"  Daimler, 134 S. Ct. at 755 (quoting Goodyear, 564 U.S.

16  at 925).  Accordingly, there are "few" Supreme Court opinions

17  over the past half-century that deal with general jurisdiction.

18  Id.

19      "Specific jurisdiction, on the other hand, depends on an

20  affiliation between the forum and the underlying controversy,

21  principally, activity or an occurrence that takes place in the

22  forum State and is therefore subject to the State's regulation."

23  Goodyear, 564 U.S. at 919 (alterations, internal quotation

24  marks, and citation omitted).  The exercise of specific

1    jurisdiction depends on in-state activity that "*gave rise to the*

2    *episode-in-suit*."  Id. at 923 (quoting Int'l Shoe, 326 U.S. at

3    317) (emphasis in original).  In certain circumstances, the

4    "commission of certain 'single or occasional acts' in a State

5    may be sufficient to render a corporation answerable in that

6    State with respect to those acts, though not with respect to

7    matters unrelated to the forum connections."  Id. (quoting Int'l

8    Shoe, 326 U.S. at 318).

9    **A.**

10    The district court concluded that it had general

11    jurisdiction over the defendants; however, that conclusion

12    relies on a misreading of the Supreme Court's decision in

13    Daimler.

14    In Daimler, the plaintiffs asserted claims under the Alien

15    Tort Statute and the Torture Victim Protection Act of 1991, see

16    28 U.S.C. §§ 1350 & note, as well as other claims, arising from

17    alleged torture that was committed in Argentina by the

18    Argentinian government with the collaboration of an Argentina-

19    based subsidiary of the German corporate defendant.  See

20    Daimler, 134 S. Ct. at 750-52.  The Supreme Court rejected the

21    argument that the California federal court could exercise

22    general personal jurisdiction over the German corporation based

23    on the continuous activities in California of the German

24    corporation's indirect United States subsidiary.  See id. at

1  751.  Daimler concluded that the German corporate parent, which

2  was not incorporated in California and did not have its

3  principal place of business in California, could not be

4  considered to be "at home in California" and subject to general

5  jurisdiction there.  Id. at 762.

6      Daimler analogized its "at-home test" to that of an

7  individual's domicile. "[F]or a corporation, it is an equivalent

8  place, one in which the corporation is fairly regarded as at

9  home.  With respect to a corporation, the place of incorporation

10  and principal place of business are paradigm bases for general

11  jurisdiction."  Id. at 760 (alterations, internal quotation

12  marks, and citations omitted).

13      As an initial matter, while Daimler involved corporations,

14  and neither the PA nor the PLO is a corporation---the PA is a

15  non-sovereign government and the PLO is a foreign agent, and

16  both are unincorporated associations, see Part I.A---Daimler's

17  reasoning was based on an analogy to general jurisdiction over

18  individuals, and there is no reason to invent a different test

19  for general personal jurisdiction depending on whether the

20  defendant is an individual, a corporation, or another entity.

21  Indeed, in Gucci this Court relied on Daimler when it found

22  there was no general personal jurisdiction over the Bank of

23  China, a non-party bank that was incorporated and headquartered

24  in China and owned by the Chinese government.  The Court

30

described the Daimler test as applicable to "entities."
"General, all-purpose jurisdiction permits a court to hear 'any
and all claims' against an *entity*." Gucci, 768 F.3d at 134
(emphasis added); see id. at 134 n.13 ("The essence of general
personal jurisdiction is the ability to entertain 'any and all
claims' against an entity based solely on the entity's
activities in the forum, rather than on the particulars of the
case before the court."). Consequently, we consider the PLO and
the PA entities subject to the Daimler test for general
jurisdiction. See Klieman, 82 F. Supp. 3d at 245-46; Livnat, 82
F. Supp. 3d at 28; Safra, 82 F. Supp. 3d at 46.

Pursuant to Daimler, the question becomes, where are the PA
and PLO "'fairly regarded as at home'"?  134 S. Ct. at 761
(quoting Goodyear, 564 U.S. at 924).  The overwhelming evidence
shows that the defendants are "at home" in Palestine, where they
govern.  Palestine is the central seat of government for the PA
and PLO.  The PA's authority is limited to the West Bank and
Gaza, and it has no independently operated offices anywhere
else.  All PA governmental ministries, the Palestinian
president, the Parliament, and the Palestinian security services
reside in Palestine.

As the District Court for the District of Columbia
observed, "[i]t is common sense that the single ascertainable
place where a government such a[s] the Palestinian Authority

31

should be amenable to suit for all purposes is the place where
it governs.  Here, that place is the West Bank, not the United
States."  Livnat, 82 F. Supp. 3d at 30; see also Safra, 82 F.
Supp. 3d at 48.  The same analysis applies equally to the PLO,
which during the relevant period maintained its headquarters in
Palestine and Amman, Jordan.  See Klieman, 82 F. Supp. 3d at 245
("Defendants' alleged contacts . . . do not suffice to render
the PA and the PLO 'essentially at home' in the United States.")

The activities of the defendants' mission in Washington,
D.C.---which the district court concluded simultaneously served
as an office for the PLO and the PA, see Sokolow, 2011 WL
1345086, at *3---were limited to maintaining an office in
Washington, promoting the Palestinian cause in speeches and
media appearances, and retaining a lobbying firm.  See id. at
*4.

These contacts with the United States do not render the PA
and the PLO "essentially at home" in the United States.  See
Daimler, 134 S. Ct. at 754.  The commercial contacts that the
district court found supported general jurisdiction are like
those rejected as insufficient by the Supreme Court in Daimler.
In Daimler, the Supreme Court held as "unacceptably grasping" a
formulation that allowed for "the exercise of general
jurisdiction in every State in which a corporation 'engages in a
substantial, continuous, and systematic course of business.'"

32

1    134 S. Ct. at 761.  The Supreme Court found that a court in

2    California could not exercise general personal jurisdiction over

3    the German parent company even though that company's indirect

4    subsidiary was the largest supplier of luxury vehicles to the

5    California market.  Id. at 752.  The Supreme Court deemed

6    Daimler's contacts with California "slim" and concluded that

7    they would "hardly render it at home" in California.  Id. at

8    760.

9         Daimler's contacts with California were substantially

10   greater than the defendants' contacts with the United States in

11   this case.  But still the Supreme Court rejected the proposition

12   that Daimler should be subjected to general personal

13   jurisdiction in California for events that occurred anywhere in

14   the world.  Such a regime would allow entities to be sued in

15   many jurisdictions, not just the jurisdictions where the

16   entities were centered, for worldwide events unrelated to the

17   jurisdiction where suit was brought.  The Supreme Court found

18   such a conception of general personal jurisdiction to be

19   incompatible with due process.  The Supreme Court explained:

20        General jurisdiction . . . calls for an appraisal of a
21        corporation's activities in their entirety, nationwide
22        and worldwide.  A corporation that operates in many
23        places can scarcely be deemed at home in all of them.
24        Otherwise, "at home" would be synonymous with "doing
25        business" tests framed before specific jurisdiction
26        evolved in the United States.  Nothing in
27        International Shoe and its progeny suggests that "a
28        particular quantum of local activity" should give a

33

1       State authority over a "far larger quantum of . . .
2       activity" having no connection to any in-state
3       activity.
4
5  Id. at 762 n.20 (internal citations omitted). Regardless of the

6  commercial contacts occasioned by the defendants' Washington,

7  D.C. mission, there is no doubt that the "far larger quantum" of

8  the defendants' activities took place in Palestine.

9      The district court held that the record before it was

10  "insufficient to conclude that either defendant is 'at home' in

11  a particular jurisdiction other than the United States."

12  Sokolow, 2014 WL 6811395, at *2. That conclusion is not

13  supported by the record. The evidence demonstrates that the

14  defendants are "at home" in *Palestine*, where these entities are

15  headquartered and from where they are directed. See Daimler,

16  134 S. Ct. at 762 n.20.[11]

17      The district court also erred in placing the burden on the

18  defendants to prove that there exists "an alternative forum

19  where Plaintiffs' claims could be brought, and where the foreign

20  court could grant a substantially similar remedy." Sokolow,

21  2011 WL 1345086, at *7. Daimler imposes no such burden. In

22  fact, it is the plaintiff's burden to establish that the court

23  has personal jurisdiction over the defendants. See Koehler v.

---

[11] It appears that the district court, when considering where the
defendants were "at home," limited its inquiry to areas that are
within a sovereign nation. We see no basis in precedent for
this limitation.

34

1  <u>Bank of Bermuda Ltd.</u>, 101 F.3d 863, 865 (2d Cir. 1996) ("[T]he

2  plaintiff bears the ultimate burden of establishing jurisdiction

3  over the defendant by a preponderance of evidence . . . .");

4  <u>Metro. Life Ins.</u>, 84 F.3d at 566-67; <u>see also</u> <u>Klieman</u>, 82 F.

5  Supp. 3d at 243; <u>Livnat</u>, 82 F. Supp. 3d at 30; <u>Safra</u>, 82 F.

6  Supp. 3d at 49.[12]

7        Finally, the district court did not dispute the defendants'

8  ties to Palestine but concluded that the court had general

9  jurisdiction pursuant to an "exception" that the Supreme Court

10 alluded to in a footnote in <u>Daimler</u>.  In <u>Daimler</u>, the Supreme

11 Court did not "foreclose the possibility that in an exceptional

12 case, a corporation's operations in a forum other than its

13 formal place of incorporation or principal place of business may

14 be so substantial and of such a nature as to render the

15 corporation at home in that State." 134 S. Ct. at 761 n.19

16 (citing <u>Perkins v. Benguet Consol. Mining Co.</u>, 342 U.S. 437,

17 447-48 (1952)).

---

[12] The district court's focus on the importance of identifying an
alternative forum may have been borrowed inappositely from <i>forum
non conveniens</i> jurisprudence, pursuant to which a court
considers (1) the degree of deference to be afforded to the
plaintiff's choice of forum; (2) whether there is an adequate
alternative forum for adjudicating the dispute; and (3) whether
the balance of private and public interests tips in favor of
adjudication in one forum or the other.  <u>See Norex Petroleum
Ltd. v. Access Indus., Inc.</u>, 416 F.3d 146, 153 (2d Cir. 2005).
However, that is not the test for general jurisdiction under
<u>Daimler</u>, 134 S. Ct. at 762 n.20.

1    Daimler analyzed the 1952 Perkins case, "'the textbook case

2    of general jurisdiction appropriately exercised over a foreign

3    corporation that has not consented to suit in the forum.'"  Id.

4    at 755-56 (quoting Goodyear, 564 U.S. at 928).  The defendant in

5    Perkins was a company, Benguet Consolidated Mining Company

6    ("Benguet"), which was incorporated under the laws of the

7    Philippines, where it operated gold and silver mines.  During

8    World War II, the Japanese occupied the Philippines, and

9    Benguet's president relocated to Ohio, where he kept an office,

10   maintained the company's files, and oversaw the company's

11   activities. Perkins, 342 U.S. at 447-48.  The plaintiff, a

12   nonresident of Ohio, sued Benguet in a state court in Ohio on a

13   claim that neither arose in Ohio nor related to the

14   corporation's activities in Ohio, but the Supreme Court

15   nevertheless held that the Ohio courts could constitutionally

16   exercise general personal jurisdiction over the defendant.  Id.

17   at 438, 440.  As the Supreme Court later observed: "'Ohio was

18   the corporation's principal, if temporary, place of business.'"

19   Daimler, 134 S. Ct. at 756 (quoting Keeton v. Hustler Magazine,

20   Inc., 465 U.S. 770, 780 n.11 (1984)).

21   Such exceptional circumstances did not exist in Daimler,

22   id. at 761 n.19, or in Gucci.  In Gucci, this Court held that,

23   while a nonparty bank had branch offices in the forum, it was

24   not an "exceptional case" in which to exercise general personal

36

1   jurisdiction where the bank was incorporated and headquartered

2   elsewhere, and its contacts were not "'so continuous and

3   systematic as to render [it] essentially at home in the forum.'"

4   768 F.3d at 135 (quoting Daimler, 134 S. Ct. at 761 n.19).

5       The defendants' activities in this case, as with those of

6   the defendants in Daimler and Gucci, "plainly do not approach"

7   the required level of contact to qualify as "exceptional."

8   Daimler, 134 S. Ct. at 761 & n.19.  The PLO and PA have not

9   transported their principle "home" to the United States, even

10  temporarily, as the defendant had in Perkins.  See Brown v.

11  Lockheed Martin Corp., 814 F.3d 619, 628-30 (2d Cir. 2016).

12      Accordingly, pursuant to the Supreme Court's recent

13  decision in Daimler, the district court could not properly

14  exercise general personal jurisdiction over the defendants.

15                              **B.**

16      The district court did not rule explicitly on whether it

17  had specific personal jurisdiction over the defendants, but the

18  question was sufficiently briefed and argued to allow us to

19  reach that issue.

20      "The inquiry whether a forum State may assert specific

21  jurisdiction over a nonresident defendant focuses on the

22  relationship among the defendant, the forum, and the litigation.

23  For a State to exercise jurisdiction consistent with due

24  process, the defendant's suit-related conduct must create a

1   substantial connection with the forum State." <u>Walden v. Fiore</u>,

2   134 S. Ct. 1115, 1121 (2014) (internal quotation marks and

3   citations omitted).  The relationship between the defendant and

4   the forum "must arise out of contacts that the 'defendant

5   *himself*' creates with the forum." <u>Id.</u> at 1122 (citing <u>Burger</u>

6   <u>King</u>, 471 U.S. at 475) (emphasis in original). The "'minimum

7   contacts' analysis looks to the defendant's contacts with the

8   forum State itself, not the defendant's contacts with persons

9   who reside there." <u>Id.</u>  And the "same principles apply when

10  intentional torts are involved." <u>Id.</u> at 1123.

11          The question in this case is whether the defendants' suit-

12  related conduct---their role in the six terror attacks at issue-

13  --creates a substantial connection with the forum State pursuant

14  to the ATA. The relevant "suit-related conduct" by the

15  defendants was the conduct that could have subjected them to

16  liability under the ATA. On its face, the conduct in this case

17  did not involve the defendants' conduct in the United States in

18  violation of the ATA.  While the plaintiff-victims were United

19  States citizens, the terrorist attacks occurred in and around

20  Jerusalem, and the defendants' activities in violation of the

21  ATA occurred outside the United States.

22          The ATA provides:

23          Any national of the United States injured in his or
24          her person, property, or business by reason of an act
25          of international terrorism, or his or her estate,

38

```
 1        survivors, or heirs, may sue therefor in any
 2        appropriate district court of the United States and
 3        shall recover threefold the damages he or she sustains
 4        and the cost of the suit, including attorney's fees.
 5
 6   18 U.S.C. § 2333(a)
```

To prevail under the ATA, a plaintiff must prove "three formal elements: unlawful *action*, the requisite *mental state*, and *causation*." Sokolow, 60 F. Supp. 3d at 514 (quoting Gill v. Arab Bank, PLC, 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012)) (emphasis in original).

To establish an "unlawful action," the plaintiffs must show that their injuries resulted from an act of "international terrorism." The ATA defines "international terrorism" as activities that, among other things, "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. § 2331(1)(A). The acts must also appear to be intended "(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(B)(i)-(iii).

The plaintiffs asserted that the defendants were responsible on a *respondeat superior* theory for a variety of

1  predicate acts, including murder and attempted murder, 18 U.S.C.

2  §§ 1111, 2332, use of a destructive device on a mass

3  transportation vehicle, 18 U.S.C. § 1992, detonating an

4  explosive device on a public transportation system, 18 U.S.C.

5  § 2332f, and conspiracy to commit those acts, 18 U.S.C. § 371.

6  See Sokolow, 60 F. Supp. 3d at 515.  They also asserted that the

7  defendants directly violated federal and state antiterrorism

8  laws, including 18 U.S.C. § 2339B, by providing material support

9  to FTO-designated groups (the AAMB and Hamas) and by harboring

10  persons whom the defendants knew or had reasonable grounds to

11  believe committed or were about to commit an offense relating to

12  terrorism, see 18 U.S.C. § 2339 et seq.; see also Sokolow, 60 F.

13  Supp. 3d at 520-21, 523.

14      The ATA further limits international terrorism to

15  activities that "occur primarily outside the territorial

16  jurisdiction of the United States, or transcend national

17  boundaries in terms of the means by which they are accomplished,

18  the persons they appear intended to intimidate or coerce, or the

19  locale in which their perpetrators operate or seek asylum."  18

20  U.S.C. § 2331(1)(C) (emphasis added).

21      The bombings and shootings here occurred entirely outside

22  the territorial jurisdiction of the United States.  Thus, the

23  question becomes: What other constitutionally sufficient

40

1   connection did the commission of *these* torts by *these* defendants

2   have to *this* jurisdiction?

3         The jury found in a special verdict that the PA and the PLO

4   were liable for the attacks under several theories.  In all of

5   the attacks, the jury found that the PA and the PLO were liable

6   for providing material support or resources that were used in

7   preparation for, or in carrying out, each attack.

8         In addition, the jury found that in five of the attacks---

9   the January 22, 2002 Jaffa Road Shooting, the January 27, 2002

10  Jaffa Road Bombing, the March 21, 2002 King George Street

11  Bombing, the July 31, 2002 Hebrew University Bombing, and the

12  January 29, 2004 Bus No. 19 Bombing---the PA was liable because

13  an employee of the PA, acting within the scope of the employee's

14  employment and in furtherance of the activities of the PA,

15  either carried out, or knowingly provided material support or

16  resources that were used in preparation for, or in carrying out,

17  the attack.

18        The jury also found that in one of the attacks---the July

19  31, 2002 Hebrew University Bombing---the PLO and the PA harbored

20  or concealed a person who the organizations knew, or had

21  reasonable grounds to believe, committed or was about to commit

22  the attack.

23        Finally, the jury found that in three attacks---the June

24  19, 2002 French Hill Bombing, the July 31, 2002 Hebrew

University Bombing, and the January 29, 2004 Bus No. 19 Bombing---the PA and PLO knowingly provided material support to an FTO-designated group (the AAMB or Hamas).

But these actions, as heinous as they were, were not sufficiently connected to the United States to provide specific personal jurisdiction in the United States. There is no basis to conclude that the defendants participated in these acts in the United States or that their liability for these acts resulted from their actions that did occur in the United States.

In short, the defendants were liable for tortious activities that occurred outside the United States and affected United States citizens only because they were victims of indiscriminate violence that occurred abroad. The residence or citizenship of the plaintiffs is an insufficient basis for specific jurisdiction over the defendants. A focus on the relationship of the defendants, the forum, and the defendants' suit-related conduct points to the conclusion that there is no specific personal jurisdiction over the defendants for the torts in this case. See Walden, 134 S. Ct. at 1121; see also Goodyear, 564 U.S. at 923.

In the absence of such a relationship, the plaintiffs argue on appeal that the Court has specific jurisdiction for three reasons. First, the plaintiffs argue that, under the "effects test," a defendant acting entirely outside the United States is

1    subject to jurisdiction "if the defendant expressly aimed its

2    conduct" at the United States.  Licci ex rel. Licci v. Lebanese

3    Canadian Bank, SAL, 732 F.3d 161, 173 (2d Cir. 2013).  The

4    plaintiffs point to the jury verdict that found that the

5    defendants provided material support to designated FTOs---the

6    AAMB and Hamas---and that the defendants' employees, acting

7    within the scope of their employment, killed and injured United

8    States citizens.  They also argue that the defendants' terror

9    attacks were intended to influence United States policy to favor

10   the defendants' political goals.  Second, the plaintiffs argue

11   that the defendants purposefully availed themselves of the forum

12   by establishing a continuous presence in the United States and

13   pressuring United States government policy by conducting terror

14   attacks in Israel and threatening further terrorism unless

15   Israel withdrew from Gaza and the West Bank.  See Banks Brussels

16   Lambert, 305 F.3d at 128.  Third, the plaintiffs argue that the

17   defendants consented to personal jurisdiction under the ATA by

18   appointing an agent to accept process.

19        Walden forecloses the plaintiffs' arguments.  First, with

20   regard to the effects test, the defendant must "expressly aim[]"

21   his conduct at the United States.  See Licci, 732 F. 3d at 173.

22   Pursuant to Walden, it is "insufficient to rely on a defendant's

23   'random, fortuitous, or attenuated contacts' or on the

24   'unilateral activity' of a plaintiff" with the forum to

43

1  establish specific jurisdiction.  _Walden_, 134 S. Ct. at 1123

2  (quoting _Burger King_, 471 U.S. at 475).  While the killings and

3  related acts of terrorism are the kind of activities that the

4  ATA proscribes, those acts were unconnected to the forum and

5  were not expressly aimed at the United States.  And "[a] forum

6  State's exercise of jurisdiction over an out-of-state

7  intentional tortfeasor must be based on intentional conduct by

8  the defendant that creates the necessary contacts with the

9  forum."  _Id._  That is not the case here.

10      The plaintiffs argue that United States citizens were

11 targets of these attacks, but their own evidence establishes the

12 random and fortuitous nature of the terror attacks.  For

13 example, at trial, the plaintiffs emphasized how the "killing

14 was indeed random" and targeted "Christians and Jews, Israelis,

15 Americans, people from all over the world."  J.A. 3836.

16 Evidence at trial showed that the shooters fired

17 "indiscriminately," J.A. 3944, and chose sites for their suicide

18 bomb attacks that were "full of people," J.A. 4030-31, because

19 they sought to kill "as many people as possible," J.A. 3944; _see_

20 _also_ J.A. 4031.

21      The plaintiffs argue that "[i]t is a fair inference that

22 Defendants _intended to_ hit American citizens by continuing a

23 terror campaign that continuously hit Americans . . . ."  Pls.'

24 Br. at 37 (emphasis in original).  But the Constitution requires

1    much more purposefully directed contact with the forum.  For

2    example, the Supreme Court has "upheld the assertion of

3    jurisdiction over defendants who have purposefully 'reach[ed]

4    out beyond' their State and into another by, for example,

5    entering a contractual relationship that 'envisioned continuing

6    and wide-reaching contacts' in the forum State," Walden, 134 S.

7    Ct. at 1122 (alteration in original) (quoting Burger King, 472

8    U.S. at 479-80), or "by circulating magazines to 'deliberately

9    exploi[t]' a market in the forum State."  Id. (alteration in

10   original) (quoting Keeton, 465 U.S. at 781).  But there was no

11   such purposeful connection to the forum in this case, and it

12   would be impermissible to speculate based on scant evidence what

13   the terrorists intended to do.

14        Furthermore, the facts of Walden also suggest that a

15   defendant's mere knowledge that a plaintiff resides in a

16   specific jurisdiction would be insufficient to subject a

17   defendant to specific jurisdiction in that jurisdiction if the

18   defendant does nothing in connection with the tort in that

19   jurisdiction.  In Walden, the petitioner was a police officer in

20   Georgia who was working as a deputized Drug Enforcement

21   Administration ("DEA") agent at the Atlanta airport.  He was

22   informed that the respondents, Gina Fiore and Keith Gipson, were

23   flying from San Juan, Puerto Rico through Atlanta en route to

24   their final destination in Las Vegas, Nevada.  See Joint

45

1   Appendix, <u>Walden v. Fiore</u>, 2013 WL 2390248, *41-42 (U.S.) (Decl.

2   of Anthony Walden).   Walden and his DEA team stopped the

3   respondents and searched their bags in Atlanta and examined

4   their California drivers' licenses.   <u>Id.</u>; <u>Walden</u>, 134 S. Ct. at

5   1119.   Walden found almost $100,000 in cash in the respondents'

6   carry-on bag and seized it, giving rise to a claim for an

7   unconstitutional search under <u>Bivens v. Six Unknown Named Agents</u>

8   <u>of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).   <u>See</u>

9   <u>Walden</u>, 134 S. Ct. at 1119-20.   The Supreme Court found that the

10  petitioner's contacts with Nevada were insufficient to establish

11  personal jurisdiction over the petitioner in a Nevada federal

12  court, even though Walden knew that the respondents were

13  destined for Nevada.   <u>See</u> <u>id.</u> at 1119.

14      In this case, the plaintiffs point us to no evidence that

15  these indiscriminate terrorist attacks were specifically

16  targeted against United States citizens, and the mere knowledge

17  that United States citizens might be wronged in a foreign

18  country goes beyond the jurisdictional limit set forth in

19  <u>Walden</u>.

20      The plaintiffs cite to several cases to support their

21  argument that specific jurisdiction is warranted under an

22  "effects test."   Those cases are easily distinguishable from

23  this case.   Indeed, they point to the kinds of circumstances

1   that would give rise to specific jurisdiction under the ATA,

2   which are not present here.

3       For example, in Mwani v. Bin Laden, 417 F.3d 1 (D.C. Cir.

4   2005), the Court of Appeals for the District of Columbia Circuit

5   found that specific personal jurisdiction over Osama Bin Laden

6   and al Qaeda was supported by allegations that they

7   "orchestrated the bombing of the American embassy in Nairobi,

8   not only to kill both American and Kenyan employees inside the

9   building, but to cause pain and sow terror in the embassy's home

10  country, the United States," as well as allegations of "an

11  ongoing conspiracy to attack the United States, with overt acts

12  occurring within this country's borders." Id. at 13 (emphasis

13  added). The plaintiffs pointed to the 1993 World Trade Center

14  bombing, as well as the plot to bomb the United Nations, Federal

15  Plaza, and the Lincoln and Holland Tunnels in New York. Id.

16  Furthermore, the Court of Appeals found that bin Laden and al

17  Qaeda "'purposefully directed' [their] activities at residents"

18  of the United States, and that the case "result[ed] from

19  injuries to the plaintiffs 'that arise out of or relate to those

20  activities,'" id. (quoting Burger King, 471 U.S. at 472).

21      "[E]xercising specific jurisdiction because the victim of a

22  foreign attack happened to be an American would run afoul of the

23  Supreme Court's holding that '[d]ue process requires that a

24  defendant be haled into court in a forum State based on his own

47

1    affiliation with the State, not based on the "random,

2    fortuitous, or attenuated" contacts he makes by interacting with

3    other persons affiliated with the State.'" Klieman, 82 F. Supp.

4    3d at 248 (quoting Walden, 134 S. Ct. at 1123); see Safra, 82 F.

5    Supp. 3d at 52 (distinguishing Mwani); see also In re Terrorist

6    Attacks on Sept. 11, 2001, 538 F.3d at 95-96 (holding that even

7    if Saudi princes could and did foresee that Muslim charities

8    would use their donations to finance the September 11 attacks,

9    providing indirect funding to an organization that was openly

10    hostile to the United States did not constitute the type of

11    intentional conduct necessary to constitute purposeful direction

12    of activities at the forum); Livnat, 82 F. Supp. 3d at 33.

13        The plaintiffs also rely on O'Neill, 714 F.3d at 659, which

14    related to the September 11 attacks.  In that case, this Court

15    first clarified that "specific personal jurisdiction properly

16    exists where the defendant took 'intentional, and allegedly

17    tortious, actions . . . expressly aimed' at the forum." Id. at

18    674 (quoting Calder, 465 U.S. at 789).  This Court also noted

19    that, "the fact that harm in the forum is foreseeable . . . is

20    insufficient for the purpose of establishing specific personal

21    jurisdiction over a defendant." Id.  This Court then held that

22    the plaintiffs' allegations were insufficient to establish

23    personal jurisdiction over about two dozen defendants, but that

24    jurisdictional discovery was warranted for twelve other

48

1   defendants whose "alleged support of al Qaeda [was] more

2   direct." Id. at 678; see also id. at 656-66.  Those defendants

3   "allegedly controlled and managed some of [the front]

4   'charitable organizations' and, through their positions of

5   control, they allegedly sent financial and other material

6   support *directly* to al Qaeda when al Qaeda allegedly was known

7   to be *targeting the United States*." Id. (second emphasis

8   added).

9        The plaintiffs argue that this Court should likewise find

10  jurisdiction because the defendants' "direct, knowing provision

11  of material support to designated FTOs [in this case, Hamas and

12  the AAMB] is enough---standing alone---to sustain specific

13  jurisdiction because they knowingly aimed their conduct at U.S.

14  interests." Pls.' Br. at 36.  But that argument misreads

15  O'Neill.  In O'Neill, this Court emphasized that the mere "fact

16  that harm in the forum is foreseeable" was "insufficient for the

17  purpose of establishing specific personal jurisdiction over a

18  defendant," 714 F.3d at 674, and the Court did not end its

19  inquiry when it concluded that the defendants may have provided

20  support to terror organizations.  Indeed, the Court held that

21  "factual issues persist with respect to whether this support was

22  'expressly aimed' at the United States," warranting

23  jurisdictional discovery. Id. at 678-79.  The Court looked at

24  the specific aim of the group receiving support---particularly

49

1   that al Qaeda was "known to be targeting the United States"---
2   and not simply that it and other defendants were "terrorist
3   organizations." Id. at 678.[13]

4       The plaintiffs also cite Calder v. Jones, 465 U.S. at 783.
5   In that case, a California actress brought a libel suit in
6   California state court against a reporter and an editor, both of
7   whom worked for a tabloid at the tabloid's Florida headquarters.
8   Id. at 784.  The plaintiff's claims were based on an article
9   written and edited by the defendants in Florida for the tabloid,
10  which had a California circulation of about 600,000.  Id. at
11  784-86.  The Supreme Court held that California's assertion of
12  personal jurisdiction over the defendants for a libel action was
13  proper based on the effects of the defendants' conduct in
14  California.  Id. at 788.  "The article was drawn from California
15  sources, and the brunt of the harm, in terms both of
16  respondent's emotional distress and the injury to her
17  professional reputation, was suffered in California," the
18  Supreme Court held.  Id. at 788-89.  "In sum, California is the

_____

[13] Furthermore, the mere designation of a group as an FTO does
not reflect that the organization has aimed its conduct at the
United States.  The Secretary of State may "designate an
organization as a foreign terrorist organization" if the
Secretary finds "the organization is a foreign organization,"
"the organization engages in terrorist activity," "or retains
the capability and intent to engage in terrorist activity or
terrorism," and "the terrorist activity or terrorism of the
organization threatens the security of United States nationals
or the national security of the United States."  8 U.S.C.
§ 1189(a)(1)(A)-(C).

1 *focal point* both of the story and of the harm suffered." Id. at

2 789 (emphasis added); see also Walden, 134 S. Ct. at 1123

3 (describing the contacts identified in Calder as "ample" to

4 support specific jurisdiction). As the Supreme Court explained

5 in Walden, the jurisdictional inquiry in Calder focused on the

6 relationship among the defendant, the forum, and the litigation.

7 Walden, 134 S. Ct. at 1123.

8 Unlike in Calder, it cannot be said that the United States

9 is the focal point of the torts alleged in this litigation. In

10 this case, the United States is not the nucleus of the harm---

11 Israel is. See Safra, 82 F. Supp. 3d at 51.

12 Finally, the plaintiffs rely on two criminal cases, United

13 States v. Yousef, 327 F.3d 56 (2d Cir. 2003) (per curiam), and

14 United States v. Al Kassar, 660 F.3d 108 (2d Cir. 2011), for

15 their argument that the "effects test" supports jurisdiction.

16 In both cases, this Court applied the due process test for

17 asserting jurisdiction over extraterritorial criminal conduct,

18 which differs from the test applicable in this civil case, see

19 Al Kassar, 660 F.3d at 118; Yousef, 327 F.3d at 111-12, and does

20 not require a nexus between the specific criminal conduct and

21 harm within the United States. See also United States v.

22 Murillo, No. 15-4235, 2016 WL 3257016, at *3 (4th Cir. June 14,

23 2016)("[I]t is not arbitrary to prosecute a defendant in the

24 United States if his actions affected significant American

51

1   interests---even if the defendant did not mean to affect those

2   interests." (internal citation and quotation marks omitted)).

3   In order to apply a federal criminal statute to a defendant

4   extraterritorially consistent with due process, "'there must be

5   a sufficient nexus between the defendant and the United States,

6   so that such application would not be arbitrary or fundamentally

7   unfair.'  For non-citizens acting entirely abroad, a

8   jurisdictional nexus exists when the aim of that activity is to

9   cause harm inside the United States *or* to U.S. citizens *or*

10  interests." Al Kassar, 660 F.3d 108, 118 (emphasis added)

11  (quoting Yousef, 327 F.3d at 111).

12      In a civil action, as Walden makes clear, "the defendant's

13  suit-related conduct must create a substantial connection with

14  the forum State."  134 S. Ct. at 1121.

15      Even setting aside the fact that both Yousef and Al Kassar

16  applied the more expansive due process test in criminal cases,

17  the defendants in both cases had more substantial connections

18  with the United States than the defendants have in the current

19  litigation.  Yousef involved a criminal prosecution for the

20  bombing of an airplane traveling from the Philippines to Japan.

21  See 327 F.3d at 79.  The Yousef defendants "conspired to attack

22  a dozen United States-flag aircraft in an effort to inflict

23  injury on this country and its people and influence American

24  foreign policy, and their attack on the Philippine Airlines

52

1  flight was a 'test-run' in furtherance of this conspiracy." Id.

2  at 112.

3      In Al Kassar, several defendants were convicted of

4  conspiring to kill United States officers, to acquire and export

5  anti-aircraft missiles, and knowingly to provide material

6  support to a terrorist organization; two were also convicted of

7  conspiring to kill United States citizens and of money

8  laundering.  660 F.3d at 115.  On appeal, the defendants

9  challenged their convictions on a number of grounds, including

10 that the defendants' Fifth Amendment due process rights were

11 violated by prosecuting them for activities that occurred

12 abroad.  Id. at 117-18.  This Court rejected that argument

13 because the defendants conspired to sell arms to a group "with

14 the understanding that they would be used to kill Americans and

15 destroy U.S. property; the aim therefore was to harm U.S.

16 citizens and interests and to threaten the security of the

17 United States."  Id. at 118.

18     In this case, the defendants undertook terror attacks

19 within Israel, and there is no evidence the attacks specifically

20 targeted United States citizens.  See Safra, 82 F. Supp. 3d at

21 53-54; see also Livnat, 82 F. Supp. 3d at 34.

22     Accordingly, in the present case, specific jurisdiction is

23 not appropriate under the "effects test."

1    Second, Walden undermines the plaintiffs' arguments that

2    the defendants met the "purposeful availment" test by

3    establishing a continuous presence in the United States and

4    pressuring United States government policy.  The emphasis on the

5    defendants' Washington, D.C. mission confuses the issue: Walden

6    requires that the "suit-related conduct"---here, the terror

7    attacks in Israel---have a "substantial connection with the

8    forum." 134 S. Ct. at 1121.  The defendants' Washington mission

9    and its associated lobbying efforts do not support specific

10   personal jurisdiction on the ATA claims.  The defendants cannot

11   be made to answer in this forum "with respect to matters

12   unrelated to the forum connections." Goodyear, 564 U.S. at 923;

13   see also Klieman, 82 F. Supp. 3d at 247 ("Courts typically

14   require that the plaintiff show some sort of causal relationship

15   between a defendant's U.S. contacts and the episode in suit.").

16   The plaintiffs argue on appeal that the defendants intended

17   their terror campaign to influence not just Israel, but also the

18   United States.  They point to trial evidence---specifically

19   pamphlets published by the PA---that, the plaintiffs argue,

20   shows that the defendants were attempting to influence United

21   States policy toward the Israel-Palestinian conflict.  The

22   exhibits themselves speak in broad terms of how United States

23   interests in the region are in danger and how the United States

24   and Europe should exert pressure on Israel to change its

1   practices toward the Palestinians. It is insufficient for

2   purposes of due process to rely on evidence that a political

3   organization sought to influence United States policy, without

4   some other connection among the activities underlying the

5   litigation, the defendants, and the forum.  Such attenuated

6   activity is insufficient under Walden.

7      The plaintiffs cite Licci, 732 F.3d 161, to support their

8   argument that the defendants meet the purposeful availment test.

9   But the circumstances of that case are distinguishable and

10   illustrate why the defendants here do not meet that test.  In

11   Licci, American, Canadian, and Israeli citizens who were injured

12   or whose family members were killed in a series of terrorist

13   rocket attacks by Hizbollah in Israel brought an action under

14   the ATA and other laws against the Lebanese Canadian Bank, SAL

15   ("LCB"), which allegedly facilitated Hizbollah's acts by using

16   correspondent banking accounts at a defendant New York bank

17   (American Express Bank Ltd.) to effectuate wire transfers

18   totaling several million dollars on Hizbollah's behalf.  Id. at

19   164-66.  This Court concluded that the exercise of personal

20   jurisdiction over the defendants was constitutional because of

21   the defendants' "repeated use of New York's banking system, as

22   an instrument for accomplishing the alleged wrongs for which the

23   plaintiffs seek redress."  Id. at 171.  These contacts

24   constituted "'purposeful[] avail[ment] . . . of the privilege of

1    doing business in [New York],' so as to permit the subjecting of

2    LCB to specific jurisdiction within the Southern District of New

3    York . . . ."  Id. (quoting Bank Brussels Lambert, 305 F.3d at

4    127).

5         "It should hardly be unforeseeable to a bank that selects

6    and makes use of a particular forum's banking system that it

7    might be subject to the burden of a lawsuit in that forum for

8    wrongs *related to*, and *arising from*, *that use*."  Id. at 171-72

9    (emphasis added) (footnote omitted).

10        In Licci, this Court also distinguished the "effects test"

11   theory of personal jurisdiction which is "typically invoked

12   where (*unlike here*) the conduct that forms the basis for the

13   controversy occurs entirely out-of-forum, and the only relevant

14   jurisdictional contacts with the forum are therefore in-forum

15   effects harmful to the plaintiff."  Id. at 173 (emphasis added)

16   (footnote omitted).   The Court held that the effects test was

17   inappropriate because "the constitutional exercise of personal

18   jurisdiction over a foreign defendant" turned on conduct that

19   "occur[ed] *within* the forum," id. (emphasis in original), namely

20   the repeated use of bank accounts in New York to support the

21   alleged wrongs for which the plaintiffs sued.

22        In this case, there is no such connection between the

23   conduct on which the alleged personal jurisdiction is based and

24   the forum.  And the connections the defendants do have with the

56

1    United States---the Washington, D.C. and New York missions---

2    revolve around lobbying activities that are not proscribed by

3    the ATA and are not connected to the wrongs for which the

4    plaintiffs here seek redress.

5         At a hearing before the district court, the plaintiffs also

6    cited Bank Brussels Lambert, 305 F.3d 120, as their "best case"

7    for their purposeful availment argument.  See J.A. 1128.  But

8    that case, too, is distinguishable.  There, a client bank sued

9    its lawyers for legal malpractice that occurred in Puerto Rico.

10   Bank Brussels Lambert, 305 F.3d at 123.  This Court held that

11   the Puerto Rican law firm defendant had sufficient minimum

12   contacts with the New York forum and purposely availed itself of

13   the privilege of doing business in New York, because, although

14   the law firm did not solicit the bank as a client in New York,

15   the firm maintained an apartment in New York partially for the

16   purpose of better servicing its New York clients, the firm faxed

17   newsletters regarding Puerto Rican legal developments to persons

18   in New York, the firm had numerous New York clients, and its

19   marketing materials touted the firm's close relationship with

20   the Federal Reserve Bank of New York.  Id. at 127-29.  "The

21   engagement which gave rise to the dispute here is not simply one

22   of a string of fortunate coincidences for the firm.  Rather, the

23   picture which emerges from the above facts is that of a law firm

24   which seeks to be known in the New York legal market, makes

1    efforts to promote and maintain a client base there, and profits

2    substantially therefrom." Id. at 128. This Court held that

3    there was "nothing fundamentally unfair about requiring the firm

4    to defend itself in the New York courts when a dispute arises

5    from its representation of a New York client---a representation

6    which developed in a market it had deliberately cultivated and

7    which, after all, the firm voluntarily undertook." Id. at 129.

8    In short, the defendants' contacts with the forum were

9    sufficiently related to the malpractice claims that were at

10   issue in the suit.

11       That is not the case here. The plaintiffs' claims did not

12   arise from the defendants' purposeful contacts with the forum.

13   And where the defendant in Bank Brussels Lambert purposefully

14   and repeatedly reached into New York to obtain New York clients-

15   --and as a result of those activities, it obtained a

16   representation for which it was sued---in this case, the

17   plaintiffs' claims did not arise from any activity by the

18   defendants in this forum.

19       Thus, in this case, unlike in Licci and Bank Brussels

20   Lambert, the defendants are not subject to specific personal

21   jurisdiction based on a "purposeful availment" theory because

22   the plaintiffs' claims do not arise from the defendants'

23   activity in the forum.

1    Third, the plaintiffs' argue that the defendants consented

2  to personal jurisdiction under the ATA by appointing an agent to

3  accept process.  It is clear that the ATA permitted service of

4  process on the representative of the PLO and PA in Washington.

5  See 18 U.S.C. § 2334(a).  However, the statute does not answer

6  the constitutional question of whether due process is satisfied.

7    The plaintiffs contend that under United States v. Scophony

8  Corp. of America, 333 U.S. 795 (1948), meeting the statutory

9  requirement for service of process suffices to establish

10  personal jurisdiction.  But Scophony does not stand for that

11  proposition.  The defendant in Scophony "was 'transacting

12  business' of a substantial character in the New York district at

13  the times of service, so as to establish venue there," and so

14  that "such a ruling presents no conceivable element of offense

15  to 'traditional notions of fair play and substantial justice.'"

16  Id. at 818 (quoting Int'l Shoe, 326 U.S. at 316).  Thus,

17  Scophony affirms the understanding, echoed by this Court in

18  Licci, 673 F.3d at 60, and O'Neill, 714 F.3d at 673-74, that due

19  process analysis---considerations of minimum contacts and

20  reasonableness---applies even when federal service-of-process

21  statutes are satisfied.  Simply put, "the exercise of personal

22  jurisdiction must comport with constitutional due process

23  principles."  Licci, 673 F.3d at 60; see also Brown, 814 F.3d at

24  641.  As explained above, due process is not satisfied in this

1  case, and the courts have neither general nor specific personal

2  jurisdiction over the defendants, regardless of the service-of-

3  process statute.

4      In sum, because the terror attacks in Israel at issue here

5  were not expressly aimed at the United States and because the

6  deaths and injuries suffered by the American plaintiffs in these

7  attacks were "random [and] fortuitous" and because lobbying

8  activities regarding American policy toward Israel are

9  insufficiently "suit-related conduct" to support specific

10  jurisdiction, the Court lacks specific jurisdiction over these

11  defendants.  Walden, 134 S. Ct. at 1121, 1123.

12                              ***

13     The terror machine gun attacks and suicide bombings that

14  triggered this suit and victimized these plaintiffs were

15  unquestionably horrific.  But the federal courts cannot exercise

16  jurisdiction in a civil case beyond the limits prescribed by the

17  due process clause of the Constitution, no matter how horrendous

18  the underlying attacks or morally compelling the plaintiffs'

19  claims.

20     The district court could not constitutionally exercise

21  either general or specific personal jurisdiction over the

22  defendants in this case.  Accordingly, this case must be

23  dismissed.

24

1                               **CONCLUSION**

2          We have considered all of the arguments of the parties.  To

3     the extent not specifically addressed above, they are either

4     moot or without merit.  For the reasons explained above, we

5     **VACATE** the judgment of the district court and **REMAND** the case to

6     the district court with instructions to **DISMISS** the case for

7     want of jurisdiction.