JOSEPH F. BIANCO, *Circuit Judge*, concurring in the order denying rehearing *en banc*:

I concur in the denial of the petition for rehearing *en banc* and, as a member of the unanimous panel issuing the opinions that are the subject of the petition, write to explain my disagreement with the views expressed by the dissent.

As discussed in the panel opinions in these cases, and discussed in greater detail below, although these appeals involved the question of personal jurisdiction in the context of a novel statutory structure, the analysis in both opinions followed clear precedent from the Supreme Court and did not articulate any new legal rule. In contrast, the dissent proposes a new rule of "deemed consent" or "constructive consent" for purposes of personal jurisdiction, which has never been recognized by the Supreme Court nor by any other court and is fundamentally incompatible with existing precedent for determining consent to waive a constitutional right. Moreover, the dissent's proposed holding that the Due Process Clause of the Fifth Amendment does not limit the exercise of personal jurisdiction by federal courts in the same way as the Due Process Clause of the Fourteenth Amendment is not only contrary to our well-settled precedent, but also has been rejected by each of the other six sister circuits who has addressed that issue. There is no persuasive reason to depart from the principles of *stare decisis* and create a new rule that could

have far-reaching ramifications for the entire body of personal jurisdiction jurisprudence beyond these two particular cases.

The principle that a court must have personal jurisdiction over a defendant "recognizes and protects an individual liberty interest" flowing from the Constitution's guarantees of due process. *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). The Supreme Court has recognized three bases for exercising personal jurisdiction over an out-of-forum defendant in accordance with the dictates of due process: general jurisdiction, specific jurisdiction, and consent. *See, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985). Consent to personal jurisdiction is a voluntary agreement on the part of a defendant to proceed in a particular forum. *See Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964); *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880–81 (2011) (plurality opinion).

The plaintiffs in these cases relied on a theory of deemed consent or constructive consent to justify personal jurisdiction in federal court. More particularly, the plaintiffs in these cases are the victims or relatives of victims of terrorist attacks in the West Bank or Israel. They sued the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA"), seeking damages for

alleged violations of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, related to those attacks. In both cases, it was undisputed that the district court did not have general jurisdiction over the PLO and the PA because those organizations were not "at home" in the United States. It was also undisputed that there was no specific jurisdiction over the PLO and the PA because the activities at issue occurred abroad and were random acts of terror, rather than acts directed against United States citizens.

The only asserted basis for personal jurisdiction over the PLO and the PA was the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), in which Congress provided that the PLO and the PA "shall be deemed to have consented to personal jurisdiction" in any civil ATA action upon engaging in certain forms of post-enactment conduct, namely (1) making payments, directly or indirectly, to the designees or families of incarcerated or deceased terrorists, respectively, whose acts of terror injured or killed a United States national, or (2) undertaking any activities within the United States, subject to a handful of exceptions. *See* 18 U.S.C. § 2334(e)(1). These activities within the United States remained unlawful, but Congress made them a basis for personal jurisdiction over the PLO and the PA.

In both *Fuld v. Palestine Liberation Organization*, 578 F. Supp. 3d 577, 580 (S.D.N.Y. 2022), and *Sokolow v. Palestine Liberation Organization*, 590 F. Supp. 3d 589, 595–97 (S.D.N.Y. 2022), the district courts held that the PSJVTA was unconstitutional because it was not a valid basis for finding that the PLO and the PA had consented to personal jurisdiction in a federal court. In both cases, this Court agreed. *See Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 97–98 (2d Cir. 2023) ("*Fuld*"); *Waldman v. Palestine Liberation Org.*, 82 F.4th 64, 73–74 (2d Cir. 2023) ("*Waldman III*"), *aff'g Sokolow*, 590 F. Supp. 3d 589. Thereafter, a majority of the active judges of this Court voted to deny the petition for rehearing *en banc*.

The purpose of this concurrence is not to reprise all of the arguments and analyses in *Fuld* and *Waldman III*. Those unanimous decisions explain at length the history of these cases and why the PSJVTA is unconstitutional. Instead, the purpose of this concurrence is to respond to the criticisms raised in the dissent from the denial of rehearing *en banc*. The dissent contends that the panel's decisions in *Fuld* and *Waldman III* erred in three ways: (1) by imposing a new requirement that consent to personal jurisdiction must be based on "reciprocal bargains"; (2) by failing to find that the alleged unlawful activities of the PLO and the PA are a basis to find they had consented to civil jurisdiction in United States

courts; and (3) by holding that the Due Process Clause of the Fifth Amendment imposes the same limits on personal jurisdiction as the Due Process Clause of the Fourteenth Amendment, except that the minimum contacts under the Fourteenth Amendment must be with a state and the minimum contacts under the Fifth Amendment are with the nation.  I respectfully disagree with these arguments and will address them in turn.

## I.

As an initial matter, the dissent contends that the government could simply recognize the PA as a state and thereby eliminate its constitutional rights.  *See post*, Menashi, *J.*, dissenting from denial of rehearing *en banc*, at 10.  However, we addressed that issue in *Waldman v. Palestine Liberation Organization*, 835 F.3d 317, 329 (2d Cir. 2016) ("*Waldman I*"), *cert. denied sub nom. Sokolow v. Palestine Liberation Org.*, 584 U.S. 915 (2018), explaining that if the government were to recognize the PA or the PLO as a state, they would receive the protection of sovereign immunity.  These cases would then have to be considered under the Foreign Sovereign Immunities Act ("FSIA").  *See id*.  Moreover, as discussed in *Waldman I* and in *Fuld*, the Oslo Accords limit the PA's authority to parts of the West Bank and Gaza Strip, and for that reason, the PLO conducts foreign affairs.  *Waldman I*, 835 F.3d at 322–

23; *see also Fuld*, 82 F.4th at 80.  Neither the PA nor the PLO is a sovereign government, and there is no dispute that they are entitled to constitutional due process.  *See Waldman I*, 835 F.3d at 329.

Turning to the merits, the dissent argues that "the panel incorrectly held that Congress may deem a foreign entity to have consented to personal jurisdiction based on its conduct only if the foreign entity receives a reciprocal benefit."  *Post* at 2.  However, *Fuld* created no such requirement.  Instead, *Fuld* described in detail numerous circumstances that the Supreme Court found "manifested" consent—including "reciprocal bargains" but also "litigation-related activities" and others—and found that the PSJVTA did not satisfy any of these circumstances.  *See* 82 F.4th at 88–90 (citing, *inter alia*, *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023)).  *Fuld* then distinguished *Mallory* and other cases involving business registration statutes on the ground that such statutes, unlike the PSJVTA, involved reciprocal bargains, but *Fuld* did not say that consent to jurisdiction can only be found if there is a reciprocal bargain.  *See* 82 F.4th at 94–96.

Moreover, contrary to the dissent's suggestion, the facts in *Mallory* offer no support for the deemed consent provision of the PSJVTA.  The PLO and the PA never registered to do business in the United States and received no benefit for

such an action. Congress simply declared that continuing to make certain payments outside the United States and conducting certain activities in the United States that were otherwise illegal were sufficient to deem the PLO and the PA to have consented to jurisdiction in United States courts. Nothing in *Mallory* supports that contention.

Relying primarily on language in plurality opinions in *Mallory*, the dissent extrapolates a general principle that "deemed consent statutes are consistent with the Constitution" and that the "consent of the foreign entity must only be knowing and voluntary and involve some nexus to the forum such that requiring consent would not be 'unfair.'" *Post* at 15–16 (citing *Mallory*, 600 U.S. at 141 (plurality opinion); *id.* at 153–54 (Alito, *J.*, concurring)). However, that formulation overlooks that the railway company in *Mallory* had registered to do business in Pennsylvania and, as a condition of doing business, had thereby consented to jurisdiction to be sued in the state. Justice Alito's concurrence framed the question as follows:

> The sole question before us is whether the Due Process Clause of the Fourteenth Amendment is violated when a large out-of-state corporation with substantial operations in a State complies with a registration requirement that conditions the right to do business in that State on the registrant's submission to personal jurisdiction in any suits that are brought there.

*Mallory*, 600 U.S. at 150. Justice Alito concluded that the Due Process Clause was not violated by requiring the railway to be subjected to suit in Pennsylvania, explaining:

> Requiring Norfolk Southern to defend against Mallory's suit in Pennsylvania . . . is not so deeply unfair that it violates the railroad's constitutional right to due process. The company has extensive operations in Pennsylvania; has availed itself of the Pennsylvania courts on countless occasions; and had clear notice that Pennsylvania considered its registration as consent to general jurisdiction. Norfolk Southern's conduct and connection with Pennsylvania are such that it should reasonably anticipate being haled into court there.

*Id.* at 153 (alterations adopted) (internal quotation marks and citations omitted). Thus, the business registration statute at issue in *Mallory* bears no reasonable resemblance to the deemed consent provisions of the PSJVTA.

The dissent asserts that the panel opinions impose additional requirements beyond that required by principles of fundamental fairness, highlighting language in the district court opinion in *Fuld* that "[d]efendants do not cite, and the Court has not found, any case holding that . . . receipt of a benefit is a necessary condition." *Post* at 17 (quoting *Fuld*, 578 F. Supp. 3d at 595 n.10). Like the district court, the panel did not adopt the defendants' argument that the receipt of a benefit is a necessary condition for consent. *See Fuld*, 82 F.4th at 96 n.13; *Fuld*, 578 F. Supp. 3d at 595 n.10. Instead, this Court noted that an exchange of benefits was

an important part of the justification for the consent to jurisdiction in business registration statutes, such as the statute at issue in *Mallory*, but was not required in all cases of consent. *See Fuld*, 82 F.4th at 96 n.13 ("The receipt of a benefit from the forum is not a necessary prerequisite to a finding that a defendant has consented to personal jurisdiction there. . . . There are other means of demonstrating consent, such as certain litigation-related conduct."). The district court ultimately rejected the constitutionality of the PSJVTA for reasons similar to those discussed by the panel:

> In the final analysis, the Court cannot acquiesce in Congress's legislative sleight of hand and exercise jurisdiction over Defendants here pursuant to the PSJVTA. A defendant's knowing and voluntary consent is a valid basis to subject it to the jurisdiction of a court, but Congress cannot simply declare anything it wants to be consent. To hold otherwise would let fiction get the better of fact and make a mockery of the Due Process Clause. . . . For today's purposes, it suffices to say that the provisions of the PSJVTA at issue push the concept of consent well beyond its breaking point and that the predicate conduct alleged here is not "of such a nature as to justify the fiction" of consent. It follows that exercising jurisdiction under the facts of this case does not comport with due process . . . .

*Fuld*, 578 F. Supp. 3d at 595 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)).

The dissent replaces the carefully balanced legal landscape of constitutional due process with a new standard, claiming that "the Supreme Court has made

clear[] [that] consent based on conduct need only be knowing and voluntary and have a nexus to the forum." *Post* at 3. *Mallory*, however, did not establish such a test and does not even use the term "nexus." Nor does any other Supreme Court decision impute consent to jurisdiction based simply on an undefined nexus to the forum. *Cf., Ins. Corp. of Ir.*, 456 U.S. at 704; *Pa. Fire Ins. Co. v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 94–95 (1917). Instead, the dissent appears to use the word "nexus" as an umbrella term for any activity that Congress might declare subjects a defendant to the jurisdiction of United States courts. In so reasoning, the dissent substitutes the well-established requirement that *consent* be knowing and voluntary with the concept that all that is necessary is that a person's *conduct* be knowing and voluntary, and that the conduct have some relation to the forum, irrespective of whether the conduct reflects consent to jurisdiction in the forum. Adopting the dissent's interpretation would allow the government to declare conduct to be consent, even if that conduct could not reasonably be considered to be consent. Indeed, the dissent's new test would allow Congress to subject any foreign entity to personal jurisdiction in the United States, even in the absence of any contacts with the United States, if that entity knowingly and voluntarily engages in any conduct around the world (with some undefined nexus to the

United States) after Congress enacts legislation deeming the continuation of that conduct to constitute consent to personal jurisdiction in the United States courts.

The dissent's test is contrary to the Supreme Court's admonition against the "deemed waiver" of constitutional rights in *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999). In that case, the question presented was whether the Trademark Remedy Clarification Act ("TRCA"), 106 Stat. 3567, subjects states to suits brought under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *See Coll. Sav. Bank*, 527 U.S. at 668–69. Like the PSJVTA, the TRCA purported to identify conduct that the targeted actors—the states—could "choose to abandon." *See id.* at 684. The states were then deemed to have "constructively waived" their sovereign immunity by engaging in those specified activities. *See id.* at 683–84. The Supreme Court held that Congress could not extract "constructive waivers" of state sovereign immunity in this manner, *see id.* at 683, and that sovereign immunity was not abrogated or waived by a state's participation in interstate commerce, *see id.* at 691.

In *College Savings Bank*, the Supreme Court did not limit its analysis to issues of sovereign immunity. *See Fuld*, 82 F.4th at 99 (citing *Coll. Sav. Bank*, 527 U.S. at 681–82). To the contrary, Justice Scalia, writing for the majority, analogized the

Eleventh Amendment privilege of state sovereign immunity to the Sixth Amendment right to trial by jury in criminal cases—concluding that the principle of "constructive waiver" would not apply in either circumstance, and that constructive waivers "are simply unheard of" in the context of other constitutionally protected privileges. *See Coll. Sav. Bank*, 527 U.S. at 681–82. In addition, because "'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights," *id.* at 682 (alteration omitted) (quoting *Aetna Ins. Co. v. Kennedy ex rel. Bogash*, 301 U.S. 389, 393 (1937)), the Supreme Court concluded that the waiver of state sovereign immunity could not be implied, *see id.* (citing *United States v. King*, 395 U.S. 1, 4 (1969)).

The PSJVTA's approach to deemed consent is likewise "unheard of" in the context of a waiver of the constitutional right to due process. *See Fuld*, 82 F.4th at 100 (quoting *Coll. Sav. Bank*, 527 U.S. at 681). Indeed, neither the dissent nor the plaintiffs in these cases have cited any case involving constructive or deemed consent to personal jurisdiction under circumstances similar to those in these actions.

The dissent cites *Pennsylvania Fire Insurance Company of Philadelphia*, 243 U.S. 93 (1917), but that case, which *Mallory* found to be controlling, involved a Missouri

business registration statute, like the Pennsylvania business registration statute at issue in *Mallory*. Justice Gorsuch described *Pennsylvania Fire* as holding that: "Pennsylvania Fire could be sued in Missouri by an out-of-state plaintiff on an out-of-state contract because it had agreed to accept service of process in Missouri on any suit as a condition of doing business there." *Mallory*, 600 U.S. at 133 (citing *Pa. Fire*, 243 U.S. at 95). There is no similar exchange of benefits in the PSJVTA.

The dissent attempts to justify the deemed consent provision in this case as "simply the adaptation of tag jurisdiction to artificial persons and works the same way." *Post* at 20. Tag jurisdiction recognizes the lawfulness of jurisdiction based on the service of process on an individual physically present in the jurisdiction. *See Burnham v. Super. Ct. of Cal., County of Marin*, 495 U.S. 604, 610 (1990). The Supreme Court has accepted tag jurisdiction as a "continuing tradition[] of our legal system," *id.* at 619, but it is difficult to see that this analogy to tag jurisdiction is akin to or can form the basis for imputing the waiver of a constitutional right.

In *Burnham*, the Supreme Court affirmed the constitutionality of tag jurisdiction as a "time-honored approach," which "dates back to the adoption of the Fourteenth Amendment." *Id.* at 622. However, the Court then made clear: "For new procedures, hitherto unknown, the Due Process Clause requires analysis

to determine whether 'traditional notions of fair play and substantial justice' have been offended." *Id.* (quoting *Int'l Shoe Co.*, 326 U.S. at 316). This Court in *Waldman III* and *Fuld* conducted an analysis consistent with *International Shoe*, and for the reasons discussed at length in our opinions, concluded that the PSJVTA's provision for deemed consent to personal jurisdiction was inconsistent with the requirements of constitutional due process. *See Waldman III*, 82 F.4th at 69.

As we explained in *Fuld*, in a civil case, "[c]onsent to personal jurisdiction is a voluntary agreement on the part of a defendant to proceed in a particular forum." 82 F.4th at 87. But neither basis for deemed consent in the PSJVTA reflects such an agreement. The first prong—making payments outside the United States to the designees or families of incarcerated or deceased terrorists—has nothing to do with any alleged agreement by the PLO or the PA to be sued in United States courts. Similarly, the second prong of the deemed consent provision—conducting certain activities in the United States—does not reflect an agreement to be sued in United States courts. Indeed, the activities that Congress described in the PSJVTA are unlawful in the United States. *See Fuld*, 82 F.4th at 93 n.10. Accordingly, for the reasons explained in *Fuld*, the "declaration of purported consent, predicated

on conduct lacking any of the indicia of valid consent previously recognized in the case law, fails to satisfy constitutional due process." *Id.* at 91.

## II.

The dissent insists that it is "strange" that the alleged conduct of the PLO and the PA in violation of federal restrictions would be an insufficient basis to find that they had not received a benefit in the forum so as to confer jurisdiction. *See post* at 22. There is, however, nothing "strange" about that result. Any office other than that maintained pursuant to the United Nations ("UN") Headquarters Agreement is unlawful, *see Fuld*, 82 F.4th at 82 n.2, and so the defendants have not received *any* benefit from the forum, much less one "even greater" than a foreign actor whose domestic activities are not restricted.[1] *Post* at 22; *see, e.g.*, 22 U.S.C. §

---

[1] Although the dissent correctly notes that the defendants do not argue on appeal that their offices and activities in the United States do not meet the second statutory prong of the PSJVTA, it is important to emphasize that the failure to make that argument on appeal should not be viewed as a concession by the defendants that they are engaged in any illegal conduct in the United States. Instead, as they explained, the district court did not reach that issue. *See* Appellees' *Fuld* Br. at 48 n.20; Appellees' *Waldman* Br. at 50 n.24. Moreover, the defendants did argue below that their alleged activities in the United States are exempt from consideration under the PSJVTA as part of their UN mission and UN-related activities, and "any personal or official activities conducted ancillary" thereto. 18 U.S.C. § 2334(e)(3); *see also Fuld*, 82 F.4th at 85 n.4. In particular, as explained in their appellate briefs, the defendants argued in the district court that, "[a]s part of its UN activities, the Palestinian Mission participates in the work of the UN Committee on the Exercise of the Inalienable Rights of the Palestinian People ('CEIRPP'). . . . In light of the CEIRPP's work, the 'political propaganda activities and proselytizing,' press conferences,

5203(a) (authorizing the Attorney General to take "the necessary steps"—

including "the necessary legal action"—to enforce restrictions against the PLO).

The dissent maintains that, in any event, the Executive Branch has essentially

conferred a benefit onto the defendants by historically allowing certain activities

"as a matter of grace." *Post* at 22 (quoting *Fuld*, 82 F. 4th 93 at n.10). As an initial

matter, the dissent cites no case law to support the proposition that executive

nonenforcement, the result of political considerations, should impact the Court's

constitutional due process analysis. Moreover, "federal law has long prohibited

the defendants from engaging in any activities or maintaining any offices in the

United States, absent specific executive or statutory waivers." *Fuld*, 82 F.4th at 92.

"The PSJVTA does not purport to relax or override these prohibitions," and the

parties did not identify "any other change in existing law (for example, a statutory

or executive waiver) that would otherwise authorize the restricted conduct."[2] *Id.*

---

and Internet and social media posts alleged in the Amended Complaint are all plainly either official UN business or 'ancillary to' such activities under 18 U.S.C. § 2334(e)(3)." Appellees' *Fuld* Br. at 48 n.20 (citations omitted); *see also* Appellees' *Waldman* Br. at 50 n.24.

[2] To the extent that the dissent suggests that specific jurisdiction might lie where a nonresident defendant "harms" the forum by engaging in illicit activities in the forum, *see post* at 22, this suggestion has no bearing on the Court's analysis regarding the consent theory of jurisdiction, which is the only theory of jurisdiction being litigated in these cases.

So long as the PLO and the PA are prohibited from conducting business in the United States other than as allowed by the UN Headquarters Agreement, to establish deemed consent to jurisdiction based on those activities is to use the denial of a due process right as a penalty for unlawful conduct. The Supreme Court has specifically cautioned against that result. *See Fuld*, 82 F.4th at 94. In *Insurance Corp. of Ireland*, the Supreme Court held that a discovery sanction against the defendant establishing the facts of jurisdiction did not violate due process because there was a presumption that the evidence that was wrongfully withheld established personal jurisdiction. 456 U.S. at 705–06. The Supreme Court made clear that "the personal jurisdiction requirement recognizes and protects an individual liberty interest." *Id.* at 702. The Supreme Court found that it did not violate due process to invoke a presumption that the refusal to produce evidence material to the administration of due process was an admission of the lack of merit of that defense. *Id.* at 705. However, the Court distinguished that presumption from the situation in *Hovey v. Elliott*, 167 U.S. 409 (1897), in which the Court held that it "violate[d] due process for a court to take similar action as 'punishment' for failure to obey an order to pay into the registry of the court a certain sum of money." *Ins. Corp. of Ir.*, 456 U.S. at 706.

17

In this case, establishing deemed-consent jurisdiction based on the alleged unlawful activities undertaken by the PLO and the PA in the United States would be nothing more than "punishment" for such conduct.[3]  And nothing about that conduct suggests that the PLO and the PA have consented to be sued in United States courts.  Instead, as we explained in *Fuld*, "the [PSJVTA] subjects the defendants to the authority of the federal courts for engaging in conduct with no connection to the establishment of personal jurisdiction, and indeed with no connection to litigation in the United States at all."  82 F.4th at 94.

---

[3]  The dissent suggests that the second prong of the PSJVTA is not a penalty for unlawful conduct, but rather "simply subjects each defendant to the jurisdiction of the federal courts by virtue of its conduct in the forum."  *Post* at 24.  However, it is uncontroverted that the alleged illegal conduct that would create jurisdiction under the second prong is wholly unrelated to the alleged activities giving rise to liability in the underlying lawsuits.  The dissent's analysis blurs the requirements for exercising personal jurisdiction through specific jurisdiction and the requirements for exercising personal jurisdiction through consent.  In the proceedings before the district court in *Fuld*, the plaintiffs never contended that the court had specific jurisdiction over the PLO and the PA.  *See* 82 F.4th at 87.  Moreover, this Court in *Waldman I* concluded that there was no specific jurisdiction over the PLO and the PA.  *See* 835 F.3d at 335–37.  The underlying acts of terrorism occurred outside the United States and were not targeted against United States nationals.

In sum, under the consent theory of jurisdiction chosen by Congress, there is no principled way to deny the PLO and the PA the due process rights they have consistently asserted.[4]

### III.

Finally, the dissent urges that the standard for determining the constitutionality of exercising personal jurisdiction under the Fifth Amendment should not be the same as under the Fourteenth Amendment.  *See post* at 26–34. Recognizing that the Supreme Court has "reserved judgment" on this question, *id.* at 26 (citing *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 269 (2017)), the dissent contends that "the facts of these cases" require this Court to overturn its previous decisions, *see id.* at 35.  As we noted in *Waldman I*, for over forty years, this Court has repeatedly held that there is a "congruence of due process analysis under both the Fourteenth and Fifth Amendments," and "has applied Fourteenth

---

[4] Although the dissent states that the "concurrence believes it would be improper for Congress to punish the unlawful conduct of the PLO and the PA," *post* at 24, I reach no such conclusion, nor did the panel opinions.  Instead, the panel opinions narrowly held that Congress could not use this particular jurisdictional mechanism under these circumstances to bypass the due process rights that otherwise exist in this civil context. As discussed *infra*, many tools are available under the broad powers of Congress to address alleged unlawful conduct of this nature.

Amendment principles to Fifth Amendment civil terrorism cases."  835 F.3d at 330 (collecting cases).

The dissent seeks to overturn our well-established law based on some scholarship to the effect that "outside of the limits imposed by service of process, a federal court's writ may run as far as Congress, within its enumerated powers, would have it go."  *Post* at 28 (alteration adopted) (internal quotation marks and citation omitted).  However, the scholarship cited in the dissent is insufficient to explain why actions in federal courts implicate individual liberty interests any less than those in state courts.  As the Supreme Court has emphasized:

> The requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause.  The personal jurisdiction requirement recognizes and protects an individual liberty interest.  It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty.

*Ins. Corp. of Ir.*, 456 U.S. at 702.  In my view, especially in the absence of any intervening applicable Supreme Court decision, the recent scholarship cited by the dissent does not provide a sufficient basis, under principles of *stare decisis*, to depart from a constitutional rule that has existed in our Circuit for over forty years and has been re-affirmed numerous times without intervention by our *en banc* Court.  *See, e.g., United States v. Bailey*, 36 F.3d 106, 110 (D.C. Cir. 2013) (*en banc*) ("[B]ecause [our precedent] represents the established law of the circuit, a due

regard for the value of stability in the law requires that we have good and sufficient reason to reject it at this late date."); *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1316–17 (Fed. Cir. 2013) (*en banc*) (emphasizing the importance of *stare decisis* when an *en banc* court considers adopting a position contrary to longstanding panel precedent); *United States v. Heredia*, 483 F.3d 913, 918 (9th Cir. 2007) ("Overturning a long-standing precedent is never to be done lightly . . . ."); *accord Al-Sharif v. U.S. Citizenship and Immig. Servs.*, 734 F.3d 207, 212 (3d Cir. 2013) (*en banc*).

Indeed, this Court's decisions, in both *Waldman I* and *Fuld*, which followed clear and longstanding precedent from this Court, are consistent with the conclusion reached by each of the six other federal courts of appeals that has addressed this specific question. *Fuld*, 82 F.4th at 103–04, 104 n.17 (collecting cases); *Waldman I*, 835 F.3d at 330; *see also Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 235 (5th Cir. 2022) (*en banc*) ("Both Due Process Clauses use the same language and serve the same purpose, protecting individual liberty by guaranteeing limits on personal jurisdiction."), *cert. denied sub nom. Douglass v. Kaisha*, 143 S. Ct. 1021 (2023); *Livnat v. Palestinian Auth.*, 851 F.3d 45, 54–55 (D.C. Cir. 2017) (noting that the Second, Sixth, Seventh, Eleventh, and Federal Circuits

have expressly analyzed whether the Fifth and Fourteenth Amendment standards differ and "all agree that there is no meaningful difference in the level of contacts required for personal jurisdiction").

Moreover, it is unclear from the dissent whether the entire body of Fourteenth Amendment personal jurisdiction jurisprudence would be jettisoned in Fifth Amendment cases, and if so, what would replace it. Would all defendants in federal courts, irrespective of the nature of the lawsuits against them, be denied the right to assert that haling them into federal court is unreasonable? *See Burger King*, 471 U.S. at 472 ("[T]he Due Process Clause 'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980))). It is precisely this type of uncertainty that the dissent's proposed approach would engender across the personal jurisdiction landscape that strongly counsels against *en banc* review to eliminate our longstanding precedent in the absence of any intervening Supreme Court decision or guidance from the highest court in the land as to what the new constitutional parameters would be.

Finally, the dissent suggests that our holding in these cases "leaves Congress powerless to afford relief to American victims of international terrorism." *Post* at 38–39. I respectfully disagree. In fact, the United States Department of Justice, in *opposing* the plaintiffs' petition to the Supreme Court for a writ of certiorari in *Waldman I*, also disagreed with any such suggestion. More specifically, in the certiorari petition, plaintiffs urged the Supreme Court to review our decision in *Waldman I* because, *inter alia*, the application of Fourteenth Amendment personal-jurisdiction standards in cases governed by the Fifth Amendment purportedly "imperil[ed] Congress's ability to protect Americans from international terrorism and other unlawful acts abroad." Petition for Writ of Certiorari at 34, *Sokolow v. Palestine Liberation Org.*, No. 16-1071 (Mar. 3, 2017), 2017 WL 913120, at *34. The Department of Justice, however, disagreed with that assessment and plaintiffs' corresponding effort to overturn our approach to personal jurisdiction under the Fifth Amendment (and that of six of our sister circuits), explaining:

> It is far from clear that the court of appeals' approach will foreclose many claims that would otherwise go forward in federal courts. As the court of appeals explained, its approach permits U.S. courts to exercise jurisdiction over defendants accused of targeting U.S. citizens in an act of international terrorism. It permits U.S. courts to exercise jurisdiction if the United States was the focal point of the harm caused by the defendant's participation in or support for overseas terrorism. And the court of appeals stated that it would

permit U.S. courts to exercise jurisdiction over defendants alleged to have purposefully availed themselves of the privilege of conducting activity in the United States, by, for example, making use of U.S. financial institutions to support international terrorism. In addition, nothing in the court's opinion calls into question the United States' ability to prosecute defendants under the broader due process principles the courts have recognized in cases involving the application of U.S. criminal laws to conduct affecting U.S. citizens or interests. Under these circumstances, in the absence of any conflict or even a developed body of law addressing petitioners' relatively novel theory, this Court's intervention is not warranted.

Brief for the United States as Amicus Curiae at 17–18, *Sokolow v. Palestine Liberation Org.*, No. 16-1071 (Feb. 22, 2018), 2018 WL 1251857, at *17–18 (citations omitted).[5]

\*          \*          \*

The dissent warns that "[i]nvalidating an act of Congress is 'the gravest and most delicate duty that [a federal court] is called on to perform.'" *Post* at 1–2 (quoting *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, *J.*)). But it is equally true that it is the responsibility of federal courts to enforce the Constitution, including when disfavored litigants are the target of government action. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) ("[T]here can be no question

---

[5] Although the Department of Justice now seeks to have the *en banc* Court re-consider this longstanding holding regarding the scope of the Fifth Amendment, it does not explain the reason for its change in position or even suggest that our holding would undermine this panoply of legislative tools, which still remain available to Congress, to address the alleged conduct at issue here. *See* Intervenor-Appellant's Petition for Rehearing En Banc at 14–17.

that it is the responsibility of th[e] Court to enforce the limits on federal power by striking down acts of Congress that transgress those limits."). At bottom, these appeals are not about whether Congress has the constitutional and statutory authority to punish foreign entities who are engaged in alleged conduct that is illegal and/or contrary to the national security interests of the United States, including through monetary sanctions, and to use such sanctions to compensate victims of that conduct. Instead, the question is whether Congress can seek to accomplish those important objectives through one particular jurisdictional mechanism—namely, by attempting to twist the doctrine of deemed consent, for purposes of establishing personal jurisdiction over foreign entities in civil cases, beyond recognition under the current due process jurisprudence of this Court and the Supreme Court. After careful consideration, the unanimous decisions in *Fuld* and *Waldman III* correctly recognized that "Congress cannot, by legislative fiat, simply deem activities to be consent when the activities themselves cannot plausibly be construed as such." *Fuld*, 82 F.4th at 97 (internal quotation marks omitted). Accordingly, I concur in the denial of rehearing *en banc*.